**Hearing Date: TBD**
**Objection Deadline: TBD**

Dennis F. Dunne
Dennis C. O'Donnell
Evan R. Fleck
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                                                             :
In re:                                                       :        Chapter 11 Case No.
                                                             :
LEHMAN BROTHERS HOLDINGS INC., et al.,                       :        08-13555 (JMP)
                                                             :
                              Debtors.                       :        (Jointly Administered)
                                                             :
------------------------------------------------------------ x

**EIGHTH APPLICATION OF MILBANK, TWEED, HADLEY & McCLOY LLP,
COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR
INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES
RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM
FEBRUARY 1, 2011 THROUGH AND INCLUDING MAY 31, 2011**

| | |
|---|---|
| Name of Applicant: | Milbank, Tweed, Hadley & McCloy LLP |
| Authorized to Provide Professional Services to: | Official Committee of Unsecured Creditors |
| Date of Retention: | November 18, 2008 (effective as of September 17, 2008) |
| Period for which compensation and reimbursement is sought: | February 1, 2011 – May 31, 2011 |

1

Amount of Compensation
requested:                          $14,678,049.25

Amount of Expense
Reimbursement requested:            $794,661.63

This is an:   X   interim  _____ final application.

This is the eighth interim fee application filed by Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP in these cases.

**EIGHTH INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>C</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(FEBRUARY 1, 2011 – MAY 31, 2011)**

| Name | Position; Experience | Hourly Rate[1] | Total Hours | Total Compensation |
|---|---|---|---|---|
| Paul Aronzon | Financial Restructuring Partner for 21 years; admitted in 1979. | $1095.00 | 19.40 | $21,243.00 |
| Dennis Dunne | Financial Restructuring Partner for 13 years; admitted in 1991. | $1095.00 | 273.30 | $299,263.50 |
| Trayton Davis | Alternative Investments Partner for 22 years, admitted in 1981. | $1075.00 | 79.00 | $84,925.00 |
| Jay Grushkin | Alternative Investments Partner for 22 years, admitted in 1982. | $1075.00 | 3.00 | $3,225.00 |
| Michael Hirschfeld | Litigation Partner for 29 years; admitted in 1974. | $1025.00 | 18.30 | $18,757.50 |
| Elizabeth Besio Hardin | Global Finance Partner for 14 years; admitted in 1996. | $1025.00 | 87.60 | $89,790.00 |
| Nicholas James Angel | Financial Restructuring Partner for 3 years; admitted in 1986. | $975.00 | 31.20 | $30,420.00 |
| Peter Benudiz | Global Corporate Partner for 18 years; admitted in 1987. | $1025.00 | 28.60 | $29,315.00 |
| David Cohen | Litigation Partner for 9 years; admitted in 1994. | $1025.00 *$512.50 | 470.20 63.80 | $481,955.00 $32,697.50 |
| Dale Ponikvar | Tax Partner for 21 years; admitted in 1981. | $995.00 | 343.30 | $341,583.50 |
| Robert M. Finkel | Global Corporate Partner for 15 years; admitted in 1988. | $950.00 | 5.80 | $5,510.00 |
| Wilbur Foster Jr | Financial Restructuring Partner for 20 years; admitted in 1982. | $995.00 | 720.70 | $717,096.50 |
| David Lamb | Global Corporate Partner for 21 years; admitted in 1992. | $975.00 *$487.50 | 84.60 12.00 | $82,485.00 $5,850.00 |
| Eric Moser | Global Finance Partner for 12 years; admitted in 1991. | $975.00 | 124.30 | $121,192.50 |
| Andrew Walker | Tax Partner for 8 years; admitted in 1995. | $995.00 | 19.40 | $19,303.00 |
| Paul Wessel | Tax Partner for 15 years; admitted in 1988. | $995.00 | 10.90 | $10,845.50 |
| Winthrop Brown | Global Finance Partner for 28 years; admitted in 1975. | $950.00 *$475.00 | 15.40 1.40 | $14,630.00 $665.00 |

---

[1]     The rates listed include, as applicable, the rates applied to non-working travel time, which, in accordance with the Fee Committee Guidelines, Milbank has billed at 50% of normal rates.

| Name | Description | Rate | Hours | Amount |
|---|---|---|---|---|
| Brett D. Goldblatt | Global Corporate Partner for 6 years; admitted in 1998. | $950.00<br>*$475.00 | 12.70<br>8.60 | $12,065.00<br>$4,085.00 |
| David Stoll | Trust & Estates Partner for 2 years; admitted in 1992. | $950.00 | 3.60 | $3,420.00 |
| Stacey J. Rappaport | Litigation Partner for 7 years; admitted in 1997. | $925.00 | 420.50 | $388,962.50 |
| James Warbey | Global Finance Partner for 6 years; admitted in 1996. | $925.00<br>*$462.50 | 265.90<br>15.90 | $245,957.50<br>$7,353.75 |
| David Wolfson | Global Corporate Partner for 7 years; admitted in 1994. | $950.00 | 2.80 | $2,660.00 |
| Russell Kestenbaum | Tax Partner for 4 years; admitted in 1999. | $900.00 | 44.20 | $39,780.00 |
| Paul Denaro | Global Securities Partner for 3 years; admitted in 2000. | $875.00 | 166.30 | $145,512.50 |
| Thomas James Canning | Litigation Partner for 1 year; admitted in 1999. | $795.00 | 3.10 | $2,464.50 |
| Evan R. Fleck | Financial Restructuring Partner for 1 year; admitted in 2002. | $850.00<br>*$425.00 | 884.30<br>7.00 | $751,655.00<br>$2,975.00 |
| Robert Liubicic | Litigation Partner for 1 year; admitted in 1999. | $850.00 | 13.50 | $11,475.00 |
| Risa Rosenberg | Financial Restructuring Of Counsel for 9 years; admitted in 1984. | $900.00 | 26.40 | $23,760.00 |
| Dennis O'Donnell | Financial Restructuring Of Counsel for 4 years; admitted in 1992. | $860.00<br>*$430.00 | 1072.30<br>39.10 | $922,178.00<br>$16,813.00 |
| Matthew Mortimer | Tax Associate for 15 years; admitted in 1996. | $765.00 | 54.10 | $41,386.50 |
| Lena Mandel | Senior Attorney for 9 years; admitted in 1991. | $705.00<br>*$352.50 | 182.60<br>1.30 | $128,733.00<br>$458.25 |
| Drew Batkin | Tax Associate for 9 years; admitted in 2003. | $715.00 | 284.80 | $203,632.00 |
| Aaron Renenger | Litigation Associate for 9 years; admitted in 2002. | $715.00 | 481.90 | $344,558.50 |
| Steven Szanzer | Financial Restructuring Associate for 11 years; admitted in 2001. | $715.00 | 235.30 | $168,239.50 |
| Stephen Tudway | Litigation Associate for 13 years; admitted in 1998. | $715.00 | 112.50 | $80,437.50 |
| Kevin Ashby | Litigation Associate for 8 years; admitted in 2004. | $715.00 | 138.60 | $99,099.00 |
| Adrian Azer | Litigation Associate for 8 years; admitted in 2003. | $715.00<br>*$357.50 | 581.30<br>28.20 | $415,629.50<br>$10,081.50 |
| Edward G. Baldwin | Litigation Associate for 8 years; admitted in 2003. | $715.00 | 19.80 | $14,157.00 |
| Alistair F. Hill | Global Leveraged Finance Associate for 8 years; admitted | $715.00 | 5.10 | $3,646.50 |

| | | | | |
|---|---|---|---|---|
| | in 2003. | | | |
| Brian Stern | Global Corporate Associate for 8 years; admitted in 2003. | $715.00 | 2.00 | $1,430.00 |
| Justin McClelland | Litigation Associate for 19 years; admitted in 1993. | $695.00 | 54.80 | $38,086.00 |
| Grace Gilligan | Litigation Associate for 7 years; admitted in 2005. | $695.00 *$347.50 | 533.30 1.10 | $370,643.50 $382.25 |
| Peter Newman | Financial Restructuring Associate for 7 years; admitted in 2005. | $695.00 | 121.80 | $84,651.00 |
| Maximilian Schneider | Global Leveraged Finance Associate for 7 years; admitted in 2005. | $695.00 | 36.20 | $25,159.00 |
| Melanie Westover | Litigation Associate for 7 years; admitted in 2005 | $695.00 | 37.10 | $25,784.50 |
| Michael L. Fleischer | Global Corporate Associate for 6 years; admitted in 2006. | $675.00 | 50.10 | $33,817.50 |
| Karen Gartenberg | Financial Restructuring Associate for 6 years; admitted in 2006. | $675.00 | 4.30 | $2,902.50 |
| John K. White Jr. | Litigation Associate for 6 years; admitted in 2006. | $675.00 | 418.20 | $282,285.00 |
| Nicholas Bassett | Litigation Associate for 5 years; admitted in 2007. | $650.00 *$325.00 | 322.80 4.50 | $209,820.00 $1,462.50 |
| Jonathan Brown | Global Finance Associate for 5 years; admitted in 2007. | $650.00 | 11.60 | $7,540.00 |
| Christa Chan-Pak | Global corporate Associate for 5 years; admitted in 2006. | $650.00 | 3.30 | $2,145.00 |
| Melissa Ann Clark | Global Corporate Associate for 5 years; admitted in 2006. | $650.00 | 15.90 | $10,335.00 |
| James Harris | Financial Restructuring Associate for 5 years; admitted in 2008. | $650.00 | 156.40 | $101,660.00 |
| Aluyah Imoisili | Litigation Associate for 5 years; admitted in 2006. | $650.00 *$325.00 | 52.00 10.00 | $33,800.00 $3,250.00 |
| Jed Schwartz | Litigation Associate for 5 years; admitted in 2007. | $650.00 | 25.70 | $16,705.00 |
| Jeremy Sussman | Financial Restructuring Associate for 5 years; admitted in 2007. | $650.00 | 205.60 | $133,640.00 |
| Constance Beverley | Litigation Associate for 5 years; admitted in 2008. | $625.00 *$312.50 | 293.70 2.40 | $183,562.50 $750.00 |

| | | | | |
|---|---|---|---|---|
| Brianne Copp | Litigation Associate for 5 years; admitted in 2008. | $625.00 | 34.20 | $21,375.00 |
| Nicole Leyton | Tax Associate for 4 years; admitted in 2008. | $625.00 | 20.20 | $12,625.00 |
| Melanie Ann McLaughlin | Financial Restructuring Associate for 4 years; admitted in 2008. | $625.00 | 25.40 | $15,875.00 |
| Elisabeth Mullen | Trust and Estates Associate for 4 years; admitted in 2008. | $625.00 | 2.00 | $1,250.00 |
| Gregory Papeika | Financial Restructuring Associate for 4 years; admitted in 2008. | $625.00 | 176.70 | $110,437.50 |
| Sangyoon Nathan Park | Litigation Associate for 4 years; admitted in 2008. | $625.00 | 371.60 | $232,250.00 |
| Alka Pradhan | Litigation Associate for 4 years; admitted in 2008. | $625.00 | 49.60 | $31,000.00 |
| Harsha Rao | Alternative Investments for 4 years; admitted in 2008. | $625.00 | 29.30 | $18,312.50 |
| Charles Rubio | Financial Restructuring Associate for 4 years; admitted in 2008. | $625.00 | 16.50 | $10,312.50 |
| Mikhel Schecter | Alternative Investments Associate for 4 years; admitted in 2008. | $625.00 | 26.80 | $16,750.00 |
| Andrew Sullivan | Global Securities Associate for 4 years; admitted in 2008. | $625.00 | 13.60 | $8,500.00 |
| Jennie Woltz | Litigation Associate for 4 years; admitted in 2008. | $625.00 | 84.90 | $53,062.50 |
| Andrew Young | Financial Restructuring Associate for 4 years; admitted in 2006. | $625.00 | 295.70 | $184,812.50 |
| Jeeseon Ahn | Global Alternative Investments Associate for 3 years; admitted in 2009. | $600.00 | 2.30 | $1,380.00 |
| La Tonya D. Brooks | Litigation Associate for 3 years; admitted in 2009. | $600.00 | 139.50 | $83,700.00 |
| Ateesh Chanda | Litigation Associate for 3 years; admitted in 2009. | $600.00 | 37.90 | $22,740.00 |
| Michael Clarke | Global Finance Associate for 3 years; admitted in 2009. | $600.00 | 22.90 | $13,740.00 |
| Julie Constantinides | Global Corporate Associate for 3 years; admitted in 2009. | $600.00 | 16.20 | $9,720.00 |
| Erin Culbertson | Litigation Associate for 3 years; admitted in 2009. | $600.00 | 278.40 | $167,040.00 |
| Joanna L. Grossman | Tax Associate for 3 years; admitted in 2009. | $600.00 | 277.10 | $166,260.00 |

| | | | | |
|---|---|---|---|---|
| Jared Joyce-Schleimer | Financial Restructuring Associate for 3 years; admitted in 2009. | $600.00 | 560.60 | $336,360.00 |
| Lee Kelsall | Global project finance Associate for 3 years; admitted in 2008. | $600.00 | 10.50 | $6,300.00 |
| Alexander Klein | Global Leveraged Finance Associate for 3 years; admitted in 2009. | $600.00 | 2.50 | $1,500.00 |
| Roger Lee | Financial Restructuring Associate for 3 years; admitted in 2009. | $600.00 | 248.60 | $149,160.00 |
| Andrea McNamara | Financial Restructuring Associate for Associate for 3 years; admitted in 2009. | $600.00 *$300.00 | 915.80 27.00 | $549,480.00 $8,100.00 |
| Tanja L. Olano | Global Corporate Associate for 3 years; admitted in 2009. | $600.00 | 4.50 | $2,700.00 |
| Raisa E. Patron | Global Corporate Associate for 3 years; admitted in 2009. | $600.00 | 5.20 | $3,120.00 |
| Rachel Pojunas | Litigation Associate for 3 years; admitted in 2009. | $600.00 | 70.00 | $42,000.00 |
| Joanne Robertson | Global Finance Associate for 3 years; admitted in 2009. | $600.00 *$300.00 | 298.50 1.00 | $179,100.00 $300.00 |
| Jeremy Steckel | Global Securities Associate for 3 years; admitted in 2009. | $600.00 | 17.70 | $10,620.00 |
| Stephanie Swanson | Global Securities Associate for 3 years; admitted in 2009. | $600.00 | 35.80 | $21,480.00 |
| Diane R. Young | Financial Restructuring Associate for 3 years; admitted in 2009. | $600.00 | 51.80 | $31,080.00 |
| Armando Acosta III | Litigation Associate for 2 years months; admitted in 2010. | $550.00 | 507.50 | $279,125.00 |
| Brittany Akins | Litigation Associate for 2 years; admitted in 2010. | $550.00 | 231.70 | $127,435.00 |
| John Babtie | Global corporate Associate for 2 years; admitted in 2010. | $550.00 | 43.60 | $23,980.00 |
| Thallen Brassel | Tax Associate for 2 years; admitted in 2010. | $550.00 | 12.00 | $6,600.00 |
| John Calabrese | Litigation Associate for 2 years; admitted in 2010. | $550.00 | 171.80 | $94,490.00 |
| Ginni Chen | Litigation Associate for 2 years; admitted in 2010. | $550.00 | 12.80 | $7,040.00 |
| Randy Clark | Tax Associate for 2 years; admitted in 2010. | $550.00 | 245.30 | $134,915.00 |

| | | | | |
|---|---|---|---|---|
| Bradley Friedman | Financial Restructuring Associate for 2 years; admitted in 2010. | $550.00 | 603.10 | $331,705.00 |
| Shemetreal J. Harris | Alternative Investments Associate for 2 years; admitted in 2010. | $550.00 | 7.40 | $4,070.00 |
| Jacob Jou | Litigation Associate for 2 years; admitted in 2010. | $550.00 | 466.50 | $256,575.00 |
| Matthew Kanter | Financial Restructuring Associate for 2 years; admitted in 2010. | $550.00 | 484.90 | $266,695.00 |
| Ethan Lee | Litigation Associate for 2 years; admitted in 2010. | $550.00 | 185.10 | $101,805.00 |
| Denise Linton | Litigation Associate for 2 years; admitted in 2010. | $550.00 | 286.20 | $157,410.00 |
| Sara Mischner | Alternative Investments Associate for 2 years; admitted in 2010. | $550.00 | 43.30 | $23,815.00 |
| Andrew Morton | Financial Restructuring Associate for 2 years; admitted in 2010. | $550.00 | 92.90 | $51,095.00 |
| Jonathan Ostrzega | Financial Restructuring Associate for 2 years; admitted n 2010. | $550.00 | 95.40 | $52,470.00 |
| Katherine Rhodes | Litigation Associate for 2 years; admitted in 2010. | $550.00 | 7.50 | $4,125.00 |
| Neema Saran | Litigation Associate for 2 years; admitted in 2010. | $550.00 | 17.70 | $9,735.00 |
| Megha Shah | Global Securities Associate for 2 years; admitted in 2010. | $550.00 | 13.40 | $7,370.00 |
| Brian Sturm | Financial Restructuring Associate for 2 years; admitted in 2010. | $550.00 | 157.10 | $86,405.00 |
| Joshua Weiss | Global Corporate Associate for 2 years; admitted in 2010. | $550.00 | 2.90 | $1,595.00 |
| Jeremy Wells | Global Securities Associate for 2 years; admitted in 2010. | $550.00 | 461.50 | $253,825.00 |
| Ryan West | Litigation Associate for 2 years; admitted in 2010. | $550.00 | 14.20 | $7,810.00 |
| Brian Youn | Alternative Investments Associate for 2 years; admitted in 2010. | $550.00 | 2.60 | $1,430.00 |
| Ranee Adipat | Global Securities Associate for 7 months; admitted in 2011. | $460.00 | 12.80 | $5,888.00 |

