HEARING DATE AND TIME: September 28, 2011 at 10:00 a.m.
RESPONSE DEADLINE: August 17, 2011

DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, New York 10019
Tel.: 212-277-6746
Fax: 212-277-6501
Deborah A. Skakel
Shaya M. Berger
Courtney E. Topic

*Attorneys for 2138747 Ontario Ltd. and 6785778 Canada Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                                        :   Chapter 11
In re                                                   :
                                                        :   Case No. 08-13555 (JMP)
LEHMAN BROTHERS HOLDINGS, INC.,                         :   (Jointly Administered)
*et al.*,                                               :
                                                        :
                        Debtors.                        :
                                                        :
------------------------------------------------------- x

## OPPOSITION TO DEBTORS' OBJECTION TO PROOFS OF CLAIM FILED BY 2138747 ONTARIO LTD. AND 6785778 CANADA INC. (CLAIM NOS. 33583 AND 33586)

2138747 Ontario Ltd. ("Ontario") and 6785778 Canada Inc. ("Canada" and, together with Ontario, "Claimants") hereby submit this Opposition (the "Opposition") to the Objection to Proofs of Claim Filed by 2138747 Ontario Ltd. and 6785778 Canada Inc. (Claim Nos. 33583 and 33586), dated July 11, 2011 (the "Objection"), of Lehman Brothers Holding Inc. ("LBHI") and its affiliated debtors in the above-referenced case (collectively, the "Debtors"), and respectfully represent as follows:

DOCSNY-475441v1

**Preliminary Statement**

1. The gravamen of the Debtors' Objection is that Claimants are not parties to the transactional document that is referenced in and attached to the Proofs of Claim filed by Ontario (Claim No. 33583) an Canada (Claim No. 33586) (together, the "Claims"). Yet the Debtors' myopic criticism of the Claims ignores the other related transactional documents – the Debtors' breach of which was likewise referenced in the Claims and a copy of which are now attached hereto.

2. The Debtors also overlook the overarching, single purpose of those related transactional documents and the Debtors' integral contractual role in implementing and effectuating that purpose – i.e., the Debtors, through a wholly-owned investment vehicle, became the controlling shareholder of SkyPower Corp ("SkyPower") – the same company in which Claimants are minority shareholders – and agreed to be the exclusive provider of the requisite funding for the wind and solar energy projects that were the lifeblood of SkyPower's business, which funding was therefore the lifeblood of Claimants' equity interests.

3. The Debtors' breaches of the obligations under these related agreements are the basis for the Claims. The Claims themselves articulated this contractual predicate. This Opposition amplifies that articulation, provides additional documentary support and also sets forth the legal grounds underlying these breach of contract claims. The Claims should therefore be allowed.

**Background**

4. In their Objection, Debtors correctly assert that LBHI became an indirect shareholder in SkyPower in June 2007. Objection ¶ 5. But the Debtors' connection to SkyPower and Claimants as a result of the multifaceted transaction that closed on June 11, 2007 was not simply that of an indirect shareholder. A review of that transaction reveals the extent of

the Debtors' role and amplifies the nexus between the Debtors and Claimants underlying the Claims.

5. Simply put, the June 2007 transaction was structured to effectuate the essential purpose of the deal – i.e., Lehman Brothers was to become the controlling shareholder of SkyPower and, through the exercise of rights to purchase additional SkyPower stock, act as the exclusive source of equity investment to fund SkyPower's third-party wind and solar projects.

6. That this was the intent of the parties – particularly the Debtors – is well documented.

- The June 1, 2007 letter of intent (the "Letter of Intent") signed by Lehman Brothers Inc. Managing Director John Veech (a copy of which is annexed hereto as Exhibit 1) states:

  "This letter confirms the agreement of Lehman Brothers and certain of its affiliates ("Lehman"), Kerry Adler ("Adler") as an owner of shares in and having the right to exercise "drag" rights on all other shareholders (collectively with Adler, the "Selling Shareholders") of SkyPower Corporation ("SkyPower" or the "Company" and collectively with Lehman and Selling Shareholders, the "Parties") and the Company to enter into a transaction (the "Transaction") pursuant to which Lehman will (1) acquire a 50% interest in an acquisition vehicle ("Acquisitionco") which in turn will acquire 100% of the Selling Shareholders' interests in SkyPower and (2) *subject to Lehman's project by project approval rights, fund the equity investment necessary to complete development of the Company's proposed projects.*" See Ex. 1 at p. 1 (emphasis added).

