occurred on or prior to the closing provided that the premiums will not exceed in the aggregate $300% of the premiums currently charged to SkyPower for directors' and officer's liability insurance; and provided, further, that from and after the Closing, SkyPower (or its successor) will honor any obligations in effect on the date hereof to indemnify the current and former directors and officers of SkyPower in respect of matters for which SkyPower may indemnify such directors and officers its articles, charter, by-laws, applicable Law and contracts of indemnity as applicable; and

(d) comply, and cause SkyPower and the Subsidiaries to comply, in all material respects, with all Laws and Orders applicable to the business and operations of SkyPower and the Subsidiaries, and promptly following receipt thereof to give Acquisitionco copies of any notice received from any Governmental or Regulatory Authority or other Person alleging any violation of any such Law or Order.

6.05   Financial Statements and Reports; Filings.  As promptly as practicable and in any event no later than forty five (45) days after the end of each fiscal quarter ending after the date hereof and before the Closing Date (other than the fourth quarter) or ninety (90) days after the end of each fiscal year ending after the date hereof and before the Closing Date, as the case may be, SkyPower will deliver to Acquisitionco true and complete copies of (in the case of any such fiscal year) the audited and (in the case of any such fiscal month or quarter) the unaudited consolidated balance sheet, and the related audited or unaudited consolidated statements of operations, stockholders' equity and cash flows, of SkyPower and its consolidated Subsidiaries, in each case as of and for the fiscal year then ended or as of and for each such fiscal quarter and the portion of the fiscal year then ended, as the case may be, together with the notes, if any, relating thereto, which financial statements shall be prepared on a basis consistent with the Audited Financial Statements.

(a) As promptly as practicable, SkyPower will deliver to Acquisitionco true and complete copies of such other financial statements, reports and analyses as may be prepared or received by SkyPower or any Subsidiary relating to the business or operations of SkyPower or any Subsidiary or as Acquisitionco may otherwise reasonably request.

(b) As promptly as practicable, the SkyPower Shareholders will deliver copies of all License applications and other filings made by SkyPower or any Subsidiary after the date hereof and before the Closing Date with any Governmental or Regulatory Authority (other than routine, recurring filings made in the ordinary course of business consistent with past practice).

6.06   Employee Matters.  Except as may be required by Law, each SkyPower Shareholder, SkyPower and the Subsidiaries will refrain from directly or indirectly:

(a) making any representation or promise, oral or written, to any officer, employee or consultant of SkyPower or any Subsidiary concerning any material term or condition of employment or any Benefit Plan, except for statements as to the rights or accrued benefits of any officer, employee or consultant under the terms of any Benefit Plan existing as of the date hereof;

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

(b) making any increase in the salary, wages or other compensation of any officer, employee or consultant of SkyPower or any Subsidiary;

(c) adopting, entering into or becoming bound by any Benefit Plan, employment-related Contract or collective bargaining agreement, or amending, modifying or terminating (partially or completely) any Benefit Plan, employment-related Contract or collective bargaining agreement, except to the extent required by applicable Law and, in the event compliance with legal requirements presents options, only to the extent that the option which SkyPower or Subsidiary reasonably believes to be the least costly is chosen;

(d) establishing or modifying any (i) targets, goals, pools or similar provisions in respect of any fiscal year under any Benefit Plan, employment-related Contract or other employee compensation or benefit arrangement or (ii) salary ranges, increase guidelines or similar provisions in respect of any Benefit Plan, employment-related Contract or other employee compensation arrangement; or

(e) granting, funding, or accelerating the vesting of any payment or benefit award to any officer, employee or consultant;

The SkyPower Shareholders will, and will cause SkyPower to, administer each Benefit Plan, or cause the same to be so administered, in all material respects in accordance with provisions of all applicable Laws. The SkyPower Shareholders will, and will cause SkyPower to, promptly notify Acquisitionco in writing of each receipt by SkyPower or any Subsidiary (and furnish Acquisitionco with copies) of any notice of investigation or administrative proceeding by any Governmental Authority or other Person involving any Benefit Plan.

6.07    Certain Restrictions.  Other than as contemplated by this Agreement or the Operative Agreements, the SkyPower Shareholders will, and will cause SkyPower to, refrain from:

(a) amending the certificates or articles of incorporation or by-laws (or other comparable corporate charter documents) or taking any action with respect to any such amendment or any recapitalization, reorganization, liquidation or dissolution of any such corporation;

(b) authorizing, issuing, selling or otherwise disposing of any shares of capital stock of or any Option with respect to SkyPower or any Subsidiary, or modifying or amending any right of any holder of outstanding shares of capital stock of or Option with respect to SkyPower or any Subsidiary;

(c) declaring, setting aside, paying or receiving any dividend or other distribution in respect of the capital stock of SkyPower or any Subsidiary not wholly owned by SkyPower, or directly or indirectly redeeming, purchasing, otherwise acquiring or receiving payment in respect of a redemption or other acquisition of, any capital stock of or any Option with respect to SkyPower or any Subsidiary not wholly owned by SkyPower;

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

(d) acquiring or disposing of, or incurring any Lien (other than a Permitted Lien) on, any Assets and Properties of SkyPower or any Subsidiary, other than in the ordinary course of business consistent with past practice;

(e) (i) entering into, amending, modifying, terminating (partially or completely), granting any waiver under or giving any consent with respect to (A) any Contract that would, if in existence on the date of this Agreement, be required to be disclosed pursuant to Section 2.18 of the Disclosure Schedule or (B) any material License held or used by SkyPower or any Subsidiary or (ii) granting any irrevocable powers of attorney;

(f) violating, breaching or defaulting under in any material respect, or taking or failing to take any action that (with or without notice or lapse of time or both) would constitute a material violation or breach of, or default under, any term or provision of any License held or used by SkyPower or any Subsidiary or any Contract to which SkyPower or any Subsidiary is a party or by which any of their respective Assets and Properties is bound;

(g) (i) incurring Indebtedness in an aggregate principal amount exceeding $50,000 (net of any amounts of Indebtedness discharged during such period), or (ii) voluntarily purchasing, canceling, prepaying or otherwise providing for a complete or partial discharge in advance of a scheduled payment date with respect to, or waiving any right of SkyPower or any Subsidiary under, any Indebtedness of or owing to SkyPower or any Subsidiary;

(h) engaging with any Person in any merger or other business combination;

(i) making c apital expenditures or commitments for additions to property, plant or equipment constituting capital assets in an aggregate amount exceeding $50,000;

(j) making an y change in the lines of business in which they participate or are engaged;

(k) writing off or writing down any of their Assets and Properties outside the ordinary course of business consistent with past practice, unless required as a result of a change to GAAP;

(l) chan ging any accounting practices, policies or procedures or any methods of reporting income, deductions or other items for income tax purposes (except insofar as may have been required by applicable Law or GAAP rule; or

(m) entering into any Contract to do or engage in any of the foregoing.

Notwithstanding the foregoing, the disposition by SkyPower or its Subsidiaries of the Excluded Assets is permitted under the terms of this Agreement.

6.08    Affiliate Transactions. Except as set forth in Section 6.08 of the Disclosure Schedule, immediately prior to the Closing, all Indebtedness and other amounts owing under Contracts between any officer, director or Affiliate (other than SkyPower or any Subsidiary) of SkyPower, on the one hand, and SkyPower or any of the Subsidiaries, on the other, will be paid in full, and the SkyPower Shareholders will cause SkyPower to terminate and

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

will cause any such officer, director or Affiliate to terminate each Contract with SkyPower or any Subsidiary. Prior to the Closing, neither SkyPower nor any Subsidiary will enter into any Contract or amend or modify any existing Contract, and will not engage in any transaction outside the ordinary course of business consistent with past practice or not on an arm's-length basis, with any such officer, director or Affiliate.

6.09   Notice and Cure. The SkyPower Shareholders will notify Acquisitionco in writing (where appropriate, through updates to the Disclosure Schedule) of, and contemporaneously will provide Acquisitionco with true and complete copies of any and all information or documents relating to, and will use all commercially reasonable efforts to cure or cause SkyPower to cure before the Closing, any event, transaction or circumstance, as soon as practicable after it becomes Known to the SkyPower Shareholders, occurring after the date of this Agreement that causes or will cause any covenant or agreement of the SkyPower Shareholders under this Agreement to be breached or that renders or will render untrue any representation or warranty of the SkyPower Shareholders as to themselves or as to SkyPower contained in this Agreement as if the same were made on or as of the date of such event, transaction or circumstance. No notice given pursuant to this Section shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of any condition contained herein or shall in any way limit Acquisitionco's right to seek indemnity under Article XI.

6.10   Fulfillment of Conditions. SkyPower and each SkyPower Shareholder will (a) execute and deliver at the Closing each Operative Agreement that such SkyPower Shareholder or SkyPower as applicable, is required hereby to execute and deliver as a condition to the Closing and (b) take all commercially reasonable steps necessary or desirable and proceed diligently and in good faith to satisfy each condition to the obligations of Purchaser and Acquisitionco contained in this Agreement (including, without limitation, the disposition of the Excluded Assets) and will not take or fail to take any action that could reasonably be expected to result in the nonfulfillment of any such condition.

6.11   Additional Covenants. SkyPower will (i) redeem the Adler Shares on or prior to the Closing Date and (ii) promptly following the Closing, will, and will cause each of its principal wholly-owned Subsidiaries to, be continued to Alberta and convert their organizational structure in accordance with Section 8.17 hereto.

6.12   Brokers; Structuring Fees. In addition to an amount not to exceed U.S.$6 million which will be paid at Closing by SkyPower as contemplated by Section 2.26 hereof, SkyPower will pay at Closing, or promptly thereafter at Purchaser's request, an amount not to exceed U.S.$1.5 million in respect of fees and expenses (including legal and outside consultants of Purchaser.

