# EXHIBIT 4

**Unanimous Shareholder Agreement**
**made as of June 11, 2007**

# UNANIMOUS SHAREHOLDER AGREEMENT

Made as of June 11, 2007

Between

## LB SKYPOWER INC.

- and -

## KERRY ADLER

- and -

## 2138747 ONTARIO INC.

- and -

## HSH NORDBANK AG

- and -

## 6785778 CANADA INC.

- and -

## THE PERSONS LISTED IN
## SCHEDULE "A" ATTACHED HERETO

- and -

## 1328392 ALBERTA ULC

*Unanimous Shareholder Agreement*

## TABLE OF CONTENTS

**Article I INTERPRETATION**..................................................................................................**2**

    1.1      Definitions............................................................................................................2

    1.2      Headings and References....................................................................................8

    1.3      Extended Meanings.............................................................................................9

    1.4      Business Day.......................................................................................................9

    1.5      Time.....................................................................................................................9

    1.6      Statutory References ...........................................................................................9

    1.7      Schedules ............................................................................................................9

**Article II IMPLEMENTATION OF AGREEMENT**......................................................**9**

    2.1      Party Covenants .................................................................................................9

    2.2      Conflict .............................................................................................................10

    2.3      Covenants by the Corporation .........................................................................10

**Article III REPRESENTATIONS AND WARRANTIES** .............................................**10**

    3.1      ULC Shareholder Representations and Warranties .........................................10

    3.2      Representations and Warranties of Holdco Shareholders other than Adler ..........11

    3.3      Representations and Warranties of Holdco Shareholders.......................................12

    3.4      Representations and Warranties of Adler .............................................................12

**Article IV MANAGEMENT**.............................................................................................**13**

    4.1      Number and Election of Directors ...................................................................13

    4.2      Meetings of Directors .......................................................................................13

    4.3      Indemnity .........................................................................................................14

    4.4      Insurance ...........................................................................................................14

    4.5      Officers .............................................................................................................14

    4.6      Advisory Board.................................................................................................15

    4.7      Restrictions on Management and Directors......................................................15

    4.8      Financial Reporting..........................................................................................18

**Article V CONFIDENTIALITY OBLIGATIONS** .........................................................**18**

    5.1      Confidentiality ..................................................................................................18

    5.2      Breach of Obligations ......................................................................................19

**Article VI EXCLUSIVE LEHMAN RIGHT TO INVEST; SPECIFIC  PROJECT BACK-
LEVERAGED PROVISIONS** ..............................................................................................**20**

    6.1      Equity Investments............................................................................................20

    6.2      Proceeds of Project Back-leveraged debt .........................................................20

**Article VII DISTRIBUTIONS**...........................................................................................**21**

    7.1      Distributions......................................................................................................21

- 2 -

**Article VIII LEHMAN SUPPORT AND THIRD PARTY PROJECT EQUITY**..................**23**

   8.1     Rights.................................................................................................................23

   8.2     Credit Support for RFPs...................................................................................24

   8.3     RFP Protocol......................................................................................................24

   8.4     Market Rates .....................................................................................................24

   8.5     Lehman Conflicts..............................................................................................24

**Article IX HSHN'S RIGHT TO RECEIVE FIRST APPLICATION WITH RESPECT TO
ADDITIONAL FINANCINGS** ...........................................................................................**24**

**Article X DEALING WITH ULC SHARES** ....................................................................**25**

   10.1   Sale and Issue Restrictions................................................................................25

   10.2   Transfer to Family Holding Vehicle ...................................................................26

   10.3   Drag-Along Rights.............................................................................................27

   10.4   Tag-Along Rights...............................................................................................27

   10.5   Sale of the Corporation/ Monetization Event .........................................................28

   10.6   Call Rights ........................................................................................................28

   10.7   Put Rights..........................................................................................................29

   10.8   Corporation Purchase........................................................................................30

   10.9   Determination of Fair Value ...............................................................................30

   10.10  Sale of Minority Holdco or Adler Holdco ............................................................31

   10.11  General Sale Provisions.....................................................................................32

   10.12  Share Certificates .............................................................................................34

   10.13  Securities Law....................................................................................................34

**Article XI GENERAL PROVISIONS**................................................................................**35**

   11.1   Assignment and Enurement ...............................................................................35

   11.2   Governing Law ..................................................................................................35

   11.3   Dispute Resolution; Arbitration. .........................................................................35

   11.4   Judicial Proceedings; Waiver of Jury Trial; Designation of Agent. ......................37

   11.5   Waiver of Jury Trial ...........................................................................................38

   11.6   Severability .......................................................................................................38

   11.7   Entire Agreement..............................................................................................38

   11.8   Waiver...............................................................................................................38

   11.9   Further Assurances...........................................................................................39

   11.10  Remedies Cumulative .......................................................................................39

   11.11  Amendments .....................................................................................................39

   11.12  Termination.......................................................................................................39

*Unanimous Shareholder Agreement*

- 3 -

11.13  Notices ............................................................................................................39

11.14  Counterparts and Facsimile.............................................................................41

11.15  Independent Legal Advice ...............................................................................41

## UNANIMOUS SHAREHOLDER AGREEMENT

This Agreement is made as of June 11, 2007.

