- 21 -

subscription price for additional Class A Shares at the Initial Pre-Money Valuation. If Lehman makes such election at a time when the Class B and Class C Proceeds are in the Escrow Account, Lehman may by direction to the Escrow Agent require that a percentage of the Class B and Class C Proceeds in the Escrow Account (corresponding to the percentage of Lehman's portion of the proceeds of Project Back-leveraged debt which Lehman has elected to re-invest) be reinvested in the Corporation by the Class B and Class C Shareholders as the subscription price for additional Class B Shares and Class C  Shares respectively, at the Initial Pre-Money Valuation, and Lehman may direct the Escrow Agent to release the appropriate funds from the Escrow Account to the Corporation for such purpose. If Lehman does not require the Class B and Class C Shareholders to reinvest at the time of Lehman's election to reinvest as aforesaid and Class B and Class C Proceeds are in the Escrow Account at such time, then the Class B and Class C Shareholders will nonetheless be entitled, at any time within five (5) Business Days of Lehman's election, to elect to reinvest a percentage of their respective portions of the Class B and Class C Proceeds in the Escrow Account (corresponding to the percentage of Lehman's portion of the proceeds of the Project Back-leveraged debt which Lehman elected to reinvest) as the subscription price for additional Class B or Class C Shares respectively issued at the Initial Pre-Money Valuation. Class B and Class C Shareholders who do not elect to reinvest the applicable portion of Class B and Class C Proceeds pursuant to the immediately prior sentence within the aforementioned five (5) Business Day period shall be deemed to have forever forfeited their right to do so.

(d)     All interest earned in the Escrow Account shall be for the account of the Class B Shareholders and Class C Shareholders and may be released to them from time to time upon the direction of Adler.

(e)     Lehman will maintain an account of proceeds of Project Back-leveraged debt distributed or returned as capital to Lehman and Lehman's reinvestment thereof. If at the time of an investment by Lehman in Class A Shares there is a positive balance standing to the credit of such account, an amount equal to the lesser of such positive balance and the amount of Lehman's investment shall be deemed for purposes hereof to be a reinvestment of Project Back-leveraged debt, and the balance in such account will be reduced by the amount of such reinvestment.

## ARTICLE VII
## DISTRIBUTIONS

**7.1**     **Distributions**

It is the Parties' intention that, except for (1) the Lehman percentage of proceeds of Project Back-leveraged debt transactions, (2) proceeds of Partial Monetization Events and (3) determinations made by a majority of the Board of Directors, all proceeds from the Business (including Project revenues and proceeds of Project financings) shall be retained by the Corporation or the appropriate Subsidiary prior to a Monetization Event, provided that such policy may be changed by the board of Directors from time to time. Proceeds of any distribution or liquidation (after payment of third party claims and establishment of reserves as determined

*Unanimous Shareholder Agreement*

- 22 -

by the board of Directors), whether or not resulting from a Monetization Event, will be divided as follows:

All ULC Shareholders will receive a return of invested capital and an eight percent (8%) per annum Convertible Preferred cash on cash return on invested capital from the date or dates of investment. The remaining proceeds will be divided as follows:

      (i)    eighty percent (80%) to ULC Shareholders (other than Optionees who have become ULC Shareholders) to be divided on a *pro rata* basis in accordance with ownership; and

      (ii)   twenty percent (20%) to the Optionees upon the exercise of their MIP Options.

Notwithstanding the foregoing, should Lehman be entitled to but not receive indemnification under the Purchase Agreement, it shall be entitled to receive from amounts which would otherwise be distributable to the Other ULC Shareholders having the obligation to indemnify under the Purchase Agreement (or deemed to have such an obligation as set forth below) an amount equal to the indemnification amount plus eight percent (8%) per annum accrued from the date demand for indemnification was first made by Lehman under the Purchase Agreement. Amounts paid to Lehman pursuant to the foregoing sentence will be deemed to have been distributed to the other ULC Shareholders who, but for the foregoing sentence, would have received the distribution. For purposes hereof the obligation of Adler or another Holdco Shareholder to indemnify under the Purchase Agreement shall be deemed to be the obligation of Adler Holdco or Minority Holdco, as the case may be.

To the extent that Lehman provides letters of credit or similar instruments, in lieu of cash, in support of a Project (which may include, for example, a letter of credit securing a turbine warehouse facility, a "forward equity contribution agreement" securing a 100% construction facility, etc.), the face amount of such letter of credit or similar instrument (plus fees, interest, etc.), such shall be deemed a contribution of cash equity at the time such letter of credit or similar instrument is issued, in return for which Class "A" Shares shall be issued to Lehman at the Initial Pre-Money Valuation. However, monies subsequently paid by Lehman under such letter of credit or other instrument will not result in the issuance of any ULC Shares to Lehman or increase its invested capital. Letters of credit provided by Lehman as bid security in the context of an RFP shall not be deemed a contribution of cash equity for purposes of the foregoing.

For the purposes of the foregoing, Lehman's invested capital will be considered to be U.S.$87,500,000 plus all amounts contributed to the Corporation by Lehman as capital or paid by Lehman to the Corporation for additional ULC Shares after the date hereof, less dividends and other distributions. The aggregate invested capital of the other ULC Shareholders (which will be allocated to them *pro rata*) will be U.S.$87,500,000, less dividends and other distributions (plus any reinvestments of proceeds of Project Back-leveraged debt under Section 6.2). The eight percent (8%) return will accrue, on a daily basis, on all amounts from the actual date of their investment, and will be calculated based on a 360 day year.

*Unanimous Shareholder Agreement*

- 23 -

To the extent that there are equity investments by Lehman (and any other ULC Shareholders) after the date on which Optionees become entitled to share in proceeds pursuant to the foregoing provisions, then such investments shall be made in Convertible Preferred Shares and 100% of the cash distributed or returned as capital shall be distributed to Lehman and such other ULC Shareholders, until Lehman and such other ULC Shareholders shall have received a return of such invested capital and an 8% per annum return thereon, and, thereafter, the 80%/20% allocation described above shall resume.

The foregoing provisions reflect the principles agreed to by the Parties with respect to the distribution of proceeds of the Corporation available for distribution from time to time. The specific mechanism implementing such principles are set out in the Rights Agreement and the Corporation's constating documents.

