# EXHIBIT 5

## Amended and Restated Equity Contribution Agreement
## dated as of February 22, 2008

DOCSNY-475441v1

EXHIBIT 5

Execution Copy

# AMENDED AND RESTATED EQUITY CONTRIBUTION AGREEMENT

Dated as of February 22, 2008

Among

SKYPOWER CORP.,

as Borrower,

LEHMAN BROTHERS HOLDINGS INC.,

as Sponsor,

and

HSH NORDBANK AG, NEW YORK BRANCH,

as Collateral Agent.

LAI - 115204.09

TABLE OF CONTENTS

Page

SECTION 1.01 Definitions ........ 1
SECTION 2.01 Equity Contributions ........ 2
SECTION 3.01 Indemnification; Bankruptcy. ........ 2
SECTION 4.01 Method and Application of Payment; Event of Default; Overdue Interest. ........ 3
SECTION 5.01 No Setoff ........ 4
SECTION 6.01 Payments Absolute. ........ 4
SECTION 7.01 Representations and Warranties ........ 6
SECTION 8.01 Covenants and Agreements ........ 6
SECTION 9.01 Execution in Counterparts ........ 7
SECTION 10.01 Enforcement ........ 7
SECTION 11.01 Survival ........ 7
SECTION 12.01 Governing Law and Jurisdiction. ........ 7
SECTION 13.01 WAIVER OF JURY TRIAL ........ 9
SECTION 14.01 Notices ........ 9
SECTION 15.01 Amendments ........ 9
SECTION 16.01 Severability ........ 9
SECTION 17.01 Assignments ........ 10
SECTION 18.01 Headings ........ 10

## AMENDED AND RESTATED EQUITY CONTRIBUTION AGREEMENT

This AMENDED AND RESTATED EQUITY CONTRIBUTION AGREEMENT (this "Agreement"), is entered into as of February 22, 2008, by and among SKYPOWER CORP., a Canadian corporation (the "Borrower"), LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation (the "Sponsor"), and HSH NORDBANK AG, NEW YORK BRANCH, as collateral agent for the Secured Parties (in such capacity, and, together with any successor collateral agent appointed pursuant to Section 7.05 of the Credit Agreement (as defined below), the "Collateral Agent").

### PRELIMINARY STATEMENTS

WHEREAS, in connection with the Second Amended and Restated Credit Agreement dated December 28, 2007, among the Borrower, the Lenders named therein, HSH Nordbank AG, New York Branch, as the Administrative Agent and as the Collateral Agent, the parties entered into an Equity Contribution Agreement dated December 28, 2007 (the "Original ECA");

WHEREAS, the Borrower simultaneously herewith is entering into the Third Amended and Restated Credit Agreement, dated as of the date hereof, among the Borrower, the Lenders named therein, HSH Nordbank AG, New York Branch ("HSHN") as the Administrative Agent and as the Collateral Agent, HSHN as Issuing Bank, HSHN as the Sole Mandated Lead Arranger, Bayerische Landesbank, New York Branch as Co-Lead Arranger and Union Bank of California, Canada Branch as Co-Lead Arranger (as the same may be amended, modified or supplemented from time to time, the "Credit Agreement"), pursuant to which the Lenders will loan certain Advances to the Borrower;

WHEREAS, in connection with the entering into of the Third Amended and Restated Credit Agreement, the parties desire to amend and restate the Original ECA;

WHEREAS, as of the Third Amended and Restated Credit Agreement Effective Date, the Sponsor owns at least 66% of the shares of the Borrower, and the Sponsor shall derive substantial benefit from the extensions of credit to the Borrower by the Lenders, pursuant to the Credit Agreement; and

WHEREAS, it is a condition precedent to the availability of the Advances under the Credit Agreement that the parties hereto enter into this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby covenant and agree as follows:

LA1 - 115204.09

SECTION 1.01 (a) <u>Definitions</u>. Unless otherwise defined herein, all capitalized terms used herein, including such terms used in the preamble and recitals hereto, which are defined in the Credit Agreement shall have their respective meanings as therein defined, and the rules of construction therein shall apply to this Agreement. All references to sections, schedules and exhibits in or to this Agreement are to sections, schedules and exhibits in or to this Agreement, unless otherwise specified. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The following terms shall have the following meanings:

"<u>Equity Contribution Obligations</u>" shall have the meaning specified in Section 2.01.

