K&L GATES LLP
Jeffrey N. Rich, Esq.
Eunice Rim, Esq.
599 Lexington Avenue
New York, NY 10022
(212) 536-3900

Hearing Date:  August 25, 2011 at 10:00 a.m. (EDT)

-and-

David C. Neu, Esq.
925 Fourth Avenue
Suite 2900
Seattle, Washington 98104
(206) 623-7580

Attorneys for Port of Tacoma

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
                                                                   :
In re                                                              :    Chapter 11
                                                                   :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                           :    Case No. 08-13555 (JMP)
                                                                   :
                                                                   :    (Jointly Administered)
                        Debtors.                                   :
                                                                   :
-------------------------------------------------------------------x

**RESPONSE OF PORT OF TACOMA TO DEBTORS' ONE HUNDRED THIRTY-EIGHTH OBJECTION TO CLAIMS (NO LIABILITY DERIVATIVES CLAIMS)**

Port of Tacoma ("Tacoma"), by and through its undersigned counsel, K&L Gates LLP, hereby files this response (the "Response") to the Debtors' One Hundred Thirty-Eighth Objection to Claims (No Liability Derivatives Claims) filed on May 16, 2011 (Docket No. 16865) (the "Objection"), and in support thereof respectfully states as follows:

NY-902333 v6

**BACKGROUND**

A.  **General Bankruptcy Background**

1.  On and after September 15, 2008 (the "LBHI Petition Date"), LBHI and certain of its subsidiaries (collectively, the "Debtors" or "Lehman") filed voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

2.  Lehman Brothers Special Financing Inc. ("LBSF")[1] filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 3, 2008 (the "LBSF Petition Date")

3.  Lehman Brothers Derivatives Products, Inc. ("LBDP")[2] filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 5, 2008 (the "LBDP Petition Date"; collectively with the LBSF and LBHI Petition Dates, the "Petition Dates").

4.  Since their respective Petition Dates, the Debtors have operated their businesses and managed their property as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

5.  On July 2, 2009, the Court entered a bar date order (the "Bar Date Order") requiring, among other things, that all claims against the Debtors be filed on or before September 22, 2009 at 5:00 p.m. (EDT) (the "Bar Date") and that all derivatives and guarantee questionnaires be uploaded to http://www.lehman-claims.com (the "Claims Website"), on or before October 22, 2009 (the "Questionnaire Deadline").

---

[1] LBSF is a wholly-owned subsidiary of Lehman Brothers Inc. ("LBI") which, in turn, is a wholly-owned subsidiary of LBHI.

[2] LBDP is a Triple-A rated special purpose subsidiary that is a stand-alone OTC derivatives products company. LBDP has a termination structure to ensure that the value of its OTC derivatives obligations will be paid promptly following the termination of LBDP.

- 2 -

6. On September 22, 2009, Tacoma filed proof of claim number 30049 ("Claim No. 30049") against LBDP in the amount of $666,062.79, which was subsequently amended by proof of claim number 42913 ("Claim No. 42913") filed on October 21, 2009 in the amount of $791,486.90 (as amended, the "Claim").

7. On October 21, 2009, Tacoma also uploaded all information required for the derivatives questionnaire to the Claims Website.

8. On May 16, 2011, the Debtors filed the Objection requesting that Claim No. 42913 be disallowed. In the Objection, the Debtors assert that Claim No. 42913 is one of many specified derivatives contracts for which the Debtors have no liability to the counterparty (each, a "No Liability Derivative Claim"). The Objection states, in pertinent part:

> [a]fter a careful review of the claimant's supporting documentation and the Debtors' books and records, the Debtors have determined that, based on the fair, accurate, and reasonable values of the subject Derivatives Contracts . . . and the netting provisions thereunder, the Debtors do not owe any amounts to the claimants but rather, in most cases, the respective claimants actually owe money to the Debtors based on such Derivatives Contracts. Therefore, the No Liability Derivatives Claims do not constitute valid *prima facie* claims, and the Debtors request that they be disallowed and expunged in their entirety.

See Objection ¶ 2.

B.     **The ISDA Agreement and the Interest Rate Swap**

9. Tacoma is a port district and municipal corporation of the State of Washington. See Declaration of David Morrison (the "Morrison Decl."), filed simultaneously herewith, at ¶ 2.

