UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
                                                          :

In re                                      :        Chapter 11

                                        :

LEHMAN BROTHERS HOLDINGS INC., *et al.*,     :        Case No. 08-13555 (JMP)

                                        :

                                        :        (Jointly Administered)

                          Debtors.            :

                                              :

------------------------------------------------------------------------x

### DECLARATION OF DAVID MORRISON
### IN SUPPORT OF RESPONSE OF PORT OF TACOMA TO DEBTORS' ONE HUNDRED THIRTY-EIGHTH OBJECTION TO CLAIMS (NO LIABILITY DERIVATIVES CLAIMS)

I, David Morrison, hereby declare pursuant to 28 U.S.C. § 1746:

1.       I am the Director of Financial Planning & Treasury at Port of Tacoma ("Tacoma").  I have served in that capacity since October 20, 2005.  I am authorized to make this declaration on Tacoma's behalf.

2.       Tacoma is a port district and municipal corporation of the State of Washington.

**The ISDA Agreement and the Interest Rate Swap**

3.       Tacoma entered into a long-term interest rate swap (the "Interest Rate Swap") with Lehman Brothers Derivatives Products Inc. ("LBDP") pursuant to: (i) that certain ISDA Master Agreement dated as of August 4, 2005 (the "ISDA") by and between Tacoma and LBDP and (ii) that certain Confirmation dated as of August 4, 2005 (the "Confirmation"; collectively with the ISDA, the Schedule to the ISDA and the Credit Support Annex that has been incorporated into the ISDA, the "Agreement")[1] by and between LBDP and Tacoma, to

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings attributed to them in the Agreement.

hedge against Tacoma's variable interest rate exposure for a thirty-year period in connection

with certain subordinate lien revenue bonds issued by Tacoma in the principal amount of

$30,000,000.00 (the "<u>Bonds</u>").  A true and correct copy of the Agreement is annexed hereto as

**<u>Exhibit A</u>**.

4.      The Interest Rate Swap was effective as of August 3, 2006 and was

scheduled to terminate on December 1, 2036 (the "<u>Scheduled Termination Date</u>").  The initial

notional amount for the Interest Rate Swap was $30,000,000.00 (the "<u>Notional Amount</u>") and

matched the principal amount of the Bonds.  The Notional Amount was subject to reduction over

time as set forth in the Confirmation.

5.      Pursuant to the Agreement, Tacoma was required to pay LBDP a fixed

interest rate of 3.795 percent on the Notional Amount and LBDP was required to pay Tacoma a

floating interest rate on the Notional Amount equal to 70 percent of the 1-Month LIBOR index.

6.      I have been involved in matters relating to the Interest Rate Swap since

October 20, 2005.

**The Trigger Events Under the ISDA and the Termination Amounts**
**Calculated by LBDP Under Loss Methodology**

7.      Pursuant to Section 6(b)(iii) of the ISDA, the Agreement was to terminate

prior to its Scheduled Termination Date if, among other events, an Additional Termination Event

occurred.

8.      Additional Termination Events, as set forth in Part 1(i)(ii) of the Schedule

to the ISDA, included Trigger Events, one of which is the institution of a proceeding in

bankruptcy against either LBHI or LBSF.

9.      If a Trigger Event occurred as specified under Section 6(e)(ii) of the ISDA

and Part 1(k)(5) of the Schedule to the ISDA, LBDP was required to: (i) notify Tacoma of the

Trigger Event, (ii) specify the nature of the Trigger Event and (iii) designate the Early

Termination Date for all transactions covered under the Agreement in light of the Trigger Event

(the "Trigger Early Termination Date"), within one business day of becoming aware of the

occurrence of a Trigger Event.

10.    Under Part 1(k)(5) of the Schedule to the ISDA, LBDP was also required

to calculate the Settlement Amount (the "Trigger Settlement Amount") upon the occurrence of a

Trigger Event with the Market Quotation component of such Trigger Settlement Amount being

specifically defined in Part 1(k)(2) of the Schedule to the ISDA (the "Trigger Market

Quotations").

11.    The Trigger Market Quotations were to be obtained by using Market Rates

and Volatilities and by polling the Dealer Group.

12.    LBDP was also required to notify Tacoma of the Trigger Market

Quotation of each Transaction terminated under the Agreement (each, a "Termination

Transaction"), the Trigger Settlement Amount and the Terminated Currency Equivalent of any

Unpaid Amounts under the ISDA within two business days following the Trigger Early

Termination Date.

13.    Any amount calculated by LBDP as being due by Tacoma upon the

occurrence of a Trigger Event was payable by Tacoma within ten Universal Business Days

following the Trigger Early Termination Date.

14.    Under Part 1(k)(4)(B) of the Schedule to the ISDA, LBDP was required to

notify (a "Market Disruption Notice") Tacoma of any conditions in the local market that

materially impeded LBDP's ability to determine the Trigger Market Quotation for certain

Transactions in the market (referred to as a "Local Market Disruption Event") no later than one

- 3 -

hour prior to the scheduled time for determining the Trigger Market Quotation for such affected

Transactions.

15.    Upon receipt of a Market Disruption Notice, Tacoma would have the right

to delay the Trigger Early Termination Date for each affected Transaction by notifying LBDP in

writing of Tacoma's election to exercise its right to delay the Early Termination Date (the

"Delay Rights") within one hour after receiving the Market Disruption Notice.

16.    If Tacoma exercised its Delay Rights, the Trigger Early Termination Date

for each affected Transaction would be delayed and LBDP would be required to continue

seeking Trigger Market Quotations until the date that LBDP and Tacoma agreed that the Local

Market Disruption Event ceased to exist.

17.    The Trigger Early Termination Date, however, could not be later than the

due date for any Settlement Amount owing to LBDP with respect to Transactions which arose

due to a Trigger Event but which were unaffected by any Local Market Disruption Event.

18.    LBDP, however, never notified Tacoma that it was unable to obtain

Trigger Market Quotations as required under Part 1(k)(4)(B) of the Schedule to the ISDA before

the expiration of the scheduled time for determining Trigger Market Quotations and did not give

Tacoma the opportunity to exercise its Delay Rights with respect to the Trigger Early

Termination Date.

19.    On September 16, 2008, LBDP delivered a Notice of Trigger Event (the

"Trigger Notice") to Tacoma notifying Tacoma that a Trigger Event had occurred due to LBHI's

filing of a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on

September 15, 2008 and that the Trigger Early Termination Date for all Transactions was

- 4 -

designated as September 23, 2008 (the "<u>Specified Early Termination Date</u>"). A copy of the

Trigger Notice delivered to Tacoma by LBDP is annexed hereto as **<u>Exhibit B</u>**.

20.    By letter dated September 25, 2008 (the "<u>Early Termination Letter</u>"), a

copy of which was faxed to Tacoma on September 26, 2008, LBDP notified Tacoma of LBDP's

determination that the Termination Amount payable by Tacoma to LBDP under the Agreement

was $666,062.29 (the "<u>Termination Amount</u>") and demanded payment from Tacoma of such

Termination Amount within five Universal Business Days following the Specified Early

Termination Date of September 23, 2008. A copy of the Early Termination Letter delivered to

Tacoma by LBDP is annexed hereto as **<u>Exhibit C</u>**.

21.    In its Early Termination Letter, LBDP also indicated that it had polled the

required Dealer Group for Market Quotations, but was unable to obtain any quotations from such

group. Additionally, LBDP claimed that it had reverted to Loss methodology to calculate the

Termination Amount.

22.    LBDP, however, never notified Tacoma that it was unable to obtain

Trigger Market Quotations as required under Part 1(k)(4)(B) of the Schedule to the ISDA <u>before</u>

the expiration of the scheduled time for determining Trigger Market Quotations and did not give

Tacoma the opportunity to exercise its Delay Rights with respect to the Trigger Early

Termination Date.

23.    On October 1 and 2, 2008, Tacoma paid the Termination Amount of

$666,062.29 to LBDP. A copy of the wire confirmations showing the Termination Amount paid

by Tacoma to LBDP is annexed hereto as **<u>Exhibit D</u>**.

**Tacoma Enters Into a Swap with Goldman Sachs Capital Markets, L.P.**

24.    On September 23, 2008 (the "<u>Goldman Trade Date</u>"), Tacoma entered into
an interest rate swap (the "<u>Goldman Swap</u>") with Goldman Sachs Capital Markets, L.P.
("<u>GSCM</u>") in an effort to replace the hedge on Tacoma's bonds previously provided by the
Interest Rate Swap with LBDP.

25.    The Goldman Swap is governed by that certain ISDA Master Agreement
dated as of February 13, 2006 by and between Tacoma and Goldman (the "<u>Goldman ISDA</u>") and
that certain Confirmation dated September 25, 2008 by and between Tacoma and Goldman (the
"<u>Goldman Confirmation</u>"; collectively with the Goldman ISDA, the Schedule to the Goldman
ISDA and the Credit Support Annex that have been incorporated into the Goldman ISDA, the
"<u>Goldman Agreement</u>").

26.    The Goldman Swap has a Scheduled Termination Date (as defined under
the Goldman ISDA) of December 1, 2036 and has a notional amount of $30,000,000.00.

**LBDP's Request for a Mutual Waiver and Release and Tacoma's
<u>Request for Calculation Information Relating to the Termination Amount</u>**

27.    On June 18, 2009, Lehman requested that Tacoma sign a termination
agreement (the "<u>Termination Agreement</u>") that would finally and mutually release Lehman and
Tacoma from any further obligations or claims against each other.  A copy of an E-mail dated
June 18, 2009 from Adam D. Hopson at Lehman Brothers to Jeff Smith at Port of Tacoma has
been annexed hereto as **<u>Exhibit E</u>**.

28.    On June 25, 2009, after being pressed to execute the Termination
Agreement, Tacoma requested supporting documentation from LBDP regarding its calculation of
the Termination Amount.  A copy of an E-mail dated July 25, 2009 from David Morrison at Port
of Tacoma to Adam D. Hopson at Lehman Brothers has been annexed hereto as <u>Exhibit E</u>.

29.    On September 1, 2009, Lehman notified Tacoma that Lehman would not provide LBDP's valuation input assumptions supporting the calculation of its Termination Amount to Tacoma, but suggested that Tacoma independently verify the Termination Amount. Copies of e-mails dated September 1, 2009 and September 2, 2009 from Adam D. Hopson at Lehman Brothers to David Morrison at Port of Tacoma have been annexed hereto as Exhibit E.

30.    Thereafter, Tacoma requested that Kensington Capital Advisors, LLC ("Kensington") prepare an independent analysis (the "Independent Analysis") of the appropriate Trigger Settlement Amount due under the Agreement.

31.    On September 22, 2009, Tacoma filed proof of claim number 30049 ("Claim No. 30049") against LBDP in the amount of $666,062.29 after Kensington notified Tacoma that LBDP failed to poll the Dealer Group for Market Rates and Volatilities and resorted to an incomplete Loss calculation that entirely omitted any Loss of Bargain and the Cost of Reestablishing the Hedge.  Tacoma filed Claim No. 30049 in an effort to preserve any claims that it may have against LBDP with respect to its erroneous Loss calculation.

32.    On October 21, 2009, Tacoma also uploaded all information required for the derivatives questionnaire to http://www.lehman-claims.com.

33.    After Tacoma filed Claim No. 30049, Kensington notified Tacoma that, after adjusting the market value of the Interest Rate Swap for the Loss of Bargain and the Cost of Reestablishing the Hedge, LBDP actually owed Tacoma $125,424.61 (the "Loss Amount") which, when coupled with the Termination Amount previously paid by Tacoma to LBDP of $666,062.29, results in a total claim of $791,486.90 owing by LBDP to Tacoma.

34.     After receiving the full results of Kensington's Independent Analysis,

Tacoma subsequently amended Claim No. 30049 on October 21, 2009 with proof of claim

number 42913 in the amount of $791,486.90.

35.     For purposes of calculating the amount of its claim, Tacoma accepts the

application of the Loss valuation methodology set forth in the Agreement.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on August 18, 2011

David Morrison

# EXHIBIT A

(Local Currency—Single Jurisdiction)



# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of August 4, 2005

**LEHMAN BROTHERS DERIVATIVE**     **and**     **PORT OF TACOMA, WASHINGTON**
**PRODUCTS INC.**

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:

1.     **Interpretation**

(a)     *Definitions.* The terms defined in Section 12 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)     *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)     *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.     **Obligations**

(a)     *General Conditions.*

(i)     Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)     Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)     Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting*. If on any date amounts would otherwise be payable: —

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of branches or offices through which the parties make and receive payments or deliveries.

(d)    *Default Interest*; *Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into) that:—

(a)    *Basic Representations*.

    (i)    *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

    (ii)    *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

    (iii)    *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

<center>2</center>

ISDA®1992
Second Printing

(iv) *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v) *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b) *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c) *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d) *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

## 4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a) *Furnish Specified Information*. It will deliver to the other party any forms, documents or certificates specified in the Schedule or any Confirmation by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b) *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c) *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

## 5.    Events of Default and Termination Events

(a) *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i) *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii) *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) or to give notice of a Termination Event) to be complied with or performed

<div align="center">3</div>

ISDA®1992
Second Printing

by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii) *Credit Support Default*.

(1) Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2) the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3) the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv) *Misrepresentation*. A representation made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v) *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi) *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—
(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its

4

ISDA®1992
Second Printing

winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1)   the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)   the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)      *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (ii) below or an Additional Termination Event if the event is specified pursuant to (iii) below:—

(i)   *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

(1)   to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)   to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)   *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

ISDA®1992
Second Printing

(iii) *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

**6.    Early Termination**

(a)    *Right to Terminate Following Event of Default*. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Two Affected Parties*. If an Illegality under Section 5(b)(i)(1) occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iii)    *Right to Terminate*. If: —

(1)    an agreement under Section 6(b)(ii) has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality other than that referred to in Section 6(b)(ii), a Credit Event Upon Merger or an Additional Termination Event occurs,

either party in the case of an Illegality, any Affected Party in the case of an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

6

(ii)  Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(d) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)  *Calculations.*

(i)  *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)  *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment), from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)  *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)  *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1)  *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party over (B) the Unpaid Amounts owing to the Defaulting Party.

(2)  *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)  *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative

ISDA®1992
Second Printing

number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting
Party.

   (ii)   *Termination Events*. If the Early Termination Date results from a Termination Event:—

      (1)  *One Affected Party*. If there is one Affected Party, the amount payable will be determined in
accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss
applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting
Party will be deemed to be references to the Affected Party and the party which is not the
Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being
terminated, Loss shall be calculated in respect of all Terminated Transactions.

      (2)  *Two Affected Parties*. If there are two Affected Parties:—

         (A) if Market Quotation applies, each party will determine a Settlement Amount in respect
of the Terminated Transactions, and an amount will be payable equal to (I) the sum of
(a) one-half of the difference between the Settlement Amount of the party with the higher
Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement
Amount ("Y") and (b) the Unpaid Amounts owing to X less (II) the Unpaid Amounts owing
to Y; and

         (B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if
fewer than all the Transactions are being terminated, in respect of all Terminated
Transactions) and an amount will be payable equal to one-half of the difference between the
Loss of the party with the higher Loss ("X") and the Loss of the party with the lower
Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X
will pay the absolute value of that amount to Y.

