UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
:
In re                                                                          :    Chapter 11
                                                                                    :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,         :    Case No. 08-13555 (JMP)
                                                                                    :
                                                                                    :    (Jointly Administered)
                       Debtors.                                          :
                                                                                    :
-----------------------------------------------------------------------x

### DECLARATION OF JEFFREY KLEIN IN SUPPORT OF RESPONSE OF PORT OF TACOMA TO DEBTORS' ONE HUNDRED THIRTY-EIGHTH OBJECTION TO CLAIMS (NO LIABILITY DERIVATIVES CLAIMS)

I, Jeffrey Klein, hereby declare pursuant to 28 U.S.C. § 1746:

1.  I am a principal of Kensington Capital Advisors, LLC ("Kensington") and have served in that capacity since March 22, 2006. Kensington is an independent financial advisory firm formed to serve end users of derivative products and specializes in the analysis, structuring and execution of derivative products. Kensington's six professionals constitute over 80 years of combined experience in derivatives trading.

2.  I have over 18 years of experience as a derivatives specialist and have focused on the areas of non-profit and tax-exempt applications. Prior to joining Kensington, I worked as, among other positions, a derivatives specialist on Bank of America's Global Derivative Trading Desk. My client base included both indirect issuers of taxable and tax-exempt municipal debt and public finance professionals, including underwriters, financial advisors, reinvestment brokers and bond counsel. A more detailed description of my background and professional experience is annexed hereto as **Exhibit A**.

3.  On or about September 18, 2009, Kensington was retained by the Port of Tacoma ("Tacoma") to prepare an independent analysis (the "Independent Analysis") of the

NY-905289 v2

appropriate Settlement Amount due under (i) that certain ISDA Master Agreement dated as of August 4, 2005 (the "ISDA") by and between Tacoma and Lehman Brothers Derivatives Products Inc. ("LBDP") and (ii) that certain Confirmation dated as of August 4, 2005 (the "Confirmation"; collectively with the ISDA, the Schedule to the ISDA and the Credit Support Annex that has been incorporated into the ISDA, the "Agreement")[1] upon the occurrence of a Trigger Event related to the bankruptcy filing of Lehman Brothers Holdings Inc.

4. I am the person at Kensington responsible for the Tacoma matter, am familiar with the facts set forth herein, have reviewed the Agreement and am authorized to make this declaration.

5. I have read and reviewed the declaration of David Morrison (the "Morrison Declaration") submitted with Tacoma's response to the above-captioned debtors' objection to Tacoma's proof of claim number 42913 and the facts set forth therein are incorporated by reference herein.

**LBDP's Obligations to Poll the Dealer Group and Obtain Trigger Market Quotations**

6. Part 1(k)(5) of the Schedule to the ISDA required LBDP to calculate the Settlement Amount (the "Trigger Settlement Amount") upon the occurrence of a Trigger Event by polling the Dealer Group for Market Rates and Volatilities (the "Trigger Market Quotations"). See Part 1(k)(5) to the Schedule to the ISDA. LBDP was required to notify Tacoma of the Trigger Market Quotations, the Settlement Amount and the Termination Currency Equivalent of any Unpaid Amounts within two Business Days following the Early Termination Date. Id.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings attributed to them in the Agreement.

7. As stated in the Morrison Declaration, LBDP did not follow the procedures requiring LBDP to obtain Trigger Market Quotations upon the occurrence of a Trigger Event and did not give Tacoma an opportunity to delay the Early Termination Date until such Trigger Market Quotations could be obtained. The Schedule to the ISDA does not specify the appropriate calculation methodology to be used in such circumstance. See Part 1(k) of the Schedule to the ISDA.

**LBDP's Loss Calculation and the Termination Amount Paid by Tacoma**

8. Based on the early termination provided by LBDP to Tacoma dated September 25, 2008, LBDP calculated the Termination Amount based on Loss methodology.

9. Under section 12 of the ISDA, Loss is defined as follows:

"Loss" means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a Party, an amount that Party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, *including any loss of bargain, cost of funding or, at the election of such Party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them)*. Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a Party's legal fees and out of pocket expenses referred to under Section 9. A Party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A Party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

See ISDA § 12.

10. On October 1 and 2, 2008, Tacoma paid the Termination Amount of $666,062.29 to LBDP.

- 3 -

**Kensington's Loss Calculation**

11. Upon conducting its Independent Analysis, Kensington discovered that LBDP entirely omitted loss of bargain ("Loss of Bargain") and the cost of reestablishing the hedge ("Cost of Reestablishing the Hedge") from its total Loss calculation as required by section 12 of the ISDA.

