# EXHIBIT B

SHEARSON LEHMAN BROTHERS INC.

VOLUNTARY DEFERRED
COMPENSATION PLAN
(FOR SHEARSON VESTED AMOUNTS
AS OF JULY 30, 1993 AND LEHMAN BROTHERS)

AS AMENDED EFFECTIVE JANUARY 1, 1991
AND SUBSEQUENTLY AMENDED THROUGH JULY 30, 1993

83690080

# TABLE OF CONTENTS

Page

ARTICLE I
Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

ARTICLE II
Participation . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

ARTICLE III
Deferred Compensation Account Credits . . . . . . . . .    6

ARTICLE IV
Deferred Compensation Accounts  . . . . . . . . . . . . .    6

ARTICLE V
Vesting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

ARTICLE VI
Payment of Deferred Compensation; Withdrawals . . . . .    7

ARTICLE VII
Funding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

ARTICLE VIII
Subordination Provisions  . . . . . . . . . . . . . . . . . .    10

ARTICLE IX
Administration  . . . . . . . . . . . . . . . . . . . . . . . . .    17

ARTICLE X
Amendment and Termination . . . . . . . . . . . . . . . . . .    18

ARTICLE XI
General Provisions  . . . . . . . . . . . . . . . . . . . . . .    18

SHEARSON LEHMAN BROTHERS INC.
VOLUNTARY DEFERRED
COMPENSATION PLAN

AS AMENDED EFFECTIVE JANUARY 1, 1991 AND SUBSEQUENTLY
AMENDED THROUGH JULY 30, 1993

## ARTICLE I
## Definitions

1.1  As used in this Plan, the following terms shall have the meanings hereinafter set forth:

"Act" means the Securities Exchange Act of 1934, as in effect from time to time.

"Beneficiary" means any person(s) or legal entity(ies) designated by the Participant or otherwise in accordance with Section 11.8.

"Bonus" means the bonus paid by the Employer to an Officer, Branch Manager or Key Employee during any Plan Year.

"Branch Manager" means a person employed by the Employer as the Manager of a domestic branch office.

"Cause" means willful misconduct, dishonesty, conviction of a felony, persistent incompetence or habitual or gross negligence in the performance of a Participant's duties to the Company other than as a result of total or partial incapacity due to disability, persistent failure to abide by the policies and regulations of the Company or American Express Company, or such other similar conduct as determined by the Committee in its sole discretion; provided, however, that for purposes of this definition, after the Closing Date and only with respect to Smith Barney Participants, the term "Company" shall mean Smith Barney.

"CBT" means the Chicago Board of Trade.

"CEA" means the Commodity Exchange Act, as in effect from time to time.

"CFTC" means the Commodity Futures Trading Commission.

"Closing Date" means the closing date of the Smith Barney Transaction.

"Commissions" means the gross commissions credited by the Employer for sales made by a Financial Consultant for any Plan Year.

"Committee" means the Employee Benefit Plans Committee of the Company which administers the Plan in accordance with ARTICLE IX.

"Company" means Shearson Lehman Brothers Inc., a Delaware corporation, and its successors and assigns and, where and only where the text specifically so indicates, Smith Barney.

"Deferred Compensation Account" means the account established and maintained under the Plan for a Participant for each Participation Year.

"Disability" means (a) prior to the Restatement Date, disability as defined under the Shearson Lehman Brothers Inc. Long-Term Disability Plan, and (b) on or subsequent to the Restatement Date, termination of a Participant's employment with the Company by reason of total and permanent disability, determined in accordance with the Shearson Lehman Brothers Inc. Long-Term Disability Plan, as in effect from time to time. For purposes of clause (b) above, after the Closing Date and only with respect to Smith Barney Participants, the term "Company" shall mean Smith Barney.

"Effective Date" means January 1, 1979.

"Eligible Employee" means an Officer, Branch Manager, Financial Consultant or Key Employee.

"Employer" means the Company and any subsidiary or affiliate thereof which shall be designated by the Committee as a participating employer under the Plan and, where and only where the text specifically so indicates, Smith Barney.

"Exchange" means the New York Stock Exchange, Inc.

"Financial Consultant" means a person employed by the Employer as a Financial Consultant.

"Financial Hardship" means severe financial hardship to the Participant resulting from a sudden and unexpected illness or accident of the Participant or a dependent, loss of the Participant's property due to casualty, or other similar extraordinary and unforeseeable circumstances arising as a result of events beyond the control of the Participant. The circumstances that will constitute a Financial Hardship will depend upon the facts of each case and will be determined by the Committee in its sole discretion, but distributions may not be made to the extent that such hardship is or may be relieved (i) through reimbursement

or compensation by insurance or otherwise or (ii) by liquidation of the Participant's assets, to the extent the liquidation of such assets would not itself cause severe financial hardship.

"Installments" means substantially equal installments payable annually as of the last day of the applicable calendar quarter and as of the anniversary thereof in each succeeding year over a period certain not to exceed 15 years, as elected by a Participant in accordance with Section 6.1.

"Interest" on a Deferred Compensation Account shall have the meaning set forth in Section 4.3.

"Key Employee" means a highly-compensated key employee of the Employer other than an Officer, Branch Manager or Financial Consultant designated by the Committee as eligible to participate in the Plan.

"NASD" means the National Association of Securities Dealers, Inc.

"Non-Vested Plan" means the Shearson Lehman Brothers, Inc. Voluntary Deferred Compensation Plan (for Shearson Non-Vested Amounts as of July 30, 1993) (as such plan may be renamed following its assumption by Smith Barney as of the Closing Date), or such similar plan as may be adopted by Smith Barney as of the Closing Date, pursuant to which Interest on amounts held in Deferred Compensation Accounts of Smith Barney Participants prior to the Closing Date will accumulate as provided in the Non-Vested Plan.

"Officer" means an officer of the Employer as defined in the Employer's By-Laws.

"Participant" for any Plan Year means an Eligible Employee who elects to participate in the Plan in accordance with ARTICLE II.

"Participation Year" means each Plan Year for which a Participant elects to participate in the Plan.

"Plan" means the Shearson Lehman Brothers Inc. Voluntary Deferred Compensation Plan, as embodied herein and as amended from time to time.

"Plan Year" means the calendar year beginning on the Effective Date and each succeeding calendar year the Plan remains in effect.

"Primerica Retirement Plan" means the defined benefit pension plan sponsored by Smith Barney or an affiliate thereof which covers a Smith Barney Participant at the time of his retirement thereunder.

"Restatement Date" means January 1, 1991.

"Retirement" means (a) prior to the Restatement Date, a Participant's retirement from employment with the Company under (i) the provisions of the Company's Retirement Plan, or (ii) some other arrangement, but only if approved in advance by the Committee, and (b) on or after the Restatement Date, termination of a Participant's employment with the Company as a result of his retirement, determined pursuant to the provisions of the Shearson Lehman Brothers Holdings Inc. Retirement Plan, as in effect from time to time, and (c) after the Closing Date, and only with respect to Smith Barney Participants, termination of a Participant's employment with Smith Barney as a result of his retirement, determined pursuant to the provisions of the Primerica Retirement Plan, as in effect from time to time.

