<u>EXHIBIT B</u>

## ILLUSTRATION OF PAYMENTS

### <u>PURSUANT TO SUBPARAGRAPH 2(a)</u>

The projected payments illustrated in this Exhibit are estimated figures which are subject to later adjustment to account for variations in the interest crediting rate. The rate used to calculate these estimates is the Moody's Crediting Rate for 1989, plus an additional 3 percentage points (12.50%) projected forward to the age stated below.

| RETIREMENT <br> <u>AT AGE</u> | TOTAL ANNUAL <br> PAYABLE BENEFIT <br> UNDER ALL LDCP <br> <u>AGREEMENTS</u> |
|---|---|
|  | |

<u>EXHIBIT C</u>

## DEFINITION OF TOTAL DISABILITY FOR PURPOSES
## OF DEFERRED COMPENSATION AGREEMENT

"Total disability" means incapacity of Employee resulting from bodily injury or disease which prevents Employee from performing substantially all of the work pertaining to the Employee's occupation or any other occupation for which Employee is or may be suited by education, training or experience (the entire and irrecoverable loss of the sight of both eyes or the loss of any two extremities by severance through or above the wrist or ankle joints shall be accepted as constituting total disability), provided that (a) the total disability must (i) have been existing for four months and (ii) not have resulted directly from injuries (x) willfully and intentionally self-inflicted or (y) while Employee was in the military, naval or air force of any country at war, or any auxiliary or civilian non-combatant unit serving with such forces, and (b) Employee has provided such written proof of Employee's total disability as Employer has requested from time to time.

<u>EXHIBIT C</u>

## DEFINITION OF TOTAL DISABILITY FOR PURPOSES
## <u>OF DEFERRED COMPENSATION AGREEMENT</u>

"Total disability" means incapacity of Employee resulting from bodily injury or disease which prevents Employee from performing substantially all of the work pertaining to the Employee's occupation or any other occupation for which Employee is or may be suited by education, training or experience (the entire and irrecoverable loss of the sight of both eyes or the loss of any two extremities by severance through or above the wrist or ankle joints shall be accepted as constituting total disability), provided that (a) the total disability must (i) have been existing for four months and (ii) not have resulted directly from injuries (x) willfully and intentionally self-inflicted or (y) while Employee was in the military, naval or air force of any country at war, or any auxiliary or civilian non-combatant unit serving with such forces, and (b) Employee has provided such written proof of Employee's total disability as Employer has requested from time to time.

<u>EXHIBIT C</u>

## DEFINITION OF TOTAL DISABILITY FOR PURPOSES
## <u>OF DEFERRED COMPENSATION AGREEMENT</u>

"Total disability" means incapacity of Employee resulting from bodily injury or disease which prevents Employee from engaging in any occupation for which Employee is or may be suited by education, training or experience (the entire and irrecoverable loss of the sight of both eyes or the loss of any two extremities or the loss of the use of one hand and one foot shall be accepted as constituting total disability), provided that (a) the total disability must (i) have been existing for six months and (ii) not have resulted directly from injuries (x) willfully and intentionally self-inflicted or (y) while Employee was in the military, naval or air force of any country at war, and (b) Employee has provided such written proof of Employee's total disability as Employer has requested from time to time. By "war" we mean any declared war, undeclared war, or international police action with force of arms by any country, the United Nations, or any other assembly of nations.

**EXHIBIT D**

## DESIGNATION OF BENEFICIARY

Pursuant to paragraph 5 of the Deferred Compensation Amendment Agreement dated September 1, 1990 between Shearson Lehman and me, I request that any amount payable to me at or after the time of my death be paid to the following designated beneficiary or beneficiaries as follows:

| Name Of Beneficiary | Relationship To Me | Address Of Beneficiary | % Of Amount To Be Paid To Beneficiary |
|---|---|---|---|
| | | | |

If the foregoing designated beneficiary or one or more of the beneficiaries predeceases me, I request that any amount payable to such designated beneficiary or beneficiaries be paid to the following contingent beneficiary or beneficiaries as follows:

| Name of Contingent Beneficiary | Relationship To Me | Address of Contingent Beneficiary | % of Amount To Be Paid To Contingent Beneficiary |
|---|---|---|---|
| | | | |

_____
            Date


                                    _____
                                            Signature

EXHIBIT E

<u>American Express Company Guarantee of Certain SLH Deferred Compensation Payments</u> (as approved by the American Express Company Board of Directors on June 25, 1990)

The Guarantee shall be subject to these provisions:

1.  The Guarantee shall cover payments that become payable under the Plans (as defined) during a period of ten years beginning as of the Effective Time of the Merger, on account balances (whether vested or unvested) as of the Effective Time of the Merger, plus interest-equivalents that will accrue on such account balances during the ten years, except as otherwise provided for in this Exhibit.

2.  Excluded from the Guarantee are account balances of participants (i) who are not current, active employees of SLH or its affiliates at the Effective Time of the Merger, (ii) whose employment terminates during the period of the Guarantee for any reason other than death, disability, retirement or involuntary termination without cause or (iii) who, during the period of the Guarantee, violate the Code of Conduct of American Express Company and its subsidiaries, as applicable, or violate any applicable code of conduct or other policies (that relate to matters such as, business ethics, compliance with laws and regulations, and proprietary information and trade secrets).

3.  Excluded from the Guarantee are <u>new</u> monies deferred under the Plans after the Effective Time of the Merger and future interest-equivalents credited on such monies.

4.  In order to be eligible for the Guarantee, a participant in the ESEP and the Lehman Program must elect to accept certain amendments to the ESEP and the Lehman Program as approved by the Compensation, Benefits and Nominating Committee of the Company.

5.  An exception to the 10-year time limit on the Guarantee is under the ESEP and the Lehman Program (as they will be amended), where a participant may elect 10 annual installment payments beginning in 2001, with the Guarantee covering the account balance for such participant as of the tenth anniversary of the Effective Time of the Merger. The Guarantee on such amount shall expire upon the first date installment payments totaling such guaranteed amount have been made to such a participant.

6.  Amexco retains the right to be released from the Guarantee, without recourse by the participants, to the extent it causes an unaffiliated, creditworthy entity to assume the Guarantee in the event of significant changes in legislative, regulatory, tax or accounting conditions.

7.  Amexco retains the right to be released from the Guarantee, without recourse by the participants, in the event of, and effective immediately prior to, any amendment or termination of one or more of the Plans or related documents during the period of the Guarantee, which amendment or termination has <u>not</u> been approved in writing by the Chief Executive Officer, the President or an Executive Vice President of the Company.

8.  The Chief Executive Officer or the General Counsel of the Company are authorized to interpret, construe and administer the terms and conditions of the Guarantee.

83690076

SHEARSON LEHMAN BROTHERS INC.

THE E.F. HUTTON PARTNERSHIP AWARD PLAN
(FOR SHEARSON VESTED AMOUNTS AS OF JULY 30, 1993
AND LEHMAN BROTHERS)

AS AMENDED EFFECTIVE JANUARY 1, 1991
AND SUBSEQUENTLY AMENDED THROUGH JULY 30, 1993

83690076

# TABLE OF CONTENTS

| | Page |
|---|---|
| ARTICLE I<br>Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| ARTICLE II<br>Participation . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| ARTICLE III<br>Account Credits . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| ARTICLE IV<br>Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| ARTICLE V<br>Vesting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| ARTICLE VI<br>Payment of Accounts; Withdrawals . . . . . . . . . . . . . . . | 4 |
| ARTICLE VII<br>Funding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 |
| ARTICLE VIII<br>Subordination Provisions . . . . . . . . . . . . . . . . . . . | 6 |
| ARTICLE IX<br>Administration . . . . . . . . . . . . . . . . . . . . . . . . . | 12 |
| ARTICLE X<br>Amendment and Termination . . . . . . . . . . . . . . . . . . . | 12 |
| ARTICLE XI<br>General Provisions . . . . . . . . . . . . . . . . . . . . . . . | 13 |

SHEARSON LEHMAN BROTHERS INC.

THE E.F. HUTTON PARTNERSHIP AWARD PLAN

AS AMENDED EFFECTIVE JANUARY 1, 1991
AND SUBSEQUENTLY AMENDED THROUGH JULY 30, 1993

## ARTICLE I
### Definitions

1.1  As used in this Plan, the following terms shall have the meanings hereinafter set forth:

"Account" means the A, B, AB or C accounts established under the Plan, and effective after December 31, 1987, the B AB or C accounts only.

"Act" means the Securities Exchange Act of 1934, as in effect from time to time.

"Beneficiary" means any person(s) or legal entity(ies) designated by the Participant or otherwise in accordance with Section 11.8.

"Cause" means willful misconduct, dishonesty, conviction of a felony, persistent incompetence or habitual or gross negligence in the performance of a Participant's duties to the Company other than as a result of total or partial incapacity due to disability, persistent failure to abide by the policies and regulations of the Company, or American Express Company or such other similar conduct as determined by the Committee in its sole discretion; provided, however, that for purposes of this definition, after the Closing Date, and only with respect to Smith Barney Participants, the term "Company" shall mean Smith Barney.

"CBT" means the Chicago Board of Trade.

"CEA" means the Commodity Exchange Act, as in effect from time to time.

"CFTC" means the Commodity Futures Trading Commission.

"Closing Date" means the closing date of the Smith Barney Transaction.

"Committee" means the Employee Benefit Plans Committee which administers the Plan in accordance with ARTICLE IX.

"Company" means Shearson Lehman Brothers Inc., a Delaware corporation, and its successors and assigns, and prior to January 1, 1988, E.F. Hutton Group Inc. and its affiliates, successors and assigns and, where and only where the text specifically so indicates, Smith Barney.

83690076

"Disability" means (a) prior to the Restatement Date, disability as defined under the Shearson Lehman Brothers Inc. Long-Term Disability Plan, and (b) on or subsequent to the Restatement Date, termination of a Participant's employment with the Company by reason of total and permanent disability, determined in accordance with the Shearson Lehman Brothers Inc. Long-Term Disability Plan, as in effect from time to time.  For the purposes of clause (b) above, after the Closing Date and only with respect to Smith Barney Participants, the term "Company" shall mean Smith Barney.

"Effective Date" means November 1, 1976.

"Employee" means any person who received remuneration for personal services rendered to the Company as an employee thereof, who is exempt from the overtime requirements of the Federal Fair Labor Standards Act, as in effect from time to time, and whose earnings for a Plan Year beginning on or after November 4, 1983, are $40,000 or greater on an annualized basis, and if prior to November 4, 1983, $20,000 or greater on an annualized basis.

"Employer" means the Company and any subsidiary or affiliate thereof which shall be designated by the Committee as a participating employer under the Plan.

"Exchange" means the New York Stock Exchange, Inc.

"Financial Hardship" means severe financial hardship to the Participant resulting from a sudden and unexpected illness or accident of the Participant or a dependent, loss of the Participant's property due to casualty, or other similar extraordinary and unforeseeable circumstances arising as a result of events beyond the control of the Participant.  The circumstances that will constitute a Financial Hardship will depend upon the facts of each case and will be determined by the Committee in its sole discretion, but distributions may not be made to the extent that such hardship is or may be relieved (i) through reimbursement or compensation by insurance or otherwise or (ii) by liquidation of the Participant's assets, to the extent the liquidation of such assets would not itself cause severe financial hardship.

"Installments" means substantially equal installments payable annually as of the last day of the applicable calendar quarter and as of the anniversary thereof in each succeeding year over a period certain not to exceed 10 years, as elected by a Participant in accordance with Section 6.1.

