**Hearing Date and Time: August 30, 2010 at 10:00 a.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Lori R. Fife
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

------------------------------------------------------------------x

## DEBTORS' RESPONSE TO OBJECTIONS TO
## APPROVAL OF PROPOSED DISCLOSURE STATEMENT

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings, Inc. ("LBHI") and its affiliated debtors in the above

referenced chapter 11 cases (collectively, the "Debtors") file this omnibus response (the

"Response") to the objections interposed to their amended motion ("Motion") pursuant to 11

U.S.C. §1125, dated June 29, 2011, ECF No. 18126, for approval of their disclosure statement

("Disclosure Statement") and solicitation procedures in connection with the Debtors' second

amended joint chapter 11 plan ("Plan"), and respectfully represent:

## Preliminary Statement

1.      It is almost three years since the worldwide financial crisis engulfed Lehman and resulted in the commencement by the Debtors of the largest and most complex chapter 11 cases ever filed in the United States, followed by over 80 independent but related foreign insolvency proceedings around the globe.  The chaos that ensued was unprecedented and presented the potential for highly fractious proceedings permeated by years of extended, complex and expensive litigation among competing interests and entities.  Through the concerted efforts of the Debtors, the Official Committee of Unsecured Creditors ("UCC"), the separate ad hoc groups that emerged during the past three years, foreign insolvency representatives and a great number of individual parties in interest, that potential undesirable scenario may be avoided.  Lehman now stands on the verge of achieving the principle objective of chapter 11, the implementation of a consensual joint Plan.  Incorporated in the Plan is an array of compromises that were negotiated heavily and at arms' length among the Debtors and their vast and diverse creditor constituencies.  These compromises represent the foundation of the Plan as filed on July 1, 2011, ECF No. 18204.

2.      On July 1, 2011, the Debtors filed their proposed Disclosure Statement, ECF No. 18205, consisting of 144 pages exclusive of exhibits and attachments, and served notice of the initial hearing required pursuant to section 1125 of the Bankruptcy Code for the approval of the Disclosure Statement and the related solicitation procedures on more than 110,000 claimants and other parties in interest in these chapter 11 cases.  As a result of the Herculean efforts that were made in the negotiations leading up to the filing of the Plan and thereafter, only 18 objections to the approval of the Disclosure Statement have been filed (collectively, the "Objections" and the objecting parties, the "Objectors"), and three joinders thereto.  The Debtors

reviewed potential objections that were proposed by certain claimants and each of the Objections

that were originally filed.  In an effort to facilitate the process, the Debtors and their

professionals have sought to confer with many of the potential objectors and the Objectors to

resolve through modifications, where appropriate, those comments and Objections directed to the

adequacy of the information contained in the Disclosure Statement.  A relatively high level of

success was achieved.  The Debtors propose to amend the Disclosure Statement and the Plan as

set forth in Exhibit A annexed hereto, to expedite the process, obviate unnecessary pleadings and

time and to effect approval of the Disclosure Statement, and move these chapter 11 cases

forward to the time when distributions to holders of allowed claims will be imminent.

   3. Other continuing Objections, as more fully described hereafter, constitute

Objections directed to the confirmation of the Plan, or make statements relating to the particular

parochial interests and dissatisfaction of the particular Objector.  They bear no relevance to the

adequacy of disclosure or the standards set forth in section 1125(a)(1) of the Bankruptcy Code

for approval of the Disclosure Statement and related solicitation procedures.

   4. The Disclosure Statement, as it will be amended, contains adequate

information consistent with and as required by section 1125(a)(1) of the Bankruptcy Code.  The

approval of the Disclosure Statement and the related solicitation procedures is actively supported

by the UCC and creditors of the Debtors holding asserted claims in excess of $100 billion.

Among the huge number of impaired entities asserting claims against the Debtors, there are only

21 claimants objecting to the approval of the Disclosure Statement and the commencement of the

process that will bring these chapter 11 cases to a successful conclusion.  The Disclosure

Statement provides adequate information to enable "a hypothetical investor typical of the holders

of claims or interests in the case(s)…to make an informed judgment about the plan…"

Accordingly, the remaining Objections to the Motion should be overruled.  As for the Objections

to the confirmation of the Plan: they are not properly before the Court and should be deferred, if

pursued, for determination at the confirmation hearing.  The Motion for the approval of the

Disclosure Statement and the related solicitation procedures, as described in the Motion, should

be granted.

**A.**     **Objections Directed to Plan Confirmation Should Not Be Determined At This Time**

> 5.     The following Objections (and joinders thereto) focus on the compromises

that have been proposed by the Debtors and incorporated into the Plan:

> a.   Objection of Bundesverband deutscher Banken e.V., ECF No. 19147;
>
> b.   Objection of Deutsche Bundesbank, ECF No. 19163;
>
> c.   Objection of Mason Capital Management, LLC, ECF No. 19151;
>
> d.   Objection of the United States Trustee, ECF No. 19157
>
> e.   Objection of Centerbridge Credit Advisors LLC, ECF No. 19254;
>
>> (i)  Joinder of Anchorage Capital Group, LLC, ECF No. 19261;
>>
>> (ii) Joinder of Monarch Alternative Capital LP, ECF No. 19262;
>
> f.   Objection of Danske Bank A/S, London Branch, ECF No. 19257;
>
> g.   Objection of Wells Fargo Bank Northwest, ECF No. 19295.
>
>> (i)  Joinder of OMX Timber Finance Investments II, LLC, ECF No. 19297,

Generally, these Objections state either that the Bankruptcy Court lacks authority to implement

the Plan compromises, or that the justification for the Plan compromises is inadequate.  Patently,

these are objections to a central provision of the Plan; they are confirmation objections, and

consistent with the applicable legal principles, they should be deferred to the confirmation

hearing.  The Debtors will demonstrate at the confirmation hearing that the compromises and

settlements incorporated in the Plan are fair and reasonable and do not "fall below the lowest

point in the range of reasonableness." *In re W.T Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983); s*ee

also Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,

390 U.S. 414 (1968).

　　　　　6.　　　　Additional Objections, as set forth below, also assert, *inter alia*, objections

to the confirmability of the Plan, and likewise such Objections should be deferred to the

confirmation hearing:

| Objections Directed To Other Confirmation Issues | |
|---|---|
| **Objecting Party** | **Objection Summary** |
| **Fidelity National Title Insurance Company**, ECF No. 19162 | ▪ The Bankruptcy Court lacks subject matter jurisdiction to hear and consider defenses to coverage.<br>▪ *Stern v. Marshall* limits the jurisdiction of the Bankruptcy Court to hear state law issues.<br>▪ The assumption and assignment procedures of the Plan are not adequate. |
| **Deutsche Bundesbank**, ECF No. 19163 | ▪ The Plan's classification scheme is not adequately justified. |
| **LibertyView et. al.**, ECF No. 19167 | ▪ The notice procedures set forth in section 8.10 of the Plan for allowance of setoff by the Debtors are improper.<br>▪ The injunction against claimants' right of setoff in sections 13.3 and 13.5 of the Plan is not justified.<br>▪ The Debtors' subrogation rights under section 8.14 of the Plan should not be effective until the guaranteed creditors are paid in full. |
| **Lead plaintiff in the consolidated securities class action entitled *In re Lehman Brothers Mortgage Backed Securities Litigation***, ECF No. 19169<br>**Lead plaintiffs in the consolidated securities class action entitled *In re Lehman Brothers Equity/Debt Securities Litigation***, ECF No. 19171 | ▪ The Plan should provide a protocol for the preservation and/or destruction of documents.<br>▪ An extension of stays or injunctions beyond the Effective Date is not justified.<br>▪ The Plan should permit plaintiffs to assert claims against the Debtors solely to the extent of available insurance coverage, irrespective of any injunctions, discharge or distribution under the Plan.<br>▪ The Plan release and injunction provisions are overly broad. |

| | |
|---|---|
| | ▪ The classification of certain subordinated §510(b) claims is improper. |
| **Sumitomo Mitsui Banking Corporation**, ECF No. 19170 | ▪ The assumptions underlying the liquidation analysis may not be reasonable. |
| **PricewaterhouseCoopers AG, Zurich**, ECF No. 19172 | ▪ Section 8.15 of the Plan violates section 1123(a)(4) of the Bankruptcy Code and principles of comity.<br><br>▪ Section 8.4 of the Plan provides for disparate treatment of claims within the same class.<br><br>▪ The rights of the Debtors' affiliates to set off their guarantee claims may be impinged by provisions of the Plan, including section 13.5. |
| **Centerbridge Credit Advisors LLC**, ECF No. 19254<br><br>*Joinders:*<br><br>**Anchorage Capital Group, LLC**, ECF No. 19261<br><br>**Monarch Alternative Capital LP**, ECF No. 19262 | ▪ The classification and treatment of the Bankhaus Claims is not adequately justified. |
| **Tommy Tewalt** (Pro Se), ECF No.19121 | ▪ Objects to existence of more senior classes.<br><br>▪ Asserts that the valuation statements are inaccurate. |
| **Gary A. Cutler** (Pro Se), ECF No. 19122 | ▪ Objects to existence of more senior classes.<br><br>▪ Asserts that the valuation statements are inaccurate. |
| **Wells Fargo Bank Northwest (trustee for OMX Timber Finance II, LLC)**, ECF No. 19295<br><br>*Joinder:*<br><br>**OMX Timber Finance Investments II, LLC**, ECF No. 19297 | ▪ The Plan improperly classifies claimant's claim as a guarantee claim. |

## B.    The Requirements of Section 1125

7.    The primary determination to be made in connection with post-petition disclosure and solicitation pursuant to section 1125 of the Bankruptcy Code is whether the proposed disclosure statement contains "adequate information" to enable the "hypothetical investor" described in that section to make an informed judgment to accept or reject the plan. The purpose of a disclosure statement approval hearing is not to determine the confirmability of a proposed chapter 11 plan but, rather, the adequacy of the information set forth in the disclosure

statement. Confirmation issues and challenges are not ripe for determination as part of a section

1125 approval hearing. Such issues and challenges are properly resolved at a hearing to consider

confirmation of the plan in accordance with the procedures governing the confirmation hearing.

*See In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) ("*care must

be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation

hearing*, due process considerations are protected and objections are restricted to those defects

that could not be cured by voting") (emphasis added); *In re CRIIMI MAE, Inc.*, 251 B.R. 796,

799 (Bankr. D. Md. 2000) ("objections to confirmation of the plan, as opposed to the adequacy

of disclosure of information in the Disclosure Statement, would not be heard and determined at

the [disclosure statement] [h]earing"); *In re Scioto Valley Mortgage Co.*, 88 B.R. 168, 172

(Bankr. S.D. Ohio 1988) ("[i]f creditors oppose their treatment in the plan, but the Disclosure

Statement contains adequate information, issues respecting the plan's confirmability will await

the hearing on confirmation"); *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D.

Ohio 1990) ("the Court will not look behind the disclosure statement to decide [confirmation]

issues at the hearing on the adequacy of the disclosure statement"); *In re Featherworks Corp.,

Inc.*, 45 B.R. 455, 457 (Bankr. E.D.N.Y. 1984). In approving the adequacy of the disclosure

statement the *Featherworks* court held that it was "too early before the hearing on confirmation

to conclude that the present plan cannot be confirmed. *That determination must await

examination of the evidence offered at the hearing on confirmation*." *Id.* at 457 (emphasis

added).

       8.     It is well settled law that issues with respect to the approval of

compromises and settlements embodied in a chapter 11 plan should be decided at the

confirmation hearing. *In re Watervillle Timeshare Group*, 67 B.R. 412 (Bankr. D.N.H. 1986).

As in *In re Waterville Timeshare Group*, all parties in interest in these chapter 11 cases will have an opportunity to object to the Plan's compromises at the confirmation hearing. In that connection, the *Watervillle* court stated:

> Much of the conflict between the objecting general partners and the Chapter 11 trustee revolves around the wisdom of *the compromise with Columbia University that is an integral part of the pending Joint Plan*. The actual settlement agreement is attached to the plan and will go out with the disclosure materials to the parties in interest. The objecting partners believe that the suspended litigation with Columbia University should be pursued to obtain a subordination of their claim. *However, the wisdom of that compromise will be a prime issue at the confirmation hearing on the Joint Plan, and the objecting partners as well as any other party in interest will have a full opportunity to voice and have heard their objections to the compromise at that time*.

*Id.* at 414 (emphasis added). The *Watervillle* Court recognized the inherent limitations of a disclosure statement hearing, observing that "approval of a disclosure statement is an interlocutory action in the progress of a chapter 11 reorganization effort leading to a confirmation hearing at which all parties have ample opportunity to object to confirmation of the plan." 67 B.R. at 413. The same Court continued that section 1125(a) excludes from a disclosure statement hearing those strategic objections designed to "delay and hobble the efforts of the [plan proponent] to put a plan before the court." *Id.* at 414. This is precisely what certain Objectors may be seeking to do by filing Objections that are substantively Objections to the confirmation of the Plan.

9.    The power to compromise and settle claims as part of a chapter 11 plan with Bankruptcy Court approval is beyond dispute. *See* 11 U.S.C. § 1123(b)(3); *In re Texaco Inc.*, 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988); *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984). The details of the Plan compromises are set forth at considerable length in the Disclosure Statement. *See* Disclosure Statement §§ X.A.,

"*Considerations Regarding the Chapter 11 Plan*"; *X.B.1.*, "*Description of the Plan and Compromise of Substantive Consolidation and Related Issues*"; X.B.4., "*Plan Negotiations With Certain Creditors*." The information provided in the Disclosure Statement is adequate to enable claimants to make an informed judgment to accept or reject the Plan without waiving or releasing any right to object to the confirmation of the Plan and the compromises included and integrated into the Plan. It will be the Debtors' burden to establish at the confirmation hearing that the compromises are in the best interests of the Debtors and their creditors and compliant with the Bankruptcy Code and governing legal principles.

## C.    The Liquidation Analysis Is Appropriate

10.    The Objection of the Deutsche Bundesbank contends (i) that the Liquidation Analysis in the Disclosure Statement should not take into account the compromises included in the Plan and (ii) that the Debtors also should include a liquidation analysis assuming substantive consolidation. Objection of Deutsche Bundesbank at ¶ 7.

