Hearing Date and Time: August 30, 2011 at 10:00 a. m. (Prevailing Eastern Time)

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Gerard Uzzi (GU – 2297)
J. Christopher Shore (JCS – 6031)

Attorneys for the Ad Hoc Group
of Lehman Brothers Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
In re                                                   :        **Chapter 11 Case No.**
                                                        :
**LEHMAN BROTHERS HOLDINGS INC., et al.,**              :        **08-13555 (JMP)**
                                                        :
                                            Debtors.    :        **(Jointly Administered)**
------------------------------------------------------------------x

**REPLY OF THE AD HOC GROUP OF LEHMAN BROTHERS CREDITORS TO
OBJECTIONS TO APPROVAL OF DEBTORS' DISCLOSURE STATEMENT
FOR SECOND AMENDED JOINT CHAPTER 11 PLAN**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

    The Ad Hoc Group of Lehman Brothers Creditors (the "Group"), by and through its undersigned counsel, hereby files this reply (the "Reply") to the various objections (collectively, the "Objections") interposed to the Debtors' motion (the "Motion") [Docket No. 18126] seeking this Court's approval of the Debtors' Disclosure Statement for Second Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code (the "Disclosure Statement") [Docket No. 18205], filed on July 1, 2011, by Lehman Brothers Holdings Inc. and its affiliated debtors (collectively, the "Debtors") in these chapter 11 cases. As and for its Reply, the Group respectfully represents as follows:

NEWYORK 8246912 (2K)

**STATEMENT**

1. On August 11, 2011, the Group[1] filed a statement supporting the Disclosure Statement. On that date, and on various dates thereafter, a number of creditors and parties-in-interest (the "Objectors") interposed objections to the approval of the Disclosure Statement. The Group understands that the Debtors will address each of these Objections in detail in their reply. Nevertheless, the Group files this limited Reply to respond to a subset of Objections that suggest that the Disclosure Statement either (i) contains inadequate disclosure as to the Plan's proposed settlements of inter-Debtor and inter-affiliate claims, causes of action and defenses or (ii) fails to justify those proposed settlements in a fashion that the Objectors deem either economically or procedurally sufficient. (See, e.g., Centerbridge Objection ¶ 6 [Docket No. 19254]; Mason Objection at 2-3 [Docket No. 19151]; Bundesbank Objection ¶ 12 [Docket No. 19163].)

2. For more than a year now, the Group has sought to apprise the Court and the creditor body as a whole of the breadth and pervasive nature of pre- and post-petition claims and causes of action that potentially exist between the various Debtor estates and their Debtor and non-Debtor affiliates (collectively, the "Inter-Debtor Issues"). These issues run the gamut from simple, but time consuming, reconciliations of ordinary course pre-petition ledger entries and allocation of post-petition administrative expenses to a series of extremely complex tangles of commercial disputes that individually would constitute some of the largest cases in the district if any one of them were to proceed to actual litigation. In between the two extremes, as the Court has already seen glimpses during these cases, sit a wide array of potential disputes over asset ownership, unwinding of securitization structures, funding of bank capitalization requirements,

---

[1] On May 13, 2011, the Group filed the Supplemental Verified Statement of the Ad Hoc Group of Lehman Brothers Creditors Pursuant to Rule 2019 (the "Supplemental Statement") [Docket No. 16842], which set forth certain supplemental information with respect to Pacific Investment Management Company ("PIMCO"). Since the filing of the Supplemental Statement, PIMCO has withdrawn from the Group. Otherwise, the membership of the Group has remained unchanged.

