## SCHEDULE F-1

### Form of Calculation Statement

### SEE ATTACHED PDF

*Edward Middlet* (signature)

---

**Form of Calculation Statement**

**(to be prepared for each of LBAH and LBCCA)**

Note:  In the table below, (1) "Creditor(s)" refers to a Third-Party Creditor(s); (2) all amounts are in HK$; and (3) capitalized terms bear the meaning given given to them in the Setttlement and Plan Support Agreement dated _____, 2011, unless otherwise defined or the context otherwise requires.

| HONG KONG DISTRIBUTION DATE: [Insert date] | (A) | (B) | (C) | (D) |
|---|---|---|---|---|
| | Total Creditor claims, as allowed and adjudicated | Amount to be distributed | Pro-rata distribution fraction, assuming LBHI Minimum Claim Amount | Pro-rata distribution fraction, assuming LBHI Compromise Claim Amount |

| | (E) | (F) | (G) | (H) |
|---|---|---|---|---|
| | Total claims, as allowed and adjudicated | Distribution assuming LBHI Minimum Claim Amount (C)* (E) | Distribution assuming LBHI Compromise Claim Amount (D) * (E) | Reallocation Amount (F) - (G) |
| LBHI | | N/A | - | N/A |
| | | | | |
| Creditors | | | | |
| Name | | - | - | - |
| Name | | - | - | - |
| Name | | - | - | - |
| Name | | - | - | - |
| etc. | | - | - | - |
| | | | | |
| Total Reallocation Amount - aggregate of (H) | | | (I) | - |
| | | | | |
| Amount of dividend payable to Third-Party Creditor Trust on the Hong Kong Distribution Date - LBHI amount in (G) | | | (J) | - |
| | | | | |
| Amount of dividend payable to LBHI from Third-Party Creditor Trust - (J) less (I) | | | | - |

## SCHEDULE F-2

### Form of Position Statement

### (to be prepared for each of LBAH and LBCCA)

Note:  In the table below (1) "Creditor" refers to a Third Party Creditor (2) all amounts are in HK$ and (3) capitalised terms bear the meaning given to them in the Settlement and Plan Support Agreement dated July 31, 2011 unless otherwise defined or the context otherwise requires.

| Creditor | (A) Amount of claim as adjudicated and admitted by the Hong Kong Liquidators or determined by the courts of Hong Kong | (B) Amounts previously received in respect of claim against the Relevant Hong Kong Lehman Entity In Liquidation | | | | Balance of claim i.e. amount in column (A) minus aggregate of amounts in column (B) |
|---|---|---|---|---|---|---|
| | | Dividend | Pro rata share of Reallocation Amount | Other amounts from LBHI | Amounts/value of consideration from other sources | |
| [Name] | | | | | | |
| [Name] | | | | | | |
| etc. | | | | | | |

**SCHEDULE G**

**Procedures for Derivatives and Failed Trades Valuation**

I.  Definitions

Unless otherwise specified herein or as the context may otherwise require all defined terms in the Agreement have the same meaning when used in this Schedule.

II.  Direct Relationships With US Debtors

(a)  On or before July 31, 2011, the US Debtors have delivered valuation statements to the Hong Kong Lehman Entities In Liquidation for each trading relationship that exists between a US Debtor and a Hong Kong Lehman Entity In Liquidation (the "Valuation Statements"). Each Valuation Statement sets forth, on a trade-by-trade basis, the mark-to-market valuation, missed cash flows and posted collateral (the "Trade-Level Calculations") to calculate an aggregate net claim against either a US Debtor or a Hong Kong Lehman Entity In Liquidation, as applicable.

(b)  The Hong Kong Lehman Entities In Liquidation will conduct an analysis of the Valuation Statements during the period of up to sixty (60) days from the date of delivery of the Valuation Statements (the "Auditing Period"), to identify any differences between the US Debtors' Trade-Level Calculations and the Hong Kong Lehman Entities In Liquidation analysis of the relevant trades (each, a "Variance"). During the Auditing Period, the US Debtors will respond in appropriate detail to any reasonable inquiries from the Hong Kong Lehman Entities In Liquidation with respect to the US Debtors' Trade-Level Calculations and the Valuation Statements.

(c)  To the extent that (i) the Hong Kong Lehman Entities In Liquidation identify Variances with respect to any trading relationship that, in the aggregate, are greater than the lesser of (x) 20% of the aggregate Trade-Level Calculations set forth on the Valuation Statement for such trading relationship and (y) USD 20 million, and (ii) the Hong Kong Lehman Entities In Liquidation wish to object to US Lehman's Valuation Statement for such trading relationship, then the Hong Kong Lehman Entities In Liquidation must deliver a written notice (an "Objection Notice") to the US Debtors in accordance with the notice procedures set forth in Section 12 of the Agreement, so that such Objection Notice is actually received no later than sixty (60) days after the date of delivery of the Valuation Statements. Any Objection Notice must set forth detailed supporting analysis and Trade-Level Calculations for each Variance identified by the Hong Kong Lehman Entities In Liquidation with respect to the trading relationship to which the Objection Notice relates.

(d)  If within fifteen (15) days after the date of delivery of an Objection Notice with respect to a trading relationship, the Parties are able to agree upon the aggregate net claim with respect to such trading relationship, then such aggregate net claim will be binding on the Parties as an Allowed US Claim or Allowed Hong Kong Claim, as applicable.

(e)  If after fifteen (15) days following the timely delivery of an Objection Notice, the Parties are unable to consensually resolve such Objection Notice, the Parties agree to submit their dispute to the final and binding determination of a mediator or arbitrator to be selected jointly in good faith by the Parties.

(f)  If (i) no Objection Notice is timely delivered by the Hong Kong Lehman Entities In Liquidation with respect to a trading relationship, or (ii) the Variances identified by the Hong Kong Lehman Entities In Liquidation with respect to any trading relationship are, in the aggregate, equal to or less than the lesser of (x) 20% of the aggregate Trade-Level Calculations set forth on the Valuation Statement for such trading relationship and (y) USD 20 million, then the aggregate net claim set forth on the Valuation Statement for

such trading relationship will be binding on the Parties as an Allowed US Claim or Allowed Hong Kong Claim, as applicable.

III.    Guarantee Claims Based On Derivatives And Secured Financings With Affiliates

(a)    Except as provided otherwise in this Section III, the Hong Kong Lehman Entities In Liquidation will grant LBHI a full and final release with respect to any guarantee claims filed against LBHI (other than Hong Kong Guarantee Claims) based on a trading relationship or secured financing with any party, and any such claims will be deemed disallowed in the Chapter 11 Cases.

(b)    With respect to any guarantee claims filed against LBHI based on a trading relationship between a Hong Kong Lehman Entity In Liquidation and a US Debtor, to the extent that a Hong Kong Lehman Entity In Liquidation has an allowed claim against a US Debtor pursuant to the procedures set forth in Section II (Direct Relationships with US Debtors) above, such Hong Kong Lehman Entity In Liquidation will have a non-priority, unsecured claim against LBHI in such amount, which shall then be discounted consistent with other similar guarantee claims and allowed in an amount after such discount.

(c)    To the extent that a Hong Kong Lehman Entity In Liquidation wishes to assert a guarantee claim against LBHI based on a trading relationship or secured financing with LBIE or, subject to Section III(j), a Lehman Affiliate, such Hong Kong Lehman Entity In Liquidation must deliver to the US Debtors a written notice (a "Lehman Affiliate Guarantee Notice") in accordance with the notice procedures set forth in Section 12 of the Agreement, so that such Lehman Affiliate Guarantee Notice is actually received no later than (i) in the case of any such claim where LBIE is the primary obligor, forty five (45) days after the Execution Date and (ii) in any other case, sixty (60) days after the Execution Date.  Any Lehman Affiliate Guarantee Notice must set forth the Hong Kong Lehman Entity In Liquidation's asserted claim amounts and detailed support and Trade-Level Calculations for the asserted claim or claims (the "Lehman Affiliate Claim and Support").

(d)    The US Debtors will conduct an analysis of each timely delivered Lehman Affiliate Guarantee Notice during the period of up to forty-five (45) days from the date of delivery of such Lehman Affiliate Guarantee Notice (the "Lehman Affiliate Auditing Period"), to identify any Variances.  During the Lehman Affiliate Auditing Period, the Hong Kong Lehman Entities In Liquidation will respond in appropriate detail to any reasonable inquiries from the US Debtors with respect to the Hong Kong Lehman Entity In Liquidation's Trade-Level Calculations and the Lehman Affiliate Guarantee Notices.

(e)    If no Lehman Affiliate Guarantee Notice is timely delivered to the US Debtors in respect of a particular Derivatives Claim, any such Derivatives Claim previously asserted by a Hong Kong Lehman Entity In Liquidation against LBHI will be disallowed and/or deemed withdrawn by such Hong Kong Lehman Entity In Liquidation.

(f)    To the extent that (i) the US Debtors identify Variances with respect to the Lehman Affiliate Guarantee Notice that, in aggregate are greater than the lesser of (x) 20% of the Lehman Affiliate Claim and Support amount and (y) USD 20 million and (ii) the US Debtors wish to object to any Lehman Affiliate Guarantee Notice on the grounds that the Trade-Level Calculations set forth therein are flawed or insufficient, the US Debtors must deliver a written notice (a "Guarantee Objection Notice") to the Hong Kong Lehman Entities In Liquidation in accordance with the notice procedures set forth in Section 12 of the Agreement, so that such Objection Notice is actually received no later than forty-five (45) days after the date of delivery of the Lehman Affiliate Guarantee Notice.

(g)    Subject to Section III(j), if (i) no Guarantee Objection Notice is timely delivered with respect to a Lehman Affiliate Guarantee Notice, or (ii) the Variances identified by the US

Debtors with respect to the Lehman Affiliate Claim and Support amount are, in the aggregate, equal to or less than the lesser of (x) 20% of the aggregate Trade Level Calculations set forth in the Lehman Affiliate Guarantee Notice and (y) USD 20 million, then the relevant Hong Kong Lehman Entity In Liquidation will have a non-priority, non-senior unsecured claim against LBHI in the amount asserted in such Lehman Affiliate Guarantee Notice, which shall then be discounted consistent with other similar guarantee claims and allowed in an amount after such discount.

(h) Subject to Section III(j), if within fifteen (15) days after the date of delivery of a Guarantee Objection Notice with respect to a Lehman Affiliate Guarantee Notice, the Parties are able to agree upon a claim amount with respect to such Lehman Affiliate Guarantee Notice, such claim amount will be binding on the Parties, and the relevant Hong Kong Lehman Entity In Liquidation will have a non-priority, non-senior unsecured claim against LBHI in such amount, which shall then be discounted consistent with other similar guarantee claims and allowed in an amount after such discount.

(i) Subject to Section III(j), if after fifteen (15) days following the timely delivery of a Guarantee Objection Notice, the Parties are unable to consensually resolve such Guarantee Objection Notice, the Parties agree to submit their dispute to the final and binding determination of a mediator or arbitrator to be selected jointly in good faith by the Parties. To the extent that the mediator or arbitrator determines that a claim should be allowed in favor of a Hong Kong Lehman Entity In Liquidation, the relevant Hong Kong Lehman Entity In Liquidation will have a non-priority, non-senior unsecured claim against LBHI in the amount determined by such mediator or arbitrator, which shall then be discounted consistent with other similar guarantee claims and allowed in an amount after such discount.

(j) It is the Parties understanding and agreement that, except for trading relationships with LBIE, the Hong Kong Lehman Entities In Liquidation guarantee claims against LBHI based on a trading relationship or secured financing with a Lehman Affiliate will not exceed the amounts set forth in the chart below, it being understood that said amounts are prior to the application of a discount consistently applied to similar guarantee claims:

| HK Entity | Lehman Affiliate | Maximum amount of claim prior to discount |
|---|---|---|
| LBCCA | Lehman Brothers Finance S.A. | USD 130,048,237 |
| LBACC | Lehman Brothers Finance S.A. | USD 5,870,285 |
| LBCCA | Lehman Brothers Japan Inc. | USD 38,595,562 |
| LBCCA | Lehman Brothers Bankhaus AG (in Insolvenz) | USD 12,407,956 |
| LBCCA | Lehman Brothers Treasury Co. B.V. | USD 261,197 |

IV. <u>Guarantee Claims Based On Failed Trades With Affiliates</u>

(a) Except as provided otherwise in this Section IV, the Hong Kong Lehman Entities In Liquidation will grant LBHI a full and final release with respect to any guarantee claim filed against LBHI (other than Hong Kong Guarantee Claims) based on failed trades with any party other than the Debtors, LBIE and Lehman Affiliates, and any such claims will be deemed disallowed in the Chapter 11 Cases.

3

(b)    On or before July 31, 2011, the Hong Kong Lehman Entities In Liquidation have delivered a summary of Failed Trade Guarantee Claims against the US Debtors in respect of failed trades, which specifies the Hong Kong Lehman Entity In Liquidation and counterparty who were party to the transactions the subject of the relevant Failed Trade Guarantee Claims ("Failed Trade Guarantee Statement").

(c)    To the extent that a Hong Kong Lehman Entity In Liquidation wishes to assert a guarantee claim against LBHI based on a failed trade, such Hong Kong Lehman Entity In Liquidation must deliver to the US Debtors a written notice (a "Failed Trade Guarantee Notice") in accordance with the notice procedures set forth in Section 12 of the Agreement, so that such Failed Trade Guarantee Notice is actually received no later than thirty (30) days after the Execution Date.  Any Failed Trade Guarantee Notice must set forth the Hong Kong Lehman Entity In Liquidation's asserted claim amounts and detailed support and Trade-Level Calculations (as applicable) for the asserted claim or claims (the "Failed Trade Claim and Support").

