Page 1

1

2     UNITED STATES BANKRUPTCY COURT

3     SOUTHERN DISTRICT OF NEW YORK

4     - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5     In the Matter of:

6

7     LEHMAN BROTHERS HOLDINGS INC., et al.,

8                                           Case No.

9          Debtors.                         08-13555(JMP)

10    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

11    LEHMAN BROTHERS INC.,

12                                          Case No.

13         Debtor.                          08-01420(JMP) (SIPA)

14    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

15

16               U.S. Bankruptcy Court

17               One Bowling Green

18               New York, New York

19

20               August 17, 2011

21               10:04 AM

22

23    B E F O R E:

24    HON. JAMES M. PECK

25    U.S. BANKRUPTCY JUDGE

Page 2

1

2   MOTION of Lehman Brothers Holdings Inc. and Lehman Commercial

3   Paper Inc. for Authority (I) to Create Two Auditable Credit-

4   Worthy Guarantors, (II) to Contribute $50 Million to Each Such

5   Entity if Necessary [Docket No. 18793]

6

7   MOTION of Lehman Brothers Holdings Inc. and Lehman Commercial

8   Paper Inc. Pursuant to Section 363 of the Bankruptcy Code for

9   Authority to Sell Interest in Rosslyn Syndication Partners JV

10  LP [Docket No. 18794]

11

12  NOTICE of Presentment of Stipulation, Agreement and Order

13  Between Lehman Commercial Paper Inc. and Piper Jaffray & Co.

14  Regarding Settlement of Claims and Turnover of Certain Shares

15  [Docket No. 19026]

16

17  MOTION of Debtors for Approval of a Settlement and Compromise

18  Among Lehman Brothers Holdings Inc., Lehman Commercial paper

19  Inc. and State Street bank and trust Company [Docket No. 18542]

20

21  DEBTORS' Motion for Authorization to (i) Enter into an Asset

22  Management Agreement for the Management of the Debtors'

23  Commercial Loan Portfolio and ii) Sell Commercial Loans to

24  Special Purpose Entities in Connection with the Issuance of

25  Collateralized Loan Obligations [Docket No. 18810]

1

2    MOTION for an Order Pursuant to Rule 9019 of the Federal Rules

3    of Bankruptcy Procedures Approving Complimentary Settlement

4    Agreements Between the Trustee and (I) Bank Leumi Le-Israel

5    B.M. and (II) Israel Discount Bank Ltd. [LBI Docket No. 4441]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sara Davis

Page 4

1

2  A P P E A R A N C E S :

3  HUGHES HUBBARD & REED LLP

4        Attorneys for the SIPA Trustee

5        One Battery Park Plaza

6        New York, NY 10004

7

8  BY:   JEFFREY S. MARGOLIN, ESQ.

9

10

11  HUGHES HUBBARD & REED LLP

12        Attorneys for the SIPA Trustee

13        101 Hudson Street

14        Suite 3601

15        Jersey City, NJ 07302

16

17  BY:   ROBERT W. BRUNDIGE, JR., ESQ.

18

19  WEIL GOTSHAL & MANGES LLP

20        Attorneys for LBHI and Affiliates

21        700 Louisiana

22        Suite 1600

23        Houston, TX 77002

24

25  BY:   ALFREDO R. PEREZ, ESQ.

Page 5

1

2   WEIL GOTSHAL & MANGES LLP

3         Attorneys for LBHI and Affiliates

4         767 Fifth Avenue

5         New York, NY 10153

6

7   BY:   JACQUELINE MARCUS, ESQ.

8         CANDACE ARTHUR, ESQ.

9

10  WEIL GOTSHAL & MANGES LLP

11        Attorneys for LBHI

12        1391 Brickell Avenue

13        Suite 1200

14        Miami, FL 33131

15

16  BY:   EDWARD MCCARTHY, ESQ. (TELEPHONICALLY)

17

18  MILBANK TWEED HADLEY & MCCLOY LLP

19        Attorneys for the Official Committee

20         of Unsecured Creditors

21        One Chase Manhattan Plaza

22        New York, NY 10005

23

24  BY:   EVAN R. FLECK, ESQ.

25        DENNIS C. O'DONNELL, ESQ.

Page 6

1

2   BINGHAM MCCUTCHEN LLP

3        Attorneys for WCAS Fraser Sullivan

4         Investment Management, LLC

5        399 Park Avenue

6        New York, NY 10022

7

8   BY:   JEFFREY S. SABIN, ESQ.

9

10   U.S. DEPARTMENT OF JUSTICE

11        Office of the United States Trustee

12        33 Whitehall Street

13        21st Floor

14        New York, NY 10004

15

16   BY:   ANDREA B. SCHWARTZ, ESQ.

17

18   STUTMAN TREISTER & GLATT

19        Attorneys for Interested Party

20        1901 Avenue of the Stars

21        12th Floor

22        Los Angeles, CA 90067

23

24   BY:   JEFFREY DAVIDSON, ESQ. (TELEPHONICALLY)

25

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 7 of 60

Page 7

1                    P R O C E E D I N G S

2              THE COURT:  Be seated, please.  Good morning.  Mr.

3      Perez.

4              MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez

5      on behalf of the debtors.  Your Honor, there are six matters on

6      the agenda for this morning.  I'm handling the first two; Ms.

7      Marcus, the next three; and then Mr. Margolin, the last one.

8              The first matter, Your Honor, is our motion to

9      capitalize two creditworthy guarantors.  In connection with our

10     real estate assets, we are foreclosing on several properties

11     and need, in essence, to provide a guarantee, primarily, you

12     know, carveout guarantee for bad boy acts.  We do not have any

13     solvent entity for which we could provide an audit, which is

14     the requirement of most lenders that you have an auditable

15     entity.  So we're going to establish two new corporations, one

16     under LCPI, one under LBHI, capitalize them to be able to use

17     them as the creditworthy guarantor.

18             Your Honor, under the cash management order, we could

19     have advanced monies to these entities, but then that would

20     have resulted in us having to take back a note and a deed of

21     trust for whatever assets they have.  So it didn't really serve

22     the function of having -- creating net worth in these entities

23     to be able to provide what amounts to bad boy guarantees.

24             Mr. Chastain has filed a declaration going through the

25     business purpose for this.  There are two circumstances

Page 8

1   currently in which that apply and there are approximately

2   another nineteen which it could apply.  Not necessarily will,

3   but there are situations where we are either contemplating a

4   foreclosure or contemplating a consensual transaction where we

5   receive the equity interest which might result in the need to

6   do that.

7          Your Honor, we have not received any objections and

8   the committee has filed a statement in support.

9          THE COURT:  I'm certainly prepared to approve it.

10  It's unopposed and I've read the papers and the supporting

11  declaration.

12         One question I have is the duration of this parking of

13  the funds.  For how long is this to be a set-aside for the

14  benefit of these transactions?

15         MR. PEREZ:  Your Honor, that's the question that

16  everyone has asked, so I'm not surprised that the Court would

17  ask that.  Your Honor, I think that the goal is obviously to

18  dispose of these assets as quickly as possible.  It's part of

19  our -- pursuant to our plan, we are counting on these assets in

20  order to make distributions to creditors.  So while there is no

21  specific sunset, you know, we think that these funds will be --

22  we will need these funds until we're able to dispose of the

23  assets.

24         I mean, the plan currently on file basically

25  contemplates a three-year liquidation process, so I would

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 9 of 60

Page 9

1    imagine that it would be along those lines.  But there is not

2    specific sunset.  But obviously we're mindful that to the

3    extent that these entities are capitalized, the money is there.

4    It's probably earning minimal amount and it's not available for

5    distribution to the creditors.  At -- you know, as we get

6    further into the liquidation, it's going to be a cost benefit

7    analysis to see whether -- well, it probably makes more sense

8    to sell the asset and get the money out than it does to keep

9    the asset.

10        THE COURT:  Can you also describe the process that

11   leads to, in effect, a doubling-down of the funds.  I

12   understand fifty million dollars will be going into each of the

13   entities with the contingency of funding an additional fifty

14   million dollars on an as-needed basis.  It's not clear to me

15   when that's needed.

16        MR. PEREZ:  Your Honor, I think it would be in a

17   situat -- I believe that each one of these guarantees is going

18   to have to be negotiated kind of on an individual basis with

19   the various lenders.  And so we have a universe of twenty-one

20   assets that this could apply to.  If we're able to sell these

21   assets before we even have to take title or we were in a

22   position to dispose of the assets so we don't ever have to take

23   that title, then obviously, there would not be call -- we would

24   not be called upon to ever issue the guarantee.  And I think

25   it's in a situation, Your Honor, where we would have to --

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 10 of 60

Page 10

1    where there are too many assets to support a fifty million

2    dollar guarantee that a lender would require us to infuse

3    additional money.

4         But the goal is to have the least amount of money

5    there possible.  We think fifty million dollars would do it,

6    but it's conceivable that because of, you know, the twenty-one

7    total assets of -- that could be subject to this, that it's

8    conceivable we may need to include more money in the -- in one

9    or the other entity.  And it could be that one entity, the LCPI

10   entity, may have the need for additional funds where the LPHI

11   entity may not or vice versa, depending on where the assets

12   are.

