WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard W. Slack
Peter Gruenberger
Robert J. Lemons
Michael J. Firestone

Attorneys for Debtor
and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

------------------------------------------------------------------x

## NOTICE OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS
## IMPROPERLY WITHHELD AS PRIVILEGED BY GIANTS STADIUM LLC

PLEASE TAKE NOTICE that a hearing on the annexed motion (the "Motion") of Lehman Brothers Special Financing Inc. ( "LBSF"), as debtor and debtor in possession (together with Lehman Brothers Holdings Inc. and its affiliated debtors in the above-referenced chapter 11 cases, the "Debtors"), for entry of an order compelling Giants Stadium LLC ("Giants Stadium") to produce certain documents pursuant to a subpoena issued on May 19, 2010 which have been withheld as privileged, all as more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **September 14, 2011 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601;

(ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Richard W. Slack, Esq., attorneys for the Debtor; (iii) the the Office of the United States Trustee for the Region 2, 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn:  Tracy Hope Davis, Esq., Andrea B. Schwartz, Esq., and Elisabetta Gasparini, Esq.; and (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Evan Fleck, Esq., and Dennis O'Donnell, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases, so as to be received no later than **September 7, 2011 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: August 25, 2011
New York, New York

/s/Richard W. Slack_____
Richard W. Slack
Peter Gruenberger
Robert J. Lemons
Michael J. Firestone

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtor
and Debtor in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard W. Slack
Peter Gruenberger
Robert J. Lemons
Michael J. Firestone

Attorneys for Debtor
and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
|  |  |
|---|---|
| **In re** | **Chapter 11 Case No.** |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | **08-13555 (JMP)** |
| **Debtors.** | **(Jointly Administered)** |

-------------------------------------------------------------------x

**DEBTORS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS**
**IMPROPERLY WITHHELD AS PRIVILEGED BY GIANTS STADIUM LLC**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

FACTUAL BACKGROUND .................................................................................. 5

    A.    The Terminated Transactions ............................................................... 5

    B.    Rule 2004 Discovery of Giants Stadium ............................................. 6

    C.    Giants Stadium's Privilege Logs ........................................................ 8

    D.    Testimony Regarding the Termination of the Transaction and Goldman's Role ............................................................................................ 8

ARGUMENT ..................................................................................................... 12

I. THE WITHHELD DOCUMENTS ARE NOT SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE .......................................................................... 12

    A.    The Attorney-Client Privilege Is Waived By The Presence of Third-Parties ...... 12

    B.    The "Interpreter" Exception To The Attorney-Client Privilege  Does Not Apply Here ................................................................................. 13

    C.    The Withheld Communications Are Not Protected By the Attorney-Client Privilege ............................................................................... 15

II. THE WITHHELD DOCUMENTS ARE NOT SUBJECT TO THE ATTORNEY-WORK PRODUCT DOCTRINE ................................................................. 19

    A.    The Attorney-Work Product Doctrine In The Second Circuit ............................ 19

    B.    The Withheld Communications Are Not Protected By The Attorney-Work Product Doctrine ............................................................... 21

    C.    The Presence of Goldman Vitiates the Work-Product Doctrine .......................... 23

    D.    The Debtors Have Substantial Need of the Withheld Communications.............. 24

NOTICE.......................................................................................................... 26

i

# TABLE OF AUTHORITIES

**Page(s)**

Cases

Allied Irish Banks v. Bank of Am., N.A.,
   240 F.R.D. 96 (S.D.N.Y. 2007) ...................................................................................20, 21, 23

Bowne of N.Y.C., Inc. v. AmBase Corp.,
   150 F.R.D. 465 (S.D.N.Y. 1993) .......................................................................................15, 16

Crawford v. Franklin Credit Mgmt. Corp.,
   261 F.R.D. 34 (S.D.N.Y. 2009) ................................................................................................13

Export-Import Bank of the U.S. v. Asia Pulp & Paper Co.,
   232 F.R.D. 103 (S.D.N.Y. 2005) .......................................................................................15, 17

Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings, Inc.,
   2010 WL 343490 (S.D.N.Y. Feb. 1, 2010) ..............................................................................13

Frias v. United States,
   2009 WL 1437797 (S.D.N.Y. May 20, 2009) .........................................................................18

In re Gaming Lottery Sec. Litig.,
   2000 WL 340897 (S.D.N.Y. Mar. 30, 2000) ...........................................................................17

In re Grand Jury Subpoenas Dated Mar. 19, 2002 and Aug. 2, 2002,
   318 F. 3d 379 (2d Cir. 2003)....................................................................................................15

Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.,
   215 F.R.D. 466 (S.D.N.Y. 2003) .......................................................................................22, 23

In re Horowitz,
   482 F.2d 72 (2d Cir. 1973).......................................................................................................13

Nat'l Cong. for Puerto Rican Rights v. City of N.Y.,
   198 F.R.D. (S.D.N.Y. 2000) ....................................................................................................26

NXIVM Corp. v. O'Hara,
   241 F.R.D. 109 (N.D.N.Y. 2007).............................................................................................24

Renner v. Chase Manhattan Bank,
   2001 WL 1819215 (S.D.N.Y. July 13, 2001) .........................................................................18

Summit Ltd. v. Levy,
   111 F.R.D. 40 (S.D.N.Y. 1986) ...............................................................................................15

Tribune Co. v. Purcigliotti,
  1997 WL 10924 (S.D.N.Y. Jan. 10, 1997) ..............................................................13

United States v. Ackert,
  169 F.2d 136 (2d Cir. 1999).................................................................4, 12, 14, 15

United States v. Adlman,
  134 F.3d 1194 (2d Cir. 1998)..................................................................20, 22, 23

United States v. Bilzerian,
  926 F.2d 1285 (2d Cir. 1991)................................................................................18

United States v. Hatfield,
  2010 WL 183522 (E.D.N.Y. Jan. 8, 2010) ...........................................................24

United States v. Int'l Bhd. of Teamsters,
  119 F.3d 210 (2d Cir. 1984).....................................................................1, 12, 15

United States v. Kovel,
  296 F. 2d 918 (2d Cir. 1961).............................................................13, 14, 15, 24

Women's Interart Ctr., Inc. v. N.Y.C. Econ. Dev.,
  223 F.R.D. 156 (S.D.N.Y. 2004) .........................................................................12

## OTHER AUTHORITIES

Fed. R. Civ. P. 23(b)(3)...........................................................................................19

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing, Inc. ("<u>LBSF</u>") and Lehman Brothers

Holdings, Inc. ("LBHI") as debtors in possession (the "<u>Debtors</u>" and, collectively with their

debtor and non-debtor affiliates, "<u>Lehman</u>"), hereby move to compel Giants Stadium LLC

("<u>Giants Stadium</u>") to produce documents improperly withheld from its production on the basis

that these documents are supposedly protected by the attorney client and work product privileges

(the "<u>Motion</u>"):

### **<u>PRELIMINARY STATEMENT</u>**

1.          This Motion concerns the sweeping assertion of the attorney-client privilege

and work-product doctrine by Giants Stadium, one of LBSF's swap counterparties, over

documents shared with Giants Stadium's financial advisor.

2.          In responding to a Rule 2004 subpoena served by the Debtors, Giants

Stadium has withheld certain (but not other) communications from or to its counsel, Sullivan &

Cromwell LLP ("<u>S&C</u>"), where Giants Stadium's financial advisor, Goldman Sachs & Co.

("<u>Goldman</u>"), was a party to the communication (as the sender, recipient or copied thereon).

3.          Under well-established Second Circuit precedent, the attorney-client

privilege only protects communications between a lawyer and its client; the presence of a third

party, such as a financial advisor, in a communication between counsel and a client destroys the

privilege. <u>See</u> <u>United States v. Int'l Bhd. of Teamsters</u>, 119 F.3d 210, 214 (2d Cir. 1984)

(application of the attorney client privilege requires that the client seek, ***in confidence***, legal

advice from a professional legal advisor) (emphasis added). Thus, once Giants Stadium and its

counsel decided to communicate freely with Giants Stadium's financial advisor, the advice given

by counsel in the presence of the financial advisor never became privileged.

4.          Moreover, Giants Stadium has attempted to use the privilege as both a sword and a shield with respect to communications between S&C and Goldman.  Giants Stadium has selectively produced certain potentially self-serving emails with Goldman, but not others, which were created during the exact same time periods.  The emails that have been produced include financial and valuation models prepared by Goldman in the wake of Giants Stadium's attempted termination of its swap transactions with LBSF.  If the Debtors ultimately determine to challenge Giants Stadium's approximately $300 million claim at the conclusion of its ongoing 2004 investigation, Giants Stadium will almost certainly wish to rely on Goldman's valuation models.  Yet, at the same time, Giants Stadium is seeking to prevent the production of other documents shared between counsel and Goldman, which creates a profoundly unfair situation for Debtors.

5.          By way of background, Giants Stadium issued auction rate securities (the "ARS") in August 2007 in order to finance the construction of a new football stadium.  Giants Stadium also entered into interest rate swap transactions (the "Transactions") with LBSF in connection with certain tranches of the ARS, as well as with Goldman with respect to other tranches of ARS.  Within days of LBHI's filing of its chapter 11 petition, Giants Stadium attempted to terminate the transactions with LBSF; it calculated an approximately $300 million Settlement Amount due Giants Stadium in connection with the Transactions, and ultimately filed a proof of claim against the Debtors in that amount.

6.          Goldman played a variety of business roles for Giants Stadium in connection with the issuance of ARS and the termination of the Transactions.  Goldman was an initial purchaser and auction manager of certain ARS tranches; as noted above, Goldman also entered into interest rate swap transactions with Giant Stadium in connection with those same ARS

tranches.  Once LBHI declared bankruptcy, Goldman acted as a traditional financial advisor for

Giants Stadium, including generating models, providing advice to Giants Stadium in the

termination process, and helping Giants Stadium value the swap.  Goldman was also one of three

leading dealers from whom Giants Stadium attempted to obtain a market quotation for the

Transactions.  Lastly,                     REDACTED

7.        In order to investigate Giants Stadium's approximately $300 million claim

and whether the swap is properly a receivable or payable to the estate, the Debtors served a

request under Rule 2004 upon Giants Stadium for the production of documents.  REDACTED

The withheld communications at issue

in this motion are identified on the privilege logs attached to the accompanying Declaration of

Michael J. Firestone (the "Firestone Decl.") as Exhibits D and E.

8.        The Debtors objected to the inclusion of these documents on the privilege

logs and have made numerous attempts to resolve the privilege dispute, but Giants Stadium has

refused to produce the documents, asserting in a conclusory manner that Goldman was assisting

S&C in its representation of Giants Stadium.  Giants Stadium has provided Debtors with no

information to support its assertion of privilege.

9.        The Second Circuit has carved out a very limited exception to its general rule

that the presence of third parties in communications between lawyers and clients destroys the

privilege.  This very limited exception focuses entirely on whether the non-lawyer is

"interpreting" non-legal concepts for the lawyer so as to facilitate that lawyer's representation of

a client – essentially analogizing between a non-English speaking client communicating through

an interpreter to his lawyer.  See United States v. Ackert, 169 F.3d 138, 139-40 (2d Cir. 1999)

(cited infra at ¶ 33).  In this regard, advice given by the financial advisor can never be privileged

since such advice is outside the role of an interpreter.  Similarly, legal advice shared with the

financial advisor is not privileged since it too is outside the role of interpretation.  The privilege

log provided by Giants Stadium has not met its heavy burden of establishing that Goldman was

simply "interpreting" financial information for S&C so as to allow it to render legal advice to

Giants Stadium, rather than simply providing it with assistance in connection with the

termination of the Transactions.  Indeed, the facts here show that Goldman played a significant

and undeniable business role for Giants Stadium. Moreover, there was no separate agreement

between S&C and Goldman by which the latter agreed to assist the former in its representation of

Giants Stadium. Quite simply, there is a complete lack of any contemporaneous factual support

for Giants Stadium's privilege claims. The Court should conduct an *in camera* review of the

documents at issue to determine whether in fact Goldman was acting in the very limited role of

an "interpreter" for S&C.  See infra Section I.

10.     With respect to Giants Stadium's improper assertion of the work-product

doctrine, an *in camera* review is not even required since the doctrine does not apply here as a

matter of law.  Work-product protection is available for documents created "because of"

litigation, but is not available for documents created in the normal course of business or that

would have been created in essentially similar form irrespective of litigation.  Once Giants

Stadium determined that LBSF was not a viable swap counterparty, it needed to terminate the

Transactions so as to re-hedge its interest-rate risk related to the ARS.  Simply put, as a result of

LBHI's bankruptcy, Giants Stadium sought to terminate the Transactions in the normal course of

its business, thus preventing it from arguing now that communications made in connection with

such termination were undertaken "because of" litigation.  Indeed, such communications would

have been made in similar form irrespective of any litigation between Giants Stadium and the

Debtors since Giants Stadium needed to terminate the Transactions for reasons related to its own

business.  Accordingly, the work-product doctrine does not apply.  Moreover, under the

circumstances here, even if work-product did apply, the need of the Debtors in reviewing this

information far outweighs the interest of Giants Stadium in shielding its production.  Finally,

Giants Stadium has asserted work-product (and attorney-client privilege) over every single

communication with Goldman withheld from production, suggesting that both labels were

slapped on these documents in a process that was less than rigorous.  See infra Section II.

## FACTUAL BACKGROUND

A.    The Terminated Transactions

11.       In August 2007, Giants Stadium issued $650 million in auction rate

securities (the "ARS"), in connection with the financing of the construction of the New

Meadowlands Stadium.  See Firestone Decl. at ¶ 2. Auction rate securities are debt instruments

with a long-term nominal maturity for which the interest rate is regularly reset through an

auction.  Goldman and Lehman were the initial purchasers of the ARS, and each served as

broker-dealer for certain tranches of the ARS.  See id. at ¶ 3; infra at ¶ 18.

12.       In connection with the ARS offering, LBSF and Giants Stadium entered into

two substantively identical interest rate swaps guaranteed by LBHI (the "Transactions"), each

pursuant to two separate 1992 ISDA Master Agreements dated July 27, 2007 (collectively, and

together with the schedules and exhibits thereto and each confirmation exchanged with regard to the Transactions, the "Master Agreements").  See Firestone Decl. at ¶ 4.  Contemporaneously with entering into the Transactions, Giants Stadium also entered into interest rate swaps with Goldman in connection with certain tranches of the ARS. See infra, at ¶ 18.  Thus, with respect to the interpretation of the ISDA Master and swap agreements, Lehman and Goldman were similarly situated.

13.        On September 15, 2008, LBHI filed its chapter 11 petition.  Three days later, on September 18, 2008, Giants Stadium purported to terminate the Transactions.  See Firestone Decl. at ¶ 5.

14.        On October 2, 2008, Giants Stadium sent LBSF letters for each of the Transactions (the "Calculation Letters"), which attempted to calculate the Settlement Amount owed under the Master Agreements.  See id. at ¶ 6.  Purportedly applying the Loss methodology, Giants Stadium determined that LBSF owed Giants Stadium a Settlement Amount of $301,025,197 as a result of its early termination of the Transactions.  See id. at ¶ 7.

15.        On September 22, 2009, Giants Stadium filed Proofs of Claim against LBHI and LBSF, each in the amount of $301,804,617.14 (the "Proofs of Claim").  See Firestone Decl. at ¶ 8.

B.    Rule 2004 Discovery of Giants Stadium

16.        In order to investigate the Proofs of Claim and determine, among other things, whether or not Giants Stadium's calculation of the Settlement Amount is subject to dispute, on or about May 19, 2010, the Debtors served a subpoena (the "Subpoena") on Giants Stadium, pursuant to Rule 2004, for the production of documents.  In response, Giants Stadium

produced certain documents.[1]  See id. at ¶ 9.  On May 25, 2011, Giants Stadium's CFO,

Christine Procops, was examined by the Debtors under oath pursuant to the Rule 2004 Order.

The Debtors' examination of the issues surrounding the Transactions is ongoing. See Id. at ¶ 10.

17.    Discovery taken to date shows that Giants Stadium was provided legal

advice by Sullivan & Cromwell LLP ("S&C"), in connection with, among other things, the

Stadium financing and the negotiation and termination of the Transactions.  See Procops Tr. at

19:9-14; 184:3-16; 192:7-13.[2]

18.    Goldman was a central participant in Giants Stadium's business affairs in

connection with the ARS and the Transactions.  Goldman played a number of roles – none of

which is consistent with the assertion of the attorney-client privilege by Giants Stadium.  First,

Goldman was in many instances a contractual counterparty to Giants Stadium. Goldman

contracted to be an initial purchaser of the ARS (see id. at 24:14-17); contracted to function as

the broker-dealer for several of the ARS tranches (see id. at 24:18-23; 53:14-23); and entered

into derivative swaps in connection with those ARS tranches (see id. at 23:11-24:7; 52:21-

53:13).  Given its role as a swap counterparty, in a very similar, if not identical position to LBSF

as a swap counterparty, Goldman was at all times potentially adverse to Giants Stadium with

respect to the interpretation of the swap documents.  Second, Goldman was also Giants

Stadium's financial advisor providing classic business advice to Giants Stadium.  See id. at

27:20-28:17.  Following the Lehman bankruptcy, Goldman provided Giants Stadium with

"consulting services" by "assisting" Giants Stadium "in trying to figure out a plan going forward

---

[1] The Subpoena was served pursuant to the Court's November 23, 2009 Order granting the
Debtors authority to issue subpoenas for the production of documents pursuant to Fed. R. Bankr.
P. 2004 (the "Rule 2004 Order").

