HEARING DATE AND TIME: OCTOBER 19, 2011 AT 10:00 A.M. (Eastern Time)
RESPONSE DEADLINE: OCTOBER 12, 2011 AT 4:00 P.M. (Eastern Time)

**QUINN EMANUEL**
**URQUHART & SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
*Counsel for the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc.*

**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
*Counsel for Debtor Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., et al.,<br><br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>Debtor. | Case No. 08-01420 (JMP) SIPA |

**NOTICE OF HEARING ON OBJECTION TO PORTIONS OF PROOFS OF CLAIM NO.**
**66462 AGAINST LEHMAN BROTHERS HOLDINGS INC. AND NO. 4939 AGAINST**
**LEHMAN BROTHERS INC. OF JPMORGAN CHASE BANK, N.A.**
<u>**REGARDING TRIPARTY REPO-RELATED LOSSES**</u>

<u>**[REDACTED]**</u>

**PLEASE TAKE NOTICE** that a hearing on the annexed objection, dated August 31, 2011 (the "Objection") filed by Lehman Brothers Holdings Inc. and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors") and the Official Committee of Unsecured Creditors (the "Committee" and, together with the Debtors, the "Objectors"), to portions of Proofs of Claim No. 66462 against Lehman Brothers Holdings Inc. and No. 4939 against Lehman Brothers Inc. shall be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **October 19, 2011 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that responses, if any, to the Objection must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the responding party, the basis for the response and the specific grounds thereof, and shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with a hard copy delivered directly to Chambers), in accordance with General Order M-182 (which can be found at www.nysb.uscourts.gov), and served in accordance with General Order M-399, and on (i) the Chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Lori Fife, Esq.); (iii) conflicts

counsel for the Debtors, Curtis, Mallet-Prevost, Colt & Mosle, LLP, 101 Park Avenue,

New York, New York 10178-0061 (Attn: Joseph D. Pizzurro, Esq. and L.P. Harrison 3rd, Esq.);

(iv) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall

Street, 21st Floor, New York, New York 10004 (Attn:  Elisabeth Gasparini, Esq. and Andrea

Schwartz, Esq.); (v) attorneys for the Official Committee of Unsecured Creditors appointed in

these cases, Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York,

New York 10005 (Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq. and Evan Fleck, Esq.);

and (vi) special counsel to the Committee, Quinn Emanuel Urquhart & Sullivan, LLP, 865 South

Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 (Attn:  John B. Quinn, Esq. and

Erica Taggart, Esq.) so as to be filed and received by no later than **October 12, 2011 at 4:00 p.m.**

**(Eastern Time)** (the "Response Deadline").

   **PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and

served with respect to the Objection or any claim set forth thereon, the Objectors may, on or after

the Response Deadline, submit to the Bankruptcy Court an order, which order may be entered

with no further notice or opportunity to be heard offered to any party.


   *[Remainder of Page Intentionally Left Blank]*

3

**PLEASE TAKE FURTHER NOTICE** that responding parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: August 31, 2011
      New York, New York

 

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By:   /s/ John B. Quinn
John B. Quinn
Erica Taggart
Tyler G. Whitmer
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000

Susheel Kirpalani
Andrew J. Rossman
James Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000
*Counsel for the Official Committee of
Unsecured Creditors of Lehman Brothers
Holdings Inc.*

**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**

By:   /s/ Joseph D. Pizzurro
Joseph D. Pizzurro
L.P. Harrison 3rd
Michael J. Moscato
Nancy E. Delaney
Peter J. Behmke
Cindi M. Giglio
101 Park Avenue
New York, New York 10178-0061
(212) 696-6000
*Counsel for Debtor Lehman Brothers
Holdings Inc.*

**QUINN EMANUEL**
**URQUHART & SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
*Counsel for the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc.*

**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
*Counsel for Debtor Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., <u>et al</u>.,<br><br>       Debtors. | Chapter 11<br>Case No. 08-13555 (JMP) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>       Debtor. | Case No. 08-01420 (JMP) SIPA |

**OBJECTION TO PORTIONS OF PROOFS OF CLAIM NO. 66462 AGAINST LEHMAN**
**BROTHERS HOLDINGS INC. AND NO. 4939 AGAINST LEHMAN BROTHERS INC.**
**OF JPMORGAN CHASE BANK, N.A. REGARDING**
**<u>TRIPARTY REPO-RELATED LOSSES</u>**

**<u>[REDACTED]</u>**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors, in the above-

referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors")

and the Official Committee of Unsecured Creditors (the "Committee" and, together with LBHI,

the "Objectors"), respectfully represent as follows:

### Preliminary Statement

This Objection seeks a ruling that the claims of JPMorgan Chase Bank, N.A.

("JPMorgan") against both Lehman Brothers Inc. ("LBI") and LBHI relating to its role as LBI's

triparty repo custodian are significantly overstated because JPMorgan (i) failed to dispose of the

collateral securing such claims in a commercially reasonable manner; (ii) included losses due to

Barclays' conduct, which have been settled for consideration; and (iii) impermissibly charged

post-petition interest.

JPMorgan's claims against LBI, and against LBHI as purported guarantor of LBI's

obligations, stem entirely from JPMorgan's role as LBI's triparty repo custodian the week of

September 15-19, 2008, between LBHI's bankruptcy filing and the commencement of LBI's

SIPA proceeding.  That week, JPMorgan acted as LBI's triparty repo custodian, including

transferring the necessary funds and securities between LBI and repo investors at night and

unwinding the transactions each morning.  JPMorgan claims it is entitled to apply over $6 billion

of LBHI's money to satisfy a deficiency supposedly arising from JPMorgan's activities as LBI's

triparty repo custodian that week.

These claims should be reduced substantially.  First, JPMorgan's disposition of the LBI

collateral was commercially unreasonable.  Although JPMorgan is one of the most sophisticated

financial institutions in the world, it conducted the largest forced liquidation of customer

2

collateral in history without first considering appropriate safeguards and processes necessary to

protect both the customer's interests and those of the bank.  ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

Second, JPMorgan itself has claimed that its losses are due to Barclays' misconduct

related to triparty repurchase agreements that week, and JPMorgan has settled its dispute with

Barclays on this subject shortly after the events took place.  It received substantial consideration

from Barclays for the very losses it claims now against LBHI, including the dismissal of a

lawsuit worth hundreds of millions of dollars.  LBHI should not have to pay for losses caused by

Barclays for which JPMorgan has already settled and received compensation.

Finally, JPMorgan has asserted a claim for post-petition interest on its claims (the "Interest Claim") notwithstanding that JPMorgan held cash and cash-equivalents totaling $8.6 billion at the time such interest was accruing. As a matter of equity, JPMorgan should not be permitted to charge LBHI's estate hundreds of millions of dollars of interest on its claims while holding billions of dollars of unapplied cash collateral.

Nothing in this Objection addresses the validity of the purported guaranties and security agreements entered into on the eve of LBHI's bankruptcy. That issue is being litigated in the separate adversary proceeding pending before this Court. But under no circumstances is JPMorgan entitled to recover for losses it caused, or for which it has blamed and settled with another.

