Presentment Date and Time: September 9, 2011 at 12:00 p.m. (Prevailing Eastern Time)
Objection Deadline: September 8, 2011 at 11:00 a.m. (Prevailing Eastern Time)
Hearing Date and Time (If an Objection is Filed): September 14, 2011 at 10:00 a.m. (Prevailing Eastern Time)

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Arthur Steinberg

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77027
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

*Counsel for the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **Chapter 11 Case No.** |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | **08-13555 (JMP)** |
| **Debtors.** | **(Jointly Administered)** |

**NOTICE OF PRESENTMENT OF MOTION OF LEHMAN COMMERCIAL PAPER INC. PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE FOR APPROVAL OF THAT CERTAIN INTERIM FUNDING AGREEMENT BY AND AMONG ALFRED H. SIEGEL, AS LIQUIDATING TRUSTEE OF THE SUNCAL DEBTORS, LEHMAN COMMERCIAL PAPER, INC., FIDELITY NATIONAL TITLE INSURANCE COMPANY, AND FIRST AMERICAN TITLE INSURANCE COMPANY**

**PLEASE TAKE NOTICE** that the undersigned will present the annexed motion (the "Motion") of Lehman Commercial Paper Inc. ("LCPI", together with its affiliated debtors in the above-referenced chapter 11 cases, the "Debtors") pursuant to sections 105 and 363 of the Bankruptcy Code, for approval of that certain interim funding agreement by and among LCPI, Fidelity National Title Insurance Company, First American Title Insurance Company, and Alfred H. Siegel, as liquidating trustee of the SunCal Debtors (the "Trustee"), all as more fully

described in the Motion, to the Honorable James M. Peck, United States Bankruptcy Judge, for

approval and signature on **September 9, 2011 at 12:00 p.m. (Prevailing Eastern Time)**.

   **PLEASE TAKE FURTHER NOTICE** that objections to the Motion, if any,

shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of

New York, shall set forth the name of the objecting party, the basis for the objection and the

specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance

with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users

of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch

disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based

word processing format (with two hard copies delivered directly to Chambers), and shall be

served upon:  (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York,

New York, 10004, Courtroom 601; (ii) Weil, Gotshal & Manges LLP, 700 Louisiana Street,

Suite 1600, Houston, Texas 77027, Attn:  Alfredo R. Pérez, Esq.; (iii) King & Spalding LLP,

1185 Avenue of the Americas, New York, NY 10036, Attn: Arthur Steinberg, Esq., attorneys for

LCPI; (iv) the Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor,

New York, New York 10004, Attn: Tracy Hope Davis, Esq., Elisabetta G. Gasparini, Esq., and

Andrea B. Schwartz, Esq.; (v) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan

Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and

Evan R. Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in

these cases; (vi) Day Pitney LLP, One Audubon Street, 6th Floor, New Haven, CT 06511, Attn:

Joshua W. Cohen, attorneys for Fidelity and First American; (vii) Miller Starr Regalia, 1331

North California Boulevard, 5th Floor, Walnut Creek, CA 94596, Attn: Tara Castro Narayanan,

Esq., attorneys for Fidelity and First American, and (iix) Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP, 650 Town Center Drive, Suite 950, Costa Mesa, CA 92626, Attn: Robert S. Marticello, Esq., attorneys for the Trustee, so as to be filed and received no later than **September 8, 2011 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that only if a written objection is timely filed and served, a hearing will be held on **September 14, 2011, at 10:00 a.m. (Prevailing Eastern Time)** at the United States Bankruptcy Court for the Southern District of New York, Honorable James M. Peck, United States Bankruptcy Judge, One Bowling Green, New York, New York 10004-1408. If an objection is filed the moving and objecting parties are required to attend the hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: September 2, 2011
New York, New York

/s/ Alfredo R. Pérez
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77027
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Arthur Steinberg

*Counsel for the Debtors*
*and Debtors-in-Possession*

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Arthur Steinberg

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77027
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

*Counsel for the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

**MOTION OF LEHMAN COMMERCIAL PAPER INC.
PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE
FOR APPROVAL OF THAT CERTAIN INTERIM FUNDING AGREEMENT BY
AND AMONG ALFRED H. SIEGEL, AS LIQUIDATING TRUSTEE OF THE SUNCAL
DEBTORS, LEHMAN COMMERCIAL PAPER, INC., FIDELITY NATIONAL TITLE
INSURANCE COMPANY, AND FIRST AMERICAN TITLE INSURANCE COMPANY**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Commercial Paper Inc. ("LCPI," together with its affiliated debtors in the above-referenced chapter 11 cases, the "Debtors", and collectively with their non-debtor affiliates, "Lehman"), files this Motion pursuant to Sections 105 and 363 of title 11 of the United States Code ("Bankruptcy Code") and respectfully represents:

**Preliminary Statement**

1. By this Motion, LCPI seeks the Court's approval of an agreement between (a) Lehman Commercial Paper, Inc. ("LCPI"), as administrative agent for the first-position secured lenders to the SunCal Parent Debtor (the "First Lien Lenders"), (b) Alfred H. Siegel, as Liquidating Trustee of the SunCal Debtors (the "SunCal Trustee"), (c) Fidelity National Title Insurance Company ("Fidelity"), and (d) First American Title Insurance Company ("First American," together with Fidelity, the "Insurers," and collectively with LCPI, the First Lien Lenders, the SunCal Trustee and Fidelity, the "Parties"), with respect to the funding of certain settlements and the allocation of distributions to be made from certain reserves to be established in the confirmed chapter 11 cases of LBREP/L-SunCal Master I LLC (the "SunCal Parent Debtor"), and LBREP/L-SunCal McAllister Ranch LLC, LBREP/L-SunCal McSweeny Farms LLC, and LBREP/L-SunCal Summerwind Ranch LLC (collectively, the "SunCal Subsidary Debtors," and together with the SunCal Parent Debtor, the "SunCal Debtors"), which are being jointly administered in the United States Bankruptcy Court for the Central District of California (the "California Bankruptcy Court").

2. Pursuant to the confirmed *Second Amended Chapter 11 Plan (Dated April 21, 2011)* for the SunCal Debtors (the "SunCal Plan"), the SunCal Trustee, LCPI, and Fidelity are authorized to commence actions to resolve disputes concerning the validity, priority, or extent of mechanic's lien claims ("Mechanic's Lien Claims")[1] asserting a priority senior to the First Deeds of Trust (as defined below) against the SunCal Subsidiary Debtors' formerly owned real property

[1] The holders of Mechanic's Lien Claims include those lienors that filed proofs of claim in the SunCal Debtors' bankruptcy cases, those parties that may conceivably hold a mechanic's lien against one of the SunCal Subsidiary Debtors' properties, or Oak Valley Partners, LP ("Oak Valley"), which has asserted a property interest in one of the SunCal Subsidiary Debtors' properties and by agreement has been classified as holding a Mechanic's Lien Claim under Class 4 of the Plan.

(the "Properties").  See SunCal Plan § VI.[2]  The Insurers are providing a defense to LCPI and the First Lien Lenders against certain of the Mechanic's Lien Claims, but the Insurers and the First Lien Lenders are currently engaged in a dispute (the "Coverage Dispute") as to the First Lien Lenders' coverage under the policies insuring the First Deeds of Trust (the "First Loan Policies")[3] and the Insurers' duty of indemnification.  Accordingly, as provided by the SunCal Plan, the SunCal Trustee will establish appropriate reserves (the "Reserves") to assure that proceeds from the recent sale of the Properties (the "Proceeds") are available to pay Mechanic's Lien Claims should it ultimately be determined that any such claim (i) is senior to the First Deeds of Trust, and (ii) is not covered by any First Loan Policies, from which payment will otherwise be made.  The SunCal Trustee expects to file a motion (the "Reserve Motion") seeking the California Bankruptcy Court's authorization to establish the Reserves in the near future.  Pursuant to the SunCal Plan, the SunCal Trustee will maintain the Reserves pending the allowance or disallowance of the Mechanic's Lien Claims.  See SunCal Plan § V(D) (a copy of the SunCal Plan is attached hereto as Exhibit 3).  After allowance or disallowance of a Mechanic's Lien Claim, the amount reserved for that claim is to be disbursed to the claim holder or the First Lien Lenders as their rights may be determined by the resolution of the Mechanic's Lien Claim, and 3.5% of the amount to be disbursed to the First Lien Lenders is to be turned over to the SunCal Trustee as part of the previously approved settlement of disputes between the First Lien Lenders and the SunCal Trustee.

---

[2] Terms used but not otherwise defined herein have the meanings given to them in the Plan.

[3] For the purposes of this Motion, the First Loan Policies include all insurance policies issued by or joined by either of the Insurers for the benefit of the First Lien Lenders with respect to any of the Properties, including, without limitation, to the extent applicable:  (a) a 1970 form ALTA Loan Policy (10-17-70 and 10-17-84) No. 27-44-94-120334, dated January 19, 2006, naming as insured LCPI and its successors and/or assigns as their interests may appear, with policy limits of $235 million, insuring the senior priority of the First Deeds of Trust issued by Fidelity; and (b) a 1992 ALTA Loan Policy (10-17-92) No. 27-042-92-3657331, dated May 3, 2006, naming as insured LCPI and its successors and/or assigns as their interests may appear, with policy limits of $235 million, insuring LCPI's title to the First Deed of Trust covering Summerwind Ranch.

3.     To implement both a prompt and efficient distribution of the Reserves by the SunCal Trustee and an agreement between the Insurers and the First Lien Lenders that the Insurers would fund the resolution of any Mechanic's Lien Claim pending resolution of any Coverage Dispute with respect to that claim, the Parties, subject to Court approval, have agreed to a protocol regulating the disbursement of that portion of the Reserves established for a Mechanic's Lien Claim, upon its resolution.  In short, the protocol provides as follows:  (a) the Insurers will pay the amount determined to be due on a Mechanic's Lien Claim upon its settlement (each, a "Resolved Mechanic's Lien Claim") subject to a full reservation of rights with respect to the Coverage Dispute; (b) that portion of the Reserves established for a Resolved Mechanic's Lien Claim will be disbursed (each such disbursement, a "Reserve Distribution" ) and then allocated as follows:  (i)  first, an amount equal to the First Lien Lenders' potential reimbursement obligation to the Insurers relating to Resolved Mechanic's Lien Claim shall be set aside (a "Carve Out") as security for any such future reimbursement obligation as determined by resolution of the Coverage Dispute, (ii) second, 3.5% of the balance of the Reserve Distribution remaining after creation of the Carve Out shall be retained by the SunCal Trustee free and clear of claims as provided for by the SunCal Plan until the Trustee's Participation (as defined below) has been fully funded, and (iii) third, the remaining balance of the Reserve Distribution shall be paid to the First Lien Lenders; and (c) any portion of the Carve Out later paid over to the First Lien Lenders shall be distributed 3.5% to the SunCal Trustee free and clear of claims as provided for by the SunCal Plan until the Trustee's Participation has been fully funded and the balance shall be retained by the First Lien Lenders..   The terms of these proposed procedures are embodied in the Interim Funding Agreement (the "Agreement") between the Parties, a copy of which is attached hereto as Exhibit 1.

4. By this Motion, therefore, LCPI requests an order from this Court authorizing it to enter into the Agreement and implement the procedures set forth therein, including the use of estate funds to establish the Carve Out. Execution of the Agreement will enable the Parties to begin resolving the Mechanic's Lien Claims as directed by the SunCal Plan. In addition, LCPI will be able to receive the majority of the Reserve Distributions due to it under the SunCal Plan immediately upon the settlement of a Mechanic's Lien Claim, rather than having to wait for a final resolution of the Coverage Dispute, which would result in unnecessary delay. Accordingly, LCPI respectfully requests that the Court grant the Motion.[4]

**Relief Requested**

5. By this Motion, LCPI seeks entry of an order pursuant to sections 105 and 363 of the Bankruptcy Code authorizing LCPI to enter into the Agreement and approving LCPI's use of estate assets as contemplated therein.

6. This Motion is brought solely for the purpose of approving the use of estate funds set forth in, and authorizing LCPI's execution of, the Agreement. Nothing set forth in the Motion shall be deemed or construed as an admission of any Party as to any liability for any Mechanic's Lien Claim, any entitlement, or lack thereof, to coverage under the First Loan Policies, any obligation concerning co-insurance, or for any other purpose.

**Background**

7. Commencing on September 15, 2008, and periodically thereafter, Lehman Brothers Holdings Inc. ("LBHI") and certain of its subsidiaries filed with this Court voluntary petitions under Chapter 11 of the Bankruptcy Code. On October 5, 2008, LCPI commenced its voluntary case under the Bankruptcy Code. The Debtors' Chapter 11 cases have been

[4] As the effectiveness of the Agreement is conditioned upon approval of both this Court and the California Bankruptcy Court, the Parties are concurrently seeking the approval of the Agreement in the California Bankruptcy Court.

consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8. On September 17, 2008, the United States Trustee for the Southern District of New York ( "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code ( "Creditors' Committee").

9. On September 1, 2011, the Debtors filed a third amended chapter 11 plan and disclosure statement [ECF Nos. 18204 and 18205].

**Lehman's Business**

10. Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States. For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients, and individuals worldwide.

11. Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these Chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications filed on September 15, 2008 [ECF No. 2].

**Jurisdiction**

12. This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Background of the SunCal Bankruptcy Cases**

*First Lien Loan and Title Insurance*

13. On January 19, 2006, the SunCal Parent Debtor entered into, inter alia, a syndicated loan pursuant to the First Lien Credit Agreement (the "First Lien Loan"), with LCPI as administrative agent. The SunCal Subsidiary Debtors guaranteed the SunCal Parent Debtor's repayment of the First Lien Loan, pledging the Properties as security for those guarantees, with each Subsidiary Debtor executing a deed of trust in favor of LCPI (the "First Deeds of Trust"). Also on January 19, 2006, and May 3, 2006, respectively, Fidelity issued the First Loan Policies naming LCPI and its successors and assigns as the insured. First American provided co-insurance with respect to the First Deeds of Trust.

14. On or about February 2008, the SunCal Parent Debtor defaulted on the First Lien Loan, and the SunCal Subsidiary Debtors ceased the development of the Properties. As a result, multiple contractors recorded mechanic's liens against the Properties, and some mechanic's lien holders commenced actions in California state court seeking to foreclose on their mechanic's liens (the "Foreclosure Actions").

*Bankruptcy Proceedings and Sale of the SunCal Debtors' Properties*

15. On September 10, 2008, and September 11, 2008, involuntary bankruptcy petitions were filed against the SunCal Debtors, thereby staying the Foreclosure Actions. On October 30, 2008, the California Bankruptcy Court entered orders appointing the SunCal Trustee. After an extended negotiation process, the SunCal Trustee, LCPI and the Official Committee of Unsecured Creditors negotiated an amended and restated term sheet (the "Term Sheet"), which provides for, among other things, the allowance of the First Lien Lenders' secured claims and the sale of the Properties, with the Proceeds to be distributed to LCPI subject

only to any lien (e.g., the Mechanic's Liens) determined to be senior in priority to the First Deeds of Trust. The Term Sheet also provides that the SunCal Trustee shall be entitled to a percentage share of the Net Proceeds (as defined in the SunCal Plan) in the amount of the lesser of (1) the amount sufficient to pay in full the Allowed Unsecured Trade Claims (as defined in the SunCal Plan), and (2) 3.5% of such Net Proceeds (the "Trustee's Participation"). The SunCal Plan incorporates and effectuates the provisions of the Term Sheet.

16.    On December 22, 2010, the California Bankruptcy Court entered an order granting the SunCal Trustee's motion to approve the Term Sheet. Prior to confirmation of the SunCal Plan, the SunCal Trustee conducted a public auction for the sale of the Properties. PVCO Land Holdings, LLC ("PVCO") was ultimately declared the winning bidder. On April 22, 2011, the California Bankruptcy Court entered orders confirming the SunCal Plan (the "Confirmation Order") and the sale of the Properties to PVCO (the "Sale Order"). By May 23, 2011, the SunCal Trustee consummated the sales of the Properties in accordance with the Sale Order. The order approving the Term Sheet and the Confirmation Order are final orders, and the time period to appeal such orders has expired and there are no pending appeals.

*Resolution of Mechanic's Lien Claims*

17.    LCPI has tendered claims and will tender additional claims against the First Loan Policies for defense and indemnification relative to the Foreclosure Actions and other Mechanic's Lien Claims, and the Insurers are providing a defense to the Foreclosure Actions and other Mechanic's Lien Claims on behalf of LCPI and the First Lien Lenders. The Insurers have

reserved rights and defenses regarding coverage under the terms of the First Loan Policies, pending the resolution of the Coverage Dispute. [5]

18. The SunCal Plan treats each Mechanic's Lien Claim as a Disputed Claim (as defined in the SunCal Plan) until the validity, priority or extent of each claim is determined. Id. § VI. The SunCal Plan authorizes the Trustee to make distributions while Disputed Claims are pending provided the Trustee establishes a reserve to pay such Disputed Claims if and to the extent such Disputed Claims become Allowed Claims (as defined in the SunCal Plan). See id. § V(D). Furthermore, the Sale Order specifically authorizes the SunCal Trustee to establish a reserve to pay the Mechanic's Lien Claims if and to the extent the liens securing those claims are determined to be senior to the First Deeds of Trust, and then to distribute the Net Proceeds, less the Trustee's Participation in such Net Proceeds, to LCPI. See Sale Order ¶ 9.

19. The SunCal Plan also provides that the SunCal Trustee, LCPI, or Fidelity will commence actions, either before the California Bankruptcy Court or an appropriate California state court, to determine the validity, priority or extent of Mechanic's Lien Claims. Id. The SunCal Trustee has been informed that LCPI and the Insurers are formulating an action plan to resolve the Mechanic's Lien Claims, and anticipates that an active litigation process regarding the validity and priority of the Mechanic's Lien Claims will commence in the near future.

**Summary of Terms of the Agreement**[6]

20. The Agreement provides procedures for the settlement of Mechanic's Lien Claims, the disbursement of Reserves, and the creation of the Carve Out as Mechanic's Lien Claims are settled and distributions made. The salient terms of the Agreement are as follows:

[5] Nothing in this Motion is intended to affect, and the SunCal Trustee, LCPI and the Insurers all shall have and retain, the right to seek an order modifying any or all of the Reserves, as and when issues involving coverage under the First Loan Policy are resolved.

[6] In the event of any inconsistency between the Agreement and this Motion, the terms of the Agreement shall control.

*Settlement of Mechanic's Lien Claims*

21.    The Insurers shall have the sole and absolute discretion to settle any and all of the tendered Mechanic's Lien Claims, subject to LCPI's reasonable satisfaction, pending the resolution of the Coverage Dispute.  Should the Insurers fund the settlement of a Mechanic's Lien Claim and (i) it is determined that the Mechanic's Lien Claim is not covered by the First Loan Policies (a "No Coverage Determination") or (ii) the Insurers and the First Lien Lenders achieve a resolution of the Coverage Dispute that involves the First Lien Lenders contributing to the payment or settlement of Mechanic's Lien Claims (a "Coverage Resolution"), then the First Lien Lenders will reimburse the Insurers an amount equal to: (a) in the case of a No Coverage Determination, all funds expended by the Insurers to effectuate the settlement of the relevant Mechanic's Lien Claim; or (b) in the case of a Coverage Resolution, any amount that the First Lien Lenders are required to contribute pursuant to the Coverage Resolution.  Each settlement of a Mechanic's Lien Claim will be subject to the California Bankruptcy Court's approval.

*Disbursement of Reserves*

22.    Upon entry of an order approving the settlement of a Mechanic's Lien Claim, the SunCal Trustee shall disburse to LCPI, as administrative agent for the First Lien Lenders, that portion of the Reserves established on account of the settled Mechanic's Lien Claim.  From each such Reserve Distribution, LCPI shall set aside the Carve Out, as described below.  LCPI shall then distribute 3.5% of the balance of each Reserve Distribution to the SunCal Trustee free and clear of claims, as provided in the SunCal Plan, until the Trustee's Participation has been fully funded.  The remaining balance of each Reserve Distribution shall be paid to the First Lien Lenders.  Additionally, the SunCal Trustee shall receive 3.5% of any amounts subsequently paid to LCPI from the Carve Out free and clear of claims, in accordance with the SunCal Plan, until

the Trustee's Participation has been fully funded, with the remaining funds to be retained by the First Lien Lenders.

*Carve Out*

23.    Upon receipt of each Reserve Distribution, LCPI shall set aside the Carve Out as security for its potential reimbursement obligations to the Insurers.  Each Carve Out shall be held in escrow subject to a first priority security interest and lien in favor of the Insurers, and the Insurers shall be deemed to have an allowed administrative priority claim in LCPI's bankruptcy case equal to the aggregate amount of Carve Outs.  No distributions shall be made from the Carve Outs until the earlier of (i) the date this Court enters an order approving a compromise of the Coverage Dispute (the "Coverage Resolution Condition"), (ii) the date of an order that a Mechanic's Lien Claim falls within coverage under the First Loan Policies and is not otherwise subject to a coverage exclusion (the "Coverage Condition"), or (iii) the date of an order that a Mechanic's Lien Claim is not covered under the First Loan Policies or is otherwise subject to a coverage exclusion (the "No Coverage Condition").

24.    Upon the occurrence of:

- a Coverage Resolution Condition, LCPI shall disburse the Carve Outs, and any amounts that otherwise would have been deposited into the Carve Outs from Reserve Distributions, to LCPI and the Insurers, in accordance with the terms of the Coverage Resolution;

- a Coverage Condition, LCPI shall disburse that portion of the Carve Outs, and any amounts that otherwise would have been deposited into the Carve Outs from Reserve Distributions, related to the Mechanic's Lien Claims for which coverage has been determined, to LCPI; or

- a No Coverage Condition, LCPI shall disburse that portion of the Carve Outs, and any amount that otherwise would have been deposited into the Carve Outs from Reserve Distributions, related to the Mechanic's Lien Claims for which coverage has been determined, to the Insurers.

**The Agreement Meets the Legal Standard Established Under
Sections 105 and 363 of the Bankruptcy Code**

25.        LCPI asks this Court to approve the Agreement pursuant to sections 105 and 363 of the Bankruptcy Code.  Section 105 provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  The order requested by LCPI is intended to permit LCPI to make use of estate assets in accordance with section 363 of the Bankruptcy Code, which provides that a debtor-in-possesion "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1); see U.S. Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.), 2003 WL 21738964, at *13 (S.D.N.Y. 2003) (holding that use of section 105 in connection with section 363(b) is proper).

26.        In considering a debtor's request to use estate property outside of the ordinary course of business pursuant to section 363(b), a bankruptcy court is to "consider whether the debtor exercised sound business judgment" in deciding to enter into the transaction at issue.  In re Borders Group, Inc., 2011 WL 1795604, at *3 (Bankr. S.D.N.Y. May 12, 2011).  In other words, the debtor must demonstrate a "good business reason" for the contemplated use.  Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); see also Official Comm. of Unsecured Creditors of LTV Aerospace and Defense Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143-45 (2d Cir. 1992) (approving sale of estate property pursuant to section 363(b) where good business reasons existed).

27.        Here, the Agreement makes good business sense for LCPI.  The Agreement is intended (in part) to allow LCPI and the First Lien Lenders to recover distributions to which they are entitled under the SunCal Plan more expeditiously than otherwise possible.

Absent the Agreement, no Reserve Distributions could be made prior to a final resolution of the Coverage Dispute without prejudicing the rights of the Insurers. LCPI would therefore be forced to litigate and/or negotiate the Coverage Dispute to conclusion – certainly a time consuming and costly exercise – before it could realize any recovery upon its claims. The net effect is to allow the Parties to commence with the settlement of Mechanic's Lien Claims sooner rather than later, thereby also freeing-up funds from the Reserves rightfully owed to LCPI and augmenting LCPI's estate. Implementation of the Carve Out minimizes the amount of money that will be tied up during the pendency of the Coverage Dispute, and allows the SunCal Trustee to administer his estate and make distributions in the meantime.

## Notice

28. No trustee has been appointed in these chapter 11 cases. LCPI has served notice of this Motion in accordance with the procedures set forth in the amended order entered on June 17, 2010 governing case management and administrative procedures [ECF No. 9635] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) counsel to the SunCal Trustee; (vii) the attorneys for the Insurers; and (viii) all parties who have requested notice in these chapter 11 cases. LCPI submits that no other or further notice need be provided.

29. No previous request for the relief sought herein has been made by LCPI to this Court.

WHEREFORE LCPI respectfully requests that the Court enter an order, substantially in the form attached as Exhibit 2 to this Motion, approving the use of estate property set forth in the

Agreement, authorizing LCPI to enter into the Agreement, and granting such other and further

relief as it deems just and proper.

Dated: September 2, 2011
     New York, New York

                /s/ Alfredo R. Pérez
                Alfredo R. Pérez
                WEIL, GOTSHAL & MANGES LLP
                700 Louisiana Street, Suite 1600
                Houston, Texas 77027
                Telephone: (713) 546-5000
                Facsimile: (713) 224-9511

                KING & SPALDING LLP
                1185 Avenue of the Americas
                New York, New York 10036
                Telephone: (212) 556-2100
                Facsimile: (212) 556-2222
                Arthur Steinberg

                *Counsel for the Debtors*
                *and Debtors-in-Possession*

# Exhibit 1

**INTERIM FUNDING AGREEMENT**

This Interim Funding Agreement (the "Agreement") is made and entered into this _____ day of September, 2011, by and among (i) Lehman Commercial Paper, Inc. ("LCPI"), as Administrative Agent for the First Lien Lenders (as defined below), (ii) Fidelity National Title Insurance Company ("Fidelity") and First American Title Insurance Company ("First American"), and (iii) Alfred H. Siegel, solely in his capacity as the SunCal Trustee (as defined below and, together with LCPI, Fidelity, and First American, the "Parties").

**RECITALS**

WHEREAS, LCPI is (or was) the Administrative Agent on three syndicated loans (referred to below as the "First Lien Loan," the "Second Lien Loan" and the "Third Lien Loan" and collectively as the "Loans") made to LBREP/L-SunCal Master I LLC (the "Parent") to finance (among other things) certain real estate development projects in Southern California known as "McAllister Ranch," "McSweeny Farms" and "Summerwind Ranch" (collectively, the "Projects"); and

WHEREAS, LCPI also participated in each of those syndicated loans as a lender; and

WHEREAS, a different single-purpose entity held title to each of the Projects until about May 23, 2011[1]: LBREP/L-SunCal McAllister Ranch LLC held title to McAllister Ranch; LBREP/L-SunCal McSweeny Farms LLC held title to McSweeny Farms; and LBREP/L-SunCal Summerwind Ranch LLC held title to Summerwind Ranch[2]; and

WHEREAS, the Owners are wholly owned subsidiaries of the Parent; and

---

[1] By its April, 22, 2011 Order Approving and Authorizing Sale of the Debtors' Real Property in Connection With the Chapter 11 Trustee's Second Amended Chapter 11 Plan (Dated April 21, 2011) (the "Sale Order"), the SunCal Bankruptcy Court (as defined below) authorized the sale of each Project to PVCO Land Holdings, LLC. Each sale was consummated by May 23, 2011.

[2] These three single-purpose entities shall each be referred to herein as an "Owner" and collectively shall be referred to herein as the "Owners."

WHEREAS, the Parent and the Owners are debtors in the jointly administered Chapter 11 bankruptcy cases styled In re LBREP/L-SunCal Master I, LLC, et al., pending in the United States Bankruptcy Court for the Central District of California (the "SunCal Bankruptcy Court") and jointly administered under the lead Case No. 8:08-bk-15588-ES (the "SunCal Master Bankruptcy"); and

WHEREAS, Alfred H. Siegel was the duly appointed Chapter 11 trustee in the SunCal Master Bankruptcy; and

WHEREAS, LCPI is a debtor in the jointly administered Chapter 11 bankruptcy cases styled In re Lehman Brothers Holdings Inc., et al., pending in the United States Bankruptcy Court for the Southern District of New York (the "LCPI Bankruptcy Court") and jointly administered under the lead Case No. 08-13555 (JMP) (the "Lehman Bankruptcy"); and

WHEREAS, the First Lien Loan, in the amount of $235 million, closed escrow on January 19, 2006, and the Owners guaranteed the Parent's repayment of the First Lien Loan and offered their respective Projects as security for their guarantees, with each Owner executing a deed of trust in favor of LCPI as security for the Owner's guaranty of the Parent's repayment of the First Lien Loan ("First Deeds of Trust")[3]; and

WHEREAS, the Second Lien Loan, in the amount of $85 million, also closed escrow on January 19, 2006, and the Owners guaranteed the Parent's repayment of the Second Lien Loan and offered their respective Projects as security for their guarantees, with each Owner executing a separate deed of trust in favor of LCPI as security for the Owner's guarantee of the Parent's repayment of the Second Lien Loan ("Second Deeds of Trust"); and

[3] The lenders that are current or future holders of and parties to the First Lien Loan collectively shall be referred to herein as the "First Lien Lenders."

WHEREAS, the Third Lien Loan, in the amount of $75 million, closed escrow on February 6, 2007, and the Owners guaranteed the Parent's repayment of the Third Lien Loan and offered their respective Projects as security for their guarantees, with each Owner executing a separate deed of trust in favor of LCPI as security for the Owner's guarantee of the Parent's repayment of the Third Lien Loan ("Third Deeds of Trust"); and

WHEREAS, Fidelity issued a 1970 form ALTA Loan Policy (10-17-70 and 10-17-84) No. 27-44-94-120334 (the "First Loan Policy"), dated January 19, 2006, naming as insured LCPI and its successors and/or assigns as their interests may appear, with policy limits of $235 million, insuring the senior priority of the First Deeds of Trust, subject to the provisions of the First Loan Policy; and

WHEREAS, Fidelity issued a 1970 form ALTA Loan Policy (10-17-70 and 10-17-84) No. 27-44-94-120335 (the "Second Loan Policy"), dated January 19, 2006, naming as insured LCPI and its successors and/or assigns as their interests may appear, with policy limits of $85 million, insuring that the Second Deeds of Trust were recorded junior only to the First Deeds of Trust, subject to the provisions of the Second Loan Policy; and

WHEREAS, Fidelity issued three separate 1992 form ALTA Loan Policies, Nos. CAFNT0925-0925-0199-0259902517 (McAllister Ranch), CAFNT0925-0925-0199-0259902518 (McSweeny Farms), and CAFNT0925-0925-0199-0259902519 (Summerwind Ranch) (collectively, the "Third Loan Policies" and, together with the First Loan Policy and the Second Loan Policy, the "Policies"), each dated February 9, 2007, naming as insured LCPI, as administrative agent, and its successors and/or assigns as their interests may appear, with policy limits of $25 million each, insuring that the Third Deeds of Trust[4] were recorded junior only to

[4] The First Deeds of Trust, the Second Deeds of Trust and the Third Deeds of Trust collectively shall be referred to as the "Insured Deeds of Trust."

the First Deeds of Trust and the Second Deeds of Trust, subject to the provisions of the Third Loan Policies; and

WHEREAS, subsequent to the closing of the First Lien Loan and the Second Lien Loan, LBREP/L-SunCal Summerwind Ranch LLC acquired additional property (the "Summerwind Phase II Property") that would be included in Summerwind Ranch; and

WHEREAS, LBREP/L-SunCal Summerwind Ranch LLC executed Amendment to First Lien Deed of Trust, Security Agreement, Assignment of Leases and Rents, and Fixture Filing (the "Summerwind Amendment") in connection with its acquisition of the Summerwind Phase II Property; and

WHEREAS, pursuant to the Summerwind Amendment, LBREP/L-SunCal Summerwind Ranch LLC added and incorporated the Summerwind Phase II Property into the First Deed of Trust covering Summerwind Ranch as though the Summerwind Phase II Property was included in the property description appended to the First Deed of Trust covering Summerwind Ranch; and

WHEREAS, LCPI, as Administrative Agent for the First Lien Lenders, asserts that Fidelity issued 1992 ALTA Loan Policy (10-17-92) No. 27-042-92-3657331 (the "Summerwind Supplemental Policy"), dated May 3, 2006, naming as insured LCPI and its successors and/or assigns as their interests may appear, with policy limits of $235 million, insuring LCPI's title to the First Deed of Trust covering Summerwind Ranch, as amended by the Summerwind Amendment; and

WHEREAS, First American provided co-insurance with respect to certain of the matters described above; and

WHEREAS, in or about February, 2008, LCPI declared the Parent in default on the Loans and the Owners subsequently failed to complete development of the Projects; and

WHEREAS, after the Owners ceased work on the Projects, numerous contractors recorded mechanics' liens against the Projects totaling more than $27,000,000.00 (the "Mechanics' Liens"); and

WHEREAS, certain holders of the Mechanics' Liens commenced suit in California seeking either to foreclose on their mechanics' liens, to recover money damages or both (the "Foreclosure Actions"), which Foreclosure Actions have been stayed as the result of the SunCal Master Bankruptcy, except to the extent that the SunCal Bankruptcy Court has granted relief from the stay contained in section 362(a) of the Bankruptcy Code in the SunCal Master Bankruptcy; and

WHEREAS, LCPI, as Administrative Agent for the First Lien Lenders, has tendered claims against the Policies with respect to certain of the Mechanics' Liens (the "ML Claims"), seeking defense and indemnification relative to both the Mechanics' Liens and the Foreclosure Actions; and

WHEREAS, Fidelity and First American are providing a defense to the Foreclosure Actions on behalf of LCPI and the First Lien Lenders with respect to the causes of action asserting priority over the Insured Deeds of Trust, under a comprehensive reservation of rights, but have not made a determination as to any duty to indemnify LCPI, as Administrative Agent for the First Lien Lenders, under the Policies since Fidelity and First American have not completed their investigation of coverage; and

WHEREAS, by virtue of the recording of a certain Memorandum and Agreement to Pay Additional Purchase Price, Oak Valley Partners, LP asserts an interest in Summerwind Ranch (the "Oak Valley Interest") prior in right to the First Deed of Trust on Summerwind Ranch, as amended by the Summerwind Amendment; and

WHEREAS, on or about May 16, 2011, LCPI, as Administrative Agent for the First Lien Lenders, tendered a claim (the "OV Claim") against the First Loan Policy and the Summerwind Supplemental Policy with respect to the Oak Valley Interest, seeking defense and indemnification relative to the Oak Valley Interest; and

WHEREAS, LCPI's tender of the OV Claim has been acknowledged by Fidelity; however, Fidelity has not provided a response to the OV Claim because Fidelity has not concluded its preliminary review and analysis of the OV Claim; and

WHEREAS, LCPI or its successor, as Administrative Agent for the First Lien Lenders, may tender claims against the Policies and/or the Summerwind Supplemental Policy in the future with respect to other interests asserted to take priority over the First Deeds of Trust (the "Future Claims"); and

WHEREAS, in connection with implementation and consummation of the confirmed Chapter 11 Trustee's Second Amended Chapter 11 Plan in the SunCal Master Bankruptcy (the "Confirmed SunCal Plan"), the Parties anticipate active litigation regarding the priority of the Mechanics' Liens and the Oak Valley Interest relative to the First Deeds of Trust; and

WHEREAS, Alfred H. Siegel is the liquidating trustee of the liquidating trust created on the effective date of the Confirmed SunCal Plan (the "SunCal Trustee"); and

WHEREAS, pursuant and subject to the terms and conditions of the Confirmed SunCal Plan, the order confirming the Confirmed SunCal Plan, and the Sale Order, the SunCal Trustee: (a) will, subject to approval by the SunCal Bankruptcy Court, establish reserves from the proceeds from the sale of the Projects for the benefit of creditors who have asserted liens against the Projects senior in priority to the First Deeds of Trust (each a "Project Reserve" and collectively the "Project Reserves") including, without limitation, the Mechanics' Liens and the Oak Valley Interest, to assure that there are sale proceeds available to pay allowed secured

claims on account of such liens should it ultimately be determined that (i) any such lien is senior to the First Deeds of Trust, and (ii) any such lien is not covered by the First Loan Policy; (b) will seek to obtain approval of the amount of each Project Reserve on a claim-by-claim basis from the SunCal Bankruptcy Court; and (c) will hold each Project Reserve in an interest-bearing account, to the extent consistent with California law, with interest to accrue on the Project Reserve for the benefit of LCPI, provided, however, the SunCal Trustee is not required to hold the Project Reserves in interest-bearing accounts if the entire balance of such interest-bearing accounts would not be fully insured by the FDIC; and

WHEREAS, as part of such lien priority litigation and in recognition of the Project Reserves, LCPI, Fidelity and First American wish to develop a protocol for settlement of the Mechanics' Liens, the OV Interest and the Future Claims (collectively the "Tendered Claims"), subject to a mutual and comprehensive reservation of rights, and to confirm with the SunCal Trustee the terms for disbursement of the Project Reserves.

