SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Bruce E. Clark
Matthew A. Schwartz
Lara J. Loyd

*Attorneys for Giants Stadium LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | : Chapter 11 |
| | : |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : Case No. 08-13555 (JMP) |
| | : |
| Debtors. | : Jointly Administered |
| | : |

**OBJECTION OF GIANTS STADIUM LLC**
**TO DEBTORS' MOTION TO COMPEL PRODUCTION OF**
**DOCUMENTS "IMPROPERLY" WITHHELD AS PRIVILEGED**

Giants Stadium LLC ("GSLLC") objects to the motion of Lehman

Brothers Holding Inc. ("LBHI") and Lehman Brothers Special Financing Inc. ("LBSF")

(together, the "Debtors") to compel GSLLC to produce documents that it has withheld

from its productions on the basis of privilege (the "Debtors' Motion").

INTRODUCTION

1.      In the nearly three years since GSLLC first filed Proofs of Claim against

LBSF and LBHI (the "Claims"), Debtors have not objected to those Claims.  Nor have

they engaged in substantive discussions with GSLLC regarding the merits of the Claims

themselves.  Instead, they have engaged in expansive Rule 2004 discovery to delay

resolution of the Claims, cause GSLLC a great deal of unnecessary expense, and pursue frivolous issues which belie Debtors' misunderstanding of the very transaction that they designed and marketed to GSLLC in the first place. This discovery has resulted in a one-way production of more than 63,900 pages of documents by GSLLC, and a deposition of GSLLC's authorized representative lasting more than seven hours. The current motion to compel, regarding seven "families" of privileged email, is more wasteful delay.

2.      The basis of the Claims arises from transactions entered into by GSLLC, at the suggestion of certain Lehman entities, as part of a stadium financing project. Specifically, Lehman Brothers Inc. ("LBI") offered to underwrite and act as a broker-dealer on auction rate bonds issued by GSLLC, while its affiliate, LBSF, entered into actual bond rate swaps, through which GSLLC would pay LBSF a fixed rate of interest and LBSF, for 40 years, would pay GSLLC the actual rate of interest generated on the bonds through monthly auctions. LBHI was guarantor of LBSF's obligations. This financing structure created the equivalent of a fixed-rate debt instrument for GSLLC, with LBSF bearing the interest rate risk.

3.      The structure of the financing that Debtors designed and marketed to GSLLC was bespoke, not standard, and valuation of the damage caused to GSLLC by Debtors' default on their obligations under that financing structure required legal analysis informed by financial market experts, particularly given the volatile financial climate that existed in the weeks surrounding Debtors' momentous bankruptcies.

4.      GSLLC has accommodated Debtors' requests at all stages of the discovery process in a good-faith effort to provide as much information as possible and speed resolution of the Claims.

5.      Contrary to Debtors' claim that GSLLC has used the attorney-client privilege in a "sweeping" manner, *see* Debtors' Motion at ¶ 1, GSLLC has so far produced nearly 64,000 pages and more than 7,200 documents, including more than 3,000 emails to which Goldman Sachs was a party.  These documents provide more than ample basis for Debtors to evaluate GSLLC's Claims.

6.      In contrast, Debtors' Motion seeks 33 documents, representing only nine distinct threads of privileged email conversation.  GSLLC objects to the release of 29 of these documents,[1] which comprise *only seven distinct "families" of email*.   The seven email privileged conversations that remain at issue represent an appropriate and narrowly tailored application of privilege in specific circumstances where Goldman Sachs provided expertise to Sullivan & Cromwell LLP ("S&C"), counsel to GSLLC, specifically for the purpose of facilitating S&C's legal advice to GSLLC.

7.      The Court should deny Debtors' Motion to Compel and encourage substantive discussion of GSLLC's claims.

## STATEMENT OF FACTS

8.      GSLLC is the company that financed approximately 50% of the costs of construction of the New Meadowlands Stadium (the "Stadium") and manages the interests in the Stadium associated with the New York Football Giants.  S&C has acted as legal counsel to GSLLC since its incorporation.  (Procops Decl. ¶ 2.)

9.       In exploring options to finance the Stadium, GSLLC looked to issue debt at the lowest possible interest rate.  GSLLC originally worked with Goldman, Sachs & Co. ("Goldman Sachs") and determined that issuing auction rate bonds would generally

---

[1]      GSLLC has reviewed the documents in question and has agreed to the release of four of them. The remaining 29 documents are still at issue in this motion.

allow GSLLC to issue 40-year debt at the lowest possible interest rate. Auction rate bonds are instruments that have interest rates—subject to a rate cap—that are set by an auction process run by a broker-dealer for the bonds (which originally was to be Goldman Sachs in this case). (Procops Decl. ¶ 3.)

10.     Because of the possibility of the auction process generating rates of up to 22%, Goldman Sachs and GSLLC also contemplated entering into a swap by which GSLLC would pay Goldman Sachs a fixed rate of interest and Goldman Sachs would pay GSLLC the LIBOR rate. By this swap, GSLLC would eliminate its risk that an increase in the LIBOR rate would cause the rates on the bonds to increase, and therefore increase GSLLC's interest expense. (Procops Decl. ¶ 4.)

11.     Prior to finalizing these arrangements with Goldman Sachs, Lehman Brothers, Inc. ("LBI") presented GSLLC with a more enticing offer. LBI offered to underwrite and act as a broker-dealer on auction rate bonds, and then its affiliate LBSF would enter into actual bond rate swaps, through which GSLLC would pay LBSF a fixed rate of interest and LBSF would pay GSLLC the actual rate of interest generated on the bonds through the auctions. In other words, GSLLC effectively would have a fixed rate of interest on the auction rate bonds as long as LBSF upheld its obligations under the swaps. (Procops Decl. ¶ 5.)

12.     This arrangement designed by the Lehman entities was attractive to GSLLC because it promised the benefit of a fixed-rate debt instrument that was not linked to LIBOR. Construction projects are subject to unpredictable operational and other risks, and, therefore, GSLLC sought the most stable and predictable debt instruments through which to finance its share of the Stadium construction costs. GSLLC

ultimately hired LBI as an underwriter and broker-dealer for several tranches of its auction-rate bonds solely because of LBSF's promise to accompany these bonds with actual bond-rate swaps. (Procops Decl. ¶ 6.)

13.     GSLLC ultimately issued $390,325,000 of auction rate bonds through LBI as underwriter and broker-dealer.  As to the swaps with LBSF, Debtors and GSLLC negotiated and drafted two ISDA Master Agreements, pursuant to which GSLLC and LBSF entered into the swaps described above (the "Transactions") and LBHI guaranteed LBSF's obligations.  GSLLC at all times complied with its obligations under the Transactions.  Copies of the ISDA Master Agreements are attached hereto as <u>Exhibit A</u>. (Procops Decl. ¶ 7.)

14.     S&C has represented and continues to represent GSLLC in legal matters relating to the Transactions.  (Procops Decl. ¶ 8.)

