Hearing Date and Time: September 14, 2011 at 10:00 a.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard W. Slack
Peter Gruenberger
Robert J. Lemons
Michael J. Firestone

Attorneys for Debtor
and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
:
**In re**                                          :    **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,       :    **08-13555 (JMP)**
:
        Debtors.                                   :    **(Jointly Administered)**
:
:
----------------------------------------------------------------x

# REPLY MEMORANDUM IN SUPPORT OF DEBTORS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS IMPROPERLY WITHHELD AS PRIVILEGED BY GIANTS STADIUM LLC

US_ACTIVE:\43800988\03\58399.0008

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing, Inc. ("LBSF") and Lehman Brothers Holdings, Inc. ("LBHI") as debtors in possession (the "Debtors" and, collectively with their debtor and non-debtor affiliates, "Lehman"), responds to the Objection (the "Objection") of Giants Stadium LLC ("Giants Stadium") to Debtors' Motion to compel production of documents improperly withheld from its production (the "Motion")[1]:

## PRELIMINARY STATEMENT

1.  The Debtors' motion to compel established the following key points:

    - The general rule that the presence of a third party, such as a financial adviser, in communications between a party and its counsel acts to destroy any attorney-client privilege;

    - A very limited exception to this general rule exists upon a showing that such third party acted as an "interpreter," or functioned in the role of an interpreter, thereby allowing the third party to participate in communications between counsel and a client without destroying the privilege;

    - Nothing in the Giants Stadium's Logs, the Rule 2004 testimony of Christine Procops, or anything else proffered by Giants Stadium, satisfies its heavy burden of establishing that Goldman, Sachs & Co. ("Goldman"), acted as the interpreter for Sullivan & Cromwell ("S&C"), in S&C's communications with its client, Giants Stadium.

---

[1] Unless otherwise defined, all capitalized terms shall have the same meaning as in the Motion.

- Giants Stadium's decision to produce Goldman's valuation analyses used to calculate Loss under the Transactions, while simultaneously withholding communications with Goldman relating to valuation and the calculation of Loss under the Transactions, was tantamount to an impermissible "sword and shield" strategy that Courts routinely reject.

2. In its Objection, Giants Stadium's own description of the role played by Goldman confirms that the Withheld Communications do not fall within the very limited "interpreter" exception, and that Giants Stadium is in fact pursuing a "sword and shield" strategy that is designed to produce certain Goldman documents that support Giants Stadium's valuation of the Transactions under the definition of Loss, while withholding other documents involving Goldman concerning valuation and Loss.  Now, for the first time, Giants Stadium admits in an after-the-fact and ad-hoc explanation that the Withheld Communications "concern *financial advice* sought by S&C on the manner of valuing the Loss suffered by [Giants Stadium] due to LBSF's default . . ."  Obj. at ¶ 41 (emphasis added).   Yet financial advice imparted by a non-lawyer to a lawyer, no matter how useful to the attorney in providing legal advice to his client, is simply not protected by the attorney-client privilege. See United States v. Ackert, 169 F.3d 136, 139 (2d Cir. 1999) ("The [attorney-client] privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client.").

3. Importantly, nowhere does Giants Stadium contend that S&C needed Goldman to assist S&C in understanding information it was receiving from its client, Giants Stadium; rather S&C received "financial advice" from Goldman so that it could advise its client

on the appropriate manner in which to calculate Loss.  In short, Giants Stadium's assertions fall short of establishing that the "purpose" of Goldman's communications with S&C was "to improve the comprehension *of the communications between the attorney and client*."  Id., at 139 (emphasis added) (cited in Mot. at ¶ 33).

