Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6                                        Case No.

7   LEHMAN BROTHERS HOLDINGS INC., ET AL.,   08-13555-jmp

8          Debtors.

9

10  - - - - - - - - - - - - - - - - - - -x

11  In the Matter of:

12                                       Case No.

13  LEHMAN BROTHERS INC.,                08-01420-jmp SIPA

14         Debtor.

15

16  - - - - - - - - - - - - - - - - - - -x

17  LEHMAN BROTHERS SPECIAL FINANCING INC.

18              Plaintiff,              Adv. No.

19         v.                          09-01032-jmp

20

21  BALLYROCK ABS CDO 2007-I LIMITED

22              Defendant.

23

24  - - - - - - - - - - - - - - - - - - -x

25

Page 2

```
 1    - - - - - - - - - - - - - - - - - - -x

 2    KATHLEEN ARNOLD AND TIMOTHY COTTEN,

 3                    Plaintiffs,              Adv. No.

 4            v.                               11-01540-jmp

 5

 6    LEHMAN BROTHERS HOLDINGS INC., ET AL.,

 7                    Defendants.

 8

 9    - - - - - - - - - - - - - - - - - - -x

10    TURNBERRY, ET AL.,

11                    Plaintiffs,              Adv. No.

12            v.                               09-01062-jmp

13

14    LEHMAN BROTHERS HOLDINGS INC., ET AL.,

15                    Defendants.

16

17    - - - - - - - - - - - - - - - - - - - -x

18    LEHMAN BROTHERS HOLDINGS INC., ET AL.,

19                    Plaintiffs,              Adv. No.

20            v.                               10-02821

21    J. SOFFER, FONTAINBLEAU RESORTS, LLC.,

22                    Defendant

23    - - - - - - - - - - - - - - - - - - - -x

24

25
```

Page 3

1   - - - - - - - - - - - - - - - - - - - -x

2   LEHMAN BROTHERS HOLDINGS INC., ET AL.,

3              Plaintiffs,              Adv. No.

4         v.                           10-02823

5   J. SOFFER, FONTAINBLEAU RESORTS, LLC.,

6              Defendant

7   - - - - - - - - - - - - - - - - - - - -x

8

9

10

11              U.S. Bankruptcy Court

12              One Bowling Green

13              New York, New York

14              June 15, 2011

15              10:04 AM

16

17

18

19

20

21

22   B E F O R E:

23   HON. JAMES M. PECK

24   U.S. BANKRUPTCY JUDGE

25

Page 4

1

2    Motion of James W. Giddens, as Trustee for the SIPA Liquidation

3    of Lehman Brothers Inc., Pursuant to Section 363 of the

4    Bankruptcy Code and Bankruptcy Rule 9019, for an Order (i)

5    Approving a Settlement with Australia and New Zealand Banking

6    Group Limited ("ANZ" and (ii) Dismissing ANZ from Adversary

7    Proceeding in Connection with its Assignment of Claims to

8    Trustee [LBI Docket No. 4300, Adv. Pro. No. 08-1759 Docket no.

9    36]

10

11   Motion of Lehman Brothers Holdings Inc. for Authority to (i)

12   Sell Two Portfolios of Ginnie Mae Reverse Mortgage Loans to

13   MetLife and (ii) Assign all Rights and Delegate all Obligations

14   Thereunder [Docket No. 17059]

15

16   Motion of Lehman Commercial Paper Inc. for Approval of

17   Settlement and Compromise with Latshaw Drilling Company, LLC

18   and Latshaw Drilling and Exploration Company, Inc. [Docket No.

19   16806]

20

21   Debtors' Motion to Extend Stay of Avoidance Actions and Grant

22   Certain Related Relief [Docket No. 17195]

23

24   Motion of Lehman Brothers Holdings Inc. Motion for Approval of

25   Settlement Agreement Relating to Real Property Located at 1107

Page 5

1

2    Broadway [Docket No. 17129]

3    Motion to Compel the Production of Documents from Goldman Sachs

4    & Co., and Goldman Sachs, Inc. [Docket No. 17231]

5

6    Lehman Brothers Special Financing Inc. v. Ballyrock ABS CDO

7    2007-I Limited Case Conference

8

9    Kathleen Arnold and Timothy A. Cotten v. Lehman Brothers

10   Holdings Inc. Expedited Motion for Court's Determination

11

12   Turnberry et al. v. Lehman Brothers Holdings Inc. Plaintiff's

13   Motion to Dismiss Counterclaims and Pretrial Conference

14

15   Lehman Brothers Holdings Inc. v. J. Soffer, Fontainebleau

16   Resorts, LLC [Adversary Case No. 10-2821] Defendant's Motion to

17   Dismiss Count IV of the Complaint and Pretrial Conference

18

19   Lehman Brothers Holdings Inc. v. J. Soffer, Fontainebleau

20   Resorts, LLC [Adversary Case No. 10-2823] Defendant's Motion to

21   Dismiss Count IV of the Complaint and Pretrial Conference

22

23

24

25   Transcribed by:  Linda Ferrara

Page 6

```
 1

 2   A P P E A R A N C E S :

 3   WEIL, GOTSHAL & MANGES LLP

 4        Attorneys for Debtors

 5        767 Fifth Avenue

 6        New York, NY 10153

 7

 8   BY:   JACQUELINE MARCUS, ESQ.

 9         SCARLETT COLLINGS, ESQ.

10         RICHARD W. SLACK, ESQ.

11         ZAW WIN, ESQ.

12         ELISA LEMMER, ESQ.

13

14   WEIL, GOTSHAL & MANGES LLP

15        Attorneys for Debtors

16        700 Louisiana

17        Suite 1600

18        Houston, TX 77002

19

20   BY:   ALFREDO R. PEREZ, ESQ.

21

22

23

24

25
```

Page 7

1

2   MILBANK, TWEED, HADLEY & MCCLOY LLP

3       Attorneys for Official Committee of Unsecured Creditors

4       One Chase Manhattan Plaza

5       New York, NY 10005

6

7   BY:   DAVID S. COHEN, ESQ.

8         DENNIS F. DUNNE, ESQ.

9

10  HUGHES HUBBARD & REED LLP

11      Attorneys for James W. Giddens, SIPA Trustee

12      One Battery Park Plaza

13      New York, NY 10004

14

15  BY:   JEFFREY S. MARGOLIN, ESQ.

16        DAVID S. LUBELL, ESQ.

17

18  WHITE & CASE LLP

19      Attorneys for Ad Hoc Group of Lehman Brothers Creditors

20      1155 Avenue of the Americas

21      New York, NY 10036

22

23  BY:   GERARD UZZI, ESQ.

24

25

Page 8

1

2    CHAPMAN AND CUTLER LLP

3         Attorneys for U.S. Bank

4         330 Madison Avenue

5         New York, New York 10017-5010

6

7    BY:   CRAIG M. PRICE, ESQ.

8

9    OUTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.

10        Attorneys for Bank of Tokyo-Mitsubishi

11        230 Park Avenue

12        New York, New York 10169

13

14   BY:   JOHN A. BOUGIAMAS, ESQ.

15

16   EMMET MARVIN & MARTIN LLP

17        Attorneys for ANZ Bank

18        120 Broadway

19        New York, New York

20

21   BY:   EDWARD P. ZUJKOWSKI, ESQ.

22

23

24

25

Page 9

1

2    SCHULTE ROTH & ZABEL, LLP

3        Attorneys for 1107 Broadway LLC

4        919 Third Avenue

5        New York, New York 10022

6

7    BY:   DAVID M. HILLMAN, ESQ.

8

9    KIRKLAND & ELLIS

10       Attorneys for Liquidators of Lehman Brothers Australia

11       601 Lexington Avenue

12       New York, New York  10022

13

14   BY:   EVAN J. SAUCIER, ESQ.

15

16   KASOWITZ, BENSON, TORRE & FRIEDMAN, LLP

17       Attorneys for the Debtors

18       1633 Broadway

19       New York, New York 10019

20

21   BY:   MICHAEL C. HARWOOD, ESQ.

22

23

24

25

Page 10

1

2    CLEARY GOTTLIEB STEEN & HAMILTON, LLP

3          One Liberty Plaza

4          New York, New York 10008

5

6    BY:   LISA M. GOULDY, ESQ.

7

8    LOCKE LORD BISSELL & LIDDELL, LLP

9          Attorneys for Wells Fargo as Trustee

10          3 World Financial Center

11          New York, New York 10281

12

13   BY:     CASEY B. HOWARD, ESQ.

14

15   SIDLEY AUSTIN, LLP

16          Attorneys for Black Rock

17          787 Seventh Avenue

18          New York, New York 10019

19

20   BY:     NICHOLAS P. CROWELL, ESQ.

21

22

23

24

25

Page 11

1    QUINN EMANUEL URQUHART & SULLIVAN, LLP

2              Attorneys for the Committee

3              51 Madison Avenue

4              New York, New York 10010

5

6    BY:      ROBERT DAKIS, ESQ.

7

8    ORRICK, HERRINGTON & SUTCLIFFE, LLP

9              Attorneys for Ballyrock CDO

10             51 West 52nd Street

11             New York, New York 10019

12

13   BY:      STEVEN J. FINK, ESQ.

14

15   SULLIVAN & CROMWELL, LLP

16             Attorneys for Barclay's Bank PLC

17             125 Broad Street

18             New York, New York 10004

19

20   BY:      ROBINSON B. LACY, ESQ.

21

22

23

24

25

Page 12

1

2   BUCHANAN INGERSOLL & ROONEY, PC

3          Attorneys for Turnberry

4          1290 Avenue of the Americas

5          New York, New York  10104

6

7   BY:      ELLIOT J. BLUMENTHAL, ESQ.

8

9   RICHARD AND RICHARD, P.A.

10         Attorneys for J. Soffer

11         825 Brickell Bay Drive

12         Miami, Florida  33131

13

14  BY:      DENNIS A. RICHARD, ESQ.

15

16  TURNBERRY ASSOCIATES

17         19950 W. Country Club Drive

18         Aventura, Florida 33180

19

20  BY:      MARIO A. ROMINE, ESQ.

21

22  TELEPHONICALLY:

23  KATHLEEN ARNOLD, pro se

24  TIMOTHY A. COTTEN, pro se

25

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

1              P R O C E E D I N G S

2         THE COURT:  Be seated, please.  Good morning.

3         I have a note that says that the SIPA matters are

4    going to go first.

5         MR. LUBELL:  Good morning, Your Honor.

6         THE COURT:  Good morning.

7         MR. LUBELL:  Dan Lubell from Hughes Hubbard & Reed on

8    behalf of James W. Giddens, trustee at Lehman Brothers Inc.

9    I'm here today on the trustee's motion for an order approving a

10   settlement with Australia and New Zealand Banking Group, Ltd.

11   or "ANZED" (ph.) as they call it down under.  The order also

12   would dismiss ANZED from the Options Clearing Corp.

13   interpleader adversary proceeding in connection with the

14   assignment of ANZED's claims to the trustee under the

15   settlement agreement.

16        THE COURT:  Do I have to call them ANZED or can I call

17   them ANZ?

18        MR. LUBELL:  I defer to what you would like to call

19   them.  If you would prefer, I can call them ANZ too.

20        THE COURT:  Well, let's call them whatever name they

21   prefer but I suppose they answer to ANZ, as well.

22        MR. LUBELL:  Yes, they do.

23        THE COURT:  Good.

24        MR. LUBELL:  Your Honor, I am pleased to report that

25   there were no objections filed to the substance of the

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 14 of 126

Page 14

1   trustee's settlement with ANZ.  The settlement will bring more

2   than 83 million dollars into the LBI estate.  It was also

3   streamline the Options Clearing Corp. interpleader action by

4   dismissing ANZ in connection with its assignment of claims to

5   the trustee.

6        The settlement is eminently reasonable, being reached

7   after extended arms length negotiations and document exchanges.

8   It also conserved resources of all parties as it was achieved

9   without commencing formal litigation.  We received a limited

10  objection from Bank of Tokyo Mitsubishi and a joinder to that

11  objection by Lloyds TSB Bank.  Both of them are interpleader

12  defendants in the Options Clearing Corp. adversary.  Those

13  limited objections have now been resolved by a paragraph in the

14  proposed order.  The revised proposed order clarifies that the

15  settlement does not affect the rights of the remaining parties

16  to the interpleader action.

17       It also provides that notwithstanding ANZ's dismissal

18  from that proceeding, ANZ will continue to be subject to the

19  discovery obligations of a party under the federal rules.

20       Unless the court has any questions, we would propose

21  to submit the revised proposed order for Your Honor's approval

22  at the end of the hearing.

23       THE COURT:  No, it's fine.  I don't have any questions

24  provided that the limited objections have been resolved in a

25  manner satisfactory to the parties who objected and I accept

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 15

1    your representation that the language you've referenced solves

2    that problem.

3            One question I have is whether ANZ has confirmed that

4    it will, in fact, be subject to the discovery that you have

5    just referenced and if they're here to confirm that.

6            MR. LUBELL:  Yes, Your Honor, they have agreed to the

7    language.

8            THE COURT:  There's someone standing who is apparently

9    about to put something on the record that will tie that point

10   down.

11           Good morning.

12           MR. ZUJKOWSKI:  Good morning, Your Honor.  Ed

13   Zujkowski of Emmet Marvin & Martin for ANZ.  And I am allowed

14   to call that ANZ.

15           THE COURT:  Good.

16           MR. ZUJKOWSKI:  Yes, we'll confirm that, Your Honor,

17   after much discussion we have agreed that ANZ will be subject

18   to discovery as provided in the amended order.

19           THE COURT:  Fine.  Thank you.  It's approved subject

20   to my seeing the order.

21           MR. LUBELL:  Thank you, Your Honor.

22           THE COURT:  And if you wish to be excused, you can be

23   excused.

24           MS. MARCUS:  Thank you, Your Honor.

25           THE COURT:  Good morning.

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 16

1          MS. MARCUS:  Good morning, Your Honor.  Jacqueline

2    Marcus of Weil Gotshal & Manges on behalf of Lehman Brothers

3    Holdings Inc. and it's affiliated debtors.

4          Item number one on the agenda, Your Honor, is the

5    motion of Lehman Commercial Paper, Inc. for approval of a

6    settlement and compromise with Latshaw Drilling Company and

7    Latshaw Exploration Company.

8          As Your Honor may recall, we were before you regarding

9    the debtors' dispute with Latshaw back in April of 2010.  At

10   that time, you permitted Latshaw to withdraw its proof of claim

11   against LCPI and we went to the Bankruptcy Court for the

12   Northern District of Oklahoma where Latshaw's bankruptcy's case

13   was pending to litigate Latshaw's objection to LCPI's claim.

14         I'm pleased to report that after fairly extensive

15   litigation in Tulsa, as well as two rounds of court-ordered

16   mediation, LCPI and Latshaw have reached a settlement of their

17   dispute which has been incorporated into the settlement

18   agreement that we seek approval of today.

19         That settlement agreement has already been approved by

20   Judge Rasure of the Northern District of Oklahoma by order

21   dated May 27.  The terms of the settlement are summarized in

22   the motion.  I'm prepared to summarize them again today if the

23   Court would like me to do that.

24         THE COURT:  If you'd like that for the record, that's

25   fine.  But we had requested a copy of the settlement agreement

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 17

1    which we received yesterday afternoon.  I've had a chance to

2    review the settlement agreement.  I'm satisfied with its terms.

3          MS. MARCUS:  Then I won't burden you with a further

4    summary on it.

5          THE COURT:  There's no -- unless you want it on the

6    record for other reasons.

7          MS. MARCUS:  I don't see any reason for doing that.

8          THE COURT:  Fine.

9          MS. MARCUS:  As indicated in the agenda, Your Honor,

10   this is an uncontested motion.  LCPI has filed a declaration of

11   Howard Liao in support of the motion.  Mr. Liao is present in

12   court today.

13         The creditors committee which has been kept apprised

14   of the status of the dispute with Latshaw, the litigation, and

15   the mediation does not object to the terms of the settlement.

16   For all of the reasons set forth in the motion and the Liao

17   declaration, LCIPI requests that the Court approve the

18   settlement agreement.

19         THE COURT:  I approve the settlement agreement and I'm

20   satisfied that it's a fair and reasonable resolution of the

21   issues.

22         MS. MARCUS:  Thank you, Your Honor.  Item number two

23   will be handled by my partner, Alfredo Perez.

24         MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez.

25   Your Honor, I'm here on a matter in which Lehman is selling two

1   packages of reverse mortgages to MetLife.  In essence, these

2   are residential reverse mortgages involved in two

3   securitizations that are guaranteed by Ginnie Mae.  Your Honor,

4   we filed a declaration of Ron Dooley on Monday, elaborating on

5   the sales process that we went through in selling the loans.

6   In addition, Your Honor, yesterday we filed a form of sale

7   agreement with the motion.  Your Honor, we did not receive any

8   objections.

9        This transaction is really the tail end of one of the

10  bank transactions.  Aurora had actually funded most of these

11  loans and with the sales proceeds will be repaid the amounts

12  that they funded.  Pursuant to the overall bank transaction we

13  had committed to repay those loans and to take that amount off

14  of Aurora's books.

15       By means of this motion, we're able to do that.  In

16  addition, Your Honor, not only are we going to receive

17  approximately 43 million dollars, but we're also going to be

18  removed of the potential liabilities and exposure going forward

19  which we estimate to be about 75 million dollars on a go

20  forward basis.

21       Your Honor, there are very few parties that are

22  authorized by Ginnie Mae to actually service these mortgages

23  and hold these mortgages.  MetLife was the original services

24  that Aurora bought it from or one of MetLife's predecessors-in-

25  interest.  So, in essence, MetLife has retained many of the

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 19

```
 1    obligations as the initial purchaser, if you will and as a
 2    result, the execution risks of doing a transaction with MetLife
 3    are significantly less than they would be with anybody else.
 4         THE COURT:  One of my concerns in this transaction and
 5    it's probably not going to come as a surprise to you is that
 6    based upon the statements made in the motion and in the
 7    supporting declaration, the number of authorized parties with
 8    whom you can negotiate is limited.
 9         I'm wondering if you can just describe how you're able
10    to assure yourself as to the fairness of the price in light of
11    this thin market.
12         MR. PEREZ:  Yes, Your Honor.  And Mr. Dooley is here
13    and he can correct me if I am wrong.  But as the Court can tell
14    from the declaration, I mean this process started back in 2009
15    and we were originally just negotiating with a couple of
16    parties.  This is not an area where people have a lot of
17    ability to step into the shoes and satisfy all of Ginnie Mae's
18    requirements.
19         We, in essence, with the help of Ginnie Mae, in
20    essence contacted anybody and everybody who could be a possible
21    candidate.  It was expanded during the course of 2010 and 2011
22    and we actually had about four potential candidates.  One two
23    bid and then it was a situation with those two; MetLife and
24    another party that we actually had the final negotiations to
25    determine what the best price could be.
```

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 20 of 126

Page 20

1            THE COURT:  Was there anything else that the debtor

2     did to assure itself that the price being achieved here

3     represents fair market value?

