**United States Bankruptcy Court/Southern District of NEW YORK**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

| In Re: Lehman Brothers Holdings Inc., et al. Debtors. | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held Lehman Brothers Holdings Inc. | Case No. of Debtor 08-13555 |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)         0000066099

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionaly, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Syncora Guarantee Inc.
c/o Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, New York 10036-6710
Att'n: David W. Dykhouse

Telephone number: (212) 336-2850     Email Address: dwdykhouse@pbwt.com

[x] Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: 13909
(If known)

Filed on: 9/16/2009

Name and address where payment should be sent (if different from above)

Telephone number:          Email Address:

[ ] Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

[ ] Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed:** $ Not less than $1,331,838,000.00 plus interest and other costs

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

[ ] Check this box if all or part of your claim is based on a Derivative Contract.*
[ ] Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

[ ] Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

**2. Basis for Claim:** See attached Exhibit A
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____
   **3a. Debtor may have scheduled account as:** _____
   (See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: [ ] Real Estate  [ ] Motor Vehicle  [ ] Other
Describe: _____
Value of Property: $_____ Annual Interest Rate ____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____

Amount of Secured Claim: $_____  Amount Unsecured: $_____

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

[ ] Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
[ ] Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
[ ] Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
[ ] Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
[ ] Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
[ ] Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

Amount entitled to priority:

$_____

**7. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:
See attached Exhibit A

| Date: | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |
|---|---|
| 1/12/2010 | David W. Dykhouse, as attorney for Syncora Guarantee Inc. |

FOR COURT USE ONLY

FILED / RECEIVED
JAN 13 2010
EPIQ BANKRUPTCY SOLUTIONS, LLC

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## EXHIBIT A TO PROOF OF CLAIM OF SYNCORA GUARANTEE INC.

**Background**

1.        Syncora Guarantee Inc., formerly known as XL Capital Assurance Inc. ("Syncora"), is a financial guaranty insurance company organized under the laws of the State of New York, with its principal place of business at 1221 Avenue of the Americas, New York, New York 10021.

2.        This Proof of Claim is filed pursuant to an order of the United States Bankruptcy Court for the Southern District of New York establishing September 22, 2009 as the bar date for the submission of claims against Lehman Brothers Holdings Inc. ("Lehman") and its affiliated debtors and debtors-in-possession (collectively including Lehman, "Debtors").

3.        *Syncora filed a proof of claim against Lehman on September 16, 2009, which was assigned number 13909 ("Claim Number 13909"). It has come to Syncora's attention that the official claims register maintained by the Debtors' claims and noticing agent reflects that Claim Number 13909 was filed in the amount of* **One Million Three-Hundred Thirty-One Thousand Eight Hundred and Thirty Eight Dollars ($1,331,838.00)**. *This amended proof of claim is submitted to correct this error. The value of Syncora's claim as asserted in Claim Number 13909 and as asserted herein is* **One Billion Three Hundred Thirty-One Million Eight Hundred and Thirty-Eight Thousand Dollars ($1,331,838,000.00)**. *This amended claim is identical in all other respects to the original proof of claim, Claim Number 13909, submitted on September 16, 2009.*

**Basis for Claim**

4.        Pursuant to an Indenture dated as of August 1, 2006 ("Indenture") between GreenPoint Mortgage Funding Trust 2006-HE1 ("Trust"), as Issuer, and U.S. Bank National As-

sociation ("Trustee"), as Indenture Trustee, the Trust issued the following two classes of mort-

gage-backed notes ("Notes"), all of which remain outstanding: (a) $1,331,838,000 in aggregate

principal amount of variable-rate Class Ax Notes and (b) $500,000,000 in aggregate principal

amount of variable-rate Class Ac Notes. The issuance of the Notes was part of a securitization

transaction known as GreenPoint Mortgage Funding Trust 2006-HE1, Home Equity Loan Asset-

Backed Notes, Series 2006-HE1 ("Transaction"). The Notes were "backed," or collateralized, by

mortgage loans originated by GreenPoint Mortgage Funding, Inc. ("GreenPoint"). A copy of the

Indenture, which is voluminous, is available upon request.

        5.      Pursuant to an Insurance and Indemnity Agreement ("I&I Agreement")

dated as of August 28, 2006 among Syncora, Lehman, the Trust and others, Syncora agreed to

irrevocably guarantee certain payments of principal and interest on the Class Ax Notes by issu-

ance of an insurance policy. As an inducement to Syncora to enter the I&I Agreement and issue

its insurance policy, Lehman made or conveyed various representations, warranties and other

assurances about the quality of the mortgage loans that back the Notes and the practices pursuant

to which the loans were originated and underwritten. A copy of the I&I Agreement is annexed

hereto as Exhibit 1.

        6.      Pursuant to the Transaction documents, principal and interest payments

from the mortgage loans were to provide the cash flow necessary to make the principal and inter-

est payments on the Notes. Syncora's insurance policy required it to make payments to holders

of insured Notes to the extent that there was a shortfall of cash flow available from the mortgage

loans. Syncora was also liable for payments to maintain parity between the outstanding principal

balance of the underlying mortgage loans and the principal balance of the Class Ax Notes in the

event that defaults and write-offs of loans caused the loan balance to decline below the Class Ax

Note balance.

       7.      Pursuant to Section 3.03(c) of the I&I Agreement, Lehman agreed to pay

to Syncora "any and all charges, fees, costs and expenses that [Syncora] may reasonably pay or

incur, including reasonable attorneys' and accountants' fees and expenses, in connection with,"

among other things, "the enforcement, defense or preservation of any rights in respect of any of

the Operative Documents,[1] including defending, monitoring or participating in any litigation or

proceeding . . . relating to any of the Operative Documents, any party to any of the Operative

Documents (in its capacity as such a party) or the Transaction," and "any action taken by [Syn-

cora] to cure an event of default (or to mitigate the effect of an event of default) under any of the

Related Agreements."

