**GREENPOINT MORTGAGE FUNDING TRUST 2006-HE1,**

as Issuer

By:     Wilmington Trust Company, not in its individual capacity but solely as Owner Trustee

By:_____

Name:_____

Title:_____

**U.S. BANK NATIONAL ASSOCIATION,**

as Indenture Trustee and not individually

By:_____

Name:____David Duclos_____

Title:____Vice President_____

*(Signature Page Two to Insurance and Indemnity Agreement - Greenpoint 2006-HE1)*

## **EXHIBIT 2**

[Complaint]

NEW YORK
COUNTY CLERK'S OFFICE

FEB 0 5 2009

NOT COMPARED
WITH COPY FILED

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

U.S. BANK NATIONAL ASSOCIATION, as
Indenture Trustee for the Benefit of the Insurers and
Noteholders of GreenPoint Mortgage Funding Trust
2006-HE1, Home Equity Loan Asset-Backed Notes,
Series 2006-HE1; SYNCORA GUARANTEE INC.,
formerly known as XL CAPITAL ASSURANCE INC.,
as Controlling Insurer, Note Controlling Party and
Class Ax Insurer; and CIFG ASSURANCE NORTH
AMERICA, INC., as Class Ac Insurer,

                  Plaintiffs,

           - against -

GREENPOINT MORTGAGE FUNDING, INC.,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

: Index No. 600352/09
: Date purchased: 2/5/09

: Plaintiffs designate New York County
: as the place of trial.

: The basis of the venue is the residence
: of two plaintiffs. *See* C.P.L.R.
: §§ 503(a), (c).

:         **SUMMONS**

: Plaintiffs reside at:

: U.S. Bank National Association
  c/o U.S. Bancorp
: U.S. Bancorp Center
  800 Nicollet Mall
: Minneapolis, Minnesota 55402

: Syncora Guarantee Inc.
  1221 Avenue of the Americas
: New York, New York 10020

: CIFG Assurance North America, Inc.
  825 Third Avenue
: New York, New York 10022

To the above-named Defendant:

        You are hereby summoned to answer the complaint in this action and to serve a

copy of your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance, on the Plaintiffs' Attorneys within 20 days after the service of this summons,

exclusive of the day of service (or within 30 days after the service is complete if this summons is

not personally delivered to you within the State of New York); and in case of your failure to

appear or answer, judgment will be taken against you by default for the relief demanded in the

complaint.

Dated: New York, New York
February 5, 2009

_____
Constance M. Boland

_____
Philip R. Forlenza
David W. Dykhouse
Erik Haas
Alexander Shapiro
Benjamin S. Litman

NIXON PEABODY LLP
437 Madison Avenue
New York, New York 10022
Telephone: (212) 940-3000
Fax: (212) 940-3111

Attorneys for U.S. Bank National Association,
as Indenture Trustee

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222

Attorneys for Syncora Guarantee Inc. and CIFG
Assurance North America, Inc.

Defendant's addresses:

GreenPoint Mortgage Funding, Inc.
100 Wood Hollow Drive
Novato, California 94945

1100 Larkspur Landing Circle
Suite 360
Larkspur, California 94939

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

U.S. BANK NATIONAL ASSOCIATION, as Inden-
ture Trustee for the Benefit of the Insurers and Note-
holders of GreenPoint Mortgage Funding Trust 2006-
HE1, Home Equity Loan Asset-Backed Notes, Series
2006-HE1; SYNCORA GUARANTEE INC., formerly
known as XL CAPITAL ASSURANCE INC., as Con-
trolling Insurer, Note Controlling Party and Class Ax
Insurer; and CIFG ASSURANCE NORTH AMERICA,
INC., as Class Ac Insurer,

                           **Plaintiffs,**

                     - against -

GREENPOINT MORTGAGE FUNDING, INC.,

                     **Defendant.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index No.: 600352/09

Filed 2/5/09

**COMPLAINT**

        The plaintiffs—(i) U.S. Bank National Association, solely in its capacity as inden-

ture trustee (the "Indenture Trustee") under the Indenture[1] for the benefit of the insurers and

holders ("Noteholders") of the notes issued by GreenPoint Mortgage Funding Trust 2006-HE1

(the "Issuer"), and at the direction of co-plaintiff Syncora Guarantee Inc., formerly known as XL

Capital Assurance Inc. ("Syncora"), as Controlling Insurer; (ii) Syncora, as Controlling Insurer,

Note Controlling Party and Class Ax Insurer under the Indenture; and (iii) CIFG Assurance

North America, Inc. ("CIFG" and, with Syncora, the "Insurers"), as Class Ac Insurer under the

Indenture—by their attorneys, Nixon Peabody LLP (for the Indenture Trustee) and Patterson

Belknap Webb & Tyler LLP (for the Insurers), for their complaint against the defendant, Green-

---

[1]  The "Indenture" is that certain Indenture dated as of August 1, 2006 between GreenPoint Mortgage
Funding Trust 2006-HE1, as Issuer, and the Indenture Trustee.

Point Mortgage Funding, Inc. ("GreenPoint"), a wholly owned subsidiary of Capital One Financial Corporation, hereby allege as follows:

**NATURE OF THE ACTION**

1.    This is a breach-of-contract action arising from GreenPoint's blanket failure to comply with the plain and unambiguous terms of two agreements governing its sale of nearly 30,000 residential mortgage loans that it originated.  In the Sale Agreements (as defined below), GreenPoint (a) made numerous representations and warranties relating to the attributes of the loans and the policies and practices pursuant to which the loans were originated, underwritten and serviced and (b) agreed either to cure breaches of those representations and warranties that materially and adversely affected the value of the loans or to repurchase the loans at a contractually specified repurchase price.  As contemplated by the Sale Agreements, the rights to enforce GreenPoint's commitments were assigned along with the loans to the Indenture Trustee in connection with a transaction involving the issuance of $1.83 billion of securities (the "Notes") that were secured and to be paid down by the cash flows from the loans.  Certain payments on the Class Ax Notes and the Class Ac Notes were guaranteed by Syncora and CIFG, respectively.

