# EXHIBIT D

ECF Filed
Document # 15075

LAZER, APTHEKER, ROSELLA
   & YEDID, P.C.
Attorneys for Inverell Shire Council
225 Old Country Road
Melville, New York 11747
Attn: Joseph C. Savino (JS8884)
Telephone: (631) 761-0855
Facsimile: (631) 761-0015

Hearing Date: March 31, 2011
Time: 2:00 p.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

In re:                                                                                          Chapter 11

    LEHMAN BROTHERS HOLDINGS INC., et al.,     Case No.: 08-13555 (JMP)

                             Debtors.

-------------------------------------------------------------------X

## OBJECTION OF INVERELL SHIRE COUNCIL TO DEBTOR'S NINETY-SECOND OMNIBUS OBJECTION TO CLAIMS (NO BLOCKING NUMBER LPS CLAIMS)

Secured Creditor Inverell Shire Council ("Inverell"), by and through its undersigned counsel, submits the following in support of its objection to the motion of Chapter 11 Debtor, Lehman Brothers Holdings Inc. ("Debtor"), for an order to reduce, modify, disallow and/or expunge the claim of Inverell ("Motion"):

1.     On September 18, 2009, Inverell filed a Proof of Claim in the above-referenced bankruptcy pursuant to the terms set forth in the order that established the deadline for filing proofs of claim dated July 2, 2009. A copy of Inverell's Proof of Claim as filed is annexed hereto and made a part hereof as Exhibit A.

1

2.      In February 2011, Inverell was advised that there was a problem with its Proof of Claim by Notice of Hearing on Debtors' Ninety-Second Omnibus Objection to Claims (No Blocking Number LPS Claims).

3.      The Motion provides that the "claim violates the Bankruptcy Court's July 2, 2009 order setting forth the procedures and deadlines for filing proof of claim in these chapter 11 cases (the "Bar Date Order") [Docket No. 4271] as it does not include an electronic instruction reference number or a blocking reference number as required by a Bar Date Order."

4.      According to the objection, the Proof of Claim filed by Inverell is valid, save for failing to include an electronic instruction reference number.

5.      The relevant electronic instruction reference number pertaining to Inverell's claim is Austraclear Series ID LBTG02.

6.      Inverell hereby seeks to amend its Proof of Claim to include the above mentioned electronic ID. A proposed amended Proof of Claim, including the Austraclear Series ID is annexed hereto and made a part hereof as Exhibit B.

7.      It is submitted that leave should be granted to amend the Proof of Claim as "[a]mendment to a claim is freely allowed where the purpose is to cure a defect in the claim as originally filed." See In Re Enron Corp., 419 F.3d 115, 133 (2d Cir. 2005).

2

WHEREFORE, for the foregoing reasons, Inverell Shire Council respectfully requests that the Court deny the Debtor's Objection to Claim as to its Proof of Claim on the grounds that the Proof of Claim is valid and the amendment required is nominal.

Dated: Melville, New York
March 16, 2011

LAZER, APTHEKER, ROSELLA
& YEDID, P.C.

By: /s/ Joseph C. Savino, Esq.
JOSEPH C. SAVINO (JS 8884)
Attorneys for Inverell Shire Council
225 Old Country Road
Melville, New York 11747
(631) 761-0855

3

# EXHIBIT

# A

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

UNIQUE IDENTIFICATION NUMBER: 4000000354

| In Re: | Chapter 11 |
|---|---|
| Lehman Brothers Holdings Inc., et al. Debtors. | Case No. 08-13555 (JMP) (Jointly Administered) |

Name of Debtor Against Which Claim is Held

**LEHMAN BROTHERS HOLDING INC**

Case No. of Debtor

**08 - 13555**

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Program Securities (See definition on reverse side).

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

LBH (MERGE2,DBF,Txnum2) Txnum2 #: 4000000354*****
INVERELL SHIRE COUNCIL
PO BOX 138
INVERELL NSW 2360
AUSTRALIA

Telephone number: 61 2 67288279  Email Address: paul.pay @ inverell.nsw.gov.au

Name and address where payment should be sent (if different from above)

Telephone number:   Email Address:

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
(If known)

Filed on: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particul

☐ Check this box if you are the debtor or trustee in this case.

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)   0000018687

|||||||||||| (barcode)

1.  Amount of Claim as of Date Case Filed: $ 300,000 —
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☑ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2.  Basis for Claim: Principal Protected Property Note
(See instruction #2 on reverse side.)

3.  Last four digits of any number by which creditor identifies debtor: _____
3a.  Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

4.  Secured Claim (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☑ Other
Describe: _____
Value of Property: $_____ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____
Amount of Secured Claim: $ 300,000 —  Amount Unsecured: $_____

6.  Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $_____
(See instruction #6 on reverse side.)

7.  Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8.  Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

5.  Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

Amount entitled to priority:

$_____

FOR COURT USE ONLY

**FILED / RECEIVED**

SEP 18 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date: 14.9.09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

| If by overnight mail, to: | If by first-class mail, to: |
|---|---|
| Epiq Bankruptcy Solutions, LLC<br>Attn: Lehman Brothers Holdings Claims Processing<br>757 Third Avenue, 3rd Floor<br>New York, New York 10017 | Lehman Brothers Holdings Claims Processing<br>c/o Epiq Bankruptcy Solutions, LLC.<br>FDR Station, P.O. Box 5076<br>New York, New York 10150-5076 |

If by hand delivery, to:

Epiq Bankruptcy Solutions, LLC
Attn: Lehman Brothers Holdings Claims Processing
757 Third Avenue, 3rd Floor
New York, New York 10017

or

Clerk of the United States Bankruptcy Court
Attn: Lehman Brothers Holdings Claims Processing
One Bowling Green
New York, New York 10004

Proofs of Claim will be deemed timely filed only if _actually_ _received_ by Epiq or the Court on or before the Bar Date. Proofs of Claim may _not_ be delivered by facsimile, telecopy, or electronic mail transmission.

In the event the Debtors amend their Schedules to (a) designate a claim as disputed, contingent, unliquidated or undetermined, (b) change the amount of a claim reflected therein, or (c) add a claim that was not listed on the Schedules or remove a claim that was listed on the Schedules, then, and in such event, the Debtors will notify the affected claimant be notified of such amendment and be granted thirty (30) days from the date of such notification within which to file a claim or be forever barred from doing so.

5.      WHAT TO FILE

If you file a Proof of Claim, your filed Proof of Claim must: (i) be written in the English language; (ii) be denominated in the lawful currency of the United States; (iii) conform substantially with the form attached to this notice (the "Proof of Claim Form"); (iv) state the name and case number of the specific Debtor against which it is filed; (v) set forth with specificity the legal and factual basis for the alleged claim; (vi) include supporting documentation or an explanation as to why documentation is not available; and (vii) be signed by the claimant or by an authorized agent of the claimant.

If you are asserting a claim against more than one Debtor or have claims against different Debtors, a separate Proof of Claim must be filed with respect to each such Debtor.

EXCEPT AS SET FORTH IN THE FOLLOWING EIGHT PARAGRAPHS, YOU SHOULD ATTACH TO YOUR COMPLETED PROOF OF CLAIM FORM COPIES OF ANY WRITINGS UPON WHICH YOUR CLAIM IS BASED. IF THE DOCUMENTS ARE VOLUMINOUS, ATTACH A SUMMARY.

CLAIMS BASED ON DERIVATIVE CONTRACTS

IF YOU FILE A PROOF OF CLAIM BASED ON AMOUNTS OWED PURSUANT TO A DERIVATIVE CONTRACT, YOU MUST: (A) ON OR BEFORE THE BAR DATE, FILL OUT AND RETURN A PROOF OF CLAIM FORM IN THE SAME MANNER AS ALL OTHER CLAIMANTS INCLUDING CHECKING THE APPROPRIATE BOX ON THE PROOF OF CLAIM AND (B) ON OR BEFORE THE QUESTIONNAIRE DEADLINE, LOG ON TO http://www.lehman-claims.com, ENTER THE UNIQUE IDENTIFICATION NUMBER INCLUDED ON THE PROOF OF CLAIM FORM MAILED TO SUCH HOLDER BY THE DEBTORS AND COMPLETE THE ELECTRONIC DERIVATIVE QUESTIONNAIRE SUBSTANTIALLY IN THE FORM ATTACHED AS EXHIBIT C TO THE BAR DATE ORDER (THE "DERIVATIVE QUESTIONNAIRE") AND ELECTRONICALLY UPLOAD SUPPORTING DOCUMENTATION ON THE WEBSITE (AS REQUIRED IN THE DERIVATIVE QUESTIONNAIRE), RATHER THAN ATTACHING SUCH DOCUMENTS TO THE PROOF OF CLAIM FORM.

Inverell Shire Council Portfolio

## Portfolio Valuation - Market Value Components

As at: 31/08/09

| Stock Code | Security Description | Volume Held | Yield/Margin (clean) | Capital Price (clean mid) | Accrued Interest | Total Price (dirty) | Capital Value | Accrued Value | Market Value |
|---|---|---|---|---|---|---|---|---|---|
| **Interest Bearing Securities (issued by ADIs)** | | | | | | | | | |
| MBL0909 | Macquarie Bank FR Sub Debt (Sep-09) | 250,000 | +0.782% | 100.003% | 0.843% | 100.846% | 250,007.50 | 2,107.50 | 252,115.00 |
| ERB0710 | Elders Rural Bank Sub Debt (Jul-10) | 1,000,000 | +14.00% | 89.602% | 0.533% | 90.135% | 896,020.00 | 5,330.00 | 901,350.00 |
| SUN0910 | Suncorp FR Sub FRN (call Sep-10) | 500,000 | +6.00% | 94.509% | 0.773% | 95.282% | 472,545.00 | 3,865.00 | 476,410.00 |
| BOQ0511 | Bank of Queensland Sub Debt (May-11) | 500,000 | +6.50% | 90.673% | 0.203% | 90.876% | 453,365.00 | 1,015.00 | 454,380.00 |
| HSBC0911 | HSBC FR Snr Debt (Sep-11) | 500,000 | +4.60% | 91.999% | 0.678% | 92.677% | 459,995.00 | 3,390.00 | 463,385.00 |
| *Total: Interest Bearing Securities (issued by ADIs)* | | | | | | | 2,531,932.50 | 15,707.50 | 2,547,640.00 |
| **Interest Bearing Securities (issued by non-ADIs)** | | | | | | | | | |
| LEH0609 | Lehman Global Property Note (Jun-09) [Arranger - Lehman Brothers] | 300,000 | | 21.750% | 0.000% | 21.750% | 65,250.00 | 0.00 | 65,250.00 |
| BELO0212 | BELO [Kalgoorlie AA+] [Arranger - Barclays Capital] | 500,000 | | 86.500% | 0.051% | 86.551% | 432,500.00 | 255.00 | 432,755.00 |
| MAGN0309 | Magnolia (Flinders AA) [Arranger - Credit Suisse] | 200,000 | | 71.000% # | 0.912% | 71.912% | 142,000.00 | 1,824.00 | 143,824.00 |
| ZIRC0613A | Zircon (Merimbula AA) [Arranger - Lehman Brothers] | 200,000 | | 80.000% # | 0.000% | 80.000% | 160,000.00 | 0.00 | 160,000.00 |
| CORS0609 | Corsair (Torquay AA) [Arranger - JP Morgan] | 400,000 | | 5.000% | 0.940% | 5.940% | 20,000.00 | 3,760.00 | 23,760.00 |
| STRT1210 | Start (Blue Gum AA-) [Arranger - HSBC] | 350,000 | | 2.000% # | 0.892% | 2.892% | 7,000.00 | 3,122.00 | 10,122.00 |
| CORS1209 | Corsair (Kakadu AA) [Arranger - JP Morgan] | 350,000 | | 28.000% # | 0.816% | 28.816% | 98,000.00 | 2,856.00 | 100,856.00 |
| HEL0609 | Helium (Scarborough AA) [Arranger - Merrill Lynch] | 200,000 | | 3.000% # | 0.857% | 3.857% | 6,000.00 | 1,714.00 | 7,714.00 |
| ZIRC0311A | Zircon (Coolangatta AA) [Arranger - Lehman Brothers] | 400,000 | | 76.000% # | 0.000% | 76.000% | 304,000.00 | 0.00 | 304,000.00 |
| BERY0310 | Beryl (AAA Global Bank Note) [Arranger - Lehman Brothers] | 250,000 | | 84.000% # | 0.000% | 84.000% | 210,000.00 | 0.00 | 210,000.00 |
| MAST0309S1 | MAS6-7 (Parkes IA 'AAA') [Arranger - Morgan Stanley] | 300,000 | | 9.000% # | 0.820% | 9.820% | 27,000.00 | 2,460.00 | 29,460.00 |
| ZIRC0917 | Zircon (Miami AA) [Arranger - Lehman Brothers] | 50,000 | | 59.000% # | 0.000% | 59.000% | 29,500.00 | 0.00 | 29,500.00 |
| *Total: Interest Bearing Securities (issued by non-ADIs)* | | | | | | | 1,501,250.00 | 15,991.00 | 1,517,241.00 |





| | |
|---|---|
| <settlements@grangesecurities.com.au> | To <Julie.holder@inverell.nsw.gov.au> |
| 12/06/2007 05:08 PM | cc |
| | bcc |
| | Subject Grange Securities Contract Note - G64449 |

