SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York  10022
Telephone:  (212) 848-4000
Facsimile:  (212) 848-7179
Douglas P. Bartner
Brian H. Polovoy
Henry Weisburg

*Attorneys for Nomura International plc,*
*Nomura Securities Co., Ltd., and Nomura Global Financial Products, Inc.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

-------------------------------------------------------------x

| | |
|---|---|
| LEHMAN BROTHERS HOLDINGS INC. and LEHMAN BROTHERS SPECIAL FINANCING, INC., and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Adv. Proc. No. 10-03228-jmp |
| Plaintiffs and Intervenor, | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS** |
| -against- | |
| NOMURA INTERNATIONAL PLC, | |
| Defendant. | |

-------------------------------------------------------------x

| | |
|---|---|
| LEHMAN BROTHERS HOLDINGS INC. and LEHMAN BROTHERS SPECIAL FINANCING, INC., and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Adv. Proc. No. 10-03229-jmp |
| Plaintiffs and Intervenor, | |
| -against- | |
| NOMURA SECURITIES CO., LTD., | |
| Defendant. | |

-------------------------------------------------------------x

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. ii

PRELIMINARY STATEMENT ............................................................. 1

BACKGROUND ................................................................................ 3

    A.    NIplc, NSC, And NGFP Enter Into ISDAs With LBSF ........................... 3

    B.    An Event Of Default Occurs And The Parties' Derivative
Transactions Pursuant To The Master Agreements Are Terminated ......... 4

    C.    NIplc, NSC, And NGFP Calculate Their Respective Losses Resulting
From The Termination ............................................................. 4

    D.    The Bar Date Order Sets The Process For Filing And Supporting
Creditor Claims Based On Derivative Transactions ................................ 6

    E.    The Debtors Commence These Proceedings ............................................. 7

    F.    The Debtors Demand That Nomura Produce Everything But Insist
They Do Not Need To Produce Any Post-Petition Documents ................. 7

ARGUMENT ...................................................................................... 9

    I.    NIplc, NSC, And NGFP Are Entitled To Obtain Information In The Debtors'
Possession Provided By Other Counterparties Who Submitted Derivative
Questionnaires ................................................................................ 10

    II.    NIplc Is Entitled To Information From The Debtors Regarding Their
Derivative And Other Financial Transactions Involving The Icelandic Banks .... 13

    III.    NIplc Is Entitled To Information From The Debtors Regarding Their
Derivative And Other Financial Transactions Involving CMBS ........................ 16

    IV.    Nomura Is Entitled To Information Regarding The Debtors' Valuations Of
Terminated Derivative Transactions Between The Debtors And Ambac ........... 18

CONCLUSION ................................................................................... 19

# TABLE OF AUTHORITIES

## CASES

*Trilegiant Corp. v. Sitel Corp.*, No. 09-Civ-6492, 2010 WL 4668950
    (S.D.N.Y. Nov. 15, 2010) ............................................................... 9

## STATUTES

11 U.S.C. § 562 .........................................................................................13, 14

Fed. R. Civ. P. 26(b)(1) ............................................................................. 9

Fed. R. Civ. P. 37 ...................................................................................... 1

Fed. R. Bankr. P. 7037............................................................................... 1

Fed. R. Bankr. P. 9014(c) .......................................................................... 1

## MISCELLANEOUS

Debtors' Disclosure Statement for Joint Chapter 11 Plan of Lehman Brothers Holdings
    Inc. and Its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code
    (Dkt. No. 8332)....................................................................................... 15

Debtors' Omnibus Reply to Objections to Motion of the Debtors, Pursuant to Section
    502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3), For
    Establishment of the Deadline for Filing Proofs of Claim, Approval of the Form
    and Manner of Notice Thereof and Approval of the Proof of Claim Form
    (Dkt. No. 4113)..................................................................................... 6, 13

Debtors' PowerPoint Presentation, *Lehman Brothers Holdings Inc., The State of the
    Estate*, Nov. 18, 2009............................................................................. 6

Motion of Debtors Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy
    Rule 9019(a) for the Authorization and Approval of the Global Settlement
    Among the Debtors and the Ambac Settling Parties (Dkt. No. 11806).......................... 18

Motion of the Debtors, Pursuant to Section 502(b)(9) of the Bankruptcy Code and
    Bankruptcy Rule 3003(c)(3), for Establishment of the Deadline for Filing Proofs
    of Claim, Approval of the Form and Manner of Notice Thereof and Approval of
    the Proof of Claim Form (Dkt. No. 3654)................................................... 11

Mulholland, Sarah, *Lehman, Merrill Woes Sting Commercial Mortgages Debt (Update1)*,
Bloomberg, Sept. 17, 2008 ........................................................................................... 16

Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule
3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving of
the Form and Manner of Notice Thereof and Approving the Proof of Claim Form
(Dkt. No. 4271) ............................................................................................................. 6

Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(a)
Authorizing and Approving the Global Settlement Among the Debtors and the
Ambac Settling Parties (Dkt. No. 12200) ..................................................................... 18

Report of Anton R. Valukas, Examiner (Dkt. No. 7531) ........................................................... 16

Stipulation and Order (Dkt. No. 17013) ..................................................................................... 9

Nomura International plc ("NIplc"), Nomura Securities Co., Ltd. ("NSC") and Nomura

Global Financial Products, Inc. ("NGFP," together with NIplc and NSC, "Nomura"), through

their undersigned counsel, pursuant to Federal Rule of Civil Procedure 37, made applicable by

Federal Rules of Bankruptcy Procedure 7037 and 9014(c), respectfully submit this memorandum

in support of their motion for an order compelling plaintiffs Lehman Brothers Holdings Inc.

("LBHI") and Lehman Brothers Special Financing, Inc. ("LBSF," together with LBHI and

certain of LBHI's debtor affiliates, the "Debtors") to produce the documents identified herein.

The parties have met and conferred repeatedly with respect to these issues and have failed to

reach a resolution.

## PRELIMINARY STATEMENT

The Debtors brought these lawsuits to challenge Nomura's claims arising from

terminated derivative transactions.  The Debtors allege that Nomura failed to act in a

commercially reasonable manner in calculating the values of those derivative transactions.  Any

assessment of whether a party acted in a commercially reasonable manner, particularly in the

context of derivative transactions, necessarily involves a comparison between the way that party

acted and the way that others in a similar position would have acted or did in fact act.  The

Debtors hold the information that would allow such a comparison to be made, but have refused

to produce it.  Nomura has no other means of accessing such information, and therefore, the

Debtors' refusal denies Nomura the opportunity to defend the claims and precludes the Court

from making an informed assessment of the merits of the lawsuits.

The Debtors' approach to discovery has been simple:  They do not have to produce

relevant documents, but Nomura does.  In particular, the Debtors largely refuse to produce

documents or information created on or after September 15, 2008, the day LBHI filed for

bankruptcy.  Perhaps most unacceptable is the Debtors' refusal to produce any information

relating to how other derivative claimants calculated their claims, even in a manner designed to

ensure such claimants' anonymity and to protect fully such claimants' proprietary trading

strategies and information.  The Debtors also refuse to produce documents about two groups of

derivative transactions between NIplc and LBSF – each of which constitutes a substantial portion

of NIplc's proof of claim – related to three Icelandic banks and commercial mortgage-backed

securities.  Last, the Debtors refuse to produce information from their settlement with Ambac in

which the Debtors assumed the role of "Non-defaulting Party" in relation to derivatives

transactions LBSF had with Ambac – information that would reveal how the Debtors themselves

valued terminated derivatives transactions when they were not in the position of second-guessing

what others have done.

The fundamental issue in this litigation is whether Nomura's calculations were

reasonable.  This issue cannot be decided in a vacuum, and the limited information Nomura

seeks is directly relevant to the Debtors' claims and Nomura's defenses.  LBSF was Nomura's

counterparty in the terminated transactions, and NIplc, NSC and NGFP were three of thousands

of derivative claimants trying to value their terminated derivative claims in the chaos that

followed the LBHI bankruptcy.  Knowing what the Debtors did, and what similarly situated

derivatives claimants did, both in terms of the market data that they took into consideration and

the manner in which such data was then applied in calculating values, is plainly relevant to

determining market prices and practices and, therefore, whether Nomura acted reasonably.

LBHI has in its possession more relevant, non-privileged information regarding market activity

following its bankruptcy filing than anyone in the world.  It is unacceptable for LBHI to claim

that Nomura acted "egregiously" in connection with its calculation of its Loss amount under its

terminated derivatives transactions – but then to deny Nomura and the Court access to the most

2

relevant information concerning the valuations performed by others.  Nomura and the Court are

entitled to know what others in the industry did in calculating their Settlement Amounts and how

LBSF valued its own exposures.  Especially where the Debtors could seek to have the rulings in

this case applied in future cases involving derivative transactions, the Court's decisions should

be made on a full record, not a record in which the Debtors decide what information can be

considered.

