Hearing Date and Time: October 19, 2011 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date and Time: October 12, 2011 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------------------------------x
                                          :
In re                                     :      Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :      08-13555 (JMP)
                                          :
                    Debtors.              :      (Jointly Administered)
                                          :
---------------------------------------------------------------x
```

### NOTICE OF LEHMAN COMMERCIAL PAPER INC.'S MOTION PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE AND RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR AUTHORIZATION TO RESTRUCTURE ITS INTERESTS IN ITALIAN REAL ESTATE FUND

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman Commercial Paper Inc. ("LCPI," together with its affiliated debtors in the above-referenced chapter 11 cases, the "Debtors"), pursuant to sections 105(a) and 363 of title 11 of the United States Code and rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for authorization to restructure its interests in an Italian real estate fund (the "Motion"), all as more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **October 19, 2011 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that any responses to the Motion must be in writing, shall conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and served in accordance with General Order M-399 and

on (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Jacqueline Marcus, Esq.); (iii) the Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Tracy Hope Davis, Esq., Elisabetta Gasparini, Esq. and Andrea B. Schwartz, Esq.); and (iv) attorneys for the official committee of unsecured creditors appointed in these cases, Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005 (Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq.); so as to be so filed and received by no later than **October 12, 2011 at 4:00 p.m. (Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: September 27, 2011
    New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                     :

**In re**                            :        **Chapter 11 Case No.**
                                     :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*   :        **08-13555 (JMP)**
                                     :

                      **Debtors.**     :        **(Jointly Administered)**
                                     :
-------------------------------------------------------------------x

**MOTION OF LEHMAN COMMERCIAL**
**PAPER INC. PURSUANT TO SECTIONS 105(a) AND 363 OF**
**THE BANKRUPTCY CODE AND RULE 9019 OF THE FEDERAL**
**RULES OF BANKRUPTCY PROCEDURE FOR AUTHORIZATION**
**TO RESTRUCTURE ITS INTERESTS IN ITALIAN REAL ESTATE FUND**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Commercial Paper Inc. ("LCPI," together with its affiliated debtors in the

above-referenced chapter 11 cases, the "Debtors," and collectively with their non-Debtor

affiliates, "Lehman") files this motion pursuant to sections 105 and 363 of title 11 of the United

States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") for authorization to restructure its interests in an Italian real

estate fund, and respectfully represents:

## Preliminary Statement

1.      On or about August 15, 2007, LCPI and Zwinger OpCo 6 B.V. ("Zwinger"), a Dutch borrower, entered into a €328 million mezzanine loan facility (the "Calvino Credit Facility") pursuant to which LCPI provided financing for the acquisition of approximately 95% of the units in an Italian real estate fund.  As of the Commencement Date, LCPI still held a €278 million mezzanine debt position in the Calvino Credit Facility.  LCPI has not been receiving amounts due to it under the Calvino Credit Facility due to a non-functioning security agent and the delayed pace of asset sales that have resulted from the slowdown in the Italian real estate market.

2.      In light of this substantial investment, LCPI has been pursuing a number of different strategies for resolving the issues impeding the Calvino Credit Facility including through the judicial enforcement of LCPI's security or through the restructuring of the Calvino Credit Facility to eliminate the issues with the security agent and position LCPI to maximize recoveries from its mezzanine debt position.  Following substantial negotiations among LCPI, Zwinger, and the co-lender, LCPI has been able to arrange a consensual restructuring of the Calvino Credit Facility (the "Restructuring").

3.      Accordingly, LCPI has determined, in the exercise of its sound business judgment, that the Restructuring is in the best interests of its estate and its creditors and requests that the Court authorize it to effectuate the Restructuring pursuant to the terms set forth on the term sheet entered into by the Parties (as defined below) on or about August 30, 2011 (the "Term Sheet"), a copy of which is attached hereto as Exhibit A.

## Background

4.        Commencing on September 15, 2008 (the "Commencement Date") and periodically thereafter, the Debtors commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.        On September 17, 2008, the United States Trustee for Region 2 (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

6.        On September 19, 2008, a proceeding was commenced under the Security Investor Protection Act of 1970, as amended (the "SIPA"), with respect to Lehman Brothers Inc. ("LBI").  A trustee appointed under the SIPA is administering LBI's estate.

7.        On September 1, 2011, the Debtors filed their Third Amended Joint Chapter 11 Plan [ECF No. 19627] and the Disclosure Statement to the Debtors' Third Amended Joint Chapter 11 Plan (the "Disclosure Statement") [ECF No. 19629].  The Court approved the Disclosure Statement later that day [ECF No. 19631].  On September 15, 2011, the Court entered an order approving a modification to the Disclosure Statement [ECF No. 20016].

8.        Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [ECF No. 2].

## Jurisdiction

9.        This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Relief Requested

10.        LCPI seeks authorization, pursuant to sections 105(a) and 363 of the

Bankruptcy Code and Bankruptcy Rule 9019, to effectuate the Restructuring.  LCPI has

determined, in the exercise of its sound business judgment, that the Restructuring, and the related

transactions described herein, are in the best interests of its estate and its creditors and should be

approved.

## The Calvino Credit Facility

11.        In 2007, LCPI and Zwinger entered into the Calvino Credit Facility.

Zwinger, which is an indirect, wholly-owned subsidiary of the Whitehall Funds, used the

proceeds of the Calvino Credit Facility, along with an additional equity investment of

approximately €196 million, to acquire 95% of the units in an Italian closed-end real estate fund

(the "Berenice Fund").[1]  The remaining 5% of the units in the Berenice Fund are held by public

shareholders.  The Berenice Fund currently is comprised of 14 high-end office buildings and 20

Telecom Italia switching stations on long-term leases.  Each of these assets is located in Italy,

with large concentrations in Rome and Milan.  The Berenice Fund also has approximately €286

million of senior debt that is held by a syndicate of Italian banks.

12.        In order to promote syndication, LCPI divided the Calvino Credit Facility

into a €220 million senior tranche ("Tranche A") and a €108 million subordinate tranche

("Tranche B").  LCPI successfully syndicated €50 million of Tranche A to Banca Popolare di

---

[1] The Whitehall Funds are a real estate private investment vehicle for Goldman Sachs.

Milano ("BPM," together with LCPI and Zwinger, the "Parties") in July 2008.  LCPI retains the

remaining €170 million portion of the Tranche A debt and the entire Tranche B debt, for an

aggregate exposure of €278 million in connection with the Calvino Credit Facility.

13.     The Calvino Credit Facility was scheduled to mature on or about

September 3, 2011.  LCPI and BPM have agreed to refrain from exercising their rights and

remedies under the operative loan documents until November 5, 2011 to allow the Parties to

finalize the Restructuring and to obtain Court approval thereof.

14.     Lehman Brothers International (Europe) ("LBIE"), which is the subject of

a separate insolvency proceeding in the United Kingdom, is the security agent (the "Agent") for

the Calvino Credit Facility.  Since the commencement of its insolvency proceeding, however,

LBIE has refused to perform its duties as Agent.  As a result, approximately €152 million that

should have been distributed to LCPI and BPM remains trapped in a LBIE-controlled bank

account (the "Blocked Funds").  LCPI has been unable to replace LBIE as Agent – and thereby

effectuate the release of the Blocked Funds – because the Calvino Credit Facility documents

require the consent of Zwinger and BPM in order to replace the Agent and such consent has not

been forthcoming.

15.     As set forth in the declaration of Jeffrey Fitts, attached hereto as Exhibit

B, LCPI has been engaged in an extensive analysis of its enforcement and restructuring options

with respect to the Calvino Credit Facility.  Due to the current inability to replace LBIE as Agent

