1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)

Case No. 08-01420(JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., et al.,

                    Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the matter of:

LEHMAN BROTHERS INC.,

                    Debtor.

- - - - - - - - - - - - - - - - - - - -x

              U.S. Bankruptcy Court

              One Bowling Green

              New York, New York


              January 13, 2010

              10:12 a.m.


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1    DEBTORS' Motion Requesting Joint Administration of the Chapter

2    11 Cases of LB Somerset LLC and LB Preferred Somerset LLC

3

4    DEBTORS' Motion for a Determination That Certain Orders and

5    Other Pleadings Entered or Filed in the Chapter 11 Cases of

6    Affiliated Debtors be Made Applicable to the Chapter 11 Cases

7    of LB Somerset LLC and LB Preferred

8

9    DEBTORS' Motion to Extend the Time to File LB Somerset LLC's

10    and LB Preferred Somerset LLC's Schedules, Statements of

11    Financial Affairs, and Related Documents

12

13    DEBTORS' Motion to Strike William Kuntz's Notice of Appeal of

14    the Order Authorizing Lehman Commercial Paper Inc. to Purchase

15    Fairpoint Participation

16

17    DEBTORS' Motion for Authorization and Approval of a Settlement

18    Agreement With the Insolvency  Administrator of Lehman Brothers

19    Bankhaus AG (In Insolvenz)

20

21    MOTION of Merrill Lynch International for Relief From the

22    Automatic Stay

23

24    LBHI's Motion for Authorization to Sell Certain Asset Backed-

25    Securities and Related Relief

3

1    MOTION of Seattle Pacific University Compelling Lehman Brothers

2    Special Financing Inc. to Assume or Reject Executory Contracts

3

4    LEHMAN Brothers Special  Financing Inc.'s Motion to Strike

5    Capital Automotive L.P.'s Objection to Debtors' Motion to

6    Compel Performance

7

8    JOINT Motion of Sea Port Group Securities and Berner

9    Kantonalbank to Deem Proofs of Claim to be Timely Filed by

10   Securities Programs Bar Date

11

12   MOTION of the Debtors for Establishment of Procedures for the

13   Debtors to Compromise and Settle Pre-Petition Claims Asserted

14   by the Debtors Against Third Parties

15

16   DEBTORS' Motion for Approval of Claim Objection Procedures and

17   Settlement Procedures

18

19   MOTION by Insolvency Administrator and Foreign Representative

20   for Authorization to Enter Into and Approval of a Settlement

21   Agreement With the Lehman Parties

22

23

24

25

4

1    THIRD Application of Hughes Hubbard & Reed, LLP for Allowance

2    of Interim Compensation for Services Rendered and Reimbursement

3    of Actual and Necessary Expenses Incurred from June 1, 2009

4    Through September 30, 2009

5

6    PRETRIAL CONFERENCE

7    Federal Home Loan Bank of Pittsburgh v. Lehman Brothers

8    Holdings Inc., et al.,

9

10   MOTION of Tuxedo Reserve Owner LLC and Tuxedo TPA Owner LLC for

11   an Order Compelling Actions by Debtors as Agent and Lender

12   Under Loan Facility

13

14   DEBTORS' Motion to Compel Performance by AIG CDS, Inc. of its

15   Obligations Under an Executory Contract and to Enforce the

16   Automatic Stay

17

18   MOTION of Laurel Cove Development for an Order Directing Debtor

19   to Assume or Reject an Executory Contract

20

21   MOTION of U.S. Bank National Association for Relief From the

22   Automatic Stay

23

24

25

5

1    MOTION to Compel Performance of Capital Automotive L.P.'s

2    Obligations Under an Executory Contract and to Enforce the

3    Automatic Stay

4

5    MOTION of 1407 Broadway Real Estate LLC and PGRS 1407 BWAY LLC

6    for an Order (I) Compelling Certain of the Debtors to Comply

7    With Their Lending Obligations

8

9    NOTICE of Debtors' Objection to Proof of Claim Filed by David

10   Schwartzman

11

12   MOTION of U.S. Bank National Association for Relief From

13   Automatic Stay

14

15   MOTION of U.S. Bank National Association for Relief From

16   Automatic Stay

17

18   MOTION of Property Asset Management Inc. for Relief From the

19   Automatic Stay

20

21   MOTION of U.S. Bank National Association for Relief From the

22   Automatic Stay

23

24

25

6

1    MOTION of Debtors to Compel Performance of Board of Education

2    of the City of Chicago's Obligations Under an Executory

3    Contract and to Enforce the Automatic Stay

4

5    MOTION of Official Committee of Unsecured Creditors for

6    Reconsideration of Court's September 17, 2008 Interim Order

7    Authorizing Debtor to Obtain Post-Petition Financing

8

9    MOTION of WWK Hawaii-Waikapuna, LLC, et al. for Relief From the

10   Automatic Stay

11

12   FIRST Motion of Mark Glasser to Extend Time for Claim

13

14   MARKIT Group Limited's Motion for Relief from the Automatic

15   Stay to Terminate Data Services Agreement and Associated

16   Addenda

17

18   MOTION of Newport Global Opportunities Fund LP, Newport Global

19   Credit Fund (Master) L.P., PEP Credit Investor and Providence

20   TMT Special Situations Fund L.P. for Leave to Conduct Rule 2004

21   Discovery of Lehman Brothers Inc. and the SIPA Trustee

22

23   LEHMAN Brothers Special Financing Inc.'s Motion to Dismiss in

24   Chicago Board of Education v. Lehman Brothers Special Financing

25   Inc.

7

1    PRE-TRIAL Conferences

2    Lehman Brothers Holdings Inc. v. Barclays Capital, Inc.

3    James W. Giddens, as Trustee for the SIPA Liquidation of Lehman

4    Brothers Inc. v. Barclays Capital Inc.

5    The Official Committee of Unsecured Creditors of Lehman

6    Brothers Holdings Inc. v. Lehman Brothers Holdings Inc.

7    Berenshteyn v. Lehman Brothers Holdings Inc.

8    Lehman Brothers Special Financing, Inc. v. Metropolitan West

9    Asset Management, et al.

10   Lehman Brothers Special Financing, Inc. v. Metropolitan West

11   Asset Management, LLC, et al.

12

13   NOTICE of Hearing on Interim Applications for Allowance of

14   Compensation for Professional Services Rendered and for

15   Reimbursement of Actual and Necessary Expenses

16

17   DEBTORS' Motion to Strike William Kuntz's Notice of Appeal of

18   Order Denying Relief Under Federal Rule of Civil Procedure

19   60(b) or, in the Alternative, to Dismiss William Kuntz's Appeal

20

21   MOTION of the Examiner to Compel ABN AMRO Inc. to Respond to

22   Subpoena for Rule 2004 Examination

23

24   Transcribed by:  Esther Accardi and Clara Rubin

25

8

1    A P P E A R A N C E S :

2    WEIL GOTSHAL & MANGES, LLP

3          Attorneys for Lehman Brothers Holdings, Inc. and

4           Affiliated Debtors

5          767 Fifth Avenue

6          New York, New York 10153

7

8    BY:   SHAI Y. WAISMAN, ESQ.

9          RICHARD P. KRASNOW, ESQ.

10         PETER GRUENBERGER, ESQ.

11         ROBERT J. LEMONS, ESQ.

12         ANTHONY J. ALBANESE, ESQ.

13

14

15   HUGHES HUBBARD & REED LLP

16         Attorneys for the James W. Giddens, SIPA Trustee

17         One Battery Park Plaza

18         New York, New York 10004

19

20   BY:   JAMES B. KOBAK JR., ESQ.

21         JEFFREY S. MARGOLIN, ESQ.

22

23

24

25

9

```
 1    A P P E A R A N C E S : (continued)

 2    KRAMER LEVIN NAFTALIS & FRANKEL LLP

 3         Attorneys for Rutger Schimmelpennick and Frederic

 4          Verhoeven, as Co-Trustees of Lehman Brothers Treasury

 5          Co. B.V.

 6          1177 Avenue of the Americas

 7          New York, New York 10036

 8

 9    BY:   THOMAS MOERS MAYER, ESQ.

10

11

12    MILBANK TWEED HADLEY & MCCLOY, LLP

13         Attorneys for the Official Committee of

14          Unsecured Creditors

15          One Chase Manhattan Plaza

16          New York, New York 10005

17

18    BY:   DENNIS C. O'DONNELL, ESQ.

19          DENNIS F. DUNNE, ESQ.

20

21

22

23

24

25
```

10

1    A P P E A R A N C E S : (continued)

2    SKADDEN ARPS SLATE MEAGHER & FLOM LLP

3         Attorneys for Merrill Lynch International and Certain of

4          Its Affiliates

5         Four Times Square

6         New York, New York 10036

7

8    BY:   GEORGE A. ZIMMERMAN, ESQ.

9          ANDREW M. THAU, ESQ.

10

11

12   WHITE & CASE LLP

13        Attorneys for the Ad Hoc Group of Lehman Brothers

14         Creditors

15        1155 Avenue of the Americas

16        New York, New York 10036

17

18   BY:   LISA THOMPSON, ESQ.

19

20

21

22

23

24

25

11

1    A P P E A R A N C E S : (continued)

2    LATHAM & WATKINS LLP

3         Attorneys for Bundesverband Deutscher Bank

4         885 Third Avenue

5         New York, New York 10022

6

7    BY:   MARK A. BROUDE, ESQ.

8

9

10   SONNENSCHEIN NATH & ROSENTHAL LLP

11        Attorneys for Michael C. Frege

12        1221 Avenue of the Americas

13        New York, New York 10020

14

15   BY:   D. FARRINGTON YATES, ESQ.

16

17

18   HUNTON & WILLIAMS LLP

19        Attorneys for Bank of America National Association

20        200 Park Avenue

21        New York, New York 10166

22

23   BY:   SCOTT H. BERNSTEIN, ESQ.

24

25

12

1   A P P E A R A N C E S : (continued)

2   CHAPMAN & CUTLER LLP

3        Attorneys for U.S. Bank

4        330 Madison Avenue

5        New York, New York 10017

6

7   BY:   CRAIG M. PRICE, ESQ.

8

9

10  MAYER BROWN LLP

11       Attorneys for Canadian Imperial Bank of Commerce and

12        Societe Generale

13       1675 Broadway

14       New York, New York 10019

15

16  BY:   BRIAN TRUST, ESQ.

17

18

19  REED SMITH LLP

20       Attorneys for Bank of New York Mellon

21       599 Lexington Avenue

22       New York, New York 10022

23

24  BY:   ERIC A. SCHAFFER, ESQ.

25

13

```
 1    A P P E A R A N C E S : (continued)

 2    K&L GATES LLP

 3         Attorneys for Seattle Pacific University

 4         599 Lexington Avenue

 5         New York, New York 10022

 6

 7    BY:   ROBERT N. MICHAELSON, ESQ.

 8

 9

10    LOVELLS LLP

11         Attorneys for Sea Port Group Securities, LLC

12          and Berner Kantonalbank

13         590 Madison Avenue

14         New York, New York 10022

15

16    BY:   CHRISTOPHER H. DONOHO, III, ESQ.

17

18

19    LOWENSTEIN SANDLER PC

20         1251 Avenue of the Americas

21         New York, New York 10020

22

23    BY:   JONATHAN A. KAPLAN, ESQ.

24

25
```

14

1    A P P E A R A N C E S : (continued)

2    SECURITIES INVESTOR PROTECTION CORPORATION

3         805 15th Street, N.W.

4         Suite 800

5         Washington, DC 20005

6

7    BY:   KENNTH J. CAPUTO, ESQ.

8

9

10   UNITED STATES DEPARTMENT OF JUSTICE

11   OFFICE OF THE UNITED STATES TRUSTEE

12        33 Whitehall Street, Suite 2100

13        New York, New York 10004

14

15   BY:   LINDA A. RIFFKIN, AUST

16        ELISABETH G. GASPARINI, ESQ.

17

18

19   ARNOLD & PORTER LLP

20        Attorneys for Woodlands Communal Bank

21        399 Park Avenue

22        New York, New York 10022

23

24   BY:   MONIQUE ANNE GAYLOR, ESQ.

25

15

1   A P P E A R A N C E S : (continued)

2   COLE SCHOTZ MEISEL FORMAN & LEONARD, PA

3         900 Third Avenue

4         New York, New York 10022

5

6   BY:   NOLAN E. SHANAHAN, ESQ.

7

8

9   BLANK ROME LLP

10        Attorneys for Capital Automotive

11        405 Lexington Avenue

12        New York, New York 10174

13

14  BY:   JEREMY REISS, ESQ.

15

16

17  BLANK ROME LLLP

18        Attorneys for Capital Automotive

19        130 North 18th Street

20        Philadelphia, Pennsylvania 19103

21

22  BY:   THOMAS BIRON, ESQ.

23

24  WILLIAM KUNTZ,

25  Appearing Pro Se

16

1    A P P E A R A N C E S : (continued)

2    APPEARING TELEPHONICALLY:

3    DAVID W. AMBROSIA, COLUMBUS HILL CAPITAL MANAGEMENT

4    MARC BARRECA, K&L GATES

5    ARIEL BARZIDEH, CITIGROUP

6    JEFFREY H. DAVIDSON, STUTMAN TREISTER & GLATT

7    MARINA FINEMAN, SUTMAN TREISTER & GLATT

8    WILLIAM FLYNN, OZ CAPITAL MANAGEMENT

9    REBECCA L. FORDON, BROWN RUDNICK LLP

10   JEFF FORLIZZI, SILVER POINT CAPITAL

11   JAMES HEISER, CHAPMAN & CUTLER

12   MATT HIGBEE, PRO SE

13   PAMELA HOLLEMAN, SULLIVAN & WORCESTER

14   WHITMAN L. HOLT, STUTMAN TREISTER & GLATT

15   KERRI KOHN, WATERSHED ASSET MANAGEMENT, LLC

16   KATHARINE L. MAYER, MCCARTER & ENGLISH

17   JEFFREY H. DAVIDSON, STUTMAN TREISTER & GLATT

18   WHITMAN L. HOLT, STUTMAN TREISTER & GLATT

19   JOHN OMEARA, MORGAN STANELY

20   ANDREW REBAK, CREDIT SUISSE FIRST BOSTON

21   JENNIFER H. SCHILLING, FARALLON CAPITAL MANAGEMENT

22   MEGHAN S. SHERWOOD, THE BAUPOST GROUP

23   SAMUEL STUCKI, LOVELLS LLP

24   WILL SUGDEN, ALSTON & BIRD LLP

25   ANGELO THALASSINOS, BROWN RUDNICK, LLP

17

1    A P P E A R A N C E S : (continued)

2    APPEARING TELEPHONICALLY:

3    FRANKLIN TOP, CHAPMAN & CUTLER

4    COREY R. WEBER, EZRA BRUTZKUS GUBNER LLP

5    MICHAIL ZEKYRGIAS, MERRILL LYNCH

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

18

1              P R O C E E D I N G S

2          THE COURT:  Please be seated.  Good morning.

3          MR. WAISMAN:  Good morning, Your Honor, and Happy New

4     Year.

5          THE COURT:  Happy New Year to you, too.

6          MR. WAISMAN:  Shai Waisman, Weil Gotshal & Manges on

7     behalf of the Lehman debtors.

8          Your Honor, we filed an agenda letter yesterday

9     afternoon, which was supplemented by an amended agenda letter

10    filed yesterday evening.

11         Notwithstanding that, we do have a request to take at

12    least one matter out of order.  And the first matter would be

13    the LBI matter.  LBI has only one matter on it's agenda, and

14    that's the uncontested fee application of Hughes Hubbard.

15    Because there's that uncontested matter, we would ask that --

16    LBI would ask that that lead off today's calendar and then get

17    to the regular agenda, if that's okay with Your Honor.

18         THE COURT:  That's fine.

19         MR. KOBAK:  Thank you, Your Honor.  Good morning.

20    James Kobak, Hughes Hubbard & Reed, LLP on behalf of the SIPA

21    Trustee.  And thank you to Mr. Waisman and Mr. Krasnow for

22    letting us go out of order.

23         Your Honor, I'll try to be brief, I hope this will be

24    brief.  We've submitted our application, this is for the third

25    period for interim compensation.  It's a period that runs from

1    June through September of last year, a four-month period.  It

2    was quite an active period in the case, with the claims process

3    getting underway as well as a lot of activity on the transfer

4    of accounts.  Many other activities with disputes, which I

5    think Your Honor is well aware of.  We also spent considerable

6    time starting up our investigation of the debtor, where we

7    worked very closely in coordination with the examiner.

8         The total hours were somewhat over 56,000 hours, of

9    which 600 -- something over 600 were billed by the trustee,

10   himself, and the rest by me and other members of my firm.

11        As Mr. Waisman noted, there's no opposition to this

12   application and SIPC has filed a statement in support.  Which

13   as you know, under the statute is entitled at least to

14   considerable reliance.

15        I'll also note for the record, that our fees are

16   subject to a fifteen percent holdback, which in this case

17   amounts to several million dollars for this period.

18        As I think Your Honor knows, we also voluntarily

19   extend a public service discount for this type of work, which

20   is ten percent of our normal billing rates.  And that amounts

21   to almost two and a half million dollars.

22        In addition to that, SIPC, as you know, reviews the

23   bills very carefully and we have written off several hundred

24   thousand dollars of time and expenses voluntarily at their

25   request.

20

1        So if Your Honor likes, I could go through much more

2   detail of what we did, but I think that's all set forth in our

3   application, and I know you have a busy schedule today.

4        THE COURT:  There's no need to go through the

5   application on the record, at this point.  And I have reviewed

6   the application and the submission from Josephine Wang in

7   support of your application, which included references to

8   various adjustments made in the fees, including one that I

9   found a little obscure relating to something that was an

10  adjustment to your fees that should have been an adjustment to

11  expenses.

12       MR. KOBAK:  To expenses.

13       THE COURT:  Maybe it was the other way around?

14       MR. KOBAK:  No, it was -- we took it out of fees but

15  it was -- I think it was an adjustment to expenses.

16       THE COURT:  I think we may be equally confused about

17  what that adjustment was.

18       MR. KOBAK:  It wasn't very significant in dollar

19  amount.

20       THE COURT:  I think there was an adjustment and I

21  recognize that it was a downward adjustment, and that's fine.

22  I'm pleased to approve the application in the form that it was

23  presented.

24       MR. KOBAK:  Thank you, Your Honor, we'll submit an

25  order at the end of the hearing.  And if we could indulge you

1    if Mr. Caputo and I could be excused.

2        THE COURT:  I think that's wonderful because you'll

3    save fees for the next application.

4        MR. KOBAK:  Right.  Thank you, Your Honor.

5        MR. WAISMAN:  Your Honor, the next three matters on

6    the calendar, we would actually go back to the agenda letter

7    filed last night, and these would be the first three

8    uncontested matters.

9        Shortly before the holidays, Your Honor, on December

10    21st, the debtors were compelled to commence two additional

11    Chapter 11 cases.  Those are for two entities; the LB Somerset

12    LLC entity, and the LB Preferred Somerset LLC entity.

13        Your Honor, these two entities, their primary business

14    is membership interest in a joint venture that owns six office

15    buildings in Raleigh, North Carolina.  Disputes have arisen

16    between these two members and their joint venture partners, and

17    litigation was instituted -- initiated in the Delaware Chancery

18    Court in December by the joint venture partner against these

19    two Lehman affiliated entities, seeking among other things,

20    really a forfeiture of many of their rights under the

21    membership joint venture agreement.

22        Given limited resources of these two entities, the

23    expense of a litigation and the risk of a forfeiture, these

24    entities really had no choice but to commence these two cases.

25        The three uncontested matters are the joint admin

22

1   motion, which would seek to jointly administer for

2   administrative purposes only.  These two estates, with the rest

3   of the Lehman entities, what we commonly call the all orders

4   motion, which seeks to apply many of the orders that this Court

5   has entered to the other debtors, to these two new cases.  And,

6   finally, an extension of time to file schedules and statements.

7   And the extension here would be to February 3, 2010.

8        The debtors are working on preparing those schedules.

9   The holidays and New Year posed a bit of a challenge and that

10  was the reason for the request for the extension.  But we do

11  believe the extension would permit us to file the schedules by

12  the period sought.

13       I'm happy to answer any questions Your Honor may have,

14  otherwise we would ask that the relief in those three motions

15  be granted.

16       THE COURT:  The relief is granted as to all three

17  motions.

18       MR. WAISMAN:  Thank you, Your Honor.

19       Item 4 on the agenda, Your Honor, is the debtors'

20  motion to strike William Kuntz' notice of appeal of the order

21  authorizing Lehman Commercial Paper to purchase Fairpoint

22  Participation.

23       Your Honor entered an order on October 16th permitting

24  the debtors to purchase a participation in a Fairpoint loan.

25  Mr. Kuntz untimely filed a motion to extend the time to appeal.

23

1    That motion was filed on October 27th, again, untimely, never

2    prosecuted.  And a little more -- over a month after that a

3    notice of appeal was filed.

4           The appeal has been assigned to District Judge Barbara

5    Jones.  Subsequently, on December 28th, Mr. Kuntz sent a letter

6    to the District Court withdrawing his appeal.  The District

7    Court has not acted on that letter, this motion was already

8    filed, already scheduled to be heard today.  And given some of

9    the history here the debtors would -- and the fact that the

10   appeal still appears pending on the District Court's docket,

11   would continue to prosecute this motion.

12          If Your Honor would like I'm happy to hand up the

13   submission by Mr. Kuntz to the District Court withdrawing his

14   appeal.

15          THE COURT:  I've already seen it.  I saw it on the

16   electronic docket.

17          MR. WAISMAN:  With that, unless Your Honor has any

18   questions, we would ask the relief be granted.

19          THE COURT:  I believe I see Mr. Kuntz in Court, am I

20   right?

21          MR. KUNTZ:  That's correct, Your Honor.  And the

22   notice was filed with the Bankruptcy Court, not the District

23   Court.  So I --

24          THE COURT:  All right.

25          MR. KUNTZ:  All I can say is that they're spinning

1    their wheels with you.

2          THE COURT:  Mr. Kuntz, I don't know if what you've

3    said has been picked up on the record.  And I don't know if you

4    want it to be.  But it may be just as well for purposes of

5    completion that you come forward, at least --

6          MR. KUNTZ:  I have no desire to come forward, Your

7    Honor.  The notice was filed in December, the debtors'

8    attorney --

9          THE COURT:  Mr. Kuntz, what I'm trying to explain to

10   you --

11         MR. KUNTZ:  I understand, Your Honor.  The answer is

12   no.  You can elaborate all you wish from the bench.

13         MR. WAISMAN:  Your Honor, for the record --

14         THE COURT:  Just so I'm trying -- I'm just trying to

15   get something established for the record.  I have no idea

16   whether or not what Mr. Kuntz said from the gallery, because

17   he's about six rows back, was picked up by the recording

18   equipment.  And so my concern has absolutely nothing to do with

19   anything that Mr. Kuntz is presently saying, as much as whether

20   or not it's being recorded.  And so this little aside is purely

21   about the integrity of the record at today's proceedings.

22         So my question, Mr. Kuntz, is whether you would like

23   to come forward simply --

24         MR. KUNTZ:  Could we put this over to February, Your

25   Honor?

25

1          THE COURT:  No.  The question is whether you would

2     like to come forward so that you can be heard.  If you don't

3     want to come forward, that's fine, in which case you don't need

4     to say anything.  But if you're going to say something in this

5     Court it's going to be recorded as part of the official record,

6     it's not going to be a catcall from the audience.

7          Do you or do you not consent to the striking of your

8     notice of appeal?

9          MR. KUNTZ:  Your Honor, I already dismissed the notice

10    of appeal and I have a copy, and it was sent certified mail to

11    the clerk.

12         THE COURT:  I don't care what piece of paper you have.

13    Do you or do you not consent --

14         MR. KUNTZ:  It's already been dismissed.

15         THE COURT:  Do you --

16         MR. KUNTZ:  No, I do not consent, because it's already

17    been dismissed as far as I'm concerned.

18         THE COURT:  Well, as far as you're concerned is

19    different from what the record reflects.

20         MR. KUNTZ:  That's fine, Your Honor.  You go ahead and

21    rule any way you wish.  I decided after evaluating the

22    situation, I thought the investment was risky.  I don't believe

23    the business rule applies for investing estate funds.  I

24    thought a prudent man rule or a very prudent man rule should

25    apply.

26

1          The creditors' committee made no objection and it

2     seemed to me related to my small interest in this estate, it

3     was basically a non-starter.

4          THE COURT:  Is it your present intention to withdraw

5     your appeal as it relates to this matter?

6          MR. KUNTZ:  Yes.

7          THE COURT:  Fine.

8          MR. KUNTZ:  Thank you, Your Honor.

9          THE COURT:  Thank you very much.  The motion to strike

10    is granted, both on the basis of the allegations in the motion

11    and Mr. Kuntz' acknowledgement that he has no intention at this

12    point to prosecute the appeal.

13         MR. WAISMAN:  Thank you, Your Honor.  I would turn the

14    podium over to Mr. Krasnow.

15         MR. KRASNOW:  Good morning, Your Honor.  Richard

16    Krasnow, Weil Gotshal & Manges on behalf of the Chapter 11

17    debtors.

18         Your Honor, the next item on the uncontested portion

19    of the calendar is the debtors' motion for authorization and

20    approval of a settlement agreement which does go beyond mere

21    settlement of disputes with the insolvency administrator of

22    Lehman Brothers Bankhaus AG, that is a Lehman Bank which is an

23    insolvency proceeding in Germany.

24         Your Honor, there is a companion motion that was filed

25    by the administrator in connection with its -- or his pending

27

1    Chapter 15 case, which is before this Court.  And with the

2    Court's permission I would suggest that following our

3    presentation with respect to the debtors' motion, it might make

4    sense to take that item, which is number 13 on the agenda,

5    immediately following.  They are parallel proceedings.

6         THE COURT:  It seems to me that we should here them in

7    tandem.

8         MR. KRASNOW:  Very well, Your Honor.

9         Your Honor, the motion currently before the Court in

10   the Chapter 11 cases is probably -- would probably be viewed in

11   an ordinary Chapter 11 case as somewhat extraordinary.  And

12   it's probably even unusual in the context of this extraordinary

13   Chapter 11 case that is currently before the Court in the form

14   of Lehman Brothers.

15        What this agreement contemplates and provides for is,

16   both resolutions of disputes with respect to certain loans, as

17   well as the acquisition of certain loans.  All of which would

18   be reflected in a transaction pursuant to which the Lehman

19   parties, which would include two Chapter 11 debtors; LBHI and

20   LCPI, paying to the administrator on a net-net basis, that is

21   after taking into account cash that is supposed to move back

22   and force, but netting that, if you will, from the purchase

23   price.  A payment to the administrator of approximately one

24   billion dollars, and the receipt by the Lehman parties, which

25   include those two Chapter 11 debtors and a non-debtor; Lehman

28

1    non-debtor, Lehman ALI, that's A-L-I, of commercial loans and

2    real estate loans which have an aggregate outstanding principal

3    balance of in excess of three billion dollars and which have a

4    value, in our view, of in excess of two billion dollars.  Large

5    sums, Your Honor, that's why I characterize this as somewhat

6    extraordinary.  But what is interesting, Your Honor, is as one

7    looks through the docket there are no objections to this

8    transaction.

9          There was one formal objection that was, indeed,

10   filed, I would style that objection as one really asking for

11   information, which was supplied and which resulted in that

12   objection being withdrawn.  There was an informal inquiry made

13   by a party which did not culminate in an objection, but rather

14   in a revision to the proposed order, which reflects that if

15   Your Honor were to approve these transactions it would be

16   without prejudice to their interests, and two other documents

17   which were filed; one by the creditors' committee and one

18   yesterday by the ad hoc committee, both of which support this

19   transaction -- or these transactions.

20         Your Honor, in light of the fact that there are no

21   objections, but, nonetheless, at least in our view, and we

22   assume the Court's view, that given the size of these

23   transactions perhaps there ought to be more of a record than

24   simply the filing of an application.  In lieu of my summarizing

25   the motion, and the events, and the agreement, what I would

29

1    propose, with the Court's permission, is to make a proffer of

2    the testimony of the Mr. Daniel Ehrman.  Mr. Ehrman is in Court

3    today.  Mr. Ehrman is a managing director at Alvarez & Marsal.

4    He's also an officer of various of the Chapter 11 debtors.  And

5    he was, in fact, the lead negotiator with the administrator,

6    Dr. Frege, who I believe is also in the courtroom, in

7    connection with his application for approval of this

8    transaction in the Chapter 15 case.  And I would offer his

9    proffer in lieu of my summary in support of the motion, if

10   that's acceptable, Your Honor.

11          THE COURT:  That's perfectly acceptable.

12          MR. KRASNOW:  Your Honor, pursuant to Rule 102 of the

13   Federal Rules of Evidence, I offer as a proffer the testimony

14   that would be given by Mr. Daniel Ehrman, a managing director

15   of Alvarez & Marsal.  As I noted, Your Honor, Mr. Ehrman is in

16   Court today and he's available for cross-examination.

17          Your Honor, if called to testify, Mr. Ehrman would

18   testify as follows:

19          Mr. Ehrman would testify that he is a managing

20   director with Alvarez & Marsal, or A&M.  And was assigned to

21   the Lehman matter in September of 2008.  His primary areas of

22   responsibilities include managing all international and foreign

23   matters of the debtors, and, also, managing and overseeing the

24   debtors' derivative transactions.

25          Mr.  Ehrman began his professional career as an

1   attorney practicing law in France for five years.  He has

2   specialized in turnaround and restructurings with A&M for more

3   than eight years, serving in a variety of interim management

4   advisory and financial restructuring roles.

5        On behalf of the Lehman debtors Mr. Ehrman led the

6   negotiations with the administrator that resulted in the

7   settlement agreement that is the subject of today's hearing.  A

8   copy of which agreement is attached to the debtors' motion.

9        Prior to its filing he also reviewed and approved the

10  debtors' motion seeking approval of the agreement, and the

11  settlement and the transactions provided for in the agreement,

12  and adopts the representations contained in the motion.

13       Mr. Ehrman would testify that he first became involved

14  with Bankhaus soon after the commencement of these Chapter 11

15  cases, participating in discussions through the months of

16  October and November of 2008 with respect to a potential

17  transaction, that if successful might have avoided the Bankhaus

18  insolvency proceedings.  In those discussions he became

19  familiar with various of Bankhaus assets and in particular with

20  the loans on Bankhaus' books that had been the subject of

21  participation with other Lehman entities.

22       While a Bankhaus insolvency could not be avoided, Mr.

23  Ehrman continued to focus on the loans, and in particular, on a

24  category of loans referred to in the motion and the agreement

25  as category 1 loans.  In light of the intercompany claims that

1   the debtors and Bankhaus have against each other and the

2   relationships between the debtors and Bankhaus with respect to

3   the participated loans.

4        Mr. Ehrman would testify that the participations

5   generally appear in two forms.  As to both forms, the

6   participations are structured with a named stated lender who

7   participates out all or a portion of the loan to a third-party.

8   One form of participation is generally referred to, at least at

9   Lehman, as U.S.-style, while the other form is generally

10  referred to as U.K.-style.

11       Generally and U.K.-style participation, the named

12  stated lender, has a legal and beneficial interest in the loan,

13  itself.  The participant, therefore, has a debtor/creditor

14  relationship with the named lender as to any claims that it has

15  for monies received by the lender from the borrower.

16       In a U.S.-style participation, on the other hand, the

17  named lender is really only a nominal lender and beneficial

18  rights lie with the participant.

19       Mr. Ehrman would testify that it is his understanding

20  that the named lender in the case of U.S.-style participations

21  has only bear legal title and that the essential difference

22  between the two forms of participations, is that the risks,

23  exposure and liability with respect to the loans in a U.S.-

24  style participation are borne by the participation.  Where

25  under a U.K.-style participation, it is the named lender that

1    bears the risk associated with and thus has the ownership of

2    the participated loans.

3         Mr. Ehrman would testify that it is his understanding

4    that although the category loans have many characteristics

5    associated with the U.S.-style of participations, they arguably

6    could be characterized as U.K.-style participations.  In which

7    case all ownership rights would reside with the named Lehman

8    lender.

9         He understands, that among other reasons, this is

10   because on or about August 15, 2002, LBHI and Bankhaus entered

11   into a security and collaborative agreement that generally

12   required LBHI to make payments to Bankhaus to the extent that

13   Bankhaus had to write down or mark down asset fields of values

14   including loans.

15        He further understands that to the extent that the

16   security and collateral agreement could be viewed as a

17   guarantee, it would shift the risks associated with the loans

18   to LBHI, which arguably could result in the recharacterization

19   and/or treatment of the category loans as U.K.-style and not

20   U.S.-style participations, such that the debtors and other

21   lenders would have all entitlements with respect to those

22   loans.  And Bankhaus would have only an unsecured claim against

23   the debtors and other lenders for the amount due it under the

24   participations.

25        The category 1 loan participations, therefore,

1    presented litigable issues concerning the true ownership of

2    those loans, and thus, an opportunity for the debtors to engage

3    in discussions with the administrator regarding the ownership

4    of these loans.  While there were some discussions with

5    Bankhaus' insolvency administrator, they're in the first four

6    to five months of 2001 regarding the category 1 loan

7    participations.  It was in or about June 2009 that substantive

8    discussions began regarding a potential resolution of the

9    status of these loans.  These discussions also expanded to

10   include discussions regarding other participated loans where

11   Bankhaus was the stated lender.  These more substantive

12   discussions extended from June or July of 2009 until almost the

13   date prior to the execution of the agreement.

14        Mr. Ehrman would testify that the parties concluded

15   that the best way to resolve the uncertainty over the ownership

16   of category 1 loans, was for the Lehman parties to acquire the

17   category 1 loans, of which there are approximately eighty-six

18   with a total outstanding balance due of approximately 2.9

19   billion.  For an appropriate purchase price that would account

20   for the litigation risks attendant to resolving the dispute and

21   the commercial risk attended to collection of the amounts due

22   under the loans.  The parties agreed on what is referred to in

23   the agreement as an applicable value that refers to the status

24   of the loans, the anticipated collections on the loans, the

25   present value of payments to be made on the loans.  Some might

34

1    say market value, I'm not sure it's reflective of market value,

2    Your Honor, but the value.

3         Mr. Ehrman would testify that the valuation of the

4    real estate loans was undertaken by Lehman's real estate team,

5    that it's managing Lehman's real estate portfolio and entailed

6    a loan-by-loan review that included cash flow analysis and

7    present value discounting.

8         Commercial loan values were developed by Lehman's

9    commercial loan team that is managing Lehman's commercial loans

10   and entailed an evaluation of market trading values associated

11   with these loans.  These values were reviewed by and agreed to

12   by the administrator and Lehman.

13        A discount of these values was then negotiated at

14   sixty percent of applicable value, or a forty percent discount

15   and the agreed purchase price with respect to the category 1

16   loans.

17        Mr. Ehrman would testify that during the negotiations

18   and as part of the overall resolution between the debtors and

19   the administrator, the administrator indicated that he also

20   wanted to include Lehman's acquisition of what is referred to

21   in the agreement and the motion as category 2 and category 4

22   loans where Bankhaus is the named lender.

23        Notwithstanding the fact that these loans are not

24   subject to any litigation issues, the inclusion of the category

25   2 loans of which there are approximately five, which have or

35

1    had total outstanding principal amounts due of approximately

2    eighty-seven million dollars, and the category four loans of

3    which there are approximately twenty-four with a total

4    outstanding principal balance due of approximately 481 million

5    dollars represented a potential pure acquisition, which Mr.

6    Ehrman would testify, the debtors concluded would be

7    appropriate if they were appropriate discounts, since it would

8    afford to the estates an opportunity to realize significant and

9    substantial value.

10           In that regard Mr. Ehrman would testify that the

11   agreement provides that there is an agreed applicable amount as

12   with the category 1 loans, and purchase price of essentially as

13   to the category 4 loans, eighty percent of that value, or a

14   discount of twenty percent.  The formula with respect to the

15   category 2 loans is characterized somewhat differently but

16   essentially results in the same formulation.

17           Mr. Ehrman would testify that the difference between

18   the discount factors of the category 1 and 4 loans, a forty

19   percent versus twenty percent, is attributable to the

20   litigation risk relating to the category 1 loans that don't

21   exist with respect to the category 4 loans.

22           Mr. Ehrman would further testify that there are

23   various other material terms and conditions of the agreement

24   relating to, among other things, indemnities, releases and

25   agreements as to certain claim amounts.  Based upon his review

36

1  of the agreement and the motion, he believes that those

2  material terms and conditions are accurately summarized in the

3  motion.

4  Mr. Ehrman would note that the agreement upon amounts

5  of the Bankhaus claims, that I've alluded to, against certain

6  of the Chapter 11 debtors, relate to category 3 loans.  Which

7  are loans where a Lehman party has all of the ownership rights

8  with respect to the loans and Bankhaus only has unsecured

9  claims against the named lender for amounts due to it as a

10  participant.  And unsecured claims against LBHI under the

11  security and collateral agreement.

12  Under the settlement agreement the administrator is to

13  be granted a non-priority general unsecured claim against LCPI

14  in the amount of approximately one billion dollars, which is an

15  amount net of certain amounts owed to LCPI with respect to

16  certain category 2 and category 4 loans.

17  The administrator will also be granted a non-priority

18  general unsecured claim against LBHI under the security and

19  collateral agreement relating to the category 3 loans and one

20  other loan in the gross amount of approximately 1.38 billion

21  dollars less any distributions that he receives with respect to

22  the allowed claim against LCPI.

23  Mr. Ehrman would note that his testimony regarding the

24  terms of the agreement represents a summary of those terms, and

25  that to the extent there's any inadvertent inconsistency with

37

1    the summary and the terms of the agreement, it is the agreement

2    that controls.

3            Mr. Ehrman would testify that subsequent to the

4    execution of the agreement, the agreement was modified or

5    amended by a consent document dated December 18, 2008 and a

6    letter agreement dated January 8, 2009, both of which were

7    filed with the Court on January 8, 2009.

8            Mr. Ehrman would further testify --

9            THE COURT:  I think you mean 2010.

10           MR. KRASNOW:  I'm sorry, Your Honor.

11           Mr. Ehrman would correct his testimony and note it was

12    2010.

13           Mr. Ehrman would further testify that he understands

14    that both of these documents were reviewed by the creditors'

15    committee and they have no objection to them.  He understands

16    that both documents take into account the fact that significant

17    principal payments were made on the affected loans, the loans

18    referred to in those documents.  And with respect to certain

19    category 2 loans, full principal payments were made by

20    borrowers which are to be acquired by the relevant Lehman

21    party.  Both the Lehman parties and the Bankhaus administrator

22    determined that these circumstances warranted modifications to

23    the agreements such that as to one loan the purchase price to

24    be paid would be reduced, and as to others, the amount of cash

25    to be received by the Lehman parties would be increased.

38

1        In sum, Your Honor, these amendments are favorable to

2   the debtors and the other Lehman parties.

3        If the motion is granted the Lehman parties will make

4   a net payment to the administrator of approximately 1.388

5   billion dollars.  Again, Your Honor, that's a gross number, if

6   you will.

7        If a closing as to all the loans takes place, this

8   amount which is subject to adjustments as provided for in the

9   agreement includes payment for cash held by the administrator

10  that will be transferred to or retained by the Lehman parties

11  such that if this account is accounted for the net-net payment

12  to the administrator will approximately be one billion dollars.

13  Again, subject to adjustments.

14       Payments for loan in cash will be made with respect to

15  loans that have an aggregate applicable value of approximately

16  2. billion dollars inclusive of approximate 442 million dollars

17  of cash.  Using October and November numbers to the cash

18  collections as of that, all of which would be transferred to

19  the appropriate Lehman parties.

20       Mr. Ehrman would testify while there -- there can be

21  no certainty as to the actual amounts that will be realized on

22  these loans, the debtors believe that based on their analysis

23  and their business judgment, it is reasonable to anticipate

24  that the Lehman parties will recover substantial amounts,

25  significantly in excess of the purchase price.

39

1          Mr. Ehrman would note that the motion does include an

2     illustrative example of an allocation of the purchase price

3     amongst the three Lehman parties.  That would be, Your Honor,

4     LBHI paying a purchase price of approximately 158 million

5     dollars.  LCPI paying a purchase price of approximately 1.2

6     billion dollars.  And Lehman ALI paying a purchase price of

7     approximately 48.4 million dollars.  However, the allocation of

8     certain loans have not been finalized particularly as between

9     LCPI and LBHI and, therefore, there could be adjustments as to

10    which of those entities would actually own certain loans and,

11    therefore, which of those entities will be paying the purchase

12    price applicable to those loans.

13          Mr. Ehrman would testify that based on discussions

14    with the debtors' counsel it his understanding that many of the

15    litigation issues and claims that would be made concerning the

16    nature of the category 1 loan participations are somewhat novel

17    in nature and the results are highly uncertain.  To a

18    significant extent, the debtors' success in litigating with

19    respect to the categorization of the category 1 line

20    participations would turn on determinations that the security

21    and collateral agreement with LBHI was a guarantee and that

22    those Lehman parties, other than LBHI who are the named lenders

23    under certain loans were, themselves, deemed to be at risk with

24    respect to the loans, that they had participated to Bankhaus

25    even though they aren't parties to the security and collateral

40

1    agreement, which naturally could raise potential mutuality

2    issues.

3         Mr. Ehrman would testify that it is clear that these

4    issues would be highly contested and the results of any

5    litigation would be far from certain.  The only certainty being

6    protracted litigation at great costs and with risks that while

7    the parties were fighting about who owned the loans, no one

8    would be devoting the necessary resources to managing the loans

9    and maximizing their value.

10        Mr. Ehrman would testify that it his view that the

11   forty percent discount against applicable value of category 1

12   loans more than adequately takes these risks into account and

13   is more than reasonable.

14        Mr. Ehrman would also testify that the debtors believe

15   that their decision to acquire all of the loans covered by the

16   agreement, taking into account the potential significant total

17   recoveries that they might realize on these loans even given

18   the collection risks inherent in any loan at the discounts

19   provided for in the agreement, represents an exercise of

20   prudent business judgment.  In that regard Mr. Ehrman would

21   note that no creditors have challenged the debtors' business

22   judgment, and the creditors' committee, which was kept abreast

23   of the negotiations and undertook its own analysis of the

24   transactions, supports the debtors' motion.

25        In conclusion, Mr. Ehrman would testify that in light

41

1  of all of this, the debtors believe that the agreement is in

2  the best interest of their estates and creditors and should be

3  approved.

4        Your Honor, that would conclude Mr. Ehrman's proffer.

5        THE COURT:  Is there any party who would wish to

6  cross-examine Mr. Ehrman with respect to the proffer? I hear no

7  such request I accept the proffer as the functional equivalent

8  of live testimony by Mr. Ehrman who is in Court.

9        MR. KRASNOW:  Thank you, Your Honor.  Your Honor,

10  based upon the proffer, the motion -- the amendments to the

11  agreement that have been filed with the Court, the statements

12  in support, we would respectfully request that the Court

13  approve the motion, approve the settlement agreement and all of

14  the transactions contemplated by that agreement.

15        THE COURT:  All right.  I note that there are

16  statements that have been made by, both the creditors'

17  committee and the ad hoc group of creditors in support of this.

18  I'll just ask whether there's any desire for comment before I

19  rule with respect to the motion?  Apparently not.

20        I've read the motion and I appreciate being informed

21  further by means of the offer of proof of Mr. Ehrman's

22  testimony concerning the business judgment, which underlies the

23  transaction which has been characterized by counsel as unusual

24  and which I view as unusual myself, independently.

25        One of the more unusual aspects of the transaction is

42

1    that it involves a very significant acquisition of financial

2    assets as a means to, both resolve litigation risk and to

3    potentially realize gain.  In light of the fact that the

4    creditor constituencies that have observed this and who have

5    studied it support the transaction and in light of the fact

6    that Mr. Ehrman of Alvarez & Marsal has dedicated significant

7    personal time and attention to analyzing the risks and rewards

8    of the transaction, I'm satisfied that this represents a

9    prudent exercise of the debtors' business judgment.  And

10   significantly reduces litigation risk.

11           Under the circumstances, I'm pleased to approve the

12   motion as presented.

13           MR. KRASNOW:  Thank you, Your Honor.  Your Honor, we

14   had filed with the Court, I believe yesterday, a blackline of a

15   revised form of order which took into account, among other

16   things, the resolution of some issues that had been raised by a

17   party who had not filed an objection, that just without

18   prejudice language.  That revised proposed order was reviewed

19   by the administrators counsel and the committee and they have

20   no objection.

21           Subsequent to that, in reviewing the order, we caught

22   a typo.  The decretal paragraph in question we think clearly

23   authorizes the debtors to proceed with the transaction, but

24   there was a word missing "authorize" and so the order has been

25   further revised.  That has been reviewed by, both the committee

43

1    and the administrator, and we would propose, Your Honor, at the

2    conclusion of today's hearings to provide that with the Court.

3         THE COURT:  Fine.

4         MR. KRASNOW:  I think, Your Honor, at this point it's

5    probably appropriate to turn over the rostrum to the

6    administrator's counsel.

7         THE COURT:  Very well.

8         MR. YATES:  Good morning, Your Honor.  Farrington

9    Yates with Sonnenschein on behalf of Dr. Michael C. Frege, the

10   insolvency administrator for Lehman Brothers Bankhaus AG, and

11   insolvents.

12        And as Mr. Krasnow noted we had also filed in our

13   Chapter 15 proceeding a parallel motion to approve the

14   settlement agreement as some of the assets that were included

15   and affected by the settlement agreement were located within

16   the territory of the United States.

17        I have with me Mr. Frege.

18        DR. FREGE:  Good morning.

19        MR. YATES:  As by way of background, Your Honor, as

20   the Court may recall, on April 29th Dr. Frege filed the

21   petition for recognition under Chapter 15 with this Court.  And

22   on May 22, 2009 the Court entered the order granting

23   recognition to Dr. Frege as the foreign representative.  And

24   also recognizing the Bankhaus insolvency proceedings in Germany

25   as a foreign-named proceeding.  And with respect to that

44

1    particular recognition order, so far we were able to work

2    through a number of issues with respect to administering the

3    estate.  And that -- one of them is the settlement agreement

4    and that's one of the reasons why we're here.

5         Our parallel motion is to seek approval of the

6    settlement under Section 363 of the Bankruptcy Code as

7    incorporated by Sections 1520 of the Bankruptcy Code, as I

8    said, because the settlement involves U.S. assets of Bankhaus.

9         With respect to the motion in the Chapter 15

10   proceeding, we provided notice to all of the parties that were

11   to be given notice in the Chapter 15 proceeding.  We refer to

12   that as the notice parties.  And also because of the notice

13   that was given in the LBHI case, generally, we believe that any

14   party that has any interest in being heard today has had the

15   opportunity to understand the motion and the impact.  And in

16   the Chapter 15 proceeding, as Mr. Krasnow had mentioned in the

17   LBHI proceeding, no objections have been filed.

18        The motion essentially requests approval of the

19   settlement from the Bankhaus perspective.  And in that light,

20   Mr. Frege believes that the settlement -- I'm sorry, Dr. Frege

21   believes that the settlement demonstrates an exercise of his

22   sound business judgment as the insolvency administrator of the

23   Bankhaus estate.  And that the settlement is in the best

24   interest of the creditors of the Bankhaus estate, is fair and

25   equitable and is within a range of litigated outcomes in the

45

1    event that, in fact, the issues were litigated.

2          As Mr. Krasnow spent some time and also with the

3    proffer of Mr. Ehrman's testimony, outlining the settlement

4    terms and conditions, I won't belabor the points or try to get

5    through and summarize them again, so that we won't waste time.

6          Dr. Frege was involved personally in the negotiations

7    with respect to this settlement agreement.  And settlement

8    negotiations were extensive and they were at arms length, and

9    this agreement was heavily negotiated.

10          However, notwithstanding that there were extensive

11   negotiations, he does believe that the settlement discharges

12   his duty as an insolvency administrator for the German estate

13   to liquidate assets in a commercially reasonable way.  And that

14   is essentially the standard by which he has held in Germany.

15          Now, in the exercise of his judgment and with respect

16   to entering into the settlement agreement, he also evaluated

17   the litigation risks.  And as Mr. Krasnow described to the

18   Court, there is significant risk with respect to the

19   characterization of these loans and participation interest.

20   And the issues were novel, and, again, if there was litigation

21   it would be protracted and costly.

22          And so in light of the dispute on the merits and in

23   light of the timing, as far as how long it might take in order

24   to resolve these issues, Dr. Frege evaluated these points among

25   others in deciding to enter into the settlement agreement.

46

1          As Mr. Krasnow had referenced, the length of time with

2    respect to litigation who would administer the assets during

3    the dispute, that was also an issue.  Also the value of the

4    assets might change over a period of time.  And, also, there

5    was a potential for exchange rate and currency risks from the

6    German perspective.  And, so, with respect to the settlement

7    the benefits to the Bankhaus estate include the following:

8          Essentially it yields now money and it monetizes

9    assets so that Dr. Frege can then take the money and make

10   distributions to creditors in Germany.  Because there is -- the

11   assets are being monetized now as opposed to sometime in the

12   future, there is also time value to having the money delivered

13   to the estate now as opposed to ten years from now at the end

14   of any sort of protracted litigation.

15         The Lehman parties will take these assets.  And so

16   they will take on the risk of these assets.  As far as the

17   valuation going up and down, whether they can be administered,

18   if there's going to be any collection risks, et cetera.  And so

19   from the Bankhaus perspective that was a positive to entering

20   into this agreement, it transfer the risk of ownership to the

21   Lehman parties.

22         As Mr. Krasnow also mentioned, Bankhaus receives

23   substantial allowed general unsecured claims against certain

24   Lehman entities.  And, again, as opposed to litigating those

25   issues with respect to guarantee, whether they're not

47

1    guarantee, whether the security and collateral agreement has

2    the effect that Mr. Krasnow suggested, these are all issues

3    that could be litigated but they're resolved pursuant to the

4    settlement agreement.

5           So, overall, we believe and Dr. Frege agrees, that

6    this settlement agreement is also in the best interest of the

7    Bankhaus creditors.

8           With respect to creditor approval, there's a creditors

9    assembly in Germany and a creditors' committee, which is a

10   smaller subset.  Both have vetted this settlement agreement,

11   and both have approved it.  Now, as Mr. Krasnow mentioned with

12   this last minute letter agreement and consent that was filed

13   earlier in the week, Dr. Frege needs to go back to the creditor

14   committee, he will do so after this hearing.  And assuming that

15   the motion is approved confirm with them and then proceed to

16   closing.  And all of this is provided for in the agreement.  So

17   from his perspective as far as the overall construct of the

18   settlement agreement, et cetera, it's been approved by

19   creditors in Germany.  And under German law there's no German

20   court that has to approve this settlement, it's really only

21   done in material matters, the administrator is instructed to

22   consult with creditors; the credit assembly and the creditor

23   committee, before taking material lapse, and as I've mentioned

24   he is about to.

25          I also have a proffer of Dr. Frege.

48

1        THE COURT:  It sounds as if you've already given it.

2        MR. YATES:  Well, if you want for me to proceed that

3   way we can certainly do so.

4        THE COURT:  No, it's fine, I'm happy to hear your

5   proffer.  But note that I've already heard quite a lot about

6   what I assume will be the substance of the proffer by virtue of

7   the presentation you've already made.

8        MR. YATES:  I think you're right, Your Honor.

9        I'll proffer as follows:

10       This proffer will serve as the testimony of Dr. Frege.

11  If he were to take the stand and to testify, he is present here

12  in the courtroom, and if so, taking the stand would testify as

13  follows:

14       I am Michael C. Frege.  I am the court appointed

15  insolvency administrator for Lehman Brothers Bankhaus AG, which

16  is In Insolvenz proceedings in Germany.

17       I've been an insolvency administrator for over twenty

18  years.  I have a degree in law and also a doctoral degree,

19  hence Dr. Frege.

20       He is a member of a number of professional

21  organizations in Germany with respect to insolvency and also

22  has a number of certifications as an insolvency practitioner in

23  Germany.

24       He is a published author and has published the leading

25  treatise on German insolvency law and practice, and he is also

49

1    a mediator.

2         He has been involved in over 800 insolvency

3    proceedings in German.

4         Under German insolvency law the insolvency proceeding

5    in which Bankhaus is subject the purpose of it is to liquidate

6    assets.  And German authority permits and authorizes the

7    insolvency administrator to liquidate assets in the best

8    commercial way and within the exercise of his discretion.

9         I am very familiar with the settlement agreement.  I

10   directed the negotiations from the Bankhaus side and was

11   personally involved.  I've heard the description of the

12   settlement agreement from Mr. Ehrman and would concur with his

13   description.

14        And I would, in my view, the settlement agreement as

15   described previously impacts U.S. assets of Bankhaus located

16   here, within the territory of the United States.

17        And the settlement agreement was negotiated

18   extensively and over an extended period of time.

19        In my view, the settlement is in the best interest of

20   the Bankhaus estate.  The dispute involving the litigation

21   risks described with respect to loans versus participation and

22   in characterization and the owners of each presented a risk

23   that would be litigated if not settled.  If litigated in my

24   view the litigation would be protracted and costly.  During

25   that time, because neither party would have ownership, per se,

1    to these assets, neither party; the Lehman parties nor

2    Bankhaus, would be administering those assets.

3        The settlement agreement offers an opportunity to

4    monetize these assets now, which is consistent with my mandate

5    under German law.  The result yields settlement -- yields

6    certainty and it also yields immediate cash.  That immediate

7    cash has a value now as opposed to over time in the event that

8    we were ultimately successful at some point in the future.  The

9    Lehman parties will also take risk of ownership of these assets

10   going forward, and in that way they will also bear the risk of

11   changing market values for the loans or participations.  If

12   there is any sort of exchange rate volatility they will also

13   take on that risk.  And I intend to take this money and make a

14   distribution to creditors hopefully in the spring.

15       Moreover, Bankhaus as part of the settlement, receives

16   substantial allowed claims against the Lehman parties' estate.

17   I have discussed these matters and the settlement agreement

18   with the creditors assembly.  It has vetted and approved this

19   agreement.  I've also met on a number of occasions with the

20   creditors' committee, in at least seven meetings, and have also

21   vetted the settlement agreement.  Both have approved this

22   settlement agreement and both have authorized Dr. Frege,

23   myself, to execute and sign the agreement.

24       In light of the settlement -- I'm sorry, the

25   settlement letter that was just supplemented, I intend to meet

1   with the creditors' committee next week to advise them of these

2   proceedings and the conclusion, and then move to closing as

3   provided for in the agreement.  And under German law there's no

4   requirement for a court authority in Germany to enter into this

5   agreement.

6          So, in conclusion, entering into the settlement

7   agreement, in my view, reflects a demonstration of sound

8   business judgment as an insolvency administrator under the

9   circumstances.  I believe that discretion is sound and it's

10  within my authority as an insolvency administrator for

11  Bankhaus.

12         It is also in my view, the settlement agreement is

13  fair and equitable and in the best interest of creditors of the

14  Bankhaus bankruptcy estate.

15         That would be Dr. Frege's testimony if called.

16         THE COURT:  Is there any party who objects to my

17  receipt of the offer of Dr. Frege's testimony by means of his

18  counsel's proffer?  There's no objection and I accept the

19  proffer.

20         MR. YATES:  Thank you, Your Honor.  With that, we

21  would also then move for approval of the settlement agreement

22  in the Chapter 15 proceedings.  And for the Court's

23  information, the way that we have structured the order is that

24  we make relevant findings with respect to the Chapter 15

25  process, filing service, et cetera.  But then essentially we

52

1    incorporate by attaching the order that would be entered with

2    respect to the LBHI proceedings.  And in that way we retain

3    consistency between both documents.  So our order is going to

4    be, you know, considerably less voluminous, but, essentially,

5    it will incorporate it by reference as if attached.

6             THE COURT:  It's your Chapter 15 case.  And if that's

7    what you want, that's fine.

8             MR. YATES:  All right.  Thank you, Your Honor.

9             THE COURT:  I'm prepared to enter the order in the

10   form that it has just been described in the Chapter 15 case.

11   This now becomes I think the longest uncontested matter in the

12   history of the Lehman bankruptcy.  And appears to represent one

13   of those unusual win-win circumstances in which parties on both

14   sides of the litigation risk recognize that there are mutual

15   advantages to an early settlement and a businesslike settlement

16   as opposed to a litigated outcome.  I think for that reason

17   it's worth the time, and I also think it's a good example for

18   others to emulate.

19            I assumed by virtue of the proffer just made of Dr.

20   Frege's testimony that the ability to monetize assets and to do

21   so promptly represented a significant reason that supported the

22   business judgment of Dr. Frege because the insolvency regime in

23   Germany is focused on liquidation in a commercially reasonable

24   manner.

25            To the extent that it is helpful to his process for me

53

 1    to confirm that I believe that what has been represented

 2    constitutes a commercially reasonable liquidation, I so order

 3    the record.

 4            Now, is there anything more for this?

 5            MR. YATES:  Your Honor, I have a proposed order.

 6            THE COURT:  You can -- why don't you just give that to

 7    Mr. Krasnow to --

 8            MR. YATES:  Sure.

 9            THE COURT:  -- hand up when he hands up everything

10    else at the end of today's --

11            MR. YATES:   Thank you, Your Honor.

12            THE COURT:  Fine.  And if you wish to be excused, you

13    may be excused.

14            MR. YATES:  Thank you.

15            THE COURT:  And if you wish to stay you're perfectly

16    welcome to stay.

17            MR. KRASNOW:  Your Honor, before we get to the next

18    item, in that regard, just to advise the Court Mr. Ehrman does

19    need to leave.  Among other reasons, we are holding the third

20    global protocol meeting this time in New York, and his

21    attendance is required and mine will be.  But if those who need

22    to attend that meeting may be excused and we can then proceed

23    to what is the contested section of the calendar.

24            THE COURT:  That's fine.  I'm just going to make the

25    suggestion that at the next omnibus hearing in February that

54

1    there be a brief status report as to the progress, if any, made

2    at this most recent meeting of the parties pursuant to the

3    protocol.

4            MR. KRASNOW:  I'm sorry, Your Honor.  We would intend

5    to do so.

6            THE COURT:  Great.

7            MR. KRASNOW:  Your Honor, the next matter on the

8    calendar which is the contested portion may be shorter than the

9    uncontested portion, is item number 6.  It is the motion of

10   Merrill Lynch International for relief from the automatic stay.

11           Your Honor, this is styled as a status conference.  At

12   the omnibus hearing Your Honor heard arguments with respect to

13   that particular matter.  And before we get to the substance of

14   that I'd like to make an application to the Court.

15           There was much discussion, Your Honor, with respect --

16   at the last hearing about the request that Merrill had been

17   making -- was making, the potential implications, if any, that

18   it might have with respect to a whole series of similar notes

19   that had been issued by the Lehman Dutch entity referred to as

20   LBT.  And Your Honor heard from counsel representing the Dutch

21   trustees in that regard, who I believe is in the courtroom now.

22           THE COURT:  Yes, he is.

23           MR. KRASNOW:  While we certainly have firm views which

24   were expressed at that last hearing with respect to this

25   motion, subsequent to the matter being heard then we thought

1   that what might make the most sense, is rather than dealing

2   with this acceleration, automatic stay issue, in the context of

3   the Merrill Lynch motion, that we be afforded an opportunity,

4   particularly given that we have the global protocol meetings

5   this week, and plan on having separate meetings on this issue

6   among others with the Dutch trustee and his respective Dutch

7   and U.S. counsel if this matter were adjourned to February, to

8   see whether or not as a result of those discussions there was a

9   more global approach, if you will, that could be taken with

10  respect to the acceleration, automatic stay issue.  We made

11  that request of Merrill, they're not prepared to adjourn this

12  matter, and so I make this application to the Court, if you

13  will, for the Court to consider an adjournment of this hearing

14  to the February hearing to afford us an opportunity to have the

15  kinds of discussions I've just described with the Dutch

16  trustee.  And depending upon what the outcome of that may be,

17  obviously, then with Merrill, rather than proceeding to deal

18  with the automatic stay issue, albeit, it's limited to Merrill,

19  but could have broader implications.  Again, rather than

20  pursuing the merits of that today.  So that is our request.

21        THE COURT:  All right.  Does Merrill oppose that

22  request?

23        MR. KRASNOW:  Yes, they do, Your Honor.

24        THE COURT:  Okay.  I guess I'll hear the reason why.

25        MR. ZIMMERMAN:  Good morning, Your Honor.  George

56

1    Zimmerman of Skadden Arps on behalf of Merrill Lynch

2    International and certain of its affiliates.

3         We do oppose the motion for adjournment.  And if I can

4    just --

5         THE COURT:  Let's just say that you were to prevail

6    what would I do with this today?  I expected the parties to

7    have worked out, consistent with comments that I made from the

8    bench, a stipulation which would be presumably entered as an

9    agreed order.  If not, you run the risk of losing, don't you?

10        MR. ZIMMERMAN:  Yes.  And that's just --

11        THE COURT:  Is that what you want to have happen?

12        MR. ZIMMERMAN:  No.

13        THE COURT:  Okay.  So why do you oppose this --

14        MR. ZIMMERMAN:  Two reasons.  We did pursuant to your

15   instructions submit a proposed order that was very simple,

16   because you had dictated what you thought the parameters should

17   be last time.

18        THE COURT:  It wasn't exactly dictated as much as

19   musings from the bench.

20        MR. ZIMMERMAN:  No, fair enough.  Musings from the

21   bench.  That basically, forget the words for a second, would

22   say that Merrill Lynch has the ability to serve its notice of

23   acceleration on LBHI, with no deleterious impact whatsoever on

24   LBHI, and reserving all parties' rights to do whatever -- to

25   argue whatever they want if and when we have to come before

57

1    you.  And it would be without prejudice to everybody's rights.

2         We submitted it -- now, we submitted the draft

3    language to LBHI.  We then asked for comments followed-up and

4    they said they'd like an adjournment to discuss a global

5    protocol with the LBD trustee.  We have no problem, we know you

6    are very respectful of global protocols, as are we.  Merrill

7    Lynch has no objection to them having whatever discussions they

8    want.  They've had two months to try to start that, they can

9    take as much time as they want.  Nothing about the proposed

10   order, which I'll get to in a minute, would impact in any way

11   their ability to have those discussions.  However, an

12   adjournment has two adverse effects on Merrill Lynch.

13        And you will recall, Your Honor, that a lot of the

14   other noteholders of LBT have already, without coming to this

15   Court, served their notices of acceleration.  As a result of

16   that in the LBT the trustee has issued some guidelines as to

17   how they may or may not value the claims.  I don't know that

18   there -- I'm not constraining the trustee in any way.  He's

19   free to calculate any way he wants he can change.  But based on

20   his current guidelines and without prejudicing our rights, let

21   me just put it this way.  There is a risk that because Merrill

22   Lynch has not -- has come to Your Honor in respect to you

23   prerogatives of this Court before serving a notice of

24   acceleration, the claim of Merrill Lynch continues to diminish

25   because it hasn't accelerated in LBT.  It's continuing to be

58

1   discounted.  All the other noteholders that have served their

2   notices without coming to Your Honor don't have that problem.

3   They've cut off the discount, arguably.  Therefore, by coming

4   to you and now adjourning it, not only is Merrill Lynch being

5   damaged vis-a-vis the other creditors, but we are -- in effect,

6   we are being subordinated to those noteholders who rightly or

7   wrongly did not come to you to do that.  So the problem is

8   entering into the order, the agreed order, that we would

9   propose to Your Honor has no bearing whatsoever, has no

10  interference with LBHI's ability to discuss it -- global

11  protocol with the trustee.  We're all for that.  Because if it

12  works we can be part of it, we're fine.  That's not a problem.

13  If we have an objection we can come to you at the appropriate

14  time.  So there's no adverse impact in their ability to do

15  that, but Merrill Lynch gets affirmatively hurt or could be --

16  I want to reserve my rights, could be affirmatively be hurt by

17  their claim being diminished by having adjournment.

18       And if I may talk about just briefly, because it is

19  really brief, when we submitted out proposed order after the

20  adjournment issue was discussed, LBH marked up our order and

21  had their own version.  All in -- we incorporated virtually all

22  their changes.  The one I think substantive issue is this.

23       The language we are proposing and we got the

24  transcripts and we understand your musings, Judge, but we tried

25  to now track your language.  And what you said was and what we

59

1     put in was, that when Merrill Lynch serves its notice of

2     acceleration across the board, to the extent that in any way at

3     the end of the day augments its claim, then that will have no

4     deleterious impact whatsoever, on these Chapter 11 proceedings,

5     subject to further order by Your Honor.  It explicitly reserves

6     everybody's rights to argue whatever they want about how the

7     claim should be calculated here.  And it explicitly reserves

8     LBH's right -- LBHI's right to argue that somehow if they want

9     to challenge the validity enforceability of the guarantee, they

10    can do that, too.  So it is without prejudice to anything.  By

11    definition it can impact their ability to get the global

12    protocol they want.  It preserves our rights and Merrill

13    Lynch's claim from being diminished.  And we think it's exactly

14    what mirrors what you had -- your musings last time.  We're

15    happy to show it to you and you can mark it up any way you

16    want.  But we don't think it's appropriate to put this off

17    again two months after we moved to begin a dialogue about a

18    global protocol that they're free to make whether you enter

19    this order or not.

20         THE COURT:  I'd like to hear from Mr. Mayer in a

21    couple of respects.  First, I'd like to understand the nature

22    of the prejudice in the Netherlands proceeding that has just

23    been alluded to and whether or not it's possible to stipulate

24    around that problem by agreeing that an acceleration that takes

25    place pursuant to court order would be as of, say, today's

60

1    date, which would be the functional equivalent of giving both

2    sides a little bit of what they want without my having to rule.

3    That's my first question.

4         My second question is whether or not you can comment

5    about the potential loss of position expressed by Merrill

6    Lynch's counsel associated with delay in acceleration?  Is that

7    an appreciable issue as you understand Netherland's proceeding.

8         MR. MAYER:  Thank you, Your Honor.  Can I address them

9    both together?  They're kind of --

10        THE COURT:  Absolutely.

11        MR. MAYER:  -- very merged.  For the record, Thomas

12   Moers Mayer of Kramer Levin Naftalis & Frankel for the LBT

13   trustees, I'll give the reporter the exact spelling at the end

14   of the hearing, if that's okay.  It's like their names are

15   lengthy.

16        Your Honor, Dutch bankruptcy law is well over 100

17   years old.  And part of our problem with dealing with claims is

18   that we write on an extremely inadequate slate.  And I say this

19   as someone whose knowledge of Dutch law has increased meeting

20   by meeting with sessions with my client.

21        But there is a concept of discounting back to present

22   value depending on when an acceleration occurs.  And I think

23   that what Merrill Lynch is concerned about is that to the

24   extent the date of acceleration is pushed off their claim will

25   be further discounted by the passage of time.  So I understand

61

1    Merrill Lynch's argument.  I can't tell you that I support it

2    or not for the following reason:

3          My client has not decided whether or not the filing of

4    an acceleration notice, in and of itself, irrespective of the

5    automatic stay stops discounting or not.  As I said at our last

6    hearing we're not eager to run to conclude to draw the explicit

7    conclusion that the automatic stay has no force and effect and

8    we will take acceleration notices without regard to what this

9    Court does, but we might get there.  And if we get there then

10   there is no prejudice to Merrill Lynch, their notice is the

11   same as everybody else's notice, whether or not relief from the

12   stay is granted.

13         If we decide that everyone needs to get relief from

14   the automatic stay in order for us to recognize the notice yes,

15   then, Merrill Lynch is first past the post and they're getting

16   a benefit over all of the 394 other notices that were filed as

17   of yesterday, according to my client.

18         We're not in this to give Merrill Lynch a leg up on

19   anybody else, we're in this for administrative deficiency.

20         If I have to rank my preferable outcomes and we filed

21   papers basically in an observer's status, I'm not here

22   objecting to Merrill Lynch's motion, I'm -- we supported

23   particular relief being a finding that the automatic stay did

24   not affect calculations in the Netherlands because we had our

25   very own -- our own parochial, if I may, interest at heart.

62

1    First, we wanted to treat everybody equally in the Netherlands.

2    And, second, Your Honor, the process of determining claims

3    under these notices is very difficult.  To give you just one

4    example, a couple of months ago we gave a trial run on one

5    issue of these notes to the folks at LBHI and it took them a

6    week.  There are 4,000 notes.

7         Now, hopefully, whoever does this gets better with it

8    over time, because 4,000 times one week and we're here a long

9    time.  But the point is the work of determining how to

10   calculate these notes is ongoing and it will pick up steam.

11   And there is a benefit to certainty.  My client is meeting with

12   the debtors on Friday.  This is an issue we hope to address.

13   In our view, what is most important is that there is a uniform

14   determination that we can reach, that both accords appropriate

15   deference to this Court and treats everybody the same.  So I'm

16   not unsympathetic to the debtors' request for an adjournment so

17   that we can work all this out, but I am also not unsympathetic

18   to the notion that this thing shouldn't linger.  Because if

19   we're continuing to make determinations on claims and then the

20   legal framework isn't solid, we may have to do them again, and

21   that's a bad idea.

22        So I guess, bottom-line, I can't tell you Merrill

23   Lynch is going to be prejudiced because I don't know which way

24   we're going to come out, on whether their notice is effective

25   without relief, or not effective without relief.  And I can't

63

1    say that there is a meeting set up to discuss a global protocol

2    solution to this on Friday with the company.  If the Court

3    provides an adjournment we'd more than understand it, but we

4    would hope that this process doesn't linger and at some

5    point -- and maybe we need to file a separate set of papers to

6    specifically ask for this relief in our own hook, that the

7    Court does enter an order providing that nothing -- that no

8    notice of acceleration shall have any affect on the

9    administration of the U.S. estate, but that the automatic stay

10   does not provide that notice of acceleration of whatever effect

11   it may be given in the administration of the Dutch estate.

12        THE COURT:  I don't want to get into the practice of

13   once again drafting orders from the bench off the cuff.  And

14   everybody is stating their own positions, and that isn't

15   necessarily what will be in the order to be entered.

16        I took a look at my calendar and I note that I have

17   some Lehman time set aside at 2 o'clock on the 21st.  I believe

18   that is in connection with certain adversary proceedings.  My

19   inclination having heard the various arguments is to give the

20   protocol process a chance to globalize, to use Mr. Krasnow's

21   term, this issues as it relates to the Merrill Lynch notice of

22   acceleration.  And in particular to allow the parties to speak

23   principal to principal with the advice of lawyers to try to

24   develop a broader application to this potential blunt

25   instrument that we're creating.  And, so, I will adjourn this

64

1    to the 21st at -- I have a 2 o'clock note on my calendar.  I

2    don't know what the precise time will be.  And rather than have

3    the lawyers who are involved in what I hope will be a very

4    concise presentation of we have an agreement sit around

5    waiting, perhaps we'll calendar that for later in the afternoon

6    at a time to be determined once I have a better understanding

7    of what the agenda looks like for January 21.

8            I'm sensitive to the arguments made by Merrill Lynch's

9    counsel that there is some potential prejudiced associated with

10   delay, but I can see no appreciable prejudice associated with

11   the delay of about one week.  And I also recognize from Mr.

12   Mayer's remarks that prejudice is entirely hypothetical at this

13   moment, and may not exist at all based upon the procedures to

14   be adopted by the trustee in the Netherland's proceeding.  So,

15   with that, we'll adjourn it at least until the 21st without

16   their being any assurance that I will enter any order on that

17   day.  It will once again be a status report with the hope for

18   result being that the very diligent and intelligent lawyers who

19   are involved on all sides will not choose to make this a

20   contested proceeding.  Because as was noted in the earlier

21   uncontested matter, there is litigation risk to be avoided.

22           MR. MAYER:  Thank you, Your Honor.  May I be excused?

23           THE COURT:  You may.

24           MR. MAYER:  And may I approach the reporter with the

25   correct spelling of my client's name?

65

1          THE COURT:  You may.

2          MR. KRASNOW:  Thank you, Your Honor.  And if I may be

3     excused to attend the global protocol meeting?

4          THE COURT:  You certainly may.

5          MR. KRASNOW:  Thank you, Your Honor.

6          THE COURT:  And anyone else who needs to be excused or

7     who wants to leave may also leave.

8          And for those who are listening in on the telephone

9     please make sure that your phones are muted.

10          MR. WAISMAN:  Your Honor, Shai Waisman for Lehman

11     Brothers.

12          We are now at matter number 7 on the amended agenda

13     filed last night.  This is LBHI's motion for authorization to

14     sell certain asset backed securities and related relief.

15          By this motion, Your Honor, the debtors seek three

16     forms of relief.  Establishment of procedures to sell asset

17     backed securities with an approximate value of about 180

18     million dollars authorizing the debtors to, in essence,

19     authorize Neuberger Berman, who manages these securities, to

20     exercise rights that come along with the ownership of those

21     securities and authorizing the debtors to hedge against certain

22     risks in the ownership of the securities in certain amounts

23     specified in the order.

24          Your Honor, the motion was filed on December 23rd and

25     served, objection deadline was January 6th.  One objection was

1    filed, that was the objection of U.S. Bank.  Your Honor, the

2    debtors have spoken at length to U.S. Bank have provided U.S.

3    Bank with a list of securities.  U.S. Bank has indicated that

4    based upon its review it does not believe it has any interest

5    in the securities and has asked that the debtors also represent

6    on the record, which I am now doing, that we do not believe

7    that U.S. Bank has any interest in these securities.  And with

8    that representation, that objection has been withdrawn.

9         I'm happy to answer any questions Your Honor may have.

10   Otherwise, we ask that the order be entered authorizing the

11   relief requested.

12        THE COURT:  Does anyone wish to be heard with respect

13   to this matter?  Apparently, somebody does.

14        MR. PRICE:  Craig Price from Chapman & Cutler on

15   behalf of U.S. Bank.

16        And I'm just confirming what the debtor said is indeed

17   correct.  We have reviewed the list of securities to be sold,

18   and U.S. Bank does not believe -- it does not appear that any

19   of them are related to U.S. Bank.  So we're withdrawing our

20   reservation on that.

21        THE COURT:  Everybody seems to stipulate that you have

22   no interest here.

23        MR. PRICE:  That's right.

24        MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank

25   Tweed Hadley McCloy, on behalf of the committee.

1          I'm just confirming that we have reviewed this motion.

2     And, in fact, our derivative subcommittee signed off on it.

3     Provides for a role for the committee that's comparable to the

4     role it has with respect to other asset classes and we're

5     comfortable with the procedures as proposed.

6          THE COURT:  Fine.  This is now an uncontested matter

7     and it's approved.

8          MR. WAISMAN:  Thank you, Your Honor.  The next matter

9     on the calendar is a motion of Seattle Pacific University.  And

10    I would ask their counsel to come forward on the matter.

11         THE COURT:  Okay.

12         MR. MICHAELSON:  Good morning, Your Honor.  Robert

13    Michaelson of K&L Gates on behalf of Seattle Pacific

14    University.

15         This is a motion to compel the debtor to assume or

16    reject an interest-rate swap agreement.  By way of background

17    my client is a not-for-profit educational institution located

18    in Seattle.  It is not well endowed.  This agreement was

19    entered into in order to hedge its liability under a twenty

20    million dollar bond use for the construction of facilities at

21    the college.  In other words, this agreement is an insurance

22    policy against unforeseen or excessive increases in the

23    interest rate because it's a floating rate.

24         Now, there is a representation been made to the Court

25    by debtors' counsel that we had an opportunity to reject this

68

1    agreement pursuant to 560, to walk away from it pursuant to the

2    Safe Harbor provisions.  We did not.  And the reason we did not

3    was because we were under the impression based on conversations

4    with debtors' counsel that this agreement would be assumed and

5    assigned, or at least a strong effort would be made, and that

6    there would be a possibility -- I don't want to characterize

7    the likelihood of the possibility.  We relied on that and we

8    reserved our rights accordingly.

9         It became obvious to us over time that this wasn't

10   going to happen.  And we became increasingly concerned about

11   what would ultimately become of our position should this be

12   rejected.  At this point we are paying, as we're required to

13   under the agreement, but we're really paying for an insurance

14   policy that won't be there should we ever need it.  We need to

15   cover ourselves and we understand that in order to do that we

16   need to extricate ourselves from this agreement.

17        We don't believe that this agreement is one that is

18   readily assignable for one reason that's a bit peculiar to this

19   agreement.

20        THE COURT:  I read that in your papers and I

21   understand the issue of one-way posting of collateral in this

22   particular transaction.  I gather that Lehman is required to

23   post collateral but your client is not.  And as a result from

24   the perspective assignee, you at least allege that that makes

25   this a difficult agreement to assign, correct?

1          MR. MICHAELSON:  That is correct, Your Honor.

2          THE COURT:  Okay.  I understand that's your argument

3     but it's just an argument.  And I don't know anything yet about

4     the actual marketing efforts with respect to this swap

5     agreement, nor do I have any expert reports or testimony to

6     confirm the allegation.  So I want you to know that at least

7     from an evidentiary perspective, I accept what you're saying,

8     but I have no way of knowing if it's correct.  And it's not

9     going to be determined today.

10          MR. MICHAELSON:  I understand that, Your Honor.

11     However, even aside from that issue we do know one thing.  We

12     know that it has not been assigned as of this date.  I don't

13     think that the debtor is going to deny that efforts have been

14     made and that those efforts have been unsuccessful.  In the

15     meantime, we continue to be paying what are essentially

16     premiums on an insurance policy that will not be there should

17     circumstances change, interest rates are obviously the

18     governing force here, and we will be left naked.

19          I know there are other institutions that have these

20     sorts of contracts.  And I simply want to reiterate what I said

21     at the beginning of my presentation, which is this is an

22     institution that is not wealthy that depends very heavily on

23     its ability to finance these construction bonds.  And if the

24     interest rate were to shift dramatically they would not have

25     the reserves of an institution like a Harvard or Yale in which

70

1    to cover these.  So they're left exposed and need to protect

2    themselves.  And all we're asking for at this point is for the

3    debtor to make up its mind so that we can do what we need to

4    do.  If there is an assignee out there we'd be delighted.  But

5    if there is no assignee and there is no prospect for an

6    assignee in the immediate future leave us to do what we need to

7    do to protect ourselves.  And that's really all that we're

8    asking for, Your Honor.

9         THE COURT:  Well, I think you're asking for more than

10    that.  You're seeking by virtue of the motion your prosecuting

11    to compel the debtor, in effect, to reject this now and to

12    allow you to go about your business and not have to pay them

13    money.  And this is an in the money swap.  And I also

14    understand that ADR has been demanded by Lehman in connection

15    with this transaction.  So this is not as simple as you portray

16    it, at least in my view it's not.

17         I like your comments as to why I should decide

18    anything in connection with a matter that has been, at least

19    from Lehman's perspective, assigned to the ADR process.

20         MR. MICHAELSON:  Your Honor, I'm glad you asked that

21    question, because I'm not sure the ADR process is applicable in

22    this situation.  As we read paragraph 3(a) of the ADR process

23    in order for there to be some sort of alternative dispute

24    resolution there has to be a terminated -- a swap agreement

25    does not apply if the swap agreement -- let me read this so

71

1   there's no confusion about it.  Paragraph 3(a) of the ADR order

2   indicates, "That the ADR procedures do not apply if the swap

3   agreement has not been terminated."  This swap agreement hasn't

4   been terminated.  So it's our view under what I think is clear

5   language of the order, the ADR, that alternative dispute

6   resolution, isn't applicable or available in this matter.

7        THE COURT:  Why don't I hear from Lehman, at least --

8   not only in opposition to the motion on the merits, but also as

9   it relates to the whole question of the applicability of

10   alternative resolution procedures.

11        MR. LEMONS:  Good morning, Your Honor.  Robert Lemons

12   from Weil Gotshal & Manges on behalf of the debtors.

13        I'll start with the ADR procedures applicability,

14   because I think it's a -- certainly a simpler answer and that's

15   where SPU's counsel left off.

16        Your Honor, SPU's counsel said he wanted to read you

17   the words so that there wouldn't be any misunderstanding or

18   miscommunication.  I think that's interesting because he left

19   out a critical word when he read you the words.  The words are

20   not "has not been terminated" the words are "has not been

21   purportedly terminated."  The word purportedly was inserted in

22   that order for a purpose.  The reason it was put in there is

23   because as Your Honor is aware, the debtors have received

24   numerous termination notices, some of which they contest and

25   many of which -- some of which they do not contest, and many of

72

1   which they do contest.  So this word was inserted in there and

2   the procedures were established so that among other types of in

3   the money contracts to the debtors the ADR procedures would

4   also apply to those where a counterparty has purported to

5   terminate what the debtor may dispute the effectiveness of that

6   termination.  So, Your Honor, we believe after SPU has

7   purported to terminate this contract, that it clearly falls

8   within the scope of the ADR procedures and is eligible for

9   those.  And we believe that the notice that we have served on

10  SPU to trigger those procedures is certainly effective.

11          THE COURT:  Okay.  I've read your papers, I'm familiar

12  with this.  I'm also familiar with the disputed reply that was

13  filed yesterday by Seattle Pacific University.  And I'm not

14  sure if I was supposed to read it, but I actually read the

15  exhibit which is the demand for ADR, which was Exhibit A to

16  that reply.  Was I supposed to have seen that or not, I have no

17  idea?

18          MR. LEMONS:  Your were not, Your Honor.  I'm not sure

19  that makes it a significant difference, but under the terms of

20  the ADR that was not something you were supposed to see.  I

21  believe that was inadvertent on SPU's behalf.  And when we

22  informed their counsel they took steps promptly to withdraw it.

23  But it sounds like it may have made it into your chambers

24  before the withdrawal was complete.

25          THE COURT:  I read it with great interest.  It doesn't

1    influence my decision on this motion, however.  The content of

2    the ADR demand, the position asserted by Lehman and any defense

3    to that position taken by Seattle Pacific University are all

4    irrelevant to the disposition of the pending motion.

5              What is relevant it seems to me is that there is a

6    procedure that the debtors have sought to employ to try to read

7    some kind of accommodation, mutually acceptable, I assume,

8    because that's what ADR is about, with Seattle Pacific

9    University as to this in the money swap transaction.  It makes

10   sense it seems to me for that procedure to run its course

11   before I deal with the merits of this motion.  And, frankly,

12   from Seattle Pacific's perspective it's a plus.  Because if

13   there were no ADR procedure available to perhaps lead to a

14   mutually acceptable resolution of the issues in dispute, I

15   would deny the motion.  So the good news is there's a procedure

16   that you can all look to to maybe get to the business

17   accommodation you need to reach.  The bad news is if you didn't

18   have that this motion would be denied without prejudice.  And I

19   say that because at this moment while there is hypothetical

20   risk to an undoubtedly sympathetic counterparty at some future

21   date if there is a move in interest rates that's not a risk

22   today that I can value.  And to the extent that we have an in

23   the money contract I'm not going to accelerate the time for the

24   debtor to assume or reject simply because I have a sympathetic

25   counterparty.  The contract is what it is.  Says what it says.

74

1    And the debtor has the time available under the Bankruptcy Code

2    to make its decision to assume or reject.

3          I say that in no way to limit the discretion that I

4    have under 365 in appropriate cases to accelerate the time, and

5    it may be that at some time in the future I might conclude that

6    Seattle Pacific has shown cause.  Such cause has not been shown

7    as of today.

8          MR. LEMONS:  Thank you, Your Honor.

9          MR. WAISMAN:  Your Honor, my colleague Peter

10   Gruenberger will present the next motion.

11         THE COURT:  All right.

12         MR. GRUENBERGER:  Thank you, Your Honor.  Good

13   morning, Your Honor.  Peter Gruenberger, Weil Gotshal & Manges,

14   counsel for LBSF and affiliated debtors.

15         I am here today pinch-hitting for my partner, Richard

16   Slack.  Unfortunately, he's in another city, in another court

17   today on an emergency and he apologizes for not being here.

18         Your Honor, I can't promise that --

19         THE COURT:  He should be apologizing to you.

20         MR. GRUENBERGER:  He has already in spades.  I can't

21   promise that my remarks are going to be as interesting as those

22   proffers we heard earlier today, but I'm going to try to raise

23   the excitement level from that a little bit.

24         As Your Honor is aware, on October 28, 2009 LBSF filed

25   a motion to compel Capital Automotive to perform its obligation

75

1    pursuant to the 2006 master agreement between the parties,

2    which agreement the parties' papers have labeled the swap

3    agreement.  On November 30, 2009, Capital Automotive filed an

4    objection to that motion to compel with two supporting

5    declarations.  Those opposition papers, Your Honor, were

6    replete with references to negotiations and communications

7    between the parties relating to potential settlement of

8    disputes between as to the swap agreement at issue.  LBSF

9    believed all such references were barred explicitly by the very

10   specific terms contained in a negotiation agreement that

11   Capital Automotive itself drafted.

12        For that reason after a chambers conference in

13   December we moved to strike Capital Automotives objection to

14   the motion to compel.  It is that motion to strike that is

15   before Your Honor today.  The merits of the motion to compel

16   are not before the Court today.

17        We served our motion to strike on December 23, 2009,

18   Capital Automotive filed timely it's objection thereto on

19   January 5, 2010.  We filed our reply yesterday morning.

20        I ask permission, Your Honor, to hand up a hearing

21   binder which will aid the Court in following word-by-word the

22   numerous ways in which Capital Automotive has ignored the

23   negotiation agreement, violated its terms and in so doing

24   simultaneously has attempted to rewrite the swap agreement at

25   issue.  May I approach, Your Honor?

76

1          THE COURT:  You may approach with the hearing binder.

2     Okay.  Just so long as this isn't flown around the courtroom as

3     a weapon.

4          Before we get into the substance of the hearing

5     binder, I want everybody involved in this particular dispute to

6     understand what my current perspective is on it so that you can

7     mold your comments to some of my concerns.

8          One of my concerns is that this seems to be a

9     proliferation of litigation in a case which already has a fair

10    degree of active motion practice in it.  And when we had our

11    chambers conference that was really a telephone conference I

12    was not encouraging in respect of the filing of this motion to

13    strike, and made the comment that to the extent that there was

14    a violation of the negotiation agreement or a violation of Rule

15    408 of the Federal Rules of Evidence that it was an evidentiary

16    question and we're not having an evidentiary hearing today.

17    Mr. Gruenberger, you said so yourself, this is just a hearing

18    on the motion to strike --

19          MR. GRUENBERGER:  Right.

20          THE COURT:  -- not on the merits.  Additionally,

21    motion practice in the Lehman case generally and in basically

22    every single case I have on my docket is not at least at the

23    first call of the motion, an evidentiary hearing, if an

24    evidentiary hearing is required it's later scheduled.  So I

25    have a threshold question which is is it even appropriate for

77

1    me to be considering on a motion to strike basis material that

2    I have already read?  I mean, this is in some respects very

3    much like the last case with Seattle Pacific, where I wasn't

4    supposed to have read the ADR demand, but I did read it.  Well,

5    I read the declarations which set forth from Capital

6    Automotive's perspective, the back and forth of negotiations,

7    some of which were detailed and some of which were general, and

8    most of what I supposed you are concerned about reflect a

9    perception, to use your reply papers terms, that Capital

10   Automotive was "bamboozled" by your client.  Not by you,

11   personally, but that this whole process as it relates to the

12   negotiation that I wasn't supposed to learn about, was unfair

13   from the perspective of Capital Automotive.

14        Let's just say for the sake of discussion that none of

15   that detail was presented to me and that all that Capital

16   Automotive was saying in their motion papers was the following:

17   "Judge, we have a negotiation agreement, we're going to honor

18   it.  But let me tell you something, if it weren't for that

19   agreement we'd be able to tell you a parade of horribles of the

20   activities of Lehman Brothers' employees who misled us.  and if

21   it weren't for those misleading statements we would have

22   terminated this swap agreement in December of 2008."  I'm being

23   purely hypothetical in what I just said.

24        But if they had filed papers that said that how is

25   that different in terms of the motion practice that's before me

78

1    in February from my seeing more detail as to what they have to

2    say?  That's question one.

3            Question two, what's the proper remedy for a violation

4    of the negotiation agreement?  Is it a motion to strike?  Is it

5    an adversary proceeding seeking equitable relief in the form of

6    an injunction that would prohibit certain activity?  Is it an

7    action for damages?  Is it simply a defensive posture that you

8    make in the context of the motion, itself?  Is it a motion in

9    limine before an evidentiary hearing that might take place at

10   some point in the future?  In other words, is the motion to

11   strike even appropriate?  And finally, I recognize that there

12   may be some policy issues here that go beyond the matter at

13   issue with Capital Automotive.  And here's what I think it is.

14           I think that most of the activity in the Lehman

15   bankruptcy case takes place outside the courtroom.  I think

16   that a lot of the activity that takes place in the courtroom is

17   staged.  This is, like, the Lehman Theater.  We have an

18   audience.  We have proffers.  We have very well prepared

19   lawyers.  And the material which is presented to me is

20   distilled.  It's distilled because good lawyers are involved on

21   all sides.  It's distilled because really confidential

22   information shouldn't be on the public record sometimes.  It's

23   distilled because we have the press in the room and we have an

24   open courtroom, as we should, where the public is available to

25   hear what is supposed to be a transparent proceeding.

1          Nonetheless, I recognize that a lot of what is

2    important in complex business negotiations is intended to be

3    private.  Are you pressing this motion because you believe the

4    negotiation agreements, such as this one, from a policy

5    perspective need to be enforced or are you pressing this motion

6    simply as a preemptive evidentiary objection?  If it is the

7    former, I'm interested in hearing argument as to the policy

8    issue.  And that's my reason for the preamble to that last

9    question.  And my suggestion is that while I'm happy to see

10   anything that you want me to see in any order you want me to

11   see it in the hearing binder that I've already expressed to you

12   what I'm most interested in in today's argument.

13        MR. GRUENBERGER:  Your Honor, I'll try to take up each

14   one of those.  It's like running the 440 hurdles.  I set up

15   some hurdles, I've got to clear them, I shall.

16        THE COURT:  Okay.

17        MR. GRUENBERGER:  Take the last question first.  It's

18   the former, certainly, not the latter.  Is it appropriate

19   today?  Yes.  If the motion to compel had been responded to on

20   the merits without violating an agreement, then that motion to

21   compel would have been proceeded with in the manner that we

22   representing debtors always proceed with things; directly and

23   not for show, not for theater.  Your Honor, we seek the last

24   harmful remedies.  I think Mr. Lemons in responding to the

25   prior motion by Seattle Pacific University, they could have

80

1   moved for sanctions for that violation of the ABR order and

2   Your Honor is very aware of who drafted that order.  I did.

3   They could have moved for sanctions.  We could have.  We

4   didn't.  We asked them to remove it from the record without

5   theater.  We're not making theater here.

6          Your Honor's hurdles, however, omitted one thing.  And

7   I think this was inadvertent on Your Honor's part.  We're

8   talking about the sanctity of contracts.  Your Honor left that

9   out.

10         There's a message that's going to be taken away from

11   this hearing not by this counterparty but by a lot of

12   counterparties.  And let's focus today just on post-petition

13   contracts like this negotiation agreement.  When I finish

14   today, Your Honor, I hope I will have persuaded you that the

15   facts upon which we rely will show that this counterparty has

16   ignored every word in a contract it presented to us to sign.

17   And rather than reward such conduct, I think that the objection

18   should be stricken.

19         Now, you ask for what other remedies could exist?

20   Well, we could have asked for cost in making this motion to

21   strike.  We didn't do that.  We aren't trying to be vindictive.

22   We're just trying to get people to abide by contracts

23   especially ones they make with debtors' post-petition and

24   especially ones they draft and ask us to sign.

25         THE COURT:  Mr. Gruenberger, let me just ask you a

81

1   question about something I perhaps don't need to know and maybe

2   shouldn't know.

3          Is the negotiation agreement which was entered into in

4   connection with the discussions between Lehman and Capital

5   Automotive, even though it was drafted by Capital Automotive's

6   counsel, as I understand it, a form of agreement that Lehman

7   regularly and routinely enters into before engaging in

8   discussions of this sort?  If the answer to that is yes, this

9   becomes a classwide issue.  If the answer to that is no, this

10  is a one of a kind or a relatively rare example of a party

11  being extra careful that leads me to a different place.  Which

12  is it?

13         MR. GRUENBERGER:  To my knowledge, Your Honor, this is

14  unique.  This is not part of Lehman's regular course of

15  business and negotiations.  I'm not aware of any.

16         THE COURT:  Okay.  So this is not a situation where

17  we're seeking to protect the sanctity of allegedly private and

18  confidential negotiations relating to settlement pursuant to a

19  form of agreement that Lehman regularly uses.  This is rather a

20  one-off situation.

21         MR. GRUENBERGER:  No, Your Honor.  I don't agree with

22  that however, and let me draw the distinction.  A contract is a

23  contract.  You just said that yourself.  I don't want to quote

24  you back from another matter but the last matter you just said,

25  "A contract is a contract and it goes where it goes".  I don't

82

1    think we have different rules for negotiation agreements,

2    agreements to buy and sell, agreements to assume or reject.  I

3    think we have agreements that should be honored or should not

4    be honored.  And the message that I would like to send away

5    after this motion is decided is that contracts ought to be

6    honored not dishonored.

7         THE COURT:  I won't disagree with you that contracts

8    are intended to be performed, but that's not really the point.

9    The point is whether or not a motion to strike certain

10   statements that were made in papers filed by Capital Automotive

11   should be stricken on account of alleged violations of the

12   contract.  We're not dealing with a contract in an abstract

13   way.  We're dealing with the application of a particular

14   contract to particular allegedly inappropriate conduct.

15        MR. GRUENBERGER:  Correct, Your Honor.  And when we

16   get to the statement of the law, I will cite you law that says

17   that this is the appropriate remedy when this type of agreement

18   is violated.

19        THE COURT:  Okay.  Why don't you go ahead?  It's now

20   high noon.

21        MR. GRUENBERGER:  Thank you.  And now, the hearing

22   binder -- the hearing binder, Your Honor, does not contain any

23   cases.  It does not contain argument of law.  It doesn't

24   contain legal argument from me or anybody else.  There's no

25   clever spin on the facts whatsoever.  All it is in the binder

83

1    is in three distinct parts we have documents of record and only

2    documents of record in this case.  Each part rebuts beyond per

3    adventure, I believe, each one of the three themes that Capital

4    Automotive has woven seeking to justify its use of settlement

5    negotiations and communications.

6         Theme 1 is that the negotiation agreement is merely a

7    restatement of Federal Rule of Evidence 408.  A rule that

8    generally precludes evidentiary use of settlement talks to

9    prove liability but permits use of settlement talks for other

10   purposes.  A standard Courts have always used in applying Rule

11   408.

12        Tabs 1 through 7 of the binder, Your Honor, set forth

13   the specific terms of the negotiation agreement revealing

14   clearly that that agreement is the exact antithesis of Rule

15   408.  And unlike Rule 408 stands as an explicit bar to the very

16   uses to which Capital Automotive has put the settlement

17   negotiations and communications and has done so in an attempt

18   to negate LBSF's contention that Capital Automotive unduly

19   delayed exercising its rights under the swap agreement.  Now,

20   those words become very important.  And I'm going to come back

21   to them again.

22        Theme 2, they read, is that the negotiation agreement

23   does permit use of negotiations and communications in

24   connection with attempts to enforce rights and remedies under

25   the swap agreement and that such enforcement is all that

84

1    Capital Automotive innocently was trying to accomplish by way

2    of its references to the negotiations.

3           Well, Tabs 8 to 10 of the hearing binder, Your Honor,

4    set forth specific sections of the swap agreement that

5    demonstrate that the alleged rights and remedies that Capital

6    Automotive was trying to enforce never existed at all and thus

7    are not capable of being enforced in this or any other matter

8    suggested by Capital Automotive.  Rather, as we demonstrate,

9    Capital Automotive has tried to use the negotiations and the

10   communications to rewrite the swap agreement's terms.

11          Theme 3, that Capital Automotive puts forth is that it

12   has no idea about which communications and negotiations we're

13   complaining about.  No idea at all.  However, Your Honor, on

14   the Tabs 11 through 23, we set forth thirteen specific

15   paragraphs, word by word, that add two declarants in support of

16   their motion to object -- their objection to our motion to

17   compel filed and those declarations led to this motion to

18   strike.  Those declarants very words pull away the simple sun

19   mask that Capital Automotive would wear in this courtroom

20   today.

21          Let me begin with the cavalier approach that this

22   negotiation agreement is Rule 408 in another cloth.  That poses

23   rarely undermined by just a cursory comparison of the words of

24   Rule 408 with the words of the negotiation agreement.  We have

25   set forth the entire Rule 408 at pages 8 and 9 and paragraph 18

85

1    of our reply brief.

2           Rule 408 on its face provides only for certain limited

3    protections against disclosure as follows:  A) Prohibitive

4    uses.  Evidence in the following is not admissible on behalf of

5    any party when offered to prove liability for invalidity of or

6    amount of a claim that was disputed as to validity or amount or

7    to impeach through a prior inconsistent statement or

8    contradiction.  And there are two different things that are

9    prohibited.  You can't talk about furnishing or offering or

10   promising to furnish or accepting or offering or promising to

11   accept a valuable consideration in compromising or attempting

12   to compromise a claim.  And 2) Conduct or statements made in

13   compromised negotiations regarding the claim.

14          And 408(b) talks about permitted uses.  That says,

15   "This rule does not require exclusion if the evidence is

16   offered for purposes not prohibited by subdivision A.  This is

17   still", I'm quoting, "within the rule examples of permissible

18   purposes include among other things" and I'm emphasizing this,

19   "include among other things negating a contention of undue

20   delay."

21          Now, Your Honor will notice that Capital Automotive

22   nowhere in its objection anywhere cites all of Rule 408 or

23   quotes its terms.  Rather, through a clever use of ellipses,

24   Capital Automotive's objection at page 12, footnote 6, omits

25   that key language from 408(b).  They omit examples of

86

1    permissible purposes include "negating attention, a contention

2    of undue validity", unquote.  They just leave it out.  There's

3    a reason they leave it out.  Because that's exactly what they

4    put into the negotiation agreement could not be done.  They put

5    into the negotiation agreement that no negotiations or

6    communications can be used to try to prove or negate a

7    contention of undue delay.  I'm going to take you through the

8    agreement and show you exactly where that is.

9          Under Tab 1 of the binder, Your Honor, we have the

10   whole negotiation agreement.  Under the succeeding tabs we have

11   pullouts.  So that Tab 2 shows, or paragraph 2, what this is

12   definition of negotiations defined as covering all discussions

13   and negotiations concerning the parties obligations to each

14   other under or relating to the swap agreement including its

15   termination.

16         The definition of communication as it's contained

17   under Tab 3.  Paragraph 3 defines communications as all

18   correspondence, discussions, negotiations, meetings, graphs and

19   telephone communications among the parties or their respective

20   attorney, agents and representatives with respect to the swap

21   agreement or with respect to defined -- the defined term

22   negotiations.

23         The main guts of the negotiation first appear in

24   paragraph 2 contained under tab 4 where it says, quote, "It is

25   understood that the negotiations and any communications shall

1    be made with a view toward compromise and settlement and all

2    such negotiations shall be protected accordingly and shall not

3    be admissible as evidence on any issue that is or may be before

4    any court or administrative body including without limitation

5    as proof or admission of liability for -- or for other

6    evidentiary purposes." Let's allow that one to sink in for a

7    moment.

8         No use as proof or admission of liability or for other

9    evidentiary purposes. These words alone directly contradict

10   Capital Automotive's twisted argument that it may use

11   negotiations and communications to negate LBF's (sic)

12   contention that Capital Automotive was guilty of undue delay.

13   But that isn't all that's in the agreement. It goes on much

14   further and much more directly.

15        Under tab 5, Your Honor, we find the specific terms of

16   paragraph 4 of the negotiation agreement in which Capital

17   Automotive expressly agreed that negotiations and

18   communications were contemplated for purposes of compromise and

19   settlement and that no such negotiations or communications

20   shall ever be admissible for any other purposes such as a

21   purpose to prove intent or to negate a contention of undue

22   delay or any other purpose. So much for their argument that

23   this is exactly like Rule 408. It's the exact antithesis of

24   Rule 408. Thus, we have no quarrel with the Second Circuit

25   cases that Capital Automotive cites at pages 12 to 15 of their

88

1    objection because under those cases we win.

2        Those cases include the 1989 case of Trebor,

3    T-R-E-B-O-R Sportswear v. Limited Stores, 856 (sic) F.2d 506 at

4    page 511 and the 1999 case of Starter v. Converse, 170 F.3d 286

5    at page 293.  Both cases state the age-old standard; governing

6    application of 408 in both (a) and (b).  Evidence of a

7    settlement agreement and surrounding circumstances though

8    barred by 408(a) can fall outside the rule if offered for

9    another purpose.  But that age-old application of 408 does not

10   and cannot fit here where the parties have agreed expressly

11   that such other purposes are also barred from use including the

12   ones about intent and the one about negating undue delay

13   assertions.

14       And thus, Your Honor, I now turn to the case that says

15   that we're doing exactly the right thing by moving to strike.

16   The Connecticut District Court in the 2006 case, Victor G.

17   Reuling, R-E-U-L-I-N-G Associate v. Fischer Price Toys, 407 F.

18   Supp. 401 at page 404, the Court struck all references to

19   negotiations because of an agreement signed by the parties that

20   is here barred any use thereof for any purpose.  We seek the

21   same relief here because the facts here are even better for

22   LBSF than they were for the movant in that case.

23       It's ironic, Your Honor, that the party who drafted

24   this agreement contended all these encompassing restrictions

25   which stand here today contending it has the right to try to

89

1    use the negotiations and communications that it said should not

2    be used to create the impression that we agreed to a

3    termination of a swap agreement in December 2008.  And that

4    Capital Automotive uses these negotiations and communications

5    merely to try to enforce its alleged rights and remedies under

6    the swap agreement.

7         But happily for us and unhappily for Capital

8    Automotive, the negotiation agreement and swap agreement

9    itself, I think, bar and I think Your Honor will conclude, bar

10   such a tortured assertion.

11        Under tab 6 of the binder in paragraph 3 of the

12   negotiation agreement, Capital Automotive agreed that, quote,

13   "No amendment, modification, compromise, settlement, agreement

14   or understanding with respect to the swap agreement and no

15   rights, claims, obligations or liabilities of any kind either

16   express or implied shall arise or exist in favor of any party

17   or be binding upon any party or other person as a result of the

18   negotiations or communications except to the extent set out in

19   a written agreement executed by all parties to be bound."

20   There is no such writing in this matter, signed or otherwise.

21   That is not all.

22        In the fifth and last paragraph of the negotiation

23   agreement, under tab 6 also, the parties acknowledged that they

24   had executed that agreement, quote, "With the goal of engaging

25   in negotiations or communications in an open, frank and direct

90

1   manner without risk of exposure to liability as a result

2   thereof and an order to avoid any claim or allegation that the

3   swap agreement or any obligation arising thereunder has been

4   modified, amended, waived or altered in any matter -- in any

5   manner whatsoever by the negotiations or any communications."

6   Yet, that is exactly what Capital Automotive stands here today

7   trying to do.

8          And finally, with respect to the bamboozle point Your

9   Honor alluded to earlier, the negotiation agreement in

10  paragraph 2 under tab 7 gives the absolute deaf note to that

11  last melody Capital Automotive plays in its Theme 2.  It's

12  criticism to LBSF for allegedly stringing Capital Automotive

13  along by pretending to continue with negotiations but not even

14  settling this dispute or giving notice that it was terminating

15  negotiations.  That's their allegation.  Unhappily for Capital

16  Automotive on this brand of its theme, paragraph 2 of the

17  negotiations where it clearly provides and expresses that no

18  party shall have any obligation to commence any negotiation or

19  once -- and if commenced to continue with such negotiations and

20  any party and such parties sole and absolute discretion may

21  terminate the negotiations at any time and for any or no reason

22  with or without cause or notice.

23         Your Honor, I now turn to the matter in which Capital

24  Automotive has tried to use these negotiations for settlement

25  to change the swap agreement itself.

1          As Your Honor is well aware, Section 6(a) of the

2    master swap agreement set forth, and it's under tab 8 in the

3    binder, that " A noninformed party may give notice to the

4    defaulting party specifying a relevant event of default", here

5    LBHI's Chapter 11 filing of September 15, 2008, "and the rights

6    of designated day not earlier than the effective date of the

7    notice as the early termination date."

8          The record is clear here that Capital Automotive never

9    sent any termination notice to LBSF prior to November 30, 2009

10   some fourteen months after the Chapter 11 filing and more than

11   a month after LBSF had filed its motion to compel performance.

12   Nor can there be any dispute that this fourteen month late

13   termination notice in it Capital Automotive tries retroactively

14   to backdate the effectiveness of the termination back to

15   December 1, 2008.

16         At the same time, Capital Automotive, through what we

17   believe are illicit uses of negotiations and communications

18   occurring between January and August 2009 argues that somehow

19   LBSF magically knew that the swap agreement had been terminated

20   in December 2008.  That's what they contend.  But the swap

21   agreement itself, Your Honor, in paragraph 9(b) and this is

22   under tab 9, requires that any amendment, modification or

23   waiver in respect of the swap agreement is not effective unless

24   in a writing executed by each of the parties.  This is the same

25   writing requirement that the termination -- I'm sorry, the

1    negotiation agreement by Capital Automotive contains.  We just

2    looked at it

3           And just to make certain that there could be no

4    misunderstanding about the swap agreement, it provides in

5    Section 12, and that's under tab 10, that "Any notice of

6    communication given in respect of the swap agreement may be

7    given only by some form of writing."  A writing.  Not by smoke

8    signals, not by smoke and mirrors and not by smoking anything

9    else, Your Honor, and certainly not by a notice of termination

10   that was never sent to or agreed to in writing by LBSF.

11          THE COURT:  That's a nice reference to the 60s there.

12          MR. GRUENBERGER:  Well, some of us were there.

13          Your Honor, now having established that the

14   negotiation agreement forecloses use of negotiations or

15   communications to effect modifications of the swap agreement, I

16   turn to the Theme 3 assertions by Capital Automotive that they

17   are still unaware of precisely how it violated the negotiation

18   agreement pretending that our motion to strike was not clear

19   enough when it cited the precise sections and pages of Capital

20   Automotive's objection to motion to compel that contain the

21   offending uses of negotiations and communications.

22          That reference should have been good enough, but just

23   to make sure that the record is clear on this, Your Honor, tabs

24   11 through 13 of the hearing binder contain the exact words

25   used by the two declarants who filed declarations supporting

93

1    Capital Automotive's objections.

2          Now, let's look at the declaration of Roger Statle

3    (ph.), dated November 30, 2009 which contains an entire section

4    entitled "Negotiations between the parties".  I think that

5    label has a familiar and telling ring to it.  And under that

6    section, under tab 11 in paragraph 19, Statle refers to a

7    specific telephonic negotiation on December 17, 2008 with an

8    LBSF representative describing the outlines of an alleged

9    potential settlement.

10          Then, under tab 12, paragraph 20, Statle sets forth

11   what he believes was the intent of both negotiating parties.

12          And under tab 13 in paragraph 21, Statle again uses

13   negotiations and a specific e-mail in an attempt to evidence

14   both parties alleged intent concerning the framework of

15   settlement including discounts.  Your Honor will recall that

16   the negotiation agreement specifically bars use of negotiations

17   as evidence of intent.

18          Then, under tab 14, in paragraph 22, Statle asserts

19   that in January 2009, LBSF made a settlement offer as further

20   proof of the party's alleged common understanding using

21   specific dollar signs.

22          And under tab 15, Statle describes an alleged January

23   2009 counteroffer by Capital Automotive using specific dollar

24   amounts.

25          And under tab 16 paragraph 24, he again asserts LBSF's

1    understanding of how close the parties allegedly were to

2    settlement as of January 12th, 2009.

3        And in paragraph 26 under tab 17, Statle describes yet

4    another counteroffer made on February 17 by Capital Automotive

5    with more specific dollar amounts included.  On and on and on

6    to paragraph 27, 28 where Statle does it again and again but

7    not resting with one declarant, they had another one, Mr.

8    Dennis Rosenfeld, and so he does the same thing.

9        And under tabs 21, 22 and 23, he too talks about the

10   intent of the parties, the settlement descriptions that the

11   parties were engaged in all barred by the negotiation

12   agreement.

13       Your Honor, I have nothing further and I don't think

14   anything further is needed to send this counterparty and all

15   counterparties in these cases of Lehman, these Chapter 11

16   cases, a clear message from the Court.  That message ought to

17   be that agreements really do mean something.  They are not

18   chess pieces to be moved around at the whim of a counterparty

19   depending on any day how the winds may be blowing or how

20   interest rates may be moving.

21       Debtors submit, Your Honor, respectfully that anything

22   less than the striking of these objections and these offensive

23   uses of negotiations and communications may transmit the wrong

24   message.  One that says parties can walk away from contracts,

25   walk away from their commitments with no accountability.  And

95

1    that's what we're talking about; accountability.  We trust that

2    the Court will rule on the side of accountability and send the

3    appropriate message.

4           I hope I've answered your questions and I'm here to

5    answer any more Your Honor may have

6           THE COURT:  Not quite.  You haven't quite answered

7    them in this respect and this is still something that's

8    bothering me.

9           Declarations were submitted in connection with the

10   original papers filed by Capital Automotive and you've

11   highlighted the sections of the declarations that the debtors

12   view as offensive.

13          MR. GRUENBERGER:  Correct.

14          THE COURT:  But at the moment, these declarations have

15   not been offered into evidence.  There's no evidentiary hearing

16   in connection with the substance of the motion.  In fact,

17   that's not to be heard --

18          MR. GRUENBERGER:  Right.

19          THE COURT:   -- as I understand until February 10th.

20   And at least at this moment, what I conclude you're seeking is

21   a preemptive evidentiary determination that if these

22   declarations were to be offered, they should not be admitted

23   because they are -- they have been crafted in violation of the

24   negotiation agreement  Apparently, you're seeking more than

25   that.

1          You are seeking a determination that it's a violation

2     of the agreement to have prepared and filed the declarations in

3     the first place and that the negotiation agreement precludes

4     any use whatsoever --

5          MR. GRUENBERGER:  Or attempt to use, Your Honor.

6     Those are the words it uses.

7          THE COURT:  -- well, let's go to that language.  Let

8     me understand how the language of the negotiation agreement

9     ties to the motion to strike at this stage of the proceeding.

10         MR. GRUENBERGER:  Okay.  Well, there are several ways

11    to approach that, Your Honor. If Your Honor comes from the

12    point of view that everybody is entitled to two bites of the

13    apple, that is that you can just ignore an agreement and if

14    you're caught then we have time to talk about it.  That the

15    agreement says you can't try to introduce it and by introduce

16    Federal Rule of Evidence 408 does not mean in an evidentiary

17    hearing, it's any use in any court for any purpose.  That's

18    what paragraph 2 says.  Any use for any evidentiary purpose.

19    Now, an evidentiary purpose, Your Honor, is not an evidentiary

20    hearing, it is support for a position.  They didn't cite the

21    negotiations and communications and give declarant support, I

22    swear that it's true, for a purpose other than to use it to

23    sway your mind.  That's an evidentiary purpose, Your Honor,

24    whether it's an evidentiary hearing or not.  There is not two,

25    three bites.  One, we can do it if we're caught well, may --

1    then we'll argue about whether we should have done it.  They

2    shouldn't do it in the first place.  Otherwise, agreements

3    don't mean anything.  That's where I'm coming from.  That's

4    where the debtor is coming from.  And, Your Honor, if what you

5    just said was the rule with all respect, your words from the

6    bench could be ignored and somebody could say, well, it's only

7    words, I'll try.  That isn't the way we want to do things.  Not

8    in this court, not in this case, not in this country.  It's

9    wrong.  That's where I'm coming from, Your Honor, and that's

10   where our estate is coming from.

11            THE COURT:  Okay.

12            MR. GRUENBERGER:  Thank you, Your Honor.

13            MR. REISS:  Your Honor, Jeremy Reiss, Blank Rome, LLP

14   on behalf of Capital Automotive.  With me today also is my

15   partner, Tom Biron, to my left.  I'm going to try to proceed in

16   order with the questions you posed at the beginning of my fine

17   colleague's soliloquy there.

18            First, I think it's important to note that what we're

19   dealing with here is not a confidentiality agreement.  We're

20   dealing here with an agreement which, if anything, limits the

21   use of the introduction of evidence.  It does not say that

22   Capital and LBSF cannot tell others what were discussed during

23   these negotiations.  It does not say we couldn't take out an ad

24   in the New York Times and say this is the position LBSF has

25   taken in regards to the settlement of our rights under the swap

1    agreement.  That's an important point, because one of the

2    issues you raised is what is the -- if the negotiation

3    agreement has been violated, what is the remedy.  And

4    certainly, I would say there is no remedy for -- there is no

5    availability of damages, no availability of injunctive relief.

6    We have done nothing that the agreement prohi -- we have not

7    done anything the agreement prohibits.

8          First, also to be clear, we do not want to litigate

9    this issue.  Finally, yesterday after six weeks of trying to

10   ferret out exactly what LBSF was concerned about, exactly what

11   statements, it thought violated the negotiation agreement, they

12   were finally identified in the reply that was filed sometime

13   yesterday morning and now we have even further elucidation in

14   this trial binder, this hearing binder, that was just provided,

15   which gives us a little bit of more detail.  And what is

16   important to note is that their position has changed in the

17   intervening six weeks.

18         At first, they said, let's strike the Statle

19   declaration.  Let's strike the Rosenfeld declaration.  And now

20   though identifies specific paragraphs.  And our position has

21   been and continues to be that we are happy it wants LBSF

22   identified specific allegations that it thought were barred by

23   the negotiation agreement in some capacity.  We were happy to

24   sit down with them and discuss whether those -- whether those

25   allegations were, in fact, barred, what that meant, and how we

99

1    could fix that.

2         My colleague, Mr. Biron, sent Mr. Slack (ph.) a letter

3    on December 4th and -- excuse me -- on December 7th in response

4    to an e-mail Mr. Slack had transmitted on December 4th

5    demanding we withdraw the objection and the declarations.  Mr.

6    Biron sent a letter saying, "Please identify exactly what

7    you're talking about and we'll talk."  We get it the day before

8    the hearing and, in fact, it is much narrower than the relief

9    they originally had demanded.

10         Now, the second question I believe he raised is

11    whether this was right for adjudication at this juncture.  And

12    our position is is, no, it's not because as I noted in the

13    negotiation agreement is not a confidentiality agreement.  It

14    does not bar us raising these allegations that are at issue.

15    All it prohibits, if anything, is that certain allegations

16    cannot be used as evidence.

17         Now, one of the things we have sought in our

18    substantive response in the motion to compel is that this

19    entire motion to compel that LBSF has brought is properly

20    brought through an adversary proceeding.  And if it were, in

21    fact, re-filed as such, we would have -- we would have full

22    latitude to make these very same allegations even if they were

23    barred in their entirety by the negotiation agreement.  We

24    would have the right to put them in a pleading because that is

25    not using them as evidence as that term is used in Federal

100

1   Rules of Evidence.  That is an issue for trial.  That is an

2   issue determined in motions in limine before trial.  But I

3   would renew our point that we are happy to sit down with LBSF

4   and discuss how some of these issues could be resolved if there

5   is merit to their positions.

6          Now, another point that I think is very -- that we

7   just recently learned that is very useful is that this is

8   apparently a unique right on which LBSF is now relying.  It is

9   not present, apparently, and other swap agreements or

10  negotiation agreements in connection with the resolution of

11  other swap agreement disputes.  Accordingly, the overarching

12  policy concern that LBSF seem to be articulating in its papers

13  would appear to be minimalized vis-a-vis what they originally

14  seemed to posit it as.

15         I also just want to make one note.  We do not concede

16  necessarily that Capital Automotive or its counsel drafted this

17  agreement in part.  That may be the case; it may not be the

18  case.  I can't speak to that today.  I can't speak to whether

19  some specific language might have been added by LBSF or its

20  counsel just so that's clear that we have no conceded that

21  point, necessarily.

22         Okay.  Now, let's turn to the merits of what's at

23  issue right now.  I have three types of arguments.  You know,

24  the first we'll call them situational, textural and practical.

25  I think I've already addressed the practical arguments.  But

1    now turning to the situational arguments.

2         The reason we -- the reason Capital Automotive was

3    compelled to introduce these allegations into the papers, was

4    because of what LBSF itself put into dispute in this action.

5    Two things specifically I would note.  In paragraph 29 of the

6    motion to compel, LBSF specifically noted the issues present in

7    its motion against Capital Automotive were, quote, "virtually

8    identical", unquote, to those in connection with a motion to

9    compel, performance under a swap agreement.  LBSF lodged

10   against the Metavante Corporation.

11        Now, Your Honor, I'm sure recalls that dispute.  And

12   central to that dispute was Metavante's conduct in terminating

13   or not terminating its swap agreement with LBSF.  And I won't

14   go into detail of what happened in connection with that matter

15   but Your Honor recalls that Metavante apparently was trying to

16   time the market on when was the best time to terminate its

17   agreement.  And I believe Your Honor may have believed there

18   was a little bit of bad faith inherent in that posture as well.

19        It was very clear given that LBSF alleged that the

20   issues were virtually identical to the issues that are present

21   here that we distinguish ourselves from the Metavante position.

22   Here, by contrast, almost immediately upon the occurrence in

23   event of default under the swap agreement, my client went out

24   and acquired a substitute hedge clearly indicating that it was

25   going to terminate that swap agreement.

102

1        Our client began discussions with LBSF as soon as

2   practical following its bankruptcy filing and the record as to

3   what happened after that is spelled out in Mr. Statle's

4   declaration, Mr. Rosenfeld's declaration.  The point simply is

5   that we are not a party who sat on our hands and waited for the

6   market to somehow change to perhaps put us in the money on some

7   kind of swap.  We began from the original -- from the original

8   LBHI bankruptcy filing instead to begin planning for

9   substitutes, to begin planning for termination and LBSF knew

10  this.

11       The other reason we felt compelled to introduce some

12  of the specific allegations and the declarations such as the

13  amount of the settlement offers that were exchanged, was not to

14  demonstrate, not to try to pin LBSF on what the value of the

15  swap agreement was, but rather to show that Capital

16  Automotive's positions, Capital Automotive's settlement offers

17  were good faith offers.  There was real money on the table.

18  There was fifteen million dollars on the table.  There was not

19  offers of 200,000 dollars nominal pittances.  This was real

20  money as evidencing a real attempt by our client to resolve

21  this dispute in early time.

22       Now, the other allegation that specifically puts at

23  issue our client's conduct is paragraph 32 of the motion to

24  compel which allege that Capital never attempted to terminate,

25  never attempted to accelerate or otherwise offset or net out

103

1    its position under the swap agreement.  Again, I think the

2    conduct of Capital Automotive clearly belies that contention.

3         Even if, and I'm just assuming for sake of argument

4    now, even if these allegations were barred by the negotiation

5    agreement and barred at this time by the negotiation agreement,

6    we have analogized to the at issue waiver under the

7    attorney/client privilege, with cited cases under that doctrine

8    from this circuit which we believe would support the notion

9    that fundamental fairness sometimes overrides concerns such as

10   privilege information.  It override concern such as a private

11   inter se a contractual limitation.  You know, this is well

12   recognized.  We have, for example, United States v. Bilzerian

13   from the Second Circuit where the Court noted, quote, "The

14   privilege may be implicitly waived when defendant asserts a

15   claim that in fairness requires examination of protected

16   communications."  Here by analogy, examining LBSF's claim in

17   fairness requires examination of the entire factual picture

18   that's at issue here.

19        Turning now to the textual arguments, I'm not going to

20   quibble too much with the reading of the negotiation agreement

21   that LBSF has made except I'm going to point out the important

22   language they failed to note, which is that there is a carve

23   out of what the term "communications" means.

24        And the term communications specifically is defined to

25   not include, quote, "Any action, communication or statements

104

1    made by a party in connection with the party's enforcement of

2    its rights and remedies under the swap agreement or this

3    letter", that being the negotiation agreement.

4           Your Honor, respectfully, that is exactly what the

5    communications we have raised were.  They related to attempts

6    by our client, by Capital Automotive, to enforce its rights to

7    terminate the swap agreement upon the occurrence of events of

8    default.  Furthermore, it's broad to include not only

9    statements by Capital Automotive, but statements by LBSF that

10   relate to Capital Automotive's attempts to exercise its rights

11   under the swap agreement.

12          Now, we are not taking the position that this means

13   that any and all -- any and all statements made by LBSF could

14   be used for any purpose.  That is not what we're saying at all.

15   We would concede, for example, that we could not use statements

16   concerning quantification of those rights as some kind of

17   binding evidence in this proceeding as it moves towards the

18   entry of facts into evidence.  But certainly, the statements

19   that relate to the actual exercise of the rights themselves,

20   are carved out of communications under this agreement and thus

21   we think are not barred.

22          The only other point I would make, Your Honor, is

23   concerning Rule 408.  We have not argued that Rule 408 somehow

24   is the governing standard here.  We have raised Rule 408 to

25   note that if there is a policy concerning the exclusion of

105

1    settlement negotiations, of compromised negotiations from

2    evidence, that is the policy.  The policy as our nation's

3    jurisprudence has enshrined it is evidence by Rule 408.  And

4    that allows for the use of a lot of allegations for a lot of

5    different purposes.  That to the extent the negotiation

6    agreement goes beyond that, it perhaps the reading that LBSF

7    has given it is out of line with what our jurisprudence deems

8    the acceptable and prudent limitations on the introduction of

9    compromised negotiations into evidence.

10        And one other point, just the Reuling case, which is,

11   I believe, the only case on which LBSF relies; two points I

12   would make concerning that.

13        The first is that unless I am incorrect, that case was

14   concerning motions in limine to keep evidence out as determined

15   prior to trial.  It wasn't an attempt to strike some kind of

16   pleading lodged in the case that would have -- could have

17   broader substantive ramifications.

18        The other point is that in the Reuling case the

19   evidence in question was offered in the case in chief, the

20   evidence that was alleged precluded was offered in the case in

21   chief in an offensive way.  Here, I would just remind the

22   Court, we are only attempting to use these facts, these

23   allegations, in a defensive manner and only because we are

24   compelled to by what LBSF has put at issue.

25        And finally in that case, there was also -- the Court

1   noted that the reason it was excluding the evidence in part was

2   because there was no separate wrong and there was no separate

3   purpose to which the evidence could be put other than trying to

4   prove liability on the primary claim, which is, again, not what

5   we're trying to do here with anything they've identified.

6         In short, to sum up, we are happy as we have said for

7   a month and a half now to discuss specific allegations, how

8   those specific allegations could be tempered with LBSF.  And

9   now that the day before the hearing we were provided with the

10  allegations in question, perhaps we could do that.  But

11  otherwise we would view this, their motion, as untimely and

12  substantively improper.  Any questions, Your Honor?

13        THE COURT:  I think Mr. Gruenberger wants to respond

14  to some of the things you've said.

15        MR. GRUENBERGER:  Very briefly, Your Honor.  I'm not

16  going to get into whether or not this has to be a

17  confidentiality agreement.  That needs no response.

18        I think what you heard and what we all heard today is

19  exactly what we were afraid of.  Not only are they trying to

20  use this in papers filed in court to win a motion, they're now

21  trying to sway Your Honor by using the negotiations themselves

22  against us to color your mind against us.  That's more than

23  just reading it, now they're saying, we're good guys, they're

24  bad guys, let's look at the negotiations that we're not

25  supposed to refer to.  That's what they're doing and that's

107

1    what this is all about.

2         THE COURT:  I actually disagree with that.  I think

3    that what I heard in argument is an attempt to differentiate

4    this situation from the situation that was litigated in

5    Metavante.  And whether that's a fair use of the negotiating

6    history, I don't know, but I don't -- I don't draw the

7    conclusion that you've just asserted that they're trying to

8    paint Lehman as a bad guy.  I think instead, they're trying to

9    paint themselves as endeavoring to reach an accommodation and

10   that it took some time.

11        MR. GRUENBERGER:  Your Honor may draw that inference.

12   I respectfully disagree and maintain our position.  I think the

13   position --

14        THE COURT:  But let's understand what we're dealing

15   with here.  That's one of the reasons why I asked some

16   threshold questions.  With the -- mostly for courtroom, we've

17   spent a considerable amount of time debating an issue that is

18   clearly important but let's look at the context in which we're

19   debating it.  This is not the Dartmouth College case.  We're

20   not debating the sanctity of contract as an issue of seminal

21   law of the United States.  We're talking about something that

22   really is a one-off agreement that I suppose Capital Automotive

23   now wishes it hadn't proposed in the first place.  But you know

24   what, they did.  This is not a governing issue in this case.

25   You've already acknowledged that all of these counterparty

108

1    negotiations are going on without such agreements in place

2    which means that negotiations without this agreement would be

3    before me in multiple cases.

4         MR. GRUENBERGER:  That's correct, Your Honor.  I --

5    you asked me a question whether this was the standard that the

6    debtors use and I said no.  There are confidentiality

7    agreements, as you know, that come before you in other context,

8    but this is not the standard.  But you heard counsel, when they

9    think that they can get away with making statements like, well,

10   we really don't know whether we drafted it, so we're not going

11   to agree or disagree.  You notice that that was -- Your Honor

12   just said they drafted it.  They walked away from that.

13   They're not agreeing with anything.  They accuse me of not

14   mentioning the clause in the -- on negotiation agreement that

15   says that, yes, it's legitimate to try to use negotiations for

16   enforcement purposes.  They're choosing to not mentioning that.

17   Your Honor knows I mentioned that and we don't have to go check

18   the transcript, it's all over that.  And I mentioned that the

19   enforcement could not be possible because what they're trying

20   to do to enforce doesn't exist as a right under the swap

21   agreement.  So I think this is a question of how slippery a

22   slope are we going to allow to be used here.  They said that

23   the case was only an evidentiary case.  The case we cite in the

24   District Court of Connecticut.  That came up on a motion to

25   amend a pleading.  The case is only three pages long, Your

109

1    Honor.  It's not hard.  I'm sure your clerk will read it.  And

2    it's there.  Whatever the case stands for, it stands for that

3    that use of negotiations was stricken.  It wasn't permitted.

4    That's what we're talking about.  How far can parties go

5    freely?

              Of course, this is not the Dartmouth College case.  Of

6    course not.  Even I in my rhetoric don't go that far.  Never

7    close.

8              THE COURT:  You almost did.  You almost did as you

9    were closing your argument.  You were suggesting that this was

10   a case about the sanctity of contract.

11             MR. GRUENBERGER:  And I still believe it.

12             THE COURT:  That is in fact the Dartmouth College

13   case.

14             MR. GRUENBERGER:  Yes, it is, Your Honor.  But this is

15   only in a very small, small universe.  That was in the 18th

16   century, Your Honor, at the start of this country.  And when

17   Justice Marshall wrote that decision, he was writing on a clean

18   slate.  We're not writing on a clean slate.  Contracts meant

19   something after that case and they still mean something and

20   that's why I submit, Your Honor, that you should enforce it

21   against Capital Automotive.  And I thank you very much for

22   giving me the opportunity.

23             THE COURT:  Okay.  Apparently, that's not the last

24   word.

25             MR. REISS:  Your Honor, with your indulgence, one

1    point just on the Reuling case just so my reading of the case

2    is not besmirched; 407 F. Supp 2d, 401, 402 clearly identifies

3    that the issue was before the Court on a motion in limine.

4    That's all I have.

5            THE COURT:  All right.

6            MR. REISS:  Thank you.

7            THE COURT:  It's lunchtime.  It's actually twenty

8    minutes past lunchtime.  And we have some other matters from

9    the morning agenda which will be heard at the start of the 2

10   o'clock calendar.

11           As it relates to this motion to strike, I'm going to

12   take some time to review the entirety of the negotiation

13   agreement not just the parts that have been excerpted although

14   I think if I read all the excerpts it's probably the whole

15   agreement.  And I'm going to take this under advisement for

16   disposition if it hasn't become moot by that time on February

17   10 at the time of hearing, the motion to compel performance.

18           Notwithstanding the rhetoric, I question the need to

19   hear this motion to strike as a freestanding piece of motion

20   practice on an already crowded omnibus docket.  And I need to

21   sift the relative importance of this issue in the context not

22   only of the dispute with Capital Automotive, but in the context

23   of the case as a whole.

24           I am left with the impression that this is

25   notwithstanding the characterization by debtors' counsel much

111

1  ado about not very much.  I think it would be highly desirable

2  for the parties to meet and confer in good faith in accordance

3  with the proposal made by counsel for Capital Automotive to

4  endeavor to reach by consensus a molding of the pleadings and

5  the declarations to the obligations undertaken in the

6  negotiation agreement.  To the extent that there can be a

7  rewriting of those declarations and a truncating of them in a

8  manner that makes them congruent with the agreement, that would

9  be desirable.  If that can't be done, I'll deal with the motion

10 on February 10 as a motion in limine which is what I believe it

11 is.

12       There seems to be little dispute as I have heard the

13 argument that the language of the agreement says what it says,

14 that it's plain, that there's no ambiguity and that there's no

15 need as a result to get to the intention of the parties in

16 having prepared in the first instance.  It does not purport to

17 be a confidentiality agreement but it does by its terms limit

18 use.  The question that's still before the Court is whether the

19 use that has been made of the material set forth in the two

20 declarations constitutes a fair use of negotiation history

21 consistent with the terms of the agreement.  I'll give some

22 thought to the analogy made to an at issue privilege waiver

23 which I view as something of a stretch, but I'll at least give

24 it some thought.

25       What it basically is is a plea for mercy by a lawyer

112

1   who represents a party that now wishes it didn't enter into a

2   particular form of agreement.

3          As Mr. Gruenberger has articulated with considerable

4   flourish, this is a contract.  It should be enforced.  But the

5   question still exists as to what it means and how it should be

6   applied in these circumstances.  I'll do that if it's necessary

7   on February 10 but suggest with emphasis that the parties might

8   do well to take this problem away from me by reaching an

9   agreement before February 10 so we don't have to spend anymore

10  time on what I think is an unfortunately small point.  We're

11  adjourned till 2 o'clock.

12         (Recess from 12:53 p.m. until 2:00 p.m.)

13         THE COURT:  Be seated, please.

14         MR. WAISMAN:  Good afternoon, Your Honor.  Shai

15  Waisman, Weil Gotshal & Manges, on behalf of the Lehman

16  debtors.

17         Your Honor, as I indicated at this morning's session,

18  we filed an amended agenda letter last night reflecting that

19  two of the adversary proceedings, numbers 16 and 17 of the

20  prior agenda letter that were scheduled for this afternoon's

21  session, have been further adjourned.  That left one adversary

22  proceeding to proceed this afternoon at the 2 o'clock calendar.

23         If we could, there is a request to proceed slightly

24  out of order as to that adversary proceeding.  I understand the

25  parties have agreed on a discovery schedule and simply request

113

1   to hand up a stipulation, so it should be very -- a relatively

2   quick matter.

3           THE COURT:  That's fine.

4       (Pause)

5           MR. ALBANESE:  Good afternoon, Your Honor.  Anthony

6   Albanese from Weil Gotshal, on behalf of the debtors.

7           This is the adversary proceeding of Federal Home Loan

8   Bank of Pittsburgh versus various entities and LBI, Woodlands

9   and Aurora Bank.  We were before Your Honor on December 11th

10  with respect to all of the defendants' motions to dismiss the

11  proceeding.  Your Honor had decided to defer the decision on

12  the motions to dismiss and allow the parties, at plaintiff's

13  request, to conduct discovery.  And Your Honor indicated that

14  we could have sixty days for discovery.

15          So the parties have entered into a scheduling

16  stipulation which would provide that the discovery would be

17  completed by March 1st and that any supplemental papers with

18  respect to the motions that are pending would be submitted by

19  April 2nd and that any oppositions or objections to the

20  supplemental papers would be filed by April 19th.  And all the

21  parties have agreed to the stipulation, which I can hand up to

22  Your Honor.

23          THE COURT:  Sounds fine.

24          MR. ALBANESE:  Thank you, Your Honor.

25          THE COURT:  If it's as you describe, it's approved.

114

1          MR. ALBANESE:  Okay, thank you.

2          THE COURT:  And that can be handed when all matters

3     relating to the afternoon calendar are submitted.

4          MR. ALBANESE:  Okay, thank you, Your Honor.

5          THE COURT:  And everybody who's involved can go home.

6          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

7          MR. WAISMAN:  Thank you, Your Honor.  We would now

8     jump back to this -- the agenda for this morning, which we

9     didn't have an opportunity to close out.  And I believe the

10    next matter on the calendar is reflected in agenda item number

11    10, motion of Sea Port and Berner to deem proofs of claim to be

12    timely filed.

13         THE COURT:  Good afternoon.

14         MR. DONOHO:  Good afternoon, Your Honor.  It's

15    Christopher Donoho of Lovells LLP, on behalf of Sea Port Group

16    Securities, LLC and Berner Kantonalbank jointly.  And the

17    reason it's a joint motion is these are buyers and -- a buyer

18    and a seller of some Lehman programs securities.  And I think

19    from your nodding that you have read the papers and understand

20    that this is --

21         THE COURT:  I understand the papers and I understand

22    that a mistake was made with respect to the second page of the

23    spreadsheet.  And it hardly seems excusable, but let me hear

24    you tell me why it should be.

25         MR. DONOHO:  Okay.  Not a great start for me, but I --

115

1          THE COURT:  No, it's --

2          MR. DONOHO:  -- hope I can convince you.

3          THE COURT:  -- it's not a great start.

4          MR. DONOHO:  Well, as you -- well, let me start off by

5      saying that we are talking about three trades that were on that

6      second page; it's a total of a little bit less than five

7      million dollars of claim amount for those three trades in the

8      aggregate.  And I'll go over briefly the facts for you,

9      although I won't belabor them because obviously you're up to

10     speed.  But I would also note that Jonathan Silverman, who's

11     the general counsel of Sea Port Group, is here today.  And on

12     the phone is Samuel Stucki of Berner Kantonalbank -- sometimes

13     we call them BEKB -- is on the phone as well.

14          And, I guess, taking it from sort of the brief

15     history, on September 4th there was the confirmation of the

16     trade; it was two separate pages, as you know:  eight on one

17     page, three on the other.  The eight -- well, essentially seven

18     of the eight closed a few days later, as was contemplated.

19     There was some confusion about a currency issue on the other

20     one; that then closed on September 30th.  At that time, there

21     was -- sort of first raised the question of those other three

22     trades between the back offices, not involving the traders who

23     were directly involved.  The BEKB back office said what about

24     these other three trades.  The Sea Port back office said we

25     don't recognize those three trades.

1          And that -- it then just sort of fell into the ether

2     for a short period of time, when on November 5 the BEKB trader

3     contacted the Sea Port trader and said we have these other

4     three trades, we want to close on these, what happened.  It was

5     then it was realized that, you know, that they had not closed

6     on those three trades and the November 2nd bar date had been

7     missed.  I don't think that those facts are disputed by the

8     debtor, and I think they sort of speak for themselves.

9          But what I wanted to talk about was whether the

10    failure to file the proof of claim for those three securities

11    by the November 2nd bar date constitutes excusable neglect.

12         THE COURT:  Let me ask you this question.

13         MR. DONOHO:  Yeah.

14         THE COURT:  At this moment --

15         MR. DONOHO:  Yes.

16         THE COURT:  -- who owns the securities?  Was this a

17    failed trade, or did the trade go through and the proof of

18    claim fell between the cracks in the hands of the owner?

19         MR. DONOHO:  It's a great question, and the answer is,

20    I think, unsettled.  The claims have not -- the trade has not

21    closed.  The seller would say that the obligation and the

22    ownership interest is in the hands of the buyer and it was

23    their responsibility.  The buyer would say that, because it

24    never closed, the responsibility for filing the claim is in the

25    hands of the seller.  That's an issue between the two of them

117

1    that remains unresolved.  And the hope is that if there's a

2    favorable outcome from this late-filed claim motion, that that

3    issue will no longer be an issue and then it can close and

4    everyone will be happy.  If we get an unfavorable result from

5    this joint motion, then that question becomes the core question

6    as between those two parties.

7              THE COURT:  I'm glad I asked it.

8              MR. DONOHO:  But it is the, sort of, key question,

9    because you have two parties who are getting along for purposes

10   of bringing this motion, but behind the scenes are both

11   pointing at each other saying this is your -- this is not our

12   fault, this is your responsibility.  BEKB would say on their

13   records, their systems, once they have a trade confirmation it

14   gets a different coding, it gets treated differently and it's

15   treated as sold, and they don't keep records of it.  The buyer

16   would say -- well, here it got mistaken, so it didn't get coded

17   that way.  But the buyer would say until the trade closes we

18   don't have title, and without title we can't file a proof of

19   claim.

20             So you have this push and pull.  And that's why I

21   say -- that's why this is such an important hearing, because

22   that issue will go away if we get a favorable result.  That, to

23   me, is part of the prejudice argument of, sort of, the four-

24   prong test as it relates to excusable neglect.  To me, the

25   prejudice issue sort of falls in, sort of, three categories;

1    one of them is just that.  There's a five million dollar issue

2    that we're looking at, which will lead to litigation if this

3    isn't resolved.  On the flip side, as to the Lehman estate,

4    five million dollars is below a rounding error, given the size

5    of the estate.

6         I think the other two points to make on prejudice --

7    the first one is that this five million dollars, being a small

8    amount for Lehman, is a lot for these parties and potentially

9    people's jobs are on the line.  Like, this was a mistake that

10   someone is having to take responsibility for; they haven't had

11   to face that judgment, I guess, until we have a decision here.

12   But potentially, you know, there could be consequences.  This

13   is real money for both the buyer and the seller.

14        The other point I guess I would make is that the

15   prejudice for a Lehman programs security, which this is, seems

16   that -- seems, to the movants, that these are the kinds of

17   securities that were known by the debtors.  It's not like the

18   Pacific Life case, which you are obviously still considering.

19   But there you had a derivative with a guarantee claim, and it's

20   hard to say whether that guarantee claim was known, was part of

21   the books and records, was easily identifiable.  These are

22   Lehman programs securities where there was a guarantee claim

23   form that was sent out and available.  The existence of these

24   claims should have been very well known to the debtors.  So

25   it's hard to see how it can be prejudiced by having those

119

1    claims allowed, which they were probably counting on being

2    filed.

3              The three other factors:  Delay:  We have a forty-two

4    day delay.  As soon as this became clear that it was a problem

5    that was not going to resolve itself, we put the motion

6    together, filed the claims, came before this Court.

7              Good faith:  I don't think anyone questions that --

8    everyone recognizes something terrible happened here, and

9    everyone's been acting in good faith to get this resolved.

10             The last factor, and we understand that they're not,

11   sort of, considered as equally weighted factors, is, sort of,

12   the reason.  And I think the facts set forth the reason.  But

13   what I wanted to do was really contrast this with some of the

14   other cases that either they've cited or we've cited or that

15   you are considering now.  I think one of the cases that the

16   debtors cite is the Enron Midland Cogeneration case.  I think

17   this is very different than that in the sense that there was a

18   six-month delay; people knew about, or should have known about,

19   the claim that they could have filed, and they really sat on

20   their rights.  We don't have that here.  We have people who

21   acted promptly; as soon as they became aware of the problem,

22   they acted.

23             I think the case that the debtors are really relying

24   on, and the one that's probably sticking with you, is Pacific

25   Life, where you have two people in the same institution, each

1   charged with the responsibility, one doing European claims, the

2   other one doing U.S. claims.  You have a U.S. guarantee on the

3   European claim.  Both people look at each other and say this

4   was your responsibility, what you referred to as the fly ball

5   that lands between the two outfielders.

6          And I think this is different, and the reason I think

7   it's different is those two outfielders play on the same team;

8   they're managed by the same coach.  And that ball fell between

9   the two of them.  Ultimately, the manager of that baseball team

10  had the responsibility to tell the center fielder, or the left

11  fielder or the right fielder, whose responsibility it is to

12  take control of the ball; that's an indeterminate.

13         Here you have two different organizations, BEKB, which

14  is a Swiss entity which doesn't normally trade in these kinds

15  of U.S.-type securities, and a U.S. entity that doesn't have

16  this trading partner very often, speaking primarily different

17  languages, dealing in securities that they don't spend a lot of

18  time with, and they have a mistake and the ball falling between

19  them, so to speak; they're on different teams and they have

20  different managers.

21         And so what I think was really underlying your concern

22  in Pacific Life is the manager of that baseball team had the

23  ability to control their actions and didn't do a good job of

24  it.  And you haven't ruled against them, so I'm not saying

25  that -- I'm not trying to prejudice your decision there in any

1    way.  But here you have a very different situation because you

2    don't have one manager; you have two different managers.  And I

3    think this is a lot more like a situation like PB Capital or

4    Banesco where you have people doing their jobs as best they can

5    and making unfortunate slip-ups, but the consequences are so

6    dire on the one hand and so mild on the other hand that we

7    would hope that this would constitute excusable neglect.

8         THE COURT:  I need to understand a little bit more as

9    to why the facts you have laid out, in what I'm afraid is a

10   tortured metaphor that I started last time we had a hearing

11   with the subject of excusable neglect, gets us to the point of

12   exercising discretion in your favor.  It's one thing to pick up

13   the metaphor to have two players who see the ball and drop it;

14   it's another thing to have players who are drinking coffee in

15   the dugout.  Here, we have players who are closer to the second

16   imagery.  They didn't see it.  In fact, they weren't even

17   looking.  They weren't playing.  They didn't know that there

18   were three securities on this second spreadsheet.

19        So in some ways you can say it's a harder case for

20   you, because there isn't even an effort at diligence.  There is

21   knowledge of the bar date on the part of both seller and buyer

22   but a failure to recognize that these are securities that

23   either party needs to attend to for purposes of preserving

24   rights.  I'm troubled by that.

25        MR. DONOHO:  I -- I don't know that it's laid out

122

1    expressly in the affidavit in a way that addresses your

2    question, but I think it's implicit in the affidavits that this

3    is an unusual situation, these are unusual circumstances.  And

4    I can sort of flip that into two categories.  First off, I

5    don't think the seller has much experience in U.S. bankruptcy

6    matters and understands the idea of who has the responsibility

7    for filing claims.  And they coded these securities, once they

8    had the confirmations, as sold.  So in their minds, they were

9    aware of them; they just didn't know that they were

10   responsible, or could be responsible, for filing claims.

11        On the other hand, you have a buyer who doesn't -- you

12   know, doesn't -- didn't have that extra layer of check to make

13   sure that every time a trader gets a two-page spreadsheet page

14   of securities that both pages make their way through.  I am --

15   you know, I am -- I understand that this kind of thing doesn't

16   happen.  And so this is so unusual that to have the, sort of,

17   requirement that they have this extra layer of protection built

18   into their own system is sort of what I think you're saying

19   should have been there.  And they don't have that; maybe they

20   will after this, but they didn't have it in place at the time.

21   And so the ability to correct for those kinds of mistakes just

22   simply wasn't there.

23        And, again, I don't think this is so different

24   ultimately than PB Capital or Banesco in the sense that in

25   those situations where you ruled in their favor, someone either

1   misread the form or saw the list of securities, saw they were

2   on there, and didn't go back and check the second time when the

3   new list came out.  In both of those instances, someone could

4   have discovered it but didn't because either they misread it or

5   they didn't follow up.  And I think that's no different,

6   really, ultimately than what we have here where you have a

7   seller who mis -- potentially misinterpreted their

8   responsibility, and a buyer who didn't follow up because they

9   haven't had the experience that tells them you need to follow

10  up.

11       THE COURT:  I guess here's the distinction in my mind:

12  In the other two examples, there were parties who were

13  scrupulously endeavoring to comply with the bar date and

14  exercising due diligence, but there was a mistake, and the

15  mistake in both instances occurred within highly respected law

16  firms that were doing the best they could under the

17  circumstances to get a job done by a hard deadline that they

18  recognized.

19       In this instance, there seems to have been -- whether

20  it's excusable or not we'll have to get to in a minute -- a

21  failure to recognize the obligation.  There was a failure to

22  recognize the obligation on the part of the seller because it

23  was coded as sold.  So even though there -- and I have no idea

24  what this institution's knowledge of U.S. bankruptcy practice

25  may be.  And, frankly, even if it were sophisticated in U.S.

124

1    bankruptcy practice, the Lehman case is, for all practices

2    cases, sui generis as it relates to the proof-of-claim drill,

3    particularly as it affects securities.

4            So I have no idea what they did, except they didn't do

5    anything because they didn't think there was anything to do,

6    because they'd sold the securities.

7            MR. DONOHO:  Your Honor, a response that I think

8    answers that question is these are not parties who were acting

9    carelessly.  As the debtor notes in its pleading, both BEKB and

10   Sea Port filed proofs of claim on their own behalf in other

11   instances with respect to other securities.  So they were aware

12   of the bar date, knew their responsibility and acted in

13   accordance with that.  This is the exception to that where,

14   again, for the reasons they set out, either they didn't know it

15   was their responsibility or they didn't realize they had it to

16   do.  But it wasn't like they were flaunting this Court's order

17   that says you have to do.

18           THE COURT:  No, I'm not suggesting for a minute that

19   that's what I think happened.  I'm really talking about a blind

20   spot.  I'm talking about something that's completely missed.

21   It's the intersectional collision and you didn't see the stop

22   sign at all, but the stop sign was there and you had a

23   collision, but you're at fault.  It doesn't mean that you

24   wanted the accident to happen; it's that you were texting or

25   doing something else, your mind was elsewhere.

125

1          And, again, this may not be a completely apt image,

2     but my image of this is that the seller didn't even think about

3     filing a proof of claim as to the securities, for the reasons

4     that you've described, because the securities were, for their

5     records, sold.  As a result, it was, in their mind, the buyer's

6     responsibility to do whatever needed to be done to protect

7     claims as against this estate.  And from the buyer's

8     perspective, they didn't see the second sheet.  Now, the second

9     sheet was there to see, the securities on the second sheet were

10    part of this eleven-security trade, but because the second

11    sheet was missed it's as if they weren't there at all.

12         So the real mistake, I guess, we're talking about is

13    the buyer's back-office mistake in missing the sheet and in

14    failing to pick up the fact that mistake was made.  That's how

15    I'm seeing it.

16         MR. DONOHO:  Your Honor, I guess I don't fundamentally

17    disagree with the facts as you lay them out; it's really a

18    question of degree.  And I know you haven't ruled in Pacific

19    Life, and I know you have ruled on PB Capital and Banesco, but,

20    to me, in PB Capital and in Banesco you have something that

21    could have been caught, but either they didn't read it closely

22    enough or they had a misunderstanding or they didn't look at it

23    at the right time.  In each case they were acting in good

24    faith; they just made a mistake.

25         And I would say that in this situation, you have --

126

1    obviously the facts are different, but the good faith, the lack

2    of prejudice and the effort, I think, was all there.  And,

3    again, they acted very promptly to respond.

4         And I think one other point I guess I would make, and

5    you're going to say this isn't quite what you were asking me

6    but I didn't want to miss this point:  I think one of the other

7    factors on prejudice is the sort of -- the fear of the flood,

8    right, the other claims that come in front of you.  But from my

9    understanding, you've had six or so motions to allow late-filed

10   claims and a host, and maybe there are hundreds, of claims that

11   were late-filed.  I don't know where those people are, but they

12   should be here in front of you on motions to have late-filed

13   claims if they believe they have good grounds to do so.

14        You have six movants who came in front of you saying

15   we made a mistake.  I don't think that allowing this claim,

16   under these circumstances where people's jobs are on the line

17   and you're talking about a rounding error in a case of this

18   size is going to lead to the flood that's going to cause this

19   Court to be stuck with lots of people coming in and saying me

20   too, me too.  Their chance to file motions really has come and

21   gone.  We acted as promptly as we possibly could under the

22   circumstances.  And, again, I don't think the prejudice is

23   there.

24        And I know that the factors aren't weighted equally,

25   but here the prejudice on the movants' side is so great

127

1    relative to the size of the estate and the facts at play, it

2    has to be considered.

3            THE COURT:  Okay.

4            MR. DONOHO:  Thank you, Your Honor.

5            THE COURT:  I understand your argument, and I should

6    hear from Lehman.

7            MR. WAISMAN:  Your Honor, Shai Waisman for Lehman.  I

8    think what we've just heard is a very understandable and

9    laudable slight of hand embracing as vigorously as possible

10   Banesco and PB Capital and running away as much as possible

11   from the facts of Pacific Life.  Of course, we view the world

12   very differently.

13           And to further torture Your Honor's analysis --

14   analogy in the baseball context -- you know, they weren't just,

15   in this context, sitting in the dugout drinking coffee.  Here

16   they kind of actually pointed at the ball till it dropped on

17   the ground, left, and didn't pick up the ball till the very

18   next game.

19           Both parties here don't deny they received actual

20   notice of the bar date.  What happened was this second page

21   didn't go through and Berner's back house contacts Sea Port and

22   says urgently there's a mistake here, you need to get to us

23   because there's an error.  And what happens?  Nothing.  Nothing

24   happens until Berner goes at them again and says you need to

25   get back to us.  And then people realize something went wrong,

128

1    and then they take an additional -- I think it's over thirty

2    days; it's set forth very clearly in the affidavits -- to

3    actually consider filing a proof of claim.  And where we end up

4    is that Berner, who at all times, it's not admitted on the

5    record, owned the security, blows past all the bar dates and,

6    well after the securities program bar date, determines to file

7    a proof of claim.

8         It owned the securities as a result of the mix-up on

9    the trade.  It owned the securities before the bar date, at the

10   bar date, to this day -- in response to Your Honor's question,

11   to this day, owns the securities, and offers really no excuse

12   as to why it did not file a proof of claim.  And not

13   understanding the procedures doesn't excuse one from the

14   Court's bar date order, especially since it was so explicit.

15        And all of the commentary on the record that everyone

16   acted as soon as they realized that there was a mix-up in the

17   transfer of securities is completely unsupported by the two

18   affidavits, which make clear that people sat around.  They knew

19   there was a screw-up in the transfer; they sat around.  They

20   knew they missed the bar date; they still sat around.  And to

21   this day we haven't heard any excuse for that.

22        And there's -- an argument's been made that, well, it

23   really doesn't matter because at all times Lehman knew about

24   these securities.  Well, at this point that's not really

25   relevant.  If Your Honor recalls, the reason we established the

129

1      programs securities bar date was because these were securities

2      that Lehman, Lehman the estate, the entities before Your Honor,

3      actually didn't know.  These were issued by affiliates in

4      foreign proceedings, and we had no record.

5           So we had to give more time to prepare a list, set

6      them out and encourage people to file claims, and that's what

7      was done here; these were the B.V. notes which were guaranteed

8      by LBHI.  But they got the benefit of a later bar date.  And to

9      say that "They were known to us" doesn't excuse them from

10     failing to file even by the later bar date that these

11     securities provided.

12          I think we're getting -- I'm sorry, going back to

13     Banesco and PB Capital, as I recall Your Honor's reactions to

14     those matters, Your Honor first of all was very, I think, aware

15     and appreciative of the fact that, as Your Honor just said,

16     everyone had their eye on the ball, they were working

17     diligently.  I think there was also an element there of

18     confusion over several bar dates and very detailed procedures

19     as to each of those bar dates.  And the confluence of those

20     two, I feel, persuaded the Court that those parties had

21     established excusable neglect.

22          That is very different from the circumstances in

23     Pacific Life, and now in Sea Port, where there isn't even an

24     allegation of confusion over the procedures; there isn't any

25     confusion over the bar date.  It is we missed the bar date

130

1    because we did not follow the instructions that were provided

2    to us, that we had full knowledge of, and it's because of an

3    error on our end, not the debtors' end, on our end, and because

4    we messed up, and there's a whole host of reasons we did, and

5    we interact with other parties all the time, and it's all very

6    confusing, and, by the way, it's an exception because no one

7    else will be like us; that doesn't cut the mustard.

8           The line of cases in the Second Circuit, I think, make

9    clear that the standard is strictly construed in this circuit.

10   And mere neglect -- and I'm not sure this is even mere neglect;

11   I think the absence of action during both intervening periods

12   rises beyond mere neglect in this case -- I think, precludes

13   the relief sought.

14          THE COURT:  What do you say about the flood?

15          MR. WAISMAN:  What I say about the flood, you know, we

16   didn't push the flood argument with respect to the last several

17   motions; we still don't push the flood argument.  We merely

18   apprise the Court of how many late-filed claims there were.

19   But the flood was used very interestingly in the presentation.

20   It wasn't, well, there's no prejudice, there is no flood, so

21   that weighs in our favor.  In fact, the argument was, as I read

22   it, there hasn't been a flood, we're here early and therefore,

23   no matter what the reason is, we get to file a late claim.

24   That isn't the standard.  I think it's quite the opposite.  If

25   you establish the basis for a late claim, you then consider the

131

1    flood argument.  And I think here it was turned on its head.

2         And if we permit this late claim on these specific

3    circumstances, we essentially are left simply to any further

4    motion.  Well, how many days after the bar date do they come?

5    Because at this point the reasons don't really matter.  At this

6    point, if you made an error on your end, not because you didn't

7    receive notice and not because you didn't understand but you

8    just messed up, back office, two people didn't speak to each

9    other, you didn't follow any sort of procedures to make sure

10   your claims were transferred, you stuck it in a drawer and

11   forgot about it and just found it -- those are all perfectly

12   fine reasons if we accept this rationale -- at that point we're

13   just going to be counting days on a calendar as to how far away

14   we are from the bar date and whether the timing is -- you know,

15   has gotten beyond us.

16        And at this point we stand here nearly 120 days after

17   the original bar date; I think it was a little over 70 days

18   from the securities program bar date.  There was even, in terms

19   of timing, a delay in the bringing of this motion.  So I'm not

20   sure it cuts in their favor.  But in any event, the prejudice

21   flood argument is not as set forth in Sea Port's presentation.

22        THE COURT:  Okay.

23        MR. WAISMAN:  Thank you.

24        THE COURT:  Mr. Donoho, do you have some more?

25        MR. DONOHO:  Just very quickly to clarify on a couple

132

1    of points.  I guess I take offense to Mr. Waisman's opening

2    comment that this is somehow a slight of hand.  I think, if

3    anything, this is a fairly candid admission that something

4    terrible has happened and we're trying to correct it.  We've

5    been very open and honest about it.

6           He also refers to an absence of action.  I don't think

7    there was any absence of action.  I think people acted as

8    rapidly as they could once they realized there was a problem.

9           And his reference to looking at today as the reference

10   point for how far we are past the bar date is really unfair.

11   The claims were filed on December 14th; the motion was brought

12   on December 11th.  Those are the dates you should be looking

13   at, not from today.

14          We acted as fast as we could; we were just working

15   within the Court's calendar.  We didn't want to bring this on,

16   an order for shortening time.  We didn't think that was a good

17   use of the Court's calendar.  Thank you, Your Honor.

18          THE COURT:  Okay.

19          When I looked at this motion in connection with

20   preparing for today's omnibus calendar, I recognized that there

21   were some overlaps with the Pacific Life case that has been

22   referenced during the argument.  Because the Pacific Life case

23   is still under advisement, I'm going to take Sea Port and

24   Berner's motion and place it in the same spot, but it's not

25   going to stay there all that long.  I think it's actually

133

1    helpful to the process of attempting to identify some

2    benchmarks for excusable neglect, in the context of a proof-of-

3    claim process that is here so complex, to have a couple of

4    examples to consider at the same time.

5         I'll be deciding this probably at the February 10

6    omnibus hearing date.  And to the extent that someone would

7    like to advise Pacific Life, if they're not monitoring the

8    case, that they'll likely have an adjudication at that time, I

9    would appreciate debtors' counsel doing that.  If for some

10   reason there's a change in plan because of workload or other

11   reasons, I'll let you know, but otherwise let's assume that

12   there'll be a decision on both of these pending matters at that

13   time.

14        MR. DONOHO:  Thank you, Your Honor.

15        MR. WAISMAN:  Thank you, Your Honor.  And truly,

16   truly, no offense meant by "slight of hand" to my esteemed

17   counsel, honestly; more meant to emphasize trying to draw lines

18   between the various other motions that had been filed and

19   decided or adjourned by the Court.

20        THE COURT:  Okay.

21        MR. WAISMAN:  Next matter on the calendar, Your Honor,

22   appears at number 11:  motion of the debtors for establishment

23   of procedures for the debtors to compromise and settle pre-

24   petition claims asserted by the debtors against third parties.

25        As Your Honor is well aware, this was a global

1    enterprise with a very large presence in the U.S.  The debtors

2    conducted a great deal of business and had many customers and

3    vendors with whom they dealt with on a daily basis.  The

4    debtors have identified certain claims they have against third

5    parties, and continue to identify those claims.  Most recently,

6    Your Honor may be familiar with a stipulation entered into

7    between the debtors and LBI on the pursuit of certain pre-

8    petition loans to employees, just one category of the type of

9    claims against third parties that these debtors would proceed

10   with.

11          Given the de minimis amount of some of those claims,

12   any recovery would be severely diminished, if not entirely

13   diminished, by the need to prosecute individual motions with

14   respect to each.  And as a result, the debtors proposed and

15   worked hand in hand with the creditors' committee to prepare

16   this motion outlining procedures by which they can settle pre-

17   petition claims, and I think the procedures are rather

18   explicitly set forth and rather standard.

19          One objection was filed prior to the January 6 expiry

20   of the objection deadline, and that was U.S. Bank's "limited"

21   objection.  I found it difficult to discern how it was limited.

22   In reading the objection, it in fact suggested that none of the

23   relief was warranted and that, in particular, any settlement

24   that may affect any trust requires a motion on notice with an

25   opportunity for all creditors to respond, quite contrary to the

135

1    spirit and purpose of the motion.

2         I am at a loss as to what the aim of the objection was

3    if U.S. Bank as trustee, as we set forth in our reply, has

4    rights vis-a-vis the beneficiaries of trusts pursuant to the

5    documents underlying the trust.  Those agreements remain in

6    place and they have whatever rights they have.  The debtors, to

7    the extent they even have claims against U.S. Bank or any of

8    the beneficiaries of a trust, would be negotiating directly

9    with those parties.  And the rights those parties have vis-a-

10   vis one another are governed by whatever agreements and

11   documents govern those relationships and should not be an

12   impairment to this administr -- the administration of this

13   estate being efficient and cost-effective, as well as not a

14   burden to the Court's docket.

15        I do note that the U.S. Bank objection did make clear

16   that the end game of any settlement and motion that would be

17   required, as per U.S. Bank's view, would require an exculpation

18   of U.S. Bank, and perhaps that was the motivation for the

19   objection.

20        With that, there were no other objections.  I know --

21   I believe U.S. Bank is here.  I'll cede the podium.

22        THE COURT:  Fine.

23        MR. PRICE:  Good afternoon, Your Honor.  Craig Price

24   from Chapman and Cutler, on behalf of U.S. Bank.

25        First of all, I'd like to apologize for any confusion

136

1    we have caused to debtors' counsel and to the Court with our

2    papers, but I think our objection was a limited objection.

3    U.S. Bank is the trustee to over 800 complex -- I'm not going

4    to repeat the entire papers.

5            THE COURT:  No, it's not that.  What is a limited

6    objection?  I don't even know what a limited objection --

7            MR. PRICE:  Well, I think --

8            THE COURT:  Isn't an objection an objection?

9            MR. PRICE:  It's an objection, but it's limited in

10   scope.

11           THE COURT:  You're trying to make it seem like it

12   wasn't a really --

13           MR. PRICE:  It's not --

14           THE COURT:  -- hard-nose --

15           MR. PRICE:  No, no, right.

16           THE COURT:  -- hard-fighting, bare-knuckled objection?

17   It's kind of a soft objection?

18           MR. PRICE:  Well, it's limited in the sense that, you

19   know, we're fine with the settlement procedures that the

20   debtors have put forward; we, in fact, encourage it.  We don't

21   want to hinder that process.  In fact, we'd like to settle some

22   of our own claims.  So it's not an objection to any

23   settlements.  But we think that the claims that they are

24   attempting to settle are quite broad.  We don't know exactly

25   every kind of claim that's covered by it.

137

1          So U.S. Bank is a gatekeeper for its beneficial

2     holders as well as itself.  We're just asking that, to the

3     extent that there are any claims that are related to a U.S.

4     Bank trust, which is, you know, a small world of potential

5     claims, that those -- that any settlements with regard to those

6     claims -- that we're provided notice and a meaningful

7     opportunity to review the settlement just to make sure that

8     other beneficial holders are given the rights and that, you

9     know, we can look at the documents and make sure that

10    everyone's rights are maintained.

11         I think it's a quite limited-in-scope objection.

12    That's what we're asking is that, to the extent it's related to

13    an indenture or any other type of agreement or document that

14    U.S. Bank is the trustee to, that we're provided notice of that

15    settlement and that we're given an opportunity to review it and

16    make sure that everyone that would be affected is at the table.

17         And so that's, I think -- I don't know if that

18    answered your question about why it's a limited objection, but

19    it's quite narrow in scope.

20         THE COURT:  It sounds like it's narrow, as you

21    describe it, but my interpretation of it is that it's

22    incredibly cumbersome in its potential application and of no

23    particular value.  If in fact people do get notice, what are

24    they supposed to do with it?  We're talking about recreating a

25    process that from the very beginning of this case was one where

138

1  individual creditors were stepping forward for 2004 exams for

2  the rights to be heard with respect to basically everything

3  that was going on at the time, and the creditors' committee

4  ended up as the principal clearinghouse for creditor concerns.

5      To the extent that there is some requirement that U.S.

6  Bank as trustee, as opposed to any other trustee, or as opposed

7  to any other party-in-interest who might be affected, is

8  somehow entitled to special notice, to me, is a curiosity and I

9  don't understand it.  So maybe you could explain why that's

10  necessary --

11      MR. PRICE:  Well, it's necessa --

12      THE COURT:  -- why you as opposed to any other

13  fiduciary, why you as opposed to any other party-in-interest.

14      MR. PRICE:  Well, I guess us because, one, we're here.

15  But, two, you know, U.S. Bank is just trying to perform its

16  functions as a trustee and make sure that all beneficial

17  holders are given the rights that they're entitled to.

18      And so, you know, the question of whether that should

19  be granted to all trustees, I can't answer that question.  But

20  we think that it's part of our role to look at the -- any type

21  of agreement that's made with the beneficial holders, to make

22  sure that those rights are spread across everyone equally and

23  everyone is treated fairly and equally.  And that's what we see

24  as our role and our job.

25      THE COURT:  Okay.  I just don't understand how it's

1  going to work, but maybe if the debtor's willing to do that,

2  that's, I suppose, okay.

3         MR. PRICE:  Well, I don't think they're willing to do

4  it, so --

5         THE COURT:  Well, I'm not surprised.

6         MR. PRICE:  -- because -- that's why we're here.

7         THE COURT:  So let me find out why they don't want to

8  do it.

9         MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank

10  Tweed Hadley & McCloy, on behalf of the official committee of

11  unsecured creditors.

12         Just rising to confirm that we did in fact work hand

13  in glove with the debtors on this and believe that the

14  procedures, as proposed, are entirely appropriate.  They're

15  consistent with other procedures that have already been entered

16  in this case that have proven effective to permit the committee

17  to review settlements and other transactions of this type.

18         And we too are puzzled by U.S. Bank's objection.  I

19  think it goes so far as to suggest that the thresholds which

20  are integral to the protocol be eliminated, which would

21  eviscerate the whole point.  The whole point here is to allow

22  the debtors to settle some things entirely on their own and

23  some things in cooperation with us, and only need to get to you

24  at a twenty-five million dollar level, which we believe is

25  entirely appropriate.

140

1          So we think that objection should be overruled and the

2     motion entered as proposed.

3          THE COURT:  Okay.

4          MR. WAISMAN:  To answer Your Honor's question, we

5     can't agree.  First, we don't understand -- I don't understand

6     what may or may not affect a trust; I don't understand what may

7     or may not affect U.S. Bank.

8          Secondly, the -- secondly, it would be impossible to

9     police; we would have to get into the essence of every single

10    one of these settlements that we would rely heavily on the

11    businesspeople to keep down the administrative costs of this

12    estate; we would have to get involved and figure out whether

13    they have the potential of effecting a trust.

14         And thirdly, as I think counsel was basically saying,

15    they would like to police all settlements.  Well, you know, I'm

16    not sure that that's appropriate or the estate's problem.  If

17    we enter into a settlement with a beneficial holder, and that

18    beneficial holder was supposed to tell the other beneficial

19    holders or was supposed to tell the trustee under the

20    indenture, well, those parties have rights one against the

21    other and that does not involve the estate and should not hold

22    up the administration of the estate.

23         MR. PRICE:  I would just add, Your Honor, we're not

24    trying to eviscerate this process.  I mean, we want it to go

25    forward.  We're just concerned with those particular claims

1    that are being settled that relate to a trust that's being

2    administered by U.S. Bank.

3         And to the point that it's impossible to know which of

4    these involves U.S. Bank, I mean, U.S. Bank's name is all over

5    these documents.  So to the extent that they were settling with

6    a beneficiary, it would be in the documentation that U.S. Bank

7    was the trustee.

8         I don't think it's an impossible burden for the

9    debtors to police or to inform people to the extent that it's

10   U.S. Bank that's being -- that's involved.  We need to give

11   them notice.  And we're not trying to police all settlements;

12   we're only, one, trying to police those that involve U.S. Bank-

13   administered trusts.

14        And to the extent that, you know, we review the

15   settlement agreement and all parties that should be there,

16   their rights are being protected, we're fine with no Rule 9019

17   motion being filed; it doesn't need to be.  But to the extent

18   that there are instances where someone's rights, who is not at

19   the table, is being affected, then -- and there are objections

20   to that, then we would inform the debtors and we would hope,

21   then, that 9019 motion would be filed.

22        So, you know, it could be that there are no claims in

23   this world of the -- that relate to a U.S. Bank trust, and it

24   could be two.  We just feel that in those instances they should

25   contact us, give us notice and so that we can perform our job,

142

1    our function.

2        THE COURT:  The objection, limited or otherwise, of

3    U.S. Bank is overruled and the motion is granted.  Based on my

4    review of the motion, the comments of the creditors' committee

5    that participated in developing these procedures with the

6    debtor, and the debtors' papers and argument made today, I am

7    satisfied that these procedures, particularly in the context of

8    this case, are appropriate and that no single party-in-

9    interest, whether a trustee or otherwise, should have special

10   rights of oversight in connection with these procedures.

11   Indeed, the procedures are designed to eliminate the need for

12   such administrative oversight for those settlements that fall

13   within certain predetermined ranges of materiality.

14        U.S. Bank National Association, as trustee, will

15   simply have to be as vigilant as it thinks it needs to be to

16   protect its beneficiaries in the various matters in which it

17   has an interest.  And I don't believe that U.S. Bank is

18   entitled to any more rights, even though they filed a limited

19   objection, than any other comparable fiduciary in this case.

20        MR. WAISMAN:  Thank you, Your Honor.  I believe the

21   final matter on the calendar this afternoon is item number 12

22   on the amended agenda letter:  debtors' motion for approval of

23   claim objection procedures and settlement procedures.

24        As Your Honor is well aware, all of the bar dates have

25   now passed.  In response, over 65,000 claims have been filed

143

1    against these estates, and the debtors are preparing to embark

2    on the claims resolution process.  We have filed, and will

3    continue to file, additional pleadings in order to streamline

4    the claims process that we feel would otherwise overwhelm our

5    resources as well as the resources of the Court, and this

6    motion is one of those meant to streamline the process.

7         Also, as indicated in Mr. Marsal's state-of-the-estate

8    presentation, I believe, at the last omnibus hearing, we do

9    hope to shortly file alternate dispute resolution procedures

10   for all of the claims that have been filed, or a large subset

11   of those claims.

12        But getting to the motion at hand, Your Honor, this is

13   what is somewhat routine in this and other districts, a motion

14   for authority to file omnibus objections on the grounds set

15   forth in the Bankruptcy Rules as well as additional grounds.

16        When we filed this motion we were somewhat surprised

17   but, as the docket reflects, received a number of calls and

18   concerns.  And we worked with many of the parties that are very

19   familiar to this Court in these cases to try and reach an

20   accommodation and resolve any concerns.  And, really, if I was

21   to summarize, I think many of the concerns stemmed from a

22   concern or wanting to assure that no one was going to be

23   essentially playing a game of Gotcha with claimants.  And as

24   Your Honor is aware, that's not the way these debtors have

25   conducted themselves, nor intend to conduct themselves.

144

1          So in an effort to assuage concerns, and as reflected

2     in the blacklined order that was filed with our reply yesterday

3     afternoon, we've made a number of really, in our view,

4     clarifications to the order, which helped, I think, avoid a

5     number of objections and led to at least six of the objections

6     subsequently being withdrawn as well.

7          And the clarifications, first of all, go to the fact

8     that nothing in the motion, the proposed order or the notice

9     was or is intended to change the evidentiary burdens with

10    respect to proofs of claims, as those burdens are established

11    by the Rules and case law.  Nothing in the motion or the

12    proposed order is meant to or intended to or will prejudice any

13    counterparty's rights to discovery under the applicable

14    Bankruptcy Rules, or to use documentation obtained or located

15    in discovery subsequent to the filing of a response to a claim

16    objection in a contested matter over a claim.

17         Specific modifications to the additional permitted

18    grounds included that if the debtors were to interpose

19    colloquially what's referred to as a books-and-records

20    objection, we would of course, as is routine and as was the

21    intent, include the amount of such claim as reflected in the

22    debtors' books and records.  Similarly, if we interposed an

23    objection that the debtors had no liability for a given claim,

24    we would include the legal basis for such objection.

25         A number of objections also went to the response time

145

1    by which parties had to respond to a claims objection.  The

2    Rules require that a hearing on a claims objection be set no

3    sooner than thirty days after the objection has been filed, but

4    do not set out the response timetable.  We proposed, in the

5    motion, to establish a twenty-one day response deadline.  And

6    after speaking to many of the parties, we have revised that to

7    a thirty-day response deadline.

8            With those modifications and representations, we were

9    able to avoid many objections and resolve a number of

10   objections.  There remain, I believe, ten outstanding

11   objections, as reflected in the amended agenda letter.

12           Your Honor, because of the robust calendar this

13   morning and the need to adjourn this matter to this afternoon,

14   we had a bit of a conflict with some of the parties that

15   objected and that had hoped to be heard by the Court but had

16   other conflicts.  And in order to accommodate them, I think

17   we've reached an agreement, with all of the remaining

18   objectors, that would permit this Court to enter the proposed

19   order.

20           And as to the ten remaining objections, those in

21   essence would be carried to the February 10th hearing, meaning

22   that the objections as filed are on the record, all of the

23   parties' rights as reflected and objections as reflected in

24   what they filed are preserved, and until a further order of

25   this Court or resolution between the parties, the debtors would

146

1    not object under the additional grounds with respect to any

2    claims filed by those ten objectors.

3         But as to the universe of clams filed against the

4    debtors, excepting those filed by these ten objectors, we would

5    be able to proceed on all of the grounds and in the framework

6    set forth in the revised proposed order.

7         THE COURT:  If I understand what you have just said,

8    as to the ten objectors, this order to be entered today,

9    without objection, will have no application, but it's only as

10   to these objectors.  And if the objectors are successful, and

11   this is really my point, at the next hearing in persuading me

12   that they're right, does that mean that there'll be an amended

13   order that will apply to everybody, or simply an amended order

14   that will apply as to them?

15        MR. WAISMAN:  It would be an amended order that would

16   apply to them and them only.  And the order that would be

17   entered today would, from today forward, apply to all other

18   claims that have been filed.

19        THE COURT:  All right, well, that's fine, although I'm

20   going to reserve the right to amend the order that's entered

21   today if one of the objectors that I haven't yet heard from is

22   particularly eloquent and capable of demonstrating that the

23   order that has been entered includes some anomalies that should

24   be fixed for the benefit of all, not just for their client.

25        MR. WAISMAN:  Okay.  That puts us in a bit of an

147

1    awkward situation, Your Honor.  The debtors were prepared to

2    proceed today, and in fact have omnibus objections prepared,

3    because we are eager to get the claims objection process

4    underway.

5          THE COURT:  It won't affect anything --

6          MR. WAISMAN:  It was an accommodation --

7          THE COURT:  It won't affect anything that's been

8    started.  I view this phase of your motion as administrative in

9    nature and expanding, as is permissible, the scope of omnibus

10   objections, both as to the number of those objections from 100

11   to 500 and as to the categories of claims that can be subject

12   to broad-based objection.  I also consider that the notice

13   procedures that you have outlined in your motion, providing

14   particularized and targeted notice to individual claimants,

15   represents, if anything, an improvement over what has become

16   standard practice in providing omnibus objections to claimants

17   who then have to come through fairly thick documents to figure

18   out where in the document their claims are addressed.

19          So I don't have any problem with the procedures, as I

20   understand them, that are currently the subject of the order

21   you proposed.  I'm simply suggesting that, from a prospective

22   perspective, if it turns out that there is some adjustment that

23   an objector is able to persuade me should be made, it won't

24   just be in my view something that will apply as to that single

25   objector but something that should have classwide application.

148

1          MR. WAISMAN:  Understood, Your Honor.  I guess, two

2    clarifying points:  First, and not in the nature of an argument

3    to the Court but perhaps a plea to the remaining objectors, as

4    Your Honor just noted, we actually spent a great deal of time

5    and tried to make sure that the notice to be provided as to

6    objections would be particularized.  In essence, we would

7    proceed by omnibus objection, but really it would be as if we

8    were filing one-off objections.  And given that we could file

9    those one-off objections on our additional permitted grounds if

10   it was a one-off as opposed to an omnibus, and we're providing

11   personalized notice, you know, really the relief requested is

12   not such a far stretch, putting aside the routine nature of the

13   relief.

14          But we reserve that to February 10th as to the

15   objections that are remaining on the docket, and would ask the

16   Court enter the order as revised and set forth in our reply

17   last night.

18          As Your Honor may have noticed, the entire section

19   relating to settlement procedures was struck.  We are

20   working -- continue to work with the creditors' committee; we

21   had together done a great deal of work leading up to the filing

22   of the motion and subsequent.  But there are a few areas that

23   we still wanted to work on cooperatively and thought better to

24   take the time and try to come back on a consensual basis as to

25   that portion of the order as well on February 10th.

149

1          THE COURT:  That's fine.  Let me just inquire if

2     there's anybody in the courtroom who objects to the entry of

3     this order in the form that it has been revised.

4          (No response)

5          THE COURT:  There's no objection.  I'll -- I will

6     enter the --

7          MS. HOLLEMAN:  Your Honor, forgive me.  On the

8     telephone speaking, Pamela Holleman, Sullivan & Worcester, for

9     the Finnish programs securities noteholders.

10          I just wanted to ask a point of clarification as I am

11     not in the courtroom and have not had the discussion with the

12     debtors with regards to outstanding objections being preserved.

13     And I just wanted to confirm that we are of record and that the

14     Finnish programs securities noteholders' objection likewise is

15     carried forward to February 10th.  Is that correct?

16          MR. WAISMAN:  Objection on the docket, 6490, is

17     preserved and carries to February 10th.

18          MS. HOLLEMAN:  Thank you.

19          THE COURT:  That's a pretty amazing display of recall

20     of the docket.

21          Okay, I guess we're done.

22          MR. WAISMAN:  We are adjourned, Your Honor.

23          THE COURT:  Thank you, we're adjourned.

24          (Proceedings concluded at 3:20 p.m.)

25

150

1

2                        I N D E X

3

4                      R U L I N G S

5    DESCRIPTION                               PAGE      LINE

6    Fee Application of Hughes Hubbard          20        22

7    & Reed Approved

8

9    Motion Requesting Joint Administration     21        17

10   of the Chapter 11 cases Approved

11

12   Motion for a Determination that Certain    22        17

13   Orders and Other Pleadings Entered or

14   Filed be Made Applicable to the Chapter 11

15   Case of LB Somerset LLC and LB Preferred

16   Somerset LLC Approved

17

18   Motion to Extend Time to File LB Somerset LLC   22    17

19   and LB Preferred Somerset LLC's Schedules,

20   Statements of Financial Affairs

21   and Related Documents Granted

22

23   Motion to Strike Appeal of William Kuntz    26        10

24

25

1

2                         I N D E X

3                        (continued)

4                       R U L I N G S

5    DESCRIPTION                                    PAGE      LINE

6    Debtors' Motion for Authorization                42        12

7    and Approval of a Settlement Agreement

8    Which Does go Beyond Mere Settlement

9    of Disputes With the Insolvency Administrator

10   of Lehman Brothers Bankhaus AG Granted

11

12   This is LBHI's Motion for Authorization          67         7

13   to Sell Certain Asset Backed Securities

14   and Related Relief Granted

15

16   Motion of SPU to Compel the Debtor to Assume     74         7

17   or Reject an Interest-Rate Swap Agreement

18   Denied

19

20   Scheduling stipulation in Federal Home          113        25

21   Loan Bank of Pittsburgh v. LBHI, et al.,

22   Approved

23

24

25

152

I N D E X

(continued)

R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Motion of the Debtors for Establishment | 142 | 3 |
| of Procedures for the Debtors to Compromise | | |
| and Settle Pre-Petition Claims Asserted by | | |
| the Debtors Against Third Parties Granted | | |
| | | |
| Debtors' Motion for Approval of Claim | 149 | 6 |
| Objection Procedures and Settlement | | |
| Procedures Granted | | |

153

1

2                    C E R T I F I C A T I O N

3

4       I, Esther Accardi, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

        ESTHER ACCARDI (CET**D-485)

8       AAERT Certified Electronic Transcriber

9

        Also transcribed by: Clara Rubin (CET**D-491)

10

11

        Veritext

12

        200 Old Country Road

13

        Suite 580

14

        Mineola, New York 11501

15

16

        Date:  January 14, 2010

17

18

19

20

21

22

23

24

25