**Hearing Date and Time: October 19, 2011 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time: October 12, 2011 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Peter Gruenberger
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                                                    :
In re                                                               :    Chapter 11 Case No.
                                                                    :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                            :    08-13555 (JMP)
                                                                    :
                                         Debtors.                   :    (Jointly Administered)
                                                                    :
                                                                    :
-------------------------------------------------------------------x

## NOTICE OF DEBTORS' MOTION PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR APPROVAL OF A SETTLEMENT AGREEMENT AMONG ESP FUNDING I, LTD., U.S. BANK NATIONAL ASSOCIATION AS TRUSTEE, BNP PARIBAS, NATIXIS FINANCIAL PRODUCTS LLC, LEHMAN BROTHERS SPECIAL FINANCING INC., AND LEHMAN BROTHERS HOLDINGS INC.

PLEASE TAKE NOTICE that a hearing on the annexed motion (the "Motion") of

Lehman Brothers Special Financing Inc. ("LBSF") and its affiliated debtors in the above-

referenced chapter 11 cases, including Lehman Brothers Holdings Inc. ("LBHI") (collectively,

the "Debtors"), pursuant to rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), for approval of a settlement among ESP Funding I Ltd., U.S. Bank

National Association (successor to Bank of America, N.A. (successor by merger to LaSalle Bank

National Association)), as Trustee, BNP Paribas, London Branch, Natixis Financial Products

LLC, LBSF and LBHI, all as more fully described in the Motion, will be held before the

Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy

Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York,

New York 10004 (the "Bankruptcy Court"), on **October 19, 2011 at 10:00 a.m. (Prevailing**

**Eastern Time)** (the "Hearing").

   PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Bankruptcy Rules, shall set forth the name of the objecting

party, the basis for the objection and the specific grounds thereof, shall be filed with the

Bankruptcy Court electronically in accordance with General Order M-242 (which can be found

at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and

by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format

(PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies

delivered directly to Chambers), and shall be served upon:  (i) the chambers of the Honorable

James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil,

Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Ralph I. Miller,

Esq., Peter Gruenberger, Esq. and Robert J. Lemons, Esq., attorneys for the Debtors; (iii) the

Office of the United States Trustee for the Region 2, 33 Whitehall Street, 21st Floor, New York,

New York 10004 Attn:  Tracy Hope Davis, Esq., Andrea B. Schwartz, Esq., and Elisabetta

Gasparini, Esq.; and (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza,

New York, New York 10005, Attn:  Dennis F. Dunne, Esq., Evan Fleck, Esq. and Dennis

O'Donnell, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these

cases, so as to be so filed and received by no later than **October 12, 2011, at 4:00 p.m.**

**(prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:  September 28, 2011
         New York, New York

/s/ Ralph I. Miller
Ralph I. Miller
Peter Gruenberger
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Peter Gruenberger
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                                  :
**In re**                                                         :      **Chapter 11 Case No.**
                                                                  :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,                      :      **08-13555 (JMP)**
                                                                  :
                                    **Debtors.**                  :      **(Jointly Administered)**
                                                                  :
                                                                  :
-------------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT TO RULE 9019 OF**
**THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR**
**APPROVAL OF A SETTLEMENT AGREEMENT AMONG ESP FUNDING I,**
**LTD., U.S. BANK NATIONAL ASSOCIATION AS TRUSTEE, BNP**
**PARIBAS, NATIXIS FINANCIAL PRODUCTS LLC, LEHMAN BROTHERS**
**SPECIAL FINANCING INC., AND LEHMAN BROTHERS HOLDINGS INC.**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Special Financing Inc. ("LBSF") and Lehman Brothers

Holdings Inc. ("LBHI"), as debtors and debtors in possession (together, the "Debtors"), file this

Motion and respectfully represent:

                                    **Relief Requested**

        1.        By this Motion, the Debtors seek approval, pursuant to Bankruptcy Rule

9019, of a settlement, the terms of which are reflected in a termination agreement (the

"Settlement Agreement") that is annexed hereto as "Exhibit A." The Settlement Agreement

provides for resolution of all disputes relating to two particular swap transactions described

below among ESP Funding I Ltd. ("ESP"), U.S. Bank National Association (successor to Bank

of America, N.A. (successor by merger to LaSalle Bank National Association)), as Trustee

("Trustee"), BNP Paribas, London Branch as the holder of the Class A-1R and Class A-1T1

Notes ("BNP"), Natixis Financial Products LLC as Advance Swap Counterparty ("Natixis" and

together with BNP, the "Controlling Class"), LBSF and LBHI, and confirms the termination of

the Master Agreement and Transactions thereunder (each as defined below) as of September 23,

2008. The Debtors have determined, in the exercise of their sound business judgment, that the

Settlement Agreement is in the best interests of the Debtors, their estates and their creditors. The

Creditors' Committee is fully informed of and supports the Settlement Agreement. Entry of an

order approving and authorizing the Settlement Agreement is a condition precedent to the

effectiveness of the Settlement Agreement.

## Background

2.      Commencing on September 15, 2008 and periodically thereafter, LBHI

and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of

title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' chapter 11 cases have

been consolidated for procedural purposes only and are being jointly administered pursuant to

Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The

Debtors are authorized to operate their businesses and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

4.      On September 17, 2009, the Court entered the Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts [ECF No. 5207] (the "ADR Procedures Order").

5.      On September 1, 2011, the Debtors filed their third amended joint chapter 11 plan (the "Chapter 11 Plan") pursuant to section 1121 of the Bankruptcy Code [ECF No. 19627] and related disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code [ECF No. 19629].  On September 1, 2011, the Court entered an amended order approving the Disclosure Statement and voting procedures with respect to the Chapter 11 Plan [ECF No. 19631].

## Jurisdiction

6.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Agreements Between ESP and LBSF

7.      ESP, a special purpose vehicle, entered into swap transactions with LBSF under a 2002 Master Agreement, dated March 23, 2007 (the "Master Agreement").[1]  LBSF and ESP subsequently entered into an asset-based index swap (the "ABX Swap")[2] with a $10 million notional value and a total return swap (the "Total Return Swap") on a synthetic note based on a $15 million notional value bond under the Master Agreement (together, the ABX Swap and the Total Return Swap are the "Transactions").  A copy of the Master Agreement, together with the Transactions, is annexed hereto as "Exhibit B."  LBHI guaranteed LBSF's payment obligations under the Transactions to ESP.

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Master Agreement.

[2] The ABX is comprised of residential mortgage backed securities.

8.      Under the Indenture between ESP and Trustee, dated September 7, 2006, (the "Indenture"), ESP issued rated notes that were secured by a pool of collateral.  Together, BNP and Natixis are the controlling class under the Indenture.  The collateral consists of asset-backed securities, synthetic securities, and other assets and accounts, including all payments and proceeds received.  The Trustee holds the collateral on behalf of secured parties under the Indenture and collects the proceeds payable on the collateral.  The secured parties' recourse for payment of claims against ESP is limited to the collateral and/or any assets of ESP related to that particular series of notes.

9.      The Transactions are among the synthetic securities assets held by the Trustee as part of the collateral.  With respect to the ABX Swap, LBSF agreed to make periodic payments to ESP in exchange for ESP's promise to make payments to LBSF in respect of losses incurred on assets specified in the index.  Through the Total Return Swap, LBSF took the "short position" on the fluctuations of a $15 million bond issued by Exum Ridge CBO 2006-2, Ltd. (the "Exum Bond"), meaning that LBSF would be in "in the money" when the value of the asset dropped.  ESP took the "long position," meaning that when the value of the asset rose, ESP would be "in the money."  In effect, LBSF purchased protection from ESP, which sold protection on the fluctuating value of the Exum Bond, and LBSF's payoff from the total return swap was based on the price of the Exum Bond.  Specifically, the payment due to LBSF is calculated based on the difference between the face value and the market value of the $15 million Exum Bond at the time of redemption.

10.     Under the terms of the Indenture, the Trustee applies proceeds received in accordance with a "waterfall" provision.  The Indenture further provides that so long as LBSF is not the "defaulting party" under the Master Agreement, LBSF is paid any amounts it is owed

under the Master Agreement before the noteholders in the waterfall.  However, if LBSF is the

"defaulting party" under the Master Agreement, the Indenture purports to modify LBSF's right

to receive payment priority under the waterfall as a result of termination such that noteholders

and other secured parties receive payment first, and LBSF receives little or no payment at all.

The Debtors assert that payment modification provision is similar to the provision that has been

previously held by the Court to be unenforceable.  *See Lehman Bros. Special Fin. Inc. v. BNY*

*Corporate Tr. Servs. Ltd.*, 422 B.R. 407, 422 (Bankr. S.D.N.Y. 2010).

### Termination of the Transactions

11.    One week after the filing of LBHI's chapter 11 case, Elliot Structured

Products LLC as Collateral Manager, delivered to LBSF a notice of termination of the Master

Agreement on behalf of ESP, which designated September 23, 2008 as the Early Termination

Date because of an event of default resulting from the chapter 11 bankruptcy filing of LBHI,

LBSF's Credit Support Provider under the Transactions.  Under the Master Agreement, the

commencement of a case under the Bankruptcy Code by either LBSF or LBHI constituted an

Event of Default under the Master Agreement with respect to LBSF.

12.    On April 13, 2009, LBSF received a statement from the Collateral

Manager containing ESP's termination calculation stating an amount owed to LBSF of

approximately $8.7 million for the ABX Swap and $0 for the Total Return Swap.  According to

LBSF's calculation, LBSF asserted that it was entitled to the $8.7 million for the value of the

ABX Swap plus an additional approximately $3 million for the value of the Total Return Swap,

for a total payment due LBSF of approximately $11.7 million.

### The Interpleader Action

13.    After initial negotiations between LBSF, the Controlling Class, and the

Trustee regarding termination of the Transactions and payment to LBSF were unsuccessful, on

August 4, 2010, the Trustee filed a complaint (the "Interpleader Complaint") in this Court,

Adversary Proceeding No. 10-03489-JMP (the "Interpleader Action").  In the Interpleader

Complaint, the Trustee asserted that it brought the action for adjudication of the respective rights

of the defendants, BNP, Natixis and LBSF, with respect to the assets the Trustee holds pursuant

to the Indenture.  The Trustee also sought, and was authorized by the Court to deposit funds in

the amount of $11,467,730.12 into an account representing the amount LBSF claimed it was

owed as a result of termination of the Transactions.  LBSF filed a counterclaim to the Interpeader

Complaint (the "Interpleader Counterclaim") in the Interpleader Action on September 14, 2010.

The transactions at issue here are described in further detail in the Interpleader Complaint and

the Interpleader Counterclaim.

    14.  At issue in the Interpleader Counterclaim are certain provisions (the

"Modification Provisions") of the Transaction documents, the application of which were

conditioned on the commencement of LBHI or LBSF's bankruptcy case, that would operate to

allegedly deprive LBSF of a valuable property interest.  In the Interpleader Counterclaim, LBSF

seeks declaratory judgment that the Modification Provisions constitute unenforceable *ipso facto*

clauses that inappropriately modify a debtor's interest in property in violation of sections

365(e)(1) and 541(c)(1) of the Bankruptcy Code.  LBSF also seeks a declaratory judgment that

effecting the Modification Provisions violates the automatic stay under section 362(a)(3) of the

Bankruptcy Code because it involves an improper exercise of control over property of LBSF's

estate.  In the alternative, LBSF seeks a declaratory judgment that, if the Modification Provisions

ultimately are found to be enforceable in whole or in part, they constituted either (a) a

preferential transfer of an interest of LBSF in property that may be avoided under section 547 of

the Bankruptcy Code, recovered under section 550 of the Bankruptcy Code, and preserved for

the benefit of LBSF's estate under section 551 of the Bankruptcy Code; (b) a constructive

fraudulent transfer of an interest of LBSF in property that may be avoided under section

548(a)(1)(B) of the Bankruptcy Code, recovered under section 550 of the Bankruptcy Code, and

preserved for the benefit of LBSF's estate under section 551 of the Bankruptcy Code; or (c) an

unauthorized postpetition transfer of property of LBSF's estate that may be avoided under

section 549 of the Bankruptcy Code, recovered under section 550 of the Bankruptcy Code, and

preserved for the benefit of LBSF's estate under section 551 of the Bankruptcy Code.

15.    The Bankruptcy Court issued the Order Staying Avoidance Actions and

Granting Certain Related Relief Pursuant to Section 105(a) of the Bankruptcy Code and

Bankruptcy Rule 7004(a)(1), dated October 20, 2010 (the "Stay"), thereby staying the

Interpleader proceeding for nine months, to give parties to this and other avoidance actions time

to attempt to resolve their disputes through the alternative dispute resolution process ("ADR").

*See In re Lehman Bros. Holdings Inc.*, ECF No. 12199.  The Stay was subsequently extended

through January 20, 2012.  *See* Case No. 08-13555, ECF No. 17763; Case No. 10-03489, ECF

No. 14.

### The ADR Process

16.    On January 26, 2011, LBSF served ADR Notice No. 223 on ESP, the

Trustee, BNP, and Natixis under the ADR Procedures Order.  On February 25, 2011, BNP and

Natixis served their responses, and LBSF served its reply on March 11, 2011.  On April 27,

2011, LBSF, BNP, Natixis and the Trustee engaged in mediation pursuant to the ADR

Procedures Order, resulting in the Settlement Agreement described below.

## The Settlement Agreement

17.    As a result of the ADR process, the parties have agreed to payment of a confidential settlement amount to LBSF (the "Settlement Amount") in respect of the claims arising under the Master Agreement.[3]

18.    The salient terms of the Settlement Agreement are as follows:[4]

- Payment:  The Trustee on behalf of ESP shall pay the Settlement Amount, without deduction, set-off, or counterclaim, to LBSF.

- Releases:  Upon payment of the Settlement Amount, each party to the Settlement Agreement, including ESP, the Trustee, the Controlling Class, LBSF and LBHI, agrees to generally release each other party from claims related to the Master Agreement and the Transactions.

- Dismissal of Interpleader Complaint and Interpleader Counterclaim: Within 30 days of the Court's approval of this Motion, the Trustee and LBSF will submit to the Court a joint stipulation to dismiss with prejudice the Interpleader Complaint and Interpleader Counterclaim.

- Costs:  Each party will bear its own costs and expenses relating to the ADR process unless otherwise agreed by the parties.

- Notice:  The Trustee will provide notice of this Motion to all registered noteholders and other secured parties under the Indenture, including all holders who have identified themselves to the Trustee, in accordance with its standard procedures with respect to notices, advising such parties of the filing of this Motion and of their respective opportunity to object thereto. Following such notice and opportunity to be heard, any order entered in this action pursuant to the Motion shall be binding on such noteholders and other secured parties under the Indenture.

---

[3] In keeping with the confidentiality provisions of paragraph 13 of the ADR Procedures Order, and due to the parties' mutual desire to keep the Settlement Amount confidential, the Settlement Amount is redacted from the publicly filed version of this Motion but the unredacted Motion containing the Settlement Amount will be provided to the Court, the U.S. Trustee and the Creditors' Committee, and may be distributed by the Trustee to other noteholders and secured parties.

[4] To the extent there is any inconsistency between the following summary and the terms of the Settlement Agreement, the Settlement Agreement shall control.

19.    Although LBSF believes its claims against ESP are valid, LBSF has

determined in its business judgment that the terms of the Settlement Agreement are in the best

interest of its estate.  Absent consummation of the Settlement Agreement, LBSF, BNP, Natixis

and the Trustee would proceed with litigation, which could include time-consuming and

expensive legal proceedings, including potential appeals.  The Settlement Agreement will enable

LBSF to avoid expending further resources to this dispute and will maximize recoveries for

creditors.

### The Controlling Legal Standard

20.    Bankruptcy Rule 9019(a) provides that, "[o]n motion by the [debtor-in-

possession] and after notice and a hearing, the court may approve a compromise or settlement."

Fed R. Bankr. P. 9019(a).  This rule empowers bankruptcy courts to approve compromises "if

they are in the best interest of the estate."  *Vaughn v. Drexel Burnham Lambert Group, Inc. (In*

*re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also*

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414,

424 (1968); *Fisher v. Pereira* (*In re 47-49 Charles St., Inc.*), 209 B.R. 618, 620 (S.D.N.Y. 1997);

*In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir.

1994).  Indeed, courts have long considered compromises to be "a normal part of the process of

reorganization."  *TMT Trailer Ferry*, 390 U.S. at 424 (quoting *Case v. Los Angeles Lumber*

*Prods. Co.*, 308 U.S. 106, 130 (1939).

21.    Bankruptcy courts have applied the following factors in determining

whether a settlement should be approved:  (i) the probability of success in litigation, with due

consideration for the uncertainty in fact and law; (ii) the complexity and likely duration of the

litigation and any attendant expense, inconvenience, and delay; (iii) the proportion of creditors

who do not object to, or who affirmatively support, the proposed settlement; and (iv) the extent

to which the settlement is truly the product of arm's-length bargaining and not the product of

fraud or collusion.  *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.,*

390 U.S. at 424; *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 804 (Bankr. S.D.N.Y. 1998); *In re*

*Best Prods. Co.*, 168 B.R. at 50.

          22.     The decision to approve a particular compromise lies within the sound

discretion of the bankruptcy court.  *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).  The

settlement need not result in the best possible outcome for the debtor, but must not fall beneath

the lowest point in the range of reasonableness."  *In re Drexel Burnham Lambert Group*, 134

B.R. at 505; *see also Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983);

*In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).  Additionally, a court may exercise

its discretion "in light of the general public policy favoring settlements."  *In re Hibbard Brown*

*& Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).  However, the analysis must focus on the

question of whether a particular compromise is "fair and equitable, and in the best interest of the

estate."  *In re Best Prods. Co.*, 165 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations

omitted).

          23.     While a court must "evaluate . . . all . . . factors relevant to a fair and full

assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court

need not conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699

F.2d at 608, or conduct a full independent investigation.  *Drexel Burnham Lambert Group*, 134

B.R. at 496.  "[T]he bankruptcy judge does not have to decide the numerous questions of law and

fact . . ..  The court need only canvass the settlement to determine whether it is within the

accepted range of reasonableness."  *Nellis*, 165 B.R. at 123 (internal citations omitted).

24.     The court may give weight to the "informed judgments of the . . . debtor-in-possession and their counsel that a compromise is fair and equitable, and consider the competency and experience of counsel who support the compromise." *Drexel Burnham Lambert Group*, 134 B.R. at 505 (internal citations omitted); *see also In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993); *accord In re Ashford Hotels Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate that I substitute my judgment for the Trustee's, but only that I test his choice for reasonableness . . .. If the Trustee chooses one of two reasonable choices, I must approve that choice, even if, all things being equal, I would have selected the other.").

25.     Significantly, there is no requirement that "the value of the compromise . . . be dollar-for-dollar the equivalent of the claim." *Ionosphere Clubs, Inc.*, 156 B.R. at 427. Instead, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* at 427-28 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).

**The Settlement Meets the Legal Standard
Established Under Rule 9019 and Is in the Bests Interests of the Debtors' Estates**

26.     The Settlement Agreement will benefit LBSF and its creditors.  First, the Settlement Agreement will result in a substantial payment to LBSF's estate.  LBSF has determined, in the exercise of its business judgment, that the Settlement Amount adequately compensates its estate for the value of the Transactions.  Second, entry into the Settlement Agreement will avoid future disputes and litigation concerning the Transactions because the parties to the Settlement Agreement have agreed to release one another from claims thereunder.

27.     Absent approval of the Settlement Agreement, LBSF will incur costly legal fees and endure the distraction of litigation through the Interpleader Action, which could

delay recovery of any amount by LBSF for an extended period of time, including the possibility

of multiple appeals.  Furthermore, the Settlement Agreement allows LBSF to avoid the risk that

it would not prevail in the Interpleader action and that it would get no recovery at all.

28.    Thus, the Settlement Agreement will allow LBSF to capture the value of

the Transactions for its estate, while avoiding the costs associated with litigation.  The Debtors

therefore submit that the Settlement Agreement falls well above the lowest point in the range of

reasonableness and is in the best interests of LBSF and its estate.  For these reasons, the Court

should approve the Settlement Agreement pursuant to Bankruptcy Rule 9019.

29.    The Creditors' Committee has been involved in the discussion and

negotiation of the Settlement Agreement, has been fully informed of and supports the Debtors'

entry into the Settlement Agreement.

### Notice

30.    No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Motion in accordance with the procedures set forth in the amended

order entered on June 17, 2010 governing case management and administrative procedures for

these cases [ECF No. 9635] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors'

Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v)

the United States Attorney for the Southern District of New York; and (vi) all parties who have

requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice

need be provided.

31.    No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court approve the

Settlement Agreement and grant such other and further relief as it deems just and proper.

Dated:  September 28, 2011
        New York, New York

/s/ Ralph I. Miller
Ralph I. Miller
Peter Gruenberger
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                        :
In re                                   :    Chapter 11 Case No.
                                        :
LEHMAN BROTHERS HOLDINGS INC., *et al.*, :    08-13555 (JMP)
                                        :
              Debtors.                  :    (Jointly Administered)
                                        :
                                        :
---------------------------------------------------------------x

## ORDER PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR APPROVAL OF A SETTLEMENT AGREEMENT AMONG ESP FUNDING I, LTD., U.S. BANK NATIONAL ASSOCIATION AS TRUSTEE, BNP PARIBAS, NATIXIS FINANCIAL PRODUCTS LLC, LEHMAN BROTHERS SPECIAL FINANCING INC.,  AND LEHMAN BROTHERS HOLDINGS INC.

Upon the motion, dated September 28, 2011 (the "Motion"),[1] of Lehman Brothers

Special Financing Inc. ("LBSF") and its affiliated debtors in the above-referenced chapter 11

cases, including Lehman Brothers Holdings Inc. ("LBHI") (collectively, the "Debtors"), pursuant

to rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for

approval of a settlement among ESP Funding I Ltd., U.S. Bank National Association (successor

to Bank of America, N.A. (successor by merger to LaSalle Bank National Association)), as

Trustee, BNP Paribas, London Branch, Natixis Financial Products LLC, LBSF and LBHI (the

"Settlement Agreement"), all as more fully described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern

District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward,

Acting C.J.); and consideration of the Motion and the relief requested therein being a core

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Motion.

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in

accordance with the procedures set forth in the amended order entered June 17, 2010 governing

case management and administrative procedures [ECF No. 9635] to (i) the United States Trustee

for the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured

Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v)

the United States Attorney for the Southern District of New York; and (vi) all parties who have

requested notice in these chapter 11 cases, the Court having found that U.S. Bank National

Association, in its capacity as Trustee  (the "Trustee"), provided reasonable notice to noteholders

and other secured parties under the Indenture, and it appearing that no other or further notice

need be provided; and a hearing having been held to consider the relief requested in the Motion;

and the Court having found and determined that the relief sought in the Motion is in the best

interests of the Debtors, their estates and creditors, the holders of notes issued by ESP Funding I,

Ltd. and all parties in interest and that the legal and factual bases set forth in the Motion establish

just cause for the relief granted herein; and after due deliberation and sufficient cause appearing

therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to Bankruptcy Rule 9019, the Settlement Agreement is

approved; and it is further

ORDERED that LBSF and LBHI are authorized to execute, deliver, implement

and fully perform any and all obligations, instruments, documents and papers and to take any and

all actions reasonably necessary or appropriate to consummate the Settlement Agreement and

perform any and all obligations contemplated therein; and it is further

ORDERED that, the Trustee's notice of the Settlement Agreement and the Motion to noteholders and other secured parties under the Indenture is valid and sufficient notice; and it is further

ORDERED that, that all holders of notes issued by ESP Funding I, Ltd. and other secured parties under the Indenture, are bound by, and are deemed to have consented to, the terms of this Order and the Settlement Agreement and are deemed to have directed and instructed U.S. Bank National Association, as Trustee, to execute and perform the Settlement Agreement. Having found the compromises set forth in the Settlement Agreement to be fair and reasonable, the Court finds no bona fide basis for any claims or actions against the Debtors, U.S. Bank, as Trustee or in its individual capacity, or the Issuers of the notes; and the Debtors, U.S. Bank National Association, as Trustee and in its individual capacity, and the Issuers and their respective legal counsel and/or financial advisors shall not have any liability for any claims, demands, suits, actions or causes of action arising out of the Transactions (as defined in the Motion), the Interpleader Action, the Settlement Agreement, or the events giving rise to the Interpleader Action and Settlement Agreement (the "Transactions and Events"). Noteholders and other secured parties under the Indenture shall be forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing claims in any way related to the Transactions and Events against the Debtors, U.S. Bank National Association as Trustee or in any capacity, or the Issuers; and it is further

ORDERED that the terms of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising

from or related to the implementation of this Order.

Dated: October __, 2011
        New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit A**
**(Settlement Agreement)**

# TERMINATION AGREEMENT

This Termination Agreement (the "Termination Agreement") is made and entered into as of September 28, 2011 by and among ESP Funding I, Ltd. ("Counterparty"), U.S. Bank National Association (successor to Bank of America, N.A. (successor by merger to LaSalle Bank National Association)), as Trustee (the "Trustee"), BNP Paribas, London Branch as the holder of the Class A-1R and Class A-1T1 Notes ("BNP"), Natixis Financial Products LLC as Advance Swap Counterparty ("Natixis"), Lehman Brothers Special Financing Inc. ("Lehman") and Lehman Brothers Holdings Inc. ("Holdings"), as credit support provider of Lehman (each of the foregoing a "Party" and collectively the "Parties").

RECITALS:

WHEREAS, the Counterparty, ESP Funding I, (Delaware) Corp. (the "Co-Issuer") and the Trustee entered into an Indenture dated as of September 7, 2006 (the "Indenture").

WHEREAS, Counterparty and Lehman entered into two transactions bearing the Lehman Global ID number of 3205286 and 2433156 (each a "Transaction" and, together, the "Transactions") that were governed by a 2002 ISDA Master Agreement, dated as of March 23, 2007, which included certain schedules, documents, confirmations and a guaranty of the obligations of Lehman by Holdings (collectively, the "Agreement Documents").

WHEREAS, on September 15, 2008, Holdings filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

WHEREAS, on September 22, 2008, the collateral manager, on behalf of the Counterparty, delivered a notice to Lehman terminating the Transactions and designating September 23, 2008, as the Early Termination Date.

WHEREAS, on October 3, 2008, Lehman filed a voluntary petition for relief under the Bankruptcy Code.

WHEREAS, the Parties wish to terminate and/or acknowledge the termination of the Transactions and the Master Agreement as of September 23, 2008.

WHEREAS, on December 16, 2008, the Bankruptcy Court entered an Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts.

WHEREAS, on September 17, 2009, the Bankruptcy Court entered the Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts (the "ADR Procedures Order").

WHEREAS, pursuant to an agreement dated as of July 2, 2010 (the "Escrow Agreement"), by and among the Trustee, BNP and Natixis, the Trustee placed approximately

1

$11,467,730.12 (the "Reserve Amount") in a segregated account pending the settlement of certain disagreements among the Parties.

WHEREAS, Trustee filed an Interpleader Complaint, Adversary Proceeding No. 10-03489-JMP on August 4, 2010 (the "Adversary Proceeding"), placing the entire Reserve Amount in escrow with the Bankruptcy Court.

WHEREAS, Lehman filed an Interpleader Counterclaim on September 14, 2010 (the "Counterclaim") against Trustee, Counterparty and ESP Funding I (Delaware) Corp.

WHEREAS, as of the date hereof, the Parties have agreed to a settlement amount in favor of Lehman in the amount of [Redacted] (the "Settlement Amount") in respect of its claims arising under the Agreement Documents.

NOW, THEREFORE, in consideration of the recitals set forth above and promises made herein, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

Section 1.    Payment and Release.  Trustee shall pay the Settlement Amount from the Reserve Amount, without deduction, set-off, or counterclaim, to Lehman within five (5) business days of service by Lehman (by hand, e-mail transmission or by overnight delivery) on counsel for the Trustee of a copy of the Approval Order (as defined in Section 4 below).  In consideration of each other Party's execution of this Termination Agreement and effective upon payment of the Settlement Amount without deduction, set-off, or counterclaim to Lehman, each Party on behalf of itself and any other party, person, or entity claiming under or through it, hereby generally releases, discharges, and acquits each other Party, and its respective current and former agents, servants, officers, directors, shareholders, employees, subsidiaries, divisions, branches, units, affiliates, parents, attorneys, successors, predecessors, heirs, personal representatives, and assigns (each of the foregoing, a "Released Party"), from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, and claims of every kind, nature, and character whatsoever, whether in law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort (including, without limitation, intentional torts, fraud, misrepresentation, defamation, breaches of alleged fiduciary duty, recklessness, gross negligence, or negligence) or otherwise, accrued or unaccrued, known or unknown, matured, unmatured, liquidated or unliquidated, certain or contingent, that such releasing Party ever had or claimed to have, or now has or claims to have presently or at any future date, against any Released Party arising under or related to the Escrow Agreement or the Transactions or the Agreement Documents insofar as they concern the Transactions, including their negotiation, execution, performance, any breaches thereof, or their termination.

Section 2.    The Trustee shall distribute the proceeds of the Reserve Amount (including any accrued interest) in the following order:  (i) the Settlement Amount to Lehman as provided for in Section 1 of this Termination Agreement and (ii) on the next succeeding monthly payment date under the Indenture, (A) the next $4,181,396.00 shall be applied to (1) reimburse BNP for amounts drawn under the Class A-1R Notes in connection with the Escrow Agreement and (2) upon such reimbursement, make a corresponding increase of $4,181,396.00 to the Class

A-1R Undrawn Amount and a corresponding decrease of $4,181,396.00 to the outstanding principal amount of the Class A-1R Notes and (B) the remaining funds (approximately $3,786,000.00) shall be deposited into the Synthetic Asset Collateral Account.  The Parties agree that, on such monthly payment date, a Synthetic Unfunded Excess Capacity Reduction should occur with respect to an amount equal to the sum of clauses (ii)(A) and (ii)(B), above (i.e., an amount equal to the Reserve Amount less the Settlement Amount), and should be applied as follows:  (a) 35.45% of such amount to reduce the Class A-1R Undrawn Amount ; and (b) 64.55% of such amount to reduce Advance Swap Undrawn Notional Amount.  Each of BNP and Natixis hereby acknowledges and agrees that, upon the completion of the actions referenced above in this Section 2, each such party shall have been properly restored to the position it should be in as required under the Escrow Agreement in connection with the return of any of the Reserve Amount.

Section 3.    Representations.  Each Party represents and warrants to each other Party that (i) subject to the entry of the Approval Order by the Bankruptcy Court approving this Termination Agreement, the execution, delivery, and performance by such Party of this Termination Agreement are within the powers of such Party and have been duly authorized by all necessary action on the part of such Party, (ii) subject to the entry of the Approval Order by the Bankruptcy Court approving this Termination Agreement, this Termination Agreement has been duly executed and delivered by such Party and constitutes a valid and binding obligation of such Party, enforceable against such Party in accordance with the terms hereof, (iii) it is not relying upon any statements, understandings, representations, expectations, or agreements other than those expressly set forth in this Termination Agreement, (iv) it has had the opportunity to be represented and advised by legal counsel in connection with this Termination Agreement, which it enters voluntarily and of its own choice and not under coercion or duress, (v) it has made its own investigation of the facts and is relying upon its own knowledge and the advice of its counsel, and (vi) it has no expectation that any of the other Parties will disclose facts material to the Agreement Documents or this Termination Agreement.  Counterparty and Trustee represent and warrant to Lehman and Holdings that to the extent the Settlement Amount includes a component for collateral or other credit support that had been delivered to Lehman prior to the commencement of the Bankruptcy Cases, neither Counterparty nor any of its predecessors in interest has asserted claims for such collateral or credit support other than in connection with the Bankruptcy Cases.  Additionally, Lehman and Holdings represent and warrant that the Official Committee of Unsecured Creditors consents to Lehman and Holdings entering into this Termination Agreement.  The Parties agree and stipulate that each Party is relying upon the representations and warranties in this Section in entering into the Termination Agreement. Furthermore, the Parties agree that these representations and warranties are a material inducement for entering into this Termination Agreement.  These representations and warranties shall survive the execution of this Termination Agreement indefinitely without regard to statutes of limitations.

Section 4.    Effectiveness.  This Termination Agreement shall become effective upon (i) execution hereof by each of the Parties and (ii) entry of an order (the "Approval Order") pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure by the Bankruptcy Court approving this Termination Agreement, provided, however, that if the Approval Order does not contain a provision forever barring, estopping, and permanently enjoining noteholders and other secured parties under the Indenture from asserting, prosecuting or otherwise pursuing claims in

3

any way related to the Transactions and the events giving rise to this Termination Agreement and the Adversary Proceeding against Lehman, Holdings, the Trustee, the Counterparty or the Co-Issuer, but otherwise approves this Termination Agreement, the Termination Agreement shall nonetheless become effective.  The Transactions that are not already terminated according to their terms will terminate automatically on the effective date of this Termination Agreement. Unless and until the parties have executed this Termination Agreement and the Bankruptcy Court has entered the Approval Order, the Termination Agreement shall remain ineffective. Lehman agrees that, within 14 calendar days of the date on which this Termination Agreement has been executed by all Parties, it shall move for entry of the Approval Order. The Trustee agrees that it will provide notice of the filing of the motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure by Lehman and Holdings for approval of this Termination Agreement by the Bankruptcy Court (the "Motion") to all registered noteholders and other secured parties under the Indenture, including all holders who have identified themselves to the Trustee, in accordance with its standard procedures with respect to notices, advising such parties of the filing of the Motion and of their respective opportunity to object thereto.  In the event that the Bankruptcy Court does not approve this Termination Agreement, this Termination Agreement shall be null and void and of no force and effect and it shall not have any res judicata or collateral estoppel effect against the Parties, and each of the Parties' respective interests, rights, remedies and defenses shall be restored as if this Termination Agreement had never been executed.

Section 5.    Dismissal of Adversary Proceeding Claims and Counterclaims.  Trustee and Lehman agree that, within 30 calendar days of entry of the Approval Order, they will submit to the Bankruptcy Court a joint stipulation (the "Stipulation") to dismiss with prejudice the Adversary Proceeding and Counterclaim, signed by each of the Parties.  Upon the Bankruptcy Court's approval of the Stipulation, Trustee's claims in the Adversary Proceeding against Lehman, Natixis, and BNP, along with the counterclaims made by Lehman against the Parties, shall be dismissed with prejudice.

Section 6.    Related Claims.  The Parties acknowledge and agree that Lehman, Holdings and any of their affiliated chapter 11 debtors may object through a filing with the Bankruptcy Court to any proofs of claim filed against any of them in relation to the Agreement Documents or the Transactions.  Pending the filing of such objections, any such proofs of claim and related Derivatives Questionnaires and/or Guarantee Questionnaires shall be deemed so amended.  Each other Party agrees not to challenge or object to such objections if filed.

Section 7.    Execution in Counterparts.  This Termination Agreement may be executed in any number of counterparts and by different Parties in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same instrument.  Delivery of an executed counterpart of a signature page by facsimile or PDF transmission shall be as effective as delivery of a manually executed counterpart.

Section 8.    Governing Law.  This Termination Agreement will be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York (including Section 5-1401 of the New York General Obligations Law),

without regard to conflicts of laws principles that would require the application of the law of another jurisdiction.

Section 9.    <u>Special Provision for Unknown Claims.</u>  All rights under Section 1542 of the California Civil Code, or any analogous state or federal law, are hereby expressly WAIVED, if applicable, with respect to any of the claims, injuries, or damages described in the Release in Section 1.  Section 1542 of the California Civil Code reads as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

Section 10.    <u>Confidentiality.</u>  The Parties shall not disclose the Settlement Amount ("<u>Confidential Information</u>") to any person other than to their directors, officers, employees, counsel and other advisors (hereinafter, "<u>Related Party</u>" or collectively, the "<u>Related Parties</u>") (it being understood that the Parties shall ensure that such Related Parties will be informed in advance of the confidential nature of the Confidential Information and that the Confidential Information is subject to the ADR Procedures Order, and will be directed to maintain the confidentiality of such Confidential Information), except as may be required by law, including but not limited to as may be required by United States federal securities and bankruptcy laws. Notwithstanding the foregoing, the Settlement Amount shall be disclosed to the Bankruptcy Court, the Office of the United States Trustee for Region 2, the Official Committee of Unsecured Creditors and any other party directed by the Bankruptcy Court.  The Parties acknowledge and agree that the motion filed with the Bankruptcy Court for entry of the Approval Order shall include a copy of this Termination Agreement from which the Settlement Amount shall be redacted and that the Parties shall endeavor to keep the Settlement Amount out of the public record.

If any Party or any Related Party becomes legally obligated (whether by court or regulatory order or otherwise) to disclose any of the Confidential Information, that Party or such Related Party, as the case may be, will promptly provide the other Parties, if permitted by law, with notice of such proposed disclosure so that such other Parties may seek a protective order or other appropriate remedy.  If such a protective order or other protective remedy is not obtained, the Party or such Related Party, as the case may be, will disclose only that portion of the Confidential Information which is legally required, in the opinion of its own counsel, and the Party or such Related Party, as the case may be, will exercise its reasonable efforts to obtain reliable assurances that confidential treatment will be accorded the Confidential Information.

Notwithstanding anything else in this Section 10, the Parties shall be permitted to provide a copy of this Agreement (A) to their affiliates or any of their affiliates' directors, officers, employees, advisors, representatives, attorneys, accountants, and auditors (collectively, the "Representatives"), in each case who need to know such information and who are instructed to maintain the Agreement in confidence; and (B) to any governmental agency or regulatory body having or claiming to have authority to regulate or oversee any aspect of the Parties' business or that of their Representatives, including, without limitation, bank and securities examiners, as may be required by such agency or regulatory body.  In addition, notwithstanding

anything else in this Section 10, the Trustee shall be permitted to (i) disclose to Note Owners and other secured parties under the Indenture the fact that the parties to the Adversary Proceeding have entered into an agreement resolving the claims in the Adversary Proceeding and the amount of the Settlement Amount, (ii) comply with its obligations pursuant to Section 6.1(f) of the Indenture, and (iii) to any governmental agency or regulatory body having or claiming to have the authority to regulate or oversee any aspect of the Trustee's business (including in its individual capacity as a national bank); *provided, however*, that if the Trustee discloses the Confidential Information to Note Owners in accordance with the foregoing, it shall inform such parties in advance of the confidential nature of the Confidential Information and that the Confidential Information is subject to the ADR Procedures Order and advise such parties that the confidentiality of such Confidential Information should be maintained.

Section 11.    <u>Successors and Assigns</u>.  The provisions of this Termination Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

Section 12.    <u>Non-Admission of Liability</u>.  Nothing in this Termination Agreement shall be construed as an admission of liability by any Party.

Section 13.    <u>Amendment</u>.  This Termination Agreement may only be amended, modified, superseded, or canceled and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the Parties.

Section 14.    <u>Entire Agreement</u>.  This Termination Agreement constitutes the entire agreement and understanding of the Parties relating to the subject matter hereof and supersedes all prior agreements and understandings relating to the subject matter hereof.  Notwithstanding the foregoing, this Termination Agreement shall not supersede the Escrow Agreement.

Section 15.    <u>Construction</u>.  This Termination Agreement has been negotiated by the Parties and their respective legal counsel, and legal or equitable principles that might require the construction of this Termination Agreement or any of its provisions against the Party responsible for drafting this Termination Agreement will not apply in any construction or interpretation of this Termination Agreement.

Section 16.    <u>Execution by Trustee</u>.  U.S. Bank National Association is executing this Termination Agreement solely in its capacity as Trustee and not in its individual capacity.  None of U.S. Bank National Association or its officers, directors, shareholders or agents shall be liable for any claim, liability or obligation arising out of this Agreement.

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Termination Agreement on the date first written above.

ESP FUNDING I, LTD.

By: _____
Name: Phillip Hinds
Title:   Director

U.S. BANK NATIONAL ASSOCIATION, not in its individual capacity but solely as Trustee

By: _____
Name:
Title:

BNP PARIBAS, LONDON BRANCH

By: _____
Name:
Title:

NATIXIS FINANCIAL PRODUCTS LLC

By: _____
Name:
Title:

By: _____
Name:
Title:

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:
Title:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Termination Agreement on the date first written above.

ESP FUNDING I, LTD.

By: _____
Name:
Title:

U.S. BANK NATIONAL ASSOCIATION, not in its individual capacity but solely as Trustee

By: _Kenneth Sliwa_____
Name:
Title:          **Kenneth Sliwa**
                **Assistant Vice President**

BNP PARIBAS, LONDON BRANCH

By: _____
Name:
Title:

NATIXIS FINANCIAL PRODUCTS LLC

By: _____
Name:
Title:

By: _____
Name:
Title:

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:
Title:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:

BNP PARIBAS, LONDON BRANCH

By: _____

**DAVID REYNOLDS**
**AUTHORISED SIGNATORY**

Name:

Title:

**SURIL PATEL**
**AUTHORISED SIGNATORY**

NATIXIS FINANCIAL PRODUCTS LLC


By: _____

Name:

Title:


By: _____

Name:

Title:


LEHMAN BROTHERS SPECIAL FINANCING INC.


By: _____

Name:

Title:


LEHMAN BROTHERS HOLDINGS INC.


By: _____

Name:

Title:

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Termination Agreement on the date first written above.

ESP FUNDING I, LTD.

By: _____
Name:
Title:

U.S. BANK NATIONAL ASSOCIATION, not in its individual capacity but solely as Trustee

By: _____
Name:
Title:

BNP PARIBAS, LONDON BRANCH

By: _____
Name:
Title:

NATIXIS FINANCIAL PRODUCTS LLC

By: _Vasanth K. Victor_
Name:   Vasanth K. Victor
Title:    Managing Director

By: _____
Name:   Thomas G. Sharpe
Title:    Managing Director

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:
Title:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:

7

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Termination Agreement on the date first written above.

ESP FUNDING I, LTD.

By: _____
Name:
Title:

U.S. BANK NATIONAL ASSOCIATION, not in its individual capacity but solely as Trustee

By: _____
Name:
Title:

BNP PARIBAS, LONDON BRANCH

By: _____
Name:
Title:

NATIXIS FINANCIAL PRODUCTS LLC

By: _____
Name:
Title:

By: _____
Name:
Title:

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name: Robert Hershon
Title: Vice President

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name: Robert Hershon
Title: Senior Vice President

**Exhibit B**
**(Master Agreement)**



# ISDA®

International Swaps and Derivatives Association, Inc.

# 2002 MASTER AGREEMENT

dated as of March 23, 2007

**between**

| | |
|---|---|
| LEHMAN BROTHERS SPECIAL FINANCING INC. | ESP FUNDING I, LTD. |

.................................................................. and .......................................................................

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this 2002 Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties or otherwise effective for the purpose of confirming or evidencing those Transactions. This 2002 Master Agreement and the Schedule are together referred to as this "Master Agreement".

Accordingly, the parties agree as follows:—

**1.    Interpretation**

(a)    *Definitions.* The terms defined in Section 14 and elsewhere in this Master Agreement will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement, such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.    Obligations**

(a)    *General Conditions.*

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

Copyright © 2002 by International Swap and Derivatives Association, Inc.

compensation in respect of that obligation or deferred obligation, as the case may be, pursuant to Section 9(h)(ii)(1) or (2), as appropriate. The fair market value of any obligation referred to in clause (b) above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it will be the average of the Termination Currency Equivalents of the fair market values so determined by both parties.

"*Waiting Period*" means:—

(a)        in respect of an event or circumstance under Section 5(b)(i), other than in the case of Section 5(b)(i)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of three Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance; and

(b)        in respect of an event or circumstance under Section 5(b)(ii), other than in the case of Section 5(b)(ii)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of eight Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

**ESP FUNDING I LTD.**
By Elliott Structured Products LLC as
Collateral Manager

By: _____

By: _____

Name:
Title:
Date: Zdenka S. Griswold
Authorized Signatory

Name: Elliot Greenberg
Title: Vice President
Date: 23 Mar 07

**SCHEDULE**

to the ISDA Master Agreement

dated as of March 23, 2007

between

**LEHMAN BROTHERS SPECIAL FINANCING INC.**
a corporation organized under the laws of Delaware
**("Party A")**

**and**

**ESP FUNDING I, LTD.,**
an exempted company incorporated and existing under the laws of the Cayman Islands
**("Party B")**

**Part 1   Termination Provisions**

(a)      "*Specified Entity*" means

in relation to Party A for the purpose of:

Section 5(a)(v) (Default under Specified Transaction), not applicable;
Section 5(a)(vi) (Cross Default), not applicable;
Section 5(a)(vii) (Bankruptcy), not applicable;
Section 5(b)(v) (Credit Event Upon Merger), not applicable; and

in relation to Party B for the purpose of:

Section 5(a)(v) (Default under Specified Transaction), not applicable;
Section 5(a)(vi) (Cross Default), not applicable;
Section 5(a)(vii) (Bankruptcy), not applicable;
Section 5(b)(v) (Credit Event Upon Merger), not applicable.

(b)      "*Events of Default*".   The following Events of Default shall apply as specified below and the definition of "Event of Default" in Section 14 of this Agreement is deemed to be modified accordingly:

| | | |
|---|---|---|
| (i) | Section 5(a)(i), Failure to Pay or Deliver: | Party A and Party B. |
| (ii) | Section 5(a)(ii), Breach of Agreement; Repudiation of Agreement: | Party A only other than with respect to Part 3(g) and Part 4(s) which shall apply to Party B. |
| (iii) | Section 5(a)(iii), Credit Support Default: | Party A only. |

Synthetic Security
1

NYB 1537981.4

| (iv) | Section 5(a)(iv), Misrepresentation: | Party A only other than with respect to Part 4(m)(x) which shall apply to Party B. |
| (v) | Section 5(a)(v), Default Under Specified Transaction: | Neither Party A nor Party B. |
| (vi) | Section 5(a)(vi), Cross Default: | Party A only. |
| (vii) | Section 5(a)(vii), Bankruptcy: | Party A and Party B; provided that with respect to Party B, only, Section 5(a)(vii)(2) will not apply. |
| (viii) | Section 5(a)(viii), Merger Without Assumption: | Party A and Party B |

(d)    The *"Credit Event Upon Merger"* provisions of Section 5(b)(v) of this Agreement will not apply to either Party A or Party B.

(e)    For purposes of Section 5(a)(vi), the following provisions apply:

*"Specified Indebtedness"* has the meaning specified in Section 14 of this Agreement.

*"Threshold Amount"* means 3% of the stockholders' equity of Party A.

For purposes of the above, stockholders' equity shall be determined by reference to the relevant party's most recent consolidated quarterly balance sheet and shall include legal capital, paid-in capital, retained earnings and cumulative translation adjustments. Such balance sheet shall be prepared in accordance with U.S. generally accepted accounting principles.

(f)    The *"Automatic Early Termination"* provision of Section 6(a) of this Agreement will not apply to Party A or to Party B; provided that if an Event of Default specified in Section 5(a)(vii)(1), (3), (4), (5), (6) or the extent analogous thereto, (8), is governed by a system of law that does not permit termination to take place after the occurrence of the relevant Event of Default with respect to a party, then the Automatic Early Termination provision of Section 6(a) will apply to such party.

(g)    *"Termination Currency"* means United States Dollars.

(h)    *Additional Termination Events.*

(1)    Each of the following shall constitute an Additional Termination Event with respect to Party B, in which each such case the sole Affected Party shall be Party B, Party A shall have the sole right to designate an Early Termination Date and each Transaction shall be an Affected Transaction:

(i)    *Acceleration of Notes.* The acceleration of the Notes in accordance with Article 5 of the Indenture following the occurrence of an Event of Default (as defined in the Indenture) and such acceleration can no longer be rescinded or annulled under the terms of the Indenture.

(ii)    *Amendments.* The entry into of any amendment, modification or supplement (whether by means of a supplemental indenture or otherwise) of the Indenture, the Class A-1 Note Purchase Agreement, the Advance Swap or the Account Control Agreement that would have a material adverse effect on Party A (including but not limited to any changes that would cause Party A to fail to be a Secured Party under the Indenture), unless the prior written consent of Party A has been obtained. Any payments owed to Party A under Section 6(e) of this

2

NYB 1537981.4

Agreement as a result of such Additional Termination Event shall be made without regard to the effect of any such amendment, modification or supplement.

(iii)    **_Redemptions in Whole._**    The delivery of notice by Party B or the Collateral Manager of a redemption in whole of the Secured Notes in connection with an Optional Redemption, a Tax Redemption or an Auction Call Redemption pursuant to Article 9 of the Indenture, as applicable.  Notwithstanding the foregoing, this clause (iii) shall not constitute an Additional Termination Event until such date as the notice of redemption of the Secured Notes can no longer be withdrawn in accordance with Section 9.6 of the Indenture.

(iv)    **_Liquidation of the Collateral._**    The liquidation of the Collateral in accordance with Section 5.5 of the Indenture following the occurrence of an Event of Default, in which event Party B shall be the sole Affected Party and all Transactions shall be Affected Transactions; provided, however, that Party A shall have the sole right to select the Early Termination Date and may elect more than one date, terminating the Transactions in part, if the liquidation of the Collateral continues for longer than a 24-hour period; provided that the first Early Termination Date shall be no less than four Business Days prior to the initial liquidation of the Collateral and the last Early Termination Date shall be no less than three Business Days prior to the payment date on which the proceeds of the liquidation are distributed.

(v)    **_Return of Collateral._**    Party B or its Custodian fails to transfer any Return Amount pursuant to the terms of the Credit Support Annex following any applicable notice, cure and grace periods provided for thereunder.

(2)    Each of the following shall constitute an Additional Termination Event with respect to Party A, in which each such case the sole Affected Party shall be Party A and Party B shall have the sole right to designate an Early Termination Date:

(i)    **_Ratings Downgrade._**    If Party A fails to take any action in accordance with Part 5(a)(i) below within 30 days of any Ratings Event or in accordance with Part 5(a)(ii) below within 5 Local Business Days of a Replacement Ratings Event, such failure shall constitute an Additional Termination Event, Party A shall be the sole Affected Party and all Transactions shall be Affected Transactions.

**Part 2**
**Tax Representations**

(a)    **_Payer Tax Representations._**    For the purpose of Section 3(e) of this Agreement, Party B and Party A each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 9(h) of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on sub-clause (ii) above and the other party

3

does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)    ***Payee Tax Representations.***  For the purpose of Section 3(f), each of Party B and Party A will make the following representations:

Party A represents to Party B that it is a national banking association organized under the laws of the United States and its US tax payer identification number is 11-2751029. It is "exempt" within the meaning of Treasury Regulation sections 1.6041-3(p) and 1.6049-4(c) from information reporting on Form 1099 and backup withholding.

Party B represents to Party A that (i) it is a "non-U.S. branch of a foreign person" for purposes of Section 1.1441-4(a)(3)(ii) and a "foreign person" for purposes of Section 1.6041-4(a)(4) of the United States Treasury Regulations and (ii) each payment received or to be received by Party B in connection with the Agreement will not be effectively connected with the conduct of a trade or business in the United States.

## Part 3
## Agreement to Deliver Documents

For the purposes of Sections 3(d), 4(a)(i) and (ii) of this Agreement, each Party B agrees to supply the following documents:

(a)    Tax forms, documents or certificates to be delivered are:

| PARTY REQUIRED TO DELIVER | FORM/DOCUMENT/ CERTIFICATE | DATE BY WHICH TO BE DELIVERED |
|---|---|---|
| Party B | As required under Section 4(a)(i) of the Agreement, IRS Form W-8BEN (or successor form). | (i) Upon execution of this Agreement, (ii) before December 31 of each third succeeding calendar year, (iii) promptly at the reasonable request of the other party and (iv) promptly upon learning that any such Form previously provided by such party has become obsolete or incorrect. |

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| (a)  Party B | Opinion of counsel to Party B in form and substance satisfactory to Party A. | Upon execution. | No |

4

NYB 1537981.4

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| (b)  Party A and Party B | Evidence reasonably satisfactory to the other party of the (i) authority of such party to enter into the Agreement and any Transactions and (ii) the authority and genuine signature of the individual signing the Agreement on behalf of such party to execute the same. | As soon as practicable after execution of this Agreement and, if requested by the other party, as soon as practicable after execution of any Confirmation of any other Transaction. | Yes |
| (c)  Party B | A certified copy of (i) Party B's certificate of incorporation, memorandum of association and articles of association, as amended, (ii) the current Collateral Management Agreement (or other similar agreement) between Elliott Structured Products LLC (the "*Collateral Manager*") and Party B, and (iii) any investment policies, trading strategies or restrictions of Party B that relate to derivative transactions. | Upon execution of this Agreement and each time that any document or policy referenced therein is revised or established. | Yes |
| (d)  Party B | A fully executed copy of the Indenture. | Upon execution. | Yes |
| (e)  Party B | A letter from the Process Agent in The City of New York designated pursuant to paragraph b of Part 4 of this Schedule in which such Process Agent agrees to act as agent for service of process with respect to this Agreement and each Transaction and to forward promptly to Party B all process received by such Process Agent.. | Upon execution. | Yes |
| (g)  Party B | A copy of the most recent Monthly Report and Note Valuation Report (each as defined in the Indenture (as defined below)). | When received. | Yes |
| (h) Party B | All reports that go to the Rating Agencies. | As applicable. | Yes |
| (i) Party A | A guarantee of Holdings substantially in the form of Exhibit A to this Schedule. | Upon execution of this Agreement | No |

NYB 1537981.4

**Part 4**
**Miscellaneous**

(a)    *Address for Notices*.  For the purpose of Section 12(a) of this Agreement:

    (i)    Address for notices or communications to Party A:

Address:    Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Corporate Advisory Division
Transaction Management Group
745 Seventh Avenue
New York, New York 10019

Attention:    Documentation Manager
Telephone No.:    (212) 526-7187
Facsimile No.:    (212) 526-7672
For all purposes.

6

NYB 1537981.4

    (ii)     Address for notices or communications to Party B:

ESP Funding I, Ltd.
c/o Maples Finance Limited
P.O. Box 1093GT
Queensgate House, South Church Street
George Town, Grand Cayman
Cayman Islands

Attention:    Directors

Facsimile No.:  (345) 945–7100

With a copy to the Trustee:

LaSalle Bank National Association
181 West Madison Street
32nd Floor
Chicago, Illinois  60602

Attention:  CDO Trust Services Group – ESP Funding I, Ltd.

Fax Number:   (312) 264–0192

With a copy to the Collateral Manager:

Elliott Structured Products LLC
712 Fifth Avenue
New York, New York 10019

Attention:   Steve Kasoff

Facsimile No.:  (212) 974–2092

(b)    *Process Agent.*  For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent:    Not Applicable.

Party B appoints as its Process Agent:    CT Corporation System
    111 Eighth Avenue, 13th floor
    New York, New York 10011
    Attention:  ESP Funding I, Ltd.
    Facsimile No.:  (212) 894-8790
    Telephone No.:  (212) 894-8700

(c)    *Offices.*  The provisions of Section 10(a) to this Agreement will apply to this Agreement.

(d)    *Multibranch Party.*  For the purpose of Section 10(b) of this Agreement:

Party A is not a Multibrank Party.
Party B is not a Multibranch Party.

7

NYB 1537981.4

(e)    *Calculation Agent.* Party A shall be the Calculation Agent, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(f)    *Credit Support Document.* Details of any Credit Support Document:

Details of any Credit Support Document in respect of Party A:  (1) A guarantee of Party A's obligations hereunder substantially in the form annexed hereto as <u>Exhibit A</u> to this Schedule, and (2) the Credit Support Annex attached hereto.

Details of any Credit Support Document in respect of Party B:
None.

(g)    *Credit Support Provider.* Credit Support Provider means:

Details of any Credit Support Provider in respect of Party A:  Lehman Brothers Holdings Inc. ("Holdings").

Details of any Credit Support Provider in respect of Party B:  None.

(h)    *Governing Law.* This Agreement shall be construed in accordance with, and this Agreement and all matters arising out of or relating in any way whatsoever to this Agreement (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York.

(i)    *Jurisdiction.* Section 13(b)(i) of the Agreement is hereby amended by deleting in line 2 the word "non-" and by deleting paragraph (iii) thereof. The following shall be added at the end of Section 13(b):  "Nothing in this provision shall prohibit a party from bringing an action to enforce a money judgment in any other jurisdiction."

(j)    *Netting of Payments.* Netting will not apply to any Transactions under this Agreement.

(k)    *No Set-Off.* Without affecting the provisions of this Agreement requiring the calculation of certain net payment amounts, all payments under this Agreement will be made without set-off or counterclaims.

(l)    "*Affiliate*" will have the meaning set out in Section 14 of this Agreement; provided that Party B shall be deemed to have no Affiliates and <u>provided</u>, <u>however</u>, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

(m)    *Additional Representations.* Section 3(a) of this Agreement is hereby amended by the deletion of "and" at the end of Section 3(a)(iv); the substitution of a comma for the period at the end of Section 3(a)(v) and the addition of Sections 3(a)(vii) to (x), as follows:

(vii)    *Non Reliance.* In connection with the execution and delivery by it of this Agreement and its entry into each Transaction, (1) the other party is not acting as a fiduciary or financial or investment adviser for it, (2) it is not relying upon any representations or warranties (written or oral) of the other party or any Credit Support Provider of the other party other than representations and warranties made by the other party or any Credit Support Provider of the other party in this Agreement and in any Credit Support Documents with respect to the other party, (3) it has consulted with its own legal, regulatory, accounting,

8

NYB 1537981.4

tax, financial and investment advisors to the extent it has deemed necessary, (4) it has made its own investment, hedging and other decisions based upon its own judgment and upon any advice from such advisors as it has deemed necessary and (5) it has a full understanding of the risks and benefits of this Agreement and each such Transaction and is capable of assuming and willing to assume (financially and otherwise) such risks;

(viii)  *Eligible Contract Participant.* (a) It is an "eligible contract participant" as such term is defined in Section 1a(12) of the Commodity Exchange Act (7 U.S.C. § 1a(12)) (the CEA); (b) this Agreement and each Transaction is subject to individual negotiation by each Party and (c) neither this Agreement nor any Transaction will be executed or traded on a "trading facility" within the meaning of Section 1a(33) of the CEA; and

(ix)  *U.S. Bankruptcy Code.* It intends and acknowledges that this Agreement, including all Transactions hereunder, shall constitute a "swap agreement" as defined in 11 U.S.C. §101(53B) as in effect on the date of this Agreement (or any successor provision of similar import)."

(x)  **Monthly Report.** The Issuer will (i) cause the Monthly Report, delivered pursuant to Part 3(b)(g), to specify (A) the aggregate Reference Obligation Notional Amount under all CDS Assets; (B) the Advance Swap Undrawn Notional Amount; (C) the Class A-1R Note Undrawn Amount; (D) the Synthetic Asset Collateral Account Balance; and (E) the Synthetic Reserve Account Balance, in each case as of the relevant Calculation Date for such Monthly Report, and (ii) ensure that after giving effect to the notional amount of each Transaction entered into hereunder, the Synthetic Asset Capacity Amount shall not be below zero. Notwithstanding any other provision of the Agreement, any failure of the Issuer to comply with the foregoing shall not give rise to any Event of Default or Termination Event hereunder unless the Issuer and the Collateral Manager shall have been given written notice of such failure and such failure shall remain uncured for a period of at least 30 days following receipt of such notice.

Section 3 of this Agreement is hereby further amended by the addition of the following clauses (h) to (k):

"(h)  *Financial Institution.* In addition to the foregoing representations, Party A represents that it is a "financial institution" as defined in the Federal Deposit Insurance Corporation Improvement Act of 1991 or Regulation EE promulgated by the Federal Reserve Board thereunder.

(i)  *ERISA.* The assets that are used in connection with the execution, delivery and performance of this Agreement and the Transactions entered into pursuant hereto are not the assets of an employee benefit or other plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan described in Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), an entity whose underlying assets include "plan assets" by reason of Department of Labor regulation section 2510.3-101, or a governmental plan that is subject to any federal, state, or local law that is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code;

(j)  *Compliance with Investment Policies.* Party B represents to Party A that the execution, delivery, and performance by it of this Agreement and the Confirmation does not conflict with or violate the investment policies, trading strategies and/or restrictions of Party B as

9

set forth in Party B's memorandum of association, articles of association or the Indenture; and

    (k)    *Collateral Manager Authorized as Agent.* Party B represents that, until Party B gives notice to Party A that the Collateral Management Agreement has terminated or that the Collateral Manager has resigned or been removed thereunder, the Collateral Manager is duly authorized to act as Party B's agent in entering into and confirming Transactions and receiving notices to Party B under this Agreement, and that the Collateral Manager's entering into or confirmation of any Transaction shall be sufficient to bind Party B, with the result that Party B's signature shall not be required on any Confirmation."

(n)    *Absence of Litigation.* For the purpose of Section 3(c): "Specified Entity" means in relation to Party A and Party B, none.

(o)    *No Agency.* The provisions of Section 3(g) will apply to this Agreement.

(p)    *General Conditions.* Section 2(a)(iii) is hereby amended by (X) inserting in the third line thereof after the words "and is continuing, (2)" and before the words "the condition precedent" the following phrase "the condition precedent that no Additional Termination Event has occurred and is continuing with respect to which the other party is an Affected Party and with respect to which all outstanding Transactions are Affected Transactions, (3)" and (Y) delete the symbol "(3)" before the words "each other applicable condition" and substitute the symbol "(4)" in lieu thereof.

(q)    **Accuracy of Specified Information.** Section 3(d) is hereby amended by inserting in the third line thereof after the words "in every material respect" and before the period the phrase "or, in the case of audited or unaudited financial statements, a fair presentation, in all material respects, of the financial condition of the relevant person."

(r)    **Swap Agreement.** (i) Party A is one of the Secured Parties, (ii) this Agreement (and each Transaction entered into hereunder) is a Synthetic Asset and (iii) the obligations and liabilities of Party B under this Agreement and the relevant Credit Support Documents constitute the secured obligations of Party B under the Indenture and rank *pari passu* with and equal in right and priority of payment with the all other Synthetic Assets under the Indenture.

(s)    **Exercise of Rights, Synthetic Asset Capacity Amount.** The Issuer agrees that (i) it will exercise such rights as it has under each of the Class A-1R Note Purchase Agreement and the Advance Swap upon any Class A-1R Noteholder or Advance Swap Counterparty failing to maintain any required rating or to take any required action following any downgrade below any required ratings thresholds, (ii) it shall, upon receipt of notice that any Class A-1R Noteholder or Advance Swap Counterparty has ceased to meet the ratings requirement thresholds set forth in the Class A-1R Note Purchase Agreement or the Advance Swap, respectively, cause such information to be transmitted to Party A, and (iii) it shall notify Party A in writing immediately if the Synthetic Asset Capacity Amount is reduced below zero.

Any failure of any of the foregoing shall not give rise to any Event of Default or Termination Event unless such failure continues for a period of at least 30 days after the Issuer and the Collateral Manager are given written notice of such failure; provided, however, that such notice requirement shall not apply with respect to clause (iii) above; provided further that any failure under clause (iii) shall not give rise to any Event of Default or Termination Event unless such failure continues until the later of (a) 30 days from the occurrence of such failure or (b) 5 Business Days after the Collateral Manager obtains actual knowledge of such failure.

NYB 1537981.4

(t)    Section 14 is hereby amended by deleting the definition of "Waiting Period" in its entirety and replacing it with the following:

**"Waiting Period"** means: --

    (a)    in respect of an event or circumstance under Section 5(b)(i), other than in the case of Section 5(b)(i)(2) where (i) the relevant payment, delivery or compliance is actually required on the relevant day and (ii) the Credit Support Document is not a guarantee issued by an Affiliate (in which case no Waiting Period will apply), a period of three Local Business Days (or days that would have been Local Business Days but for the occurrence of that circumstance) following the occurrence of that event or circumstance; and

    (b)    in respect of an event or circumstance under Section 5(b)(ii), other than in the case of Section 5(b)(ii)(2) where (i) the relevant payment, delivery or compliance is actually required on the relevant day and (ii) the Credit Support Document is not a guarantee issued by an Affiliate (in which case no Waiting Period will apply), a period of eight Local Business Days (or days that would have been Local Business Days but for the occurrence of that circumstance) following the occurrence of that event or circumstance."

(u)    **Outstanding Specified Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

## Part 5
## Other Provisions

(a)(i)    **Ratings Downgrade.** If a Ratings Event (as defined below) shall occur and be continuing with respect to Party A, Party A agrees to take one of the following actions (at its own expense and while continuing to perform): (A) transfer all of its rights and obligations under this Agreement and all Transactions to another entity with ratings of its short-term and long-term senior unsecured debt or deposits (or financial strength or counterparty rating) by Moody's and S&P at least equal to the thresholds set forth in the definition of Ratings Event; provided that as of the date of such transfer, neither the transferee nor Party B will be required to withhold or deduct on account of any Tax from any payments under this Agreement in excess of what would have been required to be withheld or deducted in the absence of such transfer; (B) cause an entity with ratings of its short-term and long-term senior unsecured debt or deposits (or financial strength or counterparty rating) by Moody's and S&P at least equal to the thresholds set forth in the definition of Ratings Event to guarantee or provide an indemnity or letter of credit in respect of the obligations of Party A under this Agreement, or (C) post collateral from time to time pursuant to the Credit Support Annex attached hereto.

    (ii)    If the Replacement Ratings Event is still in existence on the date that is five Local Business Days following the occurrence of the Replacement Ratings Event, then commencing on the first Local Business Day following the date that is five Local Business Days after the occurrence of such Replacement Ratings Event, Party A shall, at its own expense and while continuing to perform, transfer all of its rights and obligations under this Agreement and the Transactions to another entity with ratings of its short-term and long-term senior unsecured debt or deposits (or financial strength or counterparty rating) by Moody's and S&P at least equal to the thresholds set forth in the definition of Replacement Ratings Event; provided that as of the date of such transfer, neither the transferee nor Party B will be

NYB 1537981.4

required to withhold or deduct on account of any Tax from any payments under this Agreement in excess of what would have been required to be withheld or deducted in the absence of such transfer.

(iii)    Upon any transfer pursuant to section (i)(A) or (ii) above, this Agreement and all Transactions shall terminate without any payment by either party hereto and any and all collateral posted by Party A shall be returned to it within three (3) Business Days and any other form of collateral arrangement (including letters of credit, surety bond or other guarantee) provided by or on behalf of Party A shall terminate.

(iv)    *Additional Definitions.*  As used in this Schedule, the following terms shall have the following meanings:

"*Moody's*" means Moody's Investors Service, Inc. or any successor thereto.

"*Ratings Event*" shall occur with respect to Party A, if Party A's guarantor (or, if Party A has no guarantor, Party A's) (A) (x) long-term senior unsecured debt or deposit rating by Moody's is lower than A1 or (y) short-term senior unsecured debt or deposit rating by Moody's is lower than P-1, or (B) either (x) long term senior unsecured debt or deposit rating by S&P is lower than AA- or (y) short-term senior unsecured debt or deposit rating by S&P is lower than A-1+.

"*Replacement Ratings Event*" shall occur with respect to Party A, if Party A's guarantor (or, if Party A has no guarantor, Party A's) (A) (x) long-term senior unsecured debt or deposit rating by Moody's is lower than A3 and (y) short-term senior unsecured debt or deposit rating by Moody's is lower than P-2, or (B) either (x) long term senior unsecured debt or deposit rating by S&P is lower than BBB+ or (y) short-term senior unsecured debt or deposit rating by S&P is lower than A-2 (unless Party A shall deliver within four Local Business Days of such Replacement Ratings Event and at its own expense a legal opinion of nationally recognized counsel confirming the ability of Party B to terminate this Agreement and all Transactions and access any collateral posted by Party A without application of the automatic stay or other interference upon the receivership of Party A);

"*S&P*" means by Standard & Poor's Ratings Service or any successor thereto.

(b)    *Waiver of Jury Trial.*  **EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY CREDIT SUPPORT DOCUMENT OR ANY TRANSACTION.** Each party (i) certifies that no representative, agent or attorney of the other party or any Credit Support Provider has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of any such suit, action or proceeding and (ii) acknowledges that it and the other party have entered into this Agreement and any Credit Support Document, as applicable, in reliance on, among other things, the mutual waivers and certifications in this Section.

(c)    *Severability.*  If any term, provision, covenant or condition of this Agreement, or the application thereof to either party or any circumstance, is held to be unenforceable, invalid or illegal (in whole or in part) for any reason (in any relevant jurisdiction), the remaining terms, provisions, covenants and conditions of this Agreement, modified by the deletion of the unenforceable, invalid or illegal portion (in any relevant jurisdiction), will continue in full force and effect, and such unenforceability, invalidity, or illegality will not otherwise affect the enforceability, validity or legality of the remaining terms, provisions, covenants and conditions of this Agreement so long as this Agreement as so modified continues to express, without material change, the original

12

intentions of the parties as to the subject matter hereof and the deletion of such portion of this Agreement will not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties; provided however that this severability provision shall not be applicable if any provision of Section 2, 5, 6 or 13 (or any definition or provision in Section 14 to the extent it relates to, or is used in or in connection with any such Section) shall be so held to be invalid or unenforceable. The parties will endeavor in good faith negotiations to replace the prohibited or unenforceable provision with a valid provision, the economic effect of which comes as close as possible to that of the prohibited or unenforceable provision.

(d)   *Confirmation Procedures*. For each Transaction that Party A and Party B enter hereunder, Party A shall promptly send to Party B a Confirmation setting forth the terms of such Transaction. Party B shall execute and return the Confirmation to Party A or request correction of any error within five Business Days of receipt. Failure of Party B to respond within such period shall not affect the validity or enforceability of such Transaction and shall be deemed to be an affirmation and acceptance of such terms.

(e)   *Escrow Payments*. If by reason of the time difference between the cities in which payments are to be made, it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may at its option and in its sole discretion notify the other party that payments on that date are to be made in escrow. In this case the deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the party giving the notice, accompanied by irrevocable payment instructions (i) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by the irrevocable payment instructions to the same effect or (ii) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay the costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 am. local time on that day) if that payment is not released by 5:00 p.m. on the date it is deposited for any reason other than the intended recipients' failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(f)   *Notice of Certain Events or Circumstances*. Each Party agrees, upon learning of the occurrence or existence of any event or condition that constitutes (or that with the giving of notice or passage of time or both would constitute) an Event of Default or Termination Event with respect to the party, promptly to give the other party, the Trustee and each Rating Agency notice of such event or condition (or, in lieu of giving notice of such event or condition in the case of an event or condition that with the giving of notice or passage of time or both would constitute an Event of Default or Termination Event with respect to the party, to cause such event or condition to cease to exist before becoming an Event of Default or Termination Event); provided that failure to provide notice of such event or condition pursuant to this clause (e) shall not constitute an Event of Default or a Termination Event.

(g)   *Consent to Recording*. The parties agree that each may electronically record all telephone conversations between them and that any such recordings may be submitted in evidence to any court or in any proceeding for the purpose of establishing any matters pertinent to any

NYB 1537981.4

Transaction, provided, however, that notwithstanding the terms of this clause, the parties do not waive any rights they may have under the applicable rules of evidence.

(h)     *Definitions*. Unless otherwise specified in a Confirmation, this Agreement and each Transaction between the parties is subject to the 2000 ISDA Definitions, as published by the International Swaps and Derivatives Association, Inc. (the "*2000 Definitions*"), and will be governed in all respects by the provisions set forth in the 2000 Definitions, without regard to any amendment to the 2000 Definitions subsequent to the date hereof. The provisions of the 2000 Definitions are incorporated by reference in and shall be deemed a part of this Agreement, except that all references in the 2000 Definitions to a "Swap Transaction" shall be deemed references to a "Transaction" for the purposes of this Agreement. Capitalized terms used and not otherwise defined herein (or in the 2000 Definitions) shall have the respective meanings ascribed to such terms in the Indenture dated September 7, 2006 (the "*Indenture*"), between Party B, ESP Funding I (Delaware) Corp. and LaSalle Bank National Association, as trustee (the "*Trustee*"). If in relation to any Transaction there is any inconsistency between the 2000 Definitions, this Agreement, the Indenture, any Confirmation and any other definitions published by ISDA that are incorporated into any Confirmation, the following will prevail for purposes of such Transaction in the order of precedence indicated: (i) such Confirmation (without reference to any definitions or provisions incorporated therein); (ii) the Indenture; (iii) this Agreement; (iv) such other definitions; and (v) the 2000 Definitions.

(i)     *Repository*. Upon execution and delivery of this Agreement, Party B shall deliver a copy hereof, and as promptly as possible following the execution of any amendment to this Agreement, Party B shall deliver a copy of such amendment, to the Repository (as such term is defined in the Indenture) for posting on the Repository in the manner provided in Section 14.3(g) of the Indenture. Party A hereby consents to the posting by Party B of a copy of this Agreement and each amendment hereto on the Repository as contemplated in this paragraph.

(j)     *Amendment*. Section 9(b) of the Agreement is hereby amended by adding the following proviso at the end thereof: "; *provided* that no material amendment, modification or waiver in respect of this Agreement shall be entered into by the parties unless (i) notice of such proposed amendment, modification or waiver has been delivered by Party B to each of the Rating Agencies no less than 10 Business Days prior to the proposed effective date thereof and (ii) such material amendment, modification or waiver satisfies the Rating Agency Condition and the consent of a Majority of the Controlling Class has been obtained by Party B with respect thereto".

(k)     *Transfers*. Section 7 is hereby deleted in its entirety and replaced by the following:

"Except as stated under Section 6(b)(ii) of this Agreement and as expressly provided herein, and except for the assignment by way of security in favor of the Trustee under the Indenture, neither Party B nor Party A is permitted to assign, novate or transfer (whether by way of security or otherwise) as a whole or in part, any of its rights, obligations or interests under this Agreement without the prior written consent of the other party, such consent not to be unreasonably withheld; *provided, however*, that Party A may assign its rights and obligations under the Agreement, in whole or in part, (1) to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor, or (2) to any entity with the same or higher long term senior unsecured debt rating (as determined by S&P or Moody's) as Holdings at the time of such transfer. Party A will provide prior written notice to each Rating Agency of any such assignment. Notwithstanding the foregoing, Party B may assign and delegate its rights and obligations under this Agreement to the Trustee as

14

NYB 1537981.4

provided in the Indenture." Notwithstanding the foregoing, any transfer hereunder shall not be permitted if, as a result thereof, a payment becomes subject to any deduction or withholding for or on account of any tax (or increase in any tax) which would not have arisen had such transfer not been effected or if an Event of Default or Termination Event shall occur as a result of such transfer.

(l)    *Waiver of Set-Off.* Notwithstanding Section 6(f) but without affecting the provisions of this Agreement requiring the calculation of certain net payment amounts, as a result of an Event of Default or Additional Termination Event or otherwise, all payments under this Agreement will be made without setoff, offset or counterclaim.

(m)    *Acknowledgment of Security Interest.* Party A hereby acknowledges and consents to Party B's grant of all its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, this Agreement (including, without limitation, its right to payments due to it hereunder or with respect hereto), pursuant to the terms of the Indenture, to the Trustee, for the benefit of the persons identified therein, and further acknowledges and agrees that the Trustee may directly enforce the rights of Party B hereunder. Party A shall be entitled to rely on any notice or communication reasonably believed by it to have come from the Trustee to such effect. Party A shall be entitled to assume the authenticity of such communication or notice and shall have no obligation to verify any facts asserted therein or the authority of the sender thereof. Party B hereby irrevocably appoints the Trustee its agent and attorney-in-fact for enforcing its rights hereunder, which appointment is coupled with an interest, and Party B confirms that notice of such appointment has been effectively given to the Trustee. Party A agrees that, unless notified in writing by the Trustee of other payment instructions, any and all amounts payable by Party A to Party B under this Agreement will be paid to the Trustee, at such account as the Trustee specifies in writing to Party A. Any payment made to the Trustee in accordance with this provision or to any other account for payment specified by the Trustee shall extinguish the obligations of Party A to the extent of such payment.

(n)    *Limitation of Liability.* Without limiting the effect of any of the express provisions of this Agreement, neither party shall be required to pay or be liable to the other party for any consequential, indirect or punitive damages, opportunity costs or lost profits.

(o)    *2002 Master Agreement Protocol.* The parties agree that the definitions and provisions contained in Annexes 1 to 16 and Section 6 of the 2002 Master Agreement Protocol published by the International Swaps and Derivatives Association, Inc. on 15th July, 2003 are incorporated into and apply to this Agreement.

(p)    *Collateral Manager Representations.* The following representations shall be made by the Collateral Manager in accordance with Section 3 of the Agreement as if the Collateral Manager was a party to the Agreement:

"(i)    Collateral Manager Representations. The Collateral Manager represents and warrants to Party A that it is (x) duly authorized to act as Party B's agent in entering into and confirming Transactions and in receiving notices to Party B under this Agreement, and (y) that any Transaction shall be entered into in accordance with the applicable investment policies, trading strategies and/or restrictions of Party B as are then in effect.

(ii)    No Investment Advice from Party A. The Collateral Manager represents and agrees that no advice given by Party A or its Affiliates shall form a primary basis for any decision by or on behalf of the Collateral Manager relating to any Transaction under or in connection

15

with this Agreement, that neither Party A nor any of its Affiliates is or shall be a fiduciary or advisor with respect to the Investment Adviser or Party B and that no amounts paid or to be paid to Party A or its Affiliates are attributable to any advice provided by Party A or its Affiliates."

(q)     For the avoidance of any ambiguity, Party A and Party B agree that the previous ISDA Master Agreement dated 13 March 2007 between Party A and Party B ("Old ISDA Master Agreement") is hereby cancelled and replaced by this ISDA Master Agreement dated 23 March 2007. Any reference in a Transaction to the Old ISDA Master Agreement will be deemed to be a reference to this ISDA Master Agreement dated 23 March 2007.

**Part 6**
**Provisions Relating to the Indenture**

(a)     *Limited Recourse.* Except as expressly set forth in this Part 6(a), the obligations of Party B under this Agreement or arising in connection with this Agreement and the Indenture, as the case may be, are limited recourse obligations of Party B, payable solely in accordance with this Agreement and the Indenture. Following realization of the Collateral, all obligations of and all claims against Party B hereunder or arising in connection herewith shall be extinguished and shall not thereafter revive. No recourse shall be had against any officer, member, director, employee, security holder or incorporator of Party B or its successors or assigns for the payment of any amounts payable hereunder. It is understood that the foregoing provisions of this Part 6(a) shall not constitute a waiver, release or discharge of any indebtedness or obligation evidenced by this Agreement or secured by the Indenture until all Collateral has been realized and applied in accordance with this Agreement and the Priority of Payments, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing provisions of this Part 6(a) shall not limit the right of any Person to name Party B as a party defendant in any action or suit or in the exercise of any other remedy under this Agreement, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such person or entity. The provisions of this Part 6(a) shall survive any termination of this Agreement. Notwithstanding the foregoing, Party A and Party B agree that, if a notice designating an Early Termination Date is duly given in accordance with this Agreement by Party B solely as a result of an Event of Default where Party A was the Defaulting Party and Party A is entitled to receive payment from Party B of any amount under Section 6(e) in connection with such Early Termination Date, Party A's sole recourse with respect to such payment shall be to the funds available to be paid to Party A in accordance with the Priority of Payments.

(b)     *No Petition for Bankruptcy.* Party A may not, prior to the date which is one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all of the Secured Notes, institute against, or join any other person or entity in instituting against, Party B any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under federal or state bankruptcy or similar laws (of any jurisdiction). Nothing in this Part 6(b) shall preclude, or be deemed to stop, Party A (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (A) any case or proceeding voluntarily filed or commenced by Party B or (B) any involuntary insolvency proceeding filed or commenced by a person or entity other than Party A or any of its affiliates, or (ii) from commencing against Party B or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar proceeding.

16

(c)     ***Rating Agency Confirmation of Assignments and Transfers***.  All transfers and assignments hereunder after the closing date for the issuance of the Notes shall require Party B to obtain prior written confirmations from S&P and Moody's that such transfer or assignment and any guarantee related to such transfer or assignment (to the extent such guarantee is provided by an entity that is not an Affiliate of Party A), as the case may be, will not result in the downgrade, withdrawal or other modification of their then current ratings on the Notes.

(d)     ***Additional Covenant of Party B***.  Party B covenants that it will not enter into any amendment, modification or supplement (whether by means of a supplemental indenture or otherwise) of the Indenture, the Class A-1 Note Purchase Agreement, the Advance Swap or the Account Control Agreement that would have a material adverse effect on Party A (including but not limited to any changes that would cause Party A to fail to be a Secured Party under the Indenture), unless the prior written consent of Party A has been obtained.  Party B will furnish to Party A a copy of each proposed and each executed supplemental indenture and copies of any related Rating Agency Confirmation.

NYB 1537981.4

**IN WITNESS WHEREOF** the parties have executed this Schedule on the respective dates specified below with effect from the date specified on the first page of this document.

| | |
|---|---|
| **LEHMAN BROTHERS SPECIAL FINANCING INC.** | **ESP FUNDING I, LTD.**<br>By Elliott Structured Products LLC as Collateral Manager |

By: _____

Name:

Title:  Zdenka S. Griswold
        Authorized Signatory

By: _____

Name:  Elliot Greenberg

Title:    Vice President

**ELLIOTT STRUCTURED PRODUCTS LLC,**
**in its individual capacity in respect of the**
**representations made by the Collateral Manager in**
**Part 5(p) of this Schedule**

By: _____

Name: Elliot Greenberg

Title:    Vice President

[SIGNATURE PAGE – SYNTHETIC SECURITY SCHEDULE]

# LEHMAN BROTHERS

EXHIBIT A to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and ESP FUNDING I, LTD. ("Party B") have entered into a Master Agreement dated as of March 23, 2007, (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally and irrevocably (subject to the provisions herein) guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect and shall be binding on Guarantor and its successors and permitted assigns until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof. This Guarantee shall remain in full force and effect notwithstanding Party A's merger, consolidation, loss of separate legal identity or ceasing to exist.    (e) Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee. Guarantor hereby waives any right to set-off or withhold payment of any obligations of Party B to Guarantor or Party A.

# LEHMAN BROTHERS

(g)    Guarantor agrees that Party B may at any time and from time to time, either before or after the maturity thereof, without notice to or further consent of the Guarantor, take or fail to take any action, exercise or refrain from exercising any right against Party A, compromise or subordinate any obligation of Party A, without impairing, releasing or otherwise affecting Guarantor's obligation other than a tolling of the statute of limitations.

(h)    Guarantor agrees to pay on demand all fees and out of pocket expenses (including the reasonable fees and expenses of Party B's counsel) in any way relating to the enforcement or protection of the rights of Party B hereunder.

(i)    No failure on the part of Party B to exercise, and no delay in exercising, any right, remedy or power hereunder other than a tolling of the statute of limitations shall operate as a waiver thereof, nor shall any single or partial exercise by Party B of any right, remedy or power hereunder preclude any other or future exercise of any right, remedy or power. Each and every right, remedy and power hereby granted to Party B or allowed it by law or other agreement shall be cumulative and not exclusive of any other, and may be exercised by Party B at any time or from time to time.

(j)    Guarantor hereby represents and warrants that:

(i)    it is duly organized, validly existing and in good standing under the laws of the State of Delaware and has full corporate power to execute, deliver and perform this Guarantee;

(ii)    the execution, delivery and performance of this Guarantee have been and remain duly authorized by all necessary corporate action and do not contravene any provision of the Guarnator's certificate of incorporation or by-laws, as amended to date;

(iii)    all consents, licenses, clearances, authorizations and approvals of, and registration and declarations with, any governmental authority or regulatory body necessary for the due execution, delivery and performance of this Guarantee have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority or regulatory body is required in connection with the execution, delivery or performance of this Guarantee;

(iv)    this Guarantee constitutes a legal, valid and binding obligation of Guarantor enforceable against Guarantor in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium and other laws of general applicability relating to or affecting creditors' rights and to general equity principles;

(k)    Guarantor is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any jurisdiction to make any deduction or withholding for or on account of any Tax from any payment to be made under this Guarantee.

(l)    Guarantor shall not assign or transfer this Guarantee or any of its duties and obligations hereunder without the written consent of Party B. Any purported assignment or transfer of this Guarantee without the prior written consent of Party B shall be void.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

2

# LEHMAN BROTHERS

Name:

Title:

Date:

.

EXHIBIT B to Schedule


[Form of Opinion of Counsel for Party B]

[Date]

Lehman Brothers Special Financing Inc.
c/o                              Lehman                    Brothers                    Inc.
745 Seventh Avenue, 28th Floor
New York, New York 10019
USA


Ladies and Gentlemen:

I have acted as counsel to [Counterparty], a [cp jurisdiction] corporation ("Party B"), and am familiar with matters pertaining to the execution and delivery of the Master Agreement (the "Master Agreement") dated as of [date] between Party B and Lehman Brothers Special Financing Inc. ("Party A").

In connection with this opinion, I have examined, or have had examined on my behalf, an executed copy of the Master Agreement, certificates and statements of public officials and officers of Party B and such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.    Party B is a [entity type] duly incorporated, validly existing and in good standing under the laws of the State of [cp jurisdiction].

2.    The execution, delivery and performance of the Master Agreement, by or on behalf of Party B, are within its corporate power, have been duly authorized by all corporate action and do not conflict with any provision of its certificate of incorporation or by-laws.

3.    The Master Agreement, has been duly executed and delivered by Party B and constitutes a legal, valid and binding obligation, enforceable against it in accordance with its terms.

4.    To the best of my knowledge no consent, authorization, license or approval of or registration or declaration with, any U.S. federal or state governmental authority is required in connection with the execution, delivery and performance of the Master Agreement by Party B.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.    My opinion in paragraph 3 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B.    I am a member of the Bar of the State of [licensed State] and render no opinion on the laws of any jurisdiction other than the laws of the State of [cp jurisdiction], the federal laws of the United States of America and the General Corporation Law of the State of [cp jurisdiction].

C.    My opinions are limited to the present laws and to the facts as they presently exist. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.    This letter is rendered to you in connection with the Master Agreement and the Guarantee and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose. This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Party B, except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Party B, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Master Agreement.

E.    I have assumed with your permission (i) the genuineness of all signatures by each party other than Party B, (ii) the authenticity of documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Master Agreement by each party other than Party B.


Very truly yours,


2

The parties executing this Credit Support Annex have executed the Master Agreement and have agreed as to the contents of this Credit Support Annex.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

*Party A*

**ESP FUNDING I, LTD.**

*Party B*

By Elliott Structured Products LLC as Collateral Manager

By: _____

Name:  Zdenka S. Griswold

Title:  Authorized Signatory

Date:

By: _____

Name:  Elliot Greenberg

Title:  Vice President

Date:  23 Mar 07

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

2 or the definitions in Paragraph 12, (a) the term *"Secured Party"* as used in this Annex means only Party B, (b) the term *"Pledgor"* as used in this Annex means only Party A, (c) only Party A makes the pledge and grant in Paragraph 2, the acknowledgment in the final sentence of Paragraph 8(a) and the representations in Paragraph 9 and (d) only Party A will be required to make transfers of Eligible Credit Support hereunder.

(ii)    **Local Business Day.**  For purposes of effecting a Transfer pursuant to this Annex, "Local Business Day" shall mean a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in both the jurisdiction of the party obligated to make such Transfer and the place, if different, where the relevant Eligible Collateral or Posted Collateral subject to such Transfer, is located.

(iii)   **Events of Default.**  Paragraph 7(i) is hereby amended by deleting the word "two" and inserting in lieu thereof the word "one".

(iv)    **No offset.**  The following subparagraph (c) is hereby added to Paragraph 3 of this Annex:

    (c)    *No offset.*  On any Valuation Date, if either (i) each party is required to make a Transfer under Paragraph 3(a) or (ii) each party is required to make a transfer under Paragraph 3(b), then the amounts of those obligations will not offset each other.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

by a mutually acceptable principal market maker for such Collateral Obligations, or (y) if no such quotation is available from a principal market maker for such date, such bid price as of the day, next preceding such date, on which such quotation was available, in either case multiplied by the applicable Valuation Percentage, plus (2) the accrued interest on such Collateral Obligations (except to the extent Transferred to a party pursuant to any applicable section of this Agreement or included in the applicable price referred to in (1) of this clause) as of such date.

      (iii)    **Alternative.** Paragraph 5 will apply.

(g)    **Holding and Using Posted Collateral.**

      (i)    **Eligibility to Hold Posted Collateral; Custodians.**

Party B and/or its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), provided that the following conditions applicable to it are satisfied:

        (1)    The Custodian is a bank or trust company located in the United States having total assets of at least $250,000,000 and a short term unsecured debt or counterparty rating of "Prime-1" from Moody's and "A-1" from Standard & Poor's.

Initially, the **Custodian** for Party B is:  Deutsche Bank Trust Company Americas as Secured Parties Representative.

      (ii)    **"Use of Posted Collateral"** The provisions of Paragraph 6(c) will not apply with respect to the collateral posted by Party A.

(h)    **Distributions and Interest Amount.**

      (i)    **Interest Rate.** The Interest Rate will be the actual interest rate achieved on Posted Collateral in the form of Cash that is held by Party B's Custodian.

      (ii)    **Transfer of Interest Amount.** A notice confirming the Interest Amount due will be sent by the Secured Party to the Pledgor on the first Local Business Day of each calendar month. A Transfer of the Interest Amount will be made as soon as reasonably practicable (and in any event no later than the following Local Business Day) after receipt by the Secured Party from the Pledgor of confirmation of the Interest Amount to be Transferred.

      (iii)    **Alternative to Interest Amount.** Paragraph 6(d)(ii) will apply.

(i)    **Additional Representation(s).** Not applicable.

(j)    **"Other Eligible Support and Other Posted Support."**

      (i)    **"Value"** with respect to Other Eligible Support and Other Posted Support means:  Not applicable.

      (ii)    **"Transfer"** with respect to Other Eligible Support and Other Posted Support means:  Not applicable.

(k)    **Demands and Notices.** All demands, specifications and notices made by a party to this Annex will be made pursuant to Section 12 (Notices) of this Agreement unless otherwise notified from time to time.

(l)    **Addresses for Transfers.** As agreed between the parties from time to time.

(m)    **Other Provisions.**

      (i)    **Agreement as to Single Secured Party and Pledgor.** Party A and Party B agree that, notwithstanding anything to the contrary in the recital to this Annex, Paragraph 1(b) or Paragraph

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

(iii)   **Other Eligible Support.** The following items will qualify as **"Other Eligible Support"** for the party specified: Not applicable.

(iv)   **Thresholds.**

(1)   **"Independent Amount"** shall mean an amount, if any, as set forth in a Confirmation with respect to Party A, provided however, that in no event shall such amount exceed the next periodic payment due from Party A to Party B with respect to each outstanding Transaction.

(2)   **"Threshold"** means, with respect to Party A, zero for so long as (1) Party A's Credit Support Provider does not have the required ratings set forth in the definition of "Ratings Event" in Part 5(a)(iv) of the Schedule; otherwise the Threshold shall be unlimited.

(3)   **"Minimum Transfer Amount"** means, with respect to a party, USD 50,000; provided that, notwithstanding anything to the contrary contained herein, the Minimum Transfer Amount shall not apply to the Independent Amount, and provided further that, if an Event of Default, Credit Event Upon Merger, or Additional Termination Event with respect to Pledgor has occurred and is continuing, then the Minimum Transfer Amount with respect to Pledgor shall be zero.

(4)   **Rounding.** The Delivery Amount and the Return Amount shall be rounded up and down respectively to the nearest integral multiple of USD 1,000.

(c)   **Valuation and Timing.**

(i)   **"Valuation Agent"** means Party A.

(ii)   **"Valuation Date"** means any Local Business Day.

(iii)   **"Valuation Time"** means the close of business in New York on a Local Business Day provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv)   **"Notification Time"** means 3:00 p.m., New York time, on a Local Business Day.

(d)   **Conditions Precedent and Secured Party's Rights and Remedies.** For purposes of Paragraph 8(a), each Termination Event will constitute a Specified Condition with respect to Pledgor, if Pledgor fails to pay when due any amount payable by it in connection with an Early Termination Date designated in connection with that Termination Event. For all other purposes of this Annex, each Termination Event specified below with respect to a party will be a "Specified Condition" for that party (that party being the Affected Party if the Termination Event occurs with respect to that party): None.

(e)   **Substitution.**

(i)   **"Substitution Date"** has the meaning specified in Paragraph 4(d)(ii).

(ii)   **Consent.** The Pledgor need not obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d).

(f)   **Dispute Resolution**

(i)   **"Resolution Time"** means 1:00 p.m., New York time, on the Local Business Day following the date on which notice is given that gives rise to a dispute.

(ii)   **Value.** For the purpose of Paragraph 5(i)(c) and 5(ii), the Value of Posted Credit Support other than Cash will be calculated as follows:

With respect to any Eligible Collateral in the form of securities listed in Paragraph 13(b)(ii) (referred to herein as "Collateral Obligations") the sum of (1) (x) the bid price quoted on such date

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

**CREDIT SUPPORT ANNEX**
Elections and Variables
dated as of March 23, 2007
between
**LEHMAN BROTHERS SPECIAL FINANCING INC.**
(hereinafter referred to as either "Party A" or "Pledgor")
and
**ESP FUNDING I, LTD.**
(hereinafter referred to as either "Party B" or "Secured Party")

**Paragraph 13. Elections and Variables**

(a)    **Security Interest for "Obligations".** The term **"Obligations"** as used in this Annex includes the following additional obligations: None.

(b)    **Credit Support Obligations.**

    (i)    **Delivery Amount, Return Amount and Credit Support Amount**

        (1)    **"Delivery Amount"** has the meaning specified in Paragraph 3(a).

        (2)    **"Return Amount"** has the meaning specified in Paragraph 3(b).

        (3)    **"Credit Support Amount"** means, for any Valuation Date, the Independent Amount.

    (ii)    **Eligible Collateral.** The following items will qualify as **"Eligible Collateral"** for the party specified:

| Collateral Type | Party B | Valuation Percentage |
|---|---|---|
| (1) Cash, in the form of U.S. Dollars. | [X] | 100% |
| (2) Negotiable debt obligations issued by the U.S. Treasury Department having a maturity at issuance of not more than one year. | [X] | 98.8% |
| (3) Negotiable debt obligations issued by the U.S. Treasury Department having a maturity at issuance of more than one year but not more than ten years. | [X] | 92.2% |
| (4) Negotiable debt obligations issued by the U.S. Treasury Department having a maturity at issuance of more than ten years. | [X] | 87.7% |
| (5) Negotiable debt obligations which are rated Aaa by Moody's and AAA by S&P and are fully guaranteed as to both principal and interest by the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation that are <u>not</u> pass-through, multi-class or multi-branch securities or paying interest only or principal only. | [X] | 86.4% |
| (6) Such other Eligible Collateral as may be agreed between the parties. | [X] | As agreed between the parties and confirmed by the Rating Agencies. |

Synthetic Security
18

NYB 1537981.4



*International Swaps and Derivatives Association, Inc.*

# CREDIT SUPPORT ANNEX

to the Schedule to the

**Master Agreement**

dated as of March 23, 2007

between

| | |
|---|---|
| **LEHMAN BROTHERS SPECIAL FINANCING INC.** | **ESP FUNDING I, LTD.** |
| *Party A* | *Party B* |

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:

**Paragraph 1. Interpretation**

(a)    *Definitions and Inconsistency*. Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)    *Secured Party and Pledgor*. All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2. Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.