WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Lori R. Fife
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

------------------------------------------------------------------x

**NOTICE OF DEBTORS' MOTION FOR**
**APPROVAL OF SETTLEMENT AGREEMENTS WITH (I) BANK OF**
**AMERICA, N.A. AND (II) MERRILL LYNCH INTERNATIONAL AND ITS AFFILIATES**

PLEASE TAKE NOTICE that a hearing on the annexed motion (the "Motion") of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors"), for approval of settlement agreements with (i) Bank of America, N.A. ("BOA") and (ii) Merrill Lynch International and certain of its affiliates (the "Merrill Counterparties"), all as more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York, 10004 (the "Bankruptcy Court"), on **October 19, 2011, 2011 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections to the Motion, if any, shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon:   (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York, 10004, Courtroom 601; (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York, 10153, Attn:

Harvey R. Miller, Esq., Lori R. Fife, Esq. and Robert J. Lemons, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Region 2, 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn:   Tracy Hope Davis, Esq., Andrea B. Schwartz, Esq., and Elisabetta Gasparini, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York, 10005, Attn:   Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; and (v) Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York 10022, Attn:   Fredric Sosnick, Esq., William J.F. Roll III, Esq., Daniel H. R. Laguardia, Esq. and Ned S. Schodek, Esq., attorneys for BOA and the Merrill Counterparties, so as to be so filed and received by no later than **October 12, 2011 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:  September 28, 2011
     New York, New York

/s/ Harvey R. Miller
Harvey R. Miller
Lori R. Fife
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Lori R. Fife
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------x
In re                                          :         **Chapter 11 Case No.**
                                               :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*   :         **08-13555 (JMP)**
                                               :
                        **Debtors.**           :         **(Jointly Administered)**
---------------------------------------------------------------------x

**DEBTORS' MOTION FOR APPROVAL OF**
**SETTLEMENT AGREEMENTS WITH (I) BANK OF AMERICA, N.A.**
**AND (II) MERRILL LYNCH INTERNATIONAL AND ITS AFFILIATES**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-

referenced chapter 11 cases, as debtors in possession (together, the "Debtors," and, collectively

with their non-debtor affiliates, "Lehman"), file this Motion and respectfully represent:

**Preliminary Statement**

1.      The Debtors seek approval, pursuant to Rule 9019 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), of (i) a termination and settlement agreement

(the "BOA Settlement Agreement") among the Lehman Entities and Bank of America, N.A.

("BOA") and (ii) a termination and settlement agreement (the "Merrill Settlement Agreement"

and together with the BOA Settlement Agreement, the "Settlement Agreements")[1] among the

Lehman Entities and Merrill Lynch International and certain of its affiliates (together, the

"Merrill Counterparties").[2]   The Settlement Agreements resolve billions of dollars of derivatives

claims and derivatives guarantee claims asserted by BOA and the Merrill Counterparties against

the Lehman Entities as well as BOA's pending appeal of this Court's judgment and order

holding that BOA's setoff of amounts owing by LBHI to BOA against approximately $500

million of LBHI funds was an unauthorized and impermissible setoff in violation of the

automatic stay.[3]

> 2.       The Settlement Agreements avoid the inherent risks for the Debtors in the

setoff litigation with BOA and any potential litigation with BOA or the Merrill Counterparties

regarding their asserted complex and substantial derivatives claims.   The Settlement

Agreements provide multiple benefits to the Debtors, including:

- The termination and withdrawal of BOA's appeal from the judgment entered by the Court reversing BOA's setoff of $500 million, as described in the BOA Decision.

- The return of approximately 71% of the set off funds (*i.e.,* approximately $356 million) by BOA to LBHI plus interest.

- The resolution of BOA's asserted primary and guarantee derivatives claims in accordance with the Derivatives Framework (defined below), pursuant to which BOA has agreed to reduce its primary derivatives claims by

---

[1]  Copies of the BOA Settlement Agreement and the Merrill Settlement Agreement are annexed hereto as Exhibit A and Exhibit B, respectively.   Neither the BOA Settlement Agreement nor the Merrill Settlement Agreement is contingent on the other.   Consequently, although the Debtors are seeking approval of the Settlement Agreements in a single motion, they are submitting to the Court a separate proposed order for approval of each Settlement Agreement.

[2]  The "Lehman Entities" that are parties to the BOA Settlement Agreement are LBHI, Lehman Brothers Special Financing Inc. ("LBSF"), Lehman Brothers Commercial Corporation ("LBCC") and Lehman Brothers Commodities Services Inc. ("LBCS").   The "Lehman Entities" that are parties to the Merrill Settlement Agreement are LBHI, LBSF, LBCS, LBCC and Lehman Brothers OTC Derivatives Inc. ("LOTC").

[3]  *See Bank of America, N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.),* 439 B.R. 811 (Bankr. S.D.N.Y. 2010) (the "BOA Decision").

approximately $2.4 billion and its corresponding derivatives guarantee claims against LBHI by approximately $2.1 billion (taking into account the permitted setoff under the BOA Settlement Agreement), for a total reduction of BOA's aggregate derivatives claims of approximately $4.5 billion.

▪ The resolution of the Merrill Counterparties' asserted primary and guarantee derivatives claims in accordance with the Derivatives Framework, pursuant to which the Merrill Counterparties have agreed to reduce their primary derivatives claims by approximately $1.5 billion and their corresponding derivatives guarantee claims against LBHI by approximately the same amount, for a total reduction of the Merrill Counterparties' aggregate derivatives claims of approximately $3 billion.

▪ The execution and delivery to the Debtors of plan support agreements from BOA and the Merrill Counterparties.

3.      Based upon the pertinent facts as described in the Declaration of Daniel Ehrmann in Support of the Motion (the "Ehrmann Declaration"), filed contemporaneously herewith, entry into the Settlement Agreements is a proper and appropriate exercise of sound business judgment and their approval by the Court is in the best interests of the Debtors.   The Debtors request that the Court approve the Settlement Agreements and that the proposed orders annexed hereto as Exhibit C and Exhibit D be entered.

## Background

4.      Commencing on September 15, 2008, and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").   The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).   The Debtors are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors for the Debtors pursuant to section 1102 of the Bankruptcy Code (the "Creditors'

Committee").

6.      On September 1, 2011, the Debtors filed their third amended joint chapter

11 plan (the "Plan") pursuant to section 1121 of the Bankruptcy Code [ECF No. 19627] and

related disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the

Bankruptcy Code [ECF No. 19629].   On September 1, 2011, the Court entered an amended

order approving the Disclosure Statement and voting procedures with respect to the Plan [ECF

No. 19631].

### Jurisdiction

7.      This Court has subject matter jurisdiction to consider and determine this

motion pursuant to 28 U.S.C. § 1334.   This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### BOA's and the Merrill Counterparties' Claims

BOA's Asserted Derivatives Claims

8.      LBSF, LBCS, and LBCC were each party to one or more transactions

(the "BOA Transactions") that were governed by an ISDA Master Agreement with BOA, which

included certain schedules, documents, confirmations, and a guaranty of the obligations of the

respective Lehman Entity by LBHI (as the same may have been amended from time to time,

collectively, the "BOA Agreements").   The BOA Transactions include various (i) interest rate

swap, swaption, cap/floor and option rate transactions, (ii) single name, index and tranched index

credit derivatives on corporate and government entities, (iii) credit derivatives on mortgaged

backed and other asset-backed bonds and indices, (iv) commodity swaps, forwards and options,

(v) cross currency transactions and (vi) foreign exchange options and forward transactions.

Following the commencement of these cases, BOA terminated the BOA Agreements and filed proofs of claim against the Debtors asserting (i) over $2.8 billion of claims in the aggregate against LBSF, LBCS, and LBCC based on alleged obligations arising under the applicable BOA Agreements and (ii) over $2.3 billion of claims against LBHI (taking into account the setoff of approximately $500 million described in the BOA Decision) based on LBHI's asserted guarantees under the BOA Agreements (collectively, the "BOA Asserted Claims").    At the time of the termination of the BOA Agreements, the Lehman Entities and BOA were parties to more than 22,000 BOA Transactions.

The Setoff Litigation

9.    The facts in connection with the setoff litigation are set forth in detail in the BOA Decision and are summarized here.   For many years prior to the Commencement Date, BOA provided clearing services to support Lehman's worldwide foreign exchange and other financial activities.   BOA Decision at 819.   LBHI and certain of its subsidiaries maintained several cash management accounts with BOA.   *Id*. at 815.   On August 25, 2008, LBHI and BOA entered into a security agreement, which required collateral solely for such intraday overdrafts to be deposited in the amount of $500 million.   *Id*. at   822.   Shortly thereafter, Lehman wired BOA $500 million, which was maintained in two accounts (the "Accounts").   *Id*. The Accounts were created specifically and exclusively to hold the $500 million collateral and any interest the collateral earned.   *Id*. 822, 825.

10.    On November 10, 2008, subsequent to the Commencement Date, BOA, without seeking relief from the automatic stay, notified LBHI that it had set off $501,820,712 (the "Account Balance") from the Accounts plus the balance in certain other accounts,[4] totaling

---

[4] Such other accounts are the subject of a separate settlement agreement between the relevant parties that was approved by the Court.   *See* ECF No. 16935.

$6,987,872, against LBHI to BOA under the BOA Agreements. *Id*. at 823. The Debtors objected to the setoff on the grounds that, among other things, it violated the automatic stay, and demanded a return of the Account Balance. *Id*. Shortly thereafter, BOA commenced an adversary proceeding in this Court (Adv. Pro. No. 08-1753 (JMP)) (the "Adversary Proceeding") seeking a declaratory judgment that (a) it properly exercised its right of setoff; (b) the setoff did not violate the automatic stay; and/or (c) in the alternative, BOA was entitled to retroactive relief from the automatic stay validating the setoff. *Id*.

11.    On November 16, 2010, this Court issued the BOA Decision, granting the Debtors' summary judgment motion in full and denying BOA's motion for summary judgment. *Id*. at 837. On May 20, 2011, a judgment against BOA in favor of LBHI in the amount of $501.8 million plus interest was entered (the "Judgment"). On May 23, 2011, BOA filed a notice of appeal from the Judgment (the "Appeal"), and the Appeal is currently pending before the United States District Court for the Southern District of New York, Case No. 1-11-cv-03958 (DAB) (the "District Court"). BOA has posted an appeal bond (the "Bond") in favor of LBHI in the maximum amount of $660,553,847.34 in connection with the Appeal.

The Merrill Counterparties' Asserted Derivatives Claims

12.    LBSF, LBCS, LBCC, and LOTC were each party to one or more transactions (the "Merrill Transactions") that were governed by an ISDA Master Agreement with a Merrill Counterparty, which included certain schedules, documents, confirmations, and a guaranty of the obligations of the respective Lehman Entity by LBHI (as the same may have been amended from time to time, collectively, the "Merrill Agreements"). The Merrill Transactions include various (i) interest rate swap, swaption, cap/floor and option rate transactions, (ii) single name, index and tranched index credit derivatives on corporate and

government entities, (iii) credit derivatives on mortgaged backed and other asset-backed bonds

and indices, (iv) commodity swaps, forwards and options, (v) cross currency transactions and

(vi) foreign exchange options and forward transactions.    Following the commencement of these

cases, the Merrill Counterparties terminated the Merrill Agreements and filed proofs of claim

against the Debtors asserting (i) over $2.6 billion of claims in the aggregate against LBSF,

LBCS, LBCC, and LOTC based on alleged obligations arising under the applicable Merrill

Agreements and (ii) approximately the same amount of claims against LBHI (after reductions for

certain setoffs applied against LBHI) based on LBHI's asserted guarantees under the Merrill

Agreements (collectively, the "<u>Merrill Asserted Claims</u>").    At the time of the termination of the

Merrill Agreements, the Lehman Entities and the Merrill Counterparties were parties to more

than 27,000 Merrill Transactions.

<b><u>The Derivatives Framework</u></b>

13.    As of the Commencement Date, Lehman was party to or guarantor of over

10,000 derivatives contracts, essentially ISDA[5] agreements covering an excess of 1,700,000

transactions.    Winding down a derivatives portfolio of the size and scale of the Debtors'

portfolio has been a monumental task never before faced by a chapter 11 debtor.    In addition to

recovering the value of the Debtors' "in the money" derivatives contracts, the Debtors have been

required to analyze more than 8,000 filed derivatives and derivatives guarantees claims asserting

more than $75 billion in damages against the Debtors.    Within this group of claims are the

derivatives claims and derivatives guarantee claims (collectively, the "<u>Bank Derivatives</u>

<u>Claims</u>") of corporate groups comprising thirteen of the Debtors' largest counterparties,

---

[5]  The term ISDA refers to the International Swap Dealers Association, Inc.

including BOA and the Merrill Counterparties (the "Bank Counterparties"), aggregating in
excess of $20 billion.

14.     Prior to the Commencement Date, certain Debtors and the Bank
Counterparties engaged in substantial derivatives trading involving the most sophisticated,
complex and esoteric financial instruments then in existence having notional amounts in the
billions of dollars.   As of the Commencement Date, each Bank Counterparty had at least 5,000
transactions with the Debtors.   The Bank Derivatives Claims are not only massive in amount,
but are also enormously difficult to analyze.   The Debtors established a team of over 50 highly
qualified full-time employees to unwind the derivatives trades of the Bank Counterparties.   For
more than two years, this team has been devoted to the task of gathering and collating trade data
with respect to the Bank Derivatives Claims to determine and reconcile trade values and evaluate
the validity and accuracy of such claims.   The team also engaged in extended discussions and
negotiations with the Bank Counterparties as part of the process.

15.     After an in-depth review of the Bank Derivatives Claims and following
discussions and negotiations with the Bank Counterparties and the Creditors' Committee, it was
concluded that the Bank Derivatives Claims, if left unresolved, would result in protracted and
very expensive, prolix litigation to fix and determine the valid amounts of the Bank Derivatives
Claims.   Litigation with each of the thirteen Bank Counterparties was projected to take years
and the results were highly uncertain given the substantial amounts of the Bank Derivatives
Claims, the limited applicable legal precedents and the enormous number of transactions and
facts involved.   As a result, the litigation, if pursued, would significantly reduce and likely delay
distributions to all creditors because the Debtors would have to provide appropriate reserves for
the filed amounts of the Bank Derivatives Claims pending resolution.   In an effort to avoid such

extensive and costly litigation and to maximize and accelerate recoveries to creditors, the

Debtors, in consultation with the Creditors' Committee, formulated and proposed a common

settlement approach for the Bank Derivatives Claims pursuant to standardized, uniform and

transparent principles and methodologies (the "Derivatives Framework").

16.    Thereafter, over a period of several months, the Debtors and their

professionals participated in multiple group and individual meetings, and considered the input of,

the Bank Counterparties, the Creditors' Committee and their respective professionals as to issues

underlying the Derivatives Framework.   The finalized Derivatives Framework reflects certain

modifications and adjustments incorporated by the Debtors as a result of the above meetings.

The Derivatives Framework is the product of a collaborative, laborious effort on the part of

sophisticated institutions to settle the highly complex disputes pertinent to the resolution of the

derivatives claims.   In general, the Derivatives Framework establishes: (i) common dates and

times for calculation of mid market values; (ii) a uniform approach to portfolio aggregation to

derive groups of netted exposures; and (iii) a methodology for the calculation of allowable

additional charges.

17.    During the course of plan negotiations in June 2011, the Debtors and eight

Bank Counterparties (the "Settled Counterparties") entered into settlement agreements for the

allowance of their respective Bank Derivatives Claims or the payment of amounts due from such

counterparties to the Debtors, as applicable, as calculated pursuant to the Derivatives

Framework, plus an amount to be added to the agreed amount of such Bank Derivatives Claims

equal to 11.25% of the said calculated amounts as a result of further arm's-length negotiations

with the Settled Counterparties (the "Framework Values").[6]    Pursuant to such settlement

agreements, the Bank Derivatives Claims of the Settled Counterparties have been allowed in the

aggregate amount of approximately $6.2 billion, representing a reduction of more than $3.4

billion from their aggregate filed amount.   In addition, the Settled Counterparties have agreed to

support the Debtors' Plan.   The Creditors' Committee has consented to each of the settlements

with the Settled Counterparties at the Framework Values.

18.    One of the fundamental components of the Derivatives Framework is the

uniform treatment of the similarly situated claims of the Bank Counterparties.   Prior to the

development of the Derivatives Framework, no Bank Counterparty was willing to be the first to

settle with the Debtors out of concern that the Debtors would later treat other Bank

Counterparties more favorably.   To induce the Settled Counterparties to accept the Framework

Values, the Debtors agreed to provide the Settled Counterparties with "Most Favored Treatment"

protection (the "MFT Protection").   If the Debtors enter into a settlement with a non-Settled

Bank Counterparty under certain circumstances that deviate from the Derivatives Framework

and Framework Values in a manner more favorable to a non-Settled Bank Counterparty, the

MFT Protection provides that the Settled Bank Counterparties' allowed claims will be

automatically increased by the proportion that a non-Settled Bank Counterparty's claims are

allowed in excess of its Framework Value.   The Settlement Agreements are at the Framework

Values for BOA and the Merrill Counterparties and, therefore, do not trigger the MFT Protection

provisions in the settlement agreements with the Settled Counterparties.

---

[6]  The Debtors entered into such settlement agreements with the Settled Counterparties in accordance with the order,
dated December 16, 2008 [ECF No. 2257], establishing Procedures for the Settlement or Assumption and
Assignment of Prepetition Derivatives Contracts.

## The BOA Settlement Agreement

19.    After extensive arm's-length negotiations, the Lehman Entities and BOA

reached a comprehensive, integrated compromise and settlement that resolves the Appeal and the

BOA Asserted Claims at the Framework Values.   The BOA Settlement Agreement provides:[7]

- Allowance of General Unsecured Claim Against LBSF.   BOA shall have an allowed, nonpriority, non-subordinated, general unsecured claim against LBSF in the amount of the $402,122,339 for its aggregate claims against LBSF under or in connection with the pre-chapter 11 BOA Agreements governing the BOA Transactions between BOA and LBSF.   *See* BOA Settlement Agreement § 6(a).   The Debtors believe that such allowed claim should be classified in LBSF Class 4A of the Plan

- Allowance of General Unsecured Claim Against LBCS.   BOA shall have an allowed, nonpriority, non-subordinated, general unsecured claim against LBCS in the amount of $11,919,269 for its aggregate claims against LBCS under or in connection with the pre-chapter 11 BOA Agreements governing the BOA Transactions between BOA and LBCS.   *See* BOA Settlement Agreement § 6(b).   The Debtors believe that such allowed claim should be classified in LBCS Class 4 of the Plan.

- Allowance of General Unsecured Claim Against LBHI.   BOA shall have an allowed, nonpriority, non-subordinated, general unsecured claim against LBHI in an amount equal to (i) the aggregate of the Final LBSF Settlement Amount and the Final LBCS Settlement Amount *minus* (ii) the Setoff Amount (defined below), for its claims against LBHI under or in connection with the pre-chapter 11 Agreements governing the BOA Transactions between BOA and LBSF and BOA and LBCS.   *See* BOA Settlement Agreement § 6(c). The Debtors believe that such allowed claim should be classified in LBHI Class 9A of the Plan.

- Setoff of Account Balance.   BOA may set off and apply an aggregate of $145,800,000 (the "Setoff Amount") of the Account Balance in partial satisfaction of its claims against LBHI (but not its corresponding claims against LBSF and LBCS).   *See* BOA Settlement Agreement § 5(a).

- Recovery of Account Balance.   Within ten (10) business days of any initial payment or transfer made by any of the Debtors to BOA pursuant to an effective chapter 11 plan in the Chapter 11 Cases, BOA shall pay to LBHI by

---

[7] To the extent there is any inconsistency between this summary and the BOA Settlement Agreement, the BOA Settlement Agreement controls.   Capitalized terms used but not defined in this summary shall have the meanings ascribed to them in the BOA Settlement Agreement.

wire transfer without deduction, setoff or counterclaim of any kind cash in the amount of $356,020,712 less the Overdraft Amounts ($5,039) plus interest thereon (the "Turnover Amount").   BOA may in its sole discretion prepay the Turnover Amount at any time to LBHI without penalty.   Upon receipt and collection of the Turnover Amount by LBHI, LBHI shall release the Bond. *See* BOA Settlement Agreement § 5(b).

- <u>MFT Protection</u>.   The BOA Settlement Agreement provides BOA with the same MFT Protection provided to the Settled Counterparties.   If the Debtors later settle with a non-settling Bank Counterparty under certain circumstances that deviate from the Derivatives Framework and the Framework Values in a manner more favorable to a non-settling Bank Counterparty, the LBSF Settlement Amount and the LBCS Settlement Amount may be increased pursuant to the terms of the MFT Protection provision to a maximum of the BOA Asserted Claim with respect to the corresponding Transactions.   *See* BOA Settlement Agreement § 13.

- <u>Payment of LBCC Receivable Amount</u>.   Within ten (10) business days of any initial payment or transfer made by any of the Debtors to BOA pursuant to an effective chapter 11 plan in the Chapter 11 Cases, BOA shall pay $14,695,124 in cash to LBCC by wire transfer without deduction, set-off or counterclaim of any kind in full and complete satisfaction of all claims of LBCC against BOA under or in connection with the pre-chapter 11 BOA Transactions between LBCC and BOA.   BOA may in its sole discretion prepay the LBCC Receivable Amount at any time to LBCC without penalty.   Interest shall not accrue on the LBCC Receivable Amount.   *See* BOA Settlement Agreement § 7.

- <u>Releases and Covenants Not to Sue</u>.   The Parties will release one another from, and covenant not to sue upon, any and all claims arising out of or related in any way whatsoever to (i) the BOA Asserted Claims, the BOA Agreements, the BOA Transactions or the negotiation, execution, performance, termination or any breaches thereof or (ii) the Account Balance, the Adversary Proceeding and any claims asserted therein or in connection with the Appeal.   *See* BOA Settlement Agreement §§ 9, 10.

- <u>Dismissal of Appeal</u>.   Within ten (10) business days of the Effective Date, BOA shall take all steps necessary to withdraw the Appeal with prejudice. *See* BOA Settlement Agreement § 14.

- <u>Effective Date</u>.   The BOA Settlement Agreement becomes effective upon the entry of an order by the Court approving the BOA Settlement Agreement and such order having become a Final Order.   *See* BOA Settlement Agreement § 2.

- ▪ <u>Termination</u>.   The Lehman Entities or BOA may terminate the BOA Settlement Agreement if an order approving the BOA Settlement Agreement is not entered by the Court on or before October 31, 2011.   In addition, BOA may terminate the BOA Settlement Agreement, in its sole discretion, if the BOA Settlement Agreement does not become effective within 120 days after approval by the Court or if such approval order is reversed or vacated.   *See* BOA Settlement Agreement § 3.

**<u>The Merrill Settlement Agreement</u>**

20.      After extensive arm's-length negotiations, the Lehman Entities and the Merrill Counterparties reached a comprehensive, integrated compromise and settlement that resolves the Merrill Asserted Claims at the Framework Values.   The Merrill Settlement Agreement provides:[8]

- ▪ <u>Allowance of General Unsecured Claim Against LBSF and LBHI</u>.   Merrill Lynch International, Merrill Lynch Capital Services Inc., Merrill Lynch International Bank Ltd. and Merrill Lynch Bank & Trust Co. FSB shall each have an allowed, nonpriority, non-subordinated, general unsecured claim against each of LBSF and LBHI for their aggregate claims against LBSF and LBHI under or in connection with the pre-chapter 11 Merrill Agreements governing the Merrill Transactions between such Merrill Counterparties and LBSF in the Framework Values.   The aggregate amount of such allowed claims against each of LBSF and LBHI is $1,117,961,071.   *See* Merrill Settlement Agreement §§ 4(a) – (d).   The Debtors believe that such allowed claims against LBSF and LBHI should be classified in LBSF Class 4A and LBHI Class 9A, respectively.

- ▪ <u>Allowance of General Unsecured Claim Against LBCS</u>.   Merrill Lynch Commodities Inc. shall have an allowed, nonpriority, non-subordinated, general unsecured claim against LBCS and LBHI, in each case, in the amount of $16,700,273 for its aggregate claims against LBCS and LBHI under or in connection with the pre-chapter 11 Merrill Agreements governing the Merrill Transactions between Merrill Lynch Commodities Inc. and LBCS.   *See* Merrill Settlement Agreement § 4(e).   The Debtors believe that such allowed claims against LBCS and LBHI should be classified in LBCS Class 4 and LBHI Class 9A, respectively.

---

[8]  To the extent there is any inconsistency between this summary and the Merrill Settlement Agreement, the Merrill Settlement Agreement controls.   Capitalized terms used but not defined in this summary shall have the meanings ascribed to them in the Merrill Settlement Agreement.

- **Allowance of General Unsecured Claim Against LOTC.**   Merrill Lynch International shall have an allowed, nonpriority, non-subordinated, general unsecured claim against LOTC and LBHI, in each case, in the amount of $10,266,107 for its aggregate claims against LOTC and LBHI under or in connection with the pre-chapter 11 Merrill Agreements governing the Merrill Transactions between Merrill Lynch International and LOTC.   *See* Merrill Settlement Agreement § 4(f). The Debtors believe that such allowed claims against LOTC and LBHI should be classified in LOTC Class 4 and LBHI Class 9A, respectively.

- **MFT Protection.**   The Merrill Settlement Agreement provides the Merrill Counterparties with the same MFT Protection provided to the Settled Counterparties.   If the Debtors later settle with a non-settling Bank Counterparty under certain circumstances that deviate from the Derivatives Framework and the Framework Values in a manner more favorable to a non-settling Bank Counterparty, the settlement amounts may be increased pursuant to the terms of the MFT Protection provision to a maximum of the Merrill Asserted Claim with respect to the corresponding Merrill Transactions.   *See* Merrill Settlement Agreement § 12.

- **Payment of Receivable Amounts.**   Within ten (10) business days of any initial payment or transfer made by any of the Debtors to any of the Merrill Counterparties pursuant to an effective chapter 11 plan in the Chapter 11 Cases (i) Merrill Lynch Bank USA shall pay to LBSF $1,534,579, (ii) Merrill Lynch Commodities (Europe) Ltd. shall pay to LBCS $3,536,995, (iii) Merrill Lynch International Bank Ltd. shall pay to LBCC $4,162,280, and (iv) Merrill Lynch Capital Services Inc. shall pay to LBCC $2,661,898, in each case, in cash by wire transfer without deduction, set-off or counterclaim of any kind in full and complete satisfaction for the aggregate claims of such Lehman Entities against the applicable Merrill Counterparties under or in connection with the respective pre-chapter 11 Merrill Transactions.   The Merrill Counterparties may in their sole discretion prepay any Lehman Receivable without penalty.   Interest shall not accrue on the Lehman Receivables.   *See* Merrill Settlement Agreement § 5.

- **Releases and Covenants Not to Sue.**   The Parties will release one another from, and covenant not to sue upon, any and all claims arising out of or related in any way whatsoever to the Merrill Asserted Claims, the Merrill Agreements, the Merrill Transactions or the negotiation, execution, performance, termination or any breaches thereof.   *See* Merrill Settlement Agreement §§ 8, 9.

- **Effective Date.**   The Merrill Settlement Agreement becomes effective upon the entry of an order by the Court approving the Merrill Settlement Agreement and such order having become a Final Order.   *See* Merrill Settlement Agreement § 2.

> ■ Termination.  The Lehman Entities or the Merrill Counterparties may terminate the Merrill Settlement Agreement if an order approving the Merrill Settlement Agreement is not entered by the Court on or before October 31, 2011.  In addition, the Merrill Counterparties may terminate the Merrill Settlement Agreement, in their sole discretion, if the Merrill Settlement Agreement does not become effective within 120 days after approval by the Court or if such approval order is reversed or vacated.  *See* Merrill Settlement Agreement § 3.

## The Controlling Legal Standard Under Bankruptcy Rule 9019

21.    Compromises are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).   The decision to approve a particular compromise lies within the sound discretion of the bankruptcy court.  *See Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).   A settlement must not "fall below the lowest point in the range of reasonableness."  *Vaughn v. Drexel Burnham Lambert Group, Inc. (Drexel Burnham Lambert Group)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).   Discretion may be exercised by the court "in light of the general public policy favoring settlements."  *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).   A proposed compromise and settlement implicates the issue of whether it is "fair and equitable, and in the best interest of the [debtor's] estate."  *In re Best Products*, 165 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations omitted).

22.    The following factors are considered in determining whether a settlement should be approved:   (i) the probability of success in litigation, with due consideration for the uncertainty in fact and law; (ii) the complexity and likely duration of the litigation and any

attendant expense, inconvenience, and delay; (iii) the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement; and (iv) the extent to which the settlement is truly the product of arm's-length bargaining and not the product of fraud or collusion.  *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.,*  390 U.S. at 424; *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 804 (Bankr. S.D.N.Y. 1998); *In re Best Prods. Co.*, 168 B.R. at 50.

23.     While a court must "evaluate. . .all. . .factors relevant to a fair and full assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court need not conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699 F.2d at 608, or conduct a full independent investigation.  *Drexel Burnham Lambert Group*, 134 B.R. at 496.   "[T]he bankruptcy judge does not have to decide the numerous questions of law and fact....The court need only canvass the settlement to determine whether it is within the accepted range of reasonableness."  *Nellis*, 165 B.R. at 123 (internal citations omitted).

24.     The court may give weight to the "informed judgments of the … debtor-in-possession and their counsel that a compromise is fair and equitable, and consider the competency and experience of counsel who support the compromise."  *Drexel Burnham Lambert Group*, 134 B.R. at 505 (internal citations omitted); *see also In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993); *accord In re Ashford Hotels Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate that [the court] substitute [its] judgment for the Trustee's, but only that [the court] test his choice for reasonableness . . . . If the Trustee chooses one of two reasonable choices, [the court] must approve that choice, even if, all things being equal, [the court] would have selected the other.").

25.    There is no requirement that "the value of the compromise … be dollar-for-dollar the equivalent of the claim."   *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 427 (S.D.N.Y. 1993).   While not the settlement at bar, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."   *Id*. at 427-28 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)).

### The Settlement Agreements Meet the Legal Standard
### Established Under Rule 9019 and Are in the Best Interests of the Lehman Entities

26.    The Settlement Agreements represent an integrated and comprehensive resolution of highly complex issues.   Although the Debtors believe that each component of the settlements is independently supported by sound business judgment, when evaluated as a whole, it is clear that the settlements are well within the range of reasonableness and should be approved.   The Lehman Entities have comprehensively analyzed and considered the issues relating to the BOA Asserted Claims, the Adversary Proceeding, the Appeal and the Merrill Asserted Claims and have concluded that, in light of the numerous benefits of the Settlement Agreements, the settlements are fair and equitable and represent a reasonable resolution of highly complex issues.

27.    Pursuant to the BOA Settlement Agreement, BOA's primary derivatives claims will be reduced by $2.4 billion and its guarantee derivatives claims will be reduced [by approximately $2.1 billion (taking into account the permitted setoff under the BOA Settlement Agreement)], for a total reduction of approximately $4.5 billion or 86% of the Asserted BOA Claims.   Also, the BOA Asserted Claims against LBCC and LBHI in the amount of $13,221,605 each will not be allowed, but rather, BOA will pay $14,695,124 to LBCC in respect of the BOA Transactions between BOA and LBCC.   In addition, pursuant to the Merrill Settlement

Agreement, the Merrill Counterparties' primary derivatives claims will be reduced by approximately $1.5 billion and their guarantee derivatives claims will be reduced by approximately the same amount, for a total reduction of approximately $3.0 billion or 56% of the Asserted Merrill Claims.    Certain other Merrill Asserted Claims will not be allowed, but, rather, the Merrill Counterparties involved will pay to LBSF, LBCS, and LBCC, as applicable, an aggregate amount of $11,855,752 in respect of the underlying Merrill Transactions.    The total reductions of BOA's and the Merrill Counterparties' asserted claims against the Debtors – approximately $7.5 billion – are very significant.

28.    Importantly, if the Settlement Agreements are approved, the BOA Asserted Claims and the Merrill Asserted Claims will be allowed at the Framework Values that do not trigger the MFT Protection of the Settlement Counterparties.    As set forth above, the Debtors have also entered into settlement agreements with the Settled Counterparties at the Framework Values.    The Framework Values are the product of months of extended discussions and negotiations between the Debtors, certain of the Bank Counterparties and the Creditors' Committee and represent a common, duly considered settlement approach for the allowance of the Bank Derivatives Claims.    The reasonableness of the Framework Values under the circumstances of these cases is evidenced by the facts that the Settled Counterparties, the Merrill Counterparties and BOA – ten leading financial institutions – have agreed to the allowance of their Bank Derivatives Claims at the Framework Values, which amounts are significantly less than the amounts they respectively asserted.    The Creditors' Committee was consulted and consented to the allowance of the Settled Counterparties' Bank Derivatives Claims at the Framework Values.

29.     The derivatives transactions between the Debtors and the Bank Counterparties, including BOA and the Merrill Counterparties, represent highly speculative and very sophisticated, complex financial transactions created during the boom years of 2004-2007. They present highly difficult and esoteric issues, the resolution of which, in the absence of the Derivatives Framework, would entail extensive, protracted litigation that would likely delay and reduce distributions to creditors.   The novelty of the legal issues may swing values widely, with a risk that the Bank Derivatives Claims of BOA and the Merrill Counterparties could be allowed in amounts greatly in excess of the Framework Values.   If the Court approves the Settlement Agreements, distributions to other creditors will be enhanced by virtue of the billions of dollars of reductions in the claims of BOA and the Merrill Counterparties.   Approval of the Settlement Agreements will also accelerate distributions to holders of allowed claims because the Debtors will not have to provide large reserves for such unresolved claims.

30.     BOA and the Merrill Counterparties expended considerable resources and time negotiating the Framework Values and have made material concessions by agreeing to the reductions of the claim amounts previously asserted.   In recognition thereof, and in light of the fact that certain other Bank Counterparties have not yet agreed to the allowance of their respective Derivatives Claims at the Framework Values, and consistent with settlement agreements with the Settled Counterparties, the Debtors agreed to provide BOA and the Merrill Counterparties MFT Protection.   The Creditors' Committee consented to the MFT Protection with respect to the eight Settled Counterparties.

31.     In entering into the Settlement Agreements, the Debtors have assessed the probability of success in the Appeal, and considered the legal and factual issues in dispute in consultation with their attorneys.   The Debtors believe that the BOA Decision is grounded in

sound principles of law and should be affirmed; nevertheless, the results of litigation are never

certain.   The BOA Decision reflects that the Court's careful consideration and analysis of the

Security Agreement, other relevant documents, and the live and deposition testimony of relevant

persons, in light of applicable legal principles, amply supports the Court's conclusion that the

parties intended to establish special accounts that were not available for general setoff purposes

under applicable law.   In addition, the Court rejected BOA's defenses, including BOA's novel

assertion that the safe harbor provisions of the Bankruptcy Code authorized BOA's actions.   On

appeal, although the Court's decision to reverse BOA's setoff is within its permissive discretion,

all of the legal conclusions underpinning its decision – including the determinations that the

Accounts were special deposits, that the Security Agreement prohibited setoff for anything other

than overdrafts, and the safe harbor provisions do not apply to these facts – will be subject to

plenary *de novo* review.

        32.     The BOA Settlement Agreement also enables the Debtors to avoid the

risks and costs associated with an extended period of appellate review.   If the District Court

affirms the Court's decision, BOA will likely appeal to the United States Court of Appeals for

the Second Circuit.   Conversely, if the District Court reverses the Court's decision, the Debtors

would likely seek appellate review in the Second Circuit.   The Debtors have already spent

substantial amounts litigating the Adversary Proceeding.   The proposed BOA Settlement

Agreement avoids continued litigation of the Appeal and eliminates the risks associated with that

litigation while providing for a substantial guaranteed recovery to LBHI of over $356 million,

more than 71% of the Account Balance, plus interest.   By contrast, continued litigation with

BOA would likely take years and substantial expenditures to fully prosecute, with no certainty of

recovery, much less any certainty of a greater recovery than that provided under the BOA

Settlement Agreement.   Additionally, the economic impact of the Debtors foregoing collection of the remaining portion of the Account Balance is blunted by the reduction of BOA's claim against LBHI in the amount of that remaining portion.

33.   The Debtors have also taken into consideration the integrated nature of the Settlement Agreements and the numerous benefits that will be realized from the settlements, in addition to the benefits from the resolution of the Appeal.   Indeed, without a resolution of the Appeal on the terms of the BOA Settlement Agreement, BOA or the Merrill Counterparties may not have entered into any settlement with the Debtors.   In addition to the sizeable reductions of their derivatives claims against the Debtors, BOA and the Merrill Counterparties have executed agreements to support the Debtors' Plan.   In the perspective of the totality of the circumstances, the resolution of the Appeal is fair and reasonable.

34.   Finally, the Debtors have negotiated the Settlement Agreements at arm's-length over several months to reach a fair resolution of their disputes with BOA and the Merrill Counterparties.   The settlements are not the product of fraud or collusion.   The Lehman Entities, BOA and the Merrill Counterparties have all been represented by competent and experienced professionals.   Significant resources have been invested by the Debtors in evaluating the BOA Asserted Claims, the Merrill Asserted Claims, the Adversary Proceeding, the Appeal, and the Settlement Agreements.   Each of the BOA Settlement Agreement and the Merrill Settlement Agreement is the product of well-informed judgment and satisfies the standards for approval.

35.   Accordingly, the Debtors submit that the Settlement Agreements are well within the range of reasonableness and should be approved by the Court.

**Notice**

36.     No trustee has been appointed in these chapter 11 cases.   The Debtors

have served notice of this Motion in accordance with the procedures set forth in the second

amended order entered on June 17, 2010 governing case management and administrative

procedures for these cases [ECF No. 9635] on (i) the U.S. Trustee; (ii) the attorneys for the

Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue

Service; (v) the United States Attorney for the Southern District of New York; (vi) BOA; (vii)

the Merrill Counterparties; and (viii) all parties who have requested notice in these chapter 11

cases.

37.     No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court approve the

Settlement Agreements, grant the relief requested and such other and further relief as is just.

Dated:  September 28, 2011
        New York, New York

                                        /s/ Harvey R. Miller
                                        Harvey R. Miller
                                        Lori R. Fife
                                        Robert J. Lemons

                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        Attorneys for Debtors
                                        and Debtors in Possession

## Exhibit A

**(The BOA Settlement Agreement)**

Execution Version

## TERMINATION AND SETTLEMENT AGREEMENT

This Termination and Settlement Agreement (the "Termination and Settlement Agreement") dated as of September 28, 2011 among Bank of America, N.A., (the "Counterparty") and Lehman Brothers Special Financing, Inc. ("LBSF"), Lehman Brothers Commodities Services Inc. ("LBCS"), Lehman Brothers Commercial Corporation ("LBCC") and Lehman Brothers Holdings Inc. ("Holdings" and together with LBSF, LBCS and LBCC, the "Lehman Entities" and each a "Lehman Entity"), each as a debtor and debtor in possession in cases under chapter 11 pending in the United States Bankruptcy Court for the Southern District of New York. Counterparty and each of the Lehman Entities may be referred to in this Termination and Settlement Agreement as a "Party" and collectively, the "Parties".

## RECITALS

WHEREAS, Counterparty entered into one or more transactions (the "Lehman Transactions") that were governed by an ISDA Master Agreement dated as of the date specified on Column 7 of Exhibit A with the Lehman Entity specified on Column 3 of Exhibit A, which included certain schedules, documents, confirmations and a guaranty of the obligations of the specified Lehman Entity by Holdings (as the same may have been amended from time to time, collectively, the "Lehman Agreement Documents").

WHEREAS, on September 15, 2008, Holdings and, on several dates thereafter (as applicable, the "Commencement Date"), certain of its affiliates (collectively, including the Lehman Entities, the "Debtors"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

WHEREAS, the chapter 11 cases of the Debtors are being jointly administered in the Bankruptcy Court as Case No. 08-13555 (collectively, the "Chapter 11 Cases") and the Debtors are operating and managing their businesses and assets as debtors in possession.

WHEREAS, pursuant to an order of the Bankruptcy Court entered on December 16, 2008, the Bankruptcy Court established Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts (as amended and/or supplemented from time to time, the "Derivatives Procedures Order").

WHEREAS, following the commencement of the Chapter 11 Cases, Counterparty filed the following proofs of claim against (a) LBSF, LBCS and LBCC, as applicable, based on such Debtor's alleged obligations to Counterparty arising under the applicable Lehman Agreement Documents (each such Proof of Claim, a "Primary Claim") and (b) Holdings, which includes a claim, among other things, arising pursuant to Holdings' asserted guarantees under the Lehman Agreement Documents (the portion of such guarantee claim that relates solely to said guarantees under the Lehman Agreement Documents, the "Guarantee Claim," and together with each Primary Claim, the "Asserted Lehman Claims"):

| **Lehman Entity** | **Primary Claim Number** | **Guarantee Claim Number** |
|:---:|:---:|:---:|
| LBSF | 20137 | 20105 |
| LBCS | 20139 | 20108 |
| LBCC | 20138 | 20106 |

*The Derivatives Framework*

WHEREAS, certain creditors, including Counterparty, asserted significant amounts due from certain of the Debtors as a result of the termination of their respective derivatives transactions with such Debtors (each such creditor, a "Bank Counterparty").

WHEREAS, the Debtors engaged in extended negotiations and discussions with Bank Counterparties to formulate a uniform derivatives settlement framework for the reconciliation, settlement and allowance of the claims of the Bank Counterparties against the Debtors or to provide for the payment of obligations from Bank Counterparties to the Debtors (the "Lehman Receivables"), as applicable, to avoid extensive and costly litigation relating to such claims.

WHEREAS, the Debtors incorporated changes and made adjustments to the proposed derivatives claims settlement framework as a result of arms-length negotiations with certain Bank Counterparties.

WHEREAS, on May 31, 2011, the Debtors posted on their website (www.lehman-docket.com) a final version of the proposed derivatives settlement framework setting forth the principles and methodologies for the calculation, allowance and resolution of the claims of the Bank Counterparties against the Debtors (as updated by the Debtors' posting on their website of a corrected Grid 17, the "Framework").

WHEREAS on May 27, 2011, the Debtors proposed settlements for the allowance of claims of the Bank Counterparties against the Debtors or the payment of Lehman Receivables to the Debtors, as applicable, under their respective derivatives transactions in amounts that are calculated in accordance with the Framework (the "Initial Proposals").

WHEREAS, after further arms-length negotiations and due consideration, the Debtors offered each of the Bank Counterparties a settlement proposal for the allowance of their respective derivatives claims against certain of the Debtors that are subject to the Framework in an amount equal to the Initial Proposal multiplied by 1.1125 (such multiplier, the "Framework True-up") as a full and final resolution of all issues outstanding as to such claims independent and separate from the Lehman Receivables.

WHEREAS, on or about June 30, 2011, certain Bank Counterparties agreed to settlement agreements with the Debtors in accordance with the Derivatives Procedures Order for the allowance of their derivatives claims against the Debtors and/or the payment of Lehman Receivables to the Debtors in amounts calculated in accordance with the Framework and the Framework True-up.

WHEREAS, thereafter the Debtors continued to engage in negotiations with the non-settling Bank Counterparties (each such creditor identified on Column 2 of Exhibit A, a "Remaining Bank Counterparty;" and the aggregate amount of derivatives claims asserted by each such Remaining Bank Counterparty against a Debtor set forth on Column 4 of Exhibit A, as reconciled from time to time between such Remaining Bank Counterparties and the Debtors, the "Asserted Claims") seeking the settlement of their derivatives claims in amounts calculated in accordance with the Framework (such amount, as set forth on Column 5 of Exhibit A as to each Remaining Bank Counterparty and inclusive of the Framework True-up, the "Framework Value") and/or the payment of Lehman Receivables by the Remaining Bank Counterparties to the Debtors.

WHEREAS, Counterparty and the Lehman Entities acknowledge (a) the termination of their respective Lehman Transactions to which they were party under the applicable Lehman Agreement Documents on September 15, 2008, (b) the allowed and agreed upon amount of the Asserted Lehman Claims against the particular Lehman Entity in an amount equal to the Framework Values, and (c) the agreement and amount of the Lehman Receivable payable by Counterparty to LBCC.

WHEREAS, the Debtors may hold or have asserted avoidance claims or causes of action against Counterparty under sections 510, 544, 545, 547, 548, 549, 550 and/or 553(b) of the Bankruptcy Code or under applicable state law in connection with the Lehman Agreement Documents (collectively, the "Avoidance Claims").

### The Setoff Litigation

WHEREAS, prior to the Commencement Date, Holdings established various accounts with Counterparty including accounts numbered 6550xxx465 and 40xxx1 (the "Accounts").

WHEREAS, as of November 10, 2008, the balance of the Accounts was $501,820,712 (the "Account Balance"), prior to giving effect to overdraft amounts of $5,039.00 (the "Overdraft Amounts").

WHEREAS, on November 10, 2008, without seeking relief from the automatic stay, Counterparty notified Holdings of the seizure and set off of the Account Balance plus the balance in four other accounts (the "Four Accounts") totaling $6,987,872 (the Four Accounts being the subject of the Separate Settlement (defined below) and not the subject of this Termination and Settlement Agreement) against indebtedness of Holdings to Counterparty under the Lehman Agreement Documents.

WHEREAS, the Debtors objected to the setoff and demanded a return of the Account Balance.

WHEREAS, on November 26, 2008, Counterparty commenced an adversary proceeding in the Bankruptcy Court (Adv. Pro. No. 08-01753) (JMP)) (the "Adversary Proceeding"), seeking a declaratory judgment that (a) it properly exercised its right of setoff, (b) the setoff did not violate the automatic stay, and (c) in the alternative, Counterparty was entitled to retroactive relief from the automatic stay validating the setoff.

WHEREAS, by order dated May 18, 2011 [Docket No. 16935], the Bankruptcy Court approved a settlement between and among Counterparty, LBSF, LBHI, and the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. (the "Separate Settlement"), resolving certain portions of the Adversary Proceeding.

WHEREAS, on May 20, 2011, a judgment entered against Counterparty in favor of Holdings in the amount of $501,800,000 plus prejudgment interest thereon calculated at the rate of 9% per annum from November 10, 2008 through December 3, 2010, and at the federal judgment interest rate thereafter (the "Judgment").

WHEREAS, on May 23, 2011, Counterparty filed a notice of appeal from the Judgment (the "Appeal"), which Appeal is currently pending before the United States District Court for the Southern District of New York, Case No. 1-11-cv-03958 (DAB) (the "District Court").

WHEREAS, Counterparty posted a bond in favor of Holdings in the amount of $660,553,847.34 in connection with the Appeal (the "Bond").

### Plan Support

WHEREAS, on September 1, 2011, the Debtors filed the *Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors* [Docket No. 19627] (as the same may be amended from time to time, the "Plan") and the *Debtors' Disclosure Statement for the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors* [Docket No. 19629] (the "Disclosure Statement").

WHEREAS, on September 1, 2011, the Bankruptcy Court entered an amended order approving the Disclosure Statement and voting procedures with respect to the Plan [Docket No. 19631].

WHEREAS, contemporaneously herewith, the Debtors and Counterparty have entered into an agreement pursuant to which Counterparty will support confirmation of the Plan (the "Plan Support Agreement"), subject to the terms and conditions set forth in the Plan Support Agreement.

NOW, THEREFORE, in consideration of the above recitals and good and sufficient consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

Section 1.     Filing of Motion to Approve Agreement.  The Debtors shall file a motion seeking approval of this Termination and Settlement Agreement by no later than September 28, 2011, after the following have occurred:

(a)     the Lehman Entities and Counterparty have executed and delivered this Termination and Settlement Agreement;

(b)     the applicable Debtors and each Remaining Bank Counterparty that is affiliated with Merrill Lynch & Co. Inc. (as identified on page 2 of Exhibit A) have executed and delivered a termination and settlement agreement acknowledging the termination of all of their derivatives transactions set forth on Exhibit A thereto and providing for the allowance of claims against the applicable Debtors in an amount equal to the amount of their Framework Values and the payment of the Lehman Receivables to the applicable Debtors (the "Merrill Counterparty TSA"); and

(c)     Counterparty has executed and delivered the Plan Support Agreement.

Section 2.     Conditions Precedent to the Effectiveness of Agreement.  This Termination and Settlement Agreement shall be effective on the first business day that all of the following have occurred (such date, the "Effective Date"):

(a)     the Bankruptcy Court has entered an order approving the terms and conditions of this Termination and Settlement Agreement (the "Settlement Order"); and

(b)     the Settlement Order has become a Final Order.

For purposes of this Termination and Settlement Agreement, the term "Final Order" shall mean an order of the Bankruptcy Court that has not been stayed, reversed or withdrawn and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance reasonably satisfactory to the Counterparty, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, reargument, or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired. For the avoidance of doubt, the Merrill Counterparty TSA need not become effective in order for the Effective Date to occur.

Section 3.     Termination.   If the Effective Date does not occur on or before October 31, 2011 as a result of the failure to satisfy the condition set forth in Section 2(a) of this Termination and Settlement Agreement, either the Lehman Entities or the Counterparty, may, upon

written notice to other Party, terminate this Termination and Settlement Agreement (a "Section 2(a) Termination Notice").  Notwithstanding anything to the contrary herein, Counterparty may, at its sole discretion and upon written notice to the Lehman Entities (collectively with a Section 2(a) Termination Notice, a "Termination Notice"), terminate this Termination and Settlement Agreement either: (i) on any date following the 120th day after the satisfaction of the condition set forth in Section 2(a), if the Effective Date has not occurred, or (ii) if, after satisfaction of the condition set forth in Section 2(a), the Settlement Order is reversed or vacated.  Upon delivery of a Termination Notice, this Termination and Settlement Agreement shall be null and void (other than this Section 3 and Section 18 through Section 24, all of which shall survive), and each of the Parties' respective interests, rights, remedies and defenses (including, without limitation, with respect to the Asserted Lehman Claims) shall be fully restored without prejudice as if this Termination and Settlement Agreement had never existed.

Section 4.    Settlement Amounts.

(a)    LBSF and Holdings agree to (i) a settlement amount in favor of Counterparty against LBSF in the amount of $402,122,339, which represents Counterparty's Framework Value in respect of the Lehman Transactions between Counterparty and LBSF (the "LBSF Settlement Amount") and (ii) a settlement amount in favor of Counterparty against Holdings in the LBSF Settlement Amount in respect of its Guarantee Claim against Holdings based upon Holdings' guarantee of LBSF's obligations under the applicable Lehman Transactions.

(b)    LBCS and Holdings agree to (i) a settlement amount in favor of Counterparty against LBCS in the amount of $11,919,269, which represents Counterparty's Framework Value in respect of the Lehman Transactions between Counterparty and LBCS (the "LBCS Settlement Amount") and (ii) a settlement amount in favor of Counterparty against Holdings in the LBCS Settlement Amount in respect of its Guarantee Claim against Holdings based upon Holdings' guarantee of LBCS's obligations under the applicable Lehman Transactions.

(c)    Counterparty agrees to a settlement amount in favor of LBCC in the amount of $14,695,124 (the "LBCC Receivable Amount") in respect of the Lehman Transactions between Counterparty and LBCC.

Section 5.    Account Balance.

(a)    Counterparty may set off and apply an aggregate of $145,800,000 (the "Setoff Amount") of the Account Balance in partial satisfaction of its claims against Holdings (but not its corresponding claims against LBSF and LBCS).

(b)    Within ten (10) business days of any initial distribution, payment or transfer made by any of the Debtors to Counterparty under a confirmed and effective chapter 11 plan in the Chapter 11 Cases, Counterparty shall pay to Holdings by wire transfer without deduction, setoff or counterclaim of any kind cash in the amount of $356,020,712 less the Overdraft Amounts plus interest thereon calculated (i) at the annual rate of 2.84% (non-compounded) on $356,020,712 less the Overdraft Amounts from November 10, 2008 through December 3, 2010 and (ii) at the annual

rate of 6 basis points on the sum of (1) $356,020,712 less the Overdraft Amounts and (2) the amount of interest accrued thereon in accordance with Section 5(b)(i), from December 4, 2010 through the date of such transfer (the "Turnover Amount").  Counterparty may in its sole discretion prepay the Turnover Amount at any time to Holdings without penalty.  Upon receipt and collection of the Turnover Amount by Holdings, Holdings shall release the Bond.

Section 6.        Allowance of General Unsecured Claims.

(a)      Counterparty shall have an allowed, nonpriority, non-subordinated, general unsecured claim against LBSF in the amount of the LBSF Settlement Amount (as such amount may be increased from time to time pursuant to Section 13 of this Termination and Settlement Agreement the "Final LBSF Settlement Amount") for its claims against LBSF under or in connection with the Lehman Agreement Documents governing the Lehman Transactions between Counterparty and LBSF (the "Allowed LBSF Claim").

(b)      Counterparty shall have an allowed, nonpriority, non-subordinated, general unsecured claim against LBCS in the amount of the LBCS Settlement Amount (as such amount may be increased from time to time pursuant to Section 13 of this Termination and Settlement Agreement the "Final LBCS Settlement Amount") for its claims against LBCS under or in connection with the Lehman Agreement Documents governing the Lehman Transactions between Counterparty and LBSF (the "Allowed LBCS Claim").

(c)      Counterparty shall have an allowed, nonpriority, non-subordinated, general unsecured claim against Holdings in an amount equal to (i) the aggregate of the Final LBSF Settlement Amount and the Final LBCS Settlement Amount *minus* (ii) the Setoff Amount, for its claims against Holdings under or in connection with the Lehman Agreement Documents governing the Lehman Transactions between Counterparty and LBSF and Counterparty and LBCS (the "Allowed Holdings Claim," together with the Allowed LBSF Claim and the Allowed LBCS Claim, the "Allowed Lehman Claims").

(d)      Except as provided in Section 5(a) hereof, the Allowed Lehman Claims shall not be subject to (i) objections or defenses, whether by way of netting, set-off, recoupment, counterclaim, crossclaim, disallowance, including without limitation under section 502(d) of the Bankruptcy Code, reconsideration under section 502(j) of the Bankruptcy Code, or otherwise, or (ii) any claim under section 510 of the Bankruptcy Code or otherwise that would have the effect of subordinating such claims to the claims of other general unsecured creditors or other creditors having the same or lower priority to general unsecured creditors.  Notwithstanding the allowance of the Allowed Lehman Claims hereunder, the treatment of any such Allowed Lehman Claims, including any distributions in respect of such Allowed Lehman Claims, shall be subject to the terms of a confirmed and effective chapter 11 plan in the Chapter 11 Cases.

Section 7.        Payment of LBCC Receivable Amount.  Within ten (10) business days of any initial distribution, payment or transfer made by any of the Debtors to Counterparty under a confirmed and effective chapter 11 plan in the Chapter 11 Cases, Counterparty shall pay the LBCC Receivable Amount in cash to LBCC by wire transfer without deduction, set-off or

counterclaim of any kind in full and complete satisfaction of all claims of LBCC against Counterparty under or in connection with the Lehman Transactions between LBCC and Counterparty. Counterparty may in its sole discretion prepay the LBCC Receivable Amount at any time to LBCC without penalty. Interest shall not accrue on the LBCC Receivable Amount.

Section 8. <u>Claims Register</u>. In order to reflect the entry into this Termination and Settlement Agreement, the Parties hereto acknowledge and agree that (a) the Asserted Lehman Claims are each hereby deemed amended to the extent necessary to reflect the terms of the settlement reached in this Termination and Settlement Agreement and/or to reflect the reconciliation of the Asserted Lehman Claims that has been ongoing among the Counterparty and the Lehman Entities, which reconciliation has been completed as of the date hereof, (b) none of the Debtors shall join or support, and the Debtors shall file a response in opposition to, any objection to all or any portion of the Asserted Lehman Claims or any derivative or guarantee questionnaire filed in connection therewith, and (c) the Debtors shall not propose, file or support any Chapter 11 plan or any other pleading in any of the Chapter 11 Cases that is inconsistent with the terms and conditions of this Termination and Settlement Agreement. Promptly after the Effective Date, the Lehman Entities and Counterparty shall execute and submit joint instructions to Epiq Bankruptcy Solutions, LLC, requesting that the claims register in the Chapter 11 Cases be amended (i) to reflect the allowance and/or disallowance of the Asserted Lehman Claims in accordance with the terms set forth herein, and (ii) if necessary, to reflect any increase to the Allowed Lehman Claims in accordance with Section 13 of this Termination and Settlement Agreement.

Section 9. <u>Releases and Covenants Not to Sue by the Debtor Releasors</u>.

(a) Upon the Effective Date and except as to the rights and obligations of the Parties as set forth in this Termination and Settlement Agreement, including, without limitation, (i) the Turnover Amount payable to Holdings and (ii) the LBCC Receivable Amount payable to LBCC, each of the Lehman Entities on behalf of itself, its estate, and any other party, person or entity claiming under or through it (each of the foregoing, a "<u>Debtor Releasor</u>"), hereby generally releases, discharges, waives and acquits, unconditionally and irrevocably, Counterparty and its current and former agents, servants, officers, directors, shareholders, employees, subsidiaries, divisions, branches, units, affiliates, parents, attorneys, successors, predecessors, heirs, personal representatives, and assigns (each of the foregoing, a "<u>Released Counterparty</u>"), from all manners of action, causes of action, judgments, sanctions, executions, debts, demands, rights, damages, costs, expenses and claims of every kind, nature, and character whatsoever, including, without limitation, the Avoidance Claims, whether in law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort (including, without limitation, intentional torts, fraud, misrepresentation, defamation, breaches of alleged fiduciary duty, recklessness, gross negligence, or negligence) or otherwise, accrued or unaccrued, known or unknown, matured, unmatured, liquidated or unliquidated, certain or contingent, that such Debtor Releasor ever had or claimed to have or now has or claims to have presently or at any future date, against any Released Counterparty arising under or related to (x) the Asserted Lehman Claims, the Lehman Agreement Documents, the Lehman Transactions or the negotiation, execution, performance, termination or any breaches thereof or (y) the Account Balance, the

Adversary Proceeding and any claims asserted therein or the Appeal (the foregoing released claims, the "Debtor Released Claims").

(b)    Each Debtor Releasor covenants not to sue upon or assert against a Released Counterparty, or any person or entity whether or not a Party to this Termination and Settlement Agreement, in any court or other forum any claim of any kind related to the Lehman Agreement Documents, the Lehman Transactions or the performance, breach, liquidation, termination or acceleration thereof, except with respect to a claimed breach by Counterparty of one or more of the terms of this Termination and Settlement Agreement.

Section 10.    Releases and Covenants Not to Sue by the Counterparty Releasors.

(a)    Upon the Effective Date, and except as to the rights and obligations of the Parties set forth in this Termination and Settlement Agreement, including, without limitation, (i) the setoff authorized pursuant to Section 5(a) hereof and (ii) the Allowed Lehman Claims, Counterparty on behalf of itself and any other party, person or entity claiming under or through it (each of the foregoing, a "Counterparty Releasor"), hereby generally releases, discharges, waives and acquits, unconditionally and irrevocably, each of the Lehman Entities, and its respective current and former agents, servants, officers, directors, shareholders, employees, subsidiaries, divisions, branches, units, affiliates, parents, attorneys, successors, predecessors, heirs, personal representatives, and assigns (each of the foregoing, a "Released Debtor Party"), from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses and claims of every kind, nature, and character whatsoever, whether in law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort (including, without limitation, intentional torts, fraud, misrepresentation, defamation, breaches of alleged fiduciary duty, recklessness, gross negligence, or negligence) or otherwise, accrued or unaccrued, known or unknown, matured, unmatured, liquidated or unliquidated, certain or contingent, that such Counterparty Releasor ever had or claimed to have or now has or claims to have presently or at any future date, against any Released Debtor Party arising under or related to (x) the Asserted Lehman Claims, the Lehman Agreement Documents, the Lehman Transactions or the negotiation, execution, performance, termination or any breaches thereof or (y) the Account Balance, the Adversary Proceeding or the Appeal (the foregoing released claims, the "Counterparty Released Claims," and together with the Debtor Released Claims, the "Released Claims").

(b)    Each Counterparty Releasor covenants not to sue upon or assert against a Released Debtor Party, or any person or entity whether or not a Party to this Termination and Settlement Agreement, in any court or other forum any claim of any kind related to the Lehman Agreement Documents, the Lehman Transactions or the performance, breach, liquidation, termination or acceleration thereof, except with respect to a claimed breach by a Lehman Entity of one or more of the terms of this Termination and Settlement Agreement.

Section 11.    No Effect on Claims Other than Released Claims.    Each of (a) the Lehman Entities, on behalf of itself and each of the other Debtor Releasors, on the one hand, and (b) Counterparty, on behalf of itself and each of the other Counterparty Releasors, on the other

hand, expressly reserves, and nothing herein shall impair, all of its rights, actions, defenses, objections, causes of action and claims it might have against the other that are not Released Claims, including, without limitation, any claims asserted by any Counterparty Releasor in a fiduciary or similar capacity for the benefit a party other than Counterparty Releasor (e.g., as trustee, as custodian, as agent or otherwise on behalf of a third party including, without limitation, on behalf of any customer or employee pension plans of any Counterparty Releasor).  Nothing herein shall impair the rights and defenses of any of the Debtor Releasors, the Counterparty Releasors or any other person or entity with respect to any claims or causes of action that are not Released Claims.  Without limitation of the foregoing, nothing in this Termination and Settlement Agreement is intended to modify in any way the Separate Settlement.

Section 12.    Special Provision for Unknown Claims.  All rights under Section 1542 of the California Civil Code, or any analogous state or federal law, are hereby expressly WAIVED, if applicable, with respect to any of the claims, injuries, or damages described in the Releases in Section 9 and Section 10.  Section 1542 of the California Civil Code reads as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

Section 13.    Claims Adjustment.  From time to time, the LBSF Settlement Amount and the LBCS Settlement Amount may be increased pursuant to this section to a maximum of Counterparty's Asserted Claims with respect to the corresponding Lehman Transactions.

(a)    Subject to Section 13(b), if after the execution and delivery of this Termination and Settlement Agreement by the Parties any of the Debtors enters into a binding settlement agreement with, or files a chapter 11 plan or any other pleading that provides for a settlement with, a Remaining Bank Counterparty that provides for the allowance of its Asserted Claims in an aggregate amount that is greater than such Remaining Bank Counterparty's Framework Value (each such Remaining Bank Counterparty, a "Non-Framework Creditor" and any such settlement, a "Non-Framework Settlement"), the LBSF Settlement Amount and the LBCS Settlement Amount shall automatically be increased to an amount equal to the product of (i) the LBSF Settlement Amount or the LBCS Settlement Amount, as applicable, and (ii) the quotient of (A) the Non-Framework Creditor's aggregate allowed claim amount pursuant to its Non-Framework Settlement Agreement, divided by (B) such Non-Framework Creditor's Framework Value.

(b)    If any of the Debtors enters into a Non-Framework Settlement with a Non-Framework Creditor after the execution and delivery of this Termination and Settlement Agreement, the claim amount increases in Section 13(a) shall not apply if any of the following occur:

(i)    the Debtors have objected to, opposed or otherwise commenced and prosecuted litigation with reasonable diligence against such Non-Framework Creditor in any judicial forum to challenge the allowance of such Remaining Bank Counterparty's derivatives claims, in whole or in part, in an amount that is not calculated in accordance with the Framework (collectively, the "Litigation") and such Litigation has been pending, including any appeals, for a period of at least eighteen (18) months following the later of (A) the Effective Date and (B) the date on which such Litigation was commenced;

(ii)    the Bankruptcy Court or any other trial court has entered an order allowing, over the Debtors' opposition and reasonably diligent prosecution of its objection, such Non-Framework Creditor's Asserted Claims in an amount greater than such Non-Framework Creditor's Framework Value;

(iii)    the Non-Framework Settlement, including any chapter 11 plan that may incorporate such Non-Framework Settlement, has not become effective; or

(iv)    the allowance of such Non-Framework Creditor's Asserted Claims in an amount in excess of such Non-Framework Creditor's Framework Value is solely as a result of incomplete, inaccurate or improper data regarding trades or collateral between the Lehman Entities and such Non-Framework Creditor, a mathematical miscalculation of such Non-Framework Creditor's Framework Value or some other factual mistake, but is not as a result of a modification of or deviation from the application of the principles set forth in the Framework.

(c)    In addition, the Lehman Entities shall provide to Counterparty, no later than the fifth business day of each calendar quarter following the Effective Date, an officer's certificate in the form attached hereto as Exhibit B informing Counterparty whether the Debtors have entered into any settlement with a Remaining Bank Counterparty of its Asserted Claims after the Effective Date, and, if so, the amount of such settlement and the Framework Value for such Remaining Bank Counterparty.  If Counterparty has been advised of a settlement with a Remaining Bank Counterparty of its Asserted Claims after the Effective Date, upon a reasonable request from Counterparty, a representative of Counterparty may audit the Lehman Entities in a reasonable manner for purposes of determining whether Section 13(a) and (b) of this Termination and Settlement Agreement have been triggered; *provided, however*, that Counterparty acknowledges and agrees that all of the Bank Counterparties may not conduct more than two audits in the aggregate in respect of a settlement with a Non-Framework Creditor; *provided, further* that, subject to the foregoing, in the event that the Debtors have received an audit request from any other Bank Counterparty within the 60 days prior to the request from Counterparty, the Debtors may delay the audit by such Counterparty until 60 days have elapsed from such prior audit request; *provided, further* that, the Lehman Entities shall provide to Counterparty the result of any audit conducted by a Bank Counterparty that is not affiliated with Counterparty.

(d)    At all relevant times after the Effective Date, the Debtors shall use the Final LBSF Settlement Amount or the Final LBCS Settlement Amount, as applicable, that properly reflects all adjustments made pursuant to this Section 13 to calculate the amount of the Allowed

Lehman Claims for all relevant purposes in the Chapter 11 Cases, including voting on and distributions under any Chapter 11 plan.

(e)       Counterparty agrees that, notwithstanding anything to the contrary contained in any other agreement of the Parties, the Lehman Entities may provide notice of this Termination and Settlement Agreement, including the Framework Values, Asserted Claims and allowed claim amounts of Counterparty, to other Bank Counterparties as necessary to comply with any similar notice and audit obligations of the Debtors.

Section 14.       Stay of and Dismissal of Appeal.

(a)       Upon the execution of this Termination and Settlement Agreement, the parties will jointly move in the District Court to stay the Appeal until the Effective Date or termination of this Termination and Settlement Agreement in accordance with the terms hereof.

(b)       Within ten (10) business days of the Effective Date, Counterparty shall take all steps necessary to withdraw the Appeal with prejudice.

Section 15.       No Opposition to Framework.  Counterparty agrees not to oppose, object to or join in or support any objection to, the application of the Framework to the Asserted Claims of other Bank Counterparties and other claimants that have filed derivative claims against the Debtors, including, without limitation, in connection with any (a) objection by the Debtors to the allowance of derivative claims that are not calculated in accordance with the Framework or (b) request by the Debtors for estimation of derivative claims in amounts that are calculated in accordance with the Framework for purposes of voting on or maintaining reserves pursuant to a chapter 11 plan.

Section 16.       Setoff.  Except as provided in Section 5(a) hereof, Counterparty agrees that it will not, nor will it permit any controlled affiliate, assigns or third party, to set off, recoup, appropriate, or otherwise apply any deposits (general, special, time or demand, provisional or final) in any currency, or any other credits, indebtedness or claims, in any currency, whether direct or indirect, absolute or contingent, matured or unmatured, that are held or owing by it or any third party or affiliate to the Lehman Entities or any of the Debtors, including the Turnover Amount, against the Allowed Lehman Claims.  Counterparty hereby irrevocably and unconditionally waives any and all rights to do so, whether such rights arise by virtue of contract or law, including, without limitation, any purported right to set off the Allowed Lehman Claims against (i) any amount payable to a Lehman Entity or any of the Debtors by an entity other than Counterparty, or (ii) any amount payable by Counterparty to a Lehman Entity or a Debtor other than the Lehman Entity against which the applicable Allowed Lehman Claim has been allowed, as applicable.  Without limiting the foregoing, under no circumstance (except as provided in Section 5(a) hereof) shall any Counterparty withhold payment to any Lehman Entity or any Debtor on the basis of a right to purportedly set off the Allowed Lehman Claims.

Section 17.    <u>Representations</u>.

(a)    Each Party represents and warrants to each other Party that (i) subject to Bankruptcy Court approval in the case of the Lehman Entities, the execution, delivery, and performance by such Party of this Termination and Settlement Agreement and the transactions contemplated under this Termination and Settlement Agreement are within the powers of such Party and have been duly authorized by all necessary action on the part of such Party, (ii) this Termination and Settlement Agreement has been duly executed and delivered by such Party and, subject to Bankruptcy Court approval in the case of the Lehman Entities, constitutes a valid and binding obligation of such Party, enforceable against such Party in accordance with the terms hereof, (iii) it is not relying upon any statements, understandings, representations, expectations, or agreements other than those expressly set forth in this Termination and Settlement Agreement, (iv) it has had the opportunity to be represented and advised by legal counsel in connection with this Termination and Settlement Agreement, which it enters voluntarily and of its own choice and not under coercion or duress, (v) it has made its own investigation of the facts and is relying upon its own knowledge and the advice of its counsel, (vi) it has no expectation that any of the other Parties will disclose facts material to the Lehman Agreement Documents or this Termination and Settlement Agreement to it, and (vii) it knowingly waives any and all claims that this Termination and Settlement Agreement was induced by any misrepresentation or non-disclosure and knowingly waives any and all rights to rescind or avoid this Termination and Settlement Agreement based upon presently existing facts, known or unknown.

(b)    Each Counterparty represents to the Lehman Entities that as of the date of execution of this Termination and Settlement Agreement, it (i) owns and has good title to the Asserted Lehman Claims, and (ii) has requisite legal authority to enter into and be bound by this Termination and Settlement Agreement.

(c)    Each Lehman Entity represents to the Counterparty that as of the date of execution of this Termination and Settlement Agreement, it has not entered into a binding settlement agreement with any other Bank Counterparty that provides for the allowance of such Bank Counterparty's Asserted Claims in an aggregate amount that is greater than such Bank Counterparty's Framework Value.

(d)    Each Party is relying upon the representations in this section in entering into the Termination and Settlement Agreement, and such representations are a material inducement for entering into this Termination and Settlement Agreement, which shall survive the execution of this Termination and Settlement Agreement.

Section 18.    <u>Execution in Counterparts</u>.  This Termination and Settlement Agreement may be executed in any number of counterparts and by different Parties in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same instrument.  Delivery of an executed counterpart of a signature page by facsimile or PDF transmission shall be as effective as delivery of a manually executed counterpart.

Section 19.    <u>Governing Law/Jurisdiction</u>.  This Termination and Settlement Agreement will be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York (including Section 5-1401 of the New York General Obligations Law), without regard to conflicts of laws principles that would require the application of the law of another jurisdiction.  The Bankruptcy Court shall have exclusive jurisdiction over any action or proceeding with respect to the construction, interpretation and enforcement of this Termination and Settlement Agreement and each Party submits to such jurisdiction and waives any defense based on the location or jurisdiction of such court.

Section 20.    <u>Successors and Assigns and Survival</u>.  The provisions of this Termination and Settlement Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and assigns.  The provisions of this Termination and Settlement Agreement shall survive the confirmation of any chapter 11 plan with respect to any of the Debtors and/or the appointment of a chapter 7 or 11 trustee with respect to any of the Debtors and shall be binding on any chapter 11 trustee or chapter 7 trustee appointed with respect to any of the Debtors.

Section 21.    <u>Amendment</u>.  This Termination and Settlement Agreement may only be amended, modified, superseded or canceled and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing executed and delivered by each of the Parties.

Section 22.    <u>No Admissions</u>.  Neither this Termination and Settlement Agreement, nor any of the terms hereof, nor any negotiations or proceedings in connection herewith, shall constitute or be construed as or be deemed to be evidence of an admission on the part of any Party of any liability or wrongdoing whatsoever, or the truth or untruth, or merit or lack of merit, of any claim or defense of any Party, nor shall this Termination and Settlement Agreement, or any of the terms hereof, or any negotiations or proceedings in connection herewith, or any performance or forbearance hereunder, be offered or received in evidence or used in any proceeding against any Party or its affiliates, except with respect to the effectuation and enforcement of this Termination and Settlement Agreement.  Each of the Lehman Entities, on behalf of itself and the other Debtor Releasors, acknowledges that other than with respect to the Asserted Lehman Claims (if the Effective Date has occurred and so long as this Termination and Settlement Agreement continues to be in effect), the resolution and valuation of the Asserted Lehman Claims in accordance with the Framework shall not serve any authoritative purpose against Counterparty or its affiliates with respect to the resolution or valuation of any claims relating to derivatives transactions between Counterparty or its affiliates, and the Debtors or their controlled affiliates.  For the avoidance of doubt, and without in any way limiting the foregoing, neither the existence of this Termination and Settlement Agreement nor the terms hereof shall be used, referred to, or submitted as evidence in any dispute or action by the Debtors or Counterparty or its affiliates, including the Merrill Counterparties (as defined in the Merrill Counterparty TSA), with respect to the resolution or valuation of any claims relating to derivatives transactions between any Merrill Counterparty (as defined in the Merrill Counterparty TSA) and the Debtors; *provided*, *however*, that the Parties may use, refer to or submit into evidence this Termination and Settlement Agreement as is necessary to obtain Bankruptcy Court approval of this Termination and

Settlement Agreement or the Merrill Counterparty TSA, or in the prosecution of any appeals related thereto.

Section 23.    Entire Agreement.  This Termination and Settlement Agreement, together with the Plan Support Agreement, constitute the entire agreement and understanding of the Parties relating to the subject matter hereof.  This Termination and Settlement Agreement and the Plan Support Agreement supersede and replace any and all prior or contemporaneous verbal or written agreements between the Parties concerning the subject matter hereof.

Section 24.    Construction.  This Termination and Settlement Agreement has been negotiated by the Parties and their respective legal counsel, and legal or equitable principles that might require the construction of this Termination and Settlement Agreement or any of its provisions against the Party responsible for drafting this Termination and Settlement Agreement shall not apply in any construction or interpretation of this Termination and Settlement Agreement after the Effective Date.

Section 25.    Severability.   If, after the Effective Date any term or other provision of this Termination and Settlement Agreement is invalid, illegal or incapable of being enforced, all other terms and provisions of this Termination and Settlement Agreement shall nevertheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to the Parties.  Upon any determination that any term or other provision is invalid, illegal, or incapable of being enforced, each Party hereto shall negotiate in good faith to modify this Termination and Settlement Agreement so as to effect the original intent of this Termination and Settlement Agreement as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Termination and Settlement Agreement on the Effective Date.

BANK OF AMERICA, N.A.

By: _____
Name:
Title:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:    *Daniel Ehrmann*
Title:    SVP

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:
Title:    *Daniel Ehrmann*
         VP

LEHMAN BROTHERS COMMODITIES SERVICES INC.

By: _____
Name:
Title:    *Daniel Ehrmann*
         VP

LEHMAN BROTHERS COMMERCIAL CORPORATION

By: _____
Name:
Title:    *Daniel Ehrmann*
         VP

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Termination and Settlement Agreement on the Effective Date.

BANK OF AMERICA, N.A.

By: _____
Name:    Kevin M. Behan
Title:    Senior Vice President


LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:


LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:
Title:


LEHMAN BROTHERS COMMODITIES SERVICES INC.

By: _____
Name:
Title:


LEHMAN BROTHERS COMMERCIAL CORPORATION

By: _____
Name:
Title:

**<u>Exhibit A</u>**

**(Remaining Bank Counterparties)**

# Termination and Settlement Agreement - Exhibit A

**All Amounts in US Dollars**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 |
|---|---|---|---|---|---|---|
| **Bank** | **Remaining Bank Counterparty** | **Debtor Legal Entity**[1] | **Asserted Claims** | **Framework Value** | **Contract ID** | **Contract Date** |
| Bank of America Corporation | Bank of America, N.A. | LBSF | (2,859,750,169) | (402,122,339) | 60394NBNCLBSF | 10/31/1996 |
| Bank of America Corporation | Bank of America, N.A. | LBCS | (11,954,605) | (11,919,269) | 60394NBNCLBCS | 6/15/2006 |
| **Bank** | **Remaining Bank Counterparty** | **Debtor Legal Entity**[1] | **Asserted Claims** | **Lehman Receivable** | **Contract ID** | **Contract Date** |
| Bank of America Corporation | Bank of America, N.A. | LBCC | (13,221,922) | 14,695,124 | 60394NBNCLBCC | 10/28/1998 |

[1]LBCC means Lehman Brothers Commercial Corporation
LBCS means Lehman Brothers Commodity Services Inc.
LBDP means Lehman Brothers Derivative Products Inc.
LBSF means Lehman Brothers Special Financing Inc.
LOTC means Lehman Brothers OTC Derivatives Inc.

1

# Termination and Settlement Agreement - Exhibit A

**All Amounts in US Dollars**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 |
|---|---|---|---|---|---|---|
| **Bank** | **Remaining Bank Counterparty** | **Debtor Legal Entity**[1] | **Asserted Claims** | **Framework Value** | **Contract ID** | **Contract Date** |
| Merrill Lynch & Co. Inc. | Merrill Lynch International | LBSF | Redacted | Redacted | 102696MLILLBSF | 6/21/2001 |
| Merrill Lynch & Co. Inc. | Merrill Lynch Capital Services, Inc. | LBSF | Redacted | Redacted | 71499MLCSLBSF | 8/9/2001 |
| Merrill Lynch & Co. Inc. | Merrill Lynch International Bank Limited | LBSF | Redacted | Redacted | 060600MLCBLBSF | 7/27/1998 |
| Merrill Lynch & Co. Inc. | Merrill Lynch Bank & Trust Co., FSB | LBSF | Redacted | Redacted | 37282MLBTLBSF | 8/9/2001 |
| Merrill Lynch & Co. Inc. | Merrill Lynch Commodities, Inc. | LBCS | Redacted | Redacted | 120605MERRLBCS | 4/19/2006 |
| Merrill Lynch & Co. Inc. | Merrill Lynch International | LOTC | Redacted | Redacted | 102696MLILLOTC | 9/4/2007 |

| **Bank** | **Remaining Bank Counterparty** | **Debtor Legal Entity**[1] | **Asserted Claims** | **Lehman Receivable** | **Contract ID** | **Contract Date** |
|---|---|---|---|---|---|---|
| Merrill Lynch & Co. Inc. | Merrill Lynch Bank USA | LBSF | Redacted | Redacted | 111601MLUSLBSF | 8/9/2001 |
| Merrill Lynch & Co. Inc. | Merrill Lynch Commodities (Europe) Limited | LBCS | Redacted | Redacted | 052606MLCELBCS | 5/23/2006 |
| Merrill Lynch & Co. Inc. | Merrill Lynch International Bank Limited | LBCC | Redacted | Redacted | 091197XMLLBCC | 7/28/2004 |
| Merrill Lynch & Co. Inc. | Merrill Lynch Capital Services, Inc. | LBCC | Redacted | Redacted | 71499MLCSLBCC | 7/28/2004 |

---

[1] LBCC means Lehman Brothers Commercial Corporation
LBCS means Lehman Brothers Commodity Services Inc.
LBDP means Lehman Brothers Derivative Products Inc.
LBSF means Lehman Brothers Special Financing Inc.
LOTC means Lehman Brothers OTC Derivatives Inc.

# Termination and Settlement Agreement - Exhibit A

**All Amounts in US Dollars**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 |
|---|---|---|---|---|---|---|
| **Bank** | **Remaining Bank Counterparty** | **Debtor Legal Entity**[1] | **Asserted Claims** | **Framework Value** | **Contract ID** | **Contract Date** |
| Citigroup Inc | Citibank, N.A. | LBSF | Redacted | Redacted | 40797CITILBSF | 5/14/1992 |
| Citigroup Inc | Citigroup Global Markets Ltd | LBSF | Redacted | Redacted | 82393SBILLBSF | 2/16/2000 |
| Citigroup Inc | Salomon Swapco Inc | LBSF | Redacted | Redacted | 112096SSILBSF | 8/16/1996 |
| Citigroup Inc | Citigroup Global Markets Ltd | LBCS | Redacted | Redacted | 82393SBILLBCS | 4/17/2007 |
| Citigroup Inc | Citibank, N.A. | LBCS | Redacted | Redacted | 40797CITILBCS | 2/21/2006 |
| Citigroup Inc | Citigroup Global Markets Ltd | LBCS | Redacted | Redacted | 101607CITILBCS | 3/13/2008 |
| Citigroup Inc | TOB Capital LP | LBSF | Redacted | Redacted | 050106TOBCLBSF | 11/15/2007 |
| Citigroup Inc | Citigroup Financial Products Inc | LBSF | Redacted | Redacted | Rate Cap Agreements terminated September 2, 2009 | N/A |
| Citigroup Inc | Citigroup Financial Products Inc | LBDP | Redacted | Redacted | Rate Cap Agreements terminated September 2, 2009 | N/A |
| Citigroup Inc | Citigroup Financial Products Inc | LBDP | Redacted | Redacted | 71521SBHILBDP | 9/10/1998 |

| **Bank** | **Remaining Bank Counterparty** | **Debtor Legal Entity**[1] | **Asserted Claims** | **Lehman Receivable** | **Contract ID** | **Contract Date** |
|---|---|---|---|---|---|---|
| Citigroup Inc | Citigroup Financial Products Inc | LBSF | Redacted | Redacted | 71521SBHILBSF | 8/15/1989 |
| Citigroup Inc | Citigroup Energy Inc | LBCS | Redacted | Redacted | 111505CITILBCS | 2/1/2006 |
| Citigroup Inc | Citibank, N.A. | LBCC | Redacted | Redacted | 40797CITILBCC | 3/29/1993 |
| Citigroup Inc | Citi Canyon Ltd | LBSF | Redacted | Redacted | 072204CITILBSF | 10/6/2005 |

---

[1] LBCC means Lehman Brothers Commercial Corporation
LBCS means Lehman Brothers Commodity Services Inc.
LBDP means Lehman Brothers Derivative Products Inc.
LBSF means Lehman Brothers Special Financing Inc.
LOTC means Lehman Brothers OTC Derivatives Inc.

# Termination and Settlement Agreement - Exhibit A

**All Amounts in US Dollars**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 |
|---|---|---|---|---|---|---|
| **Bank** | **Remaining Bank Counterparty** | **Debtor Legal Entity[1]** | **Asserted Claims** | **Framework Value** | **Contract ID** | **Contract Date** |
| Credit Suisse Group | Credit Suisse International | LBSF | Redacted | Redacted | 79280CSFLLBSF | 9/12/2008 |
| Credit Suisse Group | Credit Suisse | LBSF | Redacted | Redacted | 071597QCSFLBSF | 8/20/2004 |
| Credit Suisse Group | Credit Suisse Securities (Europe) Limited | LBSF | Redacted | Redacted | 051697CFBELBSF | 6/6/1997 |
| Credit Suisse Group | Credit Suisse Energy LLC | LBCS | Redacted | Redacted | 051706CREDLBCS | 5/17/2006 |
| Credit Suisse Group | Credit Suisse International | LBCC | Redacted | Redacted | 79280CSFLLBCC | 12/18/1995 |
| Credit Suisse Group | Credit Suisse | LBCC | Redacted | Redacted | 071597QCSFLBCC | 8/20/2004 |
| Credit Suisse Group | Credit Suisse Securities (Europe) Limited | LBCC | Redacted | Redacted | 051697CFBELBCC | 9/28/1998 |
| **Bank** | **Remaining Bank Counterparty** | **Debtor Legal Entity[1]** | **Asserted Claims** | **Lehman Receivable** | **Contract ID** | **Contract Date** |
| Credit Suisse Group | Credit Suisse International | LBCS | Redacted | Redacted | 79280CSFLLBCS | 3/23/2008 |

[1]LBCC means Lehman Brothers Commercial Corporation
LBCS means Lehman Brothers Commodity Services Inc.
LBDP means Lehman Brothers Derivative Products Inc.
LBSF means Lehman Brothers Special Financing Inc.
LOTC means Lehman Brothers OTC Derivatives Inc.

# Termination and Settlement Agreement - Exhibit A

**All Amounts in US Dollars**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 |
|---|---|---|---|---|---|---|
| **Bank** | **Remaining Bank Counterparty** | **Debtor Legal Entity[1]** | **Asserted Claims** | **Framework Value** | **Contract ID** | **Contract Date** |
| JPMorgan Chase & Co. | JPMorgan Chase Bank, N.A. | LBSF | Redacted | Redacted | 71504MGTYLBSF | 12/20/1995 |
| JPMorgan Chase & Co. | JPMorgan Chase Bank, N.A. | LBCC | Redacted | Redacted | 71504MGTYLBCC | 11/15/1993 |
| JPMorgan Chase & Co. | JPMorgan Chase Bank, N.A. | LBCS | Redacted | Redacted | 71504MGTYLBCS | 2/2/2006 |
| JPMorgan Chase & Co. | Washington Mutual Bank | LBSF | Redacted | Redacted | 35622ASBKLBSF | 5/28/1998 |
| JPMorgan Chase & Co. | J.P. Morgan Ventures Energy Corporation | LBCS | Redacted | Redacted | 061306JPMOLBCS | 8/8/2006 |

| **Bank** | **Remaining Bank Counterparty** | **Debtor Legal Entity[1]** | **Asserted Claims** | **Lehman Receivable** | **Contract ID** | **Contract Date** |
|---|---|---|---|---|---|---|
| JPMorgan Chase & Co. | Bear Stearns Credit Products Inc. | LBSF | Redacted | Redacted | 080803BECRLBSF | 7/1/2003 |
| JPMorgan Chase & Co. | J.P. Morgan Securities Ltd. | LBCS | Redacted | Redacted | 101498JPMSLBCS | 10/1/2007 |
| JPMorgan Chase & Co. | Bear, Stearns International Limited | LBSF | Redacted | Redacted | 040797EBSILBSF | 7/11/2001 |
| JPMorgan Chase & Co. | Bear Stearns Forex Inc. | LBCC | Redacted | Redacted | 091097BSFLBCC | 3/9/1995 |
| JPMorgan Chase & Co. | JPMorgan Chase & Co. | LBSF | Redacted | Redacted | 021207JPMOLBSF | 2/14/2003 |
| JPMorgan Chase & Co. | Bear Stearns Bank plc | LBSF | Redacted | Redacted | 10493BSCMLBSF | 1/6/1993 |

---

[1]LBCC means Lehman Brothers Commercial Corporation
LBCS means Lehman Brothers Commodity Services Inc.
LBDP means Lehman Brothers Derivative Products Inc.
LBSF means Lehman Brothers Special Financing Inc.
LOTC means Lehman Brothers OTC Derivatives Inc.

## Exhibit B

### Form of Officer's Certificate

[Counterparty]
[Address]


   Reference is made to that Termination and Settlement Agreement (the "Agreement"), dated as of September [  ], 2011, between [Counterparty], on the one hand, and Lehman Brothers Special Financing, Inc., Lehman Brothers Commodities Services Inc., Lehman Brothers Commercial Corporation, and Lehman Brothers Holdings Inc. (collectively, the "Lehman Entities"), on the other.  Any capitalized term used but not defined herein has the meaning assigned to it in the Agreement.


   Pursuant to Section 13(c) of the Agreement, the Lehman Entities, in each case by and through its undersigned officer, hereby certify that the Debtors [have / have not] entered into a binding settlement agreement with, or filed a chapter 11 plan or any other pleading that provides for a settlement with, a Remaining Bank Counterparty of its Asserted Claims after the Effective Date.  [Such settlement provides for the allowance of such Remaining Bank Counterparty's Asserted Claims in the amount of [$_____] and such Remaining Bank Counterparty's Framework Value is $_____]].


   As a result, an adjustment to Counterparty's Framework Value and Allowed Lehman Claims [has / has not] been triggered in accordance with Section 13 of the Termination and Settlement Agreement.


   IN WITNESS WHEREOF, the undersigned has executed this CERTIFICATE as of the date first written above.


       LEHMAN BROTHERS HOLDINGS INC.
       LEHMAN BROTHERS SPECIAL FINANCING INC.
       LEHMAN BROTHERS COMMODITIES SERVICES INC.
       LEHMAN BROTHERS COMMERCIAL CORPORATION

       By:
       Name:
       Title:

## **Exhibit B**

**(The Merrill Settlement Agreement)**

Execution Version

## TERMINATION AND SETTLEMENT AGREEMENT

This Termination and Settlement Agreement (the "Termination and Settlement Agreement") dated as of September 28, 2011 among Merrill Lynch International ("MLI"), Merrill Lynch Capital Services Inc. ("MLCS"), Merrill Lynch International Bank Ltd. ("MLIB"), Merrill Lynch Bank & Trust Co. FSB ("MLBT"), Merrill Lynch Commodities Inc. ("MLCI"), Bank of America, N.A., as successor in interest to Merrill Lynch Bank USA ("ML Bank"), and Merrill Lynch Commodities (Europe) Ltd. ("MLCE," and together with MLI, MLCS, MLIB, MLBT, MLCI and ML Bank, the "Merrill Counterparties and each a "Merrill Counterparty") and Lehman Brothers Special Financing, Inc. ("LBSF"), Lehman Brothers Commodities Services Inc. ("LBCS"), Lehman Brothers OTC Derivatives Inc. ("LOTC"), Lehman Brothers Commercial Corporation ("LBCC") and Lehman Brothers Holdings Inc. ("Holdings" and together with LBSF, LBCS, LOTC and LBCC, the "Lehman Entities" and each a "Lehman Entity"), each as a debtor and debtor in possession in cases under chapter 11 pending in the United States Bankruptcy Court for the Southern District of New York.  The Merrill Counterparties and the Lehman Entities may each be referred to in this Termination and Settlement Agreement as a "Party" and collectively, the "Parties".

## RECITALS

WHEREAS, the Merrill Counterparty specified in Column 2 of Exhibit A entered into one or more transactions (the "Lehman Transactions") that were governed by an ISDA Master Agreement dated as of the date specified on Column 7 of Exhibit A with the Lehman Entity specified on Column 3 of Exhibit A, which included certain schedules, documents, confirmations and a guaranty of the obligations of the specified Lehman Entity by Holdings (as the same may have been amended from time to time, collectively, the "Lehman Agreement Documents").

WHEREAS, on September 15, 2008, Holdings and, on several dates thereafter (as applicable, the "Commencement Date"), certain of its affiliates (collectively, including the Lehman Entities, the "Debtors"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

WHEREAS, the chapter 11 cases of the Debtors are being jointly administered in the Bankruptcy Court as Case No. 08-13555 (collectively, the "Chapter 11 Cases") and the Debtors are operating and managing their businesses and assets as debtors in possession.

WHEREAS, pursuant to an order of the Bankruptcy Court entered on December 16, 2008, the Bankruptcy Court established Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts (as amended and/or supplemented from time to time, the "Derivatives Procedures Order").

WHEREAS, following the commencement of the Chapter 11 Cases, certain of the Merrill Counterparties filed the proofs of claim identified on Exhibit B hereto against (a) LBSF, LBCS, LOTC and LBCC, as applicable, based on such Debtor's alleged obligations to the Merrill Counterparty asserting such claim arising under the applicable Lehman Agreement Documents (each such Proof of Claim, a "Primary Claim") and (b) Holdings, which includes a claim, among

other things, arising pursuant to Holdings' asserted guarantees under the Lehman Agreement Documents (the portion of such guarantee claim that relates solely to said guarantees under the Lehman Agreement Documents, the "Guarantee Claim," and together with each Primary Claim, the "Asserted Lehman Claims").

### The Derivatives Framework

WHEREAS, certain creditors, including the Merrill Counterparties, asserted significant amounts due from certain of the Debtors as a result of the termination of their respective derivatives transactions with such Debtors (each such creditor, a "Bank Counterparty").

WHEREAS, the Debtors engaged in extended negotiations and discussions with Bank Counterparties to formulate a uniform derivatives settlement framework for the reconciliation, settlement and allowance of the claims of the Bank Counterparties against the Debtors or to provide for the payment of obligations from Bank Counterparties to the Debtors (the "Lehman Receivables"), as applicable, to avoid extensive and costly litigation relating to such claims.

WHEREAS, the Debtors incorporated changes and made adjustments to the proposed derivatives claims settlement framework as a result of arms-length negotiations with certain Bank Counterparties.

WHEREAS, on May 31, 2011, the Debtors posted on their website (www.lehman-docket.com) a final version of the proposed derivatives settlement framework setting forth the principles and methodologies for the calculation, allowance and resolution of the claims of the Bank Counterparties against the Debtors (as updated by the Debtors' posting on their website of a corrected Grid 17, the "Framework").

WHEREAS on May 27, 2011, the Debtors proposed settlements for the allowance of claims of the Bank Counterparties against the Debtors or the payment of Lehman Receivables to the Debtors, as applicable, under their respective derivatives transactions in amounts that are calculated in accordance with the Framework (the "Initial Proposals").

WHEREAS, after further arms-length negotiations and due consideration, the Debtors offered each of the Bank Counterparties a settlement proposal for the allowance of their respective derivatives claims against certain of the Debtors that are subject to the Framework in an amount equal to the Initial Proposal multiplied by 1.1125 (such multiplier, the "Framework True-up") as a full and final resolution of all issues outstanding as to such claims independent and separate from the Lehman Receivables.

WHEREAS, on or about June 30, 2011, certain Bank Counterparties agreed to settlement agreements with the Debtors in accordance with the Derivatives Procedures Order for the allowance of their derivatives claims against the Debtors and/or the payment of Lehman Receivables to the Debtors in amounts calculated in accordance with the Framework and the Framework True-up.

WHEREAS, thereafter the Debtors continued to engage in negotiations with the non-settling Bank Counterparties (each such creditor identified on Column 2 of Exhibit A, a

"Remaining Bank Counterparty;" and the aggregate amount of derivatives claims asserted by each such Remaining Bank Counterparty against a Debtor set forth on Column 4 of Exhibit A, as reconciled from time to time between such Remaining Bank Counterparties and the Debtors, the "Asserted Claims") seeking the settlement of their derivatives claims in amounts calculated in accordance with the Framework (such amount, as set forth on Column 5 of Exhibit A as to each Remaining Bank Counterparty and inclusive of the Framework True-up, the "Framework Value") and/or the payment of Lehman Receivables by the Remaining Bank Counterparties to the Debtors.

WHEREAS, the Merrill Counterparties and the Lehman Entities acknowledge (a) the termination of their respective Lehman Transactions to which they were party under the applicable Lehman Agreement Documents on September 15, 2008, (b) the allowed and agreed upon amount of the Asserted Lehman Claims against the particular Lehman Entity in an amount equal to the Framework Values, and (c) the agreement and amount of the Lehman Receivables payable to certain Debtors.

WHEREAS, the Debtors may hold or have asserted avoidance claims or causes of action against the Merrill Counterparties under sections 510, 544, 545, 547, 548, 549, 550 and/or 553(b) of the Bankruptcy Code or under applicable state law in connection with the Lehman Agreement Documents (collectively, the "Avoidance Claims").

### Plan Support

WHEREAS, on September 1, 2011, the Debtors filed the *Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors* [Docket No. 19627] (as the same may be amended from time to time, the "Plan") and the *Debtors' Disclosure Statement for the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors* [Docket No. 19629] (the "Disclosure Statement").

WHEREAS, on September 1, 2011, the Bankruptcy Court entered an amended order approving the Disclosure Statement and voting procedures with respect to the Plan [Docket No. 19631].

WHEREAS, contemporaneously herewith, the Debtors and the Merrill Counterparties have entered into an agreement pursuant to which the Merrill Counterparties will support confirmation of the Plan (the "Plan Support Agreement"), subject to the terms and conditions set forth in the Plan Support Agreement.

NOW, THEREFORE, in consideration of the above recitals and good and sufficient consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

Section 1.    Filing of Motion to Approve Agreement.  The Debtors shall file a motion seeking approval of this Termination and Settlement Agreement by no later than September 28, 2011, after the following have occurred:

(a)    the Lehman Entities and the Merrill Counterparties have executed and delivered this Termination and Settlement Agreement;

(b)      the applicable Debtors and Bank of America, N.A. have executed and delivered a termination and settlement agreement acknowledging the termination of all of their derivatives transactions set forth on <u>Exhibit A</u> thereto and providing for the allowance of claims against the applicable Debtors in accordance with the Framework and the payment of the Lehman Receivables to the applicable Debtors (the "<u>BANA TSA</u>"); and

(c)      the Merrill Counterparties have executed and delivered the Plan Support Agreement.

Section 2.   <u>Conditions Precedent to the Effectiveness of Agreement</u>.  This Termination and Settlement Agreement shall be effective on the first business day that all of the following have occurred (such date, the "<u>Effective Date</u>"):

(a)      the Bankruptcy Court has entered an order approving the terms and conditions of this Termination and Settlement Agreement (the "<u>Settlement Order</u>"); and

(b)      the Settlement Order has become a Final Order.

For purposes of this Termination and Settlement Agreement, the term "<u>Final Order</u>" shall mean an order of the Bankruptcy Court that has not been stayed, reversed or withdrawn and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance reasonably satisfactory to the Merrill Counterparties, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, reargument, or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired.  For the avoidance of doubt, the BANA TSA need not become effective in order for the Effective Date to occur.

Section 3.   <u>Termination</u>.  If the Effective Date does not occur on or before October 31, 2011 as a result of the failure to satisfy the condition set forth in Section 2(a) of this Termination and Settlement Agreement, either the Lehman Entities or the Merrill Counterparties, may, upon written notice to other Party, terminate this Termination and Settlement Agreement (a "<u>Section 2(a) Termination Notice</u>").  Notwithstanding anything to the contrary herein, the Merrill Counterparties may, at their sole discretion and upon written notice to the Lehman Entities (collectively with a Section 2(a) Termination Notice, a "<u>Termination Notice</u>"), terminate this Termination and Settlement Agreement either: (i) on any date following the 120th day after the satisfaction of the condition set forth in Section 2(a), if the Effective Date has not occurred, or (ii) if, after satisfaction of the condition set forth in Section 2(a), the Settlement Order is reversed or vacated.  Upon delivery of a Termination Notice, this Termination and Settlement Agreement shall be null and void (other than this Section 3 and Section 16 through Section 22, which shall survive), and each of the Parties' respective interests, rights, remedies and defenses (including, without limitation, with respect to the Asserted Lehman Claims) shall be fully restored without prejudice as if this Termination and Settlement Agreement had never existed.

Section 4.    <u>Allowance of General Unsecured Claims</u>.

(a)    LBSF and Holdings agree to (i) a settlement amount in favor of MLI against LBSF in the amount of $831,628,736, which represents MLI's Framework Value in respect of the Lehman Transactions between MLI and LBSF (as such amount may be increased from time to time pursuant to Section 12 of this Termination and Settlement Agreement, the "<u>MLI-LBSF Settlement Amount</u>") and (ii) a settlement amount in favor of MLI against Holdings in the MLI-LBSF Settlement Amount in respect of its Guarantee Claim against Holdings based upon Holdings' guarantee of LBSF's obligations under the applicable Lehman Transactions.  MLI shall have (i) an allowed, nonpriority, non-subordinated, general unsecured claim against LBSF, and (ii) an allowed, nonpriority, non-subordinated, general unsecured claim against Holdings, in each case, in the MLI-LBSF Settlement Amount for its claims against LBSF and Holdings under or in connection with the Lehman Agreement Documents governing the Lehman Transactions between MLI and LBSF.

(b)    LBSF and Holdings agree to (i) a settlement amount in favor of MLCS against LBSF in the amount of $234,310,929, which represents MLCS's Framework Value in respect of the Lehman Transactions between MLCS and LBSF (as such amount may be increased from time to time pursuant to Section 12 of this Termination and Settlement Agreement, the "<u>MLCS-LBSF Settlement Amount</u>") and (ii) a settlement amount in favor of MLCS against Holdings in the MLCS-LBSF Settlement Amount in respect of its Guarantee Claim against Holdings based upon Holdings' guarantee of LBSF's obligations under the applicable Lehman Transactions.  MLCS shall have (i) an allowed, nonpriority, non-subordinated, general unsecured claim against LBSF, and (ii) an allowed, nonpriority, non-subordinated, general unsecured claim against Holdings, in each case, in the MLCS-LBSF Settlement Amount for its claims against LBSF and Holdings under or in connection with the Lehman Agreement Documents governing the Lehman Transactions between MLCS and LBSF.

(c)    LBSF and Holdings agree to (i) a settlement amount in favor of MLIB against LBSF in the amount of $49,012,965, which represents MLIB's Framework Value in respect of the Lehman Transactions between MLIB and LBSF (as such amount may be increased from time to time pursuant to Section 12 of this Termination and Settlement Agreement, the "<u>MLIB-LBSF Settlement Amount</u>") and (ii) a settlement amount in favor of MLIB against Holdings in the MLIB-LBSF Settlement Amount in respect of its Guarantee Claim against Holdings based upon Holdings' guarantee of LBSF's obligations under the applicable Lehman Transactions.  MLIB shall have (i) an allowed, nonpriority, non-subordinated, general unsecured claim against LBSF, and (ii) an allowed, nonpriority, non-subordinated, general unsecured claim against Holdings, in each case, in the MLIB-LBSF Settlement Amount for its claims against LBSF and Holdings under or in connection with the Lehman Agreement Documents governing the Lehman Transactions between MLIB and LBSF.

(d)    LBSF and Holdings agree to (i) a settlement amount in favor of MLBT against LBSF in the amount of $3,008,441, which represents MLBT's Framework Value in respect of the Lehman Transactions between MLBT and LBSF (as such amount may be increased from time to time pursuant to Section 12 of this Termination and Settlement Agreement, the "<u>MLBT-LBSF Settlement Amount</u>") and (ii) a settlement amount in favor of MLBT against Holdings in the MLBT-LBSF Settlement Amount in respect of its Guarantee Claim against Holdings based upon

Holdings' guarantee of LBSF's obligations under the applicable Lehman Transactions.  MLBT shall have (i) an allowed, nonpriority, non-subordinated, general unsecured claim against LBSF, and (ii) an allowed, nonpriority, non-subordinated, general unsecured claim against Holdings, in each case, in the MLBT-LBSF Settlement Amount for its claims against LBSF and Holdings under or in connection with the Lehman Agreement Documents governing the Lehman Transactions between MLBT and LBSF.

(e)     LBCS and Holdings agree to (i) a settlement amount in favor of MLCI against LBCS in the amount of $16,700,273, which represents MLCI's Framework Value in respect of the Lehman Transactions between MLCI and LBCS (as such amount may be increased from time to time pursuant to Section 12 of this Termination and Settlement Agreement, the "MLCI-LBCS Settlement Amount") and (ii) a settlement amount in favor of MLCI against Holdings in the MLCI-LBCS Settlement Amount in respect of its Guarantee Claim against Holdings based upon Holdings's guarantee of LBCS's obligations under the applicable Lehman Transactions.  MLCI shall have (i) an allowed, nonpriority, non-subordinated, general unsecured claim against LBCS, and (ii) an allowed, nonpriority, non-subordinated, general unsecured claim against Holdings, in each case, in the MLCI-LBCS Settlement Amount for its claims against LBCS and Holdings under or in connection with the Lehman Agreement Documents governing the Lehman Transactions between MLCI and LBCS.

(f)     LOTC and Holdings agree to (i) a settlement amount in favor of MLI against LOTC in the amount of $10,266,107, which represents MLI's Framework Value in respect of the Lehman Transactions between MLI and LOTC (as such amount may be increased from time to time pursuant to Section 12 of this Termination and Settlement Agreement, the "MLI-LOTC Settlement Amount") and (ii) a settlement amount in favor of MLI against Holdings in the MLI-LOTC Settlement Amount in respect of its Guarantee Claim against Holdings based upon Holdings' guarantee of LOTC's obligations under the applicable Lehman Transactions.  MLI shall have (i) an allowed, nonpriority, non-subordinated, general unsecured claim against LOTC, and (ii) an allowed, nonpriority, non-subordinated, general unsecured claim against Holdings, in each case, in the MLI-LOTC Settlement Amount for its claims against LOTC and Holdings under or in connection with the Lehman Agreement Documents governing the Lehman Transactions between MLI and LOTC.

(g)     All of the claims allowed pursuant to Section 4(a) – (f) hereof shall collectively be referred to as the "Allowed Lehman Claims."  The Allowed Lehman Claims shall not be subject to (i) objections or defenses, whether by way of netting, set off, recoupment, counterclaim, crossclaim, disallowance, including without limitation under section 502(d) of the Bankruptcy Code, reconsideration under section 502(j) of the Bankruptcy Code, or otherwise, or (ii) any claim under section 510 of the Bankruptcy Code or otherwise that would have the effect of subordinating such claims to the claims of other general unsecured creditors or other creditors having the same or lower priority to general unsecured creditors.  Notwithstanding the allowance of the Allowed Lehman Claims hereunder, the treatment of any such Allowed Lehman Claims, including any distributions in respect of such Allowed Lehman Claims, shall be subject to the terms of a confirmed and effective chapter 11 plan in the Chapter 11 Cases.

Section 5.   Payment of Lehman Receivables.  Within ten (10) business days of any initial distribution, payment or transfer made by any of the Debtors to any of the Merrill

Counterparties under a confirmed and effective chapter 11 plan in the Chapter 11 Cases, the following Lehman Receivables shall be paid by the specified Merrill Counterparty to the specified Lehman Entity:

> (a)    ML Bank shall pay to LBSF $1,534,579 in full and complete satisfaction of all claims of LBSF against ML Bank under or in connection with the Lehman Transactions between LBSF and ML Bank.

> (b)    MLCE shall pay to LBCS $3,536,995 in full and complete satisfaction of all claims of LBCS against MLCE under or in connection with the Lehman Transactions between LBCS and MLCE.

> (c)    MLIB shall pay to LBCC $4,162,280 in full and complete satisfaction of all claims of LBCC against MLIB under or in connection with the Lehman Transactions between LBCC and MLIB.

> (d)    MLCS shall pay to LBCC $2,661,898 in full and complete satisfaction of all claims of LBCC against MLCS under or in connection with the Lehman Transaction between LBCC and MLCS.

All Lehman Receivables payable by the Merrill Counterparties shall be paid in cash in the amount stated by wire transfer without deduction, set-off or counterclaim of any kind.  The Merrill Counterparties may in their sole discretion prepay any Lehman Receivable at any time without penalty.  No interest shall accrue on the Lehman Receivables payable by the Merrill Counterparties.

> Section 6.    <u>VAT</u>.  All settlement amounts and Lehman Receivable amounts referred to in this Termination and Settlement Agreement are exclusive of VAT.  Any VAT properly chargeable in relation to such amounts shall be payable in addition to such amount on receipt of a valid VAT invoice.  "VAT" means UK value added tax pursuant to the Value Added Tax Act 1994 or similar tax arising in any other jurisdiction.

> Section 7.    <u>Claims Register</u>.  In order to reflect the entry into this Termination and Settlement Agreement, the Parties hereto acknowledge and agree that (a) the Asserted Lehman Claims are each hereby deemed amended to the extent necessary to reflect the terms of the settlement reached in this Termination and Settlement Agreement and/or to reflect the reconciliation of the Asserted Lehman Claims that has been ongoing among the Merrill Counterparties and the Lehman Entities, which reconciliation has been completed as of the date hereof, (b) none of the Debtors shall join or support, and the Debtors shall file a response in opposition to, any objection to all or any portion of the Asserted Lehman Claims or any derivative or guarantee questionnaire filed in connection therewith, and (c) the Debtors shall not propose, file or support any Chapter 11 plan or any other pleading in any of the Chapter 11 Cases that is inconsistent with the terms and conditions of this Termination and Settlement Agreement. Promptly after the Effective Date, the Lehman Entities and the Merrill Counterparties shall execute and submit joint instructions to Epiq Bankruptcy Solutions, LLC, requesting that the claims register in the Chapter 11 Cases be amended (i) to reflect the allowance and/or disallowance of the Asserted Lehman Claims in accordance with the terms set forth herein, and (ii) if necessary, to

reflect any increase to the Allowed Lehman Claims in accordance with Section 12 of this Termination and Settlement Agreement.

Section 8.    <u>Releases and Covenants Not to Sue by the Debtor Releasors</u>.

(a)    Upon the Effective Date and except as to the rights and obligations of the Parties as set forth in this Termination and Settlement Agreement, each of the Lehman Entities on behalf of itself, its estate, and any other party, person or entity claiming under or through it (each of the foregoing, a "<u>Debtor Releasor</u>"), hereby generally releases, discharges, waives and acquits, unconditionally and irrevocably, each of the Merrill Counterparties and its current and former agents, servants, officers, directors, shareholders, employees, subsidiaries, divisions, branches, units, affiliates, parents, attorneys, successors, predecessors, heirs, personal representatives, and assigns (each of the foregoing, a "<u>Released Counterparty</u>"), from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses and claims of every kind, nature, and character whatsoever, including, without limitation, the Avoidance Claims, whether in law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort (including, without limitation, intentional torts, fraud, misrepresentation, defamation, breaches of alleged fiduciary duty, recklessness, gross negligence, or negligence) or otherwise, accrued or unaccrued, known or unknown, matured, unmatured, liquidated or unliquidated, certain or contingent, that such Debtor Releasor ever had or claimed to have or now has or claims to have presently or at any future date, against any Released Counterparty arising under or related to the Asserted Lehman Claims, the Lehman Agreement Documents, the Lehman Transactions or the negotiation, execution, performance, termination or any breaches thereof (the foregoing released claims, the "<u>Debtor Released Claims</u>").

(b)    Each Debtor Releasor covenants not to sue upon or assert against a Released Counterparty, or any person or entity whether or not a Party to this Termination and Settlement Agreement, in any court or other forum any claim of any kind related to the Lehman Agreement Documents, the Lehman Transactions or the performance, breach, liquidation, termination or acceleration thereof, except with respect to a claimed breach by a Merrill Counterparty of one or more of the terms of this Termination and Settlement Agreement.

Section 9.    <u>Releases and Covenants Not to Sue by the Counterparty Releasors</u>.

(a)    Upon the Effective Date and except as to the rights and obligations of the Parties set forth in this Termination and Settlement Agreement, each of the Merrill Counterparties on behalf of itself and any other party, person or entity claiming under or through it (each of the foregoing, a "<u>Counterparty Releasor</u>"), hereby generally releases, discharges, waives and acquits, unconditionally and irrevocably, each of the Lehman Entities, and its respective current and former agents, servants, officers, directors, shareholders, employees, subsidiaries, divisions, branches, units, affiliates, parents, attorneys, successors, predecessors, heirs, personal representatives, and assigns (each of the foregoing, a "<u>Released Debtor Party</u>"), from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses and claims of every kind, nature, and character whatsoever, whether in law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort (including, without limitation, intentional torts, fraud, misrepresentation, defamation, breaches of alleged fiduciary duty, recklessness, gross negligence, or negligence) or otherwise, accrued or

unaccrued, known or unknown, matured, unmatured, liquidated or unliquidated, certain or contingent, that such Counterparty Releasor ever had or claimed to have or now has or claims to have presently or at any future date, against any Released Debtor Party arising under or related to the Asserted Lehman Claims, the Lehman Agreement Documents, the Lehman Transactions or the negotiation, execution, performance, termination or any breaches thereof (the foregoing released claims, the "Counterparty Released Claims," and together with the Debtor Released Claims, the "Released Claims").

(b)    Each Counterparty Releasor covenants not to sue upon or assert against a Released Debtor Party, or any person or entity whether or not a Party to this Termination and Settlement Agreement, in any court or other forum any claim of any kind related to the Lehman Agreement Documents, the Lehman Transactions or the performance, breach, liquidation, termination or acceleration thereof, except with respect to a claimed breach by a Lehman Entity of one or more of the terms of this Termination and Settlement Agreement.

Section 10.  No Effect on Claims Other than Released Claims.  Each of (a) the Lehman Entities, on behalf of itself and each of the other Debtor Releasors, on the one hand, and (b) Merrill Counterparties, on behalf of itself and each of the other Counterparty Releasors, on the other hand, expressly reserves, and nothing herein shall impair, all of its rights, actions, defenses, objections, causes of action and claims it might have against the other that are not Released Claims, including, without limitation, any claims asserted by any Counterparty Releasor in a fiduciary or similar capacity for the benefit a party other than Counterparty Releasor (e.g., as trustee, as custodian, as agent or otherwise on behalf of a third party including, without limitation, on behalf of any customer or employee pension plans of any Counterparty Releasor).  Nothing herein shall impair the rights and defenses of any of the Debtor Releasors, the Counterparty Releasors or any other person or entity with respect to any claims or causes of action that are not Released Claims.

Section 11.  Special Provision for Unknown Claims.  All rights under Section 1542 of the California Civil Code, or any analogous state or federal law, are hereby expressly WAIVED, if applicable, with respect to any of the claims, injuries, or damages described in the Releases in Section 8 and Section 9.  Section 1542 of the California Civil Code reads as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

Section 12.  Claims Adjustment.  From time to time, the Framework Value of the Merrill Counterparties whose claims are allowed pursuant to Section 4 hereof may be increased pursuant to this section to a maximum of the Merrill Counterparty's Asserted Claims with respect to the corresponding Lehman Transactions.

(a)    Subject to Section 12(b), if after the execution and delivery of this Termination and Settlement Agreement by the Parties any of the Debtors enters into a binding settlement agreement with, or files a chapter 11 plan or any other pleading that provides for a settlement with, a Remaining Bank Counterparty that provides for the allowance of its Asserted

Claims in an aggregate amount that is greater than such Remaining Bank Counterparty's Framework Value (each such Remaining Bank Counterparty, a "Non-Framework Creditor" and any such settlement, a "Non-Framework Settlement"), the MLI-LBSF Settlement Amount, the MLCS-LBSF Settlement Amount, the MLIB-LBSF Settlement Amount, the MLBT-LBSF Settlement Amount, MLCI-LBCS Settlement Amount and the MLI-LOTC Settlement Amount shall each automatically be increased to an amount equal to the product of (i) the Framework Value corresponding to such settlement amount as set forth in Section 4 hereof and (ii) the quotient of (A) the Non-Framework Creditor's aggregate allowed claim amount pursuant to its Non-Framework Settlement Agreement, divided by (B) such Non-Framework Creditor's Framework Value.

(b)    If any of the Debtors enters into a Non-Framework Settlement with a Non-Framework Creditor after the execution and delivery of this Termination and Settlement Agreement, the claim amount increases in Section 12(a) shall not apply if any of the following occur:

(i)    the Debtors have objected to, opposed or otherwise commenced and prosecuted litigation with reasonable diligence against such Non-Framework Creditor in any judicial forum to challenge the allowance of such Remaining Bank Counterparty's derivatives claims, in whole or in part, in an amount that is not calculated in accordance with the Framework (collectively, the "Litigation") and such Litigation has been pending, including any appeals, for a period of at least eighteen (18) months following the later of (A) the Effective Date and (B) the date on which such Litigation was commenced;

(ii)    the Bankruptcy Court or any other trial court has entered an order allowing, over the Debtors' opposition and reasonably diligent prosecution of its objection, such Non-Framework Creditor's Asserted Claims in an amount greater than such Non-Framework Creditor's Framework Value;

(iii)    the Non-Framework Settlement, including any chapter 11 plan that may incorporate such Non-Framework Settlement, has not become effective; or

(iv)    the allowance of such Non-Framework Creditor's Asserted Claims in an amount in excess of such Non-Framework Creditor's Framework Value is solely as a result of incomplete, inaccurate or improper data regarding trades or collateral between the Lehman Entities and such Non-Framework Creditor, a mathematical miscalculation of such Non-Framework Creditor's Framework Value or some other factual mistake, but is not as a result of a modification of or deviation from the application of the principles set forth in the Framework.

(c)    In addition, the Lehman Entities shall provide to the Merrill Counterparties, no later than the fifth business day of each calendar quarter following the Effective Date, an officer's certificate in the form attached hereto as Exhibit C informing the Merrill Counterparties whether the Debtors have entered into any settlement with a Remaining Bank Counterparty of its Asserted Claims after the Effective Date, and, if so, the amount of such settlement and the Framework Value for such Remaining Bank Counterparty.  If the Merrill Counterparties have been advised of a settlement with a Remaining Bank Counterparty of its Asserted Claims after the Effective Date, upon a reasonable request from the Merrill Counterparties, a representative of the Merrill Counterparties may audit the Lehman Entities in a reasonable manner for purposes of

determining whether Section 12(a) and (b) of this Termination and Settlement Agreement have been triggered; *provided, however*, that the Merrill Counterparties acknowledge and agree that all of the Bank Counterparties may not conduct more than two audits in the aggregate in respect of a settlement with a Non-Framework Creditor; *provided, further* that, subject to the foregoing, in the event that the Debtors have received an audit request from any other Bank Counterparty within the 60 days prior to the request from the Merrill Counterparties, the Debtors may delay the audit by the Merrill Counterparties until 60 days have elapsed from such prior audit request; *provided*, *further* that, the Lehman Entities shall provide to each Merrill Counterparty the results of any audit conducted by a Bank Counterparty that is not affiliated with a Merrill Counterparty.

(d)    At all relevant times after the Effective Date, the Debtors shall use the amount that properly reflects all adjustments made pursuant to this Section 12 to calculate the amount of the Allowed Lehman Claims for all relevant purposes in the Chapter 11 Cases, including voting on and distributions under any Chapter 11 plan.

(e)    The Merrill Counterparties agree that, notwithstanding anything to the contrary contained in any other agreement of the Parties, the Lehman Entities may provide notice of this Termination and Settlement Agreement, including the Framework Values, Asserted Claims and allowed claim amounts of the Merrill Counterparties, to other Bank Counterparties as necessary to comply with any similar notice and audit obligations of the Debtors.

Section 13.  <u>No Opposition to Framework</u>.  The Merrill Counterparties agree not to oppose, object to or join in or support any objection to, the application of the Framework to the Asserted Claims of other Bank Counterparties and other claimants that have filed derivative claims against the Debtors, including, without limitation, in connection with any (a) objection by the Debtors to the allowance of derivative claims that are not calculated in accordance with the Framework or (b) request by the Debtors for estimation of derivative claims in amounts that are calculated in accordance with the Framework for purposes of voting on or maintaining reserves pursuant to a chapter 11 plan.

Section 14.  <u>Setoff</u>.  Each of the Merrill Counterparties agrees that it will not, nor will it permit any controlled affiliate, assigns or third party, to set-off, recoup, appropriate, or otherwise apply any deposits (general, special, time or demand, provisional or final) in any currency, or any other credits, indebtedness or claims, in any currency, whether direct or indirect, absolute or contingent, matured or unmatured, that are held or owing by it or any third party or affiliate to the Lehman Entities or any of the Debtors against the Allowed Lehman Claims.  Each of the Merrill Counterparties hereby irrevocably and unconditionally waives any and all rights to do so, whether such rights arise by virtue of contract or law, including, without limitation, any purported right to set off the Allowed Lehman Claims against (i) any amount payable to a Lehman Entity or any of the Debtors by an entity other than the Merrill Counterparty that holds the applicable Allowed Lehman Claim, or (ii) any amount payable by a Merrill Counterparty to a Lehman Entity or a Debtor other than the Lehman Entity against which the applicable Allowed Lehman Claim has been allowed.  Without limiting the foregoing, under no circumstance shall any Counterparty withhold payment to any Lehman Entity or any Debtor on the basis of a right to purportedly set-off the Allowed Lehman Claims.

Section 15.  <u>Representations</u>.

(a)      Each Party represents and warrants to each other Party that (i) subject to Bankruptcy Court approval in the case of the Lehman Entities, the execution, delivery, and performance by such Party of this Termination and Settlement Agreement and the transactions contemplated under this Termination and Settlement Agreement are within the powers of such Party and have been duly authorized by all necessary action on the part of such Party, (ii) this Termination and Settlement Agreement has been duly executed and delivered by such Party and, subject to Bankruptcy Court approval in the case of the Lehman Entities, constitutes a valid and binding obligation of such Party, enforceable against such Party in accordance with the terms hereof, (iii) it is not relying upon any statements, understandings, representations, expectations, or agreements other than those expressly set forth in this Termination and Settlement Agreement, (iv) it has had the opportunity to be represented and advised by legal counsel in connection with this Termination and Settlement Agreement, which it enters voluntarily and of its own choice and not under coercion or duress, (v) it has made its own investigation of the facts and is relying upon its own knowledge and the advice of its counsel, (vi) it has no expectation that any of the other Parties will disclose facts material to the Lehman Agreement Documents or this Termination and Settlement Agreement to it, and (vii) it knowingly waives any and all claims that this Termination and Settlement Agreement was induced by any misrepresentation or non-disclosure and knowingly waives any and all rights to rescind or avoid this Termination and Settlement Agreement based upon presently existing facts, known or unknown.

(b)      Each Merrill Counterparty represents to the Lehman Entities that as of the date of execution of this Termination and Settlement Agreement, it (i) owns (either outright or pursuant to participation) and has good title to the Asserted Lehman Claims, and (ii) has requisite legal authority to enter into and be bound by this Termination and Settlement Agreement.

(c)      Each Lehman Entity represents to the Merrill Counterparties that as of the date of execution of this Termination and Settlement Agreement, it has not entered into a binding settlement agreement with any other Bank Counterparty that provides for the allowance of such Bank Counterparty's Asserted Claims in an aggregate amount that is greater than such Bank Counterparty's Framework Value.

(d)      Each Party is relying upon the representations in this section in entering into the Termination and Settlement Agreement, and such representations are a material inducement for entering into this Termination and Settlement Agreement, which shall survive the execution of this Termination and Settlement Agreement.

Section 16.  <u>Execution in Counterparts</u>.  This Termination and Settlement Agreement may be executed in any number of counterparts and by different Parties in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same instrument.  Delivery of an executed counterpart of a signature page by facsimile or PDF transmission shall be as effective as delivery of a manually executed counterpart.

Section 17.  <u>Governing Law/Jurisdiction</u>.  This Termination and Settlement Agreement will be construed and enforced in accordance with, and the rights of the Parties shall be

governed by, the laws of the State of New York (including Section 5-1401 of the New York General Obligations Law), without regard to conflicts of laws principles that would require the application of the law of another jurisdiction. The Bankruptcy Court shall have exclusive jurisdiction over any action or proceeding with respect to the construction, interpretation and enforcement of this Termination and Settlement Agreement and each Party submits to such jurisdiction and waives any defense based on the location or jurisdiction of such court.

Section 18. Successors and Assigns and Survival. The provisions of this Termination and Settlement Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and assigns. The provisions of this Termination and Settlement Agreement shall survive the confirmation of any chapter 11 plan with respect to any of the Debtors and/or the appointment of a chapter 7 or 11 trustee with respect to any of the Debtors and shall be binding on any chapter 11 trustee or chapter 7 trustee appointed with respect to any of the Debtors.

Section 19. Amendment. This Termination and Settlement Agreement may only be amended, modified, superseded or canceled and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing executed and delivered by each of the Parties.

Section 20. No Admissions. Neither this Termination and Settlement Agreement, nor any of the terms hereof, nor any negotiations or proceedings in connection herewith, shall constitute or be construed as or be deemed to be evidence of an admission on the part of any Party of any liability or wrongdoing whatsoever, or the truth or untruth, or merit or lack of merit, of any claim or defense of any Party, nor shall this Termination and Settlement Agreement, or any of the terms hereof, or any negotiations or proceedings in connection herewith, or any performance or forbearance hereunder, be offered or received in evidence or used in any proceeding against any Party or its affiliates, except with respect to the effectuation and enforcement of this Termination and Settlement Agreement. Each of the Lehman Entities, on behalf of itself and the other Debtor Releasors, acknowledges that other than with respect to the Asserted Lehman Claims (if the Effective Date has occurred and so long as this Termination and Settlement Agreement continues to be in effect), the resolution and valuation of the Asserted Lehman Claims in accordance with the Framework shall not serve any authoritative purpose against each Merrill Counterparty or its affiliates with respect to the resolution or valuation of any claims relating to derivatives transactions between any Merrill Counterparty or its affiliates, and the Debtors or their controlled affiliates. For the avoidance of doubt, and without in any way limiting the foregoing, neither the existence of this Termination and Settlement Agreement nor the terms hereof shall be used, referred to, or submitted as evidence in any dispute or action by the Debtors or the Merrill Counterparties or their affiliates, including Bank of America, N.A. with respect to the resolution or valuation of any claims relating to derivatives transactions between Bank of America, N.A. and the Debtors; *provided*, *however*, that the Parties may use, refer to or submit into evidence this Termination and Settlement Agreement as is necessary to obtain Bankruptcy Court approval of this Termination and Settlement Agreement or the BANA TSA, or in the prosecution of any appeals related thereto.

Section 21. Entire Agreement. This Termination and Settlement Agreement, together with the Plan Support Agreement, constitute the entire agreement and understanding of the Parties relating to the subject matter hereof. This Termination and Settlement Agreement and

the Plan Support Agreement supersede and replace any and all prior or contemporaneous verbal or written agreements between the Parties concerning the subject matter hereof.

Section 22.  <u>Construction</u>.  This Termination and Settlement Agreement has been negotiated by the Parties and their respective legal counsel, and legal or equitable principles that might require the construction of this Termination and Settlement Agreement or any of its provisions against the Party responsible for drafting this Termination and Settlement Agreement shall not apply in any construction or interpretation of this Termination and Settlement Agreement after the Effective Date.

Section 23.  <u>Severability</u>.  If, after the Effective Date any term or other provision of this Termination and Settlement Agreement is invalid, illegal or incapable of being enforced, all other terms and provisions of this Termination and Settlement Agreement shall nevertheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to the Parties.  Upon any determination that any term or other provision is invalid, illegal, or incapable of being enforced, each Party hereto shall negotiate in good faith to modify this Termination and Settlement Agreement so as to effect the original intent of this Termination and Settlement Agreement as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Termination and Settlement Agreement on the Effective Date.

MERRILL LYNCH INTERNATIONAL

By: _____

Name: Kevin M. Behan

Title: Senior Vice President

MERRILL LYNCH CAPITAL SERVICES INC.

By: _____

Name: Kevin M. Behan

Title: Senior Vice President

MERRILL LYNCH INTERNATIONAL BANK LTD.

By: _____

Name: Kevin M. Behan

Title: Senior Vice President

MERRILL LYNCH BANK & TRUST CO. FSB

By: _____

Name: Kevin M. Behan

Title: Senior Vice President

MERRILL LYNCH COMMODITIES INC.

By: _____

Name: Kevin M. Behan

Title: Senior Vice President

BANK OF AMERICA, N.A., as successor in interest to
MERRILL LYNCH BANK USA

By: _____
Name:     Kevin M. Behan
Title:     Senior Vice President


MERRILL LYNCH COMMODITIES (EUROPE) LTD.

By: _____
Name:     Kevin M. Behan
Title:     Senior Vice President


LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:


LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:
Title:


LEHMAN BROTHERS COMMODITIES SERVICES INC.

By: _____
Name:
Title:


LEHMAN BROTHERS OTC DERIVATIVES INC.

By: _____
Name:
Title:

BANK OF AMERICA, N.A., as successor in interest to
MERRILL LYNCH BANK USA

By: _____
Name:
Title:


MERRILL LYNCH COMMODITIES (EUROPE) LTD.

By: _____
Name:
Title:


LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:    Daniel Ehrmann
            SVP


LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:
Title:    Daniel Ehrmann
            VP


LEHMAN BROTHERS COMMODITIES SERVICES INC.

By: _____
Name:
Title:    Daniel Ehrmann
            VP


LEHMAN BROTHERS OTC DERIVATIVES INC.

By: _____
Name:
Title:    Daniel Ehrmann
            VP

LEHMAN BROTHERS COMMERCIAL CORPORATION

By:

Name:

Title:

Daniel Ehrmann
VP

## Exhibit A

**(Remaining Bank Counterparties)**

US_ACTIVE:\43782530\11\58399.0003

# Termination and Settlement Agreement - Exhibit A

**All Amounts in US Dollars**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 |
|---|---|---|---|---|---|---|
| **Bank** | **Remaining Bank Counterparty** | **Debtor Legal Entity[1]** | **Asserted Claims** | **Framework Value** | **Contract ID** | **Contract Date** |
| Merrill Lynch & Co. Inc. | Merrill Lynch International | LBSF | (1,536,014,058) | (831,628,736) | 102696MLILLBSF | 6/21/2001 |
| Merrill Lynch & Co. Inc. | Merrill Lynch Capital Services, Inc. | LBSF | (987,546,249) | (234,310,929) | 71499MLCSLBSF | 8/9/2001 |
| Merrill Lynch & Co. Inc. | Merrill Lynch International Bank Limited | LBSF | (49,012,965) | (49,012,965) | 060600MLCBLBSF | 7/27/1998 |
| Merrill Lynch & Co. Inc. | Merrill Lynch Bank & Trust Co., FSB | LBSF | (3,008,441) | (3,008,441) | 37282MLBTLBSF | 8/9/2001 |
| Merrill Lynch & Co. Inc. | Merrill Lynch Commodities, Inc. | LBCS | (16,828,687) | (16,700,273) | 120605MERRLBCS | 4/19/2006 |
| Merrill Lynch & Co. Inc. | Merrill Lynch International | LOTC | (10,266,107) | (10,266,107) | 102696MLILLOTC | 9/4/2007 |

| Bank | Remaining Bank Counterparty | Debtor Legal Entity[1] | Asserted Claims | Lehman Receivable | Contract ID | Contract Date |
|---|---|---|---|---|---|---|
| Merrill Lynch & Co. Inc. | Merrill Lynch Bank USA | LBSF | N/A | 1,534,579 | 111601MLUSLBSF | 8/9/2001 |
| Merrill Lynch & Co. Inc. | Merrill Lynch Commodities (Europe) Limited | LBCS | (7,236,491) | 3,536,995 | 052606MLCELBCS | 5/23/2006 |
| Merrill Lynch & Co. Inc. | Merrill Lynch International Bank Limited | LBCC | (13,674,128) | 4,162,280 | 091197XMLLBCC | 7/28/2004 |
| Merrill Lynch & Co. Inc. | Merrill Lynch Capital Services, Inc. | LBCC | N/A | 2,661,898 | 71499MLCSLBCC | 7/28/2004 |

[1] LBCC means Lehman Brothers Commercial Corporation
LBCS means Lehman Brothers Commodity Services Inc.
LBDP means Lehman Brothers Derivative Products Inc.
LBSF means Lehman Brothers Special Financing Inc.
LOTC means Lehman Brothers OTC Derivatives Inc.

## Termination and Settlement Agreement - Exhibit A

**All Amounts in US Dollars**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 |
|---|---|---|---|---|---|---|
| **Bank** | **Remaining Bank Counterparty** | **Debtor Legal Entity**[1] | **Asserted Claims** | **Framework Value** | **Contract ID** | **Contract Date** |
| Bank of America Corporation | Bank of America, N.A. | LBSF | Redacted | Redacted | 60394NBNCLBSF | 10/31/1996 |
| Bank of America Corporation | Bank of America, N.A. | LBCS | Redacted | Redacted | 60394NBNCLBCS | 6/15/2006 |
| **Bank** | **Remaining Bank Counterparty** | **Debtor Legal Entity**[1] | **Asserted Claims** | **Lehman Receivable** | **Contract ID** | **Contract Date** |
| Bank of America Corporation | Bank of America, N.A. | LBCC | Redacted | Redacted | 60394NBNCLBCC | 10/28/1998 |

---

[1] LBCC means Lehman Brothers Commercial Corporation

LBCS means Lehman Brothers Commodity Services Inc.

LBDP means Lehman Brothers Derivative Products Inc.

LBSF means Lehman Brothers Special Financing Inc.

LOTC means Lehman Brothers OTC Derivatives Inc.

## Termination and Settlement Agreement - Exhibit A

**All Amounts in US Dollars**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 |
|---|---|---|---|---|---|---|
| **Bank** | **Remaining Bank Counterparty** | **Debtor Legal Entity[1]** | **Asserted Claims** | **Framework Value** | **Contract ID** | **Contract Date** |
| Citigroup Inc | Citibank, N.A. | LBSF | Redacted | Redacted | 40797CITILBSF | 5/14/1992 |
| Citigroup Inc | Citigroup Global Markets Ltd | LBSF | Redacted | Redacted | 82393SBILLBSF | 2/16/2000 |
| Citigroup Inc | Salomon Swapco Inc | LBSF | Redacted | Redacted | 112096SSILBSF | 8/16/1996 |
| Citigroup Inc | Citigroup Global Markets Ltd | LBCS | Redacted | Redacted | 82393SBILLBCS | 4/17/2007 |
| Citigroup Inc | Citibank, N.A. | LBCS | Redacted | Redacted | 40797CITILBCS | 2/21/2006 |
| Citigroup Inc | Citigroup Global Markets Ltd | LBCS | Redacted | Redacted | 101607CITILBCS | 3/13/2008 |
| Citigroup Inc | TOB Capital LP | LBSF | Redacted | Redacted | 050106TOBCLBSF | 11/15/2007 |
| Citigroup Inc | Citigroup Financial Products Inc | LBSF | Redacted | Redacted | Rate Cap Agreements terminated September 2, 2009 | N/A |
| Citigroup Inc | Citigroup Financial Products Inc | LBDP | Redacted | Redacted | Rate Cap Agreements terminated September 2, 2009 | N/A |
| Citigroup Inc | Citigroup Financial Products Inc | LBDP | Redacted | Redacted | 71521SBHILBDP | 9/10/1998 |
| **Bank** | **Remaining Bank Counterparty** | **Debtor Legal Entity[1]** | **Asserted Claims** | **Lehman Receivable** | **Contract ID** | **Contract Date** |
| Citigroup Inc | Citigroup Financial Products Inc | LBSF | Redacted | Redacted | 71521SBHILBSF | 8/15/1989 |
| Citigroup Inc | Citigroup Energy Inc | LBCS | Redacted | Redacted | 111505CITILBCS | 2/1/2006 |
| Citigroup Inc | Citibank, N.A. | LBCC | Redacted | Redacted | 40797CITILBCC | 3/29/1993 |
| Citigroup Inc | Citi Canyon Ltd | LBSF | Redacted | Redacted | 072204CITILBSF | 10/6/2005 |

---

[1]LBCC means Lehman Brothers Commercial Corporation
LBCS means Lehman Brothers Commodity Services Inc.
LBDP means Lehman Brothers Derivative Products Inc.
LBSF means Lehman Brothers Special Financing Inc.
LOTC means Lehman Brothers OTC Derivatives Inc.

# Termination and Settlement Agreement - Exhibit A

**All Amounts in US Dollars**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 |
|---|---|---|---|---|---|---|
| **Bank** | **Remaining Bank Counterparty** | **Debtor Legal Entity**[1] | **Asserted Claims** | **Framework Value** | **Contract ID** | **Contract Date** |
| Credit Suisse Group | Credit Suisse International | LBSF | Redacted | Redacted | 79280CSFLLBSF | 9/12/2008 |
| Credit Suisse Group | Credit Suisse | LBSF | Redacted | Redacted | 071597QCSFLBSF | 8/20/2004 |
| Credit Suisse Group | Credit Suisse Securities (Europe) Limited | LBSF | Redacted | Redacted | 051697CFBELBSF | 6/6/1997 |
| Credit Suisse Group | Credit Suisse Energy LLC | LBCS | Redacted | Redacted | 051706CREDLBCS | 5/17/2006 |
| Credit Suisse Group | Credit Suisse International | LBCC | Redacted | Redacted | 79280CSFLLBCC | 12/18/1995 |
| Credit Suisse Group | Credit Suisse | LBCC | Redacted | Redacted | 071597QCSFLBCC | 8/20/2004 |
| Credit Suisse Group | Credit Suisse Securities (Europe) Limited | LBCC | Redacted | Redacted | 051697CFBELBCC | 9/28/1998 |

| **Bank** | **Remaining Bank Counterparty** | **Debtor Legal Entity**[1] | **Asserted Claims** | **Lehman Receivable** | **Contract ID** | **Contract Date** |
|---|---|---|---|---|---|---|
| Credit Suisse Group | Credit Suisse International | LBCS | Redacted | Redacted | 79280CSFLLBCS | 3/23/2008 |

---

[1] <u>LBCC</u> means Lehman Brothers Commercial Corporation

<u>LBCS</u> means Lehman Brothers Commodity Services Inc.

<u>LBDP</u> means Lehman Brothers Derivative Products Inc.

<u>LBSF</u> means Lehman Brothers Special Financing Inc.

<u>LOTC</u> means Lehman Brothers OTC Derivatives Inc.

4

# Termination and Settlement Agreement - Exhibit A

**All Amounts in US Dollars**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 |
|---|---|---|---|---|---|---|
| **Bank** | **Remaining Bank Counterparty** | **Debtor Legal Entity[1]** | **Asserted Claims** | **Framework Value** | **Contract ID** | **Contract Date** |
| JPMorgan Chase & Co. | JPMorgan Chase Bank, N.A. | LBSF | Redacted | Redacted | 71504MGTYLBSF | 12/20/1995 |
| JPMorgan Chase & Co. | JPMorgan Chase Bank, N.A. | LBCC | Redacted | Redacted | 71504MGTYLBCC | 11/15/1993 |
| JPMorgan Chase & Co. | JPMorgan Chase Bank, N.A. | LBCS | Redacted | Redacted | 71504MGTYLBCS | 2/2/2006 |
| JPMorgan Chase & Co. | Washington Mutual Bank | LBSF | Redacted | Redacted | 35622ASBKLBSF | 5/28/1998 |
| JPMorgan Chase & Co. | J.P. Morgan Ventures Energy Corporation | LBCS | Redacted | Redacted | 061306JPMOLBCS | 8/8/2006 |

| **Bank** | **Remaining Bank Counterparty** | **Debtor Legal Entity[1]** | **Asserted Claims** | **Lehman Receivable** | **Contract ID** | **Contract Date** |
|---|---|---|---|---|---|---|
| JPMorgan Chase & Co. | Bear Stearns Credit Products Inc. | LBSF | Redacted | Redacted | 080803BECRLBSF | 7/1/2003 |
| JPMorgan Chase & Co. | J.P. Morgan Securities Ltd. | LBCS | Redacted | Redacted | 101498JPMSLBCS | 10/1/2007 |
| JPMorgan Chase & Co. | Bear, Stearns International Limited | LBSF | Redacted | Redacted | 040797EBSILBSF | 7/11/2001 |
| JPMorgan Chase & Co. | Bear Stearns Forex Inc. | LBCC | Redacted | Redacted | 091097BSFLBCC | 3/9/1995 |
| JPMorgan Chase & Co. | JPMorgan Chase & Co. | LBSF | Redacted | Redacted | 021207JPMOLBSF | 2/14/2003 |
| JPMorgan Chase & Co. | Bear Stearns Bank plc | LBSF | Redacted | Redacted | 10493BSCMLBSF | 1/6/1993 |

---

[1] LBCC means Lehman Brothers Commercial Corporation
LBCS means Lehman Brothers Commodity Services Inc.
LBDP means Lehman Brothers Derivative Products Inc.
LBSF means Lehman Brothers Special Financing Inc.
LOTC means Lehman Brothers OTC Derivatives Inc.

## Exhibit B

**(Proofs of Claim)**

| Merrill Counterparty | Primary Debtor | Primary Claim Number | Guarantee Claim Number |
|---|---|---|---|
| MLI | LBSF | 20149 | 20121 |
| MLCS | LBSF | 20148 | 20120 |
| MLIB | LBSF | 20118 | 20146 |
| MLBT | LBSF | 20119 | 20147 |
| MLCI | LBCS | 20123 | 20135 |
| MLI | LOTC | 20122 | 20133 |
| ML Bank | LBSF | N/A | N/A |
| MLCE | LBCS | 20124 | 20136 |
| MLIB | LBCC | 20145 | 20117 |
| MLCS | LBCC | N/A | N/A |

## Exhibit C

### Form of Officer's Certificate

[Counterparty]
[Address]


      Reference is made to that Termination and Settlement Agreement (the "Agreement"), dated as of September [  ], 2011, between Merrill Lynch International, Merrill Lynch Capital Services Inc., Merrill Lynch International Bank Ltd., Merrill Lynch Bank & Trust Co. FSB, Merrill Lynch Commodities Inc., Merrill Lynch Bank USA and Merrill Lynch Commodities (Europe) Ltd., on the one hand, and Lehman Brothers Special Financing, Inc. ("LBSF"), Lehman Brothers Commodities Services Inc. ("LBCS"), Lehman Brothers OTC Derivatives Inc. ("LOTC"), Lehman Brothers Commercial Corporation ("LBCC") and Lehman Brothers Holdings Inc., as credit support provider.  Any capitalized term used but not defined herein has the meaning assigned to it in the Agreement.

      Pursuant to section 12(c) of the Agreement, the Lehman Entities, in each case by and through its undersigned officer, hereby certify that the Debtors [have / have not] entered into a binding settlement agreement with, or filed a chapter 11 plan or any other pleading that provides for a settlement with, a Remaining Bank Counterparty of its Asserted Claims after the Effective Date.  [Such settlement provides for the allowance of such Remaining Bank Counterparty's Asserted Claims in the amount of [$_____] and such Remaining Bank Counterparty's Framework Value is $_____]].

      As a result, an adjustment to Counterparty's Framework Value and Allowed Lehman Claims [has / has not] been triggered in accordance with Section 12 of the Termination and Settlement Agreement.


      IN WITNESS WHEREOF, the undersigned has executed this CERTIFICATE as of the date first written above.


           LEHMAN BROTHERS HOLDINGS INC.
           LEHMAN BROTHERS SPECIAL FINANCING INC.
           LEHMAN BROTHERS COMMODITIES SERVICES INC.
           LEHMAN BROTHERS OTC DERIVATIVES INC.
           LEHMAN BROTHERS COMMERCIAL CORPORATION

           By:
           Name:
           Title:

## <u>Exhibit C</u>

**(Proposed Order Approving the BOA Settlement Agreement)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                            :
In re                                       :          Chapter 11 Case No.
                                            :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,    :          08-13555 (JMP)
                                            :
                        Debtors.            :          (Jointly Administered)
                                            :
                                            :
------------------------------------------------------------------x

<u>ORDER APPROVING SETTLEMENT AGREEMENT WITH BANK OF AMERICA, N.A.</u>

Upon the motion, dated September 28, 2011 (the "Motion"),[1] of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors in possession (together, the "Debtors"), pursuant to Rule 9019 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for approval of a termination and

settlement agreement (the "BOA Settlement Agreement") among the Lehman Entities and Bank

of America, N.A. ("BOA"), all as more fully described in the Motion; and upon the Declaration

of Daniel Ehrmann, dated September 28, 2011, in support of the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern

District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward,

Acting C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in

accordance with the procedures set forth in the amended order entered June 17, 2010 governing

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

case management and administrative procedures [ECF No. 9365] on (i) the United States Trustee

for the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured

Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v)

the United States Attorney for the Southern District of New York; (vi) all parties who have

requested notice in these chapter 11 cases; and (vii) BOA, and it appearing that no other or

further notice need be provided; and a hearing having been held to consider the relief requested

in the Motion; and the Court having found and determined that the relief sought in the Motion is

in the best interests of the Debtors, their estates and creditors, and all parties in interest and that

the legal and factual bases set forth in the Motion establish just cause for the relief granted

herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted with respect to the BOA Settlement

Agreement; and it is further

ORDERED that, pursuant to Bankruptcy Rule 9019, the Lehman Entities' entry

into the BOA Settlement Agreement is approved and the Lehman Entities are authorized to

execute, deliver, implement and fully perform any and all obligations, instruments, documents

and papers and to take any and all actions reasonably necessary or appropriate to consummate

the BOA Settlement Agreement, including waiving any conditions precedent to its effectiveness,

and perform any and all obligations contemplated therein; and it is further

ORDERED that BOA is authorized to set off and apply an aggregate of

$145,800,000 of the Account Balance in accordance with the terms of the BOA Settlement

Agreement; and it is further

ORDERED that the terms of this Order shall be immediately effective and

enforceable upon its entry; it is further

ORDERED that notice of the Motion as provided therein shall be deemed good

and sufficient notice of such Motion; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising

from or related to the implementation of this Order.

Dated: _____, 2011
        New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

## <u>Exhibit D</u>

**(Proposed Order Approving the Merrill Settlement Agreement)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
                                                    :
In re                                               :          **Chapter 11 Case No.**
                                                    :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*        :          **08-13555 (JMP)**
                                                    :
                              **Debtors.**          :          **(Jointly Administered)**
                                                    :
                                                    :
----------------------------------------------------------------x

## ORDER APPROVING SETTLEMENT AGREEMENT
## WITH MERRILL LYNCH INTERNATIONAL AND ITS AFFILIATES

Upon the motion, dated September 28, 2011 (the "Motion"),[10] of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases, as debtors and debtors in possession (together, the "Debtors"), pursuant to Rule 9019 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for approval of a

termination and settlement agreement (the "Merrill Settlement Agreement") among the Lehman

Entities and Merrill Lynch International and certain of its affiliates (together, the "Merrill

Counterparties"), all as more fully described in the Motion; and upon the Declaration of Daniel

Ehrmann, dated September 28, 2011, in support of the Motion; and the Court having jurisdiction

to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and

1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of

New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.);

and consideration of the Motion and the relief requested therein being a core proceeding pursuant

to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409; and due and proper notice of the Motion having been provided in accordance with the

---

[10] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

procedures set forth in the amended order entered June 17, 2010 governing case management

and administrative procedures [ECF No. 9365] on (i) the United States Trustee for the Southern

District of New York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii)

the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United

States Attorney for the Southern District of New York; (vi) all parties who have requested notice

in these chapter 11 cases; (vii) the Merrill Counterparties, and it appearing that no other or

further notice need be provided; and a hearing having been held to consider the relief requested

in the Motion; and the Court having found and determined that the relief sought in the Motion is

in the best interests of the Debtors, their estates and creditors, and all parties in interest and that

the legal and factual bases set forth in the Motion establish just cause for the relief granted

herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted with respect to the Merrill Settlement

Agreement; and it is further

ORDERED that, pursuant to Bankruptcy Rule 9019, the Lehman Entities' entry

into the Merrill Settlement Agreement is approved and the Lehman Entities are authorized to

execute, deliver, implement and fully perform any and all obligations, instruments, documents

and papers and to take any and all actions reasonably necessary or appropriate to consummate

the Merrill Settlement Agreement, including waiving any conditions precedent to its

effectiveness, and perform any and all obligations contemplated therein; and it is further

ORDERED that the terms of this Order shall be immediately effective and

enforceable upon its entry; it is further

ORDERED that notice of the Motion as provided therein shall be deemed good

and sufficient notice of such Motion; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising

from or related to the implementation of this Order.

Dated: _____, 2011
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE