**Hearing Date and Time: October 19, 2011 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time:  October 12, 2011 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------x
                                                :
In re                                           :   Chapter 11 Case No.
                                                :
LEHMAN BROTHERS HOLDINGS INC., et al.,          :   08-13555 (JMP)
                                                :
                     Debtors.                   :   (Jointly Administered)
                                                :
------------------------------------------------------------------x
```

**NOTICE OF DEBTORS' MOTION PURSUANT**
**TO SECTION 363 OF THE BANKRUPTCY CODE AND**
**FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 FOR AUTHORITY**
**TO ENTER INTO SETTLEMENT WITH ARCH INSURANCE COMPANY**

**PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "Motion")[1]

of Lehman Brothers Holdings Inc. and its affiliated debtors in the above-referenced chapter 11

cases, including Lehman Commercial Paper Inc., as debtors-in-possession (collectively, the

"Debtors"), pursuant to section 363 of title 11 of the United States Code (the "Bankruptcy

Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

for authority to enter into a settlement with Arch Insurance Company ("Arch"), all as more fully

described in the Motion, will be held before the Honorable James M. Peck, United States

Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House,

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on

**October 19, 2011 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

       **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion

shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of

New York, shall set forth the name of the objecting party, the basis for the objection and the

specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance

with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users

of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch

disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based

word processing format (with two hard copies delivered directly to Chambers), and shall be filed

with the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York

10004, Courtroom 601; and served upon (i) Weil Gotshal & Manges LLP, 767 Fifth Avenue,

New York, New York 10153, Attn: Alfredo R. Pérez, Esq., attorneys for the Debtors; (ii) the

Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York,

New York 10004 Attn: Tracy Hope Davis, Esq., Andrea B. Schwartz, Esq., Elisabetta G.

Gasparini, Esq.; (iii) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New

York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck,

Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; (iv)

The Lobel Firm, LLP, 840 Newport Center Drive, Suite 750, Newport Beach, CA 92660, Attn:

William N. Lobel, Esq., attorneys for the SunCal Trustee and (v) Leo & Weber, P.C., One N.

LaSalle Street, Suite 3600, Chicago, Illinois 60602, Attn: T. Scott Leo, Esq. and Gascou Hopkins

LLP, 1801 Avenue of the Stars, Suite 230, Los Angeles, CA 90067, Attn: Ronald Hopkins, Esq.,

counsel to Arch, so as to be so filed and received by no later than **October 12, 2011, at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

    **PLEASE TAKE FURTHER NOTICE** that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing. If an objection is filed the moving and objecting parties are required to attend the hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: September 28, 2011
  Houston, Texas

       /s/ Alfredo R. Pérez     
       Alfredo R. Pérez

       WEIL, GOTSHAL & MANGES LLP
       700 Louisiana Street, Suite 1600
       Houston, Texas  77002
       Telephone: (713) 546-5000
       Facsimile: (713) 224-9511

       Attorneys for Debtors
       and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
:
**In re**                                                          :    **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,   :    **08-13555 (JMP)**
:
**Debtors.**               :    **(Jointly Administered)**
:
-------------------------------------------------------------------x

## DEBTORS' MOTION PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 FOR AUTHORITY TO ENTER INTO SETTLEMENT WITH ARCH INSURANCE COMPANY

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-

referenced chapter 11 cases, including Lehman Commercial Paper Inc. ("LCPI"), as debtors-in-

possession (collectively, the "Debtors," and collectively with their non-debtor affiliates,

"Lehman"), file this motion (the "Motion") seeking approval to enter into a settlement with Arch

Insurance Company ("Arch"), pursuant to section 363 of title 11 of the United States Code (the

"Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") and respectfully represent:

## Preliminary Statement

1.      Prior to the commencement of the Debtors' chapter 11 cases, LCPI and three non-Debtor Lehman affiliates, Lehman ALI, Inc. ("Lehman ALI"), OVC Holdings LLC ("OVC Lender"), and Northlake Holdings LLC ("Northlake Lender, and together with LCPI, Lehman ALI and OVC Lender, the "Lehman Creditors") provided approximately $1.8 billion in senior secured financing (the "Financing") to certain direct or indirect subsidiaries and/or affiliates of SCC Acquisitions, Inc. ("SCC Acquisitions"), pursuant to various separate loan agreements.  The Financing was used by such subsidiaries and/or affiliates to acquire and develop certain real estate projects located in California.

2.      After the commencement of the Debtors' chapter 11 cases, certain of such subsidiaries and/or affiliates of SCC Acquisitions became involuntary debtors (the "SunCal Involuntary Debtors")[2] or voluntary debtors (the "SunCal Voluntary Debtors"[3] and together with the SunCal Involuntary Debtors, the "SunCal Debtors") in cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "California Bankruptcy Court").  The real estate projects owned by the SunCal Debtors are collectively referred to herein as the "SunCal Properties."

---

[2] The SunCal Involuntary Debtors are:  SunCal Oak Knoll, LLC ("SunCal Oak Knoll"); SunCal Torrance Properties, LLC ("SunCal Torrance"); SunCal Marblehead, LLC ("SunCal Marblehead"); SunCal Heartland, LLC ("SunCal Heartland"); LB/L-SunCal Northlake, LLC ("SunCal Northlake"); LB/L-SunCal Oak Valley, LLC ("SunCal Oak Valley"); SunCal PSV, LLC ("SunCal PSV"); Delta Coves Venture, LLC ("Delta Coves"); and SunCal Century City, LLC ("SunCal Century").  Following the commencement of the chapter 11 cases of the SunCal Involuntary Debtors (the "SunCal Involuntary Debtors' Cases"), Steven Speier was appointed as trustee (the "SunCal Trustee") to administer such cases.

[3] The SunCal Voluntary Debtors are: Palmdale Hills Property, LLC ("Palmdale"); SunCal Bickford Ranch, LLC ("Bickford Ranch"); Acton Estates, LLC ("Acton"); SunCal Summit Valley, LLC ("Summit Valley"); SCC Communities LLC ("SCC Communities"); Tesoro SF, LLC ("Tesoro"); SunCal Communities I, LLC ("SunCal I"); Seven Brothers, LLC ("Seven Brothers"); Kirby Estates, LLC ("Kirby"); SunCal Beaumont Heights, LLC ("Beaumont Heights"); SunCal Johannson Ranch, LLC ("Johannson Ranch"); SJD Development Corp.; SunCal Communities III, LLC; SCC/Palmdale, LLC; SJD Partners, Ltd.; North Orange Del Rio Land, LLC ("Del Rio"); and SunCal Emerald Meadows, LLC ("SunCal Emerald").

3.      Prior to the commencement of the SunCal Debtors' chapter 11 cases, Arch and Bond Safeguard Insurance Company and its affiliate Lexon Insurance Company (collectively, "Bond Safeguard" and, together with Arch, the "Bond Issuers") issued certain surety bonds, including subdivision, payment, performance and other bonds, in connection with the SunCal Debtors' development of certain of the SunCal Properties (the "Project Bonds").  The Bond Issuers contend that they are owed tens of millions of dollars in respect of the Project Bonds and have asserted claims exceeding two hundred million dollars, in the aggregate, against the SunCal Debtors.

4.      Following the commencement of the SunCal Debtors' chapter 11 cases, certain of the SunCal Debtors commenced an adversary proceeding in the California Bankruptcy Court pursuant to which they sought to equitably subordinate the claims of the Lehman Creditors pursuant to section 510 of the Bankruptcy Code (the "Adversary Proceeding").  Arch intervened as a plaintiff in the Adversary Proceeding, asserting that the claims of the Lehman Creditors should be subordinated to those of Arch.

5.      As set forth in more detail in the *Debtors' Motion Pursuant to Section 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 for Authority to (I) Enter Into the Second Amended Joint Chapter 11 Plan Proposed By the Lehman Creditors and the SunCal Trustee on Behalf of the SunCal Involuntary Debtors In Eight of the SunCal Involuntary Debtors' Cases; (II) Enter Into the Second Amended Joint Chapter 11 Plan Proposed By the Lehman Lenders In Eleven of the SunCal Voluntary Debtors' Cases; and (III) Participate In Any Auction of the SunCal Debtors' Assets*, dated June 28, 2011 [E.C.F. No. 18122] (the "Plan Authority Motion"), the Lehman Creditors and the SunCal Trustee proposed a chapter 11 plan in eight of the SunCal Involuntary Debtors' chapter 11 cases (the "Lehman TD

3

Plan")[4] and certain of the Lehman Creditors proposed a chapter 11 plan in 11 of the SunCal

Voluntary Debtors' chapter 11 cases (the "Lehman VD Plan"[5] and collectively, with the Lehman

TD Plan,  the "Lehman-SunCal Plans"), respectively.[6]  Pursuant to the Plan Authority Motion,

the Debtors sought, among other things, approval to effectuate the transactions contemplated in

the Lehman-SunCal Plans.  On or about July 21, 2011, this Court entered an order granting the

relief requested in the Plan Authority Motion [ECF No. 18655].  The hearing to consider

confirmation of the Lehman-SunCal Plans is currently scheduled to commence in the California

Bankruptcy Court on October 24, 2011.

       6.      The Lehman-SunCal Plans provide for (and require, as a condition

precedent to the entry of a confirmation order confirming the Lehman-SunCal Plans, which

condition may be waived by the Lehman Creditors in their sole and absolute discretion) the

consummation of a settlement between the Lehman Creditors, as applicable, and the Bond

Issuers.  In connection therewith, LBHI, LCPI, ALI and the OVC Lender (collectively, the

"Lehman Parties") have reached a settlement with Arch concerning its claims against the SunCal

Debtors.  The settlement is memorialized in two separate agreements (i) an agreement that

relates to Arch's claims against the SunCal Voluntary Debtors (the "Arch VD Settlement

Agreement") and (ii) an agreement that relates to Arch's claims against the SunCal Involuntary

Debtors (the "Arch TD Settlement Agreement" and collectively, with the Arch VD Settlement

Agreement, the "Arch Settlement Agreements").  As is set forth in more detail below, in

---

[4] *Third Amended Joint Chapter 11 Plan for Eight Trustee Debtors Proposed By the Trustee and Subject Lehman Creditors,* dated  July 15, 2011 and filed on August 23, 2011.

[5] *Third Amended Joint Chapter 11 Plan for Eleven Voluntary Debtors Proposed By the Lehman VD Lenders,* dated July 15, 2011 and filed on August 23, 2011

[6] The salient terms of the Lehman-SunCal Plans are summarized in the Plan Authority Motion.  In the event of any inconsistency between the summaries contained in the Plan Authority Motion and the Lehman-SunCal Plans, the Lehman-SunCal Plans control.

exchange for certain reimbursement and other obligations to be undertaken by the Lehman

Parties, the Arch Settlement Agreements contemplate, among other things, (i) full and final

settlement of Arch's claims against the SunCal Debtors (except as expressly provided otherwise

in the Arch Settlement Agreements and as summarized below), (ii) that Arch will forego certain

distributions on its claims under the Lehman-SunCal Plans, (iii) the waiver, release and/or

assignment to the Lehman Parties of Arch's claims (except as is otherwise provided in the Arch

Settlement Agreements and summarized below), and (iv) Arch's dismissal, with prejudice, of its

claims in the Adversary Proceeding.

    7.  The Debtors believe that entry into the Arch Settlement Agreements is

critical to the resolution of Arch's claims in the SunCal Debtors' chapter 11 cases and, more

importantly, integral to confirming the Lehman-SunCal Plans.  The Arch Settlement Agreements

were anticipated under, and are in furtherance of, the consummation of the Lehman-SunCal

Plans and the transactions contemplated thereunder, including without limitation, the conveyance

of the SunCal Properties owned by the SunCal Debtors that are subject to the Lehman-SunCal

Plans to affiliates of the Lehman Creditors.  Absent a settlement with Arch, there could be no

assurance that the claims asserted by Arch against the SunCal Debtors would not be estimated by

the California Bankruptcy Court at an amount or amounts that would exceed certain caps and

thresholds provided for in the Lehman-SunCal Plans, which would then require the Lehman

Creditors, as plan proponents, either to elect to withdraw the applicable Lehman-SunCal Plan(s)

(despite all of their efforts in seeking confirmation of such plans) or proceed to confirmation and

effectiveness of such plans and, in so doing, commit to make payments and distributions to

creditors in excess of estimated aggregate amounts and/or the caps and thresholds provided in the

Lehman-SunCal Plans and/or likely incur significant expense and risk in litigating Arch's claims.

Absent a settlement with Arch, the likely increase in the aggregate estimated unsecured claim amounts created by the addition of Arch's claims would reduce distributions to other creditors if certain thresholds are exceeded.

## Relief Requested

8.      The Debtors request, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, as applicable, authority for LBHI and LCPI to enter into the Arch Settlement Agreements and to consummate the transactions contemplated thereunder including, without limitation, establishing and funding the escrow accounts contemplated by the Arch Settlement Agreements to reimburse Arch for payments made by Arch to contractors performing work on the Marblehead Project (as defined below) (up to $2.5 million) and/or to secure the obligations of the Lehman Nominees thereunder following transfer of title to the applicable SunCal Properties to the Lehman Nominees.

## Jurisdiction

9.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Background

A.      General

10.      Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

11.      Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and the other Debtors commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases

have been consolidated for procedural purposes only and are being jointly administered pursuant

to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their businesses and manage

their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

12.    On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the Creditors' Committee pursuant to

section 1102 of the Bankruptcy Code (the "Creditors' Committee").

13.    On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as

examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January

20, 2009, ECF No. 2583, the Court approved the U.S. Trustee's appointment of the Examiner.

The Examiner issued a report at his investigation pursuant to section 1106 of the Bankruptcy

Code on March 11, 2010, ECF No. 7531.

14.    On September 1, 2011, the Debtors filed a third amended joint chapter

11 plan (the "Plan") and disclosure statement (the "Disclosure Statement") [ECF Nos.

19627 and 19629].  On September 1, 2011, this Court entered an amended order [ECF No.

19631] approving the Disclosure Statement, establishing solicitation and voting procedures in

connection with the Plan, scheduling the confirmation hearing and establishing notice and

objection procedures for the confirmation hearing.

15.    Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to the commencement of these chapter 11 cases is

contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York in Support of First-Day Motions and Applications,

filed on September 15, 2008, ECF No. 2.

**B.      The SunCal Debtors' Chapter 11 Cases and the Arch Bonds**

16.      As noted above, the SunCal Debtors are owners of various real estate projects in California that, prior to the filing of the chapter 11 cases on various dates in November 2008 (the "SunCal Petition Dates"), received Financing from the Lehman Creditors on a senior secured basis in the approximate amount of $1.8 billion.  Also prior to the SunCal Petition Dates, Arch issued certain Project Bonds with respect to real estate projects owned by certain of the SunCal Debtors in exchange for the payment of bond insurance premiums and certain indemnity obligations from the applicable SunCal Debtors and certain principals thereof.

17.      With respect to the SunCal Voluntary Debtors, Arch issued Project Bonds (collectively, the "Arch VD Bonds") in connection with the real estate development of (a) a project comprised of, in part, approximately 10,625 acres of real property owned by Palmdale (the "Ritter Ranch Project")  and (b) a project comprised of, in part, approximately 185 acres of real property owned by Tesoro (the "Tesoro Burnham Project" and collectively, with the Ritter Ranch Project, the "Arch VD Projects").  With respect to the SunCal Involuntary Debtors, Arch issued Project Bonds in connection with the real estate development of (a) a project comprised of, in part, approximately 247 acres of real property owned by SunCal Marblehead (the "Marblehead Project") and (b) a project comprised of, in part, approximately 985 acres of real property owned by SunCal Oak Valley (the "Oak Valley Project" and collectively, with the Marblehead Project, the "Arch TD Projects" and collectively, with the Arch VD Projects, the "Arch Projects").

18.      As a result of the issuance of the Project Bonds by Arch, and in some instances, the issuance of surety bonds for other SunCal Debtors and/or affiliates of SCC Acquisitions that are not debtors in the SunCal chapter 11 cases, Arch asserts that it is owed by

the applicable SunCal Debtors over $155 million dollars, in the aggregate.  This aggregate amount includes claims in respect of Arch's contingent liability to others, including other creditors of the SunCal Debtors, such as contractors and municipalities, who may be beneficiaries of the Project Bonds issued by Arch.

## C.    The Lehman-SunCal Plans[7]

### (i) The Lehman VD Plan

19.    On or about August 23, 2011, LCPI and ALI filed, in the California Bankruptcy Court, the Lehman VD Plan in respect of the following 11 SunCal Voluntary Debtors: (1) Acton; (2) Palmdale; (3) SCC Communities;  (4) Bickford Ranch; (5) SunCal Communities I; (6) Summit Valley; (7) Tesoro; (8) Kirby; (9) Seven Brothers; (10) Beaumont Heights; and (11) Johannson Ranch (the "VD Plan Debtors").  The Lehman VD Plan provides that, upon confirmation and effectiveness of the Lehman VD Plan, the VD Plan Debtors will convey ownership of the real estate projects they own (as specifically set forth in the Lehman VD Plan) to nominees of LCPI and/or ALI.  In exchange, LCPI and ALI will provide certain funding (i) to provide for the settlement of claims of settling creditors and a minimum guaranteed payment of 1% to non-settling creditors holding allowed claims against the VD Plan Debtors and (ii) for payment of certain post-confirmation expenses.

### (ii) The Lehman TD Plan

20.    Also, on or about August 23, 2011, the Lehman Creditors, along with the SunCal Trustee, filed in the California Bankruptcy Court, the Lehman TD Plan in respect of the following eight SunCal Involuntary Debtors: (1) SunCal Oak Valley; (2) SunCal Heartland; (3)

---

[7] The brief descriptions of the Lehman-SunCal Plans contained herein are included for convenience only.  Nothing herein is intended to supersede the terms of the Lehman-SunCal Plans.  In the event of any inconsistencies between the Lehman-SunCal Plans and the descriptions herein, the Lehman-SunCal Plans control.

SunCal Marblehead; (4) SunCal PSV; (5) Delta Coves; (6) SunCal Torrance; (7) SunCal

Northlake and (8) SunCal Oak Knoll (collectively, the "TD Plan Debtors" and together with the

VD Plan Debtors, the "Plan Debtors").  Similar to the Lehman VD Plan, the Lehman TD Plan

provides that, upon confirmation and effectiveness of the Lehman TD Plan, the TD Plan Debtors

will convey ownership of the real estate projects they own (as specifically set forth in the

Lehman TD Plan) to designees of the Lehman Creditors.  In exchange, the Lehman Creditors

will provide certain (i) funding to provide for the settlement of claims of settling creditors and a

minimum guaranteed payment of 1% to non-settling creditors holding allowed claims against the

TD Plan Debtors and (ii) funding for payment of certain post-confirmation expenses.

21.     Specifically, the Lehman VD Plan contemplates that, on or after the

effective date, certain nominees will take title to the Tesoro Burnham Project and the Ritter

Ranch Project (the designees referred to as the "Tesoro Burnham Nominee" and the "Ritter

Ranch Nominee," respectively, and collectively, the "Arch VD Nominees"). Further, the Lehman

TD Plan contemplates that, on or after the effective date, certain designees will take title to the

Marblehead Project and the Oak Valley Project (the nominees referred to as the "Marblehead

Nominee" and the "Oak Valley Nominee" and collectively, the "Arch TD Nominees").

22.     The Lehman-SunCal Plans are also premised, in part, on obtaining

settlements with the Bond Issuers.  Many of the claims asserted against the Plan Debtors, or

portions thereof, arise from Project Bonds issued by the Bond Issuers.  The Bond Issuers have

made and continue to make payments to certain creditors of the SunCal Debtors and others who

are beneficiaries of the Project Bonds issued by the Bond Issuers.  Accordingly, the Bond Issuers

have asserted claims against certain of the SunCal Debtors that, in the aggregate (and without

duplication) exceed $200 million.  The Bond Issuers have contended that (i) if a Bond Issuer is

10

required to pay or perform under a Project Bond because of a demand from a municipality that is

the beneficiary of such Project Bond, the costs for improving the subject SunCal Property can be

recovered upon sale or transfer of such SunCal Property from its subsequent owner, and (ii)

absent consent of the applicable Bond Issuer, the Project Bonds must be replaced on sale or

transfer of each applicable SunCal Property.  The Lehman Creditors dispute these contentions.

23.    Accordingly, the Lehman-SunCal Plans contemplate a settlement with the

Bond Issuers whereby the Bond Issuers agree, in essence, that (a) as to amounts a Bond Issuer

actually incurs with respect to certain bonded work performed for the benefit of a Plan Debtor's

project, such Bond Issuer would be reimbursed by a Lehman Nominee for all or a portion

thereof; (b) the Bond Issuers would forego certain distributions under the Lehman-SunCal Plans

on certain of their claims and (c) the Bond Issuers would assign to the Lehman Creditors or their

designees or otherwise release, all or part of the Bond Issuers' claims against the Plan Debtors

and their related claims against any indemnitors or other obligors who provided indemnities to

the Bond Issuers for any losses incurred under the Project Bonds.

**D.    The Arch Settlement Agreements**

24.    Consistent with the parameters indicated in the Lehman-SunCal Plans, on

or about September 27, 2011, the Debtors and other Lehman Parties entered into the Arch

Settlement Agreements, subject to this Court's approval.  A copy of the Arch VD Settlement

Agreement is annexed as Exhibit A hereto.  A copy of the Arch TD Settlement Agreement is

annexed as Exhibit B hereto.  The salient terms of each Arch Settlement Agreement are

described below.[8]

---

[8] The descriptions of the Arch Settlement Agreements are provided for summary purposes only.  To the extent of
any inconsistencies between summaries contained herein and the Arch Settlement Agreements, the Arch Settlement
Agreements shall govern.

11

(i)    **Arch VD Settlement Agreement**[9]

| | |
|---|---|
| **Debtors Party to the Arch VD Settlement Agreement:** | LBHI and LCPI |
| **Other non-Debtor Lehman Entities Party to the Arch VD Settlement Agreement:** | ALI |
| **Projects Covered:** | • Ritter Ranch Project<br>• Tesoro Burnham Project |
| **Termination Right:** | • Either Arch or the Lehman Parties have the right to terminate the Arch VD Settlement Agreement if the Transfer Closing Date does not occur by September 30, 2012. |
| **Transfer Closing Date:** | • The date on which the applicable Arch VD Nominee takes title to the Ritter Ranch Project or the Tesoro Burnham Project, as applicable. |
| **Agreements Specific to Ritter Ranch Project:** | • <u>Ritter Ranch Bonds:</u> The Ritter Ranch Bonds will remain in effect after the Transfer Closing Date and after the transfer of the Ritter Ranch Project to the Ritter Ranch Nominee.<br><br>• <u>ELR Settlement:</u>[10] Arch will continue to perform its obligations to the City of Palmdale pursuant to the ELR Settlement Agreement.<br><br>• <u>Escrow:</u> If the Lehman VD Plan is confirmed, then within 10 days following the later of (i) entry of a final non-appealable order by this Court approving this Motion and (ii) entry of an order by the California Bankruptcy Court confirming the Lehman VD Plan, the Lehman Parties will deposit the sum of $1.5 million in to an interest-bearing escrow account (the "<u>Ritter Ranch Escrow</u>") to be held in escrow pending the occurrence of the Transfer Closing Date.<br><br>  ▪ If the Transfer Closing Date <u>does not</u> occur on or prior to September 12, 2012 and the Arch VD Settlement Agreement is terminated as a result, then upon such termination, the funds contained in the Ritter Ranch Escrow shall be released to the Lehman Parties.<br><br>• <u>Deed of Trust:</u> On the Transfer Closing Date, the Ritter Ranch Nominee will provide to Arch a first priority lien on the Ritter Ranch Project as additional security for the Ritter Ranch Nominee's reimbursement |

---

[9] Capitalized terms used, but not otherwise, defined in this section shall have the meanings ascribed to them in the Arch VD Settlement Agreement.

[10] The ELR Settlement Agreement is an agreement between Arch and the City of Palmdale that settled certain claims by the City of Palmdale against certain Project Bonds of Arch relating to work performed on Elizabeth Lake Road.

| | |
|---|---|
| | obligations under the Arch VD Settlement Agreement. The Ritter Ranch Nominee can cause the lien to be released if it deposits an additional $2 million cash or an equivalent letter of credit into the Ritter Ranch Escrow. <br><br> • <u>ELR Settlement Agreement Reimbursements:</u> <br> ▪ The Ritter Ranch Nominee will reimburse Arch in an aggregate amount equal to the lesser of (a) $1,100,000 and (b) the actual amounts paid by Arch in respect of the ELR Work (the "<u>Cap Amount</u>"), with any such amounts being paid to Arch on the Transfer Closing Date and thereafter (up to the Cap Amount). Any amounts in excess of the Cap Amount are waived by Arch. <br><br> ▪ Arch will consult with the Ritter Ranch Nominee prior to retaining contractors to complete the work required under the ELR Settlement Agreement, and the Ritter Ranch Nominee will consent to release of the ELR Bonds upon completion of the ELR Work in accordance with the ELR Settlement Agreement. The Ritter Ranch Nominee will reasonably cooperate with Arch, as necessary, to obtain the City of Palmdale's release of the Ritter Ranch Bonds following completion of the ERL Work, but shall have no other obligations or liability in connection therewith. <br><br> • <u>Continued Obligations/Reimbursement</u>: Arch shall be primarily responsible to engage and pay completion contractors to finish bonded improvements with respect to the Ritter Ranch Project. Except with respect to the ELR Work which shall be reimbursed as provided above, the Ritter Ranch Nominee will reimburse Arch for costs relating to such work and for any valid payments made under the Ritter Ranch Bonds for work performed after the Transfer Closing Date. <br><br> • <u>Assignment of Claims</u>: On the Transfer Closing Date, Arch will assign to the Lehman Parties all rights it has to certain claims assigned to it by payment bond claimants for work performed on the Ritter Ranch Project prior to the Transfer Closing Date and indemnify and hold harmless the Lehman Parties and the Ritter Ranch Nominee from any claims asserted by such claimants. <br><br> • <u>Recovery</u>: If the Ritter Ranch Nominee fails to pay its reimbursement obligations under the Arch VD Settlement Agreement, then after the requisite notice period and other requirements set forth in the Arch VD Settlement Agreement, Arch shall be able to seek recovery of such obligations from the Ritter Ranch Escrow or through foreclosing on the lien on the Ritter Ranch Project, in addition to its rights against the Ritter Ranch Nominee provided that, Arch agrees to first seek recovery from the Ritter Ranch Escrow before seeking recovery on the lien or pursuing any other rights of Arch. |
| **Agreements Specific to the Tesoro Burnham Project:** | • <u>Tesoro Burnham Bonds</u>: The Tesoro Burnham Bonds will remain in effect after the Transfer Closing Date and after the transfer of the Tesoro Burnham Project to the Tesoro Burnham Nominee. |

13

|  |  |
|---|---|
|  | • Continued Obligations/Reimbursement:  If and to the extent a call is made on the Tesoro Burnham Bonds, Arch will honor its obligations under the applicable Tesoro Burnham Bonds and will be primarily responsible to engage and pay completion contractors to finish bonded improvements with respect to the Tesoro Burnham Project.  The Tesoro Burnham Nominee will reimburse Arch for costs relating to such work and for any valid payments made under the Tesoro Burnham Bonds for work performed after the Transfer Closing Date.<br><br>• Assignment of Claims:  Currently, there are no payment bond claimants with respect to the Tesoro Burnham Bonds.  Arch will indemnify and hold harmless the Lehman Parties and the Tesoro Burnham Nominee from any claims asserted by any bond claimants as to any work performed on the Tesoro Burnham Project prior to the Transfer Closing Date. |
| **Bond Premiums:** | • On the Transfer Closing Date, Arch will waive any payments and release any claims it may have against the Palmdale Hills Debtor and the Tesoro Burnham Debtor in respect of unpaid bond premiums and will obtain a release of the Rohm's Agency claims for its share of the premiums incurred prior to the Transfer Closing Date or if a release from Rohm cannot be obtained, Arch will indemnify the Lehman Parties and Arch VD Nominees from any claims of Rohm against any such parties, and Arch will reimburse such parties for any disbursements made to Rohm under the Lehman VD Plan in respect of such claims.  The Arch VD Nominees will pay Arch bond premiums on the Arch VD Bonds that remain outstanding after the Transfer Closing Date per a schedule attached to the Arch VD Settlement Agreement. |
| **Residual Rights/ Additional Claim Assignments:** | • On or prior to the Transfer Closing Date, Arch will obtain a full release or assignment of the residual rights held by claimants for whom Arch has previously received only a partial assignment of such claimants' rights and will assign such rights to the Lehman Parties on the Transfer Closing Date.<br><br>• All bonded claims held by or acquired by Arch from bond claimants who may also have claims against the SunCal VD Plan Debtors, will be transferred to the Lehman Parties on the Transfer Closing Date. |
| **Conveyance of Properties to Third Parties:** | • If a project is transferred to a third person or entity that is not a Lehman Party or an Arch VD Nominee, then the applicable Arch VD Nominee will require that such third party furnish replacement bonds with respect to the project and obtain a full release and exoneration of the Arch VD Bonds, as applicable.  Upon exoneration and release of such bonds, Arch shall release all collateral, including any cash, letters of credit or deeds of trust and any other security interests provided by the Arch VD Nominee to Arch. |
| **Releases:** | • On the Transfer Closing Date and to the extent not otherwise assigned to the Lehman Parties,<br><br>    ▪ Arch will release any claims against the VD Plan Debtors and/or the Lehman Parties with respect to the paid payment bond claims arising from work performed prior to the Transfer Closing Date.<br><br>    ▪ Arch will release all claims against all SunCal Voluntary Debtors except certain specified claims against certain SunCal Voluntary |

14

<table>
<tr><td></td><td>

Debtors.

- Arch will dismiss, with prejudice, its complaint and its claims in the Adversary Proceeding against all defendants.

- Arch will release all Lehman Parties and the Arch VD Nominees from all claims arising from the Arch VD Projects, the Arch VD Bonds, or the SunCal Voluntary Debtors (other than those specifically excluded in the Arch VD Settlement Agreement and any claims in connection with the Arch VD Settlement Agreement and any document executed in connection therewith).

- Arch will dismiss all claims against the SunCal Involuntary Debtors for guaranty or indemnity liability arising from any of the Arch VD Bonds.
</td></tr>
</table>

### (ii) Arch TD Settlement Agreement[11]

| | |
|---|---|
| **Debtors Party to the Arch TD Settlement Agreement:** | • LBHI<br>• LCPI |
| **Other non-Debtor Lehman Entities Party to the Arch TD Settlement Agreement:** | • ALI<br>• OVC Lender |
| **Termination Right:** | • Either Arch or the Lehman Parties have the right to terminate the Arch TD Settlement Agreement if the Transfer Closing Date does not occur by September 30, 2012. |
| **Projects Covered:** | • Marblehead Project<br>• Oak Valley Project |
| **Transfer Closing Date:** | • The date on which the applicable Arch TD Nominee takes title to the Marblehead Project or the Oak Valley Project, as applicable. |
| **Agreements Specific to Marblehead Project:** | • <u>Marblehead Bonds:</u> The Marblehead Bonds will remain in effect after the Transfer Closing Date and after the transfer of the Marbleahead Project to the Marblehead Nominee.<br><br>• <u>Marblehead Settlement</u>:[12] Arch will continue to perform its obligations to the City of San Clemente pursuant to the Marblehead Settlement Agreement. |

---

[11] Capitalized terms used, but not otherwise, defined in this section shall have the meanings ascribed to them in the Arch TD Settlement Agreement.

[12] <u>Marblehead Settlement Agreement</u>: an agreement dated as of February 2, 2010 by and between Arch and the City of San Clemente resolving certain disputes between them in respect of the Marblehead Bonds.

- Escrow:  Within 10 days following the entry of a final non-appealable order by this Court approving this Motion, the Lehman Parties will deposit the sum of $2.5 million into an interest-bearing escrow account (the "Marblehead Escrow") to be held and disbursed as follows:

  - If the Lehman TD Plan is not confirmed as to the Marblehead Debtor, Arch may demand that the escrow agent release the funds held in the Marblehead Escrow to reimburse it with respect to work performed under the terms of the Marblehead Settlement Agreement after August 15, 2010.

  - If the Lehman TD Plan is confirmed as to the Marblehead Debtor, then within 10 days following the later of entry of a final non-appealable order by this Court approving the Motion and entry of an order by the California Bankruptcy Court confirming the Lehman TD Plan, the Lehman Parties will deposit an additional $2.5 million into the Marblehead Escrow pending the occurrence of the Transfer Closing Date.

  - If the Transfer Closing Date does not occur by September 30, 2012 and the Arch TD Settlement Agreement is terminated, the Lehman Parties and Arch are required to direct the release of $2.5 million of the funds in the Marblehead Escrow (plus all accrued interest on all amounts held in escrow) to the Lehman Parties and release all remaining funds in the Marblehead Escrow to Arch; provided, that as a condition to the release of any such funds to Arch, Arch will assign its claims against the Marblehead Debtor arising from Arch's expenditure of $2.5 million for work performed in respect of the Marblehead project to the Lehman Parties (or their designee) and Arch agrees that distributions in respect of the assigned claims shall be paid to the holder thereof prior to any payment to Arch in respect of any other claims of Arch against the Marblehead Debtor.

- Marblehead Settlement Agreement:

  - On the Transfer Closing Date, the Marblehead Nominee will reimburse Arch for payments made by Arch to date under the Marblehead Settlement Agreement, and the Marblehead Nominee will also reimburse Arch for payments made by Arch pursuant to the Marblehead Settlement Agreement after the Transfer Closing Date.

  - Arch will consult with the Marblehead Nominee prior to retaining contractors to complete the work required under the Marblehead Settlement Agreement.

|  |  |
|---|---|
|  | ▪ Following the Transfer Closing Date, Arch shall be primarily responsible to engage and pay completion contractors to finish the remaining bonded improvements with respect to the Marblehead Project. After the occurrence of the Transfer Closing Date, the Marblehead Nominee will reimburse Arch for any valid payments made under the Marblehead Bonds for work performed after August 15, 2010.<br><br>● <u>Assignment of Claims</u>: On the Transfer Closing Date, Arch will assign to the Lehman Parties all rights it has to certain claims assigned to it by payment bond claimants for work performed on the Marblehead Project prior to the August 15, 2010 and indemnify and hold harmless the Lehman Parties and the Marblehead Nominee from any claims asserted by such claimants.<br><br>● <u>Deed of Trust</u>: On the Transfer Closing Date, the Marblehead Nominee will provide to Arch a first priority lien on the Marblehead Project as additional security for the Marblehead Nominee's reimbursement obligations under the Arch TD Settlement Agreement. The Marblehead Nominee can cause the lien to be released if it deposits an additional $10 million cash or an equivalent letter of credit into the Marblehead Escrow.<br><br>● <u>Recovery</u>: If the Marblehead Nominee fails to pay its reimbursement obligations under the Arch TD Settlement Agreement, then after the requisite notice period and other requirements set forth in the Arch TD Settlement Agreement, Arch shall be able to seek recovery of such obligations from the Marblehead Escrow or through foreclosing on the lien on the Marblehead Project, in addition to its rights against the Marblehead Nominee, provided that, Arch agrees to first seek recovery from the Marblehead Escrow before seeking recovery on the lien or pursuing any other rights of Arch. |
| **Agreements Specific to the Oak Valley Project:** | ● <u>OVC Bonds</u>: The OVC Bonds will remain in effect after the Transfer Closing Date and after the transfer of the Oak Valley Project to the Oak Valley Nominee.<br><br>● <u>Continued Obligations/Reimbursement</u>:<br>▪ If and to the extent a call is made on the OVC Bonds following the Transfer Closing Date, Arch will honor its obligations under the applicable OVC Bonds and will be primarily responsible to engage and pay completion contractors to finish bonded improvements with respect to the OVC Project. The Oak Valley Nominee will reimburse Arch for costs relating to such work and for any valid payments made under the OVC Bonds for work performed after August 15, 2010.<br><br>● <u>Assignment of Claims</u>: On the Transfer Closing Date, Arch will assign to the Lehman Parties all rights it has to certain claims assigned to it by payment bond claimants for work performed on the OVC Project prior to August 15, 2010 and will indemnify and hold harmless the Lehman Parties and the Oak Valley Nominee from any claims asserted by such claimants. |

| | |
|---|---|
| **Bond Premiums and Other Reimbursements:** | • On the Transfer Closing Date, the Lehman Parties will reimburse Arch the lesser of $350,000 or 1/2 of the current total aggregate unpaid bond premiums incurred under the Arch TD Bonds as of the Transfer Closing Date.<br><br>• Arch will waive any other payments and release any claims against the Marblehead Debtor or the Oak Valley Debtor in respect of unpaid bond premiums and will obtain a release of Rohm Agency's claims for its share of the premiums incurred prior to the Transfer Closing Date, or if a release from Rohm cannot be obtained, Arch will indemnify the Lehman Parties and Arch TD Nominees from any claims of Rohm against any such parties, and Arch will reimburse such parties for any disbursements made to Rohm under the Lehman TD Plan in respect of such claims. The Arch TD Nominees will make payments to Arch of all accruing bond premiums on Arch TD Bonds that remain outstanding after the Transfer Closing Date per a schedule attached to the Arch TD Settlement Agreement.<br><br>• On the Transfer Closing Date, the Lehman Parties shall reimburse Arch for actual attorneys' fees incurred by Arch with respect to the Adversary Proceeding in an aggregate amount not to exceed $750,000. |
| **Residual Rights/ Additional Claim Assignments:** | • On or prior to the Transfer Closing Date, Arch will obtain a full release or assignment of the residual rights held by claimants for whom Arch has previously received only a partial assignment of such claimants' rights and will assign such rights to the Lehman Parties on the Transfer Closing Date. In exchange, the Lehman Parties will reimburse Arch up to $1,100,000 for the actual amounts paid by Arch to the Residual Rights Claimants in obtaining such releases or assignments, and up to $100,000 for actual and reasonable legal fees incurred by Arch in connection therewith. |
| **Reliance Claim under Lehman TD Plan:** | • Arch will retain allowed Reliance Claims (as defined in the Lehman TD Plan) of $3 million in the aggregate with respect to certain third party claims against the Marblehead Debtor which were secured by Marblehead Bonds and acquired by Arch pursuant to settlements with such claimants and will release all other claims against Lehman TD Plan Debtors. Arch will cooperate with the Lehman Parties as to which bonded claims held by Arch remain in Arch's name (to constitute the $3 million allowed Reliance Claims). Any other bonded claims held by Arch against the Lehman TD Plan Debtors will be transferred and assigned to the Lehman Parties or their designees on the Transfer Closing Date. |
| **Conveyance of Properties to Third Parties:** | • If a project is transferred to a third person or entity that is not a Lehman Party or an Arch TD Nominee, then the applicable Arch TD Nominee will require that such third party furnish replacement bonds with respect to the project and obtain a full release and exoneration of the Arch TD Bonds, as applicable. Upon exoneration and release of such bonds, Arch shall release all collateral, including any cash, letters of credit or deeds of trust and any other security interests provided by the Arch TD Nominee to Arch. |
| **Releases:** | • On the Transfer Closing Date and to the extent not otherwise assigned to the Lehman Parties,<br><br>▪ Arch will release any claims against the TD Plan Debtors and/or the Lehman Parties with respect to the paid payment bond claims arising |

18

|  | from work performed prior to August 15, 2010 (except for the $3 million in designated Reliance Claims). |
|  | ▪ Arch will release all claims against all SunCal Involuntary Debtors. |
|  | ▪ Arch will dismiss, with prejudice, its complaint and its claims in the Adversary Proceeding against all defendants. |
|  | ▪ Arch will release all Lehman Parties and the Arch TD Nominees from all claims arising from the Arch TD Projects, the Arch TD Bonds, or the SunCal Involuntary Debtors other than any claims in connection with the Arch TD Settlement Agreement and any document executed in connection therewith. |
|  | ▪ Arch will dismiss all claims against the SunCal Voluntary Debtors for guaranty or indemnity liability arising from any of the Arch TD Bonds. |

25.    As set forth in the Arch Settlement Agreements, the economic costs to be incurred in connection with effectuating the Arch Settlement Agreements is subject to certain variables, including, without limitation, the extent and cost of the work to be performed by Arch on the Arch Projects, particularly the Marblehead Project. Pursuant to the Arch TD Settlement Agreement, the Lehman Parties anticipate that the Lehman Nominees, and to the extent applicable the Lehman Parties, will be responsible on the applicable Transfer Closing Date for reimbursing Arch for costs ranging from $5.4 million to $11.6 million for work performed by Arch in respect of the Marblehead Project, up to $1.1 million for amounts paid by Arch to residual rights claimants as a means of obtaining such claimants releases and approximately $1.1 million in reimbursement of other expenditures. In addition, a total of $5 million will be required to be funded into escrow prior to the Transfer Closing Date to secure the reimbursement obligations of the Lehman Nominee taking title to the Marblehead Project. Pursuant to the Arch VD Settlement Agreement, the Lehman Parties anticipate that the Lehman Nominees, and to the extent applicable the Lehman Parties, will be responsible on the applicable Transfer Closing Date for reimbursing Arch for costs up to $1.1 million for work being performed in connection

19

with the Ritter Ranch Project.  In addition, a total amount of $1.5 million will need to be funded

into escrow prior to the Transfer Closing Date to secure the reimbursement obligations of the

Lehman Nominee taking title to the Ritter Ranch Project.

### The Relief Requested Should be Approved Pursuant to Rule 9019 and Section 363 of the Bankruptcy Code

26.      Bankruptcy Rule 9019 provides, in part, that "[o]n motion by the [debtor

in possession] and after notice and a hearing, the court may approve a compromise or

settlement."  FED. R. BANKR. P. 9019(a).  Bankruptcy Rule 9019 empowers bankruptcy courts to

approve settlements "if they are in the best interests of the estate."  *Vaughn v. Drexel Burnham

Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr.

S.D.N.Y. 1991); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

Anderson*, 390 U.S. 414, 424 (1968); *Fisher v. Pereira (In re 47-49 Charles St., Inc.)*, 209 B.R.

618, 620 (S.D.N.Y. 1997); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993),

*aff'd*, 17 F.3d 600 (2d Cir. 1994).  A decision to accept or reject a compromise or settlement is

within the sound discretion of the Court.  *Drexel Burnham Lambert Group*, 134 B.R. at 505.

Additionally, a court may exercise its discretion "in light of the general public policy favoring

settlements."  *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).  The

settlement need not result in the best possible outcome for the debtor, but must not "fall beneath

the lowest point in the range of reasonableness."  *Drexel Burnham Lambert Group*, 134 B.R. at

505; *see also Cosoff v. Rodman* (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983); *In re

Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).

27.      The court may give weight to the "informed judgments of the . . .  debtor-

in-possession and their counsel that a compromise is fair and equitable, and consider the

competency and experience of counsel who support the compromise."  *Drexel Burnham Lambert*

*Group*, 134 B.R. at 505 (internal citations omitted); *see also In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522-23 (S.D.N.Y. 1993); *accord In re Ashford Hotels, Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate that I substitute my judgment for the Trustee's, but only that I test his choice for reasonableness. . . . If the Trustee chooses one of two reasonable choices, I must approve that choice, even if, all things being equal, I would have selected the other.") (internal citations omitted).

28.    Significantly, there is no requirement that "the value of the compromise … be dollar-for-dollar the equivalent of the claim." *Ionosphere Clubs, Inc.*, 156 B.R. at 427. Instead, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* at 427-28 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2nd Cir. 1974)).

29.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale, disposition, or other use of a debtor's assets, courts in the Second Circuit, in applying this section, have required that it be based upon the sound business judgment of the debtor. *See In re Chateaugay Corp.*, 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same). In addition, section 105 of the Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a).

21

30.    It is generally understood that "[when] the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is a strong presumption that "'the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment. *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

31.    The Arch Settlement Agreements satisfy the legal standard established under Bankruptcy Rule 9019 and are in the best interests of the Debtors' estates.  Further, pursuant to section 363 of the Bankruptcy Code, entering into the Arch Settlement Agreements is an appropriate exercise of the Debtors' business judgment and should be approved. The terms of the Arch Settlement Agreements are the product of a good-faith, arms' length negotiation process between Arch and the Debtors and other Lehman Parties.  The parties to the Arch Settlement Agreements were each represented by counsel and have participated in numerous meetings and discussions.  The parties have negotiated the terms of the Arch Settlement Agreements over the course of many months, and as a result of this successful negotiation process, the parties have arrived at the agreed set of terms described herein that provide mutually acceptable benefits and burdens to all concerned.  This Court has already authorized the Debtors to enter into, and perform the obligations under, the Lehman-SunCal Plans (which SunCal Plans specifically contemplated entry into settlement agreements with the Bond Issuers).

22

32.      The Lehman-SunCal Plans are intended to account for the Lehman

Creditors' awareness that the SunCal Debtors have (and will have) no ability to pay, in the

foreseeable future, the full amount of the debt owed to the Lehman Creditors and, thus, reflect

the Lehman Creditors desire of immediate ownership of their collateral.  The Debtors believe

that entering into the Arch Settlement Agreements will enable the Lehman Creditors to confirm

the Lehman-SunCal Plans without Arch's claims increasing the estimated claims and

distributions to be made by the Lehman Creditors under the Lehman-SunCal Plans beyond the

caps and thresholds provided for in the Lehman-SunCal Plans and without having to incur

significant expense and risk in litigating Arch's claims.  Further, absent a settlement with Arch

the likely increase in the estimated aggregate unsecured claim amounts created by the addition of

Arch's claims would reduce distributions to other creditors if certain thresholds are exceeded.

Thus, entry into the Arch Settlement Agreements will relieve a potential obstacle to confirmation

and effectiveness of the Lehman-SunCal Plans.

33.      The Lehman Creditors are cognizant of their litigation exposure with

respect to Arch's claims against the SunCal Debtors and the uncertainty attendant in litigating

said claims.  In addition to the Lehman Creditors' uncertain prospects of success in litigating

Arch's claims against the SunCal Debtors, such litigation will likely be prolonged and costly.

The Arch Settlement Agreements and the settlements embodied therein resolve the risk of

entering into costly and prolonged litigation where the outcome is uncertain.  After analyzing

various alternatives, the Lehman Creditors have determined that entering into the Arch

Settlement Agreements will provide the best framework for resolving disputes with Arch.

34.      The cost of entering into the Arch Settlement Agreements, namely the

agreement by the Lehman Parties to reimburse certain expenditures Arch incurs in connection

with certain Project Bond claims, is outweighed by the benefits of obtaining a resolution of

Arch's claims against the SunCal Debtors (subject to specific exceptions as described above) that

results in Arch waiving, releasing and/or assigning certain claims and/or rights it has against the

SunCal Debtors and the bond indemnitors who provided indemnities to Arch in respect of the

Project Bonds issued by Arch.

35.    For the reasons set forth above, granting authority for the Debtors, as

applicable, to enter into and undertake their obligations under the Arch Settlement Agreements

is in the best interests of the Debtors' estates, is a proper exercise of the Debtors' business

judgment, and should be approved.

## Reservation of Rights

36.    Nothing contained in the Arch Settlement Agreements or in this Motion

shall be deemed to be a waiver or the relinquishment of any rights, claims, interests, obligations,

benefits or remedies of LBHI, LCPI or any other Lehman Creditor, that such entity may have or

choose to assert on behalf of itself or its respective estate, as applicable, under any provision of

the Bankruptcy Code or any applicable nonbankruptcy law, including against each other or third

parties.

37.    Further, as among the Debtors and non-Debtor affiliates, all pre- and post-

petition rights, claims and defenses, including, but not limited to those associated with the costs

and benefits of the Arch Settlement Agreements and this Motion, are preserved.

## Notice

38.    No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Motion in accordance with the procedures set forth in accordance with

the procedures set forth in the second amended order entered on June 17, 2010 governing case

management and administrative procedures for these cases, ECF No. 9635, on (i) the U.S.

24

Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange

Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern

District of New York; (vi) counsel to the Arch; and (vii) all parties who have requested notice in

these chapter 11 cases.  No other or further notice need be provided.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as is just.

Dated: September 28, 2011
        Houston, Texas

/s/ Alfredo R. Pérez
Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for Debtors
and Debtors in Possession

# Exhibit A

# SETTLEMENT AGREEMENT

This Settlement Agreement (this "<u>AGREEMENT</u>"), dated as of September 27, 2011 (the "<u>EXECUTION DATE</u>"), is made by and among Lehman Brothers Holdings, Inc. ("<u>LBHI</u>"), a Delaware corporation, Lehman ALI, Inc., a Delaware corporation ("<u>ALI</u>"), Lehman Commercial Paper Inc., a New York corporation ("<u>LCPI</u>"), on the one hand and collectively referred to as the "<u>LEHMAN PARTIES</u>", and Arch Insurance Company, a Missouri corporation ("<u>ARCH</u>") on the other hand (the LEHMAN PARTIES, ARCH and, upon the execution and delivery of an amendment or joinder to this AGREEMENT as described below, the LB NOMINEES, may be referred to collectively as the "<u>PARTIES</u>").

All initially capitalized terms used herein shall have the respective meanings ascribed to such terms in this Agreement or, where indicated, in the JOINT PLAN.

The PARTIES anticipate that affiliates of the LEHMAN PARTIES which have not yet been formed will be added to this AGREEMENT by amendment or joinder on or prior to the TRANSFER CLOSING DATE. The affiliate taking title to the RITTER RANCH PROJECT is referred to herein as the "<u>LEHMAN RITTER RANCH NOMINEE</u>" and the affiliate taking title to the TESORO BURNHAM PROJECT is referred to herein as the "<u>LEHMAN TESORO BURNHAM NOMINEE</u>" and collectively as the "<u>LB NOMINEES</u>" and each as an "<u>LB NOMINEE</u>".

# RECITALS

WHEREAS, ARCH has issued certain surety bonds (including subdivision, payment, performance and other bonds) with respect to the development of (a) the real estate development project comprised of, in part, certain real property consisting of approximately 10,625 acres located in the City of Palmdale, California and owned, as of the EXECUTION DATE, by the RITTER RANCH DEBTOR (the "<u>RITTER RANCH PROJECT</u>"), which are outstanding as of the EXECUTION DATE in the aggregate outstanding penal sum of $12,796,467, for the benefit of Palmdale Hills Property, LLC, a Delaware limited liability company (the "<u>RITTER RANCH DEBTOR</u>"), as more particularly described in <u>Exhibit A</u> attached hereto and made a part hereof (collectively, the "<u>RITTER RANCH BONDS</u>") and (b) the real estate development project comprised, in part, of certain real property consisting of approximately 185 acres located in the City of Santa Clarita, California and owned, as of the EXECUTION DATE, by the TESORO BURNHAM DEBTOR (the "<u>TESORO BURNHAM PROJECT</u>" and together with the RITTER RANCH PROJECT, collectively, the "<u>PROJECTS</u>" and each a "<u>PROJECT</u>"), which are outstanding as of the EXECUTION DATE in the aggregate outstanding penal sum of $536,000, for the benefit of Tesoro SF, LLC, a Delaware limited liability company (the "<u>TESORO BURNHAM DEBTOR</u>"), as more particularly described in <u>Exhibit A</u> attached hereto and made a part hereof (collectively, the "<u>TESORO BURNHAM BONDS</u>" and together with the RITTER RANCH BONDS, the "<u>BONDS</u>");

WHEREAS, LCPI made certain loans to the RITTER RANCH DEBTOR in the original aggregate maximum principal amount of $264,000,000 (collectively, the "<u>RITTER RANCH</u>

LOAN"), which RITTER RANCH LOAN is secured by, among other things, a first priority deed of trust encumbering the RITTER RANCH PROJECT;

WHEREAS, ALI made a loan to SCC Acquisitions, LLC (the "INTERIM LOAN BORROWER") in the original maximum principal amount of $20,000,000 (the "INTERIM LOAN"), which INTERIM LOAN is guaranteed by the TESORO BURNHAM DEBTOR, as a wholly-owned subsidiary of the INTERIM LOAN BORROWER, and secured by, among other things, a first priority deed of trust encumbering the TESORO BURNHAM PROJECT;

WHEREAS, as a result of various repurchase transactions entered into prior to the commencement of the LEHMAN CASES, LBHI and/or LCPI may hold interests in the RITTER RANCH LOAN and/or the INTERIM LOAN;

WHEREAS, on September 15, 2008 and on various dates thereafter, LBHI, LCPI and certain of their subsidiaries commenced voluntary cases (collectively, the "LEHMAN CASES") under the Bankruptcy Code, which LEHMAN CASES have been consolidated for procedural purposes only and are being jointly administered under Case Number 08-13555 and are pending in the United States Bankruptcy Court for the Southern District of New York ("NY BANKRUPTCY COURT");

WHEREAS, in November 2008, (i) the RITTER RANCH DEBTOR, the TESORO BURNHAM DEBTOR and certain affiliates of the RITTER RANCH DEBTOR and the TESORO BURNHAM DEBTOR more particularly identified as "VOLUNTARY DEBTORS" on Exhibit B attached hereto and made a part hereof (collectively the "VOLUNTARY DEBTORS"), filed voluntary cases (the "VOLUNTARY DEBTOR CASES") under the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California (the "CALIFORNIA BANKRUPTCY COURT") and (ii) various creditors filed involuntary cases under the Bankruptcy Code (the "TRUSTEE DEBTOR CASES"; and together with the VOLUNTARY DEBTOR CASES, the "SUNCAL CASES") in the CALIFORNIA BANKRUPTCY COURT against certain other affiliates of the RITTER RANCH DEBTOR and the TESORO BURNHAM DEBTOR more particularly identified as "TRUSTEE DEBTORS" on Exhibit B attached hereto and made a part hereof (collectively, the "TRUSTEE DEBTORS" and, together with the VOLUNTARY DEBTORS, the "SUNCAL DEBTORS"), all of which SUNCAL CASES are being jointly administered under Case Number 8:08-bk-17206-ES;

WHEREAS, on or about March 18, 2009 and April 15, 2009, ARCH filed various proofs of claim against certain of the SUNCAL DEBTORS as more particularly described on Exhibit C attached hereto and made a part hereof (collectively, the "ARCH PROOFS OF CLAIM");

WHEREAS, the City of Palmdale made demand upon and filed a lawsuit against ARCH seeking the performance of certain work and other obligations which the RITTER RANCH DEBTOR failed to perform under various subdivision improvement agreements, development agreements and other agreements with the City of Palmdale, and on or about February 10, 2010, ARCH and the City of Palmdale resolved certain disputes between them by entering into a Settlement and Mutual Release Agreement with respect to the RITTER RANCH PROJECT and certain RITTER RANCH BONDS, a true and correct copy of which is attached hereto as Exhibit

D (as amended, restated, supplemented or otherwise modified to the extent permitted hereunder and including all exhibits, schedules and annexes thereto, the "ELR SETTLEMENT AGREEMENT");

WHEREAS, ARCH is an intervening plaintiff in the equitable subordination adversary proceeding styled *Palmdale Hills Property, LLC vs. Lehman ALI, Inc.*, Case Number 8:09-ap-01005 pending in the CALIFORNIA BANKRUPTCY COURT (the "ADVERSARY PROCEEDING"), in which ARCH alleges, among other things, that the claims of the LEHMAN PARTIES in the SUNCAL CASES should be subordinated to ARCH's claims in the SUNCAL CASES as evidenced in the ARCH PROOFS OF CLAIM;

WHEREAS, on August 23, 2011, LCPI and ALI (collectively the "PLAN PROPONENTS") filed that certain Third Amended Joint Chapter 11 Plan for Eleven Voluntary Debtors with respect to all of the VOLUNTARY DEBTORS except SCC/Palmdale, LLC, SunCal Emerald Meadows, LLC, SJD Partners, Ltd., SJD Development Corp., SunCal Communities III, LLC and North Orange Del Rio Land, LLC (collectively, the "PLAN DEBTORS") in the applicable VOLUNTARY DEBTOR CASES (as modified, amended, supplemented or superseded from time to time, the "JOINT PLAN"), which JOINT PLAN sets forth, among other things, a settlement proposal to unsecured creditors of the PLAN DEBTORS, and a proposal for the reorganization of the PLAN DEBTORS, and their respective assets and liabilities;

WHEREAS, among other things, the JOINT PLAN provides for the transfer and conveyance of each of the PROJECTS, as well as the other Plan Projects (as such term is defined in the JOINT PLAN), to one or more Lehman Nominees (as such term is defined in the JOINT PLAN) designated by the Lehman Lenders (as such term is defined in the JOINT PLAN), or any of them, to take title to the applicable Plan Project(s) and/or any other assets of the applicable PLAN DEBTOR(S) on the Effective Date (as such term is defined in the JOINT PLAN) or, if later than the Effective Date, the subsequent date on which title to the PROJECTS is transferred pursuant to the JOINT PLAN to the LB NOMINEES (the "TRANSFER CLOSING DATE");

WHEREAS, the JOINT PLAN also provides for distributions to be made to the creditors of the PLAN DEBTORS as provided in the JOINT PLAN; and

WHEREAS, the LEHMAN PARTIES (certain of which are PLAN PROPONENTS and/or creditors of the PLAN DEBTORS) and ARCH have negotiated a settlement and resolution of all of ARCH's claims against the PLAN DEBTORS (as reflected in the ARCH PROOFS OF CLAIM) that, upon the confirmation and effectiveness of the JOINT PLAN, would result in ARCH accepting less favorable treatment under the JOINT PLAN than other creditors of the PLAN DEBTORS holding allowed claims in the same class(es) as ARCH's claims, all in consideration of the promises, covenants, agreements and undertakings more particularly set forth in this AGREEMENT.

NOW therefore, the PARTIES agree as follows:

1.      *Intentionally Omitted*

2.      *General Purpose of Agreement*

The purpose of this agreement is for ARCH, as surety for and creditor of the RITTER RANCH DEBTOR and the TESORO BURNHAM DEBTOR, and party to settlement agreements with bond claimants pertaining to the PROJECTS, and the LEHMAN PARTIES, as secured creditors of the RITTER RANCH DEBTOR and TESORO BURNHAM DEBTOR who propose to take title to the PROJECTS through the JOINT PLAN to reach agreement as to their respective past and future obligations pertaining to the BONDS issued by ARCH on the PROJECTS.

3.      *Agreements pertaining to Ritter Ranch Project*

      a.  ARCH agrees that its RITTER RANCH BONDS will remain in effect after the TRANSFER CLOSING DATE and after transfer of the RITTER RANCH PROJECT to the LEHMAN RITTER RANCH NOMINEE, and ARCH will continue to perform its obligations to the City of Palmdale pursuant to the ELR SETTLEMENT AGREEMENT.

      b.  If requested by the LEHMAN PARTIES or the LEHMAN RITTER RANCH NOMINEE, ARCH will cooperate with the LEHMAN PARTIES and the LEHMAN RITTER RANCH NOMINEE to seek permission from the City of Palmdale for the LEHMAN RITTER RANCH NOMINEE to assume the necessary entitlements and development agreements to continue development of the RITTER RANCH PROJECT, and to seek permission from the City of Palmdale to substitute the LEHMAN RITTER RANCH NOMINEE as the bond principal on the existing RITTER RANCH BONDS.  Further, at the request of the LEHMAN PARTIES or the LEHMAN RITTER RANCH NOMINEE, ARCH will assist them in negotiating with the City of Palmdale and/or other public bodies regarding the scope of improvements to comply with the requirements of the RITTER RANCH PROJECT or the modification of the existing requirements.  LEHMAN RITTER RANCH NOMINEE agrees to bear any actual and reasonable out-of-pocket expenses incurred by ARCH in providing this cooperation provided that such expenses have been pre-approved by the LEHMAN RITTER RANCH NOMINEE.

      c.  If the JOINT PLAN is confirmed as to the RITTER RANCH DEBTOR, then within ten (10) days following the later of (i) entry of the LEHMAN COURT APPROVAL, and (ii) entry of an order by the CALIFORNIA BANKRUPTCY COURT confirming the JOINT PLAN, the LEHMAN PARTIES shall deposit the sum of $1.5MM into an interest-bearing escrow account to be held by a mutually acceptable escrow agent (the "RITTER RANCH ESCROW AGENT") at a mutually acceptable financial institution and pursuant to a mutually acceptable escrow arrangement (the "RITTER RANCH ESCROW") to be held in escrow pending the occurrence of the TRANSFER CLOSING DATE.  If the TRANSFER CLOSING DATE does not occur on or prior to September 30, 2012 and this AGREEMENT is terminated as a result as provided in

Section 10 hereof, then upon termination of this AGREEMENT, the PARTIES shall direct the RITTER RANCH ESCROW AGENT to immediately release all funds in the RITTER RANCH ESCROW to the LEHMAN PARTIES. The foregoing obligations of the PARTIES to direct the disbursement of the funds in the RITTER RANCH ESCROW as provided above following the termination of this AGREEMENT shall survive the termination of this AGREEMENT.

d. Provided that the TRANSFER CLOSING DATE has occurred, the LEHMAN RITTER RANCH NOMINEE will reimburse ARCH in an aggregate amount (the "ELR PAYMENT CAP AMOUNT") equal to the lesser of (a) $1,100,000, and (b) the actual amounts paid by ARCH in respect of the work ("ELR WORK") committed to be performed by ARCH under the ELR SETTLEMENT AGREEMENT. Any and all claims that ARCH may have against the RITTER RANCH DEBTOR or any other SUNCAL DEBTOR arising from any costs, expenses or other losses incurred by ARCH in respect of the ELR WORK in excess of the ELR PAYMENT CAP AMOUNT shall be waived by ARCH. On the TRANSFER CLOSING DATE, the LEHMAN RITTER RANCH NOMINEE shall reimburse ARCH for amounts actually paid by ARCH through the TRANSFER CLOSING DATE in respect of the ELR WORK (up to the ELR PAYMENT CAP AMOUNT). ARCH will provide reasonable documentation of its actual payments in respect of the ELR WORK as a pre-requisite to any payment to ARCH, including conditional releases of contract and lien rights from the completion contractors to the extent of such payments. Upon the LEHMAN RITTER RANCH NOMINEE's taking title to the RITTER RANCH PROJECT, ARCH will consult with the LEHMAN RITTER RANCH NOMINEE prior to engaging any other contractors or vendors required to complete the ELR WORK pursuant to the ELR SETTLEMENT AGREEMENT and the LEHMAN RITTER RANCH NOMINEE will have the right to reasonably approve any contracts to be entered into by ARCH for the performance of such work. ARCH shall continue to make direct payments to the completion contractors for progress payment invoices submitted by the completion contractors within the time that a progress payment is due under the completion contract and the LEHMAN RITTER RANCH NOMINEE will reimburse ARCH (up to the ELR PAYMENT CAP AMOUNT) for such progress payments as provided herein. In that event, ARCH and the LEHMAN RITTER RANCH NOMINEE will cooperate reasonably to verify the accuracy of the completion contractor's invoice. The PARTIES acknowledge that change orders occur frequently in complex construction projects. ARCH agrees that it will not agree to any requested change orders by the bond obligee City of Palmdale or its completion contractors in excess of $10,000 without written notice to, consultation with and consent from the LEHMAN RITTER RANCH NOMINEE or any entity designated by the LEHMAN PARTIES to monitor the construction. The LEHMAN RITTER RANCH NOMINEE agrees that it will not unreasonably withhold consent to any change orders necessary for ARCH to fulfill its ELR SETTLEMENT AGREEMENT obligations to the bond obligee City of Palmdale. The LEHMAN RITTER RANCH NOMINEE shall have the right to monitor the construction (or designate someone to do so on its behalf) and supervise, review and approve all work performed by contractors, approve any payments to be made to such contractors and

to obtain lien waivers, releases and other such documentation as a condition to payment to such contractors as required or prescribed under the applicable construction documents.

e.  The LEHMAN RITTER RANCH NOMINEE will consent to the release of the ELR BONDS upon completion of the ELR WORK as provided in the ELR SETTLEMENT AGREEMENT.  Any amendments or modifications to the ELR SETTLEMENT AGREEMENT shall be subject to the LEHMAN RITTER RANCH NOMINEE'S consent and approval.  If ARCH completes the ELR WORK in accordance with the terms of the ELR SETTLEMENT AGREEMENT and otherwise satisfies all other conditions and requirements in the ELR SETTLEMENT AGREEMENT to the release of the RITTER RANCH BONDS that the City of Palmdale has agreed to release pursuant to the terms of the ELR SETTLEMENT AGREEMENT (the "ELR BONDS"), and notwithstanding the foregoing, the City of Palmdale refuses or otherwise fails to release all of the ELR BONDS, and specifically those ELR BONDS securing the performance of work that the City of Palmdale has agreed under the ELR SETTLEMENT AGREEMENT does not need to be performed by ARCH (the "WAIVED WORK"), then the LEHMAN RITTER RANCH NOMINEE will agree to reasonably cooperate with ARCH in ARCH's efforts to convince or persuade the City of Palmdale to comply with its obligations to ARCH under the ELR SETTLEMENT AGREEMENT and release all of the ELR BONDS; provided, however, that the LEHMAN RITTER RANCH NOMINEE shall have no obligation to (i) file or pursue any claim, action, lawsuit or proceeding against the City of Palmdale, or join in any such claim, action, lawsuit or proceeding that may be filed or pursued by ARCH, (ii) replace, substitute or exonerate the ELR BONDS; or (iii) take any action that requires the expenditure of funds or the incurrence of any obligation or liability on the part of the LEHMAN RITTER RANCH NOMINEE; provided, further, that the foregoing shall not impair any right that ARCH may have to reimbursement for payments actually made by ARCH in performing any WAIVED WORK that constitutes work performed after the TRANSFER CLOSING DATE in accordance with Section 3.g. below.

f.  Upon taking title to the RITTER RANCH PROJECT, the LEHMAN RITTER RANCH NOMINEE shall be responsible for negotiating the terms for development of the RITTER RANCH PROJECT with the City of Palmdale and for providing any bonds required by the City of Palmdale to secure development of the RITTER RANCH PROJECT, provided that the LEHMAN RITTER RANCH NOMINEE shall have absolutely no liability or obligation to ARCH and there shall be no effect on the obligations of the LEHMAN RITTER RANCH NOMINEE or ARCH under this AGREEMENT if the LEHMAN RITTER RANCH NOMINEE fails to provide any such bonds that may be required by the City of Palmdale.

g.  Following the occurrence of the TRANSFER CLOSING DATE, ARCH will have primary responsibility to engage and to pay completion contractors to finish the remaining bonded improvements with respect to the RITTER RANCH PROJECT but the LEHMAN RITTER RANCH NOMINEE may, at its option, elect to enter into any such completion contract.  Except with respect to the ELR WORK which shall be

reimbursed as provided in Section 3.d. above, if the City of Palmdale or any other obligee under the RITTER RANCH BONDS makes a demand upon the RITTER RANCH BONDS to perform bonded works of improvement and the City of Palmdale or other obligee and LEHMAN RITTER RANCH NOMINEE do not reach agreement as to performance of that work, ARCH will perform its obligations under the RITTER RANCH BONDS and the LEHMAN RITTER RANCH NOMINEE will reimburse ARCH for the costs of any such work.  The LEHMAN RITTER RANCH NOMINEE will also reimburse ARCH for any valid payment bond claims made under RITTER RANCH BONDS which are payment bonds for work performed after the TRANSFER CLOSING DATE.  The reimbursement obligations of the LEHMAN RITTER RANCH NOMINEE described in Section 3.d. above and this Section 3.g. are referred to herein as such LEHMAN RITTER RANCH NOMINEE's "REIMBURSEMENT OBLIGATIONS."

h.  ARCH represents that it has made payments to certain payment bond claimants for work performed on the RITTER RANCH PROJECT prior to the TRANSFER CLOSING DATE for which ARCH has obtained a full release and assignment of the claimant's rights as listed in Exhibit E attached hereto and made a part hereof.  On the TRANSFER CLOSING DATE, ARCH will assign all rights ARCH has to the payment bond claims, including any rights obtained  from those claimants, to the LEHMAN PARTIES (or their designees), including any rights to a bankruptcy claim or proof of claim associated with the payment bond claims.  ARCH does not warrant that the assigned claims are valid, but does warrant that it owns the claims (including all settled claims identified on Exhibit E, in full, free and clear of any and all rights, interests or claims of any other person.  ARCH will indemnify and hold the LEHMAN PARTIES and the LEHMAN RITTER RANCH NOMINEE harmless from any further claims by payment bond claimants pertaining to work performed prior to the TRANSFER CLOSING DATE and reimburse the LEHMAN PARTIES for any payments or distributions made by the LEHMAN PARTIES to any such claimants under the JOINT PLAN.

i.  On the TRANSFER CLOSING DATE, the LEHMAN RITTER RANCH NOMINEE shall provide to ARCH a first priority lien on the RITTER RANCH PROJECT (the "RITTER RANCH DOT") as additional collateral for and to further secure the LEHMAN RITTER RANCH NOMINEE'S REIMBURSEMENT OBLIGATIONS.

j.  In the event that the LEHMAN RITTER RANCH NOMINEE fails to pay its REIMBURSEMENT OBLIGATIONS as provided in this AGREEMENT within fifteen (15) business days following its receipt of written notice from ARCH demanding payment of such REIMBURSEMENT OBLIGATIONS, together with documentation evidencing ARCH's actual payments to completion contractors giving rise to such REIMBURSEMENT OBLIGATIONS as well as conditional releases of contract and lien waivers from such completion contractors with respect to any payments made to them and with respect to which ARCH is seeking reimbursement from the LEHMAN RITTER RANCH NOMINEE.  ARCH can seek recovery of such REIMBURSEMENT OBLIGATIONS from the collateral provided  by the LEHMAN

RITTER RANCH NOMINEE (i.e., the RITTER RANCH ESCROW and the RITTER RANCH DOT) in addition to pursuing ARCH's rights and remedies directly against the LEHMAN RITTER RANCH NOMINEE for any breach of this AGREEMENT. Notwithstanding the foregoing or anything to the contrary contained herein, ARCH agrees to first seek recovery from the funds available in the RITTER RANCH ESCROW before seeking recovery under the RITTER RANCH DOT or pursuing any other rights or remedies for any breach of this AGREEMENT. The RITTER RANCH ESCROW and RITTER RANCH DOT shall be the only collateral required by ARCH for maintaining the RITTER RANCH BONDS and shall be the only security for the LEHMAN RITTER RANCH NOMINEE'S REIMBURSEMENT OBLIGATIONS.

k. The LEHMAN RITTER RANCH NOMINEE shall have the right, at any time and in its sole discretion, to cause ARCH to release the RITTER RANCH DOT provided that, in connection with any such release the LEHMAN RITTER RANCH NOMINEE deposits with the RITTER RANCH ESCROW AGENT cash or a letter of credit from a banking institution reasonably acceptable to ARCH in the amount of $2MM which shall be added to, held as part of and otherwise disbursed in the same manner as other funds held in the RITTER RANCH ESCROW. Upon delivery of the $2MM cash or letter of credit to the RITTER RANCH ESCROW AGENT, ARCH will release the RITTER RANCH DOT and any other security interests granted to ARCH pursuant thereto.

l. Upon the release, substitution, replacement or exoneration of the RITTER RANCH BONDS, ARCH shall release all collateral for the RITTER RANCH NOMINEE's REIMBURSEMENT OBLIGATIONS, including, without limitation, all funds and/or letters of credit in the RITTER RANCH ESCROW, the RITTER RANCH DOT and any other security interests granted to ARCH.

4.     *Agreements Pertaining to Tesoro Burnham Project*

a. ARCH agrees that its TESORO BURNHAM BONDS will remain in effect after the TRANSFER CLOSING DATE and after transfer of the TESORO BURNHAM PROJECT to the LEHMAN TESORO BURNHAM NOMINEE.

b. If requested by the LEHMAN PARTIES, ARCH will cooperate with the LEHMAN PARTIES and the LEHMAN TESORO BURNHAM NOMINEE to seek permission from the City of Santa Clarita for the LEHMAN TESORO BURNHAM NOMINEE to assume the necessary entitlements and development agreements to continue development of the TESORO BURNHAM PROJECT, and to seek permission from the City of Santa Clarita to substitute the LEHMAN TESORO BURNHAM NOMINEE as the bond principal on the existing TESORO BURNHAM BONDS. Further, at the request of the LEHMAN PARTIES or the LEHMAN TESORO BURNHAM NOMINEE, ARCH will assist them in negotiating with the City of Santa Clarita and/or other public bodies regarding the scope of improvements to

comply with the requirements of the TESORO BURNHAM PROJECT or the modification of the existing requirements   LEHMAN TESORO BURNHAM NOMINEE agrees to bear any actual and reasonable out-of-pocket expenses incurred by ARCH in providing this cooperation provided that such expenses have been pre-approved     by the LEHMAN TESORO BURNHAM NOMINEE.

c.   If and to the extent that a call is made on the TESORO BURNHAM BONDS following the TRANSFER CLOSING DATE, ARCH will honor its obligations under the applicable TESORO BURNHAM BONDS  and will have primary responsibility to engage and to pay completion contractors to finish the remaining bonded improvements with respect to the TESORO BURNHAM PROJECT but the LEHMAN TESORO BURNHAM NOMINEE may, at its option, elect to enter into any such completion contract.  If the City of Santa Clarita or any other obligee under the TESORO BURNHAM BONDS makes a demand upon the TESORO BURNHAM BONDS to perform bonded works of improvement and the City of Santa Clarita or other obligee and LEHMAN TESORO BURNHAM NOMINEE do not reach agreement as to performance of that work, ARCH will perform its obligations under the TESORO BURNHAM BONDS and the LEHMAN TESORO BURNHAM NOMINEE will reimburse ARCH for the costs of any such work. The LEHMAN TESORO BURNHAM NOMINEE will also reimburse ARCH for any valid payment bond claims made under TESORO BURNHAM BONDS  which are payment bonds for work performed after the TRANSFER CLOSING DATE.   The reimbursement obligations of the LEHMAN TESORO BURNHAM NOMINEE described in this clause c. are referred to herein    as    such    LEHMAN    TESORO    BURNHAM    NOMINEE's "REIMBURSEMENT OBLIGATIONS."

d.   ARCH will indemnify and hold the LEHMAN PARTIES and the LEHMAN TESORO BURNHAM NOMINEE harmless from any claims by payment bond claimants as to work performed on the TESORO BURNHAM PROJECT prior to the TRANSFER CLOSING DATE and reimburse the LEHMAN PARTIES for any payments or distributions made by the LEHMAN PARTIES to any such claimants under the JOINT PLAN.

5.   _Agreements Pertaining to Both Projects_

a.   On the TRANSFER CLOSING DATE, ARCH will waive any payments and release any claims it may have against the RITTER RANCH DEBTOR and TESORO BURNHAM DEBTOR in respect of all unpaid bond premiums incurred under the BONDS as of the TRANSFER CLOSING DATE and will obtain a release of the Rohm Agency's claims for its share of the premiums (as to the BONDS only) incurred prior to the TRANSFER CLOSING DATE as a condition of this reimbursement; provided, that if ARCH is unable to obtain such release from the Rohm Agency, ARCH hereby agrees to

indemnify and hold the LEHMAN PARTIES harmless from any and all claims of the Rohm Agency in respect of any such premiums and reimburse the LEHMAN PARTIES for any disbursements made by the LEHMAN PARTIES under the JOINT PLAN to the Rohm Agency (or any assignee thereof) in respect of such claims.  ARCH hereby represents and warrants that there are no amounts in respect of any bond premiums owing to any brokers or other persons other than Rohm Agency.  The LB NOMINEES shall make payment to ARCH of all accruing bond premiums on BONDS that remain outstanding after the TRANSFER CLOSING DATE in the amounts specified in Exhibit F attached hereto and made a part hereof until the applicable BONDS are released, substituted, replaced or exonerated. All such annual premiums shall be calculated on a pro rata basis from the TRANSFER CLOSING DATE.

b.  ARCH represents that the chart attached hereto as Exhibit E identifies all claims made under any payment BONDS, the status of ARCH's resolution of such claims and, if settled, the amounts paid by ARCH in settling such claims, the date of payment, the extent to which ARCH has taken an assignment of the corresponding claims against the RITTER RANCH DEBTOR and/or TESORO BURNHAM DEBTOR and the extent to which the claimants are RESIDUAL RIGHTS CLAIMANTS.  ARCH further represents that it has made payments to certain payment bond claimants who contend that they have additional, valid non-bonded claims and for which ARCH has received only a partial assignment of the claimant's rights (the "RESIDUAL RIGHTS CLAIMANTS"). All such RESIDUAL RIGHTS CLAIMANTS are listed on Exhibit E attached hereto and made a part hereof.  On or prior to the TRANSFER CLOSING DATE, ARCH will obtain a full release or assignment of all such residual rights from each of the RESIDUAL RIGHTS CLAIMANTS.  ARCH will provide the LEHMAN PARTIES with copies of all such releases or assignments and evidence reasonably acceptable to the LEHMAN PARTIES that, on the TRANSFER CLOSING DATE, ARCH is the owner and holder of 100% of the bonded claims held by the RESIDUAL RIGHTS CLAIMANTS, free and clear of such RESIDUAL RIGHTS CLAIMANTS' rights.  On the TRANSFER CLOSING DATE, ARCH will assign all such rights to the LEHMAN PARTIES (or their designees) (to the extent such rights have not otherwise been released) without any reimbursement to ARCH of any amounts paid by ARCH to the RESIDUAL RIGHTS CLAIMANTS in obtaining such releases or assignments.

c.  All bonded claims held or otherwise acquired by ARCH from bond claimants who also have claims against any of the PLAN DEBTORS will be transferred and assigned to the LEHMAN PARTIES (or their designees) on the TRANSFER CLOSING DATE.

6.      *Assignments*

      a.  ARCH shall sell, assign and convey to the LEHMAN PARTIES on the TRANSFER CLOSING DATE, all of ARCH's right, title and interest to the ARCH-owned payment bond claims referenced in <u>Exhibit E</u>, free and clear of any right, claim, lien or interest of the bond claimants or any other person provided that all amounts that are due and payable under this AGREEMENT by the LEHMAN PARTIES to ARCH on the TRANSFER CLOSING DATE are paid to ARCH.

      b.  ARCH shall sell, assign and convey to the LEHMAN PARTIES on the TRANSFER CLOSING DATE, all of its right, title and interest to the ARCH-owned payment bond Residual Rights claims referenced in <u>Exhibit E</u>, free and clear of any right, claim, lien or interest of the RESIDUAL RIGHTS CLAIMANTS, any other bond claimants or any other person provided that all amounts that are due and payable under this AGREEMENT by the LEHMAN PARTIES to ARCH on the TRANSFER CLOSING DATE are paid to ARCH.

      c.  ARCH shall sell, assign and convey to the LEHMAN PARTIES on the TRANSFER CLOSING DATE, all rights, claims or causes of action that ARCH has against any indemnitors who have provided indemnity to ARCH with respect to losses incurred by ARCH in connection with the BONDS, free and clear of any rights, claims, liens or interests of any person provided that all amounts that are due and payable under this AGREEMENT by the LEHMAN PARTIES to ARCH on the TRANSFER CLOSING DATE are paid to ARCH.

      d.  ARCH and the LEHMAN PARTIES shall reasonably cooperate to effectuate the assignments and conveyances described in this Section 6 including the delivery by ARCH of such assignments and other instruments reasonably requested by the LEHMAN PARTIES.

7.      *Conveyance of Properties to Third Party Transferees*

      The LEHMAN PARTIES agree that if a PROJECT is transferred to a person or entity that is not an affiliate of any LEHMAN PARTY or LB NOMINEE (a "<u>THIRD PARTY TRANSFEREE</u>"), the applicable LB NOMINEE will require as a condition of closing of such transfer that the THIRD PARTY TRANSFEREE furnishes replacement bonds with respect to such PROJECT acceptable to the bond obligee(s), and obtain the full release and exoneration by the obligee(s) of the applicable BONDS. Upon the full release and exoneration of such BONDS, ARCH shall release all collateral, including any cash, letters of credit, and/or deeds of trust, and all other security interests provided or granted to or for the benefit of ARCH by such LB NOMINEE. The applicable LB NOMINEE will indemnify and hold ARCH harmless for any performance or payment bond losses, including attorney's fees and expenses, which may arise if the LB NOMINEE does not obtain a full release and exoneration of the applicable BONDS as a part of the transfer of the applicable PROJECT to a THIRD PARTY TRANSFEREE.

8.    *Releases*

On the TRANSFER CLOSING DATE and to the extent not otherwise assigned to the LEHMAN PARTIES (or their designees) pursuant to the terms of this AGREEMENT, (a) ARCH will release any claims against the PLAN DEBTORS and/or LEHMAN PARTIES with respect to the paid payment bond claims arising from work performed prior to the TRANSFER CLOSING DATE, (b) ARCH will release all claims against any of the VOLUNTARY DEBTORS including, without limitation, claims with respect to performance bond obligations on the PROJECTS and any claims pertaining to any of the other projects owned by the other VOLUNTARY DEBTORS (except any claims against SJD Partners, Ltd. and any liquidated, non-contingent claims against North Orange Del Rio Land, LLC (the "EXCLUDED CLAIMS")), (c) ARCH will dismiss, with prejudice, its complaint and all claims it has in intervention in the ADVERSARY PROCEEDING against all defendants, (d) ARCH will release all LEHMAN PARTIES and the LB NOMINEES from all claims arising from or with respect to the PROJECTS, the BONDS or the VOLUNTARY DEBTORS other than the EXCLUDED CLAIMS and any claims arising under this AGREEMENT or any other document executed and delivered in connection herewith, and (e) ARCH will dismiss all claims against the TRUSTEE DEBTORS for guaranty or indemnity liability arising from any of the BONDS. The obligations of the LB NOMINEES to reimburse ARCH for future bond payments (above the amounts to be paid on the TRANSFER CLOSING DATE) shall in no way be waived, lessened or affected by the release of the VOLUNTARY DEBTORS under this AGREEMENT.

9.    *Dates and Events Governing the Terms of this Agreement*

a.    Entry of Confirmation Order by California Bankruptcy Court.  Within ten (10) days following the entry of an order of the CALIFORNIA BANKRUPTCY COURT confirming the JOINT PLAN, the LEHMAN PARTIES shall deposit $1.5MM into the RITTER RANCH ESCROW as provided in Section 3.c. hereof.

b.    Transfer Closing Date.  On the TRANSFER CLOSING DATE, all other rights and obligations to reimburse and post collateral, as expressly provided herein, shall become effective and the LEHMAN PARTIES shall pay to ARCH the amounts expended by ARCH with respect to work performed under the ELR SETTLEMENT AGREEMENT (up to the ELR PAYMENT CAP AMOUNT).

c.    Transfer of the Projects to Third Party Transferees.  In the event a PROJECT is transferred to a THIRD PARTY TRANSFEREE, the applicable LB NOMINEE shall obtain the release of the then outstanding BONDS issued for such LB NOMINEE'S PROJECT and replace those BONDS.

10.    *Conditions to Effectiveness of Agreement*.

Except as expressly provided in this Section 10, this AGREEMENT shall become effective after each of the following conditions have occurred:

    a.    The PARTIES (other than the LB NOMINEES) have delivered executed copies of this AGREEMENT to each other.  Upon execution and delivery of an amendment or joinder to this AGREEMENT by the LB NOMINEES, such LB NOMINEES shall thereafter be bound by the terms of this AGREEMENT as if they had originally been parties hereto.

    b.    The NY BANKRUPTCY COURT has issued a final non-appealable order approving the entry into the AGREEMENT by LBHI and LCPI (the "LEHMAN COURT APPROVAL").

    c.    An order confirming the JOINT PLAN has been approved as a final non-appealable order by the CALIFORNIA BANKRUPTCY COURT, the Effective Date of the JOINT PLAN has occurred and title to the PROJECTS has been conveyed to the LB NOMINEES.

If any of the foregoing conditions has not occurred by September 30, 2012, each of the ARCH and the LEHMAN PARTIES (and the LB NOMINEES if they have become PARTIES hereto) shall have the right to terminate this AGREEMENT upon written notice to the other PARTY(IES), whereupon this AGREEMENT shall automatically terminate and be of no further force or effect and the PARTIES shall be automatically relieved of any further obligations hereunder (except for any obligations which are expressly stated to survive the termination of this AGREEMENT) and shall be fully restored to their respective legal positions as if this AGREEMENT had never been executed.  Notwithstanding the foregoing or anything to the contrary contained herein, the obligation of the LEHMAN PARTIES to make the deposit provided for under Section 3.c. hereof in the amount of $1.5MM shall become effective upon satisfaction only of the conditions described in clauses a. and b. above.

11.    *Warranties and Representations*

ARCH hereby represents and warrants to the LEHMAN PARTIES that each of the representations and warranties of ARCH contained in this Agreement are true and correct as of the EXECUTION DATE and will be true and correct as of the TRANSFER CLOSING DATE. Each of the LEHMAN PARTIES hereby represents and warrants to ARCH that each of the representations and warranties of such LEHMAN PARTY contained in this AGREEMENT are true and correct as of the EXECUTION DATE and will be true and correct as of the TRANSFER CLOSING DATE.

Each PARTY represents and warrants to the other PARTIES that, subject to obtaining the LEHMAN COURT APPROVAL, this AGREEMENT has been duly executed and delivered by such PARTY and constitutes the legal, valid and binding agreement of such PARTY, enforceable against such PARTY in accordance with its terms and, upon execution and delivery

of the ancillary documents to be executed and delivered by such PARTY pursuant to or in accordance with the terms of this AGREEMENT, all such ancillary documents will have been duly executed and delivered by such PARTY and will constitute the legal, valid and binding agreement of such PARTY, enforceable against such PARTY in accordance with their respective terms.

12.    _Further Assurances_

The PARTIES will execute and deliver, or cause to be executed and delivered, on the TRANSFER CLOSING DATE such instruments, agreements, assignments, releases, waivers, certificates and other documents contemplated to be delivered pursuant to or in accordance with the terms of this AGREEMENT or otherwise reasonably requested by another PARTY to effectuate or otherwise in furtherance of the terms of this AGREEMENT in such form and substance reasonably and mutually acceptable to the PARTIES and, from time to time after the TRANSFER CLOSING DATE, without further consideration, will execute and deliver, or cause to be executed and delivered, such instruments, agreements, assignments, releases, waivers, certificates or other documents as the other PARTIES may reasonably request, and take such actions as the other PARTIES may reasonably request, to effectuate, consummate or otherwise give effect to the transactions contemplated herein and to assure that the benefits of this AGREEMENT are realized by the PARTIES.

13.    _Dispute Resolution Procedures, Venue and Choice of Law_

If the PARTIES cannot resolve any dispute which may arise between them concerning the performance, interpretation or enforcement of this AGREEMENT or with respect to any claims arising under this AGREEMENT, the PARTIES agree that any such dispute will be submitted to binding arbitration at and be administered by the Judicial Arbitration and Mediation Service ("JAMS") before retired Judge Daniel Weinstein (or such other mediator/arbitrator as JAMS may appoint and the PARTIES may agree to if Judge Weinstein is unavailable).  The PARTIES will request consideration of the dispute by Judge Weinstein (or other agreed upon mediator/arbitrator) within forty-eight (48) hours following a written notice from any PARTY to the other PARTIES that a dispute has arisen which cannot be resolved consensually among the PARTIES and will request the issuance of an expedited written opinion from Judge Weinstein (or other agreed upon mediator/arbitrator) which written opinion will be fully binding upon the PARTIES.  The administration fees and expenses of any mediation shall be borne equally by the LEHMAN PARTIES, on the one hand, and ARCH, on the other hand.

14.    _Integrated Document and Future Modifications_

This AGREEMENT represents the final agreement of the PARTIES, and supersedes all prior written and oral agreements, including the term sheet executed by LBHI and ARCH pertaining to the BONDS.  This AGREEMENT may only be modified by a writing executed by all PARTIES.  Evidence of prior writings and/or verbal communications may not be used as evidence in any proceeding pertaining to breach of or interpretation of this AGREEMENT.  This is a fully negotiated AGREEMENT among sophisticated parties, and none of the PARTIES shall

be deemed the primary drafter of this AGREEMENT if any dispute arises concerning interpretation of this AGREEMENT.

15.    *No Admission of Liability*

No provision in this AGREEMENT shall be construed as an admission of any liability or wrongdoing between the PARTIES.

16.    *Binding Effect; Successors and Assignees*

This AGREEMENT shall inure to the benefit of and be binding upon the PARTIES and their respective successors and permitted assignees; provided that no PARTY may assign its rights or obligations under this AGREEMENT without the written consent of the other PARTIES.

17.    *Counterparts and Facsimile Transmittal of Executed Agreements*

This AGREEMENT may be executed in counterparts, each of which constitutes an original, and all of which collectively constitute one agreement. The signatures of all PARTIES need not appear on the same counterpart. Facsimile transmitted signatures shall constitute originals for all purposes.

18.    *Severability and Construction*

If any provision of this AGREEMENT shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect if the essential terms and conditions of this AGREEMENT for each PARTY remain valid, binding and enforceable.

19.    *Headings; Schedules and Exhibits; Interpretation*.

The headings, titles or captions utilized in this AGREEMENT are designed for the sole purpose of facilitating ready reference this AGREEMENT and shall in no way define, limit, extend or describe the scope or intent of this AGREEMENT or any provisions hereof. References to Sections, unless otherwise indicated, are references to Sections of this AGREEMENT. All Schedules and Exhibits to this AGREEMENT are hereby made a part hereof and incorporated herein by reference for all purposes. Reference to any Schedule or Exhibit herein shall be to the Schedules and Exhibits attached hereto. As used herein, (i) the term "including" shall mean "including, without limitation," and (ii) the masculine shall include the feminine and the neuter.

20.    *Survival*

The representations, warranties, covenants and agreements made by the PARTIES in this AGREEMENT shall survive the closing of the transactions contemplated herein.

21.    *No Set-off Rights*

None of the PARTIES shall have any set-off rights under this AGREEMENT or any other document executed in connection with the transactions contemplated by this AGREEMENT.

22.    *Notices*

All notices and other communications given or made pursuant to this AGREEMENT shall be in writing and shall be deemed effectively given: (a) upon personal delivery to any PARTY to be notified, (b) when sent by electronic mail or facsimile confirmed by the recipient, (c) on the date of a registered or certified mail receipt prepared by the U.S. Postal Service, or (d) the date of a nationally recognized overnight courier's written verification of receipt. All communications shall be sent to the following, unless a written notice of changed recipient or address is exchanged between the PARTIES:

To any LEHMAN PARTY or LB NOMINEE at:

c/o Lehman Brothers Holdings, Inc.
1271 Avenue of the Americas
New York, New York 10020
Attn: Joelle Halperin
Facsimile: (646) 834-0874

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn: Michael Bond, Esq.
Facsimile (212) 310-8007

To ARCH at:

c/o Arch Insurance Group, Inc.
300 Plaza III, 3d Floor
Jersey City, NJ 07311
Attn: Patrick K. Nails, Esq.
Senior Vice president and Associate General Counsel
Facsimile: (201) 743-4659

With copies (which shall not constitute notice) to:

Leo & Weber, P.C.
One N. LaSalle Street, Suite 3600
Chicago, IL 60602

Attn:  T. Scott Leo, Esq.
Facsimile: (312) 857-1240

Gascou Hopkins LLP
1801 Avenue of the Stars, Suite 230
Los Angeles, CA. 90067
Attn: Ronald Hopkins, Esq.
Facsimile: (310) 785-9149


*[Remainder of Page Intentionally Blank, Signatures on Following Page]*

IN WITNESS WHEREOF, each Party by its duly authorized signatory has executed this Agreement:

**LEHMAN BROTHERS HOLDINGS, INC.**, a Delaware corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555-(JMP)

By: _____
Name: Philip Cyburt
Title: Authorized Signatory

**LEHMAN ALI, INC.**, a Delaware corporation

By: _____
Name: Philip Cyburt
Title: Authorized Signatory

**LEHMAN COMMERCIAL PAPER INC.**, a New York corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Philip Cyburt
Title: Authorized Signatory

**ARCH INSURANCE COMPANY**, a Missouri corporation

By: _____
Name: _____
Title: _____

SIGNATURE PAGE TO SETTLEMENT AGREEMENT

IN WITNESS WHEREOF, each Party by its duly authorized signatory has executed this Agreement:

**LEHMAN BROTHERS HOLDINGS, INC.**, a Delaware corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: _____
Title: _____

**LEHMAN ALI, INC.**,
a Delaware corporation

By: _____
Name: _____
Title: _____

**LEHMAN COMMERCIAL PAPER INC.**, a New York corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: _____
Title: _____

**ARCH INSURANCE COMPANY**,
a Missouri corporation

By: _Delee K Neil_
Name: _Patrick K. Nails_
Title: _Senior Vice President_

# EXHIBIT A

**BONDS**

See Attached.

Palmdale Hills and Tesoro Bonds
Suncal Cos.

8/29/2011

| Principal Name | Bond Num | Bond Amount | Annual Premium Amount | Bond Description | Obligee Name |
|---|---|---|---|---|---|
| Palmdale Hills Property, LLC | SU 5012719-0000 | 1,186,225 | $ 5,931.00 | Tract 51508-01 & 02; Grading | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012909-0000 | 675,500 | $ 3,378.00 | Tract 51508-01, Street; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012910-0000 | 129,750 | $ 649.00 | Tract 51508-01, Sewer; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012911-0000 | 694,500 | $ 3,473.00 | Tract 51508-01, Drainage; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012912-0000 | 306,500 | $ 1,533.00 | Tract 51508-01, Water; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012913-0000 | 668,400 | $ 3,342.00 | Tract 51508-01, Landscaping; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012915-0000 | 454,700 | $ 2,274.00 | Tract 51508-02, Street & Street Lights; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012916-0000 | 112,900 | $ 565.00 | Tract 51508-02, Sewer; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012917-0000 | 555,300 | $ 2,777.00 | Tract 51508-02, Sewer (Offsite); Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012918-0000 | 151,050 | $ 755.00 | Tract 51508-02, Drainage; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012919-0000 | 144,000 | $ 720.00 | Tract 51508-02, Water; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012920-0000 | 317,300 | $ 1,587.00 | Tract 51508-02, Landscaping; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5014359-0000 | 4,229,500 | $ 21,148.00 | Ritter Ranch Elizabeth Lake Road/Street | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5014360-0000 | 404,800 | $ 2,024.00 | Ritter Ranch Elizabeth Lake Road/Street Lights | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5014361-0000 | 1,224,800 | $ 6,124.00 | Ritter Ranch Elizabeth Lake Road/Sewer | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5014362-0000 | 305,050 | $ 1,525.00 | Ritter Ranch Elizabeth Lake Road/ Drainage | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5014363-0000 | 1,126,620 | $ 5,633.00 | Ritter Ranch Elizabeth Lake Road/Water | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5014365-0000 | 17,572 | $ 100.00 | Ritter Ranch Elizabeth Lake Road/ Grading | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5019404-0000 | 92,000 | $ 460.00 | Tract 51508 Ritter Ranch/Bio-Basin | City of Palmdale |
| Suncal/Tesoro LLC | SU 6001759-0000 | 320,000 | $ 1,600.00 | Tract No. 51644-05 / Improvements | County of Los Angeles |
| Suncal/Tesoro LLC | SU 6001771-0000 | 54,000 | $ 270.00 | Tract 51644-05/Paving Private Driveways | County of Los Angeles |
| Suncal/Tesoro LLC | SU 5000285-0000 | 162,000 | $ 699.00 | Tract No. 51644-10, Sanitary Sewers, Contract No, 11624 | County of Los Angeles |

C:\Documents and Settings\sleo\Local Settings\Temporary Internet Files\OLK38\Suncal Palmdale Hills and Tesoro Premiums 8-2011.xls

## EXHIBIT B

## SUNCAL DEBTORS

<u>Voluntary Debtors</u>

Acton Estates, LLC
Kirby Estates, LLC
North Orange Del Rio Land, LLC
Palmdale Hills Property, LLC
SCC Communities LLC
SCC/Palmdale, LLC
Seven Brothers LLC
SJD Development Corp.
SJD Partners, Ltd.
SunCal Beaumont Heights, LLC
SunCal Bickford Ranch LLC
SunCal Communities I, LLC
SunCal Communities III, LLC
SunCal Emerald Meadows LLC
SunCal Johannson Ranch LLC
SunCal Summit Valley LLC
Tesoro SF LLC

<u>Trustee Debtors</u>

Delta Coves Venture LLC
LB/L – SunCal Northlake LLC
LB/L – SunCal Oak Valley LLC
SunCal Century City, LLC
SunCal Heartland LLC
SunCal Marblehead LLC
SunCal Oak Knoll, LLC
SunCal PSV, LLC
SunCal Torrance Properties LLC

# EXHIBIT C

## ARCH PROOFS OF CLAIM

<u>Voluntary Debtors</u>

Proof of Claim No. 10 in the amount of $155,558,245.73 filed against Acton Estates, LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 2 in the amount of $155,558,245.73 filed against Kirby Estates, LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 19 in the amount of $155,558,245.73 filed against North Orange Del Rio Land, LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 54 in the amount of $155,558,245.73 filed against Palmdale Hills Property, LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 10 in the amount of $155,558,245.73 filed against SCC Communities LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 2 in the amount of $155,558,245.73 filed against SCC/Palmdale, LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 1 in the amount of $155,558,245.73 filed against Seven Brothers LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 3 in the amount of $155,558,245.73 filed against SJD Development Corp. on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 47 in the amount of $155,558,245.73 filed against SJD Partners, Ltd. on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 10 in the amount of $155,558,245.73 filed against SunCal Beaumont Heights, LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 22 in the amount of $155,558,245.73 filed against SunCal Bickford Ranch LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 2 in the amount of $155,558,245.73 filed against SunCal Communities I, LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 3 in the amount of $155,558,245.73 filed against SunCal Communities III, LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 10 in the amount of $155,558,245.73 filed against SunCal Emerald Meadows LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 5 in the amount of $155,558,245.73 filed against SunCal Johannson Ranch LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 15 in the amount of $155,558,245.73 filed against SunCal Summit Valley LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 8 in the amount of $155,558,245.73 filed against Tesoro SF LLC on March 18, 2009 with the California Bankruptcy Court

<u>Trustee Debtors</u>

Proof of Claim No. 25 in the amount of $155,558,245.73 filed against Delta Coves Venture LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 9 in the amount of $155,558,245.73 filed against LB/L – SunCal Northlake LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 24 in the amount of $155,558,245.73 filed against LB/L – SunCal Oak Valley LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 16 in the amount of $155,558,245.73 filed against SunCal Heartland LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 34 in the amount of $155,558,245.73 filed against SunCal Marblehead LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 28 in the amount of $155,558,245.73 filed against SunCal PSV, LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 6 in the amount of $155,558,245.73 filed against SunCal Torrance Properties LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 8 in the amount of $155,558,245.73 filed against SunCal Century City, LLC on March 18, 2009 with the California Bankruptcy Court

## <u>EXHIBIT D</u>

## ELR SETTLEMENT AGREEMENT

See Attached.

A- 3444

## SETTLEMENT AND MUTUAL RELEASE AGREEMENT

This Settlement and Mutual Release Agreement ("Agreement") is made between Arch Insurance Company, a Missouri corporation ("Arch") and the City of Palmdale, a California municipal corporation ("City"). Arch and the City are collectively referenced as the "Parties", or singularly, as a "Party."

### 1.    RECITALS

This Agreement is made with reference to the following facts:

(a)    On or about April 20, 2005, and on subsequent dates, Arch, acting as surety for its principal, Palmdale Hills Property, LLC ("Developer"), issued several faithful performance bonds guarantying performance to the City various public improvements in conjunction with the Developer's planned construction of a residential housing project in the City commonly known as "Ritter Ranch" ("Property"). The performance bonds at issue are listed below by bond number, general description of improvements and penal sum:

1.    Bond No. SU5014359 (Street Improvements Ritter Ranch-Elizabeth Lake Road) -- penal sum of $4,229,500.

2.    Bond No. SU5014360 (Street Lights -- Ritter Ranch Elizabeth Lake Road) -- penal sum of $404,800.

3.    Bond No. SU5014361 (Sewer Improvements Ritter Ranch Elizabeth Lake Road) -- penal sum of $1,224,800.

-1-

A 3444

*City of Palmdale v. Arch Insurance*: Settlement and Mutual Release Agreement

4.    Bond No. SU5014362 (Drainage Improvements Ritter Ranch Elizabeth Lake Road) -- penal sum of $610,100.

5.    Bond No. SU5014363 (Water Improvements Ritter Ranch Elizabeth Lake Road) -- penal sum of $1,126,620.

6.    Bond No. SU5014364 (Grading Ritter Ranch Elizabeth Lake Road) -- penal sum of $35,145.

The term "Bonds" refers to the 6 performance bonds listed above, unless there is a specific reference to a defined lesser group of bonds.

(b)    The Developer began construction of various improvements required by a subdivision improvement agreement entered into between the Developer and the City, dated May 9, 2005, entitled "Ritter Ranch Elizabeth Lake Road" encompassing Improvement Plan No. GD-95-9, as subsequently supplemented by plan numbers ST 05-72, SL 05-39, 20-P-39, and SD 95-9 (the "Subdivision Improvement Agreement").  The improvements required to be completed under the Subdivision Improvement Agreement are collectively referenced as the "Improvements."

(c)    Prior to completing the Improvements, the Developer filed a Chapter 11 proceeding on November 7, 2008, in the United States Bankruptcy Court in the Central District of California, Santa Ana Division (Case No. 8:08-bk-

-2-

A-3444

*City of Palmdale v. Arch Insurance*:   Settlement and Mutual Release Agreement

17206-ES) ("Bankruptcy Proceeding"). The Bankruptcy Proceeding remains pending.

(d)   The Developer has previously obtained certain United States Bankruptcy Court approved allocations of funds that have permitted the Developer to engage contractors to perform additional components of the work required by the Subdivision Improvement Agreement and covered by the Bonds. That work, however, remains uncompleted.

(e)   On October 29, 2009, the City filed an action against Arch based upon the default of the Developer in completing performance of the Improvements covered by the Bonds, and seeking damages under the Bonds (Los Angeles County Superior Court Case No. BC 425071 (the "Action")).

(f)   During settlement negotiations for the resolution of the Action, the City conceptually agreed to accept less than all of the Improvements required to be completed by the Developer, in full satisfaction of any obligations Arch may have under the Bonds without prejudice as to the City's ability to seek completion of the Improvements by any third parties.

(g)   The City also seeks to recover its attorneys' fees expended in prosecution of the Action and in the Bankruptcy Proceeding, and its attorneys' fees and costs spent in attempting to seek completion of the Improvements. The Parties

-3-

A- 3444

*City of Palmdale v. Arch Insurance:* Settlement and Mutual Release Agreement

now desire and intend by this Agreement, among other things, to settle finally and forever all existing and potential claims of any type concerning the disputes that have arisen between them regarding the matters which were the subject of the Action.

(h)    The Parties agree that this Agreement is a settlement of the disputes between the City and Arch, and the terms in this Agreement shall not be construed in any way to limit the City's rights to seek to compel third parties to perform any work on the Property or any public improvements benefiting the Property.

NOW, THEREFORE, the Parties agree as follows:

## 2.    DEFINITIONS

In addition to the terms specially defined above:

"Claim" shall mean and refer to all alleged and potential damages, attorneys' fees and costs, accrued interest, causes of action, claims for relief (including but not limited to injunctive and declaratory relief) alleged in the Action, and potentially recoverable against Arch under the Bonds and/or the underlying bonded completion of the Subdivision Improvement Agreement, for the Developer's alleged failure to complete the Improvements.

-4-

A- 3444

*City of Palmdale v. Arch Insurance*:  Settlement and Mutual Release Agreement

"Completion Contractor(s)" means any contractor hired to undertake the Improvements identified in Appendix A or B, or both.

"Effective Date" means the date on which the last Party signs this Agreement and transmits their signature to the other Party via facsimile transmittal or overnight mail.

## 3.    PAYMENT AND CONSIDERATION

In consideration of the covenants, conditions and releases provided for in this Agreement:

(a)    Arch shall pay the sum of One Hundred and Thirty-Five Thousand Dollars ($135,000) to the City within 20 days of the Effective Date as reimbursement for attorneys' fees, costs and expenses incurred by the City in the Action and in the Bankruptcy Proceeding.

(b)    Within 30 days of the Effective Date, Arch shall, at its own expense, engage Completion Contractor(s) to complete the Improvements listed in Appendix A.  Such Improvements shall be completed at Arch's expense no later than 4 months from the date Arch engages Completion Contractor(s).  The date for completion of the Improvements listed in Appendix A may be extended if circumstances beyond Arch's control render it impossible to complete the Improvements listed in Appendix A as required by this Agreement, including but

-5-

A- 3444

*City of Palmdale v. Arch Insurance*:  Settlement and Mutual Release Agreement

not limited to natural disaster, refusal of a public entity to grant necessary approval

or permit, or issuance of a court order preventing work.

(c)    If the Developer obtains permission from the United States

Bankruptcy Court to use funds from the Developer's bankruptcy estate to pay for

some or all of the Improvements listed in Appendix A, Arch's performance under

paragraph 3(b) hereof may be satisfied in whole or in part by completion of those

Improvements by Completion Contractor(s) hired by the Developer, or by the

Developer's reimbursement to Arch for its Completion Contractor(s)' completion

of those Improvements, provided that all of the other obligations of this Agreement

are satisfied.

(d)    If, however, under paragraph 3(c) hereof the Developer fails to

complete the Improvements listed in Appendix A within 5 months of the Effective

Date, Arch shall complete those Improvements at its own expense within 6 months

of the Effective Date, either through the Completion Contractor(s) hired by the

Developer, or through Arch's own Completion Contractor(s).

(e)    Certain of the street lights-related Improvements listed in

Appendix B cannot be completed until the Developer or Completion Contractor(s)

has/have obtained certain approvals from the City and the relevant public

utility(ies) for the re-designed street light plan.  Within 30 days of the Effective

-6-

A- 3444

*City of Palmdale v. Arch Insurance*: Settlement and Mutual Release Agreement

Date, Arch shall, through its consultant, submit the re-designed street light plan for the Improvements listed in Appendix B to the required public utility for approval. The Parties will cooperate to facilitate approval of the re-designed street light plan.

(f)    Upon Arch's notification that the required public utility approvals for the street light Improvements have been obtained ("Notification Date"):

1.    Within 30 days of the Notification Date, Arch shall, at its own expense, engage Completion Contractor(s) to perform the Improvements listed in Appendix B.

2.    Arch shall cause the Improvements listed in Appendix B to this Agreement to be completed within 4 months of the date the Completion Contractor(s) are engaged to perform those Improvements.  The date for completion of the Improvements listed in Appendix B may be extended if circumstances beyond Arch's control render it impossible to complete the Improvements listed in Appendix B as required by this Agreement, including but not limited to natural disaster, refusal of a public entity to grant necessary approval or permit, or issuance of a court order preventing work.

(g)    If the Developer obtains permission from the United States Bankruptcy Court on or before the Notification Date to use funds from the

-7-

A- 3444

*City of Palmdale v. Arch Insurance*:  Settlement and Mutual Release Agreement

Developer's bankruptcy estate to pay for the Improvements listed in Appendix B,

Arch's performance obligations in paragraphs 3(e) and 3(f) hereof may be

satisfied, in whole or in part, by completion of those Improvements through

Completion Contractor(s) hired by the Developer or reimbursement in whole or

part by the Developer of Completion Contractor(s) hired by Arch, provided that all

of the other obligations of this Agreement are satisfied, including engaging

Completion Contractor(s) within 30 days of the Notification Date as required by

paragraph 3(f)(1) hereof.

     (h)    If, however, the Developer fails to complete those

Improvements listed in Appendix B within 4 months of the date the Completion

Contractor(s) are engaged to perform them pursuant to paragraph 3(f) above, Arch

shall complete those Improvements within 5 months of the Notification Date,

either through the Completion Contractor(s) hired by the Developer, or through its

own Completion Contractor(s).

     (i)    If a new owner of the Property has assumed the obligations

covered by this Agreement as part of a confirmed bankruptcy plan or an authorized

sale prior to the Notification Date, Arch shall seek the new owner's valid and

enforceable commitment to (1) complete the Improvements listed in Appendix A

within 5 months of the date Arch engages Completion Contractor(s)  pursuant to

-8-

A-3449

*City of Palmdale v. Arch Insurance*:  Settlement and Mutual Release Agreement

paragraph (3)(b) of this Agreement; and (2) complete the Improvements listed in

Appendix B within 5 months of the Notification Date.  If, however, the new owner

fails to complete the any of the Improvements identified in Appendix A and/or B,

Arch shall remain obligated to complete those Improvements within 1 month of the

new owner's completion date.

      (j)    Arch shall have the obligation to monitor the Developer's or

new owner's progress of completion of the Improvements referenced in Paragraphs

3 (g) through (i) hereof, and Arch shall take immediate actions in the event of the

Developer's or new owner's default(s) under those provisions so that Arch will

timely satisfy its performance obligations set forth therein in the event of such

default(s).

### 4.    **COMPLETION CONTRACTORS**

      (a)    Completion Contractor(s)  shall be subcontractors to Arch, and

no contractual relationship, pursuant to this Agreement, shall exist between the

City and the Completion Contractor(s).  The City agrees to cooperate reasonably

with the Completion Contractor(s) to effectuate the construction of the

Improvements.

      (b)    Routine day-to-day operations and decisions as to the manner

of performance of the Improvements identified in Appendix A and/or B shall be

-9-

A- 3444

*City of Palmdale v. Arch Insurance*:  Settlement and Mutual Release Agreement

made by the Completion Contractor(s), provided, however, that the Completion

Contractor(s) have no authority to agree to any changes in those Improvements.

(c)    Arch reserves the right to terminate the Completion

Contractor(s) at any time.  Arch will provide 5 calendar days written notice to the

City of any change in the Completion Contractor(s) engaged to complete the

Improvements, including but not limited to the Developer or a new owner taking

over completion of the Improvements identified in Appendix A and/or B pursuant

to an approved bankruptcy plan.

(d)    If Arch terminates the Completion Contractor(s), Arch shall

contract with any other Completion Contractor(s) pre-approved by the City within

5 calendar days of such termination.

### 5.    **RELEASES AND WAIVERS**

(a)    In consideration for and following receipt of the payment and

items of performance, including full performance and completion of the

Improvements identified in Appendix A and B, and in consideration of the mutual

releases provided below, and except for the obligations preserved and created by

this Agreement, the Parties for themselves and their respective representatives,

agents, employees, attorneys, predecessors, successors, sureties, and assigns, do

hereby fully and forever release, discharge and acquit the other Party and its

-10-

A- 3444

representatives, agents, employees, attorneys, predecessors, successors, sureties, and assigns, from any and all claims, demands, causes of action, obligations, rights, attorneys' fees, costs, and/or liabilities of any nature, whether anticipated or unanticipated, known or unknown, past or present, contingent or fixed, heretofore or hereafter arising from or relating to the matters and issues raised in the Claim and Action including, but not limited to, the incurred to date interest, attorneys' fees and litigation costs of the Parties herein, and covenant not to file suit or any other legal proceeding against each other with respect to the Claim and the Action.

(b)     This Agreement does not release, waive, negate, impact or otherwise affect the City's right to compel any third parties, including but not limited to the Developer, or successors, assigns, or any other entity desirous to develop the Property, to complete Elizabeth Lake Road, and/or the Improvements.

(c)     Nothing in this Agreement shall in anyway whatsoever extinguish, negate, impact, or otherwise affect the City's authority to exercise to the full extent of applicable law its police power and regulatory land use authority in connection with the Property.

(d)     Upon full and complete performance of Arch's obligations under this Agreement, the City will provide Arch with a written letter, confirming Arch's release of any remaining obligations under each of the Bonds listed in

-11-

A- 3444

*City of Palmdale v. Arch Insurance*:  Settlement and Mutual Release Agreement

paragraph 1(a) hereof.  The City shall also release labor and material bonds,

accompanying each of the Bonds after passage of any applicable time period

required by the Subdivision Map Act and any other applicable laws.

## 6.    INDEMNITY

Arch agrees to defend (including the appointment of defense counsel),

indemnify, and hold the City, its employees, officials, agents, and/or attorneys,

harmless from and against any and all claims, demands, lawsuits arising out of

and/or related to Arch's performance of the obligations set forth in this Agreement,

and/or the performance of the Improvements.

## 7.    DISMISSALS AND RELEASE DOCUMENTS

Within 10 days after the settlement payment required by paragraph 3(a) of

this Agreement has been made by Arch, the City shall file a Request For Dismissal

of the Action, without prejudice.  The Parties agree that the Court in the Action

shall have continuing jurisdiction pursuant to California Code of Civil Procedure

§ 664.6 to enforce this Agreement.

## 8.    REPRESENTATIONS AND WARRANTIES

(a)    Each Party has made such investigation of the facts pertaining

to this Agreement and of all the matters pertaining to it, as it deems necessary.

-12-

P6399-1244\1324477v2.doc

A- 3444

*City of Palmdale v. Arch Insurance*: Settlement and Mutual Release Agreement

(b)    Each Party or responsible officer or agent thereof has read this Agreement and understands its contents. Each of the individuals executing this Agreement on behalf of the respective Party possesses the power, capacity and authority to do so and thereby to bind that respective Party.

(c)    The Parties acknowledge that in entering into this Agreement, each of them is relying solely on the recitals, statements and other terms of this Agreement and the advice of its own attorneys and other advisors. The Parties acknowledge, further, that they are not relying on any written or oral statement, representation or warranty made by any other Party, or the representative of any other Party, except as referenced in this Agreement. Except with respect to the representations and warranties made in this Agreement, each Party, in entering into this Agreement, assumes the risk that any fact upon which it relied in entering into this Agreement proves to be false, or that its understanding of the facts or the law was incorrect.

(d)    This Agreement is binding upon and shall inure to the benefit of each of the Parties hereto and to their respective parent companies, subsidiaries, affiliates, joint ventures, successors and assigns.

-13-

A- 3494

*City of Palmdale v. Arch Insurance*: Settlement and Mutual Release Agreement

(e)     The Parties agree to execute, acknowledge, and/or deliver any and all documents and to perform any and all acts reasonably necessary to carry out and perform their obligations hereunder.

(f)     Subject to the obligations, limitations, reservations and exceptions specifically set forth in this Agreement, the Parties, and each of them, acknowledge that they are aware that they or their attorneys may hereafter discover facts different from or in addition to the facts which they now know or believe to be true with respect to the subject matter of this Agreement, but that it is their intention to fully, finally, absolutely, and forever settle any and all claims, disputes and differences which do now exist, may exist, or heretofore have existed between them related to the Claim, the Bonds, and the Action, and that in furtherance of such intention, the releases herein given by the Parties shall be and remain in effect as full and complete releases notwithstanding the discovery of any different or additional facts.

(g)     The Parties intend this Agreement to be effective as a full and final accord and satisfactory release of each and every matter specifically or generally referred to herein upon completion of Arch's payment and performance obligations under paragraph 3 hereof.  In furtherance of this intention, the Parties

-14-

A- 3444

*City of Palmdale v. Arch Insurance*:  Settlement and Mutual Release Agreement

expressly acknowledge that they are familiar with California Civil Code §1542

("Section 1542"), which provides as follows:

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS**
>
> **WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT**
>
> **TO EXIST IN HIS OR HER FAVOR AT THE TIME OF**
>
> **EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM**
>
> **OR HER MUST HAVE MATERIALLY AFFECTED HIS OR**
>
> **HER SETTLEMENT WITH THE DEBTOR."**

The Parties waive and relinquish any rights and benefits which they may

have under Section 1542, but only as to the limited scope of the releases in this

Agreement.  The Parties acknowledge that they may hereafter discover facts in

addition to or different from those which it now knows or believes to be true with

respect to the subject matter of this Agreement, but it is the Parties' intention fully,

finally, and forever to settle and to release any and all such matters, disputes and

differences known or unknown, suspected or unsuspected, which do now exist,

may exist or heretofore have existed as against any other party with respect to the

matters set forth in the Recitals.  In furtherance of this intention, the release herein

will be and remain in effect as a full and complete general release of such released

matters notwithstanding the discovery or existence of any such additional or

-15-

A- 3444

*City of Palmdale v. Arch Insurance*: Settlement and Mutual Release Agreement

different facts.  The Parties warrant and represent to one another that the effect and import of the provisions of Section 1542 have been fully explained to it by its attorneys and the parties expressly acknowledge their respective understanding of the same.

(h)    The Parties acknowledge that this Agreement represents a compromise of disputed claims, and shall not be deemed as admission of liability on behalf of any Party.

(i)    The Parties represent and warrant that none of them has voluntarily, involuntarily or by operation of law, granted, assigned or transferred, or purported to assign or transfer to any third person or entity whatsoever any right, cause of action, or claim that is based on, arises out of, or is in connection with the Claim.

### 9.    THIRD PARTY BENEFICIARIES

This Agreement is not intended to create, nor shall it be in any way interpreted or construed to create, any third party beneficiary rights in any other person or entity not a Party hereto unless otherwise expressly provided herein.

### 10.    GOVERNING LAW

This Agreement shall be interpreted, enforced and governed by and under the local laws of State of California.

-16-

A₁- 3444

*City of Palmdale v. Arch Insurance*:  Settlement and Mutual Release Agreement

## 11.    INTEGRATION

This Agreement memorializes and constitutes the final expression and the complete and exclusive statement of agreement and understanding between the Parties.  This Agreement supersedes and replaces all prior negotiations, proposed agreements, and agreements, whether written or oral.  Neither Arch nor the City executed this Agreement in reliance upon any promise, representation, statement, or warranty whatsoever, express or implied, which is not expressly contained in this Agreement, nor did Arch or the City execute this Agreement in reliance upon any belief as to any fact not expressly recited herein.

## 12.    ATTORNEYS' FEES IN SUIT ON AGREEMENT

The prevailing party in any suit to enforce the terms of this Agreement shall be entitled to recover all attorneys' fees and costs incurred as a result of enforcing the obligations under this Agreement as an element of damage arising from the breach of this Agreement.

## 13.    NO CHANGES OR AMENDMENTS

No changes in, additions to, or modifications of this Agreement shall be valid unless set forth in writing and executed by all parties hereto.

-17-

A-3444

*City of Palmdale v. Arch Insurance*:  Settlement and Mutual Release Agreement

### 14.   INDEPENDENT ADVICE

The Parties each acknowledge that they have received independent legal advice with respect to the advisability of making this Agreement.

### 15.   SEVERANCE

If a provision of this Agreement is adjudged illegal or invalid, such provision shall: (1) be rewritten by the court to be legal and valid as long as the rewritten provision remains consistent with the Parties' mutual intentions expressed in this Agreement; or (2) be deemed severed and deleted, but only if any such severance and deletion will not affect the benefits of the Agreement which, according to its terms or as a whole, any Party is to receive.

### 16.   COUNTERPARTS

This Agreement may be executed in one or more counterparts all of which together shall constitute one and the same Agreement.  Facsimile signatures shall be deemed original signatures for all purposes.

### 17.   NOTICES

The Parties shall send the notices required by this Agreement to the following Party representatives at the address written below:

Arch Insurance Company          Ronald W. Hopkins, Esq.

                                GASCOU HOPKINS LLP

-18-

P6399-1244\1324477v2.doc

A- 3444

*City of Palmdale v. Arch Insurance*:  Settlement and Mutual Release Agreement

City of Palmdale

1801 Avenue of the Stars, Suite 230

Los Angeles CA 90067

Steven R. Orr/B. Tilden Kim

Richards Watson & Gershon

355 South Grand Avenue, 40th Floor

Los Angeles, CA 90071-3101

## 18.    INTERPRETATION

The Parties have each agreed to the use of the particular language of the provisions of this Agreement, and any question of doubtful interpretation shall not be resolved by any rule of interpretation providing for interpretation against the Parties who cause an uncertainty to exist or against the draftsperson.

-19-

a\→ 3444

*City of Palmdale v. Arch Insurance*:  Settlement and Mutual Release Agreement

Date: 2-10-2011

**CITY OF PALMDALE**

By: _____
Mayor
James C. Ledford, Jr.

Attest:

_____
Acting    City Clerk

Date: _____

**ARCH INSURANCE COMPANY**

By: _____
Susan Neff

**APPROVED AS TO FORM:**

Date: February 10, 2011

**RICHARDS, WATSON & GERSHON**
A Professional Corporation

By: _____
Steven R. Orr
Attorneys for City of Palmdale

[Signatures continued]

-20-

P6399-1244\1324477v2.doc

A- 3444

*City of Palmdale v. Arch Insurance*:  Settlement and Mutual Release Agreement


Date:_____                GASCOU HOPKINS LLP


                                    By:  _____
                                         Ronald W. Hopkins
                                    Attorneys for Arch Insurance Company

-21-

*City of Palmdale v. Arch Insurance*: Settlement and Mutual Release Agreement

Date: _____                     CITY OF PALMDALE

                                           By: _____
                                                        Mayor

Attest:

_____
        City Clerk

Date: 3-7-11                               ARCH INSURANCE COMPANY

                                           By: _____
                                                        Susan Neff

APPROVED AS TO FORM:

Date: _____                      RICHARDS, WATSON & GERSHON
                                             A Professional Corporation

                                           By: _____
                                                Steven R. Orr
                                                Attorneys for City of Palmdale

        [Signatures continued]

                                           -20-

P:\056-23\013214477v2.doc

*City of Palmdale v. Arch Insurance*:  Settlement and Mutual Release Agreement

Date: 2/7/11

GASCOU HOPKINS LLP

By: _____

Ronald W. Hopkins
Attorneys for Arch Insurance Company

-21-

A- 3444

# APPENDIX A

## NON-LIGHTING IMPROVEMENTS

| ITEM | IMPROVEMENT DESCRIPTION | IMPROVEMENT PLAN |
|------|------------------------|------------------|
| 1 | Clear, grub, and re-grade inlet and outlet channels of storm drain line A, per grading and storm drain plan. | GD, SD 95-09. |
| 2 | Grade access road, adjacent to outlet channel of storm drain line A, from Elizabeth Lake Road to the drainage channel.  Per grading plan GD 95-09, access road shall consist of six (6) inch of aggregate base on compacted native. | GD 95-09 |
| 3 | Clear, grub, and re-grade inlet and outlet channels of storm drain line C, per grading and storm drain plan. | GD, SD 95-09 |
| 4 | Grade access road, adjacent to outlet channel of storm drain line C, from Elizabeth Lake Road to the drainage channel.  Per grading plan GD 95-09, access road shall consist of six (6) inch of aggregate base on compacted native. | GD 95-09 |
| 5 | Clear, grub, and re-grade inlet and outlet channels of storm drain line D, per grading and storm drain plan. | GD, SD 95-09. |

APPENDIX A-1



A- 3444

| 6 | Install rip-rap blanket and cut-off wall for outlet structure of storm drain line D.  Complete railing on east and west ends of outlet structure, per storm drain plan. | SD 95-09. |
|---|---|---|
| 7 | Clear construction debris both north and south sides of Elizabeth Lake Road within Phase I limits, including debris near the outlet structure of storm drain line D. | SD 95-09 |
| 8 | Clear, grub, and re-grade inlet and outlet channels of storm drain line E, per grading and storm drain plan. | GD, SD 95-09 |
| 9 | Clear, grub, and re-grade inlet and outlet channels of storm drain line F, per grading and storm drain plan. | GD, SD 95-09 |
| 10 | Grade access road, adjacent to outlet channel of storm drain line F, from Elizabeth Lake Road to the drainage channel.  Per grading plan GD 95-09, access road shall consist of six (6) inch of aggregate base on compacted native. | GD 95-09 |
| 11 | Grade access road, adjacent to outlet channel of storm drain line G, from Elizabeth Lake Road to the drainage channel.  Per grading plan GD 95-09, access road shall consist of six (6) inch of aggregate base on compacted native. | GD 95-09 |
| 12 | Clear, grub, and re-grade inlet and outlet channels of storm drain line I, per grading and storm drain plan. | GD, SD 95-09 |
| 13 | Complete railing for the outlet structure of storm line I, per storm drain plan. | SD 95-09 |

APPENDIX A-2

A- 3444

| 14 | Clear, grub, and re-grade inlet and outlet channels of storm drain line J, per grading and storm drain plans. | GD, SD 95-09 |
|----|----|----|
| 15 | Grade access road, adjacent to outlet channel of storm drain line J, from Elizabeth Lake Road to the drainage channel.  Per grading plan GD 95-09, access road shall consist of six (6) inch of aggregate base on compacted native. | GD 95-09 |
| 16 | Clear, grub, and re-grade inlet and outlet channels of storm drain line K, per grading and storm drain plans. | GD, SD 95-09 |
| 17 | Install railing and trash rack for the inlet structure of storm drain line K, north side of Elizabeth Lake Road, per storm drain plan. | SD 95-09 |
| 18 | Install railing for the outlet structure of storm drain line K, south side of Elizabeth Lake Road, per storm drain plan. | SD 95-09 |
| 19 | Complete driveway approach for access road adjacent to storm drain line K, per grading plan. | GD 95-09 |
| 20 | Construct drainage shoulder improvements next to Department of Water Resources, per grading plan. | GD 95-09 |
| 21 | Complete drainage v-ditch, down drains, parkway drain, and rip-rap blanket next to Department of Water Resources right-of-way, per grading and storm drain plan. | GD, SD 95-09 |
| 22 | Grade shoulders and parkway per the typical section shown on approved grading plan GD 95-09.  Slopes shall be graded at a 2:1 maximum. | GD 95-09 |

APPENDIX A-3



| 23 | Provide permanent erosion control measures, grading plan general notes GD 95-09. | GD 95-09 |
|----|----|----|
| 24 | Reconstruct Elizabeth Lake Road, phase I east end transition per street plan. | ST 05-72 |
| 25 | Complete driveway approach for Department of Water Resources, located on the south side of Elizabeth Lake Road, per street plan ST 05-72. Including grading per agreement with Department of State Water Resources (DWR). | ST 05-72 |

APPENDIX A-4

P6399-1244\1324477v2.doc

A- 3444

# APPENDIX B

## STREET LIGHT IMPROVEMENTS

| ITEM | IMPROVEMENT DESCRIPTION | IMPROVEMENT PLAN |
|------|------------------------|------------------|
| 1 | Install streetlights as shown on amended street lighting plans SL 05-39 (reflecting change from traffic signal to traffic lights), within Phase I limits of Elizabeth Lake Road.<br><br>Includes 24" steel casing in DWR right of way and all remaining conduit, sweeps, pull boxes and transformers and first time installation of all backbone conduits west of Ranch Center Drive. | SL 05-39 |
| 2 | Submit amended street lighting plans to the City and Edison for review and approval of Phase I limits of Elizabeth Lake Road, reflecting change from traffic signal to traffic light.  Includes annexation to City Street Light District. | SL 05-39 |
| 3 | Prepare and process underground dry utility plan with Edison. | SL 05-39 |

APPENDIX B

## EXHIBIT E

**CLAIMS AGAINST BONDS**

See Attached.

**CLAIMS AGAINST ARCH BONDS RE LABOR, MATERIALS AND SERVICES – VOLUNTARY DEBTOR PROPERTIES**

| Claimant | Status of Claim | Scheduled Claim or POC Amount ($) and POC # | Principal Claim Amount ($) | Amount of Payment ($) (Date of Payment) | Description of Payment and Non-Bonded Work | Extent of Bonded Claim Assignment to Arch | Claimant Residual Rights | Pro-Rata Recovery | Duty Re Offer to Reassign |
|---|---|---|---|---|---|---|---|---|---|
| **RITTER RANCH** | | | | | | | | | |
| Sierra Cascade Construction Inc. | Settled | $550,677.29 POC 33 | $107,334.19 and $408,262.44 | $450,000 (July 2009) | Full Payment pursuant to settled mediation | FULL (POC 33) | NO | NO | NO |
| Staats Construction Inc. | Settled | $166,105.82 POC 51 | $148,854.96 | $80,000 (December 2009) | Full Payment. Claimant retained right to pursue claim in its own name and share any recovery with Arch. | NONE; provided, however, Staats can elect to no longer prosecute claim, in which event Arch is allowed to take over prosecution of claim, but pro-rata recovery still applies | YES | Arch 53.33% Staats 46.67% | NO |
| Professional Pipeline Contractors, Inc. | Claim Dismissed Case settled and paid by RADCO. Arch dismissed from lawsuit in September 2008. | No POC filed and not listed as a scheduled claim | $2,156,821.00 | N/A | N/A | N/A | N/A | N/A | N/A |
| Flow-Line Concrete | Claim asserted, but not pursued. Flow-Line is a sub of Professional Pipeline. | No POC filed and not listed as a scheduled claim | $61,743.27 | N/A | N/A | N/A | N/A | N/A | N/A |
| Summers Murphy & Partners Inc. | Claim asserted, but not pursued | $54,375.00 POC 66 | $48,475.00 | N/A | N/A | N/A | N/A | N/A | N/A |

| Claimant | Status of Claim | Scheduled Claim or POC Amount ($) and POC # | Principal Claim Amount ($) | Amount of Payment ($) (Date of Payment) | Description of Payment and Non-Bonded Work | Extent of Bonded Claim Assignment to Arch | Claimant Residual Rights | Pro-Rata Recovery | Duty Re Offer to Reassign |
|---|---|---|---|---|---|---|---|---|---|
| Arrow Transit Mix | Claim asserted, but not pursued.  Arrow Transit is a sub of Camarillo Engineering | No POC filed and not listed as a scheduled claim | $16,512.00 | N/A | N/A | N/A | N/A | N/A | N/A |
| Arrow Construction | Claim asserted, but not pursued.  Arrow Construction is a sub of Camarillo Engineering | No POC filed and not listed as a scheduled claim | $17,652.71 | N/A | N/A | N/A | N/A | N/A | N/A |

# **EXHIBIT F**

**BOND PREMIUMS**

See Attached.

Palmdale Hills and Tesoro Bonds
Suncal Cos.

8/29/2011

| Principal Name | Bond Num | Bond Amount | Annual Premium Amount | Bond Description | Obligee Name |
|---|---|---|---|---|---|
| Palmdale Hills Property, LLC | SU 5012719-0000 | 1,186,225 | $ 5,931.00 | Tract 51508-01 & 02; Grading | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012909-0000 | 675,500 | $ 3,378.00 | Tract 51508-01, Street; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012910-0000 | 129,750 | $ 649.00 | Tract 51508-01, Sewer; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012911-0000 | 694,500 | $ 3,473.00 | Tract 51508-01, Drainage; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012912-0000 | 306,500 | $ 1,533.00 | Tract 51508-01, Water; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012913-0000 | 668,400 | $ 3,342.00 | Tract 51508-01, Landscaping; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012915-0000 | 454,700 | $ 2,274.00 | Tract 51508-02, Street & Street Lights; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012916-0000 | 112,900 | $ 565.00 | Tract 51508-02, Sewer; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012917-0000 | 555,300 | $ 2,777.00 | Tract 51508-02, Sewer (Offsite); Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012918-0000 | 151,050 | $ 755.00 | Tract 51508-02, Drainage; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012919-0000 | 144,000 | $ 720.00 | Tract 51508-02, Water; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5012920-0000 | 317,300 | $ 1,587.00 | Tract 51508-02, Landscaping; Improvements | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5014359-0000 | 4,229,500 | $ 21,148.00 | Ritter Ranch Elizabeth Lake Road/Street | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5014360-0000 | 404,800 | $ 2,024.00 | Ritter Ranch Elizabeth Lake Road/Street Lights | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5014361-0000 | 1,224,800 | $ 6,124.00 | Ritter Ranch Elizabeth Lake Road/Sewer | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5014362-0000 | 305,050 | $ 1,525.00 | Ritter Ranch Elizabeth Lake Road/ Drainage | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5014363-0000 | 1,126,620 | $ 5,633.00 | Ritter Ranch Elizabeth Lake Road/Water | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5014365-0000 | 17,572 | $ 100.00 | Ritter Ranch Elizabeth Lake Road/ Grading | City of Palmdale |
| Palmdale Hills Property, LLC | SU 5019404-0000 | 92,000 | $ 460.00 | Tract 51508 Ritter Ranch/Bio-Basin | City of Palmdale |
| Suncal/Tesoro LLC | SU 6001759-0000 | 320,000 | $ 1,600.00 | Tract No. 51644-05 / Improvements | County of Los Angeles |
| Suncal/Tesoro LLC | SU 6001771-0000 | 54,000 | $ 270.00 | Tract 51644-05/Paving Private Driveways | County of Los Angeles |
| Suncal/Tesoro LLC | SU 5000285-0000 | 162,000 | $ 699.00 | Tract No. 51644-10, Sanitary Sewers, Contract No, 11624 | County of Los Angeles |

C:\Documents and Settings\sleo\Local Settings\Temporary Internet Files\OLK38\Suncal Palmdale Hills and Tesoro Premiums 8-2011.xls

# Exhibit B

EXECUTION COPY

# SETTLEMENT AGREEMENT

This Settlement Agreement (this "AGREEMENT"), dated as of September 27, 2011 (the "EXECUTION DATE"), is made by and among Lehman Brothers Holdings, Inc. ("LBHI"), a Delaware corporation, Lehman ALI, Inc., a Delaware corporation ("ALI"), Lehman Commercial Paper Inc., a New York corporation ("LCPI"), OVC Holdings LLC, a Delaware limited liability company ("OVC HOLDINGS"), on the one hand and collectively referred to as the "LEHMAN PARTIES", and Arch Insurance Company, a Missouri corporation ("ARCH") on the other hand (the LEHMAN PARTIES, ARCH and, upon the execution and delivery of an amendment or joinder to this AGREEMENT as described below, the LB NOMINEES, may be referred to collectively as the "PARTIES").

All initially capitalized terms used herein shall have the respective meanings ascribed to such terms in this Agreement or, where indicated, in the JOINT PLAN.

The PARTIES anticipate that affiliates of the LEHMAN PARTIES which have not yet been formed will be added to this AGREEMENT by amendment or joinder on or prior to the TRANSFER CLOSING DATE. The affiliate taking title to the MARBLEHEAD PROJECT is referred to herein as the "LEHMAN MARBLEHEAD NOMINEE" and the affiliate taking title to the OAK VALLEY PROJECT is referred to herein as the "LEHMAN OAK VALLEY NOMINEE" and collectively as the "LB NOMINEES" and each as an "LB NOMINEE".

## RECITALS

WHEREAS, ARCH has issued certain surety bonds (including subdivision, payment, performance and other bonds) with respect to the development of (a) the real estate development project comprised of, in part, certain real property consisting of approximately 247 acres located in the City of San Clemente, California and owned, as of the EXECUTION DATE, by the MARBLEHEAD DEBTOR (the "MARBLEHEAD PROJECT"), which are outstanding as of the EXECUTION DATE in the aggregate outstanding penal sum of $56,473,183.91, for the benefit of SunCal Marblehead, LLC, a Delaware limited liability company (the "MARBLEHEAD DEBTOR"), as more particularly described in Exhibit A attached hereto and made a part hereof (collectively, the "MARBLEHEAD BONDS") and (b) the real estate development project comprised, in part, of certain real property consisting of approximately 985 acres located in Riverside County, California and owned, as of the EXECUTION DATE, by the OVC DEBTOR (the "OAK VALLEY PROJECT" and together with the MARBLEHEAD PROJECT, collectively, the "PROJECTS" and each a "PROJECT"), which are outstanding as of the EXECUTION DATE in the aggregate outstanding penal sum of $11,798,041.53, for the benefit of LB/L SunCal Oak Valley, LLC, a Delaware limited liability company (the "OVC DEBTOR"), as more particularly described in Exhibit A attached hereto and made a part hereof (collectively, the "OVC BONDS" and together with the MARBLEHEAD BONDS, the "BONDS");

WHEREAS, ALI made certain loans to the MARBLEHEAD DEBTOR, among other borrowers, in the original aggregate maximum principal amount of $316,061,300 (collectively, the "MARBLEHEAD/HEARTLAND LOAN"), which MARBLEHEAD/HEARTLAND LOAN

is secured by, among other things, a first priority deed of trust encumbering the MARBLEHEAD PROJECT;

WHEREAS, ALI made certain loans to the OVC DEBTOR in the original aggregate maximum principal amount of $120,000,000 (collectively, the "OVC LOAN"), which OVC LOAN is secured by, among other things, a first priority deed of trust encumbering the OAK VALLEY PROJECT; the OVC LOAN and all right, title and interest of ALI therein and under all loan documents evidencing, securing or otherwise relating to the OVC LOAN were subsequently assigned by ALI to OVC HOLDINGS;

WHEREAS, as a result of various repurchase transactions entered into prior to the commencement of the LEHMAN CASES, LBHI and LCPI may hold interests in the MARBLEHEAD/HEARTLAND LOAN and the OVC LOAN;

WHEREAS, on September 15, 2008 and on various dates thereafter, LBHI, LCPI and certain of their subsidiaries commenced voluntary cases (collectively, the "LEHMAN CASES") under the Bankruptcy Code, which LEHMAN CASES have been consolidated for procedural purposes only and are being jointly administered under Case Number 08-13555 and are pending in the United States Bankruptcy Court for the Southern District of New York ("NY BANKRUPTCY COURT");

WHEREAS, in November 2008, (i) certain affiliates of the MARBLEHEAD DEBTOR and the OVC DEBTOR more particularly identified as "VOLUNTARY DEBTORS" on Exhibit B attached hereto and made a part hereof (collectively, the "VOLUNTARY DEBTORS"), filed voluntary cases (the "VOLUNTARY DEBTOR CASES") under the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California (the "CALIFORNIA BANKRUPTCY COURT") and (ii) various creditors filed involuntary cases under the Bankruptcy Code (the "TRUSTEE DEBTOR CASES"; and together with the VOLUNTARY DEBTOR CASES, the "SUNCAL CASES") in the CALIFORNIA BANKRUPTCY COURT against the MARBLEHEAD DEBTOR, the OVC DEBTOR and certain of their affiliates more particularly identified as "TRUSTEE DEBTORS" on Exhibit B attached hereto and made a part hereof (collectively, the "TRUSTEE DEBTORS" and; together with the VOLUNTARY DEBTORS, the "SUNCAL DEBTORS"), all of which SUNCAL CASES are being jointly administered under Case Number 8:08-bk-17206-ES;

WHEREAS, (i) on or about January 8, 2009, the CALIFORNIA BANKRUPTCY COURT entered orders for relief in the TRUSTEE DEBTOR CASES, (ii) on or about January 15, 2009, the CALIFORNIA BANKRUPTCY COURT entered orders granting the appointment of a chapter 11 trustee in each of the TRUSTEE DEBTOR CASES, and (iii) thereafter, the Office of the United States Trustee appointed Steven M. Speier as the trustee for the TRUSTEE DEBTORS (together with any successor trustee for the TRUSTEE DEBTORS, the "SUNCAL TRUSTEE");

WHEREAS, on or about March 18, 2009 and April 15, 2009, ARCH filed various proofs of claim against certain of the SUNCAL DEBTORS as more particularly described on Exhibit C attached hereto and made a part hereof (collectively, the "ARCH PROOFS OF CLAIM");

WHEREAS, the City of San Clemente made demand upon and filed a lawsuit against ARCH seeking the performance of certain work and other obligations which the MARBLEHEAD DEBTOR failed to perform under various subdivision improvement agreements, development agreements and other agreements with the City of San Clemente, and on or about February 2, 2010, ARCH and the City of San Clemente resolved certain disputes between them by entering into a Settlement Agreement with respect to the MARBLEHEAD PROJECT and the MARBLEHEAD BONDS, a true and correct copy of which is attached hereto as <u>Exhibit D</u> (as amended, restated, supplemented or otherwise modified to the extent permitted hereunder and including all exhibits, schedules and annexes thereto, the "<u>MARBLEHEAD SETTLEMENT AGREEMENT</u>");

WHEREAS, ARCH is an intervening plaintiff in the equitable subordination adversary proceeding styled *Palmdale Hills Property, LLC vs. Lehman ALI, Inc.*, Case Number 8:09-ap-01005 pending in the CALIFORNIA BANKRUPTCY COURT (the "<u>ADVERSARY PROCEEDING</u>"), in which ARCH alleges, among other things, that the claims of the LEHMAN PARTIES in the SUNCAL CASES should be subordinated to ARCH's claims in the SUNCAL CASES as evidenced in the ARCH PROOFS OF CLAIM;

WHEREAS, on August 23, 2011, the SUNCAL TRUSTEE, LCPI, ALI, OVC HOLDINGS and Northlake Holdings LLC (collectively the "<u>PLAN PROPONENTS</u>") filed that certain Third Amended Joint Chapter 11 Plan for Eight Trustee Debtors with respect to all of the TRUSTEE DEBTORS except SunCal Century City, LLC (collectively, the "<u>PLAN DEBTORS</u>") in the applicable TRUSTEE DEBTOR CASES (as modified, amended, supplemented or superseded from time to time, the "<u>JOINT PLAN</u>"), which JOINT PLAN sets forth, among other things, a settlement proposal to unsecured creditors of the PLAN DEBTORS, and a proposal for the reorganization of the PLAN DEBTORS, and their respective assets and liabilities;

WHEREAS, among other things, the JOINT PLAN provides for the transfer and conveyance of each of the PROJECTS, as well as the other Plan Projects (as such term is defined in the JOINT PLAN), to one or more Lehman Nominees (as such term is defined in the JOINT PLAN) designated by the Lehman Creditors (as such term is defined in the JOINT PLAN), or any of them, to take title to the applicable Plan Project(s) and/or any other assets of the applicable PLAN DEBTOR(S) on the Effective Date (as such term is defined in the JOINT PLAN) or, if later than the Effective Date, the subsequent date on which title to the PROJECTS is transferred pursuant to the JOINT PLAN to the LB NOMINEES (the "<u>TRANSFER CLOSING DATE</u>");

WHEREAS, the JOINT PLAN also provides for distributions to be made to the creditors of the PLAN DEBTORS as provided in the JOINT PLAN; and

WHEREAS, the LEHMAN PARTIES (certain of which are PLAN PROPONENTS and/or creditors of the PLAN DEBTORS) and ARCH have negotiated a settlement and resolution of all of ARCH's claims against the PLAN DEBTORS (as reflected in the ARCH PROOFS OF CLAIM) that, upon the confirmation and effectiveness of the JOINT PLAN, would result in ARCH accepting less favorable treatment under the JOINT PLAN than other creditors

of the PLAN DEBTORS holding allowed claims in the same class(es) as ARCH's claims, all in consideration of the promises, covenants, agreements and undertakings more particularly set forth in this AGREEMENT.

NOW therefore, the PARTIES agree as follows:

1.   *Intentionally Omitted*

2.   *General Purpose of Agreement*

The purpose of this agreement is for ARCH, as surety for and creditor of the MARBLEHEAD DEBTOR and the OVC DEBTOR, and party to settlement agreements with bond claimants pertaining to the PROJECTS, and the LEHMAN PARTIES, as secured creditors of the MARBLEHEAD DEBTOR and OVC DEBTOR who propose to take title to the PROJECTS through the JOINT PLAN to reach agreement as to their respective past and future obligations pertaining to the BONDS issued by ARCH on the PROJECTS.

3.   *Agreements pertaining to Marblehead Project*

a.   ARCH agrees that its MARBLEHEAD BONDS will remain in effect after the TRANSFER CLOSING DATE and after transfer of the MARBLEHEAD PROJECT to the LEHMAN MARBLEHEAD NOMINEE, and ARCH will continue to perform its obligations to the City of San Clemente pursuant to the MARBLEHEAD SETTLEMENT AGREEMENT.

b.   If requested by the LEHMAN PARTIES or the LEHMAN MARBLEHEAD NOMINEE, ARCH will cooperate with the LEHMAN PARTIES and the LEHMAN MARBLEHEAD NOMINEE to seek permission from the City of San Clemente for the LEHMAN MARBLEHEAD NOMINEE to assume the necessary entitlements and development agreements to continue development of the MARBLEHEAD PROJECT, and to seek permission from the City of San Clemente to substitute the LEHMAN MARBLEHEAD NOMINEE as the bond principal on the existing MARBLEHEAD BONDS.  Further, at the request of the LEHMAN PARTIES or the LEHMAN MARBLEHEAD NOMINEE, ARCH will assist them in negotiating with the City of San Clemente and/or other public bodies regarding the scope of improvements to comply with the requirements of the MARBLEHEAD PROJECT or the modification of the existing requirements.   LEHMAN MARBLEHEAD NOMINEE agrees to bear any actual and reasonable out-of-pocket expenses incurred by ARCH in providing this cooperation provided that such expenses have been pre-approved by the LEHMAN MARBLEHEAD NOMINEE.

c.   The LEHMAN PARTIES and the LEHMAN MARBLEHEAD NOMINEE will reimburse ARCH for all expenses incurred by ARCH in engaging completion contractors (and related necessary parties such as engineers, inspectors, etc.) to perform bonded works of improvement under the MARBLEHEAD BONDS for work performed under the MARBLEHEAD SETTLEMENT AGREEMENT after August

15, 2010,  to the extent, but only to the extent, provided in subsections i. through v. below:

    i.   Within ten (10) days' following entry of the LEHMAN COURT APPROVAL, the LEHMAN PARTIES shall deposit the sum of $2.5MM into an interest-bearing escrow account to be held by a mutually acceptable escrow agent (the "MARBLEHEAD ESCROW AGENT") at a mutually acceptable financial institution and pursuant to a mutually acceptable escrow arrangement (the "MARBLEHEAD ESCROW").  In the event the LEHMAN PARTIES are unable to confirm the JOINT PLAN as to the MARBLEHEAD DEBTOR (as evidenced by a final order of the CALIFORNIA BANKRUPTCY COURT denying confirmation of the JOINT PLAN as to the MARBLEHEAD DEBTOR), ARCH may make demand upon the MARBLEHEAD ESCROW AGENT to release such funds to ARCH to reimburse ARCH for amounts expended by ARCH with respect to work performed under the terms of the MARBLEHEAD SETTLEMENT AGREEMENT after August 15, 2010.  If the JOINT PLAN is confirmed as to the MARBLEHEAD DEBTOR, then within ten (10) days following the later of (i) entry of the LEHMAN COURT APPROVAL, and (ii) entry of an order by the CALIFORNIA BANKRUPTCY COURT confirming the JOINT PLAN, the LEHMAN PARTIES shall deposit an additional $2.5MM into the MARBLEHEAD ESCROW to be held in escrow pending the occurrence of the TRANSFER CLOSING DATE. If the TRANSFER CLOSING DATE does not occur on or prior to September 30, 2012 and this AGREEMENT is terminated as a result as provided in Section 10 hereof, then upon termination of this AGREEMENT, the PARTIES shall direct the MARBLEHEAD ESCROW AGENT to immediately release $2.5MM of the funds in the MARBLEHEAD ESCROW plus all interest accrued on all funds in the MARBLEHEAD ESCROW to the LEHMAN PARTIES and to release all remaining funds in the MARBLEHEAD ESCROW to ARCH; provided, however, that as a condition to the release of any such funds to ARCH, ARCH shall assign its claims against the MARBLEHEAD DEBTOR arising from ARCH's expenditure of $2.5MM for work performed in respect of the MARBLEHEAD PROJECT to the LEHMAN PARTIES (or their designee) and ARCH hereby agrees that such assigned claims (or distributions in respect thereof) shall be paid to the holder of such claims prior to any payment to ARCH in respect of any other claims (whether administrative, secured or unsecured) of ARCH against the MARBLEHEAD DEBTOR.   ARCH shall also provide to the LEHMAN PARTIES such backup documents relating to the assigned claims and/or underlying work performed by ARCH and giving rise to such assigned claims as the LEHMAN PARTIES may reasonably request and delivery of such backup documentation shall be a

condition to the release of such funds to ARCH. ARCH hereby represents that ARCH's expenditures to date exceed $2.5MM. The foregoing obligation of the PARTIES to direct the disbursement of the funds in the MARBLEHEAD ESCROW as provided above following the termination of this AGREEMENT shall survive the termination of this AGREEMENT.

ii. Upon the occurrence of the TRANSFER CLOSING DATE, the LEHMAN MARBLEHEAD NOMINEE will reimburse ARCH for all its payments to date to completion contractors to complete works of improvement under the MARBLEHEAD BONDS and which work was performed after August 15, 2010 under the MARBLEHEAD SETTLEMENT AGREEMENT, by wire transfer on the TRANSFER CLOSING DATE. The PARTIES acknowledge that (x) the amount of such payments incurred and paid by ARCH to date for works of improvements under the MARBLEHEAD BONDS including amounts paid to completion contractors Fullmer Companies and Brutoco and any inspectors and engineers is equal to $5,386,072, (y) ARCH has entered into completion contracts for a total completion amount equal to $11,621,138, which completion amount includes all amounts to be paid to Fullmer, Brutoco and any inspectors and engineers, and (z) the aggregate unpaid amount under such completion contracts is $6,235,066. ARCH will provide reasonable documentation of its actual payments to the completion contractors as a pre-requisite to any payment to ARCH, including conditional releases of contract and lien rights from the completion contractors to the extent of such payments.

iii. Upon the LEHMAN MARBLEHEAD NOMINEE's taking title to the MARBLEHEAD PROJECT, ARCH will consult with the LEHMAN MARBLEHEAD NOMINEE prior to engaging any other contractors or vendors required to complete work pursuant to the MARBLEHEAD SETTLEMENT AGREEMENT and the LEHMAN MARBLEHEAD NOMINEE will have the right to reasonably approve any contracts to be entered into by ARCH for the performance of such work. ARCH shall continue to make direct payments to the completion contractors for progress payment invoices submitted by the completion contractors within the time that a progress payment is due under the completion contract and the LEHMAN MARBLEHEAD NOMINEE will reimburse ARCH for such progress payments as provided herein. In that event, ARCH and the LEHMAN MARBLEHEAD NOMINEE will cooperate reasonably to verify the accuracy of the completion contractor's invoice. The Parties acknowledge that change orders occur frequently in complex construction projects. ARCH agrees that it will not agree to any requested change orders by the bond obligee City of San Clemente or its completion contractors in excess of $10,000 without written notice to, consultation with and consent from

the LEHMAN MARBLEHEAD NOMINEE or any entity designated by the LEHMAN PARTIES to monitor the construction. The LEHMAN MARBLEHEAD NOMINEE agrees that it will not unreasonably withhold consent to any change orders necessary for ARCH to fulfill its MARBLEHEAD SETTLEMENT AGREEMENT obligations to the bond obligee City of San Clemente. The LEHMAN MARBLEHEAD NOMINEE shall have the right to monitor the construction (or designate someone to do so on its behalf) and supervise, review and approve all work performed by contractors, approve any payments to be made to such contractors and to obtain lien waivers, releases and other such documentation as a condition to payment to such contractors as required or prescribed under the applicable construction documents.

iv. Following the occurrence of the TRANSFER CLOSING DATE, ARCH will have primary responsibility to engage and to pay completion contractors to finish the remaining bonded improvements with respect to the MARBLEHEAD PROJECT but the LEHMAN MARBLEHEAD NOMINEE may, at its option, elect to enter into any such completion contract. If the City of San Clemente or any other obligee under the MARBLEHEAD BONDS makes a demand upon the MARBLEHEAD BONDS for additional work under the MARBLEHEAD SETTLEMENT AGREEMENT or otherwise to perform bonded works of improvement (including but not limited to work that is deferred or non-priority work under the MARBLEHEAD SETTLEMENT AGREEMENT) and the City of San Clemente or other obligee and LEHMAN MARBLEHEAD NOMINEE do not reach agreement as to performance of that work, ARCH will perform its obligations under the MARBLEHEAD BONDS and the LEHMAN MARBLEHEAD NOMINEE will reimburse ARCH for the costs of any such work. The LEHMAN MARBLEHEAD NOMINEE will also reimburse ARCH for any valid payment bond claims made under MARBLEHEAD BONDS which are payment bonds for work performed after August 15, 2010 after the LEHMAN MARBLEHEAD NOMINEE takes title to the MARBLEHEAD PROJECT. The reimbursement obligations of the LEHMAN MARBLEHEAD NOMINEE described in clause iii. above and this clause iv. are referred to herein as such LEHMAN MARBLEHEAD NOMINEE's "REIMBURSEMENT OBLIGATIONS."

v. ARCH represents that it has made payments to certain payment bond claimants for work performed on the MARBLEHEAD PROJECT prior to August 15, 2010 for which ARCH has obtained a full release and assignment of the claimant's rights as listed in Exhibit E attached hereto and made a part hereof. On the TRANSFER CLOSING DATE, ARCH will assign all rights ARCH has to the payment bond claims,

including any rights obtained from those claimants, to the LEHMAN PARTIES (or their designees), including any rights to a bankruptcy claim or proof of claim associated with the payment bond claims. ARCH does not warrant that the assigned claims are valid, but does warrant that it owns the claims (including all settled claims identified on Exhibit E) in full, free and clear of any and all rights, interests or claims of any other person. ARCH will indemnify and hold the LEHMAN PARTIES and the LEHMAN MARBLEHEAD NOMINEE harmless from any further claims by payment bond claimants pertaining to work performed prior to August 15, 2010 and reimburse the LEHMAN PARTIES for any payments or distributions made by the LEHMAN PARTIES to any such claimants under the JOINT PLAN. Except for any payments that may be made or work that may be commissioned by ARCH in order to satisfy demands made by obligees or claimants under the MARBLEHEAD BONDS after the EXECUTION DATE and prior to the TRANSFER CLOSING DATE, ARCH hereby represents and warrants that ARCH has not paid for and has not arranged for the furnishing of any labor, materials or services in respect of or to the MARBLEHEAD PROJECT that was performed after August 15, 2010 other than labor, materials or services that have been and are being provided pursuant to and in satisfaction of ARCH's obligations under the MARBLEHEAD SETTLEMENT AGREEMENT.

d. On the TRANSFER CLOSING DATE, the LEHMAN MARBLEHEAD NOMINEE shall provide to ARCH a first priority lien on the MARBLEHEAD PROJECT (the "MARBLEHEAD DOT") as additional collateral for and to further secure the LEHMAN MARBLEHEAD NOMINEE'S REIMBURSEMENT OBLIGATIONS.

e. In the event that the LEHMAN MARBLEHEAD NOMINEE fails to pay its REIMBURSEMENT OBLIGATIONS as provided in this AGREEMENT within fifteen (15) business days following its receipt of written notice from ARCH demanding payment of such REIMBURSEMENT OBLIGATIONS, together with documentation evidencing ARCH's actual payments to completion contractors giving rise to such REIMBURSEMENT OBLIGATIONS as well as conditional releases of contract and lien waivers from such completion contractors with respect to any payments made to them and with respect to which ARCH is seeking reimbursement from the LEHMAN MARBLEHEAD NOMINEE. ARCH can seek recovery of such REIMBURSEMENT OBLIGATIONS from the collateral provided by the LEHMAN MARBLEHEAD NOMINEE (i.e., the MARBLEHEAD ESCROW and the MARBLEHEAD DOT) in addition to pursuing ARCH's rights and remedies directly against the LEHMAN MARBLEHEAD NOMINEE for any breach of this AGREEMENT. Notwithstanding the foregoing or anything to the contrary contained herein, ARCH agrees to first seek recovery from the funds available in the MARBLEHEAD ESCROW before seeking recovery under the MARBLEHEAD DOT or pursuing any other rights or remedies for any breach of this AGREEMENT.

The MARBLEHEAD ESCROW and MARBLEHEAD DOT shall be the only collateral required by ARCH for maintaining the MARBLEHEAD BONDS and shall be the only security for the LEHMAN MARBLEHEAD NOMINEE'S REIMBURSEMENT OBLIGATIONS.

f.  The LEHMAN MARBLEHEAD NOMINEE shall have the right, at any time and in its sole discretion, to cause ARCH to release the MARBLEHEAD DOT provided that, in connection with any such release the LEHMAN MARBLEHEAD NOMINEE deposits with the MARBLEHEAD ESCROW AGENT cash or a letter of credit from a banking institution reasonably acceptable to ARCH in the amount of $10MM which shall be added to, held as part of and otherwise disbursed in the same manner as other funds held in the MARBLEHEAD ESCROW.  Upon delivery of the $10MM cash or letter of credit to the MARBLEHEAD ESCROW AGENT, ARCH will release the MARBLEHEAD DOT and any other security interests granted to ARCH pursuant thereto.

g.  Upon the release, substitution, replacement or exoneration of the MARBLEHEAD BONDS, ARCH shall release all collateral for the LEHMAN MARBLEHEAD NOMINEE's REIMBURSEMENT OBLIGATIONS, including, without limitation, all funds and/or letters of credit in the MARBLEHEAD ESCROW, the MARBLEHEAD DOT and any other security interests granted to ARCH.

4.  *Agreements Pertaining to Oak Valley Project*

a.  ARCH agrees that its OVC BONDS will remain in effect after the TRANSFER CLOSING DATE and after transfer of the OAK VALLEY PROJECT to the LEHMAN OAK VALLEY NOMINEE.

b.  If requested by the LEHMAN PARTIES, ARCH will cooperate with the LEHMAN PARTIES and the LEHMAN OAK VALLEY NOMINEE to seek permission from the City of Beaumont for the LEHMAN OAK VALLEY NOMINEE to assume the necessary entitlements and development agreements to continue development of the OAK VALLEY PROJECT, and to seek permission from the City of Beaumont to substitute the LEHMAN OAK VALLEY NOMINEE as the bond principal on the existing OVC BONDS. Further, at the request of the LEHMAN PARTIES or the LEHMAN OAK VALLEY NOMINEE, ARCH will assist them in negotiating with the City of Beaumont and/or other public bodies regarding the scope of improvements to comply with the requirements of the OAK VALLEY PROJECT or the modification of the existing requirements  LEHMAN OAK VALLEY NOMINEE agrees to bear any actual and reasonable out-of-pocket expenses incurred by ARCH in providing this cooperation provided that such expenses have been pre-approved  by the LEHMAN OAK VALLEY NOMINEE.

c.  If and to the extent that a call is made on the OVC BONDS following the TRANSFER CLOSING DATE, ARCH will honor its obligations under the

applicable OVC BONDS and will have primary responsibility to engage and to pay completion contractors to finish the remaining bonded improvements with respect to the OVC PROJECT but the LEHMAN OAK VALLEY NOMINEE may, at its option, elect to enter into any such completion contract.  If the City of Beaumont or any other obligee under the OVC BONDS makes a demand upon the OVC BONDS to perform bonded works of improvement and the City of Beaumont or other obligee and LEHMAN OAK VALLEY NOMINEE do not reach agreement as to performance of that work, ARCH will perform its obligations under the OVC BONDS and the LEHMAN OAK VALLEY NOMINEE will reimburse ARCH for the costs of any such work. The LEHMAN OAK VALLEY NOMINEE will also reimburse ARCH for any valid payment bond claims made under OVC BONDS  which are payment bonds for work performed after August 15, 2010 after the LEHMAN OAK VALLEY NOMINEE takes title to the OAK VALLEY PROJECT.  The reimbursement obligations of the LEHMAN OAK VALLEY NOMINEE described in this clause c. are referred to herein as such LEHMAN OAK VALLEY NOMINEE's "REIMBURSEMENT OBLIGATIONS."

d.    ARCH represents that it has made payments to certain payment bond claimants for work performed on the OAK VALLEY PROJECT for which ARCH has obtained a full release and assignment of the claimant's rights as listed in Exhibit E attached hereto and made a part hereof.   On the TRANSFER CLOSING DATE, ARCH will assign all rights ARCH has to the payment bond claims, including any rights obtained from those claimants, to the LEHMAN PARTIES (or their designees), including any rights to a bankruptcy claim or proof of claim associated with the payment bond claims. ARCH does not warrant that the assigned claims are valid, but does warrant that it owns the claims (including all settled claims identified on Exhibit E) in full, free and clear of any and all rights, interests or claims of any other person. ARCH will indemnify and hold the LEHMAN PARTIES and the LEHMAN OAK VALLEY NOMINEE harmless from any further claims by payment bond claimants as to work performed prior to August 15, 2010 and reimburse the LEHMAN PARTIES for any payments or distributions made by the LEHMAN PARTIES to any such claimants under the JOINT PLAN. Except for any payments that may be made or work that may be commissioned by ARCH in order to satisfy demands made by obligees or claimants under the OVC BONDS after the EXECUTION DATE and prior to the TRANSFER CLOSING DATE, ARCH hereby represents and warrants that ARCH has not paid for and has not arranged for the furnishing of any labor, materials or services in respect of or to the OAK VALLEY PROJECT that was performed after August 15, 2010.

5.    _Agreements Pertaining to Both Projects_

*a.* On the TRANSFER CLOSING DATE, the LEHMAN PARTIES will reimburse ARCH for unpaid bond premiums owed to ARCH with respect to the BONDS in an amount equal to the lesser of $350,000 or one-half of the current total aggregate unpaid bond premiums incurred under the BONDS as of the TRANSFER CLOSING DATE.  ARCH will waive any other payments and release any claims it may have against the MARBLEHEAD DEBTOR and OVC DEBTOR in respect of these unpaid bond premiums and will obtain a release of the Rohm Agency's claims for its share of the premiums (as to the BONDS only) incurred prior to the TRANSFER CLOSING DATE as a condition of this reimbursement; provided, that if ARCH is unable to obtain such release from the Rohm Agency, ARCH hereby agrees to indemnify and hold the LEHMAN PARTIES harmless from any and all claims of the Rohm Agency in respect of any such premiums and reimburse the LEHMAN PARTIES for any disbursements made by the LEHMAN PARTIES under the JOINT PLAN to the Rohm Agency (or any assignee thereof) in respect of such claims.  ARCH hereby represents and warrants that there are no amounts in respect of any bond premiums owing to any brokers or other persons other than Rohm Agency.  The LB NOMINEES shall make  payment to ARCH of all accruing bond premiums on BONDS that remain outstanding after the TRANSFER CLOSING DATE in the amounts specified in <u>Exhibit F</u> attached hereto and made a part hereof until the applicable BONDS are released, substituted, replaced or exonerated. All such annual premiums shall be calculated on a pro rata basis from the TRANSFER CLOSING DATE.

*b.* ARCH represents that the chart attached hereto as <u>Exhibit E</u> identifies all claims made under any payment BONDS, the status of ARCH's resolution of such claims and, if settled, the amounts paid by ARCH in settling such claims, the date of payment, the extent to which ARCH has taken an assignment of the corresponding claims against the MARBLEHEAD DEBTOR and/or OVC DEBTOR and the extent to which the claimants are RESIDUAL RIGHTS CLAIMANTS.  ARCH further represents that it has made payments to certain payment bond claimants who contend that they have additional, valid non-bonded claims and for which ARCH has received only a partial assignment of the claimant's rights (the "<u>RESIDUAL RIGHTS CLAIMANTS</u>"). All such RESIDUAL RIGHTS CLAIMANTS are listed on <u>Exhibit E</u> attached hereto and made a part hereof.  On or prior to the TRANSFER CLOSING DATE, ARCH will obtain a full release or assignment of all such residual rights from each of the RESIDUAL RIGHTS CLAIMANTS.  ARCH will provide the LEHMAN PARTIES with copies of all such releases or assignments and evidence reasonably acceptable to the LEHMAN PARTIES that, on the TRANSFER CLOSING DATE, ARCH is the owner and holder of 100% of the bonded claims held by the RESIDUAL RIGHTS CLAIMANTS, free and clear of such RESIDUAL RIGHTS CLAIMANTS' rights.  On the TRANSFER CLOSING DATE, ARCH will assign all such rights to the LEHMAN PARTIES (or their designees) (to the extent such rights have not otherwise been released) and, in exchange, the LEHMAN PARTIES will

reimburse ARCH up to $1,100,000 for the actual amounts paid by ARCH to the RESIDUAL RIGHTS CLAIMANTS in obtaining such releases or assignments, and up to $100,000 for actual and reasonable legal fees incurred by ARCH in obtaining and documenting the releases or assignments (together with invoices and other documents substantiating such fees) without any further reimbursement to ARCH of any amounts paid by ARCH in excess thereof.

*c.* ARCH shall be entitled to retain an allowed Reliance Claim (as such term is defined in the JOINT PLAN) for $3 million against the MARBLEHEAD DEBTOR. ARCH will release all other claims against the PLAN DEBTORS. ARCH and the LEHMAN PARTIES will cooperate reasonably as to which bonded claims held by ARCH will remain in ARCH's name to constitute the $3MM allowed Reliance Claim; all other bonded claims held or otherwise acquired by ARCH from bond claimants who also have claims against any of the PLAN DEBTORS will be transferred and assigned to the LEHMAN PARTIES (or their designees) on the TRANSFER CLOSING DATE.

*d.* On the TRANSFER CLOSING DATE, the LEHMAN PARTIES shall reimburse ARCH for actual attorneys' fees incurred by ARCH with respect to the ADVERSARY PROCEEDING in an aggregate amount not to exceed $750,000, provided that the LEHMAN PARTIES shall have received any requested non-privileged invoices and evidence of payment to substantiate all such fees prior to the TRANSFER CLOSING DATE.

6.    *Assignments*

a. ARCH shall sell, assign and convey to the LEHMAN PARTIES on the TRANSFER CLOSING DATE, all of ARCH's right, title and interest to the ARCH-owned payment bond claims referenced in Exhibit E (except for the $3MM of allowed claims to be designated Reliance Claims), free and clear of any right, claim, lien or interest of the bond claimants or any other person provided that all amounts that are due and payable under this AGREEMENT by the LEHMAN PARTIES to ARCH on the TRANSFER CLOSING DATE are paid to ARCH.

b. ARCH shall sell, assign and convey to the LEHMAN PARTIES on the TRANSFER CLOSING DATE, all of its right, title and interest to the ARCH-owned payment bond Residual Rights claims referenced in Exhibit E (except for the $3MM of allowed claims to be designated Reliance Claims), free and clear of any right, claim, lien or interest of the RESIDUAL RIGHTS CLAIMANTS, any other bond claimants or any other person provided that all amounts that are due and payable under this AGREEMENT by the LEHMAN PARTIES to ARCH on the TRANSFER CLOSING DATE are paid to ARCH.

c.  ARCH shall sell, assign and convey to the LEHMAN PARTIES on the TRANSFER CLOSING DATE, all rights, claims or causes of action that ARCH has against any indemnitors who have provided indemnity to ARCH with respect to losses incurred by ARCH in connection with the BONDS, free and clear of any rights, claims, liens or interests of any person provided that all amounts that are due and payable under this AGREEMENT by the LEHMAN PARTIES to ARCH on the TRANSFER CLOSING DATE are paid to ARCH.

d.  ARCH and the LEHMAN PARTIES shall reasonably cooperate to effectuate the assignments and conveyances described in this Section 6 including the delivery by ARCH of such assignments and other instruments reasonably requested by the LEHMAN PARTIES.

7.    *Conveyance of Properties to Third Party Transferees*

The LEHMAN PARTIES agree that if a PROJECT is transferred to a person or entity that is not an affiliate of any LEHMAN PARTY or LB NOMINEE (a "THIRD PARTY TRANSFEREE"), the applicable LB NOMINEE will require as a condition of closing of such transfer that the THIRD PARTY TRANSFEREE furnishes replacement bonds with respect to such PROJECT acceptable to the bond obligee(s), and obtain the full release and exoneration by the obligee(s) of the applicable BONDS.  Upon the full release and exoneration of such BONDS, ARCH shall release all collateral, including any cash, letters of credit, and/or deeds of trust, and all other security interests provided or granted to or for the benefit of ARCH by such LB NOMINEE.  The applicable LB NOMINEE will indemnify and hold ARCH harmless for any performance or payment bond losses, including attorney's fees and expenses, which may arise if the LB NOMINEE does not obtain a full release and exoneration of the applicable BONDS as a part of the transfer of the applicable PROJECT to a THIRD PARTY TRANSFEREE.

8.    *Releases*

On the TRANSFER CLOSING DATE and to the extent not otherwise assigned to the LEHMAN PARTIES (or their designees) pursuant to the terms of this AGREEMENT, (a) ARCH will release any claims against the PLAN DEBTORS and/or LEHMAN PARTIES with respect to the paid payment bond claims arising from work performed prior to August 15, 2010 (except for the allowed designated Reliance Claims in the amount of $3,000,000), (b) ARCH will release all claims against any of the TRUSTEE DEBTORS including, without limitation, claims with respect to performance bond obligations on the PROJECTS and any claims pertaining to any of the other projects owned by the other TRUSTEE DEBTORS, (c) ARCH will dismiss, with prejudice, its complaint and all claims it has in intervention in the ADVERSARY PROCEEDING against all defendants, (d) ARCH will release all LEHMAN PARTIES and the LB NOMINEES from all claims arising from or with respect to the PROJECTS, the BONDS or the TRUSTEE DEBTORS other than any claims arising under this AGREEMENT or any other document executed and delivered in connection herewith, and (e) ARCH will dismiss all claims against the VOLUNTARY DEBTORS for guaranty or indemnity liability arising from any of the BONDS.  The obligations of the LB NOMINEES to reimburse ARCH for future bond payments

(above the amounts to be paid on the TRANSFER CLOSING DATE) shall in no way be waived, lessened or affected by the release of the TRUSTEE DEBTORS under this AGREEMENT. ARCH's full claim against the TRUSTEE DEBTORS and their estates, including any claims for cross indemnity for bonds issued with respect to projects that are not subject to the TRUSTEE CASES, is limited to the $3 million Reliance Claim against the MARBLEHEAD DEBTOR provided for in this AGREEMENT.

9.    *Dates and Events Governing the Terms of this Agreement*

        a.    <u>Execution of Agreement and Lehman Court Approval</u>.  Within ten (10) days following the later of (i) the execution and delivery of this AGREEMENT by all PARTIES (other than the LB NOMINEES) and (ii) receipt of the LEHMAN COURT APPROVAL, $2.5MM shall be deposited by the LEHMAN PARTIES into the MARBLEHEAD ESCROW as provided in Section 3.c.i. hereof.

        b.    <u>Entry of Confirmation Order by California Bankruptcy Court</u>.  Within ten (10) days following the entry of an order by the CALIFORNIA BANKRUPTCY COURT confirming the JOINT PLAN, the LEHMAN PARTIES shall deposit an additional $2.5MM into the MARBLEHEAD ESCROW as provided in Section 3.c.i. hereof.

        c.    <u>Transfer Closing Date</u>.  On the TRANSFER CLOSING DATE, all other rights and obligations to reimburse and post collateral, as expressly provided herein, shall become effective and the LEHMAN PARTIES shall pay to ARCH the amounts expended by ARCH with respect to work performed under the MARBLEHEAD SETTLEMENT AGREEMENT after August 15, 2010.

        d.    <u>Transfer of the Projects to Third Party Transferees</u>.  In the event a PROJECT is transferred to a THIRD PARTY TRANSFEREE, the applicable LB NOMINEE shall obtain the release of the then outstanding BONDS issued for such LB NOMINEE'S PROJECT and replace those BONDS.

10.    *Conditions to Effectiveness of Agreement*.

    Except as expressly provided in this Section 10, this AGREEMENT shall become effective after each of the following conditions have occurred:

        *a.*    The PARTIES (other than the LB NOMINEES) have delivered executed copies of this AGREEMENT to each other.  Upon execution and delivery of an amendment or joinder to this AGREEMENT by the LB NOMINEES, such LB NOMINEES shall thereafter be bound by the terms of this AGREEMENT as if they had originally been parties hereto.

b. The NY BANKRUPTCY COURT has issued a final non-appealable order approving the entry into the AGREEMENT by LBHI and LCPI (the "LEHMAN COURT APPROVAL").

c. An order confirming the JOINT PLAN has been approved as a final non-appealable order by the CALIFORNIA BANKRUPTCY COURT, the Effective Date of the JOINT PLAN has occurred and title to the PROJECTS has been conveyed to the LB NOMINEES.

If any of the foregoing conditions has not occurred by September 30, 2012, each of the ARCH and the LEHMAN PARTIES (and the LB NOMINEES if they have become PARTIES hereto) shall have the right to terminate this AGREEMENT upon written notice to the other PARTY(IES), whereupon this AGREEMENT shall automatically terminate and be of no further force or effect and the PARTIES shall be automatically relieved of any further obligations hereunder (except for any obligations which are expressly stated to survive the termination of this AGREEMENT) and shall be fully restored to their respective legal positions as if this AGREEMENT had never been executed. Notwithstanding the foregoing or anything to the contrary contained herein, the obligation of the LEHMAN PARTIES to make the deposits provided for under Section 3.c.i. hereof in the aggregate amount of $5MM shall become effective upon satisfaction only of the conditions described in clauses a. and b. above.

11.    _Warranties and Representations_

ARCH hereby represents and warrants to the LEHMAN PARTIES that each of the representations and warranties of ARCH contained in this Agreement are true and correct as of the EXECUTION DATE and will be true and correct as of the TRANSFER CLOSING DATE. Each of the LEHMAN PARTIES hereby represents and warrants to ARCH that each of the representations and warranties of such LEHMAN PARTY contained in this AGREEMENT are true and correct as of the EXECUTION DATE and will be true and correct as of the TRANSFER CLOSING DATE.

Each PARTY represents and warrants to the other PARTIES that, subject to obtaining the LEHMAN COURT APPROVAL, this AGREEMENT has been duly executed and delivered by such PARTY and constitutes the legal, valid and binding agreement of such PARTY, enforceable against such PARTY in accordance with its terms and, upon execution and delivery of the ancillary documents to be executed and delivered by such PARTY pursuant to or in accordance with the terms of this AGREEMENT, all such ancillary documents will have been duly executed and delivered by such PARTY and will constitute the legal, valid and binding agreement of such PARTY, enforceable against such PARTY in accordance with their respective terms.

12.    _Further Assurances_

The PARTIES will execute and deliver, or cause to be executed and delivered, on the TRANSFER CLOSING DATE such instruments, agreements, assignments, releases, waivers, certificates and other documents contemplated to be delivered pursuant to or in accordance with

the terms of this AGREEMENT or otherwise reasonably requested by another PARTY to effectuate or otherwise in furtherance of the terms of this AGREEMENT in such form and substance reasonably and mutually acceptable to the PARTIES and, from time to time after the TRANSFER CLOSING DATE, without further consideration, will execute and deliver, or cause to be executed and delivered, such instruments, agreements, assignments, releases, waivers, certificates or other documents as the other PARTIES may reasonably request, and take such actions as the other PARTIES may reasonably request, to effectuate, consummate or otherwise give effect to the transactions contemplated herein and to assure that the benefits of this AGREEMENT are realized by the PARTIES.

13.    _Dispute Resolution Procedures, Venue and Choice of Law_

If the PARTIES cannot resolve any dispute which may arise between them concerning the performance, interpretation or enforcement of this AGREEMENT or with respect to any claims arising under this AGREEMENT, the PARTIES agree that any such dispute will be submitted to binding arbitration at and be administered by the Judicial Arbitration and Mediation Service ("JAMS") before retired Judge Daniel Weinstein (or such other mediator/arbitrator as JAMS may appoint and the PARTIES may agree to if Judge Weinstein is unavailable). The PARTIES will request consideration of the dispute by Judge Weinstein (or other agreed upon mediator/arbitrator) within forty-eight (48) hours following a written notice from any PARTY to the other PARTIES that a dispute has arisen which cannot be resolved consensually among the PARTIES and will request the issuance of an expedited written opinion from Judge Weinstein (or other agreed upon mediator/arbitrator) which written opinion will be fully binding upon the PARTIES. The administration fees and expenses of any mediation shall be borne equally by the LEHMAN PARTIES, on the one hand, and ARCH, on the other hand.

14.    _Integrated Document and Future Modifications_

This AGREEMENT represents the final agreement of the PARTIES, and supersedes all prior written and oral agreements, including the term sheet executed by LBHI and ARCH pertaining to the BONDS. This AGREEMENT may only be modified by a writing executed by all PARTIES. Evidence of prior writings and/or verbal communications may not be used as evidence in any proceeding pertaining to breach of or interpretation of this AGREEMENT. This is a fully negotiated AGREEMENT among sophisticated parties, and none of the PARTIES shall be deemed the primary drafter of this AGREEMENT if any dispute arises concerning interpretation of this AGREEMENT.

15.    _No Admission of Liability_

No provision in this AGREEMENT shall be construed as an admission of any liability or wrongdoing between the PARTIES.

16.    _Binding Effect; Successors and Assignees_

This AGREEMENT shall inure to the benefit of and be binding upon the PARTIES and their respective successors and permitted assignees; provided that no PARTY may assign its

rights or obligations under this AGREEMENT without the written consent of the other PARTIES.

17.    *Counterparts and Facsimile Transmittal of Executed  Agreements*

This AGREEMENT may be executed in counterparts, each of which constitutes an original, and all of which collectively constitute one agreement. The signatures of all PARTIES need not appear on the same counterpart.  Facsimile transmitted signatures shall constitute originals for all purposes.

18.    *Severability and Construction*

If any provision of this AGREEMENT shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect if the essential terms and conditions of this AGREEMENT for each PARTY remain valid, binding and enforceable.

19.    *Headings; Schedules and Exhibits; Interpretation*.

The headings, titles or captions utilized in this AGREEMENT are designed for the sole purpose of facilitating ready reference this AGREEMENT and shall in no way define, limit, extend or describe the scope or intent of this AGREEMENT or any provisions hereof. References to Sections, unless otherwise indicated, are references to Sections of this AGREEMENT.  All Schedules and Exhibits to this AGREEMENT are hereby made a part hereof and incorporated herein by reference for all purposes.  Reference to any Schedule or Exhibit herein shall be to the Schedules and Exhibits attached hereto.  As used herein, (i) the term "including" shall mean "including, without limitation," and (ii) the masculine shall include the feminine and the neuter.

20.    *Survival*

The representations, warranties, covenants and agreements made by the PARTIES in this AGREEMENT shall survive the closing of the transactions contemplated herein.

21.    *No Set-off Rights*

None of the PARTIES shall have any set-off rights under this AGREEMENT or any other document executed in connection with the transactions contemplated by this AGREEMENT.

22.    *Notices*

All notices and other communications given or made pursuant to this AGREEMENT shall be in writing and shall be deemed effectively given: (a) upon personal delivery to any PARTY to be notified, (b) when sent by electronic mail or facsimile confirmed by the recipient, (c) on the date of a registered or certified mail receipt prepared by the U.S. Postal Service, or (d)

the date of a nationally recognized overnight courier's written verification of receipt. All communications shall be sent to the following, unless a written notice of changed recipient or address is exchanged between the PARTIES:

To any LEHMAN PARTY or LB NOMINEE at:

c/o Lehman Brothers Holdings, Inc.
1271 Avenue of the Americas
New York, New York 10020
Attn: Joelle Halperin
Facsimile: (646) 834-0874

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn: Michael Bond, Esq.
Facsimile (212) 310-8007

To ARCH at:

c/o Arch Insurance Group, Inc.
300 Plaza III, 3d Floor
Jersey City, NJ 07311
Attn: Patrick K. Nails, Esq.
Senior Vice president and Associate General Counsel
Facsimile: (201) 743-4659

With copies (which shall not constitute notice) to:

Leo & Weber, P.C.
One N. LaSalle Street, Suite 3600
Chicago, IL 60602
Attn:  T. Scott Leo, Esq.
Facsimile: (312) 857-1240

Gascou Hopkins LLP
1801 Avenue of the Stars, Suite 230
Los Angeles, CA. 90067
Attn: Ronald Hopkins, Esq.
Facsimile: (310) 785-9149

*[Remainder of Page Intentionally Blank, Signatures on Following Page]*

IN WITNESS WHEREOF, each Party by its duly authorized signatory has executed this Agreement:

**LEHMAN BROTHERS HOLDINGS, INC.**, a Delaware corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Philip Cybert
Title: Authorized Signatory

**LEHMAN ALI, INC.**,
a Delaware corporation

By: _____
Name: Philip Cybert
Title: Authorized Signatory

**LEHMAN COMMERCIAL PAPER INC.**, a New York corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Philip Cybert
Title: Authorized Signatory

**OVC HOLDINGS LLC**,
a Delaware limited liability company

By: _____
Name: Philip Cybert
Title: Authorized Signatory

**ARCH INSURANCE COMPANY**,
a Missouri corporation

By: _____
Name: _____
Title: _____

SIGNATURE PAGE TO SETTLEMENT AGREEMENT

IN WITNESS WHEREOF, each Party by its duly authorized signatory has executed this Agreement:

**LEHMAN BROTHERS HOLDINGS, INC.**, a Delaware corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: _____
Title: _____

**LEHMAN ALI, INC.**, a Delaware corporation

By: _____
Name: _____
Title: _____

**LEHMAN COMMERCIAL PAPER INC.**, a New York corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: _____
Title: _____

**OVC HOLDINGS, LLC**, a Delaware limited liability company

By: _____
Name: _____
Title: _____

**ARCH INSURANCE COMPANY**, a Missouri corporation

By: _~~Patrick K. Norris~~_ *(signature)*
Name: _Patrick K. Norris_
Title: _Senior Vice President_

SIGNATURE PAGE TO SETTLEMENT AGREEMENT

# **EXHIBIT A**

## **BONDS**

See Attached.

Suncal Cos

| Principal Name | Bond Num | Bond Amount | Remaining Bond Liability | Premium Amount | Bond Description | Obligee Name | Effective Date |
|---|---|---|---|---|---|---|---|
| LBL/L-Suncal Oak Valley, LLC | SU 5014598-0000 | 599,508.00 | 599,508.00 | 5,995.00 | Contingent Guarantee Obligation | Beaumont Cherry Valley Water District | 4/29/2008 |
| LBL/L-Suncal Oak Valley, LLC | SU 5015421-0000 | 616,860.00 | 616,860.00 | 6,169.00 | Tract 31462/Subsidy | Fairway Canyon Community Association | 6/16/2008 |
| LBL/L-Suncal Oak Valley, LLC | SU 5015422-0000 | 218,772.00 | 218,772.00 | 1,094.00 | Tract 31462/Common Facilities | Fairway Canyon Community Association | 6/15/2008 |
| SCC/Oak Valley, LLC | SU 5008349-0000 | 1,425,419.50 | 1,425,419.50 | 7,127.00 | J & G Street Alignment - Development Plan Review #0404-002 | City of Calimesa | 6/3/2008 |
| SCC/Oak Valley, LLC | SU 5010585-0000 | 573,865.00 | 573,865.00 | 5,739.00 | Permit No. 200400762-JPL | U.S. Department of the Army Corps of Engineers | 9/13/2008 |
| SCC/Oak Valley, LLC | SU 5012365-0000 | 3,682,000.00 | 3,682,000.00 | 18,410.00 | Tract 31462, Infrastructure Street & Sewer Improvements | City of Beaumont | 12/22/2008 |
| SCC/Oak Valley, LLC | SU 5012366-0000 | 541,000.00 | 541,000.00 | 2,705.00 | Tract 31462, Infrastructure Storm Drain Improvements - Lines B, G, J, K | City of Beaumont | 12/22/2008 |
| SCC/Oak Valley, LLC | SU 5012367-0000 | 2,082,000.00 | 2,082,000.00 | 10,410.00 | Tract 31462, Infrastructure Storm Drain Improvements - Lines D, E, F | City of Beaumont | 12/22/2008 |
| SCC/Oak Valley, LLC | SU 5012368-0000 | 131,000.00 | 131,000.00 | 655.00 | Tract 31462, Infrastructure Storm Drain Improvements - Lines H, I | City of Beaumont | 12/22/2008 |
| SCC/Oak Valley, LLC | SU 5012369-0000 | 245,584.97 | 245,584.97 | 1,228.00 | Tract 31462-1, Infrastructure Street & Sewer Improvements | City of Beaumont | 12/22/2008 |
| SCC/Oak Valley, LLC | SU 5012370-0000 | 340,000.00 | 340,000.00 | 1,700.00 | Tract 31462-2, Infrastructure Street, Drainage & Sewer Improvements | City of Beaumont | 12/22/2008 |
| SCC/Oak Valley, LLC | SU 5012371-0000 | 343,000.00 | 343,000.00 | 1,715.00 | Tract 31462-3, Infrastructure Street, Drainage & Sewer Improvements | City of Beaumont | 12/22/2008 |
| SCC/Oak Valley, LLC | SU 5012372-0000 | 159,032.06 | 159,032.06 | 795.00 | Tract 31462-4, Infrastructure Street & Sewer Improvements | City of Beaumont | 12/22/2008 |
| SCC/Oak Valley, LLC | SU 5012373-0000 | 540,000.00 | 540,000.00 | 2,700.00 | Tract 31462-6, Infrastructure Street, Drainage & Sewer Improvements | City of Beaumont | 12/22/2008 |
| SCC/Oak Valley, LLC | SU 5017059-0000 | 300,000.00 | 300,000.00 | 1,500.00 | Tract 32702 Summerwind Ranch/Grading | City of Calimesa | 9/30/2008 |
| Suncal Marblehead, LLC | SU 5013729-0000 | 295,200.00 | 295,200.00 | 2,952.00 | Marblehead Coastal Project, Permit No. USACOE #200300978-CJF | U.S. Department of the Army Corps of Engineers | 1/19/2009 |
| Suncal Marblehead, LLC | SU 5014712-0000 | 1,707,100.00 | 1,707,100.00 | 8,536.00 | Tract 8817 Street Improvements Lots 1 77 | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014713-0000 | 863,000.00 | 863,000.00 | 4,315.00 | Tract 8817 Streets-Lots 78-120 | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014714-0000 | 751,000.00 | 751,000.00 | 3,755.00 | Tract 8817 Streets-Lots 121-182 | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014715-0000 | 1,354,600.00 | 1,354,600.00 | 6,773.00 | Tract 8817 Street Improvements Lots 183-313 (Via Cantabria, Via Galicia, Via ASturias, Via Murcia) | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014716-0000 | 1,858,866.00 | 1,858,866.00 | 9,295.00 | TTM 8817 Avenida Costa Azul Via Artemesia Park access Road | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014717-0000 | 180,000.00 | 180,000.00 | 900.00 | Tract 8817 JRWSS Waterline Relocation/ Grading | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014718-0000 | 804,000.00 | 804,000.00 | 4,020.00 | Tract 8817/Commercial Service Entry Wall | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014719-0000 | 15,350.00 | 15,350.00 | 100.00 | Tract 8817/ Canyon Edge Walls | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014720-0000 | 1,005,000.00 | 1,005,000.00 | 5,025.00 | Tract 8817/Retaining Wall | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014721-0000 | 443,727.00 | 443,727.00 | 2,219.00 | Tract 8817 RR Park/Grading | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014722-0000 | 225,513.00 | 225,513.00 | 1,128.00 | Tract 8817 Habitat Management | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014723-0000 | 3,571,133.91 | 3,571,133.91 | 17,856.00 | Tract 8817/Residential Streets, Landscape | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014724-0000 | 1,705,500.00 | 1,705,500.00 | 8,528.00 | TTM 8817 AVH & Avenida Pico/ Waterline | City of San Clemente Engineering Division | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014725-0000 | 170,000.00 | 170,000.00 | 850.00 | Tract 8817/Monument | City of San Clemente Engineering Division | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014726-0000 | 4,671,000.00 | 4,671,000.00 | 23,355.00 | Tract 8817/Rough Grading | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014727-0000 | 221,100.00 | 221,100.00 | 1,106.00 | TTM 8817 Caltrans Grading | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014728-0000 | 508,500.00 | 508,500.00 | 2,543.00 | Tract 8817 Production Precise Grading | City of San Clemente Engineering Division | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014729-0000 | 294,000.00 | 294,000.00 | 1,470.00 | Tract 8817 Lots 78-120/Grading | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014730-0000 | 404,800.00 | 404,800.00 | 2,024.00 | Tract 8817 Lots 121-182/Grading | City of San Clemente | 5/4/2008 |

1

Re: Letters of Credit
Suncal Cos

| Principal Name | Bond Num | Bond Amount | Remaining Bond Liability | Premium Amount | Bond Description | Obligee Name | Effective Date |
|---|---|---|---|---|---|---|---|
| Suncal Marblehead, LLC | SU 5014731-0000 | 866,500.00 | 866,500.00 | 4,333.00 | Tract 8817 Marblehead Coastal/Grading | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014791-0000 | 3,492,280.00 | 3,492,280.00 | 17,462.00 | Tract 8817/Backbone Storm Drain | City of San Clemente | 5/10/2008 |
| Suncal Marblehead, LLC | SU 5014792-0000 | 1,409,100.00 | 1,409,100.00 | 7,046.00 | TTM 8817 AVH & Pico/Sewer , Water | City of San Clemente | 6/2/2008 |
| Suncal Marblehead, LLC | SU 5014794-0000 | 3,696,398.55 | 3,696,398.55 | 18,482.00 | Tract 8817 Urban Runoff Bioswales, Wetlands, CDS Units, Storage Vaults | City of San Clemente | 5/10/2008 |
| Suncal Marblehead, LLC | SU 5014795-0000 | 9,101,200.00 | 9,101,200.00 | 45,506.00 | Tract 8817 Avenida Vista Hermosa Bridge | City of San Clemente | 5/10/2008 |
| Suncal Marblehead, LLC | SU 5014796-0000 | 3,243,200.00 | 3,243,200.00 | 16,216.00 | Tract 8817 Commercial Site Bridge Improvements | City of San Clemente | 5/10/2008 |
| Suncal Marblehead, LLC | SU 5014797-0000 | 200,000.00 | 200,000.00 | 1,000.00 | Tract 8817 Bluff Restoration Grading | City of San Clemente Engineering Division | 6/8/2008 |
| Suncal Marblehead, LLC | SU 5014986-0000 | 59,946.07 | 59,946.07 | 300.00 | TTM 8817 MSE Wall Planting, Etc. | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014987-0000 | 1,135,905.00 | 1,135,905.00 | 5,680.00 | TTM 8817, Pico Park; Precise Grading | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014988-0000 | 3,261,370.00 | 3,261,370.00 | 16,307.00 | Tract 8817 Sports Park/Grading | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014989-0000 | 658,851.00 | 658,851.00 | 3,295.00 | TTM 8817; Precise Grading for Lot N Park | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014990-0000 | 686,819.00 | 686,819.00 | 3,434.00 | TTM 8817, Lot R Park; Precise Grading | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014991-0000 | 165,028.00 | 165,028.00 | 825.00 | TTM 8817, Avenida Pico Medians & Parkway; Improvements | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014992-0000 | 306,200.00 | 306,200.00 | 1,531.00 | TTM 8817 Avenida Vista Hermosa Medians & Parkway | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014993-0000 | 1,532,785.00 | 1,532,785.00 | 7,664.00 | TTM 8817/Trails, Signage | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014994-0000 | 117,832.00 | 117,832.00 | 589.00 | TTM 8817/Entry Monument Signage | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014995-0000 | 1,765,526.00 | 1,765,526.00 | 8,828.00 | Tract 8817 Avenida Vista Hermosa/ Street | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014996-0000 | 881,102.00 | 881,102.00 | 4,406.00 | Tract 8817 Streets -Avenida Pico | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014997-0000 | 1,086,376.00 | 1,086,376.00 | 5,432.00 | Tract 8817 El Camino Real Improvements | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5015039-0000 | 901,450.00 | 901,450.00 | 4,508.00 | TTM 8817 Avenida Vista Hermosa Traffic Signal | City of San Clemente Engineering Division | 5/24/2008 |
| Suncal Marblehead, LLC | SU 5015040-0000 | 409,200.00 | 409,200.00 | 2,046.00 | TTM 8817 Avenida Pico Traffic Signal | City of San Clemente Engineering Division | 5/24/2008 |
| Suncal Marblehead, LLC | SU 5015679-0000 | 225,000.00 | 225,000.00 | 2,250.00 | TTM 8817; Encroachment Permit, Permit No. 1204-6MC-0649 | Caltrans | 7/5/2008 |
| Suncal Marblehead, LLC | SU 5017323-0000 | 123,806.38 | 123,806.38 | 619.00 | TTM 8817 Calle de los Molinos Street Improvements | City of San Clemente | 9/20/2008 |
| Suncal Marblehead, LLC | SU 5017324-0000 | 97,919.00 | 97,919.00 | 490.00 | TTM 8817 Via Socorro Street Improvements | City of San Clemente | 9/20/2008 |
| | 59 | | | 352,941.00 | | | |

2

## EXHIBIT B

## SUNCAL DEBTORS

### Voluntary Debtors

Acton Estates, LLC
Kirby Estates, LLC
North Orange Del Rio Land, LLC
Palmdale Hills Property, LLC
SCC Communities LLC
SCC/Palmdale, LLC
Seven Brothers LLC
SJD Development Corp.
SJD Partners, Ltd.
SunCal Beaumont Heights, LLC
SunCal Bickford Ranch LLC
SunCal Communities I, LLC
SunCal Communities III, LLC
SunCal Emerald Meadows LLC
SunCal Johannson Ranch LLC
SunCal Summit Valley LLC
Tesoro SF LLC

### Trustee Debtors

Delta Coves Venture LLC
LB/L – SunCal Northlake LLC
LB/L – SunCal Oak Valley LLC
SunCal Century City, LLC
SunCal Heartland LLC
SunCal Marblehead LLC
SunCal Oak Knoll, LLC
SunCal PSV, LLC
SunCal Torrance Properties LLC

## EXHIBIT C

## ARCH PROOFS OF CLAIM

<u>Voluntary Debtors</u>

Proof of Claim No. 10 in the amount of $155,558,245.73 filed against Acton Estates, LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 2 in the amount of $155,558,245.73 filed against Kirby Estates, LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 19 in the amount of $155,558,245.73 filed against North Orange Del Rio Land, LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 54 in the amount of $155,558,245.73 filed against Palmdale Hills Property, LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 10 in the amount of $155,558,245.73 filed against SCC Communities LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 2 in the amount of $155,558,245.73 filed against SCC/Palmdale, LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 1 in the amount of $155,558,245.73 filed against Seven Brothers LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 3 in the amount of $155,558,245.73 filed against SJD Development Corp. on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 47 in the amount of $155,558,245.73 filed against SJD Partners, Ltd. on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 10 in the amount of $155,558,245.73 filed against SunCal Beaumont Heights, LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 22 in the amount of $155,558,245.73 filed against SunCal Bickford Ranch LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 2 in the amount of $155,558,245.73 filed against SunCal Communities I, LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 3 in the amount of $155,558,245.73 filed against SunCal Communities III, LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 10 in the amount of $155,558,245.73 filed against SunCal Emerald Meadows LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 5 in the amount of $155,558,245.73 filed against SunCal Johannson Ranch LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 15 in the amount of $155,558,245.73 filed against SunCal Summit Valley LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 8 in the amount of $155,558,245.73 filed against Tesoro SF LLC on March 18, 2009 with the California Bankruptcy Court

<u>Trustee Debtors</u>

Proof of Claim No. 25 in the amount of $155,558,245.73 filed against Delta Coves Venture LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 9 in the amount of $155,558,245.73 filed against LB/L – SunCal Northlake LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 24 in the amount of $155,558,245.73 filed against LB/L – SunCal Oak Valley LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 16 in the amount of $155,558,245.73 filed against SunCal Heartland LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 34 in the amount of $155,558,245.73 filed against SunCal Marblehead LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 28 in the amount of $155,558,245.73 filed against SunCal PSV, LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 6 in the amount of $155,558,245.73 filed against SunCal Torrance Properties LLC on March 18, 2009 with the California Bankruptcy Court

Proof of Claim No. 8 in the amount of $155,558,245.73 filed against SunCal Century City, LLC on March 18, 2009 with the California Bankruptcy Court

## EXHIBIT D

**MARBLEHEAD SETTLEMENT AGREEMENT**

See Attached.

## SETTLEMENT AGREEMENT

This Settlement Agreement (the **"Agreement"**) is dated for references purposes only as of the 2nd day of February, 2010 (the **"Agreement Date"**), and is being entered into by and between the City of San Clemente, a municipal corporation (**"CITY"**), and Arch Insurance Company, a Missouri corporation (**"ARCH"**). CITY and ARCH are sometimes hereinafter referred to collectively as the **"Parties"** and individually as a **"Party."**

### R E C I T A L S:

The Parties are entering into this Agreement on the basis of the following facts:

A.    The Marblehead property consists of approximately two hundred forty-seven and eighty-eight one hundredths (247.88) acres of land area located in the City of San Clemente, County of Orange, State of California, and bounded generally by El Camino Real (aka Pacific Coast Highway) to the southwest, Avenida Pico to the southeast, the Interstate 5 freeway to the northeast, and the Colony Cove residential subdivision to the northwest (the **"Property"**).

B.    On or about June 21, 2005, CITY and SunCal Marblehead, LLC, a Delaware limited liability company (**"SunCal"**), entered into that certain Subdivision Improvement Agreement (the **"Subdivision Improvement Agreement"**) relating to the construction and installation of certain "Works of Improvement" which were and are required to be constructed and installed in order to accommodate the planned development of the Property. The Works of Improvement referred to in the Subdivision Improvement Agreement are sometimes collectively referred to in this Agreement as the **"Project."** Subject to authorized extensions of time for events of force majeure delay, the Subdivision Improvement Agreement requires, *inter alia*, that SunCal complete construction and installation of the Project no later than two years after the date of the Subdivision Improvement Agreement, i.e., on or before June 21, 2007.

C.    At or about the time that CITY and SunCal entered into the Subdivision Improvement Agreement, SunCal, as principal, and ARCH, as surety, executed forty-three (43) statutory subdivision performance bonds (collectively, the **"Bonds"**) in order to guarantee completion of the Project. A list of the Bonds by bond number, with a brief description of the improvements covered by each Bond, is attached hereto as Exhibit "A" and incorporated herein by reference. CITY is the obligee under the Bonds.

D.    At the time CITY and SunCal entered into the Subdivision Improvement Agreement SunCal owned the entire Property. Subsequent to that date, SunCal conveyed approximately 22.3 acres of land area within the Property (the **"Commercial Site"**) to Villa San Clemente, LLC, (**"VSC"**), and SunCal retained the balance of the Property (the **"Residential Site"**).

E.    Subsequent to entering into the Subdivision Improvement Agreement and posting the Bonds with CITY, SunCal commenced construction and installation of the Project. Due to financial difficulties, however, SunCal later discontinued such work. SunCal did not complete construction and installation of the Project on or before June 21, 2007, or at any time thereafter. The Project remains uncompleted as of the Agreement Date.

112/062266-0382
1060778.05 a02/03/10

-1-

F.    On November 4, 2008, CITY filed suit in the Superior Court of the State of California, County of Orange, Case No. 30-2008-0016297 (the "**State Court Action**"), against SunCal and ARCH alleging, *inter alia*, that SunCal had breached the Subdivision Improvement Agreement by failing to timely complete the Project and that CITY was entitled to recover from ARCH the full cost of completing construction and installation of the various elements of the Project, plus attorney's fees and costs. On or about December 8, 2008, ARCH filed an answer in the State Court Action generally denying the allegations set forth in CITY's complaint and asserting certain affirmative defenses thereto.

G.    In November of 2008, an involuntary Chapter 11 bankruptcy proceeding was filed against SunCal in the United States Bankruptcy Court, Central District of California, Santa Ana Branch (Case No. 8:08-17409 ES, *In re Suncal Marblehead LLC* [ the "**Bankruptcy Action**"]). As a result of the filing of the Bankruptcy Action, CITY's claims in the State Court Action against SunCal have been stayed. CITY's claims in the State Court Action against ARCH have not been stayed, however, and those claims have been severed for a separate trial.

H.    As of the Agreement Date, the Bankruptcy Action remains pending. The Bankruptcy Court has appointed an independent trustee, Steven Speier (the "**Trustee**"), to oversee the affairs of the debtor-in-possession. The Trustee is not at present pursuing active construction of the Project.

I.    Mindful of the uncertainty and expense of litigation, CITY and ARCH have agreed to settle certain of the disputes between them in the State Court Action, while reserving their respective rights, obligations, and defenses relating to other disputes, all in accordance with and subject to the terms and conditions set forth in this Agreement.

## C O V E N A N T S:

Based upon the foregoing Recitals, which are incorporated into this Agreement by this reference, and for good and valuable consideration, the receipt and sufficiency of which is acknowledged by both Parties, CITY and ARCH agree as follows:

1.    **ARCH Reimbursement of CITY's Litigation Expenses.**

Within fourteen (14) days after the date upon which this Agreement is fully executed and delivered by the Parties (the "**Effective Date**"), ARCH shall pay to CITY the sum of Six Hundred One Thousand Three Hundred Eighty-Eight Dollars and Thirty-One Cents ($601,388.31) to reimburse CITY for its litigation expenses incurred through the Agreement Date to prosecute the State Court Action, including CITY's attorneys' fees, consultant fees, costs, and miscellaneous expenses.

2.    **Completion of Priority Work by Arch.**

2.1    **Category A Priority Work.** The Parties believe that the following listed portions of the Project (identified together with the Bonds corresponding thereto) are located entirely on public property and/or within existing dedicated public rights-of-way: (i) Via Socorro

112/062266-0382
1060778.05 a02/03/10                                -2-

Improvements (Bond SU5017324); (ii) Avenida Pico Improvements (Bond 5014996); (iii) Avenida Pico Medians and Parkway (Bond SU5014991); (iv) Avenida Pico Traffic Signal Improvements (Bond SU5015040); (v) AVH/Pico-Sewer Improvements/Reclaimed Water (Bond SU5014792); (vi) Rough Grading (partial) (Bond SU 5014726); and (vii) Monumentation (Bond SU 5014725). The foregoing portions of the Project are sometimes collectively referred to herein as the "**Category A Priority Work**"). If, however, subsequent to the Agreement Date the Parties determine that any of the aforementioned portions of the Project are in fact located on SunCal's Property and subject to the jurisdiction of the Trustee and the Bankruptcy Court in the Bankruptcy Action, such items and the corresponding Bonds relating thereto shall be addressed as Category B Priority Work items in accordance with Section 2.2 hereinbelow.

Within sixty (60) days after the Effective Date of this Agreement, ARCH shall enter into a binding written contract or contracts with a completion contractor or contractors (subject to approval of each such contractor by the City Engineer of CITY, which approval shall not be unreasonably withheld), to complete the Category A Priority Work pursuant to the most recently available plans and specifications approved by CITY for each such item of work. Subject to Section 2.7 of this Agreement, ARCH shall cause such contractor(s) to complete the Category A Priority Work within the times set forth in the Schedule of Performance set forth in Exhibit "B" to this Agreement (the "**Schedule of Performance**"). Arch shall pay all of the costs and expenses incurred to complete the Category A Priority Work.

2.2    **Category B Priority Work.** The Parties believe that the following listed portions of the Project (identified together with the Bonds corresponding thereto) are located entirely or in part on the Residential Site owned by SunCal, on the Commercial Site owned by VSC, and/or on property owned by the State of California ("**Caltrans**"), or other third party(ies): (i) Trails (Bond SU5014993); (ii) Habitat Management Plan (Bond SU5014722); (iii) Street Improvements for Costa Azul, Artemesa, and Park access Road (Bond SU5014716); (iv) Lot G [now referred to as Lot N] park (Bond SU5014989); (v) Storage Vaults/CDS Units (Bond SU5014794); (vi) JRWSS 27" Water Line (Bond SU5014724); and (vii) Connect Storm Drain underwater line to main storm drain system (Bond SU 5014791). The foregoing portions of the Project are sometimes collectively referred to herein as the "**Category B Priority Work.**" Within thirty (30) days after the Effective Date of this Agreement, the Parties shall apply to the Bankruptcy Court in the Bankruptcy Action, to VSC, to Caltrans, and to such other owner or owners of land upon which any of the Category B Priority Work is to be performed, as applicable, to authorize ARCH and CITY and their respective contractors and consultants to enter onto such land to complete the applicable portions of the Category B Priority Work (and any Category C Priority Work located entirely or in part on the Residential Property owned by SunCal) and, to the extent such improvements are located entirely or in part on the Property, to authorize CITY to accept SunCal's offer of dedication for such improvements and the rights-of-way pertaining thereto upon completion: Prior to making such application to the Bankruptcy Court, the Parties shall cooperate in a good faith effort to obtain the Trustee's stipulation agreeing to the elements of said application to the Bankruptcy Court. Arch shall pay all of the costs and expenses incurred to obtain the stipulation of the Trustee, to file any application or motion that needs to be filed in the Bankruptcy Action, and to obtain Bankruptcy Court approval thereof. In seeking authorization to enter onto the Residential Site, the Commercial Site, the Caltrans property, and any other third party's property, as needed to construct/install any portion of the Category B Priority Work (or for any Category C Priority Work for which Bankruptcy

112/062266-0382
1060778.05 a02/03/10

-3-

Court approval is needed), ARCH agrees to act reasonably in executing such entry permit or similar agreement that the owner of the applicable parcel(s) (and, with respect to the Residential Site, the Trustee and the Bankruptcy Court) may require which obligates ARCH to perform only the work authorized by CITY consistent with the Subdivision Improvement Agreement, to comply with applicable laws, to repair and restore any damage to the balance of the parcel(s), to require each completion contractor to maintain reasonable insurance limits naming the owner(s) as an additional insured, to indemnify the owner(s) from claims, of personal injury, property damage, and other similar losses arising out of ARCH's and its contractor's entry, and similar matters.

The parties do not intend that ARCH's request for approval from VSC or other third parties would require ARCH to waive any right to recover the cost of construction of the improvements located on such third party's property, whether by subrogation, reimbursement, indemnification, or otherwise.

Within sixty (60) days after the date that ARCH succeeds in obtaining approval from each applicable owner (and, as to the Residential Site, from the Bankruptcy Court) for entry onto such owner's property to perform the Category B Priority Work on such owner's property, and subject to Section 2.3 hereinbelow, ARCH shall enter into a binding written contract or contracts with a completion contractor or contractors (subject to approval of each such contractor by the City Engineer of CITY, which approval shall not be unreasonably withheld), to complete the Category B Priority Work pursuant to the most recently available plans and specifications approved by CITY for each such item of work. Subject to Section 2.7 of this Agreement, ARCH shall cause such contractor(s) to complete the Category B Priority Work within the times set forth in the Schedule of Performance. ARCH shall pay all of the costs and expenses incurred to complete the Category B Priority Work.

If for any reason any owner of property on which any of the Category B Priority Work is to be performed (and, as to the Residential Site, the Bankruptcy Court) declines to grant the Parties' request, application, or motion for authorization to enter onto such property to perform the work and to authorize CITY to accept SunCal's offer of dedication for such work upon completion, as applicable, then CITY reserves all rights under the Bonds as to any such affected work, and ARCH reserves any defenses.

2.3    **Category C Priority Work.** The Parties agree that the following portions of the Project cannot practicably be constructed and installed prior to the construction, installation, and/or relocation of certain "dry" utilities herein, the **"Dry Utilities"**), including but not limited to electrical utilities and fiber optic cable, that are not bonded and are not ARCH's responsibility: (i) El Camino Real Improvements (Bond SU5014997); (ii) Los Molinos Street Improvements (Bond SU50117323); (iii) JRWSS Water Line/Rough Grade (Bond SU5011417); (iv) Caltrans Grading (Bond SU 50114727); (v) AVH Improvements (Bond SU5014995); (vi) AVH Traffic Signal Improvement (Bond SU 5015039); (vii) AVH Median and Parkway (Bond SU5014992); and (viii) AVH Bridge Improvements (Bond SU5014998);. The foregoing portions of the Project are sometimes collectively referred to herein as the **"Category C Priority Work."**

CITY and ARCH understand that SunCal previously made deposits with one or more utility companies and/or Caltrans to pay for some or all of the cost of the unbonded Dry Utility Work. To the extent that the utility companies and Caltrans currently retain any such deposits which are not property of the Debtor in the Bankruptcy Action, CITY will request that the utility companies and Caltrans proceed with the work, subject to Bankruptcy Court approval, if required. ARCH covenants to act with commercially reasonable diligence to coordinate with such utility companies and/or Caltrans to have them or their contractors complete the Dry Utility Work as quickly as is possible so that ARCH can then proceed with the Category C Priority Work pertaining thereto.

CITY and ARCH further understand that one or more utility companies and/or Caltrans may have returned to the Trustee a deposit or deposits previously made by SunCal for some or all of the cost of the Dry Utility Work. If and to the extent this has occurred, ARCH covenants to include in its proposed stipulation with the Trustee and its application or motion with the Bankruptcy Court in the Bankruptcy Action referred to in Section 2.2 above a request that such deposit(s) be re-deposited with the applicable utility company(ies) and/or Caltrans so that the Dry Utility Work can be expeditiously completed and ARCH will then be in a position to proceed with the Category C Priority Work pertaining thereto.

In addition to the foregoing, CITY shall have the right but not the obligation to advance funds to one or more utility companies and/or Caltrans (reserving CITY's rights against SunCal with respect to same) so that said utility company(ies) and/or Caltrans will be able to complete some or all of the Dry Utility Work and ARCH will be in a position to complete the Category C Priority Work relating thereto.

Alternatively, CITY shall have the right but not the obligation to instruct ARCH to complete some or all of the Category C Priority Work prior to completion of the Dry Utility Work pertaining thereto, in which case ARCH shall have no responsibility or liability for either (i) alleged defects in the Category C Priority Work arising out of the absence of the Dry Utility Work pertaining thereto or (ii) costs or damages of any kind whatsoever arising out of the relocation of the Dry Utility Work to another location or locations or any subsequent excavation, cutting, demolition, removal, repair, or reconstruction of the Category C Priority Work for which ARCH is responsible hereunder.

Within sixty (60) days after the date that the Dry Utility Work for any of the Category C Priority Improvements has been completed or the date CITY notifies ARCH in writing that CITY has elected to have ARCH complete some or all of the Category C Priority Work prior to completion of the Dry Utility Work pertaining thereto, whichever first occurs, ARCH shall enter into a binding written contract or contracts with a completion contractor or contractors (subject to approval of each such contractor by the City Engineer of CITY, which approval shall not be unreasonably withheld), to complete the Category C Priority Work (or portion thereof that has been delayed by the Dry Utility Work pertaining thereto) pursuant to the most recently available plans and specifications approved by CITY for each such item of work. Subject to Section 2.7 of this Agreement, ARCH shall cause such contractor(s) to complete the Category C Priority Work or applicable portion(s) thereof within the times set forth in the Schedule of Performance. Subject to CITY's right to tender to ARCH the cost of the Dry Utility Work, as stated in this Section 2.3, and CITY's obligation to tender to ARCH the Deficiency Amount under the

circumstances described in Section 2.9 below, ARCH shall pay all of the costs and expenses incurred to complete the Category C Priority Work.

Finally, and notwithstanding any other provision set forth in this Agreement to the contrary, if for any reason the funding for installation of any of the Dry Utility Work has not been secured within six (6) months after the scheduled completion date of Category A Priority Work and Category B Priority Work (excluding work relating to Trails (Bond SU5014993), Habitat Management Plan (Bond SU5014722)), such that ARCH is unable to proceed to complete the corresponding Category C Priority Work at that time (and assuming CITY has neither elected to advance the costs for the Dry Utility Work or have ARCH complete the applicable portions of the Category C Priority Work prior to installation of the Dry Utility Work pertaining thereto), CITY shall have the right, but not the obligation, to require ARCH to pay to CITY the amount reasonably determined by the City Engineer to be needed to complete the unperformed Category C Priority Work, not to exceed the penal sum of the Bond(s) pertaining thereto, and the tender of such deposit shall forever discharge ARCH's obligation with respect to such portion of the Category C Priority Work.  CITY agrees that if it accepts a tender of funds from ARCH pursuant to this last paragraph of Section 2.3 it shall hold the deposited sum(s) in trust to secure completion of the Category C Priority Work to which such deposit relates.  If at a later date not to exceed two years from the date of ARCH's deposit, CITY determines that the Category C Priority Work for which such deposit relates should not be constructed or installed, or the improvements are completed of the expense of a new owner or third party, CITY shall return to ARCH the full amount of ARCH's deposit relating to such improvement within a reasonable time not to exceed sixty (60) days from the date CITY determines that the particular improvement will not be built.  In the event that CITY returns any deposits under this provision prior to completion of the improvements, CITY shall reserve and maintain all of its rights under the Bonds pertaining to the incomplete improvement.

    2.4    **Additional Matters to be Included in Requests to Property Owners and in Proposed Stipulation with Bankruptcy Trustee and Application/Motion to Bankruptcy Court.**  In addition to the matters specifically addressed in Sections 2.1-2.3, ARCH and CITY agree to cooperate by including in their requests to any property owner (including without limitation VSC and/or Caltrans), in their requested stipulation with the Trustee, and in their application/motion to the Bankruptcy Court in the Bankruptcy Action all additional authorizations and approvals consistent with the foregoing as may be reasonably necessary to cause the Category A Priority Work, the Category B Priority Work, and the Category C Priority Work to be commenced and completed within the times set forth in this Agreement.  Not by way of limitation of the foregoing, ARCH and CITY understand that SunCal may have custody of certain equipment, materials, and supplies that are needed for the Project (e.g., some or all of the Avenida Pico Traffic Signal Improvements referred to as item (iv) of the Category A Priority Work in Section 2.1) and, to such extent, ARCH and CITY shall request that such equipment, materials, and supplies be released to ARCH and its completion contractors so that the applicable portion(s) of the Project can timely proceed.

    2.5    **Compliance With Subdivision Improvement Agreement and Applicable Laws.**  In constructing and installing the Category A Priority Work, the Category B Priority Work, and the Category C Priority Work (collectively, the "**Priority Work**"), ARCH shall perform and shall cause its contractor(s) to perform in accordance with the obligations and

duties of the Subdivider as set forth in the Subdivision Improvement Agreement and in
accordance with all applicable provisions of federal, State, and local laws, regulations, and
official policies, including without limitation CITY's and the California Coastal Commission's
conditions of approval for the Marblehead development. In the event of any express conflict
between the provisions of the Subdivision Improvement Agreement and this Agreement,
however (including without limitation with respect to the timing and phasing of the completion
of the Priority Work), the provisions of this Agreement shall prevail and control as between
CITY and ARCH (and without any intent on the part of either Party to amend or modify the
Subdivision Improvement Agreement or waive or release any right or claim that it may have
against SunCal).

     2.6    **City Cooperation.**    CITY shall reasonably cooperate with ARCH and
the completion contractor(s) engaged by ARCH to make available all information, plans,
specifications, and other documents necessary for the obtaining of bids and cost quotes for
ARCH's completion of the Priority Work, including access to information of the City Engineer's
office. City shall be entitled to charge its normal permitting and inspection fees.

     2.7    **Extensions of Time.**    Notwithstanding the timelines for commencement
and completion of the Priority Work set forth in Sections 2.1-2.3 and the Schedule of
Performance, said timelines shall be extended for a reasonable time if and to the extent that: (i)
final plans and specifications approved by the City Engineer are not available for any of the
uncompleted portions of the Project or if for any reason changes or revisions of any of the
previously approved plans and specifications are required; (ii) field conditions are discovered
after the Agreement Date that vary from the approved plans and specifications and that cause
delays in completion of the work; (iii) SunCal would be entitled to an extension of time to
perform pursuant to Section 2.3 (entitled "Force Majeure") of the Subdivision Improvement
Agreement; or (iv) as to the Category B Priority Work and Category C Priority Work only, if,
prior to ARCH's completion of any portions of such work, either SunCal or a new owner of the
Residential Site approved by the Bankruptcy Court (collectively, the "**Residential Site Owner**")
provides reasonable assurances to CITY that the Residential Site Owner intends to and will
assume the obligation to complete such work no later than ninety (90) days after the deadline for
ARCH to complete such work in accordance with this Agreement, ARCH ensures that its
completion contractors maintain continued compliance with regulatory requirements pertaining
to such items as storm water runoff and erosion control during any temporary suspension of
work, and the Residential Site Owner diligently pursues such portions of the Category B Priority
Work and/or Category C Priority Work to completion within said extended timeline. In all such
circumstances, ARCH shall act reasonably to limit the duration of any delay in performance and
shall keep the City Engineer informed with respect to all facts pertaining thereto.

     2.8    **Exoneration/Release/Replacement of Bonds.**    In no event shall any
ARCH's Bond for any portion of the Priority Work be released or exonerated until the earlier of
(i) the date on which all of the Priority Work secured by such Bond is satisfactorily completed
and accepted by CITY or the Bonds are replaced or (ii) ARCH tenders to CITY the penal sum of
the Bond or portion thereof pursuant to Section 2.3 or 2.9 of this Agreement, as applicable.
CITY agrees to accept replacement Bonds from a solvent, admitted surety if the Bankruptcy
Court in the Bankruptcy Action orders that the Residential Site Owner (as that term is defined in
Section 2.7) tender replacement Bonds to CITY and the surety providing the replacement Bonds

assumes ARCH's obligations set forth in this Agreement in a written assignment and assumption agreement approved as to form and content by the City Attorney of CITY. Upon ARCH's satisfactory completion of the Priority Work in accordance with the Subdivision Improvement Agreement and this Agreement and acceptance of the Priority Work by CITY, CITY and ARCH shall release each other and their respective officers, directors, agents, consultants, attorneys, and employees from any and all claims, demands, actions, liabilities, damages, and causes of action, whatsoever, including costs and attorney's fees, in regard to, or in any way arising from or relating to, the Priority Work and the BONDS pertaining to the Priority Work, except for latent defect claims and claims arising during the one year warranty period. The Parties understand that, except as otherwise provided herein, this release extends to any and all claims, demands, actions, and causes of action of any and every kind or nature whatsoever, contractual, tortious, or otherwise, present or future, known or unknown, contemplated or uncontemplated, in connection with, or in any way arising from or relating to, the Priority Work.

        2.9    **Priority Work Costing More than Penal Sum of Bond.**
Notwithstanding any other provision set forth in this Agreement, CITY and ARCH agree that if ARCH reasonably determines prior to entering into a contract or contracts to perform any of the separate items comprising the Priority Work that the cost of completing such work exceeds the penal sum of the Bond that secures such work, ARCH may satisfy its obligations in full to CITY by tendering to CITY the penal sum of the particular Bond; provided, however, that: (i) prior to tendering to CITY the penal sum of a particular Bond, ARCH shall provide CITY with a minimum of thirty (30) days notice of its intention to do so, together with all information available to ARCH (including without limitation bidding documents and responses to ARCH's request for bids from all qualified and licensed contractors who submit bids) substantiating that the cost of the bonded improvement in fact exceeds the penal sum of the Bond and the amount of the deficiency between the penal sum of the Bond and the estimated cost of the work; and (ii) as to Category A Priority Item (iii) (Avenida Pico Medians and Parkway—Bond SU5014991) and Category C Priority Item (vii) (AVH Median and Parkway—Bond SU5014992) if ARCH elects to not construct either such portion of the Project based on its determination that the cost of such work exceeds the penal sum of the Bond(s) therefor, ARCH acknowledges and agrees that it shall still be obligated to and shall stub the bonded utility conduits and utilities to the medians as part of the adjacent street work so that the streets do not have to be cut or damaged at a later date when the medians and parkway improvements are constructed and installed. CITY agrees that if ARCH tenders to CITY the penal sum of a Bond pursuant to this Section 2.9 CITY shall hold the deposited penal sum in trust to secure completion of the bonded portion of the Priority Work to which said deposit relates. If at a later date CITY determines that the particular bonded improvement to which such deposit relates should not be constructed or installed, CITY shall return to ARCH the full amount of ARCH's deposit relating to such improvement within a reasonable time not to exceed sixty (60) days from the date CITY determines that the particular improvements will not be built.

     3.     **Non-Priority Work.**

        3.1    **Deferral of Obligation to Complete Non-Priority Work.** The Parties agree that ARCH shall not be required at this time to construct or install certain of the items of work covered by the Bonds (the "**Non-Priority Work**"), nor shall ARCH be required at this time to pay to CITY the estimated costs for CITY to complete the same. CITY's agreement to defer

completion of the Non-Priority Work is based upon a combination of factors, including without limitation, the following: (i) CITY has determined that the Non-Priority Work items do not need to be completed at this time to protect the public health and safety; (ii) SunCal is in bankruptcy and is not actively proceeding at this time with development of the residential project on the Residential Site; (iii) as between SunCal and VSC, VSC has assumed responsibility for construction and installation of the Commercial Site Bridge and VSC is not actively proceeding at this time with development of its commercial project on the Commercial Site; (iv) some of the Non-Priority Work items will primarily be of benefit to and are required for the completed developments on the Residential Site and the Commercial Site; and (v) CITY does not wish to assume the maintenance responsibility for the Non-Priority Work items that are to be dedicated to CITY upon completion absent the development of the Residential Site and/or the Commercial Site.  The elements of the Non-Priority Work and the Bonds corresponding thereto are the following (i) Precise Grade for the Sports Park (Bond SU5014988); (ii) Precise Grading Lots 1-77 (Bond SU 5014728); (iii) Precise Grading Lots 78-120 (Bond SU5014729); (iv) Precise Grading Lots 121-182 (Bond SU5014370); (v) Precise Grading Lots 183-313 (Bond SU5014731); (vi) Street Improvements Lots 1-77 (Bond SU 5014712); (vii) Street Improvements Lots 78-120 (Bond SU5014713); (viii) Street Improvements Lots 121-182 (Bond SU 5014714; (ix) Street Improvements Lots 183-313(Bond SU5014715); (x) Residential Streets Landscape (Bond SU5014723); (xi) Entry Monument Signage (Bond SU 5014994); (xii) Precise Grading Lot "RR" (Bond SU5014721); (xiii) MSE Wall Planting (Bond SU 5014986); (xiv) Grading Bluff Repair (Bond SU50111114797); (xv) Precise Grade-Pico Park (Bond SU5014987); (xvi) Precise Grade-Lot R Park (Bond SU5014990); (xvii) Commercial Site Bridge (Bond SU5014796); and (xviii) Rough Grading pertaining to Commercial Site Bridge (Bond SU5014726—partial).

      3.2    **Reservation of Rights and Obligations With Respect to Non-Priority Work; Tolling of Claims.**    The Bonds securing the Non-Priority Work shall remain in full force and effect, in accordance with their terms, and each Party reserves all of its rights, claims, and defenses with respect thereto, except as expressly set forth in this Section 3.2. Upon CITY's dismissal without prejudice of the State Court Action pursuant to Section 4.2 of this Agreement, the Parties agree that the time period for CITY to file a new lawsuit (the **"New Lawsuit"**) arising out of the alleged failure by SunCal or successor to timely complete the Non-Priority Work items and/or ARCH's failure to perform its obligations with respect to the Bonds securing the Non-Priority Work shall be tolled from the original commencement of the State Court Action (i.e., November 4, 2008) through the date(s) upon which the Non-Priority Work is satisfactorily completed or the Bonds pertaining thereto are replaced, whichever occurs sooner (the **"Tolling Period"**), said the Tolling Period shall not be counted in determining whether CITY has filed the New Lawsuit within the time required by any applicable statute of limitations or in considering any time-related defense that may be asserted by ARCH in the New Lawsuit, including without limitation a defense based on the equitable doctrine of laches.

      CITY further agrees with ARCH that CITY will reasonably cooperate with the Residential Site Owner and/or Commercial Site Owner to extend the applicable deadlines in the Subdivision Improvement Agreement for performance of the various items of Non-Priority Work consistent with such owner's development schedule (for a period not in excess of two (2) additional years after the Agreement Date); provided, however, that (i) neither the Residential Site Owner nor the Commercial Site Owner is intended to be a third party beneficiary of said

CITY agreement with ARCH and neither the Residential Site Owner nor the Commercial Site Owner shall have standing to enforce said CITY covenant to ARCH; (ii) any such extension of the deadlines set forth in the Subdivision Improvement Agreement for completion of the Non-Priority Work shall be conditional and contingent upon CITY's entering into a written amendment to the Subdivision Improvement Agreement with SunCal or the appropriate party or parties that succeed(s) to SunCal's rights and obligations thereunder, and CITY makes no representation or warranty to ARCH that such an amendment to the Subdivision Improvement Agreement will be approved or executed; (iii) nothing in this Agreement is intended or shall be interpreted to limit any new conditions that CITY may place upon the other party(ies) to such an amended Subdivision Improvement Agreement relating to the deferred completion of the Non-Priority Work; (iv) notwithstanding any other provision set forth in this Agreement, CITY additionally reserves the right to reinstitute or resume enforcement of ARCH's obligations as surety with respect to the Non-Priority Work if CITY reasonably determines after the Agreement Date that the public health and safety requires completion of any or all of the items of Non-Priority Work prior to the time that the Residential Site Owner and/or Commercial Site Owner proceeds with its development; (v) if the Residential Site Owner or Commercial Site Owner seeks permission from CITY to materially change the items of Non-Priority Work and CITY and any other governmental agencies with jurisdiction (including without limitation the California Coastal Commission) approves said change, CITY agrees to require the Residential Site Owner or Commercial Site Owner, as applicable, to provide new surety bonds to replace the ARCH bonds and, upon receipt of replacement bonds, CITY shall release ARCH from any and all claims pertaining to the Non-Priority Work and the Bonds that are covered by said replacement bonds.

Upon the satisfactory lien-free completion of the Non-Priority Work by the Residential Site Owner and/or Commercial Site Owner in accordance with the Subdivision Improvement Agreement and the normally applicable CITY requirements pertaining thereto, CITY shall release ARCH from all claims with respect to the Bonds pertaining to such work, except for latent defect and warranty claims arising within the one-year warranty period.

4.    **Continuance of Trial in State Court Action; Dismissal Without Prejudice**.

4.1    **Continuance of Trial**.    Within three (3) business days after the Effective Date, CITY and ARCH shall jointly apply to the trial judge in the State Court Action for an order continuing the trial date for a period of approximately nine (9) months, which amount of time the Parties mutually expect will be sufficient to enable ARCH to complete the Category A Priority Work and significant portions of the Category B Priority Work. The Parties further agree to support the scheduling of a status conference with the trial court in the State Court Action approximately two (2) months prior to the rescheduled trial date in order to provide an opportunity for the Parties to advise the Court of the status of said work. If ARCH is proceeding with reasonable diligence to complete the Category A Priority Work and Category B Priority Work but said work remains uncompleted at the time of the status conference and/or continued trial date for reasons authorized pursuant to Section 2.7 of this Agreement, the Parties agree to cooperate in seeking additional continuances of the trial date (with the length of any such additional continuance to be based upon the facts and circumstances at said time and the then-anticipated schedule for completion of the work) and additional status conferences until said work is satisfactorily completed. If for any reason ARCH is unable, after and despite its best efforts, to implement the provisions of this Agreement pertaining to performance of the Category

A Priority Work and Category B Priority Work (e.g., because the Bankruptcy Court does not authorize ARCH's entry onto the Property to perform the Category B Priority Work), neither Party shall be obligated to consent to further continuances of the trial date. Notwithstanding any other provision set forth in this Agreement to the contrary, if the trial court does not agree to continue the trial date pursuant to the joint request of the Parties pending ARCH's completion of the Category A Priority Work and Category B Priority Work, this Agreement shall be deemed terminated as of the date the trial court issues such order and neither Party shall have any further rights or obligations hereunder.

If the Court will not agree to continuing the trial date pursuant to the joint request of the parties pending compliance with this Agreement, CITY, at its sole option and discretion, may file a dismissal without prejudice of the State Court Action prior to the scheduled trial date. Should the CITY exercise this option, this Agreement shall not be terminated and shall remain in full force and effect, notwithstanding any contrary provision in this Section 4.1. Should the CITY exercise this option, in any event the CITY shall retain all rights to enforce this Agreement and the Bonds, including the filing of a subsequent action. The Parties agree that if the State Court Action is so dismissed, the time period for CITY to file a subsequent action arising out of the alleged failure by SunCal or its successor to timely complete the work covered by the Bonds, and/or ARCH's failure to perform its obligations with respect to the Bonds securing such work, shall be tolled from the original commencement of the State Court Action (i.e., November 4, 2008), through the date upon which a subsequent action is filed. If the CITY files a subsequent action, ARCH agrees that such action may be placed on a "fast track" schedule for expedited trial.

4.2    **Dismissal Without Prejudice As To Arch Only.**    Upon ARCH's satisfactory completion of the Category A Priority Work and the Category B Priority Work, CITY shall file a dismissal without prejudice of the State Court Action as to ARCH only (but not as to SunCal). Thereafter, if CITY files a New Lawsuit against ARCH with respect to any of the Category C Priority Work and/or the Non-Priority Work, ARCH agrees that such action may be placed on a "fast track" schedule for expedited trial.

4.3    **Resolution of Disputes Concerning Interpretation of Construction Performance Duties of this Agreement.**    The Parties desire a quick mechanism to resolve any dispute which may arise between the Parties as to the interpretation of this Agreement with respect to the performance of construction of the improvements under this Agreement by ARCH's completion contractors, including but not limited to, disputes concerning the scope of construction required under any particular bond, the applicable plans, specifications and requirements of such construction, any change orders which may become advisable during the course of construction, and similar types of technical construction disputes. The Parties agree to cooperate in every regard to quickly resolve any dispute which may arise. If the Parties cannot resolve such a dispute voluntarily, the Parties agree to submit such dispute for binding determination on an expedited basis to Judicate West, and the Parties agree to follow any such interpretation of the construction-related obligations of this Agreement made by Judicate West.

This provision is not intended to limit the right of any party to apply to the court to enforce material provisions of this Agreement prior to the dismissal of this action upon an alleged material breach by any other party to this Agreement, or after the dismissal of this Action

if the court retains jurisdiction to enforce provisions of this Agreement after dismissal. Further, no party will oppose a request to the court to retain jurisdiction to enforce material provisions of this Agreement after any dismissal without prejudice of the action.

5.    **MISCELLANEOUS.**

5.1    **Rights Against Third Parties.** CITY and ARCH agree that this agreement is not intended to limit or otherwise affect their respective rights against third parties pertaining to the project, including but not limited to: (1) any rights of ARCH to pursue indemnity from its principals, indemnitors or third parties, whether in bankruptcy or other legal proceedings including, but not limited to, VSC; (2) any rights of ARCH to seek indemnity, subrogation, reimbursement or recovery of mechanics' liens, or other liens against any property on which ARCH pays for construction of improvements, including any private property not owned by the Debtor in Possession or its assignees; (3) any rights of CITY against Suncal, its successors or assignees, except to the extent that ARCH's performance of the completion contracts may reduce the obligations of its principal SUNCAL MARBLEHEAD LLC to the CITY to the extent of such performance only.

5.2    **Releases; Civil Code Section 1542 Waiver.** Each Party waives with respect to the releases contained herein its respective rights given by Section 1542 of the Civil Code of the State of California, which reads as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his settlement with the debtor."

Each Party understands and acknowledges the significance and consequence of this specific waiver of Section 1542.

5.3    **Agreement Binding on Successors and Assigns.** This Agreement shall bind and inure to the benefit of the Parties and to each of their respective successors and assigns.

5.4    **No Admission of Fault, Liability, or Damages.** It is understood and agreed that this Agreement is a compromise of disputed claims and that nothing contained herein shall be deemed or treated as an admission of any kind by either Party.

5.5    **Entire Agreement; Interpretation.** This Agreement contains the entire agreement of the Parties and supersedes any prior written or oral agreements between them concerning the subject matter contained herein. This Agreement shall be construed in all respects as having been jointly drafted and shall not be construed in any way against either Party on the ground that that Party was the drafter of this Agreement. This Agreement shall be governed in all respects by the internal laws of the State of California in effect at the time of its execution, without regard to conflict of law principles.

112/062266-0382
1060778 05 a02/03/10                        -12-

5.6   **Amendments and Modifications.**   No supplement, modification, or amendment to this Agreement shall be binding unless the same shall in writing and executed by both Parties.

5.7   **Cooperation.**   Each Party agrees to execute and deliver such other and further documents and perform such other acts as shall be necessary to effectuate the purposes of this Agreement.

5.8   **Attorney's Fees and Costs.**   In any litigation arising from or relating to this Agreement, including, without limitation, proceedings in any state, federal, or bankruptcy court, in addition to whatever other relief to which it may be entitled, the prevailing Party shall be entitled to recover its costs and reasonable attorneys' fees in an amount to be determined by the court.

5.9   **No Third Party Beneficiaries.**   The Parties hereto agree that no third party is intended to be a third party beneficiary of this Agreement, either express or implied.

5.10   **Authority.**   Each person signing this Agreement on behalf of a Party represents that he/she is authorized to execute this Agreement on behalf of his/her respective principal and that his/her signature is sufficient to legally bind his/her respective principal. Each Party represents that it has obtained all necessary authority to enter into this Agreement and that it is aware of no reason why this Agreement is not legally binding and effective.

5.11   **Counterpart Signatures.**   This Agreement may be executed in counterparts by facsimile signature and the counterparts, when taken together, shall have the same force and effect as if a single, original document had been executed by both Parties.

Dated: _4-2-10_                          CITY OF SAN CLEMENTE

                                         By: _____

                                         Its: Mayor


ATTEST:

By _____
Its: City Clerk

APPROVED AS TO FORM:

By: _____
Its: City Attorney   By: Robert Owen

*Signatures continued on page 14*

112c062266-0382
106077E.05 s02/03/10                          -13-

Dated: 2/4/10

APPROVED AS TO FORM:

Dated: 2/4/10

ARCH INSURANCE COMPANY

By: _Patrecbd K Ueel_

Its: _Vice President_

GASCOU HOPKINS LLP

By: _Ronald W. Hopkins_

Ronald W. Hopkins
Attorneys for Arch Insurance Company

# EXHIBIT A

## EXHIBIT A - BONDS

| Bond # | Bond Description | Bond Amount |
|---|---|---|
| SU5014712 | Street Imp., Tract 8817, Lots 1-77 | $ 1,707,100.00 |
| SU5014713 | Street Imp., Tract 8817, Lots 78-120 | $ 863,000.00 |
| SU5014714 | Street Imp., Tract 8817, Lots 121-182 | $ 751,000.00 |
| SU5014715 | Via Cantabria, Via Galicia, Via Asturias, Via Murcia TTM 8817, Lots 183-313 | $ 1,354,600.00 |
| SU5014716 | Avenida Costa Azul, Via Artemesia & Park Access Rd. for TTM 8817 | $ 1,858,866.00 |
| SU5014717 | Rough Grading for JRWSS Waterline Relocation Tract 8817 | $ 180,000.00 |
| SU5014718 | Commercial Service Entry Wall for TTM 8817 | $ 804,000.00 |
| SU5014719 | Canyon Edge Walls for TTM 8817 | $ 15,350.00 |
| SU5014720 | Retaining Wall for TTM 8817 | $ 1,005,000.00 |
| SU5014721 | Precise Grading for Lot V Park (Original Lot RR) | $ 443,727.00 |
| SU5014722 | Habitat Management Plan, Tract 8817 | $ 225,513.00 |
| SU5014723 | Residential Streets Landscape Improvements, Tract 8817 | $ 3,571,133.91 |
| SU5014724 | SCWD/JRWSS 27" Waterline Avh & Ave Pico Comm. Site | $ 1,705,500.00 |
| SU5014725 | Tract No. 8817 | $ 170,000.00 |
| SU5014726 | Rough Grading for TTM 8817 | $ 4,671,000.00 |
| SU5014727 | Caltrans Grading for TTM 8817 | $ 221,100.00 |
| SU5014728 | Production Precise Grading, Tract 8817, Lots 1-77 | $ 508,500.00 |
| SU5014729 | Production Precise Grading, Tract 8817, Lots 78-120 | $ 294,000.00 |
| SU5014730 | Production Precise Grading, Tract 8817, Lots 121-182 | $ 404,800.00 |
| SU5014731 | Production Precise Grading, Tract 8817, Lots 183-313 | $ 866,500.00 |
| SU5014791 | Backbone Storm Drain for TTM 8817 | $ 3,492,280.00 |
| SU5014792 | Avh and Pico Sewer/Water/Tecl. Water Plans | $ 1,409,100.00 |
| SU5014794 | Urban Runoff Bioswales, Constructed Wetlands, CDs Units & Storage Vaults for TTM 8817 | $ 3,696,398.55 |
| SU5014795 | Avenida Vista Hermosa Bridge Improvements, Tract 8817 | $ 9,101,200.00 |
| SU5014796 | Commercial Site Bridge Improvements, Tract 8817 | $ 3,243,200.00 |

390/062266-0382
10663400.01 a01/27/10

| Bond # | Bond Description | Bond Amount |
|---|---|---|
| SU5014797 | Grading for Tract 8817, Bluff Restoration | $ 200,000.00 |
| SU5014986 | MSE Wall Planting, Etc. Tract 8817 | $ 59,946.07 |
| SU5014987 | Precise Grading, Construction & Landscape for Pico Park | $ 1,135,905.00 |
| SU5014988 | Precise Grading, Construction & Landscape for Sports Park | $ 3,261,370.00 |
| SU5014988 | Precise Grading, Construction & Landscape for Playing Field | $ 3,261,370.00 |
| SU5014989 | Precise Grading, Construction & Landscape for Lot N Park (Has changed to Lot G on final map) | $ 658,851.00 |
| SU5014990 | Precise Grading, Construction & Landscape for Lot H Park - (Originally Lot R) | $ 686,819.00 |
| SU5014991 | Avenida Pico Medians & Parkway Improvement Tract 8817 | $ 165,028.00 |
| SU5014992 | Avenida Vista Hermosa Medians & Parkway Tract 8817 | $ 306,200.00 |
| SU5014993 | Trails, Including Interpretive signage, Tract 8817 | $ 1,532,785.00 |
| SU5014994 | Entry Monument Signage | $ 117,832.00 |
| SU5014995 | Avenida Vista Hermosa Storm Drain, Tract 8817 & St. Improvements, Tract 8817 | $ 1,765,526.00 |
| SU5014996 | Avenida Pico Storm Drain, and St. Improvements, Tract 8817 | $ 881,102.00 |
| SU5014997 | El Camino Real Improvements, Tract 8817 | $ 1,086,376.00 |
| SU5015039 | Avh Traffic Signal Improvements TTM 8817 1) avh at I-5 SB Ramps, 2) Avh @ Park Access Rd. 3) Avh at Avenida Costa Azul, 4) Avh at Commercial Service Entrance No. 2, 5) Avh at Via Canon Verde | $ 901,450.00 |
| SU5015040 | Avenida Pico Traffic Signal Improvements, TTM 8817, 1) Avenida Pico at AVH, 2) Avenida Pico at Water Reclamation Plant Entrance | $ 409,200.00 |
| SU5017323 | Calle De Los Molinos Street Improvements, TTM 8817 | $ 123,806.38 |
| SU5017324 | Via Socorro Street Improvements, TTM 8817 | $ 97,919.25 |

29006z2266-0382
16663+0.01 a01/27/10

# EXHIBIT B

<u>EXHIBIT B SCHEDULE OF PERFORMANCE</u>

Category "A" Priority Work

1. Bid Process sixty days after Effective Date
2. Anticipated Duration and Sequencing
    a. Via Socorro Improvements(Bond SU5017324) 32 days
    b. Avenida Pico Improvements(Bonds SU50-14996, SU5014991, SU5015040 and SU 50-14792) Sequenced Total Duration of 165 days
3. Contingency 30 days
4. Anticipated Total Duration Bidding, Construction and Contingency 255 Days after Effective Date

Category "B" Priority Work

1. Bid Process 60 days after Bankruptcy Court Approval
2. Anticipated Duration and Sequencing
    a. 66" Storm Drain and Wet Well(Bond SU5014791) 121 days
    b. 27" Water line(Bond SU 5014724) 61 days sequenced after item (a)
    c. Remove Temporary 27" Water(Bond SU 5014724) 12 days sequenced after item(b)
    d. Park G(Bond SU5014989) 154 days
    e. Trails and Signs(Bond SU5014993) 184 Days
    f. Detention Basins (Bond        SU5014726)40 days
    g. Street Improvements for Costa Azul, Artemesa and Park Access Road(Bond SU5014716)  (contemporaneous with Park G work----item (d) 14 days)
    h. Habitat Management Plan(Bond SU5014722) 504 days for habitat restoration, 2526 days for habitat maintenance
3. Contingency 60 days
4. Anticipated Total Duration Bidding, Construction and Contingency 304 days after bankruptcy court approval(excluding long-term habitat management items)

Category "C" Priority Work

1. Bid process 60 days after completion of each separate area of non-bonded utility work by utility companies
2. Anticipated duration and sequencing
    a. El Camino Real activities below 142 days total
    b. 8" Water Line(Bond SU 5014997) 42 DAYS
    c. SDG&E Vaults(non-bonded)14 days sequenced after item(b)
    d. CDS conduit(Bond SU5014794) 14 days sequenced after item (c)
    e. Move K rail(Bond SU5014997)2 days sequenced after item (d)
    f. Grade for paving(Bond SU5014997) 21 days sequenced after item (e)
    g. Curb and Gutter(Bond SU5014997) 21 days sequenced after item (f)
    h. Sidewalk(Bond SU5014997) 14 days sequenced after item (g)

    i.  Los Molinos(Bond SU50117323) (activities below)
    j.  Underground Utilities(non-bonded) 42 days
    k.  Curb & Gutter(Bond SU     5017323)14 days sequenced after item (j)
    l.  Paving(Bond SU5017777323    ) 14 days sequenced after item(k)
    m.  Cal Trans Area(activities below)
    n.  Install ATT conduit(non-bonded )    61 days
    o.  Splice Fiber Optic Lines(non-bonded) 243 days sequenced after item (o)
    p.  Grade Cal Trans Area(Bond SU5014727) 40 days sequenced after item (o)
    q.  AVH Bridge( Bond 5014795) 184 days
    r.  Tie utilities in at AVH Bridge(Bond SU 5014795    ) 61 days
    s.  Bridge Approaches(Bond SU    5014795) 31 days sequenced after (r)
    t.  AVH Curb and Gutter(Bond 5014995) 30 days sequenced after(s)
    u.  Cathodic protection( Bond SU    SU5014792) 30 days also sequenced after(s)
    v.  AVH Paving(Bond SU5014995) 12 days sequenced after (t) and (u)
    w.  Traffic Signals and Street Lights(Bond 5015039) 61 days sequenced after (t) and (u)
    x.  Landscaping(Bond SU 5014992) 61 days sequenced after (w)

3.  Contingency 60 days
4.  Longest Anticipated Duration Bidding, Construction and Contingency including completion of non-bonded utilities for any Sequenced Set is 464 days(Install ATT Conduit, Spice Fiber Optic Lines, and Grade Cal Trans Area)

## EXHIBIT E

**CLAIMS AGAINST BONDS**

See Attached.

US_ACTIVE:\43804686\06\58399.0008

**CLAIMS AGAINST ARCH BONDS RE LABOR, MATERIALS AND SERVICES – TRUSTEE DEBTOR PROPERTIES**

| Claimant | Status of Claim | Scheduled Claim or POC Amount ($) and POC # | Principal Claim Amount ($) | Amount of Payment ($) (Date of Payment) | Description of Payment and Non-Bonded Work | Extent of Bonded Claim Assignment to Arch | Claimant Residual Rights | Pro-Rata Recovery | Duty Re Offer to Reassign | Side Letter Agreement |
|---|---|---|---|---|---|---|---|---|---|---|
| **MARBLEHEAD** | | | | | | | | | | |
| Boudreau | Settled | $1,673,295.70 POC 61 | $1,527,907.80 | $930,000 (June 2009) | Full payment for bonded work. Claim included contract charges for equipment ordered but not installed at site. | Partial (POC 61) | YES | ARCH 61% Boudreau 39% | YES | YES |
| BnB | Settled | $1,608,722.64 POC 37 | $1,349,460.70 | $163,251.33 (May 2009) $1,575,000 (June 2009) | Full Payment | Full (POC 37) | NO | NO | NO | NO |
| AAA | Settled | $1,344,444.71 POC 63 | $1,344,449.21 | $1,508,322 (June 2009) | Full Payment. AAA retained 2.3% of bankruptcy claim due to an item of non-bonded work for $35,907. | Partial (POC 63) | YES | ARCH 97.7% AAA 2.3% | YES: in side letter | YES |
| Jasper Companies | Settled | $165,260.29 POC 29 | $143,657.80 | $160,000 (June 2009) | Full Payment | Full (POC 29) | NO | NO | NO | NO |
| RMF (R&M) | Settled | $315,591.63 POC 28 | $264,749.10 | $145,640 (June 2009) | Full payment for one contract at $126,838 in principal, plus $18,802 in interest/fees. Second contract for $137,910.60 was for a non-bonded parking lot | Partial (POC 28) | YES | ARCH 55% RMF 45% | YES | NO |
| Rockey Murata | Settled | $285,643.04 POC 60 | $285,643.04 | $131,000 (June 2009) | Payment is for estimate of bonded work. Remaining $154,643 is estimate of non-bonded grading work. | Partial (POC 60) | YES | 34% ARCH 66% Rockey | Yes: in side letter | YES |

| Claimant | Status of Claim | Scheduled Claim or POC Amount ($) and POC # | Principal Claim Amount ($) | Amount of Payment ($) (Date of Payment) | Description of Payment and Non-Bonded Work | Extent of Bonded Claim Assignment to Arch | Claimant Residual Rights | Pro-Rata Recovery | Duty Re Offer to Reassign | Side Letter Agreement |
|---|---|---|---|---|---|---|---|---|---|---|
| Chino Grading | Settled | $2,065,194.05 POC 62 | $2,065,194.05 | $500,000 (October 2009) | Payment is for estimate of bonded miscellaneous work. Remainder of $1,565,194.05 is estimate of non-bonded grading work. | Partial (POC 62) | YES | 25% ARCH 75% Chino | YES | NO |
| Griffith | Settled | No POC – Scheduled Claim Amount of $1,618,362.07 | $4,098,793 | $4,800,000 (August 2010) | Full Payment | Full | NO | NO | NO | NO |
| SoCal Pipeline | Settled | No POC – Scheduled Claim Amount of $41,620.25 | $72,438.50 | $72,438.50 (December 2009) | Full Payment | Full | NO | NO | NO | NO |
| Steiny | Settled | $259,775.29 POC 17 | $72,115.86 | $72,115.86 (September 2009) | Full Payment. Claimant retained right to pursue any bankruptcy recovery of interest above full payment | Partial (POC 17) | YES | ARCH to recover up to $72,115.86: Steiny any amount above $72,115.86 | YES | NO |
| Orange County Striping | Settled | $ 11,752.27 POC 54 | $7,352.27 | $14,486.84 (January 2010) | Plaintiff accepted statutory offer of judgment. Full payment. No settlement agreement. | Plaintiff accepted statutory offer of judgment. Arch agrees to file a Notice of Transfer of Claim as soon as possible. (POC 54) | NO | N/A | N/A | N/A |
| Savala Equipment Company | Settled | $34,440.00 POC 56 | $34,440.00 | $37,434.90 (January 2010) | Plaintiff accepted statutory offer of judgment. Full payment. No settlement agreement. | Plaintiff accepted statutory offer of judgment. Arch agrees to file a Notice of Transfer of Claim as soon as possible. (POC 56) | NO | N/A | N/A | N/A |

| Claimant | Status of Claim | Scheduled Claim or POC Amount ($) and POC # | Principal Claim Amount ($) | Amount of Payment ($) (Date of Payment) | Description of Payment and Non-Bonded Work | Extent of Bonded Claim Assignment to Arch | Claimant Residual Rights | Pro-Rata Recovery | Duty Re Offer to Reassign | Side Letter Agreement |
|---|---|---|---|---|---|---|---|---|---|---|
| Kirk Negrete, Inc. | Settled | $270,056.42 POC 38 | $270,056.42 | $0 | Second tier sub to Griffith. ARCH payment to Griffith. Rights transferred to ARCH as part of Griffith settlement | Full (POC 38) | NO | NO | NO | NO |
| WEC Corporation | Settled | $102,418.75 POC 66 | $102,418.75 | $102,418.75 (August 2011) | Full Payment | Full (POC 66) | NO | NO | NO | NO |
| Mesa Pacific Construction | Claim Dismissed | $686,000.00 POC 68 | $1,710,242.00 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| R.H. Masonry Inc. | Claim Dismissed | $189,592.00 POC 55 | $189,592.00 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Fenceworks Inc. | Claim Dismissed | No POC – Scheduled Claim Amount of $0.00; listed as disputed | $74,337.00 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| R.J Noble Co | Pending | $175,030.81 POC 42 | $161,631.22 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| C. Wells Pipeline Materials, Inc. | Claim asserted but not pursued | No POC and No Scheduled Claim | $44,654.35 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Construction Testing & Engineering Inc. | Claim asserted but not pursued | No POC and No Scheduled Claim | $3,150.00 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Park West Rescom | Claim asserted but not pursued | No POC – Scheduled Claim Amount of $48,586.70 | $48,586.70 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| EIS | Claim asserted but not pursued | No POC and No Scheduled Claim | $112,540.00 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

| Claimant | Status of Claim | Scheduled Claim or POC Amount ($) and POC # | Principal Claim Amount ($) | Amount of Payment ($) (Date of Payment) | Description of Payment and Non-Bonded Work | Extent of Bonded Claim Assignment to Arch | Claimant Residual Rights | Pro-Rata Recovery | Duty Re Offer to Reassign | Side Letter Agreement |
|---|---|---|---|---|---|---|---|---|---|---|
| **OAK VALLEY** | | | | | | | | | | |
| KIP | Settled | No POC – Scheduled Claim Amount of $194,873.36; listed as disputed | $166,985.10 | $166,985.10 (May 2010) | Full Payment | If KIP seeks filing of a late-filed claim in bankruptcy and the late-filed claim is allowed to be filed, Arch agrees to obtain an assignment of the portion of claim settled by Arch and assign the same to Lehman. | NO | NO | NO | NO |
| AAA | Settled | $60,355.48 POC 26 | $60,355.46 | $60,355.46 (July 2010) | Full payment | Arch agrees to file a Notice of Transfer of Claim as soon as possible. (POC 26) | NO | NO | NO | NO |
| Elite Bobcat Service, Inc. | Claim Dismissed | No POC – Scheduled Claim Amount of $45,000.00; listed as disputed | $64,025.00 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Hillcrest Contracting Inc. | Claim Dismissed | $136,567.43 POC 23 | $136,567.43 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| TC Construction Co. | Claim Dismissed | No POC – Scheduled Claim Amount of $309,498.46 | $327,162.70 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

## **EXHIBIT F**

**BOND PREMIUMS**

See Attached.

Suncal Cos

| Principal Name | Bond Num | Bond Amount | Remaining Bond Liability | Premium Amount | Bond Description | Obligee Name | Effective Date |
|---|---|---|---|---|---|---|---|
| LBL/L-Suncal Oak Valley, LLC | SU 5014598-0000 | 599,508.00 | 599,508.00 | 5,995.00 | Contingent Guarantee Obligation | Beaumont Cherry Valley Water District | 4/29/2008 |
| LBL/L-Suncal Oak Valley, LLC | SU 5015421-0000 | 616,860.00 | 616,860.00 | 6,169.00 | Tract 31462/Subsidy | Fairway Canyon Community Association | 6/16/2008 |
| LBL/L-Suncal Oak Valley, LLC | SU 5015422-0000 | 218,772.00 | 218,772.00 | 1,094.00 | Tract 31462/Common Facilities | Fairway Canyon Community Association | 6/15/2008 |
| SCC/Oak Valley, LLC | SU 5008349-0000 | 1,425,419.50 | 1,425,419.50 | 7,127.00 | J & G Street Alignment - Development Plan Review #0404-002 | City of Calimesa | 6/3/2008 |
| SCC/Oak Valley, LLC | SU 5010585-0000 | 573,865.00 | 573,865.00 | 5,739.00 | Permit No. 200400762-JPL | U.S. Department of the Army Corps of Engineers | 9/13/2008 |
| SCC/Oak Valley, LLC | SU 5012365-0000 | 3,682,000.00 | 3,682,000.00 | 18,410.00 | Tract 31462, Infrastructure Street & Sewer Improvements | City of Beaumont | 12/22/2008 |
| SCC/Oak Valley, LLC | SU 5012366-0000 | 541,000.00 | 541,000.00 | 2,705.00 | Tract 31462, Infrastructure Storm Drain Improvements - Lines B, G, J, K | City of Beaumont | 12/22/2008 |
| SCC/Oak Valley, LLC | SU 5012367-0000 | 2,082,000.00 | 2,082,000.00 | 10,410.00 | Tract 31462, Infrastructure Storm Drain Improvements - Lines D, E, F | City of Beaumont | 12/22/2008 |
| SCC/Oak Valley, LLC | SU 5012368-0000 | 131,000.00 | 131,000.00 | 655.00 | Tract 31462, Infrastructure Storm Drain Improvements - Lines H, I | City of Beaumont | 12/22/2008 |
| SCC/Oak Valley, LLC | SU 5012369-0000 | 245,584.97 | 245,584.97 | 1,228.00 | Tract 31462-1, Infrastructure Street & Sewer Improvements | City of Beaumont | 12/22/2008 |
| SCC/Oak Valley, LLC | SU 5012370-0000 | 340,000.00 | 340,000.00 | 1,700.00 | Tract 31462-2, Infrastructure Street, Drainage & Sewer Improvements | City of Beaumont | 12/22/2008 |
| SCC/Oak Valley, LLC | SU 5012371-0000 | 343,000.00 | 343,000.00 | 1,715.00 | Tract 31462-3, Infrastructure Street, Drainage & Sewer Improvements | City of Beaumont | 12/22/2008 |
| SCC/Oak Valley, LLC | SU 5012372-0000 | 159,032.06 | 159,032.06 | 795.00 | Tract 31462-4, Infrastructure Street & Sewer Improvements | City of Beaumont | 12/22/2008 |
| SCC/Oak Valley, LLC | SU 5012373-0000 | 540,000.00 | 540,000.00 | 2,700.00 | Tract 31462-6, Infrastructure Street, Drainage & Sewer Improvements | City of Beaumont | 12/22/2008 |
| SCC/Oak Valley, LLC | SU 5017059-0000 | 300,000.00 | 300,000.00 | 1,500.00 | Tract 32702 Summerwind Ranch/Grading | City of Calimesa | 9/30/2008 |
| Suncal Marblehead, LLC | SU 5013729-0000 | 295,200.00 | 295,200.00 | 2,952.00 | Marblehead Coastal Project, Permit No. USACOE #200300978-CJF | U.S. Department of the Army Corps of Engineers | 1/19/2009 |
| Suncal Marblehead, LLC | SU 5014712-0000 | 1,707,100.00 | 1,707,100.00 | 8,536.00 | Tract 8817 Street Improvements Lots 1 77 | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014713-0000 | 863,000.00 | 863,000.00 | 4,315.00 | Tract 8817 Streets-Lots 78-120 | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014714-0000 | 751,000.00 | 751,000.00 | 3,755.00 | Tract 8817 Streets-Lots 121-182 | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014715-0000 | 1,354,600.00 | 1,354,600.00 | 6,773.00 | Tract 8817 Street Improvements Lots 183-313 (Via Cantabria, Via Galicia, Via ASturias, Via Murcia) | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014716-0000 | 1,858,866.00 | 1,858,866.00 | 9,295.00 | TTM 8817 Avenida Costa Azul Via Artemesia Park access Road | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014717-0000 | 180,000.00 | 180,000.00 | 900.00 | Tract 8817 JRWSS Waterline Relocation/ Grading | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014718-0000 | 804,000.00 | 804,000.00 | 4,020.00 | Tract 8817/Commercial Service Entry Wall | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014719-0000 | 15,350.00 | 15,350.00 | 100.00 | Tract 8817/ Canyon Edge Walls | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014720-0000 | 1,005,000.00 | 1,005,000.00 | 5,025.00 | Tract 8817/Retaining Wall | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014721-0000 | 443,727.00 | 443,727.00 | 2,219.00 | Tract 8817 RR Park/Grading | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014722-0000 | 225,513.00 | 225,513.00 | 1,128.00 | Tract 8817 Habitat Management | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014723-0000 | 3,571,133.91 | 3,571,133.91 | 17,856.00 | Tract 8817/Residential Streets, Landscape | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014724-0000 | 1,705,500.00 | 1,705,500.00 | 8,528.00 | TTM 8817 AVH & Avenida Pico/ Waterline | City of San Clemente Engineering Division | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014725-0000 | 170,000.00 | 170,000.00 | 850.00 | Tract 8817/Monument | City of San Clemente Engineering Division | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014726-0000 | 4,671,000.00 | 4,671,000.00 | 23,355.00 | Tract 8817/Rough Grading | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014727-0000 | 221,100.00 | 221,100.00 | 1,106.00 | TTM 8817 Caltrans Grading | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014728-0000 | 508,500.00 | 508,500.00 | 2,543.00 | Tract 8817 Production Precise Grading | City of San Clemente Engineering Division | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014729-0000 | 294,000.00 | 294,000.00 | 1,470.00 | Tract 8817 Lots 78-120/Grading | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014730-0000 | 404,800.00 | 404,800.00 | 2,024.00 | Tract 8817 Lots 121-182/Grading | City of San Clemente | 5/4/2008 |

1

Suncal Cos

| Principal Name | Bond Num | Bond Amount | Remaining Bond Liability | Premium Amount | Bond Description | Obligee Name | Effective Date |
|---|---|---|---|---|---|---|---|
| Suncal Marblehead, LLC | SU 5014731-0000 | 866,500.00 | 866,500.00 | 4,333.00 | Tract 8817 Marblehead Coastal/Grading | City of San Clemente | 5/4/2008 |
| Suncal Marblehead, LLC | SU 5014791-0000 | 3,492,280.00 | 3,492,280.00 | 17,462.00 | Tract 8817/Backbone Storm Drain | City of San Clemente | 5/10/2008 |
| Suncal Marblehead, LLC | SU 5014792-0000 | 1,409,100.00 | 1,409,100.00 | 7,046.00 | TTM 8817 AVH & Pico/Sewer , Water | City of San Clemente | 6/2/2008 |
| Suncal Marblehead, LLC | SU 5014794-0000 | 3,696,398.55 | 3,696,398.55 | 18,482.00 | Tract 8817 Urban Runoff Bioswales, Wetlands, CDS Units, Storage Vaults | City of San Clemente | 5/10/2008 |
| Suncal Marblehead, LLC | SU 5014795-0000 | 9,101,200.00 | 9,101,200.00 | 45,506.00 | Tract 8817 Avenida Vista Hermosa Bridge | City of San Clemente | 5/10/2008 |
| Suncal Marblehead, LLC | SU 5014796-0000 | 3,243,200.00 | 3,243,200.00 | 16,216.00 | Tract 8817 Commercial Site Bridge Improvements | City of San Clemente | 5/10/2008 |
| Suncal Marblehead, LLC | SU 5014797-0000 | 200,000.00 | 200,000.00 | 1,000.00 | Tract 8817 Bluff Restoration Grading | City of San Clemente Engineering Division | 6/8/2008 |
| Suncal Marblehead, LLC | SU 5014986-0000 | 59,946.07 | 59,946.07 | 300.00 | TTM 8817 MSE Wall Planting, Etc. | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014987-0000 | 1,135,905.00 | 1,135,905.00 | 5,680.00 | TTM 8817, Pico Park; Precise Grading | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014988-0000 | 3,261,370.00 | 3,261,370.00 | 16,307.00 | Tract 8817 Sports Park/Grading | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014989-0000 | 658,851.00 | 658,851.00 | 3,295.00 | TTM 8817; Precise Grading for Lot N Park | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014990-0000 | 686,819.00 | 686,819.00 | 3,434.00 | TTM 8817, Lot R Park; Precise Grading | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014991-0000 | 165,028.00 | 165,028.00 | 825.00 | TTM 8817, Avenida Pico Medians & Parkway; Improvements | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014992-0000 | 306,200.00 | 306,200.00 | 1,531.00 | TTM 8817 Avenida Vista Hermosa Medians & Parkway | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014993-0000 | 1,532,785.00 | 1,532,785.00 | 7,664.00 | TTM 8817/Trails, Signage | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014994-0000 | 117,832.00 | 117,832.00 | 589.00 | TTM 8817/Entry Monument Signage | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014995-0000 | 1,765,526.00 | 1,765,526.00 | 8,828.00 | Tract 8817 Avenida Vista Hermosa/ Street | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014996-0000 | 881,102.00 | 881,102.00 | 4,406.00 | Tract 8817 Streets -Avenida Pico | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5014997-0000 | 1,086,376.00 | 1,086,376.00 | 5,432.00 | Tract 8817 El Camino Real Improvements | City of San Clemente | 5/23/2008 |
| Suncal Marblehead, LLC | SU 5015039-0000 | 901,450.00 | 901,450.00 | 4,508.00 | TTM 8817 Avenida Vista Hermosa Traffic Signal | City of San Clemente Engineering Division | 5/24/2008 |
| Suncal Marblehead, LLC | SU 5015040-0000 | 409,200.00 | 409,200.00 | 2,046.00 | TTM 8817 Avenida Pico Traffic Signal | City of San Clemente Engineering Division | 5/24/2008 |
| Suncal Marblehead, LLC | SU 5015679-0000 | 225,000.00 | 225,000.00 | 2,250.00 | TTM 8817; Encroachment Permit, Permit No. 1204-6MC-0649 | Caltrans | 7/5/2008 |
| Suncal Marblehead, LLC | SU 5017323-0000 | 123,806.38 | 123,806.38 | 619.00 | TTM 8817 Calle de los Molinos Street Improvements | City of San Clemente | 9/20/2008 |
| Suncal Marblehead, LLC | SU 5017324-0000 | 97,919.00 | 97,919.00 | 490.00 | TTM 8817 Via Socorro Street Improvements | City of San Clemente | 9/20/2008 |
| | 59 | | | 352,941.00 | | | |

2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------x
                                          :
In re                                     :    **Chapter 11 Case No.**
                                          :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,    :    **08-13555 (JMP)**
                                          :
                          **Debtors.**    :    **(Jointly Administered)**
                                          :
--------------------------------------------------------------------x

**ORDER GRANTING DEBTORS' MOTION PURSUANT**
**TO SECTION 363 OF THE BANKRUPTCY CODE AND**
**FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 FOR AUTHORITY**
**TO ENTER INTO SETTLEMENT WITH ARCH INSURANCE COMPANY**

Upon the motion (the "Motion"),[1] of Lehman Brothers Holdings Inc. ("LBHI")

and its affiliated debtors in the above-referenced chapter 11 cases, including Lehman

Commercial Paper Inc. ("LCPI"), as debtors (the "Debtors"), pursuant to section 363 of title 11

of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") for an order authorizing LBHI and LCPI to

enter into the Arch Settlement Agreements and to consummate the transactions and obligations

contained therein, all as more particularly described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern

District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward,

Acting C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in

accordance with the procedures set forth in the second amended order entered on June 17, 2010

---

[1] Capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Motion.

governing case management and administrative procedures for these cases, ECF No. 9635, on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) counsel to Arch; and (vii) all parties who have requested notice in these chapter 11 cases, and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, it is

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, the Debtors are duly authorized, but not directed, to (i) enter into the Arch Settlement Agreements and consummate all of the transactions contemplated thereunder, as described in the Motion and (ii) execute and deliver such documents, instruments, certificates, and agreements and to take such other actions as may be reasonably necessary to consummate the transactions contemplated under the Arch Settlement Agreements, and (iii) consent to any amendment, restatement, waiver, supplement or other modification of any of the documents; and it is further

ORDERED that the Debtors are authorized, but not directed, to make all payments contemplated to be made by the Debtors under the Arch Settlement Agreements, it being understood that any actions described in this paragraph taken by the Debtors or their affiliates may be taken without the necessity of (x) any further court proceedings or approval or (y) any consent of any third party, and shall be conclusive and binding in all respects on all parties in interest in these cases; and it is further

ORDERED that nothing contained herein shall be deemed to be a waiver or the relinquishment of any rights, claims, interests, obligations, benefits or remedies of LCPI, LBHI, or any other Lehman entity that is party to the Arch Settlement Agreements or the Lehman-SunCal Plans, that such Lehman entity may have or choose to assert on behalf of itself or its respective estate, as applicable, under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including against each other or third parties, and the Debtors are hereby authorized and directed to execute such further documents to evidence such reservations; and it is further

ORDERED that nothing contained in the Arch Settlement Agreements or in the Motion shall be deemed to be a waiver or the relinquishment of any rights, claims, interests, obligations, benefits or remedies of LBHI, LCPI or any other Lehman Creditor, that such entity may have or choose to assert on behalf of itself or its respective estate, as applicable, under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including against each other or third parties; and it is further

ORDERED that any and all pre- and post-petition claims, rights and obligations that the Debtors may have against each other in connection with the subject matter of the Motion or the transactions contemplated by the Arch Settlement Agreements are hereby fully preserved and shall not be prejudiced by the entry of this Order; and it is further

ORDERED that the allocation of costs and benefits between or among the Debtors and non-Debtor affiliates in connection with the Arch Settlement Agreements is preserved; and it is further

ORDERED that the Arch Settlement Agreements, may be modified, amended or supplemented by the proponents thereof without further order of the Court, and any agreements,

documents or other instruments related to the Arch Settlement Agreements, documents or other

instruments may be modified, amended or supplemented by the parties thereto, in a writing

signed by such parties, and in accordance with the terms, provisions and conditions thereof,

*provided* that, in each case, any such modification, amendment or supplement does not have a

material adverse effect on the Debtors' estates; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and/or interpretation of this Order;

*provided*, *however*, that nothing contained in this Order is intended to reduce the jurisdiction of

or predetermine any concurrent jurisdiction otherwise vested in the Bankruptcy Court for the

Central District of California in the chapter 11 cases of the SunCal Debtors.

Dated: October __, 2011
     New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE