Hearing Date and Time:  October 19, 2011 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date and Time:  October 12, 2011 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                                                 :
In re                                                            :    Chapter 11 Case No.
                                                                 :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                         :    08-13555 (JMP)
                                                                 :
                                   Debtors.                      :    (Jointly Administered)
                                                                 :
                                                                 :
-----------------------------------------------------------------x

**NOTICE OF DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b)(1)
OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO IMPLEMENT 2012
DERIVATIVES INCENTIVE PROGRAM AND CERTAIN RELATED RELIEF**

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases (together, the "Debtors") for authorization to implement a derivatives incentive program

for 2012 and for certain related relief, all as more fully described in the Motion, will be held

before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States

Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green,

New York, New York 10004 (the "Bankruptcy Court"), on **October 19, 2011 at 10:00 a.m.**

**(Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

<u>Rules</u>") and the Local Rules of the Bankruptcy Court for the Southern District of New York,

shall set forth the name of the objecting party, the basis for the objection and the specific grounds

thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order

M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy

Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing

format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York

10153, Attn:  Richard P. Krasnow, Esq. and Sunny Singh, Esq., attorneys for the Debtors; (iii)

the Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York,

New York 10004 Attn:  Tracy Hope Davis, Esq., Elisabetta G. Gasparini, Esq. and Andrea B.

Schwartz, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New

York, New York 10005, Attn:  Dennis F. Dunne, Esq., Evan Fleck, Esq., Dennis O'Donnell,

Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; and

(v) any person or entity with a particularized interest in the Motion, so as to be so filed and

received by no later than **October 12, 2011 at 4:00 p.m. (Prevailing Eastern Time)** (the

"<u>Objection Deadline</u>").

        PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: September 28, 2011
        New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                          :
**In re**                                                  :        **Chapter 11 Case No.**
                                                          :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*   :        **08-13555 (JMP)**
                                                          :
                                    **Debtors.**    :        **(Jointly Administered)**
                                                          :
                                                          :
-------------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b)(1) OF THE**
**BANKRUPTCY CODE FOR AUTHORIZATION TO IMPLEMENT 2012**
**DERIVATIVES INCENTIVE PROGRAM AND CERTAIN RELATED RELIEF**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-
referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and,
collectively with their non-debtor affiliates, "Lehman"), file this Motion and respectfully
represent:

**Preliminary Statement**

1.    The Debtors are at a critical stage in their chapter 11 cases.  The disclosure
statement (the "Disclosure Statement") for the Debtors' third amended chapter 11 plan (the
"Plan") has been approved and solicitation of votes to accept or reject the Plan has commenced.

The Plan is supported by major foreign and domestic creditors asserting more than $140 billion in claims and more than fifty creditors have executed plan support agreements. The hearing to consider confirmation of the Plan is scheduled for December 6, 2011.

2.    In that context, the Debtors seek to capitalize on and maintain the momentum that has been generated in the ongoing wind down of their derivatives businesses and assets through the derivatives employee incentive plans implemented in 2010 and 2011 (together the "Prior Derivatives Incentive Plans").[1] The Debtors request approval of and authorization to implement a derivatives incentive plan for 2012 (the "Derivatives Incentive Plan") and to modify certain aspects of the previously approved Retention and Recruitment Program (defined below) with respect to derivatives employees. The aggregate amount payable under the Derivatives Incentive Plan will not exceed $12 million.

3.    Like the Prior Derivatives Incentive Plans, the Derivatives Incentive Plan is designed to motivate and reward the Derivatives Workforce (defined below) for its services that result in direct benefit to the Debtors through recovery on, or preservation of, the Debtors' derivatives assets and mitigation of derivatives claims against the Debtors. The Derivatives Incentive Plan is constructed on the same principles as the Prior Derivatives Incentive Plans and is designed to maximize the value of the Debtors' derivatives assets and to ensure that the Debtors are able to continue to expeditiously review derivatives claims filed against their estates. No payments will be made under the Derivatives Incentive Plan unless the specified performance metrics are satisfied.

4.    Next year will continue to require a substantial commitment by the Derivatives Workforce to effectively wind down and maximize recovery on the Debtors'

---

[1] The 2010 Derivatives Incentive Plan and the 2011 Derivatives Incentive Plan were approved by the Court on December 17, 2009 [ECF No. 6298] and November 18, 2010 [ECF No. 12897], respectively.

derivatives assets and review and reconcile derivatives claims filed against the Debtors' estates. Without a qualified and motivated workforce, the Debtors will be operating at a serious disadvantage in their efforts to maximize value for their stakeholders.  In addition, with the general focus of the chapter 11 cases now being on confirmation of the Plan and the Debtors having made significant progress on preserving and maximizing the value of their assets, the Debtors believe there is a sense of uncertainty within the Derivatives Workforce regarding their continued employment with the Debtors in 2012 and beyond.  Accordingly, the Debtors have developed a meaningful and targeted incentive program to motivate the Derivatives Workforce to continue to excel at their highest and best levels in the unwind of the Debtors' derivatives businesses and to compete with the compensation and prospect of long-term employment offered by their competitors taking into account the constraints of the Bankruptcy Code.

5.      In order to maximize the value of their derivatives businesses, the Debtors require the expertise of highly qualified individuals with in-depth knowledge of Lehman's pre-petition businesses, assets, counterparties and transactions.  The members of the Derivatives Workforce have significant institutional knowledge and Lehman process knowledge and have developed a core understanding of Lehman's businesses, which would make replacing such individuals very difficult.  The loss of key individuals with knowledge of the Debtors' assets and developed relationships causes delay and frustrates the Debtors' goals and objectives of maximizing the value of their derivatives businesses.  The inefficiencies created by employee attrition and the delay associated with overcoming learning curves by replacement employees directly result in increased costs to the Debtors.

6.      As demonstrated in this Motion and in the Declaration of Robert Hershan (the "Hershan Declaration") in support of the Motion, executed as of the date hereof, the

Derivatives Incentive Plan and the related relief described herein are in the best interest of the

Debtors' estates and their stakeholders.  They should, therefore, be approved.  The Debtors have

consulted the financial advisors to the Creditors' Committee's (defined below) regarding the

Derivatives Incentive Plan.

### **Background**

7.      Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with

this Court voluntary cases under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural

purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

8.      On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

9.      On September 1, 2011, the Debtors filed the Plan [ECF No. 19627] and

Disclosure Statement [ECF No. 19629].  Also on September 1, 2011, the Bankruptcy Court

entered an amended order [ECF No. 19631] approving the Disclosure Statement, establishing

solicitation and voting procedures in connection with the Plan, scheduling the confirmation

hearing and establishing notice and objection procedures for the confirmation hearing.

### **Jurisdiction**

10.     This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Relief Requested

11.     By this Motion, pursuant to sections 105(a), 363(b)(1), and 503(b)(1)(A) of the Bankruptcy Code, the Debtors seek (i) authorization to adopt, implement or otherwise take actions consistent with the Derivatives Incentive Plan, including making all payments thereunder, (ii) authorization to modify certain aspects of the Retention and Recruitment Program for derivatives employees, including to modify the criteria that must be satisfied for derivatives employees to earn their 2012 Contractual Bonus (as defined below), and (iii) approval of an administrative expense priority of distribution entitlements under the 2012 Derivatives Incentive Plan and the modified Retention and Recruitment Program for derivatives employees.

## Retention and Recruitment Program

12.     In 2011, the Debtors employed 170 individuals to wind down their derivatives businesses (the "Derivatives Workforce").  By order dated April 15, 2010 [ECF No. 8372], the Court approved the Debtors' transfer to LAMCO Holdings LLC and its subsidiaries (collectively, the "LAMCO Entities") of a majority of LBHI's asset management employees and certain infrastructure.  As a result, the members of the Derivatives Workforce are now employed directly by the LAMCO Entities, but provide the same services to the Debtors as they performed prior to the establishment of the LAMCO Entities.  The Debtors are seeking Court approval of the Derivatives Incentive Plan because they will be funding all payments thereunder.

13.     The cost to the LAMCO Entities to employ the Derivatives Workforce are paid by the Debtors in the form of a "management fee."   Such costs are paid initially by LBHI, but the cost of every employee is then reallocated to the particular Debtor for whom an employee

performs its services.  The payments made under the Derivatives Incentive Plan will be allocated

among the Debtors in the same manner as currently applied for the Debtors' payroll expenses.

14.     All of the Debtors' and the LAMCO Entities' employees are currently

compensated pursuant to the authority granted to the Debtors to implement the retention and

recruitment program (the "Retention and Recruitment Program").  *See* ECF No. 1662 (order

approving Retention and Recruitment Program).  The Derivatives Workforce is also

compensated pursuant to amounts that are earned under the Prior Derivatives Incentive Plans.

Generally, under the Retention and Recruitment Program, employees are paid a base salary and

are eligible to earn a performance based bonus (the "Contractual Bonus"), the metrics of which

are set at the time of employment or extension by Alvarez and Marsal North America LLC

("A&M") with the review and consent of the Creditors' Committee.  The amount of Contractual

Bonus ultimately paid to an eligible employee is based upon a review of the employee's

performance over the course of the employment or extension term by A&M and subject to the

consent of the Creditors' Committee.  In addition, under the Retention and Recruitment Program,

employees terminated without cause prior to the expiration of their commitment period are

entitled to the balance of their salary for the commitment period, their Contractual Bonus (pro

rated through the termination date) and accrued post-petition severance.  *See* Debtors' Motion to

Implement Retention and Recruitment Program ¶ 31, ECF No. 1278.

### The Derivatives Incentive Plan

A.     The Derivatives Workforce

15.     The Debtors have established derivatives reconciliation and management

teams based upon relevant industry, counterparty and derivatives product experience.  Generally,

the members of the Derivatives Workforce are assigned to a particular group, such as

"Counterparty Teams" or "Trading/Valuation," and then further assigned to a specific team that

is led by a team leader.  Each team is charged with a specified task.  For example, the "SPV"

team is tasked with the objective of reconciling and winding down the Debtors' derivatives

contracts with counterparties that are special purpose entities.

16.    As set forth in the Hershan Declaration, on a day-to-day basis, among

other things, the Derivatives Workforce gathers and collates trade data, determines and

reconciles trade values, engages with counterparties to negotiate and recover payments or

collateral, and reconciles derivatives claims against the Debtors.  Given the unique nature of

Lehman's derivatives unwind activities, the Derivatives Workforce is being asked to perform

and undertake tasks that are not normally performed in the derivatives marketplace.  Indeed,

there is no comparable entity in or out of bankruptcy that is engaged in the unwind of a

derivatives portfolio of the size and scale of the Debtors.  The Derivatives Workforce is subject

to exceptional demands, complexities and pressures.  Currently, approximately 56% of the

Derivatives Workforce is made up of Lehman legacy employees and 93% of the workforce has

been assisting the Debtors unwind their derivatives business for more than 12 months, which

would make replacing these individuals very difficult and costly for the Debtors.

17.    Through the efforts of the Derivatives Workforce, as of August 30, 2011,

the Debtors have recovered approximately $1.4 billion in cash in 2011, bringing the total amount

of cash recovered by the Debtors on account of their derivatives assets since September 15, 2008

to more than $13.6 billion.  In addition, the Debtors' valuation of their derivatives contracts has

been substantially completed and 70% of the Derivatives Contracts with third-parties are

considered to be "final settled."  Substantial progress has also been made on the collection of

derivatives receivables and reconciliation and resolution of derivatives claims with third-parties

and the Debtors' foreign affiliates, including the settlement of derivatives claims and receivables of ten (10) of the Debtors' largest "Big Bank" counterparties.[2]

18.    Notwithstanding the tremendous efforts and achievements of the Derivatives Workforce, much remains to be done.  The Debtors are continuing to pursue their strategies on collection of receivables, particularly through alternative dispute resolution procedures separately approved by the Court for Derivatives Contracts with recovery potential [ECF No. 5207] and for affirmative claims of the Debtors under Derivatives Contracts with special purpose vehicle counterparties [ECF No. 14789].   In addition, the Derivatives Workforce will continue to be focused on reviewing and reconciling the unresolved portfolio remaining from the more than 8,000 derivatives and derivatives guarantee claims that have been filed against the Debtors asserting more than $75 billion in amounts due from the Debtors, including the enormously complex claims asserted by the remaining "Big Bank" counterparties that have not yet settled with the Debtors.  Reviewing and reconciling derivatives claims filed against the Debtors and monetizing the value of the Debtors' "in the money" Derivatives Contracts will continue to require substantial efforts of the Derivatives Workforce through 2012.

B.    2012 Compensation for Derivatives Employees
and Modifications to Retention and Recruitment Program

19.    Approximately ninety-five (95) members of the Derivatives Workforce are being extended for a full term of 12 months.  None of the employees that are eligible for participation in the Derivatives Incentive Plan or the modifications to the Retention and Recruitment Program are officers, directors or persons in control of the Debtors.[3]  As

---

[2] A motion for approval of the Debtors' settlements with Bank of America, N.A. and Merrill Lynch International and certain of its affiliates regarding, among other things, their asserted derivatives claims against the Debtors has been filed and is scheduled to be heard on October 19, 2011.

[3] There are two co-heads of the Debtors' derivatives group (the "Derivatives Co-Heads"): an A&M employee and a Lehman legacy employee.  As was the case with the Prior Derivatives Incentive Plans, the Lehman legacy

compensation for 2012, members of the Derivatives Workforce will: (i) receive a base salary; (ii) receive an amount equal to at least their earned 2011 Contractual Bonus; and (iii) be eligible to earn up to an additional maximum incentive payment for 2012 pursuant to the Derivatives Incentive Plan described below (such incentive payment, in the case of each derivatives employee, the "2012 Derivatives Incentive Payment").  The criteria for the payment of the Contractual Bonus under the Retention and Recruitment Program to members of the Derivatives Workforce will be modified for 2012.  Currently under the Retention and Recruitment Program, the Contractual Bonus is payable based upon the satisfaction of certain performance criteria by employees and the review by A&M and consent of the Creditors' Committee.  In 2012, unless a derivatives employee is terminated for cause, he or she will be entitled to receive their 2012 Contractual Bonus if he or she is employed by the estate through December 31, 2012 and provides satisfactory services to the Debtors in 2012 that are consistent with the level of effort and dedication put forth by such employee in prior years.

        20.    If a derivatives employee is terminated with cause at any time in 2012 or without cause prior to September 30, 2012, such derivatives employee will not be entitled to their 2012 Derivatives Incentive Payment.  If a derivatives employee is terminated without cause after September 30, 2012, such derivatives employee will be entitled to a pro rata share, based on the period of active employment, of their 2012 Derivatives Incentive Payment on or about January 31, 2012.  If a derivatives employee is terminated without cause at any time through 2012, such derivatives employee will still receive his or her base salary through the commitment

---

Derivatives Co-Head will be eligible to participate in the 2012 Derivatives Incentive Plan, but all decisions made with respect to such individual's 2012 Contractual Bonus and 2012 Derivatives Incentive Payment are made by A&M, with the consent of the Creditors' Committee.  In addition, the Lehman legacy Co-Head will not receive the benefit of the modifications to the Retention and Recruitment Program described in paragraph 19 of the Motion.  Rather, in the event the Lehman legacy Co-Head is terminated without cause in 2012 at any time, the total incentive payment earned by him under the Derivatives Incentive Plan through the date of termination will be due and payable.

period, any severance entitlement that such derivatives employee may have, such derivatives

employee's earned Contractual Bonus (pro rated through the date of departure) and, as an

additional modification to the Retention and Recruitment Program, 50% of his or her pro rated

Contractual Bonus for the remaining commitment period.[4]  For example, if a derivatives

employee's Contractual Bonus in 2012 was $200,000 and such derivatives employee was

terminated on June 30, 2012, then such derivatives employee would receive $100,000 (pro rated

Contractual Bonus for services rendered) plus $50,000 (50% of pro rated Contractual Period for

remaining period).

   21. The modifications to the criteria for payment of the 2012 Contractual

Bonus under the Retention and Recruitment Program for derivatives employees and the

additional 50% pro rated Contractual Bonus that may be paid to a derivatives employee

terminated without cause in 2012 are necessary to balance the Debtors' need to minimize

disruption to their derivatives businesses from derivatives employee attrition with the Debtors'

goal of incentivizing the members of the Derivatives Workforce to continue to excel at their

highest and best levels in the wind down of the Debtors' derivatives businesses.  The Creditors'

Committee retains the right to consent to the maximum 2012 Contractual Bonus that is payable

to each member of the Derivatives Workforce (such consent not to be unreasonably withheld).[5]

---

[4] The Lehman legacy Co-Head will be eligible to participate in this modification to the Retention and Recruitment Program.

[5] As noted in various sections of this Motion, the Creditors' Committee has the right to consent to certain aspects of the Derivatives Incentive Plan and Retention and Recruitment Program as modified.  The Plan provides that the Creditors' Committee will be dissolved on the Effective Date other than for limited purposes.  *See* Plan § 15.1(a). Accordingly, such consent of the Creditors' Committee will only be required for so long as the Creditors' Committee remains in existence.

Extension Option

22.     The Debtors and the LAMCO Entities retain the option to offer to extend

derivatives employee contracts by no later than September 30, 2012.  If a derivatives employee

accepts an extension offer, such individual's 2013 base salary will be at least equal to his or her

2012 earned base salary and such individual's 2013 Contractual Bonus will be at least equal to

his or her earned 2012 Contractual Bonus, both pro rated for the period of extension.  In addition,

if a derivatives employee is offered an extension of employment beyond December 31, 2012, the

Debtors will hold back an amount equal to 15% of the total 2012 Contractual Bonus and 2012

Derivatives Incentive Payment earned by such individual (the "2012 Derivatives Holdback").

The 2012 Derivatives Holdback does not apply to derivatives employees earning total

compensation in 2012 (inclusive of base salary and Contractual Bonus) of less than $200,000.

Except as described below, the 2012 Derivatives Holdback will be paid at the earlier of (a)

January 31, 2014 or (b) within 30 days of the end of the extension period if the extension is for

less than 12 months.

23.     If a derivatives employee is terminated without cause during the 2013

extension period, the derivatives employee will be paid the full amount of his or her 2012

Derivatives Holdback.  If, however, a derivatives employee declines an extension offer, is

terminated with cause during the extension period or should resign prior to the completion of the

extension period, such derivatives employee shall not be entitled to receive his or her 2012

Derivatives Holdback and shall forfeit such amounts.

C.     The Derivatives Incentive Plan

24.     The Debtors have designed an incentive pool to be calculated based upon

the total value recovered or preserved by the Derivatives Workforce as well as for claims

mitigated through December 31, 2012 capped at $12 million in the aggregate (the "Derivatives

Incentive Pool"). This amount excludes any holdback payments that were authorized to be made to derivatives employees under the Prior Derivatives Incentive Plans. Like the Prior Derivatives Incentive Plans, contributions to the Derivatives Incentive Pool will be based upon percentages of (i) cash collections; (ii) realizable asset value of live trades; (iii) counterparty settlement offers; and (iv) mitigation of claims, including claims settlement offers. The Debtors have carefully selected the benchmarks set by the Derivatives Incentive Plan, which have been reviewed by the Creditors' Committee's financial advisors, and believe that they are reasonably calculated to achieve the desired result of maximizing value for creditors. The Debtors have set the benchmarks based upon their experience in these cases, the progress made to date, a review of their derivatives portfolio, including counterparties and risks associated with litigation, and an assessment of the size, qualification and performance to date of the Derivatives Workforce.

Eligibility and Payout

25.    To be eligible for the Derivatives Incentive Plan, a derivatives employee must be employed by the Debtors or the LAMCO Entities from January 1, 2012 through the December 31, 2012. Employees terminated without cause after September 30, 2012 are eligible to receive a pro rated portion of the 2012 incentive payment for the period of active employment. Employees hired after January 1, 2012, but on or prior to September 30, 2012 (either to fill new or replacement positions) and who are employed through the December 31, 2012 may also be eligible to earn a 2012 Derivatives Incentive Payment, as determined by the Derivatives Co-Heads subject to the consent of the Creditors' Committee, which consent shall not be unreasonably withheld. At the time a derivatives employee is extended an offer of employment for 2012, or at the time a new or replacement employee is hired and the Derivatives Co-Heads determine to allow such new or replacement employee to participate in the Derivatives Incentive

Plan, such individual will be allotted a specified percentage share of the Derivatives Incentive

Pool determined by the Derivatives Co-Heads based upon each employee's performance,

function, seniority, and historical compensation.  The Debtors may use the maximum incentive

payment previously allocated to terminated employees to compensate replacement employees.

26.    Other than derivatives employees who are terminated with or without

cause in 2012, each derivatives employee will receive his or her percentage share of the

Derivatives Incentive Pool that will accumulate pursuant to the performance criteria set forth

below for the Derivatives Incentive Plan.  The maximum 2012 Derivatives Incentive Payment

that may be paid to each employee, including any reallocation of a maximum 2012 Derivatives

Incentive Payment of a terminated employee to a replacement employee, is subject to the consent

of the Creditors' Committee, which consent shall not be unreasonably withheld.

Calculation of the Derivatives Incentive Pool

27.    The amounts contributed to the Derivatives Incentive Pool will be

calculated, as of the December 31, 2012, based upon an "Asset Recovery" component and a

"Claims Mitigation" component and shall be subject to the consent of the Creditors' Committee,

which consent shall not be unreasonably withheld, as explained below.  Contributions to the

2012 Incentive Pool for Asset Recovery and Claims Mitigation will commence on the date that

the minimum thresholds described below are reached, which may occur in 2011.

28.    The criteria for contributions to the Derivatives Incentive Pool under the

2012 Derivatives Incentive Plan are largely the same as the criteria for the 2011 Derivatives

Incentive Plan, with certain modifications to reflect the evolution of these cases.  For example, as

was the case with the 2011 Derivatives Incentive Plan, the Debtors recognize that the focus of

the Derivatives Workforce in 2012 on reviewing and reconciling derivatives claims will continue

to increase.  Accordingly, the contribution to the Derivatives Incentive Pool for claims mitigation

has been increased from 30 basis points under the 2011 Derivatives Incentive Plan to 40 basis

points under the 2012 Derivatives Incentive Plan for claims mitigated in excess of $12.6 billion

(other than mitigation of certain guarantee claims described below).  The adjustments in

contributions to the 2012 Derivatives Incentive Pool reflect the Debtors' focus and are intended

to further align the interests of the Derivatives Workforce with the Debtors' organizational goals

for their derivatives businesses in 2012.  A chart identifying the material differences between the

2011 Derivatives Incentive Plan and 2012 Derivatives Incentive Plan is annexed hereto as

Exhibit A.

**Asset Recovery**

29.     Like the Prior Derivatives Incentive Plans, contributions to the Derivatives

Incentive Pool under the Asset Recovery component are calculated based upon total recovery

through cash collections, value of live trades (referred to as "Realizable Asset Value") and

counterparty settlement offers without duplication (collectively, "Asset Recovery Value").  Asset

Recovery Value is based upon collections realized or value preserved since September 15, 2008.

30.     Contributions to the Incentive Pool will be made in the amount of 100

basis points for total Asset Recovery Value in excess of $16.1 billion.  For example, if total

Asset Recovery Value is $16.6 billion as of the December 31, 2012, then there will be a

contribution to the 2012 Derivatives Incentive Pool based upon Asset Recovery Value of 100

basis points of $500 million (difference between $16.6 billion and $16.1 billion), or $5 million.

**Cash Collections and Realizable Asset Value**

31.     Cash collections are the amounts of cash realized on a Derivatives

Contract (including Derivatives Contracts with affiliates) and other derivatives-related assets

included in the Derivatives Incentive Plan through a settlement, liquidation, transfer or

assignment to a third party. Realizable Asset Value relates to the benefit to the estate from

preservation of value of open live contracts and is the liquidation value of the live portfolio as of,

or reasonably close to, the December 31, 2012. In many cases, due to current market conditions,

preservation or management of a portfolio of derivatives assets, as opposed to immediate sale or

liquidation, may be in the best interests of the Debtors. As was the case under the Prior

Derivatives Incentive Plans where there was a similar metric, because it evidences a value

enhancement, to encourage the preservation of such value and to attract individuals with unique

management skills to remain with or join the Debtors, the Debtors believe that offering an

incentive on Realizable Asset Value in addition to cash collections is appropriate.

32.    Consistent with the Prior Derivatives Incentive Plans, the Realizable Asset

Value will initially be determined by the derivatives team charged with managing that portfolio

of contracts. The derivatives team has the greatest understanding of the portfolio and will be in

the best position to determine the intrinsic value of the contracts. To ensure an objective

assessment of value, the assigned Realizable Asset Value is subject to review and approval by

A&M and the consent of the Creditors' Committee, which consent shall not be unreasonably

withheld. There shall be no incremental contribution to the Derivatives Incentive Pool under the

Derivatives Incentive Plan for Realizable Asset Value credited to the Derivatives Workforce

under the Prior Derivatives Incentive Plans (except for any excess value obtained that is over the

amount that was credited to the Derivatives Workforce under the Prior Incentive Plans).

**Settlement Offer Value**

33.    Lastly, like the Prior Derivatives Incentive Plans, the Asset Recovery

component includes the settlement value offered by a counterparty, but rejected by the Debtors.

To reward the Derivatives Workforce for the time and effort expended in negotiating a settlement and to encourage favorable settlements, the Debtors believe it is appropriate to calculate the contribution to the Derivatives Incentive Pool based upon the last settlement offer negotiated by the Derivatives Workforce that remains outstanding as of the December 31, 2012, even if such offer is not accepted.  To ensure an objective assessment of the settlement offer value, including verification that the settlement offer is a true offer and not subject to further negotiation, the proposed settlement value will be subject to review and approval by A&M and the consent of the Creditors' Committee, which consent shall not be unreasonably withheld. There shall be no incremental contribution to the Derivatives Incentive Pool for settlement offers that were credited to the Derivatives Workforce under the Prior Derivatives Incentive Plans but for which final agreement was not reached until 2012 (except for any excess value obtained that is over the amount that was credited to the Derivatives Workforce under the Prior Derivatives Incentive Plans).

**Claims Mitigation**

34.    In addition to the Asset Recovery Component, the Derivatives Incentive Pool will be calculated based upon "Claims Mitigation."  For every dollar mitigated on a derivatives claim in excess of $12.6 billion (other than a derivatives guarantee claim against LBHI for which the primary obligor is not a subsidiary Debtor or an entity controlled by a Debtor (a "Non-Controlled Affiliate")) as a result of the efforts of the Derivatives Workforce, *i.e.*, the difference between either the valuation statement submitted by a creditor or the claim filed by that creditor (each after reductions for trades that are determined to be inappropriately included in the trade population due to maturation, termination or novation prior to the Early Termination Date or duplicate and frivolous claims) and the amount of the claim as ultimately

allowed by agreement or order of the Court, 40 basis points will be contributed to the Derivatives

Incentive Pool.  For derivatives guarantee claims for which the primary obligor is a Non-

Controlled Affiliate, 12.5 basis points will be contributed to the Derivatives Incentive Pool for

mitigation of such claims up to $2 billion and 25 basis points will be contributed to the

Derivatives Incentive Pool for mitigation of such claims in excess of $2 billion.  For the same

reasons that the Debtors have determined it is appropriate to include settlement offer value for

calculation of the Asset Recovery component of the Derivatives Incentive Pool and consistent

with the Prior Derivatives Incentive Plans, the Claims Mitigation component also includes the

settlement value offered by a counterparty on mitigation of a claim, but rejected by the Debtors.

There will be no contribution to the Derivatives Incentive Pool for (i) duplicate or frivolous

claims mitigation, (ii) settlement offers that are retracted by a counterparty, or (iii) settlement

offers that were credited to the Derivatives Workforce under the Prior Derivatives Incentive

Plans but for which final agreement or determination on a claim was not reached until 2012

(except for any excess value obtained that is over the amount that was credited to the Derivatives

Workforce under the Prior Derivatives Incentive Plans).  To ensure an objective assessment of

value, prior to a claim being processed by the derivatives team, the initial amount of the claim

will be subject to review and approval by A&M and the consent of the Creditors' Committee,

such consent not to be unreasonably withheld.

35.    The following is a summary of the material terms of the Derivatives

Incentive Plan as described above:

| Criteria | Asset Recovery Component<br>Cash Collections<br>Realizable Asset Value (value preservation)<br>Settlement Offer Value | Claims Mitigation<br>Claims Mitigation (after adjustment for duplicates and frivolous claims)<br>Claims Mitigation Settlement Offers |
|---|---|---|
| **Incentive Pool** | 100 basis points for Asset Recovery Value exceeding $16.1 billion | 40 basis points for claims mitigation or claims settlement offers in excess of $12.6 billion for all derivatives claims other than guarantee claims for which the primary obligor is a Non-Controlled Affiliate<br><br>12.5 basis points for first $2 billion of claims mitigation or claims settlement offers for derivatives guarantee claims for which the primary obligor is a Non-Controlled Affiliate<br><br>25 basis points for claims mitigation or claims settlement offers in excess of $2 billion for derivatives guarantee claims for which the primary obligor is a Non-Controlled Affiliated |
| **Individual Payouts** | Individual percentage share of total Incentive Pool allotted to each employee by the Derivatives Co-Heads (date of extension or hire), subject to Creditors' Committee consent (not to be unreasonably withheld)<br><br>Each individual will receive 2012 Derivatives Incentive Payment based upon amounts accumulated in Incentive Pool as of December 31, 2012 | |
| **Aggregate Cap** | **$12 million** | |

**The Derivatives Incentive Plan and the Modifications to the Retention and Recruitment Program Are Supported by Sound Business Judgment and Should be Approved**

36.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). When considering a transaction outside the ordinary course of business, courts in the Second Circuit, and others, require that such transaction be based upon the sound business judgment of the debtor. *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *accord In re*

*Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *In re Martin*, 91 F.3d 389, 395 (3d Cir.

1996) (citing *Fulton State Bank v. Schipper* (*In Re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991));

*Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc.* (*In re Cont'l Airlines, Inc.*),

780 F.2d 1223, 1226 (5th Cir. 1986).

        37.     It is generally understood that "[w]here the debtor articulates a reasonable

basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),

courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville*

*Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). If a valid business justification exists, there is

a strong presumption that "'the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interests of the company.'" *In*

*re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488

A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). The burden of rebutting

this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.

*Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

        38.     For all of the reasons that the Court approved the Prior Derivatives

Incentive Plans, the Derivatives Incentive Plan, which is designed for the same purpose of

motivating the Derivatives Workforce to continue to excel at their highest and best levels to

maximize recoveries to creditors, should be approved. The resolution of the Debtors' derivatives

assets and claims will have a significant impact on recoveries to creditors. The Derivatives

Incentive Plan will enable the Debtors to maintain the momentum that has been generated by the

Prior Derivatives Incentive Plans and promotes the expeditious resolution of the Debtors'

derivatives businesses by motivating the Derivatives Workforce to continue to efficiently pursue

the Debtors' objectives. The total cost of the Derivatives Incentive Plans – no more than $12

million – is *de minimis* in comparison to the total value of the Debtors' derivatives portfolio, with assets estimated to be in excess of $17 billion and additional claims mitigation estimated to be more than $20 billion, that can be achieved for the benefit of creditors.

39.     The Derivatives Incentive Plan and modifications to the Retention and Recruitment Program are appropriate also because they encourage the Derivatives Workforce to continue their commitment to the Debtors through these challenging chapter 11 cases.  To be successful in achieving their goals, the Debtors must be represented by highly qualified individuals.  Not only does the unprecedented complexity of the Debtors' derivatives contracts demand the expertise of individuals with extensive experience in the derivatives industry generally, but the Derivatives Workforce also possesses intimate knowledge of Lehman's derivatives businesses, assets and counterparties.  The distractions and time that must be expended to continuously search for replacements could have a detrimental impact on recoveries for creditors and are far more costly than the costs associated with the Derivatives Incentive Plan.  Moreover, due to the uncertainty that Debtors' believe to exist within the Estate Workforce regarding their continued employment with the Debtors through 2012 and beyond, the modifications to the Retention and Recruitment Program are necessary to provide the Derivatives Workforce reasonable assurances and security and to incentivize the Derivatives Workforce to continue their commitment to the Debtors in the wind down of their derivatives business.

40.     Accordingly, the Derivatives Incentive Plan and modifications to the Retention and Recruitment Program should be approved as a sound exercise of the Debtors' business judgment.

## The Requirements of Section 503(c)(1) of the Bankruptcy Code Are Not Applicable

41.     Section 503(c)(1) of the Bankruptcy Code imposes heightened evidentiary

burdens on the approval of a "transfer or payment made to, or an obligation incurred for the

benefit of, an *insider* of the debtor *for the purpose of inducing such person to remain with the*

*debtor's business*…" 11 U.S.C. § 503(c) (emphasis added).  Section 101(31) of the Bankruptcy

Code defines the term "insider" to include an officer, director or person in control of the debtor if

the debtor is a corporation.  *See* 11 U.S.C. § 101(31)(B).  As noted above and set forth in the

Hershan Declaration, no officer, director or person in control of the Debtors will participate in

the Derivatives Incentive Plan or the modified Retention and Recruitment Program.

Accordingly, by its terms, section 503(c)(1) of the Bankruptcy Code is inapplicable to the

Derivatives Incentive Plan or the modified Retention and Recruitment Program for derivatives

employees.  *See In re Nellson Nutraceutical Inc.*, 369 B.R. 787, 801 (Bankr. D. Del. 2007)

(holding that section 503(c)(1) is inapplicable to non-insiders).

42.     None of the employees that are eligible for participation in the 2012

Incentive Plans or the modified Retention and Recruitment Program for derivatives employees

have extensive control over the Debtors or the LAMCO Entities that would afford them the

opportunity for self-dealing.  *See In re 455 CPW Assoc's. v. The Greater New York Savings Bank*

*(In re 455 CPW Assoc's.)*, 2000 U.S. App. LEXIS 23470, at *17-20 (2d Cir. Sept. 14, 2000)

(holding that "courts have required evidence of *extensive* control before finding insider status"

and that individual was not an insider because the evidence did not demonstrate that such person

"executed actual management of the Debtor's affairs that afforded him an opportunity to self-

deal.") (emphasis added).  As described in the Hershan Declaration, none of the members of the

Derivatives Workforce exercise control over the Debtors or the LAMCO Entities or made any
decisions with respect to their 2012 incentive payments or 2012 Contractual Bonus.

43.    Additionally, section 503(c)(1) does not apply to the Derivatives Incentive
Plan because the Derivatives Incentive Plan is not a retention plan.  "[M]erely because a
[compensation] plan has some retentive effect does not mean that the plan, overall, is retentive
rather than incentivizing in nature."  *In re Dana Corp.*, 358 B.R. 567, 571 (Bankr. S.D.N.Y.
2006) (concluding that "incentivizing plans with *some* components that arguably have a retentive
effect do not necessarily violate section 503(c)" (emphasis in original)); *see also In re Borders
Group, Inc.*, 2011 Bankr. LEXIS 1537, at *22 – 28 (Bankr. S.D.N.Y. April 27, 2011) (holding
that incentive plan, which also included retentive elements, was primarily incentivizing because
it was tied to milestones achieved in chapter 11 case and, therefore, permissible); *In re Nellson
Nutraceutical Inc.*, 369 B.R. at 802 (noting that "[a]ny payment to an employee, including
regular wages, has at least a partial purpose of retaining the employee. . . if the Court did not
apply a materiality standard, all payments to insiders would be subject to 503(c)(1), which would
be an absurd result.  At the same time, applying a 'sole purpose' standard goes too far.").  Courts
have therefore read section 503(c)(1) "to mean 'a transfer made to . . . an insider for the
*[primary]* purpose of inducing such person to remain with the debtor's business."  *Id.* at 802
(quoting 11 U.S.C. § 503(c)(1)) (emphasis in original); *see also In re Global Home Products,
LLC*, 369 B.R. 778, 785 (Bankr. D. Del. 2007) (holding that "[t]he entire analysis changes if a
bonus plan is not *primarily* motivated to retain personnel…") (emphasis added).

44.    Like the Prior Derivatives Incentive Plans that were approved by the
Court, the Derivatives Incentive Plan is not a prohibited retention plan under section 503(c)(1) of
the Bankruptcy Code because the primary purpose of the Derivatives Incentive Plan is to

maximize recoveries to creditors, not to retain insiders.  The Derivatives Incentive Plans is a

performance based reward to the Derivatives Workforce for direct benefits created for the

Debtors and their stakeholders.  The total amounts payable are directly tied to the value created

or preserved by the members of the Derivatives Workforce.  If the threshold metrics are not

satisfied, no payments will be made.

### The Requirements of Section 503(c)(3), to the Extent Applicable, Are Satisfied

45.    Section 503(c)(3) of the Bankruptcy Code prohibits "other transfers or

obligations that are outside the ordinary course of business and not justified by the facts and

circumstances of the case, including transfers made to, or obligations incurred for the benefit of,

officers, managers or consultants hired after the date of the filing of the petition."  11 U.S.C. §

503(c)(3).  Some courts have held that the business judgment standard is the relevant test under

503(c)(3).  *See In re Dana Corp.*, 358 B.R. at 576 (holding that the "test in section 503(c)(3)

appears to be no more stringent a test than the one courts must apply in approving any

administrative expense under section 503(b)(1)(A).  Any expense must be an actual, necessary

cost or expense of preserving the estate" (citation omitted)).  Other courts "have held that section

503(c)(3) sets a higher bar than the simple business judgment test."  *In re Pilgrim's Pride Corp.*,

401 B.R. 229, 236 (Bankr. N.D. Tex. 2009) (reading the "justified by the facts and circumstances

of the case" requirement to mean that the "court must make its own determination that the

transaction will serve the interests of creditors and the debtor's estate"); *see also In re CEP

Holdings, LLC*, 2006 WL 3422665, *3 (Bankr. N.D. Ohio 2006) (holding that 'facts and

circumstances' that must be considered before determining that the transaction is justified

include "whether the potential plan recipient had significant input into the negotiation of the plan

(including the amount of additional compensation that the employee would receive under the plan)").

46.    Under either standard, like the Prior Derivatives Incentive Plans, the Derivatives Incentive Plan and the modifications to the Retention and Recruitment Program for derivatives employees are more than justified by the "facts and circumstances" of these cases. The metrics of the Derivatives Incentive Plan have been carefully selected and tailored by the Debtors to achieve the desired outcome of maximizing recoveries to creditors from their derivatives businesses.  The criteria has been established based upon the Debtors' experience in these cases, the progress made to date, a review of the various assets of the Debtors and an assessment of the size, qualification and performance to date of the Derivatives Workforce, with the recognition of the constraints imposed by the Bankruptcy Code.

47.    Moreover, the modifications to the Retention and Recruitment Program for derivatives employees are necessary and appropriate.  It is widely recognized that derivatives contracts are extremely complex and require expertise and extensive experience to manage and liquidate.  In addition to their complexity, the Debtors' derivatives contracts are massive in number.  There is a limited pool of professionals that possess the necessary skills to perform the functions of these individuals who also possess the intimate knowledge of Lehman's derivatives business.  Indeed, as the Court found in approving the 2010 Derivatives Incentive Plan, "in this instance providing reasonable incentives for these very qualified and absolutely critical employees is an essential ingredient to the success of the Lehman liquidation, at least as it relates to the derivatives book.  And so I approve it."  *See* Tr. of Dec. 16, 2009 Hr'g at 54:12-16.

48.    The Debtors submit that the factors set forth by the Court in *Dana*, 358 B.R. at 576, are irrelevant here because of the unique circumstances of the Debtors.  There are no

market comparables because there are no other companies that are engaged in the business of unwinding a derivatives business of such massive size and complexity. Moreover, the Debtors' derivatives assets are the most significant assets of their estates. Indeed, the efforts of the Derivatives Workforce have resulted in the recovery of over $13.6 billion in cash and the preservation of significant additional value for the benefit of creditors. As such, comparison to other employees of the Debtors or the LAMCO Entities charged with the task of administering other assets of the estates is irrelevant.

49. Nevertheless, to the extent any of the *Dana* factors are helpful to the Court's analysis, as explained in the Hershan Declaration, the metrics of the Derivatives Incentive Plan, which have been reviewed by the financial advisors to the Creditors' Committee and are comparable to the metrics utilized in the Prior Derivatives Incentive Plans, have been carefully selected and tailored by the Debtors to achieve the desired outcome of maximizing recoveries to creditors. The criteria has been established based upon the Debtors' experience in these cases, the progress made to date, a review of the derivatives portfolio, an assessment of the size, qualification and performance to date of the Derivatives Workforce, and relevant market information (recognizing that the Debtors are constrained by the Bankruptcy Code in ways that the market is not).

**Payments Pursuant to the Derivatives Incentive Plan and the Modified
Retention and Recruitment Program Are Administrative Expenses**

50. Because the wind-down of the Debtors' business would be less efficient and more costly without the continued services of the Derivatives Workforce, the payment rights of the derivatives employees under the Derivatives Incentive Plan and the modified Retention and Recruitment Program will be actual, necessary costs and expenses of preserving the Debtors'

estates, and, therefore, should be accorded administrative expense priority under section

503(b)(1)(a) of the Bankruptcy Code.

<u>**Notice**</u>

51.      No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Motion in accordance with the procedures set forth in the amended

order entered on June 17, 2010 governing case management and administrative procedures for

these cases [ECF No. 9635] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors'

Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v)

the United States Attorney for the Southern District of New York; and (vi) all parties who have

requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice

need be provided.

52.      No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the

relief requested herein and such other and further relief as it deems just and proper.

Dated:  September 28, 2011
        New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## Exhibit A

**(2011 Derivatives Incentive Plan v 2012 Derivatives Incentive Plan)**

**2011 Derivatives Incentive Plan v 2012 Derivatives Incentive Plan**

| | **2011 Derivatives Incentive Plan** | **2012 Derivatives Incentive Plan** |
|---|---|---|
| *Maximum Derivatives Incentive Pool* | ▪ $15 million | ▪ $12 million |
| *Eligible Employees* | ▪ Employees that start before October 1, 2011 and remaining through December 31, 2011.<br><br>▪ Employees working partially on derivatives project also eligible (in discretion of Derivatives Co-Heads) | ▪ Employees that start before October 1, 2012 and remaining through December 31, 2012.<br><br>▪ Employees terminated without cause after September 30, 2012 eligible to earn pro rated portion of 2012 incentive payment |
| *Claims Mitigation Definition* | ▪ Claims actually mitigated plus claims mitigation settlement offers | ▪ Same as 2011 Derivatives Incentive Plan – Claims actually mitigated plus claims mitigation settlement offers |
| *Contributions to Incentive Pool* | ▪ 100 bps for Asset Recovery exceeding greater of $15 billion and total Asset Recovery Value determined for the 2010 Derivatives Incentive Plan as of December 31, 2010<br><br>▪ 30 bps for claims mitigated or claims settlement offers exceeding $10 billion | ▪ 100 basis points for Asset Recovery Value exceeding $16.1 billion<br><br>▪ 40 basis points for claims mitigation or claims settlement offers in excess of $12.6 billion for all derivatives claims other than guarantee claims for which the primary obligor is a Non-Controlled Affiliate<br><br>▪ 12.5 basis points for first $2 billion of claims mitigation or claims settlement offers for derivatives guarantee claims for which the primary obligor is a Non-Controlled Affiliate<br><br>▪ 25 basis points for claims mitigation or claims settlement offers in excess of $2 billion for derivatives guarantee claims for which the primary obligor is a Non-Controlled Affiliated<br><br>▪ Incentive pool can begin monetizing in 2011 if the minimum amounts are reached |

| | | |
|---|---|---|
| *Individual Payout Maximum Calculations* | ▪ 100% of maximum and actual payout determined in discretion of Derivatives Co-Heads (based on performance, function, seniority, historical compensation, etc.)<br><br>▪ Maximum and actual payout subject to Creditors' Committee Consent, such consent not to be unreasonably withheld | ▪ 100% of maximum payout equal to attributable share of aggregate incentive pool (based on performance, function, seniority, historical compensation, etc.)<br>▪ Maximum payout subject to Creditors' Committee consent, such consent not to be unreasonably withheld |
| *Extension / Holdback* | ▪ If extension for 2012 is offered, estate has option to hold back 25% of total 2011 incentive payment (only for employees earning greater than $150,000)<br><br>▪ If an employee accepts an extension offer, such individual's (i) 2012 base salary will be at least equal to his or her 2011 earned base salary and (ii) 2012 Contractual Bonus will be at least equal to his or her earned 2011 Contractual Bonus | ▪ If extension for 2013 is offered, estate has option to hold back 15% of total 2012 Contractual Bonus and 2012 incentive payment (only for employees earning total base salary and Contractual Bonus in 2012 greater than $200,000)<br><br>▪ If an employee accepts an extension offer, such individual's (i) 2013 base salary will be at least equal to his or her 2012 earned base salary and (ii) 2013 Contractual Bonus will be at least equal to his or her earned 2012 Contractual Bonus |
| *Termination* | Employees terminated without cause prior to December 31, 2011 receive:<br>▪ balance of base salary for commitment period<br>▪ pro rata share of 2011 Contractual Bonus<br>▪ any severance entitlements<br>▪ 2011 incentive payment only if terminated after September 30, 2011 and mandatory distribution pool not distributed to employees remaining on payroll as of December 31, 2011 | Employees terminated without cause prior to December 31, 2012 receive:<br>▪ balance of base salary for commitment period<br>▪ pro rata share of 2012 Contractual Bonus<br>▪ any severance entitlements<br>▪ 50% of pro rated Contractual Bonus for balance of commitment period<br><br>Not entitled to receive Derivatives Incentive Payment unless terminated without cause after September 30, 2012 (pro rated) |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                     :

| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| | : | |
| | : | |

-------------------------------------------------------------------x

**ORDER GRANTING DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND
363(b)(1) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO IMPLEMENT
2012 DERIVATIVES INCENTIVE PROGRAM AND CERTAIN RELATED RELIEF**

Upon the motion, dated September 28, 2011 (the "Motion")[1], of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "Debtors" and, together with their non-

debtor affiliates, "Lehman"), pursuant to sections 105(a) and 363 of title 11 of the United States

Code (the "Bankruptcy Code") for (i) authorization to adopt, implement or otherwise take

actions consistent with the Derivatives Incentive Plan as described in the Motion, including

making all payments thereunder, (ii) authorization to modify certain aspects of the Retention and

Recruitment Program for derivatives employees, including to modify the criteria that must be

satisfied for derivatives employees to earn their 2012 Contractual Bonus, and (iii) approval of an

administrative expense priority of distribution entitlements under the Derivatives Incentive Plan

and the modified Retention and Recruitment Program for derivatives employees, all as more

fully described in the Motion; and the Court having jurisdiction to consider the Motion and the

relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the
Motion.

M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All

Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the

Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b);

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Motion having been provided in accordance with the procedures set forth in

the amended order entered June 17, 2010 governing case management and administrative

procedures [ECF No. 9635] to (i) the United States Trustee for the Southern District of New

York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities

and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for

the Southern District of New York; and (vi) all parties who have requested notice in these

chapter 11 cases, and it appearing that no other or further notice need be provided; and a hearing

having been held to consider the relief requested in the Motion; and the Court having found and

determined that the relief sought in the Motion is in the best interests of the Debtors, their estates

and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion

establish just cause for the relief granted herein; and after due deliberation and sufficient cause

appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that the Debtors are authorized to take all necessary action to adopt,

implement or otherwise take actions consistent with the Derivatives Incentive Plan, including

making all payments thereunder; and it is further

ORDERED that the Debtors are authorized to take all necessary action to adopt,

implement or otherwise take actions consistent with the modifications to the Retention and

Recruitment Program with respect to derivatives employees on the terms and conditions set forth

in the Motion, including making all payments thereunder; and it is further

ORDERED that distribution entitlements under the Derivatives Incentive Plan

and the modified Retention and Recruitment Program with respect to derivatives employees are

entitled to administrative expense status and priority under sections 503(b)(1)(A) and 507(a)(2);

and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated:  October __, 2011
          New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE