# EXHIBIT A

NEWYORK 8269660 v6 (2K)

| **United States Bankruptcy Court/Southern District of New York**<br>Lehman Brothers Holdings Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 5076<br>New York, NY 10150-5076 | | **PROOF OF CLAIM** |

| In Re:<br>Lehman Brothers Holdings Inc., et al.<br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) |
| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
| Lehman Brothers Holdings Inc. | 08-13555 |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)       0000027838

THIS SPACE IS FOR COURT USE ONLY

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

**Name and address of Creditor:** (and name and address where notices should be sent if different from Creditor)

Commerzbank AG, New York and Grand Cayman Branches
Attn: Michael Fruchter
2 World Financial Center
New York, NY 10281-1050

Telephone number: (212) 266-7230   Email Address: mfruchter@cbkna.com

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
(*If known*)

Filed on: _____

**Name and address where payment should be sent (if different from above)**

Telephone number:                Email Address:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1. **Amount of Claim as of Date Case Filed:** $ 200,081,967.21 (See Annex A)
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☑ Check this box if all or part of your claim is based on a Guarantee.*
***IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OR A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**
☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** See Annex A
(See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** _____
3a. **Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe: See Annex A

Value of Property: $_____   Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____   Basis for perfection: _____

Amount of Secured Claim: $ See Annex A   Amount Unsecured: $ 202,327,001.60(See Annex A)

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**Amount entitled to priority:**

$ See Annex A

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $ 0
(See instruction #6 on reverse side.)

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (*See definition of "redacted" on reverse side.*) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:
See Annex A

FILED / RECEIVED

SEP 22 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date:<br>9/21/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |

Michael P. McCarthy SVP

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

## Items to be completed in Proof of Claim form

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

## _____DEFINITIONS_____

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:
Lehman Brothers Holdings Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150- 5076

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

**Lehman Programs Securities**
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on http://www.lehman-docket.com as of July 27, 2009.

## _____INFORMATION_____

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

LEHMAN BROTHERS HOLDINGS INC.,
*et al.*

                                          Debtor.

Chapter 11 Case No.

08-13555 (JMP)

ANNEX A TO PROOF OF CLAIM OF
COMMERZBANK AG, NEW YORK AND
GRAND CAYMAN BRANCHES AGAINST
LEHMAN BROTHERS HOLDINGS, INC.

1.    Claimant.  Commerzbank AG, New York and Grand Cayman Branches (the

"Claimant"), is filing this proof of claim against Lehman Brothers Holdings Inc. (the "Debtor")

as assignee of a claim against the Debtor arising from certain prepetition transactions described

more fully below.

2.    Transactions Between the Parties.  The Claimant is the sole holder of

$200,000,000 original face amount 7th Avenue Inc. Series 2 USD200,000,000 Floating Rate

Secured Notes due 2008 (ISIN: XS020601; Common Code:  020601728) maturing on December

8, 2008 (the "Notes").  The Notes were constituted as of December 8, 2004, and are governed

and secured by a Master Trust Deed, dated as of September 12, 2002, a Supplemental Trust

Deed, dated as of December 8, 2004, and a First Supplemental Trust Deed, dated as of December

23, 2004 (together, the "Trust Deed"),[1] each between the 7th Avenue Inc. (the "Issuer") and

HSBC Trustee (C.I.) Limited, as trustee (in such capacity, the "Deed Trustee").

---

[1] The Trust Deed is voluminous and is therefore not attached hereto.  A copy will be provided to any party in interest
upon request.

3.      The primary security available under the Trust Deed (the "Trust Deed Collateral")
is the Issuer's rights and interests in a Term Loan Agreement, dated as of December 8, 2004 (the
"Loan Agreement"),[2] among the Issuer, as lender, the Lehman Brothers Special Financing Inc.
("LBSF"), as borrower, and the Deed Trustee as trustee, and a related Security Agreement, dated
as of December 8, 2004 (the "Security Agreement"),[3] among the Issuer, as secured party, LBSF,
as debtor, and the Deed Trustee, as trustee, to whom the security interest created by the Security
Agreement was assigned.

4.      Pursuant to the Security Agreement, the Debtor's obligations under the Loan
Agreement are secured by, among other things, a security interest in LBSF's rights, title and
interest in, to and under certain ISDA Master Agreements (each a "Contract," collectively the
"Contracts,"[4] and together with the transactions thereunder and the proceeds thereof, the
"Collateral"). Such security interest is perfected pursuant to a Uniform Commercial Code
financing statement filed with the Delaware Department of State on December 8, 2004 (file No.
43464031) and a Uniform Commercial Code continuation statement in respect thereof filed with
the Delaware Department of State on June 26, 2009 (such financing statement and continuation
statement herein collectively referred to as the "Financing Statements").[5] Pursuant to the Trust
Deed, the Issuer's rights, title and interest in the Collateral were pledged to, and exercisable by,
the Deed Trustee for the benefit of the Claimant as the sole beneficial owner of the Notes.

5.      By a Deed of Assignment dated as of February 13, 2009 among the Issuer, the
Deed Trustee and the Claimant (the "Deed of Assignment"), all rights, title and interest of the

---

[2] A copy of the Loan Agreement is attached hereto as Exhibit A.
[3] A copy of the Security Agreement is attached hereto as Exhibit B.
[4] A copy of the last Collateral Schedule (as defined in the Security Agreement) provided by the Debtor and received by the Claimant is attached hereto as Exhibit C.
[5] Copies of the Financing Statements are attached hereto as Exhibit D.

2

Issuer and the Deed Trustee in and to the Loan Agreement, Security Agreement and Collateral have been assigned by them to the Claimant.[6]

6.      All liabilities, obligations and commitments of LBSF are fully guaranteed under that certain Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc. (the "Guaranty") dated as of June 9, 2005.[7]

7.      On September 15, 2008 (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition under chapter 11 of the United States Bankruptcy Code.  On July 2, 2009, this Court entered an order establishing the deadline to file proofs of claim against the Debtor (the "Bar Date Order").  This Proof of Claim is being submitted pursuant to the Bar Date Order.  In connection with the Proof of Claim, the Claimant is submitting a Guarantee Questionnaire (as defined in the Bar Date Order).

8.      On October 3, 2008, LBSF commenced its chapter 11 case by filing a voluntary petition under chapter 11 of the United States Bankruptcy Code.

9.      Claim.

   a. As of the Petition Date, the outstanding **principal** amount due under the Loan Agreement was **$200,000,000**.

   b. **Unpaid interest** accrued under the Loan Agreement as of the Petition Date was $81,967.21 and as of September 14, 2009 was **$2,136,754.25** and continues to accrue.[8]

   c. In addition, the Claimant is entitled to the amount of all costs and expenses (including legal fees) incurred by it in connection with the enforcement or

---

[6] A copy of the Deed of Assignment is attached hereto as Exhibit E.
[7] A copy of the Guaranty is attached hereto as Exhibit F.
[8] *See* Interest Statement, Exhibit G.

preservation of its rights under the Loan Agreement and the Security

Agreement.  These **expenses** total **$190,247.55** through September 14, 2009.[9]

    d.   Accordingly, the amount owed to the Claimant by the Debtor under the

Guaranty, Loan Agreement and Security Agreement totals not less than

**$202,327,001.80**, namely principal of **$200,000,000**, plus accrued interest

thereon through September 14, 2009 of **$2,136,754.25** plus legal fees and

other expenses of Claimant accrued through September 14, 2009 of

**$190,247.55** (such amount, together with subsequently accruing interest and

subsequently incurred expenses, the "Claim").  As of the Petition Date, the

Claim totaled $200,081,967.21.

    10.    Supporting Documents.  Copies of the Loan Agreement, Security Agreement,

Collateral Schedule, financing statements, Guaranty, Deed of Assignment, an Interest Statement,

and an Expenses Statement are attached hereto as Exhibits A – H, respectively.

    11.    Judgments.  No judgment has been rendered on the Claim.

    12.    Credit and Setoffs.  The Claim is not subject to any setoffs, defenses or

counterclaims by the Debtor or any of its affiliates.

    13.    Security Interests and Priority Status.  The Claim is filed (i) as a secured claim to

the extent of any right of setoff by the Claimant and (ii) as a general unsecured claim to the

extent of the remaining amount, if any, of the Claim, without any prejudice to any and all rights

of the Claimant to assert that any portion of the Claim is entitled to administrative priority under

Sections 503 and 507 of the Bankruptcy Code.

---

[9] *See* Expenses Statement, Exhibit H.  The costs and expenses shown above are a 50 percent allocation of the total costs and expenses that have arisen in connection with this Claim and related claims against Lehman Brothers Bankhaus AG.

4

14.    <u>Reservation of Rights</u>.  The execution and filing of this proof of claim is not and shall not be deemed: (a) a waiver or release of the Claimant's rights against any other entity or person liable for all or any part of the Claim asserted herein; (b) a consent by the Claimant to the jurisdiction of this Court with respect to any proceeding commenced in this case against or otherwise involving the Claimant; (c) a waiver of the right to withdraw the reference with respect to the subject matter of the Claim, any objection or other proceedings commenced with respect thereto or any other proceedings commenced in this case against or otherwise involving the Claimant; (d) a waiver or release by the Claimant of any right to trial by jury, or a consent by the Claimant to a trial by jury, in this Court or any other court; (e) a waiver of any right to the subordination or recharacterization, in favor of the Claimant, of indebtedness or liens held by any creditors of the Debtor or any of its affiliates; or (f) an election of remedies which waives or otherwise affects any other remedy.

15.    <u>Amendments</u>.  The Claimant expressly reserves its right to file any separate or additional proof of claim with respect to the Claim set forth herein or otherwise (which proof of claim, if so filed, shall not be deemed to supersede this proof of claim unless expressly so stated therein), to amend or supplement this proof of claim in any respect, including with respect to the filing of an additional or amended claim for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

16.    Notice. All notices in respect of this claim should be forwarded to:

COMMERZBANK AG,
New York and Grand Cayman Branches
Attn: Michael Fruchter
2 World Financial Center
New York, NY 10281-1050

with copy to:

WHITE & CASE LLP
Attn: Abraham L. Zylberberg
1155 Avenue of the Americas
New York, New York 10036.

Dated: September 21, 2009
New York

COMMERZBANK AG,
New York and Grand Cayman Branches

By: _____
Name:    Michele Woessner-Larkin
         Assistant Vice President

By: _____
Name:    Michael P. McCarthy
         Senior Vice President

Penalty for Presenting a Fraudulent Claim. Fine of not more than $500,000.00 or imprisonment
of not more than five years or both – Title 18, U.S.C. §§ 152 and 3571.

# **EXHIBIT A**

## LOAN AGREEMENT

# TERM LOAN AGREEMENT

### DATED [8TH] DECEMBER, 2004

### U.S.$200,000,000

### TERM LOAN FACILITY

### FOR

### LEHMAN BROTHERS SPECIAL FINANCING INC.

## ALLEN & OVERY

### ALLEN & OVERY LLP

### LONDON

15616-00920 ICM:886700.10

# CONTENTS

**Clause**                                                                **Page**

1.      Interpretation ...........................................................................................1
2.      Facility ....................................................................................................5
3.      Purpose ....................................................................................................5
4.      Conditions Precedent ...............................................................................5
5.      Repayment ...............................................................................................5
6.      Interest .....................................................................................................5
7.      Payments ..................................................................................................6
8.      Taxes ........................................................................................................6
9.      Increased costs .........................................................................................7
10.     Early Repayment ......................................................................................7
11.     Representations and Warranties ...............................................................8
12.     Undertakings ..........................................................................................10
13.     Default ....................................................................................................12
14.     Acceleration ...........................................................................................14
15.     Expenses .................................................................................................14
16.     Stamp Duties ..........................................................................................15
17.     Indemnities .............................................................................................15
18.     Evidence and Certifications ...................................................................15
19.     Amendments and Waivers ......................................................................16
20.     Assignments ...........................................................................................16
21.     Register ...................................................................................................16
22.     Disclosure of Information .......................................................................16
23.     Severability .............................................................................................17
24.     Counterparts ...........................................................................................17
25.     Notices ....................................................................................................17
26.     Jurisdiction .............................................................................................19
27.     Waiver of Immunity ...............................................................................20
28.     Integration ..............................................................................................20
29.     Waiver of Jury Trial ...............................................................................20
30.     Governing Law .......................................................................................20
**Schedule 1** ..........................................................................................21
Signatories ........................................................................................................22

15616-00920 ICM:886700.10

**THIS AGREEMENT** is dated [8th] December, 2004

**BETWEEN:**

(1)    **LEHMAN BROTHERS SPECIAL FINANCING INC.** (the Borrower);

(2)    **7TH AVENUE INC.** (the Lender); and

(3)    **HSBC TRUSTEE (C.I.) LIMITED** (the **Trustee**), which has agreed to become a party to this Agreement solely for the purpose of taking the benefit of Clause 20 of this Agreement and for the preservation and enforcement of its rights under the Trust Deed.

**IT IS AGREED** as follows:

1.    **INTERPRETATION**

1.1    **Definitions**

In this Agreement:

**Affiliate** means any direct or indirect Subsidiary or a Holding Company of a person or any other direct or indirect Subsidiary of that Holding Company.

**Business Day** means a day on which commercial banks and foreign exchange markets settle payments and are open for general business (including dealings in foreign exchange and foreign currency deposits) in London and New York City.

**Code** means the United States Internal Revenue Code of 1986, as amended.

**Default** means an Event of Default or an event which, with the giving of notice, lapse of time, determination of materiality or fulfilment of any other applicable condition (or any combination of the foregoing), would constitute an Event of Default.

**Dollars, U.S.$** or **U.S. Dollar** means the lawful currency for the time being of the United States of America.

**Drawdown Date** means the date of the advance of the Loan.

**ERISA** means the United States Employee Retirement Income Security Act of 1974, as amended from time to time.

**ERISA Affiliate** means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

**ERISA Event** means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived), (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived, (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan, (e) the receipt by the Borrower

or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, (f) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan, or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is reasonably expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

**Event of Default** means an event specified as such in Clause 13.1 (Events of Default).

**Holding Company** means, in relation to a person, an entity of which that person is a Subsidiary.

**Information Memorandum** means the information memorandum dated [●] December, 2004 in relation to the EUR2,500,000,000 Multi-Structure Secured Note Programme for the Issuer.

**Interest Amount** means the amount of interest per Note determined by the Lender or the Lender's agent in accordance with paragraph 17 of the Pricing Supplement to the Supplemental Information Memorandum.

**Interest Period** means each period from and including the Drawdown Date or each Payment Date, as applicable, to but excluding the next Payment Date or the Repayment Date, as applicable. If an Interest Period would otherwise end on a day which is not a Business Day, that Interest Period shall instead end on the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not).

**Issuer** means 7th Avenue Inc., as issuer of the Notes.

**Loan** means the principal amount of borrowing by the Borrower under this Agreement or the principal amount outstanding of that borrowing.

**Material Adverse Change** means any material adverse change in the business, operations, property, assets or condition (financial or otherwise) of the Borrower and its Subsidiaries taken as a whole, or any such change which could reasonably be expected materially to impair the Borrower's ability to perform its obligations under this Agreement or any of the Notes.

**Multiemployer Plan** means a "multiemployer plan" within the meaning of section 3(37) or 4001(a)(3) of ERISA.

**Noteholder** means any holder from time to time of the Notes.

**Notes** means the Series 2 USD 200,000,000 Floating Rate Secured Notes due 2008 in relation to the EUR2,500,000,000 Multi-Structure Secured Note Programme for the Issuer.

**Number of Notes** means, at any time, the number of Notes outstanding at such time.

**Party** means a party to this Agreement.

**Payment Date** means the [8th] day of each calendar month in each year commencing on [8th] January, 2005 to and including the Repayment Date.

**PBGC** means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

**Plan** means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

**Repayment Date** means the Payment Date falling in December, 2008.

**Security Document** means any of (i) the Security Agreement dated [8th] December, 2004 between Lehman Brothers Special Financing Inc. as Debtor, 7th Avenue Inc. as Secured Party and HSBC Trustee (C.I.) Limited as Trustee (the **Security Agreement**); (ii) the Deposit Account Control Agreement dated [8th] December, 2004 between Lehman Brothers Special Financing Inc. as Pledgor, 7th Avenue Inc. as Lender, HSBC Bank USA, National Association as Bank and HSBC Trustee (C.I.) Limited as Trustee (the **Deposit Account Control Agreement**); and (iii) the Securities Account Control Agreement dated [8th] December, 2004 between Lehman Brothers Special Financing Inc. as Pledgor, 7th Avenue Inc. as Lender, HSBC Bank USA, National Association as Securities Intermediary and HSBC Trustee (C.I.) Limited as Trustee (**the Securities Account Control Agreement**).

**Security Interest** means any mortgage, pledge, lien, charge, assignment, hypothecation or security interest or any other agreement or arrangement having the effect of conferring security.

**Subsidiary** means an entity from time to time of which a person has direct or indirect control or owns directly or indirectly more than fifty per cent. (50%) of the share capital or similar right of ownership.

**Supplemental Information Memorandum** means the Supplemental Information Memorandum dated [8th] December, 2004 in respect of the Notes.

**Trust Deed** means the Master Trust Deed dated 12th September, 2002 between the Issuer and the Trustee, as supplemented by a Supplemental Trust Deed dated [8th] December, 2004 between the Trustee and the Issuer.

**Withdrawal Liability** means the liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

1.2     **Construction**

(a)     In this Agreement, unless the contrary intention appears, a reference to:

(i)     an **amendment** includes a modification, supplement, novation, restatement or re-enactment and **amended** is to be construed accordingly;

**assets** includes present and future properties, revenues and rights of every description (whether real, personal or mixed, and whether tangible or intangible);

an **authorization** includes an authorization, consent, approval, order, resolution, license, permit, notice, exemption, filing, registration or notarization;

**control** means the power to direct the management and policies of an entity, whether through the ownership of voting capital, by contract or otherwise;

a **law** includes any law, regulation, regulatory requirement, rule, ordinance, ruling, decision, treaty, directive, order, guideline, regulation, policy, writ, judgment, injunction or request of any court or other governmental body, fiscal or monetary authority, or other ministry or public entity (and their interpretation, administration and application), whether or not having the force of law;

a **month** is a reference to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month, except that:-

(A)    if there is no numerically corresponding day in the month in which that period ends, that period shall end on the last Business Day in that calendar month; or

(B)    if an Interest Period commences on the last Business Day of a calendar month, that Interest Period shall end on the last Business Day in the calendar month in which it is to end;

a **person** includes any individual, company, corporation, trust, unincorporated association or body of persons (including a partnership, joint venture or consortium), government, state, agency, international organization or other entity;

a **regulation** includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, inter-governmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organization;

(ii)    a provision of law is a reference to that provision as amended or re-enacted;

(iii)    a Clause or a Schedule is a reference to a clause of or a schedule to this Agreement;

(iv)    a person includes its successors, transferees and assigns;

(v)    this Agreement, a Security Document or another document is a reference to this Agreement, that Security Document or other document as amended; and

(vi)    a time of day is a reference to New York City time.

(b)    Unless the contrary intention appears, a term used in any Security Document or in any notice given under or in connection with any Security Document has the same meaning in that Security Document or notice as in this Agreement.

(c)  Unless the contrary intention appears, reference in this Agreement to the singular includes a reference to the plural and vice versa and reference to the masculine includes a reference to the feminine and neuter.

(d)  The term **including, include** or **includes** shall be deemed to be followed by the phrase **but not limited to**.

(e)  The index to and the headings in this Agreement are for convenience only and are to be ignored in construing this Agreement.

## 2.  FACILITY

Subject to the terms of this Agreement, the Lender agrees to make a Loan to the Borrower up to an aggregate principal amount not exceeding USD 200,000,000.

## 3.  PURPOSE

The Borrower shall apply the Loan towards working capital and other general corporate purposes.

## 4.  CONDITIONS PRECEDENT

The Borrower may not receive any amount under the Loan until the Lender has received all of the documents set out in Schedule 1 in form and substance satisfactory to the Lender.

## 5.  REPAYMENT

Subject to Clauses 10 and 14, the Borrower shall repay the Loan in full on the Repayment Date.

## 6.  INTEREST

### 6.1  Interest amount

The amount of interest due on the Loan for each of its Interest Periods is the product of the Interest Amount and the Number of Notes.

Interest shall accrue at the rate so determined from and including the first day of the Interest Period to but excluding the last day of the Interest Period.

### 6.2  Due dates

Except as otherwise provided in this Agreement, accrued interest on the Loan is payable by the Borrower on the Payment Date occurring immediately after the end of the relevant Interest Period.

### 6.3  Notification of rates of interest

The Lender or the Lender's agent shall promptly notify the Borrower of the determination of a rate of interest under this Agreement.

### 6.4  Calculations

Interest shall accrue from day to day and will be calculated on the basis of the actual number of days elapsed and a year of 360 days.

## 7.    PAYMENTS

### 7.1    Place

All payments by the Borrower under this Agreement shall be made to such account of the Lender or to its order as may be designated from time to time.

### 7.2    Set-off and counterclaim

All payments made by the Borrower under this Agreement shall be made without set-off or counterclaim and without the requirement of presentment, notice or demand, all of which the Borrower waives.

### 7.3    Non-Business Days

If a payment under this Agreement is due on a day which is not a Business Day, the due date for that payment shall instead be the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

## 8.    TAXES

(a)    All payments by the Borrower under this Agreement shall be made free and clear of and without any deduction for or on account of any taxes, except to the extent that the Borrower is required by law to make payment subject to any taxes.  Subject to paragraph (b) below, if any tax or amounts in respect of tax must be deducted, or any other deductions must be made, from any amounts payable or paid by the Borrower under this Agreement, the Borrower shall pay such additional amounts as may be necessary to ensure that the Lender receives a net amount equal (on an after-tax basis, taking into account any income taxes the Lender will owe on the additional amounts) to the full amount which it would have received had payment not been made subject to tax or any other deduction.

(b)    The Borrower is not obliged to pay any additional amount pursuant to paragraph (a) above in respect of any deduction which would not have been required if the Lender had completed a declaration, claim, exemption or other form which it is able to complete.

(c)    The Borrower shall:

(i)    pay when due all taxes required by law to be deducted or withheld by it from any amounts paid or payable under this Agreement;

(ii)    within 15 days of the payment being made, deliver to the Lender evidence satisfactory to the Lender (including all relevant tax receipts) that the payment has been duly remitted to the appropriate authority; and

(iii)    forthwith on demand indemnify the Lender against any loss or liability which the Lender incurs as a consequence of the payment or non-payment of those taxes.

ICM:886700.10                                                                                              6

## 9.    INCREASED COSTS

### 9.1    Increased costs

(a)    Subject to Clause 9.2 (Exceptions), the Borrower shall forthwith on demand by the Lender pay to the Lender the amount of any increased cost incurred by it as a result of:

   (i)    the introduction of, or any change in, or any change in the interpretation or application of, any law or regulation; or

   (ii)   compliance with any regulation made after the date of this Agreement,

   (including any law or regulation relating to taxation, change in currency of a country or reserve, reserve asset, special deposit, cash ratio, liquidity or capital adequacy requirements or any other form of banking or monetary control).

(b)    In this Agreement **increased cost** means:

   (i)    an additional cost incurred by the Lender as a result of it having entered into, or performing, maintaining or funding its obligations under, this Agreement; or

   (ii)   a reduction in any amount payable to the Lender or in the effective return to a the Lender under this Agreement or (to the extent that it is attributable to this Agreement) on its capital; or

   (iii)  the amount of any payment made by the Lender or the amount of any interest or other return foregone by the Lender calculated by reference to any amount received or receivable by the Lender from any other Party under this Agreement.

### 9.2    Exceptions

Clause 9.1 (Increased costs) does not apply to any increased cost:

(a)    compensated for by the operation of Clause 8 (Taxes); or

(b)    attributable to any change in the rate of, or change in the basis of calculating, tax on the overall net income of the Lender (or the overall net income of a division or branch of the Lender) imposed in the jurisdiction in which its principal office is for the time being situate.

## 10.    EARLY REPAYMENT

### 10.1    Early repayment due to illegality

If it is or becomes unlawful in any jurisdiction for the Lender to give effect to any of its obligations as contemplated by this Agreement or to fund or maintain its participation in the Loan, then:

(a)    the Lender may notify the Borrower accordingly; and

(b)    the Borrower shall forthwith prepay any amounts outstanding under the Loan in full.

**10.2    Mandatory early repayment**

If on any Collateral Valuation Date (as defined in the Security Agreement) the Borrower determines that there is a Collateral Deficiency (as defined in the Security Agreement) and does not within two Business Days of the determination of such Collateral Deficiency deliver Collateral (as defined in the Security Agreement) to the Lender with a Collateral Value (as defined in the Security Agreement) equal to or exceeding the amount of such Collateral Deficiency, then the amount of such Collateral Deficiency shall become immediately due and payable under this Agreement.

**10.3    Optional early repayment**

The Borrower shall have the right at any time upon 15 days' notice to the Lender to prepay the Loan in whole or in part, provided that if the Borrower chooses to prepay the Loan in part it shall prepay in a minimum amount of USD 500,000 and multiples thereof.

**10.4    Payments**

Any amounts prepaid in accordance with this Clause 10 shall include accrued interest thereon.

**11.    REPRESENTATIONS AND WARRANTIES**

**11.1    Representations and warranties**

The Borrower makes the representations and warranties set out in this Clause 11 to the Lender.

**11.2    Status**

(a)    It is a corporation, duly incorporated and in good standing and validly existing under the laws of the State of Delaware.

(b)    It is duly qualified to conduct business in each jurisdiction in which qualification is necessary or desirable for the conduct of its business.

**11.3    Powers and authority**

It has the power and authority to enter into and perform, and has taken all necessary action to authorize the entry into, performance and delivery of, this Agreement and the Security Documents to which it is or will be a party and the transactions contemplated by this Agreement and the Security Documents.

**11.4    Legal validity**

This Agreement constitutes, or when executed in accordance with its terms will constitute, its legally valid and binding obligation enforceable in accordance with its terms.

**11.5    Authorizations**

All authorizations required or desirable in connection with the entry into, performance, validity and enforceability of, and the transactions contemplated by, this Agreement have been obtained or effected (as appropriate) and are in full force and effect, and no action has been initiated or is pending to revoke or modify any authorization obtained or effected.

**11.6    Taxes on payments**

All amounts payable by the Borrower under this Agreement may be made free and clear of and without deduction for or on account of any tax.

**11.7    Jurisdiction/governing law**

The Borrower's agreement that this Agreement is governed by New York law is legal, valid and binding under the laws of the State of New York.

**11.8    Non-conflict**

The entry into and performance by it of, and the transactions contemplated by, this Agreement do not and will not:

(a)    conflict with any authorization, law or regulation or judicial or official order; or

(b)    conflict with the constitutional documents of the Borrower; or

(c)    conflict with any document which is binding upon the Borrower.

**11.9    No default**

(a)    No Default is outstanding or might result from the making of the Loan; and

(b)    no other event is outstanding which constitutes (or with the giving of notice, lapse of time, determination of materiality or the fulfilment of any other applicable condition or any combination of the foregoing, might constitute) a default under any document which is binding on the Borrower or any asset of the Borrower to an extent or in a manner which might have a material adverse effect on the ability of the Borrower to perform its obligations under this Agreement.

**11.10   Litigation**

No material litigation, arbitration or administrative proceedings are current or, to its knowledge, pending or threatened, which might, if adversely determined, have a material adverse effect on the ability of the Borrower to perform its obligations under this Agreement.

**11.11   ERISA**

No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Change.  The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the current fair market value of the assets of such Plan by an amount that could reasonably be expected to result, individually or in the aggregate, in a Material Adverse Change, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans by an amount that could reasonably be expected to result, individually or in the aggregate, in a Material Adverse Change.

### 11.12    Investment Company Act

It is not an "investment company" or a company "controlled" by an "investment company", within the meaning of the United States Investment Company Act of 1940, as amended.

### 11.13    Public Utility Holding Company Act

It is not a "holding company", or an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company", within the meaning of, or otherwise subject to regulation under, the United States Public Utility Holding Company Act of 1935, as amended.

### 11.14    Other regulation

It is not subject to regulation under any United States Federal or State statute or regulation that limits its ability to incur or guarantee indebtedness.

### 11.15    Margin stock

(a)    The proceeds of the Loan have been and will be used only for the purposes described in Clause 3 (Purpose).

(b)    It is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T, U and X of the Board of Governors of the United States Federal Reserve System), and no portion of the Loan has been or will be used, directly or indirectly, to purchase or carry margin stock or to extend credit to others for the purpose of purchasing or carrying margin stock.

### 11.16    Times for making representations and warranties

The representations and warranties set out in this Clause 11:

(a)    are made on the date of this Agreement; and

(b)    are deemed to be repeated by the Borrower on the first day of each Interest Period with reference to the facts and circumstances then existing.

## 12.    UNDERTAKINGS

### 12.1    Duration

The undertakings in this Clause 12 remain in force from the date of this Agreement for so long as any amount is or may be outstanding under this Agreement is in force.

### 12.2    Information and notices

The Borrower will give the Lender prompt notice of any litigation, arbitration or administrative proceedings which are current, threatened or pending and which might, if adversely determined, have a material adverse effect on the ability of the Borrower to perform its obligations under this Agreement;

In any notice delivered under this Clause, the Borrower will include reasonable details concerning the occurrence that is the subject of the notice as well as the Borrower's proposed course of action, if any.  Delivery of a notice under this Clause will not affect the Borrower's obligations to comply with any other provision of this Agreement.

**12.3    ERISA reporting obligations**

As soon as possible and, in any event, within 15 days after the Borrower knows of the occurrence of an ERISA Event that could result in a liability that is reasonably likely to exceed $50,000,000, the Borrower will give written notice of such occurrence to the Lender. Such notice shall be accompanied by a statement of the Chief Financial Officer or Treasurer of the Borrower setting forth details of such occurrence and stating what action the Borrower or the ERISA Affiliate proposes to take with respect thereto.

**12.4    Notification of Default**

The Borrower shall notify the Lender of any Default (and the steps, if any, being taken to remedy it) promptly upon its becoming aware of such occurrence.

**12.5    Compliance certificates**

The Borrower shall supply to the Lender promptly at any time, if the Lender so requests, a certificate signed by two of its senior officers on its behalf certifying that no Default is outstanding or, if a Default is outstanding, specifying the Default and the steps, if any, being taken to remedy it.

**12.6    Authorizations**

The Borrower shall promptly:

(a)    obtain, maintain and comply with the terms of; and

(b)    supply certified copies to the Lender of,

any authorization required under any law or regulation to enable it to perform its obligations under, or for the validity or enforceability of, this Agreement.

**12.7    Pari passu ranking**

The Borrower shall procure that its obligations under this Agreement do and will rank at least pari passu with all its other present and future unsecured obligations, except for obligations mandatorily preferred by law applying to companies generally.

**12.8    Change of business**

The Borrower shall procure that no substantial change is made to the nature of the derivatives business of the Borrower from that carried on at the date of this Agreement.

**12.9    Maintenance of status**

The Borrower shall:

(a)    do all such things as are necessary to maintain its corporate existence; and

(b)    ensure that it has the right and is duly qualified to conduct its business as it is conducted in all applicable jurisdictions.

### 12.10   Investment Company Act

The Borrower will not, either by act or omission, become an "investment company" or a company "controlled" by an "investment company", within the meaning of the United States Investment Company Act of 1940, as amended.

### 12.11   Public utility status

The Borrower will not, either by act or omission, become or permit the Lender to become subject to regulation under the United States Public Utility Holding Company Act of 1935, as amended.

### 12.12   Margin stock

The Borrower will use the proceeds of the Loan only for the purpose described in Clause 3 (Purpose).  The Borrower will not engage in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T, U and X issued by the Board of Governors of the United Sates Federal Reserve System), and no portion of the Loan will be used, directly or indirectly, to purchase or carry margin stock or to extend credit to others for the purpose of purchasing or carrying margin stock.  No portion of the Loan will be used to acquire any security in a transaction that is subject to Section 13 or 14 of the United States Securities Exchange Act of 1934, as amended.

### 12.13   No winding-up of Lender

The Borrower hereby waives irrevocably all right, and hereby irrevocably covenants not, to petition or take any other step for the winding up (or any analogous proceeding) of the Lender.

### 13.   DEFAULT

### 13.1   Events of Default

Each of the events set out in this Clause 13 is an Event of Default (whether or not caused by any reason whatsoever outside the control of the Borrower or any other person).

### 13.2   Non-payment

The Borrower does not pay on the due date any amount payable by it under this Agreement at the place at and in the currency in which it is expressed to be payable, and such failure remains uncured for 7 calendar days following such due date.

### 13.3   Breach of other obligations

The Borrower does not comply with any provision of this Agreement (other than those referred to in Clause 13.2 (Non-payment)) and such failure remains uncured for 7 calendar days.

### 13.4   Misrepresentation

A representation, warranty or statement made or repeated in or in connection with this Agreement or in any document delivered by or on behalf of the Borrower under or in connection with this Agreement is incorrect in any respect when made or deemed to be made or repeated and not corrected for 7 calendar days.

### 13.5  Insolvency

The Borrower is, or is deemed for the purposes of any law to be, unable to pay its debts as they fall due or to be insolvent, or admits inability to pay its debts as they fall due.

### 13.6  Creditors' process

Any attachment, sequestration, distress or execution affects any asset of the Borrower and is not discharged within 14 days.

### 13.7  U.S. bankruptcy laws

(a)    The Borrower makes a general assignment for the benefit of creditors; or

(b)    the Borrower commences a voluntary case or proceeding under the United States Bankruptcy Code of 1978, as amended, or under any other United States Federal or State bankruptcy, insolvency or other similar law (collectively **U.S. Bankruptcy laws**); or

(c)    an involuntary case under any U.S. Bankruptcy Law is commenced against the Borrower and the petition is not controverted within 30 days and is not dismissed or stayed within 90 days after commencement of the case; or

(d)    a custodian, conservator, receiver, liquidator, assignee, trustee, sequestrator or other similar official is appointed under any U.S. Bankruptcy Law for or takes charge of, all or substantial part of the property of the Borrower.

### 13.8  Analogous proceedings

There occurs, in relation to the Borrower, any event anywhere which, in the opinion of the Lender, appears to correspond with any of those mentioned in Clauses 13.5 (Insolvency) to 13.7 (U.S. bankruptcy laws) (inclusive).

### 13.9  Cessation of business

The Borrower ceases, or threatens to cease, to carry on all or a substantial part of its business.

### 13.10  Unlawfulness

It is or becomes unlawful for the Borrower to perform any of its obligations under this Agreement.

### 13.11  ERISA

(a)    Any event or condition that presents a material risk that the borrower or any ERISA Affiliate may incur a material liability to a plan or to the United States Internal Revenue Service or to the United States Pension benefit guaranty corporation; or

(b)    an "accumulated funding deficiency" (as that term is defined in section 412 of the Code or section 302 of ERISA), whether or not waived, by reason of the failure of the Borrower or any ERISA Affiliate to make a contribution to a Plan.

14.    **ACCELERATION**

14.1    **Pursuant to Event of Default under U.S. Bankruptcy Code**

Upon the occurrence of an Event of Default described in Clause 13.7 (U.S. bankruptcy laws) the Loan, together with accrued interest, and all other amounts accrued under this Agreement, will be immediately due and payable.

14.2    **Pursuant to other Events of Default**

On and any time after the occurrence of an Event of Default (other than an Event of Default described in Clause 13.7 (U.S. bankruptcy laws)), the Lender may, by notice to the Borrower:

(a)    demand that all or part of the Loan, together with accrued interest, and all other amounts accrued under this Agreement be immediately due and payable, whereupon they shall become immediately due and payable; and/or

(b)    demand that all or part of the Loan be payable on demand, whereupon it shall immediately become payable on demand by the Lender.

14.3    **Pursuant to early redemption of Notes**

On and any time after the occurrence of any early redemption of the Notes as described in Conditions 7(c), 7(g) and 11 of the Terms and Conditions of the Notes set forth in the Information Memorandum, the Lender may, by notice to the Borrower:

(a)    demand that all or part of the Loan, together with accrued interest, and all other amounts accrued under this Agreement be immediately due and payable, whereupon they shall become immediately due and payable; and/or

(b)    demand that all or part of the Loan be payable on demand, whereupon it shall immediately become payable on demand by the Lender.

15.    **EXPENSES**

15.1    **Initial and special costs**

The Borrower shall forthwith on demand pay the Lender the amount of all costs and expenses (including legal fees) incurred by it in connection with:

(a)    the negotiation, preparation, printing and execution of this Agreement and any other documents referred to in this Agreement; and

(b)    any amendment, waiver, consent or suspension of rights (or any proposal for any of the foregoing) requested by or on behalf of the Borrower and relating to this Agreement or a document referred to in this Agreement.

15.2    **Enforcement costs**

The Borrower shall forthwith on demand pay to the Lender the amount of all costs and expenses (including legal fees) incurred by it in connection with the enforcement of, or the preservation of any rights under, this Agreement.

16. **STAMP DUTIES**

The Borrower shall pay, and forthwith on demand indemnify the Lender against any liability it incurs in respect of, any stamp, registration and similar tax which is or becomes payable in connection with the entry into, performance or enforcement of this Agreement or any Security Document.

17. **INDEMNITIES**

17.1 **Currency indemnity**

(a) If the Lender receives an amount in respect of the Borrower's liability under this Agreement or if that liability is converted into a claim, proof, judgment or order in a currency other than the currency (the **contractual currency**) in which the amount is expressed to be payable under this Agreement:

    (i) the Borrower shall indemnify the Lender as an independent obligation against any loss or liability arising out of or as a result of the conversion;

    (ii) if the amount received by the Lender, when converted into the contractual currency at a market rate in the usual course of its business is less than the amount owed in the contractual currency, the Borrower shall forthwith on demand pay to the Lender an amount in the contractual currency equal to the deficit; and

    (iii) the Borrower shall forthwith on demand pay to the Lender concerned any exchange costs and taxes payable in connection with any such conversion.

(b) The Borrower waives any right it may have in any jurisdiction to pay any amount under this Agreement in a currency other than that in which it is expressed to be payable.

17.2 **Other indemnities**

The Borrower shall forthwith on demand indemnify the Lender against any loss or liability which the Lender incurs as a consequence of:

(a) the occurrence of any Default;

(b) a change in currency of a country or the operation of Clause 14; or

(c) the Loan not being prepaid in accordance with a notice of prepayment.

The Borrower's liability in each case includes any loss of Margin or other loss or expense on account of funds borrowed, contracted for or utilized to fund any amount payable under this Agreement, any amount repaid or prepaid or the Loan.

18. **EVIDENCE AND CERTIFICATIONS**

18.1 **Accounts**

Accounts maintained by the Lender in connection with this Agreement are prima facie evidence of the matters to which they relate.

**18.2    Certificates and determinations**

Any certification or determination by the Lender or its agent of a rate or amount under this Agreement is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

## 19.    AMENDMENTS AND WAIVERS

**19.1    Procedure**

Any term of this Agreement may be amended or waived with the agreement of the Borrower and the Lender.

**19.2    Waivers and remedies cumulative**

The rights of the Lender under this Agreement:

(a)    may be exercised as often as necessary;

(b)    are cumulative and not exclusive of its rights under the general law; and

(c)    may be waived only in writing and specifically.

Delay in exercising or non-exercise of any such right is not a waiver of that right.

## 20.    ASSIGNMENTS

**20.1    Assignments by the Borrower**

The Borrower may not assign, transfer, delegate, novate or dispose of any of, or any interest in, its rights or obligations under this Agreement.

**20.2    Assignments by Lender**

The Borrower hereby agrees and consents to the assignment by way of security by the Lender of its interests under this Agreement to the Trustee (or any successor thereto) pursuant to and in accordance with the Trust Deed and acknowledges notice of such assignment . Each of the parties hereby confirms and agrees that the Trustee shall not be liable for any of the obligations of the Lender hereunder.

## 21.    REGISTER

The Borrower shall maintain a book-entry registration transfer system (the **Register**) for the purpose of all transfers and assigns made of Lender's interests under this Agreement. Notwithstanding any other provision of this Agreement, the transfer of all or any part of the rights and/or obligations under this Agreement shall not be effective until such transfer is recorded on the Register and prior to such recordation all amounts owing to the existing Lender with respect to such rights and/or obligations shall remain owing to the existing Lender.

## 22.    DISCLOSURE OF INFORMATION

The Lender may disclose to one of its Affiliates or any person with whom it is proposing to enter, or has entered into, any kind of transfer, participation or other agreement in relation to this Agreement:-

(a)     a copy of this Agreement; and

(b)     any information which the Lender has acquired under or in connection with this Agreement.

### 23.    SEVERABILITY

If a provision of this Agreement is or becomes illegal, invalid or unenforceable in any jurisdiction, that shall not affect:

(a)     the legality, validity or enforceability in that jurisdiction of any other provision of this Agreement; or

(b)     the legality, validity or enforceability in other jurisdictions of that or any other provision of this Agreement.

### 24.    COUNTERPARTS

This Agreement may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

### 25.    NOTICES

#### 25.1    Giving of notices

All notices or other communications under or in connection with this Agreement shall be given in writing and, unless otherwise stated, may be made by letter, telex, electronic mail or facsimile. Any such notice will be deemed to be given as follows:

(a)     if by letter, when delivered personally or on actual receipt;

(b)     if by electronic mail, when delivered or on actual receipt; and

(c)     if by facsimile, when received in legible form.

However, a notice given in accordance with the above but received on a non-working day or after business hours in the place of receipt will only be deemed to be given on the next working day in that place.

#### 25.2    Addresses for notices

The address, electronic mail address and facsimile number of the Borrower are:

Lehman Brothers
Operations, FID Mid Office Admin
745 7th Ave 5th Floor
New York, NY, 10019

Tel:     (212) 526-2240

Attn:     Seth Konheim; e-mail: skonheim@lehman.com;
          Paul Puskuldjian; e-mail: ppusk@lehman.com

Lehman Brothers

Derivative Trading
745 7th Ave 5th Floor
New York, NY, 10019

Tel:    (212) 526-8140

Attn:    Kaushik Amin; e-mail: kamin@lehman.com

Lehman Brothers
Derivative Trading - London
25 Bank Street
London E14 5LE

Tel:    44-(0)20-7103-2444

Attn:    Andrew Morton ; e-mail: amorton@lehman.com

Lehman Brothers
Central Funding Unit
25 Bank Street
London E14 5LE

Tel:    44-(0)20 7103 1305

Attn:    John Feraca; e-mail: joferaca@lehman.com

Lehman Brothers
Derivative Trading
745 7th Ave
New York, NY, 10019

Tel:    (212) 526-6697

Attn:    Neville Nagarwalla; e-mail: nneville@lehman.com

or such other as the Borrower may notify to the Lender by not less than five Business Days' notice.

The address and facsimile number of the Lender are:

7th Avenue Inc.
P.O. Box 1109 GT
HSBC House
Mary Street
Grand Cayman
Cayman Islands
British West Indies
Fax: (345) 949-7634

With a copy to:

Lehman Brothers
Derivative Operations
25 Bank Street
London E14 5LE

Tel:    44-(0)20 7102 5293

Attn:   David West; e-mail: dwest@lehman.com

or such other as the Lender may notify to the Borrower by not less than five Business Days'
notice.

The address and facsimile number of the Trustee are:

HSBC Trustee (C.I) Limited
1 Grenville Street
St Helier
Jersey JE4 9PF

Fax:    44 1534 606504

Attn:   Manager, Corporate Services

## 26.    JURISDICTION

### 26.1    Submission

For the benefit of the other parties to this Agreement, each party agrees that any New York
State court or Federal court sitting in New York City has jurisdiction to settle any disputes in
connection with this Agreement and accordingly submits to the jurisdiction of those courts.

### 26.2    Forum convenience and enforcement abroad

Each party:

(a)     waives objection to the New York State and Federal courts on grounds of
        inconvenient forum or otherwise as regards proceedings in connection with this
        Agreement; and

(b)     agrees that a judgment or order of a New York State or Federal court in connection
        with this Agreement is conclusive and binding on it and may be enforced against it in
        the courts of any other jurisdiction.

### 26.3    Non-exclusivity

Nothing in this Clause 26 limits the right of the Lender to bring proceedings against the
Borrower in connection with this Agreement:

(a)     in any other court of competent jurisdiction; or

(b)     concurrently in more than one jurisdiction.

ICM:886700.10                                    19

27.     **WAIVER OF IMMUNITY**

The Borrower irrevocably and unconditionally:

(a)     agrees that if the Lender brings proceedings against it or its assets in relation to this Agreement, no immunity from those proceedings (including, without limitation, suit, attachment prior to judgment, other attachment, the obtaining of judgment, execution or other enforcement) will be claimed by or on behalf of itself or with respect to its assets;

(b)     waives any such right of immunity which it or its assets now has or may subsequently acquire; and

(c)     consents generally in respect of any such proceedings to the giving of any relief or the issue of any process in connection with those proceedings, including, without limitation, the making, enforcement or execution against any assets whatsoever (irrespective of its use or intended use) of any order or judgment which may be made or given in those proceedings.

28.     **INTEGRATION**

This Agreement contains the complete agreement between the parties on the matters to which they relate and supersedes all prior commitments, agreements and understandings, whether written or oral, on those matters.

29.     **WAIVER OF JURY TRIAL**

THE BORROWER AND THE LENDER WAIVE ANY RIGHTS THEY MAY HAVE TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED ON OR ARISING FROM THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

30.     **GOVERNING LAW**

This Agreement is governed by the law of the State of New York.

This Agreement has been entered into on the date stated at the beginning of this Agreement.

**SCHEDULE 1**

**CONDITIONS PRECEDENT DOCUMENTS**

1.      A copy of the constitutional documents of the Borrower.

2.      A copy of a resolution of the board of directors of the Borrower approving the terms of, and the transactions contemplated by, this Agreement.

3.      A specimen of the signature of each person authorized to sign this Agreement on behalf of the Borrower and to sign and/or despatch all documents and notices to be signed and/or despatched by the Borrower under or in connection with this Agreement.

4.      A copy of any other authorization or other document, opinion or assurance which the Lender considers to be necessary or desirable in connection with the entry into and performance of, and the transactions contemplated by, this Agreement or for the validity and enforceability of this Agreement.

5.      A certificate of an authorized signatory of the Borrower certifying that each copy document delivered under this Schedule 1 is correct, complete and in full force and effect as at a date no earlier than the date of this Agreement.

6.      A legal opinion of Allen & Overy LLP, legal advisers in New York to the Borrower, in form and substance satisfactory to the Lender, addressed to Lender.

## SIGNATORIES

**BORROWER**

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By:

**LENDER**

**7TH AVENUE INC.**

By:

**TRUSTEE**

**HSBC TRUSTEE (C.I.) LIMITED**

By two authorised signatories:

## **EXHIBIT B**

### SECURITY AGREEMENT

# SECURITY AGREEMENT

### DATED [8TH] DECEMBER, 2004

### BETWEEN

### LEHMAN BROTHERS
### SPECIAL FINANCING INC.

### AND

### 7TH AVENUE INC.

### AND

### HSBC TRUSTEE (C.I.) LIMITED

# ALLEN & OVERY

## ALLEN & OVERY LLP

## LONDON

15616-00920 ICM:886693.11

# CONTENTS

**Clause**                                                                                          **Page**

1.    Interpretation .................................................................................................1
      1.1    UCC and Credit Agreement Defined Terms..........................................1
      1.2    Other Definitions ...................................................................................1
      1.3    Construction............................................................................................5
2.    Creation and Perfection of Security Interest............................................5
      2.1    Grant .......................................................................................................5
      2.2    Continuing security interest ..................................................................5
      2.3    Filing of financing statements ...............................................................6
      2.4    No liability ..............................................................................................6
3.    Valuation and Transfer of Collateral .......................................................6
      3.1    Collateral Valuation and Reporting ......................................................6
      3.2    Transfer of Collateral.............................................................................7
4.    Administration of Collateral.......................................................................7
      4.1    Custody of Master Agreement Files .....................................................7
      4.2    Substitution and release of Collateral prior to a Disclosure Event .........7
      4.3    Substitution and release of Collateral following a Disclosure Event.......7
5.    Representations and Warranties ................................................................8
      5.1    Representations and warranties..............................................................8
      5.2    The Debtor ..............................................................................................8
      5.3    The Swap Collateral................................................................................9
      5.4    Litigation...............................................................................................10
      5.5    Security interest ...................................................................................10
      5.6    Times for making representations and warranties ...............................10
      5.7    Survival.................................................................................................11
6.    Undertakings ..............................................................................................11
      6.1    Undertakings.........................................................................................11
      6.2    The Debtor ............................................................................................11
      6.3    The Collateral .......................................................................................11
      6.4    Security interest ...................................................................................12
      6.5    Litigation...............................................................................................12
      6.6    Notices ..................................................................................................12
      6.7    No winding-up of 7th Avenue Inc. ......................................................13
      6.8    Confidentiality......................................................................................13
7.    Rights to Deal with Collateral ..................................................................14
8.    Rights and Remedies..................................................................................14
      8.1    Events of Default ..................................................................................14
      8.2    Collections ............................................................................................14
      8.3    Secured Party's rights upon default .....................................................15
      8.4    No marshaling.......................................................................................16
9.    Miscellaneous .............................................................................................16
      9.1    Further assurances.................................................................................16
      9.2    Costs and indemnity..............................................................................16
      9.3    Successors.............................................................................................17
      9.4    Amendments and waivers .....................................................................17
      9.5    Rights cumulative .................................................................................18
      9.6    Severability............................................................................................18
      9.7    Counterparts..........................................................................................18
      9.8    Notices ..................................................................................................18

| 9.9 | Jurisdiction | 20 |
| 9.10 | Complete Agreement | 20 |
| 9.11 | Waiver of Jury Trial | 21 |
| 9.12 | Governing Law | 21 |
| 9.13 | Limited Recourse | 21 |
| Signatories | | 22 |

15616-00920 ICM:886693.11

**THIS AGREEMENT** is dated [8th] December, 2004

**BETWEEN:**

(1)    **Lehman Brothers Special Financing Inc.** (the **Debtor**);

(2)    **7th Avenue Inc.**, as Lender under the Credit Agreement described below (in that capacity the **Secured Party**); and

(3)    **HSBC Trustee (C.I.) Limited**, as Trustee under the Notes (the **Trustee**).

**BACKGROUND:**

(A)    The Debtor, the Secured Party and the Trustee are concurrently entering into the Term Loan Agreement dated [8th] December, 2004 (the **Credit Agreement**).

(B)    It is a condition precedent to the obligations of the Secured Party under the Credit Agreement that the Debtor enter into this Agreement and grant the security described in this Agreement.

(C)    The Debtor, the Secured Party, HSBC Bank USA, National Association and the Trustee are concurrently entering into the Securities Account Control Agreement dated[8th] December, 2004 (the **Securities Account Control Agreement**) and the Deposit Account Control Agreement dated [8th] December, 2004 (the **Deposit Account Control Agreement** and, together with the Securities Account Control Agreement, the **Control Agreements**).

(D)    In addition, the Secured Party has secured its obligations to the Noteholders (as defined in the Credit Agreement) by assigning the security interest pledged hereunder by the Debtor to the Trustee. Accordingly, the Trustee shall have the benefit of all rights and discretions under this Agreement and may, at its discretion, or shall, if directed by a relevant majority of the Noteholders, enforce the Secured Party's rights hereunder on the Secured Party's behalf.

**IT IS AGREED** as follows:

**1.    INTERPRETATION**

**1.1    UCC and Credit Agreement Defined Terms**

Any term defined in the Uniform Commercial Code as in effect from time to time in the State of New York (the **UCC**) and not defined in this Agreement has the meaning given to the term in the UCC. Any term defined in the Credit Agreement and not defined in this Agreement or the UCC has the meaning given to the term in the Credit Agreement.

**1.2    Other Definitions**

In this Agreement:

**Available Amount** has the meaning given to that term in Clause 9.13.

**Business Day** means a day on which commercial banks and foreign exchange markets settle payments and are open for general business (including dealings in foreign exchange and foreign currency deposits) in London and New York City.

**Collateral** means (i) the Swap Collateral, (ii) all Qualifying Cash Collateral constituting Account Property (as defined in the Deposit Account Control Agreement), and (iii) all

Qualifying Securities Collateral constituting Account Property (as defined in the Securities Account Control Agreement).

**Collateral Deficiency** means the amount, if any, by which (A) the Minimum Collateral Value exceeds (B) the Collateral Value.

**Collateral Posting Date** means the Business Day next succeeding each Collateral Valuation Date on which there is a Collateral Deficiency.

**Collateral Reporting Date** means each Monday, or if such day is not a Business Day, the next succeeding Business Day.

**Collateral Schedule** means the schedule prepared by the Debtor on each Collateral Valuation Date, which shall indicate: 1) the Minimum Collateral Value; 2) the Collateral Value; 3) the Collateral Deficiency, if any; 4) the internal Debtor identifying number with respect to each Master Agreement constituting Swap Collateral; 5) the issuer of any securities constituting Qualifying Securities Collateral; 6) the outstanding principal amount of the Loan, 7) the counterparty's long term debt rating, 8) the Counterparty's country of incorporation and 9) the industry sector of the Counterparty's principal business. The Collateral Schedule may be in electronic form.

**Collateral Valuation Date** means each Business Day.

**Collateral Value** means the aggregate of (i) the Swap Collateral Value, (ii) the Qualifying Cash Collateral Value, and (iii) the Qualifying Securities Collateral Value.

**Collection Account** means one or more segregated demand deposit accounts established in the corporate trust department of HSBC Bank USA, National Association pursuant to the Deposit Account Control Agreement.

**Confirmation** means, with respect to each Swap Transaction, the related confirmation between the Debtor and the Counterparty with respect thereto, which may be in electronic form.

**Contracts** means each Master Agreement listed on the most recent Collateral Schedule to be delivered by Debtor to the Secured Party from time to time and any Swap Transactions entered into under such Master Agreements including any Confirmations evidencing such Swap Transactions, together with all amendments, modifications, supplements, restatements, novations and replacements of or to any of the foregoing, but not including any Counterparty Security.

**Counterparty** means, with respect to each Master Agreement, the counterparty of the Debtor under such Master Agreement.

**Counterparty Maximum** has the meaning given to that term in Clause 5.3(c).

**Counterparty Security** means any credit support annex or security agreement related to a Master Agreement and any related property pledged to a Debtor by a Counterparty under any such credit support annex or security agreement.

**Disclosure Event** means (i) an Event of Default hereunder or (ii) a Note Event of Default.

**Event of Default** has the meaning given to that term in Clause 8.1 (Events of Default).

**Issuer** means 7th Avenue Inc., as issuer of the Notes.

**LBHI** means Lehman Brothers Holdings Inc.

**Lien** means any security interest, lien, mortgage, pledge, encumbrance, charge, assignment, hypothecation, agreement or arrangement having the effect of conferring security, adverse claim, claim, or restriction on assignment, transfer or pledge.

**Master Agreement** means, with respect to any Counterparty, the ISDA Master Agreement between the Debtor and such Counterparty.

**Master Agreement File** shall mean, with respect to any Contract, a file, which may be in electronic form, consisting of a photocopy of the related fully executed Contract, with the internal Debtor identifying number clearly marked thereon.

**Minimum Collateral Value** means the product of (i) the outstanding principal amount of the Loan and (ii) (A) before the Notification Date, 105 percent and (B) after the Notification Date, 112.5 percent.

**Moody's** means Moody's Investors Service, Inc., or any successor thereto.

**Non-qualifying Industry** means any of the telecommunications, hotel or gaming industries.

**Note Event of Default** means an "Event of Default" as defined in the Notes.

**Notes** means the Series 2 USD 200,000,000 Floating Rate Secured Notes due 2008 in relation to the EUR 2,500,000,000 Multi-Structure Secured Note Programme of the Issuer.

**Notification Date** has the meaning given to that term in the Notes.

**Pari Passu Creditors** has the meaning given to that term in Clause 9.13.

**Qualifying Currency** means the lawful currency of:

(a)     the United States of America;

(b)     the United Kingdom of Great Britain and Northern Ireland; or

(c)     the member states of the European Union that adopt the single currency in accordance with the Treaty establishing the European Community (signed in Rome on March 25, 1957), as amended by the Treaty on European Union (signed in Maastricht on February 7, 1992) and as amended by the Treaty of Amsterdam (signed in Amsterdam on October 2, 1997).

**Qualifying Cash Collateral** means cash in a Qualifying Currency.

**Qualifying Cash Collateral Value** means the US dollar equivalent of all Qualifying Cash Collateral forming part of the Collateral, converted by the Debtor at the spot rate available to it at the relevant time.

**Qualifying Jurisdiction** means the United States of America, the United Kingdom, Canada, Germany, France, Italy and Japan.

**Qualifying Securities Collateral** means:

(a)    negotiable debt obligations issued by the United States Treasury Department; or

(b)    negotiable debt obligations denominated in a Qualifying Currency or in the lawful currency of Canada or Japan deposited at a common depositary for the Depository Trust Company, Euroclear or Clearstream with a rating of "BBB-" or greater by S&P or "Baa2" or greater by Moody's.

**Qualifying Securities Collateral Value** means the sum of (a) the value as determined by the Debtor through the use of a third party pricing service such as Reuters, Bloomberg or another similar service of the securities forming part of the Collateral; plus (b) the accrued interest on such securities forming part of the Collateral (except to the extent transferred to a party or otherwise accounted for in this Agreement or included in the applicable price referred to in (a) of this clause) as of such date.

**Relevant States** means the State of the Debtor's incorporation and the State where the Debtor has its chief executive office.

**S&P** means Standard & Poor's Ratings Group, a division of McGraw-Hill.

**Secured Obligations** means:

(a)    the Loan and all other amounts payable under the Credit Agreement;

(b)    all other obligations of the Debtor under the Credit Agreement;

(c)    all obligations of the Debtor under this Agreement and the Security Documents;

(d)    all amounts owed under any modifications, renewals or extensions of any of the foregoing obligations; and

(e)    any of the foregoing that arises after the filing of a petition by or against the Debtor under the U.S. Bankruptcy Code, even if the obligations do not accrue because of the automatic stay under U.S. Bankruptcy Code § 362 or otherwise.

**Swap Collateral** means all right, title and interest that the Debtor now has or later acquires in, to and under the Contracts, together with all proceeds of the Contracts.

**Swap Collateral Value** means with respect to any Collateral Valuation Date and with respect to each Master Agreement listed on the most recent Collateral Schedule, the net mid-market value to the Debtor of all Swap Transactions under such Master Agreement, less (i) the market value of all Counterparty Security and (ii) the mid-market value of any Swap Transaction under such Master Agreement for which the Counterparty owes the Debtor any amount to the extent there is a dispute between the Debtor and the related Counterparty (which is under litigation or for which written notice has been received or sent by the Debtor that litigation is pending), provided that no Contract shall have a Swap Collateral Value less than zero. The value of any Master Agreement listed on the most recent Collateral Schedule that, at the time of such valuation, is not in compliance with the representations in Clauses 5.3(a) and 5.3(b) or in respect of which the Debtor is not in compliance with the undertakings in Clause 6.3(a) shall be zero, and the value of any Master Agreement listed on the most recent Collateral Schedule that, at the time of such valuation, would exceed the Counterparty Maximum applicable to such Master Agreement as provided in Clause 5.3(c), shall be the applicable Counterparty Maximum.

**Swap Transaction** means, with respect to each Contract and Counterparty, any transaction entered into between the Debtor and the Counterparty pursuant to such Contract.

**Trust Deed** means the Master Trust Deed dated 12th September, 2002 between the Secured Party and the Trustee, as supplemented by a Supplemental Trust Deed dated [8th] December, 2004 between the Trustee and the Secured Party.

### 1.3 Construction

(a) No reference to "proceeds" in this Agreement authorizes any sale, transfer or other disposition of Collateral by the Debtor.

(b) "Includes" and "including" are not limiting.

(c) "Or" is not exclusive.

(d) "All" includes "any" and "any" includes "all".

(e) The term "law" includes any law, statute, regulation, regulatory requirement, rule, ordinance, ruling, decision, treaty, directive, order, guideline, regulation, policy, writ, judgment, injunction or request of any court or other governmental, inter-governmental or supranational body, fiscal or monetary authority, or other ministry or public entity (and their interpretation, administration and application), whether or not having the force of law.

(f) A reference to a law is a reference to that law as amended or re-enacted.

(g) A reference to an agreement is a reference to that agreement as amended, supplemented, restated or novated.

(h) Clause headings used in this Agreement are for convenience only. They are not a part of this Agreement and shall not be used in construing it.

(i) Any reference in this Agreement to the "Secured Party" shall include the Trustee as long as it is the assignee of 7th Avenue Inc. and all provisions of this Agreement shall be construed accordingly with respect to any party that has the right to direct or consent to matters contained herein.

## 2.    CREATION AND PERFECTION OF SECURITY INTEREST

### 2.1    Grant

As security for the prompt and complete payment and performance of the Secured Obligations when due (whether due because of stated maturity, acceleration, mandatory prepayment, or otherwise) and to induce the Secured Party to make the Loan, the Debtor grants to the Secured Party a continuing first-priority security interest in the Collateral.

### 2.2    Continuing security interest

(a) This Agreement creates a continuing first-priority security interest in the Collateral and will remain in full force and effect until the irrevocable and indefeasible payment in full of the ultimate balance of the Secured Obligations, regardless of any intermediate payment or discharge in whole or in part.

(b)   If, at any time for any reason (including the bankruptcy, insolvency, receivership, reorganization, dissolution or liquidation of the Debtor or the appointment of any receiver, intervenor or conservator of, or agent or similar official for, the Debtor or any of its properties), any payment received by the Secured Party in respect of the Secured Obligations is rescinded or avoided or must otherwise be restored or returned by the Secured Party, that payment shall not be considered to have been made for purposes of this Agreement, and this Agreement will continue to be effective or will be reinstated, if necessary, as if that payment had not been made.

## 2.3   Filing of financing statements

The Debtor authorizes the Secured Party to prepare and file, at the Debtor's expense, an initial financing statement describing the Collateral as of the date of this Agreement, as well as continuation statements and amendments in respect of those financing statements when necessary.

## 2.4   No liability

The Debtor represents, warrants and agrees that:

(a)   its liabilities and obligations under the Contracts shall not be affected by this Agreement or the exercise by the Secured Party of its rights under this Agreement;

(b)   the Secured Party, unless it expressly agrees in writing, shall not have any liabilities or obligations under any Contract as a result of this Agreement, the exercise by the Secured Party of its rights under this Agreement or otherwise; and

(c)   the Secured Party neither has nor shall have any obligation to collect upon or enforce any Contract or any claims relating to or deriving from any Contract, or to take any other action with respect to any Contract.

## 3.   VALUATION AND TRANSFER OF COLLATERAL

## 3.1   Collateral Valuation and Reporting

(a)   By 12:30 p.m. (New York time) on each Collateral Valuation Date, the Debtor shall determine the Collateral Value and the Minimum Collateral Value as of the close of the previous Business Day.   The calculations hereunder shall be binding absent manifest error.

(b)   On or before 5:00 p.m. (New York time) on each Collateral Reporting Date, the Debtor shall deliver to the Secured Party a Collateral Schedule, updated for such Collateral Reporting Date including, among other things, all additions and releases of Collateral, the Collateral Value and the Minimum Collateral Value as calculated pursuant to paragraph (a) above; provided, however, that if the Debtor fails to deliver a Collateral Schedule, the Collateral Schedule last delivered shall continue to be utilized as the Collateral Schedule. Such Collateral Schedule shall indicate wherever a Collateral Deficiency exists.

(c)   The Secured Party shall, on reasonable notice, have reasonable access during normal business hours to examine all the books, correspondence and records of the Debtor, solely to the extent that such information relates to the determination that the computation of the Collateral Value and the information contained in the Collateral

Schedule is consistent with the methodology used by the Debtor in its trading, risk management and regulatory disclosure statement.

**3.2    Transfer of Collateral**

(a)    If on any Collateral Valuation Date the Debtor determines that there is a Collateral Deficiency, the Debtor shall, by 5:00 p.m. (New York time) on the Collateral Posting Date, deliver to the Secured Party as additional security for the Secured Obligations, Collateral with a Collateral Value not less than the amount of such Collateral Deficiency.

(b)    If at any time the Secured Party is holding Collateral pledged by the Debtor under this Agreement and the Debtor has fully and indefeasibly paid all amounts owing under the Secured Obligations, the Secured Party shall, upon written request of the Debtor, return all such Collateral to the Debtor.

**4.    ADMINISTRATION OF COLLATERAL**

**4.1    Custody of Master Agreement Files**

The Debtor shall maintain as custodian for the Secured Party, in hard copy or electronic format, a Master Agreement File relating to each Master Agreement pledged as Collateral hereunder and shall mark its electronic ledger to indicate that all such Master Agreements have been pledged hereunder. Within five Business Days of a Disclosure Event, the Debtor shall deliver to the Secured Party the Master Agreement File relating to each Master Agreement identified on the last Collateral Schedule delivered to the Secured Party. In respect of any Master Agreement File the Secured Party holds upon the occurrence of a Disclosure Event, to the extent any of the documentation contained in such Master Agreement File is amended, the Debtor shall deliver a copy of such amendment to the Secured Party as soon as practicable after such amendment has been completed.

**4.2    Substitution and release of Collateral prior to a Disclosure Event**

Prior to the occurrence of a Disclosure Event, the Debtor may freely remove or substitute Collateral, provided that immediately after any such removal or substitution, the Collateral Value equals or exceeds the Minimum Collateral Value. Collateral removed or substituted as provided in this Clause 4.2 shall be released from the lien in favor of the Secured Party provided by this Agreement upon receipt by the Secured Party of an updated Collateral Schedule specifying any substitute Collateral and deleting any Collateral to be removed, and the Debtor shall be deemed to have represented and warranted to the Secured Party that no Collateral Deficiency shall exist upon such substitution or removal.

**4.3    Substitution and release of Collateral following a Disclosure Event**

Upon the occurrence and during the continuation of a Disclosure Event, the Debtor may not remove or substitute Collateral without the prior written consent of the Secured Party, except as provided below. To release Collateral consisting of Contracts from the lien in favor of the Secured Party provided by this Agreement after a Disclosure Event has occurred and is continuing, the Debtor shall deliver to the Secured Party a written request therefor and an updated Collateral Schedule reflecting such release. Upon receipt of such written request, and provided the Collateral Value of the Collateral listed in the updated Collateral Schedule is equal to or exceeds the Minimum Collateral Value, the Debtor may substitute Collateral and, upon such substitution, the Secured Party shall substitute the updated Collateral Schedule for the existing Collateral Schedule and the related Collateral shall be released from the lien in

favor of the Secured Party provided by this Agreement. In connection with the release of Collateral consisting of a Contract, if the Secured Party is in possession of the Master Agreement File, the Secured Party shall within five Business Days after such release deliver the related Master Agreement File to the Debtor. Upon payment in full by the Debtor of all of the Secured Obligations, the Secured Party shall return all Master Agreement Files in its possession to the Debtor.

**4.4    Substitution of Collateral at the Secured Party's request**

(a)    The Secured Party may request a substitution of Collateral by the Debtor (i) in the case of Qualifying Securities Collateral, at any time, and (ii) in the case of Swap Collateral, only upon the occurrence and during the continuation of a Disclosure Event. Collateral substituted as provided in this Clause 4.4 shall be released from the lien in favor of the Secured Party provided by this Agreement upon receipt by the Secured Party of an updated Collateral Schedule specifying any substitute Collateral and deleting any Collateral to be removed.

(b)    The Secured Party agrees and covenants with the Debtor that it shall not request a substitution of Collateral pursuant to paragraph (a) above except upon the reasonable request of Noteholders holding 100 per cent. in aggregate principal amount outstanding of the Notes (and upon receipt of satisfactory evidence of such holding of Notes). Upon receipt of such request from the Noteholders in respect of such a substitution of Collateral, the Secured Party shall make a similar request to the Debtor.

**5.    REPRESENTATIONS AND WARRANTIES**

**5.1    Representations and warranties**

The Debtor makes the representations and warranties set out in this Clause 5 to the Secured Party.

**5.2    The Debtor**

(a)    The Debtor is incorporated in the State of Delaware, or in such jurisdiction as the Debtor has specified in a notice pursuant to Clause 6.2(b).

(b)    The Debtor's exact legal name, as it appears in the public records of its jurisdiction of incorporation, is Lehman Brothers Special Financing Inc. The Debtor has not changed its name, whether by amendment of its charter, reorganization, merger or otherwise, since November 9, 1990, unless it has provided a notice to the Secured Party pursuant to Clauses 6.2(a) or 6.2(c), in which event the Debtor has not changed its name since the date of such notice.

(c)    The employer identification number of the Debtor is EIN 11-2751029.

(d)    The Debtor's executive office is located at 745 7th Avenue, New York, New York 10019.

(e)    The Debtor keeps at its address indicated in Clause 5.2(d) its corporate records and all records, documents and instruments constituting, relating to or evidencing Collateral (including the originals of all Contracts).

(f)    The Debtor has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

(g)     The execution, delivery and performance by the Debtor of this Agreement are within the Debtor's corporate powers, have been duly authorized by all necessary corporate action, and do not contravene (i) the Debtor's charter or by-laws, (ii) any law, rule or regulation applicable to the Debtor, (iii) any contractual restriction binding on or affecting the Debtor or its property or (iv) any order, writ, judgment, award, injunction or decree binding on or affecting the Debtor or its property.

(h)     This Agreement constitutes a legal, valid and binding obligation of the Debtor enforceable against the Debtor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally or by general principles of equity.

(i)     The Debtor has not issued any debt securities.

**5.3    The Swap Collateral**

(a)     With respect to the Contracts pledged as Swap Collateral hereunder:

(i)     Each Contract is a master agreement governed by the laws of the State of New York and executed by both parties based on the form of 2002 ISDA Master Agreement, 1992 ISDA Master Agreement (Multicurrency-Cross Border), 1992 ISDA Master Agreement (Local Currency - Single Jurisdiction), 1987 ISDA Interest Rate Swap Agreement or 1987 ISDA Interest Rate and Currency Exchange Agreement or any successor forms of master agreement published by ISDA as and when published;

(ii)     the representations contained in Section 3 of each Contract are repeated herein mutatis mutandis by the Debtor with respect to each Contract as of the date of this Agreement for the benefit of the Secured Party;

(iii)     the Debtor has not made any prior assignment, transfer, participation or subparticipation of any Contract or of any interest therein and it has not entered into any agreement (other than this Agreement) or arrangement to do the same, and it has not created, or by operation of its being a party to any Contract, caused to attach, any lien of record, claims or encumbrances, with respect to the Contract other than that created by this Agreement;

(iv)     the Counterparty to each Contract is not an Affiliate (as defined in such Contract) of the Debtor;

(v)     the Counterparty to each Contract is located in, or has its principal office in, a Qualifying Jurisdiction;

(vi)     the principal business of the Counterparty to each Contract is not in a Non-qualifying Industry; and

(vii)     each Contract provides, where applicable, that upon early termination the Second Method (as defined in such Contract) (or its equivalent) applies.

(b)     No Contract has been rescinded or revoked.

(c)     The net mid-market value to the Debtor of any Contract, excluding the value of any Counterparty Security, the Counterparty to which (or any relevant guarantor) has an unsecured long-term debt rating of

(i)     "AAA" by S&P and "Aaa" by Moody's;

(ii)    "AA" by S&P and "Aa2" by Moody's; or

(iii)   "A" by S&P and "A2" by Moody's,

shall not constitute more than

(x)     50%;

(y)     40%; or

(z)     30%

respectively (each such percentage, the **Counterparty Maximum**), of the Minimum Collateral Value. If a Counterparty (or any relevant guarantor) to a Contract has an unsecured long-term debt rating from one rating agency that is lower than that of the other rating agency, for purposes of determining the allocation of the value of such Contract to the Minimum Collateral Value, the lower rating shall prevail.

## 5.4    Litigation

No material litigation, arbitration or administrative proceedings are current or, to its knowledge, pending or threatened, involving or affecting the Collateral; and none of the Collateral is subject to any order, writ, injunction, execution or attachment.

## 5.5    Security interest

(a)     This Agreement confers the security interest it purports to confer over the Collateral in favor of the Secured Party, and, subject to the provisions of § 552 of the U.S. Bankruptcy Code, that security interest is not liable to avoidance on liquidation or bankruptcy, composition or any other similar insolvency proceedings.

(b)     The description of the Collateral contained in this Agreement and included in the Collateral Schedule attached hereto as Exhibit A is true, correct, and complete and is sufficient to describe the Collateral for the purpose of creating, attaching, and perfecting the security interest in favor of the Secured Party intended to be created by this Agreement.

(c)     As of the Drawdown Date, all necessary and appropriate deliveries, notices, recordings, filings, and registrations have been effected to perfect a first-priority security interest in the Collateral in favor of the Secured Party in all relevant jurisdictions, and the Secured Party has as of the Drawdown Date, and will continue to have until the Secured Party has been repaid in full and the Secured Party's security interest has been released, a duly and validly created, attached, perfected and enforceable first-priority security interest in the Collateral in all relevant jurisdictions.

## 5.6    Times for making representations and warranties

The representations and warranties set out in this Clause 5:

(a)    are made on the date of this Agreement; and

(b)    are deemed to be repeated by the Debtor on the first day of each Interest Period with reference to the facts and circumstances then existing.

## 5.7    Survival

The representations and warranties of the Debtor contained in this Agreement or made by the Debtor in any certificate, notice or report delivered under this Agreement will survive the Drawdown Date, the making and repayment of the Loan, and any novation, transfer or assignment of the Loan.

## 6.    UNDERTAKINGS

## 6.1    Undertakings

The Debtor covenants and agrees that, so long as any amount due under the Credit Agreement is outstanding and until payment in full of the Secured Obligations, it will perform and observe each of the undertakings in this Clause 6.

## 6.2    The Debtor

(a)    The Debtor will provide the Secured Party with 14 days written notice following a transaction or series of related transactions that result in a merger into or consolidation with another entity, or a sale of all or substantially all its assets.

(b)    The Debtor will provide the Secured Party with 14 days written notice following a change in its jurisdiction of incorporation.

(c)    The Debtor will provide the Secured Party with 14 days written notice following a change in the Debtor's name.

(d)    Subject to Clause 4.1, the Debtor will keep at its address indicated in Clause 5.2(d) or in such address as notified to the Secured Party from time to time its corporate records and all records, documents and instruments constituting, relating to or evidencing Collateral (including the originals of all Contracts).

(e)    The Debtor agrees to permit the Secured Party and its agents and representatives, during normal business hours and upon reasonable notice, to inspect the Collateral, to examine and make copies of and abstracts from the records referred to in paragraph (d) above, and to discuss matters relating to the Collateral directly with the Debtor's officers and employees.

(f)    Upon request, the Debtor shall provide the Secured Party with such information concerning the Collateral as the Secured Party shall reasonably request.

(g)    The Debtor will not change or alter the internal Debtor identifying numbers with respect to Contracts without delivering an updated Collateral Schedule to the Secured Party reflecting corresponding changes.

## 6.3    The Collateral

(a)    Except as permitted by the Credit Agreement and this Agreement:

(i)    the Debtor will maintain sole legal and beneficial ownership of the Collateral;

(ii)     the Debtor will not permit any Collateral to be subject to any Lien other than the Secured Party's security interest and will at all times warrant and defend the Secured Party's security interest in the Collateral against all other Liens; and

(iii)    subject to Clause 7, the Debtor will not, and is not authorized to, pledge, license, lease or encumber, or grant any option, warrant, or right with respect to, any of the Collateral, or agree or contract to do any of the foregoing.

(b)    The Debtor shall pay when due (and in any case before any penalties are assessed or any Lien is imposed on any Collateral) all taxes, assessments and charges imposed on or in respect of Collateral and all claims against the Collateral.

(c)    In any suit, legal action, arbitration or other proceeding involving the Collateral or the Secured Party's security interest, the Debtor will take all lawful action to avoid impairment of the Secured Party's security interest or the Secured Party's rights under this Agreement or the imposition of a Lien on any Collateral.

## 6.4    Security interest

The Debtor shall take all actions necessary to ensure that the Secured Party has and continues to have in all relevant jurisdictions a duly and validly created, attached, perfected and enforceable first-priority security interest in the Collateral (including after-acquired Collateral).

## 6.5    Litigation

In any suit, legal action, arbitration or other proceeding involving the Collateral, the Debtor will make all filings and responses in a timely manner, will pursue all remedies and appeals, will defend its rights and interests with diligence, and will take all lawful action to avoid impairment of the Debtor's rights under any Contract or impairment of the Secured Party's security interest or rights under this Agreement.

## 6.6    Notices

If (a) the Debtor fails to deliver Collateral to the Secured Party as provided in Clause 3.2(a) hereof, or (b) a Disclosure Event has occurred and is continuing, the Debtor will give the Secured Party prompt notice of the occurrence of any of the following events:

(i)    any claim, suit, legal action, arbitration or other proceeding involving or affecting the Debtor or any Collateral which could reasonably be expected to impair the Secured Party's security interest or the Secured Party's rights under this Agreement or result in the imposition of a Lien on any Collateral;

(ii)    any breach of or default under any Contract; or

(iii)    any representation or warranty contained in this Agreement is or becomes untrue, incorrect or incomplete in any material respect.

In each notice delivered under this Clause, the Debtor will include reasonable details concerning the occurrence that is the subject of the notice as well as the Debtor's proposed course of action, if any. Delivery of a notice under this Clause will not affect the Debtor's obligations to comply with any other provision of this Agreement.

**6.7    No winding-up of 7th Avenue Inc.**

The Debtor irrevocably waives all right, and irrevocably covenants not, to petition or take any step for the winding up (or any analogous proceeding) of 7th Avenue Inc.

**6.8    Confidentiality**

(a)    The Secured Party shall hold in confidence for the benefit of the Debtor, its principals and affiliates all information, knowledge, and data received in connection with this Agreement, the Credit Agreement or any Control Agreement that relates to or is concerned with the Debtor's operations, business and affairs obtained from the Debtor, its principals or affiliates in connection herewith, and the Secured Party shall not, at any time hereafter, use, disclose or divulge any such information, knowledge or data to any person, firm or corporation other than to the other party or its designees, except:

(i)    information which at the time of disclosure is a part of the public knowledge or literature and readily accessible to such third party, provided that any combination of features shall not be deemed within this exception merely because individual features are part of the public knowledge or literature and readily accessible to such third party, but only if the combination itself and its principles of operation are part of the public knowledge or literature and readily accessible to such third party;

(ii)    to the extent that the recipient is required to disclose the same pursuant to any law or order of any court or pursuant to any direction, request or requirement of any governmental or other regulatory authority;

(iii)    as may be expressly permitted by the terms of this Agreement, the Credit Agreement or any Control Agreement, provided however, that prior to the occurrence of a Disclosure Event, the Secured Party shall not disclose the name or identity of any Counterparty to any person;

(iv)    to the extent that the recipient needs to disclose the same for the protection or enforcement of any of its rights under this Agreement, the Credit Agreement or any Control Agreement, or, in the case of the Trustee, for the purpose of discharging, in such manner as it thinks fit, its duties under or in connection with the Trust Deed, in each case to such persons as are required to be informed of such information for such purposes; or

(v)    the disclosure of any information to professional advisers who receive the same under a duty of confidentiality.

(b)    This confidentiality agreement specifically excludes the Collateral Schedule made available pursuant to Clauses 3 and 4 hereof and the information contained in the Supplemental Information Memorandum.

(c)    Notwithstanding any other provision of this Agreement, the Credit Agreement or any Control Agreement, the obligation of confidentiality set forth herein and agreed to by the parties hereto shall survive the expiration or termination of this Agreement.

7.   **RIGHTS TO DEAL WITH COLLATERAL**

Notwithstanding anything to the contrary in this Agreement, prior to a Disclosure Event, the Debtor shall have full right, power and authority to assign, modify, terminate and/or enter into new Swap Transactions in respect of Master Agreements that constitute Collateral. Subsequent to the occurrence of a Disclosure Event, the Debtor shall not assign, modify, terminate, enter into new Swap Transactions under or alter the terms of any existing Swap Transactions under any of the Master Agreements that constitute Collateral except as may be directed by the Secured Party.

8.   **RIGHTS AND REMEDIES**

8.1   **Events of Default**

**Event of Default** for purposes of this Agreement means:

(a)   failure to comply with any other provision of this Agreement or any Control Agreement if the failure continues for 7 days after notice from the Secured Party;

(b)   failure, in any material respect, of any representation or warranty contained in this Agreement or any Control Agreement to be true and correct on the date made or deemed to be repeated; or

(c)   an **Event of Default**, as that term is defined in the Credit Agreement;

provided, however, that the breach of any representation or warranty contained in Clause 5.3 with respect to any Contract shall not constitute an Event of Default.

8.2   **Collections**

(a)   Until the Secured Party exercises its right after the occurrence and during the continuation of an Event of Default to collect the proceeds of and amounts payable in respect of Collateral, the Debtor will collect with diligence, and at its own expense, all of these proceeds and amounts as they become due or payable. For the avoidance of doubt, the parties expressly agree that any failure by the Debtor diligently to collect the proceeds of and amounts payable in respect of Collateral or to enforce its rights in respect of Collateral shall constitute an Event of Default.

(b)   Within five Business Days after an Event of Default, the Debtor shall mail to the Counterparty of any Master Agreement listed at that time on the Collateral Schedule, a notice, instructing each such Counterparty to send all future payments on or in respect of such Contract directly to the Collection Account. A copy of the notice from the Debtor to the Counterparty of each Contract shall also be sent to the Secured Party. The Debtor shall not terminate, revoke or modify such notice until either (i) such Contract is released or substituted for pursuant to Clause 4.3 above, or (ii) the Loan is repaid in full. Notwithstanding the foregoing, in the event that the location or identity of the Collection Account is changed for any reason, the Debtor, prior to the occurrence of an Event of Default, and the Secured Party, following the occurrence of an Event of Default, shall promptly modify all such notices to indicate that Counterparties shall send all payments under the Contracts which constitute Collateral to the new Collection Account.

**8.3    Secured Party's rights upon default**

(a)    Upon the occurrence and during the continuation of an Event of Default, the Secured Party may, in its sole discretion, take any of the following actions to the extent permitted under the terms of the Collateral, in each case at the Debtor's expense:

(i)    transfer or assign to, or register in the name of, the Secured Party or its nominees any of the Collateral;

(ii)    exercise all consent and other rights relating to any Collateral;

(iii)    perform or comply with any Contract;

(iv)    receive, endorse, negotiate, execute and deliver or collect upon any check, draft, note, acceptance, chattel paper, account, instrument, document, letter of credit, contract, agreement, receipt, release, bill of lading, invoice, endorsement, assignment, bill of sale, deed, security, share certificate, stock power, proxy, or instrument of conveyance or transfer constituting or relating to any Collateral;

(v)    assert, institute, file, defend, settle, compromise, adjust, discount or release any suit, action, claim, counterclaim or right of set-off relating to any Collateral;

(vi)    execute and deliver acquittances, receipts and releases in respect of Collateral;

(vii)    exercise any other right or remedy available to the Secured Party under applicable law, the Credit Agreement, or any other agreement between the parties.

(b)    The Debtor agrees that the Secured Party will have, with respect to the Collateral, in addition to the rights and remedies described in this Agreement, all of the rights and remedies available to a secured party under applicable law and under the UCC (whether or not the UCC applies to the affected Collateral and regardless of whether or not the UCC is the law of the jurisdiction where the rights or remedies are asserted) as if those rights and remedies were fully set forth in this Agreement.

(c)    The Secured Party may exercise the rights and remedies described in this Agreement and those available under applicable law in such order, at such times and in such manner as the Secured Party may, in its sole discretion, determine from time to time. The Secured Party may at any time and from time to time release or relinquish any right, remedy, or security interest it has with respect to a particular item of Collateral without releasing, relinquishing, or in any way affecting its rights, remedies, or security interests with respect to any other item of Collateral.

(d)    The Debtor irrevocably constitutes and appoints the Secured Party, with full power of substitution, as the Debtor's true and lawful attorney-in-fact, in the Debtor's name or in the Secured Party's name or otherwise, and at the Debtor's expense, to take any of the actions authorized by this Agreement or permitted under applicable law upon the occurrence and during the continuation of an Event of Default, without notice to or the consent of the Debtor. This power of attorney is a power coupled with an interest and cannot be revoked. The Debtor ratifies and confirms all actions taken by the Secured Party or its agents under this power of attorney.

(e)    The Secured Party may comply with any applicable state or federal law requirements in connection with a disposition of Collateral and compliance will not be considered adversely to affect the commercial reasonableness of any sale of Collateral.

(f)    The grant to the Secured Party under this Agreement of any right or power does not impose upon the Secured Party any duty to exercise that right or power. The Secured Party will have no obligation to take any steps to preserve any claim or other right against any person or with respect to any Collateral.

(g)    All risk of loss of the Collateral will be borne by the Debtor.

(h)    The Debtor agrees that the sale, transfer or other disposition under this Agreement of any right, title, or interest of the Debtor in any item of Collateral will operate to permanently divest the Debtor and all persons claiming under or through the Debtor of that right, title, or interest, and will be a perpetual bar, both at law and in equity, to any claims by the Debtor or any person claiming under or through the Debtor with respect to that item of Collateral.

## 8.4    No marshaling

The Secured Party has no obligation to attempt to satisfy the Secured Obligations by collecting them from any other person liable for them and the Secured Party may release, modify or waive any collateral provided by any other person to secure any of the Secured Obligations, all without affecting the Secured Party's rights against the Debtor. The Debtor waives any right it may have to require Secured Party to pursue any third person for any of the Secured Obligations. Except to the extent required by applicable law, the Secured Party will not be required to marshal any Collateral or any guaranties of the Secured Obligations, or to resort to any item of Collateral or any guaranty in any particular order, and the Secured Party's rights with respect to the Collateral and any guaranties will be cumulative and in addition to all other rights, however existing or arising. To the extent permitted by applicable law, the Debtor irrevocably waives, and agrees that it will not invoke or assert, any law requiring or relating to the marshaling of Collateral or any other law which might cause a delay in or impede the enforcement of the Secured Party's rights under this Agreement or any other agreement.

## 9.    MISCELLANEOUS

## 9.1    Further assurances

At any time and from time to time upon the request of the Secured Party, the Debtor will execute and deliver such further documents and instruments and do such other acts as the Secured Party may reasonably request in order to effect fully the purposes of this Agreement, to create, perfect, maintain, and preserve a first-priority security interest in the Collateral in favor of the Secured Party, to facilitate any sale, transfer or other disposition of Collateral and to make any sale, transfer or other disposition of Collateral valid, binding, and in compliance with applicable law.

## 9.2    Costs and indemnity

(a)    The Debtor will pay to the Secured Party on demand all reasonably incurred costs, expenses (including legal fees and expenses) and taxes (including any stamp duty or transfer tax) incurred or arising in connection with the preparation, documentation, negotiation, execution, delivery, administration or enforcement of this Agreement, the

administration or maintenance of Collateral, or any amendment or restructuring of or waiver or consent under this Agreement, including:

(i)    costs of foreclosure and of disposition and sale of the Collateral;

(ii)    costs of enforcing and collecting under the Contracts;

(iii)    costs of obtaining money damages; and

(iv)    fees and expenses of attorneys employed by the Secured Party for any purpose related to this Agreement or the Secured Obligations, including consultation, drafting documents, sending notices or instituting, prosecuting or defending litigation or arbitration.

(b)    The Debtor agrees to indemnify the Secured Party and its affiliates, directors, officers, representatives and agents from and against all claims, liabilities, obligations, losses, damages, penalties, judgments, costs and expenses of any kind (including attorney's fees and expenses and any stamp duty or transfer tax) which may be imposed on, incurred by or asserted against any of them by any person in any way relating to or arising out of:

(i)    the Secured Party's security interest in the Collateral;

(ii)    any Event of Default;

(iii)    any action taken or omitted by the Secured Party in exercise or enforcement of rights or remedies under this Agreement; or

(iv)    any sale, delivery or other disposition of or any realization on Collateral except where such sale or disposition is made by the Secured Party at a price below the fair market value of the Collateral,

but the Debtor will not be liable to an indemnified party to the extent any liability results from that indemnified party's negligence or willful misconduct. Payment by an indemnified party will not be a condition precedent to the obligations of the Debtor under this indemnity.

(c)    This Clause 9.2 will survive the Drawdown Date, the making and repayment of the Loan and any novation, transfer or assignment of the Loan.

### 9.3   Successors

This Agreement shall be binding upon and inure to the benefit of the Debtor and the Secured Party and their respective successors and assigns, except that the Debtor may not assign or transfer all or any part of its rights or obligations under this Agreement without the prior written consent of the Secured Party, and any assignment by the Debtor in violation of this provision shall be void and of no effect. The Debtor waives and will not assert against any assignee of the Secured Party any claims, defenses or set-offs which the Debtor could assert against the Secured Party except for defenses which cannot be waived under applicable law.

### 9.4   Amendments and waivers

Any term of this Agreement may be amended or waived only by the written agreement of the Debtor and the Secured Party.

**9.5**    **Rights cumulative**

The rights and remedies of the Secured Party under this Agreement:

(a)    may be exercised as often as necessary;

(b)    are cumulative and not exclusive of its rights under applicable law; and

(c)    may be waived only in writing and specifically.

The Secured Party's delay in exercising, or failure to exercise, any right or remedy under this Agreement is not a waiver of that right or remedy.

**9.6**    **Severability**

If any provision of this Agreement is or becomes illegal, invalid or unenforceable in any jurisdiction, that shall not affect:

(a)    the legality, validity or enforceability in that jurisdiction of any other provision of this Agreement; or

(b)    the legality, validity or enforceability in any other jurisdiction of that or any other provision of this Agreement.

**9.7**    **Counterparts**

This Agreement may be executed in counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

**9.8**    **Notices**

(a)    All notices or other communications under or in connection with this Agreement shall be given in writing.  Any such notice will be deemed to be given:

(i)    if by mail or courier, when delivered;

(ii)    if by facsimile, when sent with confirmation of transmission; and

(iii)    if by electronic mail, when delivered,

except that a notice given on a non-working day or after business hours in the place of receipt will only be deemed to be given on the next working day in that place.

(b)    The address, facsimile number and electronic mail address of the Debtor are:

Lehman Brothers
Operations, FID Mid Office Admin
745 7th Ave 5th Floor
New York, NY, 10019

Tel:    (212) 526-2240

Attn:    Seth Konheim; e-mail: skonheim@lehman.com;
Paul Puskuldjian; e-mail: ppusk@lehman.com

Lehman Brothers
Derivative Trading
745 7th Ave 5th Floor
New York, NY, 10019

Tel:    (212) 526-8140

Attn:    Kaushik Amin; e-mail: kamin@lehman.com

Lehman Brothers
Derivative Trading - London
25 Bank Street
London E14 5LE

Tel:    44-(0)20-7103-2444

Attn:    Andrew Morton; e-mail: amorton@lehman.com

Lehman Brothers
Central Funding Unit
25 Bank Street
London E14 5LE

Tel:    44-(0)20 7103 1305

Attn:    John Feraca; e-mail: joferaca@lehman.com

Lehman Brothers
Derivative Trading
745 7th Ave
New York, NY, 10019

Tel:    (212) 526-6697

Attn:    Neville Nagarwalla; e-mail: nneville@lehman.com

(c)    The address and facsimile number of the Secured Party are:

7th Avenue Inc.
P.O. Box 1109 GT
HSBC House
Mary Street
Grand Cayman
Cayman Islands
British West Indies

Fax:    (345) 949-7634

With a copy to:

Lehman Brothers
Derivative Operations

25 Bank Street
London E14 5LE

Tel:    44-(0)20 7102 5293

Attn:    David West; e-mail: dwest@lehman.com

(d)    The address and facsimile number of the Trustee are:

HSBC Trustee (C.I) Limited
1 Grenville Street
St Helier
Jersey JE4 9PF

Fax:    44 1534 606504
Attn:    Manager, Corporate Services

(e)    Either party may change its address, facsimile number or electronic mail address for notices by a notice to the other party given in accordance with this Clause 9.8.

## 9.9    Jurisdiction

(a)    For the benefit of the Secured Party, the Debtor agrees that any New York State court or Federal court sitting in New York City has jurisdiction to settle any disputes in connection with this Agreement and accordingly submits to the jurisdiction of those courts.

(b)    The Debtor:

(i)    waives objection to the New York State and Federal courts on grounds of personal jurisdiction, inconvenient forum or otherwise as regards proceedings in connection with this Agreement; and

(ii)    agrees that a judgment or order of a New York State or Federal court in connection with this Agreement is conclusive and binding on it and may be enforced against it in the courts of any other jurisdiction.

(c)    Nothing in this Clause 9.9 limits the right of the Secured Party to bring proceedings against the Debtor in connection with this Agreement:

(i)    in any other court of competent jurisdiction; or

(ii)    concurrently in more than one jurisdiction.

## 9.10    Complete Agreement

This Agreement contains the complete agreement between the parties on the matters to which it relates and supersedes all prior commitments, agreements and understandings, whether written or oral, on those matters.

**9.11    Waiver of Jury Trial**

THE DEBTOR, THE SECURED PARTY AND THE TRUSTEE WAIVE ANY RIGHTS THEY MAY HAVE TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED ON OR ARISING FROM THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

**9.12    Governing Law**

This Agreement is governed by the laws of the State of New York, except to the extent that the validity, perfection or enforcement of any security interest granted under this Agreement or any remedy in respect of any particular Collateral is mandatorily governed by the law of another jurisdiction.

**9.13    Limited Recourse**

Notwithstanding any other provisions of this Agreement, the Credit Agreement or the Control Agreements or otherwise, the Debtor acknowledges that the obligations of the Secured Party hereunder or thereunder shall not exceed its pro rata share (as provided below) of the lesser of the principal amount of the Mortgaged Property for the Notes and the actual amount received or recovered by or for the account of the Secured Party, subject always to the charges created by the Trust Deed and the Trustee having realized the same and after all other claims in respect thereof (other than those of any other Pari Passu Creditors (as defined below)) have been satisfied (the **Available Amount**). The Debtor shall look solely to its pro rata share of the Available Amount and the obligations of the Secured Party to the Debtor shall be satisfied. Any such claims by the Debtor and the claims in respect of the Notes of any and all Agents under the Agency Agreement relating to the Notes and of any and all Dealers and Arrangers under the Dealer Agreement relating to the Notes and of any other parties who have agreed to limited recourse wording on the same terms (mutatis mutandis) as this Clause 9.13 (together, the **Pari Passu Creditors**) shall be reduced pro rata so that the total amount of all such claims does not exceed the Available Amount. The Debtor shall not be entitled to take any further steps against the Secured Party to recover any further sums hereunder or thereunder once the proceeds of the Mortgaged Property in respect of the Notes have been exhausted for whatever reason and the right of the Debtor to claim any amount exceeding its pro rata share of the Available Amount shall be automatically extinguished. It is a fundamental term of any amounts which may be payable to the Debtor that the Debtor shall not be entitled to exercise any right of set-off, lien, consolidation of accounts or other similar right arising by operation of law or otherwise against any person entitled to receive any payment under the Notes or against Mortgaged Property in respect of any other Series or any other assets of the Secured Party (and the Debtor hereby waives all such rights). Capitalized terms used in this Clause 9.13 but not otherwise defined in this Agreement shall have the meanings set forth in the Trust Deed.

The undersigned, intending to be legally bound, have executed and delivered this Agreement on the date stated at the beginning of this Agreement.

## SIGNATORIES

**DEBTOR**

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By:

**SECURED PARTY**

**7TH AVENUE INC.**

By:

**TRUSTEE**

**HSBC TRUSTEE (C.I.) LIMITED**

By two authorised signatories:

**EXHIBIT C**

COLLATERAL SCHEDULE

9/12/2008

| Counterparties | Securities | Industry Sector | Counterparty Country of Incorporation | Counterparties Long Term Debt Rating - Moody's Rating | Counterparties Long Term Debt Rating - S&P Rating | Collateral Value | Allocated Collateral Value |
|---|---|---|---|---|---|---|---|
| Counterparty 2 | | Government-Sponsored Enterprises | US | Aaa | AA+ | 43,271,331.49 | 43,271,331.49 |
| Counterparty 3 | | Government-Sponsored Enterprises | US | Aaa | AAA | 121,216,768.02 | 105,000,000.00 |
| Counterparty 4 | | Colleges/Universities | US | Aaa | AAA | 10,103,466.70 | 10,103,466.70 |
| Counterparty 6 | | Municipal Issuer - Revenue | US | Aa3 | A- | 12,674,571.21 | 12,674,571.21 |
| Counterparty 7 | | Commercial Bank | Germany | Aa2 | A | · | · |
| Counterparty 10 | | Commercial Bank | US | Aa2 | AA- | 42,884,601.08 | 42,884,601.08 |
| Counterparty 12 | | Government-Sponsored Enterprises | US | Aaa | AAA | 26,302,468.61 | 26,302,468.61 |
| Counterparty 15 | | Municipality - General Obligations | US | A1 | AA | 22,156,454.89 | 22,156,454.89 |
| Counterparty 19 | | Commercial Bank | Germany | Aa2 | A-1+ | · | · |
| Counterparty 21 | | Insurance | US | Aa2 | AA- | 4,791,314.41 | 4,791,314.41 |
| Counterparty 24 | | Government-Sponsored Enterprises | US | Aaa | AAA | 6,883,667.24 | 6,883,667.24 |

Swap Collateral Totals                                                                                         290,286,624.64          274,069,766.53

Issuer of Any Qualifying Securities Collateral          None

Net Collateral Value                                                                                                                        274,069,766.53

Outstanding Principal Amount of the Loan:                                                                                       210,000,000.00

Minimum Collateral Value (Currently 105% of the Loan):                                                                              None

Cash collateral posted                                                                                                                              ·

Sufficiency                                                                                                                                 64,069,766.53

# **EXHIBIT D**

## FINANCING STATEMENTS

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 05:16 PM 12/08/2004
INITIAL FILING NUM: 4346403 1
AMENDMENT   NUMBER: 0000000
SRV: 040886880

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Lehman Brothers Special Financing Inc. | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 745 7th Avenue, 5th Floor | New York | NY | 10019 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | Corporation | Delaware | 2042246 | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 7th Avenue Inc. | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| PO Box 1109GT, Strathvale House, North Church St. | George Town, Grand Cayman, Cayman Is. | | | BWI |

**4. This FINANCING STATEMENT covers the following collateral:**

All right, title and interest in and to the "Contract", as that term is defined in the Security Agreement dated December 8, 2004 between Lehman Brothers Special Financing Inc., 7th Avenue Inc. and HSBC Trustee (C.I.) Limited, in relation to the Series 2 USD 200,000,000 Floating Rate Notes due 2008 as the same may be amended, supplemented, restated, extended, modified or novated from time to time.

| 5. ALTERNATIVE DESIGNATION (if applicable): | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.  Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA

file with SOS DE                                                  071333-5/1

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

███████████████

███████████████

███████████████

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 12:41 PM 06/26/2009
INITIAL FILING # 4346403 1
AMENDMENT    # 2009 2066030
SRV: 090652170

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

⌐ CSC
1133 Avenue of the Americas, Suite 3100
New York, NY 10036
L

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 43464031, 12/8/04 | |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☑ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Lehman Brothers Special Financing Inc. | | | |
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Commerzbank AG, New York and Grand Cayman Branches | | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA

SOS DE  (1109065-0028)

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

## EXHIBIT E

DEED OF ASSIGNMENT

NEWYORK 7270493 (2K)

EXECUTION VERSION

# DEED OF ASSIGNMENT

### DATED 13 FEBRUARY 2009

### BETWEEN

### HSBC TRUSTEE (C.I.) LIMITED

### 7TH AVENUE INC.

### AND

### COMMERZBANK AG, NEW YORK AND CAYMAN ISLAND BRANCHES

## ALLEN & OVERY

Allen & Overy LLP

41483-00185 ICM:8028113.3

THIS DEED OF ASSIGNMENT is dated 13 February 2009 and is made BETWEEN:

(1)   HSBC TRUSTEE (C.I.) LIMITED, as trustee in respect of the Notes (the Trustee);

(2)   7TH AVENUE INC. as issuer of the Notes (the Issuer); and

(3)   COMMERZBANK AG, NEW YORK AND CAYMAN ISLAND BRANCHES as holder of 100 per cent. of the aggregate outstanding principal amount of the Notes (the Noteholder).

## BACKGROUND

(A)   On 8 December 2004 (the Issue Date), the Series 2 USD200,000,000 Floating Rate Notes due 2008 (ISIN: XS0206017286) (the Notes) were issued by the Issuer. The Notes were constituted and secured by a master trust deed dated 12 September 2002 (the Master Trust Deed) as supplemented and modified by a supplemental trust deed dated the Issue Date made between, *inter alios*, the Trustee and the Issuer (the Supplemental Trust Deed) and a first supplemental trust deed dated 23 December 2004 (the First Supplemental Trust Deed and, together with the Master Trust Deed and the Supplemental Trust Deed, the Trust Deed).

(B)   The Notes are secured by way of a first ranking assignment by way of security of all the Issuer's rights, title and interest under (i) a term loan agreement (the Loan Agreement) dated the Issue Date between the Issuer and Lehman Brothers Special Financing Inc. (LBSF), (ii) a security agreement between the Issuer, LBSF and the Trustee (the Security Agreement), the securities account control agreement between the Issuer, LBSF and HSBC Bank USA, National Association (the Securities Account Control Agreement) and a deposit account control agreement between the Issuer, LBSF and HSBC Bank USA, National Association (the Deposit Account Control Agreement and, together with the Security Agreement and the Securities Account Control Agreement, the Charged Assets Security Documents), in each case dated the Issue Date and entered into in respect of the Notes and (iii) any sums or money, securities or other property received or receivable under the Loan Agreement and/or the Charged Assets Security Documents.

(C)   As from 3 October 2008, LBSF is the subject of a Chapter 11 case in the United States Bankruptcy Court for the Southern District of New York (the LBSF Proceedings) and, as a result, demands of LBSF (or against its property) are subject to an automatic stay.

(D)   An event of default (a Loan Event of Default) has occurred pursuant to Clause 13.7 of the Loan Agreement as a result of the LBSF Proceedings. Pursuant to Clause 14.1 of the Loan Agreement, all amounts under the Loan Agreement have become immediately due and payable. The Loan Event of Default has resulted in an event of default pursuant to Clause 8.1 of the Security Agreement.

(E)   Pursuant to Condition 7(b)(i) of the Notes, if the loan made pursuant to the Loan Agreement (or part thereof) becomes due and repayable on a date prior to its stated repayment date (other than by reason of default in payment or an optional prepayment), the Issuer shall, forthwith upon becoming aware of such event, on giving notice as soon as reasonably practicable following the date upon which the Issuer is to receive the repayment amount of such Charged Assets (or if applicable the redemption proceeds of enforcement of the Charged Assets Security Documents) (or such other period of notice as may be otherwise agreed with the Trustee unless the Trustee shall (at the expense of the Issuer) certify to the Issuer that it considers in its absolute discretion that it is in the best interests of the Noteholders that such notice be delayed or not given or an Extraordinary Resolution of the Noteholders shall otherwise direct) to the Trustee, the Principal Paying Agent and to the Noteholders in accordance with Condition 16, redeem the Notes at the Early Redemption Amount on expiry of such notice.

(F)     Clause 2 of the Supplemental Trust Deed provides that, upon enforcement of the security over the
        Charged Assets, the Trustee and the Issuer may (upon consent of the holders of all outstanding
        Notes) effect the assignment of the Issuer's rights in respect of LBSF's rights and obligations under
        the Contracts (as defined in the Schedule to the Pricing Supplement in respect of the Notes) directly
        to the Noteholders, subject to all relevant laws and regulations and the terms of the Contracts and,
        upon such assignment, the Issuer will have no further liability in respect of the Notes.

(G)     In accordance with the Trust Deed and the Conditions of the Notes, the Noteholder may direct the
        Trustee in writing to take certain actions in respect of the Notes and to enforce rights in respect of
        the Mortgaged Property relating to the Notes. The Noteholder has directed the Trustee to take such
        action as set out in a letter dated 6 October 2008 and has indemnified the Trustee pursuant to a deed
        of indemnity dated 22 October 2008.

(H)     It is intended that this document takes effect as a deed notwithstanding the fact that a party may only
        execute this document under hand.

IT IS AGREED as follows:

1.      INTERPRETATION

        Capitalised terms defined in the Trust Deed, the Loan Agreement and the Charged Assets Security
        Documents have, unless expressly defined in this Deed, the same meaning in this Deed.

2.      CONDITIONS PRECEDENT

(a)     The provisions of Clause 3 below shall not be effective until the Noteholder has paid (i) the Trustee's
        costs and expenses in full in respect of action taken (including legal advice and any applicable value
        added taxes) in respect of the negotiation, preparation and execution of this Deed and any related
        documentation and all other matters in relation thereto, (ii) all other costs and expenses that would be
        payable to the Trustee, the Paying Agents and the Registrar pursuant to Clause 11 of the Master
        Trust Deed or otherwise, being (in total) GBP49,708.74 (the Trustee Costs) and (iii) the Issuer's
        costs and expenses in full in respect of action taken (including legal advice and any applicable value
        added taxes) in respect of the negotiation, preparation and execution of this Deed and any related
        documentation and all other matters in relation thereto, being (in total) USD47,708.81 and
        GBP4,677.44 (the Issuer Costs). The Trustee and the Issuer shall deliver to the Noteholder (both (i)
        in writing to Michael Fruchter at Commerzbank AG, New York and Cayman Island Branches, 2
        World Financial Center, New York, NY 10281-1050 and (ii) by email to mfruchter@cbkna.com)
        reasonably detailed invoices or other reasonable documentary evidence (together, the Invoices) of
        the Trustee Costs or the Issuer Costs, as the case may be, and the Noteholder shall not be obliged to
        pay for (i) in respect of the Invoices to be provided by the Trustee, such Trustee Costs and (ii) in
        respect of the Invoices to be provided by the Issuer, such Issuer Costs until it has received the
        relevant Invoices.

(b)     The Noteholder hereby agrees to pay the unpaid Trustee Costs and Issuer Costs on or prior to the
        date hereof.

3.      ASSIGNMENT

(a)     The Trustee and the Issuer without representation, warranty or recourse irrevocably and
        unconditionally transfer and assign all of their respective rights, title and interest under the Loan
        Agreement, the Charged Assets Security Documents (which shall, for the avoidance of doubt,
        include a continuing first priority security interest in the Collateral granted in favour of the Secured
        Party and including the Trustee's and the Issuer's rights in respect of all rights, title and interest that
        LBSF has or later acquires in, to and under the Contracts, together with all proceeds of the

Contracts) and any sums or money, securities or property received or receivable under the Loan Agreement and the Charged Assets Security Documents and the Trustee irrevocably and unconditionally transfers and assigns all of its rights, title and interest under the Trust Deed, the Agency Agreement, the Conditions of the Notes, the Loan Agreement and the Charged Assets Security Documents (the Assigned Assets), in each case, to the Noteholder (the Assignment).

(b)   The Noteholder directs the Issuer and the Issuer hereby irrevocably and unconditionally:

   (i)    releases the Trustee from all duties, obligations and liability arising following the date of this Deed to the Noteholder and each other secured party in respect of the trusts created by the Trust Deed (the Trust); and

   (ii)   discharges each of the Agents (excluding the Redemption Agent and the Calculation Agent) and the Trustee from all of their duties, obligations and liabilities of whatsoever nature under the Trust Deed, the Agency Agreement and the Conditions of the Notes.

(c)   Upon the Assignment, the Trust shall terminate in full, the Trustee shall no longer be an assignee of the Issuer and the Trustee shall have no further duties, obligations or liabilities arising following the date of this Deed in respect of the Loan Agreement and the Charged Assets Security Documents, and the Noteholder shall succeed to all rights and interests of the Trustee under the Trust Deed, the Loan Agreement and the Charged Assets Security Documents including rights of enforcement contained therein. For the avoidance of doubt, the Trustee shall no longer be included in the definition of "Lender" in respect of the Securities Account Control Agreement and the Deposit Account Control Agreement or the definition of "Secured Party" in respect of the Security Agreement, and the Noteholder shall be substituted for the Trustee as such "Lender" and "Secured Party" thereunder.

(d)   The Issuer by way of security hereby irrevocably appoints the Noteholder to be its attorney on its behalf and in its name to exercise and do any assurances, acts and things which the Issuer ought to execute or do under the covenants and provisions of the Trust Deed relating to the Notes and generally on its behalf and in its name to exercise all and any of the powers, authorities and discretions relating to the Notes conferred by or pursuant to the Trust Deed or otherwise to the Trustee. The Issuer hereby revokes and the Trustee hereby agrees to the revocation of its appointment as attorney of the Issuer pursuant to Clause 8(M) of the Trust Deed.

(e)   Notwithstanding the Assignment, the limitation on recourse to the Issuer in respect of the Notes set forth in Condition 3(f)(C) shall remain in full force and effect, and the Noteholder accordingly acknowledges and agrees that it shall look solely to the Assigned Assets and any other Charged Assets and Mortgaged Property for payments to be made by the Issuer on the Notes.

(f)   The Issuer and the Trustee shall, as soon as reasonably practicable on or following the date hereof, send a copy of this Deed to each of the Agents (excluding the Redemption Agent and the Calculation Agent) and inform them that they have been discharged from all of their obligations and liabilities of whatsoever nature under the Trust Deed, the Agency Agreement and the Conditions of the Notes. The parties hereby agree that notwithstanding anything to the contrary in the Trust Deed, the Agency Agreement and the Conditions of the Notes, neither the Issuer nor the Trustee shall be obliged to appoint any replacement Agents.

(g)   The Issuer shall, as soon as reasonably practicable on or following the date hereof, send a notice to LBSF in the form attached at Annex 1 hereto informing it of the Assignment. For the avoidance of doubt, the Assignment shall be effective notwithstanding whether LBSF acknowledges such notice.

(h)   Subject to the Issuer and the Trustee being indemnified and secured to their satisfaction, the Issuer and the Trustee shall take all reasonable actions and execute and deliver all documents reasonably

41483-00185 ICM:8028113.3                               4

requested by the Noteholder to protect, perfect and further assure the effectiveness of the Assignment and the Noteholder's rights and remedies under this Deed or under or in respect of the Assigned Assets, including, without limitation, executing such UCC assignments as the Noteholder shall specify in respect of any UCC financing statements previously filed by the Trustee or the Issuer in respect of any Charged Assets, contracts or other collateral.

4.      **LIABILITY**

Subject to the immediately succeeding paragraph of this Clause 4, upon the Assignment, the Trustee shall not have any further liability (a) in respect of the Notes, the Trust Deed, the Agency Agreement, the Loan Agreement, the Charged Assets Security Documents and any other document in relation thereto and (b) any action taken, purported to be taken or omitted to be taken by the Noteholder or the Issuer under the Notes, the Trust Deed, the Agency Agreement, the Loan Agreement, the Charged Assets Security Documents and/or any other document in relation thereto. Except as set forth herein, the respective rights, remedies, liabilities, obligations and duties of the Issuer and the Noteholder under the Trust Deed, the Notes, any documents related thereto and applicable law shall remain in full force and effect.

The Trustee shall, in any event, remain fully liable (i) to the fullest extent provided under the Trust Deed, the Notes, the Loan Agreement, the Charged Assets Security Documents, any documents in relation to any of the foregoing and applicable law for all actions taken or omitted to be taken by it prior to the effective date of the Assignment, and (ii) for any breach of its agreements and obligations under or in respect of this Deed, and the Issuer shall remain fully liable to the Noteholder, in its capacity as Noteholder or as assignee of the Trustee, (i) under or in respect of the Notes, the Trust Deed, the Loan Agreement, the Charged Assets Security Documents for all obligations of the Issuer thereunder and (ii) for any breach of the Issuer's agreements and obligations under or in respect of this Deed.

5.      **COUNTERPARTS**

This Deed may be executed in any number of counterparts. This has the same effect as if the signatures on the counterparts were on a single copy of the Deed.

6.      **CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999**

No third party shall have any rights to enforce any term or condition of this Deed under the Contracts (Rights of Third Parties) Act 1999 but this does not affect any right or remedy of a third party which exists or is available apart from under that Act.

7.      **GOVERNING LAW**

This Deed and any non-contractual obligations arising out of or in connection with it are governed by English law.

This Deed has been entered into as a deed on the date stated at the beginning of this Deed.

41483-00185 ICM:8028113.3                             .5

**ANNEX 1**

To:    Lehman Brothers Special Financing, Inc.

Lehman Brothers
Operations, FID Mid Office Admin
745 7th Ave 5th Floor
New York, NY, 10019

Tel:    (212) 526-2240

Attn:    Seth Konheim; e-mail: skonheim@lehman.com;
Paul Puskuldjian; e-mail: ppusk@lehman.com

Lehman Brothers
Derivative Trading
745 7th Ave 5th Floor
New York, NY, 10019

Tel:    (212) 526-8140

Attn:    Kaushik Amin; e-mail: kamin@lehman.com

Lehman Brothers
Derivative Trading - London
25 Bank Street
London E14 5LE

Tel:    44-(0)20-7103-2444

Attn:    Andrew Morton; e-mail: amorton@lehman.com

Lehman Brothers
Central Funding Unit
25 Bank Street
London E14 5LE

Tel:    44-(0)20-7103-1305

Attn:    John Feraca; e-mail: joferaca@lehman.com

Lehman Brothers
Derivative Trading
745 7th Ave
New York, NY, 10019

Tel:    (212) 526-6697

Attn:    Neville Nagarwalla; e-mail: nneville@lehman.com

Dear Sirs,

**7TH AVENUE INC. (the Issuer)**
**HSBC TRUSTEE (C.I) LIMITED (the Trustee)**
Series 2 USD200,000,000 Floating Rate Notes due 2008 (ISIN: XS0206017286) (the Notes)

13 February 2009

We refer to the deed of assignment (the Deed of Assignment) dated 13 February 2009 between the Issuer, the Noteholder and the Trustee attached at Schedule 1 hereto.

Capitalised terms not otherwise defined herein shall bear the same meaning as in the Deed of Assignment.

We hereby give you notice that by Clause 3 of the Deed of Assignment, we transferred and assigned in favour of the Noteholder, all of our respective rights, title and interest under the Loan Agreement, the Charged Assets Security Documents (which shall, for the avoidance of doubt, include a continuing first priority security interest in the Collateral granted in favour of the Secured Party and including our respective rights in respect of all rights, title and interest that Lehman Brothers Special Financing Inc. has or later acquires in, to and under the Contracts, together with all proceeds of the Contracts) and any sums or money, securities or property received or receivable under the Loan Agreement and the Charged Assets Security Documents and the Trustee irrevocably and unconditionally transferred and assigned in favour of the Noteholder, all of its rights, title and interest under the Trust Deed, the Agency Agreement, the Conditions of the Notes, the Loan Agreement and the Charged Assets Security Documents (together, the **Assignment**).

Additionally, we hereby give you notice that the Issuer has, to the extent provided in the Deed of Assignment, irrevocably and unconditionally released the Trustee from all duties, obligations and liability to the Noteholder and each other secured party in respect of the trusts created by the Trust Deed (the **Trust**). Upon the Assignment, the Trust shall terminate in full, the Trustee shall no longer be an assignee of the Issuer and, to the extent provided in the Deed of Assignment, the Trustee shall have no further duties, obligations or liabilities in respect of the Loan Agreement and the Charged Assets Security Documents, and the Noteholder shall succeed to all rights and interests of the Trustee under the Trust Deed, the Loan Agreement and the Charged Assets Security Documents including rights of enforcement contained therein. For the avoidance of doubt, the Trustee shall no longer be included in the definition of "Lender" in respect of the Securities Account Control Agreement and the Deposit Account Control Agreement or the definition of "Secured Party" in respect of the Security Agreement, and the Noteholder shall be substituted for the Trustee as such "Lender" and "Secured Party" thereunder.

The Issuer by way of security has appointed the Noteholder to be its attorney on its behalf and in its name to exercise and do any assurances, acts and things which the Issuer ought to execute or do under the covenants and provisions of the Trust Deed relating to the Notes and generally on its behalf and in its name to exercise all and any of the powers, authorities and discretions relating to the Notes conferred by or pursuant to the Trust Deed or otherwise to the Trustee. The Issuer has ratified and confirmed and agreed to ratify and confirm whatever the Noteholder shall do or purport to do in the exercise or purported exercise of all or any of the relevant powers, authorities and discretions referred to in this paragraph.

We should be grateful if you would sign and return to each of us and to the Noteholder the attached copies of this letter to confirm that you have received this notice of such transfer. For the avoidance of doubt, the Assignment shall be effective notwithstanding whether you acknowledge such notice.

Yours faithfully

**7TH AVENUE INC.**

41483-00185 ICM:8028113.3                    7

By:_____
Name:
Title:

**HSBC TRUSTEE(C.I.) LIMITED**

By:_____
Name:
Title:

Accepted and agreed to:
**LEHMAN BROTHERS SPECIAL FINANCING, INC.**

By:_____
Name:
Title:

**SCHEDULE 1**

**DEED OF ASSIGNMENT**

SIGNATORIES

Trustee

EXECUTED AS A DEED by          )
HSBC TRUSTEE (C.I.) LIMITED    )
acting by                      )

Authorised Signatory:                         Ian Graham
                                              Authorised Signatory

Authorised Signatory:

                                              Jacki Braid
                                              Authorised Signatory

Issuer

EXECUTED AS A DEED by          )
7TH AVENUE INC.                )
acting by                      )

Director

In the presence of:

Witness's signature:
Name:
Address:


Noteholder

EXECUTED AS A DEED by                                                    )
COMMERZBANK AG, NEW YORK AND CAYMAN ISLAND BRANCHES                      )
acting by                                                               )

Authorised Signatory

In the presence of:

Witness's signature:
Name:
Address:


41483-00185 ICM:8028113.3                    10

## SIGNATORIES

**Trustee**

EXECUTED AS A DEED by          )
HSBC TRUSTEE (C.I.) LIMITED     )
acting by                      )

Authorised Signatory:

Authorised Signatory:

**Issuer**

● EXECUTED AS A DEED by        )
7TH AVENUE INC.                )        *[signature]*
acting by                      )

Director                                **Cónnan Hill**
                                        **Director**
In the presence of:

Witness's signature:           *[signature]*
Name:                          SEAN MURPHY
Address:                       68 WEST BAY ROAD, GEORGE TOWN
                               GRAND CAYMAN

**Noteholder**

● EXECUTED AS A DEED by                                              )
COMMERZBANK AG, NEW YORK AND CAYMAN ISLAND BRANCHES                  )
acting by                                                           )

Authorised Signatory

In the presence of:

Witness's signature:
Name:
Address:

41483-00185 ICM:8028113.3                    10

## SIGNATORIES

**Trustee**

| | |
|---|---|
| EXECUTED AS A DEED by | ) |
| HSBC TRUSTEE (C.I.) LIMITED | ) |
| acting by | ) |

Authorised Signatory:

Authorised Signatory:

**Issuer**

| | |
|---|---|
| EXECUTED AS A DEED by | ) |
| 7TH AVENUE INC. | ) |
| acting by | ) |

Director

In the presence of:

Witness's signature:
Name:
Address:

**Noteholder**

| | |
|---|---|
| EXECUTED AS A DEED by | ) |
| COMMERZBANK AG, NEW YORK AND CAYMAN ISLAND BRANCHES | ) |
| acting by | ) |

Authorised Signatory

Michael P. McCarthy
Senior Vice President

Michele Woessner-Larkin
Assistant Vice President

In the presence of:

Witness's signature:
Name:
Address:

41483-00185 ICM:8028113.3                    10

**EXHIBIT F**

GUARANTY

# UNANIMOUS WRITTEN CONSENT OF THE

# EXECUTIVE COMMITTEE OF THE

# BOARD OF DIRECTORS OF

# LEHMAN BROTHERS HOLDINGS INC.

The undersigned, being both members of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., a Delaware corporation (the "Corporation"), do hereby adopt the following resolutions by unanimous written consent in lieu of a meeting in accordance with Section 141(f) of the General Corporation Law of the State of Delaware:

WHEREAS, the Corporation has previously authorized by specific resolution, which authority has not been revoked (the "Outstanding Guarantee Resolutions"), the guarantee of all or specified obligations and liabilities of certain direct and indirect subsidiaries of the Corporation, each of which is a "Guaranteed Subsidiary" as such term is used in the Corporation's Code of Authorities as currently in effect (the "Code"),

WHEREAS, certain of the Guaranteed Subsidiaries presently enjoy full guarantees while others have only partial guarantees, and the Corporation now wishes to expand such partial guarantees to full guarantees,

WHEREAS, due to the passage of time the names of certain of the Guaranteed Subsidiaries have changed, rendering the Outstanding Guarantee Resolutions out of date to that extent,

WHEREAS, the Corporation wishes to clarify that its guarantee of any Guaranteed Subsidiary with respect to any given transaction is not contingent upon the issuance of a signed guarantee pertaining to such transaction,

WHEREAS, Management wishes to establish additional Guaranteed Subsidiaries,

WHEREAS, Management wishes to specify that to the extent lawful and allowable, guarantees issued by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, so as to secure certain tax and accounting benefits, and

WHEREAS, Management believes that it would facilitate the conduct of the business of the Corporation to supersede and replace the various Outstanding Guarantee Resolutions in their entirety with this single document,

NOW THEREFORE BE IT,

RESOLVED, that the Corporation hereby fully guarantees the payment of all liabilities, obligations and commitments of the subsidiaries set forth on Schedule A hereto, each of which shall be a Guaranteed Subsidiary for purposes of the Code;

RESOLVED, that the Outstanding Guarantee Resolutions are hereby superseded and replaced in their entirety with this single document, provided that any guarantees provided pursuant to the Outstanding Guarantee Resolutions and outstanding on the date hereof, whether in the form of a separately executed individual guarantee or otherwise, shall remain issued, outstanding and valid for all purposes;

RESOLVED, that guarantees provided by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, to the extent lawful and allowable, as specified on Schedule A hereto;

RESOLVED, that each of the persons listed in the Code (as it may be amended from time to time) as being authorized to approve individual guarantees issued by the Corporation with respect to Guaranteed Subsidiaries, or any proper delegee thereof (collectively, "Authorized Persons"), are hereby authorized, in the name and on behalf of the Corporation, to execute such guarantees in such form as is approved by an attorney of the Corporation and such Authorized Person, subject to any limitations specified herein, his or her execution of each such guarantee to be conclusive evidence of approval thereof; and to do such other acts and things as may be advisable or necessary in order to effect the purposes and intent of these resolutions; and

FURTHER RESOLVED, that any and all actions contemplated by the foregoing resolutions and taken by such Authorized Persons prior to the date hereof are hereby ratified, confirmed and approved in all respects.

Dated: June 9, 2005

Richard S. Fuld, Jr.                              John D. Macomber

2

Schedule A
to LBHI Unanimous Written Consent
dated June 9 , 2005

| | Name of Subsidiary | Issue Corporation guarantee from branch located in London, England, to the extent lawful and allowable? |
|---|---|---|
| 1. | Lehman Brothers Asia Holdings Limited | No |
| 2. | Lehman Brothers Bankhaus A.G. | Yes (London branch of such subsidiary only) |
| 3. | Lehman Brothers Commercial Bank | No |
| 4. | Lehman Brothers Commercial Corporation | No |
| 5. | Lehman Brothers Commercial Corporation Asia Limited | No |
| 6. | Lehman Brothers Equity Finance (Cayman) Limited | No |
| 7. | Lehman Brothers Finance S.A. | No |
| 8. | Lehman Brothers Holdings Plc | Yes |
| 9. | Lehman Brothers International (Europe) | Yes |
| 10. | Lehman Brothers Japan Inc. | No |
| 11. | Lehman Brothers (Luxembourg) Equity Finance S.A. | No |
| 12. | Lehman Brothers (Luxembourg) S.A. | No |
| 13. | Lehman Brothers OTC Derivatives Inc. | No |
| 14. | Lehman Brothers Securities Asia Limited | No |
| 15. | Lehman Brothers Securities N.V. | No |
| 16. | Lehman Brothers Special Financing Inc. | No |
| 17. | Lehman Brothers Treasury Co. B.V. | No |
| 18. | Lehman Re Limited | No |

3

# **EXHIBIT G**

## INTEREST STATEMENT

# Lehman Brothers Holdings Inc. (Exhibit G) (Accrued Interest)

**Principal Amount: $200,000,000.00**

| Start | End | Days | Fed Funds | Spread | All-In Rates | Amount |
|---|---|---|---|---|---|---|
| 9/9/2008 | 9/15/2008 | 6 | 2.00% | 0.50% | 2.50% | 81,967.21 |
| 9/15/2008 | 10/8/2008 | 23 | 2.00% | 0.50% | 2.50% | 314,207.65 |
| 10/8/2008 | 10/29/2008 | 21 | 1.50% | 0.50% | 2.00% | 229,508.20 |
| 10/29/2008 | 12/16/2008 | 48 | 1.00% | 0.50% | 1.50% | 393,442.62 |
| 12/16/2008 | 1/1/2009 | 16 | 0.25% | 0.50% | 0.75% | 65,573.77 |
| 1/1/2009 | 9/14/2009 | 256 | 0.25% | 0.50% | 0.75% | 1,052,054.79 |
| | | | | | **TOTAL** | **$2,136,754.25** |

7295071

## EXHIBIT H

EXPENSES STATEMENT

## Expenses Statement (Exhibit H)

Deed Trustee Costs and Expenses Reimbursement   GBP 49,708.74

     x 1.41[10]                                                                   **$70,089.32;**

Issuer Costs and Expenses Reimbursement          GBP 4,677.44

     x 1.41                                                                     **$6,595.19;**

     and                                                                       **$47,708.81;**

Direct Legal Fees and Expenses                                                 **$256,101.77;**

Total as of September 14, 2009                                                 **$380,495.09**.

**Total allocated to this claim**                                              **$190,247.55**

(50% of the total costs and expenses
attributable to Lehman Brothers Bankhaus
AG and LBSF in connection with the
Notes.)

---

[10] Bloomberg average exchange rate as of 3-4 March, 2009, when the reimbursement transfers were made.

NEWYORK 7270493 (2K)

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number  13-5605970

September 30, 2008
Invoice No. 883611

## REMITTANCE COPY

re:  LEHMAN
Ref. No. 1109065-0028

**FOR PROFESSIONAL SERVICES RENDERED** in connection with the
above-referenced matter for the period ending September 30, 2008            $            51,442.50

COSTS AND DISBURSEMENTS                                                                                  106.96

TOTAL DUE                                                                                       $            51,549.46

## PAYMENT INSTRUCTIONS

This invoice is due upon receipt. Wire payment should be made to the account of White & Case LLP,
Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-
000021/Swift Code: CHASUS33). For proper crediting the wire must reference 1109065-0028
COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028
COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE
LLP, 23802 Network Place, Chicago, IL 60673-1238.

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5605970

October 31, 2008
Invoice No. 885908

**REMITTANCE COPY**

re: LEHMAN
Ref. No. 1109065-0028

| | | |
|---|---|---|
| **FOR PROFESSIONAL SERVICES RENDERED** in connection with the above-referenced matter for the period ending October 31, 2008 | $ | 65,435.00 |
| COSTS AND DISBURSEMENTS | | 2,967.63 |
| TOTAL DUE | $ | 68,402.63 |

**PAYMENT INSTRUCTIONS**

This invoice is due upon receipt. Wire payment should be made to the account of White & Case LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-000021/Swift Code: CHASUS33). For proper crediting the wire must reference 1109065-0028 COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028 COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE LLP, 23802 Network Place, Chicago, IL 60673-1238.

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5605970

November 30, 2008
Invoice No. 890350

### REMITTANCE COPY

re:  LEHMAN
Ref. No. 1109065-0028

**FOR PROFESSIONAL SERVICES RENDERED** in connection with the
above-referenced matter for the period ending November 30, 2008          $          31,085.50

COSTS AND DISBURSEMENTS                                                           605.54

TOTAL DUE                                                                 $          31,691.04

### PAYMENT INSTRUCTIONS

This invoice is due upon receipt. Wire payment should be made to the account of White & Case LLP,
Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-
000021/Swift Code: CHASUS33). For proper crediting the wire must reference 1109065-0028
COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028
COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE
LLP, 23802 Network Place, Chicago, IL 60673-1238.

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5605970

December 31, 2008
Invoice No. 893725

## REMITTANCE COPY

re:  LEHMAN
Ref. No. 1109065-0028

| | | |
|---|---|---:|
| **FOR PROFESSIONAL SERVICES RENDERED** in connection with the above-referenced matter for the period ending December 31, 2008 | $ | 19,377.00 |
| COSTS AND DISBURSEMENTS | | 92.02 |
| TOTAL DUE | $ | 19,469.02 |

## PAYMENT INSTRUCTIONS

This invoice is due upon receipt. Wire payment should be made to the account of White & Case LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-000021/Swift Code: CHASUS33). For proper crediting the wire must reference 1109065-0028 COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028 COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE LLP, 23802 Network Place, Chicago, IL 60673-1238.

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5605970

January 31, 2009
Invoice No. 896478

**REMITTANCE COPY**

re: LEHMAN
Ref. No. 1109065-0028

|  |  |  |
|---|---|---|
| **FOR PROFESSIONAL SERVICES RENDERED** in connection with the above-referenced matter for the period ending January 31, 2009 | $ | 19,364.50 |
| COSTS AND DISBURSEMENTS |  | 210.75 |
| TOTAL DUE | $ | 19,575.25 |

**PAYMENT INSTRUCTIONS**

This invoice is due upon receipt. Wire payment should be made to the account of White & Case LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-000021/Swift Code: CHASUS33). For proper crediting the wire must reference 1109065-0028 COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028 COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE LLP, 23802 Network Place, Chicago, IL 60673-1238.

HC2

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5605970

February 28, 2009
Invoice No. 900640

## REMITTANCE COPY

re:  LEHMAN
Ref. No. 1109065-0028

| | | |
|---|---|---|
| **FOR PROFESSIONAL SERVICES RENDERED** in connection with the above-referenced matter for the period ending February 28, 2009 | $ | 13,531.50 |
| COSTS AND DISBURSEMENTS | | 30.52 |
| TOTAL DUE | $ | 13,562.02 |

## PAYMENT INSTRUCTIONS

This invoice is due upon receipt. Wire or ACH payment should be made to the account of White & Case LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-000021/Swift Code: CHASUS33). For proper crediting the wire/ACH must reference 1109065-0028 COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028 COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE LLP, 23802 Network Place, Chicago, IL 60673-1238.

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5605970

March 31, 2009
Invoice No. 903412

**REMITTANCE COPY**

re: LEHMAN
Ref. No. 1109065-0028

| | | |
|---|---|---|
| **FOR PROFESSIONAL SERVICES RENDERED** in connection with the above-referenced matter for the period ending March 31, 2009 | $ | 5,423.50 |
| COSTS AND DISBURSEMENTS | | 588.30 |
| TOTAL DUE | $ | 6,011.80 |

## PAYMENT INSTRUCTIONS

This invoice is due upon receipt. Wire or ACH payment should be made to the account of White & Case LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-000021/Swift Code: CHASUS33). For proper crediting the wire/ACH must reference 1109065-0028 COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028 COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE LLP, 23802 Network Place, Chicago, IL 60673-1238.

AC2

## WHITE & CASE

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5629870

April 30, 2009
Invoice No. 906969

### REMITTANCE COPY

re:  LEHMAN
Ref. No. 1109065-0028

**FOR PROFESSIONAL SERVICES RENDERED** in connection with the
above-referenced matter for the period ending April 30, 2009          $          3,677.00

COSTS AND DISBURSEMENTS                                                            40.14

TOTAL DUE                                                              $          3,717.14

### PAYMENT INSTRUCTIONS

This invoice is due upon receipt. Wire or ACH payment should be made to the account of White & Case
LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No.
021-000021/Swift Code: CHASUS33). For proper crediting the wire/ACH must reference 1109065-0028
COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028
COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE
LLP, 23802 Network Place, Chicago, IL 60673-1238.

\A L2

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5805970

May 31, 2009
Invoice No. 910294

REMITTANCE COPY

re: LEHMAN
Ref. No. 1109065-0028

| | | |
|---|---|---|
| **FOR PROFESSIONAL SERVICES RENDERED** in connection with the above-referenced matter for the period ending May 31, 2009 | $ | 2,616.00 |
| COSTS AND DISBURSEMENTS | | 258.82 |
| TOTAL DUE | $ | 2,874.82 |

## PAYMENT INSTRUCTIONS

This invoice is due upon receipt. Wire or ACH payment should be made to the account of White & Case LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-000021/Swift Code: CHASUS33). For proper crediting the wire/ACH must reference 1109065-0028 COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028 COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE LLP, 23802 Network Place, Chicago, IL 60673-1238.

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5605970

June 30, 2009
Invoice No. 913152

**REMITTANCE COPY**

re: LEHMAN
Ref. No. 1109065-0028

| | | |
|---|---|---|
| **FOR PROFESSIONAL SERVICES RENDERED** in connection with the above-referenced matter for the period ending June 30, 2009 | $ | 5,645.50 |
| COSTS AND DISBURSEMENTS | | 45.98 |
| TOTAL DUE | $ | 5,691.48 |

## PAYMENT INSTRUCTIONS

This invoice is due upon receipt. Wire or ACH payment should be made to the account of White & Case LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-000021/Swift Code: CHASUS33). For proper crediting the wire/ACH must reference 1109065-0028 COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028 COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE LLP, 23802 Network Place, Chicago, IL 60673-1238.

WHITE & CASE

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5605970

July 31, 2009
Invoice No. 915058

### REMITTANCE COPY

re:  LEHMAN
Ref. No. 1109065-0028

**FOR PROFESSIONAL SERVICES RENDERED** in connection with the above-referenced matter for the period ending July 31, 2009      $      8,553.50

COSTS AND DISBURSEMENTS      280.59

TOTAL DUE      $      8,834.09

### PAYMENT INSTRUCTIONS

This invoice is due upon receipt. Wire or ACH payment should be made to the account of White & Case LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-000021/Swift Code: CHASUS33). For proper crediting the wire/ACH must reference 1109065-0028 COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028 COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE LLP, 23802 Network Place, Chicago, IL 60673-1238.

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5605970

September 4, 2009
Invoice No. 916620

## REMITTANCE COPY

re: LEHMAN
Ref. No. 1109065-0028

| | | |
|---|---|---|
| **FOR PROFESSIONAL SERVICES RENDERED** in connection with the above-referenced matter for the period ending September 4, 2009 | $ | 24,518.00 |
| COSTS AND DISBURSEMENTS | | 205.02 |
| TOTAL DUE | $ | 24,723.02 |

## PAYMENT INSTRUCTIONS

This invoice is due upon receipt. Wire or ACH payment should be made to the account of White & Case LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-000021/Swift Code: CHASUS33). For proper crediting the wire/ACH must reference 1109065-0028 COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028 COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE LLP, 23802 Network Place, Chicago, IL 60673-1238.

H
A
N
D

D
E
L
I
V
E
R
Y

**FILED / RECEIVED**

SEP 2 2 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

_Lis Novaz_

**RECEIVED BY:**

**DATE**

12:09

**TIME**

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

| In Re: Lehman Brothers Holdings Inc., et al. Debtors. | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) |
|---|---|

| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
|---|---|
| Lehman Brothers Holdings Inc. | 08-13555 |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (see definition on reverse side.)

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)        0000027840

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

**Commerzbank AG, New York and Grand Cayman Branches**
Attn: Michael Fruchter
2 World Financial Center
New York, NY 10281-1050

Telephone number: **(212) 266-7230**  Email Address: mfruchter@cbkna.com

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number:
  (*If known*)

Filed on: _____

Name and address where payment should be sent (if different from above):

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:       Email Address:

**1.** Amount of Claim as of Date Case Filed: $ 200,281,614.95 (See Annex A)
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to administrative priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☑ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

**2.** Basis for Claim: See Annex A
(See instruction #2 on reverse side.)

**3.** Last four digits of any number by which creditor identifies debtor: _____
  3a. Debtor may have scheduled account as: _____
  (See instruction #3a on reverse side.)

**4.** Secured Claim (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe: See Annex A
Value of Property: $ _____ Annual Interest Rate _____ %
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$ _____ Basis for perfection: _____
Amount of Secured Claim: $ See Annex A   Amount Unsecured: $ 207,518,817.36 (See Annex A)

**6.** Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $ 0
(See instruction #6 on reverse side.)

**5.** Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

Amount entitled to priority:

$ See Annex A

**7.** Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8.** Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:
See Annex A

FOR COURT USE ONLY
**FILED / RECEIVED**
SEP 22 2009
EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date: 9/21/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. [signature] AVP Michael P. McCarthy, SVP |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

**Items to be completed in Proof of Claim form**

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 13-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9)**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

___DEFINITIONS___

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:
Lehman Brothers Holdings Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150- 5076

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured Claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the
initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

**Lehman Programs Securities**
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on http://www.lehman-docket.com as of July 27, 2009.

___INFORMATION___

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), and applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

LEHMAN BROTHERS HOLDINGS INC.,
*et al.*

Debtor.

Chapter 11 Case No.

08-13555 (JMP)

ANNEX A TO PROOF OF CLAIM OF
COMMERZBANK AG, NEW YORK AND GRAND CAYMAN BRANCHES


1.    Claimant.  Commerzbank AG, New York and Grand Cayman Branches (the

"Claimant") is filing this proof of claim against Lehman Brothers Holdings Inc. (the "Debtor")

as holder of a claim against the Debtor arising from certain prepetition transactions between the

Claimant and the Debtor described more fully below.

2.    Transactions Between the Parties.  The Claimant and Lehman Brothers Bankhaus,

AG ("Bankhaus"), a wholly-owned subsidiary of the Debtor, were parties to a Master

Repurchase Agreement dated as of November 29, 2004 (the "Master Repurchase Agreement")

and the 7th Avenue Notes Addendum thereto dated as of November 29, 2004 (the "7th Avenue

Notes Addendum, and together with the Master Repurchase Agreement, the "Master

Agreement"), under which the Claimant, as Buyer, and Bankhaus, as Seller, entered into a letter

agreement dated December 8, 2004 (the "Confirmation," and together with the Master

Agreement, the "Repo Agreement").[1]  The Confirmation represented the only Transaction under

the Repo Agreement, a transfer of $200,000,000 original face amount 7th Avenue Inc. Series 2

---

[1] Capitalized terms not otherwise defined herein carry the meanings ascribed to them in the Repo Agreement. The
Repo Agreement is attached hereto as Exhibit A.

USD200,000,000 Floating Rate Secured Notes due 2008 (ISIN: XS020601; Common Code: 020601728) maturing on December 8, 2008 (the "Notes")[2] from Bankhaus to the Claimant in exchange for the Purchase Price ($200,000,000[3]) and a contractual promise from Bankhaus under the Repo Agreement that it would repurchase the Notes on the Repurchase Date for the Repurchase Price.

3.    The Notes were constituted as of December 8, 2004, and are governed and secured by a Master Trust Deed, dated as of September 12, 2002, a Supplemental Trust Deed, dated as of December 8, 2004, and a First Supplemental Trust Deed, dated as of December 23, 2004 (together, the "Trust Deed"), each between the 7th Avenue Inc. (the "Issuer") and HSBC Trustee (C.I.) Limited, as trustee (in such capacity, the "Deed Trustee").

4.    The primary security available under the Trust Deed (the "Trust Deed Collateral") is the Issuer's rights and interests in a Term Loan Agreement, dated as of December 8, 2004 (the "Loan Agreement"), among the Issuer, as lender, Lehman Brothers Special Financing Inc. ("LBSF"), as borrower, and the Deed Trustee as trustee, and a related Security Agreement, dated December 8, 2004 (the "Security Agreement"), among the Issuer, as secured party, LBSF, as debtor, and the Deed Trustee, as trustee, to whom the security interest created by the Security Agreement was assigned.

5.    Pursuant to the Security Agreement, LBSF's obligations under the Loan Agreement are secured by, among other things, a security interest in LBSF's rights, title and interest in, to and under certain ISDA Master Agreements (each a "Contract," collectively the "Contracts," and together with the transactions thereunder and the proceeds thereof, the "Collateral"). Pursuant to the Trust Deed, the Issuer's rights, title and interest in the Collateral

---

[2] *See* Confirmation, Transaction Term 11.
[3] *See* Confirmation, Transaction Term 5.

2

were pledged to, and exercisable by, the Deed Trustee for the benefit of the Claimant as the sole beneficial owner of the Notes.[4]

6.       The Debtor guaranteed prompt payment of Bankhaus' obligations under the Repo Agreement in respect of any Transaction (as defined therein) not exceeding $200,000,000 (plus payment of expenses (including the reasonable fees and expenses of counsel) incurred by the Claimant in enforcing or protecting its obligations under such guarantee) pursuant to a written guarantee dated as of November 29, 2004 (the "2004 Guarantee").[5]

7.       The Debtor also guaranteed payment of all Bankhaus' obligations under the Repo Agreement pursuant to a written of guarantee dated as of November 21, 2002 (the "2002 Guarantee," and together with the 2004 Guarantee, the "Guarantees").[6]

8.       On September 15, 2008, the Debtor commenced this case by filing a voluntary petition under chapter 11 of the United States Bankruptcy Code, and Bankhaus' regulator, the German Federal Financial Supervisory Authority (*Bundesanstalt für Finanzdienleistungsaufsicht*, the "BaFin"), issued a moratorium order under Section 46a of the German Banking Act (*Kreditwesengesetz*). Pursuant to the moratorium, Bankhaus was prohibited from, among other things, disposing of any assets and making any payments to its creditors. Such filing by the Debtor (and the moratorium order in respect of Bankhaus) constituted Events of Default under the Repo Agreement which caused the Repurchase Date to occur thereunder.

9.       On July 2, 2009, this Court entered an order establishing the deadline to file proofs of claim against the Debtor (the "Bar Date Order"). This Proof of Claim is being

---

[4] By a Deed of Assignment dated as of February 13, 2009 among the Issuer, the Deed Trustee and the Claimant, all rights, title and interest of the Issuer and the Deed Trustee in and to the Loan Agreement, Security Agreement and Collateral have been assigned to the Claimant.
[5] A copy of the 2004 Guarantee is attached hereto as Exhibit B.
[6] A copy of the 2002 Guarantee is attached hereto as Exhibit C.

3

submitted pursuant to the Bar Date Order. In connection with the Proof of Claim, the Claimant
is submitting a Guarantee Questionnaire (as defined in the Bar Date Order).

10.     On November 12, 2008, the BaFin filed an application for the opening of
insolvency proceedings respecting Bankhaus with the insolvency court at the Frankfurt Lower
District Court *(Amtsgericht Frankfurt am Main)* (the "German Court"), which opened such
insolvency proceedings on November 13, 2008 (the "*Insolvenzverfahren*").

11.     By letter dated April 3, 2009, the Claimant filed a proof of claim with the German
Court-appointed administrator in the *Insolvenzverfahren*.[7]

12.     The Claimant remains the holder and owner of the Notes (through Clearstream
Banking, Société Anonyme) and has received no payments thereon.

13.     Claim.

        a.  The Debtor's commencement of its bankruptcy proceeding constituted an Act
            of Insolvency under Paragraph 2(a) of the Master Repurchase Agreement, as
            modified by Paragraph 4 of the 7th Avenue Notes Addendum. Pursuant to
            Paragraph 11(b) of the Master Repurchase Agreement, upon the occurrence of
            such Act of Insolvency (i) an Event of Default was deemed to have been
            declared by the Claimant under the Master Repurchase Agreement, (ii) the
            Repurchase Date was deemed to have occurred and (iii) the Repurchase Price
            payable by Bankhaus in respect of the Notes became immediately due and
            payable.[8]

---

[7] A copy of such letter, together with an English translation, will be uploaded on the Debtor's claim agent's website.
[8] *See* Master Repurchase Agreement para. 11(a).

b.  The Repurchase Price for the Notes is the sum of the Purchase Price "plus any accrued and unpaid Price Differential then outstanding at the time of the Repurchase Date."[9]

c.  The **Purchase Price** is the "price at which the Purchased Securities [the Notes] are transferred by Seller to Buyer,"[10] i.e., **$200,000,000.**[11]

d.  The Price Differential is the aggregate amount obtained by daily application of the Pricing Rate for a Transaction to the Purchase Price for such Transaction on a 360 day per year basis for the actual number of days during the period commencing on (and including) the Purchase Date (December 8, 2004[12]) for such Transaction and ending on (but excluding) the date of determination (i.e., September 15, 2008, the Repurchase Date) reduced by any amount of such Price Differential previously paid by Seller to Buyer with respect to such Transaction.[13]  The Pricing Rate is the Fed Funds (Open) + 0.90%.[14]  The Fed Funds (Open) is set on a daily basis, normally as "displayed on Reuters screen RTRTSY1, or any successor service or page[.]"[15]  The Price Differential was paid through Friday, August 29, 2008. The **total accrued and unpaid Price Differential** as of (but excluding) September 15, 2008 was **$281,614.95**[16] Thus, the **Repurchase Price** is **$200,281,614.95.**[17]

---

[9] *See* Confirmation, Transaction Term 10.
[10] *See* Master Repurchase Agreement para. 2(o).
[11] *See* Confirmation, Transaction Term 5.
[12] *See* Confirmation, Transaction Term 6.
[13] *See* Master Repurchase Agreement para. 2(k).
[14] *See* Confirmation, Transaction Term 12 (as amended).
[15] *See* Confirmation, Transaction Term 12.
[16] *See* Price Differential Calculation, Exhibit D.
[17] I.e., $200,000,000.00 + $281,614.95.

5

e. Pursuant to Paragraph 11(d) of the Master Repurchase Agreement, Bankhaus
   is entitled to a credit for the value of the Notes "in an amount equal to the
   price therefor on such date [i.e., September 15, 2008, the Repurchase Date],
   obtained from a generally recognized source or the most recent closing bid
   quotation from such a source, against the aggregate unpaid Repurchase Price
   and any other amounts owing" under the Repo Agreement.  In the absence of
   a "generally recognized source for prices or bid or offer quotations, the
   nondefaulting party may establish the source therefor in its sole
   discretion . . . ."[18]

f. There was no "generally recognized source" for prices for, or bids on, the
   Notes on September 15, 2008 or at any time after that date, and it was
   otherwise impossible to price the Notes because the sole source of payments
   on the Notes was the Collateral therefor, and the value of such Collateral (the
   Issuer's claim against LBSF in respect of the loans made to LBSF by the
   Issuer, and the collateral for such loans) was difficult to determine.
   Accordingly the Claimant established itself as the source for valuation, and
   (for purposes of the credit to be given to Bankhaus on September 15, 2008
   against the Repurchase Price required to be paid by Bankhaus to Claimant on
   such date under the Repo agreement) the Claimant valued the Notes at zero.

g. The Claimant is also entitled to interest on the unpaid amounts owing by
   Bankhaus from the Repurchase Date until they are paid in full.[19]  Such interest
   is payable at a rate per annum equal to the greater of the Pricing Rate

---

[18] Master Repurchase Agreement para. 11(d).
[19] Master Repurchase Agreement para. 11(h).

6

(discussed above) or the Prime Rate, which is "the prime rate of U.S. commercial banks as published in the Wall Street Journal (or, if more than one such rate is published, the average of such rates)."[20] Such interest has been accruing on the Repurchase Price since September 15, 2008, remains unpaid and continues to accrue. As of September 14, 2009 the amount of such **accrued interest** is **$7,046,954.87**.[21]

h.    In addition, the Claimant is entitled to the "(i) the amount of all reasonable legal or other expenses incurred by [the Claimant] in connection with or as a result of [the] Event of Default, (ii) damages in an amount equal to the cost (including all fees, expenses and commissions) of entering into a replacement transactions and entering into or terminating hedge transactions in connection with or as a result of an Event of Default, and (iii) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default in respect of a Transaction."[22] These **fees, losses, damages, costs and expenses**, all of which accrued after the Petition Date and are summarized in Exhibit F, total **$190,247.54** through September 14, 2009.[23]

i.    Accordingly, the amount owed to the Claimant by Bankhaus under the Repo Agreement and covered by the Guarantees of the Debtor, plus additional amounts owing to Claimant by the Debtor under the Guarantees for out of pocket expenses in connection with the Guarantees, total not less than **$207,518,817.36**, namely the Repurchase price of **$200,281,614.95,** plus

---

[20] Master Repurchase Agreement para. 2(m).
[21] The interest calculations are summarized in Exhibit E.
[22] Master Repurchase Agreement para. 11(g).
[23] The costs and expenses shown above are a 50 percent allocation of the total costs and expenses that have arisen in connection with this Claim and the related claims against LBSF.

accrued interest thereon through September 14, 2009 of **$7,046,954.87** plus

legal fees and other losses, costs and expenses of the Claimant accrued

through September 14, 2009 of **$190,247.54** (such amount, together with

subsequently accruing interest and subsequently incurred losses, costs and

expenses, the "Claim"). As of the Petition Date, the Claim was

$200,218,614.95 plus losses, costs and expenses.

14. Supporting Documents. Copies of the Repo Agreement, the 2004 Guarantee, the 2002 Guarantee, a Price Differential calculation, an interest calculation, and a losses/expenses calculation are attached hereto as Exhibits A – F, respectively. Copies of the proof of claim filed in the *Insolvenzverfahren* (with an English translation), and other supporting documentation will be attached to the Guaranty Questionnaire being submitted in connection with this Proof of Claim.

15. Judgments. No judgment has been rendered on the Claim.

16. Credit and Setoffs. The Claim is not subject to any setoffs, defenses or counterclaims by the Debtor or any of its affiliates. In the event the distributions received by the Claimant in the insolvency proceedings of Bankhaus plus the value of the distributions received by Claimant in respect of the Claim exceed the total amount of the Claim, Claimant will so advise the Debtor and will remit such excess to the Debtor.

17. Security Interests and Priority Status. The Claim is filed (i) as a secured claim to the extent of the value of any right of setoff and (ii) as a general unsecured claim to the extent of the remaining amount of the Claim, without any prejudice to any and all rights of the Claimant to assert that any portion of the Claim is entitled to administrative priority under Sections 503 and 507 of the Bankruptcy Code.

8

18.    <u>Reservation of Rights</u>.  The execution and filing of this proof of claim is not and shall not be deemed: (a) a waiver or release of the Claimant's rights against any other entity or person liable for all or any part of the Claim asserted herein; (b) a consent by the Claimant to the jurisdiction of this Court with respect to any proceeding commenced in this case against or otherwise involving the Claimant; (c) a waiver of the right to withdraw the reference with respect to the subject matter of the Claim, any objection or other proceedings commenced with respect thereto or any other proceedings commenced in this case against or otherwise involving the Claimant; (d) a waiver or release by the Claimant of any right to trial by jury, or a consent by the Claimant to a trial by jury, in this Court or any other court; (e) a waiver of any right to the subordination or recharacterization, in favor of the Claimant, of indebtedness or liens held by any creditors of the Debtor or any of its affiliates; or (f) an election of remedies which waives or otherwise affects any other remedy.

19.    <u>Amendments</u>.  The Claimant expressly reserves its right to file any separate or additional proof of claim with respect to the Claim set forth herein or otherwise (which proof of claim, if so filed, shall not be deemed to supersede this proof of claim unless expressly so stated therein), to amend or supplement this proof of claim in any respect, including with respect to the filing of an additional or amended claim for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

9

20.     Notice. All notices in respect of this claim should be forwarded to:

COMMERZBANK AG,
New York and Grand Cayman Branches
Attn: Michael Fruchter
2 World Financial Center
New York, NY 10281-1050

with copy to:

WHITE & CASE LLP
Attn: Abraham L. Zylberberg
1155 Avenue of the Americas
New York, New York 10036.

Dated: September 21, 2009
        New York

                    COMMERZBANK AG,
                    New York and Grand Cayman Branches

By: _____
     Name:   Michele Woessner-Larkin
             Assistant Vice President

By: _____
     Name:   Michael P. McCarthy
             Senior Vice President

Penalty for Presenting a Fraudulent Claim. Fine of not more than $500,000.00 or imprisonment of not more than five years or both – Title 18, U.S.C. §§ 152 and 3571.

## __EXHIBIT A__

REPO AGREEMENT



# Master Repurchase Agreement

September 1996 Version

Dated as of **November 29, 2004**

Between: **Lehman Brothers Bankhaus AG**

and **Commerzbank AG, New York and Grand Cayman Branches**

*[complete legal name of counterparty]*

## 1. Applicability

From time to time the parties hereto may enter into transactions in which one party ("Seller") agrees to transfer to the other ("Buyer") securities or other assets ("Securities") against the transfer of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such Securities at a date certain or on demand, against the transfer of funds by Seller. Each such transaction shall be referred to herein as a "Transaction" and, unless otherwise agreed in writing, shall be governed by this Agreement, including any supplemental terms or conditions contained in Annex I hereto and in any other annexes identified herein or therein as applicable hereunder.

## 2. Definitions

(a) "Act of Insolvency", with respect to any party, (i) the commencement by such party as debtor of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency or similar law, or such party seeking the appointment or election of a receiver, conservator, trustee, custodian or similar official for such party or any substantial part of its property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the commencement of any such case or proceeding against such party, or another seeking such an appointment or election, or the filing against a party of an application for a protective decree under the provisions of the Securities Investor Protection Act of 1970, which (A) is consented to or not timely contested by such party, (B) results in the entry of an order for relief, such an appointment or election, the issuance of such a protective decree or the entry of an order having a similar effect, or (C) is not dismissed within 15 days, (iii) the making by such party of a general assignment for the benefit of creditors, or (iv) the admission in writing by such party of such party's inability to pay such party's debts as they become due;

(b) "Additional Purchased Securities", Securities provided by Seller to Buyer pursuant to Paragraph 4(a) hereof;

(c) "Buyer's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(d) "Buyer's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Seller's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction;

(e) "Confirmation", the meaning specified in Paragraph 3(b) hereof;

(f) "Income", with respect to any Security at any time, any principal thereof and all interest, dividends or other distributions thereon;

(g) "Margin Deficit", the meaning specified in Paragraph 4(a) hereof;

(h) "Margin Excess", the meaning specified in Paragraph 4(b) hereof;

(i) "Margin Notice Deadline", the time agreed to by the parties in the relevant Confirmation, Annex I hereto or otherwise as the deadline for giving notice requiring same-day satisfaction of margin maintenance obligations as provided in Paragraph 4 hereof (or, in the absence of any such agreement, the deadline for such purposes established in accordance with market practice);

(j) "Market Value", with respect to any Securities as of any date, the price for such Securities on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein (other than any Income credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) as of such date (unless contrary to market practice for such Securities);

(k) "Price Differential", with respect to any Transaction as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction on a 360 day per year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the date of determination (reduced by any amount of such Price Differential previously paid by Seller to Buyer with respect to such Transaction);

(l) "Pricing Rate", the per annum percentage rate for determination of the Price Differential;

(m) "Prime Rate", the prime rate of U.S. commercial banks as published in The Wall Street Journal (or, if more than one such rate is published, the average of such rates);

(n) "Purchase Date", the date on which Purchased Securities are to be transferred by Seller to Buyer;

(o) "Purchase Price", (i) on the Purchase Date, the price at which Purchased Securities are transferred by Seller to Buyer, and (ii) thereafter, except where Buyer and Seller agree otherwise, such price increased by the amount of any cash transferred by Buyer to Seller pursuant to Paragraph 4(b) hereof and decreased by the amount of any cash transferred by Seller to Buyer pursuant to Paragraph 4(a) hereof or applied to reduce Seller's obligations under clause (ii) of Paragraph 5 hereof;

(p) "Purchased Securities", the Securities transferred by Seller to Buyer in a Transaction hereunder, and any Securities substituted therefor in accordance with Paragraph 9 hereof. The term "Purchased Securities" with respect to any Transaction at any time also shall include Additional Purchased Securities delivered pursuant to Paragraph 4(a) hereof and shall exclude Securities returned pursuant to Paragraph 4(b) hereof;

(q) "Repurchase Date", the date on which Seller is to repurchase the Purchased Securities from Buyer, including any date determined by application of the provisions of Paragraph 3(c) or 11 hereof;

(r) "Repurchase Price", the price at which Purchased Securities are to be transferred from Buyer to Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price and the Price Differential as of the date of such determination;

(s) "Seller's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Seller's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(t) "Seller's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Buyer's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction.

## 3. Initiation; Confirmation; Termination

(a) An agreement to enter into a Transaction may be made orally or in writing at the initiation of either Buyer or Seller. On the Purchase Date for the Transaction, the Purchased Securities shall be transferred to Buyer or its agent against the transfer of the Purchase Price to an account of Seller.

(b) Upon agreeing to enter into a Transaction hereunder, Buyer or Seller (or both), as shall be agreed, shall promptly deliver to the other party a written confirmation of each Transaction (a "Confirmation"). The Confirmation shall describe the Purchased Securities (including CUSIP number, if any), identify Buyer and Seller and set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date, unless the Transaction is to be terminable on demand, (iv) the Pricing Rate or Repurchase Price applicable to the Transaction, and (v) any additional terms or conditions of the Transaction not inconsistent with this Agreement. The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and Seller with respect to the Transaction to which the Confirmation relates, unless with

respect to the Confirmation specific objection is made promptly after receipt thereof. In the event of any conflict between the terms of such Confirmation and this Agreement, this Agreement shall prevail.

(c) In the case of Transactions terminable upon demand, such demand shall be made by Buyer or Seller, no later than such time as is customary in accordance with market practice, by telephone or otherwise on or prior to the business day on which such termination will be effective. On the date specified in such demand, or on the date fixed for termination in the case of Transactions having a fixed term, termination of the Transaction will be effected by transfer to Seller or its agent of the Purchased Securities and any Income in respect thereof received by Buyer (and not previously credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) against the transfer of the Repurchase Price to an account of Buyer.

## 4. Margin Maintenance

(a) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer is less than the aggregate Buyer's Margin Amount for all such Transactions (a "Margin Deficit"), then Buyer may by notice to Seller require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional Securities reasonably acceptable to Buyer ("Additional Purchased Securities"), so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller).

(b) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Seller exceeds the aggregate Seller's Margin Amount for all such Transactions at such time (a "Margin Excess"), then Seller may by notice to Buyer require Buyer in such Transactions, at Buyer's option, to transfer cash or Purchased Securities to Seller, so that the aggregate Market Value of the Purchased Securities, after deduction of any such cash or any Purchased Securities so transferred, will thereupon not exceed such aggregate Seller's Margin Amount (increased by the amount of any Margin Excess as of such date arising from any Transactions in which such Seller is acting as Buyer).

(c) If any notice is given by Buyer or Seller under subparagraph (a) or (b) of this Paragraph at or before the Margin Notice Deadline on any business day, the party receiving such notice shall transfer cash or Additional Purchased Securities as provided in such subparagraph no later than the close of business in the relevant market on such day. If any such notice is given after the Margin Notice Deadline, the party receiving such notice shall transfer such cash or Securities no later than the close of business in the relevant market on the next business day following such notice.

(d) Any cash transferred pursuant to this Paragraph shall be attributed to such Transactions as shall be agreed upon by Buyer and Seller.

(e) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer or Seller (or both) under subparagraphs (a) and (b) of this Paragraph may be exercised only where a Margin Deficit or Margin Excess, as the case may be, exceeds a specified dollar amount or a specified percentage of the Repurchase Prices for such Transactions (which amount or percentage shall be agreed to by Buyer and Seller prior to entering into any such Transactions).

(f) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer and Seller under subparagraphs (a) and (b) of this Paragraph to require the elimination of a Margin Deficit or a Margin Excess, as the case may be, may be exercised whenever such a Margin Deficit or Margin Excess exists with respect to any single Transaction hereunder (calculated without regard to any other Transaction outstanding under this Agreement).

## 5.  Income Payments

Seller shall be entitled to receive an amount equal to all Income paid or distributed on or in respect of the Securities that is not otherwise received by Seller, to the full extent it would be so entitled if the Securities had not been sold to Buyer. Buyer shall, as the parties may agree with respect to any Transaction (or, in the absence of any such agreement, as Buyer shall reasonably determine in its discretion), on the date such Income is paid or distributed either (i) transfer to or credit to the account of Seller such Income with respect to any Purchased Securities subject to such Transaction or (ii) with respect to Income paid in cash, apply the Income payment or payments to reduce the amount, if any, to be transferred to Buyer by Seller upon termination of such Transaction. Buyer shall not be obligated to take any action pursuant to the preceding sentence (A) to the extent that such action would result in the creation of a Margin Deficit, unless prior thereto or simultaneously therewith Seller transfers to Buyer cash or Additional Purchased Securities sufficient to eliminate such Margin Deficit, or (B) if an Event of Default with respect to Seller has occurred and is then continuing at the time such Income is paid or distributed.

## 6.  Security Interest

Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, Seller shall be deemed to have pledged to Buyer as security for the performance by Seller of its obligations under each such Transaction, and shall be deemed to have granted to Buyer a security interest in, all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof.

## 7.  Payment and Transfer

Unless otherwise mutually agreed, all transfers of funds hereunder shall be in immediately available funds. All Securities transferred by one party hereto to the other party (i) shall be in suitable form for transfer or shall be accompanied by duly executed instruments of transfer or assignment in blank and such other documentation as the party receiving possession may reasonably request, (ii) shall be transferred on the book-entry system of a Federal Reserve Bank, or (iii) shall be transferred by any other method mutually acceptable to Seller and Buyer.

## 8. Segregation of Purchased Securities

To the extent required by applicable law, all Purchased Securities in the possession of Seller shall be segregated from other securities in its possession and shall be identified as subject to this Agreement. Segregation may be accomplished by appropriate identification on the books and records of the holder, including a financial or securities intermediary or a clearing corporation. All of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities, but no such transaction shall relieve Buyer of its obligations to transfer Purchased Securities to Seller pursuant to Paragraph 3, 4 or 11 hereof, or of Buyer's obligation to credit or pay Income to, or apply Income to the obligations of, Seller pursuant to Paragraph 5 hereof.

---

### Required Disclosure for Transactions in Which the Seller Retains Custody of the Purchased Securities

Seller is not permitted to substitute other securities for those subject to this Agreement and therefore must keep Buyer's securities segregated at all times, unless in this Agreement Buyer grants Seller the right to substitute other securities. If Buyer grants the right to substitute, this means that Buyer's securities will likely be commingled with Seller's own securities during the trading day. Buyer is advised that, during any trading day that Buyer's securities are commingled with Seller's securities, they [will]* [may]** be subject to liens granted by Seller to [its clearing bank]* [third parties]** and may be used by Seller for deliveries on other securities transactions. Whenever the securities are commingled, Seller's ability to resegregate substitute securities for Buyer will be subject to Seller's ability to satisfy [the clearing]* [any]** lien or to obtain substitute securities.

* Language to be used under 17 C.F.R. B403.4(e) if Seller is a government securities broker or dealer other than a financial institution.
** Language to be used under 17 C.F.R. B403.5(d) if Seller is a financial institution.

---

## 9. Substitution

(a) Seller may, subject to agreement with and acceptance by Buyer, substitute other Securities for any Purchased Securities. Such substitution shall be made by transfer to Buyer of such other Securities and transfer to Seller of such Purchased Securities. After substitution, the substituted Securities shall be deemed to be Purchased Securities.

(b) In Transactions in which Seller retains custody of Purchased Securities, the parties expressly agree that Buyer shall be deemed, for purposes of subparagraph (a) of this Paragraph, to have agreed to and accepted in this Agreement substitution by Seller of other Securities for Purchased Securities; provided, however, that such other Securities shall have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.

## 10. Representations

Each of Buyer and Seller represents and warrants to the other that (i) it is duly authorized to execute and deliver this Agreement, to enter into Transactions contemplated hereunder and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery and performance, (ii) it will engage in such Transactions as principal (or, if agreed in writing, in the form of an annex hereto or otherwise, in advance of any Transaction by the other party hereto, as agent for a disclosed principal), (iii) the person signing this Agreement on its behalf is duly authorized to do so on its behalf (or on behalf of any such disclosed principal), (iv) it has obtained all authorizations of any governmental body required in connection with this Agreement and the Transactions hereunder and such authorizations are in full force and effect and (v) the execution, delivery and performance of this Agreement and the Transactions hereunder will not violate any law, ordinance, charter, by-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected. On the Purchase Date for any Transaction Buyer and Seller shall each be deemed to repeat all the foregoing representations made by it.

## 11. Events of Default

In the event that (i) Seller fails to transfer or Buyer fails to purchase Purchased Securities upon the applicable Purchase Date, (ii) Seller fails to repurchase or Buyer fails to transfer Purchased Securities upon the applicable Repurchase Date, (iii) Seller or Buyer fails to comply with Paragraph 4 hereof, (iv) Buyer fails, after one business day's notice, to comply with Paragraph 5 hereof, (v) an Act of Insolvency occurs with respect to Seller or Buyer, (vi) any representation made by Seller or Buyer shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, or (vii) Seller or Buyer shall admit to the other its inability to, or its intention not to, perform any of its obligations hereunder (each an "Event of Default"):

(a) The nondefaulting party may, at its option (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), declare an Event of Default to have occurred hereunder and, upon the exercise or deemed exercise of such option, the Repurchase Date for each Transaction hereunder shall, if it has not already occurred, be deemed immediately to occur (except that, in the event that the Purchase Date for any Transaction has not yet occurred as of the date of such exercise or deemed exercise, such Transaction shall be deemed immediately canceled). The nondefaulting party shall (except upon the occurrence of an Act of Insolvency) give notice to the defaulting party of the exercise of such option as promptly as practicable.

(b) In all Transactions in which the defaulting party is acting as Seller, if the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, (i) the defaulting party's obligations in such Transactions to repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase Date determined in accordance with subparagraph (a) of this Paragraph, shall thereupon become immediately due and payable, (ii) all Income paid after such exercise or deemed exercise shall be retained by the nondefaulting party and applied to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder, and (iii) the defaulting party shall immediately deliver to the nondefaulting party any Purchased Securities subject to such Transactions then in the defaulting party's possession or control.

(c) In all Transactions in which the defaulting party is acting as Buyer, upon tender by the nondefaulting party of payment of the aggregate Repurchase Prices for all such Transactions, all right, title and interest in and entitlement to all Purchased Securities subject to such Transactions shall be deemed transferred to the nondefaulting party, and the defaulting party shall deliver all such Purchased Securities to the nondefaulting party.

(d) If the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, the nondefaulting party, without prior notice to the defaulting party, may:

(i) as to Transactions in which the defaulting party is acting as Seller, (A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source, against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder; and

(ii) as to Transactions in which the defaulting party is acting as Buyer, (A) immediately purchase, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, securities ("Replacement Securities") of the same class and amount as any Purchased Securities that are not delivered by the defaulting party to the nondefaulting party as required hereunder or (B) in its sole discretion elect, in lieu of purchasing Replacement Securities, to be deemed to have purchased Replacement Securities at the price therefor on such date, obtained from a generally recognized source or the most recent closing offer quotation from such a source.

Unless otherwise provided in Annex I, the parties acknowledge and agree that (1) the Securities subject to any Transaction hereunder are instruments traded in a recognized market, (2) in the absence of a generally recognized source for prices or bid or offer quotations for any Security, the nondefaulting party may establish the source therefor in its sole discretion and (3) all prices, bids and offers shall be determined together with accrued Income (except to the extent contrary to market practice with respect to the relevant Securities).

(e) As to Transactions in which the defaulting party is acting as Buyer, the defaulting party shall be liable to the nondefaulting party for any excess of the price paid (or deemed paid) by the nondefaulting party for Replacement Securities over the Repurchase Price for the Purchased Securities replaced thereby and for any amounts payable by the defaulting party under Paragraph 5 hereof or otherwise hereunder.

(f) For purposes of this Paragraph 11, the Repurchase Price for each Transaction hereunder in respect of which the defaulting party is acting as Buyer shall not increase above the

amount of such Repurchase Price for such Transaction determined as of the date of the exercise or deemed exercise by the nondefaulting party of the option referred to in sub-paragraph (a) of this Paragraph.

(g) The defaulting party shall be liable to the nondefaulting party for (i) the amount of all reasonable legal or other expenses incurred by the nondefaulting party in connection with or as a result of an Event of Default, (ii) damages in an amount equal to the cost (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of an Event of Default, and (iii) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default in respect of a Transaction.

(h) To the extent permitted by applicable law, the defaulting party shall be liable to the non-defaulting party for interest on any amounts owing by the defaulting party hereunder, from the date the defaulting party becomes liable for such amounts hereunder until such amounts are (i) paid in full by the defaulting party or (ii) satisfied in full by the exercise of the nondefaulting party's rights hereunder. Interest on any sum payable by the default-ing party to the nondefaulting party under this Paragraph 11(h) shall be at a rate equal to the greater of the Pricing Rate for the relevant Transaction or the Prime Rate.

(i) The nondefaulting party shall have, in addition to its rights hereunder, any rights other-wise available to it under any other agreement or applicable law.

## 12. Single Agreement

Buyer and Seller acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, each of Buyer and Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the perfor-mance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder and (iii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.

## 13. Notices and Other Communications

Any and all notices, statements, demands or other communications hereunder may be given by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the address specified in Annex II hereto, or so sent to such party at any other place specified in a notice of change of address hereafter received by the other. All notices, demands and requests hereun-der may be made orally, to be confirmed promptly in writing, or by other communication as specified in the preceding sentence.

## 14. Entire Agreement; Severability

This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions. Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

## 15. Non-assignability; Termination

(a) The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by either party without the prior written consent of the other party, and any such assignment without the prior written consent of the other party shall be null and void. Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. This Agreement may be terminated by either party upon giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

(b) Subparagraph (a) of this Paragraph 15 shall not preclude a party from assigning, charging or otherwise dealing with all or any part of its interest in any sum payable to it under Paragraph 11 hereof.

## 16. Governing Law

This Agreement shall be governed by the laws of the State of New York without giving effect to the conflict of law principles thereof.

## 17. No Waivers, Etc.

No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure herefrom shall be effective unless and until such shall be in writing and duly executed by both of the parties hereto. Without limitation on any of the foregoing, the failure to give a notice pursuant to Paragraph 4(a) or 4(b) hereof will not constitute a waiver of any right to do so at a later date.

## 18. Use of Employee Plan Assets

(a) If assets of an employee benefit plan subject to any provision of the Employee Retirement Income Security Act of 1974 ("ERISA") are intended to be used by either party hereto (the "Plan Party") in a Transaction, the Plan Party shall so notify the other party prior to the Transaction. The Plan Party shall represent in writing to the other party that the Transaction does not constitute a prohibited transaction under ERISA or is otherwise exempt therefrom, and the other party may proceed in reliance thereon but shall not be required so to proceed.

(b) Subject to the last sentence of subparagraph (a) of this Paragraph, any such Transaction shall proceed only if Seller furnishes or has furnished to Buyer its most recent available audited statement of its financial condition and its most recent subsequent unaudited statement of its financial condition.

(c) By entering into a Transaction pursuant to this Paragraph, Seller shall be deemed (i) to represent to Buyer that since the date of Seller's latest such financial statements, there has been no material adverse change in Seller's financial condition which Seller has not disclosed to Buyer, and (ii) to agree to provide Buyer with future audited and unaudited statements of its financial condition as they are issued, so long as it is a Seller in any outstanding Transaction involving a Plan Party.

## 19. Intent

(a) The parties recognize that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Securities subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(b) It is understood that either party's right to liquidate Securities delivered to it in connection with Transactions hereunder or to exercise any other remedies pursuant to Paragraph 11 hereof is a contractual right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as amended.

(c) The parties agree and acknowledge that if a party hereto is an "insured depository institution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract," as that term is defined in FDIA and any rules, orders or policy statements thereunder (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(d) It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation", respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA).

## 20. Disclosure Relating to Certain Federal Protections

The parties acknowledge that they have been advised that:

(a) In the case of Transactions in which one of the parties is a broker or dealer registered with the Securities and Exchange Commission ("SEC") under Section 15 of the Securities Exchange Act of 1934 ("1934 Act"), the Securities Investor Protection Corporation has

taken the position that the provisions of the Securities Investor Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(b) in the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(c) in the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.

Lehman Brothers Bankhaus AG

By: _____

Name: Franz O. Zeik    Bormann

Title: Executive Director    Pro Kurist

Date: 12-6-2004    12-6-2004

Commerzbank AG, New York and Grand Cayman Branches

By: _____

Name: _____

Title: _____

Date: _____

taken the position that the provisions of the Securities Investor Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(b) in the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(c) in the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.

**Lehman Brothers Bankhaus AG**

By: _____

Name: _____

Title: _____

Date: _____

**Commerzbank AG, New York and Grand Cayman Branches**

By: _____

Name: _____
William M. Earley
Senior Vice President

Michael P. McCarthy
Vice President

Title: _____

Date: _____

Version of 29 Nov 04

**ANNEX I**
**Supplemental Terms and Conditions**

This Annex I forms a part of the Master Repurchase Agreement dated as of **November 29, 2004** (the "Agreement") between **Lehman Brothers Bankhaus AG** and **Commerzbank AG, New York and Grand Cayman Branches**.

Capitalized terms used but not defined in this Annex I shall have the meanings ascribed to them in the Agreement.

1.  In addition to this Annex I, Annex II shall be deemed executed by the parties hereto and shall also form a part of the Agreement.

2.  <u>Definitions</u>. For purposes of the Agreement, the following terms shall have the following meanings:

    (a) "Margin Notice Deadline", 10:00 am New York City time.

    (b) "Business Day" or "business day", with respect to any Transaction hereunder, a day on which regular trading may occur in the principal market for the Purchased Securities subject to such Transaction. In no event shall a Saturday or Sunday be considered a business day.

3.  <u>Purchase Price Maintenance</u>.

    (a) Unless otherwise expressly agreed by the parties hereto, the parties agree that in any Transaction hereunder whose term extends over an Income payment date for the Securities subject to such Transaction, Buyer shall on the date such Income is paid transfer to or credit to the account of Seller an amount equal to such Income payment or payments pursuant to Paragraph 5(i) and shall not apply the Income payment or payments to reduce the amount to be transferred to Buyer or Seller upon termination of the Transaction pursuant to Paragraph 5(ii) of the Agreement.

    (b) Unless otherwise expressly agreed by the parties hereto, notwithstanding the definition of Purchase Price in Paragraph 2 of the Agreement and the provisions of Paragraph 4 of the Agreement, the parties agree (i) that the Purchase Price will not be increased or decreased by the amount of any cash transferred by one party to the other pursuant to Paragraph 4 of the Agreement and (ii) that transfer of cash shall be treated as if it constituted a transfer of Securities (with a Market Value equal to the U.S. dollar amount of such cash) pursuant to Paragraph 4(a) or (b), as the case may be (including for purposes of the definition of "Additional Purchased Securities").

4.  <u>Submission to Jurisdiction; Waiver of Immunity; Waiver of Jury Trial</u>.

    (a) Each party irrevocably and unconditionally (i) submits to the non-exclusive jurisdiction of any United States Federal or New York State court sitting in Manhattan, and any appellate court from any such court, solely for the purpose of any suit, action or proceeding brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement and (ii) waives, to the fullest extent it may effectively do so, any defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right of jurisdiction on account of its place of residence or domicile.

    (b) To the extent that either party has or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit, or proceeding, from jurisdiction of any court or from set off or any legal process (whether service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) with respect to itself or any of its property, such party hereby irrevocably waives and agrees not to plead or claim such immunity in respect of any action brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement.

    (c) Each party hereto hereby irrevocably waives any right that it may have to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or the Transactions contemplated hereby.

Version of 29 Nov 04

5. <u>Jurisdiction Specific Terms</u>. This paragraph applies where a party to the Agreement is incorporated in Germany.

   (a) In this paragraph 5, "Insolvenzordnung" means the Insolvency Act, which came into force in Germany on 1 January 1999. " Insolvenzverfahren" means insolvency proceedings instituted under that Act and "Insolvenzverwalter" means an Insolvenzverwalter appointed under that Act.

   (b) Without limiting any other provision of Paragraph 2(a) or Paragraph 11 of the Agreement, in the case of a party incorporated in Germany –

      i)     the reference to a "similar official" in Paragraph 2(a)(i) shall include Isolvenzverwalter;

      ii)    the reference to "case or proceeding" in Paragraph 2(a)(i) and 2(a)(ii) shall include an Insolvenzverfahren;

      iii)   an Event of Default shall for the purposes of Paragraph 11 of the Agreement occur immediately if an application is made for the institution of an Insolvenzverfahren [or if measures are taken pursuant to §§ 46 or 46a para.1 of the German Banking Act (Kreditwesengesetz)."

6. <u>Designated Offices</u>.

   (a) The parties agree that **Lehman Brothers Bankhaus AG** may act through the following branches or offices when entering into Transactions governed by the Agreement:

      -- Frankfurt

[remainder of page intentionally left blank]

Version of 29 Nov 04

### 7th Avenue Notes Addendum
### to Master Repurchase Agreement

Reference is made to the Master Repurchase Agreement (together with Annex I of such agreement, the "Agreement"), dated as of **November 29, 2004** between **Lehman Brothers Bankhaus AG** ("Lehman") and **Commerzbank AG, New York and Grand Cayman Branches** ("Commerz-AG"). Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Agreement.

The modifications to the Agreement contained in this Addendum are with respect to the 7th Avenue Notes Transaction and shall apply only to the Transactions described in the 7th Avenue Notes Transaction. For the avoidance of doubt, all terms of Annex I of the agreement shall apply to transactions contemplated under this Addendum.

1.  <u>Additional Definitions</u>.  For purposes of this Addendum, the following terms shall have the following meanings:

    (a)  "7th Avenue Notes Transaction": the transactions described in the Letter Agreement i/c/w 7th Avenue Notes Facility dated as of December 8, 2004 among the undersigned, as such Letter Agreement may be amended from time to time.

    (b)  "7th Avenue Notes": the Purchased Securities as stipulated in the 7th Avenue Notes Transaction.

    (c)  "Guarantee", the certain guarantee dated as of November 29, 2004 of the Guarantor furnished to Commerz-AG pursuant to Section 6 of this Addendum with respect to the obligations of Lehman under this 7th Avenue Notes Transaction.

    (d)  "Guarantor", Lehman Brothers Holding Inc., a Delaware corporation.

2.  <u>Modification to Paragraph 1 regarding definition of "Securities"</u>:  The definition of Securities in Section 1 of the Agreement is deemed to specifically include the assets known as the 7th Avenue Notes.

3.  <u>Modification to Paragraph 2(i) ("Market Value") of the Agreement</u>:  The definition of "Market Value" in Section 2 of the Agreement is modified by replacing the phrase "with respect to any Securities" with the phrase "with respect to any Securities which are not 7th Avenue Notes". In addition, the following is to be appended at the end of such definition:

    "Market Value, with respect solely to Securities which are 7th Avenue Notes, the price as determined by Lehman in good faith, in the same manner and using the same assumptions that Lehman customarily employs when determining the fair market value of similar assets (including 7th Avenue Notes) which are the subject of repurchase transactions in which Lehman is the buyer of such assets, as of the end of Lehman's Business Day on the immediately preceding Business Day, and shall not include any Income received in respect of such 7th Avenue Notes paid to and held by Lehman.

    Lehman shall determine the market value of the 7th Avenue Notes as described above, and communicate such market value to the Commerz-AG not less frequently than weekly. Commerz-AG shall have the right to request from Lehman, from time to time, a description of the methodology used by Lehman in determining the fair market value of the 7th Avenue Notes.

    If Commerz-AG in good faith objects to such methodology, the assumptions underlying such methodology or the fair market value determined thereby, Commerz-AG shall have the right to submit such methodology to a pricing service reasonably acceptable to Lehman (with the cost of such third party service to be shared equally by Lehman and Commerz-AG."

7th Ave Notes Addendum-1

4.  <u>Modifications to Paragraph 2(a)</u>: The definition of "Act of Insolvency" in Section 2 is amended by (a) inserting the words "or Guarantor" after each instance of the word "party" and (b) inserting the words "or  Guarantor's" after each instance of the word "party's".

5.  <u>Modifications to Paragraph 11</u>: The definition of Event of Default in Section 11 of the Agreement is modified by inserting, immediately before the phrase "(each an "Event of Default)", the following:

> ", (viii) an Act of Insolvency occurs with respect to the Guarantor, (ix) the Guarantor shall fail to perform any of its obligations under the Guarantee, the Guarantee shall for any reason fail to be in full force and effect or the Guarantor shall repudiate any of its obligations thereunder, and (x) the Guarantor shall cease to own, directly or indirectly, at least 51% of the outstanding capital stock of Lehman."

It is further understood that, as regards any of the Events of Default described immediately above, Lehman shall be deemed the "defaulting party" and Commerz-AG shall be deemed the "nondefaulting party".

6.  <u>Delivery of Guarantee</u>:  On or around the date of the commencement of the 7th Avenue Notes Transaction, Lehman shall deliver to Commerz-AG the duly executed Guarantee of the Guarantor, in form and substance to reasonably satisfactory to Commerz-AG, together with such supporting documents as Commerz-AG may reasonably request.

| Lehman Brothers Bankhaus AG | Commerzbank AG, New York and Grand Cayman Branches |
|---|---|
| By: _____ | |
| Name: Franz O.Zeih   M. Bormann | By: _____ |
| Title: Executive Director  Pro Kurst | Name: _____ |
| Date: 12-6-2004    12-6-2004 | Title: _____ |
| | Date: _____ |

*Signatures Verified Mc Carthy 7/29/05*

Version of 29 Nov 04

4.  **Modifications to Paragraph 2(a)**: The definition of "Act of Insolvency" in Section 2 is amended by (a) inserting the words "or Guarantor" after each instance of the word "party" and (b) inserting the words "or  Guarantor's" after each instance of the word "party's".

5.  **Modifications to Paragraph 11**: The definition of Event of Default in Section 11 of the Agreement is modified by inserting, immediately before the phrase "(each an "Event of Default)", the following:

> ", (viii) an Act of Insolvency occurs with respect to the Guarantor, (ix) the Guarantor shall fail to perform any of its obligations under the Guarantee, the Guarantee shall for any reason fail to be in full force and effect or the Guarantor shall repudiate any of its obligations thereunder, and (x) the Guarantor shall cease to own, directly or indirectly, at least 51% of the outstanding capital stock of Lehman."

It is further understood that, as regards any of the Events of Default described immediately above, Lehman shall be deemed the "defaulting party" and Commerz-AG shall be deemed the "nondefaulting party".

6.  **Delivery of Guarantee**:  On or around the date of the commencement of the 7th Avenue Notes Transaction, Lehman shall deliver to Commerz-AG the duly executed Guarantee of the Guarantor, in form and substance to reasonably satisfactory to Commerz-AG, together with such supporting documents as Commerz-AG may reasonably request.

**Lehman Brothers Bankhaus AG**

By: _____

Name: _____

Title: _____

Date: _____

**Commerzbank AG, New York and Grand Cayman Branches**

By: _____

Name: William M. Earley          Michael P. McCarthy
      Senior Vice President            Vice President

Title: _____

Date: _____

7th Ave Notes Addendum-2

**Annex II**
**Names and Addresses for Communications Between Parties**

Lehman Brothers Bankhaus AG
Rathenauplatz 1
60313 Frankfurt am Main
Attn.: Frank Zeitz (Legal/Compliance)
Tel.: +49-69-15307-6401
Fax: +49-69-15307-6499

w/ copy to: Lehman Commercial Paper Inc.
745 Seventh Avenue, 19th Floor
New York, New York 10019
Attn.: Robert Guglielmo, Senior Vice President
Transaction Management
(212) 526-7121 phone
(212) 526-7672 fax

**Legal/Documentation Information for counterparty:**

| | |
|---|---|
| Name of Firm: | Commerzbank AG, New York and Grand Cayman Branches |
| Address: | 2 World Financial Center, 34th Floor |
| | New York, NY 10281-1050 |
| | |
| Attn: | Mike McCarthy |
| Tel #: | (212) 266-7325 |
| Fax #: | (212) 266-7629 |

**Business/Trading Information for counterparty:**

| | | |
|---|---|---|
| Name of Firm: | Commerzbank AG, NY Branch and Grand Cayman Branch | |
| Address: | 2 World Financial Center, 34th Floor | |
| | | |
| | | |
| Attn: | Mike McCarthy | Katrina Dengler |
| Tel #: | (212) 266-7325 | (212) 266-7347 |
| Fax #: | (212) 266-7629 | (212) 266-7515 |

## CERTIFICATE OF INCUMBENCY/CAPACITY
## In Connection With Master Repurchase Agreement

I, _____Bernard Kallmeyer_____, certify as follows:

*(printed name of certifying person;
should be different from person who
signed the Master Repo)*

1.  I am the ___Vice President and Deputy___
    ___General Counsel___ of ___Commerzbank AG, New York and Grand Cayman___

    *(official title of certifying person,
    such as Secretary or President)*

    (the "Company") and, as such, I am duly authorized to execute this Certificate on behalf of
    the Company.

2.  The person named below was duly elected or appointed to the office set forth opposite
    his/her name and at all material times was duly authorized by the Company to execute
    and deliver the Master Repurchase Agreement among the Company and Lehman
    Brothers Inc./Lehman Commercial Paper Inc.( collectively "Lehman") dated as of
    ___November 29, 2004___, and the signature below set opposite his/her name is
    his/her genuine signature.

    | Name | Title | Signature |
    |------|-------|-----------|
    | William Earley | Senior Vice President | |
    | Mike McCarthy | Vice President | |

    *(printed name of person who*        *(such person's official title)*        *(such person's signature)*
    *signed the Master Repo)*

3.  The Master Repurchase Agreement has been duly authorized and approved by the
    Company and the Company is fully empowered to engage in repurchase transactions with
    Lehman.

    IN WITNESS WHEREOF, I have hereunto set my hand as of the ___8th___ day of
    ___December___, 2004.

    _____
    *(signature of certifying person)*
    Bernd E. Kallmeyer
    Vice President

AuthCap.doc

# LEHMAN BROTHERS

## Required Authority & Capacity Documentation For Financing Transactions

Please locate the category below which best corresponds to your organization, and return the requested documentation along with the executed agreement(s).

**A. Registered Broker/Dealers; National and Money Center Banks**
1. Incumbency certificate for signatory(ies) (or relevant excerpts from bank's signature book)

**B. Other Banks; Thrift Institutions; Credit Unions**
1. Incumbency certificate for signatory(ies) (or relevant excerpts from bank's signature book); and
2. (i) Board of directors' resolutions or similar document showing the ability of the entity to engage in transactions contemplated under the signed agreement(s) or (ii) copies of the powers of attorney for bank directors in the case of some non-U.S. banks.

**C. Corporations (including hedge funds set up as companies with limited liability)**
1. Incumbency certificate for the signatory(ies); and
2. Board of director's resolutions showing the ability of the corporation to engage in transactions contemplated under the signed agreement(s) certified by a corporate officer; and
3. Investment management agreement, if applicable.

**D. Governmental Entities**
1. Incumbency certificate for the signatory(ies); and
2. Resolutions of the governmental entity approving the transactions contemplated under the signed agreement(s); and
3. (i) State or other local statute or regulation permitting the governmental entity to enter into transactions contemplated under the signed agreement(s) or (ii) state Attorney General opinion as to authority of the governmental entity to enter into contemplated transactions under the agreement.
4. Investment management agreement, if applicable.

**E. Investment Advisors**
1. Incumbency certificate as to signatory(ies); and
2. Completion of Annex III to the Master, Party Acting as Agent; and
3. List of Clients.

**F. Mutual Funds**
1. Incumbency certificate for the signatory(ies); and
2. A copy of any prospectus or other information provided to investors.

**G. Partnerships or LLCs (including hedge funds set up as partnerships or LLCs)**
1. Incumbency certificate for the signatory(ies); and
2. Certified copy of the partnership agreement/operating agreement (or certified excerpts thereof) showing the ability of the entity to engage in the transactions contemplated under the signed agreement(s); and
3. Offering memorandum, if any, which is provided to investors in the hedge fund/partnership/LLC; and
4. Investment management agreement, if applicable.

**H. Pension Plans**
1. Incumbency certificate as to plan signatory(ies); and
2. Excerpts of a plan document (such as a Trust Agreement or Investment Guidelines) evidencing in writing the plan's ability to enter transactions contemplated under the signed agreement(s); or if a State Pension Plan, copies of applicable state statute or legislation permitting the plan to enter into such transactions; and
3. Written evidence of the appointment of the plan trustee and/or plan investment manager as the investment manager for the pension plan.

**I. Trusts**
1. Incumbency certificate as to signatory(ies); and
2. Copy of trust agreement showing ability of Trust to enter transactions contemplated under the signed agreement(s); and
3. Copy of appointment of investment advisor, if applicable.

**J. Insurance Companies**
1. Incumbency certificate as to signatory(ies); and
2. Copy of resolutions showing the ability of the insurance company to enter into transactions contemplated under the signed agreement(s); and
3. Copy of applicable state statutes or regulations enabling the insurance company to enter into such transactions.

**K. Personal Holding Companies**
1. Incumbency certificate; and
2. High-Net-Worth Addendum

Execution

# LEHMAN BROTHERS

December 8, 2004

COMMERZBANK AG, NEW YORK AND GRAND CAYMAN BRANCHES
2 World Financial Center, 34th Floor
New York, NY 10281-1050
    Attention: Mike McCarthy

    Re:    <u>Letter Agreement ("Letter Agreement") i/c/w 7th Avenue Notes Facility
          described in the TRANSACTION TERMS</u>

Ladies and Gentlemen:

        We refer to the *Master Repurchase Agreement* dated as of November 29, 2004 between **Lehman Brothers Bankhaus AG (LBBAG)** and **Commerzbank AG, New York and Grand Cayman Branches** (" Commerzbank") (together with all Annexes, Addendums and Schedules thereto, as amended from time to time, the "Repo Agreement").

        For purposes of this Letter Agreement, **Seller** shall refer to Lehman Brothers Bankhaus AG and **Buyer** shall refer to Commerzbank AG, New York and Grand Cayman Branches.

        This Letter Agreement (which constitutes, as to the Transaction described herein, a "Confirmation" pursuant to the Repo Agreement) confirms the agreement between Buyer and Seller with respect to the Transaction described herein, all subject to the terms and conditions of this Letter Agreement and the TRANSACTION TERMS set forth herein.

        All capitalized terms used and not defined herein will have the respective meanings ascribed to them in the Repo Agreement. The Repo Agreement is hereby incorporated herein and made a part hereof, and provisions thereof shall be deemed to constitute additional terms of this Letter Agreement as if set forth in full herein. If there is any conflict between (i) the terms of this Letter Agreement or (ii) the Repo Agreement, or (iii) any automated confirmation that is sent out with respect to this Transaction, the terms of this Letter Agreement shall control.

        On the Purchase Date, as defined below, respecting this Transaction Seller shall sell to Buyer the applicable assets on the terms and conditions provided below in TRANSACTION TERMS.

| TRANSACTION TERMS | |
|---|---|
| 1.  Seller | Lehman Brothers Bankhaus AG |
| 2.  Buyer | Commerzbank AG, New York and Grand Cayman Branches |
| 3.  7th Avenue Notes Facility Amount | $200,000,000 (two hundred million US dollars) |
| 4.  7th Avenue Notes Facility | The Buyer grants to the Seller a repurchase facility of up to an aggregate amount not to exceed the 7th Avenue Notes Facility Amount for repurchase transactions under the terms outlined in these Transaction Terms. |
| 5.  Purchase Price | $200,000,000 (two hundred million US dollars) |
| 6.  Purchase Date | December 8, 2004 subject to the Condition Precedent |
| 7.  Repurchase Date | The day following the Purchase Date, which shall be extended for one day each and every day on a rolling overnight basis when mutually agreed to by both Buyer and Seller but, in any event the Repurchase Date will not extend later than either of (i) the Maturity Date of the 7th Avenue Notes, or (ii) the Final Repurchase Date in the event that the Buyer delivers the Buyer's Term-out Notice to the Seller pursuant to Section 8 below, or (iii) the day specified by Seller in Seller Termination Notice pursuant to Section 9 below, or (iv) the day specified in Seller On-demand Termination Notice, in accordance with Section 8 below, or (iv) the date that all or any portion of the 7th Avenue Notes are redeemed for such corresponding portion of the repurchase transaction of the 7th Avenue Notes which are redeemed, or (v) the occurrence and continuance of an Event of Default under the Repo Agreement. |
| 8.  Buyer's Right to Terminate 7th-Ave Notes Facility | On each Business Day, by 10 am New York time on any Business Day, the Buyer may give Seller written notice of its intention not to extend the Repurchase Date for an additional one day increment (the "*Buyer's Term-out Notice*"). The date on which Seller receives Buyer's Term-out Notice shall be the *Notification Date*. The *Final Repurchase Date* shall be the last day of the Term-out Period which is the 365th day following the Notification Date.<br><br>Following the delivery of such notice, Seller may at any time deliver to Buyer notice of termination on demand of the repurchase transaction ("*Seller On-demand Termination Notice*"). |

| TRANSACTION TERMS | |
|---|---|
| 9. Prepayment by Seller | By delivering written notice to the Buyer (the *"Seller Termination Notice"*) by 10 am New York time on any business day, the Seller may elect to terminate the Transaction without penalty. In the event that such prepayment notice is delivered, the Transaction shall terminate on the date specified by Seller in the Seller Termination Notice but not earlier than the third business day following delivery of the Seller Termination Notice. |
| 10. Repurchase Price | The Purchase Price plus any accrued and unpaid Price Differential then outstanding at the time of the Repurchase Date. |
| 11. Purchased Securities | $200,000,000 original face value of 7th Avenue Inc. Series 2 USD200,000,000 Floating Rate Secured Notes due 2008 (ISIN: XS0206017286; Common Code: 020601728) maturing on December 8, 2008 (the *"7ᵃ Avenue Notes"*). |
| 12. Pricing Rate | Starting on the Purchase Date and up to and including the date upon which Buyer shall have delivered Buyer's Term-out Notice pursuant to Section 8 above:<br>**Fed Funds (Open) + .375 %**<br><br>After the date upon which the Buyer shall have delivered Buyer's Term-out Notice pursuant to Section 8 above:<br>**Fed Funds (Open) + .50 %**<br><br>The Fed Funds (Open) rate shall be set on a daily basis as displayed on Reuters screen RTRTSY1, or any successor service or page Seller shall calculate the Pricing Rate and communicate such rate to Buyer. |
| 13. Payment Dates for Payment of Price Differential | Seller shall pay to Buyer an amount equal to accrued and unpaid Price Differential on the last business day of each month. |
| 14. Substitution | In accordance with Section 9 of the Repo Agreement. |
| 15. Condition Precedent | Buyer shall deliver to the Seller an executed IRS Form W-8 ECI prior to the Purchase Date. |
| 16. Information for Notices for Purposes of this Letter Agreement | If to Commerzbank AG, New York and Grand Cayman Branches:<br><br>Attn.: Mike McCarthy<br>2 World Financial Center, 34th floor<br>New York, NY 10023<br>Tel.: (212) 266-7325<br>Fax.: (212) 266-7629<br>E-mail: mmccarthy@cbkna.com<br><br>For Administration: |

| TRANSACTION TERMS | |
|---|---|
| | Attn: Kitty Yip and Katrina Dengler<br>2 World Financial Center, 32nd floor<br>New York, NY 10023<br>Tel: (212) 266-7393; (212) 266-7347<br>Fax: (212) 266 7515; (212) 266-7515<br>E-mail: syip@cbkna.com; kdengler@cbkna.com<br><br><br>If to Lehman Brothers Bankhaus AG:<br><br>Attn.: John Feraca, Chaz Gothard and David Rushton<br>Lehman Brothers Bankhaus<br>c/o Lehman Brothers International Europe<br>25 Bank Street<br>London E14 5LE<br>E-mail: joferaca@lehman.com; cgothard@lehman.com;<br>drushton@lehman.com |
| 17. Wiring Instructions | If to Commerzbank AG, New York and Grand Cayman Branches:<br>Bank Name: Commerzbank AG, New York<br>ABA Number: 026008-044<br>Account Number: 150940125800<br>Account Name: Commerzbank AG, Grand Cayman<br>Reference: Lehman Repo<br>Attn: Kitty Yip/Katrina Dengler<br><br>If to Lehman Brothers Bankhaus AG<br>Bank Name: JP Morgan Chase New York, NYC<br>ABA Number: 021000021<br>Account Number: 066-639557<br>Account Name: Lehman Brothers Bankhaus AG |

The parties hereto hereby confirm that the Repo Agreement is still in force and effect.

The Seller shall notify and shall only notify each of Lehman Brothers Special Financing Inc. ("*LBSF*") and 7th Avenue Inc. ("*7th Avenue*") of the Notification Date on the day of receipt of Buyer's Term-out Notice.

This Letter Agreement may not be amended or modified except in writing and shall be governed by and construed in accordance with the laws of the State of New York, without regard to such state's conflicts of laws principles.

The invalidity or unenforceability of any provisions of this Letter Agreement shall not affect the validity or enforceability of any other provision of this Letter Agreement, which shall remain in full force and effect.

This Letter Agreement may be executed in one or more counterparts, together which shall constitute one and the same instrument.

This Letter Agreement shall be effective as of the date of this letter.

Execution

Very truly yours,

**Lehman Brothers Bankhaus AG**

By: _____

Name: _Frank O. Zeib_

Title: _Executive Director_

AGREED AND ACCEPTED:

**Commerzbank AG, New York and Grand Cayman Branches**

By: _____

Name: _____

Title: _____

Very truly yours,

**Lehman Brothers Bankhaus AG**

By: _____

Name: _____

Title: _____

**AGREED AND ACCEPTED:**

**Commerzbank AG, New York and Grand
Cayman Branches**

By: _____

Name: _____
William M. Earley          Michael P. McCarthy
Senior Vice President          Vice President

Title: _____

**AMENDMENT**
**TO THE**
**LETTER AGREEMENT, DATED DECEMBER 8, 2004,**
**BETWEEN**
**LEHMAN BROTHERS BANKHAUS AG and**
**COMMERZBANK AG, NEW YORK AND GRAND CAYMAN BRANCHES**

WHEREAS, Lehman Brothers Bankhaus AG ("LBBAG"), and Commerzbank AG, New York and Grand Cayman Branches ("Client") entered into a Letter Agreement i/c/w 7th Avenue Notes Facility dated , December 8 2004 (the "Agreement"); and

WHEREAS, LBBAG and Client now wish to amend the Agreement in order to increase the Pricing Rate paid by Seller;

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements contained herein and in the Agreement, LBBAG and the Client agree as follows:

1. Capitalized terms used but not defined in this Amendment shall have the meanings ascribed to them in the Agreement.

2. Section 12 of the Agreement is hereby deleted in its entirety and replaced with the following.

12. Pricing Rate

Starting on May _, 2008, the Pricing Rate shall be equal to Fed Funds (Open) + .90%. The Fed Funds (Open) rate shall be set on a daily basis as displayed on Reuters screen RTRTSY1, or any successor service or page. Seller shall calculate the Pricing Rate and communicate such rate to Buyer.

3. Except as provided above, all terms and conditions of the Agreement shall remain unchanged and are in full force and effect.

4. This Amendment shall become effective as of the date of this Amendment set forth below.

5. This Amendment shall be governed by and construed in accordance with the laws of the State of New York, without regard to such state's conflicts of law principals.

6. This Amendment may be executed in one or more counterparts, together which shall constitute one and the same instrument.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their duly authorized signatories as of May 19, 2008.

**LEHMAN BROTHERS BANKHAUS AG**

Name:     Frank Oliver Zeitz          Dr. Cornelia Binla
Title:    Executive Director          Director
Date:     May 19, 2008          May 19, 2008

**COMMERZBANK AG, NEW YORK AND GRAND CAYMAN BRANCHES**

Name:
Title:  William M. Earley
Date:   Senior Vice President

5/20/2008
Michele Woessner-Larkin
Assistant Vice President

# **EXHIBIT B**

## 2004 GUARANTEE

# GUARANTEE

**GUARANTEE**, dated as of November 29, 2004, by Lehman Brothers Holdings Inc., a Delaware corporation (the "Guarantor"), in favor of **Commerzbank AG, New York and Grand Cayman Branches**, (the "Bank").

1.  **Guarantee.** In order to induce the Bank to enter into transactions ("Transactions") with Lehman Brothers Bankhaus AG (the "Obligor") under a Master Repurchase Agreement, dated as of November 29, 2004, between the Bank and the Obligor (the "Agreement"), upon such terms and in such amounts as the Obligor may negotiate with the Bank from time to time, and in consideration thereof, the Guarantor absolutely, unconditionally and irrevocably guarantees to the Bank, its successors, endorsees and assigns, the prompt payment of all amounts payable by the Obligor under the Agreement and/or pursuant to any Transaction (in an amount not to exceed two hundred million dollars ($200,000,000) (the "Guarantee Amount") as the same become due, whether at maturity, by declaration, acceleration, demand or otherwise and whether secured or unsecured, joint or several, together with any accrued interest or charges thereon (collectively, the "Obligations").

2.  **Nature of Guarantee.** This Guarantee is a guarantee of payment and not of collection and the Bank may exercise its rights hereunder without (i) first taking any action against the Obligor or any other obligor or guarantor with respect to the Obligations or (ii) filing a claim relating to the Obligations in the event that the Obligor becomes subject to a bankruptcy, reorganization or similar proceedings, and any failure on the part of the Bank to take such action or file such a claim shall not affect the Guarantor's obligations hereunder. If any payment to the Bank on account of an Obligation is returned or recovered for any reason whatsoever, including without limitation because all or any part of such payment constituted a preferential or fraudulent transfer under applicable bankruptcy or insolvency law, the Guarantor shall remain liable hereunder for such Obligations as if such payment had not been made. The Guarantor expressly waives the right to assert defenses to the payment of any Obligation that the Obligor may have including, without limitation, defenses arising from (i) the genuineness, validity or informality of the Obligations, (ii) the bankruptcy, insolvency, reorganization, receivership or like proceedings of or involving the Obligor, or (iii) the status or authority of the Obligor (excepting, however, a defense based on payment in full or statute of limitations). This Guarantee is absolute and unconditional without limitation as to duration up to the Guarantee Amount. The Guarantor will have no rights of subrogation with respect to any payments made hereunder unless and until all Obligations have been paid in full to the Bank.

3.  **Consents, Waivers and Renewals.** The Guarantor agrees that the Bank may at any time and from time to time, either before or after the maturity thereof, without notice to or further consent of the Guarantor, extend the time of

payment of, exchange or surrender any collateral for, or renew any of the Obligations owing to it, and may also enter into a written agreement with the Obligor or with any other obligor under the Agreement or person liable on any Obligation, or interested therein, for the amendment, extension, renewal, payment, compromise, discharge or release thereof, in whole or in part, without impairing or affecting this Guarantee, and the Guarantor hereby irrevocably waives and defense based on any such occurrence or similar event. The Guarantor agrees that the Bank may have to resort to the Guarantor for payment of any of the Obligations, whether or not the Bank has proceeded against any collateral security or any obligor principally or secondarily liable with respect to the Obligation. The Guarantor hereby irrevocably waives diligence, presentment, protest or any demand or notice of any kind in connection with the delivery, acceptance, performance, default or enforcement of this Guarantee or that may otherwise be required by law or in order to perfect the Bank's rights hereunder. No failure, delay or single or partial exercise by the Bank of its rights or remedies hereunder shall operate as a waiver of such rights or remedies. All rights and remedies available to the Bank hereunder or under the Agreement, or allowed by law, shall be cumulative and exercisable from time to time.

4.     **Expenses.** The Guarantor agrees to pay, in addition to the Guaranteed Amount, on demand all out-of-pocket expenses (including the reasonable fees and expenses of counsel) as incurred by the Bank in enforcing or protecting, or endeavoring to enforce or protect, its rights hereunder.

5.     **Representations and Warranties.** The Guarantor hereby represents and warrants that:

(a)    the Guarantor is duly organized, validly existing and in good standing under the laws of the State of Delaware;

(b)    the Guarantor has the requisite power and authority to issue this Guarantee and to perform its obligations hereunder, and has duly authorized, executed and delivered this Guarantee;

(c)    the Guarantor is not required to obtain any authorization, consent, approval, exemption or license from, or to file any registration with, any government authority as a condition to the validity of, or to the execution, delivery or performance of, this Guarantee;

(d)    as of the date of this Guarantee, there is no action, suit or proceeding pending or threatened against the Guarantor before any court or arbitrator or any governmental body, agency or official which could affect the ability of the Guarantor to perform any of its obligations under, or which in any manner questions the validity of, this Guarantee;

2

(e) the execution, delivery and performance of this Guarantee by the Guarantor does not contravene or constitute a default under any statute, regulation or rule of any governmental authority or under any provision of the Guarantor's certificate of incorporation or by-laws; and

(f) this Guarantee constitutes the legal, valid and binding obligation of the Guarantor enforceable in accordance with its terms subject to the effect of any bankruptcy, insolvency, reorganization, moratorium, arrangement or similar laws relating to or affecting creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers), general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or law), an implied covenant of good faith and fair dealing and, as to rights to indemnification, to public policy.

6.      **Termination**. This Guarantee may not be terminated or revoked by the Guarantor unless and until all of the Obligations have been fully and finally paid or until notice of termination is given by the Guarantor. Any termination of this Guarantee by the Guarantor must be in writing and will not be effective until actual receipt thereof by the Bank. Termination shall not affect any Obligations incurred prior to the termination hereof.

7.      **Notices**. Any notice or communication required or permitted to be made hereunder shall be made in the same manner and with the same effect, unless otherwise specifically provided herein, as set forth in the Agreement.

8.      **Governing Law**. This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to any provision thereof that would permit or require the laws of another jurisdiction to apply.

9.      **Miscellaneous**. This Guarantee may not be amended or assigned by the Guarantor. The Bank may assign its rights under this Guarantee with the written consent of the Guarantor.

3

**IN WITNESS WHEREOF,** the undersigned has executed this Guarantee as of the date first above written.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name: Oliver Budde
Title:   Vice President

*Signature Verified MC Carthy 7/28/05*

4

# **EXHIBIT C**

## 2002 GUARANTEE



③

E-2279-211102-LC

## GUARANTEE

THIS GUARANTEE is dated as of November 21, 2002 and is by Lehman Brothers
Holdings Inc., a Delaware corporation (the "Guarantor") in favor of Lehman Brothers
Bankhaus A.G., a company incorporated under the laws of the Federal Republic of
Germany ("LBB" which expression shall include its successors and assigns) and any
Counterparty (as defined below).

The Guarantor desires to unconditionally guarantee LBB's obligations to Counterparties
(the "Obligations") as set forth in this Guarantee.

Accordingly, in consideration of the benefits accruing to the Guarantor from LBB's
becoming obligated to Counterparties, the mutual promises contained in this Guarantee
and other valuable consideration, the receipt and sufficiency of which are hereby
acknowledged, the Guarantor and LBB hereby agree as follows:

1.    Definitions.

      The following terms shall have the following meanings:

      "Counterparty" means any Person that is entitled to payment by LBB.

      "Person" means any individual, partnership, limited liability company,
      corporation, trust, joint stock company, unincorporated organization, joint
      venture, association, company, business trust or other entity or any government or
      agency, instrumentality or political subdivision of a government.

2.    Representation and Warranties.

      The Guarantor represents and warrants that this Guarantee has been duly
      authorized, executed and delivered by the Guarantor and that this Guarantee
      constitutes a valid and legally binding obligation of the Guarantor enforceable in
      accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency,
      reorganization and other laws of general applicability relating to or affecting
      creditors' rights affecting the Guarantor and to general equity principles.

3.    Payment Obligations.

      If LBB fails to make any payment to a Counterparty, the Guarantor will following
      the request of the Counterparty promptly pay directly to the Counterparty the
      amount of funds that LBB was required to pay and did not pay the Counterparty
      under the Obligation. Any payment by the Guarantor to the Counterparty shall
      discharge and satisfy, by a like amount, any obligation of LBB to the
      Counterparty. Each of the Guarantor and LBB acknowledges and agrees that
      each Counterparty is an express third-party beneficiary of this Guarantee. No

other persons or entities, other than the parties hereto and Counterparties, shall
have any rights, directly or indirectly, under or pursuant to this Guarantee.

4.    Waiver of Subrogation.

The Guarantor waives any and all rights that the Guarantee may have with respect
to LBB as a result of making any payment under this Guarantee, including,
without limitation, any right of subrogation, set off or counterclaim. The
Guarantor understands and agrees that LBB shall have no obligations to it as a
result of any payment made under this Guarantee.

5.    Nature of Obligations, Non Performance; Waivers.

The obligations of the Guarantor under Section 3 of this Guarantee are continuing
and irrevocable and the Guarantor waives all other defenses to payment
hereunder. Without limiting the foregoing, the failure by LBB to perform its
obligations under any agreement or instrument under which it is a party or by
which it is bound or the bankruptcy of LBB shall not affect the Guarantor's
obligations under this Guarantee. The Guarantor waives any failure or delay on
the part of the Counterparty in asserting or enforcing any of its rights or making
any claims or demands under this Guarantee. The Guarantor acknowledges and
agrees that this Guarantee is one of payment and not of collection.

6.    Rank of Obligations.

The Guarantor warrants and agrees that the payment obligations of the Guarantor
that may arise under Section 3 of this Guarantee constitute irrevocable,
unconditional, unsecured and unsubordinated obligations of the Guarantor and
rank pari passu with all other unsecured and unsubordinated obligations of the
Guarantor.

7.    Reinstatement.

If any payment by LBB that would be an Obligation of the Guarantor if not for
such payment by LBB is voided (an "Avoidance Event") under any bankruptcy or
other insolvency-related law of any jurisdiction to which LBB may be or become
subject, and, as a result of such Avoidance Event, the applicable Counterparty (or
any assignee(s) or successor(s) in interest thereof) is required to return such
voided payment, or any portion of such voided payment (an "Avoided Payment"),
the Guarantor will pay the amount of the Avoided Payment out of funds of the
Guarantor within three business days of receipt by the Guarantor of a certified
copy of a final non-appealable order of a court or other governmental body having
jurisdiction, or such other written evidence as shall be reasonably acceptable to
the Guarantor, with respect to such Avoided Payment (specifying the amount and
required manner of repayment thereof), either (i) directly to such court or other
governmental body having jurisdiction or (ii) upon presentation of evidence

Page 2 of 5

reasonably satisfactory to the Guarantor that the applicable Counterparty (or, if applicable, any assignee(s) or successor(s) in interest thereof) has repaid such amount in satisfaction of the legal requirements relating thereto, to such Counterparty (or, if applicable, any assignee(s) or successor(s) in interest thereof). This Guarantee, and the obligations of the Guarantor hereunder, shall be deemed reinstated if and to the extent required to give effect to the obligation of the Guarantor to pay any Avoided Payment in accordance with the preceding sentence.

8.    Termination; Amendment.

This Guarantee may be amended or terminated at any time by written amendment or agreement signed by all parties executing this Guarantee provided, however, that no such amendment may adversely affect the rights, whether absolute or contingent, of any Counterparty that shall have accrued or which may accrue under any agreement or instrument, other than any rights with respect to any Obligation agreed to after the date that Counterparty has received notice of such amendment; and provided further that no such termination shall be effective with respect to any agreement or instrument agreed to prior to Counterparty's receipt of notice of such termination until such time as all such Obligations theretofore agreed to or incurred by LBB shall either no longer be outstanding or be satisfied in full.

9.    Notices.

All notices or demands on the Guarantor shall be deemed effective when received, shall be in writing and shall be delivered by hand or by registered mail, or by facsimile transmission promptly confirmed by registered mail, addressed to the Guarantor at:

If to the Guarantor:    Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, NY 10019
Attention:    Corporate Counsel
Telephone:    (212) 526-0858
Facsimile:    (212) 520-0176

If to LBB:    Lehman Brothers Bankhaus A.G.
Rathenauplatz 1
D-60313, Frankfurt Am Main, Germany
Attention:    Legal Counsel
Telephone:    +49-69-15307-6401
Facsimile:    +49-69-15307-6499

Any such notice or demand shall be deemed to have been received:

(a)    if sent by telefax, with a confirmed receipt of transmission from the receiving machine, on the day on which transmitted; and

(b)    in the case of a written notice given by hand or by courier, on the day of actual delivery.

10.    Assignment: Successors.

Neither this Guarantee nor any rights or obligations hereunder may be assigned, transferred or delegated to any other Person or entity, and any such assignment, transfer or delegation shall be null and void, provided however that any Counterparty may assign their rights and interest and obligations hereunder to an assignee or transferee to which they have transferred their interest and obligations under any agreement or instrument in which the Counterparty and Guarantor are parties pursuant to the provisions thereof. This Guarantee shall be binding upon the Guarantor and upon its successors.

11.    Withholding Taxes.

Any payments to a Counterparty under this Guarantee shall be free of all withholding, stamp and other taxes and other governmental charges of any nature whatsoever. If any withholding is required, the Guarantor will pay the same to the appropriate governmental body and pay such additional amount to the Counterparty which, after deduction of any withholding, stamp or other taxes or other governmental charge of any nature whatsoever imposed with respect to the payment of such additional amount, shall result in the Counterparty receiving an amount equal to the amount that otherwise would have been payable had there been no such withholding.

12.    Governing Law.

(a)    This Guarantee shall be governed and construed in accordance with the substantive law of the State of New York, without regard to conflicts of law principles.

(b)    The Guarantor irrevocably submits to the non-exclusive jurisdiction of the courts of New York City.

(c)    LBB irrevocably appoints LBHI in relation to proceedings in State of New York as its agent to receive service of any legal processes on its behalf in connection with this Guarantee without excluding any other means of service permitted by the law of the relevant jurisdiction.

IN WITNESS WHEREOF, this Guarantee has been duly executed as of the date
first above written.

LEHMAN BROTHERS HOLDINGS INC.

By:

Name: Oliver Budde
Title:  Vice President

LEHMAN BROTHERS BANKHAUS A.G.

By:

Name: Helmut Olivier                                Frank Oliver Zeitz
Title:  Member of the Managing Board                Prokurist

Page 5 of 5

# **EXHIBIT D**

PRICE DIFFERENTIAL CALCULATION

# Lehman Brothers Holdings Inc. (Exhibit D- Calc. of Price Differencial)

| | |
|---|---|
| Loan Amount: | $200,000,000.00 |
| Price Differencial: | $281,614.95 |
| Repurchase Price: | $200,281,614.95 |

| Start | End | Days | All-In Rates | Amount |
|---|---|---|---|---|
| 29-Aug-2008 | 3-Sep-2008 | 5 | 3.0250% | 84,027.78 |
| 3-Sep-2008 | 12-Sep-2008 | 9 | 2.9625% | 148,125.00 |
| 12-Sep-2008 | 15-Sep-2008 | 3 | 3.0250% | 50,416.67 |
| | | | | $282,569.45 |
| | | | - | 954.50 |
| | | | | |
| Fed Funds Open | | | | $281,614.95 |

Interest was paid fully through 8/28/08. However, extra funds of $954.50 was left and applied to 8/29/08.

→ Total amount unpaid on the Fed Funds (open) from 8/29/08 through 9/14/08

## **EXHIBIT E**

INTEREST CALCULATION

# Lehman Brothers Holdings Inc. (Exhibit E)

| Start | End | Days | All-In Rates (Prime) | Amount |
|---|---|---|---|---|
| 15-Sep-2008 | 8-Oct-2008 | 23 | 5.0000% | 629,300.16 |
| 8-Oct-2008 | 29-Oct-2008 | 21 | 4.5000% | 517,120.56 |
| 29-Oct-2008 | 16-Dec-2008 | 48 | 4.0000% | 1,050,657.65 |
| 16-Dec-2008 | 1-Jan-2009 | 16 | 3.2500% | 284,553.11 |
| 1-Jan-2009 | 14-Sep-2009 | 256 | 3.2500% | 4,565,323.39 |
| | | | TOTAL | $7,046,954.87 |

# **EXHIBIT F**

## FEES, LOSSES, DAMAGES, COSTS AND EXPENSES

## Expenses Statement (Exhibit F)

| | | |
|---|---|---|
| Deed Trustee Costs and Expenses Reimbursement | GBP 49,708.74 | |
| x 1.41[24] | | **$70,089.32;** |
| Issuer Costs and Expenses Reimbursement | GBP 4,677.44 | |
| x 1.41 | | **$6,595.19;** |
| and | | **$47,708.81;** |
| Direct Legal Fees and Expenses | | **$256,101.77;** |
| Total as of September 14, 2009 | | **$380,495.09.** |
| **Total allocated to this claim** | | **$190,247.54** |

(50% of the total costs and expenses
attributable to Lehman Brothers Bankhaus
AG and LBSF in connection with the
Notes.)

.

---

[24] Bloomberg average exchange rate as of 3-4 March, 2009, when the reimbursement transfers were made.

NEWYORK 7255563 (2K)

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number  13-5605970

September 30, 2008
Invoice No. 883611

**REMITTANCE COPY**

re:  LEHMAN
Ref. No. 1109065-0028

| | | |
|---|---|---|
| **FOR PROFESSIONAL SERVICES RENDERED** in connection with the above-referenced matter for the period ending September 30, 2008 | $ | 51,442.50 |
| COSTS AND DISBURSEMENTS | | 106.96 |
| TOTAL DUE | $ | 51,549.46 |

**PAYMENT INSTRUCTIONS**

This invoice is due upon receipt.  Wire payment should be made to the account of White & Case LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-000021/Swift Code: CHASUS33).  For proper crediting the wire must reference 1109065-0028 COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028 COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE LLP, 23802 Network Place, Chicago, IL 60673-1238.

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number  13-5605970

October 31, 2008
Invoice No. 885908

**REMITTANCE COPY**

re:  LEHMAN
Ref. No. 1109065-0028

| | | |
|---|---|---|
| **FOR PROFESSIONAL SERVICES RENDERED** in connection with the above-referenced matter for the period ending October 31, 2008 | $ | 65,435.00 |
| COSTS AND DISBURSEMENTS | | 2,967.63 |
| TOTAL DUE | $ | 68,402.63 |

**PAYMENT INSTRUCTIONS**

This invoice is due upon receipt. Wire payment should be made to the account of White & Case LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-000021/Swift Code: CHASUS33). For proper crediting the wire must reference 1109065-0028 COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028 COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE LLP, 23802 Network Place, Chicago, IL 60673-1238.

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5605970

November 30, 2008
Invoice No. 890350

REMITTANCE COPY

re: LEHMAN
Ref. No. 1109065-0028

| | | |
|---|---|---|
| **FOR PROFESSIONAL SERVICES RENDERED** in connection with the above-referenced matter for the period ending November 30, 2008 | $ | 31,085.50 |
| COSTS AND DISBURSEMENTS | | 605.54 |
| TOTAL DUE | $ | 31,691.04 |

## PAYMENT INSTRUCTIONS

This invoice is due upon receipt. Wire payment should be made to the account of White & Case LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-000021/Swift Code: CHASUS33). For proper crediting the wire must reference 1109065-0028 COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028 COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE LLP, 23802 Network Place, Chicago, IL 60673-1238.

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5605970

December 31, 2008
Invoice No. 893725

**REMITTANCE COPY**

re: LEHMAN
Ref. No. 1109065-0028

| | | |
|---|---|---:|
| **FOR PROFESSIONAL SERVICES RENDERED** in connection with the above-referenced matter for the period ending December 31, 2008 | $ | 19,377.00 |
| COSTS AND DISBURSEMENTS | | 92.02 |
| TOTAL DUE | $ | 19,469.02 |

**PAYMENT INSTRUCTIONS**

This invoice is due upon receipt. Wire payment should be made to the account of White & Case LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-000021/Swift Code: CHASUS33). For proper crediting the wire must reference 1109065-0028 COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028 COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE LLP, 23802 Network Place, Chicago, IL 60673-1238.

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5605970

January 31, 2009
Invoice No. 896478

## REMITTANCE COPY

re:  LEHMAN
Ref. No. 1109065-0028

**FOR PROFESSIONAL SERVICES RENDERED** in connection with the
above-referenced matter for the period ending January 31, 2009          $          19,364.50

COSTS AND DISBURSEMENTS                                                                  210.75

TOTAL DUE                                                                        $          19,575.25

## PAYMENT INSTRUCTIONS

This invoice is due upon receipt. Wire payment should be made to the account of White & Case LLP,
Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-
000021/Swift Code: CHASUS33). For proper crediting the wire must reference 1109065-0028
COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028
COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE
LLP, 23802 Network Place, Chicago, IL 60673-1238.

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5605970

February 28, 2009
Invoice No. 900640

REMITTANCE COPY

re: LEHMAN
Ref. No. 1109065-0028

**FOR PROFESSIONAL SERVICES RENDERED** in connection with the
above-referenced matter for the period ending February 28, 2009         $         13,531.50

COSTS AND DISBURSEMENTS                                                              30.52

TOTAL DUE                                                                 $         13,562.02

## PAYMENT INSTRUCTIONS

This invoice is due upon receipt. Wire or ACH payment should be made to the account of White & Case
LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No.
021-000021/Swift Code: CHASUS33). For proper crediting the wire/ACH must reference 1109065-0028
COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028
COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE
LLP, 23802 Network Place, Chicago, IL 60673-1238.

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5605970

March 31, 2009
Invoice No. 903412

### REMITTANCE COPY

re: LEHMAN
Ref. No. 1109065-0028

| | | |
|---|---|---:|
| **FOR PROFESSIONAL SERVICES RENDERED** in connection with the above-referenced matter for the period ending March 31, 2009 | $ | 5,423.50 |
| COSTS AND DISBURSEMENTS | | 588.30 |
| TOTAL DUE | $ | 6,011.80 |

### PAYMENT INSTRUCTIONS

This invoice is due upon receipt. Wire or ACH payment should be made to the account of White & Case LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-000021/Swift Code: CHASUS33). For proper crediting the wire/ACH must reference 1109065-0028 COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028 COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE LLP, 23802 Network Place, Chicago, IL 60673-1238.

ACZ

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number  13-56059/0

April 30, 2009
Invoice No. 906969

**REMITTANCE COPY**

re:  LEHMAN
Ref. No. 1109065-0028

| | | |
|---|---|---|
| **FOR PROFESSIONAL SERVICES RENDERED** in connection with the above-referenced matter for the period ending April 30, 2009 | $ | 3,677.00 |
| COSTS AND DISBURSEMENTS | | 40.14 |
| TOTAL DUE | $ | 3,717.14 |

**PAYMENT INSTRUCTIONS**

This invoice is due upon receipt.  Wire or ACH payment should be made to the account of White & Case LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-000021/Swift Code: CHASUS33).  For proper crediting the wire/ACH must reference 1109065-0028 COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028 COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE LLP, 23802 Network Place, Chicago, IL 60673-1238.

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5605970

May 31, 2009
Invoice No. 910294

### REMITTANCE COPY

re: LEHMAN
Ref. No. 1109065-0028

**FOR PROFESSIONAL SERVICES RENDERED** in connection with the above-referenced matter for the period ending May 31, 2009          $          2,616.00

COSTS AND DISBURSEMENTS          258.82

TOTAL DUE          $          2,874.82

### PAYMENT INSTRUCTIONS

This invoice is due upon receipt. Wire or ACH payment should be made to the account of White & Case LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-000021/Swift Code: CHASUS33). For proper crediting the wire/ACH must reference 1109065-0028 COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028 COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE LLP, 23802 Network Place, Chicago, IL 60673-1238.

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5605970

June 30, 2009
Invoice No. 913152

REMITTANCE COPY

re:  LEHMAN
Ref. No. 1109065-0028

| | |
|---|---|
| **FOR PROFESSIONAL SERVICES RENDERED** in connection with the above-referenced matter for the period ending June 30, 2009 | $    5,645.50 |
| COSTS AND DISBURSEMENTS | 45.98 |
| TOTAL DUE | $    5,691.48 |

## PAYMENT INSTRUCTIONS

This invoice is due upon receipt.  Wire or ACH payment should be made to the account of White & Case LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-000021/Swift Code: CHASUS33).  For proper crediting the wire/ACH must reference 1109065-0028 COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028 COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE LLP, 23802 Network Place, Chicago, IL 60673-1238.

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5605970

July 31, 2009
Invoice No. 915058

## REMITTANCE COPY

re:  LEHMAN
Ref. No. 1109065-0028

| | | |
|---|---|---:|
| **FOR PROFESSIONAL SERVICES RENDERED** in connection with the above-referenced matter for the period ending July 31, 2009 | $ | 8,553.50 |
| COSTS AND DISBURSEMENTS | | 280.59 |
| TOTAL DUE | $ | 8,834.09 |

## PAYMENT INSTRUCTIONS

This invoice is due upon receipt. Wire or ACH payment should be made to the account of White & Case LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No. 021-000021/Swift Code: CHASUS33). For proper crediting the wire/ACH must reference 1109065-0028 COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028 COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE LLP, 23802 Network Place, Chicago, IL 60673-1238.

**WHITE & CASE**

Commerzbank AG
Attn: Steven Troyer
Commerzbank AG
2 World Financial Center
New York, NY 10281-1050
USA

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Federal Identification Number 13-5605970

September 4, 2009
Invoice No. 916620

### REMITTANCE COPY

re:  LEHMAN
Ref. No. 1109065-0028

**FOR PROFESSIONAL SERVICES RENDERED** in connection with the
above-referenced matter for the period ending September 4, 2009      $      24,518.00

     COSTS AND DISBURSEMENTS      205.02

     TOTAL DUE      $      24,723.02

## PAYMENT INSTRUCTIONS

This invoice is due upon receipt. Wire or ACH payment should be made to the account of White & Case
LLP, Account No. 301177137265 at JPMorgan Chase, 270 Park Avenue, New York, NY 10017 (ABA No.
021-000021/Swift Code: CHASUS33). For proper crediting the wire/ACH must reference 1109065-0028
COMMERZBANK.

Alternatively, payment can be made by check to "White & Case LLP" as payee, referencing 1109065-0028
COMMERZBANK on the face of the check, and mailing the check to our Remittance Address: WHITE & CASE
LLP, 23802 Network Place, Chicago, IL 60673-1238.

H
A
N
D

D
E
L
I
V
E
R
Y

FILED / RECEIVED

SEP 2 2 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

12:09

RECEIVED BY: _____     DATE _____     TIME _____