# EXHIBIT A

EXECUTION COPY

* * *

SALE OF
PARTNERSHIP INTERESTS IN
ROSSLYN SYNDICATION PARTNERS JV LP

* * *

# PURCHASE AND SALE AGREEMENT

BETWEEN

ROSSLYN LB SYNDICATION PARTNER LLC

AS SELLER

AND

USREO/ROSSLYN INVESTORS, LLC

AS PURCHASER

* * *

ARTICLE 1        PURCHASE AND SALE OF PARTNERSHIP INTERESTS ....................... 3

   1.1    Purchase and Sale ....................................................................... 3
   1.2    Recapitalization Transaction ....................................................... 3

ARTICLE 2        EXISTING LOANS ................................................................. 3

   2.1    Existing Loans ............................................................................ 3

ARTICLE 3        PURCHASE PRICE; DEPOSIT ........................................... 3

   3.1    Payment ...................................................................................... 3
   3.2    Purchase Price Allocation ........................................................... 4

ARTICLE 4        TITLE; SURVEY ................................................................... 4

   4.1    State of Title to the Property ....................................................... 4
   4.2    Title Commitment and Survey ..................................................... 5
   4.3    Title Objections ........................................................................... 5

ARTICLE 5        PROPERTY INFORMATION ............................................. 7

   5.1    Property Information .................................................................... 7
   5.2    Partnership Financial Information ............................................... 7
   5.3    Organizational Documents ........................................................... 8

ARTICLE 6        PURCHASER'S DUE DILIGENCE ................................... 8

   6.1    Purchaser's Due Diligence .......................................................... 8
   6.2    As Is, Where Is ............................................................................ 9

ARTICLE 7        REPRESENTATIONS AND WARRANTIES ................... 11

   7.1    Seller's Representations and Warranties ................................... 11
   7.2    Purchaser's Representations and Warranties ............................ 13
   7.3    Partnership's Representations and Warranties .......................... 14
   7.4    Seller Parent's Representations and Warranties ....................... 19
   7.5    Knowledge ................................................................................ 19
   7.6    Survival ..................................................................................... 19
   7.7    Limitations ................................................................................ 19
   7.8    Material Adverse Effect ............................................................ 20

ARTICLE 8        COVENANTS OF SELLER AND PARTNERSHIP PRIOR TO
                     CLOSING .......................................................................... 20

   8.1    Actions as a Partner .................................................................. 20
   8.2    Bankruptcy Court Approval ....................................................... 20
   8.3    Tax Matters ............................................................................... 21
   8.4    Partnership's Covenants ............................................................ 21
   8.5    Purchaser's Consent .................................................................. 23

ARTICLE 9        CONDITIONS PRECEDENT TO CLOSING ............................. 23

   9.1    Conditions Precedent to Purchaser's Obligation to Close ................... 23
   9.2    Conditions Precedent to Seller's Obligation to Close ........................ 26
   9.3    Waiver of Conditions ................................................................ 27

ARTICLE 10        CLOSING ................................................................................. 27

   10.1    Closing Date................................................................................. 27
   10.2    Seller's Obligations at the Closing .............................................. 27
   10.3    Purchaser's Obligations at the Closing ....................................... 28
   10.4    Escrow........................................................................................... 28
   10.5    Costs and Adjustments at Closing ............................................... 28

ARTICLE 11        [Intentionally deleted]........................................................ 34

ARTICLE 12        REMEDIES AND ADDITIONAL COVENANTS ..................... 34

   12.1    Seller or Partnership Default At or Before Closing .................... 34
   12.2    Seller or Partnership Default From and After Closing ............... 35
   12.3    [Intentionally Omitted] ............................................................... 36
   12.4    Guaranty of Seller Parent............................................................ 36
   12.5    Purchaser Default ........................................................................ 36
   12.6    Delivery of Materials .................................................................. 37
   12.7    Tax Cooperation........................................................................... 37
   12.8    Survival ........................................................................................ 37

ARTICLE 13        BROKERAGE COMMISSION ............................................... 37

   13.1    Broker .......................................................................................... 37
   13.2    Indemnity ..................................................................................... 37

ARTICLE 14        NOTICES .............................................................................. 38

   14.1    Written Notice ............................................................................. 38
   14.2    Method of Transmittal ................................................................ 38
   14.3    Addresses ..................................................................................... 38

ARTICLE 15        ASSIGNMENT....................................................................... 40

ARTICLE 16        MISCELLANEOUS .............................................................. 41

   16.1    Entire Agreement ........................................................................ 41
   16.2    Modifications ............................................................................... 41
   16.3    Gender and Number..................................................................... 41
   16.4    Captions ....................................................................................... 41
   16.5    Successors and Assigns................................................................ 41
   16.6    Controlling Law ........................................................................... 41
   16.7    Exhibits ........................................................................................ 41
   16.8    No Rule of Construction .............................................................. 41
   16.9    Severability; Survival.................................................................. 41
   16.10   Time of Essence ........................................................................... 42
   16.11   Business Day ................................................................................ 42
   16.12   No Memorandum .......................................................................... 42
   16.13   Press Releases .............................................................................. 42
   16.14   Attorneys' Fees and Costs ........................................................... 42
   16.15   Counterparts and Expiration of Offer ......................................... 42
   16.16   Waiver of Jury Trial..................................................................... 42
   16.17   Confidentiality ............................................................................. 42

16.18   Jurisdiction and Service of Process.......................................................................43
16.19   Exculpation .....................................................................................................43
16.20   Further Assurances............................................................................................44
16.21   Lis Pendens .....................................................................................................44

## EXHIBITS AND SCHEDULES

### Exhibits

Exhibit A        Form of Assignment of Partnership Interests
Exhibit B        Form of Certificate of Non-Foreign Status
Exhibit C        Form of Termination of Syndication Agreement
Exhibit D        Form of Termination of Capital Services and Financing Agreement

### Schedules

Schedule C(1)        REIT Subsidiaries
Schedule C(2)        Property Owning Subsidiaries
Schedule 2.1        Existing Loan Documents
Schedule 3.1(A)    Wire Transfer Instructions
Schedule 3.1(B)    Escrow Agreement
Schedule 4.1        Surveys
Schedule 4.2        Title Commitment
Schedule 5.3        Organizational Documents
Schedule 7.1.3        Litigation (Seller)
Schedule 7.3.3        Litigation (Partnership and Owner Entities)
Schedule 7.3.11    Contracts
Schedule 7.3.12    Leases
Schedule 7.3.13    Current Leasing Commissions; Current Tenant Inducement Costs
Schedule 7.3.14    Security Deposits
Schedule 7.3.15    Violations of Law
Schedule 7.3.17    Reports
Schedule 7.3.18    KPMG REIT Questionnaire and Memo
Schedule 8.2        Sale Motion and Proposed Sale Order
Schedule 9.1.5(A)  Form of Tenant Estoppel
Schedule 9.1.5(B)  Major Tenants
Schedule 9.1.7(A)  Form of CMBS Lender Estoppel
Schedule 9.1.7(B)  Form of Corporate Lender Estoppel
Schedule X        Current Annual Plan

## PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "**Agreement**") is made and entered into on August 16, 2011 (the "**Effective Date**"), by and between **ROSSLYN LB SYNDICATION PARTNER LLC**, a Delaware limited liability company ("**Seller**"), and **USREO/ROSSLYN INVESTORS, LLC**, a Delaware limited liability company ("**Purchaser**").

## Recitals

This Agreement is made with reference to the following facts:

A.     Seller owns a 78.481% limited partner interest (the "**Partnership Interests**") in Rosslyn Syndication Partners JV LP, a Delaware limited partnership (the "**Partnership**") pursuant to the Limited Partnership Agreement of the Partnership dated as of May 15, 2007, as amended by a First Amendment dated as of July 9, 2010 (the "**Partnership Agreement**").

B.     Subject to the terms and conditions of this Agreement, as used herein, the term "Partnership Interests" shall also include all of Seller's right, title and interest in, to and under the Partnership and the Organizational Documents (as defined below) and, including, without limitation, all of Seller's right, title and interest in, to and under all: (i) distributions after the Closing of the profits and income of the Partnership; (ii) capital distributions after the Closing from the Partnership; (iii) distributions after the Closing of cash flow by the Partnership; (iv) property of the Partnership to which Seller now or in the future may be entitled; (v) other claims which Seller now has or may in the future acquire against the Partnership, or its properties; (vi) proceeds of any liquidation upon the dissolution of the Partnership and winding up of its affairs; (vii) general intangibles for money due or to become due from the Partnership; (viii) other rights of Seller after the Closing to receive any distributions or other payments of any kind whatsoever from or in respect of the Partnership, whether any of the above distributions consists of money or property, and (ix) all other rights of Seller as a partner in the Partnership, including, without limitation, rights to reports, accounting, information and voting; *provided, however*, that the Partnership Interests shall not include (y) the proceeds of the sale of the Partnership Interests contemplated hereby, and (z) any amounts reimbursable to Seller, the Owner Entities (as defined below) or the Partnership pursuant to the terms of this Agreement. The term "Partnership Interests" shall also include all of Seller's right, title and interest in and to a partner loan (the "**Monday Partner Loan**") in the original principal balance of $17,974,683.54 as set forth in the Partnership Agreement, made by Seller to the Monday LP (as defined below) pursuant to the Partnership Agreement.

C.     The Partnership owns 100% of the limited liability company interests in the "**REIT Subsidiaries"** identified in Schedule C(1) attached hereto.  The REIT Subsidiaries own 100% of the limited liability company interests in Rosslyn Series, LLC, a Delaware limited liability company ("**Series LLC**"), established pursuant to the Limited Liability Company Agreement of Series LLC dated as of May 15, 2007 ("**Series LLC Agreement**").  Series LLC owns 100% of the shares of Rosslyn TRS Corp., Inc., a Delaware corporation ("**TRS Corp.**"), and 100% of the limited liability company interests in the entities listed in Schedule C(2) attached hereto ("**Property Owning Subsidiaries**").  Each Property Owning Subsidiary owns or

ground leases the tract of land in Arlington County, Virginia and all improvements thereon set forth next to its name on Schedule C(2) (each such tract of land or ground leasehold and improvements referred to herein as an "**Individual Property**" and collectively as the "**Property**").  As used in this Agreement, the term "**Owner Entities**" shall mean, collectively, the Partnership, the REIT Subsidiaries, Series LLC, TRS Corp., and the Property Owning Subsidiaries, and the term "**Subsidiary**" shall mean any corporation, limited liability company or other entity owned directly or indirectly by the Partnership (including any Property Owning Subsidiary).

D.       Purchaser desires to purchase the Partnership Interests from Seller, and Seller desires to sell and assign the Partnership Interests to Purchaser, upon and subject to the terms and provisions of this Agreement.

E.       The remaining interests in the Partnership (not owned by Seller) are currently held by (i) Rosslyn LBREP LP LLC (the "**LBREP LP**"), which owns a 10.7595% limited partner interest, (ii) Rosslyn Monday LP, LLC (the "**Monday LP**"), which owns a 10.5595% limited partner interest (Seller, the LBREP LP and the Monday LP, collectively, the "**Limited Partners**"), and (iii) Rosslyn JV Partners, LLC (the "**General Partner**"), which owns a .2% general partner interest.  Each of Rosslyn Monday GP LLC ("**Monday GP**") and Rosslyn LBREP GP LLC ("**LBREP GP**") owns a 50% membership interest in the General Partner.

F.       Pursuant to that certain Purchase and Sale Agreement dated as of the date hereof between Purchaser and LBREP LP (the "**Silverpeak Purchase Agreement**"), Purchaser has agreed to purchase all of LBREP LP's right, title and interest in and to LBREP LP's 10.7595% membership interest in the Partnership.

G.       Pursuant to that certain Purchase and Sale Agreement dated as the date hereof between Monday GP and LBREP GP (the "**GP Purchase Agreement**"), Monday GP has agreed to purchase all of LBREP GP's right, title and interest in and to LBREP GP's 50% membership interest in the General Partner.

H.       The LBREP LP, the Monday LP and the General Partner have joined in this Agreement (i) for the purpose of waiving their rights of first offer under the Partnership Agreement with respect to the sale of the Partnership Interests pursuant to this Agreement, and consenting to the Partnership's joinder to this Agreement, and (ii) in the case of the General Partner only, for the additional purpose of evidencing the General Partner's consent to the sale of the Partnership Interests to Purchaser pursuant to this Agreement and its agreement that, notwithstanding anything to the contrary in the Partnership Agreement, the sale of the Partnership Interests to Purchaser pursuant to this Agreement is in compliance with the terms of the Partnership Agreement.  The Partnership has joined in this Agreement for the sole purpose of agreeing to be bound by the provisions of Section 3.2 (Purchase Price Allocation), Section 4.1 (State of Title to the Property), Section 4.3 (Title Objections), Section 6.1.2, Section 7.3 (Partnership's Representations and Warranties), Section 8.4 (Partnership's Covenants), Section 10.5.2 (Working Capital Adjustment) and Section 16.19 (Exculpation).

F.       Lehman Commercial Paper Inc., a New York corporation ("**Seller Parent**"), has joined in this Agreement for the sole purpose of agreeing to be bound by the

provisions of Section 7.4 (Seller Parent's Representations and Warranties) and Section 12.4 (Guaranty of Seller Parent).

## ARTICLE 1   PURCHASE AND SALE OF PARTNERSHIP INTERESTS

**1.1 Purchase and Sale.**  On the terms and conditions stated in this Agreement, Seller hereby agrees to sell to Purchaser, and Purchaser hereby agrees to purchase from Seller, the Partnership Interests.

**1.2 Recapitalization Transaction.**  As set forth in the Recitals of this Agreement, Monday LP, Monday GP, LBREP LP, LBREP GP, Seller and Purchaser (individually a "**Transaction Party**" and collectively, the "**Transaction Parties**") intend to restructure the ownership of, and recapitalize the Partnership through three (3) related purchase and sale transactions, as more specifically contemplated in the GP Purchase Agreement, Silverpeak Purchase Agreement and this Agreement (collectively, the "**PS Agreements**").  Unless expressly provided to the contrary in any of the PS Agreements: (i) a valid termination of this Agreement or the Silverpeak Purchase Agreement shall operate as an automatic termination of each of the other PS Agreements, (ii) any adjournment or extension of a closing date under either of this Agreement or the Silverpeak Purchase Agreement shall operate as an automatic adjournment or extension of the closing date under each of the other PS Agreements, subject to the payment of any extension deposit to the extent applicable and (iii) a final, non-appealable judgment that "Purchaser" (as defined in the Silverpeak Purchase Agreement) has defaulted under the Silverpeak Purchase Agreement and is not entitled to a refund of the "Deposit" (as defined in the Silverpeak Purchase Agreement) or "Purchaser's" (as defined in the Silverpeak Purchase Agreement) uncontested forfeiture of same to "Seller" (as defined in the Silverpeak Purchase Agreement) shall operate as an automatic default by Purchaser under this Agreement (subject to Section 12.5 hereof),.

## ARTICLE 2   EXISTING LOANS

**2.1 Existing Loans.**  It shall be a condition to Purchaser's obligation to close that, after giving effect to the purchase and sale of the Partnership Interests pursuant to this Agreement, the "**Corporate Credit Facility Loan**" and the "**CMBS Loans**" (collectively, the "**Existing Loans**") shall remain outstanding and that, immediately after Closing, the Owner Entities shall remain liable to the lenders under the loan documents listed on Schedule 2.1 annexed hereto (the "**Existing Loan Documents**") in accordance with their respective terms, and portions of the Property shall remain subject to the liens securing the CMBS Loans to the extent set forth therein.

## ARTICLE 3   PURCHASE PRICE; DEPOSIT

**3.1 Payment**.  The purchase price for the Partnership Interests (the "**Purchase Price**") is Three Hundred Eighty-Five Million Five Hundred Ninety-Six Thousand One Hundred Ninety-Six Dollars ($385,596,196.00), subject to adjustment as set forth in Section 10.5 hereof. The Owner Entities shall remain liable for all of their respective obligations set forth in Existing Loan Documents, and the Property shall remain subject to the liens of the Existing Loan Documents.  The Purchase Price shall be payable as follows:

(i)    The sum of SIXTY-SIX MILLION DOLLARS ($66,000,000.00) (the "Initial Deposit"), by wire transfer of immediately available funds to First American Title National Commercial Services ("Escrow Agent") (to an account as described in Schedule 3.1(A)) within one (1) Business Day of the delivery to Seller of an executed copy of this Agreement.  If Purchaser exercises the Extension Right provided for in Section 10.1, Purchaser shall pay the Additional Deposit to the Escrow Agent as provided in Section 10.1. The Initial Deposit and the Additional Deposit (if any), together with any interest earned thereon, shall be collectively referred to in this Agreement as the "Deposit" and shall be held by the Escrow Agent in accordance with the provisions of the Escrow Agreement annexed hereto as Schedule 3.1(B).

(ii)    At Closing, Purchaser shall deliver the balance of the Purchase Price (i.e., the Purchase Price, as adjusted, if necessary, pursuant to Section 10.5 hereof, less the Deposit), to Seller, or as Seller shall direct.

(iii)    All monies payable by Purchaser under this Agreement shall be paid by Bank wire transfer of immediately available funds.

**3.2  Purchase Price Allocation**.  For tax purposes, the Purchase Price (together with all amounts treated as consideration for U.S. federal, state, local and foreign income tax purposes) shall be allocated among the assets of the Owner Entities in accordance with a "**Purchase Price Allocation Schedule**."  Purchaser shall prepare and deliver to Seller and LBREP LP the Purchase Price Allocation Schedule with respect to the Purchase Price within sixty (60) days from the Closing Date, and shall deliver to Seller from time to time revised copies of the Purchase Price Allocation Schedule (the "**Revised Schedule**") so as to report any matters on the Purchase Price Allocation Schedule that need updating as a result of purchase price adjustments, if any. The Purchase Price Allocation Schedule and the Revised Schedules shall be prepared in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended from time to time (the "**Code**") and the Income Tax Regulations promulgated thereunder (the "**Regulations**").  Seller shall have a period of thirty (30) days after the delivery of such allocation schedule(s) (the "**Purchase Price Allocation Response Period**") to present in writing to Purchaser notice of any objections Seller may have to the allocations set forth therein (a "**Tax Objections Notice**").  If Seller shall raise any such objections within the Purchase Price Allocation Response Period, Purchaser and Seller, in cooperation with the LBREP LP, shall negotiate in good faith and use their reasonable best efforts to resolve such dispute.  If the parties fail to agree within fifteen (15) days after the delivery of the Tax Objections Notice to Purchaser, then the disputed items shall be resolved by a mutually acceptable nationally recognized independent accounting firm (the "**Accounting Firm**"), whose determination shall be final and binding on the parties.  The Accounting Firm shall resolve the dispute within thirty (30) days after the item has been referred to it.  The costs, fees and expenses of the Accounting Firm shall be borne equally by Seller and Purchaser.  Each of Purchaser, Seller and the Partnership agrees to, and shall cause their respective affiliates and Subsidiaries to, (a) act in accordance with such allocation schedule for all tax purposes and file all tax returns in a manner consistent with the Purchase Price Allocation Schedule and Revised Schedules and (b) not to voluntarily take any position inconsistent therewith in the course of any tax proceeding, unless required to do so by applicable law.  For purposes of clarification, the allocation of the Purchase Price and the purchase price under the Silverpeak Purchase Agreement among the assets of the

Owner Entities as set forth in the Purchase Price Allocation Schedule or the Revised Schedule, as applicable, shall be in the same proportion.

## ARTICLE 4   TITLE; SURVEY

**4.1 State of Title to the Property**.  Fee or leasehold title to each Individual Property shall be owned at Closing by the Property Owning Subsidiary identified as the fee or leasehold owner thereof on Schedule C(2) free and clear of any and all liens, mortgages, deeds of trust, security interests and other encumbrances, except for the following (collectively, the "**Permitted Exceptions**"): (i) the title exceptions set forth in the Title Commitment (hereinafter defined); (ii) the state of facts disclosed on the surveys listed in Schedule 4.1 (collectively, the "**Surveys**"); (iii) [reserved]; (iv) the lien of real property taxes, assessments, business improvement district taxes and similar municipal and other charges not yet due and payable, subject to proration; (v) any laws, rules, regulations, statutes, ordinances, orders or other legal requirements affecting the Property; (vi) the rights and interests held by tenants (as tenants only) leasing or otherwise occupying any portion of the Improvements under all leases, licenses and occupancy agreements ("**Leases**") in effect at Closing and others claiming by, through or under such Leases; (vii) any lien or encumbrance (including, without limitation, any mechanic's lien or materialmens' lien), the removal of which is an obligation of a tenant under a Lease, but only up to a maximum of one million dollars ($1,000,000.00) in the aggregate (any such liens or encumbrances in excess of one million dollars ($1,000,000.00) in the aggregate shall not be a Permitted Exception and shall be removed or bonded over by the Partnership at its expense prior to or at the Closing); (viii) the Existing Loan Documents; (ix) all violations of laws, rules, regulations, statutes, ordinances, orders or requirements, now issued or noted or hereafter issued or noted relating to conditions existing on, prior to, or subsequent to the date hereof; (x) any public utility company rights, easements and franchises for electricity, water, steam, gas, telephone or other services or the right to use and maintain poles, lines, wires, cables, boxes and other fixtures and facilities in, over, under and upon the Property; (xi) [reserved]; and (xii) all matters, whether or not of record, to the extent caused solely by Purchaser or its agents, representatives or contractors.

**4.2 Title Commitment and Survey**.  Purchaser hereby acknowledges receipt of (i) commitments for an owner's title insurance policy for each Individual Property issued by Commonwealth Land Title Insurance Company (the "**Purchaser's Title Company**") as set forth in Schedule 4.2 annexed hereto (collectively, the "**Title Commitment**").  Purchaser hereby accepts the state of title and survey as reflected on the Title Commitment and waives any claim of defect or other title or survey objection based on matters revealed in the Surveys. If Purchaser elects to obtain at Closing new title insurance policies with respect to the Property or any Individual Property, such new title insurance coverage shall be provided by the Purchaser's Title Company.

**4.3 Title Objections**.

4.3.1 Purchaser may update the Title Commitment and/or the Surveys at its sole cost and expense.  Upon the issuance of any updates or revisions to the Title Commitment, from time to time, which disclose title exceptions arising after the effective date of the Title Commitment, Purchaser shall within ten (10) Business Days after Purchaser's receipt thereof

(the "**Objection Period**"), provide Seller and the Partnership with a written statement (a "**Title Objection Notice**") setting forth those specific title exceptions in the updated Title Commitment (arising after the effective date of the Title Commitment) which are not Permitted Exceptions ("**Title Objections**"). If Purchaser does not deliver a Title Objection Notice with respect to a Title Objection within the applicable Objection Period, Purchaser shall be deemed to have waived its right to object thereto and the same shall not constitute a Title Objection and shall be deemed a Permitted Exception.

4.3.2  Except as set forth in Section 4.3.3 below, it is expressly understood that in no event shall Seller, the Partnership or any Owner Entity be required to bring any action or institute any proceeding, or to otherwise incur any costs or expenses in order to attempt to eliminate any Title Objections, provided that the Partnership agrees to eliminate (or to cause the Property Owning Subsidiary in title to eliminate) Title Objections placed upon any Individual Property by any Owner Entity in violation of this Agreement. The Partnership shall notify Purchaser within five (5) Business Days after receipt of any Title Objections whether it will cause the cure of such Title Objections (with affirmative title insurance over a Title Objection reasonably satisfactory to Purchaser being deemed to be a cure of such Title Objection), in the absence of which, the Partnership shall be deemed to have elected not to cause the cure of such Title Objections. In the event the Partnership notifies Purchaser that it will cause the cure of a Title Objection then the Partnership shall be obligated to do so. Should the Partnership fail to do so, same shall be deemed to be a default hereunder on the part of Seller. In the event the Partnership notifies Purchaser that the Partnership is unable or unwilling to cause the cure of any of the Title Objections ("**Partnership's Response Notice**"), then Purchaser as its sole remedy may elect by written notice to Seller, given no later than the earlier to occur of (x) five (5) Business Days of receipt of the Partnership's Response Notice or (y) the Closing Date (the "**Outside Notice Date**") to either (A) accept title to the Property subject to the Title Objections that are not otherwise required to be cured by the Partnership as provided in this Agreement, without any abatement of the Purchase Price, or any liability or obligation on the part of Seller or the Partnership by reason of such Title Objections, or (B) terminate this Agreement in which event the Deposit shall be immediately returned to Purchaser and this Agreement shall terminate except for the provisions of this Agreement which expressly survive termination.  In the event Purchaser fails to notify Seller in writing of its intention to either terminate this Agreement or accept title to the Premises on or before the Outside Notice Date, then Purchaser shall be deemed to have elected to accept title to the Property.

4.3.3  Notwithstanding the foregoing, the Partnership shall be obligated to remove (or to cause the Property Owning Subsidiaries in title to remove) (i) all mortgages and deeds of trust which affect the Property ("**Mortgages and Deeds of Trust**") (other than those which secure the Existing Loan Documents), and (ii) all mechanic's liens, judgment liens, and other monetary liens affecting the Property, other than any mechanic's lien to the extent it is a tenant's obligation to remove and liens which have become Permitted Exceptions pursuant to Section 4.3.1 and Section 4.3.2 (collectively, "**Liens**").  Should the Partnership fail to do so, the same shall be deemed to be a default hereunder on the part of Seller.

4.3.4  Notwithstanding anything to the contrary contained herein, if the Partnership is unable to eliminate (or to cause the Property Owning Subsidiaries in title to eliminate) the Title Objections by the Scheduled Closing Date (as hereinafter defined), unless the

same are waived by Purchaser without any abatement in the Purchase Price, Seller may, upon five (5) Business Days written notice ("**Title Cure Notice**") to Purchaser, which notice(s) shall set forth the new Scheduled Closing Date elected by Seller, adjourn the Scheduled Closing Date for a period not to exceed fifteen (15) days in the aggregate (less the number of days by which the Closing Date was previously extended by Seller pursuant to Section 9.1.15) ("**Title Cure Period**"), in order to allow the Partnership to attempt to eliminate the Title Objections or remove Mortgages and Deeds of Trust and Liens, provided, however, that nothing contained herein shall be deemed to relieve the Partnership of its obligation to cause the removal of (i) Mortgages and Deeds of Trust and Liens (other than those which secure the Existing Loan Documents), (ii) any matter created by any Owner Entity after the Effective Date, or (iii) any Title Objection which the Partnership has agreed to cure or remove.  If Seller adjourns the Closing pursuant to this Section 4.3.4, then the Partnership shall use diligent commercially reasonable efforts to cause the elimination of the Title Objections and/or the removal of the Mortgages and Deeds of Trust and Liens.  In no event shall any lien, encumbrance or other exception arising as a result of any act or omission of Purchaser or anyone acting on behalf of Purchaser be deemed a Title Objection. Notwithstanding anything in this Agreement to the contrary, in no event shall Seller have the right to adjourn the Scheduled Closing Date (whether for a Title Cure Period as provided in this Section 4.3.4, the failure of a condition precedent as provided in Section 9.1.15 or any combination thereof) for a period of more than fifteen (15) days in the aggregate.

4.3.5  The remedies afforded to Purchaser in Section 4.3.2 may only be exercised by Purchaser with respect to the entire Property in the aggregate and not with respect to any one or more Individual Properties (i.e., if the Partnership notifies Purchaser that it is unable or unwilling to cure Title Objections with respect to a particular Individual Property, Purchaser's sole remedy as provided in Section 4.3.2 shall be either to proceed to Closing (with title to the Property as-is) or to terminate the Agreement and obtain the return of the Deposit).

4.3.6  Any notice required or permitted to be given by Purchaser to the Partnership pursuant to this Section 4.3 shall also be given to Seller.

## ARTICLE 5   PROPERTY INFORMATION

**5.1  Property Information**.  The Partnership has made available to Purchaser certain leasing and other information with respect to the Property, the Owner Entities and the Partnership Interests, contained in an offering memorandum distributed to Purchaser by Broker (hereinafter defined) and in a due diligence website or "war room" (collectively, the "**Property Information**").   Purchaser shall keep the Property Information confidential, subject to Purchaser's right to disseminate Property Information to or among the parties listed in Section 16.17 of this Agreement, and subject to the restrictions set forth in Section 16.17. Neither Seller nor any of the Owner Entities makes any representation or warranty as to the truth, accuracy or completeness of the Property Information provided to Purchaser, except as otherwise set forth in the Express Representations and Purchaser hereby waives any and all claims against Seller, the Partnership, the Owner Entities, and any other party that prepared or furnished the Property Information arising out of any untruthfulness, inaccuracy or incompleteness thereof (except for any claims to which Purchaser is otherwise entitled hereunder based on the Express Representations).

**5.2  Partnership Financial Information.**  Seller has caused the Partnership to deliver, or otherwise made available, as appropriate, to Purchaser copies of certain financial statements, balance sheets, tax returns and other documentation with respect to the Partnership, the other Owner Entities and the Partnership Interests (collectively, the "**Partnership Information**"). Purchaser shall keep the Partnership Information confidential, subject to Purchaser's right to disseminate Partnership Information to or among the parties listed in <u>Section 16.17</u>, and subject to the restrictions set forth in <u>Section 16.17</u>.  Neither Seller nor any of the Owner Entities makes any representation or warranty as to the truth, accuracy or completeness of the Partnership Information provided to Purchaser, except as may be set forth in the Express Representations, and Purchaser hereby waives any and all claims against Seller, the Partnership, the Owner Entities, Property Manager (hereinafter defined) and any other party that prepared or furnished the Partnership Information arising out of any untruthfulness, inaccuracy or incompleteness thereof (except for any claims that Purchaser is otherwise entitled to assert hereunder based on the Express Representations).

**5.3  Organizational Documents**.  Seller has delivered to Purchaser for review copies of the organizational documents of the Partnership and each of the other Owner Entities (collectively, the "**Organizational Documents**"), a current, complete and accurate list of which is attached hereto as <u>Schedule 5.3</u>.

## ARTICLE 6   PURCHASER'S DUE DILIGENCE

**6.1  Purchaser's Due Diligence**.

6.1.1 Subject to the provisions of this Section, Purchaser and its agents, employees, consultants, inspectors, appraisers, engineers and contractors (collectively "**Purchaser's Representatives**") shall have the right, through the Closing Date, from time to time, upon the advance notice required pursuant to this Section 6.1, to enter upon and pass through the Property during normal business hours to examine and inspect the same.

6.1.2 In conducting any inspection of the Property or otherwise accessing the Property, Purchaser shall at all times comply with all laws and regulations of all applicable governmental authorities, and neither Purchaser nor any of Purchaser's Representatives shall (i) contact or have any discussions with any Owner Entity's employees, agents or representatives, or with any tenants (including, without limitation, conducting tenant interviews or having any contacts whatsoever with tenants, including but not limited to telephone conversations or electronic mail messages) at, or contractors providing services to, the Property, unless in each case Purchaser obtains the prior written consent of the Partnership (which may be given via electronic mail), it being agreed that all such contacts or discussions shall, pending any such approval, be directed to the Partnership's property manager, Monday Properties Services, LLC (the "**Property Manager**") via electronic mail (at WMachen@mondayre.com), (ii) interfere with the business of any Owner Entity (or any of its tenants) conducted at the Property or unreasonably disturb the use or occupancy of any occupant of the Property or (iii) damage the Property.  In conducting the foregoing inspection or otherwise accessing the Property, Purchaser and Purchaser's Representatives shall at all times comply with, and shall be subject to, the rights of the tenants under the Leases (and any persons claiming by, under or through such tenants). The Partnership  may from time to time establish reasonable rules of conduct for Purchaser and

Purchaser's Representatives in furtherance of the foregoing. Purchaser shall schedule and coordinate all inspections, including, without limitation, any environmental tests, and other access and any tenant contacts with the Property Manager, and shall give the Property Manager at least one (1) Business Day's prior notice thereof. The Partnership shall be entitled to have an officer or employee of the Property Manager and a representative of the Partnership present at all times during each such inspection or other access and contacts with tenants. Purchaser agrees to pay to the Partnership on demand the cost of repairing and restoring any damage which Purchaser or Purchaser's Representatives shall cause to the Property. All inspection fees, appraisal fees, engineering fees and other costs and expenses of any kind incurred by Purchaser or Purchaser's Representatives relating to such inspection and its other access shall be at the sole expense of Purchaser. In the event that the Closing hereunder shall not occur for any reason whatsoever (other than as a result of Seller's default), Purchaser shall use good faith commercially reasonable efforts to promptly return to the Partnership (or, at Purchaser's election, destroy) all copies of all Property Information and Partnership Information delivered by Seller or the Owner Entities or the Property Manager to Purchaser and destroy all copies and abstracts thereof. Purchaser and Purchaser's Representatives shall not be permitted to conduct borings of the Property or drilling in or on the Property, or any other invasive, intrusive or destructive testing in connection with the preparation of an environmental audit or in connection with any other inspection of the Property without the prior written consent of the Partnership (and, if such consent is given, Purchaser shall be obligated to pay to the Partnership on demand the cost of repairing and restoring any damage as aforesaid). Prior to any inspections or tests on any Individual Property Purchaser shall provide to Seller, the Partnership, the Property Manager and the Property Owning Subsidiary that owns such Individual Property a certificate of commercial general liability insurance, which insurance shall be satisfactory to Seller, the Property Manager and the Partnership in their reasonable discretion and shall remain in effect at all times while this Agreement is in effect. The provisions of this <u>Section 6.1.2</u> shall survive the Closing or any termination of this Agreement.

6.1.3  Purchaser shall not, through its officers, employees, managers, contractors, consultants, agents, representatives or any other person (including, without limitation, any person that conducted inspections by or on behalf of Purchaser), directly or indirectly, communicate with any governmental authority or any official, employee or representative thereof, involving any matter with respect to the Property, without the Partnership's prior written consent, which consent may be withheld in the Partnership's sole discretion. It is further agreed by the parties hereto that in no event shall Purchaser provide any governmental authority with information concerning the environmental condition of the Property without first obtaining the Partnership's prior written consent thereto unless Purchaser is legally required to disclose (in which event Purchaser shall promptly give notice to the Partnership and Seller and afford the Partnership a reasonable opportunity to enjoin such disclosure with the appropriate governmental authority). Notwithstanding the foregoing, Purchaser may (a) conduct, or cause to be obtained on its behalf, searches of the public records as are customary in similar transactions including without limitation: (i) code and zoning compliance diligence, (ii) violation searches and diligence, (iii) municipal and real estate lien searches, (iv) UCC searches and (v) bankruptcy and litigation searches, and (b) may communicate without restriction with any governmental authority that is a direct or indirect investor in Purchaser or Purchaser's equity owner or any official, employee or representative thereof.

6.1.4 Purchaser agrees to protect, indemnify, defend and hold Seller and the Owner Entities harmless from and against any claims, liabilities, losses, costs, expenses (including reasonable attorneys' fees), damages or injuries arising out of or resulting from the inspection of the Property at any time by Purchaser, its agents, employees, representatives or consultants or any act or omission by Purchaser or its agents, employees or consultants which breach the terms of this Section 6.1, and notwithstanding anything to the contrary in this Agreement, such obligation to indemnify and hold harmless Seller and the Owner Entities shall survive Closing or any earlier termination of this Agreement. The foregoing indemnity expressly excludes the mere discovery by Purchaser of a pre-existing condition.

## 6.2  As Is, Where Is

6.2.1 Except for those representations and warranties expressly provided in this Agreement and in the FIRPTA Certificate (as defined below) (collectively, the "**Express Representations**"), neither Seller nor any of the Owner Entities does, and neither Seller nor any of the Owner Entities shall, by execution and delivery of this Agreement or by the execution and delivery of any document or instrument executed and delivered in connection with Closing, make any representation or warranty, express or implied, of any kind or nature whatsoever, with respect to Seller, the Partnership Interests, the Owner Entities or the Property, and all such warranties are hereby disclaimed.

6.2.2 Without limiting the generality of the foregoing, other than the Express Representations, neither Seller nor any of the Owner Entities makes, or shall make, any express or implied warranty as to matters of title, zoning, acreage, tax consequences, actual or projected revenue and expenses, physical or environmental condition (including, without limitation, laws, rules, regulations, orders and requirements pertaining to the use, handling, generation, treatment, storage or disposal of any toxic or hazardous waste or toxic, hazardous or regulated substance), valuation, governmental permits and approvals, covenants, conditions and restrictions of record applicable to the Property and compliance therewith, compliance with laws, ordinances, rules, building codes, zoning proffers, and other governmental regulations, the quantity, quality or condition of any personal property and fixtures, any leases or occupancy agreements relating to the Property, any management agreements, service agreements or other contracts relating to the Property, the use or occupancy of the Property, whether the entering by Seller into this Agreement or the consummation of the transaction contemplated by this Agreement is or may become a breach or event of default under any of the Existing Loan Documents, the truthfulness, accuracy or completeness of the Property Information, or any other matter or thing relating to or affecting the Property (collectively, the "**Disclaimed Matters**").

6.2.3 Notwithstanding anything to the contrary set forth in this Agreement, but subject to the Express Representations and Seller's and the Partnership's obligations set forth in Article 8 hereof, (i) beneficial ownership interest in the Property (indirectly, through assignment of the Partnership Interests to Purchaser), including without limitation the roofs, all structural components, all heating, ventilating, air conditioning, mechanical, plumbing, and electrical systems, fire and life safety and all other parts of the buildings constituting a portion of the Property and (ii) the Partnership Interests, shall be transferred to Purchaser, and Purchaser shall accept same, in their "AS IS" "WHERE IS" condition on the Closing Date, "WITH ALL FAULTS" and "SUBJECT TO ALL DEFECTS."  Purchaser acknowledges that Seller's

willingness to sell the Partnership Interests to Purchaser at the Purchase Price has been induced, in part, by the agreement of Purchaser to purchase the Partnership Interests in the Partnership and indirectly, the Property, in such "AS IS" "WHERE IS" condition. Purchaser hereby acknowledges, represents and warrants that in executing, delivering and performing this Agreement Purchaser (i) has not and does not rely upon any statement, information or representation to whomsoever made or given, whether to Purchaser or others, and whether directly or indirectly, verbally or in writing, made by any person or entity, except for the Express Representations, (ii) expressly disclaims any intent to rely on the Property Information other than with respect to the Express Representations related thereto, (iii) has relied solely on its own independent investigation, inspection, analysis, appraisal, examination and evaluation of the facts and circumstances, (iv) agrees to assume the risk that adverse matters, including but not limited to construction or mechanical defects and adverse physical and environmental conditions, may not have been revealed by its investigations of the Property, (v) agrees that neither Seller nor any of the Owner Entities has any obligation to remedy or cause compliance with any violation of any federal, state, county, or municipal laws, ordinances, orders, rules, regulations, requirements, or recorded covenants or restrictions affecting the Property, (vi) is not in a disparate bargaining position with respect to Seller in connection with the transaction contemplated hereby, (vii) freely and fairly agreed to the waivers and conditions of this <u>Section 6.2</u> as part of the negotiations of this Agreement, (viii) has been represented by adequate legal counsel in connection herewith and has conferred with such legal counsel concerning the waivers and other conditions of this <u>Section 6.2</u>, and (ix) Purchaser is experienced in and knowledgeable about the ownership, management, leasing and purchase of commercial real estate and office properties, has relied and will rely exclusively on its own consultants, advisors, counsel, employees, agents, principals and/or studies, investigations and/or inspections with respect to the Property, its tax or legal status, condition, value and potential, and will not rely on any information provided by Seller or the Partnership or their agents or consultants, except solely for the Express Representations.

6.2.4 Without in any way limiting any provision of this <u>Section 6.2</u>, Purchaser specifically acknowledges and agrees, for itself and any of its assigns pursuant to Article 16 and their affiliates, that except with respect to the Express Representations and the obligations of Seller and the Partnership set forth in <u>Article 8</u> hereof, and except to the extent necessary to pursue any claim against any predecessor to Seller in ownership of the Partnership Interests or against any third party, Purchaser hereby waives, releases and discharges any claim it has, might have had or may have against Seller, any of the Owner Entities, and their respective affiliates or any direct or indirect partner, member, trustee, beneficiary, director, shareholder, officer, attorney, employee, representative or broker of any of the foregoing, and any of their respective heirs, successors, personal representatives, devisees, and assigns, with respect to (i) the Disclaimed Matters, (ii) the condition of the Property as of the Closing Date, (iii) the past, present or future condition or compliance of the Property with regard to any environmental protection, pollution control or land use laws, rules, regulations, orders or requirements, including, without limitation, CERCLA (as hereinafter defined), or (iv) any other state of facts that exists with respect to the Property. The waiver, release and discharge set forth in this <u>Section 6.2.4</u> shall survive the Closing or any termination of this Agreement.

## ARTICLE 7    REPRESENTATIONS AND WARRANTIES

**7.1 Seller's Representations and Warranties**.  Seller represents to Purchaser, both as of the Effective Date and as of the Closing, as follows:

7.1.1 <u>Organization</u>.  Seller is duly formed and validly existing under the laws of the jurisdiction of its organization.

7.1.2 <u>Authority/Consent</u>.    Subject to Bankruptcy Court Approval (hereinafter defined), Seller possesses all requisite power and authority, and has taken all actions required by its organizational documents and applicable law, to execute and deliver this Agreement and will by Closing have taken all actions required by its organizational documents and applicable law, to consummate the transactions contemplated by this Agreement.   This Agreement constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

7.1.3 <u>Litigation</u>.   Subject to Bankruptcy Court Approval and except as may be disclosed on <u>Schedule 7.1.3</u> attached hereto, no action, suit or other proceeding not covered by insurance is pending against Seller or, to Seller's knowledge, has been threatened in writing against Seller that would prevent Seller from performing its obligations pursuant to this Agreement or that would be reasonably likely to have a Material Adverse Effect (hereinafter defined).   There are no judgments, decrees or orders entered in any suit or proceeding against Seller that adversely affect Seller's ability to perform its obligations pursuant to, or Purchaser's rights under, this Agreement, or that purport to restrain, prohibit, invalidate, set aside, rescind, prevent or make unlawful this Agreement or the carrying out of this Agreement or the transactions contemplated hereby.

7.1.4 <u>Other Sales Agreements</u>.   Other than rights of first offer as set forth in Section 10.2(b) of the Partnership Agreement, Seller has not entered into any other contract to sell, or granted any warrant, option or other purchase right with respect to, the Partnership Interests or any portion thereof, or any Equity Security (as defined below) in any of the Owner Entities, which contract, warrant, option or purchase right is currently in effect.

7.1.5 <u>Partnership Interests</u>.

(a)   The Partnership Interests are owned by Seller free and clear of all liens, claims and any other rights or encumbrances.

(b)   True and complete copies of the Organizational Documents as identified in <u>Schedule 5.3</u> have been made available to the Purchaser.  No Organizational Document has been amended or otherwise modified except as set forth on <u>Schedule 5.3</u>. Each such Organizational Document is in full force and effect in accordance with its terms.

(c)   Except as set forth in the Organizational Documents, Seller is not a party to any voting agreements, voting trusts, proxies or any other agreements, instruments or understandings with respect to the voting of the equity interests of any

Owner Entity or any agreements, instruments or understandings with respect to the transferability of the Partnership Interests or the equity interests in any Owner Entity.

7.1.6 <u>No Conflicts</u>.  Subject to Bankruptcy Court Approval, the execution and delivery of this Agreement by Seller and the consummation by Seller of the transactions contemplated hereby will not: (i) violate any judgment, order, injunction, or decree to which Seller is subject, or (ii) conflict with, result in a breach of, or constitute a default under the organizational documents of Seller, or other agreement or instrument to which Seller is a party or by which Seller may be bound, other than such violations, conflicts, breaches or defaults that individually or in the aggregate would not be reasonably likely to have a Material Adverse Effect or to prevent the consummation of the transactions contemplated by this Agreement.

7.1.7 <u>Prohibited Transaction</u>.  Neither Seller, nor any member, partner or shareholder of Seller, nor, to Seller's knowledge, any person or entity with actual authority to direct the actions of any member, partner or shareholder of Seller, nor, to Seller's knowledge, any other person or entity holding any legal or beneficial interest whatsoever in Seller (i) are named on any list of persons and governments issued by the Office of Foreign Assets Control of the United States Department of the Treasury ("<u>OFAC</u>") pursuant to Executive Order 13224 – Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism ("<u>Executive Order 13224</u>"), as in effect on the Effective Date, or any similar list known to Seller or publicly issued by OFAC or any other department or agency of the United States of America (collectively, the "<u>OFAC Lists</u>"), (ii) are included in, owned by, controlled by, knowing acting for or on behalf of, knowingly providing assistance, support, sponsorship, or services of any kind to, or otherwise knowingly associated with any of the persons referred to or described in the OFAC Lists, or (iii) has knowingly conducted business with or knowingly engaged in any transaction with any person named on any of the OFAC Lists or any person included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or, to Seller's knowledge, otherwise associated with any of the persons referred to or described in the OFAC Lists.

**7.2 Purchaser's Representations and Warranties**.  Purchaser represents to Seller, both as of the Effective Date and as of the Closing, as follows:

7.2.1 <u>Organization</u>.  Purchaser is duly formed, validly existing and in good standing under the laws of the jurisdiction of its organization.

7.2.2 <u>Authority/Consent</u>.  Purchaser possesses all requisite power and authority, has taken all actions required by its organizational documents and applicable law, and has obtained all necessary consents, to execute and deliver this Agreement and will by Closing have taken all actions required by its organizational documents and applicable law, to consummate the transactions contemplated in this Agreement.

7.2.3 <u>Prohibited Transaction</u>.  Neither Purchaser, nor any member, partner or shareholder of Purchaser, nor, to Purchaser's knowledge, any person or entity with actual authority to direct the actions of any member, partner or shareholder of Purchaser, nor, to Purchaser's knowledge, any other person or entity holding any legal or beneficial interest whatsoever in Purchaser (i) are named on any list of persons and governments issued by OFAC

pursuant to Executive Order 13224, as in effect on the Effective Date, or any of the OFAC Lists, (ii) are included in, owned by, controlled by, knowing acting for or on behalf of, knowingly providing assistance, support, sponsorship, or services of any kind to, or otherwise knowingly associated with any of the persons referred to or described in the OFAC Lists, or (iii) has knowingly conducted business with or knowingly engaged in any transaction with any person named on any of the OFAC Lists or any person included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or, to Purchaser's knowledge, otherwise associated with any of the persons referred to or described in the OFAC Lists.

       7.2.4 <u>ERISA</u>.  Purchaser is not an employee pension benefit plan subject to the provisions of Title IV of the Employee Retirement Income Security Act of 1974, as in effect from time to time ("**ERISA**") or subject to the minimum funding standards under Part 3, Subtitle B, Title I of ERISA or Section 412 of the Code or Section 302 of ERISA, and none of its assets constitutes or will constitute assets of any such employee benefit plan subject to Part 4, Subtitle B, Title I of ERISA.  Purchaser is not a "governmental plan" within the meaning of Section 3(32) of ERISA and the funds used by Purchaser to acquire the Partnership Interests are not subject to any state statutes regulating investments of and fiduciary obligations with respect to governmental plans.  The transactions contemplated by this Agreement are not specifically excluded by Part I(b) of PTE 84-14.

       **7.3 Partnership's Representations and Warranties**.  As a material inducement for Purchaser to enter into this Agreement, the Partnership represents to Purchaser, both as of the Effective Date and as of the Closing, as follows:

       7.3.1 <u>Organization.</u>  The Owner Entities are duly formed, validly existing and in good standing under the laws of the State of Delaware.  The Partnership Interests are duly authorized, validly issued, and have been issued by the Partnership in compliance with all applicable laws, contracts applicable to the Partnership, and the Partnership's Organizational Documents.  All of the Equity Securities that have been issued to the Partnership by the other Owner Entities are duly authorized, validly issued, and have been issued by such Owner Entity in compliance with all applicable laws, contracts applicable to such Owner Entity, and such Owner Entity's Organizational Documents.  Except for the Organizational Documents of the Owner Entities and amendments and modifications thereto referenced on <u>Schedule 5.3</u>, there are no other organizational documents or amendments or modifications thereto relating to the Partnership or the Owner Entities.  Seller has provided Purchaser with true, correct and complete copies of all of the Organizational Documents.  The Partnership has taken all necessary action to authorize and approve the execution and delivery of this Agreement by the Partnership for the limited purposes set forth in the Partnership's joinder to this Agreement, and this Agreement constitutes the legal, valid and binding obligation of the Partnership for the limited purposes set forth in the Partnership's joinder to this Agreement, enforceable against the Partnership in accordance with its terms.

       7.3.2. <u>Capitalization.</u>  No person or entity other than Seller, the LBREP LP and the Monday LP owns any limited partnership interest in the Partnership.  No person or entity other than the General Partner owns any general partnership interest in the Partnership.  No person or entity other than an Owner Entity owns any Equity Security in any of the REIT

Subsidiaries, Series LLC, TRS Corp., and/or the Property Owning Subsidiaries, and the Owner Entities own all such Equity Securities free and clear of all liens, claims, rights or encumbrances other than the liens of the Existing Loans and the Permitted Exceptions. The Partnership owns no Equity Security in any person or entity other than the REIT Subsidiaries, Series LLC, TRS Corp., and the Property Owning Subsidiaries. For purposes of this Agreement, "**Equity Security**" means, with respect to any entity, (i) any shares of capital stock, membership interests (including, but not limited to, the Partnership Interests), partnership interests or other direct or indirect ownership or equity interests in, or securities of such entity, or (ii) any securities, rights or obligations convertible into, exchangeable for or exercisable to acquire, or options, warrants, calls commitments or rights of any kind to acquire any securities described in clause (i) of this definition.

7.3.3. <u>Litigation</u>. Except as may be disclosed on <u>Schedule 7.3.3</u> attached hereto, no material action or suit not covered by insurance, and no other proceeding (including, but not limited to, any condemnation action or real estate tax appeal) is pending or, to General Partner's knowledge, has been threatened in writing concerning or involving the Partnership or any Owner Entity, or the Property or any Individual Property, that would prevent the consummation of the transactions contemplated by this Agreement or would be reasonably likely to have a Material Adverse Effect.

7.3.4 <u>Bankruptcy</u>. No bankruptcy, insolvency, reorganization or similar action or proceeding, whether voluntary or involuntary, is pending, or, to General Partner's knowledge, threatened in writing, against any Owner Entity.

7.3.5 <u>Other Sales Agreements</u>. There is no contract to sell the Property, the Partnership Interests, any Equity Security in any Owner Entity or any part thereof that is currently in effect.

7.3.6 <u>Options or Rights of First Refusal</u>. Other than rights of first offer as set forth in Section 10.2(b) of the Partnership Agreement, no Owner Entity has granted any option, warrant, call, right of first refusal or first opportunity, preemptive right, subscription or any other right, agreement, arrangement or commitment of any character to any party to acquire any right, title, or interest in the Property, the Partnership Interests, any Equity Security in any Owner Entity or any portion thereof. There are no issued and outstanding securities, rights or obligations which are convertible into, exchangeable for, or exercisable to acquire any Equity Securities of any of the Owner Entities.

7.3.7 <u>Employees</u>. The Owner Entities have no employees, and during the Partnership's period of ownership of the Owner Entities, the Owner Entities have had no employees.

7.3.8 <u>No Conflicts</u>. The execution and delivery of this Agreement by Seller and the consummation by Seller of the transactions contemplated hereby, and the joinder by the Partnership to this Agreement, will not: (i) violate any judgment, order, injunction, or decree to which any Owner Entity, or the Property or any Individual Property is subject, or (ii) conflict with, result in a breach of, or constitute a default under the Organizational Documents of any Owner Entity or any lease, mortgage, deed of trust or loan agreement, covenant, or other

agreement or instrument to which any Owner Entity is a party or by which any Owner Entity, or the Property or any Individual Property, may be bound, other than such violations, conflicts, breaches or defaults that individually or in the aggregate would not be reasonably likely to have a Material Adverse Effect or to prevent the consummation of the transactions contemplated by this Agreement.

7.3.9 <u>Assets of the Partnership.</u>   Other than any cash on hand, bank accounts, prepaid insurance and other assets as disclosed in the Partnership Information, (i) the only assets of the Partnership are its direct or indirect membership interests in the Owner Entities, (ii) the only assets of the REIT Subsidiaries are their membership interest in Series LLC, (iii) the only assets of Series LLC are its equity interest in TRS Corp. and its membership interests in the Property Owning Subsidiaries, and (iv) the only assets of the Property Owning Subsidiaries are the Individual Properties and non-material assets held in connection with the ownership and operation of the Individual Properties.   During their entire respective periods of legal existence, the Owner Entities have not directly or indirectly owned any real property or other assets other than the Property, cash, and assets related to the operation, leasing and maintenance of the Property, except that the Partnership indirectly owned a property at 2990 Telestar Court, Falls Church, Virginia, which was sold in 2010.

7.3.10 <u>Indebtedness and Liabilities.</u>   No Owner Entity has any Indebtedness or Liability, except (a) the Existing Loans, (b) other debt for borrowed money that will be repaid in full at Closing, (c) the Indebtedness and Liabilities disclosed in <u>Schedule 2.1</u> attached hereto, (d) the Indebtedness and Liabilities (including, without limitation, Liabilities under the Contracts) taken into account in calculating the Working Capital Adjustment (as defined below), and (e) Indebtedness and Liabilities pursuant to the Permitted Exceptions.   <u>Schedule 2.1</u> lists all of the Existing Loan Documents, and the Partnership has provided Purchaser with true, complete and correct copies of all of the Existing Loan Documents listed on <u>Schedule 2.1</u>, and the same have not been amended or modified in any way.   As of the Effective Date, the outstanding principal balance of the Corporate Credit Facility Loan is $198,000,735.84 and no accrued and unpaid interest, late fees or other charges pursuant to the Corporate Credit Facility Loan are due and owing.   As of the Effective Date, the aggregate outstanding principal balance of the CMBS Loans is $567,675,000.00, and no accrued and unpaid interest, late fees or other charges pursuant to the CMBS Loans are due and owing.   Other than with respect to assertions previously made by Cadim Note Inc. (a prior holder of a portion of the Corporate Credit Facility Loan), the Owner Entities have not received any written notices of default under the Corporate Credit Facility Loan or the CMBS Loans.   For purposes of this Agreement, "**Indebtedness**" means, without duplication, (i) indebtedness for borrowed money (including the aggregate principal amount thereof and the aggregate amount of any accrued but unpaid interest thereon) or for the deferred purchase price of property or services (other than current trade liabilities incurred in the ordinary course of business and payable consistent with customary practices), (ii) obligations evidenced by bonds, notes, debentures or similar instruments, (iii) drawn (but not undrawn) amounts under any outstanding letters of credit, (iv) obligations under financing leases, (v) mortgages, deeds of trust, liens, judgments, delinquent tax obligations or other encumbrances for amounts owed or owing (whether or not then due), and (vi) guaranties of Indebtedness of other persons or entities; and "**Liability**" means any liability or obligation, whether accrued, absolute, contingent, unliquidated or otherwise, whether due or to become due, whether known or unknown, and regardless of when asserted.

7.3.11 <u>Contracts</u>.  Except for the contracts entered into by the Owner Entities ("**Contracts**") referenced on <u>Schedule 7.3.11</u> and any Non-Material Contracts (hereafter defined), there are no currently outstanding contracts for construction or architecture, employment, parking, maintenance, management, leasing or brokerage services, service, or supply in effect (other than purchase orders) that will bind any Owner Entity after Closing.  The Partnership has provided Purchaser with true, complete and correct copies of all Contracts (other than Non-Material Contracts), including all amendments and modifications thereof, prior to the execution and delivery of this Agreement by Purchaser and Seller. The term "**Non-Material Contracts**" means Contracts which (i) require annual payments not exceeding $10,000, or (ii) can be terminated on not more than thirty (30) days notice without penalty.

7.3.12 <u>Leases</u>.  Except for the Leases referenced on <u>Schedule 7.3.12</u>, there are no leases, subleases (approved or consented to by the Owner Entities), rental agreements, licenses, license agreements or other occupancy agreements with anyone affecting the Property which will bind any Owner Entity after Closing.  Each Lease is in full force and effect, and no rent has been paid more than one month in advance.  Except as may be described in <u>Schedule 7.3.12</u> attached hereto, there exists no default by any landlord under the Leases or, to General Partner's knowledge, any tenant thereunder.  The Partnership has provided or made available to Purchaser true, correct and complete copies of all Leases, including all amendments and modifications thereto, prior to the execution and delivery of this Agreement by Purchaser and Seller.  Except as set forth on <u>Schedule 7.3.11</u>, no Owner Entity is party to any brokerage agreement with any party.  Except as set forth on <u>Schedule 7.3.13</u>, there is no remaining obligation, present or contingent, on the part of any Owner Entity to pay to any broker or other party any commission, finder's fee or similar compensation with respect to the current term of any Lease.  Notwithstanding the foregoing, the representation and warranty made by the Partnership in this <u>Section 7.3.12</u> shall terminate as to any Major Tenant Lease or other Lease, as of the date of Purchaser's receipt of an executed tenant estoppel certificate with respect to such Lease satisfying the requirements of <u>Section 9.1.5</u>, if and only to the extent that the subject matter of the representation and warranty is addressed in such tenant estoppel certificate in a manner consistent with this representation and warranty.  Except as set forth on Schedule 7.3.13 or as otherwise contained in the Leases, (i) all Tenant Inducement Costs (as defined below) are paid and/or completed in full with respect to the current term of any existing Lease, and (ii) no Tenant Inducement Costs are payable with respect to any renewal or expansion of any Lease.

7.3.13 <u>Leasing Commissions; Tenant Inducement Costs</u>.   All Leasing Commissions (hereinafter defined) and all Tenant Inducement Costs (hereinafter defined) currently due and payable (excluding Post-Effective Date LC/TI Costs, as hereinafter defined) with respect to the Leases listed on <u>Schedule 7.3.12</u> ("**Existing Leases**") ("**Current Leasing Commissions**" and "**Current Tenant Inducement Costs**", respectively) are itemized in the Outstanding column in <u>Schedule 7.3.13</u> attached hereto (excluding so called "paint and carpet" costs under Leases with the General Services Administration).

7.3.13.1     The term "**Post-Effective Date LC/TI Costs**" means any Leasing Commissions or Tenant Inducement Costs that become due and payable (A) by reason of the exercise by a tenant under an Existing Lease of any renewal option, extension option, expansion option, lease of additional space, right of first offer, right of first refusal or similar right or option provided in such Existing Lease, or a tenant's waiver of or failure to exercise a

cancellation right provided in such Existing Lease, in each case, that occurs during the period between the Effective Date and the Apportionment Date, or (B) in connection with any new Leases entered into during the period between the Effective Date and the Apportionment Date. The term "**Leasing Commissions**" means any leasing commissions which become due and payable pursuant to any brokerage agreements entered into by the Owner Entities in connection with leases of space in the Property to tenants. The term "**Tenant Inducement Costs**" means any out-of-pocket payments required under a Lease to be paid by the landlord thereunder to or for the benefit of the tenant thereunder which is in the nature of a tenant inducement or concession, including, without limitation, tenant improvement costs, design, refurbishment and other work allowances, lease buyout costs, and moving allowances.

7.3.14 <u>Security Deposits</u>. Set forth on <u>Schedule 7.3.14</u> is a true, correct and complete list of all security deposits held by the Owner Entities with respect to the Leases, whether in the form of cash, a letter of credit, or otherwise. All such security deposits remain in the Owner Entities' possession.

7.3.15 <u>Violations of Law</u>. Except as set forth on <u>Schedule 7.3.15</u>, no Owner Entity has received written notice from any governmental authority of any violation of any federal, state, county or municipal laws, ordinances, orders, regulations and requirements affecting the Property or any portion thereof (including the conduct of business operations thereon) which are unresolved, other than such violations that individually or in the aggregate would not be reasonably likely to have a Material Adverse Effect or to prevent the consummation of the transactions contemplated by this Agreement. In addition, except as set forth on <u>Schedule 7.3.15</u>, the Owner Entities have not received any written notice from any governmental authorities, and the General Partner has no knowledge, with respect to (i) any special assessments or proposed increases in the assessed value of the Property or (ii) any condemnation or eminent domain proceedings affecting the Property, that would be reasonably likely to have a Material Adverse Effect or to prevent the consummation of the transactions contemplated by this Agreement.

7.3.16 <u>Ground Leases</u>. All of the Property Owning Subsidiaries own their respective Individual Properties in fee simple, except that the Property Owning Subsidiary Berkley Property Associates, LLC ground leases the Individual Property at 1701 N. Fort Myer Drive from the Property Owning Subsidiary Lynn Estates Property Associates, LLC.

7.3.17 <u>Reports</u>. The Partnership has provided the Purchaser with true, complete and correct copies of the environmental assessments and other reports relating to the Property listed on <u>Schedule 7.3.17</u> annexed hereto.

7.3.18 <u>Taxes</u>. The Partnership is treated as a partnership for U.S. federal income tax purposes. Each of the REIT Subsidiaries, Series LLC, and the Property Owning Subsidiaries is and has always been disregarded as separate from its owner for U.S. federal income tax purposes, and none of the REIT Subsidiaries has ever been treated as a real estate investment trust for U.S. federal income tax purposes. Series LLC is and has always been a "series organization", and each Series (as defined in the Series LLC Agreement) is and has always been a "series" within the meaning of Proposed Treasury Regulations Section 301.7701-1(a)(5)(viii). Each Series is and has always been disregarded as separate from its owner for U.S. federal

income tax purposes.  To the General Partner's knowledge the responses in the REIT Questionnaire provided by the Partnership to KPMG LLP attached hereto as <u>Schedule 7.3.18</u>, in connection with KPMG LLP's preparation of the memo entitled Rosslyn REIT Tax Considerations, dated August 3, 2011, was true and correct in all material respects and the memo fairly and accurately describes the facts presented therein.  The Partnership and its Subsidiaries have timely filed all material tax returns or other information with respect to taxes of the Partnership and its Subsidiaries that are required to be filed with any governmental authority.  The Partnership and its Subsidiaries have timely paid (or withheld) all material amounts of taxes payable by the Partnership or its Subsidiaries (including taxes required to be withheld).  No extensions, waivers, or comparable consents have been given by or requested with respect to the statute of limitations for any taxes of the Partnership or its Subsidiaries.  To the General Partner's knowledge, there is no audit, examination (other than the assumed customary review by taxing authorities of the filings) or other proceeding currently pending or threatened with respect to taxes of the Partnership or its Subsidiaries.  Neither the Partnership nor any of its Subsidiaries is party to or bound by tax sharing agreements or tax indemnity obligations.

**7.4 Seller Parent's Representations and Warranties**.  As a material inducement for Purchaser to enter into this Agreement, Seller Parent represents to Purchaser, both as of the Effective Date and as of the Closing, that, subject to Bankruptcy Court Approval, Seller Parent has taken all necessary action to authorize and approve the execution and delivery of this Agreement by Seller Parent for the limited purposes set forth in Seller Parent's joinder to this Agreement, and this Agreement constitutes the legal, valid and binding obligation of Seller Parent for the limited purposes set forth in Seller Parent's joinder to this Agreement, enforceable against Seller Parent in accordance with its terms.

**7.5 Knowledge**.  For purposes of this Agreement, the phrase "to Seller's knowledge" and similar expressions means the present, actual (as distinguished from implied, imputed or constructive) knowledge (without investigation or review of files or documents relating to the Property, the Partnership, Seller or the Owner Entities) of Ashish Gupta or Jeffrey Fitts ("**Seller Knowledge Party**"). For purposes of this Agreement, the phrase "to General Partner's knowledge" and similar expressions means the present, actual (as distinguished from implied, imputed or constructive) knowledge (without investigation or review of files or documents relating to the Property, the Partnership, Seller or the Owner Entities) of Richard Brookshire, Anthony Westreich, Brian Robin, Terry Piscitelli or Tim Helmig ("**General Partner Knowledge Party**"); it being acknowledged that "to the General Partner's knowledge" shall not be construed to mean the knowledge of the LBREP GP or any of its affiliates or their officers or employees. For purposes of this Agreement, the phrase "to Purchaser's knowledge" and similar expressions means the present, actual (as distinguished from implied, imputed or constructive) knowledge of Jeffrey Fine or Robert Milkovich ("**Purchaser Knowledge Party**").  In no event shall the Seller Knowledge Party, the General Partner Knowledge Party, the Purchaser Knowledge Party or any officer or employee of Purchaser, Seller, the General Partner or the Partnership have any personal liability hereunder.

**7.6 Survival**.  All of the representations and warranties of Seller, Purchaser, the Partnership and Seller Parent set forth in this <u>Article 7</u> shall survive the Closing for a period of one (1) year (the "**Survival Date**"), except for the representations set forth in <u>Sections 7.1</u>,

<u>7.3.2</u>, <u>7.3.6</u>, <u>7.3.9</u>, <u>7.3.10</u> and <u>7.4</u> (the "**Core Representations**") which shall survive the Closing for a period of eighteen (18) months.

**7.7 Limitations**.  Seller's and the Partnership's representations and warranties in this Agreement are subject to the following express limitations:

7.7.1  Neither Seller nor the Partnership represents or warrants that any particular Lease will be in force and effect on the Closing Date or that the tenants will have performed their obligations thereunder.

7.7.2  The existence of any note or notice of violation relating to a fact, condition or circumstance described in the Title Commitment referenced in <u>Schedule 4.2</u> hereto shall not affect the obligations of Purchaser hereunder or render any representation or warranty of Seller or the Partnership untrue, and neither Seller nor the Partnership shall have any obligation to take steps to cure the same.

7.7.3  Any reference to a written notice received by Seller or the Partnership shall mean actual documentary notice which has been received by Seller or the Partnership from a governmental authority or a tenant, vendor or any other third party asserting a claim, liability, or violation against Seller or the Partnership and shall not include any constructive notice or any verbal statement by a party other than such actual documentary notice.

**7.8 Material Adverse Effect**.  "Material Adverse Effect" means any event, circumstance, change or effect that, individually or in the aggregate with any other event, circumstance, change or effect, materially interferes with the use of, or materially adversely affects the value of, the Property as it is currently operated, but excluding any such event, circumstance, change or effect resulting from (i) general changes in the economy or financial markets of the United States or any other region outside of the United States (including without limitation changes in interest or exchange rates), except to the extent that such changes have a materially disproportionate adverse effect on the Property relative to other similarly situated properties or participants in the office real estate properties business, (ii) changes in general (national, regional or local) economic, legal, regulatory or political conditions or changes in the real estate industry or the market for office real estate properties generally, except to the extent that such changes have a materially disproportionate adverse effect on the Property relative to other similarly situated properties or participants in the office real estate properties business, (iii) acts of war, armed hostilities, sabotage or terrorism, or any escalation of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of this Agreement, except to the extent that such changes have a materially disproportionate adverse effect on the Property relative to other similarly situated properties or participants in the office real estate properties business, (iv) changes in laws or generally accepted accounting principles in the United States ("**GAAP**") or (v) earthquakes, hurricanes or other natural disasters, except to the extent such events have a materially disproportionate adverse effect on the Property relative to other similarly situated properties or participants in the industry or business and in the geographic region in which the Property is located.

## ARTICLE 8    COVENANTS OF SELLER AND PARTNERSHIP PRIOR TO CLOSING

**8.1 Actions as a Partner**.   From the Effective Date until the earlier of (x) the termination of this Agreement and (y) the Closing, Seller shall not take any action as a partner of the Partnership or give any consent or vote, including giving any consent to any Major Decision (as defined in the Partnership Agreement) without Purchaser's prior written consent in its sole and absolute discretion.

**8.2 Bankruptcy Court Approval.**   The Seller has filed with the bankruptcy court having jurisdiction over the LBHI Bankruptcy (as defined below), a motion and proposed order, a true, correct and complete copy of which is attached hereto as <u>Schedule 8.2</u>, seeking bankruptcy court approval to enter into this Agreement.   Seller shall use diligent efforts to pursue the bankruptcy court's approval of such motion and entry of such proposed order.   Seller shall promptly notify Purchaser in writing of the approval or disapproval thereof by the bankruptcy court, and shall keep Purchaser reasonably apprised of the status of such motion. Seller shall use reasonable efforts to comply (or obtain an order from the bankruptcy court waiving compliance) with all requirements under the U.S. Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and local rules of court in connection with obtaining approval of the motion and proposed order, including serving on all required persons in the LBHI Bankruptcy notice of the motion and proposed order, the hearing to approve the motion and proposed order and the objection deadline in accordance with the applicable Federal Rules of Bankruptcy Procedure, local rules of court and prior orders of the bankruptcy court.   In the event the motion is approved and a sale order is entered by the bankruptcy court and the same are subsequently appealed, Seller shall use reasonable efforts to defend such appeal.   Seller shall not file any motion with the bankruptcy court related to or affecting Purchaser, the Partnership or the transaction contemplated by this Agreement without providing Purchaser's counsel a reasonable opportunity to review and consult.

**8.3 Tax Matters.**   Any items of income, gain, loss and expense taken into account in the Partnership's taxable income and loss for the Partnership year in which the Closing Date occurs shall be allocated among Purchaser and Seller as of the Closing Date pursuant to the closing of the books method.

**8.4 Partnership's Covenants.**   From the Effective Date until the Closing Date, the Partnership shall and shall cause the other Owner Entities to:

(1) maintain in full force and effect all insurance policies currently in effect with respect to the Property, or policies providing similar coverage, subject to customary exceptions at the time of renewal or issuance, and deliver to Purchaser, upon request, reasonable evidence of same including certificates of such insurance;

(2) perform their obligations under the Leases and Contracts in effect as of the Effective Date in all material respects and otherwise operate, manage and lease the Property in accordance with past practice and the current annual plan (a copy of which is attached hereto as <u>Schedule X</u>) (the "**Annual Plan**"); <u>provided</u>, <u>however</u>, that the Owner Entities shall not be obligated to perform any capital improvements or capital repairs at the Property

except to the extent such repairs are necessary to protect against imminent damage to the Property or any individual located thereon, and provided, further, that (a) 1812 Holdings, LLC and/or the Partnership shall continue the development and construction of the parking garage and other improvements at the Individual Property known as 1812 N. Moore Street in accordance with past practice (but without any obligation to issue a notice to proceed under the Guaranteed Maximum Price construction contract applicable to 1812 N. Moore Street), unless otherwise approved by Purchaser in writing, which approval shall not be unreasonably withheld, and (b) the Owner Entities shall pursue completion of any tenant improvements and capital improvements, in accordance with past practice, identified in <u>Schedule 7.3.13</u> or provided for in the Annual Plan, unless otherwise approved by Purchaser in writing, which approval shall not be unreasonably withheld;

(3) perform their obligations under the Existing Loan Documents in all material respects;

(4) not further encumber all or any portion of the Property, grant any easements or rights of way with respect to all or any portion of the Property or in any way voluntarily affect title to or zoning of the Property and shall not engage in any activity or effect any material transaction with respect to the Owner Entities or the Property including but not limited to the disposal of any material items of personalty or fixtures which are attached to the realty without Purchaser's prior written consent, which consent shall not be unreasonably withheld or delayed;

(5) without the prior written consent of Purchaser, not (a) call capital from any of the Limited Partners or the General Partner; (b) merge into or with or consolidate with any other entity; (c) other than in the ordinary course of business, cancel any debts owed to or claims held by any Owner Entity; (d) amend or terminate any Organizational Document or any Existing Loan Document; (e) issue or authorize any Equity Security; (f) incur any Indebtedness other than in accordance with the Annual Plan; (g) make, authorize or agree to make any capital expenditures outside of the ordinary course of business or expenditures contemplated by the Annual Plan or this Agreement; (h) except in connection with the Contracts, engage in any transaction with, or enter into any contract with, any Limited Partner, the General Partner or any affiliate of any of the foregoing, or modify any Contract with any Limited Partner, the General Partner or any affiliate of any of the foregoing; (i) acquire any property (other than replacement personal property in the ordinary course of business) or sell, transfer or otherwise dispose of the Property, any Individual Property or any portion thereof; (j) pay, discharge, satisfy, settle or compromise any claim, litigation or any legal proceeding, except for a discharge, satisfaction, settlement or compromise involving less than $2,500,000, including all fees, costs and expenses associated therewith, but excluding from such amounts any contribution from any insurance company or other parties to the litigation; (k) select new accountants for any Owner Entity or change any accounting policy or procedure; (l) file a voluntary petition or join in or acquiesce in any involuntary petition with respect to any Owner Entity under the U.S. Bankruptcy Code or any similar state or federal law affecting creditor's rights or for the appointment of a trustee, or cause or permit any Owner Entity to make a general assignment for the benefit of its creditors or admit in writing its inability to pay its debts as they become due; or (m) enter into, amend or modify any Contract (other than a Non-Material Contract) other than pursuant to the Annual Plan or as an approved Major Decision pursuant to Section 8.1;

(6) no later than the Closing Date, terminate all Contracts with any Limited Partner, the General Partner or any affiliate of any of the foregoing, except for the Contracts listed on <u>Schedule 7.3.11</u> and notated as being a Contract with the General Partner, any Limited Partner or any affiliate thereof, or otherwise with the prior written consent of Purchaser, in its sole and absolute discretion;

(7) within three (3) Business Days of receipt, furnish Purchaser with copies of any and all notices that it receives from Federal, State or local governmental authorities having jurisdiction over the Property, any Board of Fire Underwriters, any lender under the Existing Loans, and from any other body having jurisdiction with respect to the use and occupancy or physical condition of the Property, and copies of all material notices and correspondence received by the Partnership or any Property Owning Subsidiary with respect to the Leases or otherwise related to the Property, including, but not limited to, any legal action filed against the Partnership or any Property Owning Subsidiary, provided, however, that copies of any such notices and correspondence received by the Partnership or any Property Owning Subsidiary on and after the third Business Day preceding the Closing shall be furnished by the Partnership to Purchaser on the next Business Day following Seller's or any Property Owning Subsidiary's receipt thereof; and

(8) cooperate in good faith with Purchaser to terminate, no later than the Closing Date, any lease agreements between the Property Owning Subsidiaries or the REIT Subsidiaries and MPARK LLC, and to enter into any necessary operating agreements with MPARK LLC.

**8.5 Purchaser's Consent.**  Except as otherwise set forth herein, if Purchaser's consent is required under this Article 8, Purchaser shall, within five (5) Business Days after receipt of Seller's request therefor, notify Seller of its approval or disapproval of same and, if Purchaser fails to notify Seller of its disapproval within such five (5) Business Day period, Purchaser shall be deemed to have approved same.

## ARTICLE 9   CONDITIONS PRECEDENT TO CLOSING

**9.1 Conditions Precedent to Purchaser's Obligation to Close**.   Purchaser's obligation to purchase the Partnership Interests is subject to satisfaction on or before the Closing Date (as such date may be extended as provided herein) of the following conditions, any of which may be waived in writing by Purchaser in Purchaser's sole and absolute discretion.

9.1.1 <u>Delivery of Closing Documents</u>.  Seller shall have delivered each of the Closing Documents required to be delivered under <u>Section 10.2.1</u> of this Agreement.

9.1.2 <u>Representations and Warranties</u>.  All representations and warranties of Seller and the Partnership set forth in this Agreement shall be true and correct in all material respects as if made on the Closing Date, assuming for this purpose that none of the representations and warranties set forth in this Agreement were qualified by the concept of materiality or Material Adverse Effect (such qualifications being "read out" for this purpose). For purposes hereof, a representation or warranty shall not be deemed to have been breached if

the representation or warranty is not true and correct in all material respects as of the Closing Date by reason of changed facts or circumstances which  pursuant to the terms of this Agreement are expressly permitted to have occurred.  If any representation or warranty made in Sections 7.3.11, 7.3.12, 7.3.13 or 7.3.14 of this Agreement is not true and correct in all material respects as of the Closing Date solely by reason of either (i) the entry into Leases or Contracts consistent with the Annual Plan or approved as a Major Decision or (ii)  the application of tenant security deposits in accordance with the applicable Leases, in either case between the Effective Date and Closing, such actions shall be deemed to be expressly permitted for the purposes of this Section 9.1.2 and such representation or warranty shall not be deemed to have been breached if and only if such actions (a) are in the ordinary course of the Partnership's business and (b) would not have required Purchaser's consent under this Agreement (unless such consent was in fact obtained before the action was taken).

9.1.3 <u>Bankruptcy Court Approval</u>.  The bankruptcy court shall have entered a final, non-appealable order approving Seller's execution, delivery and performance of this Agreement, in form and substance substantially identical to the proposed order attached hereto as <u>Schedule 8.2</u> or otherwise acceptable to Purchaser in its sole and absolute discretion ("**Bankruptcy Court Approval**").

9.1.4  [Reserved]

9.1.5 <u>Tenant Estoppels</u>.  Promptly following the Effective Date, the Partnership shall or shall cause the Property Owning Subsidiaries to request in writing, from all of the private sector tenants of the Property, estoppel certificates in the form attached hereto as Schedule 9.1.5(A).  On or before the Scheduled Closing Date, Purchaser shall have received an estoppel certificate addressed to the Property Owning Subsidiaries from (i) the private sector tenants identified in Schedule 9.1.5(B) attached hereto as "Major Tenants" (the "<u>Major Tenants</u>") and (ii) a portion of the other private sector tenants identified in Schedule 9.1.5(B) attached hereto as "Non-Major Tenants" (the "<u>Non-Major Tenants</u>") whose Leases cover, in the aggregate, at least eighty percent (80%) of the space leased to Non-Major Tenants, in each case in the form attached hereto as Schedule 9.1.5(A) (provided, however, that if a tenant's Lease contains a prescribed estoppel form or requirements for an estoppel, such prescribed estoppel form or requirements shall be acceptable for such tenant so long as such prescribed form contains substantially the same information as the representations numbered 2, 3, 5, 6, 7, 9 and 10 on the form of estoppel attached hereto as Schedule 9.1.5(A)) (the estoppel certificates required to satisfy the conditions in clauses (i) and (ii) above, the "<u>Requisite Tenant Estoppel Certificates</u>"), dated after the Effective Date.  If (i) the Partnership and/or the Property Owning Subsidiaries are unable to obtain and deliver to Purchaser the Requisite Tenant Estoppel Certificates on or before the Closing Date or (ii) the Requisite Tenant Estoppel Certificates received contain any material and adverse qualifications or modifications to the form attached hereto as Schedule 9.1.5(A) (other than qualifications or modifications set forth in a prescribed estoppel form or estoppel requirements contained in such Major Tenant's Lease) or any material deviations from the Property Information provided to Purchaser prior to the Effective Date or from Seller's or the Partnership's representations hereunder, then (x) Seller shall not be in default hereunder and (y) Purchaser may, by written notice given to Seller before the Closing Date, elect to terminate this Agreement and receive an immediate return of the Deposit or waive such condition, provided, however, that if Purchaser fails to object to a Requisite Tenant Estoppel Certificate within five

(5) Business Days after Purchaser's receipt thereof from the Partnership or a Property Owning Subsidiary, Purchaser shall be deemed to have approved such Requisite Tenant Estoppel Certificate.  If Purchaser so elects to terminate this Agreement, then neither party shall have any further rights or obligations hereunder except as otherwise expressly set forth herein.

9.1.6    <u>Silverpeak Purchase Agreement</u>.    All conditions precedent to "Purchaser's" (as defined in the Silverpeak Purchase Agreement) obligation to close under the Silverpeak Purchase Agreement shall have been satisfied, other than the Closing under this Agreement.

9.1.7    <u>Lender Estoppels</u>.  Promptly following the Effective Date, the Partnership shall request in writing, (i) from the authorized representative for the lenders under the  CMBS Loans, an estoppel certificate substantially in the form attached hereto as <u>Schedule 9.1.7(A)</u> (the "**CMBS Lender Estoppel**"), and (ii) from the Administrative Agent under the Corporate Credit Facility Loan, an estoppel certificate substantially in the form attached hereto as <u>Schedule 9.1.7(B)</u> (the **Corporate Lender Estoppel**", and together with the CMBS Lender Estoppel, the "**Lender Estoppels**").  On or before the Scheduled Closing Date, Purchaser shall have received the Lender Estoppels, each dated as of a date after September 1, 2011.  If (i) the Partnership is unable to obtain and deliver to Purchaser the Lender Estoppels on or before the Closing Date, or (ii) the CMBS Lender Estoppel or the Corporate Lender Estoppel contain any material and adverse qualifications or modifications to the forms attached hereto as <u>Schedule 9.1.7(A)</u> or <u>Schedule 9.1.7(B)</u>, respectively (provided, however, that the CMBS Lender Estoppel shall not be deemed to contain any material and adverse qualifications or modifications if it does not contain the statement set forth in paragraph (g) of Schedule 9.1.7(A) ("To the knowledge of the Administrative Agent, there are no existing uncured defaults or Events of Default under any Loan Document"), or any material deviations from the Property Information provided to Purchaser prior to the Effective Date or from Seller's or the Partnership's representations hereunder, then (x) Seller shall not be in default hereunder and (y) Purchaser may, by written notice given to Seller before the Closing Date, elect to terminate this Agreement and receive an immediate return of the Deposit or waive such condition, provided, however, that if Purchaser fails to object to the CMBS Lender Estoppel or the Corporate Lender Estoppel within five (5) Business Days after Purchaser's receipt thereof from the Partnership, Purchaser shall be deemed to have approved such Lender Estoppel.  If Purchaser so elects to terminate this Agreement, then neither party shall have any further rights or obligations hereunder except as otherwise expressly set forth herein.

9.1.8    <u>Title Objections, Mortgages and Deeds of Trust and Liens</u>.    The Partnership shall have caused the cure of all Title Objections that it has undertaken to cure as set forth in <u>Section 4.3.2</u> and shall have caused the removal of all Mortgages and Deeds of Trust (other than those which secure the Existing Loan Documents) and Liens as set forth in <u>Section 4.3.3</u>.

9.1.9    <u>Transfer Under Existing Loan Documents</u>.    Seller and the Partnership shall have taken all actions necessary, if any, to obtain the consents necessary to consummate the transaction contemplated hereby pursuant to the CMBS Loan Documents (including the execution and delivery of the documentation described in <u>Section 10.2.1.5</u>), in the reasonable judgment of Purchaser; *provided*, that this condition shall not be satisfied if the obligations of the

Owner Entities pursuant to the CMBS Loan Documents are increased in any respect (other than a *de minimis* respect), or if any obligations (other than *de minimis* obligations) are imposed on Purchaser or its affiliates. For the avoidance of doubt, no monetary obligation of any amount (unless such obligation is paid by Seller) shall be considered *de minimis* for the purposes of the preceding sentence. No lender, servicer, special servicer or rating agency under the CMBS Loans shall have delivered written notice to any Owner Entity that the consummation of the transactions contemplated by this Agreement shall constitute an Event of Default under the CMBS Loans.

9.1.10 <u>Termination of Asset Management Agreement</u>. Purchaser shall have received (a) reasonably satisfactory evidence that the asset management arrangement with Trimont Real Estate Advisors, Inc. ("**Trimont**") shall be terminated as of Closing and (b) an acknowledgement from Trimont that the Partnership does not owe Trimont any unpaid fees or expenses.

9.1.11 <u>Termination of Syndication Agreement</u>. The Syndication Agreement, dated as of May 15, 2007 (as the same may have been further amended or modified) by and among the Limited Partners and the General Partner shall be terminated as of Closing (except for any provisions thereof which by their express terms survive termination) pursuant to a Termination Agreement substantially in the form of <u>Exhibit C</u> annexed hereto to be executed by the Limited Partners and the General Partner at Closing.

9.1.12 <u>Termination of Capital Services and Financing Agreement</u>. The Capital Services and Financing Agreement, dated as of May 15, 2007 (as the same may have been further amended or modified) by and among the Partnership, the Limited Partners and the General Partner shall be terminated as of Closing (except for any provisions thereof which by their express terms survive termination) pursuant to a Termination Agreement substantially in the form of <u>Exhibit D</u> annexed hereto to be executed by the Partnership, the Limited Partners and the General Partner at Closing.

9.1.13 <u>Existing Loans</u>. None of the Partnership, the General Partner or any Limited Partner shall have received any written notice of default under any of the Existing Loans.

9.1.14 <u>Non-Contravention</u>. There shall not be in effect any law or regulation that prohibits the consummation of the Closing and the consummation of the Closing shall not violate any non-appealable final order, decree or judgment of any court of governmental body having competent jurisdiction.

9.1.15 <u>Failure of a Condition</u>. Purchaser acknowledges that Seller does not guarantee the satisfaction of the conditions precedent listed in this Section 9.1 and that Seller's failure to satisfy such conditions shall not be deemed to be a default hereunder (unless same constitutes a default as provided elsewhere in this Agreement) but rather, same shall merely be a failure of a condition to Closing, in which event Purchaser's sole remedy (unless same constitutes a default as provided elsewhere in this Agreement) shall be to (i) waive such condition(s) as provided above, or (ii) terminate this Agreement and receive a refund of the Deposit. Further, at Seller's election, Seller shall be permitted to extend the Closing Date for any

period of time up to fifteen (15) days in the aggregate (less the number of days by which the Closing Date was previously extended by Seller pursuant to <u>Section 4.3.4</u>) in order to satisfy any of the conditions set forth in this <u>Section 9.1</u>.  Notwithstanding anything in this Agreement to the contrary, in no event shall Seller have the right to adjourn the Scheduled Closing Date (whether for a Title Cure Period as provided in <u>Section 4.3.4</u>, the failure of a condition precedent as provided in this <u>Section 9.1.15</u> or any combination thereof) for a period of more than fifteen (15) days in the aggregate.

**9.2  Conditions Precedent to Seller's Obligation to Close**.  Seller's obligation to sell the Partnership Interests is subject to satisfaction, on or before the Closing Date (as such date may be extended as provided herein) of the following conditions, any of which may be waived in writing by Seller, in Seller's sole and absolute discretion:

9.2.1  <u>Representations and Warranties</u>.  All representations and warranties of Purchaser set forth in this Agreement shall be true and correct in all material respects as if made on the Closing Date.

9.2.2  <u>Delivery of Closing Documents</u>.  Purchaser shall have delivered each of the Closing Documents required to be delivered under <u>Section 10.3.1</u> of this Agreement.

9.2.3  <u>Balance of Purchase Price</u>.  Purchaser shall have delivered to Seller the balance of the Purchase Price and the Escrow Agent shall have delivered to Seller the Deposit.

9.2.4  <u>Bankruptcy Court Approval</u>.  Bankruptcy Court Approval shall have been obtained.

9.2.5  <u>Non-Contravention</u>.  There shall not be in effect any law or regulation that prohibits the consummation of the Closing and the consummation of the Closing shall not violate any non-appealable final order, decree or judgment of any court of governmental body having competent jurisdiction.

**9.3  Waiver of Conditions.**  If the transaction contemplated by this Agreement closes, the parties shall be deemed to have waived any and all unmet or unsatisfied conditions, other than any unmet or unsatisfied conditions arising out of a breach by either party of any of its representations and warranties hereunder of which the other party has no knowledge as of Closing.

## ARTICLE 10   CLOSING

**10.1  Closing Date**.  The consummation of the transaction contemplated hereby (the "**Closing**", and the date on which the Closing actually occurs, the "**Closing Date**") will take place at the office of Seller's counsel in New York, New York via an escrow closing, on the 20th Business Day after the date on which Bankruptcy Court Approval has been obtained (the "**Scheduled Closing Date**"); provided, however, that (i) if the Scheduled Closing Date occurs prior to October 6, 2011, Purchaser shall have a one-time right to extend the Scheduled Closing Date to a date not later than October 6, 2011 (the "**Extension Right**") upon written notice given to Seller not later than five (5) Business Days prior to the Scheduled Closing Date and payment (by wire transfer to Escrow Agent) of an additional deposit in the amount of THIRTY-FOUR

MILLION DOLLARS ($34,000,000.00) (the "**Additional Deposit**") not later than one Business Day prior to the Scheduled Closing Date, and (ii) if Seller fails to obtain Bankruptcy Court Approval by September 30, 2011 (the "**Bankruptcy Court Approval Outside Date**", as such date may be extended by mutual agreement of Seller and Purchaser in writing), either party may terminate this Agreement by written notice given to the other party within five (5) Business Days after the Bankruptcy Court Approval Outside Date, and the Deposit shall be immediately returned to Purchaser, subject, however, to the Seller's right to extend the Closing Date pursuant to Section 4.3.4 and Section 9.1.15.  For the avoidance of doubt, in the event that the Closing has not occurred by the initial Scheduled Closing Date, as the same may have been extended (a) by Seller pursuant to Section 4.3.4 or Section 9.1.15 (for a period not to exceed fifteen (15) days in the aggregate) or (b) by Purchaser pursuant to this Section 10.1, then either party may terminate this Agreement by written notice given to the other party, and the Deposit shall be immediately returned to Purchaser.  Purchaser and Seller agree to finalize and execute all documents necessary for the consummation of the transaction contemplated herein, and to deliver all such documents to the Escrow Agent in escrow not later than the end of the Business Day immediately preceding the Closing Date in order to ensure the orderly and timely transfer of all funds necessary for Closing by not later than 2:00 p.m. (New York City time) on the Closing Date.

**10.2  Seller's Obligations at the Closing**.  At the Closing, Seller will do, or cause to be done, the following:

10.2.1  Closing Documents.  Seller shall execute, acknowledge (if necessary) and deliver originals of the following documents:

10.2.1.1    An Assignment and Assumption of Partnership Interests by Seller as to the Partnership Interests in the form of Exhibit A attached hereto (the "**Assignment of Partnership Interests**");

10.2.1.2    Certificate of Non-Foreign Status in the form of Exhibit B attached hereto (the "**FIRPTA Certificate**"); provided, however, that in the case of a failure to deliver such certification (or alternative certifications that exempt Purchaser from any withholding obligation), Purchaser's sole remedy shall be to withhold on payments hereunder to the extent required by Section 1445 Code and Regulations;

10.2.1.3    An escrow agreement, in form and substance mutually agreeable to the parties thereto, among Seller, the Partnership, LBREP LP and an escrow agent, mutually agreeable to the parties thereto, to hold $14,789,320, funded at the Closing by Seller and  LBREP LP ($13,006,210 and $1,783,110, respectively).

The amounts held pursuant to such escrow agreement:

(i) with respect to tenant improvement work described in the Contingent column in Schedule 7.3.13 (i.e., $1,410,825 (excluding the VAV Allowance referred to below)) will either be released (a) to the Partnership upon request of such funds by the tenants potentially entitled to such funds, pursuant to the terms of the current applicable Leases, for tenant improvement work related to their Leases together with the Partnership providing to Seller and

LBREP LP tenant's notice of request for such funds to the extent and in the form prescribed by the applicable Lease, corresponding invoices from the payee for such work, a certification from the Partnership that the tenant under such Lease has not entered into an extension or renewal of the applicable Lease and promptly after the funding of such amounts to pay for such work a certification by the Partnership that the funds were disbursed in accordance with the request and the Partnership funded its pro rata (i.e., 10.7595%) share of such disbursement, or (b) to Seller and LBREP LP (87.94326% and 12.05674%, respectively) upon the currently stated expiration of such Leases, if such funds were never utilized for the benefit of the underlying tenants pursuant to the terms of the Leases;

(ii) with respect to leasing commissions described in the Contingent column in Schedule 7.3.13 (i.e., $551,091) will either be released (a) to the Partnership upon the tenants under such Leases not exercising their early termination rights and triggering the payment of an additional leasing commission together with the Partnership providing to Seller and LBREP LP a certification from the Partnership that such tenants have not exercised their early termination rights, corresponding invoices from the payee for such expense and promptly after the funding of such amounts a certification by the Partnership that the funds were disbursed in accordance with the request and the Partnership funded its pro rata (i.e., 10.7595%) share of such disbursement or (b) to Seller and LBREP LP (87.94326% and 12.05674%, respectively) upon such tenants exercising their termination rights pursuant to the terms of the Leases;

(iii) with respect to the VAV Allowance described on Schedule 7.3.13 (i.e., $4,171,994) will either be released (a) to the Partnership upon request by the tenant potentially entitled to the benefit of such funds for such work related to its Lease only in connection with an election by such tenant to Substantially Renovate (as such term is currently defined in the related Lease) floors 2-13 in accordance with paragraph 6(t) and Exhibit "C" of such Lease in effect on the date hereof together with the Partnership providing to Seller and LBREP LP tenant's notice of request for such funds to the extent and in the form prescribed by the applicable Lease, evidence that the tenant has elected to Substantially Renovate floors 2-13 (to the extent and in the form prescribed by the Lease), corresponding invoices from the payee for such work and promptly after the funding of such amounts to pay for such work a certification by the Partnership that the funds were disbursed in accordance with the request and the Partnership funded its pro rata (i.e., 10.7595%) share of such disbursement or (b) to Seller and LBREP LP (87.94326% and 12.05674%, respectively) upon the currently stated expiration of such Lease (i.e., June 30, 2014), if such funds were never utilized for the benefit of the underlying tenant pursuant to the terms of the applicable Lease, provided, that, whether or not such funds are released to the Partnership in the event the tenant under such Lease enters into an extension or renewal of such Lease (including any other type of arrangement where the tenants continues to occupy a majority of the space it leases on the date hereof) beyond the current expiration date of such Lease, then upon entering into such extension or renewal of the Lease, either (a) the funds from escrow will be released to Seller and LBREP LP (87.94326% and 12.05674%, respectively) if such funds were never utilized for the benefit of the underlying tenant pursuant to the terms of the applicable Lease or (b) the Partnership shall promptly repay to Seller and LBREP LP (87.94326% and 12.05674%, respectively) such funds that were previously released to the Partnership pursuant to this sub-clause in an amount not to exceed $3,435,760 (to the extent funded, the remainder shall not be repaid), provided, further, that in all events if the Lease expires on the current expiration date (i.e., 6/30/2014) and is not be extended

or renewed, on such date, the Partnership shall certify to Seller and LBREP LP that the tenant under such Lease did not enter into an extension or renewal of such Lease (including any other type of arrangement where the tenants continues to occupy a majority of the space it leases on the date hereof) beyond the current expiration date of such Lease, and to the extent the funds were utilized for the benefit of the underlying tenant prior to such expiration, Seller and LBREP LP shall not be entitled to any repayment of the funds;

(iv) with respect to the Potential Future Loan described on Schedule 7.3.13 (i.e., $6,424,397) will either be released (a) to the Partnership upon request of such funds by the tenants potentially entitled to such funds in accordance with the current terms of their Leases together with the Partnership providing to Seller and LBREP LP tenant's notice of request for such funds (to the extent and in the form prescribed by the Lease), Seller and LBREP LP's reasonable approval over the provisions of the supplemental lease amendment related to the loan to be entered into in connection with such loan, which will provide, among other things, that the loan fully amortizes over the current term of the existing Lease in question and promptly after the funding of such amounts to fund such loan a certification by the Partnership that the funds were disbursed in accordance with the request and the Partnership funded its pro rata (i.e., 10.7595%) share of such loan, or (b) to Seller and LBREP LP (87.94326% and 12.05674%, respectively) upon the currently stated expiration of such Lease, if such funds were never utilized for the benefit of the underlying tenants pursuant to the terms of the Leases, provided, that, the Partnership agrees that any lease payments received under the terms of any Lease where funds were released for such loan shall be paid pari passu to the Owner Entity under such Lease and Seller and LBREP LP (87.94326% and 12.05674%, respectively) based on the amount of the loan funded, the interest rate thereunder and the rate of amortization all in relation to the rent payable under such Lease prior to the advancing of such loan, provided, further, that the Partnership cannot, without the consent of Seller and LBREP LP, take any action under the lease to extend the term or otherwise subordinate the payment of such loan, provided, further, that any funds not requested under this sub-clause by June 30, 2014 shall be released to Seller and LBREP LP (87.94326% and 12.05674%, respectively); provided further, that, at any time that a loan is outstanding, the Partnership shall have the right to purchase such loan from Seller and LBREP LP (87.94326% and 12.05674%, respectively) at par plus any accrued interest outstanding;

(v) with respect to so called "paint and carpet" costs (i.e., capped at $2,231,013) will either be released (a) to the Partnership upon request of such funds by the tenants potentially entitled to such funds, pursuant to the terms of the current applicable Leases, for so called "paint and carpet" costs in an amount not to exceed the capped amount above multiplied by a fraction the numerator of which is the square footage leased to such tenant related to the request for so called "paint and carpet" costs and the denominator of which is the total square footage of all Leases that provide for so called "paint and carpet" costs together with the Partnership providing to Seller and LBREP LP tenant's notice of request for such funds to the extent and in the form prescribed by the applicable Lease, corresponding invoices from the payee for such work, a certification that the tenant under such Lease has not entered into an extension or renewal of the applicable Lease and after the funding of such amounts to pay for work a certification by the Partnership that the funds were disbursed in accordance with the request and the Partnership funded its pro rata (i.e., 10.7595%) share of such disbursement or (b) to Seller and LBREP LP (87.94326% and 12.05674%, respectively) upon the currently stated

expiration of any Lease, if such funds were never utilized for the benefit of the underlying tenants pursuant to the terms of the Leases an amount not to exceed the capped amount above multiplied by a fraction the numerator of which is the square footage leased to such tenant and the denominator of which is the total square footage of all Leases that provide for so called "paint and carpet" costs, provided, that the Partnership will prepare a schedule prior to Closing, to be reasonably agreed upon among the parties thereto, that sets forth the Leases that have an obligation to provide for such so called "paint and carpet" costs, the square footage related to such leases and the date on which such costs can no longer be called for by the underlying tenants provided, further, that any funds not requested under this sub-clause by June 30, 2014 shall be released to Seller and LBREP LP (87.94326% and 12.05674%, respectively); and

(vi) if there shall arise a dispute among the Partnership, Seller, and/or LBREP LP with respect to any disbursement to be made under the escrow agreement, such dispute shall be resolved pursuant to the expedited arbitration procedures of the American Arbitration Association, and the losing party (or parties) in any such arbitration proceeding shall pay the fees of the winning party (or parties).

10.2.1.4    The Preliminary Closing Statement (as defined below); and

10.2.1.5    Any agreements, opinions, certificates or other documentation necessary to effect the transaction contemplated hereby pursuant to the Existing Loan Agreements, in the reasonable judgment of Purchaser.

10.2.2    _Costs_.  Seller will pay all costs allocated to Seller pursuant to <u>Section 10.5</u> of this Agreement.

**10.3  Purchaser's Obligations at the Closing**.  At the Closing, Purchaser will do, or cause to be done, the following:

10.3.1    <u>Closing Documents</u>.  At Closing, Purchaser shall execute, acknowledge (if necessary) and deliver originals of the following documents:

10.3.1.1    The Assignment of Partnership Interests; and

10.3.1.2    The Preliminary Closing Statement.

10.3.2    <u>Payment of Consideration</u>.  Purchaser shall deliver the balance of the Purchase Price payable at Closing in the manner required under this Agreement.

10.3.3    <u>Costs</u>.  Purchaser will pay all costs allocated to Purchaser pursuant to <u>Section 10.5</u> of this Agreement.

**10.4  Escrow**.  The delivery of the documents and the payment of the sums to be delivered and paid at the Closing shall be accomplished through an escrow with the Escrow Agent.

**10.5  Costs and Adjustments at Closing**

10.5.1 <u>Adjustments to Purchase Price</u>.  The Purchase Price shall be increased by the following amounts (or if the Working Capital Adjustment (as defined below) is a negative number, the Purchase Price shall be decreased by such amount), which shall be paid by Purchaser at Closing:  (i) the par value of the Monday Partner Loan, plus interest accrued to the Apportionment Date (as defined below) pursuant to the Partnership Agreement; (ii) the Working Capital Adjustment; and (iii) an amount equal to 78.481% of the sum of (v) development costs for the Individual Property at 1812 N. Moore Street (including a parking garage) paid and incurred by the Owner Entities during the period beginning on November 1, 2010 and ending on the Apportionment Date, (w) development costs for the parking garage at 1812 N. Moore Street incurred by the Owner Entities prior to November 1, 2010 and paid prior to and including the Apportionment Date, in accordance with the Annual Plan or the then applicable annual plan, (x) the amount of any outstanding principal under the Existing Loans paid after the Effective Date; (y) all Post-Effective Date LC/TI Costs paid by the Owner Entities as of the Apportionment Date and (z) the costs of any new capital improvements or capital repairs at the Property commenced after the Effective Date except to the extent such repairs are necessary to protect against imminent damage to the Property or any individual located thereon.  The Purchase Price shall be decreased by an amount equal to 78.481% of the amount, if any, by which the outstanding principal under the Existing Loans as of the Effective Date exceeds the sum of the amounts represented in <u>Section 7.3.10</u>.

10.5.2 <u>Working Capital Adjustment</u>.  The Working Capital accounts of the Owner Entities (collectively, the "**Partnership Working Capital Account**") shall be apportioned as of 11:59 p.m. local time in Arlington County, Virginia on the day preceding the Closing Date (the "**Apportionment Date**").  As used herein, "**Working Capital**" shall mean (a) the sum of the total consolidated current assets of the Owner Entities as of the Apportionment Date as determined in accordance with GAAP, applied on a basis consistent with the Partnership Information, excluding any income tax assets, <u>minus</u> (b) the sum of the total consolidated current liabilities of the Owner Entities as the Apportionment Date, as determined in accordance with GAAP, applied on a basis consistent with the Partnership Information, but excluding any income tax liabilities and outstanding principal under the Existing Loans as of the Effective Date.  The term "**Working Capital Adjustment**" shall mean 78.481% of the balance in the Partnership Working Capital Account as of the Apportionment Date.  In furtherance of and without limiting the foregoing, the following items shall be taken into account on an accrual basis (except with respect to Rents, which shall be apportioned as set forth in <u>Section 10.5.3</u>) as of the Apportionment Date in calculating the Working Capital Adjustment (it being understood that no item shall be counted more than once in determining the Working Capital Adjustment):

10.5.2.1        subject to <u>Section 10.5.3</u> below, prepaid rents, fixed rents and additional rents payable pursuant to any Leases (including, without limitation, operating expense escalation payments, real estate tax escalation payments and percentage rent, if any, payable under the Leases) (collectively, "**Rents**");

10.5.2.2        real estate taxes, sewer rents and taxes, water rates and charges, vault charges and taxes, business improvement district taxes and assessments and any other governmental taxes, charges or assessments levied or assessed against the Properties (collectively, "**Property Taxes**"), on the basis of the respective periods for which each is assessed or imposed, to be apportioned in accordance with <u>Section 10.5.4</u> below;

10.5.2.3     administrative charges, if any, permitted under the Leases or applicable law, on security deposits held pursuant to the Leases;

10.5.2.4     to the extent not included in Base Rents or Additional Rents (as such terms are hereinafter defined), garage and parking income and all fees, charges and payments of every kind or description received from tenants;

10.5.2.5     any amounts prepaid or payable by any Owner Entities pursuant to any Contracts in effect relating to the operation of the Property;

10.5.2.6     all interest and investment income on funds owned by the Owner Entities;

10.5.2.7     all accrued interest and other required payments related to the Existing Loans, including, without limitation, the repayment of the outstanding principal amount of the Existing Loans on the applicable maturity date thereunder;

10.5.2.8     reserves, escrows, and all fees and expenses related to the Existing Loans, including but not limited to the fair market value of any interest rate hedges or "caps";

10.5.2.9     insurance;

10.5.2.10     operating expenses of the Partnership;

10.5.2.11     appraisal, audit, accounting, and tax return preparation fees;

10.5.2.12     personal property taxes and business, professional and occupational licensing taxes;

10.5.2.13     all other accounts payable and accrued operating expenses with respect to the Owner Entities (including, but not limited to, commissions payable to the Broker pursuant to Section 13.1);

10.5.2.14     such other items as are customarily apportioned in real estate closings of commercial properties in Arlington County, Virginia; and

10.5.2.15     Current Leasing Commissions and Current Tenant Inducement Costs not paid by the Owner Entities (excluding so called "paint and carpet" costs under Leases with the General Services Administration and the Contingent and Potential Future Loan items expressly described in <u>Schedule 7.3.13</u>) as of the Apportionment Date shall be credited to the Purchaser.

10.5.3  The rents actually collected from tenants under the Leases in effect on the Apportionment Date shall be prorated and adjusted as follows (all references to "Leases" in this <u>Section 10.5.3</u> shall be deemed to refer to the Leases in effect on the Apportionment Date):

10.5.3.1        Fixed or so-called base rent payments (collectively, "**Base Rents**") due under the Leases shall be prorated on a cash basis on the Apportionment Date (with all Base Rents due with respect to periods prior to the Apportionment Date to be fully credited to the Partnership Working Capital Account on the Apportionment Date only to the extent actually collected in cash).

10.5.3.2        Additional rents payable pursuant to the Leases including, without limitation, operating expense escalation payments, real estate tax escalation payments, utility charges, and all other sums and charges payable by Tenants under the Leases (collectively, "**Additional Rents**") and other retroactive rental escalations, sums and charges payable by Tenants which accrue as of the Apportionment Date shall be prorated as of the Apportionment Date, on an estimated basis if the amount of Additional Rents accruing cannot be determined with certainty as of the Apportionment Date (with all Additional Rents due with respect to periods prior to and including the Apportionment Date to be fully credited to the Partnership Working Capital Account on the Apportionment Date).  After the Closing Date the Partnership may receive, retain and attempt to collect all such Additional Rents owed with respect to periods prior to the Apportionment Date.

10.5.3.3        Notwithstanding the foregoing, Base Rents or Additional Rents that are delinquent as of the Apportionment Date shall not be prorated and adjusted and shall not be considered "current assets" for purposes of the Working Capital Adjustment.  After the Closing Date the Partnership may receive and attempt to collect all such delinquent Rents, and shall pay 78.481% of such delinquent Rents to Seller as and when collected.

10.5.4 Property Taxes shall be apportioned on the basis of the fiscal period for which assessed.  If the Apportionment Date shall occur before an assessment is made or a tax rate is fixed for the tax period in which the Apportionment Date occurs, the apportionment of such Property Taxes based thereon shall be made as of such Apportionment Date by applying the tax rate for the preceding year to the latest assessed valuation, but the apportionment thereof shall be recalculated upon the later to occur of the Final Closing Statement or the date on which the assessment and/or tax rate for the current year are fixed.  If as of the Apportionment Date the Property or any portion thereof shall be affected by any special or general assessments which are or may become payable in installments of which any installment is then a lien and has become due and payable, such currently due and payable installment(s) shall be allocated to the period prior to the Apportionment Date and all installments not due and payable on the Apportionment Date shall be allocated to the period after the Apportionment Date.

10.5.5 If there are water meters at the Property, the unfixed water rates and charges and sewer rents and taxes covered by meters, if any, shall be apportioned (i) on the basis of an actual reading done within thirty (30) days prior to the Apportionment Date, or (ii) if such reading has not been made, on the basis of the last available reading.  If the apportionment is not based on an actual current reading, then upon the taking of a subsequent actual reading, the parties shall, in the Final Closing Statement, readjust such apportionment based upon the amount determined to be due upon such readjustment.

10.5.6 Charges for all electricity, steam, gas and other utility services shall be apportioned on the basis of actual current readings or, if such readings have not been made, on

the basis of the most recent bills that are available.  If any apportionment is not based on an actual current reading, then upon the taking of a subsequent actual reading, the parties shall, in the Final Closing Statement, readjust such apportionment based upon the amount determined to be due upon such adjustment.

10.5.7 All casualty, liability, rental, business interruption or other insurance proceeds (except for proceeds of rental insurance for losses occurring prior to the Apportionment Date, which shall be allocated to the period prior to the Apportionment Date), if and to the extent any such proceeds are delivered to any Owner Entity or are otherwise derived from policies insuring any of the Owner Entities, shall be allocated to the period after the Apportionment Date.

10.5.8(a)        Purchaser agrees that all Future Leasing Commissions payable by the Partnership or any of the Owner Entities shall be allocated to the period after the Apportionment Date.  For purposes hereof, the term "**Future Leasing Commissions**" shall mean (A) any Leasing Commissions which may become due and payable after the Apportionment Date pursuant to any brokerage agreements entered into by the Partnership, any of the Subsidiaries or the Property Owning Subsidiaries and affecting the Property or entered into in connection with Leases in effect on the Apportionment Date (the "**Brokerage Agreements**") solely by reason of the exercise of any renewal option, extension option, expansion option, lease of additional space, right of first offer, right of first refusal or similar right or option, or a tenant's waiver of or failure to exercise a cancellation right provided in a Lease, in each case, that occurs on or after the Apportionment Date, and (B) all Leasing Commissions which may become due and payable after the Apportionment Date in connection with any new Leases entered into from and after the Apportionment Date.  For the avoidance of doubt, Leasing Commissions (excluding Contingent items expressly described in Schedule 7.3.13) which may become due and payable after the Apportionment Date pursuant to Brokerage Agreements in connection with Leases in effect on the Apportionment Date that are not payable by reason of the exercise of any renewal option, extension option, expansion option, lease of additional space, right of first offer, right of first refusal or similar right or option, or the waiver or lapse of any cancellation right provided in a Lease on or after the Apportionment Date, shall not be deemed "Future Commissions" and shall be allocated to the period prior to the Apportionment Date, subject, however, to the provisions of Section 7.3.13.

(b)        Purchaser further agrees all Future Tenant Inducement Costs payable by the Partnership, any of the Subsidiaries or the Property Owning Subsidiaries shall be allocated to the period after the Apportionment Date.  For purposes hereof, the term "**Future Tenant Inducement Costs**" shall mean (A) any Tenant Inducement Costs which may become due and payable after the Apportionment Date pursuant to the Leases in effect on the Apportionment Date solely by reason of the exercise of any renewal option, extension option, expansion option, lease of additional space, right of first offer, right of first refusal or similar right or option, or a tenant's waiver of or failure to exercise a cancellation right provided in a Lease, in each case, that occurs on or after the Apportionment Date, and (B) all Tenant Inducement Costs which may become due and payable after the Apportionment Date in connection with any new Leases entered into from and after the applicable Apportionment Date. For the avoidance of doubt, Tenant Inducement Costs (excluding so called "paint and carpet" costs under Leases with the General Services Administration and Contingent and Potential Future Loan items expressly described in Schedule 7.3.13) which may become due and payable

after the Apportionment Date pursuant to Leases in effect on the Apportionment Date that are not payable by reason of the exercise of any renewal option, extension option, expansion option, lease of additional space, right of first refusal or similar right or option, or the waiver or lapse of a cancellation right provided in a Lease on or after the Apportionment Date, shall not be deemed "Future Tenant Inducement Costs" and shall be allocated to the period prior to the Apportionment Date, subject, however, to the provisions of Section 7.3.13.  For purposes hereof, the term "**Future Tenant Inducement Costs**" shall not include any loss of income resulting from any free rental period with respect to the period prior to the Apportionment Date.

10.5.9 <u>Costs</u>.  Any transfer, documentary, sales, use, registration and any real property sale and transfer or gains tax, stamp tax, equity transfer tax, excise tax or other similar tax (including the Virginia grantor's tax, if applicable to this transaction), including any penalties or interest with respect thereto, but specifically excluding any income, franchise or gross receipts taxes, imposed on the Owner Entities, Purchaser, or Seller as a result of the transactions contemplated by this Agreement (collectively, "Transfer Taxes") shall be paid by Purchaser and Purchaser will file all necessary tax returns and other documentation with respect to all Transfer Taxes (and the costs of filing such tax returns and other documentation shall be borne by Purchaser).  Purchaser shall pay all costs and fees for title examination, title insurance and related title company charges, any update requested by Purchaser of the surveys of the Property and all of Purchaser's due diligence studies and investigations.  Purchaser shall also pay the reasonable attorney's fees and expenses of counsel engaged by the Partnership in connection with obtaining tenant estoppel certificates pursuant to this Agreement.  Purchaser shall reimburse the Partnership for costs paid or incurred by the Partnership after July 1, 2011, for the Title Commitment, Surveys, environmental, operations and maintenance and property condition reports, and UCC searches, which costs, as of the Effective Date, do not exceed $130,000.00.  Seller shall pay any lender fees or charges imposed in connection with assumption of the Existing Loans or otherwise required by the lenders under the Existing Loans.  Seller shall pay the cost of preparing the Partnership's final Federal income tax return for the taxable period ending on the Closing Date.  Seller and Purchaser shall each pay one-half of any closing or escrow fees of the Escrow Agent.  Each of Seller and Purchaser shall pay its own attorneys' fees.

10.5.10 <u>Closing Statement</u>.  Fifteen (15) days prior to the Closing, Seller and Purchaser will jointly prepare and agree upon (and provide a copy thereof to LBREP LP) a closing statement (the "**Preliminary Closing Statement**"), based upon the most recent consolidated balance sheet of the Partnership as adjusted to the extent of available information for the Working Capital Adjustment and other adjustments and prorations provided for in this Agreement, that will show the net amount due either to Seller or to Purchaser pursuant to this Agreement, and such net due amount, to the extent in Seller's favor, will be added to, or, to the extent in Purchaser's favor, such net due amount will be subtracted from the cash balance of the Purchase Price to be paid to Seller at the Closing, as applicable.  Not later than the date that is one hundred eighty (180) days after the Closing Date, the Partnership's internal accountants shall prepare a final closing statement reasonably satisfactory to Seller and Purchaser in form and substance (the "**Final Closing Statement**") setting forth the final determination of the adjustments and prorations provided for herein and setting forth any items that are not capable of being determined at such time (and the manner in which such items shall be determined and paid).  The net amount due Seller or Purchaser, if any, by reason of adjustments to the Preliminary Closing Statement as shown in the Final Closing Statement, shall be paid in cash by

the party obligated therefore within five (5) Business Days following that party's receipt of the approved Final Closing Statement.  Notwithstanding the foregoing, if Seller and Purchaser do not agree on the treatment of any of the items set forth in the Final Closing Statement, either party may require that such dispute be submitted for resolution by the Partnership's outside accounting firm (the "**Arbiter**") mutually acceptable to Seller and Purchaser and the decision of the Arbiter shall be final and conclusive with respect to such disputed item(s).  The adjustments, prorations and determinations agreed to by Seller and Purchaser in the Preliminary Closing Statement shall be conclusive and binding on the parties hereto except for any items that are not capable of being determined at the time the Preliminary Closing Statement is agreed to by Seller and Purchaser, which items shall be determined and paid in the manner set forth in the Final Closing Statement and except for other amounts payable hereunder pursuant to provisions which survive the Closing.  Prior to and following the Closing Date, each party shall provide the other with such information as the other shall reasonably request (including, without limitation, access to the books, records, files, ledgers, information and data with respect to the Property during normal business hours upon reasonable advance notice) in order to make the preliminary and final adjustments and prorations provided for herein.  Notwithstanding anything to the contrary contained herein, Seller and Purchaser acknowledge and agree that pursuant to Section 10.5.2 of the Silverpeak Purchase Agreement, the rights and obligations of Seller and Purchaser under this Section inure to and are binding fully upon LBREP LP as Seller and "Purchaser" (as defined in the Silverpeak Purchase Agreement) as Purchaser and that Seller and Purchaser shall at all times recognize such rights of LBREP LP as if incorporated into this provision directly.

10.5.11    If any payment to be made after Closing under this <u>Section 10.5</u> shall not be paid when due hereunder, the same shall bear interest (which shall be paid together with the applicable payment hereunder) from the date due until so paid at a rate per annum equal to the Prime Rate (as such rate may vary from time to time) as reported in The Wall Street Journal plus two percent (2%) (the "**Default Rate**").  To the extent a payment provision in this <u>Section 10.5</u> does not specify a period for payment, then for purposes hereof such payment shall be due within ten (10) calendar days of the date such payment obligation is triggered.

10.5.12    <u>Survival</u>.  The provisions of this <u>Section 10.5</u> shall survive Closing.

## ARTICLE 11    [INTENTIONALLY DELETED]

## ARTICLE 12    REMEDIES AND ADDITIONAL COVENANTS

**12.1 Seller or Partnership Default At or Before Closing**.  If any of Seller's representations contained in <u>Section 7.1</u> or the Partnership's representations contained in <u>Section 7.3</u> should be false in any material respect (subject to the provisions of <u>Section 9.1.2</u>), and if the Purchaser Knowledge Party has acquired actual knowledge of such breach or default or misrepresentation, then Purchaser shall give Seller or the Partnership (whichever party is in breach or default or has made a material misrepresentation) (the "**Defaulting Party**") written notice of same within ten (10) days after the Purchaser Knowledge Party has acquired actual knowledge of same and the Defaulting Party shall have fifteen (15) days from the receipt of such notice to cure such breach or default; provided, however, if Seller or the Partnership has delivered or made available to Purchaser information in a due diligence website or "war room"

or as set forth in tenant estoppel certificates at any time prior to the Closing, and such information is inconsistent with any of the representations and warranties herein and/or indicate that any such representations and warranties were not true when made, Purchaser shall be deemed to have actual knowledge of such misrepresentation and shall give notice of same to the Defaulting Party within ten (10) days after the date on which Purchaser shall have been deemed to have acquired such knowledge and the Defaulting Party shall have fifteen (15) days from the receipt of such notice to cure same; provided further, however, that if the Defaulting Party fails to cure such breach or default within such 15 day cure period, Purchaser's sole and exclusive remedy at law or in equity shall be to either (i) terminate this Agreement by written notice to Seller within ten (10) days after the expiration of the 15 day cure period afforded to the Defaulting Party in this Section 12.1, whereupon (except as expressly provided below) neither party shall have any further rights, duties or obligations hereunder other than the obligations and rights set forth herein that expressly survive the termination of this Agreement (except that in the event that all conditions precedent to close under this Agreement have been satisfied and Seller nevertheless willfully breaches its obligation to close hereunder, Seller shall reimburse Purchaser for up to One Million Dollars ($1,000,000.00) of its actual out of pocket costs and expenses incurred in connection with the review of the transaction and the negotiation and execution of this Agreement), or (ii) proceed to Closing notwithstanding such breach or default or misrepresentation (and in no event whatsoever shall Purchaser be entitled to any reduction in the Purchase Price if Purchaser elects to proceed to Closing). Notwithstanding the foregoing, if Purchaser fails to give the Defaulting Party notice of a breach or default or misrepresentation within ten (10) days after the date on which the Purchaser Knowledge Party acquired (or was deemed to acquire) actual knowledge of same, Purchaser shall be deemed to have waived its right to terminate this Agreement on account of such breach or default or misrepresentation. For the avoidance of doubt, if any of Seller's representations contained in Section 7.1 or the Partnership's representations contained in Section 7.3 should be false but such breach of representation is not material within the meaning of Section 9.1.2, this Section 12.1 shall not apply and Purchaser shall not be deemed to have waived such breach by proceeding to Closing.

**12.2 Seller or Partnership Default From and After Closing**.  If Seller or the Partnership is in breach or default of any of its covenants or obligations hereunder that survive the Closing, or if any of Seller's representations set forth in Section 7.1 or the Partnership's representations set forth in Section 7.3 should be false in any respect (subject to the provisions of Section 9.1.2) and the Purchaser Knowledge Party shall first obtain knowledge (as defined in Section 7.5) of same after the Closing Date, then to the extent the reasonably estimated losses or damages sustained as a result of such breach or default exceed Two Hundred Fifty Thousand Dollars ($250,000.00) in the aggregate (the "**Floor**"), then Seller or the Partnership (whichever party is in breach or default or has made a material misrepresentation) (the "**Defaulting Party**") shall be liable for the actual direct damages suffered by Purchaser accruing above the Floor amount due to such uncured breach or default; provided, however, that if the Partnership is the Defaulting Party, then the Monday LP, the LBREP LP and Seller shall be liable to Purchaser in the same proportion, respectively, that the Monday LP Cap, the LBREP LP Cap and the Seller Cap bear to the total aggregate amount of the Cap (as such terms are hereafter defined). Notwithstanding anything to the contrary contained herein, (i) in no event shall the Monday LP be liable to Purchaser for damages under this Section 12.2 related to a breach of representation by the Partnership in Section 7.3 in excess of its pro rata share of the Partnership's overall liability which amount shall not exceed $2,056,453 (the "**Monday LP Cap**"), (ii) in no event

shall the LBREP LP be liable to Purchaser for damages under this <u>Section 12.2</u> related to a breach of representation by the Partnership in <u>Section 7.3</u> in excess of its pro rata share of the Partnership's overall liability which amount shall not exceed $2,056,453 (the "**LBREP LP Cap**"), (iii) in no event shall Seller be liable (whether as Seller with respect to the representations in Section 7.1 or as a Limited Partner of the Partnership with respect to the representations in Section 7.3, to the extent of Seller's pro rata share of the Partnership's overall liability) to Purchaser for damages under this <u>Section 12.2</u> in an aggregate amount in excess of Fifteen Million Dollars ($15,000,000.00) (the "**Seller Cap**" and, together with the Monday LP Cap and the LBREP LP Cap, the "**Cap**"), except to the extent of any actual fraud committed by Seller (without any imputation of knowledge or actions by the Partnership, the General Partner, the Monday LP or the LBREP LP) solely in connection with the Core Representations, for which Seller shall be liable to Purchaser for Purchaser's actual direct damages up to the amount of the Purchase Price, (iv) in no event shall the Defaulting Party be liable for consequential, special or punitive damages), (v) Seller's or the Partnership's inability to satisfy a condition of this Agreement shall not be considered a default or breach by Seller or the Partnership hereunder unless such inability results from the breach of any of Seller's representations set forth in <u>Section 7.1</u> or the Partnership's representations set forth in <u>Section 7.3</u> or the breach of Seller's or Partnership's express covenants and obligations hereunder, and (vi) if the Purchaser Knowledge Party has actual or deemed knowledge of a default or breach by the Defaulting Party on the Closing Date and Purchaser nevertheless elects to close the transaction contemplated herein, Purchaser shall be deemed to have irrevocably waived such default or breach and Seller and the Partnership shall not have any liability with respect to such default (except as otherwise provided by the last sentence of <u>Section 12.1</u>). For the avoidance of doubt, the LBREP LP Cap shall not be deemed to impose any cap on the LBREP LP's liability under the Silverpeak Purchase Agreement, and the "Seller Cap" (as defined in the Silverpeak Purchase Agreement) shall not be deemed to impose any cap on the LBREP LP's liability under this Agreement.

**12.3**    [Intentionally Omitted]

**12.4    Guaranty of Seller Parent**.  Seller Parent agrees that it shall guarantee and be personally liable and responsible (i) up to the amount of the Seller Cap, for Purchaser's actual direct damages resulting from any breach of the representations made by Seller in Section 7.1 or by the Partnership in Section 7.3 (provided that such representation is then in effect in accordance with Section 7.6), and (ii) up to the amount of the Purchase Price, for Purchaser's actual direct damages resulting from actual fraud committed by Seller or Seller Parent (without any imputation of knowledge or actions by the Partnership, the General Partner, the Monday LP or the LBREP LP) solely in connection with the Core Representations, as a primary obligor and not merely as a surety.  This <u>Section 12.4</u> is a guaranty of payment and not a guaranty of collection and upon any failure of Seller or the Partnership to pay any amounts to Purchaser when due in accordance with the terms of this Agreement as a result of any breach of the representations made by Seller, the Partnership or Seller Parent in <u>Sections 7.1</u>, <u>7.3</u>, or <u>7.4</u>, Purchaser may, at its option, proceed directly and at once, without notice, against Seller Parent to collect and recover the full amount of such obligation.  The liability of Seller Parent pursuant to this <u>Section 12.4</u> shall in no way be terminated, affected, modified, impaired or diminished by reason of the happening, from time to time, of any of the following without notice to or the further consent of Seller Parent: (a) any assignment, amendment, modification or waiver of or

change in any of the terms, covenants, conditions or provisions of this Agreement, or the invalidity or unenforceability of any of the foregoing; (b) any extension of time that may be granted by Purchaser to Seller or the Partnership or their respective successors or assigns; or (c) any action which Purchaser may take or fail to take under or in respect of this Agreement or any other documents entered into or to be entered into in connection therewith or by reason of any waiver of, or failure to enforce any of the rights, remedies, powers or privileges available to Purchaser under this Agreement or any other documents entered into or to be entered into in connection therewith or available to Purchaser at law, in equity or otherwise, or any action on the part of Purchaser granting indulgence or extension in any form whatsoever.  Seller Parent hereby waives notice of the acceptance hereof, presentment, demand for payment, protest, notice of protest, or any and all notice of non-payment, non-performance or non-observance, or other proof, or notice or demand, whereby to charge Seller Parent therefore.

**12.5  Purchaser Default**.  If, because of a default by Purchaser, Purchaser fails to consummate the purchase of the Partnership Interests on the Closing Date or fails to perform any of its other covenants or obligations hereunder when performance is required on or prior to the Closing Date, then Seller as its sole and exclusive remedy shall be entitled to terminate this Agreement by giving written notice thereof to Purchaser prior to or at the Closing and to retain the Deposit (after payment from the Deposit of the reasonable out-of-pocket expenses paid or incurred by the Partnership, including reasonable attorney's fees and costs, in connection with the transactions contemplated by this Agreement and enforcing its rights under this Agreement) as liquidated damages for Purchaser's default hereunder, it being agreed that the damages by reason of Purchaser's default are difficult, if not impossible, to ascertain, and thereafter Purchaser and Seller shall have no further rights or obligations under this Agreement except for those that are expressly provided in this Agreement to survive the termination hereof; *provided, however*, that if Seller shall itself be in breach or default of any of its covenants or obligations hereunder when performance is required on or prior to the Closing Date, or if any of Seller's representations contained in <u>Section 7.1</u>, the Partnership's representations contained in <u>Section 7.3</u> or Seller Parent's representations contained in <u>Section 7.4</u> should be false in any material respect (subject to the provisions of <u>Section 9.1.2</u>), then Seller shall not be entitled to retain the Deposit and the same shall be refunded in full to Purchaser upon any termination of this Agreement.

**12.6  Delivery of Materials**.  Notwithstanding anything contained in this Agreement to the contrary, if this Agreement is terminated for any reason whatsoever, then Purchaser shall use good faith commercially reasonable efforts to promptly deliver to Seller all Property Information provided to Purchaser by Seller or the Owner Entities, including copies thereof in any form whatsoever, including electronic form, along with any and all test results and studies of the Property performed by or on behalf of Purchaser pursuant to Article 6, excluding any confidential or proprietary information or financial modeling.

**12.7  Tax Cooperation**.  Purchaser and Seller shall provide information to each other and cooperate in good faith with respect to the filing of any tax returns with respect to the Partnership or the other Owner Entities.  The cost of the final tax return of the Partnership for the period prior to Closing shall be borne by the Partnership as constituted prior to Closing. With respect to the qualification, to be obtained after the Closing, of the REIT Subsidiaries, or

any other Subsidiary, as a real estate investment trust for U.S. federal income tax purposes, the costs thereof shall be borne by the Partnership as constituted after the Closing.

**12.8 Survival**.  The provisions of this Section 12 shall survive the Closing and any termination of this Agreement.

## ARTICLE 13    BROKERAGE COMMISSION

**13.1 Broker**.  Seller represents and warrants to Purchaser that Seller has not contacted, negotiated with or entered into any agreement with any real estate broker, agent, finder, or any party in connection with this Agreement other than Eastdil Secured LLC ("**Broker**") and that the Partnership has agreed to pay Broker a brokerage commission in accordance with a separate agreement between the Partnership and Broker.  Purchaser hereby represents and warrants to Seller and the Owner Entities that Purchaser has not contacted, negotiated with or entered into any agreement with any real estate broker, agent, finder, or any party in connection with this transaction other than Broker.  The commission payable to the Broker shall be treated as a Partnership expense accrued prior to the Apportionment Date.

**13.2 Indemnity**.  Each party shall indemnify and hold the other party harmless from any claim, demand, cause of action, loss, liability, damage, cost, or expense (including, without limitation, reasonable attorneys' fees) paid or incurred by the other party by reason of a breach of the representation and warranty made by such party under this Article 13.  Notwithstanding anything to the contrary contained in this Agreement, the indemnities set forth in this Section 13.2 shall survive the Closing or earlier termination of this Agreement.

## ARTICLE 14    NOTICES

**14.1 Written Notice**.  All notices, demands and requests which may be given or which are required to be given by either party to the other party under this Agreement must be in writing and must be given to all parties referenced in Section 14.3.

**14.2 Method of Transmittal**.  All notices, demands, requests or other communications required or permitted to be given hereunder must be sent (i) by United States certified mail, postage fully prepaid, return receipt requested, (ii) by hand delivery, (iii) by UPS or a similar nationally recognized overnight courier service, or (iv) by facsimile with both telephonic confirmation and a confirmation copy delivered by another method set forth in this Section.  All such notices, demands, requests or other communications shall be deemed to have been given for all purposes of this Agreement upon the date of receipt or refusal, except that whenever under this Agreement a notice is either received on a day which is not a Business Day or is required to be delivered on or before a specific day which is not a Business Day, the day of receipt or required delivery shall automatically be extended to the next Business Day.

**14.3 Addresses**.  The addresses for proper notice under this Agreement are as follows:

*As to Seller:*               Rosslyn LB Syndication Partner LLC
1271 Avenue of the Americas
38th Floor
New York, New York 10020
Attention: Joelle Halperin and Ashish Gupta
Telephone: (646) 285-9066
Fax: (646) 285-9336

*With a copy to:*           Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153-0119
Attention: W. Michael Bond, Esq. and David Herman, Esq.
Telephone: (212) 310-8035
Fax: (212) 310-8007

*As to the Partnership:*    Rosslyn Syndication Partners JV LP
c/o Monday Properties
230 Park Avenue, Suite 500
New York, New York 10169
Attention: Anthony Westreich
Telephone: (212) 692-4360
Facsimile: (212) 490-7266

*With a copy to:*           Silverpeak Real Estate Partners
1330 Sixth Avenue
New York, NY 10019
Attention: Quentin Reynolds
Telephone: (212) 716-2027
Facsimile⊗212) 716-2028

Silverpeak Real Estate Partners
3424 Peachtree Road, Suite 1475
Atlanta, Georgia 30326
Attention: Brad S. Lebovitz
Telephone: (678) 536-4200
Facsimile: (678) 536-4112

Monday Properties Services, LLC
c/o Monday Properties
230 Park Avenue, Suite 500
New York, New York 10169
Attention: Brian Robin
Telephone: (212) 692-4362
Facsimile: (212) 490-7266

Rosslyn LB Syndication Partner LLC
1271 Avenue of the Americas
38th Floor
New York, New York 10020
Attention:  Joelle Halperin and Ashish Gupta
Telephone: (646) 285-9066
Fax: (646) 285-9336

Venable LLP
575 7th Street, NW
Washington, DC 20004
Attention:  Robert G. Gottlieb, Esq. and Jennifer J.
Bruton, Esq.
Telephone:  (202) 344-8526
Facsimile:  (202) 344-8300

Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
Attention: Christopher B. Price, Esq. and Marian George,
Esq.
Telephone: (212) 813-8951
Facsimile: (212) 355-3333

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153-0119
Attention:  W. Michael Bond, Esq. and David Herman,
Esq.
Telephone: (212) 310-8035
Fax: (212) 310-8007

| | |
|---|---|
| *As to Purchaser:* | USREO/Rosslyn Investor, LLC<br>c/o US Real Estate Opportunities I, L.P.<br>200 West Street<br>New York, New York 10282<br>Attention: Jeffrey Fine<br>Telephone: (212) 902-4252<br>Fax: (212) 357-5505 |
| *With a copy to:* | USREO/Rosslyn Investor, LLC<br>c/o US Real Estate Opportunities I, L.P.<br>200 West Street<br>New York, New York 10282<br>Attention: General Counsel |

|  | Telephone: (212) 902-1000 |
|  | Fax: (212) 357-5505 |
| *And a copy to:* | Sullivan & Cromwell LLP |
|  | 125 Broad Street |
|  | New York, New York 10004 |
|  | Attention: Anthony J. Colletta, Esq. |
|  | Telephone: (212) 558-4608 |
|  | Fax: (212) 291-9029 |
| *As to Escrow Agent:* | First American Title National Commercial Services |
|  | 111 N. Orange Avenue, Suite 1285 |
|  | Orlando, Florida 32801 |
|  | Attention: Scott Brown |
|  | Telephone: (407) 843-8674 |
|  | Fax: (888) 216-9921 |

Either party may from time to time by written notice to the other party designate a different address for notices.  Notices sent to or from an address outside of the continental United States shall be sent only by one of the methods specified in clauses (ii), (iii) or (iv) of this Section 14.3.

## ARTICLE 15   ASSIGNMENT

Purchaser shall not have the right to assign, transfer or encumber this Agreement or any rights of Purchaser herein (or the granting or an option, put or call right with respect to a transfer) of any class of ownership interests in Purchaser, other than (a) to a majority owned affiliate or wholly owned subsidiary of Purchaser or (b) a direct or indirect transfer of interests in US Real Estate Opportunities I, L.P., without Seller's prior written consent, which consent may be granted or denied in Seller's sole and absolute discretion.

## ARTICLE 16   MISCELLANEOUS

**16.1  Entire Agreement.**  This Agreement embodies the entire agreement between the parties and cannot be varied except by the written agreement of the parties and supersedes all prior agreements and undertakings.

**16.2  Modifications**.  This Agreement may not be modified except by the written agreement of the parties.

**16.3  Gender and Number**.  Words of any gender used in this Agreement will be construed to include any other gender and words in the singular number will be construed to include the plural, and vice versa, unless the context requires otherwise.

**16.4  Captions**.   The captions used in connection with the Articles, Sections and Subsections of this Agreement are for convenience only and will not be deemed to expand or limit the meaning of the language of this Agreement.

**16.5  Successors and Assigns**.  This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns.

**16.6  Controlling Law**.  This Agreement and any actions related thereto will be construed under, governed by and enforced in accordance with the laws of the State of New York (without reference to conflicts of laws principles).

**16.7  Exhibits**.  All exhibits, attachments, schedules, annexed instruments and addenda referred to herein will be considered a part hereof for all purposes with the same force and effect as if set forth verbatim herein.

**16.8  No Rule of Construction**.  Seller and Purchaser have each been represented by counsel in the negotiations and preparation of this Agreement; therefore, this Agreement will be deemed to be drafted by both Seller and Purchaser, and no rule of construction will be invoked respecting the authorship of this Agreement.

**16.9  Severability; Survival**.  In the event that any one or more of the provisions contained in this Agreement (except the provisions relating to Seller's obligations to assign the Partnership Interests and Purchaser's obligation to pay the Purchase Price, the invalidity of either of which shall cause this Agreement to be null and void) are held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability will not affect any other provisions hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had not been contained herein; *provided, however*, that the parties hereto shall endeavor in good faith to rewrite the affected provision to make it (i) valid, and (ii) consistent with the intent of the original provision.  All of the provisions of Articles 12, 14 and 16 shall survive the Closing or the termination of this Agreement.

**16.10  Time of Essence**.  Time is important to both Seller and Purchaser in the performance of this Agreement, and both parties have agreed that TIME IS OF THE ESSENCE with respect to any date set out in this Agreement.

**16.11  Business Day**.  "**Business Day**" means any day on which business is generally transacted by banks in New York, New York.  If the final date of any period which is set out in any paragraph of this Agreement falls upon a day which is not a Business Day, then, and in such event, the time of such period will be extended to the next Business Day.

**16.12  No Memorandum**.  Purchaser and Seller agree not to record this Agreement or any memorandum hereof.

**16.13  Press Releases**.  Prior to Closing, any release to the public of information with respect to the matters set forth in this Agreement will be made only in the form approved by Purchaser and Seller and their respective counsel.

**16.14 Attorneys' Fees and Costs**.  In the event either party is required to resort to litigation to enforce its rights under this Agreement, the prevailing party in such litigation will be entitled to collect from the other party all reasonable costs, expenses and attorneys' fees incurred in connection with such action.

**16.15 Counterparts and Expiration of Offer**.  This Agreement may be executed in multiple counterparts (which counterparts may be executed by facsimile) which shall together constitute a single document.  However, this Agreement shall not be effective unless and until all counterpart signatures have been obtained.  An unsigned draft of this Agreement shall not be considered an offer by either party.

**16.16 Waiver of Jury Trial**.  EACH PARTY HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM (WHETHER IN CONTRACT OR IN TORT) BROUGHT BY EITHER PARTY IN CONNECTION WITH ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, THE RELATIONSHIP OF SELLER AND PURCHASER HEREUNDER, PURCHASER'S OWNERSHIP OF THE PARTNERSHIP INTERESTS OR THE USE OF THE PROPERTY, AND/OR ANY CLAIMS OF INJURY OR DAMAGE RELATED TO THE PROPERTY.

### 16.17  Confidentiality

16.17.1  Except as provided otherwise in this Section 16.17, Purchaser and Seller, for the benefit of each other, hereby agree that neither of them will release or cause or permit to be released to the public any press notices, publicity (oral or written) or advertising promotion relating to, or otherwise publicly announce or disclose or cause or permit to be publicly announced or disclosed, in any manner whatsoever, the terms, conditions or substance of this Agreement or the transactions contemplated hereby, without first obtaining the consent of the other party hereto, which may be granted or withheld in the sole discretion of the other party, except that Seller may disclose the terms of this Agreement and the transactions contemplated hereby (i) to the bankruptcy court having jurisdiction over the bankruptcy proceedings of certain of Seller's Affiliates (the "**LBHI Bankruptcy**") as reasonably determined by Seller, (ii) to the unsecured creditors committee in connection with the LBHI Bankruptcy, and/or (iii) to the lenders under the Existing Loan Documents.  However, each party consents to any disclosure of this Agreement that the other party reasonably believes is required by law or pursuant to any litigation or arbitration between the parties or that is recommended in good faith by counsel to such other party.  In addition, each party consents to any disclosure of matters relating to the Property and its ownership (but not the terms of this Agreement) after Closing.

16.17.2  It is understood that the foregoing shall not preclude any party from discussing the substance or any relevant details of the transactions contemplated in this Agreement on a confidential basis with any of its attorneys, accountants, professional consultants, financial advisors, investors or rating agencies, as the case may be, or prevent any party hereto from complying with applicable laws, including, without limitation, governmental regulatory, disclosure, tax and reporting requirements.  In addition to any other remedies available to Seller and Purchaser, Seller and Purchaser shall each have the right to seek equitable relief, including, without limitation, injunctive relief or specific performance, against the other

party or its representatives in order to enforce the provisions of this Section 16.17. Notwithstanding any other provision of this Agreement, the provisions of Section 16.17 shall survive until the earlier of Closing or the date that is one (1) year after the termination of this Agreement.

**16.18 Jurisdiction and Service of Process**.  The parties hereto agree to submit to personal jurisdiction in the State of New York in any action or proceeding arising out of this Agreement and, in furtherance of such agreement, the parties hereby agree and consent that without limiting other methods of obtaining jurisdiction, personal jurisdiction over the parties in any such action or proceeding may be obtained within or without the jurisdiction of any state or federal court located in New York County, New York and that any process or notice of motion or other application to any such court in connection with any such action or proceeding may be served upon the parties by certified mail to or by personal service at the last known address of the parties, whether such address be within or without the jurisdiction of any such court.  Any legal suit, action or other proceeding by one party to this Agreement against the other arising out of or relating to this Agreement (other than any dispute which, pursuant to the express terms of this Agreement, is to be determined by arbitration) shall be instituted only in the State Court of New York, or the United States District Court for the Southern District of New York, and each party hereby waives any objections which it may now or hereafter have based on venue and/or forum non-conveniens of any such suit, action or proceeding and submits to the jurisdiction of such courts.  The provisions of this Section 16.18 shall survive the Closing or the termination hereof.

**16.19 Exculpation.**

(a)  Each of Purchaser and the Partnership agrees that it does not have and will not have any claims or causes of action against any disclosed or undisclosed officer, director, employee, trustee, shareholder, member, manager, partner, principal, parent, subsidiary or other affiliate of Seller, or any officer, director, employee, trustee, shareholder, partner or principal of any such parent, subsidiary or other affiliate (collectively, "**Seller's Affiliates**"), arising out of or in connection with this Agreement or the transactions contemplated hereby.  Each of Purchaser and the Partnership agrees to look solely to Seller and its assets for the satisfaction of any liability or obligation arising under this Agreement or the transactions contemplated hereby, or for the performance of any of the covenants, warranties or other agreements contained herein, and further agrees not to sue or otherwise seek to enforce any personal obligation against any of Seller's Affiliates with respect to any matters arising out of or in connection with this Agreement or the transactions contemplated hereby.  Without limiting the generality of the foregoing provisions of this Section, each of Purchaser and the Partnership hereby unconditionally and irrevocably waives any and all claims and causes of action of any nature whatsoever it may now or hereafter have against Seller's Affiliates, and hereby unconditionally and irrevocably releases and discharges Seller's Affiliates from any and all liability whatsoever which may now or hereafter accrue in favor of Purchaser or the Partnership against Seller's Affiliates, in connection with or arising out of this Agreement or the transactions contemplated hereby.  The provisions of this Section shall survive the termination of this Agreement and the Closing.

(b)    Each of Seller and the Partnership agrees that it does not have and will not have any claims or causes of action against any disclosed or undisclosed officer, director, employee, trustee, shareholder, member, manager, partner, principal, parent, subsidiary or other affiliate of Purchaser, or any officer, director, employee, trustee, shareholder, partner or principal of any such parent, subsidiary or other affiliate (collectively, "**Purchaser's Affiliates**"), arising out of or in connection with this Agreement or the transactions contemplated hereby.  Each of Seller and the Partnership agrees to look solely to Purchaser and its assets for the satisfaction of any liability or obligation arising under this Agreement or the transactions contemplated hereby, or for the performance of any of the covenants, warranties or other agreements contained herein, and further agrees not to sue or otherwise seek to enforce any personal obligation against any of Purchaser's Affiliates with respect to any matters arising out of or in connection with this Agreement or the transactions contemplated hereby.  Without limiting the generality of the foregoing provisions of this Section, each of Seller and the Partnership hereby unconditionally and irrevocably waives any and all claims and causes of action of any nature whatsoever it may now or hereafter have against Purchaser's Affiliates, and hereby unconditionally and irrevocably releases and discharges Purchaser's Affiliates from any and all liability whatsoever which may now or hereafter accrue in favor of Seller or the Partnership against Purchaser's Affiliates, in connection with or arising out of this Agreement or the transactions contemplated hereby.  The provisions of this Section shall survive the termination of this Agreement and the Closing.

**16.20 Further Assurances.**  The parties each agree to do such other and further acts and things, and to execute and deliver such instruments and documents as either may reasonably request from time to time, whether at or after the Closing, in furtherance of the purposes of this Agreement, including, without limitation, instruments and documents requested by public sector or private sector tenants pursuant to the Leases.  The provisions of this Section 16.20 shall survive the Closing.

**16.21 Lis Pendens.**  In no event shall Purchaser have the right to file a lis pendens against the Property or any Individual Property or portion thereof except pursuant to a judicial order.

[signature page follows]

IN WITNESS WHEREOF, the parties have executed this Purchase and Sale Agreement as of the date first written above.

**SELLER**:

**ROSSLYN LB SYNDICATION PARTNER LLC,**
a Delaware limited liability company

By:     PAMI LLC, its sole member

By:_____
Name: Jeffrey Fitts
Title:  Authorized Signatory

**PURCHASER:**

**USREO/ROSSLYN INVESTORS, LLC**, a Delaware limited liability company

By:     U.S. Real Estate Opportunities Fund I, L.P.
        a managing member

    By:  US Real Estate Advisors, LLC, its general
         partner

        By:_____
        Name:
        Title:

IN WITNESS WHEREOF, the parties have executed this Purchase and Sale Agreement as of the date first written above.

**SELLER**:

**ROSSLYN LB SYNDICATION PARTNER LLC**,
a Delaware limited liability company

By:    PAMI LLC, its sole member

        By: _____
        Name:
        Title:

**PURCHASER**:

**USREO/ROSSLYN INVESTORS, LLC**, a Delaware limited liability company

By:    U.S. Real Estate Opportunities Fund I, L.P.
       a managing member

        By: US Real Estate Advisors, LLC, its general
           partner

           By: _____
           Name:
           Title:    Alan S. Kava
                    Vice President

## JOINDER OF LIMITED PARTNERS

The undersigned ROSSLYN LBREP LP LLC, a Delaware limited liability company, and ROSSLYN MONDAY LP, LLC, a Delaware limited liability company, being limited partners in Rosslyn Syndication Partners JV LP, a Delaware limited partnership (the "**Partnership**"), hereby join in the foregoing Purchase and Sale Agreement between Rosslyn LB Syndication Partner LLC, as Seller, and USREO/Rosslyn Investors, LLC, as Purchaser (the "**PSA**"), for the sole purpose of (i) waiving their rights of first offer under the Partnership Agreement (as defined in the PSA) with respect to the sale of the Partnership Interests (as defined in the PSA) to the Purchaser pursuant to the PSA, (ii) consenting to the Partnership joining in the PSA for the purposes expressed therein and (iii) with respect to LBREP LP, entering into the escrow agreement described in Section 10.2.1.3.

ROSSLYN LBREP LP LLC,
a Delaware limited liability company
By: Silverpeak Legacy Pension Partners II, L.P., a Delaware limited partnership, a Managing Member
By: Silverpeak Real Estate Partners, L.P., a Delaware limited partnership, its investment advisor, u/p/a dated May 29, 2010
By: REPE CP ManageCo LLC, a Delaware limited liability company, its general partner

By: _____
Name:  Rodolpho Amboss
Title:   Authorized Signatory


ROSSLYN MONDAY LP, LLC,
a Delaware limited liability company

By: _____
Name:
Title:

## JOINDER OF LIMITED PARTNERS

The undersigned ROSSLYN LBREP LP LLC, a Delaware limited liability company, and ROSSLYN MONDAY LP, LLC, a Delaware limited liability company, being limited partners in Rosslyn Syndication Partners JV LP, a Delaware limited partnership (the "**Partnership**"), hereby join in the foregoing Purchase and Sale Agreement between Rosslyn LB Syndication Partner LLC, as Seller, and USREO/Rosslyn Investors, LLC, as Purchaser (the "**PSA**"), for the sole purpose of (i) waiving their rights of first offer under the Partnership Agreement (as defined in the PSA) with respect to the sale of the Partnership Interests (as defined in the PSA) to the Purchaser pursuant to the PSA, (ii) consenting to the Partnership joining in the PSA for the purposes expressed therein and (iii) with respect to LBREP LP, entering into the escrow agreement described in Section 10.2.1.3.

ROSSLYN LBREP LP LLC,
a Delaware limited liability company
By: Silverpeak Legacy Pension Partners II, L.P., a
Delaware limited partnership, a Managing Member
By: Silverpeak Real Estate Partners, L.P., a
Delaware limited partnership, its investment
advisor, u/p/a dated May 29, 2010
By: REPE CP ManageCo LLC, a Delaware limited
liability company, its general partner

By: _____
Name:
Title:   Authorized Signatory


ROSSLYN MONDAY LP, LLC,
a Delaware limited liability company

By: _____
Name:
Title:

Aug 16 2011 3:22PM Westreich 15168766556

## JOINDER OF GENERAL PARTNER

The undersigned ROSSLYN JV PARTNERS, LLC, a Delaware limited liability company, General Partner of Rosslyn Syndication Partners JV LP, a Delaware limited partnership (the "**Partnership**"), hereby joins in the foregoing Purchase and Sale Agreement between Rosslyn LB Syndication Partner LLC, as Seller, and USREO/Rosslyn Investors, LLC, as Purchaser (the "**PSA**"), for the sole purpose of (i) waiving its rights of first offer under the Partnership Agreement (as defined in the PSA) with respect to the sale of the Partnership Interests (as defined in the PSA) to the Purchaser pursuant to the PSA; (ii) evidencing its consent to the sale of the Partnership Interests to Purchaser on the terms and conditions provided in the PSA, and its agreement that, notwithstanding anything to the contrary in the Partnership Agreement, the sale of the Partnership Interests to Purchaser pursuant to the PSA is in compliance with the terms of the Partnership Agreement; and (iii) consenting to the Partnership joining in the PSA for the purposes expressed therein.

ROSSLYN JV PARTNERS, LLC,
a Delaware limited partnership

By: _____
Name: Anthony Westreich
Title: Authorized Signatory

## JOINDER OF PARTNERSHIP

The undersigned ROSSLYN SYNDICATION PARTNERS JV LP, a Delaware limited partnership (the "**Partnership**"), hereby joins in the foregoing Purchase and Sale Agreement between Rosslyn LB Syndication Partner LLC, as Seller, and USREO/Rosslyn Investors, LLC, as Purchaser (the "**PSA**"), for the sole purpose of agreeing to be bound by the provisions of Section 3.2 (Purchase Price Allocation), Section 4.1 (State of Title to the Property), Section 4.3 (Title Objections), Section 6.1.2, Section 7.3 (Partnership's Representations and Warranties), Section 8.4 (Partnership's Covenants), Section 10.5.2 (Working Capital Adjustment), 10.2.1.3 and Section 16.19 (Exculpation) of the PSA.

ROSSLYN SYNDICATION PARTNERS JV LP,
a Delaware limited partnership

By: Rosslyn JV Partners, LLC, a Delaware limited
liability company, its general partner

By: _____
Name:
Title:

### JOINDER OF SELLER PARENT

The undersigned Lehman Commercial Paper Inc., a Delaware corporation ("**Seller Parent**"), hereby joins in the foregoing Purchase and Sale Agreement between Rosslyn LB Syndication Partner LLC, as Seller, and USREO/Rosslyn Investors, LLC, as Purchaser (the "**PSA**"), for the sole purpose of agreeing (i) to be bound by the provisions of Section 7.4 (Seller Parent's Representations and Warranties) and Section 12.4 (Guaranty of Seller Parent).

LEHMAN COMMERCIAL PAPER INC.,
a Delaware corporation

By: _____
Name: Jeffrey Fitts
Title: Authorized Signatory

**EXHIBIT A**

**FORM OF ASSIGNMENT AND ASSUMPTION OF PARTNERSHIP INTERESTS**

### ASSIGNMENT AND ASSUMPTION OF PARTNERSHIP INTERESTS

THIS ASSIGNMENT AND ASSUMPTION OF PARTNERSHIP INTERESTS (this "**Assignment**") is made as of _____, 2011, by and among **ROSSLYN LB SYNDICATION PARTNER LLC,** a Delaware limited liability company (the "**Assignor**"), and **USREO/ROSSLYN INVESTORS, LLC**, a Delaware limited liability company ("**Assignee**").

### RECITALS:

This Assignment is made with reference to the following facts:

A.      Assignor owns a 78.481% limited partnership interest (the "**Partnership Interests**") in Rosslyn Syndication Partners JV LP, a Delaware limited partnership (the "**Partnership**"), pursuant to the Limited Partnership Agreement of the Partnership dated as of May 15, 2007, as amended by a First Amendment dated as of July 9, 2010 (the "**Partnership Agreement**").

B.      Pursuant to that certain Purchase and Sale Agreement dated as of August 16, 2011 (the "**Agreement**"), by and between Assignor and Assignee, Assignor has agreed to assign and transfer all of Assignor's Partnership Interests in the Partnership to Assignee.

C.      Assignee desires to accept the aforesaid Partnership Interests in the Partnership.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

1.      Assignor hereby assigns and transfers to Assignee the Partnership Interests.

2.      Assignee hereby accepts the assignment from Assignor of the Partnership Interests.  Assignee hereby agrees to be bound by the terms and conditions of the Partnership Agreement and hereby assumes all obligations related to or arising out of the Partnership Interests to the extent the same arise from and after the date hereof.  Immediately after giving effect to this Assignment such that the Partnership Interests have vested in Assignee, Assignor shall be deemed to have withdrawn from the Partnership and the Partnership Agreement shall be amended to reflect such withdrawal.

3.      The representations and warranties of Seller and Purchaser (as such terms are respectively defined in the Agreement) expressly set forth in the Agreement are incorporated herein by reference with the same force and effect and limitations as if such representations and warranties were set forth in this Assignment in their entirety.

4.      The term "Partnership Interests" shall not include, and Assignee does not hereby assume from Assignor, any debts, liabilities or obligations of Assignor to the Partnership or the other general or limited partners in the Partnership that arose or shall arise in whole or in part before the date hereof.

5.      General Provisions.

a.      <u>Further Assurances</u>.  The parties hereto agree to take such further actions and to execute and deliver such further customary documents, agreements and instruments as may be necessary or appropriate to carry out the purposes of this Assignment.

b.      <u>Governing Law</u>.  This Assignment and any actions related thereto shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to the conflicts of laws provisions thereof.

c.      <u>Effective Date</u>.  This Assignment shall become effective only upon its delivery to Assignee or its representatives, and all of the representations, warranties and other matters set forth herein shall be deemed effective as of such date.

d.      <u>Survival of Agreement</u>.  Nothing in this Assignment shall be construed to amend or modify the Agreement or any terms thereof in any manner and, notwithstanding the execution and delivery of this Assignment, the Agreement shall remain in full force and effect in accordance with its terms.

e.      <u>Exculpation</u>. The direct and indirect officers, directors, partners, agents, employees, members and shareholders of Assignor or Assignee, as applicable, shall not be personally liable for any debts or other obligations of Assignor or Assignee, as applicable, or in respect of any claims against Assignor or Assignee, as applicable, arising under this Assignment, and such debts, obligations and claims shall be satisfied solely out of the assets of Assignor or Assignee, as applicable.  No personal judgment shall be sought or obtained against any direct or indirect officer, director, partner, agent, employee, member or shareholder of Assignor or Assignee, as applicable.

f.      <u>Counterparts</u>.  Any number of counterparts of this Assignment may be executed.  Each counterpart will be deemed to be an original instrument and all counterparts taken together will constitute one agreement.  Delivery of an executed counterpart of a signature page to this Assignment by facsimile shall be as effective as delivery of a manually executed counterpart of this Assignment.

g.      <u>Modification and Waiver</u>.  No supplement, modification, waiver or termination of this Assignment or any provisions hereof shall be binding unless executed in writing by all parties hereto.

*[signature page follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be executed and delivered as of the effective date hereinabove provided.

**ASSIGNOR:**

**ROSSLYN LB SYNDICATION PARTNER LLC**,
a Delaware limited liability company

By:    PAMI LLC, its sole member

      By:_____
      Name:
      Title:

**ASSIGNEE:**

**USREO/ROSSLYN INVESTORS, LLC**,
a Delaware limited liability company

By:    U.S. Real Estate Opportunities Fund I, L.P.
      a managing member

    By:  U.S. Real Estate Advisors, LLC, its general
        partner

      By:_____
      Name:
      Title:

## EXHIBIT B

**FORM OF CERTIFICATE OF NON-FOREIGN STATUS**

## CERTIFICATE OF NON-FOREIGN STATUS

Section 1445 of the Internal Revenue Code provides that a transferee of a United States real property interest must withhold tax if the transferor is a foreign person.

To inform USREO/ROSSLYN INVESTORS, LLC (the "**Transferee**"), purchaser of certain partnership interests in a partnership that owns, indirectly, certain United States real property located in Arlington County, Virginia, that withholding of tax is not required upon the disposition of a United States real property interest by ROSSLYN LB SYNDICATION PARTNER LLC, a Delaware limited liability company  (the "**Transferor**"), the undersigned hereby certifies the following:

Transferor is not a nonresident alien, foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

Transferor's U.S. employer identification number is 26-0159772.  Transferor's business address is 1271 Avenue of the Americas, New York, New York 10020.  Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury, the undersigned declares that he/she has examined this certification and, to the best of his/her knowledge and belief, it is true, correct and complete, and further declares that he/she has the authority to sign this document on behalf of Transferor.

[signature page follows]

**TRANSFEROR**:

**ROSSLYN LB SYNDICATION PARTNER LLC**,
a Delaware limited liability company

By:    PAMI LLC, its sole member

    By:    _____
    Name:
    Title:

## EXHIBIT C

**FORM OF TERMINATION OF SYNDICATION AGREEMENT**

## TERMINATION OF SYNDICATION AGREEMENT

THIS TERMINATION OF SYNDICATION AGREEMENT (this "**Agreement**") is entered into as of _____, 2011, by and between ROSSLYN JV PARTNERS LLC, a Delaware limited liability company ("**Rosslyn GP**"), ROSSLYN MONDAY LP, LLC, a Delaware limited liability company ("**Monday LP**"), ROSSLYN LBREP LP LLC, a Delaware limited liability company ("**LBREP LP**"), and ROSSLYN LB SYNDICATION PARTNER LLC ("**Lehman LP**").

## RECITALS:

**WHEREAS**, Rosslyn GP, Monday LP, LBREP LP, and Lehman LP entered into that certain Syndication Agreement dated May 15, 2007, as amended by that certain First Amendment to Syndication Agreement dated January 22, 2008, as further amended by that certain Second Amendment to Syndication Agreement dated July 9, 2010 (collectively, the "**Syndication Agreement**"); and

**WHEREAS**, Rosslyn GP, Monday LP, LBREP LP, and Lehman LP desire to enter into this Agreement to terminate the Syndication Agreement;

**NOW, THEREFORE**, for and in consideration of the mutual promises and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      Termination of Syndication Agreement.  From and after the date hereof, Rosslyn GP, Monday LP, LBREP LP, and Lehman LP hereby cancel and terminate the Syndication Agreement and agree that the Syndication Agreement shall be of no further force or effect, and none of Rosslyn GP, Monday LP, LBREP LP, and Lehman LP shall have any further rights, obligations or liabilities arising out of, in connection with, or under the Syndication Agreement.

2.      Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, and all of which when taken together shall constitute one and the same instrument as if the parties hereto had executed the same instrument.  PDF or facsimile copies shall be fully binding as if manually signed.

3.      Entire Agreement.  This Agreement constitutes the entire agreement among the parties hereto in respect of the subject matter hereof and superseded any and all prior agreements, understandings, and representations, whether written or oral, relating to the subject matter hereof.

4.      <u>Governing Law</u>.  This Agreement and the rights and obligations hereunder and any actions related thereto shall be governed in all respects, including as to validity, interpretation, and effect, by the internal laws of the State of New York, without giving effect to the principles thereof relating to conflicts of law.

- Remainder of Page Intentionally Left Blank -

IN WITNESS WHEREOF, the parties hereto hereby execute this Agreement as of the date and year above first written.

**ROSSLYN GP:**

**ROSSLYN JV PARTNERS LLC**, a Delaware limited liability company

By: _____
Name: _____
Its: _____

**MONDAY LP:**

**ROSSLYN MONDAY LP, LLC**, a Delaware limited liability company

By: _____
Name: _____
Its: _____

**LBREP LP:**

**ROSSLYN LBREP LP LLC**, a Delaware limited liability company

By: _____
Name: _____
Its: _____

**LEHMAN LP:**

**ROSSLYN LB SYNDICATION PARTNER LLC**, a Delaware limited liability company

By: _____
Name: _____
Its: _____

## EXHIBIT D

### FORM OF TERMINATION OF CAPITAL SERVICES AND FINANCING AGREEMENT

## TERMINATION OF CAPITAL SERVICES AND FINANCING AGREEMENT

THIS TERMINATION OF CAPITAL SERVICES AND FINANCING AGREEMENT (this "**Agreement**") is entered into as of _____, 2011, by and between ROSSLYN SYNDICATION PARTNERS JV LP, a Delaware limited partnership (the "**Partnership**"), ROSSLYN JV PARTNERS LLC, a Delaware limited liability company ("**Rosslyn GP**"), ROSSLYN MONDAY LP, LLC, a Delaware limited liability company ("**Monday LP**"), ROSSLYN LBREP LP LLC, a Delaware limited liability company ("**LBREP LP**"), and ROSSLYN LB SYNDICATION PARTNER LLC ("**Lehman LP**").

### RECITALS:

**WHEREAS**, the Partnership, Rosslyn GP, Monday LP, LBREP LP, and Lehman LP entered into that certain Capital Services and Financing Agreement dated May 15, 2007 (the "**Capital Services and Financing Agreement**"); and

**WHEREAS**, the Partnership, Rosslyn GP, Monday LP, LBREP LP, and Lehman LP desire to enter into this Agreement to terminate the Capital Services and Financing Agreement;

**NOW, THEREFORE**, for and in consideration of the mutual promises and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

5.    Termination of Capital Services and Financing Agreement.  From and after the date hereof, the Partnership, Rosslyn GP, Monday LP, LBREP LP, and Lehman LP hereby cancel and terminate the Capital Services and Financing Agreement and agree that the Capital Services and Financing Agreement shall be of no further force or effect, and none of the Partnership, Rosslyn GP, Monday LP, LBREP LP, and Lehman LP shall have any further rights, obligations or liabilities arising out of, in connection with, or under the Syndication Agreement.

6.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, and all of which when taken together shall constitute one and the same instrument as if the parties hereto had executed the same instrument.  PDF or facsimile copies shall be fully binding as if manually signed.

7.    Entire Agreement.  This Agreement constitutes the entire agreement among the parties hereto in respect of the subject matter hereof and superseded any and

all prior agreements, understandings, and representations, whether written or oral, relating to the subject matter hereof.

       8.    <u>Governing Law</u>.  This Agreement and the rights and obligations hereunder and any actions related thereto shall be governed in all respects, including as to validity, interpretation, and effect, by the internal laws of the State of New York, without giving effect to the principles thereof relating to conflicts of law.

- Remainder of Page Intentionally Left Blank -

     IN WITNESS WHEREOF, the parties hereto hereby execute this Agreement as of the date and year above first written.

**PARTNERSHIP:**

**ROSSLYN SYNDICATION PARTNERS JV LP**, a Delaware limited partnership

By:    Rosslyn JV Partners LLC, a Delaware limited liability company
Its:    General Partner

    By:    _____
    Name:  _____
    Its:    _____

**ROSSLYN GP:**

**ROSSLYN JV PARTNERS LLC**, a Delaware limited liability company

By:    _____
Name:  _____
Its:    _____

**MONDAY LP:**

**ROSSLYN MONDAY LP, LLC**, a Delaware limited liability company

By:    _____
Name:  _____
Its:    _____

**LBREP LP:**

**ROSSLYN LBREP LP LLC**, a Delaware limited liability company

By:    _____
Name:  _____
Its:    _____

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

**LEHMAN LP:**

**ROSSLYN LB SYNDICATION PARTNER
LLC**, a Delaware limited liability company

By: _____

Name: _____

Its: _____