Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Lead Case No. 08-13555(JMP); 08-01420(JMP)(SIPA)

4   - - - - - - - - - - - - - - - - - - - - -x

5   In the Matters of:

6

7   LEHMAN BROTHERS HOLDINGS INC., et al.,

8            Debtors.

9   - - - - - - - - - - - - - - - - - - - - -x

10   In the Matters of:

11

12   LEHMAN BROTHERS INC.,

13            Debtor.

14   - - - - - - - - - - - - - - - - - - - - -x

15               U.S. Bankruptcy Court

16               One Bowling Green

17               New York, New York

18

19               September 14, 2011

20               10:02 AM

21

22   B E F O R E:

23   HON. JAMES M. PECK

24   U.S. BANKRUPTCY JUDGE

25

Page 2

1

2    HEARING re Debtors' Motion for Approval of a Modification to

3    the Debtors' Disclosure Statement [Docket No. 19813]

4

5    HEARING re Motion of the Official Committee of Unsecured

6    Creditors of Lehman Brothers Holdings Inc., et al., for Entry

7    of an Order Granting Leave, standing and Authority to Prosecute

8    and, if Appropriate, Settle Causes of Action on Behalf of

9    Lehman Commercial Paper Inc. [Docket No. 19622]

10

11   HEARING re Motion of Insured Persons for an Order Modifying the

12   Automatic Stay to Allow Settlement Payment Under Directors and

13   Officers Insurance Policy to Settle New Jersey Action [Docket

14   No. 19480]

15

16   HEARING re Debtors' Motion to Compel Production of Documents

17   Improperly Withheld as Privileged by Giants Stadium LLC [Docket

18   No. 19585]

19

20

21

22

23

24

25

Page 3

1

2    HEARING re RBS N.V.'s Motion for Order Dismissing, Without

3    Prejudice, the LBI Trustee's Motion, Dated June 29, 2011, or

4    Alternatively, Converting the LBI Trustee's Motion to an

5    Adversary Proceeding Complaint, Requiring Application of

6    Certain Bankruptcy and Local Rules, and Staying all Non-

7    Discovery-Related Proceedings in Respect of the LBI Trustee's

8    Motion Pending a Determination by the District Court with

9    Respect to RBS N.V.'s Motion to Withdraw the Reference [LBI

10    Docket No. 4454]

11

12    Adversary Proceeding: 10-02821 Lehman Brothers Holdings Inc. v.

13    J. Soffer, Fountainebleau Resorts, LLC

14    Pre-Trial Conference

15

16    Adversary Proceeding:  10-02823 Lehman Brothers Holdings Inc.

17    v. J. Soffer, Fontainebleau Resorts, LLC

18

19    Adversary Proceeding:  11-01875 Melissa King v. Lehman Brothers

20    Holdings Inc.

21    HEARING re Lehman Brothers Holdings Inc.'s Motion to Dismiss

22

23

24

25    Transcribed by:  Aliza Chodoff

```
 1

 2    A P P E A R A N C E S :

 3    WEIL, GOTSHAL & MANGES LLP

 4         Attorneys for Debtors

 5         767 Fifth Avenue

 6         New York, NY 10153

 7

 8    BY:    RICHARD W. SLACK, ESQ.

 9           RICHARD P. KRASNOW, ESQ.

10           ZAW WIN, ESQ.

11

12    WEIL, GOTSHAL & MANGES LLP

13         Attorneys for Debtors

14         700 Louisiana

15         Suite 1600

16         Houston, TX   77002

17

18    BY:    ALFREDO R. PEREZ, ESQ.

19

20

21

22

23

24

25
```

Page 5

1

2   WEIL, GOTSHAL & MANGES LLP

3          Attorneys for Debtors

4          1395 Brickell Avenue

5          Suite 1200

6          Miami, FL

7

8   BY:   EDWARD R. MCCARTHY, ESQ.

9

10  HUGHES HUBBARD & REED LLP

11         Attorneys for SIPA Trustee

12         One Battery Park Plaza

13         New York, NY 10004

14

15  BY:   JEFFREY S. MARGOLIN, ESQ.

16

17  MILBANK, TWEED, HADLEY & MCCLOY LLP

18         Attorneys for Unsecured Creditors Committee

19         One Chase Manhatten Plaza

20         New York, NY  10005

21

22  BY:   BRADLEY SCOTT FRIEDMAN, ESQ.

23         DENNIS O'DONNELL, ESQ.

24

25

Page 6

MENAKER & HERRMANN LLP

      Attorneys for SIPA Trustee

      10 East 40th Street

      New York, NY  10016

BY:  RICHARD G. MENAKER, ESQ.

DEWEY & LEBOEUF LLP

      Attorneys for RBS N.V.

      1301 Avenue of the Americas

      New York, NY  10019

BY:  MARTIN J. BIENENSTOCK, ESQ.

      IRENA GOLDSTEIN, ESQ.

      MONIKA WIENER, ESQ. (TELEPHONICALLY)

MAYER BROWN LLP

      Attorneys for BNP Paribas and Affiliates

      1675 Broadway

      New York, NY  10019

BY:  CHRISTINE WALSH, ESQ.

**Page 7**

DECHERT LLP

    Attorneys for LBHI Director Defendants

    1095 Avenue of the Americas

    New York, NY  10036


BY:   ADAM J. WASSERMAN, ESQ.


ANDERSON KILL & OLICK, P.C.

    Attorneys for Essex Equity Holdings, Ltd.

    1251 Avenue of the Americas

    New York, NY  10020


BY:   TODD E. DUFFY, ESQ.


FRIED FRANK HARRIS SHRIVER & JACOBSON LLP

    Attorneys for Joseph M. Gregory

    One New York Plaza

    New York, NY  10004


BY:   ISRAEL DAVID, ESQ.

Page 8

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3         Office of the United States Trustee

4         33 Whitehall Street

5         21st Floor

6         New York, NY 10004

7

8    BY:   ANDREA B. SCHWARTZ, ESQ.

9

10   SULLIVAN & CROMWELL LLP

11        Attorneys for Giants Stadium

12        125 Broad Street

13        New York, NY  10004

14

15   BY:   BRUCE E. CLARK, ESQ.

16

17   MEISTER SEELIG & FEIN LLP

18        Attorneys for Defense

19        2 Grand Central Tower

20        140 East 4th Street

21        New York, NY  10017

22

23   BY:   CHRISTOPHER J. MAJOR, ESQ.

24

25

Page 9

1

2    TELEPHONICALLY:

3    ANATOLY BUSHLER, FARALLION CAPITAL MANAGEMENT

4    JEFFREY J. DAVIDSON, ESQ., STUTMAN, TREISTER & GLATT

5    MARINA FINEMAN, ESQ., STUTMAN, TREISTER & GLATT

6    STEPHEN GRISANTI, TRICADIA CAPITAL

7    JAMES HEISER, ESQ., CHAPMAN & CUTLER

8    MICHAEL NEUMEISTER, ESQ., STUTMAN, TREISTER & GLATT

9    CAROLYN ROSENBERG, ESQ., REED SMITH LLP

10   FRANKLIN TOP, ESQ., CHAPMAN & CUTLER

11   JEEFREY H. DAVIDSON, ESQ., STUTMAN, TREISTER & GLATT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2            THE COURT:  Be seated, please.  Good morning.

3            Mr. Perez.

4            MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez

5     on behalf of the debtors.  Your Honor, we're here on the motion

6     to approve a very slight modification to the disclosure

7     statement on a show cause order.  I appreciate the Court

8     hearing us so quickly.

9            After the disclosure statement here and we went back

10    and someone brought to our attention that the description of

11    what was a senior guarantee claim included securities lending,

12    and there was a question as to whether in fact that should be

13    treated as a senior claim.  So the purpose of this amendment is

14    strictly to take that out of there.

15            Your Honor, several people have called and said well,

16    what's this about.  Basically, Your Honor, the reason this came

17    up was to determine what ballot the individuals get.  Do they

18    get 5 -- Class 5 ballot or do they get a Class 9-A ballot?  And

19    the people who would otherwise fit in this are going to receive

20    a 9-A ballot.  And in essence, Your Honor, the definitions of

21    senior claim is for borrowed money, indebtedness for borrowed

22    money.  And these are situations where you would enter into an

23    agreement where you would lend securities in return for

24    collateral, and there's a question as to whether in fact that

25    is for borrowed money.

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 11 of 103

Page 11

1          Your Honor, several people wanted me to state on the

2     record this doesn't affect anybody's substantive rights.  I

3     mean, the plan says that we're going to enforce the

4     subordination provisions.  This was included, I believe, at the

5     request of the committee or maybe some other parties to explain

6     what types of transactions would fall into the various classes.

7     And we just eliminated it.  We didn't put it in another class;

8     we eliminated it.

9          But nobody's substantive rights are being affected

10    here, number one.  And number two, the ability to challenge

11    classification, as the Court is aware, has been deferred to

12    confirmation.  That's a proper confirmation.  So if somebody

13    receives a Class 9-A ballot, thinks they're a Class 5, they

14    have the ability to raise that.

15          But with that, Your Honor, that's all the

16    presentation that we have.

17          THE COURT:  Okay.  I read the statement that was

18    submitted I suppose overnight, I received it this morning,

19    indicating no objection but also reserving rights, and to some

20    extent, this is a ministerial matter.

21          The Court reviewed this proposed change and

22    determined that it was probably outside the boundaries of the

23    kind of adjustment that was authorized under the original

24    disclosure statement order and as a result urged the debtor to

25    proceed by means of order to show cause to list this today so

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 12

1    that all parties would have actual notice of the proposed

2    change.  I recognize that the committee's papers indicate that

3    from an economic prospective these changes appear to be de

4    minimis.  From a structural prospective, however, I believe

5    they are nontrivial, and so we requested that you proceed in

6    this manner.

7            I've reviewed the proposed changes and I've taken

8    into consideration the committee's statement as well as your

9    presentation, and the proposed amendments are approved.

10           MR. PEREZ:  Thank you, Your Honor.  Your Honor, I

11   have an order, but on the basis of your oral ruling can we go

12   ahead?

13           THE COURT:  Yes.

14           MR. PEREZ:  We have been waiting to print or burn the

15   CDs, but on the basis your order --

16           THE COURT:  Go print.

17           MR. PEREZ:  Thank you, Your Honor.

18           UNIDENTIFIED SPEAKER:  Your Honor, the next matter is

19   Mister --

20           THE COURT:  Are you actually going to print now?

21           MR. PEREZ:  No.

22           MS. WALSH:  I just wanted to put my appearance on the

23   record if I may?

24           THE COURT:  Sure.

25           MS. WALSH:  Good morning, Your Honor.  Christine

Page 13

1   Walsh of Mayer Brown on behalf of BNP Paribas and Affiliates.

2   I just wanted to place on the record we, of course, do not

3   object to the motion but just wanted to confirm the reservation

4   of rights with respect to this at a later time.  So I

5   appreciate your time.  Thank you.

6            THE COURT:  Okay.

7            MR. O'DONNELL:  Good morning, Your Honor.  Dennis

8   O'Donnell, Milbank, Tweed, Hadley, McCloy on behalf of the

9   committee.  The next item up is, as Mr. Perez indicated, our

10  motion, the committee's motion seeking authority or seeking

11  standing to prosecute certain adversary proceedings on behalf

12  of LCPI.

13           This is a motion that is being made with the consent

14  of the debtors.  And in the papers we submitted, I think we've

15  laid out how we have satisfied the applicable standards under

16  STN and Commodore in terms of there being colorable claims here

17  and the benefit to the estate together with the consent of the

18  debtors.  The motion was filed on August 31st.  There have been

19  no objections.

20           I would just briefly by terms -- in terms of

21  background, it relates to claims that arise out of certain

22  participation agreements that were entered into with parties

23  under LMA forms.  And under these LMA forms, the parties did

24  not get a property right; they got a debtor -- they got a claim

25  essentially.  It was a debtor-creditor relationship created.

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 14 of 103

Page 14

 1    The contention in the adversary complaints that have been filed

 2    to date and the claims that will potentially be asserted to --

 3    against parties who have signed tolling agreements arise out of

 4    that relationship and elevations that were granted by the

 5    debtors during the preference period were in certain cases

 6    post-petition, which we contend are avoidable as preferences or

 7    unauthorized post-petition transfers.

 8           As indicated, there have been five adversaries filed

 9    already.  Those have been stayed under the order staying the

10    adversary proceedings.  And there are tolling agreements with

11    respect to approximately 13 other parties, which with whom the

12    debtors and we have been in contact.

13           The committee is assuming prosecution of these claims

14    primarily because it has taken the lead with respect to these

15    claims since the outset going back approximately a year and a

16    half.  The committee was involved in the initial investigation

17    and was most focused on these particular claims and has

18    continued to be involved.  And given that background, this

19    motion -- as well as just recognizing the status quo, the

20    committee will, the committee has been pursuing the claims.

21    They will continue to pursue the claims.

22           As indicated, the objection deadline was September

23    7th.  There have been no objections.  The debtors have

24    consented.  So unless the Court has additional questions about

25    the claims or the relief sought, we would request that the

08-13555-mg    Doc 20661    Filed 09/15/11    Entered 10/07/11 14:19:30    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 15 of 103

Page 15

1    Court grant the motion.

2        THE COURT:  I have no problem with the motion, and

3    I'm prepared to grant it.  But I did have a question when I

4    reviewed it because it wasn't obvious to me as to why the

5    committee was pursuing these claims as opposed to LCPI itself.

6    And since that was not clear to me, I'd like you to make it

7    clear now.

8        MR. O'DONNELL:  Sure.  As I've already indicated,

9    Your Honor, during the process leading up to the bar date for

10   the filing of avoidance actions, we -- there was a certain

11   amount of divvying up of responsibility for different types of

12   claims.  And the committee initially raised the potential

13   theory here and persuaded the debtors to pursue the theory.

14   The claims that were filed were filed by the debtors.

15        In the months that have ensued, there has been,

16   again, a sort of allocation of responsibilities or focus by

17   either the committee or the debtors on various of the avoidance

18   actions.  This is -- these are avoidance actions that the

19   committee initiated the investigation with respect to and has

20   always felt most strongly about.  We believe that the theory

21   here is very viable and that there are no colorable defenses.

22   The debtors, recognizing our involvement and commitment of time

23   and effort thought it made sense for us to continue that

24   prosecution and have consented.

25        THE COURT:  Okay.  I'll accept that as an

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 16

1   explanation, and the motion is granted.  You have authority to

2   proceed with prosecution of those causes of action.

3            I do have a question, however, relating to the

4   agenda.  And this is probably a question for Mr. Perez.  I

5   remember that one of the items that I prepared for on the

6   uncontested list, which is not on the amended agenda, gave the

7   debtor permission to serve certain foreign defendants in

8   connection with some pending litigation.  I believe one of the

9   parties was BlueBay, and BlueBay was also identified as a party

10  in the motion that we just heard giving the committee authority

11  to proceed.

12           I'm just wondering what happened to that.  Was that

13  resolved by other means?

14           MR. PEREZ:  Your Honor, if the Court will give me

15  five minutes I'll go find out because I don't know the answer

16  to that.  I can make a call.

17           THE COURT:  I don't know if it was resolved by

18  certificate of no objection that I didn't hear about but --

19           MR. PEREZ:  It was.

20           THE COURT:  Apparently it was my law clerks have

21  confirmed that.  Fine.  Then I withdraw the comment and you

22  don't have to look further.

23           MR. PEREZ:  All right.  Thank you, Your Honor.  Your

24  Honor, may I be excused?

25           THE COURT:  Yes.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 17

1          MR. PEREZ:  Thank you.

2          THE COURT:  You're going to go print.

3          UNIDENTIFIED SPEAKER:  Your Honor, the next matter on

4    the agenda is the motion of the insured persons for order

5    modifying the stay.  I don't know who is actually presenting

6    that motion.

7          MR. WASSERMAN:  Hi.  Good morning, Your Honor.  My

8    name is Adam Wasserman.  I'm of Dechert LLP.  I will be

9    presenting that motion.  We represent the current and former

10   directors of LBHI, who are the defendants in the New Jersey

11   action.  The motion is also being made on behalf of the various

12   officer defendants in that action as well.

13          I'm going to do my best to keep this very short.  As

14   the Court is aware, on nine prior occasions it has provided a

15   comfort order lifting the automatic stay to the extent

16   necessary in order to permit the insurers to pay settlements

17   and/or legal fees from the LBHI D&O policies.  Here, the

18   current and former LBHI officers and directors seek very

19   similar relief in connection with a settlement that was reached

20   of a securities action brought by the State of New Jersey

21   Department of Treasury, which settles a case that has about

22   approximately 192 million in alleged claims for 8.25 million

23   dollars.

24          I am not going to repeat for you all the reasons in

25   our moving papers for why we think the comfort order is

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 18

1   appropriate.  I'll rest on those.  Rather, I will just address

2   the one limited objection that was raised by the Essex

3   plaintiffs to this motion.

4          The Essex plaintiffs' limited objection is

5   essentially that they do not know whether or not the New Jersey

6   settlement should be covered by the 2007/2008 D&O policy or

7   whether it should be covered by the 2008 to 2011 D&O policy.

8   Another way to put it is they're not sure if it should be

9   covered by tower one or tower two, to use short firm.

10          We believe that this objection should be objected for

11   three reasons.  The first is this very same argument was

12   previously raised in oral argument by the objector to the 15

13   million U.S. Air comfort motion in July, which this Court had

14   rejected.  And we believe that the argument should be rejected

15   here for those same reasons as well.

16          THE COURT:  And that objector is the very same party

17   who is benefiting from today's settlement.

18          MR. WASSERMAN:  That is, Your Honor, the State of New

19   Jersey.

20          The second reason is that we believe that Essex lacks

21   a legal basis to object to the comfort motion for the exact

22   same reasons that New Jersey previously lacked standing.  Essex

23   is not an insured whose case is even claimed to be covered

24   under the policy, but rather it is a Plaintiff in a ongoing

25   arbitration where there has been -- and the arbitration is

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 19

1   against certain LBI brokers.  And there has been no resolution

2   of that arbitration to date.  Thus, as this Court stated in

3   court in July, they're merely one representative of a whole

4   host of third parties who might have claims that could proceed

5   against -- claims against the proceeds of the insurance policy

6   and thus, they would lack standing to object.

7           The third reason their objection should be denied is

8   that absolutely no one is claiming that the New Jersey case is

9   not covered by tower one, the 2007/2008 policy.  The estate I

10  believe agrees.  The New Jersey defendant agrees.  The insured

11  agrees, and you don't even have Essex saying that they

12  disagree.

13          So under the circumstances where there is absolutely

14  no question that this settlement is covered by the 2007/2008

15  policy, we think that their objection should be denied.  And

16  unless this Court has any questions, I will just respectfully

17  ask that the order be granted.

18          THE COURT:  I'll hear from Essex.  But before hearing

19  from Mr. Duffy to the extent he wants to say a few words, I'd

20  like to hear from the insurer, assuming the insurer is

21  represented in court, on the proposition that you've just

22  advanced in argument which is the coverage question that is

23  embedded in the Essex objection.  In effect, Essex is saying

24  it's not clear to us that your term tower one applies.

25  Frankly, it's the first term I've -- first time I've used the

08-13555-mg    Doc 20661    Filed 09/15/11    Entered 10/07/11 14:19:30    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 20 of 103

Page 20

1    term tower one to describe an insurance stack, and I'm not

2    comfortable using that term.  So I'm not going to do it again

3    particularly --

4              MR. WASSERMAN:  Yes, Your Honor.

5              THE COURT:  -- in a week that includes September 11.

6    But I'd like to hear from the insurer.  Is the insurer here?

7              Apparently, the insurer is so lacking in concern

8    about the coverage question that the insurer is unrepresented;

9    is that correct?

10             MR. WASSERMAN:  I am not sure if the insurer is

11   represented.  I know that we have insurance counsel for the

12   estate present who can address that issue.  And I am happy to

13   address our understanding of that issue if it pleases the

14   Court.

15             THE COURT:  I'm not looking for an evidentiary

16   showing on the question of coverage as much as I'm trying to

17   get a sense as to whether or not the Essex objection is purely

18   theoretical or if there's any substance to it.

19             MR. WASSERMAN:  Well, the basis why we believe it is

20   theoretical and that there isn't any substance to it, Your

21   Honor, is that according to the insurers there was a case filed

22   in February 22nd, 2008, which was the Reese case, which was a

23   securities class action, which would have been covered by the

24   2007/2008 policy.

25             It is our belief and I believe it is also the

Page 21

1    estate's belief, though I will let the estate speak for itself,

2    that the Reese case involved securities questions, which

3    related to allegations relating to LBHI securities and relating

4    to whether or not there were misstatements or omissions in

5    connection to Lehman's financial condition and/or exposure to

6    mortgages.  So that is the initial case, which triggered the

7    2007-2008 policy.

8            The New Jersey case, similarly, is a case by an

9    investor who is claiming a securities case against the

10    defendants.  And their case is also based on the similar types

11    of alleged misstatements and/or omissions relating to Lehman's

12    or LBHI's financial condition and/or exposure to various

13    mortgage and real estate assets.  So because the New Jersey

14    action is related to this action that was first filed in what

15    is a claims made policy, it is our understanding that it is in

16    fact covered.

17            And I will defer to either counsel for the estate or

18    counsel for -- or insurance counsel for the estate if you have

19    any additional questions on that.

20            MR. KRASNOW:  Good morning, Your Honor.  Richard

21    Krasnow, Weil, Gotshal & Manges on behalf of the debtors.  We

22    are not insurance counsel, but just a few introductory

23    comments.

24            Your Honor, the debtors have no objection to the

25    granting of the motion for the reasons that Mr. Wasserman

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 22

1    outlined.  And we concur with his views with respect to the one

2    objection that was filed.

3              I would make one observation in response to Your

4    Honor's question as to whether or not this is a theoretical

5    issue.  Your Honor, we believe that Essex, if you will, stands

6    in the shoes that New Jersey wore when it opposed the last

7    motion where relief was sought to lift the stay to allow for

8    insurance payments to be made, which is to say that ethic,

9    excuse me, Essex's standing is nonexistent.

10             It does -- it has asserted claims.  There is

11   litigation with respect to its claims.  But it has no rights

12   with respect to either the policies at issue or the policies

13   that it alluded to, which I believe is the 2008/2009 policy

14   years.

15             With respect to the 2007/2008 policy years, I will

16   defer to Mr. Hirsch from the Reed Smith firm, who is insurance

17   counsel to the debtors.  But again, my understanding is

18   consistent with what Mr. Wasserman said, which is that the

19   claims that have been asserted by New Jersey are similar to

20   claims that were previously asserted during the 2007/2008

21   policy year.  And therefore, under the policies in question and

22   applicable insurance law, there is a relation back.

23             Your Honor, if I could introduce Mr. Hirsch, he is

24   with the firm of Reed Smith.  It wasn't clear that he was going

25   to need to speak today.  He is admitted in the State of

08-13555-mg    Doc 20661    Filed 09/15/11    Entered 10/07/11 14:19:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 23 of 103

Page 23

```
 1    Illinois.  He is not admitted in New York.  We had not filed

 2    any pro hac papers because it might just be a one-day matter.

 3    But we would request that he be admitted pro hac for the

 4    purpose of today's hearing.

 5                THE COURT:  He's --

 6                MR. HIRSCH:  Good morning, Your Honor.

 7                THE COURT:  He's admitted pro hac, and he needs to

 8    recognize that that carries with a $200 payment obligation.

 9                MR. HIRSCH:  I think my firm can cover it, Your

10    Honor.

11                THE COURT:  Good.  And we appreciate all

12    contributions to our treasury.

13                MR. HIRSCH:  Your Honor, Mr. Wasserman I believe did

14    state accurately why the New Jersey matter should fall within

15    the '07/'08 tower.  I can answer any other questions you have

16    if you have any.  But I'd also say there really isn't any

17    dispute on behalf of the estate.  If there were a basis to

18    dispute, then I think we would.  It would be in the estate's

19    interests.  But there really isn't.

20                THE COURT:  Okay.  I -- Mr. Duffy can speak for

21    himself, but I view his limited objection as being more in the

22    nature of a reservation of rights as to whether or not a

23    particular claim is covered under the 2007/2008 policy or under

24    the 2008/2011 policy.  Is there any current question in the

25    mind of the debtor or, if you know, in the mind of the
```

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 24

1    insurance carriers and their representatives as to applicable

2    coverage concerns?

3           MR. HIRSCH:  No, there is no question.  And I know

4    the position of the insurance carriers because we have

5    correspondence from the insurance carriers.  There's no

6    dispute.  They took -- the insurance carriers took the position

7    that this matter is in the '07/'08 tower because it relates

8    back to claims first made during that policy period.  And

9    again, that's reflected in correspondence.  And neither the

10   estate nor any of the insureds has disputed that.

11          THE COURT:  Okay.  I appreciate your comments.

12          MR. HIRSCH:  Thank you, Your Honor.

13          THE COURT:  I'll hear from Mr. Duffy.  But I'll hear

14   from Mr. Duffy on the same basis that I heard from the State of

15   New Jersey on July 21.

16          MR. DUFFY:  Yes, Your Honor.  For the record, Todd

17   Duffy, Anderson Kill and Olick on behalf of Essex Equity

18   Holdings Limited.

19          Our objection is, as the Court rightly characterized

20   it, was more of a reservation of rights.  We believe that there

21   will be a policy question as to which policy these charges will

22   be associated with and not only these but others.  If you see

23   the SASCO objection, they say they've been stuffed into the

24   2007/2008 tower when they really believe that they should be in

25   the 2008/2009 -- or 2008/2009 tower.

08-13555-mg    Doc 20661    Filed 09/15/11    Entered 10/07/11 14:19:30    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 25 of 103

Page 25

1          Now, all of these representations on the record from

2     the debtors' insurance counsel, Mr. Wasserman, they were not in

3     the papers.  So we contacted or reached out to debtors' counsel

4     and asked could we see the notice of claim, which usually comes

5     from the risk managers.  We received nothing.

6          So I am not an insurance coverage attorney, but our

7     concern is merely that it's not to object to this -- to the

8     Court entering any order granting -- lifting the stay for the

9     settlement.  Our objection is that -- our concern is that later

10    on someone will use this order to say this esteemed Court said

11    that this belongs in the 2007/2008 policy tower.  And this

12    simple reservation of rights in the order, I don't see why

13    anybody -- if in fact this is the correct tower, I don't see

14    why anybody else would have any objection to that.  Thank you,

15    Your Honor.

16          THE COURT:  Okay.

17          MR. HIRSCH:  Your Honor, may I step up just to

18    clarify one matter?  I want to be absolutely clear on this.

19    When I answered your question a moment ago, I understood you

20    were asking about the New Jersey case, which is what we're

21    talking about now.

22          There is a coverage dispute, not before Your Honor

23    right now, regarding whether or not the -- what we call the

24    SASCO litigation, the mortgage-backed securities cases, whether

25    that falls under the '07/'08 tower or the '08/'09 tower.

1    There's a large dispute about that.  I wasn't addressing that,

2    and that's not before Your Honor at this moment.

3          THE COURT:  Understood.  Thank you.

4          MR. DUFFY:  Your Honor, may I have one moment?  I'm

5    sorry.

6          THE COURT:  All right.  It has to be quick.  This is

7    -- we're already spending more time on this than I think it

8    probably warrants.

9          MR. DUFFY:  Yes, Your Honor.  Someone mentioned the

10   Reese case previously.  And honestly, I think that the Reese

11   case may involve securities questions that are similar to this

12   question.  But I -- my understanding from my insurance coverage

13   partners is that that type of, quote, notice to the insurance

14   company suspect, that it's not always considered rock solid

15   notice of claim.  So as a result, there may actually be a

16   question, but I don't have anything in front of me to question

17   that.

18         THE COURT:  Look --

19         MR. DUFFY:  Thank you, Your Honor.

20         THE COURT:  -- I've heard enough on this whole

21   subject.  This is not a hearing to determine a coverage dispute

22   nor as far as I can tell in the matter before the Court is

23   there any coverage dispute.  In fact, based upon the

24   representations of counsel for the insured persons, for the

25   estate, both general bankruptcy counsel for the estate and

08-13555-mg    Doc 20661    Filed 09/15/11    Entered 10/07/11 14:19:30    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 27 of 103

Page 27

1    special insurance counsel for the estate, there is no question

2    but that the proposed settlement to be authorized by virtue of

3    granting the motion is a settlement that falls within the

4    2007/2008 D&O coverage.

5            However, one thing is clear.  The motion itself is a

6    motion for what we conveniently describe as a comfort order

7    that authorizes the parties-in-interest to proceed with the

8    proposed settlement but in no way constitutes a determination

9    as to underlying insurance coverage issues.  That's a matter

10   that I presume the parties have satisfied themselves is not an

11   issue.  Also, I will note for whatever it may be worth that at

12   least in my experience, an insurance carrier rarely if ever

13   will pay out significant settlement proceeds whenever there is

14   a legitimate coverage dispute then pending without involving

15   other carriers that might share the load.

16           So without ruling on the question, I do overrule the

17   Essex Equity Holdings limited objection.  And I'm satisfied by

18   the representations that I've heard that there really is no

19   coverage issue here.  However, even if there had been no

20   objection by Essex Equity Holdings, the grant of this motion

21   would not have constituted and does not constitute a

22   determination of any coverage issues.  That's one of the

23   reasons why this has been largely a waste of time.  The motion

24   is granted.

25           MR. WASSERMAN:  May I approach to give a CD to your

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 28 of 103

Page 28

1    clerk?

2         THE COURT:  There's actually no need for you to do

3    that because the ordinary course action in our omnibus calendar

4    is to collect the orders and hand them up at the end of the

5    morning calendar.  And in the ordinary hearing, Weil Gotshal

6    acts as the keeper of the proposed orders.  So you can hand

7    that to one of the Weil Gotshal partners, and they'll take care

8    of it.

9         MR. WASSERMAN:  Thank you, Your Honor.

10        THE COURT:  And you're excused if you want to me.

11   And, Mr. Duffy, you're excused if you want to be.

12        Good morning.

13        MR. SLACK:  Good morning, Your Honor.  Richard Slack

14   from Weil on behalf of the debtors.  The next matter concerns a

15   very narrow discovery dispute between the debtors and Giant

16   Stadium LLC concerning whether Giants Stadium can withhold

17   certain documents as privileged that were shared with Giants

18   Stadium's financial adviser, Goldman.

19        In May 2010, the debtors served a subpoena on Giants

20   Stadium pursuant to Rule 2004 and this Court's November 2009

21   order permitted the debtors to take 2004 discovery.  The result

22   of that subpoena was a fairly extensive production by Giants

23   Stadium that was reviewed.  There was a 2004 examination of a

24   witness.

25        Now, the discovery that was served was done so in

1   connection with swaps that Lehman had entered into with Giants

2   Stadium.  In a nutshell, Giants Stadium financed the building

3   of a new stadium in New Jersey by issuing auction rate

4   securities, and auction rate securities are long-term debt

5   interest instruments for which the interest rate is regularly

6   reset through an auction process.  And because of the potential

7   interest rate fluctuations, Giants Stadium sought to limit

8   their interest rate exposure by entering into swaps.  And they

9   did so by entering into some swaps with Goldman, which had some

10  of the auction rate security risk, and some of those were

11  hedged with Lehman in separate swaps.

12          Now, upon the Lehman bankruptcy, Giants Stadium

13  sought to terminate the swaps as did, as we know, a number of

14  Lehman swap counterparties.  There were certain contractual

15  provisions in the governing documents between LBSF and Giants

16  Stadium, which add some complication.  And I'm not going to go

17  through them, but one example is there was a provision in the

18  governing documents that had LBI acting as the auction agent

19  for the auction rate securities.  And the provision stated that

20  if for some reason LBI was no longer the auction rate agent

21  that the interest rate on the Lehman swaps would change from

22  one that was based on the actual auction rates that were set to

23  a LIBOR rate.  And the importance of that is, is that in this

24  situation after the Lehman bankruptcy, a matter of days

25  afterwards, LBI in fact resigned and shortly thereafter was

1    replaced.

2         So one of the matters, and it is just one and it's an

3    example, in the debtors' investigation is what were the

4    assumptions that underlie the valuation of the swap upon

5    termination by Giants Stadium and in particular if the swaps

6    were set to go out let's say 38 years or so, which is these

7    were 40-year swaps so they still had 38 years left, and you're

8    valuing them, how did Giants Stadium take into account the fact

9    that upon the resignation of LBI it was expected that there

10   would be a change and would there be a change in the interest

11   rate essentially in their calculation.  So if they did that,

12   great.  If not, why not.  And that's one of the issues that

13   we're looking at in the 2004 investigation.

14        Now, not surprisingly, upon the termination that

15   Giants Stadium sought, Goldman prepared the valuation of the

16   swaps.  So the financial adviser actually prepared the

17   valuations.  And those valuations became the basis for Giants

18   Stadium's 300 million dollar claim that it filed in the

19   bankruptcy.

20        Giants Stadium has produced the valuations that

21   Goldman did.  Your Honor, what we did was in our exhibits we

22   submitted the cover e-mails and didn't burden the Court with

23   the actual valuations, which are quite substantial.  But we

24   have those here if the Court would like to see those.  But the

25   bottom line is, is that Giants Stadium produced the Goldman

Page 31

1   valuations.  They -- you know, one of the issues, again, that

2   we're looking at in our investigation is what were the

3   assumptions that went into the valuations and why those

4   assumptions were made by Goldman.  Of course, that's all

5   classic financial adviser work.

6          Giants Stadium ultimately produced a extensive

7   privilege log.  And this motion only seeks thirty-three

8   documents on the Giants Stadium log where Goldman was a party

9   to the communication, so again, a very narrow motion.

10         With that, there is a little bit of cleanup for two

11  reasons.  Number one, yesterday Giants Stadium produced four of

12  the thirty-three documents that were at issue.  So as they had

13  said I think in their objection they were going to do, they in

14  fact produced those.  And for the record, we've identified

15  those as Exhibit 351 off of the privilege log, which is -- was

16  Exhibit D to our motion, and Numbers 270, 271 and 272 off the

17  redaction log.  So those, Your Honor, are no longer at issue.

18  They have been produced.

19         The other thing is, is that the list that we had in

20  our motion of the documents is accurate.  That's at page 10 of

21  our motion.  We had an exhibit for Your Honor, which we thought

22  would be helpful, where we highlighted on the privilege and

23  redaction logs the items that were at issue, and we mismarked

24  Number 197.  We actually highlighted that one on Exhibit E, but

25  that is not at issue.  So Number 197 off the redaction log is

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 32

1   not at issue.

2          So turning to the law for a second, there really is

3   no dispute as to the general rule that the presence of a third

4   party in communications between a lawyer and the client

5   destroys the privilege.  In the Second Circuit, there is a very

6   limited exception to that.  And again, I don't think is at

7   issue as Giants Stadium has said that they accept the Kovel and

8   Ackert decisions as being the law.  And that is that where you

9   have essentially a client who needs an interpreter, then there

10  is a very limited interpreter exception to this idea that a

11  third party destroys the privilege.  And when the courts in

12  Kovel and Ackert use the word interpreter, they're talking

13  about obviously non-language interpreters.

14         And Ackert, which is a Second Circuit decision I

15  think, is an important case in terms of the facts there.  You

16  had an in-house lawyer for a company which sought to advise the

17  company about tax implications of a certain investment.  And in

18  the course of providing that legal advice, the in-house lawyer

19  contacted Ackert, who was an employee coincidentally at Lehman

20  or at Goldman.  And the company argued that the information

21  provided by the financial adviser was both important and

22  necessary to rending the legal advice by the lawyer.

23         Interestingly enough, the lower court agreed and held

24  that the information was privileged.  The Second Circuit

25  reversed.  And relying on Kovel, the Second Circuit held that

 1    communications between a party and its counsel may not be

 2    destroyed if the third-party adviser was acting as an

 3    interpreter akin to a client speaking a different language.

 4    The Second Circuit found, however, here that, quote, "the

 5    privilege protects communications between a client and an

 6    attorney not communications that prove important to an

 7    attorney's legal advice to the client."  And the Second Circuit

 8    went on to say the communication between an attorney and a

 9    third party does not become shielded by attorney-client

10    privilege solely because a communication proves important to

11    the attorney's ability to represent the client.

12            And here, this situation is no different than in

13    Ackert.  The declaration of the lawyer here from Sullivan and

14    Cromwell submitted by Giants Stadium in opposition to the

15    motion confirms, frankly, that the communications do not fall

16    within the Second Circuit's holding in either Kovel or Ackert.

17    In Paragraph 15 of Mr. Dietderich's declaration, he states,

18    quote:

19            "These seven communications represent legal

20    discussions among S&C, Goldman Sachs and GS LLC in which S&C

21    required the assistance of an expert on financial markets in

22    order to provide certain advice to GS LLC concerning the amount

23    of loss as that term is defined in the ISDA agreements suffered

24    by GS LLC due to LBSF's default on the transactions.  This

25    financial expertise was provided by Goldman Sachs at the

Page 34

1     request of GS LLC solely for the purpose of assisting S&C to

2     adequately advise GS LLC on legal questions."

3              And this is precisely the situation in Ackert.  By

4     its own admission, Sullivan and Cromwell wanted financial

5     advice that it thought would be useful, perhaps even necessary,

6     in rendering legal advice.  And that's exactly what happened in

7     Ackert where the in-house lawyer wanted Goldman's financial

8     advice on taxes in a transaction at issue there in order to

9     help it render legal advice.

10             I would also point out, Your Honor, though I won't

11    read it, that you have a very similar description of the work

12    done by Goldman in these communications in the declaration by

13    Christine Procops in paragraphs 18 and 19 essentially saying

14    that what was being provided was financial advice by Goldman to

15    help the lawyers render legal advice.  And that is not

16    privileged under Ackert or Kovel.  The only thing that is

17    privileged potentially in the limited exception under Ackert is

18    where the client is providing information and it's being

19    interpreted by the financial adviser.  But as in Ackert, when

20    you're getting financial advice from the financial adviser,

21    that is not privileged.

22             Now, the withholding of this information here is even

23    more egregious than in Ackert or in Kovel, and the reason is,

24    is that Giants Stadium has actually produced certain valuations

25    and certain valuation information while trying to hide other

Page 35

1    information on exactly the same topic.

2              THE COURT:  This is your sword and shield argument.

3              MR. SLACK:  That's correct.

4              THE COURT:  One of the questions I have, I want to go

5    back to your opening remarks about the four documents that have

6    recently been turned over.  So there are now twenty-nine by my

7    count of these documents that are at issue.  What distinguished

8    those four documents, and what if anything did you learn about

9    the role of Goldman as a result of looking at those four

10   documents?

11             MR. SLACK:  Well, I think in fairness we looked at

12   the documents and we didn't even see a colorable argument that

13   -- from those four documents that they were being withheld

14   under Kovel.  I don't know whether -- I think they're

15   confidential, and I don't know whether I can describe them to

16   the Court.  But I -- what I guess I would suggest is that after

17   the motion we will submit them to the Court and the Court can

18   review them.

19             THE COURT:  Okay.  And apropos of that last remark, I

20   gathered from looking at the papers that have been filed that

21   there is some ongoing issue as to whether or not the disputed

22   documents should be the subject of an in-camera review.  How

23   can I possibly decide the question of privilege here and the

24   role of Goldman without an in-camera review?

25             MR. SLACK:  I think, Your Honor, that it's -- the

08-13555-mg    Doc 20661    Filed 09/15/11    Entered 10/07/11 14:19:30    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 36 of 103

Page 36

1    answer is I think it's entirely appropriate.  I think Your

2    Honor should take them in-camera.

3            I think Your Honor could decide it without it in the

4    following respect, and that is that based on the declarations

5    that were provided they just simply don't set out a -- even a

6    colorable claim that these are protected by Kovel and Ackert.

7    Because what each of the declarations says, so the only

8    information that we have from Giants Stadium, is that Goldman

9    was asked to provide financial advice and financial expertise

10   to help Sullivan and Cromwell render legal advice.  Nowhere in

11   either of the declarations that were filed is there any

12   suggestion that they acted as any kind of interpreter of any

13   information from the client.  And so I think on the face of the

14   opposition, Your Honor can correctly decide that there hasn't

15   even been a colorable claim or colorable opposition to

16   providing these documents.

17           But having said that, we think an in-camera review is

18   appropriate.  We think it's typical in these situations.  And

19   we would expect Your Honor to conduct one.

20           THE COURT:  All right.  Please proceed.  You were at

21   sword and shield when I interjected.

22           MR. SLACK:  Right.  So, Your Honor, I think you

23   understand the sword and shield, and so what I wanted to do is

24   talk about the one case that Giants Stadium seeks to rely on in

25   order to make its argument.  But that case, the Calvin Klein

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 37 of 103

Page 37

1   Trademark Trust matter, which is 124 F. Supp. 207, doesn't

2   really help it.

3           In that case, a party sought discovery of

4   communications between a lawyer and a client that was attended

5   by a financial adviser.  The court first off affirmed the

6   limited interpreter exception.  So I think, again, there's no

7   issue as to the law.  The court reviewed the documents in-

8   camera -- and I think that's apropos of what Your Honor just

9   said -- and then determined after review that the financial

10  adviser was in fact interpreting information provided by the

11  client and made that distinction there that there was

12  information being provided by the client that the financial

13  adviser was interpreting.  The court did require production of

14  one document there that didn't meet the interpreter test.

15          And so here, in stark contrast, again, there is

16  nothing in the declarations that say that there was anything

17  different here other than the financial adviser was actually

18  providing financial advice, and that is not protected under

19  Ackert or Kovel.  Moreover, if you read on in Calvin Klein

20  towards the end of the decision, it makes it clear that had

21  this situation involved a sword-and-shield strategy where some

22  information was provided and some wasn't that it would perhaps

23  have changed the opinion.  So in that respect, I think Calvin

24  Klein actually supports the motion here.

25          With respect to an in-camera review, we just talked

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 38

1   about that.  I would only point out that the cases that are

2   cited by Giants Stadium almost uniformly have an in-camera

3   review.  Ackert had an in-camera review.  Calvin Klein had an

4   in-camera review.  It's perfectly appropriate here.

5           One last point on the attorney-client privilege,

6   completely independent from the idea of the Ackert and Kovel

7   exception.  Now, there's dispute that Goldman had entered into

8   swaps with Giants Stadium that were essentially parallel.

9   There were some different terms with respect to the interest

10  rates, but other than that, they were ISDA master agreement

11  swaps.  And at various point in the -- in their papers and in

12  the declarations, Giants Stadium states that Goldman was

13  helping provide financial advice so that Sullivan and Cromwell

14  could interpret loss, and they use that in quotations, for

15  purposes of the ISDA master.

16          But the definition of loss is typically a uniform

17  concept.  And so Goldman having had swaps -- again, almost

18  identical swaps other than the interest rate -- was in an

19  adverse position vis-à-vis this kind of legal advice, that is,

20  what is the definition of loss because they had the same issue

21  with respect to their swaps.  And the idea that Goldman could

22  be inside the privilege tent with respect to an interpretation

23  of an ISDA master agreement when it was in an adverse position

24  with respect to an ISDA master, it's arm's length, contractual

25  counterparty, destroys the privilege in and of itself.  And so

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 39

1   we suggest and it's in our papers that the fact of adversity

2   here independently destroyed the attorney-client privilege.

3            There is a suggestion in the Giants Stadium papers

4   that they didn't provide this information as a swap

5   counterparty, as if they could change their hats.  Well, we're

6   a swap counterparty and now we're giving this kind of financial

7   advice over here.  I think that's pure fiction.  I think that

8   if you're adverse, if Goldman is adverse it change its hats and

9   say well, I'm providing this information as a swap counterparty

10   and this information as something else.

11            A quick word on work product, which I think frankly,

12   Your Honor, just doesn't work here.  The law from the Second

13   Circuit in Adelman is very clear that if you would have created

14   the documents regardless of litigation then you -- they're not

15   protected by work product.  In other words, what happened here

16   was they purported to terminate the swap and therefore wanted

17   to value it.  And if they're valuing the swap and figuring out

18   what loss means for valuing the swap, that work would have been

19   done regardless of whether or not there was going to be

20   litigation over or not.  They needed to value the swap for the

21   termination.  And what Adelman says is that that is not

22   protected by work product.

23            The case that they cite, which is a Weil Gotshal

24   case, if you read their block quote says specifically that it

25   doesn't apply if the work would have been done anyhow.  So I

Page 40

1    think there the one case that Giants Stadium cites is actually

2    right on point there.

3            So with that, Your Honor, we would ask that you

4    compel the production of these.  And of course, Your Honor, we

5    are willing to and expect that you will view them in-camera

6    first.  Thank you.

7            THE COURT:  All right.  Thank you.

8            I'll hear from Giants Stadium.

9            MR. CLARK:  Good morning, Your Honor.  Bruce Clark

10   for Giants Stadium.

11           THE COURT:  I take it that we're going to continue to

12   call it Giants Stadium and that MetLife has nothing to do with

13   this.

14           MR. CLARK:  That's the entity, Your Honor.  We're

15   quite right.  That's just a name on the --

16           THE COURT:  I figured as much.

17           MR. CLARK:  -- name on the front.  I thought you were

18   going to ask about the game the other day, and I have no answer

19   for that either.

20           Your Honor, much but not all of what Mr. Slack said

21   we do agree with, including some of the general statements

22   about the law.  Originally, they painted our claims of

23   privilege as sweeping.  Now they're narrow.  We agree with that

24   change in approach.

25           There are exactly seven families of e-mails that are

Page 41

 1    at issue, twenty-nine e-mails because you will have one as the

 2    original e-mail and then somebody will reply and so forth.

 3    It's not a lot of e-mail or documentation.  And the subject is

 4    the proper interpretation of the term loss under the ISDA

 5    agreement.  And literally, what happened here is the client

 6    presented to its lawyers, some of my colleagues, this ISDA

 7    agreement and said how is one to interpret that -- that was the

 8    question that was being discussed -- in the circumstances where

 9    we have a swap of the nature of the swap with Lehman.

10          Now, the debtors continue to say that the two swaps

11    were similar or even identical.  That simply could not be

12    further from the truth.  If you look at all of the filings in

13    this case and all the swaps that have been presented to you, I

14    haven't looked at every one.  I've looked at as many as I can

15    over time.  I haven't found another like this because typically

16    under the ISDA agreements there are fixed terms and variable

17    terms.  The fixed term is self-defining, and the variable term

18    is usually something that is market aware.  It's LIBOR, LIBOR

19    plus twenty or something like that.

20          In the Lehman swap, it was quite different.  What

21    Lehman did was come to Giants Stadium and say we can prevent

22    even that amount of risk.  And there was risk there under the

23    deal because what the Giants were paying out was an auction

24    rate subject to an auction that would be held every thirty

25    days.  And what they were going to have to pay on the bonds --

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 42 of 103

Page 42

1     on the auction rate bonds would depend very much on how the

2     construction was going and a lot of other variables.  It was

3     not just a credit issue.

4            So what happened was Lehman came to the Giants and

5     said we can put you into a secure position where we will make

6     our swap payment the same as your payment on the auction rate

7     bonds.  In effect, at the end of the day what you have, Giants

8     Stadium, is a 6.18 percent fixed rate for forty years.  And the

9     terms of the contract were quite remarkable in a number of

10    other ways.  There are no termination provisions of the type

11    you ordinarily have, no caveats, no ability to get out of that

12    commitment.  It was a very unique contract.

13           And so there was the question of how do you interpret

14    loss under the circumstances presented here after the

15    bankruptcy filing.  And loss under the ISDA documentation means

16    an amount a party reasonably determines in good faith to be its

17    total losses and costs in connection with the agreement

18    including any loss of bargain.  The benefit of the bargain was

19    an essential element in the ISDA agreement as it is in all of

20    these contracts, but this was an unusual swap.  And so the

21    issue was what will the market consider reasonable.  What will

22    the market consider reasonable under these circumstances?

23           And it is a fact that for this limited purpose in

24    this limited respect, Giants Stadium asked Goldman Sachs to

25    give some advice and information to Sullivan and Cromwell so

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 43

1    that Sullivan and Cromwell could advise Giants Stadium.  It's

2    the same thing that happened when Wachtell asked Lazard for

3    advice in Calvin Klein, and that was upheld.  And if you look

4    at the Hallmark Cards case, although that was a work product

5    case, there's a mention of the fact that Weil Gotshal was

6    claiming attorney-client privilege over twelve documents

7    relating to advice they got from Lusa Data (ph), it's data

8    consultant, which is probably the same theory.  This is not

9    unusual.  People have arrangements like these on narrow issues

10   all the time.

11          Now, under the law, the debtors went on at some

12   length about the Ackert case.  And of course, the Ackert case

13   does have considerable influence here.  But what happened in

14   Ackert is that the trial court barred any questions of Mr.

15   Ackert.  David Ackert was interviewed by the trial court

16   in-camera, and the privilege claim there was upheld across the

17   board.  There were to be no questions at all, no documents

18   produced at all.

19          And what the Second Circuit reversed was that broad

20   bar against any questioning.  But they went on to say at page

21   140 of the reported opinion, we do not preclude the possibility

22   that as the examination of Ackert proceeds Paramount might

23   demonstrate circumstances bringing some particular question or

24   questions put to Ackert within the scope of Paramount's

25   privilege.

Page 44

1           That's exactly analogous to what we have here.  We

2      have turned over three thousand Goldman Sachs e-mails where

3      they sent them or received them or were copied on them.  We're

4      raising the narrow issue of how you value loss under these

5      circumstances.  Just as in Ackert, we're not claiming -- we're

6      not claiming a general bar against Goldman Sachs production.

7      That's -- we're way beyond that.

8           THE COURT:  Let me ask you this though, I'm being

9      asked to decide a discovery dispute in the middle of a Lehman

10     omnibus hearing.  And this may not be unique, but it's the

11     first time I can remember that a discovery dispute has been

12     front and center with a big audience that has -- probably has

13     very little interest in the outcome.

14           I'm assuming that the parties have acted in the

15     utmost good faith in trying to resolve this and would not have

16     brought this to the Court's attention during prime time were it

17     not viewed by both sides as an incredibly important issue.  But

18     how am I supposed to resolve the question, a relatively subtle

19     one, as to the role that Goldman is actually playing in respect

20     of these particular e-mails without, (a) actually seeing the e-

21     mails myself, and (b) perhaps having some further explanation

22     as to what capacity Goldman was fulfilling in connection with

23     what may be ambiguous communications?

24           As I understand the arguments that have been made,

25     Sullivan and Cromwell and its client takes the position that

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 45

1    Goldman was not here acting purely in its capacity as a

2    financial adviser.  But in the declaration cited by Lehman in

3    its argument, one could interpret what has been stated there as

4    classifying Goldman as a financial adviser not as an

5    interpreter.

6         One of the problems I have in applying the law is

7    that I'm being asked to apply labels that have broad meaning to

8    particular circumstances that may or may not be unique.  What

9    is your position as a matter of law as to whether these

10   documents are discoverable if I determine that Goldman is

11   acting in its capacity purely as a financial adviser and not as

12   a, quote, "interpreter" close quote?

13        MR. CLARK:  There are three or four questions there.

14   Let me see if I can answer them in order.

15        The question you did not ask but alluded to in your

16   opening remark was whether or not the parties have acted in

17   good faith.  I think the answer to that is yes.  I'm not

18   charging anybody with bad faith.  We did offer to meet and

19   confer on these documents before the motion was filed, and that

20   was rejected.

21        Now, the second -- maybe all your questions are

22   really wrapped up in the last one.  I think if you were to

23   conclude -- first of all, I think you should look at these

24   documents in-camera.  I agree with that.  Once upon a time, a

25   long time ago at a bar association meeting, a lecturer got up

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 46 of 103

Page 46

1    and told the story of a judge who asked to see documents in-

2    camera, and the lawyer claiming the privilege said very well,

3    Your Honor.  And the judge looked at him and said that's a

4    waiver.  So I don't think Your Honor is going to do that to me,

5    so I don't have any problem with your looking at these in-

6    camera.

7            I think the third question -- second question you

8    actually asked about whether you need to take some further

9    evidence, I think you should look at the documents first and

10   see if that's necessary.

11           Your final question, if you conclude at the end of

12   the day that Goldman Sachs was simply acting as a financial

13   adviser and not helping Sullivan and Cromwell advise its client

14   on the market meaning of loss and how that should be

15   interpreted in the work that it was doing and giving advice on,

16   then I think the documents have to be turned over.

17           THE COURT:  Okay.  Now, this is difficult because

18   we're talking about a subject with the documents in a black

19   box.  I don't know what they look like.  I don't know what they

20   say.

21           What is it about the documents that would lead an

22   impartial observer such as me to conclude that you are right in

23   the interpretation, and let me use the word twice --

24           MR. CLARK:  Okay.

25           THE COURT:  -- that Goldman was acting as an

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 47

1    interpreter?

2            MR. CLARK:  I think when you see the e-mails at

3    issue, the question that is being addressed there is not what's

4    the valuation.  As Mr. Slack said, we have produced thousands

5    and thousands of pages, and some hundreds of those are

6    valuation ones.  They have all of those.

7            It's not the question of what the valuation is after

8    you determine what the right process is.  It's a discussion

9    about what goes into the process, and I think if you see that,

10   you can understand why there is a different category of

11   document before you.

12           THE COURT:  Okay.  I think it's simply too hard to

13   discuss this further without my having a chance to actually see

14   the documents.  And I take it you have no objection to that.

15           MR. CLARK:  I don't, Your Honor, no.

16           THE COURT:  Fine.  So what more do we have to talk

17   about here since I can't resolve this until I see the

18   documents?

19           MR. CLARK:  Can I have a minute on sword and shield

20   and work product, or do you want to hold off on that, too?

21           THE COURT:  I'm confident you're going to say that

22   you're not using this in the sword and shield way, and that --

23           MR. CLARK:  You read my script, Your Honor.

24           THE COURT:  All right.  I'm just guessing --

25           MR. CLARK:  All right.

Page 48

1          THE COURT:  -- what you might say, and as to work

2    product, I'm not sure that it's relevant, other than for you to

3    make some comment about how these documents wouldn't have been

4    prepared but for the anticipated litigation, but perhaps you're

5    going to say something else.

6          MR. CLARK:  I think they were prepared because of the

7    anticipation of litigation solely.  This was a step toward

8    litigation.

9          THE COURT:  So I'm reading your mind, is that what

10   you're telling me?

11         MR. CLARK:  Either I'm communicating very well, or I

12   don't need to say anything more, and I think that may be the

13   case.

14         THE COURT:  Okay.  Well, let's then defer further

15   argument on this, until after I've had a chance to review the

16   documents.  And so I have some sense as to what burden may be

17   associated with this, what are we talking about in terms of

18   number of overall pages?

19         MR. CLARK:  Maybe forty.  I mean, it's not a lot,

20   Your Honor.

21         THE COURT:  Okay.

22         MR. CLARK:  I'm just guessing if I'm wrong, by a

23   factor of sum and sorry, but I can say it's not going to be a

24   great burden to look through these I don't think.

25         THE COURT:  Fine.  That's what we'll do.  We'll just

08-13555-mg    Doc 20661    Filed 09/15/11    Entered 10/07/11 14:19:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 49 of 103

Page 49

1    have to make a date for the turnover of the documents, making

2    sure that that's done in a secure manner, and on a date when I

3    have a little bit of time, so I can sit and review them.

4            Now, the question that I have after the review is

5    what happens next.  Because conceivably, and I'm guessing this

6    may be like bedtime reading.  These may not be the most

7    scintillating documents.  Conceivably, I may have questions

8    about the documents, and since you know what the documents

9    contain and I know, as a result of reviewing them and what the

10   documents contain, but debtor's counsel does not yet know, how

11   am I to engage in further dialogue without this being an ex

12   parte communication of one sort or another?

13           MR. CLARK:  Well, I'm not sure that's prohibited

14   actually.  If -- again if you look at the Ackert case, what the

15   lower court judge did, was have an ex parte interview with

16   David Ackert.  And the Second Circuit did reverse the lower

17   court in some respects, but did not criticize that procedure.

18   So perhaps that's the next step if you think it's necessary.

19           THE COURT:  Well, we'll cross that bridge when we get

20   to it.  But if we do get to that point, I'm not going to have

21   the conversation with questions without first giving debtor's

22   counsel notice that this is something I intend to do, and to

23   the extent that I can provide a broad statement of the area of

24   inquiry, I plan to do that as well, so that both parties are

25   fully aware of what I'm doing.

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 50

1           MR. CLARK:  I'm sure Your Honor can do that, and we

2     would have no objection.

3           THE COURT:  Okay.  Is there more?

4           MR. SLACK:  I want to say literally a minute worth of

5     comments.

6           Your Honor, I do have an extra copy of the four

7     documents that were produced, and if I could approach and give

8     those to you.

9           THE COURT:  Sure.

10          MR. SLACK:  They're all stapled together, Your Honor,

11    but there are four separate documents there.

12          The other thing I wanted to say just because I didn't

13    want to leave it hanging, is that we had extensive

14    communications with Giants Stadium by both phone and letter

15    about resolving this, and there were situations where they

16    continued to produce additional documents.

17          In the last step, Your Honor, even though we didn't

18    meet, we did offer and because this is an investigation, it was

19    more important for us to find or to have the information, than

20    to have some kind of a waiver.  We offered to take the

21    documents on a non-waivered basis, and that was rejected by

22    Giants Stadium.

23          THE COURT:  Yeah.  I have one last question for

24    counsel.  One of the things about presiding over a case like

25    Lehman Brothers is that there are certain disputes that involve

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 51 of 103

Page 51

1   much more money than we're talking about today that just get

2   resolved.

3            The parties meet, confer, assess the relative risks,

4   and make agreements, thereby providing certainty to the parties

5   and diminishing the overall burden on the Court.  As a result,

6   I applaud such agreements.

7            But there are certain other disputes, this is one,

8   and we're about to hear one in the SIPA case in a moment that

9   just become huge battles with the parties on both sides

10  spending a lot of time and effort dealing with issues that

11  maybe shouldn't get to this level, and I'm not being critical

12  of anybody in saying that we're having a discovery dispute in

13  the middle of a Lehman omnibus hearing, but I can't help but

14  note how exceptional this is.

15           Clearly at this point in the history of your

16  discovery efforts, you probably know an awful lot about the

17  issues that matter.  And what's currently behind the curtain

18  may or may not include a smoking gun.  I think we should

19  assume, at least I'm assuming, that there is no smoking gun.

20  And that while there may be some incremental advantage to your

21  seeing the documents, my guess is you're probably not going to

22  know that much more than you already know.

23           Given that, why is this so important, why is this a

24  matter that requires all of our time and attention this

25  morning?

Page 52

1          MR. SLACK:  I think that's a fair question, Your

2     Honor, with the following background, which is the debtor

3     really has bent over backwards not to have discovery disputes,

4     which is why this is so unique.  We've issued, and I've

5     personally been involved in issuing, you know, more than fifty

6     subpoenas to counter-parties.  We've worked diligently,

7     sometimes night and day to resolve disputes, and we've been

8     pretty successful doing it, and will continue to do it.

9          As I said here, and it's the reason I wanted to get

10    up, we offered to look at these documents for purposes of the

11    investigation on a non-waiver basis.  The information was more

12    important than -- you know, than some kind of legal ruling, so

13    we were willing to do that and that was denied.

14          This particular derivative matter, Your Honor, is a

15    300 million dollar claim against the estate.  So it's -- while

16    granted we have a very large estate here, 300 million is still

17    a very, very large claim within the estate.

18          There is a question, Your Honor, and it's one that

19    we're looking at as part of the investigation whether, in fact,

20    it's a claim at all, or whether it's a receivable.  And so that

21    is -- so the swing here is between not just the 300 million,

22    but also a potential receivable of some magnitude.  So it is a

23    significant matter to the estate.

24          I don't assume anything.  I don't know whether the

25    documents that are being withheld are going to have a smoking

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 53 of 103

Page 53

1   gun or not, I just don't know.  What I do know is I believe

2   we're entitled to them, and when we didn't have any alternative

3   other than being told we weren't going to see them, or come

4   into the court, it's the first time that I brought a motion to

5   compel in front of this Court on a 2004, again I've done a

6   number of them.  So we tried very hard to resolve this short of

7   coming to the Court and were unable to do it.

8              THE COURT:  Okay.

9              MR. CLARK:  We have been trying for over a year to

10  move beyond the debtor's hiding behind 2004 saying they get

11  everything and they give nothing, to a point where we can

12  discuss the merits of this.  Anything else I have to say would

13  just be argumentation between counsel and not help the Court,

14  but we have offered to move this along for well over a year.

15             THE COURT:  Okay.  I guess my suggestion to the

16  parties would be this, during the period of in-camera review,

17  however long that may be, it seems to me that it would be

18  desirable for the parties to spend a little bit of time

19  thinking about possible resolution of this on the merits.  It

20  seems to me to be an issue that is relatively narrow, although

21  one as to which there may be significant areas of disagreement

22  concerning the calculation of loss.

23             I don't pretend to understand all the issues at this

24  point, but I suspect the lawyers who have been speaking to me

25  today about the discovery dispute already have a deep

08-13555-mg    Doc 20661    Filed 09/15/11    Entered 10/07/11 14:19:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 54 of 103

Page 54

1    understanding of the risks and rewards.  I heard the comment

2    about this may be a receivable, suggesting a doubling down on

3    the part of Lehman, and I accept the argument for what it is,

4    argument, but recognize that the substance of this is something

5    that you might be able to address profitably even while I'm

6    reviewing the documents.

7            MR. CLARK:  Thank you, Your Honor.

8            MR. SLACK:  Your Honor, I just want to say the

9    following, is that -- and make a representation that we are, in

10   fact, still involved and still engaged in trying to finish the

11   investigation.  And what I don't want to happen, Your Honor, is

12   to engage in some kind of preliminary discussions, and be

13   confronted by an argument by Giants Stadium that by discussing

14   the merits that we're now somehow not entitled to get and

15   finish our investigation.

16           So if we could get a -- essentially a commitment that

17   they're not going to try to gotcha us if we sit down and talk

18   to them preliminarily before our investigation is finished,

19   then I would certainly be willing to advise my client to sit

20   down with them.  But I don't want to be faced with a gotcha.

21           THE COURT:  Okay.  You don't even need that

22   commitment because I'm going to give you a gotcha from the

23   bench -- a no gotcha.  If you choose to have a conversation

24   that could lead to some kind of productive business-like

25   resolution of this, doing that will not constitute a waiver of

Page 55

1  any of your discovery rights or your rights to continue with

2  your investigation as you see fit.  And frankly, you could've

3  had such a conversation although it might not have been

4  productive a year ago.

5          This is to be carried until some further omnibus

6  hearing date after I've had a chance to review the documents,

7  and I'm going to suggest that counsel for Giants Stadium make

8  arrangements directly with my chambers for an appropriate time

9  to turn over the documents.  And we'll see where we go from

10  there.

11          MR. CLARK:  Thank you, Your Honor.

12          THE COURT:  Okay.

13          MR. CLARK:  May I be excused?

14          THE COURT:  Oh, yes, you may.  That's the end of the

15  contested LBHI docket and we're now into the LBI SIPA

16  proceeding.

17          MS. SCHWARTZ:  Your Honor, may I be excused?

18          THE COURT:  Yes.  Anybody who wishes to be excused,

19  may be excused.  Maybe we should just take a moment for

20  people's movements to settle down.

21      (Pause)

22          THE COURT:  Okay.  Let's proceed.

23          MR. MENAKER:  Good morning, Your Honor.  Richard

24  Menaker, special counsel to the SIPA trustee.  The next matter

25  on the agenda is the motion of RBS N.V. and I gather Mr.

08-13555-mg    Doc 20661    Filed 09/15/11    Entered 10/07/11 14:19:30    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 56 of 103

Page 56

1    Bienenstock will start things rolling.

2            THE COURT:  I think Mr. Menaker was simply acting as

3    transition host for the morning.

4            MR. BIENENSTOCK:  I appreciate that.  Good morning,

5    Your Honor, Martin Bienenstock of Dewey & Leboeuf for RBS N.V.

6            We're here pursuant to RBS N.V.'s motion dated August

7    2, 2011.  The relief requested is an order either dismissing

8    without prejudice the LBI trustee motion dated June 29, 2011

9    for an order collecting approximately 345 million dollars in

10   interest under an ISDA contract, or converting the motion to an

11   adversary proceeding complaint and making Part VII of the

12   Bankruptcy Rules applicable.

13           And regardless of which alternative, if any,

14   obviously the Court would choose, we're asking for a stay of

15   everything other than discovery pending determination of the

16   reference withdrawal motion that RBS N.V. filed on August 16,

17   2011.

18           I want to assure the Court that we have tried to take

19   into account the Court's ruling in some other matters that have

20   some similarities, but big differences from this, and also,

21   Your Honor's comments just now in the previous contested matter

22   in the other case.

23           After the teleconference that Your Honor hosted with

24   or Your Honor participated -- presided over between the LBI

25   trustees, attorneys, and ourselves, we submitted a stipulation

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 57 of 103

Page 57

1    that Your Honor had so ordered, which provided for the timing

2    that led to this, and also for potentially a subsequent hearing

3    on the LBI's trustee's motion, but a hearing at which no

4    disputed facts would be determined, and there are many disputed

5    facts.

6              Perhaps most interestingly since we filed our motion,

7    the LBI trustee did file the complaint that we said the LBI

8    trustee should have filed in the first place to collect money

9    on a contract and served the complaint, and then volunteered,

10   basically unilaterally, that the LBI trustee would toll the

11   time for responding to the complaint because even after having

12   drafted it, filed it, and served it, wanted to come here to say

13   it should not have to prosecute it, it wants to go forward with

14   its motion.

15             Another development since the teleconference, Your

16   Honor, is that we have already propounded discovery, document

17   discovery so far which goes to the disputed issues.  And I

18   think the other development which for obvious reasons I don't

19   want to go into in any detail, but I will say also that the

20   negotiations on the merits have been enlarged from things just

21   between counsel to now, business people meetings, and I won't

22   go further other than to say that they are occurring, and I

23   think on all sides, people are proceeding as I hope -- as I

24   think the Court would want them to proceed.

25             There is a very easy method, Your Honor, we believe

08-13555-mg    Doc 20661    Filed 09/15/11    Entered 10/07/11 14:19:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 58 of 103

Page 58

1    for this motion to be resolved, and then there's a more complex

2    method that we believe would lead to the same result, and I

3    want to mention the easy method first.

4            Bankruptcy Rule 9014(c) says the Court at any stage

5    in a particular matter -- the Court may at any stage in a

6    particular matter, direct that one or more of the other rules

7    in Part VII shall apply.  There's not even a requirement of

8    cause, there's just the power of the Court to do that.

9            And because this is a matter where the parties have

10   very different opinions as to what the facts are, and to what

11   certain things mean, and as Your Honor can see from -- I'll go

12   through some of the factual disputes, so Your Honor has in mind

13   what is going to have to be tried, et cetera, and then there's

14   the Stern v. Marshall issue which led to the reference

15   withdrawal motion.

16           We think it -- there's more than ample cause if there

17   were need for cause in the first place for the Court simply to

18   say, please let -- Part VII shall apply so that the parties can

19   fully vindicate their rights in a matter that is, granted not

20   of the order and magnitude of the Lehman case that Your Honor

21   is proceeding over, but for 345 million plus interest, a matter

22   of significant significance to both my client, RBS N.V. and Mr.

23   Menaker's client.

24           The disputes, Your Honor, I think are as follows,

25   which would give the Court a good concept of why the parties

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
Pg 59 of 103
LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 59

1    are certainly started at very different positions and what's

2    going to lie ahead, regardless of which Court ends up presiding

3    over this.  The speech are as follows:

4         As is shown by the LBI's trustee's initial motion in

5    this matter, they take the position that RBS N.V. owes 345

6    million dollars under an ISDA contract, has admitted its owing,

7    and the only issue to be decided is whether triangular set-off

8    is enforceable in bankruptcy.

9         The RBS position is very much different.  The RBS

10   position is there is an ISDA contract, but there's also another

11   contract called the terms of agreement.  And that contract came

12   into being because in trade confirmations that RBS furnished

13   the LBI over 880 times without objections as they were doing

14   all their trading, those were the terms on which the parties

15   were transacting business.  And there are at least two terms of

16   agreement that have particular significance here.

17        One is that they grant RBS a security interest in all

18   property it holds of any of the LBI and Lehman entities.

19        THE COURT:  Let me stop you right there.  That's

20   paragraph 14 I think of the terms of agreement.

21        MR. BIENENSTOCK:  That is correct.

22        THE COURT:  I've looked at it.  I also looked at the

23   form of this unsigned apparent adhesion contract created by RBS

24   internally, and I am frankly shocked that you are hanging your

25   hat on so weak a hook.  If that's your hook, I'm really amazed

Page 60

1    at all of the paper you have generated to suggest that this is

2    a dispute that takes you out of SIM Crude (ph).  I am amazed.

3    But go right ahead.  I've looked at it.  You don't have to go

4    into your merits argument.  I'm fully familiar with the facts,

5    we're just going to deal with a narrow motion you're making now

6    on the Part VII rules and what happens to the trustee's motion.

7             I've also read, by the way, with care, your motion to

8    withdraw reference, and I'll make no comment with respect to

9    it.

10            MR. BIENENSTOCK:  Your Honor, I wasn't coming here to

11   argue the merits of the trustee's motion, but I wanted to in

12   part lay out the different facts in dispute.

13            THE COURT:  I know them.  I've read your papers.  I

14   don't want to hear them again.  At least not now.

15            MR. BIENENSTOCK:  Okay.

16            THE COURT:  I want to hear the specifics of your

17   pending motion.

18            MR. BIENENSTOCK:  Okay.

19            THE COURT:  I'm fully familiar with the facts you

20   allege.

21            MR. BIENENSTOCK:  Then the -- sticking to the

22   procedural motion, Your Honor, as I said a moment ago, there

23   are two methods of resolution.  One is under Bankruptcy Rule

24   9014(c), the Court can make Part VII applicable, and doesn't

25   have to get into any of the individual factual disputes that

1       the papers raise.

2              The other does get into the factual disputes because

3       under Rule 7001.1, actions to collect money must be brought by

4       complaint in an adversary proceeding with an exception.  And

5       the exception is when the plaintiff is seeking delivery of

6       property which ties into Section 542(a) of the Bankruptcy Code,

7       which is delivery of property of the estate.  They both use the

8       word deliver property.

9              Interestingly, Your Honor, the LBI trustee in his

10      first motion never said that the money that should satisfy the

11      alleged contractual obligation was property of the estate.

12      Very carefully, the LBI trustee said that the LBI contract

13      rights under the ISDA contract is property of the estate.  It

14      didn't say the money was.

15             When we made our motion that they should convert

16      their contested matter to an adversary proceeding, they then

17      made the next argument that they had not made before.  They

18      say, oh, no, the money that you should use to satisfy the

19      contractual obligation that they allege, that is property of

20      the estate.  They cite -- and that's really what, in a large

21      part, their whole case turns on.

22             THE COURT:  Well, let me break in because I just want

23      to understand the simple and the more complicated way for you

24      to achieve the relief that you're seeking today.  I really

25      don't want to get into the weeds, I want to get into the merits

1    of your motion, and what relief you seek today.

2         I think the easy way that you had proposed was that

3    the Part VII rules apply by fiat to the trustee's motion.  I

4    assume that's what you mean by the easy route; is that correct?

5         MR. BIENENSTOCK:  Yes, sir.

6         THE COURT:  What's the more complicated route?

7         MR. BIENENSTOCK:  The more complicated route is, as I

8    was just saying, to apply 7001.1.  Subdivision 1 of Rule 7001,

9    however, turns on whether this is an action to collect money

10   under a contract or whether this is an action for a turnover

11   for delivery of property of the estate.  That's what the LBI

12   trustee's opposition to our motion got into.  They had not

13   previously said that the money was property of the estate.

14   Now, they are saying that.

15        So -- and as we pointed out, we were surprised they

16   were saying that because the security interest we get would

17   cause them to have no recovery whatsoever, without any

18   application of bankruptcy law or anything else.  And we had

19   possession of the money obviously, it's our money, so you

20   perfect an interest in money by possession, we obviously had

21   that, but they've even lost the ability to challenge that

22   because of the safe harbors and the statute of limitations.

23        THE COURT:  Mr. Bienenstock, I'm not making myself

24   clear.  I don't want to hear the particular arguments that

25   you're now advancing.  I'm interested in knowing the procedural

1    route that you are proposing, that is --

2          MR. BIENENSTOCK:  Okay.

3          THE COURT:  -- maybe I misunderstood what your

4    alternative was at the outset, but I don't want to hear the

5    merits of your argument.  I've read your papers.

6          MR. BIENENSTOCK:  Okay.  So as I've said, other than

7    by fiat, using Rule 9014(c), the other way to get to the same

8    result is under Bankruptcy Rule 7001, Subdivision 1 an action

9    to collect money under a contract is -- must be brought by

10   complaint in an adversary proceeding, it's that simple.

11   They're arguing the exception to that subdivision.  So that's

12   why I have to get into the nitty gritty I got into, Your Honor,

13   but that's -- they didn't argue it originally.

14          Also, Your Honor, having argued the exception in that

15   subdivision, they're nevertheless still not bringing a claim in

16   their motion or in their filed complaint under 542(a), so

17   they're being internally inconsistent.  If they really believed

18   the money we should pay them is already their property, then

19   the right vehicle is 542(a).  They don't have a 542(a) claim

20   pending.  They've now cited for the first time 542(b) in their

21   opposition and in their complaint, 542(b) is to pay money owing

22   under a contract.

23          Now, to support their argument that it's -- the money

24   owing is property of the estate, they cite Nimco and they cite

25   Amhall (ph), Nimco being a Southern District decision and

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 64

1    Amhall being Eastern District.  In each of those cases, the

2    party owing the money agreed it owed it under the contract.  It

3    simply wanted to know who to pay it to, and because there were

4    conflicting claims to it.

5         When that happens, that money can be considered

6    property of the estate.  Here where RBS is saying we have

7    security interest reasons independently that would let RBS win.

8    We have triangular set-off that would let RBS win.  There's no

9    agreement under the contract.

10        What they say is our consent is they cite half in a

11   misleading way of our Section 6(d) statement.  The part of the

12   6(d) statement that says on ISDA alone, approximately 345

13   million was owing, but the beginning of the sentence is, before

14   getting to set-off which includes the security interest, that

15   amount would be owing.  Once you apply those things, there is

16   no admission, consent, or anything like that, with the monies

17   owing.

18        We've -- I now want -- so under either way, Your

19   Honor, we think by fiat, simply because it's fair, or under

20   Rule 7001, effectively the reason we think Your Honor could --

21   should rule for us on both reasons, albeit -- although only one

22   is necessary, is that for them to prevail on their 7001.1

23   exception, they basically have to prove their whole case, and

24   this is not the time for them to prove their whole case.

25   Because until such time as they prove that the money we're

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 65 of 103

Page 65

1   holding is actually their money, they can't win on their

2   procedural argument.

3         So it's relatively circular, but since this is not

4   the time for the factual disputes to be determined, and because

5   the ISDA contract is governed by UK law, the terms of agreement

6   by New York law, they raise all these things in their opening

7   motion, Your Honor.

8         The Court for this procedural hearing would have to

9   go through all of those factual disputes to rule on the 7001

10  issue if their exception is to prevail.  But under 9014(c), the

11  Court doesn't have to resolve any of those contested issues.

12        THE COURT:  Have the parties on their own attempted

13  to simplify what you are complicating?  Because it's very

14  obvious to me, Mr. Bienenstock, from the review of your papers,

15  that you are engaged in an issue proliferation exercise, rather

16  than an issue simplification exercise.  I'm not going to

17  comment on my views now because it's premature of some of the

18  things you've said in your papers, but I'm concerned for

19  reasons that are somewhat similar to comments made at the end

20  of the Giants statement argument with regard to discovery, that

21  the parties here, despite the fact that you say there's been

22  signs of progress at the business level, are not making this

23  simple, but instead creating straw men here and in the district

24  court to somehow take this out of what is really a fairly

25  standard dispute that I hear and determine routinely.

1        You don't have to dispute that.  I'm just saying it.

2   So what I want to know is not the merits of creative arguments,

3   but rather what you have done, if anything, to try to resolve

4   the procedural conflicts that you have created.

5        MR. BIENENSTOCK:  Well, sure, Your Honor.  When we

6   received their motion, we engaged in a colloquy by telephone.

7   We explained our position.  When that didn't work, Your Honor

8   presided over the teleconference I mentioned.  After that we

9   reached a stipulation.  After that we were pleasantly surprised

10  that they actually did file a complaint.  What we were not

11  pleasant surprised at, and which is what Mr. Menaker will

12  obviously explain to Your Honor is having filed the complaint,

13  where they've changed their claims, they've obviously thought

14  about this some more, and now have different legal theories,

15  they still want to come here and argue they shouldn't have to

16  go forward with the very complaint they filed.  And we're not

17  sure why they did that, but as I mentioned earlier, the good

18  news was that in 2008 or 9, when the LBLI trustee first raised

19  this issue, we answered on the merits comprehensively sent them

20  a letter.

21        The next thing that happened was, a year went by, no

22  response.  Then they asked for a tolling agreement which

23  doesn't just toll the statute of limitations, it basically says

24  don't litigate, we want to resolve it.

25        THE COURT:  You're going in the wrong direction, Mr.

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 67

1    Bienenstock.  I don't want to hear about what happened over the

2    years.  I want to know what, if anything, has been done by the

3    parties to try to deal with today's procedural reality.

4    Today's procedural reality being that there is a trustee motion

5    and there is a parallel adversary proceeding with overlapping

6    issues.  You clearly have the right to discovery in the

7    adversary proceeding.  To what extent has there been any

8    consensual behavior by the parties to try to resolve your Part

9    VII rules' proposal, which is the easy path to resolving your

10   pending motion.

11           MR. BIENENSTOCK:  Your Honor, we've -- on the RBS

12   side, we feel like we did everything we could.  We started

13   discovery and we excluded discovery from the stay we're

14   requesting precisely because we don't want to delay.  We

15   explained all our theories first orally and when they didn't

16   work, you know, in writing to the trustee.

17           As I -- I'm somewhat stumped, Your Honor, because I

18   don't know why when they went to the trouble of filing their

19   complaint, they still insisted on coming here and arguing, they

20   shouldn't have to -- they don't want to prosecute it, they want

21   to go back to their motion.

22           THE COURT:  Let me ask you another question, Mr.

23   Bienenstock.  Why do you need a stay and why do you think the

24   stay is appropriate, particularly if it carving out discovery,

25   what is the behavior within the contested matter that you're

08-13555-mg    Doc 20661    Filed 09/15/11    Entered 10/07/11 14:19:30    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 68 of 103

Page 68

1    concerned about?

2           MR. BIENENSTOCK:  That I can answer.  According to

3    the stipulation that Your Honor so ordered, the LBI trustee

4    comes here, I think it's on October 20th, and although the

5    stipulation says no contested disputed facts will be

6    determined, they are going to be seeking judgment on the

7    merits.  And we have outstanding discovery, with due respect,

8    Your Honor, we think that the terms agreement, et cetera, I

9    won't go into it, have been accepted by the Second Circuit

10   before, that these are part of the contractual relations among

11   the parties.  They're obviously disputed because in the LBI

12   trustee's initial motion, he knew about them.  We told -- we

13   were candid, and he tries to take issue with them, but

14   notwithstanding the factual disputes between the parties, he's

15   made crystal clear as evidenced by the stipulation Your Honor

16   so ordered that he wants to show up on October 20 on the

17   merits.

18           There's no summary judgment motion pending or

19   anything like that.  I don't think there could reasonably be,

20   given the outstanding discovery, and the factual issues, but

21   that's why we need the stay.

22           Now, we don't mean, as Your Honor sees, to slow

23   anything down.  We already started our discovery.  The

24   reference withdrawal motion we made, he's responded, our reply

25   is due in a few weeks, nothing is being done to slow anything

Page 69

1    down.

2            THE COURT:  So is your request for a stay really a

3    request for an adjournment sine die pending the outcome of your

4    motion to withdraw the reference?  Is that what this is?

5            MR. BIENENSTOCK:  Well, and discovery so that we can

6    be ready for the ultimate either summary judgment or a hearing

7    on the merits.

8            THE COURT:  I don't know what you mean by and

9    discovery.  I'm trying to understand, as plainly I can why you

10   want the stay, and I think what you said was, you want the stay

11   so that the trustee is not permitted to proceed on the merits

12   of his motion.

13           MR. BIENENSTOCK:  That's one reason.

14           THE COURT:  Is there another reason?

15           MR. BIENENSTOCK:  Yes.  Because we need -- he might

16   proceed by summary judgment.  He -- using the motion forum as

17   opposed to the adversary proceeding he hasn't moved for summary

18   judgment.

19           THE COURT:  So are you, in effect, seeking what

20   amounts to a procedural hat trick in which you deal with issues

21   relating to your Stern v Marshall arguments in the district

22   court, deal with the issues that concern you on the merits

23   here, only in the context of the adversary proceeding, which

24   prevents full discovery, or third point, in the context of a

25   transformed contested matter practice that takes on the form

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 70

1    that you want, but it includes manifest discovery rights and

2    other procedural protections.  Is that the hat trick that you

3    seek, meanwhile nothing happens in the bankruptcy court that

4    bothers you --

5              MR. BIENENSTOCK:  No.

6              THE COURT:  -- get it all your way, is that what this

7    is about?

8              MR. BIENENSTOCK:  No, Your Honor.  And very

9    specifically -- Your Honor, respectfully I submit just got it

10   wrong.  We read Your Honor's order and decision in the Lehman

11   JPM dispute, and we specifically tailored everything we're

12   doing, so as not to be in the position where we're even

13   suggesting that we're saying we can win here, but not lose

14   here.

15             So let me go -- this is very important obviously what

16   Your Honor just raised, and I want to make our position very

17   clear.  We've said from the outset, we filed a proof of claim,

18   their first in underwriting loans or some such thing, having

19   nothing to do with the trustee's counterclaim.  They filed

20   their counterclaim in the form of the contested matter motion.

21   We said at the outset, this is a Stern v. Marshall issue,

22   you're collecting contract damages, we're entitled to an

23   Article 3 forum to exercise the essential attributes of

24   judicial power.

25             We are moving for reference withdrawal, basically to

08-13555-mg    Doc 20661    Filed 09/15/11    Entered 10/07/11 14:19:30    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 71 of 103

Page 71

1    vindicate our rights under Stern v. Marshall.  It is clear,

2    unlike perhaps in the other matter, that the facts that they

3    need in this contested matter are different than our proof of

4    claims, so resolving our proof of claim can't resolve this

5    contract dispute.

6            We are dealing with the reality, Your Honor, that

7    while we have strong beliefs that Stern v. Marshall applies,

8    that this matter is here until a Court says it's not here.  So

9    what we have come to court here with, is a requested procedure

10   that will not slow things down, so that either court that

11   ultimately hears this, will not be slowed down.  We've started

12   our discovery, we just want to be able to -- like in any case

13   for 345 million dollars, we want to be able to take the

14   discovery that's reasonable and that we're entitled to.

15           If they move for summary judgment, we want to be able

16   to show that there are disputed facts, but to some extent, we

17   need discovery for that.  We also need it for the ultimate

18   hearing on the merits.  And frankly, Your Honor, I have no -- I

19   don't understand how perhaps the Court came to the conclusion

20   that we're here for some kind of hat trick, everything in our

21   favor, nothing in theirs.  We're doing everything we can simply

22   to get ready for trial, in whatever court that happens in.

23           THE COURT:  Maybe you misunderstand my --

24           MR. BIENENSTOCK:  I must have.

25           THE COURT:  -- use of a metaphor that may not be

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 72 of 103

Page 72

1   correctly applied to what I view as a triple play.  The three

2   things that you are engaged in involve one, a transformation of

3   the contested matter, which has been filed against your client,

4   dealing one way or the other with the adversary proceeding,

5   which involves some different claims, and then dealing in a

6   third proceeding in the withdrawal of reference.

7           I didn't say that you were engaged in a strategy

8   that's inappropriate.  I didn't say that you were doing

9   anything that was inconsistent with your duties to your client.

10  But if I connect what I've just said to something I said

11  earlier, you'd engaged in issue proliferation, that's hard to

12  deny but you don't have to say anything in response to it.

13          I view what you are doing as complicating in as many

14  ways as you can creatively do it consistent with Rule 11, what

15  started out as a standard issue, relatively standard issue,

16  motion to enforce the automatic stay and to seek recovery of

17  damages, you've sought to distinguish that, we don't need to

18  get into the merits.

19          I'm simply saying that a relatively plain vanilla

20  procedural start has been transformed into a matter of enormous

21  complexity, mostly through your design.  My concern --

22          MR. BIENENSTOCK:  I would say it's the opposite.

23          THE COURT:  My concern is that the parties not

24  proliferate the issues, but rather manage the issues, hence my

25  earlier question which got sidetracked as to what you have done

08-13555-mg    Doc 20661    Filed 09/15/11    Entered 10/07/11 14:19:30    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 73 of 103

Page 73

1    within the context of this case to make it easier, smoother,

2    more efficient, as opposed to just the opposite, which is what

3    I have perceived.

4              No merits conversations, please, I don't want to hear

5    any of your merits arguments.

6              MR. BIENENSTOCK:  I'm not --

7              THE COURT:  I've read them.  I've evaluated them.

8    But I haven't made up my mind with respect to them.

9              MR. BIENENSTOCK:  Your Honor, the first thing I must

10   say in response to what you just said is, what you characterize

11   is the standard stay enforcement, we think is a horrible abuse.

12   There is no way the motion can ever get to the stay issue

13   without deciding the contract issue, and they're camouflaging

14   that this is an action on a contract, a Northern Pipeline

15   action as an excuse to make it seem like a contested matter in

16   a court proceeding.

17             THE COURT:  We don't need to get into

18   characterizations here.

19             MR. BIENENSTOCK:  Okay.  But --

20             THE COURT:  I'm simply urging --

21             MR. BIENENSTOCK:  So what we've done is --

22             THE COURT:  I'm urging that in the context of this

23   case now, that the parties actually try to make some progress

24   as opposed to gaming the system.

25             MR. BIENENSTOCK:  Well, okay.  We obviously disagree

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 74 of 103

Page 74

1   vehemently that we gamed the system as opposed to number one,

2   made sure that we can assert and vindicate all of our defenses.

3   Your Honor calls that proliferation of issue, we call it -- I

4   call that, we have defenses, we want to be able to assert them

5   fairly.

6            Number two, Your Honor can tell from everything we've

7   done, it's been quick, it's been timely, we're getting ready

8   for the ultimate resolution.  That's what we're -- that's the

9   best answer I can give Your Honor to your questions, what are

10  we doing to resolve this.  We are getting ready with all the

11  facts to get to the ultimate resolution in whatever court we're

12  ultimately told is going to make that determination.

13           THE COURT:  Okay.  I think I've probably heard enough

14  unless there's more you want to add at this point.  I'd like to

15  hear from Mr. Menaker.

16           MR. BIENENSTOCK:  That's it, Your Honor.

17           MR. MENAKER:  Your Honor, if Your Honor please, may I

18  address the last question you asked, which is that I think it's

19  fair to say that off the record the trustee and counsel for the

20  trustee and RBS and its counsel get along very well, and have

21  had productive discussions and there's productive activity

22  going on.

23           This started back in March, long before any

24  proceeding began, you don't want to hear the history of that,

25  but -- and since the proceedings began, I have to say that

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 75

1    dealings between the parties, off the record, have been

2    appropriate, I believe.  I think the Court would be pleased to

3    know how we have proceeded.

4         On the record it is inexplicable to me that there

5    should be a cascade of ad homonyms, in papers which you've

6    heard just now and a few remarks that were made are a shadow of

7    that of what has actually appeared in the papers.  I was

8    personally accused in a letter that came to Your Honor of

9    engaging in discourtesy.  I don't understand that.  But I can

10   tell you that it does have an impact on our ability to confer

11   about making the procedures work simply and effectively and get

12   the job done without a multiplication of the proceedings.

13        THE COURT:  Let me then ask you a very, very pointed

14   and I think uncontroversial question.  The narrow procedural

15   issue presented by the motion is stop the freight train of your

16   motion for relief under the automatic stay to compel payment,

17   and incorporate into that motion practice procedural safeguards

18   from the Part VII rules.  Is that or is that not a problem from

19   the perspective of the trustee?

20        MR. MENAKER:  Of course not.  We have no problem with

21   importing all possible and available procedural safeguards

22   under Part VII, to the extent appropriate in the circumstances

23   of the case.

24        One thing this case doesn't need is any discovery

25   because -- may I respond to your question by referring to the

08-13555-mg    Doc 20661    Filed 09/15/11    Entered 10/07/11 14:19:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 76 of 103

Page 76

 1    merits for a moment?

 2            THE COURT:  Look you may.  One of my -- my comments

 3    earlier about the merits represented a desire on my part to

 4    focus on the substance of the motion practice on today's

 5    calendar, which is a purely procedural motion.  And to the

 6    extent that we have contagion of the facts bleeding into the

 7    procedural aspects of this, this simply becomes an opportunity

 8    for lawyers to argue matters that I have read and don't want to

 9    hear about today.

10            I understand that RBS has a whole host of arguments

11    designed to take this out from the umbrella of triangular set-

12    off and designed to identify other procedural arguments that

13    create potential leverage.  I think I see what's going on.

14    That doesn't mean that I'm in any way dismissing the validity

15    of the points made.  But I will recognize that it's the first

16    time in three years that some of these arguments have been

17    identified as potential arguments, and Northern Pipeline was

18    the law long before Stern v. Marshall.

19            So I don't want to get into those merits.  I don't

20    want to talk about the terms of agreement.  I don't want to

21    talk about the merits of the dispute.  I want to talk about how

22    we can solve today's problem.

23            MR. MENAKER:  All right.  Your Honor, I'll take that

24    as guidance.  And first, on the matter of -- I think there's

25    really two parts to the motion that RBS has before the Court

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 77

```
 1    today.

 2              One is whether the 9014 contested matter is

 3    appropriate.  I'll say parenthetically that the adversary

 4    proceeding is sitting in abeyance, it is a protective

 5    submission, it is intended to sit there, not -- we've

 6    stipulated that it sits there, we do nothing with it, we wait

 7    to see what can be accomplished on the simpler 9014 approach.

 8    If it can't be done that way, then we can move quickly forward

 9    on the adversary proceeding.  It is not in play at the moment.

10    I want to emphasize that, and they know that, and we have a

11    stipulation on that, and they don't have to do anything on it

12    until X number of days after there's a ruling with regard to

13    what we're dealing with here.

14              THE COURT:  Okay.  So does that mean that if that's

15    being held in abeyance and you have no objection to the

16    incorporation of the Part VII rules, that you have what amounts

17    to an agreement, although you didn't talk to each other about

18    it, as to how the contested matter will proceed?

19              MR. MENAKER:  I have -- the answer on that is yes.

20    And you're correct that we didn't talk about it, and I think

21    that the approach here is that the Part VII rules are, in large

22    part, always included under Part IX or under a 9014 proceeding.

23    And anything else in Part VII that is appropriate here, and if

24    it were to turn out the discovery were appropriate, we would

25    certainly go forward with discovery on it, we don't think any
```

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 78 of 103

Page 78

1   discovery is appropriate, we don't think there's any issue of

2   fact.

3          THE COURT:  Okay.  What's your position with respect

4   to the request that this be stayed?

5          MR. MENAKER:  Well, the default under 550.11(c) is no

6   stay.  We start with that proposition.  Just because you're

7   worried about what's happening in the bankruptcy court and you

8   decide to go to the district court and say you were going to

9   withdraw the reference, which by the way is not a withdrawal of

10  reference under 157 here.  This is a SIPA proceeding, so it's a

11  revocation of the removal that they would be seeking.  That may

12  be as a practical matter, a distinction without a difference,

13  but I'm not sure that it is.  But we needn't get into that

14  today.

15          This is here on a mandatory removal under

16  78(eee)(B)(4).  It didn't come here under the judiciary act.

17  It didn't come here under the standing order.  And that is a

18  factor that certainly the district court would have to consider

19  on this motion.

20          THE COURT:  I assume you're briefing that to the

21  district court.

22          MR. MENAKER:  We were briefing that --

23          THE COURT:  We don't need to get into that here.

24          MR. MENAKER:  We're briefing that separately, yes.

25          But we start with the proposition there should be no

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 79 of 103

Page 79

1    stay.  So there's a hurdle.  The burden is on the moving party

2    to show that a stay is really needed.  And there's standards

3    for that.  I mean RBS has said that there are matters of

4    judicial efficiency, institutional considerations, it's wrong

5    for there to be two proceedings, one here, one there at the

6    same time, a state of affairs of which they are responsible

7    for.  That is not the basis upon which a stay ought to be.

8         Granted, a stay must be granted or may be granted,

9    discretion -- on the Court's discretion if the standards that

10   are established in the cases are satisfied.  In the first item

11   is likelihood of success on the merits.  So -- and I say this

12   very respectfully, Your Honor, on the issue of the stay, you do

13   have to give some consideration to whether there's any merit in

14   the removal grounds that have been asserted.

15        And this is as a core a core proceeding as could be

16   imagined.  It is a routine matter.  We're dealing with a motion

17   that's been made for enforcement of the stay, and it's not just

18   the 362(a) stay, there's also stays in the liquidation -- SIPA

19   liquidation order.

20        THE COURT:  Let me break in for one second.  Mr.

21   Bienenstock in his papers argues that you have the wrong set of

22   standards in mind when you talk about, in effect, traditional

23   grounds for the grant of the stay pending appeal, and likely

24   the success on the merits is actually not one of the standards

25   I need consider, instead it's a broad discretion having to do

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 80 of 103

Page 80

1    with -- I won't put words in his mouth, but I'm going to use

2    the words, literally an efficient case management in light of

3    the fact that the motion for withdrawal of the reference is

4    pending, and I have the ability, although I may not choose to

5    exercise that ability, to hold everything in abeyance while the

6    district court chooses to act on the pending motion.

7         I have other matters currently pending where there

8    are motions to withdraw the reference pending, and I have not

9    issued any stay.  So one of the real questions here is why I

10   should or should not stay this particular contested matter

11   while a creative motion to withdraw the reference is pending

12   before the district court.

13        MR. MENAKER:  Two aspects of that observation.  The

14   first is the cases that are cited by RBS in support of its

15   reduced standard approach to stay are twenty years old or more.

16   A much more recent case is the Dana, In Re: Dana Corp. from

17   2007 from this court, which flatly states each of the standards

18   that are traditional standards for a stay.

19        I believe their standards for a stay, I mean, that

20   seems to be the law currently.  Maybe it's some years ago, two

21   decades ago there were some cases that were -- took a more

22   discretionary approach, or a -- it's not more discretionary, a

23   loser approach on whether there are standards.  But there are

24   clearly standards.

25        And it also does make sense, Your Honor, to consider

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 81 of 103

Page 81

1   whether this range of arguments that have been made, a number

2   of those arguments were presented to you in the motion that's

3   before you now.  You have also seen now the full panoply of

4   arguments that have been made in the district court.  They're

5   not going to win in the district court says I.  I don't know,

6   but I think this Court might well conclude, I think this Court

7   should conclude, there is very little likelihood of success on

8   the merits, on the motion to withdraw.

9          And on that ground alone, it would be a mistake to

10  exercise your discretion and put this off for what could be

11  months in order to await the ruling.  I suspect actually it

12  will not be months.  I suspect that the decision will come down

13  more rapidly than that, and we have put in our opposition

14  papers yesterday in the district court, and I believe this

15  matter comes on with a reply at the end of this month, so it's

16  going to be heard rather rapidly.

17          THE COURT:  Okay.  This is a matter that has been on

18  the backburner for quite a while.  How is the trustee

19  prejudiced if this matter is stayed here pending the

20  determination of the motion to withdraw the reference, thereby

21  giving us at least clarity as to the right procedural forum for

22  disposition of these issues?  And I ask that particularly in

23  light of your last --

24          MR. MENAKER:  I understand exactly.

25          THE COURT:  -- comment which indicated that this is

Page 82

1    probably not going to be a particularly time-consuming process

2    of determining once and for all whether the motion filed by RBS

3    has any merit.

4          MR. MENAKER:  First, I think it would be fair to say

5    that there was a passage of time from when the issue first

6    arose of the Section 6(d) statement which admitted a 347 and

7    then asserted the triangular set offs came in May of 2009.

8    That's eight months into the liquidation, and there was

9    considerable back and forth that went on right after that.

10   There's an exchange of letters, some of which appears in the

11   papers.

12          This matter then was told last February we were

13   engaged with special counsel and we moved rather rapidly and

14   communicated with counsel for RBS, and there were discussions

15   about meeting.  There were discussions over the phone, and then

16   there was a meeting in the spring, a face-to-face meeting with

17   counsel, so there was considerable activity.  So to call it --

18   at this point, this spring it's no longer on the backburner.

19   And it's only after a considerable back and forth that in June,

20   the motion was brought.  And the motion was brought on a

21   reasonably, on a fast-tracked basis.  In other words, it was

22   not an adversary proceeding, it was a motion.

23          For the reason that the trustee has made a commitment

24   that was announced at the state of the estate presentation,

25   that the trustee wishes to make a substantial distribution in

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 83 of 103

Page 83

1    2012, perhaps in the spring of 2012, and 347 less a million

2    five, which is the set-off we acknowledge, so 345 million

3    dollars, which really ought to be in the hands of the trustee

4    is of significance to the trustee in that regard.

5          So there is harm.  It's not just -- it's not harm to

6    the trustee, it's harm to the customers, it's harm to the

7    beneficiaries of the work that the SIPA trustee does in this

8    liquidation.  And while we're not talking about billions of

9    dollars, we're talking about a substantial enough amount of

10   money that it makes a difference.

11         THE COURT:  Okay.

12         MR. MENAKER:  I do want to say a word about the

13   reference to Enron creditors that appears in the papers, and

14   that showed up in the reply, and that we did not see in the

15   opening papers.

16         I don't want there to be any mistake about Enron

17   creditors and how it could conceivably apply in this case.

18   Your Honor's expression suggests that maybe I don't have to say

19   anymore about that.

20         THE COURT:  Okay.  Well, apparently I have a

21   transparent expression on my face.  Mr. Bienenstock, do you

22   want to say anything more?

23         MR. BIENENSTOCK:  Thank you, Your Honor, very

24   briefly.

25         First, I think just as the scheduling we had

Page 84

1    originally requested, we have to resort to ask the Court for a

2    teleconference to get it resolved.  Here Your Honor always

3    creates a better, I guess, environment because the LBI trustee

4    has now agreed, I think, if I heard right, that the Part VII

5    rules can apply.  The easiest way to apply them is to go

6    forward with his filed complaint, that is one of the rules that

7    we proceed by complaint, but that might resolve it.

8            As for the stay, perhaps I should've said the obvious

9    because the obvious is the most easiest to overlook.  The Court

10   that grants the stay in this case we're asking Your Honor,

11   controls it.  So as I explained earlier, our concern is only to

12   be able to take appropriate discovery and vindicate all our

13   substantive rights at the trial.

14           If things got -- are taking too long for whatever

15   reason Your Honor could always revisit it.  But given the LBI

16   trustee's stated and written intent to basically get judgment

17   on the merits on October 20 before we've had our discovery et

18   cetera and before presumably the district court will have had

19   an opportunity to have oral argument and rule, that concerned

20   us.  And so if the Court grants a stay, it's obviously subject

21   to the Court's ability to revisit it whenever the Court

22   believes is appropriate.

23           There were many comments Mr. Menaker made that I

24   don't think are well taken or correct, but I don't have the

25   feeling Your Honor really wants to spend the time at this

1       hearing for that type of back and forth.  So I think the

2       critical part is, if I heard right, we have an agreement that

3       there should be an adversary proceeding, and Your Honor has

4       heard the --

5                   THE COURT:  That's not what --

6                   MR. BIENENSTOCK:  -- arguments on the stay.

7                   THE COURT:  That's not what Mr. Menaker said.  I

8       think what he said was, that the adversary proceeding is being

9       held in abeyance, that the contested matter may be one in which

10      Part VII rules apply to the extent applicable.  I believe

11      that's what he said, but he needs to confirm that I have

12      correctly --

13                  MR. BIENENSTOCK:  Well --

14                  THE COURT:  -- stated what I think he said.

15                  MR. BIENENSTOCK:  Okay.  One of the things that I

16      would take issue and will now with what Mr. Menaker said is the

17      adversary proceeding being held in abeyance.  He filed it and

18      served it.  He then unilaterally volunteered a tolling of the

19      times to respond.  It's out there.  We don't understand why we

20      just shouldn't respond to it and that we can -- especially

21      since it has different claims, which apparently are, after they

22      thought through things, what they'd rather proceed on, it ought

23      to be the vehicle that we go forward on, and if -- even if all

24      Mr. Menaker said or meant to say was Part VII should apply to

25      the contested matter, the easiest way to accomplish that is to

08-13555-mg    Doc 20661    Filed 09/15/11    Entered 10/07/11 14:19:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 86 of 103

Page 86

1    go forward on the complaint; otherwise, do we answer the motion

2    as if it were a complaint or not, and we have that type of

3    question which should be unnecessary.

4            And on the stay as I think I explained, to us since

5    Mr. Menaker spoke to -- the Court has to look to probability of

6    success, as I said earlier, we filed a proof of claim for

7    underwriting loans, they filed this contract action.  Yes, they

8    put a stay on top of it, but they -- you don't know if there's

9    a violation of the stay or not until you decide the underlying

10   contract action.  We think Stern v. Marshall clearly applies,

11   and the probability of success is very significant.  And

12   frankly, in none of Mr. Menaker's papers has he explained why

13   that's not the case.

14           THE COURT:  Let's limit the current back and forth to

15   the question of what Mr. Menaker said, and whether or not we're

16   dealing with the contested matter as to which Part VII rules

17   will be deemed to apply, or whether or not we're dealing with

18   an adversary proceeding.

19           It's obvious that Mr. Bienenstock would prefer that

20   the contested matter be held in abeyance, and that the

21   adversary proceeding be the vehicle for determining the rights

22   of the parties, but he's the defendant and he doesn't get to

23   choose.

24           MR. MENAKER:  I don't want to have to tell the

25   trustee that I was the victim of a gotcha.  The fact is that we

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 87

1    would like to proceed with the contested matter under 9014 and

2    are happy to have such Part VII rules as may be appropriate,

3    either because they're mandatorily included within 9014, or

4    because they're appropriated included for the purposes of this

5    matter.

6              We have not brought a contract action.  We have

7    brought an adversary proceeding in abeyance in parallel with

8    our contested matter with the same predicates, so that's not

9    correct.  And I hope it is clear that by saying that we are

10   willing to have Part VII rules apply, the next thing I will

11   here will not be, oh, you have admitted that you've given up

12   your contested matter and you are now proceeding only as an

13   adversary in the matter.  That is not what we have said.

14             MR. BIENENSTOCK:  Your Honor mentioned I'm the

15   defendant and I don't get to choose.  There are two matters

16   they have commenced.  We could join issue on the adversary

17   proceeding, in that sense I guess we can choose, but we don't

18   want to play the games.

19             Procedurally, Your Honor, we're just looking at what

20   is the best way to get ready for resolution with the least

21   disputes.  We know how to answer the complaint.  We can move

22   our answer, et cetera, know how to take discovery, there are

23   rules for summary judgment.

24             On the motion that he thinks should be heard on the

25   merits on October 20, I explained already, that we can't deal

Page 88

1    with.  There we can't be fairly prepared.  We will not have had

2    adequate discovery and we don't know what further response to

3    file to it until we have had adequate discovery.  So it's a

4    little disingenuous to say, well Part VII can apply to the

5    extent appropriate.  What's the extent appropriate?  We'll

6    constantly have these disputes.  It's just much easier to go

7    forward with the complaint.  Their complaint, they drafted it,

8    they didn't have to do it.  They drafted it, they filed it,

9    they served it.

10           THE COURT:  Okay.  I'm going to rule with respect to

11   the RBS motion.  Everything that has been said on the record

12   that relates to the merits of the dispute plays no role in

13   determining this purely as a procedural matter.

14           It's obvious to the Court that from the very early

15   days of this contested matter, counsel for RBS has been eager

16   to come up with a procedural device that would allow RBS to

17   assert a host of defenses to the trustee's motion that would

18   take it out of the ordinary stay violation context.

19           Nothing that I'm about to say is designed to limit in

20   any way RBS's rights to raise whatever arguments and defenses

21   it feels appropriate, regardless of whether that is occurring

22   within the context of the contested matter first initiated by

23   the trustee, or in the context of the adversary proceeding more

24   recently initiated by the trustee.

25           The motion brought by RBS is styled in a manner that

Page 89

1   dictates the nature of the relief that I need to issue.  One is

2   a request that the trustee's motion be dismissed without

3   prejudice or that alternatively that motion be converted to an

4   adversary proceeding complaint.  That aspect of the RBS motion

5   is denied.

6          It is denied in part because the trustee has already

7   brought an adversary proceeding complaint that in effect

8   responded to the invitation made by RBS in this motion.  RBS

9   didn't get exactly what it asked for, but it did get an

10  adversary proceeding.

11         The motion also asks that there be what amounts to

12  incorporation of the protections otherwise available to a

13  defendant in an adversary proceeding within the contested

14  matter originally commenced by the trustee.  I treat the

15  statements made by counsel on the record today, although if you

16  read the transcript it may not look like a clean agreement, as

17  an agreement by the trustee that the Part VII rules, to the

18  extent applicable, will be deemed to apply to the contested

19  matter brought by the trustee.

20         By virtue of these rules being incorporated by

21  reference into the contested matter, RBS should be in a

22  position to pursue all appropriate discovery.  I make no

23  judgment as to what discovery is appropriate at this point, and

24  to have all of the procedural protections otherwise available

25  in an adversary proceeding context.

Page 90

1        As to the request that there be a stay of all non-

2   discovery related proceedings in respect of this motion brought

3   by the trustee pending a determination of the motion to

4   withdraw the reference which is now pending in the district

5   court, I deny the request for a stay.  There's no basis for a

6   stay.

7        I also believe as a matter of general practice that

8   it is inappropriate for motions for withdrawal of the reference

9   that are predicated on Stern v. Marshall to produce, except in

10  extraordinary circumstances, a stay of proceedings in the

11  bankruptcy court.

12       As Mr. Bienenstock acknowledged in his comments,

13  unless and until the motion to withdraw the reference is

14  granted, this Court controls its docket in those matters that

15  the parties choose to file that are ultimately assigned to me.

16       In the wake of Stern v. Marshall, there are many

17  motions to withdraw the reference that have been filed.  Not

18  only in this court by all over the country.  I do not predict

19  outcomes, but as to this outcome I am confident in making the

20  following prediction.  Not all of those motions will be

21  granted.

22       In a setting in which the parties are seeking to

23  exploit to the extent there is an advantage in exploiting it,

24  Stern v. Marshall for procedural advantage, it is a genuinely

25  bad idea for there to be a practice of staying matters in the

08-13555-mg    Doc 20661    Filed 09/15/11    Entered 10/07/11 14:19:30    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 91 of 103

Page 91

1    bankruptcy court pending the outcome of those motions.

2         There's another reason for denying the request for a

3    stay, however, and it's probably a much more significant

4    rationale.  I have the power as does every bankruptcy court

5    judge, notwithstanding our Article 1 status to manage my docket

6    in the interests of justice, and I intend to do just that.

7         There's no need for a stay to protect the interest of

8    RBS.  If RBS has a legitimate grievance of any sort, and an

9    argument to be made regarding an adjournment of the hearing set

10   for October or any other month for that matter, I will consider

11   that.  There's no need to stay proceedings, especially in an

12   environment in which RBS itself is carving out a stay of

13   discovery from its requested stay.

14        In other words, the litigation is going to proceed in

15   all respects as it would up to the date of hearing, and I view

16   this request as a disguised request for a continuing

17   adjournment of what RBS must view as the most coercive aspect

18   of the present motion brought by the trustee, the potential for

19   an adverse determination with respect to a stay violation.

20        We will hear that when the Court is ready to hear it.

21   That may be in October.  That may be later.  But I encourage

22   the parties as I tried to do earlier in today's hearing to see

23   if they can't reach agreements outside of the courtroom, as

24   well as in the courtroom, particularly as these agreements

25   relate to the orderly administration of this dispute.

08-13555-mg    Doc 20661    Filed 09/15/11    Entered 10/07/11 14:19:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 92 of 103

Page 92

1          I will accept an order consistent with the ruling I

2     just made, and would hope that the parties could agree as to

3     the form of that order.

4          We are adjourned until the two o'clock adversary

5     calendar unless there's anything more from the parties.

6          MR. BIENENSTOCK:  Your Honor, may I ask a question?

7     The stipulation that Your Honor so ordered says something to

8     the effect of subject to the Court's ruling today RBS would

9     respond to the motion and then there's a hearing scheduled I

10    think for October 20.  So the immediate question is what that

11    means.  We've already propounded discovery but can't possibly

12    completed and it's not the final discovery, to get ready for a

13    hearing on the merits.  Is it fair for us to assume that the

14    meaning of the Court's ruling today is the -- those times have

15    to be changed to something we -- hopefully the parties can

16    agree on?

17         THE COURT:  Not necessarily.  The parties can agree

18    to change the dates, absent any agreement to change the dates,

19    it's listed for hearing on October 20th.  At the hearing on

20    October 20th, assuming you show up and make the argument that

21    you're prejudiced in going forward because you don't have the

22    discovery that you need to be prepared, I will presumably

23    consider that as a request for adjournment.

24         If the parties meet and confer concerning the literal

25    handling of the case as I suggested in my remarks, you might

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 93 of 103

Page 93

1    come up with a new schedule.  And if you don't, I'll see what

2    I'll do with the time, but I'm not predicting now what I'm

3    going to do a month from now.

4              MR. BIENENSTOCK:  I was just trying to avoid further

5    dispute.  Because the stipulation also says that at that

6    hearing, no disputed facts will be determined.

7              THE COURT:  If the stipulation which I so ordered

8    continues to be in effect and is not changed either by

9    agreement of the parties or as a result of a contest of its

10   meaning by order of the Court, that would no doubt control.

11   But to the extent that the stipulation fairly read does not

12   apply to the current state of facts including the incorporation

13   of the Part VII rules as described in my remarks, I'm assuming

14   that the parties will try to make the current stipulation work

15   in the context of the case as it is evolving.

16              I don't know that I can be any clearer than that, and

17   I certainly don't intend to give you a prediction today as to

18   what I'm going to be like in October.

19              MR. BIENENSTOCK:  Thank you.

20              THE COURT:  Is there anything more?

21              We're adjourned until two o'clock.

22         (Recessed at 12:29 p.m.; reconvened at 2:05 p.m.)

23              THE COURT:  Be seated, please.  Good afternoon.

24              MR. MCCARTHY:  Good afternoon.

25              THE COURT:  Let's start with Soffer.

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 94 of 103

Page 94

 1              MR. MCCARTHY:  Good afternoon, Your Honor.  My name

 2    is Ed McCarthy on behalf of Lehman Brothers.

 3              THE COURT:  Were you on the phone last time?

 4              MR. MCCARTHY:  I was.  I was, Your Honor.

 5              THE COURT:  Welcome to the courtroom.

 6              MR. MCCARTHY:  Thank you very much and thank you for

 7    having me.

 8              This morning, Your Honor, we're here to set a

 9    schedule for moving forward in the Fountainebleau matters.

10    We've worked since the last hearing with opposing party, and we

11    have agreed to a stipulated schedule.  We're here today to ask

12    the Court to issue a consent order on that schedule.

13              THE COURT:  Okay.  What do I need to know about it,

14    and does it apply to all the cases or only to the first one?

15              MR. MCCARTHY:  The first two cases.

16              THE COURT:  Okay.

17              MR. MCCARTHY:  If you'd like, Your Honor, I can

18    approach with it.

19              THE COURT:  Sure.  What do you have to tell me about

20    it?

21              MR. MCCARTHY:  I don't think we have much to discuss.

22    It's fairly straight forward, Your Honor.  We attempted to be

23    aggressive with it, move these cases forward, which we would

24    both like to do.

25              THE COURT:  And what's happening with proceedings in

08-13555-mg    Doc 20661    Filed 09/15/11    Entered 10/07/11 14:19:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 95 of 103

Page 95

1    Nevada?

2              MR. MCCARTHY:  The proceedings in Nevada in the Towne

3    Square litigation, Lehman Brothers has foreclosed through a

4    non-judicial foreclosure process.  There -- we've talked to

5    opposing counsel about this, who we didn't see any emergency

6    there to respond, because through the non-judicial foreclosure

7    process, there's no need to respond until the sale is set.

8    That won't be set until December through an agreement with the

9    parties.  That's a different case than the case before Your

10   Honor.

11             THE COURT:  Okay.

12             MR. MCCARTHY:  So --

13             THE COURT:  And that one is not on for today?

14             MR. MCCARTHY:  It is not, Your Honor.  We will be

15   here next month on that for opposing counsel's motion to seek

16   relief from the automatic stay in that case.

17             THE COURT:  Okay.  Any comments from the defendant's

18   perspective?

19             MR. MAJOR:  Not much, Your Honor, there's any

20   questions.  And it's Chris Major for the defense.

21             THE COURT:  All right.  I have no questions.  And if

22   this is in electronic form, I'll enter the order.

23             MR. MCCARTHY:  We can submit it to Your Honor in

24   electronic form.

25             THE COURT:  I can't do anything with a piece of

08-13555-mg    Doc 20661    Filed 09/15/11    Entered 10/07/11 14:19:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 96 of 103

Page 96

1    paper.

2             MR. MCCARTHY:  Of course, of course.

3             THE COURT:  And I take it this is something that

4    you're satisfied with on behalf of your clients?

5             MR. MAJOR:  Yes, Your Honor.  It's the product of

6    much back and forth between plaintiff and defendant.

7             THE COURT:  Okay.  Fine.

8             MR. MCCARTHY:  We'll submit it then as soon as this

9    is done.

10             THE COURT:  Fine.  I'll enter it then.

11             MR. MCCARTHY:  Thank you.

12             THE COURT:  Thank you.

13             MR. MAJOR:  Thank you, Your Honor.

14             MR. WIN:  Good afternoon, Your Honor, Zaw Win from

15    Weil Gotshal and Manges for the debtors.

16             The final item on today's agenda is an adversary

17    proceeding of Melissa King versus Lehman Brothers Holdings,

18    Inc., Case No. 11-10875, and it's the debtor's motion to

19    dismiss, which is docketed at UCF No. 8.

20             The debtor's motion to dismiss is uncontested, but

21    before going into the substance of the motion, it may be

22    helpful to provide the Court with a little bit of background

23    information on this matter.

24             As the Court may recall, Ms. King failed to appear at

25    the July 20th hearing on the debtor's motion for a temporary

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 97

1    stay of the adversary proceeding.  Following entry of the

2    order, of that order, granting the temporary stay, the debtors

3    contacted the Chapter 13 trustee in Ms. King's case which is

4    pending -- which was at the time pending in the United States

5    Bankruptcy Court for the Northern District of Georgia.

6            The Chapter 13 trustee provided the debtors with an

7    additional service address for Ms. King in Pasadena,

8    California, and the debtors served copies of the order granting

9    the temporary stay of the adversary proceeding, as well as this

10   motion on both that address and the address in Mableton,

11   Georgia.

12           Additionally, since the July 20th hearing, Ms. King's

13   Chapter 13 case has been dismissed, and I understand from local

14   counsel that LBHI has successfully executed on its writ of

15   possession and taken title to and possession of the property in

16   Georgia.  No objections or other responsive pleadings were

17   filed to this motion.  And unless Ms. King is here today, the

18   debtor's motion appears to be uncontested.

19           Unless the Court has any questions, the debtors

20   respectfully request the motion to dismiss be granted.

21           THE COURT:  Let me inquire if Melissa King is present

22   in the courtroom or participating by telephone conference.

23           I hear no response.  And so she's not here to

24   informally oppose your motion to dismiss.  I would ask if

25   you've had any contact with her since the last time this case

1       was listed for the adversary docket?

2              MR. WIN:  We haven't.  We haven't gotten any response

3       from her, either formally or informally.

4              THE COURT:  And are you satisfied that you have a

5       reliable address for her in Pasadena, California?

6              MR. WIN:  It's the address that was provided to us by

7       the Chapter 13 Trustee who informed us that she had received it

8       from Ms. King.  So it's the best address that we have.

9              I would note that Ms. King brought this adversary

10      proceeding, and it does seem to us that she has some

11      responsibility to inform us of how to reach her in connection

12      with it.

13             THE COURT:  All right.  Since the adversary

14      proceeding principally relates to the property which now has

15      been taken over by Lehman in Georgia, that's correct?

16             MR. WIN:  That's correct.

17             THE COURT:  In effect, the subject matter of the

18      complaint appears to no longer be current.  The likely reason,

19      although I can't look into this pro se plaintiff's mind that

20      she brought the complaint, was to try to hold on to the

21      property in a different way since that appears not to any

22      longer be applicable, I gather, but don't know, that she may

23      have abandoned this action.

24             I will grant the motion to dismiss, as unopposed.

25      But if it should turn out that there is some fundamental defect

08-13555-mg   Doc 20661   Filed 09/15/11   Entered 10/07/11 14:19:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 99 of 103

Page 99

1    in the service, and Ms. King is able to come into court at some

2    reasonable time in the future demonstrating that she did not

3    have actual or constructive notice of today's proceeding, I'll

4    certainly give consideration to any argument she may make at

5    that time.  However, I will enter the proposed form of order if

6    you have one.

7              MR. WIN:  Thank you, Your Honor, we'll submit one

8    this afternoon.

9              THE COURT:  Fine.  We're adjourned.

10       (Whereupon these proceedings were concluded at 2:12 PM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 100

1

2                          I N D E X

3                        R U L I N G S

4    DESCRIPTION                                    PAGE   LINE

5

6    Motion for Approval of a Modification

7    To Debtors' Disclosure Statement - APPROVED      12     9

8

9    Motion of Official Committee of Unsecured

10   Creditors of Lehman Brothers Holdings Inc.

11   Et al. for Entry of an Order Granting Leave,

12   Standing and Authority to Prosecute and,

13   If Appropriate, Settle Causes of Action on

14   Behalf of Lehman Commercial Paper Inc.

15    - GRANTED                                       16     1

16

17   Motion of Insured Persons for an Order

18   Modifying the Automatic Stay to Allow

19   Settlement Payment Under Directors and

20   Officers Insurance Policy to Settle

21   New Jersey Action - GRANTED                      27    24

22

23

24

25

Page 101

1

2                          I N D E X, continued

3

4     DESCRIPTION                                    PAGE   LINE

5

6     RBS N.V.'s Motion for Order Dismissing,

7     Without Prejudice, the LBI Trustee's Motion

8     Dated June 29, 2011 or Alternatively,

9     Converting the LBI Trustee's Motion to

10    An Adversary Proceeding Complaint

11    - DENIED                                        89     5

12

13    RBS N.V.'s Motion for Staying all

14    Non-Discovery-Related Proceedings

15    In Respect of the LBI Trustee's Motion

16    Pending a Determination by the District

17    Court with Respect to RBS N.V.'s Motion

18    To Withdraw the Reference - DENIED              90     5

19

20

21

22

23

24

25

Page 102

I N D E X, continued

DESCRIPTION                                    PAGE   LINE


Adversary Proceeding:  11-01875

Lehman Brothers Holdings Inc.'s Motion

To Dismiss - GRANTED                            98    24

Page 103

1

2                C E R T I F I C A T I O N

3

4    I, Aliza Chodoff, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    Aliza Chodoff    Digitally signed by Aliza Chodoff
                       DN: cn=Aliza Chodoff, o, ou,
                       email=digital1@veritext.com, c=US
8    _____    Date: 2011.09.15 15:24:18 -04'00'

9    ALIZA CHODOFF

10

11    Veritext

12    200 Old Country Road

13    Suite 580

14    Mineola, NY 11501

15

16    Date:  September 15, 2011

17

18

19

20

21

22

23

24

25