Lisa M. Solomon, Esq. (LS 0086)
LAW OFFICES OF LISA M. SOLOMON
305 Madison Avenue, Suite 4700
New York, NY 10165
Tel: 212- 471-0067; Fax: 212-980-6965

Counsel for Claimant Vincent Primiano

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT | Hearing Date October 27, 2011 |
| SOUTHERN DISTRICT OF NEW YORK | Objection Deadline: October 7, 2011 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:                                                                          Chapter 11
                                                              :                Case No. 08-13555 (JMP)
LEHMAN BROTHERS HOLDINGS, INC.,
et al.,
                                                              :                (Jointly Administered)
                    Debtors.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### RESPONSE OF VINCENT PRIMIANO TO
### DEBTORS' 118TH OMNIBUS OBJECTION TO CLAIMS

Vincent Primiano ("Claimant"), by his undersigned counsel, hereby submits this response to the Debtor's 118th Omnibus Objection to Claims to Reclassify Claims as Equity Interests (the "Claims Objection"). In support thereof, Claimant respectfully represents as follows:

### BACKGROUND

1.  Commencing on September 15, 2008 (the "Petition Date"), Lehman Brothers Holdings, Inc. (the "Bank" or the "Debtor") and certain of its subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under title 11 of the United States Code (the "Code").

2.  Claimant, a former employee of the Bank, is a creditor of the Debtors. On or prior to the bar date for filing proofs of claim herein, Claimant filed a general unsecured proof of claim against the Bank designated as claim no. 31795 (the "Claim"). The Claim was filed in the

1

total amount of $4,856,359.00 on account of deferred compensation owed to Claimant.

3. The Claims Objection seeks to reclassify the Claim as an equity interest that will receive no distribution under the Debtors' plan of reorganization. Alternatively, the Claims Objection seeks mandatory subordination of the Claim pursuant to §510(b) of the Code, and to subordinate the Claim on the basis of contractual subordination pursuant to §510(a) of the Code.[1]

## CLAIMANT'S PAY ARRANGMENT

4. Claimant is a former employee of the Debtor whom was employed by the Bank for nearly twenty years. As part of Claimant's compensation arrangement Claimant was paid a bi-weekly base salary and a bonus based on net revenue production of the Prinicpal Finance Group (having two other members). For the year 2004, Claimant had a "minimum guaranteed bonus."

5. The Bank did not pay Claimant's total wages on a current basis, but instead deferred a portion until on or about January 31 after the end of each work year. At the Bank's discretion, a part of Claimant's deferred wages including his bonus was made in restricted stock units and/or options (the "Deferred Compensation Awards"). The portion of Claimant's pay made in Deferred Compensation Awards varied from year to year in accordance with the Bank's award program in effect for each plan year as described in the Lehman Brothers Equity Award Program booklets distributed to Claimant and other employees and the Bank's Stock Incentive Plan. Claimant was awarded restricted stock units based upon a fixed award table and his

---

[1] As discussed below, Claimant seeks herein priority treatment for a part of the Claim, i.e., $10,950, to the extent it is determined a portion of the Claim is based upon services rendered by Claimant within 180 days prior to the Petition Date. It is noted herein that Claimant also filed similar claims against each of the other Debtors based upon the compensation owed to Claimant that the Debtors have also objected to pursuant to the Claims Objection and pursuant to the Debtors' 135th omnibus claims objection. This response is intended to address each of the subject objections.

2

group's generation of revenue. Typically, the Deferred Compensation Awards approximated 35% of Claimant's total annual wages. The Bank's practice of requiring part of Primiano's wages be paid in Deferred Compensation Awards was consistent with its firm-wide compensation program implemented among thousands of its employees.

6.      As of the Petition Date, the Bank had granted Claimant 124,618 restricted stock units that were either unvested or not yet deliverable to Claimant (the "RSU's") based upon the services that he had rendered and the pay that he had earned.[2]  The RSU's gave Claimant the right to the collection of his wages by the means of either the Bank's future delivery of shares of common stock, or at the discretion of the Bank, cash in lieu thereof, generally five years after the award date.  The Bank's Stock Incentive Plan under which the restricted stock units were issued acknowledges the rights of participants (such as Claimant) as unsecured creditors and the Bank's unsecured liability to such participants.  It provides that "Nothing herein contained shall give any Participant any rights that are greater than those of a general creditor."  (See 2005 Stock Incentive Plan at ¶8).  The future delivery of shares or cash in lieu thereof was subject to Claimant's continued employment.

7.      As of the Petition Date, Claimant was an employee of the Debtor.  As of the Petition Date, no shares had been issued to Claimant on account of the RSU's, and no shares were due to be delivered to him until various dates in 2008-2013.  Claimant could not assign the RSU's nor could they be sold, traded, hedged or pledged.  Claimant did not receive or hold any

---

[2] Claimant had also received a small amount of stock options, but is not seeking general unsecured treatment on account of any such stock options.

stock certificates, book entry certificates, options, warrants or any other form of security.

## GROUNDS FOR RESPONSE

8. Claimant opposes the relief sought in the Claims Objection. First, Claimant denies that there is any legal basis to classify and treat any compensation the Debtor owes him as an equity interest under the Debtors' plan of reorganization. Second, there is no legal basis, and no caselaw supporting the subordination of the Claim under §510(b) of the Bankruptcy Code. Claimant also denies that any contractual subordination provisions apply to his Claim.

A. <u>The Claim is Not On Account of an Equity Interest</u>

9. Section 101(16) of the Code defines "equity security" as "(A) share in a corporation, whether or not transferable or denominated 'stock", or similar security; (B) interest of a limited partner in a limited partnership; or (C) warrant or right, other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph (A) or (B) of this paragraph."

10. The unpaid, unvested and not yet deliverable RSUs at issue here do not fall into the definition of equity secuirty. An RSU, as opposed to a stock option, does not give the holder the right to "purchase" or "subscribe to" a share of common stock. Common stock ultimately issued to holders of RSUs is granted to the holder of the RSU through vesting upon the satisfaction of the contractual conditions. Thus, the RSU's might be a "right to convert" to common stock if future conditions are satisfied. Even so, a "right to convert" is specifically excluded from the definition of "equity security" under §101(16)(C).[3]

---

[3] It is noted herein that Debtors' description of restricted stock units in their financial statements provides restricted stock units "convert" to common stock upon vesting and the satisfaction of the conditions.

4

11. Claimant's RSUs lack any indicia of ownership and the fundamental rights generally associated with an equity interest, such as voting rights, ability to sell stock or possession of such certificates. *See In re Motels of Am.*, 146 B.R. 542 (Bankr. Del. 1992).

12. In addition, §101(49)(B) of the Code provides the term "security" does "*not* include" (emphasis added) a "debt or evidence of an indebtedness for goods sold and delivered or services rendered." The Bank was indebted to Claimant for the pre-petition services he rendered, and the RSU's granted to Claimant were evidence of that indebtedness. The fact that the share price of the Bank's stock was used to value the individual units of the RSU's does not change the fact that the RSU's evidenced the Bank's indebtedness to Claimant for services rendered, and were not a "security."

B. The Claim is Not Subject to Subordination Under §510(b) of the Code.

13. Long before these chapter 11 cases were filed, Claimant had a claim for wages against the Bank based upon the services he rendered to the Bank. Long before these cases were filed, a promise was made to Claimant that he would be paid his wages. He was a general unsecured creditor at the time these cases were filed (other than for wages earned within 180 days before the Petition Date), and not an equity holder. Notwithstanding this, the Debtors seek in the alternative to subordinate the Claim under §510(b) and all other former employee-claimants with share based compensation with no right to distribution of any kind against any of the Debtors. The Debtors seek to sweep aside any employment based claim held by a claimant who had *not* been an equity holder and who might *never* he an equity holder. By the relief that

5

the Debtors seek, general creditors who had no priority over Claimant when he rendered his services for the Bank and earned his right to his wages would be gifted a preference.

14. Section 510(b) of the Code provides for subordination of claims "arising from recission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security" and for certain other transactions not applicable here. The Debtors here suggest by their interpretation of the Code that this Court should take an overly expansive view of §510(b), citing cases not factually on point. While certainly it is within the purview of a court to read a statute expansively or restrictively, depending on its view of the intent of Congress, Claimant respectfully suggests that a court exceeds its authority when it reads whole words, phrases and conditions out of a statute. That is what must occur here in order for this Court to grant the relief the Debtors seek. This Court would have to rewrite the statute, and render irrelevant to the inquiry its actual language and legislative purpose. The Debtors do not even address the requirement that a claim under §510(b) must be one for "damages." The Claim is not a damage claim but one based upon a debt for deferred compensation, specifically wages. Nor does the Claim satisfy the other requirements for mandatory subordination under §510(b). To grant the relief sought by the Debtors here would lead to a great injustice and reorder the priorities for wage claims granted under the Code.

1. <u>Neither the Terms Nor the Policies of §510(b) are Applicable</u>

   (a) <u>The Claim is Not a Damage Claim As Required by §510(b) but Is for Unpaid Wages</u>

15. In *In re Wyeth Company, Debtor*, 134 B.R. 920 (Bankr. W.D. Mo. 1991), the trustee objected to claims based upon promissory notes taken by the claimants from the debtor for their shares in the debtor. Several years after the issuance of the notes, the debtor filed its

bankruptcy case. The debtor sought to subordinate the claims as damage claims under §510(b). The court rejected the debtor's request, stating as follows:

> [U]se of the term 'damages' implies more than a simple debt. . . Such a claim must . . . not merely be a claim on a debt.

16. Similarly, in *Montgomery Ward Holding Corp. v. Scheber (In re Montgomery Ward)*, 272 B.R. 836 (Bankr. Del 2001), the court denied subordination of a claim based upon the debtor's default on a promissory note, holding that "damages" in §510(b) "connotes a recovery broader than a simple claim on an unpaid debt." "'[D]amages' implies a tortuous injury, as for example, one suffered from the fraudulent issue, purchase or sale of securities."

17. Here, the Bank had a liability to Claimant for his deferred compensation that was wages, an unpaid debt. The Claim involves neither loss or injury based upon a wrongful act of the Debtor, nor a tort or breach of contract. It is a claim seeking to enforce Claimant's rights based upon the Bank's promise to pay him his deferred compensation, his wages, through the vehicle of the RSU's. The Debtor did not breach or default in its deferred payment obligation to Claimant. As of the Petition Date, the RSUs had not vested or were not yet deliverable, although Claimant had earned his wages. Claimant was a creditor before these cases were filed, as acknowledged by the Bank in its Stock Incentive Plan and in the Bank's financials (as discussed below). Section 510(b) is inapplicable to the Claim. It does not extend to the current case because Claimant is a creditor who seeks payment based upon a debt, and not damages.

18. The cases upon which the Debtors rely for subordination of the Claim are inapposite. Those cases involve damage claims of creditors premised upon wrongful conduct of the debtor, either tort or breach of contract claims. *See e.g., In re Med Diversified, Inc.*, 461 F.3d 251, 254 (2d Cir. 2006)(claim for damages based on debtor's failure to issue shares of common

stock in another company pursuant to a termination agreement); *In re Enron* (employee's claim for damages for vested stock options based upon fraud and breach of contract claims and decline in value of stock). This case is different. It does not involve damage claims, but a claim for deferred compensation and wages that the Bank had agreed to pay before the Petition Date in the form of RSU's that were either unvested or not yet deliverable as of the Petition Date.

19.     That the Claim here for deferred share-based compensation that has been earned is not a damage claim but instead one for an unpaid debt, Claimant's wages, is supported by Delaware state law. The Claim is one for "wages" under Delaware's Wage Payment and Collection Act of the State, codified at Delaware Code Annotated at Title 19, Part I, Chapter 11, Sections 1101 to 1115 (the "Wage Act").[4]  *See SCOA Indus. Inc. v. Bracken*, 374 A.2d 263 (Del. 1977)(claim for year-end bonus was for wages under Wage Act); *Sietz v. Siegfried Group*, 2001 WL 1198941 (Del. Super. 2001)(deferred compensation earned but not paid based upon services rendered fell within definition of "wages"); *Dept. of Labor Commons v. Green Giant*, 394 A.2d 753, 394 A.2d 753 (Del. Super. 1978)("wages" refers to recurrent compensation for services rendered).[5]

---

[4] The Bank, Claimant's employer, and a party to the Stock Incentive Plan under which the RSU's were issued, is a Delaware corporation. The Stock Incentive Plan provides that Delaware law is controlling.

[5] The Wage Act defines "wages" as those that are "determined on a time, task, piece, commission or other basis of calculation." 19 Del. C. §1101(a)(2). Under Delaware law, Claimant was entitled to various protections granted his wages that were deferred and unpaid. "Chapter 11 of Title 19 Delaware Code [was] enacted by the General Assembly in 1965 (55 Del. Laws, Ch. 1) to provide for payment of wages and to enforce their collection." *State Christopher v. Planet Ins.*, 321 A.2d 128 (Del. Super. 1974). Thus, in a case of a dispute over the amount of wages, §1104 of the Act requires that the employer shall pay without condition all wages or parts thereof conceded by the employer to be due leaving the employee all remedies the employee otherwise might be entitled to under the Wage Act or other applicable law. As to insolvent corporations, the amount of wages due not exceeding two months have priority to other debts. Title 8, Chapter 1, Subchapter XI, §300. Section 1107 of the Wage Act forbids an employer to withhold or divert any portion of any employee's wages with the exception of deductions provided by State or Federal law, deductions for medical, surgical or hospital care, or deductions authorized in writing by the employee. Section 1103(d) of the Wage Act provides that if an employer withholds without reasonable grounds funds to pay an

20.     It would seem illogical under the basic contract principle of restitution and against the policy of Delaware labor law to find the Claim is one for damages for purposes of subordinating the Claim and withholding valid compensation earned on account of value-rendering services already performed.  Finding that the Claim seeks "damages" within the meaning of §510(b) and one that is subject to mandatory subordination would plainly undermine the wage protections granted under Delaware law.

21.     The Claim here for deferred compensation also qualifies as "wages," and a portion thereof is entitled to priority treatment under §507(a)(4) of the Code, *i.e.*, for services Claimant rendered within 180 days of the Petition Date.  The RSU's were given to Claimant, an employee as of the Petition Date, in lieu of regular wages under Claimant's employment arrangement for his daily work. *See. e.g.*, *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651 (2006) (workers' compensation claims for unpaid premiums denied priority because premiums were not bargained-for benefits in lieu of increased wages); *In re Cardinal Indus, Inc.*, 160 B.R. 83 (Bankr. S.D. Ohio 1993)(bonus given as compensation for work performed considered within wage priority).  The consideration for the RSU's was Claimant's services rendered pre-petition. *In re Hechinger Inv. Co of Del.*, 298 F.3d 219 (3d Cir. 2002(stay-on benefits payable post-petition but earned pre-petition treated as unsecured claim).  The RSU's were not a "perk," but instead were for work Claimant performed pre-petition.  Further evidence that the RSU's were on account of Claimant's wages is the Debtors' accounting.  The Debtors

---

employee wages the employer shall in addition be liable to the employee for liquidated damages as calculated therein.

acknowledged in their financial statements that the RSU's were given on account of wages and salary by recognizing as compensation expense the grants of restricted stock units, and amortizing them as compensation expense over the relevant service periods.[6]

22. That part of Claimant's compensation was share-based and the value of the compensation ultimately to be paid to him was a variable does not alter the conclusion that his Claim is for wages, a portion of which is entitled to priority status, and that the remainder of the Claim is entitled to general unsecured status. The fundamental character of the underlying obligation, one for wages, is not changed by the fact that the ultimate value of the compensation is a variable, or that it is tied to the price of the Debtor's stock.[7]

23. Pursuant to §507(a)(4) of the Code, wages of employees earned within 180 days prior to a bankruptcy case are granted priority under the Code.[8] Congress found it important to compensate employees for their wage based claims. It is illogical to conclude that Congress recognized the importance of wages and the hardship caused by bankruptcies upon employees, but at the same time intended to eviscerate them of the protections granted as wage holders if they had share-based claims, and relegate such claims to claims not even on a parity with general creditors.

24. A trilogy of published opinions from this District warrants rejection of §510(b) subordination with respect to the Claim. *See In re Drexel Burnham Lambert Group, Inc.,* 138

---

[6] It is also noted herein that upon conversion of the RSU's into common stock five years after the grant, any gain was considered for tax purposes as ordinary income and not capital gain.

[7] Claimant acknowledges the decision of the court in *In re Baldwin United Corp.*, 52 B.R. 549 (Bankr. S.D. Ohio 1985). There, the court held that a stock option plan did not qualify as priority wages because it was designed as a perk to increase the attractiveness of the employment arrangement, and not in lieu of regular salary. That is distinguishable from this case. Here, the RSU's were granted in lieu of Claimant's regular salary.

[8] Section 507(a)(4) increased the time period from 90 days to 180 days by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 for all cases commenced after April 20, 2005.

B.R. 717 (Bankr. S.D.N.Y. 1992) *("Drexel I); In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723 (Bankr. S.D.N.Y. 1992) *("Drexel II);* and *In re Drexel Burnham Lambert Group, Inc.,* 140 B.R. 347 (S.D.N.Y. 1992) *("Drexel III).* In the *Drexel* litigation, Debtors' counsel here, Weil Gotshal & Manges, successfully argued for the non-subordination of compensation-based claims of employee-shareholders.

25. In *Drexel I,* the bankruptcy court judge ruled on a securities class objection to the plan's classification and treatment of claims as unsecured claims on the ground that it failed to relegate the claims of the employee-shareholders to common stockholders at the bottom of the plan distribution heap. The bankruptcy judge overruled the objection to the settlement with the compensation-based claimants (that was incorporated into the plan of reorganization) who were shareholders whose claims the court noted were based upon a series of statutory and common law theories, ERISA theories, labor law theories and common law fraud theories. The employee-claimants argued that Drexel should have protected the employees who held shares under Drexel benefit plans. The objection premised on §510(b) argued that the claims held by the employee shareholders were the definitional equivalent of a §510(b) claim, and could not be treated on a parity with general unsecured creditors. The court rejected this position, noting that there were multifaceted issues of law and fact involved in the many separate and distinct claims that had been asserted, and found that the claims could be treated as unsecured creditors under the plan pursuant to a stipulation with the debtor. *Drexel I,* 138 B.R. at 720-721.[9]

---

[9] *Drexel II* details the confirmation requirements under Bankruptcy Code § 1129(b) and how the debtor's plan satisfied them. The settlement of the employee compensation claims was an integral part of the plan, and the court found the treatment of such claims pursuant to the settlement "fair and equitable" as required by the Code, explaining as follows: "Given the conflicting positions and interests, the risks that some Employee ERISA Compensation Claims may be subject to one or more forms of subordination under § 510 [which includes

26.     By denying mandatory subordination here, Claimant and the other employee claimants who have rendered valuable services for the benefit of the Debtors and their creditors would have a footing equal to that of other general creditors. That would harmonize the Code's general interest in equity with the protection of wages claimants under Delaware law and the Code and both laws' interest in protecting those claims. Such a result would also avoid a reordering of the priority status granted to wage claims under the Code.

(b) The Claim Does not Arise from the Purchase or Sale of A Security

27.     This is not a claim arising out of a purchase of a security. The Claim arises out of firmly fixed rights under Claimant's employment arrangement and Delaware law. It is for deferred compensation, his wages, a portion of which was "guaranteed" compensation. It arises from his services rendered and for the wages that were earned just as a salary is earned. His claim is based upon a promise made by the Debtor to pay his wages by granting a possible equity stake in the Debtor in the future or granting cash in lieu thereof the amount of which was to be measured by the price of the stock. The shares were not required to be delivered prior to the Petition Date, and his wages remained unpaid. Claimant did not give up the protections afforded his wage claim under Delaware law or under the Code. He did not bargain for the status as a shareholder, but as a wage claimant to be paid through the vehicle of the RSU's. He did not

---

discretionary subordination due to wrongful conduct], ... the [treatment of the claims] each fall well within a range of reasonableness." *Drexel II,* 138 B.R. at 750.

*Drexel III* is the securities class' appeal of *Drexel I* and *Drexel II* to the district court. In *Drexel III,* the district court affirmed the bankruptcy court's approval of the settlement and affirmed the bankruptcy court's approval of the treatment of the employee claims as unsecured claims. The court rejected the contention that under § 510(b) the employee claims were to be mandatorily subordinated: "Without delving into an unnecessary examination of the applicability of §510(b) to ERISA claims, this Court holds that the bankruptcy court did not abuse its discretion in considering that the [employee class] owned distinct securities possessing different legal rights from those in the [securities class] and approving the ERISA Settlement and Plan which classified the varied mix of employee shareholder claims as unsecured."

conclude a bargain to become a shareholder or an investor. His claim is therefore not a claim arising out of a purchase of a security. It is neither an equity interest nor a claim subject to subordination.

28.   The RSU's issued to Claimant that were either unvested or not yet deliverable as of the Petition Date differ from the stock options or phantom stock at issue in *In re Enron Corp.*, *supra*, 341 B.R. 141. In *Enron*, the employee-claimants held actual securities in the form of stock options. The employees there argued that they had been fraudulently induced to retain their stock options. The court ruled that the employees' claims arose in connection with a purchase of securities for purposes of §510(b). Significantly, the employees in *Enron* elected not to exercise their stock options -- they had the contractual right to do so. The one employee claimant whose claim was based on phantom stock also had a contractual entitlement to the delivery of the shares prior to the petition date. [10] With regard to breach of contract claims asserted by the employees, the court found they were rechacterized fraud claims.

29.   Here, by contrast, Claimant is not seeking payment on a vested stock option, and as of the Petition Date the time for delivery of shares of stock under the RSU's had not yet occurred. Moreover, there are no fraud claims, or recharacterized contract claims, only a claim for a debt.

(c) Subordination Here Would Violate the Policies of §510(b)

30.   The Claim does not fall within the policy of §510(b). The purpose of §510(b) is to place the risk of an unlawful issuance of securities on security holders as opposed to general

---

[10] The court in *Enron* specifically noted in footnote 3 that its conclusion with regard to the stock options in that case applied only to stock options similar to those presented.

13

creditors. Claims for wages do not depend upon whether the issuance of stock was illegal or whether the company engaged in a breach of contract or other form of wrongdoing. The claim here and the claims of other former employees are triggered simply by the rendering of services. They are not the sort to which §510(b) applies. This situation involving thousands of former employees for their unpaid wages is a situation that extends the reach of §510(b) beyond its legislative history and purpose.

31. In *Med Diversified, supra*, the Second Circuit acknowledged the outer boundaries of the statute and cautioned as follows:

> 'Nothing in our rationale would require the subordination of a claim simply because the identity of the claimant happens to be a shareholder [or one who completed a bargain to become a shareholder], where the claim lacks any causal relationship to the purchase or sale of stock and when subordinating the claim [ ] would not further the policies underlying §510(b).

*quoting from In re Telegroup*, 281 F.2d 133, 144, n.2 (3d Cir. 2002).

32. Claimant has submitted this response to preserve his rights herein and prevent the reclassification or subordination of the Claim. Claimant reserves all rights with respect to the Claim and any additional claims he has filed in these proceedings. Claimant fully reserves all rights he may have against all non-Debtor affiliates and any other third parties. Nothing in this response is intended nor should be taken as Claimant's waiver of any claims against non-debtor affiliates or a consent to jurisdiction of this Court to determine Claimant's rights as against any such affiliates.

33. Claimant joins in, to the extent not inconsistent herewith, other responses filed herein of similarly situated former employees of the Debtors with respect to the Debtors' omnibus objection to such claims.

WHEREFORE, this Court should deny the Debtor's objection to the Claim, allow the Claim as requested herein, afford priority treatment to $10,950 of the Claim, and grant such other further relief as the Court deems just and proper.

Dated: New York, New York
       October 7, 2011

                           LAW OFFICES OF LISA M. SOLOMON

                           By: /s/ Lisa M. Solomon
                           Lisa M. Solomon (LS-0086)
                           305 Madison Avenue, Suite 4700
                           New York, New York 10165
                           (212) 471-0067

                           Counsel for Vincent Primiano