**QUINN EMANUEL**
**URQUHART & SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
*Counsel for the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc.*

**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
*Counsel for Debtor Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., <u>et al.</u>,<br><br>       Debtors. | Chapter 11<br>Case No. 08-13555 (JMP) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>       Debtor. | Case No. 08-01420 (JMP) SIPA |

**NOTICE OF HEARING ON OBJECTION TO PORTIONS OF PROOFS OF CLAIM NO.**
**66462 AGAINST LEHMAN BROTHERS HOLDINGS INC. AND NO. 4939 AGAINST**
**LEHMAN BROTHERS INC. OF JPMORGAN CHASE BANK, N.A.**
<u>**REGARDING TRIPARTY REPO-RELATED LOSSES**</u>

<u>**[REDACTED PER STIPULATION]**</u>

**PLEASE TAKE NOTICE** that a hearing on the annexed objection, dated August 31, 2011 (the "Objection") filed by Lehman Brothers Holdings Inc. and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors") and the Official Committee of Unsecured Creditors (the "Committee" and, together with the Debtors, the "Objectors"), to portions of Proofs of Claim No. 66462 against Lehman Brothers Holdings Inc. and No. 4939 against Lehman Brothers Inc. shall be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **October 19, 2011 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that responses, if any, to the Objection must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the responding party, the basis for the response and the specific grounds thereof, and shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with a hard copy delivered directly to Chambers), in accordance with General Order M-182 (which can be found at www.nysb.uscourts.gov), and served in accordance with General Order M-399, and on (i) the Chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Lori Fife, Esq.); (iii) conflicts

2

counsel for the Debtors, Curtis, Mallet-Prevost, Colt & Mosle, LLP, 101 Park Avenue, New York, New York 10178-0061 (Attn: Joseph D. Pizzurro, Esq. and L.P. Harrison 3rd, Esq.); (iv) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Elisabeth Gasparini, Esq. and Andrea Schwartz, Esq.); (v) attorneys for the Official Committee of Unsecured Creditors appointed in these cases, Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005 (Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq. and Evan Fleck, Esq.); and (vi) special counsel to the Committee, Quinn Emanuel Urquhart & Sullivan, LLP, 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 (Attn: John B. Quinn, Esq. and Erica Taggart, Esq.) so as to be filed and received by no later than **October 12, 2011 at 4:00 p.m. (Eastern Time)** (the "Response Deadline").

   **PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and served with respect to the Objection or any claim set forth thereon, the Objectors may, on or after the Response Deadline, submit to the Bankruptcy Court an order, which order may be entered with no further notice or opportunity to be heard offered to any party.

*[Remainder of Page Intentionally Left Blank]*

**PLEASE TAKE FURTHER NOTICE** that responding parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: August 31, 2011
      New York, New York

 

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By:   /s/ John B. Quinn
John B. Quinn
Erica Taggart
Tyler G. Whitmer
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000

Susheel Kirpalani
Andrew J. Rossman
James Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000
*Counsel for the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc.*

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**

By:   /s/ Joseph D. Pizzurro
Joseph D. Pizzurro
L.P. Harrison 3rd
Michael J. Moscato
Nancy E. Delaney
Peter J. Behmke
Cindi M. Giglio
101 Park Avenue
New York, New York 10178-0061
(212) 696-6000
*Counsel for Debtor Lehman Brothers Holdings Inc.*

**QUINN EMANUEL**
**URQUHART & SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
*Counsel for the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc.*

**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
*Counsel for Debtor Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., <u>et al</u>.,<br><br>         Debtors. | Chapter 11<br>Case No. 08-13555 (JMP) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>         Debtor. | Case No. 08-01420 (JMP) SIPA |

**OBJECTION TO PORTIONS OF PROOFS OF CLAIM NO. 66462 AGAINST LEHMAN**
**BROTHERS HOLDINGS INC. AND NO. 4939 AGAINST LEHMAN BROTHERS INC.**
**OF JPMORGAN CHASE BANK, N.A. REGARDING**
**<u>TRIPARTY REPO-RELATED LOSSES</u>**

**<u>[REDACTED PER STIPULATION]</u>**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors, in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors") and the Official Committee of Unsecured Creditors (the "Committee" and, together with LBHI, the "Objectors"), respectfully represent as follows:

## Preliminary Statement

This Objection seeks a ruling that the claims of JPMorgan Chase Bank, N.A. ("JPMorgan") against both Lehman Brothers Inc. ("LBI") and LBHI relating to its role as LBI's triparty repo custodian are significantly overstated because JPMorgan (i) failed to dispose of the collateral securing such claims in a commercially reasonable manner; (ii) included losses due to Barclays' conduct, which have been settled for consideration; and (iii) impermissibly charged post-petition interest.

JPMorgan's claims against LBI, and against LBHI as purported guarantor of LBI's obligations, stem entirely from JPMorgan's role as LBI's triparty repo custodian the week of September 15-19, 2008, between LBHI's bankruptcy filing and the commencement of LBI's SIPA proceeding. That week, JPMorgan acted as LBI's triparty repo custodian, including transferring the necessary funds and securities between LBI and repo investors at night and unwinding the transactions each morning. JPMorgan claims it is entitled to apply over $6 billion of LBHI's money to satisfy a deficiency supposedly arising from JPMorgan's activities as LBI's triparty repo custodian that week.

These claims should be reduced substantially. First, JPMorgan's disposition of the LBI collateral was commercially unreasonable. Although JPMorgan is one of the most sophisticated financial institutions in the world, it conducted the largest forced liquidation of customer

collateral in history without first considering appropriate safeguards and processes necessary to protect both the customer's interests and those of the bank. Perhaps because JPMorgan believed it could look to the extra LBHI collateral it held as a "cushion," JPMorgan rushed to liquidate the LBI collateral without any procedures to ensure it was sold at a fair market price. Virtually no price was rejected as being too low. JPMorgan did not require traders to solicit a minimum number of bids for any of the collateral. The single memorandum with procedures for the liquidation was limited to administrative issues, and traders received it days into the liquidation process. Not surprisingly, the resulting prices were often below fair market value for the collateral.

JPMorgan also used the collateral disposition to enrich itself at the expense of LBHI's other creditors. JPMorgan sold large numbers of illiquid securities to itself and its affiliates at private dispositions after soliciting few, and sometimes no, competing bids from other potential purchasers. Such private self-sales of collateral violate the express terms of New York's Uniform Commercial Code. Furthermore, JPMorgan sometimes purchased securities from the LBI collateral pool and then quickly "flipped" them – reselling them shortly thereafter for a profit. Such profit from self-dealing is clearly improper.

Second, JPMorgan itself has claimed that its losses are due to Barclays' misconduct related to triparty repurchase agreements that week, and JPMorgan has settled its dispute with Barclays on this subject shortly after the events took place. It received substantial consideration from Barclays for the very losses it claims now against LBHI, including the dismissal of a lawsuit worth hundreds of millions of dollars. LBHI should not have to pay for losses caused by Barclays for which JPMorgan has already settled and received compensation.

Finally, JPMorgan has asserted a claim for post-petition interest on its claims (the "Interest Claim") notwithstanding that JPMorgan held cash and cash-equivalents totaling $8.6 billion at the time such interest was accruing. As a matter of equity, JPMorgan should not be permitted to charge LBHI's estate hundreds of millions of dollars of interest on its claims while holding billions of dollars of unapplied cash collateral.

Nothing in this Objection addresses the validity of the purported guaranties and security agreements entered into on the eve of LBHI's bankruptcy. That issue is being litigated in the separate adversary proceeding pending before this Court. But under no circumstances is JPMorgan entitled to recover for losses it caused, or for which it has blamed and settled with another.

### Relief Requested

1.      This Objection seeks to reduce the portions of Proof of Claim No. 66462 against LBHI and Proof of Claim No. 4939 against LBI[1] described therein as arising from the purported $6,333,781,099 deficiency remaining after application of the sale proceeds of securities collateral pledged by LBI to secure certain LBI indebtedness related to JPMorgan's role as LBI's triparty repo custodian (the "Deficiency Claims") pursuant to section 502(b) of title 11 of the United States Code, as amended (the "Bankruptcy Code"), Rule 3007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and this Court's Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 3007 and 9019(b) for Approval of Claim

---

[1]      LBHI's standing to assert this Objection in LBI's SIPA Proceeding is predicated upon its status as the largest unsecured creditor of LBI.

Objections Procedure (the "Procedures Order") [Docket No. 6664]. This Objection also seeks the disallowance of postpetition interest and other related relief described further herein.[2]

2.     In its proofs of claim, JPMorgan explains that "[a]s of October 1, 2008, [JPMorgan] was owed $25,279,675,964 for extensions of credit for the clearance and settlement of securities transactions under the Clearance Agreement signed by [LBI] on June 7, 2000, as amended, to which JPMCB and [LBI] are party together with certain of [LBI's] affiliates . . . . As of March 15, 2010, such amount had been reduced to $6,333,781,099, principally by application of the sale proceeds of securities collateral . . . pledged by [LBI] pursuant to the Clearance Agreement to secure such claims . . . ."[3]

3.     Objectors have examined the Deficiency Claims and have determined that they should be reduced for a number of reasons. Objectors therefore request entry of an order reducing the Deficiency Claims as set forth below. Objectors reserve their right to object to the Deficiency Claims on all other grounds.[4]

## Jurisdiction

4.     The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).

---

[2]   An excerpted copy of Proof of Claim No. 66462 is attached hereto as Exhibit A. Proof of claim No. 4939 against LBI is attached as Exhibit B to Proof of Claim No. 66462.

[3]   Ex. A, Proof of Claim at Exhibit B p. 2.

[4]   These grounds include, but are not limited to, whether JPMorgan is entitled to apply LBHI collateral to satisfy all or part of those claims.

## Procedural Background

5.     Beginning on September 15, 2008, and periodically thereafter, LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

6.     On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Committee.

7.     On September 19, 2008, the Honorable Gerard E. Lynch, Judge of the United States District Court for the Southern District of New York, entered the Order Commencing Liquidation pursuant to the provisions of the Securities Investor Protection Corporation Act ("SIPA") with respect to LBI.

8.     On July 2, 2009, this Court entered an order setting forth the procedures and deadlines for filing proofs of claim in these chapter 11 cases (the "Bar Date Order") [Docket No. 4271].  A copy of the Bar Date Order was made publicly available at http://www.lehman-docket.com.

9.     Claimants received notice of the Bar Date Order by mail.  (*See* Notice of Deadlines for Filing Proofs of Claim (the "Bar Date Notice")).  The Bar Date Notice also was posted on the docket, and the Bar Date Order was published in The New York Times (International Edition), The Wall Street Journal (International Edition), and The Financial Times. A list of the Debtors in these chapter 11 cases and their respective case numbers was included as part of the Bar Date Notice as well as on the instructions to the proof of claim form.  (Bar Date Notice at Schedule A).  In accordance with the Bar Date Order's requirement that claims be filed

against the proper Debtor, the Bar Date notice stated, in bold-face type and in capital letters, that "YOU SHOULD NOT FILE A PROOF OF CLAIM IF YOU DO NOT HAVE A CLAIM AGAINST THE DEBTORS." (*Id.* at 3).

10.     On January 14, 2010, this Court entered the Procedures Order, which authorizes the Debtors, among other things, to file omnibus objections to no more than 500 claims at a time, on various grounds, including those set forth in Bankruptcy Rule 3007(d) and those additional grounds set forth in the Procedures Order.

**Factual Background**

## I.     PRIOR TO LBHI'S BANKRUPTCY, JPMORGAN ACTED AS LBI'S CLEARING BANK AND DEMANDED GUARANTIES FROM LBHI

11.     From June 2000 until September 2008, JPMorgan served as LBI's primary clearing bank for broker-dealer activities.  In that role, JPMorgan agreed to receive and transfer securities on behalf of LBI, to make payment and collections of monies, and to permit transfers between accounts to facilitate clearing services.  JPMorgan also acted as LBI's custodial bank/clearing agent for purposes of LBI's triparty repurchase agreements ("repos").

12.     LBI designated JPMorgan as its clearing bank through a Clearance Agreement entered into on June 15, 2000 (the "2000 Clearance Agreement") between LBI and The Chase Manhattan Bank, JPMorgan's predecessor-in-interest.  LBHI was not a party to the 2000 Clearance Agreement.

13.     For the next eight years, LBI used triparty repos to finance its operations, selling securities collateral to counterparties while agreeing to repurchase those securities on a later date – often the next morning – for the purchase price plus some agreed amount of interest.  In its role as custodian bank, JPMorgan acted as the intermediary, processing the purchase and sale transactions underlying the repurchase agreement.

14.     Each morning, JPMorgan would "unwind" all of LBI's triparty repo trades. LBI, and other broker dealers using JPMorgan's securities-related services, relied on intraday credit from JPMorgan to provide the cash required to unwind. In other words, each morning, JPMorgan advanced funds on LBI's behalf to unwind the triparty repos. This "intraday" loan from JPMorgan was secured by the repurchased securities and other LBI assets until LBI sold the securities again in a repo with the same or another counterparty.

15.     Starting in early 2008, JPMorgan began demanding additional collateral from LBI to secure JPMorgan's intraday exposure – above and beyond the collateral it already held and valued at the amount of the intraday loan. In addition, JPMorgan required LBHI to deposit securities that would serve as collateral over and above the LBI collateral it was retaining to cover its intraday loans.

16.     In August 2008, JPMorgan required LBHI to enter into a set of agreements, including a guaranty (the "August Guaranty"), a security agreement (the "August Security Agreement"), and an amendment to the 2000 Clearance Agreement (collectively, the "August Agreements"). In the August Guaranty, LBHI guaranteed the obligations of certain of its subsidiaries – primarily LBI – "pursuant to the Clearance Agreement, dated as of June 15, 2000, to which one or more of [LBHI's subsidiaries] and [JPMorgan] are parties . . . ." The August Guaranty was thus limited to liabilities arising from JPMorgan's clearance and triparty repo functions. The August Security Agreement secured LBHI's obligations under the August Guaranty. *See* August Security Agreement, at 1-2 (defining "Liabilities" as, in pertinent part, "all 'Liabilities' as defined in the [August] Guaranty" and providing that LBHI "grant(s) to the Bank a security interest in, and a general lien upon and/or right of set-off of, the Security"). These

documents purported to make it possible for JPMorgan to look to LBHI's pledged securities in the event LBI's collateral was insufficient.

17.     Two weeks later, just as LBHI was about to announce its third quarter earnings, JPMorgan demanded that LBHI execute another guaranty (the "September Guaranty"), security agreement (the "September Security Agreement") and related documents (collectively, the "September Agreements"). The September Agreements purported to cover far more than potential clearance-related liabilities. Whereas the August Guaranty covered only certain of LBHI's subsidiaries' obligations under the 2000 Clearance Agreement, the September Guaranty covered "all obligations and liabilities of [all of LBHI's direct and indirect subsidiaries] to the Bank of whatever nature" with no limitation to any particular agreement or type of transaction. JPMorgan sent LBHI the September Agreements at 8:50 p.m. on the night of September 9 and demanded that LBHI execute them before the earnings call at 7:30 a.m. the following morning.

18.     The same day JPMorgan sent LBHI the September Agreements, JPMorgan also demanded billions of dollars of cash collateral. Between September 9 and September 11, LBHI deposited as collateral $3.6 billion in cash and cash equivalents. These cash deposits were in addition to billions of dollars worth of securities already provided by LBHI to JPMorgan earlier in the summer. Then, during the evening of September 11, 2008, JPMorgan demanded yet another $5 billion in cash, coupled with an explicit, written threat to stop extending credit to LBI unless the funds were received by the start of business the following morning, Friday, September 12. LBHI transferred the $5 billion in cash to JPMorgan, as demanded.

19.     As of the close of business on September 12, JPMorgan had "locked down" over $13 billion in LBHI collateral despite what JPMorgan itself described as having "little or no

clearance-related exposure to LBI."[5] JPMorgan's own internal documents reported that "[a]fter the morning unwind on 9/15 JPM will have US$9.8 billion margin covering its intraday financing" not including any of the $8.6 billion in cash collateral LBHI was forced to deliver that week.[6] On September 15, LBHI filed for bankruptcy.

## II. JPMORGAN CONTINUES ACTING AS LBI'S TRIPARTY REPO CUSTODIAN THE WEEK AFTER LBHI'S BANKRUPTCY

20. Although LBHI filed for bankruptcy on September 15, 2008, LBI continued to operate the following week. JPMorgan continued to act as LBI's clearing bank and triparty repo custodian that week.

21. In this bankruptcy proceeding, JPMorgan claims a deficiency of $25,279,667,411 related to triparty repo services for LBI that week. According to JPMorgan, this deficiency resulted in large part from a $15.8 billion repo with Barclays that JPMorgan unwound the morning of September 18 and which Barclays refused to "roll" that evening (the "$15.8 Billion Repo").

22. Against this deficiency, JPMorgan held LBI securities that had a market value according to JPMorgan's records of $27,218,845,261.[7] JPMorgan also had $1,172,404,237 cash from the net result of LBI's daily securities trading activity. Additionally, JPMorgan was secured by LBI's opening cash balance in its clearance account of $2,317,046,527. Thus,

---

[5] Counterclaims of JPMorgan Chase Bank, N.A. in Adversary Proceeding No. 10-03266 [Docket No. 33] at ¶ 2.

[6] Ex. FF, JPMorgan repo analysis.

[7] This number does not include LCPI's securities, including but not limited to the securities known as Kingfisher and SASCO held in the LCD securities account. It should be noted that approximately $122 million of this figure is valued at (potentially depressed) Project Tassimo sales proceeds prices because those securities were not involved in LBI triparty repos the week of September 15.

without ever looking to any of LBHI's pledged collateral, JPMorgan held $30,708,296,025 in LBI cash, incoming payments, and securities collateral to secure its triparty exposure from that week.

23. JPMorgan has claimed that it also had an additional $5 billion in LBI collateral as of September 18, but that it gave away that margin to Barclays because Bob Diamond of Barclays told JPMorgan that Barclays would take over all LBI securities the following day.

24. Thus, JPMorgan should have been overcollateralized by $10 billion, not counting any of LBHI's collateral.

## III. JPMORGAN IMMEDIATELY BLAMES BARCLAYS FOR CAUSING ITS TRIPARTY LOSSES AND ENTERS INTO TWO SETTLEMENT AGREEMENTS WITH BARCLAYS

25. As soon as JPMorgan realized it had been left with outstanding loans to LBI related to the $15.8 Billion Repo with Barclays, it looked to Barclays for compensation. On September 19, 2008, JPMorgan took $7 billion that it had deposited in a Barclays account and moved it to an LBI account as collateral for JPMorgan's exposure. It spent the following weekend negotiating with Barclays, with the help of the Federal Reserve Bank of New York (the "Fed"), resulting in a Services and Settlement Agreement ("SSA") on September 22, 2008 that, among other things, released all claims between them relating to Barclays' decision not to roll the $15.8 Billion Repo.[8] As part of that agreement, Barclays agreed to dismiss a pending lawsuit against JPMorgan worth hundreds of millions of dollars (the "Bear Stearns Lawsuit"). Specifically, the SSA among Barclays, LBI, SIPC, LBHI and JPMorgan, dated September 22, 2008, included the following release between JPMorgan and Barclays:

---

[8]  Ex. B, Services and Settlement Agreement.

> JPMorgan and BarCap shall be deemed to forever release . . . all
> claims . . . that are based in whole or in part on any act, omission,
> transaction or other occurrence taking place on or prior to the date
> hereof in any way relating to the clearing, settlement and other
> processing services provided by JPMorgan to LBI, any
> transactions relating to the Accounts or any cash, securities or
> property in the Accounts, including without limitation any disputes
> relating to a repurchase agreement allegedly agreed to on or about
> September 18, 2008 in respect of approximately $15.8 billion face
> amount of securities . . . .[9]

26.     Over the next several months, JPMorgan and Barclays continued to negotiate over

this dispute. JPMorgan maintained its position that Barclays' actions had caused JPMorgan to be

exposed to the full amount of the deficiency between the loan amount and the value of the

collateral.[10] At no time during this process did JPMorgan ever claim that Lehman was in any

way the cause of the deficiency.[11] Nor did JPMorgan ever claim that the deficiency was

guaranteed by LBHI.[12]

27.     Eventually, on December 5, 2008, JPMorgan and Barclays executed a second

settlement agreement (the "December Settlement Agreement), finally resolving the issues

between them. In that agreement, Barclays reaffirmed its commitment to dismiss the Bear

Stearns Lawsuit, and JPMorgan kept much of the $7 billion in cash it had moved from Barclays'

account, but also transferred to Barclays billions of dollars of securities that Barclays claimed

were owed to it.[13]

---

[9] Ex. B, SSA § 4(a).

[10] Transcript of the August 18, 2011 deposition of Shari Leventhal ("Leventhal Tr.") at
139:5-16, attached hereto as Exhibit C.

[11] Ex. C, Leventhal Tr. at 127:25-129:3; 135:13-17; 139:12-20.

[12] Ex. C, Leventhal Tr. at 189:24-190:6.

[13] Ex. D, December Settlement Agreement § 4(d) and Recital D.

## IV. JPMORGAN LIQUIDATES THE LBI COLLATERAL WITHOUT ANY LIMITS OR SAFEGUARDS ENSURING A FAIR PRICE

28.     On September 19, 2008, the day of the commencement of LBI's SIPA proceeding, JPMorgan began liquidating the LBI collateral that secured its tripatrty repo and intraday financing. JPMorgan termed the liquidation "Project Tassimo" after the coffee maker of one of the JPMorgan employees central to coordination of the project.[14] JPMorgan assigned a group of employees known as the Special Situations Group ("SSG") to oversee the liquidation. Prior to Project Tassimo, the SSG had never before been involved in a project specifically oriented around the liquidation of collateral.[15] And the SSG employee who served as the day-to-day manager of Project Tassimo had only minimal experience with collateral liquidations, having only advised CDO traders before in a single liquidation involving fewer than 10 securities.[16]

29.     Over the four trading days from September 19 to September 24, and before initiating any written procedures or guidelines, JPMorgan sold 1,339 CUSIPs of LBI collateral that secured JPMorgan's triparty repo exposure, generating over half of the sales proceeds ultimately generated by Project Tassimo.

### A. Days into the Process, JPMorgan Sets Forth the Most Minimal of Procedures for the Liquidation of LBI Collateral

30.     On September 24, 2008, four trading days into the liquidation of LBI securities collateral, the SSG issued a three-page memorandum entitled "Project Tassimo Trade Process

---

[14]     Transcript of the June 7, 2011 deposition of John Costango ("Costango Tr.") at 39:2-18, attached hereto as Exhibit E.

[15]     Ex. E, Costango Tr. at 46:8-24.

[16]     Ex. E, Costango Tr. at 52:11-22.

and Procedure" (the "Tassimo Memorandum").[17] The Tassimo Memorandum constituted the only formal written procedures governing Project Tassimo, and it was limited to administrative issues and the information flow between the trading desks and the SSG, such as how the trading desks would receive "trading lists" of the collateral they were tasked with selling and the information the desks were to send back to the SSG, including specified trade documentation for executed trades and information about securities assigned to the wrong desk.

31.     Notably, the Tassimo Memorandum provided no guidance to the traders to ensure that collateral was sold at a fair market price. For example, there was no instruction for when collateral would require a public, rather than private, sale. It did not require any amount or quality of competing bids – or even any bids at all. There was no approval process for any price, and no price was ever deemed too low. In fact, the only policy regarding a floor price for sales through Project Tassimo was a decision made "[a]t some point" by the two senior SSG employees that bids where "people would offer a fraction of a cent for an asset" were "best left not taken."[18] Nor was there any organized effort to evaluate trades for substantive fairness to Lehman. JPMorgan executed thousands of trades during Project Tassimo, but the day-to-day manager of the project could not recall a single transaction that was ever challenged or changed.[19]

---

[17]    A copy of the Tassimo Memorandum is attached hereto as Exhibit F. John Costango, one of the JPMorgan employees primarily responsible for coordinating Project Tassimo, confirmed that he was unaware of any other formal write-up of procedures applicable to Project Tassimo. *See* Ex. E, Costango Tr. at 151:3-9 ("Q.   So other than the document that's attached as an exhibit -- attached to the email that's Exhibit Number 3, you're not aware of any other documents that explain the process by which Tassimo project would go forward; is that correct? A.   That's correct.").

[18]    Ex. E, Costango Tr. at 109:3-22.

[19]    Ex. E, Costango Tr. at 265:2-13.

32.     The traders making all of the decisions on how to liquidate each piece of collateral were not compensated for their efforts.  JPMorgan decided not to allow its traders to make money on the Project Tassimo trades, as they would ordinarily do when trading for clients.[20]  And JPMorgan did not otherwise pay the traders to move the assets.[21]  As one of JPMorgan's senior traders told the SSG, he "wished he didn't have to do [the liquidation] . . . [b]ecause he wasn't going to make any money."[22]  They thus had no incentive whatsoever to locate a fair price.  Their only incentive was to sell the collateral as quickly, and with as little effort, as possible.  As described further below, however, JPMorgan failed to enforce its no-compensation rule effectively.  This combination of no incentive and no enforcement squeezed sales proceeds from both sides, as generally disincentivized traders nevertheless skimmed proceeds off the tops of some trades by flipping them for a profit shortly after purchasing them for their own account.

**B.      JPMorgan Sells Significant Quantities of LBI Collateral to Itself, Often Without Any Competing Bids, Sometimes Re-Selling for a Quick Profit**

33.     There was also no restriction against traders selling the LBI collateral to JPMorgan or its own affiliates, even without competing bids or other checks on the fairness of the price.  In many instances, that is exactly what JPMorgan did.[23]  JPMorgan's records show that

---

[20]     Ex. E, Costango Tr. at 111:23-112:24.

[21]     Ex. E, Costango Tr. at 111:8-11.

[22]     Ex. E, Costango Tr. at 75:4-76:9.

[23]     Despite numerous requests, JPMorgan has refused to identify which of the collateral was sold to JPMorgan and its affiliates.  Objectors' efforts to learn of such self-sales began in earnest on December 21, 2010, when Objectors wrote to JPMorgan seeking the identity of the purchaser of each security and whether the counterparty was JPMorgan itself or one of its affiliates. Ex. G, December 21, 2010 Letter from Scheck to Novikoff.  JPMorgan responded by claiming it had no obligation to identify sales to affiliates because "the LBI Trustee is the

(continued...)

it purchased hundreds of securities for its own account after soliciting three or fewer bids and receiving none.[24]

34.     There was also no prohibition against traders "selling" LBI collateral to JPMorgan itself and then subsequently selling it to a third party at a higher price. Although JPMorgan has withheld the information needed to determine the extent of such profits, what it has produced indicates that it did on occasion profit from subsequent sales of LBI collateral.[25]

---

(...continued)

appropriate person to make such inquiries, not the committee (or LBHI)." Ex. H, January 4, 2011 Letter from Novikoff to Scheck.

After continued meet and confer correspondence, JPMorgan stated that it would produce responsive documents in the Adversary Proceeding and advised Objectors' not to rely on previously provided information because it had "not been thoroughly checked." Ex. I, January 13, 2011 Letter from Novikoff to Scheck. When Objectors pointed out that JPMorgan had still not produced the information requested, JPMorgan would not confirm it was contained in its Adversary Proceeding production. Ex. J, January 21, 2011 Letter from Scheck to Novikoff; Ex. K, February 11, 2011 Letter from Novikoff to Scheck. Finally, after claiming that it did not track sales to affiliates and could not identify them, JPMorgan agreed to produce some of the information requested. Ex. L, March 28, 2011 email from Scheck to Lin; Ex. M, April 1, 2011 Letter from Lin to Scheck.

The first spreadsheet provided six weeks later by JPMorgan, however, is difficult to decipher. Counterparties are identified by abbreviations with no indication of whether each is an affiliate. It only accounts for approximately 1,200 of the securities liquidated through Project Tassimo and clearly includes quantities of each CUSIP in excess of what was actually liquidated. When Objectors pointed out these deficiencies and asked for information needed to decipher it, counsel for JPMorgan represented that no explanatory key was available and that Objectors would have to depose the appropriate individuals to learn what was being conveyed. Ex. N, June 7, 2011 Letter from Scheck to Lin. Moreover, although JPMorgan said that it would provide the same information for the remainder of the Project Tassimo securities, it has not done so. It has provided only two additional spreadsheets, covering an additional approximately 600 CUSIPs, which suffer from the same deficiencies and issues as the first.

Thus, while Objectors know from select documents, such as those described below, that JPMorgan sold LBI collateral to itself, JPMorgan has thus far withheld the information needed to determine the full scope of such sales.

[24]   Ex. O, Treasury Bidlist; Ex. P, CMO Bidlist.

[25]   Objectors have requested this information from JPMorgan repeatedly, but JPMorgan has not provided it, as described in footnote 23 above.

35.     For each Project Tassimo sale, JPMorgan booked two trades.[26] The first trade was booked from "TSS" – JPMorgan's Treasury and Securities Services line of business – to a JPMorgan trading desk. JPMorgan then booked a second trade on the same day from the JPMorgan trading desk to the client purchasing the asset (unless JPMorgan was purchasing the position itself, in which case only one trade would be booked for the day). According to the SSG employee coordinating Project Tassimo, these two trades should always have been at identical prices.[27] JPMorgan did not enforce this requirement effectively, however, failing even to track situations where traders purchased collateral and did not immediately sell it out at the same price.[28] And documents produced by JPMorgan show trades where the second sale was at a higher price, indicating that JPMorgan booked an immediate profit.[29] While there may be examples where the second "sale" generated a loss, JPMorgan's records indicate this occurred far less often than gains on the second sale.

36.     In the months following the September 24, 2008 distribution of the Tassimo Memorandum, JPMorgan liquidated almost all of the rest of LBI's collateral, except for certain securities turned over to LBHI pursuant to the Collateral Disposition Agreement ("CDA"), as described below. JPMorgan ultimately executed 4,266 trades selling LBI securities it was holding as collateral for a total recovery of $18,351,408,054, plus $716,885,327 from corporate

---

[26]   Ex. E, Costango Tr. at 104:10-20.

[27]   Ex. E, Costango Tr. at 106:11-22. When asked whether he thought it would be okay if JPMorgan purchased a security and then resold it for a profit the same day, the SSG witness testified that it "would not be in the spirit of the instructions." *Id.* at 117:6-20.

[28]   Ex. E, Costango Tr. at 117:6-118:11.-

[29]   Ex. Q, Spreadsheet produced by JPMorgan showing purchases and sales of securities through Project Tassimo (the "Buy/Sell Spreadsheet").

actions and redemptions and $304,802,836 from principal and interest payments received by JPMorgan.[30]

## V. THE PARTIES EXECUTE THE CDA AND JPMORGAN FILES ITS REVISED PROOFS OF CLAIM

37.     On March 16, 2010, JPMorgan and LBHI executed the CDA, which was approved by the Court on March 24, 2010 [Docket No. 7785]. Pursuant to the CDA, JPMorgan transferred to LBHI the remainder of the LBI collateral that JPMorgan had not liquidated (along with all of the securities posted as collateral by LBHI to secure its purported guaranty of LBI's clearance obligations). These unsold securities included the LBI collateral referred to as RACERS, which had a par value of $5 billion.

38.     On March 31, 2010, JPMorgan filed its amended and restated Proof of Claim No. 4939 against LBI seeking a deficiency of $6,333,781,099 remaining after the disposition of the LBI collateral through Project Tassimo and the CDA. On April 1, 2010, JPMorgan filed Proof of Claim No. 66462 against LBHI, seeking the same deficiency from LBHI pursuant to the August Guaranty and Security Agreement. As a result of the CDA, these Deficiency Claims have now been provisionally satisfied, primarily by applying LBHI cash collateral. Objectors reserved their rights, however, to challenge all claims and seek return of the collateral.

## Objection

39.     In their review of the claims filed on the claims register in these chapter 11 cases and maintained by the Court-appointed claims agent, the Objectors have identified the Deficiency Claims and claims for postpetition interest as claims that should be reduced or disallowed.

---

[30]  Some of these proceeds were transferred by JPMorgan to Barclays pursuant to the December Settlement Agreement.

## I.    JPMORGAN'S LIQUIDATION OF LBI COLLATERAL WAS COMMERCIALLY UNREASONABLE

### A.    Legal Standards for Liquidation of Collateral

40.    According to New York's Uniform Commercial Code ("U.C.C."),[31] "[a]fter default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing." N.Y. U.C.C. Law § 9-610(a) (McKinney). The U.C.C. requires that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." *Id.* § 9-610(b). "If the secured party's compliance is placed in issue, the secured party has the burden of establishing that the collection, enforcement, disposition, or acceptance was conducted in accordance with this part." *Id.* § 9-626(a)(2); *see also id.* § 9-626(a)(1) ("A secured party need not prove compliance with the provisions of this part relating to collection, enforcement, disposition, or acceptance unless the debtor or a secondary obligor places the secured party's compliance at issue."). As this Objection places at issue JPMorgan's compliance with section 9-610 of the U.C.C., JPMorgan has the burden of establishing that its disposition complied with the commercial reasonableness requirement contained in that section.[32] *Ford Motor Credit Co., Inc. v. Racwell Const., Inc.*, 24 A.D. 3d 500, 501 (2d Dep't

---

[31]    Many of the cases cited in this Objection were decided under the previous version of the NY U.C.C. or under the U.C.C. as adopted in other jurisdictions. Unless the differing statute substantively affects the legal analysis involved, however, the Objection will not make note of this fact.

[32]    Under the U.C.C., LBHI, as guarantor of LBI's obligations to JPMorgan, has independent standing to object to the commercial reasonableness of JPMorgan's disposition of LBI collateral. Section 9-625 of the U.C.C., titled "Remedies for Secured Party's Failure to Comply with Article," grants rights to "debtors" and "obligors" to bring actions against secured creditors. *See id.* § 9-625(c)(1) ("[A] person that, at the time of the failure, was a debtor, was an obligor, or held a security interest in or other lien on the collateral may recover damages under
(continued...)

2005) (citing NY U.C.C. § 9-626(a)(2) and holding that creditor had not met its burden of proving propriety of a deficiency judgment).

41.    If a secured creditor disposes of collateral in a commercially unreasonable manner, damages are determined by calculating the difference between the value actually received for the collateral and the fair market value of the collateral. *Bank of China v. Chan*, 937 F.2d 780, 787-88 (2d Cir. 1991) ("Normally, when a debtor has defaulted and the creditor has repossessed the collateral then disposed of it unreasonably, the proper way to calculate the effect of the unreasonable acts is to prove the fair market value of the collateral . . . and then subtract the value actually received in order to calculate the loss."). The secured creditor bears the burden of proving the fair market value of the collateral used to determine damages, in the face of a presumption that the collateral is worth the full amount of the debt. *Gen. Elec. Credit Corp. v. Durante Bros. & Sons, Inc.*, 79 A.D. 2d 509, 510-11 (1st Dep't 1980) ("[T]here is a presumption

_____

(...continued)

subsection (b) for its loss . . . ."). As both "debtors" and "obligors" for purposes of this section, guarantors have the right to bring actions against secured creditors.

Under New York law, a guarantor has an interest in the collateral and therefore meets the definition of "debtor" under section 9-102(28). *See Marine Midland Bank v. CMR Indus., Inc.*, 159 A.D.2d 94, 106, (2d Dep't 1990) ("In our view, a guarantor is a 'debtor' within the definition set forth in Uniform Commercial Code § 9-105(1)(d)") (decided under previous version of the N.Y. U.C.C.); *Chase Manhattan Bank, N.A. v. Natarelli*, 93 Misc. 2d 78, 89, 401 N.Y.S.2d 404, 412 (N.Y. Sup. Ct. 1977) ("This court is of the opinion that the better rule is the one arrived at in the majority of jurisdictions and, accordingly, holds that a guarantor is a "debtor" within the meaning of U.C.C. §§ 9-105(1)(d) and 9-504(3) and entitled to notice of the disposition of the collateral."). Similarly, because a guarantor owes "payment or other performance" of the guaranteed obligation and is "accountable in whole or in part for payment or other performance" of that obligation, a guarantor thus falls under the definition of "obligor." *See e.g., Tropical Jewelers, Inc. v. Nationsbank, N.A.*, 781 So. 2d 392, 394 (Fl. App. 2000) ("Certainly a guarantor is a person who owes 'payment or other performance . . .'"). Therefore, under both the definition of "debtor" and "obligor," a guarantor has standing to bring private rights of action pursuant to the U.C.C., including as a defense to a deficiency claim. *See* N.Y. U.C.C. §§ 9-625(b), (c), 9-626(a)(2); *see also Marine Midland Bank, N.A. v. Kristin Int'l Ltd.*, 141 A.D. 2d 259, 261-63 (4th Dep't 1988) (holding that the guarantor is a debtor under the U.C.C. and thus cannot waive the defense of commercial reasonableness).

that the security was equal to the debt and . . . the secured party has the burden of proof to overcome such presumption.") (quoting *Security Trust Co. v. Thomas*, 59 A.D.2d 242, 246 (4th Dep't 1977)).

42. The Southern District of New York has applied this "rebuttable presumption" rule to determine the deficiency where a secured creditor has failed to meet the standards of the New York U.C.C. in disposing of collateral. *Siemens Credit Corp. v. Marvik Colour, Inc.*, 859 F. Supp. 686, 691-92 (S.D.N.Y. 1994) (noting that the majority of New York courts have adopted the rebuttable presumption approach and agreeing with Judge Easterbrook of the 7th Circuit that federal courts should do the same). It has also, however, provided the debtor an opportunity to prove any damages caused by the secured creditor's failure to comply with the requirements of the U.C.C. – sometimes called the "setoff" rule. *Id.* at 691-92 (describing the setoff rule and explaining that "[c]ombining the rebuttable presumption rule and the setoff rule best balances the interests at stake").

**B. JPMorgan's Process for Liquidation of the Collateral Was Commercially Unreasonable**

43. "The primary focus of commercial reasonableness is . . . the procedures employed for sale." *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 545 (S.D.N.Y. 2001) (quoting *In re Zsa Zsa Ltd.*, 352 F. Supp. 665, 671 (S.D.N.Y. 1972)) (denying secured creditor's motion for summary judgment that its disposition was commercially reasonable).

44. JPMorgan did not dispose of LBI's collateral in a commercially reasonable manner or through commercially reasonable methods. As described above, JPMorgan failed to institute any procedures to ensure a fair price was obtained. It did not require any independent verification of price or solicitation of adequate bids in an auction process. There was no substantive review process. It did not use an independent third party agent. Instead, JPMorgan

left the sales entirely to the discretion of its own traders, who were supposed to receive no compensation for the work and lacked any incentive to maximize recovery. The drive to get rid of the LBI collateral as quickly as possible was no doubt magnified by the "sense of urgency" that the Project Tassimo coordinators communicated to the traders.[33]

45. Indeed, JPMorgan instituted almost no centralized process or procedure at all. Neither the SSG nor the trading desks created formal processes for traders to follow as they liquidated the LBI securities. The bare minimum procedures that were instituted through the Tassimo Memorandum were almost purely logistical, and even so JPMorgan did not distribute them to its trading desks until after JPMorgan's traders had executed over 1,300 trades.[34]

46. Under these circumstances, at least some traders made it clear to potential buyers that they were willing to sell at below-market prices. For example, a Lehman employee was forwarded an October 1, 2008 email from a representative of Church Street Advisors, a fund specializing in structured finance projects. In the email, a Church Street representative describes bonds to be sold by JPMorgan, explaining that "JP Morgan has acquired the bonds in question as a result of a Lehman repo default."[35] The email states that JPMorgan had already sold a $70 million position in the bonds and suggests that the next $100 million JPMorgan sells "will go for an even lower price because JPM acquired them at a significant discount pursuant to the repo transaction . . . and has stated that they do not have a lot of price sensitivity."[36]

---

[33] Ex. E, Costango Tr. at 269:6-9.

[34] Ex. F, Tassimo Memorandum cover email, showing it was distributed at 9:14 p.m. on September 24, 2008. *See also* Ex. R, Project Tassimo Masterfile.

[35] Ex. S, Email from Seery to Antoncic.

[36] Ex. S, Email from Seery to Antoncic.

47.     Because JPMorgan failed to employ adequate procedures that would reasonably

lead to ensuring it received a fair market price for LBI's collateral, its disposition of that

collateral was unreasonable. *New Jersey Bank, N.A. v. Verano*, 120 A.D.2d 505, 506 (2d Dep't

1986) (denying secured creditors motion for summary judgment because of "a valid dispute as to

whether the methods chosen by the plaintiff for the disposition of the [collateral] were

commercially reasonable").

**C.      JPMorgan Sold LBI Collateral at Commercially Unreasonable Prices**

48.     "[A] low price suggests that a court should scrutinize carefully all aspects of a

disposition to ensure that each aspect was commercially reasonable." N.Y. U.C.C. § 9-610 cmt.

10.  Consequently, at least one treatise has found that price is "the single most important fact in

most . . . cases – even in cases where it is not identified as the basis for the court's finding of

noncompliance." 4 White & Summers, Uniform Commercial Code § 34-11 (6th ed.).  Given the

lack of procedures or incentive for traders to maximize sales prices, it comes as no surprise that

securities were sold at prices far below their fair market value at the time.

49.     For example, on September 26, 2008, a JPMorgan trader sold a position in a AAA

rated security issued by the restaurant chain Applebees.  JPMorgan sold approximately $200

million par amount of the security to a client at a price of 50.00, netting approximately $100

million in sale proceeds.[37]  JPMorgan's independent, third-party pricing vendor Gifford Fong

priced the same bond at 92.15 as of that same day, nearly twice the price at which JPMorgan sold

the bond.[38]  And just the prior week, JPMorgan had valued the bond at approximately 66.5 for

---

[37]  Ex. R, Project Tassimo Masterfile, row 2017.

[38]  Ex. T, Gifford Fong Pricing Spreadsheet, row 1026.

purposes of LBI's overnight financing.[39]  Compared against the JPMorgan price, the sale created

a loss of over $33 million, and compared to the contemporaneous Gifford Fong price, the sale

lost over $80 million.  The trader's documentation of the trade includes the note "1 account

shown" — apparently indicating that the trader involved did not solicit bids on the security from

more than a single potential buyer.[40]

50.      Similarly, JPMorgan sold another corporate bond, issued by Mobile Satellite

Ventures (now SkyTerra), at a below-market price.  On September 17, 2008, JPMorgan had

priced the bond at 59.00 for purposes of LBI's $15.8 Billion Repo with Barclays.[41]  As of

September 26, Gifford Fong priced the bond at 60.00.[42]  Nevertheless, on September 29,

JPMorgan sold a par position of a little over $49 million at a price of just 3.00 – a 95% discount

from the Gifford Fong price – for sales proceeds of under $1.5 million.[43]  Compared to the price

assigned to the security for the $15.8 billion repo, that represents a loss of over $27.5 million in

Lehman collateral value.  Moreover, JPMorgan sold approximately half of this position to itself

at this very low price.[44]

51.      JPMorgan's sales at below-market prices further demonstrate that JPMorgan

failed to dispose of LBI's collateral in a commercially reasonable manner.  *FDIC v. Forte*, 94

---

[39]  Ex. R, Project Tassimo Masterfile, row 2017.

[40]  Ex. U, Trade Documentation for CUSIP 037898AB9.

[41]  Ex. V, $15.8 Billion Repo PLOW Report.

[42]  Ex. T, Gifford Fong Pricing Spreadsheet, row 4507.

[43]  Ex. R, Project Tassimo Masterfile, row 6197; Ex. Q, Buy/Sell Spreadsheet, rows 4157-4158.

[44]  Ex. Q, Buy/Sell Spreadsheet, rows 4157-4158.  JPMorgan made a similar trade with a bond issued by AMD.  For LBI's secured financing the week of September 15, JPMorgan assigned the bond a price of 58.875, but sold the nearly $120 million par amount on September 24 at an even 30, half to itself and half to another purchaser a short time later.  Ex. R, Project Tassimo Masterfile, row 573; Ex. Q, Buy/Sell Spreadsheet, rows 44-46.

A.D.2d 59, 66 (2d Dep't 1983) ("[A] wide or marked discrepancy between the sale price and the value of the property will trigger close scrutiny even in the face of procedural propriety.").

### D. JPMorgan Improperly Sold LBI Collateral To Itself

#### 1. Legal Standards for Self-Sales

52.     The U.C.C. also limits a secured creditor's ability to dispose of collateral by selling to itself and claiming a deficiency.  Courts analyzing whether a creditor's disposition of collateral was commercially reasonable regularly consider whether there was an opportunity for "self dealing" and more closely inspect the circumstances of dispositions where the secured creditor sells the collateral to itself or a related person or entity. *See Central Budget Corp. v. Garrett*, 48 A.D.2d 825, 825-26 (2d Dep't 1975) (holding that creditor's sale to a successor of the original lender was a factor in denying recovery in a suit for a deficiency judgment under the predecessor statute to N.Y. U.C.C. § 9-610).  Extra scrutiny for commercial reasonableness is especially warranted if the secured party or its affiliates then resold collateral at a profit.  For example, in *Primavera*, the fact that the secured party "bought several securities itself and then resold them to [a third-party] at a profit of just under $500,000--or just over 2%--later the same day [was] evidence that [the secured party] may have failed to maximize the return on the Funds' securities in the liquidation." 130 F. Supp. 2d at 546. *See also In re Solfanelli*, 230 B.R. 54, 67-68 (M.D. Pa. 1999) (finding a secured party acted in a commercially unreasonable manner where its agent sold a majority of securities to itself and then resold them at higher price two days later), *aff'd*, 203 F.3d 197 (3d Cir. 2000).

53.     According to the U.C.C., a secured creditor can purchase collateral "at a private disposition only if the collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations." NY U.C.C. § 9-610(c)(2); *see also In re Stedman*, 264 B.R. 298, 301 (Bankr. W.D.N.Y. 2001) (holding that purchase of the assets

of a pesticide company by a secured creditor at private sale was a commercially unreasonable disposition). The term "recognized market" means "one in which the items sold are fungible and prices are not subject to individual negotiation." NY U.C.C. § 9-610 cmt. 9. The Official Comments use the New York Stock Exchange as an example. *Id.* "Courts treat the term 'recognized market' restrictively." *FDIC v. Blanton*, 918 F.2d 524, 528 (5th Cir. 1990) (holding under Texas's version of the U.C.C. that the New York Stock Exchange was a recognized market); *Marine Midland Bank-Rochester v. Vaeth*, 388 N.Y.S.2d 548 (N.Y. Sup. 1976) (finding the sale of stock on the New York Stock Exchange was a sale of "collateral . . . of a type customarily sold on a recognized market").

54.     Courts have interpreted these provisions of the U.C.C. to prevent a secured party from disposing of collateral to itself at a private sale unless the collateral consists of "widely traded" securities. *See Chittenden Trust Co. v. Andre Noel Sports*, 621 A.2d 215, 218 (Vt. 1992) ("This exception generally applies to widely traded stocks, bonds or commodities sold in recognized markets, where the prices are fixed and therefore not subject to manipulation by the secured party."); *Hertz Comm. Leasing Corp. v. Dynatron, Inc.*, 37 Conn. Sup. 7, 13 (1980) ("It would seem that the only items logically included in this category would be widely traded stocks and bonds.").

55.     Moreover, a sale is a "public disposition" where "the price is determined after the public has had a meaningful opportunity for competitive bidding. 'Meaningful opportunity' is meant to imply that some form of advertisement or public notice must precede the sale . . . and that the public must have access to the sale." NY U.C.C. § 9-610 cmt. 7. Thus, in order for a sale to qualify as a "public disposition," the secured creditor must invite the general public. *Ford Motor Credit Co. v. Soloway*, 825 F.2d 1213, 1218 (7th Cir. 1987) (holding that automobile

auction that only automobile dealers were invited to attend did not qualify as a public sale); *John Deery Motors, Inc. v. Steinbronn*, 383 N.W.2d 553, 554-55 (Iowa Sup. Ct. 1986) (same).

### 2. JPMorgan Improperly Sold Illiquid Securities to Itself Through Private Sales

56. In contravention of the U.C.C.'s rules regulating self-sales, JPMorgan often sold itself LBI collateral that lacked standardized pricing through private dispositions. First of all, JPMorgan did not use anything close to a public disposition for any of the collateral sales. The day-to-day coordinator of Project Tassimo testified that JPMorgan never did anything to publicize the sale of any of the LBI collateral to the general public.[45] Furthermore, in an October 15, 2008 email between the two senior JPMorgan employees in the SSG, the day-to-day manager of the project asked to speak to his immediate supervisor regarding, among other things, "Tassimo - public auction process for select positions."[46] He explained that, as of that mid-October, JPMorgan was "considering a public auction process for some of the positions in the Tassimo pool."[47] By that time, however, JPMorgan had already sold securities making up approximately 86% of the total sales proceeds the entire liquidation would generate.

57. Moreover, much of the LBI collateral liquidated by JPMorgan did not trade on an exchange and did not consist of "widely traded" securities. For example, it appears that over 30% of the securities JPMorgan liquidated lacked any price information available through Bloomberg. Because most of the LBI securities were not exchange-traded or subject to widely distributed price quotations, the U.C.C. did not permit JPMorgan to sell the collateral to itself through private dispositions.

---

[45] Ex. E, Costango Tr. at 209:18-210:6.

[46] Ex. W, October 14, 2008 Email from Costango to Lansing.

[47] Ex. E, Costango Tr. at 205:13-206:21.

58.     As described above, JPMorgan sold at least some of these securities to itself.[48]
On January 26, 2009, for example, a JPMorgan trader wrote to the SSG:

> We bought three bonds from Tassimo on December 12 without
> relying on an auction process. All three of the bonds were from
> the JPMCC 06-FL1 trust, where we had other mezzanine tranches
> in our trading position as of the 12th. Specifically, we were long
> (and offering to clients) Classes H and J.[49]

This reveals two things. First, not only did JPMorgan not use a "public disposition" to sell these

bonds to itself, it bought them without showing them to any other potential buyers. It also

suggests, however, that JPMorgan chose to purchase the bonds without showing them to anyone

in the market for strategic reasons related to its existing holdings of more junior tranches of the

same issues.[50]

59.     Clearly these securities were not "customarily sold on a recognized market or the

subject of widely distributed standard price quotations." NY U.C.C. § 9-610(c). They were

commercial mortgage-backed securities packaged by JPMorgan itself. Despite the fact that

JPMorgan undoubtedly served as a market-maker for the bonds, the SSG employee explained in

relatively contemporaneous emails that "there was no bid out there for bonds like this at the

time."[51] In other words, the bonds were highly illiquid and were not subject to widely distributed

price quotations. JPMorgan's purchase of these bonds at the most private of sales clearly

violated section 9-610(c) of the New York U.C.C.

---

[48] Although JPMorgan has thus far withheld information needed to understand the scope
of such sales, it is clear that it was a material amount. *See* Footnote 23.

[49] Ex. X, January 26, 2009 Email from Taylor to Costango.

[50] In other words, showing these particular securities to the market could have
negatively impacted JPMorgan's other holdings in the same securitization, so it chose to buy
them quietly itself.

[51] Ex. Y, January 9, 2009 Email from Costango to Taylor.

60.     Even where JPMorgan showed LBI collateral to other potential buyers before purchasing the collateral itself, it often did so through private dispositions using commercially unreasonable practices.  For example, the SSG would sometimes synthesize bidding information into bid lists showing the number of bids solicited and the bids received.  One such bid list reports on JPMorgan's sales of CMOs on September 24, 2008 (the "CMO Bid List").  The CMO Bid List shows 140 different CMO securities sold by a particular JPMorgan trader.[52]  For each of the securities, the trader appears to have solicited bids from only three different potential buyers.[53]  JPMorgan received bids for only 19 of the 140 CUSIPs, however, with all three potential bidders passing on the remaining 121.  For each of those 121 CUSIPs, the notation under "Comments" on the bid list reads "JPM Buys – No bids,"[54] apparently indicating that JPMorgan purchased the securities itself after soliciting only three bids from non-brokers and receiving none.

61.     Another bid list appears to cover treasury securities (the "Treasury Bid List").[55] The Treasury Bid List includes 199 securities.  For 173 of those securities, the "Bid #3" column states that the security "[o]nly went to two bidders."[56]  Of the 173 securities for which JPMorgan solicited only two bids, the Treasury Bid List indicates that both bidders passed on 150 and, for

---

[52]   Ex. P, CMO Bidlist at JPM-LBHI01379097-100.

[53]   JPMorgan appears to have solicited bids from ███████████ and ███████████, both hedge funds, and ████████, a reinsurance group.  *See* Ex. P, CMO Bidlist at JPM-LBHI01379101-102.

[54]   Ex. P, CMO Bidlist at JPM-LBHI01379097-100.

[55]   Ex. O, Treasury Bidlist at JPM-LBHI01299867-870.

[56]   The bidders appear to have been ██████ and █████████████████████████. Ex. O, Treasury Bidlist at LBHI-JPM01299872 (showing columns for ████████ and ███████).  The trader apparently solicited three bids for the other 26 CUSIPs.

each of those securities, the "Comments" column indicates "Sold to JPM."[57] JPMorgan's decision to solicit only two bids for 173 securities and then purchase almost ninety percent of them itself after both bidders passed was a commercially unreasonable private sale of LBI collateral to itself and highly unlikely to have yielded the best price available.

### 3. JPMorgan Unjustly Enriched Itself by Selling Collateral to Itself and Then Re-Selling it Shortly Thereafter at a Profit

62.      A secured creditor has an obligation to act in the "mutual best advantage" of itself and the debtor when disposing of collateral. *Garrett*, 48 A.D. 2d at 825-26 (quotations omitted). A creditor may not use the collateral disposition as a means of profiting at the expense of the debtor. These principles have led courts to find that a creditor or its agent buying collateral at one price and then reselling it shortly thereafter at a profit is weighty evidence that the disposition was commercially unreasonable. *See, e.g., In re Solfanelli*, 230 B.R. 54, 67-68 (M.D. Pa. 1999) (upholding bankruptcy court finding of commercial unreasonableness where broker hired by secured creditor to dispose of collateral purchased the collateral itself and then resold it two days later at a half a million dollar profit). For example, the District Court for the Southern District of New York denied a motion for summary judgment by a secured creditor on the issue of commercial reasonableness, in part because the secured creditor "bought several securities itself and then resold them to [another company] at a profit of just under $500,000-or just over 2%-later the same day," noting that "this is evidence that [the secured creditor] may have improperly diverted profits to itself." *Primavera*, 130 F. Supp. 2d at 546.

63.      Based on the still-incomplete information Objectors have to date, it is clear that JPMorgan "flipped" many securities for a quick profit. For example, the spreadsheets produced

---

[57]      Ex. O, Treasury Bidlist at JPM-LBHI01299867-870.

by JPMorgan purporting to show counterparty information for Project Tassimo trades include information on a Fannie Mae bond with CUSIP number 3128X7QP2. On September 23, 2008, a JPMorgan trading desk purchased $18.475 million par amount of this security from TSS at a price of 95.25. JPMorgan's records show that the entire position was resold the very same day to ████████ at a price of 97.873.[58] The sale of the security from the LBI collateral pool to JPMorgan generated a loss of over $1.3 million against the value JPMorgan assigned to the position when it lent against it the week before,[59] but by purchasing the collateral and then reselling it the very same day, JPMorgan booked a profit of almost $500,000.[60] The following day, JPMorgan executed a nearly identical and impermissible series of self-serving transactions. JPMorgan purchased another $5.825 million face amount of the same bond from the LBI collateral pool on September 25 at a price of 95, reselling it the same day at 97.25, netting another profit of over $131,000.[61]

64. Even the incomplete records provided thus far by JPMorgan contain many other examples:

- On September 22, 2008, JPMorgan bought a $148.975 million position of a Fannie Mae bond with CUSIP number 313586RC5 at a price of 32.295 and made over $19 million by reselling the entire position the next day at a price of 45.3.[62]

- JPMorgan purchased $9.595 million face amount of a bond with CUSIP number 34073NWZ9 at a price of 80 and resold the entire position the next day at a price of 90, netting nearly $1 million.[63]

---

[58] Ex. Q, Buy/Sell Spreadsheet, rows 939-40 .

[59] Ex. R, Project Tassimo Masterfile, row 4785.

[60] In fact, JPMorgan's records suggest that it sold the same par amount just a day later at a price of over 101. Ex. Q, Buy/Sell Spreadsheet, rows 939-44. Comparing to that sale, JPMorgan netted nearly $800,000 in profit.

[61] Ex. Q, Buy/Sell Spreadsheet, rows 942-43.

[62] Ex. Q, Buy/Sell Spreadsheet, rows 1703-96.

- JPMorgan sold itself $25 million face amount of a bond with CUSIP number 3134A4ZZ0 on September 25 at a price of 91, selling $10 million face amount that day at 93.776 and the remaining $15 million face amount the following day at 94.2133, pocketing over $765,000.[64]

- JPMorgan purchased $12.7 million face amount of bond with CUSIP number 13034PFY8 at a price of 84 and sold $12 million of the position the next day at 93.525, for a quick profit of over half a million dollars.[65]

- On October 22, JPMorgan sold $20 million face amount of a CMO with CUSIP number 525245AP1 to itself at a price of 35, reselling it just two days later at a price of 44, yielding a return of over $1.5 million.[66]

- JPMorgan purchased two different municipal bonds as of September 24 within two minutes of one another and resold them both the next day within one minute of each other to the same counterparty at prices over 10% higher than the purchase price. All told, JPMorgan made nearly $1.5 million on the trades.[67]

- On September 25, JPMorgan purchased $5 million face amount of a security with CUSIP number 4041A2AG9 at a price of 45, reselling nearly half of the position that day at 50 and the remainder the next day at 55 for a total profit of over $385,000.[68]

- JPMorgan sold itself $6.495 million face amount of a municipal security with CUSIP number 46246BHP0 from the LBI collateral pool at a price of 80 on

---

(...continued)

[63] Ex. Q, Buy/Sell Spreadsheet, rows 2418-20. Although the dates on the Buy-Sell Spreadsheet are difficult to decipher, the "AsOf_Dt" column appears to comport with the sale date as recorded in the Tassimo Masterfile. Compared to the price assigned by JPMorgan for LBI's secured financing just the prior week, the self-sale lost over $1.7 million in collateral value. Ex. R, Project Tassimo Masterfile, row 1483.

[64] Ex. Q, Buy/Sell Spreadsheet, rows 1696-98. The loss of collateral value compared to the price JPMorgan assigned the security the week before was over $1.6 million. Ex. R, Project Tassimo Masterfile, row 5216.

[65] Ex. Q, Buy/Sell Spreadsheet, rows 535-36. JPMorgan's sale of this bond to itself resulted in a loss of nearly $3 million compared to the price assigned by JPMorgan for triparty repo trades the week before. Ex. R, Project Tassimo Masterfile, row 4902.

[66] Ex. Q, Buy/Sell Spreadsheet, rows 3778-80. The loss of collateral value from JPMorgan's purchase of this security was over $3.9 million.

[67] Ex. Q, Buy/Sell Spreadsheet, rows 3968-69 and 3972-73.

[68] Ex. Q, Buy/Sell Spreadsheet, rows 2784-86.

September 24 and then resold it the next day at 90, pulling in over $650,000 overnight.[69]

- JPMorgan purchased $8.985 million face amount of a bond with CUSIP number 57419NU77 at a price of 80 and sold it two days later at 87 for a profit of over $630,000.[70]

- JPMorgan bought positions in two bonds from the LBI collateral pool on consecutive days and resold them each the day after purchasing them to the same counterparty, yielding over $1.6 million on the flips.[71]

- JPMorgan purchased $7.175 million par amount of a bond with CUSIP number 924195P53 at a price of 77 and sold it two days later at 90, for a profit of over $930,000.[72]

65. Needless to say, JPMorgan should not be permitted to use self-dealing in its collateral disposition to enrich itself at the expense of LBHI's other creditors. *See Dougherty v. 425 Dev. Assocs.*, 93 A.D.2d 438, 446-48 (1st Dep't 1983) (denying summary judgment on unjust enrichment claim where secured creditor sold collateral to a nominee).

### 4. JPMorgan Improperly Sold Securities to Itself at Steep Discounts

66. Even where JPMorgan did not immediately resell securities it bought through Project Tassimo, it appears that JPMorgan often bought them at below-market prices. For example, in December 2008, JPMorgan purchased from the LBI collateral pool a $113.45 million par amount position in a general obligation bond of Georgetown University, CUSIP number 254839UE1, at a price just over 70.[73] In September 2008, Gifford Fong priced the bond at 80.81.[74] Had JPMorgan purchased the bond at Gifford Fong's price, it would have generated

---

[69] Ex. Q, Buy/Sell Spreadsheet, rows 3154-55.

[70] Ex. Q, Buy/Sell Spreadsheet, rows 3970-71.

[71] Ex. Q, Buy/Sell Spreadsheet, rows 4169-72.

[72] Ex. Q, Buy/Sell Spreadsheet, rows 8940-42.

[73] Ex. Q, Buy/Sell Spreadsheet, row 85.

[74] Ex. T, Gifford Fong Pricing Spreadsheet, row 749.

approximately $12 million of additional collateral value. By the time JPMorgan purchased the bond, however, it was probably worth at or near par. S&P had upgraded its rating to A- in September 2008, and the bond was backed directly by Georgetown University's $899 million endowment and impliedly by Washington D.C. In fact, the bond paid off at par just nine months after the sale date. Assuming it still held the bond when it was called, JPMorgan made a return of approximately 60% when the benchmark index was returning less than 6%. Had JPMorgan bought the bond at par instead of the steeply discounted price of 70, it would have created an additional $33.7 million in collateral value.

67. As another example, JPMorgan purchased a security issued by AIG Matched Funding Corp.[75] for its own account on September 24, at a discounted price of 82.50. The bond paid off at par just twelve days later, netting JPMorgan nearly $8.5 million – resulting in an implied yield of 35,000%. By September 24, 2008, the Federal Reserve had issued AIG a two year line of credit up to $85 billion, of which only $18 billion had been drawn as of September 18, 2008.[76] On September 23, 2008, Fed Chairman Bernanke testified before Congress that, "in light of the prevailing market conditions and the size and composition of AIG's obligations, a disorderly failure of AIG would have severely threatened global financial stability and, consequently, the performance of the U.S. economy."[77] With the federal government's assistance in place for AIG, there was no justification for the dramatic discount JPMorgan applied to this security.

---

[75] CUSIP number 001383DN5.

[76] Ex. Z, Federal Reserve Press Release.

[77] Ex. AA, September 23, 2008 Testimony of Ben Bernanke before the Senate Committee on Banking, Housing, and Urban Affairs.

68.     Still further examples demonstrate both JPMorgan's commercially unreasonable process for liquidating the collateral and its self-dealing.  On several days, for example, JPMorgan sold itself large numbers of positions in CMOs and ABSs in bulk, all at the same low price:

- On October 28, 2008 JPMorgan sold itself 71 separate CMO and ABS positions with a cumulative par value of over $600 million, all at the same price of 2.046875.[78]

- On October 31, JPMorgan sold itself 74 separate CMO and ABS positions with a cumulative par value of over $650 million, all at the same price of 2.23.[79]

- On November 12, JPMorgan sold itself 32 separate CMO and ABS positions with a par value in excess of $110 million, all at the same price of 3.015625.[80]

- On November 14, it sold itself 44 separate CMO and ABS positions with a cumulative par value of over $100 million, all at the same price of 1.761.[81]

The fact that JPMorgan would sell large numbers of different positions to itself at the same low price implies there was little diligence or analysis done on the securities being sold to confirm the price was reasonable and fair to Lehman creditors.  In a normal sale, each of these securities would have fetched different prices, based on their individual characteristics and values.  Instead, JPMorgan appears to have sold itself these securities at fire sale prices without putting in the work to value each CUSIP individually.

69.     It appears that JPMorgan decided on the prices without reference to the individual CUSIPs and then applied those prices across multiple CUSIPs when it bought the securities.  This bulk self-sale of illiquid collateral was not commercially reasonable.  Most of the collateral

---

[78]  Ex. Q., Buy/Sell Spreadsheet, multiple rows.

[79]  Ex. Q., Buy/Sell Spreadsheet, multiple rows.

[80]  Ex. Q., Buy/Sell Spreadsheet, multiple rows.

[81]  Ex. Q., Buy/Sell Spreadsheet, multiple rows.

sold in this manner does not have any publicly available pricing information. Of the 221 securities sold in bulk at the prices listed above, Objectors have been able to find Bloomberg pricing for only three. JPMorgan sold all three of those securities to itself at a price of 1.761. Bloomberg priced them as of the date of sale at 7.4375, 8.96875 and 8.9375, respectively. Had JPMorgan used the Bloomberg prices of just those three securities to sell to itself instead of its artificially discounted price, it would have reduced the deficiency by almost half a million dollars.

70.    In summary, JPMorgan's collateral disposition was commercially unreasonable. JPMorgan had almost no centralized planning and procedures for the sale. Its traders then used commercially unreasonable practices to sell the collateral, including by impermissibly selling collateral to JPMorgan itself through private dispositions. As a result of these flawed methods, JPMorgan harmed LBHI's creditors by failing to recover a reasonable amount of sales proceeds from the LBI collateral. At the same time, JPMorgan used self-dealing to enrich itself both in the short term by flipping collateral for a quick profit and also in the longer term, by purchasing collateral for its own accounts at prices far below fair market value. As a result, JPMorgan's Deficiency Claims against LBHI and LBI should be reduced substantially, in an amount to be determined by the Court following full discovery into JPMorgan's disposition of LBI's collateral.

## II.    JPMORGAN'S DEFICIENCY CLAIMS INCLUDE LOSSES CAUSED SOLELY BY BARCLAYS, WHICH HAVE BEEN SETTLED FOR CONSIDERATION

71.    JPMorgan's Deficiency Claims should also be reduced to the extent they include losses caused solely by Barclays' conduct, for which JPMorgan has settled with Barclays.

### A.    JPMorgan Has Repeatedly Stated That Barclays' Conduct Caused its Losses

72.    In September 2008, when these events took place, JPMorgan blamed Barclays – and only Barclays – for the very same losses it now seeks to have paid by LBHI. Immediately

after learning that it was left with an outstanding loan when Barclays failed to roll the $15.8

Billion Repo, it took $7 billion from a Barclays account. Three days later, JPMorgan entered

into a settlement agreement which released Barclays from all claims based on the very acts and

damages at issue in both JPMorgan's Amended Counterclaims and its Deficiency Claims.

73.     Specifically, in the September 22, 2008 SSA, JPMorgan and Barclays mutually

released all claims "relating to a repurchase agreement allegedly agreed to on or about

September 18, 2008 in respect of approximately $15.8 billion face amount of securities . . . ."[82]

That contemporaneous settlement agreement further provided that "in consideration of the

release granted to it . . . [Barclays] shall promptly cause the lawsuit identified on Schedule B [the

Bear Stearns Lawsuit] to be withdrawn with prejudice . . . ."[83] This was over and above the $7

billion that JPMorgan had taken out of Barclays' account, although Barclays did not learn that

cash was missing until later.[84]

74.     Moreover, shortly after agreeing to release Barclays in exchange for dismissal of

the Bear Stearns Lawsuit, on October 11, 2008, JPMorgan's CEO, Jamie Dimon, sent a strongly-

worded letter to Barclays again claiming that Barclays was the cause of JPMorgan's losses,

including the loss of the $5 billion of margin. In the letter, Dimon states that "Barclays Capital

assured JPMorgan that it was going to fully repay JPMorgan's advances by purchasing or

refinancing the entire LBI securities portfolio that we were financing as LBI's agent clearing

bank,"[85] and that "[w]e [JPMorgan] understood that you [Barclays] were going to repay all of our

---

[82]   Ex. B, SSA § 4(a).

[83]   Ex. B, SSA § 4(b) and Schedule A.

[84]   Ex. C, Leventhal Tr. at 137:6-11, 146:14-19.

[85]   Ex. BB, Letter from Jamie Dimon to John Varley, dated October 11, 2008 (the "Dimon-Varley Letter") at 2.

intra-day funding and relied on that understanding in relinquishing our margin."[86] Notably in his letter, Mr. Dimon did not blame LBHI, or anyone other than Barclays, for JPMorgan's deficiency.

75.    Then, in subsequent litigation with LBHI, JPMorgan has repeatedly blamed Barclays for causing most if not all the losses it seeks through its Deficiency Claims.[87] JPMorgan has alleged that those losses were caused by Barclays' misrepresentations, including:

- "LaRocca [of Barclays] told Miller [of JPMorgan] that, as part of an asset sale negotiated between Barclays and Lehman, Barclays would take out LBI's entire triparty book, after which JPMorgan would no longer have to provide LBI with intraday loans to finance that book."[88]

- "LaRocca [of Barclays] told Buyers-Russo that, under the deal with Barclays, JPMorgan would have no clearing exposure to LBI by the end of Thursday, September 18. LaRocca explicitly represented that all of JPMorgan's triparty exposure to LBI would be eliminated on Thursday, September 18."[89]

76.    JPMorgan has specifically claimed that much of these losses resulted from JPMorgan's decision to release $5 billion in margin to Barclays on September 18, 2008.  For example, David Weisbrod, in 2008 a Managing Director in JPMorgan's Treasuries and Securities Services Risk Management Group, recently testified that the decision to release the margin was based entirely on Barclays' representing on September 18 that it would take JPMorgan completely out of its financing of LBI that week.[90]

---

[86]   Ex. BB, Dimon-Varley letter at 3.

[87]   *Compare* Proof of Claim No. 66462 at Ex. B, p. 2 (describing a debt of approximately $25 billion under the 2000 Clearance Agreement reduced to approximately $6.3 billion through collateral sales proceeds) *with* Amended Counterclaims of JPMorgan Chase Bank, N.A. in Adversary Proceeding No. 10-03266 [Docket No. 63] ("Amended Counterclaims") ¶ 13 (describing "more than $25 billion of loans under the Clearance Agreement that [have] not been paid in full").

[88]   Amended Counterclaims at ¶ 32.

[89]   Amended Counterclaims at ¶ 56.

[90]   Transcript of the July 14, 2011 deposition of David Weisbrod ("Weisbrod Tr.") at 384:9-22, attached hereto as Exhibit CC.

77.     Moreover, in its Amended Counterclaims in the adversary proceeding with LBHI, JPMorgan has alleged that Barclays, and *only* Barclays, convinced JPMorgan to release the $5 billion of margin it was holding to secure its intraday exposure.  For example, JPMorgan has alleged that, "[t]o induce JPMorgan to release the margin, [Barclays CEO Bob] Diamond, through his affirmative statements and failure to reveal Barclays' true agreements and intentions, persuaded JPMorgan that, by the end of Thursday, JPMorgan's triparty exposure to LBI would be extinguished and, at the conclusion of the transaction, JPMorgan would not have further exposure to LBI."[91]  JPMorgan also alleges that it released the $5 billion of margin "[b]ased on Diamond's representations."[92]

### B.     LBHI Should Not Pay for Losses Due to Barclays Which Have Been Settled For Consideration

78.     "[A] creditor is entitled to only a single satisfaction of its claim."  *In re Jason*, Case No. 01-10082-SSM, 2007 WL 4553608, at *5 (Bankr. E.D. Va. Dec. 19, 2007) (crediting previous payment against claim amount); *see also In re Morgan*, Case No. 01-60889, 2003 WL 1728667, at *1 (Bankr. E.D. Ga. Mar. 14, 2003) ("For every debt there can be only one satisfaction."); *In re Park Forest Devel. Corp.*, 197 B.R. 388, 397 (N.D. Ga. 1996) ("A creditor is only entitled to a single satisfaction of its claim.").  Thus, to the extent a creditor has received value in satisfaction of the debt underlying its claim against a bankrupt estate, its claim should be reduced accordingly.

79.     This result follows from the basic, underlying goal of the bankruptcy process of equitable distribution to creditors.  For example, in the recent case of *In re Pilgrim's Pride Corp.*, the court prevented a creditor from collecting payment in release of contract rejection claims and

---

[91]    Amended Counterclaims at ¶ 76.

[92]    Amended Counterclaims at ¶ 77.

also filing administrative expense claims. --- B.R. ---, 2011 WL 1671745, at *5 (N.D. Tex. May 3, 2011). Having determined that the creditors involved would potentially receive a double recovery, the court noted that it "would result in a windfall at the expense of other unsecured creditors. Such a result runs contrary to the Congressional policy that 'equity is equality' – that is, similarly situated creditors should be treated the same." *Id.* (citing *In re Elcona Homes Corp.*, 863 F.2d 483, 484 (7th Cir. 1988)); *see also In re Oakland City Apartments*, 1 B.R. 123, 125 (N.D. Ga 1979) (invoking "the equitable powers vested in this Court" and "the anti-preference principles embodied in the pre-emptive Federal law of bankruptcy" to prevent a potential double recovery by a creditor after foreclosure sale of a property). The same principle of "equitable distribution" has led at least one court to disallow claims temporarily to prevent a double recovery by a creditor. *In re Circuit City Stores, Inc.*, 426 B.R. 560, 577-78 (E.D. Va. 2010) ("[T]he Court agrees with the Debtors that the best approach is to temporarily disallow the Claims and hold them in abeyance until the preference litigation takes place so that the Court can adjudicate these issues together and ensure that Claimants do not receive windfalls to which they may not be entitled to the detriment of other creditors.").

80.     Furthermore, courts analyzing claims against debtor-guarantors where the primary obligor already settled with the creditor and the consideration was a foregone lawsuit have concluded that any claim against the debtor on the underlying debt should be reduced by the value to the creditor of the primary obligor foregoing its lawsuit. *See In re El Paso Refining, Inc.*, 192 B.R. 144, 148-49 (N.D. Tex. 1996) (requiring a hearing on the value of a foregone lawsuit by primary obligor against creditor to determine how much to credit guarantor against claim by creditor on the same debt); *see also Central Soya Co. v. Epstein Fisheries, Inc.*, 676 F.2d 939,

941-43 (7th Cir. 1982) (holding debt of guarantor should be reduced by value to creditor of primary obligor dismissing suit against creditor).

81.     This principle is also expressed in the context of joint tortfeasors. Under section 15-108 of New York's General Obligations Law, a release of one tortfeasor "reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages . . . whichever is the greatest." N.Y. Gen. Oblig. Law § 15-108(a). According to the New York Court of Appeals:

> The purpose of the statute is to encourage settlement, although the statute is also concerned with ensuring equity. Plaintiffs should be fairly compensated, but nonsettling defendants should not bear more than their fair share of a plaintiff's loss. Moreover, the possibility of double recovery should be avoided.

*Whalen v. Kawasaki Motors Corp.*, 92 N.Y.2d 288, 292 (1998).

82.     In this case, JPMorgan's Deficiency Claims should be reduced by the greater of the damage caused solely by Barclays or the value JPMorgan received through its settlement with Barclays. That amount includes the value of the lawsuit that Barclays dismissed, valued at approximately $400 million, plus interest and punitive damages.[93] To permit JPMorgan to receive that value from Barclays toward the debt and then claim the entire debt against LBHI would provide JPMorgan with an impermissible double recovery at the expense of LBHI's other

---

[93]     Ex. DD, Third Amended Complaint in *Barclays Bank PLC v. Bear Stearns Asset Management Inc., et al.* (Case No. 07-CV-11400 (LAP)) at ¶ 467 and prayer for relief. *See also* Ex. EE, Transcript of the Deposition of Alan Kaplan, dated June 7, 2011 ("Kaplan Tr.") at 134:25-135:7. Barclays' Deputy General Counsel for the Americas described the lawsuit as follows: "[i]t was a very high profile, important case. I mean, [Barclays] didn't sue another bank lightly." Ex. EE, Kaplan Tr. at 18:15-24; 136:7-17. In addition to the amount of money at stake, there were "reputational issues on both sides." Ex. EE, Kaplan Tr. at 136:18-22. The dismissal of such a high profile case seeking hundreds of millions of dollars in damages conferred a substantial benefit on JPMorgan.

creditors. But it includes more than that – whatever damages Barclays uniquely caused that were later settled between Barclays and JPMorgan. After all, JPMorgan spent months trying to extract whatever value it could from Barclays to compensate for directly causing triparty repo losses. It should not later be able to recover for those same losses in full from someone else who was not to blame.

### III.     JPMORGAN'S INTEREST CLAIM SHOULD BE DISALLOWED

83.     Although JPMorgan has tried to fit its Interest Claim within the rubric of Section 506(b) of the Bankruptcy Code, for the reasons discussed below, JPMorgan's claim for recovery of post-petition interest in this case should be disallowed.

84.     As a threshold matter, Section 506(b)'s allowance of post-petition interest is an exception to the well-established rule that interest on claims ceases to accrue when a bankruptcy case is commenced. *See In re Venable*, 48 B.R. 853, 854-55 (S.D.N.Y. 1985); *see also Urban Communicators PCS Ltd. Partnership v. Gabriel Capital, L.P.*, 394 B.R. 325, 334 (S.D.N.Y. 2008). This exception is only applicable in cases where a creditor is oversecured. 11 U.S.C § 506(b). *See Kitrosser v. CIT Group/Factoring, Inc.*, 177 B.R. 458, 467 n. 4 (S.D.N.Y. 1995).

85.     Thus, if LBHI and the Committee prevail in the Adversary Proceeding causing JPMorgan to lose its purported entitlement to the collateral it siphoned from LBHI, the Interest Claim should be disallowed.

86.     Moreover, equity requires disallowance of the Interest Claim. The grant of post-petition interest set forth in Section 506(b) is not absolute. Equitable considerations may override a professed entitlement to post-petition interest. *See In re Lapiana*, 909 F.2d 221, 223 (7th Cir. 1990); *see also In re Rozel Indust., Inc.*, 120 B.R. 944, 952 (Bankr. N.D. Ill. 1990). Applying equitable principles, courts have recognized a limitation on the accrual of post petition interest after the point where a creditor's claim could have been satisfied. *See In re Rozel Indust.*,

120 B.R. at 954; *see also Solomon v. Wein (In re Huhn)*, 145 B.R. 872, 878 (W.D. Mich. 1992). Indeed, "rigid literalism" in the application of Section 506(b) should be rejected. *See Lapiana*, 909 F.2d at 224.

87.     The extraordinary circumstances of this case require a departure from the literal language of Section 506(b). The exception for allowance of post-petition interest for oversecured creditors simply does not make sense under these unique circumstances. Here, JPMorgan charged LBHI over $280 million in interest on a purported deficiency while holding $8.6 billion in cash and cash equivalents as collateral. In fact, when LBHI transferred $6.9 billion in cash into its pledged account at JPMorgan during the last few days before its bankruptcy filing, JPMorgan immediately transferred those funds into its own account. JPMorgan held that purported collateral in its own bank accounts until it was provisionally applied to JPMorgan's claims pursuant to the CDA.

88.     By virtue of its position as a bank, JPMorgan not only held the cash collateral, but was also able to profit from these funds by using them as any bank does to support further lending and earning further interest, all the while charging LBHI's estate hundreds of millions of dollars in post-petition interest. Moreover, during the period of time when LBI collateral was being liquidated, JPMorgan routinely delayed the application of proceeds from the sales of securities, even when hundreds of millions of dollars were involved. This delay kept the alleged debt on which JPMorgan was charging interest at an incorrectly high level.

89.     Thus, this case is easily distinguishable from the garden-variety case where an oversecured creditor is simply receiving the benefit of its bargain by charging a debtor post-petition interest on non-cash collateral that has not yet been liquidated and applied to reduce the deficiency. This case presents an even more compelling case for the rejection of a purely literal

application of Section 506(b) than cases where courts disallowed claims for post-petition interest because a creditor failed to satisfy its claim at the earliest possible time. *See In re Rozel Indust.*, 120 B.R. at 954-56. JPMorgan was doubling its profits, once on the back of the LBHI estate through interest charges on an artificial and risk-free debt and the second time from other borrowers. Simply stated, the Interest Claim, yet another example of JPMorgan's overreaching, should be disallowed.

## Conclusion

90.     Accordingly, the Objectors respectfully request that the Court enter an order reducing the Deficiency Claims by an amount to be determined by the Court following discovery and a hearing on the merits of this Objection.

## Reservation of Rights[94]

91.     Nothing in this objection or in any objection notice will constitute a waiver of the right to assert any claims, counterclaims, rights of offset or recoupment or any other claims of the Objectors against a claimant, or to seek estimation of any claim or object to claims on any basis not previously set forth in this objection.  Unless the Court allows a claim or specifically orders otherwise, the Objectors retain the right to object on any grounds to the claim (or to any other claims or causes of action filed by a claimant or that have been scheduled by the Objectors) at a later date.  In such event, the respective claimant will receive a separate notice of any such objections.

92.     The Objectors expressly reserve the right to amend, modify, or supplement this objection and to file additional objections to the Deficiency Claims and Interest Claim or any

_____

[94] It should be noted that proof of claim number 66462 encompasses the entire relationship between JPMorgan and LBHI and is not in any way limited to the claims discussed herein.

other claims (filed or not) which may be asserted against the Debtors. Should one or more of the grounds for objection stated herein be dismissed, the Objectors reserve their rights to object on other stated grounds or on any other grounds that the Objectors discover during the pendency of these cases. Nothing herein shall constitute an admission of liability to the Objectors with respect to any proof of claim.

### Notice

93.     No trustee has been appointed in these chapter 11 cases. The Objectors have served notice of this Objection on (i) the U.S. Trustee; (ii) the attorney for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) JPMorgan Chase Bank, N.A.; and (vii) all other parties entitled to notice in accordance with the procedures set forth in the *Second Amended Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures* entered on June 17, 2010 [Docket No. 9635]. The Objectors submit that no other or further notice need be provided.

94.     No previous request for the relief sought herein has been made by the Objectors to this or any other court.

**WHEREFORE**, the Objectors respectfully request that the Court enter an Order (a) granting the relief requested herein and (b) granting the Objectors such other relief as is just.

Dated: August 31, 2011
New York, New York

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By:     /s/ John B. Quinn
John B. Quinn
Erica Taggart
Tyler G. Whitmer
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000

Susheel Kirpalani
Andrew J. Rossman
James Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000
*Counsel for the Official Committee of
Unsecured Creditors of Lehman Brothers
Holdings Inc.*

CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP

By:     /s/ Joseph D. Pizzurro
Joseph D. Pizzurro
L.P. Harrison 3rd
Michael J. Moscato
Nancy E. Delaney
Peter J. Behmke
Cindi M. Giglio
101 Park Avenue
New York, New York 10178-0061
(212) 696-6000
*Counsel for Debtor Lehman Brothers
Holdings Inc.*