# EXHIBIT BB

**From:**      Robert M Macallister/JPMCHASE <█████████████████████>
**Sent:**      Saturday, October 11, 2008 5:24 PM
**To:**        john.varley@groupcomm.barclays.co.uk
**Cc:**        Bill T Winters/JPMCHASE <███████████████████>; Jamie Dimon/IL/ONE
               <███████████████████>; Stephen M Cutler/JPMCHASE
               <███████████████████>; bob.diamond@barclayscapital.com;
               jonathan.hughes@barclayscapital.com
**Bcc:**       Barry L Zubrow/JPMCHASE <██████████████████████>; Frank J
               Bisignano/JPMCHASE <███████████████████>; Heidi Miller/NY/ONE
               <███████████████>; Jeff I Hack/JPMCHASE <████████████████████>;
               Robert M Macallister/JPMCHASE <██████████████████>; Robert T.
               Colleran/JPMCHASE <████████████████>; Scott Sandler/JPMCHASE
               <████████████████>; Steven D. Black/JPMCHASE
               <████████████>; HSNovikoff███████; dkmayer███████
**Subject:**   Letter
**Attach:**    InlineImage1.gif;Dimon_Letter_to_Barclays_10_11_08.pdf

Gentlemen: Please see attached a letter from Jamie Dimon to Mr. Varley.

HIGHLY CONFIDENTIAL                                        JPM-LBHI02274976



Dimon Letter to Barclays 10 11 08.pdf

HIGHLY CONFIDENTIAL

FOR SETTLEMENT DISCUSSION PURPOSES ONLY
WITHOUT PREJUDICE

October 11, 2008

John Varley, Group CEO
Barclays Bank PLC
One Churchill Place – Level 31
London  E145HP
England

Dear John:

I thought it would be useful to communicate directly about the dispute
between our firms, in the hope that we can have an honest and forthright
discussion about what we might do to resolve our differences – and what I
think we *must* do in light of the potential impact of these matters on the
Lehman Brothers Inc. (LBI) estate and LBI's creditors.  I know you are
focused on the movement of $7 billion of cash out of a cash collateral
account into an LBI clearance account on Friday, September 19.  What I do
not know is whether you are aware of (1) the context (at least from our
perspective) in which that occurred, and (2) the interests that LBI, its
creditors, the SIPA Trustee and the Bankruptcy Court may have in these
events and in a thorough reconciliation and accounting of the relevant cash
and securities movements.

Background

After the Lehman Brothers holding company filed its bankruptcy petition on
September 15, JPMorgan continued to act as the clearing bank for LBI – i.e.,
as the firm's agent – in order to facilitate an orderly wind-down of the firm
and the subsequent sale of LBI assets to Barclays Capital.  We did so at the
request of both the Federal Reserve Bank of New York and Barclays Capital
itself.  Even though we knew that a bankruptcy of LBI was imminent, we
advanced tens of billions of dollars to LBI to protect the markets against the

HIGHLY CONFIDENTIAL

John Varley, Group CEO
October 11, 2008
Page 2 of 7

impact of a disorderly collapse of LBI and to permit the firm to remain in business pending the asset sale. We had no legal obligation to do that, but believed it was the right thing to do.

Throughout this period, Barclays Capital assured JPMorgan that it was going to fully repay JPMorgan's advances by purchasing or refinancing the entire LBI securities portfolio that we were financing as LBI's agent clearing bank. We have contemporaneous notes of some of the conversations between our respective personnel confirming that Barclays Capital would be succeeding to all of the assets that we were financing. Consistent with that confirmation, on Tuesday, September 16, Lehman Brothers filed with the Bankruptcy Court a motion to authorize an Asset Purchase Agreement with Barclays Capital contemplating, among other things, a purchase by Barclays Capital of $70 billion in securities and the assumption of $69 billion in related debt.

During the course of that week, a significant amount of the borrowing LBI had been doing from the Fed was assumed by Barclays Capital.

| | Mon, Sept 15 | | Tues, Sept 16 | | Wed, Sept 17 | |
|---|---|---|---|---|---|---|
| | Fed | Barclays | Fed | Barclays | Fed | Barclays |
| **FRB Securities** | | | | | | |
| Freddie Mac & Fannie Mae MBS | 12,211 | - | 9,209 | 2,613 | 10,477 | - |
| Freddie Mac & Fannie Mae REMICs | 3,603 | - | 2,835 | 94 | 2,754 | - |
| Ginnie Mae MBS Pools | 204 | - | 1,147 | 1 | 353 | - |
| Ginnie Mae REMICs | 553 | - | 500 | 2 | 501 | - |
| US Government Agency Securities | 3,965 | - | 5,948 | 209 | 11,437 | - |
| US Treasuries and Strips | 1,465 | - | 5,760 | - | 6,887 | - |
| subtotal | 22,000 | - | 25,399 | 2,919 | 32,408 | - |
| **DTC Securities** | | | | | | |
| Asset Back Securities | 5,011 | - | 4,377 | 212 | 4,326 | 203 |
| Commercial Paper | 4,366 | - | 5,228 | - | - | 5,228 |
| Corporate Bonds | 9,376 | - | 7,329 | 1,955 | 7,570 | 2,090 |
| Municipal Bonds | 3,350 | - | 451 | 3,112 | 144 | 3,320 |
| Other | 772 | - | 90 | 587 | 68 | 45 |
| Private Label CMO | 4,264 | - | 4,532 | 37 | 1,679 | 2,815 |
| DTC Equities | 3,281 | 2,100 | 2,886 | 2,100 | 4,445 | 2,887 |
| subtotal | 30,419 | 2,100 | 24,894 | 8,003 | 18,231 | 16,590 |
| Cash | 13,500 | - | - | - | - | - |
| Total | 65,919 | 2,100 | 50,294 | 10,922 | 50,640 | 16,590 |

Indeed, much of the collateral financed by Barclays Capital on Wednesday night was the very collateral financed by the Fed on Monday and Tuesday nights. (For a very significant amount of that collateral, the movement of which between the Fed collateral pool and the Barclays Capital collateral pool was undoubtedly deliberate, Barclays Capital assigned a loan value greater than the amount that had been assigned by the Fed.)

HIGHLY CONFIDENTIAL

John Varley, Group CEO
October 11, 2008
Page 3 of 7

On Thursday morning, September 18, JPMorgan "unwound" these facilities by advancing cash to repay the Fed and Barclays Capital. Again, we did so with the clear expectation that Barclays Capital would either purchase or finance all of the securities in these facilities and that JPMorgan's intra-day funding would be fully repaid prior to the commencement of LBI's SIPA proceeding.

During the day on Thursday, you commenced what we thought was the assumption of the entire portfolio. You sent $5 billion in cash and we released our lien on securities valued at $5 billion. In the early evening, Bob Diamond spoke to Heidi Miller and several other of our senior executives and asked that we release our lien on additional securities so that Barclays Capital would receive an aggregate of $49.7 billion in securities in exchange for aggregate payments of $45 billion in cash. (The Fed has apprised us that the loan amount on the Fed collateral pool was $46.1 billion and we and the Fed agree that the loan amount on $49.7 billion of the collateral was $45.2 billion. Accordingly, we have difficulty understanding any claim that you were to receive the entire Fed collateral pool in exchange for $45 billion in cash.) As you can appreciate, there would have been absolutely no reason for us to give up our margin – and lien position – on the securities financed by the Fed on Wednesday night had there been any chance that we would have been left (post-bankruptcy) unpaid on the securities that Barclays Capital financed on Wednesday night. We understood that you were going to repay all of our intra-day funding and relied on that understanding in relinquishing our margin.

Chaos reigned throughout Thursday evening. You sent in another $40 billion in cash. Billions of dollars of securities were sent out and many were "DK'd" or otherwise sent back. By about 11 o'clock, when DTC shut down, you had apparently received a net total of approximately $42.7 billion of securities. All of the confusion was heightened by the absence of any definitive list of securities that you were purchasing – an absence that we believe further supports the notion that you were taking *all* of the securities collateralizing our intraday advances.

The securities you received were *not* limited to the collateral that had been financed by the Fed on Wednesday night. You took a substantial amount of securities that had been part of your own "Barclays Capital tri-party financing" on that Wednesday night, as well as securities from other JPMorgan financings.

HIGHLY CONFIDENTIAL

John Varley, Group CEO
October 11, 2008
Page 4 of 7

**Activity on Thursday September 18, 2008**

| | Fed Programs | | Barclays Tri-Party | | Other | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Received Back | Delivered Out | Received Back | Delivered Out | Received Back | Delivered Out | Received Back | Delivered Out |
| US Treasuries | - | 549 | - | - | - | 4,565 | - | 5,114 |
| Agency Securities | - | 23,431 | - | - | 18 | - | 18 | 23,431 |
| subtotal Fed-wire eligible | - | 23,980 | - | - | 18 | 4,565 | 18 | 28,545 |
| ABS | 1,094 | 2,378 | - | - | 7 | 312 | 1,101 | 2,691 |
| CMO | 91 | 701 | 4 | 1,463 | 2 | 73 | 98 | 2,237 |
| Commercial Paper | - | - | - | 53 | - | - | - | 53 |
| Corporate | 696 | 3,055 | 583 | 1,677 | 348 | 29 | 1,626 | 4,761 |
| Equities | 1,015 | 4,993 | 430 | 1,858 | 1,020 | 1,821 | 2,465 | 8,672 |
| Muni | - | 69 | 644 | 1,430 | 210 | 3 | 854 | 1,502 |
| Other | 7 | 131 | - | 132 | 95 | 185 | 103 | 448 |
| subtotal DTC | 2,904 | 11,328 | 1,661 | 6,613 | 237 | 1,444 | 6,248 | 20,364 |
| **Total** | **2,904** | **35,382** | **1,661** | **6,613** | **237** | **1,451** | **6,266** | **48,910** |

(Subsequently, we have learned that you may have also received from LBI
securities that were not financed by JPMorgan at all on Wednesday.)

After DTC closed, in order to facilitate the completion of the transactions
necessary to transfer the entire portfolio of securities over to Barclays
Capital, we agreed (at LBI's request) to advance LBI the cash necessary for
LBI to pledge $7 billion to Barclays Capital to protect it against overnight
exposure pending such completion. Again, we understood that we would be
fully repaid on the advances made on Thursday morning and the transfers of
cash and securities would be completed prior to the commencement of LBI's
SIPA proceeding, scheduled for Friday afternoon, September 19.

Still later on Thursday night, and into the early hours of Friday morning,
LBI personnel told us that LBI needed financing from us because you were
not purchasing or financing the securities that had been part of the Barclays
Capital tri-party financing. When we told LBI that this was contrary to our
understanding, and instructed them to speak with your personnel, they came
back on the line and said that you would take care of the tri-party later on
that Friday morning. That did not happen. On Friday, your personnel told
ours that they had "forgotten" about the tri-party and were "confused," and
simply wanted the $7 billion back. At that point, understanding that you had
no intention of living by the assurances that you had given us – or of even
completing the "take-out" of the "Fed collateral" – we credited the $7 billion
back to the LBI clearing account, from which we had advanced the funds in
the first place.

HIGHLY CONFIDENTIAL

John Varley, Group CEO
October 11, 2008
Page 5 of 7

On Friday night, for the first time as far as we know, the Bankruptcy Court was apprised of a different "deal" between Barclays Capital and Lehman Brothers – and that Barclays Capital was no longer purchasing $70 billion in assets and assuming $69 billion in related debt. But the Court was *not* apprised of the purchase that Barclays Capital now says it agreed to make. Instead of the Court being told that Barclays Capital was purchasing approximately $49.7 billion in securities for $45 billion in cash, the Court was told that Barclays Capital was purchasing $47.4 billion in securities for $45.5 billion in cash. In addition, the Court was told that the reason for the change was a deterioration in market prices, an explanation that we now know to be incorrect.

Proposal

I know that many mistakes were made during the course of the week leading up to the LBI bankruptcy filing – including by Barclays Capital. (You have pointed out a number of mistakes that you believe we made.) While of course we can litigate about these mistakes (in which case we are confident in our position that Barclays Capital released its claims with respect to the $7 billion pursuant to the mutual release contained in the Services and Settlement Agreement signed on September 22), and see ourselves tied up in court proceedings over the next several years, I do think there is a more sensible course:

1.  Subject to SIPA Trustee and Bankruptcy Court approval, we do think you should get from LBI the "Fed collateral" still remaining at LBI – to which the Fed ascribed a market value of approximately $6 billion on that Wednesday night/Thursday morning. (We assume for these purposes – but certainly a different view would be reasonable – that you had contemplated the purchase of $49.7 billion in securities for $45 billion in cash rather than (1) the purchase of $47.4 billion in securities for $45.5 billion in cash, as described to the Bankruptcy Court, or (2) the purchase of $49.7 billion in securities for $45.2 billion in cash, the loan amount assigned to the securities by the Fed and JPMorgan.) We understand that the Fed, you and we agree that, even if you had only contemplated a "take-out" of the Fed on that Thursday night, this is collateral you would have received and that the Fed (and LBI) did indeed value it at approximately $6 billion. If the collateral had a market value of less than $6 billion that night, you nevertheless would have been obliged to take it. You are not entitled

John Varley, Group CEO
October 11, 2008
Page 6 of 7

to a windfall – to the detriment of LBI (or JPMorgan) – simply because the securities may have been worth less. Neither the SIPA Trustee, the Bankruptcy Court nor LBI's creditors would accept such a result. If the value of the securities has diminished during the time of this dispute, we are prepared to discuss that with you. But to be clear, in our view, any differences between the market value of the securities on September 18 and the value that was being used for their financing on September 18 should be for Barclays Capital's account.

2.  Also subject to the approval of the SIPA Trustee and the Bankruptcy Court, the "completion" of the transaction you have said you contemplated on Thursday evening may entitle you to approximately $1 billion of additional "Fed collateral" from LBI. (Again, we are assuming for these purposes that you were purchasing a $49.7 billion pool of securities for $45 billion in cash and not either (1) a $47.4 billion pool of securities for $45.5 billion in cash, or (2) a $49.7 billion pool of securities for $45.2 billion in cash.) Because that collateral has already been liquidated, we would suggest that a cash payment be substituted.

3.  In connection with items 1 and 2, and inasmuch as you ended up taking securities that had not been part of the "Fed collateral" – again, some were part of the "Barclays Capital tri-party collateral" and still others were not financed by JPMorgan at all – we believe that a full accounting should be done. It is altogether possible that the LBI estate and its creditors gave you more or less value than you were entitled to receive. Moreover, the Bankruptcy Court was told that Barclays Capital was to receive $47.4 billion (not $49.7 billion) in securities and to pay $45.5 billion (not $45 or $45.2 billion) in cash. We are both duty-bound to ensure that LBI received the value it was supposed to receive in exchange for your $45 billion. We have offered several times to do this accounting with you (and, as appropriate, the Fed), and it is entirely possible that the SIPA Trustee and the Bankruptcy Court would want such an accounting, but your personnel have declined, citing the amount of time and effort it would take. We should do this accounting and should do it now. We would be willing to discuss the concept of an escrow while such reconciliation was taking place.

HIGHLY CONFIDENTIAL

John Varley, Group CEO
October 11, 2008
Page 7 of 7

4. We are prepared to submit to arbitration or mediation to resolve any remaining differences between us – including (1) whether the provision of securities and cash contemplated by items 1 and 2 above is a fair proxy for the "completion" of the transaction that you say you agreed to complete, and (2) our claim that you were obliged to take all of the securities that were part of the Barclays tri-party collateral. Again, we think the LBI estate (and the SIPA Trustee and Bankruptcy Court) may have a keen interest in these matters as well.

5. In the September 22, Settlement and Services Agreement, you agreed that you would drop your lawsuit concerning the Bear Stearns hedge funds. That agreement should remain part of any resolution we reach.

John, we are prepared to sit down and discuss these issues this weekend. If we have to litigate them, so be it, but it would be a shame if we did not expend every effort now to avoid such an outcome and cooperate to fashion a result that is fair to all parties. Please let me know when you can meet.

Sincerely,


Jamie Dimon


Cc:    Robert Diamond, President
       Bill Winters

HIGHLY CONFIDENTIAL