**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **LEHMAN BROTHERS HOLDINGS INC.,** | § | Case No. 08-13555 (JMP) |
| | § | |
| Debtor. | § | |

# MEMORANDUM OF LAW OF SHELL TRADING (US) COMPANY, SHELL TRADING INTERNATIONAL LIMITED AND SHELL INTERNATIONAL EASTERN TRADING COMPANY IN OPPOSITION TO DEBTORS' ONE HUNDRED EIGHTY-SIXTH AND ONE HUNDRED EIGHTY-SEVENTH OMNIBUS OBJECTIONS TO CLAIMS

Dated: October 13, 2011

SUTHERLAND ASBILL & BRENNAN LLP

Paul B. Turner (*pro hac vice*)
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Tel: (713) 470-6100
Fax: (713) 654-1301

Mark D. Sherrill (*pro hac vice*)
1275 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 383-0100
Fax: (202) 637-3593

*Counsel for Shell Trading (US) Company,*
*Shell Trading International Limited and*
*Shell International Eastern Trading Company*

Of counsel:

Jennifer M. Gore
Senior Legal Counsel
Shell Oil Company
909 Fannin, Plaza Level I
Houston, Texas 77010
Tel: (713) 767-5400
Fax: (713) 265-3070

14434475.16

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ………………………………………………………  1

II. FACTUAL BACKGROUND ……………………………………………………...  3

    A. The Bankruptcy Filings ………………………………………………………  3

    B. The Shell-LBCS Contracts …………………………………………………  4

        1. The STIL Master Agreement ………………………………………………  4

        2. The SIETCO Master Agreement ……………………………………………  4

        3. The STUSCO Master Agreement ……………………………………………..  5

        4. The STUSCO Physical Transactions ………………………………………  5

        5. The SENA Master Agreement ……………………………………………...  5

        6. Other Relevant Contracts …………………………………………………...  6

    C. Termination Values of the Shell-LBCS Contracts ………………………………  6

    D. Setoff Provisions in the Shell-LBCS Contracts …………………………………  7

III. PROCEDURAL BACKGROUND ………………………………………………....  7

    A. The Proofs of Claim ………………………………………………………..  7

    B. The Claim Objections ………………………………………………………  8

IV. BURDEN OF PROOF …………………………………………………………  9

V. ARGUMENT ……………………………………………………………………  9

    A. The Claim Objections Are Procedurally Improper ………………………………...  9

    B. The Plain Meaning of the Safe Harbor Statutes Requires
       Enforcement of the Contractual Setoff Provisions…………………………………  11

        1. Numerous Principles of Statutory Construction Require
          The Application of the Statute's Plain Meaning …………………………..  12

2. The Court Should Employ a Different Analysis
Than It Has Used in the Past ……………………………………… 15

(a) Section 560 Directly Addresses Any Contrary Mutuality
Requirement in Section 553(a)……………………………….. 15

(b) Even if Reference to Legislative History Were Appropriate
(Which It Is Not), It Would Weigh In Favor of Enforceability … 17

(c) The Court's Inquiry Was Too Narrow In Looking for
A "Notwithstanding" Clause …………………………………… 19

(d) The Amendments under the FNIA Were Substantial, and
Support the Enforceability of Cross-Affiliate Setoff Rights…… 21

(e) The Safe Harbor Statutes Are More Specific Than
Section 553 ………………………………………………….. 24

3. Policy Implications Demand Enforcement of Contractual
Cross-Affiliate Setoff Rights ………………………………………… 24

C. Even in the Absence of the Safe Harbor Statutes, Shell Can
Exercise Its Cross-Affiliate Setoff Rights……………………………… 28

1. Assuming, *Arguendo*, that Mutuality Is Required,
the Parties Created Mutuality in their Contracts ……………………….. 29

2. Bankruptcy Law Allows Triangular Setoff ……………………… 30

VI. CONCLUSION ……………………………………………………………… 32

# TABLE OF AUTHORITIES

**CASES**

*In re Air Vermont, Inc.*, 761 F.2d 130, 133-34 (2d Cir. 1985)……………………….....    21

*Bank of N.Y. v. Meridien BIAO Bank Tanz. Ltd.*,
1997 WL 53172, at *2-4 (S.D.N.Y. Feb. 10, 1997)…………………………………....    29

*BedRoc Ltd. LLC v. United States*, 541 U.S. 176, 183, 124 S.Ct. 1587 (2004)………….    17

*Blanton v. Prudential-Bache Secs., Inc.*, 105 B.R. 321, 334 (Bankr. E.D. Va. 1989)……    28

*Bores v. Domino's Pizza LLC*, 530 F.3d 671, 675 (8th Cir. 2008) ………………………    14

*Bromfield v. Trinidad Nat'l Investment Co.*, 36 F.2d 646, 647-48 (10th Cir. 1929)………    31

*In re Brown*, 221 B.R. 46 (Bankr. S.D. Ga. 1998)……………………………………….....    9

*Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18-19 (1995) ………………………    28, 31

*Department of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 132-33 (2002)……………    17

*Depositors Trust Co. of Augusta v. Frati Enters., Inc.*,
590 F.2d 377, 379 (1st Cir. 1979)…………………………………………………………    29-30

*Eckles v. Petco Inc. (In re Balducci Oil Co.)*, 33 B.R. 847, 853 (Bankr. D. Colo. 1983)….    30

*Equibank v. Lang Mach. Co. (In re Lang Mach. Co.)*,
1988 WL 110429, at *5 (Bankr. W.D. Pa. Oct. 19, 1988)…………………………………    31

*In re Fasano/Harriss Pie Co.*, 43 B.R. 864, 870-71 (Bankr. W.D. Mich. 1984)………….    30

*Fuller v. Fasig-Tipton Co.*, 587 F.2d 103, 107 (2d Cir. 1978)……………………………    29

*In re Garden Ridge Corp.*, 338 B.R. 627, 633 (Bankr. D. Del. 2006)……………………    29, 30

*Harbison v. Bell*, 129 S.Ct. 1481, 1493 (2009) ……………………………………….....    13

*Hardt v. Reliance Std. Life Ins. Co.*, 130 S.Ct. 2149, 2156 (2011)………………………..    12-13

*In re Harford Sands Inc.*, 372 F.3d 637, 640 (4th Cir. 2004) ……………………………..    9

*Hibbs v. Winn*, 542 U.S. 88, 101, 124 S.Ct. 2276 (2004) …………………………………    13

*Inland Steel Co. v. Berger Steel Co. (In re Berger Steel Co.)*,
327 F.2d 401, 404-05 (7th Cir. 1964)……………………………………………………   31

*Kramer v. Lockwood Pension Servs. Inc.*, 653 F. Supp. 2d 354, 378 (S.D.N.Y. 2009)…..   29

*In re Lehman Bros. Holdings Inc.*, 445 B.R. 130 (S.D.N.Y. 2011) ……………………… *passim*

*In re Lehman Bros. Holdings Inc.*,  433 B.R. 101 (Bankr. S.D.N.Y. 2010) ……………… *passim*

*In re Lehman Brothers Inc.*, Memorandum Decision Enforcing
 the Automatic Stay and Compelling Payment by UBS AG,
case no. 08-01420 (Bankr. S.D.N.Y. Oct. 4, 2011)…………………………………………….. *passim*

*Lockhart v. United States*, 546 U.S. 142, 149 (2005)……………………………………...  14-15

*In re Narragansett Clothing Co.*, 143 B.R. 582, 583 (Bankr. D.R.I. 1992) ………………    9

*New England Mut. Life Ins. Co. v. Caruso*, 538 N.Y.S.2d 217, 221 (N.Y. 1989)……...…   29

*In re O'Connor*, 153 F.3d 258 (5th Cir. 1998) ………………………………………………    9

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658 (1985)….   13

*Piedmont Print Works, Inc. v. Receivers of People's State Bank of S. Carolina*,
68 F.2d 110, 111 (4th Cir. 1934)………………………………………………………………..   31

*PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2579-80 (2011)………………………………….   20

*In re Spiegel, Inc.*, 2007 WL 2456626, *15 n.6 (S.D.N.Y. Aug. 22, 2007) ………………    9

*Shamrock Farms Co. v. Veneman*, 146 F.3d 1177, 1180 (9th Cir. 1998)………………….   21

*Stoltz v. Brattleboro Housing Auth. (In re Stoltz)*, 315 F.3d 80, 93 (2d Cir. 2002)……….   24

*Thrifty Oil Co. v. Bank of Am. Nat. Trust & Sav. Ass'n*,
322 F.3d 1039, 1050 (9th Cir. 2003)………………………………………………………….  12, 18

*United States v. Fisk Bank of Massachusetts
(In re Calore Express Co., Inc.)*, 288 F.3d 22, 43 (1st Cir. 2002)…………………………..   28

*United States v. LaPorta*, 46 F.3d 152, 156 (2d Cir. 1994)………………………………..   24

*United States v. Ron Pair Enters.*, 489 U.S. 235, 245-46 (1989) …………………..……..   25

*United States v. Sanchez*, 639 F.3d 1201, 1205 (9th Cir. 2011) ………………………….   21

*Virginia Block Co. v. Bushong (In re Virginia Block Co.)*,
16 B.R. 560, 562 (Bankr. W.D. Va. 1981)………………………………………………..    31

*West Virginia Univ. Hospitals, Inc. v. Casey*, 449 U.S. 83, 98, 111 S.Ct. 1138 (1991)…..    13

*Wooten v. Vicksburg Ref. Inc. (In re Hill Petroleum Co.)*,
95 B.R. 404, 411 (Bankr. W.D. La. 1988)………………………………………………..    30

**STATUTES**

11 U.S.C. § 101……………………………………………………………………………    12

11 U.S.C. § 362(b)(17)………………………………………………………………… 16, 21-24, 28

11 U.S.C. § 546(f) ………………………………………………………………………    22

11 U.S.C. § 553(a)………………………………………………………………… *passim*

11 U.S.C. § 560 ………………………………………………………………… *passim*

**MISCELLANEOUS**

American Heritage Dictionary, 81 (4th ed. 2000)…………………………………………    14

Brief *Amicus Curiae* in Support of the Brief of Defendant-Appellant-Cross-Appellee,
*Finance One Public Company Ltd. v. Lehman Brothers Special Financing, Inc.*,
No. 03-9049(L) (2d Cir.  May 19, 2004)…………………………………………………    27

Douglas G. Baird & Thomas H. Jackson, "Corporate Reorganizations and the
Treatment of Diverse Ownership Interests," 51 U. CHI. L. REV. 97, 105-06 (1984)……...    25

Charles A. Beckham, Jr. & Erik K. Martin, "Derivative Exposure and
Counterparty Insolvency," 8th Annual Gas & Power Institute (Sept. 2009)………………    23

BLACK'S LAW DICTIONARY (6th ed. 1990) ……………………………………………..    14, 21

5 COLLIER ON BANKRUPTCY 555.04[2], n.6 ……………………………………………    21

Dennis J. Connolly & Leib M. Lerner, "Recent Developments with
Respect to the 'Safe Harbors' for Swaps and Repo Agreements,"
2010 Ann. Surv. Of Bankr. Law 1 (2010)…………………………………………………    23

136 Cong. Rec. S7535……………………………………………………………………    18

136 Cong. Rec. H2281-06, H2282 (1990) …………………………………………….. 18

FED. R. BANKR. P. 3007(d) advisory committee's note………………………………….. 10

Seth Grosshandler et al., "Securities, Forward and Commodity Contracts
and Repurchase, Swap and Master Netting Agreements under U.S. Insolvency
Laws," Advanced Swaps & Other Derivatives in 2007 (Apr. 18, 2007)………………… 23

Jonathon Keath Hance, "Derivatives at Bankruptcy,"
65 WASH. & LEE L. REV. 711, 765 (Spring 2008)……………………………………….. 23, 26

H.R. Rep. 101-484, at 2, as reprinted in 1900 U.S.C.C.A.N. 223, 224 (1990) ………….. 18, 19

Stephen J. Lubben, "Repeal the Safe Harbors,"
18 AM. BANKR. L. REV. 319, 319 (Spring 2010)………………………………………… 26

Caleb Nelson, "Preemption," 86 VA. L. REV. 225, 240-41 (March 2000)……………….. 20-21

Harold S. Novikoff, "Special Bankruptcy Code Protections for
Derivative and Other Financial Market Transactions,"
Chapter 11 Business Reorganizations (Apr. 28-29, 2011)……………………………….. 23

Mark J. Roe, "The Derivatives Market's Payment Priorities as Financial Crisis
Accelerator," 63 STAN. L. REV. 539, 552 (March 2011)…………………………………. 26

Hon. Barry Russell, Bankruptcy Evidence Manual, § 301.13(3) (West Group, 1999)….. 9, 11

S. Rep. No. 101-285 (1990) ……………………………………………………………… 19

2A N. Singer, Statutes and Statutory Construction,
§ 46.06, pp. 181-186 (rev. 6th ed. 2000)……………………………………………….. 13

Stroock Special Bulletin, "Financial Netting Improvements
Act of 2006" (Feb. 1, 2007)…………………………………………………………….. 23

Shell Trading (US) Company ("STUSCO"), Shell Trading International Limited ("STIL") and Shell International Eastern Trading Company ("SIETCO" and collectively with STUSCO and STIL, "Shell") file this Memorandum of Law (the "Brief") in opposition to the Debtors' *One Hundred Eighty-Sixth Omnibus Objection to Claims (Misclassified Claims)* (the "186th Omnibus") and *One Hundred Eighty-Seventh Omnibus Objection to Claims(Misclassified Claims)* (the "187th Omnibus" and collectively with the 186th Omnibus, "Claim Objections"). Shell respectfully states as follows:

## I.  PRELIMINARY STATEMENT

As a threshold matter, the Claim Objections should be denied as procedurally improper with respect to Shell.   Either Lehman Brothers Holdings Inc. and its debtor affiliates (collectively, the "Debtors") mistakenly included Shell in the Claim Objections (given the ongoing settlement negotiations between the parties and the substantive issues between them that should merit a separate proceeding if judicial involvement becomes necessary), or otherwise the Debtors have intentionally disguised a very substantive (albeit piecemeal)[1] objection to Shell's Claims (as hereinafter defined) as a generic omnibus objection to "misclassified claims" in an attempt to gain some type of litigation advantage.

In either event, Shell was surprised by its inclusion in the 186th Omnibus and 187th Omnibus and believes the Claim Objections are both procedurally improper and factually inaccurate, and should therefore be denied. Indeed, contrary to the Debtors' generic and vague contentions in the Claim Objections,[2] Shell has fully supported the secured status of its claims -- specifically, by virtue of its contractual rights to setoff amounts due under one or more Safe

---

[1]    Notably, the Claim Objections address only one piece of the overall issues needed to resolve fully the Shell Claims.

[2]    *See* 186th Omnibus, ¶ 9; 187th Omnibus, ¶ 9.

Harbor Contracts.  The documents attached to Shell's Claims provide prima facie evidence of the

legitimacy of the Claims, which the Claim Objections have failed to rebut.

Assuming, however, that the Debtors intentionally included Shell's Claims in the Claim

Objections in order to object on a basis never mentioned in the Claim Objections -- that cross-

affiliate setoff is not permitted -- and the Court finds such objections to be procedurally proper,

Shell responds on the merits.  Shell is fully aware of the prior rulings, including the recent *UBS*

decision, in which the Court indicated that cross-affiliate netting is not allowed.[3]  Shell, however,

respectfully asks the Court to reexamine the issues for the reasons outlined below.

The overarching theme of the *UBS* decision is the conclusion that the fundamental

mutuality requirement in section 553(a) of the Bankruptcy Code cannot be overridden by the

Safe Harbor Statutes.[4]  Shell asserts that this is incorrect -- and in fact, runs afoul of the plain text

of the Bankruptcy Code.  When one focuses on the literal text of section 553, it provides a type

of "savings clause" for "mutual setoffs" (subject to certain exceptions).  Section 553(a) merely

says that "this title does not affect," subject to certain exceptions, "any right of a creditor to

offset a mutual debt owing by such creditor to the debtor that arose before the commencement of

the case under this title against a claim of such creditor against the debtor that arose before the

commencement of the case" (for purposes of this Brief, a "Mutual Setoff").  Nowhere does

---

[3]     This Court reached a similar decision in *Swedbank I*, although the factual circumstances
and context were materially different than those at issue here.  This Brief will refer to this
Court's opinion as "*Swedbank I*," *In re Lehman Bros. Holdings Inc.*,  433 B.R. 101 (Bankr.
S.D.N.Y. 2010), and to the district court's decision as "*Swedbank II*," *In re Lehman Bros.
Holdings Inc.*, 445 B.R. 130 (S.D.N.Y. 2011).  It will further refer to the Court's *Memorandum
Decision Enforcing the Automatic Stay and Compelling Payment by UBS AG*, *In re Lehman
Brothers Inc.*, case no. 08-01420 (Bankr. S.D.N.Y. Oct. 4, 2011), as "*UBS*."

[4]     For purposes of this Brief, the term "Safe Harbor Statutes" shall mean sections 556, 560
and 561 of the Bankruptcy Code.  "Safe Harbor Contracts" shall mean contracts subject to the
Safe Harbor Statutes.  This Brief focuses on the guaranty of the enforcement of Shell's setoff
rights pursuant to section 560 for swap agreements, but the same analysis could apply under
section 556 or 561.

section 553 (i) mention non-mutual setoff -- much less prohibit, avoid, or otherwise limit non-mutual setoff, or (ii) otherwise say that ***only*** Mutual Setoffs may be allowed.  Instead, it only provides a savings clause for the type of setoff mentioned in section 553 -- the Mutual Setoff. Clearly, a party such as Shell asserting non-mutual setoff cannot invoke section 553 as its saving clause.  But Shell does not – and need not try to – rely on section 553.

Instead, Shell has its own "savings clause" in the Safe Harbor Statutes.[5]  And, when one focuses on the express text of the Safe Harbor Statutes, it is clear that "any contractual right" of Shell as swap participants to "offset or net out" under one more Safe Harbor Contracts (including swap agreements) "shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court."   Section 560 never mentions a mutuality requirement nor does it cross-reference section 553 or otherwise exclude section 553 from its prohibition that Shell's rights "shall not be . . . limited by operation of any provision of this title." Thus, Shell's non-mutual setoff rights must be enforced in accordance with their terms.  For this, and the other reasons set forth below, Shell requests that the Court overrule the Claim Objections.

## II.  FACTUAL BACKGROUND

### A.    The Bankruptcy Filings

On September 15, 2008 (the "Petition Date"), Lehman Brothers Holdings Inc. ("LBHI") filed its voluntary petition for relief under chapter 11 of the U.S. Bankruptcy Code.  On October

---

[5]   There could be a situation in which a party asserts Mutual Setoff with respect to Safe Harbor Contracts and thus, both section 553 and the Safe Harbor Statutes provide "savings clauses" (hence the references to some of the Safe Harbor Statutes in section 553).   That situation is not present here except to the extent certain Mutual Setoffs may have been claimed in the Shell Claims, and Shell does not believe that the Debtors are challenging any such setoffs.

3, 2008, Lehman Brothers Commodity Services Inc. ("LBCS") filed its own voluntary petition
under the Bankruptcy Code.

### B.    The Shell-LBCS Contracts

#### 1.    The STIL Master Agreement

STIL entered into that certain ISDA Master Agreement (as amended, the "STIL Master
Agreement") with LBCS, dated October 16, 2006.  A copy of the STIL Master Agreement is
attached as Exhibit A.    LBCS's parent, LBHI, provided a guaranty of LBCS's payment
obligations under the Master Agreement and served as the Credit Support Provider.

Because LBHI served as Credit Support Provider under the Master Agreement, the LBHI
bankruptcy filing constituted an Event of Default under Section 5(a)(vii) of the STIL Master
Agreement.  Exercising its rights under (*inter alia*) section 560 of the Bankruptcy Code and
Section 6(a) of the Master Agreement, STIL provided LBCS with its notice of termination (the
"STIL Termination Notice") of all transactions under the STIL Master Agreement on September
16, 2008.  The STIL Termination Notice established September 16, 2008 as the Early
Termination Date of the STIL Master Agreement.

#### 2.    The SIETCO Master Agreement

SIETCO entered into that certain ISDA Master Agreement (as amended, the "SIETCO
Master Agreement") with LBCS, dated June 28, 2007.  A copy of the SIETCO Master
Agreement is attached as Exhibit B.  LBHI provided a guaranty of LBCS's payment obligations
under the SIETCO Master Agreement and served as the Credit Support Provider.

The LBHI bankruptcy filing therefore constituted an Event of Default under Section
5(a)(vii) of the SIETCO Master Agreement.  On September 16, 2008, SIETCO therefore sent

4

LBCS its notice of termination (the "SIETCO Termination Notice") of all transactions under the SIETCO Master Agreement, establishing September 16, 2008 as the Early Termination Date.

### 3.    The STUSCO Master Agreement

STUSCO entered into that certain ISDA Master Agreement (as amended, the "STUSCO Master Agreement") with LBCS, dated April 2, 2008.   A copy of the STUSCO Master Agreement is attached as Exhibit C.  LBHI provided a guaranty of LBCS's payment obligations under the STUSCO Master Agreement and served as the Credit Support Provider.

The LBHI bankruptcy filing constituted an Event of Default under Section 5(a)(vii) of the STUSCO Master Agreement.  On September 17, 2008, STUSCO therefore sent LBCS its notice of termination (the "STUSCO Termination Notice") of all transactions under the STUSCO Master Agreement, establishing September 17, 2008 as the Early Termination Date.

### 4.    The STUSCO Physical Transactions

In addition to the STUSCO Master Agreement, STUSCO and LBCS were parties to certain transactions (the "Physical Transactions") for the purchase and sale of crude oil and/or refined oil products under the Conoco General Terms and Conditions (the "Conoco GTCs"). Each of the Physical Transactions was for the purchase, sale or transfer of a physical commodity. In addition, each of the Physical Transactions matured more than two days after execution of the agreement.  Shortly after the Petition Date, STUSCO sent LBCS notice of its termination of all Physical Transactions.

### 5.    The SENA Master Agreement

On October 10, 2006, Coral Energy Holding, L.P. ("Coral") entered into an ISDA Master Agreement (the "SENA Master Agreement") with LBCS.   A copy of the SENA Master Agreement is attached as Exhibit D.   Coral is now known as Shell Energy North America (US),

L.P. ("SENA").  LBHI provided a guaranty of LBCS's payment obligations under the SENA Master Agreement and served as the Credit Support Provider.

### 6.    Other Relevant Contracts

SENA and LBCS were both signatories to the Western Systems Power Pool Agreement (the "WSPPA").

On August 18, 2008, Shell Energy Trading Limited ("SETL") and LBCS entered into a Cross Product Master Agreement (the "CPMA").

### C.    Termination Values of the Shell-LBCS Contracts

After termination of the various contracts between the Shell entities and LBCS, Shell was in the money with regard to the STIL Master Agreement, the SIETCO Master Agreement, the STUSCO Master Agreement and the Physical Transactions (collectively, the "ITM Contracts"). Shell's affiliates were out of the money with regard to the SENA Master Agreement, the WSPPA and the CPMA (collectively, the "OTM Contracts").[6]

Generally, the Claims showed (i) that LBCS owed Shell an aggregate amount of $22,661,763.61 under the ITM Contracts, and (ii) SENA and SETL owed LBCS an aggregate amount of $31,018,265.61 under the OTM Contracts.[7]

---

[6]    By way of explanation, the nomenclature in "OTM Contracts" and "ITM Contracts" reflects whether Shell was out-of-the-money (OTM) or in-the-money (ITM) as of the date that transactions under each agreement were terminated.

[7]    For the past three years, the parties have been negotiating and reconciling numbers with regard to the amounts owed under both the OTM Contracts and the ITM Contracts, and accordingly, the number reflected in the Claims may not be consistent with the parties' current understanding of those numbers.  Shell reserves all rights available at law or equity to modify the amounts reflected in the Claims and/or herein.

D.    **Setoff Provisions in Shell-LBCS Contracts**

Each of the ITM Contracts includes broad rights of setoff, allowing for a non-defaulting

party to offset amounts owed by it or its affiliates against amounts owed by the defaulting party.

For example, the STUSCO Master Agreement states:

> Upon the occurrence of an Event of Default … and the designation … of an Early
> Termination Date pursuant to Section 6 of the Agreement, … the Non-defaulting Party
> … ("X") may, at its option and in its discretion, setoff any amounts payable by X (or
> any of X's Affiliates) to the Defaulting Party … ("Y") under this Agreement or
> otherwise … against any amounts payable by Y to X (or any of X's Affiliates) under
> this Agreement or otherwise….

STUSCO Master Agreement, Schedule, Part 5(g).  The setoff provisions in the STIL Master

Agreement and the SIETCO Master Agreement[8] are substantially similar.[9]

## III.  PROCEDURAL BACKGROUND

A.    **The Proofs of Claim**

On September 21, 2009, STIL filed proof of claim number 26243 ("Claim 26243").

Claim 26243 asserts a secured claim against LBCS in the amount of $14,030,383.40.  Pursuant

to the Court's Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule

3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and

---

[8]      The setoff language for the SIETCO Master Agreement and the STIL Master Agreement
provides:

> upon the occurrence of an Event of Default … and the designation of an Early
> Termination Date pursuant to Section 6 of the Agreement with respect to a party
> ("X"), the other Non-Defaulted Party … ("Y") will have the right (but not be obliged)
> to setoff or apply any obligation of X owed to Y … against any obligation of Y (and of
> any Affiliate of Y) owed to X.

STIL Master Agreement, Schedule, Part 5(c); SIETCO Master Agreement, Schedule, Part
5(c).

[9]      In addition, the setoff language in the SENA Master Agreement is identical to that of the
STUSCO Master Agreement.  As with the other Shell parties, SENA constitutes a swap
participant and the SENA Master Agreement constitutes a swap agreement.

Manner of Notice Thereof and Approving the Proof of Claim Form (the "Bar Date Order"), STIL duly completed the Derivatives Questionnaire with regard to Claim 26243 on a timely basis.

On September 21, 2009, SIETCO filed proof of claim number 24182 ("Claim 24182"). Claim 24182 asserts a secured claim against LBCS in the amount of $6,150,724.24. Pursuant to the Bar Date Order, SIETCO duly completed the Derivatives Questionnaire with regard to Claim 24182 on a timely basis.

On September 18, 2009, STUSCO filed proof of claim number 15939 ("Claim 15939" and collectively with Claim 26243 and Claim 24182, the "Claims"). Claim 15939 asserts a secured claim against LBCS in the amount of $2,480,655.98. Pursuant to the Bar Date Order, STUSCO duly completed the Derivatives Questionnaire with regard to Claim 15939 on a timely basis.

**B.    The Claim Objections**

On September 9, 2011, the Debtors filed the 186th Omnibus. In the 186th Omnibus, the Debtors assert that Claim 26243 "do[es] not articulate any valid basis for treatment as a secured claim." 186th Omnibus, ¶ 9. The 186th Omnibus proposes to reclassify Claim 26243 as an unsecured claim in an undetermined amount.

On September 9, 2011, the Debtors filed the 187th Omnibus. In the Claim Objection, the Debtors assert that Claim 24182 and Claim 15939 "do not articulate any valid basis for treatment as a secured claim." Claim Objection, ¶ 9. The 187th Omnibus proposes to reclassify Claim 24182 and Claim 15939 as unsecured claims in the amounts asserted.

Each of the Claim Objections further states: "many of the Misclassified Claims assert secured status based upon a reservation of a right of setoff pursuant to section 553 of the

Bankruptcy Code; however, such Misclassified Claims do not disclose the obligation owed to the Debtors by such claimant that are subject to setoff or actually assert any basis for a setoff." *Id.* [10]

## IV. BURDEN OF PROOF

"The Bankruptcy Code establishes a burden-shifting framework for proving the amount and validity of a claim.  The creditor's filing of a proof of claim constitutes prima facie evidence of the amount and validity of the claim.  The debtor must introduce evidence to rebut the claim's presumptive validity." *In re Harford Sands Inc.*, 372 F.3d 637, 640 (4th Cir. 2004) (internal citations omitted). *See also In re Spiegel, Inc.*, 2007 WL 2456626, *15 n.6 (S.D.N.Y. Aug. 22, 2007).

Fundamental principles of bankruptcy law require the Debtors to introduce admissible evidence to overcome the prima facie validity of a claim and to shift the burden of proof back to the claimant.  "Mere denial of [a] claim's validity or amount is not sufficient to rebut prima facie effect of [the] proof of claim."  Hon. Barry Russell, Bankruptcy Evidence Manual, § 301.13(3) (West Group, 1999) (citing *In re O'Connor*, 153 F.3d 258 (5th Cir. 1998); *In re Brown*, 221 B.R. 46 (Bankr. S.D. Ga. 1998); *In re Narragansett Clothing Co.*, 143 B.R. 582, 583 (Bankr. D.R.I. 1992)).

## V. ARGUMENT

### A.    The Claim Objections Are Procedurally Improper

The Court's *Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 3007 and 9019(b) for Approval of Claim Objection Procedures* (the "Claim Objection Order") provides that the Debtors may "file Omnibus Claims Objections to claims seeking

---

[10]    As discussed below, with regard to the Shell Claims, the Debtors are mistaken.  Shell provided more than adequate explanation and documentation supporting its assertion of setoff rights (and does not cite section 553 as the basis for its setoff rights in the Claims).

reduction, reclassification and/or disallowance of claims on one or more of the following grounds… the Claims were incorrectly classified." Claim Objection Order, p. 2. From that wording, the Court's intent appears to be to permit omnibus objections with regard to claims that simply check the wrong box for priority status. Consistent with such a limited scope, the Advisory Committee Note to the 2007 amendments to Rule 3007 demonstrate that omnibus claim objections are meant to be used in instances when the objections can "be resolved without material factual or legal disputes." FED. R. BANKR. P. 3007(d) advisory committee's note. Here, there is no indication that the Court intended to contravene the procedural rules to allow substantively meaty claim objections to proceed, buried among hundreds of other claims.

In addition, the Debtors allege in the Claim Objections that the Claims "assert that all or a portion of such claim is a secured claim under section 506 of the Bankruptcy Code, [but] such claims do not articulate any valid basis for treatment as a secured claim." 186th Omnibus, ¶ 9; 187th Omnibus, ¶ 9. They also state: "In addition, many of the Misclassified Claims assert secured status based upon a reservation of a right of setoff pursuant to section 553 of the Bankruptcy Code; however, such Misclassified Claims do not disclose the obligation owed to the Debtors by such claimant that are subject to setoff or actually assert any basis for a setoff." *Id.* The Debtors, however, make no effort to indicate which of its alleged bases of defect applies to which creditor. Creditors are therefore left to guess as to the basis of the Debtor's objection with respect to them. Plainly, this is not what the Court or the procedural rules intend.

The Debtor's allegations are flatly inaccurate with regard to Shell's Claims.[11]  Shell provided ample detail in the text accompanying its Claims. It also attached documentary support and spreadsheets demonstrating the amounts due and owing under both the ITM Contracts and

---

[11]    In addition to the inaccuracies listed above, Shell also reemphasizes that it asserts setoff rights pursuant to the Safe Harbor Statutes.

the OTM Contracts.   Again in responding to the Derivatives Questionnaires, Shell provided

much of the same information, and more supporting data.   For the Debtors to suggest that Shell

has not provided adequate support for its claim of security is mistaken.

The relevance of the Debtors' wayward allegations becomes clear against the backdrop of

the burden of proof.   As noted above, the Debtors are required to introduce admissible evidence

to overcome the prima facie validity of the Claims.   They have not done so.   Because "[m]ere

denial of [a] claim's validity or amount is not sufficient to rebut prima facie effect of [the] proof

of claim," the Debtors have not succeeded in shifting the burden.   Russell, at § 301.13(3).   As a

result, the Claims remain prima facie valid.

### B.    The Plain Meaning of the Safe Harbor Statutes Requires Enforcement Of the Contractual Setoff Provisions

Regardless of the analyses employed in the *Swedbank* and *UBS* opinions, the plain

language of the Safe Harbor Statutes <u>must</u> govern.   The Safe Harbor Statutes, including section

560 of the Bankruptcy Code[12] in particular, provide, in pertinent part:   "The exercise of any

contractual right of any swap participant … to offset or net out any termination values or

payment amounts arising under or in connection with the termination, liquidation, or acceleration

of one or more swap agreements shall not be stayed, avoided or otherwise limited by operation

of any provision of this title or by order of a court."   11 U.S.C. § 560.

Each of the ITM Contracts (as well as the OTM Contracts) is a swap agreement.   Each

was   an   agreement   used   for   the   purposes   of   financially   settled   commodity   swaps.    The

---

[12]    This Brief focuses on the guaranty of the enforcement of Shell's setoff rights pursuant to section 560, but the same analysis could apply under section 556 or 561.  The ITM Contracts and the OTM Contracts also constitute "forward contracts" and "master netting agreements" under the Bankruptcy Code, and Shell qualifies as a "forward contract merchant" and a "master netting agreement participant" (as do SENA and SETL).  *See* 11 U.S.C. § 101(25), (26), (38A), (38B). Because the analysis of Shell's rights would be substantially identical under each of the Safe Harbor Statutes, Shell's discussion centers upon section 560.

Bankruptcy Code's definition of "swap agreement" includes any agreement that is "a commodity index or a commodity swap, option, future or forward agreement." 11 U.S.C. § 101(53B)(A)(i)(VII). Moreover, the ISDA Master Agreement constitutes the quintessential swap agreement, and has been determined to be a swap agreement by other courts. *See, e.g.*, *Thrifty Oil Co. v. Bank of Am. Nat. Trust & Sav. Ass'n*, 322 F.3d 1039, 1050 (9th Cir. 2003).

None of the ITM Contracts (nor the OTM Contracts) had been terminated or had expired prior to and as of the Petition Date. The Bankruptcy Code defines a "swap participant" as "an entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor." 11 U.S.C. § 101(53C). As counterparties to LBCS under a pre-petition swap agreement, each of the Shell entities qualifies as a swap participant (as do SENA and SETL).

Accordingly, applying the present facts to Section 560 produces the following paraphrase: "The exercise of any contractual right of [Shell – as well as SENA and SETL] … to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of [the ITM Contracts, as well as the OTM Contracts] shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court." 11 U.S.C. § 560 (emphasis added). The plain meaning of the statute, therefore, is clear. No other provision of the Bankruptcy Code – including section 553 – may limit any of Shell's contractual setoff rights, and this Court lacks the authority to enter any order purporting to limit those setoff rights.

### 1.    Numerous Principles of Statutory Construction Require the Application of the Statute's Plain Meaning

Several tenets of statutory construction require that the Court apply the Safe Harbor Statutes according to their plain terms. The first is that a court "must enforce plain and unambiguous statutory language according to its terms." *Hardt v. Reliance Standard Life Ins.*

*Co.*, 130 S.Ct. 2149, 2156 (2011). This maxim is familiar because it is repeated so frequently by the United State Supreme Court; yet it provides the fundamental starting point for statutory interpretation. In this case, there is nothing ambiguous about the Safe Harbor Statutes. Therefore, the Court must apply the plain meaning of those statutes.

Second, a related tenet is that in interpreting a statute, a court must not "be influenced by the supposition that 'it is highly unlikely that Congress intended' a given result. Congress's intent is found in the words it has chosen to use." *Harbison v. Bell*, 129 S.Ct. 1481, 1493 (2009) (Thomas, J., concurring) (citing *W. Va. Univ. Hosps., Inc. v. Casey*, 449 U.S. 83, 98 (1991)). *See also Hardt*, 130 S.Ct. at 2156 (noting "we begin by analyzing the statutory language, assuming that the ordinary meaning of that language accurately expresses the legislative purpose") (internal citations omitted); *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658 (1985) (stating "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose"). This principle undercuts much of the reasoning of the *Swedbank* decisions. The district court, in particular, seemed to focus on how unlikely it was that Congress would have intended the Safe Harbor Statutes to partially abolish the traditional mutuality requirement for setoff. Yet, by the plain terms of the Safe Harbor Statutes, that is exactly what Congress intended – and pursuant to the rule articulated in *Harbison* and many other cases, it is inappropriate for a court to engage in that type of analysis.

Third, the Supreme Court has also emphasized that a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (quoting 2A N. Singer, <u>Statutes and Statutory Construction</u>, § 46.06, pp. 181-186 (rev. 6th ed. 2000)). This doctrine of statutory

construction is particularly important with regard to the Safe Harbor Statutes.    Courts'

interpretations of section 560, for example, have focused heavily on the guaranty of termination

rights.    Equal emphasis must be placed, however, on the guaranty of enforcement of "*any*

contractual right … to offset."    11 U.S.C. § 560.    The "American Heritage Dictionary defines

'any' to include 'one, some, every or all without specification.'"    *Bores v. Domino's Pizza LLC*,

530 F.3d 671, 675 (8th Cir. 2008) (quoting <u>American Heritage Dictionary</u>, 81 (4th ed. 2000)).

The Safe Harbor Statutes, therefore, protect every single contractual right related to setoff – not

only those that fit within the traditional understanding of setoff in bankruptcy jurisprudence.

Similarly, courts' analyses have sometimes focused on ensuring that contractual rights

are not stayed – *i.e.*, not subject to the automatic stay.    Again, however, the proper analytical

framework must focus equally on the prohibition against such contractual rights being "*limited*."

*Id.*    Black's Law Dictionary defines "limit" as "to abridge, confine, restrain and restrict."

BLACK'S LAW DICTIONARY, p. 926 (6th ed. 1990).    Unquestionably, the effect of the *UBS*

opinion was to abridge, confine, restrain or restrict the scope of the parties' setoff rights.    That

result is prohibited by the plain language of the Safe Harbor Statutes.

Yet another clause of significance in the Safe Harbor Statutes is "*shall not*."    Black's

defines "shall" by stating:    "As used in statutes, … this word is generally imperative or

mandatory … It has the invariable significance of excluding the idea of discretion."    BLACK'S

LAW DICTIONARY, p. 1375 (6th ed. 1990).    Applying that definition to section 560, the Court

*must not* enter any Order that would limit Shell's contractual setoff rights.

A final principle of statutory construction is that when statutes conflict, the later law

takes precedence over the earlier.    "When the plain import of a later statute directly conflicts

with an earlier statute, the later enactment governs."    *Lockhart v. United States*, 546 U.S. 142,

149 (2005).  Because section 553 was enacted as part of the original Bankruptcy Code in 1978

and section 560 became law in 1982, the latter must govern.

### 2.    The Court Should Employ A Different Analysis Than It Has Used in the Past

Basic legal principles should lead the Court to employ a different analysis with regard to

Shell's Claims.    A proper analysis requires only a reading of the plain language of the Safe

Harbor Statutes.  The text of those provisions is clear and unambiguous.   When the Safe Harbor

Statutes are given their straightforward meaning, no reference to any other authority – including

section 553(a) – is appropriate.  Indeed, the proper analysis in this case begins and ends with the

plain meaning of section 560.

Contrary to that approach that looks only to the plain meaning of the Safe Harbor

Statutes, several aspects of the *Swedbank* and *UBS* decisions do not withstand additional scrutiny

under the present facts.

### (a)    Section 560 Directly Addresses any Contrary Mutuality Requirement in Section 553(a)

*Swedbank I* states that the Safe Harbor Statutes "simply do not directly address the

requirement of mutuality under section 553(a).  Instead, these exceptions permit the exercise of a

contractual right of offset in connection with swap agreements, notwithstanding the operation of

any provision of the Bankruptcy Code that could operate to stay, avoid or otherwise limit that

right, but that right must exist in the first place."  *Swedbank I*, 433 at 109.  *See also UBS*, at p.

14.

Shell respectfully disagrees; the Safe Harbor Statutes directly address any potentially

contrary mutuality requirement.  The clause relating to a mutuality requirement resides in section

553(a), which, under the language of section 560,  is another "provision of this title."  Because

the Safe Harbor Statutes prohibit any other "provision of this title" from limiting "any contractual right … to offset," they directly address section 553(a)'s mutuality requirement. Section 560 does not contain a mutuality requirement of its own.  Neither does it (a) incorporate the provisions of section 553, nor (b) exclude section 553 from its overall prohibition that Shell's rights "shall not be … limited by operation of any provision of this title."  11 U.S.C. § 560. Moreover, as discussed more fully below, the deletion of mutuality from the relevant portions of section 362(b) further supports the proposition that offset under the Safe Harbor Statutes is specifically intended to apply without regard to mutuality.

The Safe Harbor Statutes do permit the exercise of a contractual right of offset in connection with swap agreements, notwithstanding the operation of any provision of the Bankruptcy Code.  It is also true that the right must exist in the first place – but that inquiry is limited to the non-debtor party's contractual rights.  If the party has the contractual rights to exercise setoff, then neither the court nor any other section of the Bankruptcy Code has the power to prevent such setoff.  The implication in *Swedbank I* is that the court must look to section 553(a) to determine whether the right exists in the first place, but because section 553(a) would *limit* a contractual right, such an analysis violates the very terms of the Court's own statement.  Moreover, nothing in section 553(a) suggests that it is intended to determine the existence of a setoff right; instead, it acts as a savings clause, preserving certain types of pre-existing rights.

*UBS* repeats the *Swedbank I* admonition that "the safe harbors permit the exercise of a contractual right of offset in connection with swap agreements, notwithstanding the operation of any provision of the Bankruptcy Code that could operate to stay, avoid or otherwise limit that right, *but that right must exist in the first place*." *UBS*, at p. 14 (emphasis in original).  There can

be no question that the contractual right to cross-affiliate setoff exists here.  The ITM Contracts provide for the cross-affiliate setoff rights (as do the OTM Contracts), so there can be no question that the rights "exist in the first place."  In fact, the Court acknowledges that the setoff rights exist outside of bankruptcy in the *UBS* opinion.  *UBS*, at p. 6 ("outside of the bankruptcy context, section 5(a) without question is a valid and enforceable provision").  Therefore, the Court's analysis is really whether they exist not "in the first place," but at some later time, after the Petition Date.  The only way for the setoff rights to go from existing in the first place to not existing after the Petition Date is for those contractual rights to have been *limited* by the operation of section 553(a) – which is expressly forbidden by the Safe Harbor Statutes.

       (b)      *Even If Reference to Legislative History Were Appropriate (Which It Is Not), It Would Weigh In Favor of Enforceability*

Under generally accepted rules of statutory construction – including some discussed above – reliance on the legislative history of the Safe Harbor Statutes, to change the plain meaning of such provisions is inappropriate. A court's "inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd. LLC v. United States*, 541 U.S. 176, 183 (2004).

The Safe Harbor Statutes contain no ambiguity.  In no decision to date has this Court found the text to be ambiguous.  Moreover, legislative history cannot be used to create ambiguity that does not exist in the text of a statute.  *Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 132-33 (2002).  Therefore, the statutory analysis must go no further.  The Court should apply the Safe Harbor Statutes in accordance with their plain terms, without regard to the legislative history.

Even if reference to the legislative history were appropriate, however, it supports Shell's position.  There are pieces of legislative history that suggest a more restrictive reading – but this

is to be expected, because of the gradual trend of liberalizing the Bankruptcy Code's safe harbor provisions.[13]   A party opposing an interpretation that arises out of the 2005 amendments can easily find legislative history from the 1982 amendments, suggesting a more limited interpretation of the provisions – but that does not translate to an accurate portrayal of the present-day law.[14]

A more complete review of the legislative history reveals statements consistent with the enforcement of cross-affiliate setoff rights.   For example, the purpose of the provisions was "to provide certainty for swap transactions and thereby stabilize domestic markets by allowing the terms of the swap agreement to apply notwithstanding the bankruptcy filing."   136 Cong. Rec. S7535 (remarks of Sen. DeConcini).   *See also Thrifty Oil*, 322 F.3d at 1051 (quoting DeConcini remarks with approval); 136 Cong. Rec. H2281-06, H2282 (1990) ("Congress has concluded certain rapid, high volume financial transactions warrant special treatment so as not to disrupt capital markets") (statement of Rep. Brooks); H.R. Rep. 101-484, at 2, *as reprinted in* 1990 U.S.C.C.A.N. 223, 224 (1990) ("US bankruptcy law has long accorded special treatment to transactions involving financial markets"); 136 Cong. Rec. H2281, 2284 (1990) (high volume transactions deserve "different treatment" and are in "different category" under Bankruptcy Code) (statement of Rep. Schumer).   Consistent with Senator DeConcini's remarks, Shell seeks nothing more here than simply to apply the ITM Contracts by their terms, just as it would do outside of bankruptcy.

---

[13]      *See* Section V (A)(4), *infra*.

[14]      Similarly, it is worth noting that many of the cases cited in *UBS* and *Swedbank I* occurred in years prior to the passage of the 2005 and 2006 amendments.  Perhaps those earlier cases would not have been decided any differently on present-day questions concerning 553(a) alone -- but they should not be viewed as dispositive with regard to the interplay between section 553(a) and the present incarnation of the Safe Harbor Statutes.

One other piece of legislative history stands out, particularly given the Court's emphasis on the absences of a "notwithstanding" clause (discussed more fully below).  In discussing the enactment of section 560, Congress plainly stated that the purpose was to preempt all other sections of the Bankruptcy Code:  "Section 560 provides that the exercise of any such right shall not be stayed, avoided or otherwise limited by operation of the Bankruptcy Code or by order of any court … This provision is not intended to preempt the statute of frauds or any other provision of law, except for the provisions of the Bankruptcy Code."  H.R. Rep. No. 101-484, at 5-6, *as reprinted in* 1990 U.S.C.C.A.N. 223, 227-28 (1990).  *See also* S. Rep. No. 101-285, at 9 (1990) ("This provision means that these contractual rights are not to be interfered with by any court proceeding under the Code").

In its review of Congressional intent, *Swedbank II* noted:  "the legislative history reflects a concern for the stability of the often-volatile swap market.  Consequently, Congress emphasized that the Safe Harbor Provisions permit immediate termination of swap transactions in order to minimize unpredictability."  *Swedbank II*, 445 B.R. at 135.  Although the court's focus was on termination rights rather than setoff rights, the same policy goals govern here.  Enforcement of cross-affiliate setoff reduces systemic risk by preventing the effects of one major player's default from rippling across the markets.

(c)    *The Court's Inquiry Was Too Narrow In Looking for
a "Notwithstanding" Clause*

A prominent feature of *Swedbank I* is the discussion of whether the Safe Harbor Statutes contain any clause to the effect of:  "notwithstanding any other provision of law."  *Swedbank I*, 433 B.R. at 111.  Because the Court found no such clause in the statutory text, it declined to conclude that the Safe Harbor Statutes should trump section 553.

In that discussion, however, the Debtors framed the issue too narrowly.  If the question is solely whether a "notwithstanding" clause exists, absurd results would follow. For example, a court would still subordinate a hypothetical statute that included language such as:  "Despite the provisions of section 553…."

Instead, the proper inquiry is whether a given statute contains any *non obstante* provision. The Supreme Court recently explained:

> The phrase 'any [state law] to the Contrary notwithstanding' is a *non obstante* provision.  Eighteenth-century legislatures used *non obstante* provisions to specify the degree to which a new statute was meant to repeal older, potentially conflicting statutes in the same field.  A *non obstante* provision in a new statute acknowledged that the statute might contradict prior law and instructed courts not to apply the general presumption against implied repeals.

*PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2579-80 (2011).  Although *non obstante* clauses may often use the term "notwithstanding," sometimes they do not.  In a seminal article on the provisions, Caleb Nelson instructed:  "The precise wording of these clauses varied from state to state and from statute to statute.  Many statutes provided that they applied 'any law to the contrary notwithstanding' or 'any law, usage or custom to the contrary notwithstanding.'  Others used some variation of the formulation… But in one form or another, such 'non obstante clauses' were ubiquitous."  Caleb Nelson, "Preemption," 86 VA. L. REV. 225, 240-41 (March 2000).

Nelson notes that courts ordinarily prefer not to interpret a statute in a manner contrary to prior law.  "The presumption against implied repeals … might cause courts to distort the new statute."  *Id.*  If legislatures wanted new legislation to supersede whatever prior law it contradicted, then the *non obstante* clause signaled courts to override the presumption against implied repeals.  "A *non obstante* clause in the new statute acknowledged that the statute might contradict prior law and instructed courts not to apply the general presumption against implied repeals.  Rather than straining the new statute in order to harmonize it with prior law, courts were

supposed to give the new statute its natural meaning and to let the chips fall where they may." *Id*. at 241-42.*

Because many *non obstante* clauses do include the word "notwithstanding," the scope of the proper inquiry is only slightly wider than the scope employed in *Swedbank I*. Nevertheless, the difference is highly pertinent. The statutory language in section 560 provides that the relevant contractual rights "shall not be stayed, avoided, or otherwise limited by operation of any provision of this title." 11 U.S.C. § 560. By drafting the statute so that the rights could not be limited by any other section of the Bankruptcy Code, Congress "acknowledged that the statute might contradict prior law and instructed courts not to apply the general presumption against implied repeals." Nelson, 86 VA. L. REV. at 241-42. *See also Shamrock Farms Co. v. Veneman*, 146 F.3d 1177, 1180 (9th Cir. 1998) (giving "any other provision" clause similar treatment to "notwithstanding" clause); *In re Air Vermont, Inc.*, 761 F.2d 130, 133-34 (2d Cir. 1985) (same); 5 COLLIER ON BANKRUPTCY 555.04[2], n.6 (equating Safe Harbor Statutes provision with a "notwithstanding" clause).

In short, the text in the Safe Harbor Statutes is quite *explicit* in overriding section 553(a). "'Explicit' means 'not obscure or ambiguous, having no disguised meaning or reservation.'" *United States v. Sanchez*, 639 F.3d 1201, 1205 (9th Cir. 2011) (quoting BLACK'S LAW DICTIONARY 579 (rev. 6th ed. 1990)). There is nothing obscure or ambiguous in the Safe Harbor Statutes' *non obstante* clauses, nor do they have any disguised meaning or reservation. On the contrary, they are clear – hence, explicit – in their directive to apply the Safe Harbor Statutes notwithstanding the terms of any other section of the Bankruptcy Code.

>   *(d)     The Amendments under the FNIA Were Substantial, and
>             Support the Enforceability of Cross-Affiliate Setoff Rights*

The Financial Netting Improvements Act of 2006 (the "FNIA") enacted certain changes to the Bankruptcy Code that are relevant to the present analysis. In particular, the FNIA modified certain exceptions to the automatic stay under section 362(b) of the Bankruptcy Code. Prior to the enactment of the FNIA, the statute provided that swap participants were exempt from the automatic stay for purposes of exercising the setoff of "mutual debts and claims." 11 U.S.C. § 362(b)(14) (2005), *amended by* 11 U.S.C. § 362(b)(17). The FNIA deleted the reference to "mutual debts and claims" and instead substituted "any contractual right." As a result, the statute now reads that the automatic stay does not apply to "the exercise by a swap participant … of any contractual right … to offset or net out any termination value, payment amount or other transfer obligation…." 11 U.S.C. § 362(b)(17).

Congress's deletion of mutuality from the section 362(b) provisions further supports the fact that the Safe Harbor Statutes were similarly intended to be exempt from any possible mutuality requirement. *Swedbank I*, however, dismisses the significance of the FNIA amendments by suggesting that they merely made "technical changes" to "update the language to reflect current market and regulatory practices." *Swedbank I*, 433 B.R. at 112. The Court concluded: "These technical amendments cannot be read as authority for so fundamental a change in creditor rights." *Id.*

Although some portions of the legislative history may suggest that the FNIA involved merely "technical changes," the reality is to the contrary. The FNIA included a number of substantive changes to the Bankruptcy Code.[15]  Other pieces of legislative history give a more accurate representation of the changes, indicating that the FNIA was a way to "amend banking,

---

[15]      As one example of substantive changes in the FNIA amendments, certain of the section 546 safe harbor defenses were modified to remove the requirement that the transfers at issue must be "margin payments" or "settlement payments." Instead, any type of transfer would now qualify for the defense. *Cf.* 11 U.S.C. § 546(f) (2005) *with* 11 U.S.C. § 546(f).

bankruptcy, and securities laws related to the disposition of financial contracts in the event of insolvency" and "to reduce the risk – especially the systemic risk associated with activities in derivatives markets – that the failure of one entity will disrupt and endanger financial markets." H.R. Rep. No. 109-648, pt. 1 at 2 (2006).

Moreover, bankruptcy authorities consistently recognized the enactment of the FNIA as expanding the scope of the safe harbor protections. *See* Harold S. Novikoff, "Special Bankruptcy Code Protections for Derivative and Other Financial Market Transactions," Chapter 11 Business Reorganizations (Apr. 28-29, 2011); Dennis J. Connolly & Leib M. Lerner, "Recent Developments with Respect to the 'Safe Harbors' for Swaps and Repo Agreements," 2010 Ann. Surv. Of Bankr. Law 1 (2010); Jonathon Keath Hance, "Derivatives at Bankruptcy," 65 WASH. & LEE L. REV. 711, 765 (Spring 2008) ("The latest amendment to the Bankruptcy Code, the Financial Netting Improvements Act of 2006, further widens the safe harbor"); Bruce H. White & Bryan L. Elwood, "Are You Sailing in Safe Harbors?" 26 AM. BANKR. INST. J. 44, 45 (Dec. 2008); Seth Grosshandler et al., "Securities, Forward and Commodity Contracts and Repurchase, Swap and Master Netting Agreements under U.S. Insolvency Laws," Advanced Swaps & Other Derivatives in 2007 (Apr. 18, 2007).

More specifically, other leading bankruptcy authorities recognized the FNIA changes as opening the door to cross-affiliate setoff rights. The FNIA "took [the preexisting] expansion a step further by removing the 'mutuality' requirement, which seemed to clear the way for setoff between a counterparty and multiple debtors, or 'cross-party netting.'" Charles A. Beckham, Jr. & Erik K. Martin, "Derivative Exposure and Counterparty Insolvency," 8th Annual Gas & Power Institute (Sept. 2009). *See also* Stroock Special Bulletin, "Financial Netting Improvements Act of 2006" (Feb. 1, 2007) (stating "Significantly, the second category of exempted actions now

speaks of rights to offset or net out, without an express requirement of mutuality. This appears to recognize contractual netting provisions regardless of mutuality").

The weight of the authority, therefore, indicates that the FNIA made more than mere technical changes. Instead, it effected a relatively small number of significant and substantive changes to the Bankruptcy Code and other insolvency statutes. Among those substantive changes was Congress's deliberate removal of the mutuality requirement in section 362(b), which further supports the proposition that the Safe Harbor Statutes are independent from the traditionally-stated mutuality requirement.

(e)    <i>The Safe Harbor Statutes Are More Specific Than Section 553</i>

One final lynchpin to the *Swedbank I* decision was the proposition that section 553(a) is more specific than section 560. Because a general statute is understood to "give way to a specific one," the Court opined that section 553(a) must be read as superior. *Swedbank I*, 433 B.R. at 109 (quoting *United States v. LaPorta*, 46 F.3d 152, 156 (2d Cir. 1994)).

In determining which of two statutes is more specific, the Second Circuit has focused on the breadth of the class of interested or affected parties. *Stoltz v. Brattleboro Housing Auth. (In re Stoltz)*, 315 F.3d 80, 93 (2d Cir. 2002). Section 553(a) provides a savings clause to certain types of setoff but potentially to all creditors. The Safe Harbor Provisions apply only to a relatively narrow band of participants in the financial and commodity markets. Therefore, the Safe Harbor Statutes apply to a narrower class of interested parties. Under *Stoltz*, they are more specific than section 553(a).

**3.    Policy Implications Demand Enforcement of Contractual Cross-Affiliate Setoff Rights**

Two general and related policies underlie the *Swedbank* and *UBS* opinions. First, the courts emphasize the routine nature of imposing a mutuality requirement in bankruptcy law. *See*

*Swedbank II*, 445 B.R. at 135; *UBS,* at p. 7; *Swedbank I*, 433 B.R. at 113.  Second, allowing any form of setoff affects the bankruptcy estate and the general creditor body.

Congress, however, often must juggle more than one policy concern when enacting legislation.  Whereas one set of policies may seem universal in the context of bankruptcy law, a broader view may introduce a host of competing policies that Congress must consider.  When faced with such competing policies, courts must respect the balance that Congress ultimately chose.  *United States v. Ron Pair Enters.*, 489 U.S. 235, 245-46 (1989).

As quoted extensively in the opinions and briefs, the countervailing policy is to reduce systemic risk by minimizing disruptions within financial and commodity markets when a major player within those markets defaults.  *See, e.g., Swedbank II*, 445 B.R. at 135 (noting "the legislative history reflects a concern for the stability of the often-volatile swap market").  Allowing counterparties to exercise broad rights of setoff may be disadvantageous for other unsecured creditors of debtors in bankruptcy and their bankruptcy estates, but it is advantageous for the smooth functioning of markets.  Because the universe of parties protected by the latter policy is larger than the universe of parties protected by the former (even in a bankruptcy case as large as this), it is entirely rational for Congress to strike a balance that favors derivatives counterparties.

At its most general level, the bankruptcy system is about the collective benefit.  *See, e.g.*  Douglas G. Baird & Thomas H. Jackson, "Corporate Reorganizations and the Treatment of Diverse Ownership Interests," 51 U. Chi. L. Rev. 97, 105-06 (1984).  When a debtor is a participant in financial markets – and particularly a large-scale participant such as the Lehman Brothers enterprise – then the choice becomes whether collective benefit of the creditor body should be superior or inferior to the collective benefit of the markets in which the debtor traded.

Either alternative might present a rational choice, but the safe harbor provisions of the Bankruptcy Code evidence a policy judgment by Congress to prefer to the collective benefit of the market participants.

Regardless of whether one agrees with that policy decision, it is the reality reflected in the consistent trend of liberalizing the Bankruptcy Code's safe harbor provisions. "With each amendment to the Bankruptcy Code, Congress has expanded the scope of financial instruments covered under the safe harbor provisions… Each series of amendments attempted to create stability and certainty for an expanding derivatives market by providing broader protection for a greater variety of instruments." Hance, 65 WASH. & LEE L. REV. at 738. *See also* Mark J. Roe, "The Derivatives Market's Payment Priorities as Financial Crisis Accelerator," 63 STAN. L. REV. 539, 552 (March 2011) ("Congress added derivatives priorities to the Code over the last three decades, expanding them in 1982, 1984, 1994, 2005 and 2006"); Stephen J. Lubben, "Repeal the Safe Harbors," 18 AM. BANKR. L. REV. 319, 319 (Spring 2010) (describing "immense expansion of derivative safe harbor provisions").[16]

The effect of the strong trend of liberalizing the safe harbor provisions is two-fold. First, as noted above, it undermines the effectiveness of any references to early legislative history for purposes of more restrictive interpretations of the provisions. Second, it demonstrates the high priority that Congress has placed on the policy goals of protecting financial markets. Therefore, the analysis of the Safe Harbor Statutes' interplay with the mutuality requirement should be viewed through a different lens. If viewed solely from a bankruptcy perspective, then the

---

[16]    Undeniably, certain of the law review articles cited herein are highly critical of the safe harbor provisions and their scope. Whatever the merits of the arguments found in those articles, however, the salient point is what rights the Safe Harbor Statutes presently confer. The fact that the articles argue for repeal (or similar measures) demonstrates that there is indeed a broad set of rights in existence.

historical emphasis on mutuality in setoff issues may seem paramount. When viewed from a broader perspective to reflect the legislative priority in protecting markets, it becomes clear that Congress did indeed intend to subordinate mutuality in the context of the Safe Harbor Statutes.

Finally, cross-affiliate setoff rights represent useful risk management tools that are widely used in the derivatives industry. The ISDA Master Agreement alone is one of the most important commercial agreements in the world today, providing legal and contractual underpinning for more than $500 trillion dollars of privately negotiated derivatives contracts. "ISDA: OTC Market Needs Transparency," Futures Magazine (Sept. 16 2010). As the International Swaps and Derivatives Association, Inc. ("ISDA") noted in a 2004 amicus brief:

> The ISDA Master Agreement (Multicurrency-Cross Border) (as published and copyrighted by ISDA in 1992, the "ISDA Master") is a standard form of agreement entered into by parties that wish to enter into one or more derivatives transactions with each other. Parties that have entered into an ISDA Master may then enter into derivatives transactions over time, each transaction being governed by and becoming part of the relevant ISDA Master. It has been estimated that there are many tens of thousands of executed ISDA Masters in place…now governing many trillions of dollars of notional amount of transactions. [17]

Against this backdrop, cross-affiliate setoff rights facilitate commerce by encouraging parties to enter into transactions when they otherwise might not transact. They therefore serve as a means for allowing parties to further economic activity and to hedge their risks effectively. Parties throughout the industry have entered into agreements that feature cross-affiliate setoff, and they have done so in reliance on the plain language of the Safe Harbor Statutes. The *UBS* opinion actually slows economic activity by reducing certainty in the markets – a result at odds with clear Congressional instruction.

---

[17]    Brief *Amicus Curiae* in Support of the Brief of Defendant-Appellant-Cross-Appellee, *Finance One Public Company Ltd. v. Lehman Brothers Special Financing, Inc*., No. 03-9049(L) (2d Cir.,  May 19, 2004).

**C.     Even in the Absence of the Safe Harbor Statutes, Shell Can
Exercise Its Cross-Affiliate Setoff Rights**

As discussed above, the Safe Harbor Statutes demonstrably preempt any mutuality requirement in section 553(a).  Even if that were not true, however, Shell would nevertheless be entitled to enforce its cross-affiliate setoff rights.

Section 553(a) states:  "Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor…."  11 U.S.C. § 553(a).  The language of section 553(a) is therefore directly subject to section 362.  Section 362(b)(17) provides that the automatic stay does not prevent "the exercise by a swap participant of … any contractual right … to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements."  11 U.S.C. § 362(b)(17).  Because there is no reference to mutuality in section 362(b)(17) – and, in fact, any mention of mutuality was intentionally removed by the FNIA –  the exception allows for the offset of "*any* termination value, payment amount or other transfer obligation."  *Id.* (emphasis added).  Section 553(a) explicitly defers to that allowance.

Even were that not so, section 553 does not create setoff rights, but rather defers to applicable non-bankruptcy law.  *See Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18-19 (1995).  Applicable non-bankruptcy law may arise from the common law, but may also come from contractual rights governed by state law.  *See United States v. Fisk Bank of Mass. (In re Calore Express Co., Inc.)*, 288 F.3d 22, 43 (1st Cir. 2002); *Blanton v. Prudential-Bache Secs., Inc.*, 105 B.R. 321, 334 (Bankr. E.D. Va. 1989).

Likewise, "[m]utuality of obligations is determined by state law." *In re Garden Ridge Corp.*, 338 B.R. 627, 633 (Bankr. D. Del. 2006), *aff'd* 399 B.R. 135. The Court's analysis in the *UBS* opinion seems to rest on a federal definition of mutuality, but that approach is unsupported by the case law. *See UBS*, at pp. 8-9. On the contrary, the Court must look to the governing state law (or other applicable non-bankruptcy law) to determine whether mutuality exists. Only after doing so should the Court turn to federal law.

### 1.    Assuming, *Arguendo*, that Mutuality Is Required, the Parties Created Mutuality in their Contracts

New York law allows parties to create mutuality through a given contract. "Freedom of contract itself is deeply rooted in public policy" in New York. *Kramer v. Lockwood Pension Servs. Inc.*, 653 F. Supp. 2d 354, 378 (S.D.N.Y. 2009) (citing *New England Mut. Life Ins. Co. v. Caruso*, 538 N.Y.S.2d 217, 221 (N.Y. 1989)). *See also UBS*, at p. 6 ("Under New York law, parties are free to create contractual setoff rights that differ from those provided by common law or statute"). The freedom of contract provides that legally competent parties may agree to any contractual provision, provided that it does not violate the law or public policy.

Freedom of contract allows parties to contractually provide for broader setoff rights than the common law or statutory setoff would allow. *Bank of N.Y. v. Meridien BIAO Bank Tanz. Ltd.*, 1997 WL 53172, at *2-4 (S.D.N.Y. Feb. 10, 1997). Similarly, New York law allows the parties to adjust the scope of mutuality beyond its interpretations under common law or statutory law. *Fuller v. Fasig-Tipton Co.*, 587 F.2d 103, 107 (2d Cir. 1978). Here, Shell contracted with LBCS in a way that expanded any concept of mutuality to include Shell affiliates. That expansion is permissible under New York law, and leads to the conclusion that to the extent mutuality is required under section 553(a), it exists. *See also Depositors Trust Co. of Augusta v. Frati Enters., Inc.*, 590 F.2d 377, 379 (1st Cir. 1979) (holding affiliated banks were "basically

the same bank, [but] we cannot treat them as such, in the absence of an agreement by the bankrupt to treat the two banks as one"). Indeed, in the *UBS* opinion, the Court acknowledges that cross-affiliate setoff is permissible outside of bankruptcy. *UBS*, p.6

Thus, if section 553(a) applies, the Court must look to underlying law to determine mutuality. *Garden Ridge Corp.*, 338 B.R. at 633. Here, applicable law allows for the parties to create mutuality contractually to include more than two parties.[18] Therefore, there is mutuality to the extent it is required for purposes of section 553(a) of the Bankruptcy Code.

### 2.    Bankruptcy Law Allows Triangular Setoff

Even if the Court declines to recognize the mutuality that would be recognized under New York law, it should nevertheless enforce the setoff provisions. Bankruptcy courts have stated that triangular setoff is permissible, particularly in instances when there is a formal agreement by the debtor. *See Garden Ridge*, 338 B.R. at 634; *Wooten v. Vicksburg Ref. Inc. (In re Hill Petroleum Co.)*, 95 B.R. 404, 411 (Bankr. W.D. La. 1988); *In re Fasano/Harriss Pie Co.*, 43 B.R. 864, 870-71 (Bankr. W.D. Mich. 1984); *Eckles v. Petco Inc. (In re Balducci Oil Co.)*, 33 B.R. 847, 853 (Bankr. D. Colo. 1983). Therefore, an express agreement allowing for triangular setoff rights should be enforced in bankruptcy court.

First, a close reading of section 553 reveals that it does not impose limits on or prohibit any form of non-mutual setoff. Instead, it says only that the statute "does not affect any right of a creditor to offset a mutual debt" and claim. 11 U.S.C. § 553(a). The treatment of non-mutual debts and claims is not addressed in the statutory text; it is completely silent. Had Congress intended to impose a strict mutuality requirement, it would have done so. The silence of section

---

[18]    To the extent that there is any question on the ability of parties to create mutuality under New York law – and judging from *UBS*, it appears there is not – Shell respectfully requests that the Court certify the question to the New York Court of Appeals.

553 with regard to non-mutual setoff creates a question of whether any other provision of the Bankruptcy Code governs non-mutual setoff. The only provisions that even approach an answer to that question are the Safe Harbor Statutes and section 362(b), which prohibit the limitation of *any* contractual right of setoff (which necessarily includes any cross-affiliate right of setoff).

Again, even if section 553(a) applies and requires mutuality, mutuality does not require only two parties. Many cases in the jurisprudence make reference to obligations between the parties or to payments between A and B – but when only two parties are involved, that is the logical way to describe the arrangement. The case law contains few instances when more than two parties are involved, so references to setoff involving A, B and C are necessarily uncommon.

In addition, a number of bankruptcy cases have declined to apply triangular setoff rights, but only on the basis of contractual defect. *See Inland Steel Co. v. Berger Steel Co. (In re Berger Steel Co.)*, 327 F.2d 401, 404-05 (7th Cir. 1964); *Vicksburg Ref.*, 95 B.R. at 411-12; *Equibank v. Lang Mach. Co. (In re Lang Mach. Co.)*, 1988 WL 110429, at *5 (Bankr. W.D. Pa. Oct. 19, 1988);. *Fasano/Harriss Pie Co.*, 43 B.R. at 870; *Balducci Oil*, 33 B.R. at 853; *Virginia Block Co. v. Bushong (In re Virginia Block Co.)*, 16 B.R. 560, 562 (Bankr. W.D. Va. 1981). In those cases, the implication is that the triangular setoff would have been allowed if an enforceable contract had been in place.

Likewise, several receivership cases have also allowed triangular setoff. *See Piedmont Print Works, Inc. v. Receivers of People's State Bank of S. Carolina*, 68 F.2d 110, 111 (4th Cir. 1934); *Bromfield v. Trinidad Nat'l Investment Co.*, 36 F.2d 646, 647-48 (10th Cir. 1929). *UBS* indicates that setoff rights are necessarily narrower in the bankruptcy context than in the receivership context, but if section 553(a) generally defers to non-bankruptcy law, there is no reason why that should be true. *See Strumpf*, 516 U.S. at 18; *UBS*, at p. 11. Instead, the Court

should recognize that the bankruptcy jurisprudence does follow the equity receivership jurisprudence in allowing triangular setoff in instances when the parties specifically agree to it.

## VI.  CONCLUSION

Accordingly, for the reasons discussed above, the weight of authority strongly favors enforcement of Shell's contractual setoff rights.   Shell respectfully requests that the Court overrule the Claim Objections.


Dated:  October 13, 2011

SUTHERLAND ASBILL & BRENNAN LLP

By:  /s/ Paul B. Turner
     Paul B. Turner (*pro hac vice*)
     1001 Fannin Street, Suite 3700
     Houston, Texas  77002
     (713) 470-6100

     Mark D. Sherrill (*pro hac vice*)
     1275 Pennsylvania Avenue, NW
     Washington, DC  20004
     Tel:  (202) 383-0100
     Fax:  (202) 637-3593

COUNSEL FOR SHELL TRADING (US) COMPANY,
SHELL TRADING INTERNATIONAL LIMITED
AND SHELL INTERNATIONAL EASTERN
TRADING COMPANY

Of Counsel:

Jennifer M. Gore
Senior Legal Counsel
Shell Oil Company
909 Fannin, Plaza Level I
Houston, Texas  77010
Tel:    (713) 767-5400
Fax:    (713) 265-3070