(Multicurrency—Cross Border)

# ISDA®



International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of 28 June, 2007

LEHMAN BROTHERS COMMODITY SERVICES
INC.

SHELL INTERNATIONAL EASTERN
TRADING COMPANY (OWNED BY SHELL
EASTERN TRADING (PTE) LTD)

LEHMAN BROTHERS COMMODITY SERVICES INC. and SHELL INTERNATIONAL EASTERN TRADING COMPANY (owned by Shell Eastern Trading (Pte) Ltd) have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:-

1.     **Interpretation**

(a)     *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)     *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)     *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.     **Obligations**

(a)     *General Conditions.*

(i)   Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.



(b)     *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)     *Netting.* If on any date amounts would otherwise be payable:—

> (i)  in the same currency; and

> (ii)  in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)     *Deduction or Withholding for Tax.*

> (i)  *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

>> (1)  promptly notify the other party ("Y") of such requirement;

>> (2)  pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

>> (3)  promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

>> (4)  if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

>>> (A)  the failure by Y to comply with or perform any agreement contained in   Section 4(a)(i), 4(a)(iii) or 4(d); or

>>> (B)  the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

**ISDA ® 1992**



(ii)  *Liability.* If:—

    (1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

    (2)  X does not so deduct or withhold; and

    (3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)  *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.    Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)  *Basic Representations.*

    (i)  *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

    (ii)  *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

    (iii)  *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    (iv)  *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v)  *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3



**ISDA ® 1992**

(b)   *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)   *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)   *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)   *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)   *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.   **Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)   *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

    (i)   any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

    (ii)   any other documents specified in the Schedule or any Confirmation; and

    (iii)   upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)   *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)   *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)   *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)   *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon   it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

4



ISDA ® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.    Events of Default and Termination Events**

(a)    *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

> (i)    *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

> (ii)    *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

> (iii)    *Credit Support Default.*

>> (1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

>> (2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

>> (3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

> (iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

> (v)    *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

> (vi)    *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

ISDA ® 1992

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii)  **Bankruptcy.** The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1)  is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)  **Merger Without Assumption.** The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1)  the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)  the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)  **Termination Events.** The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

ISDA ® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)    **Illegality.** Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

        (1)    to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)    to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)    **Tax Event.** Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)    **Tax Event Upon Merger.** The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)    **Credit Event Upon Merger.** If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v)    **Additional Termination Event.** If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    **Event of Default and Illegality.** If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.



7             **ISDA ® 1992**

**6.    Early Termination**

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

   (i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

   (ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

   If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

   Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

   (iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)( 1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

   (iv)    *Right to Terminate.* If:—

      (1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

      (2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

   either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then



8                                          ISDA ® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    *Calculations.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1)    *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)    *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)    *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

9



ISDA ® 1992

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)     *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)   *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)     *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)     *Two Affected Parties.* If there are two Affected Parties:—

(A)    if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)    if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.



10                                                                      **ISDA ® 1992**

7.    **Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    **Contractual Currency**

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.



**ISDA ® 1992**

**9.    Miscellaneous**

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

> (i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

> (ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document



ISDA ® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 12.    Notices

(a)    *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

   (i)    if in writing and delivered in person or by courier, on the date it is delivered;

   (ii)    if sent by telex, on the date the recipient's answerback is received;

   (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

   (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

   (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 13.    Governing Law and Jurisdiction

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

   (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

   (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any



13                                         **ISDA © 1992**

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    **Waiver of Immunities.** Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

14



ISDA ® 1992

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

ISDA ® 1992

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.



16

ISDA ® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a) (iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

17



ISDA ® 1992

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| | |
|---|---|
| **LEHMAN BROTHERS COMMODITY SERVICES INC.** | **SHELL INTERNATIONAL EASTERN TRADING COMPANY (owned by Shell Eastern Trading (Pte) Ltd)** |
| By: | By: |
| Name: | Name: MR. PHIL SMAITH |
| Title: *Scott Willoughby* | Title: PRESIDENT, SIETCO |
| Date: *Senior Vice President* | Date: 12/07/07 |

*September 7, 2007*

ISDA ® 1992

**SCHEDULE**
to the
**Master Agreement**
dated as of 28 June, 2007
between

**LEHMAN BROTHERS COMMODITY SERVICES INC. ("Party A"),**
a corporation organized under the laws of
the State of Delaware
and

**SHELL INTERNATIONAL EASTERN TRADING COMPANY** (Business Registration Number 44480800X )
owned by Shell Eastern Trading (Pte) Ltd **("Party B"),**
a corporation organized under the laws of
Singapore.

**Part 1: Termination Provisions**

In this Agreement:

(a)    **"Specified Entity"** means:

   in relation to Party A for the purpose of:

|  |  |
|---|---|
| Section 5(a)(v), | Not applicable |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

   and in relation to Party B for the purpose of:

|  |  |
|---|---|
| Section 5(a)(v), | Shell Eastern Trading (Pte) Ltd |
| Section 5(a)(vi), | Shell Eastern Trading (Pte) Ltd |
| Section 5(a)(vii), | Shell Eastern Trading (Pte) Ltd |
| Section 5(b)(iv), | Shell Eastern Trading (Pte) Ltd |

(b)    **"Specified Transaction"**.

   **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement.

(c)    The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and Party B.

   The following provisions apply:

   **"Specified Indebtedness"** will have the meaning specified in Section 14 of this Agreement.

   **"Threshold Amount"** means USD 100 million (or its equivalent in any other currency) in the case of Party A and Party B.

(d)    The **"Credit Event Upon Merger"** provisions of Section 5(b)(iv) shall be deleted and replaced by the following and will apply to Party A and Party B:

   A Designated Event (as defined below) occurs with respect to a party, any Credit Support Provider of such party or any applicable Specified Entity of such party (in each case "X") and such Designated Event does not constitute a Merger Without Assumption, and the creditworthiness of X or, if applicable, the successor, surviving or transferee entity of X, after taking into account any applicable Credit Support Document, is materially weaker (provided, however, that the term "materially weaker" means, with respect to the Credit Support Provider of Party A, that Lehman Brothers Holdings Inc. ("Holdings") or the resulting successor, surviving or transferee entity of Holdings, as the case may be, fails to maintain a long-term senior

18



unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P")) immediately after the occurrence of such Designated Event than that of X immediately prior to the occurrence of such Designated Event (and, in any such event, such party or its successor, surviving or transferee entity, as appropriate, will be the Affected Party). A "Designated Event" with respect to X means that:-

(i)     X consolidates or amalgamates with or merges with or into, or transfers all or substantially all its assets (or any substantial part of the assets comprising the business conducted by X as of the date of this Master Agreement) to, or reorganises, reincorporates or reconstitutes into or as, other entity;

(ii)    any person, related group of persons or entity acquires directly or indirectly the beneficial ownership of (A) equity securities having the power to elect a majority of the board of directors (or its equivalent) of X or (B) any other ownership interest enabling it to exercise control of X; or

(iii)   X effects any substantial change in its capital structure by means of the issuance, incurrence or guarantee of debt or the issuance of (A) preferred stock or other securities convertible into or exchangeable for debt or preferred stock or (B) in the case of entities other than corporations, any other form of ownership interest.

Each party agrees with the other that, so long as either party has or may have any obligations under this Agreement, it will give notice to the other party of the occurrence of any of the events specified in (i) (ii) or (iii) above immediately as they occur. A Merger Without Assumption shall mean an event specified in Section 5(a)(viii).

(e)    The "Automatic Early Termination" provision of <u>Section 6(a)</u> will <u>not</u> apply to Party A and <u>not</u> apply to Party B.

(f)    **Payments on Early Termination.** For the purpose of <u>Section 6(e)</u> of this Agreement, (i) Either Market Quotation or Loss will apply, at the election of the Non-defaulting Party or non-Affected Party, and Market Quotation will apply if there are two Affected Parties; and (ii) the Second Method (full two-way payments) will apply.

(g)    **"Termination Currency"** means United States Dollars ("USD").

(h)    **Additional Termination Events** will apply. Each of the following shall constitute an Additional Termination Event:

The occurrence of a Credit Event with respect to either party shall be an Additional Termination Event. Upon the occurrence of a Credit Event, the party subject to the Credit Event shall be the sole Affected Party.

For the purposes hereof, "Credit Event" means, and shall be deemed to occur:

(i)     in respect of Party B, if either (a) Royal Dutch Shell plc is assigned a long term senior debt rating below Baa3 by Moody's, or below BBB- by S&P or (b) is not rated by Moody's or S&P; or (c) Royal Dutch Shell plc ceases to own, by way of indirect shareholding, at least 51% of the issued shares in Party B or Shell Eastern Trading (Pte) Ltd and/or ceases to hold indirectly the right to exercise at least 51% of the authorised voting rights in Party B or Shell Eastern Trading (Pte) Ltd; and

(ii)    in respect of Party A, if either (a) Lehman Brothers Holdings Inc is assigned a long term senior debt rating below Baa3 by Moody's, or below BBB- by S&P; or (c) Lehman Brothers Holdings Inc or S&P or (c) Lehman Brothers Holdings Inc ceases to own, by way of direct shareholding, at least 51% of the issued shares in Party A and/or ceases to hold directly the right to exercise at least 51% of the authorised voting rights in Party A.

For the avoidance of doubt, if Lehman Brothers Holdings Inc is assigned a long term senior debt rating below Baa3 by Moody's or below BBB- by S&P or Royal Dutch Shell plc is assigned a long term senior debt rating below Baa3 by Moody's or below BBB- by S&P and is then subsequently assigned a different long term senior debt rating also below Baa3 or BBB- (as the case may be) or becomes not rated by



Moody's or S&P, such subsequent assignment shall be deemed to be a further Credit Event. For the further avoidance of doubt, the lowest rating by any rating agency shall be used in priority to any other rating in this clause.



**Part 2: Tax Representations**

(a)     **Payer Tax Representations.** For the purpose of <u>Section 3(e)</u> of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under <u>Sections 2(e)</u>, <u>6(d)(ii)</u> or <u>6(e)</u> of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on

    (i)     the accuracy of any representation made by the other party pursuant to <u>Section 3(f)</u> of this Agreement;

    (ii)     the satisfaction(s) of the agreement of the other party contained in <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement; and

    (iii)     the satisfaction of the agreement of the other party contained in <u>Section 4(d)</u> of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under <u>Section 4(a)(iii)</u> of this Agreement by reason of material prejudice to its legal or commercial position.



**Part 3: Agreement to Deliver Documents**

Each party agrees to deliver the following documents as applicable:

(a)  For the purpose of section 4(a)(i) tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document Certificate | Date by which to be delivered |
|---|---|---|
| Party B | Party B agrees to complete, execute and deliver to Party A a United States Internal Revenue Service Form W8-BEN or any successor form. | (i)  Before the first scheduled payment date under this agreement. <br><br> (ii)  promptly upon reasonable demand by Party A |

(b)  For the purpose of <u>Sections 4(a)</u> <u>(ii)</u> of this Agreement, each party agrees to deliver the following documents, as applicable:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Incumbency certificate or other evidence reasonably satisfactory to the other party of the authority and genuine signature of the individual signing the Agreement and any Credit Support Document on behalf of such party to execute the same. | Upon execution of this Agreement. | Yes |
| Party A and Party B | Evidence reasonably satisfactory to the other party of the authority of such party and its Credit Support Provider to enter into the Agreement, any Credit Support Document and each Transaction entered into hereunder. | Upon execution of this Agreement. | Yes |
| Party A and Party B | Upon request of a party, the other party's annual audited accounts, if publicly filed, and such other publicly available information about the business, condition or operations, financial or otherwise of the other party or the Credit Support Provider of the other party. | Upon request. | Yes |
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of this Schedule. | Upon execution of this Agreement. | No |



| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | A copy of a letter from a process agent in England & Wales acknowledging and confirming such agent's appointment as Party B's Process Agent. | Upon execution of this Agreement. | Yes |
| Party A and Party B | A certified copy of its Memorandum and Articles of Association, Certificate of Incorporation | Upon execution of this Agreement. | Yes |



**Part 4: Miscellaneous**

(a)  **Addresses for Notices.** For the purpose of <u>Section 12(a)</u> of this Agreement:

Address for notices or communications to **Party A**:

| | |
|---|---|
| Address: | Lehman Brothers Commodity Services Inc.<br>c/o Lehman Brothers Inc.<br>Transaction Management Group<br>Corporate Advisory Division<br>745 Seventh Avenue<br>New York, NY 10019 |
| Attention: | Documentation Manager |
| Telephone No.: | (212) 526-7187 |
| Facsimile No.: | (212) 526-7672 |

For all purposes.

Address for notices or communications to **Party B**:

| | |
|---|---|
| Address: | 80 Strand, London WC2R 0ZA |
| Attention: | Derivatives Commercial Advisor |
| Facsimile No: | +44 (0) 20 7546 5134 |
| Telephone No: | +44 (0) 20 7546 5142 |

With a copy of notices or communications pursuant to Sections 5 or 6 to:

| | |
|---|---|
| Address: | 83 Clemenceau Avenue, #04-00 Singapore 239920 |
| Attention: | Legal Department |
| Facsimile No.: | +65 6384 8494 |
| Telephone No.: | +65 6384 8409 |

| | |
|---|---|
| Address: | 83 Clemenceau Avenue, #09-00 Singapore 239920 |
| Attention: | Contracts Team |
| Facsimile No.: | +65 6384 8524 |
| Telephone No.: | +65 6384 8360 |

(b)  **Process Agent.** For the purpose of <u>Section 13(c)</u> of this Agreement:

| | |
|---|---|
| Party A appoints as its Process Agent: | Lehman Brothers International (Europe)<br>Attention: Head of Transaction Management Group,<br>Europe<br>25 Bank Street<br>London E14 5LE<br>England |
| Party B appoints as its Process Agent: | Shell International Trading And Shipping Company<br>Limited<br>80 Strand,<br>London, WC2R 0ZA, U.K.<br>England |

(c)  **Offices.** The provisions of <u>Section 10(a)</u> will apply to this Agreement.



(d)  **Multibranch Party.** For the purpose of <u>Section 10(c)</u> of this Agreement:

Party A is a Multibranch Party and may act through the following Offices: Head Office and London

Party B is not a Multibranch Party.

(e)  **Calculation Agent (Joint).**  Party A and Party B shall be joint Calculation Agents with respect to each Transaction.  If Party A and Party B are unable to agree on any calculation or determination, the parties shall appoint an independent third party that would qualify as a Reference Market-maker (a "Substitute Calculation Agent") to resolve the dispute the determination of which shall be final and binding absent manifest error.  If the parties cannot agree on a Substitute Calculation Agent within two Business Days, each party shall elect an independent Reference Market-maker and such two Reference Market-maker's jointly shall appoint a third Reference Market-maker which shall be deemed to be the Substitute Calculation Agent.

(f)  **Credit Support Document.**

In the case of **Party A:**  Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.

In the case of **Party B:**  Not applicable

(g)  **Credit Support Provider.**

Credit Support Provider means in relation to Party A:     Lehman Brothers Holdings Inc.

Credit Support Provider means in relation to Party B:     Not applicable

(h)  **Governing Law.** This Agreement will be governed by and construed in accordance with English law, without reference to its choice of law doctrine. Any and all disputes arising out of the subject matter of this Agreement shall be subject to the exclusive jurisdiction of the English courts.

(i)  **Netting of Payments.** <u>Subparagraph (ii)</u> of <u>Section 2(c)</u> of this Agreement will <u>not</u> apply to any Transactions.

(j)  **"Affiliate"** will have the meaning specified in <u>Section 14</u> of this Agreement, <u>provided, however,</u> that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.



**Part 5: Other Provisions**

(a)     **Representations.** <u>Section 3</u> of this Agreement is hereby amended by adding the following additional subsections:

    (g)     *No Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of the Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

    (h)     *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

    (i)     *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

    (j)     *No Agency.* Save as provided in this Agreement, it is entering into this Agreement, any Credit Support Document to which it is a party, each Transaction, and any other documents relating to this Agreement or any Transaction as principal and not as agent or in any other capacity, fiduciary or otherwise.

    (k)     *Eligible Contract Participant.* It is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act (the "Act").

    (l)     *Pari Passu.* Its payment obligations upon termination of this Agreement will rank, for the purposes of the insolvency laws to which it is subject, pari passu with all of its other unsecured and unsubordinated payment obligations (except for those which are preferred by mandatory operation of law).

(b)     **Default Under Specified Transaction.** Section 5(a)(v) is hereby amended to read as follows:

    (v)     *Default Under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:

    (1)     defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

    (2)     defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment or exchange date of, or any payment on early termination of, a Specified Transaction (or, if there is no applicable notice requirement or grace period, such default continues for at least three Local Business Days);

    (3)     defaults in making any delivery due under (including any delivery due on the last delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or



(4)      disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other confirming evidence executed and delivered by that party, Credit Support Provider or Specified Entity (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(c)    **Set-off.** Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

(f)    *Set-off.*

(i)    In addition and not in limitation of any other right or remedy under applicable law (including to any rights of set-off a party may have as a matter of law or otherwise), upon the occurrence of an Event of Default, Termination Event, Credit Event Upon Merger, or an Additional Termination Event and the designation of an Early Termination Date pursuant to Section 6 of the Agreement with respect to a party ("X"), the other Non-Defaulted Party or Non-Affected ("Y") will have the right (but not be obliged) to set-off or apply any obligation of X owed to Y  (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation). Y will give X notice of any set-off effected under this section as soon as practicable after the set-off is effected provided that failure to give such notice shall not affect the validity of the set-off.

(ii)    For the purpose of cross-currency set-off, Y may convert the amounts subject to the set-off into the Termination Currency at the applicable market exchange rate selected by Y on the relevant date.

(iii)    If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained.

(iv)    This clause (f) shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement. This set-off provision shall be without prejudice to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (by operation of law, contract or otherwise).

(d)    **Transfer.** Section 7 is amended by adding the following after the words "under this Agreement" at the end of section 7(a): "provided however, that where the entity receiving a transfer hereunder ("Successor Entity") is a partnership, trust or other organization, more than 50% of the equity interest in such Successor Entity shall be directly or indirectly controlled by the persons or entities that directly or indirectly held more than 50% of the equity interest in the transferring party immediately prior to the time of the transfer. In the event of any such transfer by Party A to any Affiliate of Holdings such transfer shall only be effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor.

(e)    **Notices.** For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(f)    **Accuracy of Specified Information.** Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person at the dates and for the periods indicated therein."

27



(g)     **Failure to Pay or Deliver.** Section 5(a)(i) of this Agreement is hereby amended by deleting the word "third" and inserting in lieu thereof the word "second".

(h)     **Escrow Payments** If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5:00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(i)     **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

(j)     **Recording of Conversations.** Each party consents to the recording of telephone conversations between trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction.

(k)     **Limitation Of Liability**

Except to the extent included in any amounts to be paid under Sections 6, 8(a), 8(b) and 11, neither party shall be liable to the other, whether in contract, tort (including negligence and breach of duty) or otherwise at law, for any loss of use, profits, contracts, production, revenue or for business interruption or for any consequential, indirect, punitive, exemplary or indirect loss or damage of whatsoever nature and howsoever arising. These limitations are without regard to the cause or causes related to the liability, including the negligence of any party, whether such negligence be sole, joint or concurrent, or active or passive.

(l)     **Statute of Frauds.** The parties agree not to contest, or to enter any defense concerning the validity or enforceability of any Transaction on the grounds that the documentation for such Transaction fails to comply with the requirements of any jurisdiction's (of whatever country, province, or state) statute of frauds or any other statute, regulation or judicial decision that agreements be written or signed.

(m)    **Confirmations.** Notwithstanding anything to the contrary in the Agreement:

(a) The Parties hereto agree that with respect to each Transaction hereunder a legally binding agreement shall exist from the moment that the Parties hereto agree on the essential terms of such Transaction, which the Parties anticipate will occur by telephone.



28

(b)  For each Transaction Party A and Party B agree to enter into hereunder, Party A shall promptly (and in any event within two Business Days after a Transaction has been entered into) send to Party B, via the facsimile numbers provided by Party B, a Confirmation.

(c)  setting forth the terms of such Transaction. Party B shall execute and return the Confirmation to Party A or request correction of any error within two Local Business Days of receipt. Failure of Party B to respond within such period shall not affect the validity or enforceability of such Transaction and shall, subject to manifest error, be deemed to be an affirmation of such terms.

(n)  **General Conditions.** Section 2(a)(ii) shall be deleted and replaced with the following:

"(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of and to the account specified below or as otherwise agreed by the parties hereto in freely transferable funds and in the manner customary for payments in the required currency without any discount, deduction, withholding, set-off or counterclaim whatsoever (except as may be expressly specified in this Agreement).

Payment to Party B:
Account for payments:
JP Morgan Chase Bank, New York for account of JP Morgan Chase Bank,Singapore, CHIPS UID 021295 swift code CHASGSG for further credit to Shell International Eastern Trading Co., a division of Shell Eastern Trading (Pte) Ltd, A/c No. 151-875-707

Payment to Party A:
Account for payments: As advised from time to time.

(o)  **Change of Account:**  Section 2(b) is hereby amended by the addition of the following words "to another account in the same legal and tax jurisdiction as the original account" after the word "delivery" in the first line and by the deletion of the word "timely" in the third line thereof and the insertion of "two Local Business Days" in its place.

(p)  **Transfer to Avoid Termination Event.**  The following sentence shall be added at the end of the last paragraph of Section 6(b)(ii):

"However, consent may be withheld if the other party reasonably considers that its credit exposure to the transferee would be adversely affected by the transfer".

Section 6(b)(ii) is also amended by deleting the word "Affiliates" and inserting the words "Credit Support Provider" in it's place.

(q)  **Affected Parties in Termination Events.**  For the purposes of Section 6(e) (Payments on Early Termination), both parties shall be deemed to be Affected Parties in connection with the Termination Event described in Section 5(b)(i), so that payments on early termination shall be calculated as provided in Section 6(e)(ii)(2).

(r)  **Third Party Rights.** Nothing in this Agreement shall be considered or construed as conferring any right or benefit on a person not a party to this Agreement and the parties do not intend that any term of this Agreement should be enforceable, by virtue of the Contracts (Rights of Third Parties) Act 1999, by any person who is not a party to this Agreement or a Credit Support Provider under this Agreement.

(s)  **Events of Default.** Section 5(a)(viii) is hereby amended by deleting the introductory paragraph in its entirety and replacing it with the following:

"The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, or reorganizes, incorporates, reincorporates, or reconstitutes into or as, another entity and, at the time of such consolidation, amalgamation, merger, transfer, reorganization, incorporation, reincorporation, or reconstitution;"



(t)    Section 3(c) is amended by deleting the words "of its Affiliates" and inserting the words "Credit Support Provider" after the words "threatened against it or any" and by inserting the words "in a material and adverse manner" after the words "is likely" in the third line.



**Part 6: Additional Terms for Commodity Transactions**

(a) **Definitions.** This Agreement and each Transaction are subject to the 2000 ISDA Definitions (the "2000 Definitions"), and the 2005 ISDA Commodity Definitions (the "2005 Definitions"), (collectively, the "Definitions"), each as published by the International Swaps and Derivatives Association, Inc. ("ISDA"), and will be governed in all respects by the Definitions, but without regard to any further amendments, supplements, updates or restatements made to the Definitions unless otherwise agreed to in a Confirmation (except that any references to "Swap Transactions" in the Definitions will be deemed to be references to "Transactions"). The Definitions are incorporated herein by reference in and made a part of, this Agreement as if set forth in full herein. In the event of any inconsistency between the 2000 Definitions and the 2005 Definitions, the 2005 Definitions will prevail. In the event of any inconsistency between the provisions of this Part of the Schedule and the provisions of any other Part of the Schedule the application of which is limited to any class of Transactions (as defined in the Commodity Definitions) including, without limitation, NBP Transactions, GTMA Transactions and ZBT Transactions, that other Part shall prevail with respect to such class of Transactions. In the event of any inconsistency between the provisions of this Master Agreement (including the Schedule) and the Definitions, this Master Agreement (including the Schedule) will prevail. In the event of any inconsistency between the provisions of a Confirmation and this Master Agreement (including the Schedule) or the Definitions, the Confirmation will prevail for the purpose of such Transaction provided that the Confirmation shall not amend sections 5 and 6 unless the parties otherwise expressly agree.

(b) Section 7.5(d)(i) of the 2005 Definitions shall be applicable to all Transactions unless specified in a confirmation.

(c) **Rounding.** Section 9 of the Commodity Definitions is deleted in its entirety and the following is substituted therefore:

"**Section 9.** For purposes of preparing any calculations referred to in the Commodity Definitions, unless otherwise agreed and specified in a Confirmation, rounding conventions shall be as follows:

| | |
|---|---|
| Commodity Pricing in MWh: | rounded to four (4) decimals; |
| Commodity Pricing in MMBtus: | rounded to four (4) decimals; |
| Commodity Pricing in Gal: | rounded to four (4) decimals; |
| Commodity Pricing in BBL: | rounded to three (3) decimals; |
| Commodity Pricing in NGL: | rounded to five (5) decimals; |
| Commodity Pricing in MT: | rounded to three (3) decimals; |
| All Dollar Amounts: | rounded to the nearest cent." |

(d) **Payment:**

(ii) FIXED / FLOATING or FLOATING/FLOATING SWAPS: Payment of the Amount Due shall be made by the owing party, against presentation of a commercial invoice (telex copy acceptable) from the owed party, without any deduction, withholding, set-off or counterclaim whatsoever (save as provided further in the Agreement), in USD via wire transfer, to the owed party's designated bank account, in immediately available funds on or before the 5th (fifth) New York Banking Day after the Determination Date.



The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

**LEHMAN BROTHERS
COMMODITY SERVICES INC.**

*(Name of Party)*

By: *Scott E. Willoughby*
Name:
Title:
Date:

Scott Willoughby
Senior Vice President

*September 7, 2007*

**SHELL INTERNATIONAL EASTERN TRADING
COMPANY (owned by Shell Eastern Trading (Pte)
Ltd)**

*(Name of Party)*

By: _____
Name: MR. PHIL SMITH
Title: PRESIDENT, SIETCO
Date: 12/07/07

EXHIBIT A to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS COMMODITY SERVICES INC. ("Party A") and SHELL TRADING INTERNATIONAL LIMITED (acting through its arranger Shell International Trading and Shipping Company Limited) ("Party B") have entered into a Master Agreement dated as of 28 June, 2007, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under the Agreement and each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable and in the currency in which the same falls due for payment.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity, legality or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any extension of time, compromise, release, waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments, novation or supplement to or termination of the Agreement, additional Transactions under the Agreement, any insolvency, winding-up, similar proceedings or other proceedings for protection from its creditors and any change in the constitution, control, ownership, name or style of Counterparty or any other person or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination, provided that Guarantor shall provide Party B with at least ten (10) days' prior written notice of such termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

33



(f)   Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantor will be governed by and construed in accordance with English law. Any and all claims or disputes arising out of or in connection with this Guarantee, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the Rules of the London Court of International Arbitration ("LCIA"), which rules are deemed to be incorporated by reference to this clause. Unless the parties shall agree forthwith upon the nomination of a sole arbitrator, the number of arbitrators shall be three, one nominated by each party and a Chairman nominated by the first two chosen. The Chairman shall be a lawyer, unless the first two chosen are both lawyers. All arbitrators shall be appointed by the LCIA. The seat, or legal place, of arbitration shall be London and the language to be used in the arbitral proceedings shall be English.. The arbitration award shall be final without appeal to the English Courts or otherwise.

All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

**IN WITNESS WHEREOF,** Guarantor has caused this Guarantee to be executed as a deed in its corporate name by its duly authorized officer as of the date of the Agreement.

Executed as a deed for and on behalf of:
**LEHMAN BROTHERS HOLDINGS INC.**

By:_____

Name:

Title:

being a person acting under the authority of LEHMAN BROTHERS HOLDINGS INC. under the laws of the state of Delaware

Date:



# LEHMAN BROTHERS

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS COMMODITY SERVICES INC. ("Party A") and SHELL INTERNATIONAL EASTERN TRADING COMPANY have entered into a Master Agreement dated as of 28 June, 2007, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)     Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under the Agreement and each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable and in the currency in which the same falls due for payment.

(b)     Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)     Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity, legality or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any extension of time, compromise, release, waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments, novation or supplement to or termination of the Agreement, additional Transactions under the Agreement, any insolvency, winding-up, similar proceedings or other proceedings for protection from its creditors and any change in the constitution, control, ownership, name or style of Counterparty or any other person or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)     This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination, provided that Guarantor shall provide Party B with at least ten (10) days' prior written notice of such termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)     Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

1

# LEHMAN BROTHERS

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantor will be governed by and construed in accordance with English law. Any and all claims or disputes arising out of or in connection with this Guarantee, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the Rules of the London Court of International Arbitration ("LCIA"), which rules are deemed to be incorporated by reference to this clause. Unless the parties shall agree forthwith upon the nomination of a sole arbitrator, the number of arbitrators shall be three, one nominated by each party and a Chairman nominated by the first two chosen. The Chairman shall be a lawyer, unless the first two chosen are both lawyers. All arbitrators shall be appointed by the LCIA. The seat, or legal place, of arbitration shall be London and the language to be used in the arbitral proceedings shall be English. The arbitration award shall be final without appeal to the English Courts or otherwise.

All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

**IN WITNESS WHEREOF,** Guarantor has caused this Guarantee to be executed as a deed in its corporate name by its duly authorized officer as of the date of the Agreement.

Executed as a deed for and on behalf of:
**LEHMAN BROTHERS HOLDINGS INC.**

By:

Name:  James J. Killerlane III

Title:    Vice President

being a person acting under the authority of LEHMAN BROTHERS HOLDINGS INC. under the laws of the state of Delaware

Date:  June 29, 2007

**(Bilateral Form – Transfer)[1]**                    **(ISDA Agreements Subject to English Law)[2]**



# ISDA®

International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

## ISDA Master Agreement

dated as of 28 June, 2007
between

### LEHMAN BROTHERS COMMODITY SERVICES INC.
### ("Party A")

**and**

### SHELL INTERNATIONAL EASTERN TRADING COMPANY OWNED BY
### SHELL EASTERN TRADING (PTE) LTD
### ("Party B")

This Annex supplements, forms part of, and is subject to, the ISDA Master Agreement referred to above and is part of its Schedule. For the purposes of this Agreement, including, without limitation, Sections 1(c), 2(a), 5 and 6, the credit support arrangements set out in this Annex constitute a Transaction (for which this Annex constitutes the Confirmation).

**Paragraph 1. Interpretation**

Capitalised terms not otherwise defined in this Annex or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 10, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 11 and the other

---

[1] This document is not intended to create a charge or other security interest over the assets transferred under its terms. Persons intending to establish a collateral arrangement based on the creation of a charge or other security interest should consider using the ISDA Credit Support Deed (English law) or the ISDA Credit Support Annex (New York law), as appropriate.

[2] This Credit Support Annex has been prepared for use with ISDA Master Agreements subject to English law. Users should consult their legal advisers as to the proper use and effect of this form and the arrangements it contemplates. In particular, users should consult their legal advisers if they wish to have the Credit Support Annex made subject to a governing law other than English law or to have the Credit Support Annex subject to a different governing law than that governing the rest of the ISDA Master Agreement (e.g., English law for the Credit Support Annex and New York law for the rest of the ISDA Master Agreement).

Copyright © 1995 by International Swaps and Derivatives Association, Inc.




provisions of this Annex, Paragraph 11 will prevail. For the avoidance of doubt, references to "transfer" in this Annex mean, in relation to cash, payment and, in relation to other assets, delivery.

**Paragraph 2. Credit Support Obligations**

(a)     *Delivery Amount.* Subject to Paragraphs 3 and 4, upon a demand made by the Transferee on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Transferor's Minimum Transfer Amount, then the Transferor will transfer to the Transferee Eligible Credit Support having a Value as of the date of transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 11(b)(iii)(D)). Unless otherwise specified in Paragraph 11(b), the "Delivery Amount" applicable to the Transferor for any Valuation Date will equal the amount by which:

> (i)     the Credit Support Amount
>
> exceeds
>
> (ii)     the Value as of that Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in either case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date).

(b)     *Return Amount.*     Subject to Paragraphs 3 and 4, upon a demand made by the Transferor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Transferee's Minimum Transfer Amount, then the Transferee will transfer to the Transferor Equivalent Credit Support specified by the Transferor in that demand having a Value as of the date of transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 11(b)(iii)(D)) and the Credit Support Balance will, upon such transfer, be reduced accordingly. Unless otherwise specified in Paragraph 11(b), the "Return Amount" applicable to the Transferee for any Valuation Date will equal the amount by which:

> (i)     the Value as of that Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in either case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date)
>
> exceeds
>
> (ii)     the Credit Support Amount.

**Paragraph 3. Transfers, Calculations and Exchanges**

(a)     *Transfers.*     All transfers under this Annex of any Eligible Credit Support, Equivalent Credit Support, Interest Amount or Equivalent Distributions shall be made in accordance with the instructions of the Transferee or Transferor, as applicable, and shall be made:

> (i)     in the case of cash, by transfer into one or more bank accounts specified by the recipient;

**ISDA® 1995**

(ii)    in the case of certificated securities which cannot or which the parties have agreed will not be delivered by book-entry, by delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, transfer tax stamps and any other documents necessary to constitute a legally valid transfer of the transferring party's legal and beneficial title to the recipient; and

(iii)    in the case of securities which the parties have agreed will be delivered by book-entry, by the giving of written instructions (including, for the avoidance of doubt, instructions given by telex, facsimile transmission or electronic messaging system) to the relevant depository institution or other entity specified by the recipient, together with a written copy of the instructions to the recipient, sufficient, if complied with, to result in a legally effective transfer of the transferring party's legal and beneficial title to the recipient.

Subject to Paragraph 4 and unless otherwise specified, if a demand for the transfer of Eligible Credit Support or Equivalent Credit Support is received by the Notification Time, then the relevant transfer will be made not later than the close of business on the Settlement Day relating to the date such demand is received; if a demand is received after the Notification Time, then the relevant transfer will be made not later than the close of business on the Settlement Day relating to the day after the date such demand is received.

(b)    *Calculations.* All calculations of Value and Exposure for purposes of Paragraphs 2 and 4(a) will be made by the relevant Valuation Agent as of the relevant Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or, in the case of Paragraph 4(a), following the date of calculation).

(c)    *Exchanges.*

(i)    Unless otherwise specified in Paragraph 11, the Transferor may on any Local Business Day by notice inform the Transferee that it wishes to transfer to the Transferee Eligible Credit Support specified in that notice (the "New Credit Support") in exchange for certain Eligible Credit Support (the "Original Credit Support") specified in that notice comprised in the Transferor's Credit Support Balance.

(ii)    If the Transferee notifies the Transferor that it has consented to the proposed exchange, (A) the Transferor will be obliged to transfer the New Credit Support to the Transferee on the first Settlement Day following the date on which it receives notice (which may be oral telephonic notice) from the Transferee of its consent and (B) the Transferee will be obliged to transfer to the Transferor Equivalent Credit Support in respect of the Original Credit Support not later than the Settlement Day following the date on which the Transferee receives the New Credit Support, unless otherwise specified in Paragraph 11(d) (the "Exchange Date"); *provided* that the Transferee will only be obliged to transfer Equivalent Credit Support with a Value as of the date of transfer as close as practicable to, but in any event not more than, the Value of the New Credit Support as of that date.

3

**Paragraph 4. Dispute Resolution**

(a)    *Disputed Calculations or Valuations*. If a party (a "Disputing Party") reasonably disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any transfer of Eligible Credit Support or Equivalent Credit Support, then:

(1)    the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following, in the case of (I) above, the date that the demand is received under Paragraph 2 or, in the case of (II) above, the date of transfer;

(2)    in the case of (I) above, the appropriate party will transfer the undisputed amount to the other party not later than the close of business on the Settlement Day following the date that the demand is received under Paragraph 2;

(3)    the parties will consult with each other in an attempt to resolve the dispute; and

(4)    if they fail to resolve the dispute by the Resolution Time, then:

(i)    in the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 11(c), the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A)    utilising any calculations of that part of the Exposure attributable to the Transactions that the parties have agreed are not in dispute;

(B)    calculating that part of the Exposure attributable to the Transactions in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction, then fewer than four quotations may be used for that Transaction, and if no quotations are available for a particular Transaction, then the Valuation Agent's original calculations will be used for the Transaction; and

(C)    utilising the procedures specified in Paragraph 11(e)(ii) for calculating the Value, if disputed, of the outstanding Credit Support Balance;

(ii) in the case of a dispute involving the Value of any transfer of Eligible Credit Support or Equivalent Credit Support, the Valuation Agent will recalculate the Value as of the date of transfer pursuant to Paragraph 11(e)(ii).

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) as soon as possible but in any event not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following such notice given by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraph 3(a), make the appropriate transfer.

**ISDA® 1995**

(b)    *No Event of Default.* The failure by a party to make a transfer of any amount which is the subject of a dispute to which Paragraph 4(a) applies will not constitute an Event of Default for as long as the procedures set out in this Paragraph 4 are being carried out. For the avoidance of doubt, upon completion of those procedures, Section 5(a)(i) of this Agreement will apply to any failure by a party to make a transfer required under the final sentence of Paragraph 4(a) on the relevant due date.

**Paragraph 5. Transfer of Title, No Security Interest, Distributions and Interest Amount**

(a)    *Transfer of Title.* Each party agrees that all right, title and interest in and to any Eligible Credit Support, Equivalent Credit Support, Equivalent Distributions or Interest Amount which it transfers to the other party under the terms of this Annex shall vest in the recipient free and clear of any liens, claims, charges or encumbrances or any other interest of the transferring party or of any third person (other than a lien routinely imposed on all securities in a relevant clearance system).

(b)    *No Security Interest.* Nothing in this Annex is intended to create or does create in favour of either party any mortgage, charge, lien, pledge, encumbrance or other security interest in any cash or other property transferred by one party to the other party under the terms of this Annex.

(c)    *Distributions and Interest Amount.*

(i)    *Distributions.* The Transferee will transfer to the Transferor not later than the Settlement Day following each Distributions Date cash, securities or other property of the same type, nominal value, description and amount as the relevant Distributions ("Equivalent Distributions") to the extent that a Delivery Amount would not be created or increased by the transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed a Valuation Date for this purpose).

(ii)    *Interest Amount.* Unless otherwise specified in Paragraph 11(f)(iii), the Transferee will transfer to the Transferor at the times specified in Paragraph 11(f)(ii) the relevant Interest Amount to the extent that a Delivery Amount would not be created or increased by the transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed a Valuation Date for this purpose).

**Paragraph 6. Default**

If an Early Termination Date is designated or deemed to occur as a result of an Event of Default in relation to a party, an amount equal to the Value of the Credit Support Balance, determined as though the Early Termination Date were a Valuation Date, will be deemed to be an Unpaid Amount due to the Transferor (which may or may not be the Defaulting Party) for purposes of Section 6(e). For the avoidance of doubt, if Market Quotation is the applicable payment measure for purposes of Section 6(e), then the Market Quotation determined under Section 6(e) in relation to the Transaction constituted by this Annex will be deemed to be zero, and, if Loss is the applicable payment measure for purposes of Section 6(e), then the Loss determined under Section 6(e) in relation to the Transaction will be limited to the Unpaid Amount representing the Value of the Credit Support Balance.

ISDA® 1995

**Paragraph 7. Representation**

Each party represents to the other party (which representation will be deemed to be repeated as of each date on which it transfers Eligible Credit Support, Equivalent Credit Support or Equivalent Distributions) that it is the sole owner of or otherwise has the right to transfer all Eligible Credit Support, Equivalent Credit Support or Equivalent Distributions it transfers to the other party under this Annex, free and clear of any security interest, lien, encumbrance or other restriction (other than a lien routinely imposed on all securities in a relevant clearance system).

**Paragraph 8. Expenses**

Each party will pay its own costs and expenses (including any stamp, transfer or similar transaction tax or duty payable on any transfer it is required to make under this Annex) in connection with performing its obligations under this Annex, and neither party will be liable for any such costs and expenses incurred by the other party.

**Paragraph 9. Miscellaneous**

(a)     *Default Interest.*   Other than in the case of an amount which is the subject of a dispute under Paragraph 4(a), if a Transferee fails to make, when due, any transfer of Equivalent Credit Support, Equivalent Distributions or the Interest Amount, it will be obliged to pay the Transferor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value on the relevant Valuation Date of the items of property that were required to be transferred, from (and including) the date that the Equivalent Credit Support, Equivalent Distributions or Interest Amount were required to be transferred to (but excluding) the date of transfer of the Equivalent Credit Support, Equivalent Distributions or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)     *Good Faith and Commercially Reasonable Manner.*   Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(c)     *Demands and Notices.*   All demands and notices given by a party under this Annex will be given as specified in Section 12 of this Agreement.

(d)     *Specifications of Certain Matters.*   Anything referred to in this Annex as being specified in Paragraph 11 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

**Paragraph 10. Definitions**

As used in this Annex:

*"Base Currency"* means the currency specified as such in Paragraph 11(a)(i).

ISDA® 1995

*"Base Currency Equivalent"* means, with respect to an amount on a Valuation Date, in the case of an amount denominated in the Base Currency, such Base Currency amount and, in the case of an amount denominated in a currency other than the Base Currency (the "Other Currency"), the amount of Base Currency required to purchase such amount of the Other Currency at the spot exchange rate determined by the Valuation Agent for value on such Valuation Date.

*"Credit Support Amount"* means, with respect to a Transferor on a Valuation Date, (i) the Transferee's Exposure plus (ii) all Independent Amounts applicable to the Transferor, if any, minus (iii) all Independent Amounts applicable to the Transferee, if any, minus (iv) the Transferor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

*"Credit Support Balance"* means, with respect to a Transferor on a Valuation Date, the aggregate of all Eligible Credit Support that has been transferred to or received by the Transferee under this Annex, together with any Distributions and all proceeds of any such Eligible Credit Support or Distributions, as reduced pursuant to Paragraph 2(b), 3(c)(ii) or 6. Any Equivalent Distributions or Interest Amount (or portion of either) not transferred pursuant to Paragraph 5(c)(i) or (ii) will form part of the Credit Support Balance.

*"Delivery Amount"* has the meaning specified in Paragraph 2(a).

*"Disputing Party"* has the meaning specified in Paragraph 4.

*"Distributions"* means, with respect to any Eligible Credit Support comprised in the Credit Support Balance consisting of securities, all principal, interest and other payments and distributions of cash or other property to which a holder of securities of the same type, nominal value, description and amount as such Eligible Credit Support would be entitled from time to time.

*"Distributions Date"* means, with respect to any Eligible Credit Support comprised in the Credit Support Balance other than cash, each date on which a holder of such Eligible Credit Support is entitled to receive Distributions or, if that date is not a Local Business Day, the next following Local Business Day.

*"Eligible Credit Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 11(b)(ii) including, in relation to any securities, if applicable, the proceeds of any redemption in whole or in part of such securities by the relevant issuer.

*"Eligible Currency"* means each currency specified as such in Paragraph 11(a)(ii), if such currency is freely available.

*"Equivalent Credit Support"* means, in relation to any Eligible Credit Support comprised in the Credit Support Balance, Eligible Credit Support of the same type, nominal value, description and amount as that Eligible Credit Support.

*"Equivalent Distributions"* has the meaning specified in Paragraph 5(c)(i).

*"Exchange Date"* has the meaning specified in Paragraph 11(d).

7

ISDA® 1995

*"Exposure"* means, with respect to a party on a Valuation Date and subject to Paragraph 4 in the case of a dispute, the amount, if any, that would be payable to that party by the other party (expressed as a positive number) or by that party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(1) of this Agreement if all Transactions (other than the Transaction constituted by this Annex) were being terminated as of the relevant Valuation Time, on the basis that (i) that party is not the Affected Party and (ii) the Base Currency is the Termination Currency; *provided* that Market Quotations will be determined by the Valuation Agent on behalf of that party using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the Base Currency Equivalent of the amount specified as such for that party in Paragraph 11 (b)(iii)(A); if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the Base Currency Equivalents of the amounts of interest determined for each relevant currency and calculated for each day in that Interest Period on the principal amount of the portion of the Credit Support Balance comprised of cash in such currency, determined by the Valuation Agent for each such day as follows:

(x)    the amount of cash in such currency on that day; multiplied by

(y)    the relevant Interest Rate in effect for that day; divided by

(z)    360 (or, in the case of pounds sterling, 365).

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the Local Business Day on which Eligible Credit Support or Equivalent Credit Support in the form of cash was transferred to or received by the Transferee) to (but excluding) the Local Business Day on which the current Interest Amount is transferred.

*"Interest Rate"* means, with respect to an Eligible Currency, the rate specified in Paragraph 11(f)(i) for that currency.

*"Local Business Day"*, unless otherwise specified in Paragraph 11(h), means:

(i)    in relation to a transfer of cash or other property (other than securities) under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment;

(ii)    in relation to a transfer of securities under this Annex, a day on which the clearance system agreed between the parties for delivery of the securities is open for the acceptance and execution of settlement instructions or, if delivery of the securities is contemplated by other means, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place(s) agreed between the parties for this purpose;

ISDA® 1995

(iii)    in relation to a valuation under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place of location of the Valuation Agent and in the place(s) agreed between the parties for this purpose; and

(iv)    in relation to any notice or other communication under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place specified in the address for notice most recently provided by the recipient.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 11(b)(iii)(C); if no amount is specified, zero.

*"New Credit Support"* has the meaning specified in Paragraph 3(c)(i).

*"Notification Time"* has the meaning specified in Paragraph 11(c)(iv).

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 4; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 2 prior to the resolution of the dispute, then the *"Recalculation Date"* means the most recent Valuation Date under Paragraph 2.

*"Resolution Time"* has the meaning specified in Paragraph 11(c)(i).

*"Return Amount"* has the meaning specified in Paragraph 2(b).

*"Settlement Day"* means, in relation to a date, (i) with respect to a transfer of cash or other property (other than securities), the next Local Business Day and (ii) with respect to a transfer of securities, the first Local Business Day after such date on which settlement of a trade in the relevant securities, if effected on such date, would have been settled in accordance with customary practice when settling through the clearance system agreed between the parties for delivery of such securities or, otherwise, on the market in which such securities are principally traded (or, in either case, if there is no such customary practice, on the first Local Business Day after such date on which it is reasonably practicable to deliver such securities).

*"Threshold"* means, with respect to a party, the Base Currency Equivalent of the amount specified as such for that party in Paragraph 11(b)(iii)(B); if no amount is specified, zero.

*"Transferee"* means, in relation to each Valuation Date, the party in respect of which Exposure is a positive number and, in relation to a Credit Support Balance, the party which, subject to this Annex, owes such Credit Support Balance or, as the case may be, the Value of such Credit Support Balance to the other party.

*"Transferor"* means, in relation to a Transferee, the other party.

*"Valuation Agent"* has the meaning specified in Paragraph 11(c)(i).

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 11(c)(ii).

ISDA® 1995

*"Valuation Percentage"* means, for any item of Eligible Credit Support, the percentage specified in Paragraph 11(b)(ii).

*"Valuation Time"* has the meaning specified in Paragraph 11(c)(iii).

*"Value"* means, for any Valuation Date or other date for which Value is calculated, and subject to Paragraph 4 in the case of a dispute, with respect to:

     (i)      Eligible Credit Support comprised in a Credit Support Balance that is:

          (A)     an amount of cash, the Base Currency Equivalent of such amount multiplied by the applicable Valuation Percentage, if any; and

          (B)     a security, the Base Currency Equivalent of the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any; and

     (ii)     items that are comprised in a Credit Support Balance and are not Eligible Credit Support, zero.

ISDA® 1995

CREDIT SUPPORT ANNEX
Elections and Variables
dated as of June 28, 2007
between
**Lehman Brothers Commodity Services Inc.**
(hereinafter referred to as "Party A")
and
**Shell International Eastern Trading Company**
**owned by Shell Eastern Trading (Pte) Ltd**
(hereinafter referred to as "Party B")

**PARAGRAPH 11. ELECTIONS AND VARIABLES**

(a)     **Base Currency and Eligible Currency.**

    (i)     **"Base Currency"** means United States Dollars.

    (ii)    **"Eligible Currency"** means the Base Currency.

(b)     **Credit Support Obligations.**

    (i)     **Delivery Amount, Return Amount and Credit Support Amount**

        (1)     **"Delivery Amount"** has the meaning specified in Paragraph 2(a).

        (2)     **"Return Amount"** has the meaning specified in Paragraph 2(b).

        (3)     **"Credit Support Amount"** means, for any Valuation Date (A) the Transferee's Exposure for that Valuation Date plus (B) the aggregate of all Independent Amounts applicable to the Transferor, if any, minus (C) the Transferor's Threshold; provided, however, that (x) in the case where the sum of the Independent Amounts applicable to the Transferor exceeds zero, the Credit Support Amount will not be less than the sum of all Independent Amounts applicable to the Transferor and (y) in all other cases, the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields an amount less than zero.

    (ii)    **Eligible Credit Support.** The following items will qualify as **"Eligible Credit Support"** for the party specified:

|  |  | Party A | Party B | Valuation Percentage |
|---|---|---|---|---|
| (1) | Cash in an Eligible Currency. | Yes | Yes | 100% |

    (iii)   **Thresholds.**

        (1)     **"Independent Amount"** shall mean Zero with respect to Party A or Party B.

        (2)     **"Credit Rating"** means the long-term senior unsecured debt of Party A's Credit Support Provider in the case of Party A, and the long-term senior unsecured debt (and any successor rating) of Royal Dutch Shell plc, in the case of Party B, which is rated by Moody's Investors Service Inc. (or any successor rating agency) ("Moody's") and Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. (or any successor rating agency) ("S&P").

11



(3)    "**Threshold**" means, with respect to Transferor, or its Credit Support Provider, as the case may be, or in the case of Party B Royal Dutch Shell plc, the amount corresponding to the Credit Rating of such entity as set forth in the table below, provided that (A) if Moody's and S&P have assigned ratings at different levels for any Credit Rating, the lower of such ratings shall be used for purposes hereof and (B) if (I) an Event of Default, Credit Event Upon Merger, or Additional Termination Event has occurred and is continuing, then the Threshold with respect to the Defaulting Party or the Affected Party shall be zero and (II) such entity ceases to be rated by either S&P or Moody's or ceases to have a Credit Rating, then the Threshold with respect to Transferor shall be zero:

| S&P's Rating | Moody's Rating | Threshold |
|---|---|---|
| AAA | Aaa | $10,000,000 |
| AA+ | Aa1 | $10,000,000 |
| AA | Aa2 | $10,000,000 |
| AA- | Aa3 | $10,000,000 |
| A+ | A1 | $10,000,000 |
| A | A2 | $10,000,000 |
| A- | A3 | $10,000,000 |
| BBB+ | Baa1 | $5,000,000 |
| BBB | Baa2 | $2,500,000 |
| BBB- | Baa3 | US$ nil |

(4)    "**Minimum Transfer Amount**" means, with respect to a party, USD 250,000; provided that, notwithstanding anything to the contrary contained herein, the Minimum Transfer Amount shall not apply to the Independent Amount, and provided further that if (A) an Event of Default, Credit Event Upon Merger, or Additional Termination Event with respect to Transferor has occurred and is continuing, then the Minimum Transfer Amount with respect to the Defaulting Party or the Affected Party shall be zero and (B) if Transferor, or its Credit Support Provider, as the case may be, or in the case of Party B Royal Dutch Shell plc, ceases to be rated by either S&P or Moody's or ceases to have a Credit Rating, then the Minimum Transfer Amount with respect to Transferor shall be zero.

(5)    **Rounding.**  The Delivery Amount and the Return Amount will be rounded up and down respectively to the nearest integral multiple of USD 10,000.

(c)    **Valuation and Timing.**

(i)    "**Valuation Agent**" means, for purposes of Paragraphs 2 and 4, the party making the demand under Paragraph 2, and, for purposes of Paragraph 5(c),  the Transferee, as applicable.

(ii)    "**Valuation Date**" means any Local Business Day.

(iii)    "**Valuation Time**" means the close of business in the location where the relevant product is traded provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv)    "**Notification Time**" means by 3.00pm., London time on a Local Business Day.

(d)    "**Exchange Date**" has the meaning specified in Paragraph 3(c)(ii).

12



(e) **Dispute Resolution.**

    (i)    **"Resolution Time"** means close of business, London time, on the Local Business Day on which notice is given that gives rise to a dispute under Paragraph 4.

    (ii)    **Value.** For the purpose of Paragraphs 4(a)(4)(i)(C) and 4(a)(4)(ii), the Value of the outstanding Credit Support Balance or of Eligible Credit Support or Equivalent Credit Support other than cash, as the case may be, will be calculated as follows: not applicable

    (iii)    **Alternative.** .
The provisions of Paragraph 4(a)(4)(i) will be deleted and replaced by the following:
(i) in the case of a dispute involving a Delivery Amount or Return Amount, the Valuation Agent will recalculate the Delivery Amount or Return Amount as of the Recalculation Date by calculating the arithmetic mean of both party's calculation of the Delivery Amount or Return Amount.

(f) **Distributions and Interest Amount.**

**Interest Rates**

**With respect to:**

    (i)    **USD Cash.** The Interest Rate will be the Federal Funds Rate. "Federal Funds Rate" means the rate per annum equal to the overnight Federal Funds Rate for each day cash is held by the Transferee, as reported in Federal Reserve Publication H.15-519.

    (ii)    **Transfer of Interest Amount.** A notice confirming the Interest Amount due will be sent by the Transferee to the Transferor on the first Local Business Day of each calendar month. A transfer of the Interest Amount will be made as soon as reasonably practicable (and in any event no later than the third Local Business Day) after receipt by the Transferee from the Transferor of confirmation of the Interest Amount to be transferred.

    (iii)    **Alternative to Interest Amount.** Paragraph 5(c)(ii) will apply.

(g) **Addresses for Transfers.**

Party A: To be advised.

Party B: To be advised.

(h) **Other Provisions.**

    (i)    **Paragraph 6.** For the purposes of determining the Credit Support Balance pursuant to Paragraph 6, the definition of Value in Paragraph 10 shall be amended by deleting the words "multiplied by the applicable Valuation Percentage, if any" from subsection (i)(A) and (B).

    (ii)    **Minimum Transfer Amount.** Notwithstanding the provisions of 11(b)(iii)(3), when the Credit Support Amount with respect to both parties on a Valuation Date is zero, the Minimum Transfer Amount with respect to both parties will be zero.



13

The parties executing this Credit Support Annex have executed the Master Agreement and have agreed as to the contents of this Credit Support Annex.

<table>
<tr><td>

**LEHMAN BROTHERS
COMMODITY SERVICES INC.**

*Party A*

By: _____
Name:
Title:
Date:

**Scott Willoughby
Senior Vice President**

*September 7, 2007*

</td><td>

**SHELL INTERNATIONAL EASTERN
TRADING COMPANY (owned by Shell
Eastern Trading (Pte) Ltd)**

*Party B*

By: _____
Name: MR. PHIL SMITH
Title: PRESIDENT, SIETCO
Date: 12/07/07

</td></tr>
</table>

14

**(Bilateral Form – Transfer)[1]**          **(ISDA Agreements Subject to English Law)[2]**



# ISDA ®

International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

## ISDA Master Agreement

dated as of 28 June, 2007
between

## LEHMAN BROTHERS COMMODITY SERVICES INC.
## ("Party A")

### and

## SHELL INTERNATIONAL EASTERN TRADING COMPANY OWNED BY
## SHELL EASTERN TRADING (PTE) LTD
## ("Party B")

This Annex supplements, forms part of, and is subject to, the ISDA Master Agreement referred to above and is part of its Schedule. For the purposes of this Agreement, including, without limitation, Sections 1(c), 2(a), 5 and 6, the credit support arrangements set out in this Annex constitute a Transaction (for which this Annex constitutes the Confirmation).

**Paragraph 1. Interpretation**

Capitalised terms not otherwise defined in this Annex or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 10, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 11 and the other

---

[1] This document is not intended to create a charge or other security interest over the assets transferred under its terms. Persons intending to establish a collateral arrangement based on the creation of a charge or other security interest should consider using the ISDA Credit Support Deed (English law) or the ISDA Credit Support Annex (New York law), as appropriate.

[2] This Credit Support Annex has been prepared for use with ISDA Master Agreements subject to English law. Users should consult their legal advisers as to the proper use and effect of this form and the arrangements it contemplates. In particular, users should consult their legal advisers if they wish to have the Credit Support Annex made subject to a governing law other than English law or to have the Credit Support Annex subject to a different governing law than that governing the rest of the ISDA Master Agreement (e.g., English law for the Credit Support Annex and New York law for the rest of the ISDA Master Agreement).

Copyright © 1995 by International Swaps and Derivatives Association, Inc.





provisions of this Annex, Paragraph 11 will prevail. For the avoidance of doubt, references to "transfer" in this Annex mean, in relation to cash, payment and, in relation to other assets, delivery.

**Paragraph 2. Credit Support Obligations**

(a)    *Delivery Amount.* Subject to Paragraphs 3 and 4, upon a demand made by the Transferee on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Transferor's Minimum Transfer Amount, then the Transferor will transfer to the Transferee Eligible Credit Support having a Value as of the date of transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 11(b)(iii)(D)). Unless otherwise specified in Paragraph 11(b), the "Delivery Amount" applicable to the Transferor for any Valuation Date will equal the amount by which:

        (i)    the Credit Support Amount

        exceeds

        (ii)    the Value as of that Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in either case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date).

(b)    *Return Amount.* Subject to Paragraphs 3 and 4, upon a demand made by the Transferor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Transferee's Minimum Transfer Amount, then the Transferee will transfer to the Transferor Equivalent Credit Support specified by the Transferor in that demand having a Value as of the date of transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 11(b)(iii)(D)) and the Credit Support Balance will, upon such transfer, be reduced accordingly. Unless otherwise specified in Paragraph 11(b), the "Return Amount" applicable to the Transferee for any Valuation Date will equal the amount by which:

        (i)    the Value as of that Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in either case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date)

        exceeds

        (ii)    the Credit Support Amount.

**Paragraph 3. Transfers, Calculations and Exchanges**

(a)    *Transfers.* All transfers under this Annex of any Eligible Credit Support, Equivalent Credit Support, Interest Amount or Equivalent Distributions shall be made in accordance with the instructions of the Transferee or Transferor, as applicable, and shall be made:

        (i)    in the case of cash, by transfer into one or more bank accounts specified by the recipient;

**ISDA® 1995**

(ii)     in the case of certificated securities which cannot or which the parties have agreed will not be delivered by book-entry, by delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, transfer tax stamps and any other documents necessary to constitute a legally valid transfer of the transferring party's legal and beneficial title to the recipient; and

(iii)    in the case of securities which the parties have agreed will be delivered by book-entry, by the giving of written instructions (including, for the avoidance of doubt, instructions given by telex, facsimile transmission or electronic messaging system) to the relevant depository institution or other entity specified by the recipient, together with a written copy of the instructions to the recipient, sufficient, if complied with, to result in a legally effective transfer of the transferring party's legal and beneficial title to the recipient.

Subject to Paragraph 4 and unless otherwise specified, if a demand for the transfer of Eligible Credit Support or Equivalent Credit Support is received by the Notification Time, then the relevant transfer will be made not later than the close of business on the Settlement Day relating to the date such demand is received; if a demand is received after the Notification Time, then the relevant transfer will be made not later than the close of business on the Settlement Day relating to the day after the date such demand is received.

(b)      *Calculations.* All calculations of Value and Exposure for purposes of Paragraphs 2 and 4(a) will be made by the relevant Valuation Agent as of the relevant Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or, in the case of Paragraph 4(a), following the date of calculation).

(c)      *Exchanges.*

(i)      Unless otherwise specified in Paragraph 11, the Transferor may on any Local Business Day by notice inform the Transferee that it wishes to transfer to the Transferee Eligible Credit Support specified in that notice (the "New Credit Support") in exchange for certain Eligible Credit Support (the "Original Credit Support") specified in that notice comprised in the Transferor's Credit Support Balance.

(ii)     If the Transferee notifies the Transferor that it has consented to the proposed exchange, (A) the Transferor will be obliged to transfer the New Credit Support to the Transferee on the first Settlement Day following the date on which it receives notice (which may be oral telephonic notice) from the Transferee of its consent and (B) the Transferee will be obliged to transfer to the Transferor Equivalent Credit Support in respect of the Original Credit Support not later than the Settlement Day following the date on which the Transferee receives the New Credit Support, unless otherwise specified in Paragraph 11(d) (the "Exchange Date"); *provided* that the Transferee will only be obliged to transfer Equivalent Credit Support with a Value as of the date of transfer as close as practicable to, but in any event not more than, the Value of the New Credit Support as of that date.

3