# EXHIBIT 2

**(Bond VD Settlement Agreement)**

# SETTLEMENT AGREEMENT

by and among

LEHMAN BROTHERS HOLDINGS INC.,
a Delaware corporation

LEHMAN ALI, INC.,
a Delaware corporation

LEHMAN COMMERCIAL PAPER INC.,
a New York corporation

BOND SAFEGUARD INSURANCE COMPANY,
an Illinois corporation

and

LEXON INSURANCE COMPANY,
a Texas corporation

Dated:  As of October 12, 2011

## SETTLEMENT AGREEMENT

This Settlement Agreement (this "**Agreement**"), dated as of October 12, 2011 (the "**Execution Date**"), is made by and among Lehman Brothers Holdings Inc., a Delaware corporation ("**LBHI**"), Lehman ALI, Inc., a Delaware corporation ("**ALI**"), Lehman Commercial Paper Inc., a New York corporation ("**LCPI**"), Bond Safeguard Insurance Company, an Illinois corporation ("**Bond Safeguard**") and Lexon Insurance Company, a Texas corporation ("**Lexon**"; Lexon and Bond Safeguard are each referred to herein as a "**Bond Company**" and collectively as the "**Bond Companies**" and LBHI, ALI, LCPI, the Bond Companies, and upon their execution and delivery of the Joinder, the Project Transferees, are each referred to herein as a "**Party**" and collectively as the "**Parties**"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them on Schedule 1 attached hereto and made a part hereof.

### RECITALS:

WHEREAS, the Bond Companies have issued certain surety bonds (including subdivision, payment, performance and other bonds) with respect to the development of (a) the Acton Project, which are outstanding as of the Effective Date, on behalf of the Acton Debtor, as principal (collectively, the "**Acton Bonds**"), (b) the Bickford Project, which are outstanding as of the Effective Date, on behalf of the Bickford Debtor, as principal (collectively, the "**Bickford Bonds**"), and (c) the Ritter Ranch Project, which are outstanding as of the Effective Date, on behalf of the Ritter Ranch Debtor, as principal (collectively, the "**Ritter Ranch Bonds**"; and together with the Acton Bonds and Bickford Bonds, the "**Bonds**"). Each of the Bonds are more particularly described on Schedule 2 attached hereto and made a part hereof;

WHEREAS, on September 15, 2008 and on various dates thereafter, LBHI, LCPI and certain of their subsidiaries commenced voluntary cases (collectively, the "**Lehman Cases**") under the Bankruptcy Code, which Lehman Cases have been consolidated for procedural purposes only and are being jointly administered under Case Number 08-13555 and are pending in the United States Bankruptcy Court for the Southern District of New York (the "**NY Bankruptcy Court**");

WHEREAS, in November 2008, (i) the Acton Debtor, Bickford Debtor, Ritter Ranch Debtor and certain of their Affiliates more particularly identified as "Voluntary Debtors" on Schedule 3 attached hereto and made a part hereof (collectively, the "**Voluntary Debtors**"), filed voluntary cases (the "**Voluntary Debtor Cases**") under the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California (the "**California Bankruptcy Court**") and (ii) various creditors filed involuntary cases under the Bankruptcy Code (the "**Trustee Debtor Cases**"; and together with the Voluntary Debtor Cases, the "**SunCal Cases**") in the California Bankruptcy Court against certain other Affiliates of the Acton Debtor, Bickford Debtor, and Ritter Ranch Debtor more particularly identified as "Trustee Debtors" on Schedule 3 attached hereto and made a part hereof (collectively, the "**Trustee Debtors**" and, together with the Voluntary Debtors, the "**SunCal Debtors**"), all of which SunCal Cases are being jointly administered under Case Number 8:08-bk-17206-ES;

WHEREAS, the Bond Companies filed various proofs of claim against certain of the SunCal Debtors as more particularly described on Schedule 4 attached hereto and made a part hereof (collectively, the "**Bond Company Proofs of Claim**");

WHEREAS, on August 23, 2011, LCPI and ALI (collectively, the "**Plan Proponents**") filed that certain Third Amended Joint Chapter 11 Plan for Eleven Voluntary Debtors with respect to all of the Voluntary Debtors except SCC/Palmdale, LLC, SunCal Emerald Meadows, LLC, SJD Partners, Ltd., SJD Development Corp., SunCal Communities III, LLC and North Orange Del Rio Land, LLC (collectively, the "**Plan Debtors**") in the applicable Voluntary Debtor Cases (as modified, amended, supplemented or superseded from time to time, the "**Joint Plan**"), which Joint Plan sets forth, among other things, a settlement proposal to unsecured creditors of the Plan Debtors, and a proposal for the reorganization of the Plan Debtors and their respective assets and liabilities;

WHEREAS, among other things, the Joint Plan provides for the transfer and conveyance of each of the Projects, as well as the other Plan Projects, to one or more Lehman Nominees designated by the Lehman Creditors, or any of them, to take title to the applicable Plan Project(s) and/or any other assets of the applicable Plan Debtor(s); and

WHEREAS, the Joint Plan also provides for distributions to be made to the creditors of the Plan Debtors as provided in the Joint Plan;

WHEREAS, the Lehman Parties (certain of which are Plan Proponents and/or creditors of the Plan Debtors) and the Bond Companies have negotiated a settlement and resolution of all of the Bond Companies' claims against the Plan Debtors (as reflected in the Bond Safeguard/Lexon Proofs of Claim) that, upon the confirmation and effectiveness of the Joint Plan, would result in the Bond Companies accepting less favorable treatment under the Joint Plan than other creditors of the Plan Debtors holding allowed claims in the same class as the Bond Companies' claims, all in consideration of the promises, covenants, agreements and undertakings more particularly set forth in this Agreement.

NOW, THEREFORE, in consideration of the Recitals stated above, the agreements, promises and warranties set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    *Incorporation of Recitals*.  The above Recitals are hereby incorporated into and made a part of this Agreement.

2.    *Settlement*.  Notwithstanding anything to the contrary contained in the Joint Plan and subject to the terms and conditions of this Agreement, the Parties hereby agree as follows:

(a)    *Bonds*.

(i)    *Bonds to Remain Outstanding*.  Each of the Bond Companies acknowledges and agrees that all of the Bonds that are outstanding as of the Effective Date shall remain outstanding from and after the Effective Date until the same have been fully released by the obligees thereof (as to each Bond, such date being referred to as the "**Bond Release Date**") and that until the applicable Bond Release Date for any particular Bond, upon the request of the

applicable obligee under such Bond, the applicable Bond Company shall deliver to such obligee, a continuation certificate with respect to such Bond in substantially the form attached hereto as <u>Exhibit D</u>. Neither the Project Transferees nor any other Lehman Party shall be deemed to be a principal of, for or under any of the Bonds (or under any indemnity agreement made by any of the SunCal Debtors or Bond Indemnitors or any Affiliate thereof) nor shall any of them have any liability or obligation to any of the Bond Companies except as provided for under this Agreement or under the Ancillary Documents. Notwithstanding the foregoing or anything to the contrary contained herein, the applicable Project Transferee shall replace, substitute and/or cause to be released or exonerated any Bond issued with respect to its Project upon the earlier to occur of (A) the date on which such Project is sold, transferred or conveyed to a third party that is not affiliated with any Lehman Party (a "**Third Party Conveyance**"), (B) the modification, amendment, substitution or replacement of any subdivision improvement agreement or development agreement that contemplated or required the issuance of such Bonds or (C) the date on which the applicable Project Transferee voluntarily initiates development of such Project by commencing actual construction of improvements that (x) are being made pursuant to the development agreement and/or subdivision improvement agreement applicable to such Project, and (y) are not improvements that have been demanded be made by any obligee on any Bonds or which are being made solely to address, mitigate or respond to any life/safety issues or public nuisances or hazards. Each Project Transferee shall include in any applicable purchase and sale agreement for a Third Party Conveyance of a Project, an express condition to such Third Party Conveyance that the purchaser or transferee thereunder substitute or replace, or cause to be substituted or replaced, all outstanding Bonds for such Project on the closing of such Third Party Conveyance. Upon the closing of such Third Party Conveyance and the substitution or replacement of the applicable Bonds and provided that all reimbursements required to be paid hereunder, if any, to the Bond Companies in respect of the Bonds issued for the applicable Project to be conveyed in such Third Party Conveyance have been paid or otherwise reserved for, each Bond Company shall (i) release and terminate any LBHI Guaranty then in effect and securing such Project Transferee's obligations hereunder, (ii) return to such Project Transferee any cash or Letter of Credit held in a Reimbursement Trust with respect to Bonded Work being performed by the Bond Companies with respect to such Project, and (iii) release such Project Transferee and all other Lehman Parties from any and all further obligations to the Bond Companies in respect of or arising from the Bonds to be exonerated or released. Nothing contained herein shall obligate any Bond Company to issue any new or additional surety bonds for the benefit of any of the Project Transferees or any successor owner of any of the Projects.

(ii)    *Reimbursement Obligations.*

(A)    If any Bond Company receives a Bond Claim against a payment Bond after September 22, 2011 (the "**Cutoff Date**") (each such Bond Claim being referred to as a "**Payment Bond Claim**"), then such Bond Company shall reimburse the applicable Lehman Creditor(s) for fifty percent (50%) of any distributions made under the Joint Plan in respect of any corresponding or related Allowed Claim of the applicable Bond Claimant against any Plan Debtor in the applicable SunCal Case regardless of the ultimate disposition of such Payment Bond Claim.

(B)    If any Bond Company receives a Bond Claim from an obligee on a performance Bond (a "**Performance Bond**") after the Cutoff Date but prior to the

earlier of the Effective Date or February 1, 2012 (such earlier date being referred to herein as the "**Liability Switch Date**" and each such Bond Claim being referred to as a "**Gap Performance Bond Claim**"), then and in that event, such Bond Company shall conduct an investigation thereof in accordance with its customary procedures. If the applicable Bond Company determines (and/or it is ordered by a court) that work must be performed to satisfy, in whole or in part, such Bond Company' obligations under the subject Performance Bond (the "**Gap Bonded Work**"), then such Bond Company shall cause the Gap Bonded Work to be performed by Contractors reasonably selected by such Bond Company and reasonably approved by the Lehman Parties and pursuant to Construction Contracts entered into by such Bond Company and reasonably approved by the Lehman Parties. Payment and other agreements between the Parties concerning the Gap Bonded Work performed with respect to any Project are as follows:

(x)    The applicable Bond Company shall give written notice to the Lehman Parties when a Gap Performance Bond Claim is received and shall advise and consult with the Lehman Parties as to the scope of the Gap Bonded Work to be performed, the solicitation of Contractors and the cost of the Gap Bonded Work. The Lehman Parties may make any suggestions they deem appropriate in this regard and the selection of the final Contractor(s) as well as the form(s) of the Construction Contract(s) to be entered into by such Bond Company with such Contractor(s) shall be subject to the Lehman Parties' reasonable approval; notwithstanding the above, if and to the extent required or mandated by applicable insurance regulations, such Bond Company shall otherwise conduct all activity undertaken in response to a Gap Performance Bond Claim in its sole discretion.

(y)    The applicable Bond Company shall pay for the cost of all Gap Bonded Work performed prior to the Liability Switch Date and shall insure that such payment has been made in full in accordance with the applicable Construction Contract(s). The Bond Companies hereby indemnify and hold harmless the applicable Plan Debtor and the Lehman Parties for any Losses incurred by any of such Persons as a result of the applicable Bond Company's failure to satisfy such payment obligations.

(z)    Regardless of when the Effective Date occurs and provided that the Effective Date has occurred, the applicable Project Transferee that owns such Project shall reimburse the applicable Bond Company for the cost of all Gap Bonded Work performed after the Liability Switch Date, in accordance with the following procedure:

i.    If the Effective Date has occurred as of February 1, 2012, and the applicable Project Transferee has not elected to undertake completion of the work as set forth in clause (z)iii. below, then within five (5) Business Days of the Effective Date, the applicable Project Transferee shall deposit cash and/or provide a letter of credit in a form reasonably acceptable to the applicable Bond Company and otherwise containing the terms more specifically described on Exhibit A attached hereto (a "**Letter of Credit**"), in an amount equal to the cost of the Gap Bonded Work to be performed after the Effective Date to be held in trust (each, a "**Reimbursement Trust**") pursuant to the terms of a Collateral Trust Agreement to be entered into by the applicable Bond Company, as trustee and as surety, and

the applicable Project Transferee.   Upon payment by the applicable Bond Company for the Gap Bonded Work performed after the Effective Date and subject to the terms of the applicable Collateral Trust Agreement, such Bond Company may immediately utilize the cash or Letter of Credit held in the applicable Reimbursement Trust to reimburse itself for all amounts due from the applicable Project Transferee in accordance with this paragraph.   Upon completion of the Gap Bonded Work, the applicable Bond Company shall return all remaining cash and/or the original Letter of Credit in the Reimbursement Trust to the applicable Project Transferee.

ii.    If the Effective Date has not occurred as of February 1, 2012, then within five (5) Business Days of the Effective Date, the applicable Project Transferee shall pay the applicable Bond Company an amount equal to the amount paid by such Bond Company for the Gap Bonded Work performed between February 1, 2012 and the Effective Date and, unless the applicable Project Transferee has elected to undertake completion of the work as set forth in clause (z)iii. below, the applicable Project Transferee shall deposit cash and/or provide a Letter of Credit in an amount equal to the cost of the Gap Bonded Work to be performed after the Effective Date to be held in a Reimbursement Trust pursuant to a Collateral Trust Agreement to be entered into by the applicable Bond Company, as trustee as surety, and the applicable Project Transferee.  Upon payment by the applicable Bond Company for Gap Bonded Work performed after the Effective Date and subject to the terms of the applicable Collateral Trust Agreement, such Bond Company may immediately use the cash or Letter of Credit in the Reimbursement Trust to reimburse itself for all amounts due from the applicable Project Transferee in accordance with this paragraph.   Upon completion of the Gap Bonded Work, the applicable Bond Company shall return all remaining cash and/or the original Letter of Credit in the Reimbursement Trust to the applicable Project Transferee.

iii.    The applicable Project Transferee may elect, in its sole discretion, to undertake the completion of any Gap Bonded Work to be performed after the Effective Date ("**Post-ED Gap Bonded Work**").  If such Post-ED Gap Bonded Work is to be performed under a Construction Contract previously entered into by the applicable Bond Company, then the applicable Project Transferee, as a condition to its election to undertake the completion of such Post-ED Gap Bonded Work, shall assume such Bond Company's obligations under such Construction Contract (including the payment of any outstanding amounts owed to the applicable Contractor) and cause such Bond Company to be released from all further liability thereunder provided that such Bond Company assigns all of its rights thereunder to such Project Transferee (including, without limitation, any warranties, guarantees, bonds and other collateral or security provided to such Bond Company).

(C)    If any Bond Company receives a Bond Claim from an obligee on a Performance Bond after the Liability Switch Date (each such claim being referred to

as a "**New Performance Bond Claim**"), then and in that event, such Bond Company shall conduct an investigation thereof in accordance with its customary procedures. If the applicable Bond Company determines (and/or it is ordered by a court) that work must be performed to satisfy, in whole or in part, such Bond Company's obligations under the subject Performance Bond (the "**New Bonded Work**") then, unless the applicable Project Transferee elects to undertake performance of the New Bonded Work itself in accordance with clause (y)iii. below, such Bond Company shall cause the New Bonded Work to be performed by Contractors reasonably selected by such Bond Company and reasonably approved by the Lehman Parties and pursuant to Construction Contracts entered into by such Bond Company and reasonably approved by the Lehman Parties. Payment and other agreements between the Parties concerning the New Bonded Work performed with respect to any Project are as follows:

(x)    The applicable Bond Company shall give written notice to the Lehman Parties when a New Performance Bond Claim is received and, unless the applicable Project Transferee elects to undertake performance of the New Bonded Work itself pursuant to clause (y)iii. below, shall advise and consult with the Lehman Parties as to the scope of New Bonded Work to be performed, the solicitation of Contractors and the cost of the New Bonded Work. The Lehman Parties may make any suggestions they deem appropriate in this regard and the selection of the final Contractor(s) as well as the form(s) of the Construction Contract(s) to be entered into by such Bond Company with such Contractor(s) shall be subject to the Lehman Parties' reasonable approval; notwithstanding the above, if such Bond Company is performing the New Bonded Work, to the extent required or mandated by applicable insurance regulations, such Bond Company shall otherwise conduct all activity undertaken in response to a New Performance Bond Claim in its sole discretion.

(y)    Except to the extent that it has elected to undertake the performance of the applicable New Bonded Work pursuant to clause (y)iii. below, the applicable Project Transferee shall reimburse the applicable Bond Company for the cost of all New Bonded Work in accordance with the following procedure:

i.    If the Effective Date has occurred as of February 1, 2012, then the applicable Project Transferee shall, within five (5) Business Days of the determination of the cost of the New Bonded Work, deposit cash and/or provide a Letter of Credit in an amount equal to the cost of the New Bonded Work to be held in a Reimbursement Trust pursuant to a Collateral Trust Agreement to be entered into by the applicable Bond Company, as trustee and surety, and the applicable Project Transferee. Upon payment by the applicable Bond Company for the New Bonded Work and subject to the terms of the applicable Collateral Trust Agreement, such Bond Company may immediately utilize the cash or Letter of Credit in the applicable Reimbursement Trust to reimburse itself in full for all amounts due from the applicable Project Transferee in accordance with this paragraph. Upon completion of the New Bonded Work, the applicable Bond Company shall return all remaining cash and/or the original Letter of Credit in the Reimbursement Trust to the applicable Project Transferee.

ii.     If the Effective Date has not occurred as of February 1, 2012, then within five (5) Business Days of the Effective Date, the applicable Project Transferee shall pay the applicable Bond Company an amount equal to the cost of the New Bonded Work paid to date and it shall deposit cash and/or provide a Letter of Credit in an amount equal to the cost of the New Bonded Work to be performed after the Effective Date to be held in a Reimbursement Trust pursuant to a Collateral Trust Agreement to be entered into by the applicable Bond Company, as trustee and surety, and the applicable Project Transferee. Upon payment by the applicable Bond Company for the New Bonded Work performed after the Effective Date and subject to the terms of the applicable Collateral Trust Agreement, such Bond Company may immediately utilize the cash or Letter of Credit in the Reimbursement Trust to reimburse itself for all amounts due from the applicable Project Transferee in accordance with this paragraph. Upon completion of the New Bonded Work, the applicable Bond Company shall return all remaining cash and/or the original Letter of Credit in the Reimbursement Trust to the applicable Project Transferee.

iii.    The applicable Project Transferee may elect, in its sole discretion, to undertake the completion of any New Bonded Work to be performed after the Effective Date ("**Post-ED New Bonded Work**"). If such Post-ED New Bonded Work is to be performed under a Construction Contract entered into by the applicable Bond Company prior to the Effective Date, then the applicable Project Transferee, as a condition to its election to undertake the completion of such Post-ED New Bonded Work, shall assume such Bond Company's obligations under such Construction Contract (including the payment of any outstanding amounts owed to the applicable Contractor) and cause such Bond Company to be released from all further liability thereunder provided that such Bond Company assigns all of its rights thereunder to such Project Transferee (including, without limitation, any warranties, guarantees, bonds and other collateral or security provided to such Bond Company). If such Post-ED New Bonded Work is not provided for under a Contract entered into by the applicable Bond Company prior to the Effective Date, then the applicable Project Transferee shall have sole discretion to select the Contractor(s) to perform the New Bonded Work, enter into agreements with such Contractor(s), all in its sole and absolute discretion and without any consultation with any such Bond Company; provided, however, that if such Post-ED New Bonded Work has not been contracted for and commenced by the applicable Project Transferee within the period of time required by the applicable obligee making the New Performance Bond Claim, then the applicable Bond Company, after giving the applicable Project Transferee three (3) Business Days' written notice during which 3-Business Day period the applicable Project Transferee has failed to contract for and/or commence such Post-ED New Bonded Work, shall have the right to contract for and/or cause such Post-ED New Bonded Work to be performed, in which case such Bond Company's selection of the Contractor(s) and the form of any Construction Contract(s) to be entered into by such Bond Company with such Contractor(s) shall be subject to the reasonable approval of the applicable Project Transferee. The applicable Project Transferee and the

applicable Bond Company shall, to the extent reasonable, work cooperatively to obtain a resolution which will result in a release of the New Performance Bond Claim. Notwithstanding the foregoing, if there is a dispute between the applicable Bond Company and the applicable Project Transferee as to whether or not such Bond Company is required, pursuant to its obligations under any Bonds, to perform any Post-ED New Bonded Work and/or as to the nature or extent of such Post-ED New Bonded Work or with respect to any other matter relating to the performance (or non-performance) of such Post-ED New Bonded Work, such Bond Company shall have the right to make such determination if and to the extent required or mandated by applicable insurance regulations and only after consultation with the applicable Project Transferee and after giving such Project Transferee a reasonable opportunity to perform (or cause to be performed) such Post-ED New Bonded Work; provided, however, that in connection with any such determination by the applicable Bond Company, the applicable Project Transferee shall have the right to contest and/or defend against any claim made by such Bond Company for reimbursement under this Agreement for the cost of any such Post-ED New Bonded Work.

(D)    The Parties acknowledge that a demand has been made by the City of Palmdale on certain Ritter Ranch Bonds for the mitigation of hazardous conditions and the completion of certain other improvements with respect to Elizabeth Lake Road (the "**ELR Work**") and that the City of Palmdale and Bond Safeguard have entered into a Settlement and Mutual Release Agreement, effective as of February 18, 2011, with respect to the ELR Work (the "**ELR Settlement**"), a true and correct copy of which is attached hereto as <u>Schedule 5</u>. The Ritter Ranch Transferee shall reimburse Bond Safeguard for a portion of any expenditures actually incurred and paid or any amount otherwise paid by Bond Safeguard in respect of the ELR Work in an amount equal to the lesser of (a) one-half of the aggregate amount of such expenditures or payments or (b) $800,000 (such lesser amount being referred to herein as the "**ELR Reimbursement Amount**"). None of the Bond Companies shall have any administrative or other claim against the Ritter Ranch Debtor or otherwise be entitled to any distribution under the Joint Plan in respect of or arising from the ELR Work and, other than the obligation of the Ritter Ranch Transferee to pay the ELR Reimbursement Amount as provided above, none of the Lehman Parties shall have any obligation to reimburse any Bond Company for any amount paid by any Bond Company in respect of the ELR Work. The Bond Companies will promptly provide the Lehman Parties with copies of any documents, correspondence and other materials relating to the ELR Settlement.

(iii)    *Payment of Annual Bond Premiums by Project Transferees.* Each Project Transferee will pay annual premiums for each outstanding Bond relating to its respective Project in the respective amount equal to one and one-half percent (1.5%) per annum of the penal sum of each such outstanding Bond (such amounts to be prorated for any partial year for which any particular Bond remains outstanding). Such premiums shall be payable for each outstanding Bond from and after the Effective Date and until the date on which such Bond is released, exonerated, substituted or replaced; provided, however, that the Bond Companies hereby waive all such annual premiums until the earlier of (a) twenty-four (24) months following the Effective Date, (b) December 31, 2013, or (c) with respect to any particular Bond(s), the date on which

such Bond(s) are substituted or replaced by new surety bond(s) issued by any Bond Company or another surety company relating to the same work or improvements that were the subject of the replaced Bonds.

(iv)    *Waiver or Assignment of Past Due Premiums.*  Neither the Project Transferees nor any other Lehman Party shall have any obligation to pay or reimburse any Bond Company for any bond premiums that may be due and owing to any Bond Company or to any Bond Broker, in each case, as of the Effective Date, for the Bonds (or any other bonds issued by any Bond Company in connection with the Projects or any other Plan Projects which have previously been released) (collectively, the "**Past Due Premiums**").  As of the Effective Date, each of the Bond Companies hereby releases the SunCal Debtors, the Project Transferees and the other Lehman Parties from any and all claims that the Bond Companies may have against any of them in respect of any such Past Due Premiums other than any Excluded Debtor Claims.  On or prior to the Effective Date, the Bond Companies will obtain and deliver to the Lehman Parties the following (collectively, the "**Bond Premium Waiver Documents**"): (1) at the option of the Lehman Parties, either a waiver and release or an assignment, in each case in form and substance reasonably acceptable to the Lehman Parties, from each Bond Broker pursuant to which such Bond Broker waives and releases or assigns, as applicable, all rights such Bond Broker may have to the payment of any Past Due Premiums and releases or assigns, as applicable, any and all claims that such Bond Broker may have against the SunCal Debtors in respect of any such Past Due Premiums, (2) a release, in form and substance reasonably acceptable to the Lehman Parties, from each Bond Broker pursuant to which such Bond Broker releases the Project Transferees and the other Lehman Parties from any and all claims that such Bond Broker may have against any of them in respect of any such Past Due Premiums, and (3) at the option of the Lehman Parties, either a withdrawal or assignment, as applicable, of each proof of claim filed by any Bond Broker for or in respect of any Past Due Premiums.  If the Lehman Parties elect to take an assignment of the rights and claims of any Bond Broker with respect to any Past Due Premiums, the assignee shall be a Person designated by the Lehman Parties in their sole and absolute discretion.

(v)    *Additional Deposits to Reimbursement Trust.*  Notwithstanding anything to the contrary contained herein, if the amount of any Gap Bonded Work and/or New Bonded Work is not totally determined as of the time that the applicable Project Transferee is required to deposit cash or post a Letter of Credit as set forth in <u>Section 2(a)(ii)</u> (<u>*Reimbursement Obligations*</u>), then within five (5) Business Days of the Effective Date (as to Gap Bonded Work) or the date on which a deposit is required to be made in respect of New Bonded Work, the applicable Project Transferee shall deposit such cash and/or post such Letter of Credit in an amount equal to the known cost(s) of such Gap Bonded Work and/or New Bonded Work and, in addition, shall make further deposits or post additional Letters of Credit within five (5) Business Days of such additional cost(s) being determined.    Any withdrawal of cash from any Reimbursement Trust and any draws on any Letters of Credit held in any Reimbursement Trust shall be done in accordance with the terms of the applicable Collateral Trust Agreement.

(vi)    *LBHI Guaranty.*  On the Effective Date, LBHI shall deliver to the Bond Companies, a guarantee from LBHI for the benefit of the Bond Companies to further secure the payment and performance of the obligations of the Project Transferees hereunder, which guarantee shall be in substantially the form attached hereto as <u>Exhibit C</u> (the "**LBHI**

**Guaranty**"). The Reimbursement Trust(s) (if any) and the LBHI Guaranty shall be the sole collateral for the obligations of the Project Transferees hereunder (or certain of them, as applicable), and none of the Lehman Parties, including the Project Transferees, shall be obligated to provide, and the Bond Companies shall not be entitled to receive, any other collateral for any of the obligations of the Project Transferees or for any other obligation, liability, covenant or agreement of any Lehman Party under or pursuant to this Agreement or any Ancillary Document.

(b)    *Payment and Assignment of Bonded Claims.* Each of the Bond Companies hereby represents and warrants to the Lehman Parties that (1) Schedule 6 attached hereto sets forth, as of the Execution Date, all claims which have ever been asserted against any of the Bond Companies under any of the Bonds by any Person including, without limitation, by any claimants who hold (or previously held) claims against one or more of the Project Debtors (collectively, the "**Bond Claimants**") and further identifying for each such claim (A) the name of the Bond Claimant, (B) to the best of the Bond Companies' knowledge, the specific Bond(s) under which each such claim was made, (C) the Project for which such Bond(s) were issued, (D) if such claim has been settled, either consensually or by court order (collectively, the "**Settled Bond Claims**"), the amounts paid or to be paid (pursuant to an executed and fully binding settlement agreement) by the Bond Companies in settlement of such Settled Bond Claims, the date or dates on which settlement payments were made or are required to be made to the applicable Bond Claimants, the extent to which any Bond Company has taken an assignment of the corresponding Bonded Claims and the extent to which the Bond Claimants have any residual rights to the claims assigned to any Bond Company, (E) if such claim or any action brought by the applicable Bond Claimant has been denied, withdrawn or dismissed (collectively, the "**Dismissed Bond Claims**"), a description of the disposition of such claim and/or action including the basis for any such denial, withdrawal or dismissal, and (F) whether the claim is still pending (collectively, the "**Pending Bond Claims**"), and (2) the Bond Companies have provided the Lehman Parties with true, correct and complete copies of all Bond Settlement Documents with respect to each of the Settled Bond Claims. The Bond Companies will revise Schedule 6 to update and reflect all information thereon as of the Effective Date. For each Settled Bond Claim, the Bond Companies hereby represent and warrant that, as of the Effective Date, one of them (as indicated on Schedule 6) has or will have acquired 100% of the applicable Bond Claimant's rights to any claims that such Bond Claimant may have against any Project Debtor relating to such Settled Bond Claims as indicated on Schedule 6. On the Effective Date, the Bond Companies shall transfer and assign all Bonded Claims to a Lehman Party or other Person designated by the Lehman Parties (the "**Bonded Claim Assignee**"), free and clear of any and all rights, interests and claims of the Bond Claimants or any other Person. The Bond Companies hereby waive, as of the Effective Date, any further rights they may have in respect of the Bonded Claims and waive any payment to the Bond Companies under the Joint Plan in respect of the Bonded Claims and the corresponding claims of the Bond Companies against any of the Plan Debtors under the Bond Company Proofs of Claim. Further, the Bond Companies hereby agree to release the Lehman Released Parties with respect to any claims arising from or in respect of the Bonded Claims. The Bond Companies shall deliver, on the Effective Date, such assignments, waivers and releases as may be reasonably requested by the Lehman Parties to evidence and effectuate the foregoing assignments, waivers and releases. The Bond Companies hereby agree to accept less favorable treatment for Bonded Claims than other holders of similar claims will receive under the Joint Plan.

(c)    *Release of Bond Issuer Claims.* Each of the Bond Companies hereby agrees, to the extent not otherwise assigned to the Bonded Claim Assignee pursuant to the terms of this Agreement, to (i) waive, dismiss and release, on the Effective Date, all Bond Issuer Claims (except the Excluded Debtor Claims) and all Related Debtor Claims (except the Excluded Debtor Claims) and (ii) release each of the Lehman Released Parties from any and all claims arising from, in connection with, or with respect to any of the Projects, the Bonds, the Voluntary Debtors, and/or their respective projects (except any Excluded Debtor Claims) other than any claims arising from the obligations of the Lehman Parties under this Agreement or any of the Ancillary Documents. The foregoing waivers, dismissals and releases shall be effective automatically as of the Effective Date but, in furtherance thereof, the Bond Companies shall execute and deliver to the Lehman Parties on the Effective Date such releases, waivers, withdrawals, dismissals and other instruments, documents or agreements as the Lehman Parties may reasonably request to effectuate the foregoing.

(d)    *Assignment of Claims Against Bond Indemnitors.* Each of the Bond Companies hereby agrees to sell, transfer, assign and convey, on and as of the Effective Date, to an entity to be designated by the Lehman Parties (the "**Bond Indemnitor Claims Assignee**") any and all rights, claims or causes of action (including, without limitation, any judgments, security interests or other collateral) that any Bond Company has or may have against any of the Bond Indemnitors arising from or otherwise relating to any of the Bonds or the Projects including, without limitation, claims for or in respect of any amounts paid by any Bond Company to Bond Claimants, any interest accrued on any claimed amounts or losses, any and all unpaid bond premiums, any loss adjustment expenses (including, without limitation, attorneys' fees, interest, costs and expenses) and any other costs or expenses incurred by any Bond Company in pursuing its claims against any Bond Indemnitor, in each case, free and clear of any lien, claim, right or interest of any Person (collectively, the "**Assigned Rights**"); provided, however, if any loss adjustment expenses or other costs or expenses incurred by any Bond Company are attributable to one or more Bonds and are also attributable to other surety bonds issued by a Bond Company relating to projects other than the Projects, then such loss adjustment expenses and/or other costs and expenses shall be apportioned as between such Bond(s) and other bonds/projects in a manner reasonably acceptable to the Parties. In furtherance of the foregoing, each of the Bond Companies shall execute and deliver to the Bond Indemnitor Claims Assignee on the Effective Date such assignment agreements and other instruments as the Lehman Parties may reasonably request to effectuate the foregoing. The Parties acknowledge that an action has been brought by the Bond Companies against certain Bond Indemnitors which relates to both the Bonds and other surety bonds issued by the Bond Companies with respect to projects other than the Projects (the "**Pending Action**"). To the extent that the Pending Action is not otherwise resolved through the entry of an Indemnity Judgment which, as of the Effective Date, is final and unappealable, the Parties agree that they will endeavor, in good faith, to negotiate a co-plaintiff or other arrangement that would enable each Party to prosecute its respective claims against the Bond Indemnitors in the Pending Action without impairing the rights of the other Party. Absent such agreement, to the extent possible, the Bond Companies will take all necessary action to separate that portion of the Pending Action relating to the Bonds from the other portions of the Pending Action and assign its rights with respect to the Assigned Rights to the Bond Indemnitor Claims Assignee. In furtherance of the foregoing, the Bond Companies will execute and deliver any stipulations, pleadings or other documents reasonably requested by the Lehman Parties in order to effectuate the addition (or substitution, if necessary)

of the Bond Indemnitor Claims Assignee as a party plaintiff in the Pending Action on the Effective Date. If a judgment against one or more of the Bond Indemnitors is obtained by the Bond Companies prior to the Effective Date (collectively, an "**Indemnity Judgment**"), then the Bond Companies shall assign to the Bond Indemnitor Claims Assignee that portion of the Indemnity Judgment attributable to the Assigned Rights. The Bond Companies shall not enter into or agree to any stipulated judgment, settlement or other resolution in the Pending Action without the prior written consent of the Lehman Parties, which consent shall not be unreasonably withheld.

3.    ***Bond Company Representations and Warranties***. In order to induce the Lehman Parties to enter into and perform their obligations under this Agreement and the Ancillary Documents to which they are parties, each of the Bond Companies hereby represents, warrants and acknowledges as follows (as of the Execution Date and as of the Effective Date):

(a)    *Authority.* (i) Such Bond Company has the power and authority to execute, deliver and perform its obligations under this Agreement and the Ancillary Documents to which it is a party, and to consummate the transactions contemplated hereby, and (ii) the execution, delivery and performance by such Bond Company of this Agreement and each of the Ancillary Documents to which such Bond Company is a party and the consummation of the transactions contemplated thereby have been duly authorized by all necessary action on the part of such Bond Company and no other proceedings on the part of such Bond Company are necessary to authorize and approve this Agreement or any of the Ancillary Documents or any of the transactions contemplated thereby.

(b)    *Validity.* (i) This Agreement has been duly executed and delivered by such Bond Company and constitutes the legal, valid and binding agreement of such Bond Company, enforceable against such Bond Company in accordance with its terms, and (ii) upon execution and delivery of the Ancillary Documents to be executed by such Bond Company, all such Ancillary Documents will have been duly executed and delivered by such Bond Company and will constitute the legal, valid and binding agreement of such Bond Company, enforceable against such Bond Company in accordance with their respective terms.

(c)    *Title; No Transfer of Claims.* Such Bond Company is the owner and holder of all of its respective Bonded Claims, Bond Issuer Claims and Related Debtor Claims, free and clear of any rights, interests or claims of the Bond Claimants or any other Person and such Bond Company has not assigned, transferred or conveyed to any other Person, in whole or in part, including for security, any of the Bonded Claims, Bond Issuer Claims and Related Debtor Claims or any right, title or interest therein or any other claims or causes of action that are the subject of this Agreement or any of the Ancillary Documents. No Payment Bond Claims, Gap Performance Bond Claims or New Performance Bond Claims exist except those which have been previously disclosed to the Lehman Parties in writing.

(d)    *Description of Bonds.* Schedule 2 attached hereto identifies and describes all surety bonds issued by the Bond Companies or any Affiliate of the Bond Companies for the benefit of the Projects Debtors or any other Plan Debtor or otherwise in respect of or relating to any of the Projects or any other Plan Project which are outstanding as of the Execution Date.

4.    *Lehman Parties Representations and Warranties*.  In order to induce the Bond Companies to enter into and perform their obligations under this Agreement and the Ancillary Documents to which they are a party, each of the Lehman Parties (other than the Project Transferees, whose representations, warranties, acknowledgements and obligations hereunder shall become effective and valid only after the execution and delivery of the Joinder) hereby represents, warrants and acknowledges as follows (as of the Execution Date and as of the Effective Date):

(a)    *Authority*.  Subject to the Lehman Court Approval, (i) such Lehman Party has the power and authority to execute, deliver and  perform its obligations under this Agreement and the Ancillary Documents to which it is a party, and (ii) the execution, delivery and performance by such Lehman Party of this Agreement and each of the Ancillary Documents to which such Lehman Party is a party and the consummation of the transactions contemplated thereby have been duly authorized by all necessary action on the part of such Lehman Party and no other proceedings on the part of such Lehman Party are necessary to authorize and approve this Agreement or any of the Ancillary Documents or any of the transactions contemplated thereby.

(b)    *Validity*.  Subject to the Lehman Court Approval, (i) this Agreement has been duly executed and delivered by such Lehman Party and constitutes the legal, valid and binding agreement of such Lehman Party, enforceable against such Lehman Party in accordance with its terms, and (ii) upon execution and delivery of the Ancillary Documents to be executed by such Lehman Party, all such Ancillary Documents will have been duly executed and delivered by such Lehman Party and will constitute the legal, valid and binding agreement of such Lehman Party, enforceable against such Lehman Party in accordance with their respective terms.

5.    *Lehman Court Approval*.  LBHI and LCPI have filed with the NY Bankruptcy Court a motion (the "**Approval Motion**") seeking entry of an order (the "**Lehman Court Order**"): (i) approving, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and applicable provisions of the Bankruptcy Code, the terms of the settlement set forth in the term sheet attached to such motion which settlement is embodied in this Agreement; and (ii) authorizing LBHI and LCPI to take all necessary corporate actions to complete the transactions contemplated by this Agreement and the Ancillary Documents.  Within one (1) Business Day after the execution and delivery of this Agreement by all of the Parties, LBHI and LCPI will file a copy of this Agreement with the NY Bankruptcy Court as a supplement to the Approval Motion.

6.    *Condition to Effectiveness of Agreement*.  The effectiveness of this Agreement shall be subject to the entry of the Lehman Court Order by the NY Bankruptcy Court and such order having become a Final Order (referred to herein as the "Lehman Court Approval").

7.    *Effective Date Deliveries*.

(a)    *Lehman Deliveries*.  On the Effective Date, the respective Lehman Parties shall execute and/or deliver, or cause to be executed and/or delivered, each of the following documents and other items (collectively, the "**Lehman Deliveries**"):

(i)      a joinder to this Agreement duly executed by each of the Project Transferees whereby each Project Transferee agrees to become a Party to this Agreement and be bound by the terms hereof applicable to such Project Transferee and assume all obligations of such Project Transferee hereunder to the extent applicable to such Project Transferee (the "**Joinder**");

(ii)      the LBHI Guaranty duly executed by LBHI;

(iii)      any other instruments, certificates, documents and agreements required to be delivered by or on behalf of any of the Lehman Parties under this Agreement on the Effective Date and any other documents or deliveries reasonably requested by the Bond Companies in order to effectuate the transactions contemplated herein.

(b)      *Bond Companies Deliveries*.  On the Effective Date, each of the Bond Companies shall execute and/or deliver, or cause to be executed and/or delivered, each of the following documents and other items (collectively, the "**Bond Companies Deliveries**"):

(i)      the Bond Premium Waiver Documents, duly executed by the applicable Bond Brokers and Bond Companies;

(ii)      all releases, waivers, withdrawals, dismissals, instruments, certificates, documents and agreements required to be delivered by or on behalf of any of the Bond Companies under this Agreement on the Effective Date and any other documents or deliveries reasonably requested by the Lehman Parties in order to effectuate the transactions contemplated herein.

8.    *Covenants*.

(a)      *Approvals*.  None of the Parties shall take any action which would cause the Lehman Court Approval to be modified, vacated or stayed or otherwise to not remain in full force and effect.

(b)      *Modifications to Existing Bond Settlement Documents*.  None of the Bond Companies shall amend, modify, supplement or terminate any Bond Settlement Documents in effect as of the Execution Date or any provision thereof or otherwise enter into any agreement affecting any Bond Company's obligations thereunder, without the prior written consent of the Lehman Parties.  The Bond Companies shall promptly deliver to the Lehman Parties true, correct and complete copies of any amendments, modifications, supplements, terminations or other agreements upon execution and delivery thereof.

(c)      *Bond Modification Discussions*.  Upon request by any of the Lehman Parties, the Bond Companies shall cooperate with the Lehman Parties in providing information as may be requested by the Lehman Parties in connection with or in furtherance of the Lehman Parties' negotiations with the various municipalities, utilities and governmental, quasi-governmental and other agencies and entities who may be obligees under one or more of the Bonds and/or who may have jurisdiction over the Projects, in each case, regarding the scope of any improvements required to be made in order to comply with any entitlements or development

rights or obligations relating to the Projects or in connection with any modifications to such entitlements or development rights or obligations.

9. **Termination**. This Agreement shall automatically terminate and be of no further force or effect and the Parties shall be automatically relieved of any further obligations hereunder (except for any obligations which are expressly stated to survive the termination of this Agreement) if and on any date on which the NY Bankruptcy Court denies the motion seeking issuance of the Lehman Court Order, with prejudice, or if the Lehman Court Approval is not obtained on or prior to February 1, 2012. Further, this Agreement shall automatically terminate and be of no further force or effect and the Parties shall be automatically relieved of any further obligations hereunder (except for any obligations which are expressly stated to survive the termination of this Agreement) if (a) a final, non-appealable order denying confirmation of the Joint Plan as to all Plan Debtors is entered by the California Bankruptcy Court, (b) the Joint Plan has not been confirmed pursuant to a final, non-appealable order of the California Bankruptcy Court prior to June 1, 2012; provided that if the Joint Plan has been so confirmed as to one or more of the Project Debtors (even if it has not been so confirmed as to any of the other Plan Debtors), this Agreement shall not automatically terminate as provided herein, or (e) the Effective Date has not occurred prior to September 1, 2012; provide that if the Effective Date has so occurred as to one or more of the Project Debtors (even if it has not occurred as to any of the other Plan Debtors), this Agreement shall not automatically terminate as provided herein.

10. **No Set-off Rights**. Neither the Lehman Parties nor the Bond Companies shall have any set-off rights under this Agreement or any of the Ancillary Documents.

11. **Survival**. The representations, warranties, covenants and agreements made by the Parties in this Agreement shall survive the closing of the transactions contemplated by this Agreement.

12. **Venue and Choice of Law**.

(a) **Venue**. To the maximum extent permissible by law, the Parties expressly consent and submit to the exclusive jurisdiction of the NY Bankruptcy Court over any actions or proceedings relating to the enforcement or interpretation of this Agreement or any of the Ancillary Documents and any Party bringing such action or proceeding shall bring such action or proceeding in the NY Bankruptcy Court. Each of the Parties agrees that a final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. If the NY Bankruptcy Court refuses or abstains from exercising jurisdiction over the enforcement of this Agreement or any of the Ancillary Documents and/or any actions or proceedings arising hereunder or thereunder, then the Parties agree that venue shall be in any court in the County of New York in the State of New York having proper jurisdiction. Each Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any of the Ancillary Documents with the NY Bankruptcy Court or with any other state or federal court located within the County of New York in the State of New York; and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. Each Party irrevocably consents to

service of process in the manner provided for notices in <u>Section 13</u> hereof. Nothing in this Agreement will affect the right, or requirement, of any Party to this Agreement to serve process in any other manner permitted or required by law.

(b)    *Choice of Law*.    This Agreement and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement or any matters of construction, validity and performance relating to this Agreement and the obligations arising hereunder), shall be governed by, and construed in accordance with, the laws of the State of New York without giving effect to the conflict of laws principles of such State. Notwithstanding the foregoing or anything to the contrary contained herein, the Parties acknowledge and agree that the LBHI Guaranty shall be governed by, and construed in accordance with, the laws of the State of California as set forth in the LBHI Guaranty.

13.    *Notices*.    All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next Business Day, (c) three days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one Business Day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent:

To any Lehman Party at:

c/o Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, New York 10020
Attn:  Joelle Halperin
Facsimile:  (646) 834-0874

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn: W. Michael Bond, Esq.
Facsimile: (212) 310-8007

To any Bond Company at:
c/o Bond Safeguard Insurance Company
256 Jackson Meadow Drive, Suite 201
Hermitage, TN 37076
Attn: David Campbell, President
Facsimile: (615) 250-3044

With a copy (which shall not constitute notice) to:

Harris Beach PLLC
99 Garnsey Road
Pittsford, NY 14534
Attn: Bruce L Maas, Esq.
Facsimile: (585) 419 - 8801

or to such other address as may have been furnished by a party to each of the other parties by notice given in accordance with the requirements set forth above.

14. **_Expenses_**. The fees and expenses incurred by each Party (including the fees of any attorneys, accountants, investment bankers, financial advisors or any other professionals engaged by such Party) in connection with this Agreement and the transactions contemplated hereby, whether or not the transactions contemplated hereby are consummated, will be paid by such Party.

15. **_Specific Performance_**. Without limiting or waiving the rights or remedies under this Agreement now existing or hereafter arising at law, in equity or by statute, each Party acknowledges that there is no adequate remedy at law for a breach of the covenants and obligations of the Parties under this Agreement and each Party agrees that, except as otherwise expressly provided in this Agreement, the other Parties shall be entitled to specific performance of this Agreement as a remedy to any such breach, and each Party hereby waives any legal or equitable defense to the granting thereof, including, without limitation, the requirement of posting a bond.

16. **_Further Assurances_**. The Parties will execute and deliver, or cause to be executed and delivered, on the Effective Date such instruments, agreements, assignments, releases, waivers, certificates and other documents contemplated to be delivered pursuant to or in accordance with the terms of this Agreement or otherwise reasonably requested by another Party to effectuate or otherwise in furtherance of the terms of this Agreement in such form and substance reasonably and mutually acceptable to the Parties and, from time to time after the Effective Date, without further consideration, the Parties will execute and deliver, or cause to be executed and delivered, such instruments, agreements, assignments, releases, waivers, certificates or other documents as the other Parties may reasonably request, and take such actions as the other Parties may reasonably request, to effectuate, consummate or otherwise give effect to the transactions contemplated herein and to assure that the benefits of this Agreement and the Ancillary Documents are realized by the Parties.

17. **_No Admission of Liability_**. Each Party acknowledges that this Agreement effects a settlement of potential claims and counterclaims that are denied and contested, and that nothing contained herein shall be construed as an admission of liability or wrongdoing.

18. **_Entire Agreement_**. This Agreement, together with the Ancillary Documents, constitutes the entire and only agreement of the Parties concerning the subject matter hereof. This Agreement supersedes and replaces any and all prior or contemporaneous verbal or written

agreements between the Parties (including that certain Term Sheet Regarding Resolution of Bond Safeguard/Lexon Claims and Bond Liability, executed by LBHI on September 26, 2011 and by the Bond Companies on September 23, 2011). The Parties acknowledge that this Agreement is not being executed in reliance on any verbal or written agreement, promise or representation not contained herein or in the Ancillary Documents.

19.    *No Oral Modifications*. This Agreement only may be modified or amended by a writing signed by a duly authorized representative of each Party hereto. Any waiver of compliance with any term or provision of this Agreement on the part of any Party must be provided in a writing signed by the other Parties. No waiver of any breach of any term or provision of this Agreement shall be construed as a waiver of any subsequent breach.

20.    *Construction*. This Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any Party, and any rule or maxim of construction to such effect shall not apply to this Agreement.

21.    *Binding Effect; Successor and Assigns*. This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns; provided, however, that no Party may assign its rights or obligations under this Agreement without the written consent of the other Parties, which consent shall not be unreasonably withheld or delayed. Any assignment not in accordance with the terms hereof shall be null and void *ab initio*.

22.    *Counterparts; Facsimile Execution*. This Agreement may be executed in counterparts, each of which constitutes an original, and all of which, collectively, constitute only one agreement. The signatures of all of the Parties need not appear on the same counterpart. Signatures delivered by facsimile or by email transmission in PDF format shall constitute originals for all purposes.

23.    *Headings; Schedules and Exhibits; Interpretation*. The headings, titles or captions utilized in this Agreement are designed for the sole purpose of facilitating ready reference to the subject matter of this Agreement and shall in no way define, limit, extend or describe the scope or intent of this Agreement or any provisions hereof. References to Sections, unless otherwise indicated, are references to Sections of this Agreement. All Schedules and Exhibits to this Agreement are hereby made a part hereof and incorporated herein by reference for all purposes. Reference to any Schedule or Exhibit herein shall be to the Schedules and Exhibits attached hereto. As used herein, (i) the term "including" shall mean "including, without limitation," and (ii) the masculine shall include the feminine and the neuter.

24.    *Effectiveness of Agreement*. This Agreement shall be effective upon execution by the Parties, subject only to the Lehman Court Approval.

25.    *Severability and Construction*. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect if the essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

26.    *Waiver of Jury Trial*. EACH OF THE PARTIES HERETO HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RESPECTIVE RIGHTS UNDER THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS OR IN ANY WAY RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF THE PARTIES HERETO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION 26 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER. THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.

27.    *Joinder*. Unless and until such time as the Joinder is executed and delivered in accordance with the terms of this Agreement, LBHI shall be principally and directly obligated for all of the Project Transferees' obligations under this Agreement.

28.    *Joint Plan*. To the extent the description in the Joint Plan of the Settling Bond Issuer Agreements is inconsistent with the terms, conditions and agreements set forth in this Agreement, this Agreement shall control.

**[SIGNATURES ON FOLLOWING PAGE]**

IN WITNESS WHEREOF, each Party by its duly authorized representative has executed this Agreement as of the date first written above.

**LEHMAN BROTHERS HOLDINGS INC.,** a Delaware corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: _____
Title: _____
                              Jeffrey Fitts
                              Authorized Signatory

**LEHMAN ALI, INC.,** a Delaware corporation

By: _____
Name: _____
Title: _____
                              Jeffrey Fitts
                              Authorized Signatory

**LEHMAN COMMERCIAL PAPER INC.,** a New York corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: _____
                              Jeffrey Fitts
Title: _____
                              Authorized Signatory

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

**BOND SAFEGUARD INSURANCE
COMPANY**, an Illinois corporation

By:
Name: David E. Campbell
Title: President

**LEXON INSURANCE COMPANY,**
a Texas corporation

By:
Name: David E. Campbell
Title: President

## SCHEDULE 1

## DEFINITIONS

"Acton Debtor" shall mean Acton Estates, LLC, a Delaware limited liability company.

"Acton Transferee" shall mean the Lehman Nominee designated by the Lehman Creditors, or any of them, to take title to the Acton Project.

"Acton Project" shall mean the real estate development project comprised, in part, of certain real property consisting of approximately 175 acres located in Los Angeles County, California and owned, as of the Execution Date, by the Acton Debtor.

"Affiliate" shall mean, with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with, such Person.  A Person will be deemed to control another Person if such Person possess, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, partnership interests or other equity interests, by contract or otherwise.

"Allowed Claim" shall have the meaning ascribed thereto in the Joint Plan

"Ancillary Documents" shall mean each of the documents that are part of the Bond Companies Deliveries and/or the Lehman Deliveries and any other document, instrument, certificate or agreement explicitly agreed and designated by the Parties to be executed and delivered pursuant to the terms of this Agreement or in connection herewith or otherwise in furtherance of the consummation of the transactions contemplated by this Agreement.

"Bankruptcy Code" shall mean chapter 11 of title 11 of the United States Bankruptcy Code as in effect from time to time.

"Bickford Debtor" shall mean SunCal Bickford Ranch LLC, a Delaware limited liability company.

"Bickford Project" shall mean the real estate development project comprised of, in part, certain real property consisting of approximately 1,940 acres located in Placer County, California and owned, as of the Execution Date, by the Bickford Debtor.

"Bickford Transferee" shall mean the Lehman Nominee designated by the Lehman Creditors, or any of them, to take title to the Bickford Project.

"Bond Broker" shall mean Rohm Insurance Agency and any other broker who facilitated the placement or issuance of any of the Bonds and who has asserted or hereafter asserts claims against any SunCal Debtor for unpaid bond premiums in respect of any of the Bonds or any other bonds issued by any Bond Company for or in respect of the Projects or any other Plan Projects.

"Bonded Claim" shall mean all Claims or portions of Claims against any Project Debtor which have been assigned to the Bond Companies by the Bond Claimants in connection with or pertaining to Settled Bond Claims as of the Effective Date.

"Bonded Work" shall mean, with respect to each Project, any labor, materials, services or other work or improvements, the payment, performance and/or completion of which is secured by one or more Bonds relating to such Project, including, without limitation, any Gap Bonded Work and any New Bonded Work.

"Bond Indemnitors" shall mean SCC Acquisitions, Inc., a California corporation, Bruce Elieff, Kathy Elieff, any affiliate thereof and any other Person that is or may be liable to the Bond Companies under any indemnity agreement or guarantee executed in connection with the issuance or maintenance of the Bonds (other than the SunCal Debtors).

"Bond Issuer Claims" shall mean any Claims that the Bond Companies, or either of them, may have or may have acquired by assignment, subrogation or otherwise against any of the Voluntary Debtors including, without limitation, any Claims asserted by any Bond Company under or pursuant to any of the Bond Company Proofs of Claim filed against any of the Voluntary Debtors.

"Bond Settlement Documents" shall mean all agreements, instruments and other documents entered into between any Bond Company and any Bond Claimant with respect to the settlement of any Bond Claim and corresponding Bonded Claim or any related claims of such Bond Claimant with respect to any Bond.

"Business Day" shall mean any day other than a Saturday or Sunday or a day on which commercial banks in New York, New York are authorized or permitted to close.

"Claim" shall have the meaning ascribed thereto in the Joint Plan.

"Collateral Trust Agreement" shall mean a Collateral Trust Agreement, substantially in the form of Exhibit B attached hereto, pursuant to which a Project Transferee deposits cash or a Letter of Credit to secure and provide for the payment of the costs of any Gap Bonded Work or New Bonded Work to be performed by a Bond Company with respect to such Project Transferee's Project.

"Construction Contracts" shall mean any and all construction, engineering, architectural and other agreements, contracts and undertakings entered into by any Bond Company for or with respect to any Bonded Work to be performed by any Bond Company in response to and in satisfaction of any claims made under any Bonds and including, without limitation, any and all warranties, guaranties, indemnities, collateral, security and other benefits or assurances (including any bonds furnished thereunder) inuring to the benefit of such Bond Company thereunder.

"Contractors" shall mean all contractors, subcontractors, vendors, material suppliers and others performing any Bonded Work.

"Effective Date" shall have the meaning ascribed to such term in the Joint Plan.

"Excluded Debtor Claims" shall mean any Claims that the Bond Companies, or either of them, may have against SJD Partners, Ltd. or SunCal Century City, LLC and any liquidated, non-contingent Claims against North Orange Del Rio Land, LLC, and any Claims against any other Plan Debtor with respect to whom the Joint Plan has not been confirmed which Claims arise solely from Bonds issued for the benefit of such Plan Debtor or its Plan Project.

"Final Order" shall mean an order or judgment of a court of competent jurisdiction that has not been reversed, vacated or stayed, and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired, and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule, may be filed relating to such order shall not cause such order to not be a Final Order.

"Lehman Creditors" shall mean have the meaning ascribed thereto in the Joint Plan.

"Lehman Nominees" shall have the meaning ascribed thereto in the Joint Plan.

"Lehman Parties" shall mean LBHI, ALI, and LCPI and, following their execution and delivery of the Joinder, each of the Project Transferees.

"Lehman Released Parties" shall mean all of the following Persons: (a) the Lehman Creditors, (b) each, every and any owner, including future owners, of each of the Plan Projects, including the Lehman Nominees, which owner is, was or will be a grantee, transferee, successor or assign of the applicable Plan Debtor that owns or owned such Plan Project, (c) LBHI, Property Asset Management, Inc., and any other direct or indirect subsidiary thereof including, without limitation, any entity that is or was a member or partner of any upper-tier joint venture, partnership or limited liability company that is or was a direct or indirect parent of any Plan Debtor, (d) Alvarez & Marsal, LLC, and (e) the respective Affiliates of all of the foregoing Persons and each of their respective officers, directors, shareholders, members, managers, employees, agents, independent contractors, administrators, consultants, asset managers, attorneys, accountants, trustees, insurers, representatives, successors and assigns, including, without limitation, the Lehman Successor (as such term is defined in the Joint Plan).

"Losses" shall mean any and all losses, liabilities, damages, fines, penalties, fees, amounts paid in settlement, taxes, costs (including costs of investigation or enforcement), expenses and claims (including, without limitation, interest, fees and disbursements of counsel, witness fees and court costs).

"Plan Projects" shall have the meaning ascribed thereto in the Joint Plan.

"Project Debtors" shall mean, collectively, the Acton Debtor, the Bickford Debtor and the Ritter Ranch Debtor.

"Projects" shall mean, collectively, the Acton Project, the Bickford Project and the Ritter Ranch Project.

"Project Transferees" shall mean, collectively, the Acton Transferee, the Bickford Transferee and the Ritter Ranch Transferee.

"Related Debtor Claims" shall mean any Claims asserted by any Bond Company against any of the Trustee Debtors for or in respect of any liability arising from any guaranty or indemnity provided by any Trustee Debtors to any Bond Company and further arising from any of the Bonds including, without limitation, any such Claims asserted by any Bond Company under or pursuant to any of the Bond Company Proofs of Claims filed against the Trustee Debtors.

"Ritter Ranch Debtor" shall mean Palmdale Hills Property, LLC, a Delaware limited liability company.

"Ritter Ranch Transferee" shall mean the Lehman Nominee designated by the Lehman Creditors, or any of them, to take title to the Ritter Ranch Project.

"Ritter Ranch Project" shall mean the real estate development project comprised, in part, of certain real property consisting of approximately 10,625 acres located in Los Angeles County, California and owned, as of the Execution Date, by the Ritter Ranch Debtor.

"Settling Bond Issuer Agreements" shall have the meaning ascribed thereto in the Joint Plan.

## SCHEDULE 2

## BONDS

### Acton Estates, LLC 8:08-17236 ES (Acton Ranch)

| Bond Nos. | Penal Sum of Bonds |
| --- | --- |
| 5025398 | $1,290,000.00 |

### SunCal Bickford Ranch, LLC 8:08-17231 ES (Bickford Ranch)

| Bond Nos. | Penal Sum of Bonds |
| --- | --- |
| 5020974 | $2,500,000.00 |
| 5024793 | $327,458.00 |

### Palmdale Hills Property, LLC 8:08-17206 ES (Ritter Ranch)

| Bond Nos. | Penal Sum of Bonds |
| --- | --- |
| 5020969 | $573,400.00 |
| 5020971 | $522,700.00 |
| 5020972 | $4,235,000.00 |
| 5020973 | $2,107,100.00 |
| 5024751 | $19,500.00 |
| 5024772 | $433,000.00 |
| 5024800 | $5,900.00 |
| 5025395 | $150,700.00 |
| 5026507 | $2,748,000.00 |
| 5026526 | $160,500.00 |
| 5026530 | $2,276,200.00 |
| 5026531 | $1,784,000.00 |
| 5026546 | $25,300.00 |
| 5029509 | $13,000.00 |

## SCHEDULE 3

## SUNCAL DEBTORS

Voluntary Debtors

Acton Estates, LLC
Kirby Estates, LLC
North Orange Del Rio Land, LLC
Palmdale Hills Property, LLC
SCC Communities LLC
SCC/Palmdale, LLC
Seven Brothers LLC
SJD Development Corp.
SJD Partners, Ltd.
SunCal Beaumont Heights, LLC
SunCal Bickford Ranch LLC
SunCal Communities I, LLC
SunCal Communities III, LLC
SunCal Emerald Meadows LLC
SunCal Johannson Ranch LLC
SunCal Summit Valley LLC
Tesoro SF LLC

Trustee Debtors

Delta Coves Venture LLC
LB/L – SunCal Northlake LLC
LB/L – SunCal Oak Valley LLC
SunCal Century City, LLC
SunCal Heartland LLC
SunCal Marblehead LLC
SunCal Oak Knoll, LLC
SunCal PSV, LLC
SunCal Torrance Properties LLC

## SCHEDULE 4

## BOND SAFEGUARD/LEXON PROOFS OF CLAIM

<u>Voluntary Debtors</u>

Proof of Claim No. 72 in the amount of $1,784,700.00 filed against Palmdale Hills Property, LLC on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 73 in the amount of $6,353,850.00 filed against Palmdale Hills Property, LLC on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 74 in the amount of $150,700.00 filed against Palmdale Hills Property, LLC on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 75 in the amount of $3,414,300.00 filed against Palmdale Hills Property, LLC on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 76 in the amount of $240,750.00 filed against Palmdale Hills Property, LLC on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 77 in the amount of $649,500.00 filed against Palmdale Hills Property, LLC on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 78 in the amount of $3,160,650.00 filed against Palmdale Hills Property, LLC on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 79 in the amount of $4,122,000.00 filed against Palmdale Hills Property, LLC on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 80 in the amount of $784,050.00 filed against Palmdale Hills Property, LLC on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 81 in the amount of $37,950.00 filed against Palmdale Hills Property, LLC on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 82 in the amount of $19,500.00 filed against Palmdale Hills Property, LLC on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 83 in the amount of $5,900.00 filed against Palmdale Hills Property, LLC on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 84 in the amount of $13,000.00 filed against Palmdale Hills Property, LLC on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 85 in the amount of $3,549,700.00 filed against Palmdale Hills Property, LLC on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 86 in the amount of $573,400.00 filed against Palmdale Hills Property, LLC on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 87 in the amount of $24,859,950.00 filed against Palmdale Hills Property, LLC on March 31, 2009 with the California Bankruptcy Court, as amended by Proof of Claim No. 107 in the amount of $24,859,950.00 filed against Palmdale Hills Property, LLC on June 5, 2009 with the California Bankruptcy Court; as amended by Proof of Claim No. 107-2 in the amount of $11,332,789.76 filed against Palmdale Hills Property, LLC on September 26, 2011 with the California Bankruptcy Court

Proof of Claim No. 7 in the amount of $1,290,000.00 filed against Acton Estates, LLC on March 31, 2009 with the California Bankruptcy Court; as amended by Proof of Claim No. 7-3 in the amount of $11,332,789.76 filed against Acton Estates, LLC on September 26, 2011 with the California Bankruptcy Court

Proof of Claim No. 19 in the amount of $2,500,000.00 filed against SunCal Bickford Ranch LLC on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 20 in the amount of $327,548.00 filed against SunCal Bickford Ranch LLC on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 24 in the amount of $2,827,548.00 filed against SunCal Bickford Ranch LLC on March 31, 2009 with the California Bankruptcy Court; as amended by Proof of Claim No. 24-3 in the amount of $11,332,789.76 filed against SunCal Bickford Ranch LLC on September 26, 2011 with the California Bankruptcy Court

Proof of Claim No. 8 in the amount of $3,060,045.00 filed against North Orange Del Rio Land, LLC on March 20, 2009 with the California Bankruptcy Court

Proof of Claim No. 9 in the amount of $250,100.00 filed against North Orange Del Rio Land, LLC on March 20, 2009 with the California Bankruptcy Court

Proof of Claim No. 10 in the amount of $2,809,945 filed against North Orange Del Rio Land, LLC on March 20, 2009 with the California Bankruptcy Court

Proof of Claim No. 4 in the amount of $25,000.00 filed against SCC Communities LLC on March 20, 2009 with the California Bankruptcy Court; as amended by Proof of Claim No. 4-3 in the amount of $11,332,789.76 filed against SCC Communities LLC on September 26, 2011 with the California Bankruptcy Court

Proof of Claim No. 5 in the amount of $12,500.00 filed against SCC Communities LLC on March 20, 2009 with the California Bankruptcy Court

Proof of Claim No. 6 in the amount of $12,500.00 filed against SCC Communities LLC on March 20, 2009 with the California Bankruptcy Court

Proof of Claim No. 26 in the amount of $319,287.00 filed against SJD Partners, Ltd. on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 27 in the amount of $343,468.00 filed against SJD Partners, Ltd. on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 28 in the amount of $378,797.00 filed against SJD Partners, Ltd. on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 29 in the amount of $114,291.00 filed against SJD Partners, Ltd. on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 30 in the amount of $710,192.00 filed against SJD Partners, Ltd. on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 31 in the amount of $476,943.00 filed against SJD Partners, Ltd. on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 32 in the amount of $364,676.00 filed against SJD Partners, Ltd. on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 33 in the amount of $262,073.00 filed against SJD Partners, Ltd. on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 34 in the amount of $1,639,486.00 filed against SJD Partners, Ltd. on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 35 in the amount of $1,537,973.00 filed against SJD Partners, Ltd. on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 36 in the amount of $434,156.00 filed against SJD Partners, Ltd. on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 37 in the amount of $763,671.00 filed against SJD Partners, Ltd. on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 38 in the amount of $219,070.00 filed against SJD Partners, Ltd. on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 39 in the amount of $70,005.00 filed against SJD Partners, Ltd. on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 40 in the amount of $83,952.00 filed against SJD Partners, Ltd. on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 41 in the amount of $78,031.00 filed against SJD Partners, Ltd. on March 31, 2009 with the California Bankruptcy Court

Proof of Claim No. 42 in the amount of $7,712,119.00 filed against SJD Partners, Ltd. on March 31, 2009 with the California Bankruptcy Court; as amended by Proof of Claim No. 42-3 in the amount of $11,332,789.76 filed against SJD Partners, Ltd on September 26, 2011 with the California Bankruptcy Court

<u>Trustee Debtors</u>

Proof of Claim No. 32 in the amount of $24,413,824.00 filed against Delta Coves Venture LLC on February 14, 2011 with the California Bankruptcy Court

Proof of Claim No. 33 in the amount of $UNKNOWN filed against Delta Coves Venture LLC on February 14, 2011 with the California Bankruptcy Court; as amended by Proof of Claim No. 33-4 in the amount of $11,332,789.76 filed against Delta Coves Venture LLC on September 26, 2011 with the California Bankruptcy Court

Proof of Claim No. 16 in the amount of $UNKNOWN filed against LB/L – SunCal Northlake LLC on February 14, 2011 with the California Bankruptcy Court; as amended by Proof of Claim No. 16-3 in the amount of $11,332,789.76 filed against LB/L – SunCal Northlake LLC on September 26, 2011 with the California Bankruptcy Court

Proof of Claim No. 41 in the amount of $24,489,848.98 filed against LB/L – SunCal Oak Valley LLC on February 14, 2011 with the California Bankruptcy Court; as amended by Proof of Claim No. 41-4 in the amount of $11,332,789.76 filed against LB/L – SunCal Oak Valley LLC on September 26, 2011 with the California Bankruptcy Court

Proof of Claim No. 42 in the amount of $UNKNOWN filed against LB/L – SunCal Oak Valley LLC on February 14, 2011 with the California Bankruptcy Court; as amended by Proof of Claim No. 42-3 in the amount of $11,332,789.76 filed against LB/L – SunCal Oak Valley LLC on September 26, 2011 with the California Bankruptcy Court

Proof of Claim No. 21 in the amount of $UNKNOWN filed against SunCal Century City, LLC on February 14, 2011 with the California Bankruptcy Court; as amended by Proof of Claim No. 21-5 in the amount of $11,332,789.76 filed against SunCal Century City, LLC on September 26, 2011 with the California Bankruptcy Court

Proof of Claim No. 28 in the amount of $55,918,440.00 filed against SunCal Heartland LLC on February 14, 2011 with the California Bankruptcy Court; as amended by Proof of Claim No. 28-2 in the amount of $55,918,440.00 filed against SunCal Heartland LLC on April 15, 2011 with the California Bankruptcy Court

Proof of Claim No. 29 in the amount of $UNKNOWN filed against SunCal Heartland LLC on February 14, 2011 with the California Bankruptcy Court; as amended by Proof of Claim No. 29-4 in the amount of $11,332,789.76 filed against SunCal Heartland LLC on September 26, 2011 with the California Bankruptcy Court

Proof of Claim No. 69 in the amount of $36,836.00 filed against SunCal Marblehead LLC on February 14, 2011 with the California Bankruptcy Court; as amended by Proof of Claim No. 69-2 in

the amount of $36,836.00 filed against SunCal Marblehead LLC on April 15, 2011 with the California Bankruptcy Court

Proof of Claim No. 70 in the amount of $UNKNOWN filed against SunCal Marblehead LLC on February 14, 2011 with the California Bankruptcy Court; as amended by Proof of Claim No. 70-4 in the amount of $11,332,789.76 filed against SunCal Marblehead LLC on September 26, 2011 with the California Bankruptcy Court

Proof of Claim No. 33 in the amount of $UNKNOWN filed against SunCal Oak Knoll, LLC on February 14, 2011 with the California Bankruptcy Court; as amended by Proof of Claim No. 33-3 in the amount of $11,332,789.76 filed against SunCal Oak Knoll, LLC on September 26, 2011 with the California Bankruptcy Court

Proof of Claim No. 58 in the amount of $29,765,800.60 filed against SunCal PSV, LLC on February 14, 2011 with the California Bankruptcy Court; as amended by Proof of Claim No. 58-2 in the amount of $29,765,800.60 filed against SunCal PSV, LLC on April 15, 2011 with the California Bankruptcy Court

Proof of Claim No. 59 in the amount of $UNKNOWN filed against SunCal PSV, LLC on February 14, 2011 with the California Bankruptcy Court; as amended by Proof of Claim No. 59-4 in the amount of $11,332,789.76 filed against SunCal PSV, LLC on September 26, 2011 with the California Bankruptcy Court

Proof of Claim No. 12 in the amount of $UNKNOWN filed against SunCal Torrance Properties LLC on February 14, 2011 with the California Bankruptcy Court; as amended by Proof of Claim No. 12-3 in the amount of $11,332,789.76 filed against SunCal Torrance Properties LLC on September 26, 2011 with the California Bankruptcy Court

## SCHEDULE 5

## ELR SETTLEMENT

See Attached.

## SETTLEMENT AND MUTUAL RELEASE AGREEMENT

This Settlement and Mutual Release Agreement ("Agreement") is made between Bond Safeguard Insurance Company, an Illinois corporation ("Bond Safeguard") and the City of Palmdale, a California municipal corporation ("City"). Bond Safeguard and the City are collectively referenced as the "Parties," or singularly, as a "Party."

1.  **RECITALS**

This Agreement is made with reference to the following facts:

(a)  On or about June 26, 2006, and on subsequent dates, Bond Safeguard, acting as surety for its principal, Palmdale Hills Property, LLC ("Developer") issued several Faithful Performance Bonds ("Bonds") in conjunction with Developer's planned construction of a residential housing subdivision in the City known as "Ritter Ranch" (the "Property"). The Bonds are listed below by bond number, general description of improvements, and penal sum, as follows:

1.  Bond No. 5020969 (Grading) -- penal sum of $573,400.00.

2.  Bond No. 5020971 (Street Improvements – Streets 2 Lanes Only) -- penal sum of $522,700.00.

3.  Bond No. 5020972 (Street Improvements – Less 2 Lanes Street) -- penal sum of $4,235,900.00.

4.  Bond No. 5020973 (Drainage Improvements) -- penal sum of $2,107,100.00.

P6399-1243\1310704v4.doc – Execution Copy                    1          GML

The term "Bonds" refers to all four Bonds listed above, unless there is a specific reference to a defined lesser group of bonds.

(b)  Developer began construction of the improvements required by two Subdivision Improvement Agreements (more particularly described and defined herein), effective on July 6, 2006, and August 8, 2006. The improvements required to be completed therein are collectively referenced as the "Improvements."

(c)  Prior to completing the work required by the Subdivision Improvement Agreements, Developer experienced financial difficulties leading to its filing of a Chapter 11 proceeding in the United States Bankruptcy Court in the Central District of California, Santa Ana Division on November 7, 2008 (Case No. 8:08-bk-17206-ES) ("Bankruptcy Proceeding"). The Bankruptcy Proceeding remains pending.

(d)  The work covered by the Bonds is not complete.

(e)  On October 29, 2009, the City filed an action against Bond Safeguard based upon the default of Developer in completing performance of the Improvements, and seeking damages under the Bonds (Los Angeles County Superior Court Case No. BC 425072 ("Action")).

(f)  In an attempt to settle the Action, the City desires to accept completion of less than all of the Improvements as a compromise and settlement of the City's claims against Bond Safeguard in the Action, without prejudice to the City's rights to seek full completion of the Improvements from any and all third parties.

P6399-1243\1310704v4.doc – Execution Copy          2          GML

(g)  The City also seeks to recover its attorneys' fees expended in prosecution of the Action, and its attorney's fees spent in attempting to complete the Improvements and relief from the automatic stay in the Bankruptcy Proceeding.

(h)  The Parties now desire and intend by this Agreement, among other things, to settle finally and forever all existing and potential claims of any type concerning the disputes that have arisen between them regarding the matters which were the subject of the Action and under the Bonds.

NOW, THEREFORE, the Parties agree as follows:

2.    **DEFINITIONS**

In addition to the terms specially defined above:

"Claim" means all amounts of any type sought to be recovered by the City against Bond Safeguard in the Action, and under the Bonds, including but not limited to all claims or damages sought from Bond Safeguard as a result of the default of its principal, Developer, in performance of the Subdivision Improvement Agreements (defined herein), and all damages allegedly arising from any breach of the Bonds by Bond Safeguard and its principal, Developer.

"Completion Contractor(s)" means any contractor hired by Bond Safeguard to undertake the improvements identified in Exhibit A and Exhibit B herein.

"Effective Date" means the date on which the last Party signs this Agreement.

P6399-1243\1310704v4.doc – Execution Copy          3          GML

"Subdivision Improvement Agreements" means the Subdivision Improvement Agreements dated July 6, 2006, and August 8, 2006, entitled "Ritter Ranch ELR Phase 2" and "Elizabeth Lake Road – Phase 2," respectively, encompassing Improvement Plan Nos. GD05-138, ST 05-138, and SD 05-138.

3.   **PAYMENT AND CONSIDERATION**

In consideration of the covenants, conditions and releases provided for in this Agreement:

(a)  Bond Safeguard will pay One Hundred Twenty-Seven Thousand Dollars $127,000.00  to City within 20 days of the Effective Date of this Agreement as reimbursement for attorneys' fees, costs and expenses incurred by the City in seeking to enforce performance under the Bonds and the City's appearances in the Bankruptcy Proceeding.

(b)  Bond Safeguard will pay $12,861.40 to City within 20 days of the Effective Date of this Agreement as reimbursement for repair work the City was required to undertake to the Improvements to ensure public health and safety following the wildfire damage to Phase 2 which occurred in or around August 2010.

(c)  Within 30 days of the Effective Date, Bond Safeguard, through its consultant, shall submit to the City engineered plans for the Interim Facilities (defined herein), with sufficient detail and particularity and in conformance with all applicable laws and codes necessary for the City's approval of such plans. Within 2 weeks of such submission, the City shall approve these plans, or provide

4   GML

written comments, corrections, and other reasons, if any, for the City's non-approval of such plans. Review of subsequent plan submissions, if any, shall be subject to this same 2-week time requirement. Within 60 days following the City's approval of such plans, Bond Safeguard shall, at its own expense, engage a Completion Contractor(s) to complete the scope of work listed in Exhibit A ("Interim Facilities"). Bond Safeguard covenants, warrants and agrees that the Interim Facilities shall be completed by no later than August 30, 2011. This August 30, 2011 completion date shall be extended by (1) the number of days, if any, the City exceeds each 2-week plan submission review, and comment/correction period set forth herein; and (2) the number of days work cannot be performed on the Interim Facilities caused by any "uncontrollable forces" which prevents the timely completion of the Interim Facilities. "Uncontrollable forces" shall include flood, earthquake, storm, fire, epidemic, war, riot, federal, state or local government statute, ordinance, regulation or action, which by exercise of due diligence such party could not have reasonably been expected to avoid and by exercise of due diligence has been unable to overcome.

(d)   Within 45 days of the Effective Date, Bond Safeguard, through its consultant, shall submit to the City engineered plans for the Permanent Facilities (defined herein), with sufficient detail and particularity and in conformance with all applicable laws and codes necessary for the City's approval of such plans. Within 2 weeks of such submission, the City shall approve those plans, or provide written comments, corrections, and other reasons, if any, for the City's non-approval of such plans. Review of subsequent plan submissions, if any, shall be subject to this

same 2-week time requirement. Bond Safeguard shall, at its own expense, engage a Completion Contractor(s) to complete the scope of work listed in Exhibit B ("Permanent Facilities"). Bond Safeguard covenants, warrants and agrees that the Permanent Facilities shall be completed within 6 months following the City's approval of such plans. This 6-month completion date shall be extended by (1) the number of days, if any, the City exceeds each 2-week plan submission review, comment/correction period set forth herein; and (2) the number of days work cannot be performed on the Permanent Facilities caused by any "uncontrollable forces" which prevents the timely completion of the Permanent Facilities. "Uncontrollable forces" shall include flood, earthquake, storm. fire, epidemic, war, riot, federal, state or local government statute, ordinance, regulation or action, which by exercise of due diligence such party could not have reasonably been expected to avoid and by exercise of due diligence has been unable to overcome.

4.    **COMPLETION CONTRACTOR(S):**

    (a) Completion Contractor(s) shall be a subcontractor to Bond Safeguard, and no contractual relationship, pursuant to this Agreement, shall exist between the City and the Completion Contractor(s).

    (b) Routine day-to-day operations and decisions as to the manner of performance of the Improvements shall be made by the Completion Contractor(s), provided, however, that the Completion Contractor(s) has no authority to agree to any changes in the Improvements.

P6399-12431131070704v4.doc – Execution Copy      6   GML

(c)  Bond Safeguard reserves the right to terminate the Completion Contractor(s) at any time.  Bond Safeguard will provide at least 5 calendar days written notice to the City of any change in the Completion Contractor(s) engaged to complete the Improvements, including but not limited to the Developer or a new owner taking over completion of the Improvements pursuant to an approved bankruptcy plan.

(d)  If Bond Safeguard terminates the Completion Contractor(s), Bond Safeguard will employ any other completion contractor pre-approved by the City within 2 weeks of such termination.

5.    **RELEASES AND WAIVERS**

(a) In consideration for and following receipt of the payment of the sums identified in Sections 3(a) and (b) hereof, and completion of the Interim Facilities and Permanent Facilities, and in consideration of the mutual releases provided below and except for the obligations preserved and created by this Agreement, the Parties for themselves and their respective representatives, agents, employees, attorneys, predecessors, successors, sureties, assigns and all others, do hereby fully and forever release, discharge and forever acquit the other Party and its representatives, agents, employees, attorneys, predecessors, successors, sureties, assigns, and all others from any and all claims, demands, causes of action, obligations, rights, attorneys' fees, costs, and/or liabilities of any nature, whether anticipated or unanticipated, known or unknown, past or present, contingent or fixed, heretofore or hereafter arising from or relating to the Bonds, the Property

P6399-1243\1310794v4.doc – Execution Copy                 7    _GML_        __