PROSPECTUS SUPPLEMENT DATED August 25, 2006
(To Prospectus dated August 11, 2006)

## $1,831,838,000 (Approximate)
## GREENPOINT MORTGAGE FUNDING TRUST 2006-HE1
## Home Equity Loan Asset-Backed Notes, Series 2006-HE1

**Lehman Brothers Holdings Inc.**
Sponsor and Seller

**Structured Asset Securities Corporation**
Depositor

**Greenpoint Mortgage Funding Trust 2006-HE1**
Issuing Entity

---

| | |
|---|---|
| Consider carefully the risk factors beginning on page S-10 of this prospectus supplement and on page 6 of the prospectus.<br><br>The notes will represent obligations of the trust fund only and will not represent interests in or obligations of the sponsor, the depositor or any of their affiliates or any other party.<br><br>This prospectus supplement may be used to offer and sell the notes offered hereby only if accompanied by the prospectus. | The trust fund will issue notes including the following class offered hereby:<br><br>• **Two classes of senior notes**<br><br>The classes of notes offered by this prospectus supplement are listed together with the initial note principal amounts and interest rates, in the table under "The Offered Notes" on page S-1 of this prospectus supplement.<br><br>This prospectus supplement and the accompanying prospectus relate only to the offering of the notes listed in the table on page S-1 and not to the other classes of notes that will be issued by the trust fund as described in this prospectus supplement.<br><br>Principal and interest will be payable monthly, as described in this prospectus supplement. The first expected payment date will be September 12, 2006.<br><br>Credit enhancement for the offered notes includes excess interest, financial guaranty insurance policies and overcollateralization features.<br><br>The assets of the trust fund will primarily consist of a pool of adjustable rate, one-to-four family residential first lien and second lien revolving home equity lines of credit and certain fixed rate, closed end, second lien mortgage loans. One or more REMIC elections will be made with respect to the assets of the trust fund.<br><br>The notes offered by this prospectus supplement have the benefit of financial guaranty insurance policies from XL Capital Assurance Inc., in the case of the Class Ax notes, and CIFG Assurance North America, Inc., in the case of the Class Ac notes, that will each guarantee timely payment of interest and the ultimate payment of principal with respect to the related notes, as described in this prospectus supplement. |

**XL CAPITAL ASSURANCE**     

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved the notes or determined that this prospectus supplement or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense.

The notes offered by this prospectus supplement will be purchased by Lehman Brothers Inc., as underwriter, from Structured Asset Securities Corporation, and are being offered from time to time for sale to the public in negotiated transactions or otherwise at varying prices to be determined at the time of sale. The underwriter has the right to reject any order. Proceeds to Structured Asset Securities Corporation from the sale of these notes will be approximately 100% of their initial total note principal amount before deducting expenses.

On or about August 28, 2006, delivery of the notes offered by this prospectus supplement will be made through the book-entry facilities of The Depository Trust Company, Clearstream Banking Luxembourg and the Euroclear System.

*Underwriter:*
## LEHMAN BROTHERS

The date of this prospectus supplement is August 25, 2006

### Important notices about information presented in this prospectus supplement and the accompanying prospectus:

We provide information to you about the notes offered by this prospectus supplement in two separate documents that progressively provide more detail: (1) the accompanying prospectus, which provides general information, some of which may not apply to your notes and (2) this prospectus supplement, which describes the specific terms of your notes.

The information presented in this prospectus supplement is intended to enhance the general terms of the accompanying prospectus. If the specific terms of this prospectus supplement and the general terms of the accompanying prospectus vary, you should rely on the information in this prospectus supplement.

You should rely only on the information contained or incorporated by reference in this prospectus supplement and the accompanying prospectus. We have not authorized anyone to provide you with different information. We are not offering the notes in any state where the offer is not permitted. We do not claim that the information in this prospectus supplement and prospectus is accurate as of any date other than the dates stated on their respective covers.

---

Dealers will deliver a prospectus supplement and prospectus when acting as underwriters of the notes and with respect to their unsold allotments or subscriptions. In addition, all dealers selling the notes will be required to deliver a prospectus supplement and prospectus for ninety days following the date of this prospectus supplement.

---

We include cross-references in this prospectus supplement and the accompanying prospectus to captions in these materials where you can find further related discussions. The following table of contents and the table of contents included in the accompanying prospectus provide the pages on which these captions are located.

### For European Investors Only

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), the underwriter has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of notes to the public in that Relevant Member State prior to the publication of a prospectus in relation to the notes which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of notes to the public in that Relevant Member State at any time: (a) to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities; (b) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or (c) in any other circumstances which do not require the publication by the issuer of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of notes to the public" in relation to any notes in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the notes to be offered so as to enable an investor to decide to purchase or subscribe the notes, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

# Table of Contents
## Prospectus supplement

| | Page | | Page |
|---|---|---|---|
| The Offered Notes | 1 | Policy of CIFG Assurance North America, Inc. | 53 |
| Summary of Terms | 3 | The Servicer | 55 |
| The Loans | 7 | GMAC Mortgage Corporation, as Servicer | 55 |
| Servicing | 8 | Administration of the Trust Fund | 58 |
| Optional Redemption | 8 | Servicing and Administrative Responsibilities | 58 |
| Tax Status | 8 | Trust Accounts | 59 |
| ERISA Considerations | 8 | Example of Distributions | 60 |
| Legal Investment Considerations | 9 | Servicing of the Loans | 61 |
| Ratings of the Offered Notes | 9 | General | 61 |
| Risk Factors | 10 | Servicing Compensation and Payment of Expenses | 61 |
| Description of the Notes | 20 | Collection of Taxes, Assessments and Similar Items | 61 |
| General | 20 | Insurance Coverage | 61 |
| Book-Entry Registration | 21 | Evidence as to Compliance | 61 |
| Interest Payments | 24 | The Sale and Assignment Agreement and the Transfer and Servicing Agreement | 61 |
| Determination of LIBOR | 25 | General | 61 |
| Principal Payments | 25 | Assignment of Loans | 62 |
| Priority of Payments | 28 | Representations and Warranties | 63 |
| Credit Enhancement | 31 | Event of Servicer Termination; Rights Upon Event of Servicer Termination | 63 |
| Final Scheduled Payment Date | 32 | Amendment | 64 |
| Optional Redemption | 32 | Voting Rights | 65 |
| Fees and Expenses of the Trust Fund | 33 | The Trust Agreement, Indenture and Administration Agreement | 65 |
| Description of the Loan Pool | 33 | General | 65 |
| General | 34 | Events of Default | 65 |
| HELOC Terms | 34 | Termination | 67 |
| Additional Information | 35 | Trust Administration | 68 |
| Static Pool Information | 36 | Amendment | 68 |
| Affiliations and Relationships | 36 | Servicing | 68 |
| The Sponsor | 36 | Control Rights of the Insurers | 68 |
| The Depositor | 36 | Reports to Noteholders | 69 |
| Origination of the Loans and Underwriting Guidelines | 37 | Yield, Maturity and Prepayment Considerations | 70 |
| General | 37 | General | 70 |
| GreenPoint Mortgage Funding, Inc. | 37 | Effect of Overcollateralization Feature | 72 |
| GreenPoint's Underwriting Guidelines | 38 | Certain Federal Income Tax Considerations | 73 |
| General Underwriting Guidelines | 40 | General | 73 |
| The Trust Fund | 42 | | |
| General | 42 | | |
| Certain Activities | 42 | | |
| The Owner Trustee | 42 | | |
| The Indenture Trustee | 43 | | |
| The Custodian | 44 | | |
| The Trust Property | 45 | | |
| The Insurers and the Policies | 45 | | |
| XL Capital Assurance Inc. | 45 | | |
| Policy of XL Capital Assurance Inc. | 47 | | |
| CIFG Assurance North America, Inc. | 51 | | |

Table of Contents
(continued)

Tax Treatment of the Offered Notes.............73
State Tax Considerations ................................75
Legal Investment Considerations....................75
ERISA Considerations.....................................75
    General................................................75
    Purchases of the Notes.................................76
Use of Proceeds............................................77
Underwriting...............................................77
Legal Matters ..................................................77
Experts .............................................................77
Ratings .............................................................78
Annex A ............................................................1
ANNEX C-1: ....................................................1
Assumed Loan Characteristics..........................1
ANNEX C-2: Note Principal Amount
    Decrement Tables ..........................................1

## Fees and Expenses of the Trust Fund

In consideration of their duties on behalf of the Trust Fund, the Servicer, the Indenture Trustee and the Insurers will receive from the assets of the Trust Fund certain fees as set forth in the following table:

| Fee Payable to: | Frequency of Payment: | Amount of Fee: | How and When Fee Is Payable: |
|---|---|---|---|
| **Servicer** | monthly | For each Loan, a monthly fee paid to the Servicer out of interest collections received from the related Loan calculated as the product of (a) the outstanding principal balance of each Loan and (b) 0.375% per annum. | Withdrawn from Payment Account in respect of each Loan before payment of any amounts to the Noteholders. |
| **Indenture Trustee and Trust Administrator** | monthly | One day of interest on amounts in the Payment Account held by the Indenture Trustee. | Withdrawn from the Payment Account before payment of any amounts to the Noteholders. |
| **Owner Trustee** | monthly | $3,000 upfront fee and a per annum fee of $4,000 payable monthly in the amount of $333.33. | Withdrawn from the Payment Account before payment of any amounts to the Noteholders. |
| **Insurer for Class Ax Notes** | monthly | Principal Balance of the Class Ax Notes multiplied by 0.10% per annum. | Paid out of Available Funds, before payments of any amounts to the Noteholders. |
| **Insurer for Class Ac Notes** | monthly | Principal Balance of the Class Ac Notes multiplied by 0.09% per annum. | Paid out of Available Funds, before payments of any amounts to the Noteholders. |

Unless a servicing transfer occurs in which case the Servicing Fee may be increased to 0.50% per annum, the Servicing Fee set forth in the table above may not be increased without amendment of the Transfer and Servicing Agreement, as described under *"The Sale and Assignment Agreement and Transfer and Servicing Agreement— Amendment"* below. None of the other fees set forth in the table above may be changed without amendment of the Trust Agreement as described under *"The Trust Agreement, Indenture and Administration Agreement— Amendment"* below.

Expenses of the Servicer will be reimbursed after payments of interest and principal are made on the Notes. Expenses of the Indenture Trustee will be reimbursed up to a specified amount annually before payments are made on the Notes; any additional unpaid expenses will be paid to the Indenture Trustee after payments of interest and principal on the Notes have been made.

## Description of the Loan Pool

The assets of the Trust Fund shall be comprised of a pool of adjustable rate home equity lines of credit secured by first and second lien mortgages or deeds of trust on residential properties, as well as fixed rate, closed end, second lien mortgage loans (the "**Loan Pool**"), as hereinafter described. The information set forth in the following paragraphs is based on servicing records and representations about the Loans that were made by each Originator at the time it sold the Loans to the Seller. None of the Underwriter, the Seller, the Owner Trustee, the Depositor, the Insurers, or the Indenture Trustee or any of their respective affiliates have made or will make any representation as to the accuracy or completeness of such information.

**General**

Except where otherwise specifically indicated, the discussion that follows and the statistical information presented therein is derived solely from the characteristics of the Loans as of the Cut-Off Date. Whenever reference is made herein to the characteristics of the Loans or to a percentage of the Loans, unless otherwise specified, that reference is based on the Principal Balances of the Loans as of the Cut-Off Date (the "**Cut-Off Date Principal Balance**").

The Loans in the Trust Fund were originated under loan agreements and disclosure statements (the "**Credit Line Agreements**") and are secured by mortgages or deeds of trust, which are primarily first and second lien mortgages or deeds of trust, on residential properties that are primarily one- to four-family properties and also include planned unit developments and condominiums (the "**Mortgaged Properties**"). Approximately 81.98% of the Mortgaged Properties were owner-occupied at the time of origination. The Loans were underwritten in accordance with the Underwriting Guidelines, as in effect at the time of origination. Current underwriting standards are described under "Underwriting Guidelines" in the prospectus supplement.

Prior to the Closing Date, some of the Loans may be removed from the pool and other Loans may be substituted for those Loans removed. The Seller believes that the information in this prospectus supplement relating to the Loans to be included in the Loan Pool as presently constituted is representative of the characteristics of the Loans to be included in the Loan Pool as of the Closing Date, although some characteristics may vary.

In the information that follows, weighted average percentages are based upon the Cut-Off Date Principal Balances of the Loans.

The Loan Pool consists of 29,915 Loans with an aggregate Cut-Off Date Principal Balance of approximately $1,831,838,948. As of the Cut-Off Date, the minimum Principal Balance and the maximum Principal Balance is approximately $0 and $550,000, respectively, the average Principal Balance was approximately $61,234.80, the minimum Loan Rate and the maximum Loan Rate of the entire Loan Pool was approximately 4.750% and 16.250% per annum, respectively, and the weighted average Loan Rate was approximately 9.552% per annum. The weighted average combined original loan-to-value ratio of the Loans was approximately 87.82% as of the Cut-Off Date. The combined original loan-to-value ratio is weighted based on the credit limit for HELOCs and original balance for Closed End 2nds.

As of the Cut-Off Date, no Loan had a combined loan-to-value ratio greater than approximately 100%. As of the Cut-Off Date, no more than approximately 0.19% of the Loans were delinquent by more than 30 days.

None of the Loans were subject to the Home Ownership and Equity Protection Act of 1994 and, as of the date of origination, none of the Loans were subject to any comparable state law, including the Georgia Fair Lending Act.

**HELOC Terms**

All of the HELOCs consist of loans originated under two different loan term options: a 15-year HELOC or a 25-year HELOC. The credit limit utilization rate of the HELOCs was approximately 86.46%, the minimum credit limit utilization rate was approximately 0.00%, and the maximum credit limit utilization rate was approximately 100.96%. The credit limit utilization rate is determined by dividing the Cut-Off Date Principal Balance by the credit limit of the related Credit Line Agreement.

Substantially all of the HELOCs were originated by GreenPoint or acquired by GreenPoint in the secondary market in the ordinary course of its business and were underwritten or re-underwritten by GreenPoint in accordance with its underwriting standards as described under "*Underwriting Guidelines*" below. The Seller acquired most of the HELOCs from GMAC Mortgage Corporation ("**GMACM**"). All of the HELOCs have either a 5-year, 10-year or 15-year draw period, during which the borrower may make cash withdrawals against the equity line and substantially all of the HELOCs have a 10-year repayment period, during which the balance of the HELOC as of the end of the draw period is repaid. Generally, the HELOC borrowers are subject to a termination fee for loans terminated within one year of origination of $750 or $500 and a termination fee of $500 for loans terminated in the

second or third year. A borrower may access a HELOC credit line at any time during the draw period by writing a check.

Subject to applicable law, the Servicer may change the terms of a Credit Line Agreement at any time provided that such changes (i) do not adversely affect the interest of the Noteholders or the Insurers (including, without limitation, any adverse affect to the tax status of any REMIC created by the Trust Agreement) and (ii) are consistent with prudent business practice. In addition, the Servicer, within certain limitations described in the Transfer and Servicing Agreement, may increase the credit limit of the HELOC serviced by the Servicer.

The HELOCs bear interest at a variable rate which changes monthly with changes in the applicable "**Index Rate**" which is a variable per annum rate based on the prime rate or base rate published in the Money Rates table of the Wall Street Journal. The HELOCs are subject to a maximum rate equal to approximately 12.000%, 16.000%, 17.000% or 18.000% per annum and are subject to applicable usury limitations. As of the Cut-Off Date approximately 4.65% of the HELOCs accrue interest at a weighted average introductory rate of approximately 5.356%. The weighted average remaining period that this introductory rate will remain in effect is approximately 0.6 months. The "**Loan Rate**" on the HELOCs following the introductory period, if applicable, is a per annum rate equal to the sum of the Index Rate plus a margin ranging from approximately 0.000% to 8.000% (the "**Margin**"). As of the Cut-Off Date, the minimum remaining draw period and the maximum remaining draw period for the HELOCs were approximately 27 months and 180 months, respectively, and the weighted average remaining draw period for the HELOCs was approximately 70.7 months.

**Closed End 2nd Terms**

Substantially all of the Closed End 2nds were originated by GreenPoint or acquired by GreenPoint in the secondary market in the ordinary course of its business and were underwritten or re-underwritten by GreenPoint in accordance with its underwriting standards as described under "*Underwriting Guidelines*" below. The Seller acquired most of the Closed End 2nds from GreenPoint.

The Closed End 2nds will be evidence by promissory notes and secured by a mortgage. The mortgages create second liens on the mortgaged property.

All of the Closed End 2nds bear interest at a fixed rate. Approximately 4.61% and 69.45% of the Closed End 2nds have 5-year and 10-year interest only periods, respectively, and repayment terms of 10-years, 15-years or 20 years. The remaining Closed End 2nds require payment of principal and interest throughout their term.

## Additional Information

Additional expected stated characteristics of the Loans as of the Cut-Off Date are set forth in Annex B to this prospectus supplement. The description in this prospectus supplement of the Loans included in the Loan Pool and the Mortgaged Properties is based upon the Loan Pool as constituted at the close of business on the Cut-Off Date. In the event that Loans are removed from or added to the Loan Pool, such removal or addition, to the extent material, will be noted in a Current Report on Form 8-K.

Pursuant to the Indenture, the Indenture Trustee will prepare a monthly statement to Noteholders and the Insurers containing certain information regarding the Notes and the Loan Pool. The Indenture Trustee may make available each month, to any interested party, the monthly statement to Noteholders via the Indenture Trustee's website at trust.investorreporting.usbank.com and assistance in using the website can be obtained by calling the Indenture Trustee at (617) 603-6409. Parties that are unable to use the above distribution option are entitled to have a paper copy mailed to them via first class by notifying the Indenture Trustee at (617) 603-6409. The Indenture Trustee will have the right to change the way such reports are distributed in order to make such payments more convenient and/or more accessible, and the Indenture Trustee will provide timely and adequate notification to such parties regarding any such changes.

## Static Pool Information

Certain static pool information may be found at:

*http://www.lehman.com/reg_ab/deal.html?deal=GPHE06-HE1*

Access to this internet address is unrestricted and free of charge. Information provided through this internet address that relates to the performance during periods prior to January 1, 2006, of securitized assets included in the portfolio of assets originated or acquired by a party is not deemed to be part of this prospectus supplement, the prospectus or the registration statement for the Offered Notes. The static pool information includes (i) the Sponsor's prior securitized pools of home equity lines of credit, which include substantially all GreenPoint home equity lines of credit and (ii) vintage pool data for home equity lines of credit originated by GreenPoint.

Various factors may affect the prepayment, delinquency and loss performance of the Loans over time. The various loan pools for which performance information is shown at the above internet address had initial characteristics that differed, and may have differed in ways that were material to the performance of those loan pools. These differing characteristics include, among others, product type, credit quality, geographic concentration, originator concentration, servicer concentration, average principal balance, weighted average interest rate, weighted average loan-to-value ratio, weighted average term to maturity, and the presence or absence of prepayment premiums. We do not make any representation, and you should not assume, that the performance information shown at the above internet address is in any way indicative of the performance of the Closed End 2nds in the Trust Fund.

## Affiliations and Relationships

The Depositor, the Sponsor, the Underwriter, and the Bank are all affiliates of each other and have the following ownership structure:

> The Depositor, Structured Asset Securities Corporation, is a wholly-owned, direct subsidiary of Lehman Commercial Paper Inc., which is a wholly-owned, direct subsidiary of Lehman Brothers Inc., which is a wholly-owned, direct subsidiary of the Sponsor, Lehman Brothers Holdings Inc.

> The Underwriter, Lehman Brothers Inc., is a wholly-owned, direct subsidiary of the Sponsor.

> The Bank, Lehman Brothers Bank, FSB, is a wholly owned subsidiary of Lehman Brothers Bancorp Inc., which is a wholly-owned, direct subsidiary of the Sponsor.

## The Sponsor

Lehman Brothers Holdings Inc., a Delaware corporation, whose executive offices are located at 745 Seventh Avenue, New York, New York 10019, U.S.A., will be the Sponsor. See "The Sponsor" in the prospectus for more information regarding Lehman Brothers Holdings Inc.

## The Depositor

The Depositor, Structured Asset Securities Corporation, was incorporated in the State of Delaware on January 2, 1987. The principal office of the Depositor is located at 745 Seventh Avenue, New York, New York 10019. Its telephone number is (212) 526-7000. The Depositor has filed with the Securities and Exchange Commission a registration statement under the Securities Act with respect to the Notes (Registration No. 333-129480).

For more information regarding the Depositor, see "The Depositor" in the prospectus.

# Origination of the Loans and Underwriting Guidelines

**General**

Approximately 99.56% of the Loans were originated by GreenPoint under the GreenPoint's Underwriting Guidelines. The remainder of the Loans were originated by other Originators in accordance with Underwriting Guidelines generally comparable to the General Underwriting Guidelines described below under "General Underwriting Guidelines." Such General Underwriting Guidelines differ among Originators in various areas. The following is a general summary of GreenPoint's Underwriting Guidelines and General Underwriting Guidelines believed by the Depositor to be generally applied, with some variation, by the Originators, as applicable. The following does not purport to be a complete description of the underwriting standards of the Originators.

**GreenPoint Mortgage Funding, Inc.**

GreenPoint Mortgage Funding, Inc., a New York corporation ("**GreenPoint**"), is an indirect, wholly-owned subsidiary of North Fork Bancorporation, Inc., a Delaware corporation and bank holding company ("**North Fork**"). North Fork's other subsidiaries include North Fork Bank, a New York commercial bank. North Fork is listed on the New York Stock Exchange under the symbol "NFB". GreenPoint was formerly an indirect wholly-owned subsidiary of GreenPoint Financial Corp., which was acquired by North Fork in October 2004. On March 12, 2006, North Fork and Capital One Financial Corporation ("**Capital One**") announced that they signed a definitive agreement in which Capital One will acquire North Fork. Shareholders of both companies approved the transaction. Capital One and North Fork expect the transaction to close in the fourth quarter of 2006 pending the receipt of regulatory approvals and the expiration of regulatory waiting periods.

GreenPoint is engaged in the mortgage banking business, and as part of that business, originates, acquires, sells and services mortgage loans. GreenPoint originates loans primarily through its wholesale division, which works with a nationwide network of independent mortgage brokers, each of which must be approved by GreenPoint. GreenPoint also originates loans through its retail and correspondent lending divisions. Mortgage loans originated by GreenPoint are secured primarily by one-to-four family residences. GreenPoint's executive offices are located at 100 Wood Hollow Drive, Novato, California, 94945.

GreenPoint has originated residential mortgage loans of substantially the same type as the Mortgage Loans since its formation in October 1999, when it acquired the assets and liabilities of Headlands Mortgage Company.

The following table sets forth, by number and dollar amount of mortgage loans, GreenPoint's residential mortgage loan production for the periods indicated.

| Residential Mortgage Loan Production Table | | | | |
|---|---|---|---|---|
| Loan Type | **2003** | **2004** | **2005** | **2006 Q1** |
| **Alt A and Specialty** | | | | |
| Number of Loans | 56,702 | 65,284 | 67,707 | 13,752 |
| Dollar Volume | $11,505,997,786 | $14,579,659,658 | $19,148,814,451 | 4,034,288,749 |
| Percent Adjustable | 19% | 67% | 84% | 78% |
| Percent of Total Dollar Volume | 30% | 37% | 45% | 52% |
| **Agency** | | | | |
| Number of Loans | 28,460 | 10,975 | 12,408 | 2,108 |
| Dollar Volume | $5,378,009,580 | $2,188,737,211 | $2,746,779,129 | $480,214,325 |
| Percent Adjustable | 0% | 3% | 1% | 2% |
| Percent of Total Dollar Volume | 14% | 6% | 7% | 6% |
| **Jumbo** | | | | |
| Number of Loans | 53,106 | 53,522 | 41,614 | 5,860 |
| Dollar Volume | $19,426,400,804 | $17,667,106,136 | $14,899,732,857 | 2,254,652,746 |
| Percent Adjustable | 69% | 84% | 74% | 77% |
| Percent of Total Dollar Volume | 50% | 44% | 35% | 29% |
| **Heloc and Seconds** | | | | |
| Number of Loans | 44,346 | 83,902 | 82,258 | 14,847 |
| Dollar Volume | $2,556,735,253 | $5,374,039,738 | $5,450,355,355 | 1,002,614,650 |
| Percent Adjustable | 96% | 97% | 95% | 91% |
| Percent of Total Dollar Volume | 7% | 14% | 13% | 13% |
| | | | | |
| Number of Loans | 182,614 | 213,683 | 203,987 | 36,567 |
| Dollar Volume | $38,867,143,423 | $39,809,542,743 | $42,245,681,792 | 7,771,770,470 |
| Average Loan Amount | $212,838 | $186,302 | $207,100 | 212,535 |
| Non-Purchase Transactions | 66% | 52% | 52% | 58% |
| Adjustable Rate Loans* | 47% | 75% | 76% | 75% |
| *% of total loan production based on dollar volume | | | | |
| % may not add to 100% due to rounding | | | | |

## GreenPoint's Underwriting Guidelines

Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Exceptions to the guidelines are permitted where compensating factors are present. The GreenPoint underwriting guidelines are generally not as strict as Fannie Mae or Freddie Mac guidelines. GreenPoint's underwriting guidelines are applied in accordance with applicable federal and state laws and regulations.

In assessing a prospective borrower's creditworthiness, GreenPoint may use FICO® credit scores. FICO credit scores are statistical credit scores designed to assess a borrower's creditworthiness and likelihood to default on a consumer obligation over a two-year period based on a borrower's credit history. FICO credit scores were not developed to predict the likelihood of default on mortgage loans and, accordingly, may not be indicative of the ability of a borrower to repay its mortgage loan. FICO credit scores range from approximately 300 to approximately 850, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score.

In determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally considers the ratio of those amounts to the proposed borrower's monthly gross income. These ratios vary depending on a number of underwriting criteria, including loan-to-value ratios ("LTV"), and are determined on a loan-by-loan basis. The ratios generally are limited to 40% but may be extended to 50% with adequate compensating factors, such as disposable income, reserves, higher FICO credit score, or lower LTV's. Each mortgage loan has a required amount of reserves, with the minimum being three months of principal, interest, taxes and insurance for full documentation loans. Depending on the LTV and occupancy types, these reserve requirements may be increased to compensate for the additional risk.

As part of its evaluation of potential borrowers, GreenPoint generally requires a description of the borrower's income. If required by its underwriting guidelines, GreenPoint obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Employment verification may be obtained through analysis of the prospective borrower's recent pay stubs and/or W-2 forms for the most recent two years or relevant portions of the borrower's most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the borrower's length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

GreenPoint acquires or originates many mortgage loans under "limited documentation" or "no documentation" programs. Under limited documentation programs, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower, than on verified income of the borrower. Mortgage loans underwritten under this type of program are generally limited to borrowers with credit histories that demonstrate an established ability to repay indebtedness in a timely fashion, and certain credit underwriting documentation concerning income or income verification and/or employment verification is waived. Mortgage loans originated and acquired with limited documentation programs include cash-out refinance loans, super-jumbo mortgage loans and mortgage loans secured by investor-owned properties. Permitted maximum loan-to-value ratios (including secondary financing) under limited documentation programs are generally more restrictive than mortgage loans originated with full documentation requirements. Under no documentation programs, income ratios for the prospective borrower are not calculated. Emphasis is placed on the value and adequacy of the mortgaged property as collateral and the credit history of the prospective borrower, rather than on verified income and assets of the borrower. Documentation concerning income, employment verification and asset verification is not required and income ratios are not calculated. Mortgage loans underwritten under no documentation programs are generally limited to borrowers with favorable credit histories and who satisfy other standards for limited documentation programs.

Periodically, the data used by GreenPoint to underwrite mortgage loans may be obtained by an approved loan correspondent. In those instances, the initial determination as to whether a mortgage loan complies with GreenPoint's underwriting guidelines may be made by such loan correspondent. In addition, GreenPoint may acquire mortgage loans from approved correspondent lenders under a program pursuant to which GreenPoint delegates to the correspondent the obligation to underwrite the mortgage loans to GreenPoint's standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by GreenPoint before acquisition of the mortgage loan, and the correspondent represents to GreenPoint that its underwriting standards have been met. After purchasing mortgage loans under those circumstances, GreenPoint conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including GreenPoint's prior experience with the correspondent lender and the results of the quality control review process itself.

In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing. All appraisals are required to conform the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac. The requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property is in a good condition and verify that construction, if new, has been substantially completed. The appraisal generally will have been based on prices obtained on recent sales of comparable properties determined in accordance with Fannie Mae and Freddie Mac guidelines. In certain cases, an

analysis based on income generated by the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property may be used. GreenPoint's Underwriting Guidelines require that the underwriters be satisfied that the value of the property being financed supports, and will continue to support, the outstanding loan balance, and provides sufficient value to mitigate the effects of adverse shifts in real estate values.

GreenPoint may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to the limitation that the combined Loan-to-Value Ratio may not exceed 100%. GreenPoint's underwriting guidelines do not prohibit or otherwise restrict a borrower from obtaining secondary financing from lenders other than GreenPoint, whether at origination of the mortgage loan or thereafter.

Generally, each mortgage with an LTV at origination of greater than 80% is covered by a primary mortgage insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac. The policy provides coverage in the amount equal to a specified percentage multiplied by the sum of the remaining principal balance of the related mortgage loan, the accrued interest on it and the related foreclosure expenses. The specified coverage percentage is, generally, 12% for LTV's between 80.01% and 85.00%, 25% for LTV's between 85.01% and 90% and 30% for LTV's between 90.01% and 95%. However, under certain circumstances, the specified coverage levels for these mortgage loans may vary from the foregoing. No primary mortgage insurance policy will be required with respect to any mortgage loan if maintaining the policy is prohibited by applicable law, after the date on which the related LTV is 80% or less, or where, based on a new appraisal, the principal balance of the mortgage loan represents 80% or less of the new appraised value.

GreenPoint requires title insurance on all of its mortgage loans secured by first liens on real property. In addition, GreenPoint requires that fire and extended coverage casualty insurance be maintained on the mortgaged property in an amount at least equal to the principal balance of the related single-family mortgage loan or the replacement cost of the mortgaged property, whichever is less. GreenPoint also requires flood insurance to be maintained on the mortgaged property if and to the extent such insurance is required by applicable law or regulation.

### General Underwriting Guidelines

The General Underwriting Guidelines used by Originators other GreenPoint are generally intended to evaluate the credit risk of loans made to borrowers with imperfect credit histories, ranging from minor delinquencies to bankruptcy, or borrowers with relatively high ratio of monthly mortgage payments to income or relatively high ratios of total monthly credit payments to income. In addition, such guidelines also evaluate the value and adequacy of the Mortgaged Property as collateral. On a case by case basis, the Originators may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the applicable underwriting guidelines warrants an underwriting exception. Compensating factors may include, but are not limited to, relatively low ratio, relatively low debt-to-income ratio, good credit history, stable employment, financial reserves, and time in residence at the applicant's current address. A significant number of the Loans may represent such underwriting exceptions.

Under the General Underwriting Guidelines, the Originators review and verify the loan applicant's sources of income (except under the stated income programs), calculate the amount of income from all such sources indicated on the loan application or similar documentation, review the credit history of the applicant and calculate the debt-to-income ratio to determine the applicant's ability to repay the loan, and review the Mortgaged Property for compliance with the General Underwriting Guidelines. The General Underwriting Guidelines are applied in accordance with a procedure that generally requires (i) an appraisal of the Mortgaged Property that conforms to Fannie Mae and Freddie Mac standards and (ii) a review of such appraisal, which review may be conducted by the Originator's staff appraiser or representative and, depending upon the amount of property data available, the original principal balance and loan-to-value ratio of the Mortgaged Property, may include a review of the original appraisal or a drive-by review appraisal of the Mortgaged Property. The General Underwriting Guidelines generally permit single-family loans with loan-to-value ratios at origination of up to 90% (or, with respect to certain Loans, up to 100%) for the highest credit grading category, depending on the creditworthiness of the mortgagor and, in some cases, the type and use of the property and the debt-to-income ratio. Under the General Underwriting Guidelines, the maximum combined loan-to-value ratio for purchase money loans may differ from those applicable to refinancings.

The Loans were originated on the basis of loan application packages submitted through mortgage brokerage companies or at the related Originator's retail branches or were purchased from originators approved by

the Originators. Loan application packages submitted through mortgage brokerage companies, containing in each case relevant credit, property and underwriting information on the loan request, are compiled by the applicable mortgage brokerage company and submitted to the Originator for approval and funding. The mortgage brokerage companies receive all or a portion of the loan origination fee charged to the mortgagor at the time the loan is made.

Each prospective borrower completes an application that includes information with respect to the applicant's liabilities, income (except with respect to certain "No Documentation" loans described below) and employment history, as well as certain other personal information. Each Originator requires a credit report on each applicant from a credit reporting company. The report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and (to the extent reported) any record of payment defaults, bankruptcy, repossession, suits or judgments.

Mortgaged Properties that secure loans are generally appraised by qualified independent appraisers. Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. Except with respect to purchase money closed end 2nds, independent appraisals are generally reviewed by the related Originators before the loan is funded, and a drive-by review or appraisal is generally performed in connection with loan amounts over a certain predetermined dollar amount established for each state or when property data is unavailable. With respect to purchase money closed end 2nds, an independent appraisal may or may not be reviewed by the Originator.

The General Underwriting Guidelines are less stringent than the standards generally acceptable to Fannie Mae and Freddie Mac. Mortgagors who qualify under the General Underwriting Guidelines generally have payment histories and debt ratios that would not satisfy Fannie Mae and Freddie Mac underwriting guidelines and may have a record of major derogatory credit items such as outstanding judgments or prior bankruptcies. The General Underwriting Guidelines establish the maximum permitted loan-to-value ratio for each loan type based upon these and other risk factors. Because such General Underwriting Guidelines do not conform to Fannie Mae or Freddie Mac guidelines, the Loans are likely to experience higher rates of delinquency, foreclosure and bankruptcy than if they had been underwritten to a higher standard. See *"Risk Factors—Risks Related to Higher Expected Delinquencies of the Loans"* herein.

Substantially all of the Loans were originated consistent with and generally conform to "Full Documentation," "Limited Documentation," or "Stated Income Documentation" residential loan programs. Under each of such programs, the related Originator generally reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the type and use of the property being financed. The General Underwriting Guidelines require that loans be underwritten according to a standardized procedure that complies with applicable federal and state laws and regulations and requires the Originator's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal and a review of the appraisal, supports the outstanding loan balance. The General Underwriting Guidelines permit two to four family loans to have loan-to-value ratios at origination of generally up to 90% (or, in certain cases, 100%), depending on, among other things, the loan documentation program, the purpose of the mortgage loan, the mortgagor's credit history, and repayment ability, as well as the type and use of the property. With respect to loans secured by Mortgaged Properties acquired by a mortgagor under a "lease option purchase," the loan-to-value ratio of the related mortgage loan is generally based on the appraised value at the time of origination of such mortgage loan.

Certain of the Loans were originated under "No Documentation" programs pursuant to which no information was obtained regarding the borrower's income or employment and there was no verification of the borrower's assets.

Under the Full Documentation programs, applicants generally are required to submit two written forms of verification of stable income for 12 to 24 months, depending on the particular Originator and its guidelines. Under the Limited Documentation programs, generally one such form of verification is required for six or 12 months, depending upon the practices of the applicable Originator. Under the Stated Income Documentation programs, generally an applicant may be qualified based upon monthly income as stated on the mortgage loan application if the applicant meets certain criteria. All the foregoing programs typically require that with respect to each applicant,

there be a telephone verification of the applicant's employment. Verification of the source of funds (if any) required to be deposited by the applicant into escrow in the case of a purchase money loan is generally required under the Full Documentation program guidelines, except, with respect to certain Originators, in the case of loans with loan-to-value ratios below a specified level. Generally, no such verification is required under the other programs.

Under the General Underwriting Guidelines, various risk categories are used to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loan. These categories establish the maximum permitted loan-to-value ratio and loan amount, given the occupancy status of the mortgaged property and the mortgagor's credit history and debt ratio. In general, higher credit risk loans are graded in categories that permit higher debt ratios and more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies; however, the Underwriting Guidelines establish lower maximum loan-to-value ratios and maximum loan amounts for loans graded in such categories.

A substantial portion of the Loans were classified by the related Originators in relatively low (i.e., relatively higher risk) credit categories. The incidence of delinquency, default and bankruptcy with respect to such Loans is expected to be greater than if such Loans had been classified in relatively higher categories.

# The Trust Fund

### General

Greenpoint Mortgage Funding Trust 2006-HE1 (the "**Trust Fund**" or the "**Issuing Entity**") is a statutory trust formed under the laws of the State of Delaware pursuant to the Trust Agreement. Prior to the sale and assignment of the Loans and other related assets to the Trust Fund, the Trust Fund will have no assets, obligations or any operating history. The Trust Fund will not engage in any business other than (i) acquiring, holding and managing the Loans, the other assets of the Trust Fund and any proceeds therefrom, (ii) issuing the Notes and the Certificates, (iii) making payments on the Notes and the Certificates and (iv) engaging in other activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto.

The Trust Fund will not acquire any assets other than the property of the Trust Fund described below under the heading "The Trust Property" (the "**Trust Property**"), and it is not anticipated that the Trust Fund will have any need for additional capital resources. Because the Trust Fund will have no operating history upon its establishment and will not engage in any business other than the duties discussed above, no historical or pro forma financial statements or ratios of earnings to fixed charges with respect to the Trust Fund have been included herein.

### Certain Activities

The Trust Fund will not, except as expressly provided in the Trust Agreement, the Transfer and Servicing Agreement and the Indenture: (i) sell or dispose of the property of the Trust Fund; (ii) make loans; (iii) invest in securities for the purpose of exercising control; (iv) make any expenditure for capital assets; or (v) pay any dividend.

### The Owner Trustee

Wilmington Trust Company, as owner trustee (the "**Owner Trustee**") under the Trust Agreement, is a Delaware banking corporation with trust powers incorporated in 1903, and its principal place of business is located at 1100 North Market Street, Wilmington, Delaware 19890, Attention: Corporate Trust Administration. Wilmington Trust Company has served as owner trustee in numerous asset-backed securities transactions involving mortgage and mortgage-related receivables.

Wilmington Trust Company is subject to various legal proceedings that arise from time to time in the ordinary course of business. Wilmington Trust Company does not believe that the ultimate resolution of any of these proceedings will have a materially adverse effect on its services as owner trustee.