Presentment Date and Time: October 31, 2011 at 12:00 p.m. (Prevailing Eastern Time)
Objection Deadline:  October 31, 2011 at 11:00 a.m. (Prevailing Eastern Time)
Hearing Date and Time (If an Objection is Filed): November 16, 2011 at 10:00 a.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                          :
**In re**                                 :       **Chapter 11 Case No.**
                                          :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,    :    **08-13555 (JMP)**
                                          :
                          **Debtors.**    :       **(Jointly Administered)**
                                          :
-------------------------------------------------------------------x

**NOTICE OF PRESENTMENT OF SUPPLEMENTAL**
**APPLICATION OF THE DEBTORS PURSUANT TO SECTION**
**327(a) OF THE BANKRUPTCY CODE AND RULE 2014 OF THE FEDERAL**
**RULES OF BANKRUPTCY PROCEDURE FOR AUTHORIZATION TO EXPAND**
**THE SCOPE OF THEIR  RETENTION OF ERNST & YOUNG LLP AS AUDITORS**
**TO THE DEBTORS, *NUNC PRO TUNC* TO JULY 18, 2011**

**PLEASE TAKE NOTICE** that the undersigned will present the annexed

supplemental application (the "Supplemental Application") of Lehman Brothers Holdings Inc.

and its affiliated debtors in the above-referenced chapter 11 cases (together, the "Debtors")

pursuant to section 327(a) of the Bankruptcy Code and Rule 2014 of the Federal Rules of

Bankruptcy Procedure, for authorization to expand the scope of their existing retention of Ernst

& Young LLP as auditors to the Debtors, *nunc pro tunc* to July 18, 2011, all as more fully

described in the Supplemental Application, to the Honorable James M. Peck, United States

Bankruptcy Judge, for approval and signature on **October 31, 2011 at 12:00 p.m. (Prevailing**

**Eastern Time)**.

PLEASE TAKE FURTHER NOTICE that objections to the Supplemental

Application, if any, shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of

New York, shall set forth the name of the objecting party, the basis for the objection and the

specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with

General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the

Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk,

preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word

processing format (with two hard copies delivered directly to Chambers), and shall be served upon:

(i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York,

10004, Courtroom 601; (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New

York, 10153, Attn:  Richard P. Krasnow, Esq.; (iii) the Office of the United States Trustee for

Region 2, 33 Whitehall Street, 21st Floor, New York, New York, 10004, Attn:  Tracy Hope Davis,

Esq., Elisabetta G. Gasparini, Esq.; Andrea B. Schwartz, Esq.; (iv) Milbank, Tweed, Hadley &

McCloy LLP, 1 Chase Manhattan Plaza, New York, New York, 10005, Attn:  Dennis F. Dunne,

Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official Committee of

Unsecured Creditors appointed in these cases; and (v) Latham & Watkins LLP, 885 Third Avenue

New York, NY 10022, Attn: Michael J. Riela, Esq., attorneys for Ernst & Young LLP, **so as to be**

**so filed and received by no later than October 31, 2011 at 11:00 a.m. (prevailing Eastern**

**Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that only if a written objection is timely

filed and served, a hearing will be held on **November 16, 2011, at 10:00 a.m. (Prevailing**

**Eastern Time)** at the United States Bankruptcy Court for the Southern District of New York,

Honorable James M. Peck, United States Bankruptcy Judge, One Bowling Green, New York,

New York 10004-1408.  If an objection is filed the moving and objecting parties are required to

attend the hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:  October 17, 2011
       New York, New York

                                          /s/ Richard P. Krasnow
                                          Richard P. Krasnow
                                          WEIL, GOTSHAL & MANGES LLP
                                          767 Fifth Avenue
                                          New York, New York 10153
                                          Telephone: (212) 310-8000
                                          Facsimile: (212) 310-8007

                                          Attorneys for Debtors
                                          and Debtors in Possession

Presentment Date and Time:  October 31, 2011 at 12:00 p.m. (Prevailing Eastern Time)
Objection Deadline:  October 31, 2011 at 11:00 a.m. (Prevailing Eastern Time)
Hearing Date and Time (If an Objection is Filed): November 16, 2011 at 10:00 a.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                          :
In re                                     :     Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :     08-13555 (JMP)
                                          :
                          Debtors.        :     (Jointly Administered)
                                          :
                                          :
-----------------------------------------------------------------x
```

**SUPPLEMENTAL APPLICATION OF THE DEBTORS**
**PURSUANT TO SECTION 327(a) OF THE BANKRUPTCY CODE**
**AND RULE 2014 OF THE FEDERAL RULES OF BANKRUPTCY**
**PROCEDURE FOR AUTHORIZATION TO EXPAND THE SCOPE OF**
**THEIR  RETENTION OF ERNST & YOUNG LLP AS AUDITORS TO**
**THE DEBTORS, *NUNC PRO TUNC* TO JULY 18, 2011**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-

referenced chapter 11 cases, as debtors in possession (together, the "Debtors" and, collectively

with their non-debtor affiliates, "Lehman"), submit this supplemental application to expand the

scope of their existing retention of Ernst & Young LLP ("E&Y") as auditors to the Debtors, *nunc*

*pro tunc* to July 18, 2011, and respectfully represent:

## Background

1.        Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), the Debtors commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.        On September 17, 2008, the United States Trustee for Region 2 (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

3.        On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"). A trustee appointed under SIPA is administering LBI's estate.

4.        On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January 20, 2009 [ECF No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner. The Examiner issued a report of his investigation pursuant to section 1106 of the Bankruptcy Code on March 11, 2010 [ECF No. 7531].

5.        On September 1, 2011, the Debtors filed a third amended joint chapter 11 plan (the "Plan") and disclosure statement (the "Disclosure Statement") [ECF Nos. 19627 and 19629]. Also on September 1, 2011, this Court entered an amended order [ECF No.

19631] approving the Disclosure Statement, establishing solicitation and voting procedures in connection with the Plan, scheduling the confirmation hearing and establishing notice and objection procedures for the confirmation hearing.

### Jurisdiction

6.        This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Lehman's Business

7.        Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

8.        Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Supplemental Applications, filed on September 15, 2008 [ECF No. 2].

### E&Y's Retention

9.        On December 31, 2008 the Debtors filed their *Application Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code and Rule 2014 of the Bankruptcy Rules for Authorization to Employ and Retain Ernst & Young LLP as Auditors and Tax Services Providers to, Nunc Pro Tunc to the Commencement Date* [ECF No. 2423] (the "Retention Application"). The Court entered an order on January 15, 2009 [ECF No. 2547] (the "Retention Order") authorizing the Debtors to retain E&Y to provide certain necessary tax, audit, and such other

services as the Debtors and E&Y agree pursuant to the terms and conditions set forth in the

agreements between the Debtors and E&Y (the "Engagement Letters"), attached as Exhibits A-1

through A-6 of the Retention Application.  Specifically, the services under the Engagement

Letters included, without limitation, the following:[1]

Tax Services

(a)    Routine tax advice.

(b)    Tax consultation regarding the chapter 11 filings.

(c)    IRS examination assistance.

(d)    Corporate tax compliance.

Integrated Audit Services

(a)    Audit services including but not limited to an audit of the Debtors'
        financial statements and internal control over financial reporting, if
        required and on request of the Debtors, to provide other audit and audit
        related, attest, and advisory serviced.

10.    In addition to the services E&Y has been providing pursuant to the

Retention Order, prior to the Commencement Date and thereafter, E&Y has provided certain

audit and reporting services for the Employee Benefit Plans Committee and the Audit Committee

of LBHI.  E&Y received compensation and reimbursement for these services by the Savings

Plan itself using funds available in such plan's forfeiture account (the "Fund"), which is not

otherwise available to use by LBHI for non-Savings Plan related expenditures.  However, there

are no longer funds available in the Fund that can be used to fund the Services (as defined

below).

---

[1]  The following is only a summary of the services set forth in the Engagement Letters and should not be construed
to modify or amend such letters.  The actual terms of the Engagement Letters govern the scope of services provided
to the Debtors by E&Y.

## Relief Requested

11.    The Debtors request authorization, pursuant to section 327(a) of the Bankruptcy Code, Rule 2014(a) of the Bankruptcy Rules, and Rule 2014-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), to expand the scope of E&Y's retention to include those audit and reporting services it has heretofore been providing but paid for by the Fund.  Specifically, E&Y would perform an audit and report on the financial statements and supplemental schedules of Lehman Brothers Savings Plan (the "Savings Plan") for the year ended December 31, 2010 (the "2010 Savings Plan Audit").  E&Y's report would be included in the Savings Plan's form 5500 filing with the Employee Benefits Security Administration of the Department of Labor, as well as in the Savings Plan's Form 11-K filing with the Securities and Exchange Commission.

## Scope of Services to be Provided

12.    Subject to an order of this Court granting this supplemental application, it is proposed that E&Y perform the 2010 Savings Plan Audit and such other services (collectively, the "Services") contemplated under the agreement dated July 18, 2011 between the Debtors and E&Y (the "Supplemental Engagement Letter"), annexed hereto as Exhibit A.

13.    The Debtors request that E&Y's retention be made *nunc pro tunc* to July 18, 2011 to allow E&Y to be compensated for work performed on behalf of the Debtors on or after July 18, 2011, but prior to the submission of this supplemental application.  Since the Commencement Date, E&Y has been actively involved in assisting the Debtors by providing services nearly identical to those proposed in this supplemental application, including the Savings Plan's audit and reporting for the year ended December 31, 2009.  It is imperative that the Debtors submit timely filings, which are due on October 15, 2011, to the Employee Benefits Security

Administration of the Department of Labor and Securities and Exchange Commission in connection with the Savings Plan. To ensure that the October 15, 2011 deadline is met, E&Y commenced providing the Services as of July 18, 2011. Further, as discussed more fully below, E&Y's compensation is project oriented and pursuant to a fixed fee arrangement. The Debtors are not compensating E&Y on a monthly or hourly basis and the amount of fees payable to E&Y will not be affected by granting the relief requested herein.

14.      The complex, global nature of these chapter 11 cases and the need for professionals to provide immediate services in exigent circumstances has warranted retroactive approval of professional retentions. *See In re Anthony Stylianou*, 2010 Bankr. Lexis 3193 at *15 (Bankr. S.D.N.Y. 2010) (stating the "determination as to whether the *nunc pro tunc* appointment is appropriate is in essence an equitable one, taking into account all relevant circumstances surrounding the party's omission."); *In re Motors Liquidation Company*, 2010 Bankr. Lexis 2367 at *28 (Bankr. S.D.N.Y. 2010) (stating that in "exercising its discretion regarding the existence of 'extraordinary circumstances,' a bankruptcy court considers factors such as . . . whether the applicant was under time pressure to begin service without approval"); *see also In re Hasset, Ltd.*, 283 B.R. 376, 379 (Bankr. E.D.N.Y. 2002) (approving *nunc pro tunc* retention and recognizing that "*nunc pro tunc* applications are disfavored in this Circuit but have been permitted when the attorney performs services of 'value' to the estate" (internal citations omitted)); *In re Piecuil*, 145 B.R. 777, 779 (Bankr. W.D.N.Y. 1992) (stating that "'it is not unreasonable . . . for the court, in its carefully exercised discretion, to utilize *nunc pro tunc* orders' . . . where the failure to make timely application has been explained and no violation of underlying policy has occurred." (internal

citations omitted)).  Indeed, this Court has granted *nunc pro tunc* approval of the retention of at

least thirty-eight other professionals in these cases.[2]

15.        As described in the affidavit of Salvatore Restivo in support of this

supplemental application, annexed hereto as <u>Exhibit B</u> (the "<u>Restivo Affidavit</u>"), once the Debtors

determined that the Fund would be unable to compensate E&Y for the Services, E&Y began to

prepare the Restivo Affidavit and finalize the terms and conditions of the Supplemental

Engagement Letter.  Based on the foregoing, retroactive approval should be granted.

<b><u>Basis for Relief</u></b>

16.        The Debtors seek approval to retain E&Y pursuant to section 327(a) of the

Bankruptcy Code.  Section 327(a) provides, in relevant part, that the Debtors "with the court's

approval, may employ. . . professional persons, that do not hold or represent an interest adverse

to the estate, and that are disinterested persons, to represent or assist" the Debtor in fulfilling its

duties under the Bankruptcy Code.

<b><u>The Retention of E&Y</u></b>

17.        As discussed more fully in the Restivo Affidavit, E&Y is a highly

respected and experienced professional services firm, well recognized in the fields of audit and

tax, and is frequently engaged by companies that have chapter 11 cases pending in United States

bankruptcy courts.  The Debtors have been informed that E&Y possesses extensive auditing

---

[2] *See, e.g.,* ECF No. 7824, (approving *nunc pro tunc* appointment dating approximately 1 year and 4 months prior), ECF No. 9724, (approving *nunc pro tunc* appointment dating approximately 3 months prior), ECF No. 5305, (approving *nunc pro tunc* appointment dating approximately 11 months prior), ECF No. 2547, (approving *nunc pro tunc* appointment dating approximately 4 months prior), ECF No. 9857, (approving *nunc pro tunc* appointment dating approximately 9 months prior), ECF No. 5037, (approving *nunc pro tunc* appointment dating approximately 9 months prior), ECF No. 2925, (approving *nunc pro tunc* appointment dating approximately 4 months prior), ECF No. 7825, (approving *nunc pro tunc* appointment dating approximately 9 months prior), ECF No. 12204, (approving *nunc pro tunc* appointment dating approximately 4 months prior), ECF No. 10647, (approving *nunc pro tunc* appointment dating approximately 6 months prior), ECF No. 4009, (approving *nunc pro tunc* appointment dating approximately 4 months prior), ECF No. 10677, (approving *nunc pro tunc* appointment dating approximately 5 months prior), ECF No. 2680, (approving *nunc pro tunc* appointment dating approximately 4 months prior), ECF No. 10949, (approving *nunc pro tunc* appointment dating approximately 7 months prior).

experience useful in these chapter 11 cases, and E&Y is well-qualified to provide the Services.

Furthermore, E&Y has been providing services similar, if not identical in nature to those

proposed in the Supplemental Engagement Letter.  E&Y is familiar with the Debtors and the

Savings Plan and, therefore, is uniquely able to provide the Services.  It is the Debtors'

understanding that E&Y has also provided similar services to debtors in chapter 11 and other

distressed situations.  *See e.g.,  In re Silicon Graphics, Inc. et al.*, Case No. 06-10977 (BRL)

(Bankr. S.D.N.Y. Sept. 6, 2006) [ECF No. 547]; *In re Kasper A.S.L., Ltd., et al.*, Case No. 02-

10497 (ALG) (Bankr. S.D.N.Y. Sept. 19, 2002) [ECF No. 305]; *In re Sun Healthcare Group,*

*Inc., et al.*, Case No. 99-3657 (MFW) (Bankr. D. Del. Jan. 24, 2002) [ECF No. 6841].

18.        E&Y has indicated a desire and willingness to act in these chapter 11

cases and render the necessary Services on the terms set forth in the Supplemental Engagement

Letter and described herein, and to subject itself to the jurisdiction of the Court with respect to

this professional retention.

19.        Therefore, the Debtors submit that the retention of E&Y on the terms and

conditions set forth in the Supplemental Engagement Letter and herein is necessary and

appropriate, is in the best interests of their estates, creditors, and all other parties in interest, and

should be granted in all respects.

## E&Y's Disinterestedness

20.        To the best of the Debtors' knowledge, and except as set forth in the

Restivo Affidavit and the previous affidavits that E&Y has filed with this Court, E&Y does not

represent or hold any interest adverse to the Debtors or their estates.  The Debtors have been

informed that E&Y is in the process of updating its disclosures concerning its relationships with

parties-in-interest in these chapter 11 cases that have been identified by the Debtors or their

counsel.  The Debtors have also been informed that as soon as practicable after that updated

search is completed, E&Y LLP will file an affidavit or declaration with this Court to make all

necessary and appropriate disclosures of relationships that have not already been disclosed in

prior affidavits.

21.     Based on the foregoing and on the disclosures set forth in the Restivo

Affidavit, the Debtors believe that E&Y does not hold or represent an interest adverse to the

Debtors' estates that would impair E&Y's ability to perform professional services for the

Debtors, objectively and in accordance with section 327(a) of the Bankruptcy Code.

**Professional Compensation**

22.     In the previous weeks, the Debtors negotiated the terms of the

Supplemental Engagement Letter, which reflect commercially reasonable compensation and

employment agreements.  Thus, the Debtors request approval of the Supplemental Engagement

Letter, including the fee and expense structure and the reimbursement provisions detailed therein

(the "Fee Structure"), pursuant to section 330 of the Bankruptcy Code.

23.     Pursuant to the terms and conditions of the Supplemental Engagement

Letter, E&Y has estimated that it will charge the Debtors a fixed fee of $100,000 for the

Services.[3]  Should E&Y determine during the course of its engagement that any additional work

is necessary, whether at the Debtors' request or because the complexity of any project increases,

E&Y will contact the Debtors to discuss any adjustments to the scope of work or E&Y's fees.

24.     In addition to the fixed fee set forth above, the Debtors shall reimburse

E&Y for any direct expenses incurred in connection with E&Y's performance of the Services set

forth in the Supplemental Engagement Letter.  E&Y's direct expenses shall include, but not be

---

[3] The fixed fee is exclusive of taxes or similar charges, as well as customs, duties or tariffs, imposed in respect of the
Services, all of which the Debtors shall pay (other than taxes imposed on E&Y's income generally).

limited to, reasonable and customary out-of-pocket expenses for items such as travel, meals,

accommodations and other expenses (including any fees or reasonable expenses of E&Y's legal

counsel, but not any such legal fees or expenses related to E&Y's efforts to be retained or to

E&Y's fee applications in these chapter 11 cases) specifically related to this engagement.  The

Debtors have been informed that the Fee Structure detailed in the Supplemental Engagement

Letter is consistent with and typical of arrangements entered into by E&Y with respect to

rendering comparable services for clients similar to the Debtors, both in and outside of

bankruptcy.

25.      It is the Debtors' understanding that E&Y intends to apply to the Court by

separate application for all fees and expenses incurred during these chapter 11 cases on or after

July 18, 2011 in connection with providing the Services to the Debtors.  The Debtors understand

that E&Y will submit detailed billing information with its applications to the Court.

Compensation and reimbursement of such fees and expenses shall be subject to approval of the

Court upon proper application by E&Y in accordance with sections 330 and 331 of the

Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the guidelines promulgated by the

U.S. Trustee, as those procedures may be modified or supplemented by order of this Court,

including this Court's Fourth Amended Order Pursuant to Sections 105(a) and 331 of the

Bankruptcy Code and Bankruptcy Rule 2016(a) Establishing Procedures for Interim Monthly

Compensation and Reimbursement of Expenses of Professionals [ECF No. 15997], this Court's

Order Amending Fee Protocol [ECF No. 15998] and General Order M-389.

26.      It is the Debtors understanding that to the extent any of the Services are

subcontracted to other E&Y Firms, there will be no mark-up of the fees or expenses.  Pursuant to

the subcontracting arrangement, as set forth in the Supplemental Engagement Letter, E&Y

intends to pay the subcontracted E&Y Firms directly for their services, and to apply to this Court

for reimbursement by the Debtors of any such payments made.

27.     Considering the services that E&Y will provide the Debtors submit that

the Fee Structure (including reasonable reimbursements) is reasonable and fulfills the

requirements of Rule 2014-1 of the Local Rules.

28.     Except as set forth in the Restivo Affidavit, E&Y has not shared or agreed

to share any of its compensation in connection with this matter with any other person, as

permitted by section 504 of the Bankruptcy Code.

29.     Based on the foregoing, the Debtors submit that the relief requested is

necessary and appropriate, is in the best interests of their estates and creditors, and should be

granted in all respects.

### Notice

30.     No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Supplemental Application in accordance with the procedures set forth

in accordance with the procedures set forth in the second amended order entered on June 17,

2010 governing case management and administrative procedures for these cases [ECF No. 9635]

on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and

Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the

Southern District of New York; (vi) E&Y; and (vii) all parties who have requested notice in

these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

31.     No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: October 17, 2011
New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## EXHIBIT A

**(Supplemental Engagement Letter)**

**⧌ ERNST & YOUNG**

Ernst & Young LLP
5 Times Square
New York, New York 10036-6530

Tel: +1 212 773 3000

Lehman Brothers Holdings Inc.                                July 18, 2011
1271 Avenue of the Americas
New York, NY 10020

Attention: Carol Rado
Chairperson, Lehman Brothers Holdings Inc.
Employee Benefit Plans Committee

Dear Ms. Rado:

1.  This agreement (together with all attachments hereto, the "Agreement") confirms the
    engagement of Ernst & Young LLP ("we" or "EY") by the Employee Benefit Plans Committee and
    the Audit Committee of Lehman Brothers Holdings Inc. (the "Plan Sponsor") to audit and report
    on the financial statements and supplemental schedules of Lehman Brothers Savings Plan (the
    "Plan") for the year ended December 31, 2010, which are to be included in the Plan's Form 5500
    filing with the Employee Benefits Security Administration of the Department of Labor (the "DOL")
    and the Plan's Form 11-K filing with the Securities and Exchange Commission ("SEC"). All of the
    services described in this paragraph are referred to collectively as the "Audit Services" or the
    "audit." References to "management" herein shall be deemed to be references to management
    of the Plan Sponsor, acting for the Plan Sponsor in its capacity as such.  Our performance of Audit
    Services is contingent upon the Bankruptcy Court's approval of our retention in accordance with
    the terms and conditions that are set forth in this Agreement.  This Agreement shall be effective
    as of the date set forth in the order entered by the Bankruptcy Court approving our retention.

**Audit responsibilities and limitations**

2.  The objective of the audit of the financial statements is to express an opinion on whether the
    financial statements are presented fairly, in all material respects, in conformity with US generally
    accepted accounting principles and whether the supplemental schedules are fairly stated, in all
    material respects, in relation to the financial statements taken as a whole. Should conditions not
    now anticipated preclude us from completing the audit and issuing a report, we will advise the
    Plan Sponsor and management promptly and take such action as we deem appropriate.

3.  We will conduct the audit in accordance with the standards of the Public Company Accounting
    Oversight Board (the "PCAOB") and auditing standards generally accepted in the United States,
    as established by the American Institute of Certified Public Accountants (the "AICPA"). Those

A member firm of Ernst & Young Global Limited

**⧻ ERNST & YOUNG**

standards require that we obtain reasonable, rather than absolute, assurance that the financial statements are free of material misstatement, whether caused by error or fraud. As management is aware, there are inherent limitations in the audit process, including, for example, selective testing and the possibility that collusion or forgery may preclude the detection of material error, fraud, or illegal acts, including prohibited transactions with parties in interest and other violations of the DOL's Rules and Regulations under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Accordingly, there is some risk that a material misstatement of the financial statements would remain undetected. Also, an audit is not designed to detect error or fraud that is immaterial to the financial statements.

4.  In accordance with professional standards, we will communicate certain matters related to the conduct and results of the audit to the Plan Sponsor.

5.  In accordance with the rules of the SEC implementing the requirements of Section 204 of the Sarbanes-Oxley Act of 2002, we will communicate to the Plan Sponsor all critical accounting policies and practices used by the Plan, and all alternative treatments within generally accepted accounting principles for policies and practices related to material items that have been discussed with management, including ramifications of the use of such alternative disclosures and treatments along with the treatment preferred by us. We also will advise the Plan Sponsor of other material written communications between management and us.

6.  We will obtain pre-approval from the Plan Sponsor's Audit Committee for any services we are to provide to the Plan pursuant to the Plan Sponsor's Audit Committee's pre-approval process, policies, and procedures, in accordance with the standards and rules of the SEC and PCAOB. We also will communicate at least annually with Plan Sponsor on independence matters as required by the rules of the PCAOB. We will communicate at least annually with the Plan Sponsor and provide a report on certain matters as specified in the Corporate Governance Standards of the New York Stock Exchange.  We will inform the Chair of the Plan Sponsor and management if the Audit Services are selected for inspection by the PCAOB and also will communicate any information of which we become aware as a result of such inspection that has a material effect on the financial statements previously reported on by us or that would result in a modification to an audit report previously issued by us. Upon request, we will provide the Plan Sponsor and management with a copy of any publicly available inspection reports on EY issued by the PCAOB, but we will not provide any confidential inspection reports issued by the PCAOB to EY, the confidentiality of which is provided for in the Sarbanes-Oxley Act of 2002 and the PCAOB's inspection rules.

7.  As a part of our audit, we will perform certain procedures, as required by professional standards, directed at considering the Plan's compliance with applicable Internal Revenue Code ("IRC") requirements for tax-exempt status, including reading the Plan's latest tax determination letter

A member firm of Ernst & Young Global Limited



from the Internal Revenue Service ("IRS"). As we conduct our audit, we may become aware of the possibility that events affecting the Plan's tax status may have occurred. Similarly, we may become aware of the possibility that events affecting the Plan's compliance with the requirements of ERISA may have occurred. We will inform you of any instances of tax or ERISA noncompliance that come to our attention during the course of our audit. You should recognize, however, that the audit is not designed to nor is it intended to verify the Plan's overall compliance with applicable provisions of the IRC or ERISA, including but not limited to the Plan Sponsor's deduction limits, and, accordingly, we assume no responsibility for failure to detect instances of noncompliance with applicable provisions of the IRC or ERISA.

8.  As part of our audit, we will consider, solely for the purpose of planning the audit and determining the nature, timing, and extent of the audit procedures, the Plan's internal control over financial reporting. Our consideration of internal control for the audit of the financial statements will not be sufficient to enable us to express an opinion on the effectiveness of internal control over financial reporting or to identify all significant deficiencies and material weaknesses.

9.  If we determine that there is evidence that fraud or possible illegal acts may have occurred, we will bring such matters to the attention of the appropriate level of management. If we become aware of fraud involving senior management or fraud (whether committed by senior management or other employees) that causes a material misstatement of the financial statements, we will report this matter directly to the Plan Sponsor. We will determine that the Plan Sponsor and appropriate members of management are adequately informed of illegal acts that come to our attention unless they are clearly inconsequential. We also will inform the Plan Sponsor and the appropriate members of management of significant audit adjustments noted during our audit procedures.

10. We will communicate in writing to management and Plan Sponsor all significant deficiencies and material weaknesses identified during our audit. In addition, if we become aware that the Plan Sponsor's oversight of the Plan's external financial reporting and internal control over financial reporting is ineffective, we will communicate that information in writing to the Plan Sponsor's Board of Directors.

11. We also may communicate other opportunities we observe for economies in or improved controls over the Plan's operations.

**Management's responsibilities and representations**

12. The financial statements and supplemental schedules are the responsibility of management. Management is also responsible for establishing and maintaining effective internal control over

A member firm of Ernst & Young Global Limited

**ᴤ ERNST & YOUNG**

financial reporting, for properly recording transactions in the accounting records, for safeguarding assets, and for the overall fair presentation of the financial statements and supplemental schedules. Management also is responsible for the identification of, and for the Plan's compliance with, the laws and regulations applicable to its activities.

13. Management is responsible for adjusting the financial statements to correct material misstatements and for affirming to us in its representation letter that the effects of any unrecorded audit differences accumulated by us during the current audit and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

14. Management is responsible for apprising us of all allegations involving financial improprieties received by management or the Plan Sponsor (regardless of the source or form and including, without limitation, allegations by "whistle-blowers"), and providing us full access to these allegations and any internal investigations of them, on a timely basis. Allegations of financial improprieties include allegations of manipulation of financial results by management or employees, misappropriation of assets by management or employees, intentional circumvention of internal controls, inappropriate influence on related party transactions by related parties, intentionally misleading EY, or other allegations of illegal acts or fraud that could result in a misstatement of the financial statements or otherwise affect the financial reporting of the Plan. If management limits the information otherwise available to us under this paragraph (based on the management's claims of attorney/client privilege, work product doctrine, or otherwise), management will immediately inform us of the fact that certain information is being withheld from us. Any such withholding of information could be considered a restriction on the scope of the audit and may prevent us from opining on the Plan's financial statements; alter the form of report we may issue on such financial statements; prevent us from consenting to the inclusion of previously issued auditor's reports in future Plan filings; or otherwise affect our ability to continue as the Plan's independent registered public accounting firm (or independent auditor). We will disclose any such withholding of information to the Plan Sponsor.

15. As required by professional standards, we will make specific inquiries of management about the representations contained in the financial statements and supplemental schedules. Professional standards also require that, at the conclusion of the audit, we obtain representation letters from certain members of management about these matters. The responses to those inquiries, the written representations, and the results of our procedures comprise evidence on which we will rely in forming an opinion on the financial statements and supplemental schedules. Management is responsible for providing us with all financial records and related information on a timely basis, and its failure to do so may cause us to delay our report, modify our procedures, or even terminate the Audit Services.

A member firm of Ernst & Young Global Limited

**ERNST & YOUNG**

16. Management is responsible for informing EY about any related party transactions, including transactions with parties in interest, as defined in ERISA section 3(14) and the regulations thereunder, including sales, purchases, loans, transfers, leasing arrangements, and guarantees, and amounts receivable from or payable to related parties. We will assess whether all identified prohibited party-in-interest transactions are included in the supplemental schedule of nonexempt transactions.

17. Management shall make appropriate inquiries of the Plan Sponsor's officers, directors, and substantial stockholders to determine whether any business relationships exist between any such officer, director, or substantial stockholders (or any entity for or of which such an officer, director, or substantial stockholder acts in a similar capacity) and EY or any other member firm of the global Ernst & Young organization (any of which, an "EY Firm"), other than one pursuant to which an EY Firm performs professional services. For this purpose, a "substantial stockholder" is a person or entity (excluding mutual funds) that owns a beneficial interest of five percent or more of the Plan Sponsor

18. Management shall discuss any independence matters with EY that, in management's judgment, could bear upon EY's independence

19. The Staff of the SEC has publicly stated that auditors and public companies share responsibility for compliance with auditor independence rules. Accordingly, the Plan Sponsor shall provide to EY information about the entities over which the Plan Sponsor has direct or indirect control or significant influence or which otherwise qualify as the "audit client" under Regulation S-X. The Plan Sponsor understands that EY will use this information to assess its independence in this engagement. In addition, to facilitate independence determinations, the "Big 4" accounting firms have created a database, called the Global Master File, to aggregate public information identifying the entities associated with their SEC audit clients, as well as information confirmed or provided by clients as to the relationships between such entities. The Plan Sponsor understands that EY will submit information to this database solely for the internal use of authorized accounting firms.

20. The Plan Sponsor shall be responsible for its personnel's compliance with the Plan Sponsor's obligations under this Agreement.

**Fees and billings**

21. Our fees shall be paid by the Plan Sponsor. Subject to the following sentences in this paragraph, we will charge the Plan Sponsor a fixed fee of $100,000 for the audit of the 2010 financial statements and supplemental schedules. However, our fee may exceed this amount based on changes to the Plan (e.g., change in Plan provisions or change in service providers) or out-of-

A member firm of Ernst & Young Global Limited

**ERNST & YOUNG**

scope work. Our fees are exclusive of taxes or similar charges, as well as customs, duties or tariffs, imposed in respect of the Audit Services, all of which the Plan Sponsor shall pay (other than taxes imposed on our income generally). We will submit our invoices monthly.

22. In addition, the Plan Sponsor shall reimburse us for direct expenses incurred in connection with the performance of the Audit Services. Direct expenses include reasonable and customary out-of-pocket expenses such as travel, meals, accommodations and other expenses specifically related to this engagement. EY may receive rebates in connection with certain purchases, which are used to reduce charges that EY would otherwise pass on to its clients.

23. We will submit an itemized and detailed billing statement, and we will request payment of our fees and expenses, in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules for the United States Bankruptcy Court for the Southern District of New York ("Local Rules") and any relevant administrative orders. We will submit our invoices as the work progresses and payment of them will be made upon receipt, or as quickly as the Bankruptcy Code, the Bankruptcy Rules, Local Rules and any relevant administrative orders allow. We acknowledge that payment of our fees and expenses hereunder is subject to (i) the jurisdiction and approval of the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code, any order of the Bankruptcy Court approving the retention of us and the U.S. Trustee Guidelines, (ii) any applicable fee and expense guidelines and/or orders and (iii) any requirements governing interim and final fee applications.

24. Our estimated pricing and schedule of performance are based upon among other things, our preliminary review of the Plan's records and the representations management has made to us and are dependent upon management providing a reasonable level of assistance. Should our assumptions with respect to these matters be incorrect or should the condition of records, degree of cooperation, or other matters beyond our reasonable control require additional commitments by us beyond those upon which our estimates are based, we may adjust our fees subject to Bankruptcy Court approval, and planned completion dates. Fees for any special audit-related projects, such as research and/or consultation on operational or financial issues of the Plan, will be billed separately from the fees referred to above and will be the subject of other written agreements which shall be subject to Bankruptcy Court approval.

25. If we are requested or authorized by management or are required by government regulation, subpoena, or other legal process to produce our documents or our personnel as witnesses with respect to our engagement for the Plan, the Plan Sponsor will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such requests.

A member firm of Ernst & Young Global Limited

**ΞＵ ERNST & YOUNG**

**Other matters**

26. The audited financial statements of the Plan are required to be filed with the Form 5500. AICPA auditing standards require that we read the Plan's Form 5500 prior to its filing. The purpose of this procedure is to consider whether such information, or the manner of its presentation in the Form 5500, is materially inconsistent with the information, or the manner of its presentation, appearing in the financial statements and supplemental schedules. These procedures are not sufficient nor are they intended to determine that the Form 5500 is completely and accurately prepared. Accordingly, you understand and agree that we do not assume any responsibility for the completeness and/or accuracy of the Form 5500 as part of the Audit Services. In the event that our auditor's report is issued prior to our having read the Plan's Form 5500, you agree not to attach such auditor's report to the financial statements included with the Form 5500 filing until we have read the completed Form 5500.

27. From time to time, and depending on the circumstances, subject to Bankruptcy Court approval (1) we may subcontract portions of the Audit Services to other EY Firms, who may deal with the Plan Sponsor or its affiliates directly, although EY alone will remain responsible to you for the Audit Services, and (2) personnel (including non-certified public accountants) from an affiliate of EY or another EY Firm or any of their respective affiliates, or from independent third-party service providers (including independent contractors), may participate in providing the Audit Services. In addition, subject to Bankruptcy Court approval third-party service providers may perform services for EY in connection with the Audit Services. Unless prohibited by applicable law, we may disclose Plan information to other EY Firms and their personnel to facilitate performance of the Audit Services, to comply with regulatory requirements, or for quality, risk management or financial accounting purposes. Either EY or the Plan Sponsor may use electronic media to correspond or transmit information relating to the Audit Services, and such use will not, in itself, constitute a breach of any confidentiality obligations.

28. We may be requested to make certain workpapers available to the DOL pursuant to authority given to it by law or regulation. If requested, access to such workpapers will be provided under the supervision of our personnel. Furthermore, upon request, we may provide photocopies of selected workpapers to the DOL. We will label all workpapers as confidential and maintain control over their duplication.

29. The Plan Sponsor shall not, during the term of this Agreement and for 12 months following its termination for any reason, without the prior written consent of EY, solicit for employment or a position on the Plan Sponsor's Board of Directors, or hire or appoint to the Plan Sponsor's Board of Directors any current or former partner, principal, or professional employee of EY, any affiliate thereof, any other EY Firm or any of their respective affiliates if any such professional either: (i) performed any audit, review, attest, or related service for or relating to the Plan or Plan

Lehman Brothers Savings Plan
Page 7 of 13

A member firm of Ernst & Young Global Limited

**ERNST & YOUNG**

Sponsor at any time (a) since the date on which the Plan filed its most recent periodic annual report with the SEC (or since the beginning of the most recent fiscal year to be covered by the Plan's first such report, if applicable) or (b) in the 12 months ended on that date; or (ii) influences EY's operations or financial policies or has any capital balances or any other continuing financial arrangement with EY.

30. The Plan Sponsor may not, on behalf of the Plan or otherwise, make a claim or bring proceedings relating to the Audit Services or otherwise under this Agreement against any other EY Firm or our or its subcontractors, members, shareholders, directors, officers, partners, principals or employees (all of whom, "EY Persons"). EY alone will remain responsible to you for the Audit Services, and the Plan Sponsor shall make any claim or bring proceedings only against EY. This paragraph is intended to benefit the other EY Firms and all EY Persons, who shall be entitled to enforce it. Each EY Firm is a separate legal entity.

31. We may collect, use, transfer, store or otherwise process (collectively, "Process") Plan information that can be linked to specific individuals ("Personal Data"). We may Process Personal Data in various jurisdictions in which EY and the other EY Firms operate (which are listed at www.ey.com). We will Process the Personal Data in accordance with applicable law and professional regulations, including, where applicable, the European Union Safe Harbor program of the US Department of Commerce, in which EY participates. We will require any service provider that Processes Personal Data on our behalf to adhere to such requirements. If any Plan information is protected health information under the Health Insurance Portability and Accountability Act, as amended, this Agreement is deemed to incorporate all of the terms otherwise required to be included in a business associate contract relating to such information. The Plan Sponsor warrants that it has the authority to provide the Personal Data to EY in connection with the performance of the Audit Services and that the Personal Data provided to us has been Processed in accordance with applicable law.

32. By your signature below, you confirm that the Plan Sponsor, acting through its Board of Directors, has authorized the Employee Benefit Plans Committee to enter into this Agreement in the name of the Plan Sponsor, and that you have been expressly authorized by the Employee Benefit Plans Committee to execute this Agreement on behalf of, and to bind, the Plan Sponsor with respect to the audit of the Plan. Either EY or the Plan Sponsor may execute this Agreement (and any supplements or modifications hereto) by electronic means, and each of EY and the Plan Sponsor may sign a different copy of the same document.

33. EY retains ownership in the workpapers compiled in connection with the performance of the Audit Services.

A member firm of Ernst & Young Global Limited

**⧓ ERNST & YOUNG**

34. Salvatore Restivo will be the Audit Partner responsible for the provision of our audit services. Danny Seedorf, Manager, will work closely with management in performing all required Audit Services. If one or more of these individuals ceases to provide audit services to the Plan pursuant to this Agreement, EY will so advise the Plan Sponsor and, if that professional is replaced, provide the Plan Sponsor with the name of that professional's replacement. Other partners and staff, not identified herein, may be utilized as required to conduct our work in an efficient manner.

35. Any controversy or claim with respect to, in connection with, arising out of, or in any way related to this Agreement or the services provided hereunder (including any such matter involving any parent, subsidiary, affiliate, successor in interest or agent of the Plan Sponsor or its subsidiaries or of EY) shall be brought in the Bankruptcy Court or the applicable district court (if such district court withdraws the reference) and the parties to this Agreement, and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole and exclusive forum (unless such court does not have jurisdiction and venue of such claims or controversies) for the resolution of such claims, causes of action or lawsuits. The parties to this Agreement, and any and all successors and assigns thereof, hereby waive trial by jury, such waiver being informed and freely made. If the Bankruptcy Court, or the district court upon withdrawal of the reference, does not have or retain jurisdiction over the foregoing claims or controversies, the parties to this Agreement and any and all successors and assigns thereof, agree to submit first to nonbinding mediation; and, if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures as set forth in the attachment to this Agreement, which is incorporated herein by reference. Judgment on any arbitration award may be entered in any court having proper jurisdiction. The foregoing is binding upon the Plan Sponsor, EY and any all successors and assigns thereof.

36. If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this Agreement shall remain in effect. This Agreement applies to all Audit Services performed at any time (including before the date of this Agreement).To the extent that EY agrees to perform Audit Services for a subsequent fiscal year and subject to Bankruptcy Court approval, the terms and conditions set forth in this Agreement shall apply to the performance of such Audit Services, except as specifically modified, amended or supplemented in writing by the parties. Changes in the scope of the Audit Services and estimated fees for such services in subsequent fiscal years will be communicated in supplemental letters. This Agreement may be terminated at any time by the Plan Sponsor upon written notice. EY may terminate performance of the Audit Services and this Agreement upon written notice if we reasonably determine that we can no longer provide the Audit Services in accordance with applicable law or professional obligations. In any event, this Agreement will expire upon the effective date of the Plan Sponsor's confirmed plan of reorganization, or liquidation of the Plan

A member firm of Ernst & Young Global Limited



Sponsors assets under Chapter 11 or 7 of the Bankruptcy Code, or otherwise.  Upon any termination of the Audit Services or this Agreement, the Plan or the Plan Sponsor shall pay EY for all work-in-progress, Audit Services already performed and expenses incurred by us up to and including the effective date of such termination.  The provisions of this Agreement that give either of us rights or obligations beyond its termination including, without limitation, paragraph 37, shall continue indefinitely following the termination of this Agreement and shall survive completion of the Company's bankruptcy whether through a confirmed plan of reorganization under Chapter 11, liquidation of the Plan Sponsor's assets under Chapter 7 of the Bankruptcy Code, or otherwise.

37. By agreement to the provision of the Audit Services, we are not providing a guarantee to you that our performance of those services pursuant to the terms and conditions set forth in this Agreement will guarantee your successful reorganization under Chapter 11.

A member firm of Ernst & Young Global Limited



**ERNST & YOUNG**

EY appreciates the opportunity to be of assistance to the Plan and Plan Sponsor. If this Agreement accurately reflects the terms on which the Plan Sponsor has agreed to engage EY, please sign below on behalf of the Plan Sponsor and return it to Salvatore Restivo, Ernst & Young LLP, 5 Times Square, 30th Floor, New York, NY 10036.

Yours very truly,

*Ernst & Young LLP*

Agreed and accepted by:

Lehman Brothers Holdings Inc.

By: _____

Ms Carol Rado
Chairperson, Lehman Brothers Holdings Inc.
Employee Benefit Plans Committee

Date: ___9/14/2011___

By: _____

Mr. Cliff Feibus, Senior Vice President

Date: ___9/16/11___

A member firm of Ernst & Young Global Limited

**ΞIJ ERNST & YOUNG**

## Dispute Resolution Procedures

### Mediation

A party shall submit a dispute to mediation by written notice to the other party or parties. The mediator shall be selected by the parties. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR") shall designate a mediator at the request of a party. Any mediator must be acceptable to all parties and must confirm in writing that he or she is not, and will not become during the term of the mediation, an employee, partner, executive officer, director, or substantial equity owner of any Ernst & Young audit client.

The mediator shall conduct the mediation as he/she determines, with the agreement of the parties. The parties shall discuss their differences in good faith and attempt, with the mediator's assistance, to reach an amicable resolution of the dispute. The mediation shall be treated as a settlement discussion and shall therefore be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. The mediation proceedings shall not be recorded or transcribed.

Each party shall bear its own costs in the mediation. The parties shall share equally the fees and expenses of the mediator.

If the parties have not resolved a dispute within 90 days after written notice beginning mediation (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute shall be settled by arbitration. In addition, if a party initiates litigation, arbitration, or other binding dispute resolution process without initiating mediation, or before the mediation process has terminated, an opposing party may deem the mediation requirement to have been waived and may proceed with arbitration.

### Arbitration

The arbitration will be conducted in accordance with the procedures in this document and the CPR Rules for Non-Administered Arbitration ("Rules") as in effect on the date of the Agreement, or such other rules and procedures as the parties may agree. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, to be selected in accordance with the screened selection process provided in the Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may be appointed unless he or she has agreed in writing to these



procedures and has confirmed in writing that he or she is not, and will not become during the term of the arbitration, an employee, partner, executive officer, director, or substantial equity owner of any Ernst & Young audit client.

The arbitration panel shall have no power to award non-monetary or equitable relief of any sort or to make an award or impose a remedy that (i) is inconsistent with the agreement to which these procedures are attached or any other agreement relevant to the dispute, or (ii) could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only in accordance with the Rules or applicable professional standards. Before making any such disclosure, a party shall give written notice to all other parties and shall afford them a reasonable opportunity to protect their interests, except to the extent such disclosure is necessary to comply with applicable law, regulatory requirements or professional standards.

The result of the arbitration shall be binding on the parties, and judgment on the arbitration award may be entered in any court having jurisdiction.

A member firm of Ernst & Young Global Limited

## EXHIBIT B

**(Restivo Affidavit)**

DOCS_NY:24241.3

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------------ x
In re                                        :    Chapter 11
                                             :
LEHMAN BROTHERS HOLDINGS INC., et al.,       :    Case No. 08-13555 (JMP)
                                             :
                    Debtors.                 :    (Jointly Administered)
                                             :
------------------------------------------------------------------ x
```

### AFFIDAVIT OF SALVATORE RESTIVO IN SUPPORT OF SUPPLEMENTAL APPLICATION OF THE DEBTORS PURSUANT TO SECTION 327(a) OF THE BANKRUPTCY CODE AND RULE 2014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR AUTHORIZATION TO EXPAND THE SCOPE OF THEIR   RETENTION OF ERNST & YOUNG LLP AS AUDITORS TO THE DEBTORS, *NUNC PRO TUNC* TO JULY 18, 2011

Pursuant to Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), I, Salvatore Restivo, being duly sworn, deposes and says:

1.      I am a partner of Ernst & Young LLP ("E&Y LLP"). I provide this Affidavit on

behalf of E&Y LLP in support of the application of Lehman Brothers Holdings, Inc. ("LBHI")

and certain of its affiliated debtors in the above-captioned cases, as debtors and debtors in

possession herein (together, the "Debtors"), to supplement their employment and retention of

E&Y LLP, *nunc pro tunc* to July 18, 2011 (the "Supplemental Application") under the terms and

conditions set forth in the agreement between the Debtors and E&Y LLP (the "Supplemental

Engagement Letter") that is attached to the Supplemental Application as Exhibit A. Unless

otherwise defined, all capitalized terms used herein shall have the meanings given to them in the

Supplemental Application.

2.      The facts set forth in this Affidavit are based upon my personal knowledge, upon

information and belief, and upon client matter records kept in the ordinary course of business

that were reviewed by me or other employees of E&Y LLP under my supervision and direction.

3.      As set forth in further detail in the Supplemental Engagement Letter, E&Y LLP

has agreed to provide the following services in connection with these chapter 11 cases upon

approval of the Court:[1]

- Audit and report on the financial statements and supplemental schedules of Lehman Brothers Savings Plan (the "Savings Plan") for the year ended December 31, 2010 (the "2010 Savings Plan Audit"). E&Y LLP's report would be included in the Savings Plan's Form 5500 filing with the Employee Benefits Security Administration of the Department of Labor, as well as in the Savings Plan's Form 11-K filing with the Securities and Exchange Commission.

4.      As the plan sponsor of the Savings Plan, LBHI is obligated to pay E&Y LLP's

fees and expenses with respect to the 2010 Savings Plan Audit to the extent such fees and

expenses are not paid by the Fund (as defined below). Subject to the Court's approval and

pursuant to the terms and conditions of the Supplemental Engagement Letter, E&Y LLP intends

to charge the Debtors a flat fee of $100,000 for the 2010 Savings Plan Audit. However, if, during

the term of its engagement by the Debtors, E&Y LLP determines that any additional work is

necessary, whether at the Debtors' request or because the complexity of any project increases,

E&Y LLP will contact the Debtors to discuss any adjustments to the scope of work or E&Y

LLP's fees.

5.      In addition to the fee set forth above, the Debtors would reimburse E&Y LLP for

any direct expenses incurred in connection with the performance of the 2010 Savings Plan Audit.

Direct expenses include reasonable and customary out-of-pocket expenses such as travel, meals,

accommodations and other expenses. E&Y LLP may receive rebates in connection with certain

---

[1]   All summaries of the Supplemental Engagement Letter in this Affidavit and the Supplemental Application are presented as an aid to the Court and parties-in-interest. Such summaries are subject entirely to the terms and conditions of the Supplemental Engagement Letter itself. To the extent that this Affidavit, the Supplemental Application and the terms of the Supplemental Engagement Letter are inconsistent in any way, the terms of the Supplemental Engagement Letter shall control.

purchases, which are used to reduce charges that E&Y LLP would otherwise pass on to its clients.

6.      Either the Debtors or E&Y LLP may terminate the Supplemental Engagement Letter in accordance with its terms, but in any event the Supplemental Engagement Letter will expire upon the effective date of the Debtors' confirmed plan of reorganization, or liquidation of the Debtors' assets under Chapter 11 or 7 of the Bankruptcy Code, or otherwise. As set forth more fully in the Supplemental Engagement Letter, certain provisions of the Supplemental Engagement Letter relating to "Fees and Billings," "Other Matters," limitations and alternative dispute resolution will remain operative and in full force and effect regardless of the termination or expiration of the Supplemental Engagement Letter, and shall survive completion of the Debtors' bankruptcy cases whether through a confirmed plan under chapter 11 of the Bankruptcy Code, the liquidation of the Debtors' assets under chapter 7 or 11 of the Bankruptcy Code, or otherwise. Upon the expiration or termination of the Supplemental Engagement Letter, the Debtors will remain obligated to pay all accrued fees and expenses to E&Y LLP as of the effective date of such termination.

7.      E&Y LLP's provision of services to the Debtors is contingent upon the Court's approval of each term and condition set forth in the Supplemental Engagement Letter. Included among the terms and conditions set forth in the Supplemental Engagement Letter is language substantially similar to the following:

> The Plan Sponsor shall not, during the term of this Agreement and for 12 months following its termination for any reason, without the prior written consent of E&Y LLP, solicit for employment or a position on the Plan Sponsor's Board of Directors, or hire or appoint to the Plan Sponsor's Board of Directors any current or former partner, principal, or professional employee of E&Y LLP, any affiliate thereof, any other EY Firm or any of their respective affiliates if any such professional either: (i) performed any audit, review, attest, or related service for or

relating to the Savings Plan or Plan Sponsor at any time (a) since the date on which the Savings Plan filed its most recent periodic annual report with the SEC (or since the beginning of the most recent fiscal year to be covered by the Plan's first such report, if applicable) or (b) in the 12 months ended on that date; or (ii) influences E&Y LLP's operations or financial policies or has any capital balances or any other continuing financial arrangement with E&Y LLP.

The Plan Sponsor may not, on behalf of the Savings Plan or otherwise, make a claim or bring proceedings relating to the services or otherwise under this Agreement against any other EY Firm or our or its subcontractors, members, shareholders, directors, officers, partners, principals or employees (all of whom, "EY Persons"). The Plan Sponsor shall make any claim or bring proceedings only against E&Y LLP. This paragraph is intended to benefit the other EY Firms and all EY Persons, who shall be entitled to enforce it. Each EY Firm is a separate legal entity.

Any controversy or claim with respect to, in connection with, arising out of, or in any way related to this Agreement or the services provided hereunder (including any such matter involving any parent, subsidiary, affiliate, successor in interest or agent of the Plan Sponsor or its subsidiaries or of E&Y LLP) shall be brought in the Bankruptcy Court or the applicable district court (if such district court withdraws the reference) and the parties to this Agreement, and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole and exclusive forum (unless such court does not have jurisdiction and venue of such claims or controversies) for the resolution of such claims, causes of action or lawsuits. The parties to this Agreement, and any and all successors and assigns thereof, hereby waive trial by jury, such waiver being informed and freely made. If the Bankruptcy Court, or the district court upon withdrawal of the reference, does not have or retain jurisdiction over the foregoing claims or controversies, the parties to this Agreement and any and all successors and assigns thereof, agree to submit first to nonbinding mediation; and, if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures as set forth in the attachment to this Agreement, which is incorporated herein by reference. Judgment on any arbitration award may be entered in any court having proper jurisdiction. The foregoing is binding upon the Plan Sponsor, E&Y LLP and any all successors and assigns thereof.

8.    E&Y LLP intends to apply to the Court for payment of compensation and reimbursement of expenses for its work on the 2010 Savings Plan Audit under the Supplemental

Engagement Letter in accordance with applicable provisions of the Bankruptcy Code, the

Bankruptcy Rules, the Local Rules of this Court, any administrative order of this Court

governing the compensation of retained professionals in these chapter 11 cases, and the

Supplemental Engagement Letter.

9.    To ensure that the October 15, 2011 filing deadline with the Employee Benefits

Security Administration of the Department of Labor and the Securities and Exchange

Commission is met, E&Y LLP commenced providing the services under the Supplemental

Engagement Letter as of July 18, 2011.    Accordingly, the Debtors and E&Y LLP are

respectfully requesting that E&Y LLP's supplemental retention under the Supplemental

Engagement Letter be approved *nunc pro tunc* to July 18, 2011.

10.    Except as otherwise set forth herein or in the Supplemental Engagement Letter,

E&Y LLP has not shared or agreed to share any of its compensation in connection with this

matter with any other person, other than the partners and employees of E&Y LLP. The proposed

employment of E&Y LLP is not prohibited by or improper under Federal Rule of Bankruptcy

Procedure 5002.

11.    In connection with the Savings Plan for the year ended December 31, 2009 (the

"2009 Savings Plan Audit"), E&Y LLP provided audit services to the Employee Benefit Plans

Committee and the Audit Committee of LBHI pursuant to an engagement letter dated July 22,

2010, which is annexed hereto as Exhibit A.[2]   I have been informed that prior to the Debtors

commencing these chapter 11 cases, E&Y LLP has received compensation and reimbursement

for prior audits of the Savings Plan by the Savings Plan itself, using funds available in such

---

[2]   For the avoidance of doubt, the July 22, 2010 engagement letter for the 2009 Savings Plan Audit is attached for
information and disclosure purposes only.   The Debtors are not requesting Court approval to retain E&Y LLP
pursuant to the July 22, 2010 engagement letter for the 2009 Savings Plan Audit.   The Debtors are only requesting
Court approval to retain E&Y LLP pursuant to the Supplemental Engagement Letter.

plan's forfeiture account (the "Fund"). After the 2009 Savings Plan Audit was completed, I was informed that there is no longer money available in the Fund that could be used to compensate E&Y LLP for the services in connection with the 2010 Savings Plan Audit and in accordance with the terms set forth in the Supplemental Engagement Letter.

12.   Upon completion of the 2009 Savings Plan Audit, $50,000 of the balance owed was paid from monies in the Fund and LBHI, as the plan sponsor of the Savings Plan, paid E&Y LLP the remaining balance of $50,000 on account of the fees and expenses for the 2009 Savings Plan Audit.   LBHI has recently told me that the payment it made should have been made from the Fund.   E&Y LLP has returned that $50,000 payment to the Debtors, and the remaining balance of E&Y LLP's fees for the 2009 Savings Plan Audit ($50,000) will be paid to E&Y LLP from monies from the Fund.

13.   E&Y LLP is in the process of updating its disclosures concerning its relationships with parties-in-interest in these chapter 11 cases that have been identified by the Debtors or their counsel. In that regard, E&Y LLP currently is searching or causing to be searched certain databases to determine whether E&Y LLP has provided in the last three years or is currently providing services to the parties-in-interest that have been identified by the Debtors or their counsel, and to determine whether E&Y LLP has certain other relationships with those parties-in-interest. Because the list of the parties-in-interest in these cases is very extensive, E&Y LLP has not yet completed its updated search. As soon as practicable after that updated search is completed, E&Y LLP will file an affidavit or declaration with this Court to make all necessary and appropriate disclosures of relationships that have not already been disclosed in prior affidavits.

14.    At this time, I am unaware of any relationships with any party-in-interest that would preclude E&Y LLP from being retained to provide the services described in the Supplemental Engagement Letter.

Dated: October 12 , 2011

_____
Salvatore Restivo

Sworn to and subscribed before me this 12 day of OCTOBER , 2011.

_____
Notary Public

> TATJANA BODLOVIC
> Notary Public - State of New York
> No. 01BO6217414
> Qualified in Queens County
> My Comm. Expires Feb. 8. 2014

My Commission Expires: FEB 8, 2014

# EXHIBIT A

## 2009 Engagement Letter

**⊒Ⅱ ERNST & YOUNG**

Ernst & Young LLP
5 Times Square
New York, NY 10036-6530

Tel: +1 212 773 3000
Fax: +1 212 773 6350
www.ey.com

Lehman Brothers Holdings Inc.                                July 22, 2010
1271 Avenue of the Americas
New York, NY 10020

Attention: Carol Rado
Chairperson, Lehman Brothers Holdings Inc.
Employee Benefit Plans Committee

Dear Ms. Rado:

1.  This agreement (together with all attachments hereto, the "Agreement") confirms the engagement
    of Ernst & Young LLP ("we" or "EY") by the Employee Benefit Plans Committee and the Audit
    Committee of Lehman Brothers Holdings Inc (the "Plan Sponsor" and the "Company") to audit
    and report on the financial statements and supplemental schedules of Lehman Brothers Savings
    Plan (the "Plan") for the year ended December 31, 2009, which are to be included in the Plan's
    Form 5500 filing with the Employee Benefits Security Administration of the Department of Labor
    (the "DOL") and the Plan's Form 11-K filing with the Securities and Exchange Commission
    ("SEC"). All of the services described in this paragraph are referred to collectively as the "Audit
    Services" or the "audit." References to "management" herein shall be deemed to be references to
    management of the Plan Sponsor, acting for the Plan Sponsor in its capacity as such.

**Audit responsibilities and limitations**

2.  The objective of the audit of the financial statements is to express an opinion on whether the
    financial statements are presented fairly, in all material respects, in conformity with US generally
    accepted accounting principles and whether the supplemental schedules are fairly stated, in all
    material respects, in relation to the financial statements taken as a whole. Should conditions not
    now anticipated preclude us from completing the audit and issuing a report, we will advise the
    Audit Committee and management promptly and take such action as we deem appropriate.

3.  We will conduct the audit in accordance with the standards of the Public Company Accounting
    Oversight Board (the "PCAOB") and auditing standards generally accepted in the United States,
    as established by the American Institute of Certified Public Accountants (the "AICPA"). Those
    standards require that we obtain reasonable, rather than absolute, assurance that the financial
    statements are free of material misstatement, whether caused by error or fraud. As management is
    aware, there are inherent limitations in the audit process, including, for example, selective testing
    and the possibility that collusion or forgery may preclude the detection of material error, fraud, or
    illegal acts, including prohibited transactions with parties in interest and other violations of the



**=!! ERNST & YOUNG**

DOL's Rules and Regulations under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Accordingly, there is some risk that a material misstatement of the financial statements would remain undetected. Also, an audit is not designed to detect error or fraud that is immaterial to the financial statements.

4.  In accordance with professional standards, we will communicate certain matters related to the conduct and results of the audit to the Employee Benefit Plans Committee and the Audit Committee of the Plan Sponsor.

5   In accordance with the rules of the SEC implementing the requirements of Section 204 of the Sarbanes-Oxley Act of 2002, we will communicate Employee Benefit Plans Committee and the Audit Committee of the Plan Sponsor all critical accounting policies and practices used by the Plan, and all alternative treatments within generally accepted accounting principles for policies and practices related to material items that have been discussed with management, including ramifications of the use of such alternative disclosures and treatments along with the treatment preferred by us. We also will advise the Employee Benefit Plans Committee and the Audit Committee of the Plan Sponsor of the Plan Sponsor of other material written communications between management and us.

6.  We will obtain pre-approval from the Plan Sponsor's Audit Committee for any services we are to provide to the Plan pursuant to the Plan Sponsor's Audit Committee's pre-approval process, policies, and procedures, in accordance with the standards and rules of the SEC and PCAOB. We also will communicate at least annually with the Employee Benefit Plans Committee and the Audit Committee of the Plan Sponsor on independence matters as required by the rules of the PCAOB. We will communicate annually with the Employee Benefit Plans Committee and the Audit Committee of the Plan Sponsor and provide a report on certain matters as specified in the Corporate Governance Standards of the New York Stock Exchange. We will inform the Chair of the Employee Benefit Plans Committee and the Audit Committee of the Plan Sponsor if the Audit Services are selected for inspection by the PCAOB and also will communicate any information of which we become aware as a result of such inspection that has a material effect on the financial statements previously reported on by us or that could result in a significant modification to an audit report previously issued by us. Upon request, we will provide the Employee Benefit Plans Committee and the Audit Committee of the Plan Sponsor with a copy of any publicly available inspection reports on EY issued by the PCAOB, but we will not provide any confidential inspection reports issued by the PCAOB to EY, the confidentiality of which is provided for in the Sarbanes-Oxley Act of 2002 and the PCAOB's inspection rules.

7.  As a part of our audit, we will perform certain procedures, as required by professional standards, directed at considering the Plan's compliance with applicable Internal Revenue Code ("IRC") requirements for tax-exempt status, including reading the Plan's latest tax determination letter from the Internal Revenue Service ("IRS"). As we conduct our audit, we may become aware of

A member firm of Ernst & Young Global Limited



the possibility that events affecting the Plan's tax status may have occurred. Similarly, we may become aware of the possibility that events affecting the Plan's compliance with the requirements of ERISA may have occurred. We will inform you of any instances of tax or ERISA noncompliance that come to our attention during the course of our audit. You should recognize, however, that the audit is not designed to nor is it intended to verify the Plan's overall compliance with applicable provisions of the IRC or ERISA, including but not limited to the Plan Sponsor's deduction limits, and, accordingly, we assume no responsibility for failure to detect instances of noncompliance with applicable provisions of the IRC or ERISA.

8. As part of our audit, we will consider, solely for the purpose of planning the audit and determining the nature, timing, and extent of the audit procedures, the Plan's internal control over financial reporting. Our consideration of internal control for the audit of the financial statements will not be sufficient to enable us to express an opinion on the effectiveness of internal control over financial reporting or to identify all significant deficiencies and material weaknesses.

9. If we determine that there is evidence that fraud or possible illegal acts may have occurred, we will bring such matters to the attention of the appropriate level of management. If we become aware of fraud involving senior management or fraud (whether committed by senior management or other employees) that causes a material misstatement of the financial statements, we will report this matter directly to the Employee Benefit Plans Committee and the Audit Committee of the Plan Sponsor. We will determine that Employee Benefit Plans Committee and the Audit Committee of the Plan Sponsor and appropriate members of management are adequately informed of illegal acts that come to our attention unless they are clearly inconsequential. We also will inform the U Employee Benefit Plans Committee and the Audit Committee of the Plan Sponsor and the appropriate members of management of significant audit adjustments noted during our audit procedures.

10. We will communicate in writing to management and Employee Benefit Plans Committee and the Audit Committee of the Plan Sponsor all significant deficiencies and material weaknesses identified during our audit. In addition, if we become aware that Employee Benefit Plans Committee and the Audit Committee of the Plan Sponsor's oversight of the Plan's external financial reporting and internal control over financial reporting is ineffective, we will communicate that information in writing to the Plan Sponsor's Board of Directors.

11. We also may communicate other opportunities we observe for economies in or improved controls over the Plan's operations.

## Management's responsibilities and representations

12. The financial statements and supplemental schedules are the responsibility of management. Management is also responsible for establishing and maintaining effective internal control over

A member firm of Ernst & Young Global Limited

*Ξ⫪ ERNST & YOUNG*

financial reporting, for properly recording transactions in the accounting records, for safeguarding assets, and for the overall fair presentation of the financial statements and supplemental schedules. Management also is responsible for the identification of, and for the Plan's compliance with, the laws and regulations applicable to its activities.

13. Management is responsible for adjusting the financial statements to correct material misstatements and for affirming to us in its representation letter that the effects of any unrecorded audit differences accumulated by us during the current audit and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

14. Management is responsible for apprising us of all allegations involving financial improprieties received by management or the Employee Benefit Plans Committee and the Audit Committee of the Plan Sponsor (regardless of the source or form and including, without limitation, allegations by "whistle-blowers"), and providing us full access to these allegations and any internal investigations of them, on a timely basis. Allegations of financial improprieties include allegations of manipulation of financial results by management or employees, misappropriation of assets by management or employees, intentional circumvention of internal controls, inappropriate influence on related party transactions by related parties, intentionally misleading EY, or other allegations of illegal acts or fraud that could result in a misstatement of the financial statements or otherwise affect the financial reporting of the Plan. If management limits the information otherwise available to us under this paragraph (based on the management's claims of attorney/client privilege, work product doctrine, or otherwise), management will immediately inform us of the fact that certain information is being withheld from us. Any such withholding of information could be considered a restriction on the scope of the audit and may prevent us from opining on the Plan's financial statements; alter the form of report we may issue on such financial statements; prevent us from consenting to the inclusion of previously issued auditor's reports in future Plan filings; or otherwise affect our ability to continue as the Plan's independent registered public accounting firm (or independent auditor). We will disclose any such withholding of information to the Employee Benefit Plans Committee and the Audit Committee of the Plan Sponsor.

15. As required by professional standards, we will make specific inquiries of management about the representations contained in the financial statements and supplemental schedules. Professional standards also require that, at the conclusion of the audit, we obtain representation letters from certain members of management about these matters. The responses to those inquiries, the written representations, and the results of our procedures comprise evidence on which we will rely in forming an opinion on the financial statements and supplemental schedules. Management is responsible for providing us with all financial records and related information on a timely basis, and its failure to do so may cause us to delay our report, modify our procedures, or even terminate the Audit Services.

A member firm of Ernst & Young Global Limited

**≡IJ ERNST & YOUNG**

16. Management is responsible for informing EY about any related party transactions, including transactions with parties in interest, as defined in ERISA section 3(14) and the regulations thereunder, including sales, purchases, loans, transfers, leasing arrangements, and guarantees, and amounts receivable from or payable to related parties. We will assess whether all identified prohibited party-in-interest transactions are included in the supplemental schedule of nonexempt transactions.

17. Management shall make appropriate inquiries of the Plan Sponsor's officers, directors, and substantial stockholders to determine whether any business relationships exist between any such officer, director, or substantial stockholders (or any entity for or of which such an officer, director, or substantial stockholder acts in a similar capacity) and EY or any other member firm of the global Ernst & Young organization (any of which, an "EY Firm"), other than one pursuant to which an EY Firm performs professional services. For this purpose, a "substantial stockholder" is a person or entity (excluding mutual funds) that owns a beneficial interest of five percent or more of the Plan Sponsor.

18. Management shall discuss any independence matters with EY that, in management's judgment, could bear upon EY's independence.

19. The Staff of the SEC has publicly stated that auditors and public companies share responsibility for compliance with auditor independence rules. Accordingly, the Plan Sponsor shall provide to EY information about the entities over which the Plan Sponsor has direct or indirect control or significant influence or which otherwise qualify as the "audit client" under Regulation S-X. The Plan Sponsor understands that EY will use this information to assess its independence in this engagement. In addition, to facilitate independence determinations, the "Big 4" accounting firms have created a database, called the Global Master File, to aggregate public information identifying the entities associated with their SEC audit clients, as well as information confirmed or provided by clients as to the relationships between such entities. The Plan Sponsor understands that EY will submit information to this database solely for the internal use of authorized accounting firms.

20. The Plan Sponsor shall be responsible for its personnel's compliance with the Plan Sponsor's obligations under this Agreement.

**Fees and billings**

21. We estimate that the fees for the audit of the 2009 financial statements and supplemental schedules will be approximately $100,000. However, our actual fees may exceed this range based on changes to the Plan (e.g., change in Plan provisions or change in service providers) or out-of-scope work. Our fees are exclusive of taxes or similar charges, as well as customs, duties or tariffs, imposed in respect of the Audit Services, all of which the Plan or the Plan Sponsor shall pay (other than taxes imposed on our income generally).

A member firm of Ernst & Young Global Limited

**ΞU ERNST & YOUNG**

We will submit our invoices based upon the following schedule and we expect that payment of them will be made upon receipt:

| Billing Date | Amount |
|---|---|
| September 10, 2010 | $ 50,000 |
| October 1, 2010 | 50,000 |
| Total | $ 100,000 |

22. In addition, the Plan Sponsor or the Plan shall reimburse us for direct expenses incurred in connection with the performance of the Audit Services. Direct expenses include reasonable and customary out-of-pocket expenses such as travel, meals, accommodations and other expenses specifically related to this engagement. EY may receive rebates in connection with certain purchases, which are used to reduce charges that EY would otherwise pass on to its clients.

23. Our estimated pricing and schedule of performance are based upon, among other things, our preliminary review of the Plan's records and the representations management has made to us and are dependent upon management providing a reasonable level of assistance. Should our assumptions with respect to these matters be incorrect or should the condition of records, degree of cooperation, or other matters beyond our reasonable control require additional commitments by us beyond those upon which our estimates are based, we may adjust our fees and planned completion dates. Fees for any special audit-related projects, such as research and/or consultation on operational or financial issues of the Plan, will be billed separately from the fees referred to above and will be the subject of other written agreements.

24. If we are requested or authorized by management or are required by government regulation, subpoena, or other legal process to produce our documents or our personnel as witnesses with respect to our engagement for the Plan, the Plan Sponsor will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such requests.

**Other matters**

25. The audited financial statements of the Plan are required to be filed with the Form 5500. AICPA auditing standards require that we read the Plan's Form 5500 prior to its filing. The purpose of this procedure is to consider whether such information, or the manner of its presentation in the Form 5500, is materially inconsistent with the information, or the manner of its presentation, appearing in the financial statements and supplemental schedules. These procedures are not sufficient nor are they intended to determine that the Form 5500 is completely and accurately

A member firm of Ernst & Young Global Limited



prepared. Accordingly, you understand and agree that we do not assume any responsibility for the completeness and/or accuracy of the Form 5500 as part of the Audit Services. In the event that our auditor's report is issued prior to our having read the Plan's Form 5500, you agree not to attach such auditor's report to the financial statements included with the Form 5500 filing until we have read the completed Form 5500.

26. From time to time, and depending on the circumstances, (1) we may subcontract portions of the Audit Services to other EY Firms, who may deal with the Plan Sponsor or its affiliates directly, although EY alone will remain responsible to you for the Audit Services, and (2) personnel (including non-certified public accountants) from an affiliate of EY or another EY Firm or any of their respective affiliates, or from independent third-party service providers (including independent contractors), may participate in providing the Audit Services. In addition, third-party service providers may perform services for EY in connection with the Audit Services. Unless prohibited by applicable law, we may disclose Plan information to other EY Firms and their personnel to facilitate performance of the Audit Services, to comply with regulatory requirements, or for quality, risk management or financial accounting purposes. Either EY or the Plan Sponsor may use electronic media to correspond or transmit information relating to the Audit Services, and such use will not, in itself, constitute a breach of any confidentiality obligations.

27. We may be requested to make certain workpapers available to the DOL pursuant to authority given to it by law or regulation. If requested, access to such workpapers will be provided under the supervision of our personnel. Furthermore, upon request, we may provide photocopies of selected workpapers to the DOL. We will label all workpapers as confidential and maintain control over their duplication.

28. The Plan Sponsor shall not, during the term of this Agreement and for 12 months following its termination for any reason, without the prior written consent of EY, solicit for employment or a position on the Plan Sponsor's Board of Directors, or hire or appoint to the Plan Sponsor's Board of Directors any current or former partner, principal, or professional employee of EY, any affiliate thereof, any other EY Firm or any of their respective affiliates if any such professional either: (i) performed any audit, review, attest, or related service for or relating to the Plan or Plan Sponsor at any time (a) since the date on which the Plan filed its most recent periodic annual report with the SEC (or since the beginning of the most recent fiscal year to be covered by the Plan's first such report, if applicable) or (b) in the 12 months ended on that date; or (ii) influences EY's operations or financial policies or has any capital balances or any other continuing financial arrangement with EY.

29. The Plan Sponsor may not, on behalf of the Plan or otherwise, make a claim or bring proceedings relating to the Audit Services or otherwise under this Agreement against any other EY Firm or our or its subcontractors, members, shareholders, directors, officers, partners, principals or employees (all of whom, "EY Persons"). The Plan Sponsor shall make any claim or bring proceedings only

A member firm of Ernst & Young Global Limited

**EY** *ERNST & YOUNG*

against EY. This paragraph is intended to benefit the other EY Firms and all EY Persons, who shall be entitled to enforce it. Each EY Firm is a separate legal entity.

30. We may collect, use, transfer, store or otherwise process (collectively, "Process") Plan information that can be linked to specific individuals ("Personal Data"). We may Process Personal Data in various jurisdictions in which EY and the other EY Firms operate (which are listed at www.ey.com). We will Process the Personal Data in accordance with applicable law and professional regulations, including, where applicable, the European Union Safe Harbor program of the US Department of Commerce, in which EY participates. We will require any service provider that Processes Personal Data on our behalf to adhere to such requirements. If any Plan information   is protected health information under the Health Insurance Portability and Accountability Act, as amended, this Agreement is deemed to incorporate all of the terms otherwise required to be included in a business associate contract relating to such information. The Plan Sponsor warrants that it has the authority to provide the Personal Data to EY in connection with the performance of the Audit Services and that the Personal Data provided to us has been processed in accordance with applicable law.

31. By your signature below, you confirm that the Plan Sponsor, acting through its Board of Directors, has authorized the Employee Benefit Plans Committee to enter into this Agreement on the Plan Sponsor's behalf, and that you have been expressly authorized by Employee Benefit Plans Committee to execute this Agreement on behalf of, and to bind, the Plan Sponsor with respect to the audit of the Plan. Either EY or the Plan Sponsor may execute this Agreement (and any supplements or modifications hereto) by electronic means, and each of EY and the Plan Sponsor may sign a different copy of the same document.

32. EY retains ownership in the workpapers compiled in connection with the performance of the Audit Services.

33. Except for a claim limited solely to seeking non-monetary or equitable relief, any dispute or claim arising out of or relating to the Audit Services, this Agreement, or any other services provided by or on behalf of EY or any of its subcontractors or agents to the Plan Sponsor or at the Plan Sponsor's request, shall be resolved by mediation or arbitration as set forth in the attachment to this Agreement, which is incorporated herein by reference. Judgment on any arbitration award may be entered in any court having jurisdiction.

34. If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this Agreement shall remain in effect. This Agreement applies to all Audit Services performed at any time (including before the date of this Agreement).

To the extent that EY agrees to perform Audit Services for a subsequent fiscal year, the terms and conditions set forth in this Agreement shall apply to the performance of such Audit Services, except

A member firm of Ernst & Young Global Limited



**ERNST & YOUNG**

as specifically modified, amended or supplemented in writing by the parties. Changes in the scope of the Audit Services and estimated fees for such services in subsequent fiscal years will be communicated in supplemental letters. We may terminate performance of the Audit Services and this Agreement upon written notice if we reasonably determine that we can no longer provide the Audit Services in accordance with applicable law or professional obligations. Upon any termination of the Audit Services or this Agreement, the Plan or the Plan Sponsor shall pay EY for all work-in-progress, Audit Services already performed and expenses incurred by us up to and including the effective date of such termination.

EY appreciates the opportunity to be of assistance to the Plan and Plan Sponsor. If this Agreement accurately reflects the terms on which the Plan Sponsor has agreed to engage EY, please sign below on behalf of the Plan Sponsor and return it to Salvatore Restivo 31st Floor, Ernst & Young LLP, 5 Times Square, New York, NY 10036.

Yours very truly,

*Ernst & Young LLP*

Ernst & Young LLP

Agreed and accepted by:

Lehman Brothers Holdings Inc.

By: _____

Ms Carol Rado
Chairperson, Lehman Brothers Holdings Inc.
Employee Benefit Plans Committee

Date: _____

By: _____

Mr. Cliff Feibus, Senior Vice President

Date: _____

Lehman Brothers Savings Plan
Page 9 of 9

A member firm of Ernst & Young Global Limited

## Dispute Resolution Procedures

### Mediation

A party shall submit a dispute to mediation by written notice to the other party or parties. The mediator shall be selected by the parties. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR") shall designate a mediator at the request of a party. Any mediator must be acceptable to all parties and must confirm in writing that he or she is not, and will not become during the term of the mediation, an employee, partner, executive officer, director, or substantial equity owner of any Ernst & Young audit client.

The mediator shall conduct the mediation as he/she determines, with the agreement of the parties. The parties shall discuss their differences in good faith and attempt, with the mediator's assistance, to reach an amicable resolution of the dispute. The mediation shall be treated as a settlement discussion and shall therefore be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. The mediation proceedings shall not be recorded or transcribed.

Each party shall bear its own costs in the mediation. The parties shall share equally the fees and expenses of the mediator.

If the parties have not resolved a dispute within 90 days after written notice beginning mediation (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute shall be settled by arbitration. In addition, if a party initiates litigation, arbitration, or other binding dispute resolution process without initiating mediation, or before the mediation process has terminated, an opposing party may deem the mediation requirement to have been waived and may proceed with arbitration.

### Arbitration

The arbitration will be conducted in accordance with the procedures in this document and the CPR Rules for Non-Administered Arbitration ("Rules") as in effect on the date of the Agreement, or such other rules and procedures as the parties may agree. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, to be selected in accordance with the screened selection process provided in the Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may be appointed unless he or she has agreed in writing to these procedures and has confirmed in writing that he or she is not, and will not become during the term of the arbitration, an employee, partner, executive officer, director, or substantial equity owner of any Ernst & Young audit client.

The arbitration panel shall have no power to award non-monetary or equitable relief of any sort or to make an award or impose a remedy that (i) is inconsistent with the agreement to which these

## Dispute Resolution Procedures

### Mediation

A party shall submit a dispute to mediation by written notice to the other party or parties. The mediator shall be selected by the parties. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR") shall designate a mediator at the request of a party. Any mediator must be acceptable to all parties and must confirm in writing that he or she is not, and will not become during the term of the mediation, an employee, partner, executive officer, director, or substantial equity owner of any Ernst & Young audit client.

The mediator shall conduct the mediation as he/she determines, with the agreement of the parties. The parties shall discuss their differences in good faith and attempt, with the mediator's assistance, to reach an amicable resolution of the dispute. The mediation shall be treated as a settlement discussion and shall therefore be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. The mediation proceedings shall not be recorded or transcribed.

Each party shall bear its own costs in the mediation. The parties shall share equally the fees and expenses of the mediator.

If the parties have not resolved a dispute within 90 days after written notice beginning mediation (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute shall be settled by arbitration. In addition, if a party initiates litigation, arbitration, or other binding dispute resolution process without initiating mediation, or before the mediation process has terminated, an opposing party may deem the mediation requirement to have been waived and may proceed with arbitration.

### Arbitration

The arbitration will be conducted in accordance with the procedures in this document and the CPR Rules for Non-Administered Arbitration ("Rules") as in effect on the date of the Agreement, or such other rules and procedures as the parties may agree. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, to be selected in accordance with the screened selection process provided in the Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may be appointed unless he or she has agreed in writing to these procedures and has confirmed in writing that he or she is not, and will not become during the term of the arbitration, an employee, partner, executive officer, director, or substantial equity owner of any Ernst & Young audit client.

The arbitration panel shall have no power to award non-monetary or equitable relief of any sort or to make an award or impose a remedy that (i) is inconsistent with the agreement to which these

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                           :
In re                                      :     **Chapter 11 Case No.**
                                           :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, :     **08-13555 (JMP)**
                                           :
                    **Debtors.**           :     **(Jointly Administered)**
                                           :
-------------------------------------------------------------------x

**ORDER PURSUANT TO SECTION**
**327(a) OF THE BANKRUPTCY CODE AND RULE 2014**
**OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**
**AUTHORIZING THE EXPANSION OF ERNST & YOUNG LLP'S RETENTION**
**AS AUDITORS TO THE DEBTORS,** *NUNC PRO TUNC TO JULY 18,* **2011**

Upon consideration of the supplemental application, dated October 17, 2011 (the

"Supplemental Application"),[1] of Lehman Brothers Holdings Inc. and its affiliated debtors in the

above-referenced chapter 11 cases, as debtors and debtors-in-possession (together, the

"Debtors"), pursuant to section 327(a) of title 11 of the United States Code (the "Bankruptcy

Code") and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") for authorization to expand the scope of the Debtors' retention of Ernst & Young LLP

("E&Y") as auditors to the Debtors, *nunc pro tunc* to July 18, 2011, on the terms set forth in that

certain supplemental engagement letter dated July 18, 2011 between the Debtors and E&Y (the

"Supplemental Engagement Letter"), annexed as Exhibit A to the Supplemental Application; and

upon the affidavit of Salvatore Restivo, a partner of E&Y, in support of the Supplemental

Application and annexed thereto as Exhibit B; and the Court being satisfied, based on the

representations made in the Supplemental Application and the Salvatore Affidavit, that E&Y

represents no interest adverse to the Debtors or the Debtors' estates under section 327 of the

Bankruptcy Code as modified by section 1107(b); and the Court having jurisdiction to consider

---

[1]   Capitalized terms that are used but not defined in this order have the meanings ascribed to them in the
      Supplemental Application.

the Supplemental Application and the relief requested therein in accordance with 28 U.S.C. §§

157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern

District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward,

Acting C.J.); and consideration of the Supplemental Application and the relief requested therein

being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Supplemental

Application having been provided in accordance with the procedures set forth in the amended

order entered June 17, 2010 governing case management and administrative procedures for these

cases [ECF No. 9635] on (i) the United States Trustee for Region 2; (ii) the attorneys for the

Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue

Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties

who have requested notice in these chapter 11 cases, and it appearing that no other or further

notice need be provided; and the Court having found and determined that the relief sought in the

Supplemental Application is in the best interests of the Debtors, their estates and creditors, and

all parties in interest and that the legal and factual bases set forth in the Supplemental

Application establish just cause for the relief granted herein; and after due deliberation and

sufficient cause appearing therefor, it is

ORDERED that the Supplemental Application is approved as set forth herein; and

it is further

ORDERED that pursuant to section 327(a) of the Bankruptcy Code, the Debtors

are hereby authorized to expand the scope of their retention of E&Y as their auditors to include

the Services, *nunc pro tunc* to July 18, 2011, in accordance with the terms and conditions set

forth in the Supplemental Engagement Letter and this Order; and it is further

2

ORDERED that the terms and conditions of the Supplemental Engagement Letter are approved and the Debtors will be bound by such terms; and it is further

ORDERED that E&Y shall apply to the Court for compensation and reimbursement of expenses for all fees payable in connection with the Services pursuant to the standard of review set forth in section 330 of the Bankruptcy Code, and in accordance with the procedures set forth in sections 330 and 331 of the Bankruptcy Code, applicable Bankruptcy Rules, the Local Rules and orders of the Court, guidelines established by the U.S. Trustee, and such other procedures that have been or may be fixed by order of this Court, including but not limited to the Court's Fourth Amended Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals [ECF No. 15997], the Court's Order Amending the Fee Protocol, [ECF No. 15998] and General Order M-389; and it is further

ORDERED that to the extent this Order is inconsistent with the Supplemental Application, this Order shall govern; and it is further

ORDERED that the Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated:  October [  ], 2011
      New York, New York

                              _____
                              UNITED STATES BANKRUPTCY JUDGE