Hearing Date and Time: October 27, 2011 at 10:00 a.m.
Response Deadline: October 12, 2011 at 4:00 p.m.[1]

THE MICHAELSON LAW FIRM
Robert N. Michaelson
11 Broadway, Suite 615
New York, New York, 10004
(p) (212) 604-0685
(f) (800) 364-1291

*Attorneys for the Washington State Tobacco Settlement Authority*

**THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
In re                                              :     Chapter 11
                                                   :
LEHMAN BROTHERS HOLDINGS INC. *et al.*              :     Case No. 08-13555 (BRL)
                                                   :
                                                   :
                    Debtors.                       :
-------------------------------------------------------------------x

**RESPONSE OF THE WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY TO DEBTORS' ONE HUNDRED NINETY FIRST OMNIBUS
OBJECTION TO CLAIMS**

      The Washington State Tobacco Settlement Authority ("TSA"), by its undersigned counsel, hereby responds to the One Hundred and Ninety First Omnibus Objection to Claims (the "Objection") by Lehman Brothers Special Financing Inc. ("LBSF"), a debtor-in-possession in the above captioned, jointly administered cases, that seeks to reduce and allow TSA proofs of claim 37355 and 37356 (the "TSA Claim") from $47,063,714.01 to $4,325,931.16.

**Introduction**

      1.     The Objection seeks reduction of the TSA Claim on the alleged and unsubstantiated ground the amount sought is "greater than the fair, accurate, and reasonable value determined by the Debtors after a review of the claimant's supporting documentation and the Debtors' books and

---

[1] Extended on consent to October 19, 2011.

records". However, the Objection fails to provide the valuation methodology LBSF used to reduce the TSA Claim by more than forty million dollars. Instead, the Objection merely refers to the 2009 Declaration of Gary H. Mandelblatt (the "<u>Mandelblatt Declaration</u>") "for a more comprehensive discussion of the valuation process". (Objection at FN 2, p.6, *see also* Docket No. 4113, Exhibit "C" and Objection at ¶2).

2. TSA has reviewed the Mandelblatt Declaration and found that it only describes in general terms the valuation methodology LBSF proposed to use in 2009 to value a large number of creditor claims. The Mandelblatt Declaration is not TSA-claim-specific nor does it offer any details or calculations that would allow a reasonable person to understand why LBSF believes that the TSA Claim is overstated.

3. Rather than providing a specific analysis of the TSA Claim, the Mandelblatt Declaration merely states that LBSF intends to "value the transactions on the same date as that particular counterparty's transactions were terminated and determine whether the Debtors" valuation matches the counterparty's valuation. The derivative contracts, including the ISDA Master Agreements and schedules, describe standard methodologies for valuation upon early termination of the transactions. Such valuation methods include obtaining "market quotations or using a 'loss' calculation." (Mandelblatt Decl. at ¶30). Simply put, all the Mandelblatt Declaration does is describe in general terms alternate methodologies that might or could be employed to value claims but provides no definitive statement as to how the TSA Claim should be valued.

4. After describing the market quotations methodology the Mandelblatt Declaration goes on to conclude that "under the typical governing contract, if counterparties are unable to obtain the required number of market quotations, they must resort to the 'loss' calculation method.[2] Loss calculation allows the counterparty to consider factors other than market quotations in valuing the Transaction under the Derivative Contract. It is <u>critical</u> that the Debtors receive the necessary information required to understand the counterparty's loss calculation to verify the reasonableness and validity of the calculation <u>because minor differences in loss methodology can lead to significant differences in valuations.</u>" (Mandelblatt Decl. at ¶33, emphasis added).

5. Indeed, the difference of over forty million dollars is plainly significant and TSA has no idea which methodology LBSF used. However, if it was the "loss" calculation method then it is just as critical for TSA to "receive necessary information" as it is for LBSF. To date TSA has no

---

[2] TSA used the loss calculation method

information by which to verify what "necessary information" LBSF may have received and is relying on. The Objection offers no explanation other than "the valued derivative claims should be reduced and allowed" on "the basis that the amounts listed on the proofs of claim are greater than the fair, accurate, and reasonable values determined by the Debtors after a review of the claimant's supporting documentation and the Debtor's books and records". (Objection at ¶11).

6. LBSF claims that "the debtors have developed and currently utilize a thorough, multi-step process to review claims filed against the debtors and based on a derivative contract ("Derivative Claims") in order to determine the fair, accurate, and reasonable value of such claims for purposes of settlement". In order to determine the Proposed Settlement Amount the Debtors "(i) collect and review documents related to the relevant Derivative Claim including, but not limited to the relevant Derivative Questionnaire and/or Guarantee Questionnaire, the termination notice, and the valuation statement; (ii) reconcile posted collateral and any cash payments already received, made, or missed; and (iii) review the valuation methodology used by the claimant to determine the value of the claim, including verifying the legitimacy of quotes provided by the claimant in connection with their valuation statement, reviewing claimant's 'loss' calculation, and evaluating any set-off claims." (Objection at ¶14). But, once again, LBSF offers no explanation of the valuation methodology it relies on to justify the reduction of the TSA Claim, does not reference the Reserve Fund Agreement ("RFA") between LBSF and TSA (a copy of which is annexed hereto as Exhibit A) that governs the relationship between the parties and does not provide any calculations or even the date of the calculations. TSA, on the other hand, employs a broadly accepted market methodology to value its claim in accordance with rules LBSF and TSA stipulated in the RFA.

### TSA' S Valuation Methodology

7. Under the terms of the RFA, the Burdened Party, TSA, has the right to calculate a Termination Amount "as reasonably determined in good faith by the Burdened Party, to be the Burdened Party's total losses and costs, or gains, in connection with a termination, including any loss of bargain, cost of funding, or, at the election of the Burdened Party but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position ... "

8. In 2002, under the terms of the RFA, TSA delivered to LBSF an amount equal to the "Scheduled Reserve Amount" or $45,534,106.25 in exchange for Eligible Securities to deposit

{00002365911} 3

with the trustee to satisfy the liquidity reserve account requirement of its tobacco settlement securitization bonds. When these securities matured, TSA would again deliver the "Scheduled Reserve Amount" to LBSF to purchase new securities. In exchange for the periodic purchase of securities, LBSF provided TSA with a guaranteed rate of return on the Scheduled Reserve Amount.

9. The RFA had a scheduled termination date of May 30, 2042 when the final Bond Payment is due. (*See* Exhibit A to RFA). LBSF provided TSA with a guaranteed rate of return of 4.484 %.

10. Lehman Brothers Holdings, Inc., the credit support provider for LBSF, filed for bankruptcy on September 15, 2008 and LBSF ceased to perform under the terms of the RFA. LBSF filed for bankruptcy on October 3, 2008.

11. Without the RFA, when the securities in the RFA matured, TSA was able to reinvest the proceeds only in the open market at significantly lower yields than the guaranteed rate of return promised by LBSF.

12. For the purpose of the Calculation of Loss, TSA has looked at a valuation on March 25, 2009, the date that LBSF rejected the RFA.

13. In order to calculate TSA's Loss, TSA first examined the cash flows. Under the RFA, Lehman guaranteed a fixed rate of return for TSA"s Reserve Fund in the form of the discount on the securities that LBSF agreed to deliver to the trustee on a periodic basis. The scheduled term of the RFA extended through May 30, 2042 (*See* Exhibit A to RFA). The parties could terminate the Agreement prior to that date in the event that TSA's tobacco settlement securitization bonds are redeemed prior to their obligations.

14. The appropriate method to value the cash flows under the RFA is to use a similar interest rate swap in which one payer (LBSF) would pay a fixed rate of 4.484% and the other payer (TSA) would pay a floating rate.

15. The broadly accepted market methodology to value agreements like the RFA is to use LIBOR plus spread analysis with an interest rate swap. In the case of the RFA, the value of the floating leg is of great importance, since the value of the fixed leg is already known. The value of the floating leg should represent the value of the securities that are going to be delivered – short-term obligations (treasuries, agencies or commercial paper) with the highest short-term ratings from Moody's (P-1) and Standard & Poor's (A-1+) – and also incorporate the ongoing credit risk of the

RFA as an agreement in the first loss position of a municipal tobacco securitization.

16. To complete the Calculation of Loss, it is also appropriate to include the profit or spread component that another provider would charge to replace the RFA, if such replacement agreement was possible.

### A. Commercial Paper Spreads

17. The trading relationship between commercial paper and LIBOR has widened markedly as the overall credit markets have suffered during the financial crisis. This has been even more dramatic in the case of the structured commercial paper such as RFA. Under normal, orderly market conditions, spreads for high-grade, structured commercial paper would typically be in a range of 0.20% to .30% over LIBOR. However, on the valuation date in question, the trading spreads were significantly greater, approximately 0.666% on March 25, 2009, the date that LBSF rejected the RFA between LBSF and TSA.

### B. Charges for Municipal Tobacco Credit

18. In order to assess a proper credit charge for the RFA, TSA examined the trading levels of TSA's bonds on the valuation date and compared the levels to a benchmark municipal index. On March 25, 2009, the bonds traded at a yield of 10.000%, which represents a spread of 4.290% over the Bloomberg 30-Year General purpose Revenue Bond Index (A-Rated).

### C. Profit Component

19. The TSA valuation also took into account the profit or spread component that a replacement investment would cost if TSA were to replace the economic bargain of the RFA. Given the challenging nature of the municipal tobacco credit, as well as the widening of bid-offer spreads in the fixed income markets in general and in the municipal derivatives market in specific, a dealer would charge a profit component on the order of 0.25% to provide a replacement RFA, if such an agreement was ever possible.

### D. Calculation of Loss

20. Below is the summary of the various components that TSA included in calculating the floating rate for the RFA and incorporated into the Calculation of TSA's Loss.

| Date | CP Spread | Credit Spread | Profit | Total |
|---|---|---|---|---|
| March 25, 2009 | 0.666% | (4.290%) | (0.25%) | (3.874%) |

Using the spreads to LIBOR described above, TSA arrived at a Loss value of $ 46,437,610 for the March 25 valuation date in TSA's favor.

21.     A significant part of this difference is attributable to the rate environment on the valuation date, in addition to the spread assumptions. Illustratively, the 30-year Treasury Bond Yield on March 25, 2009 was 3.742% while the 30-year LIBOR swap 3.433%. These yields were significantly lower than historical averages. The lower yield increased TSA's loss.

**E.  Cost of Non-Performance**

22.     TSA has also incurred a loss due to Lehman's non-performance under the RFA from December 1, 2008 (securities delivery date, see Exhibit A) until March 25, 2009. Instead of the Guaranteed Rate on the RFA, TSA's reserve fund was only able to obtain a significantly lower rate of short-term Eligible Securities. Thus, instead of 4.484%, TSA's reserve fund earned 1.1874%, 0.64%, 0.48% and 0.20% for the months of December 2008 and January, February and March 2009, respectively. TSA's reserve fund should have earned $646,553.95 from December 1, 2008 until March 25, 2009 instead of the $93,473.93 that was actually earned. The difference of $553,080.02 is therefore added to the Loss amount of $46,437,610 resulting in total Loss of $46,990,690.02.

**[This space left intentionally blank]**

**WHEREFORE**, TSA requests that the Court (i) deny the Objection, with prejudice; (ii) allow the TSA Claim in its full amount and (iii) provide such other relief as is just.

Dated: October 19, 2011

>THE MICHAELSON LAW FIRM
>Robert N. Michaelson
>11 Broadway, Suite 615
>New York, New York 10004
>(p) (212) 604-0685
>(f) (800) 364-1291
>
>
>/s/ Robert N. Michaelson
>Robert N. Michaelson
>
>*Attorneys for the Washington State Tobacco Settlement Authority*