EXECUTION COPY

## **RESERVE FUND AGREEMENT**

This Reserve Fund Agreement (this "Agreement") dated as of November 5, 2002 by and among TOBACCO SETTLEMENT AUTHORITY, an independent public instrumentality of the State of Washington (the "Issuer"), U.S. BANK, N.A., a national banking association, as Trustee under the Indenture as defined herein (the "Trustee"), and LEHMAN BROTHERS SPECIAL FINANCING INC., a Delaware corporation ("Lehman").

SECTION I.     DEFINITIONS

For purposes of this Agreement, unless the context clearly indicates otherwise, the words and terms defined in this Section I have the respective meanings given to them herein:

"Bond Payment Date" means, with respect to each Deposit Date, each date identified as a "Bond Payment Date" on Exhibit A unless such date is not a Business Day, in which case "Bond Payment Date" means the immediately succeeding Business Day; *provided* that in determining whether any such date is a Business Day no effect shall be given to clause (c) or (d) of the definition of Business Day.

"Bonds" means $517,905,000 Tobacco Settlement Authority Tobacco Settlement Asset-Backed Bonds, Series 2002.

"Burdened Party" means, (i) in the case of (A) an Issuer Event of Default or a Trustee Event of Default or (B) a termination of this Agreement by the Issuer pursuant to Section 3.1 following a redemption, defeasance or refunding of the Bonds, Lehman and (ii) in the case of a Lehman Event of Default, the Issuer.

"Business Day" means any day other than (a) a Saturday or Sunday, (b) a day on which the principal corporate trust office of the Trustee is authorized or required by law to close, (c) a day on which banking institutions in the City of New York are authorized or required by law to close, or (d) a day on which any Qualified Securities which may be delivered hereunder are not subject to delivery in the City of New York.

"Closing Date" means November 5, 2002.

"Coupon Payment" means, for any Qualified Security, a payment of interest which is due to be paid thereon prior to the scheduled maturity of such Qualified Security.

"Dealer" means a leading dealer in the relevant markets selected by Lehman in good faith and reasonably acceptable to the Issuer (a) from among dealers of the highest credit standing which satisfy all the criteria that Lehman applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from such dealers having an office in the same city.

RFA: 413853L/413879L/413871L

1

EXECUTION COPY

"Debt Service Payment" means (i) a scheduled payment of maturing principal of or interest on the Bonds, including any such payment in connection with Sinking Fund Installments (as defined in the Indenture), but not including any such payment designated in the Indenture as a Turbo Redemption (as defined in the Indenture) and excluding any such payment in connection with any other redemption of the Bonds, other than a mandatory clean-up redemption described in Section 404(i) of the Indenture, or (ii) a payment of principal of or interest on the Bonds in connection with an Extraordinary Prepayment (as defined in the Indenture) following an event of default under the Indenture.

"Default Rate" means a per annum rate equal to the lesser of (a) Three Month LIBOR plus 1% per annum, or (b) the maximum rate permitted by law.

"Delivery Notice" means a notice substantially in the form of Exhibit E or in such other form as provided by the Qualified Dealer and is reasonably acceptable to the Trustee.

"Deposit Date" means each date identified as a "Deposit Date" on Exhibit A unless such date is not a Business Day, in which case "Deposit Date" means the immediately succeeding Business Day.

"Differential" means the amount, if any, by which the Purchase Price of any Qualified Security delivered hereunder exceeds the Market Value thereof.

"Eligible Securities" means non-callable and non-prepayable (a) direct obligations of the United States of America including only notes, bonds, bills or certificates of indebtedness, (b) senior debt and/or guaranteed mortgage pass-through obligations of the Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Government National Mortgage Association, any Federal Home Loan Bank, and the Federal Farm Credit System, or (c) commercial paper rated "P-1" by Moody's and "A-1+" by Standard & Poor's; provided that, at the time of delivery, any such commercial paper is not on negative credit watch and the issuer thereof is subject to U.S. law; additionally, if the maturity date of the commercial paper tendered is 100 days of more, the issuer thereof must have long-term debt ratings of at least "A1" by Moody's, "A+" by Standard & Poor's and "A" by Fitch.

"Fitch" means Fitch Ratings, Inc, its successors and assigns.

"Guaranteed Rate" means a rate per annum equal to 4.484% assuming that the interest on the applicable security was compounded semi-annually on the basis of a year of 360 days with twelve thirty day months.

"Illegality" means any event due to the adoption of, or any change in, any applicable law after the date on which this Agreement is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, upon which it becomes unlawful to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or

RFA: 413853L/413879L/413871L

EXECUTION COPY

delivery in respect of this Agreement or to comply with any other material provision of this Agreement.

"Incipient Illegality" means (a) the enactment by any legislative body with competent jurisdiction over the Issuer of legislation which, if adopted as law, would render unlawful (i) the performance by the Issuer of any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of this Agreement or the compliance by the Issuer with any other material provision of this Agreement or (ii) the performance by the Issuer of any contingent or other obligation which the Issuer relating to this Agreement, (b) any assertion in any proceeding, forum or action by the Issuer, in respect of the Issuer or in respect of any entity located or organized under the laws of the territory in which the Issuer is located to the effect that performance under this Agreement or similar agreements is unlawful or (c) the occurrence with respect to the Issuer of any event that constitutes an Illegality.

"Indenture" means the Indenture dated as of October 1, 2002 by and between the Issuer and the Trustee.

"Insolvent" means (i) either the Trustee or Lehman as the case may be, shall (1) commence a voluntary case under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter), (2) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, (3) consent to any petition filed against it in an involuntary case under such bankruptcy or insolvency or other laws, (4) apply for or consent to the appointment of, or the taking of possession by, a trustee, receiver, custodian, liquidator or the like for itself or for all or a substantial part of its property, (5) admit in writing its inability to pay, or generally not be paying, its debts as they come due, (6) make a general assignment for the benefit of creditors, or (7) take any official action for the purpose of effecting any of the foregoing; or (ii) a case or other proceeding shall be commenced against either the Trustee or Lehman, as the case may be, in any court of competent jurisdiction seeking (1) relief under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter) or under any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, or (2) the appointment of a trustee, receiver, custodian, liquidator or the like for the Trustee or Lehman, as the case may be, or for all or a substantial part of its property, and any such case or proceeding shall continue undismissed and unstayed for a period of 60 consecutive calendar days, or an order granting the relief requested in any such case or proceeding against such party shall be entered and shall remain in effect and unstayed for a period of 60 consecutive days.

"Issuer Event of Default" means the occurrence of an event specified in Section 7.2 hereof.

"LBH" means Lehman Brothers Holdings Inc., which wholly owns and unconditionally guarantees the obligations of Lehman, and which, as of the date of this Agreement, has long-term senior unsecured debt rated A2 by Moody's and A by Standard & Poor's.

"Lehman Cure Period" has the meaning specified in Section 7.3(a) hereof.

EXECUTION COPY

"Lehman Event of Default" means the occurrence of an event specified in Section 7.3 hereof.

"Mandatory Cleanup Call" means a mandatory redemption of the Bonds in whole equal to 100 percent of the principal amount being redeemed at any time that the available amounts on deposit in the Accounts (as defined in the Indenture) (other than the Rebate Account, the Operating Account, the Operating Contingency Account and the Costs of Issuance Account) exceed the aggregate principal amount of, and accrued interest on, the Bonds.

"Market Value" means with respect to any Qualified Security, the market value thereof (including accrued interest thereon) as specified by the Qualified Dealer delivering that Qualified Security, provided that the Market Value of any Qualified Security shall in no event exceed the lesser of the Maturity Amount thereof and the Purchase Price thereof.

"Maturity Amount" means, with respect to any Qualified Security, the amount, payable in cash, representing the principal and interest (including any Coupon Payments) due thereon on or prior to its maturity date.

"Moody's" means Moody's Investors Service, Inc, its successors and assigns.

"Purchase Price" means, for any Eligible Security delivered hereunder, that price for such Qualified Security, as set forth in the Delivery Notice, which will produce a rate of return on such Qualified Security for the period from (and including) the Deposit Date to (but excluding) the immediately succeeding Bond Payment Date equal to the Guaranteed Rate.

"Qualified Dealer" means Lehman Brothers Inc., its successors or assigns, or any other dealer in Eligible Securities selected by Lehman.

"Qualified Securities" means, for any Deposit Date or subsequent deposit date pursuant to Section 2.3 or 2.4, Eligible Securities which, to the extent available on the open market, (i) mature on or prior to the related Bond Payment Date and (ii) have an aggregate Purchase Price which is as close as possible to but does not exceed the related Scheduled Reserve Amount.

"Reserve Fund" means the account created pursuant to the Indenture and designated thereunder as the Liquidity Reserve Account.

"Scheduled Reserve Amount" means, for each Deposit Date, $45,534,106.25, assuming that (i) no withdrawals from the Reserve Fund have been made to make a Debt Service Payment and (ii) no Bonds will have been defeased or redeemed on or prior to such date except in connection with a scheduled sinking fund redemption; provided, however, such Scheduled Reserve Amount shall be amended with respect to this Agreement upon a withdrawal to make a Debt Service Payment or upon any replenishment of any such withdrawal.

"Specified Indebtedness" means any general obligation of the Issuer (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money in excess of $5,000,000.

"Standard & Poor's" means Standard & Poor's, a division of The McGraw-Hill Companies, its successors and assigns.

"Termination Amount" means an amount, as determined by the Burdened Party reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers of the amount, if any, that each such Dealer would require the Burdened Party to pay to the Dealer (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer) or would pay to the Burdened Party (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in consideration of such Dealer entering into an agreement with the Burdened Party (with such documentation as Lehman and the Dealer may in good faith agree) which would have the effect of preserving for the Burdened Party the economic equivalent of its rights under this Agreement for the period commencing on the termination date of this Agreement and terminating on the last Bond Payment Date set forth in Exhibit A (assuming for these purposes that this Agreement were not terminating on the termination date and continued in full force through such last Bond Payment Date); provided, however, that:

(i) if more than three quotations are provided, the Termination Amount will be the arithmetic mean of such quotations, without regard to the quotations having the highest and lowest values,

(ii) if exactly three quotations are provided, the Termination Amount will be the quotation remaining after disregarding the highest and lowest quotations,

for purposes of clauses (i) and (ii), if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded, and

(iii) if the Burdened Party is unable to obtain three such quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by the Burdened Party, to be the Burdened Party's total losses and costs (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer), or gains (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in connection with a termination of this Agreement, including any loss of bargain, cost of funding or, at the election of the Burdened Party but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position, and;

provided further, however, that in any event the Termination Amount shall also include (A) any unpaid amounts due as of the date of termination of this Agreement (including any amounts due under Section 7.7 hereof) and (B) if such Termination Amount is being paid in connection with a termination of this Agreement following an Event of Default or if any Termination Amount

otherwise due hereunder is not paid when due, the Termination Amount shall also include any incidental costs and expenses incurred by the Burdened Party in connection with such termination and the enforcement of its rights hereunder (including costs of collection and reasonable attorneys' fees). Any determination of the Termination Amount by the Burdened Party shall be conclusive and binding on the parties hereto absent manifest error.

"Three Month LIBOR" as of any date of determination means the rate for deposits in US dollars for a period of three months which appears on the Telerate Page 3750 as of 11:00 a.m., London time, on the day that is two Business Days before the day for which such determination is being made. If no such rate appears on the Telerate Page 3750 as of such date, Lehman may select another nationally recognized published source to determine Three Month LIBOR.

"Trustee Event of Default" means the occurrence of an event specified in Section 7.1 hereof.

SECTION II.        PURCHASE AGREEMENT

Section 2.1    Purchase and Sale of Qualified Securities.

(a)    Lehman shall cause a Qualified Dealer to deliver to the Trustee, on any Deposit Date, in accordance with the delivery requirements of Section 2.2 hereof, to the extent such securities are available on the open market, Qualified Securities selected by Lehman or the Qualified Dealer and shall be sold without recourse and free and clear of all liens, claims and encumbrances of Lehman or any Qualified Dealer or any third party.

(b)    If Lehman causes a Qualified Dealer to deliver Qualified Securities, the Trustee shall, out of funds available in the Reserve Fund, at the time of the delivery of such Qualified Securities, purchase such Qualified Securities and pay to the Qualified Dealer or Lehman, as applicable, in accordance with Section 2.2(b) hereof, an amount equal to the Purchase Price thereof.

Section 2.2    Delivery; Payment.

(a)    All Qualified Securities delivered hereunder shall be delivered to the Trustee to the account specified in Section 9.1 hereof or such other account designated by the Trustee in writing to Lehman from time to time, in such manner as at the time is generally acceptable for delivery of Qualified Securities. All Qualified Securities delivered hereunder shall be delivered to the Trustee on a "delivery versus payment" basis.

(b)    (i)    Lehman shall cause the Qualified Dealer to send a Delivery Notice to the Trustee at least one Business Day prior to the delivery of any Qualified Securities. The Trustee may conclusively rely on the Qualified Dealer's specification in the Delivery Notice of the Market Value, the Maturity Amount and the Purchase Price of a Qualified Security and any other information contained in the Delivery Notice.

(ii)     Concurrently with the delivery of any Qualified Securities, unless otherwise directed by Lehman in writing, the Trustee shall, subject to clause (iii) below, pay the Qualified Dealer delivering such Qualified Securities, in its individual capacity, the Market Value thereof, and to the Qualified Dealer as agent for Lehman, the Differential, if any.

(iii)    Lehman may in the Delivery Notice, direct the Trustee to pay (A) to the Qualified Dealer, the Market Value of any Qualified Securities delivered to the Trustee hereunder, and (B) to Lehman, the Differential, if any. Any such payment to Lehman shall be at Lehman's account as set forth in the Delivery Notice.

(iv)    All payments to be made hereunder shall be made in immediately available funds by means of a bank or Federal funds wire.

Section 2.3    Subsequent Deliveries.    If any Qualified Securities delivered by a Qualified Dealer pursuant to Section 2.1 hereof (a) mature prior to the Bond Payment Date for which such Qualified Securities were delivered, or (b) have a Coupon Payment, Lehman shall have the right, upon at least two Business Days prior written notice to the Trustee in the form of the Delivery Notice, to cause a Qualified Dealer to deliver to the Trustee, at any time on or after the maturity date of such Qualified Securities (or, as applicable, on or after the interest payment date of such Coupon Payment) but prior to the date which is one Business Day before such Bond Payment Date, other Qualified Securities, provided that such additional Qualified Securities shall be delivered to the Trustee so that the purchase price of such Qualified Securities shall equal the Maturity Amount (at a zero yield) and the Maturity Amount thereof does not exceed the Maturity Amount of the securities which have so matured (or as applicable, the amount of the Coupon Payment) and such deliveries may occur no more frequently than twice in any six month period ending on a Bond Payment Date. Any such deliveries by the Qualified Dealer shall conform to the requirements of Section 2.2(a) and (b) hereof. Upon the delivery by the Qualified Dealer of such Qualified Securities, the Trustee shall pay the purchase price thereof in the manner required by Section 2.2(b)(ii) hereof. Neither Lehman nor any Qualified Dealer shall have any right of substitution of any Qualified Securities previously delivered and sold to the Trustee in connection with this Agreement.

Section 2.4    Late Delivery; Failure to Deliver.

(a)     If Lehman fails to cause a Qualified Dealer to deliver Qualified Securities as required hereunder by 4:30 p.m. New York City time on any Deposit Date or during the Lehman Cure Period, the Trustee shall, on each such date, invest the related Scheduled Reserve Amount on an overnight basis in Eligible Investments (as defined in the Indenture) and if Lehman's failure continues beyond the Lehman Cure Period, the Trustee, to the extent directed by the Issuer pursuant to the Indenture, shall invest the related Scheduled Reserve Amount in Permitted Investments with the longest possible maturities, provided such maturities are not later than the related Bond Payment Date.

EXECUTION COPY

(b)  Except as provided in Sections 7.3 and 7.6 hereof, no failure on Lehman's part to cause a Qualified Dealer to deliver Qualified Securities hereunder shall terminate or affect Lehman's right to cause future sales of Qualified Securities in accordance with this Agreement.

Section 2.5   Notice of Withdrawal from Reserve Fund; Replenishment.

(a)  If at any time the Trustee is required under the Indenture to withdraw any investments or other amounts from the Reserve Fund (including any Qualified Securities) to make a Debt Service Payment, the Trustee shall promptly give oral and written notice thereof to Lehman and shall in such notice specify (i) the amount or investments which are to be withdrawn and (ii) the amount which will be in the Reserve Fund after giving effect to such withdrawal.

(b)  If, following the Trustee's withdrawal of funds from the Reserve Fund pursuant to Section 2.5(a) hereof, within one (1) year of such withdrawal, (i) sufficient funds are deposited into the Reserve Fund to permit the purchase of Qualified Securities hereunder in the amount of such withdrawal or (ii) the Issuer has notified the Trustee in writing (with a copy to Lehman) that it intends, in compliance with the Indenture, to deposit sufficient funds in the Reserve Fund to replenish the Reserve Fund, then the Trustee shall, within two Business Days of such replenishment of the Reserve Fund, give oral and written notice (a "Reserve Fund Replenishment Notice") to Lehman stating (A) the amount of funds which have been or will be deposited into the Reserve Fund and (B) the date(s) or expected date(s) of such deposit(s). If the Trustee has so delivered a Reserve Fund Replenishment Notice to Lehman, then by no later than the Business Day after delivery thereof, the Trustee shall purchase any Qualified Securities (at the Guaranteed Rate) in the amount stated in the Reserve Fund Replenishment Notice duly tendered by the Qualified Dealer in accordance with Section 2.2 hereof. In the event the Issuer fails to replenish the Reserve Fund within one year of a withdrawal and in accordance with the requirements of the Indenture, Lehman shall have the right to either accept such replenishment amount and deliver Qualified Securities to the Trustee in accordance with Section 2.2 hereof or terminate that portion of the Reserve Fund withdrawn to make a Debt Service Payment with no Termination Amount being due from any party hereto.

Section 2.6   Direction by Issuer to Trustee.  The Issuer hereby irrevocably instructs the Trustee and the Trustee agrees to take the actions and to make the purchases required hereby.

Section 2.7   LBH Downgrade.

(a)  If during the term of this Agreement the long-term senior unsecured debt ratings of LBH are suspended, withdrawn or fall below "A3" by Moody's or "A-" by Standard & Poor's (in any such case, a "Lehman Downgrade"), Lehman shall provide written notice to the Issuer and the Trustee within five Business Days of such Lehman Downgrade.

(b)  Upon receipt of the written notice from Lehman of such Lehman Downgrade, the Issuer shall have the right, but not the obligation, to require Lehman within ten Business Days of Lehman's receipt of written notice from the Issuer to:

RFA: 413853L/413879L/413871L

8