Robert N. Michaelson
The Michaelson Law Firm
11 Broadway, Suite 615
New York, New York 10004
Tel: 212.604.0685
Fax: 800.364.1291

Hearing Date: October 27, 2011
Hearing Time: 10:00 a.m.

**Claims 3373 and 3374**

*Attorney for Henry Morgan Lawrence III and
Nicole S. Lawrence*

**UNITED STATES BANKRUPTCY COURT
SOUNTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
In re

LEHMAN BROTHERS HOLDINGS INC., et al.,

                        Debtors.

-----------------------------------------------------------------X

Chapter 11

Case No. 08-13555 (JMP)

(Jointly Administered)

**AMENDED JOINT RESPONSE OF HENRY MORGAN LAWRENCE III
AND NICOLE S. LAWRENCE TO DEBTORS' ONE HUNDRED
EIGHTEENTH AND ONE HUNDRED THIRTIETH OMNIBUS
OBJECTIONS TO CLAIMS (TO RECLASSIFY PROOFS OF CLAIM
AS EQUITY INTERESTS) RE: CLAIMS 3373 AND 3374**

**TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:**

Henry Morgan Lawrence III and Nicole S. Lawrence (together, "<u>Claimants</u>")[1] by their undersigned counsel, hereby respond to Debtors' 118th and 130th Omnibus Objection to Claims (To Reclassify Claims as Equity Interests) (the "<u>Objections</u>"). In support thereof, Claimants respectfully state as follows:

---

[1] Claimants are husband and wife.

{00002062v2 }

**Preliminary Statement**

1.      Lehman Brothers Holdings Inc. ("LBHI") and its affiliates object to Claim No. 3374 of Mr. Morgan and Claim No. 3373 or Mrs. Morgan on the grounds that Claimants' claims are based on either restricted stock units, contingent stock awards, stock options, or other equity related compensation, both distributed and not distributed, and vested and unvested, the ownership of which constitutes equity interests in a debtor but do not constitute a claims against a debtor's estate. LBHI bases its objections on an overly broad interpretation of Section 510(b) of the United States Bankruptcy Code that does not apply in this case.

2.      Claimants are former employees of LBHI. Mr. Morgan was a Senior Vice President and Mrs. Morgan was a Vice President in Fixed Income Sales.

3.      At the commencement of their employment by LBHI Claimants received cash commissions in accordance with standard industry practice. In 2005 LBHI amended its compensation structure and forced its commission based employees to receive wages partially in Restricted Stock Units ("RSU") (the "RSU Plan") which had a five year cliff vesting period. At first, the percentage of earnings that LBHI forced its employees to receive in RSUs was approximately 10% of the total commission earned. However, over the course of the next several years LBHI unilaterally increased that percentage to approximately 60%.

4.      The RSU Plan forced employees, against their will, to receive deferred non-taxable income. Employees did not any the rights in RSUs that typically run with a purchase of stock because LBHI did have to issue any stock until the end of the five year cliff vesting period.  Thus, an employee only received rights to a future distribution of stock in lieu of already earned commissions. Making made matters even worse, employees had no choice but to accept this arrangement if they wanted to remain employed by LBHI. Employees who chose to leave LBHI forfeited the entire

unvested portion of RSUs allocated to them. Thus, employees who received RSU's instead of cash compensation were tied to LBHI by "golden handcuffs". In addition, LBHI kept changing the RSU Plan rules as time went on. At one point LBHI announced that it would buy the RSUs back but it never kept its promise.

5. Following the commencement of the LBHI Chapter 11 proceeding, Mr. Lawrence filed Claim No. 3374 in the amount of $2,843,574.67 consisting of unpaid compensation relating to unvested RSUs in the amount of $2,510,120 and unpaid compensation in the amount of $333,454.67 relating to unpaid compensation earned in 2008 that was never contributed to the RSU Plan and Mrs. Lawrence Claim No. 3373 in the amount of $354,008.53 consisting of unpaid compensation relating to unvested RSUs in the amount of $321,210 and unpaid compensation in the amount of $32,798.53 relating to unpaid compensation earned in 2008 that was never contributed to the RSU Plan

### Claimants' Claims and Reason They Should be Allowed as General Unsecured Claims

6. As just noted, Claimants' claims each consist of two parts. One part is based on withheld compensation actually contributed to the RSU Plan but which falls outside the scope and intent of the Section 510(b) restrictions. The other consists of withheld compensation that was never contributed to the RSU Plan and, therefore, is simply a claim for unpaid wages that does not require any interpretation or application of Section 510(b). For the reasons stated below, both portions of these distinct claims should be allowed in their entirety as general unsecured claims.

A. **RSU Plan Contributions**

7. A total of $2,510,120.00 of was unilaterally withheld from Mr. Lawrence in lieu of cash compensation and $321,210 was unilaterally from Mrs. Lawrence in lieu of cash

{00002062v2 }                                                   3

compensation and contributed to the RSU Plan. However, these funds were never invested in actual LBHI shares and no shares for were ever delivered to Claimants.

8. Section 101(15) of the Bankruptcy Code defines "equity security" either as:

> (A) share in a corporation, whether or not transferable or denominated "stock", or similar security (This definition clearly does not apply since no shares were issued or transferred.) or
>
> (B) interest of a limited partner in a limited partnership;  or
>
> (C) warrant or right, other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of kind specified in subparagraph (A) or (B) of this paragraph."

9. The unissued non-vested RSUs do not fall within a definition of a security in Section 101(15) because Claimants did not have any rights to purchase or sell or subscribe to LBHI stock. They had no rights that typically run with the ownership of an equity security.

10. Relying on a broad interpretation of section 510(b) and In re Enron Corp., 341 B.R. 141 (Bankr. S.D.N.Y. 2006), the Debtors assume that the unissued and non-vested RSUs constitute equity interests. In Enron, however, the Court expressly noted that its ruling was limited to the facts of that case. Enron, 341 B.R. at 144 fn.3 ("The Court notes that its conclusions apply only to stock options similar to those presented here. The Court issues no opinion as to whether stock options might be designed in such fashion that would result in different treatment under section 510(b)."). Unlike this case, Enron involved stock options which Enron employees were free to, but chose not to, exercise before filing of the petition. Enron, 341 B.R. at 151-52.

11. RSUs are substantially different from stock options in that prior to vesting the employee owns nothing and has no right to exercise anything. As of the grant date, the employee is

only promised the value of RSUs as of that date in exchange for the performance of an employee's responsibilities. Thus, Claimants could only become equity holders if, and only if, RSUs vested and, therefore, no "purchase" occurred.

12. Debtors essentially held RSUs in escrow until the vesting point, at which time the shares were transferred to a different account controlled by the employees. Claimants were not equity holders within the meaning of Section 101(15) and their claims should not be subordinated because they had no control over the RSUs prior to the vesting point. See In re Motels of America, Inc., 146 B.R. 542, 544 (Bankr. D. Del. 1992).

13. Debtors' reliance on the "phantom stock" portion of the Enron decision is also unavailing. In Enron deferred stock was vested before the filing of the bankruptcy petition and the purchasers had a right to physical possession of the shares. Enron, 341 B.R. at 162-63.

14. By contrast, Claimants were not able to exercise any rights with respect to the RSUs prior to Debtors' bankruptcy filing. Therefore, this case presents a fundamentally different set of facts. Thus, Claimants, as former employees, must be regarded as "creditors," rather than "investors", and, therefore, their claims are not subject to subordination as they would if they were for damages arising from purchase of stock. The LBHI Prospectus( the "Prospectus") (copy of which is annexed hereto as Exhibit A) states: "The plan is intended to constitute an "unfunded" plan for long –term incentive compensation. With respect to any payments not yet made to a participant, including any Participant - Optionee, by the company, nothing here in contained shall give any Participant any rights that are greater than those of a general creditor of the Company. "No Participant shall have any of the rights of a shareholder of the Company with respect to shares of

Common Stock subject to an Award until the delivery of such shares of Common Stock'. (Prospectus at p.11).

15. The plain language of the Prospectus contradicts the rational for LBHI's objection. The clause "nothing here in contained shall give any Participant any rights that are greater than those of a general creditor" implies that the drafter's intent was to restrict the rights of a Participant to rights that do not exceed the rights of a general creditor. However, at the same time it does not subordinate the status of a Participant to a general creditor. Rather, it clearly allows a Participant to have rights at least equal to those of a general unsecured creditor.

16. Accordingly, Claimants' claims are not equity claims. Claimants' claims are more akin to that of a creditor than an investor and subordinating those claims as "arising from the purchase or sale" of stock would not serve the underlying purposes of subordination under Section 510(b). The Claimants' compensation was not to be valued on the basis of the Debtors' share price at the time of earnings, because they had already earned a set amount of dollars but were issued RSUs of uncertain future value instead. The past service gave rise to a matured right to payment with a payment simply deferred to later date. Claimants did not pursue greater profits as shareholders nor did they ever become shareholders according to LBHI's Prospectus.

17. Finally, the unilateral terms of the agreement between LBHI and its employees to participate in the stock plan were unconscionable. The Prospectus states that: "The Committee shall have the full and exclusive power and authority to make, and establish the terms and conditions of, any Award to any person eligible to be a Participant, or waive any such terms and conditions at any time. [T]he Committee shall be entitled, among other things, to make non-uniform and selective determinations under Award agreements, and to enter into non-uniform and selective Award

agreements, as to (i) the persons to receive Awards, (ii) the terms and provisions of Awards, (iii) whether a Participant's employment has been terminated for purposes of the Plan and (iv) any adjustments made to Awards. This clause clearly illustrates that no participant had any control over anything that related to issuance or control of stock. This scheme was imposed upon employees against their will. The employees had no power to decide how to spend their own paycheck.

### B. Claims for Unpaid Wages

18.     The funds allocated to the RSU Plan normally entered the RSU Plan on December 1st of each year as compensation waiting to be deferred.

19.     However, in 2008 $333,454.67 of compensation attributable to Mr. Morgan and $32,798.53 of compensation attributable to Mrs. Morgan that was supposed to be contributed to the RSU Plan simply "disappeared" and is unaccounted for. Accordingly, these portions of Claimants' claims are plainly outside the scope of Section 510(b) and must be treated as general unsecured claims.

**WHEREFORE**, Claimants respectfully request the entry of order (i) dismissing the Objections, with prejudice; (ii) and allowing the Claims, in their entirety, as general unsecured claims; and (iii) providing for such other relief as this Court deems just.

Dated: New York, New York
October 20, 2011

                                                The Michaelson Law Firm
11 Broadway, Suite 615
New York, New York 10004
Tel: 212.604.0685
Fax: 800.364.1291

By: /s/ _____
      Robert N. Michaelson

*Attorney for Henry Morgan Lawrence III and Nicole S. Lawrence*