| | | | | |
|---|---|---|---|---|
| Eluard Alegre | Financial Restructuring Associate for 7 months; admitted in 2011. | $460.00 | 46.00 | $21,160.00 |
| Alicia Bove | Litigation Associate for 7 months; admitted in 2011. | $460.00 | 81.70 | $37,582.00 |
| Matthew Brod | Financial Restructuring Associate for 7 months; admitted in 2011. | $460.00 | 700.00 | $322,000.00 |
| Matthew Chain | Global Corporate Associate for 7 months; admitted in 2011. | $460.00 | 6.00 | $2,760.00 |
| Brenton T. Culpepper | Litigation Associate for 7 months; admitted in 2011. | $460.00 | 147.20 | $67,712.00 |
| Dalia De Leon | Global Securities Associate for 7 months; admitted in 2011. | $460.00 | 4.40 | $2,024.00 |
| Jason Frank | Global Securities Associate for 7 months; admitted in 2011. | $460.00 | 54.00 | $24,840.00 |
| Eric S. Gold | Alternative Investments Associate for 7 months; admitted in 2011. | $460.00 | 35.00 | $16,100.00 |
| Regina Gromen | Alternative Investments Associate for 7 months; admitted in 2011. | $460.00 | 38.00 | $17,480.00 |
| Katie J. Hamilton | Litigation Associate for 7 months; admitted in 2011. | $460.00 | 3.60 | $1,656.00 |
| Nicole J. Lee | Financial Restructuring Associate for 7 months; admitted in 2011. | $460.00 | 457.10 | $210,266.00 |
| Mark McCrone | Litigation Associate for 7 months; admitted in 2011. | $460.00 | 88.40 | $40,664.00 |
| Michael Price | Financial Restructuring Associate for 7 months; admitted in 2011. | $460.00 | 57.70 | $26,542.00 |
| Christina Totino | Litigation Associate for 7 months; admitted in 2011. | $460.00 | 234.80 | $108,008.00 |
| Monica Alston | Case Manager | $255.00 | 510.80 | $130,254.00 |
| Abayomi A. Ayandipo | Case Manager | $255.00 | 156.70 | $39,958.50 |
| Oscar Castrillon | Case Manager | $255.00 | 40.00 | $10,200.00 |
| Angel Anderson | Case Manager | $255.00 | 17.30 | $4,411.50 |
| Rena Ceron | Case Manager | $255.00 | 149.30 | $33,592.50 |
| Jennifer L. Russo | Case Manager | $255.00 | 5.50 | $1,402.50 |
| Richard Cosentino | Legal Assistant | $280.00 | 369.50 | $103,460.00 |
| Randy Hooks | Legal Assistant | $280.00 | 266.60 | $74,648.00 |
| Kim Strosser | Legal Assistant | $280.00 | 50.70 | $14,196.00 |
| Charles Sheehan | Legal Assistant | $280.00 | 109.50 | $30,660.00 |
| Tobias Brinkmann | Legal Assistant | $245.00 | 25.10 | $6,149.50 |

| Dakota Blake | Legal Assistant | $225.00 | 17.10 | $3,847.50 |
|---|---|---|---|---|
| Paul Butters | Legal Assistant | $225.00 | 85.40 | $19,215.00 |
| Grace Green | Legal Assistant | $225.00 | 2.80 | $630.00 |
| Chris Georgakis | Legal Assistant | $200.00 | 3.00 | $600.00 |
| Peter Delfausse | Legal Assistant | $195.00 | 6.00 | $1,170.00 |
| Benjamin Harris | Legal Assistant | $195.00 | 8.90 | $1,735.50 |
| Charmaine Thomas | Legal Assistant | $195.00 | 264.80 | $51,636.00 |
| Ricky R. Windom | Legal Assistant | $195.00 | 2.70 | $526.50 |
| Kyle Martin | Legal Assistant | $185.00 | 511.70 | $94,664.50 |
| Michael Giammanco | Legal Assistant | $175.00 | 29.90 | $5,232.50 |
| Jason Hsu | Legal Assistant | $175.00 | 212.30 | $37,152.50 |
| Liga R Michailovs | Legal Assistant | $175.00 | 3.00 | $525.00 |
| Jacqueline Brewster | Managing Attorney Clerk | $185.00 | 117.70 | $21,774.50 |
| Matthew Ottenstein | Librarian | $215.00 | 9.60 | $2,064.00 |
| Robin Traylor | Librarian | $215.00 | 24.00 | $5,160.00 |
| Janelle Blanchard | Litigation Support Specialist | $290.00 | 4.50 | $1,305.00 |
| James McGuire | Litigation Support Specialist | $290.00 | 19.00 | $5,510.00 |
| Rhodely Vallon | Litigation Support Specialist | $290.00 | 501.30 | $145,377.00 |
| Joseph S. Klock | Litigation Support Specialist | $290.00 | 38.80 | $11,252.00 |
| Theartis Everett | Litigation Support Specialist | $290.00 | 86.80 | $25,172.00 |
| Mitchell Gaines | Programmer | $230.00 | 2.50 | $575.00 |
| Gabrielle Zsebi | Librarian | $220.00 | 6.80 | $1,496.00 |
| Maria Smilen | File Clerk | $125.00 | 16.90 | $2,112.50 |
| | | | | |
| **Total** | | **$615.00** **(blended rate)[2]** | **Hours** **23,866.60** | **$14,678,049.25** |

---

[2]      The blended rate <u>excluding</u> paraprofessionals is $683.03 per hour.

**EIGHTH INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>C</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(FEBRUARY 1, 2011 – MAY 31, 2011)**

| ACTIVITY | HOURS | FEES |
|---|---|---|
| General Case Administration | 124.20 | 93,098.50 |
| General Case Strategy Meetings | 25.80 | 23,943.00 |
| Project Monitoring/Court Calendar & Docket Maintenance | 395.60 | 137,730.00 |
| Hearings and Court Communications | 257.40 | 160,760.50 |
| Non-Working Travel | 223.30 | 95,223.75 |
| Interested Party Communications/Website/Lehman Team Hotline | 313.10 | 191,553.00 |
| Communications with Debtors | 42.10 | 34,869.00 |
| Unsecured Creditors Issues/Meetings/Communications/Creditors' Committee | 675.80 | 512,849.50 |
| Secured Creditors Issues/Meetings/Communications | 3.00 | 2,674.50 |
| LBI/SIPC Coordination and Issues | 272.90 | 163,146.50 |
| Insurance Issues | 16.70 | 10,879.00 |
| Employee/ERISA/Benefits/Pension Issues | 32.70 | 23,219.00 |
| Intellectual Property | 0.40 | 240.00 |
| Tax Issues | 1,844.70 | 1,302,298.00 |
| Other General Business Operation Issues | 60.10 | 49,589.00 |
| Intercompany Issues | 823.50 | 500,669.00 |
| Real Estate Matters | 661.40 | 479,811.00 |
| Private Equity | 36.20 | 24,902.50 |
| Derivatives/SWAP Agreement Issues (Including Derivatives- Related Adversary Proceedings, Alternative Dispute Resolution, and Claims Reconciliation and Litigation) | 5,744.40 | 3,831,535.50 |
| Loans/Investments | 373.50 | 205,384.50 |
| Domestic Bank and Related Regulatory Issues | 71.30 | 58,060.50 |
| International Insolvency Issues | 824.40 | 586,380.00 |
| Schedules/Statement of Financial | 1.90 | 1,193.50 |

| | | |
|---|---:|---:|
| Non-Derivative Automatic Stay/Safe Harbor Issues | 66.10 | 33,263.50 |
| Miscellaneous Asset Sales/363 Issues | 24.80 | 16,822.50 |
| Non-Derivative Executory Contracts/365 Issues | 75.80 | 45,378.00 |
| DIP Financing | 4.70 | 1,244.50 |
| Exit Financing | 0.60 | 597.00 |
| Plan of Reorganization/Plan Confirmation/Plan Implementation | 2,350.10 | 1,516,198.50 |
| Disclosure Statement/Solicitation/Voting | 687.40 | 401,011.50 |
| Derivatives/SWAP Agreement Issues (Including Derivatives- Related Adversary Proceedings, Alternative Dispute Resolution, and Claims Reconciliation and Litigation) | 2,808.60 | 1,641,624.50 |
| Other Bankruptcy Motions and Matters | 54.10 | 42,331.50 |
| Non-Derivative Adversary Proceedings Preparation and Litigation | 2,585.70 | 1,406,470.50 |
| Non-Bankruptcy Litigation | 2.80 | 1,834.50 |
| 2004 Issues | 12.80 | 8,688.00 |
| Appeals | 13.30 | 3,911.50 |
| Firm's Own Billing/Fee Applications | 1,265.20 | 463,114.00 |
| Firm's Own Retention Issues | 184.10 | 104,459.50 |
| Third Party Retention/Fee Application/Other Issues | 253.50 | 147,412.00 |
| Stock Loan Litigation | 652.60 | 353,678.00 |
| **Total** | **23,866.60** | **$14,678,049.25** |

**EIGHTH INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>C</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(FEBRUARY 1, 2011 – MAY 31, 2011)**

| DISBURSEMENTS | AMOUNT |
|---|---|
| Airfreight | 1,957.28 |
| Cab Fares/Local Travel | 38,360.65 |
| Computer Database Research | 563,555.50 |
| Fees | 9,643.41 |
| Global Filings | 540.00 |
| Mail | 90.17 |
| Meals | 23,039.56 |
| Messenger | 4,491.14 |
| Misc | 938.24 |
| Outside Reproduction | 74.26 |
| Photocopies | 77,843.30 |
| Telephone | 22,446.20 |
| Travel | 51,681.92 |
| **TOTAL DISBURSEMENTS** | **$794,661.63** |

Dennis F. Dunne
Evan R. Fleck
Dennis C. O'Donnell
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 Case No. |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., et al., | : | 08-13555 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

------------------------------------------------------------ x

**EIGHTH APPLICATION OF MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP,**
**COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR**
**INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES**
**RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM**
**FEBRUARY 1, 2011 THROUGH AND INCLUDING MAY 31, 2011**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP ("Milbank"), counsel to the Official

Committee of Unsecured Creditors (the "Committee") of Lehman Brothers Holdings Inc.

("LBHI"), Lehman Brothers Special Financing Inc. ("LBSF"), Lehman Commercial Paper Inc.

("LCPI") and their affiliated debtors and debtors in possession in the above-captioned cases

(collectively, the "Debtors" and, together with their non-Debtor affiliates, "Lehman"), hereby

submits its application (the "Application"), pursuant to sections 330 and 331 of chapter 11 of

title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy

Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the

Guidelines for Fees and Disbursements for Professionals in Southern District of New York

Bankruptcy Cases adopted by the Court on June 24, 1991, and amended on April 21, 1995 and

November 25, 2009 (collectively, the "Local Guidelines"), the United States Trustee Guidelines

for Reviewing Applications for Compensation and Reimbursement of Expenses Filed

Under 11 U.S.C. § 330, effective January 30, 1996 (the "U.S. Trustee Guidelines"), the Fourth

Amended Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy

Rule 2016(a) Establishing Procedures for Interim Monthly Compensation and Reimbursement of

Expenses of Professionals, dated April 14, 2011 (the "Interim Compensation Order") [Docket

No. 15997], and the guidelines contained in the Fee Committee's Confidential Letter Report on

the Sixth Interim Application of Milbank, dated April 12, 2011 (the "Fee Committee

Guidelines"), for the allowance of interim compensation for professional services rendered from

February 1, 2011 through and including May 31, 2011 (the "Eighth Interim Compensation

Period"), and for reimbursement of expenses incurred in connection with such services.  In

support thereof, Milbank respectfully represents as follows:

## **INTRODUCTION**

**A.    Background**

   1. Bankruptcy Filing.  On September 15, 2008, and periodically thereafter

(the "Petition Date"), the Debtors commenced the above-captioned chapter 11 cases (the

"Chapter 11 Cases").  The Debtors' Chapter 11 Cases have been consolidated for procedural

purposes and are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules.

The Debtors are authorized to operate their businesses and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2

2.    Creditors' Committee.  On September 17, 2008, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Committee in the Chapter 11 Cases.

3.    SIPA Trustee.  On September 19, 2008, a proceeding (the "SIPA Proceeding") was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"), a wholly owned subsidiary of LBHI and a registered broker-dealer.  James W. Giddens, Esq. is the trustee appointed under SIPA (the "SIPA Trustee") administering LBI's estate.

4.    Examiner.  The United States Bankruptcy Court for the Southern District of New York (the "Court") approved the appointment of Anton R. Valukas as examiner (the "Examiner") in the Chapter 11 Cases in the Order Approving the Appointment of Examiner, dated January 20, 2009.  In accordance with his appointment, the Examiner issued his report (the "Examiner's Report") on February 8, 2010 under seal, which was subsequently unsealed on March 11, 2010.

5.    Fee Committee.  On May 26, 2009, the Court appointed a fee committee (the "Fee Committee") and approved a fee protocol (the "Fee Protocol") in the Chapter 11 Cases.  On January 24, 2011, the Court approved the Fee Committee's recommendation to appoint Richard A. Gitlin as the successor Independent Member on the Fee Committee.  By motion dated March 11, 2011, the Fee Committee sought authorization to amend the Fee Protocol, which the Court granted on April 14, 2011 (the "Amended Fee Protocol") [Docket No. 15998].

6.    Debtors' Plan and Disclosure Statement.  On March 15, 2010, the Debtors filed their Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated

Debtors [Docket No. 7572].  Subsequently, on April 14, 2010, the Debtors filed their Disclosure

Statement for Joint Chapter 11 Plan of Lehman Brothers Holding Inc. and its Affiliated Debtors

Pursuant to Section 1125 of the Bankruptcy Code [Docket No. 8332], along with their revised

Chapter 11 Plan [Docket No. 8330].

       7.     <u>Debtors' First Amended Plan and Disclosure Statement</u>.  On January 25,

2011, the Debtors filed their First Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and its Affiliated Debtors (the "<u>Debtors' First Amended Plan</u>") [Docket No.

14150] and the Debtors' Disclosure Statement for First Amended Joint Chapter 11 Plan of

Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the

Bankruptcy Code  (the "<u>Debtors' First Amended Disclosure Statement</u>") [Docket No. 14151].

       8.     <u>Debtors' Second Amended Plan and Disclosure Statement</u>.  After

numerous and lengthy negotiations among the Debtors, the Committee and multiple creditor

groups – and following the filing of competing plans of reorganization by the Ad Hoc Group of

Lehman Brothers Creditors (the "<u>Ad Hoc Group Plan</u>") and the Non-Consolidation Plan

Proponents (the "<u>Non-Con Plan</u>") – the Debtors filed their Second Joint Chapter 11 Plan of

Lehman Brothers Holdings Inc. and its Affiliated Debtors (the "<u>Plan</u>") [Docket No. 18204] and

the Debtors' Disclosure Statement for Second Amended Joint Chapter 11 Plan of Lehman

Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy

Code  (the "<u>Disclosure Statement</u>") [Docket No. 18205] on June 30, 2011.

       9.     <u>Jurisdiction</u>.  This Court has jurisdiction over this matter pursuant to 28

U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases is proper pursuant to 28 U.S.C. §§

1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  The statutory

predicates for the relief sought herein are sections 330 and 331 of the Bankruptcy Code.

Pursuant to the Local Guidelines, a certification regarding compliance with the Local

Guidelines is attached hereto as Exhibit "A."

**B.**     **Retention of Milbank and Billing History**

10.     Authorization for Milbank's Retention.  On November 5, 2008, pursuant

to the Interim Order Under 11 U.S.C. § 1103 And Fed. R. Bankr. P. 2014 And 5002

Authorizing The Retention And Employment Of Milbank, Tweed, Hadley & McCloy LLP, As

Counsel For The Official Committee Of Unsecured Creditors Effective As Of September 17,

2008 (the "Retention Order"), the Court authorized Milbank's retention as counsel for the

Committee in these Chapter 11 Cases.  The Retention Order, which became a final order on

November 21, 2008, authorized Milbank to receive compensation pursuant to the procedures set

forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Guidelines, the U.S. Trustee

Guidelines, and the local rules and orders of this Court.  Among other things, the Retention

Order provides that Milbank's hourly rates are subject to periodic firm-wide adjustments in the

ordinary course of Milbank's business.

11.     First Interim Fee Application.  On April 10, 2009, Milbank filed its First

Application Of Milbank, Tweed, Hadley & McCloy LLP, Counsel to Official Committee of

Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From September 17, 2008

Through And Including January 31, 2009 (the "First Interim Fee Application").  In the First

Interim Fee Application, Milbank requested (i) allowance of compensation for professional

services rendered during the period from September 17, 2008 through and including January 31,

5

2009 (the "<u>First Interim Compensation Period</u>") in the total amount of $12,123,376.00,[1] and (ii) reimbursement of its actual and necessary expenses incurred during the First Interim Compensation Period in the amount of $668,388.72.  Pursuant to the Interim Compensation Order, Milbank received payment in the amount of $10,397,943.56 during the First Interim Compensation Period.  On August 5, 2009, the Court approved the First Interim Fee Application, subject to a ten percent holdback pursuant to the recommendation of the Fee Committee.  On September 10, 2009, the Court approved the release of the remaining holdback, subject to a $69,990.04 deduction, at the recommendation of the Fee Committee.[2]

12.    <u>Second Interim Fee Application</u>.  On August 14, 2009, Milbank filed its Second Application Of Milbank, Tweed, Hadley & McCloy LLP, Counsel to Official Committee of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services Rendered And For Reimbursement Of Expenses During Period From February 1, 2009 Through And Including May 31, 2009 (the "<u>Second Interim Fee Application</u>").  In the Second Interim Fee Application, Milbank requested (i) allowance of compensation for professional services rendered during the period from February 1, 2009 through and including May 31, 2009 (the "<u>Second Interim Compensation Period</u>") in the total amount of $16,829,521.00,[3] and (ii) reimbursement of its actual and necessary expenses incurred during the Second Interim Compensation Period in the amount of $1,019,754.61.  Pursuant to the Interim Compensation

---

[1]    Milbank voluntarily reduced the fees it sought to have allowed for the First Interim Compensation Period by $129,111.00.  However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[2]    Milbank reserved and continues to reserve the right to seek, at a later date, the allowance of all or a portion of such fees.

[3]    Milbank voluntarily reduced the fees it sought to have allowed for the Second Interim Compensation Period by $154,700.25, on account of, among other things, certain matters identified by the Fee Committee.  However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

Order, Milbank received payment in the amount of $14,582,737.21 during the Second Interim

Compensation Period.  On September 25, 2009, the Court approved the Second Interim Fee

Application, subject to a ten percent holdback pursuant to the recommendation of the Fee

Committee.  On December 23, 2009, the Court released the ten percent holdback, subject to a

$311,734.82 deduction, at the recommendation of the Fee Committee.[4]

13.    Third Interim Fee Application.  On December 14, 2009, Milbank filed its

Third Application Of Milbank, Tweed, Hadley & McCloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From June 1, 2009 Through

And Including September 30, 2009 (the "Third Interim Fee Application").  In the Third Interim

Fee Application, Milbank requested (i) allowance of compensation for professional services

rendered during the period from June 1, 2009 through and including September 30, 2009 (the

"Third Interim Compensation Period") in the total amount of $10,881,540.00,[5] and (ii)

reimbursement of its actual and necessary expenses incurred during the Third Interim

Compensation Period in the amount of $583,803.10.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $7,480,652.96 during the Third Interim

Compensation Period.  On April 9, 2010, the Court approved the Third Interim Fee Application,

subject to a $292,555.40 deduction, at the recommendation of the Fee Committee.[6]

---

[4]    Milbank reserved and continues to reserve the right to seek, at a later date, the allowance of all or a portion
of such fees.

[5]    Milbank voluntarily reduced the fees it sought to have allowed for the Third Interim Compensation Period
by $419,548.50, on account of, among other things, certain matters identified by the Fee Committee.
However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of
such fees at a later date.

[6]    Milbank reserved, and continues to reserve, the right to seek, at a later time, the allowance of all or a
portion of such fees.

14.    <u>Fourth Interim Fee Application</u>.  On April 16, 2010, Milbank filed its

Fourth Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From October 1, 2009 Through

And Including January 31, 2010 (the "<u>Fourth Interim Fee Application</u>").  In the Fourth Interim

Fee Application, Milbank requested (i) allowance of compensation for professional services

rendered during the period from October 1, 2009 through and including January 31, 2010 (the

"<u>Fourth Interim Compensation Period</u>") in the total amount of $13,595,778.50,[7] and (ii)

reimbursement of its actual and necessary expenses incurred during the Fourth Interim

Compensation Period in the amount of $451,410.54.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $11,341,325.19 during the Fourth Interim

Compensation Period.  On September 7, 2010, the Court approved the Fourth Interim Fee

Application, subject to a holdback of $733,570.87, relating to certain unresolved objections

asserted by the Fee Committee.[8]

15.    <u>Fifth Interim Fee Application</u>.  On August 16, 2010, Milbank filed its

Fifth Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee of

Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From February 1, 2010 Through

And Including May 31, 2010 (the "<u>Fifth Interim Fee Application</u>").  In the Fifth Interim Fee

Application, Milbank requested (i) allowance of compensation for professional services

---

[7]    Milbank voluntarily reduced the fees it sought to have allowed for the Fourth Interim Compensation Period by $111,446.50, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[8]    Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

rendered during the period from February 1, 2010 through and including May 31, 2010 (the

"Fifth Interim Compensation Period") in the total amount of $19,450,342.75,[9] and (ii)

reimbursement of its actual and necessary expenses incurred during the Fifth Interim

Compensation Period in the amount of $851,804.27.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $16,427,844.72 during the Fifth Interim

Compensation Period.[10]  On May 12, 2011, the Court approved the Fifth Interim Fee

Application, subject to a holdback of $413,818.13, relating to certain unresolved objections

asserted by the Fee Committee.[11]

       16.      Sixth Interim Fee Application.  On December 14, 2010, Milbank filed its

Sixth Application Of Milbank, Tweed, Hadley & M^cCloy LLP, Counsel to Official Committee of

Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From June 1, 2010 Through

And Including September 30, 2010 (the "Sixth Interim Fee Application").  In the Sixth Interim

Fee Application, Milbank requested (i) allowance of compensation for professional services

rendered during the period from June 1, 2010 through and including September 30, 2010 (the

"Sixth Interim Compensation Period") in the total amount of $18,359,367.75,[12] and (ii)

reimbursement of its actual and necessary expenses incurred during the Sixth Interim

---

[9]     Milbank voluntarily reduced the fees it sought to have allowed for the Fifth Interim Compensation Period by $199,247.00, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[10]     Milbank reserves the right to seek the allowance of all or a portion of such fees at a later date.

[11]     Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[12]     Milbank voluntarily reduced the fees it sought to have allowed for the Sixth Interim Compensation Period by $229,420.50, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

Compensation Period in the amount of $792,924.64.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $15,491,759.01 during the Sixth Interim

Compensation Period.  Due to recent developments relating to and ongoing discussions with the

Fee Committee, no hearing date has yet been scheduled with respect to the Sixth Interim Fee

Application.

17.    <u>Seventh Interim Fee Application</u>.  On June 2, 2011, Milbank filed its

Seventh Application Of Milbank, Tweed, Hadley & M$^{c}$Cloy LLP, Counsel to Official

Committee of Unsecured Creditors, For Interim Approval And Allowance Of Compensation

For Services Rendered And For Reimbursement Of Expenses During Period From October 1,

2010 Through And Including January 31, 2011 (the "<u>Seventh Interim Fee Application</u>").  In the

Seventh Interim Fee Application, Milbank requested (i) allowance of compensation for

professional services rendered during the period from October 1, 2010 through and including

January 31, 2011 (the "<u>Seventh Interim Compensation Period</u>") in the total amount of

$14,180,784.75,[13] and (ii) reimbursement of its actual and necessary expenses incurred during

the Seventh Interim Compensation Period in the amount of $633,261.80.  Pursuant to the

Interim Compensation Order, Milbank received payment in the amount of $11,995,760.01

during the Seventh Interim Compensation Period.  No hearing date has yet been scheduled with

respect to the Seventh Interim Fee Application.

18.    <u>Application</u>.  Milbank makes this eighth interim application for approval

and allowance of compensation and reimbursement of expenses pursuant to sections 330 and

331 of the Bankruptcy Code.

---

[13]    Milbank voluntarily reduced the fees it sought to have allowed for the Seventh Interim Compensation
Period by $133,519.75, on account of, among other things, certain matters identified by the Fee Committee.
However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of
such fees at a later date.

19.     In accordance with the Interim Compensation Order, Milbank submitted monthly fee statements to the Debtors seeking interim compensation and reimbursement of expenses.  During the Eighth Interim Compensation Period, Milbank submitted the following fee statements:

    a.    On May 25, 2011, pursuant to the Interim Compensation Order, Milbank served its twenty-ninth fee statement for the period from February 1, 2011 through and including February 28, 2011 (the "<u>Twenty-Ninth Fee Statement</u>").  The Twenty-Ninth Fee Statement sought (i) an allowance of $3,013,073.25 as compensation for services rendered and (ii) the reimbursement of $132,093.03 in expenses.  As of the date hereof, Milbank has received a total of $2,542,551.63, which represents payment for (y) 80% of Milbank's fees and (z) 100% of the expenses incurred pursuant to the Twenty-Ninth Fee Statement.

    b.    On July 12, 2011, pursuant to the Interim Compensation Order, Milbank served its thirtieth fee statement for the period from March 1, 2011 through and including March 31, 2011 (the "<u>Thirtieth Fee Statement</u>").  The Thirtieth Fee Statement sought (i) an allowance of $4,010,700.25 as compensation for services rendered and (y) the reimbursement of $174,375.15 in expenses.  As of the date hereof, Milbank has received a total of $3,382,935.35, which represents payment for (i) 80% of Milbank's fees and (z) 100% of the expenses incurred pursuant to the Thirtieth Fee Statement.

    c.    On July 29, 2011, pursuant to the Interim Compensation Order, Milbank filed and served its thirty-first fee statement for the period from April 1, 2011 through and including April 30, 2011 (the "<u>Thirty-First Fee Statement</u>").  The Thirty-First Fee Statement sought (i) an allowance of $3,702,302.50 as compensation for services rendered and (ii) the reimbursement of $245,526.81 in expenses.  As of the date hereof, Milbank has received a total of $3,207,368.81, which represents payment for (y) 80% of Milbank's fees and (z) 100% of the expenses incurred pursuant to the Thirty-First Fee Statement.

    d.    On August 12, 2011, pursuant to the Interim Compensation Order, Milbank filed and served its thirty-second fee statement for the period from May 1, 2011 through and including May 31, 2011 (the "<u>Thirty-Second Fee Statement</u>") and, together with the Twenty-Ninth Fee Statement, Thirtieth Fee Statement and Thirty-First Fee Statement, the "<u>Fee Statements</u>").  The Thirty-Second Fee Statement sought (i) an allowance of $3,951,973.25 as compensation for services rendered and (ii) the reimbursement of $251,776.53 in expenses.  As of the date hereof, Milbank has received a total of $3,413,355.13, which represents payment for (y) 80% of Milbank's fees and (z) 100% of the expenses incurred pursuant to the Thirty-Second Fee Statement.

20.     Milbank has not entered into any agreement, express or implied, with any other party for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in these cases.  No promises have been received by Milbank or any member thereof as to compensation in connection with these cases other than in accordance with the provisions of the Bankruptcy Code.

## II.

## APPLICATION

21.     By this Application, Milbank is seeking allowance of (a) compensation for professional services rendered by Milbank, as counsel for the Committee, during the Eighth Interim Compensation Period and (b) reimbursement of expenses incurred by Milbank in connection with such services during the Eighth Interim Compensation Period.

22.     In this Application, Milbank seeks approval of $14,678,049.25[14] for legal services rendered on behalf of the Committee during the Eighth Interim Compensation Period and $794,661.63[15] for reimbursement of expenses incurred in connection with the rendering of such services, for a total award of $15,472,710.88.

23.     Pursuant to the Interim Compensation Order, Milbank has already received payment of $2,542,511.63 during the Eighth Interim Compensation Period.  Milbank will seek a total payment of $12,930,199.25 pursuant to this Application, which amount represents the portion of Milbank's fees for legal services rendered and expenses incurred

---

[14]     The compensation sought by this Application reflects a voluntary reduction of approximately $191,269.75 including, but not limited to, certain fee issues identified by the Fee Committee.  However, Milbank reserves the right to seek allowance of all or a portion of such fees at a future date.

[15]     This amount reflects a reduction of certain expenses as per the Fee Committee Guidelines, including overtime meal expenses for which Milbank seeks reimbursement of no more than $20 per meal.  Milbank reserves the right to seek, at a later date, reimbursement for the total amount of expenses incurred in connection with its representation of the Committee.

during the Eighth Interim Compensation Period not previously paid to Milbank pursuant to the Interim Compensation Order.[16]

24.      The fees sought by this Application reflect an aggregate of 23,866.60 hours of attorney and paraprofessional time spent and recorded in performing services for the Committee during the Eighth Interim Compensation Period, at a blended average hourly rate of $615.00 for both professionals and paraprofessionals.  The blended hourly rate for professionals only is $683.03.

25.      Milbank rendered to the Committee all services for which compensation is sought solely in connection with these cases, in furtherance of the duties and functions of the Committee.

26.      Milbank maintains computerized records of the time expended in the rendering of the professional services required by the Committee.  These records are maintained in the ordinary course of Milbank's practice.  For the convenience of the Court and parties in interest, a billing summary for the Eighth Interim Compensation Period is attached as part of the cover sheet, setting forth the name of each attorney and paraprofessional for whose work on these cases compensation is sought, each attorney's year of bar admission, the aggregate of the time expended by each such attorney or paraprofessional, the hourly billing rate for each such attorney or paraprofessional at Milbank's current billing rates, and an indication of the individual amounts requested as part of the total amount of compensation requested.  In addition, set forth in the billing summary is additional information indicating whether each

---

[16]      As is customary, in connection with the preparation of this Application, Milbank has reviewed the fees and expenses set forth in its Fee Statements.  Based on this review, the amount requested herein on account of fees and expenses incurred by Milbank during the Eighth Interim Compensation Period is $9,109.89 less than the sum of fees and expenses set forth in the Fee Statements.   Accordingly, upon approval of the relief requested herein, Milbank will reduce its request for payment from the Debtors by such amount.

attorney is a partner, counsel or associate, the number of years each attorney has held such

position, and each attorney's area of concentration.  The compensation requested by Milbank is

based on the customary compensation charged by comparably skilled practitioners in cases

other than cases under the Bankruptcy Code.

27.     Attached hereto as Exhibit "B" are time entry records broken down in

tenths of an hour by project category, based on the U.S. Trustee Guidelines, setting forth a

detailed description of services performed by each attorney and paraprofessional on behalf of

the Committee.[17]

28.     Milbank also maintains computerized records of all expenses incurred in

connection with the performance of professional services.  A summary of the amounts and

categories of expenses for which reimbursement is sought, as well as a breakdown of expenses

by project category and detailed descriptions of these expenses, are attached hereto as

Exhibit "C."

## III.

## SUMMARY OF PROFESSIONAL SERVICES RENDERED

29.     To provide an orderly summary of the services rendered on behalf of the

Committee by Milbank, and in accordance with the U.S. Trustee Guidelines, the Fee Committee

adopted the following billing categories in connection with these cases:

| | |
|---|---|
| 00100 | General Case Administration |
| 00200 | General Case Strategy Meetings |
| 00300 | Project Monitoring/Court Calendar & Docket Maintenance |
| 00400 | Hearings and Court Communications |
| 00500 | Non-Working Travel |
| 00600 | Interested Parties Communications |

---

[17]     Due to the volume of the time and expense records, and consistent with the Interim Compensation Order, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the U.S. Trustee; (iii) the Debtors; (iv) counsel for the Debtors; and (v) the Fee Committee.

| | |
|---|---|
| 00700 | Communications with Debtors |
| 00800 | Unsecured Creditors Issues/Meetings/Communications/Creditors' Committee |
| 00900 | Secured Creditors Issues/Meetings/Communications |
| 01000 | Equity Holders/Motions/Hearings/Communications |
| 01100 | LBI/SIPC Coordination and Issues |
| 01200 | Cash Management |
| 01300 | Insurance Issues |
| 01400 | Employee/ERISA/Benefits/Pension Issues |
| 01800 | Tax Issues |
| 01900 | Corporate Governance |
| 02000 | Other General Business Operation Issues |
| 02100 | Intercompany Issues |
| 02200 | Data Preservation/Migration |
| 02300 | Real Estate Matters |
| 02400 | Private Equity |
| 02500 | Derivatives/Swap Agreement Issues |
| 02600 | Loans/Investments |
| 02700 | Domestic Bank and Related Regulatory Issues |
| 02800 | International Insolvency Issues |
| 02900 | Schedules/Statement of Financial Affairs |
| 03000 | Non-Derivative Automatic Stay/Safe Harbor Issues |
| 03100 | Miscellaneous Asset Sales/363 Issues |
| 03200 | Non-Derivative Executory Contracts/365 Issues |
| 03300 | DIP Financing |
| 03400 | Exit Financing |
| 03500 | Plan of Reorganization/Plan Confirmation/Plan Implementation |
| 03600 | Disclosure Statement/Solicitation/Voting |
| 03700 | Non-Derivative Claims Reconciliation, Estimation, Litigation, and Alternative Dispute Resolution and Bar Date Issues |
| 03800 | Other Bankruptcy Motions and Matters |
| 03900 | Non-Derivative Adversary Proceedings Preparation and Litigation |
| 04000 | Non-Bankruptcy Litigation |
| 04100 | Rule 2004 Issues |
| 04200 | Appeals |
| 04300 | US Trustee Related Issues |
| 04400 | SEC/DOJ Issues |
| 04500 | Examiner Issues |
| 04600 | Firm's Own Billing/Fee Applications |
| 04700 | Firm's Own Retention Issues |
| 04800 | Third Party Retention/Fee Application/Other Issues |
| 04900 | Tax Litigation |

30.    The following summary is intended only to highlight key services

rendered by Milbank in certain project billing categories where Milbank has expended a

considerable number of hours on behalf of the Committee, and is not meant to be a detailed

description of all of the work performed.  Detailed descriptions of the day-to-day services

provided by Milbank and the time expended performing such services in each project billing

category are fully set forth in Exhibit "<u>B</u>" hereto.  Such detailed descriptions demonstrate that

Milbank was heavily involved in the performance of services for the Committee on a daily

basis, including night and weekend work, often under extreme time constraints, to meet the

needs of the Committee.  The sheer magnitude of matters in these Chapter 11 Cases has

required and continues to require substantial and continuing efforts on the part of the Committee

and its professional advisors, including Milbank, to address the many complicated issues and

problems that are presented by these extraordinary and complex cases.

A.     <u>General Case Administration</u>

31.     During the Eighth Interim Compensation Period, Milbank continued to

maintain and undertake action in accordance with an elaborate protocol developed earlier in

these Chapter 11 Cases for the organization and delegation of the substantial number of tasks

engendered by Lehman's chapter 11 process.  The protocol is designed to ensure that the

Committee is kept apprised of all aspects of the Chapter 11 Cases.  The protocol also guarantees

that all matters are addressed, without duplication of effort.  Due to the highly complex nature

of the Debtors' cases, these tasks require knowledge, expertise, and input from a range of

Milbank timekeepers, from paralegals to senior partners, all of whom have become intimately

familiar with the issues and the parties in the Chapter 11 Cases.

32.     Additionally, Milbank has established a system whereby all substantive

court filings are reviewed to provide the Committee with a comprehensive summary and

analysis of each material pleading filed in the Chapter 11 Cases.  Milbank's efforts in setting up

efficient and comprehensive methods of administering the Committee's needs ensure that the

Committee has the information necessary to effectively carry out its fiduciary responsibilities to

the unsecured creditors of each of the Debtors.

**B.      Unsecured Creditors' Issues/Meetings/Communications/Creditors' Committee**

33.      During the Eighth Interim Compensation Period, the Committee held

weekly telephonic meetings and monthly in-person meetings in advance of in-person meetings

with the Debtors.  In addition, the Committee convened special telephonic and in-person

meetings dedicated to discussing particular issues of import.  Prior to each Committee meeting,

Milbank prepared and distributed memoranda, presentations, and other materials for the

Committee members' review and consideration.  During the Committee meetings, Milbank

discussed with Committee members and their counsel all significant matters arising during the

Eighth Interim Compensation Period, in particular, the Debtors' First Amended Plan, the Plan,

and post-Effective Date asset management options, and assisted the Committee in formulating

positions with respect to such issues.

34.      Through Committee meetings, conference calls and numerous other

communications with members of the Committee, Milbank has assisted the Committee in

(i) fulfilling its obligations to unsecured creditors of each of the Debtors' estates, and

(ii) making informed decisions regarding the multitude of issues that have arisen in the Chapter

11 Cases.  Indeed, without such meetings and the advice furnished to it by attorneys with

expertise in a variety of different practice areas, the Committee could neither function as a

committee nor make the many decisions that its statutory role and fiduciary duties require it to

make in connection with these cases.

**C.**     **Project Monitoring/Court Calendar & Docket Maintenance**

35.     During the Eighth Interim Compensation Period, Milbank continued to
maintain internal filing, record-keeping, docket-monitoring, and calendaring systems to
organize and track (i) pleadings filed in the Chapter 11 Cases, the SIPA Proceeding, and related
adversary proceedings; (ii) ongoing projects; and (iii) upcoming deadlines.  On a real-time
basis, Milbank downloaded, consolidated, and organized pleadings to ensure efficient access.
Milbank also monitored the dockets and summarized and circulated substantive pleadings to the
Milbank team.  These summaries enabled Milbank to stay abreast of ongoing developments in
these cases, facilitated the assignment of projects and helped ensure that deadlines were not
missed.

36.     Additionally, Milbank maintained a comprehensive calendar of active
matters in these cases.  This calendar ensured that Milbank could effectively monitor and update
the status of all pending matters, a resource that proved beneficial in responding to inquiries and
discussing these matters with the Committee and other parties in interest.  Milbank also
maintained, and circulated to the Committee on a weekly basis, a calendar of upcoming
motions, hearing dates, and other important deadlines.

**D.**     **Hearings and Court Communications**

37.     During the Eighth Interim Compensation Period, Milbank prepared for
and appeared at each of the hearings conducted before this Court, including, among others,
(i) numerous regularly scheduled omnibus hearings; (ii) hearing on claims-related matters;
(iii) special hearings and case conferences; (iv) hearings in the SIPA Proceeding; (v) hearings in
a wide variety of adversary proceedings arising out of the Chapter 11 Cases and the SIPA
Proceeding; and (vi) hearings in related cases and litigations, including the chapter 11 cases of

Innkeepers and SunCal (each as defined below) and a number of matters before the High Court

of Justice for England and Wales (the "UK High Court").

38.    In advance of each hearing, Milbank conferred internally to address the

issues presented by each motion or other substantive pleading and coordinate a response thereto.

To that end, among other things, Milbank reviewed and analyzed documents, including

correspondence and pleadings, conducted factual and legal research, and met with numerous

parties to work toward the consensual resolution of any objections raised by the Committee or

other parties in interest.  Following each hearing, Milbank promptly advised the Committee of

pertinent Court rulings and developments.

**E.    Interested Party Communications/Website/Lehman Team Hotline**

39.    In accordance with the Stipulation and Agreed Order Between the

Debtors and the Official Committee of Unsecured Creditors Regarding Creditor Access to

Information Pursuant to 11 U.S.C. §§ 105(a), 1102(b)(3) and 1103(c) [Docket No. 498], which

the Court approved on October 1, 2008 (the "Creditor Information Protocol"), Milbank, on

behalf of the Committee, continued to populate and maintain a public website (the "Committee

Website").  The Committee Website contains a significant amount of content produced by

Milbank, which is updated frequently and designed to provide information to creditors

worldwide, including, among other things, (i) general information concerning the Debtors'

Chapter 11 Cases, including adversary proceedings and the SIPA Proceeding; (ii) highlights of

significant events; (iii) a database of the Court's memorandum decisions and opinions issued in

connection with the Chapter 11 Cases, adversary proceedings and the SIPA Proceeding; (iv) a

listing of the orders granting the Debtors' omnibus objections to claims, detailing the affected

claims by claim number; (v) a case calendar; and (vi) answers to frequently asked questions, which are available in several foreign languages.

40.    The Committee Website also acts as a critical pathway for the dissemination of information between Milbank and the Debtors' creditors.  For example, the Committee Website permits creditors to register to receive monthly reports and to submit inquiries directly to Milbank, as to which Milbank works in collaboration with the Debtors' counsel (as required by the Creditor Information Protocol) to provide responses.

41.    During the Eighth Interim Compensation Period, Milbank continued to expend substantial time maintaining and improving the Committee Website.  In addition, hundreds of creditors contacted Milbank via the Committee Website and telephonically with questions concerning the Chapter 11 Cases and, more specifically, inquiries concerning the proposed treatment of certain claims under the Debtors' First Amended Plan and the Debtors' omnibus claim objection process.  In accordance with the Creditor Information Protocol, Milbank reviewed and responded to all such creditor inquiries.

42.    Milbank also spent considerable time working with each of the *ad hoc* groups that formed during the Chapter 11 Cases, as well as with numerous individual creditors, to advance the objectives of various creditor constituencies, assist such creditors' understanding of critical issues in the Chapter 11 Cases, and negotiate resolutions of disputed issues.  At the Court's direction, Milbank also frequently acted as an information "liaison" between the Debtors, these *ad hoc* groups and other creditors.

**F.    Communications with Debtors**

43.    During the Eighth Interim Compensation Period, Milbank continued its frequent communication and exchange of correspondence with the Debtors' counsel regarding,

among numerous other issues, case administration, responses to pleadings, issues related to the

Debtors' First Amended Plan, negotiations with the administrators and trustees (the "Foreign

Administrators") managing the affairs of the numerous proceedings (the "Foreign Proceedings")

initiated by or against Lehman's affiliates in countries outside of the U.S. (the "Foreign

Affiliates"), substantive consolidation, claims based LBHI's purported guarantee of its

affiliates' obligations, intercompany claims and negotiations with the aforementioned *ad hoc*

groups.  Furthermore, Milbank prepared for and attended in-person meetings with the

Committee members, the Debtors, and their respective professionals to, among other things,

discuss the ongoing administration of and long term strategy for the Chapter 11 Cases and,

specifically, the Plan and asset management options.

**G.      LBI/SIPC Coordination and Issues**

44.      During the Eighth Interim Compensation Period, Milbank devoted

significant time to monitoring, evaluating, and analyzing various aspects of LBI's claims

reconciliation process including, in pertinent part, (i) monitoring and, where contested,

analyzing, the SIPA Trustee's objections to claims; (ii) reviewing and making recommendations

to the Committee with respect to stipulations to close out prepetition transactions between LBI

and various counterparties; and (iii) analyzing and making recommendations to the Committee

regarding various motions and applications filed in the SIPA Proceeding.  In connection with

the foregoing, Milbank regularly participated in Court hearings related to the administration of

the LBI estate.

45.      Additionally, Milbank cooperated with the Debtors to address numerous

inter-estate issues between the Debtors and LBI.  In particular, Milbank and the Debtors'

counsel worked closely to prepare for a summit meeting with the SIPA Trustee and

representatives of the LBI estate to discuss various issues related to administration of LBI and

to reconcile the claims filed between the parties.  To that end, Milbank analyzed various legal

issues related to the treatment of claims under SIPA and the standards for determining the status

of claims filed against a broker-dealer.  Milbank continues to monitor and, where appropriate,

take part in the ongoing claim reconciliation process.

## H.    Employee/ERISA/Benefits/Pension Issues

46.    During the Eighth Interim Compensation Period, Milbank devoted

substantial time to researching, analyzing and communicating with the Debtors' counsel with

respect to certain administrative and judicial proceedings (the "UK Pension Proceedings") in the

United Kingdom ("UK") related to the Debtors' obligations to fund the Lehman Brothers

Pension Scheme (the "Pension Scheme"), sponsored by Lehman Brothers Limited ("LBL").

The UK Pensions Regulator commenced the UK Pension Proceedings against LBHI and certain

of its non-Debtor affiliates based on a purported funding shortfall in the Pension Scheme, and

ultimately issued a "financial support directive" imposing liability on LBHI, among others, with

respect to this shortfall.  The Debtors subsequently (i) appealed the administrative ruling to

issue the financial support directive against LBHI and its non-Debtor affiliate Lehman Brothers

Asset Management, LLC in respect of the Pension Scheme (the "Upper Tribunal Proceeding"),

and (ii) joined the UK Pensions Regulator as a respondent in a separate case involving the

treatment of pension-related liabilities under UK insolvency laws (the "Insolvency

Proceeding").  The Debtors obtained a stay in the Upper Tribunal Proceeding pending

resolution in the Insolvency Proceeding.  The UK High Court decided, consistent with the

Debtors' position, that pension-related liabilities should be treated as an expense of the

administration (i.e., entitled to "super-priority" status).  The Foreign Affiliates in administration

22

in the UK appealed the UK High Court's decision to which the Debtors and the UK Pensions

Regulator have submitted responses.  The case was heard by the Court of Appeals in July 2011.

In connection therewith, Milbank reviewed the relevant documentation, researched applicable

laws, and regularly discussed and analyzed the proceedings with Debtors.  Milbank frequently

updated the Committee as to the status of the UK Pension Proceedings.

47.    In addition, Milbank researched and analyzed issues related to the

Debtors' reclassification of claims filed by former employees of Debtors based on restricted

stock units issued pursuant to certain equity award programs.   The claims filed by the Debtors'

former employees assert that unvested restricted stock units that they received pursuant

to certain equity award programs entitled them to treatment as unsecured creditors of LBHI.

The Debtors have objected to these claims by arguing that the restricted stock units should be

reclassified as equity interests.  Milbank reviewed the relevant equity award documentation,

researched the applicable reclassification and equitable subordination case law, and discussed

the results of such research with the Debtors.

## I.    Tax Issues

48.    During the Eighth Interim Compensation Period, Milbank analyzed and

evaluated federal, state, local, and international tax issues relating to the Debtors' estates.  A

subcommittee (the "Tax Subcommittee") convened, as necessary, to address the myriad tax

issues arising in the Chapter 11 Cases.  In addition to attending meetings of the Tax

Subcommittee, Milbank participated in the Committee's weekly telephonic meetings to

(i) inform the Committee of significant tax matters (e.g., the structure of the Plan, the proposed

terms of the Plan, the status and substance of the Debtors' planned private letter ruling request

from the Internal Revenue Service ("IRS") and related filings); (ii) obtain Committee input as to

23

certain tax matters (e.g., the approval of the Debtors' settlements with New York State Department of Taxation and Finance); and (iii) ascertain information that may be relevant to the tax analysis (e.g., recovery projections, ongoing activities that may give rise to tax and substantive consolidation discussions, and business and derivative settlements).

49.     Milbank also participated in weekly conferences with the Debtors' in-house tax department and the Debtors' counsel to discuss (i) the Debtors' ongoing business activities; (ii) the Debtors' tax compliance activities and preparedness; (iii) the progress of negotiations with the IRS, the Department of Justice, and state and local taxing authorities concerning tax audits by, and settlement discussions with, those authorities; (iv) certain tax issues with LBI's counsel; and (v) strategies for obtaining a ruling from the IRS regarding the tax consequences of the Plan.

50.     Milbank also reviewed and analyzed (i) tax issues related to the disposition of certain of the Debtors' assets; (ii) the Debtors' federal, state, local, and international tax exposures and potential refund claims; (iii) tax allocation issues among the Debtors, non-Debtor affiliates, and LBI; (iv) structural issues related to the Plan; and (v) the Debtors' request for a ruling from the IRS regarding the tax consequences of the Plan.

51.     Finally, Milbank researched, prepared legal memoranda, and corresponded with the Debtors regarding (i) the allocation of liability for New York State and New York City taxes; (ii) the distinction between vote and control for federal income tax purposes; (iii) combined and consolidated tax return reporting under New York State and New York City law; (iv) privilege matters regarding the use of accountants to prepare for audit; (v) tax liability allocation among debtor entities; (vi) the continuity of interest requirements for preservation of tax attributes; (vii) recommendations with respect to Debtor's proposed

24

settlement of its combined New York State tax liabilities; (viii) the offset of tax overpayments against penalty claims; and (ix) the Debtors' potential liability for withholding taxes under the Foreign Account Tax Compliance Act.

52.     **Tax Litigation**.  Milbank, on behalf of the Committee, intervened in the Debtors' suit against the United States (the "Government") for a tax refund relating to the "stock loan" transactions (the "Tax Litigation") and undertook activities associated with representing the Committee's interests in that litigation.  In particular, Milbank monitored and participated in the discovery process and analyzed the various legal issues in connection with motions filed by Debtors and the Government.

53.     Milbank advised Debtors' counsel regarding whether the Debtors should waive attorney-client privilege over any advice given to the Debtors' tax counsel in connection with the stock loan transactions.  In addition, Milbank reviewed the Government's discovery productions and privilege logs and assisted Debtors' counsel in drafting objections to certain privilege claims asserted by the Government.   Milbank also advised Debtors' counsel on the Debtors' Motion for a Letter of Request for International Judicial Assistance, seeking discovery of documents relating to the stock loan transactions in the possession of Lehman Brothers International (Europe) ("LBIE").  When LBIE objected to the motion, Milbank reviewed the Debtors' response to LBIE's objection, filed a joinder in the Debtors' response on behalf of the Committee and attended the hearing on the motion.

54.     Finally, Milbank researched, prepared legal memoranda, and corresponded with the Debtors regarding (i) the Debtors' motion to bifurcate the Tax Litigation proceedings (which Milbank assisted Debtors' counsel in drafting); (ii) the penalty provisions potentially applicable to the Debtors and the potential exemptions therefrom; (iii) several issues

relating to interpretation of the U.S.-U.K. Tax Treaty; and (iv) various privileges claimed by the

Debtors and the Government in response to discovery requests.

**J.**    **Other General Business Operation Issues**

55.    During the Eighth Interim Compensation Period, Milbank continued to

review and analyze myriad issues in connection with potential business plans for the Debtors.

In that connection, Milbank assisted Houlihan Lokey, Inc. ("Houlihan") and FTI Consulting

Inc. ("FTI"), the Committee's financial advisors, with their review and analysis of the Debtors

current asset management strategy and various potential alternatives.  This project culminated in

the preparation of a comprehensive presentation to the Committee that outlined the Debtors'

asset management options by asset class.  Milbank, Houlihan and FTI discussed these options

on both the Committee and subcommittee level in order to help the Committee evaluate

alternatives for the post-Effective Date management of the Debtors' assets.

**K.**    **Intercompany Issues**

56.    During the Eighth Interim Compensation Period, Milbank expended

considerable time investigating matters related to intercompany claims among LBHI and its

affiliates.   Specifically, Milbank devoted substantial resources to analyzing the treatment of the

intercompany claims between the Debtors and (i) Lehman Brothers Treasury Co. B.V. ("LBT");

(ii) Lehman Brothers Finance AG ("LBF"); and (iii) LBIE.  In connection therewith, Milbank

had numerous discussions with the Debtors, the Debtors' counsel and the Committee's financial

advisors regarding the treatment of intercompany claims in the Plan and the potential impact of

distributions in the Foreign Proceedings initiated by or against the Foreign Affiliates.

57.    Furthermore, Milbank, analyzed the Debtors' potential opportunities to

enhance recoveries by U.S. creditors through actions in the Chapter 11 Cases or in the Foreign

Proceedings.  In particular, Milbank examined legal issues surrounding setoff and subrogation strategies in the context of the Bankruptcy Code, as well as whether remedies may be available under state law.  In addition, Milbank researched and analyzed significant cross-border intercompany issues during the Eighth Interim Compensation Period.

58.    Milbank also devoted significant resources to investigate and apprise the Committee on certain intercompany issues raised by the Debtors' First Amended Plan. Specifically, Milbank examined the Debtors' treatment of claims arising in connection with the Debtors' intercompany repurchase agreements and the considerations affecting such treatment. In connection with this analysis, Milbank performed extensive research into the potential recharacterization of such claims as equity, as well as defenses that could be asserted against such recharacterization.  Milbank's analysis also evaluated issues with respect to valuation and alternatives to the Debtors' proposed treatment of intercompany claims.

59.    The Debtors also disclosed that assets held by LBIE for Lehman affiliates as clients were potentially subject to liens (the "Extended Liens") in favor of other Lehman affiliates.  Milbank reviewed agreements purporting to create Extended Liens in order to advise the Committee of the potential impact that Extended Liens could have on cross-border insolvency issues between the Debtors and their Foreign Affiliates and, ultimately, creditor recoveries.  Milbank produced multiple memoranda for the Committee to explain the Extended Liens and evaluate how the UK High Court would treat the Extended Liens if the issues were to be litigated by LBIE.  In connection therewith, Milbank analyzed arguments likely to be raised by LBIE, its clients, or other Lehman affiliates that may benefit from enforcement of Extended Liens, as well as how the Debtors could benefit from or be harmed by the Extended Liens.

L.      **Real Estate Matters**

60.     As reflected in the First Interim Fee Application, due to the size,
complexity and potential for exposure of the Debtors' real estate portfolio, the Committee
established a subcommittee (the "Real Estate Subcommittee") to evaluate issues relating to the
Debtors' extensive real estate portfolio.  During the Eighth Interim Compensation Period, the
Real Estate Subcommittee continued to hold regular meetings to address and make
recommendations to the full Committee with respect to issues related to the Debtors' real estate
holdings in discrete assets (e.g., Archstone, Edgewood, Eola, Hamilton Praedium, Heritage
Fields, Innkeepers, Moonlight Basin, Ritz Carlton Kapalua, Rosslyn, SunCal, 25 Broad Street,
45 Broad Street, 200 Fifth Avenue, 695 East Main Street and 1107 Broadway) and work with
the Debtors under previously approved protocols to maximize the value of the Debtors' real
estate assets.

61.     The Debtors' real estate portfolio includes commercial, residential and
corporate interests in which the Debtors hold both debt and equity positions, often in the form
of joint ventures to develop large commercial projects.  Milbank continued to work closely with
the Committee's financial advisors to assess whether the Debtors should continue to meet
various real estate-related funding obligations and whether to invest additional funds in certain
assets to increase the potential sale value.  In addition, Milbank evaluated the terms of the
Debtors' proposed restructurings of their debt facilities.  In connection therewith, Milbank
reviewed the Debtors' rights, obligations and exposures relative to joint venture partners,
borrowers, senior secured lenders, unsecured creditors and other third parties, in order to further
analyze the potential consequences of the proposed restructurings or failures to fund capital

28

calls on the Debtors' creditors.  Milbank also participated in the consensual resolution of several outstanding real estate-related motions.

62.       During the Eighth Interim Compensation Period, Milbank researched and drafted memoranda in connection with certain real estate matters, and prepared and filed several pleadings in connection with real estate transactions requiring Court approval.  Furthermore, Milbank monitored legal proceedings related to the Debtors' real estate assets, made site visits to evaluate the Debtors' assets throughout the United States and Europe, and met with the Debtors and the Debtors' advisors regarding how the Debtors should use their real estate assets to generate maximum value for the Debtors' creditors.

63.       **Innkeepers**.  Innkeepers USA Trust and certain of its affiliates (collectively, "Innkeepers") owned 71 hotel properties throughout the U.S.  Prior to the Petition Date, Lehman ALI, Inc. ("Lehman ALI") originated a $367,658,725 financing with Innkeepers that was bifurcated into a $250,000,000 floating rate first mortgage loan (the "ALI Mortgage Loan") and a $117,658,725 floating rate mezzanine loan (the "Mezzanine Loan").  The ALI Mortgage Loan was secured by 19 of Innkeepers' hotel properties and the Mezzanine Loan was secured by pledges of the equity of the entities holding those same 19 properties.  Facing significant financial difficulties, Innkeepers filed for chapter 11 bankruptcy protection in July 2010 (the "Innkeepers Chapter 11 Cases").  During the Eighth Interim Compensation Period, the Debtors filed a motion (the "Innkeepers Motion") seeking authority to enter into a commitment letter (the "Commitment Letter") regarding a stalking horse bid (the "Innkeepers Stalking Horse Bid") for substantially all of the Innkeepers enterprise by the Debtors, Five Mile Capital II Pooling REIT LLC and Midland Loan Services Inc [Docket No. 15259].  Milbank and Houlihan monitored the negotiations surrounding the sale of Innkeepers' assets, analyzed

the terms of the Commitment Letter and the Stalking Horse Bid and determined that these

transactions were in the best interest of the Debtors' estates.  Accordingly, Milbank drafted a

statement in support of the Innkeepers Motion [Docket No. 15813], which set forth the

Committee's support for the Debtors' entry into the Commitment Letter and the Innkeepers

Stalking Horse Bid.  The Court agreed with the Debtors and the Committee that the

Commitment Letter was in the best interests of the Debtors' estates and, on April 14, 2011,

approved the Innkeepers Motion [Docket No. 16002].

64.    In addition, Milbank attended the hearing on the bid procedures motion in

the Innkeepers Chapter 11 Cases, the auction for Innkeepers' hotels and other relevant

proceedings in the Innkeepers Chapter 11 Cases, and generally kept the Real Estate

Subcommittee – and the full Committee – apprised of relevant developments with respect to the

sale of Innkeepers' assets and the effects on Lehman's recoveries.

65.    **Ritz-Carlton Kapalua.**  The Ritz-Carlton Kapalua (the "Ritz-Carlton")

consists of a 463-room first class luxury beach resort situated on a 50-acre oceanfront site in

Hawaii.  In March 2007, Lehman originated a floating rate loan (the "Floating Rate Loan"),

which was subsequently bifurcated into a senior loan (the "Senior Loan") and two mezzanine

loans (the "Ritz-Carlton Mezzanine Loans").  In 2008, Lehman pledged the Senior Loan to

Structured Asset Securities Corporation and the Ritz-Carlton Mezzanine Loan to Lehman Re,

Ltd.  The loans matured in February 2009, and the borrower, Whitehall Global Real Estate,

Gengate, Maul Land and Pineapple Company ("Whitehall"), has failed to make interest

payments since March 2009.  During the Eighth Interim Compensation Period, the Debtors

sought to enter into three separate agreements regarding the Ritz-Carlton: (i) an agreement

contemplating Whitehall's transfer of title to the Ritz-Carlton to Lehman; (ii) a long-term asset

management agreement ("AMA") between Lehman and The Gencom Group ("Gencom") for

the Ritz-Carlton; and (iii) amendments to certain lines of credit of two of Gencom's principals,

Karim Alibhai and Munir Walji.  Milbank, along with the Committee's financial advisors,

reviewed and commented on various iterations of the AMA and the line of credit amendments,

ultimately making recommendations with respect thereto to the Real Estate Subcommittee and

the full Committee.

66.      **SunCal**.  SunCal is a collection of large-scale residential and commercial

real estate projects in California.  Prior to the Petition Date, Lehman ALI, LCPI and certain

other non-Debtor affiliates of LBHI provided debt financing for the SunCal projects totaling

over $2 billion.  As a result of its financial difficulties, SunCal became a debtor in possession

(collectively, the "SunCal Debtors") in the United States Bankruptcy Court for the Central

District of California (the "SunCal Cases") and the Debtors filed a proof of claim against certain

of the SunCal Debtors in the SunCal Cases.  In October 2010, Judge Erithe Smith ("Judge

Smith"), the bankruptcy judge in the SunCal Cases, heard SunCal's motion for relief from the

stay in order to equitably subordinate the Debtors' claims against the SunCal Debtors.  Judge

Smith denied relief from the stay and ordered the parties to mediate the issue.  Milbank, on

behalf of the Committee, participated in the mediation in California regarding the equitable

subordination issue and evaluated potential settlement options.

67.      Certain of the SunCal properties (the "Pool I Properties") were sold at an

auction during the Eighth Interim Compensation Period.  Milbank evaluated Lehman's request

to credit bid at the auction for the Pool I Properties, approved a credit bid amount and monitored

the results of the auction, which took place on April 5, 2011.  Other SunCal Properties (the

"Palmdale Properties") filed voluntary chapter 11 petitions (the "Voluntary Debtors") or had

31

involuntary proceedings filed against them (the "Involuntary Debtors").  Lehman filed a joint

plan of reorganization for the Voluntary Debtors on September 30, 2011, and a joint plan of

reorganization for the Involuntary Debtors on the same day.  Lehman subsequently filed first

amended joint plans of reorganization for both the Voluntary (the "Voluntary POR") and

Involuntary (the "Involuntary POR") Debtors on March 28, 2011.  Milbank, along with the

Committee's financial advisors, reviewed and analyzed the Voluntary POR and the Involuntary

POR, which ultimately led to the Real Estate Subcommittee authorizing the Debtors to spend up

to a certain capped amount to confirm the Voluntary and Involuntary PORs and take control of

the underlying real estate assets.  Milbank also monitored the disclosure statement hearing for

the Palmdale Properties, which took place on May 13, 2011, and promptly reported back to the

Committee on all relevant developments in the SunCal Cases.

    68. **25 and 45 Broad Street**.  LBHI is the holder of senior and mezzanine

loans (the "Broad Street Loans") secured by properties located at 25 and 45 Broad Street in

New York, NY (collectively, the "Broad Street Properties").  In January 2009, LBHI

commenced two separate actions in the Supreme Court of the State of New York (the "State

Court") to foreclose on the mortgages encumbering the Broad Street Properties, which actions

were still pending during the Eighth Interim Compensation Period.  As the foreclosure process

continued, LBHI sought authority from the Court to invest approximately $25.1 million (the

"Additional Investments") in the Broad Street Properties to enhance their value and comply

with the relevant New York City regulations [Docket No. 15257].  Milbank and the

Committee's financial advisors analyzed the request to make the Additional Investments, as

well as other potential strategies with respect to the Broad Street Properties, to assist in the

Committee's determination that allowing the Debtors to make the Additional Investments

would generate the highest recovery for creditors by realizing the full potential of the Broad

Street Properties.  Milbank prepared a statement in support of the Additional Investments,

outlining the Committee's belief that the these investments would lead to maximum creditor

recoveries [Docket No. 15789].  The Court agreed with the Debtors and the Committee, and

authorized the Debtors to make the Additional Investments in the Broad Street Properties

[Docket No. 16000].

**M.**     **Private Equity**

> 69.     As reflected in the First Interim Fee Application, the Committee

established a subcommittee (the "Private Equity Subcommittee") to monitor and analyze

developments with respect to the Debtors' private equity assets.  During the Eighth Interim

Compensation Period, the Private Equity Subcommittee continued to review specific issues

surrounding the Debtors' private equity portfolio with a view toward helping the Debtors

maximize the value of such portfolio for the benefit of all creditors.  Milbank worked closely

with the Debtors, the Debtors' professionals and the Committee's financial advisors regarding

these assets.

> 70.     Most significantly, the Committee's advisors reviewed a sale by LBHI of

80,000 Class A shares (the "Class A Shares") that it held in Quadrant Structured Products

Company, Ltd. to Magnetar MQ Ltd. for $90.0 million.  The Private Equity Subcommittee

reviewed the financial terms of the proposed sale and ultimately concluded that the sale was in

the best interests of the Debtors' estates and their creditors.  In addition, Milbank analyzed the

legal issues surrounding the sale, including the fact that the Debtors did not conduct an auction,

and determined that the sale – and sale process – satisfied the Debtors' fiduciary duty to ensure

the highest possible return on the Class A Shares.  As a result, Milbank drafted and filed a

statement in support of the Debtors' motion seeking approval of the sale of the Class A Shares

[Docket No. 15174], which motion the Court granted on March 24, 2011 [Docket No. 15312].

**N.**     **Derivatives Issues**

71.     As reflected in the First Interim Fee Application, the Committee

established a subcommittee (the "Derivatives Subcommittee") to evaluate issues and develop

value-maximizing strategies relating to the Debtors' valuable derivatives portfolio.  During the

Eighth Interim Compensation Period, Milbank continued to conduct regular (at least weekly)

meetings with the Derivatives Subcommittee to address and, where appropriate, make

recommendations to the Committee with respect to specific issues concerning the Debtors'

portfolio of derivatives positions.

72.     **Derivatives ADR**.  On September 17, 2009, this Court entered an order

approving the Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and General

Order M-143 for Authorization to Implement Alternative Dispute Resolution Procedures for

Affirmative Claims of Debtors Under Derivative Contracts (the "Derivatives ADR Order")

[Docket No. 5207], pursuant to which the Committee, the Debtors and derivatives

counterparties mediate disputes arising from the closing out of the Debtors' "in-the-money"

derivatives portfolio.  During the Eighth Interim Compensation Period, Milbank continued to

work closely with the Debtors to review and respond to counterparty notices filed under the

Derivatives ADR Order, and to evaluate settlement proposals arising under the alternative

dispute resolution process.  In addition, Milbank participated in such mediations on behalf of

the Committee.  In preparation for each such mediation, Milbank conducted extensive legal and

factual research on the issues in dispute and drafted numerous memoranda, including

memoranda to the Derivatives Subcommittee, describing such issues and seeking approval of

minimum settlement amounts.  Such efforts have been instrumental in helping the Debtors

achieve settlements in a total of 91 matters involving 102 counterparties, as of July 12, 2011,

resulting in the recovery of almost $794 million into the Debtors' estates.

73.    **Derivatives Litigation**.  Milbank also continued to address issues related

to, and provided recommendations regarding, the highly complex derivatives-related adversary

proceedings commenced by and against the Debtors.  To that end, Milbank devoted substantial

resources to analyzing derivative contracts and other related transaction documents, monitoring

and participating actively in the derivatives-related adversary proceedings, communicating with

the Debtors' counsel and the Committee's financial advisors, and developing and evaluating

strategies to monetize complicated derivative transactions for the benefit of unsecured creditors

of each of the Debtors' estates.  Milbank expended considerable time summarizing such

analyses and recommendations in numerous memoranda to the Committee.  In particular,

Milbank researched and analyzed the issues presented in certain contested matters and

adversary proceedings, and acted on behalf of the unsecured creditors in hearings or

negotiations, including, among others, negotiating or monitoring settlements (i) with Swedbank

AB (publ) ("Swedbank") regarding its purported right to set off certain of the Debtors' funds on

deposit at Swedbank against amounts receivable to the Debtors under the parties' prepetition

derivative contracts, and (ii) with respect to certain notes underlying the Hong Kong

"minibonds."

74.    Prior to representing the Committee in the derivatives-related adversary

proceedings in which the Committee intervened, Milbank researched, among other things,

complex legal issues related to the treatment of derivative contracts in bankruptcy.  Such

research and analysis played an essential role in the development of strategies to recover

amounts due to the Debtors in disputed derivatives transactions for the benefit of the Debtors'
unsecured creditors.

75.    **Derivatives Settlements**.  On December 16, 2008, this Court entered an
order pursuant to sections 105 and 365 of the Bankruptcy Code to establish procedures for the
settlement or assumption and assignment of prepetition derivative contracts (the "December
Order") [Docket No. 2257], pursuant to which the Committee, the Debtors and derivatives
counterparties negotiate outstanding derivative and guarantee claims of the counterparties or
amounts due to the Debtors as they may arise from the closing out of the Debtors' derivatives
portfolio.  On March 11, 2009 and April 22, 2010, respectively, this Court entered further orders
authorizing the Debtors to grant first priority liens in cash collateral posted in connection with
the hedging transactions entered into through certain futures and prime brokerage accounts (the
"Hedge Order") [Docket No. 3047], and to purchase and sell notes issued by certain special
purpose vehicles that are party to transactions with certain Debtors (the "SPV Notes Purchase
Order") [Docket No. 8596].

76.    Pursuant to the December Order, the Hedge Order, and the SPV Notes
Purchase Order, during the Eighth Interim Compensation Period, Milbank continued to work
closely with the Debtors to review claims or receivables, hedge proposals, and proposed note
purchases, and to arrive at negotiated settlements or transactions with respect thereto.  To that
end, Milbank devoted substantial resources to analyzing derivative contracts and other related
transaction documents, communicating with the Debtors' counsel and the Committee's financial
advisors, and developing and evaluating strategies to monetize complicated derivatives
transactions for the benefit of unsecured creditors of each of the affected Debtors' estates.

Milbank also expended considerable time describing such analyses and recommendations in numerous presentations to the Committee.

**O.**    **Loans/Investments**

77.      As reflected in the First Interim Fee Application, the Committee established a subcommittee (the "Loan Book Subcommittee") to review and analyze issues related to the Debtors' portfolio of commercial loans.  During the Eighth Interim Compensation Period, the Loan Book Subcommittee reviewed and considered the proposed settlement of certain of the Debtors' outstanding prepetition agreements, which included (i) a credit agreement entered into with Latshaw Drilling Company, LLC and Latshaw Drilling and Exploration Company, Inc. as borrower; (ii) a revolver commitment entered into with First Data Corporation as borrower; and (iii) prepetition agreements to purchase or sell a position in par or distressed loans entered into with AXA Mezzanine II SA, Sicar and MD Mezzanine SA, Sicar that had yet to be consummated or settled.  Additionally, the Loan Book Subcommittee continued to review the monetization of several structured finance vehicles established by the Debtors, including (i) a collateralized loan obligation with Spruce CCS Ltd. as issuer; and (ii) a collateralized loan obligation with Verano CCS Ltd. as issuer.

78.      Milbank also continued to analyze issues related to the chapter 11 cases of the Tribune Company ("Tribune") and its related subsidiaries, in which LCPI has an approximately $200 million participation interest in certain senior loan indebtedness with Tribune.  As such, Milbank evaluated, among other things, (i) the potential avoidance of obligations owing to lenders such as the Debtors; and (ii) whether, assuming such obligations were avoided, such lenders could enforce contractual payment sharing provisions against their co-lenders whose claims are not avoided.  Additionally, Milbank monitored the Tribune chapter

11 cases and provided updates to the Committee regarding relevant developments in those cases and the effect of such developments on the Debtors' participations.

79.    Additionally, Milbank, together with Houlihan, evaluated various options proposed by the Debtors to facilitate the management and monetization of the Debtors' loan book portfolio.  In connection therewith, Milbank reviewed, among other things, (i) the circumstances under which an asset transfer transaction would be anticipated to give rise to a true sale of loan interests; (ii) the likelihood that a final court order approving the Debtors' proposed transfer could be modified or reversed upon reconsideration or appeal; and (iii) other issues related to the potential management of the Debtors' loan portfolio.  Milbank provided the Committee with its analyses of the Debtors' proposed transfer and the potential implications such transfer would have on the Debtors' estates.

80.    During the Eight Interim Fee Period, Milbank also reviewed legal analyses prepared by the Debtors' counsel concerning the treatment of the unfunded or partially funded loan commitments still remaining in its portfolio of commercial loans.  As part of this review, Milbank conducted additional research with respect to the various issues raised in the Debtors' analyses, which included (i) the characteristics that establish a particular agreement as an executory contract for bankruptcy purposes; (ii) the legal implications and business risks associated with the assumption or rejection of executory contracts of this type; and (iii) the applicability of setoff principles to the Debtors' portfolio of commercial loans.

81.    Finally, Milbank continued to work with the Committee's financial advisors to present the legal and financial implications of the Debtors' loan book transactions to the Loan Book Subcommittee in order to facilitate its recommendations and responsive courses

of action to the full Committee.  To that end, the Loan Book Subcommittee convened meetings

to discuss and formulate recommendations regarding all outstanding loan book matters.

**P.**  **Domestic Bank and Related Regulatory Issues**

82.    Milbank continued to expend considerable time in connection with

analyzing issues related to Woodlands Commercial Bank ("Woodlands") and Aurora Bank FSB

("Aurora" and, together with Woodlands, the "Banks"), which are overseen by the Office of

Thrift Supervision (the "OTS") and the Federal Deposit Insurance Company (the "FDIC" and,

together with the OTS, the "Regulators").  Throughout the Chapter 11 Cases, the Debtors and

the Committee's professionals have sought to improve the capital levels at each of the Banks to

satisfy regulatory requirements, avoid potential seizures and liquidations by the Regulators, and

facilitate the resumption of depository functions at the Banks to preserve and maximize value.

Accordingly, Milbank worked closely with the Debtors and their advisors on finalizing the

terms of settlements with the Debtors and the Banks to achieve the Regulators' approval to

resume normal profit-generating banking and lending operations.  On September 23, 2010, the

Court approved the Debtors' entry into such settlements, which were executed on November 30,

2010.

83.    Specifically, during the Eighth Interim Compensation Period, Milbank

continued to work with the Debtors and their bankruptcy and regulatory counsel concerning

implementation of the settlements, including, without limitation, through commencement of a

sale process for Aurora and its subsidiaries.  In addition, Milbank reviewed and analyzed issues

in connection with the commencement of a loan modification litigation against Aurora.  This

analysis involved various calls with the Debtors and counsel to Aurora, as well as research

regarding the relevant legal issues implicated by such investigation.  Milbank continues to

39

review issues in connection with this litigation and how, if at all, this may impact the sale

process of Aurora.

**Q.    International Insolvency Matters**

84.    During the Eighth Interim Compensation Period, Milbank continued to

monitor and analyze issues regarding the Foreign Proceedings.  Specifically, Milbank attorneys

and paraprofessionals across various jurisdictions continued to collaborate with each other, the

Debtors' counsel and the Foreign Administrators regarding the status of major issues among the

Debtors and certain of the Foreign Affiliates.  Milbank also reviewed and analyzed status

reports published by the Foreign Administrators – including reports published by the

administrators of LBIE and LBT – and other publicly available information to kept the

Committee informed with respect to, among other things, asset recoveries and claims

reconciliation.  Based on such analyses, Milbank provided regular updates to the Committee

regarding the status of the Foreign Proceedings, and their impact on the Debtors and the overall

recoveries of the Debtors' creditors.  Furthermore, Milbank worked with Houlihan and FTI to

provide regular updates to the Committee on the status of negotiations with Foreign

Administrators regarding potential settlements of their claims against the Debtors.  Milbank

participated in negotiations regarding plan settlements with certain Foreign Administrators,

reviewed and analyzed settlement proposals, and made recommendations to the Committee

regarding whether potential settlements would benefit the Debtors' estates.  In particular,

Milbank analyzed proposed settlements among the Debtors and LBF, LBIE, Lehman Brothers

Securities N.V. ("LBSNV") and Lehman Brothers Bankhaus AG ("Bankhaus").

85.    Milbank also continued to monitor developments regarding that certain

Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies (the

"Protocol"), approved by the Court on June 17, 2009 [Docket No. 4020].  In connection

therewith, Milbank reported to the Committee on meetings of the Protocol signatories, in which

Milbank actively participated, held in New York City on March 23, 2011 and April 29, 2011.

At the Protocol Meetings, Milbank engaged with certain Foreign Administrators to, among

other things, (i) discuss plan settlement proposals, (ii) understand the Foreign Administrators'

concerns regarding proposed changes to the Debtors' First Amended Plan, and (iii) facilitate

consensual resolutions of contested issues among the Debtors and the Foreign Administrators.

86.    Moreover, during the Eighth Interim Compensation Period, Milbank

(i) researched standards for the approval of plan settlement agreements in relevant foreign

jurisdictions, and (ii) performed substantial research and analysis, and drafted multiple

memoranda, regarding issues related to the claims among the Debtors and the Foreign Affiliates

under administration in the UK, including LBIE.

87.    **UK Issues.**  LBIE, the Debtors' principal trading company in the UK,

and several other UK subsidiaries and affiliates of the Debtors, were placed into insolvency

administration in the UK (the "UK Administration"), and the UK High Court appointed

PricewaterhouseCoopers as joint administrators (the "Joint Administrators").  During the Eighth

Interim Compensation Period, Milbank reviewed and analyzed the Fifth Progress Report issued

by the Joint Administrators for the Committee.  Milbank also monitored various ongoing

litigation proceedings in the UK, including the appeal of the UK High Court's decision holding

that LBIE, and not any of the affiliates involved in the Regulation and Administration of Safe

Custody and Global Settlements ("RASCALS"), was the legal owner of not less than £700

million in securities subject to the RASCALS process.

88.     Moreover, Milbank analyzed and engaged in discussions with the
Debtors' counsel regarding the appropriate treatment of LBIE's guarantee claims against LBHI.
In connection therewith, Milbank advised the Committee as to LBIE's ability to enforce general
guarantees issued by LBHI and whether LBHI has rights of indemnity, subrogation or
contribution arising from LBHI's payments on account of LBIE's creditors' guarantee claims.
As part of its review of LBIE's claims against the Debtors, Milbank also researched and
analyzed legal issues in connection with (i) the agreement, dated November 1, 2000, entered
into by LBIE and LBHI, which purports to give LBIE the right to assign any receivable it may
have from LBI to LBHI in respect of indebtedness LBIE may have to LBHI; and (ii) the side
letter agreement dated July 24, 2006, entered into by LBIE and LBSF, relating to transactions
between LBIE and LBSF for which LBIE has offsetting transactions on identical terms with
clients, leaving LBIE with no market positions risk.

89.     **Bankhaus Issues.**  Bankhaus is a wholly-owned subsidiary of LBHI that
was placed into an insolvency proceeding by the Frankfurt Local Court (*Amtsgericht*) on
November 13, 2008.  During the Eighth Interim Compensation Period, Milbank analyzed
numerous issues relating to Bankhaus' German insolvency proceeding and the claims among
Bankhaus, LBHI, LBSF and LCPI.  Specifically, as part of Milbank's participation in the
negotiations between Bankhaus and certain of the Debtors, Milbank reviewed and commented
on successive drafts of two proposed note purchase agreements (the "Note Purchase
Agreements"), pursuant to which LBHI agreed to purchase certain notes from Bankhaus.
Following these negotiations, the Debtors filed a motion seeking approval of the Note Purchase
Agreements with Bankhaus [Docket No. 14743].  After Milbank reviewed and analyzed the
relevant issues in connection with the motion, the Committee determined that the Note Purchase

42

Agreements would maximize recoveries to unsecured creditors of LBHI and LCPI. Accordingly, Milbank filed a statement in support of the Debtors' entry into the Note Purchase Agreements [Docket No. 15020]. The Court ultimately agreed with the Debtors and the Committee, and approved the Note Purchase Agreements [Docket No. 15278].

90.    Additionally, during the Eighth Interim Compensation Period, Milbank analyzed the likelihood of success of the Association of German Banks (*Bundesverband deutscher Banken e.v.*) on its claims against LBHI under a certain guaranty and indemnity letter.

**R.    Non-Derivative Automatic Stay/Safe Harbor Issues**

91.    During the Eighth Interim Compensation Period, Milbank reviewed numerous motions filed by parties in interest seeking to lift the automatic stay in order to enforce various contractual agreements or otherwise exercise rights against the Debtors' estates.

92.    Specifically, Milbank analyzed lift-stay motions filed by (i) Jason T. Taylor and Phillip Walsh; (ii) Merrill Lynch Portfolio Management, Inc. and Merrill Lynch Capital Services, Inc.; (iii) Bank of Nova Scotia; and (iv) individuals who are owners of single-family homes in the Ironbridge Development, a housing project in Glenwood Springs, Colorado. In each case, Milbank reviewed the motion, researched relevant legal issues, drafted a memorandum to the Committee analyzing the merits of the motion and provided a recommended course of action to the Committee.

**S.    Plan of Reorganization/Plan Confirmation/Plan Implementation**

93.    During the Eighth Interim Compensation Period, Milbank, working together with Houlihan and FTI, continued its extensive review of the myriad issues involved in developing a confirmable plan of reorganization. Such analyses included a thorough review of relevant bankruptcy, corporate governance, tax and structural issue, and recovery scenarios.

Further, Milbank and the Committee's financial advisors met with various creditor groups to discuss each group's position on the Debtors' First Amended Plan, and alternative proposals to settle certain issues that arose in connection with plan negotiations, including substantive consolidation, the reconciliation of intercompany claims and guarantee claims, and the treatment of claims arising from the structured notes issued by LBHI, LBT and LBSNV. Milbank also reviewed and analyzed the Ad Hoc Group Plan and the Non-Con Plan, and regularly spoke with the Ad Hoc Group of Lehman Brothers Creditors (the "<u>Ad Hoc Group</u>") and the proponents of the Non-Con Plan, among other creditor groups, to discuss the terms of their plans.

94.    **The Second Amended Plan**.  Taking into account the often disparate opinions of the various creditor groups in these cases, Milbank assisted the Committee in developing an alternative framework for the plan of reorganization.  In that connection, Milbank researched and analyzed the various inter-Debtor, Debtor-creditor, and inter-creditor issues affecting the Chapter 11 Cases, and the feasibility of a compromise and settlement of such issues.  This analysis led to the formulation of a proposal (the "<u>Committee Proposal</u>"), premised on a global compromise, that addressed the legal risk of substantive consolidation, the legal risk of the recharacterization of intercompany claims as equity, challenges to the enforceability of guarantee claims, the unique legal risks facing holders of claims on account of securities issued by certain of the Foreign Affiliates, and the inter-Debtor issues concerning the ownership of certain assets.  Such efforts led to the formulation of the Debtors' First Amended Plan, filed on January 25, 2011, with the support of the Committee.

95.    Following the filing of the Debtors' First Amended Plan, Milbank and the Committee's financial advisors worked closely with the Debtors to reach consensual

agreements with various of the domestic and foreign creditor groups.  Such work included

frequent meetings with the advisors to such groups, and the evaluation and analysis of their

proposals with respect to the entire body of creditors.  Milbank and Houlihan negotiated

extensively with the Debtors and other creditor groups regarding the non-economic, as well as

economic, terms of the revised plan.  Milbank also worked to ensure that any further

amendments and compromises maintained the aspects of the Debtors' First Amended Plan that

provided the unsecured creditors with a voice in the Debtors' post-Effective Date corporate

governance and the Committee with continued involvement in significant derivative and

litigation matters.

96.      In further negotiating with the Debtors and creditor parties, Milbank

analyzed various issues related to memorializing such compromises in a plan of reorganization.

Such work included the evaluation of potential plan support agreements and the ability of the

Debtors to provide for global settlements in a plan of reorganization.  While such efforts

ultimately led to the formulation of the Plan, filed on June 30, 2011, much of Milbank's work

was undertaken during the Eighth Interim Compensation Period.  Moreover, Milbank worked

closely with Debtors and the Ad Hoc Group to address various issues related to disclosures by

creditor groups pursuant to Rule 2019 of the Bankruptcy Rules.

97.      **Treatment of Claims Based on Repurchase Agreements**.  During the

Eighth Interim Compensation Period, Milbank also reviewed and analyzed the Debtors'

proposed treatment of claims arising from certain intercompany repurchase transactions, as

described in the Debtors' First Amended Disclosure Statement, and various analyses prepared

by the Debtors and their counsel.  More specifically, Milbank (i) researched issues related to

repurchase agreements, including the application of "safe harbors" under the Bankruptcy Code

and proper methods for measuring claims arising from terminated repurchase agreements, (ii) analyzed the propriety of the Debtors' proposed treatment of its intercompany repurchase agreement claims; and (iii) prepared comprehensive memoranda to advise the Committee on such issues.

98.      **Substantive Consolidation Analysis**.  Milbank also continued its work on a comprehensive analysis of substantive consolidation and the factors that courts generally consider when analyzing whether substantive consolidation is appropriate in a particular case. Specifically, Milbank focused on the substantive consolidation of LBHI with its major domestic subsidiaries and the legal challenges to the separateness of LBSNV.  In preparing such analyses and, as a result of new information included in the Debtors' First Amended Plan, Milbank continued in-depth research on the doctrine of substantive consolidation and other legal theories by which the assets and liabilities of a subsidiary may be pooled with its parent, and undertook extensive factual investigation on the issues, including document review and employee and creditor interviews.  In connection therewith, Milbank, together with the Committee's financial advisors, further analyzed the potential applicability of the principles articulated in such cases to the facts and circumstances of LBHI's major domestic subsidiaries and LBSNV.  Milbank researched and drafted several comprehensive memoranda on the foregoing issues and their implications for the Debtors' estates, LBSNV's estate and creditor recoveries, and made numerous presentations to the Committee with respect thereto.

99.      **Plan Discovery Protocol**.  Finally, in response to the document request served by the Ad Hoc Group on the Debtors seeking discovery on plan issues, Milbank, the Debtors and certain other creditor groups sought to develop a comprehensive protocol by which creditors could take discovery on plan-related matters (the "Plan Discovery Protocol").  The

46

Plan Discovery Protocol was intended to ensure that the Debtors' unsecured creditors had access to adequate information so that, with proper confidentiality restrictions in place, they could review the pertinent information to make informed decisions on plan issues.  Milbank assisted the Debtors in formulating procedures for discovery on plan-related matters, which led to the Plan Discovery Protocol, which the Court approved on April 14, 2011 [Docket No. 16003].

100.    Following the approval of the Plan Discovery Protocol, the Committee was appointed as the Designated Party under the terms of the protocol on May 19, 2011 [Docket No. 16984].  In such role, Milbank was responsible for performing the Committee's responsibilities as a facilitator and intermediary for Discovery Requests, as outlined in the Plan Discovery Protocol.  Milbank analyzed each of the competing disclosure statements and plans of reorganization in order to prepare preliminary suggested document requests related to Plan Issues, as defined in the Plan Discovery Protocol.  Additionally, during the Eighth Interim Compensation Period, Milbank maintained a database of each of the discovery participants and served as a general informational resource regarding the Plan Discovery Protocol.

T.    **Disclosure Statement/Solicitation/Voting**

101.    During the Eighth Interim Compensation Period, Milbank reviewed the Debtors' First Amended Disclosure Statement as well as the Debtors' Motion (i) for Approval of the Disclosure Statement and the Form and Manner of Notice of the Disclosure Statement Hearing, (ii) Establishing Solicitation and Voting Procedures, (iii) Scheduling a Confirmation Hearing, and (iv) Establishing Notice and Objection Procedures for Confirmation of the Debtors' Joint Chapter 11 Plan (the "Disclosure Statement Approval Motion") [Docket No. 15078].  Milbank researched and analyzed numerous legal issues related to (i) the Disclosure

47

Statement Approval Motion, (ii) the Debtors' proposed solicitation and voting procedures and (iii) potential deficiencies in the Debtors' First Amended Disclosure Statement in light of the disclosures required under section 1125 of the Bankruptcy Code.

102.    On March 29, 2011, the Ad Hoc Group filed a motion requesting that the Ad Hoc Group Plan and Disclosure Statement (the "Ad Hoc Group Disclosure Statement") be heard concurrently with the Debtors' First Amended Plan and Disclosure Statement [Docket No. 15431]. In response thereto, Milbank drafted and filed with the Court a response [Docket No. 15774] in which the Committee requested that the Court (i) permit the hearing on the Ad Hoc Group Disclosure Statement (and any other disclosure statements filed and served at least twenty-eight days prior to the deadline for objections to the Debtors' First Amended Disclosure Statement) to proceed concurrently with the hearing on the Debtors' First Amended Disclosure Statement and (ii) schedule a status conference to discuss coordinating the approval process for all disclosure statements that are filed and noticed for hearing on June 28, 2011.

U.    **Claims Analysis**

103.    **Claims Database**. Milbank continued, during the Eighth Interim Compensation Period, to refine the database of the Debtors' and certain of the Foreign Affiliates' debt offering documents (the "Database") that was created during the First Interim Compensation Period. Milbank also expanded the Database to cover debt offerings by LBSNV. Milbank continued to use the Database to develop and present summary forensic capital structure information to the Committee and its advisors, as well as to answer individual queries from the Committee and the public about specific Lehman debt instruments. The Database is used by Milbank and the Committee's financial advisors on a regular basis to understand the Debtors' and certain Foreign Affiliates' capital structures, review proofs of claim, establish a

48

basis upon which to determine and validate claim amounts, and analyze substantive

consolidation, intercompany, preference and other potential issues.  Access to the Database has

proven invaluable to the Committee and its advisors, particularly with respect to the matters

related to the claims reconciliation process and the Plan.

104.    **Capital Structure Analysis and Classification**.  Milbank expended

consideration time analyzing numerous proofs of claim filed against the Debtors, valuations of

such claims, and proposed settlements thereof.  Milbank reviewed and analyzed claims based on

guarantees, make-whole arrangements, warrants, certificates, notes, derivatives, repurchase

agreements, security collateral agreements, master custody agreements, structured securities,

and residential mortgage backed securities, and intercompany claims, among others, to analyze

the proposed classification of claims set forth in the Debtors' First Amended Plan.  Milbank

also reviewed and analyzed issues affecting the valuation and settlement of such claims,

including alternative dispute resolution procedures, exchange rate analysis, derivative valuation,

and the rights of subrogation, setoff, indemnification and restitution.

105.    **Omnibus Claims Objections**.  Milbank reviewed and analyzed the

Debtors' omnibus objections to claims, and spoke regularly with the Debtors and their counsel

regarding such objections.  In that connection, Milbank researched and analyzed legal issues

and responded to various creditor inquiries regarding objections to such creditors' claims.

## V.    <u>Other Bankruptcy Motions and Matters</u>

106.    After the deadline for bringing avoidance actions passed on September

15, 2010 and tolling agreements were executed with various counterparties, Milbank continued

to work with the Debtors, the Debtors' counsel and advisors, the Committee's financial

advisors, the Committee's conflicts counsel, the SIPA Trustee and the SIPA Trustee's advisors

to, among other things, to (i) identify and analyze categories of pre- and post-petition transfers
potentially subject to avoidance and recovery; (ii) analyze the prepetition financial condition of
the Debtors to determine whether the Debtors were insolvent and/or undercapitalized during any
period for purposes of pursuing preference and constructive fraudulent transfer claims;
(iii) investigate and analyze particular transfers identified as potential avoidance targets; (iv)
analyze potential legal issues and defenses that might arise in connection with the pursuit of any
avoidance actions; and (v) develop potential litigation strategies.

**W.   <u>Non-Derivative Adversary Proceedings Preparation and Litigation</u>**

107.   During the Eighth Interim Compensation Period, Milbank researched and
prepared memoranda regarding the claims and issues raised by a wide range of pending and
potential lawsuits and settlements impacting the Debtors' estates.  Milbank also held
teleconferences and meetings, both internally and with the Debtors, and provided regular
updates to the Committee regarding numerous adversary proceedings related to the Chapter 11
Cases.

108.   More specifically, excluding cases in which the Committee's interests are
represented by the Committee's conflicts counsel, Milbank monitored developments in and
provided updates in the form of reports and presentations to the Committee with respect to
(i) all pending and potential adversary proceedings commenced, or to be commenced, in this
Court; (ii) prepetition lawsuits commenced against the Debtors and pre- and post-petition
lawsuits against non-Debtor affiliates, officers, directors, and related parties; (iii) litigation
issues similar to those raised, or to be raised, in the Chapter 11 Cases; and (iv) contested matters
in the Chapter 11 Cases (collectively, the "<u>Monitored Matters</u>").  When appropriate and directed
by the Committee, Milbank intervened in the Monitored Matters, prepared pleadings and

participated in oral arguments and other proceedings with respect to the Monitored Matters on the Committee's behalf.

109.    In connection with the Monitored Matters, Milbank reviewed and analyzed proposed settlement agreements and advised the Committee regarding the same. Milbank also participated in numerous settlement negotiations, conferences and mediations with respect to the Monitored Matters on behalf of the Committee.

110.    In addition, Milbank sought discovery from a third party, and conducted research to assess the viability of potential claims against such party.  In this connection, Milbank continued to review documents from two sources:  (i) the Debtors' "Stratify" database, which contains documents that Lehman submitted in connection with the Examiner's investigation of various prepetition issues (the "Stratify Documents"); and (ii) documents received from various third parties in response to the Committee's motions seeking the production of documents pursuant to Rule 2004 of the Bankruptcy Rules and/or informal discovery requests (the "2004 Documents").  Milbank reviewed the results of its extensive discovery process and made various presentations to the Committee, which ultimately culminated in the Committee's support for pursing claims against such third party.  Milbank continues to review legal theories and engage in discussions with the Debtors regarding such potential claims.

111.    As with any complex litigation handled by Milbank, there were generally two levels of review of the Stratify and 2004 Documents.  The first level entailed review of the relevant documents for responsiveness and issue coding, which review was generally assigned to the most junior associates.  The second level entailed review of selected documents by more senior attorneys involved in assembling and assessing the evidence required to establish the

proposed claims.  The Committee's financial advisors also participated in such document review where the documents at issue were primarily financial in nature.  Throughout this process, every effort was made to avoid duplication of effort by carefully allocating the review tasks among attorneys and directing the financial advisors to review only those portions of the relevant databases requiring their analysis.

**X.**    **Firm's Own Billing/Fee Applications**

112.    During the Eighth Interim Compensation Period, Milbank reviewed the Fee Statements for, among other purposes, compliance with the Interim Compensation Order, the Local Guidelines and the Fee Committee Guidelines.  Milbank also prepared and served its Fee Statements on all parties, as required by the Interim Compensation Order.

113.    In connection with the appointment of the new Independent Member of the Fee Committee, Milbank reviewed and analyzed matters related to the Amended Fee Protocol, and corresponded regularly with the members of the Fee Committee and the other professionals retained in the Chapter 11 Cases regarding such matters.  Additionally, Milbank continued to work cooperatively with the Fee Committee to settle certain outstanding issues identified in the Fee Committee reports pertaining to the retained professionals' Sixth Interim Fee Applications.

**Y.**    **Third Party Retention/Fee Application/Other Issues**

114.    During the Eighth Interim Compensation Period, Milbank reviewed the retention applications of Foster, Graham, Milstein & Calisher, LLP; Latham & Watkins LLP, and others, as certain of these professionals originally retained as ordinary course professionals pursuant to the Court's Order Pursuant to Sections 105(a), 327, 328 and 330 of the Bankruptcy Code Authorizing the Debtors to Employ Professionals Utilized in the Ordinary Course of

Business, dated November 5, 2008 (the "OCP Order") [Docket No. 1394], exceeded the

$1 million cap on fees during the pendency of the Chapter 11 Cases established in the OCP

Order.

115.    Milbank also reviewed the monthly fee statements received from other

professionals pursuant to the Interim Compensation Order.  Finally, Milbank assisted in the

filing and service of the seventh interim fee applications of other Committee professionals.

## IV.

## ALLOWANCE OF COMPENSATION

116.    The professional services rendered by Milbank have required a high

degree of professional competence and expertise to address, with skill and dispatch, the

numerous issues requiring evaluation and action by the Committee.  The services rendered to

the Committee were performed efficiently, effectively and economically, and the results

obtained to date have benefited not only the members of the Committee, but also the unsecured

creditors of each of the Debtors' estates.

117.    The allowance of interim compensation for services rendered and

reimbursement of expenses in bankruptcy cases is expressly provided for in section 331 of the

Bankruptcy Code:

> Any professional person . . . may apply to the court not more than once
> every 120 days after an order for relief in a case under this title, or more
> often if the court permits, for such compensation for services rendered . . .
> as is provided under section 330 of this title.

11 U.S.C. § 331.

118.    With respect to the level of compensation, section 330(a)(1)(A) of the

Bankruptcy Code provides, in pertinent part, that the Court may award to a professional person,

"reasonable compensation for actual, necessary services rendered."  Section 330(a)(3), in turn,

provides that:

> In determining the amount of reasonable compensation to be awarded to
> . . . [a] professional person, the court shall consider the nature, the extent,
> and the value of such services, taking into account all relevant factors,
> including –
>
> (A)    the time spent on such services;
>
> (B)    the rates charged for such services;
>
> (C)    whether the services were necessary to the administration of, or
>        beneficial at the time which the service was rendered toward the
>        completion of, a case under this title;
>
> (D)    whether the services were performed within a reasonable amount
>        of time commensurate with the complexity, importance, and nature
>        of the problem, issue, or task addressed;
>
> (E)    with respect to a professional person, whether the person is board
>        certified or otherwise has demonstrated skill and expertise in the
>        bankruptcy field; and
>
> (F)    whether the compensation is reasonable based on the customary
>        compensation charged by comparably skilled practitioners in cases
>        other than cases under this title.

11 U.S.C. § 330(a)(3).

119.    The congressional policy expressed above provides for adequate

compensation in order to continue to attract qualified and competent professionals to

bankruptcy cases.  In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 850 (3d Cir. 1994)

("Congress rather clearly intended to provide sufficient economic incentive to lure competent

bankruptcy specialists to practice in the bankruptcy courts.") (citation and internal quotation

marks omitted); In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 18 (Bankr. S.D.N.Y.

1991) ("Congress' objective on requiring that the market, not the Court, establish attorneys'

rates was to ensure that bankruptcy cases were staffed by appropriate legal specialists.").

120.    In assessing the "reasonableness" of the fees requested, courts have

looked to a number of factors, including those first enumerated by the Fifth Circuit in In re First

Colonial Corp. of America, 544 F.2d 1291, 1298-99 (5th Cir. 1977), and thereafter adopted by

most courts.[18]  See In re Nine Assocs., Inc., 76 B.R. 943, 945 (S.D.N.Y. 1987) (adopting First

Colonial/Johnson analysis); In re Cuisine Magazine, Inc., 61 B.R. 210, 212-13 (Bankr. S.D.N.Y

1986) (same); see generally 3 Collier on Bankruptcy ¶ 330.04[3] (Lawrence P. King, et al., eds.,

15th rev. ed. 2009) (enumerating First Colonial and Johnson as the "leading cases to be

considered in determining a reasonable allowance of compensation").  Milbank respectfully

submits that the consideration of these so-called Johnson factors should result in this Court's

allowance of the full compensation requested.

(A)    The Time and Labor Required.  The Debtors' cases are among the largest, most
complex and active bankruptcy cases ever filed.  Accordingly, the professional
services rendered by Milbank on behalf of the Committee have required the
continuous expenditure of substantial time and effort, under time pressures which
sometimes required the performance of services late into the evening and, on a
number of occasions, over weekends and holidays.  The services rendered
required a high degree of professional competence and expertise in order to be
administered with skill and dispatch.

(B)    The Novelty and Difficulty of Questions.  Novel and complex issues have arisen
in the course of these Chapter 11 Cases, and it is anticipated that other such issues
will be encountered.  In these cases, as in many others in which the firm is
involved, Milbank's effective advocacy and creative approach to problem solving
have helped clarify and resolve difficult issues and will continue to prove
beneficial.

(C)    The Skill Requisite to Perform the Legal Services Properly.  Milbank believes
that its recognized expertise in the area of financial restructuring, its ability to
draw from highly experienced professionals in other areas of its practice such as
securities, structured products, asset divestiture, litigation, and regulatory law and

---

[18]    The factors embraced by the Fifth Circuit in First Colonial were first adopted by the Fifth Circuit's decision
in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), except that First Colonial also
included the "spirit of economy" as a factor expressly rejected by Congress in enacting section 330 of the
Bankruptcy Code.  Stroock & Stroock & Lavan v. Hillsborough Holdings Corp. (In re Hillsborough
Holdings Corp.), 127 F.3d 1398, 1403 (11th Cir. 1997).  A majority of the First Colonial factors are now
codified in section 330(a)(3).  3 Collier on Bankruptcy ¶ 330.04[3].

its practical approach to the resolution of issues help maximize the distributions to the unsecured creditors of each of the Debtors.

(D)     The Preclusion of Other Employment by Applicant Due to Acceptance of the Case.  Due to the size of Milbank's financial restructuring department and the firm as a whole, Milbank's representation of the Committee has not precluded the acceptance of new clients.  However, the number of matters needing attention on a continuous basis has required numerous Milbank attorneys, across multiple practice groups, to commit significant portions of their time to these cases.

(E)     The Customary Fee.  The compensation sought herein is based upon Milbank's normal hourly rates for services of this kind.  Milbank respectfully submits that the compensation sought herein is not unusual given the magnitude and complexity of these cases and the time dedicated to the representation of the Committee.  Such compensation is commensurate with fees Milbank has been awarded in other cases, as well as with fees charged by other attorneys of comparable experience.

(F)     Whether the Fee is Fixed or Contingent.  Milbank charges customary hourly rates, adjusted annually, for the time expended by its attorneys and paraprofessionals in representing the Committee, and Milbank's fee is not outcome dependent.

(G)     Time Limitations Imposed by Client or Other Circumstances.  As stated above, Milbank has been required to attend to various issues as they have arisen in these cases.  Often, Milbank has had to perform these services under significant time constraints requiring attorneys and paraprofessionals assigned to these cases to work evenings and on weekends.

(H)     The Amount Involved and Results Obtained.  The Committee represents the interests of unsecured creditors of each of the Debtors that, in the aggregate, hold unsecured claims estimated to be valued in the hundreds of billions of dollars in what has been widely described as the largest chapter 11 case ever filed.  The Committee's participation, with Milbank's counsel and guidance, has greatly contributed to the efficient administration and prospects for reorganization of these cases.

(I)     The Experience, Reputation and Ability of the Attorneys.  Milbank has a sophisticated and nationally recognized corporate reorganization and financial restructuring practice, and Milbank attorneys involved in this representation have played a major role in numerous complex restructurings including, for example, the chapter 11 cases of Lyondell Chemical Company, Nortel Networks Inc., Capmark Financial Group Inc., Hayes Lemmerz International, Inc., DBSD North America, Inc., Refco, Inc., Enron Corp., TOUSA, Inc., Vicorp, Interstate Bakeries Corp., Winn-Dixie Stores, Inc., Fruit of the Loom Inc., Adelphia Communications Corp., Maxxim Medical Group, Inc., RCN Corp., US Airways Group, Inc., Global Crossing Ltd., Fleming Companies, Inc., Dairy Mart Convenience Stores, Inc., Lernout & Hauspie Speech Products N.V., Teligent, Inc., World Access,

Inc., ORBCOMM Global, L.P., ICO Global Communications Inc., Safety-Kleen Corp., HomePlace Stores, Inc., Hvide Marine, Inc., Sun TV and Appliances, Inc., Seven-Up/RC Bottling Company of Southern California, Inc. and Ames Department Stores, Inc.  Milbank's experience enables it to perform the services described herein competently and expeditiously.

(J)  <u>The "Undesirability" of the Case</u>.  These cases are not undesirable but, as already indicated, have required a significant commitment of time from many of Milbank's attorneys.

(K)  <u>Nature and Length of Professional Relationship</u>.  Milbank was selected as the Committee's counsel shortly after the Committee's formation, on September 17, 2008, and was retained <u>nunc</u> <u>pro</u> <u>tunc</u> to that date pursuant to an order of the Court dated November 21, 2008.  Milbank has been rendering services continuously to the Committee since the Committee was formed, and Milbank has rendered such services in a necessary and appropriate manner.

121.    The total time spent by Milbank attorneys and paraprofessionals during the Eighth Interim Compensation Period was 23,866.60 hours and has a fair market value of $14,678,049.25.  As shown by this Application and supporting exhibits, Milbank's services were rendered economically and without unnecessary duplication of efforts.  In addition, the work involved, and thus the time expended, was carefully assigned in consideration of the experience and expertise required for each particular task.

### V.

### EXPENSES

122.    Milbank has incurred a total of $794,661.63 in expenses in connection with representing the Committee during the Eighth Interim Compensation Period.  Milbank records all expenses incurred in connection with the performance of professional services.  A schedule of expenses by project billing category, as well as a summary of these expenses and detailed descriptions of these expenses, is annexed hereto as Exhibit "<u>C</u>."

123.    In connection with the reimbursement of expenses, Milbank's policy is to charge its clients in all areas of practice for expenses, other than fixed and routine overhead

expenses, incurred in connection with representing its clients.  The expenses charged to

Milbank's clients include, among other things, telephone and telecopy toll and other charges,

mail and express mail charges, special or hand delivery charges, photocopying charges, out-of-

town travel expenses, local transportation expenses, expenses for working meals, computerized

research and transcription costs.

124.    Milbank charges the Committee for these expenses at rates consistent

with those charged to Milbank's other bankruptcy clients, which rates are equal to or less than

the rates charged by Milbank to its non-bankruptcy clients.  Milbank seeks reimbursement from

the Debtors at the following rates for the following expenses:  (i) ten cents ($0.10) per page for

photocopying and printing; (ii) fifty cents ($0.50) for color copies; (iii) no charge for incoming

facsimiles; (iv) toll charges only for outgoing facsimiles; and (v) an average of nineteen cents

($0.19) per minute for long distance.  Specifically, with respect to phone charges over $100.00,

such charges were generally accrued in connection with (i) conference calls in which the

Committee, the Debtors and/or other parties in interest participated; and (ii) mobile phone

charges for selected attorneys who were required to participate in Committee conference call

while traveling on Committee business.

125.    In accordance with section 330 of the Bankruptcy Code, the Local

Guidelines and the U.S. Trustee Guidelines, Milbank seeks reimbursement only for the actual

cost of such expenses to Milbank.[19]  Additionally, Milbank has further limited and defined its

expenses in accordance with the Fee Committee Guidelines.

---

[19]    The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts
which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a
retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted
cost of such expenses.

126.    In providing or obtaining from third parties services which are reimbursable by clients, Milbank does not include in such reimbursable amount any costs of investment, equipment or capital outlay.

127.    Milbank regularly charges its non-bankruptcy clients for ordinary business hourly fees and expenses for secretarial, word processing and other staff services because such items are not included in the firm's overhead for the purpose of setting the billing rates.  However, in light of discussions with Fee Committee, no reimbursement for the charges incurred in connection with such services is requested in the Application.

128.    Attorneys at Milbank have not incurred expenses for luxury accommodations or deluxe meals.  The Application does not seek reimbursement of air travel or train fare expenses in excess of coach fares.[20]  Further, all overtime transportation costs were incurred after 8:00 p.m. for transporting timekeepers to their respective homes.  Moreover, although overtime meal expenses are listed in their actual amounts, per the Fee Committee guidelines, Milbank does not seek reimbursement for overtime meal expenses beyond the $20.00 maximum per meal.  Throughout the Eighth Interim Compensation Period, Milbank has been keenly aware of cost considerations and has tried to minimize the expenses charged to the Debtors' estates.

## VI.

## NOTICE

129.    Notice of this Application has been given to (a) the Debtors, (b) counsel for the Debtors, (c) the United States Trustee, and (d) the Fee Committee.

---

[20]    Except in the instance of Amtrak's Acela Express train, where the lowest class is "business class."

## VII.

## CONCLUSION

WHEREFORE, Milbank respectfully requests the Court to enter an order conforming to the amounts set forth in Fee Schedule A(1) attached hereto as Exhibit "D" (i) allowing Milbank (a) interim compensation for professional services rendered as counsel for the Committee during the Eighth Interim Compensation Period in the amount of $14,678,049.25 and (b) reimbursement of expenses incurred in connection with rendering such services in the aggregate amount of $794,661.63 for a total award of $15,472,710.88; (ii) authorizing and directing the Debtors to pay to Milbank $12,930,199.25 which is an amount equal to the difference between (a) this $15,472,710.88 award and (b) $2,542,511.63, the total of all amounts that the Debtors have previously paid to Milbank pursuant to the Interim Compensation Order for services rendered and expenses incurred during the Eighth Interim Compensation Period; and (iii) granting such further relief as is just.

Dated: New York, New York
      August 15, 2011

**MILBANK, TWEED, HADLEY & McCLOY LLP**

By:  _/s/ Dennis F. Dunne_              _
Dennis F. Dunne
Evan R. Fleck
Dennis C. O'Donnell
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

# EXHIBIT A

**Certification**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------------------------------- x
                                          :
In re:                                    :         Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :         08-13555 (JMP)
                                          :
                      Debtors.            :         (Jointly Administered)
                                          :
--------------------------------------------------------- x
```

**CERTIFICATION UNDER GUIDELINES FOR FEES AND DISBURSEMENTS
FOR PROFESSIONALS IN RESPECT OF EIGHTH APPLICATION OF MILBANK,
TWEED, HADLEY & McCLOY LLP, COUNSEL TO
OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR INTERIM
ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND
FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM
FEBRUARY 1, 2011 THROUGH AND INCLUDING MAY 31, 2011**

Pursuant to the Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991, and

amended on April 21, 1995 and November 25, 2009 (collectively, the "Local Guidelines"), the

United States Trustee Guidelines for Reviewing Applications for Compensation and

Reimbursement of Expenses Filed Under 11 U.S.C. § 330, effective January 30, 1996 (the "U.S.

Trustee Guidelines"), and the guidelines contained in the Fee Committee's Confidential Letter

Report on the Sixth Interim Application of Milbank, Tweed, Hadley & McCloy LLP, dated April

12, 2011 (the "Fee Committee Guidelines" and, together with the Local Guidelines and the U.S.

Trustee Guidelines, the "Guidelines"), the undersigned, a member of the firm Milbank, Tweed,

Hadley & McCloy LLP ("Milbank"), counsel to the Official Committee of Unsecured Creditors of

Lehman Brothers Holdings Inc., Lehman Brothers Special Financing Inc., Lehman Commercial

Paper Inc. and their affiliated debtors and debtors in possession in the above-captioned cases

(collectively, the "<u>Debtors</u>"), hereby certifies with respect to Milbank's eighth application for allowance of compensation for services rendered and for reimbursement of expenses, dated August 15, 2011 (the "<u>Application</u>"), for the period of February 1, 2011 through and including May 31, 2011 (the "<u>Eighth Interim Compensation Period</u>") as follows:

1.    I am the professional designated by Milbank in respect of compliance with the Guidelines.

2.    I make this certification in support of the Application, for interim compensation and reimbursement of expenses for the Eighth Interim Compensation Period, in accordance with the Local Guidelines.

3.    In respect of section A.1 of the Local Guidelines, I certify that:

a.    I have read the Application.

b.    To the best of my knowledge, information and belief formed after reasonable inquiry, the fees and disbursements sought fall within the Guidelines.

c.    Except to the extent that fees or disbursements are prohibited by the Guidelines, the fees and disbursements sought are billed at rates in accordance with practices customarily employed by Milbank and generally accepted by Milbank's clients.

d.    In providing a reimbursable service, Milbank does not make a profit on that service, whether the service is performed by Milbank in-house or through a third party.[1]

4.    In respect of section A.2 of the Local Guidelines, I certify that Milbank has provided statements of Milbank's fees and disbursements previously accrued, by filing and serving monthly statements in accordance with the Interim Compensation Order (as defined in the Application), except that completing reasonable and necessary internal accounting and

---

[1]    The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted cost of such expenses.

review procedures have at times precluded filing fee statements within the time periods

established in the Interim Compensation Order.

5.   In respect of section A.3 of the Local Guidelines, I certify that copies of the

Application are being provided to (a) the Court, (b) the Debtors, (c) counsel for the Debtors, (d)

the Office of the United States Trustee, and (e) the Fee Committee.

6.   I certify that the Application for interim compensation and reimbursement of

expenses for the Eighth Interim Compensation Period has been prepared in accordance with the

Fee Committee Guidelines.

7.   Pursuant to the Fee Committee Guidelines, I certify that all transportation

charges fall within the reimbursement rule for transportation expenses.

Dated:        New York, New York
              August 15, 2011


                              By:  /s/ Dennis F. Dunne
                                    Dennis F. Dunne

# **EXHIBIT B**

**Time Entry Records**[1]

---

[1]     Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; and (v) the Fee Committee.

# **EXHIBIT C**

**Expenses**[1]

---

[1]    Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; (v) the Fee Committee.

# EXHIBIT D

**Fee Schedule A(1)**

CASE NO.:  08-13555 (JMP) (Jointly Administered)

CASE NAME:  IN RE LEHMAN BROTHERS HOLDINGS INC., et al.

| FIRST INTERIM FEE PERIOD SEPTEMBER 17, 2008 – JANUARY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 4/10/09 Docket No. 3337 | $12,132,376.00 | $12,062,428.50 | $1,213,237.60 | $1,143,247.54 | $668,388.72 | $668,346.18 |

| SECOND INTERIM FEE PERIOD FEBRUARY 1, 2009 – MAY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 8/14/09 Docket No. 4821 | $16,829,521.00 | $16,233,210.42 | $1,682,952.10 | $1,371,217.28 | $1,019,754.61 | $1,006,175.08 |

| THIRD INTERIM FEE PERIOD JUNE 1, 2009 – SEPTEMBER 30, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & | 12/14/09 | $10,881,540.00 | $10,689,053.40 | $1,088,154.00 | $795,598.60 | $583,803.10 | $483,734.30 |

FEE SCHEDULE A(1)

| McCloy LLP | Docket No. 6203 | | | | | | |
|---|---|---|---|---|---|---|---|

| **FOURTH INTERIM FEE PERIOD**<br>**OCTOBER 1, 2009 – JANUARY 31, 2010** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 4/16/10 Docket No. 8432 | $13,595,778.50 | $12,908,822.79 | $1,359,577.85 | $6,211,791.04 | $451,410.54 | $404,795.38 |

| **FIFTH INTERIM FEE PERIOD**<br>**FEBRUARY 1, 2010 – MAY 31, 2010** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 8/16/10 Docket No. 10804 | $19,450,342.75 | $19,041,118.43 | $1,945,034.28 | $11,674,570.75 | $851,804.27 | $847,210.46 |

| **SIXTH INTERIM FEE PERIOD**<br>**JUNE 1, 2010 – SEPTEMBER 30, 2010** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 12/14/10 Docket No. 13493 | $18,359,367.75 | $18,191,238.85 | $1,835,936.78 | $3,681,873.55 | $792,924.64 | $787,642.86 |

**FEE SCHEDULE A(1)**

| SEVENTH INTERIM FEE PERIOD OCTOBER 1, 2010 – JANUARY 31, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 6/2/11 Docket No. 17343 | $14,180,784.75 | [ ] | $2,818,286.54 | $[ ] | $633,261.80 | [ ] |

| EIGHTH INTERIM FEE PERIOD FEBRUARY 1, 2011 – MAY 31, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 8/15/11 Docket No. [    ] | 14,678,049.25[1] | [ ] | $2,935,609.85 | [ ] | $794,661.63 | [ ] |

---

[1]    The amount requested on account of fees and expenses incurred by Milbank during the Eighth Interim Compensation Period was $9,109.89 less than the sum of fees and expenses set forth in the Fee Statements served during the Eighth Interim Compensation Period.

**FEE SCHEDULE A(1)**