- The June 11, 2007 memorandum prepared by Goodmans LLP, Canadian counsel who represented the Lehman entities in connection with the June 2007 transaction, served as the closing memo for that transaction (the "Goodmans Steps Memo"). (A copy of the Goodmans Steps Memo is annexed hereto as Exhibit 2.) According to Lehman's counsel's "steps" memorandum (as it is referred to in the "Record Book Index" for the closing), multiple "transaction steps" were undertaken "pursuant to which Lehman Brothers Inc. ('Lehman'), indirectly through LB SkyPower Inc. ('Purchaser') will indirectly acquire a 50% interest" in SkyPower. See Ex. 2 at p. 1.

- In the "Closing Transaction" section of Goodmans Steps Memo, Lehman's counsel states:

3

"Lehman [Brothers Inc.] will subscribe for Class A common shares of Acquisitionco in consideration for cash of approximately $87,500,000 million [sic]. Acquisitionco will grant to Lehman [Brothers Inc.] rights (the "Rights") to acquire additional Class A common shares of Acquisitionco at the current per share valuation."

Id.

- This Steps Memo of Lehman's counsel then includes as one of the "Post-Closing Transactions":

"Future equity contributions by Lehman [Brothers Inc.] will be made in consideration for additional Class A common shares of Acquisitionco pursuant to the Rights."

Id. at p. 5.

7. The closing documents – in particular, the Stock Purchase Agreement and the Unanimous Shareholder Agreement – implemented the acquisition by Lehman of the controlling interest in SkyPower, established the mechanism by which Lehman was to acquire additional SkyPower stock and thereby positioned the parties for the post-closing equity contributions by Lehman to fund SkyPower's business.

8. The Stock Purchase Agreement, dated as of June 11, 2007 (the "Stock Purchase Agreement") (a copy of which – without Schedules or Exhibits – is annexed hereto as Exhibit 3), is by and between (among others) LB SkyPower Inc. (an entity created by Lehman to purchase the SkyPower equity interest), 1328392 Alberta ULC (an entity to which the minority shareholders transferred their SkyPower shares and from which LB SkyPower purchased those minority interests) and Claimants. Underscoring the single purpose of this multistep transaction is the Stock Purchase Agreement's definition of "Operative Agreements" – the Stock Purchase Agreement, the Unanimous Shareholder Agreement, the Rights Agreement (by which LB SkyPower obtained the "Rights" to purchase additional stock) and "any other support or other agreements to be entered into in connection with the transaction." Ex. 3, § 14.01 at p. 52.

9. As a result of the Lehman acquisition of its equity interest in SkyPower, the Lehman-SkyPower ownership structure was as follows:

Lehman Brothers Holding Inc.

↓ 100%

Lehman Brothers Inc.

↓ 100%

LB 1 Group Inc.

↓ 100%

LB SkyPower Inc.

Majority Shareholder + Rights ↓     ↓ Minority
 Shareholders (incl. Claimants)

1328392 Alberta

↓ 100%

SkyPower Corp.

As noted in the Goodsman Steps Memo, Lehman's acquisition vehicle acquired control over SkyPower "[a]s a result of these transactions." Ex. 2 at n.7.

10. The Unanimous Shareholder Agreement, made as of June 11, 2007 (the "Shareholder Agreement") (a copy of which – without Schedules or Exhibits – is annexed hereto as Exhibit 4), includes the same parties as those to the Stock Purchase Agreement. Under the Shareholder Agreement, "the written consent of Lehman [LB SkyPower]" was necessary to undertake virtually any corporate action of any significance – including the implementation of the development or operating plan and budget for each wind or solar electrical energy "Project"; and the "participation, development or construction . . . in or of any Project and the terms of any RFP bid submitted in connection with any RFP Project." Id. § 4.7(a)(i)-(ii), (iv).

11. Article VIII of the Shareholders Agreement provides for "Lehman Support and Third Party Project Equity." Id. at p. 23. Section 8.1 provides:

> "As and when determined by Lehman to be necessary to fund expenditures contemplated by an approved annual operating Budget for the Operating Plan, Lehman *will* exercise the Rights. Lehman in its discretion may also fund any Development Budget for the Corporation [1328392 Alberta] or any Subsidiary [e.g., SkyPower] by exercising the Rights."

Id. § 8.1 (emphasis added). Subject to an exception not applicable here, "Lehman's right to provide all follow-on equity capital shall be *exclusive*." Id. (emphasis added).

12. To satisfy its obligation to provide credit support for RFP Projects, "Lehman" was required to do the following:

> "Lehman *will* as appropriate either:
>
> (a) *provide reasonable assistance* to [SkyPower] or any other relevant Subsidiary in obtaining a credit rating, as required; or
>
> (b) *use commercially reasonable efforts* to provide a 'keep well', guarantee or other suitable arrangement, *in the necessary amounts* as applicable,
>
> to allow [SkyPower] or a Subsidiary to be competitive in a RFP process in which Lehman has agreed that [SkyPower] or a Subsidiary shall participate."

Id. § 8.2 (emphasis added).

13. The Shareholder Agreement prohibited Claimants from transferring their minority interest in SkyPower. Id. § 10.1. They and their investment were therefore wholly dependent on Lehman (in the form of LB SkyPower) – Lehman controlled the board of directors, management and operations; Lehman's provision of "all follow-on equity capital" was "exclusive"; and Lehman thereby dictated whether the Projects that were the lifeblood of SkyPower's business as well as Claimants' investment were funded.

DOCSNY-475441v1

14. As expressly contemplated by these transactional documents, "Lehman" – through LBHI – provided the requisite equity contribution in 2007 pursuant to an Equity Contribution Agreement, dated December 28, 2007. Likewise, the Amended and Restated Equity Contribution Agreement, dated as of February 22, 2008 (the "Equity Contribution Agreement," a copy of which – without Schedules or Exhibits – is annexed hereto as Exhibit 5), implements and effectuates "Lehman's" obligation to provide "follow-on equity capital." See Equity Contribution Agr. § 2.01 (LBHI "agrees to make one or more cash equity contributions" in connection with certain "Projects"). LBHI's defined "Equity Contribution Obligations" are unconditional and are not diminished by any transfer by LBHI of any of its direct or indirect equity interests in SkyPower. Id. § 6.01(e)-(f). As a result of equity infusions during 2007 and 2008, the Debtors (through their wholly-owned subsidiaries) owned almost 80% of SkyPower (plus the Rights to acquire additional shares).

15. With the Debtors' bankruptcy in September 2008 came the failure to fund SkyPower as required under, inter alia, the Shareholder Agreement and the Equity Contribution Agreement. And with that failure to fund came the dire financial straits that resulted in SkyPower filing a Canadian insolvency proceeding – and Claimants' investment being wiped out.

16. Because of their losses, Claimants filed their respective Proofs of Claim on September 22, 2009. These Claims specifically state that the Claimants' damages arise out of or relate to

> (i) LBHI's failure to adequately fund, or cause its direct or indirect subsidiaries to adequately fund, SkyPower; (ii) LBHI's breaches and defaults under an Equity Contribution Agreement dated February 22, 2008 (a copy of the agreement is attached hereto), and any other wrongful acts relating to the agreement; (iii) LBHI's, or its direct or indirect subsidiaries, breaches and defaults under other agreements,

7

and other wrongful acts, that were in any way associated with LBHI's investment in SkyPower; and (iv) related claims as a result of LBHI's bankruptcy filing.

17.  While Claimants did not attach the Stock Purchase Agreement or Shareholder Agreement to their Claims, the Claims plainly state that "LBHI, through intermediate holding companies, is a majority shareholder of SkyPower." Likewise, the Claims relate to the breach of LBHI "or its direct or indirect subsidiaries" to fund SkyPower. Finally, the breaches of the Shareholder Agreement provisions described herein certainly are "LBHI's, or its direct or indirect subsidiaries', breaches and defaults under [agreements other than the Equity Contribution Agreement], and other wrongful acts, that were . . . associated with LBHI's investment in SkyPower."

### I.  THE MINORITY SHAREHOLDERS CLAIMS SHOULD BE ALLOWED

18.  The Debtors argue that the Claims should be disallowed and expunged with prejudice "because they lack prima facie validity as they do not set forth any facts or legal basis in support of their asserted theories of liability" and as such, they "are wholly deficient under Bankruptcy Rule 3001(f)." Objection ¶ 14. Even if that were true, it would mean only that the Claims would lose their prima facie validity, not that they were subject to disallowance. In re Guidry, 321 B.R. 712, 714-15 (Bankr. N.D. Ill. 2005); see also In re Minbatiwalla, 424 B.R. 104, 120 (Bankr. S.D.N.Y. 2010) (holding that failure to attach documents cannot be the basis for disallowance of claim and therefore sustaining objection to claim without prejudice and allowing the filing of an amended claim to attach relevant documents).

19.  In this case, the Claims are in fact valid, because, as set forth in detail below, the facts stated in and language of the Claims support multiple legal grounds for imposing liability against the Debtors. Moreover, to the extent the Debtors are feigning ignorance, purportedly unaware of the transactional agreements referenced in the Claims – all of which were part of

LBHI's investment in SkyPower and therefore undoubtedly in the Debtors' possession – those agreements are attached hereto and support the Claims.[1] Finally, at the very least, the Claims should be afforded their prima facie validity under Bankruptcy Rule 3001(f) with respect to the Claimants' third-party beneficiary claim under the Equity Contribution Agreement (as set forth fully below), because that agreement (i) is expressly identified in the Claims; (ii) attached to the Claims; and (iii) has no provision expressly disclaiming the rights of third parties, as evident by the irrelevant provision upon which Debtors rely in the Objection. Objection ¶ 19. Accordingly, the Objection should be denied.

A. **All Of The Agreements To The Transaction Must Be Construed Together**

20. Contrary to the Debtors' assertions in their Objection, it is of no consequence that the agreements were not all between the same parties. TVT Records v. Island Def Jam Music Grp., 412 F.3d 82, 90 (2d Cir. 2005) (explaining that the critical legal query is not whether the documents at issue were between the same parties or imposed congruent obligations, but "whether the contracts were part of a single transaction intended to effectuate the same purpose").

21. It well settled that "'all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed

---

[1] To the extent the Debtors contend that Claimants must "establish the validity of the claims" (Objection ¶ 17 (emphasis added)), the imposition of that standard would improperly and without proper notice convert the "Sufficiency Hearing" into a "Merits Hearing" – thereby running afoul of this Court's Court-Ordered Claims Hearing Procedures and Alternative Dispute Resolution Procedures, so ordered on April 29, 2010. Likewise, it would be fundamentally unfair to handcuff Claimants with the temporary injunction imposed by the Court against discovery at this stage in the claims objection process – if the Debtors expect Claimants to "establish" the claims. See Fed. R. Bankr. P. 9014 (allowing discovery in contested matters – such as a claims objection – unless otherwise directed by the Court).

on different dates and were not all between the same parties.'" TVT Records, 412 F.3d at 89 (alternation in original) (quoting This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998)).

22. The agreements entered into by and among Claimants, LBHI, LB SkyPower, and other entities must be construed together, because they are all part of the same transaction and are designed to effectuate the same purpose – to use Lehman Brothers as a funding source and investor to support and grow SkyPower's business.

23. The parties likewise intended for the agreements to be read together as part of the single overall transaction. The agreements at issue and history of the transaction support that conclusion.

- The Stock Purchase Agreement expressly contemplates such a result, by broadly defining the Operative Agreements to include, among others, the Stock Purchase Agreement, the Rights Agreement, the Shareholder Agreement "and any other support or other agreement to be entered into in connection with the transaction." Ex. 3, Stock Purchase Agr. § 14.01. Notably, the Stock Purchase Agreement, Rights Agreement and Shareholders Agreement were all dated or made as of the closing date, June 11, 2007. Although the original and amended Equity Contribution Agreements were executed after the closing date, those agreements were contemplated as the essential post-closing step necessary to support the overall transaction by providing funding for SkyPower. The Equity Contribution Agreement is therefore exactly the type of agreement contemplated by the definition of Operative Agreement.

- The Letter of Intent, which was drafted by Lehman Brothers Inc., recognizes that the parties contemplated that the agreements were all part of one transaction. In that regard, the Letter of Intent defines the transaction as one in which "Lehman will (1) acquire a 50% interest in an acquisition vehicle ("Acquistionco") which in turn will acquire 100% of the Selling Shareholders' interests in SkyPower and (2) subject to Lehman's project by project approval rights, fund the equity investment necessary to complete development of [SkyPower's] proposed projects." Ex. 1, Letter of Intent, p. 1.

- The Goodmans Steps Memo explains the overall transaction and refers to the steps needed to accomplish LBI's investment in SkyPower, including all of the various agreements needed as part of the June 11, 2007 closing (including the Shareholders Agreement and Stock Purchase Agreement) as well as detailing the several agreements to be signed and steps to be taken

10

post-closing to effectuate the requirement of "Lehman" to make future equity contributions. Ex. 2.

24. Additionally, LBHI and LBI also maintain obligations under the various agreements as "Affiliates" of LB SkyPower. See Ex. 4, Shareholder Agr. § 1.1(c). For instance, as "Affiliates" of LB SkyPower, LBI and LBHI –

- Are responsible for being the sole source of equity investments for Lehman's investment vehicle (1328392 Alberta) and therefore the sole funding source for SkyPower. Id. §§ 6.1-6.2.

- Maintain the exclusive right to provide follow-on equity capital. Further, the entities are obligated to make SkyPower competitive in the RFP process and must provide reasonable assistance and use commercially reasonable efforts to do so. Id. §§ 8.1-8.3.

25. Accordingly, while the agreements were not all between the same parties, they were primarily executed on the same dates, the language of the agreements, the history of the transaction, and the internal cross-references in the agreements all support the conclusion that the agreements should be read together as part of one overall transaction. See TVT Records, 412 F.3d at 89-90 (holding that an interference claim against a non-signatory to one agreement, that was a signatory to other agreements, was barred because the agreements, though executed at different times, among different parties and including different obligations, were all intended to effectuate the same result and expressly contemplated the non-signatory's eventual participation in the project); This Is Me, Inc., 157 F.3d at 143 (upholding jury verdict that non-signatories to a contractual guaranty provision were liable under the contract because the various agreements at issue were all part of one transaction given the drafting history, cross-references to the various agreements, and the relationships among the parties and entities involved).

26. Construing the agreements together, LBI and LBHI breached their contractual obligations to Claimants by failing to provide funding and to allow SkyPower to be competitive in the RFP Process, as required by the Shareholder Agreement.

DOCSNY-475441v1

B.  **Claimants Are Third-Party Beneficiaries Of The Equity Contribution Agreement**

27. Given that all of the operative agreements should be read together as part of a single transaction, it is likewise apparent that the parties intended Claimants to be third-party beneficiaries of the Equity Contribution Agreement. Whether a party qualifies as a third-party beneficiary to an agreement is a matter of the parties' intent. MK W. St. Co. v. Meridien Hotels, Inc., 184 A.D.2d 312, 313, 584 N.Y.S.2d 310, 312 (1st Dep't 1992); Res. Funding Corp. v. Congrecare, Inc., No. 91 Civ. 8163 (RWS), 1994 WL 24825, at *8 (S.D.N.Y. Jan. 21, 1994).

28. The Equity Contribution Agreement between LB SkyPower and LBHI establishes the parameters through which LBHI must make equity contributions to SkyPower. Specifically, under the Equity Contribution Agreement, LBHI maintains the unconditional obligation to provide equity contributions. Ex. 5, Equity Contribution Agr. §§ 2.01, 6.01(e)-(f).

29. The contractually-mandated equity contributions were designed to keep SkyPower a competitive, profitable and operating business. Thus, LBHI's funding obligations under the Equity Contribution Agreement were simply the mechanism used to implement and effectuate (with respect to certain specified "Projects") "Lehman's" obligations under the Shareholder Agreement to provide equity and credit support. As such, the Equity Contribution Agreement was intended to benefit Claimants, as minority shareholders of SkyPower and parties to the Shareholder Agreement. Moreover, LBHI's failure to make equity contributions drove SkyPower out of business and therefore directly impacted Claimants, causing them to lose their substantial monetary investment in SkyPower.

30. Based on the foregoing, the parties to the Equity Contribution Agreement intended for Claimants, as minority shareholders in SkyPower, to be third-party beneficiaries of

the agreement.[2] Thus, disallowance of the Claims at this phase is inappropriate. See Res. Funding, 1994 WL 24825, at *8 (holding that defendant's counterclaim asserting that a non-signatory to an agreement that was part of an overall transaction survived a motion to dismiss the counterclaim and strike certain affirmative defenses, because whether the parties intended the non-signatory to be a third-party beneficiary presented a triable issue of fact that was not appropriate for summary disposition).

31. Accordingly, as third-party beneficiaries to the Equity Contribution Agreement, Claimants have properly asserted a claim against LBHI for breaching its obligations under that agreement, including breaches of sections 2.01 and 6.01(e)-(f) by failing to make the requisite funding contributions to SkyPower. See Ex. 5, Equity Contribution Agr. §§ 2.01, 6.01(e)-(f). Claimants have suffered significant damages as a result, namely the loss of the entire financial investment in SkyPower, which was valued at approximately $87.5 million at the time of closing.

C. **The Corporate Veil Should Be Pierced To Hold LBI and LBHI Liable For Breaches Under the Shareholders Agreement**

32. LBHI and its direct, wholly-owned subsidiary, LBI, are also liable for breaches of the Shareholders Agreement based on the doctrine of piercing the corporate veil. A claim for breach of contract or breach of the covenant of good faith and fair dealing may be asserted against a parent corporation that is not a party to a contract if the claim is predicated on the parent's liability through the corporate veil piercing doctrine. Emposimato v. CIFC Acquisition

---

[2] Notably, the Equity Contribution Agreement does not contain a provision prohibiting the enforcement of the agreement by third-party beneficiaries. The provision of the Equity Contribution Agreement upon which the Debtors rely in their Objection (§ 10.01) simply allows direct enforcement by the "Secured Parties"; it does not, however, prohibit enforcement by third-party beneficiaries indirectly.

DOCSNY-475441v1

08-13555-mg    Doc 19315    Filed 08/17/11    Entered 08/17/11 13:10:20    Main Document
Pg 14 of 17

Corp., 30 Misc. 3d 1233(A), 926 N.Y.S.2d 344 (Sup. Ct. N.Y. County 2011) (unpublished table decision), available at 2011 WL 833801, at *10.

33. Under this doctrine, a parent or affiliate may be held liable for a corporation's breach "where the officers and employees of the parent corporation exercise control over the daily operations of the subsidiary and act as the true prime movers behind the subsidiary's action, or on the theory that the parent conducts business through the subsidiary, which exists solely to serve the parent." Pritchard Servs. (NY) Inc. v. First Winthrop Props., Inc., 172 A.D.2d 394, 395, 568 N.Y.S.2d 775, 776 (1st Dep't 1991). Additionally, the parent corporation's domination or control must be used to commit a wrong against the claimants, such as "caus[ing] the [subsidiary] to breach the contract, or render[ing] the [subsidiary] unable to meet its obligations under the contract, and/or the [subsidiary] is a mere shell or 'dummy' corporation which has no assets of its own." Emposimato, 2011 WL 833801, at *11; Teachers Ins. Annuity Ass'n of Am. v. Cohen's Fashion Optical of 485 Lexington Ave. Inc., 45 A.D.3d 317, 318, 847 N.Y.S.2d 2, 3 (1st Dep't 2007).

34. LBI and LBHI created LB SkyPower, the indirect wholly-owned subsidiary of LBI and LBHI, with the sole purpose of serving as the vehicle through which LBI and LBHI would invest in SkyPower. Indeed, documents describing Lehman's investment role in SkyPower likewise support that conclusion:

- LBI signed the Letter of Intent for the transaction, which indicated that LBI and its affiliates (i.e., LBHI) would be participating in the transaction.

- In the Goodsman Steps Memo, Lehman's counsel states that LBI would be providing future equity contributions to the company following the June 11, 2007 closing of LBI's $87.5 million investment in SkyPower.

- A September 5, 2007 memorandum to SkyPower's Board of Directors from LBI details "Lehman Brothers' deemed and actual equity contributions to SkyPower" – both existing and future. (A copy of the

14

Lehman Brothers Inc. memorandum dated September 5, 2007 is annexed hereto as Exhibit 6.)

35. As such, LB SkyPower was created by LBHI and LBI, is completely controlled by LBHI and LBI, and is merely a shell and instrument of LBHI and LBI.

36. Additionally, LBI held itself out to SkyPower as the real party in interest to the overall transaction throughout negotiation and in various memos from LBI's counsel and other documents.

37. Therefore, LBI and LBHI, as a result of their complete domination and control of LB SkyPower, should be held liable for breaches of the operative agreements as the alter ego of LB SkyPower. Teachers Ins. Annuity Ass'n, 45 A.D.3d at 318, 847 N.Y.S.2d at 3 (holding that a claim to pierce the corporate veil survived a motion for summary judgment where the parent corporation negotiated the lease on behalf of its subsidiary, held itself out as the real party in interest and ultimately violated the lease while leaving the subsidiary as an empty shell with no assets). Specifically, LBHI and LBI are liable for breaches under the Shareholder Agreement of their obligations to provide requisite funding and ensure that SkyPower would remain competitive. Ex. 4, Shareholder Agr. §§ 6.1-6.2, 8.1-8.3. Further, LBHI and LBI are liable for breaching the covenant of good faith and fair dealing for engaging in a course of conduct that ultimately forced SkyPower into bankruptcy, stripping Claimants of the value of their equity interest.

38. Moreover, all contracts contain "an implied covenant of fair dealing and good faith on the parties to employ reasonable or 'best efforts' in performing their contractual obligations." Middle Vill. Assocs. v. Pergament Home Ctrs., Inc., 184 Misc. 2d 552, 556, 708 N.Y.S.2d 840, 844 (Sup. Ct. Nassau County 2000) (explaining that the duty to use best efforts arises where a contract definitively sets forth a the obligation of a party); Wood v. Duff-

15

Gordon, 222 N.Y. 88, 118 N.E. 214 (1917). Here, the Shareholders Agreement clearly sets forth LBI and LBHI's <u>exclusive</u> right to provide follow on equity capital. Ex. 4, Shareholder Agr. § 8.1. The agreement further obligates the entities to make SkyPower competitive in the RFP process, and to provide reasonable assistance and use commercially reasonable efforts to do so. <u>Id.</u> §§ 8.1-8.2. Those obligations, including the exclusivity requirement, support the conclusion that LBI and LBHI were required to use best efforts to perform their contractual obligations. <u>See</u> <u>B. Lewis Prods., Inc. v. Angelou</u>, No. 01 Civ. 0530 (MBM), 2005 WL 1138474 (S.D.N.Y. May 12, 2005) (finding that the parties had an obligation to act in good faith in furtherance of the agreement because the agreement required that the author-defendant's contributions be exclusive). Accordingly, LBI and LBHI have breached the implied covenant of good faith and fair dealing – providing yet another meritorious basis for the Claims.

## **<u>Conclusion</u>**

39.     Thus, consistent with the facts and description set forth in the Proofs of Claim, Claimants have been damaged due to (i) LBHI and LBI's failure to adequately fund, or to cause its wholly-owned subsidiary LB SkyPower to adequately fund, SkyPower; (ii) LBHI's breach of the Equity Contribution Agreement (based on Claimants status as third-party beneficiaries of that Agreement); and (iii) Debtors and LB SkyPower's breaches of the Shareholder Agreement – an agreement that was integral to LBHI and LBI's investment in SkyPower. The Claims should therefore be allowed.

DOCSNY-475441v1

WHEREFORE, 2138747 Ontario Ltd. and 6785778 Canada Inc. respectfully request that the Court deny the Objection, allow the Claims and grant 2138747 Ontario Ltd. and 6785778 Canada Inc. such other and further relief as the Court deems just and proper.

Dated: New York, New York
August 17, 2011

Respectfully Submitted,

DICKSTEIN SHAPIRO LLP

By: /s/ Deborah A. Skakel
    Deborah A. Skakel
    Shaya M. Berger
    Courtney E. Topic
1633 Broadway
New York, New York 10019
Tel.: (212) 277-6500
Fax: (212) 277-6501

*Attorneys for 2138747 Ontario Ltd. and 6785778 Canada Inc.*