6.13   Insurance. Promptly following the Closing, SkyPower will obtain a key man life insurance policy on Adler, in form, substance and amount and from an issuer acceptable to Purchaser Group (the "**Key Man Life Insurance Policy**"). Adler will cooperate promptly with all reasonable requests by Purchaser Group or the designated insurance policy issuer to facilitate the issuance of the Key Man Life Insurance Policy.

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

## ARTICLE VII

## COVENANTS OF ACQUISITIONCO AND PURCHASER

Each of Acquisitionco and Purchaser covenants and agrees with SkyPower and
the SkyPower Shareholders that, at all times from and after the date hereof until the Closing, and,
where expressly provided, after Closing, Acquisitionco will comply with all covenants and
provisions of this Article VII, except to the extent SkyPower or any SkyPower Shareholder may
otherwise consent in writing.

7.01    Regulatory and Other Approvals.  Each of Acquisitionco and Purchaser
will as promptly as practicable (a) take all commercially reasonable steps necessary or desirable
to obtain all consents, approvals or actions of, make all filings with and give all notices to
Governmental or Regulatory Authorities or any other Person required of Acquisitionco or
Purchaser to consummate the transactions contemplated hereby and by the Operative
Agreements, (b) provide such other information and communications to such Governmental or
Regulatory Authorities or other Persons as the SkyPower Shareholders or such Governmental or
Regulatory Authorities or other Persons may reasonably request in connection therewith and
(c) cooperate with the SkyPower Shareholders in connection with the performance of their
obligations under Section 5.01. Each of Acquisitionco and Purchaser will provide prompt
notification to SkyPower or the SkyPower Shareholders when any such consent, approval,
action, filing or notice referred to in clause (a) above is obtained, taken, made or given, as
applicable, and will advise SkyPower or the SkyPower Shareholders of any communications
(and, unless precluded by Law, provide copies of any such communications that are in writing)
with any Governmental or Regulatory Authority or other Person regarding any of the
transactions contemplated by this Agreement or any of the Operative Agreements.

7.02    Notice and Cure.  Each of Acquisitionco and Purchaser will notify
SkyPower and the SkyPower Shareholders in writing of, and, to the extent not prohibited
pursuant to confidentiality or other agreements, contemporaneously will provide SkyPower and
the SkyPower Shareholders with true and complete copies of any and all information or
documents relating to, and will use all commercially reasonable efforts to cure before the
Closing, any event, transaction or circumstance, as soon as practicable after it becomes known
Acquisitionco or Purchaser, as applicable, occurring after the date of this Agreement that causes
or will cause any covenant or agreement of Acquisitionco or Purchaser, as applicable, under this
Agreement to be breached or that renders or will render untrue any representation or warranty of
Acquisitionco or Purchaser, as applicable, contained in this Agreement as if the same were made
on or as of the date of such event, transaction or circumstance. No notice given pursuant to this
Section shall have any effect on the representations, warranties, covenants or agreements
contained in this Agreement for purposes of determining satisfaction of any condition contained
herein or shall in any way limit the SkyPower Shareholders right to seek indemnity under
Article XII.

7.03    Fulfillment of Conditions. Each of Acquisitionco and Purchaser will execute and deliver at the Closing each Operative Agreement that such Party is hereby required to execute and deliver as a condition to the Closing, will take all commercially reasonable steps necessary or desirable and proceed diligently and in good faith to satisfy each other condition to the obligations of SkyPower and the SkyPower Shareholders contained in this Agreement and will not take or fail to take any action that could reasonably be expected to result in the nonfulfillment of any such condition.

7.04    Additional Covenants. Following the Closing, (i) Acquisitionco will incorporate a new corporation ("**GPCo**") pursuant to the laws of Ontario, Canada; (ii) Acquisitionco and GPCo will form a new limited partnership (the "**LP**") pursuant to the laws of the Province of Ontario, Canada. Acquisitionco will cause GPCo to be the general partner of the LP and to be entitled to a 0.01% interest in such LP and will cause Acquisitionco to be the sole limited partner of the LP and to be entitled to a 99.99% interest in such LP; and (iii) Acquisitionco will transfer all of the SkyPower Shares to such LP and will cause such transfer to be effected on a tax-deferred basis pursuant to subsection 97(2) of the Tax Act.

## ARTICLE VIII

## CONDITIONS TO OBLIGATIONS OF PURCHASER AND ACQUISITIONCO

The obligations of Purchaser and Acquisitionco (the "**Purchaser Group**") to purchase the SkyPower Shares and to perform their other obligations at the Closing are subject to the fulfillment, at or before the Closing, of each of the following conditions (all or any of which may be waived in whole or in part by the Purchaser Group in its sole discretion):

8.01    Representations and Warranties. Each of the representations and warranties made by the SkyPower Shareholders on their own behalf and on behalf of SkyPower in this Agreement or any Operative Agreement (other than those made as of a specified date earlier than the Closing Date) shall be true and correct in all material respects on and as of the Closing Date as though such representation or warranty was made on and as of the Closing Date, and any representation or warranty made as of a specified date earlier than the Closing Date shall have been true and correct in all material respects on and as of such earlier date; provided that to the extent that any representation or warranty is qualified as to materiality pursuant to the terms of such representation or warranty, such representation or warranty shall be true and correct in all respects as of the Closing Date unless such representation or warranty was made as of a specified date earlier than the Closing Date in which case such representation shall be true and correct in all respects on and as of such earlier date.

8.02    Operative Agreements. The Purchaser Group shall have received the Operative Agreements duly executed and delivered by each party thereto other than Purchaser and Acquisitionco.

8.03    Performance. Each of SkyPower and the SkyPower Shareholders shall have performed and complied with, in all material respects, each agreement, covenant and obligation required by this Agreement or any Operative Agreement to be so performed or

complied with by SkyPower or such SkyPower Shareholders at or before the Closing, in all material respects, each agreement, covenant and obligation required by this Agreement or any Operative Agreement to be so performed or complied with by SkyPower or any SkyPower Shareholder at or before the Closing.

    8.04    Officer's Certificates. Each of SkyPower, Shareholder Holdco, Adler Holdco I and Adler Holdco II have delivered to the Purchaser Group a certificate, dated the Closing Date and executed in the name and on behalf of the Chairman of the Board, the President or any Vice President of each of the applicable SkyPower Shareholders and of SkyPower, authorizing and approving the Transaction contemplated hereby and by the Operative Agreements and the obligations of such Party related thereto and otherwise substantially in the form and to the effect of Exhibits A1-4 hereto.

    8.05    Orders and Laws. There shall not be in effect on the Closing Date any Order or Law restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement or any of the Operative Agreements or which could reasonably be expected to otherwise result in a material diminution of the benefits of the transactions contemplated by this Agreement or any of the Operative Agreements to the Purchaser Group, and there shall not be pending or threatened on the Closing Date any Action or Proceeding in, before or by any Governmental or Regulatory Authority which could reasonably be expected to result in the issuance of any such Order or the enactment, promulgation or deemed applicability to the Purchaser Group, the SkyPower Shareholders, SkyPower or the transactions contemplated by this Agreement or any of the Operative Agreements of any such Law.

    8.06    Regulatory Consents and Approvals. All consents, approvals and actions of, filings with and notices to any Governmental or Regulatory Authority necessary to permit the Parties to perform their obligations under this Agreement and the Operative Agreements and to consummate the transactions contemplated hereby and thereby (a) shall have been duly obtained, made or given, (b) shall be in form and substance reasonably satisfactory to the Purchaser Group, (c) shall not be subject to the satisfaction of any condition that has not been satisfied or waived and (d) shall be in full force and effect, and all terminations or expirations of waiting periods imposed by any Governmental or Regulatory Authority necessary for the consummation of the transactions contemplated by this Agreement and the Operative Agreements shall have occurred.

    8.07    Third Party Consents. The consents (or in lieu thereof waivers) listed in Section 8.07 of the Disclosure Schedule (a) shall have been obtained, (b) shall be in form and substance reasonably satisfactory to the Purchaser Group, (c) shall not be subject to the satisfaction of any condition that has not been satisfied or waived and (d) shall be in full force and effect.

    8.08    Opinion of Counsel. The Purchaser Group shall have received the opinions of (i) Bennett Jones LLP, counsel to SkyPower and the SkyPower Shareholders, (x) with respect to Alberta law and (y) with respect to Ontario law, and (ii) Dorsey & Whitney LLP, with respect to New York law, dated the Closing Date, substantially in the form and to the effect of Exhibits B1-3 hereto, and to such further effect as the Purchaser Group may reasonably request.

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

8.09    Restructuring of Advisory Board, Board of Directors and Officers.
Acquisitionco and SkyPower shall have effectuated a restructuring of their respective Advisory
Board, Board of Directors and Officers such that the Advisory Board, Board of Directors and
Officers shall, on or before the Closing Date, be as set forth on Schedule F attached hereto and
applicable officers and directors shall have tendered, effective on or before the Closing Date,
their resignations as such directors and officers.

8.10    Intentionally Omitted

8.11    Due Diligence. SkyPower Shareholders shall have delivered to the
Purchaser Group all materials referenced in Article II or in the Disclosure Schedule as being
delivered prior to Closing (and all updates to the Disclosure Schedule required to be made by the
SkyPower Shareholders to make the Disclosure Schedule accurate in all material respects), and
such materials, including without limitation all corporate documents for SkyPower and
Acquisitionco, which documents shall include evidence of the grant by Acquisitionco to
Purchaser of the exclusive right to make all future equity investments or capital contributions
required or sought by Acquisitionco, and the Disclosure Schedule updates shall be in form and
substance satisfactory to the Purchaser Group.

8.12    Proceedings. All proceedings to be taken on the part of any SkyPower
Shareholder or SkyPower in connection with the transactions contemplated by this Agreement or
any Operative Agreement and all documents incident thereto, including without limitation the
execution and delivery of the Employment Agreements, the Shareholders Agreement, the
operating plan and the hiring plan, shall be reasonably satisfactory in form and substance to the
Purchaser Group, and the Purchaser Group shall have received copies of all such documents and
other evidences as the Purchaser Group may reasonably request in order to establish the
consummation of such transactions and the taking of all proceedings in connection therewith.

8.13    Independent Engineer; Environmental Review. The Purchaser Group
shall have received independent third party review and assessment in form and substance
reasonably satisfactory to the Purchaser Group, regarding (i) Development Project wind quality
assumptions, (ii) project cost assumptions, and (iii) environmental and hazardous material
assumptions.

8.14    Budget; Business Plan; Projections. The Purchaser Group shall have
received and approved the business plan, budget and projections and such documents and other
evidences as the Purchaser Group may reasonably request with regard to the Development
Projects, and such shall be reasonably satisfactory in form and substance to the Purchaser Group.

8.15    No Material Adverse Change. No SkyPower Material Adverse Change
shall have occurred and be continuing and the Purchaser Group shall not have become aware
after the Effective Date of any information or other matter affecting SkyPower, any Subsidiary
or any of their Assets or the transactions contemplated hereby that is inconsistent in a material
and adverse manner with any information or other matter disclosed to the Purchaser Group prior
to the Effective Date.

- 38 -

8.16    Excluded Assets. The Excluded Assets shall be sold or otherwise disposed of by SkyPower.

8.17    Employee Benefit Documents. The Parties shall have agreed on final form of all Employee Benefit Documents for Acquisitionco, including the Employee Stock Option Plan, the terms of which are attached hereto as Exhibit E. The Persons listed on Schedule C shall have entered into the Employment Agreements.

8.18    Payment of Fees. SkyPower shall have paid, or agreed to pay post Closing at request of Purchaser, the fees described in Section 2.26.

8.19    Exclusive Contribution Right. The Shareholders Agreement shall be executed contemporaneously herewith, in form and substance satisfactory to Purchaser and shall evidence, to Purchaser's satisfaction, the grant by Acquisitionco to Purchaser of the exclusive right to contribute additional capital to Acquisitionco, at a deemed Acquisitionco valuation of U.S.$175,000,000, subject to the exceptions, limitations, terms and conditions set forth therein.

## ARTICLE IX

## CONDITIONS TO OBLIGATIONS OF SKYPOWER AND THE SKYPOWER SHAREHOLDERS

The obligations of the SkyPower and the SkyPower Shareholders hereunder are subject to the fulfillment, at or before the Closing, of each of the following conditions (all or any of which may be waived in whole or in part by the majority SkyPower Shareholders in their sole discretion):

9.01    Representations and Warranties. Each of the representations and warranties made by any member of the Purchaser Group in this Agreement (other than those made as of a specified date earlier than the Closing Date) shall be true and correct in all material respects on and as of the Closing Date as though such representation or warranty was made on and as of the Closing Date and any representation or warranty made as of a specified date earlier than the Closing Date shall have been true and correct in all material respects as of such date; provided that to the extent that any representation or warranty is qualified as to materiality pursuant to the terms of such representation or warranty, such representation or warranty shall be true and correct in all respects as of the Closing Date unless such representation or warranty was made as of a specified date earlier that the Closing Date in which case such representation shall be true and correct in all respects on and as of such earlier date.

9.02    Operative Agreements. SkyPower and the SkyPower Shareholders shall have received the Operative Agreements duly executed and delivered by the parties thereto other than SkyPower and such SkyPower Shareholders.

9.03    Performance. Each member of the Purchaser Group shall have performed and complied with, in all material respects, each agreement, covenant and obligation required by this Agreement to be so performed or complied with by such Party at or before the Closing.

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

9.04    Officers' Certificates. Each member of the Purchaser Group shall have delivered to SkyPower and the SkyPower Shareholders a certificate, dated the Closing Date and executed in the name and on behalf of such member of the Purchaser Group by the Chairman of the Board, the President or any Vice President of such Party authorizing and approving the Transaction contemplated hereby and by the other Operative Documents and the obligations of such Party related thereto and otherwise substantially in the form and to the effect of Exhibit D hereto.

9.05    Orders and Laws. There shall not be in effect on the Closing Date any Order or Law that became effective after the date of this Agreement restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement or any of the Operative Agreements.

9.06    Regulatory Consents and Approvals. All consents, approvals and actions of, filings with and notices to any Governmental or Regulatory Authority necessary to permit the Parties to perform their obligations under this Agreement and the Operative Agreements and to consummate the transactions contemplated hereby and thereby (a) shall have been duly obtained, made or given, (b) shall not be subject to the satisfaction of any condition that has not been satisfied or waived and (c) shall be in full force and effect, and all terminations or expirations of waiting periods imposed by any Governmental or Regulatory Authority necessary for the consummation of the transactions contemplated by this Agreement and the Operative Agreements shall have occurred.

9.07    Proceedings. All proceedings to be taken on the part of any member of the Purchaser Group in connection with the transactions contemplated by this Agreement and all documents incident thereto shall be reasonably satisfactory in form and substance to SkyPower and the SkyPower Shareholders, and SkyPower and the SkyPower Shareholders shall have received copies of all such documents and other evidences as SkyPower and the SkyPower Shareholders may reasonably request in order to establish the consummation of such transactions and the taking of all proceedings in connection therewith.

9.08    No Material Adverse Change. No material adverse change shall have occurred and be continuing in the financial condition of any member of the Purchaser Group precluding its ability to perform its obligations hereunder.

## ARTICLE X

## *[ INTENTIONALLY NOT USED]*

## ARTICLE XI

## SURVIVAL OF REPRESENTATIONS, WARRANTIES,
## COVENANTS AND AGREEMENTS

11.01    Survival of Representations, Warranties, Covenants and Agreements. Notwithstanding any right of any member of the Purchaser Group (whether or not exercised) to

LA1:#6351530v20                                   - 40 -

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

investigate the affairs of any SkyPower Shareholder, SkyPower and the Subsidiaries or any right
of any party (whether or not exercised) to investigate the accuracy of the representations and
warranties of the other party contained in this Agreement, SkyPower, each SkyPower
Shareholder and each member of the Purchaser Group have the right to rely fully upon the
representations, warranties, covenants and agreements of the others contained in this Agreement.
Except where otherwise expressly set forth herein, the representations, warranties, covenants and
agreements of SkyPower, each SkyPower Shareholder and each member of the Purchaser Group
contained in this Agreement will survive the Closing until that date which is the later of
(x) thirteen (13) months after the Closing Date or (y) sixty (60) days after the date of delivery of
the 2007 Audited Financial Statements, in the case of representations and warranties and any
covenant or agreement to be performed in whole or in part on or prior to the Closing provided
that the representations and warranties in Sections 2.11 or 2.23 shall survive after the Closing for
the longer of six (6) years or the applicable statute of limitations period and the representations
and warranties in Sections 2.01, 2.02, 3.01, 3.02, 3.03, 4.01, 4.02, 4.03, 5.01, 5.02, and 5.03 shall
survive indefinitely; provided that any representation, warranty, covenant or agreement that
would otherwise terminate in accordance this Agreement will continue to survive if a Claim
Notice or Indemnity Notice (as applicable) shall have been timely given under Article XII on or
prior to such termination date, until the related claim for indemnification has been satisfied or
otherwise resolved as provided in Article XII.

## ARTICLE XII

## INDEMNIFICATION

12.01  Indemnity by SkyPower and the SkyPower Shareholders.  SkyPower and
each SkyPower Shareholder shall, severally and not jointly, indemnify and hold harmless the
Purchaser and its Affiliates together with their respective directors, officers, employees and
agents (each a "**Purchaser Indemnified Party**") from and against all claims, damages, losses,
liabilities, costs, deficiencies and expenses (including, without limitation, investigative costs,
settlement costs and any reasonable outside legal, accounting or other expenses for investigating
or defending any actions or threatened actions) (collectively, the "**Losses**") to which any
Purchaser Indemnified Party becomes subject, which Losses arise out of or are incurred in
connection with each and all of the following:

(a) any breach of any representation or warranty made by SkyPower or any
SkyPower Shareholder in this Agreement or as re-certified in a certificate delivered by
SkyPower or any SkyPower Shareholder at the Closing;

(b) any breach of any covenant, agreement or obligation of SkyPower or any
SkyPower Shareholder contained in this Agreement;

(c) any fraud or willful misconduct by SkyPower or any SkyPower Shareholder
in connection with this Agreement or the transactions contemplated by this Agreement; and

(d) any claims or Liabilities for purchase price or indemnification or breach of any covenant, representation or warranty or other matters arising out of the sale of any Assets or Subsidiaries by SkyPower or any SkyPower Shareholder prior to the Closing Date.

12.02   Indemnification by Purchaser.   Purchaser shall indemnify and hold harmless each SkyPower Shareholder and its respective agents (each, a "**Shareholder Indemnified Party**") from Losses to which any Shareholder Indemnified Party becomes subject, which Losses arise out of or are incurred in connection with each and all of the following:

(a) any breach of any representation or warranty made by Purchaser or Acquisitionco in this Agreement;

(b) any breach of any covenant, agreement or obligation of Purchaser or Acquisitionco contained in this Agreement; and

(c) any fraud or willful misconduct by Purchaser or Acquisitionco in connection with this Agreement or the transactions contemplated by this Agreement.

12.03   Claims for Indemnification.   A Party seeking indemnification (the "**Indemnified Party**") under this Article 12 shall give written notice (a "**Claim Notice**") to the other Party (the "**Indemnifying Party**") as soon as practicable after the Indemnified Party becomes aware of any fact, condition or event which may give rise to Losses for which indemnification may be sought under this Section 12.03 (a "**Claim**"). The failure of the Indemnified Party to timely give a Claim Notice to the Indemnifying Party hereunder shall not affect the Indemnified Party's rights to indemnification hereunder, except and only to the extent that the Indemnifying Party demonstrates actual damage caused by such failure. No Purchaser Indemnified Party shall be entitled to make a Claim until such Claims, in the aggregate, exceed US$1,000,000.00; provided however that once such Claims exceed this threshold amount, Claims may include the threshold amount.

12.04   Defense.   In the case of a Claim involving the assertion of a claim by a third party (whether pursuant to a lawsuit or other legal action or otherwise, a "**Third-Party Claim**"), the Indemnifying Party may, upon written notice to the Indemnified Party, take control of the defense and investigation of such Third-Party Claim if the Indemnifying Party acknowledges to the Indemnified Party in writing the obligation of the Indemnifying Party to indemnify the Indemnified Party with respect to all elements of such Third-Party Claim. If the Indemnifying Party assumes the defense of any such Third-Party Claim, the Indemnifying Party shall select counsel reasonably acceptable to the Indemnified Party (and separate from counsel to the Indemnifying Party if there is any conflict or divergence of interest between the Indemnifying Party and the Indemnified Party) to conduct the defense of such claims or legal proceedings and, at the sole cost and expense of the Indemnifying Party, shall take all steps necessary in the defense or settlement thereof. The Indemnifying Party shall not consent to a settlement of or the entry of any judgment arising from, any such Third-Party Claim, without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed). The Indemnified Party shall be entitled to participate in (but not control) the defense of any such Third-Party Claim, with its own counsel and at its own expense; provided, however, that the Indemnified Party shall be entitled to settle any Third Party Claim involving

criminal penalties, civil fines without the consent, but at the expense, of the Indemnifying Party if the Indemnifying Party shall unreasonably fail to do so after being requested to do so by the Indemnified Party. If the Indemnifying Party does not assume the defense of such Third-Party Claim within twenty (20) days after the date such claim is made: (a) the Indemnified Party may defend against such Third-Party Claim in such manner as it may deem reasonably appropriate, provided that the Indemnified Party shall not consent to a settlement of or the entry of any judgment arising from such Third-Party Claim without the prior written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed), and (b) the Indemnifying Party shall be entitled to participate in (but not control) the defense of such action, with its counsel and at its own expense. Regardless of which Party shall assume the defense of the Third-Party Claim, the Parties agree to cooperate fully with one another in connection therewith. Such cooperation shall include the providing of records and information which are relevant to such Third-Party Claim and making employees and officers available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder and to act as a witness or respond to legal process, in each case to the extent that the Party being requested to provide records and information or to make employees and officers available can do so without waiving any evidentiary privileges to which it is entitled.

12.05   Limitations on Damages.  Except for Losses resulting from a Party's fraud or willful misconduct, neither the Shareholder Indemnified Parties nor the Purchaser Indemnified Parties shall be entitled to be indemnified for Losses for any special, indirect, non-compensatory, consequential, incidental, punitive or exemplary damages of any type, including lost profits, loss of business opportunity or business interruptions whether arising in contract or tort (including negligence, whether sole, joint, or concurrent or strict liability) or otherwise; provided that the foregoing shall not preclude the Purchaser Group from proving and recovering its actual losses based on a diminution in the value of the SkyPower Shares and assets purchased under this Agreement. Without limiting the generality of the foregoing, damages recovered by a third party from a Shareholder Indemnified Party or a Purchaser Indemnified Party, regardless of the theory under which such damages were recovered by such third party, including consequential or punitive damages recovered by such third party, shall be considered direct damages for purposes of, and shall be recoverable under, this Agreement.

(a)  Notwithstanding any other provision of this Agreement, (i) the maximum aggregate liability of Purchaser to the Shareholder Indemnified Parties shall not exceed $43,750,000 (fifty percent (50%) of the Aggregate Purchase Price), provided that the maximum liability of Purchaser to any SkyPower Shareholder (as a further limitation and not additional to the foregoing clause) shall not exceed an amount equal to the pro rata portion of such amount attributable to such SkyPower Shareholder based on its shares in SkyPower prior to the transactions contemplated by Section 1.02 (such pro rata amount, the "**Shareholder Amount**"); and (ii) the maximum aggregate liability of a SkyPower Shareholder to the Purchaser Indemnified Parties under this Agreement shall not exceed its Shareholder Amount, provided that the maximum liability of any SkyPower Shareholder except Adler with respect to breach of Sections 2.01, 2.02, 3.01, 3.02 and 3.03 shall be twice its Shareholder Amount (provided further that for any claim brought by a Purchaser Indemnified Party within eighteen months after the Closing Date, the maximum liability of Adler for a breach of Section 3.01 shall be the Aggregate Purchase Price). Notwithstanding the foregoing, (x) there shall be no time limitation and the aggregate liability to an Indemnified Party, after application of any offset,

- 43 -

shall be unlimited for claims arising from fraud and willful misconduct of such Indemnified Party, (y) the maximum liability of a SkyPower Shareholder to the Purchaser Indemnified Parties for claims with respect to tax matters shall not exceed twice the Shareholder Amount for such SkyPower Shareholder and (z) claims made under Section 12.01(d) shall not be subject to the limitation on claims under Section 12.06 and this Section 12.05(b).

(b) Each Purchaser Indemnified Party and each Shareholder Indemnified Party shall have a duty to mitigate any Loss, including to recover under an applicable insurance policy (including title insurance) or under a contractual right of set-off or indemnity. In the event that an Indemnified Party receives insurance proceeds after being paid (or having a Third-Party Claim paid) under an indemnity under this Article 12, then such Indemnified Party shall promptly remit such proceeds to the Indemnifying Party up to the amount previously paid by such Indemnifying Party with respect to such matter. In the event that any Person entitled to indemnification hereunder receives insurance proceeds in respect of a Claim for which indemnification is provided by an Indemnifying Party prior to the date such indemnification payment is due, such payment shall be reduced on a dollar-for-dollar basis by the amount of insurance proceeds received by such Person with respect to such Claim. Notwithstanding anything to the contrary in the two preceding sentences, all amounts in respect of Claims for indemnification shall be paid when due. Each Indemnifying Party shall be fully subrogated to the rights of the Indemnified Party against any other person (including, without limitation, rights against any insurer or under any applicable insurance policy) in respect of any Claim for which the Indemnifying Party is liable hereunder, and the Indemnified Party shall execute and deliver to or upon the request of the Indemnifying Party any written confirmations of such subrogation or other assignment of rights as may reasonably be requested by the Indemnifying Party in order to give effect to such subrogation. Without limiting the generality of the foregoing, in the event that an Indemnified Party receives any insurance proceeds, surety bond payments, or other payments from any other person in respect of any Claim that has been paid by an Indemnifying Party hereunder, such Indemnified Party shall promptly remit such proceeds to the Indemnifying Party. Notwithstanding anything to the contrary in this Section 12.05(b), no Person shall be required to remit any insurance or similar proceeds to an Indemnifying Party if such insurance or similar proceeds are received by such Person from an Affiliate of such Person (unless such Affiliate writes insurance policies for non-Affiliates) or through self-insurance.

12.06  Nature of Remedies. After the Closing occurs, the indemnities set forth in this Article 12 shall be the exclusive remedies of any Shareholder Indemnified Party or any Purchaser Indemnified Party for any breach of warranty, covenant or any other provision of this Agreement or any other claim arising under this Agreement, except for any claims for Losses resulting from a Party's fraud or willful misconduct. Except as preserved in the preceding sentence, each Party expressly waives any right to assert, claim or bring an action arising under this Agreement after Closing, except for a claim for indemnification in accordance with Sections 12.01, 12.02, 12.03, 12.04 and 12.05 above. The Parties shall not be entitled to a rescission of this Agreement or to any further indemnification rights or claims of any nature whatsoever in respect thereof, all of which the Parties hereby waive.

12.07  Offset; Unpaid Claims. If there shall exist any amount payable by any SkyPower Shareholder to any member of the Purchaser Group hereunder on any date upon

LA1:#6351530v20                                    - 44 -

which a payment is otherwise due to be made by any member of the Purchaser Group to such SkyPower Shareholder hereunder, an amount equal to such amount shall be deducted from such payment amount and applied to reduce the amount owing by such SkyPower Shareholder to such member of the Purchaser Group. If there shall exist any matter with respect to which a Claim Notice has been delivered by any member of the Purchaser Group to any SkyPower Shareholder, but with respect to which the amount of the indemnification obligation has not been determined (such matter, an "**Unresolved Claim**"), such Person shall have the right to retain any payment that would otherwise be made to such SkyPower Shareholder hereunder an amount equal to the estimate, as reasonably determined by such Person, for such Unresolved Claim, if any until such time as the Unresolved Claim is resolved either between the Parties or by a court of competent jurisdiction. Any unpaid Claims shall accrue interest at a rate of 8% per annum. Purchaser and Acquisitionco shall have the right to treat any unpaid Claim as a preferred capital and to recover such amount in accordance with the priority of payments set forth in the Shareholders Agreement.

12.08    Indemnity Amounts to be Computed on After-Tax Basis; Interest. Any amount of indemnification payable pursuant to the provisions of this Article 12 shall (i) to the extent possible, be treated as an adjustment to the Aggregate Purchase Price, (ii) be net of any Tax benefit actually realized and the then present value (based on a discount rate of eight percent (8%) per annum) of any Tax benefit to be realized by the Indemnified Party (including, where Purchaser, Acquisitionco or SkyPower is the Indemnified Party, their Affiliates), and (iii) be increased by the amount of any Tax required to be actually paid by the Indemnified Party on the accrual or receipt of the indemnification payment (including any amount payable pursuant to this clause (iii)). For purposes of the preceding sentence, the amount of any non-federal income Tax benefit or cost shall take into account the federal income tax effect of such benefit or cost.

## ARTICLE XIII

## TERMINATION

13.01    Termination. This Agreement may be terminated, and the transactions contemplated hereby may be abandoned:

(a) at any time before the Closing, by mutual written agreement of the Parties;

(b) at any time before the Closing, by the SkyPower Shareholders (acting as a group) or by the Purchaser Group, in the event (i) of a material breach hereof by any non-terminating party if such non-terminating party fails to cure such breach within five (5) Business Days following notification thereof by the terminating party or (ii) upon notification of the non-terminating party by the terminating party that the satisfaction of any condition to the terminating party's obligations under this Agreement becomes impossible or impracticable with the use of commercially reasonable efforts if the failure of such condition to be satisfied is not caused by a breach hereof by the terminating party; or

(c) at any time after June 30, 2007 by the SkyPower Shareholders (acting as a group) or by the Purchaser Group upon notification of the non-terminating parties by the

terminating party if the Closing shall not have occurred on or before such date and such failure
to consummate is not caused by a breach of this Agreement by the terminating party.

13.02  Effect of Termination. If this Agreement is validly terminated pursuant to
Section 13.01, this Agreement will forthwith become null and void, and there will be no liability
or obligation on the part of any Party (or any of their respective officers, directors, employees,
agents or other representatives or Affiliates), except as provided in the next succeeding sentence
and except that the provisions with respect to expenses in Section 15.03 and confidentiality in
Section 15.04 will continue to apply following any such termination. Notwithstanding any other
provision in this Agreement to the contrary, upon termination of this Agreement pursuant to
Section 13.01(b) or (c), each Party will remain liable to the other Parties for any breach of this
Agreement by such Party existing at the time of such termination and the applicable Party may
seek such remedies, including damages and fees of attorneys, against the other with respect to
any such breach as are provided in this Agreement or as are otherwise available at Law or in
equity.

## ARTICLE XIV

## DEFINITIONS

14.01  Defined Terms. As used in this Agreement, the following defined terms
have the meanings indicated below:

"Acquisition Proposal" means any proposal for a merger or other business
combination to which SkyPower or any Subsidiary is a party or the direct or indirect acquisition
of any equity interest in, or a substantial portion of the assets of, SkyPower or any Subsidiary,
other than the transactions contemplated by this Agreement .

"Acquisitionco" has the meaning ascribed to it in the forepart of this Agreement.

"Actions or Proceedings" means any action, suit, proceeding, arbitration or
Governmental or Regulatory Authority investigation or audit.

"Adler" has the meaning ascribed to it in the forepart of this Agreement.

"Adler Class B Common Stock Purchase Price" has the meaning ascribed to it in
Section 1.01.

"Adler Holdco" has the meaning ascribed to it in the forepart of this Agreement.

"Adler Redemption" has the meaning ascribed to it in the forepart of this
Agreement.

"Adler Shares" has the meaning ascribed to it in the forepart of this Agreement.

"Adler Share Purchaser Price" has the meaning ascribed to it in Section 1.01.

"Adler Share Redemption Price" has the meaning ascribed to such term in Section 1.01.

"Affiliate" means any Person that directly, or indirectly through one of more intermediaries, controls or is controlled by or is under common control with the Person specified. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by Contract or otherwise and, in any event and without limitation of the previous sentence, any Person owning ten percent (10%) or more of the voting securities of another Person shall be deemed to control that Person. Notwithstanding the foregoing, at no time and in no event will Acquisitionco, Purchaser or any Person controlling Purchaser be deemed to be an Affiliate of SkyPower, any Subsidiary or any SkyPower Shareholder.

"Aggregate Purchase Price" has the meaning ascribed to such term in Section 1.02(a).

"Agreement" means this Stock Purchase Agreement and the Exhibits, the Disclosure Schedule and the Schedules hereto and the certificates delivered in accordance with Sections 8.04 and 9.04, as the same shall be amended from time to time.

"Amended Acquisitionco Charter" means those Articles of Amendment of Acquisitionco filed on June 11, 2007, evidenced by the Certificate of Amendment and Registration of Restated Articles.

"Assets and Properties" of any Person means all assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, whether absolute, accrued, contingent, fixed or otherwise and wherever situated), including the goodwill related thereto, operated, owned or leased by such Person, including without limitation cash, cash equivalents, Investment Assets, accounts and notes receivable, chattel paper, documents, instruments, general intangibles, real estate, equipment, inventory, goods and Intellectual Property; provided however, that with reference to SkyPower such term shall not include the Excluded Assets.

"Audited Financial Statement Date" means the last day of the most recent fiscal year of SkyPower for which Financial Statements are delivered to Acquisitionco pursuant to Section 2.08.

"Audited Financial Statements" means the Financial Statements for the most recent fiscal year of SkyPower delivered to Acquisitionco pursuant to Section 2.08.

"Band" means any body of Persons constituting a "band" under the Indian Act, R.S.C. 1985 c.I-5, as well as any other group of aboriginal or First Nations Persons acting in concert as, or holding themselves out, as a group or band, and any corporation or other Person established by or purporting to act on behalf of any such "band" or group.

"Benefit Plan" means any Plan relating to employee benefits with respect to which SkyPower or any Subsidiary contributes or has contributed or has any actual, secondary or contingent liability.

LA1:#6351530v20                                    - 47 -

"Board of Directors" means (a) with respect to a corporation, the board of directors of the corporation, (b) with respect to a partnership, the board of directors or similar governing body of the general partner, and (c) with respect to any other Person, the governing body of such Person exercising the authority or serving a similar function as the board of directors of a corporation.

"Books and Records" means all files, documents, instruments, papers, books and records relating to the Business or Condition of SkyPower, including without limitation financial statements, Tax Returns and related work papers and letters from accountants, budgets, pricing guidelines, ledgers, journals, deeds, title policies, minute books, stock certificates and books, stock transfer ledgers, Contracts, Licenses, customer lists, computer files and programs, retrieval programs, operating data and plans and environmental studies and plans.

"Business" means the business of developing, owning or operating wind or solar energy projects in Canada.

"Business Day" means a day other than Saturday, Sunday or any day on which banks located in Toronto, Canada are authorized or obligated to close.

"Business or Condition" means the business, condition (financial or otherwise), results of operations, Assets and Properties and prospects of an entity and its Subsidiaries taken as a whole.

"Certificate" has the meaning ascribed to such term in Section 1.03.

"Class A Common Stock" has the meaning ascribed to it in the forepart of this Agreement.

"Class A Purchase Price" has the meaning ascribed to such term in Section 1.01.

"Class B Common Stock" has the meaning ascribed to it in the forepart of this Agreement.

"Class B Options" has the meaning ascribed to it in the forepart of this Agreement.

"Class C Common Stock" has the meaning ascribed to it in the forepart of this Agreement.

"Convertible Common Stock" has the meaning ascribed to it in the forepart of this Agreement.

"Closing" means the closing of the transactions contemplated by Section 1.02.

"Closing Date" means (a) the fifth Business Day after the day on which the last of the consents, approvals, actions, filings, notices or waiting periods described in or related to the filings described in Article VII or Article VIII has been obtained, made or given or has expired, as applicable, or (b) such other date as the Parties mutually agree upon in writing.

- 48 -

"Contract" means any agreement, lease, Option to Lease, license, evidence of Indebtedness, mortgage, indenture, security agreement, or other contract (whether written or oral) with any Person, including without limitation any of the foregoing or any other arrangement with any Band.

"Development Project(s)" has the meaning ascribed to it in Section 2.28.

"Disclosure Schedule" means the record delivered to Acquisitionco by SkyPower or the SkyPower Shareholders, as applicable, herewith and dated as of the date hereof, containing all lists, descriptions, exceptions and other information and materials as are required to be included therein by the SkyPower Shareholders or SkyPower, as applicable, pursuant to this Agreement.

"Employment Agreement(s)" means those certain employment agreements dated as of the date hereof by and between Acquisitionco and the Persons listed on Schedule C attached hereto.

"Environmental Claim" means, with respect to any Person, any written or oral notice, claim, demand or other communication (collectively, a "claim") by any other Person alleging or asserting such Person's liability for investigatory costs, cleanup costs, Governmental or Regulatory Authority response costs, damages to natural resources or other property, personal injuries, fines or penalties arising out of, based on or resulting from (a) the presence, or Release into the environment, of any Hazardous Material at any location, whether or not owned by such Person, or (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law. The term "Environmental Claim" shall include, without limitation, any claim by any Governmental or Regulatory Authority for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and any claim by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from the presence of Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment.

"Environmental Law" means any Law or Order relating to the regulation or protection of human health, safety or the environment or to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or wastes into the environment (including, without limitation, ambient air, soil, surface water, ground water, wetlands, land or subsurface strata), or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or wastes.

"Escrow Agent" means Goodmans LLP.

"Escrow Agreement" means the escrow agreement to be entered into on the Closing Date, substantially in the form of Exhibit F hereto.

"ETA" means the *Excise Tax Act* (Canada).

"Excluded Assets" means: (a) ninety-five thousand (95,000) common shares in the capital of KMX Corp. beneficially owned by SkyPower (the "**KMX Shares**"); (b) a certain

LA1:#6351530v20                                          - 49 -

nominal price repurchase right in favour of SkyPower, pro rata to its respective interest in NIM Tech Inc. granted to SkyPower pursuant to a letter agreement dated October 13, 2005 among, *inter alios*, SkyPower and Miroslaw Wrobel, Michael Maris and Amar Dhanantwari acting on behalf of NIM Tech Inc.; and (c) a certain share purchase option to acquire an additional number of shares in the capital of a technology corporation to be incorporated to pursue the development of Mobile Cube technology granted to SkyPower pursuant to a letter agreement dated October 21, 2003 among Kerry Adler, on behalf of SkyPower, and Robert Niederer, Rene Pardo and Khalid Hossain.

"Financial Statements" means the consolidated financial statements of SkyPower and its consolidated Subsidiaries delivered to Acquisitionco pursuant to Section 2.08 or 6.05.

"GAAP" means Canadian generally accepted accounting principles applied on a consistent basis and which are in accordance with recommendations from time to time of the Canadian Institute of Chartered Accountants (as published in the CICA handbook) at the date on which such generally accepted accounting principles are applied.

"GPCo" has the meaning ascribed to such term in Section 7.04.

"GST" means all Taxes payable under the ETA or under any provincial legislation similar to the ETA and any reference to a specific provision of the ETA or any such provincial legislation shall refer to any successor provision thereto of like or similar effect.

"Governmental or Regulatory Authority" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of any country, province, county, city or other political subdivision.

"Hazardous Material" means (a) any petroleum or petroleum products, flammable explosives, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation and transformers or other equipment that contain dielectric fluid containing levels of polychlorinated biphenyls (PCBs); (b) any chemicals or other materials or substances which are now or hereafter become defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants" or words of similar import under any Environmental Law; and (c) any other chemical or other material or substance, exposure to which is now or hereafter prohibited, limited or regulated by any Governmental or Regulatory Authority under any Environmental Law.

"HSHN" has the meaning ascribed to it in the forepart of this Agreement.

"HSHN Purchase Price" has the meaning ascribed to it in Section 1.01.

"HSHN Shares" has the meaning ascribed to it in the forepart of this Agreement.

"Indebtedness" of any Person means all obligations of such Person (a) for borrowed money, (b) evidenced by notes, bonds, debentures or similar instruments, (c) for the deferred purchase price of goods or services (other than trade payables or accruals incurred in the

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

ordinary course of business), (d) under capital leases and (e) in the nature of guarantees of the obligations described in clauses (a) through (d) above of any other Person.

"Intellectual Property" means all intellectual property rights of any nature or form of protection of a similar nature or having equivalent or similar effect to any of the foregoing, including, without limitation:

(a)      inventions, discoveries, processes, designs, techniques, developments, technology, and related improvements, whether or not patentable, and patents, patent applications, divisionals, continuations, reissues, renewals, registrations, confirmations, re-examinations, certificates of inventorship, extensions, and the like, and any provision applications of any such patents or patent applications (collectively "Patents");

(b)      any word, name, symbol, color, designation, or device or any combination thereof (to the extent the same may be trademarked under applicable Law), including, without limitation, any pending trademark, trade dress, service mark, service name, trade name, brand name, logo, domain name, or business symbol, and any foreign or international equivalent of any of the foregoing and all goodwill associated therewith (collectively "Trademarks");

(c)      any work, whether or not a registered copyright, that incorporates, is based upon, derived from, or otherwise uses any intellectual property, including, without limitation, mechanical and electronic design drawings (including, without limitation, computer-aided design files), specification, software (including, without limitation, source code and object code), processes, technical or engineering data, test procedures, schematics, writings, materials, products, artwork, packaging and advertising materials algorithms, flowcharts, and know-how (collectively "Copyrights");

(d)      technical, scientific, and other know-how and information, trade secrets, knowledge, technology, means, methods, processed, practices, formulas, assembly procedures, computer programs, source code, apparatuses, specifications, books, records, production data, publications, databases, reports, manuals, data and results, in written, electronic, or any other form not known or hereafter developed (collectively "Trade Secrets"); and

(e)      mask work and similar rights protecting integrated circuit or chip topographies or designs.

"Investment Assets" means all debentures, notes and other evidences of Indebtedness, stocks, securities (including rights to purchase and securities convertible into or exchangeable for other securities), interests in joint ventures and general and limited partnerships, mortgage loans and other investment or portfolio assets owned of record or beneficially by SkyPower or any Subsidiary and issued by any Person other than SkyPower or any Subsidiary (other than trade receivables generated in the ordinary course of business of SkyPower and the Subsidiaries).

"Key Man Life Insurance Policy" has the meaning ascribed to it in Section 6.13.

"Knowledge of SkyPower" "Knowledge of any SkyPower Shareholder" or "Known to any SkyPower Shareholder" means the knowledge of any officer, director or employee of such SkyPower Shareholder, SkyPower, or any Subsidiary, as applicable.

"Laws" means all laws, statutes, rules, regulations, ordinances and other pronouncements having the effect of law of any country, province, county, city or other political subdivision or of any Governmental or Regulatory Authority.

"Liabilities" means all Indebtedness, obligations and other liabilities of a Person (whether absolute, accrued, contingent, fixed or otherwise, or whether due or to become due).

"Licenses" means all licenses, permits, certificates of authority, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental or Regulatory Authority.

"Liens" means any mortgage, pledge, hypothec, assessment, security interest, lease, lien, adverse claim, levy, charge or other encumbrance of any kind, or any conditional sale Contract, title retention Contract or other Contract to give any of the foregoing.

"Loss" means any and all damages, fines, fees, penalties, deficiencies, diminution in value, losses and expenses (including without limitation interest, court costs, fees of attorneys, accountants and other experts or other expenses of litigation or other proceedings or of any claim, default or assessment).

"LP" has the meaning ascribed to such term in Section 7.04.

"New Options" has the meaning ascribed to such term in Section 1.01.

"Non-Canadian Shareholder(s)" means any Person listed under Article I of Schedule D hereto.

"Non-Canadian Optionholder(s)" means any Person listed under Article II of Schedule D hereto.

"Operative Agreements" means this Agreement, the Employment Agreements, the Rights Agreement, the Shareholders Agreement, the Amended Acquisitionco Charter, and any other support or other agreements to be entered into in connection with the transaction, each such agreement in the form agreed upon by the Parties.

"Option" with respect to any Person means any security, right, subscription, warrant, option, "phantom" stock right or other Contract that gives the right to (a) purchase or otherwise receive or be issued any shares of capital stock of such Person or any security of any kind convertible into or exchangeable or exercisable for any shares of capital stock of such Person or (b) receive or exercise any benefits or rights similar to any rights enjoyed by or accruing to the holder of shares of capital stock of such Person, including any rights to participate in the equity or income of such Person or to participate in or direct the election of any directors or officers of such Person or the manner in which any shares of capital stock of such Person are voted.

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

"the Options" has the meaning ascribed to it in the forepart of this Agreement.

"Option Holder(s)" has the meaning ascribed to it in the forepart of this
Agreement.

"Option Holder Shares" has the meaning ascribed to it in the forepart of this
Agreement.

"Option Purchase Price" has the meaning ascribed to it in Section 1.01.

"Optioned Lands" means any lands subject to an Option to Lease.

"Option to Lease" means any option granted to SkyPower or any Subsidiary to
lease or use or be granted any easement, license, right to occupy or use, or right-of-way over any
real property.

"Order" means any writ, judgment, decree, injunction or similar order of any
Governmental or Regulatory Authority (in each such case whether preliminary or final).

"Pension Plan(s)" means, collectively, each Benefit Plan which is a "registered
pension plan," as that term is defined in subsection 248(1) of the Tax Act.

"Permitted Lien" means (a) any Lien for Taxes not yet due or delinquent or being
contested in good faith by appropriate proceedings for which adequate reserves have been
established in accordance with GAAP, (b) any statutory Lien arising in the ordinary course of
business by operation of Law with respect to a Liability that is not yet due or delinquent and
(c) any minor imperfection of title or similar Lien which individually or in the aggregate with
other such Liens does not materially impair the value of the property subject to such Lien or the
use of such property in the conduct of the business of SkyPower or any Subsidiary.

"Person" means any natural person, corporation, limited liability company,
general partnership, limited partnership, proprietorship, other business organization, trust, union,
association or Governmental or Regulatory Authority.

"Plan" means any employment agreement and any bonus, incentive
compensation, deferred compensation, pension, profit sharing, retirement, stock purchase, stock
option, restricted stock, deferred stock, stock ownership, stock appreciation rights, phantom
stock, equity-related, leave of absence, layoff, vacation, day or dependent care, legal services,
cafeteria, life, health, accident, disability, workmen's compensation or other insurance, change in
control, retention, severance, separation or other employee benefit plan, practice, policy or
arrangement of any kind, whether written or oral, including, but not limited to, any employee
benefit plan.

"Pro Rata Shareholder Purchase Price" has the meaning ascribed to such term in
Section 1.03.

"Purchaser" has the meaning ascribed to it in the forepart of this Agreement.

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

"Purchaser Indemnified Parties" has the meaning ascribed to it in Section 12.01.

"Purchaser Group" has the meaning ascribed to it in the introductory paragraph to Article VIII.

"Purchase Price" means any of the Class A Purchase Price, the SkyPower Common Stock Purchase Price, the Shareholder Holdco Purchase Price, the Shareholder Share Purchase Price, the Option Purchase Price, the HSHN Purchase Price, or the Adler Class B Common Stock Purchase Price, as the context requires.

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Materials through ambient air, soil, surface water, ground water, wetlands, land or subsurface strata.

"Representatives" has the meaning ascribed to it in Section 6.02.

"Rights" has the meaning ascribed to it in the forepart of this Agreement.

"Rights Agreement" means that certain Rights Agreement dated as of June 11, 2007 by and between Purchaser and Acquisitionco.

"Shares" has the meaning ascribed to it in the forepart of this Agreement.

"Shareholder(s)" has the meaning ascribed to it in the forepart of this Agreement.

"Shareholders Agreement" means that certain Unanimous Shareholder Agreement date as of June 11, 2007 by and between Purchaser, Adler, Adler Holdco II, HSHN, Shareholder Holdco, the Shareholders, and Acquisitionco.

"Shareholder Amount" has the meaning ascribed to such term in Section 12.05(a).

"Shareholder Holdco" has the meaning ascribed to it in the forepart of this Agreement.

"Shareholder Holdco Purchase Price" has the meaning ascribed to such term in Section 1.01.

"Shareholder Holdco Shares" has the meaning ascribed to it in the forepart of this Agreement.

"Shareholder Shares has the meaning ascribed to it in the forepart of this Agreement.

"Shareholder Share Purchase Price" has the meaning ascribed to Section 1.01.

"Shareholder Indemnified Parties" has the meaning ascribed to it in Section 12.02.

"SkyPower" has the meaning ascribed to it in the forepart of this Agreement.

"SkyPower Class B Stock" has the meaning ascribed to it in the forepart of this Agreement.

"SkyPower Common Stock Purchase Price" has the meaning ascribed to Section 1.01.

"SkyPower Confidential Technology and Information" has the meaning ascribed to it in Section 2.17 hereto.

"SkyPower Material Adverse Effect" shall mean a material adverse effect on the business, condition (financial or otherwise), Assets and Properties, liabilities, results of operations or prospects of SkyPower and its Subsidiaries on or the validity or enforceability in any material respect of any Operative Document; provided, however, that none of the following shall be or will be at the Closing, deemed to constitute and shall not be taken into account in determining the occurrence of a SkyPower Material Adverse Effect:  (a) any effect or change that results from the announcement of the execution and delivery of this Agreement, and (b) any effect or change that results from the taking of any action required pursuant to this Agreement or expressly permitted by the written consent of the Purchaser Group pursuant to this Agreement.

"SkyPower Shares" has the meaning ascribed to it in the forepart of this Agreement.

"SkyPower Shareholder(s)" has the meaning ascribed to it in the forepart of this Agreement.

"Statutory Plans" means statutory benefit plans which SkyPower or any Subsidiary is required to participate in or comply with, including the Canada and Quebec Pension Plans and plans administered pursuant to applicable health tax, workplace safety insurance and employment insurance legislation.

"Subsidiary" means (i) a subsidiary as defined under GAAP, including without limitation, any corporate subsidiary as to which SkyPower owns at least fifty percent (50%) of the voting securities or has the contractual power presently to elect at least fifty percent (50%) of directors and (ii) non-corporate entities (including without limitation, limited liability companies and limited partnerships) in which SkyPower has the right to at least fifty percent (50%) of the profits or fifty percent (50%) of the assets, (ii) Terrawinds Resources Corp. and (iii) any partnership the only general partner or general partners of which are SkyPower or one or more of its Subsidiaries. Further, where any representation in Articles 2 or 3 cover Subsidiaries, such representation shall be deemed to cover all joint venture entities in which SkyPower has any equity or voting interest; provided, however, that representations with respect to such joint venture entities shall only be deemed to be given on a 'best of knowledge" basis.

"Taxes" or "Tax" means all taxes, levies, duties, assessments, reassessments and other charges of any nature whatsoever imposed by any Authority, whether direct or indirect, including income tax, profits tax, gross receipts tax, corporation tax, sales and use tax, wage tax, payroll tax, worker's compensation levy, capital tax, stamp duty, real and personal property tax,

- 55 -

land transfer tax, customs or excise duty, excise tax, turnover or value added tax on goods sold or services rendered, withholding tax, social security, Canada or Quebec pension plans and employment or unemployment insurance charges or retirement contributions, and any interest, fines, additions to tax and penalties thereon.

"Tax Act" means the *Income Tax Act* (Canada).

"Tax Return" means all returns, reports, declarations, elections, notices, filings, forms, statements and other related documents required to be filed by Law in respect of Taxes.

"Third Party Claim" has the meaning ascribed to it in Section 12.04.

"Transaction" means all transactions contemplated by this Agreement.

"Unaudited Financial Statement Date" means the last day of the most recent fiscal quarter of SkyPower for which Financial Statements are delivered to Acquisitionco pursuant to Section 2.07.

"Unaudited Financial Statements" means the Financial Statements for the most recent fiscal quarter of SkyPower delivered to Acquisitionco pursuant to Section 2.08.

"Water Pump Technology" has the meaning ascribed to such term in Section 2.17.

"Withheld Amount" has the meaning ascribed to such term in Section 1.03.

(a) Construction of Certain Terms and Phrases. Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "**hereof**," "**herein**," "**hereby**" and derivative or similar words refer to this entire Agreement; (iv) the terms "**Article**" or "**Section**" refer to the specified Article or Section of this Agreement; and (v) the phrases "**ordinary course of business**" and "**ordinary course of business consistent with past practice**" refer to the business and practice of SkyPower or a Subsidiary. Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP. For the purposes hereof, two Persons are considered to be at "arm's length" to one another if they would be considered to be dealing at arm's length under the Tax Act.

## ARTICLE XV

## MISCELLANEOUS

15.01   Notices. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (a) on the date of service if served personally on the party to whom notice is to be given; (b) on the day of transmission if sent via facsimile transmission to the facsimile number given below, and telephonic confirmation of receipt is obtained promptly after completion of transmission; (c) on

the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (d) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to the Purchaser Group, to:

LB Skypower Inc.
c/o Lehman Brothers Inc.
745 Seventh Avenue; New York, NY 10019-6801
Facsimile No.: 212-520-0327
Attn: Andrew Weber

with a copy to:

Lehman Brothers Inc.
745 Seventh Avenue; New York, NY 10019-6801
Facsimile No.: 646-758-2651
Attn: Office of General Counsel

If to Adler or any of the other SkyPower Shareholders other than HSHN, to:

c/ o SkyPower Corp.
250 Yonge Street, Suite 1600
Toronto, Ontario M5B2L7
Facsimile No.: 416-981-8686
Attn: Kerry Adler

If to HSHN, to:

c/o HSH Nordbank AG
New York Branch
230 Park Avenue
New York, NY 10169-0005

with a copy to:

c/ o SkyPower Corp.
250 Yonge Street, Suite 1600
Toronto, Ontario M5B2L7
Facsimile No.: 416-981-8686

LA1:#6351530v20

- 57 -

Attn: Kerry Adler

Any party from time to time may change its address, facsimile number or other information for the purpose of notices to that party by giving notice specifying such change to the other party hereto.

15.02   Entire Agreement. This Agreement and the Operative Agreements supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof and thereof, including without limitation (i) that certain letter of intent; between the parties dated May 11, 2007 and (ii) that certain letter of intent between the parties dated June 1, 2007, and contains the sole and entire agreement between the parties hereto with respect to the subject matter hereof and thereof.

15.03   Expenses. Except as otherwise expressly provided in this Agreement (including without limitation as provided in Section 13.02), whether or not the transactions contemplated hereby are consummated, each party will pay its own costs and expenses, and the SkyPower Shareholders shall pay the costs and expenses of the SkyPower Shareholders and the Subsidiaries, incurred in connection with the negotiation, execution and closing of this Agreement and the Operative Agreements and the transactions contemplated hereby and thereby.

15.04   Confidentiality; Publicity. (a) Each party hereto will hold, and will use its best efforts to cause its Affiliates, and their respective Representatives to hold, in strict confidence from any Person (other than any such Affiliate or Representative), unless (i) compelled to disclose by judicial or administrative process (including without limitation in connection with obtaining the necessary approvals of this Agreement and the transactions contemplated hereby of Governmental or Regulatory Authorities) or by other requirements of Law or (ii) disclosed in an Action or Proceeding brought by a party hereto in pursuit of its rights or in the exercise of its remedies hereunder, all documents and information concerning any other party or any of its Affiliates furnished to it by the other party or such other party's Representatives in connection with this Agreement or the transactions contemplated hereby, except to the extent that such documents or information can be shown to have been (a) previously known by the party receiving such documents or information, (b) in the public domain (either prior to or after the furnishing of such documents or information hereunder) through no fault of such receiving party or (c) later acquired by the receiving party from another source if the receiving party is not aware that such source is under an obligation to another party hereto to keep such documents and information confidential. In the event the transactions contemplated hereby are not consummated, upon the request of the other party, each party hereto will, and will cause its Affiliates and their respective Representatives to, promptly redeliver or cause to be redelivered all copies of documents and information furnished by the other party in connection with this Agreement or the transactions contemplated hereby and destroy or cause to be destroyed all notes, memoranda, summaries, analyses, compilations and other writings related thereto or based thereon prepared by the party furnished such documents and information or its Representatives.

(b) Except in accordance with Paragraph (a) above, neither Party, nor their respective Affiliates or Representatives, without the written consent of the other, will make any

public announcement or issue any press release with respect to the transactions contemplated by this Agreement. In no event will SkyPower, the SkyPower Shareholders or either of their respective Subsidiaries, Affiliates or Representatives make any public announcement or issue any press release with respect to the transactions contemplated by this Agreement without the approval of the Purchaser Group.

15.05 Waiver. Any term or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the party waiving such term or condition. No waiver by any party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion. All remedies, either under this Agreement or by Law or otherwise afforded, will be cumulative and not alternative.

15.06 Amendment. This Agreement may be amended, supplemented or modified only by a written instrument duly executed by or on behalf of each party hereto.

15.07 No Third Party Beneficiary. The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person other than any Person entitled to indemnity under Article XII.

15.08 No Assignment; Binding Effect. Neither this Agreement nor any right, interest or obligation hereunder may be assigned by any party hereto without the prior written consent of the other party hereto and any attempt to do so will be void, except (a) for assignments and transfers by operation of Law, (b) the assignment by any SkyPower Shareholder to a wholly-owned affiliate or subsidiary holding company of such SkyPower Shareholder (provided that such SkyPower Shareholder shall remain obligated under this Agreement and under any applicable Operating Agreement) and (c) that Purchaser or Acquisitionco may assign any or all of its rights, interests and obligations hereunder (including without limitation its rights under Article XII) to (i) a wholly-owned subsidiary, provided that any such subsidiary agrees in writing to be bound by all of the terms, conditions and provisions contained herein, (ii) any post-Closing purchaser of all of the issued and outstanding stock of the SkyPower Shareholders or a substantial part of its assets or (iii) any financial institution providing purchase money or other financing to Purchaser, Acquisitionco or the SkyPower Shareholders from time to time as collateral security for such financing, but no such assignment shall relieve any SkyPower Shareholder, Purchaser or Acquisitionco, as the case may be, of its obligations hereunder. Subject to the preceding sentence, this Agreement is binding upon, inures to the benefit of and is enforceable by the parties hereto and their respective successors and assigns.

15.09 Headings. The headings used in this Agreement have been inserted for convenience of reference only and do not define or limit the provisions hereof.

15.10 Dispute Resolution; Arbitration.

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

(a) The parties agree that disputes under this Agreement shall be resolved pursuant to arbitration in accordance of the rules and procedures of the American Arbitration Association. The place of the arbitration will be New York, New York.

(b) The parties will agree on the appointment of an arbitrator (the "Sole Arbitrator"). If the parties are unable to agree upon a Sole Arbitrator, each party will appoint a person as arbitrator, and those two arbitrators will appoint a third arbitrator (the "Arbitrators").

(c) The Sole Arbitrator or, as the case may be, the Arbitrators appointed above will in its or their absolute discretion, establish reasonable rules to govern all aspects of the arbitration and to ensure that the arbitration is conducted expeditiously. The parties may request that the Sole Arbitrator or the Arbitrators, as the case may be, decide between final and complete proposals submitted by each of the parties.

(d) The decision of the Sole Arbitrator or the Arbitrators with respect to the dispute must be rendered, in writing and must contain a brief recital of the facts and principles upon which the decision was made and the reasons therefor. The decision or award of the Sole Arbitrator or the Arbitrators made pursuant to this Schedule is final and binding upon each of the parties and there is no appeal therefrom. Thereafter, any action may only be for the purpose of enforcing the decision or award and the recovery of costs incidental to the action.

(e) The decision or award of the Sole Arbitrator or Arbitrators, as the case may be, will be conclusively deemed to determine the interpretation of this Agreement or any Operative Agreements and the rights and liabilities as between the parties in respect of the matter in disagreement.

(f) Except as may be otherwise agreed by the parties, or as may be ordered by the Sole Arbitrator or the Arbitrators, the Sole Arbitrator or the Arbitrators will be entitled to its or their usual charges for services rendered to be paid equally by the parties.

(g) Subject to this paragraph, no dispute that is or may be the subject of a submission to arbitration in accordance with this Section will give rise to a cause of action between or will be made the subject matter of an action in any court of law or equity by either of the parties unless and until the dispute has been submitted to arbitration and finally determined in accordance with this Section and any action commenced thereafter with respect to the dispute may only be for judgment in accordance with the decision of the Sole Arbitrator or the Arbitrators, as applicable, and the costs incidental to the action. In any action of this sort, the decision of the Sole Arbitrator or the Arbitrators, as applicable, will be conclusively deemed to determine the rights and liabilities between the parties in respect of the dispute.

Notwithstanding the foregoing, if the actions or inactions of a party are, in the honest view of the other party, producing or likely to produce irreparable harm that cannot be adequately compensated for by damages or that will result in damages that are difficult to estimate, the aggrieved party may apply to a court for injunctive or mandatory injunctive relief to remedy the situation pending the conduct of arbitration. The court before which the proceeding is brought may, if it determines that arbitration would not, in the circumstances be beneficial to a continuing relationship between the parties, grant the aggrieved party the right to proceed with

an action notwithstanding the otherwise general application of arbitration as the chosen mode of dispute resolution.

(h) The parties desire that any dispute that is to be determined in accordance with the dispute resolution provisions should be conducted in strict confidence and that there will be no disclosure to any Person of the fact of the dispute or any aspect of the dispute except as necessary for the resolution of the dispute. Any hearing will be attended only by those Persons whose presence, in the opinion of any party or the arbitrator, is reasonably necessary for the determination of the dispute. All matters relating to, all evidence presented to, all submissions made in the course of, and all documents produced in accordance with the dispute resolution procedure or any order of the arbitrator or created in the course of or for the purposes of the arbitration, including any award or interim award by the arbitrator, will be kept confidential and will not be disclosed to any Person without the prior written consent of all parties to the arbitration except as required to enforce the award or as required by law or as permitted by an order of the arbitrator made pursuant to a motion or application on notice to all parties to the arbitration.

15.11  Invalid Provisions.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of any party hereto under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, and (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom.

15.12  Governing Law.  This Agreement shall be governed by and construed in accordance with the Laws of New York applicable to a Contract executed and performed in such State, without giving effect to the conflicts of laws principles thereof.

15.13  Judicial Proceedings; Waiver of Jury Trial; Designation of Agent. SUBJECT TO SECTION 15.10, ANY JUDICIAL PROCEEDING ARISING OUT OF OR IN CONNECTION WITH ANY CLAIM UNDER THIS AGREEMENT (INCLUDING TO ENFORCE ANY ARBITRATION AWARD OR TO COMPEL ARBITRATION PURSUANT TO SECTION 15.10) MAY BE BROUGHT IN ANY COURT OF COMPETENT JURISDICTION IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY  (A) ACCEPTS, GENERALLY AND UNCONDITIONALLY, THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT AND ANY RELATED APPELLATE COURT AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH ANY LOAN DOCUMENT CLAIM AND (B) TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH JURISDICTION. EACH PARTY NOT LOCATED IN NEW YORK SHALL APPOINT AND MAINTAIN CT CORPORATION SYSTEM, THE PRENTICE-HALL CORPORATION SYSTEM INC. OR A

SIMILAR ENTITY (THE "**SERVICE AGENT**") AS AGENT TO RECEIVE ON ITS
BEHALF SERVICE OF PROCESS IN ANY PROCEEDING IN A STATE OR FEDERAL
COURT LOCATED IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK
BY ENTERING INTO AN AGREEMENT AS OF THE DATE OF THIS AGREEMENT WITH
THE SERVICE AGENT TO SUCH EFFECT, AND SUCH PARTY SHALL MAINTAIN
SUCH AGREEMENT (OR AN APPROPRIATE SUBSTITUTE TO THE SAME EFFECT
WITH THE SAME OR A DIFFERENT SERVICE AGENT) FOR THE ENTIRE TERM OF
THIS AGREEMENT AND EACH OF THE OTHER OPERATIVE DOCUMENTS TO WHICH
IT IS A PARTY. THE FOREGOING CONSENT TO JURISDICTION AND APPOINTMENT
OF AGENT TO RECEIVE SERVICE OF PROCESS SHALL NOT CONSTITUTE A
GENERAL CONSENT TO SERVICE OF PROCESS IN THE STATE OF NEW YORK FOR
ANY PURPOSE EXCEPT AS PROVIDED ABOVE AND SHALL NOT BE DEEMED TO
CONFER RIGHTS ON ANY PERSON OTHER THAN THE PARTIES HERETO. NOTHING
HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY OR ANY OTHER INDEMNIFIED
PERSON TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR
SHALL LIMIT THE RIGHT OF ANY PARTY OR ANY OTHER INDEMNIFIED PERSON
TO BRING PROCEEDINGS IN THE COURTS OF ANY OTHER JURISDICTION. IN
LIGHT OF THE EXPRESS AGREEMENT OF THE PARTIES TO SUBMIT TO THE
JURISDICTION OF NEW YORK COURTS FOR THE RESOLUTION OF ANY AND ALL
DISPUTES ARISING UNDER THIS AGREEMENT AND BROUGHT IN NEW YORK
COURTS PURSUANT TO THIS SECTION 15.13, EACH PARTY FURTHER HEREBY
KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES, TO THE FULLEST
EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL AFFIRMATIVE
DEFENSES IT COULD OR MIGHT OTHERWISE BE ABLE TO ASSERT BASED ON AN
ALLEGED INCAPACITY OF SUCH PARTY TO ASSERT A CLAIM OR
COUNTER-CLAIM IN THE STATE COURTS OF THE STATE OF NEW YORK LOCATED
IN THE BOROUGH OF MANHATTAN WHETHER ON THE GROUNDS THAT SUCH
PARTY HAS FAILED TO COMPLY WITH ANY OR ALL REGISTRATION,
CERTIFICATION, NOTIFICATION, FILING OR DESIGNATION-OF-AGENT
GOVERNMENTAL REQUIREMENTS OF THE STATE OF NEW YORK OR ON OTHER
GROUNDS. EACH PARTY HERETO EACH HEREBY KNOWINGLY, VOLUNTARILY
AND INTENTIONALLY, IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE
FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE
TO A TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING ANY CLAIM
ARISING OUT OF, RELATING TO OR IN CONNECTION WITH ANY OPERATIVE
DOCUMENT CLAIM. EACH PARTY HERETO (A) CERTIFIES THAT NO
REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS
REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD
NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER
AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE
BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER OPERATIVE
DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL
WAIVERS AND CERTIFICATIONS IN THIS SECTION 15.13. THE PROVISIONS OF THIS
SECTION 15.13 SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT AND
THE PAYMENT IN FULL OF THE OBLIGATIONS.

15.14  <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by the duly authorized officer of each party hereto as of the date first above written.

**LB SKYPOWER INC.**

By: _____

Name:

Title:

**1328392 ALBERTA ULC**

By: _____
      Name:
      Title:

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

**SKYPOWER CORP.**

By: _____

Name:  Kerry Adler

Title:

**6785778 CANADA INC.**

By: _____

    Name: Kerry Adler

    Title:

**HSH NORDBANK AG,** by its Attorney, Kerry
Adler

By: _____

   Name: Kerry Adler
   Title:

**2138746 ONTARIO INC.**

By: _____

Name: Kerry Adler

Title:

**2138747 ONTARIO INC.**

By: _____

　　　Name: Kerry Adler
　　　Title:

_____    }    _____
Witness                                              **KERRY ADLER**

**KERRY ADLER,** as an Attorney for the Shareholders
listed in Schedule "A" attached hereto

_____

**KERRY ADLER**

**KERRY ADLER,** as an Attorney for the Option Holders
listed in Schedule "B" attached hereto

**KERRY ADLER**

GOODMANS\\5456420.1

S-10

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*