**B E T W E E N:**

**LB SKYPOWER INC.,** a corporation existing under the laws of Delaware

("**Lehman**")

- and -

**KERRY ADLER**, an individual resident in the Province of Ontario

("**Adler**")

- and -

**2138747 ONTARIO INC.,** a corporation existing under the laws of Ontario

("**Adler Holdco**")

- and -

**HSH NORDBANK AG** a corporation existing under the laws of Germany

("**HSHN**")

- and -

**6785778 CANADA INC.,** a corporation existing under the laws of Canada

("**Minority Holdco**")

- and -

**THE PERSONS LISTED IN
SCHEDULE "A" ATTACHED HERETO**

(the "**Minority Principals**")

- and -

**1328392 ALBERTA ULC,** an unlimited liability company existing under the laws of Alberta

(the "**Corporation**")

- 2 -

**RECITALS**

A.          The authorized capital of the Corporation consists of an unlimited number of
Class A common shares (the "**Class A Shares**"), an unlimited number of Class B common
shares, (the "**Class B Shares**"), an unlimited number of Class C common shares (the "**Class C
Shares**"), 100,000 Class D common shares (the "**Class D Shares**" and together with the Class A
Shares, the Class B Shares and the Class C Shares the "**Common Shares**"), an unlimited number
of convertible preferred shares issuable in a series (the "**Convertible Preferred Shares**") and an
unlimited number of non-convertible preferred shares.

B.          At the date of this Agreement, all of the issued and outstanding shares of the
Corporation are legally and beneficially owned as set forth below:

| Name of Shareholder | Number and Class of Shares |
|---|---|
| Lehman | 2,702,258 Class A Shares |
| Minority Holdco | 625,075 Class B Shares |
| HSHN | 616,800 Class C Shares |
| Adler Holdco | 1,348,028 Class B Shares |

C.          The Parties have agreed to enter into this Agreement to provide for certain
restrictions on the transfer and ownership of shares of the Corporation, Adler Holdco and
Minority Holdco and to record their agreement as to the manner in which the affairs of the
Corporation shall be conducted.

D.          The Parties have agreed this Shareholders Agreement supersedes any or all prior
agreements regarding the subject matter herein.

**FOR VALUE RECEIVED**, the Parties agree as follows:

**ARTICLE I**
**INTERPRETATION**

**1.1**      **Definitions**

            In this Agreement:

(a)      "**ABCA**" means the *Business Corporations Act* (Alberta) and the regulations
            made thereunder, as amended from time to time, and any statute that may be
            substituted therefor, and in the case of any such amendment or substitution, any
            reference in this Agreement to the ABCA shall be read as referring to the
            amended or substituted provisions therefor.

*Unanimous Shareholder Agreement*

- 3 -

(b)    **"Adoption Agreement"** means an agreement in writing to become bound by the terms and conditions of this Agreement, substantially in the form of Schedule 1.2(b).

(c)    **"Affiliate"** means any Person that directly, or indirectly through one of more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. Any Person that is an investment vehicle or fund managed by Lehman (or any Affiliate of Lehman) shall be deemed an Affiliate of Lehman, and the Corporation and its Subsidiaries shall be deemed not to be Affiliates of Lehman.

(d)    **"Agreement"** means this unanimous shareholder agreement including any recitals and schedules to this agreement, as amended, supplemented or restated from time to time.

(e)    **"Annual Operating Budget"** has the meaning given to it in Section 4.7(a)(ii).

(f)    **"Arbitrators"** has the meaning given to it in Section 11.3(c).

(g)    **"Arm's Length"** has the meaning given to it in the *Income Tax Act* (Canada).

(h)    **"Budgets"** has the meaning given to it in Section 4.7(a)(ii).

(i)    **"Business"** means the development, acquisition, financing, management, operation and disposition of wind and solar energy projects in Canada and such other activities as shall be approved from time to time by the Directors pursuant to this Agreement.

(j)    **"Business Day"** means a day on which banks are open for business in Toronto, Ontario and in New York, New York but does not include a Saturday, a Sunday and any other day which is a legal holiday in such city.

(k)    **"Buyer"** has the meaning given to it in Section 10.3(a).

(l)    **"Call Notice"** has the meaning given to it in Section 10.6(a).

(m)    **"Call Price"** has the meaning given to it in Section 10.6(a).

(n)    **"Call Sale"** has the meaning given to it in Section 10.6(a).

(o)    **"Called Options"** has the meaning given to it in Section 10.6(a).

(p)    **"Called Shares"** has the meaning given to it in Section 10.6(a).

(q)    **"Class B Shareholders"** means the holders of Class B Shares from time to time.

(r)    **"Class B and Class C Proceeds"** has the meaning attributed to such term in Section 6.2(a).

- 4 -

(s) **"Class C Shareholders"** means the holders of Class C Shares from time to time.

(t) **"Confidential Information"** means all confidential, proprietary or personal information, documentation, knowledge, data or know-how owned, possessed or controlled by, or relating to, the Corporation or any Subsidiary or acquired or developed for its benefit including without limitation, supplier and customer lists, price lists, marketing information, product information, trade secrets and computer software, but excluding any information:

    (i) that is or becomes part of the public domain by publication or otherwise without any breach of this Agreement; or

    (ii) that is obtained on a non-confidential basis from another source acting in good faith without any breach of this Agreement.

(u) **"Control"** means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by proxy, shareholder agreements or otherwise and, in any event, any Person owning or having the right to direct the voting of ten percent (10%) or more of the voting securities of another Person and controlling the voting rights thereto shall be deemed to Control that Person.

(v) **"Corresponding Shares"** has the meaning given to it in Section 10.8.

(w) **"Defaulting Party"** has the meaning given to it in Section 10.6(a).

(x) **"Development Budget"** has the meaning given to it in Section 4.7(a)(ii).

(y) **"Directors"** means the persons who are, from time to time, elected or appointed directors of the Corporation and **"Director"** means any one of them.

(z) **"Disposition Notice"** has the meaning given to it in Section 10.4(a).

(aa) **"Disproportionate Distribution"** has the meaning given to it in Article VII.

(bb) **"Entitled Principal"** means a shareholder of Minority Holdco, *other than* a shareholder who is (or, at any time since the effective date of this Agreement, was) a Director, a member of management of the Corporation or any Subsidiary (including Adler, David Kassie, David Bacon, Cory Basil and Benoit Fortin), and HSHN and any other institutional shareholder.

(cc) **"Escrow Account"** has the meaning given to it in Section 6.2(a).

(dd) **"Escrow Agent"** has the meaning given to it in Section 6.2(a).

(ee) **"ESOP"** means the employee stock option plan of the Corporation to be implemented on the date hereof, as amended from time to time.

*Unanimous Shareholder Agreement*

- 5 -

(ff)   **"ESOP Options"** means the rights to acquire Class B Shares pursuant to the ESOP.

(gg)   **"Fair Value"** has the meaning given to it in Section 10.9(a).

(hh)   **"Family Holding Vehicle"** means, with respect to an Individual Principal, a corporation incorporated pursuant to the laws of Canada or a province thereof having no shareholders other than:

    (i)   the Individual Principal;

    (ii)   the spouse and/or issue of the Individual Principal; or

    (iii)   a trust, the sole trustee of which is the Individual Principal and the sole beneficiaries of which are the spouse or issue of the Individual Principal,

and in which all securities therein are held by such Persons free and clear of Liens and with respect to which the Individual Principal has the sole power to direct its management and policies and owns one hundred percent (100%) of all securities to which are attached any votes that may be cast to elect the directors thereof.

(ii)   **"GAAP"** means those accounting principles which are recognized as being generally accepted in Canada, from time to time, approved by the Canadian Institute of Chartered Accountants (as revised from time to time).

(jj)   **"Holdco Principal"** means any Person who at the relevant time holds securities in Adler Holdco or Minority Holdco, as the context requires.

(kk)   **"Holdco Shares"** means the issued and outstanding securities of Minority Holdco or Adler Holdco, as the context requires.

(ll)   **"Individual Principal"** means, collectively, a Minority Principal who is an individual, Adler and the Optionees.

(mm)   **"Initial Pre-Money Valuation"** means a valuation of the Corporation of U.S.$175,000,000.00.

(nn)   **"Insolvency Event"** means, with respect to a Person:

    (i)   such Person has made an assignment for the benefit of creditors or a proposal under the *Bankruptcy and Insolvency Act* (Canada) (or analogous legislation in another jurisdiction) or has declared bankruptcy or became insolvent;

    (ii)   such Person has been wound up, dissolved or liquidated or has become subject to the provisions of the *Winding Up Act* (Canada) (or analogous legislation in another jurisdiction) or its existence has been terminated or a resolution has been passed therefore; or

*Unanimous Shareholder Agreement*

- 6 -

     (iii)    any trustee in bankruptcy, receiver, receiver and manager, liquidator or other officer with similar powers has been appointed for such Person or for all or any material part of its property;

(oo)    **"Invested Capital Statement"** has the meaning given to it in Article VII.

(pp)    **"Lien"** means any mortgage, lien, charge, hypothec or encumbrance, whether fixed or floating, on, or any security interest in, any property, whether real, personal or mixed, tangible or intangible, any pledge or hypothecation of any property, any deposit arrangement, priority, conditional sale agreement, other title retention agreement or other security arrangement of any kind.

(qq)    **"MIP"** means the management incentive plan of the Corporation to be implemented on the date hereof, as amended from time to time.

(rr)    **"MIP Options"** means the rights to acquire Class D Shares pursuant to the MIP.

(ss)    **"Monetization Event"** means (i) a sale, merger, amalgamation, disposition, winding-up or other corporate action related to the Corporation, SkyPower LP or Opco, and (ii) any other transaction or series of transactions (including any issuance of securities or incurrence of debt) providing proceeds available for distribution to the Parties (provided, however, for the avoidance of doubt, an incurring of Project Back-leveraged debt shall not constitute a Monetization Event).

(tt)    **"Opco"** means SkyPower Corp., a corporation which, after the date hereof, will continue into the Province of Alberta as an unlimited liability company.

(uu)    **"Operating Plan"** has the meaning given to it in Section 4.7(a)(i).

(vv)    **"Optionee"** means any individual who is granted Options.

(ww)    **"Options"** means the MIP Options and the ESOP Options.

(xx)    **"Other ULC Shareholders"** has the meaning given to it in Section 10.3(a).

(yy)    **"Partial Monetization Event"** shall mean any transaction which would constitute a Monetization Event, but which does not involve the complete sale, merger, amalgamation, disposition, or winding-up of the Corporation (examples would be, without limitation, the sale of the Corporation's solar business but not its wind business, or a sale of a minority stake in the Corporation).

(zz)    **"Party"** means each Person who is a party hereto from time to time.

(aaa)    **"Person"** means any natural person, sole proprietorship, partnership, corporation, trust, joint venture, any governmental authority or any incorporated or unincorporated entity or association of any nature.

*Unanimous Shareholder Agreement*

- 7 -

(bbb)   **"Project"** means a wind or solar electrical energy project developed or proposed to be developed by the Corporation.

(ccc)   **"Project Back-leveraged debt"** shall mean any debt issued by any Subsidiary (which is non-recourse to the Corporation), based primarily on leveraging the levered equity cash flows from one or more Projects.

(ddd)   **"Purchase Agreement"** means the Stock Purchase Agreement among the parties hereto dated the date hereof.

(eee)   **"Put Notice"** has the meaning given to it in Section 10.7(a).

(fff)   **"Put Price"** has the meaning given to it in Section 10.7(a).

(ggg)   **"Put Sale"** has the meaning given to it in Section 10.7(a).

(hhh)   **"RFP"** means any request for proposals with respect to wind or solar electrical energy generation projects issued by any Person in Canada.

(iii)   **"RFP Project"** means a Project described in a submission made by the Corporation or a Subsidiary in response to an RFP.

(jjj)   **"Rights"** means Lehman's right to acquire additional Class A Shares and Convertible Preferred Shares, Series I as provided in the rights agreement dated the date hereof.

(kkk)   **"Service Agent"** has the meaning given to it in Section 11.4.

(lll)   **"Share Price"** has the meaning given to it in Section 10.8.

(mmm) **"SkyPower LP"** means SkyPower Limited Partnership, a limited partnership to be formed under the laws of Ontario.

(nnn)   **"Sole Arbitrator"** has the meaning given to it in Section 11.3(c).

(ooo)   **"Structured Tax Equity Transaction"** means a transaction which in substance constitutes a monetization of certain tax benefits associated with the Corporation and/or one or more Subsidiaries.

(ppp)   **"Subject Shares"** has the meaning given to it in Section 10.7(a).

(qqq)   **"Subsidiary"** means any entity with respect to which the Corporation directly or indirectly owns securities or interests to which are attached more than fifty percent (50%) of the votes that may be cast to elect the directors (or persons exercising similar powers) of such entity, and any other entity with respect to which the Corporation, directly or indirectly, has the power to direct its management and policies, and includes SkyPower LP and its general partner, SkyPower GP Inc. and Opco.

*Unanimous Shareholder Agreement*

- 8 -

(rrr)    **"Tag-along Notice"** has the meaning given to it in Section 10.4(b).

(sss)    **"Tag-along Shares"** has the meaning given to it in Section 10.4(b).

(ttt)    **"Tag Period"** has the meaning given to it in Section 10.4(b).

(uuu)    **"Third Party"** has the meaning given to it in Section 10.4(a).

(vvv)    **"Third Party Offer"** has the meaning given to it in Section 10.3(a).

(www) **"Third Party Sale"** has the meaning given to it in Section 10.4(a).

(xxx)    **"Transfer"** means to sell, assign, surrender, gift, transfer, pledge, mortgage, charge, create a security interest in, hypothecate or otherwise encumber or dispose of any securities, directly or indirectly, in the Corporation, Minority Holdco, Adler Holdco or in any Family Holding Vehicle, or any interest therein, whether legal or beneficial, whether voluntarily, involuntarily, by operation of law or otherwise.

(yyy)    **"ULC Shareholders"** means Lehman, Minority Holdco, HSHN, Adler Holdco and any other Person who at the relevant time directly owns ULC Shares.

(zzz)    **"ULC Shares"** means:

   (i)     Common Shares and Convertible Preferred Shares in the capital of the Corporation;

   (ii)    any other securities ("converted securities") into which those Common Shares and Convertible Preferred Shares may be converted, exchanged, reclassified, redesignated, subdivided, consolidated or otherwise changed from time to time;

   (iii)   any securities of any successor corporation to or corporation continuing from the Corporation which those Common Shares, Convertible Preferred Shares or converted securities may be changed into or become as a result of any amalgamation, continuance, merger, consolidation, plan of arrangement or reorganization, statutory or otherwise; and

   (iv)    any securities received as a stock dividend or other distribution on or in respect of those Common Shares, Convertible Preferred Shares or converted securities.

(aaaa)  **"Valuator"** has the meaning given to it in Section 10.9(a).

**1.2       Headings and References**

The division of this Agreement into sections and subsections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement. The terms "this Agreement," "hereof," "hereunder" and similar

*Unanimous Shareholder Agreement*

- 9 -

expressions refer to this Agreement and not to any particular section, subsection or other portion
hereof and include any agreement supplemental hereto. Unless something in the subject matter or
context is inconsistent therewith, references herein to "Sections" are to sections, subsections and
further subdivisions of sections of this Agreement.

### 1.3    Extended Meanings

Unless otherwise specified, words importing the singular include the plural and
vice versa and words importing gender include all genders. The term "including" means
"including without limitation."

### 1.4    Business Day

If under this Agreement any payment or calculation is to be made or any other
action is to be taken, on or as of a day which is not a Business Day, that payment or calculation
is to be made, and that other action is to be taken, as applicable, on or as of the next day that is a
Business Day.

### 1.5    Time

Time shall be of the essence of this Agreement.

### 1.6    Statutory References

Each reference to an enactment is deemed to be a reference to that enactment, and
to the regulations made under that enactment, as amended or re-enacted from time to time.

### 1.7    Schedules

The following are the schedules annexed to this Agreement and incorporated by
reference and deemed to be a part hereof:

| | |
|---|---|
| Schedule 1.2(b) | Adoption Agreement |
| Schedule 4.6 | Advisory Board |
| Schedule A | Minority Principals |

### ARTICLE II
### IMPLEMENTATION OF AGREEMENT

### 2.1    Party Covenants

Each of the Parties covenants and agrees that it shall vote or cause to be voted the
ULC Shares and Holdco Shares, as applicable, owned directly or indirectly by them to
accomplish and give effect to the terms and conditions of this Agreement and that such Party
shall otherwise act in accordance with the provisions and intent of this Agreement.

*Unanimous Shareholder Agreement*

- 10 -

**2.2**        **Conflict**

        Subject to the provisions of the ABCA, in the event of any conflict between the provisions of this Agreement and the Corporation's articles or bylaws, the provisions of this Agreement shall govern.

**2.3**        **Covenants by the Corporation**

        The Corporation consents to the terms of this Agreement and hereby covenants with each of the other Parties hereto that it will at all times during the term of this Agreement be governed by the terms and provisions hereof in carrying on its business and affairs, and each of the Parties shall vote or cause to be voted their respective ULC Shares and Holdco Shares to cause the Corporation to fulfil its foregoing covenants.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

**3.1**        **ULC Shareholder Representations and Warranties**

        Each of the ULC Shareholders severally represents and warrants, as to itself only, to each of the other Parties, and shall be deemed to represent and warrant throughout the term of this Agreement, that:

   (a)    the execution and delivery of this Agreement has been duly and validly authorized by such ULC Shareholder;

   (b)    such ULC Shareholder has executed and delivered this Agreement, and this Agreement is binding upon such ULC Shareholder and is enforceable in accordance with its terms;

   (c)    such ULC Shareholder is the registered and beneficial owner of the ULC Shares set forth opposite their name in Recital B (or as set forth in an Adoption Agreement as to any ULC Shareholder becoming a party hereto after the date hereof or in connection with any Transfer of ULC Shares in accordance with the terms of this Agreement), free and clear of all Liens;

   (d)    such ULC Shareholder is not a party to, bound by or subject to any indenture, mortgage, lease, agreement, instrument, charter, constating document, order, judgment, decree, or, to the best of the knowledge of the ULC Shareholder, law, statute or regulation which would be violated, contravened, or breached by, or under which any default would occur as a result of, the execution and delivery by such ULC Shareholder of this Agreement or the performance by such ULC Shareholder of any of the terms hereof;

   (e)    such ULC Shareholder is not subject to any unsatisfied judgments or consent decrees or injunctions and there is no litigation, proceeding, action or claim brought by or commenced or, to the best of the knowledge of the ULC Shareholder, pending or threatened, against the ULC Shareholder before any

*Unanimous Shareholder Agreement*

- 11 -

court, tribunal or governmental agency which could reasonably likely result in a
judgment impairing the ULC Shareholder's title to its ULC Shares; and

(f)    if the ULC Shareholder is a Person other than an individual, such ULC
Shareholder is a duly organized and validly existing under the laws of its
jurisdiction of its organization and that it has the legal power and capacity to own
its assets and enter into and perform its obligations pursuant to this Agreement.

**3.2**        **Representations and Warranties of Holdco Shareholders other than Adler**

Each of the Holdco Shareholders (other than Adler) severally represents and
warrants, as to itself only, to each of the other Parties, and shall be deemed to represent and
warrant throughout the term of this Agreement, that:

(a)    the execution and delivery of this Agreement has been duly and validly authorized
by the Holdco Shareholder;

(b)    the Holdco Shareholder has executed and delivered this Agreement, and this
Agreement is binding upon the Holdco Shareholder and is enforceable against it
in accordance with its terms;

(c)    the Holdco Shareholder is the registered and beneficial owner of the number and
class of Holdco Shares shown in Schedule "3.2(c)" (or as set forth in an Adoption
Agreement as to any Holdco Shareholder becoming a party hereto after the date
hereof or in connection with any Transfer of Holdco Shares in accordance with
the terms of this Agreement), free and clear of all Liens;

(d)    the Holdco Shareholder is not a Party to, bound by or subject to any indenture,
mortgage, lease, agreement, instrument, charter, constating document, order,
judgment, decree, or, to the best of the knowledge of the Holdco Shareholder,
law, statute or regulation which would be violated, contravened, or breached by,
or under which any default would occur as a result of, the execution and delivery
by the Holdco Shareholder of this Agreement or the performance by such Holdco
Shareholder of any of the terms hereof;

(e)    the Holdco Shareholder is not subject to any unsatisfied judgments or consent
decrees or injunctions and there is no litigation, proceeding, action or claim
brought by or commenced or, to the best of the knowledge of the Holdco
Shareholder, pending or threatened, against the Holdco Shareholder before any
court, tribunal or governmental agency which could reasonably likely result in a
judgment impairing the Holdco Shareholder's title to its Holdco Shares; and

(f)    if the Holdco Shareholder is a Person other than an individual, the Holdco
Shareholder is a duly organized and validly existing under the laws of its
jurisdiction of its organization and that it has the legal power and capacity to own
its assets and enter into and perform its obligations pursuant to this Agreement.

*Unanimous Shareholder Agreement*

- 12 -

**3.3**            **Representations and Warranties of Holdco Shareholders**

The Holdco Shareholders jointly and severally represent and warrant to each of
the other Parties, and shall be deemed to represent and warrant throughout the term of this
Agreement, that:

(a)        Minority Holdco is a duly incorporated and validly existing corporation under the
laws of its jurisdiction of incorporation or creation and that it has the corporate or
legal power and capacity to own its assets and enter into and perform its
obligations pursuant to this Agreement;

(b)        the authorized and issued capital of Minority Holdco consists of an unlimited
number of voting common shares and an unlimited number of non-voting
Convertible Preferred shares of which Adler holds all of the voting common
shares;

(c)        Adler holds a voting trust and power of attorney on behalf of the Minority
Principals with respect to the Corporation and has the authority to bind the
Minority Principals with respect to this Agreement and in particular to Transfer
the Holdco Shares of the Minority Principals as their attorney whenever such a
Transfer is required pursuant to the provisions hereof; and

(d)        Minority Holdco carries on no business or activity whatsoever other than holding
ULC Shares of the Corporation and has no liabilities of any nature whatsoever,
whether absolute, contingent or otherwise.

Any liability incurred as a result of a breach of this Section shall be borne 50% by Adler and the
remaining 50% shall be borne by the Minority Principals *pro rata* based on their percentage
ownership in Minority Holdco.

**3.4**            **Representations and Warranties of Adler**

Adler represents and warrants to each of the other Parties and shall be deemed to
represent and warrant throughout the term of this Agreement that:

(a)        Adler Holdco is a duly incorporated and validly existing corporation under the
laws of its jurisdiction of incorporation or creation and that it has the corporate or
legal power and capacity to own its assets and enter into and perform its
obligations pursuant to this Agreement;

(b)        Adler is the registered and beneficial owner of all of the Holdco Shares of Adler
Holdco free and clear of all Liens;

(c)        Adler is not subject to any unsatisfied judgments or consent decrees or injunctions
and there is no litigation, proceeding, action or claim brought by or commenced
or, to the best of the knowledge of Adler, pending or threatened, against Adler
before any court, tribunal or governmental agency which could result in a
judgment against Adler which could result in the impairment or loss of Adler's
title to the Holdco Shares of Adler Holdco;

*Unanimous Shareholder Agreement*

- 13 -

(d)     Adler holds a voting trust and power of attorney on behalf of HSHN with respect
        to the Corporation and has the authority to bind HSHN with respect to this
        Agreement and in particular to Transfer the Shares of HSHN as its attorney
        whenever such a Transfer is required pursuant to the provisions hereof; and

(e)     Adler Holdco carries on no business or activity whatsoever other than holding
        ULC Shares of the Corporation and has no liabilities of any nature whatsoever,
        whether absolute, contingent or otherwise.

## ARTICLE IV
## MANAGEMENT

**4.1**        **Number and Election of Directors**

(a)     Subject to Section 4.1(b), the board of Directors shall be increased from four (4)
        to six (6) Directors. Lehman shall be entitled to nominate and have elected three
        (3) Directors, and Adler shall be entitled and have elected three (3) Directors. The
        initial Directors shall be as follows:

| Adler | (Adler nominee) |
|---|---|
| David Kassie | (Adler nominee) |
| Thomas Emmons | (Adler nominee) |
| Romita Shetty | (Lehman nominee) |
| Thomas E. Bernard | (Lehman nominee) |
| John V. Veech | (Lehman nominee) |

(b)     From and after such time that Lehman holds ULC Shares to which are attached
        sixty percent (60%) or more of the total votes attached to all issued and
        outstanding Common Shares, it will have the option, but not the obligation, to
        increase the size of the board of Directors to seven (7) Directors and to nominate
        and have elected one (1) additional Director.

(c)     A party entitled to nominate a Director may replace a Director nominated by it at
        any time and from time to time, provided that for so long as Adler is employed by
        the Corporation or a Subsidiary, he will be one of his nominees.

(d)     Adler's nominees shall not be entitled to vote on any matter relating to Adler's
        employment arrangements with the Corporation or any Subsidiary.

**4.2**        **Meetings of Directors**

(a)     **Quorum.** The quorum for meetings of the Directors shall be a majority of the
        Directors then in office, including at least one nominee of Lehman and one
        nominee of Adler. No meeting of the Directors shall continue with the transaction
        of business in the absence of a quorum. Notwithstanding the foregoing, if proper
        *Unanimous Shareholder Agreement*

- 14 -

original notice of a meeting of the board of Directors, specifying the business to
be transacted at the meeting, is given and a quorum of Directors is not present,
then a meeting of the board of Directors may thereafter be held on three (3)
Business Days' written notice of the second meeting to transact the business set
forth in the original notice and, subject to the ABCA, any members of the board
of Directors present at that meeting shall constitute a quorum for the transaction
of the business set out in the original notice in respect of that meeting and such
business may be transacted by a majority vote of those Directors in attendance at
the meeting. A Director may, if all the Directors consent, participate in a meeting
of Directors by means of such telephone or other communication facilities as
permit all Persons participating in such meeting to hear each other.

(b)     **Notice.** Unless all of the Directors are present (except where a Director attends a
meeting for the express purpose of objecting to the transaction of any business on
the grounds that the meeting is not lawfully called) or those absent waive notice,
no meeting of Directors shall be validly convened unless three (3) Business Days'
written notice thereof is given.

(c)     **Content of Notice.** No resolution with respect to any matter may be put to any
meeting of the board of Directors unless the notice of the meeting contains
reasonable detail of the matter or unless all of the Directors are either present and
do not object to the matter being put to the meeting or otherwise waive the
provisions of this Section 4.2(c).

(d)     **Voting.** Subject to Section 4.7, any matter to be approved by the Directors shall
require a majority of the votes cast on the matter. The chairman of a meeting of
Directors shall not have a second or casting vote.

(e)     **Frequency of Meetings.** The Directors shall meet at least once every three (3)
months.

**4.3      Indemnity**

The Corporation hereby agrees to enter into an agreement to indemnify each
Director and his or her heirs and legal representatives to the maximum extent permitted by law.

**4.4      Insurance**

The Corporation shall arrange insurance coverage for the Directors on terms and
conditions and in amounts reasonably acceptable to Lehman.

**4.5      Officers**

The officers of the Corporation and the officers and directors of each Subsidiary
will be appointed by the board of Directors of the Corporation. The initial officers of the
Corporation shall be:

Kerry Adler, President and Chief Executive Officer

*Unanimous Shareholder Agreement*

- 15 -

David Bacon, Treasurer, Secretary and Chief Financial Officer

Cory Basil, Vice President Development

**4.6**        **Advisory Board**

The Corporation shall have an Advisory Board. The initial members of the Advisory Board shall be set forth in Schedule 4.6 hereto. The Advisory Board shall serve at the pleasure of the Board of Directors, who shall retain all right and authority to change the composition of the Advisory Board from time to time. Members of the Advisory Board participating in the MIP shall execute such documentation and agreements as the Board of Directors shall from time to time determine.

**4.7**        **Restrictions on Management and Directors**

(a)        None of the following actions in respect of the Corporation shall be taken by the management of the Corporation or the Directors without the written consent of Lehman:

   (i)        implementing the original and any annual updates to the operating plan of the Corporation and its Subsidiaries (including as part thereof the development or operating plan for each Project under development or in operation) (the "**Operating Plan**");

   (ii)        implementing (x) an annual budget itemizing the expenditures required to implement each Operating Plan (the first such budget to cover the period from execution of the date hereof until December 31, 2008, and annually thereafter) (the "**Annual Operating Budget**") and (y) as to any Project in development, the development budget for such Project through expected date of commencement of construction (each, a "**Development Budget**" and collectively with the Annual Operating Budget, the "**Budgets**");

   (iii)        any material changes to any Operating Plan or any material change to any Budget (including any increase in a Budget by more than five percent (5%));

   (iv)        participation, development or construction by the Corporation or any Subsidiary in or of any Project and the terms of any RFP bid submitted in connection with any RFP Project;

   (v)        any registration or issuance or securities, any incurrence of funded debt by, or entering into any transaction creating financial obligations such as loan agreements, indentures, interest or currency hedges, reimbursement agreements, insurance products or similar transactions by or for the Corporation or any Subsidiary;

   (vi)        any Monetization Event;

*Unanimous Shareholder Agreement*

- 16 -

(vii)    any amendment to the constating documents of the Corporation or any Subsidiary;

(viii)    the entry into by the Corporation or any Subsidiary, or the amendment of, any shareholder, partnership or other joint venture agreement, any turbine "frame" agreement, any agreement for engineering, procurement and/or construction of a project (including any turbine installation agreement or balance of plant construction agreement), any turbine warranty agreement, any manufacturer turbine service agreement, any contract having a term of greater than twelve (12) months and not terminable by the Corporation or any Subsidiary on thirty (30) days notice or less without penalty, any contract with a payment obligation by or to the Corporation or any Subsidiary in an amount greater than Cdn.\$5,000,000 per year or Cdn.\$20,000,000 million in the aggregate; and/or any contract with any person not dealing at Arm's Length with the Corporation or any Subsidiary;

(ix)    the disposition of any securities in any Subsidiary, or the disposition by the Corporation or any Subsidiary of any of its assets, other than dispositions of furnishings, fixtures or equipment that is no longer used or useful in the ordinary course of the Business;

(x)    the engagement by the Corporation or any Subsidiary in any business or activity other than the Business;

(xi)    the declaration or payment by the Corporation or any Subsidiary of any dividends or the making by the Corporation or any Subsidiary of any other distribution in respect of any securities thereof or making any other distribution of any nature (including repayment of loans) to any person not acting at Arm's Length with the Corporation and its Subsidiaries;

(xii)    retention by the Corporation of the net proceeds of any Partial Monetization Event or Project Back-leveraged debt (it being understood that, absent such approval, all such net proceeds shall be distributed or returned as capital as soon as practicable after the closing of such transaction, and, further, that the distribution of proceeds of Project Back-leveraged debt shall be further subject to the provisions of Section 6.2 hereof);

(xiii)    the hiring by the Corporation or any Subsidiary of any individual at the vice-president level or higher or the hiring by the Corporation or any Subsidiary of any individual if such hiring would cause the amount allocated to compensation in an Annual Operating Budget to be exceeded or amending, terminating or otherwise altering or waiving the terms of any written employment, consulting or management contract with any such individual;

*Unanimous Shareholder Agreement*

- 17 -

(xiv)   entering into any transactions with officers, directors or employees of the Corporation or any Subsidiary or members of their families or other persons with whom they do not act at Arm's Length;

(xv)    creating any Lien with respect to any of the assets of the Corporation or any Subsidiary;

(xvi)   making any loans or guarantees to any Person except in the ordinary course of business of the Corporation and except for any loans to any Subsidiary of the Corporation;

(xvii)  entering into any derivative transaction or issuing any debt securities;

(xviii) selecting or changing the auditors of the Corporation or any Subsidiary, or changing any accounting practices, policies or procedures or any methods of reporting income, deductions or other items for income tax purposes (except insofar as may have been required by applicable law or GAAP);

(xix)   issuing or selling any of the share capital of the Corporation or any Subsidiary or any rights, warrants or securities convertible into or exercisable or exchangeable for any such securities;

(xx)    purchasing any of the securities of the Corporation or any Subsidiary;

(xxi)   any acquisition of the securities, assets or business of any other Person;

(xxii)  the winding-up, dissolution or liquidation of the Corporation or any Subsidiary, or the filing of any proceedings in respect of same;

(xxiii) the issuance by the Corporation or any Subsidiary of any press release or other public communication which mentions Lehman;

(xxiv)  making or committing to make during any fiscal year investments or capital expenditures which in the aggregate exceed five percent (5%) of the total amount of expenditures provided for in an approved budget unless such capital expenditure has been expressly provided for in that budget;

(xxv)   consent to any judgment or order or enter into any settlement of litigation by any Person or any proceeding by a governmental authority resulting in either a payment obligation in excess of Cdn.$50,000 or injunctive action against any material activity of the Corporation or any Subsidiary or any criminal sanctions against the Corporation or any Subsidiary; or

(xxvi)  any agreement by the Corporation with respect to any of the matters listed above,

provided, however, an action expressly included in an Operating Plan or Budget approved by Lehman, and the substance and terms of which are adequately

*Unanimous Shareholder Agreement*

- 18 -

described will not require a further separate Lehman approval (provided that the inclusion in an Operating Plan or Budget of costs related to matters described in clauses (iv) through (xi), (xv), (xviii), (xxi) or (xxiv) (except for matters solely requiring the payment of money) shall not be subject to this proviso such matters being subject to separate approval).

(b)      The Development Budget for a Project will be prepared for approval by Lehman no later than the date: (i) in the case of a RFP Project, 15 days prior to the date for submission of the bid in response to the RFP; and (ii) as to any other Project, prior to the earlier of: (a) the signing of a power purchase agreement with respect to such Project; or (b) the incurrence of expenses exceeding $1,000,000 as to such Project. Lehman shall not be asked to approve Project and the related Development Budget prior to the dates specified in the preceding sentence. Once a Project and Development Budget are approved by Lehman, Lehman shall have the further and independent right to approve any increase in a Development Budget by more than five percent (5%) or any material change in a Project schedule or scope.

**4.8**        **Financial Reporting**

The Corporation and the Subsidiaries will cause management to work with the financial controls personnel of Lehman and its Affiliates to ensure delivery of monthly, quarterly and annual financial reports and statements in a manner which will satisfy the financial reporting requirements of Lehman and its Affiliates.

## ARTICLE V
## CONFIDENTIALITY OBLIGATIONS

**5.1**        **Confidentiality**

(a)      No Party shall disclose any Confidential Information to any other Person, except:

(i)      to those of their employees or agents or investors having a need to know and who either are bound by the duties of their employment or engagement to maintain the confidentiality of the Confidential Information or enter into a confidentiality agreement in a form reasonably acceptable to the Corporation;

(ii)      as authorized by the Corporation;

(iii)      as required by law or regulation (provided that the Party shall immediately notify the Corporation of that requirement of law, unless precluded by law from doing so); or

(iv)      as required to be disclosed as part of a rating agency review, bank examination, securities examination, financial audit or similar review (provided that the Party shall immediately notify the Corporation of such review, unless precluded by law from doing so).

*Unanimous Shareholder Agreement*

- 19 -

(b)     Each Party shall use at least the same degree of care in maintaining the confidentiality of the Confidential Information as such Party uses in maintaining the confidentiality of such Party's own confidential or proprietary information, but in no event with less care than is reasonable given the nature of the information.

(c)     No Party shall use or copy any Confidential Information, except:

      (i)     to advance the business of the Corporation or a Subsidiary;

      (ii)     as authorized by the Corporation;

      (iii)     as required by law (if the Party has immediately notified the Corporation of that requirement of law, unless precluded by law from doing so); or

      (iv)     as required to be disclosed as part of a rating agency review, bank examination, securities examination, financial audit or similar review (provided that the Party shall immediately notify the Corporation of such review, unless precluded by law from doing so).

(d)     The Corporation may at any time require a Party that ceases to be a Party or ceases to hold ULC Shares or Holdco Shares to immediately deliver to the Corporation or, at the Corporation's option, to immediately erase or destroy, any documents and other materials and copies and translations of them (whether recorded, stored or reproduced in or any medium or by means of any device) containing any Confidential Information in the Party's possession or control, unless such Party shall be required by law or regulation to maintain a copy of such documents or materials. The Party shall provide evidence satisfactory to the Corporation that all those documents, materials, copies and translations have been delivered, erased or destroyed.

**5.2**     **Breach of Obligations**

(a)     Each Party acknowledges that a breach or threatened breach of its obligations under Section 5.1 would result in irreparable harm to the Corporation and/or a Subsidiary that could not be calculated or adequately compensated by recovery of damages alone. Each Party therefore agrees that the Corporation shall be entitled to interim or permanent injunctive relief, specific performance and other equitable remedies.

(b)     The obligations of the Parties under Section 5.1 shall survive termination of this Agreement.

*Unanimous Shareholder Agreement*

- 20 -

## ARTICLE VI
## EXCLUSIVE LEHMAN RIGHT TO INVEST; SPECIFIC
## PROJECT BACK-LEVERAGED PROVISIONS

**6.1**          **Equity Investments**

Lehman shall have the exclusive right to make all equity investments in the Corporation (after the initial closing of the Acquisition), at the Initial Pre-Money Valuation, except in the case of:

(a)          third party Project level equity, solely to the extent set forth in Section 7.1; and

(b)          re-investment by the Class B and Class C Shareholders, as set forth in Section 6.2 below, in the case of proceeds of Project Back-leveraged debt.

All equity investments by Lehman shall take the form of subscriptions for Class A Shares at a price reflective of the Initial Pre-Money Valuation, or in Convertible Preferred Shares as contemplated by the third to final paragraph of Section 7.1 by exercising the Rights.

**6.2**          **Proceeds of Project Back-leveraged debt**

(a)          Proceeds of Project Back-leveraged debt shall, unless Lehman otherwise approves pursuant to Section 4.7, be distributed or returned as capital to the ULC Shareholders, provided that the Class B Shareholders and Class C Shareholders hereby irrevocably authorize and direct that the portion of such proceeds corresponding to their equity interest in the Corporation (the "**Class B and Class C Proceeds**") be deposited in an escrow account in the name of a third party escrow agent designated by Lehman (the "**Escrow Account**" and "**Escrow Agent**", respectively).

(b)          The Class B and Class C Proceeds shall be retained in the Escrow Account for a period of not less than six (6) months. Upon the expiration of such six (6) month period, the Escrow Agent shall release the Class B and Class C Proceeds and any interest earned therein to the Class B and Class C Shareholders upon the mutual written direction of Adler and Lehman. Lehman shall not unreasonably withhold its direction to release, it being acknowledged however, that valid reasons for withholding Lehman's direction shall include, but not be limited to, matters such as the disability or resignation of Adler as Chief Executive Officer of the Corporation, or other factors materially impacting his performance in that role, failure by the Corporation to achieve the goals set out in its original business plan or material diminution in the business prospects of the Corporation. Upon the expiration of twenty-four (24) months, any funds remaining in the Escrow Account, including any interest which has been earned thereon, will, unless Adler otherwise directs, be released by the Escrow Agent to the Class B Shareholders and Class C Shareholders.

(c)          Lehman may at any time elect to reinvest by exercise of the Rights, all or a part of its portion of proceeds of Project Back-leveraged debt in the form of the

*Unanimous Shareholder Agreement*