The Corporation will maintain a record of the invested capital of the ULC Shareholders (and the accrued eight percent (8%) return thereon) from time to time and in particular, at the time of any dividend or distribution or new investment of capital. Upon each investment of capital, the Corporation shall provide to Lehman a calculation statement, showing the ownership interests, invested capital and 8% accrual as of the date of such investment. Any other ULC Shareholder shall also have the right to review such statement. If Lehman shall not agree with the statement prepared by the Corporation, as to the amount of invested capital, the relative ownership percentages of the Corporation, the accrued return thereon, or any other portion of such statement then the parties shall in good faith seek to resolve the dispute and in the absence of any agreed resolution, arbitration may be commenced pursuant to Section 10.3.

## ARTICLE VIII
## LEHMAN SUPPORT AND THIRD PARTY PROJECT EQUITY

**8.1**      **Rights**

As and when determined by Lehman to be necessary to fund expenditures contemplated by an approved annual operating Budget for the Operating Plan, Lehman will exercise the Rights. Lehman in its discretion may also fund any Development Budget for the Corporation or any Subsidiary by exercising the Rights.

Lehman's right to provide all follow-on equity capital shall be exclusive (except as provided in Section 6.2), provided that if Lehman elects to approve proceeding with an individual Project (but does not approve the Development Budget for such Project), then the Corporation or the relevant Subsidiary may obtain third party equity capital specifically for such Project at the Project level.

Such third party equity must: (1) be provided from one or more parties that are not affiliated with any ULC Shareholder or Holdco Shareholder, (2) must be for the entire equity amount required by the Project (unless Lehman approves a partial third party equity funding), (3) shall be cash funded, or secured/supported in a manner acceptable to the project finance debt markets, such that the Project may attract non-recourse debt on customary terms and (4) such equity shall have no terms limiting the ability of the Project to "upstream" dividends or distributions to the Corporation.

*Unanimous Shareholder Agreement*

- 24 -

**8.2**    **Credit Support for RFPs**

Lehman will as appropriate either:

(a)    provide reasonable assistance to Opco or any other relevant Subsidiary in obtaining a credit rating, as required; or

(b)    use commercially reasonable efforts to provide a "keep well", guarantee or other suitable arrangement, in the necessary amounts as applicable,

to allow Opco or a Subsidiary to be competitive in a RFP process in which Lehman has agreed that Opco or a Subsidiary shall participate.

**8.3**    **RFP Protocol**

Though Opco or the appropriate Subsidiary will have primary responsibility for responding to a RFP, Lehman will designate one (1) or more individuals as point persons within Lehman to be responsible for reviewing RFP responses and consulting with Opco or the appropriate Subsidiary on the terms of response to such RFP. Lehman will use commercially reasonable efforts to respond to all requests for input and advice regarding each RFP on a timely basis and to cause all requisite internal processes to be completed on a timely basis.

**8.4**    **Market Rates**

The provision of any goods or services (other than financing, hedging and other customary investment banking services) by Lehman or an Affiliate of Lehman to the Corporation or any Subsidiary will require the approval of a majority of Adler's nominees on the Corporation's board of Directors.

**8.5**    **Lehman Conflicts**

Lehman will ensure that those of its employees who devote a substantial amount of time to the Business and/or who are privy to material Confidential Information do not directly participate in any RFP process on behalf of any other entity. Appropriate "walls" and other procedures will be put in place to ensure that information concerning an RFP or business strategies or other Confidential Information is not shared or discussed between the Lehman employees referred to above and other Lehman employees involved with entities that directly compete with the Corporation and the Subsidiaries in the wind or solar energy business in Canada.

**ARTICLE IX**
**HSHN'S RIGHT TO RECEIVE FIRST APPLICATION WITH RESPECT TO
ADDITIONAL FINANCINGS**

(a)    The Corporation and each Subsidiary shall provide an opportunity to HSHN to provide a first offer for any debt financing it may require, whether at the corporate or project level (where, in the case of project financing a Subsidiary is the lead developer or otherwise has the right to apply for debt financing) on terms that will permit HSHN to participate in such financing as sole (or joint) lead arranger. If

*Unanimous Shareholder Agreement*

- 25 -

the Corporation or the relevant Subsidiary cannot reach agreement with HSHN on the terms and conditions of such a financing (or the Corporation or the relevant Subsidiary otherwise elects not to accept such offer of financing) and another lender becomes lead arranger for any such financing, the Corporation or the relevant Subsidiary will use good faith efforts to ensure that HSHN is offered the right to participate in such financing (subject to the rights of the lead arranger for such financing to determine the tier of such participation). Notwithstanding the foregoing, the Corporation and its Subsidiaries will not be required to use good faith efforts to ensure that HSHN is offered the right to participate (subject to the rights of the lead arranger for such financing to determine the tier of such participation) in a financing if, in their opinion, acting reasonably, the participation of HSHN in that other financing would be reasonably likely to have adverse consequences to the financing. If so required by HSHN, but subject to the preceding sentences which are paramount, any debt financing or participation referred to herein shall be structured so as to permit HSHN to finance, arrange or participate from outside of Canada without violating Canadian law.

(b)     HSHN's rights pursuant to this Section shall terminate upon the earlier of: (i) the date HSHN has been offered Cdn.$2,000,000,000 of debt financing opportunities whether such opportunities are in the form of project debt, corporate debt facilities, turbine warehouse facilities, or similar facilities (and whether or not HSHN has elected to pursue them); and (ii) July 1, 2011.

(c)     HSHN shall have a 15 day window to provide indicative terms for each "first look" under this provision.

(d)     The foregoing provisions shall not apply to capital market financing.

## ARTICLE X
## DEALING WITH ULC SHARES

**10.1     Sale and Issue Restrictions**

(a)     No Party (other than Lehman and its Affiliates) will cause or permit any Transfer of ULC Shares or Holdco Shares, as the case may be, held by such Party and no Individual Principal who has Transferred any ULC Shares or Holdco Shares to a Family Holding Vehicle will cause or permit any Transfer of such securities in their Family Holding Vehicle which would cause it to cease to be a Family Holding Vehicle without the prior approval of Lehman, which approval may be unreasonably withheld, in its sole discretion.

(b)     Provided that they comply with the terms and conditions of this Agreement, Lehman and its Affiliates shall be entitled at any time to sell any or all of the ULC Shares held by them.

(c)     Subject to the provisions of the ABCA, no proposed dealing or transaction with any ULC Shares or Holdco Shares in violation of this Agreement shall be valid, and the Corporation, Minority Holdco or Adler Holdco, as applicable, shall not

*Unanimous Shareholder Agreement*

- 26 -

record or Transfer any of the ULC Shares or Holdco Shares dealt with in violation of this Agreement in the records of the Corporation, Minority Holdco or Adler Holdco, as applicable, nor shall any voting rights attached to such ULC Shares or Holdco Shares be exercised, nor shall any dividends be paid on such ULC Shares or Holdco Shares during the period of such violation. Such disqualification shall be in addition to and not in lieu of any other remedies to enforce the provisions of this Agreement.

(d)    Each Person who proposes to become a ULC Shareholder or a Holdco Shareholder or is proposed to be granted Options shall execute an Adoption Agreement; however, notwithstanding any failure by a Person who becomes a ULC Shareholder or a Holdco Shareholder or an Optionee to execute and Adoption Agreement, such Person shall be bound by the provisions of this Agreement as if such Person had executed such Adoption Agreement.

(e)    For so long as the articles of incorporation of the Corporation require that a Transfer of ULC Shares requires the approval of a majority of the Shareholders, the Shareholders will approve any Transfer permitted by the terms of this Agreement.

**10.2**    **Transfer to Family Holding Vehicle**

(a)    Individual Principals may, on notice to the ULC Shareholders and the Corporation, Transfer all or part of their Holdco Shares or ULC Shares (in the case of Optionees who acquire same), to a Family Holding Vehicle subject to the limitations that the Individual Principal shall be appointed by the Family Holding Vehicle as its proxy to attend and vote at all meetings of Minority Holdco, Adler Holdco or the Corporation (in the case of Optionees who have acquired ULC Shares), as applicable, which they are entitled to attend.

(b)    No Transfer to a Family Holding Vehicle shall be effective unless and until the proposed Family Holding Vehicle has executed an Adoption Agreement, and by doing so, for greater certainty, shall be bound by the terms of this Agreement as a Party.

(c)    Each Individual Principal Transferring its Holdco Shares or ULC Shares, as applicable, shall continue to be bound by this Agreement notwithstanding any such Transfer and shall at all times:

(i)    cause such Family Holding Vehicle to carry out the provisions of this Agreement and any agreement entered into pursuant to this Agreement;

(ii)    guarantee the performance by his Family Holding Vehicle of all of its obligations under this Agreement;

(iii)    guarantee that the Family Holding Vehicle continues to qualify as such in accordance with the definition of such term; and

*Unanimous Shareholder Agreement*

- 27 -

(iv)    guarantee that the Family Holding Vehicle carries on no business or
activity whatsoever other than its holding of Holdco Shares or ULC
Shares, as applicable, and that the Family Holding Vehicle has no
liabilities of any nature whatsoever, whether absolute, contingent or
otherwise.

(d)    The estate of an Individual Principal who is deceased may, upon prior written
notice to Lehman, Transfer his or her Holdco Shares or ULC Shares, as
applicable, and his or her Family Holding Vehicle's Holdco Shares or ULC
Shares, as applicable, to another shareholder of Minority Holdco specified in such
notice without Lehman's consent.

**10.3    Drag-Along Rights**

(a)    If Lehman obtains from an Arm's Length third party (the "**Buyer**") a *bona fide*
offer to purchase all of the ULC Shares which it and its Affiliates hold and it
wishes to accept (the "**Third Party Offer**"), then Lehman shall deliver to all of
the other ULC Shareholders (the "**Other ULC Shareholders**") a notice requiring
all of the Other ULC Shareholders to sell all, but not less than all, of the ULC
Shares owned by them to the Buyer at the purchase price and on the same terms
and conditions, including representations, warranties and covenants contained in
the Third Party Offer, whereupon such Other ULC Shareholders shall then be
obliged to sell their ULC Shares to the Buyer at such purchase price and on such
terms and conditions.

(b)    Notwithstanding the foregoing, until the date which is two (2) years from the date
hereof, Adler Holdco may decline to sell its ULC Shares pursuant to Section
10.3(a) by providing notice in writing to Lehman within ten (10) Business Days
of receipt of notice of the Third Party Offer.

**10.4    Tag-Along Rights**

(a)    If Lehman proposes to sell any of its ULC Shares to an Arm's Length third party
or parties (the "**Third Party Sale**"), Lehman shall, at least 45 days prior to the
date specified for completion of the Third Party Sale, give notice in writing (a
"**Disposition Notice**") to the other Parties of the name and address of that third
party (the "**Third Party**") and the terms and conditions of such Third Party Sale,
provided that the foregoing shall not apply to any Transfers of ULC Shares by
Lehman to any of Lehman's Affiliates or to any sale by Lehman to a Third Party
which is structured as a Structured Tax Equity Transaction.

(b)    If Lehman has provided a Disposition Notice in accordance with Section 10.4(a),
the other ULC Shareholders shall have the right, exercisable within ten (10) days
of receipt of a Disposition Notice (the "**Tag Period**"), upon notice in writing to
Lehman and the Third Party (the "**Tag-along Notice**"), to require the Third Party
to purchase the *pro rata* portion (based on the same proportion as the Lehman
ULC Shares to be sold bears to all ULC Shares held by Lehman) of the ULC

*Unanimous Shareholder Agreement*

- 28 -

Shares held by the ULC Shareholders (the "**Tag-along Shares**") at the time of completion of, and upon the same terms and conditions, as the Third Party Sale.

(c)     If the ULC Shareholders give a Tag-along Notice to the Corporation and the Third Party within the Tag Period, then Lehman shall be entitled to sell the offered ULC Shares to the Third Party pursuant to the Third Party Sale only if such Third Party also offers to purchase from the ULC Shareholders who have given a Tag-along Notice the Tag-along Shares held by such ULC Shareholders, conditional upon the completion of the transaction of purchase and sale contemplated in the Third Party Sale.

(d)     If such Third Party declines to purchase the Tag-along Shares required to be purchased by the Third Party, Lehman shall not complete the Third Party Sale.

**10.5**     **Sale of the Corporation/ Monetization Event**

(a)     Lehman shall be entitled, at any time from the date hereof with Adler's consent, and at any time after the date which is two years from the date hereof without Adler's consent, by notice in writing to the Corporation and the other ULC Shareholders, to require the Corporation or any Subsidiary to commence the process for a Monetization Event, whereupon:

(i)     the Corporation shall, at the Corporation's expense, retain an investment banker (who may, without Adler's approval, be Lehman or an Affiliate of Lehman) and instruct such investment bankers to commence the process for a Monetization Event; and

(ii)     unless Lehman terminates the sale process contemplated by this Section 10.5 or the proposed Monetization Event reflects a valuation of the Corporation of less than U.S.$205,000,000, the ULC Shareholders shall (i) vote to accept any offer recommended by the investment banker and approved by Lehman; (ii) suffers or permits a family law application to be made in respect of such Party's Holdco Shares or ULC Shares and fails to produce evidence satisfactory to Lehman certifying that such Party's spouse has no claim to such Holdco Shares or ULC Shares within forty-five (45) days of the application; (iii) execute and deliver the purchase and sale agreement to such purchaser who makes such offer, as applicable; and (iv) execute and deliver all other documents necessary to complete a Monetization Event or Transfer the ULC Shares to such purchaser, as applicable.

**10.6**     **Call Rights**

(a)     At any time and from time to time following the date upon which: a Party other than Lehman (a "**Defaulting Party**") (i) defaults under the provisions of this Agreement; (ii) suffers or permits an Insolvency Event to occur with respect to such Party; or (iii) defaults in the performance of any obligation pursuant to any employment agreement with the Corporation or any Subsidiary, Lehman will

- 29 -

have the right to acquire or to require the Corporation, Minority Holdco or Adler Holdco, as applicable, to acquire, all Holdco Shares and ULC Shares (collectively, the "**Called Shares**") and all Options (the "**Called Options**") owned by the Party free and clear from all Liens (a "**Call Sale**") for a purchase price equal to the Fair Value of the Called Shares or Called Options, as applicable (the "**Call Price**"), by giving written notice (a "**Call Notice**") to the Defaulting Party. For certainty, the occurrence of one of the foregoing events with respect to an Individual Principal who has Transferred Holdco Shares or ULC Shares to a Family Holding Vehicle shall render such Family Holding Vehicle a Defaulting Party.

(b)     The closing of the Call Sale shall take place on a date selected by Lehman, to be no later than 60 days following the date that the Fair Value of the Called Shares or Called Options, as applicable, is finally determined.

(c)     For the purposes of this Section 10.6, the term "Party" includes, as the case may be, (i) the trustee in respect of the bankrupt Party, or (ii) other legal representatives of the Party.

**10.7     Put Rights**

(a)     If no Monetization Event has occurred prior to the date which is seven (7) years from the date hereof, an Entitled Principal may require Minority Holdco to purchase all (but not less than all) of his or her Holdco Shares and those Holdco Shares held by his or her Family Holding Vehicle (the "**Subject Shares**"), provided such Subject Shares are free and clear from all Liens, for a purchase price equal to the Fair Value of the Subject Shares (the "**Put Price**"), by giving written notice (a "**Put Notice**") to the Corporation (a "**Put Sale**"). The issuance of a Put Notice pursuant to this Section 10.7(a) shall be irrevocable. The Put Notice shall be issued on a single occasion, only by all Entitled Principals wishing to have the Subject Shares purchased under this Section 10.7(a). An Entitled Principal who elects not to participate in the giving of the Put Notice shall have not further rights to have its Holdco Shares purchased under this Section 10.7(a).

(b)     Notwithstanding anything else contained herein, the obligation of Minority Holdco to purchase the Subject Shares pursuant to a Put Notice and the Corporation to purchase Corresponding Shares pursuant to Section 10.8 shall be subject to and conditional upon:

    (i)     compliance with applicable laws;

    (ii)     the approval of each Person to whom the Corporation owes indebtedness, to the extent that the agreement or other documentation evidencing the indebtedness requires such approval, and including that the purchase will not result in a default (with or without the passing of time) under such agreements or other documentation (provided that, if such approval is not received in respect of a Put Notice, Minority Holdco and the Corporation shall agree to complete the Put Sale in respect of such Put Notice in

*Unanimous Shareholder Agreement*

- 30 -

accordance with this Section 10.6 (for greater certainty, all provisions applying *mutatis mutandis*) upon the receipt of such approval, notwithstanding the expiry of the 60 day period referred to in Section 10.7(a); and

(iii) the approval of the board of Directors, acting reasonably, provided, without limitation, it shall be deemed to be reasonable for the board of Directors to consider whether the payment by the Corporation of the Share Price in respect of the Corresponding Shares may have a material and detrimental impact on the Corporation or any of its Subsidiaries.

(c) The closing of the Put Sale shall take place on a date selected by the Corporation, to be no later than 60 days following the date that the Fair Value of the Subject Shares is finally determined, and otherwise in accordance with Section 10.7(b).

**10.8      Corporation Purchase**

If Lehman or Minority Holdco purchases Subject Shares or Called Shares which are Holdco Shares, Lehman may require the Corporation to simultaneously purchase the number of ULC Shares (the "**Corresponding Shares**") from Minority Holdco equal to the selling Holdco Principal's indirect proportionate interest in the Corporation for an amount equal to the Put Price or the Call Price, as applicable (the "**Share Price**").

**10.9      Determination of Fair Value**

(a) The aggregate "**Fair Value**" of the Subject Shares or the Called Shares, as the case may be, shall be equal to the aggregate fair value of the Corresponding Shares (as at the last day of the month immediately preceding the month in which the Call Notice or Put Notice, as the case may be, is delivered) as agreed between Lehman and the selling Party. The aggregate Fair Value of the Called Options, shall be equal to the fair value of the Options (as at the last day of the month immediately preceding the month in which the Call Notice is delivered) as agreed between Lehman and the selling Party. If Lehman and the selling Party cannot agree on the Fair Value within 15 days of the date the Call Notice or Put Notice, as the case may be, is delivered, then the board of Directors shall appoint a valuator with significant experience in valuing private companies in Canada from one of the "Big Four" accounting firms, other than a firm of which the Corporation's auditors or accountants are members (the "**Valuator**"), and shall instruct the Valuator to determine the Fair Value of the Corresponding Shares or the Called Options, as applicable (as at the last day of the month immediately preceding the month in which the Call Notice or Put Notice, as the case may be, is delivered) in accordance with GAAP within 60 days following his or her appointment. The determination of the Valuator as to the Fair Value of the Corresponding Shares or the Called Options, as applicable, shall be final and binding upon the selling Party and Lehman for the purposes of the specific provisions of this Agreement for which the Fair Value was to be determined.

- 31 -

(b)     The Defaulting Party or the Entitled Principals, as applicable, shall be responsible for all fees and disbursements charged by the Valuator in connection with this Section 10.9, which shall be deducted from net proceeds.

(c)     The Corporation's Valuator in connection with this Section 10.9 shall have access to the books, accounts, records, vouchers, cheques, papers and documents of, or which relate to, the Corporation. The Parties shall co-operate with the valuators and shall provide all information and documents reasonably requested by the Valuator.

(d)     The determination of Fair Value of the Corresponding Shares pursuant to this Section shall determine (at all times assuming the conversion of all in the money convertible securities convertible into ULC Shares, the exchange of all in the money exchangeable securities exchangeable for ULC Shares, and the exercise of all in the money options, warrants and other rights to acquire ULC Shares) the most probable price that would be obtained for the ULC Shares at the date of closing of the Put Sale or Call Sale in an Arm's Length sale in an open market, on a going concern basis, assuming a willing purchaser and a willing seller, without any discount for a minority interest or any voting rights or agreement among the Parties or any premium for a special purchaser or control, the buyer and seller each acting prudently, knowledgeably and willingly.

**10.10**     **Sale of Minority Holdco or Adler Holdco**

If Minority Holdco or Adler Holdco elects or is required to sell its ULC Shares pursuant to this Agreement it may elect instead that such a sale be effected through the sale of all the issued and outstanding Holdco Shares of Minority Holdco or Adler Holdco, as applicable. In such event, the following representations, warranties and covenants shall be provided to the buyer by Adler, in the case of Adler Holdco, and by the Holdco Principals, in the case of Minority Holdco:

(a)     the Holdco Shares are owned free and clear of all Liens and constitute 100% of all of the securities of Minority Holdco or Adler Holdco;

(b)     Minority Holdco or Adler Holdco, as applicable, have been duly incorporated and are duly subsisting under the laws of their jurisdiction of incorporation;

(c)     Minority Holdco or Adler Holdco, as applicable, owns their ULC Shares free and clear of all Liens, and they have never owned any asset other than their ULC Shares;

(d)     Minority Holdco or Adler Holdco, as applicable, have never engaged in any activity or business other than holding their ULC Shares and have no liabilities of any nature whatsoever, whether absolute, contingent, or otherwise;

(e)     Minority Holdco or Adler Holdco, as applicable, and the buyer shall be indemnified and saved harmless from and against all liabilities, suits, claims and expenses arising out of a breach of their representations, warranties and covenants

*Unanimous Shareholder Agreement*

- 32 -

or relating to any taxes arising out of or relating to the period prior to the closing of the sale;

(f)     none of the sellers are non-residents of Canada for the purposes of the *Income Tax Act* (Canada), or those who are shall provide a certificate under section 116 of the *Income Tax Act* (Canada);

(g)     on the closing of the sale, up-to-date books and records relating to Minority Holdco and Adler Holdco, as applicable, including all statutorily required resolutions of directors and shareholders, will be delivered to the buyer and all officers and directors will resign their positions and all shareholders will, and will cause all officers and directors to, release Minority Holdco and Adler Holdco, as applicable, from all claims, liabilities, contracts, covenants and commitments of any nature whatsoever, howsoever arising; and

(h)     the foregoing representations, warranties and covenants will survive closing for an indefinite period.

The foregoing representations, warranties and covenants shall be in addition to such other representations, warranties and covenants which may be required to be given in connection with any sale contemplated by the foregoing provisions. Should a Family Holding Vehicle be a seller of securities in Minority Holdco or Adler Holdco, its Individual Principal will guarantee the performance by the Family Holding Vehicle of the representations, warranties and covenants given by it in connection with the sale. Any liability incurred as a result of a breach of this Section shall be borne 50% by Adler and the remaining 50% shall be borne by the Minority Principals *pro rata* based on their percentage ownership in Minority Holdco.

Notwithstanding the foregoing, if Minority Holdco or Adler Holdco elects to sell Holdco Shares to a purchaser pursuant to this Section and any of the Holdco Principals do not tender their Holdco Shares to such purchaser or do not provide the representations, warranties or covenants required by this Section, Lehman may require Adler Holdco or Minority Holdco, as applicable, to sell all of their ULC Shares to such purchaser in lieu of the sale by the Holdco Principals of their Holdco Shares to such purchaser.

**10.11     General Sale Provisions**

(a)     Except as may otherwise be expressly provided in this Agreement, the provisions of this Section 10.8 shall apply to any sale of ULC Shares or Holdco Shares by any Party.

(b)     Any Party who is to be a vendor of ULC Shares or Holdco Shares shall, at or prior to the completion of the sale transaction as set forth in the relevant offer, and subject to satisfaction of the terms thereof:

(i)     assign and Transfer to the purchaser of the ULC Shares or Holdco Shares to be sold and deliver the share certificate(s) representing such ULC Shares or Holdco Shares duly endorsed for Transfer to the purchaser or as directed by it;

*Unanimous Shareholder Agreement*

- 33 -

(ii)     do all other things required in order to deliver good and marketable title to the ULC Shares or Holdco Shares to be sold to the purchaser free and clear of any encumbrances whatsoever;

(iii)    deliver to the Corporation and the purchaser all necessary documents (which documents shall be in form and substance reasonably satisfactory to the purchaser) required to comply fully with this Agreement;

(iv)     deliver to the Corporation signed resignations of the vendor's nominees, if any, as Directors and officers of the Corporation or its Subsidiaries, as the case may be; and

(v)      either provide the purchaser with evidence reasonably satisfactory to the purchaser that such vendor is not then a non-resident of Canada within the meaning of the *Income Tax Act* (Canada), or provide the purchaser with a certificate pursuant to subsection 116(2) of the *Income Tax Act* (Canada) with a certificate limit in an amount not less than the purchase price for the ULC Shares or Holdco Shares to be sold.

(c)     Lehman is hereby irrevocably appointed as the true and lawful attorney for each Party with full power of substitution in the name of and on behalf of such Party, with no restriction or limitation in that regard for the purposes of Transferring any ULC Shares or Holdco shares required to be Transferred hereunder, executing and delivering any sale agreement in connection therewith including all representations and warranties and covenants contained therein and executing and delivering all other documents necessary to complete a Monetization Event or Transfer the ULC Shares or Holdco Shares, on the condition that the Party's portion of the purchase price, if applicable, is deposited in an account in such Party's name with the Corporation's banker for which account the Party shall be entitled to withdraw such deposited funds. This power of attorney shall not be revoked or terminated by any act or thing nor, to the extent permitted by law, by the death or disability of any Party (in which case the heir(s), executors, administrators and estate shall be bound hereby to the maximum extent permitted by law).

(d)     If at completion (i) the ULC Shares or Holdco Shares to be sold are not free and clear of all Liens, the purchaser may, without prejudice to any other rights which it may have, purchase the ULC Shares or Holdco Shares subject to such Liens and, in that event, the purchaser shall, at completion, (ii) assume the obligations and liabilities relating to such encumbrances, and (iii) make the payment of tax required under section 116 of the *Income Tax Act* (Canada), as the case may be; and, in each such case, the purchase price payable by the purchaser for such ULC Shares or Holdco Shares shall be satisfied, in whole or in part, as the case may be, by such assumption or payment and the amount so assumed or paid, as determined by the purchaser acting reasonably, shall be deducted from the purchase price payable at completion.

- 34 -

(e)     if the sale of any ULC Shares or Holdco Shares requires that notice be given thereof to any governmental authority and that a prescribed period of time must have passed following the giving of such notice before such sale may be completed, or if such sale requires the approval or consent of any governmental authority, all Parties shall promptly co-operate in taking all steps necessary to ensure that such notice is properly given or such approval or consent is properly applied for and if by the date otherwise prescribed herein for the completion of such sale the required notice period has not expired or any required approval or consent has not been obtained, completion shall occur at 10:00 a.m. on the Business Day immediately following the Business Day on which such notice period expires or such consent or approval is obtained, as the case may be.

**10.12**          **Share Certificates**

Share certificates of the Corporation, Adler Holdco and Minority Holdco shall bear the following language conspicuously on their face as well as any other legends required by applicable law:

> "Unless permitted under securities legislation, the holder of the securities represented by this certificate must not trade the securities before the date that is 4 months and a day after the later of (i) **[insert distribution date]** and (ii) the date the issuer became a reporting issuer in any province or territory. The securities represented by this certificate are also subject to the terms of an agreement or agreements in respect of the transferability of the securities and the right to control or direct the disposition and voting thereof, including with respect to requiring the holder to participate in a sale of the securities and requiring the participation of other securities of the same class in a sale by the holder of the securities represented by this certificate. A copy of the agreement or agreements is on file at the corporation's head office."

> The shares represented by this certificate are subject to the provisions of a unanimous shareholder Agreement made as of the 11th day of June, 2007 between all of the shareholders of the Corporation and the Corporation.

> The liability of an owner of the share or shares represented by this certificate for any liability, act or default of the unlimited liability corporation is unlimited in extent and joint and several in nature.

**10.13**          **Securities Law**

Notwithstanding anything in this Agreement to the contrary, no Party may Transfer any ULC Shares, except in compliance with all applicable securities laws.

*Unanimous Shareholder Agreement*

- 35 -

## ARTICLE XI
## GENERAL PROVISIONS

**11.1**        **Assignment and Enurement**

Except in connection with a Transfer of ULC Shares or Holdco Shares permitted hereunder, no Party may assign its rights or obligations under this Agreement without the prior written consent of the other Parties, which consent may be unreasonably withheld or delayed without reasons. This Agreement enures to the benefit of and binds the Parties and their respective heirs, executors, administrators, personal and legal representatives, successors and permitted assigns and all transferees of ULC Shares.

**11.2**        **Governing Law**

This Agreement shall be governed by and construed in accordance with the laws of New York applicable to a contract executed and performed in such State, without giving effect to the conflicts of laws principles thereof.

**11.3**        **Dispute Resolution; Arbitration.**

(a)        Disputes under the final paragraph of Section 7.1 will be resolved in accordance with this Section.

(b)        The parties agree that disputes under Section 11.3 shall be resolved pursuant to arbitration in accordance of the rules of the American Arbitration Association. The place of the arbitration will be New York, New York.

(c)        The parties will agree on the appointment of an arbitrator (the **"Sole Arbitrator"**). If the parties are unable to agree upon a Sole Arbitrator, each party will appoint a person as arbitrator, and those two arbitrators will appoint a third arbitrator (the **"Arbitrators"**).

(d)        The Sole Arbitrator or, as the case may be, the Arbitrators appointed above will in its or their absolute discretion, establish reasonable rules to govern all aspects of the arbitration and to ensure that the arbitration is conducted expeditiously.  The parties may request that the Sole Arbitrator or the Arbitrators, as the case may be, decide between final and complete proposals submitted by each of the parties.

(e)        The decision of the Sole Arbitrator or the Arbitrators with respect to the dispute must be rendered, in writing and must contain a brief recital of the facts and principles upon which the decision was made and the reasons therefor.  The decision or award of the Sole Arbitrator or the Arbitrators made pursuant to this Schedule is final and binding upon each of the parties and there is no appeal therefrom.  Thereafter, any action may only be for the purpose of enforcing the decision or award and the recovery of costs incidental to the action.

(f)        The decision or award of the Sole Arbitrator or Arbitrators, as the case may be, will be conclusively deemed to determine the interpretation of this Agreement or

*Unanimous Shareholder Agreement*

- 36 -

any Operative Agreements and the rights and liabilities as between the parties in respect of the matter in disagreement.

(g) Except as may be otherwise agreed by the parties, or as may be ordered by the Sole Arbitrator or the Arbitrators, the Sole Arbitrator or the Arbitrators will be entitled to its or their usual charges for services rendered to be paid equally by the parties.

(h) Subject to this paragraph, no dispute that is or may be the subject of a submission to arbitration in accordance with this Section will give rise to a cause of action between or will be made the subject matter of an action in any court of law or equity by either of the parties unless and until the dispute has been submitted to arbitration and finally determined in accordance with this Section and any action commenced thereafter with respect to the dispute may only be for judgment in accordance with the decision of the Sole Arbitrator or the Arbitrators, as applicable, and the costs incidental to the action. In any action of this sort, the decision of the Sole Arbitrator or the Arbitrators, as applicable, will be conclusively deemed to determine the rights and liabilities between the parties in respect of the dispute.

Notwithstanding the foregoing, if the actions or inactions of a party are, in the honest view of the other party, producing or likely to produce irreparable harm that cannot be adequately compensated for by damages or that will result in damages that are difficult to estimate, the aggrieved party may apply to a court for injunctive or mandatory injunctive relief to remedy the situation pending the conduct of arbitration. The court before which the proceeding is brought may, if it determines that arbitration would not, in the circumstances be beneficial to a continuing relationship between the parties, grant the aggrieved party the right to proceed with an action notwithstanding the otherwise general application of arbitration as the chosen mode of dispute resolution.

(i) The parties desire that any dispute that is to be determined in accordance with the dispute resolution provisions should be conducted in strict confidence and that there will be no disclosure to any Person of the fact of the dispute or any aspect of the dispute except as necessary for the resolution of the dispute. Any hearing will be attended only by those Persons whose presence, in the opinion of any party or the arbitrator, is reasonably necessary for the determination of the dispute. All matters relating to, all evidence presented to, all submissions made in the course of, and all documents produced in accordance with the dispute resolution procedure or any order of the arbitrator or created in the course of or for the purposes of the arbitration, including any award or interim award by the arbitrator, will be kept confidential and will not be disclosed to any Person without the prior written consent of all parties to the arbitration except as required to enforce the award or as required by law or as permitted by an order of the arbitrator made pursuant to a motion or application on notice to all parties to the arbitration.

*Unanimous Shareholder Agreement*

- 37 -

**11.4**        **Judicial Proceedings; Waiver of Jury Trial; Designation of Agent.**

ANY JUDICIAL PROCEEDING ARISING OUT OF OR IN CONNECTION
WITH ANY CLAIM UNDER THIS AGREEMENT (INCLUDING OT ENFORCE ANY
ARBITRATION AWARD OR TO COMPEL ARBITRATION PURSUANT TO SECTION
15.10 MAY BE BROUGHT IN ANY COURT OF COMPETENT JURISDICTION IN THE
BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK, COUNTY OF NEW YORK,
AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY (A)
ACCEPTS, GENERALLY AND UNCONDITIONALLY, THE NONEXCLUSIVE
JURISDICTION OF EACH SUCH COURT AND ANY RELATED APPELLATE COURT
AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED
THEREBY IN CONNECTION WITH ANY LOAN DOCUMENT CLAIM AND (B) TO THE
FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, IRREVOCABLY
WAIVES ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION
TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON
CONVENIENS, IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY
SUCH ACTION OR PROCEEDING IN SUCH JURISDICTION. EACH PARTY SHALL
APPOINT AND MAINTAIN CT CORPORATION SYSTEM, THE PRENTICE HALL
CORPORATION SYSTEM INC. OR A SIMILAR ENTITY (THE "**SERVICE AGENT**") AS
AGENT TO RECEIVE ON ITS BEHALF SERVICE OF PROCESS IN ANY PROCEEDING
IN A STATE OR FEDERAL COURT LOCATED IN THE BOROUGH OF MANHATTAN IN
THE CITY OF NEW YORK BY ENTERING INTO AN AGREEMENT AS OF THE DATE OF
THIS AGREEMENT WITH THE SERVICE AGENT TO SUCH EFFECT, AND SUCH
PARTY SHALL MAINTAIN SUCH AGREEMENT (OR AN APPROPRIATE SUBSTITUTE
TO THE SAME EFFECT WITH THE SAME OR A DIFFERENT SERVICE AGENT) FOR
THE ENTIRE TERM OF THIS AGREEMENT AND EACH OF THE OTHER OPERATIVE
DOCUMENTS TO WHICH IT IS A PARTY.    THE FOREGOING CONSENT TO
JURISDICTION AND APPOINTMENT OF AGENT TO RECEIVE SERVICE OF PROCESS
SHALL NOT CONSTITUTE A GENERAL CONSENT TO SERVICE OF PROCESS IN THE
STATE OF NEW YORK FOR ANY PURPOSE EXCEPT AS PROVIDED ABOVE AND
SHALL NOT BE DEEMED TO CONFER RIGHTS ON ANY PERSON OTHER THAN THE
PARTIES HERETO. NOTHING HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY
OR ANY OTHER INDEMNIFIED PERSON TO SERVE PROCESS IN ANY OTHER
MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF ANY PARTY OR
ANY OTHER INDEMNIFIED PERSON TO BRING PROCEEDINGS IN THE COURTS OF
ANY OTHER JURISDICTION. IN LIGHT OF THE EXPRESS AGREEMENT OF THE
PARTIES TO SUBMIT TO THE JURISDICTION OF NEW YORK COURTS FOR THE
RESOLUTION OF ANY AND ALL DISPUTES ARISING UNDER THIS AGREEMENT
AND BROUGHT IN NEW YORK COURTS PURSUANT TO THIS SECTION 15.13, EACH
PARTY FURTHER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY
WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND
ALL AFFIRMATIVE DEFENSES IT COULD OR MIGHT OTHERWISE BE ABLE TO
ASSERT BASED ON AN ALLEGED INCAPACITY OF SUCH PARTY TO ASSERT A
CLAIM OR COUNTER CLAIM IN THE STATE COURTS OF THE STATE OF NEW YORK
LOCATED IN THE BOROUGH OF MANHATTAN WHETHER ON THE GROUNDS THAT
SUCH PARTY HAS FAILED TO COMPLY WITH ANY OR ALL REGISTRATION,
CERTIFICATION, NOTIFICATION, FILING OR DESIGNATION OF AGENT

*Unanimous Shareholder Agreement*

- 38 -

GOVERNMENTAL REQUIREMENTS OF THE STATE OF NEW YORK OR ON OTHER GROUNDS. EACH PARTY HERETO EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING ANY CLAIM ARISING OUT OF, RELATING TO OR IN CONNECTION WITH ANY OPERATIVE DOCUMENT CLAIM.   EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER OPERATIVE DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 15.13. THE PROVISIONS OF THIS SECTION 15.13 SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT AND THE PAYMENT IN FULL OF THE OBLIGATIONS.

**11.5      Waiver of Jury Trial**

Each Party hereby irrevocably waives all right to trial by jury in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

**11.6      Severability**

The invalidity or unenforceability of any provision in this Agreement shall not affect the validity or enforceability of any other provision or part of this Agreement, and the Parties hereby undertake to renegotiate in good faith any such invalid or unenforceable provision, with a view to concluding valid and enforceable arrangements as nearly as possible the same as those contained in this Agreement.

**11.7      Entire Agreement**

The provisions contained in the Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior communications, proposals, representations and agreements, whether oral or written, with respect to the subject matter of the Agreement, including, without limitation, the letter of intent dated June 1, 2007 between Lehman Brothers Inc. and Opco, and any prior agreements relating to the governance of, or shareholdings in, Opco. Without limiting the generality of the foregoing, the shareholders agreement among HSHN, Adler, David Kassie and Opco dated July 28, 2006, is hereby terminated.

**11.8      Waiver**

No waiver of any provision of this Agreement is binding unless it is in writing and signed by all the Parties to this Agreement entitled to grant the waiver. No failure to exercise, and no delay in exercising, any right or remedy under this Agreement will be deemed to be a waiver of that right or remedy. No waiver of any breach of any provision of this Agreement will be deemed to be a waiver of any subsequent breach of that provision.

*Unanimous Shareholder Agreement*

- 39 -

**11.9        Further Assurances**

Each of the Parties hereto shall promptly do, make, execute, deliver or cause to be done, made, executed or delivered, all such further acts, documents and things as the other Parties hereto may require, acting reasonably, from time to time, for the purpose of giving effect to this Agreement and shall take such steps as may be reasonably within its power to implement the full extent of this Agreement.

**11.10      Remedies Cumulative**

The rights and remedies under this Agreement are cumulative and in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise. No single or partial exercise by a Party of any right or remedy precludes or otherwise affects the exercise of any other right or remedy to which that Party may be entitled.

**11.11      Amendments**

Except as expressly provided in this Agreement, no amendment, supplement, restatement or termination of any provision of this Agreement is binding unless it is in writing and signed by the Corporation, Lehman and Adler, which amendment, supplement, restatement or termination shall be binding on all of the Parties.

**11.12      Termination**

(a)      Except as otherwise provided, this Agreement shall terminate upon the earliest to occur of:

    (i)      the written agreement of all the Parties;

    (ii)     the direct or indirect sale of all of the ULC Shares to a third party in accordance with the terms of this Agreement; and

    (iii)    one ULC Shareholder becoming the direct or indirect owner of all of the ULC Shares.

(b)      All obligations of the Parties which expressly or by their nature survive termination of this Agreement shall continue in full force and effect subsequent to and notwithstanding termination of this Agreement until they are fully satisfied or by their nature expire. No Party shall by reason of termination of this Agreement be relieved of any obligation or liability towards any other Party accrued under this Agreement before termination, and all those obligations and liabilities shall remain enforceable until they are fully satisfied or by their nature expire.

**11.13      Notices**

Each notice, demand and payment under this Agreement must be given in writing and delivered, personally or by courier, sent by prepaid registered mail or transmitted by fax to the Party as follows:

*Unanimous Shareholder Agreement*

- 40 -

If to Lehman or the Corporation:

| | |
|---|---|
| Address: | c/o Lehman Brothers Inc. |
| | 745 Seventh Avenue, |
| | New York, NY  100019-6801 |

Fax No.:        (646) 758-4076

Attention:    John V. Veech

If to Adler or Adler Holdco:

| | |
|---|---|
| Address: | c/o SkyPower Corp. |
| | 250 Yonge Street, Suite 1600 |
| | Toronto, ON |
| | M5B 2L7 |

Fax No.:        (416) 981-8686

Attention:    Kerry Adler

If to Minority Holdco or the Minority Principals:

| | |
|---|---|
| Address: | c/o SkyPower Corp. |
| | 250 Yonge Street, Suite 1600 |
| | Toronto, ON |
| | M5B 2L7 |

Fax No.:        (416) 981-8686

Attention:    Kerry Adler

If to Optionees:

| | |
|---|---|
| Address: | c/o SkyPower Corp. |
| | 250 Yonge Street, Suite 1600 |
| | Toronto, ON |
| | M5B 2L7 |

Fax No.:        (416) 981-8686

Attention:    Kerry Adler

If to HSHN:

| | |
|---|---|
| Address: | c/o HSH Nordbank AG |
| | New York Branch |
| | 230 Park Avenue |

*Unanimous Shareholder Agreement*

- 41 -

New York, N.Y.
U.S.A.   10169-0005

Fax No.:          (212) 407-6011
                  Attention:      Rohan Singh

or to any other address, fax numbers or Person that the Party designates. Any notice, demand or payment, if delivered personally or by courier, will be deemed to have been given when actually received, if transmitted by fax before 3:00 p.m. on a Business Day, will be deemed to have been given on that Business Day, and if transmitted by fax after 3:00 p.m. on a Business Day, will be deemed to have been given on the next succeeding Business Day after the date of the transmission.

**11.14          Counterparts and Facsimile**

This Agreement and any amendment, supplement, restatement or termination of any provision of this Agreement may be executed and delivered in any number of counterparts, each of which when executed and delivered is an original but all of which taken together constitute one and the same instrument. A Party's transmission by facsimile of a copy of this Agreement duly executed by that Party shall constitute effective delivery by that Party of an executed copy of this Agreement to the Party receiving the transmission. A Party that has delivered this Agreement by facsimile shall forthwith deliver an originally executed copy to the other Party or Parties.

**11.15          Independent Legal Advice**

The Parties acknowledge that they have entered into this Agreement willingly and with full knowledge of the obligations imposed by the terms of this Agreement. The Parties to this Agreement, by execution hereof, acknowledge that they have been afforded the opportunity to obtain independent legal advice and confirm by the execution hereof that they have either done so or waived their right to do so and agree that this Agreement constitutes a legal and binding obligation and they are estopped from raising any claim on the basis that they have not received such advice.

**[Balance of page intentionally left blank]**

- 42 -

The Parties have executed this Agreement.

**LB SKYPOWER INC.**

By: _____
Authorized Signatory

By: _____
Authorized Signatory

_____
**Kerry Adler**

**2138747 ONTARIO INC.**

By: _____
Authorized Signatory

**6785778 CANADA INC.**

By: _____
Authorized Signatory

*Unanimous Shareholder Agreement*

- 42 -

The Parties have executed this Agreement.

**LB SKYPOWER INC.**

By: _____

Authorized Signatory

By:

Authorized Signatory

_____

**Kerry Adler**

**2138747 ONTARIO INC.**

By: _____

Authorized Signatory

**6785778 CANADA INC.**

By: _____

Authorized Signatory

*Unanimous Shareholder Agreement*

- 43 -

**THE PERSONS LISTED IN SCHEDULE
"A" ATTACHED HERETO, by their
attorney, Kerry Adler**

_____

Kerry Adler


**1328392 ALBERTA ULC**

By:  _____

Authorized Signatory


**HSH NORDBANK AG, by its attorney, Kerry
Adler**

By:  _____

Kerry Adler

By:  _____


*Unanimous Shareholder Agreement*