"<u>Purchase Price</u>" shall mean $312,500,000 and is intended to represent the aggregate purchase price paid by the Borrower to Terrawinds in consideration for the Terrawinds Project assets.

(b)    <u>Entire Agreement</u>. This Agreement supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties relating to the subject matter hereof and entered into prior to the date of this Agreement and amends, restates, consolidates and supersedes the Original ECA. This Agreement is and shall for all purposes be deemed to be an amendment and restatement to the Original ECA and does not constitute a discharge or novation of any debt, obligation, covenant or agreement contained in the Original ECA or in any other Basic Documents.

SECTION 2.01 <u>Equity Contributions</u>. The Sponsor agrees to make one or more cash equity contributions to the Borrower (the "<u>Equity Contribution Obligations</u>") as follows:

(a)    On the date of any requested Advance or requested issuance of a Letter of Credit, or following the occurrence and continuance of an Event of Default on the date any Turbine Purchase Costs are then due, the Sponsor shall make a cash equity contribution to the Borrower in an amount equal to the sum of (i) 20% of the Purchase Price (less any amounts previously paid toward Purchase Price other than with Advances), plus (ii) 20% of the Contract Price of the Vestas TSA (less any amounts previously paid toward the Contract Price of the Vestas TSA other than with Advances). <u>Schedule 2.01</u> attached hereto and incorporated herein sets forth all amounts paid toward the Purchase Price and the Contract Price of the Vestas TSA on or before the date hereof.

(b)    Within five Business Days following Borrower's receipt of any appraisal pursuant to Sections 3.01(a)(xvi) or 5.01(a) of the Credit Agreement determining that the appraised market value of a TSA (including all Wind Turbines purchased or to be purchased thereunder) is less than, in the case of the GE TSA, the Purchase Price or, in the case of the Vestas TSA, the Contract Price for such TSA, including any such determination following the occurrence and continuance of an Event of Default, the Sponsor shall make a cash equity contribution to the Borrower in an amount equal to 80% of the difference between, in the case of the GE TSA, the Purchase Price and the appraised market value of the GE TSA or, in the case of the Vestas TSA, the Contract Price and the appraised market value of the Vestas TSA.

2

LAI - 115204.09

(c) At the times such amounts are due and payable, including following the occurrence and continuance of an Event of Default, the Sponsor shall make a cash equity contribution to the Borrower in an amount equal to the aggregate costs (including Turbine Purchase Costs) payable under each TSA not covered by (x) in the case of costs payable under the GE TSA, the sum of the initial aggregate Term Loan Commitment amount under the Credit Agreement (prior to the making of any Advances) plus any equity amount previously advanced toward such TSA costs under Section 2.01(a) above and (y) in the case of costs payable under the Vestas TSA, the sum of the initial Aggregate Letter of Credit Loan Commitment (less the Vestas Sales Tax Amount) plus any equity amount previously advanced toward such TSA costs under Section 2.01(a) above; provided that the aggregate amount paid by the Sponsor pursuant to this Section 2.01(c) shall not exceed $10,000,000.

(d) On the date any amount described in clauses (i) through (iv) below is due and owing, the Sponsor shall make a cash equity contribution to the Borrower in an amount equal to (i) any costs of storage, shipping and transportation, to the extent such costs are contemplated by any TSA, of any of the Wind Turbines to a Project site designated by the Borrower or an Affiliate of the Borrower or, following an Event of Default and the exercise of remedies by the Secured Parties, to a Project designated by the Collateral Agent, (ii) the cost of any additional Services (as defined in the GE TSA) purchased by the Buyer pursuant to Article 4 of the GE TSA, or any services purchased by the Buyer pursuant to the Service and Maintenance Agreement, dated as of November 30, 2007, by and between the Borrower and Vestas, (iii) any sales taxes and duties payable by the Buyer (as defined in the TSAs) under either TSA (including Sales Taxes and GST (each as defined in the Vestas TSA)), and (iv) any interest accrued under the Credit Agreement on any Advance and any payments payable under any Secured Hedge Agreement, provided that the aggregate amount paid by the Sponsor pursuant to this Section 2.01(d)(iv) shall not exceed $34,000,000 less any interest previously paid under the Credit Agreement or payments payable under any Secured Hedge Agreement.

(e) The aggregate amount paid by the Sponsor pursuant to Sections 2.01(a) and (b) or otherwise previously advanced toward Turbine Purchase Costs (other than with Advances) shall not exceed 48% of the sum of the Purchase Price plus the Contract Price of the Vestas TSA; and any amount required to be paid by Sponsor based on the amounts payable under the TSAs shall be based on the TSAs as in effect on the date hereof or as amended hereafter with the consent of the Sponsor and to the extent permitted under the Credit Agreement.

SECTION 3.01 Borrower Bankruptcy. The Sponsor hereby irrevocably and unconditionally waives, to the extent it may do so under Applicable Law, any protection it may be entitled to under any Debtor Relief Laws or similar Applicable Laws of any state having jurisdiction, in the event of any Bankruptcy Event with respect to the Borrower. In the event the trustee in bankruptcy or the debtor-in-possession takes any action (including, without limitation, the institution of any action, suit or other proceeding) following a Bankruptcy Event affecting the Borrower for the purpose of enforcing the obligations of the Sponsor under Section 2.01, the Sponsor agrees not to assert any defense, claim or counterclaim denying liability thereunder on the basis that this Agreement is either (i) a financial accommodation or similar instrument or (ii) an executory contract that cannot be assumed, assigned or enforced or on any other theory

3

LAI-115204.09

directly or indirectly based on Applicable Law, including any Debtor Relief Laws. If a Bankruptcy Event affecting the Borrower shall occur, the Sponsor agrees, after the occurrence of such Bankruptcy Event, to reconfirm its pre-petition waiver of any protection it may be entitled to under Applicable Law, including any Debtor Relief Laws and, to give effect to such waiver, the Sponsor consents to the assumption and enforcement of each provision of this Agreement by the debtor-in-possession or the Borrower's trustee in bankruptcy, as the case may be.

SECTION 4.01 <u>Method and Application of Payment; Event of Default; Overdue Interest.</u>

(a) <u>Payment Instructions</u>. Subject to Section 4.01(b), all payments owing by, or on behalf of, the Sponsor under this Agreement shall be made by, or on behalf of, the Sponsor on the date due in cash in immediately available funds to the Borrower, which, (1) in the case of the payments described in Sections 2.01(a) and (c), shall apply such amounts to pay Turbine Purchase Costs then due or next becoming due and payable under the relevant TSA; (2) in the case of the payments described in Section 2.01(b), shall apply such amounts (i) to the extent the sum of (x) Advances made, (y) the aggregate Maximum Available Amount of the Letter of Credit then outstanding, and (z) following the occurrence and continuance of an Event of Default, any additional amounts paid or being paid by the Lenders or their designees in respect of Turbine Purchase Costs then due and payable are more than 80% of the appraised market value of the relevant TSA (including the Wind Turbines purchased thereunder), immediately to prepayment of the Advances pursuant to Section 2.09(b)(iii) of the Credit Agreement until such time as Advances made, the aggregate Maximum Available Amount of the Letter of Credit then outstanding and, following the occurrence and continuance of an Event of Default, any additional amounts paid or being paid by the Lenders or their designees in respect of Turbine Purchase Costs then due and payable shall equal 80% of the appraised market value of the relevant TSA and (ii) otherwise to pay Turbine Purchase Costs next becoming due and payable under the relevant TSA; and (3) in the case of any payments described in Section 2.01(d), shall apply such amounts to payment of the relevant costs or amounts as and when due and payable.

(b) <u>Event of Default</u>. The Sponsor consents to the assignment as collateral security to the Collateral Agent (for the benefit of the Secured Parties) of the Borrower's rights and interest under this Agreement and acknowledges the right, but not the obligation, of the Collateral Agent in the exercise of its rights and remedies under the Security Agreement to, upon notice to Sponsor that an Event of Default has occurred and is continuing under the Credit Agreement, make all demands, give all notices, take all actions and exercise all rights of the Borrower under this Agreement and agrees to accept any such exercise; provided, that upon and following any such exercise of rights and remedies by the Collateral Agent, the Sponsor agrees to make all payments owing by the Sponsor hereunder to or as directed by the Collateral Agent (for the benefit of the Secured Parties), which the Collateral Agent agrees to apply for the same uses as would be required of the Borrower in accordance with Section 4.01(a) if the Borrower had received such funds directly.

(c) <u>Interest</u>. If any Equity Contribution Obligations shall not be paid within three days of when such amounts are due and payable by the Sponsor under this Agreement, such Equity Contribution Obligations shall accrue interest until the Sponsor has paid such Equity Contribution Obligations in full at the Default Rate.

4

LA3 - 115204.09