10. Tacoma entered into a long-term interest rate swap (the "Interest Rate Swap") with LBDP pursuant to: (i) that certain ISDA Master Agreement dated as of August 4, 2005 (the "ISDA") by and between Tacoma and LBDP and (ii) that certain Confirmation dated

- 3 -

as of August 4, 2005 (the "Confirmation"; collectively with the ISDA, the Schedule to the ISDA and the Credit Support Annex that has been incorporated into the ISDA, the "Agreement")[3] by and between LBDP and Tacoma, to hedge against Tacoma's variable interest rate exposure for a thirty-year period in connection with certain subordinate lien revenue bonds issued by Tacoma in the principal amount of $30,000,000.00 (the "Bonds"). Morrison Decl. at ¶ 3.

11. The Interest Rate Swap was effective as of August 3, 2006 and was scheduled to terminate on December 1, 2036 (the "Scheduled Termination Date"). Id. at ¶ 4. The initial notional amount for the Interest Rate Swap was $30,000,000.00 (the "Notional Amount") and matched the principal amount of the Bonds. Id. The Notional Amount was subject to reduction over time as set forth in the Confirmation. Id. Pursuant to the Agreement, Tacoma was required to pay LBDP a fixed interest rate of 3.795 percent on the Notional Amount and LBDP was required to pay Tacoma a floating interest rate on the Notional Amount equal to 70 percent of the 1-Month LIBOR index. Id. at ¶ 5.

**C. The Trigger Events Under the ISDA and the Termination Amounts Calculated by LBDP Under Loss Methodology**

12. Pursuant to Section 6(b)(iii) of the ISDA, the Agreement was to terminate prior to its Scheduled Termination Date if, among other events, an Additional Termination Event occurred. Id. at ¶ 7. Additional Termination Events, as set forth in Part 1(i)(ii) of the Schedule to the ISDA, included Trigger Events, one of which is the institution of a proceeding in bankruptcy against either LBHI or LBSF. Id. at ¶ 8.

---

[3] All capitalized terms used but not otherwise defined herein shall have the meanings attributed to them in the Agreement.

A copy of the Agreement, which includes the Confirmation, the ISDA, the Schedules to the ISDA and the Credit Support Annex to the ISDA, is attached as Exhibit A to the Morrison Decl. filed simultaneously herewith.

13. If a Trigger Event occurred as specified under Section 6(e)(ii) of the ISDA and Part 1(k)(5) of the Schedule to the ISDA, LBDP was required to: (i) notify Tacoma of the Trigger Event, (ii) specify the nature of the Trigger Event and (iii) designate the Early Termination Date for all transactions covered under the Agreement in light of the Trigger Event (the "Trigger Early Termination Date"), within one business day of becoming aware of the occurrence of a Trigger Event. Id. at ¶ 9.

14. Under Part 1(k)(5) of the Schedule to the ISDA, LBDP was also required to calculate the Settlement Amount (the "Trigger Settlement Amount") upon the occurrence of a Trigger Event with the Market Quotation component of such Trigger Settlement Amount being specifically defined in Part 1(k)(2) of the Schedule to the ISDA (the "Trigger Market Quotations"). Id. at ¶ 10; Declaration of Jeffrey Klein (the "Klein Decl."), filed simultaneously herewith, at ¶ 6. The Trigger Market Quotations were to be obtained by using Market Rates and Volatilities and by polling the Dealer Group. Id. at ¶ 11; Klein Decl. at ¶ 6. LBDP was also required to notify Tacoma of the Trigger Market Quotation of each Transaction terminated under the Agreement (each, a "Termination Transaction"), the Trigger Settlement Amount and the Terminated Currency Equivalent of any Unpaid Amounts under the ISDA within two business days following the Trigger Early Termination Date. Id. at ¶ 12; Klein Decl. at ¶ 6. Any amount calculated by LBDP as being due by Tacoma upon the occurrence of a Trigger Event was payable by Tacoma within ten Universal Business Days following the Trigger Early Termination Date. Id. at ¶ 13.

15. Under Part 1(k)(4)(B) of the Schedule to the ISDA, LBDP was required to notify (a "Market Disruption Notice") Tacoma of any conditions in the local market that materially impeded LBDP's ability to determine the Trigger Market Quotation for certain

Transactions in the market (referred to as a "Local Market Disruption Event") no later than one hour prior to the scheduled time for determining the Trigger Market Quotation for such affected Transactions. Id. at ¶ 14.  Upon receipt of a Market Disruption Notice, Tacoma would have the right to delay the Trigger Early Termination Date for each affected Transaction by notifying LBDP in writing of Tacoma's election to exercise its right to delay the Early Termination Date (the "Delay Rights") within one hour after receiving the Market Disruption Notice.  Id at ¶ 15.  If Tacoma exercised its Delay Rights, the Trigger Early Termination Date for each affected Transaction would be delayed and LBDP would be required to continue seeking Trigger Market Quotations until the date that LBDP and Tacoma agreed that the Local Market Disruption Event ceased to exist.[4]  Id at ¶ 16.

    16. On September 16, 2008, LBDP delivered a Notice of Trigger Event (the "Trigger Notice")[5] to Tacoma notifying Tacoma that a Trigger Event had occurred due to LBHI's filing of a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on September 15, 2008 and that the Trigger Early Termination Date for all Transactions was designated as September 23, 2008 (the "Specified Early Termination Date").  Id at ¶ 19.

    17. By letter dated September 25, 2008 (the "Early Termination Letter")[6], a copy of which was faxed to Tacoma on September 26, 2008, LBDP notified Tacoma of LBDP's determination that the Termination Amount payable by Tacoma to LBDP under the Agreement was $666,062.29 (the "Termination Amount") and demanded payment from Tacoma of such

---

[4] The Trigger Early Termination Date, however, could not be later than the due date for any Settlement Amount owing to LBDP with respect to Transactions which arose due to a Trigger Event but which were unaffected by any Local Market Disruption Event.  Id. at ¶ 17.

[5] A copy of the Trigger Notice is attached as Exhibit B to the Morrison Decl. filed simultaneously herewith.

[6] A copy of the Early Termination Letter is attached as Exhibit C to the Morrison Decl. filed simultaneously herewith.

Termination Amount within five Universal Business Days following the Specified Early Termination Date of September 23, 2008.  Id at ¶ 20.

18.     In its Early Termination Letter, LBDP also indicated that it had polled the required Dealer Group for Market Quotations, but was unable to obtain any quotations from such group.  Id at ¶ 21.  Additionally, LBDP claimed that it had reverted to Loss methodology to calculate the Termination Amount.  Id.

19.     LBDP, however, never notified Tacoma that it was unable to obtain Trigger Market Quotations as required under Part 1(k)(4)(B) of the Schedule to the ISDA before the expiration of the scheduled time for determining Trigger Market Quotations and did not give Tacoma the opportunity to exercise its Delay Rights with respect to the Trigger Early Termination Date.  Id. at ¶ 18.

20.     The Schedule to the ISDA does not specify the appropriate calculation methodology to be used upon the occurrence of a Trigger Event where LBDP does not follow the procedures requiring it to obtain Trigger Market Quotations and does not give Tacoma an opportunity to delay the Early Termination Date until such Trigger Market Quotations can be obtained.  See Part 1(k) of the Schedule to the ISDA.  Klein Decl. at ¶ 7.

21.     Loss methodology, which was the methodology employed by LBDP to calculate the Termination Amount, however, is defined in Section 12 of the ISDA, as follows:

> "Loss" means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a Party, an amount that Party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be**, including any loss of bargain, cost of funding or, at the election of such Party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them)**. Loss includes losses and costs (or gains) in

- 7 -

> respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a Party's legal fees and out of pocket expenses referred to under Section 9. A Party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A Party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

Klein Decl. at ¶ 9 (emphasis added).

22. On October 1 and 2, 2008, Tacoma paid the Termination Amount of $666,062.29[7] to LBDP. Id. at ¶ 23; Klein Decl. at ¶ 10.

### D. Tacoma Enters Into a Swap with Goldman Sachs Capital Markets, L.P.

23. On September 23, 2008 (the "Goldman Trade Date"), Tacoma entered into an interest rate swap (the "Goldman Swap") with Goldman Sachs Capital Markets, L.P. ("GSCM") in an effort to replace the hedge on Tacoma's bonds previously provided by the Interest Rate Swap with LBDP. Id. at ¶ 24; Klein Decl. at ¶ 24. The Goldman Swap is governed by that certain ISDA Master Agreement dated as of February 13, 2006 by and between Tacoma and Goldman (the "Goldman ISDA") and that certain Confirmation dated September 25, 2008 by and between Tacoma and Goldman (the "Goldman Confirmation"; collectively with the Goldman ISDA, the Schedule to the Goldman ISDA and the Credit Support Annex that have been incorporated into the Goldman ISDA, the "Goldman Agreement"). Id. at ¶ 25. The Goldman Swap has a Scheduled Termination Date (as defined under the Goldman ISDA) of December 1, 2036 and has a notional amount of $30,000,000.00 (the "Goldman Notional Amount"). Id. at ¶ 26. The Goldman Swap contains less valuable features than the Interest Rate

---

[7] A copy of the wire confirmations showing the Termination Amount paid by Tacoma to LBDP is attached as Exhibit D to the Morrison Decl. filed simultaneously herewith.

- 8 -

Swap with LBDP and, due to the preceding and for other reasons, is not determinative of Tacoma's damages under the Agreement resulting from LBDP's early termination of the Interest Rate Swap.[8]  Klein Decl. at ¶¶ 24-25.

### E. LBDP's Request for a Mutual Waiver and Release and Tacoma's Request for Calculation Information Relating to the Termination Amount

24. On June 18, 2009, Lehman requested that Tacoma sign a termination agreement (the "Termination Agreement") that would finally and mutually release Lehman and Tacoma from any further obligations or claims against each other.[9]  Morrison Decl. at ¶ 27.

25. On June 25, 2009, after being pressed to execute the Termination Agreement, Tacoma requested supporting documentation from LBDP regarding its calculation of the Termination Amount.[10]  Id. at ¶ 28.  On September 1, 2009, Lehman notified Tacoma that Lehman would not provide LBDP's valuation input assumptions supporting the calculation of its Termination Amount to Tacoma, but suggested that Tacoma independently verify the Termination Amount.[11]  Id. at ¶ 29.

26. Thereafter, Tacoma requested that Kensington Capital Advisors, LLC ("Kensington") prepare an independent analysis (the "Independent Analysis") of the appropriate Trigger Settlement Amount due under the Agreement.  Id. at ¶ 30.

---

[8] Tacoma sets forth the existence of the Goldman Swap, however, in the interest of full disclosure to the Court.

[9] A copy of an E-mail dated June 18, 2009 from Adam D. Hopson at Lehman Brothers to Jeff Smith at Tacoma is attached as Exhibit E to the Morrison Decl. filed simultaneously herewith.

[10] A copy of an E-mail dated June 25, 2009 from David Morrison at Tacoma to Adam D. Hopson at Lehman Brothers is attached as Exhibit E to the Morrison Decl. filed simultaneously herewith.

[11] A copy of an E-mail dated September 1, 2009 and September 2, 2009 from Adam D. Hopson at Lehman Brothers to David Morrison at Tacoma is attached as Exhibit E to the Morrison Decl. filed simultaneously herewith.

27. Upon conducting its Independent Analysis, Kensington discovered that LBDP entirely omitted loss of bargain ("Loss of Bargain") and the cost of reestablishing the hedge ("Cost of Reestablishing the Hedge") from its total Loss calculation. Klein Decl. at ¶ 11.

28. Kensington concluded that, after accounting for Loss of Bargain and the Cost of Reestablishing the Hedge, LBDP actually owed Tacoma $125,424.61 (the "Loss Amount") which, when coupled with the Termination Amount previously paid by Tacoma to LBDP of $666,062.29, results in a total claim of $791,486.90 (the "Claim Amount")[12] owing by LBDP to Tacoma. Morrison Decl. at ¶ 33; Klein Decl. at ¶ 12.

## RESPONSE TO THE DEBTORS' CLAIM OBJECTION

### A. The Debtors' Have Failed to Overcome the Prima Facie Validity of the Claim

29. The Debtors have failed to meet their burden of producing sufficient evidence to defeat the *prima facie* validity of Tacoma's Claim.

30. A proof of claim "constitutes *prima facie* evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f); see also, In re Reilly, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000); In re Guadalupe, 365 B.R. 17, 20 (D. Conn. 2007). To overcome this prima facie evidence, the objecting Party must produce substantial evidence in opposition to the claim. In re George R. Burrows, Inc., 156 F. 2d 640, 641 (2d Cir. 1946).

31. It is only after the objecting party introduces substantial evidence in opposition to the claim that the burden of proof shifts back to the claimant to establish by a preponderance of the evidence that its claims are allowed under applicable law. Burrows, 156 F.

---

[12] For purposes of calculating the amount of its Claim, Tacoma accepts the application of the Loss valuation methodology set forth in the Agreement. Morrison Decl. at ¶ 35.

A summary of Tacoma's Loss calculation is attached as Exhibit B to the Klein Decl. filed simultaneously herewith.

- 10 -

2d at 641; Reilly, 245 B.R. at 773; Guadalupe, 365 B.R. at 20.  It is often said that the objecting party must produce evidence equal in force to the *prima facie* case.  In re Allegheny Int'l. Inc., 954 F.2d 167, 173 (3d Cir. 1992).  At a minimum, however, the objecting Party must produce evidence sufficient to refute at least one of the allegations that are essential to the claim's sufficiency.  Reilly, 245 B.R. at 773; Guadalupe, 365 B.R. at 20; Allegheny, 954 F.2d at 173-74.

32.     In its Claim and corresponding derivatives questionnaire, Tacoma has previously provided LBDP with a detailed description of the calculation of the Claim Amount based on Loss methodology.  Loss methodology was the calculation methodology applied by LBDP to determine the Termination Amount.  Tacoma has also provided LBDP with documentation supporting Tacoma's Claim.

33.     By contrast, the Debtors have failed to sustain their burden of proof inasmuch as they merely make conclusory statements in their Objection that LBDP does not owe any amounts to Tacoma under the Terminated Transactions and that the Claim is not *prima facie* valid without including any support or basis for such statements.  The Objection merely provides an exhibit with a long list of claims for which the Debtors seek disallowance and a general and vague reference to the Debtors' books and records.  The Debtors have not provided any evidence, let alone *substantial* evidence, to defeat the *prima facie* validity of the Claim.  Accordingly, the Objection must be overruled.

**B.    The Loss Calculation Must Include Loss of Bargain and
the Cost of Reestablishing the Hedge**

34.     LBDP failed to properly calculate Loss under the ISDA by entirely omitting Loss of Bargain and the Cost of Reestablishing the Hedge from LBDP's total Loss calculation as required by section 12 of the ISDA.  Klein Decl. at ¶ 11.

35. Kensington's Independent Analysis shows that, after accounting for Loss of Bargain and the appropriate Cost of Reestablishing the Hedge, LBDP actually owes Tacoma a Loss Amount of $125,424.61. Klein Decl. at ¶ 12. The Loss Amount coupled with the Termination Amount previously paid to LBDP of $666,062.29, results in an aggregate Claim Amount of $791,486.90 owing by LBDP to Tacoma. Id.

36. A summary of Tacoma's Loss calculation is set forth below:

**(i) Calculation of payment due to LBDP:**

| | |
|---|---|
| Notional as of date of demand: | $30,000,000.00 |
| Agreement Termination Date | 9/23/2008 |
| Fixed interest rate on Agreement (A): | 3.795% |
| Market interest rate as of the date of demand (B): | 3.540% |
| Present Value of a Basis Point on remaining term (C): | $24,972.66 |
| Formula used to determine unadjusted payment: (A-B)*C*10,000 | |
| *Calculation: (3.540% -3.795%)  * $24,972.66*10,000*[2] | -$679,498.92[1] |

**(ii) Payment adjustments:**

| | |
|---|---|
| Loss of funding | $0[3] |
| Loss of bargain | $240,972.66 |
| Cost of reestablishing hedge | $563,950.87 |
| Total | $804,923.53 |
| **LOSS AMOUNT (i) – (ii)** [4] | **$125,424.61**[4] |
| **Payment due from LBDP (Loss Amount)** | **$125,424.61** |
| **Plus: Amount Paid to Lehman on October 1 and 2, 2008** | **$666,062.29** |
| **TOTAL DUE FROM LBDP** | **$791,486.90** [5] |

[1] *This figure represents the Initial Market Value inclusive of accrual and adjusted for rounding. The Initial Market Value of the Interest Rate Swap on the Specified Early Termination Date calculated by Kensington of $679,498.92 closely approximated the Termination Amount determined by LBDP of $666,062.29.  The difference between the Initial Market Value calculated by Kensington and the Termination Amount determined by LBDP can be accounted for by fluctuating market rates in existence on the Specified Early Termination Date of September 23, 2008.*

[2] *Before adjusting for the applicable calculation period accrual.*

[3] *To the extent that the Loss Amount results in Tacoma receiving a payment, the Cost of Funding does not apply.*

[4] *Positive value implies termination payment from LBDP to Tacoma.*

[5] *Loss Amount requested inaccurately by LBDP and paid by Tacoma:*

  *10/1/08 - $660,062.29*
  *10/2/08 - $   6,000.00*

(a)  The Initial Market Value of the Interest Rate Swap

37. Kensington first determined the market value of the Interest Rate Swap as of the Specified Early Termination Date (the "Initial Market Value")[13] by using an industry standard discounted cash flow method. Id. at ¶ 13. Kensington's calculation of the Initial Market Value closely approximated LBDP's calculation of the Termination Amount. Id. at ¶ 14.

38. First, Kensington derived a LIBOR zero-coupon curve from the spot interest rates prevailing in the market on the Specified Early Termination Date. Id. at ¶ 15. Using the zero-coupon rates from the LIBOR zero-coupon curve, Kensington discounted the remaining fixed rate payments to be paid by Tacoma under the Interest Rate Swap to present value. Id. Kensington then used the LIBOR forward curve to determine the future floating rate payments owing by LBDP under the Interest Rate Swap and discounted these floating payments to present value using the same zero-coupon rates. Id. Kensington then determined the Initial Market Value by netting the discounted fixed and floating cash flow streams against each other. Id. Finally, Kensington adjusted the Initial Market Value to take into account Tacoma's Loss of Bargain as well as the Cost of Reestablishing the Hedge, which reflect the adjustments that would have been applied by market dealers if they were to enter into a replacement swap with LBDP as of the Specified Early Termination Date. Id. at ¶ 16.

(b)  Loss of Bargain

39. Loss of Bargain is essentially an adjustment to the Initial Market Value of the Interest Rate Swap that would be made by Reference Market-makers if polled in a Market Quotation process regarding the value of the Interest Rate Swap as of the Specified Early Termination Date. Id. at ¶ 18. The Loss of Bargain adjustment is made by Reference Market-

---

[13] All of Kensington's market data inputs were obtained from market-standard inter-dealer brokers. Id. at ¶ 13.

makers to counterbalance terms in the Interest Rate Swap that favor Tacoma. Id. at ¶ 18. Due to several factors in the Interest Rate Swap that favor Tacoma, a Reference Market-maker would make a dollar adjustment to the Initial Market Value (which can also be represented as a basis point adjustment) to ensure that a replacement swap would be profitable for such swap dealer. Id. at ¶ 20.

        40.       In calculating Loss of Bargain, Kensington considered several factors (collectively, the "Loss of Bargain Factors") including, without limitation: (i) Tacoma's right to terminate the Interest Rate Swap with LBDP, in whole or in part, without cost, by providing two (2) business days notice on any business day from December 1, 2016 forward so long as the Notional Amount was reduced by at least $30,000.00, (ii) the less restrictive debt ratings that Tacoma was required to maintain under the Agreement than Tacoma would likely be required to maintain under swaps with other potential Reference Market-makers; (iii) Trigger Events that allowed Tacoma to terminate the Agreement for (a) downgrades in LBDP's counterparty ratings, (b) LBDP's failure to maintain certain collateral requirements, (c) the institution of bankruptcy proceedings by either LBHI or LBSF and (d) LBDP's failure to maintain capital in a specified amount; and (iv) certain restrictive insurer provisions under the Agreement with LBDP pursuant to which the insurer's consent must be obtained to, among other things (i) amend, modify or supplement the Agreement and (ii) assign or transfer any insured transaction.[14] Id. at ¶ 21. Kensington also took into account the fact that LBDP was a Triple-A rated counterparty at the

---

[14] One of the specific considerations that Kensington considered in determining the Loss of Bargain related to the fact that XL Capital Assurance Inc. (currently d/b/a Syncora Guarantee Inc.) ("XL Capital"), the insurer under the Agreement, upon information and belief, is undergoing a restructuring and is under order of the New York Insurance Department suspending XL Capital from paying any and all claims as of April 26, 2009. Klein Decl. at ¶ 22. Obtaining consent to amend, modify or supplement the Agreement from XL Capital under such conditions, therefore, may be a difficult and time-consuming process. Id. Such potential restrictions would be taken into account by a Reference Market-maker in adjusting the Initial Market Value of the Interest Rate Swap. Id.

time Tacoma entered into the Interest Rate Swap and that Tacoma's prospects of collecting market quotes from solely Triple-A rated counterparties in the market after Lehman's bankruptcy were significantly limited.[15]  Id. at ¶ 23.

41.     Accordingly, Kensington determined that an adjustment of $240,972.66, representing an adjustment of approximately 9.50 basis points, should be netted against the Initial Market Value to reflect the Loss of Bargain incurred by Tacoma from LBDP's early termination of the Agreement.  Id. at ¶ 26.

(c)     Cost of Reestablishing the Hedge

42.     Kensington also determined that an adjustment must be made to the Initial Market Value to account for the total additional revenue that a Reference Market-maker would require from Tacoma to counterbalance the credit risk borne by the Reference Market-maker for the remainder of the swap term.  Id. at ¶ 28.  Kensington took Tacoma's future payment performance into consideration in calculating the Cost of Reestablishing the Hedge as well as other relevant costs that may be considered by a swap dealer including, but not limited to, legal, accounting, operational and trading costs.  Id. at ¶ 29.  The Cost of Reestablishing the Hedge does not include amounts that are duplicative of the amounts included in the Loss of Bargain calculation.  Id. at ¶ 35.

43.     Kensington also took into account the fact that LBDP, like other swap dealers, included a markup into the fixed interest rate of the Interest Rate Swap in order to ensure that the Interest Rate Swap would be profitable to LBDP and to counterbalance any expected

---

[15] To the best of Kensington's knowledge, information and belief, GSCM is an unrated entity.  The Goldman Sachs Group, Inc. ("GSGI"), however, provides credit support to GSCM under the Agreement by means of a guaranty by GSGI in favor of Tacoma for GSCM's obligations under the Agreement.  As of the trade date of the Goldman Swap, GSGI's credit rating was AA- with both Standard & Poor's and Fitch.  As of the date of this declaration, GSGI's credit rating is A1 with Moody's, A with Standard & Poor's and A+ with Fitch.  Id. at ¶ 24.

credit risk to LBDP from carrying the Interest Rate Swap through the Scheduled Termination Date (the "Carrying Risk") from any potential default by Tacoma. Id. at ¶ 30. As a result of LBDP's bankruptcy-related early termination, however, LBDP improperly benefitted from the value of this markup for the entire term of the Interest Rate Swap by failing to adjust for the Cost of Reestablishing the Hedge, but was released from any Carrying Risk from the Specified Early Termination Date through the Scheduled Early Termination Date (the "Lehman Term Remainder") and no longer has to perform on the Interest Rate Swap for the Lehman Term Remainder. Id. at ¶ 31. The Cost of Reestablishing the Hedge, therefore, must also account for the markup built into the Interest Rate Swap by LBDP for the Lehman Term Remainder at the outset of the Interest Rate Swap, in exchange for which Tacoma will receive no performance for the Lehman Term Remainder. Id. at ¶ 32.

44.     Therefore, Kensington determined that an adjustment of $563,950.87, representing an adjustment of approximately 22.50 basis points, should be netted against the Initial Market Value to reflect the Cost of Reestablishing the Hedge. Id. at ¶ 34.

**[REMAINDER LEFT INTENTIONALLY BLANK]**

WHEREFORE Tacoma requests that the Court: (a) overrule the Objection as it relates to Tacoma's Claim, (b) allow Claim No. 42913 against LBDP in the amount of $791,486.90, and (c) grant such other or further relief as this Court deems just and proper.

Dated: New York, New York
August 18, 2011

Respectfully submitted,

K&L GATES LLP

By: /s/ Jeffrey N. Rich
Jeffrey N. Rich, Esq.
Eunice Rim, Esq.
599 Lexington Avenue
New York, NY 10022
(212) 536-3900 (telephone)
(212) 536-3901 (facsimile)

-and-

David C. Neu, Esq.
925 Fourth Avenue
Suite 2900
Seattle, Washington 98104
(206) 623-7580 (telephone)
(206) 623-7022 (facsimile)
Attorneys for Port of Tacoma