   (iii)   *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs
because "Automatic Early Termination" applies in respect of a party, the amount determined under
this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to
reflect any payments or deliveries made by one party to the other under this Agreement (and retained
by such other party) during the period from the relevant Early Termination Date to the date for
payment determined under Section 6(d)(ii).

   (iv)   *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under
this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for
the loss of bargain and the loss of protection against future risks and except as otherwise provided
in this Agreement neither party will be entitled to recover any additional damages as a consequence
of such losses.

7.    **Transfer**

Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether
by way of security or otherwise) by either party without the prior written consent of the other party, except
that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation amalgamation
with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without
prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from
a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void

8

**8.    Miscellaneous**

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i)  This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii)  The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**9.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**10.    Notices**

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

ISDA®1992
Second Printing

(iii)  if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)  if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)  if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)  *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 11.   Governing Law and Jurisdiction

(a)  *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)  *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably: —

(i)  submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)  waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)  *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 12.   Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

ISDA®1992
Second Printing

"*Affected Transactions*" means (a) with respect to any Termination Event consisting of an Illegality, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

"*Affiliate*" means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"*Applicable Rate*" means:—

(a)   in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)   in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)   in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)   in all other cases, the Termination Rate.

"*consent*" includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

"*Credit Event Upon Merger*" has the meaning specified in Section 5(b).

"*Credit Support Document*" means any agreement or instrument that is specified as such in this Agreement.

"*Credit Support Provider*" has the meaning specified in the Schedule.

"*Default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

"*Defaulting Party*" has the meaning specified in Section 6(a).

"*Early Termination Date*" means the date determined in accordance with Section 6(a) or 6(b)(iii).

"*Event of Default*" has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

"*Illegality*" has the meaning specified in Section 5(b).

"*law*" includes any treaty, law, rule or regulation and "*lawful*" and "*unlawful*" will be construed accordingly.

"*Local Business Day*" means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

"*Loss*" means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position ( or any gain

ISDA®1992
Second Printing

resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 9. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under

ISDA®1992
Second Printing

this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

"*Settlement Amount*" means, with respect to a party and any Early Termination Date, the sum of:—

(a)   the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)   such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

"*Specified Entity*" has the meaning specified in the Schedule.

"*Specified Indebtedness*" means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"*Specified Transaction*" means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

"*Terminated Transactions*" means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

"*Termination Event*" means an Illegality or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

"*Termination Rate*" means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

"*Unpaid Amounts*" owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined

13

ISDA®1992
Second Printing

by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be
the average of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below
with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS DERIVATIVE**          PORT OF TACOMA, WASHINGTON
**PRODUCTS INC.**


By:_____          By:_____
    Name:                                    Name: Timothy J Farrell
    Title:                                   Title: Executive Director
    Date:                                    Date:

IN WITNESS WHEREOF the parties have executed this document on the respective
dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS DERIVATIVE              PORT OF TACOMA, WASHINGTON
PRODUCTS INC.

By: _____            By: _____
   Name:  T. Courtney Jenkins                Name:
   Title:   Vice President                    Title:
   Date:                                     Date:

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYK 922632-2.071370.0011

EXECUTION COPY

## SCHEDULE
### to the
### ISDA MASTER AGREEMENT
### dated as of
### August 4, 2005

### Between

### Lehman Brothers Derivative Products Inc.
### ("Party A"),

### and

### Port of Tacoma, Washington,
### a municipal corporation of the State of Washington
### (the "Port").

## Part 1. Termination Provisions and Certain Other Matters

(a)    **Scope of Agreement.**  This Master Agreement and Schedule relate to the Transaction that consists of an interest rate swap transaction with a Trade Date of August 4, 2005, an initial notional amount of USD 30,000,000, and a reference number of 2228204 (the "Initial Transaction"), together with any additional Transaction expressly authorized by resolution of the Port Commission and directed, pursuant to the express terms of such resolution, to be included hereunder.

(b)    **Specified Entity.**  "*Specified Entity*" means in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v)  (Default under Specified Transactions), | Not Applicable |
| Section 5(a)(vi) (Cross Default), | Not Applicable |
| Section 5(a)(vii) (Bankruptcy), | Not Applicable |
| Section 5(b)(ii)  (Credit Event Upon Merger), | Not Applicable |

and in relation to the Port for the purpose of:

| | |
|---|---|
| Section 5(a)(v)  (Default under Specified Transactions), | Not Applicable |
| Section 5(a)(vi) (Cross Default), | Not Applicable |
| Section 5(a)(vii) (Bankruptcy), | Not Applicable |
| Section 5(b)(ii)  (Credit Event Upon Merger), | Not Applicable |

(c)    **Specified Transaction.**  The term "*Specified Transaction*" will have the meaning specified in Section 12.

(d)    **Cross Default.**  The "*Cross Default*" provisions of Section 5(a)(vi) will **not** apply to Party A and to the Port.

(e)    Section 5 of the Agreement is hereby amended as follows:

(i)   **Bankruptcy.** Section 5(a)(vii)(6) of the Agreement is amended to read in its entirety as follows:

"(6)(A) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets or (B) in the case of the Port, there shall be declared by it or any legislative or regulatory body with competent jurisdiction over it the existence of a state of financial emergency or similar state of financial distress in respect of it;"

(ii)   **Merger Without Assumption.** Section 5(a)(viii) of the Agreement is hereby amended to read in its entirety as follows:

"(viii) <u>Merger Without Assumption</u>. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if such party is the Port, an entity such as an organization, board, commission, authority, agency or body succeeds to the principal functions of, or powers and duties granted to, the Port) and, at the time of such consolidation, amalgamation, merger, transfer or succession:

(1)   the resulting, surviving, transferee or successor entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement;

(2)   the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving, transferee or successor entity of its obligations under this Agreement; or

(3)   in the case of the Port, the sources of payment for the obligations of the Port set forth in this Schedule are no longer legally available for the satisfaction of such resulting, surviving, transferee or successor entity's obligations to the other party."

(f)   **Credit Event upon Merger.** The *"Credit Event Upon Merger"* provisions of Section 5(b)(ii) will apply to Party A and to the Port. Section 5(b)(ii) is hereby deleted in its entirety and replaced by the following:

"(ii)   <u>Credit Event upon Merger</u>. "Credit Event Upon Merger' shall mean that a Designated Event (as defined below) occurs with respect to a party, any Credit Support Provider of the party or any applicable Specified Entity (any such party or entity, "X"), and such Designated Event does not constitute an event described in Section 5(a)(viii) but the creditworthiness of X, or, if applicable, the successor, surviving or transferee entity of X, is materially weaker than that of X immediately prior to such event. In any such case the Affected Party shall be the party with respect to which, or with respect to the Credit Support Provider of which, the Designated Event occurred, or, if applicable, the successor, surviving or transferee entity of such party. For purposes hereof, a Designated Event means that, after the date hereof:

(1)   X consolidates, amalgamates with or merges with or into, or transfers all or substantially all its assets to, or receives all or substantially all the assets or obligations of, another entity;

ISDA ® 1992                                   -2-

(2)     any person or entity acquires directly or indirectly the beneficial ownership of equity securities having the power to elect a majority of the board of directors of X or otherwise acquires directly or indirectly the power to control the policy-making decisions of X; or

(3)     without limiting the foregoing, if X is the Port, an entity such as an organization, board, commission, authority, agency or body succeeds to the principal functions of, or powers and duties granted to, the Port."

(g)     **Automatic Early Termination.** The "*Automatic Early Termination*" provisions of Section 6(a) will not apply to Party A or to the Port; provided, that where an Event of Default is specified in Section 5(a)(vii)(1), (3), (4), (5), (6) or to the extent analogous thereto, (8), and is governed by a system of law that does not permit termination to take place on or after the occurrence of the relevant Event of Default in accordance with the terms of this Agreement, then the Automatic Early Termination provisions will apply to Party A and the Port.

(h)     **Payments on Early Termination.** For the purpose of Section 6(e) of this Agreement:

(i)     Market Quotation will apply.

(ii)     Second Method will apply.

(i)     **Additional Termination Event.** "*Additional Termination Event*" will apply. It will constitute an Additional Termination Event hereunder upon the occurrence of any of the following events:

(i)     With respect to the Port, if the Port's subordinate lien revenue bond debt rating is withdrawn, suspended or reduced below the following ratings thresholds by two of the following three ratings agencies: (1) "BBB" in the case of S&P, (2) "BBB" in the case of Fitch or (3) "Baa2" in the case of Moody's. For the purpose of the Additional Termination Event set forth in this subsection (i), the Affected Party shall be the Port. For the purpose of the Additional Termination Event set forth in this subsection (i), all Transactions shall be Affected Transactions.

(ii)     **Trigger Events.** Each of the following events shall constitute a Trigger Event:

(1)     Downgrade.  Party A ceases to maintain a Single A Quality financial program, counterparty or similar rating from both of the Relevant Rating Agencies;

(2)     Failure To Deliver Collateral.  LBSF shall fail to deliver, or procure delivery of, collateral to Party A in the amounts and within the time (subject to any applicable cure period) required by the LBSF Collateral Agreement dated July 16, 1998 between Party A and LBSF, as amended from time to time without the consent of, or notice to, the Port;

(3)     Bankruptcy.  Lehman Brothers Holdings Inc. ("Holdings"), or LBSF:  (A) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (B) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (C) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (D) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency

law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (x) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (y) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (E) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (F) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (G) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (H) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (A) through (G) inclusive; or (I) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; and

(4)   Capital Requirement. Party A shall fail to maintain capital in the amount contemplated by the LBDP Operating Guidelines dated July 16, 1998, as amended from time to time without the consent of, or notice to, the Port.

(j)   **Event of Default or Other Termination Event After Trigger Event.** If a Trigger Event shall have occurred and an event or circumstance which would otherwise constitute or give rise to (1) an Event of Default with Party A as the Defaulting Party (other than an Event of Default pursuant to Section 5(a)(vii)); (2) a Termination Event other than a Trigger Event shall occur, or (3) a Credit Assignment Event (as defined in Part 4(k)(i) hereof), such Trigger Event will prevail and such other event or circumstance will not constitute an Event of Default, a Termination Event or a Credit Assignment Event, as the case may be.

(k)   **Effect of Trigger Event.** Notwithstanding anything to the contrary contained in this Agreement, if a Trigger Event occurs the following provisions shall apply:

(1)   Notice. Party A shall, within one Business Day of becoming aware of such occurrence, notify the Port by facsimile transmission or electronic messaging system (the date such notice is transmitted, the "Notice Date"), specifying the nature of the Trigger Event and designating the Early Termination Date in respect of all Transactions. The Early Termination Date so designated shall be no later than the fifth Universal Business Day following such Notice Date. The Early Termination Date so designated shall be subject to change as specified in paragraph (k)(4)(a) below and, in the case of Affected Transactions only, as specified in paragraph (k)(4)(b) below.

(2)   Market Quotation. For the purposes of determining the Settlement Amount pursuant to Section 6(e)(ii)(3), the "Market Quotation" of a Terminated Transaction (which may be positive or negative) shall be the amount determined by Party A, using Market Rates and Volatilities and by polling the Dealer Group

as required, to be the mid-market value of the Transaction as of the close of
business (New York time) on the Early Termination Date. Party A shall perform
such determinations in good faith in accordance with its usual operating
procedures and pursuant to industry standards. For purposes of this definition, if
the Market Quotation of a Terminated Transaction represents an amount payable
to Party A, it shall be expressed as a negative number, and if the Market
Quotation represents an amount payable to the Port, it shall be expressed as a
positive number. For purposes of determining the Settlement Amount, Unpaid
Amounts (which shall be determined by Party A) in respect of the Terminated
Transactions are to be excluded but, without limitation, any payment or delivery
that would, but for the Early Termination Date, have been required (assuming
satisfaction of each applicable condition precedent) after the Early Termination
Date is to be included. Party A shall notify the Port of the Market Quotation of
each Terminated Transaction, the Settlement Amount and the Termination
Currency Equivalent of any Unpaid Amounts within two Business Days
following the Early Termination Date.

(3)   Payment Date. The amount calculated as being due as a result of a Termination
Event that arises as a result of a Trigger Event pursuant to Section 6(e)(ii)(3) will
be payable, in the case of an amount due and owing to Party A, within five
Universal Business Days following the Early Termination Date, and in the case
of an amount due and owing to the Port, within ten Universal Business Days
following the Early Termination Date. Party A and the Port agree that the party
that is required to pay such amount shall be required to pay interest on such
amount for the period from (and including) the Early Termination Date to (but
excluding) the date payment is required to be made, at the Agreed Interest Rate.
If either party fails to pay such amount on the due date, such failure shall
constitute a breach of this Agreement, but shall not constitute an Event of Default
(including an Event of Default pursuant to Section 5(a)(i) or 5(a)(ii)) for purposes
of this Agreement. In the event of any such failure by either party, such party
shall be required to pay interest on such overdue amount for the period from (and
including) such due date to (but excluding) the date of actual payment, at the
default rate, which is the Agreed Interest Rate plus 3% per annum. Interest
payable under this paragraph will be calculated on the basis of daily
compounding and the actual number of days elapsed divided by 360.

(4)   Effect of Market Disruption Event. (a) In the event that a Market Disruption
Event exists on any Early Termination Date, such date shall not be an Early
Termination Date for any outstanding Transaction. In such event Party A shall
notify the Port and the earlier to occur of (i) the next succeeding Universal
Business Day on which a Market Disruption Event does not exist and (ii) the
eighth Universal Business Day following the day on which notice of the
occurrence of a Trigger Event was given shall be considered the Early
Termination Date for all outstanding Transactions and a Settlement Amount shall
be obtained for that Early Termination Date in accordance with the terms set
forth in this Part 1(k). As used herein, "Market Disruption Event" means any of
the following events, the existence of which shall be determined by Party A: (i)
any suspension or material limitation of trading (excluding daily settlement limits
in the normal course of trading) on the New York Stock Exchange, London Stock
Exchange or other recognized stock exchange the effect of which on financial

markets makes it impracticable or inadvisable, in the view of Party A, to proceed with the determination of the Settlement Amount, (ii) the declaration of a banking moratorium by the Bank of England, United States federal authorities, New York State or other recognized international, national or regional banking authority authorities to the effect of which on financial markets makes it impracticable or inadvisable, in the view of Party A, to proceed with the determination of the Settlement Amount, (iii) the occurrence of any outbreak or escalation of hostilities or a declaration by the United States of a national emergency or war the effect of which on financial markets makes it impracticable or inadvisable, in the view of Party A, to proceed with the determination of the Settlement Amount, or (iv) the occurrence of any other calamity or crisis or any other event the effect of which, in the view of Party A and a majority of eleven randomly selected unaffiliated Qualified Counterparties of Party A (who are not Affiliates of Party A) whose Settlement Amounts otherwise would have been determined on such Early Termination Date, makes it impracticable or inadvisable to proceed with the determination of such Settlement Amounts on such Early Termination Date.

(b)    If on an Early Termination Date as to which there is no Market Disruption Event, there are conditions in a local market that, in the judgment of Party A, materially would impede its ability to determine the Market Quotation for certain Transactions in that market (a "Local Market Disruption Event"), Party A shall notify the Port of those conditions no later than one hour prior to the scheduled time for determining the Market Quotation for such affected Transactions on that date. Upon receipt of such notice, the Port shall have the right to delay the Early Termination Date for the affected Transactions (without affecting the Early Termination Date for any other Transactions under this Agreement) by notifying Party A in writing within one hour of its election to exercise that right. In such event, the Early Termination Date for each such affected Transaction shall be the next day on which Party A and the Port agree that the Local Market Disruption Event ceases to exist, but in any case not later than the due date for Settlement Amount payments owed to Party A with respect to unaffected Transactions as provided in Part 1(k)(3). Market Quotations so obtained for any affected Transaction shall be included in the calculation of the Settlement Amount to paid as provided in Part 1(k)(3). No delay in the Early Termination Date for any affected Transaction as provided above shall affect the days on which payments would otherwise be required to be made pursuant to Part 1(k)(3) had no such delay occurred, it being understood, however, that interest shall begin to accrue pursuant to such paragraph with respect to any such affected Transaction only from (and including) the delayed Early Termination Date.

(5)    Payments on Early Termination. This Agreement shall be amended by adding the following new subsection (3) to Section 6(e)(ii):

"(3)    Trigger Event. If an Early Termination Date results from a Trigger Event, Party A shall determine the Settlement Amount of all Terminated Transactions on such date, and the amount payable will be equal to (A) the Settlement Amount in respect of the Terminated Transactions plus (B) the Termination Currency Equivalent of Unpaid Amounts owing to

the Port minus (C) the Termination Currency Equivalent of Unpaid
Amounts owing to Party A. If that amount is a positive number, Party A
will pay it to the Port; if it is a negative number, the Port will pay the
absolute value of that amount to Party A. For purposes of determining
the Settlement Amount under this subsection, clause (b) of the definition
of Settlement Amount shall not apply."

(l)    **Additional Definitions.**

As used in this Schedule, the following terms shall have the following meanings:

**"Agreed Interest Rate"** for any day means the overnight ask rate in effect for such day, as set
forth opposite the caption "ON" under the heading "Euro-Dollar" on Telerate Page 4756 (or any
successor page thereto), as of 11:00 a.m., New York time, on such day.

**"Business Day"** means any day other than a Saturday or Sunday on which banks in New York
are not required or authorized by law to be closed.

**"Dealer Group"** means the following entities and such other entities as may be selected by Party
A from time to time: JPMorgan Chase Bank, Citibank, N.A., Barclays Bank PLC, Merrill Lynch
Capital Services, Inc., Deutsche Bank AG, The Royal Bank of Scotland plc, HSBC Bank USA,
Sumitomo Mitsui Banking Corporation, Bank of Tokyo-Mitsubishi Limited, Westpac Bank
Corp., Goldman Sachs & Co. and BNP Paribas.

**"LBSF"** means Lehman Brothers Special Financing Inc.

**"Market Rates and Volatilities"** means, in the case of interest rates and volatilities, the interest
rates and volatilities obtained from the Telerate and Reuters screens where practicable and from
polling the Dealer Group and, in the case of foreign exchange rates and volatilities and other
pricing parameters, the foreign exchange rates and volatilities or pricing parameters obtained
from polling the Dealer Group. In each case, for all rates, volatilities or other parameters
obtained, at least five members of the Dealer Group shall be polled, the highest and lowest of
such returns (including, in the case of interest rates and volatilities, the rates and volatilities
obtained from the Telerate and Reuters screens, if any) shall be discarded and the simple
mathematical average of the remaining values shall be used to perform the applicable
determination.

**"Moody's"** means Moody's Investors Service, Inc.

**"Person"** means any individual, partnership, joint venture, firm, corporation, association, trust or
other enterprise or any government or political subdivision or any agency, department or
instrumentality thereof.

**"Relevant Rating Agencies"** means, S&P and Moody's, or such of them as then assigns a
financial program, counterparty or similar rating to Party A at Party A's request, or any other
nationally recognized rating agency then rating Party A at Party A's request (each, individually, a
Relevant Rating Agency).

**"S&P"** means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies,
Inc.

"**Single A Quality**" means, in the case of S&P, A, in the case of Moody's, A, in the case of Fitch, A, and, in the case of any other Relevant Rating Agency, a designation of similar quality.

"**Universal Business Day**" means a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in Frankfurt, London, New York, Tokyo and the city in which the Port's head or home office is located.

(m)    **Optional Termination.** Section 6 of this Agreement is hereby amended by adding the following as new subsection (f):

"(f)    *Optional Termination by the Port Only.* The Port may, upon at least five (5) Business Days' prior written notice to Party A, terminate any Transaction or portion thereof under this Agreement (provided, that no Event of Default, Potential Event of Default or Termination Event has occurred with respect to which the Port is the Defaulting Party or the Affected Party) by designating to Party A the termination date for such Transaction; provided, that the Port provides evidence reasonably satisfactory to Party A that the Port has (or will have on the termination date) sufficient available funds to pay any amounts which may be payable by it to Party A in connection with such early termination of this Transaction. In the event the Port exercises its right of optional termination under this Agreement, such exercise shall constitute an Additional Termination Event with respect to which the Port shall be the sole Affected Party and such Transaction shall be the sole Affected Transaction; provided, however, that the option to designate an optional early termination date under this Part 1(m) shall not prevent either party from designating an Early Termination Date in accordance with the provisions of Section 6 of this Agreement (as a result of the occurrence of an Event of Default or Termination Event), to be effective on any date prior to the optional early termination date designated hereunder."

For the purpose of Section 6(f) of this Agreement:

(i)    Market Quotation will apply.

(ii)    The Second Method will apply."

## Part 2. Agreement to Deliver Documents

(a)    The documents to be delivered are:

| Party Required to Deliver | Form/Document/Certificate | Date by Which to be Delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and the Port | Evidence of authority of signatories | Upon execution of this Agreement and as deemed necessary for any further documentation | Yes |
| Party A and the Port | Any Credit Support Document specified in Part 3(c) herein | Upon execution of this Agreement | Yes |
| Party A and the Port | Audited financial statements certified by independent certified public accountants and prepared in accordance with generally accepted accounting principles in the country in which such party is organized. | Within 90 days of the close of the fiscal year (provided that, if such audited financial statements are posted on a publicly accessible website, then such posting shall constitute delivery). | Yes, as amended herein |

ISDA ® 1992                                    -8-

| Party Required to Deliver | Form/Document/Certificate | Date by Which to be Delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Port | Legal opinion with respect to the Port in form attached hereto as Exhibit A-1 | Upon execution of this Agreement and, with respect to any Transaction other than the Initial Transaction identified in Part 1(a), upon execution of the Confirmation | No |
| Party A | Legal opinion(s) with respect to Party A in form and substance acceptable to the Port. | Upon execution of this Agreement and, with respect to any Transaction other than the Initial Transaction identified in Part 1(a), upon execution of the Confirmation | No |
| Party A | A Guarantee of Holdings in the form set forth at Exhibit A. | Upon substitution of LBSF for Party A pursuant to Part 4(k) of this Schedule. | No |
| Port | Certified copies of the resolution of the Port Commission (i) authorizing this Agreement and the Transaction contemplated hereby, (ii) authorizing a specified person or persons to execute and deliver (as appropriate) on its behalf this Agreement, the exhibits, supplements, and attachments hereto, the documents incorporated by reference herein, and the Confirmation hereunder, and (iii) containing the findings and determinations required pursuant to Section 39.96.030(2)(a) of the Authorizing Law. | At execution of this Agreement and, with respect to any Transaction other than the Initial Transaction identified in Part 1(a), the Confirmation and, in the case of amendments, promptly following the time each such amendment is made | Yes |
| Port | Certified copy of the Bond Resolution. | At execution of this Agreement and, with respect to any Transaction other than the Initial Transaction identified in Part 1(a), the Confirmation. | Yes |
| Port | Legal opinion of counsel to the Insurer with respect to the Swap Insurance Policy in form and substance acceptable to Party A | Upon execution of this Agreement | No |
| Port | Swap Insurance Policy in form and substance acceptable to Party A | Upon execution of this Agreement | No |

| Party Required to Deliver | Form/Document/ Certificate | Date by Which to be Delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Port | Certification of financial advisor required pursuant to Section 39.96.030(2)(b) of the Authorizing Law | Upon execution of this Agreement and, with respect to any Transaction other than the Initial Transaction identified in Part 1(a), upon execution of the Confirmation | No |
| Party A and the Port | Such other documents as the other party may reasonably request. | Upon such reasonable request | No |

## Part 3. Miscellaneous

(a)  **Addresses for Notices.**  For the purpose of Section 10(a):

    (i)  Address for notices or communications to Party A (unless otherwise noted in Part 2):

        Lehman Brothers Derivative Products Inc.
        745 Seventh Avenue
        New York, NY 10019
        Attention:   Municipal Financial Products- Middle Office
        Phone:      (212) 526-2240
        Fax:        (646) 758-2998

    (ii)  Address for notices or communications to the Port:

        Mr. Jeffrey L. Smith, CPA
        Senior Director of Finance and Administration
        Port of Tacoma
        PO Box 1837
        Tacoma, Washington 98401-1837
        Phone:      (253) 383-9411
        Fax:        (253) 597-7573
        Email:      jsmith@portoftacoma.com

    (iii)  Address for notices or communications to the Insurer:

        XL Capital Assurance Inc.
        1221 Avenues of the Americas
        31st Floor
        New York, New York 10020
        Attention:   Surveillance and General Counsel
        Phone:      (212) 478-3400
        Fax (Surveillance):
                 (212) 478-3597
        Fax (Legal):
                 (212) 478-3579

(b)     **Calculation Agent**.   The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the Transaction or unless Party A becomes a Defaulting Party in which case the Calculation Agent shall be the Port.

(c)     **Credit Support Document**.   Details of any other Credit Support Document, each of which is incorporated by reference in, and made part of, this Agreement and each Confirmation (unless provided otherwise in a Confirmation) as if set forth in full in this Agreement or such Confirmation:

   (i)     The Credit Support Annex attached hereto and dated the date hereof between Party A and the Port shall constitute a Credit Support Document with respect to the obligations of Party A; provided that, from and after the substitution of LBSF for Party A hereunder pursuant to Part 4(k) of this Schedule, the Credit Support Document applicable in the case of Party A shall be Guarantee of Holdings in the form of Exhibit B to this Schedule.

   (ii)    The Swap Insurance Policy shall constitute a Credit Support Document with respect to the obligations of the Port.

(d)     **Credit Support Provider**.

   Credit Support Provider means in relation to Party A, provided that from and after the substitution of LBSF for Party A hereunder pursuant to Part 4(k) of this Schedule, the Credit Support Provider in relation to Party A shall be Holdings.

   Credit Support Provider means in relation to the Port, the Insurer.

(e)     **Governing Law**.   This Agreement and the Transaction entered into hereunder will be governed by, and construed and enforced in accordance with, the law of the State of Washington without reference to its choice of law doctrine."

(f)     **Jurisdiction**.   Section 11(b) is hereby amended to read in its entirety as follows:

   "(b)     **Jurisdiction**.   With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:

   (i)     submits to the exclusive jurisdiction of United States District Courts located in the State of Washington; and

   (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such proceedings, that such court does not have any jurisdiction over such party.

(g)     **Waiver of Right to Trial by Jury**.   Each party hereby irrevocably waives any and all rights to trial by jury with respect to any legal proceeding arising out of or relating to this agreement.

(h)     **Netting of Payments**.   Subparagraph (ii) of Section 2(c) of this Agreement will apply to any Transaction.

(i)     **"Affiliate"** shall have the meaning specified in Section 12.

(j)    **Form of Agreement**. The parties hereby agree that the text of the body of the Agreement is intended to be the printed form of 1992 ISDA Master Agreement (Local Currency Single Jurisdiction) as published and copyrighted by the International Swaps and Derivatives Association, Inc.

## Part 4. Other Provisions

(a)    **Accuracy of Specified Information**. Section 3(d) of this Agreement is amended by inserting after the word "information" in the first line the words "other than financial information," and adding before the period at the end of the Section the words "and, in the case of each item of financial information, presents fairly and accurately the financial condition or performance that the item of financial information purports to present as of the date or for the periods for which that item of financial information is stated to refer and, in the case of interim financial information is subject to year-end adjustments."

(b)    **Waiver of Immunities**. Section 11(c) of this Agreement is hereby amended by (1) adding "(provided that the Port may not be subject to the jurisdiction of courts outside the state of Washington)" after "(ii) jurisdiction of any court", (2) deleting "(iv) attachment of its assets (whether before or after judgment)" in the fourth and fifth lines thereof and (3) replacing "(v)" in the fifth line thereof with "(iv)".

(c)    **Agreement Amendments**. Sections 2(a), 3(a) and 3(b) are hereby amended as follows:

    (i)    <u>Obligations: General Conditions</u>. Section 2(a)(iii) is hereby amended by: (x) deleting in the second line thereof the word "or" and replacing it with the comma; and (y) inserting in the second line thereof after the words "Potential Event of Default" the words ", or Incipient Illegality".

    (ii)    <u>Powers</u>. Section 3 (a)(ii) is hereby amended to read in its entirety as follows:

        "(ii)    *Powers*. It has the power (in the case of the Port, pursuant to the Authorizing Law) to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party, and has take all necessary action and made all necessary determinations and findings to authorize such execution, delivery and performance."

    (iii)    <u>Absence of Certain Events</u>. Section 3(b) is hereby amended by inserting in the first line thereof after the work "knowledge," the words "Incipient Illegality (in the case of the Port) or".

(d)    **Additional Representations**.

    (i)    The first sentence of Section 3 is amended to read in its entirety as follows:

        "Each party represents to each other party (which representations will be deemed to be repeated on each date on which a Transaction is entered into and, in the case of the representations in Section 3(a) and 3(e) of this Agreement, at all times until the termination of this Agreement) the following:"

    (ii)    Section 3 is amended by adding the following subsections (e), (f), (g), (h) and (i) thereto:

(e)   Non-Speculation.   The Port represents and warrants to Party A that this
Agreement has been, and each Transaction hereunder will be, entered into for purposes of
reducing the Port's exposure to interest rate fluctuations or to reduce the Port's net
borrowing costs in connection with the Bonds and not for the purpose of speculation;

(f)   No Immunity.   Neither party is entitled to claim immunity with respect to itself
or its revenues or assets from (i) suit, (ii) jurisdiction of any court (provided that the Port
may not be subject to jurisdiction of courts outside of Washington State), (iii) relief by
way of injunction, order for specific performance or for recovery of property, and (iv)
execution or enforcement of any judgment to which it or its revenues or assets might
otherwise be entitled in any Proceedings (as defined in Section 11(b) of the Agreement)
in the courts of any jurisdiction nor may there be attributed to a party or its property any
such immunity (whether or not claimed); and

(g)   Eligible Contract Participant.   Each Party is an "eligible contract participant"
under, and as defined in, Section 1a(12) of the Commodity Exchange Act (7 U.S.C.
§ 1a(12)), as amended by the Commodities Futures Modernization Act of 2000."

(h)   ERISA Representation.   It continuously represents that it is not (i) an employee
benefit plan (hereinafter an "ERISA Plan") as defined in Section 3(3) of the Employee
Retirement Income Security Act of 1974, as amended ("ERISA"), subject to Title I of
ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended, (ii) a person
acting on behalf of an ERISA Plan or (iii) a person the assets of whom constitute assets
of an ERISA Plan.  It will provide notice to the other party in the event that it is aware
that with the passing of time, giving of notice or expiry of any applicable grace period it
will breach this representation.

(i)   No Agency.   It is entering into this Agreement, any Credit Support Document to
which it is a party, each Transaction and any other documentation relating to this
Agreement or any Transaction as principal (and not as agent or in any other capacity,
fiduciary or otherwise).

(e)   **Relationship Between Parties.**   Each party will be deemed to represent to the other party on the
date on which it enters into a Transaction that (absent a written agreement between the parties that
expressly imposes affirmative obligations to the contrary for that Transaction):

(i)   Non-Reliance.   It is acting for its own account, and it has made its own independent
decision to enter into that Transaction and as to whether that Transaction is appropriate or
proper for it based upon its own judgment and upon advice from such advisers as it has
deemed necessary.  It is not relying on any communication (written or oral) of the other
party as investment advice or as a recommendation to enter into that Transaction; it being
understood that information and explanations related to the terms and conditions of a
Transaction shall not be considered investment advice or a recommendation to enter into
that Transaction.  No communication (written or oral) received from the other party shall be
deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii)   Assessment and Understanding.   It is capable of assessing the merits of and understanding
(on its own behalf or through independent professional advice), and understands and
accepts the terms, conditions and risks of that Transaction.  It is also capable of assuming,
and assumes, the risks of that Transaction.

**ISDA ® 1992**                                    -13-

    (iii)   <u>Status of Parties</u>. The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction."

(f)   **Additional Representations of the Port**. The Port hereby further represents to Party A (which representations will be deemed to be repeated by the Port at all times until the termination of this Agreement) that:

    (i)   The Port has taken all steps necessary and has the authority to create the pledge and lien on Available Revenue set forth hereunder, and such pledge and lien have been validly created.

    (ii)   Any Transaction entered into pursuant to this Agreement does not constitute a "debt" for the purposes of any state constitutional or statutory limitations on Port debt, or if any Transaction is such a debt it is within and does not violate or exceed any applicable constitutional or statutory debt limitation.

    (iii)   This Agreement and each Transaction hereunder is a "payment agreement" authorized to be entered into by the Port pursuant to the Authorizing Law. The obligations of the Port to make payments to Party A under this Agreement and each Transaction are not contingent upon appropriation or similar action.

    (iv)   No Affiliate or other person, firm, corporation, entity, or association may liquidate, borrow or encumber the assets of the Port.

(g)   **Bond Resolution**. The Port will deliver to Party A all financial statements and notices required to be delivered to any person under the Bond Resolution (provided, that any financial statements of the Port that are posted on a publicly accessible website shall be deemed to be delivered for this purpose). **Any amendment, supplement, modification or waiver of the Bond Resolution shall have no force and effect with respect to this Agreement.**

(h)   **Setoff**. For the purpose of Section 6 of this Agreement, *"Set-off"* will apply to both Party A and the Port as follows:

    (i)   Any amount (the "Early Termination Amount") payable to one party (the "Payee") by the other party (the "Payer") under Section 6(e), in circumstances where there is a Defaulting Party or one Affected Party in the case where a Termination Event under Section 5(b)(ii) has occurred, will, at the option of the party ("X") other than the Defaulting Party or the Affected Party (and without prior notice to the Defaulting Party or the Affected Party), be reduced by its set-off against any Other Payment Amount (as hereinafter defined). As used herein, "Other Payment Amount" shall mean (1) any payment obligation of any description whatsoever by the Payee to the Payer (irrespective of the currency, place of payment or booking office of the obligation or whether the relevant party is legally or beneficially the holder of the obligation) arising under any other agreement between the Payee and the Payer or (2) any instrument or undertaking issued or executed or guaranteed by the Payee to, or in favor of, the Payer or (3) any bond, note, or other debt instrument ((1), (2) and (3) are collectively, "Debt Instruments") issued or guaranteed by the Payee and owned or held beneficially by the Payer as a result of the purchase thereof by or on behalf of the Payer, whether directly from the issuer or in the secondary market (and the Other Payment Amount will be discharged promptly and in all respects to the extent it is so setoff).

ISDA ® 1992       -14-

X will give notice to the other party of any set-off effected under this section.

Notwithstanding the foregoing, where Party A is the Payer, only those Debt Instruments payable by their terms from Available Revenue and held by Party A pursuant to the terms of a liquidity facility, letter of credit or other similar credit agreement provided by Party A to the Port in connection with any Debt Instrument payable by its terms from Available Revenue may be deemed to be an "Other Payment Amount".

For this purpose, either the Early Termination Amount or the Other Payment Amount (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency.

If an obligation is unascertained, X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this section shall be effective to create a charge or other security interest. This section shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise).

(ii)   Notwithstanding anything to the contrary set forth in this Agreement, a party (the "Delivering Party") may, in its discretion, satisfy, in whole or in part, any payment obligation arising under Section 6 in respect of any Early Termination Date which is designated or occurs as a result of an Event of Default in respect of which the other party is the Defaulting Party or which is designated as a result of a Termination Event in respect of which the other party is the sole Affected Party by delivering to such other party (the "Receiving Party"), or for the account of the Receiving Party, Debt Instruments issued or guaranteed by the Receiving Party and owned or held legally or beneficially by or on behalf of the Delivering Party in a face amount equal to the entirety or relevant part, as the case may be, of the amount of such payment obligation. Any Debt Instrument denominated in a currency other than the Termination Currency shall, for this purpose, be valued in an amount of Termination Currency determined by the Delivering Party based upon a currency exchange rate determined in a commercially reasonable manner. Any delivery by a Delivering Party shall be made in the manner customary for the relevant Debt Instrument (including, without limitation, through a depository institution or clearance system) or, if the Delivering Party deems such delivery to be impractical, in a commercially reasonable manner determined by the Delivering Party. Notwithstanding the foregoing, where Party A is the Delivering Party, only those Debt Instruments payable by their terms from Available Revenue and held by Party A pursuant to the terms of a liquidity facility, letter of credit or other similar credit agreement provided by Party A to the Port in connection with any Debt Instrument payable by its terms from Available Revenue may be delivered pursuant to the terms hereof.

(i)   *Transfer.* Notwithstanding anything to the contrary in Section 7 of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to the Port of a guarantee by Holdings, in favor of the Port, of

the obligations of such Affiliate, such guarantee to be otherwise identical to the guarantee then effect of the obligations of the transferor.

(j)  **Confirmations.** Party A will deliver to the Port a Confirmation relating to each Transaction.

(k)  **Credit Assignment Event.**

(A) Credit Assignment Event with respect to the Port.

(i)    A "Credit Assignment Event" shall occur if at any time during the term of this Agreement, the Port (or, if there is a Credit Support Provider for the Port, then any Credit Support Provider of the Port) ceases to maintain the Minimum Rating Requirement (as defined below) from both Moody's and S&P. Following the occurrence of a Credit Assignment Event, the rights and obligations of Party A under this Agreement and all Transactions hereunder shall automatically, and without any further action by any party, be deemed to have been assigned and delegated to LBSF, effective on the third Business Day following notification by Party A to the Port of such assignment and the Port expressly and irrevocably consents to such assignment and assumption, except that no such assignment and assumption shall occur at any time after the occurrence of any event of default under any master agreement between Party A and LBSF. As of and from the effective date of such assignment, LBSF shall succeed to all rights and obligations of Party A under this Agreement and all Transactions hereunder. Notwithstanding the above, if at the time of such assignment LBSF and the Port are parties to a master agreement that sets forth general terms and conditions applicable to swap and related transactions between LBSF and the Port, the Transactions hereunder transferred to LBSF pursuant to the above provision will be governed by such master agreement.

"**Minimum Rating Requirement**" means (A) with respect to Moody's, a long term senior unsecured debt rating, counterparty rating, or long term deposit paying rating of at least Aa3 or a financial strength rating of at least Aa2 (or, in the event that Moody's does not provide the long term or other types of ratings referred to above with respect to the Port or the Port's Credit Support Provider, a commercial paper or short term rating of at least P 1); and (B) with respect to S&P, a long term senior unsecured debt rating, counterparty rating, financial program rating or certificate of deposit rating of at least AA- or a financial strength rating of at least AA (or, in the event that S&P does not provide the long term or other types of ratings referred to above with respect to the Port or the Port's Credit Support Provider, a commercial paper rating or short term rating of A-1).

(ii)    Party A represents that it has provided separate consideration to LBSF for the right to assign this Agreement and the Transactions hereunder to LBSF pursuant to clause (i), and the Port shall not owe Party A any termination or other payment upon any such assignment.

(iii)    Notwithstanding clause (i) above, no assignment of any Transaction to LBSF shall occur if, prior to the effective date of the assignment described in such clause (i), the Port notifies Party A that the Port agrees to (A) terminate all Transactions as if a Termination Event has occurred with the Port as the Affected Party or (B) assign all Transactions to a third party on terms acceptable to Party A and the Port.

(iv)    Notwithstanding clauses (i) through (iii) above, no transfer or assignment payment shall be due to or owing from either Party A or the Port other than its obligations under the Transactions.

ISDA ® 1992                    -16-

(v)    Notwithstanding the foregoing, the assignment provisions of this paragraph shall not take effect if, at the time such assignment would be required, the Port shall have satisfied in full all of its payment obligations under Section 2(a) of this Agreement and shall at such time have no future payment obligations, whether absolute or contingent, under such Section.

(vi)    Upon an assignment pursuant to this Part 4(k)(i), (1) a Trigger Event shall cease to constitute an Additional Termination Event, and (2) Part 1(i)(ii) and Parts 1(j) through (l) of this Schedule shall cease to apply.

(B) Credit Assignment Event with respect to Party A.

(i)    A "Credit Assignment Event" with respect to Party A shall occur if the financial strength ratings assigned by S&P or Moody's to Party A shall be below "AAA."

(2)    Following such Credit Assignment Event, Party A at the direction of the Port (in its discretion or at the direction of the Insurer) shall assign its rights and obligations hereunder to LBSF as provided in Part 4(k)(A)(1) above.

(3)    Part 4(k)(A)(ii), (iii), (iv), (v) and (vi) above shall apply to such assignment.

(l)    **Additional Agreements**.

(i)    The introductory clause of Section 4 of this Agreement is hereby amended to read in its entirety as follows:--

"Each party agrees with the other (and, in the case of Sections 4(d) and (e), the Port agrees with the other party) that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:"

(ii)    Section 4 of this Agreement is hereby amended by adding the following Sections (d), (e) and (f) thereto:

(d)    **Notice of Incipient Illegality**. If an Incipient Illegality occurs, the Port will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Incipient Illegality and will also give such other information about that Incipient Illegality as the other party may reasonably require.

(e)    **Source of Payments**. The Port agrees that its obligation to make regularly scheduled payments hereunder are, and until the termination of this Agreement pursuant to the terms hereof shall remain, a revenue obligation of the Port payable solely from Available Revenue. The Port hereby irrevocably obligates and binds itself to pay regularly scheduled payments hereunder out of Available Revenue, on or prior to the date on which any regularly scheduled payment hereunder becomes due. Said amounts so pledged to be paid from Available Revenues are hereby declared to be a prior lien and charge upon the Gross Revenue of the Port superior to all other charges of any kind or nature whatsoever except for Operating Expenses and except for the lien on Gross Revenue of the Permitted Prior Lien Bonds and except that the amounts so pledged shall be of equal lien to the liens and charges on Gross Revenue to pay and secure the payment of the principal of and interest on the Port's outstanding

**ISDA ® 1992**                                -17-

Subordinate Lien Revenue Notes (Commercial Paper) and any Future Subordinate Lien Parity Bonds. The Port's obligations hereunder shall not in any manner or to any extent constitute general obligations of the Port or of the State of Washington, or of any political subdivision of the State of Washington, and no tax revenues of the Port may be used to pay any amount due hereunder.

Any other payment to be made by the Port hereunder (including without limitation any termination payment) shall be payable from and secured by a lien on Gross Revenue available immediately after satisfying all payment obligations due under clause "First" through "Sixth" set forth in Section 5 of Resolution 2005-05, adopted on August 4, 2005, amending Section 4.01(b) of Resolution 2002-07 of the Port.

(f)    **Definitions.**  Capitalized terms used herein and not otherwise defined herein shall have the meanings given to such terms in the Bond Resolution and shall not include any amendments to such definitions in the Bond Resolution without the written consent of Party A. Reference is hereby made to the 1992 ISDA U.S. Municipal Counterparty Definitions (the "1992 Muni Definitions") published by the International Swap Dealers Association, Inc., which is hereby incorporated by reference herein. Any terms used and not otherwise defined herein which are contained in the 1992 Muni Definitions shall have the meaning set forth therein." In addition, Section 12 is hereby amended by inserting the following definitions in alphabetical order:

**"Authorizing Law"** means Chapter 39.96 of the Revised Code of Washington, as amended.

**"Bonds"** means the Port of Tacoma, Subordinate Lien Revenue Bonds, 2006.

**"Bond Resolution"** means Resolution No. 2005-02 of the Port adopted on July 21, 2005 authorizing the issuance of the Bonds.

**"Future Subordinate Lien Parity Bonds"** means those revenue bonds or other revenue obligations which will be issued by the Port in the future with a lien on Net Revenues equal to the lien thereon of the Port's outstanding Subordinate Lien Revenue Notes (Commercial Paper) and the Port's obligation to make regularly scheduled payments hereunder.

**"Insured Transactions"** shall have the meaning given to such term in Part 5 of this Schedule.

**"Insurer"** means XL Capital Assurance Inc, together with any successor.

**"Incipient Illegality"** means (a) the enactment by any legislative body with competent jurisdiction over the Port of legislation that, if adopted as law, would render unlawful (i) the performance by the Port of any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of a Transaction or the compliance by the Port with any other material provision of this Agreement relating to such Transaction, or (ii) the performance by the Port or a Credit Support Provider of the Port of any contingent or other obligation which the Port (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction, (b) any assertion in any proceeding, legal forum or action by the Port in respect of the Port to the effect that performance under this Agreement or any other interest rate swap agreement to which the Port is a party is unlawful or (c) the occurrence with respect to the Port or any Credit Support Provider of the Port of any event that constitutes an Illegality.

**"Fitch"** means Fitch Ratings Inc.

ISDA ® 1992                                         -18-

"**Swap Insurance Policy**" shall have the meaning given to such term in Part 5 of this Schedule.

**Part 5:     INSURER PROVISIONS**

(a)      The following provisions shall apply to any Transaction to which the Swap Insurance Policy issued by the Insurer to the account of the Port, as principal, and for the benefit of Party A, as beneficiary (the "Swap Insurance Policy"), relates (the "Insured Transactions").

(i)      Notwithstanding anything to the contrary in Section 6 of this Agreement, if any (except as otherwise provided below):

(1)      Event of Default in respect of any Insured Transaction under Section 5(a) of this Agreement occurs; or

(2)      Termination Event in respect of any Insured Transaction under Section 5(b) of this Agreement occurs;

then, in either such case, neither Party A nor the Port shall designate an Early Termination Date in respect of any such Insured Transaction unless:

(Y)      an Additional Termination Event under Part 5(a)(x) has occurred and is continuing; or

(Z)      (i) The Port would not be required to make a payment on the Early Termination Date or (ii) the Port would make a payment on the Early Termination Date and has demonstrated to the sole satisfaction of the Insurer that the Port has sufficient funds on hand to make such payment on the Early Termination Date, or (iii) the Insurer has otherwise consented in writing to such designation.

Notwithstanding the foregoing, any Additional Termination Event caused by the non-issuance of bonds of the Port that are related to an Insured Transaction shall not be subject to the limitations in this Part 5(a)(1).

Amounts payable by the Port to Party A upon termination shall not be insured by the Swap Insurance Policy.

(ii)      Notwithstanding anything in this Agreement, if any Event of Default under this Agreement occurs, with the Port as the Defaulting Party, then the Insurer shall have the right (but not the obligation) upon notice to Party A to designate an Early Termination Date with respect to the Port with the same effect as if such designation were made by Party A. For purposes of the foregoing sentence, an Event of Default with respect to the Port shall be considered to be continuing, notwithstanding any payment by the Insurer under the Swap Insurance Policy. Party A and the Port acknowledge that, except as the Swap Insurance Policy may be otherwise endorsed, unless the Insurer designates an Early Termination Date (as opposed to merely consenting to such designation by one of the parties) termination payments due from the Port because an Early Termination Date has been designated will not be insured.

(iii)      Party A and the Port hereby each acknowledge and agree that Insurer's obligation with respect to Insured Transactions shall be limited to the terms of the Swap Insurance Policy. Notwithstanding Section 2(e) or any other provision of this Agreement, Insurer

**ISDA ® 1992**                                    -19-

shall not have any obligation to pay interest on any amount payable by the Port under this Agreement.

(iv) [Reserved].

(v) Section 8(b) of this Agreement is hereby amended by (A) adding the phrase "or any Credit Support Document" after the word "Agreement" in the first line thereof and (B) adding the phrase "and their respective Credit Support Providers" following after the word "parties" in the second line thereof.

(vi) No amendment, modification, supplement or waiver of this Agreement will be effective unless in writing and signed by each of the parties hereto and unless the parties hereto shall have obtained the prior written consent of Insurer.

(vii) Party A and the Port hereby each acknowledge and agree that Insurer shall be an express third-party beneficiary (and not merely an incidental third-party beneficiary) of this Agreement and the obligations of such party under any Insured Transaction, and as such, entitled to enforce this Agreement and the terms of any such Insured Transaction against such party on its own behalf and otherwise shall be afforded all remedies available hereunder or otherwise afforded by law against the parties hereto to redress any damage or loss incurred by Insurer.

(viii) So long as the Swap Insurance Policy shall remain in effect, no Insured Transaction may be assigned or transferred by the Port without the prior written consent of Insurer or by Party A without the prior written consent of the Insurer except as permitted by Section 7(a) and (b).

(ix) Party A and the Port hereby acknowledge that to the extent of payments made by Insurer to Party A under the Swap Insurance Policy, Insurer shall be fully subrogated to the rights of Party A against the Port under the Insured Transaction to which such payments relate, including, but not limited to, the right to receive payment from the Port and the enforcement of any remedies. Party A hereby agrees to assign to Insurer its right to receive payment from the Port under any Insured Transaction to the extent of any payment thereunder by Insurer to Party A and to execute all such instruments or agreements as Insurer deems reasonably necessary to effect such assignment. The Port hereby acknowledges and consents to the assignment by Party A to Insurer of any rights and remedies that Party A has under any Insured Transaction or any other document executed in connection herewith.

(x) *Additional Termination Event will apply.* The following shall constitute Additional Termination Events in respect of the Port (and amounts payable by the Port to Party A upon such termination shall not be insured by the Swap Insurance Policy):

    (1) Insurer fails to meet its payment obligations under its Swap Insurance Policy and such failure is continuing with respect to Insurer under the Swap Insurance Policy; provided, however, that, in any such case, either

        (X) an Event of Default has occurred or is continuing with respect to the Port as the Defaulting Party; or

(Y)     a Termination Event has occurred or is continuing with respect to the Port as the Affected Party.

For the purpose of the foregoing Termination Event, the Affected Party shall be the Port.

(2)     Insurer's financial strength rating from S&P is below A- or Insurer's claims paying ability rating from Moody's is below A3;

provided, however, that in any such case, either

(X)     an Event of Default has occurred and is continuing with respect to the Port as the Defaulting Party; or

(Y)     a Termination Event has occurred and is continuing with respect to the Port as the Affected Party.

For the purpose of the foregoing Termination Event, the Affected Party shall be the Port.

(3)     (A) Insurer consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation amalgamation, merger or transfer the resulting, surviving or transferee entity fails to assume all the obligations of the Insurer under the Swap Insurance Policy by operation of law or pursuant to an agreement reasonably satisfactory to Party A and (B) the Port fails, within 20 days of notice from Party A, to provide a replacement guarantee, letter of credit, surety bond, insurance policy or other credit enhancement instrument providing, in the reasonable opinion of Party A, support substantially the same as provided by the Swap Insurance Policy by a provider whose credit ratings are at least equal to those of the Insurer at the time of the replacement. For the purpose of this Termination Event, the Affected Party shall be the Port.

(4)     (A) The entry of a non-appealable order of a court of competent jurisdiction that the Swap Insurance Policy is invalid and (B) the Port fails, within 20 days of notice from Party A, to provide a replacement guarantee, letter of credit, surety bond, insurance policy or other credit enhancement instrument providing, in the reasonable opinion of Party A, support substantially the same as provided by the Swap Insurance Policy by a provider whose credit ratings are at least equal to those of the Insurer at the time of the replacement. For the purpose of this Termination Event, the Affected Party shall be the Port.

(xi)     Notwithstanding Section 6 of this Agreement, any designation of an Early Termination Date in respect of the Insured Transactions by Insurer or by Party A with the consent of Insurer pursuant to paragraph (i) above shall apply only to the Insured Transactions and not to any other Transaction under this Agreement, unless Party A shall designate an Early Termination Date in respect of such other Transaction. The paragraph shall not affect the rights of Party A under this Agreement to designate an Early Termination Date with respect to Transactions that are not Insured Transactions.

(xii)     Notwithstanding Section 2(c) of this Agreement, in no event shall either Party A or the Port be entitled to (A) set-off its payment obligations in respect of an Insured Transaction

against the payment obligations of the other party (whether by counterclaim or otherwise) if such obligations are not Insured Transactions, or (B) net the payment obligations of the other party that are not with respect to Insured Transactions against the payment obligations of such party under Insured Transactions, it being the intention of the parties that their payment obligations under Insured Transactions be treated separate and apart from all other obligations. Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the termination of any Insured Transaction shall be determined without regard to any obligation other than those under the Insured Transactions, it being the intention of the parties that their payment obligations under the Insured Transactions be treated separate and apart from all other obligations unless otherwise specified in such other obligation and agreed to in writing by Insurer.

(xiii)   None of the rights and obligations of Insurer with respect to the Insured Transactions shall affect the rights and obligations of the parties hereto pursuant to any Transaction that is not an Insured Transaction.

(xiv)   Notice of any Change of Account under Section 2(b) shall be delivered or given to Insurer.

(xv)   Party A acknowledges that the Port's Credit Support Document is not covered by the property/casualty insurance security fund specified in Article 76 of the New York Insurance Law.

(xvi)   Pursuant to Section 8(c) of this Agreement, all obligations of the parties will survive the termination of any Transaction or the term of this Agreement so long as amounts owed under the Swap Insurance Policy or under Part 5(a)(xxi) of this Agreement remain outstanding.

(xvii)   For the purpose of Section 10(a) of the Agreement, all notices and communications shall be delivered or given to Party A, the Port and Insurer as set forth in Part 3(a) of this Schedule.

(xviii)   Notwithstanding Section 2(a)(iii) of this Agreement, Party A shall not suspend any payments due under an Insured Transaction under Section 2(a)(iii) unless (I) Insurer is in default in respect of any payment obligations due under the Swap Insurance Policy or (II) following the occurrence of any event described in Part 5(a)(x) of this Agreement .

(xix)   No notice of an Event of Default or Termination Event shall be effective against the Port unless such notice is given to Insurer.

(xx)   The Port agrees to reimburse Insurer immediately and unconditionally upon demand for all reasonable expenses incurred by Insurer in connection with the issuance of the Swap Insurance Policy and the enforcement by Insurer of the Port's obligations under this Agreement and any other documents executed in connection with the execution and delivery of this Agreement, including, but not limited to, fees (including professional fees), costs and expenses incurred by Insurer which are related to, or resulting from any breach by the Port of its obligations hereunder.

(xxi)   The Port hereby covenants and agrees that it shall reimburse Insurer for any amounts paid by Insurer under the Swap Insurance Policy and all costs of collection thereof and

enforcement of this Agreement at the Insurer Payment Rate (as hereinafter defined). For purposes of the foregoing, "Insurer Payment Rate" shall mean the lesser of (a) the greater of (i) the per annum rate of interest, publicly announced from time to time by JPMorgan Chase Bank, N.A. ("Chase") at its principal office in the City of New York, as its prime or base lending rate ("Prime Rate") (any change in such Prime Rate to be effective on the date such change is announced by Chase) plus 3 percent and (ii) the then highest rate of interest on the Bonds and (b) the maximum rate permissible under applicable usury or similar laws limiting interest rates. The Insurer Payment Rate shall be computed on the basis of the actual number of days elapsed over a year of 360 days. In the event that Chase ceases to announce its Prime Rate publicly, Prime Rate shall be the publicly announced prime or base lending rate of such national bank as Insurer shall specify.

(xxii)  Each party agrees that each of its representations and agreements in this Agreement is expressly made to and for the benefit of the Insurer.

(xxiii)  Each party agrees to send a copy of all notices or communications sent by such party to the other party, to the Insurer at the following address:

XL Capital Assurance Inc.
1221 Avenue of the Americas
31st floor
New York, New York 10020
Attention: Surveillance and General Counsel
Phone:          (212) 478-3400
Fax (Surveillance):
                (212) 478-3597
Fax (Legal):
                (212) 478-3579

**EXECUTION COPY**

IN WITNESS WHEREOF, the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS DERIVATIVE
PRODUCTS INC.

PORT OF TACOMA

By: _____
Name:   T. COURTNEY JENKINS
Title:         VICE PRESIDENT
Date: _____

By: _____
        Timothy J. Farrell
        Executive Director
        Date: August 16, 2005

Schedule Lehman Brothers Derivative Products Inc. - 24

IN WITNESS WHEREOF, the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS DERIVATIVE**
**PRODUCTS INC.**

**PORT OF TACOMA**

By: _____

By: _____

Name: _____

Timothy J. Farrell

Title: _____

Executive Director

Date: _____

Date: August 16, 2005

**ISDA ® 1992**

## TABLE I:  PARTY A THRESHOLDS AND MINIMUM TRANSFER AMOUNTS

| S&P or Fitch | Moody's | Minimum Transfer Amount | $ Threshold |
|---|---|---|---|
| AAA- or above | Aaa3 or above | USD 250,000 | USD 30,000,000 |
| AA- or above | Aa3 or above | USD 250,000 | USD 20,000,000 |
| A+ or below or unrated (if previously rated) | A1 or below or unrated (if previously rated) | USD 0 | USD 0 |

**Exhibit A-1**
**Form of Opinion of Bond Counsel to the Port**


August 16, 2005


Port of Tacoma

Tacoma, Washington


Lehman Brothers Derivative Products Inc.

New York, New York


Ladies and Gentlemen:

We have acted as bond counsel to the Port of Tacoma (the "Port"), in connection with the
ISDA Master Agreement, dated as of August 16, 2005, including the Schedule and form of
Credit Support Annex thereto and Confirmation of the initial transaction entered into thereunder
on August 4, 2005 (the Master Agreement, Schedule and form of Credit Support Annex thereto
and such Confirmation, collectively, the "Agreement"), between the Port and Lehman Brothers
Derivative Products Inc. (the "Counterparty"). Capitalized terms used herein but not otherwise
defined shall have the meanings set forth in the Agreement.

We have examined originals, or copies certified to our satisfaction, of Resolution No.
2005-02 of the Port Commissioners adopted on July 21, 2005, authorizing the execution of the
Agreement (the "Bond Resolution"), Resolution No. 2005-05 of the Port Commissioners adopted
on August 4, 2005, the Agreement, and such other documents as we have deemed necessary as a
basis for the opinions hereinafter expressed. As to certain matters of fact relevant to the opinions
hereinafter expressed, we have relied upon certifications, statements, representations, and
warranties of the Port, the Counterparty and their respective representatives, including
statements, representations and warranties contained in the Agreement, and we have assumed
and have not independently verified that all such certifications, statements, representations and
warranties are true, accurate and complete.

Based upon the foregoing, we are of the opinion, as of the date hereof, that:

1.  The Port is a duly organized and validly existing port district and municipal corporation
    of the State of Washington (the "State") under the laws of the State.

2. The Port has the power to execute and deliver the Agreement and to perform its obligations under the Agreement, and the Port has taken all necessary action to authorize such execution, delivery and performance.

3. The execution and delivery of the Agreement by the Port, and the Port's performance of its obligations under the Agreement, do not violate or conflict with the State Constitution, State statutes, or the Bond Resolution.

4. No approval, consent or authorization of any governmental or public agency or authority or any other institution not already obtained is required for the execution by the Port of, or performance of Port's obligations under, the Agreement.

5. The Agreement has been legally authorized and executed by the Port, and constitutes a valid and legally binding special obligation of the Port that is enforceable against the Port in accordance with the terms of the Agreement.

6. The Port's obligation to make regularly scheduled payments under the Agreement out of Available Revenue is a prior lien and charge upon the Gross Revenue of the Port superior to all other charges of any kind or nature whatsoever except for Operating Expenses and except for the lien on Gross Revenue of the Permitted Prior Lien Bonds, and except that the amounts so pledged are of equal lien to the liens and charges on Gross Revenue of the Port's outstanding Subordinate Lien Revenue Notes (Commercial Paper) and any Future Subordinate Lien Parity Bonds. The Port's obligation to make any other payment under the Agreement (including without limitation any termination payment) is payable from and secured by a lien on Gross Revenue available after "Sixth" set forth in Section 5 of Resolution 2005-05, adopted on August 4, 2005, amending Section 4.01(b) of Resolution 2002-07 of the Port.

7. The Port is subject to civil and commercial suit in respect of its obligations under the Agreement.

The foregoing opinion is subject to the following limitations, qualifications, exceptions, and assumptions:

(A) The enforceability of the Agreement may be subject to (i) the valid exercise of sovereign state police powers; (ii) applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws or enactments now or hereafter enacted by any state or the Federal government affecting the enforcement of creditors' rights; and (iii) the unavailability of equitable remedies or the application of general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(B) In rendering this opinion, we have assumed with your consent (i) the authenticity of all documents submitted to us as originals, the genuineness of all signatures, the legal capacity of natural persons, and the conformity to the originals of all documents submitted to us as copies; (ii) the truth and accuracy of all factual representations set forth in the Agreement.

(C)    The opinions expressed herein are qualified to the extent that the
characterization of, and the enforceability of any rights or remedies in the
Agreement, may be limited by concepts of materiality, reasonableness, public
policy, good faith and fair dealing, and rules governing specific performance,
injunctive relief, marshalling, subrogation and other equitable remedies,
regardless of whether raised in a court of law or otherwise. The opinions
expressed herein are based on an analysis of existing laws, regulations, rulings
and court decisions and cover certain matters not directly addressed by such
authorities. Such opinions may be affected by actions taken or omitted or
events occurring after the date hereof.

(D)    We express no opinion with respect to any provision for a remedy which is
determined to be in the nature of a penalty, forfeiture or punitive damages, or
which would provide the claimant with a duplication of damage awards or
cumulative remedy, or which waives the applicability of any rule requiring an
election of remedies. We express no opinion regarding the enforceability of
the obligation of the Port to make payments under Section 6(e) of the
Agreement (termination payments) insofar as it purports to obligate the Port,
on termination of the Agreement, to pay an amount in excess of that measured
by the lowest quotation from a Reference Market-maker. In addition, in
connection with any such early termination on the grounds of default, a court
might limit a party's recovery to its actual damages in the circumstances,
imposing its own settlement procedures in lieu of the provisions of Section
6(e) of the Agreement.

(E)    Our opinions are subject to the context rule of interpretation of contracts,
which provide that even though terms of a contract may be unambiguous,
courts may admit extrinsic evidence to interpret the contract. We advise you
that under Washington law, parties to an agreement can modify the agreement
by their conduct.

(F)    Our opinions with respect to any provisions of the Agreement purporting to
create rights in a third party beneficiary is limited to the extent of the named
third party beneficiary's material interests and we express no opinion as to
enforceability by a third party beneficiary in circumstances, or as to
Agreement provisions, which would not affect the third party beneficiary's
interest. Enforcement of any rights as a third party beneficiary will be subject
to defenses that could be raised against the party whose rights are asserted by
the third party beneficiary.

We are qualified to practice law in the State and do not purport to be experts on, or to
express any opinion herein concerning, any law other than the laws of the State and the federal
laws of the United States of America. The Port and the Counterparty have agreed that the
Agreement shall be governed by and be construed in accordance with the laws of the State. In
rendering this opinion, we have assumed that the Agreement and the respective rights and duties

of the Port and the Counterparty thereunder are governed by and construed in accordance with the law of the State of Washington.

   This opinion letter is rendered only to you and is solely for your benefit in connection with the Agreement, and may not be used or relied on for any other purpose or by any other person (other than your legal and professional advisors) without our prior consent.

   This opinion is provided to you as a legal opinion only, and not as a guaranty or warranty of the matters discussed herein. No opinions may be inferred or implied beyond the matters expressly stated herein. No qualification, limitation or exception contained herein shall be construed in any way to limit the scope of the other qualifications, limitations and exceptions. For purposes of this opinion, the terms "law" and "laws" do not include unpublished judicial decisions, and we disclaim the effect of any such decision on the opinions expressed. This opinion speaks as of its date only, and we disclaim any undertaking or obligation to advise you of any changes that hereafter may be brought to our attention.

                              Respectfully submitted,

                              PRESTON GATES & ELLIS LLP


                              By: _____

**(Bilateral Form)**                                   **(ISDA Agreements Subject to New York Law Only)**



International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

ISDA MASTER AGREEMENT

**dated as of August 4, 2005**

**between**

| LEHMAN BROTHERS DERIVATIVE PRODUCTS INC. | and | PORT OF TACOMA, WASHINGTON |
|---|---|---|
| ("Party A") | | ("Party B") |

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:—

**Paragraph 1. Interpretation**

(a)      *Definitions and Inconsistency.*  Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)      *Secured Party and Pledgor.* All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2. Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

**Paragraph 3. Credit Support Obligations**

(a)    *Delivery Amount.*  Subject to Paragraphs 4 and 5, upon demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Delivery Amount"* applicable to the Pledgor for any Valuation Date will equal the amount by which:

(i) the Credit Support Amount

exceeds

(ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)    *Return Amount.*  Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Return Amount"* applicable to the Secured Party for any Valuation Date will equal the amount by which:

(i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

exceeds

(ii) the Credit Support Amount.

*"Credit Support Amount"* means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)    *Conditions Precedent.*  Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

(i) no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

(ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)    *Transfer Timing.*  Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)    *Calculations.*  All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

ISDA® 1994

(d)    *Substitutions.*

(i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

**Paragraph 5. Dispute Resolution**

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i) In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

3                                                            ISDA® 1994

**Paragraph 6. Holding and Using Posted Collateral**

(a)        *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)        *Eligibility to Hold Posted Collateral; Custodians.*

(i) *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)        *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)        *Distributions and Interest Amount.*

(i) *Distributions.* Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

ISDA® 1994

(ii) *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

**Paragraph 7. Events of Default**

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

**Paragraph 8. Certain Rights and Remedies**

(a)    *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

ISDA® 1994

(b)    *Pledgor's Rights and Remedies.* If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

> (i) the Pledgor may exercise all rights and remedies available to a Pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

> (ii) the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

> (iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

> (iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

>> (A) Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

>> (B) to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)    *Deficiencies and Excess Proceeds.* The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)    *Final Returns.* When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

**Paragraph 9. Representations**

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

> (i) it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

> (ii) it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

> (iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

> (iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

ISDA® 1994

**Paragraph 10. Expenses**

(a)    *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)    *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)    *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11. Miscellaneous**

(a)    *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obliged to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that the Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)    *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)    *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)    *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)    *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)    *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

ISDA® 1994

**Paragraph 12. Definitions**

As used in this Annex:—

"*Cash*" means the lawful currency of the United States of America.

"*Credit Support Amount*" has the meaning specified in Paragraph 3.

"*Custodian*" has the meaning specified in Paragraphs 6(b)(i) and 13.

"*Delivery Amount*" has the meaning specified in Paragraph 3(a).

"*Disputing Party*" has the meaning specified in Paragraph 5.

"*Distributions*" means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

"*Eligible Collateral*" means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

"*Eligible Credit Support*" means Eligible Collateral and Other Eligible Support.

"*Exposure*" means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

"*Independent Amount*" means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

"*Interest Amount*" means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

(x) the amount of Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 360.

"*Interest Period*" means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

"*Interest Rate*" means the rate specified in Paragraph 13.

"*Local Business Day*", unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

8

ISDA® 1994

"*Minimum Transfer Amount*" means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

"*Notification Time*" has the meaning specified in Paragraph 13.

"*Obligations*" means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

"*Other Eligible Support*" means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

"*Other Posted Support*" means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

"*Pledgor*" means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

"*Posted Collateral*" means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

"*Posted Credit Support*" means Posted Collateral and Other Posted Support.

"*Recalculation Date*" means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however*, that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

"*Resolution Time*" has the meaning specified in Paragraph 13.

"*Return Amount*" has the meaning specified in Paragraph 3(b).

"*Secured Party*" means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

"*Specified Condition*" means, with respect to a party, any event specified as such for that party in Paragraph 13.

"*Substitute Credit Support*" has the meaning specified in Paragraph 4(d)(i).

"*Substitution Date*" has the meaning specified in Paragraph 4(d)(ii).

"*Threshold*" means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

"*Transfer*" means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

> (i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

> (ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

> (iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

> (iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

ISDA® 1994

"*Valuation Agent*" has the meaning specified in Paragraph 13.

"*Valuation Date*" means each date specified in or otherwise determined pursuant to Paragraph 13.

"*Valuation Percentage*" means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

"*Valuation Time*" has the meaning specified in Paragraph 13.

"*Value*" means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

> (i) Eligible Collateral or Posted Collateral that is:
>
> > (A) Cash, the amount thereof; and
> >
> > (B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;
>
> (ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and
>
> (iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

**ISDA® 1994**

**Paragraph 13. Elections and Variables**

(a)      **Security Interest for "Obligations."** The term *"Obligations"* as used in this Annex has the meaning specified in Paragraph 12 and includes no additional obligations with respect to either Party A or the Port.

(b)      **Credit Support Obligations.**

    (i)      Delivery Amount, Return Amount and Credit Support Amount.

        (A)      *"Delivery Amount"* has the meaning specified in Paragraph 3(a).

        (B)      *"Return Amount"* has the meaning specified in Paragraph 3(b).

        (C)      The definition of *"Credit Support Amount"* in paragraph 3(b) shall be amended by inserting "102% of" after "(i)" in the first line thereof and before the word, "the" in the first line thereof.

    (ii)      Eligible Collateral. The following items will qualify as *"Eligible Collateral"* for the party specified:

| Eligible Collateral | Valuation Percentage |
|---|---|
| Cash | 100% |
| Treasury Securities and Agency Notes having a remaining maturity of: | |
|      One year or under | 99 |
|      More than one year up to and including two years | 99 |
|      More than two years up to and including five years | 98 |
|      More than five years up to and including ten years | 97 |
|      More than 10 years | 96 |

    (iii)      Other Eligible Support. There will be no *"Other Eligible Support"* for Party A or the Port.

    (iv)      Thresholds.

        (A)      *"Independent Amount"* means with respect to Party A: None, unless otherwise specified in a Confirmation.

        (B)      *"Threshold"* and *"Minimum Transfer Amount"* means, for Party A, at any time the amount specified in Table I attached hereto under the relevant heading opposite whatever is the Party A Credit Rating. **"Party A Credit Rating"** means the most recent rating for Party A's senior, unsecured, unenhanced debt by at least two of the following three ratings agencies: Standard & Poor's Ratings Group (**"S&P"**), Moody's Investors Services, Inc. (**"Moody's"**) or Fitch Ratings, Inc. (**"Fitch"**). If the relevant ratings of Moody's, S&P and Fitch would result in different Thresholds, the rating that shall control for purposes of this definition shall be the lower of the two highest ratings. If two ratings result in the same Threshold, either of such ratings may be the Party A Credit Rating.

Notwithstanding the above, if an Event of Default or Potential Event of Default with respect to Party A has occurred and is continuing, the Threshold and the Minimum Transfer Amount with respect to Party A shall each be zero;

(D)    "*Rounding*." The Delivery Amount and Return Amount will not be rounded up or down.

**(c)    Valuation and Timing**.

(i)    "*Valuation Agent*" means, for purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3; for purposes of Paragraph 6(d), the Secured Party receiving or deemed to receive the Distributions or the Interest Amount, as applicable; and for purposes of Paragraph 4(d), the Secured Party for purposes of calculating the Value in connection with substitutions.

(ii)    "*Valuation Date*" means the last Business Day of each week.

(iii)    "*Valuation Time*" means the close of business in the city of the Valuation Agent; provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv)    "*Notification Time*" means no later than 1:00 p.m., New York time, on a Local Business Day.

(v)    "*Transfer Timing*". Paragraph 4(b) is amended by (A) deleting the word "next" in the third line thereof and replacing it with the word "same"; and (B) deleting the words "second Local Business Day thereafter" in the fifth line thereof and replacing them with the works "next Local Business Day."

**(d)    Conditions Precedent and Secured Party's Rights and Remedies**. For the purposes of Paragraph 8(a), each Termination Event will constitute a Specified Condition with respect to a Pledgor, if the Pledgor fails to pay when due any amount payable by it in connection with an Early Termination Date, designated in connection with that Termination Event. For all other purposes of this Annex, each Additional Termination Event will be a Specified Condition with respect to the relevant party.

**(e)    Substitution**.

(i)    "*Substitution Date*" has the meaning specified in Paragraph 4(d)(ii).

(ii)    *Consent*. The Pledgor is not required to obtain the Secured Party's consent for any substitutions pursuant to Paragraph 4(d).

**(f)    Dispute Resolution**.

(i)    "*Resolution Time*" means 1:00 p.m., New York time, on the Local Business Day following the date on which the notice is given that gives rise to a dispute under Paragraph 5.

(ii)    "*Value*." For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support or of any Transfer of Eligible Credit Support or Posted Credit Support, as the

case may be, will be calculated by the Valuation Agent in accordance with standard market practice using third party sources (such as, by way of example only, Bloomberg or Reuters), where available.

(iii)  "*Alternative*." Paragraph 5 is amended by substituting the following for subclauses (1) and (2):

"(1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day (X) that the Transfer otherwise would have been due if no dispute had existed in the case of (I) above or (Y) following the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day (X) that the Transfer otherwise would have been due if no dispute had existed in the case of (I) above or (Y) following the date of Transfer in the case of (II) above.

**(g)   Holding and Using Posted Collateral.**

(i)  ***Eligibility to Hold Posted Collateral; Custodians***. As Secured Party, the Port and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), provided that the following conditions applicable to it are satisfied, and in the event that either condition (A) or (B) below is not satisfied, the Port's Custodian shall hold Posted Collateral:

(A)  the Port is not a Defaulting Party.

(B)  No Specified Condition has occurred and is continuing with respect to the Port.

(C)  Posted Collateral is held only in the United States.

Initially, the Custodian for the Port is to be specified by the Port in writing.

(ii)  **Use of Posted Collateral**. The provisions of Paragraph 6(c) will apply.

**(h)   Distributions and Interest Amount.**

(i)  **Interest Rate**. The "Interest Rate" will be, with respect to Eligible Collateral in the form of Cash, for any day, USD-LIBOR-BBA, with a designated maturity of one month. .

(ii)  **Transfer of Interest Amount**. The Transfer of the Interest Amount will be made on the first Local Business Day of each calendar month (in respect of amounts accrued to the end of the previous calendar month) and on any Local Business Day when the cash collateral is returned in its entirety.

(iii)  **Alternative to Interest Amount**. Not Applicable.

**(i)   Other Eligible Support and Other Posted Support.**

(i)  "*Value*" with respect to Other Eligible Support and Other Posted Support means: Not Applicable.

Annex Lehman Brothers Derivative Products Inc.- 3

(ii)    *"Transfer"* with respect to Other Eligible Support and Other Posted Support means: Not Applicable.

**(j)**    **Demands and Notices.**

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement, unless otherwise specified here:

With respect to Party A:

Lehman Brothers Derivative Products Inc.
745 Seventh Avenue
New York, NY 10019
Attention:  Municipal Financial Products- Middle Office
Phone:      (212) 526-2240
Fax:        (646) 758-2998

With respect to the Port:

Mr. Jeffrey L. Smith, CPA
Senior Director of Finance and Administration
Port of Tacoma
PO Box 1837
Tacoma, Washington 98401-1837
Phone:      (253) 383-9411
Fax:        (253) 597-7573
Email:      jsmith@portoftacoma.com

Provided, that any demand, specification or notice may be made by telephone (*"Telephone Notice"*) between the employees of each party if such Telephone Notice is confirmed by a subsequent written instruction (which may be delivered via facsimile or email) by the close of business on the same day that the Telephone Notice is given.

**(k)**    **Addresses for Transfers.**

**Party A**:      To be specified by Party A in writing.

**The Port**:     To be specified by the Port in writing.

**(l)**    **Other Provisions:**

(i)    **Agreement as to Single Secured Party and Pledgor.**  Party A and the Port agree that, notwithstanding anything to the contrary in the recital to this Annex, this Annex shall constitute a Credit Support Document only with respect to Party A and not with respect to the Port, Paragraph 1(b) or in Paragraph 2 or the definitions in Paragraph 12, (a) the term "Secured Party" as used in this Annex means only the Port, (b) the term "Pledgor" as used in this Annex means only Party A, (c) only Party A makes the pledge and grant in Paragraph 2, the acknowledgment in the final sentence of Paragraph 8(a) and the representations in Paragraph 9 and (d) only Party A will be required to make Transfers of Eligible Credit Support hereunder."

Annex Lehman Brothers Derivative Products Inc.- 4

(ii)    **Agreement regarding Insured Transactions.**    Party A and the Port agree that, notwithstanding anything to the contrary in this Annex, Obligations, Delivery Amount, Return Amount, Credit Support Amount, Value of Posted Credit Support, Exposure, Independent Amounts, Posted Collateral and Posted Credit Support shall be calculated for Insured Transactions separately from Transactions under this Agreement that are not Insured Transactions. In no event shall Party A or the Port be entitled to net Obligations, Delivery Amount, Return Amount, Credit Support Amount, Value of Posted Credit Support, Exposure, Independent Amounts, Posted Collateral and Posted Credit Support in respect of Insured Transactions against Obligations, Delivery Amount, Return Amount, Credit Support Amount, Value of Posted Credit Support, Exposure, Independent Amounts, Posted Collateral and Posted Credit Support in respect of Transactions under this Agreement that are not Insured Transactions, it being the intention of the parties that their obligations to Transfer Eligible Credit Support or Posted Credit Support with respect to Insured Transactions be treated separate and apart from their obligations to Transfer Eligible Credit Support or Posted Credit Support with respect to Transactions under this Agreement that are not Insured Transactions.

The definition of **"Local Business Day"** is hereby amended by inserting the following in lieu thereof: **"Local Business Day** means a day on which commercial banks in New York City are open for business (including dealings in foreign exchange and foreign currency deposits)";

**(m)**    **Additional Definitions**

(i)    "*Agency Notes*" means U.S. Dollar-denominated fixed rate, non-amortising, non-mortgage-backed, senior debt securities of fixed maturity, rated Aaa by Moody's and AAA by S&P, issued by any federal agency and guaranteed by the full faith and credit of the United States.

(ii)    "*Treasury Securities*" means U.S. Dollar-denominated senior debt securities of the United States of America issued by the U.S. Treasury Department and backed by the full faith and credit of the United States of America.

**EXECUTION COPY**

    IN WITNESS WHEREOF the parties have executed this Annex on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS DERIVATIVE
PRODUCTS INC.**

By: _____

Name: ~~T. COURTNEY JENKINS~~

Title: ~~VICE PRESIDENT~~

Date: _____


**PORT OF TACOMA**

By: _____

Timothy J. Farrell
Executive Director
Date: August 16, 2005

IN WITNESS WHEREOF the parties have executed this Annex on the respective dates specified
below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS DERIVATIVE
PRODUCTS INC.**

By: _____
     Name:_____
     Title:_____
     Date:_____

**PORT OF TACOMA**

By: _____
     Timothy J. Farrell
     Executive Director
     Date: August 16, 2005

## TABLE I: PARTY A THRESHOLDS AND MINIMUM TRANSFER AMOUNTS

| S&P or Fitch | Moody's | Minimum Transfer Amount | $ Threshold |
|---|---|---|---|
| AAA- or above | Aaa3 or above | USD 250,000 | USD 30,000,000 |
| AA- or above | Aa3 or above | USD 250,000 | USD 20,000,000 |
| A+ or below or unrated (if previously rated) | A1 or below or unrated (if previously rated) | USD 0 | USD 0 |

# LEHMAN BROTHERS

Execution Copy

CONFIRMATION

August 4, 2005

INSURED TRANSACTION

Port of Tacoma, Washington
P.O. Box 1837
Tacoma, Washington 98401-1837

Global ID: 2228204
Ladies and Gentlemen:

The purpose of this letter agreement is to set forth the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the Master Agreement specified below. This Transaction constitutes an "Insured Transaction" as defined in the Master Agreement specified below and it is therefore subject to the special provisions of the Master Agreement which apply to Insured Transactions.

The definitions and provisions contained in the 2000 ISDA Definitions (as published by the International Swaps and Derivatives Association, Inc., the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between those Definitions and this Confirmation, this Confirmation will govern.

1.    This Confirmation supplements, forms part of, and is subject to the ISDA Master Agreement dated as of August 4, 2005, as amended and supplemented from time to time (the "Agreement") between Lehman Brothers Derivative Products Inc. and Port of Tacoma, Washington. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

2.    The terms of the particular Transaction to which this Confirmation relates are as follows:

| | |
|---|---|
| Party A: | LEHMAN BROTHERS DERIVATIVE PRODUCTS INC. |
| Party B: | PORT OF TACOMA, WASHINGTON |
| Notional Amount: | $30,000,000, reducing on the dates and in the amounts set forth in Annex I hereto. |
| Trade Date: | August 4, 2005 |

| | |
|---|---|
| Effective Date: | August 3, 2006 |
| Termination Date: | December 1, 2036, subject to adjustment in accordance with the Modified Following Business Day Convention |

**FIXED AMOUNTS:**

| | |
|---|---|
| Fixed Rate Payer: | Party B |
| Fixed Rate Payer Payment Dates: | Monthly on the first calendar day of each calendar month commencing September 1, 2006 and terminating on the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate Payer Period End Dates: | Monthly on the first calendar day of each calendar month commencing September 1, 2006 and terminating on the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate: | 3.795 % |
| Fixed Rate Day Count Fraction: | 30/360 |

**FLOATING AMOUNTS:**

| | |
|---|---|
| Floating Rate Payer: | Party A |
| Floating Rate Payer Payment Dates: | Monthly on the first calendar day of each calendar month commencing September 1, 2006 and terminating on the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Payer Period End Dates: | Monthly on the first calendar day of each calendar month commencing September 1, 2006 and terminating on the Termination Date.  No adjustment shall apply to the Floating Rate Payer Period End Date. |
| Floating Rate: | 70% of USD-LIBOR-BBA. |
| Floating Rate Designated Maturity: | One month |
| Floating Rate Day Count Fraction: | Actual/360 |
| Floating Rate Reset Date: | The Effective Date and thereafter each Floating Rate |

- 2 -

|                     | Period End Date.   |
|---------------------|--------------------|
| Compounding:        | Inapplicable       |
| Method of Averaging:| Inapplicable       |
| Business Days:      | New York, London   |

3.    *Optional Termination.*  Party B shall have the right to terminate this Transaction upon at least five (and no more than twenty) Business Days' prior written notice to Party A designating a day not earlier than the day such notice is effective as an Early Termination Date. Party B's election to terminate this Transaction shall constitute an Additional Termination Event pursuant to Section 5(b)(iii) of the Agreement and, upon such election, this Transaction shall be terminated according to Section 6 of the Agreement. Party B shall be the sole Affected Party for purposes of determining any amount payable upon such termination; provided that, notwithstanding the fact that Party B is the Affected Party, Party B shall designate the Early Termination Date pursuant to Section 6(b) of the Agreement and this paragraph. Party B agrees that it shall not terminate this Transaction unless it shall have sufficient funds to pay any Settlement Amount to Party A which may be due as provided herein

Notwithstanding anything in the Agreement or this Confirmation to the contrary, Party B may, on any Business Day from and including December 1, 2016 to but excluding the Termination (each, an "Optional Reduction Date"), reduce the Notional Amount of this Transaction, in whole or in part, (each such reduction, an "Optional Reduction") by an amount equal or greater than $30,000 (each such amount, an "Elected Optional Reduction Amount") by providing at least two Business Days' prior written notice to Party A. No amounts shall be payable by either party with respect to any such Optional Reduction. Notwithstanding anything herein to the contrary, the occurrence of an Optional Reduction Date shall not affect the obligation of the parties to pay any amounts accrued to such Optional Reduction Date. In the event the Elected Optional Reduction Amount for any Optional Reduction Date is less than the Notional Amount set forth in Annex I attached hereto for the Calculation Period beginning on such Optional Reduction Date, the parties agree that upon such Optional Reduction Date the remaining amounts set forth under the column "Revised Notional Amount" in Annex I attached hereto shall each be reduced on a pro rata basis. The parties agree that to reduce each such amount on a pro rata basis each such amount shall be multiplied by (one minus a fraction, the numerator of which is equal to the Elected Optional Reduction Amount for such Optional Reduction Date, and the denominator of which is equal to the Notional Amount for the calculation period which includes such Optional Reduction Date before making the reduction on such Optional Reduction Date). After making such calculation, all Notional Amounts under the column "Notional Amount Reduction" will be reduced to correspond with the changes under the column "Revised Notional Amount". Upon each such Optional Reduction, the dates and amounts shown on Annex I shall be deemed to be replaced in a manner consistent with the dates and amounts shown on the written notice from Party B to Party A.

4.    *Broker's Fee.*  Party B acknowledges that Party A shall pay an arrangement fee of $33,000 to PFM Asset Management LLC for swap advisory services provided by PFM Asset Management LLC to Party B and $11,400 to Preston Gates & Ellis LLP for legal fees provided by Preston Gates & Ellis LLP to Party B.

5.    *Payment Instructions:*

Payments to Party A:

- 3 -

JPMorgan Chase
ABA: 021000021
for the Account of Lehman Brothers Derivative Products Inc.
Account No. 066 143 543

Payments to Party B:

Columbia Bank
ABA No. 1251-0827-2
For: Port of Tacoma
Account No. 7000219779

6.      Please check this Confirmation carefully and immediately upon receipt so that errors or discrepancies can be promptly identified and rectified.  Please confirm that the foregoing correctly sets forth the terms of the agreement between Party A and Party B with respect to the particular Transaction to which this Confirmation relates by signing in the space provided below and immediately returning a copy of the executed Confirmation to Party A.

- 4 -

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of
this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS DERIVATIVE
PRODUCTS INC.

By:
Name: T. COURTNEY JENKINS
Title:     VICE PRESIDENT

Confirmed as of the
date first above written

PORT OF TACOMA, WASHINGTON

By:
Name:
Title:

- 5 -

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

<div style="margin-left:40%">

Yours sincerely,

LEHMAN BROTHERS DERIVATIVE
PRODUCTS INC.


_____

By:
Name:
Title:

</div>

Confirmed as of the
date first above written


PORT OF TACOMA, WASHINGTON

By:
Name: Timothy J. Farrell
Title:   Executive Director

NYK 980604-3.071370.0011

ANNEX I
to Confirmation, dated August 4, 2005
between Lehman Brothers Derivative Products Inc.
and Port of Tacoma, Washington

| Reduction Date | Notional Amount Reduction | Revised Notional Amount |
|---|---|---|
| 8/3/2006 | $0.00 | $30,000,000.00 |
| 12/1/2009 | $600,000.00 | $29,400,000.00 |
| 12/1/2010 | $624,000.00 | $28,776,000.00 |
| 12/1/2011 | $649,500.00 | $28,126,500.00 |
| 12/1/2012 | $675,000.00 | $27,451,500.00 |
| 12/1/2013 | $702,000.00 | $26,749,500.00 |
| 12/1/2014 | $730,500.00 | $26,019,000.00 |
| 12/1/2015 | $759,000.00 | $25,260,000.00 |
| 12/1/2016 | $790,500.00 | $24,469,500.00 |
| 12/1/2017 | $822,000.00 | $23,647,500.00 |
| 12/1/2018 | $855,000.00 | $22,792,500.00 |
| 12/1/2019 | $888,000.00 | $21,904,500.00 |
| 12/1/2020 | $924,000.00 | $20,980,500.00 |
| 12/1/2021 | $961,500.00 | $20,019,000.00 |
| 12/1/2022 | $999,000.00 | $19,020,000.00 |
| 12/1/2023 | $1,039,500.00 | $17,980,500.00 |
| 12/1/2024 | $1,081,500.00 | $16,899,000.00 |
| 12/1/2025 | $1,125,000.00 | $15,774,000.00 |
| 12/1/2026 | $1,170,000.00 | $14,604,000.00 |
| 12/1/2027 | $1,216,500.00 | $13,387,500.00 |
| 12/1/2028 | $1,264,500.00 | $12,123,000.00 |
| 12/1/2029 | $1,315,500.00 | $10,807,500.00 |
| 12/1/2030 | $1,368,000.00 | $9,439,500.00 |
| 12/1/2031 | $1,423,500.00 | $8,016,000.00 |
| 12/1/2032 | $1,480,500.00 | $6,535,500.00 |
| 12/1/2033 | $1,539,000.00 | $4,996,500.00 |
| 12/1/2034 | $1,600,500.00 | $3,396,000.00 |
| 12/1/2035 | $1,665,000.00 | $1,731,000.00 |
| 12/1/2036 | $1,731,000.00 | $0.00 |

- 6 -

# EXHIBIT B

# LEHMAN BROTHERS

### NOTICE OF TRIGGER EVENT

September 16, 2008

Port of Tacoma
Post Office Box 1837
Tacoma, WA 98401


   Re:  <u>Trigger Event</u>

Ladies and Gentlemen:

Reference is made to the 1992 ISDA Master Agreement (Multicurrency—Cross Border), dated as of 04 August, 2005 (the "Agreement"), by and between Port of Tacoma and Lehman Brothers Derivative Products Inc. and to trade(s) which are governed by the Agreement. Terms defined in the Agreement shall have the same meaning when used herein, except as otherwise provided.

You are hereby notified that a Trigger Event has occurred as a result of Lehman Brothers Holdings Inc.'s filing of a petition under Chapter 11 of the U.S. Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York. The Early Termination Date in respect of all Transactions shall be September 23, 2008.

Nothing in this letter shall be construed as a waiver of any rights we may have with respect to the Agreement.

If you have any specific questions, please contact our Client Relationship Manager, Jayana Desai at (212) 320-6620.

    Very truly yours,

    LEHMAN BROTHERS DERIVATIVE PRODUCTS INC.

    Lorna Brown
    Authorized Signatory
    Lehman Brothers Derivatives Products

# <u>**EXHIBIT C**</u>

# LEHMAN BROTHERS

September 25, 2008

Port of Tacoma
(253) 597-7573

Re:   Termination of ISDA Master Agreement, dated 8/4/2005 (the "Agreement"),
between Lehman Brothers Derivative Products Inc. ("LBDP") and Port of Tacoma
("Counterparty")

Dear Sirs:

Further to the Trigger Notice dated September 16, 2008 previously delivered to you, the
following provides a summary of amounts payable under the above-referenced
Agreement. Terms used herein and not otherwise defined shall have the meanings
accorded them in the Agreement.

The amount payable under the Agreement has been determined as follows:

Termination Amount:        $ 666,062.29

Pursuant to the Agreement, LBDP polled the Dealer Group for Market Quotations for the
group of Terminated Transactions listed on Schedule I attached hereto, but was unable to
obtain any quotations from such group. In accordance with industry standards, LBDP
reverted to Loss methodology to determine the above Termination Amount.

If the above amount is a positive number, the Agreement provides that Counterparty shall
pay such amount within five Universal Business Days following the Early Termination
Date of September 23, 2008.

Please be advised that LBDP reserves all of its rights with respect to the Transactions and
the Agreement, as well as with respect to all other transactions and agreements with
Counterparty and any of its affiliates, and may take such other action or actions as to
which it is entitled under each of such transactions and agreements.

If you have any questions, please contact Jayana Desai at (212) 320-6600.

Yours truly,


LEHMAN BROTHERS DERIVATIVE PRODUCTS INC.


Lorna Brown
Authorized Signatory
Lehman Brothers Derivatives Products

LEHMAN BROTHERS DERIVATIVE PRODUCTS INC.
745 SEVENTH AVENUE, NEW YORK, NEW YORK 10019

# LEHMAN BROTHERS

### SCHEDULE I

### TERMINATED TRANSACTIONS UNDER THE MASTER AGREEMENT

| Global ID | Currency | FX rate | MTM in US dollars |
|-----------|----------|---------|-------------------|
| 2228204 | USD | 1 | (1,125,118.00) |
| 2228204 | USD | 1 | 1,791,180.29 |

# **EXHIBIT D**

*GP AP*
*V# 01809*

*09100201*

## 008

**INVOICE ENTRY FORM**
FMS ACCOUNTS PAYABLE

Oct-08
**MO/YEAR**

Bank of America
Chase Manhattan
Lehman SWAP Termination

BATCH ID: _____
USER: _____
DOCUMENT:
DESCRIPTION:
Wire Date

| | 001 | VENDOR: 10339 | UNDISTRIBUTED: | |
|---|---|---|---|---|
| Term. of SWAP add'l | | INDEX: 12724 | | |
| Term. of SWAP add'l | REFERENCE DOCUMENT: | - | - | |
| 10/02/08 | | CONTROL TOTAL: | | $6,000.00 |
| | PAYMENT STATUS: | PAY DATE: | | 10/02/08 |

| TRANS CODE | AMOUNT | ACCOUNT | COMMENT | RATE |
|---|---|---|---|---|
| 101 | $6,000.00 | | | |
| | 2020-00-0000-00 | | | |

Transaction:    To Pay SWAP Termination to Lehman Bros. for 2008 refunding bond
                JPMorgan Chase Bank

# REDACTED

fbo LEHMAN BROTHERS DERIV PRODUCTS

Entered by      *DM # 22072620*

Released by     *LP 10/2/8 .2:12 pm*

A/P Process     _____

Scanned by      _____

I, the undersigned do hereby certify under penalty of perjury, that the
materials have been furnished, the services rendered or the labor performed
is described herein, and that the claim is a just, due and unpaid obligation
against the Port of Tacoma, and that I am authorized to authenticate
and certify to said claim.

# WIRE/ACH RELEASED
# ONLY POST & SCAN

Signed    _____
          Auditor

Home    My Profile    Admin    Tools

## Bank of America Direct

David Morrison | Tacoma, WA, Port of
10/02/2008 15:41 CDT
Last Sign In: 01-Oct-2008 at 11:58 PDT

**Banko**

| Payments | Receipts | Treasury | Loans | Images | Notifications |

# Payment Transaction Details

Payment  5  of  7  **Total Payments**

| | |
|---|---|
| **PI Reference:** | 22026934 |
| **Debit Account:** | |
| **Account Name:** | Port of Tacoma General Account |
| **Payment Amount:** | USD 660,062.29 |
| **Value Date:** | 10/01/2008 |
| **Your Reference:** | |

| | |
|---|---|
| **Payment Status:** | Payment Completed |
| **Payment Type:** | USD Wire |
| **Initiated:** | 09/30/2008 16:46 CDT    by |
| **Last Modified:** | 09/30/2008 16:46 CDT    by |
| **Last Rejected:** | |
| **Last Approved:** | 09/30/2008 16:46 CDT    by |
| **Released:** | 09/30/2008 18:09 CDT    by |
| **Trace Reference:** | 22026934 |
| **Service Conf:** | 20081001B6B7HU4R00( |
| **Template Used:** | |

*Ordering Party Info*

| | |
|---|---|
| **ID Type:** | |
| **ID:** | |
| **Name:** | |
| **Address:** | |

**RECEIVING BANK**    Provided By:

**INTERMEDIARY BANK**    **Provided By:** User

| | |
|---|---|
| **ID Type:** | |
| **ID:** | |
| **Name:** | |
| **Address:** | |
| **City:** | |
| **State:** | |
| **Country:** | |

REDACTED

| | |
|---|---|
| **ID Type:** | |
| **ID:** | |
| **Name:** | |
| **Address** | |
| **City:** | |
| **State:** | |
| **Country:** | |

**BENEFICIARY BANK INFORMATION**

| | |
|---|---|
| **ID Type:** | ABA |
| **ID:** | |
| **Name:** | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION |
| **Address:** | 55 WATER ST, RM 918 |
| **City:** | NEW YORK CITY |
| **State:** | NY |
| **Country:** | US |

**BENEFICIARY INFORMATION**

| | |
|---|---|
| **ID Type:** | ACCT |
| **ID:** | |
| **Name:** | Lehman Bros Derivative I |
| **Address:** | |

| | |
|---|---|
| **Bank-To-Bank Info:** | |

| | |
|---|---|
| **Details of Payment:** | Port of Tacoma |
| **Charges:** | None Selected |

[ Exit Details ]

**Previous Detail**    **Next Detail**

Payments Transaction Details

Page 1 of 1

Home   My Profile   Admin   Tools   Log   Help

## Bank of America Direct

Lien Dam | Tacoma, WA, Port of
10/02/2008 16:10 CDT
Last Sign In: 02-Oct-2008 at 09:03 PDT

**Bank of America**

Payments | Receipts | Treasury | Trade | Images | Notifications

# Payment Transaction Details

**Payment  1  of  3  Total Payments**

| | | | | |
|---|---|---|---|---|
| **PI Reference:** | 22072620 | **Payment Status:** | Payment Completed | |
| **Debit Account:** | | **Payment Type:** | USD Wire | |
| **Account Name:** | Port of Tacoma General Account | **Initiated:** | 10/02/2008 15:43 CDT | by DM630784 |
| **Payment Amount:** | USD 6,000.00 | | | |
| **Value Date:** | 10/02/2008 | **Last Modified:** | 10/02/2008 15:43 CDT | by DM630784 |
| **Your Reference:** | | **Last Rejected:** | | |

*Ordering Party Info*

| | | | | |
|---|---|---|---|---|
| **ID Type:** | | **Last Approved:** | 10/02/2008 15:43 CDT | by NOT REQU |
| **ID:** | | **Released:** | 10/02/2008 16:08 CDT | by LD373710 |
| **Name:** | | **Trace Reference:** | 22072620 | |
| **Address:** | | **Service Conf:** | 20081002B6B7HU2R011168 | |
| | | **Template Used:** | | |

| RECEIVING BANK | | INTERMEDIARY BANK | |
|---|---|---|---|
| | **Provided By:** | | **Provided By:** User |
| **ID Type:** | | **ID Type:** | |
| **ID:** | | **ID:** | |
| **Name:** | | **Name:** | |
| **Address:** | | **Address** | |
| **City:** | REDACTED | **City:** | |
| **State:** | | **State:** | |
| **Country:** | | **Country:** | |

| BENEFICIARY BANK INFORMATION | | BENEFICIARY INFORMATION | |
|---|---|---|---|
| **ID Type:** | ABA | **ID Type:** | ACCT |
| **ID:** | | **ID:** | |
| **Name:** | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | **Name:** | Lehman Brothers Derivative Products |
| **Address:** | 55 WATER ST, RM 918 | **Address:** | |
| **City:** | NEW YORK CITY | | |
| **State:** | NY | | |
| **Country:** | US | | |

| Bank-To-Bank Info: | | Details of Payment: | |
|---|---|---|---|
| | | **Charges:** | None Selected |

[ Exit Details ]

Next Detail

© Bank of America, N.A. Member FDIC 2008 Bank of America Corporation. All rights reserved. Online Privacy Policy

*✱ Additional pmt –*

# **<u>EXHIBIT E</u>**

LPDP Correspondence.txt

-----Original Message-----
From: Hopson, Adam D [mailto:hopsonad@lehman.com]
Sent: Wednesday, September 02, 2009 1:44 PM
To: Morrison, David
Cc: Dam, Lien
Subject: RE: Termination Agreement - Port of Tacoma, Washington

David,

The Market Quotation in the Master Agreement is referenced in the valuation
statement sent by LBDP to the Port on 9/25/08 (copy attached).
We polled the Dealer Group but were unable to obtain Market Quotes at that time, so
we used our trading desk's systems to generate the mark-to-market of the trades
("Loss" methodology). Before sending you the termination agreement, our traders
manually verified that the mark-to-market was accurate. Unfortunately, it is not
customary for us to share the assumptions we've used to value trades. Your swap
advisor should be able to at least approximate a value based on the terms set forth
in the confirmation and public market data.

Regards,

Adam

-----Original Message-----
From: Morrison, David [mailto:dmorrison@portoftacoma.com]
Sent: Wednesday, September 02, 2009 4:14 PM
To: Hopson, Adam D
Cc: Dam, Lien
Subject: RE: Termination Agreement - Port of Tacoma, Washington

Hi Adam,

I have not been able to get any verification of the amount paid by the Port because
our SWAP advisors need the volatility index for the swap
and the exact interest rates used to input into their model.   Our swap
advisor did not keep the interest rate information for the day of the valuation, and
only Lehman's would have the "volatility" index that was used.

Alternatively, I looked at the documents we had with Lehman's.   In the
Schedule to the master agreement, Part 1.k(2), it says "Party A
(Lehman's) shall notify the Port of the Market Quotation of each terminated
transaction, the settlement Amount and the termination currency equivalent of any
unpaid amounts within two business days
following the early termination date."    Market Quotation is as defined
in the schedule on page 7.   We did not receive any market quotation from Lehman's.
Before we can sign this agreement, we would like to see the market quotations and
the underlying components supporting these quotations.   Then I will have done the
due diligence necessary for the
Port.   Can Lehman's provide the market quotations?

Regards,

David Morrison
Port of Tacoma
253-428-8661

-----Original Message-----
From: Hopson, Adam D [mailto:hopsonad@lehman.com]
Sent: Tuesday, September 01, 2009 9:11 AM
To: Morrison, David
Cc: Smith, Jeff

LPDP Correspondence.txt
Subject: RE: Termination Agreement - Port of Tacoma, Washington

David,

Following our discussions on the phone in July, I just wanted to follow up with you
re the Termination Agreement. As I mentioned, we are unable to provide our valuation
input assumptions, but have you had any success in verifying the amount paid by Port
of Tacoma?

Warm Regards,

Adam

-----Original Message-----
From: Morrison, David [mailto:dmorrison@portoftacoma.com]
Sent: Thursday, June 25, 2009 5:10 PM
To: Hopson, Adam D
Subject: FW: Termination Agreement - Port of Tacoma, Washington

Adam,

I work with Jeff Smith at the Port of Tacoma.  Before signing this document, we
would like to verify via our own calculations the final
termination value to confirm what we paid Lehman's.   Is there a way to
get the actual calculation information (interest rates, volatility
index, etc.) or the actual calculation spreadsheet ?

David Morrison
Port of Tacoma
253-428-8661

-----Original Message-----
From: Hopson, Adam D [mailto:hopsonad@lehman.com]
Sent: Thursday, June 18, 2009 12:07 PM
To: Smith, Jeff
Cc: Koyama, Satoko S
Subject: Termination Agreement - Port of Tacoma, Washington

Dear Jeff,

In reference to the ISDA Master Agreement dated as of August 4, 2005 between Port of
Tacoma, Washington ("POTW") and Lehman Brothers Derivative Products Inc. ("LBDP"),
LBDP and the Creditors' Committee of Lehman Brothers Holdings Inc. and its
affiliates (including LBDP) have determined that POTW's payment in the amount of USD
666,062.29 to LBDP is sufficient for a final release from any further obligations or
claims from LBDP. Thank you very much for your payment.

In order to effectuate a final release, POTW needs to countersign the attached
Termination Agreement.  Please arrange to have the attached Termination Agreement
countersigned by POTW's authorized signatory. Upon the execution, please send us the
PDF of such countersigned Termination Agreement, with evidence that such authorized
signatory is authorized to sign on behalf of POTW.

If you have any questions, please feel free to contact me.

Warm regards,

Adam Hopson
Lehman Brothers Holdings, Inc.
1271 Sixth Ave, New York, NY 10019
Tel: (646) 333-9249
Email: hopsonad@lehman.com
                                      Page 2

LPDP Correspondence.txt

 <<Port of Tacoma_Termination Agreement.pdf>>  <<Bill Fox (Incumbency
Certificate).pdf>>
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -

This message is intended only for the personal and confidential use of the
designated recipient(s) named above.  If you are not the intended recipient of this
message you are hereby notified that any review, dissemination, distribution or
copying of this message is strictly prohibited.  This communication is for
information purposes only and should not be regarded as an offer to sell or as a
solicitation of an offer to buy any financial product, an official confirmation of
any transaction, or as an official statement of Lehman Brothers.  Email transmission
cannot be guaranteed to be secure or error-free.
Therefore, we do not represent that this information is complete or accurate and it
should not be relied upon as such.  All information is subject to change without
notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this
communication (including any attachments) is not intended or written to be used and
cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii)
promoting, marketing or recommending to another party any transaction or matter
addressed herein.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -

This message is intended only for the personal and confidential use of the
designated recipient(s) named above.  If you are not the intended recipient of this
message you are hereby notified that any review, dissemination, distribution or
copying of this message is strictly prohibited.  This communication is for
information purposes only and should not be regarded as an offer to sell or as a
solicitation of an offer to buy any financial product, an official confirmation of
any transaction, or as an official statement of Lehman Brothers.  Email transmission
cannot be guaranteed to be secure or error-free.
Therefore, we do not represent that this information is complete or accurate and it
should not be relied upon as such.  All information is subject to change without
notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this
communication (including any attachments) is not intended or written to be used and
cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii)
promoting, marketing or recommending to another party any transaction or matter
addressed herein.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- -

This message is intended only for the personal and confidential use of the
designated recipient(s) named above.  If you are not the intended recipient of this
message you are hereby notified that any review, dissemination, distribution or
copying of this message is strictly prohibited.  This communication is for
information purposes only and should not be regarded as an offer to sell or as a
solicitation of an offer to buy any financial product, an official confirmation of
any transaction, or as an official statement of Lehman Brothers.  Email transmission
cannot be guaranteed to be secure or error-free.  Therefore, we do not represent
that this information is complete or accurate and it should not be relied upon as
such.  All information is subject to change without notice.

--------
IRS Circular 230 Disclosure:

LPDP Correspondence.txt
Please be advised that any discussion of U.S. tax matters contained within this
communication (including any attachments) is not intended or written to be used and
cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii)
promoting, marketing or recommending to another party any transaction or matter
addressed herein.