12. Kensington concluded that, after accounting for Loss of Bargain and the Cost of Reestablishing the Hedge, LBDP actually owed Tacoma $125,424.61 (the "Loss Amount") which, when coupled with the Termination Amount previously paid by Tacoma to LBDP of $666,062.29, results in a total claim of $791,486.90 (the "Claim Amount") owing by LBDP to Tacoma. A summary of Tacoma's Loss calculation is annexed hereto as **Exhibit B**.

    **(a)    The Initial Market Value of the Interest Rate Swap**

13. Kensington first determined the market value (the "Initial Market Value") of the Interest Rate Swap as of September 23, 2008 (the "Specified Early Termination Date") by using an industry standard discounted cash flow method. All of Kensington's market data inputs were obtained from market-standard inter-dealer brokers.

14. Kensington's calculation of the Initial Market Value of $666,062.29 closely approximated LBDP's calculation of the Termination Amount of $679,498.92. The difference between the Initial Market Value calculated by Kensington and the Termination Amount determined by LBDP can be accounted for by fluctuating market rates in existence on the Early Termination Date.

15. To determine the Initial Market Value, Kensington first derived a LIBOR zero-coupon curve from the spot interest rates prevailing in the market on the Specified Early Termination Date. Using the zero-coupon rates from the LIBOR zero-coupon curve, Kensington discounted the remaining fixed rate payments to be paid by Tacoma under the Interest Rate Swap

to present value. Kensington then used the LIBOR forward curve to determine the future floating rate payments owing by LBDP under the Interest Rate Swap and discounted these floating payments to present value using the same zero-coupon rates. Kensington then determined the Initial Market Value by netting the discounted fixed and floating cash flow streams against each other.

16. Kensington then adjusted the Initial Market Value to take into account Tacoma's Loss of Bargain as well as the Cost of Reestablishing the Hedge, which reflect the adjustments that would have been applied by Reference Market-makers if they were polled for quotations in a Market Quotation process as of the Specified Early Termination Date.

17. To the extent that the Loss calculation results in a payment by LBDP to Tacoma, Kensington determined that no adjustment for "Cost of Funding" would be necessary.

**(b)** **Loss of Bargain**

18. Loss of Bargain is essentially an adjustment to the Initial Market Value of the Interest Rate Swap that would be made by Reference Market-makers if polled in a Market Quotation process regarding the value of the Interest Rate Swap as of the Specified Early Termination Date. The Loss of Bargain adjustment is made by Reference Market-makers to counterbalance terms in the Interest Rate Swap that favor Tacoma.

19. Due to several factors in the Interest Rate Swap that favor Tacoma, a Reference Market-maker would make a dollar adjustment to the Initial Market Value (which can also be represented as a basis point adjustment) to ensure that a replacement swap would be profitable for such swap dealer.

20. Because Kensington determined that Tacoma would be unable to enter into a replacement hedge with another counterparty in a manner that would allow Tacoma to fully retain the bargain contemplated in the Agreement with LBDP, Kensington adjusted the

Initial Market Value to account for the Loss of Bargain to Tacoma from LBDP's early termination of the Agreement.

21. In calculating Loss of Bargain, Kensington considered several factors (collectively, the "Loss of Bargain Factors") including, without limitation: (i) Tacoma's right to terminate the Interest Rate Swap with LBDP, in whole or in part, without cost, by providing two (2) business days notice on any business day from December 1, 2016 forward, so long as the Notional Amount was reduced by at least $30,000.00; (ii) the less restrictive debt ratings that Tacoma was required to maintain under the Agreement than Tacoma would likely be required to maintain under swaps with other potential Reference Market-makers; (iii) Trigger Events that allowed Tacoma to terminate the Agreement for (a) downgrades in LBDP's counterparty ratings, (b) LBDP's failure to maintain certain collateral requirements, (c) the institution of bankruptcy proceedings by either LBHI or LBSF and (d) LBDP's failure to maintain capital in a specified amount; and (iv) certain restrictive insurer provisions under the Agreement with LBDP pursuant to which the insurer's consent must be obtained to, among other things (i) amend, modify or supplement the Agreement and (ii) assign or transfer any insured transaction.

22. One of the specific considerations that Kensington considered in determining the Loss of Bargain related to the fact that XL Capital Assurance Inc. (currently d/b/a Syncora Guarantee Inc.) ("XL Capital"), the insurer under the Agreement, upon information and belief, is undergoing a restructuring and is under order of the New York Insurance Department suspending XL Capital from paying any and all claims as of April 26, 2009. Obtaining consent to amend, modify or supplement the Agreement from XL Capital under such conditions, therefore, may be a difficult and time-consuming process. Such potential

- 6 -

restrictions would be taken into account by a Reference Market-maker in adjusting the Initial Market Value of the Interest Rate Swap.

23. Kensington also took into account the fact that LBDP was a Triple-A rated counterparty at the time Tacoma entered into the Interest Rate Swap and that Tacoma's prospects of collecting market quotes from solely Triple-A rated counterparties in the market after Lehman's bankruptcy were significantly limited.

24. Although Tacoma entered into an interest rate swap (the "Goldman Swap") with Goldman Sachs Capital Markets, L.P. ("GSCM") on September 23, 2008 (the "Goldman Trade Date") in an effort to replace the hedge on Tacoma's bonds previously provided by the Interest Rate Swap with LBDP, the Goldman Swap contains less valuable features than the Interest Rate Swap with LBDP. Additionally, to the best of Kensington's knowledge, information and belief, GSCM is an unrated entity. The Goldman Sachs Group, Inc. ("GSGI"), however, provides credit support to GSCM under the Agreement by means of a guaranty by GSGI in favor of Tacoma for GSCM's obligations under the Agreement. As of the trade date of the Goldman Swap, GSGI's credit rating was AA- with both Standard & Poor's and Fitch. As of the date of this declaration, GSGI's credit rating is A1 with Moody's, A with Standard & Poor's and A+ with Fitch.

25. Due to the preceding and for other reasons, the Goldman Swap is not determinative of Tacoma's damages under the Agreement resulting from LBDP's early termination of the Interest Rate Swap.

26. Accordingly, Kensington determined that an adjustment of $240,972.66, representing an adjustment of approximately 9.50 basis points, should be netted against the

Initial Market Value to reflect the Loss of Bargain incurred by Tacoma from LBDP's early termination of the Agreement.

27. Kensington believes that the $240,972.66 adjustment for Loss of Bargain is similar to a comparable adjustment that would be made by a Reference Market-maker if such market maker were asked to provide a Market Quotation with respect to the Interest Rate Swap as of the Specified Early Termination Date.

### (c) Cost of Reestablishing the Hedge

28. Kensington also determined that an adjustment must be made to the Initial Market Value to account for the total additional revenue that a Reference Market-maker would require from Tacoma to counterbalance the credit risk borne by the Reference Market-maker for the remainder of the swap term.

29. Kensington took Tacoma's future payment performance into consideration in calculating the Cost of Reestablishing the Hedge as well as other relevant costs that may be considered by a swap dealer including, but not limited to, legal, accounting, operational and trading costs.

30. Kensington also took into account the fact that LBDP, like other swap dealers, included a markup into the fixed interest rate of the Interest Rate Swap in order to ensure that the Interest Rate Swap would be profitable to LBDP and to counterbalance any expected credit risk to LBDP from carrying the Interest Rate Swap through the Scheduled Termination Date (the "Carrying Risk") from any potential default by Tacoma.

31. As a result of LBDP's bankruptcy-related early termination, however, LBDP improperly benefitted from the value of this markup for the entire term of the Interest Rate Swap by failing to adjust for the Cost of Reestablishing the Hedge, but was released from any Carrying Risk from the Specified Early Termination Date through the Scheduled Early

- 8 -

- 9 -

Termination Date (the "Lehman Term Remainder") and no longer has to perform on the Interest Rate Swap for the Lehman Term Remainder.

32. The Cost of Reestablishing the Hedge, therefore, must also account for the markup built into the Interest Rate Swap by LBDP for the Lehman Term Remainder at the outset of the Interest Rate Swap, in exchange for which Tacoma will receive no performance for the Lehman Term Remainder.

33. Therefore, Kensington determined that an adjustment of $563,950.87, representing an adjustment of approximately 22.50 basis points, should be netted against the Initial Market Value to reflect the Cost of Reestablishing the Hedge.

34. Kensington believes that the $563,950.87 adjustment for the Cost of Reestablishing the Hedge is similar to a comparable adjustment that would be made by a Reference Market-maker if such Reference Market-maker were asked to provide a Market Quotation with respect to the Interest Rate Swap as of the Specified Early Termination Date.

35. The Cost of Reestablishing the Hedge does not include amounts that are duplicative of the amounts included in the Loss of Bargain calculation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 18, 2011

           /s/ *Jeffrey Klein*
           Jeffrey Klein

# **EXHIBIT A**



**JEFF KLEIN**

PRINCIPAL, KENSINGTON CAPITAL ADVISORS
6420 REA ROAD, SUITE 344
CHARLOTTE, NORTH CAROLINA 28277
OFFICE 704.644.3681
CELL 704.770.6171
JKLEIN@KENSINGTON-ADVISORS.COM

Jeff Klein joined Kensington Capital Advisors as a Principal in 2006. As a former provider of non-profit and tax-exempt derivatives, Mr. Klein brings an expert level of knowledge and sophistication to Kensington's tax-exempt consulting services.

Prior to his work at Kensington Capital Advisors, Mr. Klein was a derivative specialist on Bank of America's Global Derivative Trading Desk, with a focus on non-profit and tax-exempt applications. His client base included both indirect issuers of taxable and tax-exempt municipal debt and public finance professionals, including underwriters, financial advisors, reinvestment brokers and bond counsels. The group was responsible for all tax-exempt liability hedging such as swaps for VRDN's and forward issued municipal bonds. In addition, the group was responsible for all derivative investment products for municipal bond proceeds, including but not limited to forward supply agreements, GIC's and flexible repurchase agreements for construction funds, reserve funds, debt service funds and escrows.

Mr. Klein began his career at PNC Financial Corporation, working for two years in the Investment Management and Trust Division. Mr. Klein then joined Bank of America as an analyst in the Corporate Finance Department in 1993 and in 1995 joined the Interest Rate Risk Management Group.

Mr. Klein holds B.A. degrees in both Business Economics and Organization Behavior Management from Brown University. He also received a Certificate in International Finance from the Danish International School of Business in Copenhagen. He has received both his series 7 & 63 securities licenses as well as the Chartered Financial Analyst TM (CFA®) designation.

# **EXHIBIT B**

# "LOSS" CALCULATION SUMMARY

### CONFIRMATION – INTEREST RATE SWAP AGREEMENT
### DATED AS OF AUGUST 04, 2005 AMONG
### PORT OF TACOMA, WASHINGTON, AND
### LEHMAN BROTHERS DERIVATIVE PRODUCTS INC. ("LBDP")

**(i) Calculation of payment due to LBDP:**

| | |
|---|---:|
| Notional as of date of demand: | $30,000,000.00 |
| Agreement Termination Date | 9/23/2008 |
| Fixed interest rate on Agreement (A): | 3.795% |
| Market interest rate as of the date of demand (B): | 3.540% |
| Present Value of a Basis Point on remaining term (C): | $24,972.66 |

Formula used to determine unadjusted payment: (A-B)*C*10,000

*Calculation: (3.540% -3.795%)  * $24,972.66*10,000$^2$*     -$679,498.92[1]

**(ii) Payment adjustments:**

| | |
|---|---:|
| Loss of funding | $0[3] |
| Loss of bargain | $240,972.66 |
| Cost of reestablishing hedge | $563,950.87 |
| Total | $804,923.53 |

**LOSS AMOUNT (i) – (ii)** [4]             $125,424.61[4]

**Payment due from LBDP (Loss Amount)**          $125,424.61
**Plus: Amount Paid to Lehman on October 1 and 2, 2008**   $666,062.29
   **TOTAL DUE FROM LBDP**                    **$791,486.90** [5]

---

[1] *This figure represents the Initial Market Value inclusive of accrual and adjusted for rounding. The Initial Market Value of the Interest Rate Swap on the Specified Early Termination Date calculated by Kensington of $679,498.92 closely approximated the Termination Amount determined by LBDP of $666,062.29.  The difference between the Initial Market Value calculated by Kensington and the Termination Amount determined by LBDP can be accounted for by fluctuating market rates in existence on the Specified Early Termination Date of September 23, 2008.*

[2] *Before adjusting for the applicable calculation period accrual.*

[3] *To the extent that the Loss Amount results in Tacoma receiving a payment, the Cost of Funding does not apply.*

[4] *Positive value implies termination payment from LBDP to Tacoma.*

[5] *Loss Amount requested inaccurately by LBDP and paid by Tacoma:*

   *10/1/08 - $660,062.29*
   *10/2/08 - $   6,000.00*