"Rule" means Rule 15c3-1 under the Act.

"Salary" means the basic salary paid to an Officer, Branch Manager or Key Employee for any Plan Year by the Employer.

"SEC" means the Securities and Exchange Commission.

"Separation from Service" means termination of a Participant's employment with his Employer or the Company by reason of Retirement, Disability, death or otherwise. For purposes of the preceding sentence, on or after the Closing Date, and only with respect to Smith Barney Participants, the terms "Company" and "Employer" shall mean Smith Barney.

"SIPA" means the Securities Investor Protection Act of 1970, as in effect from time to time.

"Smith Barney" means Smith, Barney, Harris Upham & Co., Incorporated and Primerica Corporation and their successors and assigns.

"Smith Barney Participants" means those persons who were Participants for any Plan Year prior to or including the Closing Date, and who became employed by Smith Barney as of the Closing Date or later in connection with the Smith Barney Transaction.

"Smith Barney Transaction" means the sale of certain Company assets to Smith Barney pursuant to an Asset Purchase Agreement dated as of March 12, 1993 among the Company, Shearson Lehman Brothers Holdings Inc., Smith Barney, Primerica Corporation and American Express Company.

1.2 Wherever any words are used herein in the masculine gender, they shall be construed as though they were also used in the feminine gender in all cases where they would so apply, and wherever any words are used herein in the singular form, they shall be construed as though they were also used in the plural form in all cases where they would so apply.

## ARTICLE II
### Participation

2.1 (a) Prior to the December 4 preceding a Plan Year, or such other date(s) as determined by the Committee, each Eligible Employee may elect to participate in the Plan for the Plan Year by written notice to the Committee, which notice must specify, subject to the provisions of Sections 2.2 and 6.1, the percentage of Salary, Commissions and Bonus to be deferred and the time and form of payment; provided, however, that the Committee may establish procedures and forms which are applicable to all Eligible Employees under which Eligible Employees may elect to participate in the Plan on a prospective basis as of some other date(s) specified in such procedures.

(b) Notwithstanding paragraph (a) of this Section, an Eligible Employee who is first employed by the Employer during any Plan Year may elect to participate in the Plan for such Plan Year by written notice to the Committee otherwise consistent with Section 2.1(a) not later than 15 days after his date of employment.

(c) Notwithstanding the other provisions of this Section 2.1, upon application of any Participant and approval thereof by the Committee, the Participant may at any time during a Participation Year revoke, by reason of Financial Hardship, his election to participate in the Plan for such Participation Year. Upon such revocation, any amount credited to his Deferred Compensation Account for such year shall be paid to him without interest as soon as practicable thereafter.

2.2 (a) The elections pursuant to Section 2.1 may defer any whole number percentage of the Eligible Employee's Salary, Commissions and Bonus; provided, however, that the maximum amount which may be deferred for any Plan Year is 50% of an Eligible Employee's Salary, Commissions and Bonus for such Plan Year, unless the Committee determines and establishes some other percentage and/or specific dollar amount applicable to all elections under the Plan.

(b) In the event an Eligible Employee's Separation from Service occurs prior to the end of any Participation Year, his election to participate in the Plan for such Participation Year shall be deemed revoked and any amount credited to the Deferred Compensation Account for such Plan Year shall be paid to him (or his Beneficiary) without Interest as soon as practicable thereafter.

2.3 Notwithstanding anything herein to the contrary, a Participant ceases to be a Participant on the date of his Separation from Service; provided, however, that if a Participant continues to be employed by an affiliate or subsidiary of the Company, he shall not incur a Separation from Service until such

83690080                              -5-

time as he incurs a Separation from Service with such affiliate or
subsidiary.

## ARTICLE III
### Deferred Compensation Account Credits

3.1  The Committee shall cause to be credited to each
Participant's Deferred Compensation Account for a Participation
Year the amounts which he elected to defer in accordance with
Section 2.1 as of the effective date of deferral, in accordance
with such rules and procedures as shall be established by the
Committee.

3.2  Notwithstanding any provisions herein to the contrary,
the Committee in its sole discretion may suspend any and all
contributions under the Plan for such period of time as it
determines.

3.3  Notwithstanding anything herein to the contrary, no
additional amounts (including interest) shall be credited to any
Smith Barney Participant's Deferred Compensation Account on or
after the Closing Date.

## ARTICLE IV
### Deferred Compensation Accounts

4.1 The Committee shall establish and maintain a Deferred
Compensation Account for each Participant for each Participation
Year commencing on and after the Effective Date. Notwithstanding
any of the provisions of this ARTICLE IV, the subordination
provisions contained herein in ARTICLE VIII shall become effective
as to any Deferred Compensation Account for a Participation Year on
the December 31 following commencement of that Participation Year.

4.2  On and after the Closing Date, all amounts credited to
each Deferred Compensation Account of a Smith Barney Participant as
of the Closing Date shall continue to be credited to such account
until such time as they are distributed to the Participant.

4.3  Subject to Section 3.3 above, Interest shall be credited
on amounts credited to each Deferred Compensation Account as of the
last day of each calendar quarter from the effective date of
deferral to the last day of the calendar quarter immediately
preceding the date on which such amounts are distributed to the
Participant at an annual rate equal to the average 30-day
U.S. Treasury Bill rate during such quarter and such interest shall
be compounded annually commencing with the first day of each Plan
Year; provided, however, that (a) if Section 6.2 is applicable, no
interest shall be credited to the Participant's Deferred
Compensation Account after the last day of the calendar quarter in
which his Separation from Service occurred until such time as

payment is made, and (b) if Section 2.2(b) is applicable, no Interest shall be credited to the Participant's Deferred Compensation Account for the applicable Participation Year.

## ARTICLE V
### Vesting

5.1 Except as otherwise provided in Section 5.2, a Participant shall at all times be fully vested in his Deferred Compensation Account for any Participation Year.

5.2 Effective as of the Restatement Date, and notwithstanding anything herein to the contrary, a Participant shall forfeit his Deferred Compensation Account, including all earnings credited to such Deferred Compensation Account, if the Participant is terminated for Cause; provided, however, that in such event the Committee may decide, in its sole discretion, whether the Participant shall continue to be vested in any portion of the Deferred Compensation Account.

## ARTICLE VI
### Payment of Deferred Compensation; Withdrawals

6.1 At the time an Eligible Employee elects to become a Participant for any Participation Year, he shall also elect in writing to the Committee, on a form provided by the Committee, to have his Deferred Compensation Account for such year paid (a) in a lump sum as soon as practicable following the second anniversary of the last day of the applicable Participation Year or (b) as soon as practicable following the last day of the calendar quarter coincident with or next following the date which is six months following his Separation of Service as a result of his Retirement, Disability or death, in a single lump sum or, in the event of a Separation of Service on account of Retirement, Installments (as indicated on such election).

6.2 Notwithstanding the provisions of Section 6.1, if a Participant's Separation from Service occurs other than by reason of Retirement, Disability or death, payment of the amounts credited to his Deferred Compensation Accounts for all Participation Years preceding the current Participation Year shall be made in a lump sum as soon as practicable after the last day of the calendar quarter in which the first anniversary of his Separation from Service occurs and no Installment payments, if applicable, shall be made during the one-year period prior to such date.

6.3 If a Participant fails to make a timely election in accordance with procedures established by the Committee and on the form provided by the Committee, a Participant shall have the amount credited to his Deferred Compensation Account for each

Participation Year paid to him in accordance with clause (b) of
Section 6.1.

6.4 Effective as of the Restatement Date, notwithstanding
anything herein to the contrary, distributions of a Participant's
Deferred Compensation Accounts shall commence _as soon as
practicable following the commencement of distributions to the
Participant_ under the Shearson Lehman Brothers Holdings Inc.
Retirement Plan, even if the Participant has made a previous
election to defer payment and even if the Participant has not
otherwise incurred a Retirement, Disability, death, or other
Separation from Service, with the form of payments being made in
the manner elected by the Participant in accordance with the
provisions of Section 6.1; _provided_, _however_, that no such
distribution of an amount held in the Participant's Deferred
Compensation Account shall occur until the date which is one year
following the last day of the Plan Year in which such amount was
credited to such Deferred Compensation Account; _further_ _provided_,
_however_, that after the Closing Date, distributions of a Smith
Barney Participant's Deferred Compensation Account shall commence
in accordance with this Section 6.4 if distributions to the Smith
Barney Participant under the Primerica Retirement Plan commence,
even if the Smith Barney Participant has made a previous election
to defer payment and even if the Smith Barney Participant has not
otherwise incurred a Retirement, Disability, death, or other
Separation from Service, with the form of payments being made in
the manner elected by the Smith Barney Participant in accordance
with the provisions of Section 6.1.

6.5 Effective as of the Restatement Date, notwithstanding
anything herein to the contrary, any amounts payable hereunder may
be retained by the Company in the event the Participant owes the
Company any funds at the time such Participant is otherwise
entitled to receive amounts credited to his Deferred Compensation
Account.

6.6 Plan payments shall not be included in the calculation of
Financial Consultant production levels or be utilized for any
similar purpose, and all such payments shall be considered cash
compensation to the Participant when paid, subject to all
applicable federal, state and local income taxes and withholding.

6.7 Amounts paid under the Plan shall not be eligible for
further deferral under the Plan.

6.8 If a Participant dies, his Beneficiary shall be entitled
to receive, as soon as administratively practicable after the date
of his death, the payment of his Deferred Compensation Account,
with such payment being made in the form elected by the Participant
in accordance with the provisions of Section 6.1, less any
applicable federal, state and local income taxes and withholding,
if any.

83690080                        -8-

6.9  No Interest or other earnings shall be paid on any amount payable under the Plan for the period commencing on the last day of the calendar quarter in which payment is required to be made and ending on the date payment is actually made.

6.10  No payments shall be required or made if, in the opinion of the Committee, such payment would not comply with the rules and regulations of the NASD, the SEC, the CBT, any state securities regulatory authority, or any other applicable law, rule or regulation, or the Participant is subject to the provisions of Section 11.4.

6.11  Notwithstanding anything herein to the contrary, a Participant may request and receive a hardship distribution, provided the Participant is able to demonstrate, to the satisfaction of the Committee, that he has suffered a Financial Hardship. A hardship distribution request must be made on the form provided by the Committee and is subject to the rules established by the Committee governing hardship distributions. The amount distributed cannot exceed the lesser of (a) the Participant's Deferred Compensation Account, or (b) the amount necessary to satisfy the Participant's Financial Hardship. No distribution may be made prior to the time the Committee approves the distribution, and payment is subject to the provisions of Section 8.3.

6.12  Any Participant who transfers to the employ of a subsidiary or affiliate of the Company and who later incurs a Separation from Service with such subsidiary or affiliate shall receive a distribution of his Deferred Compensation Account, in accordance with the provisions of this ARTICLE VI, upon a termination of employment with such subsidiary or affiliate.

6.13  Any payment made to a Participant or his Beneficiary or estate pursuant to the terms of the Plan shall constitute a complete discharge of the obligations of the Company and the Committee with respect thereto.

ARTICLE VII
Funding

7.1  All amounts credited under the Plan shall come solely from the general assets of the Company.

7.2  All amounts credited to Participants' Deferred Compensation Accounts shall, at all times, (a) be subordinated debt of the Company, (b) be dealt with in all respects as capital of the Company, (c) be subject to the risk of the Company's business, and (d) may be deposited in an account or accounts in the Company's name in any bank or trust company.

ARTICLE VIII
Subordination Provisions

8.1    The Company's obligation to pay amounts credited to a
Participant's Deferred Compensation Account on the date such
payment is otherwise due and payable in accordance with the terms
of the Plan (the "Fixed Payment Date") shall be suspended and shall
not mature for any period of time during which after giving effect
to such payment (together with (a) the payment of any other
obligation of the Company payable at or prior to such payment and
(b) the return of any Secured Demand Note as defined in the Rule as
in effect at the time such payment is to be made and the collateral
therefor held by the Company and returnable at or prior to such
payment):

(i)    If the Company is not operating pursuant to the
alternative net capital requirements provided for in
paragraph (f) of the Rule, the aggregate indebtedness of
the Company would exceed 1200 per centum of its net
capital (or its "adjusted net capital" as defined in the
regulations under the CEA) as those terms are defined in
the Rule as in effect at the time payment is to be made
or such lesser per centum as may be made applicable to
the Company from time to time by the Exchange (or other
domestic exchange, board of trade, clearing association
or similar organization of which the Company is a member)
or a domestic governmental agency or body having
appropriate authority; or

(ii)    if the Company is operating pursuant to the alternative
net capital requirements provided for in paragraph (f) of
the Rule, the net capital of the Company (or its
"adjusted net capital" as defined in the regulations
under the CEA) would be less than the greater of (x) 5
per centum of aggregate debit items computed in
accordance with Exhibit A to Rule 15c3-3 under the Act or
any successor rule as in effect at the time payment is to
be made, (y) if the Company is registered as a futures
commission merchant with the CFTC, 6 per centum of the
funds required to be segregated pursuant to the CEA and
the regulations promulgated thereunder and the foreign
futures or foreign options secured amounts, less the
market value of commodity options purchased by option
customers on or subject to the rules of a contract market
or foreign board of trade; provided, however, the
deduction for each option customer shall be limited to
the amount of customer funds in such option customer's
account(s) and the foreign futures and foreign options
secured amounts (if greater), or (z) such greater per
centum as may be made applicable to the Company from time
to time by the Exchange (or any other domestic exchange,
board of trade, clearing association or similar
organization of which the Company is a member) or a

domestic governmental agency or body having appropriate authority; or

(iii) if the Company's net capital (or its "adjusted net capital" as defined in the regulations under the CEA), as defined in the Rule or any successor rule as in effect at the time payment is to be made, would be less than 120 per centum of any minimum dollar amount required by the Rule (or the regulations under the CEA as in effect at such time), or such greater dollar amount as may be made applicable to the Company by the Exchange (or any other domestic exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority; or

(iv) if the Company guarantees, endorses, carries or clears specialist or market maker transactions in options listed on a national securities exchange or facility of a national securities association, the amounts required to be deducted and maintained as required by the provisions of paragraphs (a)(6)(v), (a)(7)(iv) or (c)(2)(x)(b)(1) of the Rule would exceed 1000 per centum of its net capital (or its "adjusted net capital" as defined in the regulations under the CEA), as defined in the Rule as in effect at the time such payment is made or such lesser per centum as may be made applicable to the Company by the Exchange (or any other domestic exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority.

During any such suspension the Company shall, as promptly as is consistent with the protection of its customers, reduce its business to a condition whereby the amounts the payment of which has been suspended could be paid (together with (c) the payment of any other obligation of the Company payable at or prior to the payment of such amounts and (d) the return of any Secured Demand Note and the collateral therefor held by the Company or returnable at or prior to the payment of such amounts) without the Company's net capital being below the applicable minimums set forth above in this Section 8.1 or its "adjusted net capital" being below the amount required as aforesaid, at which time the Company shall pay the amounts credited to a Participant's Deferred Compensation Account the payment of which has been suspended (including Interest thereon calculated pursuant to the terms of the Plan, if any) on not less than five (5) days' prior written notice to the Exchange and the CBT. The first day on which under this ARTICLE VIII the Company has an obligation to pay amounts is hereinafter referred to as the "payment date." If, pursuant to the terms hereof, the Company's obligation to pay amounts credited to a Participant's Deferred Compensation Account is suspended, the Company recognizes and agrees that the Company may be summarily suspended by the

Exchange.    The Company agrees that, if its obligation to pay amounts credited to a Participant's Deferred Compensation Account is ever suspended for a period of six (6) months, it will promptly take whatever steps are necessary to effect a rapid and orderly complete liquidation of its business.

8.2    If payment is made of all or any part of the amounts credited to a Participant's Deferred Compensation Account on the payment date and if immediately after any such payment the Company's net capital is less than the applicable minimums set forth above in Section 8.1, the Participant by electing to participate agrees irrevocably, for himself, his beneficiaries, heirs and assigns (whether or not the Participant had any knowledge or notice of such fact at the time of any such payment) to repay to the Company, its successors or assigns, the sum so paid, to be held by the Company pursuant to the provisions hereof as if such payment had never had been made; _provided_, _however_, that any suit for the recovery of any such payment must be commenced within two (2) years of the date of such payment.

8.3    No payment of all or any portion of amounts credited to a Participant's Deferred Compensation Account shall be made prior to the Fixed Payment Date (whether as a consequence of Financial Hardship or otherwise, any such payment being herein called a "Prepayment") unless at least one year has passed from the effective date of the deferral and the Company shall have received the prior written permission of the Exchange after consultation with the SEC if the Exchange deems such consultation appropriate and the prior written permission of the CBT.    Furthermore, no Prepayment shall be made if after giving effect thereto (and to all other payments of principal of outstanding subordination agreements of the Company, including the return of any Secured Demand Note and the collateral therefor held by the Company, the maturity or accelerated maturity of which are scheduled to occur within six (6) months after the date such Prepayment is to occur, or on or prior to the date on which the Participant has elected to receive payment of the amounts credited to his Deferred Compensation Account disregarding such proposed payment, whichever date is earlier) without reference to any projected profit or loss of the Company:

(i)    if the Company is not operating pursuant to the alternative net capital requirements provided for in paragraph (f) of the Rule, the aggregate indebtedness of the Company would exceed 1000 per centum of its net capital (or its "adjusted net capital" as defined in the regulations under the CEA), as those terms are defined in the Rule as in effect at the time Prepayment is to be made; or such lesser per centum as may be made applicable to the Company from time to time by the Exchange (or any other domestic exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority; or

(ii) if the Company is operating pursuant to such alternative net capital requirement, its net capital (or its "adjusted net capital" as defined in the regulations under the CEA) would be less than the greater of: (x) 5 per centum of aggregate debit items as those terms are defined in Exhibit A to Rule 15c3-3 of the Act or any successor rule as in effect at such time; (y) if the Company is registered as a futures commission merchant with the CFTC, 6 per centum of the funds required to be segregated pursuant to the CEA and the regulations promulgated thereunder and the foreign futures or foreign options secured amounts, less the market value of commodity options purchased by option customers on or subject to the rules of a contract market or foreign board of trade; _provided_, _however_, the deduction for each option customer shall be limited to the amount of customer funds in such option customer's account(s) and foreign futures and foreign options secured amounts (if greater); or (z) such greater per centum as may be made applicable to the Company from time to time by the Exchange (or any other domestic exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority; or

(iii) if the Company's net capital (or its "adjusted net capital" as defined in the regulations under the CEA), as defined in the Rule or any successor rule as in effect at the time payment is to be made, would be less than 120 per centum of any minimum dollar amount required by the Rule (or the regulations under the CEA as in effect at such time), or such greater dollar amount as may be made applicable to the Company by the Exchange (or any other domestic exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority; or

(iv) if the Company guarantees, endorses, carries or clears specialist or market transactions in options listed on a national securities exchange or facility of a national securities association, the amounts required to be deducted and maintained as required by the provisions of paragraphs (a)(6)(v), (a)(7)(iv) or (c)(2)(x)(b)(1) of the Rule would exceed 1000 per centum of its net capital (or its "adjusted net capital" as defined in the regulations under the CEA), as defined in the Rule as in effect at the time such payment is made or such lesser per centum as may be made applicable to the Company by the Exchange (or any other exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority.

If Prepayment is made of all or any part of the amounts credited to a Participant's Deferred Compensation Account on or prior to the Fixed Payment Date, and if the Company's net capital is less than the amount required to permit such payment pursuant to the previously cited provisions of this Section 8.3, the Participant agrees irrevocably by electing to participate in the Plan (whether or not such Participant had any knowledge or notice of such fact at the time of any such Prepayment) to repay the Company, its successors or assigns, the sum so paid to be held by the Company pursuant to the provisions hereof as if such Prepayment had never been made; provided, however, that any suit for the recovery of any such Prepayment must be commenced within two (2) years of the date of such Prepayment.

8.4    A Participant, by making an election to participate in this Plan, irrevocably agrees that the obligations of the Company under the Plan with respect to the payment of amounts credited to a Participant's Deferred Compensation Account are and shall be subordinate in right of payment and subject to the prior payment or provision for payment in full of all claims of all other present and future creditors of the Company whose claims are not similarly subordinated (claims under the Plan shall rank pari passu with claims similarly subordinated) and to claims which are now or hereafter expressly stated in the instruments creating such claims to be senior in right of payment to claims arising under the Plan, arising out of any matter or event occurring prior to the payment date of the amounts credited to that Participant's Deferred Compensation Account under the Plan.    In the event of the appointment of a receiver or trustee of the Company or in the event of its insolvency, liquidation pursuant to SIPA or otherwise, its bankruptcy, assignment for the benefit of creditors, reorganization whether or not pursuant to bankruptcy laws, or any other marshalling of the assets and liabilities of the Company, a Participant shall not be entitled to participate or share, ratably or otherwise, in the distribution of the assets of the Company until all claims of all other present and future creditors of the Company, whose claims are senior to claims arising under the Plan, have been fully satisfied, or provision has been made therefor.

8.5    Notwithstanding anything herein to the contrary:

(a)    a Participant shall not be entitled to receive any payment in respect of amounts credited to his Deferred Compensation Account or to participate in the distribution of assets of the Company in respect thereof if such payment or distribution would constitute a violation of the express terms of any Senior Subordinated Debt, as hereinafter defined (or any agreement under or pursuant to which the same may be outstanding);

(b)    the right of a Participant to receive any payment in respect of amounts credited to his Deferred Compensation Account shall be subordinated to claims of the holders of

Senior Subordinated Debt so that, in the case of any distribution of assets of the Company in complete or partial liquidation, reorganization, arrangement or other marshalling of assets and liabilities of the Company, no such distribution or payment will be made with respect to amounts credited to a Participant's Deferred Compensation Account unless and until the principal of and interest on the Senior Subordinated Debt are paid in full; and

(c)    a Participant shall promptly return to the Company any amounts (whether cash, securities or otherwise) received from the Company if the payment by the Company of such amounts constituted a violation of the express terms of any Senior Subordinated Debt (or any agreement under or pursuant to which the same may be outstanding).

8.6    The term "Senior Subordinated Debt" as used herein shall mean and include all indebtedness of the Company (other than the Company's obligations under the Company's 13 1/8% Subordinated Note due March 15, 1994, the Company's 10 3/4% and 15 1/4% Subordinated Notes due from June 30, 1994 through December 31, 2025, the Company's obligations under the Plan, the Company's Asset Compensation Plan for Financial Consultants, the Company's Deferred Compensation Plan for Branch Managers, the Company's Deferred Compensation Plan for Financial Consultants, the Company's Recognition Award Plans (including the Lehman Brothers Equity Unit and Bonus Plan), the Company's E.F. Hutton Partnership Award Plan and those similar agreements with other Participants each of which rank <u>pari passu</u> with the obligations of the Company under the Plan) constituting part of its Net Capital (as defined in the Rule as in effect from time to time), and shall include without limitation thereto the indebtedness represented by the Company's obligations under the Company's 7 7/8% Senior Subordinated Notes Due August 15, 1993; the Company's 12 1/2% Senior Subordinated Notes Due October 15, 1994; the Company's Floating Rate Subordinated Note with American Express Company due April 1, 1994; the Company's 8 3/4% Senior Subordinated Debentures Due March 1, 1996; the Company's 10 3/4% Senior Subordinated Notes Due April 29, 1996; the Company's 9 1/2% Senior Subordinated Notes Due June 15, 1997; the Company's Senior Subordinated Notes Due May 15, 1999; the Company's 9 7/8% Senior Subordinated Notes Due October 15, 2000; the Company's 11 5/8% Senior Subordinated Debentures Due May 15, 2005; the Company's 9 7/8% Senior Subordinated Note Due October 1, 1993; the Company's 10 3/4% Senior Subordinated Notes due from June 30, 1994 through December 31, 2025 held by various subsidiaries and affiliates of the Company; the Company's Floating Rate Senior Subordinated Notes due from January 27, 1994 through September 30, 1994 held by an affiliate of the Company; the Company's 6% Senior Subordinated Notes due December 30, 1994; the Company's Floating Rate Senior Subordinated Notes due July 14, 1994; and the Company's Floating Rate Senior Subordinated Notes due May 17, 1996 unless, in each case, in the instrument evidencing or creating the same, or in any agreement under or pursuant to which it shall be outstanding, such

indebtedness shall be declared not to be Senior Subordinated Debt.
Senior Subordinated Debt (and any agreement under or pursuant to
which the same may be outstanding) may be amended, the commitment
under such agreements may be increased, provisions thereof may be
waived, time of payment of the Senior Subordinated Debt may be
extended and other indulgences granted to the Company in respect
thereof all from time to time without notice to or assent of any
Participant under the Plan.

8.7  Each Participant, by making an election to participate in
this Plan, irrevocably agrees and acknowledges that:

(a)  such election is not being made in reliance upon the
standing of the Company as a member organization of the
Exchange or upon the Exchange's surveillance of the
Company's financial position or its compliance with the
constitution, rules and practices of the Exchange;

(b)  the Participant is not relying upon the Exchange to
provide any information concerning or relating to the
Company and the Exchange has no responsibility to
disclose to the Participant any information concerning or
relating to the Company which it may now, or at any
future time, have; and

(c)  neither the Exchange, its Special Trust Fund, nor any
director, officer, trustee or employee of the Exchange or
said Trust Fund shall be liable to any Participant with
respect to this Plan or the payment of amounts credited
to a Participant's Deferred Compensation Account.

8.8   Upon termination of the Company as a member of the
Exchange, the references herein to the Exchange shall be deemed to
refer to the Examining Authority.   The term Examining Authority
shall refer to such regulatory body having responsibility for
inspecting or examining the Company for compliance with financial
responsibility requirements under Section 9(c) of SIPA and Section
17(d) of the Act.   References herein to the Exchange or the
Examining Authority shall also be deemed to refer to the CBT and to
any other exchange, board of trade, clearing association or similar
organization of which the Company is a member and which requires
such reference as a condition to inclusion of the amounts credited
to Deferred Compensation Accounts hereunder in the Company's net
capital as computed for the purposes of such organization.

8.9  References in the Plan to the Exchange or Examining
Authority shall also be deemed to refer to the organization(s)
designated as the self-regulatory organization(s) (also known as
DSRO) of the Company pursuant to a plan filed with the CFTC
pursuant to Regulation 1.52 under the CEA to the extent such
references are required as a condition to inclusion of the amounts
credited to Deferred Compensation Accounts in the Plan in the

Company's net capital as computed for purposes of such organization(s).

8.10   All amounts credited to Deferred Compensation Accounts shall be dealt with in all respects as capital of the Company, shall be subject to the risks of its business, and may be deposited in an account or accounts in the Company's name in any bank or trust company.

8.11   Notwithstanding any other provisions in this ARTICLE VIII, all amounts which are from time to time credited to Participants' Deferred Compensation Accounts shall be subject to the terms of subordination set forth in this ARTICLE VIII.

## ARTICLE IX
### Administration

9.1   The complete authority to control and manage the operation and administration of the Plan and the responsibility for carrying out its provisions belongs to the Committee.   The Committee shall consist of at least three members appointed from time to time by the Board of Directors to serve at the pleasure thereof.   Any member of the Committee may resign by delivering his written resignation to the Board of Directors.

9.2   The Committee shall from time to time establish rules of administration and interpretation of the Plan.   The determination of the Committee as to any disputed questions shall be conclusive and binding on all parties, including the Participant, his Beneficiary, the Company and the Employer.

9.3   Any act which the Plan authorizes or requires the Committee to do may be done by a majority of its members.   The action of such majority, expressed by a vote at a meeting or in writing without a meeting, shall constitute the action of the Committee and shall have the same effect for all purposes as if assented to by all members of the Committee.

9.4   The members of the Committee may authorize one or more of their number to execute or deliver any instrument, make any payment or perform any other act which the Plan authorizes or requires the Committee to do.

9.5   The Committee may employ counsel and other agents and may procure such clerical, accounting, and other services as they may require in carrying out the provisions of the Plan.

9.6   No member of the Committee shall receive any compensation for his services as such.   All expenses of administering the Plan, including but not limited to, fees of accountants and counsel, shall be paid by the Company.

83690080                                              -17-

9.7  The Company shall indemnify and save harmless each member of the Committee against all expenses and liabilities arising out of membership on the Committee, excepting only expenses and liabilities arising from his own gross negligence or willful misconduct, as determined by the Board of Directors.

## ARTICLE X
## Amendment and Termination

10.1 The Company, by action of the Committee, may at any time or from time to time modify or amend any or all of the provisions of the Plan or may at any time terminate the Plan; _provided, however_, that no action taken shall adversely affect the rights of any Participant hereunder to amounts due and payable to such Participant at the time such action is taken, unless the Participant otherwise consents thereto.

## ARTICLE XI
## General Provisions

11.1  No Participant, Branch Manager, Financial Consultant, Officer, Key Employee or employee of the Company or any Employer shall have any right to any payment or benefit hereunder except to the extent provided in the Plan.

11.2  The employment rights of any Participant shall not be enlarged, guaranteed or affected by reason of any of the provisions of the Plan.

11.3  Assignment, pledge or other encumbrance of any payments or benefits under the Plan shall not be permitted or recognized and to the extent permitted by law, no such payments or benefits shall be subject to legal process or attachment for the payment of any claim of any person entitled to receive the same.

11.4  The Company shall have the right to retain or to use any amounts payable under the Plan to satisfy or otherwise offset amounts the Participant owes the Company as a result of his actions or in the event he is terminated for Cause.  Amounts payable under the Plan may also be used to offset amounts the Company is required to pay a client or a regulatory agency or any other person or entity as a result of the Participant's actions.

11.5  If the Committee determines that any person to whom a payment is due hereunder is a minor or incompetent by reason of physical or mental disability, the Committee shall have the power to cause the payments then due to such person to be made to another for the benefit of the minor or incompetent, without responsibility of the Company or the Committee to see to the application of such payment, unless claim prior to such payment is made therefor by a duly appointed legal representative.  Payments made pursuant to such power shall operate as a complete discharge of the Company and the Committee.

11.6  The validity of the Plan or any of its provisions shall be determined under, and it shall be construed and administered according to, the laws of the state of New York.

11.7  Any controversy or dispute hereunder shall be resolved by arbitration pursuant to the Constitution of the Exchange or the NASD.

11.8  Each Participant may designate, in writing and on a form provided by the Committee, any person(s) or legal entity(ies), including his estate, as his Beneficiary under the Plan; <u>provided</u>, <u>however</u>, that a Participant may designate a trust as his Beneficiary only with the prior written approval of the Committee. A Participant may at any time revoke his designation of a Beneficiary or change his Beneficiary at any time prior to his death by filing with the Committee the appropriate beneficiary designation form. If no person or legal entity shall be designated by a Participant as his Beneficiary or if no designated Beneficiary survives him, his Beneficiary shall be his estate. To be effective, any designation or revocation of Beneficiary must be on the appropriate form provided by the Committee and on file with the Committee prior to the date of the Participant's death. The provisions of the Plan shall be binding on the Participant, the Company, and their respective heirs, executors, administrators, successors and assigns.

SHEARSON/AMERICAN EXPRESS INC.

SUPPLEMENTAL RETIREMENT PLAN

Effective January 1, 1980

As Amended Through October 6, 1981

General

This plan is a supplemental retirement plan for investment executives and branch managers of Shearson/American Express Inc., effective January 1, 1980. It is intended to provide additional retirement income based on certain compensation which is earned after the Effective Date and which is in excess of earnings covered by the Shearson/American Express Inc. Retirement Plan.

The Shearson/American Express Inc. Supplemental Retirement Plan is completely separate from the Shearson/American Express Inc. Retirement Plan and is not funded or qualified for special tax treatment under the Internal Revenue Code.

-1-

# ARTICLE I

## Definitions

1.1   As used in this Plan, the following terms shall have the meanings as set forth below:

"Plan" means the Shearson/American Express Inc. Supplemental Retirement Plan, as set forth herein and as amended from time to time.

"Basic Plan" means the Shearson/American Express Inc. Retirement Plan, effective January 1, 1977, as amended effective September 1, 1977, June 1, 1979, and as amended from time to time thereafter.

"Employer" means Shearson/American Express Inc., a Delaware corporation, and any successor thereto which adopts this Plan and any corporation or business association which shall be designated by the Board of Directors of Shearson/American Express Inc. as a participating employer under this Plan and which adopts the terms of this Plan by action of its board of directors or governing body, as applicable. As to any Employee, at any time of reference, "Employer" means his employer.

"Effective Date" means January 1, 1980.

"Actuarial Equivalent" means an amount as described in Section 1.1 of the Basic Plan.

"Excess Earnings" means for any Plan Year during which the Participant was an Eligible Employee, the Participant's "compensation" from the Employer which is in excess of the maximum amount of Annual Earnings covered by the Basic Plan for such Plan Year, as described in Section 1.1 of the Basic Plan. In no event shall a Participant's amount of Excess Earnings for a Plan Year exceed $150,000. In determining a Participant's

"compensation" for this purpose the following shall be included: (a) wages, overtime, bonuses, incentive compensation, commissions and any other form of additional current compensation shown on Form W-2 which was paid to the Participant by the Employer during such Plan Year, (b) any amount of compensation deferred by the Participant under the Voluntary Deferred Compensation Plan during such Plan Year.

"Board of Directors" means the Board of Directors of Shearson/American Express Inc.

"Code" means the Internal Revenue Code of 1954, as amended from time to time.

"Deferred Retirement Plan" means the date as described in Section 1.1 of the Basic Plan.

"Early Retirement Date" means the date described in Section 1.1 of the Basic Plan.

"Employee" means any person who is employed by the Employer in the United States or any person employed by the Employer outside the United States who is covered under the United States Social Security Act.

"Eligible Employee" means any Employee who is employed by the Employer as an investment executive or branch manager.

"Supplemental Accrued Benefit" means the benefit set forth in Section 3.1 of this Plan.

"Normal Retirement Date" means the first day of the month coincident with or next following a Participant's 65th birthday.

"Participant" means an Eligible Employee who has become a Participant pursuant to Article II.

"Plan Year" means the calendar year.

"Vesting Service" means the service as defined pursuant to Section 4.2 of this Plan.

"Year of Vesting Service" means 12 months of Vesting Service.

1.2   The masculine pronoun shall be deemed to include the feminine, and the singular number shall be deemed to include the plural unless a different meaning is plainly required by the text.

## ARTICLE II

### Participation

2.1   Each Employee who, as of the Effective Date, (i) is an Eligible Employee, (ii) was employed by the Employer or any predecessor thereof, in any capacity, no later than one year prior to the Effective Date, and (iii) had attained at least age 25, shall become a Participant as of the Effective Date, provided he had not reached age 60 on the date he became employed by the Employer or any predecessor thereof.

2.2   Each Employee who does not become a Participant under Section 2.1 above shall become a Participant on the first day of the month following the later of (i) the date he becomes an Eligible Employee, (ii) the first anniversary of his date of employment by the Employer or any predecessor thereof and (iii) his 25th birthday, provided he had not attained 60 the date he first became employed by the Employer or any predecessor thereof.

2.3   An Eligible Employee who has satisfied the requirements of Section 2.1 or 2.2 above shall automatically become a Participant in this Plan pursuant to either of those Sections, as applicable, even though he may have waived Basic Plan participation under Section 3.4 of the Basic Plan or is for any other reason deemed ineligible under Article III of the Basic Plan.

2.4   If a Participant is reemployed by the Employer after the Effective Date he shall become a Participant on his reemployment date provided he is then an Eligible Employee and has satisfied the requirements of Section 2.2 above. If he is not an Eligible Employee on his reemployment date, he shall become a Participant when he becomes an Eligible Employee.

-5-

## ARTICLE III

### Benefits

**3.1   Supplemental Accrued Benefit**

A Participant's annual Supplemental Accrued Benefit as of a specified date means an amount equal to 1.9% of Excess Compensation for each Plan Year of participation in this Plan. For the purpose of determining such an amount, a Participant's Excess Earnings for each Plan Year is multiplied by a fraction, the numerator of which is the number of months in the Plan Year during which the Employee was a Participant and the denominator of which is 12. The Participant's monthly Supplemental Accrued Benefit shall be the annual Supplemental Accrued Benefit divided by 12.

**3.2   Normal Retirement Benefit**

The monthly benefit amount payable to a Participant under this Plan who retires on his Normal Retirement Date shall equal his monthly Supplemental Accrued Benefit.

**3.3   Deferred Retirement Benefit**

The monthly benefit amount payable under this Plan to a Participant who retires on a Deferred Retirement Date shall be equal to his monthly Supplemental Accrued Benefit as determined as of his Deferred Retirement Date.

**3.4   Early Retirement Benefit**

The monthly benefit amount payable under this Plan to a Participant whose Benefit Commencement Date is prior to Normal Retirement Date and after his Early Retirement Date shall equal the Actuarial Equivalent of his monthly Supplemental Accrued Benefit.

**3.5  Vested Retirement Benefit**

(a)  The monthly benefit amount commencing on Normal Retirement Date payable to a Participant who had not reached his Early Retirement Date on his termination date and is vested on that date pursuant to Section 4.1 shall be equal to the Participant's monthly Supplemental Accrued Benefit as determined at his termination date.

(b)  If such a Participant begins to receive benefits prior to his Normal Retirement Age, he shall be eligible to receive a monthly benefit amount equal to the Actuarial Equivalent of his monthly Supplemental Accrued Benefit.

3.6  In the event a Participant has spouse's benefit coverage in effect for any period, as provided by Section 5.1 of this Plan, the monthly amount of his normal, deferred or early retirement benefit otherwise payable from this Plan shall be reduced by 1/24th of 1% for each month such coverage was in effect.

## ARTICLE IV

### Vesting

**4.1  Vested Percentage**

A Participant shall be vested in his Supplemental Accrued Benefit upon completing 10 Years of Vesting Service.

However, a Participant shall be vested upon reaching his Normal Retirement Date while employed by the Employer, regardless of the number of Years of Vesting Service he has completed as of such date.

**4.2  Vesting Service**

(a)  For the purpose of this Plan, Vesting Service shall begin as of the first Plan Year during which an Eligible Employee was considered a Participant pursuant to Article II and had earned Excess Compensation.  After such Plan Year, A Participant shall be credited with one month of Vesting Service for each month, or a part thereof, in which he was an Employee, regardless of his earnings levels during that period.

(b)  For any period during or after the first Plan Year described in (a) above, a Participant's Vesting Service shall include the period of any absence, including but not limited to, a leave of absence authorized by the Employer, a layoff or an absence due to disability, prior to termination of his employment relationship with the Employer.  Such Participant shall be credited with one month of Vesting Service for each month or part thereof of any such absence.

-8-

(c) Years of Vesting Service after the Effective Date shall be granted for certain periods of employment in a non-covered status and with a non-covered company pursuant to the terms of Sections 8.3 and 8.4 of the Basic Plan.

**4.3   Reemployment**

(a) If a Participant is reemployed by the Employer after his benefit commencement date and prior to his Normal Retirement Date, his retirement benefits shall cease as of the date of his reemployment. He shall become a Participant in accordance with Article II and his period of Vesting Service and Supplemental Accrued Benefit prior to his reemployment shall be restored and increased by any further participation in this Plan after such reemployment, provided, however, that if such person is reemployed by the Employer prior to the last day of the 12th month following the month in which his retirement or termination of employment occurred, he shall be credited with Vesting Service for the period from such retirement or termination of employment to his reemployment in accordance with Section 4.2(a) as if he had remained an Employee during such period. Upon his subsequent retirement or termination of employment, he shall be entitled to retirement benefits in accordance with the applicable provisions of this Plan as if he then first retired or terminated his employment with the Employer; provided, however, that the amount of such retirement benefits shall be reduced by the Actuarial Equivalent of the amount of retirement benefits previously paid to him.

(b) If a Participant is reemployed by the Employer or prior to his benefit commencement date, he shall become a Participant in accordance with Article II and his prior period of Vesting Service and his Supplemental Accrued Benefit to such date shall be restored and increased by any further participation in

-9-

this Plan, provided, however, that if such person is reemployed by the Employer on or prior to the last day of the 12th month following the month in which his termination of employment occurred, he shall be credited with Vesting Service for the period from such termination to his reemployment in accordance with Section 4.2(a) as if he had remained an Employee during such period. Upon his subsequent retirement or termination of employment, he shall be entitled to retirement benefits in accordance with the applicable provisions of this Plan as if he then first terminated his employment with the Employer.

# ARTICLE V

## Spouse's Benefit; Payment of
## Supplemental Retirement Benefits

**5.1   Coordination with Basic Plan Benefits**

Spouse's benefits shall be payable from this Plan based on a Participant's Supplemental Accrued Benefit under the same terms and conditions as are set forth in Article VII of the Basic Plan. All benefits under this Plan payable to a Participant or to his spouse shall at all times be payable in the same manner and at the same time as Participant or spouse's benefits under the Basic Plan are paid. The terms and conditions for benefit payment set forth in Article VI and VII of the Basic Plan shall also apply to the payment of benefits under this Plan.

## ARTICLE VI

### Miscellaneous

6.1  Nothing contained herein shall be deemed to exclude a Participant from any compensation, bonus, pension, insurance or other benefit to which a Participant is or may become entitled as an Employee of the Employer or shall be construed as conferring upon a Participant the right to continue in the employ of the Employer as an executive or in any other capacity.

6.2  Any amounts payable by the Employer hereunder shall not be deemed salary or other compensation to Participants for the purposes of computing benefits to which Participants may be entitled under the Basic Plan or other arrangement of the Employer for the benefit of its employees.

6.3  The rights and obligations created hereunder shall be binding on a Participant's heirs, executors and administrators and on the successors and assigns of the Employer.

6.4  The Employer may amend or terminate this Plan at any time, but such amendment or termination shall not adversely affect the rights of any Participant or spouse then receiving benefits or the benefits accrued to the date of Plan termination or amendment by any Participant then actively employed by the Employer.  Service completed by such Participants for the Employer after such termination or amendment date shall be considered Vesting Service pursuant to Section 4.2.

# SERP AMENDMENT

The Shearson/American Express Inc. Supplemental Retirement Plan effective January 1, 1980, as previously amended, is hereby further amended in the following respects:

1.  Section 1.1 is amended by revising the definition of "Actuarial Equivalent" to read as follows: "Actuarial Equivalent" means an amount as described in Section 1.1 of the Basic Plan or any successor provision (including Section 1.2 and Appendix A of the Lehman Brothers Holdings Inc. Retirement Plan).

2.  Section 5.1 is amended by adding the following sentence at the end thereof:

"In the event that the Actuarial Equivalent of the benefit otherwise payable to a Participant hereunder commencing on his Normal Retirement Date (or later date that the Participant's benefits under the Basic Plan begin after his Normal Retirement Date) is no more than $5,000, such Actuarial Equivalent amount shall be paid in a single lump sum on or about the date that the Participant's benefit under the Basic Plan (currently the Lehman Brothers Holdings Inc. Retirement Plan) becomes payable. In the event that such Actuarial Equivalent exceeds $5,000 but is not more than $7,000, the Participant shall have the right to elect to receive such Actuarial Equivalent amount in a single lump sum. In the event that the pre-retirement survivor annuity payable to an eligible surviving spouse hereunder shall have an Actuarial Equivalent present value of no more than $5,000, such present value shall be paid to the surviving spouse in a single lump sum; and if such value shall exceed $5,000 but be no more than $7,000, shall be

paid to such eligible surviving spouse if he or she so elects.  The Actuarial

Equivalent for these purposes shall be determined by using the mortality and

interest rate assumptions set forth in paragraph 1(a) of Appendix A of such Basic

Plan.

IN WITNESS WHEREOF, this instrument of amendment has been executed by a

duly authorized member of the Lehman Brothers Holdings Inc. Employee Benefit

Plans Committee this //ᵗʰ day of October, 2000.

2

AMENDMENT TO
SHEARSON/AMERICAN EXPRESS INC.
SUPPLEMENTAL RETIREMENT PLAN

The Shearson/American Express Supplemental Retirement Plan ("Plan") effective January 1,
1980, as previously amended, is hereby further amended in the following respects:

1.  The amendments to Section 5.1 adopted on October 11, 2000 shall cease to
apply as of May 31, 2003.

2.  Effective May 31, 2003, a new Article VII is added to read as follows:

"Lump Sum Payment of Certain Benefits

7.1  If the Actuarial Equivalent present value of the future payments due in
respect of a Participant who is currently receiving benefits under the Plan, or who has died,
retired, or otherwise terminated employment within the meaning of the Basic Plan (currently the
Lehman Brothers Holdings Inc. Retirement Plan), does not exceed $15,000 as of May 31, 2003,
the amount of such present value shall be paid to the Participant or his surviving spouse, joint
annuitant, or other beneficiary, as the case may be, in a single lump sum as soon as
administratively practicable after May 31, 2003; provided, however, that a Participant or
beneficiary receiving benefits in the form of a period certain annuity (as described in Section
6.5(a)(iii) of the Basic Plan) for a period scheduled to end prior to June 1, 2004 shall continue to
receive such benefits without regard to this sentence.  For purposes of this Section 7.1:

(a)  The Actuarial Equivalent present value of a benefit being paid in the
form of a single life annuity to a Participant, or in the form of a survivor annuity to a surviving
spouse or joint annuitant, shall be determined using the mortality and interest rate assumptions
set forth in paragraph 1(a) of Appendix A of the Basic Plan ("Appendix A");

KL3:2255280.10

(b)  The Actuarial Equivalent present value of a benefit being paid to a Participant in the form of a joint and survivor annuity or a certain and continuous annuity (as described in Section 6.5(a)(iv) of the Basic Plan) shall be determined by first calculating an equivalent amount to be paid in the form of a single life annuity using the mortality and interest rate assumptions set forth in paragraph 2 of Appendix A, and then determining the present value of such single life annuity using the assumptions set forth in paragraph 1(a) of Appendix A;

(c)  The Actuarial Equivalent present value of a benefit being paid to a Participant or his beneficiary in the form of a period certain annuity (as described in Section 6.5(a)(iii) of the Basic Plan) shall be determined by first calculating an equivalent amount to be paid in the form of a single life annuity using the mortality and interest rate assumptions set forth in paragraph 1(c) of Appendix A, and then determining the present value of such single life annuity using such assumptions;

(d)  The Actuarial Equivalent present value of the future payments due in respect of a Participant who has not begun to receive benefits under the Plan prior to March 31, 2003 shall be determined by applying the mortality and interest rate assumptions set forth in paragraph 1(a) of Appendix A to the single life annuity otherwise payable to him under the Plan as of his Normal Retirement Date.

7.2  In the event that a Participant is employed as of May 31, 2003 by an Employer or a Non-Covered Company (as defined in the Basic Plan) and has not begun to receive benefits under the Plan as of such date, and the Actuarial Equivalent present value of the benefit otherwise payable in respect of such Participant, including any pre-retirement survivor annuity payable to his eligible surviving spouse, commencing on the Participant's or surviving

KL3.2255280.10

spouse's Benefit Commencement Date (as defined in the Basic Plan) is no more than $15,000 as

of such Benefit Commencement Date, the amount of such present value shall be paid in a single

lump sum as soon as is practicable after such Benefit Commencement Date. For purposes of this

Section 7.2, such present value shall be determined by using the mortality and interest rate

assumptions set forth in paragraph 1(a) of Appendix A."

   IN WITNESS WHEREOF, this instrument of amendment has been executed by a

duly authorized member of the Lehman Brothers Holdings Inc. Employee Benefit Plans

Committee this 21st day of April 2003.

Employee Benefit Plans Committee

By: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