"Interest" on an Account shall have the meaning set forth in Section 4.2.

"NASD" means the National Association of Securities Dealers, Inc.

"Non-Vested Plan" means the E. F. Hutton Partnership Award Plan (for Shearson Non-Vested Amounts as of July 30, 1993) (as such plan may be renamed following its assumption by Smith Barney as of the Closing Date) or such similar plan that may be adopted by Smith Barney as of the Closing Date, pursuant to which Interest on amounts held in the Accounts of Smith Barney Participants prior to the Closing Date will accumulate as provided in the Non-Vested Plan.

"Prior Plan" means the E.F. Hutton Group Inc. Partnership Award Plan, as in effect from time to time prior to January 1, 1988.

"Participant" for any Plan Year means a person who participates in the Plan in accordance with ARTICLE II.

"Participation Year" means each Plan Year for which a Participant participates in the Plan.

83690076

"Plan" means The E.F. Hutton Partnership Award Plan, as embodied herein and as amended from time to time.

"Plan Year" means the calendar year.

"Primerica Retirement Plan" means the defined benefit pension plan sponsored by Smith Barney or an affiliate thereof which covers a Smith Barney Participant at the time of his retirement thereunder.

"Restatement Date" means January 1, 1991.

"Retirement" means (a) prior to the Restatement Date, (i) a Participant's retirement from employment with the Company under the provisions of the Company's Retirement Plan, or (ii) some other arrangement, but only if approved in advance by the Committee, and (b) on or after the Restatement Date, termination of a Participant's employment with the Company as a result of his retirement, determined pursuant to the provisions of the Shearson Lehman Brothers Holdings Inc. Retirement Plan, as in effect from time to time, and (c) after the Closing Date, and only with respect to Smith Barney Participants, termination of a Participant's employment with Smith Barney as a result of his retirement, determined pursuant to the provisions of the Primerica Retirement Plan, as in effect from time to time.

"Rule" means Rule 15c3-1 under the Act.

"Separation from Service" means termination of a Participant's employment with the Company by reason of Retirement, Disability, death or otherwise. For the purposes of the preceding sentence, on or after the Closing Date, and only with respect to Smith Barney Participants, the term "Company" shall mean Smith Barney.

"SIPA" means the Securities Investor Protection Act of 1970, as in effect from time to time.

"Smith Barney" means Smith Barney, Harris Upham & Co., Incorporated and Primerica Corporation and their successors and assigns.

"Smith Barney Participants" means those persons who were Participants for any Plan Year prior to or including the Closing Date, and who became employed by Smith Barney as of the Closing Date or later in connection with the Smith Barney Transaction.

"Smith Barney Transaction" means the sale of certain Company assets to Smith Barney pursuant to an Asset Purchase Agreement dated as of March 12, 1993 among the Company, Shearson Lehman Brothers Holdings Inc., Smith Barney, Primerica Corporation and American Express Company.

1.2    Wherever any words are used herein in the masculine gender, they shall be construed as though they were also used in the feminine gender in all cases where they would so apply, and wherever any words are used herein in the singular form, they shall be construed as though they were also used in the plural form in all cases where they would so apply.

83690076

## ARTICLE II
### Participation

2.1    Any Participant who participated in the Prior Plan on January 1, 1988 shall continue to be a Participant in the Plan as of that date and, as of such date, the Plan shall be closed to any new Participants.

2.2    Notwithstanding anything herein to the contrary, a Participant ceases to be a Participant on his Separation from Service date; provided, however, that if a Participant continues to be employed by an affiliate or subsidiary of the Company, he shall not incur a Separation from Service until such time as he incurs a Separation from Service with such affiliate or subsidiary.

## ARTICLE III
### Deferrals

3.1    On or after January 1, 1988, no amount, other than Interest, shall be credited to any Account.

3.2    Notwithstanding anything herein to the contrary, no Interest shall be credited to any Smith Barney Participant's Account on or after the Closing Date.

## ARTICLE IV
### Accounts

4.1    (a)    The Committee shall continue to maintain all existing Accounts of Participants for Plan Years prior to January 1, 1988.

(b)    On and after the Closing Date, the Committee shall continue to maintain all existing Accounts of Smith Barney Participants who have amounts which are vested as of the Closing Date in accordance with Article V until such time as they are distributed to the Participant.

4.2    Subject to Section 3.2, Interest shall be credited on amounts credited to each Account as of the last day of each calendar quarter from the effective date of deferral to the last day of the calendar quarter immediately preceding the date on which such amounts are distributed to the Participant at an annual rate equal to the average 30-day U.S. Treasury Bill rate during such quarter; provided, however, that if Section 6.2 is applicable, no Interest shall be credited to the Participant's Account after the last day of the calendar quarter in which his Separation from Service occurred.

## ARTICLE V
### Vesting

5.1    On or after the Restatement Date, a Participant shall at all times be fully vested in his Account for any Participation Year.

## ARTICLE VI
### Payment of Accounts; Withdrawals

6.1    A Participant for any Participation Year shall elect, in writing to the Committee, on a form provided by the Committee, to have his Accounts for such year paid (a) if he incurs a Separation of Service as a result of his Retirement,

83690076

Disability or death, in a lump sum or in Installments (as indicated on such election) commencing as of the last day of the second calendar quarter following the quarter in which his Retirement, Disability or death occurs, or (b) as of the last day of the calendar quarter following the first anniversary of his Separation from Service, in a lump sum or in ten annual installments (as indicated on such election); provided, however, that if a Participant fails to elect otherwise in accordance with the provisions of Section 6.1 hereof, payment shall be made in a lump sum as of the last day of the Plan Year in which he vests in his Account, with such payment being made as soon as administratively practicable following the last day of such Plan Year.

6.2   Notwithstanding the provisions of Section 6.1, if a Participant's Separation from Service occurs other than by reason of Retirement, Disability or death, payment of the amounts credited to his Account for all Participation Years preceding the current Participation Year shall be made in a lump sum as soon as practicable after the last day of the calendar quarter in which his Separation from Service occurs.

6.3   Effective as of the Restatement Date, notwithstanding anything herein to the contrary, distributions of vested Accounts shall commence as soon as administratively practicable after distributions under the Shearson Lehman Brothers Holdings Inc. Retirement Plan commence, even if the Participant has made a previous election to defer payment and even if the Participant has not otherwise incurred a Retirement, Disability, death, or other Separation from Service, with payments being made in the manner elected by the Participant in accordance with the provisions of Section 6.1; provided, however, that after the Closing Date, distributions of a Smith Barney Participant's vested Account shall commence as soon as administratively practicable after distributions to the Smith Barney Participant under the Primerica Retirement Plan commence, even if the Smith Barney Participant has made a previous election to defer payment and even if the Smith Barney Participant has not otherwise incurred a Retirement, Disability, death, or other Separation from Service, with payments being made in the manner elected by the Smith Barney Participant in accordance with the provisions of Section 6.1; provided further, however, that no amount deferred for any Participation Year shall be distributed until it has been held in the Account for at least one (1) year subsequent to the Participation Year of deferral.

6.4   Effective as of the Restatement Date, notwithstanding anything herein to the contrary, any amounts payable hereunder may be retained by the Company in the event the Participant owes the Company any funds at the time such Participant is otherwise entitled to receive amounts credited to his Account.

6.5   Plan payments shall not be included in the calculation of financial consultant production levels or be utilized for any similar purpose, and all such payments shall be considered cash compensation to the Participant when paid, subject to all applicable federal, state and local income taxes and withholding.

6.6   Amounts paid under the Plan shall not be eligible for further deferral under the Plan.

6.7   If a Participant dies, his Beneficiary shall be entitled to receive, as soon as administratively practicable after the date of his death, the payment of his Account, with such payment being made in the form elected by the Participant in accordance with the provisions of Section 6.1, less any applicable federal, state and local income taxes and withholding, if any.

6.8   No Interest or other earnings shall be paid on any amount payable under the Plan for the period commencing on the last day of the calendar quarter

83690076

in which payment is required to be made and ending on the date payment is actually made.

6.9   No payments shall be required or made if, in the opinion of the Committee, such payment would not comply with the rules and regulations of the NASD, the SEC, the CBT, any state securities regulatory authority, or any other applicable law, rule or regulation, or the Participant is subject to the provisions of Section 11.4.

6.10   Notwithstanding anything herein to the contrary, a Participant may request and receive a financial hardship distribution, provided the Participant is able to demonstrate, to the satisfaction of the Committee, that he has suffered a Financial Hardship.  A hardship distribution request must be made on the form provided by the Committee and is subject to the rules established by the Committee governing hardship distributions.  The amount distributed cannot exceed the lesser of (a) the Participant's Account balances, or (b) the amount necessary to satisfy the Participant's Financial Hardship.  No distribution may be made prior to the time the Committee approves the distribution, and payment is subject to the provisions of Section 8.3.

6.11   Any payment made to the Participant or his Beneficiary or estate pursuant to the terms of the Plan shall constitute a complete discharge of the obligations of the Company and the Committee with respect thereto.

## ARTICLE VII
### Funding

7.1   All amounts credited under the Plan shall come solely from the general assets of the Company.

7.2   All amounts credited to Participants' Accounts shall, at all times, (a) be subordinated debt of the Company, (b) be dealt with in all respects as capital of the Company, (c) be subject to the risk of the Company's business, and (d) may be deposited in an account or accounts in the Company's name in any bank or trust company.

## ARTICLE VIII
### Subordination Provisions

8.1   The Company's obligation to pay amounts credited to a Participant's Account on the date such payment is otherwise due and payable in accordance with the terms of the Plan (the "Fixed Payment Date") shall be suspended and shall not mature for any period of time during which after giving effect to such payment (together with (a) the payment of any other obligation of the Company payable at or prior to such payment and (b) the return of any Secured Demand Note as defined in the Rule as in effect at the time such payment is to be made and the collateral therefor held by the Company and returnable at or prior to such payment):

(i)   If the Company is not operating pursuant to the alternative net capital requirements provided for in paragraph (f) of the Rule, the aggregate indebtedness of the Company would exceed 1200 per centum of its net capital (or its "adjusted net capital" as defined in the regulations under the CEA) as those terms are defined in the Rule as in effect at the time payment is to be made or such lesser per centum as may be made applicable to the Company from time to time by the Exchange (or other domestic exchange, board of trade, clearing

-6-

83690076

association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority; or

(ii)    if the Company is operating pursuant to the alternative net capital requirements provided for in paragraph (f) of the Rule, the net capital of the Company (or its "adjusted net capital" as defined in the regulations under the CEA) would be less than the greater of (x) 5 per centum of aggregate debit items computed in accordance with Exhibit A to Rule 15c3-3 under the Act or any successor rule as in effect at the time payment is to be made, (y) if the Company is registered as a futures commission merchant with the CFTC, 6 per centum of the funds required to be segregated pursuant to the CEA and the regulations promulgated thereunder and the foreign futures or foreign options secured amounts, less the market value of commodity options purchased by option customers on or subject to the rules of a contract market or foreign board of trade; <u>provided</u>, <u>however</u>, the deduction for each option customer shall be limited to the amount of customer funds in such option customer's account(s) and the foreign futures and foreign options secured amounts (if greater), or (z) such greater per centum as may be made applicable to the Company from time to time by the Exchange (or any other domestic exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority; or

(iii)    if the Company's net capital (or its "adjusted net capital" as defined in the regulations under the CEA), as defined in the Rule or any successor rule as in effect at the time payment is to be made, would be less than 120 per centum of any minimum dollar amount required by the Rule (or the regulations under the CEA as in effect at such time), or such greater dollar amount as may be made applicable to the Company by the Exchange (or any other domestic exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority; or

(iv)    if the Company guarantees, endorses, carries or clears specialist or market maker transactions in options listed on a national securities exchange or facility of a national securities association, the amounts required to be deducted and maintained as required by the provisions of paragraphs (a)(6)(v), (a)(7)(iv) or (c)(2)(x)(b)(1) of the Rule would exceed 1000 per centum of its net capital (or its "adjusted net capital" as defined in the regulations under the CEA), as defined in the Rule as in effect at the time such payment is made or such lesser per centum as may be made applicable to the Company by the Exchange (or any other domestic exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority.

During any such suspension the Company shall, as promptly as is consistent with the protection of its customers, reduce its business to a condition whereby the amounts the payment of which has been suspended could be paid (together with (c) the payment of any other obligation of the Company payable at or prior to the payment of such amounts and (d) the return of any Secured Demand Note and the collateral therefor held by the Company or returnable at or prior to the payment of such amounts) without the Company's net capital being below the applicable minimums set forth above in this Section 8.1 or its "adjusted net capital" being

83690076

below the amount required as aforesaid, at which time the Company shall pay the amounts credited to a Participant's Account the payment of which has been suspended (including Interest thereon calculated pursuant to the terms of the Plan, if any) on not less than five (5) days' prior written notice to the Exchange and the CBT. The first day on which under this ARTICLE VIII the Company has an obligation to pay amounts is hereinafter referred to as the "payment date." If, pursuant to the terms hereof, the Company's obligation to pay amounts credited to a Participant's Account is suspended, the Company recognizes and agrees that the Company may be summarily suspended by the Exchange. The Company agrees that, if its obligation to pay amounts credited to a Participant's Account is ever suspended for a period of six (6) months, it will promptly take whatever steps are necessary to effect a rapid and orderly complete liquidation of its business.

8.2    If payment is made of all or any part of the amounts credited to a Participant's Account on the payment date and if immediately after any such payment the Company's net capital is less than the applicable minimums set forth above in Section 8.1, the Participant by electing to participate agrees irrevocably, for himself, his beneficiaries, heirs and assigns (whether or not the Participant had any knowledge or notice of such fact at the time of any such payment) to repay to the Company, its successors or assigns, the sum so paid, to be held by the Company pursuant to the provisions hereof as if such payment had never had been made; provided, however, that any suit for the recovery of any such payment must be commenced within two (2) years of the date of such payment.

8.3    No payment of all or any portion of amounts credited to a Participant's Account shall be made prior to the Fixed Payment Date (whether as a consequence of Financial Hardship or otherwise, any such payment being herein called a "Prepayment") unless at least one year has passed from the effective date of the deferral and the Company shall have received the prior written permission of the Exchange after consultation with the SEC if the Exchange deems such consultation appropriate and the prior written permission of the CBT. Furthermore, no Prepayment shall be made if after giving effect thereto (and to all other payments of principal of outstanding subordination agreements of the Company, including the return of any Secured Demand Note and the collateral therefor held by the Company, the maturity or accelerated maturity of which are scheduled to occur within six (6) months after the date such Prepayment is to occur, or on or prior to the date on which the Participant has elected to receive payment of the amounts credited to his Account disregarding such proposed payment, whichever date is earlier) without reference to any projected profit or loss of the Company:

  (i)    if the Company is not operating pursuant to the alternative net capital requirements provided for in paragraph (f) of the Rule, the aggregate indebtedness of the Company would exceed 1000 per centum of its net capital (or its "adjusted net capital" as defined in the regulations under the CEA), as those terms are defined in the Rule as in effect at the time Prepayment is to be made; or such lesser per centum as may be made applicable to the Company from time to time by the Exchange (or any other domestic exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority; or

  (ii)   if the Company is operating pursuant to such alternative net capital requirement, its net capital (or its "adjusted net capital" as defined in the regulations under the CEA) would be less than the greater of: (x) 5 per centum of aggregate debit items as those terms are defined in Exhibit A to Rule 15c3-3 of the Act or any successor

-8-

83690076

rule as in effect at such time; (y) if the Company is registered as a futures commission merchant with the CFTC, 6 per centum of the funds required to be segregated pursuant to the CEA and the regulations promulgated thereunder and the foreign futures or foreign options secured amounts, less the market value of commodity options purchased by option customers on or subject to the rules of a contract market or foreign board of trade; provided, however, the deduction for each option customer shall be limited to the amount of customer funds in such option customer's account(s) and foreign futures and foreign options secured amounts (if greater); or (z) such greater per centum as may be made applicable to the Company from time to time by the Exchange (or any other domestic exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority; or

(iii) if the Company's net capital (or its "adjusted net capital" as defined in the regulations under the CEA), as defined in the Rule or any successor rule as in effect at the time payment is to be made, would be less than 120 per centum of any minimum dollar amount required by the Rule (or the regulations under the CEA as in effect at such time), or such greater dollar amount as may be made applicable to the Company by the Exchange (or any other domestic exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority; or

(iv) if the Company guarantees, endorses, carries or clears specialist or market transactions in options listed on a national securities exchange or facility of a national securities association, the amounts required to be deducted and maintained as required by the provisions of paragraphs (a)(6)(v), (a)(7)(iv) or (c)(2)(x)(b)(l) of the Rule would exceed 1000 per centum of its net capital (or its "adjusted net capital" as defined in the regulations under the CEA), as defined in the Rule as in effect at the time such payment is made or such lesser per centum as may be made applicable to the Company by the Exchange (or any other exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority.

If Prepayment is made of all or any part of the amounts credited to a Participant's Account on or prior to the Fixed Payment Date, and if the Company's net capital is less than the amount required to permit such payment pursuant to the previously cited provisions of this Section 8.3, the Participant agrees irrevocably by electing to participate in the Plan (whether or not such Participant had any knowledge or notice of such fact at the time of any such Prepayment) to repay the Company, its successors or assigns, the sum so paid to be held by the Company pursuant to the provisions hereof as if such Prepayment had never been made; provided, however, that any suit for the recovery of any such Prepayment must be commenced within two (2) years of the date of such Prepayment.

8.4    A Participant, by making an election to participate in this Plan, irrevocably agrees that the obligations of the Company under the Plan with respect to the payment of amounts credited to a Participant's Account are and shall be subordinate in right of payment and subject to the prior payment or provision for payment in full of all claims of all other present and future creditors of the Company whose claims are not similarly subordinated (claims

83690076

under the Plan shall rank _pari passu_ with claims similarly subordinated) and to claims which are now or hereafter expressly stated in the instruments creating such claims to be senior in right of payment to claims arising under the Plan, arising out of any matter or event occurring prior to the payment date of the amounts credited to that Participant's Account under the Plan.  In the event of the appointment of a receiver or trustee of the Company or in the event of its insolvency, liquidation pursuant to SIPA or otherwise, its bankruptcy, assignment for the benefit of creditors, reorganization whether or not pursuant to bankruptcy laws, or any other marshalling of the assets and liabilities of the Company, a Participant shall not be entitled to participate or share, ratably or otherwise, in the distribution of the assets of the Company until all claims of all other present and future creditors of the Company, whose claims are senior to claims arising under the Plan, have been fully satisfied, or provision has been made therefor.

8.5    Notwithstanding anything herein to the contrary:

(a)    a Participant shall not be entitled to receive any payment in respect of amounts credited to his Account or to participate in the distribution of assets of the Company in respect thereof if such payment or distribution would constitute a violation of the express terms of any Senior Subordinated Debt, as hereinafter defined (or any agreement under or pursuant to which the same may be outstanding);

(b)    the right of a Participant to receive any payment in respect of amounts credited to his Account shall be subordinated to claims of the holders of Senior Subordinated Debt so that, in the case of any distribution of assets of the Company in complete or partial liquidation, reorganization, arrangement or other marshalling of assets and liabilities of the Company, no such distribution or payment will be made with respect to amounts credited to a Participant's Account unless and until the principal of and interest on the Senior Subordinated Debt are paid in full; and

(c)    a Participant shall promptly return to the Company any amounts (whether cash, securities or otherwise) received from the Company if the payment by the Company of such amounts constituted a violation of the express terms of any Senior Subordinated Debt (or any agreement under or pursuant to which the same may be outstanding).

8.6    The term "Senior Subordinated Debt" as used herein shall mean and include all indebtedness of the Company (other than the Company's obligations under the Company's 13 1/8% Subordinated Note due March 15, 1994, the Company's 10 3/4% and 15 1/4% Subordinated Notes due from June 30, 1994 through December 31, 2025, the Company's obligations under the Plan, the Company's Voluntary Deferred Compensation Plan, the Company's Deferred Compensation Plan for Branch Managers, the Company's Asset Compensation Plan for Financial Consultants, the Company's Deferred Compensation Plan for Financial Consultants, the Company's Recognition Award Plans (including the Lehman Brothers Equity Unit and Bonus Plan) and those similar agreements with other Participants each of which rank _pari passu_ with the obligations of the Company under the Plan) constituting part of its Net Capital (as defined in the Rule as in effect from time to time), and shall include without limitation thereto the indebtedness represented by the Company's obligations under the Company's 7 7/8% Senior Subordinated Notes Due August 15, 1993; the Company's 12 1/2% Senior Subordinated Notes Due October 15, 1994; the Company's Floating Rate Subordinated Note with American Express Company due April 1, 1994; the Company's 8 3/4% Senior Subordinated Debentures Due March 1, 1996; the Company's 10 3/4% Senior Subordinated Notes Due April 29, 1996; the

-10-

83690076

Company's 9 1/2% Senior Subordinated Notes Due June 15, 1997; the Company's
Senior Subordinated Notes Due May 15, 1999; the Company's 9 7/8% Senior
Subordinated Notes Due October 15, 2000; the Company's 11 5/8% Senior
Subordinated Debentures Due May 15, 2005; the Company's 9 7/8% Senior
Subordinated Note Due October 1, 1993; the Company's 10 3/4% Senior Subordinated
Notes due from June 30, 1994 through December 31, 2025 held by various
subsidiaries and affiliates of the Company; the Company's Floating Rate Senior
Subordinated Notes due from January 27, 1994 through September 30, 1994 held by
an affiliate of the Company; the Company's 6% Senior Subordinated Notes due
December 30, 1994; the Company's Floating Rate Senior Subordinated Notes due July
14, 1994; and the Company's Floating Rate Senior Subordinated Notes due May 17,
1996 unless, in each case, in the instrument evidencing or creating the same, or
in any agreement under or pursuant to which it shall be outstanding, such
indebtedness shall be declared not to be Senior Subordinated Debt.    Senior
Subordinated Debt (and any agreement under or pursuant to which the same may be
outstanding) may be amended, the commitment under such agreements may be
increased, provisions thereof may be waived, time of payment of the Senior
Subordinated Debt may be extended and other indulgences granted to the Company
in respect thereof all from time to time without notice to or assent of any
Participant under the Plan.

8.7  Each Participant, by making an election to participate in this Plan,
irrevocably agrees and acknowledges that:

(a)  such election is not being made in reliance upon the standing of the
Company as a member organization of the Exchange or upon the
Exchange's surveillance of the Company's financial position or its
compliance with the constitution, rules and practices of the
Exchange;

(b)  the Participant is not relying upon the Exchange to provide any
information concerning or relating to the Company and the Exchange
has no responsibility to disclose to the Participant any information
concerning or relating to the Company which it may now, or at any
future time, have; and

(c)  neither the Exchange, its Special Trust Fund, nor any director,
officer, trustee or employee of the Exchange or said Trust Fund
shall be liable to any Participant with respect to this Plan or the
payment of amounts credited to a Participant's Account.

8.8   Upon termination of the Company as a member of the Exchange, the
references herein to the Exchange shall be deemed to refer to the Examining
Authority.   The term Examining Authority shall refer to such regulatory body
having responsibility for inspecting or examining the Company for compliance with
financial responsibility requirements under Section 9(c) of SIPA and Section
17(d) of the Act.  References herein to the Exchange or the Examining Authority
shall also be deemed to refer to the CBT and to any other exchange, board of
trade, clearing association or similar organization of which the Company is a
member and which requires such reference as a condition to inclusion of the
amounts credited to Accounts hereunder in the Company's net capital as computed
for the purposes of such organization.

8.9   References in the Plan to the Exchange or Examining Authority shall
also be deemed to refer to the organization(s) designated as the self-regulatory
organization(s) (also known as DSRO) of the Company pursuant to a plan filed with
the CFTC pursuant to Regulation 1.52 under the CEA to the extent such references
are required as a condition to inclusion of the amounts credited to Accounts in

83690076

the Plan in the Company's net capital as computed for purposes of such organization(s).

8.10  All amounts credited to Accounts shall be dealt with in all respects as capital of the Company, shall be subject to the risks of its business, and may be deposited in an account or accounts in the Company's name in any bank or trust company.

8.11  Notwithstanding any other provisions in this ARTICLE VIII, all amounts which are from time to time credited to Participants' Accounts shall be subject to the terms of subordination set forth in this ARTICLE VIII.

## ARTICLE IX
### Administration

9.1  The complete authority to control and manage the operation and administration of the Plan and the responsibility for carrying out its provisions belongs to the Committee. The Committee shall consist of at least three members appointed from time to time by the Board of Directors to serve at the pleasure thereof.  Any member of the Committee may resign by delivering his written resignation to the Board of Directors.

9.2  The Committee shall from time to time establish rules of administration and interpretation of the Plan.  The determination of the Committee as to any disputed questions shall be conclusive and binding on all parties, including the Participant, his Beneficiary, the Company and the Employer.

9.3  Any act which the Plan authorizes or requires the Committee to do may be done by a majority of its members.  The action of such majority, expressed by a vote at a meeting or in writing without a meeting, shall constitute the action of the Committee and shall have the same effect for all purposes as if assented to by all members of the Committee.

9.4  The members of the Committee may authorize one or more of their number to execute or deliver any instrument, make any payment or perform any other act which the Plan authorizes or requires the Committee to do.

9.5  The Committee may employ counsel and other agents and may procure such clerical, accounting, and other services as they may require in carrying out the provisions of the Plan.

9.6  No member of the Committee shall receive any compensation for his services as such.  All expenses of administering the Plan, including but not limited to, fees of accountants and counsel, shall be paid by Company.

9.7  The Company shall indemnify and save harmless each member of the Committee against all expenses and liabilities arising out of membership on the Committee, excepting only expenses and liabilities arising from his own gross negligence or willful misconduct, as determined by the Board of Directors.

## ARTICLE X
### Amendment and Termination

10.1  The Company, by action of the Committee, may at any time or from time to time modify or amend any or all of the provisions of the Plan or may at any

-12-

83690076

time terminate the Plan; _provided_, _however_, that no action taken shall adversely affect the rights of any Participant hereunder to vested amounts due and payable to such Participant at the time such action is taken, unless the Participant otherwise consents thereto.

ARTICLE XI
General Provisions

11.1  No Participant, branch manager, financial consultant, key employee or employee of the Company or any Employer shall have any right to any payment or benefit hereunder except to the extent provided in the Plan.

11.2  The employment rights of any Participant shall not be enlarged, guaranteed or affected by reason of any of the provisions of the Plan.

11.3  Assignment, pledge or other encumbrance of any payments or benefits under the Plan shall not be permitted or recognized and to the extent permitted by law, no such payments or benefits shall be subject to legal process or attachment for the payment of any claim of any person entitled to receive the same.

11.4  The Company shall have the right to retain or to use any amounts payable under the Plan to satisfy or otherwise offset amounts the Participant owes to the Company as a result of his actions or in the event he is terminated for Cause.  Amounts payable under the Plan may also be used to offset amounts the Company is required to pay a client or a regulatory agency or any other person or entity as a result of the Participant's actions.

11.5  If the Committee determines that any person to whom a payment is due hereunder is a minor or incompetent by reason of physical or mental disability, the Committee shall have the power to cause the payments then due to such person to be made to another for the benefit of the minor or incompetent, without responsibility of the Company or the Committee to see to the application of such payment, unless claim prior to such payment is made therefor by a duly appointed legal representative.  Payments made pursuant to such power shall operate as a complete discharge of the Company and the Committee.

11.6  The validity of the Plan or any of its provisions shall be determined under, and it shall be construed and administered according to, the laws of the state of New York.

11.7  Any controversy or dispute hereunder shall be resolved by arbitration pursuant to the Constitution of the Exchange or the NASD.

11.8  Each Participant may designate, in writing and on a form provided by the Committee, any person(s), legal entity(ies), including his estate, as his Beneficiary under the Plan; _provided_, _however_, that a Participant may designate a trust as his Beneficiary only with the prior written approval of the Committee. A Participant may at any time revoke his designation of a Beneficiary or change his Beneficiary at any time prior to his death by filing with the Committee the appropriate beneficiary designation form.  If no person or legal entity shall be designated by a Participant as his Beneficiary or if no designated Beneficiary survives him, his Beneficiary shall be his estate.  To be effective, any designation or revocation of Beneficiary must be on the appropriate form provided by the Committee and on file with the Committee prior to the date of the Participant's death.  The provisions of the Plan shall be binding on the Participant, the Company, and their respective heirs, executors, administrators, successors and assigns.

-13-

SHEARSON LEHMAN BROTHERS INC.


DEFERRED COMPENSATION PLAN
FOR FINANCIAL CONSULTANTS
(FOR SHEARSON VESTED AMOUNTS AS OF JULY 30, 1993
AND LEHMAN BROTHERS)


As Amended and Restated Effective January 1, 1991
and Subsequently Amended Through July 30, 1993

83690084

TABLE OF CONTENTS

                                                                      Page

ARTICLE I
        Definitions . . . . . . . . . . . . . . . . . . . . . . . . .    1

ARTICLE II
        Participation . . . . . . . . . . . . . . . . . . . . . . .     4

ARTICLE III
        Deferred Compensation Credit   . . . . . . . . . . . . . . .    4

ARTICLE IV
        Deferred Compensation Accounts   . . . . . . . . . . . . . .    5

ARTICLE V
        Vesting . . . . . . . . . . . . . . . . . . . . . . . . . .     6

ARTICLE VI
        Payment of Deferred Compensation Account;
        Election to Defer Payment . . . . . . . . . . . . . . . . .     6

ARTICLE VII
        Funding . . . . . . . . . . . . . . . . . . . . . . . . . .     9

ARTICLE VIII
        Subordination Provisions   . . . . . . . . . . . . . . . . .    9

ARTICLE IX
        Administration   . . . . . . . . . . . . . . . . . . . . . .   15

ARTICLE X
        Amendment and Termination . . . . . . . . . . . . . . . . .    15

ARTICLE XI
        General Provisions   . . . . . . . . . . . . . . . . . . . .   16

## DEFERRED COMPENSATION PLAN
### FOR FINANCIAL CONSULTANTS

As Amended and Restated Effective January 1991 and Subsequently Amended Through July 30, 1993

### ARTICLE I
### Definitions

1.1   As used in the Plan, the following terms shall have the meanings hereinafter set forth:

"Act" means the Securities Exchange Act of 1934 as in effect from time to time.

"Attainment Year" means each Year for which a Participant is entitled to a deferred compensation credit in accordance with the provisions of ARTICLE III hereof and as provided in the Prior Plan.

"Beneficiary" means any person(s) or legal entity(ies) designated by the Participant or otherwise in accordance with Section 11.8.

"Board of Directors" means the Board of Directors of the Company.

"Cause" means willful misconduct, dishonesty, conviction of a felony, persistent incompetence or habitual or gross negligence in the performance of a Participant's duties to the Company other than as a result of total or partial incapacity due to disability, persistent failure to abide by the policies and regulations of the Company or American Express Company or such other similar conduct as determined by the Committee in its sole discretion; provided, however, that for purposes of this definition, after the Closing Date and only with respect to Smith Barney Participants, the term "Company" shall mean Smith Barney.

"CBT" means the Chicago Board of Trade.

"CEA" means the Commodity Exchange Act, as in effect from time to time.

"CFTC" means the Commodity Futures Trading Commission.

"Closing Date" means the closing date of the Smith Barney Transaction.

"Commissions" means gross commissions credited by the Company for sales made by a Financial Consultant for any Year.

"Committee" means the Employee Benefit Plans Committee of the Company which administers the Plan in accordance with ARTICLE IX.

"Company" means Shearson Lehman Brothers Inc., a Delaware corporation, and its successors and assigns and, where and only where the text specifically so indicates, Smith Barney.

"Credit Percentage for Commissions" means the percentage determined by the Committee for a Year on or before January 31 thereof, which is used to

83690084

determine the deferred compensation credit to a Participant for such Year in accordance with Section 3.1(a).

"Credit Percentage for Qualified Assets" means the percentage determined by the Committee for a Year on or before January 31 thereof, which is used to determine the deferred compensation credit to a Participant for such Year in accordance with Section 3.1(b).

"Deferred Compensation Account" means the account established and maintained under the Plan for a Participant for each Attainment Year.

"Deferred Payment Account" means a Participant's Deferred Compensation Account for any Attainment Year as to which he has deferred payment pursuant to an election under Section 6.2 hereof.

"Disability" means (a) prior to the Restatement Date, disability as defined under the Shearson Lehman Brothers Inc. Long-Term Disability Plan, and (b) on or subsequent to the Restatement Date, termination of a Participant's employment with the Company by reason of total and permanent disability, determined in accordance with the Shearson Lehman Brothers Inc. Long-Term Disability Plan, as in effect from time to time. For purposes of clause (b) above, after the Closing Date and only with respect to Smith Barney Participants, the term "Company" shall mean Smith Barney.

"Eligibility Level" means the minimum Commission level and/or the minimum level of Qualified Assets established by the Committee for a Year on or before January 31 thereof, which are required of a Financial Consultant for participation in the Plan for such Year.

"Effective Date" means January 1, 1977.

"Exchange" means the New York Stock Exchange, Inc.

"Financial Consultant" means a person employed by the Company as a retail Financial Consultant within the United States, Puerto Rico or elsewhere.

"Financial Hardship" means severe financial hardship to the Participant resulting from a sudden and unexpected illness or accident of the Participant or a dependent, loss of the Participant's property due to casualty, or other similar extraordinary and unforeseeable circumstances arising as a result of events beyond the control of the Participant. The circumstances that will constitute a Financial Hardship will depend upon the facts of each case and will be determined by the Committee in its sole discretion, but distributions may not be made to the extent that such hardship is or may be relieved (i) through reimbursement or compensation by insurance or otherwise or (ii) by liquidation of the Participant's assets, to the extent the liquidation of such assets would not itself cause severe financial hardship.

"Installments" means substantially equal installments payable annually as of the last day of the applicable calendar quarter and as of the anniversary thereof in each succeeding year over a period certain not to exceed 15 years, as elected by a Participant in accordance with Section 6.2.

"Interest" on a Deferred Compensation Account shall have the meaning set forth in Section 4.4.

"NASD" means the National Association of Securities Dealers, Inc.

83690084

"Non-Vested Plan" means the Shearson Lehman Brothers, Inc. Deferred Compensation Plan for Financial Consultants (for Shearson Non-Vested Amounts as of July 30, 1993) (as such plan may be renamed following its assumption by Smith Barney as of the Closing Date), or such similar plan as may be adopted by Smith Barney as of the Closing Date, pursuant to which non-vested amounts held in Deferred Compensation Accounts prior to the Closing Date will be transferred in accordance with Section 4.5.

"Participant" means a Financial Consultant who meets the requirements set forth in ARTICLE II.

"Plan" means the Shearson Lehman Brothers Inc. Deferred Compensation Plan for Financial Consultants, as embodied herein and as amended from time to time.

"Primerica Retirement Plan" means the defined benefit pension plan sponsored by Smith Barney or an affiliate thereof which covers a Smith Barney Participant at the time of his retirement thereunder.

"Prior Plan" means the Shearson Lehman Brothers Inc. Account Executive Deferred Income Benefit Plan, established July 1, 1972, as in effect from time to time prior to the Effective Date.

"Qualified Assets" means (i) the assets held by the Company which the Committee determines will be treated as such for purposes of the Plan for a Year on or before January 31 thereof, and which are valued on clients' statements for accounts for which (and to the extent that) a Financial Consultant is credited with the Commissions from such accounts, and (ii) such other assets of a Financial Consultant's clients held by the Company as the Committee shall determine in a uniform manner applicable to all Participants.

"Regular Vesting Date" of a Deferred Compensation Account means the last day of the fifth year following the Attainment Year for which such Account is maintained.

"Restatement Date" means January 1, 1991.

"Retirement" means (a) prior to the Restatement Date, a Participant's retirement from employment with the Company under (i) the provisions of the Company's Retirement Plan, or (ii) some other arrangement but only if approved in advance by the Committee, (b) on or after the Restatement Date, termination of a Participant's employment with the Company as a result of his retirement, determined pursuant to the provisions of the Shearson Lehman Brothers Holdings Inc. Retirement Plan, as in effect from time to time, and (c) after the Closing Date, and only with respect to Smith Barney Participants, termination of a Participant's employment with Smith Barney as a result of his retirement, determined pursuant to the provisions of the Primerica Retirement Plan, as in effect from time to time.

"Rule" means Rule 15c3-1 under the Act.

"SEC" means the Securities and Exchange Commission.

"Separation from Service" means termination of a Participant's employment with the Company by reason of Retirement, Disability, death or otherwise. For purposes of the preceding sentence, on or after the Closing Date, and only with respect to Smith Barney Participants, the term "Company" shall mean Smith Barney.

"SIPA" means the Securities Investor Protection Act of 1970, as in effect from time to time.

"Smith Barney" means Smith Barney, Harris Upham & Co., Incorporated and Primerica Corporation and their successors and assigns.

"Smith Barney Participants" means those persons who were Participants for any Year prior to or including the Closing Date, and who became employed by Smith Barney as of the Closing Date or later in connection with the Smith Barney Transaction.

"Smith Barney Transaction" means the sale of certain Company assets to Smith Barney pursuant to an Asset Purchase Agreement dated as of March 12, 1993 among the Company, Shearson Lehman Brothers Holdings Inc., Smith Barney, Primerica Corporation and American Express Company.

"Vesting Date" of a Deferred Compensation Account shall be determined in accordance with ARTICLE V.

"Year" means a calendar year.

1.2    Wherever any words are used herein in the masculine gender, they shall be construed as though they were also used in the feminine gender in all cases where they would so apply, and wherever any words are used herein in the singular form, they shall be construed as though they were also used in the plural form in all cases where they would so apply.


ARTICLE II
Participation

2.1    Each person who is a Financial Consultant on the last day of any Year and whose Commissions for such Year exceed the Eligibility Level for such Year shall be a Participant in the Plan for such Year; provided, however, that a Financial Consultant who is employed within the United States shall be a Participant in the Plan if his Qualified Assets for such year exceed the Eligibility Level for such Year.

2.2    Notwithstanding anything herein to the contrary, a Participant ceases to be a Participant on his Separation from Service date.


ARTICLE III
Deferred Compensation Credit

3.1    (a)    As of the last day of each Year beginning on and after the Effective Date, the Committee shall cause to be credited to the Deferred Compensation Account of each Participant whose Commissions for such Year exceed the Eligibility Level for such Year an amount of deferred compensation for such Year equal to the product of the Credit Percentage for Commissions for such Year multiplied by his Commissions for such Year.

(b)    Subject to Section 3.3, as of the last day of each Year beginning on and after the Effective Date, the Committee shall cause to be credited to the Deferred Compensation Account of each Participant whose Qualified Assets for such Year exceed the Eligibility Level for such Year an amount of deferred compensation for such Year equal to the product of the Percentage for Qualified Assets for such Year multiplied by his Qualified Assets for such Year.

-4-

3.2   The Committee shall determine annually if amounts shall be credited, and the amounts to be credited, under Section 3.1.

3.3   Notwithstanding anything herein to the contrary, no additional amounts shall be credited to any Deferred Compensation Account pursuant to Section 3.1(b) after January 31, 1992, and no Interest shall be credited to any Smith Barney Participant's Deferred Compensation Account on or after the Closing Date.   It is understood that Section 3.1(b) is replaced with the Shearson Lehman Brothers Inc. Asset Compensation Plan for Financial Consultants as of February 1, 1992.

ARTICLE IV
Deferred Compensation Accounts

4.1   (a)   The Committee shall continue to maintain all existing Deferred Compensation Accounts of Participants for Attainment Years prior to 1977.

(b)   The Committee shall establish and maintain a Deferred Compensation Account for each Participant for each Attainment Year commencing on or after the Effective Date.

4.2   (a)   The amount credited to each Deferred Compensation Account immediately prior to the Effective Date, as determined in accordance with the provisions of the Prior Plan, shall continue to be credited to such account as of the Effective Date.

(b)   On and after the Closing Date, all vested amounts credited to each Deferred Compensation Account of a Smith Barney Participant as of the Closing Date, as determined in accordance with the provisions of ARTICLE V, shall continue to be credited to such account until such time as they are distributed to the Participant.

4.3   The amount of a Participant's deferred compensation credit(s) for any Attainment Year, as determined in accordance with ARTICLE III hereof, shall be credited to his Deferred Compensation Account as of the last day of such Year.

4.4   Subject to Section 3.3, interest shall be credited on amounts credited to each Deferred Compensation Account as of the last day of each calendar quarter from the later of the Effective Date or the last day of the applicable Attainment Year to the last day of the calendar quarter immediately preceding the date on which such amounts are distributed to the Participant, at the rates of Interest indicated below:

(a)   for periods prior to July 1, 1982 -- the average brokers call rate during such quarter; and

(b)   for periods on or after July 1, 1982 whichever of the following is applicable:

(i)   with respect to all Deferred Compensation Accounts which are vested on July 1, 1982 in accordance with ARTICLE V, the Company's average cost of money, or

(ii)   with respect to all other Deferred Compensation Accounts, including Deferred Payment Accounts, the average thirty-day U.S. Treasury Bill rate for each quarter;

-5-

provided, however, that if Section 6.4 is applicable, no Interest shall be credited to the Participant's Deferred Compensation Account after the last day of the calendar quarter in which his Separation from Service occurred; provided further, however, that the Committee may change prospectively the amount of Interest to be credited to a Participant's Deferred Compensation Account.

4.5    Effective as of the Closing Date, all non-vested amounts held in Deferred Compensation Accounts for Smith Barney Participants shall be transferred to separate accounts held under and pursuant to the Non-Vested Plan, such separate accounts to be assumed by Smith Barney as of the Closing Date and paid in accordance with the terms of the Non-Vested Plan.    The Deferred Compensation Accounts of such Smith Barney Participants shall be adjusted to reflect such transfer.

## ARTICLE V
### Vesting

5.1    A Participant's Deferred Compensation Account for any Attainment Year shall vest on the earlier of (a) the Regular Vesting Date for such Deferred Compensation Account, or (b) the Participant's Retirement, Disability or death.

5.2    Notwithstanding anything herein to the contrary, a Participant shall forfeit his Deferred Compensation Account, including all earnings credited to such Deferred Compensation Account, in the event of his Separation from Service for any reason other than Retirement, Disability or death (including but not limited to termination by the Company for Cause, even if such termination also constitutes Retirement) prior to the Regular Vesting Date.

## ARTICLE VI
### Payment of Deferred Compensation Account;
### Election to Defer Payment

6.1    Except as otherwise provided herein, vested amounts credited to a Participant's Deferred Compensation Account shall be paid as follows:

(a)    if a Participant fails to elect otherwise in accordance with the provisions of Section 6.2 hereof, payment shall be made in a lump sum as of the last day of the Year in which he vests in his Deferred Compensation Account, with such payment being made as soon as administratively practicable following the last day of such Year.

(b)    if a Participant incurs a Separation from Service, other than on account of his death, Disability or Retirement, notwithstanding any previous election to the contrary, payment shall be made to him in a lump sum calculated as of the last day of the calendar quarter in which he incurs a Separation from Service, with payment being made as soon as administratively practicable after the last day of the calendar quarter which is one (1) year subsequent to the calendar quarter in which he incurs such Separation from Service, or

(c)    if a Participant Retires or becomes Disabled, and the Participant fails to elect otherwise in accordance with the provisions of Section 6.2 hereof, payment shall be made to him in a lump sum calculated as of the last day of the calendar quarter in which the Participant Retires or becomes Disabled, with such payment being made as soon as administratively

-6-

practicable after the last day of the calendar quarter in which he incurs such Retirement or Disability.

6.2    Notwithstanding the provisions of Section 6.1, at least one year prior to the Regular Vesting Date of a Participant's Deferred Compensation Account for any Attainment Year, the Participant may elect in writing, on a form provided by the Committee, to defer payment of such vested Deferred Compensation Account and to have it paid (a) in a lump sum or in Installments (as indicated on such election) commencing as soon as practicable following the last day of the calendar quarter coincident with or next following the date which is six months following his Separation from Service due to death, Disability or Retirement, provided that such Separation of Service occurs on or after his Regular Vesting Date; or (b) in a lump sum or in Installments (as indicated on such election) commencing as soon as practicable following any specified date (as indicated on such election) following his Regular Vesting Date; _provided_, _however_, that any such election made with respect to a Deferred Compensation Account for an Attainment Year whose Vesting Date occurs prior to the Regular Vesting Date for such Deferred Compensation Account shall be deemed revoked and shall not become effective; _provided further_, _however_, that Participants who work outside of the United States shall not be permitted to make an election under this Section 6.2.    Any amount held in a Deferred Compensation Account which is made subject to a deferral election under this Section 6.2 shall be considered a Deferred Payment Account.

6.3    Effective as of the Restatement Date, notwithstanding anything herein to the contrary, distributions of a Participant's vested Deferred Compensation Accounts, including Deferred Payment Accounts, shall commence as soon as administratively practicable after distributions to the Participant under the Shearson Lehman Brothers Holdings Inc. Retirement Plan commence, even if the Participant has made a previous election to defer payment and even if the Participant has not otherwise incurred a Retirement, Disability, death, or other Separation from Service, with payments being made in the manner elected by the Participant in accordance with the provisions of Section 6.2; _provided_, _however_, that after the Closing Date, distributions of a Smith Barney Participant's vested Deferred Compensation Accounts, including Deferred Payment Accounts, shall commence as soon as administratively practicable after distributions to the Smith Barney Participant under the Primerica Retirement Plan commence, even if the Smith Barney Participant has made a previous election to defer payment and even if the Smith Barney Participant has not otherwise incurred a Retirement, Disability, death, or other Separation from Service, with payments being made in the manner elected by the Smith Barney Participant in accordance with the provisions of Section 6.2.

6.4    Following a Participant's Separation from Service or such other date as he shall have elected, the amount credited to his Deferred Payment Account shall be paid to him (or to his Beneficiary in the case of his death) in accordance with his election under Section 6.2; _provided_, _however_, that (a) if a Participant's Separation from Service occurs other than by reason of Retirement, Disability or death, payment of the amount credited to his Deferred Payment Account shall be made in a lump sum as of the last day of the calendar quarter in which the first anniversary of his Separation from Service occurs and no Installment payments, if applicable, shall be made during the one-year period prior to such date; and (b) no payment or commencement of payments may be made prior to the expiration of one year from the Regular Vesting Date of the Deferred Payment Account for which the amount of any withdrawal is to be paid.

83690084

6.5   Effective as of the Restatement Date, notwithstanding anything herein to the contrary, any amounts payable hereunder may be retained by the Company in the event the Participant owes the Company any funds at the time such Participant is otherwise entitled to receive amounts credited to his Deferred Compensation Account.

6.6   Plan payments shall not be included in the calculation of Financial Consultant production levels or be utilized for any similar purpose, and all such payments shall be considered cash compensation to the Participant when paid, subject to all applicable federal, state and local income taxes and withholding.

6.7   Amounts paid or deferred under the Plan shall not be eligible for further deferral under the Plan.

6.8   If a Participant dies, his Beneficiary shall be entitled to receive, as soon as administratively practicable after the date of his death, the payment of his Deferred Compensation Account and his Deferred Payment Account, with such payment being made in the form elected by the Participant in accordance with the provisions of Section 6.2, less any applicable federal, state and local income taxes and withholding, if any.

6.9   No Interest or other earnings shall be paid on any amount payable under the Plan for the period commencing on the last day of the calendar quarter in which payment is required to be made and ending on the date payment is actually made.

6.10   No payments shall be required or made if, in the opinion of the Committee, such payment would not comply with the rules and regulations of the NASD, the SEC, the CBT, any state securities regulatory authority, or any other applicable law, rule or regulation, or the Participant is subject to the provisions of Section 11.4.

6.11   Notwithstanding anything herein to the contrary, a Participant may request and receive a hardship distribution, provided the Participant is able to demonstrate, to the satisfaction of the Committee, that he has suffered a Financial Hardship.  A hardship distribution request must be made on the form provided by the Committee and is subject to the rules established by the Committee governing hardship distributions.   The amount distributed cannot exceed the lesser of (a) the Participant's vested Deferred Compensation Account balance, or (b) the amount reasonably necessary to satisfy the Participant's Financial Hardship.   No distribution may be made prior to the time the Committee approves the distribution, and payment is subject to the provisions of Section 8.3.

6.12   For the purpose of this ARTICLE VI, the amount credited to a Participant's Deferred Compensation Account as of any date shall mean the amount initially credited to such Account under ARTICLE IV, as of the Effective Date or the last day of the applicable Attainment Year, whichever is applicable, plus Interest thereon to the date in question reduced by the amount of any withdrawals or Installment payments made to the Participant (or his Beneficiary).

6.13   Any payment made to a Participant or his or her Beneficiary or estate pursuant to the terms of the Plan shall constitute a complete discharge of the obligations of the Company and the Committee with respect thereto.

## ARTICLE VII
### Funding

7.1  All amounts credited under the Plan shall be made in such amounts as determined by the Committee annually and paid solely from the general assets of the Company.

7.2  All amounts credited to Participants' Deferred Compensation Accounts, including Deferred Payment Accounts shall, at all times, (a) be subordinated debt of the Company, (b) be dealt with in all respects as capital of the Company, (c) be subject to the risk of the Company's business, and (d) may be deposited in an account or accounts in the Company's name in any bank or trust company.

## ARTICLE VIII
### Subordination Provisions

8.1  The Company's obligation to pay amounts credited to a Participant's Deferred Compensation Account or Deferred Payment Account on the date such payment is otherwise due and payable in accordance with the terms of the Plan (the "Fixed Payment Date") shall be suspended and shall not mature for any period of time during which after giving effect to such payment (together with (a) the payment of any other obligation of the Company payable at or prior to such payment and (b) the return of any Secured Demand Note as defined in the Rule as in effect at the time such payment is to be made and the collateral therefor held by the Company and returnable at or prior to such payment):

(i)    If the Company is not operating pursuant to the alternative net capital requirements provided for in paragraph (f) of the Rule, the aggregate indebtedness of the Company would exceed 1200 per centum of its net capital (or its "adjusted net capital" as defined in the regulations under the CEA) as those terms are defined in the Rule as in effect at the time payment is to be made or such lesser per centum as may be made applicable to the Company from time to time by the Exchange (or other domestic exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority; or

(ii)   if the Company is operating pursuant to the alternative net capital requirements provided for in paragraph (f) of the Rule, the net capital of the Company (or its "adjusted net capital" as defined in the regulations under the CEA) would be less than the greater of (x) 5 per centum of aggregate debit items computed in accordance with Exhibit A to Rule 15c3-3 under the Act or any successor rule as in effect at the time payment is to be made, (y) if the Company is registered as a futures commission merchant with the CFTC, 6 per centum of the funds required to be segregated pursuant to the CEA and the regulations promulgated thereunder and the foreign futures or foreign options secured amounts, less the market value of commodity options purchased by option customers on or subject to the rules of a contract market or foreign board of trade; <u>provided</u>, <u>however</u>, the deduction for each option customer shall be limited to the amount of customer funds in such option customer's account(s) and the foreign futures and foreign options secured amounts (if greater), or (z) such greater per centum as may be made applicable to the Company

-9-

from time to time by the Exchange (or any other domestic exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority; or

(iii) if the Company's net capital (or its "adjusted net capital" as defined in the regulations under the CEA), as defined in the Rule or any successor rule as in effect at the time payment is to be made, would be less than 120 per centum of any minimum dollar amount required by the Rule (or the regulations under the CEA as in effect at such time), or such greater dollar amount as may be made applicable to the Company by the Exchange (or any other domestic exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority; or

(iv) if the Company guarantees, endorses, carries or clears specialist or market maker transactions in options listed on a national securities exchange or facility of a national securities association, the amounts required to be deducted and maintained as required by the provisions of paragraphs (a)(6)(v), (a)(7)(iv) or (c)(2)(x)(b)(1) of the Rule would exceed 1000 per centum of its net capital (or its "adjusted net capital" as defined in the regulations under the CEA), as defined in the Rule as in effect at the time such payment is made or such lesser per centum as may be made applicable to the Company by the Exchange (or any other domestic exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority.

During any such suspension the Company shall, as promptly as is consistent with the protection of its customers, reduce its business to a condition whereby the amounts the payment of which has been suspended could be paid (together with (c) the payment of any other obligation of the Company payable at or prior to the payment of such amounts and (d) the return of any Secured Demand Note and the collateral therefor held by the Company or returnable at or prior to the payment of such amounts) without the Company's net capital being below the applicable minimums set forth above in this Section 8.1 or its "adjusted net capital" being below the amount required as aforesaid, at which time the Company shall pay the amounts credited to a Participant's Deferred Payment Account the payment of which has been suspended (including Interest thereon calculated pursuant to the terms of the Plan, if any) on not less than five (5) days prior written notice to the Exchange and the CBT. The first day on which under this ARTICLE VIII the Company has an obligation to pay amounts is hereinafter referred to as the "payment date." If, pursuant to the terms hereof, the Company's obligation to pay amounts credited to a Participant's Deferred Payment Account is suspended, the Company recognizes and agrees that the Company may be summarily suspended by the Exchange. The Company agrees that, if its obligation to pay amounts credited to a Participant's Deferred Payment Account is ever suspended for a period of six (6) months, it will promptly take whatever steps are necessary to effect a rapid and orderly complete liquidation of its business.

8.2    If payment is made of all or any part of the amounts credited to a Participant's Deferred Payment Account on the payment date and if immediately after any such payment the Company's net capital is less than the applicable minimums set forth above in Section 8.1, the Participant by

-10-

electing to participate agrees irrevocably, for himself, his beneficiaries, heirs and assigns (whether or not the Participant had any knowledge or notice of such fact at the time of any such payment) to repay to the Company, its successors or assigns, the sum so paid, to be held by the Company pursuant to the provisions hereof as if such payment had never had been made; <u>provided</u>, <u>however</u>, that any suit for the recovery of any such payment must be commenced within two (2) years of the date of such payment.

8.3    No payment of all or any portion of amounts credited to a Participant's Deferred Payment Account shall be made prior to the Fixed Payment Date (whether as a consequence of Financial Hardship or otherwise, any such payment being herein called a "Prepayment") unless at least one year has passed from the effective date of the deferral and the Company shall have received the prior written permission of the Exchange after consultation with the SEC if the Exchange deems such consultation appropriate and the prior written permission of the CBT.  Furthermore, no Prepayment shall be made if after giving effect thereto (and to all other payments of principal of outstanding subordination agreements of the Company, including the return of any Secured Demand Note and the collateral therefor held by the Company, the maturity or accelerated maturity of which are scheduled to occur within six (6) months after the date such Prepayment is to occur, or on or prior to the date on which the Participant has elected to receive payment of the amounts credited to his Deferred Payment Account disregarding such proposed payment, whichever date is earlier) without reference to any projected profit or loss of the Company:

(i)    if the Company is not operating pursuant to the alternative net capital requirements provided for in paragraph (f) of the Rule, the aggregate indebtedness of the Company would exceed 1000 per centum of its net capital (or its "adjusted net capital" as defined in the regulations under the CEA), as those terms are defined in the Rule as in effect at the time Prepayment is to be made; or such lesser per centum as may be made applicable to the Company from time to time by the Exchange (or any other domestic exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority; or

(ii)    if the Company is operating pursuant to such alternative net capital requirement, its net capital (or its "adjusted net capital" as defined in the regulations under the CEA) would be less than the greater of: (x) 5 per centum of aggregate debit items as those terms are defined in Exhibit A to Rule 15c3-3 of the Act or any successor rule as in effect at such time; (y) if the Company is registered as a futures commission merchant with the CFTC, 6 per centum of the funds required to be segregated pursuant to the CEA and the regulations promulgated thereunder and the foreign futures or foreign options secured amounts, less the market value of commodity options purchased by option customers on or subject to the rules of a contract market or foreign board of trade; <u>provided</u>, <u>however</u>, the deduction for each option customer shall be limited to the amount of customer funds in such option customer's account(s) and foreign futures and foreign options secured amounts (if greater); or (z) such greater per centum as may be made applicable to the Company from time to time by the Exchange (or any other domestic exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority; or

83690084

(iii) if the Company's net capital (or its "adjusted net capital" as defined in the regulations under the CEA), as defined in the Rule or any successor rule as in effect at the time payment is to be made, would be less than 120 per centum of any minimum dollar amount required by the Rule (or the regulations under the CEA as in effect at such time), or such greater dollar amount as may be made applicable to the Company by the Exchange (or any other domestic exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority; or

(iv) if the Company guarantees, endorses, carries or clears specialist or market transactions in options listed on a national securities exchange or facility of a national securities association, the amounts required to be deducted and maintained as required by the provisions of paragraphs (a)(6)(v), (a)(7)(iv) or (c)(2)(x)(b)(1) of the Rule would exceed 1000 per centum of its net capital (or its "adjusted net capital" as defined in the regulations under the CEA), as defined in the Rule as in effect at the time such payment is made or such lesser per centum as may be made applicable to the Company by the Exchange (or any other exchange, board of trade, clearing association or similar organization of which the Company is a member) or a domestic governmental agency or body having appropriate authority.

If Prepayment is made of all or any part of the amounts credited to a Participant's Deferred Compensation Account on or prior to the Fixed Payment Date, and if the Company's net capital is less than the amount required to permit such payment pursuant to the previously cited provisions of this Section 8.3, the Participant agrees irrevocably by electing to participate in the Plan (whether or not such Participant had any knowledge or notice of such fact at the time of any such Prepayment) to repay the Company, its successors or assigns, the sum so paid to be held by the Company pursuant to the provisions hereof as if such Prepayment had never been made; _provided_, _however_, that any suit for the recovery of any such Prepayment must be commenced within two (2) years of the date of such Prepayment.

8.4    A Participant, by making an election to participate in this Plan, irrevocably agrees that the obligations of the Company under the Plan with respect to the payment of amounts credited to a Participant's Deferred Payment Account are and shall be subordinate in right of payment and subject to the prior payment or provision for payment in full of all claims of all other present and future creditors of the Company whose claims are not similarly subordinated (claims under the Plan shall rank _pari_ _passu_ with claims similarly subordinated) and to claims which are now or hereafter expressly stated in the instruments creating such claims to be senior in right of payment to claims arising under the Plan, arising out of any matter or event occurring prior to the payment date of the amounts credited to that Participant's Deferred Payment Account under the Plan.  In the event of the appointment of a receiver or trustee of the Company or in the event of its insolvency, liquidation pursuant to SIPA or otherwise, its bankruptcy, assignment for the benefit of creditors, reorganization whether or not pursuant to bankruptcy laws, or any other marshalling of the assets and liabilities of the Company, a Participant shall not be entitled to participate or share, ratably or otherwise, in the distribution of the assets of the Company until all claims of all other present and future creditors of the Company, whose claims are senior to claims arising under the Plan, have been fully satisfied, or provision has been made therefor.

-12-

8.5   Notwithstanding anything herein to the contrary:

(a)   a Participant shall not be entitled to receive any payment in respect of amounts credited to his Deferred Compensation Account or his Deferred Payment Account or to participate in the distribution of assets of the Company in respect thereof if such payment or distribution would constitute a violation of the express terms of any Senior Subordinated Debt, as hereinafter defined (or any agreement under or pursuant to which the same may be outstanding);

(b)   the right of a Participant to receive any payment in respect of amounts credited to his Deferred Compensation Account or his Deferred Payment Account shall be subordinated to claims of the holders of Senior Subordinated Debt so that, in the case of any distribution of assets of the Company in complete or partial liquidation, reorganization, arrangement or other marshalling of assets and liabilities of the Company, no such distribution or payment will be made with respect to amounts credited to a Participant's Deferred Compensation Account or Deferred Payment Account unless and until the principal of and interest on the Senior Subordinated Debt are paid in full; and

(c)   a Participant shall promptly return to the Company any amounts (whether cash, securities or otherwise) received from the Company if the payment by the Company of such amounts constituted a violation of the express terms of any Senior Subordinated Debt (or any agreement under or pursuant to which the same may be outstanding).

8.6   The term "Senior Subordinated Debt" as used herein shall mean and include all indebtedness of the Company (other than the Company's obligations under the Company's 13 1/8% Subordinated Note due March 15, 1994, the Company's 10 3/4% and 15 1/4% Subordinated Notes due from June 30, 1994 through December 31, 2025, the Company's obligations under the Plan, the Company's Voluntary Deferred Compensation Plan, the Company's Asset Compensation Plan for Financial Consultants, the Company's Deferred Compensation Plan for Branch Managers, the Company's Recognition Award Plans (including the Lehman Brothers Equity Unit and Bonus Plan), the Company's E.F. Hutton Partnership Award Plan and those similar agreements with other Participants each of which rank _pari passu_ with the obligations of the Company under the Plan) constituting part of its Net Capital (as defined in the Rule as in effect from time to time), and shall include without limitation thereto the indebtedness represented by the Company's obligations under the Company's 7 7/8% Senior Subordinated Notes Due August 15, 1993; the Company's 12 1/2% Senior Subordinated Notes Due October 15, 1994; the Company's Floating Rate Subordinated Note with American Express Company due April 1, 1994; the Company's 8 3/4% Senior Subordinated Debentures Due March 1, 1996; the Company's 10 3/4% Senior Subordinated Notes Due April 29, 1996; the Company's 9 1/2% Senior Subordinated Notes Due June 15, 1997; the Company's Senior Subordinated Notes Due May 15, 1999; the Company's 9 7/8% Senior Subordinated Notes Due October 15, 2000; the Company's 11 5/8% Senior Subordinated Debentures Due May 15, 2005; the Company's 9 7/8% Senior Subordinated Note Due October 1, 1993; the Company's 10 3/4% Senior Subordinated Notes due from June 30, 1994 through December 31, 2025 held by various subsidiaries and affiliates of the Company; the Company's Floating Rate Senior Subordinated Notes due from January 27, 1994 through September 30, 1994 held by an affiliate of the Company; the Company's 6% Senior Subordinated Notes due December 30, 1994; the Company's Floating Rate Senior Subordinated Notes due July 14, 1994; and the Company's Floating Rate Senior

-13-

Subordinated Notes due May 17, 1996 unless, in each case, in the instrument evidencing or creating the same, or in any agreement under or pursuant to which it shall be outstanding, such indebtedness shall be declared not to be Senior Subordinated Debt.  Senior Subordinated Debt (and any agreement under or pursuant to which the same may be outstanding) may be amended, the commitment under such agreements may be increased, provisions thereof may be waived, time of payment of the Senior Subordinated Debt may be extended and other indulgences granted to the Company in respect thereof all from time to time without notice to or assent of any Participant under the Plan.

8.7   Each Participant, by making an election to participate in this Plan, irrevocably agrees and acknowledges that:

(a)   such election is not being made in reliance upon the standing of the Company as a member organization of the Exchange or upon the Exchange's surveillance of the Company's financial position or its compliance with the constitution, rules and practices of the Exchange;

(b)   the Participant is not relying upon the Exchange to provide any information concerning or relating to the Company and the Exchange has no responsibility to disclose to the Participant any information concerning or relating to the Company which it may now, or at any future time, have; and

(c)   neither the Exchange, its Special Trust Fund, nor any director, officer, trustee or employee of the Exchange or said Trust Fund shall be liable to any Participant with respect to this Plan or the payment of amounts credited to a Participant's Deferred Compensation Account or Deferred Payment Account .

8.8   Upon termination of the Company as a member of the Exchange, the references herein to the Exchange shall be deemed to refer to the Examining Authority.  The term Examining Authority shall refer to such regulatory body having responsibility for inspecting or examining the Company for compliance with financial responsibility requirements under Section 9(c) of SIPA and Section 17(d) of the Act.  References herein to the Exchange or the Examining Authority shall also be deemed to refer to the CBT and to any other exchange, board of trade, clearing association or similar organization of which the Company is a member and which requires such reference as a condition to inclusion of the amounts credited to Deferred Compensation Accounts and Deferred Payment Accounts hereunder in the Company's net capital as computed for the purposes of such organization.

8.9   References in the Plan to the Exchange or Examining Authority shall also be deemed to refer to the organization(s) designated as the self-regulatory organization(s) (also known as DSRO) of the Company pursuant to a plan filed with the CFTC pursuant to Regulation 1.52 under the CEA to the extent such references are required as a condition to inclusion of the amounts credited to Deferred Compensation Accounts and Deferred Payment Accounts in the Plan in the Company's net capital as computed for purposes of such organization(s).

8.10   All amounts credited to Deferred Compensation Accounts and Deferred Payment Accounts shall be dealt with in all respects as capital of the Company, shall be subject to the risks of its business, and may be deposited in an account or accounts in the Company's name in any bank or trust company.

-14-

8.11  Notwithstanding any other provisions in this ARTICLE VIII, all amounts which are from time to time credited to Participants' Deferred Compensation Accounts or Deferred Payment Accounts shall be subject to the terms of subordination set forth in this ARTICLE VIII.

### ARTICLE IX
### Administration

9.1  The complete authority to control and manage the operation and administration of the Plan and the responsibility for carrying out its provisions belongs to the Committee.  The Committee shall consist of at least three members appointed from time to time by the Board of Directors to serve at the pleasure thereof.   Any member of the Committee may resign by delivering his written resignation to the Board of Directors.

9.2  Effective as of the Restatement Date and subject to the limitations of the Plan, the Committee shall from time to time establish rules of administration and interpretation of the Plan.  The determination of the Committee as to any disputed questions, including any question of Plan interpretation, shall be conclusive and binding on all parties, including the Participant, his Beneficiary and the Company.

9.3  Any act which the Plan authorizes or requires the Committee to do may be done by a majority of its members.   The action of such majority, expressed by a vote at a meeting or in writing without a meeting, shall constitute the action of the Committee and shall have the same effect for all purposes as if assented to by all members of the Committee.

9.4  The members of the Committee may authorize one or more of their number to execute or deliver any instrument, make any payment or perform any other act which the Plan authorizes or requires the Committee to do.

9.5  The Committee may employ counsel and other agents and may procure such clerical, accounting, and other services as they may require in carrying out the provisions of the Plan.

9.6  No member of the Committee shall receive any compensation for his services as such.  All expenses of administering the Plan, including but not limited to, fees of accountants and counsel, shall be paid by Company.

9.7  The Company shall indemnify and save harmless each member of the Committee against all expenses and liabilities arising out of membership on the Committee, excepting only expenses and liabilities arising from his own gross negligence or willful misconduct, as determined by the Board of Directors.

### ARTICLE X
### Amendment and Termination

10.1  The Company, by action of the Committee, may at any time or from time to time modify or amend any or all of the provisions of the Plan or may at any time terminate the Plan; provided, however, that no action taken shall adversely affect the rights of any Participant hereunder to vested amounts due and payable to such Participant at the time such action is taken, unless the Participant otherwise consents thereto.

-15-

83690084

## ARTICLE XI
### General Provisions

11.1  No Participant, branch manager, Financial Consultant or employee of the Company shall have any right to any payment or benefit hereunder except to the extent provided in the Plan.

11.2  The employment rights of any Participant shall not be enlarged, guaranteed or affected by reason of any of the provisions of the Plan.

11.3  Assignment, pledge or other encumbrance of any payments or benefits under the Plan shall not be permitted or recognized and to the extent permitted by law, no such payments or benefits shall be subject to legal process or attachment for the payment of any claim of any person entitled to receive the same.

11.4  The Company shall have the right to retain or to use any amounts payable under the Plan to satisfy or otherwise offset amounts the Participant owes to the Company as a result of his actions or in the event he is terminated for Cause.  Amounts payable under the Plan may also be used to offset amounts the Company is required to pay a client or a regulatory agency or any other person or entity as a result of the Participant's actions.

11.5  If the Committee determines that any person to whom a payment is due hereunder is a minor or incompetent by reason of physical or mental disability, the Committee shall have the power to cause the payments then due to such person to be made to another for the benefit of the minor or incompetent, without responsibility of the Company or the Committee to see to the application of such payment, unless claim prior to such payment is made therefor by a duly appointed legal representative.  Payments made pursuant to such power shall operate as a complete discharge of the Company and the Committee.

11.6  The validity of the Plan or any of its provisions shall be determined under, and it shall be construed and administered according to, the laws of the state of New York.

11.7  Any controversy or dispute hereunder shall be resolved by arbitration pursuant to the Constitution of the Exchange or the NASD.

11.8  Each Participant may designate, in writing and on a form provided by the Committee, any person(s), legal entity(ies), including his estate, as his Beneficiary under the Plan; provided, however, that a Participant may designate a trust as his Beneficiary only with the prior written approval of the Committee.  A Participant may at any time revoke his designation of a Beneficiary or change his Beneficiary at any time prior to his death by filing with the Committee the appropriate beneficiary designation form.  If no person or legal entity shall be designated by a Participant as his Beneficiary or if no designated Beneficiary survives him, his Beneficiary shall be his estate.  To be effective, any designation or revocation of Beneficiary must be on the appropriate form provided by the Committee and on file with the Committee prior to the date of the Participant's death.  The provisions of the Plan shall be binding on the Participant, the Company, and their respective heirs, executors, administrators, successors and assigns.

-16-

LEHMAN BROTHERS INC.

EXECUTIVE AND SELECT EMPLOYEES PLAN


Effective September 25, 1985
As Amended Through July 31, 1993

<PAGE>    2

TABLE OF CONTENTS

| Section | Page |
| --- | --- |
| 1 - Definitions . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| 2 - Administration of Plan . . . . . . . . . . . . . . . . . . . | 2 |
| 3 - Participation . . . . . . . . . . . . . . . . . . . . . . . | 3 |
| 4 - Deferred Compensation Payments . . . . . . . . . . . . . . . | 4 |
| 5 - Payments Prior to Vesting on Effective Date . . . . . . . . . | 6 |
| 6 - Termination . . . . . . . . . . . . . . . . . . . . . . . . | 6 |
| 7 - Miscellaneous Provisions . . . . . . . . . . . . . . . . . . | 7 |
| 8 - Beneficiary Designation . . . . . . . . . . . . . . . . . . | 7 |
| 9 - Subordination Provisions . . . . . . . . . . . . . . . . . . | 7 |
| 10 - Construction of Plan . . . . . . . . . . . . . . . . . . . | 8 |
| 11 - Assignment and Alienation of Benefits . . . . . . . . . . . | 8 |
| 12 - Governing Law . . . . . . . . . . . . . . . . . . . . . . . | 8 |

<PAGE>    3

Section 1.  Definitions

        1.1      As used in this Plan, the following terms shall have
        the meanings hereinafter set forth:
        "Beneficiary" means any person or entity designated by the
Participant to receive payments under the Plan after the Participant's death
determined in accordance with Section 8 and the Participant's Deferred
Compensation Agreement.
        "Board of Directors" means the Board of Directors of Lehman.
        "Committee" means the Employee Benefit Plans Committee of
Lehman, which administers the Plan in accordance with Section 2.
        "Deferred Compensation Account" means the account maintained
under the Plan for each Participant.
        "Deferred Compensation Agreement" means a contract entered
into by each Participant and Shearson which shall set forth all specific terms
of the Plan and which shall be an integral part of this Plan.
        "Disabled" means termination of a Participant's employment
with Lehman by reason of total and permanent disability as defined in Exhibit
C of the Deferred Compensation Agreement.
        "Effective Date" means September 25, 1985.
        "Eligible Employee" means certain executive and select
Employees invited to participate in the Plan by Lehman, other than any such
person who is classified as an "Eligible Employee" under any other "Executive
and Select Employees Plan" maintained
<PAGE>    4
by the Company (or who would be so classified under any other such Executive
and Select Employees Plan had such other such Plan not previously been
terminated).
        "Employee" means any employee of Lehman or a subsidiary of
Lehman .
        "Employer" means Lehman and any subsidiary thereof which has
Eligible Employees participating in the Plan.
        "Exchange" means the New York Stock Exchange, Inc.
        "Lehman" means Lehman Brothers Inc., a Delaware corporation,
and its successors and assigns.
        "Participant" means an Eligible Employee who elects to
participate in the Plan.
        "Plan" means the  Lehman Brothers Inc. Executive and
Select Employees Plan as embodied herein and as amended from time to time.
        "Retirement" means a Participant's retirement from employment
with the Employer or otherwise as determined by the Committee in accordance
with Section 4.
        1.2  The masculine pronoun shall be deemed to include the
feminine, and the singular number shall be deemed to include the plural unless
a different meaning is plainly required by the context.


Section 2.  Administration of Plan

        The Plan and each Deferred Compensation Agreement shall be
administered by the Committee which is made up of not less than three members
appointed by the Board of Directors of

<PAGE>  5

2

Lehman.  The Committee shall have authority to make rules and regulations for
the administration of the Plan, including the delegation of duties to other
persons, and the Committee's interpretations and decisions with regard thereto
shall be final and conclusive except that any controversy arising out of or
relating to the subordination provisions of Section 9, shall be submitted to
and settled by arbitration pursuant to the constitution and rules of the
Exchange.

Section 3.  Participation

        3.1  Eligible Employees may elect to participate in the Plan
only at the time or times such participation is offered to such Employees by
the Committee.  It is intended that participation shall be offered only during
a limited period of time after the Effective Date; however, lehman reserves
the right, in its absolute discretion, to offer participation to any Employee
at any time.  Eligible Employees who have elected to participate in the Plan
may withdraw only in accordance with its terms, the terms of a Participant's
Deferred Compensation Agreement or any applicable law.
        3.2  An Eligible Employee who elects to participate in the
Plan pursuant to an invitation by the Committee may do so by executing a
Deferred Compensation Agreement during the election period specified by the
Committee.  The total amount which Participants may elect to defer under the
Plan must be an amount of not less than $20,000 and not more than $400,000, and
all amounts deferred must be in increments of at least $1,000.  The

<PAGE>  6

3

deferrals may be made from future compensation to be received from the Employer
or from amounts previously deferred under the terms of the Shearson Voluntary
Deferred Compensation Plan but only to the extent permitted under the Deferred
Compensation Agreement.

Section 4.  Deferred Compensation Payments

        Subject to Sections 5, 6, 9 and a Participant's Deferred
Compensation Agreement, Lehman shall make payments to a Participant or a
Participant's Beneficiary under the Plan in accordance with one of the
following Subsections.

                (a)  If a Participant is living on the date of his Retirement,
                Lehman shall take deferred compensation payments to the
                Participant or the Participant's Beneficiary in the event of
                the Participant's death after commencement of payments, in
                substantially equal annual installments over a fifteen year
                period or such shorter period as may be determined by the
                Committee.  The amount of such installment payments shall be
                determined solely in accordance with the Participant's
                Deferred Compensation Agreement.  Regardless of whether a
                Participant's employment with Lehman and all affiliates and
                subsidiaries has terminated, a Participant shall not be
                considered to be retired under the Plan and the Deferred
                Compensation Agreement until attainment of age 55 and consent
                of the Committee.

<PAGE>  7

4

                (b)  If a Participant dies prior to the date payments provided
                for in Subsection (a) are to commence, Lehman shall make
                deferred compensation payments to the Participant's
                Beneficiary in fifteen equal annual installments or such fewer
                number of annual installments as may be determined by the
                Committee.  The amount of such installment payments shall be
                determined solely in accordance with the Participant's
                Deferred Compensation Agreement.

                (c)  If a Participant becomes Disabled prior to Retirement,
                Lehman shall make disability payments to such Participant in
                an amount determined solely in accordance with such
                Participant's Deferred Compensation Agreement.  Disability
                payments shall continue until the earlier of such
                Participant's death or the date payments under Subsection (a)
                are to commence but no later than age 65.

        Notwithstanding the foregoing provisions of this Section 4, or
of any other provision of the Plan to the contrary, if any person is ineligible
to participate in this Plan, no amounts shall be paid to such person (or his
beneficiary) under this Plan.  In that event, the entire amount, if any, which
such person (or his beneficiary) is entitled to receive, in lieu of any amounts
under this Plan, shall be determined exclusively under the terms of such other
*Executive and Select Employees

5

<PAGE>   8

Plan,* if any, then maintained by the Company in which such person is a
participant.  Section 5.  Payments Prior to Vesting on Effective Date
                If a Participant dies or becomes Disabled prior to the
Effective Date of the Plan, or if prior to September 25, 1990, a Participant
ceases to be an Employee of the Employer or an affiliate for any reason other
than death, Disability or Retirement, all deferrals of compensation under the
Plan and the Deferred Compensation Agreement shall cease and Lehman shall pay
to the Participant or the Participant's Beneficiary, as the case may be, the
amount of compensation theretofore deferred plus interest
credited at an annual rate equal to the lessor of 5% or the weekly 90-day
Treasury Bill auction rate (on a discounted basis) averaged over a 12-month
period ending on the date of payment.  Such interest shall be compounded
annually on a calendar year basis and shall be credited with respect to the
average daily balance in the Deferred Compensation Account each calendar year.
Alternatively, Lehman may, in its absolute discretion, pay to such
Participant the amount contributed to his Deferred Compensation Account plus
interest credited at a higher rate as set forth in such Participant's Deferred
Compensation Agreement.

Section 6.  Termination
                The Committee has the right to terminate the Plan if the
Committee also terminates all the Deferred Compensation Agreements which form a
part of this Plan.  Termination shall be

6

<PAGE>   9

by written notice to the Participants and in the event of termination, Lehman
shall pay to each Participant or each Participant's Beneficiary the amount of
compensation theretofore deferred plus interest credited in accordance with
paragraph 4 of the Participant's Deferred Compensation Agreement.

Section 7.  Miscellaneous Provisions
                The Plan and all Participants hereunder are subject to certain
miscellaneous provisions pursuant to paragraph 5 of the Deferred Compensation
Agreement which provisions are incorporated herein by reference.

Section 8.  Beneficiary Designation
                Participants may designate a Beneficiary or Beneficiaries
entitled to receive any of the payments to be made by Lehman hereunder if the
Participant dies.  Such designation shall be made pursuant to and in accordance
with paragraph 6 of the Deferred Compensation Agreement.

Section 9.  Subordination Provisions
                Lehman's obligations to pay amounts credited to a
Participant's Deferred Compensation Account under the Deferred Compensation
Agreement and the Plan shall be suspended and shall not mature for any period
of time during which the suspension of payment provisions of paragraph 9 of the
Deferred Compensation Agreement is in effect.  In addition, all other
provisions of said paragraph 9 are incorporated in this Plan by reference.

7

<PAGE>   10

Section 10.  Construction of Plan
                In the event there are any discrepancies or inconsistencies
between this Plan and any Deferred Compensation Agreement, the Deferred
Compensation Agreement shall control.

Section 11.  Assignment and Alienation of Benefits
                Any benefits payable under the Plan and the Deferred
Compensation Agreements may not be assigned, alienated or hypothecated and, to
the extent permitted by law, no such benefits shall be subject to legal process
or attachment for the payment of any claim of any person entitled to receive
the same.

Section 12.  Governing Law
                The Plan and all Deferred Compensation Agreements forming a
part thereof shall be governed and construed in accordance with the laws of the
State of New York except to the extent pre-empted by any other applicable laws.