11.    Both arguments are contrary to the applicable authorities within this District and the plain language of the Bankruptcy Code. The Liquidation Analysis properly reflects the compromises incorporated in the Plan. As courts in this and other districts have consistently held, for purposes of evaluating a chapter 11 plan, the disclosed liquidation analysis should be prepared using the same or substantially similar assumptions as used in the proposed plan to enable creditors to compare the potential results under the Plan and alternatively, under chapter 7 of the Bankruptcy Code. *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252-55 (Bankr. S.D.N.Y. 2007) ("it is reasonable to assume that a chapter 7 trustee would adopt settlements similar to the Settlement . . . embodied within the Plan in order to avoid the risks, length, cost and uncertainties of litigation," thus, "[c]omparing the estimated recovery for each

impaired creditor under the Plan with its estimated recovery in a hypothetical chapter 7 case requires examining . . . the Settlement embodied in the Plan."); *In re Enron Corp.*, ch. 11 Case No. 01-16034, 2004 Bankr. Lexis 2549, at *116 (Bankr. S.D.N.Y. 2004), (holding that the debtors' liquidation analysis appropriately assumed "that the many issues resolved by the [chapter 11 plan's] global compromise would remain and require resolution in a conversion to chapter 7, [and] . . . it is more useful for [c]reditors to compare estimated recoveries using the same assumptions regarding these issues."); *see also In re Capmark Fin. Group Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010) (holding that the settlement embodied in the plan would also be applied in the chapter 7 context because "if a claim is settled in a chapter 11 plan, once the court determines that the settlement should be approved, the court will assume the same settlement would be made in chapter 7 for purposes of applying section 1129(a)(7)").

12.    Objections that the Disclosure Statement must include information as to other possible or alternative plans are ill-founded.  Section 1125 of the Bankruptcy Code expressly provides that a Disclosure Statement "need not include such information about any other possible or proposed plan." 11 U.S.C. § 1125(a)(1).  The only plan being proposed is the Debtors' Plan.  Thus, the Debtors are not required to assume a substantive consolidation in the Liquidation Analysis for the purposes of their Plan.  *See In re Charter Commc'ns*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009) (finding that the chapter 11 cases have not been substantively consolidated and such consolidation may not be inferred); *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. 2003) (stating that "the [d]ebtors are not obligated to provide information regarding any other possible or proposed plan of reorganization"); *Kirk v. Texaco Inc.*, 82 B.R. 678, 684 (S.D.N.Y. 1988) (stating that "[a]ppellants could not oppose the Disclosure Statement successfully merely by citing its failure to discuss some other possible

plan, such as one in which releases would not be given"). Therefore, such Objections should be

overruled.

**D.    The Debtors' Proposed Solicitation
       Procedures Are Appropriate And Consistent With Section 1125**

13.    PricewaterhouseCoopers AG, Zürich ("PwC") and Danske Bank each

object to certain proposed solicitation procedures governing the provisional allowance of

disputed claims for voting purposes, as set forth in paragraph 5 of the order (the "Solicitation

Procedures Order") proposed by the Motion. *See* Objection of PricewaterhouseCoopers as

liquidator for Lehman Brothers Finance, ECF. No. 19172, at ¶ 36 and Objection of Danske Bank

A/S, ECF No. 19257 at ¶ 16.

14.    The relevant provisions of the proposed Solicitation Procedures Order

provide:

> (c) If a claim for which a proof of claim has been timely filed is
> contingent or unliquidated (as determined on the face of the proof
> of claim or after a review of the supporting documentation by the
> Debtors or their agent, in consultation with the Creditors'
> Committee) the claimant/creditor will be allowed to cast one vote
> valued at one dollar ($1.00) for voting purposes only.
> …
> (f) If a claim is (i) listed in the Schedules or represented by a
> timely filed proof of claim as contingent, unliquidated, or disputed
> in part, or (ii) determined by the Debtors or their agent, in
> consultation with the Creditors' Committee, to be contingent,
> unliquidated, or disputed in part, such claim will be temporarily
> allowed in the amount that is liquidated, non-contingent, and
> undisputed for voting purposes only.

Solicitation Procedures Order at ¶ 5.

15.    PwC and Danske assert that the above procedures do not provide creditors

with (i) notice regarding the provisional allowance and amount of their claims for voting

purposes or (ii) the opportunity to object to the provisional allowance of their claim. PwC

Objection at ¶ 36, Danske Bank Objection at ¶ 16.  Paragraph 5 of the Solicitation Procedures

Order does not negate pre-existing notice requirements pursuant to Rule 3018, which provides

that "the court after notice and a hearing may temporarily allow [a] claim or interest in an

amount which the court deems proper for the purpose of accepting or rejecting a plan."  *See* Fed.

R. Bankr. P. 3018(a).  Paragraph 6 of the Solicitation Procedures Order also provides a

procedure by which "any claimant/creditor [may elect] to challenge the disallowance or

classification of its claim for voting purposes" by filing a Temporary Allowance Request Motion

"pursuant to Bankruptcy Rule 3018(a) requesting such relief as it may assert is proper, including

the temporary allowance or reclassification of its claim for voting purposes."

> 16.    PwC also asserts that the Debtors' proposed timeline does not allow

sufficient time for discovery.  PwC does not specify why the proposed procedures do not allow

sufficient time for its discovery.  The chapter 11 cases have been pending for almost three years.

Holders of allowed claims are patiently awaiting receipt of distributions.  Reasonable expedition

in the processing of the Plan is appropriate.  No other claimant has complained that the proposed

timetable for discovery is too constrictive.  The proposed timetable is ample and does not

preclude PwC from applying to the Court for appropriate relief if the circumstances warrant.

> 17.    The Solicitation Procedures provide a clear, efficient process for

establishing claims for voting purposes, while affording creditors the protection of Temporary

Allowance Request Motions.  The Debtors' proposed Solicitation Procedures therefore are

appropriate and should be approved.

## E.    The Disclosure Statement And Related Solicitation Procedures Should Be Approved

> 18.    The Objections to approval of the Disclosure Statement and related

solicitation procedures are ill-founded, or constitute confirmation objections, and should be

denied and overruled without prejudice to the claimants' rights to prosecute confirmation objections as appropriate at any confirmation hearing.  It is in the best interests of the Debtors, their creditors and all parties in interest that the Disclosure Statement and Solicitation Procedures be approved.  Approval of the Disclosure Statement and Solicitation Procedures will enable the Debtors promptly to proceed to seek the confirmation and consummation of the Plan (with distributions to holders of allowed claims against the Debtors) and the expeditious closing of the administration of these chapter 11 cases.

Dated: New York, New York
       August 23, 2011

                                     /s/ Harvey R. Miller
                                     Harvey R. Miller
                                     Lori R. Fife
                                     Alfredo R. Pérez

                                     WEIL, GOTSHAL & MANGES LLP
                                     767 Fifth Avenue
                                     New York, New York 10153
                                     Telephone: (212) 310-8000
                                     Facsimile: (212) 310-8007

                                     Attorneys for Debtors
                                     and Debtors in Possession

**Exhibit A**

**Debtors' Responses to Objections to Approval of Proposed Disclosure Statement ("DS")**

| Objecting Party | Objection Summary | Debtors' Response |
|---|---|---|
| **1. Wilmington Trust Company**, ECF No. 19149 | 1. The DS does not provide a basis on which creditors can conclude that claim values derived by the Debtors using the Structured Securities Valuation Methodologies are reasonable.<br><br>2. The DS should include the Committee's conclusions regarding the Structured Securities Valuation Methodologies.<br><br>3. The DS should be revised to expressly state that Wilmington's Global Proof of Claim is not subject to the Structured Securities Procedures Order. | Based upon the additional language incorporated into the DS as set forth on <u>Annex 1</u> hereto, Wilmington Trust Company has agreed to withdraw its objection. |
| **2. LibertyView et. al.**, ECF No. 19167 | 1. The notice procedures set forth in section 8.10 of the Plan for allowance of setoff by the Debtors are improper.<br><br>2. The injunction against claimants' right of setoff in sections 13.3 and 13.5 of the Plan is not justified.<br><br>3. The Debtors' subrogation rights under section 8.14 of the Plan should not be effective until the guaranteed creditors are paid in full. | 1. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>2. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>3. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9. |

Exhibit A-1

| Objecting Party | Objection Summary | Debtors' Response |
|---|---|---|
| **3. Lead plaintiff in the consolidated securities class action entitled *In re Lehman Brothers Mortgage Backed Securities Litigation*, ECF No. 19169**<br><br>**4. Lead plaintiffs in the consolidated securities class action entitled *In re Lehman Brothers Equity/Debt Securities Litigation*, ECF No. 19171** | 1. The Plan should provide a protocol for the preservation and/or destruction of documents.<br><br>2. An extension of stays or injunctions beyond the Effective Date is not justified.<br><br>3. The Plan release and injunction provisions are overly broad.<br><br>4. The Plan should permit plaintiffs to assert claims against the Debtors solely to the extent of available insurance coverage, irrespective of any injunctions, discharge or distribution under the Plan.<br><br>5. The DS does not provide any basis for the extension of stays or injunctions for a period beyond the Effective Date and such extension is inappropriate and prejudicial to Lead Plaintiffs. Furthermore, the DS fails to adequately describe available insurance as it relates to the Lead Plaintiffs' and the putative class' claims asserted in the Debtors' cases and in the litigation or disclose whether the Plan intends to deny Lead Plaintiffs and the Class the right to proceed with their claims against the Debtors solely to the extent of available insurance coverage, irrespective of any injunctions, discharge or distribution under the Plan.<br><br>6. The DS fails to provide a description of the Objector's litigation, including its current status and its potential impact on the estate.<br><br>7. The classification of certain subordinated §510(b) claims is improper. | 1. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>2. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>3. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>4. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9. Nevertheless, the Debtors will add the language set forth on <u>Annex 2</u> hereto.<br><br>5. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9. Nevertheless, the Debtors will add the language set forth on <u>Annex 2</u> hereto.<br><br>6. These actions have been stayed against the Debtors. At the claimants' request, the Debtors will add a description of the litigation to the Amended Disclosure Statement as set forth on <u>Annex 2</u> hereto.<br><br>7. Section 510(b) claims that arise from the purchase of debt securities are classified in LBHI Class 11, whereas section 510(b) claims that arise from the purchase of equity securities are classified in LBHI Class 12 as equity interests, all consistent with section 510(b) of the Bankruptcy Code. *See* DS §§ X.C.2.a(xvi) and X.C.2.a(xvii). The classification of these claims is proper. |

Exhibit A-2

| Objecting Party | Objection Summary | Debtors' Response |
|---|---|---|
| **5. PricewaterhouseCoopers AG, Zurich**, ECF No. 19172 | 1. Section 8.15 of the Plan violates section 1123(a)(4) of the Bankruptcy Code and principles of comity.<br><br>2. Section 8.4 of the Plan provides for disparate treatment of claims within the same class.<br><br>3. The rights of the Debtors' affiliates to set off their guarantee claims may be impinged by provisions of the Plan, including section 13.5.<br><br>4. The proposed timeline does not allow sufficient time for discovery.<br><br>5. The proposed solicitation procedures do not provide claimants with appropriate notice and the opportunity to object to the Debtors' election to disallow a portion of their claim for voting purposes. | 1. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>2. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>3. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>4. The objection does not specify why the proposed timeline is inadequate. *See* Debtors' Response ¶ 16.<br><br>5. Paragraph 5 of the Solicitation Procedures Order does not negate pre-exisiting notice requirements pursuant to Rule 3018. *See* Debtors' Response ¶¶ 13 – 15. |
| **6. Fidelity National Title Insurance Compan**y, ECF No. 19162 | 1. The Debtors have failed to identify the insurance policies to be assumed and the terms of the proposed assumption of those insurance policies.<br><br>2. *Stern v. Marshall* limits the jurisdiction of the Bankruptcy Court to hear state law issues.<br><br>3. The assumption and assignment procedures of the Plan are not adequate. | 1. To the extent that any of the Debtors' insurance policies constitute executory contracts, such contracts shall be deemed assumed under the Plan. *See* DS § X.F.4., "Treatment of Executory Contracts and Unexpired Leases." The procedure is consistent with procedures in other major chapter 11 cases.<br><br>2. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>3. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9. |

Exhibit A-3

| Objecting Party | Objection Summary | Debtors' Response |
|---|---|---|
| **7. Bundesverband deutscher Banken e.V.**, ECF No. 19147 | 1. The DS does not provide an analysis of the risk of substantive consolidation on an entity-by-entity basis, and does not explain why a 20% Plan Adjustment represents a fair compromise for all Third-Party Guarantee Claims.<br><br>2. The risks associated with the Debtors' projected recoveries are not disclosed.<br><br>3. The DS should state whether projected recoveries reflect present valuing of future distributions.<br><br>4. The DS should provide analysis of how variations in projected asset realizations would effect recoveries.<br><br>5. The standards necessary to obtain approval of the Plan's compromises are not fully stated. | 1. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>2. The Debtors have included in the DS their best estimates of recoveries based on the information available to them. The DS provides adequate and extensive information concerning the risks and general assumptions associated both with the Debtors' estimates of allowed claims, *see* DS Exhibit 6, and the recovery analysis for each Debtor, *see* DS Exhibit 4.<br><br>3. Present value discounts have not been applied or considered in the preparation of the recovery analysis or the liquidation analysis. The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 3</u> hereto.<br><br>4. The Debtors have included in the DS their best estimates of recoveries based on the information available to them, and should not be required to speculate on possible variations or acts that may occur in the future that may affect asset values.<br><br>5. The applicable legal standard is adequately described in DS § X.B.c, "The Settlement and Compromise is in the Best Interests of the Economic Stakeholders." |
| **8. Deutsche Bundesbank**, ECF No. 19163 | 1. The Liquidation Analysis should not take into account the compromises and settlements included in the Plan and, and should include a liquidation analysis assuming substantive consolidation.<br><br>2. The DS should either confirm that no time-value of money discount has been applied in a chapter 7 liquidation, or alternatively, use the same discount for the recovery analysis under the Plan.<br><br>3. The DS should disclose that the Debtors may be required to litigate substantive consolidation in order to obtain approval of the Plan's settlement of substantive consolidation.<br><br>4. The Plan's classification scheme is not adequately justified. | 1. The Liquidation Analysis properly reflects the compromises incorporated in the Plan. As courts in this and other districts have consistently held, for purposes of evaluating a chapter 11 plan, the disclosed liquidation analysis should be prepared using the same or substantially similar assumptions as used in the proposed plan to enable creditors to compare the potential results under the Plan and alternatively, under chapter 7 of the Bankruptcy Code. *See* Debtors Response ¶¶ 10 – 12.<br><br>2. The Debtors did not apply any present value discounts to estimated cash proceeds in the Liquidation Analysis set forth in Exhibit 5 of the DS. The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 3</u> hereto.<br><br>3. Approval of the Plan compromises under Rule 9019 does not require a full litigation or mini-trial, and determination of issues relating to substantive consolidation. *See* DS § X.B.c, "The Settlement and Compromise is in the Best Interests of the Economic Stakeholders."<br><br>4. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9. |

Exhibit A-4

| Objecting Party | Objection Summary | Debtors' Response |
|---|---|---|
| **9. Sumitomo Mitsui Banking Corporation**, ECF 19170 | 1. The assumptions underlying the Liquidation Analysis should be shown to be reasonable.<br><br>2. The terms of the Debtors' settlement agreements with derivatives counterparties have not been disclosed. In addition, the "framework" is no longer an element of the Plan.<br><br>3. A formula for the allocation of costs and expenses among estates should be provided.<br><br>4. The DS provides inadequate information regarding which claims will be challenged, and why LBT guarantees claims will not be challenged.<br><br>5. More information should be provided regarding the proposed treatment of Intercompany-Only Repurchase Transactions.<br><br>6. The DS provides inadequate information about the nature of LAMCO's compensation and how it will be allocated.<br><br>7. The Plan is "patently" unconfirmable because it redistributes value from LBSF to LBSF's equityholder, LBHI. | 1. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>2. The framework has been filed and published on www.lehman-docket.com. The settlements are final and were consummated pursuant to the Court's Order Pursuant To Sections 105 and 365 of the Bankruptcy Code To Establish Procedures For The Settlement Or Assumption And Assignment of Prepetition Derivative Contracts, entered on December 16, 2008, ECF No. 2257. The Debtors have provided aggregate amounts of derivatives claims that have been settled with certain of the creditors asserting the most significant derivatives claims. *See* DS § V.E., "Claims Based on Derivatives Contracts."<br><br>3. The Debtor Allocation Agreement will be included in the Plan Supplement. The Debtors will file the Plan Supplement at least 10 days before the voting deadline pursuant to section 15.5 of the Plan. *See* DS § X.J.11., "Plan Supplement."<br><br>4. Claims reconciliation is an ongoing process that will extend beyond the effective date of a confirmed plan. Section 1125 does not require a plan proponent to specify objections that may be interposed to the allowance or disallowance of individual claims.<br><br>5. In addition to the detailed description of the internal repurchase agreements and related claims set forth in section VIII – "Treatment of Internal Repurchase Agreements" – of the DS, the Debtors have added the language set forth on Annex 4 hereto.<br><br>6. LAMCO's post-effective functions and compensation will be determined by the Boards of Directors of the entities who may engage LAMCO. *See* DS § IX.<br><br>7. Issues as to the consequences of the Plan Adjustment, and compliance with the Absolute Priority Rule, are manifestly confirmation issues and not § 1125(a)(1) issues. The Plan complies with the Absolute Priority Rule. Sumitomo mischaracterizes the Plan Adjustment, which redistributes value not directly to LBHI, but rather, to certain creditors of LBHI who would be the prime beneficiaries of substantive consolidation as part of the overall proposed compromises to be considered at the confirmation hearing. Contrary to Sumitomo's assertion, no value is to be reallocated directly to LBHI *on account of LBHI's prepetition equity interest* in any of the Subsidiary Debtors and as such, the Absolute Priority Rule is not violated. The Plan is not patently unconfirmable. |

Exhibit A-5

| Objecting Party | Objection Summary | Debtors' Response |
|---|---|---|
| **10. Centerbridge Credit Advisors LLC**, ECF No. 19254<br><br>*Joinders:*<br><br>**11. Anchorage Capital Group, L.L.C.**, ECF No. 19261<br><br>**12. Monarch Alternative Capital LP**, ECF No. 19262 | 1. The classification and treatment of the Bankhaus Claims is not adequately justified.[1]<br><br>2. The Plan Adjustments are not adequately justified.<br><br>3. The DS does not contain adequate disclosure regarding the transfer of certain assets from LCPI to LBHI prior to LCPI's bankruptcy filing and related potential preference claims.<br><br>4. Part VIII of the DS states that LCPI has a security interest in $2.25 bil. of assets held by LBHI subject to certain repos, but does not (and must) disclose why (i) LBHI continues to hold these assets and (ii) LCPI did not take possession of the assets when they were worth $2.25 bil. Also, the DS provides inadequate disclosure on the calculation of LCPI's deficiency claim.<br><br>5. Contains inadequate disclosure for the reallocation of administrative expenses to benefit certain Debtor-subsidiaries and not others.<br><br>6. Provides no explanation or justification for LBHI's purchase of notes issued by Spruce, Verano, and SASCO.<br><br>7. Contains no discussion regarding the transfer of assets from LCPI to certain special purpose entities, including SASCO, Spruce, Verano, and Pine, and whether such entities properly perfected their liens in the transferred assets.<br><br>8. The Debtors must show a strong likelihood of substantive consolidation in order to justify the Plan's settlement of substantive consolidation. | 1. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>2. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>3. The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 4</u> hereto.<br><br>4. The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 4</u> hereto.<br><br>5. The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 4</u> hereto.<br><br>6. The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 4</u> hereto.<br><br>7. The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 4</u> hereto.<br><br>8. Approval of the Plan compromises under Rule 9019 does not require a full litigation or mini-trial, and determination of issues relating to substantive consolidation. *See* DS § X.b.c, "The Settlement and Compromise is in the Best Interests of the Economic Stakeholders." |

---

[1]    Although objections to classification should not be considered until the confirmation hearing, the Debtors submit that Centerbridge lacks standing to object to the classification of the Bankhaus Claims.  As a purchaser of proceeds of the Bankhaus Claims held by Deutsche Bank AG ("Deutsche Bank"), Centerbridge is not in privity with and is not a creditor of the Debtors with respect to such claims.  *See In re Okura & Co.*, 249 B.R. 596, 608 (Bankr. S.D.N.Y. 2000 ("The courts are generally in agreement that a transfer of an undivided interest and participation in the context of a true participation does not allow the participant to assert a claim against the borrower.").  As a creditor of Deutsche Bank and not the Debtors, Centerbridge is not a "party in interest" that can object to the Disclosure Statement and Plan on account of the Bankhaus Claims.  *See* 11 U.S.C. § 1129(b) ("A party in interest may object to confirmation of a plan."); *Southern Blvd., Inc. v. Martin Paint Stores.*, 207 B.R. 57, 61 (S.D.N.Y. 1997) (holding that a creditor of a debtor's creditor is not a party in interest); *see also Krys. v. Official Comm. of Unsecured Creditors of Refco., Inc. (In re Refco Inc.*,), 505 F.3d 109, 110 (2d Cir. 2007) (holding that investors of a debtor's creditor are not "parties in interest" within the meaning of § 1109(b)).  Nor can Centerbridge, as holder of unrelated claims against the Debtors, object on behalf of Deutsche Bank.  *See In re Teligent, Inc.*, 417 B.R. 197, 210 (Bankr. S.D.N.Y. 2009) ("A party in interest cannot raise the rights of a third party even though it has a financial stake in the case.").  Significantly, the Debtors are *not* parties to, and have never previously been provided a copy of, the Bankhaus Sale and Assignment Agreement, and Centerbridge has selectively cited from such agreement.  Any objection by Centerbridge in respect of the Bankhaus Claims should be rejected.

Exhibit A-6

| Objecting Party | Objection Summary | Debtors' Response |
|---|---|---|
| **13. Danske Bank A/S, London Branch**, ECF No. 19257 | The DS does not provide adequate information regarding:<br><br>1. The factors and considerations leading to the Plan's compromises.<br><br>2. The PSA Parties' claims and interests.<br><br>3. The valuation of various claims of LCPI against LBHI.<br><br>4. The maximum recoveries for LBHI bondholders, which result from a redistribution from LCPI creditors to LBHI, and how such recoveries compare to recovery under a substantive consolidation plan.<br><br>5. Determination of LCPI's preference claim against LBHI for the transfer of securitized notes.<br><br>6. The risks of substantive consolidation with respect to LCPI.<br><br>7. The DS should disclose that the Debtors may need to prove that substantive consolidation is appropriate.<br><br>8. Danske also opposes the claim estimation procedures for voting purposes and submits that a timely filed proof of claim should be allowed in the amount of the timely filed claim. | 1. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>2. The names of PSA Parties are set forth on Exhibit 20 of the DS, and the claims filed by the PSA Parties are publicly available on the claims register at www.lehman-docket.com.<br><br>3. The Debtors will add language to the Amended Disclosure Statement as set forth on Annex 4 hereto.<br><br>4. Section 1125 of the Bankruptcy Code expressly provides that a disclosure statement "need not include such information about any other possible or proposed plan." 11 U.S.C. § 1125(a)(1). *See* Debtor's Response ¶ 12.<br><br>5. The Debtors will add language to the Amended Disclosure Statement as set forth on Annex 4 hereto.<br><br>6. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>7. Approval of the Plan compromises under Rule 9019 does not require a full litigation or mini-trial, and determination of issues relating to substantive consolidation. *See* DS § X.B.c, "The Settlement and Compromise is in the Best Interests of the Economic Stakeholders."<br><br>8. Paragraph 5 of the Solicitation Procedures Order does not negate pre-exisiting notice requirements pursuant to Rule 3018. *See* Debtors' Response ¶¶ 13 – 15. |
| **14. Mason Capital Management, LLC**<br><br>Filed 8/11/2011<br><br>ECF No. 19151 | 1. The DS does not provide the information necessary for Mason to ascertain whether there is a 20% risk of substantive consolidation for foreign entities such as Lehman Brothers Treasury Co. B.V. ("LBT").<br><br>2. The DS does not disclose the authority for the proposition that a bankruptcy court may order an inter-creditor wealth transfer in purposed settlement of a risk of substantive consolidation.<br><br>3. The DS does not explain why Mason and other LBT noteholders do not share in the Plan Adjustment. | 1. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>2. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>3. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9. |

Exhibit A-7

| Objecting Party | Objection Summary | Debtors' Response |
|---|---|---|
| **15. Wells Fargo Bank Northwest (trustee for OMX Timber Finance II, LLC)**, ECF No. 19295<br><br>*Joinder*:<br><br>**OMX Timber Finance Investments II, LLC**, ECF No. 19297 | 1. The Plan improperly classifies claimant's claim as a guarantee claim.<br><br>2. Claimant's claim cannot be impaired by the substantive consolidation settlement because the claim has no risk of substantive consolidation. | 1. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>2. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9. |
| **16. United States Trustee**, ECF No. 19157 | DS contains inadequate information re:<br><br>1. The Plan Overview's discussion of the contemplated liquidation, extent thereof, and time permitted for the liquidation to occur under the Plan;<br><br>2. The Debtors' future plans for LAMCO and its employees;<br><br>3. The Debtors' current financial condition, including current balance sheets;<br><br>4. The formation of, and justification for, the Plan Trust;<br><br>5. The justification for the proposed retention by Equity Holders of their Equity Interests when General Unsecured Creditors are not being paid in full;<br><br>6. The justification for the plan adjustments and the automatic reallocations of distributions, among others, from senior creditors to junior creditors;<br><br>7. The Fee Committee and the contemplated role thereof post-confirmation;<br><br>8. The professional fees that the Debtors have incurred to date and the amount anticipated through the Effective Date;<br><br>9. The justification for payment by the Debtors of fees incurred by professionals (including lawyers) engaged by the indenture trustees and individual members of the UCC;<br><br>10. The risks to creditors if the Debtors' dispute with the SIPA Trustee concerning the PIK Note or the IP PIK Note is not resolved favorably to the Debtors;<br><br>11. The differences between the competing plans and the pros and cons of each;<br><br>12. The Securitization Structures; | 1. The Debtors will add language to the Plan Overview as set forth in <u>Annex 5-1</u> hereto.<br><br>2. LAMCO's post-effective functions and compensation will be determined by the Boards of Directors of the entities who may engage LAMCO. *See* DS § IX. The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 5-2</u> hereto.<br><br>3. The recovery analysis in the DS reflects all of the information available to the Debtors through the end of May 2011. The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 5-3</u> hereto.<br><br>4. The purpose of the Plan Trust is to preserve certain tax attributes that will enable the Debtors to maximize assets and thereby recoveries to creditors. The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 5-4</u> hereto.<br><br>5. The purpose of the proposed retention of Equity Interests is to preserve certain tax attributes that will enable the Debtors to maximize assets and thereby recoveries to creditors. Creditors must be satisfied in full before equity realizes any value. The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 5-5</u> hereto.<br><br>6. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9. In addition, the Plan does not provide for reallocations of distributions from senior to junior creditors.<br><br>7. The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 5-6</u> hereto.<br><br>8. The Debtors will add language to the Amended Disclosure |

Exhibit A-8

| Objecting Party | Objection Summary | Debtors' Response |
|---|---|---|
| | 13. The Guarantee Claims and the impact that the "likely litigation" will have upon creditors; | Statement as set forth on <u>Annex 5-7</u> hereto. |
| | 14. Transactions/relationships with LBIE and the impact the resolution of these proceedings will have upon the Debtors' creditors; | 9. This Plan provision is a result of the negotiations among the Debtors, their creditors, and the UCC.  To resolve this objection the Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 5-8</u> hereto. |
| | 15. The Fenway Claim; | 10. It is the Debtors' view that the outcome of these discussions and the resolution of the values, if any, of the notes will not have a material impact on recoveries to creditors of LBHI.  The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 5-9</u> hereto. |
| | 16. The amount of Administrative Expense Claims that will be paid on the Effective Date; | |
| | 17. The Plan Administrator, including the justification for appointing LBHI; | |
| | 18. The justification for imposing an additional requirement solely upon creditors holding Allowed Claims in amounts less than $500.00 in order to receive their distributions; | 11. There is only one plan being proposed at this time.  Section 1125 of the Bankruptcy Code expressly provides that a disclosure statement "need not include such information about any other possible or proposed plan." 11 U.S.C. § 1125(a)(1).  *See* Debtor's Response ¶ 12. |
| | 19. The proposed non-debtor third-party releases, exculpation provisions, limitations of liability and injunction; | 12. The Debtors have discussed the Securitization Structured in detail in section IV.H, "Securitization Structures," of the DS.  The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 5-10</u> hereto. |
| | 20. The legal justification for the proposed discharge of the Debtors; | |
| | 21. The justification for the proposed limitation of liability of the Plan Administrator | 13. The Debtors' estimates of what claims will ultimately be allowed, and the assumptions underlying such estimates, are set forth in Exhibit 6 of the DS and the Annexes thereto.  The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 5-11</u> hereto. |
| | 22. The Debtors' proposed exemption from transfer taxes; | |
| | 23. The justification for including UST fees together with Administrative Expense Claims and the Debtors' obligation to pay UST Fees through entry of a final decree, dismissal or conversion of each Chapter 11 case; | 14. A description of the legal proceedings involving the Debtors and LBIE is set forth in section VII of the DS.  In addition, the Debtors' estimates of what claims will ultimately be allowed, as set forth in the Annexes to Exhibit 6 of the DS, reflect certain assumptions relating to these proceedings.  The Debtors will add a reference to Exhibit 6 to the Amended Disclosure Statement as set forth on <u>Annex 5-12</u> hereto. |
| | 24. The justification for the Debtors' Proposed Exemption/Modification Of The Post- Confirmation Reporting Required By Section 1106(7) of the Bankruptcy Code, Local Bankruptcy Rule 3021-1 and the UST Chapter 11 Operating Guidelines; | |
| | 25. The Debtors' proposed modifications of § 1129 providing that payments be made "as soon [after the Effective Date] as is practicable." | 15. Although it is not a significant claim, the Debtors will add a description of the Fenway Claim to the Amended Disclosure Statement as set forth on <u>Annex 5-13</u> hereto. |
| | 26. The United States Trustee objects to the Motion because the Debtors seek, without authorization, to retain Epiq as their solicitation and voting agent. | 16. The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 5-14</u> hereto. |
| | | 17. The provision appointing LBHI as the Plan Administrator is the result of the Debtors' negotiations with their creditors, and is a result of three years of LBHI's effective management of the Debtors' assets.  The Debtors will add language to the Amended |

| Objecting Party | Objection Summary | Debtors' Response |
|---|---|---|
| | | Disclosure Statement as set forth on <u>Annex 5-15</u>. |
| | | 18. This provision is included in the Plan for administrative convenience. |
| | | 19. These releases are appropriate pursuant to section 1125(e). The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 5-16</u>. |
| | | 20. The proposed discharge is necessary in order to maximize the value of the Debtors' assets. |
| | | 21. The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 5-8</u> hereto. |
| | | 22. The Plan provision is adequate and no further disclosure is required by section 1125. |
| | | 23. The Plan will recognize that charges of the United States Trustee constitute statutory charges and not administrative expense claims. The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 5-17</u> hereto. |
| | | 24. The Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 5-17</u> hereto. |
| | | 25. The Plan provision takes into account the practicalities that are inherent in the administration of these cases and is consistent with general practice in large chapter 11 cases. |
| | | 26. The Debtors have agreed to file an application on expedited notice to retain Epiq as their solicitation and voting agent as of September 1, 2011. |
| | | In addition, the Debtors will add language to the Amended Disclosure Statement as set forth on <u>Annex 5-18</u>. |
| **18. Chris Stovic (Pro Se)**, ECF No. 19099 | 1. Alleges Debtors breached the terms of a debt instrument he holds. | 1. This objection relates to claims allowance rather than to the adequacy of the information contained in the DS. |
| **19. Linda Neufeld (Pro Se)**, ECF No. 19100 | 1. The DS contains many financial inconsistencies and questionable asset valuations. In addition, the DS only includes estimated recoveries, not final numbers.<br><br>2. There are "inconsistencies" between the Debtors' First and Second Amended Disclosure Statements, including changes to Classification.<br><br>3. The DS contains insufficient tax information. | 1. The Debtors have included in the DS their best estimates of recoveries based on the information available to them.<br><br>2. The Debtors Second Amended Plan is the governing document.<br><br>3. The information contained in the DS is based on the best information available to the Debtors at the time of the preparation of their analysis. Objector should consult her own tax advisors. |

| Objecting Party | Objection Summary | Debtors' Response |
|---|---|---|
| **20. Tommy Tewalt** (Pro Se), ECF No.19121 | 1. Objects to existence of more senior classes.<br><br>2. Asserts that the valuation statements are inaccurate. | 1. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>2. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9. |
| **21. Gary A. Cutler** (Pro Se), ECF No. 19122 | 1. Objects to existence of more senior classes.<br><br>2. Asserts that the valuation statements are inaccurate. | 1. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9.<br><br>2. This is a confirmation objection that should be deferred to the confirmation hearing. *See* Debtors' Response ¶¶ 5 – 9. |

US_ACTIVE:\43785478\10\58399.0008

**Annex 1**

### D.      Valuation of Structured Securities Claims

Lehman issued a significant amount of securities to investors through LBHI and its Foreign Affiliates, including certain (i) structured notes issued by LBT (the "LBT Issued Notes"), (ii) certificates and warrants issued by LBSN (the "LBSN Certificates and Warrants"), (iii) structured notes issued by LBHI (the "LBHI Structured Notes"), (iv) structured notes issued by Bankhaus (the "Bankhaus Structured Notes"), (v) structured securities issued by Lehman Brothers (Luxembourg) Equity Finance S.A. (the "LB Lux Structured Securities") and (vi) certificates issued by Lehman Brothers Finance S.A. (the "LB Finance Structured Securities", and collectively with the LBT Issued Notes, the LBSN Certificates and Warrants, the LBHI Structured Notes, the Bankhaus Structured Notes and the LB Lux Structured Securities, the "Structured Securities"). LBT, LBSN, Bankhaus, LBHI, LB Lux and Lehman Brothers Finance S.A. are collectively referred to herein as the "Structured Securities Issuers."

Many of these Structured Securities were issued as part of the European Medium Term Note Program. These Structured Securities predominately provide that the return at maturity and/or the payment of interest is derived from or linked to the performance of an underlying asset or groups of assets including global indices, single stocks, currencies, interest rates, and various credit derivative instruments and baskets thereof. In some instances principal and/or interest due under such Structured Securities may be partially or wholly "protected." The Structured Securities Issuers generally transferred the proceeds of such issuances to LBHI and have asserted a claim against LBHI for such amounts. A large number of holders of securities issued by Structured Securities Issuers filed claims against LBHI based on its purported guarantee of the Structured Securities (or based directly on the securities in the case of LBHI Structured Notes).

LBHI filed a Form 8-K (the "October 29th 8K") on October 29, 2010 which sets forth the methodology it intended to use for determining the allowed amount of Guarantee Claims filed against it as the alleged guarantor of the LBT Issued Notes. The methodologies were developed in consultation with the court-appointed administrators of LBT, various individuals and groups of creditors that hold claims against LBHI based on LBT Issued Notes, and the Creditors' Committee. The Debtors also posted to www.lehman-docket.com a list containing the proposed maximum valuation for each LBT Issued Note in accordance with such valuation methodologies and principles.

Based on input from holders of Structured Securities, administrators of the estates of the Structured Securities Issuers and the Creditors' Committee, LBHI modified the methodologies described in the October 29th 8K. The Structured Securities Valuation Methodologies represent a negotiated resolution of the valuation methodologies initially proposed by the Debtors and the methodologies proposed by various creditors.

Since many of the Structured Securities are similar in nature to the LBT Issued Notes, LBHI will apply the valuation methodologies, as revised, to similar structured securities issued by LBSN, LBHI, Bankhaus, LBF and LB Lux. A description of the valuation methodologies for the Structured Notes is set forth on Exhibit 11 annexed hereto (the

"Structured Securities Valuation Methodologies").[1]  The Structured Securities Valuation Methodologies were utilized to calculate the maximum allowable claim amounts for each Structured Security.  The maximum allowable claim amounts for the Structured Securities were posted on www.lehman-docket.com on January 25, 2011.  The Debtors will re-publish the maximum allowable claim amounts for each Structured Security incorporating a modification to the Structured Securities Valuation Methodologies to convert amounts owed on account of Structured Securities denominated in foreign currencies to U.S. Dollars using the exchange rates in effect on September 15, 2008 and set forth on Exhibit 15 hereto.

Because many of the Structured Securities do not have an indenture trustee that filed a global proof of claim on behalf of a class of individual note holders, individual record and beneficial holders have filed Claims against the Debtors based on Structured Securities.  More than 21,000 Claims asserting claims of approximately $55 billion were filed against the Debtors based on Structured Securities.  Due to the complexity and idiosyncratic nature of many of the Structured Securities, the filed Claims assert incorrect amounts.  In order to efficiently administer and reconcile these Claims, the Debtors intend to file a motion (the "Structured Securities Procedures Motion") with the Bankruptcy Court seeking to establishestablished procedures for the determination of the allowed amount of the claims for the purposes of voting and distributions under the Plan.  The motion will seek to establish procedures pursuant to which (the "Structured Securities Procedures").  On August 10, 2011, the Bankruptcy Court approved the Structured Securities Procedures.  The Structured Securities Procedures provide that (i) the Debtors will provide individualized notices to each holder of a claim based on a Structured Security that sets forth the Debtors' proposed allowed claim amount for such claim calculated in accordance with the Structured Securities Valuation Methodologies, (ii) claimants will have an opportunity to respond and dispute such proposed amount and (iii) disputes regarding such claim amounts, that are not otherwise settled, may utilize the court-approved alternative dispute resolution procedures.  The Debtors estimate that the Structured Securities Claims will be Allowed in the aggregate amount of approximately $37 billion.  This amount is subject to revision as the Debtors obtain additional information regarding the valuation of certain of the Structured Securities.  The global proof of claim filed by Wilmington Trust Company as indenture trustee on behalf of the holders of securities issued by LBHI under the Indenture, dated September 1, 1987, including the holders of certain LBHI Structured Notes (Claim No. 10082), is expressly excluded from the Structured Securities Procedures.  The Debtors intend to negotiate the allowed claim amount of that Claim with Wilmington Trust Company directly.

On August 6, 2011, the Creditors' Committee filed a statement regarding the Structured Securities Procedures.  This statement was also published on www.lehman-docket.com.  The Creditors' Committee recommends that LBHI creditors read this statement.

---

[1] Nothing herein shall be construed to (i) characterize the Structured Securities as "securities contracts" or "swap agreements" under the Bankruptcy Code, (ii) modify or pertain to the terms of any over-the-counter derivatives or similar contract between LBHI or any of its Affiliates and any other person; or (iii) limit or otherwise modify the application of Section 562 of the Bankruptcy Code to such over-the-counter derivatives or similar contracts.  The Structured Securities Methodology has been developed by LBHI solely for the purpose of determining the Allowed Claims based on valid and timely filed proofs of claim solely for the purposes of voting and Distributions under the Plan.

**<u>Annex 2</u>**

Holders of Allowed Claims in LBHI Class 10C are not expected to receive any Distributions on account of such Claims. Any Distributions that would have been paid to such Claims are automatically reallocated to holders of Allowed Senior Unsecured Claims against LBHI, Allowed Senior Affiliate Claims against LBHI, Allowed Senior Affiliate Guarantee Claims against LBHI, Allowed Senior Third-Party Guarantee Claims against LBHI, Allowed Senior Third-Party Guarantee Claims against LBHI Allowed Subordinated Class 10A Claims against LBHI and Allowed Subordinated Class 10B Claims against LBHI pursuant to provisions of the documents underlying the Class 10C Subordinated Notes. Claims in LBHI Class 10C are impaired by the Plan. Because holders of these Claims are not expected to receive any Distributions on account of such Claims, they are deemed to reject the Plan.

### (xvi)   LBHI Class 11- Section 510(b) Claims

LBHI Class 11 includes Claims arising from the rescission of a purchase or sale of a security (other than an equity security) of the Debtors or an affiliate of the Debtors, for damages arising from the purchase or sale of such security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a claim.

Holders of Allowed Claims in LBHI Class 11 are not expected to receive any Distributions on account of such Claims. Claims in LBHI Class 11 are impaired by the Plan. Because holders of these Claims are not expected to receive any Distributions on account of such Claims, they are deemed to reject the Plan.

Plaintiffs in two pending actions assert that they may have claims in this class:

1. On July 23, 2009, a class action entitled *New Jersey Carpenters Health Fund, et al. v. Lehman XS Trust Series 200S-5N, et al.*, was filed in the Supreme Court of the State of New York, County of New York. On July 29, 2008 the actions were removed to the District Court pursuant to 28 U.S.C. §§1441 and 1446. The case was assigned Case No. 08-6762. Thereafter, another case (08-10686) asserting similar causes of action was filed. These actions allege certain offering documents for issuance of mortgage backed securities contained material misstatements and omitted material information in violation of Sections 11, 12, and 15 of the Securities Act of 1933. These action are stayed with respect to any Debtor defendants.

2. On June 18, 2008, the securities class action *In re Lehman Brothers Equity/Debt Securities Litigation*, Case No. 08-05523 (LAK) was commenced in the United States District Court for the Southern District of New York by plaintiffs asserting that they purchased certain LBHI debt or equity securities pursuant to materially false and misleading registration statements and prospectuses, and were damaged thereby. On July 27, 2011, the District Court granted in part and denied in part motions to dismiss the Securities Litigation by the Non-Debtor Defendants. These action are stayed with respect to any Debtor defendants.

Nothing in the Plan, or in any Order confirming the Plan shall preclude the lead plaintiffs and the putative classes in the above actions from seeking relief to pursue their Claims against the Debtors to the extent of available insurance proceeds.  The Debtors do not concede any liability and do not agree with the allegations in the complaints.  The Debtors reserve any and all rights to contest the claims and to enforce any stay of the actions as against the Debtors.

### (xvii)  LBHI Class 12- Equity Interests in LBHI

Equity Interests in LBHI includes any shares of common stock, preferred stock, other form of ownership interest, or any interest or right to convert into such an equity or ownership interest or acquire any equity or ownership interest, including, without limitation, vested and/or unvested restricted stock units, contingent stock awards, contingent equity awards, performance stock units, and stock options or restricted stock awards granted under management ownership plans, that was in existence immediately prior to or on LBHI's Commencement Date. Equity Interests also include Allowed Claims against LBHI arising out of, or relating to, or in connection with any of the foregoing that are subject to section 510(b) of the Bankruptcy Code. Holders of Equity Interests in LBHI are not expected to receive any Distributions under the Plan.

**<u>Annex 3</u>**

**Annex 3**

## Exhibit 5

*Liquidation Analysis for Each Debtor*

Pursuant to section 1129(a)(7) of the Bankruptcy Code (the "Best Interest Test"), each holder of an impaired Claim or Equity Interest must either (i) accept the Plan, or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such non-accepting holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. In determining whether the Best Interest Test has been met, the first step is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets in chapter 7. The gross amount of Cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the Cash held by the Debtors at the commencement of their chapter 7 cases. Such amount then would be reduced by the costs and expenses of the liquidation. Prior to determining whether the Best Interest Test has been met for general unsecured creditors, further reductions would be required to eliminate Cash and asset liquidation proceeds that would be applied to Secured Claims and amounts necessary to satisfy chapter 7 and chapter 11 Administrative Expense Claims, Priority Tax Claims, and Priority Non-Tax Claims that are senior to General Unsecured Claims, including any incremental Administrative Expense Claims that may result from the termination of the Debtors' businesses and the liquidation of assets. Any remaining Cash would be available for Distribution to general unsecured creditors and Equity Interest holders in accordance with the distribution hierarchy established by section 726 of the Bankruptcy Code.

The Liquidation Analyses (the "Liquidation Analyses") below reflect the estimated Cash proceeds, net of liquidation-related costs that would be available to each of the Debtors' creditors if each Debtor were to be liquidated in a separate chapter 7 case. The Debtors did not apply any present value discounts to estimated cash proceeds. Underlying the Liquidation Analyses are a number of estimates and assumptions regarding liquidation proceeds that, although developed and considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSES WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

For certain asset classes, estimates of the liquidation proceeds were made for each asset individually. For other assets, liquidation values were assessed for general classes of assets by estimating the percentage recoveries that a chapter 7 trustee might achieve through their disposition. A Liquidation Analysis was performed for the assets in each asset class held by the Debtors, and then allocated to each Debtor based on such Debtor's pro rata share of assets in the asset classes, and assumes that the Debtors' liquidation proceeds would be distributed in accordance with sections 726 and 1129(b) of the Bankruptcy Code. Each of the following Liquidation Analyses should be read in conjunction with the following notes.

**<u>Annex 4</u>**

The Allowed amounts of the RACERS Claims against the Debtors are part of the settlement and compromise included in the Plan.  See section X.B.4 hereof for a description of the Allowed amount and treatment of such Claims.

### I.    Avoidance Actions

Pursuant to sections 546 and 549 of the Bankruptcy Code the Debtors had two years from the Commencement Date to commence actions under sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code to seek to avoid certain payments or transfers of their interests in property made prior to the Commencement Date ("Avoidance Actions").  The Debtors, together with the Creditors' Committee, diligently investigated thousands of transactions to determine whether any potentially avoidable transfers existed.

In instances where the Debtors required additional time to investigate whether a transfer is avoidable, or to negotiate a settlement of a potentially avoidable transfer with the transferee, the Debtors requested an agreement from the recipients tolling the statute of limitations for the commencement of Avoidance Actions.  The Debtors entered into tolling agreements with more than 4,100 parties, including the vast majority of the Debtors' Affiliates, including the Foreign Debtors.  Certain Affiliate Claims among the Debtors and the Debtor-Controlled Entities may be subject to avoidance actions.  The Debtors continue to investigate such Claims.

A number of parties either did not respond to the Debtors' request or refused to enter into tolling agreements with the Debtors.  To prevent the loss of avoidance causes of action prior to the expiration of the applicable statute of limitations periods, on September 15, 2010 and periodically thereafter, the Debtors filed approximately 58 avoidance actions naming more than 445 defendants (the "Avoidance Actions").

The Bankruptcy Court has entered an order staying all activity in the Avoidance Actions so that the Debtors could pursue alternative means to resolve their claims against the defendants.  The stay will expire on or about January 20, 2012.  The stay may be lifted by either (i) the filing of a notice by the Debtors (after consultation with the Creditors' Committee) or such other entity that may be authorized to prosecute the action indicating that there is good cause for the stay to be modified, or (ii) on application to the Bankruptcy Court by a defendant in an Avoidance Action, for good cause.

### J.    Statements in Response to Certain Objections

The statements set forth below in this subsection IV.J. have been incorporated herein in response to the objections made by Centerbridge Credit Advisors LLC, Anchorage Capital Group, L.L.C., Monarch Alternative Capital LP, and Danske Bank A/S London Branch (with respect to section 1 only) (collectively, the "Objectors") for additional information.

#### 1.    Transfers of Securitization Structures' Securities

As discussed in section H. herein, prior to its chapter 11 case, LCPI sold or participated portions of certain real estate and commercial loans and, in some cases, equity positions to various Securitization Issuers, including SASCO 2008-C2, Spruce, Verano and

Pine.  The Securitization Issuers, in turn, issued securities (comprised of both notes evidencing debt of the Securitization Issuers and equity interests in the Securitization Issuers) secured by the underlying assets (or the Securitization Issuers' interests therein) and the proceeds therefrom (the "Notes").

Since LCPI held substantial assets, between June 2008 and August 2008, LBI caused LCPI to transfer billions of dollars in collateral in the form of the Notes to cover JPMorgan's risk-based margin requirements for LBI.  LCPI, however, did not have any direct obligations to JPMorgan.  JPMorgan was, therefore, concerned that LCPI, which was not in privity of contract with JPMorgan and had no direct obligations to JPMorgan (and not LBI or LBHI, each of which was in privity of contract) was posting the collateral with JPMorgan.  Accordingly, to alleviate JPMorgan's concerns, beginning in August 2008, LCPI transferred the Notes to LBHI and JPMorgan obtained a guaranty from LBHI for LBI's obligations.  LBHI subsequently pledged some of the Notes to JPMorgan and, upon information and belief, sold the others and transferred the proceeds from the sale of those Notes to JPMorgan, in each case to secure its guaranty obligations.

In exchange, LCPI received a reduction in the amount of its outstanding unsecured intercompany obligations to LBHI corresponding to the face amount of the Notes.  The Objectors allege that, at the time of the transactions, the Notes were worth par (or close thereto) while the unsecured intercompany claims against LCPI were worth significantly less than their stated amount because LCPI was insolvent.  As a result, by reducing its intercompany claim by the full face value of the Notes, such Objectors allege, LBHI received a preference, pursuant to section 547 of the Bankruptcy Code, in the amount of the difference between the value of the Notes and the actual, discounted value of the cancelled intercompany claims.

The Debtors dispute these allegations and assert that such transfers do not constitute preferential transfers.  It is the Debtors' position that there are many defenses under section 547(c) of the Bankruptcy Code or otherwise that are available to defeat any attempted avoidance action.  In addition, based upon the information available and the Examiner's Report, there are significant avoidance actions that may be asserted by LBHI against LCPI based upon the encumbered status of Notes transferred and the true value of the Notes.

## 2.    Capital Contributions

During the several months prior to LCPI's chapter 11 filing, LCPI received multiple capital infusions from its parent, LBI.  For example, LBI made two capital infusions for the benefit of LCPI (the "Capital Infusions") — one in July 2008 in the amount of $275 million and one in August 2008 in the amount of $900 million.  LCPI did not record the Capital Infusions as "assets" on its books and records.  Instead, LBI transferred the cash in connection with the Capital Infusions to LBHI, which received the cash on LCPI's behalf.  The transfers to LBHI were recorded as satisfying part of LCPI's intercompany obligations to LBHI in the amount of the Capital Infusions.

The Objectors assert that these transfers were preferential transfers satisfying each of the requirements of section 547 of the Bankruptcy Code.  The Debtors dispute these allegations and assert that there are many defenses available under section 547(c) or otherwise

**Annex 4**

that may be available to challenge any attempted avoidance action, particularly with respect to earmarked funds as to which LCPI never had control.  In addition, LBHI may have claims against LCPI based on these transactions.

### 3.      Intercompany-Only Repurchase Transactions

As discussed in greater detail in section VIII. herein, certain Intercompany-Only Repurchase Transactions with a Face Amount (as both terms are defined in section VIII.) of $2.25 billion are secured by perfected or otherwise unavoidable security interests/liens in the related assets.  LCPI was entitled to exercise remedial rights to possess and control the particular assets.  However, as of December 31, 2010, LCPI has not taken possession of the assets from LBHI (or in the case of real estate owned ("REO"), a subsidiary of LBHI established to hold the REO) of approximately $1.05 billion, of which $560 million relates to the fair value of the assets as of such date and approximately $494 million relates to cash collected by LBHI arising from the assets between LBHI's Commencement Date and December 31, 2010.  The deficiency claim related to these transactions is approximately $169 million, and was calculated using a combination of an internal analysis of the decline in real estate values subsequent to August 31, 2008 (the last valuation of assets performed by Lehman) and an analysis of Commercial Real Estate ETF's and other REIT market indices subsequent to August 31, 2008 through the default date of the repurchase transactions on September 15, 2008.

The Objectors have raised issues regarding why LBHI continues to hold these assets and why LCPI did not take possession of the assets sooner.  LBHI only holds these assets for operational, administrative, and bookkeeping purposes in order to facilitate the Debtors' management of the assets without significant disruption.  LCPI is treated as the economic owner of the assets and LAMCO has been managing the assets for the direct benefit of LCPI.  The underlying assets involved in the repurchase transactions vary from first lien commercial mortgage loans and residential mortgage loans to equity positions and involve hundreds of assets at LBHI and its Debtor-Controlled Entities, ALI and PAMI.  The transfer of these assets, specifically the equity positions owned by PAMI, would be operationally costly and burdensome to effectuate, and might be detrimental due to default provisions and/or acceleration provisions within joint venture and other agreements.

The Objectors assert that LCPI is entitled to a $1.2 billion super priority administrative expense claim or, at worst, a $1.2 billion general unsecured claim in respect of the diminution in value of the assets during the pendency of the cases.  The decline in value of the assets is not attributable to the fact that they continued to be accounted for by LBHI, but resulted from prevailing market conditions.  The Debtors do not believe there is a basis for LCPI to assert a claim for adequate protection against LBHI.  The Debtors' calculation of LCPI's unsecured deficiency claim is appropriate because, under the relevant provisions of the Bankruptcy Code, the deficiency claim is to be calculated as of September 15, 2008.  Consequently, the Debtors do not believe that LCPI has a claim against LBHI for the $1.2 billion diminution in value of the assets.

As set forth in section VIII. herein, certain Intercompany-Only Repurchase Transactions with a face amount of approximately $1.85 billion result in LCPI having general

unsecured claims against LBHI because of LCPI's failure to properly perfect the asserted security interests/liens as to a portion of the subject assets.

### 4.        Allocation of Costs and Expenses

In the context of negotiations with creditors, the Debtors agreed that it is appropriate for LBHI to bear a portion of the expenses associated with derivative claims resolution as substantially all have related guaranty claims against LBHI.  As to other costs and expenses, all of the Debtors will be parties to the Debtor Allocation Agreement and will share in the allocation of administrative expenses as appropriate.  More information regarding the allocation of costs and expense of the Debtors is set forth in section X.B.4.c.—"Allocation of Costs and Expenses of the Debtors" hereof.

### 5.        LBHI's Purchase of Bankhaus' Interests in Notes

As discussed in section IV.E.4.b.—"Settlement Negotiations with Foreign Debtors," and Exhibit 14A attached hereto, the Debtors agreed, as part of the Bankhaus Claims Settlement Agreement, to purchase from Bankhaus Purchased Notes (as that term is defined in Exhibit 14A) issued by certain Securitization Issuers.  As described in the motion to approve the Purchased Notes agreements [Docket No. 14743], the Debtors concluded that it was more appropriate for LBHI, rather than LCPI, to purchase the Purchased Notes because the sale of the Purchased Notes directly impacted the claim that Bankhaus holds against LBHI (the "SCA Claim") based on the Security & Collateral Agreement between LBHI and Bankhaus, dated August 15, 2002 (the "SCA").  In summary, pursuant to the SCA, LBHI agreed to post cash collateral to Bankhaus in respect of any losses suffered by Bankhaus if either an asset decreases in value below a certain level, or a borrower under a note held by Bankhaus fails to make a payment when due and payable.  The Purchased Notes were among the assets covered by the SCA.  Accordingly, a portion of the SCA Claim related to the Purchased Notes and arose from the shortfall in value that Bankhaus suffered on account of such notes.  As this shortfall increased, that portion of the SCA Claim that related to the Purchased Notes increased, and vice-versa.  Thus, there was a pre-existing correlation between the Purchased Notes and LBHI's liabilities.  No similar relationship or connection existed between LCPI and said notes.

In addition to the strategic benefit of ownership of the Purchased Notes, LBHI was able to fix the amount of the portion of the SCA Claim relating to the Purchased Notes and mitigate its liability to Bankhaus on account of the SCA Claim by any increase in the value of the Purchased Notes in excess of the purchase price.  For all these reasons, the Debtors concluded that it was appropriate for LBHI, rather than LCPI, to purchase the Purchased Notes.  LCPI, as a result of its holding of notes and interests in Spruce, Verano and SASCO 2008-C2, will, nonetheless, realize the benefits resulting from it and LBHI having obtained 100% control of the capital structures of those Securitization Issuers.  More information regarding LBHI's purchase of Bankhaus' interests in the Purchased Notes is set forth in Exhibit 14A, attached hereto.

**Annex 4**

### 6.        Sales or Financings and Perfection of Liens

The Debtors have analyzed whether the transfers of assets into Pine, Spruce, Verano, SASCO 2008-C2, and the RACERS Trusts were sales or financings and whether, if they were not sales, appropriate steps were taken to perfect a security interest.   In each case, other than the RACERS Trusts, the Debtors concluded that the transfers had the attributes of true sales, and that in any case, timely steps were taken to perfect a security interest, so that the applicable trust had an unavoidable perfected security interest in the relevant assets.  More information regarding this analysis in relation to the RACERS Trusts is set forth in section IV.H.b.— "The RACERS Transactions" hereof.

**<u>Annex 5</u>**

Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting on the Plan.  These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes and how the votes will be tabulated.  No solicitation of votes to accept or reject the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

## II.    OVERVIEW OF THE PLAN

For a more detailed description of the Plan, refer to section X—"Summary of the Chapter 11 Plan."  Under the Plan, distributions to holders of Allowed Claims will be funded substantially by the orderly liquidation of the Debtors' assets.  In addition, the Plan is attached hereto as Exhibit 1.

### A.    Summary of the Plan

Since the commencement of LBHI's chapter 11 case, the Debtors have engaged in numerous discussions and meetings with interested parties, including individual and representative groups of both third-party and Affiliate creditors of the various Debtors.  The Debtors' process of negotiating the Plan has been consistent with their goals of achieving confirmation of the Plan on a consensual basis in the most efficient manner.  The Debtors proposed a chapter 11 Plan on January 25, 2011 (the "First Amended Plan") that included a proposed settlement of various legal and factual disputes among the Debtors' creditors.  Two alternative chapter 11 plans were proposed by groups of creditors asserting diametrically opposing views with respect to the substantive consolidation of the Debtors and other issues.

The Debtors convened meetings and participated in intensive negotiations with numerous representative creditors during June, 2011 to pursue a global settlement of the existing issues.  As a result of the meetings and negotiations, the Debtors and the representative groups of creditors, including substantially all of the proponents of the two alternative plans,[1] agreed to the terms of the Plan. The Plan includes economic resolutions of a myriad of issues (the "Plan Issues"), including, but not limited to:

(i) the potential substantive consolidation of the Debtors and certain of their Affiliates;

(ii) the characterization of intercompany balances owed to LBHI by Subsidiary Debtors;

(iii) the Allowed Amount of certain Affiliate Claims;

---

[1] Only the "Steering Committee" of the Ad Hoc Group of Lehman Brothers Creditors (the "Ad Hoc Group") participated in negotiations with the Debtors and other creditors.  The members of the Steering Committee have executed Plan Support Agreements, will cause the Ad Hoc Group to support the Plan and encourage other members of the Ad Hoc Group to execute Plan Support Agreements.

Intercompany-Only Repurchase Transactions with a Face Amount of $2.25 billion are secured by perfected or otherwise unavoidable security interests/liens in the related assets. LCPI is entitled to exercise remedial rights to possess and control the particular assets. However, as of December 31, 2010, LCPI has not taken possession of the assets but rather has recorded a secured receivable from LBHI (or in the case of real estate owned ("REO"), a subsidiary of LBHI established to hold the REO) of approximately $1.05 billion, of which $560 million relates to the fair value of the assets as of such date and approximately $494 million of such secured receivable relates to cash collected by LBHI arising from the assets between LBHI's Commencement Date and December 31, 2010. The deficiency claim related to these transactions is approximately $169 million.

Intercompany-Only Repurchase Transactions with a Face Amount of approximately $1.85 billion result in LCPI having general unsecured Claims against LBHI because of LCPI's failure to properly perfect the asserted security interests/liens as to a portion of the subject assets.

On LCPI's Commencement Date, LCPI was party to repurchase transactions with ALI and PAMI with a Face Amount of approximately $3 billion. ALI and PAMI as non-Debtors generally would not be able to avoid unperfected interests; accordingly LCPI has recorded secured receivables from ALI and PAMI (or in the case of REO, a subsidiary thereof) of approximately $94 million and $395 million, respectively, representing the fair value of the related assets as of December 31, 2010. LCPI will have deficiency claims against ALI and PAMI in respect of these repurchase transactions in the aggregate amounts of approximately $158 million and $783 million, respectively.

The secured Claim and deficiency amounts set forth above were calculated based on the best available information and are subject to continuous review and adjustments which may be material.

## IX. LAMCO

During the Chapter 11 Cases, LBHI developed, by necessity, an infrastructure for the long-term management of the Debtors' long-term investments and assets and LBHI's asset management teams developed the skills required, and an expertise and knowledge base specifically geared to, the management of such long-term investments and distressed assets. The capabilities of LBHI's asset management team are scalable and transferable to the management of other long-term investment assets for third parties as well. In order to maximize the value of the asset management business, LBHI organized new separate but wholly owned subsidiaries to provide management services to the Debtors and, potentially, to third parties. LAMCO Holdings LLC, and its wholly owned subsidiaries, including LAMCO LLC (collectively, "LAMCO") currently provide asset management and administration services to the Debtors and, subject to certain restrictions and approvals, may provide services to third parties. The Debtors transferred to LAMCO a majority of LBHI's asset management employees and certain infrastructure and entered into an asset management agreement with LAMCO. At this time, LAMCO has approximately 300 employees and manages substantially all of the Debtors' non-cash assets.

49

LAMCO is permitted, under certain circumstances, including upon the agreement of the Creditors Committee, to enter into agreements to manage assets of third parties for a profit that would inure to the benefit of LAMCO's equity holder(s), and ultimately to the benefit of all of the stakeholders in the Debtors.  Although LBHI is not currently pursuing a strategic relationship with a third party with respect to LAMCO, including the possibility of selling an equity stake in LAMCO to a potential partner, or otherwise entering into mutually beneficial ventures and arrangements with third parties, it has reserved the option to be able to do so in the future.

At the discretion of the board of directors of LBHI following the Effective Date and subject to existing agreements, LAMCO may serve as asset manager for certain assets of each of the Debtors under the Plan.  Ownership and ultimate decision making authority with respect to each of the Debtor's assets after the Effective Date will be vested in the applicable Debtor as provided in section 13.1 of the Plan.  On August 17, 2011, the Bankruptcy Court authorized the Debtors to enter into an asset management agreement that anticipates the transfer of certain assets to one or more collateralized loan obligation issuers.  To the extent that any assets of the Debtors are transferred to collateralized loan obligation issuers, these assets will no longer be managed by LAMCO.

## X.    SUMMARY OF THE CHAPTER 11 PLAN

The Plan is annexed hereto as Exhibit 1 and forms a part of this Disclosure Statement.  The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan.

### B.    Considerations Regarding the Chapter 11 Plan

The terms of the Plan are the result of extended analyses by the Debtors and their advisors as well as numerous conferences and intensive negotiations with multiple interested parties, including individuals and representative groups of both third party creditors and Affiliates of the Debtors, and the Creditors' Committee.  One of the Debtors' guiding principles in formulating the Plan has been the avoidance of litigation of substantive consolidation and its related issues, the recharacterization of intercompany balances owed to LBHI by Subsidiary Debtors, the Allowed Amount of Affiliate Claims, allocation of costs and expenses among Debtors, and the ownership rights of various Debtors and their Affiliates with respect to certain assets, in order to expedite, in so far as practical, Distributions to holders of Allowed Claims.  Prosecution of litigation of the various issues would be costly, complex and time consuming and as well as prolong the Debtors' Chapter 11 Cases.

Accordingly, the Plan includes a settlement and compromise of such issues that will provide holders of Claims recoveries that reflect the relative risks and benefits of the prosecution of the potential litigation to final judgment.  The terms of the compromise and settlement included in the Plan should be considered together as a resolution of all of the Plan Issues.  Although litigation regarding the Plan Issues could produce different absolute or relative recoveries from those proposed by the Plan, such litigation would not be finally resolved for many years, delaying and potentially materially eroding the value of ultimate Distributions to all creditors.

stimulate significant opposition and extended and costly litigation, and result in delay in the Debtors' Chapter 11 Cases to the prejudice of all economic stakeholders.

### G. Administration of the Debtors' Assets During the Chapter 11 Plan

Since the Commencement Date, the Debtors have taken numerous steps to maximize the value of their assets. The Debtors assets are generally divided into five separate assets classes: derivative contracts, real estate assets, commercial loans, private equity/principal investments and bank platforms. For further information about the assets held by each of the Debtors, see the balance sheets, dated as of December 31, 2010 attached as Exhibit 2B.[1] For further information regarding certain significant actions taken by the Debtors as to their assets during these Chapter 11 Cases see Exhibit 17 hereto.

### 1. Derivative Contracts

Prior to the Commencement Date, Lehman entered into derivative transactions both in a trading capacity and as an end-user, conducting its derivative activities through a number of wholly-owned subsidiaries. Its fixed income derivative products business was principally conducted through LBSF and its separately capitalized "AAA" rated subsidiaries, including LBFP and LBDP. Lehman's equity derivative products business was conducted through LBF, LOTC and LBIE, and its commodity and energy derivatives product business was conducted through LBCS. Lehman conducted a significant amount of its spot, forward and option foreign exchange business through LBCC.

The Debtors' derivative assets represent amounts due from counterparties under contracts in which the contractual obligations and values are keyed to one or more underlying assets or indices of asset values (the "Derivative Contracts"). As of the Commencement Date, the Debtors (together with all Debtor-Controlled Entities) were parties to approximately 1.2 million derivative transactions, with approximately 6,500 counterparties

The Debtors have sought to (i) preserve the value of the Derivative Contracts and collect payments on Derivative Contracts as to which amounts are owed to the Debtors, and prevent erosion based on movements in the value of the underlying asset or index of live contracts including hedging of the live contracts and select purchases of notes issued by certain special purpose vehicles and (ii) enter into termination and settlement agreements with respect to Derivative Contracts as to which the Debtors owe money to counterparties. Prior to entering into a settlement agreement in connection with any Derivative Contract, the Debtors, generally, must (i) reconcile the universe of all trades between the Debtors and a particular counterparty, (ii) value each of the transactions under the Derivative Contracts, and (iii) negotiate a

---

[1]     The Debtors' balance sheets dated as of March 31, 2011 are available in the Debtors' Supplemental Monthly Operating Report filed on July 21, 2011 [Docket No. 18713]. If the Debtors had used the information contained in the March 31, 2011 balance sheets, it would have had no material impact on the Recovery Analysis contained in Exhibit 4 of the Disclosure Statement.

3.    **Plan Trust**

For securities laws purposes, and in order to preserve NOLs and certain other valuable tax attributes[2] that will maximize assets and thereby recoveries to creditors, the Plan Trust will be established on the Effective Date and continue in existence until the Closing Date. The Plan Trustees will be the members of the Director Selection Committee. Each of the Plan Trustees will continue in such capacity until he or she ceases to be a Plan Trustee in accordance with the terms and conditions set forth in the Plan Trust Agreement. In the event of a vacancy in the office of Plan Trustee, the remaining Plan Trustees will by majority vote of the remaining Plan Trustees fill the vacancy if in their discretion the circumstances of the Plan Trust warrant doing so. The Plan Trust shall exercise voting rights associated with the Plan Trust Stock in furtherance of the orderly liquidation of the Debtors and compliance with the provisions of the Plan. The sole purpose of the Plan Trust shall be to hold the Plan Trust Stock as provided in Section 4.16(b).

The Plan Trust Agreement will provide that (i) at such time as a vacancy on the board of directors of LBHI is to be filled or there is a vote on the election of a director upon the expiration of a director's term of office, the Plan Trust will fill such vacancy by majority vote of the Plan Trustees and (ii) at all other times, the Plan Trust may act, by majority vote of the Plan Trustees, to remove and replace directors, with or without cause.

4.    **Plan Administrator**

The Plan Administrator will have the rights and powers of a debtor-in-possession under section 1107 of the Bankruptcy Code, and such other rights, powers and duties incident to causing the performance of the Debtors' obligations under the Plan. The Plan Administrator shall continue to exist until entry of a Final Order by the Bankruptcy Court closing the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code.

5.    **Corporate Existence**

After the Effective Date, the Plan Administrator may decide, to (a) maintain each Debtor as a corporation in good standing until such time as all aspects of the Plan pertaining to such Debtor have been completed, or (b) at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to such Debtor, dissolve such Debtor and complete the winding up of such Debtor without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its shareholder or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate governmental authorities (including, without limitation, the transfer of all or part of the assets of such Debtor to a liquidating trust), or (c) dissolve any Debtor-Controlled Entity and complete the winding up of such Debtor-Controlled Entity in accordance with applicable law; *provided, however,* that the foregoing does not limit the Plan Administrator's ability to otherwise abandon an interest in a Debtor-Controlled Entity.

---

[2]    For further discussion of the Plan Trust, see section XV.A.3.b, "Limitations of NOL Carryforwards and Other Tax Attributes."

### 7.    Wind-Down

After the Effective Date, pursuant to the Plan, the Plan Administrator shall wind-down, sell and otherwise liquidate assets of the Debtors and/or Debtor-Controlled Entities.  The wind-down, sale and liquidation of each of such Debtor's assets (as determined for federal income tax purposes) shall occur over a period of three years after the Effective Date (it being understood that such liquidation may include the transfer of all or part of the assets of such Debtor to one or more Liquidating Trusts within the meaning of Treas. Reg. § 301.7701-4); *provided, however*, that the wind-down and liquidation may extend over a longer period of time if the Debtors receives a private letter ruling or other equivalent guidance from the IRS from which the Plan Administrator reasonably concludes that the continued wind-down and liquidation should not result in a reduction or limitation of the Debtors' tax attributes for federal income tax purposes that materially impairs the expected actual use of such tax attributes.  See section X.I—"Liquidating Trust" and section XV— "Certain Federal Income Tax Consequences of the Plan" for further information.

## XIII.   SECURITIES LAWS MATTERS

For securities laws purposes, and in order to preserve NOLs and certain other valuable tax attributes[3] that will maximize assets and thereby recoveries to creditors, on the Effective Date all existing Equity Interests in LBHI shall be cancelled and one new share of LBHI's common stock shall be issued to the Plan Trust which will hold such share for the benefit of the holders of such former Equity Interests consistent with their former economic entitlements.  On the Effective Date all existing Equity Interests in each of the Debtors other than LBHI shall be retained by such holder and only cancelled if and when such Debtor is dissolved in accordance with the Plan.  In the event that all Allowed Claims against such Debtor have been satisfied in full in accordance with the Plan, each holder of an Equity Interest in such Debtor may receive its Pro Rata Equity Share of any remaining assets of such Debtor.

Holders of Equity Interests should consult their own advisors regarding any securities law consequences of the treatment of their Equity Interest under the Plan.

## XIV.   CERTAIN RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

---

[3]    For further discussion of these tax attributes, see section XV.A.3.b, "Limitations of NOL Carryforwards and Other Tax Attributes."

Creditors' Committee's composition was amended on October 3, 2008, at which time The Royal Bank of Scotland, PLC and RR Donnelley & Sons were replaced with The Vanguard Group and Aegon USA Investment Management, respectively. The Creditors' Committee composition was reduced to five members on December 15, 2009, when Shinsei Bank, Limited and Aegon USA Investment Management resigned. On February 9, 2010, the Creditors' Committee was expanded to seven members with the appointment of U.S. Bank, N.A., as Indenture Trustee, and Elliott Management Corp.

Since the appointment of the Creditors' Committee, the Debtors have regularly consulted with the Creditors' Committee and its professionals concerning the administration of the Chapter 11 Cases. The Debtors have kept the Creditors' Committee and its professionals informed with respect to their operations and have obtained the concurrence of the Creditors' Committee for actions and transactions outside of the ordinary course of the Debtors' business. The Debtors have met with the Creditors' Committee and its advisors on at least a monthly basis, and have participated in many meetings with sub-committees of the Creditors' Committee focused on specific asset classes and related issues on a regular and frequent basis. The Creditors' Committee and its professionals have participated actively, together with the Debtors and their professionals, in, among other things, reviewing the Debtors' business operations across all of the Debtors' business lines as well as to all matters relating to the administration of the Chapter 11 Cases and the formulation of the Plan. These meetings occur on an almost daily basis.

The expenses of members of the Creditors' Committee and the fees and expenses of the Creditors' Committee's professionals are administrative expenses of the Debtors in the Chapter 11 Cases, subject to approval by the Bankruptcy Court.

The Debtors also have met and conferred with certain non-statutory groups of creditors and their financial and legal advisors.

**C.      Fee Committee**

On May 26, 2009, the Bankruptcy Court entered an Order (i) appointing a committee (the "Fee Committee"), among other things, to review the fees incurred by professionals retained in these cases, and (ii) approving a fee protocol by which the Fee Committee would operate. [Docket No. 3651]. The Fee Committee consists of four members: (i) a representative of the Debtors, (ii) a representative appointed by the Creditors' Committee, (iii) the US Trustee and (iv) an independent member.

On January 24, 2011, following the resignation of the independent member, the Fee Committee recommended Richard Gitlin to serve as the successor independent member. [Docket No. 14112]. By Order of the same date, the Bankruptcy Court approved the appointment of Mr. Gitlin to the Fee Committee [Docket No. 14117].

By Order dated April 6, 2011, the Bankruptcy Court authorized the Fee Committee to retain Godfrey & Kahn, S.C. as its counsel [Docket No. 15663].

By Order dated April 14, 2011, the Bankruptcy Court approved the implementation of an amended fee protocol (the "Amended Fee Protocol"), under which the composition of the Fee Committee remained the same [Docket No. 15998]. Pursuant to the Amended Fee Protocol, the Fee Committee is charged with: "[m]onitoring, reviewing and, where appropriate, objecting to applications for fees and expenses filed by [retained professionals] … and to [e]stablish measures to help the Court ensure that compensation and expenses paid by the Estate are reasonable, actual and necessary under the Bankruptcy Code." Amended Fee Protocol at B and C.

The Fee Committee will continue to exist after the Effective Date to perform its duties under the Amended Fee Protocol in connection with all applications for approval of professional fees incurred prior to the Effective Date, and all related proceedings, including hearings on final fee applications.  The Debtors shall pay the reasonable fees and expenses of the Independent Member and Fee Committee Counsel retained by the Fee Committee in connection with the foregoing from and after the Effective Date.  It is anticipated that subsequent to consideration of final fee applications, the Fee Committee will be disbanded.

### D.    Lehman Brothers Inc.'s SIPA Proceeding; Lehman ALI

On the Commencement Date, LBI was a wholly-owned direct subsidiary of LBHI and a broker/dealer registered with the SEC.  Following the Commencement Date, LBHI negotiated and agreed to the sale of substantially all of Lehman's North American capital markets and investment banking business to Barclays.  Barclays declined to acquire certain businesses and assets of LBI, including those relating to derivative products or real estate investments held in various subsidiaries of LBI.  Therefore, on September 19, 2008, prior to the commencement of LBI's proceeding under the SIPA, LBI transferred to Lehman ALI Inc. ("Lehman ALI"), a wholly-owned direct subsidiary of LBHI, all of LBI's interests in the shares of those subsidiaries of LBI.

**THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.**

### C.    Certain Bankruptcy Law Considerations

It is not possible to predict with certainty the length of the Chapter 11 Cases or to assure that the Plan will be confirmed.  Even if all voting Classes vote in favor of the Plan and the requirements for "cramdown" are met with respect to any Class deemed to have rejected the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  As discussed in Section XI— "Confirmation and Consummation of the Plan" of the Disclosure Statement, section 1129 of the Bankruptcy Code requires, among other things, a showing that the with respect to each Class, such Class either (i) has voted to accept the Plan or (ii) the value of distributions to dissenting Classes of Claims and Equity Interests will not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Although the Debtors expect that the Plan will meet such test with respect to all Classes for each Debtor, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Even if the Plan is confirmed, the prolongation of the Chapter 11 Cases may have an adverse effect on the Debtors' businesses and ultimate recovery on the Debtors' assets.  Prolonged Chapter 11 Cases will result in the Debtors' incurrence of substantial additional Administrative Expense Claims and Claims for professional's fees and expenses and will require the Debtors to continue to devote substantial time and energy to the Chapter 11 Cases which would otherwise be directed at efficiently operating the Debtors' distribution process and marketing the Debtors' assets to augment the value of the Debtors' Estates.

Through July 31, 2011, the Debtors have incurred approximately $1.37 billion in professional fees and expenses, inclusive of fees and expenses for professionals retained by the Debtors, the Creditors' Committee, the Court-appointed Examiner, and the Court-appointed Fee Committee, as well as  $1.48 million paid to the US Trustee for its quarterly fees.  The Debtors anticipate incurring an additional $310 million through the Effective Date of the Plan, including $450,000 in US Trustee quarterly fees.

### D.    Conditions Precedent to Consummation of the Plan

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation of the Plan and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court, and if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

### E.    Asset Sales

Under the Plan, distributions to holders of Allowed Claims will be funded substantially by the liquidation of the Debtors' assets.  Although the Debtors will seek to

any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Commencement Date through the liquidation of such Debtor as determined under applicable tax laws and (iii) represent the interest and account of each Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(xi)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required by any Governmental Unit or applicable law;

(xii)    determine whether to create a Liquidating Trust for a Debtor or Debtor-Controlled Entity pursuant to section 10.1 of the Plan and which assets of such Debtor to transfer to such Liquidating Trust or to issue New Securities; and

(xiii)    perform such other duties and functions that are consistent with the implementation of the Plan.

### b.    Liability of Plan Administrator

The Plan Administrator will have no liability whatsoever for any acts or omissions in its capacity as Plan Administrator to the Debtors or holders of Claims against or Equity Interests in the Debtors other than for gross negligence or willful misconduct of the Plan Administrator.  LBHI, solely in its capacity as the Plan Administrator will be indemnified and held harmless by each of the Debtors for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence or, willful misconduct, or criminal conduct.

### c.    Indenture Trustee and Creditors' Committee Members Fees

Subject to the entry of the Confirmation Order, the reasonable fees and expenses (including attorneys fees) of (i) the indenture trustee for the Senior Notes and the Subordinated Notes and (ii) the individual members of the Creditors' Committee, in each case, incurred in their capacities as indenture trustee or members of the Creditors' Committee, respectively, shall (a) to the extent accrued and unpaid as of the Confirmation Date, as applicable, be Allowed as Administrative Expense Claims and paid by the Debtors in accordance with the Debtor Allocation Agreement, and (b) to the extent incurred after the Confirmation Date, be Allowed as Administrative Expense Claims and paid by the Debtors on a monthly basis upon the submission of fee statements without further order of the Bankruptcy Court.[1]

### 4.    Treatment of Disputed Claims

The Debtors' rights to object to, oppose and defend against all Claims are fully preserved.  Notwithstanding that a Primary Claim is Allowed against a Primary Obligor, the Debtors reserve the right to object to, oppose and defend against all Guarantee

---

[1]    The US Trustee has objected to this provision of the Plan.

the proceeds of any sale of such shares.  LBI also transferred to Lehman ALI certain patents and trademarks that were owned by LBI but used in the investment management division.  In consideration for the transfer of such intellectual property, Lehman ALI issued another note (the "IP PIK Note") to LBI.  The amount of the IP PIK Note is equal to the fair market value of the transferred intellectual property as of September 19, 2008, with such amount to be determined pursuant to a methodology to be agreed to by LBI and Lazard.  The IP PIK Note is secured by a security interest in the transferred intellectual property.

The Debtors do not believe that Lehman ALI has any liability with respect to the value of the shares of the transferred entities. They also believe that the intellectual property acquired from LBI did not have any value as of September 19, 2008.  Accordingly, no liability has been recognized by Lehman ALI on its balance sheet.  The trustee appointed to liquidate LBI under SIPA (the "SIPA Trustee") does not concur with the conclusions of the Debtors and has reserved all of his rights with respect to such PIK Notes.  As of the date hereof, neither the value, nor the methodology for determining the value of the PIK Note and the IP PIK Note has been agreed among the parties.  The Debtors are in discussions with the SIPA Trustee regarding a possible resolution of the disputes.  At this time, however, the Debtors cannot predict whether the disputes will be resolved through a consensual settlement or judicial process.  It is the Debtors' view that the outcome of these discussions and the resolution of the values, if any, of the notes will not have a material impact on recoveries.

**D.     Sale of the North American Capital Markets and Investment Banking Business to Barclays Capital Inc.**

On September 16, 2008, one day after the Commencement Date, the Debtors and Barclays entered into an asset purchase agreement (the "Barclays Asset Purchase Agreement") with respect to the sale of all assets (except for certain excluded assets) used in connection with the Debtors' North American capital markets and investment banking business (the "Barclays Purchased Assets").  The sale of the Barclays Purchased Assets was consummated pursuant to an Order of the Bankruptcy Court, dated September 19, 2008 (the "Barclays Sale Order"), and the Barclays Asset Purchase Agreement, as amended on September 19, 2008, and a clarification letter (the "Clarification Letter") dated as of September 20, 2008, and executed on September 22, 2008 [Docket No. 258].

outstanding amount of $4 million (including accrued interest). In May 2011, following its purchase of the Class A-1 Notes from Barclays and LBHI, LCPI terminated the Pine securitization. Such transaction will benefit LCPI in two ways: (1) LCPI has the opportunity to realize a profit on the purchase of the Class A-1 Notes from Barclays, and (2) without the restrictions contained in the Pine securitization, LCPI can more efficiently manage and dispose of, as necessary, the commercial loans that were participated to the Pine securitization.

The Debtors continue, in consultation with the Creditors' Committee, to analyze and resolve various issues surrounding the Securitization Issuers. The Debtors have separately tracked cash collections from underlying assets and have reported the cash as restricted cash on their balance sheets. As of December 31, 2010, the Debtors held $1.8 billion of restricted cash related to the Securitization Issuers, excluding the RACERS MM Trust. In the second quarter of 2011, the Debtors released restricted cash held for Spruce and Verano to the trustees, who then remitted this cash plus excess cash that they were holding to the Debtors, as noteholders. Approximately, $1.7 billion was distributed reducing the outstanding note balances for Spruce and Verano. The outstanding principal amount of the notes issued by each Securitization Issuer and the Debtors' interests in each of the Securitization Issuers, as of May 31, 2011, is set forth in the table below. The amounts set forth in the below table exclude any interest accrued and unpaid through the date hereof, but include any unpaid interest that has been added to the principal amounts, "i.e., capitalized interest," in accordance with the terms of the notes.

alternative dispute resolution procedures to facilitate the negotiations and settlement of Claims. Such procedures are intended to avoid expensive and time intensive litigation of Claims and undue delay in the administration of the Chapter 11 Cases.

Annexed hereto as Exhibit 6 is additional information regarding the number and amount of Claims filed against the Debtors. The Debtors estimate that the aggregate amount of Claims that will ultimately be Allowed against the Debtors is approximately $362 billion. The estimate of Allowed Claims against each Debtor is set forth on Exhibit 6 annexed hereto.

Unless otherwise noted, the Debtors have utilized the exchange rates set forth on Exhibit 15 annexed hereto in the calculations of amounts owed by and to the Debtors.

### C.    Validity and Enforceability of Guarantee Claims

In the aggregate approximately (a) $315 billion of Guarantee Claims were filed against LBHI by its Affiliates and (b) $255 billion of Guarantee Claims were filed against LBHI by third-parties that are not Affiliates of the Debtors ("Third-Party Guarantee Claims"), in each case including estimated amounts for Claims filed in unliquidated amounts. Guarantee Claims filed by Affiliates consist largely of Claims asserted against LBHI based on (i) a purported guarantee of a specific transaction that an Affiliate entered into with another Affiliate; (ii) LBHI's purported guarantee of all of the obligations of certain of its subsidiaries (such subsidiaries, the "Guaranteed Subsidiaries") pursuant to resolutions adopted pursuant to a Unanimous Written Consent of the Executive Committee of the Board of Lehman Brothers Holdings Inc. (the "Guarantee Resolutions") or (iii) a purported guarantee by LBHI of net worth or asset values.

The Debtors are reviewing each of the Guarantee Claims and considering the circumstances surrounding the entry into the underlying contract or obligation, including whether: (i) the guarantees are valid and enforceable contracts; (ii) the guarantees were properly executed by the appropriate parties; (iii) the claimant was an express or intended beneficiary; (iv) the claimant actually relied upon the guarantee at the time that it transacted business with the primary obligor; and (v) the guarantee is avoidable under chapter 5 of the Bankruptcy Code. With respect to Guarantee Claims based on the Guarantee Resolutions, the Debtors also considered, among other things, whether (a) the Guarantee Resolutions constitute guarantees or contracts between LBHI and the Guaranteed Subsidiaries; (b) the claimant had actual knowledge of the Guarantee Resolutions at the time it transacted with the Guaranteed Subsidiary and (c) additional documentation was required to create an enforceable guarantee.

The Debtors have significant defenses to the enforceability of many of the asserted Guarantee Claims. Evaluation of each Guarantee Claim requires extensive fact-intensive investigation and analysis and could result in substantial discovery among the parties and likely active litigation.[1]

---

[1]    The Debtors' estimates of what claims will ultimately be allowed, and the assumptions underlying such estimates, are set forth in Exhibit 6 of the Disclosure Statement and the Annexes thereto.

each other.  The Debtors filed Claims against LBI (i) as "customers" as such term is defined in SIPA and (ii) as general unsecured creditors of LBI.  LBI is still reviewing its Claims, and therefore, the Debtors are not able to estimate the recoveries on these Claims.  Certain of the Debtors' Claims against LBI may be subject to subordination agreements entered into prior to the Commencement Date with LBI.  Therefore, as to certain of the Claims, the Debtors will likely only receive a minimal recovery, if any.

## VII.    CERTAIN TRANSACTIONS/RELATIONSHIPS WITH LBIE

LBIE was Lehman's European registered broker/dealer based in the United Kingdom.  LBIE offered a variety of security brokerage services to third parties as well as to various Lehman entities involved in European transactions.  LBIE was placed into administration in the United Kingdom on September 15, 2008.  In connection with the administration of LBIE, the Joint Administrators of LBIE have obtained certain rulings from the English High Court regarding rights and ownership of certain assets held by LBIE to which other Affiliates, including certain Debtors, claim an interest.  The material proceedings are summarized below.

(i)    The English High Court rendered a decision in favor of the Joint Administrators of LBIE, finding that LBIE owns the securities that are subject to the RASCALS (Regulation and Administration of Safe Custody And Global Settlement) arrangement.  All Affiliates which were a party to the proceedings, with the exception of LBI and LBSF, have filed appeals from the RASCALS decision.  The appeals are pending.

(ii)    LBIE is seeking a determination from the English High Court that it cannot be compelled to apply a lien for the benefit of Affiliates against assets it holds on behalf of other Affiliates.  Pursuant to the terms of the custodial arrangement with LBIE, the Debtors have notified LBIE that they intend to request that LBIE assert a lien against the assets of other Affiliates in order to satisfy liabilities owed by any such Affiliates to the Debtors.  Other Affiliates have similarly requested LBIE take similar actions for their benefit. A determination from the English High Court is pending.

(iii)    The English High Court rendered a decision which held that (a) a statutory trust for the benefit of a client comes into existence upon immediate receipt of client money by LBIE; (b) to the extent that there are any identifiable client monies in non-segregated client accounts, these are not part of the client money "pool," and any claims to them by clients are available only to the extent such claims are permissible in accordance with established tracing principles (the "Pooling Issue"); and (c) it is not permissible to "top-up" the client money pool from assets belonging to LBIE's general estate.  The English Court of Appeal reversed the findings on the Pooling Issue so that the client money pool includes client money in all accounts wherever identified, whether in segregated accounts or house accounts.  The decision is being appealed to the English Supreme Court.[1]

---

[1]    Please refer to Exhibit 6 of the Disclosure Statement for the Debtors' estimates of which claims will ultimately be allowed, which reflect certain assumptions relating to these proceedings.

litigation of this issue would result.  The litigation would be extremely fact-intensive, consume a substantial amount of money and Distributions to creditors would be significantly delayed.  Therefore, the Plan proposes a compromise that would eliminate the necessity of such complex litigation.  The Plan does not substantively consolidate the Debtors.  However, as to Claims against LBHI, the Plan provides that a portion of the Distributions on Claims that would be eliminated if LBHI and its Affiliates are substantively consolidated is automatically reallocated to holders of claims that would exist following the substantive consolidation and receive a larger recovery in that scenario.  As to Claims against the Participating Subsidiary Debtors, the Plan provides that a portion of the Distributions on Claims that would be eliminated or receive a lesser recovery if LBHI and the Participating Subsidiary Debtors were substantively consolidated is also automatically reallocated to holders of Claims against LBHI that would exist following the substantive consolidation and receive a larger recovery in that scenario.  The Debtors believe that the compromise included in the Plan balances the risks and provides an equitable solution that is reasonable, fair and efficient means to resolve and avoid the vexatious, multifaceted and protracted litigation and delay that might otherwise occur.

> **b.      Description of Settlement and Compromise Regarding Substantive Consolidation Included in the Plan**

The Plan includes a compromise of substantive consolidation and related issues.  The Plan provides for a reallocation of a portion of Distributions from certain classes of creditors that would receive a lower distribution if the Debtors were substantively consolidated to creditors that would benefit from substantive consolidation of the Debtors.  The amount of Distributions that are subject to the reallocation in the Plan reflects the joint determination by the Debtors' and the Creditors' Committee that there is a material risk that substantive consolidation might be directed if fully litigated.  To avoid that risk, a compromise of the issue is appropriate and in the best interests of all economic stakeholders.  The Debtors propose a reallocation of a portion of Distributions based upon at least a 20% risk of substantive consolidation.

The Plan provides that a portion of the Distribution to each holder of (i) an Allowed Senior Third-Party Guarantee Claim and Third-Party Guarantee Claim against LBHI and (other than those of the Racers Trusts) (ii) an Allowed General Unsecured Claim (excluding those of the Racers Trusts against LBSF) against each of the Participating Subsidiary Debtors, a General Unsecured Claim of Designated Entities (i.e. the Racers Trusts and Fenway[4]) against LCPI and an Affiliate Claim (excluding Affiliate Claims of LBHI) against each Participating Subsidiary Debtor (collectively, the "Contributing Classes"), will automatically be reallocated to holders of Senior Unsecured Claims and General Unsecured Claims against LBHI.  The portion of Distributions that will be reallocated for each Contributing Class (other than Classes for Claims of Designated Entities) is calculated by using a weighted average of recoveries under two scenarios: (1) estimated recoveries in a plan that does not provide for substantive consolidation of LBHI and the Participating Subsidiary

---

[4]      The Fenway Claim means the Claim asserted by LBHI in connection with the Fenway transaction, which shall be Allowed in accordance with Section 6.5(h) of the Plan.

### C.    Classification and Treatment of Claims and Equity Interests

The following summarizes the classification and treatment of Claims and Equity Interests under the Plan.

### 1.    Treatment of Unclassified Claims

#### a.    Administrative Expense Claims

Administrative Expense Claims are Claims constituting a cost or expense of administration of the Chapter 11 Cases allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code.  Such Claims include all actual and necessary costs and expenses of preserving the estates of the Debtors, all actual and necessary costs and expenses of operating the business of the Debtors, any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their business, all cure amounts owed in respect of leases and contracts assumed by the Debtors, all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code. Certain creditors may have super-priority claims against the Debtors which are Administrative Expense Claims with priority over other Administrative Expense Claims.  For example, the purchasers of Neuberger Berman in the acquisition described in section V.E.1.a—"Sale of Investment Management Division" of this Disclosure Statement were granted an allowed super-priority administrative expense claim for any claims against LBHI based on LBHI's agreement to indemnify such purchasers pursuant to the applicable purchase agreements.

Except as provided in the next paragraph with respect to ordinary course obligations and in Section X.C.1.b— "Compensation and Reimbursement Claims" of this Disclosure Statement with respect to professional compensation and reimbursement Claims, and to the extent a holder has been paid in full by a Debtor prior to the Effective Date, or agrees to less favorable treatment, Administrative Expense Claims will be paid in full, in Cash, on the later of the Effective Date and the date the Administrative Expense Claim becomes an Allowed Claim, or as soon thereafter as is practicable by the Debtor obligated for the payment of such Administrative Claim.  The Debtors estimate that Allowed Administrative Expense Claims payable on the Effective Date, including, repayments to LBHI from Subsidiary Debtors for operating expenses paid on their behalf, compensation and reimbursement of expenses payable to professionals retained in the Chapter 11 Cases, will be approximately $1.5 billion, of which only $90 million represents incurred but unpaid fees to professionals.  Also included in the $1.5 billion are amounts to be paid by LBHI to Subsidiary Debtors on account of post-petition funds received by LBHI on behalf of such Subsidiary Debtors, and amounts to be paid by Subsidiary Debtors to LBHI for the reimbursement of cost allocations.  The Debtors may pay amounts in respect of reconciled cure payments under executory contracts and unexpired leases assumed pursuant to the Plan.  The estimated amount of Allowed Administrative Expense Claims does not include amounts subject to asserted rights of setoff held by the Debtors.  In the event such asserted setoff rights are not valid, the aggregate amount of Allowed Administrative Expense Claims may increase.

class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the nonaccepting class.

### D. Consummation

The Plan will be consummated on the Effective Date.  The Effective Date of the Plan will occur on the first Business Day on which the conditions precedent to the effectiveness of the Plan, as set forth in section 12.2 of the Plan, have been satisfied or waived by the Debtors pursuant to section 12.3 of the Plan.  For a more detailed discussion of the conditions precedent to the Plan and the consequences of the failure to meet such conditions, see section X.G—"Conditions Precedent to the Plan's Confirmation and Effective Date" of the Disclosure Statement.

The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

## XII.    CORPORATE GOVERNANCE AND MANAGEMENT OF THE DEBTORS ON THE EFFECTIVE DATE

Pursuant to the Plan, on the Effective Date, the management, control, and operation of the Debtors will be the general responsibility of their respective Boards of Directors.

### F.    Board of Directors and Management

#### 1.    LBHI Board of Directors and Officers

Following the Effective Date, the board of directors of LBHI shall consist of nine persons.  The initial board of directors of LBHI shall be selected by the Director Selection Committee.  Each of the initial directors of LBHI shall have initial and, if reelected, subsequent terms of one year.  A director of LBHI may be removed from office by the Plan Trust with cause.  Subject to death, incapacity, resignation or removal for cause and reelection by the Plan Trust in accordance with the Plan Trust Agreement, the initial directors shall serve as the board of directors of LBHI through the Closing Date.  Upon expiration of the term of a director of LBHI or his or her resignation, death or removal for cause, the election of such director or a replacement director shall be determined by action of the Plan Trust as sole shareholder of LBHI.  At or before the Confirmation Hearing, the Debtors will disclose any identified directors in compliance with section 1129(a)(5) of the Bankruptcy Code.

(b)    The Director Selection Committee shall be comprised of the following nine (9) members:

(i)    Rutger Schimmelpenninck (in his capacity as co-bankruptcy trustee (curatoren) for LBT); (ii) the LBB Administrator; (iii) the Debtors; (iv) each of the co-chairs of the Creditors' Committee (each of whom shall exercise his or her independent business judgment in the selection of directors and not act at the direction of the Creditors' Committee); (v) an individual chosen by the Opco Plan Proponents who are PSA Creditors; (vi) an

(c)    all authorizations, consents and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan have been obtained and not revoked; and

(d)    the certificate of incorporation and by-laws of the Debtors shall have been amended to the extent necessary to effectuate the Plan.

### 3.    Waiver of Conditions

The Debtors, with the consent of the Creditors' Committee, and to the extent not prohibited by applicable law, may waive the occurrence of the conditions precedent to the confirmation and effectiveness of the Plan set forth above.  Any such waiver may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.

### H.    Effect of Confirmation of the Plan

### 1.    Release, Exculpation and Limitation of Liability

On and after the Effective Date, the Debtors and all entities who have held, hold or may hold Claims against or Equity Interests in any or all of the Debtors (whether proof of such Claims or Equity Interests has been filed or not), along with their respective present or former employees, agents, officers, directors or principals, shall be deemed to have released (a) the Released Parties[1] from, and none of the Released Parties shall have or incur any liability for, any Claim for, Cause of Action for or other assertion of liability for any act taken or omitted to be taken during the Chapter 11 Cases in connection with, or arising out of, the Chapter 11 Cases, the negotiation, formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Chapter 11 Cases, the Plan, the Disclosure Statement, the Plan Support Agreements or any contract, instrument, document or other agreement related thereto and (b) the PSA Creditors from, and none of the PSA Creditors will have or incur any liability for, any Claim for, Cause of Action for or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the negotiation, formulation, dissemination or confirmation, consummation or administration of the Plan, or any other act or omission in connection with the Plan, the Disclosure Statement, the Plan Support Agreements, including the filing of any alternative chapter 11 plan and any determination to not pursue solicitation or confirmation of such alternative plan or any contract, instrument, document or other agreement related thereto; *provided, however*, that (i) in no event shall any Litigation Claim, Cause of Action or other Claim or assertion of liability against any Released Party or PSA Creditor for

---

[1]    Released Parties means, collectively, and in each case, solely in such capacity, the Debtors, the Independent Directors, the Plan Administrator, the Creditors' Committee, each current and former member of the Creditors' Committee and, with respect to each of the foregoing, their respective officers, directors, managers, members, accountants, financial advisors, investment bankers, agents, restructuring advisors, attorneys, representatives or other professionals serving during the pendency of the Chapter 11 Cases (solely in their capacity as officers, directors, managers, members, accountants, financial advisors, investment bankers, agents, restructuring advisors, attorneys, representatives or other professionals serving during the pendency of the Chapter 11 Cases).

**Annex 5-16**

any act taken or omitted to be taken prior to the Commencement Date be released by the Plan, (ii) nothing herein shall affect or release any obligation of the Debtors under the Plan, and (iii) nothing in the Plan shall affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence*; provided, further*, that nothing in this Plan shall limit the liability of the professionals of the Debtors, the Creditors' Committee or the PSA Creditors to their respective clients pursuant to ~~DR 6-102 of the Model Code of Professional Responsibility~~N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8, Rule 1.8(h)(1)(2009).

12.    **Post-Effective Date Reporting**

Beginning the first month-end and first quarter-end following the Effective Date and until the Closing Date, the Plan Administrator is obligated to file with the Bankruptcy Court (i) within thirty (30) days after the end of each month, a Monthly Operating Report for such month, (ii) within one-hundred-twenty (120) days after the end of each quarter, a Quarterly Report for such quarter, and (iii) on an annual basis for two (2) years and thereafter on a semiannual basis, a Reconciliation of Cash Flow Estimates Report and a description of collections by the Debtors and a comparison of performance relative to forecasted collections and estimates of future costs and expenses of administration; *provided, however*, that, in each case, the Plan Administrator or the board of directors or manager for a Debtor, as applicable, is permitted to elect to modify or include less information in such reports than otherwise required by the Plan if the Plan Administrator or the board of directors or manager for a Debtor, as applicable, determines, in its reasonable discretion, that disclosing any such information would be unduly burdensome, such information is or has become immaterial or no longer meaningful, as the activities of the Debtor(s) evolve such disclosure could place the Debtor(s) in a competitive or negotiation disadvantage, or such disclosure is precluded by confidentiality limitations. The Debtors will include in their monthly reports all payments made to creditors under the Plan and disbursements made in the ordinary course of business on an aggregate, monthly basis for each Debtor.

Information included in the various reports includes, among other things, information regarding the Debtors' financial condition, significant transactions, liquidation of assets, reconciliation of claims, ongoing litigations and material costs and expenses incurred by the Debtors in their operations. The Debtors will also provide information regarding their cash flows.

13.    Payment of Statutory Fees

On the Effective Date, each of the Debtors, and after the Effective Date, the Plan Administrator and any Liquidating Trustee thereafter appointed, shall pay all fees incurred pursuant to Section 1930 of title 28, United States Code, together with interest, if any, pursuant to Section 3717 of title 31, United States Code for each Debtor's case, until such time as a final decree is entered closing a particular Debtor's case, an Order converting a particular case to a case under Chapter 7 of the Bankruptcy Code or an Order dismissing that case is entered.

K.    **Summary of Recovery Analysis Under the Plan**

The Recovery Analysis setting forth the estimated Claim and estimated recoveries for each Class is annexed hereto as Exhibit 4.

The Debtors indicated on Exhibit "A" to LBHI's Voluntary Petition for chapter 11 that as of May 31, 2008, LBHI and its Affiliates had approximately $639 billion of assets and approximately $613 billion of liabilities. As indicated on the Exhibit 4 annexed hereto, the estimated aggregate gross recovery (before the payment of any Claims or expenses) following an orderly liquidation of the Debtors' assets is approximately $63 billion. The substantial

DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.  CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.

ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION XIV— "CERTAIN RISK FACTORS TO BE CONSIDERED" BELOW BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENTS, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENTS.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.

**THE DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.**

**IRS CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS AND EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE IRC; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The US Trustee has filed an objection to the Disclosure Statement raising various concerns over several sections of the Disclosure Statement [Docket No. 19157].  The Debtors have made certain changes to the Disclosure Statement to address some of the US Trustee's objections.  The Debtors and the US Trustee have agreed that consideration of the unresolved objections will be deferred to confirmation of the Plan.  Notwithstanding anything to the contrary, the US Trustee's rights to object to any and all provisions of the Plan under the Bankruptcy Code, Bankruptcy Rules, applicable non-bankruptcy law and case law are preserved regardless of whether the US Trustee previously raised the objection to the Disclosure Statement.  In addition, any and all rights of the Debtors to oppose such objections are likewise preserved.