the assertion of inter-Debtor preferences and fraudulent conveyance claims, enforcement of enterprise and transactional guarantees, allocation of taxes, termination and/or unwinding of derivative instruments, and pre- and post-petition corporate governance practices. Those entanglements are disclosed in varying degrees of specificity at pages 19 through 63 of the Disclosure Statement. At its heart, the Debtors' disclosure makes clear that the path of litigation over Inter-Debtor Issues in these cases will be at best a long, expensive and arduous one, and most likely will lead into a thicket from which creditors would be lucky to emerge in this decade. The Court should consider, for example, the Debtors' disclosure that, in the pre-petition period, Lehman affiliates booked "hundreds of thousands" of affiliate transactions <u>per</u> <u>month</u> and that a transaction-by-transaction analysis would take "years" to complete. (Disclosure Statement at 60.) Given that each of the Debtors was most likely insolvent for at least a period of months prior to its respective petition date, the analysis would not only require review of the bona fides of the individual ledger entries, but also a staggeringly complex and costly chapter 5 modeling to determine which entries represent avoidable transactions and the effect that any actual avoidance would have on underlying solvency conclusions. Even then, that analysis would not capture any of the Inter-Debtor Issues that are not reflected in the Debtors' pre-petition books such as asserted transactional and board resolution guarantee claims or the myriad of asset ownership disputes. As the Group has repeatedly noted, the overarching Inter-Debtor Issue in these cases is not whether substantive consolidation should be imposed affirmatively, but rather whether a true presentation of the each Debtors' assets and liabilities on a non-consolidated basis can ever be achieved through litigation. If, as the Group believes, "true" non-consolidation proves to be a myth, substantive consolidation could be the <u>only</u> legitimate result of the litigation that the Objectors seek to precipitate.

3. Given these facts, the Group has actively proposed solutions making certain economic adjustments off of a substantive consolidation base case while the Debtors and others have proposed solutions premised on non-consolidation with adjustments made to compensate for risks associated with resolving all Inter-Debtor Issues through litigation. Critically, all of these proposals share two key characteristics – each recognizes the immense downside of a full-blown litigation of Inter-Debtor Issues to conclusion and each proposes a comprehensive response, with the Debtors' Plan currently on file being the most comprehensive to date and the one with the greatest likelihood of bringing about lasting peace.

4. Notwithstanding any of the foregoing, the Objectors now attack the Plan settlements with what can best be described as a "cherry-picking" tactic that attempts to accept as a given the settlements of those Inter-Debtor Issues that are most threatening to their estates' recoveries while still seeking to obtain more based upon a selective presentation of those Inter-Debtor Issues that appear to run in their favor. The Group addresses below the most egregious examples of this tactic, but in sum requests that this Court overrule the relevant Objections for the simple reason that the present Disclosure Statement already provides these creditors with more than a sufficient basis on which to conclude that the risks and rewards of a war over Inter-Debtor Issues are far outweighed by the economics embodied in the Plan settlements. Indeed, requiring more disclosure can only end in an ever-increasing series of advocacy pieces in which each constituency, including the Group (as to which the Group reserves all rights), presents its parochial view of those transactions and categories of claims that paint their litigation positions in the most flattering light. That type of advocacy, however, is best left to the confirmation process, to the extent that the objecting parties even decide to press objections to the substance of the Plan settlements.

A. **The LCPI Objections**

5.　　At heart, the LCPI Objectors contend that the Disclosure Statement fails to include necessary disclosures regarding potential claims and causes of action that LCPI has against LBHI and overstates LCPI's susceptibility to substantive consolidation with its affiliated Debtors. (Centerbridge Objection ¶¶ 15-25.)

6.　　The proposed curative disclosures, however, would hardly present a comprehensive picture of the existing pre- and post-petition claims between LCPI and its affiliates. Looking only at the LBHI/LCPI relationship, one would first have to accept at face value an allowance of all of LCPI's presumed millions of their existing intercompany transactions recorded in the general ledger. Even then, the LBHI estate has significant claims and causes of action against LCPI, which would require additional disclosure, including those relating to: (i) LCPI taking ownership of the underlying RACERS assets, which had an original notional balance in excess of $5 billion, (ii) LBHI having paid 100 cents on the dollar to take ownership of certain underlying collateral from JPMorgan, which now has only unsecured claims against both LBHI and LCPI, (iii) LCPI having significant secured claims with respect to related repo collateral in connection with inter-Debtor repo transactions, (iv) transfers of $900 million being made to LCPI as late as August of 2008, (v) billions of dollars of collateral currently allocated to LCPI under the CDA,[2] (vi) the ownership of certain Lehman accounts held with JPMorgan,[3] and (vii) issues subject to various reservations of rights entered in connection

---

[2]　　Although the Debtors presume the accounts to be owned by LCPI, the collateral was posted to secure LBI's clearing obligations and, therefore, LBHI (not LCPI) would have rights to that collateral under the CDA. (See Examiner's Report Vol. 4 at 1110.)

[3]　　See Examiner's Report Vol. 9 at Page 51 ("Regarding the highlighted cells, the LCD and LSD accounts were identified by JPMorgan as LBI clearing accounts. See 'JPMorgan's Responses to Examiner's First Set of Questions re Lehman/JPM Accounts & Collateral dated September 3, 2009' for discussion regarding JPMorgan's designated 'ownership' of the Lehman accounts at JPMorgan. This understanding conflicts with the presented data that identifies certain securities as being pledged by LCPI (Kingfisher, SASCO 2008-C2, and HD Supply Inc). A

with Lehman Brothers Holdings Inc.'s and Lehman Commercial Paper Inc.'s Motion Pursuant to Section 363 of the Bankruptcy Code for Authority to Transfer Funds to Rosslyn LB Syndication Partner LLC [Docket No. 9238]; Debtors' Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure for Approval of Settlement Agreement Between Lehman Brothers Holdings Inc., Lehman Commercial Paper Inc., Silver Lake Credit Fund, L.P. and Silver Lake Financial Associates, L.P. [Docket No. 9808]; LBHI's Motion Pursuant to Sections 105(a), 363(b)(1) and 363(f) of the Bankruptcy Code and Rule 6004(h) of the Bankruptcy Rules for Authorization to Transfer Certain Mortgage Servicing Rights to Aurora Bank FSB [Docket No. 9809]; LBHI's and LCPI's Motion Pursuant to Bankruptcy Rule 9019 to Enter into the Release and Termination of Loan Agreement and Other Documents with TS Boston Core Holdings, L.P.; 125 High Junior Mezz, L.P.; One Federal Intermediate Mezz, L.P.; One Federal Junior Mezz, L.P.; and Other Borrower Affiliates [Docket No. 10462].)

7.   In sum, if there is to be any more disclosure with respect to LCPI, then those disclosures would have to far more comprehensive than those currently proposed by the Objectors in order to be appropriate.

B. **The LBT Objections**

8.   Certain LBT-centric parties have objected to the Disclosure Statement on the basis that it does not contain adequate information with respect to the potential substantive consolidation of LBT, including that it fails to provide any information as to why LBT faces any risk of being substantively consolidated with LBHI at all. One such party states as follows:

---

review of the JPMorgan account statements for the LCD and LSD accounts for a sample of the trade dates involving the Kingfisher, SASCO 2008-C2, and/or HD Supply Inc securities indicate that the LCD and LSD accounts were consistently used. It appears that, although MTS identified LCPI as the legal entity involved in certain trades, the securities were held in an LBI accounts at JPMorgan.").)

> [T]he Disclosure Statement does not give even the most minimal explanation as to: (1) why there is any risk of substantive consolidation of a foreign, non-Debtor affiliate such as LBT at all, (2) why the transfers away from LBT noteholders in purported settlement of the risk that LBT would be substantively consolidated should go not to the estate as a whole but rather to particular classes of creditors, and (3) why holders of LBT notes should not share in the proceeds of the settlement of substantive consolidation risks of entities other than LBT.

(Mason Objection at 2-3.) What these type of objections assume, however, is that, in the absence of substantive consolidation, LBT's $34 billion intercompany claim against LBHI will be most certainly allowed. That assumption is unfounded.

9. According to LBT, LBT's stated corporate purpose was to help finance the activities of the Lehman enterprise by issuing financial instruments – in particular, structured notes – guaranteed by LBHI to institutional and private investors (the "Structured Notes") and on-lending the proceeds of such Structured Notes to LBHI. (See, e.g., First LBT Bankruptcy Report § 1.2.) In connection therewith, on May 26, 2000, LBHI and LBT purportedly entered in an intercompany loan agreement (the "Intercompany Loan Agreement"). (Proof of Claim No. 58612 at 2.) The Intercompany Loan Agreement by its terms is governed by English law. (Proof of Claim No. 58612, Intercompany Loan Agreement § 9(iii).) LBT has asserted that LBHI is indebted to it under the Intercompany Loan Agreement in an amount no less than $34,820,143,374.91 (the "Intercompany Receivable") "representing amounts owed . . . for principal and interest on account of intercompany loans and advances made by LBT to [LBHI] as of August 31,2008." (Proof of Claim No. 58612 at 2.) Notwithstanding any provision prohibiting setoff in the Intercompany Loan Agreement, a court applying English law would likely disallow most, if not all, of the Intercompany Receivable.

10. The English Court of Appeal recently addressed this issue and reduced intercompany claims where mutual debts could not be setoff in SSSL Realisations (2002) Ltd v.

AIG Europe (UK) Ltd [2006] 2 W.L.R. 1369.  SSSL Realisations involved a parent holding company (the "Parent Obligor") and a primary operating subsidiary (the "Subsidiary Guarantor") in a group of insolvent companies (the "SSSL Group").  The Subsidiary Guarantor held most of the SSSL Group's assets, but owed considerable intercompany debts to the Parent Obligor.  A third party, AIG, provided a bond on behalf of the SSSL Group to the English taxing authorities and the SSSL Group agreed, jointly and severally, to indemnify AIG against all claims incurred by AIG under the bond.  The indemnification agreement included a subordination provision – much like the prohibition on setoff in the Intercompany Loan Agreement – that prohibited any entity in the SSSL Group from asserting claims against any other entity in the SSSL Group until AIG was paid in full.  Thereafter, the SSSL Group became insolvent, AIG called the indemnity, and the Subsidiary Guarantor – as surety for the Group – partially satisfied AIGs claim.

11.      As a result of the subordination provision, the Subsidiary Guarantor could not seek reimbursement from the other Group entities until AIG was paid in full.  In addition to this, the "rule against double proof," which prohibits two claims in respect of the same debt, prevented the Subsidiary Guarantor from asserting claims against the Parent Obligor until AIG's claim was fully satisfied.  Accordingly, the effect was that the Subsidiary Guarantor had no contractual right to setoff its claim for indemnity against the Parent Obligor's intercompany debt claim.  Nevertheless, the Parent Obligor was not permitted to recover on its full claim.

12.      Instead, recognizing the inherent inequities of the proverbial "double dip" claim, the court applied an equitable principle known as the rule in Cherry v. Boultbee [1839] 4 My & CR 442, which, first, recognizes the separate right of indemnity for having paid on account of a guarantee and, second, provides that a party cannot recover from a fund to which it is indebted on account of such right of indemnity without first contributing to the fund amounts owed to the

fund on account of such indemnity. As a result, the Court of Appeal held that the Parent Obligor could not receive a recovery in the Subsidiary Guarantor's insolvency proceeding on account of the intercompany debts unless and until it satisfied its indemnity obligation. To give effect to the rule in Cherry, the court in SSSL Realisations reduced the Subsidiary Guarantor's intercompany debt obligations by the amount of the Parent Obligor's indemnity debt. SSSL Realisations at 1421. See also Cattles plc v. Welcome Fin. Servs. Ltd [2009] EWHC 3027 (Ch) (stating, in dicta, that the rule in Cherry would preclude an obligor from asserting claims against its guarantor until the obligor satisfied its indemnity obligation); Mills v. HSBC Trustee (CI) Ltd [2009] EWHC 3377 (Ch) (finding that the rule in Cherry prevents intercompany claims where mutual debts are owing.)

13. In determining the amount the amount of a primary obligor's indemnity obligation for the purpose of applying the rule in Cherry, the whole liability of a guarantor is taken into account regardless of what the guarantor has actually paid out on account of the guarantees at the time of the claim. Cattles plc at 15 (citing SSSL Realisations). The rule in Cherry therefore entitles LBHI to bring into account the whole amount of LBT's potential liability to LBHI before paying any dividend to LBT. By application of this equitable principle, therefore, an English court would likely disallow LBT's Intercompany Receivable.

14. In sum, and as noted above, with respect to LBT the issue is not only whether affirmative substantive consolidation is an appropriate result, but also whether in a true non-consolidation LBT would do better or worse than under the proposed Plan settlements. As to that issue, the Disclosure Statement presently makes adequate disclosure and the Court should overrule the LBT-related objections.

C.   **The LBB Objections**

15.   Similarly, certain parties assert that the Disclosure Statement does not contain adequate information with respect to the potential substantive consolidation of LBB, including that the Debtors have disclosed no precedent for (i) the substantive consolidation of a regulated deposit holding bank under administration in a foreign jurisdiction and (ii) the synthetic substantive consolidation of such entities through the disallowance or expungement of claims. Specifically, with respect to substantive consolidation, one party states as follows:

> The Disclosure Statement provides inadequate disclosure of the rationale for classifying Bundesbank's claim with other unsecured claims that are subject to a risk of substantive consolidation. See Disc. Stat. § X.C.2.a.vi, at 74 (describing claims in Class 5). Unlike many other third party guarantee creditors, the primary obligor of Bundesbank's guarantee claim, LBB, is a foreign regulated deposit holding bank under administration in a foreign jurisdiction. The Plan fails to disclose, and Bundesbank is unaware of, any US or international precedent in which a court has ordered substantive consolidation of a domestic debtor with a foreign regulated financial institution that is subject to separate administrative proceedings in a foreign jurisdiction. Nor have the Debtors provided creditors with any statutory authority or precedent for the suggestion that claims of foreign affiliates opposing substantive consolidation could be disallowed or expunged, absent substantive consolidation. See Disc. Stat. § X.B.l.c.iii, at 58. At a minimum, the Disclosure Statement must provide sufficient information to understand why one uniform 20% settlement discount rate is fair and appropriate for entities with undoubtedly vastly different risks of consolidation.

(Bundesbank Objection ¶ 12.)  As with the aforementioned LBT-related Objection, the issue may be less about the "substantive" and more about the "non" in "consolidation" and how litigation over non-consolidation could impact LBB's recoveries.

16.   Substantially all of LBB's claims against LBHI in these cases arise under an August 15, 2002 Security & Collateral Agreement by which LBHI purportedly agreed to provide financial security and infusions of cash collateral to LBB under certain circumstances.  (See

Proof of Claim No. 58233.) Specifically, the Security & Collateral Agreement provides in relevant part as follows:

> In consideration for a fee to be paid to the Security & Collateral Provider, LBHI undertakes to post cash collateral to LBB on demand unconditionally and irrevocably, as a continuing obligation, in respect of any losses suffered by LBB if an asset decreases in value or a Principal fails to make a payment when due and payable under a Trading Book or Banking Book Transaction.
>
> In addition LBHI undertakes to post cash collateral to LBB on demand unconditionally and irrevocably, as a continuing obligation, in respect of any credit risk or potential loss on the realization of payment by the Principal or decreased value of the assets based on the Internal Credit Rating (ICR) of LBB as determined by the Credit Department of LBB. . . .
>
> As a separate, continuing and primary obligation, LBHI undertakes to post collateral to LBB on demand against all losses, claims, or costs suffered or incurred by LBB should the amounts due under clause 1 hereof not be recoverable for any reason whatsoever including (but not limited to) a Transaction or agreement being or becoming void, voidable, or unenforceable.

(Id.) In its proof of claim, LBB has asserted that more than $25 billion in losses had arisen under the Security & Collateral Agreement and that LBHI was required to provide financial security and post cash collateral on demand in respect of any losses suffered by LBB. The potential losses are purportedly based on customer receivables, debt securities and other assets.

17. On March 1, 2011, LBHI and LBB executed an agreement to settle these claims (the "Plan Settlement Agreement"). The Plan Settlement Agreement seeks to allow LBB's claims under the Security & Collateral Agreement in the aggregate amount of $6.425 billion as a non-priority, unsecured claim. It also provides that the allowed claims shall not be subject to objections or defenses, including avoidance actions asserted by LBHI. The Debtors are seeking approval of the Plan Settlement Agreement in connection with plan confirmation.

18. Absent this settlement, any amounts owing under the Security & Collateral Agreement are likely avoidable. Under New York Debtor and Creditor law and section 548 of the Bankruptcy Code, an obligation is fraudulently incurred when, (i) the debtor was insolvent at the time, and (ii) when the debtor did not receive reasonably equivalent value or fair consideration in exchange for the obligation. Such conveyances are avoidable if occurring within six years of the petition date under New York law, and within two years under the Bankruptcy Code. Thus, if LBHI incurred obligations under the Security & Collateral Agreement after becoming insolvent and LBHI did not receive reasonably equivalent value or fair consideration in exchange for such obligations, the obligations were fraudulently incurred, and any claims based thereon should be subject to avoidance. 11 U.S.C. § 502(b)(1).

19. Under existing Second Circuit precedent, an obligation is incurred within the meaning of chapter five of the Bankruptcy Code when a condition giving rise to liability under a previously executed guarantee occurs, not when the underlying guarantee is executed. Rubin v. Mfrs. Hanover Trust Co., 661 F.2d 979, 990 (2d Cir. 1981) (finding that the debtor incurred an obligation within the meaning of the fraudulent conveyance provision of the Bankruptcy Act when its affiliates drew on a credit line guaranteed by the debtor, even though the guarantee was executed outside the reachback period); see also Silverman v. Paul's Landmark, Inc. (In re Nirvana Restaurant Inc.), 337 B.R. 495, 502 n.3 (Bankr. S.D.N.Y. 2006) (citing Rubin for the proposition that "the guarantor of a line of credit incurred an 'obligation' for fraudulent conveyance purposes when the principal debtor subsequently borrowed money (i.e., used the line of credit) rather than when the guarantee was executed"). Given the backstop nature of LBHI's purported obligations and the financial condition of LBB, a substantial portion of the Security &

Collateral Agreement claim would have been incurred in the years (if not months) leading up to LBHI's bankruptcy filing and are avoidable as fraudulently incurred obligations.

20. In addition, to the extent that LBB's claim on account of the Security & Collateral Agreement is for obligations arising post-petition, the claim is unenforceable because LBB, a chapter 15 debtor, cannot assume the Security & Collateral Agreement, which is a financial accommodation, by virtue of section 365(c)(2) of the Bankruptcy Code. See 11 U.S.C. § 365(c)(2) ("The trustee may not assume or assign any executory contract . . . if . . . such contract is a contract to make a . . . financial accommodations, to or for the benefit of the debtor . . . ."). Accordingly, absent settlement of the Inter-Debtor Issues, it is entirely unclear that LBB has any real economic advantage in litigating its issues to conclusion, and no additional disclosure is required.

WHEREFORE, for the foregoing reasons, the Group requests that the Court overrule all of the Objections, approve the Disclosure Statement and grant any other relief the Court deems just and proper.

Dated: August 23, 2011
      New York, New York

Respectfully submitted,

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Gerard Uzzi (GU – 2297)
J. Christopher Shore (JS – 6031)

By: /s/ Gerard Uzzi
     Gerard Uzzi

ATTORNEYS FOR THE AD HOC GROUP
OF LEHMAN BROTHERS CREDITORS