(d)    The US Debtors will conduct an analysis of each timely delivered Failed Trade Guarantee Notice during the period of up to forty five (45) days from the date of delivery of such Failed Trade Guarantee Notice (the "Failed Trade Auditing Period"), to identify any differences between the Hong Kong Lehman Entity In Liquidation's Trade-Level Calculations and the US Debtors' analysis of the relevant trades (each, a "Failed Trade Variance").  During the Failed Trade Auditing Period, the Hong Kong Lehman Entities In Liquidation will respond in appropriate detail to any reasonable inquiries from the US Debtors with respect to the Hong Kong Lehman Entity In Liquidation's Trade-Level Calculations and the Failed Trade Guarantee Notices.

(e)    If no Failed Trade Guarantee Notice is timely delivered to the US Debtors, any Failed Trade Guarantee Claims previously asserted by the Hong Kong Lehman Entities In Liquidation against LBHI will be disallowed and/or deemed withdrawn by the Hong Kong Lehman Entities In Liquidation.

(f)    To the extent that (i) the US Debtors identify Failed Trade Variances with respect to the Failed Trade Guarantee Statement that, in aggregate are greater than the lesser of (x) 20% of the Failed Trade Guarantee Statement amount and (y) USD 5 million and (ii) the US Debtors wish to object to any Failed Trade Guarantee Notice on the grounds that the Trade-Level Calculations set forth therein are flawed or insufficient, the US Debtors must deliver a written notice (a "Failed Trade Guarantee Objection Notice") to the Hong Kong Lehman Entities In Liquidation in accordance with the notice procedures set forth in Section 12 of the Agreement, so that such Failed Trade Objection Notice is actually received no later than forty five (45) days after the date of delivery of the Failed Trade Guarantee Notice.

(g)    If (i) no Failed Trade Guarantee Objection Notice is timely delivered with respect to a Failed Trade Guarantee Notice, or (ii) the Failed Trade Variances identified by the US Debtors with respect to the Failed Trade Guarantee Claim amount are, in the aggregate, equal to or less than the lesser of (x) 20% of the Failed Trade Guarantee Statement amount and (y) USD 5 million, then the relevant Hong Kong Lehman Entity In Liquidation will have a non-priority, non-senior unsecured claim against LBHI in the amount asserted in such Failed Trade Guarantee Notice, which shall then be discounted consistent with other similar guarantee claims and allowed in an amount after such discount.

(h)    If within forty five (45) days after the date of delivery of a Failed Trade Guarantee Objection Notice with respect to a Failed Trade Guarantee Notice, the Parties are able to agree upon a claim amount with respect to such Failed Trade Guarantee Notice, such claim amount will be binding on the Parties, and the relevant Hong Kong Lehman Entity In Liquidation will have a non-priority, non-senior unsecured claim against LBHI in such

4

amount, which shall then be discounted consistent with other similar guarantee claims and allowed in an amount after such discount.

(i)    If after forty five (45) days following the timely delivery of a Failed Trade Guarantee Objection Notice, the Parties are unable to consensually resolve such Failed Trade Guarantee Objection Notice, the Parties agree to submit their dispute to the final and binding determination of a mediator or arbitrator to be selected jointly in good faith by the Parties. To the extent that the mediator or arbitrator determines that a claim should be allowed in favor of a Hong Kong Lehman Entity In Liquidation, the relevant Hong Kong Lehman Entity In Liquidation will have a non-priority, non-senior unsecured claim against LBHI in the amount determined by such mediator or arbitrator, which shall then be discounted consistent with other similar guarantee claims and allowed in an amount after such discount.

## SCHEDULE H

### Surviving Contracts

| | | |
|---|---|---|
| 1. | Signed Global Protocol | May 12, 2009 |
| 2. | Confidentiality undertaking between the US Debtors and Hong Kong Lehman Entities In Liquidation (as amended) | July 30, 2009 |
| 3. | Confidentiality Agreement between Global Protocol Members | March 19, 2010 |
| 4. | The Tolling Agreement | September 9, 2010 |
| 5. | Any other data sharing agreements entered into between the US Debtors and Hong Kong Lehman Entities In Liquidation subsequent to the date of LBHI's filing of a voluntary petition for relief under chapter 11 the Bankruptcy Code | --- |

EXHIBIT A

Form 72 Authority

[Rule 142(7)]

IN THE MATTER OF
THE COMPANIES ORDINANCE (CAP. 32)

AND

IN THE MATTER OF

[LEHMAN BROTHERS COMMERCIAL
CORPORATION ASIA LIMITED (IN LIQUIDATION)]
[LEHMAN BROTHERS ASIA HOLDINGS LIMITED
(IN LIQUIDATION)][1] (the "Company")
COMPANIES WINDING-UP NO. [441][443][2] OF 2008

---

**AUTHORITY TO LIQUIDATORS TO PAY DIVIDENDS TO ANOTHER PERSON**

---

To the [Official Receiver and] Liquidators

SIRS,

We hereby authorise and request you to pay to [***Third Party Creditor Trustee***]
of
(a specimen of whose signature (or that of an authorised representative thereof) is given below), all dividends as they are declared in the above-mentioned matter, and which may become due and payable to us in respect of the proof[s] of debt for the [aggregate] sum of HK$................., against the above-named Company, made on our behalf.

And we further request that the cheque or cheques drawn [or other form of payment made] in respect of such dividends may be made payable to the order of the said [***Third Party Creditor Trustee***] whose receipt shall be sufficient authority to you for the issue of such cheque or cheques in [his][its] name [or other relevant form of payment to [him][it] in such connection].

It is understood that this authority is to remain in force until revoked by us in writing.

---

[1] Delete as appropriate

[2] Delete as appropriate

........................................................................
Duly authorised for and on behalf of
**LEHMAN BROTHERS HOLDINGS INC.**

Witness to the signature of.................................

Witness to the signature of.................................

Date:

Specimen of signature of person appointed as above:

........................................................................

Witness to the signature of person appointed as above

........................................................................

**Exhibit 15**

**Exchange Rates**

On a daily basis, Lehman's general ledger applied the exchange rates derived from Reuters at approximately 3:00 p.m. GMT on the prior business day to convert balances on the general ledger, including intercompany balances, denominated in currencies other than the U.S. Dollar into U.S. Dollars.  Consistent with this practice, the exchange rates used for the Global Close as of September 14, 2008 (more fully described in section IV.E.4.a of the Disclosure Statement), were derived from Reuters at approximately 3:00 p.m. GMT on September 11, 2008 – the business day prior to the last business day before LBHI's Commencement Date (the "Global Close Exchange Rates").  See Annex 15-1 (Table 1) for exchange rates for 27 major currencies.

For purposes of evaluating claims related to LBHI's debt issuances and LBT's Structured Securities (see Exhibit 11 for Structured Securities Valuation Methodologies), denominated in non-U.S. Dollar currencies, the Debtors valued these foreign denominated debt issuances and LBT's Structured Securities using the WM/Reuters Closing Spot Rate as of September 15, 2008.  See Annex 15-1 (Table 2) for these exchange rates.

**Table 1**

### Global Close Exchange Rates
As of Thursday, September 11, 2008
U.S. Dollar equivalent

| Currency | Currency Code | Rate |
|---|---|---|
| Australian Dollar | AUD | 1.2595 |
| Brazilian Real | BRL | 1.8178 |
| Canadian Dollar | CAD | 1.0779 |
| Czech Koruna | CZK | 17.690 |
| Danish Krone | DKK | 5.3554 |
| Euro | EUR | 0.7183 |
| Hong Kong Dollar | HKD | 7.7978 |
| Hungarian Forint | HUF | 173.083 |
| Icelandic Krona | ISK | 91.545 |
| Indian Rupee | INR | 45.565 |
| Israeli Shekel | ILS | 3.6329 |
| Japanese Yen | JPY | 106.51 |
| Mexican New Peso | MXN | 10.639 |
| New Zealand Dollar | NZD | 1.5445 |
| Norwegian Krone | NOK | 5.8414 |
| Phillipines Peso | PHP | 47.095 |
| Polish Zloty | PLN | 2.4459 |
| Pound Sterling | GBP | 0.5712 |
| Russian Federation Ruble | RUB | 25.813 |
| Singapore Dollar | SGD | 1.4460 |
| Slovak Koruna | SKK | 21.739 |
| South African Rand | ZAR | 8.2788 |
| South Korean Won | KRW | 1,109.3 |
| Swedish Krona | SEK | 6.8522 |
| Swiss Franc | CHF | 1.1405 |
| Thai Baht | THB | 34.775 |
| Turkish Lire | TRY | 1.2613 |

**Note**:
- Exchange rates for 27 major currencies.

**Table 2**

### WM/Reuters Closing Spot Rates
As of Monday, September 15, 2008
U.S. Dollar equivalent

| Currency | Currency Code | Rate |
|---|---|---|
| Australian Dollar | AUD | 1.2350 |
| Brazilian Real | BRL | 1.8020 |
| Canadian Dollar | CAD | 1.0685 |
| Czech Koruna | CZK | 17.013 |
| Danish Krone | DKK | 5.2549 |
| Euro | EUR | 0.7047 |
| Hong Kong Dollar | HKD | 7.7940 |
| Hungarian Forint | HUF | 169.63 |
| Israeli Shekel | ILS | 3.5598 |
| Icelandic Krona | ISK | 90.955 |
| Japanese Yen | JPY | 106.26 |
| Mexican New Peso | MXN | 10.706 |
| New Zealand Dollar | NZD | 1.5126 |
| Norwegian Krone | NOK | 5.7789 |
| Polish Zloty | PLN | 2.3579 |
| Pound Sterling | GBP | 0.5576 |
| Russian Federation Ruble | RUB | 25.566 |
| Singapore Dollar | SGD | 1.4273 |
| Slovak Koruna | SKK | 21.323 |
| South African Rand | ZAR | 8.0957 |
| Swedish Krona | SEK | 6.7399 |
| Swiss Franc | CHF | 1.1210 |

**Note**:
- WM/Reuters Closing Spot Rates fixed at Mid rate,
4 p.m. GMT.

**Exhibit 16**

**Summary of Alternative Plans**

1.    **The Ad Hoc Plan**

On December 15, 2010, an ad hoc group of LBHI creditors (the "Ad Hoc Group") filed a joint substantively consolidating chapter 11 plan for all of the Debtors other than Merit, Somerset and Preferred Somerset and a related disclosure statement. On April 27, 2011, the Ad Hoc Group filed its amended joint substantively consolidating chapter 11 plan (the "Ad Hoc Plan") and an amended disclosure statement (the "Ad Hoc Disclosure Statement"). This section provides a summary of the Ad Hoc Plan. The complete Ad Hoc Plan and Disclosure Statement are available on the docket at Docket Nos. 16315 and 16316, respectively.

The Ad Hoc Plan is premised on the Bankruptcy Court directing substantive consolidation of (a) the Debtors, (b) LBT and LBSN, if either LBT or LBSN, or the holders of Third-Party Guarantee Claims for which LBT or LBSN is the primary obligor, vote to reject the Ad Hoc Plan, and (c) certain of the Debtors' foreign Affiliates, including certain Foreign Debtors (the "Designated Non-Debtor Affiliates"), if any such Designated Non-Debtor Affiliate or its corresponding class of Third-Party Guarantee Claim holders vote to reject the Ad Hoc Plan. A discussion of the equitable remedy of substantive consolidation which would result in the merger of the affected Debtors' assets and liabilities into one pool and the Ad Hoc Group's arguments in support of substantive consolidation is set forth in section IV.~~F~~G.1 of the Disclosure Statement.

The Ad Hoc Group has identified the following entities as Designated Non-Debtor Affiliates that are subject to substantive consolidation with LBHI: (i) Lehman Brothers International (Europe) (In Administration); (ii) Lehman Brothers Finance AG (in Liquidation); (iii) Lehman Brothers Asia Holdings Ltd. (In Liquidation); (iv) LB RE Financing No. 1 Limited; and (v) LB RE Financing No. 2 Limited. The Ad Hoc Group has selected these entities based on its analysis of certain intercompany claims, which the Ad Hoc Group concludes are largely circular and not reflective of economic substance.

The Ad Hoc Plan provides for two possible recovery scenarios for each of (i) the creditors of Subsidiary Debtors, (ii) LBT and LBSN, (iii) the Designated Non-Debtor Affiliates, and (iv) their corresponding classes of Third Party Guarantee Claim holders. Under one scenario, as an incentive to vote to accept the Ad Hoc Plan, (a) holders of Claims in classes that would likely receive greater distributions under a plan that does not substantively consolidate the Debtors are offered certain increased distributions and (b) holders of Claims in classes that would receive a lesser or no distribution under a plan that substantively consolidates the Debtors are offered a distribution on a portion of their claim ("Scenario 1"). Under the alternative scenario, if a class votes to reject the Ad Hoc Plan, the Claims in that class receive a treatment that replicates the treatment such Claims would receive as a result of the substantive consolidation of the Debtors and the Designated Non-Debtor Affiliates ("Scenario 2"). Unsecured Claims in all classes not described above will receive their *pro rata* distribution from the combined pool of assets; *provided* that senior unsecured claims and general unsecured claims against LBHI will receive an increased distribution if both classes of LBT and LBSN related third party guarantee claims vote to accept the plan.

Under all scenarios, the Debtors are substantively consolidated and Affiliate Claims of the Debtors against each other are eliminated. A comparison of the Ad Hoc Plan's alternative scenarios is set forth below.

| Creditors of Subsidiary Debtors | |
|---|---|
| Scenario 1 | Scenario 2 |
| If creditors of the subsidiary Debtors vote to accept the Ad Hoc Plan, they receive an enhanced treatment, in that their distributions from the Debtors' consolidated estates on account of (i) their direct Claims is determined using 115% of their Allowed Claim, and (ii) their Third-Party Guarantee Claim is determined using 25% of such claim amount. | If creditors of subsidiary Debtors vote to reject the Ad Hoc Plan, each Claim against a subsidiary Debtor is merged with its corresponding Third-Party Guarantee Claim against LBHI, and creditors holding a claim against a subsidiary Debtor and a corresponding Guarantee Claim against LBHI will participate in the Ad Hoc Plan under one consolidated Claim against the consolidated Debtors (*i.e.*, without the enhancement in Scenario 1). |

| Designated Non-Debtor Affiliates And Holders of Third Party Guarantee Claims Against Such Affiliates | |
|---|---|
| Scenario 1 | Scenario 2 |
| If the Designated Non-Debtor Affiliates **AND** their creditors vote to accept the Plan: <br><br>(a) The Designated Non-Debtor Affiliate will not be substantively consolidated. <br><br>(b) The Designated Non-Debtor Affiliate and the consolidated Debtors will have allowed claims against each other that are mutually agreed to with the Ad Hoc Group. <br><br>(c) The Designated Non-Debtor Affiliate will be entitled to its pro-rata share of distributions on Affiliate Claims that are Allowed in an aggregate amount <u>agreed to by the Ad Hoc Group</u>, but only to the extent that the consolidated Debtors receive distributions on their Claims against the Designated Non-Debtor Affiliates without reduction or offset. <br><br>(d) Third Party Guarantee Claims whose class votes to accept will not be deemed disputed, and they will be entitled to pro-rata distributions of plan consideration based on 70% of their allowed claims. | If either a Designated Non-Debtor Affiliate **OR** the holders of Third-Party Guarantee claims based on primary claims against a Designated Non-Debtor Affiliate vote to reject the Ad Hoc Plan, the Bankruptcy Court must make a determination as to whether that Designated Non-Debtor Affiliate should be substantively consolidated with the Debtors. <br><br>If the Bankruptcy Court determines that substantive consolidation with respect to that Designated Non-Debtor Affiliate is appropriate, then: <br><br>(a) the Affiliate Claims of that Designated Non-Debtor Affiliate are eliminated; and <br><br>(b) Third Party Guarantee Claims corresponding to an obligation of that Designated Non-Debtor Affiliate merge with the direct Claims, and such Third-Party Guarantee creditors are left with one Claim against the consolidated Debtors. <br><br>If the Designated Non-Debtor Affiliate agrees to pool its assets with the assets of the Debtors, then creditors of the Designated Non-Debtor Affiliate are entitled to Distributions from the consolidated Debtors. If the Designated Non-Debtor Affiliate does not make its assets available to the Plan Administrator, then creditors |

of the Designated Non-Debtor Affiliate are not entitled to distributions from the consolidated Debtors.

If the Bankruptcy Court determines that substantive consolidation is *not* appropriate with respect to a Designated Non-Debtor Affiliate (the following treatment applies also to affiliates that are not Designated Non-Debtor Affiliates, as well as to their corresponding classes of Third Party Guarantee Claims):

   (a) The Designated Non-Debtor Affiliate's Affiliate Claims (or Claims of Affiliate that is not a Designated Non-Debtor Affiliate) will be entitled to their *pro rata* share of distributions, provided that it recognizes and honors each of the Debtors' and Debtor-Controlled Entities' Claims without giving effect to subordination, recharacterization or offset.

   (b) Corresponding Third Party Guarantee Claims will be deemed Disputed, and entitled to their pro-rata share of Distributions *only after* (1) the Debtors and Debtor-Controlled Entities have collected all their entitled distributions from the applicable primary obligor, and (2) the holders of such corresponding Third Party Guarantee Claim demonstrate to the Bankruptcy Court that they have received all of their entitled distributions from the Designated Non-Debtor Affiliate. If after three years following the effective date, the Third Party Guarantee creditor has not demonstrated to the Bankruptcy Court that it has collected all of its distributions on its primary claim, its Third Party Guarantee Claim will be expunged.

If, despite a Designated Non-Debtor Affiliate's rejection of the Ad Hoc Plan, a class of Third Party Guarantee Claims votes to accept, then such claims will not be deemed Disputed, and they will be entitled to pro-rata Distributions based on 70% of their Allowed Claims.

| LBT, LBSN, And Corresponding Third Party Guarantee Claims | |
|---|---|
| Scenario 1 | Scenario 2 |
| If both LBT **and** LBT's corresponding Third-Party Guarantee creditors vote to accept the Ad Hoc Plan, then (a) LBT will not be substantively consolidated, (b) LBT's Affiliate Claims will be allowed in an aggregate amount equal to $33,170,000,000 and entitled to their pro-rata share of Distributions, and (c) holders of Third Party Guarantee Claims for which LBT is the primary obligor will be entitled to 50% of their pro rata share of Distributions from the consolidated Debtors' estate. The remaining 50% of Distributions that would have been made to holders of such Third-Party Guarantee Claims will be automatically redistributed to holders of Allowed Senior Unsecured Claims, allowed General Unsecured Claims and allowed Subordinated Unsecured Claims (as defined in the Ad Hoc Plan). | If either LBT **or** LBT's corresponding Third-Party Guarantee creditors vote to reject the Ad Hoc Plan, then (a) LBT will be substantively consolidated with LBHI, (b) LBT's Affiliate Claims will be eliminated, and (c) holders of all Third-Party Guarantee Claims for which LBT is the primary obligor will be entitled to their pro-rata share of Distributions from the consolidated Debtors on account of a single consolidated Claim.

The same treatment applies to LBSN and its corresponding Third Party Guarantee creditors. |
| The same treatment applies to LBSN (with its Affiliate Claim allowed in an aggregate amount equal to $5,250,000,000) and its corresponding Third Party Guarantee creditors. | |

## 2.    The Non-Con Plan

On April 25, 2011, twenty-three creditors (together with certain of their affiliates, the "Non-Con Plan Proponents")[16] filed a joint chapter 11 plan (the "Non-Con Plan") and related disclosure statement (the "Non-Con Disclosure Statement") for all of the Debtors other than Merit, Somerset and Preferred Somerset that, in direct contrast to the Ad Hoc Plan, does not substantively consolidate the Debtors or any of their Affiliates. The Non-Con Plan gives effect to the separate corporate identity of each of the Debtors. However, the Non-Con Plan rejects the settlements and reallocations contained in the Plan, because the Non-Con Plan Proponents assert

---

[16]    The Non-Con Plan Proponents are Angelo, Gordon & Co., L.P., Contrarian Capital Management, LLC, Credit Agricole CIB, Credit Suisse International, Cyrus Capital Partners, LP, D. E. Shaw Composite Portfolios, L.L.C., D. E. Shaw Oculus Portfolios, L.L.C., Deutsche Bank AG, Goldentree Asset Management, LP, Goldman Sachs Bank USA (successor by merger to Goldman Sachs Capital Markets, L.P.), Goldman Sachs International, Hayman Capital Management, LP, Knighthead Capital Management, LLC, Mason Capital Management LLC, Morgan Stanley & Co. International plc., Morgan Stanley Capital Services Inc., Mount Kellett Capital Management, Oaktree Capital Management, L.P., The Royal Bank of Scotland plc, Serengeti Asset Management LP, Silver Point Capital, L.P., State Street Bank and Trust Company, and York Capital Management Global Advisors, LLC.

that there is virtually "no risk" to the Debtors of substantive consolidation and, therefore, no reason to provide for a corresponding re-distribution of assets. This section provides a summary of the Non-Con Plan. The complete Non-Con Plan and Disclosure Statement are available on the docket at Docket Nos. 16229 and 16230, respectively.

The Non-Con Plan also provides for the appointment of a "Domestic Operating Company Creditor Representative" to act as a fiduciary on behalf, and in the best interests, of LCPI, LBCS, LBSF, LOTC, and LBCC (the "Domestic Operating Companies") and their creditors. The Non-Con Plan Proponents assert that the Plan, which provides for LBHI, as "Plan Administrator," to administer the claims process, including administering intercompany claims held by LBHI itself against the Domestic Operating Companies, and vice versa, creates a conflict of interest. The Non-Con Plan Proponents believe that the appointment of such a fiduciary would eliminate this purported conflict of interest.

Other key differences between the Plan and the Non-Con Plan are as follows:

(i)     The Non-Con Plan provides that intercompany claims of Affiliates will be allowed in the amount recorded on the Debtors' accounting records, to the extent those records have been accepted pursuant to the Protocol or any related settlement guidelines.

(ii)    The Non-Con Plan provides for the equal sharing of costs relating to the administration of the derivatives claim process between LBSF and LBHI, as LBHI purportedly benefits equally from such procedures as a guarantor of the derivatives claims. In addition, the Non-Con Plan provides for a Debtor Allocation Agreement which will allocate various additional administrative costs among the Debtors in as close proportion as possible to the relative benefit each Debtor received as a result of such expenses.

(iii)   LBHI serves as Plan Administrator for each of the Debtors. However, the Domestic Operating Company Representative, not the Plan Administrator, will be responsible for major decisions affecting the Domestic Operating Subsidiaries.

(iv)    The Creditors' Committee shall be dissolved for all purposes other than (i) implementation of the Non-Con Plan through the date of the initial Distribution, (ii) defending any appeals from the Confirmation Order to final disposition of such appeals, and (iii) all matters relating to professional fees and the fee committee appointed in the Chapter 11 Cases for the period prior to the Effective Date. Unlike under the Debtors' Plan, the litigation and derivatives subcommittee of the Creditors' Committee will no longer continue.

(v)     The Non-Con Plan does not reallocate portions of Distributions between holders of Claims in different Classes.

16-5

(vi)    Instead of reducing the Distributions to LBHI from the Subsidiary Debtors in recognition of a risk that such debts may be recharacterized as equity, the Non-Con Plan empowers the Domestic Operating Company Creditor Representative to negotiate the amounts of the intercompany claims.

## Exhibit 17

**Diagram of Reallocation of Distributions Included in Plan**



LBHI
Classes 10A, 10B, 10C: Subordinated Debt Reallocation
Class 3: Senior Unsecured
Class 4A: Senior Affiliate
Class 4B: Senior Affiliate Guarantee
Class 5: Senior 3rd Party Guarantee
Class 6A: Convenience
Class 6B: Convenience Guarantee
Class 7: General Unsecured
Class 8: Affiliate and Affiliate Guarantee
Class 9A: 3rd Party Guarantee other than of the Racers Trusts
Class 9B: 3rd Party Guarantee of the Racers Trusts
20%
20%
RA
Plan Adjustment
LCPI
Class 3: Convenience
Class 4A: General Unsecured other than those of Designated Entities
Class 4B: General Unsecured of Designated Entities
less 20% of IFB
Class 5A: LBHI
Class 5B: Participating Subsidiary Debtors
Class 5C: Affiliates Other Than Participating Debtors
14%
20%
LCPI SA
20%
14%
LBSF
Class 3: Convenience
Class 4A: General Unsecured other than those of the Racers Trusts
Class 4B: General Unsecured of the Racers Trusts
less 20% of IFB
Class 5A: LBHI
LBSF ASA
Class 5B: Participating Subsidiary Debtors
Class 5C: Affiliates Other Than Participating Debtors
6%
RA
LBSF SA
20%
6%
Other Participating Subsidiary Debtors
Class 3: Convenience
Class 4: General Unsecured
less 20% of IFB
Class 5A: LBHI
Class 5B: Participating Subsidiary Debtors
Class 5C: Affiliates Other Than Participating Debtors
W
20%
W
Non-Participating Subsidiary Debtor
All 3rd Party and Affiliate Creditors
LEGEND
Weighted Percentage Of Distributions
W
LBCS: 14%
LOTC: 8%
LBCC: 10%
IFB
Intercompany Funding Balance
LCPI SA
LCPI Settlement Amount
RA
Racers Adjustment
LBSF ASA
LBSF Additional Settlement Amount
LBSF SA
LBSF Settlement Amount

## Exhibit 18

### Certain Significant Transactions Regarding Debtors' Assets

The Debtors' assets described in this Exhibit are only a subset of the assets held by the entire Lehman enterprise prior to the Commencement Date. As a result, the assets held by the Debtors are not equivalent to the assets set forth in public filings by Lehman prior to the Commencement Date.

### 1.    Derivative Contracts

Prior to the Commencement Date, Lehman entered into derivative transactions both in a trading capacity and as an end-user, conducting its derivative activities through a number of wholly-owned subsidiaries. Its fixed income derivative products business was principally conducted through its subsidiary LBSF and its separately capitalized "AAA" rated subsidiaries, including LBFP and LBDP. Lehman's equity derivative products business was conducted through LBF, LOTC and LBIE, and its commodity and energy derivatives product business was conducted through LBCS. Lehman conducted a significant amount of its spot, forward and option foreign exchange business through LBCC.

The Debtors' derivative assets represent amounts due from counterparties under contracts in which the contractual obligations and values are keyed to one or more underlying assets or indices of asset values (the "Derivative Contracts"). As of the Commencement Date, the Debtors (together with all Debtor-Controlled Entities) were parties to approximately 1.2 million derivative transactions, with approximately 6,500 counterparties.

The Debtors have sought to (i) preserve the value of the Derivative Contracts and collect payments on Derivative Contracts as to which amounts are owed to the Debtors, and prevent erosion based on movements in the value of the underlying asset or index of live contracts including hedging of the live contracts and select purchases of notes issued by certain special purpose vehicles and (ii) enter into termination and settlement agreements with respect to Derivative Contracts as to which the Debtors owe money to counterparties. Recoveries in respect of Derivative Contracts present a number of challenges, including (a) determining whether counterparties validly terminated the contracts and the proper termination date, (b) abnormally wide bid-offer spreads and extreme liquidity adjustments resulting from irregular market conditions and (c) certain legal provisions in the contracts that purport to penalize the defaulting party in the valuation mechanics. The Bankruptcy Court authorized the establishment of certain procedures to enable the Debtors, with the consent of the Creditors' Committee in certain circumstances, to resolve disputes regarding Derivatives Contracts.

### a.    Derivative ADR Procedures

The Debtors often are unable to agree with counterparties on the amount due to the Debtors in connection with the Debtors' "in the money" Derivative Contracts and in collecting such amounts. The difficulty is caused in part by the wide spreads in the values of illiquid securities in the markets. Such spreads result in parties valuing the payments due under certain Derivative Contracts differently. Also, certain counterparties to Derivative Contracts contend that due to the

Debtors' bankruptcy and consequent default under the Derivative Contracts, counterparties are not required to make payments to the Debtors on contracts that are "in the money" to the Debtors.

To resolve the impasse, on September 17, 2009, the Bankruptcy Court authorized the Debtors to establish procedures requiring counterparties to participate in alternative dispute resolution ("ADR") to seek to settle on a consensual basis Derivative Contracts that are "in the money" to the Debtors. These ADR procedures were intended to avoid (i) expensive and time intensive litigation with respect to such Derivative Contracts, (ii) undue delay to the administration of the Chapter 11 Cases and (iii) erosion of the embedded value in the Derivative Contracts. On September 27, 2010, the Bankruptcy Court authorized the Debtors to establish an alternative set of alternative dispute resolution procedures for affirmative Claims of the Debtors of less than $1 million.

As of May 12, 2011, pursuant to the alternative dispute resolution procedures described above, the Debtors had issued 149 notices to counterparties in connection with 176 Derivatives Contracts commencing such procedures. Resolution of 107 of those Derivative Contracts has resulted in the receipt by the Debtors of approximately $731 million.

### b. Key Litigation Relating to Derivative Contracts

### (i) Metavante Corporation

On May 29, 2009, LBSF filed a motion (the "Metavante Motion"), pursuant to sections 105(a), 362 and 365 of the Bankruptcy Code, to compel performance of the obligations of Metavante Corporation ("Metavante") under an interest rate swap agreement with LBSF. Metavante objected to the Metavante Motion and asserted that it had a legal right to withhold performance of its obligations under its Derivative Contract pursuant to section 2(a)(iii) of its Derivative Contract. Metavante also asserted that any amounts it would otherwise owe under its Derivative Contract must be reduced for alleged costs incurred in entering into a replacement swap. Metavante also filed proofs of claim against LBSF and LBHI related to the interest rate swap agreement for the alleged costs incurred in entering into a replacement swap (the "Metavante Proofs of Claim"). On September 17, 2009, the Bankruptcy Court entered an Order granting the relief requested in the Metavante Motion and held that Metavante was required to perform its obligations under the Derivative Contracts, notwithstanding section 2(a)(iii). The Bankruptcy Court's ruling in this matter has had a significant beneficial effect on the Debtors' negotiations with counterparties to Derivative Contracts. Metavante appealed that Order to the District Court, Case No. 09-CIV. 09839 (JSR) (the "Appeal"). While on appeal, LBSF entered into a settlement agreement that resolved all disputes between the parties, including the appeal and the Metavante Proofs of Claim.

### (ii) Lehman Brothers Special Financing Inc. v. BNY Corporate Trustee Services Limited

LBSF filed a complaint against BNY Corporate Trustee Services Limited as the trustee for an SPV structure, and a motion for summary judgment seeking a declaratory judgment that (i) provisions in certain transaction documents modifying LBSF's payment priority as a result of its

bankruptcy filing are unenforceable *ipso facto* clauses; and (ii) such clauses violate the automatic stay.  On January 25, 2010, the Bankruptcy Court granted LBSF's motion for summary judgment in its entirety.  On September 20, 2010, the District Court granted BNY Corporate Trustee Services Ltd.'s motion for leave to appeal the Bankruptcy Court's summary judgment decision. Concurrently with the adversary proceeding in the United States, a related action was pending in the United Kingdom.  After the English High Court of Justice held that the English common-law anti-deprivation principle did not invalidate modification of the priority of payments (see *Perpetual Trustee Co. Ltd. v. BNY Corporate Trustee Services Ltd.*, Nos. HC010C01612, HC010C01931, in the High Court of Justice, England), the Supreme Court of the United Kingdom granted LBSF's application for permission to appeal the English High Court of Justice's decision.  While the foregoing appeals were pending, LBSF entered into a settlement agreement with the parties that resolved all disputes relating to the transaction documents, including the U.S. and U.K. appeals.

### (iii)    Litigation with Libra CDO Ltd.

LBSF and LBHI commenced an adversary proceeding against Libra CDO Ltd. ("Libra"), a Collateralized Debt Obligation issuer managed by Lehman Brothers Asset Management, for which Bank of America acts as trustee, which was later consolidated with *Libra CDO Ltd., by Bank of America, N.A., as successor by merger to LaSalle Bank National Association, as Trustee, and Societe Generale, New York Branch v. Lehman Brothers Special Financing Inc.*, Case No. 09-01178.  LBSF entered into a Credit Default Swap Agreement ("CDSA") with Libra. Societe Generale entered into a senior swap agreement with Libra pursuant to which Societe Generale would provide liquidity to Libra in the event a payment was due to LBSF under the CDSA.  LBSF and LBHI have sought a declaratory judgment that (i) the CDSA was not validly terminated, (ii) the CDSA is an executory contract that may be assumed and assigned, and (iii) in the alternative, even if the CDSA was validly terminated, certain provisions in the relevant documents that effectuate a change in the priority of payments upon termination are not enforceable.  Libra, the trustee, and Societe Generale have sought a contrary declaratory judgment.  Cross motions for summary judgment, on the issue of whether the CDSA was properly terminated, were argued on August 26, 2009, and the Bankruptcy Court reserved judgment.  LBSF and LBHI have since settled with Societe Generale, and the settlement was approved pursuant to a 9019 motion on October 20, 2010.  However, LBSF and LBHI have not settled with Libra and the trustee, and therefore the adversary proceeding is not dismissed. Pursuant to the settlement (which covered both the Libra transaction and separate but similar transaction in which Societe Generale also served as senior swap counterparty), LBSF will, subject to the fulfillment of certain conditions precedent, assign its interests in the Libra transaction to Societe Generale, and LBSF's estate received from Societe Generale an immediate $370 million with an additional $75 million guarantee from Societe Generale associated with LBSF's right to assert all of its arguments to pursue the remaining assets in the Libra transaction against the other parties to the litigation.  LBSF's estate subsequently received from Libra a $128 million cash payment related to collateral release on December 31, 2010.

### c.    Updated Information Regarding Derivative Contracts

Prior to entering into a settlement agreement in connection with any Derivative Contract, the Debtors, generally, must (i) reconcile the universe of all trades between the Debtors and a

particular counterparty, (ii) value each of the transactions under the Derivative Contracts, and (iii) negotiate settlement amount with the counterparty. Due to the number and complexities of the Derivative Contracts, each step is a particularly arduous process. As of March 31, 2011, the Debtors have reconciled 99% of their Derivative Contracts, valued 99% of their Derivative Contracts and finally settled 58.5% of their Derivative Contacts.

Through December 31, 2010, the Debtors (together with their Debtor-Controlled Entities) have collected more than $12.2 billion from counterparties to Derivative Contracts (net of collections on certain Derivative Contracts which collateralize certain notes) and as of December 31, 2010, expect to collect another $5.2 billion of gross cash flows from Derivative Contracts, including recovery of Cash posted as collateral for hedging in respect of Derivative Contracts. From December 31, 2010 through March 31, 2011, the Debtors (together with their Debtor-Controlled Entities) have collected approximately $327 million of that amount. The recoveries reflected for Derivative Contracts are estimates based on financial market assumptions, the current status of negotiations with Counterparties, and the Debtors' judgment of the resolution of various legal matters. Actual recoveries could vary materially from these estimates.

Exhibit 7 annexed hereto provides the estimated timeframe for collections of amounts owed to the Debtors on account of Derivative Contracts. For further information about the Derivative Contracts held by each of the Debtors, balance sheets, dated as of December 31, 2010, of each of the Debtors are annexed hereto as Exhibit 2B.

## 2.    Real Estate Assets

As of the Commencement Date, the Debtors held and managed commercial and residential mortgage loans, commercial and residential real estate properties, joint venture equity interests in real estate properties and other real estate related investments ("Real Estate Assets"). These Real Estate Assets include debt, equity interests and real-estate owned ("REO"), located in various markets throughout the United States, Canada, and Europe. Currently, the commercial Real Estate Assets comprise nearly 825 positions across a broad array of product types (office, condo & multi-family unit apartments, hospitality, and raw land for development). The residential Real Estate Assets are comprised of approximately 5,000 mortgages, securities and REO positions located predominantly in the United States.

The Debtors have made substantial efforts to develop and implement the best course of action to maximize the value of their Real Estate Assets. Due to a downturn in the global real estate markets, many of the borrowers and sponsors of real estate projects have requested additional cash infusions or required significant restructurings of the terms of loans or equity investments in order to continue to operate or complete asset level business plans. In certain cases, the Debtors have agreed to restructure loans and/or equity investments to provide liquidity and allow the borrowers or other parties to implement new or revised business plans and ultimately repay their lenders, including various Debtors and their Affiliates and subsidiaries. Restructurings of real estate loans or equity investments were intended to avoid diminished recoveries, by preserving the value of the Debtors' sizeable investments for the benefit of creditors.

The Debtors have also made substantial progress in resolving encumbrances affecting certain Real Estate assets that were subject to litigation and/or disputes with certain entities regarding

the ownership of assets subject to pledges or repurchase agreements. Resolving these encumbrances has permitted and enabled the Debtors to pursue various value maximization strategies, including foreclosure actions, restructurings, completion of development, negotiated settlements and payoffs and asset sales that would have otherwise been unavailable to the Debtors.

### a.    Real Estate Protocols Established by the Debtors

To manage and administer the Debtors' Real Estate Assets in an efficient manner, upon Orders of the Bankruptcy Court, the Debtors established protocols by which they may take certain actions with respect to Real Estate Assets consistent with practices prior to the Commencement Date, without having to seek Court approval for each action. Specifically, the Bankruptcy Court approved protocols to (i) modify and restructure the terms of Real Estate Assets, (ii) compromise amounts due and payable to the Debtors in respect of Real Estate Assets, (iii) transfer mortgage loans to wholly-owned special purpose entities for the purpose of foreclosing on such loans, (iv) make new or additional debt or equity investments in Real Estate Assets, (v) compromise and settle claims that Debtors hold against third parties relating to the origination or sale of residential mortgage loans and (vi) dispose of assets. These protocols generally permit the Debtors to enter into transactions (a) without the consent of any other party, (b) following notice and/or consent of the Creditors' Committee or (c) only upon further order of the Bankruptcy Court. The required notice and/or consent of the Creditors' Committee and the Bankruptcy Court are determined in accordance with tiered thresholds based on the outstanding amount of, or estimated recoveries from, the Real Estate Assets.

### b.    Significant Transactions/Restructurings/Sales

This section contains summary descriptions of four significant transactions and events involving the Debtors' Real Estate Assets that have occurred during the Chapter 11 Cases.

### (i)    Restructuring of Archstone Investment

Prior to the Commencement Date, LBHI and LCPI's investments in Archstone Trust (formerly known as Archstone Smith Operating Trust) ("Archstone") represented Lehman's single largest Real Estate Asset. In 2007, certain Debtor and non-Debtor Affiliates loaned and made equity investments in Archstone in connection with the approximately $22 billion leveraged buyout of Archstone led by Lehman and Tishman Speyer. By March 2008, such Debtor and non-Debtor Affiliates reduced their total exposure to this transaction to approximately $5.5 billion. Archstone has an ownership interest in over 400 apartment communities representing over 80,000 residential units. Archstone is a recognized leader in multi-family residential property investment, development, and operations.

Due to a decline in the commercial real estate sales market, Archstone experienced difficulty in late 2008 in generating the property sales necessary to meet certain of its liabilities. In order to protect LBHI's and LCPI's substantial investment in Archstone, LBHI, LCPI and certain other lenders agreed to, among other things, commit an additional $485 million in senior-secured financing to Archstone. LCPI committed approximately 47% of the additional funds resulting in LCPI beneficially owning approximately 47% of the equity in the deal. Such transaction was

approved by the Bankruptcy Court on January 28, 2009. In 2010, LBHI, LCPI and certain other lenders agreed to implement a more comprehensive restructuring of certain financings provided to Archstone to improve Archstone's cash flow and liquidity on a long-term basis. The key terms of the restructuring included, among other things, the conversion of the debt financing provided to Archstone by the Debtors and their Affiliates and certain other lenders in the principal amount of approximately $5.4 billion, plus accrued interest, to classes of new equity interests entitled to a preferred return. Approximately $2.5 billion of the financing converted to equity is attributable to the Debtors and their Affiliates' interests. The restructuring of the Archstone credit facilities was approved by the Bankruptcy Court on May 25, 2010, and modifications thereto were approved on November 18, 2010. The transaction closed on December 2, 2010. With this substantial improvement to the Archstone balance sheet and liquidity profile, the Debtors are well positioned to maximize recovery on their investments in Archstone.

### (ii)    Acquisition of 237 Park B-Note

237 Park Avenue (hereinafter "237 Park") is a 21-story building located in New York City. In May 2007, LBHI originated $1.23 billion in loans to finance the purchase of 237 Park by affiliates of Broadway Partners, including $900 million of senior debt and an additional $330 million bridge mezzanine loan. LBHI securitized the first $419.6 million of the senior debt and sold the next $255.4 million as a B-Note (the "237 Park B-Note") to PRII 237 Park, LLC. The remaining $225 million of the senior debt was restructured as a senior mezzanine loan and was never syndicated. The bridge mezzanine loan is structured in two tranches, one of which is currently owned by LBHI, and the other (approximately $117.5 million) is part of a repo transaction completed prior to the Commencement Date. These transactions left LBHI with an investment in 237 Park of approximately $437 million.

In mid-2010, PRII 237 Park, LLC engaged a broker to run a full marketing and sale process for the 237 Park B-Note. If a party other than LBHI acquired the 237 Park B-Note, LBHI's investment in 237 Park could have been potentially wiped out through a foreclosure of the 237 Park B-Note. To protect its current investment, and pursue significant upside, LBHI purchased the 237 Park B-Note from PRII 237 Park, LLC. With the purchase of the 237 Park B-Note, LBHI can execute various strategies that will maximize recovery on 237 Park.

### (iii)    Rosslyn Capital Call

Rosslyn LB Syndication Partner LLC ("Rosslyn LB"), an indirect, non-debtor affiliate of LBHI, legally or beneficially owns a 78.5% limited partnership interest in a joint venture, Rosslyn Syndication Partners JV LP ("Rosslyn JV"), which, in turn, indirectly owns a 3,000,000 square foot, 10-property, office portfolio located in Rosslyn, Virginia, a suburb of Washington, D.C. (the "Rosslyn Venture"). The collection of assets owned in the Rosslyn Venture represents approximately 30% of all office space in Rosslyn, Virginia and is currently at 98% occupancy, with a majority of the space leased by investment grade tenants. This high quality, stable tenancy ensures a long term and resilient cash flow.

In July 2010, $239 million of the Rosslyn Venture's capital structure matured. In order to obtain the necessary funds to repay that portion of the existing capital structure, Rosslyn JV issued a

capital call (the "Rosslyn Capital Call") to its partners. Rosslyn LB funded its portion of the Rosslyn Capital Call as well as a portion for one of the other partners as a partner loan. Repaying the existing mortgages has greatly increased the marketability of the Rosslyn Venture enabling either the sale of the Rosslyn Venture in a more robust real estate market or the opportunity to refinance the properties with mortgages at more favorable terms when the capital markets improve.

### (iv)    SunCal and Bankruptcy Cases

Prior to November 2008, LCPI and certain of its non-Debtor Affiliates (collectively, the "Lehman SunCal Lenders") made various loans in an aggregate amount of over $2 billion (collectively, the "SunCal Loans") to certain affiliates of SCC Acquisitions, Inc. (collectively, "SunCal") to finance SunCal's acquisition and development of real property located throughout the State of California (the "SunCal Projects"). Through various entities, Lehman also invested millions of dollars as equity in certain SunCal entities. All of the financing provided by the Lehman SunCal Lenders went into default, and in November 2008, SunCal became debtors in various chapter 11 cases (collectively, the "SunCal Cases") which are currently pending in the United States Bankruptcy Court for the Central District of California (the "California Bankruptcy Court") under jointly administered Case No. 8:08-bk-17206-ES. Certain of those SunCal entities were subject to involuntary bankruptcy petitions (the "SunCal Trustee Debtors") for which the California Bankruptcy Court appointed an independent trustee (the "SunCal Trustee"). Other SunCal entities filed voluntary bankruptcy petitions (the "SunCal Voluntary Debtors"). Since the commencement of the SunCal Cases, certain of the Lehman SunCal Lenders have provided debtor-in-possession financing to various SunCal entities to fund certain agreed-upon expenses with respect to the SunCal Projects and, in certain instances, certain of the Lehman SunCal Lenders have consented to the use of cash collateral for similar purposes.

Shortly after the commencement of the SunCal Cases, in January 2009, certain SunCal entities initiated an adversary proceeding (the "SunCal Adversary Proceeding") against certain Lehman SunCal Lenders seeking, among other things, to equitably subordinate the Lehman SunCal Lenders' claims. Certain Lehman SunCal Lenders have filed a partial motion to dismiss and a motion to strike the Fourth Amended Complaint filed in the SunCal Adversary Proceeding. Both motions are pending. At an October 2010 hearing and in a subsequent November 2010 written order, the California Bankruptcy Court temporarily stayed certain proceedings in the SunCal Cases for 90 days to allow for mediation. Numerous motions and other pleadings have been filed in the SunCal Cases over the past two and a half years, along with appeals of various rulings which are pending.

In addition, certain Lehman SunCal Lenders have negotiated a settlement with the SunCal Trustee for the SunCal Trustee Debtors that is incorporated into their jointly sponsored Lehman/Trustee Plan filed in the California Bankruptcy Court. The Bankruptcy Court has approved the settlement. Certain Lehman SunCal Lenders also filed a plan for certain SunCal Voluntary Debtors (the "Lehman Voluntary Plan"). In turn, the SunCal Voluntary Debtors and SCC Acquisitions, Inc. filed their own plans (the "SunCal Plans") and corresponding disclosure statements. A disclosure statement hearing was held on May 13, 2011 with respect to all of the disclosure statements, at which the California Bankruptcy Court denied approval of the disclosure statements, made recommendations for changes thereto, and scheduled another

disclosure statement hearing on July 22, 2011. In response to the California Bankruptcy Court's recommended changes, the Lehman/Trustee Plan and Lehman Voluntary Plan, and the corresponding disclosure statements, were amended further and filed with the California Bankruptcy Court on June 20, 2011. LCPI and LBHI plan to seek approval of the Bankruptcy Court with respect to the roles and obligations to be undertaken by LCPI and LBHI under these amended plans. Amended and additional plans and disclosure statements were also filed by the SunCal Voluntary Debtors and SCC Acquisitions, Inc. The California Bankruptcy Court also scheduled a confirmation hearing to begin on October 24, 2011.

The Lehman plans in the SunCal Cases, if confirmed, would put the Lehman SunCal Lenders in the position of taking title to the SunCal Projects and allow the Debtors to recover on the SunCal Projects through subsequent sales, joint venture arrangements with third party investors, and/or through the execution of development plans.

### c.   Updated Information Regarding the Debtors' Real Estate Assets

The Debtors intend to manage and dispose of the Real Estate Assets in a manner that will maximize the value of such assets for the Debtors' estates. Since the Commencement Date, the Debtors and Debtor-Controlled Entities have collected in excess of $3.0 billion from the Real Estate Assets through December 31, 2010. The Debtors estimate that over the expected wind-down period from January 1, 2011 to December 31, 2014, their estates (together with their Debtor-Controlled Entities) will recover gross proceeds of approximately $13.2 billion from the Real Estate Assets. From December 31, 2010 through March 31, 2011, the Debtors (together with their Debtor-Controlled Entities) have collected approximately $490 million of that amount.

Since the Commencement Date, the Debtors have pursued strategies to create value within the portfolio of Real Estate Assets by stabilizing and controlling real estate assets that have been impaired by broken partnerships, overleveraged capitalizations, operating challenges and pledge encumbrances. Once assets are secure, the Debtors and their Affiliates and subsidiaries implement asset-level business plans to improve operational and financial stability, and capitalize on cyclical recovery. This approach to value creation allows for Real Estate Assets to evolve from a state of distress, where opportunistic capital requires higher returns, to a state of stability that will attract a broader array of investors with lower return expectations, multiple exit opportunities, and higher returns to the Debtors' estates. This approach also allows for the Debtors to take advantage of market opportunities as they arise, rather than force the sale of illiquid assets when options are limited.

A subset of the commercial Real Estate Assets represents a strategic opportunity for value creation and maximization. This defined portfolio includes specific assets where (i) the underlying real estate is in attractive markets, (ii) the Debtors have control or a path to control, and (iii) there are multiple options for monetization including public or private market executions. Within this portfolio, the Debtors are pursuing business plans to unlock not only the intrinsic asset-level value of underlying assets, but also the portfolio and enterprise values that could result from assembling groups of strategic assets and the associated management platforms.

Exhibit 7 annexed hereto provides the estimated timeframe for collections of amounts on account of Real Estate Assets. For further information about the Real Estate Assets held by each of the Debtors, balance sheets, dated as of December 31, 2010, of each of the Debtors are annexed hereto as Exhibit 2B.

### 3.    Commercial Loans

Lehman was a significant participant in the commercial lending industry prior to the Commencement Date and as of the Commencement Date held a significant amount of commercial loans ("Loans").

The Debtors primary focus has been to reduce the unfunded commitments, settle open loan trades and efficiently manage and collect on the funded Loans. The Debtors have established procedures to enable them to manage and liquidate their portfolio of Loans efficiently.

### a.    Loans with Unfunded Commitments

On June 3, 2009, the Bankruptcy Court authorized the Debtors to establish procedures to terminate unfunded commitments on Loans and to restructure and modify the terms of Loans. The Debtors are authorized to terminate commitments, and when necessary, to make payments to the borrowers to terminate such commitments. The Debtors are authorized to modify the terms of Loans in the same manner in which the Debtor would have modified the terms of Loans in the ordinary course of their businesses prior to the Commencement Date.

As of March 31, 2011, the Debtors have terminated unfunded commitments on Loans in the aggregate amount of $10.6 billion. The Debtors have paid $14 million in the aggregate to certain borrowers to effect the termination of these unfunded commitments.

With respect to the $3.0 billion in unfunded commitments remaining as of April 30, 2011 (including letters of credit) for Loans, Real Estate Assets, the Banks and Private Equity/ Principal Investments, the Debtors estimate that they may assume agreements which would result in LCPI and LBHI having to make advances on loans with unfunded commitments of approximately $476 million and $14 million, respectively. The assumption of other credit agreements is under consideration.

### b.    Updated Information Regarding the Debtors' Commercial Loan Portfolio

The Debtors estimate that over the expected wind-down period, their estates (together with their Debtor-Controlled Entities) will recover gross proceeds of approximately $4.8 billion from their portfolio of Loans. From December 31, 2010 through March 31, 2011, the Debtors (together with their Debtor-Controlled Entities) have collected approximately $315 million of that amount.

The Debtors have concluded a comprehensive credit review process of their entire portfolio of loans, and rated each loan according to the Debtors internal methodology. As of December 30,

2010, 9% of the funded loans in the Debtors' portfolio were rated "high grade," 91% of the loans in the portfolio were rated "high yield."[17]

Exhibit 7 annexed hereto provides the estimated timeframe for collections of amounts owed to the Debtors on account of Loans.  For further information about the Loans held by each of the Debtors, balance sheets, dated as of December 31, 2010, of each of the Debtors are annexed hereto as Exhibit 2B.

### 4.    Bank Platforms

LBHI is the sole indirect owner of two non-debtor domestic banks (the "<u>Banks</u>"): Woodlands Commercial Bank ("<u>Woodlands</u>") and Aurora Bank FSB ("<u>Aurora Bank</u>").  Woodlands is a Utah chartered industrial bank with operations in Salt Lake City, Utah. Woodlands is subject to the regulatory authority of the Federal Deposit Insurance Corporation ("<u>FDIC</u>") and the Department of Financial Institutions of the State of Utah.   Aurora Bank operates a multi-asset loan origination, purchasing, and servicing business, with the loan origination business involving the issuance of residential and commercial mortgage, small business, large corporate, and consumer loans.  Aurora Bank wholly owns Aurora Loan Services, LLC ("<u>Aurora Loan Services</u>"), one of the nation's largest residential loan servicing operations.  Aurora Bank is a federally chartered thrift institution subject to the regulatory authority of the Office of Thrift Supervision (the "<u>OTS</u>").  Based on their March 31, 2011 regulatory reports, the values of LBHI's equity interest in Aurora Bank and Woodlands were reported, on a fair value accounting basis, at $892 million and $896 million, respectively, for a combined value of $1.79 billion.  As of March 31, 2011, the Banks have terminated unfunded commitments on loans in the aggregate amount of $13.9 billion at a cost of $22 million.  See Exhibit 3 annexed hereto for pro forma balance sheets of the Banks, as of March 31, 2011.

Both Aurora Bank and Woodlands are required to maintain minimum capital levels under applicable regulations.  Failure to maintain required minimum capital levels would make Aurora Bank and Woodlands susceptible to appointment of the FDIC as receiver to seize and liquidate its assets.  On February 4, 2009, in response to the diminished capital levels of Aurora Bank, the OTS issued a Prompt Corrective Action directive imposing serious restrictions on Aurora Bank's operations, including its sourcing of funding and issuance of new loans.  On that same date, in connection with its diminished capital level, Woodlands consented to the entry of a cease and desist order issued by the FDIC imposing substantial restrictions on Woodlands' operations.  If the capital deficiencies were not corrected and Aurora Bank or Woodlands were seized and subjected to fire sale liquidations, LBHI's estate would have suffered a significant loss of value that could otherwise have inured to the benefit of its creditors.  Moreover, the situation of each Bank was linked.  Pursuant to 12 U.S.C. § 1815(e), a federal banking statute that imposes cross-liability on commonly owned depository institutions, the seizure of one Bank would potentially create liability on the part of the other for the first Bank's capital deficiency and would likely be followed by the seizure of the other Bank.  The OTS filed two proofs of Claim against LBHI asserting regulatory violations in the amount of $2.192 billion plus unliquidated amounts and a

---

[17] Certain claims against other chapter 11 debtors or interests in distressed debt, held by the Debtors are included in the Debtors' Loan portfolio, but are not rated by the Debtors.

priority Claim under sections 365(o) and 507(a)(9) of the Bankruptcy Code for the same amount. If the regulators successfully prosecuted a Claim under section 365(o) of the Bankruptcy Code, it would have been entitled to be paid in full ahead of all allowed general unsecured Claims against LBHI.

In order to preserve the equity value of both Aurora Bank and Woodlands and avoid the significant losses that could have resulted if the Banks were allowed to fail, since February 2009, LBHI has taken a series of actions to support the Banks' capital levels and preserve the opportunity to realize the fair value of both Banks, each with the full support of the Creditors' Committee.    LBHI's efforts culminated in global settlement agreements (the "Banks Settlements") with Aurora Bank and Woodlands that were approved pursuant to motions [Docket Nos. 11141 and 11142] by the Bankruptcy Court on September 23, 2010 and closed on November 30, 2010.  As a result of the Banks Settlements, claims against LBHI in excess of $3.1 billion were settled and expunged, the Banks released to LBHI or its Affiliates certain collateral they were holding, both Banks were substantially recapitalized and certain regulatory restrictions on both institutions' operations were modified.  In order to secure the regulatory approval of the Banks Settlements and the associated modifications of the regulatory restrictions on the operations of the Banks, LBHI entered into capital maintenance agreements (the "Capital Maintenance Agreements") with respect to both Banks, pursuant to which LBHI has agreed that, as long as LBHI's ownership or control of the Banks continues, in the event that either Aurora Bank's or Woodlands' capital falls below the 11% Tier-1 capital level or 15% total risk-based capital level, LBHI will promptly make capital contributions to Aurora Bank or Woodlands, as applicable, sufficient to restore their capital at the 11% or 15% level, as appropriate.    In the Capital Maintenance Agreements, LBHI has also agreed that it will sell Aurora Bank and sell or wind-down Woodlands within 18 months of the effective date of the Banks Settlements, and, subject to extensions in certain circumstances, if sales cannot be completed by that date, LBHI will within such period complete the dissolution and wind-down of the Banks by purchasing their respective remaining assets.  LBHI expects to sell Aurora Bank and to effectuate an orderly wind-down of Woodlands within the 18 month period to realize the equity value of its interests in the Banks and to recover its prior investments therein.  LBHI also agreed to make available throughout the period of LBHI's ownership of Aurora Bank two financing facilities, one that makes up to $450 million in financing secured by eligible mortgage loans available to Aurora Bank and another that makes up to $500 million in financing secured by servicing advance reimbursement rights available to Aurora Loan Services.  Aurora Bank's business plan does not contemplate the use of either facility, but they will be available to provide liquidity if needed.

In total, LBHI's support for the Banks culminating in the Banks Settlements allowed LBHI to avoid approximately $5.1 billion in losses, comprised of an unsecured priority claim of as much as $2.7 billion (as of February 2009 when LBHI made its first capital contribution to the Banks), and approximately $2.4 billion estimated by LBHI as (i) the aggregate liquidation value of both Banks after the Banks Settlements plus (ii) the value of the collateral recovered and now held by the Debtors in the Banks Settlements.  The total investments made in the Banks by LBHI since February 2009, including payments made as part of the Banks Settlements, equal approximately $1.6 billion.  As a result, LBHI's support for the Banks has allowed it to preserve approximately $3.4 billion in value for creditors.

Beginning in the fourth quarter of 2010, numerous investigations of foreclosure processes across the servicing industry were initiated. Aurora Bank was one of the servicers included in a review by the OTS and other regulatory agencies of the foreclosure practices of fourteen large mortgage servicers. In January and March, 2011, the OTS communicated to Aurora Bank the preliminary results of that interagency examination of their policies, procedures, and internal controls related to residential mortgage foreclosure practices. As a result of the review, Aurora Bank expects the regulators will require some or all of the large mortgage servicers, including Aurora Bank and its subsidiaries, to address certain aspects of their foreclosure processes, including developing plans related to control procedures and monitoring of loss mitigation and foreclosure activities, and taking certain other actions relating to pending or recently completed foreclosures. Though Aurora Bank believes its policies, procedures and internal controls related to foreclosure practices already follow established safeguards and legal requirements, it intends to meet any new requirements of the OTS in all material respects. Based on the information available to Aurora Bank at present, it does not believe those requirements will materially affect its financial position, results of operations, or ability to conduct normal business activities. In addition, monetary penalties may be assessed but Aurora Bank does not know, and cannot reasonably estimate, the amount of any such penalties.

### 5.    Private Equity/Principal Investments

Private Equity and Principal Investments include (i) equity and fixed-income direct investments in companies, (ii) general partner interests in asset managers, (iii) limited partner interests in third-party investment funds and (iv) general partner and limited partner or side-by-side interests in Lehman-sponsored investment funds ("Private Equity/Principal Investments"). Prior to the Commencement Date, Lehman's private equity business operated in six major asset classes: merchant banking, real estate, venture capital, credit-related investments, private funds investments and infrastructure. Lehman raised privately-placed funds in these asset classes, for which it acted as a general partner and in which it had general and limited partner or side-by-side interests. In addition, Lehman's principal investments business made other non-fund-related direct investments.

Lehman had formed various private equity or other alternative investment funds with third-party investors that were typically organized as limited partnerships. Lehman typically acted as general partner for these funds and did not consolidate the funds into its results of operations when the third-party investors to the funds had (i) rights to either remove the general partner without cause or to liquidate the partnership; or (ii) substantive participation rights.

### a.    Significant Transactions/Sales

This section includes descriptions of certain significant transactions or dispositions of the Debtors' Private Equity/ Principal Investments.

### (i)    Disposition of Eagle Energy

Eagle Energy Partners I L.P. ("Eagle") was formed in 2003 to acquire, manage, and deliver natural gas and electric power across the United States and Canada. Based in Houston, Texas,

Eagle offered energy-asset management and power-marketing services. Eagle also engaged in gas supply, transport, and storage on behalf of wholesale natural gas and power clients.

LBHI, through certain of its subsidiaries (LBCS, LBMB Fund Eagle Energy Holdings LLC, LBMB Partners Eagle Energy Holdings LLC, LBMB Fund (B) Eagle Energy Holdings LLC and LBMB Capital Partners V Eagle Energy Holdings LLC (the "Eagle Sellers")), acquired all of the limited and general partnership interests in Eagle on or about May 9, 2007. Eagle relied on LBHI for extensions of credit in order to fund its ongoing operations. During 2008, Lehman's credit rating was downgraded and it suffered from reduced liquidity and a reduced ability to sustain its operations. Those financial difficulties made it difficult to continue extending large amounts of credit to Eagle which hampered Eagle's ability to service its customer base.

Eagle's value was greatly dependent upon its ability to assure its clients and customers of its financial and operational integrity. Lehman's financial instability in the fall of 2008 made it difficult for Eagle to maintain the confidence of its clients and customers. Following the Commencement Date, in order to maximize the value of Lehman's loans and investment, a rapid sale process was conducted resulting in the sale of Eagle in October 2008 to EDF Trading North America Management LLC and EDF Trading North America Inc. (the "Eagle Purchasers"). At the time of the sale, Eagle owed LBHI approximately $663.9 million under an intercompany note (the "Eagle Loan").

Pursuant to the October 2008 purchase agreement, the Eagle Purchasers paid LBHI $230 million in exchange for all the limited and general partnership interests in Eagle. In addition, LBHI agreed to forgive approximately $433 million in outstanding debt under the Eagle Loan and assigned all its remaining rights under the Eagle Loan to the Eagle Purchasers. Any amounts owed to or by Eagle, on the one hand, and the Eagle Sellers or any of their affiliates, on the other hand, were deemed satisfied, including a $19.5 million receivable owed by LBCS to Eagle.

All proceeds of the sale were applied first to satisfy the outstanding amounts owed to LBHI under the Eagle Loan. The remaining portion of the Eagle Loan was forgiven in order for the sale to occur and so the assets would be free of any lien or encumbrances. As the sale proceeds were not in excess of the indebtedness of Eagle owed to LBHI, no proceeds were distributed to the Eagle Sellers.

### (ii)    Disposition of Other Private Equity/Principal Investments

The Debtors and their subsidiaries have completed, or are in the process of completing, sales of certain indirect interests that they hold in respect of certain affiliated Private Equity/Principal Investments. In each of the sales, the interests that have been sold have involved a combination of the interests that the Debtors indirectly held. For example, the Debtors have disposed of or otherwise monetized their interests in (i) the management rights, and in certain circumstances, the general partner interests in the Lehman Brothers Merchant Banking funds, the Lehman Brothers Real Estate funds, the Lehman Brothers European Mezzanine funds, the Lehman Brothers CDO funds and certain Lehman Brothers Venture Capital funds, (ii) a note issued by R3 Capital Partners, (iii) a note issued by Kingfisher CDO Ltd., (iv) certain liquid public company equity positions and (v) TCP Asia Fund LP.

### b.    Updated Information Regarding the Debtors' Private Equity/Principal Investments

The Debtors estimate that over the estimated wind-down period from January 1, 2011 to December 31, 2014, their estates (together with their Debtor-Controlled Entities) will recover gross proceeds of approximately $9.5 billion from their portfolio of Private Equity/Principal Investments.  From December 31, 2010 through March 31, 2011, the Debtors (together with their Debtor-Controlled Entities) have collected approximately $300 million of that amount.

Certain Private Equity/Principal Investments are held as partnership interests, limited liability company interests or other similar interests that are uniquely structured for particular private investments.  Therefore these investments are not always liquid and the Debtors may ultimately decide to sell their interests in such investments at a discount.  In addition the Debtors (and their Debtor-Controlled Entities) are the holder of record but not in possession or complete control of certain financial instruments representing Private Equity/ Principal Investments amounting to approximately $506 million in cash flows reflected in the Recovery Analysis, because such financial instruments are held in an account at a Non-Controlled Affiliate.  The Debtors (or Debtor-Controlled Entities) are seeking the return of such financial instruments.  In certain circumstances, where a financial instrument has been sold or otherwise monetized, the Debtors (or Debtor-Controlled Entities) have entered into arrangements with the applicable Non-Controlled Affiliate regarding the holding of proceeds received in respect of such sale or other monetization pending the outcome of the Debtors (or Debtor-Controlled Entities) claim against and/or negotiations with such parties.

Exhibit 7 annexed hereto provides the estimated timeframe for collections of amounts on account of Private Equity/Principal Investments.  For further information about the Private Equity/ Principal Investments held by each of the Debtors, balance sheets, dated as of December 31, 2010, of each of the Debtors are annexed hereto as Exhibit 2B.

## Exhibit 19

### Description of Business and Capital
### Structure of Lehman Prior to the Commencement Date

### 1.    General Information Regarding Lehman

Prior to the Commencement Date, Lehman provided a full array of services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity to corporations, governments and municipalities, institutional clients and high-net-worth individuals.  In addition to its worldwide headquarters in New York and regional headquarters in London and Tokyo, Lehman operated a network of offices in North America, Europe, the Middle East, Latin America and the Asia Pacific region.  Lehman was a global market-maker in all major equity and fixed income products, and was a member of all principal securities and commodities exchanges in the United States, as well as the Financial Industry Regulatory Authority (formed by the consolidation of National Association of Securities Dealers, Inc. and the member regulation, enforcement and arbitration functions of the New York Stock Exchange, Inc. ("NYSE")), and held memberships or associate memberships on several principal international securities and commodities exchanges, including the London, Tokyo, Hong Kong, Frankfurt, Paris, Milan, Singapore, and Australian stock exchanges.

Lehman generated a majority of its revenues from institutional, corporate, government and high-net-worth clients by, among other things, (i) advising on and structuring transactions; (ii) serving as a market-maker and/or intermediary in the global marketplace, including making securities and other financial instrument products available, as both an issuer and an intermediary, to allow clients to adjust their portfolios and risks across different market cycles; (iii) originating loans for distribution to clients in the securitization or loan trading market; (iv) providing investment management and advisory services; and (v) acting as an underwriter to clients.  As part of, and supplemental to, the services Lehman performed for its clients, Lehman maintained inventory positions of varying amounts across a broad range of financial instruments and actively engaged in proprietary trading and principal investment positions.  Lehman was organized into three business segments: (i) the Capital Markets division, (ii) the Investment Banking division, and (iii) the Investment Management Division, which during Lehman's 2007 fiscal year accounted for 64%, 20% and 16% of consolidated net revenues, respectively, as recorded on Lehman's books and records.

### 2.    Business Segments

### a.    Capital Markets Division

The Capital Markets division ("Capital Markets") primarily engaged in institutional client based activities, secondary trading, financing, mortgage origination and securitization, prime brokerage and research activities in fixed income and equity products.  Lehman was a global market-maker in numerous equity and fixed income products, including

U.S., European and Asian equities, government and agency securities, money market products, corporate high-grade, high-yield and emerging market securities, mortgage- and asset-backed securities, preferred stock, municipal securities, government securities, commodities and energy products, bank loans, foreign exchange, financing and derivative products. Lehman was one of the largest investment banks in terms of U.S. and pan-European listed equities trading volume and maintained a major presence in over-the-counter U.S. stocks, major Asian large capitalization stocks, warrants, convertible debentures and preferred issues. In addition, the secured financing group managed Lehman's equity and fixed income matched book activities, supplied secured financing to institutional clients and provided secured financing for its inventory of equity and fixed income products. Capital Markets also included principal investing and proprietary trading activities, including investments in real estate, private equity and other long-term investments. As of August 31, 2008,[18] Capital Markets had reported assets on Lehman's books and records in the aggregate amount of approximately $586 billion. In the nine months ended August 31, 2008, Lehman recorded revenues of approximately $16.2 billion for Capital Markets.

### b.  Investment Banking Division

The Investment Banking division ("Investment Banking") provided advice to corporate, institutional and government clients throughout the world on mergers, acquisitions and other financial matters. Investment Banking also raised capital for clients by underwriting public and private offerings of debt and equity instruments. Investment Banking was comprised of the following groups: corporate finance, mergers & acquisitions advisory, restructuring, equity capital markets, and debt capital markets, leveraged finance, private capital markets and risk solutions. Lehman maintained Investment Banking offices in North America, Europe, the Middle East, Latin America and the Asia Pacific region. In the nine months ended August 31, 2008, Lehman recorded revenues of approximately $2.3 billion for Investment Banking.

### c.  Investment Management Division

The Investment Management division (the "Investment Management Division") provided strategic investment advice and services to institutional and high-net-worth clients on a global basis, and consisted of the asset management and private investment management businesses. The asset management group provided proprietary asset management products across traditional and alternative asset classes through a variety of distribution channels to individuals and institutions. The asset management group included Neuberger Berman Holdings LLC and its subsidiaries ("Neuberger Berman"). As of May 31, 2008, Lehman reported that the Investment Management Division had $277 billion in assets under management.

---

[18]    Lehman prepared, but did not file with the SEC, a quarterly consolidated financial statement for the period ending August 31, 2008, which is the source of the information provided herein as of that date.

Lehman acquired Neuberger Berman in October 2003. Neuberger Berman's private asset management business provided discretionary, customized portfolio management across equity and fixed income asset classes for high-net-worth clients.

The Neuberger Berman family of investment funds spanned asset classes, investment styles and capitalization ranges. Its open-end mutual funds were available directly to investors or through distributors, and its closed-end funds traded on major stock exchanges. Neuberger Berman was also a sub-advisor of funds for institutional clients, including insurance companies, banks and other financial services firms. Neuberger Berman served as the investment advisor or sub-advisor for numerous defined contribution plans, and for insurance companies offering variable annuity and variable life insurance products, and provided portfolio management through both mutual fund and other managed products.

The Investment Management Division also included the Private Investment Management Group. The Private Investment Management group provided traditional brokerage services and comprehensive investment, wealth advisory, trust and capital markets execution services to both high-net-worth individuals and small and medium size institutional clients. For high-net-worth clients, Lehman's investment professionals and strategists worked together to provide asset allocation, portfolio strategy and manager selection, and integrated that advice with its tax, trust and estate planning services.

### 3.    Corporate Structure

An abridged depiction of Lehman's organizational structure as of the Commencement Date is set forth below. This summary does not identify all legal entities within the corporate structure; each of the entities listed is a holding company of direct and indirect subsidiaries.



Lehman Brothers Holdings Inc.
Neuberger Berman Holdings LLC**
Lehman Brothers Inc.
LB 745 LLC
Lehman Brothers Commercial Corporation
LBHI's "Aviation" subsidiaries (includes CES Aviation LLC CES Aviation V, LLC, and CES Aviation IX LLC)
Lehman ALI Inc.
Lehman Brothers Bancorp Inc.
Aurora Bank, FSB
BNC Mortgage LLC
(1) Woodlands Commercial Bank
(2) Lehman Brothers Trust Company, N.A.***
(3) Lehman Brothers Trust Company of Delaware***
Lehman Brothers OTC Derivatives Inc.
LAMCO Holdings L.L.C.
LAMCO L.L.C.
Lehman Brothers Special Financing Inc.*
Lehman Brothers Derivative Products Inc.*
Property Asset Management Inc.
Lehman Brothers Financial Products Inc.*
LB I Group Inc.*
Lehman Commercial Paper Inc.*
Leveraged Loan Trading Holding Partners
Lehman Brothers Commodity Services Inc. *
Fundo de Investimento Multimercado Credito Privado*
Lehman Scottish Finance L.P.
PAMI LLC
Structured Asset Securities Corp.*
East Dover Limited*
Merit LLC*
Leveraged Loan Trading Holdings Inc.
Luxembourg Trading Finance SARL
Luxembourg Residential Properties Loan Finance SARL
LB Rose Ranch LLC
PAMI Statler Arms LLC
LB Somerset LLC
LB Preferred Somerset LLC
LB 2080 Kalakaua Owners LLC
*Indicates entity was transferred from Lehman Brothers Inc. to Lehman ALI Inc. on September 19, 2008.
** Includes certain entities whose assets were sold to a group comprised of portfolio managers, the management team and senior professionals on May 4, 2009.
*** Assets of these entities were sold to Neuberger Berman.

### 4.    Description of the Business of Each Debtor

This section contains brief descriptions of the business of each Debtor.  For further information about the assets and liabilities of each Debtor, refer to the balance sheets of each Debtor (i) as of the applicable Commencement Date for each Debtor, and (ii) as of December 31, 2010, annexed hereto as Exhibits 2 and 3, respectively.

        **a.**    **Lehman Brothers Holdings Inc**.  LBHI was the ultimate parent and holding company for Lehman's businesses.  LBHI directly or indirectly held the equity in each of the Debtors as well as all non-debtor Lehman entities.

        **b.**    **Lehman Commercial Paper Inc**.  Lehman conducted a majority of its commercial loan and mortgage loan origination, lending, trading and servicing activities through LCPI.

        **c.**    **Lehman Brothers Commodity Services Inc.**  Lehman entered into commodity and energy derivatives products through LBCS.

        **d.**    **Lehman Brothers Special Financing Inc., Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.**  Lehman's fixed income derivative products business was principally conducted through LBSF, and its separately capitalized "AAA" rated subsidiaries LBFP and LBDP.

        **e.**    **Lehman Brothers OTC Derivatives Inc.**  Lehman entered into equity derivative products through LOTC.

        **f.**    **Lehman Brothers Commercial Corporation.**  LBCC acted as Lehman's dealer in over-the-counter foreign currency forwards and options and exchange-traded futures and futures options.

        **g.**    **LB 745 LLC.**  LB 745 was the owner of Lehman's corporate headquarters located at 745 Seventh Avenue in New York City.

        **h.**    **PAMI Statler Arms, LLC.**  PAMI Statler was formed to hold title to the Statler Arms Apartments, a 297-suite apartment complex in Cleveland, Ohio.

        **i.**    **CES Aviation LLC, CES Aviation V LLC and CES Aviation IX LLC.**  CES, CES V, and CES IX acquired and operated aircraft for Lehman.

        **j.**    **East Dover Limited.**  East Dover was established for the purpose of purchasing, leasing and selling aircraft and related equipment.

        **k.**    **Lehman Scottish Finance L.P.**  LS Finance was formed for the purpose of holding equity-linked notes issued by other Lehman entities.

        **l.**    **Luxembourg Residential Properties Loan Finance S.a.r.l.**  LUXCO was an investment vehicle formed to hold commercial loans.

      **m.**     **BNC Mortgage LLC.**  BNC originated subprime mortgage loans in the United States.

      **n.**     **LB Rose Ranch LLC.**  LB Rose Ranch owns and operates a housing and golf course development in Colorado.

      **o.**     **Structured Asset Securities Corporation.**  SASCO was used to acquire, and effectuate the securitization of, residential mortgage loans.

      **p.**     **LB 2080 Kalakaua Owners LLC.**  LB 2080 owned and operated commercial real property in Honolulu, Hawaii.

      **q.**     **Merit LLC.**  Merit was a special purpose vehicle created to fund the acquisition of shares of Daewoo Engineering and Construction Co. Ltd.

      **r.**     **LB Somerset LLC and LB Preferred Somerset LLC.**  Somerset and Preferred Somerset each own a membership interest in an entity called Somerset Associates, LLC, which indirectly owns several office buildings in North Carolina.

### 5.     Description of Debtors' Principal Non-Debtor Affiliates

LBHI has thousands of subsidiaries throughout the world.  This section contains a brief summary of the principal non-debtor Affiliates of the Debtors.

      **a.**     **Lehman Brothers Inc.**  LBI was a registered broker/dealer regulated by SIPC.  Lehman's North American capital markets business was operated out of LBI.

      **b.**     **Lehman Brothers Bankhaus AG (in Insolvenz).** Lehman Brothers Bankhaus AG (In Insolvenz) ("Bankhaus") is an entity organized in Germany that held a banking license issued by BaFin, Germany's Federal Supervisory Authority.  Its corporate purpose was to conduct a variety of banking activities.

      **c.**     **Lehman Brothers Treasury Co. B.V.**  LBT is an entity organized in the Netherlands that issued structured notes primarily to investors in Europe.

      **d.**     **Lehman Brothers Finance A.G. (in Liquidation) a.k.a. Lehman Brothers Finance S.A. (in Liquidation).**  LBF is an entity organized in Switzerland that engaged in the execution of bespoke over the counter equity derivatives contracts for institutional clients, including certain Affiliates.

      **e.**     **Lehman Brothers International (Europe) (in Administration).** LBIE was Lehman's European registered broker/dealer, based in the United Kingdom.  LBIE offered a variety of security brokerage services and was regulated by the Financial Services Authority.

**f.    LB I Group Inc.**  LB I Group's primary business/corporate purpose is to invest and manage equity and debt principal investments and to manage private investment funds.

**g.    Property Asset Management Inc.**  Property Asset Management Inc., directly or indirectly, held a majority of Lehman's Real Estate Assets.

## 6.    Directors and Executive Officers of LBHI

### a.    Directors

The members of the board of directors of LBHI as of the date of this Disclosure Statement are:

*Michael L. Ainslie*:  Mr. Ainslie, the non-executive chairman of LBHI's board of directors, became a director of LBHI in 1996 and is a member of Lehman's Audit Committee and Executive Committee.  Mr. Ainslie was also a Director of Lehman Brothers Bank FSB (now known as Aurora Bank FSB), which is indirectly owned by LBHI.  Mr. Ainslie was the former President, Chief Executive Officer and a Director of Sotheby's Holdings.

*John F. Akers*:  Mr. Akers became a director of LBHI in 1996 and served as the Chairman of Lehman's Compensation and Benefits Committee and as a member of the Finance and Risk Committee.  He is currently a member of the Executive Committee. Mr. Akers served as Chairman of the Board of Directors and Chief Executive Officer of IBM from 1985 until his retirement in 1993.  He is also a Director of W. R. Grace & Co.

*Roger S. Berlind*:  Mr. Berlind became a director of LBHI in 1985 and is a member of the Audit Committee and served as a member of the Finance and Risk Committee.  He also previously served as a board member of Lehman Brothers Inc. (until 2003).  Mr. Berlind is also a private investor and has been a theatrical producer and principal of Berlind Productions since 1981.

*Thomas H. Cruikshank*:  Mr. Cruikshank became a director of LBHI in 1996, and is the Chairman of the Audit Committee and served as a member of the Nominating and Corporate Governance Committee. He also served as a director of Lehman Brothers Inc.  Previously, Mr. Cruikshank served in various roles beginning in 1969, including Chairman and Chief Executive Officer from 1989 to 1995, of Halliburton Company, a major petroleum industry service company.

*Marsha Johnson Evans*:  Ms. Evans became a director of LBHI in 2004 and served as the Chairman of the Nominating and Corporate Governance Committee and as a member of the Compensation and Benefits Committee and the Finance and Risk Committee.  Ms. Evans was formerly a Rear Admiral in the United States Navy, President and Chief Executive Officer of the American Red Cross, and National Executive Director of Girl Scouts of the USA.

*Sir Christopher Gent*:  Sir Christopher Gent became a director of LBHI in 2003 and is a member of the Audit Committee, and served as a member of the Compensation and Benefits Committee. He also serves as Non-Executive Chairman of GlaxoSmithKline plc, a Director of Ferrari SpA, and a Senior Advisor to Bain & Company, Inc.  Sir Christopher Gent is a former Chief Executive Officer and director of Vodafone Group Plc.

*Roland A. Hernandez*:    Mr. Hernandez became a director of LBHI in 2005 and served as a member of the Finance and Risk Committee.  Mr. Hernandez is a retired Chairman and Chief Executive Officer of Telemundo Group, Inc., a Spanish-language television station company. Mr. Hernandez is also a Director of MGM Mirage, The Ryland Group, Inc., Vail Resorts, Inc. and Wal-Mart Stores, Inc.

*John D. Macomber*:  Mr. Macomber became a director of LBHI in 1994 and served as a member of the Compensation and Benefits Committee, the Executive Committee (of which he is still a member) and the Nominating and Corporate Governance Committee.  Mr. Macomber is a principal of JDM Investment Group.  Mr. Macomber is also a director of Collexis Holdings, Inc. and Stewart & Stevenson LLC., and was formerly Chairman and President of the Export-Import Bank of the United States, Chairman and Chief Executive Officer of Celanese Corporation, and a Senior Partner at McKinsey & Company.

### b.    Executive Officers

The key executive officers of LBHI as of the date of this Disclosure Statement are:

| Bryan Marsal | Chief Executive Officer |
|---|---|
| John Suckow | President and Chief Operating Officer |
| William Fox | Executive Vice President and Chief Financial Officer |

### 7.    Capital Structure

As of August 31, 2008, Lehman had recorded assets totaling approximately $598 billion and liabilities totaling approximately $569 billion.  The unaudited consolidating balance sheet prepared as part of Lehman's "Global Close" on September 14, 2008 reflected recorded assets totaling approximately $634 billion and liabilities totaling approximately $611 billion.  Lehman financed its operations through a combination of short-term and long-term financing as described below.  A material portion of the financing was based on short-term credit.

### a.    Prepetition Short Term Borrowings

### (i)    Repurchase Agreements and Transactions

Repurchase agreements and transactions are generally accounted for as short-term secured borrowings.  Pursuant to repurchase agreements, Lehman sold securities to counterparties under an agreement by Lehman to repurchase such securities at a future specified date.  Lehman would pay the counterparty a fee for entering into such transactions.  Such transactions generally allowed Lehman to obtain short-term financing secured by government or government agency securities or other securities or assets.  As of August 31, 2008, Lehman had recorded obligations to repurchase approximately $157 billion of securities or other assets pursuant to such repurchase agreements.

### (ii)    Securities Lending

In securities lending transactions, Lehman would lend securities to counterparties in exchange for collateral (Cash or otherwise) sufficient to secure the lending of the securities. Upon the termination of a securities lending arrangement, Lehman would be obligated to return the collateral to the counterparty and the subject securities would be returned to Lehman. Lehman would pay interest and or fees to the party borrowing the securities. These transactions allowed Lehman to obtain additional short-term secured financing. As of August 31, 2008, Lehman had recorded obligations under securities lending contracts of approximately $35 billion.

### (iii)    Commercial Paper

Commercial paper consists of short-term, promissory notes with maturity dates not longer than 270 days. As of August 31, 2008, Lehman had recorded commercial paper debt obligations of approximately $4 billion.

### (iv)    Hybrid Instruments

Lehman had recorded obligations under certain financial instruments with maturities of less than one year and zero-strike price warrants of approximately $3 billion as of August 31, 2008.

### b.    Prepetition Long-Term Borrowings

As of August 31, 2008, Lehman had recorded approximately $136 billion of notes outstanding (including notes issued pursuant to the EMTN Program described below). The long term borrowings include approximately $97 billion of senior notes, approximately $12 billion of subordinated notes, and approximately $5 billion of junior subordinated notes. The weighted-average maturity of long-term borrowings was 7.9 years as of August 31, 2008. As of August 31, 2008, 55% of Lehman's long-term debt was issued by the Lehman Affiliates located outside the United States.

A portion of the capital Lehman raised was through the issuance of notes through the European Medium Term Note Program (the "EMTN Program"). The EMTN Program was a financing program arranged by LBIE under which LBT, Bankhaus, LBHI and other entities (the "EMTN Issuers") issued structured notes (the "Structured Notes") to individuals and financial institutions. Some Structured Notes were relatively simple fixed or floating rate securities; others were highly complex and uniquely tailored to the interests of specific investors. In the case of many of the Structured Notes, the principal amount as well as the amount and payment of interest are linked to the performance of an underlying security, foreign exchange rate, commodity price, index or basket of securities or indices (the "Underlying Asset"). LBIE, with the assistance of LBL, acted as the arranger, dealer, and calculation agent with respect to the EMTN Program. More than 4,000 series of Structured Notes (the "Series") were outstanding as of the Commencement Date. The entities other than LBHI that issued the Structured Notes would typically lend the proceeds received from such issuance to LBHI.

With the exception of approximately 56 Series of notes that were issued by LBHI under the EMTN Program, LBHI's sole involvement in the EMTN Program was the issuance of a purported blanket guarantee of all notes issued pursuant to the EMTN Program. Since the

Debtors did not directly issue a large majority of the notes pursuant to the EMTN Program, the Debtors do not have complete records indicating the aggregate amount of all securities outstanding under the EMTN Program. It is the Debtors' understanding that LBIE as the arranger of the program has many of the records relating to these notes.

### c.    Prepetition Credit Facilities

Lehman used both committed and uncommitted bilateral and syndicated long-term bank facilities to complement its long-term debt issuances. In particular, Lehman maintained a $2 billion unsecured, committed revolving credit agreement with a syndicate of banks. In March 2008, Lehman amended and restated this credit facility to extend the term through February 2011. As of August 31, 2008 and as of the Commencement Date, there were no outstanding borrowings against this credit facility.

In addition, Lehman maintained a $2.5 billion multi-currency unsecured, committed revolving credit facility with a syndicate of banks for Bankhaus and LBT which would have expired in April 2010. Bankhaus and LBT drew on both of these facilities from time to time in the ordinary course of conducting business. As of August 31, 2008 and as of the Commencement Date, there were no outstanding borrowings against this credit facility.

### d.    Other Secured Borrowings

In the ordinary course of business Lehman sold loans (or participations in loans) to off-balance sheet securitization vehicles that would issue securities secured by such loans. Lehman often transferred the loans to such vehicles through participations in the loan syndications, whereby Lehman would remain the lender of record for loans but would be obligated to pass through to the securitization vehicle all proceeds Lehman received as interest, principal or fees as to such loans. These transactions allowed Lehman to monetize all or a portion of its interests in the loans it had originated. As of August 31, 2008, Lehman had recorded obligations under such transactions of approximately $22 billion.

### e.    Bank Platforms

Aurora Bank (formerly known as Lehman Brothers Bank, FSB) ("Aurora Bank") and Woodlands Bank (formerly known as Lehman Brothers Commercial Bank) ("Woodlands") provided Lehman with additional financing flexibility. Aurora Bank and Woodlands were able to raise funds by accepting deposits and then use the deposits to buy assets (or participations in assets) from certain Lehman entities. For further information regarding Aurora Bank and Woodlands.

### f.    Preferred Stock

LBHI had several classes of preferred stock (the "Preferred Stock") outstanding as of the Commencement Date. At November 30, 2007, LBHI was authorized to issue a total of 24,999,000 shares of Preferred Stock and had issued and outstanding 798,000 shares of various series as described below. All Preferred Stock had a dividend preference over LBHI's shares of common stock (the "Common Stock") in the payment of dividends and a preference in the liquidation of assets.

The following table summarizes LBHI's outstanding Preferred Stock at November 30, 2007:[3]

| Series | Depositary Shares | Shares Issued and Outstanding | Dividend Rate | Earliest Redemption Date | Redemption Value |
|---|---|---|---|---|---|
| C | 5,000,000 | 500,000 | 5.94% | May 31, 2008 | 250,000,000 |
| D | 4,000,000 | 40,000 | 5.67% | August 31, 2008 | 200,000,000 |
| F | 13,800,000 | 138,000 | 6.50% | August 31, 2008 | 345,000,000 |
| G | 12,000,000 | 120,000 | one-month LIBOR + 0.75%(1) | February 15, 2009 | 300,000,000 |

(1) Subject to a floor of 3.0% per annum.

The series C, D, F, and G Preferred Stock ranked equally as to dividends and upon liquidation, dissolution, or winding up and had no voting rights except as provided below or as otherwise from time to time required by law.  If dividends payable on any of the series C, D, F or G Preferred Stock or on any other equally-ranked series of Preferred Stock were not paid for six or more quarters, whether or not consecutive, the authorized number of directors of LBHI would have automatically increased by two.  The holders of the series C, D, F or G Preferred Stock had the right, with holders of any other equally-ranked series of Preferred Stock, to elect two directors to fill such newly created directorships until the dividends in arrears were paid.

In March 2008, LBHI issued $4 billion aggregate liquidation preference of 7.25% Non-Cumulative Perpetual Convertible Preferred Stock, series P.  On June 12, 2008, LBHI issued two million shares ($2 billion aggregate liquidation preference) of  8.75% Non-Cumulative Mandatory Convertible Preferred Stock, series Q.

---

[3]    Information regarding LBHI's outstanding preferred stock was included in LBHI's 10-K, which provided information as of November 30, 2007.  LBHI's 10-K for the year ending 2007 lists a number of classes of Preferred Stock and notes as having been registered but does not discuss how many shares were outstanding as of the reporting date, including the (i) 5.857% Mandatory Capital Advantaged Preferred Securities of Subsidiary Trust (and LBHI's guarantee thereof); (ii) Floating Rate Mandatory Capital Advantaged Preferred Securities of Subsidiary Trust (and LBHI's guarantee thereof); (iii) 6.375% Trust Preferred Securities, Series K, of Subsidiary Trust (and LBHI's guarantee thereof); (iv) 6.375% Trust Preferred Securities, Series L, of Subsidiary Trust (and LBHI's guarantee thereof); (v) 6.00% Trust Preferred Securities, Series M, of Subsidiary Trust (and LBHI's guarantee thereof); (vi) 6.24% Trust Preferred Securities, Series N, of Subsidiary Trust (and LBHI's guarantee thereof);(vii) 2.00% Medium Term Notes, Series H, Due March 3, 2009 Performance Linked to the Common Stock of Morgan Stanley (MS); (viii) 0.25% Medium Term Notes, Series I, Due February 16, 2012 Performance Linked to a Basket of Two Stocks; (ix) 0.00% Medium Term Notes, Series I, Due May 15, 2010 Performance Linked to the Common Stock of General Electric Company (GE); (x) Absolute Buffer Notes Due July 29, 2008, Linked to the Dow Jones EURO STOXX 50® Index (SX5E); (xi) Absolute Buffer Notes Due July 7, 2008, Linked to the Dow Jones EURO STOXX 50® Index (SX5E); (xii) Currency Basket Warrants Expiring February 13, 2008; (xiii) Dow Jones Global Titans 50 Index SM SUNS® Stock Upside Note Securities Due February 9, 2010; (xiv) Dow Jones Industrial Average SUNS ® Stock Upside Note Securities Due April 29, 2010; (xv) Index-Plus Notes Due December 23, 2009, Performance Linked to the Russell 2000® INDEX (RTY); (xvi) Index-Plus Notes Due March 3, 2010, Linked to the S&P 500® Index (SPX); (xvii) Index-Plus Notes Due November 15, 2009, Linked to the Dow Jones STOXX 50® Index (SX5P); (xviii) Index-Plus Notes Due September 28, 2009, Performance Linked to S&P 500® Index (SPX); (xix) Japanese Yen Linked Warrants Expiring June 20, 2008; (xx) Nasdaq-100® Index RANGERSSM Rebound Risk AdjustiNG Equity Range Securities Notes Due June 7, 2008; (xxi) Nikkei 225SM Index SUNS® Stock Upside Note Securities Due June 10, 2010; (xxiii) S&P 500® Index Callable SUNS® Stock Upside Note Securities Due November 6, 2009; and (xxiv) S&P 500® Index SUNS® Stock Upside Note Securities Due August 5, 2008.

### g.    Common Stock

As of August 31, 2008, LBHI had 689,030,169 shares of Common Stock outstanding.  As of the Commencement Date, the largest holders of LBHI Common Stock were (i) AXA and related parties owning 40,094,986 shares, or 7.25%; (ii) ClearBridge Advisors, LLC and related parties owning 34,980,989 shares, or 6.33%, and (iii) FMR LLC and related parties owning 32,441,882 shares, or 5.87%.

In 1997, LBHI established an irrevocable grantor trust (the "RSU Trust") to provide Common Stock voting rights to employees who held outstanding restricted stock units ("RSUs").  In 2007, 2006 and 2005, LBHI transferred 24.5 million, 21.0 million and 22.0 million treasury shares, respectively, into the RSU Trust.  At November 30, 2007, approximately 72.5 million shares were held in the RSU Trust with a total value of approximately $2.3 billion.

### h.    Trust Securities

Lehman formed certain trusts or limited partnerships (collectively, the "Trusts"), which acquired Lehman's junior subordinated notes and issued trust preferred securities secured by Lehman's junior subordinated securities.

The following table summarizes the key terms of Trusts with outstanding securities at November 30, 2007:

| November 30, 2007 | Issuance Date | Mandatory Redemption Date | Redeemable by Issuer on or after |
|---|---|---|---|
| Holdings Capital Trust III, Series K | March 2003 | March 15, 2052 | March 15, 2008 |
| Holdings Capital Trust IV, Series L | October 2003 | October 31, 2052 | October 31, 2008 |
| Holdings Capital Trust V, Series M | April 2004 | April 22, 2053 | April 22, 2009 |
| Holdings Capital Trust VI, Series N | January 2005 | January 18, 2054 | January 18, 2010 |
| Holdings Capital Trust VII | May 2007 | June 1, 2043(1) | May 31, 2012 |
| Holdings Capital Trust VIII | May 2007 | June 1, 2043(1) | May 31, 2012 |
| U.K. Capital Funding LP | March 2005 | Perpetual | March 30, 2010 |
| U.K. Capital Funding II LP | September 2005 | Perpetual | September 21, 2009 |
| Holdings E-Capital Trust I | August 2005 | August 19, 2065 | August 19, 2010 |
| U.K. Capital Funding III LP | February 2006 | February 22, 2036 | February 22, 2011 |
| U.K. Capital Funding IV LP | January 2007 | Perpetual | April 25, 2012 |
| U.K. Capital Funding V LP | May 2007 | Perpetual | June 1, 2012 |

(1) Or on such earlier date as Lehman may have elected in connection with a remarketing.

The trust preferred securities issued by Holdings Capital Trust VII and Holdings Capital Trust VIII were issued together with contracts to purchase depositary shares representing Lehman's Non-Cumulative Perpetual Preferred Stock, series H and Series I, respectively, with an aggregate redemption value of $1.5 billion.

### 8.    Liquidity Pool

To protect against any temporary market events limiting its ability to borrow, Lehman maintained a pool of assets that it believed were highly liquid and saleable.  Lehman's liquidity

pool was intended to cover expected cash outflows for one year in a stressed liquidity environment.

In assessing the required size of the liquidity pool, Lehman assumed that (a) assets outside the liquidity pool could not be easily sold to generate cash; (b) unsecured debt would not be accessible; and (c) any cash and unencumbered liquid assets outside of the liquidity pool could not be used to support its liquidity. The liquidity pool was primarily invested in cash instruments, government and agency securities and overnight repurchase agreements collateralized by government and agency securities.

## Exhibit 20

**List of Creditors That Have Executed Plan Support Agreements**

Angelo, Gordon & Co., L.P.

Barclays Bank PLC

Barclays Bank S.A.

BNP Paribas

Canyon Capital Advisors LLC

CarVal Investors UK Limited

Contrarian Capital Management LLC

Credit Suisse International

Credit Suisse Loan Funding LLC

Credit Suisse Securities (Europe) Limited

Cyrus Capital Partners, L.P.

Davidson Kempner Capital Management LLC

DB Energy Trading LLC

Deutsche Bank AG

D. E. Shaw Composite Portfolios, L.L.C.
D. E. Shaw Valence Portfolios, L.L.C.
D. E. Shaw Oculus Portfolios, L.L.C.
D. E. Shaw Laminar Portfolios, L.L.C.
D. E. Shaw Clams SPV, L.L.C.

Elliott Management Corporation (also Elliott Associates, L.P.
Elliott International, L.P. The Liverpool Limited Partnership)

Fir Tree, Inc.

GLG Ore Hill LLC

Goldentree Asset Management, LP

Goldman Sachs Bank USA

Goldman Sachs International

Hong Kong Lehman Entities In Liquidation

Hayman Capital Master Fund, L.P.

King Street Capital Management GP, L.L.C.

Knighthead Capital Management, L.L.C.

Lehman Brothers Bankhaus AG (In Insolvenz)

Morgan Stanley & Co. International PLC

Morgan Stanley Capital Group Inc.

Morgan Stanley Capital Services LLC

Mount Kellett Master Fund II, L.P.

Oak Tree Capital Management, L.P.

Och-Ziff Capital Management Group LLC

Paulson & Co. Inc.

Silver Point Capital, L.P.

Societe Generale

Societe Generale Asset Management Banque

Societe Generale Bank and Trust

State Street Bank and Trust Company

Taconic Capital Advisors L.P.

The Baupost Group, L.L.C.

The Royal Bank of Scotland plc

UBS AG

Varde Partners, L.P.

York Capital Management Global Advisors, LLC