13        THE COURT:  Okay.  Any comments that any party has on

14   this?

15        MR. ODONNELL:  Your Honor --

16        THE COURT:  No need to make a comment, but if you want

17   to make one, that's fine.

18        MR. ODONNELL:  Dennis O'Donnell of Milbank, Tweed.  I

19   think Mr. Perez has addressed all of your questions and the

20   question we had initially.  We were most focused on the

21   structure of the entities, how the money was going in and how

22   it would come out.  I think there are no clear answers as to

23   when it will come out, but we will be involved in the process

24   in terms of approving any of the guarantees and the committee,

25   you know, on behalf of the creditors, wants to see the assets

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 11 of 60

Page 11

1    liquidated as quickly as efficiently possible and distributions

2    made as soon as possible.  So -- but we'll be involved, at

3    least as long as we exist, with those decisions.

4              THE COURT:  Okay.  Fine.  It's approved.

5              MR. PEREZ:  Thank you, Your Honor.

6              Your Honor, the second motion we have is the motion

7    to -- LBHI's motion to authorize it to consent to its -- one of

8    its second or third tier subs affiliate, to enter into a

9    transaction to sell the Rosslyn real estate properties.  The

10   Court is somewhat familiar with that because of the fact that

11   in -- last year, we put in 206 million dollars.  You know, that

12   was a situation where it was somewhat unprecedented that we

13   would come back in here and ask to take out what was really a

14   very high cost get so that we would be able to market.  And

15   thank God we've -- our projections have panned out and we're

16   here to sell this property and it's a very substantial increase

17   from the investment that we made last year and a significant

18   return for our position.

19             Your Honor, we conducted a process -- LBHI and the

20   estate and its partners conducted a process where we hired

21   Eastdil to market the properties.  They came back with several

22   potential purchasers.  There were extensive negotiates and we

23   ended up signing a deal with an affiliate of Goldman Sachs who

24   basically leads a partnership of several investors.  You know,

25   the purchase price to the debtors is at least 385 million

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 12 of 60

Page 12

1    dollars.  There is a working capital adjustment which we hope

2    will increase the amount that we receive in connection with our

3    discussions with the ad-hoc group.  We've agreed that once the

4    price has been finalized and the closing and we -- and all of

5    those accounts have been settled, we'll file a supplementary

6    disclosure as to the actual purchase price that we received for

7    the asset.

8         In addition, Your Honor, there is a limited guarantee

9    that LCPI is issuing capped at fifteen million dollars as a

10   result of several representations.  It would be unlimited if

11   there was fraud on behalf of LCPI, but not on behalf of the

12   other vendors.  The -- most of the focus of the discussions

13   with the committee and with the other creditors have -- has

14   really revolved around the process, whether this was an

15   appropriate process.  I think everybody was comfortable that

16   the result achieved was a good result and I think we're very

17   happy with the result that was achieved.

18        And, Your Honor, we recognize that this is probably

19   not the usual process that you would normally employ in a

20   bankruptcy context.  Nevertheless, there were unique

21   circumstances here that we think have made the process very

22   robust, very transparent and appropriate under the

23   circumstances.  First, Your Honor, this is a building -- this

24   set of assets, it's not a distressed real estate.  I mean, we

25   do have a seventy-eight percent economic interest; we don't

1    manage the building and we did have joint venture partners who

2    had significant say in the matter.  These assets are really

3    terrific assets right outside of Washington, DC, Pentagon City,

4    and that -- in that area.

5            Second, Your Honor, we did hire a nationally

6    recognized real estate firm, Eastdil, who after many discussion

7    with the committee about the process that they ran, I think was

8    able to convince everyone that it was a fulsome process that

9    was intended to achieve the maximum price.

10            And three, Your Honor, based on the purchase price

11    that we achieved, we think that the process is a -- was a

12    fulsome transparent process.  We don't believe, Your Honor,

13    that having made this -- having run the process and then having

14    entered into some sort of a stalking horse agreement would have

15    increased the price at all and could have been --created issues

16    for us because of the rights of the joint venture partners,

17    plus the fact that, but for the bankruptcy, this asset is

18    really not a distressed asset.  This is a -- this is a very

19    good, very well performing asset, Your Honor.

20            We recognize that this is not the paradigm for motions

21    to come, but I can't say that in the appropriate circumstances,

22    we wouldn't come back to you under these types of

23    circumstances.  This is not something that we took lightly and

24    it was the subject of many, many, many conversations and

25    discussions.  Not only with the committee, with individual

Page 14

1      creditors, with Mr. Uzi (ph.), with his clients and everyone.

2            We did file an affidavit last night, Your Honor.  I

3      apologize -- or yesterday afternoon for Mr. Gupta, which

4      basically kind of goes through the same rationale, but we would

5      request that trio be ordered.

6            THE COURT:  I read Mr. Gupta's declaration and I've

7      also read the papers filed by the committee and by the ad-hoc

8      group.  On the issue of process, I noted that the papers filed

9      in response made clear that their going along with this is not

10     to be deemed their consent to the precedent of doing this

11     without a robust public process which includes higher and

12     better offers and the more traditional auctioning of assets

13     that takes place in the bankruptcy setting.

14           I heard your statements as being consistent with the

15     papers that I've read, although making clear that in

16     unspecified proper circumstance, presumably with the consent of

17     other parties in interest, that assets might be sold in the

18     manner that was followed here in the case of the Rosslyn

19     assets.  I'm perfectly prepared to approve the transaction,

20     notably because the creditor constituencies support the outcome

21     if not the outcome that was followed and given that this is a

22     good result and there are no objections, I approve it.

23           MR. PEREZ:  Thank you, Your Honor.

24           MS. MARCUS:  Good morning, Your Honor.  Jacqueline

25     Marcus from Weil, Gotshal & Manges on behalf of Lehman Brothers

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 15 of 60

Page 15

1    Holdings, Inc. and its affiliated debtors.

2            Item number three on the agenda, Your Honor, is the

3    debtors' notice of presentment of the stipulation settling the

4    claim of Piper Jaffray & Company.  The stipulation provides for

5    a resolution and treatment of the claim of Piper Jaffray

6    against Lehman Commercial Paper Inc. by the transfer of certain

7    shares of Delta Airlines stock, as well as LCPI's

8    acknowledgement that Piper Jaffray will have an allowed

9    unsecured claim in the amount of $2,368,021.05.

10           The objection deadline for the stipulation was August

11   15th.  Although no objections to the stipulation were filed,

12   LCPI and Piper Jaffray have agreed to a minor modification in

13   the form of the stipulation that was filed with the Court.

14   Specifically, the changes are to paragraphs 7 and 8 of the

15   stipulation and in essence, broaden the scope of the release

16   granted to the debtors and their controlled affiliates and

17   related parties by the Piper Jaffray parties.  In order to make

18   the releases mutual, the revised stipulation provides that the

19   releases will be granted by the debtor parties to the Piper

20   Jaffray parties.

21           Clean and blackline versions of the stipulation were

22   filed on August 11th, 2011.  The debtors have not received any

23   objections or further inquiries since that date.  In light of

24   the change in the stipulation, we thought it would make sense

25   to put the stipulation on today's agenda so that we might

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 16 of 60

Page 16

1    respond to any questions that the Court might have.  If the

2    Court has no questions, then we'll submit the presentment

3    package at the conclusion of the hearing.

4              THE COURT:  I have no questions.

5              MS. MARCUS:  Thank you, Your Honor.

6              THE COURT:  And let me just inquire as to whether or

7    not this is being treated as a out of the ordinary course

8    notice of presentment because it was put on the agenda or

9    whether or not you're expecting me to say I've read it and I

10   approve it.  Or don't you care?

11             MS. MARCUS:  I'm not sure that I care, but I think I

12   would call it out of the ordinary course.  That's why we had it

13   on the agenda, but we'll submit the package as we ordinarily

14   would.

15             THE COURT:  Fine.  I'm treating it as a notice of

16   presentment.

17             MS. MARCUS:  Thank you, Your Honor.

18             Item number four on the agenda is the debtors' motion

19   pursuant to Section 105(a) and Bankruptcy Rule 9019 for

20   approval of a settlement and compromise among Lehman Brothers

21   Holdings, Inc, Lehman Commercial Paper, Inc., and State Street

22   Bank and Trust Company.  Yesterday, we filed a declaration of

23   Gregory Chastain of Alvarez & Marsal in support of the motion

24   and Mr. Chastain is present in court today.

25             The settlement resolves claims filed against LBHI and

08-13555-mg    Doc 19582    Filed 08/22/11    Entered 08/30/11 15:24:20    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 17 of 60

Page 17

1    LCPI by State Street relating to a 1996 ISDA Master Repurchase

2    Agreement dated as of May 1, 2007.  State Street filed claim

3    against LBHI and LCPI in the amount of not less than 425

4    million.  The settlement provides that State Street will have a

5    general unsecured nonpriority claim against each of LBHI and

6    LCPI in the amount of 400 million.  The settlement agreement

7    further provides that the adversary proceeding commenced by

8    State Street will be withdrawn with prejudice and provides

9    additional consideration to LCPI by permitting LCPI to either

10    purchase a loan described in the motion as the ProLogis loan

11    for sixty-seven and a half million in cash plus unpaid interest

12    or to cause the borrower to discharge the loan in full by

13    paying the sixty-seven and a half million dollars to State

14    Street.  The current outstanding amount of the loan is

15    approximately eighty-three million dollars.

16            The debtors have determined that LCPI will purchase

17    the ProLogis loan and the creditors' committee has approved the

18    debtors' election.  As indicated in the agenda, no objection to

19    the State Street settlement had been filed with the Court,

20    however the debtors and State Street have agreed to a

21    modification of the proposed order.  I have a blacklined (sic)

22    order -- a blackline version of the proposed order for the

23    Court, if I may approach?

24            THE COURT:  Yes, please.  Thank you.

25            MS. MARCUS:  The changes, Your Honor, are on page 3 of

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 18 of 60

Page 18

1    the blacklined order where we are inserting two new paragraphs.

2    They read as follows, and I quote, "ordered that within ten

3    days of the entry of this order, State Street shall withdraw

4    with prejudice the adversary proceeding captioned State Street

5    Bank and Trust Company v. Lehman Commercial Paper, Inc.,

6    adversary proceeding number 08-01743(JMP).  And it further

7    ordered that a settlement agreement does not release or

8    compromise (A) any claim that the debtors may have to avoid any

9    of the eight discrete transfers made by LCPI to State Street as

10   set forth in the chart attached to this order as Exhibit 1, (B)

11   any claim or defense that State Street may have or assert in

12   response to the assertion of any such avoidance claims, and (C)

13   any reinstatement claim in favor of State Street that would

14   arise from such an avoidance claim.  And it is further" -- the

15   first quoted paragraph reflects the agreement of the parties

16   that the adversary proceeding will be withdrawn in its

17   entirety, notwithstanding the exception originally set forth in

18   the settlement agreement regarding one particular line.

19        The second quoted paragraph reflects that State Street

20   has confirmed that the release provision in the settlement

21   agreement does not affect the avoidance claims that the debtors

22   have alleged with respect to certain transfers made by --- to

23   State Street during the preference period which are the subject

24   of a tolling agreement between the parties.  Both

25   clarifications inure to the debtors' benefit.

Page 19

1      For the reasons set forth in the motion and the

2  Chastain declaration in support, the debtors believe that the

3  settlement is fair and equitable and request that the Court

4  approve the State Street settlement agreement and enter the

5  revised proposed order.

6      THE COURT:  I'm prepared to do that.  This is an

7  unopposed motion under Rule 9019 brought in the main case, but

8  it also produces the favorable outcome of disposing of one of

9  the older adversary proceedings on my docket.  So I'm very

10  pleased to approve the settlement.

11      MS. MARCUS:  Thank you, Your Honor.

12      Item number five on the agenda is the debtors' motion

13  pursuant to Sections 105 and 363 of the Bankruptcy Code and

14  Federal Rule of Bankruptcy Procedures 6004 for authorization to

15  enter into asset management agreement for the management of the

16  debtors' commercial loan portfolio and sell commercial loans to

17  special purpose entities in connection with the issuance of

18  collateralized loan obligations.  The debtors have filed two

19  declarations in support of the motion; the declaration of

20  Douglas Lambert, a managing director of Alvarez & Marsal, and a

21  declaration of David Dakota, a managing director of Lazard, the

22  debtors' investment bank.  Both Mr. Lambert and Mr. Dakota are

23  present in court today.

24      As indicated on the agenda, statements in support of

25  the motion have been filed by the creditors' committee as well

08-13555-mg    Doc 19582    Filed 08/22/11    Entered 08/30/11 15:24:20    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 20 of 60

Page 20

1    as the ad-hoc group.  No objections to the motion have been

2    filed.  Even though this is an uncontested motion, given the

3    size of the transaction and its importance, I'd like to

4    summarize for the Court the transaction as well as the process

5    used by the debtors to choose WCAS Fraser Sullivan Management

6    LLC as the asset manager.

7            As confirmation of the debtors' plan approaches, the

8    debtors have embarked on an effort to monetize their assets so

9    they will be in a position to make meaningful distribution to

10   creditors once the effective date of the plan occurs.  As the

11   Court is aware from prior motions, at the time of the

12   commencement of the Chapter 11 cases, the debtors had a very

13   larger commercial loan portfolio.  Despite the economic turmoil

14   that engulfed the national economy after the commencement date,

15   the debtors' management elected not to sell off the loans in

16   the commercial loan portfolio but rather to manage them in the

17   ordinary course of business.  In the nearly three years since

18   the commencement date, the value of the commercial loan

19   portfolio has increased considerably, while the actual size of

20   the portfolio has decreased, due to payments by borrowers,

21   refinancings and terminations of unfunded commitments that have

22   occurred since then.

23           For approximately six months, the debtors have

24   analyzed various ways in which value embedded in the commercial

25   loan portfolio could be unlocked to enhance plan distributions.

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 21 of 60

Page 21

1   As described in the motion and in the declaration of Mr.

2   Lambert, the debtors determined that effectuation of one or

3   more CLOs was the best way to monetize that value.  Pursuant to

4   the motion, the debtors request authority to enter into an

5   asset management agreement with Fraser Sullivan.

6          Under the asset management agreement, Fraser Sullivan

7   would, in the first instance, manage the commercial loan

8   portfolio which as of July 15th, 2011, was comprised of 3.8

9   billion dollars of funded loans and 1.5 billion of unfunded

10  commitments.  The commercial loan portfolio is comprised of

11  loans owned by debtors -- Lehman Brothers Holdings, Inc.,

12  Lehman Commercial paper, Inc., Lehman Brothers Special

13  Financing, Inc., nondebtor LB I Group, Inc., and securitization

14  trust RACERS 2007-A Spruce and Verano.  Initially, the

15  portfolio will not include commercial loans held by Woodlands

16  Bank in the amount of approximately 450 million or real estate

17  or private equity loans held by the debtors.  But the asset

18  management agreement does provide the debtors with the

19  flexibility to deliver additional assets to Fraser Sullivan for

20  management.

21          A schedule setting forth the managed assets is

22  attached as Schedule A to the asset management agreement and

23  was filed under seal pursuant to an order of this Court dated

24  July 27th.

25          The expectation is that shortly after the effective

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 22 of 60

Page 22

1    date of the agreement, Fraser Sullivan will work with the

2    debtors to try to launch a series of CLOs.  That will involve

3    an analysis of market conditions as well as negotiations with

4    arrangers and underwriters.  The asset management agreement

5    sets forth in Schedule C the expected terms of any CLO,

6    although the final terms won't be established until those

7    negotiations take place.  However, the asset management

8    agreement provides that the debtors retain the sole discretion

9    without determine whether any CLO shall be launched.

10           In addition, during the period prior to the effective

11   date of the plan, the debtors have agreed that the protocols

12   that govern the debtors' interaction with the creditors'

13   committee will continue to apply.  Consequently, the

14   committee's professionals will be involved in decision making

15   regarding the timing, size and composition of any particular

16   CLO.  In consideration of the asset management services to be

17   rendered, Fraser Sullivan will be entitled to a management fee

18   in the amount of thirty basis points on the funded amount of

19   the loans in the commercial loan portfolio as long as they are

20   not CLO assets.  Once loans are transferred to a CLO, then

21   Fraser Sullivan's asset management fee will be paid by the CLO

22   issuer.  Schedule C contemplates that the management fee will

23   be reduced at that time to twenty-five basis points.

24           In addition, under the asset management agreement,

25   Fraser Sullivan is entitled to be reimbursed for certain

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 23 of 60

Page 23

1    identified expenses.  The asset management agreement also

2    provides that Fraser Sullivan may be paid a success fee of up

3    to five million dollars if the debtors, in their sole and

4    absolutely discretion, determine that Fraser Sullivan has

5    successfully managed both the CLO assets and the non-CLO

6    assets.

7             An important component of the Fraser Sullivan asset

8    management agreement is that Fraser Sullivan has agreed to

9    employ tem members of the team that currently is managing the

10   commercial loan portfolio on behalf of LAMCO.  As set forth in

11   Mr. Lambert's declaration, the debtors believe that continuity

12   of the team managing the commercial loan portfolio will

13   preserve the value of the portfolio.  The three senior members

14   of the asset management team have already entered into

15   employment agreements with Fraser Sullivan that are contingent

16   upon the effective date occurring.

17            Fraser Sullivan has further agreed not to terminate

18   more than one of the senior managers for two years after the

19   effective date.  With respect within the other seven employees,

20   Fraser Sullivan has agreed to employ them through at least

21   December 31, 2011.  The debtors will pay the employees who are

22   moving to Fraser Sullivan all compensation and benefits for the

23   period prior to the effective date including a prorated portion

24   of their 2011 bonus.

25            IN order to ensure that the transistor of the

Page 24

1   employees is as seamless as possible, the debtors have also

2   agreed that the employees shall retain the severance benefit

3   that they have under their current letter agreements if they

4   are terminated by Fraser Sullivan prior to the first

5   anniversary of the effective date of the asset management

6   agreement.  With respect to the three senior managers, the

7   debtors' obligation to pay sever -- is to pay severance if they

8   are terminated within twenty-four months of the effective date.

9   For most employees, the severance benefit is equal to six

10  months at their last monthly base pay rate.  There's no

11  incremental cost to the debtors as a result of the severance

12  arrangement, because if such employees were terminated now,

13  LAMCO would owe them the six month benefit.  By transitioning

14  them to Fraser Sullivan, the debtors may actually reduce their

15  cost because they may turn out to be long term Fraser Sullivan

16  employees in which case the debtors will not have to pay the

17  severance at all.

18          The asset management agreement also provides for LAMCO

19  and Fraser Sullivan to enter into a transition services

20  agreement, the form of which is attached as Schedule 1 to the

21  asset management agreement.  LAMCO will provide certain

22  services to Fraser Sullivan regarding to record keeping, office

23  space, information technology and the like on a cost plus ten

24  percent basis.

25          With respect to termination, the debtors have the

Page 25

1    right to terminate the asset management agreement with respect

2    to non-CLO assets at any time for good reason and if other than

3    for good reason, by six months' prior written notice to Fraser

4    Sullivan.  While there are somewhat complicated provisions

5    regarding the rights of parties in the event of termination,

6    for today's purposes I'll simplify and say that if termination

7    is not for a good reason then the debtors are obligated to pay

8    a fee in the amount of the lesser of seven million dollars and

9    the remainder amount.  The remainder amount is basically the

10   amount remaining to be paid over the term of the agreement if

11   the termination occurs prior to the first anniversary; the

12   dollar threshold decreases to five million dollars if

13   termination occurs prior to the second anniversary and three

14   million dollars if termination occurs prior to the third

15   anniversary.

16          After the third anniversary of the effective date

17   there is no termination fee due at all.  In addition, if the

18   effective date does not occur by December 31, 2011, either

19   party can terminate the agreement without penalty.  The

20   expectation is that the CLO issuer will enter into a new asset

21   management agreement with Fraser Sullivan as to assets that are

22   sold to the CLOs and that agreement may or may not have

23   comparable termination provisions.

24          One of the criteria that the debtors felt was key in

25   looking for an asset manager was the willingness of the manager

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 26

1   to provide the debtors with some oversight over the management

2   of the portfolio because the debtors are fiduciary for

3   creditors and they didn't want to abdicate all control to the

4   asset manager.

5          Schedule D to the asset management agreement sets

6   forth a list of governance protocols for the non-CLO or managed

7   assets.  The issue is somewhat different for the CLO assets and

8   the authority granted to the asset manager is and must be

9   greater.  However, Annex 1 to Schedule C provides for a limited

10  involvement of the estate with respect to certain decisions,

11  even with respect to the CLO assets.

12         Another issue that was very important to the debtors,

13  again because of their role as fiduciaries, was that Frasier

14  Sullivan provide the debtors with extensive and, to a certain

15  extent, customized reporting with respect to the managed

16  assets.  Frasier Sullivan has also agreed to meet with the

17  debtors, at least quarterly, and to be available on a

18  reasonable basis for additional meetings at the debtors'

19  request.

20         The debtors felt that commencing a public auction

21  process for this transaction could have adverse consequences,

22  both because of the demoralizing effect it might have on the

23  LAMCO employees who are managing the commercial loan portfolio,

24  and because of the negative consequences that might result if

25  it were known in the debt market that the portfolio was in

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 27 of 60

Page 27

1    play.

2            As a result, the debtors opted to pursue a private

3    sale and to work with Lazard to ensure that they tested the

4    market to be sure that the transaction provided the most

5    favorable terms available.  The debtors embarked on a process

6    that lasted several months and that is described in great

7    detail in the motion beginning at page 16, as well as in the

8    Dakota declaration.

9            Since filing the motion another potential asset

10   manager did contact the debtors and the debtors engaged in a

11   similar process on an accelerated timetable to that which had

12   been engaged in with respect to the other potential asset

13   managers.  At the conclusion of the process the debtors

14   determined that the transaction proposed by Fraser Sullivan

15   provided the highest and best terms available to the debtors.

16           Although we submitted a form of proposed order with

17   the motion, the debtors and Fraser Sullivan have agreed to a

18   modified form of the order, I have a blackline version for the

19   Court that I'd like to hand up.

20           THE COURT:  Please do.  Thank you.

21           MS. MARCUS:  The only change is on page 2 of the

22   blackline, in the fifth decretal paragraph.  The change is

23   intended to make it clear that the debtors are not the only

24   entities that are transferring loans to the CLO issuers.

25           For the reasons set forth in the motion and the

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 28 of 60

Page 28

1   declarations filed in support thereof, Your Honor, the debtors

2   believe that the transactions provided in the asset management

3   agreement, including the creation of the CLOs contemplated

4   therein, is in the best interest of the debtors and their

5   creditors and requests that the Court approve the asset

6   management agreement.  I'd be happy to answer any questions

7   that you may have.

8           THE COURT:  I do have a few questions about this and I

9   appreciate your presentation this morning, which recognizes

10  that even though this is unopposed this involves substantial

11  assets of the debtors' estate and requires careful scrutiny as

12  a result.

13          One of the things that concerned me when I read the

14  papers is that this is apparently not the least expensive

15  alternative available to the debtors, although the degree to

16  which it is more expensive than other choices is not clear from

17  the papers.  I'd like to know what we're talking about in terms

18  of real dollars in terms of management costs.

19          I'm also somewhat concerned about the role that

20  continuity of management played in the decision to choose

21  Fraser Sullivan.  Embedded in the motion papers and supporting

22  documents is the notion that protecting the interests of the

23  LAMCO employees represented an aspect of the negotiations, I'd

24  like some assurance that this did not represent an issue that

25  impacted the debtors' position adversely and that those who

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 29 of 60

Page 29

1    negotiated the transaction did so at arms length and without

2    regard to any benefits to insiders.  I'm particularly

3    interested in knowing who performed the negotiations and

4    whether any of the parties who were engaged in the negotiations

5    were also benefitted by the transition of insider employees

6    from LAMCO to Fraser Sullivan under this arrangement.

7             I also have a lingering question in my mind about what

8    this means to LAMCO.  Some time ago I approved a motion that

9    led to the creation of LAMCO as a captive asset manager within

10   the Lehman organization and representations were made at that

11   time that LAMCO would provide asset management services within

12   the Lehman family but might also be a source of potential

13   growth and income for Lehman and its creditors by acquiring

14   assets from third parties.  What does it mean to LAMCO that

15   certain employees, who presumably have a lot of knowledge and

16   sophistication with respect to loan administration, are

17   transitioning to Fraser Sullivan?  Is that adverse, in any

18   respect, to the ongoing operations of LAMCO.

19            And related to that question is the question why these

20   loans aren't being managed by LAMCO and instead being managed

21   by a third party.  I understand that LAMCO may not have the

22   internal resources and expertise to structure CLO transactions

23   but this is a turnkey operation in which all the loans, it

24   appeared to me, are being transferred to Fraser Sullivan, those

25   suitable for CLO treatment and those that are to retain their

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 30 of 60

Page 30

1    hold on status.

2         So those are questions that occurred to me as I was

3    reviewing the papers and I would be interested in answers to

4    the extent you can remember what I said.

5         MS. MARCUS:  I wrote it down.  I can -- let's start

6    with the easy one, the one that perhaps was of concern but that

7    I can answer easily, the issue of the continuity of management

8    and the involvement of the employees that are moving over.

9         With respect to the involvement of the employees who

10   are moving over, what we did was initially they were involved

11   in finding the first -- the motion refers to two firms with

12   which the initial discussions took place and I think it's fair

13   to say that they were the ones who found Fraser Sullivan, as

14   well as the other firm.  And they were involved in preliminary,

15   very preliminary, discussions with them at that point.  It was

16   apparent to everybody that the -- I'll call it "conflict of

17   interest" would be an issue and therefore Alvarez & Marsal,

18   who's very involved in the process, not at the early stages but

19   once things started to move forward and Tom Baldasare, of

20   Alvarez & Marsal who's not in court today, was basically

21   designated as the person who would be the primary negotiator,

22   the primary contact for us on this issue.

23        So what we did was with respect to the negotiations

24   with Fraser Sullivan; the term sheets, the agreements, the

25   senior managers and the people at LAMCO who will be moving over

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 31 of 60

Page 31

1   were not involved in those at all.  They were kept apprised of,

2   generally, where we were in the process but they did not

3   participate in reviewing drafts or in negotiating with Fraser

4   Sullivan, all that was done through Alvarez & Marsal.

5          When we moved over to the Lazard process where Lazard

6   was identifying potential other asset managers who could be

7   approached and engaging in negotiations or in the process,

8   there was some involvement of those senior managers because

9   they're the ones who are the most familiar with the commercial

10  loan portfolio.  So, for example, when we had our six -- I'll

11  call them our six finalists, they had an initial meeting with

12  both representatives of Alvarez & Marsal as well as those three

13  senior managers because they needed to know about the -- the

14  information about the portfolio and they were also looking to

15  see whether they would be prepared to hire them.

16         However, when the competing proposals were submitted

17  to Lazard, the senior managers never saw those competing

18  proposals, they were never apprised of the terms of those

19  competing proposals and they did not participate in the

20  termination that the Fraser Sullivan proposal was the highest

21  and best offer, in fact that was -- that process was

22  spearheaded by Lazard and A&M with our involvement as well.

23  But those senior managers did not participate in that decision

24  making at all.

25         THE COURT:  Who made the selection?

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
Pg 32 of 60
LEHMAN BROTHERS HOLDINGS INC., et al.

Page 32

```
 1              MS. MARCUS:  The ultimate selection?

 2              THE COURT:  Yes.  Whose business judgment are we

 3      talking about here?

 4              MS. MARCUS:  We are talking about Mr. Lambert's

 5      business judgment and if you'd like we can put him on the

 6      stand, together with his partners Mr. Baldasare and Jeffrey

 7      Salb, also of Alvarez & Marsal.

 8              THE COURT:  Okay.

 9              MS. MARCUS:  In addition, Your Honor, I failed to

10      mention that the creditors' committee's professionals were also

11      involved in that process, so initially when we had our list of

12      people that we were going out to, we ran that by Houlihan and

13      then at the end of the process, when we had our six proposals

14      to compare to Fraser Sullivan, Houlihan and Milbank, to a

15      lesser extent, were involved in that.  And then finally when

16      this other firm showed up, last week I guess, Houlihan and

17      Milbank were involved in that process as well.

18              THE COURT:  Okay.  I don't think I need to hear from

19      Mr. Lambert.  I read his declaration and I can see him in the

20      front row so if I have any questions that occur to me later I

21      may actually call on him.  But right now I don't have a need to

22      hear, generally in reference to some of my concerns.

23              I think what I'm most interested in knowing, and I

24      don't mean to supersede any of the questions that were

25      previously asked but not yet answered, is why is this a good
```

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 33 of 60

Page 33

1   deal now?

2          MS. MARCUS:  And now is a relative term because of the

3   market events over the last couple of weeks.  But, the reason

4   that this is a good deal now is because recently the CLO market

5   has been opening up again and deals, after a period of relative

6   drought, deals have been starting to get done again.  It's a

7   good deal now because we're at the stage where confirmation of

8   a plan is actually in the not-too-distant future, we hope.  And

9   we are trying to generate cash in order to make the

10  distributions to creditors greater then they might otherwise

11  would be if we waited for the portfolio to mature over time,

12  although we expect most of the loans will be paid in full, it's

13  a three to five year horizon for those payments to be made.

14         The other reason is that, and the motion -- the

15  question that you asked about cost is really a hard question

16  that we spent a lot of time agonizing over.  It's hard to take

17  a position as to -- originally, I think, we thought that the

18  cost would be lower by going this route.  But it turns out

19  because of certain expenses of the estates that get allocated

20  over whatever assets are there, it's not such an easy question

21  and our final conclusion is that initially, in the early years,

22  the cost may be a bit higher by going this route, as opposed to

23  continuing to leave the portfolio in house.

24         However, the advantage of doing the transaction now is

25  that Fraser Sullivan will be paid a fee based on assets of

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 34 of 60

Page 34

1    their management and the portfolio will be declining over time.

2    So in the motion, what we assumed for the first -- the first

3    full year, the 2012 year, excuse me, is that Fraser Sullivan's

4    fee will be nine million dollars.  The next year after that we

5    expect it to go down to eight million and presumably in the

6    following year it would be decreased further.

7          The advantage, from the estate's point of view, is

8    that by paying Fraser Sullivan a fee based on assets under

9    management we don't have to retain the whole infrastructure

10   that the debtors currently have running this portfolio, so that

11   our fixed costs become variable costs and hopefully in the long

12   run the costs will decrease.

13         But in addition to the actual costs a very important

14   factor, and I think it's alluded to in Mr. Lambert's

15   declaration, is the concern that as the portfolio decreases in

16   size, if we had kept it in-house the people managing the

17   portfolio would be leaving over time and one by one they'd be

18   leaving for other opportunities, partly because when the

19   portfolio shrinks we wouldn't be able to compensate them in a

20   manner that would be commensurate with what they could get at

21   other firms, perhaps.  And the concern was after, let's say,

22   three years when the portfolio is still a billion dollars, a

23   huge amount of money, that we would be in a position where we

24   couldn't effectively manage the portfolio and we would

25   either -- we would probably have to sell it at that point,

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 35 of 60

Page 35

1    perhaps at some large discount.

2           And so it's this idea of maximizing the value of the

3    tail (sic), that's the real justification for doing the

4    transaction now.

5           THE COURT:  And what does this transaction mean to the

6    future of LAMCO, if anything?

7           MS. MARCUS:  Can I have one second, Your Honor, to

8    consult with Mr. Perez?

9           THE COURT:  Sure.

10       (Pause)

11          MS. MARCUS:  Your Honor, I think it's fair to say that

12   it -- we don't think it impacts the future of LAMCO.  Obviously

13   their commercial loan portfolio management people won't be

14   there anymore, so that wouldn't be part of its business going

15   forward.  But when the new board takes over it will determine

16   what the future of LAMCO is.  I'm not sure I can say more about

17   that.

18          Mr. Lambert says he's testified from the podium before

19   so --

20          THE COURT:  Mr. Lambert, if you are able to answer the

21   question about what's going on with LAMCO and how this impacts

22   LAMCO, I'd be interested and if you'd come to the podium

23   instead of the witness stand you're just as much in trouble if

24   you tell me the wrong thing.

25          MR. LAMBERT:  Good morning, Your Honor.  Doug Lambert

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 36 of 60

Page 36

1    with Alvarez & Marsal on behalf of the estate.

2         As you know, the Court approved, in May 2010, the

3    formation of LAMCO and, I think, both the estate and the

4    creditors had reasonable expectation at the time of the

5    formation of LAMCO that there would be opportunities for third

6    party mandates in the marketplace to manage the liquidation of

7    otherwise illiquid, long-lived (ph.) assets.

8         We certainly found opportunities.  We did go to market

9    offering the services of LAMCO and, I think, that we

10   demonstrated a bona fides.  I think the concern of the parties

11   that we spoke to related to the fact that they would be

12   entering into long-term arrangements with a debtor estate, even

13   though LAMCO was not a debtor itself.  And there were concerned

14   that, you know, either at confirmation of a plan or at some

15   other point decisions could be taken to discontinue the

16   operation of LAMCO.

17        With that in mind, with the help of Lazard, we had

18   actually run a fairly robust process last year to try to find a

19   joint venture partner that could provide long-term stability to

20   the LAMCO platform and particularly provide some comfort to

21   third parties.

22        By the beginning of this year we actually felt that we

23   had identified a party that was a viable -- a viable joint-

24   venture partner and by that point I think the creditors felt we

25   were very close to, hopefully this year, having a confirmable

Page 37

1    plan.  They were concerned that bringing on another or a

2    multiple-asset portfolios at a time that we were trying to move

3    towards a confirmation of the plan could be a distraction

4    towards the debtor and non-debtors' assets.  So we basically,

5    probably, at the end of the first quarter, the beginning of the

6    second quarter, had put on hold at least until, perhaps, post-

7    confirmation.

8           To specifically answer your question, we had commenced

9    this process in the fourth quarter of last year when we were in

10   active negotiations with the third party to begin the joint

11   venture process.  Certainly as it relates to the technology

12   infrastructure platform that the estate built, with respect to

13   the loans, that still remains and could be reactivated, albeit

14   with new people.  But again, because of the uncertainty of

15   whether or not ultimately, you know, the estate would move

16   forward with any third-party mandates, we felt that either way

17   that this transaction and moving forward with this asset

18   management agreement, which positions the assets to be much

19   more quickly taken to market then if we otherwise tried to do

20   that, you know, maintaining the asset team in place.

21          So I think I've rambled a lot and I'm not sure I've

22   specifically answered your question.

23          THE COURT:  I think you mostly have but you've also

24   prompted a couple of other questions.

25          MR. LAMBERT:  Sure.

1          THE COURT:  One is, what happens to that

2     infrastructure that you described, that technology, that, I

3     presume, software associated with the management of the

4     commercial loan portfolio, is that being licensed to Fraser

5     Sullivan?  Is it to be used by Fraser Sullivan?  What happens

6     to it?

7          MR. LAMBERT:  No, it is not, Your Honor.  Fraser

8     Sullivan has their own technology platform that the assets will

9     migrate to.  And I think that was part of, and why we

10    ultimately described the motion in part as not being fully cost

11    savings because we debated heavily what portion of the -- of

12    the existing infrastructure should be allocated to this and

13    we -- we took the position of allocating, you know, material

14    costs they think, for purposes of this analysis because we

15    didn't want to appear before the court describing this as a

16    significant cost savings to the estate because arguably there

17    are certain embedded fixed costs that will still remain.

18          Now, arguably, we believe that those costs will come

19    down dramatically once we migrate off of the platform.  But

20    without the absolute certainty of that, you know, and it being

21    subject to future events, including negotiations with the third

22    party that provides the technology platform that we utilize, we

23    erred on the side of conservatism and assumed that costs would

24    remain the same.  I don't believe that that's going to be the

25    case but we didn't want to mislead the Court or the creditors

08-13555-mg  Doc 19582  Filed 08/22/11  Entered 08/30/11 15:24:20  Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 39 of 60

Page 39

1   as to what the potential costs of the transaction might

2   ultimately be.

3          THE COURT:  Am I correct in concluding from those

4   remarks and from some of the other statements made by Ms.

5   Marcus, that it is very difficult to actually quantify what the

6   incremental expense to the estate will be in having Fraser

7   Sullivan manage these assets?

8          MR. LAMBERT:  I think from -- as it relates to the

9   legacy costs, clearly the initial analysis of this was a

10  significantly more favorable cost analysis to the estate.  But

11  again, in the interest of fairness, as it relates to existing

12  fixed costs, that we believe, you know, will go away but

13  without the certainty today, we added those back.  And they

14  were, you know, significant numbers which, again, I don't think

15  will ultimately materialize.  And under that scenario it, sort

16  of, comes more to a break even push analysis to, you know,

17  slightly more.  But again, I don't believe that that's a

18  realistic outcome but it is certainly, by far, the most

19  conservative we could construct.

20         THE COURT:  Okay.  I have two more questions.

21         MR. LAMBERT:  Sure.

22         THE COURT:  First, I presume, as a result of this

23  transaction, that substantially all of the LAMCO personnel, if

24  not all, who are currently involved in the management of the

25  commercial loan portfolio, will no longer be employed by LAMCO

1    and will be employed by Fraser Sullivan.

2              MR. LAMBERT:  That's correct.

3              THE COURT:  Does that effectively mean that for

4    ongoing purposes LAMCO has exited the commercial loan asset

5    management segment of the market and will not be doing that

6    work unless a business decision is made in the future to, in

7    effect, rehire these people or hire new people.

8              MR. LAMBERT:  I would probably categorize it as

9    letting that capability, that function, go dormant.  But again,

10   as I said, the technology, you know, platform still exists.

11   And again, you know, if the Court will recall the loan team,

12   together with all of the other asset management teams that now

13   make up the LAMCO organization, were recreated, you know, post-

14   filing.  So between Jeff Salb, one of my partners, who spent

15   his entire career at Chase and JPMorgan, this was one of the

16   specific teams that he and I had, you know, built.  We had

17   hand-selected this team and, I think, with the knowledge of,

18   you know, almost now three years experience, I think that, you

19   know, we feel that if the estate so chose to move forward with

20   third-party mandates with the technology and experience, we

21   could rebuild the platform fairly quickly, as we did, you know,

22   in the early days immediately following the estate's

23   bankruptcy.

24             THE COURT:  Okay.  Final question.

25             MR. LAMBERT:  Yes, sir.

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 41 of 60

Page 41

1          THE COURT:  I've read your declaration and I've heard

2     your remarks and I've heard you testify in other settings in

3     this case.  In your opinion why is this a good transaction for

4     the estate now?

5          MR. LAMBERT:  Sure.  Again, it gives us the most

6     optionality and flexibility.  And by that we did see this year

7     the CLO market, you know, begin to pick up.  You know,

8     truthfully Your Honor, you know, the question, you know, has

9     been does the estate need more cash on its balance sheet, you

10    know, pre-consummation of the plan?

11         This gives us the ability to be -- assuming that, you

12    know, the disclosure hearing goes well later this month and we

13    can move forward with the confirmation, the ability to move

14    quickly into the market to begin to execute CLO structures and

15    generate additional liquidity that we could, potentially, time

16    to an initial distribution under, you know, the plan, we think

17    it makes a lot of sense.

18         The other point I'd like to make is that, you know,

19    directionally thirty percent of the portfolio today is managed

20    out of our operation in the U.K.  And it was becoming

21    increasingly obvious to my partners and I that that team that

22    we had in place was most at risk to flight.  In the event that

23    we did lose one or more people, particularly once the decision

24    was taken not to proceed with taking on third-party mandates

25    which, quite honestly, Your Honor, most of the mandates that we

1    had bid upon were in Europe and there was a reasonable

2    expectation that that team would, you know, expand.  Our

3    concern was that that team was a retention risk and if they did

4    leave managing probably directly thirty percent of the

5    portfolio today, we felt it truly did put, you know, the debtor

6    and non-debtor entities that held those positions at risk.

7            So again, for those reasons we thought the

8    optionality, the continuity of management.  The other thing

9    that I would mention is, over the three years we've had a very

10   successful process developed of protocols, working with the

11   advisors to the committee and the committee itself and it's

12   been incredibly efficient and we wanted to ensure that we could

13   preserve those protocols and process and, again, facilitate on

14   a post-confirmation a very smooth transition and handoff.

15           Plus, we did take comments from the ad hocs late last

16   year, you know, asking us to consider financing structures

17   which, in fact, we were already working on at the time that

18   they had raised those concerns or suggestions.

19           THE COURT:  Okay.  Thank you.

20           MR. LAMBERT:  Thank you.

21           MS. MARCUS:  Your Honor, I just had to clarify one

22   answer that Mr. Lambert gave you to one of your questions.  You

23   had asked whether substantially all of the LAMCO employees

24   managing the commercial loan portfolio are moving over, they're

25   actually not.  Ten are moving over and I believe there are

08-13555-mg    Doc 19582    Filed 08/22/11    Entered 08/30/11 15:24:20    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 43 of 60

Page 43

1    twenty-three others and most of those, I believe, will be

2    terminated.  A few will be kept on to assist the estate with

3    the oversight function.

4            THE COURT:  Okay.  So, effectively, personnel

5    committed to this function are all leaving LAMCO one way or the

6    other.

7            MS. MARCUS:  Correct.

8            MR. LAMBERT:  That's how I answered the question, Your

9    Honor.

10            THE COURT:  Okay.  Understood.

11            MS. MARCUS:  Your Honor, as to your other questions I

12    think we've touched on all of them already.

13            THE COURT:  Either we have or I've forgotten the

14    questions.  So there's no need to conjure them up.  I think I'm

15    satisfied, based upon your answers and Mr. Lambert's informal

16    testimony.  But I'm going to give anybody who wishes to comment

17    on this important motion a chance to be heard now.

18            MR. FLECK:  Good morning, Your Honor.  Evan Fleck of

19    Milbank Tweed on behalf of the official committee.

20            As Your Honor noted, the official committee of

21    unsecured creditors supports the relief requested in the

22    motion.  I think Your Honor noted the filing of our statement

23    in support on the docket; I'm not going to belabor the points

24    that are raised in there.  But I did, because of the importance

25    of the motion, want to highlight a few points for the Court and

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 44 of 60

Page 44

1     also be available for any questions with respect to the

2     committee's analysis of the transaction that's before the

3     Court.

4             Because the committee believes that it is in the best

5     interest of the creditors of the estate to enter into the AMA

6     and that the transactions contemplated way back, when we

7     started the discussions initially.  Our time has been consumed

8     by looking at the documents, reviewing the documents and also

9     addressing the specific concerns that the committee had and

10    some of which were raised by the Court in colloquy this

11    morning.  We highlighted in our statement five particular

12    issues that were the focus of our attention during our inquiry.

13    These are the big items although there were, of course, other

14    issues that came up in connection with review and comment on

15    the AMA that the TSA and related documentation.  Those five

16    issues were answered to the committee's satisfaction and dealt

17    with in the documentation and in our discussions in such a way

18    that we are enthusiastically supportive of the transaction.

19            I just wanted to touch upon them, with the Court's

20    permission, at this time.  The first was whether the

21    transactions that are contemplated will maximize value and are

22    consistent with the mandate of the creditors' committee and the

23    objectives under the plan, we believe they are and I don't

24    think I need to reiterate the points that were raised,

25    particularly by Mr. Lambert, this morning because all of those

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 45 of 60

Page 45

1    points resonate with the creditors' committee.  We believe that

2    having the CLO proceeds come into the estate, also the

3    potential upside from those assets as well as the cost

4    structure and the value brought to management of the non-CLO

5    assets will -- are all consistent with and advance the goals of

6    the creditor's committee and the creditors who are -- the

7    constituency of the creditors' committee.

8         The costs were also a particular focus and it was

9    difficult to, although we anticipated the Court's questions and

10   also anticipated questions from creditors on those issues, it

11   was difficult to put into writing how we became satisfied that

12   the cost structure here is appropriate.  And the structure

13   that's reflected in the final AMA does reflect, to some extent,

14   negotiations in which the creditors' committee participated, as

15   Ms. Marcus noted, Houlihan Lokey, the financial advisor of the

16   committee, participated actively in those discussions.  We

17   believe the management fee structure is appropriate, also the

18   way the termination fee is structured is also appropriate and

19   allows, as an overall guiding principle, allows for the post-

20   effective date board of directors of both LBHI and all of the

21   boards that control the assets that are going into the CLO,

22   maximum flexibility in terms of their interaction with Fraser

23   Sullivan.

24        The success fee was mentioned on the record this

25   morning, it was also mentioned in our papers, it's not a cause

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 46

1    of objection on our part, we did think it was appropriate to

2    note it.  The most significant part of the success fee and why

3    it's acceptable, although not necessary in our -- in the

4    committee's view, was that it is in the sole discretion of the

5    post-effective date board and it's capped at five million

6    dollars.  So it doesn't, ultimately, cause concern such that

7    we're not supportive of the transaction and on the whole we are

8    supportive of the cost structure, as I noted, particularly in

9    light of alternatives that were available.

10           Speaking of the alternatives, and I think

11   particularly -- well, again, as we noted in our papers the

12   committee would support an open, robust process, we've talked

13   about that this morning in connection with the Rosslyn

14   transaction, I think this transaction is different for many

15   reasons.  But in order for the committee to be supportive of

16   not having an auction process before the Court, or some sort of

17   process to identify the asset manager, we had to be comfortable

18   that the process in which the debtors were engaged was robust

19   and appropriate.  We believe it was, particularly with the

20   involvement of Lazard and Houlihan having direct access to the

21   information that was provided to the debtors, subject to

22   certain confidentiality restrictions, so that we were able to

23   evaluate the process of identifying other managers and also the

24   debtors' process in evaluating the information that they

25   received.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 47

1          We're very comfortable that Fraser Sullivan has the

2     expertise that's required to manage the portfolio.  I did want

3     to touch upon one point the Court raised with respect to the

4     employees.  We recognized that it was a very important point

5     for the debtors that there be continuity of management.  That

6     the -- particularly because of the expertise that has been

7     developed over the course of these cases with respect to the

8     credits that are in this portfolio.  It was clear from A&M's

9     perspective, from the debtors' perspective, that there should

10    be continuity, that the managers should have the benefit of the

11    experience that's been developed in the employees of the estate

12    over the course of these cases.  We recognize that and we

13    agreed with the debtors' judgment on that point.  However, it

14    was extremely important from the committee's perspective that

15    that goal of maintaining that continuity did not interfere with

16    getting the best deal for the estate.

17         So to put it more clearly, we were extremely focused

18    on the terms and details of the management contracts for the

19    employees that were coming on board to Fraser Sullivan and in

20    fact, with respect to the three most senior managers for whom

21    the arrangements have already been finalized, the creditors'

22    committee's advisors reviewed those contracts and the terms and

23    we've determined that they are appropriate under the

24    circumstances of this case, that they were negotiated at arms

25    length and that there is not any -- that the -- what prompted

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 48 of 60

Page 48

1    the Court's concerns and questions earlier are not issues that

2    raise any further issues.  We've diligenced them and are

3    comfortable and are satisfied that the terms are appropriate

4    and, as I said, were negotiated at arms length.

5            Finally, Your Honor, with respect to oversight, the

6    continuing theme in our review of this transaction was that

7    through the effective date of the plan all of the protocols

8    that this Court has approved and that have been developed

9    between the debtors and the creditors' committee will continue

10   to apply.  That was, I think, for obvious reasons but that

11   while we thought that putting this structure in place at this

12   time is in the best interest of the estates, it still remains

13   important and indeed critical that there be a direct, real-time

14   oversight of the affairs of the loan portfolio and decisions

15   that are made with respect to the portfolio.  And therefore,

16   while the AMA speaks to the relationship between Fraser

17   Sullivan and the debtors and when Fraser Sullivan may need to

18   go to the debtors for consultation, reporting or consent, all

19   of the arrangements that have been in place and have worked

20   successfully during the course of these cases, will remain in

21   place through the effective date of the plan, vis-a-vis the

22   debtors and the creditors' committee and also on a post-

23   effective date basis we're comfortable that the board -- the

24   boards of directors will have the ability to make decisions, as

25   appropriate, with respect to this portfolio.

1          Your Honor, during the course of our interaction with

2     the debtors in evaluating this transaction, it was not

3     appropriate for us to speak to our creditor constituency about

4     the transactions because of the confidentiality and some of the

5     reasons that were discussed earlier with respect to potential

6     impact on employees that were overseeing the portfolio.  The

7     committee felt comfortable based upon prior discussions and

8     continuing discussions with creditors that this would be

9     putting this in place now would be consistent with what

10    creditors were looking for in terms of maximizing the value of

11    the assets and preparing for the post-effective date period.

12    I'm pleased to report to the Court that immediately upon the

13    filing of the motion, the creditors' committee members and

14    advisors received very positive feedback from creditors large

15    and small in connection with the motion.  There were a number

16    of questions asked as there usually are.  But we were pleased

17    that the response was overwhelmingly positive both with respect

18    to cost structure and the overall in connection with the

19    motion.

20          THE COURT:  Okay.  Thank you.

21          MR. FLECK:  Thank you.

22          THE COURT:  Mr. Sabin?

23          MR. SABIN:  Good morning, Your Honor.  Jeffrey Sabin

24    of Bingham McCutchen on behalf of Fraser Management Investment

25    LLC.  I'd like to introduce to -- sitting in the front row,

08-13555-mg    Doc 19582    Filed 08/22/11    Entered 08/30/11 15:24:20    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 50 of 60

Page 50

1    John Fraser, who is co-founder and chief investment advisor.

2    So if you have any questions regarding statements that may have

3    been attributed to him in the motion, he is certainly here to

4    answer those.  And in addition, I want to highlight a few

5    things that may be responsive to some of the questions that you

6    mentioned and otherwise have not been highlighted as yet.

7            THE COURT:  Okay.

8            MR. SABIN:  Most importantly, Your Honor, assuming the

9    business judgment that you've heard testimony to regarding

10   generating cash now as opposed to holding on to the loan and

11   clipping the coupons, if you will, and collecting what you

12   could, there are provisions inside the asset management

13   agreement that require, among other things, the commercial

14   reasonable efforts of Fraser Sullivan subject to market

15   conditions to execute at least the first of CLO, if you will,

16   or CLOs aggregating 500 million of face amount of these loans

17   within 180 days after the effective date of this transaction

18   and an obligation to do another 500 million in CLOs within the

19   first anniversary.  So those are provisions that otherwise give

20   effect to the business judgments that were made and were

21   negotiated at arm's length.

22           In addition, Your Honor, the order itself -- and I

23   call your attention now to page 2 to the fourth, fifth and

24   decretal paragraphs.  And the whole transaction contemplates

25   that there will be a decision after the effective date after,

1   if you will, Fraser Sullivan and their personnel get their arms

2   around these assets themselves as to which assets are able to

3   get to a sale or structure to generate the cash that is

4   estimated and which are left behind.  And in connection with

5   that decision, this Court is being asked today to, in essence,

6   bless those sales by the debtors in the future into the CLOs

7   under Section 363 and to bless those as true sales.  And I just

8   wanted to point that out since I haven't heard it yet on the

9   record.  But I know it's in the motion and I know the papers

10  have been read.  But I think it's important to note that we're

11  looking for good faith findings and we're looking for a finding

12  that effectively says those future sales which, as you've heard

13  from both the debtor and the committee, are subject to, in

14  essence, the sole discretion of the debtors subject to the

15  protocols with the committee will be made if, and only if,

16  those debtors and/or their successors under any plan decide

17  that they go forward.

18          THE COURT:  I have to break in and ask you a question

19  because it caught me by surprise when you said it.  Are you

20  telling me that this order constitutes a prior determination

21  that future transactions with third parties relating to the

22  creation of CLO structures will be deemed to be true sales by

23  virtue of this order?

24          MR. SABIN:  Yes, Your Honor.

25          THE COURT:  I'm not entering that order.  I do not do

Page 52

1    what lawyers need to do when they create true sale opinions.

2    And I am not now determining that anything is a true sale other

3    than the transfer from land co to Fraser Sullivan of assets for

4    management.  What happens between Fraser Sullivan's management

5    and any third party is a matter that I am now not blessing.  If

6    that's a problem, we can all go home.

7              MS. MARCUS:  May I respond, Your Honor?

8              THE COURT:  Sure.

9              MS. MARCUS:  The transfer of the assets from the

10    debtors to Fraser Sullivan isn't really a transfer.  It's just

11    a management agreement.

12              THE COURT:  I understand.

13              MS. MARCUS:  Okay.  I just want to make sure that

14    we're talking about the same thing.  And then ultimately, when

15    Fraser Sullivan structures the CLOs, at that point there would

16    be a transfer by the debtor and other debtor-controlled

17    affiliates to the CLOs.  That's when the transfer happens.  And

18    I just want to -- I want to make sure that we're on the same

19    page in terms of what's happening.

20              The true sale finding is in -- it's actually

21    referenced in the motion and the order.  If the Court would be

22    more comfortable, I have a proffer of testimony of Mr. Lambert

23    as to what the terms of those transfers will be.  I recognize

24    that there is no transaction before you today.

25              THE COURT:  I can't approve a hypothetical transaction

Page 53

1    and I'm not going to.  I don't know the structure, the

2    transaction, that may be entered into between the debtor and

3    some third party that is administered by Fraser Sullivan.  I

4    don't know what retained interest, if any, may exist with

5    respect to that transaction.  I can't give a blanket, in

6    effect, blessing of true sale when I don't know what the

7    transaction is.  And I'm not doing it.

8              MS. MARCUS:  Okay.  I understand that, Your Honor.

9    But there are two elements.  There's a true sale element and,

10   subject to Fraser Sullivan determination that the order will be

11   acceptable -- and we can break and talk about that for a

12   minute.  But the other thing that we are asking you to approve

13   is that the debtors are authorized to transfer the loans once

14   Fraser Sullivan sets up the CLO structures.  And the reason

15   that that's very important, again, it's somewhat hypothetical

16   but the reason it's very important is because of the way these

17   things are created and marketed.  We can't -- and my

18   understanding is that Fraser Sullivan and the underwriter and

19   the arranger can't go out and create and market a CLO and then

20   give us the time to come back to court to approve a particular

21   sale of loan.

22             THE COURT:  I understand.  I think those are different

23   considerations.  I'm perfectly prepared to give the debtor the

24   authority to, in effect, transfer as part of the creation of

25   the CLO assets that are under management pursuant to this

Page 54

1    arrangement and for that to happen in the future without having

2    to come back to court.  But I am not doing the work of a

3    transactional lawyer who would determine that that particular

4    transaction, as structured, constitutes a true sale.  And

5    everybody in this room knows that I wouldn't ever do that.  No

6    bankruptcy judge in his right mind would ever do that.  That's

7    what you lawyers are all paid so much to do.  You're looking at

8    a particular transaction that's structured in a particular way

9    and making a judgment as to whether or not it constitutes a

10   true sale.  There are teams of lawyers in transactional law

11   firms that spend a lot of time considering whether or not a

12   particular transaction, as structured, is a true sale.  Since

13   there are no structures before the Court, there can be no

14   blessing in advance that a structure that doesn't presently

15   exist constitutes a true sale.  It's as simple as that.

16             MS. MARCUS:  I understand, Your Honor.  I don't know

17   if this is the right time or if you want to wait till --

18             THE COURT:  We can take a break, if you want, to talk

19   about whether or not this is a deal-breaker.  It had better not

20   be.

21             MS. MARCUS:  We need a break, Your Honor.

22             THE COURT:  Fine.  Let's take a break although let's

23   see if we can deal with the uncontested matter from SIPA first

24   so we don't have them waiting while others talk in the hallway.

25             MR. SABIN:  Thank you, Your Honor.

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 55 of 60

Page 55

1            MR. BRUNDIGE:  Thank you, Your Honor.  My name is Bob

2    Brundige.  Our firm, as you know, Hughes, Hubbard & Reed,

3    represents the trustee of LBI.  And we're here this morning on

4    an uncontested 9019 motion to approve complimentary settlement

5    agreements that the trustee has reached with Bank Leumi and

6    Israel Discount Bank which I'll refer to as IDB.  Under the

7    settlement, the estate will receive approximately eighty-two

8    million dollars in the several weeks and a possibility of

9    receiving another 2.9 million dollars down the road.

10            After many, many months of negotiation and

11    reconciliation and document exchange, the trustee has achieved

12    this settlement for the estate and its customers in which it is

13    receiving nearly everything it had requested in its original

14    contempt motion against these two banks filed many months ago.

15            The Leumi settlement provides that Bank Leumi, within

16    ten days of the entry of an order approving the sale, will seek

17    and obtain from the Israeli court a lifting of an attachment

18    that it had obtained restraining, in effect, and attaching all

19    property of LBI at IDB in Israel.

20            At the same time, under the IDB settlement, it is

21    provided that within five days of the lifting of that stay, IDB

22    will send back the proceeds that it's been holding, sell

23    securities that it's been holding and send back those proceeds

24    to the estate so that the estate will then realize everything

25    that it had there with the exception of 2.9 million dollars.

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 56 of 60

Page 56

1          What that exception is, is that just recently IDB

2     brought to our attention that there was a bond transaction on

3     which they're not sure of who the obligor is on that

4     transaction and queried whether it might be LBI.  Rather than

5     delay the settlement, what we agreed to do is that this 2.9

6     million dollars would be sent to Seward & Kissel, IDB's counsel

7     here in New York to be held in an interest bearing escrow

8     account while the parties try to act in good faith and resolve

9     whether there is an obligation on the part of LBI to IDB with

10    respect to the bond transaction.  Assuming there is not, that

11    will be paid to the estate as well.

12          Upon fulfillment of the obligations by Bank Leumi and

13    IDB, the trustee has agreed that it will withdraw its contempt

14    motion against both banks.  And basically, then under the

15    settlement agreement with them, the trustee has determined with

16    the consultation of its professionals that it is fair and

17    equitable and in the best interest of the estate and request

18    Your Honor to approve the settlement agreements.

19          THE COURT:  I am prepared to do that.  Is there anyone

20    here who wishes to be heard with respect to this representing

21    either Bank Leumi or Israel Discount Bank?

22          MR. BRUNDIGE:  No.  And I think --

23          THE COURT:  There's no response.  I've reviewed the

24    papers.  It seems like it's a good transaction for the trustee

25    and I approve it.

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 57 of 60

Page 57

 1            MR. BRUNDIGE:  Thank you, Your Honor.

 2            THE COURT:  I just need a form of order.

 3            Let's take a break.  The question is how long the

 4    break needs to be.

 5            MS. MARCUS:  Fifteen minutes, Your Honor.

 6            THE COURT:  Let's take a twenty minute break.

 7            MR. SABIN:  Thank you, Your Honor.

 8            THE COURT:  Let's take a twenty minute break with

 9    provisional resumption at twenty minutes to the hour.

10         (Recess from 11:23 a.m. until 11:44 a.m.)

11            THE COURT:  Be seated, please.

12            MS. MARCUS:  Jacquelyn Marcus again, Your Honor.  We

13    have had an opportunity during the break to consult with

14    counsel for Fraser Sullivan as well as the creditors'

15    committee.  And Fraser Sullivan has agreed to the following

16    changes as have the debtors and the committee.  Do you have a

17    copy of the order handy still?

18            THE COURT:  I do.

19            MS. MARCUS:  The first decretal paragraph where it

20    says the motion is granted, we'll change it to provide -- to

21    the extent provided herein.  And then three paragraphs down,

22    the paragraphs that reads, "ORDERED, that to the extent the

23    Debtors" or contemplated transferors, et cetera, sell loans,

24    they'll be considered true sales, we're going to strike that

25    paragraph.

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 58 of 60

Page 58

1           THE COURT:  Okay.

2           MS. MARCUS:  Your Honor, we're going to do this the

3    normal way and the attorneys will provide opinions.  In the

4    event that, at a later time, when there's a transaction that's

5    fully negotiated and documented, if we need more, we may have

6    to come back to the Court.  And since these transactions are

7    likely to be time sensitive, we may have to ask for expedited

8    relief if we need something more from you at that time.

9           THE COURT:  Okay.  Fine.  I mean, my hope is that this

10   will simply be ordinary course transactional practice for the

11   creation of a CLO and that bankruptcy court orders are

12   typically not part of such transactions.  And with the strength

13   of this order and competent counsel for the issuer, I don't

14   think we should have a problem.  But if there's a need for

15   relief, you can always find me.

16          MS. MARCUS:  Thank you, Your Honor.  We'll send down a

17   revised form of this order later this afternoon.

18          THE COURT:  Okay.

19          MS. MARCUS:  I believe that --

20          THE COURT:  I think --

21          MS. MARCUS:  -- concludes our --

22          THE COURT:  I think that concludes the morning agenda.

23   There's a 2:00 calendar.  We're adjourned until then.

24          MS. MARCUS:  Thank you.

25          (Whereupon these proceedings were concluded at 11:46 a.m.)

08-13555-mg   Doc 19582   Filed 08/22/11   Entered 08/30/11 15:24:20   Main Document
Pg 59 of 60

Page 59

1

2                         **I N D E X**

3

4                          RULINGS

5                                          Page      Line

6    Establishment of two creditworthy entities    11       4

7     approved

8    Motion to sell Rosslyn properties approved    14       22

9    Settlement agreement approved                 19       10

10   LBI's uncontested 9019 motion to approve      56       25

11    complimentary settlement agreements

12    reached by the trustee with Bank Leumi

13    and Israel Discount Bank

14

15

16

17

18

19

20

21

22

23

24

25

212-267-6868          www.veritext.com          516-608-2400

Page 60

1

2                    C E R T I F I C A T I O N

3

4    I, Sara Davis, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7    Sara Davis
     Digitally signed by Sara Davis
     DN: cn=Sara Davis, c=US, o=Veritext
     Reason: I am the author of this document
8    Date: 2011.08.22 14:10:09 -04'00'
     _____

9    SARA DAVIS

10   AAERT Certified Electronic Transcriber CET**D 567

11

12   Also transcribed:

13   Lisa Bar-Leib

14   AAERT Certified Electronic Transcriber CET**D 486

15   Pnina Eilberg

16   AAERT Certified Electronic Transcriber CET**D 488

17

18   Veritext

19   200 Old Country Road

20   Suite 580

21   Mineola, NY 11501

22

23   Date:  August 18, 2011

24

25