[2] Cited excerpts from the Procops Transcript (the "Procops Tr."), are attached as Exhibit A to the
Firestone Decl.

for the securities," and Giants Stadium was "talking to Goldman Sachs about the market in

general and what we could do about it."  See id. at 54:3-21.  Goldman was also was one of three

leading dealers from whom Giants Stadium attempted to obtain a market quotation with respect

to the LBSF swaps.  See id. at 220:8-10.  Moreover, Goldman provided Giants Stadium with

valuations of the Transactions that form a basis of the asserted Settlement Amount set forth in its

proofs of claim.  See Exhibit G to Firestone Decl.        REDACTED


See Exhibits H and I

to Firestone Decl.

C.    Giants Stadium's Privilege Logs

19.        On or about November 10, 2010, Giants Stadium produced a privilege log

listing 551 documents purportedly withheld from the Debtors on the grounds of attorney-client

privilege and/or work-product doctrine (the "Privilege-Withhold Log").  That same day, Giants

Stadium also produced a log identifying 484 documents from which materials purportedly

covered by the attorney client privilege and/or work product doctrine were redacted (the

"Privilege-Redaction Log," and with the Privilege Log, the "Logs").  See Firestone Decl. at ¶ 12.

20.        REDACTED


indeed, if Goldman acted as an interpreter for S&C, what possible proper role

could its own counsel, Nixon Peabody, play?

21.        On February 24, 2011, Debtors' counsel sent a letter to Giants Stadium's

attorneys (the "February 24 Letter"), challenging Giants Stadium's designation of

communications between or among Giants Stadium, S&C, and Goldman and/or Nixon Peabody

as subject to the attorney-client privilege.  Specifically, Debtors' counsel noted that:

> From the documents produced by Giants Stadium, it appears that
> Goldman's business role in connection with the various financing
> transactions was comprehensive.  Goldman was a bond underwriter,
> auction manager, swap counterparty, remarketing agent, and according to
> Giants Stadium's October 2, 2008 calculation letter, was one of three
> leading dealers from whom a market quotation was solicited in connection
> with the termination of the Lehman swaps.  What is clear is that Goldman
> was neither rendering legal advice, nor is there anything in the documents
> produced that even remotely suggest that Goldman was hired to render
> legal advice to Giants Stadium.  Accordingly Giants Stadium may not
> claim that communications where Goldman participates or is copied are
> covered by the attorney client privilege.

See Firestone Decl., at ¶ 14.  Accordingly, Debtors' counsel requested that Giants Stadium

promptly produce all communications involving S&C and Goldman and/or Nixon Peabody. See

id.

22.        On March 17, 2011, counsel for the parties held a telephonic meet-and-

confer, during which they discussed the issues raised by the February 24 Letter.  See id. at ¶ 15.

On March 25, 2011, Giants Stadium's attorneys informed Debtors' counsel by letter that they

had re-reviewed the Logs and decided to selectively produce some additional documents in

which Goldman participated, but not all.  S&C contended without any support whatsoever, and

despite the admitted absence of any retention agreement between S&C and Goldman, that

Goldman "was acting as an advisor to Sullivan & Cromwell, LLP, who in turn was providing

legal advice to Giants Stadium."  See id. at ¶ 16.

23.        On April 4, 2011, Giants Stadium produced communications (and documents

attached thereto) which had been previously withheld as privileged, along with a revised

privilege and redaction logs, dated as of April 1, 2011 (the "Revised Privilege-Withhold Log"

and the "Revised Privilege-Redaction Log," and collectively, the "Revised Logs")).  See id. at

¶ 17.

24.         Despite having "reexamined" the Logs, Giants Stadium continues to

withhold thirty communications from September-November 2008 between or among Giants

Stadium, S&C, and Goldman on the basis of the attorney-client privilege and/or the work

product doctrine.                           REDACTED

[3] (Relevant excerpts from the Revised

Privilege-Withhold Log and revised Privileged-Redaction Log showing the Withheld

Communications are attached to the Firestone Decl. as Exhibits D and E, respectively.)

25.                         REDACTED

---

[3] Nixon Peabody is "cc'd" on some of the redacted communications, but none of the Withheld
Communications involve e-mails sent from, or directly to, that firm.

REDACTED

See id.

26.        On April 11, 2011, Debtors' counsel sent a letter to counsel for Giants Stadium, in which they reiterated that the Withheld Communications were not privileged, and requested that Giants Stadium provide Debtors with information to establish a proper privilege over the Withheld Communications.  See Firestone Decl. at ¶ 19.  To date, Giants Stadium has not done so.  See id.

D.    Testimony Regarding the Termination of the Transaction and Goldman's Role

27.        In her Rule 2004 examination, Ms. Procops testified regarding the role played by Goldman in connection with the termination of the Transactions.  Ms. Procops stated that the "swap and ISDA document was [sic] very complicated, as was our entire transaction." She testified further that, Giants Stadium's "counsel at Sullivan & Cromwell does not necessarily know what the market interpretation of certain provisions in our agreements are."  Ms. Procops did not know with certainty what role Goldman actually played for S&C, noting only that she "assume[ed]" that Giants Stadium "used Goldman Sachs to assist our counsel in that method."[4] She indicated that Goldman Sachs was not separately compensated for this "assumed" role and that its fees were incorporated into fees for later transactions.  There was no retention letter that set out the scope or duration of the project.  See Procops. Tr. at 64:12-19; 65:23-66:11; 67:20-68:9.

---

[4] Ms. Procops also testified that Goldman "assisted our counsel in interpreting the terms of the documents." Procops. Tr. at 242:4-6.

28.        Ms. Procops testimony also makes clear that the Transactions were

terminated in the ordinary course of Giants Stadium's business, as a result of the Lehman

bankruptcy.  Specifically, she testified that "[w]hen we were informed or had some information

that Lehman was having problems, we were concerned . . . about what would happen to our swap

. . . And so at that point in time, unfortunately, we were forced into terminating the swap with

Lehman, not that we would, had there not been a bankruptcy."  Procops Tr. at 49:11-23.

## ARGUMENT

## I.  THE WITHHELD DOCUMENTS ARE NOT SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE

A.        The Attorney-Client Privilege Is Waived By The Presence of Third-Parties

29.        "The broad outlines of the attorney-client privilege are clear: '(1) where

*legal advice* of any kind is sought (2) from a professional legal advisor in his capacity as such,

(3) the communications relating to that purpose, (4) *made in confidence* (5) by the client, (6) are

at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8)

except the protection be waived.'"  Int'l Bhd. of Teamsters, 119 F.3d at 214, (citations omitted)

(emphasis added); see also Women's Interart Ctr., Inc. v. N.Y.C. Econ. Dev., 223 F.R.D. 156,

159 (S.D.N.Y. 2004) ("When asserting the attorney-client privilege, a party must show that there

exists '1) a communication between client and counsel, which 2) was intended to be and was in

fact kept confidential, and 3) made for the purpose of obtaining legal advice.'") (citation

omitted).

30.        It is well-established that "the [attorney-client] privilege protects

communications between a client and an attorney, not communications that prove important to

an attorney's legal advice to a client."  See United States v. Ackert, 169 F.3d 136, 139 (2d Cir.

1999)).   Indeed, since one of the elements of the attorney client privilege is a communication in

confidence between the attorney and the client, the disclosure of communications between

counsel and its client to a third party prevents the attorney-client privilege from ever attaching

with respect to those communications. Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings, Inc.,

2010 WL 343490, *1 (S.D.N.Y. Feb. 1, 2010) ("[D]isclosure to a third party by the party of a

communication with his attorney eliminates whatever privilege the communication may have

originally possessed, whether because disclosure is viewed as an indication that confidentiality is

no longer intended or as waiver of the privilege.") (quoting In re Horowitz, 482 F.2d 72, 81 (2d

Cir. 1973);  Crawford v. Franklin Credit Mgmt. Corp., 261 F.R.D. 34, 43 (S.D.N.Y. 2009) ("It is

well-settled that the 'voluntary disclosure of confidential material to a third party waives any

applicable attorney-client privilege."); Tribune Co. v. Purcigliotti, 1997 WL 10924, *4 (S.D.N.Y.

Jan. 10, 1997) ("Privileged attorney-client communications are waived if the holder of the

privilege discloses or consents to disclosure of any significant part of the communication to a

third party or stranger to the attorney-client relationship.") (citation omitted).

      31.      Accordingly, to the extent any communications between Giants Stadium and

S&C were disclosed to any third-party, the attorney-client privilege never came into existence

with respect to those communications and these communications may not be withheld from

Debtors unless such communications falls into the exception discussed below.

**B.    The "Interpreter" Exception To The Attorney-Client Privilege
      Does Not Apply Here**

      32.      Courts in the Second Circuit have outlined a very limited exception to the

attorney client privilege when a non-lawyer is a party to an otherwise privileged communication.

In United States v. Kovel, 296 F. 2d 918 (2d Cir. 1961), the Second Circuit held that

communications between an accountant and attorney could in certain instances be covered by the

attorney-client privilege, since the accountant was essentially "interpreting" accounting

principles to the lawyer so as to allow the attorney to give the client legal advice. Id., at 921-22.

Thus, "the presence of an accountant, whether hired by the lawyer or by the client, while the

client is relating a complicated tax story to the lawyer, ought not destroy the privilege . . .; the

presence of the accountant is necessary, or at least highly useful, for the effective consultation

between the client and the lawyer which the privilege is designed to permit." Id. at 922.

33.        Citing Kovel, the Second Circuit has held that communications between an

attorney and non-lawyer may be privileged, "if the purpose of the third party's participation is to

improve the comprehension of the communications between attorney and client." Ackert, 169

F.3d at 139 (citing Kovel, 296 F.2d at 922).  In Ackert, a Goldman banker pitched a potential

transaction to the Paramount Corporation; Paramount's senior vice president and tax counsel, in

the context of conducting "legal research and analysis in order to advise Paramount about the tax

implications of the proposed investment" contacted the banker to discuss the potential

transaction.  Id. at 138.  Paramount then sought to prevent the banker from providing testimony

to the Internal Revenue Service with respect to any conversations he had with Paramount's tax

counsel by asserting the attorney-client privilege.  Id.   The Second Circuit rejected Paramount's

privilege assertion, holding that because Paramount's tax counsel contacted the banker "for

information Paramount did not have about the proposed transaction and its tax consequences,"

and not "as a translator or interpreter of client communications," the Second Circuit held that the

communications were not protected by the attorney-client privilege, "notwithstanding our

assumption that those conversations significantly assisted the attorney in giving his client legal

advice about its tax situation." Id. at 139-40.

34.        Thus, in light of Kovel and Ackert, extension of the attorney-client privilege

to non-lawyers is only proper in the very limited circumstance where the non-lawyer acts as the

lawyer's interpreter, so as to permit the lawyer to give legal advice to his or her client.    See

Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., 232 F.R.D. 103, 113 (S.D.N.Y. 2005)

(citing Kovel, 296 F.2d at 922) ("[C]ommunications with a financial advisor are covered by the

attorney-client privilege if the financial advisor's role is **limited** to helping a lawyer give

effective advice by explaining financial concepts to the lawyer.") (emphasis added); Summit Ltd.

v. Levy, 111 F.R.D. 40, 41 (S.D.N.Y. 1986) ("As [the Second] Circuit has explained, the

application of the attorney/client privilege to communications with an accountant depends upon

whether the accountant is acting as a means of translating financial data for the attorney or rather

is acting as a financial advisor.").

C.    The Withheld Communications Are Not Protected By the Attorney-Client Privilege

35.    Giants Stadium bears the burden of establishing that Goldman's role was

limited to an interpretive role under Kovel and Ackert in order to claim that Goldman's

communications with S&C are covered by the attorney-client privilege.    See In re Grand Jury

Subpoenas Dated Mar. 19, 2002 and Aug. 2, 2002, 318 F. 3d 379, 384 (2d Cir. 2003) ("[T]he

party invoking a privilege bears the burden of establishing its applicability to the case at hand.");

Int'l Bhd. of Teamsters, 119 F.3d at 214 ("The burden of establishing the existence of an

attorney-client privilege, in all of its elements, rests with the party asserting it."); Bowne of

N.Y.C., Inc. v. AmBase Corp., 150 F.R.D. 465, 470 (S.D.N.Y. 1993) ("As the Second Circuit

has repeatedly noted, 'the burden is on a party claiming the protection of a privilege to establish

those facts that are the essential elements of the privileged relationship.'") (citations omitted).

36.    To date, however, all Giants Stadium has provided are "mere[ly] conclusory

or *ipse dixit* assertions" that Goldman acted as an "interpreter" for S&C; such assertions are

plainly insufficient in order to validly invoke the privilege once challenged.    See Bowne of

N.Y.C., Inc., 150 F.R.D. at 470. Indeed, Ms. Procops's testimony that Goldman provided the

"market interpretation" of the terms of the swap documents suggests that rather than translate for

S&C what the swap documents actually meant, Goldman was instead providing its independent

view of how market participants would view the meaning of the swap documents.

37.     Moreover, the idea that S&C needed advice from Goldman as to the

interpretation of the swap documents at issue here is simply not logical. S&C is very

experienced counsel in derivatives. Indeed, S&C represented Giants Stadium in negotiating the

Transactions with Debtors. See Procops Tr. at 192:7-22. S&C presumably also negotiated for

Giants Stadium against Goldman as well, which was also swap counterparty to Giants Stadium

on similar interest rate swap transactions in connection with the ARS securities. Giants Stadium

would have the Court believe that S&C was competent to negotiate swap transactions with

Lehman and Goldman as adverse counterparties, but then required Goldman (one of those

adverse parties), to provide "interpretative services" concerning those same documents upon

termination of the swap. This position is neither credible nor legally viable.

38.     Additionally, Goldman's role as one of Giants Stadium's swap

counterparties meant that Goldman's relationship with Giants Stadium was similar, if not

identical, to Debtors' relationship with Giants Stadium. The advice that Goldman was providing

Giants Stadium and S&C in connection with the termination of the Transactions was therefore

advice that Giants Stadium could have later used against Goldman, had the Goldman swaps been

terminated by Giants Stadium as well.[5] Thus, regardless of whether Goldman was "interpreting"

the swap documents for S&C, it was at the same time in a potentially adverse position vis-à-vis

Giants Stadium on the very same set of issues. Such adversity operates as an absolute bar to the

---

[5] Indeed, in light of the economic uncertainty at the time, it would not have been unreasonable to
question the financial wherewithal of any large financial institution, including Goldman.

formation of the attorney-client privilege.   In re Gaming Lottery Sec. Litig., 2000 WL 340897,

*4 (S.D.N.Y. Mar. 30, 2000) ("[T]he attorney/client privilege is grounded on a confidentiality

requirement- the client must intend that his communications be confidential.  Generally, a party

cannot have a confidential relationship with a party who represents the interest of an adverse

party.") (citation omitted).

      39.      Indeed, Goldman's multiple business roles also bars the assertion of the

attorney client privilege here.  Goldman performed numerous tasks for Giants Stadium during

the relevant time period — as bond underwriter, auction manager, swap counterparty,

remarketing agent, and Goldman was one of the three leading dealers from whom a market

quotation was solicited in connection with the termination of the Transactions.  See supra, ¶ 18.

Additionally, Goldman provided Giants Stadium with general advice at this time regarding the

Stadium financing and the market.  See id.                    REDACTED

          See id.  This

multitude of services provided by Goldman makes any claim of privilege untenable.  See Export-

Import Bank, 232 F.R.D. at 113 (holding that communications between the client's financial

advisor and its counsel were not protected by the attorney-client privilege because the financial

advisor "was by the company's own reckoning a major participant in [its] financial affairs, not a

mere interpreter").

      40.      Moreover, Giants Stadium is attempting to use the privilege as both a sword

and a shield.  Giants Stadium has determined that it will selectively produce some emails

between itself, Goldman and its counsel during the same time period, but not all of them.

Goldman played a key role in calculating the Settlement Amount (all requiring various

assumptions concerning the termination), sending Giants Stadium numerous analyses of the

Transactions' value in September 2008 – all of which have been produced.  See supra at ¶ 18.

Since the Goldman documents are the only documents produced by Giants Stadium that explain

the methodology used to calculate the Settlement Amount, Giants Stadium has made the strategic

decision to selectively produce some communications with Goldman, but not all, so as to allow

Goldman's valuation analysis to potentially be central to Giants Stadium's valuation case.

Giants Stadium cannot withhold documents in which Goldman was consulted for its views on the

termination of the Transactions on the alleged basis that they are covered by the attorney-client

privilege, yet at the same time produce other documents – created during the exact same time

period – in which Goldman analyzed the Transactions.  Not only is that fundamentally unfair to

the Debtors, but this classic "sword and shield" strategy itself requires the production of the

Withheld Communications.  See, e.g.,  Frias v. United States, 2009 WL 1437797, *1 (S.D.N.Y.

May 20, 2009) ("The attorney-client privilege cannot at once be used as a shield and a sword . . .

Thus, the privilege may implicitly be waived when defendant: asserts a claim that in fairness

requires examination of protected communications.") (quoting United States v. Bilzerian, 926

F.2d 1285, 1292 (2d Cir. 1991))

  41.  At the very least, the Court should conduct an *in camera* review of the

Withheld Communications in order to determine whether they have been properly withheld

under the attorney-client privilege.  See Renner v. Chase Manhattan Bank, 2001 WL 1819215,

*4 (S.D.N.Y. July 13, 2001) ("An *in camera* review is appropriate where, as here, there has been

at least some showing, however preliminary and indeterminative, that these communications

may not be protected by the attorney-client privilege.").

  42.  In short, there is no indication here – other than the self-serving

"assumption" by Ms. Procops – that Goldman acted in an "interpretative" capacity – and that

assumption is belied by (1) the adversity of Goldman to Giants Stadium with respect to the

swaps since Goldman was a contractual counterpart to Giants Stadium; (2) the numerous

business roles played by Goldman in the various transactions; (3) the lack of any agreement by

Goldman to act for S&C in an interpretive capacity; (4) the lack of any scope of the interpretive

work; and (5) the lack of any specific payment for the services supposedly provided by Goldman

to S&C.  Thus, the Debtors seek the production of the Withheld Communications or, at least, that

the Court conduct an *in camera* inspection of the Withheld Communications.

## II.      THE WITHHELD DOCUMENTS ARE NOT SUBJECT TO THE ATTORNEY-WORK PRODUCT DOCTRINE

A.      The Attorney-Work Product Doctrine In The Second Circuit

43.      The attorney-work product does not apply to the Withheld Communications

for three reasons.  First, and most fundamentally, the Withheld Communications are not covered

by the work product doctrine in the first instance.  Second, even if they were, the presence of

Goldman, a third-party, vitiates whatever protection the Withheld Communications could be

afforded under the work product doctrine.  Third, even if the Withheld Communications were

eligible for protection under the work-product doctrine, the Debtors' substantial need for the

information outweighs the desire by Giants Stadium to shield the information.

44.      Federal Rule of Civil Procedure 23(b)(3) codifies the attorney-work product

doctrine, stating that documents "prepared in anticipation of litigation or for trial" are

discoverable only upon a showing of substantial need of the materials and inability, without

undue hardship, to obtain their substantial equivalent elsewhere.  "[T]he party invoking a

privilege bears the burden of establishing its applicability to the case at hand."  See supra, at

¶ 35.

45.      In interpreting the requirement under the Federal Rules that work-product

should only be applied to documents created "in anticipation of litigation," the Second Circuit

has adopted what is referred to as a "because of" standard. " United States v. Adlman, 134 F.3d

1194, 1202 (2d Cir. 1998) ) ("Where a document is created because of the prospect of litigation,

analyzing the likely outcome of that litigation, it does not lose protection under this formulation

merely because it is created in order to assist with a business decision.").  At the same time,

however, "it should be emphasized that the 'because of' formulation . . . withholds protection

from documents that are prepared *in the ordinary course of business or that would have been*

*created in essentially similar form irrespective of the litigation*." Id. (emphasis added).  See also

Allied Irish Banks v. Bank of Am., N.A., 240 F.R.D. 96, 106 (S.D.N.Y. 2007) ("Indeed, even

where '[t]here is little doubt under the evidence that [a party] had the prospect of litigation in

mind when it directed the preparation of the [document] . . . or that 'such documents might [also]

help in preparation for the litigation,' work product protection is not available for documents

'that are prepared in the ordinary course of business or that would have been created in

essentially similar forms irrespective of litigation.") (citations omitted).

      46.      Moreover, even where a document is "eligible" for work-product protection,

that does "not necessarily mean that the document will be protected against discovery."  Rather,

the court

> can assess whether the party seeking discovery has made an adequate
> showing of substantial need for the document and an inability to obtain its
> contents elsewhere without undue hardship.  The district court can order
> production of the portions of the document for which a litigant has made
> an adequate showing.  The court can focus its attention on whether the
> document or any portion is the type of material that should be disclosed,
> while retaining the authority to protect against disclosure of the mental
> impressions, strategies, and analyses of the party or its representative
> concerning the litigation.

Adlman, 134 F.3d at 1202-3.

B.    The Withheld Communications Are Not Protected By
       The Attorney-Work Product Doctrine

47.        Giants Stadium's attempt to terminate the Transactions was a decision made

in the ordinary course of its business, due to the exigencies of the Lehman bankruptcy.  As Ms.

Procops testified, "[w]hen we were informed or had some information that Lehman was having

problems, we were concerned . . . about what would happen to our swap . . . And so at that point

in time, unfortunately, we were forced into terminating the swap with Lehman, not that we

would, had there not been a bankruptcy."  See supra at ¶ 28.  In other words, Giants Stadium's

determination that LBSF could no longer function as an effective swap counterparty caused

Giants Stadium to attempt to terminate the Transactions.  Thus, communications in connection

with the termination of the Transaction cannot be subject to the work-product doctrine since such

communications were made in the ordinary course of Giants Stadium's business.

48.        Moreover, since Giants Stadium had a business reason to terminate the

Transactions, i.e., its desire to re-hedge the ARS following the LBHI bankruptcy, regardless of

whatever threat of litigation may have existed, the communications at issue would have also

been made in essentially similar form irrespective of any litigation.  For that reason as well, the

Withheld Communications are not protected by the work-product doctrine.  Indeed, nothing in

the privilege log establishes or even hints that the documents at issue were created to aid in

litigation instead of the normal business decision to terminate.

49.        Two recent cases are instructive in this regard.  In AIB, a bank retained an

outside expert and outside counsel to investigate a fraud perpetrated by one the bank's foreign

currency traders which had led to hundreds of millions of dollars in losses.  Allied Irish Banks,

240 F.R.D. at 99.  The bank then sought to protect the documents underlying the final report on

the grounds that, among other things, they were protected by the work-product doctrine.  The

Court held that the documents were not protected by the work-product doctrine, notwithstanding the fact that "there is no doubt" that as soon as the bank learned of the fraud, "it believed that litigation would result."  The Court found that the report was commissioned for "several reasons," and that the bank had "'business-related purposes'" in generating the materials," including the need to "address the concerns of [the bank's] customers, shareholders, creditors, and the media . . .  Id. at 106.  Following the Second Circuit's standard in Adlman, the court analyzed whether in light of the non-litigation purpose, the documents "'would have been created in substantially similar form' based on this non-litigation purpose."  Id. While the Court noted that "it is not easy for a factfinder to determine what 'would have' happened in some hypothetical situation . . . this is a question that the Adlman test requires us to answer and it is an exercise that courts have regularly performed."  The Court held that "all of the circumstances surrounding the creation of the Report point to the ineluctable conclusion that [the bank] would have prepared the Report, along with the materials used to generate it, simply because of its 'business-related purposes' – that is, regardless of the potential for litigation," and therefore required their disclosure.  Id. at 107.

50.        In Gulf Islands, Gulf entered into a purchase agreement with Bombardier Aerospace; the purchase was financed by an affiliate of Bombardier Aerospace, known as Bombardier Capital.  Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466, 475 (S.D.N.Y. 2003).  The purchase agreement ultimately became the subject of litigation, which Bombardier Aerospace and Gulf settled.  Id.  In the course of settlement discussions, lawyers for Bombardier Capital and Bombardier Aerospace exchanged e-mails regarding the amounts of the "make whole" and "breakage" fees allegedly owed by Gulf to Bombardier Capital under the financing documents; accurately calculating the amount of those fees was key to the terms of the

settlement, since it was agreed that Bombardier Aerospace would deduct those fees from its

settlement payment to Gulf, and then pay the total amount of the fees directly to Bombardier

Capital.  The make whole and breakage fees ultimately became the subject of litigation between

Gulf and Bombardier Capital, and Bombardier Capital asserted that communications between its

counsel and Bombardier Aerospace's counsel on the fees which were created in the context of

the settlement negotiations were protected by the work-product doctrine.  Id., at 475-6.

Following Adlman, the court held that Bombardier Capital

> might have foreseen that there might someday be a dispute with Gulf
> about its calculations or the imposition of the 'make whole' or 'breakage'
> payments.  But a mere potential for a future dispute is insufficient to show
> that a party acted in 'anticipation of litigation' . . . In any event, the mere
> fact that a potential dispute looms on the horizon is insufficient to show
> that the communications . . . would not have been made in precisely the
> same form as part of the regular course of Bombardier Capital's business
> irrespective of the possibility of litigation.  The documents at issue consist
> only of discussions that were directly relevant to provide the payoff
> amount needed to consummate the Settlement Agreement.

Id. at 476 (citation omitted).

51.       As in AIB and Gulf Islands, Giants Stadium may (or may not) have

considered the potential for litigation between itself and the Debtors when it terminated the

Transactions; however, Giants Stadium would have attempted to terminate the swaps, valued

them, calculated a Settlement Amount, and entered into alternative financing arrangements in the

ordinary course of its business irrespective of the possibility of litigation since it could not

maintain the Transactions with LBSF after the bankruptcy was commenced.  Accordingly, under

the Adlman standard and its progeny, documents exchanged as a result of the termination of the

Transactions cannot be subject to the work product doctrine.

C.       The Presence of Goldman Vitiates the Work-Product Doctrine

52.        Second, even if the Withheld Communications were prepared "because of"

litigation, they still must be produced because of the presence of Goldman, a third party who, as

discussed above, was not within the <u>Kovel</u> exception.  <u>See</u> <u>United States v. Hatfield</u>, 2010 WL

183522, at *1 (E.D.N.Y. Jan. 8, 2010) (holding that where there is no evidence that attorney

retained accountant as "translators," the accountant's work "from the outset . . . did not fall

within the attorney-client privilege or the work-product doctrine.").  Moreover, as discussed

above (supra, ¶ 38), since Goldman was in an adversarial position to Giants Stadium in

connection with their own interest rate swaps, communications between the two of them cannot

be subject to the work product doctrine.  <u>See</u> <u>NXIVM Corp. v. O'Hara</u>, 241 F.R.D. 109, 138

(N.D.N.Y. 2007) ("A voluntary disclosure of work product, for some or any inexplicable benefit,

to a third party, especially if the party is an adversary, may waive the immunity.") (citation

omitted).

D.        <u>The Debtors Have Substantial Need of the Withheld Communications</u>

53.        Even if the Withheld Communications are eligible for work-product

protection under the Second Circuit standard, Giants Stadium should still be compelled to

produce them to Debtors because Debtors have shown a substantial need for such materials,

which they cannot obtain in any other way absent undue hardship.  <u>See</u> supra, ¶ 46.  Specifically,

Ms. Procops testified that she did not believe there was anyone "at Giants Stadium who was

more involved in the termination of the Lehman swaps" than she was.  <u>See</u> Procops Tr. at 143:3-

7.  Yet during her testimony Ms. Procops, testified that she either did not recall, or had no

knowledge of, several key issues which bear directly upon the Debtors' investigation of Giants

Stadium's claims.  <u>See</u> infra, ¶¶ 54-57.  Given Ms. Procops' lack of recollection and the

apparent absence of anyone else at Giants Stadium with any greater knowledge, the Debtors'

need for the information overrides whatever protection the Withheld Communications could receive from the work-product doctrine.

54.    For example,    REDACTED

See Ex. J to the Firestone Decl.    REDACTED    When Ms. Procops was shown the e-mail, she testified that she did not recall either asking the NFL for permission to terminate the Transactions, or whether she ever responded to the NFL official's request that she verify the facts in his e-mail.  See Procops Tr. at 116:19-117:22; 119:11-18.  Ms. Procops also did not "remember or know" where the valuation referenced by the NFL "came from."  Id. at 127:10-14.

55.    On September 17, 2008, Ms. Procops sent e-mails to the Trustee and the bond insurers for the ARS, informing them that Giants Stadium needed to terminate the Transactions by September 18, 2008 "in order to preserve the value of StadCo.'s (significant) claims against the estate of the Lehman swap counterparty."  See Exs. K and L to the Firestone Decl.   Ms. Procops testified that she did not recall why Giants Stadium needed to terminate the Transactions by September 18, 2008 in order to "preserve the value" of Giants Stadium's claim. See Procops Tr. at 156:9-17; 161:14-22.

56.    REDACTED

See Ex. M to the

Firestone Decl.  Here too, Ms. Procops (who was copied on the e-mail), testified that she did not understand how a bankruptcy filing by LBI would affect Giants Stadium's ability to collect a claim.  <u>See</u> Procops Tr. at 169:7-15.

57.        Lastly, Ms. Procops did not know why Giants Stadium executed a Third Supplemental Indenture on the day that the Transactions were terminated, nor did she recall whether Giants Stadium sought approval from Lehman as a prerequisite to doing so.[6]  <u>See id.</u> at 80:6-81:5.

58.        Debtors have a substantial need to obtain information related to the sample topics described above, which concern Giants Stadium's own valuation of the Transactions, its reasons for terminating the Transactions, and the process by which termination was accomplished.  <u>See</u> <u>Nat'l Cong. for Puerto Rican Rights v. City of N.Y.</u>, 194 F.R.D. 105, 110 (S.D.N.Y. 2000) ("A substantial need for work product material exists where the information sought is 'essential' to the party's defense, is 'crucial' to the determination of whether the defendant could be held liable for the acts alleged, or carries great probative value on contested issues.'").  In light of the absence of testimony on these topics, Giants Stadium cannot protect from disclosure those documents which discuss these core factual issues on the basis of work-product.  Accordingly, work-product protection is not available for the Withheld Communications.

<u>**NOTICE**</u>

59.        No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service;

---

[6] The Third Supplemental Indenture removed language from the Indenture requiring a certain percentage of the ARS to be hedged at all times.

(v) the United States Attorney for the Southern District of New York; (vi) Giants Stadium, and (vii) all other parties entitled to notice in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures for these cases [Docket No. 9635].  The Debtors submit that no other or further notice need be provided.

60.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just.

Dated: August 25, 2011
New York, New York

By: /s/Richard W. Slack
    Richard W. Slack
    Peter Gruenberger
    Robert J. Lemons
    Michael J. Firestone

    WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
    New York, New York 10153
    Telephone: (212) 310-8000
    Facsimile: (212) 310-8007

    Attorneys for Debtor
    and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
In re                                              :          **Chapter 11 Case No.**
                                                   :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*  :          **08-13555 (JMP)**
                                                   :
                              **Debtors.**         :          **(Jointly Administered)**
-------------------------------------------------------------------x

### DECLARATION OF MICHAEL J. FIRESTONE
### IN SUPPORT OF DEBTORS' MOTION TO COMPEL
### PRODUCTION OF DOCUMENTS IMPROPERLY
### WITHHELD AS PRIVILEGED BY GIANTS STADIUM LLC

I, MICHAEL J. FIRESTONE, declare under penalty of perjury, this 25th day of

August, 2011:

1.      I am an associate at Weil, Gotshal & Manges LLP, counsel for debtors

Lehman Brothers Holdings Inc. ("LBHI"), and Lehman Brothers Special Financing Inc.

("LBSF," and with LBHI, the "Debtors" and, collectively with their debtor and non-

debtor affiliates, "Lehman").  I submit this declaration in support of the Debtors' Motion

to Compel Production of Documents Improperly Withheld as Privileged by Giants

Stadium (the "Motion").  The facts set forth below are based on my personal knowledge.

2.      In August 2007, Giants Stadium issued $650 million in auction rate

securities (the "ARS"), in connection with the financing of the construction of the New

Meadowlands Stadium.

3.      Lehman was one of the initial purchasers of tranches A4 – A7 of the ARS;

Lehman Brothers Inc. also served as broker-dealer for those tranches.

4.      In connection with the ARS offering, LBSF and Giants Stadium entered

into two substantively identical interest rate swaps guaranteed by LBHI (the

"Transactions"), each pursuant to two separate 1992 ISDA Master Agreements dated July 27, 2007 (collectively, and together with the schedules and exhibits thereto and each confirmation exchanged with regard to the Transactions, the "Master Agreements").

5.      On September 15, 2008, LBHI filed its chapter 11 petition.  Three days later, on September 18, 2008, Giants Stadium purported to terminate the Transactions.

6.      On October 2, 2008, Giants Stadium sent LBSF letters for each of the Transactions, which attempted to calculate the Settlement Amounts owed under the Master Agreements.

7.      Purportedly applying the Loss methodology, Giants Stadium determined that LBSF owed Giants Stadium a Settlement Amount of $301,025,197 as a result of its early termination of the Transactions.

8.      On September 22, 2009, Giants Stadium filed Proofs of Claim against LBHI and LBSF, each in the amount of $301,804,617.14 (the "Proofs of Claim").

9.      In order to investigate the Proofs of Claim and determine, among other things, whether or not Giants Stadium's calculation of the Settlement Amount is subject to dispute, on or about May 19, 2010 the Debtors served a subpoena (the "Subpoena") on Giants Stadium, pursuant to Rule 2004, for the production of documents.  In response to the Subpoena, Giant Stadium has produced documents to the Debtors.

10.     On May 25, 2011, Giants Stadium's chief financial officer, Christine Prcocops, was examined by the Debtors under oath pursuant to the Rule 2004 Order. (Relevant excerpts from the Procops Transcript (the "Procops Tr.") are attached hereto as Exhibit A.)

11.     The Debtors' examination of the issues surrounding the Transactions is

ongoing.

12.     On or about November 10, 2010, Giants Stadium produced a privilege log

listing 551 documents purportedly withheld from the Debtors on the grounds of attorney-

client privilege and/or work-product doctrine (the "Privilege-Withhold Log").  That same

day, Giants Stadium also produced a log identifying 484 documents from which materials

purportedly covered by the attorney client privilege and/or work product doctrine were

redacted (the "Privilege-Redaction Log," and with the Privilege-Withhold Log, the

"Logs").

13.                    REDACTED

14.     On February 24, 2011, Debtors sent a letter to Giants Stadium's attorneys

challenging, among other things, Giants Stadium's designation of communications

between or among Giants Stadium, S&C, and Goldman and/or Nixon Peabody as subject

to the attorney-client privilege (the "February 24 Letter").  (A copy of the February 24,

2011 Letter is attached hereto as Exhibit B).

15.     On March 17, 2011, counsel for the Debtors and Giants Stadium held a

telephonic meet-and-confer, during which issues raised in the February 24, 2011 Letter

were discussed.

16.     On March 25, 2011, Giants Stadium's attorneys informed Debtors'

counsel by letter that it had re-reviewed its privilege log and decided to selectively

produce some additional documents in which Goldman participated, but not all.  (A copy

of the March 25, 2011 letter is attached hereto as Exhibit C).

17.    On April 4, 2011, Giants Stadium produced communications (and

documents attached thereto) which had been previously withheld as privileged, along

with a revised privilege and redaction logs, dated as of April 1, 2011 (the "Revised

Privilege-Withhold Log" and the "Revised Privilege-Redaction Log," and collectively,

the "Revised Logs")).

18.                    REDACTED

                    (collectively, the "Withheld

Communications").                REDACTED

                    (Excerpts from the Revised Logs

identifying the Withheld Communications are attached hereto as Exhibits D and E,

respectively.  Also attached as Exhibit F is a list of individuals identified on Giants

Stadium's Revised Logs, as well as the organizations which with they are affiliated,

which was provided to the Debtors along with the Logs.)

19.    On April 8, 2011, Debtors' counsel sent a letter to counsel for Giants

Stadium, in which they reiterated that the Withheld Communications were not privileged,

and requested that Giants Stadium provide Debtors with information to establish a proper

privilege over the Withheld Communications.  To date, Giants Stadium has not done so.

20.     Attached hereto as Exhibit G are copies of e-mails produced by Giants Stadium, bates stamped GStad_LB_0058869-71; 0058890-91; 0021253; 0021260.

21.     Attached hereto as Exhibit H is a copy of an email produced by Giants Stadium, bates stamped GStad_LB_0063325

22.     Attached hereto as Exhibit I is a copy of a document produced by Giants Stadium, bates stamped GStad_LB_0018340-43.

23.     Attached hereto as Exhibit J is a copy of a document produced by Giants Stadium, bates stamped GStad_LB_0020367.

24.     Attached hereto as Exhibit K is a copy of a document produced by Giants Stadium, bates stamped GStad_LB_0052953.

25.     Attached hereto as Exhibit L is a copy of a document produced by Giants Stadium, bates stamped GStad_LB_0020291.

26.     Attached hereto as Exhibit M is a copy of a document produced by Giants Stadium, bates stamped GStad_LB_0048701-02.

Dated: August 25, 2011
New York, New York

/s/Michael J. Firestone
MICHAEL J. FIRESTONE

# EXHIBIT A

1

1
2    IN THE UNITED STATES BANKRUPTCY COURT
     FOR THE SOUTHERN DISTRICT OF NEW YORK
3    CHAPTER 11
     CASE NO. 08-13555 (JMP)
4
5    IN RE:
6    LEHMAN BROTHERS HOLDINGS, et al.,
7
          Debtors,
8    ----------------------------------------
          CONFIDENTIAL TRANSCRIPT OF
9          VIDEOTAPED DEPOSITION
            OF CHRISTINE PROCOPS
10
11        TRANSCRIPT of the stenographic
12   notes of the proceedings in the
13   above-entitled matter, as taken by and
14   before TAB PREWETT, a Registered
15   Professional Reporter, a Certified
16   Shorthand Reporter, a Certified LiveNote
17   Reporter, and Notary Public, held at the
18   Offices of WEIL GOTSHAL & MANGES LLP, 767
19   Fifth Avenue, New York, New York, on
20   Wednesday, May 25, 2011, commencing at
21   10:50 a.m.
22
23
24
25

18

Christine Procops

1
2  say the next, you know, few months.
3  And I will give you a precise --
4  precise range and you then let me
5  know.
6        MR. CLARK:  Noted.
7        (Document, September 2008
8  Calendar for Ms. Procops, requested.)
9        Q    Maybe just to be clear, we
10  talked about Giants Stadium LLC and their
11  officers and employees now.  Were there
12  officers of Giants Stadium LLC in 2008?
13      A    Same individuals that I noted
14  earlier.
15      Q    And was it essentially the same
16  structure in 2008, that there were a
17  certain number of marketing individuals who
18  worked for Giants Stadium LLC, and other
19  than that, there were the three authorized
20  representatives that you previously
21  identified?
22      A    I'm not sure there were.
23  Marketing individuals were not employed
24  until after that period.  No.
25      Q    Okay.  So in 2008, what's your

19

Christine Procops

1
2  best recollection of how many employees, if
3  any, Giants Stadium had?
4      A    My best recollection is there
5  were no employees.
6      Q    And in 2008, did Giants Stadium
7  LLC have an in-house legal function?
8      A    No.
9      Q    How were legal services that
10  Giants LLC -- Giants Stadium LLC needed,
11  how were those provided?
12      A    Giants Stadium LLC either used
13  Sullivan & Cromwell or McCarter & English
14  for their services.
15      Q    Was there any person who acted
16  as general counsel for Giants Stadium LLC
17  in 2008?
18      A    I do not believe that was the
19  official title, but John Mara did at that
20  time and has performed that function for
21  us.
22      Q    Same question, today, is there
23  an individual that acts as the general
24  counsel or has the function of a general
25  counsel for Giants Stadium LLC?

20

Christine Procops

1
2      A    Bill Heller.
3      Q    And Mr. Heller is also the
4  general counsel of the Giants football
5  team?
6      A    New York Football Giants, yes.
7      Q    Would you like me to call it
8  the New York Football Giants?  I will try.
9      A    "Football Giants" is fine.
10      Q    I will try to be official about
11  it.
12      A    Well, if we could, could we
13  just get some terminology for all of our
14  entities.  If you're referring to the team,
15  can we just call them the "Giants"?
16      Q    Yes.  That would be great.
17      A    And then if we are referring to
18  the stadium entity, can it be GS LLC.
19      Q    Well, that's not how I
20  generally speak --
21      A    Giants Stadium.
22      Q    That's not how I generally see
23  it, but we will do either.  I will
24  understand it if you want to call it
25  GS LLC.  That's what we are referring to.

21

Christine Procops

1
2      A    When you refer to it as "Giants
3  Stadium," that is a separate building,
4  distinct from Giants Stadium LLC.  That's
5  where the confusion is.
6      Q    I see.  What you are saying is
7  it's the "LLC" at the end of that.
8      A    Correct.
9      Q    Well, I'm not going to be
10  asking you about the physical building at
11  any time, I don't think.  That's -- I will
12  try to adhere as much as I can.
13      A    As long as we know.
14      Q    Yes.
15      A    "Giants Stadium" refers to the
16  LLC.
17      Q    That is what I mean when I say
18  that.
19      A    Okay.
20        MR. CLARK:  Fine, good.
21      A    Okay.
22      Q    So at some point, Giants
23  Stadium was -- Giants Stadium was formed,
24  correct?  The LLC was formed, right?
25      A    Correct.

**Elisa Dreier Reporting Corp.  (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

22

Christine Procops
2    Q    That was roughly in 2005?
3    A    Yes.
4    Q    And what was the purpose of
5    creating Giants Stadium LLC?
6    A    That entity -- that entity's
7    purpose was to construct a new building at
8    the Meadowlands.
9    Q    When you say a new building,
10    are you referring to the field and the
11    associated stadium?
12    A    The new stadium.  Correct.
13    Q    And did Giants Stadium LLC look
14    at a number of different options to finance
15    the stadium?
16    A    Yes.
17    Q    And did it ultimately issue
18    auction rate securities as part of its
19    financing of the new facility?
20    A    Yes.
21    Q    So can you explain what an
22    auction rate security is?
23    A    An auction rate security is a
24    method of financing in which investors
25    participate in a Dutch auction every so

23

Christine Procops
2    often.  In our case, it was 30-day
3    auctions; and they bid through an auction
4    agent.
5        And a broker/dealer is the
6    individual who markets those securities to
7    various investors.  And the rate in which
8    the auction rate securities clear is the
9    highest rate in which the entire tranche of
10    debt can be cleared on the auction.
11    Q    And did Giants Stadium LLC
12    issue a seven series of auction rate
13    securities as part of the financing?
14    A    Yes.
15    Q    And if I refer to them as A-1
16    through A-7, is that something that is
17    familiar to you?
18    A    Yes.
19    Q    And the A-1 through A-3 series
20    had an associated interest rate swap with
21    Goldman Sachs; didn't it?
22    A    Can you repeat the question.
23    Q    The A-1 through A-3 auction
24    rate security series had an associated
25    interest rate swap with Goldman Sachs that

24

Christine Procops
2    related to those series; is that right?
3    A    No.
4    Q    It did not?
5    A    No.
6    Q    Okay.
7    A    Only A-2 and A-3.
8    Q    Thank you.  I think that was
9    helpful.
10        And then the series A-4 through
11    A-7 had an associated interest rate swap
12    with Lehman, correct?
13    A    Correct.
14    Q    And Goldman Sachs and Lehman
15    also were underwriters for the issuance of
16    the auction rate securities; is that right?
17    A    Correct.
18    Q    And, at least initially, when
19    they were issued, Lehman and Goldman also
20    acted as broker/dealers for their
21    respective tranches that we outlined a
22    couple of questions ago; is that right?
23    A    Correct.
24    Q    What were the roles of FGIC and
25    FSA, which are insurance entities, with

25

Christine Procops
2    respect to the issuance of auction rate
3    securities that Giants Stadium LLC issued?
4    A    They provided bond insurance
5    for the auction rate securities that were
6    issued.
7    Q    So using the time frame of
8    doing the financing for the new stadium,
9    can you tell me what was your first
10    interaction with Lehman in connection with
11    the issuance of auction rate securities?
12    A    I don't remember the exact time
13    frame of -- are you specifically asking for
14    the actual issuance or just the financing
15    in general?
16    Q    What I am asking is, more
17    generally, Lehman, obviously, was involved
18    in the issuance of auction rate securities.
19    And I am just asking what your earliest
20    recollection is of the involvement of
21    Lehman in that process.
22    A    Lehman served as a consultant
23    to the project since much earlier; auction
24    rate securities had been discussed on many
25    occasions up to that point.

26

1        Christine Procops
2        Q    So let me rephrase it because I
3    obviously wasn't clear enough.
4             And I could tell -- you were
5    much clearer.  In connection with the
6    project, what was the -- what was the first
7    interaction that you recall with Lehman?
8        A    In connection with the closing
9    of the financing or just in general.
10       Q    Just in general, with -- in
11   other words, you said they were an advisor
12   to the project.  So at some point they
13   became involved with the project.  And I'm
14   asking:
15            What is your earliest
16   recollection of, you know, your interaction
17   and, you know, with Lehman?
18       A    It could have been as early as
19   2004 or 2005.
20       Q    And how is it that Lehman
21   became an advisor to Giants Stadium LLC in
22   connection with the project?
23       A    They have a group of
24   individuals that worked there that were
25   familiar with building stadiums and raising

27

1        Christine Procops
2    financing dollars in which to construct
3    them.
4        Q    And do you remember the people
5    in that, in that group at Lehman who had
6    that experience?
7        A    The person who was in charge of
8    that was Sal Galatiota.
9        Q    Do you remember any of the
10   other Lehman professionals who were
11   involved in that project?
12       A    Brent Johnston, Steve Lessing.
13   There were a number of other analysts that
14   worked with them.
15       Q    And was Goldman Sachs also an
16   advisor to Giants Stadium LLC with respect
17   to the project of building the new stadium?
18       A    Not during that period of time.
19   Not as early as Lehman was, no.
20       Q    At some point did Goldman Sachs
21   become an advisor to Giants Stadium LLC?
22       A    Yes.
23       Q    And when was that?
24       A    When we were close to
25   construction, constructing the stadium and

28

1        Christine Procops
2    needed to issue the debt, we had a series
3    of meetings interviewing various investment
4    bankers.  Goldman Sachs was ultimately the
5    firm that we selected.
6        Q    When you say they were
7    ultimately the firm that you selected,
8    selected to play what role at that time?
9        A    To advise Giants Stadium LLC on
10   how to finance the stadium, to interact
11   with the bond dealers, and to basically run
12   the financing in conjunction with Giants
13   Stadium LLC.
14       Q    And --
15       A    It was an underwriting
16   function.
17       Q    Did Lehman continue in that
18   role once Goldman Sachs was selected?
19            MR. CLARK:  Objection to "that
20       role."  I'm not sure --
21       Q    Let me ask it differently.
22   That's fine.
23            What was the role of Lehman
24   Brothers once Giants Stadium had selected
25   Goldman Sachs to act as advisor with

29

1        Christine Procops
2    respect to the project?
3        A    Lehman Brothers had established
4    a relationship with us.  They were involved
5    in following along with Giants Stadium LLC
6    as to what was issuing, what was being
7    done, how it was being issued, was there
8    any role they could play, why give this all
9    to Goldman.
10       Q    Did Lehman and Goldman Sachs
11   have a co-role.  Or was Goldman Sachs the
12   lead advisor with respect to the project?
13       A    Initially, Lehman had -- there
14   was a period of time in which that group of
15   consultants left Lehman Brothers.  Sal
16   Galatiota and formed his own firm.
17            We then -- that relationship
18   really was then with GSP as opposed to
19   Lehman Brothers.  We did not decide that
20   Lehman would have any official role with
21   the transaction until right before the
22   financing closed.
23       Q    Okay.  So how is it that Giants
24   Stadium then, as the financing -- the
25   financing was about to close, chose to

46

Christine Procops

1
2  spoke to you during these conversations
3  post him leaving Lehman to go to Barclays?
4      A    No.
5      Q    Okay.  You understood at some
6  point that Lehman had purchased all of the
7  auction rate securities in the A-4 through
8  A-7 series, correct?
9      A    We were told that by Rob
10  Taylor.
11     Q    I'm sorry.  What is that?
12     A    We were told that by Rob
13  Taylor.
14     Q    Did you come to learn that
15  those securities had been transferred to
16  Barclays?
17     A    Yes.
18     Q    And when did you learn that?
19     A    Sometime probably after they
20  were transferred to Barclays.
21     Q    How did you learn that?
22     A    I can't remember.
23     Q    Did you have a discussion with
24  Rob Taylor about Barclays' ownership of the
25  auction rate securities?

47

Christine Procops

1
2      A    I may have or Steve Lessing.  I
3  can't recall who.
4      Q    So in the period where you
5  learned that Lehman might file for
6  bankruptcy in the middle of September, what
7  do you recall doing after you learned --
8  after you learned that?
9      A    We had a lot of internal
10  conversations as to what we should do.
11     Q    And who was involved in those
12  internal conversations?
13     A    Giants Stadium LLC's counsel,
14  myself, John Mara.
15     Q    Did you have any conversations
16  with anyone from Goldman Sachs about
17  what -- what you should do next?
18     A    Yes.
19     Q    And with whom did you have
20  conversations at Goldman Sachs?
21     A    Greg Carey, Stacy Sonnenberg.
22  Dan Bingham, Sylvia Yeh, Y-e-h.  I am sure
23  there were a number of other people.  We
24  had a lot of conversations with a lot of
25  people, as you could imagine.

48

Christine Procops

1
2      Q    Well, focusing not on
3  conversations with your -- with your
4  counsel, but focusing on conversations that
5  you had either internally without counsel
6  or conversations with Goldman Sachs, what
7  do you recall being the subject of the
8  conversations that you had without counsel?
9      A    For what period of time was
10  this?
11     Q    Again, right after you learned
12  that Lehman might file for bankruptcy.
13     A    We had conversations with
14  Goldman Sachs, among others, about stepping
15  into the shoes of Lehman Brothers for the
16  swap.  We had conversations about whether
17  or not they would become broker/dealer
18  because we obviously needed one.  We had
19  conversations about what to do now.
20     Q    Did you have any discussions
21  with Goldman Sachs about potentially
22  terminating the swaps with Lehman?
23     A    Yes, since we would have had
24  conservations with bond insurers and
25  Goldman to get approval from the bond

49

Christine Procops

1
2  insurers to terminate the swap.
3      Q    What do you recall -- well,
4  let's start with the bond insurers.
5          What do you recall -- well, let
6  me ask it -- let me start this way.
7          When do you recall talking to
8  the bond insurers about potentially
9  terminating the swap with -- swaps with
10  Lehman?
11     A    When we were informed or had
12  some information that Lehman was having
13  problems, we were concerned.  I mean,
14  there's a lot of Lehman entities, and I'm
15  not sure I really understand the
16  relationship of all of them.
17          So we were concerned about what
18  would happen to our swap when it gets mixed
19  up into that whole mess of Lehman Brothers.
20  And so at that point in time,
21  unfortunately, we were forced into
22  terminating the swap with Lehman, not that
23  we would, had there not been a bankruptcy.
24          So we needed to -- the bond
25  insurers on these deals basically control

50

Christine Procops

1  Christine Procops
2  what we can or cannot do, not the
3  investors. So we need approval from them
4  to do everything.
5        We wanted to file for the
6  termination of the swap, and we needed to
7  discuss that with them and explain to them
8  as to what we were doing and why.
9     Q   And who do you recall speaking
10  with at FGIC and FSA with respect to the
11  reasons why you wanted to terminate the
12  swap?
13     A   Whoever we could find at FGIC.
14  At that point in time when that was going
15  on, I think it was Jack Friedman. I can't
16  remember specific names -- Olivia from FSA,
17  their counsel on both sides.
18     Q   Did you speak with both of
19  them, both FSA and FGIC together?
20     A   Yes, we did.
21     Q   And what do you recall saying
22  to FGIC during the conversations where you
23  were explaining to them that you wanted to
24  terminate the swap?
25     A   Specifically, to FGIC or just

51

Christine Procops

1  Christine Procops
2  in general?
3     Q   Specifically, in those
4  conversations, yes, what do you recall
5  saying in those conversations?
6        MR. CLARK: I think the witness
7     is asking, do you mean just FGIC or
8     the two of them?
9     Q   FGIC and FSA. I am asking what
10  did you say to -- what do you recall in
11  your conversations with the bond insurers
12  concerning, you know, your desire to
13  terminate the swap?
14     A   We told them we were concerned
15  about Lehman Brothers. We told them that
16  this was in the best interests of the
17  project to terminate the swap. We asked
18  for their approval.
19     Q   Why did you tell them it was in
20  the best interests of the project to
21  terminate the swap?
22     A   Because at that point in time,
23  there was really nothing going on with
24  Lehman Brothers. Rob Taylor wasn't going
25  to be there. There was concern about

52

Christine Procops

1  Christine Procops
2  Lehman Brothers's future, if any of their
3  entities had filed for bankruptcy. And so
4  we made that decision.
5     Q   Do you recall saying anything
6  else to the FGIC and FSA representatives
7  during these phone calls?
8     A   Specifically?
9     Q   Yes.
10     A   I don't remember anything
11  specifically.
12     Q   Did you also have conversations
13  with the NFL to get the NFL's approval to
14  terminate the swap?
15     A   I don't remember having
16  conversations, but we would have since we
17  would have needed approval.
18     Q   As you sit here today, you
19  don't remember any of those conversations?
20     A   No.
21     Q   In the time period of
22  September, middle of September of 2008,
23  what were the roles that you recall Goldman
24  Sachs playing with respect to Giants
25  Stadium LLC?

53

Christine Procops

1  Christine Procops
2     A   They were a counterparty to a
3  swap on A-2 and A-3.
4     Q   When you say that, that means
5  they were a -- they had a contract where
6  they were on the other side of Giants
7  Stadium LLC, correct?
8     A   Correct.
9     Q   And in one sense, they were in
10  the same position as a swap counterparty --
11  that Lehman was in financial trouble, as
12  Lehman was as a swap counterparty, correct?
13     A   Correct.
14     Q   What were the other roles that
15  you recall Goldman playing?
16     A   They were the broker/dealer for
17  the auction rate securities that we still
18  had in the market.
19     Q   And, again, at least prior to
20  the time of the bankruptcy, Lehman also
21  acted as broker/dealer for the swaps,
22  correct?
23     A   Correct.
24     Q   Okay.
25     A   They also were providing some

54

1          Christine Procops
2     consulting services for us.
3          Q     What consulting services was
4     Goldman providing to Giants Stadium LLC
5     during this time period?
6          A     After the bankruptcy?
7          Q     Yes.
8          A     They were assisting us in
9     trying to figure out a plan going forward
10    for the securities.
11         Q     When you say trying to figure
12    out a plan going forward for the
13    securities, you are talking about the
14    auction rate securities?
15         A     Correct.
16         Q     Were you talking to Goldman
17    Sachs about refinancing the auction rate
18    securities?
19         A     We were talking to Goldman
20    Sachs about the market in general and what
21    we could do about it.
22         Q     And what were the options that
23    you spoke to Goldman Sachs about with
24    respect to the auction rate securities?
25         A     There were a lot of them.  I --

55

1          Christine Procops
2     in particular, I remember VRDBs -- variable
3     rate demand bonds.
4          Q     Anything else?
5          A     Nothing, nothing specifically
6     that I can remember.  It was just a lot of
7     conversations.
8          Q     Were there any other consulting
9     services that Goldman Sachs was providing
10    to Giants Stadium LLC?
11         A     They were -- they were
12    assisting us at times in understanding the
13    market and what was going on.
14         Q     And anything else?
15         THE WITNESS:  Can I speak to
16    you for a moment.
17         MR. CLARK:  That's fine with
18    me.
19         MR. SLACK:  Well, I mean, I
20    would ask this:
21         Q     If there is something you don't
22    understand about the question, you can ask
23    me.  If there is an attorney-client
24    question that you have --
25         A     It's a privilege question that

56

1          Christine Procops
2     I have.
3          Q     You should definitely talk to
4     your counsel about that.
5          MR. CLARK:  Okay.  Take off
6     your microphone.  We will be right
7     back.
8          THE VIDEOGRAPHER:  The time is
9     11:51 a.m.; we are going off the
10    record.
11         (A break is taken.)
12         THE VIDEOGRAPHER:  The time is
13    11:58 a.m.; we are back on the record.
14         Q     Ms. Procops, we were talking
15    about Goldman Sachs and their role in mid
16    September of 2008.  And you had indicated
17    that they had the role of swap counterparty
18    broker/dealer and also provided consulting
19    services to Giants Stadium LLC.
20         And you had been describing
21    some of the consulting services that they
22    provided.  And I asked you whether there
23    was anything that you had not testified to
24    that Goldman Sachs also provided as a
25    consulting service to Giants LLC.  You said

57

1          Christine Procops
2     you needed to talk to your counsel.  So now
3     I ask you whether you have anything to add
4     to your testimony.
5          A     Goldman Sachs was also acting
6     with our counsel.
7          Q     Was there any -- was there any
8     retention letter that Giants Stadium LLC
9     had with Goldman Sachs with respect to
10    their consulting?
11         A     Not that I recall, no.
12         Q     Was there any retention letter
13    that your counsel had with Goldman Sachs
14    with respect to their consulting?
15         A     I don't know.
16         Q     Were the same people who were
17    providing consulting services to Giants
18    Stadium LLC with respect to the market and
19    options with respect to the ARS securities
20    the people who also provided help to your
21    lawyers?
22         A     Some of them may have been the
23    same, but I don't know of every
24    conversation our lawyers had with them.
25         Q     Are you aware as you sit here

62

1          Christine Procops
2    main role was, I don't know that I can
3    answer that question.
4          Q    Well, who could answer that
5    question?
6          A    Those were conversations that
7    she had with our counsel for the most part.
8    I don't know specifics.  You are talking --
9    you are asking me to remember conversations
10   that I had a long time ago.  I don't recall
11   specifics of the conversations.
12         Q    Well, what was it -- let me ask
13   it -- let me try to ask it differently.
14              What was the role that Goldman
15   Sachs played in providing services to your
16   counsel?
17              MR. CLARK:  Same objection.
18         Q    You can answer.  I guess,
19   because you have not been deposed before,
20   there is a little bit of technical aspect
21   to this, which is I ask questions, your
22   counsel can object; but the fact that your
23   counsel objects doesn't -- doesn't
24   interfere with your ability to answer.  So
25   you still need to answer the question that

63

1          Christine Procops
2    I am asking.
3          A    I am thinking about your
4    question and how I'm supposed to answer it
5    a different way.
6              MR. CLARK:  I think Richard'S
7    characterization is correct; but,
8    hopefully, if I am objecting, there is
9    a reason for it.  And it may be that's
10   why the witness is having trouble
11   answering the question.  In other
12   words, if you can't answer the
13   question as asked, simply tell Richard
14   that, and he will rephrase.
15         A    I can't answer the question as
16   asked.
17         Q    And why can't you answer the
18   question as asked?
19         A    Because I don't know the
20   specifics of conversations that she may
21   have had with our counsel.
22         Q    Did --
23         A    I can't remember them.
24         Q    Did Giants Stadium LLC ask
25   Goldman Sachs to provide advice to your

64

1          Christine Procops
2    counsel.
3          A    Repeat that one more time.
4          Q    Can you repeat the question,
5    please.
6              (Reporter read back pending
7    question.)
8          A    Yes.
9          Q    What advice did you -- what
10   type of advice did you ask Goldman Sachs to
11   provide your counsel?
12         A    Our swap and ISDA document was
13   very complicated, as was our entire
14   transaction.  Our counsel at Sullivan &
15   Cromwell does not necessarily know what the
16   market interpretation of certain provisions
17   in our agreements are.  I am assuming that
18   we used Goldman Sachs to assist our counsel
19   in that method.
20         Q    Did you ask anyone at Goldman
21   Sachs to provide that information to your
22   counsel?
23         A    I asked Goldman Sachs to assist
24   our counsel in doing that.  Yes.
25         Q    Who did you tell that to?

65

1          Christine Procops
2          A    Greg Carey and Stacy
3    Sonnenberg, I believe, also Zack Efrom; but
4    that might have been from somebody
5    internally.
6          Q    I'm sorry.
7          A    There were other people at
8    Goldman Sachs.  There is a lot of people
9    involved who understand the swap market and
10   ISDA documents a lot better than we do, and
11   our counsel, as great as they are.
12             MR. CLARK:  Thank you.
13         Appreciate that.
14         Q    And Giants Stadium was the one
15   who was paying Goldman Sachs for doing
16   that, correct?
17         A    Yes.
18         Q    And what was the agreement for
19   paying Goldman Sachs for providing services
20   to counsel?
21         A    We didn't have an official
22   agreement.
23         Q    So how was Goldman Sachs
24   compensated for providing advice to your
25   counsel?

66

Christine Procops

1
2     A     We dealt with that later on
3  when we decided to use them for other
4  services, and so, when we do that, we kind
5  of combine all of our fees together.
6     Q     And so the fees that were
7  charged by Goldman Sachs for providing
8  advice to Sullivan & Cromwell was
9  incorporated in later fees for other
10 transactions?
11    A     I believe so.  Yes.
12    Q     Were they -- was there any kind
13 of designation at the time of these later
14 transactions that fees for this work were
15 getting incorporated?
16    A     I think there was an
17 understanding, yes.
18    Q     When you say there was an
19 understanding, there was an understanding
20 with whom?
21    A     Greg Carey.
22    Q     Now, Goldman Sachs was also, at
23 the time that it was providing advice about
24 the general market interpretation of ISDA
25 agreements to Sullivan & Cromwell, a swap

67

Christine Procops

1
2  counterparty itself, correct?
3     A     To Giants Stadium LLC?
4     Q     Yes.
5     A     Correct.
6     Q     And as a swap counterparty, it
7  was in an adverse position to Giants
8  Stadium LLC; wasn't it?
9     A     I wouldn't characterize that as
10 adverse.  I characterize it as a
11 counterparty.
12    Q     That's fair.  I understand.
13 But Goldman Sachs was a counterparty on the
14 other side of a contract with Giants
15 Stadium LLC in the same position that
16 Lehman was, correct?
17    A     As counterparty.
18    Q     As counterparty?
19    A     But not bankrupt.
20    Q     I understand.  Was there any
21 writing that you are aware of that
22 discusses, sets forth, that sets forth or
23 in any other way documents the role that
24 Goldman Sachs had as advising your counsel
25 in connection with the Lehman swaps?

68

Christine Procops

1
2     A     Can you repeat that.
3         MR. SLACK:  Can you read it
4  back.
5         (Reporter read back pending
6  question.)
7     A     I don't believe that there is
8  any official document.  There were a series
9  of conversations.
10    Q     So were the auction rate
11 securities that Giants Stadium issued
12 subject to an indenture?
13    A     Yes.
14    Q     Is that a document that you
15 have seen before?
16    A     Yes.
17        (Exhibit No. Procops 1,
18        Document, Bates Nos. GStad LB 6823
19        through GStad LB 7088, a copy of the
20        indenture for the auction rate
21        securities that were issued by Giants
22        Stadium LLC Description, is marked by
23        the reporter for identification.)
24    Q     So I am putting before you a
25 fairly large document which has a Bates No.

69

Christine Procops

1
2  in the lower right-hand corner which is an
3  identifier put on by your counsel, GStad LB
4  6823 through GStad LB 7088.
5         And do you recognize this as a
6  copy of the indenture for the auction rate
7  securities that were issued by Giants
8  Stadium LLC?
9     A     In reviewing the cover, it
10 seems to be.
11    Q     If you turn to the signature
12 pages, which I will find in a second, which
13 come right after 142, which is Bates -- the
14 first signature page is GStad LB 6970.  Do
15 you recognize the signature for Giants
16 Stadium LLC?
17    A     It looks like John Mara's
18 signature.
19    Q     And was it typical for Mr. Mara
20 to sign key documents on behalf of Giants
21 Stadium LLC?
22    A     Yes.
23    Q     And what is Mr. Mara's role
24 with the Giants football team?
25    A     He's currently president and

78

1       Christine Procops
2    Q    Did you -- did Giants Stadium
3 LLC ever seek an amendment from -- consent
4 to an amendment from FGIC and FSA of 609
5 NN?
6    A    I don't know if we sought an
7 amendment or we had a conversation with
8 them telling them what we were going to do
9 and why.  I don't recall seeking an
10 amendment or not.
11   Q    Okay.  And as you sit here
12 today, do you recall whether or not Giants
13 Stadium believed at the time that it needed
14 an amendment to 609 NN in order to be able
15 to terminate the swap?
16   A    I don't know if we
17 necessarily -- Giants Stadium LLC
18 necessarily needed an amendment or they did
19 not enforce any issue with us not being
20 swapped out in accordance with this
21 section.  I cannot remember what we did at
22 the time.
23   Q    Let's mark this.
24       (Exhibit No. Procops 2, Third
25       Supplemental Indenture Trust, dated

79

1       Christine Procops
2 and effective as of September 18,
3 2008, is marked by the reporter for
4 identification.)
5    Q    Ms. Procops, I am putting
6 before you what has now been marked as
7 Procops Exhibit 2, which is the Third
8 Supplemental Indenture Trust, dated and
9 effective as of September 18, 2008.
10      Do you recognize this document?
11   A    I do.
12   Q    And what is it?
13   A    The Third Supplemental
14 Indenture of Trust.
15   Q    And what was the Third
16 Supplemental Indenture of Trust that was
17 executed and effective as of September 18,
18 2008?
19   A    In reading section 2.1, it
20 looks like an amendment to section 609 NN.
21   Q    And why did Giants Stadium
22 execute an amendment of 609 NN on
23 September 1, 2008?
24   A    By reading this, it looks like
25 that, if we did -- any failure to comply

80

1 with that section, as a result of the
2 termination, with the written consent of
3 the bond insurers, shall not constitute a
4 violation.
5    Q    And does this refresh your
6 recollection that Giants Stadium LLC
7 believed that it needed the consent of the
8 bond insurers in order to execute a third
9 supplemental indenture to modify 609 NN in
10 order to be able to terminate the swap with
11 Lehman?
12       MR. CLARK:  Objection to the
13   form.
14   A    I can't remember why we
15 executed this.
16   Q    As you sit here today, do you
17 recall seeking the consent of FGIC and FSA
18 to the third supplemental indenture?
19   A    I'm not sure if we went to FGIC
20 and FSA to approve this or just the
21 trustee.  I can't remember that.
22   Q    Okay.  Did you seek the consent
23 of Lehman as the swap counterparty for
24 approval to enter into the third

81

1       Christine Procops
2 supplemental indenture?
3       MR. CLARK:  Objection, lack of
4   foundation.
5    A    I don't recall what we did.
6    Q    As you sit here today, did you
7 have a discussion with Rob Taylor about the
8 third supplemental indenture?
9    A    I cannot recall.
10   Q    Let's take a look back at the
11 indenture, which is Procops Exhibit 1.  And
12 let's look at page 134, which is -- 6961 is
13 the Bates No. in the lower right-hand
14 corner.
15      Do you see that section 11 has
16 provisions that talk about the process for
17 getting supplemental indentures; do you see
18 that?
19   A    Yes.
20   Q    And as you sit here today, do
21 you recall whether or not Giants Stadium
22 complied with section 11 of the
23 supplemental indenture in executing the
24 third supplement?
25   A    Which subsection of this are

114

1          Christine Procops
2      from Joe Sinclair to Ms. Procops,
3      dated Thursday, September 18, 2008,
4      Bates No. GStad LB 20367, is marked by
5      the reporter for identification.)
6          Q    I am putting before you what
7      has been marked as Procops Exhibit 10,
8      which is an E-Mail from Joe Sinclair to
9      you, dated Thursday, September 18, 2008,
10     with the Bates No. GStad LB 20367.
11              And do you recognize this,
12     Ms. Procops, as an E-Mail that was sent to
13     you by Mr. Sinclair?
14         A    It looks like it.
15         Q    And the subject line is, "As
16     discussed."  Do you see that?
17         A    I do.
18         Q    So does reviewing this E-Mail
19     refresh your recollection as to any
20     discussion that you had with Mr. Sinclair
21     concerning the Lehman bankruptcy?
22         A    No.
23         Q    I assume you are not denying
24     that you had them.  You just don't remember
25     them as you sit here today, correct?

115

1          Christine Procops
2      A    Correct.
3          Q    Now, the other -- the first
4      line says, "We just left you a voice mail."
5      Do you see that?
6      A    I do.
7          Q    And do you have an
8      understanding of who the "we" is in that
9      first sentence?
10             MR. CLARK:  Objection to the
11     form.
12     A    I don't know.
13         Q    And the next sentence says:
14             "We spoke with Mr. Benson and
15     the commissioner."
16             Who is Mr. Benson?
17     A    I believe it refers to the
18     owner of the Saints.
19         Q    And why would the NFL be
20     talking to the owner of the Saints with
21     respect to a situation involving Giants
22     Stadium?
23             MR. CLARK:  Objection to the
24     form.  Lack of foundation.
25     A    Mr. Benson was the chairman of

116

1          Christine Procops
2      the finance committee.
3          Q    That is the chairman of the
4      finance committee of the NFL?
5      A    Correct.
6          Q    And the commissioner is the
7      commissioner of the NFL?
8              MR. CLARK:  Objection to the
9      form.  Lack of foundation.  Reasonable
10     guess.
11     A    I am assuming that based on the
12     E-Mail.
13         Q    And the next line says:
14             "The commissioner is prepared
15     to approve the termination of the swap to
16     protect your position."
17             Do you see that?
18     A    I do.
19         Q    Does this refresh your
20     recollection that Giants Stadium had asked
21     the NFL to approve the termination of the
22     swap with Lehman?
23     A    I don't recall specifically
24     asking the NFL for approval of the
25     termination.

117

1          Christine Procops
2          Q    When you say "we don't," do you
3      know whether anyone had asked -- anyone at
4      Giants Stadium LLC had asked the NFL for
5      approval?
6      A    I don't recall.
7          Q    The next clause says:
8              "... on the condition that we
9      have a correct understanding of the facts.
10     Please review the following to ensure we
11     have these facts correct."
12             And then there's a list of
13     facts that follow in the E-Mail.  Do you
14     see that?
15     A    I do.
16         Q    Do you recall getting back to
17     Mr. Sinclair and telling him that there
18     were any facts that he had in this that
19     were not accurate?
20             MR. CLARK:  Objection to the
21     form.  Lack of foundation.
22     A    I don't recall.
23         Q    So looking at this E-Mail --
24     and you should take time to review it -- is
25     there anything in this E-Mail which you

118

Christine Procops

1  believe today is inaccurate?
2      MR. CLARK:  Well, objection to
3  the form.  I mean, this deals with
4  very complicated financial documents.
5      MR. SLACK:  Spare me.  Okay.
6  Spare me the speech.  You can object
7  to the form.
8      MR. CLARK:  But it's not just
9  form.
10      MR. SLACK:  If I hear from the
11  witness now, "This is very
12  complicated," that's exactly the kind
13  of thing judges don't like.  So spare
14  me the speech, and let the witness
15  answer the question.
16      MR. CLARK:  I think it's an
17  unreasonable question.  I will let her
18  answer it.
19      A    I don't -- I don't know of
20  anything that is in here that is different.
21  I mean, these -- the swap documents, as I
22  said before, were very complicated.  And I
23  relied on a variety of counsels to consult
24  with on what interpretation of the

119

Christine Procops

1  documents were.
2      Q    Well, I would only note that
3  Mr. Sinclair asked you the same question I
4  just did, correct?
5      A    He did, according to this
6  E-Mail.
7      Q    And he was asking that question
8  of you, correct?
9      A    He was.
10      Q    And as you sit here today, you
11  don't remember your answer to him; is that
12  correct?  Right, that's correct, right?
13      A    Yes.
14      Q    And reading this document
15  doesn't refresh your recollection of your
16  answer to him, yes or no?
17      A    No.
18      Q    Okay.  I didn't ask that
19  question well.  That was my fault.
20      Having read this document, does
21  it refresh your recollection of getting
22  back to Mr. Sinclair and telling him there
23  was anything wrong with the facts as he set
24  out here?

120

Christine Procops

1      A    Can you repeat that question.
2      (Reporter read back pending
3  question.)
4      A    I don't remember getting back
5  to him.  No.
6      Q    Now, if you look at the second
7  heading in the middle of the page, it says,
8  "Swap, Lehman swap termination."
9      Do you see that?
10      A    I do.
11      Q    And it says:
12      "Lehman Brothers Holdings,
13  which acts as guarantor, filed for
14  bankruptcy."
15      Do you see that?
16      A    I do.
17      Q    Does that refresh your
18  recollection that the filing of bankruptcy
19  occurred prior to September 18, 2008?
20      A    I don't remember the specific
21  date of when they filed.
22      Q    Okay.  It says:
23      "Upon sale of special
24  financing, expected as early as the weekend

121

Christine Procops

1  of September 20th to 21st, termination of a
2  swap to standard merger clause would result
3  in termination fee calculated based on
4  standard LIBOR swap termination
5  calculation, not replacement value of swap,
6  would result in approximately 60 million
7  liability for club."
8      Do you see that?
9      A    I do.
10      Q    And do you have an
11  understanding of what Mr. Sinclair is
12  writing here?
13      A    As I said earlier, swap
14  documents were very complicated.  This is
15  not a standard vanilla swap.  I relied on
16  counsel to interpret the documents.  I
17  don't know what the "standard merger
18  clause" is.  I don't know what that means.
19  I do know that there were particular
20  sections of our swap that were different
21  than others.
22      Q    So putting aside whether it's
23  complicated or not complicated, the answer
24  is, is that you don't have an understanding

126

Christine Procops

1  see it, "would result in approximately
2  $60 million liability for club."
3       Q    So I apologize because it
4  sounds like maybe I wasn't -- I was on the
5  wrong paragraph --
6       A    Paragraph.
7       Q    -- when we were talking.  So
8  let me -- let me try this again so that we
9  are clear.
10      Looking at the paragraph that
11 starts:
12      "Upon sale of special
13 financing, expected as early as the weekend
14 of September 20th to 21st, the termination
15 of a swap pursuant to standard merger
16 clause would result in termination fee
17 calculated based on standard LIBOR swap
18 termination calculation, not replacement
19 value of swap, would result in
20 approximately 60 million liability for
21 club."
22      Do you see that?
23      A    I see that.
24      Q    What was your understanding of

127

Christine Procops

1  the circumstances where a termination of
2  the swap would result in a $60 million
3  liability for the club?
4       MR. CLARK:  Objection.  Lack of
5  foundation.
6       A    I don't recall all of the
7  specifics of the complicated swap
8  documents.
9       Q    As you sit here today, do you
10 have an understanding of how the 60 million
11 liability was calculated?
12      A    I don't remember or know where
13 these numbers came from.
14      Q    Now, you know --
15      MR. CLARK:  Objection to the
16 last question.  Same objection.  Lack
17 of foundation.
18      Q    Now, referring back to
19 exhibit -- we can -- I think it's 8, which
20 is the --
21      MR. SLACK:  Yes, thank you.
22      Is it 8?  Nope, it's not.  I'm
23 sorry about that.
24      MR. CLARK:  The two you said to

128

Christine Procops

1  set aside were 7 and 6.
2       MR. SLACK:  6, thank you.
3       Q    And this -- the mark-to-market
4  value of the two swaps to Lehman was
5  approximately 60 million, correct?
6       MR. CLARK:  Objection to the
7  form.
8       A    Can you repeat the question.
9       (Reporter read back pending
10 question.)
11      Q    Looking at -- let me ask it.
12 Looking at Procops Exhibit 6 and the
13 attachments, the mark-to-market valuations
14 that are attached, isn't it true that the
15 mark-to-market valuation of the Lehman swap
16 as of September, 2008, was calculated to be
17 approximately 60 million?
18      MR. CLARK:  Objection to the
19 form.
20      A    According to Exhibit Procops 6,
21 the sum of the two numbers on the
22 mark-to-market statement provided by Lehman
23 seems to be approximately 59 million and
24 change.

129

Christine Procops

1       Q    Approximately how much?
2       A    59 million and change.
3       Q    Yep.  Now, take a look down a
4  little further.
5       MR. CLARK:  I'm sorry.  Which
6  one are you back on?
7       MR. SLACK:  I am now back on
8  Procops Exhibit 10.
9       Q    Looking at the sub-bullet that
10 says:
11      "GS in process of calculating
12 replacement value, but expected to be in
13 the range of 100 million to 125 million net
14 of 60 million termination fee."
15      Do you see that?
16      A    I see that.
17      Q    Does GS refer to Goldman Sachs?
18      MR. CLARK:  Objection to the
19 form.  Lack of foundation.
20      A    GS was something we called
21 Goldman Sachs on occasion, yes.
22      Q    Well, at this time, at or and
23 September 18th, did Giants Stadium ask
24 Goldman Sachs to prepare replacement value

142

Christine Procops

1  exposure is.
2  Q    What is your understanding
3  of -- when you read this, what is your
4  understanding of what the 60 million hedge
5  exposure that's being referred to here
6  refers to?
7       MR. CLARK:  Same objection.
8  A    I don't know what Joe is
9  referring to in particular to that number.
10  Q    And so when you read this, did
11  you ask Mr. Sinclair what he meant?
12      MR. CLARK:  Objection to the
13  form.
14  A    I don't remember having this
15  E-Mail exchange with him.
16  Q    Did you ever send anything
17  additional to Mr. Sinclair that sent the
18  calculation of the 60 million hedge
19  exposure?
20      MR. CLARK:  Objection to the
21  form.
22  A    I do not remember.
23  Q    Who is Anthony Noto?
24  A    He was the former CFO of the

*(line numbers 1–25)*

143

Christine Procops

1  NFL.
2  Q    Was there anyone at Giants
3  Stadium who was more involved in the
4  termination of the Lehman swaps than you
5  were?
6  A    I don't believe so.
7  Q    This was a pretty important
8  five days from September 15th to
9  September 20th; was it not?
10      MR. CLARK:  Objection to the
11  form.
12  A    I think there are a lot of
13  important days.
14  Q    Did you think those were
15  important days?
16  A    I think they were important.
17  Q    Were you more involved in the
18  termination of the Lehman swap than
19  Mr. Mara, John Mara?
20  A    Yes.
21  Q    Were you more involved than
22  Mr. Tisch?
23  A    Yes.
24  Q    Were you more involved than

*(line numbers 1–25)*

144

Christine Procops

1  the -- than any marketing person that would
2  have worked for Giants Stadium?
3  A    I don't believe there were
4  marketing people at that time.
5  Q    Is it fair to say that you, in
6  fact, were the point person at Giants
7  Stadium LLC for the discussions that were
8  occurring with respect to the termination
9  of the Lehman swap?
10      MR. CLARK:  Objection to the
11  form.
12  A    I would say that I was involved
13  in the conversations.
14  Q    Was there -- were you the point
15  person for Giants Stadium LLC with respect
16  to the conversations that included Giants
17  Stadium LLC with respect to termination of
18  the Lehman swap?
19      MR. CLARK:  Objection to the
20  form.
21  A    I wouldn't consider myself the
22  point person.
23  Q    Who was the point person for
24  Giants Stadium LLC with respect to the

*(line numbers 1–25)*

145

Christine Procops

1  termination of the Lehman swap?
2      MR. CLARK:  Objection to the
3  form."
4  A    I was responsible for
5  representing the Mara and Tisch interests
6  in that entity.
7  Q    And who was the point person
8  for Giants Stadium LLC with respect to the
9  termination of the Lehman swaps?
10      MR. CLARK:  Objection to the
11  form.  Asked and answered.
12  A    I was the financial person
13  responsible for representing the Tisch and
14  Mara interests with regard to financial
15  matters for Giants Stadium LLC.
16      I would not characterize myself
17  as "the point person."
18  Q    And why would you not
19  characterize yourself as the point person
20  for Giants Stadium LLC?
21      MR. CLARK:  Objection to the
22  form.
23  A    Not a term I use.
24  Q    Was there any person at Giants

*(line numbers 1–25)*

154

1      Christine Procops
2  on those calls; is that correct?
3      A    That's correct.
4          (Exhibit No. Procops 15, E-Mail
5      chain with the top E-Mail from Andrew
6      Dietrich to Ms. Procops and others,
7      dated September 17, 2008, is marked by
8      the reporter for identification.)
9      Q    Putting before you what has
10  been marked as Procops Exhibit 15, which is
11  an E-Mail chain with the top E-Mail being
12  from Andrew Dietrich to you and others,
13  dated September 17, 2008, do you recall
14  receiving this E-Mail?
15      A    I don't remember.
16      Q    Well, I'd like to focus on the
17  E-Mail actually on -- the E-Mail at the
18  bottom, the first E-Mail, which is from you
19  to Deirdre Lewis at BNY Mellon, with a copy
20  to Andrew Dietrich, which is also dated
21  September 17, 2008.
22          Do you see that E-Mail?
23      A    I do.
24      Q    Who is Deirdre Lewis?
25      A    She was our contact at Bank of

155

1      Christine Procops
2  New York.
3      Q    And what role did Bank of New
4  York Mellon have with respect to the ARS
5  securities?
6      A    They were the trustee in the
7  transaction.
8      Q    And did you write the E-Mail
9  that is set forth here?
10          MR. CLARK:  Objection.
11      A    It appears that it's an E-Mail
12  from me.
13      Q    Do you have any reason to doubt
14  that you sent this E-Mail to Ms. Lewis?
15      A    No.
16      Q    The first sentence says:
17          "We need to brief you and your
18  lawyers tomorrow on developments with our
19  Lehman swap."
20          Do you see that?
21      A    I do.
22      Q    Did you ever have a call with
23  Ms. Lewis or anyone else at BNY Mellon
24  about the Lehman swap?
25      A    I don't remember having a call.

156

1      Christine Procops
2      Q    The next sentence says:
3          "In short, we must terminate
4  this swap tomorrow to preserve the value of
5  Stad Co.'s (significant) claims against the
6  estate of the Lehman swap counterparty."
7          Do you see that?
8      A    I do.
9      Q    Why was it that Giants Stadium
10  needed to terminate the swap on
11  September 18th to preserve the value of
12  Stad Co.'s claims against the Lehman
13  estate?
14      A    I don't remember all of the
15  details.
16      Q    Do you remember any details?
17      A    Not particularly, no.
18      Q    Well, not particularly, you
19  know, generally, do you remember the
20  details?
21      A    I remember that the documents
22  have a lot of provisions in them that we
23  needed to walk through.  And I remember
24  that they are complicated, and we needed
25  legal interpretation on a lot of them.

157

1      Christine Procops
2      Q    The next line says:
3          "We are obtaining bond insurer
4  approval for a short supplemental indenture
5  addressing the matter and want to walk
6  through it."
7          Do you see that?
8      A    I do.
9      Q    And do you know what that
10  refers to?
11      A    No.
12      Q    The next line says:
13          "The supplemental indenture
14  will need to be approved and signed by
15  Stad Co. and the trustee tomorrow."
16          Do you see that?
17      A    I do.
18      Q    Why was it the supplemental
19  indenture needed to be approved and signed
20  by Stad Co. and the trustee on
21  September 18, 2008?
22          MR. CLARK:  Objection to the
23  form.
24      A    I don't remember.
25      Q    The next line says:

158

1          Christine Procops
2          "Pursuant to the terms in the
3    indenture, it will require only bond
4    insurer consent, which we are obtaining."
5          Do you see that?
6      A    I do.
7      Q    And what's your understanding
8    of why the indenture only required bond
9    insurer consent?
10         MR. CLARK:  Objection to the
11   form.
12     A    I do not know.
13     Q    The next line says:
14         "We also will send the
15   necessary legal opinion."
16         Do you see that?
17     A    I see that.
18     Q    Did Giants Stadium ever send to
19   BNY Mellon a legal opinion in connection
20   with the termination of the swap?
21     A    I don't remember.
22     Q    It then says:
23         "We can explain background on
24   the phone."
25         Does reading that refresh your

159

1          Christine Procops
2    recollection that you had a phone call with
3    BNY and refreshed your recollection as to
4    anything said on that phone call?
5      A    No, it does not.
6      Q    The last line says:
7          "Sorry for the short notice.
8    The supplemental indenture is really only a
9    clarification, but it is critical that it
10   be put in place tomorrow."
11         Why was it critical that the
12   indenture supplement be put in place on
13   September 18th?
14         MR. CLARK:  Objection to the
15   form.
16     A    I don't know.
17         (Exhibit No. Procops 16,
18   Document, Bates No. GStad LB 20291,
19   Chain of E-Mails, the top E-Mail from
20   Daniel Champeau to Ms. Procops on
21   September 18, 6:43 in the morning, is
22   marked by the reporter for
23   identification.)
24     Q    Putting before you what has
25   been marked as Procops Exhibit Number 16,

160

1          Christine Procops
2    which is a chain of E-Mails, the top E-Mail
3    is from Daniel Champeau to you on September
4    18, 6:43 in the morning.
5          I would like to focus you,
6    though, on the second E-Mail in this chain.
7    Do you recall this E-Mail chain?
8      A    I don't remember it.  No.
9      Q    Let me just identify this also
10   as having the Bates No. GStad LB 20291.
11   The second E-Mail is an E-Mail from you to
12   Lisa Citron at FGIC, Jeffrey Fried at FGIC,
13   and Daniel Champeau, amongst others.
14         Do you recall sending this
15   E-Mail?
16     A    I don't remember sending it,
17   no.
18     Q    You don't deny sending this
19   E-Mail; do you?
20     A    No.  It looks like my E-Mail.
21     Q    It says, starting off:
22         "We have been informed that we
23   must terminate the Lehman swaps tomorrow to
24   preserve the value of our significant
25   claims against the estate of the Lehman

161

1          Christine Procops
2    swap counterparty."
3          Who informed you that you had
4    to "terminate the Lehman swaps tomorrow to
5    preserve the value" of "significant claims
6    against the estate of the Lehman swap
7    counterparty"?
8          MR. CLARK:  Objection to the
9    form.
10     A    I'm sure we had various
11   discussions with our counsel.
12     Q    Anyone else?
13     A    Not that I remember.
14     Q    And I am assuming that reading
15   this E-Mail does not refresh your
16   recollection of the reason that Giants
17   Stadium believed it had to terminate the
18   Lehman swaps on September 18th in order to
19   preserve the value of claims against the
20   Lehman estate; is that correct?
21     A    I don't remember any of those
22   dates, no.
23     Q    Putting aside the particular
24   date of September -- whether it was
25   September 17, 18, do you recall that, in

166

Christine Procops

1  question.)
2  A    I believe we have asked Goldman
3  Sachs to assist our counsel in preparing
4  certain calculations.
5  Q    I put before you what has been
6  marked as Procops Exhibit 18, which is,
7  again, a chain of E-Mails and ask whether
8  you recognize this document.
9  A    I don't.
10      (Exhibit No. Procops 18, E-Mail
11      chain, middle E-Mail from Joanne
12      Larkin at Lehman to Ms. Procops, with
13      the subject of Steve Lessing, Bates
14      Nos. GStad LB 58282 and 58283, is
15      marked by the reporter for
16      identification.)
17  Q    It has a Bates number, GStad LB
18  58282 and 58283. The middle E-Mail here is
19  from someone by the name of Joanne Larkin
20  from Lehman to you with the subject of
21  Steve Lessing.
22      Did you recognize that Joanne
23  Larkin was Steve Lessing's assistant?
24  A    She was.

167

Christine Procops

1  Q    And the E-Mail says:
2      "Steve and Rob are available at
3  1:00 p.m. today. Can you provide the
4  dial-in number information. Thanks."
5      Do you see that?
6  A    I do.
7  Q    Did you have a conversation
8  with Mr. Taylor and Mr. Lessing on or
9  around September 18th concerning the Lehman
10  swap?
11  A    I don't remember.
12  Q    Do you recall any conversations
13  with Mr. Lessing concerning the Lehman swap
14  during the time frame of Lehman's
15  bankruptcy and the termination issues
16  arising for Giants Stadium?
17  A    No.
18      (Exhibit No. Procops 19, E-Mail
19      chain, Bates Nos. GStad LB 48701 to
20      02, is marked by the reporter for
21      identification.)
22  A    Thank you.
23  Q    I put before you what has been
24  marked s as Procops Exhibit 19, again,

168

Christine Procops

1  another E-Mail chain, with the Bates Nos.
2  GStad LB 48701 to 02.
3      Do you recall this set of
4  E-Mails?
5  A    No.
6  Q    There is an E-Mail, the second
7  E-Mail down from Joseph Shanker to a number
8  of individuals, including some from FGIC.
9      Do you see that?
10  A    I do.
11  Q    And that E-Mail says:
12      "I have just been informed that
13  the Lehman broker/dealer is preparing for
14  his bankruptcy filing possibly within the
15  next few hours. The effect of that could
16  be to compromise our ability to collect our
17  substantial claim under the swap."
18      Do you see that?
19  A    I see that.
20  Q    Why was the filing of
21  bankruptcy by the broker/dealer something
22  that could compromise Giants Stadium's
23  ability to collect a claim under the swap?
24      MR. CLARK: Objection to the

169

Christine Procops

1  form.
2  A    The swap documents were very
3  complicated legal documents. We relied on
4  our counsel to interpret the provisions
5  within them.
6  Q    As you sit here today, do you
7  know and do you have an understanding of
8  why it is that the filing by the Lehman
9  broker/dealer could compromise Giants
10  Stadium's ability to collect a claim under
11  the swap?
12  A    As I sit here today, I do not
13  understand most of the Lehman entities,
14  much less what you just asked me.
15      Could we take a break? I need
16  to go to the lady's room.
17      MR. CLARK: That's a pretty
18  good reason.
19      MR. SLACK: Yes, I am not done
20  with the document, but I said you are
21  the master of ceremonies. We are
22  going to take a break.
23      THE WITNESS: Thank you.
24      THE VIDEOGRAPHER: The time is

182

Christine Procops

1  said, of the swap are complicated. We had
2  conversations with our counsel. We went
3  through what we needed, and I discussed it
4  with Rob.
5     Q   So, now, you remember asking
6  specifically for designating two
7  broker/dealers. That's your testimony?
8     A   I remember having conversations
9  about asking him for -- I don't remember if
10 we are using the same terminology -- about
11 broker/dealers. I would have to look at
12 the documents.
13        We specifically talked about
14 the value of the swap and what would happen
15 in the case of a termination. And that was
16 when he said, "You just could get them
17 yourself. There is nobody here."
18    Q   So what did you say -- what did
19 you say about the value of the swap to
20 Mr. Taylor?
21    A   I don't --
22        MR. CLARK:  Objection to the
23 form.
24    A   I don't remember my saying
25

183

Christine Procops

1  anything about the value of the swap. I
2  don't know.
3     Q   You just testified that, "We
4  specifically talked about the value of the
5  swap." So are you now saying you didn't
6  talk with Mr. Taylor about the value of the
7  swap?
8     A   Not specific numbers about the
9  value of the swap, but going out and
10 getting people to discuss the swap on the
11 termination of it.
12    Q   And what did you say to Mr. --
13 what do you recall saying specifically to
14 Mr. Taylor about that subject?
15    A   I can't recall specifically.
16    Q   But you recall that you asked
17 him to designate two people to go out in
18 the swap. That's your testimony?
19        MR. CLARK:  Objection to form.
20    A   I remember having a
21 conversation with Mr. Taylor about what had
22 to happen in the case of the termination of
23 the swap. After discussing with counsel,
24 we then discussed what my counsel told me I
25

184

Christine Procops

1  needed. And I asked Rob for that.
2     Q   What did you tell Mr. -- what
3  did you tell Mr. Taylor your counsel told
4  you you needed in order to terminate the
5  swap?
6     A   I cannot remember, but it
7  involved, as we discussed, going out. Each
8  of us had to designate some number of firms
9  to do some work for us.
10    Q   And who at your counsel told
11 you the information that you told
12 Mr. Taylor?
13    A   We had various people at
14 Sullivan & Cromwell, but our main contact
15 for this would have been Andy Dietrich.
16    Q   And how did you interpret the
17 comment in words or substance, "You are on
18 your own," that was said by Mr. Taylor?
19        MR. CLARK:  Just note
20 objection, asked and answered.
21    A   I believe I interpreted that to
22 mean that -- and I believe he did say to
23 us:
24        "You should go out and get them
25

185

Christine Procops

1  yourself."
2        There was nobody else there.
3  They were scrambling around. He was
4  basically working out of a Starbucks.
5     Q   So, now, you recall Mr. Taylor
6  saying, "You should go out and get bids
7  yourself." You recall him saying that
8  specifically?
9     A   I don't remember any specific
10 words. I remember him saying -- that was
11 the gist of the conversation. That's what
12 I remember.
13    Q   Well, you recall -- I thought
14 the gist of the conversation was, "You're
15 on your own."
16        Is that your interpretation of
17 "You're on your own," or do you recall him
18 saying, "You should go out and get bids
19 yourself"?
20    A   I cannot remember the exact
21 conversation, but the interpretation of
22 that conversation -- and he said it at the
23 time -- was that they were not going to get
24 bids, and we should get them.
25

190

1    Christine Procops
2    were produced by your counsel, and they do
3    have -- both of them have at the top
4    execution copy in the upper right-hand
5    corner.
6        I'm going to -- because they
7    are substantially similar. I am going to
8    be referring to Exhibit 21, which is the
9    FGIC version.
10        So if you take a look at page
11    17 of Exhibit 21, which is the FGIC swap,
12    there's a signature for Giants Stadium LLC.
13    Do you see that?
14        A    I do.
15        Q    Do you recognize that as
16    Mr. Mara's signature?
17        A    It looks to be.
18        Q    Now, if you take a look at the
19    swap, and, in particular, for my first set
20    of questions, I'm looking at pages nine and
21    ten of the swap, which is Bates Numbered
22    9510 and 9511. You see that these are
23    miscellaneous provisions that relate to the
24    swap; do you not?
25        A    I do.

191

1    Christine Procops
2        Q    And if you look at the next
3    page, page ten, part B, talking about
4    amendments, it says:
5        "No amendment, modification, or
6    waiver in respect of this agreement would
7    be effective unless in writing, including a
8    writing evidenced by a facsimile
9    transaction and executed by each of the
10    parties or confirmed by an exchange of
11    Telexes or electronic messages on an
12    electronic messaging system."
13        Do you see that?
14        A    I do.
15        Q    With respect to your
16    conversation that you had with Mr. Taylor,
17    was there ever any writing executed by each
18    of the parties or confirmed by an exchange
19    of Telexes or electronic messages on an
20    electronic messaging system whereby, in
21    words or substance, Mr. Taylor said to you
22    that, "You are on your own"?
23        A    I don't remember there being.
24        Q    Now, who was involved from
25    Giants Stadium in negotiating the swap

192

1    Christine Procops
2    documents? And, again, I'm referring to
3    Exhibit 21, which is the FGIC document, for
4    now.
5        A    Can you repeat the question.
6        Q    Let me just ask it again.
7        Who was involved on behalf of
8    Giants Stadium in negotiating the swap
9    documents which are Exhibits 20 and 21 that
10    have been put before you today?
11        A    In addition to our counsel?
12        Q    No, I'm including your counsel.
13        A    Our counsel at Sullivan &
14    Cromwell.
15        Q    Yes. Who in particular was
16    involved in negotiating at Sullivan &
17    Cromwell?
18        A    I'm not sure if that was
19    negotiating or drafting documents -- and
20    whatever your terms are. But there was an
21    entire group of people, Joe Shanker, Andy
22    Dietrich, a lot of associates.
23        Q    Who at Giants Stadium was
24    involved in reviewing or negotiating,
25    reviewing drafts or negotiating provisions

193

1    Christine Procops
2    of the agreement prior to the time that it
3    was executed?
4        A    Myself, John Mara would have
5    approved and reviewed everything.
6        Q    Anyone else?
7        A    That I remember, no.
8        Q    Were the documents also
9    reviewed by counsel for the bond insurers?
10        A    I don't know.
11        Q    Were the documents, Exhibit 20
12    and 21, were they reviewed by the NFL?
13        A    I don't know.
14        Q    Who would know whether the
15    documents were reviewed by either bond
16    insurer counsel or the NFL?
17        A    Bond insurer counsel and the
18    NFL.
19        Q    Now, do you have an
20    understanding of what the relationship is
21    between the ISDA master -- the schedules to
22    the ISDA master and the confirmation?
23        A    Very minimal.
24        Q    What is your understanding?
25        A    The master agreements are the

218

Christine Procops

1  Q    And did JP Morgan agree to bid?
2  A    I'm not sure I understand the
3  question.
4  Q    Did -- this E-Mail solicits a
5  bid from JP Morgan.  Did JP Morgan make a
6  bid for -- to enter into a replacement
7  transaction?
8  A    No, JP Morgan laughed.
9  Q    Did you have a conversation
10  with JP Morgan?
11  A    I did.
12  Q    And who did you speak with at
13  JP Morgan?
14  A    Craig Doukissa and Chris Braun.
15  Q    And when was that conversation?
16  A    I can't remember the date of
17  the conversation.
18  Q    And what did you say to the JP
19  Morgan representatives, and what did they
20  say to you in this call?
21  A    I told them we were soliciting
22  bids to enter into a placement transaction
23  for the Lehman swap.  They asked for
24  particulars on the swap.  I sent them the
25

219

Christine Procops

1  documents to review so they would see what
2  they were, what the terms were.  And they
3  said they would not enter into a placement
4  transaction.
5  Q    And you had said earlier that
6  they "laughed."  Did they actually laugh on
7  the phone?
8  A    Yes, they did.
9  Q    And why were they laughing on
10  the phone?
11  A    Because given -- I can't
12  determine why because I am assuming that,
13  given the market conditions, they were not
14  going to enter this transaction under the
15  terms of the swap.
16  Q    Did they tell you why they were
17  laughing?
18  A    I don't think they specifically
19  said why they were laughing.  No.
20  Q    Do you know whether were
21  looking at something on a computer screen?
22  A    No, I can't tell you that they
23  were not looking at a computer screen.
24  Q    Do you remember which banks
25

220

Christine Procops

1  Giants Stadium contacted to solicit bids
2  from?
3  A    In addition to JP Morgan?
4  Q    Yes.
5  A    Bank of America, and we also
6  discussed it with Goldman Sachs.
7  Q    Was there a solicitation of a
8  bid from Goldman Sachs?
9  A    I believe so, yes.
10  Q    Was that in writing?
11  A    I don't remember.
12  Q    Did Giants Stadium get a
13  response from Goldman Sachs in writing?
14  A    I don't remember.
15  Q    Is there a reason that Giants
16  Stadium went out to only three banks
17  instead of four?
18  A    I can't remember.
19  Q    If you take a look at page nine
20  of the schedule, it is Bates Numbered 9528.
21  (There was a discussion off the
22  record.)
23  Q    Do you see the definition of
24  "reference market-makers"?  It says it
25

221

Christine Procops

1  means "four leading dealers in the relevant
2  swap market"?
3  A    I see that.
4  Q    And that's consistent -- that
5  four is consistent with the requirement in
6  part A, that both a counterparty and Lehman
7  designate two reference market-makers.
8  That would equal four, correct?
9  A    Two plus two equals four, yes.
10  Q    And that's -- I am saying that
11  the provision A in designating four is
12  consistent with the definition of
13  "reference market-makers," which says that
14  it means four leading dealers, correct?
15  MR. CLARK:  Objection to the
16  form.
17  A    Can you restate the question?
18  Q    I am just -- I am asking
19  whether the fact that the provision in A
20  which requires each of Lehman and Giants
21  Stadium to designate two reference
22  market-makers is consistent with the
23  definition of "reference market-makers"
24  which requires four -- which means four
25

242

Christine Procops

1
2    A    I remember that Goldman Sachs
3  assisted us in performing various
4  calculations.  They also assisted our
5  counsel in interpreting the terms of the
6  documents.
7    Q    Was the theory behind the
8  analyses in Exhibit 27 to 28 that Goldman
9  Sachs was trying to measure what a
10  potential replacement swap might look like?
11          MR. CLARK:  Objection to the
12      form.
13    A    I don't know that.
14          MR. CLARK:  Go ahead.
15    A    I can't tell that from this.
16    Q    Do you recall that, ultimately,
17  Giants Stadium put -- sent a calculation
18  statement to Lehman with respect to the
19  termination of the swap?
20    A    We did.
21    Q    And do you know what was used
22  as the valuation in that analysis?
23    A    I can't remember the terms of
24  that, no.
25          (Exhibit No. Procops 29,

243

Christine Procops

1
2  calculation statement for FGIC swaps,
3  dated October 2, 2008, is marked by
4  the reporter for identification.)
5          MR. SLACK:  These are the next
6      two.
7          (Exhibit No. Procops 30,
8  calculation statement dated October 2,
9  2008, for the FSA swap, is marked by
10  the reporter for identification.)
11    Q    I am putting before you
12  calculation statements, which have been
13  marked as Exhibits 29 and 30, 29 being the
14  statement with respect to the FGIC swaps,
15  where they're dated October 2, 2008; and
16  number 30 being the FSA swap.
17          And if you look at the FGIC
18  swap, which is Exhibit 29, Giants Stadium
19  put in an amount payable by Lehman to
20  Giants Stadium of 254 million
21  approximately, correct?
22    A    Yes.
23    Q    And in Exhibit 30, the amount
24  on the FSA swap was essentially 46 million,
25  correct?

244

Christine Procops

1
2    A    Yes.
3    Q    Together, those are again
4  approximately $300 million, correct?
5    A    Yes, it is.
6    Q    What was the methodology used
7  to come up with the $300 million number in
8  these two calculation statements?
9    A    Without going back and looking
10  at this, I can't remember all of the
11  details of that.
12    Q    Why don't you take a look --
13  why don't you take look at -- why don't you
14  take a look at the written part and -- as
15  much as you need to, of Exhibit 29, and
16  then we can ask some questions about it.
17          MR. CLARK:  Well, note my
18      objection to that process.
19    A    I have read through the words.
20    Q    Did you review Exhibits 29 and
21  30, which were the calculation statements,
22  before they were sent to Lehman?
23    A    Yes.
24    Q    Who at Giants Stadium approved
25  the sending of these calculation statements

245

Christine Procops

1
2  to Lehman?
3    A    Myself and John Mara.
4    Q    Did John Mara also review these
5  calculation statements before they were
6  sent?
7          MR. CLARK:  Objection to the
8      form.
9    A    I don't know that.
10    Q    Who approved the methodology
11  that was used to calculate the termination
12  amounts in Exhibit 29 and 30 on behalf of
13  Giants Stadium?
14    A    Myself and John Mara.
15    Q    So taking a look at Exhibit 29,
16  the analysis that was done here essentially
17  assumes that the amounts that Giants
18  Stadium would receive on the floating
19  portion of the swap going forward would be
20  equivalent to certain auction prices that
21  were achieved on one date in the Goldman
22  swaps; isn't that correct?
23    A    It seems to be so, yes.
24    Q    Why did you believe that it was
25  a fair approximation of the amount that

# EXHIBIT B

**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

212-310-8636
michael.firestone@weil.com

February 24, 20111                                                        BY E-MAIL AND FEDEX

Bruce E. Clark, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004

Re: <u>Rule 2004 Subpoena to Giants Stadium</u>

Dear Bruce,

I write with respect to the Log of Withheld Documents (the "Withheld Documents Log") and the Log of Redacted Documents (the "Redacted Documents Log") produced by Giants Stadium LLC ("Giants Stadium") to Lehman Brothers Special Financing, Inc. ("LBSF") in connection with the Rule 2004 subpoena served upon Giants Stadium on May 19, 2010.

We have reviewed the Logs and identified a number of instances in which the information contained in the Log entries calls into question Giants Stadium's assertion of privilege.

1.      A significant number of entries reflect communications where individuals from Goldman Sachs & Co. ("Goldman") are identified in the "Author," "Recipient(s)," "CC" or "Thread Participants" fields of the Logs:

# REDACTED

From the documents produced by Giants Stadium, it appears that Goldman's business role in connection with the various financing transactions was comprehensive. Goldman was a bond underwriter, auction manager, swap counterparty, remarketing agent, and according to Giants Stadium's October 2, 2008 calculation letter, was one of three leading dealers from whom a market quotation was solicited in connection with the termination of the Lehman swaps. What is clear is that Goldman was neither rendering legal advice, nor is there anything in the documents produced that even remotely suggest that Goldman was hired to render legal advice to Giants Stadium. Accordingly Giants Stadium may not claim that communications where Goldman participates or is copied are covered by the attorney client

Bruce Clark, Esq.                                                    **Weil, Gotshal & Manges LLP**
February 24, 20111
Page 2

privilege.  See United States v. Kovel, 296 F.2d 918, 922 (2d Cir. 1961) ("What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer.").

Courts have held that "communications with a financial advisor are covered by the attorney-client privilege if the financial advisor's role is limited to helping a lawyer give effective advice by explaining financial concepts to the lawyer."  Export-Import Bank of the United States v. Asia Pulp & Paper Co., Ltd., 232 F.R.D. 103, 113 (S.D.N.Y. 2005) (citing Kovel, 296 F.2d at 922) (emphasis added).  In that regard, in order for communications with a financial advisor to be privileged, the role of the financial advisor must be limited and akin to "an interpreter in helping the attorney understand financial information passed to the attorney by the client."  United States v. Ackert, 169 F.3d 136, 139 (2d Cir. 1999) (citing Kovel, 296 F.2d at 922); see also Summit Ltd. v. Levy, 111 F.R.D. 40, 41 (S.D.N.Y. 1986) ("As this Circuit has explained, the application of the attorney/client privilege to communications with an accountant depends upon whether the accountant is acting as a means of translating financial data for the attorney or rather is acting as a financial advisor.").  Here, as set out above, Goldman had numerous roles – all business related and therefore its role was not "limited" to helping lawyers interpret information.  See Export-Import Bank, 232 F.R.D. at 113 (holding that communications between the client's financial advisor and its counsel were not protected by the attorney-client privilege because the financial advisor "was by the company's own reckoning a major participant in [its] financial affairs, not a mere interpreter"); Ackert, 160 F.3d at 139 (holding that conversations between the client's investment banker and its counsel were not privileged where those conversations were undertaken by counsel "in order to gain information and better advise his client . . . notwithstanding our assumption that those conversations significantly assisted the attorney in giving his client legal advice about its tax situation").  See also Dahl v. Bain Capital Partners, LLC, 714 F.Supp.2d 225, 229 (D. Mass. 2010) (communications between financial advisor and counsel not privileged where advisor provided advice based on its "financial expertise and industry experience," or where communications were in connection with materials "garnered or created by [the advisor] as part of its role as financial advisor").

We therefore request that all communications involving Giants Stadium, S&C, and Goldman be produced promptly.

2.       Similar to Category 1 above, a number of entries reflect communications where individuals from Nixon Peabody LLP ("Nixon Peabody") are identified as participating in such communications.  Specifically, the following entries identify Nixon Peabody individuals in the "Author," "Recipient(s)," "CC" or "Thread Participants" fields of the Logs:

# REDACTED

We understand that Nixon Peabody represented Goldman in connection with the Giants Stadium bonds and other related transactions with Giants Stadium.  The presence of Nixon Peabody attorneys is inconsistent with a privilege between Giants Stadium and S&C.  Thus, we request that Giants Stadium promptly produce all communications involving Giants Stadium, S&C, and Nixon Peabody.

Bruce Clark, Esq.
February 24, 20111
Page 3

**Weil, Gotshal & Manges LLP**

3.    There are eighteen individuals identified in the "Author," "Recipient," "CC" and "Thread Participants" fields of the Logs who are not identified in the chart of individuals which accompanied the Logs.  Those individuals are:

# REDACTED

Please provide the identity of these individuals and explain the relationship between their affiliated organizations and Giants Stadium so that we can determine whether Giants Stadium's assertion of the attorney-client privilege in the above-listed entries is appropriate.

4.    Lastly, there are two entries where organizations associated with the sender or recipient of the withheld or redacted e-mails are not affiliated with a law firm. Those two organizations are:

Bruce Clark, Esq.
February 24, 20111
Page 4

**Weil, Gotshal & Manges LLP**

# REDACTED

Please explain the relationship between Giants Stadium and these two organizations so that we can determine whether Giants Stadium's assertion of the attorney-client privilege in the above-listed entries is appropriate.

We also request that Giants Stadium produce any agreement, including any retention letters, entered into between Goldman and Giants Stadium that cover any period between January 1, 2006 to the present.

Please feel free to contact me or Richard Slack regarding the matters discussed above.

Yours truly,

Michael J. Firestone

cc: Richard W. Slack

# EXHIBIT C

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

March 25, 2011

<u>Via E-mail</u>

Michael J. Firestone, Esq.
    Weil, Gotshal & Manges LLP
      767 Fifth Avenue
        New York, New York 10153-0119

      Re:    *In re Lehman Brothers Holdings Inc., et al.*, 08-13555 (Bankr. S.D.N.Y.)

Dear Michael:

        I write in response to your letter dated February 24, 2011 (the "Letter") and our call last week concerning Giants Stadium LLC's ("Giants Stadium") Log of Withheld Documents (the "Withheld Log") and Log of Redacted Documents (the "Redact Log"; together, the "Logs") in connection with Giants Stadium's production of documents in response to the Subpoena for Rule 2004 Examination (the "Subpoena") served by Lehman Brothers Special Financing, Inc. and its affiliated debtors (collectively, "Lehman") in the above-captioned matter.

        As an initial matter, we again note, as we did in our letter of December 2, 2010, that Giants Stadium has already produced documents sufficient to show Giants Stadium's liquidated valuation of the Terminated Transactions and its assumptions concerning the future prices for auction rate securities to the extent relevant to its calculation of Loss as of the Early Termination Date.

        Nonetheless, after our meet and confer call, we undertook to re-examine the documents and the privilege calls we made. Our reexamination leads us to conclude that we will no longer assert the claim of privilege as to a number of these documents, and so we will be producing them to you shortly. On the other hand, certain of the emails in question do relate to circumstances where Goldman, Sachs & Co. ("Goldman Sachs") was acting as an advisor to Sullivan & Cromwell, LLP, who in turn was providing legal

Michael J. Firestone, Esq.                                                    -2-

advice to Giants Stadium, and we continue to believe that those communications are privileged under *Kovel*.[1]

  Your Letter also requests the identities of 18 individuals who appear on the Logs.  Their identities are as follows:

# REDACTED

---

[1] *See, e.g., Calvin Klein Trademark Trust* v. *Wachner*, 124 F. Supp. 2d 207, 209 (S.D.N.Y. 2000) (investment bank served "an interpretive function," and therefore application of *Kovel* was appropriate, where it advised lawyers "as to what a reasonable business person would consider 'material' " for the purposes of legal disclosures).

# REDACTED

Michael J. Firestone, Esq.                                                    -3-

# REDACTED

Sincerely,

Bruce E. Clark

cc:    Andrew G. Dietderich
       (Sullivan & Cromwell LLP)

# REDACTED

# **EXHIBIT D**

This Exhibit Has Been Filed Under Seal

# EXHIBIT E

This Exhibit Has Been Filed Under Seal

# EXHIBIT F

This Exhibit Has Been Filed Under Seal

# EXHIBIT G

**From:**    Dietderich, Andrew G. <dietdericha@sullcrom.com>
**Sent:**    Wednesday, September 24, 2008 5:42 PM
**To:**    Procops, Christine <Procops@giants.nfl.net>
**Subject:**    RE: NPV Analysis



-----Original Message-----
**From:** Dietderich, Andrew G.
**Sent:** Wednesday, September 24, 2008 5:09 PM
**To:** 'Procops, Christine'; Shenker, Joseph; Deutsch, Ivan
**Subject:** RE: NPV Analysis



-----Original Message-----
**From:** Procops, Christine [mailto:Procops@giants.nfl.net]
**Sent:** Wednesday, September 24, 2008 4:43 PM
**To:** Dietderich, Andrew G.
**Subject:** FW: NPV Analysis

REDACTED

Christine Procops
VP & CFO

New York Football Giants, Inc.
Giants Stadium
East Rutherford, NJ 07073
phone (201) 460-2852
fax (201) 939-5447
procops@giants.nfl.net
-----Original Message-----
**From:** Effron, Zach [mailto:Zacharias.Effron@gs.com]

**CONFIDENTIAL**

GStad_LB_0058869

**Sent:** Wednesday, September 24, 2008 4:39 PM
**To:** Procops, Christine
**Cc:** Carey, Gregory; Shultis, Keith; Sonnenberg, Stacy
**Subject:** RE: NPV Analysis

Attached please find the two additional analyses reqeusted.

The first calculates the NPV of the original swap cash flows for the Series A-4 to A-7 bonds and compares that to the NPV of a new fixed rate bond issue. The fixed rate bond issue assumes a cash funded DSRF, an additional deposit to the capitalized interest fund to account for the increased interest requirements during the capitalized interest period, and costs of issuance. We assumed T+425 bp for the fixed rate pricing based on treasuries as of today's 3 pm close. The discount rate for the analysis used the cost of capital of the fixed rate bond issue. The difference in NPV for the two cash flows is $166.5 Mn

<<Series 2008 Refunding A4-7 v9.23.08 w. Bond Rate PV RATE.pdf>>

The second calculates the NPV of the original swap cash flows for the Series A-4 to A-7 and compares that to the NPV of the same swap amortization with cash flows calculated at the rate required to produce the same difference in NPV cash flows that results from a new fixed rate bond issue. The discount rate for this analysis is used the LIBOR swap curve.

<<Series 2008 Refunding A4-7 v9.23.08 - reverse engineering floating rate.pdf>>

---

**From:**  Sonnenberg, Stacy
**Sent:**  Tuesday, September 23, 2008 9:09 PM
**To:**  Christine Procops (procops@giants.nfl.com)
**Cc:**  Carey, Gregory; Shultis, Keith; Effron, Zach
**Subject:**  NPV Analysis

Attached please find the analysis you requested that calculates the NPV of the original swap cash flows for the Series A-4 to A-7 bonds and compares that to the NPV of a new fixed rate bond issue. The fixed rate bond issue assumes a cash funded DSRF, an additional deposit to the capitalized interest fund to account for the increased interest requirements during the capitalized interest period, and costs of issuance. We assumed T+425 bp for the fixed rate pricing based on treasuries as of today's 3 pm close. The discount rate for the analysis used the LIBOR swap curve as of today's close. The difference in NPV for the two cash flows is $256.9 million.

<< File: Giants NPV Analysis.pdf >>
Thank you,
**Stacy J. Sonnenberg**
Vice President
Public Sector and Infrastructure Banking
Goldman, Sachs & Co.
85 Broad Street, 24th Floor | New York, NY 10004
Tel: 212-902-6433 | Fax: 212-256-4990
stacy.sonnenberg@gs.com

---

See the IBD Disclaimer for important information regarding this message and your reliance on information contained in it. This message may contain information that is confidential or privileged. If you are not the intended recipient, please advise the sender immediately and delete this message. See the Email Disclaimer for further information on confidentiality and the risks inherent in electronic communication.

**CONFIDENTIAL**

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

**CONFIDENTIAL**

**GStad_LB_0058871**

**From:**    Dietderich, Andrew G. <dietdericha@sullcrom.com>
**Sent:**    Thursday, September 25, 2008 2:19 PM
**To:**      Procops, Christine <Procops@giants.nfl.net>
**Subject:** RE: Giants - Calculation of Loss Analysis

---

REDACTED

---

-----Original Message-----
**From:** Procops, Christine [mailto:Procops@giants.nfl.net]
**Sent:** Thursday, September 25, 2008 12:22 PM
**To:** Dietderich, Andrew G.; Deutsch, Ivan; Shenker, Joseph
**Subject:** FW: Giants - Calculation of Loss Analysis

-----Original Message-----
**From:** Hong, Amy [mailto:Amy.Hong@gs.com]
**Sent:** Thursday, September 25, 2008 12:17 PM
**To:** Procops, Christine
**Cc:** Sonnenberg, Stacy; Effron, Zach
**Subject:** Giants - Calculation of Loss Analysis


Hello Christine -

Attached for your review is the A-4 through A-7 analysis we discussed last night. The analysis shows the economics of leaving A-4 through A-7 outstanding as unhedged ARS. The assumptions noted below result in a PV loss of $295.2mm at a discount rate of 4.365% (based on the forward LIBOR swap curve).

9/18/08 through respective interest payment dates = actual rates you provided last night

First respective interest periods = 1mL (3.4288%) * 110% = 3.77168%

Thereafter,
FGIC insured A4 through A6: 10.50% + 0.15% + 0.14% = 10.79%
FSA insured A7: 9.75% + 0.15% + 0.14% = 10.04

Please let us know of any questions/comments. Thanks.


<<REF4_7(GIANTS) Series 2008 Refunding A4-7_20080925.pdf>>

---

**Amy D. Hong**
Public Sector & Infrastructure Banking Group
Investment Banking Division
Goldman, Sachs & Co.
85 Broad Street | 24th Floor | New York, NY 10004
Tel: 212-902-3010
Mob: 510-709-9757
Fax: 646-835-3205

e-mail: amy.hong@gs.com

**CONFIDENTIAL**

See the IBD Disclaimer for important information regarding this message and your reliance on information contained in it. This message may contain information that is confidential or privileged. If you are not the intended recipient, please advise the sender immediately and delete this message. See the Email Disclaimer for further information on confidentiality and the risks inherent in electronic communication.

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

CONFIDENTIAL

GStad_LB_0058891

| From: | Hong, Amy <Amy.Hong@gs.com> |
|---|---|
| Sent: | Wednesday, October 1, 2008 4:15 PM |
| To: | Procops, Christine <procops@giants.nfl.com> |
| Cc: | Shultis, Keith <keith.shultis@gs.com>; Sonnenberg, Stacy <Stacy.Sonnenberg@gs.com>; Effron, Zach <Zacharias.Effron@gs.com> |
| Subject: | Present Value Calculations for Giants Stadium LLC_2008.10.01.xls |
| Attach: | Present Value Calculations for Giants Stadium LLC_2008.10.01.xls |

Hello Christine -

We discussed with Keith and updated the Present Value Calculations to include accrued interest on the first payments for each of the Fixed and Floating Payment calculations. Please let us know of any additional questions. Thanks.

<<Present Value Calculations for Giants Stadium LLC_2008.10.01.xls>>

**Amy D. Hong**
Public Sector & Infrastructure Banking Group
Investment Banking Division
Goldman, Sachs & Co.
85 Broad Street | 24th Floor | New York, NY 10004
Tel: 212-902-3010
Mob: 510-709-9757
Fax: 646-835-3205

e-mail: amy.hong@gs.com

See the IBD Disclaimer for important information regarding this message and your reliance on information contained in it. This message may contain information that is confidential or privileged. If you are not the intended recipient, please advise the sender immediately and delete this message. See the Email Disclaimer for further information on confidentiality and the risks inherent in electronic communication.

| **From:** | Effron, Zach <Zacharias.Effron@gs.com> |
| **Sent:** | Wednesday, October 1, 2008 9:03 PM |
| **To:** | Procops, Christine <Procops@giants.nfl.net>; Hong, Amy <Amy.Hong@gs.com> |
| **Cc:** | Sonnenberg, Stacy <Stacy.Sonnenberg@gs.com> |
| **Subject:** | RE: Any update on the calc? |
| **Attach:** | Present Value Calculations for Giants Stadium LLC_2008.10.01.xls |

Hi Christine-

Attached please find the revised numbers as requested. Please let us know if you have any questions or need anything else regarding this calculation. Thanks

-Zach

---

**Goldman, Sachs & Co.**
85 Broad Street, 24th floor | New York, NY 10004
Tel: (917) 343-4956 | Fax: (212) 256-5739
E-mail: zacharias.effron@gs.com

**Zach Effron**
Public Sector & Infrastructure Banking

---

**From:** Procops, Christine [mailto:Procops@giants.nfl.net]
**Sent:** Wednesday, October 01, 2008 8:08 PM
**To:** Hong, Amy
**Cc:** Effron, Zach; Sonnenberg, Stacy
**Subject:** Any update on the calc?

Christine Procops
VP & CFO

New York Football Giants, Inc.
Giants Stadium
East Rutherford, NJ 07073
phone (201) 460-2852
fax (201) 939-5447
procops@giants.nfl.net

See the IBD Disclaimer for important information regarding this message and your reliance on information contained in it. This message may contain information that is confidential or privileged. If you are not the intended recipient, please advise the sender immediately and delete this message. See the Email Disclaimer for further information on confidentiality and the risks inherent in electronic communication.

**CONFIDENTIAL**

# EXHIBIT H

This Exhibit Has Been Filed Under Seal

# EXHIBIT I

This Exhibit Has Been Filed Under Seal

# EXHIBIT J

This Exhibit Has Been Filed Under Seal

# EXHIBIT K

| | |
|---|---|
| **From:** | Dietderich, Andrew G. <dietdericha@sullcrom.com> |
| **Sent:** | Wednesday, September 17, 2008 11:32 PM |
| **To:** | Procops, Christine <procops@giants.nfl.net>; 'deirdre.lewis@bnymellon.com' |
| **Cc:** | 'fernandez.david@dorsey.com'; 'paparone.melissa@dorsey.com'; O'Reilly, Brian P. <OReillyB@sullcrom.com> |
| **Subject:** | Re: Giants Stadium LLC - Urgent |

I'm copying David and Dierdre at Dorsey, who are already in the loop.

---

**From:** Procops, Christine
**To:** deirdre.lewis@bnymellon.com
**Cc:** Dietderich, Andrew G.
**Sent:** Wed Sep 17 23:22:51 2008
**Subject:** Giants Stadium LLC - Urgent

We need to brief you and your lawyers tomorrow at your earliest convenience on developments with our Lehman swap. In short, we must terminate this swap tomorrow to preserve the value of StadCo's (significant) claims against the estate of the Lehman swap counterparty. We are obtaining bond insurer approval for a short supplemental indenture addressing the matter, and want to walk you through it. The supplemental indenture will need to be approved and signed by StadCo and the trustee tomorrow. Pursuant to the terms of the indenture, it will require only bond insurer consent, which we are obtaining. We also will send the necessary legal opinion. We can explain background on the phone.

Can you please respond with a time when you are available tomorrow preferably in the morning?

Sorry for the short notice. The supplemental indenture is really only a clarification, but it is critical that it be put in place tomorrow.

Christine Procops
Giants Stadium LLC

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

**CONFIDENTIAL**

**GStad_LB_0052953**

# EXHIBIT L

| | |
|---|---|
| **From:** | Champeau, Daniel <dchampeau@fsa.com> |
| **Sent:** | Thursday, September 18, 2008 6:43 AM |
| **To:** | Procops, Christine <Procops@giants.nfl.net> |
| **Subject:** | Re: Giants Stadium LLC Urgent |

I'll be back to you asap this morning with a response.

---

**From**: Procops, Christine
**To**: Lisa.Cintron@fgic.com ; Jeffrey.fried@fgic.com ; Champeau, Daniel
**Cc**: Thea.Okin@fgic.com ; Jill.Greiss@fgic.com ; dietdericha@sullcrom.com
**Sent**: Wed Sep 17 23:01:43 2008
**Subject**: Giants Stadium LLC Urgent

FGIC/FSA

We have been informed that we must terminate the Lehman swaps tomorrow to preserve the value of our (significant) claims against the estate of the Lehman swap counterparty. We need your consent to do this as quickly as possible tomorrow. We can have a joint call or separate calls as you prefer. We are available at 9:30 tomorrow morning. If you are not, can you please respond with a time when those with authority to approve are available to discuss and confirm? We are available at you convenience but need to address this in the morning if at all possible.

Sorry for the short notice but this is critical to preserve the value of claims.

Christine Procops
Giants Stadium LLC

---

This e-mail message is for the sole use of the intended recipient(s) and may contain proprietary, confidential and/or privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient (or an employee or agent responsible to deliver it to the intended recipient), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply e-mail. FSA-

# EXHIBIT M

This Exhibit Has Been Filed Under Seal