## Relief Requested

1.    This Objection seeks to reduce the portions of Proof of Claim No. 66462 against LBHI and Proof of Claim No. 4939 against LBI[1] described therein as arising from the purported $6,333,781,099 deficiency remaining after application of the sale proceeds of securities collateral pledged by LBI to secure certain LBI indebtedness related to JPMorgan's role as LBI's triparty repo custodian (the "Deficiency Claims") pursuant to section 502(b) of title 11 of the United States Code, as amended (the "Bankruptcy Code"), Rule 3007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and this Court's Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 3007 and 9019(b) for Approval of Claim

---

[1]    LBHI's standing to assert this Objection in LBI's SIPA Proceeding is predicated upon its status as the largest unsecured creditor of LBI.

Objections Procedure (the "Procedures Order") [Docket No. 6664].  This Objection also seeks

the disallowance of postpetition interest and other related relief described further herein.[2]

2.       In its proofs of claim, JPMorgan explains that "[a]s of October 1, 2008,

[JPMorgan] was owed $25,279,675,964 for extensions of credit for the clearance and settlement

of securities transactions under the Clearance Agreement signed by [LBI] on June 7, 2000, as

amended, to which JPMCB and [LBI] are party together with certain of [LBI's] affiliates . . . .

As of March 15, 2010, such amount had been reduced to $6,333,781,099, principally by

application of the sale proceeds of securities collateral . . . pledged by [LBI] pursuant to the

Clearance Agreement to secure such claims . . . ."[3]

3.       Objectors have examined the Deficiency Claims and have determined that they

should be reduced for a number of reasons.  Objectors therefore request entry of an order

reducing the Deficiency Claims as set forth below.  Objectors reserve their right to object to the

Deficiency Claims on all other grounds.[4]

## Jurisdiction

4.       The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.

Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding within the meaning of 28 U.S.C. § 157(b).

---

[2]   An excerpted copy of Proof of Claim No. 66462 is attached hereto as Exhibit A.  Proof of claim No. 4939 against LBI is attached as Exhibit B to Proof of Claim No. 66462.

[3]   Ex. A, Proof of Claim at Exhibit B p. 2.

[4]   These grounds include, but are not limited to, whether JPMorgan is entitled to apply LBHI collateral to satisfy all or part of those claims.

## **Procedural Background**

5.      Beginning on September 15, 2008, and periodically thereafter, LBHI and certain

of its subsidiaries commenced with this Court voluntary cases under chapter 11 of the

Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural

purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  The

Debtors are authorized to operate their businesses and manage their properties as debtors in

possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

6.      On September 17, 2008, the United States Trustee for the Southern District of

New York (the "U.S. Trustee") appointed the Committee.

7.      On September 19, 2008, the Honorable Gerard E. Lynch, Judge of the United

States District Court for the Southern District of New York, entered the Order Commencing

Liquidation pursuant to the provisions of the Securities Investor Protection Corporation Act

("SIPA") with respect to LBI.

8.      On July 2, 2009, this Court entered an order setting forth the procedures and

deadlines for filing proofs of claim in these chapter 11 cases (the "Bar Date Order") [Docket No.

4271].  A copy of the Bar Date Order was made publicly available at http://www.lehman-

docket.com.

9.      Claimants received notice of the Bar Date Order by mail.  (*See* Notice of

Deadlines for Filing Proofs of Claim (the "Bar Date Notice")).  The Bar Date Notice also was

posted on the docket, and the Bar Date Order was published in The New York Times

(International Edition), The Wall Street Journal (International Edition), and The Financial Times.

A list of the Debtors in these chapter 11 cases and their respective case numbers was included as

part of the Bar Date Notice as well as on the instructions to the proof of claim form.  (Bar Date

Notice at Schedule A).  In accordance with the Bar Date Order's requirement that claims be filed

against the proper Debtor, the Bar Date notice stated, in bold-face type and in capital letters, that

"YOU SHOULD NOT FILE A PROOF OF CLAIM IF YOU DO NOT HAVE A CLAIM

AGAINST THE DEBTORS." (*Id.* at 3).

10.    On January 14, 2010, this Court entered the Procedures Order, which authorizes

the Debtors, among other things, to file omnibus objections to no more than 500 claims at a time,

on various grounds, including those set forth in Bankruptcy Rule 3007(d) and those additional

grounds set forth in the Procedures Order.

## Factual Background

### I.    PRIOR TO LBHI'S BANKRUPTCY, JPMORGAN ACTED AS LBI'S CLEARING BANK AND DEMANDED GUARANTIES FROM LBHI

11.    From June 2000 until September 2008, JPMorgan served as LBI's primary

clearing bank for broker-dealer activities.  In that role, JPMorgan agreed to receive and transfer

securities on behalf of LBI, to make payment and collections of monies, and to permit transfers

between accounts to facilitate clearing services.  JPMorgan also acted as LBI's custodial

bank/clearing agent for purposes of LBI's triparty repurchase agreements ("repos").

12.    LBI designated JPMorgan as its clearing bank through a Clearance Agreement

entered into on June 15, 2000 (the "2000 Clearance Agreement") between LBI and The Chase

Manhattan Bank, JPMorgan's predecessor-in-interest.  LBHI was not a party to the 2000

Clearance Agreement.

13.    For the next eight years, LBI used triparty repos to finance its operations, selling

securities collateral to counterparties while agreeing to repurchase those securities on a later date

– often the next morning – for the purchase price plus some agreed amount of interest.  In its role

as custodian bank, JPMorgan acted as the intermediary, processing the purchase and sale

transactions underlying the repurchase agreement.

7

14.    Each morning, JPMorgan would "unwind" all of LBI's triparty repo trades. LBI, and other broker dealers using JPMorgan's securities-related services, relied on intraday credit from JPMorgan to provide the cash required to unwind. In other words, each morning, JPMorgan advanced funds on LBI's behalf to unwind the triparty repos. This "intraday" loan from JPMorgan was secured by the repurchased securities and other LBI assets until LBI sold the securities again in a repo with the same or another counterparty.

15.    Starting in early 2008, JPMorgan began demanding additional collateral from LBI to secure JPMorgan's intraday exposure – above and beyond the collateral it already held and valued at the amount of the intraday loan. In addition, JPMorgan required LBHI to deposit securities that would serve as collateral over and above the LBI collateral it was retaining to cover its intraday loans.

16.    In August 2008, JPMorgan required LBHI to enter into a set of agreements, including a guaranty (the "August Guaranty"), a security agreement (the "August Security Agreement"), and an amendment to the 2000 Clearance Agreement (collectively, the "August Agreements"). In the August Guaranty, LBHI guaranteed the obligations of certain of its subsidiaries – primarily LBI – "pursuant to the Clearance Agreement, dated as of June 15, 2000, to which one or more of [LBHI's subsidiaries] and [JPMorgan] are parties . . . ." The August Guaranty was thus limited to liabilities arising from JPMorgan's clearance and triparty repo functions. The August Security Agreement secured LBHI's obligations under the August Guaranty. *See* August Security Agreement, at 1-2 (defining "Liabilities" as, in pertinent part, "all 'Liabilities' as defined in the [August] Guaranty" and providing that LBHI "grant(s) to the Bank a security interest in, and a general lien upon and/or right of set-off of, the Security"). These

8

documents purported to make it possible for JPMorgan to look to LBHI's pledged securities in the event LBI's collateral was insufficient.

17.    Two weeks later, just as LBHI was about to announce its third quarter earnings, JPMorgan demanded that LBHI execute another guaranty (the "September Guaranty"), security agreement (the "September Security Agreement") and related documents (collectively, the "September Agreements").  The September Agreements purported to cover far more than potential clearance-related liabilities.  Whereas the August Guaranty covered only certain of LBHI's subsidiaries' obligations under the 2000 Clearance Agreement, the September Guaranty covered "all obligations and liabilities of [all of LBHI's direct and indirect subsidiaries] to the Bank of whatever nature" with no limitation to any particular agreement or type of transaction.  JPMorgan sent LBHI the September Agreements at 8:50 p.m. on the night of September 9 and demanded that LBHI execute them before the earnings call at 7:30 a.m. the following morning.

18.    The same day JPMorgan sent LBHI the September Agreements, JPMorgan also demanded billions of dollars of cash collateral.  Between September 9 and September 11, LBHI deposited as collateral $3.6 billion in cash and cash equivalents.  These cash deposits were in addition to billions of dollars worth of securities already provided by LBHI to JPMorgan earlier in the summer.  Then, during the evening of September 11, 2008, JPMorgan demanded yet another $5 billion in cash, coupled with an explicit, written threat to stop extending credit to LBI unless the funds were received by the start of business the following morning, Friday, September 12.  LBHI transferred the $5 billion in cash to JPMorgan, as demanded.

19.    As of the close of business on September 12, JPMorgan had "locked down" over $13 billion in LBHI collateral despite what JPMorgan itself described as having "little or no

9

clearance-related exposure to LBI."[5] ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ On September 15, LBHI filed for bankruptcy.

## II.  JPMORGAN CONTINUES ACTING AS LBI'S TRIPARTY REPO CUSTODIAN THE WEEK AFTER LBHI'S BANKRUPTCY

20.     Although LBHI filed for bankruptcy on September 15, 2008, LBI continued to operate the following week.  JPMorgan continued to act as LBI's clearing bank and triparty repo custodian that week.

21.     In this bankruptcy proceeding, JPMorgan claims a deficiency of $25,279,667,411 related to triparty repo services for LBI that week.  According to JPMorgan, this deficiency resulted in large part from a $15.8 billion repo with Barclays that JPMorgan unwound the morning of September 18 and which Barclays refused to "roll" that evening (the "$15.8 Billion Repo").

████ Against this deficiency, JPMorgan held LBI securities ████████████



---

    [5]  Counterclaims of JPMorgan Chase Bank, N.A. in Adversary Proceeding No. 10-03266 [Docket No. 33] at ¶ 2.

    [6]  ███████████████████████

    [7]  ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███

23.    JPMorgan has claimed that it also had an additional $5 billion in LBI collateral as of September 18, but that it gave away that margin to Barclays because Bob Diamond of Barclays told JPMorgan that Barclays would take over all LBI securities the following day.

24.    Thus, JPMorgan should have been overcollateralized by $10 billion, not counting any of LBHI's collateral.

## III.    JPMORGAN IMMEDIATELY BLAMES BARCLAYS FOR CAUSING ITS TRIPARTY LOSSES AND ENTERS INTO TWO SETTLEMENT AGREEMENTS WITH BARCLAYS

25.    As soon as JPMorgan realized it had been left with outstanding loans to LBI related to the $15.8 Billion Repo with Barclays, it looked to Barclays for compensation.  On September 19, 2008, JPMorgan took $7 billion that it had deposited in a Barclays account and moved it to an LBI account as collateral for JPMorgan's exposure.  It spent the following weekend negotiating with Barclays, with the help of the Federal Reserve Bank of New York (the "Fed"), resulting in a Services and Settlement Agreement ("SSA") on September 22, 2008 that, among other things, released all claims between them relating to Barclays' decision not to roll the $15.8 Billion Repo.[8]  As part of that agreement, Barclays agreed to dismiss a pending lawsuit against JPMorgan worth hundreds of millions of dollars (the "Bear Stearns Lawsuit").  Specifically, the SSA among Barclays, LBI, SIPC, LBHI and JPMorgan, dated September 22, 2008, included the following release between JPMorgan and Barclays:

---
[8]    Ex. B, Services and Settlement Agreement.

11

> JPMorgan and BarCap shall be deemed to forever release . . . all
> claims . . . that are based in whole or in part on any act, omission,
> transaction or other occurrence taking place on or prior to the date
> hereof in any way relating to the clearing, settlement and other
> processing services provided by JPMorgan to LBI, any
> transactions relating to the Accounts or any cash, securities or
> property in the Accounts, including without limitation any disputes
> relating to a repurchase agreement allegedly agreed to on or about
> September 18, 2008 in respect of approximately $15.8 billion face
> amount of securities . . . .[9]

26.     Over the next several months, JPMorgan and Barclays continued to negotiate over

this dispute.  JPMorgan maintained its position that Barclays' actions had caused JPMorgan to be

exposed to the full amount of the deficiency between the loan amount and the value of the

collateral.[10]  At no time during this process did JPMorgan ever claim that Lehman was in any

way the cause of the deficiency.[11]  Nor did JPMorgan ever claim that the deficiency was

guaranteed by LBHI.[12]

27.     Eventually, on December 5, 2008, JPMorgan and Barclays executed a second

settlement agreement (the "December Settlement Agreement), finally resolving the issues

between them.  In that agreement, Barclays reaffirmed its commitment to dismiss the Bear

Stearns Lawsuit, and JPMorgan kept much of the $7 billion in cash it had moved from Barclays'

account, but also transferred to Barclays billions of dollars of securities that Barclays claimed

were owed to it.[13]

---

[9]   Ex. B, SSA § 4(a).

[10]   Transcript of the August 18, 2011 deposition of Shari Leventhal ("Leventhal Tr.") at
139:5-16, attached hereto as Exhibit C.

[11]   Ex. C, Leventhal Tr. at 127:25-129:3; 135:13-17; 139:12-20.

[12]   Ex. C, Leventhal Tr. at 189:24-190:6.

[13]   Ex. D, December Settlement Agreement § 4(d) and Recital D.

**IV.    JPMORGAN LIQUIDATES THE LBI COLLATERAL WITHOUT ANY LIMITS
OR SAFEGUARDS ENSURING A FAIR PRICE**

28.    On September 19, 2008, the day of the commencement of LBI's SIPA proceeding,

JPMorgan began liquidating the LBI collateral that secured its tripatrty repo and intraday

financing. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████[16]

29.    ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

████████████████████████████████████████

████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[14] ████████████████████████████████
████████████.

[15] ████████████████████

[16] ████████████████████





33.

---

20

21

22

[23] Despite numerous requests, JPMorgan has refused to identify which of the collateral was sold to JPMorgan and its affiliates. Objectors' efforts to learn of such self-sales began in earnest on December 21, 2010, when Objectors wrote to JPMorgan seeking the identity of the purchaser of each security and whether the counterparty was JPMorgan itself or one of its affiliates. Ex. G, December 21, 2010 Letter from Scheck to Novikoff. JPMorgan responded by claiming it had no obligation to identify sales to affiliates because "the LBI Trustee is the
(continued...)

████████████████████████████████████████████████████

██████████████

34.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

---

(...continued)

appropriate person to make such inquiries, not the committee (or LBHI)." Ex. H, January 4, 2011 Letter from Novikoff to Scheck.

After continued meet and confer correspondence, JPMorgan stated that it would produce responsive documents in the Adversary Proceeding and advised Objectors' not to rely on previously provided information because it had "not been thoroughly checked." Ex. I, January 13, 2011 Letter from Novikoff to Scheck. When Objectors pointed out that JPMorgan had still not produced the information requested, JPMorgan would not confirm it was contained in its Adversary Proceeding production. Ex. J, January 21, 2011 Letter from Scheck to Novikoff; Ex. K, February 11, 2011 Letter from Novikoff to Scheck. Finally, after claiming that it did not track sales to affiliates and could not identify them, JPMorgan agreed to produce some of the information requested. Ex. L, March 28, 2011 email from Scheck to Lin; Ex. M, April 1, 2011 Letter from Lin to Scheck.



When Objectors pointed out these deficiencies and asked for information needed to decipher it, counsel for JPMorgan represented that no explanatory key was available and that Objectors would have to depose the appropriate individuals to learn what was being conveyed. Ex. N, June 7, 2011 Letter from Scheck to Lin. Moreover, although JPMorgan said that it would provide the same information for the remainder of the Project Tassimo securities, it has not done so. █████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

24 ████████████████████████████████

25    Objectors have requested this information from JPMorgan repeatedly, but JPMorgan has not provided it, as described in footnote 23 above.

16



36.

26 ████

27 ████████████

28 ████

29 ████████████

██████████████████████████████████████

████████████

## V. THE PARTIES EXECUTE THE CDA AND JPMORGAN FILES ITS REVISED PROOFS OF CLAIM

37.    On March 16, 2010, JPMorgan and LBHI executed the CDA, which was approved by the Court on March 24, 2010 [Docket No. 7785]. Pursuant to the CDA, JPMorgan transferred to LBHI the remainder of the LBI collateral that JPMorgan had not liquidated (along with all of the securities posted as collateral by LBHI to secure its purported guaranty of LBI's clearance obligations). These unsold securities included the LBI collateral referred to as RACERS, which had a par value of $5 billion.

38.    On March 31, 2010, JPMorgan filed its amended and restated Proof of Claim No. 4939 against LBI seeking a deficiency of $6,333,781,099 remaining after the disposition of the LBI collateral through Project Tassimo and the CDA. On April 1, 2010, JPMorgan filed Proof of Claim No. 66462 against LBHI, seeking the same deficiency from LBHI pursuant to the August Guaranty and Security Agreement. As a result of the CDA, these Deficiency Claims have now been provisionally satisfied, primarily by applying LBHI cash collateral. Objectors reserved their rights, however, to challenge all claims and seek return of the collateral.

### Objection

39.    In their review of the claims filed on the claims register in these chapter 11 cases and maintained by the Court-appointed claims agent, the Objectors have identified the Deficiency Claims and claims for postpetition interest as claims that should be reduced or disallowed.

---

[30]    Some of these proceeds were transferred by JPMorgan to Barclays pursuant to the December Settlement Agreement.

I.    **JPMORGAN'S LIQUIDATION OF LBI COLLATERAL WAS COMMERCIALLY UNREASONABLE**

A.    **Legal Standards for Liquidation of Collateral**

40.    According to New York's Uniform Commercial Code ("U.C.C."),[31] "[a]fter default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing." N.Y. U.C.C. Law § 9-610(a) (McKinney). The U.C.C. requires that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." *Id.* § 9-610(b). "If the secured party's compliance is placed in issue, the secured party has the burden of establishing that the collection, enforcement, disposition, or acceptance was conducted in accordance with this part." *Id.* § 9-626(a)(2); *see also id.* § 9-626(a)(1) ("A secured party need not prove compliance with the provisions of this part relating to collection, enforcement, disposition, or acceptance unless the debtor or a secondary obligor places the secured party's compliance at issue."). As this Objection places at issue JPMorgan's compliance with section 9-610 of the U.C.C., JPMorgan has the burden of establishing that its disposition complied with the commercial reasonableness requirement contained in that section.[32] *Ford Motor Credit Co., Inc. v. Racwell Const., Inc.*, 24 A.D. 3d 500, 501 (2d Dep't

---

[31]    Many of the cases cited in this Objection were decided under the previous version of the NY U.C.C. or under the U.C.C. as adopted in other jurisdictions. Unless the differing statute substantively affects the legal analysis involved, however, the Objection will not make note of this fact.

[32]    Under the U.C.C., LBHI, as guarantor of LBI's obligations to JPMorgan, has independent standing to object to the commercial reasonableness of JPMorgan's disposition of LBI collateral. Section 9-625 of the U.C.C., titled "Remedies for Secured Party's Failure to Comply with Article," grants rights to "debtors" and "obligors" to bring actions against secured creditors. *See id.* § 9-625(c)(1) ("[A] person that, at the time of the failure, was a debtor, was an obligor, or held a security interest in or other lien on the collateral may recover damages under
(continued...)

2005) (citing NY U.C.C. § 9-626(a)(2) and holding that creditor had not met its burden of proving propriety of a deficiency judgment).

41.    If a secured creditor disposes of collateral in a commercially unreasonable manner, damages are determined by calculating the difference between the value actually received for the collateral and the fair market value of the collateral. *Bank of China v. Chan*, 937 F.2d 780, 787-88 (2d Cir. 1991) ("Normally, when a debtor has defaulted and the creditor has repossessed the collateral then disposed of it unreasonably, the proper way to calculate the effect of the unreasonable acts is to prove the fair market value of the collateral . . . and then subtract the value actually received in order to calculate the loss."). The secured creditor bears the burden of proving the fair market value of the collateral used to determine damages, in the face of a presumption that the collateral is worth the full amount of the debt. *Gen. Elec. Credit Corp. v. Durante Bros. & Sons, Inc.*, 79 A.D. 2d 509, 510-11 (1st Dep't 1980) ("[T]here is a presumption

_____

(...continued)

subsection (b) for its loss . . . ."). As both "debtors" and "obligors" for purposes of this section, guarantors have the right to bring actions against secured creditors.

Under New York law, a guarantor has an interest in the collateral and therefore meets the definition of "debtor" under section 9-102(28). *See Marine Midland Bank v. CMR Indus., Inc.*, 159 A.D.2d 94, 106, (2d Dep't 1990) ("In our view, a guarantor is a 'debtor' within the definition set forth in Uniform Commercial Code § 9-105(1)(d)") (decided under previous version of the N.Y. U.C.C.); *Chase Manhattan Bank, N.A. v. Natarelli*, 93 Misc. 2d 78, 89, 401 N.Y.S.2d 404, 412 (N.Y. Sup. Ct. 1977) ("This court is of the opinion that the better rule is the one arrived at in the majority of jurisdictions and, accordingly, holds that a guarantor is a "debtor" within the meaning of U.C.C. §§ 9-105(1)(d) and 9-504(3) and entitled to notice of the disposition of the collateral."). Similarly, because a guarantor owes "payment or other performance" of the guaranteed obligation and is "accountable in whole or in part for payment or other performance" of that obligation, a guarantor thus falls under the definition of "obligor." *See e.g.*, *Tropical Jewelers, Inc. v. Nationsbank, N.A.*, 781 So. 2d 392, 394 (Fl. App. 2000) ("Certainly a guarantor is a person who owes 'payment or other performance . . . '"). Therefore, under both the definition of "debtor" and "obligor," a guarantor has standing to bring private rights of action pursuant to the U.C.C., including as a defense to a deficiency claim. *See* N.Y. U.C.C. §§ 9-625(b), (c), 9-626(a)(2); *see also Marine Midland Bank, N.A. v. Kristin Int'l Ltd.*, 141 A.D. 2d 259, 261-63 (4th Dep't 1988) (holding that the guarantor is a debtor under the U.C.C. and thus cannot waive the defense of commercial reasonableness).

that the security was equal to the debt and . . . the secured party has the burden of proof to overcome such presumption.") (quoting *Security Trust Co. v. Thomas*, 59 A.D.2d 242, 246 (4th Dep't 1977)).

42.    The Southern District of New York has applied this "rebuttable presumption" rule to determine the deficiency where a secured creditor has failed to meet the standards of the New York U.C.C. in disposing of collateral. *Siemens Credit Corp. v. Marvik Colour, Inc.*, 859 F. Supp. 686, 691-92 (S.D.N.Y. 1994) (noting that the majority of New York courts have adopted the rebuttable presumption approach and agreeing with Judge Easterbrook of the 7th Circuit that federal courts should do the same).  It has also, however, provided the debtor an opportunity to prove any damages caused by the secured creditor's failure to comply with the requirements of the U.C.C. – sometimes called the "setoff" rule. *Id.* at 691-92 (describing the setoff rule and explaining that "[c]ombining the rebuttable presumption rule and the setoff rule best balances the interests at stake").

### B.    JPMorgan's Process for Liquidation of the Collateral Was Commercially Unreasonable

43.    "The primary focus of commercial reasonableness is . . . the procedures employed for sale." *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 545 (S.D.N.Y. 2001) (quoting *In re Zsa Zsa Ltd.*, 352 F. Supp. 665, 671 (S.D.N.Y. 1972)) (denying secured creditor's motion for summary judgment that its disposition was commercially reasonable).

███ JPMorgan did not dispose of LBI's collateral in a commercially reasonable manner or through commercially reasonable methods. ██████████

██████████

██████████

██████████



45.

46.    Under these circumstances, at least some traders made it clear to potential buyers that they were willing to sell at below-market prices.  For example, a Lehman employee was forwarded an October 1, 2008 email from a representative of Church Street Advisors, a fund specializing in structured finance projects.  In the email, a Church Street representative describes bonds to be sold by JPMorgan, explaining that "JP Morgan has acquired the bonds in question as a result of a Lehman repo default."[35]  The email states that JPMorgan had already sold a $70 million position in the bonds and suggests that the next $100 million JPMorgan sells "will go for an even lower price because JPM acquired them at a significant discount pursuant to the repo transaction . . . and has stated that they do not have a lot of price sensitivity."[36]

---

[33]

[34]

[35]    Ex. S, Email from Seery to Antoncic.

[36]    Ex. S, Email from Seery to Antoncic.

47.      Because JPMorgan failed to employ adequate procedures that would reasonably lead to ensuring it received a fair market price for LBI's collateral, its disposition of that collateral was unreasonable. *New Jersey Bank, N.A. v. Verano*, 120 A.D.2d 505, 506 (2d Dep't 1986) (denying secured creditors motion for summary judgment because of "a valid dispute as to whether the methods chosen by the plaintiff for the disposition of the [collateral] were commercially reasonable").

### C.      JPMorgan Sold LBI Collateral at Commercially Unreasonable Prices

48.      "[A] low price suggests that a court should scrutinize carefully all aspects of a disposition to ensure that each aspect was commercially reasonable." N.Y. U.C.C. § 9-610 cmt. 10. Consequently, at least one treatise has found that price is "the single most important fact in most . . . cases – even in cases where it is not identified as the basis for the court's finding of noncompliance." 4 White & Summers, Uniform Commercial Code § 34-11 (6th ed.). █████

████████████████████████████████████

███████████████████████████████

49.      ████████████████████████████

██████████████████████████████████

███████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

---

37  ████████████████████████████

38  ████████████████████████████████



51.

*FDIC v. Forte*, 94

A.D.2d 59, 66 (2d Dep't 1983) ("[A] wide or marked discrepancy between the sale price and the value of the property will trigger close scrutiny even in the face of procedural propriety.").

███████████████████████████████

███████████████████

52.    The U.C.C. also limits a secured creditor's ability to dispose of collateral by selling to itself and claiming a deficiency.  Courts analyzing whether a creditor's disposition of collateral was commercially reasonable regularly consider whether there was an opportunity for "self dealing" and more closely inspect the circumstances of dispositions where the secured creditor sells the collateral to itself or a related person or entity.  *See Central Budget Corp. v. Garrett*, 48 A.D.2d 825, 825-26 (2d Dep't 1975) (holding that creditor's sale to a successor of the original lender was a factor in denying recovery in a suit for a deficiency judgment under the predecessor statute to N.Y. U.C.C. § 9-610).  Extra scrutiny for commercial reasonableness is especially warranted if the secured party or its affiliates then resold collateral at a profit.  For example, in *Primavera*, the fact that the secured party "bought several securities itself and then resold them to [a third-party] at a profit of just under $500,000--or just over 2%--later the same day [was] evidence that [the secured party] may have failed to maximize the return on the Funds' securities in the liquidation."  130 F. Supp. 2d at 546.  *See also In re Solfanelli*, 230 B.R. 54, 67-68 (M.D. Pa. 1999) (finding a secured party acted in a commercially unreasonable manner where its agent sold a majority of securities to itself and then resold them at higher price two days later), *aff'd*, 203 F.3d 197 (3d Cir. 2000).

53.    According to the U.C.C., a secured creditor can purchase collateral "at a private disposition only if the collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations."  NY U.C.C. § 9-610(c)(2); *see also In re Stedman*, 264 B.R. 298, 301 (Bankr. W.D.N.Y. 2001) (holding that purchase of the assets

of a pesticide company by a secured creditor at private sale was a commercially unreasonable disposition). The term "recognized market" means "one in which the items sold are fungible and prices are not subject to individual negotiation." NY U.C.C. § 9-610 cmt. 9. The Official Comments use the New York Stock Exchange as an example. *Id.* "Courts treat the term 'recognized market' restrictively." *FDIC v. Blanton*, 918 F.2d 524, 528 (5th Cir. 1990) (holding under Texas's version of the U.C.C. that the New York Stock Exchange was a recognized market); *Marine Midland Bank-Rochester v. Vaeth*, 388 N.Y.S.2d 548 (N.Y. Sup. 1976) (finding the sale of stock on the New York Stock Exchange was a sale of "collateral . . . of a type customarily sold on a recognized market").

54.    Courts have interpreted these provisions of the U.C.C. to prevent a secured party from disposing of collateral to itself at a private sale unless the collateral consists of "widely traded" securities. *See Chittenden Trust Co. v. Andre Noel Sports*, 621 A.2d 215, 218 (Vt. 1992) ("This exception generally applies to widely traded stocks, bonds or commodities sold in recognized markets, where the prices are fixed and therefore not subject to manipulation by the secured party."); *Hertz Comm. Leasing Corp. v. Dynatron, Inc.*, 37 Conn. Sup. 7, 13 (1980) ("It would seem that the only items logically included in this category would be widely traded stocks and bonds.").

55.    Moreover, a sale is a "public disposition" where "the price is determined after the public has had a meaningful opportunity for competitive bidding. 'Meaningful opportunity' is meant to imply that some form of advertisement or public notice must precede the sale . . . and that the public must have access to the sale." NY U.C.C. § 9-610 cmt. 7. Thus, in order for a sale to qualify as a "public disposition," the secured creditor must invite the general public. *Ford Motor Credit Co. v. Soloway*, 825 F.2d 1213, 1218 (7th Cir. 1987) (holding that automobile

auction that only automobile dealers were invited to attend did not qualify as a public sale); *John Deery Motors, Inc. v. Steinbronn*, 383 N.W.2d 553, 554-55 (Iowa Sup. Ct. 1986) (same).



56.



59.

---

48

49　　　　　　　　　　　　　　　　.

50

　　　　.

51　　　　　　　　　　　　　.

60. [redacted]

61. [redacted]

---

52 [redacted]

53 [redacted]

54 [redacted]

55 [redacted]

56 [redacted]

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

**3.**   ████████████████████████████████████████████
████████████████████████████

62.    A secured creditor has an obligation to act in the "mutual best advantage" of itself

and the debtor when disposing of collateral. *Garrett*, 48 A.D. 2d at 825-26 (quotations omitted).

A creditor may not use the collateral disposition as a means of profiting at the expense of the

debtor.  These principles have led courts to find that a creditor or its agent buying collateral at

one price and then reselling it shortly thereafter at a profit is weighty evidence that the

disposition was commercially unreasonable.  *See, e.g.*, *In re Solfanelli*, 230 B.R. 54, 67-68 (M.D.

Pa. 1999) (upholding bankruptcy court finding of commercial unreasonableness where broker

hired by secured creditor to dispose of collateral purchased the collateral itself and then resold it

two days later at a half a million dollar profit).  For example, the District Court for the Southern

District of New York denied a motion for summary judgment by a secured creditor on the issue

of commercial reasonableness, in part because the secured creditor "bought several securities

itself and then resold them to [another company] at a profit of just under $500,000-or just over

2%-later the same day," noting that "this is evidence that [the secured creditor] may have

improperly diverted profits to itself." *Primavera*, 130 F. Supp. 2d at 546.

████████████████████████████████████████████████

████████████████████████████████████████████████████

---
[57]   ████████████████████████████████████████.





(...continued)





65.

*See Dougherty v.*

*425 Dev. Assocs.*, 93 A.D.2d 438, 446-48 (1st Dep't 1983) (denying summary judgment on

unjust enrichment claim where secured creditor sold collateral to a nominee).

66.

69

70

71

72

73

74

███████████████████████████████████

█████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████

     67.   ███████████████████████████

████████████████████████████████████

███████████████████████████████

████████████████ By September 24, 2008, the Federal Reserve had issued AIG a two

year line of credit up to $85 billion, of which only $18 billion had been drawn as of September

18, 2008.[76] On September 23, 2008, Fed Chairman Bernanke testified before Congress that, "in

light of the prevailing market conditions and the size and composition of AIG's obligations, a

disorderly failure of AIG would have severely threatened global financial stability and,

consequently, the performance of the U.S. economy."[77] ████████████████████████████

████████████████████████████████████

██████

---

[75] ███████████████████████

[76] Ex. Z, Federal Reserve Press Release.

[77] Ex. AA, September 23, 2008 Testimony of Ben Bernanke before the Senate
Committee on Banking, Housing, and Urban Affairs.



[REDACTED]

70.    In summary, JPMorgan's collateral disposition was commercially unreasonable.

[REDACTED]

As a result, JPMorgan's Deficiency Claims against LBHI and LBI should be reduced substantially, in an amount to be determined by the Court following full discovery into JPMorgan's disposition of LBI's collateral.

## II.    JPMORGAN'S DEFICIENCY CLAIMS INCLUDE LOSSES CAUSED SOLELY BY BARCLAYS, WHICH HAVE BEEN SETTLED FOR CONSIDERATION

71.    JPMorgan's Deficiency Claims should also be reduced to the extent they include losses caused solely by Barclays' conduct, for which JPMorgan has settled with Barclays.

### A.    JPMorgan Has Repeatedly Stated That Barclays' Conduct Caused its Losses

72.    In September 2008, when these events took place, JPMorgan blamed Barclays – and only Barclays – for the very same losses it now seeks to have paid by LBHI.  Immediately

36

after learning that it was left with an outstanding loan when Barclays failed to roll the $15.8

Billion Repo, it took $7 billion from a Barclays account.  Three days later, JPMorgan entered

into a settlement agreement which released Barclays from all claims based on the very acts and

damages at issue in both JPMorgan's Amended Counterclaims and its Deficiency Claims.

73.    Specifically, in the September 22, 2008 SSA, JPMorgan and Barclays mutually

released all claims "relating to a repurchase agreement allegedly agreed to on or about

September 18, 2008 in respect of approximately $15.8 billion face amount of securities . . . ."[82]

That contemporaneous settlement agreement further provided that "in consideration of the

release granted to it . . . [Barclays] shall promptly cause the lawsuit identified on Schedule B [the

Bear Stearns Lawsuit] to be withdrawn with prejudice . . . ."[83]  This was over and above the $7

billion that JPMorgan had taken out of Barclays' account, although Barclays did not learn that

cash was missing until later.[84]

74.    Moreover, shortly after agreeing to release Barclays in exchange for dismissal of

the Bear Stearns Lawsuit, on October 11, 2008, JPMorgan's CEO, Jamie Dimon, sent a strongly-

worded letter to Barclays again claiming that Barclays was the cause of JPMorgan's losses,

including the loss of the $5 billion of margin.  In the letter, Dimon states that "Barclays Capital

assured JPMorgan that it was going to fully repay JPMorgan's advances by purchasing or

refinancing the entire LBI securities portfolio that we were financing as LBI's agent clearing

bank,"[85] and that "[w]e [JPMorgan] understood that you [Barclays] were going to repay all of our

---

[82]   Ex. B, SSA § 4(a).

[83]   Ex. B, SSA § 4(b) and Schedule A.

[84]   Ex. C, Leventhal Tr. at 137:6-11, 146:14-19.

[85]   Ex. BB, Letter from Jamie Dimon to John Varley, dated October 11, 2008 (the "Dimon-Varley Letter") at 2.

37

intra-day funding and relied on that understanding in relinquishing our margin."[86]  Notably in his

letter, Mr. Dimon did not blame LBHI, or anyone other than Barclays, for JPMorgan's deficiency.

75.    Then, in subsequent litigation with LBHI, JPMorgan has repeatedly blamed

Barclays for causing most if not all the losses it seeks through its Deficiency Claims.[87]

JPMorgan has alleged that those losses were caused by Barclays' misrepresentations, including:

- "LaRocca [of Barclays] told Miller [of JPMorgan] that, as part of an asset sale
  negotiated between Barclays and Lehman, Barclays would take out LBI's entire
  triparty book, after which JPMorgan would no longer have to provide LBI with
  intraday loans to finance that book."[88]

- "LaRocca [of Barclays] told Buyers-Russo that, under the deal with Barclays,
  JPMorgan would have no clearing exposure to LBI by the end of Thursday,
  September 18. LaRocca explicitly represented that all of JPMorgan's triparty
  exposure to LBI would be eliminated on Thursday, September 18."[89]

76.    JPMorgan has specifically claimed that much of these losses resulted from

JPMorgan's decision to release $5 billion in margin to Barclays on September 18, 2008. ■

---

[86]    Ex. BB, Dimon-Varley letter at 3.

[87]    *Compare* Proof of Claim No. 66462 at Ex. B, p. 2 (describing a debt of approximately
$25 billion under the 2000 Clearance Agreement reduced to approximately $6.3 billion through
collateral sales proceeds) *with* Amended Counterclaims of JPMorgan Chase Bank, N.A. in
Adversary Proceeding No. 10-03266 [Docket No. 63] ("Amended Counterclaims") ¶ 13
(describing "more than $25 billion of loans under the Clearance Agreement that [have] not been
paid in full").

[88]    Amended Counterclaims at ¶ 32.

[89]    Amended Counterclaims at ¶ 56.

[90]

77.    Moreover, in its Amended Counterclaims in the adversary proceeding with LBHI, JPMorgan has alleged that Barclays, and *only* Barclays, convinced JPMorgan to release the $5 billion of margin it was holding to secure its intraday exposure.  For example, JPMorgan has alleged that, "[t]o induce JPMorgan to release the margin, [Barclays CEO Bob] Diamond, through his affirmative statements and failure to reveal Barclays' true agreements and intentions, persuaded JPMorgan that, by the end of Thursday, JPMorgan's triparty exposure to LBI would be extinguished and, at the conclusion of the transaction, JPMorgan would not have further exposure to LBI."[91]  JPMorgan also alleges that it released the $5 billion of margin "[b]ased on Diamond's representations."[92]

### B.    LBHI Should Not Pay for Losses Due to Barclays Which Have Been Settled For Consideration

78.    "[A] creditor is entitled to only a single satisfaction of its claim."  *In re Jason*, Case No. 01-10082-SSM, 2007 WL 4553608, at *5 (Bankr. E.D. Va. Dec. 19, 2007) (crediting previous payment against claim amount); *see also In re Morgan*, Case No. 01-60889, 2003 WL 1728667, at *1 (Bankr. E.D. Ga. Mar. 14, 2003) ("For every debt there can be only one satisfaction."); *In re Park Forest Devel. Corp.*, 197 B.R. 388, 397 (N.D. Ga. 1996) ("A creditor is only entitled to a single satisfaction of its claim.").  Thus, to the extent a creditor has received value in satisfaction of the debt underlying its claim against a bankrupt estate, its claim should be reduced accordingly.

79.    This result follows from the basic, underlying goal of the bankruptcy process of equitable distribution to creditors.  For example, in the recent case of *In re Pilgrim's Pride Corp.*, the court prevented a creditor from collecting payment in release of contract rejection claims and

---

[91]    Amended Counterclaims at ¶ 76.

[92]    Amended Counterclaims at ¶ 77.

also filing administrative expense claims. --- B.R. ---, 2011 WL 1671745, at *5 (N.D. Tex. May

3, 2011). Having determined that the creditors involved would potentially receive a double

recovery, the court noted that it "would result in a windfall at the expense of other unsecured

creditors. Such a result runs contrary to the Congressional policy that 'equity is equality' – that is,

similarly situated creditors should be treated the same." *Id.* (citing *In re Elcona Homes Corp.*,

863 F.2d 483, 484 (7th Cir. 1988)); *see also In re Oakland City Apartments*, 1 B.R. 123, 125

(N.D. Ga 1979) (invoking "the equitable powers vested in this Court" and "the anti-preference

principles embodied in the pre-emptive Federal law of bankruptcy" to prevent a potential double

recovery by a creditor after foreclosure sale of a property). The same principle of "equitable

distribution" has led at least one court to disallow claims temporarily to prevent a double

recovery by a creditor. *In re Circuit City Stores, Inc.*, 426 B.R. 560, 577-78 (E.D. Va. 2010)

("[T]he Court agrees with the Debtors that the best approach is to temporarily disallow the

Claims and hold them in abeyance until the preference litigation takes place so that the Court can

adjudicate these issues together and ensure that Claimants do not receive windfalls to which they

may not be entitled to the detriment of other creditors.").

80.    Furthermore, courts analyzing claims against debtor-guarantors where the primary

obligor already settled with the creditor and the consideration was a foregone lawsuit have

concluded that any claim against the debtor on the underlying debt should be reduced by the

value to the creditor of the primary obligor foregoing its lawsuit. *See In re El Paso Refining, Inc.*,

192 B.R. 144, 148-49 (N.D. Tex. 1996) (requiring a hearing on the value of a foregone lawsuit

by primary obligor against creditor to determine how much to credit guarantor against claim by

creditor on the same debt); *see also Central Soya Co. v. Epstein Fisheries, Inc.*, 676 F.2d 939,

941-43 (7th Cir. 1982) (holding debt of guarantor should be reduced by value to creditor of

primary obligor dismissing suit against creditor).

81.    This principle is also expressed in the context of joint tortfeasors.  Under section

15-108 of New York's General Obligations Law, a release of one tortfeasor "reduces the claim of

the releasor against the other tortfeasors to the extent of any amount stipulated by the release or

the covenant, or in the amount of the consideration paid for it, or in the amount of the released

tortfeasor's equitable share of the damages . . . whichever is the greatest."  N.Y. Gen. Oblig. Law

§ 15-108(a).  According to the New York Court of Appeals:

> The purpose of the statute is to encourage settlement, although the
> statute is also concerned with ensuring equity. Plaintiffs should be
> fairly compensated, but nonsettling defendants should not bear
> more than their fair share of a plaintiff's loss. Moreover, the
> possibility of double recovery should be avoided.

*Whalen v. Kawasaki Motors Corp.*, 92 N.Y.2d 288, 292 (1998).

82.    In this case, JPMorgan's Deficiency Claims should be reduced by the greater of

the damage caused solely by Barclays or the value JPMorgan received through its settlement

with Barclays.  That amount includes the value of the lawsuit that Barclays dismissed, valued at

approximately $400 million, plus interest and punitive damages.[93]  To permit JPMorgan to

receive that value from Barclays toward the debt and then claim the entire debt against LBHI

would provide JPMorgan with an impermissible double recovery at the expense of LBHI's other

---

[93]    Ex. DD, Third Amended Complaint in *Barclays Bank PLC v. Bear Stearns Asset
Management Inc., et al.* (Case No. 07-CV-11400 (LAP)) at ¶ 467 and prayer for relief. *See also*
Ex. EE, Transcript of the Deposition of Alan Kaplan, dated June 7, 2011 ("Kaplan Tr.") at
134:25-135:7.  Barclays' Deputy General Counsel for the Americas described the lawsuit as
follows: "[i]t was a very high profile, important case.  I mean, [Barclays] didn't sue another bank
lightly." Ex. EE, Kaplan Tr. at 18:15-24; 136:7-17.  In addition to the amount of money at stake,
there were "reputational issues on both sides." Ex. EE, Kaplan Tr. at 136:18-22.  The dismissal
of such a high profile case seeking hundreds of millions of dollars in damages conferred a
substantial benefit on JPMorgan.

41

creditors. But it includes more than that – whatever damages Barclays uniquely caused that were later settled between Barclays and JPMorgan. After all, JPMorgan spent months trying to extract whatever value it could from Barclays to compensate for directly causing triparty repo losses. It should not later be able to recover for those same losses in full from someone else who was not to blame.

## III.    JPMORGAN'S INTEREST CLAIM SHOULD BE DISALLOWED

83.    Although JPMorgan has tried to fit its Interest Claim within the rubric of Section 506(b) of the Bankruptcy Code, for the reasons discussed below, JPMorgan's claim for recovery of post-petition interest in this case should be disallowed.

84.    As a threshold matter, Section 506(b)'s allowance of post-petition interest is an exception to the well-established rule that interest on claims ceases to accrue when a bankruptcy case is commenced. *See In re Venable*, 48 B.R. 853, 854-55 (S.D.N.Y. 1985); *see also Urban Communicators PCS Ltd. Partnership v. Gabriel Capital, L.P.*, 394 B.R. 325, 334 (S.D.N.Y. 2008). This exception is only applicable in cases where a creditor is oversecured. 11 U.S.C § 506(b). *See Kitrosser v. CIT Group/Factoring, Inc.*, 177 B.R. 458, 467 n. 4 (S.D.N.Y. 1995).

85.    Thus, if LBHI and the Committee prevail in the Adversary Proceeding causing JPMorgan to lose its purported entitlement to the collateral it siphoned from LBHI, the Interest Claim should be disallowed.

86.    Moreover, equity requires disallowance of the Interest Claim. The grant of post-petition interest set forth in Section 506(b) is not absolute. Equitable considerations may override a professed entitlement to post-petition interest. *See In re Lapiana*, 909 F.2d 221, 223 (7th Cir. 1990); *see also In re Rozel Indust., Inc.*, 120 B.R. 944, 952 (Bankr. N.D. Ill. 1990). Applying equitable principles, courts have recognized a limitation on the accrual of post petition interest after the point where a creditor's claim could have been satisfied. *See In re Rozel Indust.*,

42

120 B.R. at 954; *see also Solomon v. Wein (In re Huhn)*, 145 B.R. 872, 878 (W.D. Mich. 1992). Indeed, "rigid literalism" in the application of Section 506(b) should be rejected. *See Lapiana*, 909 F.2d at 224.

87.    The extraordinary circumstances of this case require a departure from the literal language of Section 506(b). The exception for allowance of post-petition interest for oversecured creditors simply does not make sense under these unique circumstances. Here, JPMorgan charged LBHI over $280 million in interest on a purported deficiency while holding $8.6 billion in cash and cash equivalents as collateral. In fact, when LBHI transferred $6.9 billion in cash into its pledged account at JPMorgan during the last few days before its bankruptcy filing, JPMorgan immediately transferred those funds into its own account. JPMorgan held that purported collateral in its own bank accounts until it was provisionally applied to JPMorgan's claims pursuant to the CDA.

88.    By virtue of its position as a bank, JPMorgan not only held the cash collateral, but was also able to profit from these funds by using them as any bank does to support further lending and earning further interest, all the while charging LBHI's estate hundreds of millions of dollars in post-petition interest. Moreover, during the period of time when LBI collateral was being liquidated, JPMorgan routinely delayed the application of proceeds from the sales of securities, even when hundreds of millions of dollars were involved. This delay kept the alleged debt on which JPMorgan was charging interest at an incorrectly high level.

89.    Thus, this case is easily distinguishable from the garden-variety case where an oversecured creditor is simply receiving the benefit of its bargain by charging a debtor post-petition interest on non-cash collateral that has not yet been liquidated and applied to reduce the deficiency. This case presents an even more compelling case for the rejection of a purely literal

application of Section 506(b) than cases where courts disallowed claims for post-petition interest because a creditor failed to satisfy its claim at the earliest possible time. *See In re Rozel Indust.*, 120 B.R. at 954-56. JPMorgan was doubling its profits, once on the back of the LBHI estate through interest charges on an artificial and risk-free debt and the second time from other borrowers. Simply stated, the Interest Claim, yet another example of JPMorgan's overreaching, should be disallowed.

### Conclusion

90.    Accordingly, the Objectors respectfully request that the Court enter an order reducing the Deficiency Claims by an amount to be determined by the Court following discovery and a hearing on the merits of this Objection.

### Reservation of Rights[94]

91.    Nothing in this objection or in any objection notice will constitute a waiver of the right to assert any claims, counterclaims, rights of offset or recoupment or any other claims of the Objectors against a claimant, or to seek estimation of any claim or object to claims on any basis not previously set forth in this objection. Unless the Court allows a claim or specifically orders otherwise, the Objectors retain the right to object on any grounds to the claim (or to any other claims or causes of action filed by a claimant or that have been scheduled by the Objectors) at a later date. In such event, the respective claimant will receive a separate notice of any such objections.

92.    The Objectors expressly reserve the right to amend, modify, or supplement this objection and to file additional objections to the Deficiency Claims and Interest Claim or any

---

[94] It should be noted that proof of claim number 66462 encompasses the entire relationship between JPMorgan and LBHI and is not in any way limited to the claims discussed herein.

other claims (filed or not) which may be asserted against the Debtors. Should one or more of the grounds for objection stated herein be dismissed, the Objectors reserve their rights to object on other stated grounds or on any other grounds that the Objectors discover during the pendency of these cases. Nothing herein shall constitute an admission of liability to the Objectors with respect to any proof of claim.

### Notice

93.    No trustee has been appointed in these chapter 11 cases. The Objectors have served notice of this Objection on (i) the U.S. Trustee; (ii) the attorney for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) JPMorgan Chase Bank, N.A.; and (vii) all other parties entitled to notice in accordance with the procedures set forth in the *Second Amended Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures* entered on June 17, 2010 [Docket No. 9635]. The Objectors submit that no other or further notice need be provided.

94.    No previous request for the relief sought herein has been made by the Objectors to this or any other court.

**WHEREFORE**, the Objectors respectfully request that the Court enter an Order (a) granting the relief requested herein and (b) granting the Objectors such other relief as is just.

Dated:  August 31, 2011
        New York, New York

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

By:  ___/s/ John B. Quinn_____
John B. Quinn
Erica Taggart
Tyler G. Whitmer
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000

Susheel Kirpalani
Andrew J. Rossman
James Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000
*Counsel for the Official Committee of
Unsecured Creditors of Lehman Brothers
Holdings Inc.*

**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**

By:  ___/s/ Joseph D. Pizzurro_____
Joseph D. Pizzurro
L.P. Harrison 3rd
Michael J. Moscato
Nancy E. Delaney
Peter J. Behmke
Cindi M. Giglio
101 Park Avenue
New York, New York 10178-0061
(212) 696-6000
*Counsel for Debtor Lehman Brothers
Holdings Inc.*