NOW, THEREFORE, the Parties hereby agree as follows:

1. Subject to the First Loan Policy and the Summerwind Supplemental Policy and except as otherwise provided herein, Fidelity and First American may, in their sole and absolute discretion, settle any and all Tendered Claims (each a "Settlement" and, collectively, the "Settlements"). However, until the disputes between LCPI and Fidelity and First American as to coverage of Tendered Claims under the First Loan Policy and/or the Summerwind Supplemental Policy are resolved by a Final Order,[5] any such Settlement must be reasonably satisfactory to

[5] "Final Order" means an order of a court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for reargument or hearing has expired and as to which no appeal, no petition for certiorari, or motion for reargument or rehearing shall then be pending or, in the event that an appeal, writ of certiorari, or reargument or rehearing has been sought, such order shall have been upheld by the highest court to which such order was appealed, or from which certiorari or reargument or rehearing was sought and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that timely

LCPI notwithstanding anything to the contrary in the First Loan Policy and/or the Summerwind Supplemental Policy. In the event that the disputes as to coverage of the Tendered Claims under the First Loan Policy and/or the Summerwind Supplemental Policy are decided by a Final Order adverse to LCPI, such that there is no coverage of the Tendered Claims under the First Loan Policy and/or the Summerwind Supplemental Policy, Fidelity and First American shall no longer have either the obligation to defend or the ability to settle any Tendered Claim.

2. To the extent that Fidelity and/or First American expend funds effectuating a Settlement (including, to the extent allowed under the First Loan Policy, the Summerwind Supplemental Policy and/or applicable law, costs and legal fees incurred by Fidelity or First American in LCPI's defense of the Tendered Claim that is the subject of such Settlement) and there is ultimately either: (x) a determination by Final Order that the Tendered Claim related to that Settlement is not covered under the First Loan Policy and/or the Summerwind Supplemental Policy or is otherwise subject to a coverage exclusion ("No Coverage Order"), or (y) a resolution between LCPI, Fidelity and First American regarding their dispute over coverage of the Tendered Claims under the First Loan Policy and/or the Summerwind Supplemental Policy that involves the First Lien Lenders (including among others LCPI) contributing to the payment/settlement of a Tendered Claim ("Coverage Resolution"), then the First Lien Lenders, acting through LCPI as Administrative Agent, shall reimburse (the "Reimbursements") Fidelity and/or First American an amount equal to: (a) in the case of a Tendered Claim subject to a No Coverage Order, all such funds expended by Fidelity and First American to effectuate the Settlement of the Tendered Claim for which the No Coverage Order is applicable, including all reasonable costs and attorneys' fees incurred by Fidelity or First American in LCPI's defense of

motion under Rule 9024 of the Federal Rules of Bankruptcy Procedure or other analogous federal or state rule of procedure may be filed with respect to such order shall not prevent such order from being a Final Order.

the Tendered Claim that is the subject of such Settlement for which the No Coverage Order is applicable (including, to the extent allowed under the First Loan Policy, the Summerwind Supplemental Policy and/or applicable law, costs and legal fees incurred by Fidelity or First American in LCPI's defense of the Tendered Claim that is the subject of such Settlement); and (b) in the case of a Coverage Resolution, any amounts that the First Lien Lenders must contribute to the Settlements under any Coverage Resolution.

3. Each Settlement shall be subject to approval by Final Order (as defined herein) of the SunCal Bankruptcy Court in the SunCal Master Bankruptcy. Nothing herein shall be deemed or constitute consent by the SunCal Trustee to the terms and conditions of any Settlement or to seek approval from the SunCal Bankruptcy Court of any Settlement. The SunCal Trustee may consent or agree to and seek approval of any Settlement in his sole and absolute discretion. In the event the SunCal Trustee refuses to submit any Settlement to the SunCal Bankruptcy Court for approval, each of LCPI, Fidelity, and First American shall be authorized to do so to prove that such Settlement is fair, equitable, and in the best interests of the Liquidating Trust and all creditors of the SunCal Master Bankruptcy, and that the terms and conditions of such Settlement are consistent with the terms and conditions of the Term Sheet (defined below) and the Confirmed SunCal Plan; provided, however, that prior to the filing of any such motion by LCPI, Fidelity, and/or First American, counsel for the Parties must meet in person or by telephone in a good faith effort to resolve any dispute concerning the terms and conditions of such Settlement. Such meet and confer requirement is a condition to the approval of any motion by LCPI, Fidelity, and/or First American to approve any Settlement. The SunCal Trustee reserves the right to oppose any such motion by LCPI, Fidelity, and/or First American to approve a Settlement.

4. Upon approval of a Settlement by a Final Order of the SunCal Bankruptcy Court, the SunCal Trustee promptly shall disburse to LCPI, as Administrative Agent for the First Lien Lenders, that portion of the Project Reserves established for the Tendered Claim covered by the Settlement plus any interest thereon (each such disbursement, a "Reserve Distribution"); provided, however, that the SunCal Trustee shall retain, free and clear of any liens, claims or interests of LCPI, the First Lien Lenders, Fidelity or First American, 3.5% of that portion of each Reserve Distribution not allocated to the Carve Out (as defined below), unless and until the Trustee's Participation (as defined in the Confirmed SunCal Plan) has been fully funded, *i.e.*, until Allowed Unsecured Trade Claims (as defined in the Confirmed SunCal Plan) are paid in full.

5. As security for the Reimbursements, LCPI, as Administrative Agent for the First Lien Lenders, shall cause funds in an amount equal to the Reimbursements attributable to the now-settled Tendered Claim to be set aside from the corresponding Reserve Distribution for that now-settled Tendered Claim, free and clear of all liens, claims and encumbrances (the "Carve Out"). The Carve Out shall be segregated, deposited in a blocked account, held in escrow and administered in accordance with the terms of this Agreement. Additionally, LCPI, as Administrative Agent for the First Lien Lenders, shall grant Fidelity and First American a first priority security interest and lien in the Carve Out (the "Security Interest") to secure payment of the Reimbursements.

6. No distributions shall be made from the Carve Out until the earlier of: (i) the date of a Final Order of the LCPI Bankruptcy Court approving any Coverage Resolution (the "Coverage Resolution Condition"); (ii) the date of a Coverage Order[6] (the "Coverage

[6] As used herein, a "Coverage Order" is a Final Order that a Tendered Claim falls within coverage under the First Loan Policy and/or the Summerwind Supplemental Policy and is not otherwise subject to a coverage exclusion.

Condition"); and (iii) the date of a No Coverage Order (the "No Coverage Condition"). Upon the occurrence of:

a. the Coverage Resolution Condition, LCPI promptly shall disburse the Carve Out, as of the date of the Coverage Resolution Condition, and thereafter promptly shall disburse any amount that would otherwise have been deposited into the Carve Out from a Reserve Distribution, to (x) LCPI, as administrative agent for the First Lien Lenders, (y) Fidelity and (z) First American in accordance with the terms of the Coverage Resolution;

b. the Coverage Condition, LCPI promptly shall disburse that portion of the Carve Out related to a Tendered Claim for which there is a Coverage Order, as of the date of the Coverage Condition, and thereafter promptly shall disburse any amount that would otherwise have been deposited into the Carve Out from a Reserve Distribution for a Tendered Claim for which there is a Coverage Order, to LCPI, as administrative agent for the First Lien Lenders, free and clear of any liens, claims or interests of Fidelity or First American; and

c. the No Coverage Condition, LCPI promptly shall disburse that portion of the Carve Out related to a Tendered Claim for which there is a No Coverage Order, as of the date of the No Coverage Condition, and thereafter promptly shall disburse any amount that would otherwise have been deposited into the Carve Out from a Reserve Distribution for a Tendered Claim for which there is a No Coverage Order, to Fidelity and First American, free and clear of any liens, claims or interests of the First Lien Lenders.

7. Upon the occurrence of a Coverage Resolution Condition, Coverage Condition, or No Coverage Condition, LCPI shall promptly disburse to the SunCal Trustee, free and clear of

any liens, claims or interests of LCPI, the First Lien Lenders, Fidelity or First American, 3.5% of any distribution that LCPI, individually or as administrative agent for the First Lien Lenders, receives from the Carve Out on account of such event, unless and until the Trustee's Participation (as defined in the Confirmed SunCal Plan) is fully funded, *i.e.*, until Allowed Unsecured Trade Claims (as defined in the Confirmed SunCal Plan) are paid in full. LCPI will provide such documents and other information reasonably requested by the SunCal Trustee to verify the amounts of the Carve Outs and to monitor LCPI's compliance with this paragraph.

8. Without the need to obtain a further Order of the Court in the Lehman Bankruptcy, Fidelity and First American shall be deemed to have finally allowed administrative priority claims against the bankruptcy estates of each debtor in the Lehman Bankruptcy (each a "Lehman Debtor" and together the "Lehman Debtors") that is a lender under the First Lien Loan in amounts equal to the shares of the Reimbursements allocable to each such Lehman Debtor including, without limitation, LCPI, in its individual capacity as a lender under the First Lien Loan, without offset, counterclaim or defense. Notwithstanding the foregoing, Fidelity and First American agree to look solely to the Carve Out for satisfaction of such allowed administrative priority claims provided the Carve Out is maintained and preserved as provided herein.

9. Except as otherwise provided herein, the Parties intend this Agreement to be without prejudice to the rights of LCPI, as Administrative Agent for the First Lien Lenders, any First Lien Lender (including, without limitation, LCPI in its capacity as an individual First Lien Lender), Fidelity and/or First American to assert any claims or defenses against each other or third parties concerning title insurance coverage under the Policies and/or the Summerwind Supplemental Policy. EACH OF THE PARTIES FULLY RESERVES ITS RIGHTS AND REMEDIES, INCLUDING TO CONTINUE ITS INVESTIGATION OF THE TENDERED CLAIMS AND THE COVERAGE AVAILABLE UNDER THE POLICIES AND/OR THE

SUMMERWIND SUPPLEMENTAL POLICY WITH RESPECT THERETO AND TO ASSERT ANY AND ALL CLAIMS OR DEFENSES THAT MAY NOW EXIST OR THAT MAY ARISE BY REASON OF SUCH INVESTIGATION.

10. The Parties agree that this Agreement is the result of arms-length, good faith settlement negotiations between the Parties that commenced with a meeting between the Parties on October 29, 2010. The Parties further agree not to assert defenses based on the principles of estoppel, laches or like doctrines with respect to any delay in the commencement of proceedings to determine the scope of coverage under the Policies and/or the Summerwind Supplemental Policy from October 29, 2010 to the date of this Agreement.

11. This Agreement shall not constitute an admission of any fact or liability by LCPI, as Administrative Agent for the First Lien Lenders, any First Lien Lender (including, without limitation, LCPI in its capacity as an individual First Lien Lender), Fidelity, First American and/or the SunCal Trustee, and the Parties agree that this Agreement shall not be used as such in any proceeding or matter between them or otherwise related to the Policies, the Summerwind Supplemental Policy, the Tendered Claims, the Settlements and/or the Reimbursements, except to enforce the terms hereof or any related Court Order.

12. Outside the scope of the Lehman Bankruptcy and the SunCal Master Bankruptcy, no Party shall introduce or attempt to introduce this Agreement or its terms and contents at deposition, hearing, trial or similar legal proceeding, except to enforce or construe this Agreement and/or any related Court Order.

13. This Agreement shall survive, be unaffected by and take precedence over the terms of any plan of reorganization or plan of liquidation for LCPI confirmed in connection with the Lehman Bankruptcy.

14. The Parties agree that this Agreement implements the Confirmed SunCal Plan, the binding and amended term sheet attached to the Confirmed SunCal Plan as Exhibit 1 (the "Term Sheet"), the Sale Order, and the order confirming the Confirmed SunCal Plan. Except as otherwise provided in this Agreement, no prior or subsequent order of either the SunCal Bankruptcy Court or the LCPI Bankruptcy Court shall modify the terms of this Agreement, and the order approving this Agreement shall so provide.

15. This Agreement shall be binding on the Parties, their successors and assigns, including any bankruptcy trustee, post-confirmation liquidating agent, liquidating trustee or similar party appointed in connection with the Lehman Bankruptcy and/or the SunCal Master Bankruptcy.

16. LCPI shall stipulate to relief from the automatic stay in the Lehman Bankruptcy to allow the Parties to take any and all actions contemplated by and/or necessary to consummate or enforce this Agreement.

17. Notwithstanding anything to the contrary contained herein, Alfred H. Siegel is signing this Agreement solely in his capacity as the SunCal Trustee, not in an individual capacity, and in no event whatsoever shall Alfred H. Siegel have any personal liability of any kind, nature or amount as a result of this Agreement, including, without limitation, any performance, failure of performance, breach, default or other circumstance arising from or related to this Agreement, the implementation thereof, or the transactions contemplated herein.

18. This Agreement shall be subject to Court approval by Final Order (the "Approval Order") in both the Lehman Bankruptcy and the SunCal Master Bankruptcy. In the absence of such Court approval, this Agreement shall be null, void and of no force, effect or probative value, except for Paragraph 10 hereof. LCPI and the SunCal Trustee agree promptly to file or to cause to be filed a Motion and conforming Order, in form and substance mutually acceptable to

the Parties, seeking Court approval of this Agreement on a no hearing basis in both the Lehman Bankruptcy and the SunCal Master Bankruptcy, as applicable, no later than September 2, 2011, provided that LCPI and the SunCal Trustee shall each schedule such Motion to be heard on the applicable court's earliest available hearing date in the event that any party timely objects to the requested relief.

LEHMAN COMMERCIAL PAPER, INC.,
As Administrative Agent for the First Lien Lenders

By: ________________________________
**[Name]**
Its ______________________________

FIDELITY NATIONAL TITLE INSURANCE COMPANY

By: ________________________________
**[Name]**
Its ______________________________

FIRST AMERICAN TITLE INSURANCE COMPANY

By: ________________________________
**[Name]**
Its ______________________________

ALFRED H. SIEGEL, SOLELY IN HIS CAPACITY AS THE LIQUIDATING TRUSTEE IN THE JOINTLY ADMINISTERED BANKRUPTCY CASES OF LBREP/L-SUNCAL MASTER I LLC, LBREP/L-SUNCAL McALLISTER RANCH, LLC, LBREP/L-SUNCAL McSWEENY FARMS LLC AND LBREP/L-SUNCAL SUMMERWIND RANCH LLC

BY:________________________________________
Alfred H. Siegel

# Exhibit 2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | : | **08-13555 (JMP)** |
| **Debtors.** | : | **(Jointly Administered)** |

**ORDER PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE APPROVING THAT CERTAIN INTERIM FUNDING AGREEMENT BY AND AMONG ALFRED H. SIEGEL, AS LIQUIDATING TRUSTEE OF THE SUNCAL DEBTORS, LEHMAN COMMERCIAL PAPER, INC., FIDELITY NATIONAL TITLE INSURANCE COMPANY, AND FIRST AMERICAN TITLE INSURANCE COMPANY**

Upon the motion, dated September 2, 2011 ( "Motion"),[1] of Lehman Commercial Paper Inc. ("LCPI" and, together with its affiliated debtors in the above-referenced chapter 11 cases, the "Debtors"), pursuant to sections 105 and 363 of Title 11 of the United States Code (the "Bankruptcy Code") for authorization to enter into and approval of an agreement with respect to the funding of certain settlements and the allocation of distributions to be made from certain reserves to be established in the confirmed chapter 11 cases of the SunCal Debtors pursuant to the Interim Funding Agreement (the "Agreement"); and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in accordance with the

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion or the Agreement.

procedures set forth in the amended order entered June 17, 2010 governing case management

and administrative procedures [Docket No. 9635] to (i) the United States Trustee for the

Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured

Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v)

the United States Attorney for the Southern District of New York; (vi) counsel to the SunCal

Trustee, and (vii) all parties who have requested notice in these chapter 11 cases, and it

appearing that no other or further notice need be provided; and the Court having found and

determined that LCPI exercised its sound business judgment in deciding to enter into the

Agreement for the use of distributions to which it is entitled to under the SunCal Plan and that

the legal and factual bases set forth in the Motion and on the record establish just cause for the

relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to Sections 105 and 363 of the Bankruptcy Code, the

Interim Funding Agreement is approved, and LCPI is duly authorized to (i) consummate all of

the transactions contemplated thereby and (ii) execute and deliver such documents and

instruments and to take such other actions as may be reasonably necessary to consummate the

transactions contemplated by the Agreement, it being understood that any actions described in

this paragraph taken by LCPI or its affiliates may be taken without the necessity of any further

Court proceedings or approval and shall be conclusive and binding in all respects on all parties in

interest in these cases; and it is further

ORDERED that the Agreement and any related agreements, documents or other

instruments may be modified, amended or supplemented by the parties thereto, in a writing

signed by such parties, and in accordance with the terms thereof, without further order of the

Court, *provided*, *however*, that any material modification, amendment or supplement shall be presented for Court approval by motion of the parties thereto; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation or interpretation of this Order; *provided*, *however* nothing contained in this decretal paragraph is intended to reduce the exclusive jurisdiction of or predetermine any concurrent jurisdiction otherwise vested in the Bankruptcy Court for the Central District of California in the confirmed chapter 11 cases of the SunCal Debtors; and it is further

Dated: New York, New York
September [ ], 2011

______________________________________
UNITED STATES BANKRUPTCY JUDGE

# Exhibit 3

**WEILAND, GOLDEN, SMILEY, WANG EKVALL & STROK, LLP**
Evan D. Smiley, State Bar No. 161812
esmiley@wgllp.com
Philip E. Strok, State Bar No. 169296
pstrok@wgllp.com
Hutchison B. Meltzer, State Bar No. 217166
hmeltzer@wgllp.com
Robert S. Marticello, State Bar No. 244256
rmarticello@wgllp.com
650 Town Center Drive, Suite 950
Costa Mesa, CA 92626
Telephone: (714) 966-1000
Facsimile: (714) 966-1002

Attorneys for Alfred H. Siegel
Chapter 11 Trustee

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

In re

LBREP/L-Sun Cal Master I LLC, et al.,

Debtor.

______ Affects LBREP/L-SunCal Master I LLC, Only

______ Affects LBREP/L-SunCal McAllister Ranch LLC, Only

______ Affects LBREP/L-SunCal McSweeny Farms LLC, Only

______ Affects LBREP/L-SunCal Summerwind Ranch LLC, Only

__X__ Affects All Debtors.

Case No. 8:08-bk-15588-ES

Chapter 11

(Jointly Administered with Case Nos. 8:08-bk-15637-ES; 8:08-bk-15639-ES; and 8:08-bk-15640-ES)

**EXHIBIT "1" TO ORDER CONFIRMING THE CHAPTER 11 TRUSTEE'S SECOND AMENDED CHAPTER 11 PLAN (DATED APRIL 21, 2011)**

**Plan Confirmation Hearing**

DATE: April 8, 2011
TIME: 10:00 a.m.
PLACE: Courtroom 5A
411 W. Fourth St.
Santa Ana, CA 92701

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**WEILAND, GOLDEN, SMILEY, WANG EKVALL & STROK, LLP**
Evan D. Smiley, State Bar No. 161812
esmiley@wgllp.com
Philip E. Strok, State Bar No. 169296
pstrok@wgllp.com
Hutchison B. Meltzer, State Bar No. 217166
hmeltzer@wgllp.com
Robert S. Marticello, State Bar No. 244256
rmarticello@wgllp.com
650 Town Center Drive, Suite 950
Costa Mesa, CA 92626
Telephone: (714) 966-1000
Facsimile: (714) 966-1002

Attorneys for Alfred H. Siegel, Chapter 11 Trustee

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re<br><br>LBREP/L-Sun Cal Master I LLC, et al.,<br><br>Debtor.<br><br>______ Affects LBREP/L-SunCal Master I LLC, Only<br><br>______ Affects LBREP/L-SunCal McAllister Ranch LLC, Only<br><br>______ Affects LBREP/L-SunCal McSweeny Farms LLC, Only<br><br>______ Affects LBREP/L-SunCal Summerwind Ranch LLC, Only<br><br>__X__ Affects All Debtors. | Case No. 8:08-bk-15588-ES<br><br>Chapter 11<br><br>(Jointly Administered with Case Nos. 8:08-bk-15637-ES; 8:08-bk-15639-ES; and 8:08-bk-15640-ES)<br><br>**SECOND AMENDED CHAPTER 11 PLAN (DATED APRIL 21, 2011)**<br><br>Plan Confirmation Hearing<br>DATE: April 8, 2011<br>TIME: 10:00 a.m.<br>PLACE: Courtroom 5A<br>411 W. Fourth St.<br>Santa Ana, CA 92701 |

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1
II. THE PLAN ..... 2
A. The Plan is a Liquidating Plan ..... 2
B. The Plan Treats Claims Against All Estates ..... 3
C. What Creditors and Interest Holders Will Receive Under the Proposed Plan ..... 4
D. Unclassified Claims ..... 4
1. Administrative Expenses ..... 4
a. Ordinary Course Administrative Claims ..... 7
b. Non-Ordinary-Course Administrative Claims ..... 7
c. Professional-Fee Claims ..... 8
2. Priority Tax Claims ..... 8
E. Classified Claims ..... 9
1. Summary of Classes ..... 9
2. Secured Claims ..... 9
a. Secured Claim of the 1st Lien Lenders ..... 10
b. Secured Claims Other Than the Secured Claim of the 1st Lien Lenders ..... 14
3. Classes of Priority Unsecured Claims ..... 17
4. Classes of Unsecured Claims ..... 18
a. Unsecured Deficiency Claim of the 1st Lien Lenders ..... 18
b. Unsecured Claims Other Than the Unsecured Deficiency Claim of the 1st Lien Lenders ..... 20
5. Class of Interest Holders ..... 22
III. MEANS OF EFFECTUATING THE PLAN ..... 22
A. The Sale of the Properties ..... 23
1. The Auction ..... 23

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc Main Document Page 4 of 125

**TABLE OF CONTENTS (cont.)**

Page

2. The Transfer of Title ... 23
3. The Surety Bonds ... 23

B. The Funding of the Plan ... 24

C. Transfer of Estate Assets ... 24

D. Dissolution of the Debtors ... 25

E. Liquidating Trust ... 25
1. Establishment of the Liquidating Trust ... 25
2. Trust Distributions ... 25
3. Duration of the Trust ... 25
4. Liquidation of Avoidance Actions and Actions ... 26
5. Liquidating Trustee ... 26
   a. Appointment ... 26
   b. Term ... 26
   c. Powers and Duties ... 27
   d. Retention of Professionals and Compensation Procedure ... 29
   e. Fees and Expenses ... 29
   f. Limitation of Liability and Indemnification ... 30
   g. Liquidating Trustee as Successor ... 31
   h. Compromising Claims ... 31
   i. Vesting of Assets ... 31
6. Liquidating Trustee as Disbursing Agent ... 31
7. Bond ... 32
8. Federal Income and Taxation of the Liquidating Trust ... 32
9. Beneficiaries ... 32

F. Release of Liens ... 33

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc Main Document Page 5 of 125

TABLE OF CONTENTS (cont.)

Page

G. Changes in Rates Subject to Regulatory Commission Approval .............. 33
H. Exemption from Transfer Taxes .............. 33
IV. DISTRIBUTIONS .............. 34
A. Dates of Distributions .............. 34
B. Manner of Distribution .............. 34
C. Delivery of Distributions in General .............. 34
D. Rounding of Payments .............. 35
E. Interest on Claims .............. 35
F. Compliance with Tax Requirements .............. 36
G. De Minimis Distributions .............. 36
H. Setoffs .............. 37
I. Limitation on Liability .............. 37
V. CLAIM OBJECTIONS AND DISPUTED CLAIMS .............. 37
A. Standing .............. 38
B. Claims Objection Deadline .............. 38
C. No Distribution Pending Allowance .............. 38
D. Reserves for Disputed Claims .............. 38
VI. MECHANIC'S LIENS .............. 39
VII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............. 41
A. Assumption and Assignment .............. 41
B. Rejections .............. 44
VIII. PRESERVATION OF CAUSES OF ACTION AND AVOIDANCE ACTIONS .............. 44
IX. RETENTION OF JURISDICTION .............. 46
X. EFFECT OF CONFIRMATION .............. 47
A. Discharge .............. 47

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

## TABLE OF CONTENTS (cont.)

Page

B. Revesting of the Assets ........ 47
C. Dissolution of the Committee ........ 48
D. Exculpation and Releases ........ 48
E. Modification of the Plan ........ 48
F. Post-Confirmation Status Report ........ 49
G. Quarterly Fees ........ 49
H. Post-Confirmation Conversion/Dismissal ........ 49
I. Final Decree ........ 50
TABLE ........ 51

## I. INTRODUCTION

On September 10 and 11, 2008 (the "Petition Dates"), involuntary chapter 11 petitions were filed under the United States Bankruptcy Code (the "Bankruptcy Code" or "Code"), 11 U.S.C. §§ 101 *et seq.*, against LBREP/L-SunCal Master I LLC (the "Parent Debtor"), and LBREP/L-SunCal McAllister Ranch LLC, LBREP/L-SunCal McSweeny Farms LLC, and LBREP/L-SunCal Summerwind Ranch LLC (collectively, the "Subsidiary Debtors," and together with the Parent Debtor, the "Debtors"), commencing the above-captioned chapter 11 cases (collectively, the "Cases") before the United States Bankruptcy Court for the Central District of California (the "Court"). On October 30, 2008, the Court entered an order for relief in each of the Cases (collectively, the "Orders for Relief") and an order approving the appointment of Alfred H. Siegel (the "Trustee") as the chapter 11 trustee of the Cases. The Cases are being jointly administered pursuant to an order of this Court entered on November 13, 2008.

The Trustee's Second Amended Chapter 11 Plan (the "Plan") is a liquidating plan. The Plan incorporates the terms of a settlement reached and approved by the Court between the Trustee, the Official Committee of Unsecured Creditors (the "Committee"), and Lehman Commercial Paper Inc. ("LCPI"), in its individual capacity and as administrative agent for the first-position secured lenders (the "1st Lien Lenders"), on the terms and conditions set forth in the amended and restated term sheet attached hereto as Exhibit "1" (the "Amended Term Sheet"). As described in further detail below, the Trustee intends to accomplish payments under the Plan through the sale of the Subsidiary Debtors' real property development projects (each, a "Property" and collectively, the "Properties") and/or the pursuit of Causes of Action[1] held by the Debtors' bankruptcy estates (each, an "Estate" and collectively, the "Estates") against third parties. The primary source of potential recoveries for creditors under the Plan will be the Estates'

Smiley, Wang Ekvall & Strok, LLP
Weiland, Golden,
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

[1] Any capitalized terms not defined in the text of this Plan are defined in the Table of Definitions found at the end of the Plan.

Causes of Action. Moreover, as discussed in further detail below, while the Trustee is not requesting the substantive consolidation of the Estates, any Distributions of Available Cash to General Unsecured Creditors with respect to each of the Estates will be made on a consolidated basis. The Effective Date of the Plan will be the first Business Day that is fourteen (14) days after the entry of an order confirming the Plan (the "Confirmation Order"), provided there has been no order staying the effectiveness of the Confirmation Order.

Sent to you in the same envelope as this document is the Disclosure Statement which has been approved by the Court and which is provided to help you understand the Plan. Also accompanying this document is a letter from the Committee in support of the Plan and recommending that creditors vote to accept the Plan.

## II. THE PLAN

### A. The Plan is a Liquidating Plan

The goal of the Plan is to liquidate the real property and other assets of the Debtors' Estates, including Causes of Action held by the Estates, and to distribute any resulting net proceeds. Under the Plan, the Properties will be sold to the 1st Lien Lenders on account of the 1st Lien Lenders' Allowed Secured Claim and/or to one or more third parties in accordance with bidding procedures approved by the Court. All other assets of the Debtors' Estates will be transferred to the liquidating trust (the "Liquidating Trust") established on the Effective Date of the Plan. Any and all Avoidance Actions and other Causes of Action of the Estates are reserved under the Plan and will be transferred to the Liquidating Trust, and the Liquidating Trustee will be vested with standing to pursue such Avoidance Actions and Causes of Action. Generally speaking, under the Plan, Distributions can be made from the following three potential sources of Cash: (1) any remaining Cash set aside for the administration of the Debtors' cases and other purposes; (2) the Estates' share of any proceeds from the sale or other disposition of the Properties; and (3) any net recoveries from any Avoidance Actions or other Causes of Action asserted by the Estates against third parties. The foregoing sources of Cash will be paid

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

to and administered and distributed by the Liquidating Trustee. The primary potential source of repayment for Unsecured Trade Creditors will be any net proceeds from litigation.

**B. The Plan Treats Claims Against All Estates**

The Plan provides treatment for the Claims against each of the Debtors' Estates. The Plan does not provide for the substantive consolidation of the Estates. Rather, the Plan contains essentially four (4) separate chapter 11 plans, one plan for each Debtor. The Trustee is submitting one plan and disclosure statement to simplify drafting and to avoid duplicative costs relating to the preparation and distribution of multiple plans and disclosure statements. Many of the procedural provisions and the treatment provided for each Class of Claims of a similar priority in each Estate is the same. Moreover, the Lien Lenders assert their respective Claims against each Debtor for the full amount owed, and the Allowed General Unsecured Trade Claims against each Estate will receive periodic Distributions from any Available Cash on a consolidated basis. However, for voting purposes, each Holder of a Claim in a Class will vote its Claim in such Class by individual Debtor. The classification scheme set forth below applies to each Debtor, but to the extent there are no Claims in a certain Class against a particular Debtor, that Class will be deemed not to exist for any purpose whatsoever as to that Debtor. Creditors asserting the same Claim against more than one Estate or Debtor will receive only one satisfaction of such Claim.[2]

Unless otherwise expressly stated in the Plan, the treatment of Allowed Claims and Allowed Interests under the Plan supersedes any agreements or rights the Holders of those Claims or Interests may have in or against the Debtors or their assets and is in full satisfaction of the legal, equitable, and contractual rights of the Holders of the Claims or Interests. Unless the Plan provides otherwise, no Distributions will be made and no rights

Smiley, Wang Ekvall & Strok, LLP
Weiland, Golden,
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

[2] For example, if a creditor asserts the same Claim in the amount of $1,000.00 for services rendered to the McAllister Ranch Property against both McAllister Ranch and the Parent Debtor, the creditor will be paid only $1,000.00 on account of such Claim, if allowed.

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc Main Document Page 10 of 125

retained on account of any Claim or Interest that has not become an Allowed Claim or Allowed Interest.

**C. What Creditors and Interest Holders Will Receive Under the Proposed Plan**

As required by the Bankruptcy Code, the Plan classifies Claims and Interests in various Classes according to their right to priority. The Plan states whether each Class of Claims or Interests is impaired or unimpaired. The Plan provides the treatment each Class will receive. In no event shall any creditor receive more than the creditor's Allowed Claim, plus interest, to the extent provided herein.

**D. Unclassified Claims**

Certain types of Claims are not placed into voting classes but are instead unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to certain treatment under the Bankruptcy Code. Accordingly, the following Claims have not been placed into a Class:

**1. Administrative Expenses**

Administrative Expenses Claims are Claims for costs or expenses of administering the Debtors' Cases which are allowed under § 507(a)(2) of the Bankruptcy Code. The Bankruptcy Code requires that all Allowed Administrative Claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment. The following charts list all of the Debtors' § 507(a)(2) unpaid Administrative Claims and their treatment under the Plan:

| Non-Professional Administrative Claims | | |
|---|---|---|
| Description | Estimated Amount Owed | Treatment |
| Ordinary-Course Administrative Claims | $0.00 | Unless the Trustee or the Liquidating Trustee object to an Ordinary-Course Administrative Claim, the Claim will be Allowed in accordance with the terms and conditions of the particular transaction that gave rise to the Ordinary-Course Administrative Claim, and the Person holding the Ordinary-Course Administrative Claim need not |

Smiley, Wang Ekvall & Strok, LLP
Weiland, Golden,
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

| Non-Professional Administrative Claims | | |
|---|---|---|
| Description | Estimated Amount Owed | Treatment |
| | | File any Request for Payment of its Claim. |
| Gramercy's Non-Ordinary Course Administrative Claim for the payment of the allowed fees and expenses of the Trustee and the Trustee's professionals pursuant to the Gramercy Stipulation | To be determined | Paid in full by the Trustee or the Liquidating Trustee on the later of (i) the Effective Date, and (ii) the date that is ten (10) Business Days after the Court enters a Final Order allowing Gramercy's Non-Ordinary-Course Administrative Claim. |
| Other Non-Ordinary Course Administrative Claims | $0.00 | To the extent that any Non-Ordinary-Course Administrative Claims are Allowed, they will be paid in full by the Trustee or the Liquidating Trustee on the later of (i) the Effective Date, and (ii) the date that is ten (10) Business Days after the Court enters a Final Order allowing the Non-Ordinary-Course Administrative Claim. |
| Clerk's Office Fees | $0.00 | Paid in full on or before the Effective Date. |
| Office of the United States Trustee Fees | $0.00 | Paid in full on or before the Effective Date. |
| Administrative Tax Claims | $0.00 | Unless the Trustee or the Liquidating Trustee objects to an Administrative Tax Claim or otherwise disputes the Administrative Tax Claim in accordance with applicable law, the Claim will be Allowed in accordance with the terms and conditions of the particular transaction that gave rise to the Administrative Tax Claim, and the Person holding the Administrative Tax Claim need not file any Request for Payment of its Claim.<br><br>Any Administrative Tax Claim asserted by the County of Riverside will be paid in the ordinary course of business, currently and timely as they are incurred and billed, unless the Trustee or the Liquidating Trustee objects to or otherwise disputes such Administrative Tax Claim in accordance with applicable law. In an event of default, and to the extent such Administrative Tax Claim is also secured, the payment thereof will |

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

| Non-Professional Administrative Claims | | |
|---|---|---|
| Description | Estimated Amount Owed | Treatment |
| | | include all costs, fees, charges and interest, if applicable, as required under 11 U.S.C. §§ 506(b) and 511, and applicable non-bankruptcy law. |
| Total | $0.00 | |

| Professional-Fee Claims | | |
|---|---|---|
| Description | Estimated Amount Owed | Treatment |
| Alfred H. Siegel | $535,000.00 | Paid in full on the later of (i) the Effective Date, and (ii) the date that is ten (10) Business Days after the Court enters a Final Order allowing the Professional-Fee Claim. |
| Weiland Golden | $1,300,000.00 | Paid in full on the later of (i) the Effective Date, and (ii) the date that is ten (10) Business Days after the Court enters a Final Order allowing the Professional-Fee Claim. |
| Levene Neale | $800,000.00 | Paid in full on the later of (i) the Effective Date, and (ii) the date that is ten (10) Business Days after the Court enters a Final Order allowing the Professional-Fee Claim. |
| Crowe Horwath | $230,000.00 | Paid in full on the later of (i) the Effective Date, and (ii) the date that is ten (10) Business Days after the Court enters a Final Order allowing the Professional-Fee Claim. |
| Sills Cummis | $75,000.00 | Paid in full on the later of (i) the Effective Date, and (ii) the date that is ten (10) Business Days after the Court enters a Final Order allowing the Professional-Fee Claim. |
| Total | $2,940,000.00[3] | |

[3] The estimate of Professional-Fee Claims is only an estimate and will change based upon the services required during these Cases and upon what the Court ultimately awards to professionals. The Estates remain liable for all allowed fees and costs regardless of the estimates.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

The following applies to Administrative Claims asserted in each Estate:

a. <u>Ordinary Course Administrative Claims</u>

Unless the Liquidating Trustee or other party-in-interest objects to an Ordinary-Course Administrative Claim, the Claim will be deemed Allowed in accordance with the terms and conditions of the particular transaction that gave rise to the Ordinary-Course Administrative Claim, and the Person holding the Ordinary-Course Administrative Claim need not File any Request for Payment of its Claim. However, any Request for Payment, or Motion to allow a Claim as an Ordinary-Course Administrative Claim must be Filed with the Court and served on counsel for the Trustee or the Liquidating Trustee, as the case may be, and the OUST by no later than sixty (60) days after the Effective Date.

b. <u>Non-Ordinary-Course Administrative Claims</u>

A Non-Ordinary-Course Administrative Claim will be paid by the Trustee on the Effective Date to the extent that prior to the Effective Date it has already been determined to be an Allowed Non-Ordinary-Course Administrative Claim by the Court pursuant to a Final Order. Any other Non-Ordinary-Course Administrative Claim will be paid by the Liquidating Trustee to the extent that it is allowed by the Court only if: (1) on or before sixty (60) days after the Effective Date, the Person holding the Non-Ordinary Course Administrative Claim both Files with the Court a Request for Payment of the Non-Ordinary-Course Administrative Claim and serves the Request for Payment on counsel for the Liquidating Trustee and the OUST; and (b) the Court, in a Final Order, allows the Non-Ordinary-Course Administrative Claim. Any party-in-interest, including, but not limited to, the Liquidating Trustee, may File an objection to such a Request for Payment within the time provided by the Bankruptcy Rules or within any other period the Court establishes. Persons holding Non-Ordinary-Course Administrative Claims who do not timely File and serve a Request for Payment will be forever barred from asserting these Claims or sustaining any action seeking payment in any forum or from any court deriving from these Claims against the Estates, the Debtors, the Trustee, the Liquidating Trust, the Liquidating Trustee, or their property.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

c. Professional-Fee Claims

A Professional-Fee Claim will be paid only if: (a) on or before forty-five (45) days after the Effective Date (or such further date if extended by Court order), the Person holding the Professional-Fee Claim both Files with the Court an application requesting allowance and payment of the Professional-Fee Claim; and (b) the Professional-Fee Claim is allowed by order of the Court (as to which fourteen (14) days has passed without a stay of the enforcement or effectiveness of such order or, if a stay has been obtained, such stay has lapsed or been dissolved). The Liquidating Trustee or any other party-in-interest may File an objection to such an application within the time provided by the Bankruptcy Rules or within any other period that the Court establishes. Persons holding Professional-Fee Claims who do not timely File and serve an application for allowance and payment will be forever barred from asserting these Claims against the Estates, the Debtors, the Trustee, the Liquidating Trust, the Liquidating Trustee or their property.

As is indicated above, the Trustee estimates that he will need to pay Administrative Expense Claims totaling approximately $2,940,000.00 on the Effective Date, unless the Claimant has agreed to be paid later or the Court has not yet ruled on the Claim. The Trustee expects that he will have sufficient Administrative Funds in excess of this amount on the Effective Date to make the necessary payments.

**2. Priority Tax Claims**

Priority Tax Claims include certain unsecured income, employment and other taxes described by Bankruptcy Code § 507(a)(8). The Bankruptcy Code requires that each Holder of such a § 507(a)(8) Priority Tax Claim receive the present value of such Claim in regular installment payments in Cash, over a period not exceeding five years from the Petition Date, unless the Holder agrees to a different treatment. The following chart lists all of the Debtors' known § 507(a)(8) Priority Tax Claims and their treatment under the Plan:

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

| Priority Tax Claims | | |
|---|---|---|
| Description | Estimated Amount Owed | Treatment |
| Priority Tax Claims | $0.00 | The Holders of Allowed Priority Tax Claims will be paid in full the allowed amount of their Claims on the Effective Date or as soon as reasonably practicable thereafter, but, in no event, more than five (5) years from the entry of the Orders for Relief. Allowed Priority Tax Claims shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim. |

## E. Classified Claims

### 1. Summary of Classes

| Summary of Classes | |
|---|---|
| Class[4] | Claimant(s) |
| 1(a)-(d) | Secured Claim of the 1st Lien Lenders |
| 2(a)-(d) | Secured Claim of the 2nd Lien Lenders |
| 3(a)-(d) | Secured Claim of the 3rd Lien Lenders |
| 4(a)-(d) | Secured Claim of Mechanic's Lien Claimants |
| 5(a)-(d) | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(6)-(7) |
| 6(a)-(d) | Priority Unsecured Wage Claims Pursuant to 11 U.S.C. §§ 507(a)(4)-(5) |
| 7(a)-(d) | Unsecured Deficiency Claims of the 1st Lien Lenders |
| 8(a)-(d) | Contractually Subordinated Unsecured Deficiency Claims of the 2nd and 3rd Lien Lenders |
| 9(a)-(d) | General Unsecured Trade Claims |
| 10(a)-(d) | Interest Holders |

### 2. Secured Claims

Secured Claims are Claims secured by liens against property of one or more of the Estates.

---

4 With respect to each Class, sub-Class (a) refers to the SunCal Master Estate, sub-Class (b) refers to the McAllister Ranch Estate, sub-Class (c) refers to the McSweeny Farms Estate, and sub-Class (d) refers to the Summerwind Ranch Estate.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

a. Secured Claim of the 1st Lien Lenders

Classes 1(a)-(d) consist of the Secured Claim of the 1st Lien Lenders. In accordance with the terms of the Amended Term Sheet, the 1st Lien Lenders hold an Allowed Claim against each of the Estates in the aggregate amount of $230,006,233.98, plus accrued and unpaid interest calculated through September 10, 2008, and accrued and unpaid legal fees (the "1st Lien Lenders Allowed Claim"), secured by a senior-in-priority lien against substantially all of the Debtors' assets, including, but not limited to, the Properties and the Retained Settlement Funds, subject to any earlier recorded and perfected liens. The value of the Properties will be determined in connection with the proposed sale of the Properties. The treatment provided herein shall be in full settlement and satisfaction of the 1st Lien Lenders' Allowed Secured Claim against each of the Debtors.

i. **Calculation of Secured Claim**. In accordance with the terms of the Amended Term Sheet, the 1st Lien Lenders hold an Allowed Secured Claim in each of the Estates in an amount equal to the aggregate amount of the "Winning Bid(s)" (as defined in the Overbid Procedures) for the Properties, plus the amount of the Retained Settlement Funds as of the Effective Date, less the amount of any customary costs and expenses of sale, including brokers' commissions, liabilities, liens, Claims, encumbrances or interests, including, but not limited to, any liens determined to be superior in priority to the liens held by the 1st Lien Lenders against any of the Properties (the "Senior Liens"), (a) assumed by the 1st Lien Lenders in connection with the transfer of title to any Properties sold to the 1st Lien Lenders by way of credit bid, or (b) assumed by the 1st Lien Lenders in connection with or paid prior to the distribution of the proceeds from the sale of the Properties sold to one or more "Winning Bidders" (as defined in the Overbid Procedures) other than the 1st Lien Lenders, up to the amount of the 1st Lien Lenders' Allowed Claim.

ii. **1st Lien Lenders' Credit Bid Rights**. The 1st Lien Lenders acting collectively shall be the initial bidder with respect to each of the Properties. The initial credit bid by the 1st Lien Lenders shall be the Aggregate Minimum Credit Bid Amount and,

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

with respect to each Property, the Allocated Minimum Credit Bid Amount for the Property. With respect to each Property, the 1st Lien Lenders, in their sole and absolute discretion, shall be entitled to increase their credit bid in accordance with the Overbid Procedures to an amount in excess of the highest competing bid for such Property, if any, up to the Allocated Maximum Credit Bid Amount for the Property.

**iii.** **Payment of Secured Claim**. Properties for which the 1st Lien Lenders are determined to be the Winning Bidder by way of credit bid shall be transferred to the 1st Lien Lenders on the Effective Date or as soon as reasonably practicable thereafter subject to: (1) any Senior Liens; and (2) liens, Claims, encumbrances or interests that satisfy clause (b), (c), and/or (d) of the definition of "Permitted Exceptions" set forth in the First Lien Credit Agreement (the items described in this clause (2) collectively, the "Permitted Liens"). Properties sold to Winning Bidder(s) other than the 1st Lien Lenders shall be sold free and clear of all liens, including, but not limited to, the liens of the 1st Lien Lenders, except, however, the Permitted Liens, which shall not include any Senior Liens. On the later of the Effective Date or the close of escrow, the proceeds from the sale of the Properties sold to a Winning Bidder other than the 1st Lien Lenders, less ordinary costs of sale, shall be distributed to LCPI, in its capacity as administrative agent for the 1st Lien Lenders, subject to any Senior Liens.

**iv.** **The Trustee's Participation**. The Liquidating Trustee, on behalf of the Holders of Allowed Unsecured Trade Claims, shall be entitled to, and shall recover and receive from the "Proceeds" (hereinafter defined) of the dispositions of the Properties, the lesser of (1) the amount sufficient to pay in full the Allowed Unsecured Trade Claims to the extent not previously paid, and (2) 3.5% of such Proceeds (the "Trustee's Participation"); provided that, at the time of any such subsequent disposition the Holders of Allowed Unsecured Trade Claims shall not have otherwise been paid the full allowed amount of their Claims. The Trustee's Participation in each portion of any Proceeds that consists of Cash shall be immediately due and payable to the Liquidating Trustee from the 1st Lien Lenders in Cash upon the 1st Lien Lenders' receipt of such portion of the

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

applicable Proceeds; provided, however, payment of the Trustee's Participation from Proceeds from the sale of Properties to one or more Winning Bidders other than the 1st Lien Lenders under the Plan shall only be made at such time when all Senior Liens have been resolved or Fidelity has accepted responsibility for all remaining Senior Liens.[5] The Trustee's Participation shall be transferred to the Liquidating Trustee free and clear of the liens of the Lien Lenders to be distributed in accordance with the terms of the Plan.

As used herein, "Proceeds" shall mean all cash and other property constituting proceeds of the disposition of each Property, including the proceeds from the sale of any of the Properties to one or more Winning Bidders other than the 1st Lien Lenders (but excluding any transfer of a Property to the 1st Lien Lenders pursuant to a credit bid) and including the proceeds from any disposition of the Property by the 1st Lien Lenders or any of their affiliates following their acquisition thereof pursuant to a credit bit, whether such Proceeds are received in a single lump sum or on a piecemeal basis over time, less (a) customary and reasonable costs and expenses of sale, and (b) Cash and other property used to satisfy any Senior Liens not otherwise satisfied under the that certain Title Insurance Policy number 27-44-94-120334 (the "Title Insurance Policy") or the Plan. For the avoidance of doubt, in the case of such property actually received that consists of promissory notes, equity interests (direct or indirect) in any entities taking title to the Properties and/or other deferred or contingent payment arrangements or mechanisms, the Liquidating Trustee shall be entitled to receive, at the time such promissory notes, equity interests and/or deferred or contingent payment arrangements or mechanisms are received or implemented by the 1st Lien Lenders or their applicable affiliates or principals, a profits participation or similar contractual right to receive the applicable amount representing the Trustee's Participation from all Cash actually received by such entities taking title to each Property from the disposition of such Property and by the Lien Lenders

[5] Fidelity asserts that certain issues remain between it and LCPI concerning the scope and existence of coverage under the Title Insurance Policy, and the potential for future issuance of title insurance, which necessitate Fidelity's full reservation of rights as to the Plan.

Smiley, Wang Ekvall & Strok, LLP
Weiland, Golden,
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

and their applicable affiliates and principals in respect of such promissory notes, which profits participation or similar right shall be provided for in the operating, partnership, or similar governing documents of such entities and in such promissory notes or other deferred or contingent payment documentation (as the case may be), in a form and substance reasonably acceptable to the Liquidating Trustee with the Liquidating Trustee being a direct contracted beneficiary of such provisions with the legal right to contractually enforce same. The Court shall retain jurisdiction with respect to the determination of the value of any component of the Proceeds. Without limiting the foregoing, if the 1st Lien Lenders form a joint venture with, or borrow funds from, any party, including any 1st Lien Lender or affiliates of a 1st Lien Lender to obtain funding necessary to develop one or more of the Properties or to maintain and/or operate the Properties prior to any disposition, the funds required to repay such unaffiliated equity or debt, as the case may be, shall reduce dollar-for-dollar the Proceeds for the applicable Properties. The 1st Lien Lenders agree to act in good faith to carry out the terms of this paragraph (Section II.E.2.a.iv. of the Plan) and to effectuate this participation interest of the Liquidating Trustee.

The 1st Lien Lenders will, at their sole expense, provide a report and accounting to the Liquidating Trustee or the Liquidating Trustee's successor-in-interest as soon as possible following receipt of Proceeds and shall provide semi-annual financial reports relating to the Properties. In addition, the 1st Lien Lenders will provide such documents and other information reasonably requested by the Liquidating Trustee or the Liquidating Trustee's successor-in-interest to monitor the 1st Lien Lenders' compliance with this paragraph (Section II.E.2.a.iv. of the Plan). LCPI shall provide the Liquidating Trustee with information reasonably necessary to verify the amount of Proceeds.

v. **Return of Remaining Development Funds**. With five (5) Business Days of the date that the Debtors transfer title to the last of the Properties such that the Debtors no longer hold title to any of the Properties, the Trustee or the Liquidating Trustee, as the case may be, shall transfer any unused portion of the Remaining Development Funds to

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

LCPI, in its capacity as administrative agent for the 1st Lien Lenders. The amount of the 1st Lien Lenders' Allowed Secured Claim shall be increased by an amount equal to the amount of the Remaining Development Funds transferred to LCPI.

**vi. Treatment of Deficiency Claim**. The amount of the 1st Lien Lenders' Claim not determined to be a Secured Claim shall be referred to as the "1st Lien Lenders' Unsecured Deficiency Claim" against each of the Debtors, and shall be treated in Classes 7(a)-(d) below.

b. Secured Claims Other Than the Secured Claim of the 1st Lien Lenders

The following chart lists all Classes of Secured Claims, other than the Secured Claim of the 1st Lien Lenders, and their treatment under the Plan:

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

| Secured Claims – SunCal Master Estate | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 2(a)-(d) | Secured Claim of the 2nd Lien Lenders<br><br>• Collateral: The Properties<br><br>• Priority of Security Interest: Second<br><br>• Total Claim Amount: $85,000,000.00, plus accrued and unpaid interest calculated through September 10, 2008<br><br>• Collateral Value: To be determined upon sale of the Properties. | N | Y | On the Effective Date, the 2nd Lien Lenders will have a Secured Claim only if and to the extent the aggregate Winning Bid(s) for the Properties exceed the amount of the 1st Lien Lenders' Allowed Claim. If and to the extent the 2nd Lien Lenders have an Allowed Secured Claim, they will be paid the allowed amount of such Secured Claim from the sale proceeds on the later of the Effective Date or the close of escrow.<br><br>Based on the fair market value of the Properties and the amount of the 1st Lien Lenders' Allowed Claim, it is expected that the 2nd Lien Lenders are wholly unsecured, and, as such, the 2nd Lien Lenders will not have any Allowed Secured Claim. If as expected the 2nd Lien Lenders do not have an Allowed Secured Claim, then upon the Effective Date, the 2nd Lien Lenders' liens against the Properties and other property of the Debtors and/or the Estates shall be valued at $0.<br><br>On the Effective Date, the liens of the 2nd Lien Lenders on the Properties and other property of the Debtors and/or the Estates shall be released, and title to the Properties will be transferred to the Winning Bidder(s) free and clear of the 2nd Lien Lenders' lien.<br><br>The treatment provided herein shall be in full settlement and satisfaction of the 2nd Lien Lenders' Secured Claim against each of the |

| Secured Claims – SunCal Master Estate | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Debtors.<br><br>The amount of the 2nd Lien Lenders' Claim not determined to be a Secured Claim shall be referred to as the "2nd Lien Lenders' Unsecured Deficiency Claim."<br><br>The 2nd Lien Lenders' Unsecured Deficiency Claim, if any, shall be paid in accordance with the treatment for Classes 8(a)-(d). |
| 3(a)-(d) | Secured Claim of the 3rd Lien Lenders<br><br>• Collateral: The Properties<br><br>• Priority of Security Interest: Third<br><br>• Total Claim Amount: $75,000,000.00, plus accrued and unpaid interest calculated through September 10, 2008<br><br>• Collateral Value: To be determined upon sale of the Properties. | N | Y | On the Effective Date, the 3rd Lien Lenders will have a Secured Claim only if and to the extent the aggregate Winning Bid(s) for the Properties exceed the amount of the 1st Lien Lenders' Allowed Claim and the 2nd Lien Lenders' Allowed Claim. If and to the extent the 3rd Lien Lenders have an Allowed Secured Claim, they will be paid the allowed amount of such Secured Claim from the sale proceeds on the later of the Effective Date or the close of escrow.<br><br>Based on the fair market value of the Properties and the amount of the 1st Lien Lenders' Allowed Claim and the 2nd Lien Lenders' Allowed Claim, it is expected that the 3rd Lien Lenders are wholly unsecured, and, as such, the 3rd Lien Lenders will not have any Allowed Secured Claim. If as expected the 3rd Lien Lenders do not have an Allowed Secured Claim, upon the Effective Date, the 3rd Lien Lenders' liens against the Properties and other property of the Debtors and/or the Estates shall be valued at $0.<br><br>On the Effective Date, the liens of the 3rd Lien Lenders on the Properties and other property of the Debtors and/or the Estates shall be released, and title to the Properties will be transferred to the Winning Bidder(s) free and clear of the 3rd Lien Lenders' liens.<br><br>The treatment provided herein shall be in full settlement and satisfaction of the 3rd Lien Lenders' Secured Claim against each of the Debtors.<br><br>The amount of the 3rd Lien Lenders' Claim not determined to be a Secured Claim shall be referred to as the "3rd Lien Lenders' Unsecured Deficiency Claim."<br><br>The 3rd Lien Lenders' Unsecured Deficiency Claim, if any, shall be paid in accordance with the treatment for Classes 8(a)-(d). |

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc Main Document Page 22 of 125

| Secured Claims – SunCal Master Estate | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 4(a)-(d) | Mechanic's Lien Claims, which shall include the secured claim, if any, of Oak Valley.<br><br>• Collateral: One or more of the Properties, respectively<br><br>• Priority of Security Interest: Fourth<br><br>• Total Amount of Claims: $46,500,000.00 (est.)<br><br>Collateral Value: To be determined upon sale of the Properties. | N | Y | Based on the fair market value of the Properties and the amount of the Lien Lenders' Claims, the Holders of mechanic's liens (each a "Mechanic's Lien Claimant" and collectively, the "Mechanic's Lien Claimants") will have a Secured Claim only if and to the extent they establish they hold liens that are senior in priority to the lien of the 1st Lien Lenders under applicable law. Oak Valley shall be considered a Mechanic Lien Claimant for purposes of this Section and Section VI below.<br><br>With respect to each Property, if a Mechanic's Lien Claimant establishes that its lien is senior in priority to the 1st Lien Lenders' lien, then:<br><br>(i) if the Property is sold to a Winning Bidder other than the 1st Lien Lenders, then the Mechanic's Lien Claimant's lien shall attach to the sale proceeds in the same validity, extent, and priority as of the Petition Date, and shall be paid in full, or as otherwise agreed by the Mechanic's Lien Claimant, from such sale proceeds on the on the date that is thirty (30) days following the later of the Effective Date, and the date of entry of a court order allowing the Claim of the Mechanic's Lien Claimant and/or determining that the lien of the Mechanic's Lien Claimant is senior in priority to the 1st Lien Lenders' lien; or<br><br>(ii) if the Property is sold to the 1st Lien Lenders by way of credit bid, then the Mechanic's Lien Claimant shall retain its lien on the Property, until the satisfaction the Mechanic's Lien Claimant's Allowed Claim in full, or as otherwise agreed by the Mechanic's Lien Claimant, at which time the lien shall be released and the 1st Lien Lenders shall retain title to the Property free and clear of such lien.<br><br>Mechanic's Lien Claimants who are unable to establish that they hold a lien that is senior in priority to the 1st Lien Lenders' lien will be paid in accordance with the treatment afforded to General Unsecured Trade Creditors in Classes 9(a)-(d).<br><br>LCPI believes that the 1st Lien Lenders have claims to assert their first priority liens over all other interests asserted in each of the Properties, including any mechanic's liens. LCPI believes that if the 1st Lien Lenders prevail on any such claims, it is likely that any other party asserting an interest in the |

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

| Secured Claims – SunCal Master Estate | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Properties, including the Mechanic's Lien Claimants, would not be entitled to any recovery from any proceeds from the sale of the Properties. The treatment provided herein shall be in full settlement and satisfaction of the Secured Claims of the Mechanic's Lien Claimants. |

### 3. Classes of Priority Unsecured Claims

Certain Priority Claims that are referred to in Bankruptcy Code §§ 507(a)(4), (5), (6), and (7) are required to be placed in Classes. The Bankruptcy Code requires that each Holder of the above Priority Claims receive Cash on the Effective Date equal to the allowed amount of such Claim. However, a Class of unsecured Priority Claim Holders may vote to accept deferred Cash payments of a value, as of the Effective Date, equal to the allowed amount of such Claim.

The Trustee does not believe that there are any valid Priority Claims. However, out of an abundance of caution, the following chart lists all Classes containing the Debtors' Bankruptcy Code §§ 507(a)(4), (5), (6), and (7) Priority Claims and their treatment under the Plan:

| Priority Unsecured Claims | | | |
|---|---|---|---|
| Class # | Description | Impaired (Y/N) | Treatment |
| 5(a)-(d) | Priority unsecured claims pursuant to 11 U.S.C. §§ 507(a)(6) and (7) Estimated total amount of claims: $0.00 | Y | Allowed Priority Unsecured Claims in Classes 5(a)-(d) shall be paid in full, subject to any statutory maximum, in Cash on the later of the following dates: (i) the Effective Date; (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Claim; and (iii) receipt of sufficient unencumbered funds to pay such Allowed Priority Unsecured Claim. |
| 6(a)-(d) | Priority wage claims pursuant to 11 U.S.C. §§ 507(a)(4) and (5) Estimated total amount of claims: $0.00 | Y | Allowed Priority Unsecured Claims in Classes 6(a)-(d) shall be paid up to the $10,950 statutory maximum, in Cash on the later of the following dates: (i) the Effective Date; (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Unsecured Claim; and (iii) receipt of sufficient unencumbered funds to pay such Allowed Priority Unsecured Claim. |

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

| Priority Unsecured Claims | | | |
|---|---|---|---|
| Class # | Description | Impaired (Y/N) | Treatment |
| | | | Any Allowed Claim amounts in excess of $10,950 will be subject to the treatment afforded Claims in Classes 9(a)-(d). |

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

### 4. Classes of Unsecured Claims

General Unsecured Claims are unsecured Claims that are not entitled to priority under 11 U.S.C. § 507(a) and include the Unsecured Deficiency Claims of the Lien Lenders. Below is a summary of the Plan's treatment of the Classes containing the Debtors' General Unsecured Claims.

a. Unsecured Deficiency Claim of the 1st Lien Lenders

Classes 7(a)-(d) consists of the 1st Lien Lenders' Allowed Unsecured Deficiency Claim. The treatment proposed herein shall be in full satisfaction of the 1st Lien Lenders' Allowed Unsecured Deficiency Claim(s) against each of the Debtors.

i. Calculation of Unsecured Deficiency Claim. On the Effective Date, the 1st Lien Lenders shall have an Allowed Unsecured Deficiency Claim in the aggregate amount of the 1st Lien Lenders' Allowed Claim, less the amount of the 1st Lien Lenders' Allowed Secured Claim.

ii. The 50/50 Distribution Scheme. On each Distribution Date, until the earlier of (a) the payment of all Allowed Unsecured Trade Claims in full; (b) the payment of the Allowed Claims of the Lien Lenders (the "Lien Lender Claims") in full; and (c) the termination of the Amended Term Sheet in accordance with its terms, 50% of any Net Other Recoveries available for distribution shall be paid to LCPI, in its capacity as administrative agent for the 1st Lien Lenders. The remaining 50% of the Net Other Recoveries available for distribution shall be retained by the Liquidating Trustee free and clear of any liens, Claims, interests or encumbrances to be distributed in accordance with the terms of the Plan and shall be referred to hereinafter as the "Trade Creditor Allocation." After all Allowed Unsecured Trade Claims are paid in full, on each Distribution

Date, any Net Other Recoveries shall be distributed on a *pro rata* basis to the Lien Lenders on account of their Allowed Unsecured Deficiency Claims, subject to the Intercreditor Agreement.

iii. Alternative Distribution Scheme. To the extent that the Court or other court of competent jurisdiction determines that the Intercreditor Agreement does not require that all Net Other Recoveries must be paid to the 1st Lien Lenders, then, on each Distribution Date, Net Other Recoveries shall be distributed on a *pro rata* basis to the respective administrative agents for the Holders of Allowed Class 8 Unsecured Deficiency Claims and to the Holders of Allowed Class 7 Unsecured Deficiency Claims. In addition, the 1st Lien Lenders' Allowed Unsecured Deficiency Claim(s) of the 1st Lien Lenders shall be deemed assigned (the "Assigned 1st Lien Lenders' Unsecured Deficiency Claim(s)") to the Liquidating Trustee to the extent necessary to provide the Liquidating Trustee with 50% of the amount of the Net Other Recoveries being distributed. As a result, on each Distribution Date, the 1st Lien Lenders' Pro Rata Share of the Net Other Recoveries being distributed shall be retained by the Liquidating Trustee up to 50% of the total amount of Net Other Recoveries being distributed, and any excess shall be distributed to LCPI, in its capacity as administrative agent for the 1st Lien Lenders. The amount retained by the Liquidating Trustee pursuant to this paragraph shall be retained free and clear of any liens, Claims, interests or encumbrances, and shall be distributed in accordance with the terms of the Plan. After all Allowed Unsecured Trade Claims are paid in full, any remaining Net Other Recoveries retained on account of the Assigned 1st Lien Lenders' Unsecured Deficiency Claim(s) shall be distributed to LCPI, in its capacity as the administrative agent for the 1st Lien Lenders.

iv. Determination of Distribution Scheme. Notwithstanding anything herein to the contrary, the Liquidating Trustee shall not distribute any Net Other Recoveries to the Lien Lenders in accordance with this Section, until the Court or other court of competent jurisdiction enters a Final Order determining whether the Intercreditor Agreement requires that, among the Lien Lenders, all Net Other Recoveries must be paid to the 1st Lien

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Lenders. Within a reasonable time following the Liquidating Trustee's receipt of any Net Other Recoveries, the Liquidating Trustee will interplead fifty percent (50%) of the Net Other Recoveries to be distributed (the "Interpled Funds") with the Court for a determination of the Lien Lenders' rights under the Intercreditor Agreement with respect to the Interplead Funds. Nothing herein prevents the Lien Lenders from seeking an earlier adjudication of their rights under the Intercreditor Agreement with respect to any Net Other Recoveries from the Court or other court of competent jurisdiction.

b. Unsecured Claims Other Than the Unsecured Deficiency Claim of the 1st Lien Lenders

| General Unsecured Claims | | | |
|---|---|---|---|
| Class # | Description | Impaired (Y/N) | Treatment |
| 8(a)-(d) | Contractually Subordinated Unsecured Deficiency Claims of the 2nd Lien Lenders and the 3rd Lien Lenders<br><br>Estimated total amount of claims: $160,000,000.00, plus accrued and unpaid interest calculated through September 10, 2008 | Y | Classes 8(a)-(d) consist of the 2nd Lien Lenders' Unsecured Deficiency Claim and the 3rd Lien Lenders' Unsecured Deficiency Claim.<br><br>The Holders of Allowed Class 8 Unsecured Deficiency Claims shall not receive any Distributions on account of such Claims; provided, however, to the extent that the Court or other court of competent jurisdiction determines, as provided in Section II.E.4.a.iv. above, that the Intercreditor Agreement does not require that all Net Other Recoveries must be paid to the 1st Lien Lenders, then Net Other Recoveries shall be distributed on a *pro rata* basis to the Holders of Allowed Class 8 Unsecured Deficiency Claims and to the Holders of Allowed Class 7 Unsecured Deficiency Claims, as follows:<br><br>(i) On each Distribution Date, the administrative agent for the 2nd Lien Lenders will receive for the benefit of the 2nd Lien Lenders the 2nd Lien Lenders' Pro Rata Share of the Net Other Recoveries being distributed, less the amounts discussed in paragraph (ii) immediately below, and the administrative agent for the 3rd Lien Lenders will receive for the benefit of the 3rd Lien Lenders the 3rd Lien Lenders' Pro Rata Share of the Net Other Recoveries being distributed, less the amounts discussed in paragraph (ii) immediately below; and<br><br>(ii) The Allowed 2nd Lien Lender Unsecured Deficiency Claim of LCPI (the "Assigned LCPI 2nd Lien Lender Unsecured Deficiency Claim") and the Allowed 3rd Lien Lender Unsecured |

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

| General Unsecured Claims | | | |
|---|---|---|---|
| Class # | Description | Impaired (Y/N) | Treatment |
| | | | Deficiency Claim of LCPI (the "Assigned LCPI 3rd Lien Lender Unsecured Deficiency Claim") shall be deemed assigned to the Liquidating Trustee to the extent that the Assigned 1st Lien Lenders' Unsecured Deficiency Claim(s) did not provide the Liquidating Trustee 50% of the amount of the Net Other Recoveries being distributed. On each Distribution Date, (1) the amount of the 2nd Lien Lenders' Pro Rata Share of the Net Other Recoveries attributable to the Assigned LCPI 2nd Lien Lender Unsecured Deficiency Claim, and (2) the amount of the 3rd Lien Lenders' Pro Rata Share of the Net Other Recoveries attributable to the Assigned 3rd Lien Lender Unsecured Deficiency Claim shall be retained by the Liquidating Trustee up to the point that 50% of the total amount of Net Other Recoveries being distributed has been retained by the Liquidating Trustee, and any excess shall be distributed to LCPI. The amount retained by the Liquidating Trustee pursuant to this paragraph shall be retained free and clear of any liens, Claims, interests or encumbrances, and shall be distributed in accordance with the terms of the Plan. Notwithstanding the foregoing, after all Allowed Unsecured Trade Claims are paid in full, any remaining Net Other Recoveries retained on account of the Assigned LCPI 2nd Lien Lender Unsecured Deficiency Claim or on account of the Assigned LCPI 3rd Lien Lender Unsecured Deficiency Claim shall be distributed to LCPI.<br><br>The treatment proposed herein shall be in full satisfaction of the 2nd Lien Lenders' Unsecured Deficiency Claim and the 3rd Lien Lenders' Unsecured Deficiency Claim against each of the Debtors. |
| 9(a)-(d) | Unsecured Trade Claims, which includes any Bond Indemnification Claims<br><br>Estimated total amount of claims: $60,000,000.00 (est.) | Y | Class 9 is four (4) separate Classes, one Class of General Unsecured Trade Claims against each Debtor. For avoidance of doubt, any Bond Indemnification Claims are treated in Classes 9(a)-(d) and are considered Unsecured Trade Claims. Any Distributions made to the Holders of Allowed Unsecured Trade Claims will be on a consolidated basis. However, for purposes of voting, each Class of General Unsecured Trade Claims will be considered separately.<br><br>On each Distribution Date, the Holders of Allowed Unsecured Trade Claims will receive their respective Pro Rata Shares from Available Cash. |

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc Main Document Page 28 of 125

| General Unsecured Claims | | | |
|---|---|---|---|
| Class # | Description | Impaired (Y/N) | Treatment |
| | | | The treatment proposed herein shall be in full satisfaction of the Allowed Unsecured Trade Claims. |

**5. Class of Interest Holders**

Interest holders are the parties who hold membership Interests (*i.e.*, equity interests) in the Debtors. Each Debtor is a Delaware limited liability company in which the owners hold Membership Interests. The following chart identifies the Plan's treatment of the Class of Interest Holders.

| Interest Holders | | | |
|---|---|---|---|
| Class # | Description | Impaired (Y/N) | Treatment |
| 10(a)-(d) | Interest Holders | Y | On the Effective Date, all existing membership Interests in each Debtor will be cancelled, annulled, and extinguished. No distribution of any kind will be made on account of any existing membership Interests. |

## III. MEANS OF EFFECTUATING THE PLAN

This Section is intended to explain how the Trustee intends to effectuate the liquidation contemplated by the Plan, and how the Trustee intends to fund the obligations to Holders of Allowed Claims as provided in the Plan. This Section provides information regarding the funding sources for Plan obligations, the establishment of the Liquidating Trust, and other material issues bearing upon performance of the Plan, such as the sale of the Properties. The Plan will be effectuated through the sale of the Properties, and the vesting of all other Assets, including, but not limited to, any Avoidance Actions and other Causes of Action, in the Liquidating Trust to be managed and administered by the Liquidating Trustee.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

A. **The Sale of the Properties**

1. **The Auction**

Under the Plan, each Property will be sold by auction (the "Auction") to the 1st Lien Lenders and/or one or more third parties in accordance with and subject to the overbid procedures to be provided and approved by the Court and attached hereto as Exhibit "3" (the "Overbid Procedures"). The 1st Lien Lenders acting collectively shall be the initial bidder with respect to each of the Properties. As further discussed in Section II.E.2.a. above and the Overbid Procedures, the 1st Lien Lenders' initial aggregate credit bid for all the Properties taken together shall be in the amount of the Aggregate Minimum Credit Bid Amount, and, with respect to each Property, the 1st Lien Lenders shall be entitled to increase their credit bid to an amount in excess of the highest competing bid for such Property, if any, up to the Allocated Maximum Credit Bid Amount for the Property. Any party wishing to submit a competing bid and participate in the Auction must be deemed a "Qualified Bidder" (as defined in the Overbid Procedures) and must otherwise comply with the Overbid Procedures.

2. **The Transfer of Title**

With respect to each Property, on the later of the Effective Date or the close of escrow, or as soon as reasonably practicable thereafter, the Trustee shall sell and transfer to the Winning Bidder all right, title, and interest of the Estate in and to such Property. Properties for which the 1st Lien Lenders are determined to be the Winning Bidder by way of credit bid shall be transferred to the 1st Lien Lenders subject to: (i) the lien of the 1st Lien Lenders; (ii) Senior Liens; and (iii) Permitted Liens. Properties sold to Winning Bidder(s) other than the 1st Lien Lenders shall be sold free and clear of all liens, Claims, encumbrances, and/or other interests, except, however, the Permitted Liens, which shall not include any Senior Liens.

3. **The Surety Bonds**

The Bond Companies assert that surety bonds were executed on behalf of all or some of the Subsidiary Debtors as a principal for its respective Property (the "Surety

Bonds"). Such Surety Bonds will not be transferred by the Trustee to the Winning Bidder(s), and, if a Winning Bidder(s) determines to develop the Property(ies), the Surety Bonds will not apply to the Winning Bidder(s)' bonding requirements with respect to such development. If a Winning Bidder(s) determines to develop all or a portion of its respective Property(ies), it will be required at that time to obtain new Surety Bonds from the Bond Companies, or another surety, to the extent surety bonds are required by applicable state and local development requirements.

**B. The Funding of the Plan**

The Plan will be funded from three potential sources of Cash: (1) the Administrative Funds; (2) any Net Other Recoveries; and (3) the Trustee's Participation. The Administrative Funds will be used by the Trustee to pay Allowed Administrative Expense Claims on the Effective Date and to make any other Effective Date Payments under the Plan, and any remaining Administrative Funds shall be transferred to the Liquidating Trust to be distributed and administered in accordance with the terms of the Plan. Distributions following the Effective Date will be made from any Net Other Recoveries and the Trustee's Participation, which will be paid to the Liquidating Trust to be distributed and administered in accordance with the terms of the Plan.

**C. Transfer of Estate Assets**

Upon the Effective Date, the Assets, including, but not limited to, Avoidance Actions and other Causes of Action, the Administrative Funds, and the Estates' right in and to Other Recoveries and the Trustee's Participation, shall be deemed transferred to and vested in the Liquidating Trust in accordance with the Plan. The Trustee is authorized to execute and deliver or cause to be executed and delivered all such documents as necessary or appropriate to transfer and vest title in and possession of the Assets to the Liquidating Trust. However, notwithstanding anything herein to the contrary, the Trustee shall have authority to pay from the Administrative Funds Administrative Expense Claims Allowed as of the Effective Date and other Effective Date Payments. Thereafter, such payments shall be made by the Liquidating Trustee.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**D. Dissolution of the Debtors**

On the Effective Date, each of the Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith.

**E. Liquidating Trust**

**1. Establishment of the Liquidating Trust**

The Liquidating Trust shall be established and shall become effective on the Effective Date. The Liquidating Trust is created pursuant to the Plan and the Confirmation Order, and no separate trust instrument shall be required. The primary purpose of the Liquidating Trust is the liquidation and distribution of the Assets transferred to it, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. The Liquidating Trust shall hold and administer the Assets of the Debtors, including, but not limited to, any Avoidance Actions or other Causes of Action, and the proceeds thereof for liquidation and distribution in accordance with the terms of the Plan.

**2. Trust Distributions**

The Liquidating Trustee shall liquidate the Assets, including, but not limited to, Avoidance Actions or other Causes of Action, and shall distribute any Other Recoveries, Net Other Recoveries, and/or Available Cash in accordance with the terms of the Plan. All Distributions to the Holders of Allowed Claims shall be from the Liquidating Trust. Persons dealing with the Liquidating Trustee, or seeking to assert Claims against the Debtors, the Estates or the Liquidating Trust, shall look only to property of the Debtors, the Estates or the Liquidating Trust to satisfy any liability to such Persons, and the Liquidating Trustee shall have no corporate, personal, or individual obligation to satisfy any such liability.

**3. Duration of the Trust**

The Liquidating Trust shall have an initial term of five (5) years; provided, however, that, the term of the Liquidating Trust may be extended for a finite term upon a finding of

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

"cause" by the Court. The Liquidating Trustee may seek an extension of the Liquidating Trust's term by Motion filed by the expiration of the term to be extended. The Liquidating Trust may be terminated earlier than its scheduled termination if (a) the Court has entered a Final Order closing the Cases pursuant to 11 U.S.C. § 350(a) and (b) the Liquidating Trustee has administrated all assets of the Liquidating Trust and performed all other duties required by the Plan.

**4. Liquidation of Avoidance Actions and Actions**

On or after the Effective Date, the Liquidating Trustee shall have sole authority and responsibility for investigating, analyzing, commencing, prosecuting, litigating, compromising, collecting, and otherwise administering Avoidance Actions and other Causes of Action. Unless an Avoidance Action or Cause of Action is expressly waived, relinquished, compromised or settled as provided or identified in the Plan, the Confirmation Order, or any other order of the Court, the Liquidating Trust expressly reserves any Avoidance Action or Cause of Action for later adjudication. Therefore, no preclusion doctrine, including, without limitation, the doctrine of *res judicata*, collateral estoppel (judicial, equitable or otherwise) or laches shall apply to such Avoidance Action or Cause of Action upon or after confirmation or consummation of the Plan.

**5. Liquidating Trustee**

a. Appointment

The appointment of the Liquidating Trustee shall be effective as of the Effective Date.

b. Term

Unless the Liquidating Trustee resigns, dies or is removed by Court order earlier, the Liquidating Trustee's term shall expire upon termination of the Liquidating Trust pursuant to the Plan. In the event the Liquidating Trustee resigns, dies or is removed by Court order prior to termination of the Liquidating Trust, the OUST shall select and recommend to the Court a successor trustee.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

c.    Powers and Duties

On the Effective Date, the Liquidating Trustee shall have the rights, powers and duties set forth in the Plan, the Confirmation Order, and Bankruptcy Code §§ 505, 1107 and 1108.  The Liquidating Trustee shall be governed in all things by the terms of the Plan and the Confirmation Order.  The Liquidating Trustee shall administer the Liquidating Trust in accordance with the Plan.  Without limitation, the Liquidating Trustee shall file final federal, state, foreign and, to the extent applicable, local, tax returns.  Without further Motion, notice, or order of the Court, the Liquidating Trustee shall be authorized, empowered and directed to take all actions necessary to comply with the Plan and exercise and fulfill the duties and obligations arising thereunder, including, without limitation to:

    i.    employ, retain, and replace one or more attorneys, accountants, auctioneers, brokers, managers, consultants, other professionals, agents, investigators, expert witnesses, consultants, and advisors as necessary to discharge the duties of the Liquidating Trustee under the Plan;

    ii.    control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors pursuant to the terms of the Plan;

    iii.    open, maintain and administer bank accounts as necessary to discharge the duties of the Liquidating Trustee under the Plan;

    iv.    make Distributions to the Holders of Allowed Claims in accordance with the Plan;

    v.    retain professionals to assist in performing his or her duties under the Plan;

    vi.    pay reasonable and necessary professional fees, costs, and expenses;

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

vii.  investigate, analyze, commence, prosecute, litigate, compromise, settle, dismiss, and otherwise administer all Causes of Action and Avoidance Actions for the benefit of the Liquidating Trust and its beneficiaries, as set forth in the Plan, and to take all other necessary and appropriate steps to collect, recover, settle, liquidate, or otherwise reduce to Cash all Causes of Action and Avoidance Actions, as the Liquidating Trustee may determine is in the best interests of the Liquidating Trust;

viii.  administer, sell, liquidate, or otherwise dispose of the Assets in accordance with the terms of the Plan;

ix.  incur and pay reasonable and necessary expenses in connection with the performance of the Liquidating Trustee's duties under the Plan;

x.  represent the Estates before the Court and other courts of competent jurisdiction with respect to matters concerning the Liquidating Trust;

xi.  seek the examination of any entity under and subject to the provisions of Bankruptcy Rule 2004;

xii.  comply with applicable orders of the Court and any other court of competent jurisdiction over the matters set forth in the Plan;

xiii.  comply with all applicable laws and regulations concerning the matters set forth in the Plan;

xiv.  exercise such other powers as may be vested in the Liquidating Trust pursuant to the Plan, the Confirmation Order, or other Final Orders of the Court;

xv.  execute any documents, instruments, contracts, and agreements necessary and appropriate to carry out the powers and duties of the Liquidating Trust;

xvi.  (1) seek a determination of tax liability under § 505 of the Code, (2) pay taxes, if any, related to a Debtor, (3) file, if necessary, any and all

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

tax and information returns required with the respect to the Liquidating Trust, including, if appropriate, treating the Liquidating Trust as a "grantor trust" pursuant to Treas. Reg. 1.671-4 or otherwise, (4) make tax elections by and on behalf of the Liquidating Trust, and (5) pay taxes, if any, payable by the Liquidating Trust; and

xvii. stand in the shoes of the Debtors for all purposes.

d. Retention of Professionals and Compensation Procedure

On and after the Effective Date, the Liquidating Trustee may, without further application or Motion, notice, hearing, or Court order, engage or employ such professionals and experts as may be deemed necessary and appropriate by the Liquidating Trustee to assist the Liquidating Trustee in carrying out the provisions of the Plan, including, but not limited to, the Professionals retained prior to the Effective Date by either the Trustee or the Committee. The Liquidating Trustee may employ such professionals on any reasonable terms and conditions of employment to be determined by the Liquidating Trustee. For the services performed on and after the Effective Date, the professionals engaged by the Liquidating Trustee (the "Liquidating Trustee Professionals") shall receive reasonable compensation and reimbursement of expenses in a manner to be determined by the Liquidating Trustee.

e. Fees and Expenses

The Liquidating Trustee and the Liquidating Trustee Professionals shall be entitled to reasonable compensation for their services, and reimbursement of expenses. The Liquidating Trustee shall be paid on an hourly basis at the rate of $575.00, as may be increased from time to time as is consistent with the Liquidating Trustee's ordinary practices. Compensation of the Liquidating Trustee and the costs and expenses of the Liquidating Trust (including, without limitation, fees and expenses of the Liquidating Trustee Professionals) shall be paid from the Liquidating Trust. The Liquidating Trustee shall pay, without further order, notice, or application to the Court, the reasonable fees

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

and expenses of the Liquidating Trustee and the Liquidating Trustee Professionals, as necessary to discharge the Liquidating Trustee's duties under the Plan. The Liquidating Trustee shall be authorized to reserve funds from the Liquidating Trust as is reasonable to pay the expenses and fees of the Liquidating Trustee and the Liquidating Trustee Professionals before making any Distributions under the Plan.

f. Limitation of Liability and Indemnification

Neither the Liquidating Trustee nor his or her employees, Liquidating Trustee Professionals or agents shall be liable (a) for any loss or damages by reason of any action taken or omitted by him or her, except in the case of fraud, willful misconduct, bad faith, or gross negligence, or (b) for any act or omission made in reliance upon the Debtors' books and records or upon information or advice given to the Liquidating Trustee by his or her professionals. Except as otherwise provided in this Plan, the Liquidating Trustee shall rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, consent, or other document believed by him or her to be genuine and to have been signed by the proper party or parties.

The Liquidating Trustee and his or her employees, Liquidating Trustee Professionals or agents (collectively, the "Indemnified Parties" and each, an "Indemnified Party") shall be indemnified and receive reimbursement from and against any and all loss, liability, expense (including attorneys' fees) or damage of any kind, type or nature, which the Indemnified Party may incur or sustain in the exercise and performance of any of the Liquidating Trustee's powers and duties under this Plan or the Confirmation Order, or in the rendering of services by the Indemnified Party to the Liquidating Trustee, to the full extent permitted by applicable law, except if such loss, liability, expense or damage is finally determined by a court of competent jurisdiction to result from the Liquidating Trustee's or an Indemnified Person's fraud, willful misconduct, bad faith, or gross negligence. The amounts necessary for such indemnification and reimbursement shall be paid by the Liquidating Trustee out of the Liquidating Trust assets. The Liquidating Trustee shall not be personally liable for the payment of any Liquidating Trust expense or

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

claim or other liability of the Liquidating Trust, and no Person shall look to the Indemnified Parties personally for the payment of any such expense or liability. This indemnification shall survive the death, resignation or removal, as may be applicable, of the Liquidating Trustee, or the termination of the Liquidating Trust, and shall inure to the benefit of the Liquidating Trustee's and the Indemnified Person's heirs and assigns.

g. Liquidating Trustee as Successor

Pursuant to Code § 1123(b), the Liquidating Trustee shall be the successor to the Debtors and the Trustee for all purposes. The Liquidating Trustee shall stand in the same position as the Debtors with respect to any claim the Debtors may have to an attorney-client privilege, the work product doctrine, or any other privilege against production, and the Liquidating Trust shall succeed to all of the Debtors' rights to preserve, assert, or waive any such privilege.

h. Compromising Claims

As of the Effective Date, the Liquidating Trustee is authorized to compromise any and all Causes of Action and Claims and to execute documents necessary to effectuate such compromises without further Motion, notice, hearing or order of the Court.

i. Vesting of Assets

On the Effective Date, all Assets including, without limitation, all right, title, and interest in any personal or real property, Cash, the Administrative Funds, the Trustee's Participation, Other Recoveries, the contractual interests, general intangibles, Causes of Action, Avoidance Actions of the Debtors and/or the Estates shall be transferred to and vest in the Liquidating Trust free and clear of all Claims, liens, encumbrances, or other interests (unless otherwise stated expressly in the Plan).

**6. Liquidating Trustee as Disbursing Agent**

The Liquidating Trustee shall make all Distributions required under the Plan, subject to the terms and provisions of the Plan. The Liquidating Trustee shall make continuing efforts to dispose of the Liquidating Trust's assets, make Distributions, and not unduly prolong the duration of the Liquidating Trust.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**7. Bond**

The Liquidating Trustee shall be required to post a bond or surety or other security for the performance of his or her duties under the Plan.

**8. Federal Income and Taxation of the Liquidating Trust**

For federal income tax purposes, the Liquidating Trust is a "liquidating trust" within the meaning of Treasury Income Tax Regulation Section 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 124. The transfer of assets to the Liquidating Trust under the Plan is treated as a deemed transfer to the Persons entitled to receive Distributions under the Plan followed by a deemed transfer of assets by such Persons to the Liquidating Trust. The Persons entitled to receive Distributions under the Plan will be deemed the grantors and owners of the Liquidating Trust and its assets. The Liquidating Trust will be taxed as a "grantor trust" within the meaning of IRC Sections 671-677 (a non-taxable pass-through tax entity) owned by the Persons entitled to receive Distributions under the Plan. The Liquidating Trust will file federal income tax returns as a grantor trust under IRC Section 671 and Treasury Income Tax Regulation Section 1.671-4 and report, but not pay tax on, the Liquidating Trust's tax items of income, gain, loss deductions, and credits ("Tax Items"). The Persons entitled to receive Distributions under the Plan will report such Tax Items on their federal income tax returns and pay any resulting federal income tax liability. The Liquidating Trust and the Persons entitled to receive Distributions under the Plan will use consistent valuations of the assets transferred to the Liquidating Trust for all federal income tax purposes, such valuations to be determined by the Liquidating Trustee.

**9. Beneficiaries**

The Holders of Allowed Claims under the Plan, or any successors to such Holders' Allowed Claims ("Beneficiary" or "Beneficiaries") shall own a beneficial interest in the Liquidating Trust which shall, subject to the Plan, be entitled to a Distribution, if any, in the amounts, and at the times, set forth in the Plan. Ownership of a beneficial interest in the Liquidating Trust shall not be evidenced by any certificate, security, or receipt or in any

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

other form or manner whatsoever, except as maintained on the books and records of the Liquidating Trust by the Liquidating Trustee. The ownership of a beneficial interest in the Liquidating Trust shall not entitle any Beneficiary to any title in or to the Liquidating Trust assets or to any right to call for a partition or division of such assets or to require an accounting. The Liquidating Trustee shall make Distributions, if any, to Beneficiaries in the manner provided in the Plan.

The rights of the Beneficiaries arising under the Liquidating Trust may be deemed "securities" under applicable law. However, such rights have not been defined as "securities" under the Plan because (a) the intent of the Plan is that such rights shall not be securities, and (b) if the rights arising under the Liquidating Trust are deemed to be "securities," the exemption from registration under § 1145 of the Bankruptcy Code is intended to be applicable to such securities.

**F. Release of Liens**

Except as otherwise expressly provided in the Plan, the Confirmation Order, or in any document, instrument or other agreement created in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens, or other security interests in or against the Assets shall be released, and the sale of the Properties to the Winning Bidder(s) shall be free and clear of any and all mortgages, deeds of trust, liens, or other security interests in or against the Properties.

**G. Changes in Rates Subject to Regulatory Commission Approval**

The Debtors are not subject to governmental regulatory commission approval of their rates.

**H. Exemption from Transfer Taxes**

Pursuant to Bankruptcy Code § 1146(a), any transfers from any of the Debtors to the Liquidating Trust or to any other Person pursuant to the Plan in the United States shall not be subject to any stamp, real estate transfer, personal property, recording or other similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc Main Document Page 40 of 125

assessment and to accept for filing and recordation any of the foregoing instruments or other documents without payment of any such tax or governmental assessment.

## IV. DISTRIBUTIONS

### A. Dates of Distributions

Effective Date Payments shall be deemed timely made if made as soon as practicable after the Effective Date, but, in any event, within fifteen (15) days of the Effective Date. Any Distribution required to be made when a Disputed Claim becomes an Allowed Claim shall be deemed timely made if made as soon as practicable thereafter, but, in any event, within fifteen (15) days thereafter.

### B. Manner of Distribution

At the option and in the sole discretion of the Liquidating Trustee, monetary Distributions may be made by (i) wire transfers from, or (ii) a check drawn on a domestic bank approved by the OUST.

### C. Delivery of Distributions in General

Distributions to Holders of Allowed Claims shall be made by the Liquidating Trustee (a) at the addresses set forth on the Proof of Claim filed by such Holders, (b) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Liquidating Trustee has not received a written notice of a change of address, or (c) in the case of a Holder of a Claim that is governed by an agreement and is administered by an agent or servicer, at the address (i) set forth on any Proof of Claim filed by the agent or servicer, (ii) in the Schedules for the agent or servicer if no Proof of Claim has been filed, or (iii) contained in the official records of such agent or servicer. Holders of Claims may change the address to which Distributions will be sent by filing a written change of address with the Court and serving a copy of the change of address on the Liquidating Trustee.

If a Distribution to any Holder of an Allowed Claim is returned to the Liquidating Trustee as undeliverable or otherwise unclaimed ("Undeliverable Distribution"), the Liquidating Trustee shall make no further Distributions to such Holder unless and until the

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Liquidating Trustee is notified in writing of such Holder's then-current address, at which time all Undeliverable Distributions shall be made to such Holder without interest. All Undeliverable Distributions shall be returned to the Liquidating Trustee until such Undeliverable Distributions are claimed. The Liquidating Trustee shall, in the case of Cash, hold Undeliverable Distributions in a segregated interest-bearing account for Undeliverable Distributions until such Undeliverable Distributions become deliverable, is claimed or is forfeited. Nothing contained in the Plan shall require the Liquidating Trustee, or anyone else, to attempt to locate the intended recipient of an Undeliverable Distribution.

Any Holder of an Allowed Claim that does not present itself within six (6) months of the Distribution Date upon which the Undeliverable Distribution was made shall be deemed to have forfeited its right or Claim to or interest in the Undeliverable Distribution and shall be forever barred and enjoined from asserting any Claim for the Undeliverable Distribution against the Debtors and their Estates, the Liquidating Trustee, the Liquidating Trust, and their respective agents, attorneys, representatives, employees or independent contractors, and/or any of its or their property. In such cases, the Undeliverable Distribution and accrued interest thereon shall become property of the Liquidating Trust free and clear of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be distributed in accordance with the terms of this Plan.

**D. Rounding of Payments**

The Liquidating Trustee shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

**E. Interest on Claims**

Unless otherwise specifically provided for in the Plan, post-petition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**F. Compliance with Tax Requirements**

In connection with this Plan and all Distributions under this Plan, the Liquidating Trustee shall, to the extent applicable, comply with all tax withholding, payment and reporting requirements imposed by federal, state, or local taxing authorities. The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. All amounts properly withheld from Distributions to a Holder of a Claim as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder. All persons holding Claims shall be required to provide any information necessary to effect information reporting and withholding of such taxes. If such information has not been received by the Liquidating Trustee, then the Liquidating Trustee may, at his option, withhold the amount required and distribute the balance to such Holder or decline to make the Distribution until the information is received.

Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Liquidating Trustee for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Liquidating Trustee in connection with such Distribution. Any property to be distributed pursuant to the Plan shall, pending implementation of such arrangements, be treated as an Undeliverable Distribution pursuant to Section IV.C. above.

**G. De Minimis Distributions**

The Liquidating Trustee shall not have any obligation to make a Distribution on account of an Allowed Claim if the amount to be distributed to the specific Holder of the

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Allowed Claim on a Distribution Date is for an amount of $5.00 or less, and may, at the Liquidating Trustee's option, either add the Distribution to the next Distribution if the collective amount would be greater than $5.00, or treat the Distribution as an Undeliverable Distribution.

**H. Setoffs**

Except as otherwise provided in the Plan, the Liquidating Trustee may, pursuant to 11 U.S.C. § 553 or applicable non-bankruptcy law, but shall not be required to, set off against any Allowed Claim and the Distribution to be made pursuant to the Plan on account of such Allowed Claim any account stated, Claim, right, or Cause of Action which the Debtors or the Estates possess against the Holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim shall constitute a waiver or release by the Liquidating Trustee of any such account, Claim, right, and Cause of Action that the Debtors of the Estates may possess against the Holder of such Allowed Claim.

**I. Limitation on Liability**

The Trustee, the Committee, the Liquidating Trustee, and any of their respective employees, members, officers, directors, shareholders, agents, or professionals shall not be liable for (i) any acts or omissions, except for willful misconduct, in connection with implementing the Distribution provisions of the Plan and the making or withholding of Distributions under the Plan, or (ii) any change in the value of Distributions made under the Plan resulting from any delays in making such Distributions in accordance with the terms of the Plan (including, but not limited to, any delays caused by the resolution of Disputed Claims).

**V. CLAIM OBJECTIONS AND DISPUTED CLAIMS**

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE BY CLAIMANTS WHOSE CLAIMS WERE NOT SCHEDULED OR WERE SCHEDULED AS DISPUTED, CONTINGENT OR UNLIQUIDATED WAS MARCH 20, 2009.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**A. Standing**

As of the Effective Date, the Liquidating Trustee shall have the sole and exclusive right to file objections to Claims. The Liquidating Trustee may settle or compromise any Disputed Claim without approval or order of the Court, notice, or hearing. The Liquidating Trustee shall replace the Trustee or the Debtors as the real party in interest in any objections to Claims commenced prior to the Effective Date.

**B. Claims Objection Deadline**

Unless extended by the Court, any objection to a Claim must be filed with the Court and served on the Holder of the Claim within one hundred eighty (180) days of the Effective Date (the "Claims Objection Deadline"). The Liquidating Trustee may seek an extension of the Claims Extension Deadline upon a showing of "cause." Any Motion for an extension of the Claims Objection Deadline must be Filed with the Court prior to the Claims Objection Deadline, as the same may be extended, and served on the OUST. There is no limit to the number of extensions that may be sought.

**C. No Distribution Pending Allowance**

Notwithstanding any other provision of the Plan, no payments or Distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim; provided, however, that if the only dispute regarding a Disputed Claim is to the amount of the Disputed Claim, the Holder of a Disputed Claim shall be entitled to a Distribution on account of that portion of the Disputed Claim which the Liquidating Trustee does not dispute at the time and in the manner that the Liquidating Trustee makes Distributions to the Holders of Allowed Claims pursuant to the provisions of the Plan.

**D. Reserves for Disputed Claims**

In the event that Disputed Claims are pending at the time of a Distribution under the Plan, the Liquidating Trustee shall establish and maintain a reserve for such Disputed Claims. For purposes of establishing a reserve, Cash will be set aside equal to the

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

amount that would have been distributed to the Holders of the Disputed Claims had the Disputed Claims been Allowed on the date a Distribution is made to the Holders of Allowed Claims in the same Class or of the same priority as the Disputed Claims. If a Disputed Claim ultimately becomes an Allowed Claim, the amount of Cash reserved for that Disputed Claim shall be distributed on the earlier of (a) the Distributed Date following the date when the Disputed Claim becomes an Allowed Claim, or (b) ninety (90) days after such Disputed Claim becomes an Allowed Claim. Any reserved Cash not ultimately distributed to the Holder of a Disputed Claim because the Disputed Claim does not become an Allowed Claim shall become property of the Liquidating Trust shall be distributed in accordance with the terms of the Plan.

## VI. MECHANIC'S LIENS

Notwithstanding any contrary provision in the Plan, any disputes concerning the validity, priority, or extent of a mechanic's lien asserted against one or more of the Properties shall be resolved by the commencement of an adversary proceeding pursuant to Bankruptcy Rule 7001 in the Court, or by the commencement of an action in a California state court of competent jurisdiction (in either forum, a "Mechanic's Lien Action"). Only the Liquidating Trustee, LCPI, and Fidelity shall have standing to commence and prosecute a Mechanic's Lien Action. All parties with standing under applicable bankruptcy or state law to defend or otherwise appear in a Mechanic's Lien Action shall be entitled to do so, except as specified below. In addition to any Person entitled to notice under applicable law, the commencement of a Mechanic's Lien Action shall be noticed on the respective counsel for the Liquidating Trustee, LCPI, and Fidelity, to the extent such party has not commenced the Mechanic's Lien Action.

To the extent it has not been previously terminated and to the extent necessary, the automatic stay of 11 U.S.C. § 362 shall terminate on the Effective Date to allow LCPI and/or Fidelity to commence a Mechanic's Lien Action and to prosecute such Mechanic Lien Action through a final judgment, and to allow any party with standing under applicable bankruptcy or state law to defend or otherwise appear in a Mechanic's Lien

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Action to do so. However, the automatic stay shall remain in effect with respect to the enforcement of any final judgment obtained in a Mechanic's Lien Action against the Estates, the Trustee, the Liquidating Trust, the Liquidating Trustee and/or their property, except as may otherwise be provided by the Plan. Until the validity, priority or extent of a mechanic's lien has been determined by Final Order, the Claim(s) asserted by the Mechanic's Lien Claimant shall be treated as Disputed Claims for purposes of this Plan.

Notwithstanding anything to the contrary in this Section IV or the Plan, nothing in this Plan is intended to affect the rights of Superior Pipelines to prosecute the Superior Pipelines Action to the extent consistent with and to the extent authorized by the New York Bankruptcy Court in its Order granting Superior Pipelines relief from the automatic stay (the "NY Stay Relief Order"), or any further Order that may be entered by the New York Bankruptcy Court. Further, in the event that the McAllister Ranch Property is sold to the 1st Lien Lenders, the Plan does not affect the rights of Superior Pipelines to enforce any judgment or settlement obtained in the Superior Pipelines Action to the extent consistent with and to the extent authorized by the NY Stay Relief Order, or any further Order that may be entered by the New York Bankruptcy Court. In the event that the McAllister Ranch Property is sold to a Winning Bidder other than the 1st Lien Lenders, then the enforcement and satisfaction of any such judgment or settlement obtained by Superior Pipelines shall be governed by the treatment provided for Mechanic's Lien Claimants in Section II.E.2.b. of this Plan.

In the event that the McAllister Ranch Property is sold to the 1st Lien Lenders, Superior Pipelines is entitled to effectuate any settlement or compromise with the 1st Lien Lenders arising out of the Superior Pipelines Action without further approval of the Trustee or the Central District Bankruptcy Court, however, the Liquidating Trustee must be given notice of and reserves the right to object to any such settlement.

Nothing herein shall affect, impair, or restrict the rights of the Trustee or the Liquidating Trustee to otherwise object to any Proofs of Claim filed by Mechanic's Lien Claimants.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

## VII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Assumption and Assignment

Under the Plan, the Properties will be sold. As a result, the Trustee will assume only those executory contracts and unexpired leases to be assigned to the Winning Bidder with respect to each Property.

On the Effective Date, the executory contracts and unexpired leases identified on the Schedule of Assumed and Assigned Agreements attached or to be attached hereto as Exhibit "4," or filed or to be filed as Exhibit "4" to this document shall be deemed assumed and assigned to the applicable Winning Bidder, as specified in the Confirmation Order. The Trustee intends to file the Schedule of Assumed and Assigned Agreements with the Court no later than twenty-eight (28) days prior to the Confirmation Hearing. The Schedule of Assumed and Assigned Agreements also identifies or will identify any amounts that must be paid to cure defaults under the executory contracts and unexpired leases to be assumed and assigned under the Plan (the "Cure Amount"). If filed earlier, the Trustee reserves the right to amend the Schedule of Assumed Agreements up to twenty-eight (28) days prior to the Confirmation Hearing (March 4, 2011) to: (a) add any executory contract or unexpired lease and provide for its assumption and assignment; or (b) modify the Cure Amount for any particular executory contract or unexpired lease. The Trustee further reserves the right to amend the Schedule of Assumed Agreements to delete any executory contract or unexpired lease and provide for its rejection at any time prior to the Confirmation Hearing. The Trustee will provide notice of any amendment to the Schedule of Assumed and Assigned Agreements to any party or parties to the executory contracts or unexpired leases affected by the amendment. Absent a timely objection as provided below, the Confirmation Order will constitute a Court order approving the assumption and assignment, on the Effective Date, of the executory contracts and unexpired leases then identified on the Schedule of Assumed and Assigned Agreements, and shall constitute a final determination of the Cure Amount and that the Trustee has shown adequate assurance of future performance. Furthermore, any Cure

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Amount ordered by the Court, through entry of the Confirmation Order, and paid shall be deemed to satisfy any and all defaults arising from, out of or related to the executory contract or unexpired lease, including any tort claims that were or could be asserted by the non-debtor party to the contract or lease on or prior to the entry of the Confirmation Order, and all actual or pecuniary losses that have resulted from such defaults.

If you are a party to an executory contract or unexpired lease to be assumed and assigned and you object to the assumption and assignment of your lease or contract and/or you dispute the Cure Amount related to your lease or contract, then you must File and serve upon counsel for the Trustee (Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP, attn: Robert S. Marticello, Esq., 650 Town Center Drive, Suite 950, Costa Mesa, California 92626) a written objection by March 14, 2011, as provided in Section I.B.3. of the Disclosure Statement. An objection to the Cure Amount must also set forth the amount you contend to be the correct Cure Amount and contain evidence to support such amount. Failure to timely File an objection as provided herein shall be deemed consent to the proposed assumption and assignment and to the Cure Amount and a waiver of any and all rights to challenge such assumption and assignment and the Cure Amount.

With respect to each executory contract and unexpired lease identified on the Schedule of Assumed and Assigned Agreements, if no dispute arises regarding the Cure Amount, adequate assurances, or some other matter related to the assumption of the executory contract or unexpired lease, then the Cure Amount set forth in the Schedule of Assumed and Assigned Agreements shall be paid to the applicable non-debtor party in Cash on the Effective Date or as soon as reasonably practicable thereafter. If a dispute arises regarding (a) whether the Trustee has provided adequate assurance of future performance of an executory contract or unexpired lease to be assumed, or (b) any other matter pertaining to a proposed assumption and assignment, the Cure Amount will be paid on the later of (1) the Effective Date or as soon as practicable thereafter, or (2) within thirty (30) days after entry of a Final Order resolving the dispute and approving the assumption and assignment; provided, however, if a dispute arises regarding any of the

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

foregoing, the Trustee reserves for himself and the Liquidating Trustee the right to completely forego assumption and assignment of and, instead, reject the subject executory contract or unexpired lease.

If a party to an executory contract or unexpired lease identified on the Schedule of Assumed and Assigned Agreements Files an objection disputing the Cure Amount, then the Trustee may amend the Schedule of Assumed and Assigned Agreements at any time prior to the Confirmation Hearing to delete the subject executory contract or unexpired lease and provide for its rejection. Executory contracts or unexpired leases not so deleted shall be conditionally assumed, subject to the Liquidating Trustee's right to file a Motion to determine the appropriate Cure Amount up to the first (1st) Business Day that is at least sixty (60) days following the Effective Date. The Liquidating Trustee will serve any such Motion on the party to the executory contract or unexpired lease affected by the Motion (or its attorney, if any). If the Liquidating Trustee does not file a Motion to determine the appropriate Cure Amount, then the executory contract or unexpired lease shall be assumed and assigned, as of the Effective Date, and the Cure Amount shall be the alternative Cure Amount asserted by the non-debtor party to the subject executory contract or unexpired lease in its objection to the Plan. The Cure Amount shall be paid as soon as reasonably practicable following the expiration of the 60-day deadline.

If the Liquidating Trustee files a Motion to determine the appropriate Cure Amount, then the Liquidating Trust shall have the right to amend the Schedule of Assumed and Assigned Agreements to completely forego assumption and assignment of and, instead, reject the subject executory contract or unexpired lease up to the first (1st) Business Day that is at least fifteen (15) days after the entry of an order fixing the Cure Amount. The Liquidating Trustee will provide notice of any amendment to the Schedule of Assumed and Assigned Agreements to the party to the executory contract or unexpired lease affected by the amendment. If the Liquidating Trustee has filed such a Motion and does not timely amend the Schedule of Assumed and Assigned Agreements within fifteen (15) days after entry of an order fixing the Cure Amount, then the executory contract or

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

unexpired lease shall be assumed and assigned, as of the Effective Date, and the Cure Amount shall be fixed as the Cure Amount ordered by the Court. The Cure Amount as soon as reasonably practicable following the expiration of the 15-day deadline.

**B. Rejections**

On the Effective Date, the Trustee will be deemed to have rejected any and all executory contracts and unexpired leases not identified on the Schedule of Assumed and Assigned Agreements attached or to be attached hereto as Exhibit "4," or filed or to be filed as Exhibit "4" to this document. The Confirmation Order will constitute a Court order approving the rejection, as of the Effective Date, of such executory contracts and unexpired leases. Any Claim for damages arising from the rejection under the Plan of any executory contract or unexpired lease must be Filed with the Court and served upon the Liquidating Trustee and his counsel within thirty (30) days of the later of (a) the Confirmation Date, and (b) the Liquidating Trustee's amendment of the Schedule of Assumed and Assigned Agreements to eliminate the executory contract or unexpired lease. Any such damage Claims that are not timely Filed and served will be forever barred and unenforceable against the Debtors, the Estates, the Trustee, the Liquidating Trust, the Liquidating Trustee and their respective property. Persons holding these Claims who fail to timely File Claims will be barred from receiving any Distributions under the Plan on account of their requested damage Claims.

If you are a party to a lease or contract to be rejected and you object to the rejection of your lease or contract, then you must File and serve your objection by March 14, 2011, as provided in Section I.B.3. of the Disclosure Statement.

**VIII. PRESERVATION OF CAUSES OF ACTION AND AVOIDANCE ACTIONS**

The Trustee reserves for the Estates and the Liquidating Trust all rights to commence and pursue, as appropriate, any and all Causes of Action and Avoidance Actions, whether arising prior to or after the Petition Date, in any court or other tribunal, including without limitation, in an adversary proceeding Filed in the Court, except those Causes of Action and Avoidance Actions released under the Amended Term Sheet. On

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

the Effective Date, the Liquidating Trustee will be vested with authority to enforce, file, litigate, prosecute, settle and collect with respect to Causes of Action and Avoidance Actions, although he will not be required to do so and the determination of whether to do so will be made solely by the Liquidating Trustee in his absolute discretion. With respect to any Causes of Action and/or Avoidance Actions commenced prior to the Effective Date to which any or all of the Debtors and/or the Trustee is a party, the Liquidating Trustee shall replace and stand in the shoes of such Debtors and/or the Trustee as the real party in interest.

While the Trustee has attempted to identify Causes of Action and Avoidance Actions in the Disclosure Statement which may be pursued, and hereby incorporates by reference those disclosures and provisions, the failure to list any potential Cause of Action or Avoidance Action, generally or specifically, is not intended to limit the rights of the Liquidating Trustee to pursue such Cause of Action or Avoidance Action. Unless a Cause of Action or Avoidance Action against any Person is expressly waived, relinquished, released, compromised or settled as provided or identified in the Plan, any Confirmation Order or prior order of the Court, the Trustee expressly reserves any Causes of Action and Avoidance Actions for later adjudication. Therefore, no preclusion doctrine, including, without limitation, the doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action or Avoidance Actions upon or after Confirmation or consummation of the Plan. All Avoidance Actions and other Causes of Action are preserved under the Plan for the benefit of the Estates. Any recoveries from Avoidance Actions and/or other Causes of Action will be paid to the Liquidating Trust.

ANY CREDITORS THAT BELIEVE THEY RECEIVED A TRANSFER OR SETOFF THAT IS AVOIDABLE UNDER THE CODE OR THAT HOLDS A CLAIM AGAINST THE ESTATES THAT COULD BE SUBJECT TO AN OBJECTION BASED UPON FAILURE TO RETURN AN AVOIDABLE TRANSFER OR SETOFF, ARE DIRECTED TO REVIEW THEIR RECORDS AND/OR THE DEBTORS' SCHEDULES FOR FURTHER

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

INFORMATION. HOWEVER, ALL RIGHTS OF THE DEBTORS AND THE ESTATES ARE RESERVED WITH RESPECT TO ANY AND ALL TRANSFERS OR SETOFFS WHICH MAY BE AVOIDABLE UNDER THE BANKRUPTCY CODE.

## IX. RETENTION OF JURISDICTION

The Court will retain exclusive jurisdiction during the Plan payout period to resolve disputes and conflicts arising from the administration of the Plan, upon request of a party-in-interest and after notice and a hearing, including, without limitation:

a. The adjudication of the validity, scope, classification, allowance, and disallowance of any Claim;

b. The estimation of any Claim;

c. The allowance or disallowance of Professional-Fee Claims, compensation, or other Administrative Expense Claims;

d. To hear and determine Claims concerning taxes pursuant to Bankruptcy Code §§ 346, 505, 525, and 1146;

e. To hear and determine any action or proceeding brought under Bankruptcy Code §§ 108, 510, 543, 544, 545, 547, 548, 549, 550, 551, and 553;

f. To hear and determine all actions and proceedings which relate to pre-confirmation matters;

g. To hear and determine any issue relating to the assumption or rejection of executory contracts and unexpired leases;

h. To hear and determine any modification to the Plan in accordance with the Bankruptcy Rules and the Bankruptcy Code;

i. To enforce and interpret the terms of the Plan;

j. To correct any defects, cure any omissions, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purpose and intent of the Plan;

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

k. The entry of any order, including injunctions, necessary to enforce title, rights and powers of the Liquidating Trust, and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Court may deem necessary including, without limitation, any right of the Liquidating Trust to recover and liquidate assets;

l. To determine the validity, extent and priority of all liens and security interests against property of the Estates or the Liquidating Trust;

m. To hear and resolve any disputes regarding employment applications and professional fees;

n. To hear and determine such matters and make such orders as are consistent with the Plan as may be necessary to carry out the provisions thereof and to adjudicate any disputes arising under or relating to any order entered by the Court in these Cases;

o. The entry of an order concluding and terminating these Cases; and

p. To resolve any disputes as to whether there has been a default under the Plan.

## X. EFFECT OF CONFIRMATION

### A. Discharge

Confirmation of the Plan does not discharge the Debtors as set forth in Bankruptcy Code § 1141.

### B. Revesting of the Assets

The Assets shall not be vested in the Debtors on or following the Effective Date, but shall be vested in the Liquidating Trust and continue to be subject to the jurisdiction of the Court following confirmation of the Plan until such Assets are distributed to the Holders of Allowed Claims in accordance with the provisions of the Plan.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

C. **Dissolution of the Committee**

On the Effective Date and except as set forth below, the Committee shall terminate and disband and the members of the Committee shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from their service as Committee members. The Professionals retained by the Committee and the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered after the Effective Date, except for (1) services provided and expenses incurred in connection with any applications by such Professionals or Committee members for allowance of compensation and reimbursement of expenses pending on the Effective Date or timely Filed after the Effective Date in accordance with the Plan, and (2) services provided and expenses incurred as requested by the Committee in connection with such Professional-Fee Claims, as approved by the Court.

D. **Exculpation and Releases**

Effective upon the entry of the Confirmation Order, neither the Trustee, the Committee, LCPI, the 1st Lien Lenders, the Professionals, nor any of their respective members, officers, directors, shareholders, employees, or agents, shall have or incur any liability to any Person, including any creditor or Interest Holder of the Debtors, for any act taken or omission made in connection with or related to the negotiation, formulation, or preparation of the Plan and the Disclosure Statement, the approval of the Disclosure Statement, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, the Cases, or the property to be distributed under the Plan, to the fullest extent permitted by applicable statutes and case law, except that the Liquidating Trust will be liable for the performance of obligations assumed by it or imposed upon it under or by the Plan. Nothing in this Section is intended to contradict or supersede Paragraph 5 of the Order granting the Second Compromise Motion.

E. **Modification of the Plan**

The Trustee may modify the Plan at any time before confirmation. If the Plan is modified, however, the Court may require a new Disclosure Statement or re-voting on the

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Plan depending on the nature of the modifications and their effect on parties in interest. The Liquidating Trustee may seek to modify the Plan at any time after confirmation if (a) the Plan has not been substantially consummated, and (b) the Court, after notice and a hearing, authorizes the proposed modification.

**F. Post-Confirmation Status Report**

Within 120 days of the entry of the Confirmation Order, the Liquidating Trustee shall file a status report with the Court explaining what progress has been made towards consummation of the confirmed Plan. The status report shall be served on the OUST, the twenty (20) largest creditors for each Estate, counsel for the Committee, counsel for LCPI, and the parties who have requested special notice. Further status reports shall be filed every 120 days and served on the same entities.

**G. Quarterly Fees**

Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) prior to confirmation shall be paid to the OUST on or before the Effective Date. Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the OUST by the Liquidating Trustee from the assets of the Liquidating Trust until a final decree, or the entry of an order dismissing the Cases or converting the Cases to chapter 7, at the rate in effect at the time such fees are due.

**H. Post-Confirmation Conversion/Dismissal**

After the Plan is confirmed, a creditor or party in interest may bring a Motion, only after notice and a hearing, to convert or dismiss the Cases under Bankruptcy Code § 1112(b) if there is a material default in performing the Plan. If the Court orders the Cases converted to chapter 7 after the Plan is confirmed, then all property that had been property of the Estates and transferred to the Liquidating Trust, and that has not been distributed under the Plan will revest in the chapter 7 estates. The automatic stay will be reimposed upon the revested property only to the extent that relief from stay was not previously authorized by the Court during the Cases.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Case 8:08-bk-13588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc Main Document Page 56 of 125

The Confirmation Order may also be revoked under very limited circumstances. The Court may revoke the Confirmation Order if it was procured by fraud and if a party in interest brings an adversary proceeding to revoke the confirmation within 180 days after the entry of the Confirmation Order.

**I. Final Decree**

Once the Estates have been fully administered as referred to in Bankruptcy Rule 3022, the Liquidating Trustee will File a Motion with the Court to obtain a final decree closing the Cases.

Dated: April 21, 2011

WEILAND, GOLDEN,
SMILEY, WANG EKVALL & STROK, LLP

By: [signature]
ROBERT S. MARTICELLO
Attorneys for Alfred H. Siegel,
Chapter 11 Trustee

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc Main Document Page 57 of 125

# TABLE OF DEFINITIONS

**"50/50 Distribution Scheme"** means the 50/50 split of Net Other Recoveries by the 1st Lien Lenders and the Estates.

**"1st Lien Lenders"** means the first-position secured lenders pursuant the First Lien Credit Agreement for which LCPI is the administrative agent.

**"1st Lien Lenders Allowed Claim"** means the Allowed Claim of the 1st Lien Lenders in the aggregate amount of $230,006,233.98, plus accrued and unpaid interest calculated through September 10, 2008, and accrued and unpaid legal fees.

**"1st Lien Lenders' Deficiency Claim"** means the amount of the 1st Lien Lenders' Claim not determined to be a Secured Claim pursuant to the Plan.

**"2nd Lien Lenders"** means the second-position secured lenders pursuant to the Second Lien Credit Agreement for which Gramercy is the administrative agent.

**"2nd Lien Lenders' Deficiency Claim"** means the amount of the 2nd Lien Lenders' Claim not determined to be a Secured Claim pursuant to the Plan.

**"3rd Lien Lenders"** means the third-position secured lenders pursuant to the Third Lien Credit Agreement for which Square Mile is the administrative agent.

**"3rd Lien Lenders' Unsecured Deficiency Claim"** means the amount of the 3rd Lien Lenders' Claim not determined to be a Secured Claim pursuant to the Plan.

**"Abandonment Motion"** means the Trustee's motion to abandon the Parent Debtor's membership interests in Patterson Ranch.

**"Administrative Claim"** means a Claim against the Debtors for administrative costs or expenses that are allowable under Bankruptcy Code § 503(b).

**"Administrative Funds"** means the $3.5 million of the Development Account Funds and the Trustee's 50% share of the Yucaipa Funds retained by the Trustee free and clear of any liens, Claims, interests, and encumbrances pursuant to the Amended Term Sheet.

**"Administrative Tax Claim"** means an Administrative Claim or other Claim that is not an Allowed Secured Claim and that a government unit asserts against Debtors for

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

taxes (or for related interest or penalties) for any tax period that, either in whole or in part, falls within the period beginning on the Petition Dates and ending on the Effective Date.

**"Aggregate Maximum Credit Bid Amount"** means the maximum amount of the 1st Lien Lenders' aggregate credit bid for the Properties established by the Trustee, the Committee, and LCPI prior to the Settlement Effective Date.

**"Aggregate Minimum Credit Bid Amount"** means $45,000,000.00.

**"Allocated Maximum Credit Bid Amount"** means the maximum amount of the 1st Lien Lenders' credit bid for each Property established by the Trustee, the Committee, and LCPI prior to the Settlement Effective Date.

**"Allocated Minimum Credit Bid Amount"** means the minimum amount of the 1st Lien Lenders' credit bid for each Property established by the Trustee, the Committee, and LCPI prior to the Settlement Effective Date.

**"Allowed Claim"** means a Claim against the Debtors, other than an Administrative Claim, to the extent that:

a. Either: (i) a Proof of Claim was Filed by the Bar Date; or (ii) a Proof of Claim is deemed timely Filed either under Bankruptcy Rule 3003(b)(1) or by a Final Order; and

b. Either: (i) the Claim is not a Disputed Claim; (ii) the Claim is allowed by a Final Order; or (iii) the Claim is allowed under the Plan.

**"Allowed [Class Designation and/or Secured, Priority, or General Unsecured or Trade] Claim"** means an Allowed Claim in the specified Class and/or of the specified type.

**"Amended Term Sheet"** means the Binding Amended and Restated Term Sheet Among LCPI as Administrative Agent for the 1st Lien Lenders, LCPI as the 2nd Lien Lender, LCPI as the 3rd Lien Lender, the Official Committee of Unsecured Creditors, and the Chapter 11 Trustee dated as of August 18, 2010, and attached to the Plan as Exhibit "1."

Smiley, Wang Ekvall & Strok, LLP
Weiland, Golden,
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**"Amendment"** means that certain Fourth Amendment and Waiver to the First Lien Credit Agreement dated January 31, 2008.

**"Appeal"** means the LCPI's appeal of the Cash Collateral Order.

**"Approved Broker"** means broker or brokers selected by the Trustee, the Committee, and LCPI to market and sell the Properties.

**"Assets"** means all tangible and intangible assets and property of every kind and nature of the Debtors and/or their Estates, and all proceeds thereof, existing as of the Effective Date.

**"Assigned 1st Lien Lenders' Unsecured Deficiency Claim(s)"** means the 1st Lien Lenders' Allowed Unsecured Deficiency Claim(s) deemed assigned pursuant to Section II.E.4.a.iii. of the Plan.

**"Assigned LCPI 2nd Lien Lender Unsecured Deficiency Claim(s)"** means the 2nd Lien Lender Unsecured Deficiency Claim of LCPI deemed assigned pursuant to Section II.E.4.b. of the Plan.

**"Assigned LCPI 3rd Lien Lender Unsecured Deficiency Claim(s)"** means the 3rd Lien Lender Unsecured Deficiency Claim of LCPI deemed assigned pursuant to Section II.E.4.b. of the Plan.

**"Auction"** means the auction sale of the Properties.

**"Available Cash"** means all Cash resulting from or constituting (a) the Trade Creditor Allocation, (b) the Trustee's Participation, and (c) the Administrative Funds, less (d) the amount necessary or estimated and reserved to pay in full (i) any Allowed Administrative Expense Claims and Allowed Unsecured Priority Claims, (ii) the reasonable fees and costs of the Liquidating Trustee and the Liquidating Trustee Professionals; (iii) the Holders of all Disputed Claims against the Debtors the amount such Holders would be entitled to receive under the Plan if all such Disputed Claims against the Debtors were to become Allowed Claims, (iv) all fees payable under section 1930 of chapter 123 of title 28 of the United States code, (v) all other amounts required to be paid to manage and/or liquidate the Debtors' assets on or after the Effective Date.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**"Avoidance Action"** means Causes of Action arising under 11 U.S.C. §§ 510, 541, 542, 544, 545, 547, 548, 549, 550, 551 and/or 553, or under related state or federal statutes and common law, including, without limitation, fraudulent transfer laws, whether or not litigation is commenced to prosecute such Causes of Action.

**"Bankruptcy Code" or "Code"** means Title 11 of the United States Code, as amended.

**"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure.

**"Bar Date"** means the last date for filing Proofs of Claim in the Debtors' Cases. The Bar Date was March 20, 2009.

**"Bar Date Motion"** means the Trustee's motion to establish the last date for filing proofs of claim in the Debtors' Cases.

**"Bar Date Notice"** means form of notice of the Bar Date attached as Exhibit "1" to the Bar Date Order.

**"Bar Date Order"** means the order of the Court granting the Bar Date Motion.

**"Bond Companies"** collectively refers to Bond Safeguard Insurance Co., Lexon Insurance Co., and Arch Insurance Company.

**"Bond Indemnification Claims"** means all Claims asserted by one or more of the Bond Companies for indemnification.

**"Business Day"** means any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Rule 9006(a) of the Bankruptcy Rules.

**"Cases"** means the Debtors' involuntary cases under chapter 11 of the Bankruptcy Code that are pending before the United States Bankruptcy Court for the Central District of California, Santa Ana Division, as Case Nos. 8:08-bk-15637-ES; 8:08-bk-15639-ES; and 8:08-bk-15640-ES.

**"Cash"** means legal tender of the United States of America.

**"Cash Collateral Order"** means the Order Granting Motion for Order Authorizing Use of Cash Collateral Through September 30, 2010, entered on June 25, 2010.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc Main Document Page 61 of 125

**"Cause of Action"** mean, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, Claims (as defined in Code § 101(5)) and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise that any Debtor and/or Estate may hold against any Person as of the Effective Date.

**"Claim"** means a claim, as the term "claim" is defined in Bankruptcy Code § 101(5), against one or more of the Debtors.

**"Claims Objection Deadline"** means the date that is one hundred eighty (180) days after the Effective Date.

**"Class"** or **"Class of Claims or Interests"** means a group of Claims or Interests as classified under the Plan.

**"Committee"** means the Official Committee of Creditors Holding Unsecured Claims.

**"Confirmation Date"** means the date on which the Court enters the Confirmation Order on its docket.

**"Confirmation Hearing"** means the hearing held by the Court on the confirmation of the Plan.

**"Confirmation Order"** means the Court order confirming the Plan under Bankruptcy Code § 1129.

**"Court"** means the United States Bankruptcy Court for the Central District of California, Santa Ana Division.

**"Crowe Horwath"** means Crowe Horwath LP.

**"Cure Amount"** means any amounts that must be paid to cure defaults under the executory contracts and unexpired leases to be assumed under the Plan.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**"Debtors"** collectively refers to LBREP/L-SunCal Master I LLC, LBREP/L-SunCal McAllister Ranch LLC, LBREP/L-SunCal McSweeny Farms LLC, and LBREP/L-SunCal Summerwind Ranch LLC.

**"Development Account"** means the Development Account established under the Lien Credit Agreements.

**"Development Account Funds"** means the Cash originally held in the Development Account.

**"Disclosure Statement"** means the *First Amended Disclosure Statement Describing First Amended Chapter 11 Plan (Dated January 7, 2011)* [Docket No. 604], as the same may be amended or modified from time to time.

**"Disputed Claim"** means all or any part of a Claim as to which any one of the following applies: (i) no Proof of Claim has been filed with respect to such Claim, and the Claim is listed in the Schedules as unliquidated, disputed, contingent or unknown, or; (ii) the Claim is the subject of a timely objection or request for estimation which is filed on or before the Claims Objection Deadline, which objection or request for estimation has not been withdrawn or determined by a Final Order. In addition, prior to the earlier of: (a) the Claims Objection Deadline, and (b) such date as the Bankruptcy Court allows the Claim pursuant to a Final Order, any Claim that is evidenced by a Proof of Claim shall be deemed a Disputed Claim for purposes of calculating and making any Distributions under this Plan if: (1) no Claim corresponding to the Proof of Claim is listed in the Schedules, (2) the Claim corresponding to the Proof of Claim is listed in the Schedules as disputed, contingent, unliquidated or unknown, (3) the amount of the Claim as specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules as not disputed, not contingent, and liquidated, but only to such extent, or (4) the priority or classification of the Claim as specified in the Proof of Claim differs from the priority of any corresponding Claim listed in the Schedules.

**"Distribution"** means any distribution pursuant to the Plan to the Holders of an Allowed Claim.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**"Distribution Date"** means the Business Day selected by the Liquidating Trustee, in its sole and absolute discretion; provided, however, that Distributions shall not take place more frequently than quarterly.

**"Dividend"** means the approximately $144 million that was distributed directly to the Parent Debtors' equity owners in connection with the January 2006 Loans.

**"Dividend Action"** means the action commenced by the Trustee on October 29, 2010, by the filing of a complaint in the United States District Court for the Central District of California, Southern Division, against Lehman Lakeside, SunCal, and certain principals and other third parties, captioned *Alfred H. Siegel, Chapter 11 Trustee v. LBREP Lakeside SC Master I, LLC et al.*, Case No. CV10-8191 GHK (VBKx).

**"Effective Date"** means the first Business Day that is fourteen (14) days after the entry of the Confirmation Order, provided there has been no order staying the effectiveness of the Confirmation Order.

**"Effective Date Payments"** means Distributions or payments required by the Plan to be made by the Trustee on the Effective Date.

**"Emergency Cash Collateral Motion"** means the Emergency Motion for Order Authorizing Use of Cash of Cash Collateral Pursuant to 11 U.S.C. § 363(c) filed by the Trustee on November 4, 2008.

**"Estate"** means the bankruptcy estate created in each of the Debtors' Cases under Bankruptcy Code § 541.

**"Evidentiary Hearing"** means the evidentiary hearing on the LCPI Stay Relief Motions.

**"February 2007 Loan"** means the loan to the Parent Debtor in the principal amount of $75 million pursuant to the Third Lien Credit Agreement.

**"Fidelity"** means Fidelity National Title Insurance Company.

**"File," "Filed,"** or **"Filing"** means duly and properly filed with the Court and reflected on the Court's official docket.

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

**"Final Order"** means an order or judgment of the Court entered on the Court's docket.

    a.    That has not been reversed, rescinded, stayed, modified, or amended;

    b.    That is in full force and effect; and

    c.    With respect to which (i) the time to appeal or to seek review, remand, rehearing, or a writ of certiorari has expired and as to which no timely Filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending, or (ii) any such an appeal or petition has been dismissed or resolved by the highest court to which the order or judgment was appealed or from which review, rehearing, remand, or a writ of certiorari was sought.

**"First Compromise Motion"** means the motion filed by the Trustee to approve the Original Term Sheet.

**"First Lien Credit Agreement"** means that certain First Lien Credit Agreement dated January 19, 2006.

**"General Unsecured Claim"** means an unsecured Claim against one or more of the Debtor, however arising, not entitled to priority under Section 507(a) of the Bankruptcy Code.

**"General Unsecured Trade Creditors," "Unsecured Trade Creditors,"** or **"Trade Creditors"** collectively refers to the Holders of Claims other than the Lien Lenders.

**"General Unsecured Trade Claims," "Unsecured Trade Claims,"** or **"Trade Claims"** means the unsecured Claims asserted by the Trade Creditors, however arising, not entitled to priority under Section 507(a) of the Bankruptcy Code.

**"Gramercy"** means Gramercy Warehouse Funding I, LLC.

**"Gramercy Action"** means the lawsuit commenced by Gramercy and currently pending before the Court, Case No. 8:08-ap-01492-ES.

**"Gramercy Action Status Conference"** means the status conference in the Gramercy Action.

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000    Fax 714-966-1002

**"Gramercy Stipulation"** means that Stipulation Regarding Creditor's Funding of Fees and Expenses of the Chapter 11 Trustee and the Trustee's Professionals and Field Agents filed on November 5, 2008.

**"Hemet"** means Hemet Manufacturing, Inc., dba Genesis Construction.

**"Holder"** means an entity holding a Claim or Interest.

**"Intercreditor Agreement"** means that certain Amended and Restated Intercreditor Agreement dated as of February 6, 2007, a copy of which is attached hereto as Exhibit "2."

**"Interests"** means an equity interest in any of the Debtors.

**"Interim Trustee Motion"** means the motion filed by the petitioning creditors, excluding Gramercy, for the appointment of an interim trustee in the Cases.

**"Involuntary Petitions"** collectively refers to the involuntary petitions filed against the Debtors.

**"January 2006 Loans"** collectively refers to the loans made to the Parent Debtor in the principal amount of $320 million pursuant to the First Lien Credit Agreement and the Second Lien Credit Agreement.

**"Lakeside Motion to Dismiss"** means Lehman Lakeside's motion to dismiss the complaint filed by Gramercy in the Gramercy Action.

**"LBHI"** means Lehman Brothers Holding Inc.

**"LBREP"** means Lehman Bros. Real Estate Partners, LP.

**"LCPI"** means Lehman Commercial Paper Inc.

**"LCPI Compromise Motion"** means the motion to approve the Amended Term Sheet filed by LCPI in the Lehman Bankruptcy Cases.

**"LCPI Stay Relief Motions"** means the motions for relief from the automatic stay filed by LCPI.

**"Lehman Ali"** means Lehman Ali, Inc.

**"Lehman Ali Loans"** means the loans made by Lehman Ali to the Subsidiary Debtors.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**"Lehman Bankruptcy Cases"** collectively refers to the bankruptcy cases commenced by LBHI and 22 affiliates of LBHI and being jointly administered under the lead case of LBHI, Case No. 08-13555 (JMP).

**"Lehman Brothers"** means Lehman Brothers, Inc.

**"Lehman Lakeside"** means LBREP Lakeside SC Master I, LLC.

**"Levene Neale"** means Levene, Neale, Bender, Yoo & Brill L.L.P.

**"Lien Credit Agreements"** collectively refers to the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Third Lien Credit Agreement.

**"Lien Lenders"** collectively refers to the 1st Lien Lenders, the 2nd Lien Lenders, and the 3rd Lien Lenders.

**"Lien Lender Claims"** collectively refers to the Allowed Claims of the Lien Lenders.

**"Lien Lenders' Unsecured Deficiency Claims"** collectively refers to the Unsecured Deficiency Claims of the Lien Lenders.

**"Liquidating Trust"** means the trust established on the Effective Date pursuant to Section III.E.1. of the Plan.

**"Liquidating Trustee"** means the Person appointed pursuant to Section III.E.5.a. of the Plan to act as trustee of and to administer the Liquidating Trust, which Person shall be Alfred H. Siegel.

**"Liquidating Trustee Professionals"** means the agents, financial advisors, attorneys, consultants, independent contractors, representatives, and other professionals engaged or retained by the Liquidating Trustee (in their capacities as such).

**"Madison Employment Application"** means the Trustee's application to employ Madison Partners.

**"McAllister Ranch"** means LBREP/L-SunCal McAllister Ranch LLC.

**"McAllister Ranch Deposits"** means the cash of McAllister Ranch totaling approximately $2,035,000.00 deposited or otherwise in the hands of third parties, which is the subject of the Superior Pipelines Action.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**"McAllister Ranch Property"** means the real estate project owned by McAllister Ranch.

**"McSweeny Farms"** means LBREP/L-SunCal McSweeny Farms LLC.

**"McSweeny Farms Property"** means the real estate project owned by McSweeny Farms.

**"McSweeny Farms Lease"** means that certain Lease for Real Property for Agricultural Purposes by and between the Trustee and Triple B.

**"Mechanic's Lien Action"** means an adversary proceeding pursuant to Bankruptcy Rule 7001 commenced in the Court or action commenced in a California state court of competent jurisdiction to resolve any disputes concerning the validity, priority, or extent of a mechanic's lien asserted against one or more of the Properties.

**"Mechanic's Lien Claimant"** refers to a Person that asserts a mechanic's lien against one or more of the Properties.

**"MOR"** means monthly operating reports.

**"Motion"** means a request asking a judge to issue a ruling or order on a legal matter.

**"Motions to Convert"** means the Debtors' motions to convert the Cases from chapter 7 to chapter 11.

**"Net Other Recoveries"** means Other Recoveries less the amount necessary or estimated and reserved to pay (a) any Allowed Administrative Expense Claims and Allowed Unsecured Priority Claims, (b) the reasonable fees and costs of the Liquidating Trustee and the Liquidating Trustee Professionals, (c) all fees payable under section 1930 of chapter 123 of title 28 of the United States code, (d) all other amounts required to be paid to manage and/or liquidate the Debtors' assets on or after the Effective Date.

**"New York Bankruptcy Court"** means the Southern District of New York.

**"Non-Ordinary-Course Administrative Claims"** means Administrative Claims that are not Ordinary Course Administrative Claims, Administrative Tax Claims, or

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Professional-Fee Claims, including Claims that may arise from agreements entered into with the Estate after the Petition Date other than trade agreements.

**"Non-Professional Administrative Claims"** means Administrative Claims that are not Professional-Fee Claims.

**"Oak Valley"** means Oak Valley Partners, L.P.

**"Orders for Relief"** collectively refers to the orders for relief entered in the Cases.

**"Ordinary-Course Administrative Claims"** means Administrative Claims other than Administrative Tax Claims, Professional-Fee Claims, and Non-Ordinary-Course Administrative Claims, based upon liabilities that Debtors incur in the ordinary course of their business.

**"Original Term Sheet"** means the original term sheet negotiated by the Trustee, the Committee, and LCPI, and attached to the First Compromise Motion.

**"Other Recoveries"** means any recovery of proceeds from any Cause of Action or Avoidance Action (including without limitation, litigation in respect of any claims of fraudulent conveyance) asset disposition, or other recovery by the Trustee or the Liquidating Trustee prior to or after the Effective Date, excluding any proceeds recovered from the sale of the Properties.

**"OUST"** means the Office of the United States Trustee, Santa Ana Division.

**"Overbid Procedures"** means the overbid procedures approved by the Court and attached to the Plan as Exhibit "3."

**"Pacific States Engineering"** means Pacific States Engineering, Inc.

**"Pacific Time"** means the time in Los Angeles, California.

**"Parent Debtor"** means LBREP/L-SunCal Master I LLC.

**"Patterson Parcel"** means the 3-acre parcel of undeveloped real property owned by Patterson Ranch.

**"Patterson Ranch"** means LBREP/L-SunCal Patterson Ranch LLC.

**"Person"** means any individual, corporation, general partnership, limited partnership, limited liability company, association, joint-stock company, joint venture,

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

estate, trust, government, political subdivision, governmental unit (as defined in the Bankruptcy Code), official committee appointed by the United States Trustee, unofficial committee of creditors or equity holders, or entity.

**"Petition Dates"** collectively refers to the petition dates for the Debtors.

**"Permitted Liens"** collectively refers to any encumbrances or interests that satisfy clause (b), (c), and/or (d) of the definition of "Permitted Exceptions" set forth in the First Lien Credit Agreement, excluding any Senior Liens.

**"Phase 3"** means the approximately 268 acres of the McSweeny Farms Property commonly known as Phase 3 and subject to the McSweeny Farms Lease.

**"Plan"** means this Second Amended Chapter 11 Plan (Dated April 21, 2011), including any modifications or amendments to the Plan.

**"Priority Claim"** means an Allowed Claim entitled to priority against an Estate under Bankruptcy Code §§ 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7).

**"Priority Tax Claim"** means an Allowed Claim entitled to priority against an Estate under Bankruptcy Code § 507(a)(8).

**"Proceeds"** shall have the meaning provided in Section II.E.2.a.iv. of the Plan.

**"Professionals"** collectively means the persons and entities employed by the Debtors, the Trustee, and by the Committee pursuant to order of the Court in accordance with Bankruptcy Code §§ 327 or 1103.

**"Professional-Fee Claim"** means:

a. A Claim under Bankruptcy Code §§ 327, 328, 330, 331, 503, or 1103 for compensation for professional services rendered or expenses incurred on an Estate's behalf, or

b. A Claim either under Bankruptcy Code § 503(b)(4) for compensation for professional services rendered or under Bankruptcy Code § 503(b)(3)(D) for expenses incurred in making a substantial contribution to an Estate.

**"Properties"** collectively refers to the McAllister Ranch Property, the McSweeny Farms Property, and the Summerwind Ranch Property.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**"Property"** refers to each of the real estate development projects owned by the Subsidiary Debtors.

"**Proof of Claim**" means a written statement filed in a Case by a creditor in which the creditor sets forth the amount of its Claim, in accordance with Rule 3001 of the Bankruptcy Rules.

**"Pro Rata Share"** means:

a. In the case of Distributions to the Holders of Allowed Unsecured Trade Claims, the ratio (expressed as a percentage) of (i) the amount of an Allowed Unsecured Trade Claim to (ii) the sum of the aggregate amounts of Allowed Unsecured Trade Claims, or

b. In the case of Distributions to the Holders of Allowed Lien Lender Unsecured Deficiency Claims, the ratio (expressed as a percentage) of (i) the amount of the Allowed 1st Lien Lender Unsecured Deficiency Claim, the Allowed 2nd Lien Lender Unsecured Deficiency Claim, or the 3rd Lien Lender Unsecured Deficiency Claim to (ii) the sum of the aggregate amounts of the Allowed Lien Lender Unsecured Deficiency Claims.

**"Qualified Bidder"** means a Qualified Bidder as defined in the Overbid Procedures.

**"Remaining Development Funds"** means the $2.0 million of the Development Account Funds retained by the Trustee under the Amended Term Sheet to pay the operating expenses of the Properties pursuant to an approved budget.

**"Retained Settlement Funds"** means the balance of the Development Account Funds, less the $5.5 million retained by the Trustee pursuant to the Amended Term Sheet, transferred to the 1st Lien Lenders on the Settlement Effective Date.

**"Request for Payment"** means a request for the payment of a Non-Ordinary Course Administrative Claim as described in Section II.D.1.b. of the Plan.

**"SCC Entities"** collectively refers to SunCal, SCC Acquisitions, Inc., SCC Acquisitions, LLC, and Bruce Elieff.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**"Schedule of Assumed and Assigned Agreements"** means a list of executory contracts and unexpired leases to be assumed and assigned under the Plan.

**"Schedules"** means the Schedules of Assets and Liabilities filed by the Debtors in the Cases, as required by § 521(1) of the Code, Bankruptcy Rules 1007(a)(3) and (b)(l), and Official Bankruptcy Form No. 6, as the Schedules may be amended from time to time.

**"Second Compromise Motion"** means the Trustee's motion to approve the Amended Term Sheet.

**"Second Lien Credit Agreement"** means that certain Second Lien Credit Agreement dated January 16, 2006.

**"Secured Claim"** means a Claim that is secured by a valid and unavoidable lien against property in which an Estate has an interest or that is subject to setoff under Bankruptcy Code § 553. A Claim is a Secured Claim only to the extent of the value of the Claim Holder's interest in that property or to the extent of the amount subject to setoff, as applicable, as determined under Bankruptcy Code § 506(a).

**"Senior Liens"** means liens determined to be superior in priority to the lien held by the 1st Lien Lenders against any of the Properties.

**"Settlement Effective Date"** means Settlement Effective Date under the Amended Term Sheet.

**"Sills Cummis"** means Sills Cummis & Gross, P.C.

**"SOFA"** means the Debtors' respective statements of financial affairs.

**"Square Mile"** collectively refers to Square Mile Structured Debt (One), LLC, and Square Mile Structured Debt (Two), LLC.

**"Subsidiary Debtors"** collectively refers to LBREP/L-SunCal McAllister Ranch, LLC, LBREP/L-SunCal McSweeny Farms, LLC, and LBREP/L-SunCal Summerwind Ranch, LLC.

**"SunCal"** means SCC Ranch Ventures, LLC.

**"SunCal Management"** means SunCal Management, LLC.

**"Summerwind Ranch"** means LBREP/L-SunCal Summerwind Ranch LLC.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**"Summerwind Ranch Property"** means the real estate development project owned by Summerwind Ranch.

**"Superior Pipelines"** means Superior Pipelines, Inc.

**"Superior Pipelines Action"** means the lawsuit commenced by Superior Pipelines and currently pending before the Court, Case No. 8:09-ap-01318-ES.

**"Tax Code"** means the Internal Revenue Code.

**"Tax Items"** means the Liquidating Trust's tax items of income, gain, loss deductions, and credits.

**"Third Lien Credit Agreement"** means that certain Third Lien Credit Agreement dated February 6, 2007.

**"Title Insurance Policy"** means that certain Title Insurance Policy number 27-44-94-120334.

**"Trade Creditor Allocation"** means the Estate's 50% share of Net Other Recoveries described in Section II.E.4.a.ii. of the Plan.

**"Triple B"** means Triple B Farms, Inc.

**"Trustee"** means Alfred H. Siegel solely in his capacity as the duly appointed chapter 11 trustee for the jointly administered estates of the Debtors.

**"Trustee's Participation"** means the Estates' right and entitlement to receive from the Proceeds of the dispositions of the Properties the lesser of (1) the amount sufficient to pay in full the Allowed Unsecured Trade Claims to the extent not previously paid, and (2) 3.5% of such Proceeds.

**"Trustee's Stay Relief Motion"** means the Trustee's motion for relief from the automatic stay filed in the Lehman Bankruptcy Cases on June 17, 2010.

**"Trustee's YFP"** means the Trustee's 50% share of the Yucaipa Funds retained by the Trustee under the Amended Term Sheet free and clear of liens, Claims, interests, and encumbrances.

**"Undeliverable Distribution"** means a Distribution to any Holder of an Allowed Claim that is returned to the Liquidating Trustee as undeliverable or otherwise unclaimed.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**"Weiland Golden"** means Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP.

**"Winning Bid(s)"** means the Winning Bid for one or more of the Properties as defined in the Overbid Procedures.

**"Winning Bidder(s)"** means the Winning Bidder for one or more of the Properties as defined in the Overbid Procedures.

**"Yucaipa Deposit"** means the approximately $1,008,000.00 on deposit with the YVWD.

**"Yucaipa Funds"** means the portion of the Yucaipa Deposit paid to the Trustee pursuant to the Yucaipa Settlement Agreement.

**"Yucaipa Settlement Agreement"** means that certain Settlement and Release Agreement between Trustee, on behalf of the Summerwind Ranch Estate, and Oak Valley Partners, L.P.

**"Yucaipa Settlement Motion"** means the Trustee's motion to approve the Yucaipa Settlement Agreement.

**"YVWD"** means the Yucaipa Valley Water District.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

# EXHIBIT 1

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc Main Document Page 75 of 125

BINDING AMENDED AND RESTATED TERM SHEET AMONG LCPI AS ADMINISTRATIVE AGENT FOR THE 1st LIEN LENDERS, LCPI AS THE 2ND LIEN LENDER, LCPI AS THE 3RD LIEN LENDER, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND THE CHAPTER 11 TRUSTEE

This Binding Amended And Restated Term Sheet dated as of August 18, 2010 (this "Term Sheet") is by and among ALFRED H. SIEGEL, solely in his capacity as the chapter 11 trustee (the "Trustee") of the administratively-consolidated estates of LBREP/L-SunCal Master I LLC ("Parent Debtor"), LBREP/L-SunCal McAllister Ranch LLC ("McAllister Ranch"), LBREP/L-SunCal McSweeny Farms LLC ("McSweeny Farms"), and LBREP/L-SunCal Summerwind Ranch LLC ("Summerwind Ranch"; with McAllister Ranch, McSweeny Farms and Summerwind Ranch being referred to collectively as the "Subsidiary Debtors," and together with the Parent Debtor, as the "Debtors") in their respective bankruptcy cases (the "SunCal Bankruptcy Cases") now pending in the United States Bankruptcy Court for the Central District of California (the "California Bankruptcy Court"); THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS of the Debtors (the "Creditors' Committee"); LEHMAN COMMERCIAL PAPER INC. ("LCPI"), in its capacity as administrative agent for the first-position secured lenders of the Debtors (the "1st Lien Lenders"); and is acknowledged and agreed as to certain provisions by one or more 1st Lien Lenders; by LCPI in its capacity as a second-position secured lender of the Debtors ("LCPI 2nd Lien Lender"); and by LCPI in its capacity as a third-position secured lender of the Debtors ("LCPI 3rd Lien Lender"), in order to reach interim agreement with respect to the distribution of certain funds, to establish certain parameters for a chapter 11 plan of reorganization for the Debtors and otherwise to establish the terms for globally resolving all disputes between the parties to this Term Sheet. Notwithstanding any references to the contrary contained herein, each and every reference in this Term Sheet to "Trustee" shall mean and refer to ALFRED H. SIEGEL solely and exclusively in his capacity as the chapter 11 trustee of the administratively-consolidated estates of the Debtors, and in no other capacity, and in no event whatsoever shall ALFRED H. SIEGEL have any personal liability of any kind, nature or amount as a result of this Term Sheet, including, without limitation, any performance, failure of performance, breach, default or other circumstance arising from or related to this Term Sheet, the implementation thereof, or the transactions contemplated herein.

That certain Binding Term Sheet Among LCPI As Administrative Agent For The 1st Lien Lenders, The Official Committee Of Unsecured Creditors, And The Chapter 11 Trustee, dated September 23, 2009 (the "Original Term Sheet"), is hereby superseded, amended, restated and replaced in its entirety by the terms hereof, and the Original Term Sheet is and shall be null and void and of no further binding force or effect.

**DEAL TERMS**

**The Amended Compromise Motion**

A. 1. The Trustee will seek approval of this compromise by filing an amended motion (the "Amended Compromise Motion") under Federal Bankruptcy Rule 9019 within ten (10) calendar days of the Trustee's actual receipt of a copy of this Term Sheet fully executed by all non-Trustee parties hereto. The Trustee shall file the Amended Compromise Motion in all of the SunCal Bankruptcy Cases and LCPI shall

concurrently file the Amended Compromise Motion in the LCPI bankruptcy case (the "LCPI Bankruptcy Case", and together with the SunCal Bankruptcy Cases, the "Bankruptcy Cases") pending in the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court", and together with the California Bankruptcy Court, the "Bankruptcy Courts") to obtain approval of this Term Sheet. The orders approving the Amended Compromise Motions (the "Compromise Orders") must be obtained, entered in the respective Bankruptcy Courts and become "Final Orders" (as defined in paragraph A(2) below), by no later than November 1, 2010, unless this date is extended by mutual agreement of the Trustee, LCPI and the Creditors' Committee. If the Compromise Orders have not become Final Orders on or before November 30, 2010, this Term Sheet, and the terms and provisions hereof and thereof shall become null and void and of no further force and effect, in which case the parties hereto shall have no further obligations hereunder or to each other with respect to the subject matter hereof. Immediately upon the last of the Compromise Orders becoming a Final Order, this Term Sheet shall be binding on LCPI, the Trustee, the Creditors' Committee and each other party hereto (such date being referred to herein as the "Settlement Effective Date"). All parties hereto acknowledge that all other parties hereto intend to and will rely on the binding nature of this Term Sheet as of the Settlement Effective Date in moving forward with the Bankruptcy Cases. The terms of this Term Sheet will be incorporated into one or more plans of reorganization to be filed by the Trustee (the "Plan") in consultation with, or jointly with, the Creditors' Committee in the California Bankruptcy Court with respect to the SunCal Bankruptcy Cases. The Trustee and the Creditors' Committee shall work together in good faith with LCPI to ensure that the Plan is consistent with this Term Sheet. If LCPI believes that the Plan filed does not materially conform to this Term Sheet, then LCPI shall have the right to object to the Plan solely with respect to the alleged material nonconformity with the Term Sheet, and the Trustee and the Committee agree that the Plan shall be modified, consistent with any ruling of the Bankruptcy Courts to make it conform materially with the Term Sheet. The Plan shall be subject to LCPI's reasonable consent prior to filing, provided such consent shall not be withheld if the Plan is in a form and substance materially consistent with the Term Sheet.

2. "Final Order" means an order or judgment of either of the Bankruptcy Courts entered on the Bankruptcy Court's docket where either: (a) the time to appeal or to seek review, remand, rehearing, or a writ of certiorari has expired and as to which no timely filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending, or (b) if such an appeal or petition has been timely filed, there is no stay pending appeal or other injunction or court order in place which prohibits the enforcement of the Term Sheet.

3. Subject to the Settlement Effective Date, the Trustee and the Creditors' Committee shall stipulate to LCPI being granted immediate relief from the automatic stay for the sole and only purpose of allowing LCPI in its capacity as administrative agent for the 1st Lien Lenders to record a new notice of default on behalf of the 1st Lien Lenders with respect to the Parent Debtor and Subsidiary Debtors so as to allow LCPI to re-commence the period within which a foreclosure sale may be conducted

with respect to such first position lien. This stipulation shall not include relief from stay for any other or further foreclosure or enforcement actions such as, but not limited to, recording of a notice of sale or the holding of a trustee's sale.

**Allowance of Claim of LCPI; Claims Filed by 2nd and 3rd Lien Lenders**

B. Upon the Settlement Effective Date, the claim of the 1st Lien Lenders in the aggregate amount of $230,006,233.98 plus accrued and unpaid interest calculated through September 10, 2008 (the "Petition Date"), and accrued and unpaid legal fees shall be allowed in each of the SunCal Bankruptcy Cases; provided, however, the 1st Lien Lenders' allowed secured claims against the Subsidiary Debtors shall be in the amount of the 1st Lien Lenders' final credit bid under 11 U.S.C. Section 1123(a)(5)(d) pursuant to the Plan, as set forth in and adjusted in accordance with paragraphs E and F below (or, in the case of one or more successful bids by any third-party purchasers at the related sales pursuant to the Plan, the aggregate amount of such successful third-party bids), plus any amounts received by the 1st Lien Lenders as described in paragraph D below, and minus any amounts paid by the 1st Lien Lenders as described in paragraph H below. Any amount not deemed a portion of the 1st Lien Lenders' allowed secured claim shall be deemed an allowed unsecured claim against all of the Debtors as further described in paragraph F below. Proofs of claim have been filed in the Bankruptcy Cases by second position lenders (the "2nd Lien Lenders") and third position lenders (the "3rd Lien Lenders", with the 1st Lien Lenders, the 2nd Lien Lenders and the 3rd Lien Lenders being referred to collectively as the "Lenders"). The Lenders have alleged that their loans to the Parent Debtor are guaranteed by each of the Subsidiary Debtors. This Term Sheet is not intended to affect the rights, if any, of (a) the 2nd Lien Lenders other than LCPI 2nd Lien Lender, (b) the 3rd Lien Lenders other than LCPI 3rd Lien Lender, or (c) any other Person (as defined in the First Lien Credit Agreement dated January 19, 2006 (as amended) among LCPI, Parent Debtor, the 1st Lien Lenders, and certain other parties (the "First Lien Credit Agreement"), except to the extent that a Person is a party hereto, with such Person's rights being affected to the extent expressly provided herein).

**Distributions Upon Settlement Effective Date**

C. 1. On the Settlement Effective Date, the Trustee will retain $3.5 million from those certain Parent Debtor funds previously held by First Bank & Trust and subsequently transferred to the Trustee for the benefit of the Debtors' estates, which funds are currently subject to the liens and rights of the 1st Lien Lenders (the "Development Account Funds"), for use by the Trustee in administration of the SunCal Bankruptcy Cases. The $3.5 million of the Development Account Funds retained by the Trustee pursuant to this Term Sheet for use by the Trustee in administration of the SunCal Bankruptcy Cases shall hereinafter be referred to as the "Administrative Funds". The Administrative Funds shall be immediately available to the Trustee to pay administrative claims owing in the SunCal Bankruptcy Cases. In addition, upon the effective date of the Plan, any portion of the Administrative Funds not used to pay administrative claims as provided in the previous sentence or used or reserved to pay post-confirmation fees and costs of professionals of the Debtors' estates and/or

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc
Main Document Page 78 of 125

quarterly fees payable to the Office of the United States Trustee and court costs shall be available to make distributions to non-Lender creditors in respect of unsecured claims. In addition to the $3.5 million in Administrative Funds, the Trustee shall also retain $2.0 million of the Development Account Funds (the "Remaining Development Funds"), which Remaining Development Funds may be used by the Trustee solely to fund the ongoing current expenses of maintaining the real property owned by McAllister Ranch, McSweeny Farms, and Summerwind Ranch (together, the "Properties") pursuant to cash collateral orders of the California Bankruptcy Court in a manner consistent with the budget attached as Exhibit "A" hereto (the "Approved Budget"), subject to the budget variances allowed pursuant to Paragraph G below, or otherwise for uses for which the Trustee obtains the 1st Lien Lenders' consent (not to be unreasonably withheld) or which are approved by the California Bankruptcy Court after notice to the 1st Lien Lenders. The Approved Budget shall include quarterly fees payable to the Office of the United States Trustee and court costs. Any unused Remaining Development Funds will be transferred to the 1st Lien Lenders within five business days of the date that the Debtors no longer hold title to the Properties.

2. The funds currently on deposit with the Yucaipa Valley Water District and to be paid to the Trustee pursuant to that certain Settlement and Release Agreement (the "Yucaipa Settlement") between the Trustee and Oak Valley Partners, L.P. (the "Yucaipa Funds"), shall be split 50/50 between the 1st Lien Lenders and the Trustee. The Trustee's 50% portion of the Yucaipa Funds shall be referred to herein as the "Trustee's YFP"; and the 1st Lien Lenders' 50% portion of the Yucaipa funds shall be referred to herein as the "1st Lien Lenders' YFP." Following the entry of an order approving the Yucaipa Settlement by the California Bankruptcy Court (the "Yucaipa Settlement Order") and the Trustee's receipt of the Yucaipa Funds, the Yucaipa Funds shall be segregated by the Trustee from other funds in his possession relating to the Debtors and held by the Trustee, subject to the asserted liens, claims, interests and encumbrances of the 1st Lien Lenders. On the Settlement Effective Date, (a) the 1stLien Lenders' YFP shall be paid to the 1st Lien Lenders free and clear of any claims or interests of the Trustee, the Debtors, the Debtors' estates and any party claiming by or through the Debtors, and (b) the asserted liens, claims, interests and encumbrances of the 1st Lien Lenders in the Trustee's YFP shall be avoided and preserved for the benefit of the Detbors' bankruptcy estates pursuant to 11 U.S.C. §§ 544 and 551, and the the Trustee's YFP shall immediately be available for use by the Trustee in the administration of the SunCal Bankruptcy Cases. The Trustee's YFP shall constitute additional funds of the Trustee and shall be treated as additional Administrative Funds (as Administrative Funds is defined in paragraph C).

Notwithstanding the foregoing, (a) if the Yucaipa Settlement is approved by the California Bankruptcy Court and the Trustee receives possession of the Yucaipa Funds but the Settlment Effective Date does not occur by the deadline set forth in paragraph A(1) above , then the Yucaipa Funds shall be segregated by the Trustee subject to the asserted liens, claims, interests and encumbrances of the 1st Lien Lenders, which liens, claims, interests and encumbrances may be challenged by the Trustee in accordance with applicable law and procedure and shall not be distributed or used without further order of the California Bankruptcy Court obtained on proper

notice and hearing, and (b) if the Yucaipa Settlement is not approved by the California Bankruptcy Court, the respective rights of the parties to the Term Sheet to all the funds currently held by the Yucaipa Valley Water District shall be preserved. Notwithstanding the foregoing, nothing herein shall be deemed an admission regarding the existence or validity of any lien or right asserted by the 1st Lien Lenders in the funds currently held by the Yucaipa Valley Water District.

D. Upon the Settlement Effective Date, the Trustee shall immediately transfer to the 1st Lien Lenders, free and clear of any claims or interests of the Trustee, the Debtors, the Debtors' estates and any party claiming by or through the Debtors, (a) all Development Account Funds less the aggregate $5.5 million in Administrative Funds and Remaining Development Funds to be retained by the Trustee pursuant to paragraph C above and (b) the 1st Lien Lenders' YFP (all of the funds to be transferred to the 1st Lien Lenders hereafter referred to as the "1st Lien Lenders Retained Settlement Funds").

**Sale Of Properties Under The Plan**

E. The 1st Lien Lenders acting collectively in concert shall be the initial bidder with respect to each of the Properties and, subject to paragraph F below, shall credit-bid their allowed secured claims with respect to each Property in accordance with the bidding procedures set forth in paragraphs F and P below, as such bidding procedures may be further drafted and agreed upon by the parties hereto in consultation with a real property broker acceptable to each of the parties hereto (the "Approved Broker") and otherwise approved by the California Bankruptcy Court to the extent required (together, the "Bidding Procedures"). Properties for which the 1st Lien Lenders are determined to be the winning bidders pursuant to, in accordance with, and as more particularly described in the Bidding Procedures (the "Winning Bidders"), and which are purchased by the 1st Lien Lenders by way of credit bid, shall be transferred to the 1st Lien Lenders subject to (i) the lien of the 1st Lien Lenders, (ii) Senior Liens (hereinafter defined), and (iii) liens, claims, encumbrances or interests that satisfy clause (b), (c) and/or (d) of the definition of "Permitted Exceptions" set forth in the First Lien Credit Agreement (items described in this clause (iii), "Permitted Liens") Properties for which one or more third parties are determined to be the Winning Bidders shall be sold under the Plan pursuant to 11 U.S.C. Section 1123(a)(5)(d) free and clear of liens, claims, encumbrances or interests other than Permitted Liens.

F. The initial credit bids by the 1st Lien Lenders shall be in an aggregate amount which shall be at least equal to $45 million (the "Aggregate Minimum Credit Bid Amount") and shall not exceed a maximum amount (the "Aggregate Maximum Credit Bid Amount"), with such Maximum Credit Bid Amount to be determined prior to the Settlement Effective Date by the 1st Lien Lenders in consultation with the Approved Broker. The Aggregate Minimum Credit Bid Amount and the Aggregate Maximum Credit Bid Amount shall be respectively allocated among the three Properties by the parties hereto in consultation with the Approved Broker prior to the Settlement Effective Date (the Aggregate Maximum Credit Bid Amount as so allocated in each case, the "Allocated Maximum Credit Bid Amount"). The 1st Lien Lenders shall be

entitled to increase their respective credit bid for each Property to an amount, to be determined prior to the Settlement Effective Date by the parties hereto in consultation with the Approved Broker, in excess of the highest competing bid for such Property, if any, up to the Allocated Maximum Credit Bid Amount with respect to such Property and up to the Aggregate Maximum Credit Bid Amount in the aggregate for all of the 1st Lien Lenders' credit bids with respect to the Properties (in each case with no set-offs, reductions or other defenses) in their discretion in accordance with the overbid procedures set forth herein. If one or more of the Properties are successfully bid upon by a qualified bidder (as the same may be more particularly described in the Bidding Procedures, each a "Qualified Bidder"), the Trustee may, subject to the right of the 1st Lien Lenders to submit a greater bid, sell such Property(ies) to such third party free and clear of all Liens (including the lien of the 1st Lien Lenders) other than Permitted Liens (hereinafter defined). Any Senior Liens and the lien of the 1st Lien Lenders shall each attach to any monies (other than the Trustee's Participation under paragraph R) received from the sale to a third party and such monies, net of any ordinary course sales costs and subject to the rights of any holders of Senior Liens, shall be paid to the 1st Lien Lenders. Payment of the Trustee's Participation to the Trustee shall only be made at such time when all Senior Lien claims have been resolved (through settlement, payment or otherwise) or Fidelity has accepted responsibility for all remaining Senior Liens. The 1st Lien Lenders shall have an allowed unsecured claim as set forth in paragraph B above. For the avoidance of doubt, in accordance with paragraph B above, the calculation of the 1st Lien Lenders' allowed unsecured claim shall take into account (1) the 1st Lien Lenders' aggregate credit bids for those Properties that were included in their winning bids pursuant to and in accordance with the Bidding Procedures (as the same may be more particularly described in the Bidding Procedures, each a "Winning Bid") minus any liabilities (including, without limitation, liabilities in respect of any Senior Liens) assumed by the 1st Lien Lenders in connection with the transfer of title to such Properties to the 1st Lien Lenders pursuant to such Winning Bids and (2) any proceeds received by the 1st Lien Lenders from the sale pursuant to the Plan of any of the Properties that were not included in the 1st Lien Lenders' Winning Bids to one or more third parties.

Use of Remaining Development Funds; Trustee Loss Collateral

G. During the period from the Settlement Effective Date until the transfer of title of all of the Properties to the 1st Lien Lenders and/or to any third party(ies), either pursuant to the Plan or by way of a foreclosure by the 1st Lien Lenders (the "Trustee Maintenance Period"), the Trustee shall be authorized to pay all expenses incidental to the ownership, operation and maintenance of the Properties from the Remaining Development Funds in amounts not to exceed those on the Approved Budget (plus a variance of 10% on a line-item basis of the amounts set forth therein), without the further consent of the 1st Lien Lenders. Immediately upon the Settlement Effective Date, LCPI on behalf of and as agent for the 1st Lien Lenders shall deliver to the Trustee cash or one or more irrevocable letters of credit acceptable to the Trustee in his reasonable discretion (together, the "Trustee Loss Collateral") in the aggregate amount of $500,000 (in the case of cash, to be held in escrow and released solely in accordance with the terms and conditions of this Term Sheet). During the Trustee

Maintenance Period, in the event the Trustee incurs proven losses (not otherwise covered by insurance) based upon claims of simple negligence or strict liability in connection with his ownership, operation, maintenance and management of the Properties, but not in the event of any gross negligence or gross malfeasance on the part of the Trustee, the Trustee shall have the right to draw and recover from the Trustee Loss Collateral an amount not to exceed in the aggregate the lesser of (i) the amount of such losses multiplied by a fraction, the numerator of which is the amount of the 1st Lien Lenders Retained Settlement Funds actually paid over to the 1st Lien Lenders (including any unused Remaining Development Funds actually paid over to the 1st Lien Lenders pursuant to paragraph C above) and the denominator of which is the aforementioned amount plus $5.5 million[1], and (ii) the full amount of the Trustee Loss Collateral, and in the event such recovery from the Trustee Loss Collateral is insufficient to cover such losses, the Trustee shall have the right, but not the obligation, to apply Administrative Funds to cover such losses. Upon the earlier to occur of (i) a Termination Event or (ii) the effective date of the Plan, the Trustee shall deliver any remaining cash Trustee Loss Collateral to LCPI for the benefit of the 1st Lien Lenders. Further, LCPI on behalf of and as agent for the 1st Lien Lenders hereby fully and forever releases and discharges the Trustee both in his capacity as trustee and in his individual capacity with respect to any acts or omissions occurring or claims arising in any way related to the subject matter hereof or the Trustee's actions or duties with respect to the Debtors or the Properties prior to the conclusion of the Trustee Maintenance Period, except to the extent of any gross negligence or gross malfeasance on the part of the Trustee.

H. To the extent that the Remaining Development Funds are inadequate to fund the Trustee's reasonable and necessary expenses with respect to the ownership, preservation and maintenance (but not development) of the Properties through and including January 31, 2011, the 1st Lien Lenders agree to pay for such reasonable and necessary expenses to the extent they are (i) consistent in nature and amount with expenses provided for in prior cash collateral budgets approved by the California Bankruptcy Court and (ii) in an aggregate amount not to exceed fifty percent (50%) of the amount of the 1st Lien Lenders Retained Settlement Funds actually received by the 1st Lien Lenders. These expenses shall be paid within ten (10) days following written request accompanied by reasonable back-up documentation by the Trustee to LCPI and LCPI's good faith determination that such expenses are reasonable and necessary; however, if there is a dispute as to the reasonableness or necessity of any of the expenses incurred by the Trustee, the California Bankruptcy Court shall retain jurisdiction to hear and determine the Trustee's motion to compel payment of such expenses. Pending payment of such expenses by the 1st Lien Lenders, the Trustee shall be authorized to use the Administrative Funds for the purposes set forth in this paragraph H.

[1] As an example only, in the case of an $800,000 loss, if the amount of 1st Lien Lenders Retained Settlement Funds actually paid over to the 1st Lien Lenders is $8.5 million, then the numerator will be $8.5 million, the denominator will be $14 million (i.e. $8.5 million plus $5.5 million), the resulting fraction will be 8.5/14 (= 0.6071428571) and the Trustee's recovery would be $485,714.29 ($800,000 multiplied by 0.6071428571) which is less than $500,000 (i.e., the full amount of the Trustee's Loss Collateral).

Information Regarding Title Insurance Policy

I. LCPI has heretofore provided the Trustee with a complete copy of that certain Title Insurance Policy number 27-44-94-120334 (the "Title Insurance Policy") issued by Fidelity National Title Insurance Company ("Fidelity") for the benefit of LCPI as administrative agent for the 1st Lien Lenders for the Properties. Promptly upon execution of this Term Sheet LCPI will provide the Trustee with all documents and information reasonably related to the Title Insurance Policy and any and all claims made by the 1st Lien Lenders thereunder so as to allow the Trustee to comply with the requirements of paragraphs J and K below and otherwise to proceed with such matters to conclusion.

Resolution of Senior Liens; Availability of Title Insurance

J. The Trustee shall reasonably cooperate with the 1st Lien Lenders in their efforts to determine whether any Liens are superior to the 1st Lien Lenders' lien in the applicable Properties and to determine the proper amount of any such superior Liens ("Senior Liens"); provided, however, the Trustee shall not be obligated to take any action that would cause the Trustee or the Debtors' bankruptcy estates to incur material cost or liability.

Release

K. 1. As of the Settlement Effective Date, (A) the Debtors' estates through the Trustee shall be deemed to have released the 1st Lien Lenders and LCPI (in its individual capacity and in its capacity as administrative agent for the 1st Lien Lenders), and, subject to the second-to-last sentence of this paragraph K, their respective affiliated parties, officers, directors, employees, agents and attorneys, and (B) LCPI (in its individual capacity as a 1st Lien Lender and in its capacity as administrative agent for the 1st Lien Lenders but not in any other capacity) and the 1st Lien Lenders will be deemed to have released the Debtors' estates and the Trustee and the Trustee's agents and attorneys, in each case for and from all claims (as defined in Section 101(5) of the Bankruptcy Code and including any claims that could be brought by or against the Trustee pursuant to the Bankruptcy Code) other than the allowance of the Lenders' claims as set forth in paragraph B above and the rights to receive distributions based on those allowed claims. Notwithstanding the foregoing and for the avoidance of doubt, the releases to be exchanged shall not include claims and causes of action against any third parties other than the 1st Lien Lenders and LCPI and their respective affiliated parties, officers, directors, employees, agents and attorneys acting in their capacities as lenders, agents, loan administrators or advisors thereto, and such releases specifically shall *not* include a release of LBREP Lakeside SC Master I LLC ("LBREP Lakeside"); SCC Acquisitions, Inc. ("SCC Inc."); SCC Acquisitions, LLC ("SCC LLC"); or SCC Ranch Ventures LLC (collectively with SCC Inc. and SCC LLC, "SCC") or any claims related to the acts of the owners of any of the Debtors including any transfers of funds by any of the owners of any of the Debtors. Notwithstanding anything above, nothing in this paragraph K shall be deemed a release of the respective parties' obligations under this Term Sheet. If the Settlement

Effective Date does not occur for any reason, the foregoing releases shall be of no force or effect.

2. As to the matters released pursuant to paragraph K(1) above, the parties hereby expressly waive all rights under the provisions of Section 1542 of the Civil Code of the State of California and any similar rights in any state or territory or under any similar statute or regulation of the United States or any of its agencies. Section 1542 of this California Civil Code reads as follows:

**"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

Each party waives and relinquishes any rights and benefits that any of them may have under California Civil Code Section 1542 pertaining to the subject of their releases set forth in paragraph K(1) above, and acknowledges that it is aware that it may hereafter discover facts in addition to or different from those which it now knows or believes to be true with respect to the matters released pursuant to paragraph K(1) above, but its intention hereby is to fully, finally and forever waive and release the claims released pursuant to paragraph K(1) above. Each party represents, warrants and agrees that this waiver is a material term of this Term Sheet, without which neither party would have entered into this Term Sheet.

**Support of the Plan**

L. LCPI hereby agrees that, subject to its receipt of a Disclosure Statement and other solicitation materials in respect of the Plan, which Disclosure Statement and other solicitation materials (i) implement this Term Sheet and (ii) are not otherwise materially inconsistent with such terms, it being recognized that this Term Sheet shall not constitute an agreement by LCPI to take any step or action that would violate any provision of applicable bankruptcy law or any other applicable laws, and to the extent any provision hereof shall be construed as constituting such a violation, such provision shall be deemed stricken herefrom and of no force and effect without liability to any of the parties, LCPI will, as promptly as practicable following the California Bankruptcy Court's approval of the Disclosure Statement and solicitation materials, present the Plan and related materials to the 1st Lien Lenders and recommend that the 1st Lien Lenders vote to accept the Plan, provided that to the extent the Plan contains additional terms and provisions unrelated to the substantive provisions of the Term Sheet, such additional terms and provisions are reasonably acceptable to LCPI and the 1st Lien Lenders. Also, subject to the occurrence of the Settlement Effective Date, LCPI and those other 1st Lien Lenders who have signed this Term Sheet agree, prior to the occurrence of a Termination Event, not to vote in favor of any other plan that fails to incorporate the substantive provisions of this Term Sheet until such time (if any) as the provisions set forth in paragraph T below are in effect.

M. All 1st Lien Lenders who are on the "steering committee" are parties to this Term Sheet. All parties to this Term Sheet agree, prior to the occurrence of a Termination

Event, to support confirmation of the Plan provided the same is consistent in all material respects with the terms of this Term Sheet and does not contain material terms and provisions which have not been approved by LCPI and the "steering committee" of 1st Lien Lenders. Notwithstanding anything to the contrary contained herein, nothing in this Term Sheet shall constitute a representation or warranty by LCPI that the 1st Lien Lenders will vote in favor of the Plan by the requisite majorities under the Bankruptcy Code to obtain acceptance of the Plan by the class of 1st Lien Lenders nor shall LCPI have any liability in respect of such voting by the 1st Lien Lenders (subject to LCPI's obligation to recommend approval as provided above).

N. Nothing contained in this Term Sheet shall limit or interfere, in any way, with the ability of any 1st Lien Lender or member of the "steering committee" to transfer or assign its interests under the First Lien Credit Agreement. However, if such transferor or assignor has signed this Term Sheet, its transferees or assignees shall be bound by the provisions of this Term Sheet to the same extent such transferor or assignor was bound thereby. The transfer or assignment of all or part of such transferor's or assignor's interests under the First Lien Credit Agreement shall constitute a novation, whereby, such transferor or assignor shall automatically receive a release of its obligations under this Term Sheet by and to the same extent that its transferee or assignee is bound by the provisions of this Term Sheet.

<u>Key Plan Provisions</u>.

O. The 1st Lien Lenders will be classified as a separate class under the Plan.

P. The Plan will provide that the Trustee will sell the Properties (including without limitation any related personal property) pursuant to 11 U.S.C. Section 1123(a)(5)(d) and in accordance with the terms and conditions of this Term Sheet and the Bidding Procedures to the 1st Lien Lenders and/or one or more successful third party Qualified Bidders, as the case may be, free and clear of Liens other than (i) Permitted Liens in the case of a sale to a third party Qualified Bidder or (ii) Senior Liens, Permitted Liens and the Liens of the 1st Lien Lenders in the case of a sale to the 1st Lien Lenders pursuant to a credit bid.

Q. 1. The Plan will provide that until such time as the earliest to occur of (a) all holders of allowed claims, other than the Lenders, have been paid in full the allowed amounts of their respective claims according to their respective legal priorities, (b) the Lenders have been paid the full amount of their allowed claims, or (c) this Term Sheet terminates in accordance with the terms hereof, any recovery of proceeds from any avoidance action, litigation (including, without limitation, litigation in respect of any claims of fraudulent conveyance), asset disposition (excluding the sale of the Properties), or other recovery by the Trustee prior to or after Plan confirmation (the "<u>Other Recoveries</u>"), after payment in full of all allowed administrative and other priority unsecured claims in all four of the SunCal Bankruptcy Cases (collectively, the "<u>Unsecured Priority Claims</u>"), shall be split 50/50 between the 1st Lien Lenders (based on the understanding of the parties hereto that, and only if, all such proceeds

would be distributed to the 1st Lien Lenders under the Intercreditor Agreement, defined below in this paragraph) and the holders of allowed claims other than the Lenders (the "Trade Creditors", which term excludes any and all claims by the Lenders). The portion of the Other Recoveries that is allocated to the Trade Creditors (the "Trade Creditor Allocation") shall be distributed to Trade Creditors pursuant to a confirmed administratively-consolidated chapter 11 plan on a pro rata basis among those Trade Creditors based on the allowed amount of their respective claims. Distributions to Trade Creditors shall be made out of a single fund consisting of Other Recoveries that shall be administered by an appropriate fiduciary. This division of Other Recoveries shall be enforceable in the Bankruptcy Courts and any court of competent jurisdiction notwithstanding (1) the effect or terms of any agreement among the Lenders; (2) that assets, claims or causes of action may be held or pursued on behalf of one or only some of the Debtors; and (3) that Parent Debtor has few if any creditors other than the Lenders. After all Trade Creditors of the Debtors' estates are paid in full, the balance of the funds in the Debtors' estates, if any, shall be distributed to the Lenders in accordance with their respective priorities but subject to that certain Amended and Restated Intercreditor Agreement among the 1st Lien Lenders, the 2nd Lien Lenders and the 3rd Lien Lenders dated as of February 6, 2007 (the "Intercreditor Agreement"). If the foregoing allocations are either altered without the consent of the parties hereto or not approved by one or both of the Bankruptcy Courts, then any allowed unsecured claim of the 1st Lien Lenders (the "Assigned 1st Lien Lenders' Claim") shall be deemed assigned to the Debtors' bankruptcy estates for the benefit of all non-Lender claims, free and clear of any claims, liens or interests of the 1st Lien Lenders, but without representation or warranty and only for the purpose of effectuating the 50/50 distribution scheme provided for in this paragraph Q. To the extent that the Assigned 1st Lien Lenders' Claim does not provide the Debtors' estates with the equivalent of what they otherwise would have received under the 50/50 distribution scheme, then any allowed unsecured claim of (x) LCPI 2nd Lien Lender (the "Assigned LCPI 2nd Lien Lender's Claim") and (y) LCPI 3rd Lien Lender (the "Assigned LCPI 3rd Lien Lender's Claim", and collectively with the Assigned 1st Lien Lenders' Claim and the Assigned LCPI 2nd Lien Lender's Claim, the "Assigned Lenders' Claims") shall each be deemed assigned to the Debtors' bankruptcy estates for the benefit of all non-Lender claims, free and clear of any claims, liens or interests of the 1st Lien Lenders, LCPI 2nd Lien Lender and LCPI 3rd Lien Lender, but without representation or warranty and only to the extent necessary to provide the Debtors' estates with the equivalent of what they otherwise would have received pursuant to this paragraph Q. The proceeds from the Assigned Lenders' Claims shall be distributed first, to all unpaid Unsecured Priority Claims and second, to all Trade Creditors on a pro rata basis. After all of the Unsecured Priority Claims (to the extent that same were not previously paid out of the Administrative Claims) and Trade Creditors are paid in full, the remaining proceeds from (i) the Assigned 1st Lien Lenders' Claim shall be paid to the 1st Lien Lenders, (ii) the Assigned LCPI 2nd Lien Lender's Claim shall be paid to the 2nd Lien Lenders, and (iii) the Assigned LCPI 3rd Lien Lender's Claim shall be paid to the 3rd Lien Lenders.

R. In addition, the Trustee shall be entitled to, and shall recover and receive from the Proceeds (hereinafter defined) of dispositions of the Properties, the lesser of (1) the amount sufficient to pay in full the allowed amount of the claims of the holders of allowed claims other than the Lenders to the extent not previously paid, and (2) 3.5% of such Proceeds (the "Trustee's Participation"); provided that, at the time of any such subsequent disposition the holders of allowed claims other than the Lenders shall not have otherwise been paid the full allowed amount of their claims. The Trustee's Participation in each portion of any Proceeds that consists of cash shall be immediately due and payable to the Trustee from the 1st Lien Lenders in cash upon the 1st Lien Lenders' receipt of such portion of the applicable Proceeds. The Trustee's Participation shall be transferred to the Trustee free and clear of Lender liens for the sole benefit of all allowed non-Lender unsecured claims. As used herein, "Proceeds" shall mean all cash and other property constituting proceeds of the disposition of each Property, including the proceeds from the sale of any of the Properties under paragraph E to a party other than the 1st Lien Lenders (but excluding any transfer of a Property to the 1st Lien Lenders pursuant to a credit bid) and including the proceeds from any disposition of the Property by the 1st Lien Lenders or any of their affiliates following their acquisition thereof pursuant to a credit bit, whether such proceeds are received in a single lump sum or on a piecemeal basis over time, less (a) customary and reasonable costs and expenses of the sale, and (b) cash and other property used to satisfy any Senior Liens not otherwise satisfied under the Title Insurance Policy or the Plan. For the avoidance of doubt, in the case of such property actually received that consists of promissory notes, equity interests (direct or indirect) in any entities taking title to the Properties and/or other deferred or contingent payment arrangements or mechanisms, the Trustee shall be entitled to receive, at the time such promissory notes, equity interests and/or deferred or contingent payment arrangements or mechanisms are received or implemented by the 1st Lien Lenders or their applicable affiliates or principals, a profits participation or similar contractual right to receive the applicable amount representing the Trustee's Participation from all cash actually received by such entities taking title to each Property from the disposition of such Property and by the Lenders and their applicable affiliates and principals in respect of such promissory notes, which profits participation or similar right shall be provided for in the operating, partnership, or similar governing documents of such entities and in such promissory notes or other deferred or contingent payment documentation (as the case may be), in a form and substance reasonably acceptable to the Trustee with Trustee being a direct contracted beneficiary of such provisions with the legal right to contractually enforce same. The California Bankruptcy Court shall retain jurisdiction with respect to the determination of the value of any component of each Proceeds. Without limiting the foregoing, if the 1st Lien Lenders form a joint venture with, or borrow funds from, any party, including any 1st Lien Lender or affiliates of a 1st Lien Lender to obtain funding necessary to develop one or more of the Properties or to maintain and/or operate the Properties prior to any disposition, the funds required to repay such unaffiliated equity or debt, as the case may be, shall reduce dollar-for-dollar the Proceeds for the applicable Properties. The 1st Lien Lenders agree to act in good faith to carry out the terms of this paragraph R and to effectuate this participation interest of the Trustee.

The 1st Lien Lenders will, at their sole expense, provide a report and accounting to the Trustee or the Trustee's successor-in-interest as soon as possible following receipt of Proceeds and shall provide semi-annual financial reports relating to the Properties. In addition, the 1st Lien Lenders will provide such documents and other information reasonably requested by the Trustee or the Trustee's successor in interest to monitor the 1st Lien Lenders' compliance with this paragraph R. LCPI shall provide the Trustee with information reasonably necessary to verify the amount of Proceeds. Finally, the Plan may contain such other reasonable provisions as may be required to effectuate the performance of the terms of this paragraph R.

S. Intentionally omitted.

**Certain Rights and Releases Upon Termination Event**

T. If a Final Order confirming the Plan shall not have been obtained by February 28, 2011 (or such later date as may be mutually agreed upon by the Trustee, LCPI and the Creditors' Committee, such later date in no event to be later than March 31, 2011) (a "Termination Event"), then:

i. The 1st Lien Lenders immediately will be granted relief from stay to foreclose on the Properties. The Bankruptcy Court will grant this relief upon the presentation of an order by LCPI, accompanied by a declaration signed by an authorized representative of LCPI, confirming that a Termination Event has occurred. No party in interest, including without limitation the Trustee and the Creditors' Committee, shall be entitled to or permitted (A) to challenge the presentation of or entry of the order granting LCPI relief from stay with respect to the Properties, except to the extent no Termination Event has in fact occurred or (B) to challenge or otherwise interfere with the foreclosure of the Properties. Upon the entry of such order, the Trustee shall cooperate with the 1st Lien Lenders' foreclosure actions.

ii. The Trustee shall retain the Administrative Funds and the Trustee's YFP free from the secured claims of the Lenders.

iii. The 1st Lien Lenders shall retain the 1st Lien Lenders Retained Settlement Funds and the Trustee shall immediately pay over to the 1st Lien Lenders (A) the unused portion of the Remaining Development Funds, and (B) the unused portion of the Trustee Loss Collateral, in each case free and clear of any claims or interests (including without limitation any right to recovery) of the Trustee, the Debtors, the Debtors' estates and any party claiming by or through the Debtors.

iv. Intentionally omitted.

v. LCPI and the 1st Lien Lenders shall in no event be deemed to have waived any right to object to the substantive consolidation of the Debtors' cases.

vi. Intentionally omitted.

vii. Except as provided in this paragraph T, this Term Sheet shall be of no further force or effect, including any obligation contained in paragraphs L and M.

No Substantive Consolidation

U. The parties hereto acknowledge and agree that neither any provision of this Term Sheet nor any of the transactions contemplated herein, including without limitation the contemplated terms and provisions of the Plan, do nor shall (i) effect substantive consolidation of any one or more of the Debtors with any one or more of the other Debtors, (ii) suggest that any such substantive consolidation is or might be possible, or (iii) affect the right of the 1st Lien Lenders to object to the substantive consolidation of any one or more of the Debtors with any one or more of the other Debtors. However, nothing here shall constitute a waiver of the rights of the parties to seek substantive consolidation of one or more of the Debtors if such is necessary or appropriate in the interests of creditors.

Miscellaneous Provisions

V. 1. Upon the last of the Compromise Orders becoming a Final Order, this Term Sheet shall be binding upon the parties hereto and their respective heirs, representatives, transferees, successors and assigns. Notwithstanding the foregoing, this Term Sheet and the rights and obligations hereunder may not be assigned by a party hereto without the prior written consent of the other parties.

2. LCPI will use reasonable efforts to obtain by September 30, 2010, an agreement from the 1st Lien Lenders tolling the statute of limitations within which the Trustee must file a complaint against the 1st Lien Lenders based on the operative facts alleged in the draft attached to his proof of claims previously filed in the LCPI chapter 11 case or to avoid the 1st Lien Lenders' asserted lien against the funds currently held by the Yucaipa Valley Water District until March 31, 2011.

3. In the event of any dispute between the parties hereto arising out of the subject matter of this Term Sheet, the prevailing party in such action shall be entitled to have and to recover from the other party its reasonable attorneys' fees and other reasonable expenses (including expert witness fees) in connection with such action or proceeding in addition to its recoverable court costs.

4. This Term Sheet shall be construed in accordance with the laws of the State of California in effect at the time of the execution of this Term Sheet except to the extent superseded by the laws of the United States. The parties hereto agree that the California Bankruptcy Court shall have jurisdiction to hear and to determine all matters, disputes and controversies related to this Term Sheet and the subject matter hereof, and each party hereby submits to the jurisdiction and venue of the California Bankruptcy Court with respect thereto. Notwithstanding the foregoing, if the California Bankruptcy Court will not accept jurisdiction or otherwise hear any such matter, then such matter shall be heard by the Orange County Superior Court for the

State of California, and each party hereby submits to the jurisdiction and venue of such court with respect thereto.

5. This Term Sheet contains the entire understanding between the parties relating to the transactions and matters contemplated hereby and all prior or contemporaneous agreements, term sheets, understandings, representations and statements, oral or written are merged herein and shall be of no further force or effect.

6. If any term, provision, condition or covenant of this Term Sheet or the application thereof to any party or circumstances shall, to any extent, be held invalid or unenforceable, the remainder of this Term Sheet, or the application of such term, provision, condition or covenant to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Term Sheet shall be valid and enforceable to the fullest extent permitted by law.

7. Any alteration, change or modification of or to this Term Sheet, in order to become effective, shall be made by written modification hereof executed by all of the parties hereto.

8. This Term Sheet and any modifications, amendments or supplements thereto may be executed in several counterparts, and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all parties are not signatories to the original or the same counterpart. The parties may also deliver executed copies of this Term Sheet to each other by facsimile or by electronic delivery (e.g., .pdf), which facsimile or electronic signatures shall be binding upon the parties as if they were originals.

9. The parties hereto each agree in good faith to undertake such further actions and deliver such further documentation as may be reasonably necessary in order to facilitate the transactions contemplated in this Term Sheet and to implement the terms hereof, provided that no party shall be obligated to incur expenses or liabilities in connection therewith which exceed those expenses and liabilities which they would otherwise incur complying with the express terms hereof.

[Signatures appear on the following page]

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc Main Document Page 90 of 125

______________________________ Dated:________________

Alfred H. Siegel, solely in his capacity as the Chapter 11 Trustee
of the administratively consolidated estates
of LBREP/L-SunCal Master I LLC,
LBREP/L-SunCal McAllister Ranch LLC,
LBREP/L-SunCal McSweeny Farms,
and LBREP/L-SunCal Summerwind Ranch

[Signatures continue on the following page]

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS
of LBREP/L-SunCal Master I LLC,
LBREP/L-SunCal McAllister Ranch LLC,
LBREP/L-SunCal McSweeny Farms,
and LBREP/L-SunCal Summerwind Ranch

By: ____________________

Lennar Homes of California, Inc., solely in its capacity as chairperson

By: ________________________________ Dated: __________________

________________________________

[Signatures continue on the following page]

LEHMAN COMMERCIAL PAPER INC., as administrative agent of the 1st Lien Lenders to LBREP/L-SunCal Master I LLC, LBREP/L-SunCal McAllister Ranch LLC, LBREP/L-SunCal McSweeny Farms, and LBREP/L-SunCal Summerwind Ranch

By:____________________
Name:
Title: Its Authorized Signatory

Dated:__________________

[Signatures continue on the following page]

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc
Main Document Page 93 of 125

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:

1ST LIEN LENDER:

[______________________]

By:______________________ Dated:________________
Name:
Title:

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc Main Document Page 94 of 125

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY
LCPI 2nd LIEN LENDER HEREIN:

LCPI 2nd LIEN LENDER:

[____________________]

By:____________________ Dated:________________
Name:
Title:

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc Main Document Page 95 of 125

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY
LCPI 3rd LIEN LENDER HEREIN:

LCPI 3rd LIEN LENDER:

[____________________]

By:____________________ Dated:________________

Name:
Title:

Pg 135 of 164
Main Document Page 96 of 125

EXHIBIT "A"

BUDGET

[See Attached]

EXH. A

EXHIBIT 1 PAGE 89

# EXHIBIT 2

EXECUTION COPY

AMENDED AND RESTATED INTERCREDITOR AGREEMENT

This AMENDED AND RESTATED INTERCREDITOR AGREEMENT ("Agreement"), is dated as of February 6, 2007, and entered into by LEHMAN COMMERCIAL PAPER INC. ("LCPI"), in its capacity as administrative agent for the First Lien Obligations (as defined below), including its successors and assigns from time to time (the "First Lien Administrative Agent"), LCPI, in its capacity as administrative agent for the Second Lien Obligations (as defined below), including its successors and assigns from time to time (the "Second Lien Administrative Agent") and LCPI, in its capacity as administrative agent for the Third Lien Obligations (as defined below), including its successors and assigns from time to time (the "Third Lien Administrative Agent"). Capitalized terms used in this Agreement have the meanings assigned to them in Section 1 below.

RECITALS

WHEREAS, LBREP/L-SunCal Master I LLC, a Delaware limited liability company (the "Borrower"), the Lenders parties thereto, Lehman Brothers Inc., as arranger, and LCPI, as syndication agent and First Lien Administrative Agent, have entered into that First Lien Credit Agreement dated as of January 19, 2006 providing for secured credit facilities in the original aggregate principal amount of $235,000,000 (as amended, restated, supplemented, modified, replaced or Refinanced from time to time, the "First Lien Credit Agreement");

WHEREAS, the Borrower, the Lenders party thereto, Lehman Brothers Inc., as arranger, and LCPI, as syndication agent and Second Lien Administrative Agent, have entered into that Second Lien Credit Agreement dated as of January 19, 2006 providing for secured credit facilities in the original aggregate principal amount of $85,000,000 (as amended, restated, supplemented, modified, replaced or Refinanced from time to time, the "Second Lien Credit Agreement");

WHEREAS, the obligations of the Borrower under the First Lien Credit Agreement and any Specified Hedge Agreements with the First Lien Qualified Counterparties are secured on a first priority basis by liens on substantially all the assets of the Borrower and the Subsidiary Guarantors, pursuant to the terms of the First Lien Collateral Documents;

WHEREAS, the obligations of the Borrower under the Second Lien Credit Agreement and any Specified Hedge Agreements with the Second Lien Lenders (or any of their Affiliates) are secured on a second priority basis by Liens on substantially all the assets of the Borrower and the Subsidiary Guarantors, respectively, pursuant to the terms of the Second Lien Collateral Documents;

WHEREAS, the First Lien Administrative Agent and the Second Lien Administrative Agent are party to the Intercreditor Agreement, dated as of January 19, 2006, as amended, supplemented or otherwise modified prior to the date hereof;

WHEREAS, the Borrower, the Lenders party thereto, Lehman Brothers, Inc., as arranger, and LCPI, as syndication agent and Third Lien Administrative Agent, have entered into that Third Lien Credit Agreement dated as of the date hereof providing for secured credit facilities in the original aggregate principal amount of $75,000,000 (as amended, restated, supplemented, modified, replaced or refinanced from time to time, the "Third Lien Credit Agreement");

WHEREAS, the obligations of the Borrower under the Third Lien Credit Agreement and any Specified Hedge Agreements with the Third Lien Qualified Counterparties will be secured on a third priority basis by liens on substantially all the assets of the Borrower and the Subsidiary Guarantors, pursuant to the terms of the Third Lien Collateral Documents;

WHEREAS, (a) in order to induce the First Lien Administrative Agent and the First Lien Claimholders to consent to the Grantors incurring the Third Lien Obligations and to induce the First Lien Claimholders to extend credit and other financial accommodations and lend monies to or for the benefit of the Borrower or any other Grantor and (b) in order to induce the Second Lien Administrative Agent and the Second Lien Claimholders to consent to the Grantors incurring the Third Lien Obligations, the Second Lien Administrative Agent on behalf of the Second Lien Claimholders and the Third Lien Administrative Agent on behalf of the Third Lien Claimholders have agreed to the intercreditor and other provisions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## SECTION 1

## DEFINITIONS

1.1 Defined Terms. As used in the Agreement, the following terms shall have the following meanings:

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Agreement" means this Amended and Restated Intercreditor Agreement, as amended, restated, renewed, extended, supplemented or otherwise modified from time to time.

"Asset Sale" has the meaning assigned to that term in the First Lien Credit Agreement.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Law" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"Borrower" has the meaning assigned to that term in the Recitals to this Agreement.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"Collateral" means all of the assets and property of any Grantor, whether real, personal or mixed, constituting First Lien Collateral, Second Lien Collateral and Third Lien Collateral.

"Comparable Junior Collateral Documents" shall mean (a) initially, the Comparable Second Lien Collateral Documents and the Comparable Third Lien Collateral Documents, and (b) upon the occurrence of a Control Change Event, the Comparable Third Lien Collateral Documents.

"Comparable Second Lien Collateral Document" means, in relation to any Collateral subject to any Lien created under any First Lien Collateral Document, the Second Lien Loan Document which creates a Lien on the same Collateral, granted by the same Grantor.

"Comparable Third Lien Collateral Document" means, in relation to any Collateral subject to any Lien created under any First Lien Collateral Document or any Second Lien Collateral Document, the Third Lien Loan Document which creates a Lien on the same Collateral, granted by the same Grantor.

"Control Change Event" means the occurrence of the Discharge of First Lien Obligations, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against Borrower or any other Grantor.

"DIP Financing" has the meaning assigned to that term in Section 6.1.

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc Main Document Page 101 of 125

"Discharge of First Lien Obligations" means, except to the extent otherwise expressly provided in Section 5.5:

(a) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest would be allowed in such Insolvency or Liquidation Proceeding), on all Indebtedness outstanding under the First Lien Loan Documents;

(b) payment in full in cash of all other First Lien Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid; and

(c) termination or expiration of all commitments, if any, to extend credit that would constitute First Lien Obligations.

"Discharge of Second Lien Obligations" means, except to the extent otherwise expressly provided in Section 5.5:

(a) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest would be allowed in such Insolvency or Liquidation Proceeding), on all Indebtedness outstanding under the Second Lien Loan Documents;

(b) payment in full in cash of all other Second Lien Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid; and

(c) termination or expiration of all commitments, if any, to extend credit that would constitute Second Lien Obligations.

"Discharge of Senior Obligations" shall mean, (x) with respect to the Second Lien Claimholders, the Discharge of First Lien Obligations and (y) with respect to the Third Lien Claimholders, the Discharge of First Lien Obligations and the Discharge of Second Lien Obligations, as applicable.

"Disposition" has the meaning assigned to that term in Section 5.1(a)(2).

"First Lien Administrative Agent" has the meaning assigned to that term in the preamble to this Agreement.

"First Lien Claimholders" means, at any relevant time, the holders of First Lien Obligations at that time, including without limitation the First Lien Lenders, the First Lien Qualified Counterparties and the agents under the First Lien Loan Documents.

"First Lien Collateral" means all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any First Lien Obligations.

"First Lien Collateral Documents" means the Security Documents (as defined in the First Lien Credit Agreement) and any other agreement, document or instrument pursuant to which a Lien is granted securing any First Lien Obligations or under which rights or remedies with respect to such Liens are governed, as the same may be amended, restated, supplemented, modified, replaced or Refinanced from time to time.

"First Lien Credit Agreement" has the meaning assigned to that term in the recitals to this Agreement.

"First Lien Lenders" means the "Lenders" under and as defined in the First Lien Loan Documents.

"First Lien Loan Documents" means the First Lien Credit Agreement and the Loan Documents (as defined in the First Lien Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other First Lien Obligation, and any other document or instrument executed or delivered at any time in connection with any First Lien Obligations, including any intercreditor or joinder agreement among holders of First Lien Obligations, to the extent such are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed, replaced, Refinanced or extended from time to time in accordance with the provisions of this Agreement.

"First Lien Mortgages" means a collective reference to each mortgage, deed of trust and other document or instrument under which any Lien on real property owned or leased by any Grantor is granted to secure any First Lien Obligations or under which rights or remedies with respect to any such Liens are governed, as the same may be amended, restated, supplemented, modified, replaced or Refinanced from time to time.

"First Lien Obligations" means, subject to the next sentence, all Obligations outstanding under the First Lien Credit Agreement, the other First Lien Loan Documents and the Specified Hedge Agreements entered into with any First Lien Qualified Counterparty and other additional Obligations designated by the Borrower and the First Lien Administrative Agent as "Obligations" under the First Lien Loan Documents. "First Lien Obligations" shall include all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant First Lien Loan Document whether or not the claim for such interest is allowed as a claim in such Insolvency or Liquidation Proceeding.

"First Lien Qualified Counterparty" means a "Qualified Counterparty" as defined in the First Lien Credit Agreement.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory

body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Grantors" means the Borrower, each of the Subsidiary Guarantors, if any, and each other Person that may from time to time hereafter execute and deliver a First Lien Collateral Document, a Second Lien Collateral Document or a Third Lien Collateral Documents as a "Grantor" (or the equivalent thereof).

"Hedge Agreements" mean all interest rate or currency swaps, caps or collar agreements, foreign exchange agreements, commodity contracts or similar arrangements entered into by the Borrower or its Subsidiaries providing for protection against fluctuations in interest rates, currency exchange rates, commodity prices or the exchange of nominal interest obligations, either generally or under specific contingencies.

"Hedging Obligation" of any Person means any obligation of such Person pursuant to any Specified Hedge Agreement.

"Indebtedness" means and includes all Obligations that constitute "Indebtedness" within the meaning of the First Lien Credit Agreement, the Second Lien Credit Agreement or the Third Lien Credit Agreement, as applicable.

"Insolvency or Liquidation Proceeding" means:

(a) any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Grantor;

(b) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of their respective assets;

(c) any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy; or

(d) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Grantor.

"Junior Agents" shall mean (a) initially, the Second Lien Administrative Agent and the Third Lien Administrative Agent, and (b) upon the occurrence of a Control Change Event, the Third Lien Administrative Agent. For the avoidance of doubt, prior to the Control Change Event, the Junior Agent with respect to the Second Lien Administrative Agent shall mean the Third Lien Administrative Agent.

"Junior Claimholders" shall mean (a) initially, the Second Lien Claimholders and the Third Lien Claimholders, and (b) upon the occurrence of a Control

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc Main Document Page 104 of 125

Change Event, the Third Lien Claimholders. For the avoidance of doubt, prior to the Control Change Event, the Junior Claimholders with respect to the Second Lien Claimholders shall mean the Third Lien Claimholders.

"Junior Collateral" shall mean (a) initially, the Second Lien Collateral and the Third Lien Collateral, and (b) upon the occurrence of a Control Change Event, the Third Lien Collateral. For the avoidance of doubt, prior to the Control Change Event, the Junior Collateral with respect to the Second Lien Collateral shall mean the Third Lien Collateral.

"Junior Collateral Documents" shall mean (a) initially, the Second Lien Collateral Documents and the Third Lien Collateral Documents, and (b) upon the occurrence of a Control Change Event, the Third Lien Collateral Documents. For the avoidance of doubt, prior to the Control Change Event, the Junior Collateral Documents with respect to the Second Lien Collateral Documents shall mean the Third Lien Collateral Documents.

"Junior Credit Agreement" shall mean (a) initially, the Second Lien Credit Agreement and the Third Lien Credit Agreement, and (b) upon the occurrence of a Control Change Event, the Third Lien Credit Agreement. For the avoidance of doubt, prior to the Control Change Event, the Junior Credit Agreement with respect to the Second Lien Credit Agreement shall mean the Third Lien Credit Agreement.

"Junior Lenders" shall mean (a) initially, the Second Lien Lenders and the Third Lien Lenders, and (b) upon the occurrence of a Control Change Event, the Third Lien Lenders. For the avoidance of doubt, prior to the Control Change Event, the Junior Lenders with respect to the Second Lien Lenders shall mean the Third Lien Lenders.

"Junior Loan Documents" shall mean (a) initially, the Second Lien Loan Documents and the Third Lien Loan Documents, and (b) upon the occurrence of a Control Change Event, the Third Lien Loan Documents. For the avoidance of doubt, prior to the Control Change Event, the Junior Loan Documents with respect to the Second Lien Loan Documents shall mean the Third Lien Loan Documents.

"Junior Obligations" shall mean (a) initially, the Second Lien Obligations and the Third Lien Obligations, and (b) upon the occurrence of a Control Change Event, the Third Lien Obligations. For the avoidance of doubt, prior to the Control Change Event, the Junior Obligations with respect to the Second Lien Obligations shall mean the Third Lien Obligations.

"Lien" means mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc Main Document Page 105 of 125

"Maximum First Priority Lien Amount" shall mean the lesser of (i) $260,000,000, and (ii) the sum of principal and/or face amounts then outstanding and any commitments in effect under the First Lien Credit Agreement and the First Lien Loan Documents.

"Maximum Second Priority Lien Amount" shall mean the lesser of (i) $85,000,000, and (ii) the sum of principal and/or face amounts then outstanding under the Second Lien Credit Agreement and the Second Lien Loan Documents.

"New Agent" has the meaning assigned to that term in Section 5.5.

"Obligations" means all obligations of every nature of each Grantor from time to time owed to any agent or trustee, the First Lien Claimholders, the Second Lien Claimholders, the Third Lien Claimholders or any of them or their respective Affiliates under the First Lien Loan Documents, the Second Lien Loan Documents, the Third Lien Loan Documents or Specified Hedge Agreements, whether for principal, interest or payments for early termination of Specified Hedge Agreements, fees, expenses, indemnification or otherwise and all guarantees of any of the foregoing.

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Pledged Collateral" has the meaning set forth in Section 5.4.

"Qualified Counterparty" means any First Lien Qualified Counterparty, any Second Lien Qualified Counterparty or any Third Lien Qualified Counterparty.

"Recovery" has the meaning set forth in Section 6.5.

"Refinance" means, in respect of any Indebtedness, to refinance, extend, renew, defease, amend, modify, supplement, restructure, replace, refund or repay, or to issue other indebtedness, in exchange or replacement for, such Indebtedness in whole or in part. "Refinanced" and "Refinancing" shall have correlative meanings.

"Second Lien Administrative Agent" has the meaning set assigned to that term in the preamble of this Agreement.

"Second Lien Claimholders" means, at any relevant time, the holders of Second Lien Obligations at that time, including without limitation the Second Lien Lenders and the agents under the Second Lien Loan Documents.

"Second Lien Collateral" means all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Second Lien Obligations.

"Second Lien Collateral Documents" means the Security Documents (as defined in the Second Lien Credit Agreement) and any other agreement, document or

instrument pursuant to which a Lien is granted securing any Second Lien Obligations or under which rights or remedies with respect to such Liens are governed, as the same may be amended, restated, supplemented, modified, replaced or Refinanced from time to time.

"Second Lien Credit Agreement" has the meaning assigned to that term in the recitals to this Agreement.

"Second Lien Lenders" means the "Lenders" under and as defined in the Second Lien Credit Agreement.

"Second Lien Loan Documents" means the Second Lien Credit Agreement and the Loan Documents (as defined in the Second Lien Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other Second Lien Obligation, and any other document or instrument executed or delivered at any time in connection with any Second Lien Obligations, including any intercreditor or joinder agreement among holders of Second Lien Obligations to the extent such are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed, replaced, Refinanced or extended from time to time in accordance with the provisions of this Agreement.

"Second Lien Mortgages" means a collective reference to each mortgage, deed of trust and any other document or instrument under which any Lien on real property owned or leased by any Grantor is granted to secure any Second Lien Obligations or under which rights or remedies with respect to any such Liens are governed, as the same may be amended, restated, supplemented, modified, replaced or Refinanced from time to time.

"Second Lien Obligations" means all Obligations outstanding under the Second Lien Credit Agreement, the other Second Lien Loan Documents, and the Specified Hedge Agreements entered into with any Second Lien Qualified Counterparty but only to the extent such Second Lien Qualified Counterparty is not also a First Lien Qualified Counterparty. "Second Lien Obligations" shall include all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant Second Lien Loan Document whether or not the claim for such interest is allowed as a claim in such Insolvency or Liquidation Proceeding.

"Second Lien Qualified Counterparty" means a "Qualified Counterparty" as defined in the Second Lien Credit Agreement.

"Senior Agent" shall mean (a) initially, the First Lien Administrative Agent and the Second Lien Administrative Agent, (b) upon the occurrence of a Control Change Event, the Second Lien Administrative Agent. For the avoidance of doubt, prior to the Control Change Event, the Senior Agent with respect to the Second Lien Administrative Agent shall mean the First Lien Administrative Agent.

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:49 Desc Main Document Page 107 of 125

"Senior Claimholders" shall mean (a) initially, the First Lien Claimholders and the Second Lien Claimholders and (b) upon the occurrence of a Control Change Event, the Second Lien Claimholders. For the avoidance of doubt, prior to the Control Change Event, the Senior Claimholders with respect to the Second Lien Claimholders shall mean the First Lien Claimholders.

"Senior Collateral" shall mean (a) initially, the First Lien Collateral and the Second Lien Collateral, and (b) upon the occurrence of a Control Change Event, the Second Lien Collateral. For the avoidance of doubt, prior to the Control Change Event, the Senior Collateral with respect to the Second Lien Collateral shall mean the First Lien Collateral.

"Senior Collateral Documents" shall mean (a) initially, the First Lien Collateral Documents and the Second Lien Collateral Documents, and (b) upon the occurrence of a Control Change Event, the Second Lien Collateral Documents. For the avoidance of doubt, prior to the Control Change Event, the Senior Collateral Documents with respect to the Second Lien Collateral Documents shall mean the First Lien Collateral Documents.

"Senior Credit Agreement" shall mean (a) initially, the First Lien Credit Agreement and the Second Lien Credit Agreement, and (b) upon the occurrence of a Control Change Event, the Second Lien Credit Agreement. For the avoidance of doubt, prior to the Control Change Event, the Senior Credit Agreement with respect to the Second Lien Credit Agreement shall mean the First Lien Credit Agreement.

"Senior Lenders" shall mean (a) initially, the First Lien Lenders and the Second Lien Lenders, and (b) upon the occurrence of a Control Change Event, the Second Lien Lenders. For the avoidance of doubt, prior to the Control Change Event, the Senior Lenders with respect to the Second Lien Lenders shall mean the First Lien Lenders.

"Senior Loan Documents" shall mean (a) initially, the First Lien Loan Documents and the Second Lien Loan Documents, and (b) upon the occurrence of a Control Change Event, the Second Lien Loan Documents. For the avoidance of doubt, prior to the Control Change Event, the Senior Loan Documents with respect to the Second Lien Loan Documents shall mean the First Lien Loan Documents.

"Senior Obligations" shall mean (a) initially, the First Lien Obligations and the Second Lien Obligations, and (b) upon the occurrence of a Control Change Event, the Second Lien Obligations. For the avoidance of doubt, prior to the Control Change Event, the Junior Obligations with respect to the Second Lien Obligations shall mean the First Lien Obligations.

"Specified Hedge Agreement" means any Hedge Agreement entered into by the Borrower or any Subsidiary Guarantor and any Qualified Counterparty.

"Standstill Period" has the meaning set forth in Section 3.1.

"Subsidiary" means, as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantors" means each Subsidiary of the Borrower that is a party to the "Guarantee and Collateral Agreement" (as defined in the First Lien Credit Agreement), the "Guarantee and Collateral Agreement" (as defined in the Second Lien Credit Agreement) or the "Guarantee and Collateral Agreement" (as defined in the Third Lien Credit Agreement).

"Third Lien Administrative Agent" has the meaning set assigned to that term in the preamble of this Agreement.

"Third Lien Claimholders" means, at any relevant time, the holders of Third Lien Obligations at that time, including without limitation the Third Lien Lenders and the agents under the Third Lien Loan Documents.

"Third Lien Collateral" means all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Third Lien Obligations.

"Third Lien Collateral Documents" means the Security Documents (as defined in the Third Lien Credit Agreement) and any other agreement, document or instrument pursuant to which a Lien is granted securing any Third Lien Obligations or under which rights or remedies with respect to such Liens are governed, as the same may be amended, restated, supplemented, modified, replaced or Refinanced from time to time.

"Third Lien Credit Agreement" has the meaning assigned to that term in the recitals to this Agreement.

"Third Lien Lenders" means the "Lenders" under and as defined in the Third Lien Credit Agreement.

"Third Lien Loan Documents" means the Third Lien Credit Agreement and the Loan Documents (as defined in the Third Lien Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other Third Lien Obligation, and any other document or instrument executed or delivered at any time in connection with any Third Lien Obligations, including any intercreditor or joinder agreement among holders of Third Lien Obligations to the extent such are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed, replaced, Refinanced or extended from time to time in accordance with the provisions of this Agreement.

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc
Main Document Page 109 of 125

"Third Lien Mortgages" means a collective reference to each mortgage, deed of trust and any other document or instrument under which any Lien on real property owned or leased by any Grantor is granted to secure any Third Lien Obligations or under which rights or remedies with respect to any such Liens are governed, as the same may be amended, restated, supplemented, modified, replaced or Refinanced from time to time.

"Third Lien Obligations" means all Obligations outstanding under the Third Lien Credit Agreement, the other Third Lien Loan Documents, and the Specified Hedge Agreements entered into with any Third Lien Qualified Counterparty but only to the extent such Third Lien Qualified Counterparty is not also a First Lien Qualified Counterparty. "Third Lien Obligations" shall include all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant Third Lien Loan Document whether or not the claim for such interest is allowed as a claim in such Insolvency or Liquidation Proceeding.

"Third Lien Qualified Counterparty" means a "Qualified Counterparty" as defined in the Third Lien Credit Agreement.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

1.2 Terms Generally. The definitions of terms in this Agreement shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise:

(a) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns;

(b) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof;

(c) all references herein to Sections shall be construed to refer to Sections of this Agreement; and

(d) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc
Main Document Page 110 of 125

SECTION 2

LIEN PRIORITIES

2.1 Relative Priorities.

(a) Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing the Third Lien Obligations granted on the Collateral, any Liens securing the Second Lien Obligations granted on the Collateral or of any Liens securing the First Lien Obligations granted on the Collateral and notwithstanding any provision of the UCC, any other applicable law, the First Lien Loan Documents, the Second Lien Loan Documents, the Third Lien Loan Documents or any defect or deficiencies in, or failure to perfect, the Liens securing the First Lien Obligations, the Second Lien Obligations, the Third Lien Obligations or any other circumstance whatsoever, each Junior Agent on behalf of itself and the applicable Junior Claimholders, hereby agrees, as applicable, that:

(i) any Lien on the Collateral securing any First Lien Obligations now or hereafter held by or on behalf of the First Lien Administrative Agent or any First Lien Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Collateral securing any Junior Obligations;

(ii) any Lien on the Collateral securing any Second Lien Obligations now or hereafter held by or on behalf of the Second Lien Administrative Agent or any Second Lien Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Collateral securing any Third Lien Obligations;

(iii) any Lien on the Collateral securing any Junior Obligations now or hereafter held by or on behalf of any Junior Agent, any Junior Claimholders or any agent or trustee therefor regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Collateral securing any Senior Obligations. All Liens on the Collateral securing any First Lien Obligations shall be and remain senior in all respects and prior to all Liens on the Collateral securing any Junior Obligations for all purposes, whether or not such Liens securing any First Lien Obligations are subordinated to any Lien securing any other obligation of the Borrower, any other Grantor or any other Person; and

(iv) any Lien on the Collateral securing any Third Lien Obligations now or hereafter held by or on behalf of the Third Lien

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:53:45 Desc
Main Document Page 111 of 125

Administrative Agent, any Third Lien Claimholders or any agent or trustee therefor regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Collateral securing any Second Lien Obligations.

(b) Each Junior Agent, on behalf of itself and the applicable Junior Claimholders, acknowledges that a portion of the First Lien Obligations represents debt that is revolving in nature and that the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, and the terms of the First Lien Obligations may be modified, extended or amended from time to time, and that the aggregate amount of the First Lien Obligations may be increased, replaced or refinanced, in each event, without notice to or consent by the Junior Claimholders and without affecting the provisions hereof. The lien priorities provided in Section 2.1(a) shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of any of the First Lien Obligations, the Second Lien Obligations or the Third Lien Obligations, or any portion thereof.

2.2 Prohibition on Contesting Liens. Each of (a) the Third Lien Administrative Agent, for itself and on behalf of each Third Lien Claimholder, (b) Second Lien Administrative Agent, for itself and on behalf of each Second Lien Claimholder, and (c) the First Lien Administrative Agent, for itself and on behalf of each First Lien Claimholder, agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the priority, validity or enforceability of a Lien held (x) by or on behalf of any of the First Lien Claimholders in the First Lien Collateral, (y) by or on behalf of any of the Second Lien Claimholders in the Second Lien Collateral or (z) by or on behalf of any of the Third Lien Claimholders in the Third Lien Collateral, as the case may be, or the provisions of this Agreement; provided that (A) nothing in this Agreement shall be construed to prevent or impair the rights of any Senior Agent or any Senior Claimholder to enforce this Agreement, including the provisions of this Agreement relating to the priority of the Liens securing the applicable Senior Obligations as provided in Sections 2.1 and 3.1.

2.3 No New Liens. So long as the Discharge of First Lien Obligations or the Discharge of Second Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Borrower or any other Grantor, the parties hereto agree that the Borrower shall not, and shall not permit any other Grantor to:

(a) grant or permit any additional Liens on any asset or property to secure any Third Lien Obligation or any Second Lien Obligation unless it has granted or concurrently grants a Lien on such asset or property to secure the First Lien Obligations; or

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc Main Document Page 112 of 125

(b) grant or permit any additional Liens on any asset or property to secure any Third Lien Obligation unless it has granted or concurrently grants a Lien on such asset or property to secure the Second Lien Obligations; or

(c) grant or permit any additional Liens on any asset or property to secure any First Lien Obligations unless it has granted or concurrently grants a Lien on such asset or property to secure the Second Lien Obligations and the Third Lien Obligations; or

(d) grant or permit any additional Liens on any asset or property to secure any Second Lien Obligations unless it has granted or concurrently grants a Lien on such asset or property to secure the Third Lien Obligations.

To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the Senior Agent and/or the Senior Claimholders, each Junior Agent, on behalf of each Junior Claimholder agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.3 shall be subject to Section 4.2.

2.4 Similar Liens and Agreements. The parties hereto agree that it is their intention that the First Lien Collateral, the Second Lien Collateral and the Third Lien Collateral be identical. In furtherance of the foregoing and of Section 8.9, the parties hereto agree, subject to the other provisions of this Agreement:

(a) upon request by the First Lien Administrative Agent, the Second Lien Administrative Agent or the Third Lien Administrative Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the First Lien Collateral, the Second Lien Collateral and the Third Lien Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the First Lien Loan Documents, the Second Lien Loan Documents and the Third Lien Loan Documents; and

(b) that the documents and agreements creating or evidencing the First Lien Collateral, the Second Lien Collateral and the Third Lien Collateral and guarantees for the First Lien Obligations, the Second Lien Obligations and the Third Lien Obligations, subject to Section 5.3(d), shall be in all material respects the same forms of documents other than with respect to the first lien, the second lien and third lien nature of the Obligations thereunder.

SECTION 3

ENFORCEMENT

3.1 Exercise of Remedies.

(a) Until the Discharge of Senior Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against Borrower or any other Grantor, the Junior Agents and the Junior Lien Claimholders:

(1) will not exercise or seek to exercise any rights or remedies with respect to any Collateral (including, without limitation, the exercise of any right of setoff or any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which any Junior Agent or any Junior Lien Claimholder is a party) or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure); provided, however, that:

(A) prior to the occurrence of a Control Change Event, (x) the Second Lien Administrative Agent may exercise any or all such rights or remedies after the passage of a period of at least 180 days has elapsed since: (i) the date on which the Second Lien Administrative Agent declared the existence of any Event of Default under any Second Lien Loan Document and demanded the repayment of all the principal amount of any Second Lien Obligations; and (ii) the date on which the First Lien Administrative Agent received notice from the Second Lien Administrative Agent of its intent to exercise such rights or remedies (the "First Standstill Period") and (y) the Third Lien Administrative Agent may exercise any or all such rights or remedies after the passage of a period of (i) at least 30 days has elapsed since the last day of the First Standstill Period; and (ii) at least 210 days has elapsed since the date on which the First Lien Administrative Agent and the Second Lien Administrative Agent have received notice from the Third Lien Administrative Agent of its intent to exercise such rights or remedies (the "Second Standstill Period"); and

(B) on or after the occurrence of a Control Change Event, (x) the Third Lien Administrative Agent may exercise any or all such rights or remedies after the passage of a period of at least 180 days has elapsed since: (i) the date on which the Third Lien Administrative Agent declared the existence of any Event of Default under any Third Lien Loan Document and demanded the repayment of all the principal amount of any Third Lien Obligations; and (ii) the date on which the Second Lien Administrative Agent received notice from the Third Lien Administrative Agent of its intent to exercise such rights or remedies (the "Third Standstill Period", and together with the First Standstill Period and the Second Standstill Period, the "Standstill Periods");

(C) provided, further, however, that notwithstanding anything herein to the contrary, in no event shall any Junior Agent or any Junior Claimholder exercise any rights or remedies with respect to the Collateral if, notwithstanding the expiration of any Standstill Period, the Senior Agent or Senior Claimholders shall have commenced and be diligently pursuing the exercise of their rights or remedies with respect to all or any material portion of the Collateral (prompt notice of such exercise to be given to the Junior Agents);

(2) will not contest, protest or object to any foreclosure proceeding or action brought by the Senior Agent or any Senior Claimholder or any other exercise by the Senior Agent or any Senior Claimholder of any rights and remedies relating to the Collateral under the Senior Loan Documents or otherwise;

(3) subject to their rights under clause (a)(1) above, will not object to the forbearance by the Senior Agent or the Senior Claimholders from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Collateral, in each case so long as the respective interests of the Junior Claimholders attach to the proceeds thereof subject to the relative priorities described in Section 2;

(4) will not take or cause to be taken any action, the purpose or effect of which is to make any Lien in respect of any Junior Obligation pari passu with or senior to, or to give any Junior Claimholder any preference or priority relative to, the Liens with respect to the Senior Obligations or the Senior Claimholders with respect to any of the Collateral; and

(5) will have no right to direct either the Senior Agent or any other Senior Claimholder to exercise any right, remedy or power with respect to the Collateral or pursuant to the Senior Loan Documents.

(b) Until the Discharge of Senior Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Borrower or any other Grantor, subject to Section 3.1(a)(1), the most senior Senior Agent and the most senior Senior Claimholders shall have the right to enforce rights, exercise remedies (including set off and the right to credit bid their debt) and make determinations regarding the release, disposition, or restrictions with respect to the Collateral without any consultation with or the consent of the Junior Agents or any Junior Claimholder. In exercising rights and remedies with respect to the Collateral, the most senior Senior Agent and the most senior Senior Claimholders may enforce the provisions of the most senior Senior Loan Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the Uniform Commercial Code and of a secured creditor under Bankruptcy Laws

of any applicable jurisdiction. The most senior Senior Agent agrees to provide at least the lesser of (1) five days' or (2) the number of days remaining in the applicable Standstill Period, notice to the Junior Agents of its intent to exercise and enforce its rights and remedies with respect to a material portion of the Collateral.

(c) Notwithstanding the foregoing, the Junior Agents and any Junior Claimholder may:

(1) file a claim or statement of interest with respect to the applicable Junior Obligations; provided that an Insolvency or Liquidation Proceeding has been commenced by or against the Borrower or any other Grantor;

(2) take any action (not adverse to the priority status of the Liens on the Collateral securing the Senior Obligations, or the rights of any Senior Agent or the Senior Claimholders to exercise remedies in respect thereof) in order to create, perfect, preserve or protect its Lien on the Collateral;

(3) file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Junior Claimholders, including without limitation any claims secured by the Collateral, if any, in each case in accordance with the terms of this Agreement;

(4) vote on any plan of reorganization, file any proof of claim, make other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the applicable Junior Obligations and the Collateral; and

(5) exercise any of its rights or remedies with respect to the Collateral after the termination of the Standstill Period to the extent permitted by Section 3.1(a)(1).

Each of the Junior Agents, on behalf of itself and the applicable Junior Claimholders, agrees that it will not take or receive any Collateral or any proceeds of Collateral in connection with the exercise of any right or remedy (including set-off) with respect to any Collateral in its capacity as a secured creditor, unless and until the applicable Discharge of Senior Obligations has occurred, except as expressly provided in Section 3.1(a). Without limiting the generality of the foregoing, unless and until the Discharge of Senior Obligations has occurred, except as expressly provided in Sections 3.1(a) and 3.1(c), the sole right of the Junior Agents and the Junior Claimholders with respect to the Collateral is to hold a Lien on the Collateral pursuant to the applicable Junior Collateral Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the applicable Discharge of Senior Obligations has occurred.

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc Main Document Page 116 of 125

(d) Subject to Sections 3.1(a) and (c):

(1). each of the Junior Agents, for itself and on behalf of the applicable Junior Claimholders, agrees that such Junior Agent and the applicable Junior Claimholders will not take any action that would hinder any exercise of remedies under the Senior Loan Documents or is otherwise prohibited hereunder, including any sale, lease, exchange, transfer or other disposition of the Collateral, whether by foreclosure or otherwise;

(2) each of the Junior Agents, for itself and on behalf of the applicable Junior Claimholders, hereby waives any and all rights it or the applicable Junior Claimholders may have as a junior lien creditor or otherwise to consent to or object to the manner in which the Senior Agent or the Senior Claimholders seek to enforce or collect the Senior Obligations or the Liens securing Senior Obligations granted in any of the Senior Collateral undertaken in accordance with this Agreement, regardless of whether any action or failure to act by or on behalf of the Senior Agent or Senior Claimholders is adverse to the interest of the Senior Claimholders; and

(3) each of the Junior Agents hereby acknowledges and agrees that no covenant, agreement or restriction contained in the applicable Junior Collateral Documents or any other Junior Loan Document (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the Senior Agent or the Senior Claimholders with respect to the Collateral as set forth in this Agreement and the Senior Credit Documents.

(e) Except as specifically set forth in Sections 3.1(a) and (d), the Junior Agents and the Junior Claimholders may exercise rights and remedies as unsecured creditors against Borrower or any other Grantor that has guaranteed or granted Liens to secure the Junior Obligations in accordance with the terms of the applicable Junior Loan Documents and applicable law; provided that in the event that any Junior Claimholder becomes a judgment Lien creditor in respect of Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the applicable Junior Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the Senior Obligations) as the other Liens securing the Junior Obligations subject to this Agreement.

(f) Except as specifically set forth in Sections 3.1(a) and (d), nothing in this Agreement shall prohibit the receipt by any Junior Agent or any Junior Claimholders of the required payments of interest, principal and other amounts owed in respect of the applicable Junior Obligations so long as such receipt is not the direct or indirect result of the exercise by such Junior Agent or any Junior Claimholders of rights or remedies as a secured creditor (including set off) or enforcement in contravention of this Agreement of any Lien held by any of them. Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the Senior Agent or the Senior Claimholders may have with respect to the Senior Collateral.

SECTION 4

PAYMENTS

4.1 Application of Proceeds. (a) So long as the Discharge of First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Borrower or any other Grantor, Collateral or proceeds thereof received in connection with the sale or other disposition of, or collection on, such Collateral upon the exercise of remedies by the First Lien Administrative Agent or First Lien Claimholders, shall be applied by the First Lien Administrative Agent to the First Lien Obligations in such order as specified in the relevant First Lien Loan Documents. Upon the Discharge of First Lien Obligations, the First Lien Administrative Agent shall deliver to the Second Lien Administrative Agent any Collateral and proceeds of Collateral held by it in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct to be applied by the Second Lien Administrative Agent to the Second Lien Obligations in such order as specified in the Second Lien Collateral Documents.

(b) After the occurrence of the Discharge of First Lien Obligations, so long as the Discharge of Second Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Borrower or any other Grantor, Collateral or proceeds thereof received in connection with the sale or other disposition of, or collection on, such Collateral upon the exercise of remedies by the Second Lien Administrative Agent or Second Lien Claimholders, shall be applied by the Second Lien Administrative Agent to the Second Lien Obligations in such order as specified in the relevant Second Lien Loan Documents. Upon the Discharge of Second Lien Obligations, the Second Lien Administrative Agent shall deliver to the Third Lien Administrative Agent any Collateral and proceeds of Collateral held by it in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct to be applied by the Third Lien Administrative Agent to the Third Lien Obligations in such order as specified in the Third Lien Collateral Documents.

4.2 Payments Over. So long as the Discharge of Senior Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Borrower or any other Grantor, any Collateral or proceeds thereof (including assets or proceeds subject to Liens referred to in the final sentence of Section 2.3) received by any Junior Agent or any Junior Claimholders in connection with the exercise of any right or remedy (including set off) relating to the Collateral shall be segregated and held in trust and forthwith paid over to the most senior Senior Agent for the benefit of the most senior Senior Claimholders in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The Senior Agent is hereby authorized to make any such endorsements as agent for the Junior Agents or any such Junior Claimholders. This authorization is coupled with an interest and is irrevocable until the Discharge of Senior Obligations.

Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc
Main Document Page 118 of 125

SECTION 5

OTHER AGREEMENTS

5.1 Releases. (a) If, in connection with the exercise of the most senior Senior Agent's remedies in respect of the Collateral provided for in Section 3.1, the most senior Senior Agent, for itself or on behalf of any of the applicable Senior Claimholders, releases any of its Liens on any part of the Collateral or releases any Grantor from its obligations under its guaranty of the applicable Senior Obligations, then the Liens, if any, of each Junior Agent, for itself or for the benefit of the applicable Junior Claimholders, on such Collateral, and the obligations of such Grantor under its guaranty of the Junior Obligations, shall be automatically, unconditionally and simultaneously released. Each Junior Agent, for itself or on behalf of any such applicable Junior Claimholders, promptly shall execute and deliver to the most senior Senior Agent or such Grantor such termination statements, releases and other documents as the Senior Agent or such Grantor may request to effectively confirm such release.

(b) If, in connection with any sale, lease, exchange, transfer or other disposition of any Collateral (collectively, a "Disposition") permitted under the terms of the most senior Senior Loan Documents (other than the exercise of the most senior Senior Agent's remedies in respect of the Collateral provided for in Section 3.1) the most senior Senior Agent, for itself or on behalf of any of the applicable Senior Claimholders, releases any of its Liens on any part of the Collateral, or releases any Grantor from its obligations under its guaranty of the applicable Senior Obligations, in each case other than (A) in connection with the Discharge of the most senior Senior Obligations and (B) after the occurrence and during the continuance of any Event of Default under any Junior Credit Agreement, then the Liens, if any, of the applicable Junior Agent, for itself or for the benefit of the applicable Junior Claimholders, on such Collateral, and the obligations of such Grantor under its guaranty of the applicable Junior Obligations, shall be automatically, unconditionally and simultaneously released. Each Junior Agent, for itself or on behalf of any such applicable Junior Claimholders, promptly shall execute and deliver to the most senior Senior Agent or such Grantor such termination statements, releases and other documents as the most senior Senior Agent or such Grantor may request to effectively confirm such release.

(c) Until the Discharge of Senior Obligations occurs, each Junior Agent, for itself and on behalf of applicable Junior Claimholders, hereby irrevocably constitutes and appoints the most senior Senior Agent and any officer or agent of the most senior Senior Agent, with full power of substitution, as its true and lawful attorney in fact with full irrevocable power and authority in the place and stead of such Junior Agent or such holder or in the most senior Senior Agent's own name, from time to time in the most senior Senior Agent's discretion, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1, including any endorsements or other instruments of transfer or release. This power of attorney is coupled with an interest and is irrevocable until the Discharge of the Senior Obligations.

(d) Until the Discharge of First Lien Obligations occurs, to the extent that the First Lien Administrative Agent or the First Lien Claimholders (i) have released any Lien on Collateral or any Grantor from its obligation under its guaranty and any such Liens or guaranty are later reinstated or (ii) obtain any new liens or additional guarantees from Grantors, then the Second Lien Administrative Agent, for itself and for the Second Lien Claimholders, shall be granted a second priority Lien on any such Collateral and an additional guaranty, as the case may be, and the Third Lien Administrative Agent, for itself and for the Third Lien Claimholders, shall be granted a third priority Lien on any such Collateral and an additional guaranty, as the case may be.

(e) If the Discharge of First Lien Obligation has occurred, until the Discharge of Second Lien Obligations occurs, to the extent that the Second Lien Administrative Agent or the Second Lien Claimholders (i) have released any Lien on Collateral or any Grantor from its obligation under its guaranty and any such Liens or guaranty are later reinstated or (ii) obtain any new liens or additional guarantees from Grantors, then the Third Lien Administrative Agent, for itself and for the Third Lien Claimholders, shall be granted a third priority Lien on any such Collateral and an additional guaranty, as the case may be.

5.2 Insurance. (a) Unless and until the Discharge of First Lien Obligations has occurred, the First Lien Administrative Agent and the First Lien Claimholders shall have the sole and exclusive right, subject to the rights of the Grantors under the First Lien Loan Documents, to adjust settlement for any insurance policy covering the Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting the Collateral. Unless and until the Discharge of First Lien Obligations has occurred, and subject to the rights of the Grantors under the First Lien Collateral Documents, all proceeds of any such policies and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect to the Collateral shall be paid to the First Lien Administrative Agent for the benefit of the First Lien Claimholders pursuant to the terms of the First Lien Loan Documents and thereafter, to the extent no First Lien Obligations are outstanding, and subject to the rights of the Grantors under the Second Lien Collateral Documents, to the Second Lien Administrative Agent for the benefit of the Second Lien Claimholders to the extent required under the Second Lien Collateral Documents and then, to the extent no Second Lien Obligations are outstanding, and subject to the rights of the Grantors under the Third Lien Collateral Documents, to the Third Lien Administrative Agent for the benefit of the Third Lien Claimholders to the extent required under the Third Lien Collateral Documents and then, to the extent no Third Lien Obligations are outstanding, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct. Until the Discharge of First Lien Obligations has occurred, if any Junior Agent or any Junior Claimholders shall, at any time, receive any proceeds of any such insurance policy or any such award or payment in contravention of this Agreement, it shall pay such proceeds over to the Senior Agent in accordance with the terms of Section 4.2 of this Agreement.

(b) If the Discharge of First Lien Obligation has occurred, unless and until the Discharge of Second Lien Obligations has occurred, the Second Lien Administrative Agent and the Second Lien Claimholders shall have the sole and exclusive right, subject to the rights of the Grantors under the First Lien Loan Documents, to adjust settlement for any insurance policy covering the Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting the Collateral. If the Discharge of First Lien Obligation has occurred, unless and until the Discharge of Second Lien Obligations has occurred, and subject to the rights of the Grantors under the Second Lien Collateral Documents, all proceeds of any such policies and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect to the Collateral shall be paid to the Second Lien Administrative Agent for the benefit of the Second Lien Claimholders pursuant to the terms of the Second Lien Loan Documents and thereafter, to the extent no Second Lien Obligations are outstanding, and subject to the rights of the Grantors under the Third Lien Collateral Documents, to the Third Lien Administrative Agent for the benefit of the Third Lien Claimholders to the extent required under the Third Lien Collateral Documents and then, to the extent no Third Lien Obligations are outstanding, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct. Until the Discharge of Second Lien Obligations has occurred, if the Third Lien Administrative Agent or any Third Lien Claimholders shall, at any time, receive any proceeds of any such insurance policy or any such award or payment in contravention of this Agreement, it shall pay such proceeds over to the Second Lien Administrative Agent in accordance with the terms of Section 4.2 of this Agreement.

5.3 Amendments to First Lien Loan Documents, Second Lien Loan Documents and Third Lien Loan Documents. (a) The First Lien Loan Documents may be amended, supplemented or otherwise modified in accordance with their terms and the First Lien Credit Agreement may be Refinanced, in each case, without notice to, or the consent of, the Junior Agents or the Junior Claimholders, all without affecting the lien subordination or other provisions of this Agreement; provided, however, that the holders of such Refinancing debt bind themselves in a writing addressed to each Junior Agent and the Junior Claimholders to the terms of this Agreement and any such amendment, supplement, modification or Refinancing shall not:

(1) contravene the provisions of this Agreement.

(2) increase the sum of the then outstanding aggregate principal amount of the First Lien Obligations in excess of the Maximum First Priority Lien Amount;

(3) increase the "Applicable Margin" or similar component of the interest rate or yield provisions applicable to the First Lien Obligations by more than 3% per annum (excluding increases resulting from the accrual of interest at the default rate); or

        Case 8:08-bk-15588-ES Doc 763 Filed 04/21/11 Entered 04/21/11 18:33:45 Desc Main Document Page 121 of 125

(4) modify (or have the effect of a modification of) the mandatory prepayment provisions of the First Lien Credit Agreement in a manner adverse to the lenders under any Junior Credit Agreement.

(b) Without the prior written consent of the First Lien Administrative and the Third Lien Administrative Agent, no Second Lien Loan Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Second Lien Loan Document, would:

(1) contravene the provisions of this Agreement;

(2) increase the "Applicable Margin" or similar component of the interest rate or yield provisions applicable to the Second Lien Obligations by more than 3% per annum (excluding increases resulting from the accrual of interest at the default rate);

(3) change (to earlier dates) any dates on which payments of principal or interest are due on the Second Lien Obligations, or shorten the weighted average life to maturity of the Second Lien Obligations;

(4) change any covenant, default or event of default thereunder in a manner adverse to the loan parties thereunder;

(5) change any financial maintenance covenant therein in a manner that would not preserve, on equivalent or better economic terms, the absolute or percentage difference (whichever is greater) that exists on the date hereof between such numerical threshold or limitation in the First Lien Credit Agreement and the corresponding threshold or limitation in the Second Lien Credit Agreement or add any new financial maintenance covenant;

(6) change the redemption, mandatory prepayment or defeasance provisions thereof or change the subordination provisions thereof (or of any guarantee thereof) in a manner adverse to the Loan Parties or the First Lien Claimholders or the Third Lien Claimholders;

(7) change any collateral therefor (other than to release such collateral); or

(8) increase the obligations of the loan parties thereunder or confer any additional rights on the Second Lien Lenders, in each case that would have a materially adverse effect on the loan parties under the First Lien Credit Agreement, the First Lien Claimholders, Third Lien Credit Agreement or the Third Lien Claimholders.

(c) Without the prior written consent of the First Lien Administrative Agent and the Second Lien Administrative Agent, no Third Lien Loan Document may be amended, supplemented or otherwise modified or entered into to the extent such

amendment, supplement or modification, or the terms of any new Third Lien Loan Document, would:

(1) contravene the provisions of this Agreement;

(2) increase the "Applicable Margin" or similar component of the interest rate or yield provisions applicable to the Third Lien Obligations by more than 3% per annum (excluding increases resulting from the accrual of interest at the default rate);

(3) change (to earlier dates) any dates on which payments of principal or interest are due on the Third Lien Obligations, or shorten the weighted average life to maturity of the Third Lien Obligations;

(4) change any covenant, default or event of default thereunder in a manner adverse to the loan parties thereunder;

(5) change any financial maintenance covenant therein in a manner that would not preserve, on equivalent or better economic terms, the absolute or percentage difference (whichever is greater) that exists on the date hereof between such numerical threshold or limitation in the First Lien Credit Agreement (or, after the Discharge of First Lien Obligation, the Second Lien Credit Agreement) and the corresponding threshold or limitation in the Third Lien Credit Agreement or add any new financial maintenance covenant;

(6) change the redemption, mandatory prepayment or defeasance provisions thereof or change the subordination provisions thereof (or of any guarantee thereof) in a manner adverse to the Loan Parties or the First Lien Claimholders and the Second Lien Claimholders;

(7) change any collateral therefor (other than to release such collateral); or

(8) increase the obligations of the loan parties thereunder or confer any additional rights on the Third Lien Lenders, in each case that would have a materially adverse effect on the loan parties under the First Lien Credit Agreement, the First Lien Claimholders, the Second Lien Credit Agreement or the Second Lien Claimholders.

Each of the Junior Credit Agreements may be Refinanced to the extent the terms and conditions of such Refinancing debt are no less favorable in the aggregate to the Borrower and the Grantors and to the Senior Lenders or the other Senior Obligations than the Junior Loan Documents (as determined in the reasonable opinion of the Senior Agent, acting on behalf of the "Required Lenders" (as defined in the Senior Credit Agreement)), the average life to maturity thereof is greater than or equal to that of any Junior Credit Agreement and all other terms and provisions of such Refinancing debt are reasonably acceptable to the Senior Agent and the holders of such Refinancing debt bind themselves in writing to the terms of this Agreement.

(d) The Borrower agrees that each Junior Collateral Document shall include the following language (or language to similar effect approved by the Senior Agent):

"Notwithstanding anything herein to the contrary, the lien and security interest granted to the [Second][Third] Lien Administrative Agent pursuant to this Agreement and the exercise of any right or remedy by the [Second][Third] Lien Administrative Agent hereunder are subject to the provisions of the Amended and Restated Intercreditor Agreement, dated as of February __, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), among Lehman Commercial Paper Inc., as First Lien Administrative Agent, Lehman Commercial Paper Inc., as Second Lien Administrative Agent, and Lehman Commercial Paper Inc., as Third Lien Administrative Agent, and certain other persons party or that may become party thereto from time to time. In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control."

In addition, the Borrower agrees that (x) each Second Lien Mortgage covering any Collateral shall contain such other language as the First Lien Administrative Agent may reasonably request to reflect the subordination of such Second Lien Mortgage to the First Lien Collateral Document covering such Collateral and (y) each Third Lien Mortgage covering any Collateral shall contain such other language as the most senior Senior Agent may reasonably request to reflect the subordination of such Third Lien Mortgage to the Senior Collateral Document covering such Collateral.

(e) In the event any Senior Agent or the Senior Claimholders and the relevant Grantor enter into any amendment, waiver or consent in respect of any of the Senior Collateral Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any Senior Collateral Document or changing in any manner the rights of the Senior Agent, such Senior Claimholders, the Borrower or any other Grantor thereunder, then such amendment, waiver or consent shall apply automatically to any comparable provision of each Comparable Junior Collateral Document without the consent of any Junior Agent or the Junior Claimholders and without any action by the Junior Agents, the Borrower or any other Grantor, provided, that:

(1) no such amendment, waiver or consent shall have the effect of:

(A) removing assets subject to the Lien of the Junior Collateral Documents, except to the extent that a release of such Lien is permitted or required by Section 5.1 of this Agreement;

(B) imposing duties on any Junior Agent without its consent;

(C) permitting other Liens on the Collateral not permitted under the terms of the Junior Loan Documents (after such amendment, waiver or consent becomes effective) or Section 6 hereof; or

(D) being prejudicial to the interests of the Junior Claimholders to a greater extent than the Senior Claimholders; and

(2) notice of such amendment, waiver or consent shall have been given to the Junior Agents within ten (10) Business Days after the effective date of such amendment, waiver or consent.

(f) Each Junior Claimholder and the Junior Agents, on behalf of itself and the applicable Junior Claimholders, agrees that it shall not at any time execute or deliver any amendment or other modification to any of the Junior Loan Documents inconsistent with or in violation of this Agreement.

(g) Each Senior Claimholder and the Senior Agent, on behalf of itself and the Senior Claimholders, agrees that it shall not at any time execute or deliver any amendment or other modification to any of the Senior Loan Documents inconsistent with or in violation of this Agreement.

5.4 Bailee for Perfection. (a) The most senior Senior Agent agrees to hold that part of the Collateral that is in its possession or control (or in the possession or control of its agents or bailees) to the extent that possession or control thereof is taken to perfect a Lien thereon under the Uniform Commercial Code (such Collateral being the "Pledged Collateral") as collateral agent for the applicable Senior Claimholders and as bailee for the Junior Agents (such bailment being intended, among other things, to satisfy the requirements of Section 8-301(a)(2) and 9-313(c) of the Uniform Commercial Code) and any assignee solely for the purpose of perfecting the security interest granted under the most senior Senior Loan Documents and the Junior Loan Documents, respectively, subject to the terms and conditions of this Section 5.4.

(b) The most senior Senior Agent shall have no obligation whatsoever to the Senior Claimholders, the Junior Agents or any Junior Claimholder to ensure that the Pledged Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this Section 5.4. The duties or responsibilities of the most senior Senior Agent under this Section 5.4 shall be limited solely to holding the Pledged Collateral as bailee in accordance with this Section 5.4.

(c) The Senior Agent acting pursuant to this Section 5.4 shall not have by reason of the Senior Collateral Documents, the Junior Collateral Documents, this Agreement or any other document a fiduciary relationship in respect of the Senior Claimholders, the Junior Agents or any Junior Claimholder.

(d) Upon the Discharge of First Lien Obligations under the First Lien Loan Documents to which the First Lien Administrative Agent is a party, the First Lien Administrative Agent shall deliver the remaining Pledged Collateral (if any) together with any necessary endorsements, first, to the Second Lien Administrative Agent to the

extent Second Lien Obligations remain outstanding, second, to the Third Lien Administrative Agent to the extent no First Lien Obligations or Second Lien Obligations remain outstanding, and third, to the Borrower to the extent no First Lien Obligations, Second Lien Obligations or Third Lien Obligations remain outstanding (in each case, so as to allow such Person to obtain control of such Pledged Collateral). The First Lien Administrative Agent further agrees to take all other action reasonably requested by the Second Lien Administrative Agent or Third Lien Administrative Agent, as applicable, in connection with the Second Lien Administrative Agent or Third Lien Administrative Agent, as applicable, obtaining a first priority interest in the Collateral or as a court of competent jurisdiction may otherwise direct.

(c) After the occurrence of a Control Change Event and upon the Discharge of Second Lien Obligations under the Second Lien Loan Documents to which the Second Lien Administrative Agent is a party, the Second Lien Administrative Agent shall deliver the remaining Pledged Collateral (if any) together with any necessary endorsements, first, to the Third Lien Administrative Agent to the extent Third Lien Obligations remain outstanding, and second, to the Borrower to the extent no Second Lien Obligations or Third Lien Obligations remain outstanding (in each case, so as to allow such Person to obtain control of such Pledged Collateral). The Second Lien Administrative Agent further agrees to take all other action reasonably requested by the Third Lien Administrative Agent in connection with the Third Lien Administrative Agent obtaining a first priority interest in the Collateral or as a court of competent jurisdiction may otherwise direct.

5.5 When Discharge of Senior Obligations Deemed to Not Have Occurred. If at any time after the Discharge of Senior Obligations has occurred the Borrower thereafter enters into any Refinancing of any Senior Loan Document evidencing a Senior Obligation which Refinancing is permitted by the Junior Loan Documents, then such Discharge of Senior Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken as a result of the occurrence of such first Discharge of Senior Obligations), and, from and after the date on which the New Senior Debt Notice is delivered to the Junior Agents in accordance with the next sentence, the obligations under such Refinanced Senior Loan Document shall automatically be treated as Senior Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the Senior Agent under such Senior Loan Documents shall be the Senior Agent for all purposes of this Agreement. Upon receipt of a notice (the "New Senior Debt Notice") stating that the Borrower has entered into a new Senior Loan Document (which notice shall include the identity of the new Senior Agent, such agent, the "New Agent"), each Junior Agent shall promptly (a) enter into such documents and agreements (including amendments or supplements to this Agreement) as the Borrower or such New Agent shall reasonably request in order to provide to the New Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement and (b) deliver to the New Agent any Pledged Collateral held by it together with any necessary endorsements (or otherwise allow the New Agent to obtain control of such Pledged Collateral), provided that, in the event that such New Senior Debt Notice has been delivered in connection with the Refinancing of the Second