15.     As anticipated during the negotiations between GSLLC and LBI before the swaps were in place, the ISDA Master Agreements created an exchange between GSLLC and LBSF of two payment streams, a floating monthly payment determined by auction on a series of bonds and a fixed quarterly payment at an annual rate of 6.1885%. The result was a product that fully hedged the auction rate risk of the Transactions, and created a fixed-rate debt instrument by which Giants Stadium paid a guaranteed 6.1885% rate on this portion of its financing.  (Procops Decl. ¶ 9.)

16.     LBI was also the broker dealer for the bonds and, in the period that lead up to LBSF's default on the swaps, chose not to conduct competitive market rate auctions on the bonds.  Instead, LBI, as broker dealer, exercised its right to hold the bonds in Lehman's own account at the "all hold rate".  GSLLC, as the issuer of the bonds, was

responsible for paying that "all hold" rate to LBI, as owner of the bonds; LBSF, as swap counterparty to GSLLC, was responsible for paying that "all hold rate" to GSLLC. There is not any reliable direct valuation history relating to the bonds because of this failure to conduct competitive auctions. (Procops Decl. ¶ 10.)

17.      At the same time, GSLLC entered into a separate transaction with Goldman Sachs, through which it issued other tranches of the bonds auctioned by Goldman Sachs as broker dealer. These bonds were identical to the bonds subject to the Transactions, other than the identity of the broker dealer, differences in tenor and amount and the fact that all the bonds auctioned by Goldman Sachs were insured by FSA, while most of the bonds auction by LBI and subject to the LBSF swaps were insured by FGIC. Unlike LBI, Goldman Sachs neither owned the bonds nor had an affiliate committed to pay the underlying auction rate. Accordingly, Goldman Sachs conducted competitive auctions and the price established by the auctions was paid by GSLLC to third parties at arms'-length. (Procops Decl. ¶ 11.)

18.      GSLLC also entered into a traditional interest-rate swap with Goldman Sachs. This swap was an interest rate swap in which GSLLC received LIBOR and paid fixed rate. Goldman Sachs was not exposed to any risks related to the auction rate on the underlying bonds. Therefore, although the bonds brokered by Goldman Sachs were substantially identical to the bonds brokered by LBI, the swaps entered into with Goldman were materially different from the swaps entered into with LBSF. (Procops Decl. ¶ 12.)

19.      LBHI and LBSF filed Chapter 11 petitions on September 15, 2008, and October 3, 2008, respectively, precipitating a market-wide financial panic. LBHI's

bankruptcy constituted an "Event of Default" as that term is defined in the ISDA Master Agreements.  (Procops Decl. ¶ 13.)

20.    Accordingly, on September 18, 2008, GSLLC exercised its right under those agreements to terminate the Transactions.  GSLLC then prepared a statement of loss pursuant to the applicable documentation, and timely filed Proofs of Claim against LBSF and LBHI, in the total amount of $301,804,617.14, which it has been pursuing since 2008.  (Procops Decl. ¶ 14; Dietderich Decl. ¶ 2.)

21.    Although GSLLC's claims have been pending for nearly three years, Debtors have not yet objected to the claims nor met or conferred on the claims' substance.  (Dietderich Decl. ¶ 3.)

22.    Debtors have pursued broad demands for the production of GSLLC documents and have taken the deposition of Ms. Christine Procops, an authorized representative of GSLLC.  Debtors' subpoenas are attached hereto as Exhibit B.  In a good faith effort to move the process along and to assist Debtors in understanding the nature of GSLLC's claims, GSLLC has accommodated this expansive discovery, which Debtors have justified by stating they are entitled to conduct a "fishing expedition."  See November 11, 2010 letter from R. Slack to B. Clark, attached to the hereto as Exhibit C. (Dietderich Decl. ¶ 4.)

23.    On August 10, 2011, Debtors noticed a subpoena directed to Mr. Robert Taylor, the former Lehman employee responsible for LBSF's negotiation of the ISDA Master Agreements governing the Transactions and for Lehman's relationship with GSLLC, for another examination under Rule 2004 of the Federal Rules of Bankruptcy Procedure.  Debtors refused to agree to allow GSLLC to participate in the deposition of

Mr. Taylor.  Because Mr. Taylor played an important part in the Transactions, which form the basis of GSLLC's claims against the estate, GSLLC moved on August 30, 2011 to be permitted to attend and participate in Mr. Taylor's deposition.  Debtors then withdrew their subpoena of Mr. Taylor on September 2, 2011.  (Dietderich Decl. ¶ 5.)

24.     To date, GSLLC has produced to Debtors over 7,200 emails and other documents, comprising over 63,900 pages.  These documents contain information that is more than sufficient to demonstrate the reasonable basis for GSLLC's liquidated valuation of the Transactions in accordance with the ISDA Agreements.  (Dietderich Decl. ¶ 6.)

25.     Debtors' default created an urgent need for GSLLC to receive legal advice regarding GSLLC's contractual rights under the ISDA Master Agreements and how they might be protected.  The Transactions formed a critical part of the financing of a Stadium which at that time was still under construction, and GSLLC anticipated it would suffer massive losses due to Debtors' default. (Procops Decl. ¶ 15.)

26.     The Loss calculated because of the termination of the Transactions was substantial, because of the considerable unanticipated expense that GSLLC would incur to replace the benefits of the swaps offered by Debtors, and accepted and enjoyed by GSLLC, before the bankruptcy filing.  Because this Loss was so substantial, GSLLC anticipated that Debtors might resist the GSLLC Claims and force the parties to litigate the Claims.  The assistance of Goldman Sachs regarding the Loss calculations was also for the purpose of helping GSLLC and its counsel prepare to prosecute the GSLLC Claims and anticipate potential challenges.  (Procops Decl. ¶ 16.)

27.    In the weeks surrounding the bankruptcy filings, GSLLC sought S&C's legal advice.  As a result, S&C engaged in a number of confidential communications with GSLLC to provide it with legal advice concerning, among other things, the value of any claim that GSLLC might submit in the bankruptcy cases.  (Procops Decl. ¶ 17.)

28.    S&C and GSLLC also at that time engaged in a number of communications with Goldman Sachs, a company whose employees have significant expertise in analyzing the value of complex financial issues and which had an existing relationship with GSLLC.  These communications were important to S&C's ability to provide GSLLC with legal advice concerning how to value GSLLC's Loss under the Transactions. (Procops Decl. ¶ 18.)

29.    The communications among Goldman Sachs, S&C, and GSLLC had nothing substantive to do with GSLLC's termination rights under the ISDA Agreements; rather, they concerned only the calculation of the amount of GSLLC's Loss due to Debtors' default.  The working assumption of GSLLC, Goldman Sachs, and S&C throughout these communications was that GSLLC properly terminated the Transactions and that the value of GSLLC's Loss under the Transactions was based on their status as actual bond rate swaps.  (Procops Decl. ¶ 19.)

30.    On May 25, 2011, Christine Procops, an authorized representative of GSLLC, provided deposition testimony about the termination of the Transactions and the value of the Transactions to GSLLC.  The actual deposition times exceeded seven hours of questions.  (Procops Decl. ¶ 20.)

31.    Nonetheless, on July 27, 2011, Debtors demanded, via a new subpoena, that GSLLC produce another representative to answer the same questions Debtors had

spent all of May 25, 2011 pursuing with Ms. Procops. Debtors' Subpoena is attached hereto as <u>Exhibit D</u>. (Dietderich Decl. ¶ 7.)

32.    Faced with what is effectively one-sided pre-trial discovery, GSLLC sought specific information pursuant to a limited Rule 2004 discovery request, filed on April 14, 2011. Debtors have opposed producing a single document in response. (Dietderich Decl. ¶ 8.)

33.    Debtors wrote a letter to GSLLC on February 24, 2011 regarding the privilege logs GSLLC had submitted to Debtors nine months earlier, on May 19, 2010. Seeking to avoid time-consuming motion practice—and in the hope that Debtors would at last agree to meet on the merits to discuss GSLLC's claims—GSLLC engaged in a prompt re-review of the documents it had originally withheld on grounds of privilege. (Dietderich Decl. ¶ 9.)

34.    GSLLC made every effort at that time to minimize the number of documents over which it continued to claim privilege, in an effort to ensure that Debtors had as much information as possible to assist them in understanding the nature of GSLLC's Claims. With this goal in mind, on April 4, 2011, GSLLC produced more than 100 additional documents, the vast majority of those that Debtors had requested. GSLLC strove to disclose to Debtors as much of the underlying information as was possible—for example, GSLLC provided to Debtors all of the financial and valuation models that were prepared by Goldman Sachs in relation to the claims—without revealing the substance of the few purely legal discussions that were at issue. (Dietderich Decl. ¶ 10.)

35.    In total, GSLLC has produced to Debtors more than 3,000 emails on which Goldman Sachs was a participant. (Dietderich Decl. ¶ 11.)

36.     Nonetheless, four months later, on August 16, 2011, Debtors advised that they would be moving to compel the production of additional documents.  (Dietderich Decl. ¶ 12.)

37.     On August 23, 2011, GSLLC suggested to Debtors that, upon Debtors' identification of the documents in question, GSLLC would be willing to meet and confer regarding the privilege issue, rather than wasting this Court's time with discovery-related motion practice.  GSLLC also reminded Debtors of GSLLC's continued desire to meet regarding the substance of its claims.  (Dietderich Decl. ¶ 13.)

38.     Debtors chose not to consider these suggestions.  Instead, on August 30, 2011, Debtors submitted the instant Motion to Compel Production of Documents that is at issue here, seeking 33 documents that GSLLC has withheld under attorney-client privilege and/or attorney work product.  GSLLC has agreed to produce four of these documents to Debtors, and objects to the production of the remaining 29 documents. (Dietderich Decl. ¶ 14.)

39.     The contested documents in actuality comprise only seven distinct email threads, and those seven communications represent an extremely specific and appropriate assertion of privilege.  (Dietderich Decl. ¶ 14.)

40.     These communications represent legal discussions among S&C, Goldman Sachs, and GSLLC, in order to respond to GSLLC's requests for legal advice from S&C, and for which S&C required the assistance of an expert on financial markets in order to provide GSLLC with legal advice concerning the calculation of Loss.  This financial markets was provided by Goldman Sachs at the request of GSLLC solely for the purpose

of assisting S&C to adequately advise GSLLC on legal questions.  (Procops Decl. ¶ 22; Dietderich Decl. ¶ 15.)

41.    The privilege logs state that the legal advice at issue in these communications involved such matters as bond swap structure, termination of swap agreements, valuation of terminated swap agreements, criteria for valuation of terminated swaps, the impact of Debtors' bankruptcies, and replacement financing.  These communications concern financial advice sought by S&C for the purpose of providing advice on the manner of valuing the Loss suffered by GSLLC due to LBSF's default; the communications do not substantively concern GSLLC's termination rights under the ISDA Agreements, or any non-privileged communications.  (Dietderich Decl. ¶ 16.)

42.    Debtors' bankruptcies had created an atmosphere of panic and confusion in the financial markets, resulting in a need for all parties involved to act with a sense of urgency.  At the time of these communications, this urgency removed the normal ability to enter into written agreements precisely delineating the nature of the assistance that Goldman Sachs, which had worked closely with GSLLC before, was providing to S&C. Nonetheless, all parties to these communications understood this was confidential and also understood that the assistance given in these narrow circumstances by Goldman Sachs was solely for the purpose of providing expertise required for S&C to provide legal advice to GSLLC on the amount of GSLLC's Loss due to LBSF default, and not for the purpose of providing GSLLC with advice regarding its finances.  (Procops Decl. ¶ 23; Dietderich Decl. ¶  17.)

43.    None of the withheld communications concerns issues which implicate Goldman Sachs' role as a swap counterparty, financial advisor, or provider of any

financial services or products to GSLLC.  The communications withheld do not involve consulting services; plans for the future of the securities; advice regarding the market in general; the attempt to obtain a Market Quotation as defined in the ISDA Master Agreements; bridge loans; or any aspect of replacement financing.  (Dietderich Decl. ¶ 18.)

44.    In the privileged communications at issue, Goldman Sachs was not acting in its capacity as a financial advisor, counterparty, or underwriter to GSLLC, but, rather, it was providing S&C with the expert advice on financial markets S&C needed in order to provide GSLLC with legal advice concerning how to value its Loss under the ISDA Agreements.  (Procops Decl. ¶ 24; Dietderich Decl. ¶ 19.)

<u>ARGUMENT</u>

45.    GSLLC is entitled to protect communications meeting the essential criteria for privilege: "(1) where legal advice is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor (8) except that the privilege be waived."  *U.S.* v. *Kovel*, 296 F.2d 918, 921 (2d Cir. 1961).

46.    The 29 documents at issue here—*representing only seven distinct conversations*—meet this standard.  These conversations relate to legal advice sought by GSLLC from its legal counsel, S&C, regarding valuation of a contractual default under specific provisions for "Loss" as defined in two ISDA Master Agreements.  Those discussions occurred confidentially as between GSLLC and S&C, facilitated by the

expert financial advice of Goldman Sachs, and they have not been disclosed to any other party or waived by any actions of GSLLC.

47.    Goldman Sachs' role in these seven conversations constitutes an appropriate application of privilege, as adopted in the Second Circuit, to communications with third-party advisors playing an interpretive function in order to facilitate the provision of legal advice.  As Judge Friendly explained in a leading case where privilege was recognized when an accountant assisted a lawyer in understanding accounting issues:

> "[a]ccounting concepts are a foreign language to some lawyers in almost all cases, and to almost all lawyers in some cases.  Hence the presence of an accountant, whether hired by the lawyer or by the client, while the client is relating a complicated tax story to the lawyer, ought not destroy the privilege, any more than would that of the linguist…; the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit."

*Kovel*, 296 F.2d at 922.

48.    Like the accountant in Judge Friendly's example, the role that Goldman Sachs played here was essential to the legal analysis that S&C provided to GSLLC as to what constitutes "Loss" under the ISDA Agreements, and is nearly identical to the role of the investment bank in *Calvin Klein Trademark Trust* v. *Wachner*, 124 F. Supp. 2d 207, 209 (S.D.N.Y. 2000), which also served an interpretive function in advising lawyers "as to what a reasonable business person would consider 'material'."  The court in *Calvin Klein Trademark Trust* reasoned:

> 'Materiality' in this regard is a mixed question of fact and law, which a responsible law firm in Wachtell's place would not be able to adequately resolve without the benefit of an investment banker's expert assessment of which facts were 'material' from a business person's perspective.  [The investment bank] was therefore serving, so far as these documents are concerned, an interpretive function much more akin to the accountant in *United States* v. *Kovel,* 296 F.2d 918 (2d Cir. 1961) than to the public relations firm in *Calvin Klein Trademark Trust v. Wachner,* 198 F.R.D. 53

(S.D.N.Y. 2000).  Thus, the assertion of attorney-client privilege must be sustained as to these documents.

124 F. Supp 2d at 209.

49.    Under this well-established standard, the communications at issue here are protected.  The discussions relate to the calculation of "Loss" under the ISDA Master Agreements, as entered into between GSLLC and Debtors on July 27, 2007.  When LBHI filed for bankruptcy and obtained an order for relief on September 15, 2008, that action constituted an "Event of Default" under the ISDA Master Agreements,[2] which under Section 6(a) of those agreements entitled Giants Stadium to terminate its swaps with LBSF and designate an "Early Termination Date".

50.    As defined in Section 12 of the ISDA Master Agreements, the respective party's "Loss" for each terminated transaction "for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result"  is defined as "an amount that [a] party reasonably determines in good faith to be its total losses and costs" and includes "any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position," determined as of the relevant "Early Termination Date."

51.    The process by which GSLLC calculated its Loss for each swap is set forth in Part B of Schedule 1 to the Calculation Statements, which accompanied its Proofs of Claim.  Pertinently, the underlying auction rate bonds were owned and

---

[2]    Section 5(a)(vii) of the ISDA Master Agreements provides that the filing of bankruptcy proceedings by a "Credit Support Provider", which in this case was LBHI, constitutes an "Event of Default."

brokered by LBI, which had chosen not to conduct competitive market rate auctions on those bonds.

52.      In order to ensure that its Loss calculation was sufficiently "reasonable," GSLLC required the fully informed legal advice of S&C.  S&C, in turn, required the advice of an expert in financial markets (in this case, Goldman Sachs) in order to appropriately interpret what GSLLC should consider "commercially reasonable" and what it could "reasonably determine[] in good faith to be its total losses and costs."

53.      This situation is decidedly different from the situation in *U.S.* v. *Ackert*, 169 F.3d 136 (2d Cir. 1999), cited repeatedly by Debtors, *see* Debtors' Motion at ¶¶ 9, 30, and 34, wherein counsel for one party had contacted the potential counterparty to a transaction in order to obtain information regarding that transaction.  It is also distinct from a situation, again cited repeatedly by Debtors, *see* Debtors' Motion at ¶¶ 18, 34, and 39, in which a third party acts as a financial advisor to the client, rather than as a "translator" for the attorney.  *Summit Ltd.* v. *Levy*, 111 F.R.D. 40, 41 (S.D.N.Y. 1986).

54.      Debtors set forth numerous arguments against the application of *Kovel* to the communications at issue.  None of these arguments has merit.

55.      *First*, contrary to the speculative and unfounded assertions in Debtors' brief,[3] in the limited circumstances surrounding *the seven communications at issue here*, Goldman Sachs was not acting in any of those roles.

56.      Thus, neither *Ackert* nor *Summit* applies here, and neither negates the claim of privilege over these specific communications among GSLLC, Goldman Sachs,

---

[3]        *See*, *e.g.*, Debtors' Motion at   ¶ 39 ("Goldman performed numerous tasks for Giants Stadium during the relevant time period—as bond underwriter, auction manager, swap counterparty, remarketing agent, and Goldman was one of the three leading dealers whom a market quotation was solicited in connection with the termination of the transactions.").

and S&C.  On the contrary, Goldman Sachs' sole function in these discussions was to assist S&C with interpretation of what in good faith would be considered a "reasonable" calculation of Loss.  Especially given the unusual market conditions existing at the time, S&C and GSLLC strived to be as fully informed on that subject as possible.

57.    *Second*, it is simply not true, as Debtors claim, that "Goldman's role as one of Giants Stadium's swap counterparties meant that Goldman's relationship with Giants Stadium was similar, if not identical, to Debtors' relationship with Giants Stadium."  (Debtors' Motion at ¶ 38.)  Debtors are also incorrect that "[t]he advice that Goldman was providing Giants Stadium and S&C in connection with the termination of the Transactions was therefore advice that Giants Stadium could have later used against Goldman, had the Goldman Swaps been terminated by Giants Stadium as well."  *Id*.

58.    Even if Debtors had cited any legal basis for arguing that the potential for future use of the legal advice against a *Kovel* expert would negate the privilege that otherwise clearly applies, this is simply not the situation here.  The Goldman Sachs' swaps were straightforward LIBOR swaps, and, as such, were materially dissimilar to Debtors' auction-rate swaps.  *See supra* at ¶¶ 9-18.  Any necessary calculation of "Loss" under the Goldman Sachs' swaps would therefore involve a straightforward, mechanical calculation.  Debtors' swaps, on the other hand, were bespoke instruments that required informed analysis regarding such concepts as "reasonableness." *See supra* at ¶¶ 49-52.

59.    *Third,* Debtors' assertion that "Ms. Procops's testimony that Goldman provided the 'market interpretation' of the terms of the swap documents suggests that rather than translate for S&C what the swap documents actually meant, Goldman was instead providing its independent view of how market participants would view the

17

meaning of the swap documents," Debtors' Motion at ¶ 36, again misses the point completely. Goldman Sachs was not providing a "view of how market participants would view the meaning of the swap documents;" it was providing expert advice regarding what could, in good faith, be considered a "reasonable" calculation of "Loss" *under the terms* of the swap documents. Ms. Procops explained clearly in her testimony that "[o]ur swap and ISDA document was very complicated, as was our entire transaction. Our counsel at Sullivan & Cromwell does not necessarily know what the market interpretation of certain provisions in our agreements are. I am assuming that we used Goldman Sachs to assist our counsel in that method." Procops Tr. at 64:12-19.

60.     *Fourth,* Debtors' notion that S&C, as an "experienced counsel in derivatives," Debtors' Motion at ¶ 37, could not logically have needed expert financial market advice from Goldman Sachs is unsupportable. S&C is a *law firm*, staffed with *legal* experts. Like all law firms, it often requires the interpretive services of various economic, financial, engineering, and other experts to assist the lawyers in understanding complex, specialized concepts in order to provide legal advice to its clients. In this case, the need for expert assistance was critically important—Debtors' massive bankruptcy had thrown the market into a panic, creating an urgent need for S&C to undertake an analysis of market conditions in relation to specific legal concepts and contractual terms in the agreements. S&C required the assistance of Goldman Sachs in order to undertake this analysis.

61.     If Debtors' position is that experienced counsel, such as S&C and Weil, Gotshal & Manges LLP, cannot credibly claim privilege over communications with financial experts, then presumably Debtors are prepared themselves to produce

communications between Debtors' counsel and its own advisors in discovery relating to GSLLC's claims or other matters relating to the bankruptcy proceedings. Debtors' counsel is extremely sophisticated and experienced, and has access to financial experts, including experts at Alvarez & Marsal, which presumably assist with all aspects of valuing and understanding the often complex transactions that are at issue in Debtors' bankruptcy proceedings. *See* Eric Morath, *Law Firm Weil's Lehman Bill Tops $300 Million,* MarketWatch, June 21, 2011, *available at* www.marketwatch.com, last visited September 4, 2011, ("Last month alone, Weil was paid $16 million, the largest May payment among the 45 professional firms now working on behalf of Lehman, its official creditors committee or the court in the case.…The next largest bill, $10.4 million, came from Alvarez & Marsal, the consulting firm that is managing Lehman's wind-down."), attached hereto as Exhibit E.

62.    *Fifth,* Debtors complain that S&C and Goldman Sachs did not enter into a written *Kovel* agreement and that Goldman Sachs was not separately compensated for the role that it played in these communications. *See* Debtors' Motion ¶¶ 9, 27, and 42. While a written agreement would have codified the agreement among GSLLC, S&C and Goldman Sachs for Goldman Sachs to provide expert advice to S&C, they simply did not have the luxury of time to prepare separate documentation and arrange for separate compensation methods in the chaos that surrounded the disintegration of Lehman. *See* supra at ¶ 44. This does not mean that this aspect of Goldman Sachs' assignment did not take on a distinct and privileged aspect.

63.    *Sixth,* Debtors' "sword and shield" argument, *see* Debtors' Motion ¶ 9, is completely speculative and again misses the mark. The documents at issue in Debtors'

Motion were appropriately withheld—even upon a re-review of GSLLC's withheld communications with an eye to disclosing material to Debtors whenever possible, they represented clearly privileged communications under *Kovel*. *See supra* at ¶¶ 34-35. Debtors' assumption that GSLLC and S&C selectively chose certain communications to withhold for strategic reasons is pure speculation; Debtors cannot and should not know and should not speculate about the substance of the legal advice that was exchanged in these communications. Moreover, GSLLC has already produced numerous emails, and only withheld those that qualify under a very specific application of *Kovel*.

64.     Moreover, Debtors' argument here shows once again an apparent failure to understand the nature of the documents that Debtors *have* been given. As an example, within the many valuations that GSLLC has already provided there are a variety of valuation runs that were calculated by Goldman Sachs in a separate capacity, providing Debtors with ample information regarding the processes and calculations which were run in relation to the calculations of Loss as described in GSLLC's Proofs of Claim. These documents were released, not because they were helpful to GSLLC's claim, but because upon re-review it was determined that the application of *Kovel* to those documents was too tenuous. Those documents reflected mere calculations, and GSLLC did not wish to claim *Kovel* privilege in any but the most clearly defensible situations.

65.     *Additionally,* there is no need for Debtors to waste this Court's time further by insisting on an *in camera* review of the documents at issue. Debtors have not presented this Court with any showing that the communications at issue may not be protected by the privilege.

66.     Tellingly, Debtors' request that this court order an *in camera* review, Debtors' Motion ¶ 41, is supported only by a single case—which deals with a completely different legal issue—of the appropriateness of *in camera* review to determine applicability *of the crime-fraud exception* to the privilege.  *Renner* v. *Chase Manhattan Bank*, 2001 WL  1819215 (S.D.N.Y. July 13, 2001).

67.     Debtors did not inform this Court that they were drawing an analogy to crime-fraud exception cases, perhaps because the U.S. Supreme Court itself has indicated a distrust, even in that situation, of any "blanket rule" authorizing *in camera* review of documents, absent a preliminary showing that probable cause exists to believe that a crime or fraud was committed and that the communications were in furtherance thereof. *United States* v. *Zolin*, 491 U.S. 554, 571 (1989) (reasoning that *in camera* document reviews can "place the policy of protecting open and legitimate disclosure between attorneys and clients at undue risk").  Here, there is no crime-fraud at issue.

68.     *Finally*, while the application of attorney-client privilege to these documents is entirely appropriate, the documents also constitute work product, and are thus protected from disclosure even were the attorney-client privilege inapplicable.

69.     Due to Debtors' bankruptcy, GSLLC reasonably anticipated that it would be required to engage in litigation to enforce its claims.  The communications at issue in Debtors' motion relate to that anticipated litigation.  In analyzing its Loss calculations and preparing the associated Proofs of Claim, GSLLC was facing not just the anticipation but the virtual certainty of litigation.  We are now in that very litigation, so the anticipation was real, imminent and substantial.  Debtors might continue to insist that their "examination of the issues surrounding the Transactions is ongoing", Firestone

Decl. ¶ 11, but GSLLC was—and is—acting under the quite reasonable belief that their $301,804,617.14 claim would be litigated, and subsequent events assuredly confirmed that belief.

70.    The "work-product doctrine . . . is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation' . . . ."  *United States* v. *Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998). "Neither the interests of clients nor the cause of justice would be served . . . if work product were freely discoverable."  *Adlman*, 134 F.3d at 1197.  *See also Hickman v. Taylor*, 329 U.S. 495, 516 (1947) (Jackson, J., concurring) ("Discovery was hardly intended to enable a learned profession to perform its functions . . . on wits borrowed from the adversary.").

71.    The Loss caused by the termination of the Transactions was substantial, and GSLLC reasonably anticipated that it would have to litigate with its Debtors to establish the reasonableness of its calculations.  *See supra* at ¶ 25.  In the Second Circuit, documents prepared both in anticipation of litigation and for another business purpose, so-called dual use documents, are protected work product.  For example, in *Hallmark Cards, Inc.* v. *Murley*, Slip Copy, 2010 WL 4608678 (S.D.N.Y. November 9, 2010), Weil Gotshal & Manges, LLP was retained to investigate concerns regarding a former executive's retention of confidential information.  The court reasoned that work product could apply, because "both these entities and Weil had every reason to be concerned that Murley's possible disclosure of confidential information to RPG and Clipper could result in litigation."  The court went on to explain that:

> Even if there were an additional business purpose for the creation of these documents, *Adlman* and its progeny make clear that ***where a document is***

22

> **prepared for both a business purpose and in anticipation of litigation,
> the document may be protected by the work-product doctrine** so long as it
> would not have been prepared in a substantially similar manner *but for* the
> prospect of litigation.   Under *Adlman,* even if the search and collection
> served a dual business and litigation purpose, that is not sufficient to
> defeat Weil's invocation of the work-product doctrine.… In sum, the
> circumstances here demonstrate that Clipper and RPG did not retain
> Weil's litigation department purely for a business purpose.  Instead, RPG
> and Clipper retained Weil to reduce their litigation risk.

2010 WL 4608678 at *5, n.2. (internal citations omitted) (emphasis added).

72.    Nor do Debtors have any substantial need of the communications at issue; they have engaged in ample discovery already.  Regardless, the communications at issue here do not relate to the topics which Debtors identify in their motion.  Debtors' Motion at ¶¶ 54-56.  Specifically, these communications do not relate to discussions with the National Football League; timing questions relating to termination of the Transactions; the impact of LBI's bankruptcy on transaction value; or the execution of a Third Supplemental Indenture on September 18, 2008.  These are all peripheral issues, bearing little or no relation to the valuation of GSLLC's Proofs of Claim, and the communications at issue here do not bear on these topics.

73.    The claim of privilege and work product protection over these specific communications is therefore entirely appropriate.  The Court should deny Debtors' motion to compel and encourage Debtors to engage in substantive discussions on GSLLC's claims to avoid further costs and delays to GSLLC and the Estate.

<u>CONCLUSION</u>

**WHEREFORE**, for the reasons stated herein, Giants Stadium respectfully requests that the Court deny Debtors' Motion to Compel the Production of Documents and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
September 7, 2011

Respectfully submitted,

**SULLIVAN & CROMWELL LLP**

By:   /s/_____
Bruce E. Clark
Matthew A. Schwartz
Lara J. Loyd
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Attorneys for Giants Stadium LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————

|  |  |
|---|---|
| | : |
| In re | : Chapter 11 |
| | : |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : Case No. 08-13555 (JMP) |
| | : |
| Debtors. | : Jointly Administered |
| | : |

———————————————————————

**DECLARATION OF CHRISTINE PROCOPS IN SUPPORT**
**OF OBJECTION OF GIANTS STADIUM LLC TO**
**DEBTORS' MOTION TO COMPEL PRODUCTION**
<u>**OF DOCUMENTS "IMPROPERLY" WITHHELD AS PRIVILEGED**</u>

I, CHRISTINE PROCOPS, declare under penalty of perjury, this 7th day of September, 2011:

1.      I am an authorized representative of Giants Stadium LLC ("GSLLC").  I submit this declaration in support of GSLLC's Opposition to Debtors' Motion to Compel the Production of Documents "Improperly" Withheld as Privileged.  The facts set forth below are based on my personal knowledge.

<u>**The Financing of New Meadowlands Stadium**</u>

2.      Approximately 50% of the costs of construction of the New Meadowlands Stadium (the "Stadium") in East Rutherford, New Jersey was financed by GSLLC, which manages the interests in the Stadium associated with the New York Football Giants. Sullivan & Cromwell LLP ("S&C") has acted as legal counsel to GSLLC since its incorporation.

3.      In exploring options to finance the Stadium, GSLLC looked to issue debt at the lowest possible interest rate.  GSLLC originally worked with Goldman, Sachs & Co. ("Goldman Sachs") and determined that issuing auction rate bonds would generally

allow GSLLC to issue 40-year debt at the lowest possible interest rate.  Auction rate bonds are instruments that have interest rates—subject to a rate cap—that are set by an auction process run by a broker-dealer for the bonds (which originally was to be Goldman Sachs in this case).

4.      Because of the possibility of the auction process generating rates of up to 22%, Goldman Sachs and GSLLC also contemplated entering into a swap by which GSLLC would pay Goldman Sachs a fixed rate of interest and Goldman Sachs would pay GSLLC the LIBOR rate.  By this swap, GSLLC would eliminate its risk that an increase in the LIBOR rate would cause the rates on the bonds to increase, and therefore increase GSLLC's interest expense.

5.      Prior to finalizing these arrangement with Goldman Sachs, Lehman Brothers, Inc. ("LBI") presented GSLLC with a more enticing offer.  LBI offered to underwrite and act as a broker-dealer on auction rate bonds, and then its affiliate Lehman Brothers Special Financing Inc. ("LBSF") would enter into actual bond rate swaps, through which GSLLC would pay LBSF a fixed rate of interest and LBSF would pay GSLLC the actual rate of interest generated on the bonds through the auctions.  In other words, GSLLC effectively would have a fixed rate of interest on the auction rate bonds as long as LBSF upheld its obligations under the swaps.

6.      This arrangement designed by LBSF and LBI was attractive to GSLLC because it promised the benefit of a fixed-rate debt instrument that was not linked to LIBOR.  Construction projects are subject to unpredictable operational and other risks, and, therefore, GSLLC sought the most stable and predictable debt instruments through which to finance its share of the Stadium construction costs.  GSLLC ultimately hired

2

LBI as an underwriter and broker-dealer for several tranches of its auction-rate bonds solely because of LBSF's promise to accompany these bonds with actual bond-rate swaps.

**The Transactions**

7.     GSLLC ultimately issued $390,325,000 of auction rate bonds through LBI as underwriter and broker-dealer.   As to the swaps with LBSF, Lehman Brothers Holdings Inc. ("LBHI") and LBSF (the "Debtors") and GSLLC negotiated and drafted two ISDA Master Agreements, pursuant to which GSLLC and LBSF entered into the swaps described above (the "Transactions") and LBHI guaranteed LBSF's obligations. GSLLC at all times complied with its obligations under the Transactions.  Copies of the ISDA Master Agreements are attached to the Objection of Giants Stadium LLC to Debtors' Motion to Compel Production Documents "Improperly" Withheld As Privileged ("GSLLC Brief") as Exhibit A.

8.     S&C has represented and continues to represent GSLLC in legal matters relating to the Transactions.

9.     As anticipated during the negotiations between GSLLC and LBI before the swaps were in place, the ISDA Master Agreements involved the exchange of two payment streams, a floating monthly payment determined by auction on a series of bonds and a fixed quarterly payment at an annual rate of 6.1885%.  The result was a product that fully hedged the auction rate risk of the Transactions, and created a fixed-rate debt instrument by which Giants Stadium paid a guaranteed 6.1885% rate on this portion of its financing.

3

10.    LBI was also the broker dealer for the bonds and, in the period that lead up LBSF's default on the swaps, chose not to conduct competitive market rate auctions on the bonds.    Instead, LBI, as broker dealer, exercised its right to hold the bonds in Lehman's own account at the "all hold rate".    GSLLC, as the issuer of the bonds, was responsible for paying that "all hold" rate to LBI, as owner of the bonds; LBSF, as swap counterparty to GSLLC, was responsible for paying that "all hold rate" to GSLLC.    There is not any reliable direct valuation history relating to the bonds because of this failure to conduct competitive auctions.

11.    At the same time, GSLLC entered into a separate transaction with Goldman Sachs, through which it issued other tranches of the bonds auctioned by Goldman Sachs as broker dealer.    These bonds were identical to the bonds subject to the Transactions, other than the identity of the broker dealer, differences in tenor and amount and the fact that all the bonds auctioned by Goldman Sachs were insured by FSA, while most of the bonds auction by LBI and subject to the LBSF swaps were insured by FGIC. Unlike LBI, Goldman Sachs neither owned the bonds nor had an affiliate committed to pay the underlying auction rate.    Accordingly, Goldman Sachs conducted competitive auctions and the price established by the auctions was paid by GSLLC to third parties at arms'-length.

12.    GSLLC also entered into a traditional interest-rate swap with Goldman Sachs.    This swap was an interest rate swap in which GSLLC received LIBOR and paid fixed rate.    Goldman Sachs was not exposed to any risks related to the auction rate on the underlying bonds.    Therefore, although the bonds brokered by Goldman Sachs were

4

substantially identical to the bonds brokered by LBI, the swaps entered into with Goldman were materially different from the swaps entered into with LBSF.

**LBSF Defaults on the Transactions**

13.     LBHI and LBSF filed Chapter 11 petitions on September 15, 2008, and October 3, 2008, respectively, precipitating a market-wide financial panic.   LBHI's bankruptcy constituted an "Event of Default" as that term is defined in the ISDA Master Agreements.

14.     Accordingly, on September 18, 2008, GSLLC exercised its right under those agreements to terminate the Transactions.   GSLLC then prepared a statement of loss pursuant to the applicable documentation, and timely filed Proofs of Claim against LBSF and LBHI, in the amount of $301,804,617.14, which it has been pursuing since 2008.

**The Communications at Issue in Debtors' Motion**

15.     Debtors' default created an urgent need for GSLLC to receive legal advice regarding GSLLC's contractual rights under the ISDA Master Agreements and how they might be protected.   The Transactions formed a critical part of the financing of a Stadium which at that time was still under construction, and GSLLC anticipated it would suffer massive losses due to Debtors' default.

16.     The Loss calculated because of the termination of the Transactions was substantial, because of the considerable unanticipated expense that GSLLC would incur to replace the benefits of the swaps offered by Debtors, and accepted and enjoyed by GSLLC, before the bankruptcy filing.   Because this Loss was so substantial, GSLLC anticipated that Debtors might resist the GSLLC Claims and force the parties to litigate

the Claims.  The assistance of Goldman Sachs regarding the Loss calculations was also for the purpose of helping GSLLC and its counsel prepare to prosecute the GSLLC Claims and anticipate potential challenges.

17.    In the weeks surrounding the bankruptcy filings, GSLLC sought S&C's legal advice.  As a result, S&C engaged in a number of confidential communications with GSLLC to provide it with legal advice concerning, among other things, the value of any claim that GSLLC might submit in the bankruptcy cases.

18.    S&C and GSLLC also at that time engaged in a number of communications with Goldman Sachs, a company whose employees have significant expertise in analyzing the value of complex financial issues and which had an existing relationship with GSLLC.  These communications were important to S&C's ability to provide GSLLC with legal advice concerning how to value GSLLC's "Loss" under the Transactions, as that term is set forth in the ISDA Agreements.

19.    The communications among Goldman Sachs, S&C, and GSLLC had nothing substantive to do with GSLLC's termination rights under the ISDA Agreements; rather, they concerned only the calculation of the amount of GSLLC's Loss due to Debtors' default.  The working assumption of GSLLC, Goldman Sachs, and S&C throughout these communications was that GSLLC properly terminated the Transactions and that the value of GSLLC's Loss under the Transactions was based on their status as actual bond rate swaps.

**Debtors' Motion to Compel**

20.    On May 25, 2011, I provided deposition testimony about the termination of the Transactions and the value of the Transactions to GSLLC.  The actual deposition times exceeded seven hours of questions.

21.    On August 30, 2011, Debtors submitted the Motion to Compel Production of Documents that is at issue here.  As I understand it, Debtors are seeking 29 documents that GSLLC has withheld under attorney-client privilege and/or attorney work product.[1]

22.    These communications represent legal discussions among Goldman Sachs, S&C, and GSLLC, in order to respond to GSLLC's requests for legal advice from S&C, and for which S&C required the assistance of an expert on financial markets in order to provide GSLLC with legal advice on the calculation of Loss under the ISDA Agreements.  This financial markets assistance was provided by Goldman Sachs at the request of GSLLC solely for the purpose of assisting S&C to adequately advise GSLLC on legal questions.

23.    At the time of these communications, Debtors' bankruptcies had created an atmosphere of panic and confusion in the financial markets, resulting in a need for all parties involved to act with a sense of urgency and in a way to minimize any possible arguments that Debtors might use to attempt to escape their obligations under the ISDA Agreements.  This urgency removed the normal ability to enter into agreements precisely delineating the nature of the assistance that Goldman Sachs, which had worked closely with GSLLC before, was providing to S&C.  Nonetheless, all parties understood this was confidential and also understood that the assistance given in these narrow circumstances

---

[1]    Debtors' Motion originally requested 33 documents, and after review GSLLC has agreed to produce four of these documents to Debtors.

by Goldman Sachs was solely for the purpose of providing expertise supporting S&C's legal advice on the amount of GSLLC's Loss due to LBSF's default, and not for the purpose of providing GSLLC with advice regarding its finances.

24.    In the communications at issue, Goldman Sachs was not acting in its capacity as a financial advisor, counterparty, or underwriter to GSLLC, but, rather, as an advisor to S&C.

Dated: East Rutherford, New Jersey
       September 7, 2011

                                    /s/_____
                                    Christine Procops

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| | : |
| In re | : Chapter 11 |
| | : |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : Case No. 08-13555 (JMP) |
| | : |
| Debtors. | : Jointly Administered |
| | : |

---

### DECLARATION OF ANDREW G. DIETDERICH
### IN SUPPORT OF OBJECTION OF GIANTS STADIUM LLC
### TO DEBTORS' MOTION TO COMPEL PRODUCTION OF
### DOCUMENTS "IMPROPERLY" WITHHELD AS PRIVILEGED

I, ANDREW G. DIETDERICH, declare under penalty of perjury, this 7th day of September, 2011:

1. I am a member of Sullivan & Cromwell LLP ("S&C"), counsel to Giants Stadium LLC ("GSLLC"). I submit this declaration in support of GSLLC's Opposition to Debtors' Motion to Compel the Production of Documents "Improperly" Withheld as Privileged. The facts set forth below are based on my personal knowledge.

2. On September 18, 2008, GSLLC terminated certain bond rate swap transactions ("Transactions") with Lehman Brothers Special Finance ("LBSF"), governed by ISDA Master Agreements. GSLLC ultimately filed claims in the Lehman bankruptcy against LBSF and Lehman Brothers Holdings Inc. ("LBHI", and together with LBSF, the "Debtors"), which was LBSF's guarantor under the ISDA Agreements, in the total amount of $301,804,617.14.

3. Although GSLLC's claims have been pending for nearly three years, the Debtors have not yet objected to the claims nor met or conferred on the claims' substance.

4.      Debtors have pursued broad demands for the production of GSLLC documents and have taken the deposition of Ms. Christine Procops, an authorized representative of GSLLC.  Debtors' subpoenas are attached hereto as <u>Exhibit B</u>.  In a good faith effort to move the process along and to assist Debtors in understanding the nature of GSLLC's claims, GSLLC has accommodated this expansive discovery, which Debtors have justified by stating they are entitled to conduct a "fishing expedition."  *See* November 11, 2010 letter from R. Slack to B. Clark, attached to the Objection of Giants Stadium LLC to Debtors' Motion to Compel Production Documents "Improperly" Withheld As Privileged ("GSLLC Brief") as <u>Exhibit C</u>.

5.      On August 10, 2011, Debtors noticed a subpoena directed to Mr. Robert Taylor, the former Lehman employee responsible for LBSF's negotiation of the ISDA Master Agreements governing the Transactions and for Lehman's relationship with GSLLC, for another examination under Rule 2004 of the Federal Rules of Bankruptcy Procedure.  Debtors refused to agree to allow GSLLC to participate in the deposition of Mr. Taylor.  Because Mr. Taylor played an important part in the Transactions, which form the basis of GSLLC's claims against the estate, GSLLC moved on August 30, 2011 to be permitted to attend and participate in Mr. Taylor's deposition.  The Debtors then withdrew their subpoena of Mr. Taylor on September 2, 2011.

6.      To date, GSLLC has produced to Debtors over 7,200 emails and other documents, comprising over 63,900 pages.  These documents contain information that is more than sufficient to demonstrate the reasonable basis for GSLLC's liquidated valuation of the Transactions in accordance with the ISDA Agreements.

2

7.      Additionally, I understand that on May 25, 2011, Ms. Procops provided more than seven hours of deposition testimony, including testimony relevant to the termination of the Transactions and the value of the Transactions to GSLLC. Nonetheless, on July 27, 2011, Debtors demanded, via a new subpoena, that GSLLC produce another representative to answer the same questions Debtors had spent May 25, 2011 pursuing with Ms. Procops.  Debtors' Subpoena is attached to the GSLLC Brief as <u>Exhibit D</u>.

8.      Faced with what is effectively pre-trial discovery by the Debtors, GSLLC sought specific information pursuant to a limited Rule 2004 discovery request, filed on April 14, 2011.  The Debtors have opposed producing a single document in response.

9.      On February 24, 2011, Debtors wrote a letter to GSLLC regarding the privilege logs GSLLC had submitted to Debtors nine months earlier, on May 19, 2010. Seeking to avoid time-consuming motion practice—and in the hope that Debtors would at last agree to meet on the merits to discuss GSLLC's claims—GSLLC engaged in a prompt re-review of the documents it had originally withheld on grounds of privilege.

10.     GSLLC made every effort at that time to minimize the number of documents over which it continued to claim privilege, in an effort to ensure that Debtors had as much information as possible to assist them in understanding the nature of GSLLC's claims.  With this goal in mind, on April 4, 2011, GSLLC produced more than 100 additional documents, the vast majority of those that Debtors had requested.  GSLLC strove to disclose to Debtors as much of the underlying information as was possible—for example, GSLLC provided to Debtors all of the financial and valuation models that were

prepared by Goldman Sachs & Co. ("Goldman Sachs") in relation to the claims—without revealing the substance of the few purely legal discussions that were at issue.

11.    In total, GSLLC has produced to Debtors more than 3,000 emails in which Goldman Sachs was a participant.

12.    Nonetheless, four months later, on August 16, 2011, the Debtors advised that they would be moving to compel the production of additional documents.

13.    On August 23, 2011, GSLLC suggested to Debtors that, upon Debtors' identification of the documents in question, GSLLC would be willing to meet and confer regarding the privilege issue, rather than wasting this Court's time with discovery-related motion practice.  GSLLC also reminded Debtors of GSLLC's continued desire to meet regarding the substance of its claims.

14.    Debtors chose not to consider these suggestions.  Instead, on August 30, 2011, Debtors submitted the Motion to Compel Production of Documents that is at issue here.  The Motion seeks 33 documents, the majority of which are duplicative of one another.  GSLLC objects to the release of 29 of these documents,[1] which in actuality comprise only seven distinct email threads, and those seven communications represent an extremely specific and appropriate assertion of privilege.

15.    These seven communications represent legal discussions among S&C, Goldman Sachs, and GSLLC, in which S&C required the assistance of an expert on financial markets in order to provide certain advice to GSLLC concerning the amount of "Loss" (as that term is defined by the ISDA Agreements) suffered by GSLLC due to LBSF's default on the Transactions.  This financial expertise was provided by Goldman

---

[1]    GSLLC has reviewed the documents in question and has agreed to the release of four of them. The remaining 29 documents are still at issue in this motion.

Sachs at the request of GSLLC solely for the purpose of assisting S&C to adequately advise GSLLC on legal questions.

16.     The privilege logs state that the legal advice at issue in these seven communications involved such matters as bond swap structure, termination of swap agreements, valuation of terminated swap agreements, criteria for valuation of terminated swaps, the impact of Debtors' bankruptcies, and replacement financing.  I have reviewed these communications and all of them concern advice sought by S&C for the purpose of providing legal advice on the manner of valuing the Loss suffered by GSLLC due to LBSF's default; the communications do not substantively concern GSLLC's termination rights under the ISDA Agreements or any non-privileged communications.

17.     Debtors' bankruptcies caused a great deal of panic throughout the market and created a sense of urgency which resulted in the need for S&C, GSLLC, and Goldman Sachs to act quickly and forego certain formalities.  This precluded GSLLC's ability to enter into detailed agreements precisely delineating the nature of the assistance that Goldman Sachs was providing to S&C.  Nevertheless, all parties to these communications understood that the assistance being given by Goldman Sachs in these narrow circumstances was solely for the purpose of providing expertise required for S&C to provide legal advice to GSLLC, and not for the purpose of providing GSLLC with advice regarding its finances.

18.     None of the communications withheld concerns issues which implicate Goldman Sachs' role as a swap counterparty, financial advisor, or provider of any financial services or products to GSLLC.  These discussions do not involve consulting services; plans for the future of the securities; advice regarding the market in general; the

attempt to obtain a Market Quotation as defined in the ISDA Master Agreements; bridge

loans; or any aspect of replacement financing.

19.      In the seven privileged communications at issue, Goldman Sachs was not

acting in its capacity as a financial advisor or as a counterparty to GSLLC.  Rather, it was

providing S&C (including myself) with the expert advice on financial markets we needed

in order to provide our client, GSLLC, with legal advice concerning how to value its Loss

under the ISDA Agreements.


Dated: New York, New York
        September 7, 2011

                                        /s/_____
                                        Andrew G. Dietderich