4.     Moreover, Giants Stadium's admission that the Withheld Communications all concern the calculation of Loss and the valuation of the Transactions makes it even more obvious that Giants Stadium is operating a classic "sword and shield" strategy.  It is fundamentally unfair for Giants Stadium to withhold communications with Goldman that discuss the basis for the Loss calculation when it has produced the very analyses created by Goldman that valued the Transactions for purposes of Loss under the governing contract.  See Firestone Decl. Exh. G.  Such valuations are central to Debtors' Rule 2004 investigation.  Allowing Giants Stadium to withhold certain selective communications with Goldman on the topic of its calculation of Loss while producing other self-serving communications with Goldman concerning the calculation of Loss, would therefore permit Giants Stadium to use the attorney-client privilege as a classic and impermissible means of hiding certain information directly relevant to other communications it produced.   Indeed, now that Giants Stadium has acknowledged (for the first time) that the Withheld Communications actually deal with the calculation of Loss under the contract, given that Goldman actually performed the Loss calculation for Giants Stadium under the contract and that many draft calculations were produced, the notion that Giants Stadium is using the Goldman valuations as a sword and shield is concretely established and not "speculative" as Giants Stadium argues in its Objection.  Id. at 63.

5.     In any event, the limited "interpreter" exception does not apply where the

communication between attorney and client is provided to a party in an adverse position such as Goldman here.  Giants Stadium concedes, as it must, that it entered into swaps with Goldman (as it did with LBSF) to hedge its ARS exposure.  The standard ISDA definition of "Loss" is largely uniform and thus any conversation about the definition of "Loss" with Goldman was a communication with a party in an adverse position to Giants Stadium on that very issue.  Moreover, Giants Stadium's argument that Goldman was not acting as its swap counterparty while it gave the advice (i.e., that Goldman could change "hats") is pure fiction.

6. Additionally, Giants Stadium's attempt to prevent this Court's *in camera* review by contending that such review would "waste this Court's time" (id. at ¶ 65) is not credible, particularly since Giants Stadium now concedes that the Withheld Communications comprise "only seven distinct email threads." Id. at ¶ 39.  As discussed below, courts routinely conduct *in camera* reviews in precisely these situations, as demonstrated by the very cases cited by Giants Stadium in support of its legal arguments.  This case is no different.  Debtors fail to understand why Giants Stadium opposes an *in camera* review by the Court; if Giants Stadium is correct that the privilege applies, then the Court will protect the Withheld Communications.

7. The Withheld Communications are also not protected by the attorney work-product doctrine.  Giants Stadium mistakenly argues that the work-product doctrine applies to the Withheld Communications because it believed that litigation with the Debtors was a "virtual certainty." Id. at ¶ 69.  That is not the applicable standard.  As Debtors set forth in the Motion (and as Giants Stadium acknowledges), work-product protection is not available for documents that would have been created "in essentially similar form irrespective of the litigation." United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998) (cited in Mot. at ¶ 45).  Ms. Procops testified that Giants Stadium was "forced into terminating the swap with Lehman, not that we

would, had there not been a bankruptcy." Mot. at ¶ 47.  Nowhere in its Objection does Giants Stadium argue that it would have terminated the Transactions and calculated a Settlement Amount upon LBHI's bankruptcy any differently based on whether or not the prospect of litigation existed.  Indeed, the threat of litigation with Debtors, however "certain," could have had no effect on the proper manner to calculate the Settlement Amount under Loss, because the calculation would be the same whether or not litigation were threatened.  Thus, Giants Stadium cannot credibly assert that the Withheld Communications should be protected on the basis of the work-product doctrine.

8. Lastly, Giants Stadium's lengthy suggestion (albeit irrelevant to this Motion), that Debtors' Rule 2004 investigation of Giants Stadium has been used to delay resolution of Giants Stadium's claim and to cause Giants Stadium unnecessary expense, has no merit.  Debtors have acted appropriately to investigate an approximately $300 million claim (as it has with numerous other claims) by engaging in Rule 2004 discovery; the investigation has involved the review of approximately 64,000 pages related to complex swaps, testimony from Giants Stadium's "authorized representative," and a pending additional 2004 examination of a Giants Stadium representative.  The Debtors are appropriately evaluating the claim of Giants Stadium and determining whether any claims exist against Giants Stadium by the estate.  This evaluation is not yet complete, but is winding down.  Debtors expect at the conclusion of this Motion, and the completion of currently pending additional discovery, to provide Giants Stadium with the opportunity to provide any other information it believes would be helpful to the Debtors in evaluating Giants Stadium's claim.  Giants Stadium's continued protestations simply represents frustration with the "one-way" discovery permitted under Rule 2004.  Yet, that is precisely what Congress and the Bankruptcy Code has determined is the appropriate course of

conduct for a Debtor.

## ARGUMENT

I. **GIANTS STADIUM'S OWN AFTER-THE-FACT ADMISSIONS DEMONSTRATE THAT THE "INTERPRETER" EXCEPTION DOES NOT APPLY TO THE WITHHELD COMMUNICATIONS**

9. In the nearly three years between Fall 2008, when Goldman, S&C, and Giants Stadium engaged in the communications at issue here, and today, not a single shred of contemporaneous evidence has been located establishing that Goldman was retained to provide "interpreter" services to S&C in connection with S&C's providing legal advice to Giants Stadium. There is no retention agreement, no payment by Giants Stadium for these services, and no evidence of any written request for Goldman to provide "interpreter" services to S&C. See Mot. at ¶ 27. Instead, years after the fact and in an attempt to hide certain information from the ambit of the Debtors' ongoing investigation, Giants Stadium has submitted to this Court two self-serving declarations in an attempt to justify withholding certain documents pursuant to the attorney-client privilege and work product doctrine. The declarations, by Giants Stadium's "authorized representative" Ms. Procops, and by an S&C lawyer, Andrew Dietderich, are attempts to mold the facts so as to create the impression that the "interpreter" exception to the attorney-client privilege applies here. As discussed below, these belated declarations actually support Debtors' Motion to compel production of these documents; they establish that the presence of Goldman was not as an interpreter, but as a financial advisor giving financial advice that was ultimately used by Goldman in creating valuations that were produced to Debtors.

10. The "interpreter" exception set forth in United States v. Kovel, 296 F.2d 918 (2d Cir. 1961) and Ackert, applies only in those limited situations where a lawyer requires a third party to translate information conveyed to him by his client. As Judge Friendly wrote in Kovel,

"the presence of an accountant . . . while the client is relating a complicated tax story to the lawyer, ought not destroy the privilege, any more than would that of the linguist." Kovel, 260 F.2d at 922 (cited in Obj. at ¶ 47). Similarly, in Ackert, the Second Circuit held that such communications may be privileged "if the purpose of the third party's participation is to improve the comprehension of the communications between attorney and client." Ackert, 169 F.3d at 139. By Giants Stadium's own admission, Goldman was providing "financial advice" to S&C. See Obj. at ¶ 41 ("These communications concern financial advice sought by S&C for the purpose of providing advice on the manner of valuing the Loss suffered by [Giants Stadium] due to LBSF's default . . ."). See also Dietderich Decl. at ¶ 15 ("These seven communications represent legal discussions . . . in which S&C required the assistance of an expert on financial markets in order to provide certain advice to [Giants Stadium] *concerning the amount of 'Loss'* . . .") (emphasis added).

11.     Thus, Goldman was not acting as an interpreter so that S&C could understand information it was receiving from Giants Stadium; rather, Goldman was supplying S&C with independent financial advice regarding the "financial markets" that S&C apparently did not possess but which it "needed" in order to effectively advise its client on the Loss calculation. See Obj. at ¶ 44. This situation is no different from the one in Ackert in which a lawyer contacted his client's banker for information that the lawyer "did not have about the proposed transaction and its tax consequences," but not "as a translator or interpreter of client communications." Ackert, 169 F.3d at 139-140. Accordingly, Giants Stadium's assertion of the attorney-client privilege over the Withheld Communications is improper.

12.     Giants Stadium's reliance on Calvin Klein Trademark Trust v. Wachner, 124 F. Supp. 2d 207 (S.D.N.Y. 2000), is unavailing. In that case, Calvin Klein, Inc. ("CKI") sought

to protect communications between itself, its attorney, and its investment banker, regarding "what CKI was legally required to disclose to prospective purchasers at various stages of negotiation." Id. at 209. The Court – after reviewing all the challenged documents *in camera* – found that certain documents remained privileged because the investment banker's role was covered by the "interpreter" exception. Id. In Calvin Klein, a law firm was seeking to give advice to the client about what facts needed to be disclosed in an offering document. The Court noted that the materiality issue was a "mixed question of fact and law, which a responsible law firm . . . would not be able to adequately resolve *without the benefit of an investment banker's expert assessment of which facts were material from a business person's perspective*." Id. (emphasis added). The investment banker "was therefore serving . . . an interpretive function akin to the accountant in United States v. Kovel" because it was "interpreting" facts provided by the client for the lawyers. Id. Calvin Klein is directly in line with Kovel and Ackert and does not help Giants Stadium; CKI had provided certain facts regarding its business to its counsel, and the investment banker was *interpreting* that information for CKI's counsel by making an "assessment of which facts were material from a business person's perspective." That is simply not what happened here. Both Giants Stadium's Objection and the Deitderich Declaration expressly state that Goldman was simply providing S&C with "financial advice" that was helpful to S&C in its rendering legal advice.

   13.   Indeed, Giants Stadium's position here is directly at odds with Kovel, as it argues that the exception applies to *any* communications in which an attorney receives information from a third-party that is helpful – or even necessary – to the representation of his client. The position asserted by Giants Stadium, however, would swallow the general rule that the "voluntary disclosure of confidential material to a third party waives any applicable attorney-

client privilege." Crawford v. Franklin Credit Mgmt. Corp., 261 F.R.D. 34, 43 (S.D.N.Y. 2009). Indeed, the Second Circuit in Ackert expressly rejected the contention made by Giants Stadium here: "the [attorney-client] privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client." Ackert, 169 F.3d at 139.[2]

14.    Moreover, the Calvin Klein case differs drastically from the situation here where Giants Stadium is expressly relying upon, and produced documents created by, Goldman that sought to determine the value of the Transactions for purposes of Loss – the very issue that Giants Stadium admits is the subject of the communications it seeks to withhold from production. In Calvin Klein, the Court explicitly held that had the situation there been one where the party was attempting to use the privilege as a sword and a shield, the decision might well have been different. As the Court stated, it was not a situation where "the party making the disclosure was seeking to use it affirmatively in the controversy in issue without permitting its adversary to inquire about the basis or accuracy of the disclosure: in other words, the classic sword instead of shield." Calvin Klein, 124 F. Supp. 2d at 210. Here, however, Giants Stadium has produced numerous communications with Goldman regarding the Loss calculation, including the very valuations that form the basis of its $300 million claim (see Exh. G to the Firestone Decl.),[3] while at the same time it is refusing to produce communications "concern[ing] financial

---

[2] Additionally, courts narrowly construe the attorney-client privilege, since expanding the privilege necessarily hinders a litigant's ability to obtain what may otherwise be admissible evidence. See Scanlon v. Bricklayers and Allied Craftworkers, Local No. 3, 242 F.R.D. 238, 245 (W.D.N.Y. 2007) ("Because the attorney-client privilege is in derogation of the common law that the court is entitled 'to every man's evidence,' the privilege must be construed strictly.") (citing In re Horowitz, 428 F.2d 72, 81 (2d Cir. 1973).

[3] Indeed, Giants Stadium admits that it has "produced to Debtors more than 3,000 emails in which Goldman Sachs was a participant." Dietderich Decl. at ¶ 11.

advice sought by S&C for the purpose of providing advice on the manner of valuing the Loss suffered by [Giants Stadium] due to LBSF's default . . ." Obj. at ¶ 41. Indeed, in the communications that have been disclosed, Goldman and Giants Stadium discuss, for example, the net present value of the cash flows for the terminated Transactions and the discount rate to be applied to those cash flows. See Exh. G. The net present value and the discount rate are factors that bear directly upon the "manner of valuing the Loss suffered by" Giants Stadium. In light of this glaring inconsistency, Giants Stadium's protestations that it is not employing a "sword and shield" strategy are hollow. Accordingly, Giants Stadium cannot "shield" a subset of communications with Goldman regarding the Loss calculation on the basis of an after-the-fact privilege assertion while hiding other documents on this same subject. See Mot. at ¶ 40. In addition, because the "interpreter" exception only shields the limited circumstances where a third party interprets for a lawyer what his client is saying, the "interpreter" exception does not allow Giants Stadium to withhold communications reflecting legal advice it received from S&C in the presence of Goldman. Thus, to the extent the seven email chains at issue contain legal advice by S&C, they must be produced under any circumstances.

15.    Giants Stadium argues that it produced the Goldman valuations because "it was determined that the application of Kovel to those documents was too tenuous" since they "reflected mere calculations." Obj. at ¶ 64. First, Giants Stadium fails to explain any difference that exists between "mere calculations" of the Loss valuation, which necessarily include assumptions, and "financial advice" regarding the Loss calculation. Under Kovel, a financial advisor's preparation of valuations, including the "financial advice" concerning assumptions that necessarily goes into such valuations, is not privileged and cannot be shielded from disclosure. Indeed, courts in this circuit have held in an analogous situation that where a legal opinion letter

US_ACTIVE:\43800988\03\58399.0008                                10

is incorporated into a public document, and the letter's "bona fides is placed squarely in contention," it justifies "as a matter of fairness, an exploration into the course of its preparation. That inquiry necessarily depends on exposure of what counsel reviewed or otherwise took into consideration . . ." Bodega Invs. LLC ex rel. Kreisberg v. United States, 2009 WL 1456642, at *7 (S.D.N.Y. May 14, 2009) (citing Garfinkle v. Arcata Nat'l Corp., 64 F.R.D. 688, 689 (S.D.N.Y. 1974). The result should be no different here, where, as a matter of fairness, Debtors should have access to *all* of Goldman's views on the calculation of Loss under the parties' governing documents.

16. Given the serious issues raised by Debtors in the Motion regarding the appropriateness of Giants Stadium's privilege designations, it makes sense for the Court to conduct an *in camera* review of the Withheld Communications. Such *in camera* reviews are typical under the circumstances here. Indeed, the very cases cited by Giant Stadium demonstrate that Courts regularly review documents *in camera* in disputes such as this. See e.g., Calvin Klein, 124 F. Supp. 2d at 210 (holding that "*it is evident on inspection* that the vast majority of the documents" listed on the privilege log were properly withheld as privileged) (emphasis added); Hallmark Cards, Inc. v. Murley, 2010 WL 4608678, at *4 n.2 (S.D.N.Y. Nov. 9, 2010) (agreeing that withheld documents were privileged "[b]ased on this Court's in *camera* review of the documents in question"). Simply put, an *in camera* review is not controversial, and Giants Stadium should invite an *in camera* review to assess if it has properly applied the *Kovel* exception.

17. Giants Stadium's suggestion that an *in camera* review is not necessary here because it would "waste this court's time" also makes no sense, especially in light of its disclosure that the withheld communications comprise just seven email chains. (Obj. at ¶ 65). It

is hard to imagine how the Court's review of seven e-mail chains could possibly be unduly burdensome.

## II. THE WORK-PRODUCT DOCTRINE DOES NOT APPLY TO THE WITHHELD COMMUNICATIONS

18.     The Withheld Communications are also not protected by the attorney-work product doctrine. See Mot., at Section II. The Debtors and Giants Stadium agree that "where a document is prepared for both business purpose and in anticipation of litigation, the document may be protected by the work product doctrine *so long as it would have not been prepared in a substantially similar matter but for the prospect of litigation*." (Obj. at ¶ 71, citing Hallmark, 2010 WL at *4 n.2 (emphasis added)). The Debtors established in the Motion – and Giants Stadium does not dispute – that the Transaction was terminated in the course of Giants Stadium's business. See Mot. at ¶¶ 47-48. In other words, whether or not litigation was likely or unlikely as a result of the termination, Giants Stadium still would have sought to terminate the Transactions and would have had to value the swaps for purposes of its proposed termination. It is thus entirely irrelevant that when terminating the Transactions, Giants Stadium "reasonably anticipated that it would have to litigate with its [sic] Debtors to establish the reasonableness of its calculations." (Obj. at ¶ 71) Giants Stadium has made no showing whatsoever that it would not have attempted to value the Transactions absent the threat of litigation, nor can it, since its obligation to calculate Loss pursuant to its contractual obligations, and the manner in which it did so, was the same whether litigation was anticipated or not. Accordingly, the work-product doctrine does not apply to the Withheld Communications.

### III.   THE DEBTORS HAVE PROPERLY EMPLOYED RULE 2004 DISCOVERY TO INVESTIGATE THE GIANTS STADIUM CLAIM

19.    Lastly, the vast sections of Giants Stadium's Objection designed to suggest that Debtors' Rule 2004 discovery of Giants Stadium has been undertaken to "delay resolution of the Claims, cause [Giants Stadium] a great deal of unnecessary expense, and pursue frivolous issues," is entirely irrelevant to the Motion and also wholly without merit. Obj. at ¶ 1. The Debtors served their Rule 2004 subpoena on or about May 19, 2010; Giants Stadium completed its production of approximately 64,000 documents later that year (indeed, privilege logs were not even produced until November 10, 2010). In addition to reviewing the documents produced by Giants Stadium, Debtors have sought production of the Withheld Communications and have taken the 2004 examination of Ms. Procops. As discussed in the Motion at ¶¶ 53-57, Ms. Procops had no knowledge of several issues central to Debtors' investigation (despite these issues all having been raised in her e-mail correspondence, and her testimony that there was no one "at Giants Stadium who was more involved in the termination of the Lehman swaps" than she was). This necessitated the Debtors serving a new subpoena upon Giants Stadium for a representative to be deposed. See Dietderich Decl. at ¶ 7. This deposition is scheduled to take place in early October.

20.    Debtors' investigation of Giants Stadium is permitted, if not encouraged, by Congress and the Courts pursuant to Rule 2004 of the Bankruptcy Code. Giants Stadium's suggestion that Rule 2004 discovery should be cut off because the documents already produced "provide more than ample basis for Debtors to evaluate" Giants Stadium's claim (Obj. at ¶ 5), is simply not a standard supported by Rule 2004, nor any case authority; it is not for Giants Stadium to determine when Debtors' investigation should conclude. The Debtors Rule 2004 discovery regarding Giants Stadium's claims in ongoing. See Firestone Decl. at ¶ 11.

Resolution of the this Motion and the completion of a Rule 2004 examination of a Giants Stadium representative will bring the investigation closer to conclusion.

## CONCLUSION

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just.

Dated: September 12, 2011
New York, New York

By: /s/ Richard W. Slack
    Richard W. Slack
    Peter Gruenberger
    Robert J. Lemons
    Michael J. Firestone

    WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
    New York, New York 10153
    Telephone: (212) 310-8000
    Facsimile: (212) 310-8007

    Attorneys for Debtor
    and Debtor in Possession