4            MR. PEREZ:  Your Honor, only through testing the

5     market.  The bids that we got were, in essence, roughly the

6     same amount and with the execution costs associated with the --

7     if we hadn't done the deal with MetLife, they were almost a

8     push as between the two numbers, so other than testing the

9     market with the people who were able to sell it -- I guess the

10    alternative would have been, Your Honor, for us to have paid

11    Aurora the money because we really needed to get it off of

12    their books as part of the settlement that we did a while back.

13    We could have actually paid Aurora the money and then held the

14    mortgages.  The problem with that, of course, is that we would

15    have had to fund an additional probably another 75 million

16    dollars before it was all said and done.  It's not a strategic

17    -- it's not a big strategic asset.  There's really no upside

18    for us.

19            THE COURT:  Okay.  You're satisfied that the debtor

20    exercised reasonable business judgment in deciding to sell to

21    MetLife.

22            MR. PEREZ:  We are, Your Honor.  And another point is

23    I think this -- MetLife is on the creditors committee.  So I

24    think from the standpoint of the creditors committee and the

25    non-MetLife members of the creditors committee, I think this

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 21

```
 1    transaction got a lot of scrutiny simply because there was a

 2    member of the creditors committee involved.

 3            THE COURT:  That's a nice opening for me to ask

 4    counsel for the committee for his comments.

 5            MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank

 6    Tweed Hadley & McCloy on behalf of the committee.

 7            Yes, Mr. Perez is correct, this transaction did

 8    receive significant scrutiny from the committee, minus MetLife,

 9    obviously who is conflicted, and we asked the same question you

10    asked Your Honor, because we needed to be convinced that an

11    auction was not necessary here.  That, in fact, the four people

12    -- four potential parties that were identified were the

13    universe and a combination of talking through the issues with

14    the debtors and independently verifying through our financial

15    advisors convinced us that this was the best available option.

16    And we're comfortable that it's the transaction that should be

17    approved by the Court.

18            THE COURT:  Fine.  Thank you.  Anyone else who wishes

19    to be heard?

20            (No response.)

21            THE COURT:  Apparently not.  It's approved.

22            MR. PEREZ:  Thank you.

23            MS. MARCUS:  Item number three on the agenda, Your

24    Honor, is the debtors' motion to extend stay of avoidance

25    actions and granted certain related relief.
```

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 22

1          Pursuant to this motion, the debtors seek the

2     following relief; first, an extension of the order staying

3     avoidance actions which currently expires on July 20, 2011 to

4     January 20, 2012.  As indicated in the debtors' reply in

5     further support of the motion, Your Honor, our initial request

6     was for a nine month extension of the initial stay order but we

7     have agreed to reduce our request to six months after

8     consultation with the creditors committee.

9          Second, the debtors seek an extension of the time to

10    complete service of process on avoidance action defendants

11    until the later of August 30, 2011 or the time otherwise

12    prescribed by the bankruptcy rules.  This portion of the motion

13    has not been objected to by anybody.

14          As set forth in the motion, as well as the reply, the

15    debtors have taken full advantage of the stay to conduct

16    further investigation with respect to the avoidance claims that

17    are the subject of tolling agreements, initiate settlement

18    discussions with avoidance action defendants and continue the

19    ADR process.  The success of the ADR process is irrefutable. As

20    indicated in the reply, as well as in the monthly status report

21    filed yesterday by Peter Gruenberger, as a result of mediation

22    the debtors have achieved settlements of eighty-four ADR

23    matters involving ninety-five counterparties generating in

24    excess of 759.8 million dollars for the estates.

25          Another measure of success is that out of the forty-

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 23

1    four ADR matters that have reached the mediation stage, forty

2    of them have been settled.  As indicated in Mr. Gruenberger's

3    letter, another ten mediations have been scheduled to commence

4    between today and September 8 of this year.

5         The debtors seek an extension of the stay to enable

6    them to continue to build on the successful ADR process and to

7    resolve pending matters while minimizing the time and expense

8    expanded by the debtors and avoidance action defendants and the

9    burden on the Court.

10        The SPV derivatives ADR procedures which were approved

11   in March of this year, are more complex and more time consuming

12   to apply than the original ADR procedures.  The debtors should

13   be given additional time to make the most of those procedures

14   before the stay terminates.

15        The debtors submit that under Section 105 of the

16   Bankruptcy Code, the sheer number and complexity of the

17   avoidance actions, the lack of prejudice to any of the

18   avoidance action defendants and the progress achieved to date

19   warrant the requested extension of the stay.

20        Moreover, the debtors are at a critical juncture of

21   these Chapter 11 cases.  As the Court is aware, there are three

22   competing plans on file and a disclosure statement hearing is

23   imminent.  While the debtors intend to continue resolving

24   avoidance actions during the extended period of the stay, they

25   should be permitted to focus their attention at this time on

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 24

1    negotiating the terms of their Chapter 11 plan, obtaining

2    approval of their disclosure statement and obtaining

3    confirmation of that plan.

4         The extension of the stay would affect more than 360

5    parties, yet only two parties U.S. Bank and the liquidators of

6    LB Australia, are the only entities that have objected to the

7    proposed extension.  U.S. Bank has objected to virtually every

8    one of the debtors initiatives to streamline the Chapter 11

9    process and avoid unnecessary litigation.  The U.S. Bank

10   objection is almost identical to the objection that they filed

11   to the initial stay motion.  The debtors responded at length to

12   that objection in our reply filed in support of the initial

13   motion and we're not going to rehash all of those arguments

14   this morning.

15        At the hearing held with respect to the initial stay

16   motion, the Court rejected U.S. Bank's arguments and the

17   debtors believe it is appropriate for the Court to do so again.

18   I'll reserve further comments with respect to U.S. Bank's

19   objection until their counsel has had an opportunity to be

20   heard.

21        The other objection was filed by the liquidators of LB

22   Australia.  LB Australia is neither an avoidance action

23   defendant nor even a creditor in these cases.  LB Australia did

24   not object to the initial stay order but it made the same

25   arguments it asserts in its objection in its motion to

Page 25

1    intervene in one of the avoidance actions, adversary proceeding

2    10-3545; a request that the Court denied.

3         LB Australia requests that the Court exclude this

4    adversary proceeding from the stay on the basis that LB

5    Australia cannot wind up its own estate until the Court makes a

6    determination on the enforceability of the flip clauses in the

7    Dante program.

8         But the carve-out suggested by LB Australia would be

9    basically the exception that swallows the rule.  This adversary

10   proceeding involves hundreds of defendants and hundreds of

11   millions of dollars.  So to permit it to proceed would open the

12   floodgates to a substantial amount of litigation.

13        Moreover, as set forth in our reply, LB Australia is

14   not a party-in-interest in these cases and therefore, is not

15   even entitled to be heard with respect to the stay.  We have

16   cited the Second Circuit's decision in Refco and Judge

17   Chapman's recent decision in Innkeepers as support for the

18   proposition that LB Australia as a noteholder of an SPV that is

19   at best a creditor of LBSF lacks standing to be heard in this

20   matter.

21        The issues raised in the objections pale in comparison

22   to the success of the debtors efforts to resolve these actions,

23   the potential for continued success in resolving these matters

24   and the prejudice to the debtors and their estates that would

25   result from a full scale resumption of litigation at this

Page 26

```
 1    juncture.  As a result, the debtors request that the objections

 2    be overruled and the Court extend the stay for an additional

 3    six months.

 4           Your Honor, we did file a proposed order with the

 5    motion.  We have a form, a blacklined form of the order that

 6    reflects the change to the six month extension.  I can hand

 7    that up now if you would like to see it.

 8           THE COURT:  I'd like to see it, although I assume the

 9    major change is just from nine months to six months.

10           MS. MARCUS:  And it also references the fact that

11    objections were filed.

12           THE COURT:  All right.  Fine.  Happy to see it.  Thank

13    you.

14           I'll hear from the two objectors.

15           MR. PRICE:  Good morning, Your Honor.  Craig Price

16    from Chapman & Cutler on behalf of U.S. Bank.  We are the --

17    U.S. Bank is a defendant in a large number of the avoidance

18    actions and we filed an objection to the continuation of the

19    stay.  First of all, we'd like to just make clear that contrary

20    to the assertions of the debtors, that U.S. Bank has not been

21    obstructionist in these cases.  U.S. Bank has actively worked

22    with the debtors to, among other things, settle twenty interest

23    rate cap and court-ordered transactions, settle sixty negative

24    amortizing transactions, settled a number of securitization

25    interest rate swaps, settled the Madison Avenue transaction,
```

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

1    resolved certain issues with respect to the Pine Spruce and

2    Verona transactions, agreed to terms to let the estate have

3    control over certain research transactions, resolved numerous

4    other swap transactions and with regard to the SPV derivatives,

5    ADR procedures, with regard to every transaction that we've

6    been served an ADR notice with, we have put forward an

7    authorized designee.

8            Despite this, U.S. Bank has a duty to both itself and

9    its noteholders to uphold its rights.  The law regarding

10   implementation of a stay is clear where there's a possibility

11   that issuing a stay will cause prejudice to others.  The

12   debtors have the burden to show hardship.  U.S. Bank doesn't

13   believe in this instance, that merely alleging that the stay

14   will be inconvenient and expensive is enough, to the extent

15   that the stay is lifted, we don't believe that it will result

16   in a flood of litigation.  If other parties do not wish to

17   litigate, they can enter into tolling agreements and extend its

18   scheduling orders.  This would allow those parties to protect

19   their rights while at the same time allowing other parties to

20   litigate and pursue their interests.

21           Even to the extent that this court allows this --

22   continues the stay, the Court should maintain an even balance

23   with regard to the various parties.  The debtors completely

24   failed to address the trustee's concerns that the U.S. Bank and

25   its noteholders will suffer prejudice.

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 28 of 126

                                                            Page 28

 1              THE COURT:  Could you explain that to me?

 2              MR. PRICE:  Sure.

 3              THE COURT:  What --

 4              MR. PEREZ:  Sure.

 5              THE COURT:  What's the prejudice?  I read your papers

 6    and they are similar to papers filed in connection with the

 7    initial request for a stay.  And I understand that you assert

 8    that U.S. Bank has been constructive in a variety of other ways

 9    and I recognize that you have fiduciary duties and as a result

10    are here to make a record that you're protecting the interest

11    of your beneficiaries.

12              But how, really, is anybody prejudiced by a six month

13    stay, particularly since opening the litigation will not lead

14    to expeditious resolution.

15              MR. PRICE:  The resolution; okay.  Right.  Well, U.S.

16    Bank on its own behalf is primarily concerned if it's sued in

17    its individual capacity.  It serves, as you know, as an

18    intermediary.  But to the extent that it is sued in its

19    individual capacity, the statue of limitations could run,

20    defenses could be lost.

21              THE COURT:  How?

22              MR. PRICE:  How could the statute --

23              THE COURT:  How would your defenses be lost?

24              MR. PRICE:  Well, the one major defense is the statute

25    of limitations runs in terms of receiving -- to the extent

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 29

1    we're an intermediary and we have to go after someone else, the

2    statute of limitation would run in those instances.  Those

3    parties may disappear.  A lot of these entities are foreign

4    entities or incorporated in the Cayman Islands. They may

5    disappear.  They may have distributed all their assets to

6    various holders.

7          THE COURT:  Well, let's just say for the sake of

8    argument, and that's all we're doing here, we're discussing

9    this in a somewhat theoretical environment, that the stay were

10   lifted, what would you do?  And why can't you take steps now to

11   investigate the locations of third-parties that might have some

12   obligation to the bank?

13         MR. PRICE:  Well I believe the bank is doing that but

14   to the extent that a party distributes its assets or

15   liquidates, we can't control that.  And we can't control when

16   that happens.

17         Another issue that we have is there are litigations

18   that are ongoing that haven't been stayed or have been decided.

19   In those instances, there are decisions being made that we

20   can't participate in or that we can't litigate those issues.

21   So the only --

22         THE COURT:  I'm not understanding what you just said.

23         MR. PRICE:  Oh, okay.  There are certain cases like

24   the Perpetual decision of the Ballyrock decision that have been

25   made. Those cases are going forward or have gone forward,

Page 30

1    decisions have been made, determinations are being made in

2    those cases.  We can't have similar determinations made with

3    regard to our litigations because they're not going forward.

4          THE COURT:  Well if similar decisions were going to be

5    made in the litigations that are stayed, they would be

6    decisions that are congruent with the decisions I've already

7    made in Perpetual and Ballyrock as it relates to the flip

8    clause.  I don't know to what extent you're prejudiced.  This

9    certain --

10         MR. PRICE:  Well, we can't pursue an appeal.

11         THE COURT:  You --

12         MR. PRICE:  We couldn't pursue an appeal.

13         THE COURT:  You're not even -- you're not a party as

14   far as I know to either the Perpetual or Ballyrock cases.

15         MR. PRICE:  We're not a party but we have similar

16   issues in our --

17         THE COURT:  You sound like you're making an argument

18   now that I'll be hearing in a moment from the liquidators in

19   Australia.  So why don't we reserve that for them.

20         MR. PRICE:  Okay.  So that's how we feel we'll be

21   prejudiced.  And we also believe that the noteholders will be

22   prejudiced in the sense that the litigations can't continue --

23   can't commence.  And also, there are instances where there's a

24   lot of money in certain trusts.  The claims of the debtors

25   wouldn't take all of that money and those noteholders can't

1    have any distributions made at this time.  They're going to

2    have to wait an addition -- after waiting two and a half years,

3    they're going to have to wait an additional six months.  And if

4    the debtors come back again, they're going to have to wait for

5    whatever time period in order to have, you know, distributions

6    made to them.

7            THE COURT:  You understand as a person who has thought

8    about this issue, that there are huge advantages to case

9    administration and having the continuation of the stay, that

10   the alternative dispute resolution procedures that have adopted

11   here have produced remarkable successes and that in a case such

12   as this, particularly with competing plans going on at this

13   time, that it makes some sense for there to be a prioritization

14   of how people behave in the bankruptcy case.

15           Do you say that notwithstanding those obvious benefits

16   that the almost entirely theoretical propositions that you've

17   advanced about the consequences of delay should somehow trump

18   these benefits?

19           MR. PRICE:  I mean we definitely understand that there

20   have been enormous benefits to the stay but we also believe

21   that we're being prejudiced.  And we've asked for certain

22   relief which I can explain now, that I think could resolve some

23   of these issues which is to toll the applicable statute of

24   limitations so that they don't run in the sense that if U.S.

25   Bank is sued, those statute of limitations don't run.  That's

Page 32

1    something within this court's ability and purview that it could

2    do.  And we could also have the debtors state on the record

3    that they won't be suing U.S. Bank in its individual capacity.

4    And if those issues are resolved, the stay could continue.

5            THE COURT:  Just for my information, did you attempt

6    in any informal way to achieve by agreement the relief that

7    you're now seeking to have me enter as a component of your

8    objection?

9            MR. PRICE:  Well, I do know that both of those

10   requests were made in our initial objection and I do know that

11   discussions have been ongoing with the debtors in the sense

12   that we've resolved as I mentioned before, large numbers of

13   these cases.  So I can't specifically that I've been a part of

14   those discussions but I know that they have been part of our

15   past requests.

16           THE COURT:  All right.  I think I understand your

17   position.  I'd like to hear from the liquidators of Lehman

18   Brothers Australia.

19           MR. SAUCIER:  Your Honor, Even Saucier from the law

20   firm of Kirkland & Ellis representing the liquidators of Lehman

21   Brothers Australia.   I won't take time going into the

22   substance of our limited objection, of course unless Your Honor

23   has questions, but I did want to address briefly the threshold

24   question of whether we are a party-in-interest such that we can

25   even make a limited objection here today.

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 33

```
 1              Perhaps Your Honor will remember a few months back, we

 2      were before you seeking intervention in an adversary

 3      proceeding.

 4              THE COURT:  I remember it well.

 5              MR. SAUCIER:  So Your Honor denied our motion for

 6      intervention.  We have appealed that order to the district

 7      court.  That appeal is still underway and so as far as we're

 8      concerned, it's an open issue, whether we're a party-in-

 9      interest or not.

10              I will note that in the district court, LBSF has taken

11      the position that Your Honor's order denying intervention was

12      not on the basis of whether or not we were a party-in-interest

13      but rather that we were foreclosed from even making the motion

14      based on the stay order.

15              So as far as LBSF was concerned, there was not a

16      determination by Your Honor as to whether or not we were a

17      party of interest but rather that we couldn't even make such a

18      motion because of the stay order.  If we accept LBSF's argument

19      on that point, then again, it hasn't been addressed whether or

20      not we are a party-in-interest either for purposes of

21      intervention or such that we could make a limited objection

22      here.

23              THE COURT:  Well I think there are two components to

24      this notion of party-in-interest.  My recollection -- I'm not

25      characterizing what happened at the last argument, not am I
```

Page 34

1      going to say anything that might have any impact on the pending

2      appeal in the district court --

3              MR. SAUCIER:  Understood.

4              THE COURT:  -- but I think there are at least two

5      layers to the notion of what a party-in-interest is.  For

6      purposes of the motion to intervene, your client was seeking to

7      become a party in a particular adversary proceeding.  Until you

8      became such a party, you were a stranger to that litigation,

9      except to the extent you had some indirect interests.

10             There's also the question which is being raised in the

11     reference to the Innkeepers case or the Refco case, which is

12     whether or not given the indirect nature of your interest in

13     the underlying notes that you have standing for purposes of

14     appearing and being heard in the bankruptcy case, which is I

15     think a second dimension to the notion of standing, what are

16     you referring to?

17             MR. SAUCIER:  I am referring to the second.  And just

18     to follow-up with the second point because I understand that

19     confusion may be -- what I first said could definitely be

20     confused with the first party-in-interest that Your Honor was

21     discussing.

22             With respect to the second, we'll say that when we

23     were before this court briefing the intervention issue, LBSF

24     had taken the position, hey, look liquidators Lehman Brothers

25     Australia, you didn't even object to the original stay order

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 35

1    such that you can't now argue that you are foreclosed or

2    someway aggrieved by the operations of that stay order which

3    LBSF then characterized as saying you as a non-party cannot

4    even make a motion in the first instance.

5           So now we're here today for an extension of that same

6    stay order and the position that Lehman U.S. seems to be taking

7    is oh, well we said you couldn't object in the first instance

8    to the -- or you didn't object to the stay order in the first

9    instance, but now that you're trying to do so, you don't have

10   party-in-interest standing.  It's sort of a circular argument

11   as far as we're concerned.

12          THE COURT:  Well I think what they're saying is that

13   this is a motion seeking to extend for six months a stay of

14   litigation and it just so happens that you're not a party to

15   any of the litigation that's being stayed.  I think that's the

16   simplistic argument that's being made here.  And I think even

17   your own papers indicate that you are derivatively impacted by

18   this because somehow the delay in resolving issues relating to

19   the flip clause as a general matter somehow is affecting your

20   ability to efficiently wind up your estate in Australia.  Do I

21   understand that correctly?

22          MR. SAUCIER:  Correct.

23          THE COURT:  Okay.  But you're still not a party to the

24   litigation.

25          MR. SAUCIER:  No, in fact that issue is on appeal to

1    the district court which is why we think that it's not

2    dispositive one way or the other whether or not we're a party-

3    in-interest.

4              THE COURT:  Well, at this moment, you're not a party-

5    in-interest.

6              MR. SAUCIER:  That is correct.

7              THE COURT:  Okay.  So at this moment, what standing do

8    you have to complain about the extension of the stay?

9              MR. SAUCIER:  Again, I think that issue has not been

10   resolved.  So for purposes of preserving our right to object

11   now or later, we wanted to raise this issue for the Court.

12             THE COURT:  Okay.  You've raised it but I think we

13   understand each other.  You haven't waived the argument that

14   you've just made because you've made it but you also don't have

15   standing to be heard as a party-in-interest in any litigation

16   that is the subject of the motion to stay.

17             MR. SAUCIER:  Correct, Your Honor.

18             THE COURT:  All right.  in that case, you lose.

19             MR. SAUCIER:  Okay.

20             THE COURT:  And you understand that.

21             MR. SAUCIER:  Yes, absolutely, Your Honor.  I think my

22   client's position is later down the road if we have an issue

23   with the stay, we don't want to be accused of not having said

24   anything in the bankruptcy court when the stay was under

25   consideration.  And that's why we wanted to get our interest

```
 1    out in front of you.
 2            THE COURT:  Okay.
 3            MR. SAUCIER:  I'm not trying to pull a fast one on
 4    Your Honor.  It's really just to preserve our right to object.
 5            THE COURT:  I never thought for a moment you were
 6    trying to pull a fast one.
 7            MR. SAUCIER:  Okay.
 8            THE COURT:  Okay.
 9            MR. SAUCIER:  I appreciate that, Your Honor.
10            THE COURT:  Understood.  Do you have more to say?
11            MR. SAUCIER:  No, I am done unless Your Honor has any
12    further questions.
13            THE COURT:  No, you are done.  Okay.  Do you want to
14    respond to U.S. Bank?
15            MS. MARCUS:  Your Honor, I don't think I need to
16    respond very extensively.  I just wanted to elaborate on the
17    Court's observation regarding the lack of prejudice.  One of
18    the other issues that U.S. Bank raises with respect to
19    prejudice is that it will be difficult to track the recipients
20    of any alleged preferential transfer later when the stay
21    expires.
22            We find that very puzzling because we all know what
23    the relevant preference period is and as Your Honor indicated,
24    U.S. Bank can do that work now.  There's no prejudice to them
25    by waiting.
```

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 38 of 126

Page 38

1        Secondly, with respect to the statute of limitations

2    issue that U.S. Bank raised, under New York law, the cause of

3    action doesn't accrue until liability is established.  And

4    therefore, any claims that U.S. Bank would have against third

5    parties relating to any liability that U.S. Bank sustained,

6    would not be -- the statute of limitations would not expire

7    before the stay expires.

8        With respect to LB Australia, Your Honor, maybe I can

9    clarify things just a bit.  In addition to the fact that as

10   Your Honor noted, they're not a party-in-interest in the

11   litigation, in the actual adversary proceeding.  Our point was

12   that there are 359 defendants who have not objected to the

13   extension of the stay.  And LB Australia who isn't a defendant,

14   who has objected, and we think the lack of objection of the

15   other 359 is much more important for the Court to consider.

16       If you have no further questions, Your Honor, that's

17   all I have.

18       THE COURT:  No, I have no more questions.  And the

19   objection of U.S. Bank National Association to the extension of

20   the stay is overruled.  The objections touch on prejudice but

21   frankly talk about prejudice in the most theoretical manner.

22   The reality is that litigation in this court takes quite a long

23   time to resolve.  I have a matter on at 2 o'clock this

24   afternoon and I'm not previewing it, it's just it's a 2009

25   adversary proceeding and I'm dealing with motions to dismiss

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 39 of 126

Page 39

1    this afternoon.  That litigation was unstayed.

2         Parties themselves, to a large extent, drive the

3    timeline of litigation and whether or not litigation is stayed

4    it is presumptuous for any party to assume that there is going

5    to be a truly definitive determination of unsettled law within

6    any reasonably predictable timeframe.

7         What is actually driving the limited objection with

8    the liquidators of Lehman Brothers Australia and I believe the

9    interests of certain other noteholders, is that desire to

10   expedite some kind of appellate process that would result in an

11   alternative determination of issues that have already been

12   decided by this court.

13        Those issues relate to the ipso facto clause and the

14   impact on the so-called flip clause in varies derivative

15   transactions.  In effect, issues completely unrelated to

16   orderly case management are driving objections.  One thing is

17   indisputable, the bankruptcy court has the discretion to manage

18   its docket.  The order which is sought here simply provides

19   that for an additional six month period, a certain portfolio of

20   avoidance actions will not go forward in litigation.  That

21   doesn't mean that parties do not have an opportunity to resolve

22   the issues in those litigations.  In fact, they are encouraged

23   to do so, whether by means of alternative dispute resolution

24   procedures or through the more conventional means of picking up

25   the telephone and suggesting that parties with decision making

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 40 of 126

Page 40

1    authority sit down with one another to try to resolve the

2    issues.

3            There's simply no purpose to be served in granting the

4    objection of U.S. Bank National Association, other than to

5    create unnecessary additional work that does not necessarily

6    produce one iota of benefit to the parties.

7            The Court will enter the order extending the stay of

8    the avoidance actions for a period of six months and it

9    visciates the voluntary reduction of the nine month request to

10   six months because in all likelihood if it hadn't been

11   volunteered, it would have been voided anyway.

12           MS. MARCUS:  Thank you, Your Honor.

13           THE COURT:  Thank you.

14           MS. MARCUS:  The next item on the agenda, Your Honor,

15   item number four, is Lehman Brothers Holdings, Inc.'s motion

16   for approval of a settlement agreement relating to real

17   property located at 1107 Broadway.

18           In this motion, LBHI seeks approval of a settlement

19   agreement with the mortgage borrower and the mezzanine borrower

20   for the property.  The settlement agreement is premised upon a

21   purchase agreement pursuant to which the borrower has agreed to

22   sell the property to 1107 Broadway Owner, LLC, referred to as

23   "L&L" for 161.5 million dollars plus transfer taxes and carry

24   costs paid by Lehman on the property since January 1, 2001.

25           In addition, and this is critical from the debtors'

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 41

1    perspective, the borrowers and L&L have agreed to an auction

2    process much like a Chapter 11 auction in which L&L will act as

3    the stalking horse and the property will be auctioned to the

4    highest bidder.

5            If the order approving the settlement is entered by

6    June 17, the expectation is that the auction for the property

7    will take place on June 29.  If the L&L price ends up being the

8    best price for the property, LBHI would receive 142.3 million

9    dollars of the sale proceeds, plus reimbursement of its carry

10   costs and the borrowers would receive 19 million dollars.  If

11   the auction results in a higher price being obtained for the

12   property, then LBHI and the borrowers would each get fifty

13   percent of the excess purchase price after payment of a 2.5

14   million dollar break-up fee to L&L.

15           As set forth in the motion and the declaration of

16   Jeffrey Fitts filed in support thereof, the debtors' business

17   judgment is that the settlement agreement is fair and

18   reasonable and in the best interest of the estate because it

19   provides for a sale of the property at a fair price.  It

20   provides a mechanism for the estate to realize an even higher

21   price as well as motivation for the borrower to obtain the best

22   possible purchase price for the property.

23           It eliminates the delay attendant to completing the

24   foreclosure process and the risk that a purchaser for the

25   property at the same price may not be available when all the

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 42

1    litigation is concluded.

2         It eliminates the litigation risk relating to defenses

3    that LBHI expects the borrowers to assert in the litigation

4    including arguments relating to LBHI's failure to fund the draw

5    request made by the borrower and it provides for withdrawal of

6    proofs of claim in the aggregate amount of 126 million that

7    have been filed against LBHI and the exchange of mutual

8    releases.

9         As set forth in its statement filed in support of the

10   motion, the creditors committee which has been kept up to date

11   with regard to the debtors' efforts to find a solution for 1107

12   Broadway, supports the transaction.  The settlement agreement

13   satisfies the standards for approval set forth in Iridium and

14   TMT Trailer Ferry cases.  We've gone through the relevant

15   factors in our reply.

16        The sole objection to the motion was filed by the ad

17   hoc group of Lehman creditors.  Essentially, the ad hoc group

18   believes that Lehman made a bad business deal and that the

19   settlement does not satisfy the relevant standards for approval

20   of the compromising settlement.

21        Specifically, the ad hoc group claims that the motion

22   has the following infirmities or the settlement has the

23   following infirmities.  They argue that the debtors have a

24   strong litigation position against the borrower and the

25   guarantor.  It's interesting that the ad hoc group has made an

Page 43

1   evaluation of the merits of the debtors litigation position

2   considering that they have not involved in the litigation nor

3   privy to the debtors' litigation strategy or discussions with

4   counsel.  It is hard to imagine how the ad hoc group can

5   purport to know more than the debtors and their litigation

6   counsel on this transaction.

7          As set forth in the debtors reply, it would not be in

8   the debtors best interest for them to publicly air the issues

9   relating to the foreclosure litigation for obvious reasons.

10  The evaluation of Mr. Fitts who has primary responsibility for

11  this matter arrived at after consultation with LBHI's counsel

12  on this matter, the Dechert firm, should be sufficient to

13  satisfy the debtors' burden.

14         Here we have even more, however.  The creditors

15  committee and its professionals who had been well-steeped in

16  the facts and issues related to the litigation agree with the

17  debtors' judgment.

18         The ad hoc's second argument is that there is no need

19  to monetize 1107 Broadway at this point in time since

20  distributions under the plan won't commence for at least

21  several months.  In the debtors' view, the foreclosure

22  litigation could realistically take twelve to eighteen months.

23  During that time, LBHI would have to continue to pay the carry

24  costs of approximately two million dollars per year, as well as

25  the associated litigation costs.

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
Pg 44 of 126
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 44

1          More importantly, however, the ad hoc group ignores

2     the reality that in the event that a court approval of a

3     settlement agreement is not obtained before the cut-off date

4     which is August 25, 2011, the borrower and guarantor may

5     terminate the settlement agreement.  No one, not the ad hoc

6     group, not Mr. Fitts and not the creditors committee knows

7     whether there's another purchaser who would pay a comparable

8     purchase price with or without a tenant for this space at some

9     point in the future.  That is a risk that the debtors are

10    simply not prepared to take.

11         Third, the ad hoc group contends that there is no

12    evidence that the property is at risk of diminishing in value.

13    The debtors concede that point.  On the other hand, the ad hoc

14    group has not and cannot provide evidence that the value of the

15    property will increase or even remain the same until the

16    conclusion of the foreclosure litigation.

17         The debtors have a transaction in hand as a result of

18    which they will receive in excess of 142 million dollars which

19    is a significant amount of money even in the context of these

20    cases.  And several multiples of the amount that LBHI paid to

21    reacquire the mortgage loan for Bankhaus.  The ad hoc group

22    wants to upset the transaction.  The burden should be on them

23    to prove that the asset will maintain its value if the

24    settlement is not approved, a burden they cannot possibly

25    sustain.

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 45 of 126

Page 45

1          Finally, the ad hoc group alleges that even if a

2     litigation is expensive, the debtors should pursue it because

3     the guarantor is liable under the guarantees for the cost of

4     litigation.  This argument blithely ignores the possibility

5     that the guarantor may have a valid dense to claims asserted

6     under the guarantees in which case the cost of litigation would

7     actually be borne by the debtors' estates.  The debtors are

8     prepared to proffer the testimony of Jeffrey Fitts in support

9     of the motion.  I don't know if the Court would like us to do

10    that now or wait until after the ad hoc committee addresses the

11    Court.

12          THE COURT:  Well I think it makes sense to do this in

13    an orderly way which includes, since we know it's controverted,

14    having you put on your case, having the creditors committee put

15    on its support of your case and then my hearing from the ad hoc

16    group as objectors.  I don't know whether the ad hoc group

17    intends to cross-examine your proffer with respect to Mr.

18    Fitts' testimony or has any independent evidence that it wishes

19    to offer.  Let me find out from Mr. Uzzi, who is now standing.

20          MS. MARCUS:  Yes, Your Honor.

21          MR. UZZI:  Your Honor, we would like to ask some

22    questions.  We have no objection to a proffer or relying on the

23    affidavit.  We do not have any independent evidence.

24          THE COURT:  Okay.  Fine.

25          MR. UZZI:  Thank you.

Page 46

1          THE COURT:  So let's proceed with the proffer and then

2     I'll hear from the creditors committee and then presumably,

3     we'll cross-examine the proffer.

4          MS. MARCUS:  That's fine.  Your Honor, I offer

5     pursuant to Federal Rules of Evidence 103(a)(2) and 611(a) as a

6     proffer, the following testimony of Jeffrey Fitts.  If called

7     upon to testify, Your Honor, Mr. Fitts would testify as

8     follows:

9          Mr. Fitts is a managing director of Alvarez & Marsal.

10    He has more than twenty-two years of experience in assisting

11    insolvent and troubled companies with a focus on operational

12    and financial restructuring efforts.  Prior to joining A&M, Mr.

13    Fitts was a managing director with GE Commercial Finance where

14    he led GE's Distressed Debt and Alternative Investment Group

15    and managed complex distressed credits.

16          Before joining GE, Mr. Fitts was with the corporate

17    workout division of Citicorp where he spent three years

18    managing investment grade and middle market corporate workouts.

19    Mr. Fitts began his career in 1990 as a workout officer and

20    later an asset manager with Citicorp Real Estate where he

21    managed more than one billion dollars of office, retail and

22    industrial projects.

23          Mr. Fitts received a bachelor's degree from the

24    University of Delaware in 1988.  Mr. Fitts would testify that

25    he was assigned to the representation of Lehman in September

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 47 of 126

Page 47

1    2008.  Mr. Fitts currently serves as the co-head of the real

2    estate group of LBHI and certain other Lehman entities.  Mr.

3    Fitts' primary responsibility includes the day-to-day

4    management and oversight of the real estate group's portfolio

5    including management and oversight of real estate, real estate

6    finance, and related activities.

7            As co-head of the real estate group, Mr. Fitts

8    oversees a number of Lehman and A&M employees including Joelle

9    Halperin, Anthony Barsanti, Chad DeMartino who have actively

10   participated in negotiating the terms of the settlement.

11           Mr. Fitts would testify that he personally

12   participated in many of the meetings and negotiations that

13   resulted in the settlement agreement and is thoroughly familiar

14   with all material aspects of the motion and the debtors' reply.

15           Mr. Fitts would testify that in October of 2007, a

16   non-Lehman entity called 1107 Broadway, LLC, the mortgage

17   borrower, acquired a sixteen story former office building

18   located at 1107 Broadway in Manhattan.  The mortgage borrower

19   and certain of its affiliates entered into a number of loan

20   facilities pursuant to which Lehman agreed to extend up to

21   343.4 million dollars to the mortgage borrower and its

22   affiliates for the acquisition and development of the property.

23           These loans were secured by certain mortgages,

24   assignment of leases, and rents, security agreements, and

25   fixture filing statements.  LBHI also received several

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 48 of 126

Page 48

1    guarantees of the borrower's obligations from Yitzchak Tessler.

2    Mr. Fitts would testify that the mortgage borrower and its

3    affiliates drew an aggregate amount of approximately 228,344

4    dollars from these loan facilities and that shortly before the

5    loan facilities matured, the borrowers made a draw request that

6    Lehman did not fund.

7         Mr. Fitts would testify that the loan facilities

8    matured on October 15, 2008, after the commencement of LBHI's

9    Chapter 11 case and that each of the loans currently is in

10   default.  Mr. Fitts would testify that LBHI did not actively

11   seek to enforce its rights with respect to the property in the

12   initial months of these Chapter 11 cases because significant

13   portions of the loans had been participated to other debtor and

14   non-debtor entities.

15        After LBHI reacquired the participated portion of the

16   mortgage loan from Bankhaus and following discussions with the

17   creditors committee, LBHI commenced the foreclosure proceeding

18   with respect to the mortgage loan in the New York State Supreme

19   Court, New York County, on April 27, 2010.

20        Almost immediately after the commencement of the

21   mortgage foreclosure proceeding, LBHI began negotiations with

22   the borrowers in an effort to resolve the disputes and monetize

23   Lehman's interest in the property.  These negotiations included

24   substantive discussions regarding a proposed transaction that

25   contemplated a discounted payoff by the borrowers that would

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 49

1   have resulted in a significantly lower recovery for Lehman than

2   what is contemplated under the settlement agreement.

3         Based on LBHI's discussions with third-parties, Mr.

4   Fitts concluded that LBHI would have had to accept a steep

5   discount on the face value of the loan facilities if it wanted

6   to sell its interest in the loans without first resolving its

7   dispute with the borrowers.

8         LBHI also received an inquiry from and subsequently

9   began discussions with L&L which owns a neighboring building

10  regarding various transaction structures both with and without

11  the borrowers that would monetize LBHI's interest in the

12  property.  Since virtually the commencement of the foreclosure

13  action, Mr. Fitts and others at LBHI were in frequent contact

14  with the creditors committee's professionals regarding how to

15  proceed with respect to the property.

16        Mr. Fitts would further testify that in April 2011

17  when negotiations with the borrower had reached an impasse,

18  Lehman commenced mezzanine loan foreclosure proceedings under

19  the Uniformed Commercial Code for public sales of the senior

20  mezzanine pledged collateral and the junior mezzanine pledged

21  collateral in order to accelerate the process of realizing a

22  recovery on its investment in the property.

23        Shortly thereafter, the discussions among the

24  borrowers, L&L and Lehman recommenced.  The borrowers' original

25  concept called for a discounted payoff sale transaction that

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 50 of 126

Page 50

1   was similar to the current transaction structure but without

2   the auction component. While this new proposal was a

3   substantial improvement on the offers that had been discussed

4   previously, LBHI believed that it was important to test the

5   transaction in the market to insure that LBHI was receiving the

6   highest recovery possible.

7        Accordingly, Mr. Fitts would testify that LBHI

8   insisted that any proposed transaction include a thorough

9   marketing process that would subject the L&L transaction to

10  higher offers.  The borrowers were very reluctant to include

11  this additional step in the sale process because they were

12  concerned about the affect it might have on their ability to

13  close the transaction with L&L.

14       After lengthy negotiations, the parties eventually

15  agreed upon the sale process including the auction as set forth

16  in the settlement agreement.  Mr. Fitts would testify that the

17  settlement agreement provides for L&L to serve as a stalking

18  horse bidder for the property with an initial bid price of

19  161.5 million plus transfer taxes and any carry costs that LBHI

20  has incurred with respect to the property for 2011.  142.5

21  million of the sale proceeds plus the carry costs will be

22  allocated to LBHI and nineteen million will be allocated to the

23  borrowers.

24       To the extent that the auction results in proceeds in

25  excess of the 164 million dollar floor price, such proceeds

Page 51

1   will be divided equally between LBHI and the borrowers.  The

2   borrower has retained Eastdale to market the property and

3   conduct the auction.  If the property is sold to L&L or a

4   competing bidder for up to 164 million, Eastdale will be

5   entitled to a fee of 200,000 dollars which will be paid from

6   the proceeds otherwise payable to Lehman.

7          In the event that the proceeds exceed the floor

8   amount, Eastdale will be entitled to an additional fee of six

9   percent of such excess which shall be borne equally by Lehman

10  and the borrower.  Additionally, Mr. Fitts would testify that

11  the parties will provide each other with certain releases and

12  the borrowers will withdraw their proofs of claim which have a

13  face amount of more than 126 million dollars.

14         Mr. Fitts would testify that in the event that L&L

15  does not close the proposed transaction, the borrowers are

16  obligated under the settlement agreement either to step into

17  L&L's shoes as the purchaser of the property on the terms set

18  forth in the purchase agreement or cooperate with LBHI in

19  effectuating a deal in lieu transaction, pursuant to which LBI

20  would become the owner of the property.

21         Excuse me one second, Your Honor.

22         Mr. Fitts would testify that in connection with the

23  execution of the settlement agreement, the parties have placed

24  executed copies of all the releases and transfer documents into

25  escrow so that there is virtually no execution risk for the

Page 52

1    debtors in connection with the transaction.  LBHI will either

2    receive at least 142.3 million plus carry costs or it will

3    receive title to the property.

4         Mr. Fitts would testify that the primary virtue of the

5    settlement agreement is that it resolves the disputes between

6    the parties, allowing them to move forward with the consensual

7    sale process that will provide LBHI with the opportunity to

8    either monetize its interest in the property at a market rate

9    or take possession of the property without the necessity of

10   engaging in costly and time-consuming litigation.

11        Disposing of LBHI's interest in the property pursuant

12   to the settlement agreement has a number of advantages of any

13   of LBHI's alternatives.  Mr. Fitts believes that the proceeds

14   LBHI will receive from the transaction either from L&L or a

15   competing bidder represent a very favorable return on LBHI's

16   investment in the property in light of the many issues

17   discussed in the motion in the debtors' reply.

18        Mr. Fitts believes that the releases and the

19   withdrawal of the proofs of claim are of significant value to

20   LBHI's estate both in terms of relieving LBHI of the effort and

21   expense of litigation and in terms of the gross value of the

22   claims that are being withdrawn or released, some of which may

23   relate to post-petition conduct.

24        Mr. Fitts is concerned that if a settlement agreement

25   is not approved, LBHI may not be able to achieve a comparable

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 53

1    recovery for its interest in the property.  This is primarily

2    due to three reasons; (1) the property is largely vacant and

3    has been gutted and therefore, is subject to physical

4    deterioration at a higher rate than a building that is fully

5    occupied, heated and properly maintained, (2) the volatility

6    that has characterized the real estate market for the past few

7    years has not abated and due to such volatility, there is a

8    reasonable chance that LBHI will not be able to secure a

9    comparable transaction when it comes time to sell, particularly

10   in light of the fact that LBHI will have been forced to incur

11   additional expenses relating to taxes and other carrying costs

12   in the interim in the amount of approximately two million per

13   year and (3) L&L is an unusually motivated buyer in light of

14   the fact that it owns a nearby building and appears to have a

15   tenant lined up for immediate occupancy of a significant

16   portion of the property.

17          Pursuing the foreclosures would require litigation

18   that would be lengthy and expensive with uncertain results.

19   And at the very least, it would prevent LBHI from taking

20   advantage of the transaction with L&L.  Further, if L&L were to

21   acquire title to the property through foreclosure of the senior

22   mezzanine loan, the most likely scenario, it would be required

23   to pay transfer taxes which could be as much as nine million

24   dollars, significantly reducing the ultimate recovery on LBHI's

25   interest in the property and offsetting a major portion of the

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 54

1    nineteen million that would be payable to the borrowers under

2    the settlement agreement.

3           Mr. Fitts would testify that based in part upon LBHI's

4    experience trying to complete a foreclosure at 25 and 45 Broad

5    Street, foreclosure could take an extended period of time.

6    LBHI commenced state court foreclosure proceedings with respect

7    to such properties on January 22, 2009.  Although LBHI has a

8    consent judgment against the borrower and guarantor on 25

9    Broad, and oral argument on the final judgment against the

10   junior lienholders occurred on February 24, 2011, the Court has

11   not yet ruled.

12          With respect to 45 Broad, LBHI obtained a judgment of

13   foreclosure on November 29, 2010.  LBHI is still waiting for

14   that judgment to be finalized which will enable it to schedule

15   the foreclosure sale on that property.

16          Mr. Fitts would testify that another benefit of the

17   consensual sale process is that LBHI will be able to leverage

18   the borrowers interest in and familiarity with the property to

19   enhance the sale process.  For example, the borrowers have

20   taken the lead in marketing the property, giving tours of the

21   property, negotiating confidentiality agreements with potential

22   purchasers and working with Eastdale to insure that potential

23   purchasers have an opportunity to conduct the necessary

24   diligence.

25          If the borrowers are not able to close with L&L or

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
Pg 55 of 126
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 55

1    another bidder, the borrowers have agreed to either acquire the

2    property on the same terms L&L offered or convey the property

3    to LBHI pursuant to a deed in lieu of foreclosure, thereby

4    relieving LBHI of the expense and delay attendant to the

5    foreclosures.

6         With respect to the guarantees executed by Mr.

7    Tessler, Mr. Fitts would testify that in his experience,

8    collecting under such guarantees requires expensive and time

9    consuming litigation.  In addition, even if LBHI were to obtain

10   a judgment under one or more of the guarantees, as a practical

11   matter, collecting on such judgments is often very difficult

12   and time consuming.

13        Mr. Fitts would testify that the proceeds to be

14   realized from the transaction as set forth in the settlement

15   agreement represent a fair and reasonable recovery for LBHI's

16   interest in the property in light of the fact that LBHI

17   repurchased the mortgage loan from Bankhaus for an allocated

18   price of twenty-two million dollars and a settlement agreement

19   provides an opportunity for LBHI to test the market and realize

20   fifty percent of any amount paid by a competing bidder in

21   excess of 164 million.

22        Accordingly, under any of the scenarios that are

23   contemplated by the settlement agreement, LBHI will recover

24   many multiples of the amount it paid Bankhaus for the mortgage

25   loan.  For the foregoing reasons, Mr. Fitts would testify that

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 56

1    as co-head of the real estate group, it is his considered

2    business judgment that entering into the settlement agreement

3    is in the best interest of LBHI's estate and its creditors.  He

4    would further testify that he has reached this conclusion based

5    on his participation in the negotiation and sale process, his

6    extensive review of the analysis prepared by Joelle Halperin,

7    Anthony Barsanti and Chad DeMartino, discussions with the

8    debtors and the creditors committee's professionals and his own

9    knowledge of the commercial real estate market in New York.

10        That concludes Mr. Fitts proffer, Your Honor.

11        THE COURT:  Mr. Fitts is lucky you did that for him.

12   Okay.  I think it makes sense to hear from the creditors

13   committee recognizing that much of the proffer was also an

14   argument, that we hear what the committee has to say about the

15   process that led the debtor to its business judgment and

16   presumably also led the committee to support that business

17   judgment.  And then hear from the ad hoc committee in

18   connection with its objections and I leave it to Mr. Uzzi and

19   his colleagues as to whether they want to make an argument and

20   then call Mr. Fitts as a witness or whether you wish to call

21   Mr. Fitts as a witness and then make your argument.  It's

22   entirely up to you.  But first the committee.  Oh, apparently

23   not.

24        MR. PEREZ:  I apologize, Your Honor.  I got a note

25   that the item behind us had settled and they just wanted to

Page 57

```
 1    alert the Court to that if the Court could finds one minute to

 2    take it up and they could be excused.  It's the fifth item that

 3    has been resolved.

 4             THE COURT:  What item has settled?

 5             MR. PEREZ:  The fifth item. The last item on the

 6    docket.

 7             THE COURT:  Oh, Goldman Sachs?

 8             MR. PEREZ:  Yes.

 9             THE COURT:  I was under the impression that it settled

10    even before I walked out on the bench.  So it's not big news.

11    I mean it's big news for you but I'm not going to interrupt

12    what we're in the midst of in order to hear those specifics.

13    So you'll just to sit a little longer unless there's an

14    emergency that forces you to leave.

15             MR. PEREZ:  No, Your Honor.  We were just going to

16    announce that it was done and we weren't even going to put any

17    specifics on the record.

18             THE COURT:  I appreciate that it's done but I was

19    under the impression that it was done except for some sentences

20    that needed to be written.

21             MR. PEREZ:   We don't need to bother the Court with

22    the sentences today but if you want us to wait, we will.

23             THE COURT:  We're interrupting the proceedings right

24    now to have this conversation.  So let's defer any further

25    comment on that until after we complete item four.
```

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 58 of 126

Page 58

1          MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank

2     Tweed, Hadley McCloy on behalf of the committee again.  Your

3     Honor, in terms of the process, I mean as indicated in the

4     debtors motion by Ms. Marcus the committee has, as typically

5     been the case, been involved with the evaluation of the

6     transaction for some time.  It probably goes back about two

7     years.

8          And I think what we learned over the course of that

9     process was that this is a group of borrowers that is very

10     contentious, very litigious.  There were deals on the table

11     before that went away.  And the deal that's on the table now is

12     better.  But I mean with that prelude, we came to looking at

13     this transaction knowing that any deal that gone done here was

14     going to be a fragile deal.  And with many moving parts.

15          And I think the main thing that we would say with

16     respect to the current settlement and why it makes sense is

17     that it is a package deal.  I think in terms of it's not just

18     the sale of the property and or just the settlement of the

19     claims, it's both.  And in order to get one or the other done,

20     all the moving pieces need to work together which I think

21     explains a lot of the components of the deal in terms of the ad

22     hoc committee's objection in particular.  The fact that -- you

23     know, clearly there's benefit coming to the estate in terms of

24     at least 142 million dollars.  I think their main concern is

25     with respect to what's going to the borrowers.  And what we

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

1    need to keep in mind there is it's going to the borrowers for

2    several different reasons, not one particular reason.  I mean

3    it's going to them potentially in settlement of claims we can

4    talk more about which are out there that could be litigated for

5    some time.  It's going to them perhaps in their capacity as the

6    party that brought the stalking horse bidder to the table.

7    It's also going to them in their capacity as the backstop for

8    this deal.  To the extent this deal goes away, the agreement

9    provides for them to either do the same deal or to do a deal in

10   foreclosure.  So there's multiple forms of consideration coming

11   back from the borrower in exchange for the nineteen million

12   dollars and the fifty-fifty sharing in the proceeds of anything

13   above the stalking horse bid.

14           So when the committee looked at it, we looked at it

15   from that perspective and we looked at it more than once.  I

16   mean we looked at it when it was first proffered.  We actually

17   went back to the committee after the ad hoc committee objected

18   and went over it again, reached the same conclusion.  And under

19   the unique circumstances of this case, the fact that there was

20   more going to the borrower than people would otherwise have

21   liked to have seen to be the case, made sense.

22           And some of the reasons that it made sense is, Ms.

23   Marcus covered in great detail, had to do with the risks of

24   litigation.  There is not a whole lot in the papers about those

25   risks and those risks, I guess are still to be developed

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 60 of 126

Page 60

1    because there isn't pending litigation but based on what we

2    know about the borrowers and their conduct over the past two

3    years, based on what we know about their resources and their

4    predisposition to litigate, we believe that that would be a

5    significant litigation that would likely track what was recited

6    in the proffer as the situation with respect to the 25, 45

7    Broad.

8            In that case, we have a borrower that's all but

9    insolvent and we've been stuck for the past two years trying to

10   get to closure on a foreclosure litigation at great expense

11   both in terms of litigation expenses and just interim operating

12   expenses which again were referred to in the proffer.  That's

13   number one.

14           Number two, in terms of the risks of delay, I think

15   the ad hoc group assumes that if we wait, the price will go up

16   but that's not something that we know or can guess at this

17   point.  The price may well go up but it may not.  And simply

18   waiting it out while we run the risks of the litigation in the

19   hopes that two years from now the property could be worth more

20   and someone would be willing to bid on that property at a

21   higher price with the overhang of the litigation still out

22   there, I think is largely speculation.  And this is, we

23   believe, ultimately a unique opportunity.

24           The other factor here that L&L as the stalking horse

25   bidder, we also believe is uniquely motivated.  They have space

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 61 of 126

Page 61

1    in the adjoining building, 205th and we understand that they

2    may be able to or may be in a position to rent significant

3    blocks of space in both that building and this building.  So

4    they are motivated both to be at the table with the stalking

5    horse bid and after -- you know, in the context of the auction,

6    to bid it up if necessary.

7            So for all those reasons, we concur in the debtors'

8    business judgment here and it is a question of business

9    judgment.  We don't totally dismiss the ad hoc committee's

10   concerns.  I mean there are -- at first blush without having

11   spent two years with this situation, the numbers don't add up

12   the way people might want them to add up but in light of all of

13   these considerations, we believe it does constitute a sound

14   exercise of the debtors' business judgment and should be

15   approved by the Court.

16           MR. UZZI:  Your Honor, I think it makes sense that I

17   question the witness first and then I think it will make the

18   argument a little bit easier and streamlined.

19           THE COURT:  We'll see what the answers are.

20           MR. UZZI:  Right.

21           THE COURT:  Mr. Fitts?

22       (Witness Sworn)

23   ??CROSS-EXAMINATION

24   BY MR. UZZI:

25   Q.   Good morning, Mr. Fitts.

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 62 of 126

Page 62

1    A.    Good morning.

2    Q.    My name is Gerard Uzzi. I'm with the law firm of White &

3    Case.   I represent the ad hoc group of Lehman Brothers

4    creditors.   I'm just going to ask you a few questions this

5    morning about the motion, about the affidavit that was

6    submitted, your affidavit that was submitted in connection with

7    the motion and the proffer of your testimony by Ms. Marcus this

8    morning.

9         Just as a very initial matter, are you familiar with the

10   contents of the motion?

11   A.    Yes.

12   Q.    The motion references four proofs of claims filed by the

13   borrower and the guarantor.   Are you familiar with the proofs

14   of claim that I'm referring to?

15   A.    I am. I knew there were -- I'm most familiar with three of

16   them because I think each of the three mortgage borrowers and

17   mezz borrowers submitted a forty million dollar claim and I

18   think there was a third -- sorry, a fourth six million dollar

19   claim.  Is that --

20   Q.    Yes.

21   A.    I mean you have that; correct?

22   Q.    Yes, thank you, Mr. Fitts.  So in total then there's four

23   claims you said, three at forty million and one at six --

24   A.    Uh-hum.

25   Q.    -- for a total of 126 million dollars; is that correct?

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 63 of 126

Page 63

1    A.   I believe that's correct; yes.

2    Q.   Are any of the claims asserted, do you know whether any of

3    the claims asserted are duplicative claims?

4    A.   I think an argument could be made that they're

5    duplicative.  I couldn't tell you, as not a lawyer, as to

6    whether they are duplicative or not.  I mean the question I

7    think would be, again as a non-lawyer, whether each of those

8    individual borrowers had a separate and distinct forty million

9    dollar claim in this case.

10   Q.   Well, when you exercised your business judgment in coming

11   to this settlement, did you consider whether any of the claims

12   might be duplicative claims?

13   A.   Yes, I did.

14   Q.   And so although 126 million has been asserted, it could be

15   less than that?

16   A.   Yes, absolutely.

17   Q.   What was your assumption as to the worst case scenario

18   should the claimants prevail?

19          MS. MARCUS:  Objection, Your Honor.  I'm not sure that

20      that question is clear.

21          MR. UZZI:  All right.

22          THE COURT:  I think there's a request that you maybe

23   rephrase that.

24          MR. UZZI:  That's fine, Your Honor.

25   Q.   What was your assumption as to if the claimants prevailed

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 64

1   on  the claims that they asserted in their proofs of claim, the

2   liability that Lehman might be exposed to?

3   A.   My assumption again -- how do I explain this?  In a worst

4   case scenario, we viewed a potential liability associated with

5   the claims, something less than what the claimants had put

6   forth but still tens of millions of dollars, as a claim matter.

7   Q.   So, tens of millions of dollars.  And I understand in your

8   testimony, in your affidavit, and I believe in your proffer

9   also that you don't believe that LBI -- that any of the Lehman

10  estates, LBHI, is actually liable under any of the proofs of

11  claim; is that correct?

12  A.   I think what we've said is that there is risk in any

13  litigation and certainly there are facts that have been alleged

14  by the mortgage borrowers that could give rise to liability

15  amongst the estate.

16  Q.   But you believe that the estate would prevail, if that was

17  litigated to resolution.

18  A.   I think there's certainly a chance the estate would

19  prevail.  I'm not in a position to guarantee that the estate

20  would prevail at the end of a litigation.

21  Q.   Do you know the nature of the claims asserted under the

22  proofs of claims?

23  A.   I know one of the primary assertions is liability

24  associated with a failure to fund by the Lehman estate.

25  Q.   The lender liability?

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 65 of 126

Page 65

1   A.   I think it's lender liability that comes from that action

2   or in this case, inaction.

3   Q.   Did you consider if the claimants were successful in

4   establishing their claims, the currency they would receive as a

5   consequence of being successful?

6   A.   Yes, I did.

7   Q.   And what was your assumption?

8   A.   My assumption was that they would end up with a claim that

9   would be in one of two categories, either a prepetition claim

10  or a post-petition claim depending on when it was held that

11  that liability existed.

12  Q.   Now has Lehman objected to the claims?

13  A.   I don't believe that we have.

14  Q.   Lehman has commenced foreclosure proceedings; is that

15  correct?

16  A.   Two of them actually, I believe.

17  Q.   Yes.  And the borrowers are contesting those foreclosure

18  proceeding?

19  A.   I believe so.

20  Q.   Did you ever consider whether an order from this court

21  expunging the claims would have an effect on the borrowers'

22  ability to contest those proceedings?

23  A.   I can tell you in two years, we have considered every

24  possible scenario related to this workout.  I am sure that in

25  those two years, we considered that as a potential option.  I

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 66 of 126

Page 66

1    couldn't give you chapter and verse on the date that we

2    considered that but I am sure that was one of the

3    considerations that we've had in many, many discussions around

4    this credit.

5    Q.    What's your projected costs of pursuing the foreclosure

6    action?

7    A.    As I think we've talked about with your clients prior to

8    this hearing, our view was that the best foreclosure action for

9    the estate, had we pursued that route would have been the mezz

10   foreclosure rather than the mortgage foreclosure, some of which

11   comes from my proffer on the 25 and 45 Broad.

12        In that discussion that we had prior to this hearing, I

13   think what we indicated was that we thought the mezz

14   foreclosure was a twelve to eighteen month process and that in

15   our rough estimate, that was a five plus million dollar

16   litigation cost over the next twelve to eighteen months.

17   Q.    All right.  I'm just going to shift gears.  You plan to

18   auction the property; is that correct?

19   A.    I think actually the mortgage borrower is auctioning the

20   property.

21   Q.    The property is going to be auctioned.

22   A.    Correct.

23   Q.    And has any parties expressed interest in participating in

24   the auction?

25   A.    I believe a number of parties have reached out to Eastdale

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 67 of 126

Page 67

1    as the marketing agent expressing interest in the property.

2    Q.    And are you optimistic that an active auction will

3    actually occur?

4    A.    I think there is a reasonable chance that we will have an

5    auction over and above the minimum 164 million dollar bid.

6    Certainly there are a lot of parties talking about.  As you may

7    know from this, talking about it is free.  Showing up to an

8    auction with a check is a different item.

9    Q.    LBHI has another asset here that's the subject of the

10   motion and those are claims against Mr. Tessler under the

11   guarantee; is that correct?

12   A.    Correct.

13   Q.    Do you know how much of the current liabilities are

14   guaranteed?

15   A.    I believe there are three different guarantees that Mr.

16   Tessler has and I'm doing this strictly off of memory; one is

17   completion, one is carry, one is recourse in the event of bad

18   boy acts.

19   Q.    So is it your understanding that a significant amount of

20   the costs that you're trying to avoid by doing this transaction

21   would be subject to indemnification by Mr. Tessler?

22   A.    As I considered this settlement, we certainly considered

23   that that was an argument that we could make.

24   Q.    Does Lehman need cash?

25   A.    I don't believe that the estate is cash-constrained.

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 68 of 126

Page 68

1    Q.    All right.  What is the cash that Lehman holds today

2    earning?

3    A.    I believe it something less than fifty basis points.

4    Q.    With respect to the property, there were some references

5    to the carry costs?

6    A.    Yes.

7    Q.    So you understand what I mean by that term?

8    A.    Yes.

9    Q.    What has the carry cost been or what do you project -- let

10   me rephrase that -- what do you project the carry cost to be

11   for the next twelve months?

12   A.    I believe it was in my proffer as approximately two

13   million dollars a year.

14   Q.    Thank you.  Just a few more questions.

15   A.    Sure.

16   Q.    Actually, it was in your proffer that you've been working

17   on a transaction I believe for this property since April 2010;

18   is that correct?

19   A.    Correct.

20   Q.    So over a year?

21   A.    Yes.

22   Q.    And I think it's in your proffer also that the borrower

23   and the guarantor have been impediments to getting a

24   transaction done?

25   A.    At times during the process, they have been impediments

1    and I think again in my proffer we indicated that at a point of

2    impasse in the negotiations, we chose to file the mezz

3    foreclosure.  That sort of speaks to impediments along the way.

4    I wouldn't call it impediments on each and every day.  Some

5    days are better than others.

6    Q.   Well, would you characterize them as litigious?

7    A.   I think that is a relatively fair characterization.

8    Q.   Would you characterize them as difficult to work with?

9    A.   No, I would say they're no more difficult than anybody

10   else who is in a difficult situation.

11   Q.   Okay.  Thank you.

12        MR. UZZI:  Your Honor, that's all my questions.

13        THE COURT:  All right.  Is there any redirect?

14        MS. MARCUS:  No, Your Honor.

15        THE COURT:  Mr. Fitts, you're excused.  Thank you.

16        (Witness excused.)

17        MR. UZZI:  May I proceed?

18        THE COURT:  Please.

19        MR. UZZI:  Your Honor, what we believe this comes down

20   when we just boil it down to its very basic facts or the basic

21   question here is whether the debtors are receiving sufficient

22   value for the payments that they're making to the borrower.

23   And I would like to walk the Court through how we analyze that

24   at least based upon the record that was presented.

25        We first looked at the asset sale part of this.  We

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 70

1    understand, we have a buyer that is willing to pay a certain

2    price.  The debtors contend that this buyer presents a unique

3    opportunity and maybe is particularly motivated to buy this

4    asset because the buyer has interests nearby and maybe has a

5    tenant in tow and we understand that, Your Honor.

6         But we also understand that other parties have

7    expressed interest in acquiring this asset and there is an

8    expectation or at least a reasonable belief that an active

9    auction will get going here.

10        So when we look at that, we think that that suggests

11   at least, that there's not a premium in the purchase price for

12   this asset.  Instead, that the stalking horse is at or near

13   fair market value.  And that's the only thing we have to go on

14   in the record, as far as value for this property.

15        So we question whether from just based upon a purchase

16   price basis, whether there's a compelling reason to do this

17   particular transaction now because it appears as if it's a fair

18   market value transaction inclusive of what has to be paid to

19   the borrower.

20        We next considered whether there was some other

21   compelling reason to sell this asset now.  Now there's no

22   evidence that this is a wasting asset.  And as the creditors

23   committee indicate in their statement, it appears that real

24   estate prices have turned the corner.  I understand nobody can

25   predict the future, Your Honor and we're not predicting the

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 71

1   future.  If I could, I wouldn't be standing here right now.

2              THE COURT:  Where would you be?

3              MR. UZZI:  I'd probably be in Key West.  But there's

4   no evidence that it's going down either.  As a consequence,

5   when we look at the asset monetization standpoint of this, we

6   just don't see a justification for the estate to pay amounts

7   over to the borrower, merely to facilitate this transaction.

8   So we looked for something else.

9              We considered what the debtors are actually getting

10  from the borrowers.  The debtors are getting releases from

11  claims for lender liability.  Now I appreciate the debtors

12  sensitivities and I've tried to be sensitive in my questioning

13  to the witness as to opining on the exposure there but there

14  are claims for lender liability, claims for a failure to fund a

15  prepetition commitment.  That's at least what we've been led to

16  believe.  And those claims have been filed with this court.

17             Under the debtors' current proposed plan, a nineteen

18  million dollar payment which is the minimum that the borrowers

19  will receive out of this, equates to a distribution of a claim

20  that equal to ninety-five million dollar, a general unsecured

21  claim equal to ninety-five million dollars.

22             The borrower takes fifty percent of the upside and

23  there's an expectation that this assets going to get bid up, so

24  that equivalent claim amount goes up pretty quickly.  It

25  doesn't take very much.  In fact, the borrower may be here. In

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 72 of 126

Page 72

1    fact, the testimony is for purposes of the analysis, they

2    assume tens of millions of dollars of exposure on this claim.

3    Well, this is a ninety-five million dollar claim.  This is a

4    payoff of a ninety-five million dollar claim.  If we assume

5    that all of it's going to that and if we assume that it's not

6    bid up and if it's bid up, it's even more than that, that's

7    really I think where the crux of our issue is.

8           Now do understand, Your Honor, that the analysis is

9    not that linear.  We understand there's offsetting costs but

10   there's also the guarantees.  And we are releasing -- or the

11   estate, I should say, is releasing guarantees against Mr.

12   Tessler that would not only indemnify the estate for these

13   costs but we believe also indemnify the debtors for the

14   borrowed money.  So the estate's walking away from an awful lot

15   here.

16          So, we come back to the initial question as to whether

17   we believe the debtors are receiving sufficient value for the

18   payments they are making and just based upon this record, Your

19   Honor, we just believe the answer is no.  We don't believe the

20   record supports that there's a premium that's being derived

21   from this asset sale.  In fact, we think the record supports

22   that the asset sale is at fair market value.  We don't believe

23   there's any other compelling justifications that have been

24   established to sell the asset now.

25          Importantly, there's -- Your Honor, we recognize that

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 73 of 126

Page 73

1    the dollars involved here, the nineteen million dollars which

2    is what we principally have an issue with, is relatively small

3    in the context of the big picture of this case.  So we

4    struggled over whether it was worth our time and frankly

5    whether it was worth your court's time to even rise on this.

6    And we concluded it was because of two reasons, Your Honor.

7    We're concerned about the type of precedent that this request

8    sets.  While this is a relatively small transaction, it doesn't

9    take many similar types of transactions for it to become

10   meaningful.

11          So nineteen million dollars is a meaningful sum of

12   money in the context of this case, not such a meaningful sum of

13   money but there are thousands of transactions that's coming

14   through this court, it can become meaningful.

15          More importantly, there's a lot of big transactions

16   that come through this court on motion practice and

17   appropriately so, but they are big transactions.  And we think

18   this type of payment, the reasons why they're being paid,

19   because of the litigation on the foreclosure action, it's just

20   not supported here, Your Honor.

21          Now interestingly, Your Honor, before this hearing

22   somebody asked me with respect to the objections, and you know

23   my coming in guns ablazing, I didn't think our objection was a

24   guns ablazing objection.  It certainly wasn't intended to be.

25   We're not criticizing the debtors and we're certainly not

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 74

1    criticizing Mr. Fitts with respect to their efforts to get

2    something done here.  We, as Mr. Fitts had noted on the record,

3    he's very accommodating to us and our clients with respect to

4    questions we had.  We understand he's working very hard and

5    that he also has a lot on his plate.

6         It's simple; we just think a mistake has been made

7    here.  Mistakes get made sometimes.  We just don't think the

8    record supports this transaction and we would ask the Court

9    deny the motion.

10        Your Honor, unless you have questions for me, I don't

11   have anything else to add.

12        THE COURT:  Does the ad hoc committee have a

13   collective opinion based upon consultation with financial

14   advisors or market experts as to what alternative would be more

15   appropriate for dealing with this property?

16        MR. UZZI:  Yes, Your Honor.  Based upon -- the members

17   of my steering committee have all their own internal ability to

18   analyze the situation.  They too expect that the asset is going

19   to be bid up based upon their own internal analysis.  So they

20   think there's more upside in this asset.

21        They don't believe the asset value is going to go down

22   and I would say they're probably bullish on asset values going

23   forward.  Now people were bullish in the past and got that

24   wrong, too, so that's just their view.  They think the better

25   course of action right now is to proceed with the foreclosure

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 75

1    action.  We don't think the cost of it is going to be five

2    million dollars.  We think that's kind of high.  But even at

3    five million dollars to proceed with the foreclosure action, we

4    think with the risk/reward, if there's thirty million dollars,

5    maybe forty million dollars of upside, pay the five million

6    dollars.  That's what we recommend, Your Honor.

7            THE COURT:  Thank you.

8            MR. UZZI:  Thank you.

9            MS. MARCUS:  Very briefly, Your Honor, just a couple

10   of points.  The first I think is the fundamental issue.  The ad

11   hocs reference the fact that they think that the property will

12   be bid up at the auction.  They're not focusing on the fact

13   that if we don't have this settlement approved, there is no

14   auction.  There will not be an auction on June 29 and whatever

15   interest there is in the property right now again as we've

16   noted, we don't know if that interest will be there whenever

17   the foreclosure is concluded.

18           Secondly, in terms of the nineteen million that's

19   going to the borrowers, I just wanted to emphasize, Your Honor,

20   that the L&L purchaser is paying the transfer taxes which we

21   estimate could be as much as nine million dollars.  If the

22   transaction doesn't go forward and we foreclose on the

23   property, the Lehman estate will have to bear that nine million

24   dollar cost.  So it's really not fair to look at it as nineteen

25   million dollars.  I think it's more appropriate to look at it

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 76 of 126

Page 76

1    as ten million dollars.  Sorry about that.

2            And thirdly, Your Honor, the fundamental issue here is

3    that the test that the Court is to apply based on the precedent

4    in this circuit and others is whether this settlement is a

5    reasonable settlement and whether the debtors have satisfied

6    the business judgment standard.

7            We believe that the record does support the fact that

8    the settlement is reasonable and that the debtors should be

9    authorized to proceed with the settlement.  The debtors believe

10   that the relief requested in the motion is in the best interest

11   of the debtors and their creditors and accordingly, we request

12   that the Court approve the proposed settlement agreement.

13           THE COURT:  Okay.  Anything more from the committee?

14           MR. O'DONNELL:  Your Honor, just one point.  On the

15   precedent this may set, I think we find it hard to credit that

16   allegation because we look at each transaction on its merits

17   and what happened in this transaction is unique to this

18   transaction.  We don't believe there are a lot of other

19   situations out there that will require a transaction structured

20   like this.  But we will look at the next one with fresh eyes

21   and evaluate it from that perspective and not allow the debtors

22   to pursue something solely based on this precedent.

23           THE COURT:  All right.  Thank you.  I'm granting the

24   debtors motion and overruling the objection of the ad hoc

25   committee but I'll note that looking at the ad hoc group's

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 77

1    limited objection in preparation for the hearing, I came to the

2    conclusion that a number of reasonable arguments were being

3    made raising questions as to whether or not this was the right

4    business decision and, in effect, what has been the subject of

5    this morning's contested hearing amounts to a review of

6    business judgment that is subject to different opinions.

7            That's the nature of business judgment and every trade

8    made in the market is made at a time when somebody thinks it's

9    a good time to sell and somebody else thinks it's a good time

10   to buy.  And both may be right, as a matter of fact.

11           Here, as I understand the evidence which is for all

12   practical purposes uncontroverted because Mr. Uzzi's questions

13   really don't undermine the judgments reflected in the proffer

14   of Mr. Fitts' testimony nor does it undermine the pleadings

15   filed by the estate and the creditors committee.  I don't mean

16   to minimize the significance of what's going on here but this

17   is a garden variety real estate workout, something familiar to

18   probably every lawyer in the room.  And it is not uncommon in

19   such circumstances for those who control the property to be

20   offered certain incentives to cooperate.  In effect, that's

21   what I see here.

22           And I fully appreciate the fact that third-parties who

23   are not directly involved in the negotiations could come to the

24   conclusion that a better alternative to peace is war.  And

25   that, in effect, is what the ad hoc committee is telling me.

Page 78

1    In response to my question, Mr. Uzzi indicated that in effect

2    the sophisticated business people who are his clients wouldn't

3    make this deal and instead would choose to litigate, take

4    control of the property and in effect assume the costs of going

5    forward in a litigation.  The debtors and the creditors

6    committee obviously disagree and think that the transaction

7    that's before the Court is a rational one that makes sense

8    under the present circumstances and that particularly with L&L

9    in the picture, that there is a highly motivated buyer.  And

10   having invested the time and the effort to get us to this

11   point, they urge that I endorse their business judgment and I

12   do.

13        I also note and Mr. Uzzi in his remarks notes this as

14   well, that in the context of the Lehman bankruptcy case which

15   is long in real estate assets, this particular transaction is

16   unremarkable.  The fact that we have spent as much time

17   assessing this proposed transaction is a demonstration that the

18   parties-in-interest in this bankruptcy case are paying close

19   attention to transactions large and small and as noted in Mr.

20   O'Donnell's comments, there is some concern about precedential

21   impact of transactions and how approving one may be viewed as a

22   paradigm for others.  I don't view this as a paradigm for

23   anything other than this particular property, this particular

24   guarantor and this particular opportunity to monetize an asset.

25   It's approved and the objection is overruled.

Page 79

1           MS. MARCUS:  Thank you, Your Honor.  That completes

2      our agenda for today.

3           THE COURT:  Well, there is this --

4           MS. MARCUS:  Oh, I'm sorry.

5           THE COURT:  There is this Goldman Sachs --

6           MS. MARCUS:  I've forgotten.

7           THE COURT:  -- this Goldman Sachs issue and are you

8      going to come forward and put something on the record?

9           MR. HARWOOD:  Good morning, Your Honor.  Michael

10     Harwood from Kasowitz, Benson, Torres & Friedman for the

11     debtors on this matter.  I apologize for the interruption

12     before.

13          THE COURT:  No problem.

14          MR. HARWOOD:  We have resolved the matter involved in

15     the motion to compel between us and Goldman Sachs.  The parties

16     have agreed to a particular schedule and a date certain for

17     production of the materials that we had requested in that we've

18     agreed to and have agreed to reserve and preserve all rights as

19     between us, so that that time period will not affect any

20     parties' interests.  The parties are back at the office putting

21     that into writing in a stipulation.  And that will be, I

22     expect, filed with the Court by the end of the day today.

23          THE COURT:  And you'll be looking for that to be so-

24     ordered?

25          MR. HARWOOD:  Yes, Your Honor.

1          THE COURT:  All right.  Fine.

2          MR. HARWOOD:    Thank you very much.

3          THE COURT:  Thank you.  I think that concludes the

4     morning calendar.  We're adjourned until 2 p.m.

5          MS. MARCUS:  Thank you, Your Honor.

6          THE COURT:  Thank you.

7       (Recess from 11:43 a.m. to 2:05 p.m.)

8          THE COURT:  Be seated please.  Good afternoon.  Mr.

9     Slack, how are you?

10         MR. SLACK:  Very well, Your Honor.  Your Honor, this

11    afternoon we are here for a case conference.  The first matter

12    on the docket is a case conference in the Ballyrock matter.

13    Your Honor, after you issued your opinion, I am happy to report

14    that the debtors have talked to defense counsel and have

15    reached agreement on essentially two orders that are designed

16    to, subject obviously to your approval, to be entered at the

17    same time.

18         MR. SLACK:  The first, Your Honor, is an order which

19    effectively is an order designed to deal with the motion to

20    dismiss that you granted in part and denied in part.  And the

21    other is a scheduling order, again which is designed to go

22    along with it.  A couple of words on the scheduling order.

23         It was debtors' view that the action should proceed

24    now as a normal action and the first step, Your Honor, that we

25    anticipate is filing an amended complaint.  So we propose that

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 81 of 126

Page 81

1    to the defendants.  We proposed it, in fact, as part of the

2    order denying the motion and granting the motion in part.

3    We've since worked out this solution where we have an agreement

4    to allow the debtors to file an amended complaint.  That would

5    be in the next twenty-one days.  The defendants would then have

6    twenty-one days to respond, move, answer or otherwise respond

7    to that complaint.  If they answered, Your Honor, my

8    expectation is we'd work out a discovery schedule at that point

9    and be back here if they move.  My expectation is we'll work

10   out a briefing schedule and have that.

11            The other piece to that, Your Honor, is that the

12   defendants have indicated a desire to seek an interlocutory

13   appeal of Your Honor's opinion and what's built into the

14   scheduling order is the ability for them to file that motion, I

15   think it's within fourteen days of us filing the amended

16   complaint.  And there's a timing issue under the rules for

17   that, Your Honor, which is why -- part of the reason why these

18   orders are meant to be executed by Your Honor if you agree with

19   them at the same time.

20            THE COURT:  Tell me about the timing.

21            MR. SLACK:  Why --

22            THE COURT:  What's the timing issue?

23            MR. SLACK:  The timing issue is that I think under the

24   rules, there can be an extension of twenty-one days from -- of

25   the period to file a motion seeking interlocutory appeal.  So

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 82 of 126

Page 82

1    what that would mean is that if you sort of do the math and you

2    give us twenty-one days to file an amended complaint, and then

3    I think the way the stipulation says is that or that the joint

4    motion is that they have fourteen days after that in order to

5    file their interlocutory appeal.  It works out to the thirty-

6    five days that I think they have under the rules to do that.

7             THE COURT:  Okay.

8             MR. SLACK:  And that would key off of your order

9    granting in part and denying in part, the motion to dismiss.

10            THE COURT:  Okay.  Not that I am asking anybody to

11   reveal litigation strategy but is it likely that that will be a

12   controverted motion for interlocutory appeal or is that

13   something that's going to go forward on a consensual basis?

14            MR. SLACK:  No, Your Honor, we believe that, and we

15   haven't talked to the defendants about it but we don't believe

16   that an interlocutory appeal is proper.  So we would expect

17   there to be motion practice on that before the appeal would be

18   either granted or not granted by the district court.

19            THE COURT:  My immediate reaction to this is this

20   sounds like a good news/bad news presentation.  The good news

21   is that you are working cooperatively with your adversaries in

22   developing a set of parallel orders that will accomplish the

23   litigation objectives of the parties in the short term but the

24   bad news is that this creates a whole host of potentially time

25   consuming and expensive litigation frolics and detours.  And

Page 83

1    I'm not really particularly excited about that, not that I have

2    any control over what parties choose to do.  I'm particularly

3    disappointed in light of the fact that prior to the issuance of

4    the memorandum decision, I was aware based on telephonic

5    conferences that at least the parties were endeavoring to talk

6    about a merits settlement.

7            Is there any potential for the parties to get back to

8    the drawing board of either settlement discussions or perhaps

9    mediation?  We spent part of this morning's calendar talking

10   about the success of the debtors' alternative dispute

11   resolution protocols in matters not terribly different from the

12   Ballyrock dispute in terms of the kinds of matters that are

13   going to mediation routinely.

14           I don't understand why this case is any different from

15   those cases.  I stayed a whole bunch of litigation this morning

16   to give peace a chance.  Why isn't peace possible here?

17           MR. SLACK:  Well, Your Honor, I would echo I think the

18   comments you just made, at least from the debtors' standpoint.

19   We are prepared to sit down and continue those discussions.

20   I'm not aware of whether those discussions have continued post

21   your decision.  I would imagine that the principals have talked

22   because there's a number of matters where the principals have

23   reason to talk.  But I'm not aware of any further discussion.

24           But we would welcome those and we would certainly

25   agree to sit down either in a mediation or outside a mediation.

```
 1    So we certainly take your comments I think serious and to

 2    heart.

 3              THE COURT:  Are there parties-in-interest present who

 4    would object to proceeding with an alternative dispute

 5    resolution approach to this and doing it now?

 6              MR. SLACK:  Let me see the --

 7              THE COURT:  Well, this is a pretrial conference, so I

 8    want to find out whether or not I'm barking down a path of

 9    maximum resistance.

10              MR. LACY:  Your Honor, Rob Lacy from Sullivan and

11    Cromwell for Barclays Bank.  Barclays is always happy to

12    discuss a settlement and is, in fact, constantly talking about

13    settling a variety of issues with all of these related estates.

14    I have no instructions on this subject.  I don't think that

15    there have been any discussions concerning this case since we

16    announced an impasse a couple of weeks before you issued your

17    decision and they don't always tell me what they're talking

18    about, but I haven't heard about anything.

19              I do think that Barclays would resist anything that

20    slowed down the process of the motion for permission to appeal

21    and, in fact, the rules don't allow the time period for doing

22    that to the extended by more than twenty-one days which we've

23    already asked the Court to do that maximum extension.  So

24    that's got to go forward.

25              THE COURT:  Well --
```

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 85 of 126

Page 85

1          MR. LACY:  But we're happy to talk in the meantime, I

2     think.

3          THE COURT:  I think as you know there are cases on the

4     adversary docket in the Lehman case that have gone down the

5     path of appeals to the district court and they have been

6     routinely settled while those appeals have been pending.

7          MR. LACY:  Yes.

8          THE COURT:  Everything from Metavante to Perpetual.

9          MR. LACY:  No, the appeal process actually seems to be

10    a good thing for settlement.

11         THE COURT:  I don't know if it's a good thing for the

12    district court judges but it certainly doesn't affect my life.

13    What does affect my life is the management of cases that I'm

14    responsible for and I'm just concerned about this one, in part

15    because quite a lot of time went by.  Part of that was my

16    doing.  But it also does not to me seem the least bit

17    exceptional when compared with the portfolio of other cases

18    that are going into ADR.

19         I don't mean to ask you to comment one way or the

20    other as to whether I am right but Ballyrock to me is of a

21    piece with a whole bunch of other comparable litigation much of

22    which is being settled.

23         MR. LACY:  As Your Honor observed in the NY Corporate

24    Trustee's Services decision which was the basis for your

25    decision in this case, you expected that decision to be

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 86

1    controversial and it was to some degree, new law.  And we agree

2    with Your Honor about all of those observations.

3         So to some degree this proceeding involves more, if

4    you will, sort of novel and untested legal issues than many of

5    the other cases that are being settled.

6         THE COURT:  But Perpetual was settled.

7         MR. LACY:  That's correct.

8         THE COURT:  That case was settled.

9         MR. LACY:  That's correct.

10        THE COURT:  So the fact that the case was for all the

11   reasons that you said and I said in the opinion, unprecedented,

12   didn't impede the ability of parties to reach a result.

13        MR. LACY:  Well, listen, Your Honor, again I emphasize

14   that Barclays is always happy to talk about a settlement and I

15   think it would be happy to do that in any context and under any

16   procedure, except that we do have to have this motion for

17   permission to appeal go ahead under the -- because basically,

18   no one has the power to extend the schedule for doing that.

19        THE COURT:  Okay.  Well, to the extent -- I'll hear

20   from everybody else but to the extent that there's a message

21   here which I'm looking for you to react to, it's that I'm

22   perfectly prepared to enter consensual orders that relate to

23   scheduling and that preserve the rights of the parties as it

24   relates to motions for interlocutory appeal, opposition to such

25   motions, briefing schedules, and the like, but I'd like the

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 87

1    parties to at least react to the concept of resolving this case

2    instead of litigating around the edges.

3           MR. CROWELL:  Your Honor, I'm Nick Crowell from Sidley

4    Austin for Black Rock.  Like Mr. Lacy's client, my client is

5    always willing to discuss settlement in any context.  I'd need

6    to speak to them if they would be willing to go forward with

7    any type of ADR process.

8           I will say that before your plan was issued, my

9    clients had very little minimal contact with the debtor about

10   settlement despite the representations that were sometimes made

11   on the calls.  And the last thing that I had heard from my

12   client was that they were not even in the same ballpark.  So

13   I'm not exactly sure that that type of process would work but

14   again, my client would be willing to listen but I do echo Mr.

15   Lacy's comments and I think that the appeal process does need

16   to go forward because of the requirements of the time under the

17   law.

18           THE COURT:  Okay.

19           MR. DAKIS:  Your Honor, Robert Dakis from Quinn

20   Emanuel for the committee.  Just to make sure the record is

21   clear on the committee's position, of course the committee

22   would favor settlement discussions through any mechanic, either

23   through the ADR process or outside of the process and we would

24   welcome such discussions.  Thank you.

25           THE COURT:  Okay.  I really started something here,

1    didn't I?  Yet another speaker.

2            MR. HOWARD:  I'll be brief, Your Honor.  Good

3    afternoon.  Casey Howard from Locke Lord on behalf of Wells

4    Fargo as trustee.  Obviously, we don't oppose settlement.  I

5    appear really for the point of just drawing to the attention of

6    the Court, as well as debtors' counsel that to the extent that

7    they wish to amend the complaint, I've spoken with some of Mr.

8    Slack's colleagues and it's unclear as to whether or not they

9    intend to allege new claims against Wells Fargo as trustee.

10   We, of course, rely on the June 3 order of the Court which is a

11   pretty board release and protection against Wells Fargo as

12   trustee for any claims.

13           THE COURT:  okay.

14           MR. SLACK:  So with that, Your Honor, I think from the

15   debtors' standpoint, what I can represent to the Court is that

16   after this conference we will make efforts in contacting all of

17   the parties here and start a process to try to talk.  I did

18   hear that everybody was willing to at least sit down and try to

19   do that.  So hopefully that will move this process.

20           THE COURT:  It would have been politically incorrect

21   for anyone to have disagreed with the general proposition that

22   I asserted.  So the fact that they said yes doesn't necessarily

23   mean that they're earnest in moving forward.  I'd like them to

24   be but I can't make that happen.

25           MR. SLACK:  Well, we will I think at least see if

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 89 of 126

Page 89

1    there's a possibility of doing that.  In the meantime, Your

2    Honor, we will submit to Your Honor the orders and I guess I

3    leave it to Your Honor as to when to enter them in the sense

4    that once Your Honor enters them, I think under the orders,

5    there's going to be a thirty-five day period for the defendants

6    to file their interlocutory appeal.  So that's the timing

7    issue, I think from their standpoint under the orders we're

8    going to submit once you sign the order on the motion to

9    dismiss.

10          And so with that, Your Honor, unless there's anything

11   else you would like to ask the parties who are collected, I

12   think that's where we are.

13          THE COURT:  Okay.  And those orders are drafted to the

14   satisfaction of counsel at this point and they're ready for

15   submission?

16          MR. SLACK:  They are and we should be able to submit

17   them, I would expect this afternoon but maybe first thing in

18   the morning at the latest.

19          THE COURT:  And do the parties have any prospective on

20   the most propitious timing for the entry of those orders?  Is

21   it the view that they should be entered as promptly as

22   practicable or is there any view that there might be some value

23   in avoiding the ancillary litigation expense by sitting down

24   right away?

25          MR. SLACK:  Well, I think Your Honor hit it on the

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 90 of 126

Page 90

1    nose earlier which is we will go back and immediately reach out

2    and try to start this process and given that there's been at

3    least some representations that people are willing to sit down

4    and talk, I would say from the debtors' standpoint, you know,

5    not having the expense of going through multiple motions doing

6    amendments, would be a benefit to the estate.  So from the

7    debtors' standpoint, holding off for some amount of time I

8    think would be appropriate but I can only speak from the

9    debtors' standpoint.

10        THE COURT:  One of the things about this case, I am

11    going to pre-empt Mr. Lacy's remarks, I can almost anticipate

12    what he's going to say; I may be wrong but I am going to take a

13    wild stab at this, the parties endeavored prior to the issuance

14    of the Court's order and decision to try to resolve their

15    differences with what I assume was a reasonable expectation as

16    to the general contours of what that decision might look like.

17    And despite the investment of some significant time, although I

18    have no idea how much effort actually went into it, the process

19    was not a successful one.

20        I contrast this case with Harrier, not that the cases

21    are the same, they were argued on the same day, and Harrier

22    resulted in a settlement.  So hope spring's eternal that maybe

23    a settlement is possible here.  But I am not going to delay the

24    enter of the orders in part because I delayed the entry of the

25    memorandum decision in order to encourage the parties to reach

Page 91

1    a settlement.  I also needed the time to separate the Harrier

2    decision from the Ballyrock decision because they were co-

3    joined in almost every way.

4          So for that reason, I'll enter the orders in the

5    ordinary course probably before the end of the week, it might

6    be early next week.  And I encourage the parties to engage one

7    another in a good faith effort to try to resolve this either

8    with or without the involvement of a skilled mediator.

9          It seems to me, however, that given the history of the

10   discussions to date, that the parties might be aided in the

11   process of discussing these issues by having a mediator

12   familiar with the derivatives book at Lehman to act as a

13   facilitator and I encourage that but I'm not ordering it at

14   this moment.  The parties are sophisticated here and can plot

15   their own destinies as well as anybody.  So I'll take the

16   orders when you're ready and we'll see what happens next.

17          MR. SLACK:  Thanks, Your Honor.

18          MR. LACY:  Thank you, Your Honor.

19          MR. WIN:  Good afternoon, Your Honor.  Zaw Win, Weil

20   Gotshal Manges for the debtors.  The next matter on the agenda

21   is the motion of Kathleen Arnold and Timothy Cotten for the

22   Court's determination.  Just as a brief preface, the debtors

23   understood from the Court's comments at the May 18 hearing that

24   these matters would all be moved to the July 20 hearing at

25   which time the Court would have an opportunity to discuss or to

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 92 of 126

Page 92

1    decide on subject matter jurisdiction.

2            THE COURT:  That's correct.  I mean let me be clear.

3    First of all, let me find out first of all if Kathleen Arnold

4    and Timothy Cotten are on the telephone.  I don't see them in

5    the courtroom.

6            MS. ARNOLD:  We are, Judge.

7            THE COURT:  All right.

8            MS. ARNOLD:  We enter our appearance.

9            THE COURT:  At the last hearing, I think I was fairly

10   clear in stating that the expedited motion would in fact not be

11   expedited but will be deferred until after the Court herd on

12   the merits the debtors' motions to dismiss the adversary

13   proceeding.  And we spent some time during the last status

14   conference discussing the possibility that the plaintiffs might

15   engage counsel so that they might be better equipped to deal

16   with the sophistication of the legal arguments that they need

17   to address in order to overcome a motion to dismiss based upon

18   subject matter jurisdiction.

19           So one of my questions for the plaintiffs is whether

20   first, you have made any progress in engaging a lawyer, and

21   second, whether you wish to engage a lawyer.  It's ultimately

22   your choice to do that or not do that.

23           MS. ARNOLD:  May we speak now?

24           THE COURT:  Yes, and please speak up because at least

25   I am having some difficulty hearing you and you may not --

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 93 of 126

Page 93

1           MS. ARNOLD:  It's terrible, Your Honor, I know.

2           THE COURT:  -- be on the record if you're not picked

3      up by the recording equipment here in court.

4           MS. ARNOLD:  Okay.  One moment, sir.  I'm just trying

5      to turn this down completely.

6         (Pause)

7           MS. ARNOLD:  Hello, I am sorry.  Yes?  Yes, Your

8      Honor, I'm sorry.

9           THE COURT:  Question one is --

10          MS. ARNOLD:  Yes.

11          THE COURT:  -- have you been looking for a lawyer?

12     Question two is do you want a lawyer?

13          MS. ARNOLD:  Yes, we want a lawyer and yes, we have

14     made substantial effort in trying to.  We followed up to

15     your -- on your -- I was going to send you over a written

16     report of who we contacted but that's substantial and we're

17     still contacting people as we talk right now.  We contacted our

18     local pro bono who sent us to some pro bonos up in New York and

19     other places.

20          MR. COTTEN:  With more time, Your Honor, we do believe

21     we can, you know, get somebody to serve as -- to help us.  It's

22     been -- it's just been horrendous dealing with it so far.

23          MS. ARNOLD:  We understand -- we do want to say this

24     officially.  We have the utmost appreciation for what lawyers

25     and judges go through.  And hearing these cases we understand

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 94 of 126

Page 94

1    that.  It's a lot of work.  We know that and we do not take

2    anything that we're doing very lightly at all.  We spent three

3    days just trying to respond to the brief that we just

4    submitted.  I do respect the Court, the judges and the lawyers.

5    I understand how hard this work is.  So it's not anything we

6    take lightly.

7            We are -- we are aware that our rights will be

8    affected by the discharge in reading the debtors proposed plan

9    and that's the other thing, just the voluminous nature of these

10   proceedings, we understand and we know and we are not trying in

11   any way to be frivolous or wasteful or anything.  So we want to

12   put that out there.

13           Yes, we do want a lawyer.  We would love to have a

14   lawyer.  We've had seven lawyers, Your Honor.  In almost seven

15   years we've had seven.  Our last lawyer right now is being

16   disbarred.  He's in disbarment proceedings in D.C. over

17   defrauding his clients.

18           THE COURT:  Okay.  Let me try to cut through and

19   understand what you've just said.  And it's difficult because

20   you're not physically present in court and you seem to be --

21           MS. ARNOLD:  I understand, Your Honor.

22           THE COURT:  Just let me finish what I am saying so

23   that we can have as understandable a record as possible.  That

24   means that we can only speak one at a time.

25           I believe that you said that you would like to get a

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 95

1    lawyer and that you need some more time to try to get a lawyer.

2    And that you've had seven lawyers in your --

3            MS. ARNOLD:  Seven years.

4            THE COURT:  -- various litigations that relate to what

5    happened to your home.  And that if I gave you some more time,

6    you would continue the process of looking for a lawyer.  Did I

7    understand all that correctly?

8            MS. ARNOLD:  You did, Your Honor.

9            THE COURT:  All right.  How much time -- first of all,

10   I'm in no hurry on this.  I don't even know if the debtors are

11   in a hurry on this.  One of the things that is bothering me and

12   you should know, is that there are perhaps twenty people in the

13   courtroom right now and they are not here necessarily to listen

14   to this.  They're here on other matters that are on the

15   afternoon docket.

16           Based upon the complaint that you have lodged, and

17   based upon the motion to dismiss, it seems apparent to me that

18   you have brought claims against Lehman Brothers Holdings Inc.

19   that Lehman Brothers Holdings Inc. as a separate entity has no

20   liability for, even if you're right.  And that's the problem.

21           The problem is that you've made claims that relate to

22   whether they're correct or incorrect, a subsidiary of Lehman

23   Brothers Holdings Inc. that is not a debtor before me.  For

24   that reason, I am likely to dismiss your complaint.  I'm not

25   saying I've made the decision to do that but at the last

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 96 of 126

Page 96

1    hearing in May, a similar matter was before the Court that

2    involved some claims against Aurora.  I entered a motion to

3    dismiss that.

4              MS. ARNOLD:  What is the case, Your Honor, please?

5              THE COURT:  I can't do legal research for you.

6              MS. ARNOLD:  I'm not asking you --

7              THE COURT:  I'm simply telling you that at the last

8    hearing --

9              MS. ARNOLD:  No, no.

10             THE COURT:  -- on May 18, one of the matters that was

11   before me was an adversary proceeding.  There was a motion to

12   dismiss brought.  I granted the motion to dismiss.  Now while

13   the facts are entirely different, the legal principle is the

14   same.  I do not adjudicate claims against non-debtors.  I only

15   deal with matters that arise out of or relate to the bankruptcy

16   cases that are assigned to me.  And I believe as a result, that

17   it is highly likely even if you have a lawyer, that I will

18   dismiss your case, unless you can show me and I don't know that

19   you're going to be able to , that your claims somehow are

20   properly asserted against the ultimate parent.

21             There are substantial issues in this bankruptcy case

22   that go to the questions of whether or not these debtors before

23   me should be administered separately or on a consolidated

24   basis.  It's one of the most fundamental questions in the case.

25   It is not going to be decided in your adversary proceeding.

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 97 of 126

Page 97

1    And at this moment --

2            MS. ARNOLD:  It's not -- that's not --

3            THE COURT:  Excuse me.  I'm not quite done.  At this

4    moment, on its face it appears that you are not entitled to

5    relief.  I recognize that you feel aggrieved.  I recognize that

6    you have litigated these issues for many years both in the

7    state court and in the federal district court and at the

8    appellate level, but that doesn't give you a right to be here.

9            And so while I am not deciding the question now, I'm

10   giving you comments in much the same way that I gave comments

11   to the lawyers who appeared in the case just before yours.  The

12   principle comment is please find a lawyer who can tell you

13   whether or not you have a basis to proceed because I believe

14   you are wasting your time and I believe you are wasting the

15   Court's time.

16           MS. ARNOLD:  I mean I -- obviously I don't agree with

17   that.  I just like I said --

18           THE COURT:  Well --

19           MS. ARNOLD:  I respect Your Honor's --

20           THE COURT:  -- you don't have to agree with me but you

21   have to get a lawyer who can explain this to you.

22           MS. ARNOLD:  We are trying to do that, Your Honor.

23           THE COURT:  And we are not going to hear this today.

24   And we're not going to hear this on July 20 either because you

25   need to find a lawyer and if you can't find one, there will be

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 98 of 126

Page 98

1  a hearing.  You will be physically present.  You will have

2  filed papers in response to the motion to dismiss.  You will

3  try to explain as best you can why you believe that the

4  complaint that you have filed against Lehman Brothers Holdings

5  Inc. is a complaint that belongs before me in New York.

6        MS. ARNOLD:  Thank you, Your Honor.

7        THE COURT:  Okay?

8        MS. ARNOLD:  Thank you.

9        THE COURT:  So what I suggest is that you have a

10 conversation relating to scheduling.  I am in effect adjusting

11 the oral order that I entered last time which listed this for

12 hearing on July 20, giving you more time to find a lawyer and

13 encouraging you to work out a date by which you will either

14 file papers in opposition to the motion to dismiss or the

15 motion to dismiss will be deemed unopposed.  And if it

16 unopposed, I will grant it.

17       MS. ARNOLD:  Okay.  So we have to agree on a date that

18 will be --

19       THE COURT:  Either that or I will tell --

20       MS. ARNOLD:  -- sufficient date --

21       THE COURT:  Can you agree to things with counsel

22 because I have done this -- I did this last time, as well.

23       MS. ARNOLD:  No, Your Honor, I understand.  No, I --

24       THE COURT:  Let me explain something.  Due process

25 involves predictability, schedules that people comply with,

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 99

1    fair notice to your adversary, and an opportunity before an

2    unbiased tribunal to be heard.  You're going to have that right

3    but that means answering the motion to dismiss and you're

4    either going to do that on your own or you're going to do it

5    with a lawyer.  Or you're going to choose not to do it.

6              If you do it on your own, because you're doing it

7    without a lawyer, it will be by a date that either I set or

8    that you agree to with your adversary.  If you can't reach an

9    agreement as to when that will be, I will set the date.

10             MR. COTTEN:  That's perfectly acceptable.  Thank you,

11   sir.

12             THE COURT:  Can't hear you.

13             MR. COTTEN:  I said perfectly acceptable.

14             THE COURT:  Fine.  Okay.

15             MR. WIN:  Could I ask a quick question?

16             THE COURT:  Sure.

17             MR. WIN:  Just so we're totally clear, so the only

18   matter that will be on at that hearing is the debtors' motion

19   to dismiss.

20             THE COURT:  Yes.

21             MR. WIN:  Okay.

22             THE COURT:  And that's consistent with what I said

23   last month.

24             MR. WIN:  Thank you, Your Honor.

25             THE COURT:  All right.  We'll move on to the next one.

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 100

1           MS. LEMMER:  There are three related matters;

2    Turnberry, Lehman Brothers v. J. Soffer and another one, Lehman

3    v. J. Soffer.  I'll take appearances.

4           MS. LEMMER:  Good afternoon, Your Honor.  Elisa Lemmer

5    from Weil Gotshal & Manges on behalf of the debtors.  Just as a

6    housekeeping matter, a pro hac vice motion was filed by one of

7    my colleagues on my behalf yesterday afternoon.  I checked the

8    docket this morning, an order entering the pro hac vice motion

9    has not been entered as of when I checked it.  So if you would

10   orally --

11          THE COURT:  We'll consider you admitted.

12          MS. LEMMER:  Thank you, Your Honor.  The motions that

13   are before the Court are not our motions.  They're motions

14   filed by Turnberry and Ms. Soffer.  I am happy to present but

15   because they're the movants, I'm happy to cede the podium to

16   them and respond accordingly, as well.

17          THE COURT:  Well let me first take appearances.

18          MR. RICHARD:  My name, Your Honor, is Dennis Richard

19   the law firm is Richard & Richard.  I am here as the attorney

20   for Mr. Jeffrey Soffer.

21          MR. BLUMENTHAL:  Good afternoon, Your Honor.  Elliot

22   Blumenthal from Buchannan Ingersoll & Rooney, here on behalf of

23   the Turnberry entities, Jacqueline Soffer, as well as Jeffrey

24   Soffer.

25          MR. ROMINE:  Good afternoon, Your Honor. Mario A.

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 101 of 126

Page 101

1    Romine.  I'm here on behalf of Fontainebleau Resorts, LLC.

2         THE COURT:  I couldn't hear you.

3         MR. ROMINE:  I'm here on behalf of Fontainebleau

4    Resorts, LLC.

5         THE COURT:  Okay.

6         MR. COHEN:  Good afternoon, Your Honor.  David Cohen,

7    Milbank Tweed Hadley & McCloy here on behalf of the official

8    committee of unsecured creditors.

9         MR. RICHARD:  One clarification, Your Honor.  I also

10   represent Jackie Soffer and Mr. Romine also put in pro hac vice

11   papers yesterday that had not yet been acted on.

12        THE COURT:  Okay.  Everybody who has pending pro hac

13   vice papers will be deemed admitted for the purposes of today's

14   argument.  And since I've never denied such an application, I'm

15   very confident that you will be actually admitted.

16        Now what's the order of play here?

17        MR. RICHARD:  Of the three related cases, the three

18   motions, we've reached agreement on two of them which encases

19   2821 and 2823 in which we've agreed to withdraw those motions

20   and file answers to those complaints on August 1.  July 31 is a

21   Sunday, so August 1.

22        THE COURT:  Okay.  I wish somebody had told me that

23   before I prepared so thoroughly for both of them.

24        MR. RICHARD:  We only reached the agreement just

25   before the hearing, Your Honor.  We apologize.  And we decided

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 102 of 126

Page 102

1    that the area was gray on those motions at this stage of the

2    proceeding, having analyzed all cases and the lawyers that

3    actually drew those motions are no longer present in 2821 and

4    2823.

5              So we are prepared to argue the motion on the cased

6    called the Town Square case, as well call it, with the Town

7    Square entities and Jeffrey Soffer.  That's case number 13555.

8    That's the motion to dismiss the four declaratory judgment

9    actions.

10             THE COURT:  Okay.  That's the one that involves the

11   Nevada single action rule?

12             MR. RICHARD:  Yes, sir.

13             THE COURT:  All right.

14             MR. RICHARD:  Yes.  Shall I begin?

15             THE COURT:  Sure.

16             MR. RICHARD:  The motion involves a single ground for

17   dismissal of Counts One through Four and two rounds for

18   dismissal of Count Four.  The single ground that is addressed

19   to all counts, each of which is a declaratory judgment count,

20   alleging a breach of one kind or another that occurred on or

21   before March of 2009; all four counts allege that.

22             The fourth, the breach, I'm using the word loosely

23   because it's alleging a violation of the automatic stay, Counts

24   One, Two and Three, allege a breach of -- Counts Two and Three,

25   a breach of loan agreements, Count Three an unjust enrichment

Page 103

1    prior to March of 2009.  All of the events in these DJ actions

2    occurred on or before March of 2009.

3        The first ground for dismissal of the DJ actions is

4    that the federal DJ Act is not available to adjudicate past

5    breaches or past events.  Lehman does not -- the debtor does

6    not dispute this.  Instead, the debtor argues and they actually

7    have a sentence that sums up their whole argument on page 4 of

8    their opposition which I quote, "is the uncertainty that

9    surrounds Lehman's right to foreclose on the collateral while

10   at the same time asserting the counterclaims required to defend

11   this action.

12       And the core of the uncertainty arises out of Nevada's

13   One Action Rule and their argument is that under the One Action

14   Rule, they must foreclose on their collateral before they

15   pursue claims to a monetary judgment.  And if they don't do

16   that, if they pursue claims to a monetary judgment, they can

17   forfeit their right to foreclose on the collateral.

18       THE COURT:  Is there anybody in the courtroom who is

19   an expert on the Nevada One Action Rule?  Is there a Nevada

20   lawyer in the room?

21       MR. RICHARD:  There is not to my knowledge, Your

22   Honor.

23       THE COURT:  So a bunch of non-Nevada lawyers are

24   arguing to a non-Nevada Judge about the application of the

25   Nevada One Action Rule which I presume is something that Nevada

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 104

1    lawyers know a lot about.

2         MR. RICHARD:  There are practically no annotations to

3    either the Nevada DJ Act which is also an exception to the

4    Nevada One Action Rule or for that matter, the One Action Rule

5    itself.  And that doesn't mean that Nevada lawyers wouldn't

6    have more expertise in this area, I would suggest that we have

7    four arguments that we think we could make relating to it

8    regardless of what the Nevada One Action Rule means.

9         THE COURT:  Yes, but you read a sentence from Lehman's

10   papers and I suppose I read that sentence along with all the

11   sentences that surrounded it in preparation for the argument

12   but as I read their papers, they were saying that in order to

13   preserve in a manner that is safe under the One Action Rule of

14   Nevada, claims that would otherwise be styled as monetary

15   damage claims, we've chosen to do that as declaratory judgment

16   claims.  And that doing it in this manner is somehow consistent

17   with what would occur in Nevada where practitioners finesse the

18   One Action Rule by styling claims for relief as if they are

19   declaratory judgment claims.  Now did I misread that?

20        MR. RICHARD:  I read that into their position as well.

21   However, I believe in Nevada, if Lehman were to have filed this

22   action in Nevada, it would be one action seeking to recover the

23   monetary judgment and to foreclose on the collateral.  It would

24   all be in one action.

25        It's only the division of this -- and it would be in

Page 105

1    Nevada obviously that they would have to foreclose on the

2    Nevada collateral.  And I would submit that it's only the

3    division of this litigation between two different courts and

4    two different jurisdictions that results in this anomaly.

5         THE COURT:  Well is this thing a purely procedural

6    issue because it seems to me that if in Nevada Lehman could

7    bring a unitary action that would both seek to foreclose and

8    seek a monetary judgment and not violate local practice, that

9    there should be a means to permit the same kind of relief in

10   this adversary proceeding or there may be other means that

11   Nevada lawyers or those familiar with local practice would

12   follow in order to permit a deviation from the One Action Rule,

13   so as not to waive rights.

14        What I believe has happening in the motion to dismiss

15   is that there's an attempt to wipe out all damage claims under

16   the guise of declaratory judgment claims on the theory that

17   declaratory judgment claims are impermissible.  But I also

18   understand that the declaratory judgment claims are product of

19   an amended pleading and that the amendment which was unopposed

20   was designed to get around the One Action Rule.

21        So what relief are you really seeking?  Are you

22   seeking outright dismissal of these claims because that's not

23   going to happen.  They're going to have leave to amend.

24        MR. RICHARD:  I understand, Your Honor.  The answer is

25   partially implicated with the rest of the argument of the

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 106

1    debtor.  The One Action Rule argument is coupled with an

2    argument under Rule 15 of the Federal Rules.  That being, that

3    we're required to bring all claims, all claims arising out of

4    the same transaction or occurrence as counterclaims in this

5    case in which my client is the plaintiff.

6           The problem with the approach they're taking, the flaw

7    in that argument is the initial claims which they amended were

8    suits on the note for a monetary judgment.  They're no longer

9    bringing those claims now.  We recognize that there may be a

10   means of dealing with this by way of amendment.  We are not

11   Nevada lawyers.  We believe that this -- this much we do know,

12   that the way that they have done it now is simply not

13   permissible under the Federal DJ Act.

14          There is nothing in the current complaint about the

15   Nevada One Action Rule.  All of the facts giving rise to the

16   current complaint are based upon past alleged breaches.  All of

17   the defenses that they claim they need to make my client's

18   complaint, as a result of the One Action Rule are already

19   pleaded as defenses.

20          And nothing about the One Action Rule in Nevada can by

21   rule amend or broaden what the Federal DJ Act can be used for

22   both under the plains word of the act and Brillhart and its

23   progeny as to how to use that act.  So that we would just

24   submit yes, we don't expect these claims to be dismissed with

25   prejudice.  We think that the debtor has choices here and that

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 107 of 126

Page 107

1    the DJ, however, is not one of those choices.  They have

2    choices of filing in Nevada where the collateral may be

3    sufficient to cover their indebtedness.  They have a number of

4    choices.  We just submit that one of those choices is not a DJ

5    action because no Nevada rule can change a federal statute.

6              THE COURT:  Well I must say, it's not clear to me that

7    these claims arise under a federal statute.

8              MR. RICHARD:  The statute that they're using is the

9    Federal Declaratory Judgment Act.

10             THE COURT:  Well, what I believe they're doing is

11   finessing the claims that are really damage claims by

12   characterizing them as declaratory judgment claims and doing so

13   openly as a means to avoid the potential adverse impact of the

14   One Action Rule that we've been talking about in Nevada.  So I

15   think it may be more of a labelling than it is anything else.

16             Now I hear what you're saying.  One way or another

17   they're going to bring these claims and one way or another

18   these claims are going to be brought in a manner that doesn't

19   prejudice their rights under Nevada law.  But everybody who is

20   talking about these issues, by their own admission, are not

21   Nevada lawyers.  That was my first question to the group.

22             So what do you want me to do?  Because I'm not going

23   to wipe out, and you know I'm not going to wipe out, these

24   affirmative defenses and counterclaims.

25             MR. RICHARD:  Well --

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 108 of 126

Page 108

1          THE COURT:  It's really just a question of how do you

2     properly plead in order to get around the potential adverse

3     impact of a local practice?

4          MR. RICHARD:  We haven't moved to strike their

5     affirmative defenses which was one of our four arguments that

6     when they said we need this in order to defend, all of the

7     allegations of the DJ are in their affirmative defenses to our

8     claim.  We're not challenging those in any way.  That's number

9     one.

10          Number two, what we would like this court to do is to

11     dismiss without prejudice the way that it has been approached

12     now to create an opportunity to plead it the correct way under

13     either Nevada law or the law applicable in this jurisdiction.

14     And of course we've got a little bit of a conflict of laws

15     issue here because a lot of the documents are subject to New

16     York law.

17          THE COURT:  But the remedies are subject to Nevada

18     law.

19          MR. RICHARD:  The remedies are subject to Nevada law.

20     So I think that it requires more thought to do it correctly.

21     When one factors in Rule 15 of the Federal Rules, by saying

22     that we are not going to proceed with our claims on the note

23     suing for a money judgment and we're deliberately not doing

24     that, they raise the spectre of exactly the issue that they are

25     arguing they're trying to avoid and that's waiver of a

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 109 of 126

Page 109

1    compulsory counterclaim because what the compulsory

2    counterclaim Rule 15 says is either bring the claim, in this

3    case for a monetary judgment or forever hold your peace.  And

4    so that by saying we're going to amend out of that claim into a

5    DJ claim, it doesn't accomplish the purpose and the rationale

6    behind what they're saying they're doing.

7           And so that we're suggesting that at his stage, that

8    it should be dismissed, these -- at least three or four DJ

9    counts without prejudice to see if they can amend, to perhaps

10   after consultation with Nevada counsel.  And that's our

11   commentary on three of the four counts.  There's still a fourth

12   count that we haven't addressed.

13          THE COURT:  The stay violation.

14          MR. RICHARD:  Yes.

15          THE COURT:  Do you want to go to that?

16          MR. RICHARD:  Yes.  The stay violation, the first

17   argument is the same that it's not an action on the stay

18   violation.  It's to declare that there was a stay violation.

19   So that ground we've already argued.  There's no one action

20   rule involved there.  They're using the DJ Act to try and get

21   an adjudication by way of declaration that some prior past

22   conduct was, in fact, a violation of the automatic stay.

23          The second ground for dismissal of the stay -- of the

24   automatic stay declaration, the way that we raised it in our

25   motion to dismiss is as we read the complaint, we thought that

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 110 of 126

Page 110

1    they were seeking a declaration that our adversary action

2    itself was a violation of the automatic stay.  And we argued

3    that way in our motion.

4         In their response, they've come back and they indicate

5    no, that's not the basis of our assertion.  Of course it's not

6    the basis because you could bring an adversary action.  Instead

7    they say the basis for violation of the automatic stay is

8    alleged in paragraphs 4 through 14 and 40 through 42 of their

9    counterclaim.  I've examined those paragraphs and the only

10   factual allegations in those paragraphs is a breach of a

11   promise to pay indebtedness.

12        The two cases that the debtor Lehman cites in their

13   response, the Citizen Bank v. Strumpf, which is a U.S. Supreme

14   Court case and Holden v. IRS, both say on their face that a

15   breach of a promise to pay is not a violation of the automatic

16   stay.  The examples of cases that they give in their brief

17   where the automatic stay was violated are cases where the IRS

18   or a bank puts a hold on money that belongs to the debtor and

19   exercises dominion and control over that money.  And, in fact,

20   those were factors in both of those cases.

21        In one case, which was the U.S. Supreme Court case,

22   Strumpf, they pointed out that under the law of that case the

23   money in the bank account was actually not money that belonged

24   to the debtor.  It was money that was owed by the bank to the

25   debtor, i.e, a promise to pay.  And then the Supreme Court goes

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 111

1    on to say that "breach of a promise to pay is never a basis for

2    violation of the automatic stay."

3            And the other case that they cite, Holden v. IRS, IRS

4    put a hold on a two thousand dollar -- it was a two thousand

5    dollar tax refund because the debtor owed the IRS 120 OR 170

6    dollars.  And they put a hold on the entire two thousand

7    dollars.

8            In that case, it was found that that was a violation

9    or might be a violation of the automatic stay.  The bankruptcy

10   court dismissed the action and the district court reinstated it

11   saying there may be a violation of the automatic stay but

12   emphasized citing Strumpf that if all it was was a breach of a

13   promise to pay, there could not have been a violation of the

14   automatic stay.

15           So our basis for seeking to dismiss Count Four is

16   those two bases.  It's an improper use of the DJ act and number

17   two, based upon all of the allegations there can't be a

18   violation of the automatic stay here.

19           THE COURT:  Okay.  Understood.

20           MS. LEMMER:  I'd like to clarify some of the points

21   that Your Honor aptly brought up earlier.  The plaintiffs

22   brought the action to this court first.  On the day that the

23   loan that Lehman had made to the plaintiffs matured, the very

24   same day they filed a breach of contract action, among other

25   things, against Lehman and Lehman as counsel pointed out, was

Page 112

1    compelled to answer and assert its compulsory counterclaims.

2         They filed its compulsory counterclaims and asserted

3    its damage actions and upon further review of the Nevada

4    statute, it recognized that that could potentially foreclose

5    its right to foreclose later on.

6         Now nothing that Lehman has done has been in a

7    sinister or a secret way.  As Your Honor noted, Lehman has been

8    very open about the reasons that it sought to amend its

9    compulsory counterclaims and that motion was actually unopposed

10   by the plaintiffs.

11        I understand that no one in this courtroom, Your Honor

12   -- I apologize, I'm having difficulties -- no one in this

13   courtroom, Your Honor, is a Nevada attorney but if it would

14   please the Court, I have copies of the Nevada One Action

15   statute with me and I'm happy to walk through Your Honor and

16   counsel, how it is that Lehman arrived at its decisions to

17   amend its counterclaims and show that the amendment that Lehman

18   sought is perfectly consistent with the language of the Nevada

19   statute.

20        Now Mr. Richard acknowledges there's a paucity of case

21   law on this issue but even reading the statute on its face it's

22   consistent with that.  If I could approach, I'm happy to hand

23   Your Honor a copy of the statute, as well as counsel and we can

24   go through this.

25        THE COURT:  If it will facilitate your argument, I'll

1    take a look at it.  I'm not happy about taking a look at it but

2    I'll take a look at it.

3         MS. LEMMER:  Well, Your Honor, I'm not interested in

4    disturbing the Court.

5         THE COURT:  Well, no, it's not that.  It's just it's

6    kind of consistent with how I started this discussion and

7    reading the pleadings in all three cases, it is apparent that

8    these cases one way or another tie to the same Fontainebleau

9    real estate project or Town Center project in Las Vegas.  No

10   doubt, given the sophistication of the parties involved, there

11   are plenty of Las Vegas lawyers who touched the documents.  So

12   it shouldn't be a mystery how one would go about exercising

13   remedies, at least under Nevada law and in a Nevada state

14   court.

15        I suppose the mystery or the question may be how the

16   Nevada One Action Rule, which you're about to take me through,

17   applies in an adversary proceeding within the Lehman

18   bankruptcy.  I rather suspect that there is nothing directly on

19   point in the material you're about to show me but I'm happy to

20   look at it.

21        MS. LEMMER:  Correct, Your Honor.  The material I was

22   about to show you is not to relate the Nevada One Action Rule

23   to the Lehman adversary but instead it was to point out the

24   bases for the amendments.  So, I'm happy not to walk Your Honor

25   through.  However, what the Nevada One Action Rule does provide

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 114 of 126

Page 114

1    is to the extent that an action has been commenced, that

2    violates the One Action Rule. Then to the extent that the

3    plaintiff, who commences that action, converts under Nevada

4    statute 40.35, converts that action to a declaratory action

5    that is not violative, then they won't risk -- that plaintiff

6    won't risk implicating the Nevada One Action Rule.

7             THE COURT:  And who says that?  Is that part of the

8    statute or is that commentary?

9             MS. LEMMER:  Yes, Your Honor.  It's part of the

10   statute.

11            THE COURT:  And under what authority would that

12   declaratory judgment be brought?

13            MS. LEMMER:  Well it could be brought under the

14   federal -- the DJA, Your Honor, or it could be brought under

15   whatever state declaratory judgment statute was in place.  The

16   Nevada statutes don't provide specifically which declaratory

17   judgment authority the plaintiff must rely upon.

18            THE COURT:  I think I understand this because I even

19   engaged in colloquy with your adversary in which I discussed --

20            MS. LEMMER:  Yes.

21            THE COURT:  -- my understanding of your papers to be

22   that the declaratory judgment styling of the counterclaims was

23   specifically undertaking within Delaware One Action Rule

24   practice to avoid waiving foreclosure rights.

25            MS. LEMMER:  Correct.

08-13555-mg   Doc 19962   Filed 08/25/11   Entered 09/15/11 09:18:58   Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 115 of 126

Page 115

1          THE COURT:  So I don't know that I need to see the

2     statute.  I gather that -- I'll look at it but I understand the

3     argument.  Your argument is that this is actually something

4     that's consistent with the statute.  That doesn't get us to the

5     next step which is is it consistent with federal pleading?

6          MS. LEMMER:  Well, Your Honor, yes.  We've sought --

7     the issue with federal pleading that counsel has raised is what

8     is the uncertainty and what is the harm and they allege that

9     the issues complained of were past acts.  But again, the

10    uncertainty and the harm as we've noted in our papers, is that

11    if we were to continue to pursue monetary damage claims as they

12    had been previously styled, we would risk violating the One

13    Action Rule.  Conversely --

14         THE COURT:  Let me just break in and better understand

15    that risk.  And again, I'm by no means expert in this area of

16    local practice and I think we've all confirmed that there's

17    nobody in the room who is an expert in this practice.  We could

18    probably find such a person.  But as I understand your papers,

19    the problem is triggered not by the pleading but by the entry

20    of a judgment.

21         MS. LEMMER:  Correct.

22         THE COURT:  Is that correct?

23         MS. LEMMER:  That's correct.

24         THE COURT:  So if we are at the pleading stage, and

25    you have all kinds of preparatory language in your complaint

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 116 of 126

Page 116

1    that says everything that we're doing in this pleading is

2    designed to avoid any waiver that might arise under the Nevada

3    One Action Rule as it relates to foreclosure and money

4    judgments.  And there are footnotes and all kinds italics and

5    that you can't miss that that's your position.  And we actually

6    end up in the unlikely event and I view it as unlikely, of a

7    trial of this particular adversary proceeding and you win, in

8    connection with your counterclaims, can't you control the

9    adverse effect, if any, of having won on any of your

10   counterclaims by simply not then entering judgment?

11          We were dealing with this at the very beginning of

12   this afternoon's adversary docket because I entered a

13   memorandum decision last month.  Nobody has an appealable order

14   yet.  There's no judgment yet.  Lawyers get together and they

15   work these things out.  Can't that happen here?

16          MS. LEMMER:  It's possible, Your Honor.  But there is

17   a concern that a judgment could be entered and there is a

18   concern that whatever the effect of that victory, that

19   hypothetical victory would be, could be construed as a judgment

20   for the purposes of the Nevada One Action Rule.

21          So rather than engage in a long process where parties

22   are incurring expenses litigating claims, monetary -- the

23   natural result of which could be a judgment, it seemed the more

24   prudent move to act consistent with the Nevada One Action

25   statute and convert as that statute provides to a declaratory

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 117

1    action and seek declaratory relief.

2         THE COURT:  I understand that but you're now needing a

3    motion to dismiss that says you're not entitled to that relief

4    and that it was a nice try but you fail.  And let's just say

5    that I were to grant their motion to dismiss and gave you leave

6    to amend, what would you do?

7         MS. LEMMER:  Well --

8         THE COURT:  What could you do?

9         MS. LEMMER:  We would have to evaluate, Your Honor,

10   whether we would want to amend and see and request the same

11   monetary damages that we had earlier or alternatively ask the

12   Court to stay this action, so that we could pursue rights in

13   Nevada.  Unfortunately, these were not the choices that Lehman

14   had.  Lehman was put in this position because they were sued

15   first and they had a choice of either submitting their

16   compulsory counterclaims and proceeding as set forth or waiving

17   those compulsory counterclaims.  Neither choice seemed an

18   appropriate choice.

19        THE COURT:  Well I think that what you have here is a

20   procedural dilemma that should have a practical resolution.  I

21   am not inclined to do anything here that will adversely affect

22   the substantive rights of Lehman simply because there's a

23   procedural snag under applicable non-bankruptcy law; here,

24   Nevada One Action Rules.

25        If this had been instead of an adversary proceeding, a

1    proof of claim and I believe there are proofs of claim that

2    have been filed that cover the same subject matter; isn't that

3    right?

4              MS. LEMMER:  Yes.

5              THE COURT:  Lehman would not, it seems to me, be

6    precluded from objecting to the proof of claim and raising any

7    number of affirmative defenses to that proof of claim; would

8    that procedural posture implicate the One Action Rule?

9              MS. LEMMER:  Your Honor, again I don't purport to be

10   an expert on Nevada law but I would see an affirmative defense

11   as different than a counterclaim.  That said, could someone

12   later say you raised an affirmative defense in connection with

13   the litigation of the proof of claim.  There was a judgment

14   obtained.  As a result of that judgment, you're now foreclosed

15   from seeking to foreclose in Nevada, that's a possibility.

16             So all we're asking the Court is we do not want to

17   deprive counsel of their rights to object and raise any

18   arguments that they wish to raise.  All we're seeking to do is

19   insure that we are not prevented or excuse me, that we don't

20   forfeit any of our substantive rights under the Nevada statute.

21             THE COURT:  Here's what I'd like to accomplish.  I can

22   rule one way or the other on this.  I think we all understand

23   what we're talking about.  We're talking about a very narrow

24   question and there isn't a person in the room who has true

25   expertise on the subject matter.

Page 119

1          I understand that Lehman simply trying to avoid a risk

2     which may be purely theoretical as opposed to real, so as not

3     to inadvertently waive a right of action under local law;

4     correct?

5          MS. LEMMER:  Correct.

6          THE COURT:  Have the parties in the literally years

7     since this litigation has been pending, endeavored to explore

8     some kind of thoughtful lawyer-like way to come up with a means

9     to protect everybody's rights so that there are no inadvertent

10    waivers and all rights are reserved?

11         MS. LEMMER:  Your Honor, some of the parties that have

12    been involved have switched over as counsel advised the Court

13    earlier.  To my knowledge, the discussions between the parties

14    has been more towards the aim of ultimately settling the

15    disputes between the parties as opposed to resolving the

16    differences that are -- the procedural differences that are at

17    issue before the Court today.

18         I know -- I can anticipate where Your Honor is going

19    with this.  I'm happy to try to discuss this with counsel and

20    arrive at essentially some sort of agreement or settlement that

21    would have the effect of protecting everyone's rights.  But

22    absent that, Your Honor, I don't believe that anyone has

23    specifically aimed in any other settlement conversations or any

24    other discussions dealing with this One Action situation.

25         THE COURT:  Okay.  Well it's obvious to me from having

Page 120

1    looked at all three of these cases and the procedural posture

2    of the cases, that the cases have, and I say this charitably,

3    languished at least as it relates to docketed activity.

4        MS. LEMMER:  Uh-hum.

5        THE COURT:  The motions to dismiss are not dispositive

6    motions and in the end don't really affect one way or the other

7    the rights of the parties.  The violation of the automatic stay

8    issue which we haven't even addressed is frankly something that

9    I have some problems with and I'm going to give you an

10   opportunity to respond to that.  But I don't -- I see this as a

11   dispute over payment and performance under various loan

12   documents.  These were sophisticated parties who engaged in a

13   sophisticated real estate deal and they have claims against

14   each other.  That's apparent.

15       If you are, in fact, engaged in substantive

16   discussions that may lead to an overall resolution, that's

17   great.  I note that these cases have been adjourned on any

18   number of occasions, such that we end up addressing these

19   motions to dismiss today for reasons that escape me.  I don't

20   know why the parties decided that this was the time to have it

21   out but even then you ended up resolving by agreement two of

22   them.

23       It's not a happy pattern from my perspective because

24   to the extent that I am involved, I'm doing work, my clerks are

25   doing work, we're thinking about the issues, we're being paid

08-13555-mg    Doc 19962    Filed 08/25/11    Entered 09/15/11 09:18:58    Main Document
LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.
Pg 121 of 126

Page 121

1    for that but it's terribly wasteful if you're in fact then

2    going to reach agreements.

3          Is there an ability to reach an agreement with respect

4    to the one matter that we're arguing?  It seems to me that the

5    parties are capable of that.  It's about reservations of rights

6    and avoiding inadvertent adverse consequences.  No?

7          MS. LEMMER:  Correct, Your Honor.  I agree.  I would

8    be happy to explore reaching an agreement with the Soffers and

9    Turnberry.

10          THE COURT:  Okay.  Here's what I am going to suggest.

11    I'm going to carry this to the next scheduled omnibus hearing

12    with -- just as a holding date and I'm not suggesting that

13    people actually need to travel here from Florida unnecessarily.

14    But I would urge the parties to either accept the pleadings as

15    they are with the understanding that they are slightly

16    imperfect as they relate to declaratory judgment relief but

17    nonetheless congruent with what appears to be the teachings of

18    the Nevada One Action Rule, so there is at least some ability

19    to say that a declaratory judgment action can be brought in

20    lieu of a damage claim.

21          Or that there be a further amendment of the claims

22    that are at issue to restyle them.  But in the end, it doesn't

23    matter.  The plaintiffs know what it is that you're asserting

24    and we're dealing with procedural niceties that are frankly

25    wasteful.  So, I would suggest that you spend a little time

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 122

1    trying to work out some kind of stipulation that accomplishes

2    everybody's objectives and that avoids further waste.

3        MS. LEMMER:  Thank you, Your Honor.  I agree with that

4    suggestion.

5        THE COURT:  Is that all right with you?

6        MR. RICHARD:  Yes, Your Honor.

7        THE COURT:  As far as the count for stay violation, I

8    frankly don't see it and while this isn't a ruling, it's a

9    comment.  This appears to be a non-payment.  It's not the

10   exercise of control over debtor property.  Unless you can

11   demonstrate to me that there is a good claim to be made, that

12   there is a fund of property that is being held by your

13   adversary that constitutes what amounts to a fund that could be

14   used to offset the obligations owed to you, that might be a

15   different setting.  But if it's just money due and owing, I

16   don't see this as a stay violation in the least.

17       MS. LEMMER:  Your Honor, at this stage of the

18   litigation, we do not know if they're holding a fund because

19   this litigation is essentially as Your Honor has pointed out,

20   in its infancy.  We haven't been able to conduct any discovery.

21   So to the extent that they have a fund, we don't know either

22   way.

23       However, just to address and I understand Your Honor

24   may be issuing an advisory opinion or cautioning us, but the

25   Strumpf decision that was cited -- that we cited and that

Page 123

 1    counsel discussed, that supreme court had a narrow holding

 2    there.  The issue there was that the bank had placed an

 3    administrative freeze but it was a temporary administrative

 4    freeze while it sought stay relief to essentially offset --

 5          THE COURT:  Yes, but it was exercising the right of

 6    setoff.  That case is routinely cited in the setoff context.

 7    This isn't a setoff case, as far as I know.  This is a claim

 8    for breach of contract and money due and owing.

 9          MS. LEMMER:  Well again, Your Honor, it's in its

10    infancy.  I would submit that to the extent that that's the

11    case, counsel has the opportunity to raise that argument but in

12    the motion to dismiss stage, we still don't know.

13          THE COURT:  I'm prepared to grant the motion to

14    dismiss as it relates to the alleged stay violation but without

15    prejudice to your ability to in effect amend later.

16    Everybody's on notice of this.  If a fact should develop that

17    would give rise to such a claim.  But on its face, it appears

18    to be a claim that would not ordinarily be appropriate.

19          MS. LEMMER:  Okay.  Thank you, Your Honor.

20          THE COURT:  And I suggest that you might use these

21    comments as guidance to develop an agreed resolution of the

22    pleading issues that relate to this one case.

23          MS. LEMMER:  We will.  Thank you, Your Honor.

24          THE COURT:  Okay.  So let's carry this to the next

25    omnibus hearing date with the hope that I don't have to see you

LEHMAN BROTHERS INC. (SIPA)/LBHI, ET AL.

Page 124

1    then.

2              MS. LEMMER:  Thank you.

3              THE COURT:  I think that takes care of the afternoon

4    calendar.  We're adjourned.

5         (Whereupon these proceedings were concluded at 3:20 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 125

1

2                              **I N D E X**

3    WITNESS:                                    Page

4    JEFFREY FITTS

5     by Mr. Uzzi                                 61

6                               RULINGS

7                                           Page      Line

8    James Giddens, Trustee approving settlement    15       18

9    Latshaw settlement agreement approved          17       18

10   Motion re: MetLife approved                    21       20

11   U.S. Bank Objection to extension of stay       38       17

12   overruled

13   Motion to extend stay of avoidance actions     40       6

14   - granted

15   Debtors motion granted, ad hoc committee       76       22

16   objection overruled

17   Goldman Sachs stipulation so ordered           79       22

18

19   Arnold and Cotten Court determination          98       8

20   adjourned to a later date

21   Motion to dismiss re: stay violation -         123      12

22   granted

23

24

25

Page 126

1

2                       C E R T I F I C A T I O N

3

4     I, Linda Ferrara, certify that the foregoing transcript is a

5     true and accurate record of the proceedings.

6

7        Linda Ferrara    Digitally signed by Linda Ferrara
                          DN: cn=Linda Ferrara, o, ou,
                          email=digital1@veritext.com, c=US
8     _____ Date: 2011.06.17 13:31:01 -04'00'

9     LINDA FERRARA

10

11    Veritext

12    200 Old Country Road

13    Suite 580

14    Mineola, NY 11501

15

16    Date:  June 16, 2011

17

18

19

20

21

22

23

24

25