       8.      Pursuant to Section 3.04(a) of the I&I Agreement, Lehman agreed "to pay,

and to protect, indemnify and save harmless, [Syncora] . . . from and against any and all claims,

losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or ex-

penses (including, without limitation, reasonable fees and expenses of attorneys, consultants and

auditors and reasonable costs of investigations) of any nature arising out of or relating to the

breach by [Lehman] . . . of any of the representations or warranties contained in Section 2.01 or

arising out of or relating to the transactions contemplated by the Operative Documents by reason

of," among other things, "the breach by [Lehman] . . . or any Originator [defined to include

GreenPoint] of any representation, warranty or covenant under any of the Operative Documents

to which it is a party," and "any untrue statement or alleged untrue statement of a material fact

contained in the Offering Document [defined to include the Prospectus Supplement] or the Reg-

istration Statement or any omission or alleged omission to state therein a material fact required to

---

[1]    Capitalized terms used but not defined herein have the meanings assigned to them in the I&I Agreement.

be stated therein or necessary to make the statements therein, in light of the circumstances under

which they were made, not misleading."

      9.    Pursuant to Section 3.03(d) of the I&I Agreement, Lehman agreed to pay

Syncora interest on the amounts described in the preceding two paragraphs—specifically, "any

and all amounts described in subsections 3.03(b), 3.03(c) and 3.03(e) and Sections 3.02 and 3.04

from the date such amounts become due or, in the case of subsections 3.02(b) or 3.03(c) or Sec-

tion 3.04, are incurred or paid by [Syncora] until payment thereof in full (after as well as before

judgment), at the Late Payment Rate."

      10.    Syncora is entitled to payment and reimbursement from Lehman pursuant

to Section 3.03(b) of the I&I Agreement because Syncora has incurred significant expenses, in-

cluding attorneys' fees and expert fees, in enforcing, defending and preserving rights under the

Operative Documents, including by participating in a litigation that relates to the Transaction.

On February 5, 2009 Syncora and CIFG Assurance North America, Inc. joined the Trustee in

filing an action ("GreenPoint Action") against GreenPoint in New York state court.  A copy of

the complaint in the GreenPoint Action, which is styled *U.S. Bank National Association, as In-

denture Trustee for the Benefit of the Insurers and Noteholders of GreenPoint Mortgage Fund-

ing Trust 2006-HE1, Home Equity Loan Asset-Backed Notes, Series 2006-HE1; Syncora Guar-

antee Inc., formerly known as XL Capital Assurance Inc., as Controlling Insurer, Note Control-

ling Party and Class Ax Insurer; and CIFG Assurance North America, Inc., as Class Ac Insurer,

v. GreenPoint Mortgage Funding, Inc.*, Index No. 600352/09 (N.Y. Sup. Ct.), is annexed hereto

as Exhibit 2.

      11.    The plaintiffs in the GreenPoint Action allege, among other things, that

GreenPoint pervasively breached its representations and warranties, and related remedial cove-

nants, about the quality of the mortgage loans and the practices pursuant to which the loans were

originated and underwritten, and that statements in the Prospectus Supplement about Green-

Point's underwriting practices are therefore false and misleading. In addition, the plaintiffs al-

lege that GreenPoint's pervasive breaches and underwriting failures are reflected in the severe

underperformance of the loans and the Transaction as a whole. As of December 31, 2008, the

date of the last-available performance statistics prior to the filing of the complaint in the Green-

Point Action, the Transaction had experienced cumulative losses of more than $387 million and

nearly 29% of the mortgage loans that back the Notes had been written off or were severely de-

linquent. These and additional losses to the Transaction in subsequent months have resulted to

date in more than $323 million in claims having been submitted to Syncora under its insurance

policy for the Class Ax Notes. Future losses to the Transaction will result in Syncora's having to

pay millions more. Based on forensic work that Syncora has undertaken with respect to ran-

domly selected loans that are representative of the entire pool of loans in the Transaction, Syn-

cora's total claims payments over the life of the Transaction may approach the full amount of the

original aggregate principal balance of the Class Ax Notes.

      12.    Because GreenPoint, as "Originator," has breached numerous representa-

tions, warranties and covenants—and because Lehman, which remade as its own GreenPoint's

representations and warranties, has also breached them—and those breaches have caused Syn-

cora to pay claims and incur losses, costs and expenses, and will continue to cause Syncora to

pay claims and incur losses, costs and expenses, Syncora is also entitled to payment and indem-

nification from Lehman pursuant to Section 3.04(a) of the I&I Agreement. And, pursuant to

Section 3.03(d) of the I&I Agreement, Syncora is entitled to interest on all amounts sought from

Lehman pursuant to either Section 3.03(b) or Section 3.04(a) of the I&I Agreement.

13.    In addition, Syncora has claims against Lehman for breach, indemnity, damages and otherwise, in connection with the Transaction arising under the Transaction documents or under applicable law, including (without limitation) state and federal securities laws and the common law.

**Additional Information**

14.    Notices regarding this Proof of Claim should be sent to:

> Patterson Belknap Webb & Tyler LLP
> 1133 Avenue of the Americas
> New York, New York 10036-6710
> Tel:    (212) 336-2000
> Fax:    (212) 336-2222
> Att'n:  David W. Dykhouse
>
> and
>
> Syncora Guarantee Inc.
> 1221 Avenue of the Americas
> New York, New York 10021
> Tel:    (212) 478-3405
> Fax:    (212) 478-3587
> Att'n:  James W. Lundy, Jr., Esq.

15.    This Proof of Claim is a protective Proof of Claim and is filed to protect Syncora from potential forfeiture of any rights or remedies against Lehman or any other Debtor. The filing of this Proof of Claim shall not constitute (a) a waiver or release of any claims, rights or remedies that Syncora may have against Lehman, GreenPoint, any other Debtor or any third party or property; (b) consent by Syncora to the jurisdiction of this Court with respect to the subject matter of the claims set forth herein or the waiver of any objection thereto; or (c) an election of remedies, choice of law or submission to jurisdiction.  Syncora expressly reserves its right to replace, amend or supplement this Proof of Claim to include any other claims at law or in equity.

16.    The holders of the Notes, as well as other entities involved in the Transaction, may have separate claims against Lehman or other Debtors that are not included in this Proof of Claim, and nothing contained here in shall prejudice such claims.

# **EXHIBIT 1**

[I&I Agreement]

## **EXHIBIT 2**

[Complaint]

## EXHIBIT 1

[I&I Agreement]

XL CAPITAL ASSURANCE INC.,
as Insurer,

LEHMAN BROTHERS HOLDINGS INC.,
as Sponsor,

STRUCTURED ASSET SECURITIES CORPORATION,
as Depositor,

GREENPOINT MORTGAGE FUNDING TRUST 2006-HE1,
as Issuer

GMAC MORTGAGE CORPORATION,
as Servicer,

and

U.S. BANK NATIONAL ASSOCIATION,
as Indenture Trustee

# INSURANCE AND INDEMNITY AGREEMENT

GREENPOINT MORTGAGE FUNDING TRUST 2006-HE1

HOME EQUITY LOAN ASSET-BACKED NOTES, SERIES 2006-HE1

Dated as of August 28, 2006

## TABLE OF CONTENTS

(This Table of Contents is for convenience of reference only and shall not be deemed to be part of this Agreement.  All capitalized terms used in this Agreement and not otherwise defined shall have the meanings set forth in Article I of this Agreement.)

Page

### ARTICLE I
### DEFINITIONS

Section 1.01.    *Defined Terms* ...................................................................................................3
Section 1.02.    *Other Definitional Provisions* ..........................................................................6

### ARTICLE II
### REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 2.01.    *Representations and Warranties of the Sponsor, the Issuer and the Depositor* ..7
Section 2.02.    *Affirmative Covenants of the Sponsor, the Issuer and the Depositor* ...............11
Section 2.03.    *Negative Covenants of the Sponsor, the Issuer and the Depositor* ...................13
Section 2.04.    *Representations, Warranties and Covenants of the Servicer* .............................14
Section 2.05.    *Representations, Warranties and Covenants of the Insurer* ..............................15

### ARTICLE III
### THE POLICY; REIMBURSEMENT

Section 3.01.    *Issuance of the Policy* ......................................................................................18
Section 3.02.    *Payment of Fees and Premium.* ........................................................................20
Section 3.03.    *Reimbursement Obligation* ..............................................................................20
Section 3.04.    *Indemnification.* ...............................................................................................22
Section 3.05.    *Payment Procedure* ..........................................................................................25
Section 3.06.    *[RESERVED].* ..................................................................................................25
Section 3.07.    *Subrogation* ......................................................................................................25
Section 3.08.    *Deductions* .......................................................................................................26

### ARTICLE IV
### FURTHER AGREEMENTS

Section 4.01.    *Effective Date; Term of the Insurance Agreement* ............................................26
Section 4.02.    *Further Assurances and Corrective Instruments.* ..............................................26
Section 4.03.    *Obligations Absolute.* .......................................................................................27
Section 4.04.    *Assignments; Reinsurance; Third-Party Rights* ...............................................28
Section 4.05.    *Liability of the Insurer* .....................................................................................29

### ARTICLE V
### DEFAULTS AND REMEDIES

Section 5.01.    *Defaults* ............................................................................................................29
Section 5.02.    *Remedies; No Remedy Exclusive.* .....................................................................30

Page

Section 5.03.    *Waivers.* ...................................................................................................31

ARTICLE VI
MISCELLANEOUS

Section 6.01.    *Amendments, Etc* ....................................................................................32
Section 6.02.    *Notices* .....................................................................................................32
Section 6.03.    *Payment Procedure* ................................................................................33
Section 6.04.    *Severability* .............................................................................................33
Section 6.05.    *Governing Law* ........................................................................................34
Section 6.06.    *Consent to Jurisdiction.* .........................................................................34
Section 6.07.    *Consent of the Insurer* ............................................................................34
Section 6.08.    *Counterparts* ...........................................................................................35
Section 6.09.    *Headings* ..................................................................................................35
Section 6.10.    *Trial by Jury Waived* ...............................................................................35
Section 6.11.    (a)  *Limited Liability* ...............................................................................35
Section 6.12.    *Entire Agreement* ....................................................................................36
Section 6.13.    *No Partnership* ........................................................................................36

INSURANCE AND INDEMNITY AGREEMENT (as may be amended, modified or supplemented from time to time, this "Insurance Agreement"), dated as of August 28, 2006, by and among XL CAPITAL ASSURANCE INC., as Insurer (the "Insurer"), Lehman Brothers Holdings Inc. ("Sponsor"), as Sponsor (the "Sponsor"), Structured Asset Securities Corporation, as Depositor (the "Depositor"), GMAC Mortgage Corporation, as Servicer (referred to herein as the "Servicer"), Greenpoint Mortgage Funding Trust 2006-HE1, as Issuer (the "Issuer" or the "Trust"), and U.S. Bank National Association, solely in its capacity as Indenture Trustee (the "Indenture Trustee").

## RECITALS :

WHEREAS, pursuant to the Flow Revolving Credit Loan Purchase and Warranties Agreement, between GMAC Mortgage Corporation ("GMACM") and GreenPoint Mortgage Funding, Inc. ("GreenPoint") dated as of September 26, 2006 (the "GreenPoint HELOC Purchase Agreement"), GMACM has purchased or received from GreenPoint certain home equity line of credit loans (the "GreenPoint HELOCs");

WHEREAS, pursuant to the Flow Mortgage Loan Purchase and Warranties Agreement, between GMACM and GreenPoint Mortgage Funding, Inc. ("GreenPoint") dated as of September 26, 2006 (the "GreenPoint Purchase Agreement"), GMACM has purchased or received from GreenPoint certain closed end second lien mortgage loans(the "GreenPoint Closed End Seconds," and together with the GreenPoint HELOCs, the "GreenPoint Loans");

WHEREAS, pursuant to the Flow Revolving Credit Loan Purchase and Warranties Agreement, between GMAC Mortgage Corporation "GMACM") and Impac Funding Corporation ("Impac") dated as of January 23, 2006 (the "Impac Purchase Agreement"), GMACM has purchased or received from Impac certain home equity line of credit loans and fixed rate, closed end, second lien mortgage loans (the "Impac Loans");

WHEREAS, GMACM transferred and assigned its interest in the GreenPoint HELOC Purchase Agreement to Lehman Brothers Bank, FSB ("Bank") pursuant to the terms of that certain Assignment, Assumption and Recognition Agreement, dated as of July 28, 2006 ("GreenPoint HELOC AAR," together with the GreenPoint HELOC Purchase Agreement, the "GreenPoint HELOC Transfer Agreement"), among GreenPoint, GMACM and Bank;

WHEREAS, GMACM transferred and assigned its interest in the GreenPoint Purchase Agreement to Lehman Brothers Bank, FSB ("Bank") pursuant to the terms of that certain Assignment, Assumption and Recognition Agreement, dated as of July 26, 2006 ("GreenPoint Second Lien AAR," together with the GreenPoint HELOC Transfer Agreement, the "GreenPoint Transfer Agreement"), among GreenPoint, GMACM and Bank;

WHEREAS, GMACM transferred and assigned its interest in the Impac Purchase Agreement to Bank pursuant to the terms of that certain Assignment, Assumption and Recognition Agreement, dated as of August 28, 2006 ("Impac AAR," together with the Impac Purchase Agreement, the "Impac Transfer Agreement"), among GreenPoint, GMACM and Bank;

WHEREAS, Bank transferred its interest in each of the GreenPoint Transfer Agreement and the Impac Transfer Agreement (collectively, the "Transfer Agreements") to Sponsor pursuant to the terms of that certain Assignment and Assumption Agreement, dated as of August 1, 2006, between Bank and Sponsor;

WHEREAS, the Sponsor has sold and assigned its entire interest to the Depositor, and the Depositor has accepted from the Sponsor the sale and assignment of such interest, in the Loans pursuant to the Mortgage Loan Sale and Assignment Agreement, dated as of August 1, 2006, by and between the Sponsor and the Depositor (the "Sale Agreement");

WHEREAS, a Trust Agreement, dated as of August 1, 2006, by and between the Depositor and the Owner Trustee, among the Depositor and the Owner Trustee (as may be amended, modified or supplemented from time to time as set forth therein, the "Trust Agreement") provides for, among other things the formation of GreenPoint Mortgage Funding Trust 2006-HE1 (the "Issuer" or the "Trust") and the issuance of the GreenPoint Mortgage Funding Trust 2006-HE1 Certificates (the "Certificates");

WHEREAS, a Transfer and Servicing Agreement, dated as of August 1, 2006, among the Depositor, the Issuer, the Indenture Trustee and the Servicer (as may be amended, modified or supplemented from time to time as set forth therein, the "Transfer and Servicing Agreement") provides for, among other things, the sale of the Loans by the Depositor to the Trust and the master servicing of the Loans by the Servicer;

WHEREAS, an Indenture, dated as of August 1, 2006, by and between the Trust and the Indenture Trustee (as may be amended, modified or supplemented from time to time as set forth therein, the "Indenture") provides for, among other things, the issuance of Greenpoint Mortgage Funding Trust 2006-HE1, Class Ax and Class Ac Notes (the "Notes") representing indebtedness of the Trust;

WHEREAS, the Notes will be secured by all of the Issuer's right, title and interest in the Loans;

WHEREAS, the Insurer has issued the Policy, pursuant to which it has agreed to pay in favor of the Indenture Trustee on behalf of the Issuer and for the benefit of the Holders of the Insured Notes (as defined herein), certain payments in respect of or related to the Loans;

WHEREAS, the Insurer shall be paid a Premium as set forth herein and in the Premium Letter described herein; and

2

WHEREAS, each of the Sponsor, the Issuer and the Depositor has undertaken certain obligations in consideration for the Insurer's issuance of its Policy.

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.01.**    *Defined Terms.*    Unless the context clearly requires otherwise, all capitalized terms used but not defined herein shall have the respective meanings assigned to them in the Policy described below or, if not defined therein, in the Transfer and Servicing Agreement.    For purposes of this Insurance Agreement, the following terms shall have the following meanings:

"1119 Parties" means each of GreenPoint Mortgage Funding Inc., GMAC Mortgage Corporation, Lehman Brothers Holdings Inc., Structured Asset Securities Corporation, U.S. Bank National Association, Wilmington Trust Company and Impac Funding Corporation.

"Certificates" has the meaning given such term in the Recitals section of this Agreement.

"Closing Date" means August 28, 2006.

"Commission" means the Securities and Exchange Commission.

"Custodial Agreement" means, the Custodial Agreement, dated as of August 1, 2006, by and among the Indenture Trustee, the Depositor, the Issuer, and U.S. Bank National Association, as custodian.

"Cut-off Date" means the close of business of August 1, 2006.

"Data Tape" has the meaning assigned to such term in Section 2.02 (c) (iii).

"Default" means any event which results, or which with the giving of notice or the lapse of time or both would result, in an Event of Default.

"Documents" has the meaning given such term in Section 2.01(j).

"Event of Default" means any event of default specified in Section 5.01 of this Insurance Agreement.

"Financial Statements" means, with respect to Lehman Brothers Holdings Inc., (i) its consolidated statements of financial condition as of June 30, 2006, December 31, 2005 and December 31, 2004 and the statements of operations, stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2005 and the notes thereto, and (ii) its unaudited three month and six month statements of financial condition as of June 30, 2006 and June 30, 2005.

3

"Holder" has the meaning given such term in the Policy.

"Incorporation Termination Date" means January 31, 2007 or if, prior to such date, the Insurer receives a written notification from the Depositor that no Form 15D will be filed prior to such date with the SEC in respect of the Notes (a "No Form 15D Notice"), the first January 31 to occur thereafter as of which the Insurer shall not have received a No Form 15D Notice prior to such date.

"Indemnification Agreement" means the Indemnification Agreement, dated as of August August 22, 2006, the Insurer, GreenPoint and the Underwriter.

"Indenture" has the meaning given such term in the recitals.

"Indenture Trustee" means U.S. Bank National Association, a national banking association, as indenture trustee under the Indenture, and any successor thereto under the Indenture.

"Insurance Agreement" has the meaning given such term in the initial paragraph hereof.

"Insurer Financial Statements" has the meaning assigned to such term in Section 2.05(l) below.

"Insured Notes" means GreenPoint Mortgage Funding Trust 2006-HE1, Home Equity Loan Asset-Backed Notes, Class Ax Notes.

"Insurer" means XL Capital Assurance Inc., or any successor thereto, as issuer of the Policy.

"Insurer Information" has the meaning given such term in Section 3.04(a)(v).

"Investment Company Act" means the Investment Company Act of 1940, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"Issuer" has the meaning given such term in the recitals.

"Late Payment Rate" means the lesser of (a) the greater of (i) the per annum rate of interest publicly announced from time to time by Citibank, N.A. as its prime rate (any change in such rate of interest to be effective on the date such change in announced by Citibank, N.A.), plus 2% per annum, and (ii) the then applicable rate of interest on the Insured Notes and (b) the maximum rate permissible under applicable usury or similar laws limiting interest rates. The Late Payment Rate shall be computed on the basis of the actual number of days elapsed over a year of 360 days for any Payment Date.

"Material Adverse Change" means, in respect of any Person, a material adverse change in (i) the ability of such Person to perform its obligations under any of the Operative Documents (or) (ii) the business, financial condition, results of operations or properties of such Person on a consolidated basis with its subsidiaries which might have such effect.

4

"Moody's" means Moody's Investors Service, Inc., and any successor thereto.

"Notes" has the meaning given such term in the recitals.

"Offering Document" means the Prospectus, dated August 11, 2006, as supplemented by the Prospectus Supplement, dated August 25, 2006 and the Prospectus, dated August 11, 2006, as supplemented by the Free Writing Prospectus, dated August 22, 2006 in respect of the Notes and any amendment or supplement thereto, and any other offering document in respect of the Securities prepared by or on behalf of the Depositor that makes reference to the Policy.

"Operative Documents" means this Insurance Agreement, the Indemnification Agreement, the Securities, the Certificate of Trust the Transfer and Servicing Agreement, the Custodial Agreement, the Sale Agreement, the Assignment and Assumption Agreement, the Trust Agreement, the Administration Agreement, the Indenture and each other document contemplated by any of the foregoing to which the Depositor, the Owner Trustee, the Administrator, the Indenture or the Issuer is a party.

"Originator Information" has the meaning given such term in the Indemnification Agreement.

"Originators" means with respect to any Mortgage Loan, the entity that originated such Mortgage Loan before the Mortgage Loan was transferred to the Depositor.

"Owner Trustee" means Wilmington Trust Company, a banking corporation organized and existing under the laws of Delaware, not in its individual capacity but solely as owner trustee under the Trust Agreement, and any successor thereto under the Trust Agreement.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor agency, corporation or instrumentality of the United States to which the duties and powers of the Pension Benefit Guaranty Corporation are transferred.

"Person" means an individual, joint stock company, trust, unincorporated association, joint venture, corporation, business or owner trust, partnership, limited liability company or other organization or entity (whether governmental or private).

"Policy" means the Financial Guaranty Insurance Policy No. CA03248A, together with all endorsements thereto, issued by the Insurer in favor of the Indenture Trustee, for the benefit of the Holders.

"Premium" means the premium payable in accordance with this Insurance Agreement, which shall be payable as "Premium Amounts" pursuant to the Premium Letter and payable in accordance with the Indenture.

"Premium Letter" means the letter agreement among the Insurer, the Indenture Trustee, the Sponsor and the Depositor dated the date hereof in respect of the Premium payable in consideration of the issuance of the Policy.

"Regulation AB" means Regulation AB promulgated under the Securities Act.

"<u>Registration Statement</u>" means the registration statement on Form S-3 (No. 333-133985), including the prospectus, relating to the Notes, at the time it became effective.

"<u>S&P</u>" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"<u>Sale Agreement</u>" has the meaning given such term in the recitals.

"<u>SEC</u>" means the United States Securities and Exchange Commission.

"<u>Securities</u>" means the Notes and the Certificates.

"<u>Securities Act</u>" means the Securities Act of 1933, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"<u>Securities Exchange Act</u>" means the Securities Exchange Act of 1934, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"<u>Servicer Information</u>" means the information contained under the heading "The Servicer" in the Offering Document.

"<u>Sponsor</u>" has the meaning given such term in the recitals to this Agreement.

"<u>Transaction</u>" means the transactions contemplated by the Operative Documents, including the transactions described in the Offering Document.

"<u>Trust</u>" means Greenpoint Mortgage Funding Trust 2006-HE1 created pursuant to the Trust Agreement.

"<u>Trust Agreement</u>" has the meaning assigned to such item in the recitals to this Agreement.

"<u>Trust Indenture Act</u>" means the Trust Indenture Act of 1939, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"<u>Underwriter</u>" means Lehman Brothers Inc.

"<u>Underwriter Information</u>" has the meaning assigned to such term in the Indemnification Agreement.

"<u>Underwriting Agreement</u>" means the Underwriting Agreement, dated as of August 25, 2006, between the Underwriter and the Depositor with respect to the offer and sale of the Notes, as such may be amended, modified or supplemented from time to time.

**Section 1.02.** *Other Definitional Provisions.* The words "hereof," "herein" and "hereunder" and words of similar import when used in this Insurance Agreement shall refer to this Insurance Agreement as a whole and not to any particular provision of this Insurance Agreement, and Section, subsection, Schedule and Exhibit references are to this Insurance

Agreement unless otherwise specified.  The meanings given to terms defined herein shall be
equally applicable to both the singular and plural forms of such terms.  The words "include" and
"including" shall be deemed to be followed by the phrase "without limitation."

## ARTICLE II
## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 2.01.**    *Representations and Warranties of the Sponsor, the Issuer and the
Depositor.*  Each of the Sponsor, the Issuer and the Depositor, in each case with respect to itself,
represents and warrants as of the Closing Date, as follows:

(a)    *Due Organization and Qualification.*  The Sponsor is a corporation, duly
organized, validly existing and in good standing under the laws of the State of Delaware, the
Depositor is a limited liability company, duly organized, validly existing and in good standing
under the laws of Delaware and the Issuer is a statutory trust duly organized, validly existing and
in good standing under the laws of Delaware.  Each of the Sponsor, the Issuer and the Depositor
is, or shall become, duly qualified to do business, is, or shall be, in good standing and has
obtained, or shall obtain, all necessary licenses, permits, charters, registrations and approvals
(together, "approvals") necessary for the conduct of its business as currently conducted and as
described in the Offering Document and the performance of its obligations under the Operative
Documents to which it is a party in each jurisdiction in which the failure to be so qualified or to
obtain such approvals would render any Operative Document unenforceable in any respect or
would have a material adverse effect upon the Transaction.

(b)    *Power and Authority.*  Each of the Sponsor, the Issuer and the Depositor
has all necessary power and authority to conduct its business as currently conducted and as
described in the Offering Document, to execute, deliver and perform its obligations under the
Operative Documents to which it is a party and to consummate the Transaction.

(c)    *Due Authorization.*  The execution, delivery and performance of the
Operative Documents by each of the Sponsor, the Issuer and the Depositor has been duly
authorized by all necessary action and does not require any additional approvals or consents, or
other action by or any notice to or filing with any Person, including any governmental entity or
any of the stockholders or beneficial owners, as applicable, of the Sponsor, the Issuer or the
Depositor, which have not previously been obtained or given by the Sponsor, the Issuer or the
Depositor.

(d)    *Noncontravention.*  The execution and delivery by each of the Sponsor, the
Issuer or the Depositor of the Operative Documents to which it is a party, the consummation of the
Transaction and the satisfaction of the terms and conditions of the Operative Documents do not and
will not:

(i)    conflict with or result in any breach or violation of any provision
of the applicable organizational documents of the Sponsor, the Issuer or the Depositor or
any law, rule, regulation, order, writ, judgment, injunction, decree, determination or
award currently in effect having applicability to the Sponsor, the Issuer or the Depositor
or any of their respective material properties, including regulations issued by any

administrative agency or other governmental authority having supervisory powers over the Sponsor, the Issuer or the Depositor, which conflict, breach or violation reasonably could reasonably be expected to result in a Material Adverse Change;

(ii)    constitute a default by Sponsor, the Issuer or the Depositor under, result in the acceleration of any obligation under, or breach any provision of any loan agreement, mortgage, indenture or other agreement or instrument to which the Sponsor, the Issuer or the Depositor is a party or by which any of their respective properties is or may be bound or affected, which default, acceleration or breach could result in a Material Adverse Change; or

(iii)    result in or require the creation of any lien upon or in respect of any assets of the Sponsor, the Issuer or the Depositor, which lien could reasonably be expected to result in a Material Adverse Change except as otherwise expressly contemplated by the Operative Documents.

(e)    *Legal Proceedings.* There is no action, proceeding or investigation by or before any court, governmental or administrative agency or arbitrator against or affecting the Sponsor (other than as may be disclosed in the Sponsor's financial statements), the Issuer or the Depositor or any of their respective subsidiaries, any properties or rights of the Sponsor, the Issuer or the Depositor or any of their respective subsidiaries or any of the Loans pending or, to the Sponsor's, the Issuer's or the Depositor's knowledge after reasonable inquiry, threatened, which, in any case, if decided adversely to the Sponsor, the Issuer or the Depositor or any such subsidiary could result in a Material Adverse Change with respect to the Sponsor, the Issuer or the Depositor.

(f)    *Valid and Binding Obligations.* The Operative Documents (other than the Securities) to which it is a party, when executed and delivered by the Sponsor, the Issuer or the Depositor, respectively, will constitute the legal, valid and binding obligations of each of the Sponsor, the Issuer and the Depositor, enforceable in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equitable principles and public policy considerations as to rights of indemnification for violations of federal securities laws. The Notes, when executed, authenticated and delivered in accordance with the Indenture, will be validly issued and outstanding and entitled to the benefits of the Indenture, and the Certificates when executed, authenticated and delivered in accordance with the Trust Agreement, will be validly issued and outstanding and entitled to the benefits of the Trust Agreement. Each of the Sponsor, the Issuer and the Depositor will not at any time in the future deny that the Operative Documents to which it is a party constitute the legal, valid and binding obligations of the Sponsor, the Issuer and the Depositor, as applicable.

(g)    *Financial Statements.* The Financial Statements of the Sponsor, copies of which have been furnished to the Insurer, (i) are, as of the dates and for the periods referred to therein, complete and correct in all material respects, (ii) present fairly the financial condition and results of operations of the Sponsor as of the dates and for the periods indicated and (iii) have been prepared in accordance with generally accepted accounting principles consistently applied, except as noted therein (subject as to interim statements to normal year-end

8

adjustments). Since the date of the most recent Financial Statements, there has been no Material Adverse Change in respect of the Sponsor, the Issuer or the Depositor. Except as disclosed in the Financial Statements, none of the Sponsor, the Issuer or the Depositor is subject to any contingent liabilities or commitments that, individually or in the aggregate, have a material possibility of causing a Material Adverse Change as contemplated by clause (i) of the definition of Material Adverse Change in respect of the Sponsor, the Issuer or the Depositor.

(h)     *Compliance with Law, etc.*  No practice, procedure or policy employed or proposed to be employed by the Sponsor, the Depositor or the Issuer in the conduct of its business violates any law, regulation, judgment, agreement, order or decree applicable to it which, if enforced, could result in a Material Adverse Change as contemplated by clause (i) of the definition of Material Adverse Change.

(i)     *Good Title; Absence of Liens or Security Interest.*  The Issuer is the owner of, and has good and marketable title to, all of the Collateral free and clear of all liens and has full right, power and lawful authority to assign, transfer and pledge the Collateral (and any documents which are a part thereof) and all such substitutions therefor and additions thereto delivered under the Indenture.

(j)     *Taxes.*  Each of the Sponsor and the Issuer has filed (or caused to be filed) prior to the date hereof all federal and state tax returns that are required to be filed and has paid all taxes, including any assessments received by it that are not being contested in good faith, to the extent that such taxes have become due, except with respect to any failures to file or pay that, individually or in the aggregate, would not result in a Material Adverse Change as contemplated by clause (i) of the definition with respect to the Sponsor and the Issuer.  Any taxes, fees and other governmental charges payable by the Sponsor, the Issuer or the Depositor in connection with the Transaction, the execution and delivery of the Operative Documents and the issuance of the Securities have been paid or shall have been paid at or prior to the Closing Date if such taxes, fees or other governmental charges were due on or prior to the Closing Date.

(k)     *Accuracy of Information.*  Neither the Operative Documents nor other material information relating to the Loans, the operations of the Sponsor, the Issuer or the Depositor or the financial condition of the Sponsor, the Issuer or the Depositor (collectively, the "Documents"), as amended, supplemented or superseded, furnished to the Insurer in writing or in electronic form by the Sponsor, the Issuer or the Depositor contains any statement of a material fact which was untrue or misleading in any material respect when made.  Each of the Sponsor, the Issuer and the Depositor has no knowledge of any circumstances that could reasonably be expected to cause a Material Adverse Change as contemplated by clause (i) of the definition with respect to the Sponsor, the Issuer or the Depositor.  Since the furnishing of the Documents, there has been no change nor any development or event involving a prospective change known to the Sponsor, the Issuer or the Depositor that would render any of the Documents untrue or misleading in any material respect.  Without limiting the generality of the foregoing, the information in the Data Tape with respect to each HELOC is true and correct as of the Cut-off Date.

(l)     *Compliance With Securities Laws.*  The offer of the Notes complies or shall comply in all material respects with all requirements of law, including all registration and

9

reporting requirements of applicable securities laws. Without limiting the foregoing, the Offering Document does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; *provided, however,* that no representation is made with respect to the information in the Offering Document regarding the Insurer set forth under the captions "The Policy" or the financial statements of the Insurer incorporated by reference into the Offering Document, the Servicer Information, the Underwriter Information or the Originator Information. The offer of the Insured Notes has not been and will not be in violation of the Securities Act or any other federal or state securities laws. The Indenture has been qualified under the Trust Indenture Act. Based upon advice of legal counsel, the Trust Agreement is not required to be qualified under the Trust Indenture Act and each of the Issuer and the Trust Estate is not required to be registered as an "investment company" under the Investment Company Act.

(m) *Operative Documents.* Each of the representations and warranties of the Sponsor, the Issuer and the Depositor contained in the applicable Operative Documents is true and correct in all material respects and each of the Sponsor, the Issuer and the Depositor hereby makes each such representation and warranty to, and for the benefit of, the Insurer as if the same were set forth in full herein. Each of the Sponsor, the Issuer and the Depositor will not at any time in the future deny that the Operative Documents to which it is a party constitute the legal, valid and binding obligations of the Sponsor, the Issuer and the Depositor, as applicable.

(n) *Solvency; Fraudulent Conveyance.* Each of the Sponsor, the Issuer and the Depositor is solvent and shall not be rendered insolvent by the Transaction and, after giving effect to the Transaction, the Sponsor, the Issuer and the Depositor shall not be left with an unreasonably small amount of capital with which to engage in the ordinary course of its business, and each of the Sponsor, the Issuer and the Depositor does not intend to incur, or believe that it has incurred, debts beyond its ability to pay as they mature. Each of the Sponsor, the Issuer and the Depositor does not contemplate the commencement of insolvency, liquidation or consolidation proceedings or the appointment of a receiver, liquidator, conservator, trustee or similar official in respect of the Sponsor, the Issuer and the Depositor or any of their respective assets. The amount of consideration being received by the Depositor upon the transfer of the Loans to the Trust constitutes reasonably equivalent value and fair consideration for ownership interest evidenced by the Loans. The amount of consideration being received by the Issuer upon the sale of the Securities constitutes reasonably equivalent value and fair consideration for the ownership and/or debt interest evidenced by the Securities. The Sponsor is not transferring the Loans to the Depositor, the Depositor is not transferring the Loans to the Issuer, the Issuer is not pledging the Loans to the Indenture Trustee, nor is the Issuer selling the Securities, as provided in the Operative Documents, with any intent to hinder, delay or defraud any of the Sponsor's, the Issuer's or the Depositor's creditors.

(o) *Locations of Parties.* The Sponsor is a Delaware corporation. The Depositor is a Delaware limited liability company. The Issuer is organized under the laws of Delaware.

(p) *Security Interest in the Loans.* On the Closing Date, the Indenture Trustee shall have a first perfected priority interest in the Loans..

10

**Section 2.02.**    *Affirmative Covenants of the Sponsor, the Issuer and the Depositor.* Each of the Sponsor, the Issuer and the Depositor in each case with respect to itself hereby agrees that during the term of this Insurance Agreement, unless the Insurer shall otherwise expressly consent in writing:

(a)    *Compliance With Agreements and Applicable Laws.* Each of the Sponsor, the Issuer and the Depositor shall comply in all material respects with the terms and conditions of and perform its obligations under the Operative Documents to which it is a party in all cases in which failure to so comply or perform would result in a default thereunder and shall comply with all material requirements of any law, rule or regulation applicable to it.

(b)    *Corporate Existence.* Each of the Sponsor, the Issuer and, subject to Section 2.03(c), the Depositor and their respective successors and permitted assigns shall maintain its corporate or trust existence, as applicable, and shall at all times continue to be duly organized under the laws of their formation and duly qualified and duly authorized (as described in subsections 2.01(a), (b) and (c) hereof) and shall conduct its business in accordance with the terms of its applicable organizational documents.

(c)    Other Information:  The Sponsor shall furnish or cause to be furnished to the Insurer upon request:

(i)    *HELOC Data.*  (A) On or before the Closing Date, a copy of a magnetic tape (the "Data Tape") setting forth, as to each HELOC, the information required under the definition of "Mortgage Loan Schedule" in the Transfer and Servicing Agreement and

(B)    on each Payment Date, (i) the complete servicing tape provided by the Servicer to the Indenture Trustee with respect to such Payment Date, including updated HELOC data, including changes to information discovered to have been incorrect, and including codes indicating the delinquency status of each HELOC (*e.g.*, less than 30 days delinquent, 30-59 days delinquent, 60-89 days delinquent, 90+ days delinquent) and identifying Loans that are in foreclosure, Loans for which the mortgagor is the subject of a bankruptcy or other insolvency proceeding, and Loans that have been converted into real estate owned ("REO"), (ii) a report identifying any Loans that were modified, waived or amended during the prior calendar month and (iii) any other information reasonably requested by the Insurer.

(ii)    *Other Information.*  (A) Promptly upon receipt thereof, copies of all schedules, financial statements or other similar reports delivered to or by the Sponsor, the Issuer, the Depositor, the Owner Trustee or the Indenture Trustee pursuant to the terms of any of the Operative Documents, including all reports provided to either the Indenture Trustee or any Noteholder pursuant to the Transfer and Servicing Agreement, (B) promptly upon request, such other data regarding the Loans, the servicing and administration of the Loans, the Transaction or the Sponsor's financial condition as the Insurer may reasonably request and (C) all information required to be furnished to the Owner Trustee, the Indenture Trustee, the Noteholders or the Certificateholders simultaneously with the furnishing thereof

11

to the Owner Trustee, the Indenture Trustee, the Noteholders or the Certificateholders, as the case may be.

The information supplied pursuant to clause (i) above will be in Excel or Word format or another form of an electronic data file accessible by the Insurer by means of standard application software; *provided, however,* that the information required to be furnished pursuant to Section 2.02(c)(i)(B) may be made available on the Sponsor's internet website.

(d)     *Notice of Material Events.* The Sponsor shall cause Thompson Financial to promptly notify the Insurer of all 8-K and 10-Q filings of the sponsor in accordance with its standard procedures.

(e)     *Financing Statements and Further Assurances.* The Sponsor shall cause to be filed all necessary financing statements or other instruments, and any amendments or continuation statements relating thereto, necessary to be kept and filed in such manner and in such places as may be required by law to preserve and protect fully the interest of the Indenture Trustee in the Trust Estate. Each of the Sponsor, the Issuer and the Depositor shall, upon the reasonable request of the Insurer, from time to time, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, within twenty days of such request, such amendments hereto and such further instruments and take such further action as may be reasonably necessary to effectuate the intention, performance and provisions of the Operative Documents. In addition, each of the Sponsor, the Issuer and the Depositor agrees to cooperate with S&P and Moody's in connection with any review of the Transaction that may be undertaken by S&P and Moody's after the date hereof.

(f)     *Maintenance of Licenses.* Each of the Sponsor, the Issuer and the Depositor, and any successors thereof, shall maintain all licenses, permits, charters and registrations the loss or suspension of which could result in a Material Adverse Change.

(g)     *Retirement of Notes.* The Issuer and the Depositor shall instruct the Indenture Trustee, upon a retirement or other payment of the Insured Notes, to surrender the Policy to the Insurer for cancellation.

(h)     *Disclosure Document.* It will not use, or distribute to any Person for use, any information relating to the Insurer unless such information has been furnished by the Insurer and the use or distribution of such information has been approved by the Insurer in writing. The Insurer hereby consents to the inclusion of the information in respect of the Insurer included as of the date hereof in the Offering Document. Any Offering Document delivered with respect to the Securities shall clearly disclose that the Policy is not covered by the property/casualty insurance security fund specified in Article 76 of the New York Insurance Law.

(i)     *Third-Party Beneficiary.* Each of the Sponsor, the Issuer and the Depositor agrees that the Insurer shall have all rights provided to the Insurer in the Operative Documents and that the Insurer shall constitute a third-party beneficiary with respect to such rights in respect of the Operative Documents and hereby incorporates and restates its representations, warranties and covenants as set forth therein for the benefit of the Insurer;

12

provided, that the remedy for any breach of representation and warranty of the Seller in under Section 1.04(b) of the Sale Agreement and the remedy with respect to any defective Mortgage Loan under Section 1.03 of the Sale Agreement shall be limited to the remedies specified in the Sale Agreement. The Insurer agrees that the rights it shall have as a third-party beneficiary under the Indenture shall be limited to the rights granted to it and to the Noteholders in the Indenture.

(j)   *Corporate Formalities.* Each of the Sponsor, the Issuer and the Depositor shall observe all the formalities necessary to preserve its corporate or trust existence, as applicable, under the laws of the State of its formation, including, as applicable, (i) the obligation to hold annual meetings of its beneficial owners, shareholders or its board of directors and (ii) the obligation to prepare and file annual income, franchise and other tax returns.

(k)   *Closing Documents.* The Sponsor, the Issuer and the Depositor shall provide or cause to be provided to the Insurer an executed original copy of each document executed in connection with the Transaction within 60 days after the Closing Date.

(l)   *Incorporation of Covenants.* It agrees to comply with its covenants set forth in the Operative Documents and hereby incorporate such covenants by reference as if each were set forth herein.

(m)   *Incorporation by Reference.* The Depositor shall cause the Issuing Entity or agents acting on its behalf to respond to Item 7 of each Form 10-D filing as required pursuant to Regulation AB with respect to the Notes, that the Issuing Entity is incorporating by reference any Insurer Financial Statements filed by the Insurer or its parent during the period covered by such Form 10-D, together with the Commission filing number of the Insurer and its parent, as applicable.

**Section 2.03.**   *Negative Covenants of the Sponsor, the Issuer and the Depositor.* Each of the Sponsor, the Issuer and the Depositor in each case with respect to itself hereby agrees that during the term of this Insurance Agreement, unless the Insurer shall otherwise expressly consent in writing:

(a)   *Impairment of Rights.* None of the Sponsor, the Issuer and the Depositor shall take any action, or fail to take any action, if such action or failure to take action may result in a Material Adverse Change specified in clause (i) of the definition thereof with respect to the Sponsor, the Issuer or the Depositor, nor interfere in any material respect with the enforcement of any rights of the Insurer under or with respect to any of the Operative Documents or the Policy. The Sponsor, the Issuer and the Depositor shall give the Insurer written notice of any such action or, to the best of the knowledge of any of the Sponsor, the Issuer or the Depositor, any such failure to act on the earlier of: (i) the date upon which any publicly available filing or release is made with respect to such action or failure to act and (ii) promptly prior to the date of consummation of such action or failure to act. Each of the Sponsor, the Issuer and the Depositor shall furnish to the Insurer all information reasonably requested by the Insurer that is necessary to determine compliance with this paragraph.

13