2.    But less than two years after the close of the transaction, the loans began to default at staggering rates, prompting Syncora as the Controlling Insurer to hire a consultant to review the loan documentation for compliance with GreenPoint's representations and warranties. As Syncora informed the Indenture Trustee, an astonishing 963 (or 93%) out of a sample of 1,030 of the loans sold, with a total principal balance of $91.8 million, did not comply with GreenPoint's representations and warranties under the Sale Agreements. The breaches discovered primarily involve an error, omission, misrepresentation, negligence, fraud or similar occur-

2

rence in connection with the origination and underwriting of the loans, all of which were defects

that GreenPoint explicitly represented did not exist and agreed to remedy if discovered. The re-

sults of the sample analysis, together with the severe underperformance of the entire pool of

GreenPoint loans, indicate that such breaches were not confined to the sample of loans reviewed,

but rather were pervasive. Indeed, slightly more than two years after closing, as of December 31,

2008, approximately $530 million of the loans (28.95% of the original pool balance) had either

been charged off as a total loss or were severely delinquent.

       3.     The Indenture Trustee promptly notified GreenPoint in writing of the

breaches identified by Syncora, thereby triggering GreenPoint's extensive remedial obligations

under the Sale Agreements. Specifically, the Sale Agreements require GreenPoint to repurchase

*all* of the $1.83 billion of loans that it sold under those agreements upon discovery that it made

untrue statements in connection with the sales, a fact that was established upon notice of the

breaches identified through the sample analysis. GreenPoint has failed and continues to fail to

comply with this explicit obligation, as well as its lesser-included but also explicit obligation of

repurchasing the specifically identified breaching loans. GreenPoint's widespread breaches of

the representations and warranties that it made in connection with the sale of the loans—as well

as its failure to perform its contractually required remedial cure-or-repurchase obligation—

constitute material breaches of each of the Sale Agreements as a whole.

       4.     Accordingly, the Indenture Trustee, acting at the direction of Syncora, as

the Controlling Insurer and Note Controlling Party, Syncora, as Class Ax Insurer, and CIFG, as

Class Ac Insurer, bring this action to compel the repurchase of all of the loans sold by Green-

Point, including those breaching loans, or, in the alternative, to recover as damages the contrac-

tually specified repurchase price for all the loans.

### THE PARTIES

5.      U.S. Bank National Association is a national banking association whose articles of association designate Ohio as the location of its main office, and whose principal place of business is in Minneapolis, Minnesota.

6.      Syncora is a New York corporation with its principal place of business in New York, New York.

7.      CIFG is a New York corporation with its principal place of business in New York, New York.

8.      Upon information and belief, GreenPoint is a New York corporation with its principal place of business at, until recently, 100 Wood Hollow Drive, Novato, California 94945 and, at present, 1100 Larkspur Landing Circle, Suite 360, Larkspur, California 94939.

### JURISDICTION AND VENUE

9.      This Court has personal jurisdiction over GreenPoint pursuant to C.P.L.R. § 301 because GreenPoint is present in the State of New York and C.P.L.R. § 302(a)(1) because the causes of action pleaded herein arise from transactions of business by GreenPoint within the State of New York.

10.     Venue is proper in New York County pursuant to C.P.L.R. § 503(a) and § 503(c) because several of the parties—namely, Syncora and CIFG—have their principal offices within New York County and therefore are deemed to reside therein.

### BACKGROUND

**A.      GreenPoint Built Its Mortgage-Loan Business on Its
Assurances Concerning the Quality of Its Mortgage Loans**

11.     GreenPoint is a wholly owned subsidiary of Capital One Financial Corporation ("Capital One"), which shut down GreenPoint's mortgage-origination operations in Au-

gust 2007. GreenPoint had been engaged in the business of originating and selling residential mortgage loans. GreenPoint specialized in so-called "no-doc" and "low-doc" loans, or those for which home buyers provide no or little documentation about their income and assets.[2] These loans, which had traditionally been designed for prime borrowers with strong credit histories, are also known as "non-conforming" loans because they do not comply with the standards set by Fannie Mae and Freddie Mac. As discussed below, this non-compliance and limited documentation made GreenPoint's representations and commitments regarding the loans all the more important.

12.    Upon information and belief, the profitability of GreenPoint's "originate and sell" business model was a function of its ability to originate a high volume of loans and then convert those loans into cash to fund additional originations. That is, GreenPoint earned fees from its loan originations and generated profit and funds for additional originations by selling the loans for "securitization." The securitizations involved the sale of loans to a trust, which in turn issued securities (or "notes") that were "backed" by the loans. The cash flow generated by the loans was used to pay principal and interest on the notes. The better the quality of the loans (*i.e.*, the greater the likelihood that the borrowers would make principal and interest payments when due), the higher the price GreenPoint could command upon the sale of the loans. But because GreenPoint specialized in the origination of loans with little or no documentation to substantiate the borrowers' credit quality and repayment ability, and because the majority of its loans were originated through a nationwide network of GreenPoint-approved independent mortgage brokers, the success and viability of GreenPoint's business model depended on others' acceptance of its representations concerning the attributes of the loans and its commitments to cover any loss re-

---

[2] Valerie Bauerlein, *Capital One Shuts Down GreenPoint Mortgage Unit*, Wall St. J., Aug. 22, 2007.

sulting from breaches of those representations. The importance of these representations cannot

be overstated: GreenPoint's "originate and sell" model meant that it retained no interest in the

performance of the loans after their sale and securitization—*except for* the continuing validity of

the representations that it had made, and the related remedial obligations that it had assumed, in

connection with the sales. GreenPoint's representations therefore had to be sufficiently robust to

persuade the parties to the securitization that GreenPoint—not they—bore the risk of loss due to

deficient or improper origination and underwriting practices or to misleading or incorrect loan

attributes.

        13.     Upon information and belief, from 2003 to 2006, when the securitization

at issue occurred, GreenPoint touted the quality of its mortgage loans and origination and under-

writing practices to dramatically increase the volume of its loan originations and sales for securi-

tizations. In its parent company's 2003 filings with the U.S. Securities and Exchange Commis-

sion ("SEC"), for example, Thomas S. Johnson, the Chairman of GreenPoint Financial Corp.,

stated as follows:

> I would like to emphasize that our mortgage production growth did
> not come at the expense of the quality of loans we originated. . . .
> In addition, I would like to emphasize that all of the loans we
> originate, including our specialty, or "Alternative A", loans are
> "A" quality loans. We are not in the business of originating sub-
> prime loans. . . . *It is difficult to conceive of any reasonable sce-
> nario in which GreenPoint would suffer meaningful losses on our
> loan portfolio.*[3]

        14.     The pace and volume of GreenPoint's originations and sales for securitiza-

tions escalated following its acquisition by North Fork Bank ("North Fork") in early 2004, espe-

cially with respect to the two types of loans—so-called "Alt-A" and "HELOC" loans—that con-

---

[3] Letter of Chairman Thomas S. Johnson, incorporated into Form 10-K filed by GreenPoint Financial
Corp. with the SEC on March 28, 2003 (emphasis added).

stitute the majority of the loans at issue in this action.[4] From the outset, North Fork's executives promised to significantly grow GreenPoint's productivity and geographic scope.[5] Upon information and belief, North Fork's acquisition of GreenPoint therefore increased the pressure on GreenPoint management to expand its loan-origination and loan-selling business. And, indeed, the first year following the acquisition saw a greater than 41% increase in the total dollar volume of GreenPoint's production for Alt-A and HELOC loans.[6]

15.    Moreover, North Fork reiterated and reinforced the representations concerning the purported quality of GreenPoint's loan portfolio and protocols, stating that "credit underwriting procedures [at] GreenPoint specifically are excellent" and that "[GreenPoint]'s run by what [we] believe are some of the best managers in the country, they are right up there with Countrywide and others."[7] Countrywide and its management are currently subject to myriad investigations and actions, some of which have already settled, for having engaged in systematic fraud in connection with the origination of residential mortgage loans.[8]

16.    Even when the volume of originations in the industry declined, Green-Point's executives promised that it would outperform the market.[9] But, as has only recently been

---

[4] See Prospectus Supplement dated August 25, 2006 for GreenPoint Mortgage Funding Trust 2006-HE1, Home Equity Loan Asset-Backed Notes, Series 2006-HE1 (together with the underlying Prospectus, the "ProSupp"), at S-38.

[5] See Investor call with North Fork management (Feb. 17, 2004).

[6] See ProSupp at S-38.

[7] Investor call with North Fork management (Feb. 17, 2004).

[8] See, e.g., In re Countrywide Fin. Corp. Derivative Litig., 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008) (denying Countrywide's motion to dismiss a shareholders' derivative suit and noting that former Countrywide employees credibly "tell what is essentially the same story—a rampant disregard for underwriting standards" and "support a strong inference of a Company-wide culture that, at every level, emphasized increased loan origination volume in derogation of underwriting standards").

[9] See, e.g., Investor call with Jeffrey Leeds, Executive Vice President and Chief Financial Officer of GreenPoint Financial Corp. (Oct. 16, 2003).

learned through the loan-documentation review conducted by Syncora's consultant, contrary to GreenPoint's representations and assurances, the loans that it was originating and selling for securitizations were not quality loans and were not originated and underwritten pursuant to sound, prudent practices.

17.    Capital One, which had acquired GreenPoint, together with North Fork, in late 2006, shut down GreenPoint's mortgage-loan operations in August 2007, less than a year later and only a year after the date of the securitization involved in this action. A GreenPoint spokesperson and Capital One's chairman both offered the same explanation for GreenPoint's demise:  tightened underwriting standards in the lending industry.[10] Capital One publicly announced that it would "retain exposure to future repurchases of past GreenPoint production to meet representation and warranty claims."[11]

18.    Neither Capital One nor GreenPoint, however, has repurchased the loans that GreenPoint is contractually required to repurchase to address the harm that GreenPoint's practices have inflicted on the securitization at issue. The Indenture Trustee and the Insurers bring this action to compel GreenPoint to perform its obligations under the Sale Agreements.

**B.    The Sales and Securitization**

19.    In two transactions in September 2005 and July 2006 ("Sales"), GreenPoint sold nearly 30,000 residential mortgage loans that it had originated ("Loans") to GMAC Mortgage Corporation ("GMAC"). The Sales were effectuated pursuant to two agreements: a Flow Revolving Credit Loan Purchase and Warranties Agreement dated September 26, 2005

---

[10] *See* Jed Moss, *Alt-A Mortgage Lender Closes Up Shops*, Mortgage Found., June 9, 2007 (citing GreenPoint spokesperson Julie Rakes); Bauerlein, *Capital One Shuts Down GreenPoint Mortgage Unit* (citing a memo circulated by Capital One Chairman and Chief Executive Richard D. Fairbanks).

[11] Press Release, Capital One, Capital One Closes GreenPoint Mortgage Wholesale Unit (Aug. 20, 2007) (as filed with the SEC).

("HELOC Sale Agreement") and a Flow Mortgage Loan Purchase and Warranties Agreement dated July 26, 2006 ("Mortgage Loan Sale Agreement") (collectively, "Sale Agreements").

20.     The Sale Agreements explicitly contemplated that the Loans would be securitized and used as collateral for notes issued to investors. Section 28 of the Sale Agreements not only authorizes GMAC, as Purchaser, to "convey the [Loans] to one or more securitized trust structures," but requires GreenPoint to "cooperate" with GMAC in connection with any such "Securitization Transfer."

21.     In addition, GreenPoint explicitly obligated itself to honor GMAC's rights and remedies under the Sale Agreements (the "Purchaser's Rights and Remedies") regardless of who ultimately acquired them through the assignments necessary to effectuate a contemplated securitization. Section 21 of the Sale Agreements states that the Purchaser's Rights and Remedies "shall bind and inure to the benefit of and be enforceable by [GreenPoint] and the Purchaser *and the respective successors and assigns of . . . the Purchaser*." (Emphasis added.) And Section 21 of the HELOC Sale Agreement, which applies to 95% of the Loans, states that, "in the case of a Securitization Transfer . . . , Purchaser shall have the right to assign its rights under this Agreement into such Securitization Transfer . . . *after which the issuer or trustee for the issuer of any such Securitization Transfer . . . shall be deemed to be a Purchaser*." (Emphasis added.)

22.     As contemplated, the Loans and the Purchaser's Rights and Remedies were transferred into the Issuer, a Delaware statutory trust bearing GreenPoint's name, Green-Point Mortgage Funding Trust 2006-HE1, and then granted and assigned from the Issuer to the Indenture Trustee for the benefit of the Insurers and Noteholders, all as part of a securitization

transaction that closed on August 28, 2006 (the "Securitization").[12] The transfers were accomplished through a chain of assignments executed within five days of the second GreenPoint-to-GMAC Sale.

23.    GMAC initially assigned the Purchaser's Rights and Remedies, together with the Loans, to Lehman Brothers Bank, F.S.B. ("Lehman Bank") through two Assignment, Assumption and Recognition Agreements ("AARs"), one for each of the two Sale Agreements, dated July 28, 2006. Section 6 of the AARs makes clear that Lehman Bank, as "Assignee," "shall become the 'Purchaser' under the [Sale] Agreement[s]." Accordingly, "all representations, warranties and covenants by [GreenPoint] as the 'Seller' thereunder, including, but not limited to, the representations, warranties and covenants to repurchase any [Loan] . . . , shall accrue to [Lehman Bank] by virtue of the [AARs]." AARs § 6.

24.    Lehman Bank subsequently assigned these representations, warranties and covenants and the other Purchaser's Rights and Remedies, together with the Loans, to its parent company Lehman Brothers Holdings, Inc. ("Lehman Holdings"),[13] which, in turn, assigned them to an affiliated special-purpose entity known as the Depositor, in this case, Structured Asset Securities Corporation ("SASC").[14] Finally, SASC assigned the Purchaser's Rights and Remedies, together with the Loans, to the Issuer, which then granted and assigned the Purchaser's Rights and Remedies, together with the Loans, to the Indenture Trustee for the benefit of the Insurers

---

[12] Another company, Impac Funding Corporation, originated and also sold to GMAC a negligible percentage of the loans that were ultimately deposited into the Issuer, but only the GreenPoint loans are relevant to this action.

[13] Assignment and Assumption Agreement, dated August 1, 2006.

[14] Mortgage Loan Sale and Assignment Agreement, dated August 1, 2006.

and the Noteholders.[15]  This is precisely the "Securitization Transfer" contemplated by the Sale

Agreements.

          25.     Under the Indenture, which effectuated the final step of the assignment

process described above, the Insurers are granted various rights with respect to the enforcement

of the Indenture Trustee's rights and remedies.  First, as noted, the Issuer's grant and assignment

of the Loans and the Purchaser's Rights and Remedies to the Indenture Trustee was for the bene-

fit of the Insurers, among others.  Section 11.10 of the Indenture explicitly names the Insurers as

"third-party beneficiaries to the provisions of this Indenture," a status that entitles the Insurers

"to rely upon and directly to enforce such provisions of the Indenture."  In addition, Section 5.20

of the Indenture sets forth various "Insurers' Rights Regarding Actions, Proceedings or Investi-

gations."  These include the right of the Controlling Insurer "to participate in, to direct the en-

forcement . . . of, and, at the Controlling Insurer's sole option, to institute . . . any action, pro-

ceeding or investigation that could adversely affect the Issuer . . . or the rights or obligations of

the Insurers . . . under the related Policy or the Operative Agreements."  Indenture § 5.20(a).

Syncora is, and at all times since the Securitization has been, the Controlling Insurer under the

Indenture, and CIFG would become the Controlling Insurer if certain circumstances were to

arise.  *See id.* § 1.01(a).  Finally, the Insurance and Indemnity Agreements that Syncora and

CIFG separately entered into in connection with the Securitization grant them similar rights to

direct the actions of the Indenture Trustee and the enforcement of the Indenture Trustee's rights

and remedies.[16]

---

[15]  Transfer and Servicing Agreement and Indenture, each dated August 1, 2006.

[16]  Under Section 5.02(a)(iii) of the Insurance and Indemnity Agreement dated August 28, 2006 that Syn-
cora entered into with, among others, the Indenture Trustee, Syncora is empowered to "exercise any rights
and remedies under the Indenture in accordance with the terms thereof or direct the Indenture Trustee to
exercise such remedies in accordance with the terms of the Indenture."  Section 5.02(a)(iv) also empow-
ers Syncora to "exercise any rights and remedies under the Transfer and Servicing Agreement ['TSA'],"

26.    Accordingly, the Indenture Trustee, at the direction of Syncora and with both Syncora and CIFG, brings this action to exercise and enforce the Purchaser's Rights and Remedies for the benefit of the Insurers and the Noteholders. As discussed further below, these include the right to demand that GreenPoint comply with its clear contractual obligations to re-purchase the Loans upon notice that GreenPoint is in breach of one or more of its representations and warranties.

**C.    GreenPoint's Representations and Warranties
Are the Linchpin of the Sales and Securitization**

27.    GreenPoint's numerous and broad representations and warranties relating to the Loans and the practices pursuant to which the Loans were originated and underwritten were an inducement to the initial Sales, the ultimate sale of the Loans to the Issuer as part of the Securitization, and every assignment in between, as well as an inducement to the Insurers to is-sue their insurance policies for the benefit of the Noteholders. In making these representations and warranties, GreenPoint assured the Purchasers and Securitization participants that Green-Point—not they—would bear the risk of the Loans' non-compliance. The Indenture Trustee and the Insurers and, upon information and belief, the other Securitization participants, relied on GreenPoint's representations and warranties and GreenPoint's assumption of this risk in deciding to participate in the Securitization and the other transactions contemplated by the Sale Agree-ments and, in the case of the Insurers, in assessing their own risk in issuing their respective in-surance policies.

---

which include in Section 3.03 of that agreement the Indenture Trustee's right to demand from GreenPoint the repurchase of loans upon the breach of its representations and warranties. *See* TSA § 3.03. CIFG is granted the identical power under Section 5.02(a)(i) of the separate Insurance and Indemnity Agreement dated August 21, 2006.

*i.*   ***GreenPoint's Representations and Warranties***

28.   GreenPoint's representations and warranties are contained in Sections 6 and 7 of the Sale Agreements. With respect to each of the Loans, GreenPoint represented and warranted, among other things, that, as of the closing date of the Sales:

- The information set forth in the Loan Schedule is complete, true and correct. (Sale Agreements § 7(a));

- Each Loan at the time it was made complied in all material respects with applicable local, state and federal laws (including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer-credit protection, equal-credit-opportunity and disclosure laws, predatory- and abusive-lending laws and unfair- and deceptive-practices laws). (Sale Agreements § 7(g));

- The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. (Sale Agreements § 7(k));

- No fraud was committed in connection with the origination of a Loan. (Sale Agreements § 7(k));

- Each Loan was underwritten in accordance with GreenPoint's underwriting guidelines in effect at the time such Loan was originated. (HELOC Sale Agreement § 7(u); Mortgage Loan Sale Agreement § 7(v));

- No error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Loan has taken place on the part of any person including without limitation the Mortgagor, any appraiser, any builder or developer or any other party involved in the origination of the Loan; no predatory or deceptive lending practices, including, without limitation, the extension of credit without regard to the ability of the Mortgagor to repay and the extension of credit that has no apparent benefit to the Mortgagor, were employed in the origination of the Loan. (HELOC Sale Agreement § 7(tt); Mortgage Loan Sale Agreement § 7(yy));

- The origination and collection practices used with respect to a Loan have been in accordance with Accepted Servicing Practices, in all respects in compliance with all applicable laws and regulations and in all material respects proper and prudent in the mortgage origination and servicing business. (HELOC Sale Agreement § 7(ff); Mortgage Loan Sale Agreement § 7(hh)); and

- The methodology used in underwriting the extension of credit for each Loan employs objective mathematical principles which relate the Mortgagor's income, as-

13

sets and liabilities to the proposed payment and such underwriting methodology
does not rely on the extent of the Mortgagor's equity in the collateral as the prin-
cipal determining factor in approving such credit extension. Such underwriting
methodology confirmed that at the time of origination (application/approval) the
Mortgagor had a reasonable ability to make timely payments on the Loan.
(HELOC Sale Agreement § 7(ccc)).

29.    "[A]s a condition to the consummation of" the Sales and any other trans-

actions "contemplated by" the Sale Agreements (*i.e.*, the Securitization), GreenPoint also repre-

sented and warranted, among other things, that, as of the closing date of the Sales:

> [n]either this Agreement nor any statement, report or other docu-
> ment furnished or to be furnished pursuant to this Agreement or in
> connection with the transactions contemplated hereby contains any
> untrue statement of fact or omits to state a fact necessary to make
> the statements contained therein not misleading.

(Sale Agreements § 6(h)).

30.    Among the documents furnished in connection with the Securitization was

the Prospectus Supplement (together with the underlying Prospectus, the "ProSupp") delivered to

prospective investors pursuant to the Securities Act of 1933, as amended. The ProSupp contains

additional assurances made by GreenPoint about its loan-origination and loan-underwriting

practices. The ProSupp includes, for example, an assurance to prospective investors that the

Loans were underwritten and issued in a prudent fashion and therefore were unlikely to default.[17]

Specifically, the ProSupp states that "the GreenPoint underwriting guidelines are applied to

evaluate the prospective borrower's credit standing and repayment ability and the value and

adequacy of the mortgaged property as collateral." ProSupp at S-38. The ProSupp further

specifies that, "[a]s part of its evaluation of potential borrowers, GreenPoint generally requires a

description of the borrower's income." *Id.* at S-39.

---

[17] An identical description appears in an exhibit to the August 1, 2006 Mortgage Loan Sale and Assign-
ment Agreement between Lehman Holdings and SASC.

31.    With respect to its "no-doc" or "low-doc" loan-origination programs, GreenPoint assured investors that the borrowers participating in such programs had "credit histories that demonstrate an established ability to repay indebtedness in a timely fashion." *Id.* GreenPoint also claimed to conduct a "quality control review" of a sample of the loans that it acquired from "approved correspondent lenders." *Id.*

32.    To reinforce the absolute nature of its commitment to bear the risk in the event that any of the Loans did not comply with the foregoing representations and warranties, GreenPoint explicitly agreed in the Sale Agreements that a representation and warranty made to the best of its knowledge, if proven to be inaccurate, would be deemed breached "notwithstanding [GreenPoint]'s lack of knowledge with respect to the substance of such representation and warranty." Sale Agreements § 8(b).

### ii.    *GreenPoint's Cure-or-Repurchase Obligation*

33.    GreenPoint's assumption of the risk that its representations and warranties would prove inaccurate also included an obligation to cure any such breaches or to repurchase Loans with respect to which breaches had been or are identified.  Section 8 of the Sale Agreements provides in relevant part as follows:

> Within 60 days of the earlier of either discovery by or notice to
> [GreenPoint] of any Breach of a representation or warranty,
> [GreenPoint] shall use its best efforts promptly to cure such Breach
> in all material respects and, if such Breach cannot be cured,
> [GreenPoint] shall, at the Purchaser's option, repurchase such
> [breaching loan(s)] at the Repurchase Price.[18]

Like GreenPoint's representations and warranties, its cure-or-repurchase obligation is broad, (i) arising upon discovery or notice and (ii) extending to the breach of any representation or warranty that materially and adversely affects the value of a given Loan, the interest of any Pur-

---

[18]  The "Repurchase Price" for the various types of Loans is defined in Section 1 of the Sale Agreements.

chaser, or the interest of any Purchaser in the Loan. *See* Sale Agreements § 8. The breaches at issue, which involve errors, omissions, misrepresentations, negligence, fraud or similar occurrences in connection with the origination and underwriting of the Loans, materially increased the risk of loss associated with, and decreased the value of, the Loans.

34.    And if "a Breach shall involve any representation or warranty set forth in Section 6" of the Sale Agreements, GreenPoint's remedial obligation is even broader, reflecting the seriousness of the representations set forth in that section: If "such Breach cannot be cured within 60 days of the earlier of either discovery by or notice to [GreenPoint] of such Breach, *all* of the [Loans] shall, at the Purchaser's option, be repurchased by [GreenPoint] at the Repurchase Price." Sale Agreements § 8 (emphasis added). As explained above, the Indenture Trustee, as assignee of the Issuer, is the "Purchaser" for the purposes of these provisions and has exercised its option to demand repurchase at the contractually specified "Repurchase Price."

**D.    GreenPoint's Breaches of Its Representations and Warranties**

35.    In early 2008, Syncora informed the Indenture Trustee that 963 of the Loans ("Breaching Loans") purchased by the Issuer and assigned to the Indenture Trustee and with a total principal balance of $91.8 million did not comply with GreenPoint's representations and warranties. These Breaching Loans represented 93% of a sample of 1,030 Loans that had been re-underwritten. The Breaching Loans contained one or, in most cases, more than one defect that constituted a breach of one of more of the numerous representations and warranties made by GreenPoint in the Sale Agreements, including:

a)    pervasive misrepresentations and/or negligence with respect to the statement of the income, assets or employment of the borrower (*see, e.g.*, Sale Agreements § 7(a), (k), (tt));

b)    misrepresentations of the borrower's intent to occupy the property as the borrower's residence and subsequent failure to so occupy the property (*id.*);

16

    c)      inflated and fraudulent appraisal values (*id.*); and

    d)      pervasive violations of GreenPoint's own underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with credit scores below the required minimum, (iv) with debt-to-income and/or loan-to-value ratios above the allowed maximum or (v) with relationships to GreenPoint or other non-arm's-length relationships (*see, e.g.*, HELOC Sale Agreement § 7(u), (tt); Mortgage Loan Sale Agreement § 7(v), (yy)).

36.     The large number and seriousness of the breaches identified in the re-underwriting of the sample of Loans not only demonstrate deficiencies in GreenPoint's loan-underwriting practices with respect to the Breaching Loans, but also suggest a pervasive pattern of malfeasance, misconduct and/or negligence in connection with GreenPoint's loan-origination practices as a whole, and therefore call into question the origination and underwriting of all of the Loans sold to the Issuer and assigned to the Indenture Trustee.

37.     A finding of prevalent underwriting failure and fraud in the origination of the Loans is further suggested by the remarkably poor performance of the Loans following the Securitization. As of December 31, 2008, the Securitization had experienced cumulative losses of more than $387 million. Nearly 29% of the Loans either have been written off by the Issuer as total losses or are severely delinquent. The Securitization's performance has been so poor that it cannot be explained merely by adverse conditions in the housing market. This deterioration parallels that of GreenPoint itself, which, as noted, saw its mortgage-origination operations shut down in August 2007.

38.     Numerous borrowers and former GreenPoint employees have recently sued the company and made similar allegations of fraud and other pervasive failures in its origination and underwriting practices. Such actions include a "whistleblower" action filed in June of last year by a former senior underwriter, who alleged, among other things, that GreenPoint had

17

engaged in fraudulent and other unlawful activities by forcing the approval of mortgage-loan ap-

plications containing fraudulent information or by approving applications after the underwriter

had either denied such applications or made approval contingent upon obtaining additional bor-

rower documentation.[19]  Multiple individual borrowers and a class of borrowers have also sued

GreenPoint within approximately the last year and a half, alleging, among other things, discrimi-

natory and predatory lending practices, fraudulent loan-origination practices based on misstated

or overstated income and/or employment status, violations of the Truth in Lending Act, viola-

tions of federal anti-kickback laws and elder abuse.[20]  During that same time period, the Attorney

General of the State of New York had also been investigating GreenPoint for discriminatory

lending practices.  GreenPoint paid $1 million in July of last year to settle the State's charges

against it, and two New York mortgage brokers that had worked with GreenPoint agreed earlier

this year to pay an additional $665,000 in restitution to approximately 455 minority borrowers.[21]

These numerous lawsuits and investigations only further suggest that GreenPoint engaged in a

pattern of fraudulent and otherwise improper lending practices fraught with severe underwriting

deficiencies.

        39.      By making untrue representations, warranties and other statements per-

taining to the Loans and the practices pursuant to which the Loans were underwritten, originated

and serviced, GreenPoint breached its representation and warranty in Section 6(h) of the Sale

---

[19]  *Steinmetz v. GreenPoint Mortgage Funding, Inc.*, Case No. 08-civ-5367 (S.D.N.Y. June 11, 2008).

[20]  *See Ferguson v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 0:08-CV-60854-WPD (S.D. Fla. June 5, 2008); *Lewis v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 1:08-cv-00567-TSE-TCB (E.D. Va. June 3, 2008); *Ouziz v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 3:08-cv-02201-WHA (N.D. Cal. Apr. 29, 2008); *Perez v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 5:08-cv-01972-JW (N.D. Cal. Apr. 15, 2008); *Ramirez v. GreenPoint Mortgage Funding, Inc.*, Case No. 3:08-cv-00369-EDL (N.D. Cal. Jan. 18, 2008); *Knapp v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. CIV 466080 (Cal. Super. Ct. Sept. 14, 2007); *Feinstein v. GreenPoint Mortgage Funding, Inc. et al.* (E.D. Pa. May 7, 2007).

[21]  *GreenPoint Brokers Targeted by New York*, MortgageDaily.com, Jan. 5, 2009.

Agreements that "[n]either this Agreement nor any statement, report or other document furnished

or to be furnished pursuant to this Agreement or in connection with the transactions contem-

plated hereby contains any untrue statement of fact or omits to state a fact necessary to make the

statements contained therein not misleading." These breaches entitle the Indenture Trustee, for

the benefit of the Insurers and the Noteholders, to substantial remedies, including demanding, as

it has, that GreenPoint repurchase all of the Loans.

**E.      GreenPoint's Willful Refusal to Comply with Its Con-
         tractual Cure-or-Repurchase Obligation**

40.     By letter dated March 14, 2008 ("First Breach Notice"), the Indenture

Trustee notified GreenPoint of breaches of various of its representations and warranties in the

Sale Agreements with respect to approximately 655 Loans in the re-underwritten sample. The

Indenture Trustee requested that GreenPoint comply with Section 8 of the Sale Agreements and

either cure the breaches or repurchase the Breaching Loans.

41.     GreenPoint did not respond until June 16, 2008, more than three months

later, when it refused to cure any of the identified breaches or repurchase any of the Breaching

Loans. GreenPoint did not offer any tenable justification for its blanket rejection of its contrac-

tual obligations. To the contrary, its objections sound in bad faith. GreenPoint asserted, for ex-

ample, that the Indenture Trustee had "unreasonably delayed" notifying GreenPoint of the

breached representations and warranties. There is no support for that proposition. The Indenture

Trustee provided timely notice and demand upon discovery of the Breaching Loans. It is Green-

Point's delay in complying with its express contractual obligations that was and continues to be

unreasonable and prejudicial to the Indenture Trustee's, as well as the Insurers' and the Note-

holders', interests.

42.    By letter dated July 9, 2008 ("Second Breach Notice" and, together with the First Breach Notice, the "Breach Notices"), the Indenture Trustee notified GreenPoint of breaches of various of its representations and warranties in the Sale Agreements with respect to an additional group of approximately 308 Loans in the re-underwritten sample. The Indenture Trustee again requested that GreenPoint comply with Section 8 of the Sale Agreements and either cure the breaches or repurchase the Breaching Loans. To date, GreenPoint has not responded to the Second Breach Notice.

43.    Finally, by letter dated December 9, 2008 ("Breach Clarification"), the Indenture Trustee clarified that the breaches that it had previously identified in the Breach Notices necessarily also constituted breaches of Section 6(h) of the Sale Agreements and, therefore, required GreenPoint to repurchase not only the Breaching Loans, but all of the Loans. GreenPoint responded to the Breach Clarification in a letter dated January 26, 2009 by again rejecting the Indenture Trustee's requests and failing to comply in any manner with GreenPoint's express contractual obligations.

44.    In sum, despite receipt of the Breach Notices and the Breach Clarification, GreenPoint has not cured any of the breaches identified in those letters. GreenPoint therefore must repurchase all of the Loans, including the Breaching Loans. *See* Sale Agreements § 8.

## FIRST CAUSE OF ACTION

### (Breach of Contract – Representations and Warranties)

45.    The Indenture Trustee and the Insurers repeat and reallege each and every allegation set forth in paragraphs 1 through 44 above as if fully set forth herein.

46.    The Sale Agreements are valid and binding contracts between the parties thereto and their successors and assigns.

20

47.    GreenPoint is a party to the Sale Agreements.

48.    The Issuer is the ultimate assignee of the Purchaser's Rights and Remedies
against GreenPoint under the Sale Agreements, which Purchaser's Rights and Remedies have
been granted and assigned to, and may (and, at the direction of Syncora, must) be exercised and
enforced by, the Indenture Trustee for the benefit of the Insurers and the Noteholders.

49.    The Indenture Trustee has consistently and timely performed its obliga-
tions under the Sale Agreements.

50.    By making untrue representations and warranties and statements pertain-
ing to the Loans and the practices pursuant to which the Loans were underwritten, originated and
serviced, GreenPoint breached both Sections 6 and 7 of the Sale Agreements, including, but not
limited to, the specific representations and warranties that are both set forth therein and identified
in the Breach Notices and the Breach Clarification.

51.    The breaches identified in the Breach Notices and the Breach Clarification
materially and adversely affected the value of the Breaching Loans and the interests of the Issuer,
the Indenture Trustee, the Insurers and the Noteholders.

52.    As a result of GreenPoint's breaches of representations and warranties
contained in Sections 6 and 7 of the Sale Agreements and identified in the Breach Notices and
the Breach Clarification, the Issuer, the Insurer and the Noteholders have suffered irreparable
injury and, unless the Court orders GreenPoint to specifically perform its contractual obligations
to repurchase all of the Loans, including the Breaching Loans, the Issuer, the Insurer and the
Noteholders will continue to suffer irreparable injury for which they have no adequate remedy at
law.

21

## SECOND CAUSE OF ACTION

### (Breach of Contract – The Cure-or-Repurchase Obligation)

53.    The Indenture Trustee and the Insurers repeat and reallege each and every allegation set forth in paragraphs 1 through 52 above as if fully set forth herein.

54.    The Sale Agreements are valid and binding contracts between the parties thereto and their successors and assigns.

55.    GreenPoint is a party to the Sale Agreements.

56.    The Issuer is the ultimate assignee of the Purchaser's Rights and Remedies against GreenPoint under the Sale Agreements, which Purchaser's Rights and Remedies have been granted and assigned to, and may (and, at the direction of Syncora, must) be exercised and enforced by, the Indenture Trustee for the benefit of the Insurers and the Noteholders.

57.    The Indenture Trustee has consistently and timely performed its obligations under the Sale Agreements.

58.    By rejecting the Indenture Trustee's demands that GreenPoint repurchase all of the Loans or, at a minimum, cure the breaches identified in the Breach Notices or repurchase the Breaching Loans, GreenPoint has materially breached its obligations under Section 8 of the Sale Agreements.

59.    GreenPoint's material breaches of Section 8 of the Sale Agreements were and continue to be willful and have damaged and are continuing to damage the Issuer, the Insurers and the Noteholders in an amount to be determined at trial.

22

## PRAYER FOR RELIEF

WHEREFORE, the Indenture Trustee and the Insurers respectfully pray for the following relief:

A.    For an Order compelling GreenPoint to comply with its obligations under Section 8 of the Sale Agreements and repurchase all of the Loans, including the Breaching Loans, at the Repurchase Price, as that term is defined in the Sale Agreements;

B.    For an award of damages, including an amount equivalent to the Repurchase Price of all of the Loans, including the Breaching Loans, as well as any other damages to be proven at trial for GreenPoint's willful material breaches of the Sale Agreements;

C.    For an award of compensatory damages and/or reimbursement, together with interest, court costs, disbursements, attorneys' fees and other expenses;

D.    For prejudgment interest; and

E.    For such other and further relief as the Court deems just and proper.

Dated: New York, New York
       February 5, 2009

_Constance M. Boland_ (signature)
_____
Constance M. Boland

_Philip R. Forlenza_ (signature)
_____
Philip R. Forlenza
David W. Dykhouse
Erik Haas
Alexander Shapiro
Benjamin S. Litman

NIXON PEABODY LLP
437 Madison Avenue
New York, New York 10022
Telephone: (212) 940-3000
Fax: (212) 940-3111

Attorneys for U.S. Bank National Association,
as Indenture Trustee

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222

Attorneys for Syncora Guarantee Inc. and CIFG
Assurance North America, Inc.

23

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

Brian P. Guiney
(212) 336-2305
Direct Fax:  212-336-1257
bguiney@pbwt.com

January 12, 2010

**By FedEx**

Epiq Bankruptcy Solutions, LLC
Attn: Lehman Brothers Holdings Claims Processing
757 Third Avenue, 3rd Floor
New York, New York 10017

Re:    *In re: Lehman Brothers Holdings Inc.*, Case No. 08-13555

Dear Sir or Madam:

        I am enclosing an amended Proof of Claim for filing against the above-referenced debtor.  I have also enclosed a duplicate copy of the amended claim.  Kindly date-stamp the copy and return it to me in the self-addressed, prepaid envelope that is also enclosed.

        If for any reason this amended claim is not in a form acceptable for filing, please call me immediately so that I can correct the deficiency.

        Thank you for your assistance.

Sincerely yours,

Brian P. Guiney

Enclosures



RECEIVED.

JAN 1 3 2010

Align top of FedEx Express® Shipping Label here.

PS|Ship - FedEx Label

From: Origin ID: NYCA (212)336-2000
BRIAN GUINEY
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036

Ship Date: 12JAN10
ActWgt: 1 LB
CAD: 912457/3WBU000200
Account# S *******

Page 1 of 2

Delivery Address Bar Code

SHIP TO: (212)336-2000          BILL SENDER
Epiq Bankruptcy Solutions
c/o Lehman Bros. Holdings Claims
757 3rd Ave Frnt 3

New York, NY 100172071

Ref #   x1560-000009
Invoice #
PO #
Dept #

TRK#   7994 3968 4553          WED - 13JAN    A1
STANDARD OVERNIGHT
DSR

EB OGSA                        10017
                               NY-US
                               EWR

This pouch is resealable.

Press Here. Press Here. Press Here. Press Here. Press Here.

Large Pak