Tuesdiay, 12 June 2007
**Reference Number:** G64449
**Dealer:** Stewart Calderwood
Inverell Shire Council
Administrative Centre
PO Box 138
INVERELL NSW 2360

G
Sec

## Contract Note

**Attention:** Ms Julie Holder
Dear Ms Julie Holder
We confirm having SOLD to you the following security

| | |
|---|---|
| Currency | AUD |
| Settlement Date | Wednesday, 13 June 2007 |
| Type | Principal Protected Property Note |
| Stock Issuer | Lehman Brothers Treasury Co. B.V. |
| Maturity | Monday, 15 June 2009 |
| Final Maturity | Not Applicable |
| Coupon | One year BBSW + 0.00 bps |
| Coupon Frequency | 1 per year |
| Yield | One year BBSW + 0.00 bps |
| Face Value | $300,000.00 |
| Capital Price (Per $100 Face Value) | 100.000 |
| Accrued Interest (Per $100 Face Value) | 0.000 |
| Gross Price (Per $100 Face Value) | 100.000 |
| One year BBSW | 6.4550% |
| Swap Rate | 6.8300% |
| Bill Rate | 6.4550% |
| Total Consideration | $300,000.00 |

Settlement Instructions:

This transaction did not take place in the ordinary course of business at a stock market.This confirmation is issued subject to the correction of errors or omissions; it is computer generati ed and therefore issued unsigned.Thank you for transacting this business with our company.GRANGE SECURITIES LIMITED

| SYDNEYL33, 264 George StreetSydney NSW 2000GPO Box 83Sydney NSW 2001Tel: (02) 8259 4800Fax: (02) 8259 4811 | MELBOURNEL25, 333 Collins StreetMelbourne VIC 3000PO Box 247 Collins St WestMelbourne VIC 8007Tel: (03) 8613 8000Fax: (03) 8613 8001 | BRISBANEL38, 123 Eagle StreetBrisbane QLD 4000GPO Box 1893Brisbane QLD 4001Tel: (07) 3229 5177Fax: (07) 3229 4738 | PERTHL17, 37 St George's TcePerth WA 6000GPO Box 2521Perth WA 6001Tel: (08) 9220 5600Fax: (08) 9220 5611 | Grange Securities LimitedABN 12 066 797 760Market Participant of theAustralian Stock Exchange LtdAFS Licence 246572 www.grangesecurities.com.au |
|---|---|---|---|---|

TERMS AND CONDITIONS OF DEALING WITH GRANGE SECURITIESThe client has agreed to be bound by the terms and conditions below.This contract note is issued by Grange Securities Limited ABN 12 066 797 760 ('Grange Securities').All transactions are subject to the Rules, directions, decisions and requirements of the ASX, the Clearing Rules and Settlement Rules and are subject to the customs and usages of the market and the correction of errors and omissions.Fees & ChargesGrange Securities acts as principal when we buy and sell fixed interest securities in the secondary markets. The yield that we quote to you incorporates any margin that we will receive. The margin isthe difference between the price at which we, as principal, buy the security and the price at which we sell the security to you. Grange Securities may also receive placement fees from Issuers for distributing securities on their behalf.PurchasesThe Client shall pay for purchases in full including all brokerage, taxes, costs, duties and charges prior to the settlement date. Payment in cash is not permitted. Where the client fails to pay for purchases by the due date, Grange Securities is entitled to pass on to the client all costs incurred as a result. Securities will not be registered in the clients name until payment has been made in full. This contract note constitutes notice to the client that Gran ge Securities may deposit the securities

Final Terms dated June 8, 2007

## LEHMAN BROTHERS TREASURY CO. B.V.

*(incorporated with limited liability in The Netherlands and
having its statutory domicile in Amsterdam)*

Issue of AUD 14,000,000 Principal Protected Property Markets Fund-Linked Notes due 2009

unconditionally and irrevocably

Guaranteed by Lehman Brothers Holdings Inc.
under the U.S.$60,000,000,000
Euro Medium-Term Note Program

## PART A – CONTRACTUAL TERMS

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions set forth in the Base Prospectus dated August 9, 2006 (as supplemented from time to time) (the "Base Prospectus") which constitutes a base prospectus for the purposes of the Prospectus Directive (Directive 2003/71/EC) (the "Prospectus Directive"). This document constitutes the Final Terms of the Notes described herein for the purposes of Article 5.4 of the Prospectus Directive and must be read in conjunction with such Base Prospectus as so supplemented.

Full information on the Issuer and the offer of the Notes is only available on the basis of the combination of these Final Terms and the Base Prospectus.

| | | | |
|---|---|---|---|
| 1 | (i) | Issuer: | Lehman Brothers Treasury Co. B.V. |
| | (ii) | Guarantor: | Lehman Brothers Holdings Inc. |
| 2 | (i) | Series Number: | 7457 |
| | (ii) | Tranche Number: | Not Applicable |
| | | (If fungible with an existing Series, details of that Series, including the date on which the Notes become fungible). | |
| 3 | | Specified Currency or Currencies: | Australian dollar ("AUD") |
| 4 | | Aggregate Nominal Amount: | AUD 14,000,000 |
| 5 | | Issue Price: | 100 per cent. of the Aggregate Nominal Amount |
| 6 | | Specified Denomination(s) and Units | |
| | (i) | Specified Denomination(s): | AUD5,000 |

-1-

|   |      |                                      |                          |
|---|------|--------------------------------------|--------------------------|
|   | (ii) | Trading in Units:                    | Not Applicable           |
| 7 | (i)  | Issue Date:                          | 13 June 2007             |
|   | (ii) | Interest Commencement Date:          | Not Applicable           |
| 8 |      | Maturity Date:                       | 15 June 2009             |
| 9 |      | Interest Basis:                      | As described in Annex 1  |
| 10 |     | Redemption/Payment Basis:            | Redemption at par        |
| 11 |     | Change of Interest or Redemption/Payment Basis: | Not Applicable |
| 12 |     | Put/Call Options:                    | Not Applicable           |
| 13 | (i) | Status of the Notes:                 | Senior Notes             |
|   | (ii) | Status of the Guarantee:             | Senior Guarantee         |
| 14 |     | Method of distribution:              | Non-syndicated           |

**PROVISIONS RELATING TO INTEREST (IF ANY) PAYABLE**

|    |                                                          |                         |
|----|----------------------------------------------------------|-------------------------|
| 15 | Fixed Rate Note Provisions                               | Not Applicable          |
| 16 | Floating Rate Note Provisions                            | Not Applicable          |
| 17 | Zero Coupon Note Provisions                              | Not Applicable          |
| 18 | Index-Linked Interest Note/Other Variable-Linked Interest Note Provisions | As described in Annex 1 |
| 19 | Dual Currency Note Provisions                            | Not Applicable          |

**PROVISIONS RELATING TO REDEMPTION**

|    |                                     |                   |
|----|-------------------------------------|-------------------|
| 20 | Call Option                         | Not Applicable    |
| 21 | Put Option                          | Not Applicable    |
| 22 | Final Redemption Amount of each Note:| AUD5,000 per Note |
| 23 | Early Redemption Amount of each Note |                   |

23. Early Redemption Amount(s) of each Note payable on redemption for taxation reasons or on event of default or if the Notes are cancelled pursuant to paragraph 4(ii) of Annex 1 and/or the method of calculating the same (if required or if different from that set out in the Conditions):

In respect of each Note, an amount in the Specified Currency equal to the fair market value of such Note (disregarding credit risk of the Issuer) (which value shall be less the proportion attributable to that Note of the reasonable cost to the Issuer of unwinding any underlying related hedging arrangements) on such day as is selected by the Calculation Agent in its sole and absolute discretion.

-2-

The Issuer will not pay any accrued interest.

GENERAL PROVISIONS APPLICABLE TO THE NOTES

24    Form of Notes:    Bearer form. Interests in a temporary global Note will be exchangeable for interests in a permanent global Note in bearer form which is exchangeable for definitive Notes in bearer form in the limited circumstances specified in the permanent global Note.

New Global Note Form:    Not Applicable

25    Talons for future Coupons or Receipts to be attached to Definitive Notes (and dates on which such Talons mature):    No

26    Details relating to Partly Paid Notes:    Not Applicable

amount of each payment comprising the Issue Price and date on which each payment is to be made and consequences (if any) of failure to pay, including any right of the Issuer to forfeit the Notes and interest due on late payment:

27    Details relating to Instalment Notes:    Not Applicable

Instalment Amounts and Instalment Dates:    Not Applicable

28    Details relating to Extendible Notes:    Not Applicable

29    Details relating to Renewable Notes:    Not Applicable

30    Redenomination, renominalisation and reconventioning provisions:    Not Applicable

31    Consolidation provisions:    Not Applicable

32    Other final terms:    See Annex 1

DISTRIBUTION

33    (i)    If syndicated, names and addresses of Managers and underwriting commitments:    Not Applicable

(ii)    Date of Subscription Agreement:    Not Applicable

(iii)    Stabilizing Manager (if any):    Not Applicable

34    If non-syndicated, name and address of Dealer:    Lehman Brothers International (Europe), 25 Bank Street, London E14 5LE

35    Total commission and concession:    The Issue Price herein is not an expression of the market value of the Notes and the initial placement of the Notes by the dealer appointed under the Programme may have been executed at prices above

-3-

or below such Issue Price to reflect prevailing market conditions.

36   Selling restrictions:

(i)   Netherlands Selling Restrictions:

Notes offered outside Netherlands: selling restriction 1(iv) applies

(ii)   Additional Selling Restrictions:

Australia: Any Noteholder in Australia shall represent and warrant that it is a sophisticated investor for the purposes of Chapters 6 and 7 of the Corporations Act 2001 of Australia and undertakes to inform the Issuer should its status as a sophisticated investor change.

No prospectus or other disclosure document (as defined in the Corporations Act 2001 of Australia) in relation to the Notes has been or will be lodged with the Australian Securities and Investments Commission (the "ASIC"). Each Dealer represents and agrees that it:

(a)   has not offered or invited applications, and will not offer or invite applications for the issue, sale or purchase of the Notes in Australia (including an offer or invitation which is received by a person in Australia); and

(b)   has not distributed or published, and will not distribute or publish, any draft, preliminary or definitive offering document, any final terms or pricing supplement or other offering material or advertisement relating to the Notes in Australia,

unless:

(i)   the aggregate consideration payable by each offeree is at least AUD500,000 (or its equivalent in any other currency but disregarding moneys lent by the offeror or its associates) or the offer or invitation otherwise does not require disclosure to investors under Part 6D.2 of the Corporations Act 2001 of Australia;

(ii)   the offer or the issuance of the Notes does not constitute an offer to a "retail client" for the purposes of Chapter 7 of the Corporations Act 2001 of Australia;

- 4 -

(iii)   the offer or the issuance of the Notes does not constitute an offer or invitation to the public for the purposes of section 82 of the Corporations Act 2001 of Australia;

(iv)   such action complies with all applicable laws, regulations and directives; and

(v)   such action does not require any document to be lodged with the ASIC.

By providing the information contained in these Final Terms, neither the Issuer nor any other relevant entity is providing financial product advice. The reader should consider obtaining independent advice before making any financial decisions.

RESPONSIBILITY

The Issuer accepts responsibility for the information contained in these Final Terms.

Signed on behalf of the Issuer

By:...........................................................

Duly authorised

2yr Principal Protected Property Markets Fund-Linked Note / Issue Date: June 13, 2007 / Series No. 7457 / GID: 3091419

PART B – OTHER INFORMATION

1    LISTING

    (i)    Listing:                                          None

    (ii)    Admission to Trading:                    Not Applicable

OPERATIONAL INFORMATION

    ISIN Code:                                          XS0305158031

    Common Code:                                    030515803

    New Global Note intended to be held in a          Not Applicable
    manner which would allow Eurosystem
    eligibility:

    Any clearing system(s) other than Euroclear       Not Applicable
    and Clearstream, Luxembourg and the relevant
    identification number(s):

    Delivery:                                          Delivery against payment

    The Aggregate Nominal Amount of Notes             U.S.$11,657,923.00
    issued has been translated into U.S. Dollars at
    the rate of 1 USD= AUD1.2009  producing a
    sum of (for Notes not denominated in U.S.
    Dollars):

    Names and addresses of Additional Paying          Not Applicable
    Agent(s) (if any):

Annex 1

1    Definitions

"Averaging Dates" means, subject as provided in paragraph 3 of this Annex 1 (*Disrupted Days*), each of 6 September 2007, 6 December 2007, 6 March 2008, 6 June 2008, 5 September 2008, 5 December 2008, 6 March 2009 and 8 June 2009 or, if any such day is not a Scheduled Trading Day, the next following Scheduled Trading Day;

"Basket Value$_k$" means, in respect of an Averaging Date k, a value calculated by the Calculation Agent in accordance with the following formula:

$$BasketValue_k = \frac{1}{2} \times \sum_{j=1}^{2} Fund_k^j$$

Where:

$Fund_k^j$ means a value in respect of each Fund$^j$ calculated by the Calculation Agent in accordance with the following formula:

$$Fund_k^j = \frac{NAV_k^j}{NAV_0^j}$$

Where:

$NAV_k^j$ = the Net Asset Value of Fund$^j$ on the relevant Averaging Date k

$NAV_0^j$ = the Initial Net Asset Value of Fund$^j$

"Business Day" means a day (other than a Saturday or a Sunday) on which commercial banks and foreign exchange markets settle payments and are open for general business (including dealings in foreign exchange and foreign currency deposits) in Sydney, Luxembourg and London and a day on which each clearing system is open for business;

"Calculation Agent" means Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE, United Kingdom;

"Closing Level" means, in respect of Fund$^j$ on the relevant Scheduled Trading Day, the NAV of that Fund on such Scheduled Trading Day, as calculated and published by the relevant Management Company or the administrator, service provider or other person that generally reports such value on behalf of the relevant Management Company to its investors or, at the discretion of the Calculation Agent, as published on the Bloomberg service on such Scheduled Trading Day, as determined by the Calculation Agent;

"Disrupted Day" means any Scheduled Trading Day on which (i) the NAV of any Fund or Replacement Fund fails to be published or (ii) on which the Calculation Agent has determined that any Fund or Replacement Fund is subject to a Fund Substitution Event, or (iii) where a buy or sell order is submitted in accordance with the relevant procedures of a Fund or Replacement Fund and the inability of the hedging party to buy or sell the shares or units of such Fund or Replacement Fund on any Scheduled Trading Day at, or at a value that equates to, the NAV of such share or unit;

-7-

"Funds" means each of:

(i)    ING (L) Invest – European Real Estate (Bloomberg code: INGLEIC Equity, ISIN: LU0121177280) ("Fund 1"); and

(ii)   Credit Suisse – Equity Fund (Lux) Asian Property (Bloomberg code: CSASPRB LX Equity, ISIN: LU0220210792) ("Fund 2");

and each shall be a "Fund";

"Fund$^j$" means the relevant Fund or Replacement Fund;

"Initial Net Asset Value" means, in respect of Fund$^j$, the Closing Level of that Fund$^j$ on the Strike Fixing Date;

"Interest Payment Date" means each of 13 June 2008 and 15 June 2009 provided that if either of such dates is not a Business Day the relevant date shall be postponed to the next day which is a Business Day unless it would thereby fall into the next calendar month, in which event such date shall be brought forward to the immediately preceding Business Day (the "Modified Following Business Day Convention");

"Management Company" means:

(a)    in respect of Fund 1, ING Investment Management Luxembourg S.A.; and

(b)    in respect of Fund 2, Credit Suisse Equity Fund Management Company;

and in respect of a Replacement Fund, the company as will be determined by the Calculation Agent at the Fund Substitution Date;

"NAV" means Net Asset Value;

"Net Asset Value" means in respect of Fund$^j$ and a Scheduled Trading Day, the Closing Level of that Fund or Replacement Fund;

"Replacement Fund" shall have the meaning given to it in paragraph 4 of this Annex 1 (*Adjustment to the Fund or Replacement Fund*);

"Scheduled Trading Day" means, with respect to a Fund or a Replacement Fund, a day upon which the relevant Management Company or the administrator, service provider or other person that generally reports such value on behalf of the relevant management company is scheduled to calculate and publish the Net Asset Value for such Fund or Replacement Fund;

"Strike Fixing Date" means, subject as provided in paragraph 3 of this Annex 1 (*Disrupted Days*), 15 June 2007, or if such day is not a Scheduled Trading Day, the next following Scheduled Trading Day; and

"Trade Date" means 8 June 2007.

2    Interest Amounts

Unless previously redeemed or purchased and cancelled, each Note bears interest in accordance with this paragraph 2 and the relevant interest amount (an "Interest Amount") will be payable on each Interest Payment Date.

(a)    The amount of interest payable in respect of each Note in respect of the first Interest Payment Date shall be an amount in AUD calculated by the Calculation Agent in accordance with the following formula:

-8-

$$AUD\,5{,}000 \times \left[100\% \times Max\big(Lockin(1) - Lockin(0);\,0\big)\right]$$

Where:

Lockin(1) means $Max\big(Strategy(1), Lockin(0)\big)$

Lockin(0) means 100%

Strategy(1) means the value, as calculated by the Calculation Agent, equal to the arithmetic average of the Basket Values for the first Averaging Date, the second Averaging Date, the third Averaging Date and the fourth Averaging Date

(b)    The amount of interest payable in respect of each Note in respect of the second Interest Payment Date shall be an amount in AUD calculated by the Calculation Agent in accordance with the following formula:

$$AUD\,5{,}000 \times \left[100\% \times Max\big(Lockin(2) - Lockin(1);\,0\big)\right]$$

Where:

Lockin(2) means $Max\big(Strategy(2), Lockin(1)\big)$

Lockin(1) means $Max\big(Strategy(1), Lockin(0)\big)$

Strategy(2) means the value, as calculated by the Calculation Agent, equal to the arithmetic average of the Basket Value for the first Averaging Date, the second Averaging Date, the third Averaging Date, the fourth Averaging Date, the fifth Averaging Date, the sixth Averaging Date, the seventh Averaging Date and the eighth Averaging Date

## 3    Disrupted Days

If the Strike Fixing Date or any Averaging Date, as the case may be, is a Disrupted Day, then the Strike Fixing Date or that Averaging Date, as the case may be, shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day, unless there is a Disrupted Day on each of the four Scheduled Trading Days immediately following the scheduled Strike Fixing Date or that scheduled Averaging Date. In that case,

(a)    the earlier of that fourth following Scheduled Trading Day and the fifth Business Day prior to the Maturity Date, as the case may be, shall be deemed to be the Strike Fixing Date or the relevant Averaging Date, as the case may be, notwithstanding it is a Disrupted Day (the "Deemed Date"); and

(b)    the Calculation Agent shall determine its good faith estimate of the level of the Funds and any Replacement Funds that would have prevailed but for that Disrupted Day on that Deemed Date.

## 4    Adjustment to the Fund or Replacement Fund

If the Calculation Agent determines (in its sole and absolute discretion), in respect of a Fund or a Replacement Fund, that a Fund Merger Event, an Insolvency, a De-Listing or a Fund Substitution Event (each as defined below) has occurred, the Calculation Agent may, acting in a commercially reasonable manner and in its sole and absolute discretion, in respect of the affected Fund (the "Affected Fund") either:

(i)    select a replacement investment fund (a "Replacement Fund") with similar investment objectives and policies, managed by the same Management Company as the Affected Fund, an affiliate thereof or an alternative investment manager, denominated in a currency selected by the Calculation Agent, and of similar performance and quality (as determined by the Calculation Agent), the shares or units of which

- 9 -

will replace the shares or units of the Affected Fund for the purposes of the Notes. The Calculation Agent shall give notice of such Replacement Fund and such adjustments to Noteholders as soon as is reasonably practicable after effecting such substitutions and related adjustments. The Calculation Agent shall effect such replacement of the Affected Fund on the Fund Substitution Date and the Calculation Agent shall make any corresponding adjustment(s) that it determines, acting in a commercially reasonable manner, to be appropriate to any variable, calculation or valuation methodology or any other terms relevant to the Notes to account for such replacement; or

(ii)    if the Calculation Agent is unable to select a Replacement Fund pursuant to sub-paragraph (i) above, the Issuer shall cancel the Notes by giving notice to the Noteholders within 8 Business Days from the date of such cancellation. If the Notes are so cancelled the Issuer will pay an amount to the Noteholders in respect of each Note equal to the Early Redemption Amount.

"De-Listing" means, for any Fund share or Replacement Fund share for which the reference source is an exchange, a trading system or a quotation system, the reference source announces that pursuant to the rules of such reference source, the Fund share or Replacement Fund share ceases (or will cease) to be listed, traded or publicly quoted on the reference source for any reason (other than a Fund Merger Event) and is not immediately re-listed, re-traded or re-quoted on an exchange, trading system or quotation system acceptable to the Calculation Agent;

"Fund Merger Event" means, in respect of a Fund or Replacement Fund: (i) an irrevocable commitment to transfer all of the relevant fund shares or units; or (ii) a consolidation, amalgamation or merger of such Fund with or into another fund other than a consolidation, amalgamation or merger in which such Fund is the continuing Fund; or (iii) a takeover offer for such Fund that results in a transfer of or an irrevocable commitment to transfer all of the relevant Fund shares (other than Fund shares owned or controlled by the offeror);

"Fund Substitution Date" means such date selected by the Calculation Agent for the replacement of the relevant Fund or Replacement Fund, as the case may be;

"Fund Substitution Event" means the determination by the Calculation Agent in its sole and absolute discretion that any of the following has occurred:

(a)    the main investment objective of a Fund or Replacement Fund, as the case may be, is amended in accordance with its rules so that it no longer refers solely to the benchmark as set out in the constitutive documents and/or prospectus in respect of such Fund on the Trade Date or in the case of a Replacement Fund on the Fund Substitution Date;

(b)    the currency denomination of a Fund or Replacement Fund, as the case may be, is amended in accordance with its rules so that the NAV of that Fund or Replacement Fund on any Scheduled Trading Day is no longer calculated in the same currency as at the Trade Date or in the case of a Replacement Fund as at the Fund Substitution Date;

(c)    the Issuer, its affiliates or any other designated hedging entity would be required to pay a subscription fee in respect of a purchase of units/shares of a Fund or Replacement Fund or would incur a redemption fee in respect of a sale of units/shares of such Fund or Replacement Fund in relation to their hedging activities in respect of the issue of the Notes;

(d)    the relevant Management Company or the administrator, service provider or other person that generally calculates and/or reports the NAV on behalf of the relevant Management Company in respect of a Fund or Replacement Fund fails for reasons other than of a technical or operational nature to calculate and publish the NAV of such Fund or Replacement Fund for four consecutive Scheduled

- 10 -

Trading Days and the reason for such failure is as a consequence of any decision to liquidate or dissolve such Fund or Replacement Fund;

(e)    the activities of a Fund or Replacement Fund or its Management Company is placed under review by any governmental, legal or regulatory entity for reasons of wrongdoing, breach of any rule or regulation or other similar reason;

(f)    there is any change in the regulatory or tax treatment applicable with respect to the holding, purchase and/or sale of units/shares of a Fund or Replacement Fund which (in the opinion of the Calculation Agent) could have an economic impact for the Issuer, its affiliates or any other designated hedging entity as a holder of an interest in such Fund or Replacement Fund;

(g)    any suspension of, mandatory redemption, limitation of or restriction of (including but not limited to the imposition of a minimum notice period in redeeming or subscribing in units/shares in a Fund or Replacement Fund) trading of such Fund or Replacement Fund (by reason of liquidity restrictions or otherwise) if, in any such case, such suspension or limitation is, in the determination of the Calculation Agent, material;

(h)    the Issuer, its affiliates or any other designated hedging entity would be obliged (whether by the relevant Management Company or otherwise) to redeem all or some of the units/shares of a Fund or Replacement Fund that it is holding in relation to its hedging activities in respect of the issue of the Notes; and

(i)    the annualised volatility of a Fund or Replacement Fund exceeds the percentage prescribed by any applicable law, regulation or in the constitutive documents or prospectus of such Fund or Replacement Fund. "Volatility" for the purposes of this definition in a given time window, as of any date of determination and with respect to the relevant Fund or Replacement Fund, is the annualized standard deviation of the monthly percentage changes in the net asset value of such Fund or Replacement Fund as calculated and published by the relevant Management Company or the administrator, service provider or other person that generally reports such value on behalf of the relevant Management Company to its investors or a publishing service on each Scheduled Trading Day during the particular time window preceding such date of determination, expressed as a percentage, as determined by the Calculation Agent; and

"Insolvency" means the insolvency, liquidation (whether voluntary or involuntary) or bankruptcy of, or any analogous proceedings affecting, a Fund or Replacement Fund, its Management Company, administrator or master fund.

5    Potential Adjustment Events

Following the declaration by the Issuer of the terms of any Potential Adjustment Event, the Calculation Agent will determine whether such Potential Adjustment Event has a diluting or concentrative effect on the theoretical value of the relevant units or shares in a Fund or Replacement Fund, as the case may be, and, if so, will (i) make the corresponding adjustment(s), if any, to any one or more of the Initial Net Asset Value or Net Asset Value relating to such Fund or Replacement Fund for a particular date and, in any case, any other variable relevant to the settlement, payment or other terms of the Notes as the Calculation Agent determines appropriate to account for that diluting or concentrative effect (provided that no adjustments will be made to account solely for changes in volatility, expected dividends, stock loan rate or liquidity relative to the relevant units or shares in a Fund or Replacement Fund, as the case may be) and (ii) determine the effective date(s) of the adjustment(s). The Calculation Agent may (but need not) determine the appropriate adjustment(s) by reference to the adjustment(s) in respect of such Potential Adjustment Event made by an options exchange to

options on the relevant units or shares in the relevant Fund or Replacement Fund, as the case may be, traded on such options exchange.

"Potential Adjustment Event" means any of the following:

(i)    a subdivision, consolidation or reclassification of relevant units or shares in the relevant Fund or Replacement Fund, as the case may be (unless resulting in a Fund Merger Event), or a free distribution or dividend of any such units or shares in such Fund or Replacement Fund, as the case may be, to existing holders by way of bonus, capitalization or similar issue;

(ii)   a distribution, issue or dividend to existing holders of the relevant units or shares in a Fund or Replacement Fund, as the case may be, of (A) such units or shares in such Fund or Replacement Fund, as the case may be, or (B) other share capital or securities granting the right to payment of dividends and/or the proceeds of liquidation of such Fund or Replacement Fund, as the case may be, equally or proportionately with such payments to holders of such units or shares in such Fund or Replacement Fund, as the case may be, or (C) share capital or other securities of another issuer acquired or owned (directly or indirectly) by such Fund or Replacement Fund, as the case may be, as a result of spin-off or other similar transaction, or (D) any other type of securities, rights or warrants or other assets, in any case for payment (cash or other consideration) at less than the prevailing market price as determined by the Calculation Agent;

(iii)  an Extraordinary Dividend;

(iv)   a call by a Fund or Replacement Fund, as the case may be, in respect of relevant units or shares in such Fund or Replacement Fund, as the case may be, that are not fully paid;

(v)    a repurchase by the relevant Fund or Replacement Fund, as the case may be, of relevant units or shares in such Fund or Replacement Fund, as the case may be, whether out of profits or capital and whether the consideration for such repurchase is cash, securities or otherwise;

(vi)   in respect of a Fund or Replacement Fund, as the case may be, an event that results in any shareholder rights being distributed or becoming separated from shares of common stock or other shares of the capital stock of the Issuer pursuant to a shareholder rights plan or arrangement directed against hostile takeovers that provides upon the occurrence of certain events for a distribution of preferred stock, warrants, debt instruments or stock rights at a price below their market value, as determined by the Calculation Agent, provided that any adjustment effected as a result of such an event shall be readjusted upon any redemption of such rights; or

(vii)  any other event that may have a diluting or concentrative effect on the theoretical value of the relevant units or shares in a Fund or Replacement Fund, as the case may be.

"Extraordinary Dividend" means the characterization of a dividend or portion thereof as determined by the Calculation Agent.

6    Notification of Early Redemption Amount, Interest Amount, Fund Substitution Event and Disrupted Days

6.1    As soon as reasonably practicable after calculating or otherwise determining the Early Redemption Amount or the Interest Amounts the Calculation Agent shall give notice of the relevant amount to the Issuer.

6.2    The Calculation Agent shall as soon as reasonably practicable notify the Issuer of the existence or occurrence of a Disrupted Day on any day which but for such Disrupted Day would have been the Strike Fixing Date or an Averaging Date.

- 12 -

6.3    Upon the occurrence of·a Fund Substitution Event, the Calculation Agent shall as soon as reasonably practicable notify the Issuer stating the occurrence of the event and giving details thereof.

6.4    Adjustments in accordance with the foregoing sections shall be calculated by the·Calculation Agent, shall be notified to the Noteholders in accordance with Condition 15 and shall be (in the absence of manifest error) binding on all parties concerned. However, Noteholders should be aware that there may be, necessarily, some delay between the time at which any of the above events occur and the time at which it is reported to Noteholders.

7    The Calculation Agent

The Calculation Agent shall act independently and not as an agent of the Issuer, the Guarantor or the Noteholders. The Calculation Agent shall have no responsibility to Noteholders for good faith errors or omissions in its calculations and determinations and in adopting the decisions and determinations of the Calculation Agent of the Notes. All determinations made by the Calculation Agent hereunder shall, in the absence of manifest error, wilful default or bad faith, be final and conclusive, and the Calculation Agent shall have no liability to the Issuer, the Guarantor, the·Noteholders or any third party in relation to such determinations except in the case of its wilful default, or bad faith.

Nothing contained herein shall prevent the Calculation Agent from dealing in the Notes or from entering into any related transaction, including without limitation any swap or hedging transactions with the Issuer, the Guarantor (or any of their respective affiliates) or any holder of the Notes (or any of its affiliates).



Zone A.

Zone B

Zone C

Zone D

Letters and
Documents only

RECEIVED
SEP 18 2009

Forwarder Air Bill — Non Negotiable

EA007832079AU

INTERNATIONAL COURIER

From:
Name  Lawrell Shv Corman
Postal Address
PO Box 135

To:
Name  Lehman Brothers holding claims
Company Name  processing  C/O Bankruptcy
Address  FDL Station  solutions
PO Box 5076
City New York  State New York
Country  U S A  Postcode 10150-5076

Sender's Declaration

Signature  [signature]  Date 15/9/09

Limitations of Liability

Lehman Brothers Holdings Claims Processing
C/O Equip Bankruptcy Solutions, LLC

POST

# EXHIBIT
# B

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: | Chapter 11 |
|---|---|
| Lehman Brothers Holdings Inc., et al, Debtors. | Case No. 08-13555 (JMP) (Jointly Administered) |
| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
| Lehman Brothers Holdings Inc. | 08-13555 |

# PROOF OF CLAIM

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

### THIS SPACE IS FOR COURT USE ONLY

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Inverell Shire Council
PO Box 138
Inverell NSW 2360
AUSTRALIA
Telephone number: 61 2 67288279   Email Address: paul.psy@inverell.nsw.gov.au

☒ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: __18687__
(If known)

Filed on: 9/18/2009

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:    Email Address:

1. Amount of Claim as of Date Case Filed: $ _300,000.00_

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete Item 5.

If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☒ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this Form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. Basis for Claim: __Principal Protected Property Note__
(See instruction #2 on reverse side.)

3. Last four digits of any number by which creditor identifies debtor: _____
3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

4. Secured Claim (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff:  ☐ Real Estate   ☐ Motor Vehicle   ☒ Other
Describe:
Value of Property: $ _____   Annual Interest Rate ____ %
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$ _____   Basis for perfection: _____
Amount of Secured Claim: $ _300,000.00_   Amount Unsecured: $ _____

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)( ___ ).

Amount entitled to priority:
$ _____

6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $ _____
(See instruction #6 on reverse side.)

FOR COURT USE ONLY

7. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

| Date: 16.3.11 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.  Paul Henry   General Manager |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## ATTACHMENT TO PROOF OF CLAIM

DEBTOR:           Lehman Brothers Holdings Inc., et al.
BASIS OF CLAIM:   Principal Protected Property Note
CASE #:           08-13555 (JMP)
DATE OF FILING:   September 15, 2008

The relevant electronic instruction reference number is Austraclear Series ID number LBTG02.

Inverell Shire Council Portfolio

## Portfolio Valuation – Market Value Components

As at: 31/08/09

| Stock Code | Security Description | Volume Held | Yield/Margin (clean) | Capital Price (clean mid) | Accrued Interest | Total Price (dirty) | Capital Value | Accrued Value | Market Value |
|---|---|---|---|---|---|---|---|---|---|
| **Interest Bearing Securities (issued by ADIs)** | | | | | | | | | |
| MBL8099 | Macquarie Bank FR Sub Debt (Sep-09) | 250,000 | +0.782% | 100.003% | 0.843% | 100.846% | 250,007.50 | 2,107.50 | 252,115.00 |
| EBD0710 | Elders Rural Bank Sub Debt (Jul-10) | 1,000,000 | +14.00% | 89.602% | 0.533% | 90.135% | 896,020.00 | 5,330.00 | 901,350.00 |
| SUN0910 | Suncorp FR Sub FRN (call Sep-10) | 500,000 | +6.00% | 94.509% | 0.773% | 95.282% | 472,545.00 | 3,865.00 | 476,410.00 |
| BOQ0511 | Bank of Queensland Sub Debt (May-11) | 500,000 | +6.50% | 90.673% | 0.203% | 90.876% | 453,365.00 | 1,015.00 | 454,380.00 |
| HSBC0911 | HSBC FR Snr Debt (Sep-11) | 500,000 | +4.60% | 91.999% | 0.678% | 92.677% | 459,995.00 | 3,390.00 | 463,385.00 |
| | *Total: Interest Bearing Securities (issued by ADIs)* | | | | | | 2,531,932.50 | 15,707.50 | 2,547,640.00 |
| **Interest Bearing Securities (issued by non-ADIs)** | | | | | | | | | |
| 13JR609 | Lehman Global Property Note (Jan-09) [Arranger - Lehman Brothers] | 300,000 | | 21.750% | 0.000% | 21.750% | 65,250.00 | 0.00 | 65,250.00 *** |
| BEL0012 | BELO (Kalgoorlie AA+) [Arranger - Barclays Capital] | 500,000 | | 86.500% | 0.051% | 86.551% | 432,500.00 | 255.00 | 432,755.00 |
| MAG90909 | Magnolia (Flinders AA) [Arranger - Credit Suisse Capital] | 200,000 | | 71.000% # | 0.912% | 71.912% | 142,000.00 | 1,824.00 | 143,824.00 |
| ZIRC0613A | Zircon (Merindula AA) [Arranger - Lehman Brothers] | 200,000 | | 80.000% # | 0.000% | 80.000% | 160,000.00 | 0.00 | 160,000.00 |
| COR50669 | Corsair (Torquay AA) [Arranger - JP Morgan] | 400,000 | | 5.000% | 0.940% | 5.940% | 20,000.00 | 3,760.00 | 23,760.00 |
| STRT1210 | Slat (Blue Gum AA-) [Arranger - HSBC] | 350,000 | | 2.000% # | 0.892% | 2.892% | 7,000.00 | 3,122.00 | 10,122.00 |
| COR51209 | Corsair (Kakadu AA) [Arranger - JP Morgan] | 350,000 | | 28.000% # | 0.816% | 28.816% | 98,000.00 | 2,856.00 | 100,856.00 |
| HEL0609 | Helium (Scarborough AA) [Arranger - Merrill Lynch] | 200,000 | | 3.000% # | 0.857% | 3.857% | 6,000.00 | 1,714.00 | 7,714.00 |
| ZIRC0311A | Zircon (Coolangatta AA) [Arranger - Lehman Brothers] | 400,000 | | 76.000% # | 0.000% | 76.000% | 304,000.00 | 0.00 | 304,000.00 |
| BBRY0810 | Bryl (AAA Global Bank Note) [Arranger - Lehman Brothers] | 250,000 | | 84.000% # | 0.000% | 84.000% | 210,000.00 | 0.00 | 210,000.00 |
| MASI50953 | MASI-7 (Parkes IA 'AAA') [Arranger - Morgan Stanley] | 300,000 | | 9.000% | 0.820% | 9.820% | 27,000.00 | 2,460.00 | 29,460.00 |
| ZIRC0317 | Zircon (Misani AA) [Arranger - Lehman Brothers] | 50,000 | | 59.000% # | 0.000% | 59.000% | 29,500.00 | 0.00 | 29,500.00 |
| | *Total: Interest Bearing Securities (issued by non-ADIs)* | | | | | | 1,501,250.00 | 15,991.00 | 1,517,241.00 |

SCANNED

 <settlements@grangesecuri ties.com.au>

12/06/2007 05:08 PM

To  <Julie.holder@inverell.nsw.gov.au>
cc
bcc
Subject  Grange Securities Contract Note - G64449

Tuesday, 12 June 2007
Reference Number: G64449
Dealer: Stewart Calderwood
                Inverell Shire Council
                Administrative Centre
                PO Box 138
                INVERELL NSW 2360

Gı
Secı

## Contract Note

Attention: Ms Julie Holder
Dear Ms Julie Holder
We confirm having SOLD to you the following security

| | |
|---|---|
| Currency | AUD |
| Settlement Date | Wednesday, 13 June 2007 |
| Type | Principal Protected Property Note |
| Stock Issuer | Lehman Brothers Treasury Co. B.V. |
| Maturity | Monday, 15 June 2009 |
| Final Maturity | Not Applicable |
| Coupon | One year BBSW + 0.00 bps |
| Coupon Frequency | 1 per year |
| Yield | One year BBSW + 0.00 bps |
| Face Value | $300,000.00 |
| Capital Price (Per $100 Face Value) | 100.000 |
| Accrued Interest (Per $100 Face Value) | 0.000 |
| Gross Price (Per $100 Face Value) | 100.000 |
| One year BBSW | 6.4550% |
| Swap Rate | 6.8300% |
| Bill Rate | 6.4550% |
| Total Consideration | $300,000.00 |

Settlement Instructions:

This transaction did not take place in the ordinary course of business at a stock market. This confirmation is issued subject to the correction of errors or omissions; it is computer generated and therefore issued unsigned. Thank you for transacting this business with our company. GRANGE SECURITIES LIMITED

| SYDNEYL33, 264 George StreetSydney NSW 1000GPO Box 835Sydney NSW 2001Tel: (02) 8259 4500Fax: (02) 8259 4811 | MELBOURNEL25, 333 Collins StreetMelbourne VIC 3000GPO Box 247 Collins St West Melbourne VIC 8007Tel: (03) 8613 8000Fax: (03) 8613 8001 | BRISBANEL3a, 123 Eagle StreetBrisbane QLD 4000GPO Box 18978Brisbane QLD 4001Tel: (07) 3229 3377Fax: (07) 3229 4738 | PERTHL17, 37 St George's TcePerth WA 6000GPO Box 2521Perth WA 6001Tel: (08) 9220 5600Fax: (08) 9220 5611 | Grange Securities LimitedABN 12 066 797 760Market Participant of theAustralian Stock Exchange LtdAFS Licence 246572 www.grangesecurities.com.au |
|---|---|---|---|---|

TERMS AND CONDITIONS OF DEALING WITH GRANGE SECURITIESThe client has agreed to be bound by the terms and conditions below. This contract note is issued by Grange Securities Limited ABN 12 066 797 760 ('Grange Securities'). All transactions are subject to the Rules, directions, decisions and requirements of the ASX, the Clearing Rules and Settlement Rules and are subject to the customs and usages of the market and the correction of errors and omissions. Fees & Charges Grange Securities acts as principal when we buy and sell fixed interest securities in the secondary markets. The yield that we quote to you incorporates any margin that we will receive. The margin is the difference between the price at which we, as principal, buy the security and the price at which we sell the security to you. Grange Securities may also receive placement fees from issuers for distributing securities on their behalf. Purchases The Client shall pay for purchases in cash in full including all brokerage, taxes, costs, duties and charges prior to the settlement date. Payment in cash is not permitted. Where the client fails to pay for purchases by the due date, Grange Securities is entitled to pass on to the client all costs incurred as a result. Securities will not be registered in the clients name until payment has been made in full. This contract note constitutes notice to the client that Grange Securities may deposit the securities

Final Terms dated June 8, 2007

LEHMAN BROTHERS TREASURY CO. B.V.

*(Incorporated with limited liability in The Netherlands and
having its statutory domicile in Amsterdam)*

Issue of AUD 14,000,000 Principal Protected Property Markets Fund-Linked Notes due 2009

unconditionally and irrevocably

Guaranteed by Lehman Brothers Holdings Inc.
under the U.S.$60,000,000,000
Euro Medium-Term Note Program

### PART A – CONTRACTUAL TERMS

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions set forth in the Base Prospectus dated August 9, 2006 (as supplemented from time to time) (the "Base Prospectus") which constitutes a base prospectus for the purpose of the Prospectus Directive (Directive 2003/71/EC) (the "Prospectus Directive"). This document constitutes the Final Terms of the Notes described herein for the purposes of Article 5.4 of the Prospectus Directive and must be read in conjunction with such Base Prospectus as so supplemented.

Full information on the Issuer and the offer of the Notes is only available on the basis of the combination of these Final Terms and the Base Prospectus.

| | | | |
|---|---|---|---|
| 1. | (i) | Issuer: | Lehman Brothers Treasury Co. B.V. |
| | (ii) | Guarantor: | Lehman Brothers Holdings Inc. |
| 2. | (i) | Series Number: | 7457 |
| | (ii) | Tranche Number: | Not Applicable |
| | | (If fungible with an existing Series, details of that Series, including the date on which the Notes become fungible). | |
| 3. | | Specified Currency or Currencies: | Australian dollar ("AUD") |
| 4. | | Aggregate Nominal Amount: | AUD 14,000,000 |
| 5. | | Issue Price: | 100 per cent. of the Aggregate Nominal Amount |
| 6. | | Specified Denomination(s) and Units | |
| | (i) | Specified Denomination(s): | AUD5,000 |

-1-

|   |      |                                      |                          |
|---|------|--------------------------------------|--------------------------|
|   | (II) | Trading in Units:                    | Not Applicable           |
| 7 | (I)  | Issue Date:                          | 13 June 2007             |
|   | (II) | Interest Commencement Date:          | Not Applicable           |
| 8 |      | Maturity Date:                       | 15 June 2009             |
| 9 |      | Interest Basis:                      | As described in Annex 1  |
| 10|      | Redemption/Payment Basis:            | Redemption at par        |
| 11|      | Change of Interest or Redemption/Payment Basis: | Not Applicable |
| 12|      | Put/Call Options:                    | Not Applicable           |
| 13| (I)  | Status of the Notes:                 | Senior Notes             |
|   | (II) | Status of the Guarantee:             | Senior Guarantee         |
| 14|      | Method of distribution:              | Non-syndicated           |

**PROVISIONS RELATING TO INTEREST (IF ANY) PAYABLE**

|    |                                                              |                          |
|----|--------------------------------------------------------------|--------------------------|
| 15 | Fixed Rate Note Provisions                                   | Not Applicable           |
| 16 | Floating Rate Note Provisions                                | Not Applicable           |
| 17 | Zero Coupon Note Provisions                                  | Not Applicable           |
| 18 | Index-Linked Interest Note/Other Variable-Linked Interest Note Provisions | As described in Annex 1 |
| 19 | Dual Currency Note Provisions                                | Not Applicable           |

**PROVISIONS RELATING TO REDEMPTION**

|    |                                         |                          |
|----|-----------------------------------------|--------------------------|
| 20 | Call Option                             | Not Applicable           |
| 21 | Put Option                              | Not Applicable           |
| 22 | Final Redemption Amount of each Note:   | AUD5,000 per Note        |
| 23 | Early Redemption Amount of each Note    |                          |

|                                                                                                                                                                                                                     |                                                                                                                                                                                                                                                                                                                                                            |
|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Early Redemption Amount(s) of each Note payable on redemption for taxation reasons or on event of default or if the Notes are cancelled pursuant to paragraph 4(II) of Annex 1 and/or the method of calculating the same (if required or if different from that set out in the Conditions): | In respect of each Note, an amount in the Specified Currency equal to the fair market value of such Note (disregarding credit risk of the Issuer) (which value shall be less the proportion attributable to that Note of the reasonable cost to the Issuer of unwinding any underlying related hedging arrangements) on such day as is selected by the Calculation Agent in its sole and absolute discretion. |

-2-

The Issuer will not pay any accrued interest.

## GENERAL PROVISIONS APPLICABLE TO THE NOTES

| | | |
|---|---|---|
| 24 | Form of Notes: | Bearer form. Interests in a temporary global Note will be exchangeable for interests in a permanent global Note in bearer form which is exchangeable for definitive Notes in bearer form in the limited circumstances specified in the permanent global Note. |
| | New Global Note Form: | Not Applicable |
| 25 | Talons for future Coupons or Receipts to be attached to Definitive Notes (and dates on which such Talons mature): | No |
| 26 | Details relating to Partly Paid Notes: | Not Applicable |
| | amount of each payment comprising the Issue Price and date on which each payment is to be made and consequences (if any) of failure to pay, including any right of the Issuer to forfeit the Notes and interest due on late payment: | |
| 27 | Details relating to Instalment Notes: | Not Applicable |
| | Instalment Amounts and Instalment Dates: | Not Applicable |
| 28 | Details relating to Extendible Notes: | Not Applicable |
| 29 | Details relating to Renewable Notes: | Not Applicable |
| 30 | Redenomination, renominalisation and reconventioning provisions: | Not Applicable |
| 31 | Consolidation provisions: | Not Applicable |
| 32 | Other final terms: | See Annex 1 |

## DISTRIBUTION

| | | | |
|---|---|---|---|
| 33 | (i) | If syndicated, names and addresses of Managers and underwriting commitments: | Not Applicable |
| | (ii) | Date of Subscription Agreement: | Not Applicable |
| | (iii) | Stabilising Manager (if any): | Not Applicable |
| 34 | | If non-syndicated, name and address of Dealer: | Lehman Brothers International (Europe), 25 Bank Street, London E14 5LB |
| 35 | | Total commission and concession: | The Issue Price herein is not an expression of the market value of the Notes and the initial placement of the Notes by the dealer appointed under the Programme may have been executed at prices above |

-3-

or below such Issue Price to reflect prevailing market conditions.

36   Selling restrictions:

   (i)   Netherlands Selling Restrictions:       Notes offered outside Netherlands; selling restriction 1(iv) applies

   (ii)   Additional Selling Restrictions:       Australia; Any Noteholder in Australia shall represent and warrant that it is a sophisticated investor for the purposes of Chapters 6 and 7 of the Corporations Act 2001 of Australia and undertakes to inform the Issuer should its status as a sophisticated investor change.

No prospectus or other disclosure document (as defined in the Corporations Act 2001 of Australia) in relation to the Notes has been or will be lodged with the Australian Securities and Investments Commission (the "ASIC"). Each Dealer represents and agrees that it:

   (a)   has not offered or invited applications, and will not offer or invite applications for the issue, sale or purchase of the Notes in Australia (including an offer or invitation which is received by a person in Australia); and

   (b)   has not distributed or published, and will not distribute or publish, any draft, preliminary or definitive offering document, any final terms or pricing supplement or other offering material or advertisement relating to the Notes in Australia,

unless:

   (i)   the aggregate consideration payable by each offeree is at least AUD500,000 (or its equivalent in any other currency but disregarding moneys lent by the offeror or its associates) or the offer or invitation otherwise does not require disclosure to investors under Part 6D.2 of the Corporations Act 2001 of Australia;

   (ii)   the offer or the issuance of the Notes does not constitute an offer to a "retail client" for the purposes of Chapter 7 of the Corporations Act 2001 of Australia;

- 4 -

(iii)    the offer or the issuance of the Notes does not
constitute an offer or invitation to the public
for the purposes of section 82 of the
Corporations Act 2001 of Australia;

(iv)    such action complies with all applicable laws,
regulations and directives; and

(v)    such action does not require any document to
be lodged with the ASIC.

By providing the information contained in these Final
Terms, neither the Issuer nor any other relevant entity
is providing financial product advice. The reader
should consider obtaining independent advice before
making any financial decisions.

RESPONSIBILITY

The Issuer accepts responsibility for the information contained in these Final Terms.

Signed on behalf of the Issuer

By.......................................................................

Duly authorised

- 3 -

PART B – OTHER INFORMATION

1    LISTING

    (i)    Listing:                               None

    (ii)    Admission to Trading:         Not Applicable

OPERATIONAL INFORMATION

    ISIN Code:                      XS0305158031

    Common Code:               030515803

    New Global Note intended to be held in a manner which would allow Eurosystem eligibility:      Not Applicable

    Any clearing system(s) other than Euroclear and Clearstream, Luxembourg and the relevant identification number(s):      Not Applicable

    Delivery:                    Delivery against payment

    The Aggregate Nominal Amount of Notes issued has been translated into U.S. Dollars at the rate of 1USD = AUD1.2009  producing a sum of (for Notes not denominated in U.S. Dollars):    U.S.$11,657,925.00

    Names and addresses of Additional Paying Agent(s) (if any):    Not Applicable

Annex 1

1    Definitions

"Averaging Dates" means, subject as provided in paragraph 3 of this Annex 1 (*Disrupted Days*), each of 6 September 2007, 6 December 2007, 6 March 2008, 6 June 2008, 5 September 2008, 5 December 2008, 6 March 2009 and 8 June 2009 or, if any such day is not a Scheduled Trading Day, the next following Scheduled Trading Day;

"Basket Value$_k$" means, in respect of an Averaging Date k, a value calculated by the Calculation Agent in accordance with the following formula:

$$BasketValue_k = \frac{1}{2} \times \sum_{j=1}^{2} Fund_k^j$$

Where:

Fund$_k^j$ means a value in respect of each Fund$^j$ calculated by the Calculation Agent in accordance with the following formula:

$$Fund_k^j = \frac{NAV_k^j}{NAV_0^j}$$

Where:

$NAV_k^j$ = the Net Asset Value of Fund$^j$ on the relevant Averaging Date k

$NAV_0^j$ = the Initial Net Asset Value of Fund$^j$

"Business Day" means a day (other than a Saturday or a Sunday) on which commercial banks and foreign exchange markets settle payments and are open for general business (including dealings in foreign exchange and foreign currency deposits) in Sydney, Luxembourg and London and a day on which each clearing system is open for business;

"Calculation Agent" means Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE, United Kingdom;

"Closing Level" means, in respect of Fund$^j$ on the relevant Scheduled Trading Day, the NAV of that Fund on such Scheduled Trading Day, as calculated and published by the relevant Management Company or the administrator, service provider or other person that generally reports such value on behalf of the relevant Management Company to its investors or, at the discretion of the Calculation Agent, as published on the Bloomberg service on such Scheduled Trading Day, as determined by the Calculation Agent;

"Disrupted Day" means any Scheduled Trading Day on which (i) the NAV of any Fund or Replacement Fund fails to be published or (ii) on which the Calculation Agent has determined that any Fund or Replacement Fund is subject to a Fund Substitution Event, or (iii) where a buy or sell order is submitted in accordance with the relevant procedures of a Fund or Replacement Fund and the inability of the hedging party to buy or sell the shares or units of such Fund or Replacement Fund on any Scheduled Trading Day at, or at a value that equates to, the NAV of such share or unit;

- 7 -

"Funds" means each of:

(I)     ING (L) Invest – European Real Estate (Bloomberg code: INGLEIC Equity, ISIN: LU0121177280) ("Fund 1"); and

(II)    Credit Suisse – Equity Fund (Lux) Asian Property (Bloomberg code: CSASPRB LX Equity, ISIN: LU0220210792) ("Fund 2"); -

and each shall be a "Fund";

"Fund$^{j/n}$ means the relevant Fund or Replacement Fund;

"Initial Net Asset Value" means, in respect of Fund$^j$, the Closing Level of that Fund$^j$ on the Strike Fixing Date;

"Interest Payment Date" means each of 13 June 2008 and 15 June 2009 provided that if either of such dates is not a Business Day the relevant date shall be postponed to the next day which is a Business Day unless it would thereby fall into the next calendar month, in which event such date shall be brought forward to the immediately preceding Business Day (the "Modified Following Business Day Convention");

"Management Company" means:

(a)     in respect of Fund 1, ING Investment Management Luxembourg S.A.; and

(b)     in respect of Fund 2, Credit Suisse Equity Fund Management Company;

and in respect of a Replacement Fund, the company as will be determined by the Calculation Agent at the Fund Substitution Date;

"NAV" means Net Asset Value;

"Net Asset Value" means in respect of Fund$^j$ and a Scheduled Trading Day, the Closing Level of that Fund or Replacement Fund;

"Replacement Fund" shall have the meaning given to it in paragraph 4 of this Annex 1 (*Adjustment to the Fund or Replacement Fund*);

"Scheduled Trading Day" means, with respect to a Fund or a Replacement Fund, a day upon which the relevant Management Company or the administrator, service provider or other person that generally reports such value on behalf of the relevant management company is scheduled to calculate and publish the Net Asset Value for such Fund or Replacement Fund;

"Strike Fixing Date" means, subject as provided in paragraph 3 of this Annex 1 (*Disrupted Days*), 15 June 2007, or if such day is not a Scheduled Trading Day, the next following Scheduled Trading Day; and

"Trade Date" means 8 June 2007.

2       Interest Amounts

Unless previously redeemed or purchased and cancelled, each Note bears interest in accordance with this paragraph 2 and the relevant interest amount (an "Interest Amount") will be payable on each Interest Payment Date.

(a)     The amount of interest payable in respect of each Note, in respect of the first Interest Payment Date shall be an amount in AUD calculated by the Calculation Agent in accordance with the following formula:

-8-

$$AUD\,5,000 \times \left[100\% \times Max\left(Lockin(1) - Lockin(0);0\right)\right]$$

Where:

Lockin(1) means $Max\left(Strategy(1), Lockin(0)\right)$

Lockin(0) means 100%

Strategy(1) means the value, as calculated by the Calculation Agent, equal to the arithmetic average of the Basket Values for the first Averaging Date, the second Averaging Date, the third Averaging Date and the fourth Averaging Date

(b)    The amount of interest payable in respect of each Note in respect of the second Interest Payment Date shall be an amount in AUD calculated by the Calculation Agent in accordance with the following formula:

$$AUD\,5,000 \times \left[100\% \times Max\left(Lockin(2) - Lockin(1);0\right)\right]$$

Where:

Lockin(2) means $Max\left(Strategy(2), Lockin(1)\right)$

Lockin(1) means $Max\left(Strategy(1), Lockin(0)\right)$

Strategy(2) means the value, as calculated by the Calculation Agent, equal to the arithmetic average of the Basket Value for the first Averaging Date, the second Averaging Date, the third Averaging Date, the fourth Averaging Date, the fifth Averaging Date, the sixth Averaging Date, the seventh Averaging Date and the eighth Averaging Date

3    Disrupted Days

If the Strike Fixing Date or any Averaging Date, as the case may be, is a Disrupted Day, then the Strike Fixing Date or that Averaging Date, as the case may be, shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day, unless there is a Disrupted Day on each of the four Scheduled Trading Days immediately following the scheduled Strike Fixing Date or that scheduled Averaging Date. In that case,

(a)    the earlier of that fourth following Scheduled Trading Day and the fifth Business Day prior to the Maturity Date, as the case may be, shall be deemed to be the Strike Fixing Date or the relevant Averaging Date, as the case may be, notwithstanding it is a Disrupted Day (the "Deemed Date"); and

(b)    the Calculation Agent shall determine its good faith estimate of the level of the Funds and any Replacement Funds that would have prevailed but for that Disrupted Day on that Deemed Date.

4    Adjustment to the Fund or Replacement Fund

If the Calculation Agent determines (in its sole and absolute discretion), in respect of a Fund or a Replacement Fund, that a Fund Merger Event, an Insolvency, a De-Listing or a Fund Substitution Event (each as defined below) has occurred, the Calculation Agent may, acting in a commercially reasonable manner and in its sole and absolute discretion, in respect of the affected Fund (the "Affected Fund") either:

(i)    select a replacement investment fund (a "Replacement Fund") with similar investment objectives and policies, managed by the same Management Company as the Affected Fund, an affiliate thereof or an alternative investment manager, denominated in a currency selected by the Calculation Agent, and of similar performance and quality (as determined by the Calculation Agent), the shares or units of which

2yr Principal Protected Property Markets Fund-Linked Note / Issue Date: June 13, 2007 / Series No. 7457 / GID: 3091419

will replace the shares or units of the Affected Fund for the purposes of the Notes. The Calculation Agent shall give notice of such Replacement Fund and such adjustments to Noteholders as soon as is reasonably practicable after effecting such substitutions and related adjustments. The Calculation Agent shall effect such replacement of the Affected Fund on the Fund Substitution Date and the Calculation Agent shall make any corresponding adjustment(s) that it determines, acting in a commercially reasonable manner, to be appropriate to any variable, calculation or valuation methodology or any other terms relevant to the Notes to account for such replacement; or

(ii)    if the Calculation Agent is unable to select a Replacement Fund pursuant to sub-paragraph (i) above, the Issuer shall cancel the Notes by giving notice to the Noteholders within 8 Business Days from the date of such cancellation. If the Notes are so cancelled the Issuer will pay an amount to the Noteholders in respect of each Note equal to the Early Redemption Amount.

"De-Listing" means, for any Fund share or Replacement Fund share for which the reference source is an exchange, a trading system or a quotation system, the reference source announces that pursuant to the rules of such reference source, the Fund share or Replacement Fund share ceases (or will cease) to be listed, traded or publicly quoted on the reference source for any reason (other than a Fund Merger Event) and is not immediately re-listed, re-traded or re-quoted on an exchange, trading system or quotation system acceptable to the Calculation Agent;

"Fund Merger Event" means, in respect of a Fund or Replacement Fund: (i) an irrevocable commitment to transfer all of the relevant fund shares or units; or (ii) a consolidation, amalgamation or merger of such Fund with or into another fund other than a consolidation, amalgamation or merger in which such Fund is the continuing Fund; or (iii) a takeover offer for such Fund that results in a transfer of or an irrevocable commitment to transfer all of the relevant Fund shares (other than Fund shares owned or controlled by the offeror);

"Fund Substitution Date" means such date selected by the Calculation Agent for the replacement of the relevant Fund or Replacement Fund, as the case may be;

"Fund Substitution Event" means the determination by the Calculation Agent in its sole and absolute discretion that any of the following has occurred:

(a)    the main investment objective of a Fund or Replacement Fund, as the case may be, is amended in accordance with its rules so that it no longer refers solely to the benchmark as set out in the constitutive documents and/or prospectus in respect of such Fund on the Trade Date or in the case of a Replacement Fund on the Fund Substitution Date;

(b)    the currency denomination of a Fund or Replacement Fund, as the case may be, is amended in accordance with its rules so that the NAV of that Fund or Replacement Fund on any Scheduled Trading Day is no longer calculated in the same currency as at the Trade Date or in the case of a Replacement Fund as at the Fund Substitution Date;

(c)    the Issuer, its affiliates or any other designated hedging entity would be required to pay a subscription fee in respect of a purchase of units/shares of a Fund or Replacement Fund or would incur a redemption fee in respect of a sale of units/shares of such Fund or Replacement Fund in relation to their hedging activities in respect of the issue of the Notes;

(d)    the relevant Management Company or the administrator, service provider or other person that generally calculates and/or reports the NAV on behalf of the relevant Management Company in respect of a Fund or Replacement Fund fails for reasons other than a technical or operational nature to calculate and publish the NAV of such Fund or Replacement Fund for four consecutive Scheduled

- 10 -

Trading Days and the reason for such failure is as a consequence of any decision to liquidate or dissolve such Fund or Replacement Fund;

(e)    the activities of a Fund or Replacement Fund or its Management Company is placed under review by any governmental, legal or regulatory entity for reasons of wrongdoing, breach of any rule or regulation or other similar reason;

(f)    there is any change in the regulatory or tax treatment applicable with respect to the holding, purchase and/or sale of units/shares of a Fund or Replacement Fund which (in the opinion of the Calculation Agent) could have an economic impact for the Issuer, its affiliates or any other designated hedging entity as a holder of an interest in such Fund or Replacement Fund;

(g)    any suspension of, mandatory redemption, limitation of or restriction of (including but not limited to the imposition of a minimum notice period in redeeming or subscribing in units/shares in a Fund or Replacement Fund) trading of such Fund or Replacement Fund (by reason of liquidity restrictions or otherwise) if, in any such case, such suspension or limitation is, in the determination of the Calculation Agent, material;

(h)    the Issuer, its affiliates or any other designated hedging entity would be obliged (whether by the relevant Management Company or otherwise) to redeem all or some of the units/shares of a Fund or Replacement Fund that it is holding in relation to its hedging activities in respect of the issue of the Notes; and

(i)    the annualised volatility of a Fund or Replacement Fund exceeds the percentage prescribed by any applicable law, regulation or in the constitutive documents or prospectus of such Fund or Replacement Fund. "Volatility" for the purposes of this definition in a given time window, as of any date of determination and with respect to the relevant Fund or Replacement Fund, is the annualized standard deviation of the monthly percentage changes in the net asset value of such Fund or Replacement Fund as calculated and published by the relevant Management Company or the administrator, service provider or other person that generally reports such value on behalf of the relevant Management Company to its investors or a publishing service on each Scheduled Trading Day during the particular time window preceding such date of determination, expressed as a percentage, as determined by the Calculation Agent; and

"Insolvency" means the insolvency, liquidation (whether voluntary or involuntary) or bankruptcy of, or any analogous proceedings affecting, a Fund or Replacement Fund, its Management Company, administrator or master fund.

5    **Potential Adjustment Events**

Following the declaration by the Issuer of the terms of any Potential Adjustment Event, the Calculation Agent will determine whether such Potential Adjustment Event has a diluting or concentrative effect on the theoretical value of the relevant units or shares in a Fund or Replacement Fund, as the case may be, and, if so, will (i) make the corresponding adjustment(s), if any, to any one or more of the Initial Net Asset Value or Net Asset Value relating to such Fund or Replacement Fund for a particular date and, in any case, any other variable relevant to the settlement, payment or other terms of the Notes as the Calculation Agent determines appropriate to account for that diluting or concentrative effect (provided that no adjustments will be made to account solely for changes in volatility, expected dividends, stock loan rate or liquidity relative to the relevant units or shares in a Fund or Replacement Fund, as the case may be) and (ii) determine the effective date(s) of the adjustment(s). The Calculation Agent may (but need not), determine the appropriate adjustment(s) by reference to the adjustment(s) in respect of such Potential Adjustment Event made by an options exchange to

-11-

options on the relevant units or shares in the relevant Fund or Replacement Fund, as the case may be, traded on such options exchange.

"Potential Adjustment Event" means any of the following:

(i)    a subdivision, consolidation or reclassification of relevant units or shares in the relevant Fund or Replacement Fund, as the case may be (unless resulting in a Fund Merger Event), or a free distribution or dividend of any such units or shares in such Fund or Replacement Fund, as the case may be, to existing holders by way of bonus, capitalization or similar issue;

(ii)   a distribution, issue or dividend to existing holders of the relevant units or shares in a Fund or Replacement Fund, as the case may be, of (A) such units or shares in such Fund or Replacement Fund, as the case may be, or (B) other share capital or securities granting the right to payment of dividends and/or the proceeds of liquidation of such Fund or Replacement Fund, as the case may be, equally or proportionately with such payments to holders of such units or shares in such Fund or Replacement Fund, as the case may be, or (C) share capital or other securities of another issuer acquired or owned (directly or indirectly) by such Fund or Replacement Fund, as the case may be, as a result of spin-off or other similar transaction, or (D) any other type of securities, rights or warrants or other assets, in any case for payment (cash or other consideration) at less than the prevailing market price as determined by the Calculation Agent;

(iii)  an Extraordinary Dividend;

(iv)  a call by a Fund or Replacement Fund, as the case may be, in respect of relevant units or shares in such Fund or Replacement Fund, as the case may be, that are not fully paid;

(v)   a repurchase by the relevant Fund or Replacement Fund, as the case may be, of relevant units or shares in such Fund or Replacement Fund, as the case may be, whether out of profits or capital and whether the consideration for such repurchase is cash, securities or otherwise;

(vi)  in respect of a Fund or Replacement Fund, as the case may be, an event that results in any shareholder rights being distributed or becoming separated from shares of common stock or other shares of the capital stock of the Issuer pursuant to a shareholder rights plan or arrangement directed against hostile takeovers that provides upon the occurrence of certain events for a distribution of preferred stock, warrants, debt instruments or stock rights at a price below their market value, as determined by the Calculation Agent, provided that any adjustment effected as a result of such an event shall be readjusted upon any redemption of such rights; or

(vii) any other event that may have a diluting or concentrative effect on the theoretical value of the relevant units or shares in a Fund or Replacement Fund, as the case may be.

"Extraordinary Dividend" means the characterization of a dividend or portion thereof as determined by the Calculation Agent.

6    Notification of Early Redemption Amount, Interest Amount, Fund Substitution Event and Disrupted Days

6.1   As soon as reasonably practicable after calculating or otherwise determining the Early Redemption Amount or the Interest Amounts the Calculation Agent shall give notice of the relevant amount to the Issuer.

6.2   The Calculation Agent shall as soon as reasonably practicable notify the Issuer of the existence or occurrence of a Disrupted Day on any day which but for such Disrupted Day would have been the Strike Fixing Date or an Averaging Date.

-- 12 --

6.3    Upon the occurrence of a Fund Substitution Event, the Calculation Agent shall as soon as reasonably practicable notify the Issuer stating the occurrence of the event and giving details thereof.

6.4    Adjustments in accordance with the foregoing sections shall be calculated by the Calculation Agent, shall be notified to the Noteholders in accordance with Condition 15 and shall be (in the absence of manifest error) binding on all parties concerned. However, Noteholders should be aware that there may be, necessarily, some delay between the time at which any of the above events occur and the time at which it is reported to Noteholders.

## 7    The Calculation Agent

The Calculation Agent shall act independently and not as an agent of the Issuer, the Guarantor or the Noteholders. The Calculation Agent shall have no responsibility to Noteholders for good faith errors or omissions in its calculations and determinations and in adopting the decisions and determinations of the Calculation Agent of the Notes. All determinations made by the Calculation Agent hereunder shall, in the absence of manifest error, wilful default or bad faith, be final and conclusive, and the Calculation Agent shall have no liability to the Issuer, the Guarantor, the Noteholders or any third party in relation to such determinations except in the case of its wilful default, or bad faith.

Nothing contained herein shall prevent the Calculation Agent from dealing in the Notes or from entering into any related transaction, including without limitation any swap or hedging transactions with the Issuer, the Guarantor (or any of their respective affiliates) or any holder of the Notes (or any of its affiliates).

2yr Principal Protected Property Markets Fund-Linked Note / Issue Date: June 13, 2007 / Series No. 7457 / GID: 3091419

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF SUFFOLK    )

MELISSA SCHNETTLER, being duly sworn, deposes and says:

That deponent is not a party to the action, is over 18 years of age and resides at

Coram, New York.

That on the 16th day of March, 2011 deponent served the annexed *Objection of*

*Inverell Shire Council to Debtor's Ninety-Second Omnibus Objection to Claims (No*

*Blocking Number LPS Claims*) upon the following at the address set forth below:

Weil, Gotshal & Manges, LLP
Attn: Shai Waisman, Esq. and Mark Bernstein, Esq.
767 Fifth Avenue
New York, NY 10153

Office of the United States Trustee for the Southern District of New York
Attn: Elisabeth Gasparini, Esq. and Andrea Schwartz, Esq.
33 Whitehall Street, 21st Floor
New York, NY 10004

Milbank, Tweed, Hadley & McCloy LLP
Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq. and Evan Fleck, Esq.
1 Chase Manhattan Plaza
New York, NY 10005

by depositing a true copy of same enclosed in a post-paid, properly addressed wrapper, in

a post office-official depository under the exclusive care and custody of the United States

Postal Service within the State of New York.

/s/ Melissa Schnettler
MELISSA SCHNETTLER

Sworn to before me this
16th day of March, 2011

/s/ Maryam Parvaneh
    NOTARY PUBLIC
No. 02PA6208296
Qualified in Nassau County
Commission Expires June 29, 2013

Index No. 08-13555(JMP)

UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK

In re:

LEHMAN BROTHERS HOLDING INC., et al.,

Debtor,

## OBJECTION OF INVERELL SHIRE COUNCIL TO DEBTOR'S NINETY-SECOND OMNIBUS OBJECTION TO CLAIMS (NO BLOCKING NUMBER LPS CLAIMS)

**LAZER, APTHEKER, ROSELLA & YEDID, P.C.**
*Attorneys for Creditor*
ATTORNEYS AT LAW
MELVILLE LAW CENTER
225 OLD COUNTRY ROAD
MELVILLE, NEW YORK 11747
(631) 761-0800

**Annabel Vadasz**

From:           Eckols, Erin [erin.eckols@weil.com]
Sent:           Wednesday, 30 March 2011 10:16 AM
To:             Alexander Johnson
Cc:             Eckols, Erin; O'Connor, John; Burton, Casey
Subject:        Lehman -- Inverell Shire Council

Alex --

As a follow-up to our conversation, this confirms that the Debtors withdraw without prejudice the Ninety-Second Omnibus Objection to Claims (No Blocking Number Claims) as to Inverell Shire Council's claim 18687 (the "Claim"). The Claim will appear on the exhibit of "withdrawn objections" that is attached to the final order submitted at Thursday's claims hearing. Also, as discussed, the Debtors reserve their rights to object to the Claim on any basis in the future.

If you have any questions, please do not hesitate to contact me.

Best regards,
Erin



**Erin Eckols**

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, TX 75201-6950
erin.eckols@weil.com
+1 214 746 7734 Direct
+1 214 746 7777 Fax

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.

Click here to report this email as spam.



9 September 2011

By Email: Paul.Pay@Inverell.nsw.gov.au
Original forwarded by Post

Inverell Shire Council
Administration Centre
PO Box 138
INVERELL  NSW  2360

Attention: Paul Pay

Dear Sir

**Chapter 11 Matters**

1.    Introduction

    1.1    We refer to your email dated 2 September 2011  We confirm that we are able to accept instructions to act for you.  Thank you for those instructions.

    1.2    This letter and the attached Disclosure Statement (Annexure A) set out the disclosure requirements which we are required to provide you under the Legal Profession Act 2004 (NSW) and Legal Profession Regulations 2005 (NSW) and record the terms and conditions of your instructions and summarise our understanding of the general scope of those instructions.

    1.3    This letter and the attached Disclosure Statement (Annexure A) is an offer to enter into a costs agreement with you in accordance with the Legal Profession Act 2004 (NSW). Accordingly, the terms of the costs agreement are those contained in this letter and the Disclosure Statement.

2.    Scope of the legal work

You have instructed us to advise in relation to the Second Objection filed by Lehman Brothers Holdings Inc.

3.    Acceptance of this offer

    3.1    Acceptance of this offer may be by one of the following ways:

       o    signing and returning this agreement;

       o    giving us instructions after receiving this document;

       o    oral acceptance.

Lawyers

Sydney · Melbourne
Brisbane · Adelaide

ABN 42 843 327 183

Level 23
Governor Macquarie Tower
1 Farrer Place
Sydney NSW 2000
DX 10216 Sydney Stock Exchange

t  +61 2 9253 9999
f  +61 2 9253 9900

www.piperalderman.com.au

Partner:
Amanda Banton
t  +61 2 9253 9929
abanton@piperalderman.com.au

Contact:
Christopher Martin
Senior Associate
t  +61 2 9253 3828
chris.martin@piperalderman.com.au

    3.2    If you accept this offer you will be regarded as having entered into a costs agreement and being bound by the terms and conditions set out in it.

    3.3    Please do not hesitate to contact the writer if there is anything in this letter which you do not understand or with which you disagree. Alternatively you are entitled to seek independent legal advice on the terms of this letter.

Yours faithfully
Piper Alderman

Per:

Amanda Banton
Partner

Encs   Copy of this letter
Disclosure Statement (Annexure A)
Self addressed stamped envelope

## Acceptance of terms of engagement

I/We have read and understood and agree to the above terms of the engagement. I/We acknowledge that I/we have:

1.    the right to negotiate a costs agreement and the right to independent advice and representation in relation to the negotiation;

2.    received a Disclosure Statement (which appears as Annexure A to this letter), pursuant to section 309 of the Legal Profession Act 2004 (NSW);

3.    read and approved this costs agreement;

4.    agreed that where one or more individuals and/or non-individuals are signing this letter then each agrees and acknowledges that those signatories are jointly and severally covenanting for all rights and obligations under the above terms of the engagement.

Dated    12 / 9 / 2011

Signature of Authorised Officer of the Council, Inverell Shire Council

Signature:

Print Name:   Paul Henry

Position Title:   General Manager

# Annexure A to Standard Costs Agreement

## Disclosure Statement

To:     Inverell Shire Council
        Administration Centre
        PO Box 138
        INVERELL NSW 2360

Date:   9 September 2011

The covering letter to which this Annexure A is attached and this document in sections 1-16, together with the attached schedule (Schedule), disclose information about the costs of our legal services and your rights as required by the Legal Profession Act 2004 (NSW) (the Act), and other terms and conditions (sections 17-24) which will apply to the services we propose to render you if you agree. You may enter into a costs agreement with us in terms of the agreement to which this Annexure A is attached based on the provisions of this document.

### 1.     Our fees

Subject to the provisions of the next paragraph, we charge for our services on a time cost basis plus disbursements described in section 2 (unless some other basis is set out in this document and agreed).

Where preparation of standard form documents forms the whole or part of our work our fees will be agreed between us. In default of such agreement, we will charge for our services either in accordance with the applicable Practitioner Remuneration Order/Table or on a time cost basis plus disbursements described in section 2 (unless some other basis is set out in this document and agreed).

Except where the work is charged in an amount upon which we have agreed or charged in accordance with an applicable Practitioner Remuneration Order/Table our fees are therefore the product of the hours worked multiplied by the hourly rates of the people who did the work.

Hourly rates vary depending on the level of experience and expertise of the person involved. We will charge you professional fees for the work we do at the rates set out in the Schedule or as varied following adjustment as set out below.

Our hourly rates may be adjusted in June of each year, having regard to changes in costs and market conditions. Any adjustment will be advised in writing to you in July of each year with effect from the date as advised to you at the time of communicating these adjustments (unless within 21 days of receiving that communication you advise us in writing that you do not agree to the adjusted rates and terminate this retainer).

Unusual or overtime support staff resources to be engaged specifically because of the requirements of the matter will be charged for additionally.

Fees for individual items of work shall be charged at minimum six minute units. The charge for an item of work shall be rounded up to the nearest six minute unit.

Where reasonable we may have two or more lawyers working together at the one time on the matter(s) the subject of this costs agreement, and in any such case, it is agreed and acknowledged that those lawyers can and will confer, discuss and communicate with each other and that any such conferences, discussions and communications are properly chargeable to you.

### 2.     Disbursements

In addition to our fees we charge you for the out of pocket expenses incurred by us or paid on your behalf (disbursements).

Interstate, international and mobile calls and courier fees are charged at the cost to us. There is no charge for local telephone calls. Charges for facsimile transmissions and photocopying are based on the number of pages sent or copied.

Where we provide video facilities at the request of a client then we will render an additional charge per hour, to cover the costs of equipment, use of rooms and other facilities. Direct costs rendered by any telecommunications carrier resulting from video conferencing will be charged at the cost to us.

The rates of charge for these items are set out in the Schedule. These charges may change from time to time as advised by us in writing to you and with effect as from the date so advised to you.

In addition, other expenses to be incurred (and for which we may charge you) include reasonable expenses for retrieval, copying and delivery of our file records and materials kept on current and/or stored files. Charges for any such file retrieval, copying and delivery will be advised to you at the time of any such activity.

### 3.     Goods and services tax

As we have to pay Goods and Services Tax (GST) on the legal services we provide to you and on most disbursements, you are required to pay us an amount equivalent to the applicable GST in addition to the fees and disbursements otherwise payable. You will be provided with a tax invoice.

### 4.     Costs estimates

The total costs of the fees and expenses to complete any matter will vary depending on the extent of the work required to obtain the best result, the approach and attitude of any other party and other factors which include the complexity and nature of the work, the timeframe within which the work is required and the extent to which we use standard and/or precedent documentation. For these reasons the total costs of fees and expenses cannot be predicted accurately in advance. Therefore any estimate given is not a fixed quote unless expressly so stated.

You have instructed us to advise you in relation to matters particularised in item 2 of the covering letter.

The major variable(s) that will affect the calculation of these costs is/are changes in the nature and content of your instructions.

We estimate that our legal costs, which include legal fees, expenses and office services charges (if indicated) based on

the hourly rates set out in the Schedule, for this work will be $4,500.00 (plus GST).

This estimate is made up as follows:

| | | |
|---|---|---|
| • | Legal fees | $4,000.00 |
| • | Expenses and office service charges | $500.00 |

This estimate is not binding on us if there are changes in the nature and content of your instructions. It is required to be given to you by the Act and is based on our understanding of the present circumstances. Thus, if your instructions or the scope of work changes, we may need to revise this estimate.

**5.    Interim billing**

Interim accounts of fees and disbursements will be rendered progressively during the matter (usually on a monthly basis).

**6.    Your right to a bill of costs**

You are entitled to receive a bill of costs from us. If we send you a lump sum bill then within 30 days of receipt of the lump sum bill you may request an itemised bill.

**7.    Progress reports**

You may request at reasonable intervals written progress reports on your matter. Our normal charge out rates apply for this service. You are entitled to request a written statement of the amount of the legal incurred costs since our last bill to you, free of charge.

**8.    Payment terms**

Unless we have advised you otherwise in writing, the payment of our fees and disbursements in full is not conditional upon the completion of your matter or upon the happening of any other event or thing. Subject to paragraph 6 above, we expect our accounts to be paid within 14 days. If not paid, we may cease acting.

Acceptable payment options include payment by cheque or electronic funds transfer via the internet or payment by credit card provided that if payment is to be made by credit card you will pay an additional charge (being a 1.5% surcharge) applied to the whole of the amount to be charged on the credit card.

Where we act for two or more people or entities in a matter, each is individually responsible for payment of our entire account whatever arrangements may be made between them.

Should you not pay timeously the whole or any portion of our fees and disbursements invoiced to you we have the right to refer recovery of those unpaid sums to a mercantile agent and/or a solicitor (including another solicitor employed by us). You agree that any mercantile agent and/or solicitors costs incurred in recovery of these unpaid sums shall also be paid by you.

**9.    Interest on unpaid accounts**

If our accounts are not paid within 30 days then until paid in full we shall be entitled to charge interest on the account at a rate equal to the applicable Cash Rate Target (which means the percentage (or maximum percentage) specified by the Reserve Bank of Australia as the Cash Rate Target) increased by two percentage points and with interest on our account to accrue daily from that date being 14 days after the date of the invoice.

**10.    Recovery of costs from another party**

The court may decide who will pay the successful party's costs. If your matter is successful, the court may order Lehman Brothers Holdings Inc. to pay some of your costs.

These costs are known as party/party costs and are calculated by applying the relevant court scale applying to your case.

Please note that if the court does order costs in your favour, this only gives you a right to recover some costs from Lehman Brothers Holdings Inc.. It does not affect your responsibility to pay our legal fees and legal costs.

Accordingly, if the court orders that Lehman Brothers Holdings Inc. pay some of your legal costs, we estimate that you will recover an amount of between 40% and 70% of your total costs.

We also inform that if you cannot recover the costs from Lehman Brothers Holdings Inc. (for example, if a party goes into liquidation or is bankrupted) then you will still be responsible for our legal fees and legal costs.

**11.    Your liability for the costs of another party**

If your case is unsuccessful, the court will most likely order you to pay some of the successful parties' legal costs. These costs are known as party/party costs and are calculated by applying the relevant court scale applying to your case.

You will also be responsible for our legal costs.

**12.    If you have a concern about our legal costs**

If you have any concern about our legal costs, or our legal services, please do not hesitate to speak to Amanda Banton or the Managing Partner.

**13.    Dispute as to legal costs**

The Act gives you the right to:

- apply to the Supreme Court to have the bill of costs assessed for its fairness and reasonableness by a Costs Assessor under Part 3.2, Division 11 of the Act;

    applications for assessment should be made before the expiry of 12 months after receipt of the bill of costs, or request for payment of costs made by us, or full payment made to us, whichever is the earliest;

    you may seek a costs review outside the 12 months time limit. In these circumstances the Costs Assessor will not deal with the application if we can establish that to do so would, in all the circumstances, cause unfair prejudice to us;

- have a costs agreement set aside by the Costs Assessor on the basis it is not fair or reasonable under section 328 of the Act; or

- have a costs dispute mediated (provided referral for mediation is made before an application for assessment is accepted) if the amount disputed is less than $10,000 under Part 3.2, Division 8 of the Act.

**14.    Applicable law**

The law of NSW shall apply to any legal costs assessment in this matter, being the State where the practitioner you have dealt with has created and issued to you this Disclosure Statement and the letter to which it is annexed. The law of that State shall govern this costs agreement and you submit to the jurisdiction of the Courts of competent jurisdiction located in the capital city of that State.

Because you have the right to sign a costs agreement under a corresponding law or to advise us that you require the law of another State or Territory to apply if this matter has a substantial connection with that State or Territory. If within 21 days of our sending you this Disclosure Statement you make a written request of us for this we will disclose costs as they are applicable in that State or Territory.

15.  Engagement of another lawyer

We may need to engage on your behalf a barrister or other lawyer to provide specialist advice or services. If this is to be done, *either* you may be asked to enter a costs agreement with that other barrister or lawyer who will disclose costs in a similar manner, *or* we will consult you about the terms of this engagement and provide you with a statement setting out the details of this person's or firm's fees before incurring any such expense on your behalf.

Subject to the further disclosures as referred to herein, you agree you will be liable to pay that barrister or other lawyer or, should we pay such persons on your behalf, to reimburse us for all such payments.

16.  Substantial changes to disclosure

You will be informed in writing, as soon as reasonably practicable, of any substantial changes to anything contained in this disclosure document.

17.  Ending our engagement

You may end our engagement by written notice at any time. If you do this, you must pay our legal costs up until that time.

Circumstances may arise (such as a conflict of interest) which make it impossible for us to continue to act for you. If this happens, we will contact you immediately.

If you do not pay our account or if you fail to pay money in advance if it is requested, we may stop work until we are paid. If the account continues to remain unpaid we may cease to act for you.

If we cease to act for you:

•   we will not incur any liability as a result;

•   we will remove our name from the court record in any court proceedings;

•   you will receive a final account which will include all outstanding legal costs;

•   you must pay our legal costs up until the date when we cease to act;

•   we retain the right to keep your documents until we are paid.

18.  Trust money

We may ask for money to be paid in advance into our trust account from time to time to be used to discharge anticipated fees and expenses (including barristers' fees if applicable) when they arise. A failure by you to make that advance payment into our trust account shall entitle us to give you a written notice of our intention to cease to act for you.

Money paid into our trust account may also be used to discharge any GST imposed on, or in respect of, our fees and expenses as our liability to pay GST may arise before we receive your payment in respect of accounts of fees and disbursements.

We will assume, upon receipt of your payment, your authority to draw on the money paid for expenses and our professional fees, as they become due. We will also assume your authority is given for any moneys which we receive on your behalf to be paid directly to our trust account and to pay ourselves from this money immediately after sending you our bill of costs.

19.  Internet e-mail communication

*Confidentiality:* The firm uses Internet e-mail access as a further means of communication with you. We do, however, advise that we cannot guarantee the total security of this form of communication due to the Internet being a public unregulated network. We take steps to preserve confidentiality but want to bring this fact to your attention. Subject to your direction, any correspondence which is ultra-sensitive or confidential will be sent using a more secure form of communication.

*Viruses:* Any loss/damage incurred to your computer system by using material sent to you via the Internet is not our responsibility. In any event our entire liability will be limited to resupplying the material and no warranty is made that this material is correct, free from computer virus or defect.

20.  Storage of records

We store our files for seven years after the completion of a matter, after which we destroy those files unless otherwise specifically requested.

21.  Confidentiality and privilege

We undertake to maintain confidentiality and claim privilege in relation to the information and knowledge that we acquire from you in the conduct of the matter on your behalf subject to your express waiver as to the release of confidential or privileged information or the need to comply with any statutory requirement, or rules of court.

22.  Contribution

We look to you to take care in giving us all information and documents necessary for us to act for you effectively.

Damages for any breach by us of any express or implied term of this contract are agreed to be reduced to the extent that you caused or contributed to the damage.

23.  Variation

These terms can only be effectively varied in writing.

24.  Comments

We value feedback, positive or negative. If you have any concerns or comments about the conduct of a matter or how it is progressing you are encouraged to contact the file principal or any of the other lawyers engaged, or failing them, the file principal's Divisional Head or the firm's Managing Partner.

## Schedule to Annexure A

### Our charges

Our hourly rate of $715.00 plus 10% GST for Amanda Banton.

Amanda Banton may be assisted by Annabel Vadasz whose hourly rate is $450.00 plus 10% GST.

Other lawyers and assistants who may work on your file are charged at the rates referred to in the schedule of fees set out below.

### Our expenses and disbursements

| | |
|---|---|
| Document production | $0.77 per page (including GST) (bulk rates are less) |
| Facsimile | - Local $2.20 per page (including GST) - Interstate $3.30 per page (including GST) - International $5.50 per page (including GST) |
| Video facilities | $165.00 per hour (including GST) |

Interstate and international telephone calls and courier fees are charged at the cost to us. There is no charge for local telephone calls.

All other charges or costs, at cost to us plus GST.

These rates are subject to review.

### Schedule of fees

**Sydney office**

| | |
|---|---|
| Partners & Consultants | Not exceeding $750 per hour excluding GST ($825 per hour including GST) |
| Senior Associates / Special Counsel | Not exceeding $610 per hour excluding GST ($671 per hour including GST) |
| Associates | Not exceeding $480 per hour excluding GST ($528 per hour including GST) |
| Solicitors | Not exceeding $460 per hour excluding GST ($506 per hour including GST) |
| Law Graduates | Not exceeding $250 per hour excluding GST ($275 per hour including GST) |
| Law Clerks | Not exceeding $250 per hour excluding GST ($275 per hour including GST) |
| Conveyancer | Not exceeding $230 per hour excluding GST ($253 per hour including GST) |
| Paralegal | Not exceeding $230 per hour excluding GST ($253 per hour including GST) |
| Clerical | Not exceeding $230 per hour excluding GST ($253 per hour including GST) |

# Privacy Policy of Piper Alderman

1. **Introduction**

   1.1 Piper Alderman has a commitment to privacy in accordance with the Privacy Act 1988 (Cwth) (Privacy Act). We are bound by the Privacy Act and the National Privacy Principles contained in the Privacy Act. This Privacy Policy is provided to make you aware of how we collect, use and manage personal information.

   1.2 personal information means information or an opinion recorded about an individual that makes the individual's identity reasonably apparent or ascertainable. We view the privacy of personal information as an important issue.

   1.3 In making this Privacy Policy, we do so on the basis that this policy does not replace or limit the requirements of the Privacy Act.

2. **Manner and purpose of collection of personal information**

   2.1 The type of information we collect includes, but may not be limited to:

   (a) information you provide to us at our request, your name and address and, when you use our web site, your domain name, e-mail address, and information on what pages you access;

   (b) information we collect in the course of acting for clients.

   2.2 We will only use your personal information for the purpose of:

   (a) providing and marketing our services to you;

   (b) conducting our business of a legal services provider;

   (c) inviting you to seminars and functions which we think may be of interest to you,

   unless you have consented to us using your personal information for other purposes or its use for another purpose is required or permitted by law.

   If you do not wish us to use your information in any of the above ways, please contact us (see addresses under paragraph entitled "Accessing your personal information").

3. **Accuracy and completeness of personal information**

   3.1 While we will endeavour to ensure that the personal information collected from you is up to date and complete, we will assume that any personal information provided by you is free from errors and omissions, is not misleading or deceptive and complies with all relevant laws.

   3.2 We rely on the personal information provided by you. We will not check or verify the accuracy of any personal information we obtain from you or other persons.

   3.3 You should provide us with details of any changes to your personal information as soon as reasonably practicable following such change.

4. **Distribution of your personal information**

   We do not permit the personal information we hold to be distributed to third parties unless:

   4.1 we consider it necessary to be disclosed in order that such services can be properly carried out; or

   4.2 you have consented (expressly or impliedly) or requested your personal information to be provided to a third party; or

   4.3 we are required or permitted by law to provide information to a third party.

5. **Cookies**

   A cookie is a data file that a web-site transfers to your hard drive. This enables the web-site to track the pages you have visited. A cookie only contains information you supply. It cannot read data on your hard drive. Our web-site uses cookies. You can set your browser to refuse cookies, however, this may mean you are unable to take full advantage of our web-site.

6. **Accessing your personal information**

   6.1 If you wish to access your personal information held by us, or complain about possible breaches of privacy, you should direct enquires to:

   Chief Operating Officer
   Piper Alderman
   Level 24, 385 Bourke Street
   Melbourne VIC 3000

   Telephone: +61 3 8665 5555
   Facsimile: +61 3 8665 5500
   E-mail: cscammell@piperalderman.com.au

   6.2 The Chief Operating Officer will endeavour to deal with your inquiry or complaint as soon as is reasonably practicable.

7. **Variation of privacy policy**

   We may vary the terms of this Privacy Policy from time to time.