## **BACKGROUND**

### A.    **NIplc, NSC, And NGFP Enter Into ISDAs With LBSF**

NIplc, NSC, and NGFP each entered into separate ISDA Master Agreements and

Schedules with LBSF (together, the "Master Agreements").  ¶ 2.[1]  The Master Agreements

provide the framework for the parties' derivatives transactions, which include credit derivatives,

interest rate derivatives, currency derivatives, and commodity derivatives.  *See* ¶ 20.  A credit

derivative is a contract in which one party (the "buyer" of "credit protection") pays its

counterparty (the "seller" of credit protection) to assume the risk that one or more designated

"reference obligations" (bonds or other instruments) or a "reference entity" (typically a corporate

or sovereign) will experience a "credit event" – for example, a bankruptcy filing of the reference

entity or the issuer of the reference obligation or the failure of the reference entity to make a

payment under its debt obligations.  The value of the credit derivative will broadly reflect the

value ascribed by the market to the reference obligations or the debt obligations of the reference

entity.  As with all derivative contracts, the credit derivative transaction will on any given day

have a positive value to one party and a negative value to the other.  Such values are referred to

---

[1] Because the same basic allegations are asserted in the complaints against NIplc and NSC and
the objection to NGFP's claim, citations are to the Debtors' complaint against NIplc unless
otherwise noted.  Similarly, because relevant provisions of the parties' Master Agreements are
substantively identical, citations are to NIplc's Master Agreement unless otherwise noted.

as "mark-to-market" values and fluctuate due to a number of factors, including the market's

perception of the creditworthiness of the issuer of the reference obligation or the reference entity,

the likely amount that would become due following the occurrence of a credit event and the

value of the future payments to be made by the buyer of protection.  An interest rate derivative is

an agreement pursuant to which the parties swap periodic interest payments (often one fixed and

one floating) on a notional amount of principal.  A currency derivative is an agreement to swap

different currencies for an agreed period after which the parties will reacquire their original

currency.

### B.    An Event Of Default Occurs And The Parties' Derivative Transactions Pursuant To The Master Agreements Are Terminated

On September 15, 2008, LBHI – the Credit Support Provider under the Master

Agreements – commenced a voluntary chapter 11 case in this Court.  ¶¶ 3, 21.  This constituted

an Event of Default under the Master Agreements, which caused the automatic termination of the

underlying derivative transactions (the "Terminated Transactions").  Master Agreement §§ 6(a),

6(c).  Each Nomura entity and many other derivative counterparties, as the Non-defaulting

Parties, were obligated under the Master Agreements to provide to LBSF Calculation Statements

"as soon as reasonably practicable" after the LBHI bankruptcy.  ¶¶ 5, 36.

### C.    NIplc, NSC, And NGFP Calculate Their Respective Losses Resulting From The Termination

Set forth in the Calculation Statements are the "Settlement Amounts," which are

Nomura's calculations of which party owes the other and in what amount as a result of the

termination.  ¶ 40 (citing Master Agreement §§ 6(e), 14).  The Settlement Amount may be

calculated using one of two methods under the Master Agreements.  As a first option, Non-

defaulting Parties seek Market Quotations.  If such quotations cannot be obtained, or if the Non-

defaulting Party reasonably believes that the Market Quotations would not "produce a

commercially reasonable result" (Master Agreement § 14, Settlement Amount), they instead

calculate their Loss:

> "Loss" means . . . an amount that [the Non-defaulting] party
> ***reasonably determines in good faith*** to be its total losses and costs
> (or gain, in which case expressed as a negative number) in
> connection with this Agreement or that Terminated Transaction or
> group of Terminated Transactions, as the case may be, including
> any loss of bargain, cost of funding or, at the election of such party
> but without duplication, loss or cost incurred as a result of its
> terminating, liquidating, obtaining or reestablishing any hedge or
> related trading position (or any gain resulting from any of
> them) . . . .  A party may (but need not) determine its Loss by
> reference to quotations of relevant rates or prices from one or more
> leading dealers in the relevant markets.

*Id.* § 14, Loss (emphasis added).

LBHI's bankruptcy triggered global fears of a systemic collapse of the international

financial system and caused unprecedented chaos and dysfunction in trading in a variety of asset

classes, including those asset classes relevant to the transactions at issue in these cases.  It was

during this time that Nomura, along with thousands of other market participants, contacted

market dealers with a view to obtaining market quotes to replace the Terminated Transactions

quickly, but Nomura, like countless others, was required to revert to the Loss valuation

methodology in most instances to calculate final Settlement Amounts in respect of the

Terminated Transactions.  In calculating its Loss, Nomura derived mid-point market values for

each Terminated Transaction and then included in its Loss a bid/mid-point spread or a mid-

point/offer spread (an amount reflecting the cost to enter into a similar transaction in the market)

in order to derive a claim amount.

**D.      The Bar Date Order Sets The Process For Filing And Supporting Creditor Claims Based On Derivative Transactions**

On July 2, 2009, the Court entered the Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving of the Form and Manner of Notice Thereof and Approving the Proof of Claim Form (Dkt. No. 4271, "Bar Date Order").  Pursuant to the Bar Date Order, each holder of a claim arising from a derivative contract was required to submit a derivative questionnaire and supporting documentation for its claim ("Derivative Questionnaire").  Bar Date Order at 7-8.

The Derivative Questionnaire, among other things, required creditors to provide details regarding the valuation dates, termination values, and identifying details associated with each terminated derivative transaction, as well as the "methodology used to value the claim" and, to the extent applicable, the date, identity of, and quotations received from market makers or other persons.  Omnibus Reply, Ex. C, Declaration of Gary H. Mandelblatt in Support of Omnibus Reply[2] ¶¶ 41-50; Bar Date Order, Ex. C.  Information submitted in connection with the Derivative Questionnaire by a creditor can only be accessed by the Debtors, the Official Committee of Unsecured Creditors, and that particular creditor.  Bar Date Order at 9. Approximately 4,077 claimants filed Derivatives Questionnaires and supporting data for trades terminated under derivatives contracts, including NIplc, NSC, and NGFP.  *See* Debtors' PowerPoint Presentation, *Lehman Brothers Holdings Inc., The State of the Estate* at 33, Nov. 18, 2009.

---

[2] Dkt. No. 4113, Debtors' Omnibus Reply to Objections to Motion of the Debtors, Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3), For Establishment of the Deadline for Filing Proofs of Claim, Approval of the Form and Manner of Notice Thereof and Approval of the Proof of Claim Form, filed on June 23, 2009 ("Omnibus Reply").

### E.    The Debtors Commence These Proceedings

The Debtors commenced these proceedings on April 23, 2010.   The Debtors allege that

each Nomura entity submitted calculations that were "commercially unreasonable."  ¶ 1.

Specifically, the Debtors contend Nomura should have but did not offset (or "net out")

transactions, and that Nomura should not have included bid/offer spreads in their calculations.

¶ 48.  The Debtors also allege that Nomura's Loss calculations relied on "internal models" that

resulted in calculations that purportedly bore "no reasonable relationship to the actual economic

effect of the [termination]."  ¶ 52.

### F.    The Debtors Demand That Nomura Produce Everything But Insist They Do Not Need To Produce Any Post-Petition Documents

In July and August 2010, the parties exchanged document requests and objections.

Among other things, the Debtors objected to providing Nomura with *any* post-petition

documents in connection with fact discovery.  *See* Plaintiffs' Objections and Responses to

Defendants Nomura International plc and Nomura Securities Co., Ltd.'s First Request to

Plaintiffs for the Production of Documents, dated Aug. 2, 2010.  Instead, the Debtors said they

would provide Nomura with post-petition documents *only* in connection with expert discovery,

and then, *only* in the event the Debtors choose to have their experts rely on them.  *See id*.  The

parties engaged in seven "meet and confer" teleconferences in an attempt to resolve this and

other objections.  The parties ultimately agreed that reviewing all post-petition documents in the

same way that the pre-petition documents were being reviewed would be unduly burdensome.

*See* Email from D. Lewis, Shearman & Sterling LLP to A. Warter Sisitsky and S. Lieber, Jones

Day (Nov. 3, 2010, 20:17 EST).  In short, applying the same search parameters to post-petition

documents potentially would result in hundreds of thousands of documents for review, the vast

majority of which would be non-responsive.  *Id*.  The parties therefore agreed to propose specific

categories of post-petition documents that they each believe are needed to litigate the key issues
in the case. *Id.*

For its part, Nomura identified the following four categories of relevant post-petition
documents that it wanted from the Debtors:  (i) specified trade data for terminated transactions
with other derivative counterparties that are substantially identical to the Terminated
Transactions (including, for example, dealer quotes, mid-point prices, bid-to-mid and mid-to-
offer spreads, and size and liquidity adjustments), and documents sufficient to show the extent
and degree of "netting" performed by the 20 largest derivative claimants (as measured by claim
value) plus Elliott Management Limited[3] (collectively, the "Representative Derivative
Claimants"), (ii) specified documents relating to LBSF's transactions with Nomura or others
involving or referencing three Icelandic Banks, (iii) specified documents related to LBSF's on-
going management of its commercial mortgage-backed securities and commercial mortgage loan
assets, and (iv) valuations LBSF did of its own derivative transactions with Ambac, in which
LBSF was the Non-defaulting Party. *See id.*

Notwithstanding the prior agreement, at least in principle, that each party could identify a
discrete set of post-petition documents that it needed, the Debtors backtracked completely.  They
refused to produce the documents Nomura seeks:  The Debtors flatly refused to produce any
information submitted by other derivative claimants, even in a manner designed to protect the
anonymity of other claimants as well as the confidentiality of their proprietary trading strategies.
As to the other categories of discrete documents, they alternatively stated they would "consider"
the requests, that they would produce certain "high level" information, or that Nomura's

---

[3] Elliott Management Limited is the member of The Official Committee of Unsecured Creditors
that appears to have the largest derivatives claim against the Debtors.  The Official Committee of
Unsecured Creditors is an intervenor plaintiff in these adversary proceedings.

explanations of relevance should be put in writing.  Having explained to the Debtors on numerous occasions why these documents are highly relevant, and having exhausted the meet and confer process, Nomura now files this motion to compel.[4]

## ARGUMENT

A party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1).  "Although not unlimited, relevance, for purposes of discovery, is an extremely broad concept." *Trilegiant Corp. v. Sitel Corp.*, No. 09-Civ-6492, 2010 WL 4668950, at *2 (S.D.N.Y. Nov. 15, 2010) (internal quotations and citations omitted).  "Generally speaking, discovery is limited only when 'sought in bad faith, to harass or oppress the party subject to it, when it is irrelevant, or when the examination is on matters protected by a recognized privilege.'" *Id*. (quoting *In re Six Grand Jury Witnesses*, 979 F.2d 939, 943 (2d Cir. 1992)).

As discussed above, the Debtors' complaints raise two issues:  whether Nomura's Settlement Amount calculations were "reasonable" and whether the calculations have a "relationship to the actual economic effect of the [termination]."  ¶ 52.  It is beyond argument that the limited documents falling into the four categories of documents requested by Nomura are relevant to these two issues and therefore discoverable.

---

[4] On May 23, 2011, the Court entered the Stipulation and Order staying these proceedings. (Dkt. No. 17013).  On September 23, 2011, the Debtors provided notice to the Court and Nomura with one business day's notice that they were lifting the stay.

I.    **NIplc, NSC, And NGFP Are Entitled To Obtain Information In The Debtors' Possession Provided By Other Counterparties Who Submitted Derivative Questionnaires**

The first category of information Nomura is seeking is information on a no-names basis sufficient to show how other counterparties treated substantially identical terminated transactions, specifically the date of calculation, the extent and degree of netting employed and any bid/offer spreads included in other counterparties' calculations. Nomura also is seeking market information, such as dealer quotes, that the Debtors received from other counterparties that involve transactions substantially identical to Nomura's Terminated Transactions. This category of information is unquestionably relevant to the Debtors' allegations that Nomura "egregiously inflated" its Settlement Amounts by including bid/offer spreads, by relying on "internal models," and by not offsetting transactions properly. It also is relevant to the Debtors' allegations that Nomura's calculations bore "no reasonable relationship to the actual economic effect of the [termination]." ¶ 52.

As discussed above, the Debtors' allegations raise issues that will come down to whether or not Nomura calculated their Settlement Amounts "reasonably" and in "good faith." One indicia of "reasonableness" is industry convention and practice, as reflected in how LBSF's other counterparties calculated their respective Settlement Amounts. If aspects of Nomura's Settlement Amount calculation were consistent with what LBSF's other counterparties did or market information that those counterparties had, or those counterparties' assessments as to the validity, reliability and commercial reasonableness of the market data that was available at any particular time, that may serve as evidence that those aspects of Nomura's calculations were reasonable.

Additional evidence of reasonableness will, of course, come from the testimony of experts. The opinions of experts must be based on documents and information provided to them

by the party that retained them.  Usually, these materials are drawn from what is produced in the

litigation.  The Debtors propose a different approach.  Information from other counterparties

would not be provided to Nomura *unless* the Debtors choose to provide that precise information

to the Debtors' experts.

This proposal turns the entire process on its head.  The Debtors currently have all of the

information about how thousands of derivative claimants performed their Settlement Amount

calculations.  They probably have more market information regarding all derivative transactions

from the days and weeks following September 15 than anyone in the world.  *See* Dkt. No. 3654,

Ex. A, Motion of the Debtors, Pursuant to Section 502(b)(9) of the Bankruptcy Code and

Bankruptcy Rule 3003(c)(3), for Establishment of the Deadline for Filing Proofs of Claim,

Approval of the Form and Manner of Notice Thereof and Approval of the Proof of Claim Form ¶

21 ("To substantiate such claims counterparties are required to submit details of each of the

transactions entered into with the Debtors which could amount to massive amounts of data on

printed pages.").  Now in possession of all of this market information, the Debtors propose to

determine what information will be released by choosing to provide it to their experts (and

having the right to block production of any data that may undermine their position). [5]  In other

words, the Debtors alone would decide what factual evidence of industry practice is disclosed to

Nomura and the Court.

There is no merit to the Debtors' proffered explanation that they cannot disclose this

information because it would reveal the confidential trading strategies of other creditors.

Nomura is not interested in the identity of the claimants or their trading strategies, and

---

[5] This is obviously also problematic as a matter of timing.  Nomura and its experts would not
have the information, if at all, until after fact discovery was closed and after Nomura's experts
would have submitted their reports.

specifically seeks information on a no-names basis. Moreover, because Nomura is only seeking

information sufficient to show whether the Representative Derivative Claimants took certain

steps in calculating their Settlement Amounts – *e.g.*, what bid/offer spreads were used and what

liquidity and size adjustments were made – and market data related only to transactions virtually

identical to the Terminated Transactions, there is no risk that Nomura would gain access to the

trading strategies of other creditors.

Further, the Debtors' alternative proposal that Nomura separately subpoena the

Representative Derivative Claimants for the information belies their assertion that they are

protecting the confidentiality interests of third-parties. Obviously, this alternative process would

allow Nomura to connect specific information to the specific creditor that provides it in response

to a subpoena. And, in any event, the Debtors' proposal is unworkable. Instead of managing

this dispute between the parties to this litigation, the Court would potentially become embroiled

in months of discovery disputes with third parties over the terms of the discovery. The Debtors

have the information Nomura needs. The Debtors sued Nomura, raising allegations that

Nomura's Settlement Amount calculations were "egregious" and bore "no reasonable

relationship to the actual economic effect of the [termination]." Nomura is entitled to test the

factual bases for those allegations based on the information in the Debtors' possession, and upon

which their allegations are presumably based.

When the Debtors were seeking to require derivative claimants to submit more detailed

information than is contained in the Calculation Statements, the Debtors did not hesitate to

complain and warn of the potential for derivative claimants to leverage the claimants' perceived

information advantage:

> Many of the Debtors' Derivative Contracts counterparties have
> already denied the Debtors' requests for information and are,

> instead, seeking to use the information inequality to their
> advantage.  The current objections and refusal to provide the
> requested information are further attempts by certain
> counterparties to conceal the true value of the Derivative Contracts
> and avoid a thorough vetting of their claim amounts, or at least
> significantly delay such process and force the Debtors to expend
> extraordinary sums in the hopes that such leverage will compel the
> Debtors to ignore significant discrepancies.

Omnibus Reply ¶ 16.

One can only surmise why the Debtors refuse to produce information regarding other

derivative claimants to Nomura.  But now that the shoe is on the other foot, it is the Debtors who

are trying to leverage their information advantage, telling Nomura that it should expend

"extraordinary sums" chasing the Debtors' other counterparties through a subpoena process.  The

decisions the Court will be asked to make – which will become precedent in future disputes –

should not be decided on an incomplete record, and expert opinions should not be based on

evidence cherry-picked by the Debtors.

## II.    NIplc Is Entitled To Information From The Debtors Regarding Their Derivative And Other Financial Transactions Involving The Icelandic Banks

A substantial portion of NIplc's claim relates to credit derivatives referencing three

Icelandic banks.  Shortly after LBHI filed for bankruptcy, those banks collapsed and there were

"credit events" with respect to those banks that led to an auction.[6]  NIplc attempted to prepare its

Calculation Statement in the volatile and illiquid environment prevailing immediately after

LBHI's bankruptcy.  Once the CDS auction brought some liquidity back to the market, NIplc

submitted a supplemental calculation statement based on the auction prices, which were the first

"commercially reasonable determinants" of value.  11 U.S.C. § 562 ("damages shall be measured

[for swap participants] as of the earliest subsequent date or dates on which there are

_____

[6] Generally speaking, an ISDA auction has the effect of determining the settlement value of the
credit derivatives that referenced the entity or obligation that experienced a credit event.

commercially reasonable determinants of value"); *see also* Master Agreement § 14, Loss ("… [a] party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable").  The Debtors have objected to the calculation statements as well as to NIplc's right to submit a supplemental calculation statement.  The substance of the statements, as well as the procedure employed by NIplc, will be a major subject of this proceeding given the size of the transactions, and yet the Debtors refuse to provide requested discovery.

During the meet and confer process, the Debtors represented to NIplc that they did not have a significant position in credit derivatives involving Icelandic Banks.  However, based on data provided by a third party, Nomura believes that the Debtors were counterparties in many Icelandic Banks-related derivatives.  Only 12 of these were with NIplc.  If the timing and values the Debtors assigned to other Icelandic Banks-related derivatives – for example, in connection with the Debtors' chapter 11 plan process – are similar to NIplc's calculations, that would provide support for the timing and reasonableness of NIplc's calculations.[7]  This is true whether the Debtors had many or only a few transactions involving Icelandic Banks.  Relevant for the same reasons are post-petition valuations of other positions the Debtors held with respect to the Icelandic Banks on which many of the derivatives may have been based, such as Icelandic Bank bonds or loans the Debtors may have made to the Icelandic Banks or repos, forward purchases or

---

[7] In connection with these aspects of NIplc's Iceland Banks-related request, NIplc is seeking: (i) Lehman's valuations and valuation methodologies for any credit derivatives referencing the Icelandic Banks, including but not limited to, any metrics of price volatility for the Icelandic Banks and quotations received; (ii) Lehman's internal accounting and bookkeeping for credit derivatives referencing the Icelandic Banks, including but not limited to, any documents reflecting Lehman's overall positions in Icelandic Banks or Lehman's hedging or risk management with regard to the Icelandic Banks; (iii) bid, offer and mid-market prices or values used by Lehman for its positions in the Icelandic Banks from September 15, 2008 through the November auctions; and (iv) exposure calculation for the Icelandic Banks, including any exposure calculations after the November 2008 auction relating to the Icelandic Banks.

sales of bonds of the Icelandic Banks. In addition, the Debtors' internal correspondence may show that the Debtors, like NIplc, struggled to value these transactions given the market volatility and lack of pricing transparency.[8]

NIplc is seeking another subset of information related to the Icelandic Banks. Certain of Lehman's affiliates issued "credit-linked" notes guaranteed by LBHI. The value of these notes, as well as the guarantees issued on them, fluctuate depending on the value of certain reference obligations – which may include obligations of the Icelandic Banks. *See* Dkt. No. 8332, Debtors' Disclosure Statement for Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code at 37-38 (describing the three categories of Structured Notes guaranteed by LBHI that were outstanding as of the petition date). If the Debtors' affiliates in fact did issue credit-linked notes referencing the Icelandic Banks, then, in order to figure out what those notes were worth, the Debtors would have had to assess the credit-worthiness of the Icelandic Banks, including as of LBHI's petition date (which is the date as of which the guarantee issued by LBHI would be valued under the Bankruptcy Code). Any such valuation would be relevant to the pricing of the Icelandic Bank derivatives because both ultimately are based on the underlying credit-worthiness of the Icelandic Banks.

---

[8] With respect to the requested information not specifically related to the derivatives themselves, NIplc is requesting documents related to (i) any valuations regarding the Icelandic Banks that Lehman conducted in connection with the formulation of its chapter 11 plan; (ii) any obligations owed by Lehman to any Icelandic Bank; (iii) any of Lehman's financial transactions including pricing, haircuts or other transaction terms with respect to any Icelandic Bank; (iv) any valuations or information regarding Lehman's involvement in any Icelandic Bank's self-referencing credit derivatives; (v) any research or analyst report on any Icelandic Bank prepared by or for Lehman; and (vi) any hedging or risk policies, reports and methodologies prepared, used or distributed by or within Lehman applicable to Lehman's risk and exposure calculations related to the Icelandic Banks.

**III.    NIplc Is Entitled To Information From The Debtors Regarding Their Derivative And Other Financial Transactions Involving CMBS**

Some of the Debtors' most significant assets – both pre- and post-petition – are

commercial mortgage loans and CMBS:

> Lehman's Commercial Book was comprised of debt instruments,
> such as commercial mortgage loans and CMBS. . . .  As of May
> 31, 2008, Lehman determined that the value of its worldwide
> Commercial Book was approximately $29.5 billion, with $15.1
> billion in the U.S., $10.3 billion in Europe, and $4.2 billion in
> Asia.

*See* Dkt. No. 7531, Report of Anton R. Valukas, Examiner at Vol. 2, § III.A.2.d.(1).  In fact, it

may be that the Debtors hold (or held, as of the petition date) some of the largest positions in

commercial mortgage loans and CMBS in the world.  Prior to Lehman's bankruptcy filing, NIplc

sold LBSF a substantial amount of credit protection on these assets – in total notional amount of

approximately $1.4 billion – and these CMBS-related derivatives constitute a material

component of NIplc's Settlement Amount.

NIplc was required to calculate its Loss with respect to these large derivative positions in

a market that had become volatile and illiquid in 2008, problems compounded by the Lehman

bankruptcy itself:

> A record $237 billion in U.S. commercial mortgage debt was sold
> in 2007, according to JPMorgan Chase & Co. data, while $202
> billion of the securities were sold in 2006.  Sales of debt have
> plummeted this year as wider spreads make it unprofitable for
> investment banks to underwrite new loans to sell to investors as
> bonds.  About $12.2 billion in commercial mortgage-backed bonds
> have been issued so far this year, according to Bloomberg data.

Mulholland, Sarah, *Lehman, Merrill Woes Sting Commercial Mortgages Debt (Update1)*,

Bloomberg, Sept. 17, 2008.  The Debtors' own valuations of their CMBS positions are plainly

relevant to the reasonableness of NIplc's calculations because the value of the Debtors' CMBS

exposure and the derivatives it bought from NIplc to hedge this exposure are correlated in

predictable and consistent ways.  Accordingly, NIplc seeks information regarding the Debtors' internal mark-to-market valuations of large CMBS or commercial mortgage loan positions.[9]

NIplc also is seeking information concerning the valuation of other CMBS positions held by the Debtors that are comparable in size to the terminated credit derivatives, which is relevant to the impact on pricing of the large size of the total book of CMBS-related derivatives between NIplc and LBSF.  Costs of disposing of relatively illiquid assets (or "bid-to-mid" spreads) increase as the size of the asset increases.  This was especially true for commercial mortgage-related investments.  Although trading in relatively small positions in commercial mortgage loans or CMBS before and after the Lehman bankruptcy filing may not have been unusual, it was extremely difficult (and expensive) to trade such securities in large volumes.  Information related to the Debtors' internal valuations of its commercial mortgage-related positions may confirm this fact.

Although the Debtors have offered to provide some pre-petition information and some high-level post-petition information in response to this request, the more detailed post-petition information sought by NIplc is relevant to the reasonableness of NIplc's Loss calculations in several ways.

First, the valuations of CMBS assets assigned by the Debtors in the aftermath of the Lehman bankruptcies are probative of the reasonableness of the values assigned by NIplc in its Calculation Statement.  Second, if the Debtors were applying discounts to CMBS positions to account for illiquidity, that evidence is probative of the reasonableness of the bid/offer spreads

---

[9] NIplc is specifically seeking from the Debtors information regarding (i) the Debtors' internal mark-to-market valuations of large CMBS or commercial mortgage loans (including the reserves and haircuts held against these positions and supporting data); (ii) any applicable valuation policies so that NIplc can understand how the Debtors calculated those values; and (iii) documents concerning the risk associated with these transactions, including any internal memoranda and risk reports (including value at risk).

used in NIplc's calculations.  Third, given the state of the CMBS market in late 2008 and early

2009, it is likely that the discounts applied to the Debtors' positions in CMBS persisted or even

accelerated post-petition – confirming the reasonableness of NIplc's calculation and showing

that it was not the result of "egregious inflation," as the Debtors allege.

### IV.    Nomura Is Entitled To Information Regarding The Debtors' Valuations Of Terminated Derivative Transactions Between The Debtors And Ambac

In October 2010, the Debtors entered into a settlement with Ambac, a monoline insurer

currently in rehabilitation.  *See* Dkt. No. 12200, Order Pursuant to Section 105(a) of the

Bankruptcy Code and Bankruptcy Rule 9019(a) Authorizing and Approving the Global

Settlement Among the Debtors and the Ambac Settling Parties.  One claim that was settled

involved a derivative transaction for which the Debtors were the Non-defaulting Party, as

Nomura is in this case.  *See* Dkt. No. 11806, Motion of Debtors Pursuant to Section 105(a) of the

Bankruptcy Code and Bankruptcy Rule 9019(a) for the Authorization and Approval of the

Global Settlement Among the Debtors and the Ambac Settling Parties ¶¶ 11, 22.

Because the Debtors were the Non-defaulting Party in their derivative transaction with

Ambac, they, like Nomura, needed to determine their Settlement Amount.  Whether the Debtors

submitted a Calculation Statement or followed another procedure (due to the stay imposed by the

Wisconsin state court presiding over Ambac's rehabilitation filing), they almost certainly had to

value their position in order to reach an agreement with Ambac.  This information is relevant for

the same reasons that the Debtors believe Nomura's calculation of Loss under derivative

transactions with other counterparties is relevant.  If the Debtors' calculations included amounts

they contend should not be included in Nomura's calculations, *e.g.*, bid/offer spreads, that would

be further evidence that what Nomura did was reasonable and consistent with industry practice

and, indeed, consistent with the Debtors' own practices.

18

## CONCLUSION

For the foregoing reasons, the motion to compel should be granted, and the Debtors'

should be required to produce the limited post-petition categories of information sought by

Nomura.

Dated: New York, New York
_____ __, 2011

Respectfully submitted,

SHEARMAN & STERLING LLP

By:    s/ DRAFT_____
       Douglas P. Bartner
       Brian H. Polovoy
       Henry Weisburg

599 Lexington Avenue
New York, New York  10022
Telephone:  (212) 848-4000
Facsimile:   (212) 848-7179

*Attorneys for Nomura International plc,*
*Nomura Securities Co., Ltd., and Nomura Global*
*Financial Products, Inc.*