and LBIE's unwillingness to perform its duties, LCPI engaged with Zwinger and BPM to discuss

a consensual resolution of the issues surrounding the Calvino Credit Facility.  Accordingly,

beginning shortly after the Commencement Date, LCPI entered into initial negotiations with

Zwinger and BPM regarding a consensual restructuring for the purpose of maximizing LCPI's

return on its interests in the Calvino Credit Facility.  These negotiations have been difficult and time consuming, but eventually resulted in the proposed Restructuring.

**The Restructuring**

16.    The proposed Restructuring includes the following elements: (i) LCPI will convert approximately €33.5 million of the TrancheB debt into equity in Zwinger, which will align LCPI's interests with the interests of the Whitehall Funds and allow LCPI to share in any upside value in Zwinger's interest in the Berenice Fund; (ii) the margins on LCPI's remaining portion of the Tranche B debt will be substantially increased; (iii) the maturity date of the Calvino Credit Facility will be extended for approximately 3 years; (iv) Zwinger will pay to LCPI and BPM over €2 million in extension fees; (v)LBIE will be replaced as Agent, which will result in the release of the Blocked Funds and an immediate payment of €116 million to LCPI; and (vi) the Calvino Credit Facility and related Dutch and Italian security documentation will be amended.

17.    The Restructuring will also benefit LCPI in the following respects:  (i) the maturity date extension is expected to carry Zwinger through the current instability in the Italian real estate market, which will allow Zwinger to maximize the value of its assets by increasing rental income through an aggressive leasing strategy, completing certain capital improvements, and pursuing an opportunistic asset disposition strategy; and (ii) LCPI will be relieved from the necessity of engaging in costly litigation.

18.    The Term Sheet includes, *inter alia*, the following significant terms:[2]

| | |
|---|---|
| ***Zwinger Capital Restructuring*** | Zwinger's organizational documents will be amended to provide for two classes of shares; "Class A Shares," constituting 49% of the outstanding |

---

[2] The terms listed below are provided as a summary of the terms of the Term Sheet.  In the case of any inconsistency between the terms set forth in the summary and the terms of the Term Sheet, the terms of the Term Sheet shall prevail.

and authorized shares and "Class B Shares," constituting 51% of the outstanding and authorized shares.

€33.5 million of the principal outstanding amount of the Tranche B debt will be converted into and exchanged for 100% of the authorized Class A Shares. The existing holders of equity in Zwinger will receive 100% of the authorized Class B Shares.

***Debt/Equity and Zwinger Waterfall***

All Net Cash Flow[3] shall be applied as follows:
- First, payment of unpaid interest, fees and costs in respect of the Tranche A debt;
- Second, if due, payment of principal and any other amounts due in respect of the Tranche A debt;
- Third, payment of unpaid interest, fees and costs in respect of the Tranche B debt;
- Fourth, if due, payment of principal and any other amounts due in respect of the Tranche B debt; and
- Fifth, any amounts permitted to be distributed by Zwinger under the Calvino Credit Facility (or any cash available to Zwinger for distribution after repayment in full of all indebtedness outstanding under the Calvino Credit Facility) will be applied in the following order of priority:
  - i.   first, to the payment in full of Residual Asset Management Costs;
  - ii.  second, (x) 51% to Whitehall and (y) 49% to LCPI (on a pari passu and pro rata basis) until LCPI has received (on a cumulative aggregate basis) €30 million in respect of its interest in the Class A Shares;
  - iii. third, (x) 60% to Whitehall and (y) 40% to LCPI (on a pari passu and pro rata basis) until LCPI has received (on a cumulative aggregate basis) an additional €12.5 million in respect of its interest in the Class A Shares; and
  - iv.  fourth, (x) 80% to Whitehall and (y) 20% to LCPI (on a pari passu and pro rata basis).

***Margin Fee***

Tranche A: the margin will be increased to EURIBOR plus 2.50% *per annum*.

Tranche B: the margin for the remaining Tranche B debt will be increased to EURIBOR plus 8.50% *per annum* for the first year and EURIBOR plus 9.50% *per annum* thereafter.

---

[3] Capitalized terms that are used, but no otherwise defined herein, shall have the meanings ascribed to them in the Term Sheet.

| | |
|---|---|
| *Equity Documents* | Subject to tax, accounting, legal and regulatory due diligence satisfactory to LCPI, the Whitehall Funds and LCPI will enter into a Shareholders' Agreement in respect of their respective interests in Zwinger. The Shareholders' Agreement will contain transfer restrictions, a mechanism for funding any cash shortfalls and governance provisions including a provision allowing LCPI to appoint directors or managers to Zwinger's board. |
| *Maturity Date* | The maturity date for the Calvino Credit Facility will be extended to August 15, 2014. |
| *Replacement of Agent* | LBIE will be replaced as Facility Agent by Hatfield Philips Agency Services Limited. |
| *Conditions Precedent: Tax Ruling* | LCPI shall have obtained a binding ruling from the Dutch tax authorities as to the tax-free nature (in the Netherlands) of the conversion of a portion of the existing Tranche B debt into the Class A Shares. |

### The Restructuring Meets The Legal Standard
### Established Under Sections 105(a) and 363 of the Bankruptcy
### Code and Bankruptcy Rule 9019 and is in the Best Interests of LCPI and Its Estate

19.     Bankruptcy Rule 9019(a) provides that, "[o]n motion by the [debtor-in-possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed R. Bankr. P. 9019(a). This rule empowers bankruptcy courts to approve compromises "if they are in the best interest of the estate." *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Fisher v. Pereira* (*In re 47-49 Charles St., Inc.*), 209 B.R. 618, 620 (S.D.N.Y. 1997); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994). Indeed, courts have long considered compromises to be "a normal part of the process of reorganization." *TMT Trailer Ferry*, 390 U.S. at 424 (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).

20.     The decision to approve a particular compromise lies within the sound discretion of the bankruptcy court.  *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).  The settlement need not result in the best possible outcome for the debtor, but must not fall beneath the lowest point in the range of reasonableness.  *Drexel Burnham Lambert Group*, 134 B.R. at 505; *see also Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).  Additionally, a court may exercise its discretion "in light of the general public policy favoring settlements."  *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).  However, the analysis must focus on the question of whether a particular compromise is "fair and equitable, and in the best interest of the estate."  *In re Best Products*, 165 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations omitted).

21.     While a court must "evaluate . . . all . . . factors relevant to a fair and full assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court need not conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699 F.2d at 608, or conduct a full independent investigation.  *Drexel Burnham Lambert Group*, 134 B.R. at 496.  "[T]he bankruptcy judge does not have to decide the numerous questions of law and fact. . . .  The court need only canvass the settlement to determine whether it is within the accepted range of reasonableness."  *Nellis*, 165 B.R. at 123 (internal citations omitted).

22.     The court may give weight to the "informed judgments of the . . . debtor-in-possession and their counsel that a compromise is fair and equitable, and consider the competency and experience of counsel who support the compromise."  *Drexel Burnham Lambert Group*, 134 B.R. at 505 (internal citations omitted); *see also In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993); *accord In re Ashford Hotels Ltd.*, 226 B.R. 797, 802 (Bankr.

S.D.N.Y. 1998) ("Significantly, that test does not contemplate that I substitute my judgment for the Trustee's, but only that I test his choice for reasonableness. . . .  If the Trustee chooses one of two reasonable choices, I must approve that choice, even if, all things being equal, I would have selected the other.").

23.     Significantly, there is no requirement that "the value of the compromise . . . be dollar-for-dollar the equivalent of the claim." *Ionosphere Clubs, Inc.*, 156 B.R. at 427. Instead, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* at 427-28 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)).

24.     Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  While section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale, disposition, or other use of a debtor's assets, courts in the Second Circuit, in applying this section, have required that it be based upon the sound business judgment of the debtor.  *See In re Chateaugay Corp.*, 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same).

25.     Section 105(a) of the Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]."  11 U.S.C. § 105(a).

26.     It is generally understood that "[when] the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). If a valid business justification exists, there is a strong presumption that "'the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment. *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

27.     The Restructuring is fair and equitable, is in the best interests of LCPI's estate and its creditors, and LCPI's participation therein is an appropriate exercise of its sound business judgment. By allowing LCPI to replace LBIE as agent, the Restructuring will result in an immediate payment of €116 million to LCPI from the Blocked Funds and reestablish the Calvino Credit Facility as a performing asset. The Restructuring will also increase LCPI's margins on the remaining portion of the Tranche B and provide for the payment to LCPI and BPM of more than €2 million in extension/restructuring fees.

28.     Moreover, the proposed conversion of approximately €33.5 million of the Tranche B debt into equity in Zwinger, which was the consideration required to secure the cooperation of Zwinger and BPM, will allow LCPI to share in any residual equity value that accrues to Zwinger as a result of its interest in the value of the Berenice Fund. Based on a March 2011 public valuation, the assets held by the Berenice Fund are currently worth approximately €544 million. Following the Restructuring, Zwinger will have approximately €192 million of

mezzanine debt and the Berenice Fund will have approximately €286 million of senior debt.[4]

Accordingly, there is expected to be at least €63 million in residual value in Zwinger.[5]  As

holders of the Class A Shares, LCPI will be entitled to the following equity returns from

Zwinger:

- 49% (on a pari passu and pro rata basis) until LCPI has received (on a cumulative aggregate basis) €30 million in respect of its interest in the Class A Shares;

- 40%  (on a pari passu and pro rata basis) until LCPI has received (on a cumulative aggregate basis) an additional €12.5 million in respect of its interest in the Class A Shares; and

- 20% (on a pari passu and pro rata basis) of any further distributions.

29.     Accordingly, LCPI anticipates that it will recover most, if not all, of the

value of the portion of the Tranche B debt that is being converted to equity, and there is a

possibility that LCPI will also be entitled to additional recoveries if the Italian real estate market

stabilizes and the value of the assets of the Berenice Fund increases.

30.     For the reasons stated above, and in LCPI's informed business judgment,

the Restructuring is a "fair and equitable" resolution of the issues described herein, is well within

the "range of reasonableness," and is in the best interests of LCPI's estate and its creditors.

Accordingly, the Debtors request that the Restructuring be approved.

### Relief Under Bankruptcy Rule 6004(h)

31.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale,

or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless

the court orders otherwise."  FED. R. BANKR. P. 6004(h).  Waiver of the 14-day stay imposed by

---

[4] LCPI understands that the Berenice Fund is current with respect to amounts due in connection with the senior debt.

Bankruptcy Rule 6004(h) will allow the Parties to begin the process of obtaining the necessary legal opinions from Dutch counsel, and move expeditiously toward completing the Restructuring.  Accordingly, LCPI respectfully requests that any order approving the relief requesting herein be effective immediately by waiving the 14-day stay.

### Notice

32.     No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the second amended order entered on June 17, 2010, governing case management and administrative procedures for these cases [ECF No. 9635] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) the attorneys for Zwinger; (vii) the attorneys for BPM; (viii) the attorneys for LBIE; and (ix) all parties who have requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

33.    No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as is just.

Dated:  September 27, 2011
        New York, New York

                                    /s/ Jacqueline Marcus
                                    Jacqueline Marcus
                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone: (212) 310-8000
                                    Facsimile: (212) 310-8007

                                    Attorneys for Debtors
                                    and Debtors in Possession

**<u>Exhibit A</u>**
**(The Term Sheet)**

CONFIDENTIAL

## BERENICE / CALVINO – CREDIT FACILITY AGREEMENT
## RESTRUCTURING TERM SHEET

Reference is made to the €343,000,000 Amended and Restated Credit Facility Agreement, dated 15 August 2007 (as amended and restated on 30 July 2008) (as further amended, supplemented, novated, and/or restated from time to time, the "**Credit Facility Agreement**"), *between* (1) Zwinger Opco 6 B.V. ("**Borrower**"); (2) Lehman Brothers International (Europe), as mandated lead arranger ("**Arranger**"); (3) the Original Lenders named therein; *and* (4) Lehman Brothers International (Europe), as Facility Agent ("**Facility Agent**").

Capitalized terms used but not defined in this Term Sheet have the meanings provided in the Credit Facility Agreement.

Following discussions among the Parties and their representatives, the Parties have agreed to a consensual restructuring of the Term Loan, and amendments to certain terms and conditions set forth in the Finance Documents, in accordance with this Term Sheet (collectively, the "**Restructuring**"). Subject to the next paragraph, as soon as is practicable following the date of this Term Sheet, the Parties (and any other parties to the relevant Finance Documents), shall execute amendments to the Credit Facility Agreement (and any other relevant Finance Documents) to reflect the provisions of this Term Sheet. Except as to be modified pursuant to the provisions of this Term Sheet (including any consequential or conforming amendments required in connection therewith) and subject to the results of a standard review of the security arrangement to be conducted by the Lenders' counsel, the Credit Facility Agreement and each other Finance Document shall remain in its current form.

Each Party acknowledges and agrees that this Term Sheet creates no legally enforceable obligation or commitment by or for any Party and that each Party's agreement to participate in the Restructuring is expressly subject to: (x) such Party (and, if applicable, such Party's direct or indirect shareholders) obtaining all necessary credit committee, investment committee and/or board approvals, *and* (y) preparation and execution of definitive documentation in form and substance satisfactory to such Party (in its sole discretion). Furthermore, by way of background it is noted that, Lehman Brothers Holdings, Inc. ("**LBHI**") has discussed this Term Sheet in principle with its investment committee and has received support for the transactions envisaged pursuant to this Term Sheet from the committee. It is LBHI's intention to seek formal approval for this Term Sheet from its various investment committees and the U.S. Bankruptcy Court as soon as is practicable following acceptance of this Term Sheet by Borrower.

| | |
|---|---|
| **Restructuring Completion Date:** | The "**Restructuring Completion Date**," as set forth in the definitive documentation relating to the Restructuring entered into by the Parties. |

-1-

CONFIDENTIAL

| | |
|---|---|
| **Term Loan:** | From and after the Restructuring Completion Date, "**Term Loan**" shall mean the Tranche A Term Loan and the Remaining Tranche B Term Loan (as defined below). |
| **Remaining Tranche B Term Loan:** | Approximately €87,400,000 (assuming no further distributions prior to the Restructuring Completion Date), calculated as follows: such portion of the original Tranche B Term Loan as remains following the Borrower Capital Restructuring (as defined below) in an amount of approx. €74,486,830 plus the accrued interest through the Restructuring Completion Date in respect of the original Tranche B Term Loan of approx. €12,900,000 (such accrued interest to be capitalised and added to the principal outstanding amount of the Remaining Tranche B Term Loan on the Restructuring Completion Date) in each case, net of any prepayments made pursuant to the application of any amounts contained in the Pledged Account (as described below) ("**Remaining Tranche B Term Loan**"). |
| | From and after the Restructuring Completion Date, the Tranche A Term Loan and all payments of principal, interest and fees in respect of the Tranche A Term Loan shall be senior in all respects to the Remaining Tranche B Term Loan and all payments of principal, interest and fees thereunder. |
| **Pledged Account:** | On the Restructuring Completion Date, all amounts in the Pledged Account will be applied (i) first, to pay the costs and expenses referred to in the paragraph below entitled "**Costs and Expenses**"; (ii) second, to fund the payment of interest accrued and unpaid in respect of the Tranche A Term Loan and any unpaid allocated release pricing with respect to the Tranche A Term Loan; (iii) third, to fund the payment of interest accrued and unpaid in respect of the original Tranche B Term Loan; and (iv) fourth, the remainder to prepay a portion of the Tranche A Term Loan, in each case, subject to the terms of the Finance Documents. Calculations are set forth in **Annex A**[1]. References in this Term Sheet to "interest" exclude any interest on overdue amounts (any such default interest that would |

---

[1] Annex A subject to change based on actual amounts in the Pledged Account on the Restructuring Completion Date.

-2-

CONFIDENTIAL

otherwise accrue under the terms of the Credit Facility Agreement shall not be assessed and/or shall be waived unconditionally by the Parties as of the Restructuring Completion Date).

**Final Maturity Date:** The current Final Maturity Date will be extended until August 15, 2014.

**Restructuring/Extension Fee:** Borrower will pay the following restructuring/extension fees to the Lenders (as applicable) on the Restructuring Completion Date:

(i) Tranche A Term Loan: 1.25% of the outstanding principal balance of the Tranche A Term Loan as at the Restructuring Completion Date (but net of any prepayments made pursuant to the application of any amounts contained in the Pledged Account); and

(ii) Remaining Tranche B Term Loan: 1.25% of the aggregate of the outstanding principal balance of the Remaining Tranche B Term Loan as at the Restructuring Completion Date (i.e. after the Borrower Capital Restructuring).

**Margin Fee:** Tranche A Term Loan: 2.50% *per annum* (full cash pay).

Remaining Tranche B Term Loan: 8.50% *per annum* (year 1); 9.50% *per annum* (from and after the first anniversary of the Restructuring Completion Date) (in each case payable in cash to the extent of available cash flow or shall otherwise accrue and be added to the principal of the Remaining Tranche B Term Loan).

**Deferral of Interest:** As Borrower does not control the timing or amount of Distributions, an additional 90 calendar day grace period (starting on the date of each respective interest payment date under the Credit Facility Agreement) will be introduced and may be utilized by Borrower (at Borrower's discretion) if at such time, the Berenice Fund has generated enough cash (that if distributed would be sufficient) to pay any interest due on the Tranche A Term Loan but said amounts have not been distributed to Borrower.

**Asset Management Fees:** Asset management fees and related ongoing costs to be paid current when due subject to a maximum aggregate amount of the lower of (x) €600,000 per annum (plus

-3-

CONFIDENTIAL

applicable VAT) and (y) cost of providing the relevant services (plus applicable VAT), in any consecutive 12 month period ("**Senior Asset Management Costs**"). Any asset management fees in excess of Senior Asset Management Costs (*i.e.*, a margin of 10% *per annum* of the Senior Asset Management Costs) ("**Residual Asset Management Costs**") to be subordinate to all payments due in respect of the Tranche A Term Loan and the Remaining Tranche B Term Loan (and to be paid in accordance with the Debt/Equity and Borrower Waterfall (as set out below)). Borrower to procure that Residual Asset Management Costs may accrue without default until all indebtedness under the Credit Facility Agreement is paid in full. Asset management fees and related agreements to be in form and substance satisfactory to the Tranche B Lender (as defined below).

| | |
|---|---|
| **Look-through LTV Default:** | None. All appropriate consequential changes will be made to the Finance Documents to reflect the elimination of the Look-through LTV Default. |
| **Look-through LTV Sweep:** | None. All appropriate consequential changes will be made to the Finance Documents to reflect the elimination of the Look-through LTV Sweep. |
| **Loan to Net Asset Value:** | Clause 19.2 of the Credit Facility Agreement will be amended to provide that the test will be at 87.5% for the first 18 months following the Restructuring Completion Date and 85% thereafter. |
| **Borrower Capital Restructuring** | The articles of the Borrower shall be amended to provide for two classes of shares called "Class A Shares" constituting 49% of the outstanding and authorized shares and "Class B Shares" constituting 51% of the outstanding and authorized shares. |

Subject to tax, accounting, legal and regulatory due diligence satisfactory to the Tranche B Lender (as defined below) and the Current Equity Holders (as defined below), on the Restructuring Completion Date (1) approx. €33,500,000 of the principal outstanding amount of the original Tranche B Term Loan shall be converted into and exchanged for 100% of the authorized Class A Shares (the "**Tranche B Equity**") and (2) the shares in the Borrower currently held by the Current Equity Holders will be converted into and

-4-

CONFIDENTIAL

exchanged for 100% of the authorized Class B Shares.

**Where:**

**"Current Equity Holders"** means the existing holders of the equity in the Borrower as at the date of this Term Sheet.

The Tranche B Lender shall have the right to designate an affiliate to hold the Tranche B Equity (the holder of the Tranche B Equity being the **"Tranche B Equity Holder"**) and to transfer, from time-to-time, the Tranche B Equity among members of the Lehman group.

**"Tranche B Lender"** means Lehman Commercial Paper, Inc. UK Branch.

| | |
|---|---|
| **Shareholder Loans:** | All existing shareholder loans (including profit participating loans (if any)) to be cancelled, converted to equity and/or fully subordinated to the equity interests in the Borrower in a manner satisfactory to the Tranche B Lender. (Borrower may elect to complete this cancellation/conversion/subordination at any time on or prior to the Restructuring Completion Date and will keep the Tranche B Lender fully apprised of such action.) For the avoidance of doubt, any conversion of shareholder loans to equity will take place prior to the Borrower Capital Restructuring and such converted equity will itself be converted into Class B Shares and form a part of the 51% equity position to be held following the Restructuring Completion Date by the Current Equity Holders. |
| **Cash Sweep:** | Full cash sweep of all Distributions to be deposited directly from the Berenice Fund into the Pledged Account. To the extent no Enforcement Event exists, the Lenders will authorize the release from the Pledged Account of (i) corporate and entity maintenance costs of the Borrower (including accounting and tax compliance costs) and (ii) Senior Asset Management Costs) to the extent required under the Debt/Equity and Borrower Waterfall (the amount remaining after such release, together with any other amounts received by Zwinger, being the **"Net Cash Flow"**). |
| **Debt/Equity and** | All Net Cash Flow shall be applied as follows: |

-5-

CONFIDENTIAL

**Borrower Waterfall:**

(a) first, payment of unpaid interest, fees and costs in respect of the Tranche A Term Loan;

(b) second, if due, payment of principal and any other amount due in respect of the Tranche A Term Loan;

(c) third, payment of unpaid interest, fees and costs in respect of the Remaining Tranche B Term Loan;

(d) fourth, if due, payment of principal and any other amount due in respect of the Remaining Tranche B Term Loan; and

(e) fifth, any amounts permitted to be distributed by Borrower under the Credit Facility Agreement (or any cash available to Borrower for distribution after repayment in full of all indebtedness outstanding under the Credit Facility Agreement) will be applied in the following order of priority:

(i) first, to the payment in full of Residual Asset Management Costs;

(ii) second, (x) 51% to the Current Equity Holders and (y) 49% to the Tranche B Equity Holders (on a *pari passu* and *pro rata* basis) until the Tranche B Equity Holders have received (on a cumulative aggregate basis) €30 million under this clause (ii);

(iii) third, (x) 60% to the Current Equity Holders and (y) 40% to the Tranche B Equity Holders (on a *pari passu* and *pro rata* basis) until the Tranche B Equity Holders have received (on a cumulative aggregate basis) €12.5 million under this clause (iii); and

(iv) fourth, (x) 80% to the Current Equity Holders and (y) 20% to the Tranche B Equity Holders (on a *pari passu* and *pro rata* basis).

**Equity Documents:**

Subject to tax, accounting, legal and regulatory due diligence satisfactory to the Tranche B Lender, on or prior to the Restructuring Completion Date, the holders of the Class A Shares and the Class B Shares will enter into a Shareholders' Agreement (which must be in form and substance satisfactory to the Tranche B Lender and to each initial holder of Class A Shares and each initial holder of Class B Shares (each in its sole discretion)) in respect of their interests in Borrower.    The

-6-

CONFIDENTIAL

Shareholders' Agreement will contain *inter alia* (but not limited to) (i) transfer restrictions[2]; (*provided that* no holder of Class A Shares or Class B Shares may transfer shares to the extent such transfer would cause a Default, Event of Default or mandatory prepayment event in respect of the Credit Facility Agreement). (ii) a mechanism for funding any cash shortfalls; (iii) governance provisions including provision for the holders of the Class A Shares to appoint directors or managers to the board of the Borrower, *provided that* the parties acknowledge and agree that the Current Equity Holders (acting alone) shall have the right to cause Borrower to make any entity classification election under IRS Form 8832); and (iv) other customary provisions.

| | |
|---|---|
| **Fund Extension:** | The Current Equity Holders shall have the right (exercisable at any time(s) before and/or after the Restructuring Completion Date as the Current Equity Holders may elect) to cause Borrower to vote (and to otherwise take any appropriate action) to extend the term of the Berenice Fund to any date not later than 31 July 2015. |
| **Hedging:** | Borrower will (on or prior to the Restructuring Completion Date) enter into further hedging arrangements satisfactory to the Lenders in respect of the Tranche A Term Loan and the Remaining Tranche B Term Loan with a counterparty acceptable to the Lenders (acting reasonably) with the following characteristics: (i) strike rate to be agreed between the Borrower and the Lenders; *and* (ii) a declining notional amount corresponding to the repayment projections in the Borrower's Business Plan (the "**Business Plan**") with a six-month sales delay. |
| **Replacement of Facility Agent:** | Lehman Brothers International (Europe) to be replaced as Facility Agent by Hatfield Philips Agency Services Limited in accordance with Clause 23.18 (*Resignation of the Facility Agent*) of the Credit Facility Agreement. This replacement to occur on or prior to the Restructuring Completion Date. |

---

[2] Note: Transfer restrictions to be discussed in more detail, including potential drag/tag along rights.

LEGAL_EU # 7801753 9

CONFIDENTIAL

| | |
|---|---|
| **Conditions Precedent:** | **Tax Ruling** |

Subject to confirmation from legal counsel to the Lenders, obtaining a binding ruling from the Dutch tax authorities as to the tax-free nature (in the Netherlands) as to the conversion of a portion of the existing Tranche B debt into the Tranche B Equity.

**Pledged Accounts**

(i) Borrower to provide a full breakdown of all distributions into the Pledged Account. This is to include dates on which distributions have been paid into the Pledged Account;

(ii) Borrower to provide its own calculations of interest due since June 2008 on each interest payment date in respect of the Credit Facility Agreement; and

(iii) Borrower to provide monthly bank statements from ING dating to 1 June 2008 to include all distributions, withdrawals and bank interest accrued on the Pledged Account.

**Local Law Analysis**

Subject to completion of local law and cross-border law analysis of the proposed structure and tax implications.

**Other**

Other customary conditions precedent for a transaction of this kind to include (without limitation) legal opinions, Borrower's solvency certificate and up-to-date Berenice Fund valuations.

**Costs and Expenses[3]:**

Costs and reasonable expenses incurred by the Borrowers and Lenders in relation to the Restructuring will be for the account of Borrower and may be paid on the Restructuring Completion Date out of the Pledged Account, provided that not more than an aggregate maximum amount of €[5,380,000] shall be applied from the Pledged Account in the payment of such costs

---

[3] Amounts are bracketed and subject to change based on amortization levels at the Restructuring Completion Date.

-8-

CONFIDENTIAL

and expenses and that payments shall be made in accordance with the following provisions:

(a)  Extension Fees for Tranche A Term Loan – in an amount of €[1,310,000];

(b)  Extension Fees for Remaining Tranche B Term Loan – in an amount of €[1,090,000];

(c)  legal fees and other third party professional fees in connection with the Restructuring – in an amount of €[1,000,000]; and

(d)  costs in connection with further hedging arrangements required pursuant to the Restructuring – in an amount of €[1,980,000].

Date: August 30, _____ 2011

Agreed:

_____
Jeffrey Fitts
on behalf of Lehman Commercial Paper, Inc.
UK Branch


_____
on behalf of Banca Popolare di Milano S.c.a.r.l.


_____
on behalf of Zwinger Opco 6 B.V.

-9-

CONFIDENTIAL

expenses and that payments shall be made in accordance with the following provisions:

(a)    Extension Fees for Tranche A Term Loan – in an amount of € 1,310,000;

(b)    Extension Fees for Remaining Tranche B Term Loan – in an amount of € 1,090,000;

(c)    legal fees and other third party professional fees in connection with the Restructuring – in an amount of € 1,000,000; and

(d)    costs in connection with further hedging arrangements required pursuant to the Restructuring – in an amount of € 1,980,000.

Date:   31st August 2011

Agreed:


_____
on behalf of Lehman Commercial Paper, Inc.
UK Branch

Claudio Stefani          Giulio Litta Modignani
_____
on behalf of Banca Popolare di Milano S.c.a.r.l.


_____
on behalf of Zwinger Opco 6 B.V.

LEGAL_EU # 7801753.9

CONFIDENTIAL

and expenses and that payments shall be made in accordance with the following provisions:

(a)    Extension Fees for Tranche A Term Loan – in an amount of €[1,310,000];

(b)    Extension Fees for Remaining Tranche B Term Loan – in an amount of €[1,090,000];

(c)    legal fees and other third party professional fees in connection with the Restructuring – in an amount of €[1,000,000]; and

(d)    costs in connection with further hedging arrangements required pursuant to the Restructuring – in an amount of €[1,980,000].

Date:  31 August          2011

Agreed:

_____
on behalf of Lehman Commercial Paper, Inc.
UK Branch

_____
on behalf of Banca Popolare di Milano S.c.a.r.l.

_____
on behalf of Zwinger Opeo 6 B.V.

M.F. Stijger

Whitehall Management Services B.V.

M.F. Stijger          S.K.S. IJgosse

-9-

LEGAL_EU # 7801753.9

CONFIDENTIAL

ANNEX A

## Pledged Account Overview

### PLEDGE ACCOUNT BALANCE

| | |
|---|---|
| Pledged Account Balance  as of July 2011 | 143,901,378 |
| August Distribution (expected) | 6,476,563 |
| Pledged Account Balance expected as of September 2011 | 150,382,462 |
| of which Costs | 6,380,000 |
| of which Release Pricing | 115,446,852 |
| of which Interest | 31,453,000 |

| Pledged Account Distribution at Signing | |
|---|---|
| Pledge Account Balance  as of September 2011* | 152,280,462 |
| Restructuring Costs | (5,380,000) |
| Interest Tranche A | (21,553,482) |
| Principal Tranche A | (115,446,852) |
| Interest Tranche B | (9,900,129) |
| Total | |
| Interest to capitalize on Tranche B | 12,896,463 |

*Including Q3 distribution

### PRINCIPAL

#### Release Price (Tranche A)

| | Gross Sale Price | ALA | Due (110% ALA) | Paid | RP Shortfall |
|---|---|---|---|---|---|
| Via Tomacelli | 78,900,586 | 17,690,433 | 19,459,476 | 19,459,476 | |
| Via Bissolati | 95,896,300 | 25,542,502 | 28,096,752 | 28,096,752 | |
| Via Olesgi Palazzo B | 1,260,000 | 369,266 | 626,193 | 626,193 | |
| P.za Napoli 33/4 | 2,650,000 | 897,654 | 987,419 | 987,419 | |
| Via Pelegrini 26-28 | 3,350,000 | 771,600 | 848,760 | 848,760 | |
| Via San Zeno, snc | 1,800,000 | 837,349 | 866,084 | 866,084 | |
| Via Sisba | 41,000,000 | 16,659,764 | 18,325,740 | 18,325,740 | |
| Via Bonnet | 58,000,000 | 27,113,622 | 29,824,985 | 29,824,985 | |
| Via Gioia Palazzo A | 3,600,000 | 2,134,723 | 2,348,195 | 2,348,195 | |
| Via Pesca | 10,550,000 | 4,546,052 | 5,000,657 | 5,000,657 | |
| Via Angelo Emo | 5,826,000 | 2,191,829 | 2,411,012 | 2,411,012 | |
| Via Val Di Lanzo | 3,721,000 | 1,269,543 | 1,396,497 | 1,396,497 | |
| Via Ciclamino | 4,721,000 | 1,616,020 | 1,778,480 | 1,778,480 | |
| Via Palomano | 2,070,000 | 767,392 | 844,131 | 844,131 | |
| Via Scalamonti | 2,690,000 | 841,898 | 926,088 | 926,088 | |
| Via Jacopore da Todi | 2,700,000 | 920,125 | 1,012,138 | 1,012,138 | |
| Corso Marconi | 2,540,000 | 811,133 | 892,247 | 892,247 | |
| Total | 318,972,888 | 104,951,804 | 115,446,852 | 115,446,852 | |

#### Principal Repayment Breakdown By Lender

| | Original Debt | Principal Repaid | Outstanding |
|---|---|---|---|
| BPM | 50,000,000 | 26,237,921 | 23,762,079 |
| Lehman Tranche A | 170,000,000 | 89,208,931 | 80,791,069 |
| Lehman Tranche B | 107,986,830 | - | 107,986,830 |
| Balance | 327,986,830 | 115,446,852 | 212,539,978 |

### INTEREST

#### Total Interest

| | Due | Paid | Shortfall |
|---|---|---|---|
| December 2008 | 13,479,147 | 13,479,147 | - |
| June 2009 | 9,606,203 | 8,033,592 | (1,572,611) |
| December 2009 | 5,333,101 | 3,225,975 | (2,107,126) |
| June 2010 | 6,159,661 | 3,393,407 | (2,752,243) |
| December 2010 | 4,833,928 | 2,136,314 | (2,697,614) |
| June 2011 | 5,022,041 | 2,205,174 | (2,796,867) |
| Total | 44,350,072 | 31,453,009 | (12,896,463) |

#### Interest Breakdown By Lender

| | BPM | Tranche A | Tranche B |
|---|---|---|---|
| Interest Due | 4,895,918 | 16,654,952 | 22,796,502 |
| Interest Paid | 4,895,918 | 16,654,952 | 9,900,129 |
| Balance | - | - | (12,896,463) |

-10-

LEGAL_EU # 7801753.9

**<u>Exhibit B</u>**
**(The Fitts Declaration)**

US_ACTIVE:\43798196\09\58399.0003

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------x
                                                   :
In re                                              :    Chapter 11 Case No.
                                                   :
LEHMAN BROTHERS HOLDINGS INC., et al.,             :    08-13555 (JMP)
                                                   :
                            Debtors.               :    (Jointly Administered)
                                                   :
                                                   :
------------------------------------------------------------------x
```

### DECLARATION OF JEFFREY FITTS IN SUPPORT OF LEHMAN COMMERCIAL PAPER INC.'S MOTION PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE AND RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR AUTHORIZATION TO RESTRUCTURE ITS INTERESTS IN ITALIAN REAL ESTATE FUND

I, Jeffrey Fitts, do hereby declare and depose that the following is true to the best of my knowledge, information, and belief:

1.      I am a Managing Director with Alvarez & Marsal Real Estate Advisory Services ("A&M").  I submit this declaration in support of the *Motion of Lehman Commercial Paper Inc. Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 9019 for Authorization to Restructure Its Interest in Italian Real Estate Fund* (the "Motion") filed on September 27, 2011.

2.      I have more than 22 years of experience in assisting insolvent and troubled companies, with a focus on operational and financial restructuring efforts.  Prior to joining A&M, I was a Managing Director with GE Commercial Finance ("GE"), where I led GE's

Distressed Debt and Alternative Investment Group and managed complex distressed credits. Before joining GE, I was with the Corporate Workout Division (IRM) of Citicorp, where I spent three years managing investment grade and middle market corporate workouts. I began my career in 1990 as a workout officer and, later, an asset manager with Citicorp Real Estate, where I managed more than $1 billion of office, retail, and industrial projects. I received a bachelor's degree from the University of Delaware in 1988.

3.      I was assigned to the representation of Lehman[1] in September 2008. I currently serve as the Co-Head of Lehman's real estate group (the "Real Estate Group"). My primary responsibility as Co-Head of the Real Estate Group is day-to-day management and oversight of Lehman's real estate portfolio, including management and oversight of the real estate, real estate finance and related activities that are the subject of the Motion and this Declaration. As Co-Head of the Real Estate Group, I oversee a number of Lehman employees who have been actively involved in finalizing the terms of the transactions described in this Declaration and in the Motion. If called to testify at the October 19, 2011 hearing on the Motion, the following would be my direct testimony.

4.      LCPI and Zwinger entered into the Calvino Credit Facility in 2007. Zwinger then used the proceeds of the Calvino Credit Facility, along with an additional equity investment of €196 million, to acquire 95% of the units of the Berenice Fund. The remaining 5% of the units in the Berenice Fund are held by public shareholders. The Berenice Fund currently is comprised of 14 high-end office buildings and 20 Telecom Italia switching stations on long-term leases. Each of these assets is located in Italy, with large concentrations in Rome

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

and Milan.  The Berenice Fund also has approximately €286 million of senior debt that is held by a syndicate of Italian banks.

5.      I understand from my discussions with Lehman employees that LCPI's original plan was to syndicate all or a substantial portion of the Calvino Credit Facility to third-party lenders.  In order to promote syndication, LCPI divided the Calvino Credit Facility into a €220 million senior tranche ("Tranche A") and a €108 million subordinate tranche ("Tranche B").  LCPI successfully syndicated €50 million of the Tranche A debt to BPM in July of 2008.  As of the Commencement Date, LCPI retained €170 million of the Tranche A debt and the entire €108 million Tranche B debt.

6.      LBIE, which is the Agent for the Calvino Credit Facility, has refused to perform its duties since the commencement of its insolvency proceeding in the United Kingdom.  As a result, approximately €152 million in interest and principal amortization payments due under the Calvino Credit Facility are trapped in a LBIE-controlled bank account (the "Blocked Funds").  Despite numerous efforts, LCPI has been unable to replace LBIE as Agent – and thereby effectuate the release of the Blocked Funds – because the Calvino Credit Facility documents require the consent of Zwinger and BPM in order to replace the Agent and such consent has not been forthcoming.

7.      The Calvino Credit Facility was scheduled to mature on or about September 3, 2011.  Following discussions with Zwinger, however, it became clear that Zwinger would be unable to repay the amounts due under the Calvino Credit Facility on schedule and, even if it did, such amounts would be trapped in the LBIE-controlled bank account.  Accordingly, LCPI and BPM agreed to refrain from exercising their rights and remedies under

the operative loan documents until November 5, 2011 to allow the Parties to finalize the

Restructuring and obtain Court approval thereof.

       8.     Following the Commencement Date, LCPI initiated negotiations with

Zwinger and BPM regarding a consensual restructuring of the Calvino Credit Facility. These

negotiations were complex and time-consuming and have resulted in the proposed Restructuring,

which satisfies the needs of all parties involved.

       9.     The proposed Restructuring includes the following elements:

- LCPI will do a partial debt for equity swap and convert approximately €33.5 million of its Tranche B debt into 49% of the equity of Zwinger;

- LCPI's margins on the remaining Tranche B debt will be increased to 8.5% for the first year and 9.5% thereafter;

- LCPI and BPM will receive over €2 million in restructuring / extension fees in connection with the extension of the Calvino Credit Facility; and

- LBIE will be replaced as Agent allowing for the release to LCPI and BPM of the Blocked Funds.

      10.     The Restructuring is expected to benefit LCPI in the following respects.

First, by providing for the replacement of LBIE as Agent, the Restructuring will result in the

release of the Blocked Funds and an immediate payment to LCPI of approximately €116 million.

A functioning Agent going forward will also allow LCPI to have a clear path toward judicial

enforcement of its rights under Calvino Credit Facility.

      11.     Second, the extension of the Calvino Credit Facility is expected to

stabilize Zwinger's capital structure and carry it through the current instability in the Italian real

estate market. This additional time will allow Zwinger to maximize the value of the assets of the

Berenice Fund by increasing rental income through an aggressive leasing strategy, completing

certain capital improvements, and pursuing an opportunistic asset disposition strategy. LCPI

believes that this extension will increase likelihood that the Calvino Credit Facility will be repaid in full.

12.     Third, LCPI's recoveries on its interests in the Calvino Credit Facility will be enhanced by the substantial increase in the Tranche B margin and LCPI's receipt of the extension/restructuring fees.

13.     Finally, LCPI believes that the debt for equity conversion will allow it to share in the substantial residual equity value that accrues to Zwinger as a result of its interest in the value of the Berenice Fund.  Based on a March 2011 public valuation, the assets held by the Berenice Fund are currently valued at approximately €544 million.  Following the Restructuring, Zwinger will have approximately €192 million of mezzanine debt and the Berenice Fund will have approximately €286 million of senior debt.  Accordingly, there is expected to be at least €63 million in residual value in Zwinger following the Restructuring.  As holders of the Class A Shares, LCPI will be entitled to the following equity returns from Zwinger:

- 49% (on a pari passu and pro rata basis) until LCPI has received (on a cumulative aggregate basis) €30 million in respect of its interest in the Class A Shares;

- 40%  (on a pari passu and pro rata basis) until LCPI has received (on a cumulative aggregate basis) an additional €12.5 million in respect of its interest in the Class A Shares; and

- 20% (on a pari passu and pro rata basis) of any further distributions.

14.     Accordingly, LCPI anticipates that it will recover most, if not all, of the value of the portion of the Tranche B debt that is being converted to equity, and there is a possibility that LCPI will also be entitled to additional recoveries if the Italian real estate market stabilizes and the value of the assets in the Berenice Fund increases.

15.     In light of these factors, I believe that the proposed Restructuring is a reasonable exercise of LCPI's business judgment and is in the best interests of LCPI's estate and its creditors.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 27th day of September 2011.


/s/ Jeffrey Fitts                                        
Jeffrey Fitts

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
                                              :
In re                                         :    Chapter 11 Case No.
                                              :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,      :    08-13555 (JMP)
                                              :
                        Debtors.              :    (Jointly Administered)
                                              :
----------------------------------------------------------------x

### ORDER PURSUANT TO
### SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE
### AND RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY
### PROCEDURE AUTHORIZING LEHMAN COMMERCIAL PAPER INC.
### TO RESTRUCTURE ITS INTERESTS IN ITALIAN REAL ESTATE FUND

Upon the motion, dated September 27, 2011 (the "Motion"), of Lehman

Commercial Paper Inc. ("LCPI"), as debtor and debtor-in-possession, pursuant to sections 105

and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for authorization to restructure

its interests in the Calvino Credit Facility,[1] all as more fully described in the Motion; and the

Court having jurisdiction to consider the Motion and the relief requested therein in accordance

with 28 U.S.C. §§ 157 and 1334 and Standing Order M-61 Referring to Bankruptcy Judges for

the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984

(Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a

core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been

provided in accordance with the procedures set forth in the second amended order entered June

17, 2010 governing case management and administrative procedures [ECF No. 9635] to (i) the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms
in the Motion

United States Trustee for Region 2; (ii) the attorneys for the Official Committee of Unsecured

Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v)

the United States Attorney for the Southern District of New York; (vi) the attorneys for Zwinger;

(vii) the attorneys for BPM; (viii) the attorneys for LBIE; and (ix) all parties who have requested

notice in these chapter 11 cases, and it appearing that no other or further notice need be provided;

and upon consideration of the Fitts Declaration; and a hearing (the "Hearing") having been held

to consider the relief requested in the Motion; and the Court having found and determined that

the relief sought in the Motion is in the best interests of the Debtors, their respective estates and

creditors, and all other parties in interest and that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein; and after due deliberation and sufficient

cause appearing therefor, it is

ORDERED that the relief requested in the Motion is granted; and it is further

ORDERED that, pursuant to sections 105(a) and 363 of the Bankruptcy Code and

Bankruptcy Rule 9019, LCPI (a) is duly authorized and empowered to effectuate the

Restructuring on the terms set forth in the Term Sheet; (b) is duly authorized and empowered to

execute, deliver, implement, and fully perform any and all obligations, instruments, documents

and papers, that may be necessary or appropriate to consummate or implement the transactions

contemplated by the Term Sheet; and (c) shall have the right both in connection with and

following consummation of the Restructuring to consent to any amendment, restatement, waiver,

supplement or other modification of any of the transactions described therein substantially in

accordance with the description set forth in the Motion.  Any actions described in clauses (a), (b)

and (c) taken by LCPI or its affiliates may be taken without the necessity (x) of further court

proceedings or approval or (y) of any consent of any other party, and shall be conclusive and

binding in all respects on all parties in interest in these cases; and it is further

ORDERED that LCPI is authorized to amend, modify, or supplement any

of the terms of the Term Sheet, without the necessity of further Court proceedings or approval

and without the consent of any other party, except to the extent that such changes have a material

adverse effect on LCPI's estate; and it is further

ORDERED that, pursuant to Bankruptcy Rule 6004(h), the terms of this Order

shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good

and sufficient notice of such Motion; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising

from or related to the implementation of this Order.

Dated: October __, 2011
    New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE