# EXHIBIT B

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)          0000022062

| In Re: Lehman Brothers Holdings Inc., et al. Debtors. | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held Lehman Brothers Holdings Inc. et al. | Case No of Debtor Chap. 11 #08-13555 (JMP) |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Whittier Long/Short Fund LLC
1600 Huntington Drive
South Pasadena, CA 91030

Telephone number: (626) 463-2640    Email Address: vdosti@whittiertrust.com

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** _____
(If known)

Filed on: _____

Name and address where payment should be sent (if different from above)

Telephone number: _____    Email Address: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1. **Amount of Claim as of Date Case Filed:** $ 1,003,183.00

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** kick-in reverse convertible notes on Dean Foods due September 2008
(See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** _____
   3a. **Debtor may have scheduled account as:** _____
   (See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate  ☐ Motor Vehicle  ☐ Other

Describe: _____

Value of Property: $_____ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____

Amount of Secured Claim: $_____ Amount Unsecured: $_____

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

Amount entitled to priority:

$_____

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

FOR COURT USE ONLY

**FILED / RECEIVED**

SEP 21 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

Date: | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. Vincent Dosti, VP-Director of Research

9/15/09

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

**Items to be completed in Proof of Claim form**

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9)**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

## _____DEFINITIONS_____

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:
**Lehman Brothers Holdings Claims Processing**
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150- 5076

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

**Lehman Programs Securities**
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on http://www.lehman-docket.com as of July 27, 2009.

## _____INFORMATION_____

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

## LEHMAN BROTHERS REVERSE CONVERTIBLE CALCULATION

Lehman Brothers Holdings Inc

| | Issue date | | Maturity | As of Date of Filing |
|---|---|---|---|---|
| Motorola Inc 8.20% Rev/conv<br>Market Value | 3/28/2008<br>$2,000,000 | six months at 4.10% | 9/28/2008<br>$2,082,000 | $2,076,078 |
| Motoral Inc 7.95% Rev/conv | 3/28/2008<br>$1,000,000 | six months at 3.98% | 9/28/2008<br>$1,039,800 | $1,036,926 |
| Dean Foods 6.85% Rev/conv | 3/28/2008<br>$1,000,000 | six months at 3.43% | 9/28/2008<br>$1,003,430 | $1,003,183 |
| Form Factor Inc 11%  Rev/con | 4/8/2008<br>$1,000,000 | six months at 5.5% | 10/9/2008<br>$1,005,500 | $1,004,767 |
| Office Depot 8.48 Rev/con | 4/2/2008<br>$1,000,000 | six months at 4.24% | 10/3/2008<br>$1,004,240 | $1,003,816 |

**TOTAL AMOUNT:**                                                                                    **$6,124,770.000**

NOTES:

Value at maturity is calculated by adding interest rate securities would have earned.

.

 **Jefferies**     ORIGINAL     **Jefferies & Company, Inc.**
520 Madison Avenue, 12th Floor
New York, New York 10022-4213
*tel* 212.284.2300



We are pleased to confirm the following transactions –
Processed on: 03/31/08

ACCOUNT NAME:    **WHITTIER LONG SHORT FUND LLC**
                        **C/O WHITTIER TRUST COMPANY**
ACCOUNT NUMBER: **431-00161**

| Symbol | Cusip/ Security | Action | Acct Type | Quantity | Price | Trade Date | Settle Date |
|---|---|---|---|---|---|---|---|
|  | 524935AF0 | BUY | MARGIN | 1,000,000 | $100 | 03/19/08 | 04/02/08 |
|  | 5BCXSR8 |  |  |  |  |  |  |

LEHMAN BROTHERS HOLDINGS INC REV CONV LKD TO OFFICE DEPOT
INC
10/03/2008    MATURITY DATE
04/02/08    DATED DATE
AS OF 03/19/08
EXECUTED THRU LEHM
 0.00%  COUPON RATE.
NOT RATED BY MOODY'S/S&P

|  |  |
|---|---|
| PRINCIPAL | $1,000,000.00 |
| SERVICE CHG | $10.00 |
| NET AMOUNT | $1,000,010.00 |

Tag#: A5910

Market/Capacity: 11                          AE# PB2

This confirmation shall be deemed correct in all respects unless written notice of any inaccuracy is sent to our Compliance Department.

032 002188 PZBA 000003 000632 000000007         C MSP1 AFPPRINT 03/31/08;21:37 V001

ORIGINAL

We are pleased to confirm the following transactions -
Processed on: 03/31/08

ACCOUNT NAME:   WHITTIER LONG SHORT FUND LLC
C/O WHITTIER TRUST COMPANY
ACCOUNT NUMBER: 431-00161

| Symbol | Cusip/ Security | Action | Acct Type | Quantity | Price | Trade Date | Settle Date |
|---|---|---|---|---|---|---|---|
| SPY | 78462F103 S690540 | BUY | MARGIN | 150 | $131.8367 | 03/31/08 | 04/03/08 |

STANDARD & POORS DEPOSITORY RECEIPTS (SPDRS) (BOOK ENTRY)
UNITS UNDIVIDED BENEFICIAL INT
AVG PRICE SHOWN-DETAILS ON REQ
PROSPECTUS ON INITIAL PURCHASE
EXECUTED THRU JETS

PRINCIPAL $19,775.51
COMMISSION $2.25
NET AMOUNT $19,777.76

Tag#: A4685
Market/Capacity: 13                          AE# PB2

| TIBX | 88632Q103 T005734 | SELL | MARGIN | 6,000 | $7.18 | 03/31/08 | 04/03/08 |

TIBCO SOFTWARE INC
WE MAKE A MKT IN THIS SECURITY
AVG PRICE SHOWN-DETAILS ON REQ
EXECUTED THRU JETS

PRINCIPAL $43,080.00
COMMISSION $90.00
FEE $0.48
NET AMOUNT $42,989.52

Tag#: A4705
Market/Capacity: 13                          AE# PB2

| | 524935AD5 5BCXQG9 | BUY | MARGIN | 2,000,000 | $100 | 03/14/08 | 03/28/08 |

LEHMAN BROTHERS HOLDINGS INC MOT K/I REV CONV NTS
DUE 9/28/2008
09/28/2008   MATURITY DATE
03/28/08    DATED DATE
AS OF 03/14/08
EXECUTED THRU LEHM
0.00%  COUPON RATE.
YIELD COMPUTED TO 03/28/08
NOT RATED BY MOODY'S/S&P

PRINCIPAL $2,000,000.00
SERVICE CHG $10.00
NET AMOUNT $2,000,010.00

Tag#: A6713
Market/Capacity: 11                          AE# PB2

| | 524935AE3 5BCXQM2 | BUY | MARGIN | 1,000,000 | $100 | 03/14/08 | 03/28/08 |

LEHMAN BROTHERS HOLDINGS INC DF K/I REV CONV NTS
DUE 9/28/2008
09/28/2008   MATURITY DATE
03/28/08    DATED DATE
AS OF 03/14/08
EXECUTED THRU LEHM
0.00%  COUPON RATE.
YIELD COMPUTED TO 03/28/08
NOT RATED BY MOODY'S/S&P

PRINCIPAL $1,000,000.00
SERVICE CHG $10.00
NET AMOUNT $1,000,010.00

Tag#: A6715
Market/Capacity: 11                          AE# PB2

This confirmation shall be deemed correct in all respects unless written notice of any inaccuracy is sent to our Compliance Department.

Page 4 of 5

032 002187  PZBA  000003 000632 000000007        C MSP1 AFPPRINT 03/31/08;21:37 V001

ORIGINAL

We are pleased to confirm the following transactions -
Processed on: 04/14/08

ACCOUNT NAME:    WHITTIER LONG SHORT FUND LLC
C/O WHITTIER TRUST COMPANY
ACCOUNT NUMBER: 431-00161

| Symbol | Cusip/ Security | Action | Acct Type | Quantity | Price | Trade Date | Settle Date |
|--------|-----------------|--------|-----------|----------|-------|------------|-------------|
| TRN | 896522109 T634308 | BUY | MARGIN | 1,600 | $24.6031 | 04/14/08 | 04/17/08 |

TRINITY INDUSTRIES INC
AVG PRICE SHOWN-DETAILS ON REQ
EXECUTED THRU JETS

| | | | | | | PRINCIPAL | $39,364.96 |
| | | | | | | COMMISSION | $24.00 |
| | | | | | | NET AMOUNT | $39,388.96 |

Tag#: A2905
Market/Capacity: 13                                        AE# PB2

| | 5249085W6 5BCVZV9 | BUY | MARGIN | 1,000,000 | $100 | 04/01/08 | 04/15/08 |

LEHMAN BROS HLDGS INC REV CONV NOTES ON MOT
DUE 10/15/2008
DUE 10/15/2008
INTEREST PAYS AT MATURITY
04/15/08    DATED DATE
AS OF 04/01/08
EXECUTED THRU LEHM
MOODY RATG A1   S&P RATG A+
VARIABLE RATE

| | | | | | | PRINCIPAL | $1,000,000.00 |
| | | | | | | SERVICE CHG | $10.00 |
| | | | | | | NET AMOUNT | $1,000,010.00 |

Tag#: A6556
Market/Capacity: 11                                        AE# PB2

This confirmation shall be deemed correct in all respects unless written notice of any inaccuracy is sent to our Compliance Department.

032 002251 PZBA 000002 000646 000000004          C MSP1 AFPPRINT 04/14/08;23:58 V001

# Jefferies 

ORIGINAL

**Jefferies & Company, Inc.**
520 Madison Avenue, 12th Floor
New York, New York 10022-4213
*tel* 212.284.2300



We are pleased to confirm the following transactions -
Processed on: 04/08/08

ACCOUNT NAME:    WHITTIER LONG SHORT FUND LLC
C/O WHITTIER TRUST COMPANY
ACCOUNT NUMBER: 431-00161

| Symbol | Cusip/ Security | Action | Acct Type | Quantity | Price | Trade Date | Settle Date |
|--------|-----------------|--------|-----------|----------|-------|------------|-------------|
| | 524935AH6 | BUY | MARGIN | 1,000,000 | $100 | 03/25/08 | 04/08/08 |
| | 5BCZGW1 | | | | | | |

LEHMAN BROS HLDGS INC REV CONV LKD TO FORMFACTOR INC
DUE 10/09/2008   11.000%
INTEREST DATES APR, OCT 09
04/08/08    DATED DATE
AS OF 03/25/08
EXECUTED THRU LEHM
YIELD  11.000 % TO MATURITY
NOT RATED BY MOODY'S/S&P

|  | |
|--|--|
| PRINCIPAL | $1,000,000.00 |
| SERVICE CHG | $10.00 |
| NET AMOUNT | $1,000,010.00 |

Tag#: A4669
Market/Capacity: 11                                         AE# PB2

| Symbol | Cusip/ Security | Action | Acct Type | Quantity | Price | Trade Date | Settle Date |
|--------|-----------------|--------|-----------|----------|-------|------------|-------------|
| QQBEEA | 0897509E5 | BUY | MARGIN | 10 | $1.25 | 04/08/08 | 04/09/08 |
| | 8H39722 | | | | | | |

CALL BIGBAND NETW MAY 005 CBOE
05/17/2008   EXPIRATION DATE
EXECUTED THRU JETS

|  | |
|--|--|
| PRINCIPAL | $1,250.00 |
| COMMISSION | $15.00 |
| NET AMOUNT | $1,265.00 |

Tag#: A3693
Market/Capacity: Z57                                        AE# PB2

This confirmation shall be deemed correct in all respects unless written notice of any inaccuracy is sent to our Compliance Department.

032 002090  PZBA  000003 000678 000000007          C MSP1 AFPPRINT 04/08/08;21:35 V001



# 6-Months Kick-In Reverse Convertible Notes

**Lehman Brothers**
745 Seventh Ave.
New York, NY 10019
www.lehman.com

### Kick-In Reverse Convertible Notes on Dean Foods Company (**DF**) 6.85%

---
**Indicative Terms and Conditions as of March 14, 2008**
---

Client Signature:

_____

Order Size (USD):

_____

William Levy
212-526-6759
wlevy@lehman.com

Gary Nathanson
212-526-0905
gary.nathanson@lehman.com

| | |
|---|---|
| **Issuer** | Lehman Brothers Holdings Inc. |
| **Guarantor** | Not Applicable |
| **Arranger** | Lehman Brothers International (Europe) |
| **Dealer** | Lehman Brothers Inc. |
| **Aggregate Nominal Amount** | USD TBD |
| **Specified Denomination** | USD 1,000 |
| **Issue Type** | Equity-Linked Euro Medium Term Note |
| **Issue Price** | 100.00% of the Aggregated Nominal Amount |
| **Trade Date** | March 14, 2008 |
| **Issue / Settlement Date** | March 28, 2008 |
| **Valuation Date** | September 14, 2008 |
| **Maturity Date** | September 28, 2008 |
| **Scheduled Trading Day** | Any day on which the Exchange and each Related Exchange are scheduled to be open for trading for their respective regular trading sessions. |
| **Underlying** | Shares of Dean Foods Company (Bloomberg: DF US) (the "Share") |
| **Exchange** | The principal exchange or quotation system for trading the Shares as the Calculation Agent shall determine in its sole and absolute discretion from time to time; currently, the New York Stock Exchange. |
| **Related Exchange** | Any exchange or quotation system (including any substitute or temporary exchange or quotation system) on which futures contracts and/or options contracts on the Shares are traded and any exchange or quotation system where trading has a material effect (as determined by the Calculation Agent) on the overall market for futures or options contracts relating to such Shares; |



**Lehman Brothers**
745 Seventh Ave.
New York, NY 10019
www.lehman.com

Client Signature:

_____

Order Size (USD):

_____

William Levy
212-526-6759
wlevy@lehman.com

Gary Nathanson
212-526-0905
gary.nathanson@lehman.com

| | |
|---|---|
| **Strike Price** | USD TBD (will be equal to the volume-weighted average price per Share than an affiliate of the Issuer will pay to hedge the Issuer's obligations under the Notes plus 2 cents) |
| **Kick-In Strike** | USD TBD (60% of the Strike Price) |
| **Number of Shares per Specified Denomination** | TBD Shares (Equal to the Specified Denomination/Strike Price) |
| **Closing Price** | In respect of a Scheduled Trading Day, the official closing price of a Share on the Exchange. |
| **Kick-In Event** | Means an event as determined by the Calculation Agent where the Closing Price on any Scheduled Trading Day, as determined by the Calculation Agent pursuant to the terms set forth in the Documentation, during the Observation Period is less than the Kick-In Strike. |
| **Observation Period** | Any Scheduled Trading Day during the period from but excluding, the Trade Date, to and including, the Valuation Date. |
| **Redemption Amount** | The Issuer shall pay or deliver to the holder of the Notes on the Maturity Date an amount as determined by the Calculation Agent on the Valuation Date in accordance with the following: |

**Either (A):**

If a Kick-In Event has **NOT** occurred or deemed not to have occurred as determined by the Calculation Agent, an amount equal to 100% of the Specified Denomination in cash plus USD 68.50 per Specified Denomination;

**Or (B):**

If a Kick-In Event has occurred:

(1)  If the Closing Price on the Valuation Date is **greater than or equal to** the Strike Price, an amount equal to 100% of the Specified Denomination in cash plus USD 68.50 per Specified Denomination; or

(2)  If the Closing Price on the Valuation Date is less than the Strike Price, a number of Shares equal to the Number of Shares per Specified Denomination, adjusted as necessary by the Calculation Agent; plus USD 68.50 per Specified Denomination. In the event that the Number of Shares is not a whole number of Shares, such number shall be rounded down to the nearest number of whole Shares and the Issuer shall pay a USD cash amount equal to the value of the residual fraction of a Share as determined by the Calculation Agent.

| | |
|---|---|
| **Business Day Convention** | The Maturity Date is subject to adjustment in accordance with Following Business Day Convention |
| **Calculation Agent** | Lehman Brothers Inc. |
| **Market Disruption, Adjustments and** | Detailed provisions specifying the adjustments to be made to the terms and conditions of the Notes upon the |

LEHMAN BROTHERS



| | **Extraordinary Events** | occurrence of a market disruption event, potential adjustment event, merger event, tender offer, nationalization, insolvency, delisting and/or such other similar adjustment or extraordinary event shall be contained in the documentation (including any applicable Preliminary Final Terms or Final Terms) relating to the Notes. All purchases of Notes are deemed to be subject to the terms thereof. |

**Lehman Brothers**
745 Seventh Ave.
New York, NY 10019
www.lehman.com

| | **Minimum Trading Size** | 10 Notes |

**Selling Restrictions**

The Notes have not and will not be registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"). The Notes are being offered only to qualified institutional buyers pursuant to Rule 144A under the Securities Act. Any offer, sale or transfer of the Notes must be made in compliance with the Securities Act and other applicable law of the states, territories and possessions of the United States governing the offer and sale of securities and only (i) to the Issuer (upon redemption or repurchase of the Notes or otherwise); (ii) outside of the United States in a transaction exempt from the registration requirements of the Securities Act pursuant to Rule 904 of Regulation S; (iii) pursuant to and in accordance with Rule 144A to an institutional investor that the holder reasonably believes is a qualified institutional buyer within the meaning of Rule 144A purchasing for its own account or for the account of a qualified institutional buyer whom it has informed, in each case, that the offer, resale or other transfer is being made in reliance on Rule 144A; (iv) to the Dealer; or (v) if available, pursuant to exemption from registration under the Securities Act provided by Rule 144 there under.

Client Signature:

_____

Order Size (USD):

_____

William Levy
212-526-6759
wlevy@lehman.com

Gary Nathanson
212-526-0905
gary.nathanson@lehman.com

**Documentation**

This term sheet must be read in conjunction with the Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG US$100,000,000,000 EMTN Note Programme Program Prospectus dated 24 July 2007, as supplemented by the Base Prospectus Supplement dated September 20, 2007, October 15, 2007, December 17, 2007,February 5, 2008, February 11, 2008 and February 27, 2008 which together constitutes the Base Prospectus, as well as the corresponding Preliminary Final Terms and the Final Terms for this specific issue of Notes.

**Governing Law** — English (the Guarantee is governed by New York law)

**Clearing** — DTC

**Listing** — None

**Security Identifiers**

| | Telekurs | ISIN | Common Code |
|---|---|---|---|
| | | | |

**By purchasing these Notes the purchaser represents and warrants to the Issuer, the Guarantor, Lehman Brothers Inc. and Lehman Brothers International (Europe) that it, (i) is not an affiliate (as defined under the U.S. Securities Act of 1933) of the issuer of**

LEHMAN BROTHERS



**the Shares (the "Underlying Issuer") and (ii) has not involved the Underlying Issuer
or an affiliate of the Underlying Issuer in any offer or sale of the Notes.**

**Disclaimer:**

This term sheet is indicative only if so specified in which case this term sheet will be subject to change without notice and no
assurance is given that any transaction on the terms indicated can or will be arranged or agreed. Information other than economic
terms (including market data and statistical information) has been obtained from various sources we consider reliable but we do not
represent that it is complete or accurate and it should not be relied upon as such. Any analysis presented herein that indicates a
range of outcomes that may result from changes in market parameters is not comprehensive, is not intended to suggest that any
outcome is more likely than another and may have been derived using Lehman Brothers proprietary models, historic data and
subjective interpretation. This term sheet does not constitute an offer or an agreement, or a solicitation of an offer or an agreement,
to enter into any transaction. This term sheet must be read in conjunction with the Documentation. This term sheet supersedes any
prior versions hereof and if this term sheet is indicative will be deemed to be superseded by any subsequent versions hereof and,
with respect to any transaction described therein, by the Documentation relating thereto. Notes described in this term sheet with
embedded derivatives contain complex financial characteristics and may create additional risks and exposures. Before investing in
any Notes, you should consider the suitability of the investment in light of your particular financial circumstances and independently
review (with your professional advisers as necessary) the (i) specific financial risks as well as the legal, regulatory, credit, tax and
accounting consequences of an investment in the Notes and (ii) the information, warnings, risk disclosures and other matters
disclosed in the Documentation. Lehman Brothers does not act as an adviser or fiduciary to its counterparties except where written
agreement expressly provides otherwise. This term sheet is sent for your sole information and should not be distributed to private
clients or any third parties without Lehman Brother's prior written approval. Lehman Brothers International (Europe), its affiliates
world-wide, and their respective officers, directors, partners and employees, including persons involved in the preparation or
issuance of this term sheet, may from time to time, deal in, hold or act as market-makers or advisors, brokers or commercial and/or
investment bankers in relation to any transaction described herein or any transaction related thereto, including any related
derivative transaction. References herein to "Lehman Brothers" shall include Lehman Brothers International (Europe) and its
affiliates and Lehman Brothers Inc. Lehman Brothers International (Europe) and Lehman Brothers Europe Limited are authorised
and regulated by the Financial Services Authority. Lehman Brothers Inc. is a member of the Securities Investor Protection
Corporation (SIPC).

**Lehman Brothers**
745 Seventh Ave.
New York, NY 10019
www.lehman.com

Client Signature:

_____

Order Size (USD):

_____

William Levy
212-526-6759
wlevy@lehman.com

Gary Nathanson
212-526-0905
gary.nathanson@lehman.com

LEHMAN BROTHERS

Final Terms dated 14 March 2008

**Lehman Brothers Holdings Inc.**

**Issue of USD 1,000,000 Kick-In Reverse Convertible Notes due 2008
on Dean Foods Company
Guaranteed by Lehman Brothers Holdings Inc.
under the U.S.$100,000,000,000
Euro Medium-Term Note Program
PART A – CONTRACTUAL TERMS**

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions set forth in the Base Prospectus dated July 24, 2007, as supplemented by the Base Prospectus Supplement dated September 20, 2007, October 15, 2007, December 17, 2007, February 5, 2008, February 11, 2008 and February 27, 2008 together, the "**Base Prospectus**") which constitutes a base prospectus for the purposes of the Prospectus Directive (Directive 2003/71/EC)(the "*Prospectus Directive*"). This document constitutes the Final Terms of the Notes described herein and must be read in conjunction with such Base Prospectus. Full information on the Issuer and the offer of the Notes is only available on the basis of the combination of these Final Terms and the Base Prospectus.

**Information Concerning Investment Risk**

**Noteholders and prospective purchasers of Notes should ensure that they understand the nature of the Notes and the extent of their exposure to risk and that they consider the suitability of the Notes as an investment in the light of their own circumstances and financial condition. The price performance of the Shares (as defined below) may affect the nature and value of the investment return on the Notes. Also, a relatively small movement in the value of the Shares could result in a disproportionately large movement in the value of the Notes. Noteholders and prospective purchasers of Notes should conduct their own investigations and, in deciding whether or not to purchase Notes, prospective purchasers should form their own views of the merits of an investment related to the Shares based upon such investigations and not in reliance on any information given in these Final Terms.**

**Given the highly specialised nature of these Notes, the Issuer and the Guarantor consider that they are only suitable for highly sophisticated investors who are able to determine themselves the risk of an investment linked to Shares.**

**Consequently, if you are not an investor who falls within the description above you should not consider purchasing these Notes without taking detailed advice from a specialised professional adviser.**

**SEE ANNEX A: "RISK FACTORS"**

**The information in Annex C has been extracted from publicly available information for the information of investors, without independent verification. The Shares are publicly listed, and investors may acquire such further information as they deem necessary from**

Final Terms dated 14 March 2008

**Lehman Brothers Holdings Inc.**

**Issue of USD 1,000,000 Kick-In Reverse Convertible Notes due 2008**
**on Dean Foods Company**
**Guaranteed by Lehman Brothers Holdings Inc.**
**under the U.S.\$100,000,000,000**
**Euro Medium-Term Note Program**
**PART A – CONTRACTUAL TERMS**

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions set forth in the Base Prospectus dated July 24, 2007, as supplemented by the Base Prospectus Supplement dated September 20, 2007, October 15, 2007, December 17, 2007, February 5, 2008, February 11, 2008 and February 27, 2008 together, the **"Base Prospectus"**) which constitutes a base prospectus for the purposes of the Prospectus Directive (Directive 2003/71/EC)(the *"Prospectus Directive"*). This document constitutes the Final Terms of the Notes described herein and must be read in conjunction with such Base Prospectus. Full information on the Issuer and the offer of the Notes is only available on the basis of the combination of these Final Terms and the Base Prospectus.

**Information Concerning Investment Risk**

**Noteholders and prospective purchasers of Notes should ensure that they understand the nature of the Notes and the extent of their exposure to risk and that they consider the suitability of the Notes as an investment in the light of their own circumstances and financial condition. The price performance of the Shares (as defined below) may affect the nature and value of the investment return on the Notes. Also, a relatively small movement in the value of the Shares could result in a disproportionately large movement in the value of the Notes. Noteholders and prospective purchasers of Notes should conduct their own investigations and, in deciding whether or not to purchase Notes, prospective purchasers should form their own views of the merits of an investment related to the Shares based upon such investigations and not in reliance on any information given in these Final Terms.**

**Given the highly specialised nature of these Notes, the Issuer and the Guarantor consider that they are only suitable for highly sophisticated investors who are able to determine themselves the risk of an investment linked to Shares.**

**Consequently, if you are not an investor who falls within the description above you should not consider purchasing these Notes without taking detailed advice from a specialised professional adviser.**

**SEE ANNEX A: "RISK FACTORS"**

**The information in Annex C has been extracted from publicly available information for the information of investors, without independent verification. The Shares are publicly listed, and investors may acquire such further information as they deem necessary from**

any prospectus in respect of the Shares, the annual audited financial statements of the issuers of the Shares and such other publicly available information as they deem appropriate.   Neither the Issuer, the Guarantor nor Lehman Brothers Inc. accept responsibility as to the correct extraction of such information, and no further or other responsibility (express or implied) is accepted by the Issuer, the Guarantor or Lehman Brothers Inc.in respect of such information. Investors should make their own investment, hedging and trading decisions (including decisions regarding the suitability of this investment), based upon their own judgment and upon advice from such advisers as such investors deem necessary and not upon any view expressed by the Issuer, the Guarantor or Lehman Brothers Inc.

| | | |
|---|---|---|
| 1. | Issuer: | Lehman Brothers Holdings Inc. |
| 2. | Series Number | 10308 |
| 3. | Specified Currency or Currencies: | United States Dollars ("**USD**") |
| 4. | Aggregate Nominal Amount: | USD 1,000,000 |
| 5. | Issue Price: | 100 per cent. of the Aggregate Nominal Amount |
| 6. | Specified Denomination(s): | USD 1,000 |
| 7. | (i) Issue Date: | 28 March 2008 |
| | (ii) Interest Commencement Date: (if different from the Issue Date): | Not Applicable |
| 8. | Maturity Date: | 28 September 2008 |
| 9. | Interest Basis: | Not Applicable |
| 10. | Redemption/Payment Basis: | As described in Annex B |
| 11. | Change of Interest or Redemption/Payment Basis: | As described in Annex B |
| 12. | Put/Call Options: | Not Applicable |
| 13. | (i)    Status of the Notes: | Senior Notes |
| | (ii)    Status of the Guarantee: | Senior Guarantee |
| 14. | Method of distribution: | Non-syndicated |

**PROVISIONS RELATING TO INTEREST (IF ANY) PAYABLE**

| | | |
|---|---|---|
| 15. | Fixed Rate Note Provisions | Not Applicable |
| 16. | Floating Rate Note Provisions | Not Applicable |

| 17. | Zero Coupon Note Provisions | Not Applicable |
| 18. | Index-Linked Interest Note/Other Variable-Linked Interest Note Provisions | Not Applicable |
| 19. | Dual Currency Note Provisions | Not Applicable |

**PROVISIONS RELATING TO REDEMPTION**

| 20. | Call Option | Not Applicable |
| 21. | Put Option | Not Applicable |
| 22. | Final Redemption Amount of each Note: | As described in Annex B |

23. Early Redemption Amount of each Note

Early Redemption Amount(s) per Calculation of each Note payable on redemption for taxation reasons or on event of default and/or the method of calculating the same (if required or if different from that set out in the Conditions):

In respect of each Note, an amount equal to the fair market value of such Note on such day as is determined by the Calculation Agent (as defined in Annex B) in its sole and absolute discretion (provided that such day is not more than 15 days before the date fixed for redemption of the Note), less the reasonable cost to the Issuer or any affiliate of unwinding any related hedging arrangements all as calculated by the Calculation Agent and as agreed with the Issuer.

**GENERAL PROVISIONS APPLICABLE TO THE NOTES**

24. Form of Notes:

Interests in a temporary global Note will be exchangeable for interests in a permanent global Note in bearer form. Interests in a permanent global Note will be exchangeable for, at the request of each Holder (with respect to its own Notes in bearer form), definitive Notes in bearer form.

25. Talons for future Coupons or Receipts to be attached to Definitive Notes (and dates on which such Talons mature):

Not Applicable

26.   Details relating to Partly Paid Notes:   Not Applicable
amount of each payment comprising the
Issue Price and date on which each payment
is to be made and consequences (if any) of
failure to pay, including any right of the
Issuer to forfeit the Notes and interest due
on late payment:

27.   Details relating to Instalment Notes:   Not Applicable
Instalment Amounts and Instalment Dates:

28.   Details relating to Extendible Notes:     Not Applicable

29.   Consolidation provisions:     Not Applicable

30.   Other terms:     As described in Annex B

**DISTRIBUTION**

31.   (i)   If syndicated, names of Managers:   Not Applicable

(ii)   Date of Syndicated Trade   Not Applicable
Agreement:

(iii)   Stabilizing Manager (if any):   Not Applicable

32.   If non-syndicated, name and address of   Lehman Brothers Inc.
Dealer:     745 Seventh Avenue
New York, NY 10019

33.   Total commission and concession:     0.80 per cent of Aggregate Nominal
Amount

34.    Selling restrictions:

The Notes have not and will not be
registered under the U.S. Securities Act
of 1933, as amended (the "Securities
Act"). The Notes are being offered only
to qualified institutional buyers pursuant
to Rule 144A under the Securities Act.
Any offer, sale or transfer of the Notes
must be made in compliance with the
Securities Act and other applicable law of
the states, territories and possessions of
the United States governing the offer and
sale of securities and only (i) to the Issuer
(upon redemption or repurchase of the
Notes or otherwise); (ii) outside of the
United States in a transaction exempt
from the registration requirements of the
Securities Act pursuant to Rule 904 of
Regulation S; (iii) pursuant to and in
accordance with Rule 144A to an
institutional investor that the holder
reasonably believes is a qualified
institutional buyer within the meaning of
Rule 144A purchasing for its own
account or for the account of a qualified
institutional buyer whom it has informed,
in each case, that the offer, resale or other
transfer is being made in reliance on Rule
144A; (iv) to the Dealer.

SEE ANNEX A: "RISK FACTORS"

35.    Non-Exempt Offer                                Not Applicable

**PURPOSE OF FINAL TERMS**

Those Final Terms comprise the final terms required for issue of the Notes described herein
pursuant to the U.S.$100,000,000,000 Euro Medium-Term Note Program of Lehman Brothers
Holdings Inc., Lehman Brothers Treasury Co., B.V. and Lehman Brothers Brankhaus A.G.

**RESPONSIBILITY**

The Issuer and the Guarantor accept responsibility for the information contained in these Final
Terms subject as provided in the fourth paragraph under the heading "Information Concerning
Investment Risk" on the first page of these Final Terms.

Signed on behalf of the Issuer:

By:  ......................................................
       Duly authorized

### PART B – OTHER INFORMATION

1.  **LISTING**

    (i)  Listing                               None

    (ii)  Admission to Trading:        Not Applicable

2.  **RATINGS**

    The Notes to be issued have not been rated.

    Not Applicable

3.  **INTERESTS OF NATURAL AND LEGAL PERSONS INVOLVED IN THE ISSUE/OFFER**

    Save as discussed in the section headed "Subscription and Sale" in the Base Prospectus, so far as the Issuer is aware, no person involved in the offer of the Notes has an interest material to the offer.

4.  **REASONS FOR THE OFFER, ESTIMATED NET PROCEEDS AND TOTAL EXPENSES**

    Not Applicable

5.  **YIELD (Fixed Rate Notes Only)**

    Not Applicable

6.  **HISTORIC INTEREST RATES**

    Not Applicable

7.  **PERFORMANCE OF INDEX/FORMULA/other variable, EXPLANATION OF EFFECT ON VALUE OF INVESTMENT AND ASSOCIATED RISKS AND OTHER INFORMATION CONCERNING THE UNDERLYING (Index-linked or other variable Linked Notes only)**

    See Annex C.

    The Issuer does not intend to provide post issuance information.

8.  **PERFORMANCE OF RATES OF EXCHANGE AND EXPLANATION OF EFFECT ON VALUE OF INVESTMENT (DUAL CURRENCY NOTES ONLY)**

    Not Applicable

9.  **OPERATIONAL INFORMATION**

    ISIN Code:                      US524935AE37

| | |
|---|---|
| Common Code: | 524935AE3 |
| New Global Note intended to be held in a manner which would allow Eurosystem eligibility: | No |
| Any clearing systems(s) other than Euroclear and Clearstream, Luxembourg and the relevant identification number(s): | DTC (as described in Annex B) |
| Delivery: | Delivery against payment |
| The Aggregate Nominal Amount of Notes issued has been translated into U.S. Dollars at the rate of (€=$[ ] producing a sum of (for Notes not denominated in U.S. Dollars): | Not Applicable |
| Names and addresses of Additional Paying Agents(s) (if any): | Not Applicable |

10.    **TERMS AND CONDITIONS OF THE OFFER**

| | |
|---|---|
| Offer Price: | 100% of Aggregate Nominal Amount |
| Conditions to which the offer is subject: | Not Applicable |
| Description of the application Process | Not Applicable |
| Description of the possibility to reduce subscriptions and manner for refunding excess amount paid by applicants: | Not Applicable |
| Details of the minimum and/or maximum amount of application: | Not Applicable |
| Manner in and date on which results of the offer are to be made public: | Not Applicable |
| Procedure for exercise of any right of preemption, negotiability of subscription rights and treatment of subscription rights not exercised: | Not Applicable |
| Categories of potential investors to which the Notes are offered and whether tranche(s)_have been reserved for certain countries: | Not Applicable |
| Process for notification to applicants of the amount allotted and the indication whether dealing may begin before notification is made: | Not Applicable |
| Amount of any expenses and taxes specifically charged to the subscriber or purchaser: | Not Applicable |

Name(s) and address(es), to the extent known to the Issuer, of the placers in the various countries where the offer takes place:                    None

## ANNEX A

### RISK FACTORS

The Noteholders should carefully consider the risk factors provided below as well as the other information contained in these Final Terms, the accompanying Base Prospectus and the documents incorporated in this document by reference.

Each Noteholder should reach an investment decision only after such holder has carefully considered with such holder's advisors the suitability of an investment in the Notes in light of such holder's particular circumstances.

**Unlike conventional debt securities of the Issuer, the Notes do not pay interest and the payment that the Noteholder receives at maturity may be less than the Issue Price.**

The notes do not pay interest. If the intraday trading price of the Share falls below the Kick-in Strike Price on any day between the Trade Date and the Valuation Date and the Official Closing Price per Share on the Valuation Date is less than the Strike Price, the Issuer will deliver Shares at maturity worth less than the USD 1,000 Issue Price per Note. Accordingly, you may lose some or all of the amount that you invest in the Notes.

**A Noteholder's return on the Notes could be less than if such Noteholder owned the Shares because such holder's maximum return is limited and will not reflect dividends paid on the Shares.**

A holder's return on the Notes could be less that the return obtainable if the holder had owned the Shares. A holder's return on the Notes will not reflect the return such holder would realize if the holder actually owned the Shares and received the dividends paid on the Shares. This is because the Calculation Agent will calculate the amount payable to the Noteholder by reference to the price of the Shares, which is calculated without taking into consideration the value of the dividends paid on the Shares.

**Historical values of the Shares should not be taken as an indication of the future performance of the Shares during the term of the Notes.**

It is impossible to predict whether the trading price of the Shares will fall or rise. The trading price of the Shares will be influenced by complex and interrelated political, economic, financial and other factors that can affect the markets in which those securities are traded and the values of the Shares.

**There is no trading market for the Notes and they are subject to substantial restrictions on transferability.**

There is no trading market for the Notes and none is expected to develop. Accordingly, it will be difficult to obtain reliable information about the value of the Notes at any given time. After the initial offering, Lehman Brothers Inc., and/or its affiliates intends to buy and sell the Notes to create a secondary market in the Notes and may stabilize or maintain the market price of the Notes during the initial distribution of the Notes. However, Lehman Brothers Inc., and/or its affiliates will not be obligated to engage in any of these market activities or to continue them once they are begun. Any secondary market prices will likely be lower than the Issue Price since the Issue Price included, and secondary market prices are likely to exclude, commissions paid with respect to the Notes, as well as the projected profit included in the cost of hedging our obligations under the Notes. In addition, any such prices may differ from values determined by pricing models used by Lehman Brothers Inc. and/or its affiliates, as a result of dealer discounts, mark-ups or other transaction costs. The Notes will not be registered under the Securities Act of 1933, as amended, or the securities laws of any state or any other jurisdiction and cannot, therefore, be resold unless they are subsequently registered under these laws or an exemption from registration is found. Investors must thus be prepared to bear the risk of owning Notes for an extended period of time.

**The value of the Notes will be affected by numerous factors, some of which are related in complex ways.**

The value of the Notes will be affected by supply and demand of the Notes, the price of the Shares at that time and a number of other factors, some of which are interrelated in complex ways. As a result, the effect of any one factor may be offset or magnified by the effect of another factor. The price at which Noteholders will be able to sell the Notes prior to maturity, if at all, may be at a discount, which could be substantial, from their principal amount, if, at that time, the price of the Shares is less than the Strike Price. A change in a specific factor could have the following impacts on the value of the Notes, assuming all other conditions remain constant.

- **Value.** The Issuer expects that the value of the Notes will depend substantially on the trading price of the Shares at any given point in time. If a holder of Notes decides to sell the Notes when the trading price of the Shares has fallen below the Kick-in Strike, such holder will receive substantially less than the Issue Price and potentially the amount that would be payable at maturity. Also, if a holder of Notes decides to sell such Notes when the trading price of the Shares is below the Strike Price, such holder can expect to receive less than the principal amount of the Notes sold. Political, economic and other developments that affect the trading price of the Shares and, thus, the value of the Notes.

- **Interest rates.** In general, if U.S. interest rates increase, the value of the Notes may be adversely affected.

- **Volatility of the Shares.** Volatility is the term used to describe the size and frequency of market fluctuations. If the volatility of the Shares increases or decreases, the value of the Notes may be adversely affected.

- **Merger and acquisition transactions.** The Shares may be affected by mergers and acquisitions, which can contribute to volatility of the Shares. Additionally, as a result of a merger or acquisition, one or more of the Shares may be replaced with a surviving or acquiring entity's securities. The surviving or acquiring entity's securities may not have the same characteristics as the original Shares.

- **Time remaining to maturity.** The value of the Notes may be affected by the time remaining to maturity. As the time remaining to the maturity of the Notes decreases, this time value may decrease, adversely affecting the value of the Notes.

- **Dividend yields.** If dividend yields on the Shares increase, the value of the Notes may be adversely affected because the Shares do not incorporate the value of those payments.

- **The Guarantor's credit ratings, financial condition and results.** Actual or anticipated changes in the Guarantor's credit ratings, financial condition or results may affect the value of the Notes.

- **Economic conditions and earnings performance of the Company.** General economic conditions and earnings results of the Company and real or anticipated changes in those conditions or results may affect the value of the Notes.

Noteholders should understand that the impact of one of the factors specified above, such as an increase in interest rates, may offset some or all of any change in the value of the Notes attributable to another factor, such as an increase in the value of the Shares. In general, assuming all relevant factors are held constant, the effect on the value of the Notes of a given change in most of the factors listed above will be less if it occurs later than if it occurs earlier in the term of the Notes.

**The Issuer cannot control actions by the Company.**

Actions by the Company may have an adverse effect on the price of the Shares and the Notes. In addition, the Company is not involved in the offering of the Notes and has no obligations with respect to the Notes, including any obligation to take the Issuer's or your interests into consideration for any reason. The Company will not receive any of the proceeds of this offering of the Notes and is not responsible for, and has not participated in, the determination of the timing of, prices for, or quantities of, the Notes to be issued. The Company is not involved with the administration, marketing or trading of the Notes and has no obligations with respect to the amount to be paid to you at maturity.

**Potential conflicts of interest exist because the Issuer is an affiliate of Lehman Brothers Inc., which will act as the Calculation Agent.**

Lehman Brothers Inc. will act as the Calculation Agent, which determines the amount holders will receive on the Notes, whether adjustments should be made and whether a Market Disruption Event has occurred and which selects a successor underlying security if necessary. As a result, potential conflicts of interest may exist between Lehman Brothers Inc. and the Noteholders. The Issuer, Guarantor and their affiliates act in various capacities with respect to the Notes. Lehman Brothers Inc. and other affiliates of the Issuer and Guarantor may act as a dealer or placement agent in connection with the Notes. Such affiliates will derive compensation from the distribution of the Notes and they may have an incentive to sell these Notes instead of other similar investments. The Issuer will pay compensation of up to $25 per Note to the Dealers in connection with the distribution of Notes.

**Purchases and sales of the Shares or instruments related to the Shares by the Issuer and its affiliates could affect the prices of the Shares.**

The Issuer and its affiliates, including Lehman Brothers Inc., may from time to time buy or sell the Shares or derivative instruments related to the Shares for their own accounts in connection with their normal business practices or in connection with hedging of the Issuer's obligations under the Notes, including on the Trade Date and Valuation Date. These transactions could affect the prices of those securities.

**Cost of Hedging is included in the Issue Price of the Notes.**

The Issue Price of the Notes includes the compensation paid to Lehman Brothers Inc. or one or more of its affiliates with respect to the Notes and the cost of hedging the Issuer's obligations under the Notes through one or more of its affiliates. The cost of hedging includes the projected profit that the Issuer's affiliates expect to realize in consideration for assuming the risks inherent in hedging the Issuer's obligations under the Notes. Because the actual cost of hedging the Issuer's obligations entails risk and may be influenced by market forces beyond the Issuer's or its affiliates' control, such hedging may result in profit that is more or less than expected, or may result in a loss.

**You have no shareholder rights.**

Investing in the Notes is not equivalent to investing in the Shares. As an investor in the Notes, you will not have voting rights or rights to receive dividends or other distributions or any other rights with respect to the Shares.

**Investment Experience**

The Notes are not typical, straightforward debt securities. Prospective investors should determine whether an investment in the Notes is appropriate in their particular circumstances and should consult with their legal, business, and tax advisors to determine the consequences of an investment in the Notes and to arrive at their own evaluation of the investment.

Investment in the Notes is only appropriate for investors who:

(a)    have the requisite knowledge and experience in financial and business matters to evaluate the merits and risks of an investment in the Notes;

(b)    have access to, and knowledge of, appropriate analytical tools to evaluate such merits and risks in the context of their financial situation;

(c)    are capable of bearing the economic risk of an investment in the Notes for an indefinite period of time; and

(d)    recognize that it may not be possible to dispose of the Notes prior to their maturity.

Prospective investors in the Notes should not rely on any communication (written or oral) of the Issuer or Lehman Brothers Inc. as investment advice or as a recommendation to invest in the Notes, it being understood that information and explanations related to the terms and conditions of these Notes shall not be considered to be investment advice or a recommendation to invest in the Notes.  No communication (written or oral) received from the Issuer or Lehman Brothers Inc. shall be deemed to be an assurance or guarantee as to the expected results of an investment in the Notes.

**ANNEX B**

1. **Interpretation**

1.1 **Definitions:** In this Annex:

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for business in New York;

"**Calculation Agent**" means Lehman Brothers Inc.;

"**Cash Value**" means the amount in cash equal to the product of (1) $1,000 divided by the Official Closing Price of the Shares on Trade Date and (2) the Official Closing Price of the Shares on the Valuation Date.

"**Clearance System**" means DTC, Luxembourg or any successor to any such clearance system as determined by the Calculation Agent or, if such clearance system ceases to settle trades in the Shares, such other clearance system as is determined by the Calculation Agent to be the principal domestic clearance system customarily used for settling trades in the Shares;

"**Clearance System Business Day**" means, in respect of a Clearance System, any day on which such Clearance System is (or but for the occurrence of a Settlement Disruption Event, would have been) open for the acceptance and execution of settlement instructions;

"**Company**" means Dean Foods Company (Bloomberg: DF US);

"**Disrupted Day**" means any Scheduled Trading Day on which the Exchange or any Related Exchange fails to open for trading during its regular trading session or on which a Market Disruption Event has occurred;

"**Early Closure**" means the closure on any Exchange Business Day of the Exchange or any Related Exchange(s) prior to its Scheduled Closing Time unless such earlier closing time is announced by such Exchange(s) or Related Exchange(s) at least one hour prior to the earlier of (i) the actual closing time for the regular trading session on such Exchange(s) or Related Exchange(s) on such Exchange Business Day and (ii) the submission deadline for orders to be entered into the Exchange or Related Exchange system for execution at the Valuation Time on such Exchange Business Day.

"**Exchange**" means the principal exchange or quotation system for trading the Shares as the Calculation Agent shall determine in its sole and absolute discretion from time to time;

"**Exchange Amount**" has the meaning given in paragraph 3 (*The Exchange Amount*);

"**Exchange Business Day**" means any Scheduled Trading Day on which the Exchange and each Related Exchange are open for trading during their respective regular trading sessions, notwithstanding any such Exchange or Related Exchange closing prior to its Scheduled Closing Time;

**"Exchange Date"** means the Maturity Date unless there would otherwise be less than three Exchange Business Days from but excluding the Valuation Date to and including the Exchange Date in which case the Exchange Date shall be the third Exchange Business Day following the Valuation Date *provided, however, that*:

(1)     if, in respect of any Note, on the date that would otherwise be the Exchange Date the relevant Noteholder does not comply fully with its obligations under paragraph 5 (*Exchange*) and paragraph 6 (*Expenses and taxes*) as determined by the Calculation Agent then the Exchange Date shall be such later date as the relevant Noteholder does so comply; and

(2)     in any such case, if the date that would otherwise be the Exchange Date is not a Clearance System Business Day the Exchange Date shall be postponed to the first succeeding day which is a Clearance System Business Day;

**"Exchange Disruption"** means any event (other than an Early Closure) that disrupts or impairs (as determined by the Calculation Agent) the ability of market participants in general (i) to effect transactions in, or obtain market values for, the Shares on the Exchange, or (ii) to effect transactions in, or obtain market values for, futures or options contracts relating to the Share on any relevant Related Exchange;

**"Fractional Share Amount"** has the meaning given in paragraph 3.2 (*The Exchange Amount - Fractions of a Share*);

**"Kick-In Event"** has the meaning given in paragraph 2.3 (*Final Redemption Amount and Physical Settlement - Kick-In Event*);

**"Kick-In Strike"** means USD 11.736 (will be equal to 60% of the Strike Price);

**"Market Disruption Event"** means, in respect of the Shares, the occurrence or existence of (i) a Trading Disruption, (ii) an Exchange Disruption, which in either case the Calculation Agent determines is material, at any time during the one hour period that ends at the relevant Valuation Time, or (iii) an Early Closure;

**"Number of Shares"** means, in respect of any Note, 51.1247 Shares (will be equal to the Specified Denomination divided by the Strike Price);

**"Official Closing Price"** means, in relation to the Shares and any particular Exchange Business Day, the price of the Shares at the Valuation Time on the Exchange on that Exchange Business Day as published by the relevant Exchange;

**"Physical Settlement"** has the meaning given in paragraph 2.2 (*Final Redemption Amount and Physical Settlement - Consequences of Kick-In Event*);

**"Related Exchange"** means any exchange or quotation system (including any substitute or temporary exchange or quotation system) on which futures contracts and/or options contracts on the Shares are traded and any exchange or quotation system where trading has a material effect (as determined by the Calculation Agent) on the overall market for futures or options contracts relating to such Shares;

"**Scheduled Closing Time**" means, in respect of the Exchange or a Related Exchange and a Scheduled Trading Day, the scheduled weekday closing time of such Exchange or Related Exchange on such Scheduled Trading Day, without regard to after hours or any other trading outside of the regular trading session hours;

"**Scheduled Trading Day**" means any day on which the Exchange and each Related Exchange are scheduled to be open for trading for their respective regular trading sessions;

"**Scheduled Valuation Date**" means any original date that, but for the occurrence of an event causing a Disrupted Day, would have been a Valuation Date;

"**Settlement Disruption Event**" means an event beyond the control of the Issuer as a result of which the relevant Clearance System cannot clear the transfer of Shares;

"**Shares**" means shares of common stock of the Company (selected information in respect of which is provided in Annex C);

"**Specified Office**" means the office of Lehman Brothers Inc. at 745 Seventh Avenue, New York, New York 10019, USA, or any other office of Lehman Brothers Inc., or any office of any other Calculation Agent, from time to time notified to the Noteholders by the Calculation Agent as its specified office;

"**Strike Price**" means USD 19.56 (will be equal to the volume-weighted average price per Share that an affiliate of the Issuer will pay to hedge the Issuer's obligations under the Notes plus 2 cents);

"**Trade Date**" means 14 March 2008;

"**Trading Disruption**" means any suspension of or limitation imposed on trading by the relevant Exchange or Related Exchange or otherwise and whether by reason of movements in price exceeding limits permitted by the relevant Exchange or Related Exchange or otherwise (i) relating to the Shares on the Exchange, or (ii) in futures or options contracts relating to the Share on any relevant Related Exchange;

"**Valuation Date**" means, subject to paragraph 7 (*Disrupted Days and Postponement*), 14 September 2008 (or if such is not an Exchange Business Day the immediately following Exchange Business Day);

"**Valuation Time**" means the close of trading on the Exchange;

all as calculated or determined, if necessary, by the Calculation Agent.

1.2   **Construction:**  In this Annex each reference to a paragraph shall be construed as a reference to a paragraph of this Annex.

1.3   **The Conditions:**  In the event of any inconsistency between the Conditions and the provisions of this Annex, the provisions of this Annex shall prevail.

2. **Final Redemption Amount and Physical Settlement**

2.1 **Final Redemption Amount:** Unless previously redeemed or purchased and cancelled, or a Kick-In Event has occurred, each Note shall be redeemed on the Maturity Date at an amount equal to 100% of the Specified Denomination in cash plus USD 68.50 per Specified Denomination.

2.2 **Consequences of Kick-In Event:** If a Kick-In Event has occurred:

2.2.1 if on the Valuation Date the Official Closing Price per Share is greater than or equal to the Strike Price, each Note shall be redeemed on the Maturity Date at an amount equal to 100% of the Specified Denomination plus USD 68.50 per Specified Denomination; or

2.2.2 if on the Valuation Date the Official Closing Price per Share is less than the Strike Price, Physical Settlement (or , at our election, the "Cash Value" thereof) shall apply to the Notes. **"Physical Settlement"** means that the right of each Noteholder to repayment of all outstanding amounts (including but not limited to its principal amount) shall cease and in consideration and in exchange therefor the Issuer shall deliver the relevant Exchange Amount to or to the order of each Noteholder in accordance with, and subject to, the provisions of this Annex.

2.3 **Kick-In Event:** Means an event as determined by the Calculation Agent where the Closing Price on any Scheduled Trading Day, as determined by the Calculation Agent pursuant to the terms set forth in the Documentation, during the Observation Period is less than the Kick-In Strike.

3. **The Exchange Amount**

3.1 **The Exchange Amount:** If Physical Settlement applies in respect of any Note, the Exchange Amount to be delivered in respect of such Note shall be the Number of Shares plus USD 68.50, and any Fractional Share Amount to which the Noteholder may be entitled in accordance with paragraph 3.2 (*The Exchange Amount - Fractions of a Share*).

3.2 **Fractions of a Share:** Fractions of a Share will not be delivered on exchange. If a fraction of a Share would otherwise fail to be issued upon exchange, the Issuer shall make or procure that there is made, on or before the seventh Business Day after the Maturity Date, a cash payment (the **"Fractional Share Amount"**) equal to such fraction of the fair market value of a Share as at the Valuation Date (as determined by the Calculation Agent).

4. **Settlement**

4.1 **Delivery on the Exchange Date:** If Physical Settlement applies, the Issuer shall deliver the Shares deliverable in respect of each Note through the Calculation Agent and the Clearance System on the Exchange Date, subject as provided in this paragraph 4 (*Settlement*) and paragraph 5 (*Exchange*).

4.2   **Settlement Disruption:**  If a Settlement Disruption Event prevents the Issuer from effecting delivery of any Shares on the day on which it would otherwise have effected delivery, the Issuer shall instead effect delivery of the Number of Shares comprised in the Exchange Amount on the first succeeding day on which delivery of the Shares can take place through the relevant Clearance System unless a Settlement Disruption Event prevents the Issuer from delivering the Number of Shares comprised in the Exchange Amount on each of the 10 Clearance System Business Days immediately following the original date on which the Issuer would, but for the Settlement Disruption Event, have effected delivery of the Number of Shares comprised in the Exchange Amount.  In that case:

    4.2.1   if the Calculation Agent determines that the Shares can be delivered in any other commercially reasonable manner, then delivery of the Number of Shares comprised in the Exchange Amount shall be effected on the first day on which settlement of a sale of Shares executed on that tenth Clearance System Business Day customarily would take place using such other commercially reasonable manner of delivery of the Shares (which other manner of delivery will be deemed the Clearance System for the purposes of delivery of the relevant Shares); or

    4.2.2   if the Calculation Agent determines that the Shares cannot be delivered in any other commercially reasonable manner, then delivery of the Number of Shares comprised in the Exchange Amount will be postponed until such day as the Calculation Agent determines that it can be effected through the Clearance System or in any other commercially reasonable manner.

4.3   **Manner of delivery:**  For the avoidance of doubt, the Issuer makes no representation that the Shares will be deliverable in any particular manner or to any particular Noteholder. Furthermore, the Issuer will not be obliged to procure the issue of new Shares for the purposes of satisfying the obligations of the Issuer under this paragraph 4 (*Settlement*).

5.   **Exchange**

5.1   **Procedure for exchange:**  If Physical Settlement applies, in order to receive the Exchange Amount to which it is entitled each Noteholder must promptly:

    5.1.1   complete, execute and deposit at the Noteholder's own expense during normal business hours at the Calculation Agent's Specified Office any documents which may be required by any of (a) the jurisdiction in which the Calculation Agent's Specified Office is then located or (b) the jurisdiction in which the Company is incorporated to effect delivery of the Exchange Amount to, or to the order of, the Noteholder;

    5.1.2   transfer its Notes together with any amount to be paid by the Noteholder pursuant to this paragraph 5 (*Exchange*) and/or under paragraph 6 (*Expenses and taxes*) to the account of the Calculation Agent with Euroclear and/or Clearstream, Luxembourg;

- 17 -

5.1.3   provide to the Calculation Agent and the Issuer in writing details of the accounts with the Clearance System to which the Issuer is to deliver the Exchange Amount and/or any other details which may be necessary in order to effect delivery of the relevant Shares and cash; and

5.1.4   represent in writing, delivered to the Calculation Agent, that at the time of exercising their Exchange Right and further at the time of complying with paragraphs 5.1.1 to 5.1.3 such Noteholder or, the person who has the beneficial interest in that Note, is not in the United States (within the meaning of Regulation S under the United States Securities Act of 1933 ("**Regulation S**")) and it, or such person, purchased such Note, or the beneficial interest therein, in a transaction made in accordance with Rule 903 or Rule 904 of Regulation S.

5.2   **Failure to give U.S. certification:**   If the Noteholder is unable or otherwise fails to satisfy paragraph 5.1.4, the Noteholder may transfer its Note or, the holder of a beneficial interest therein may transfer the beneficial interest therein, subject to compliance with all applicable selling restrictions (as described in the Information Memorandum and/or elsewhere in these Final Terms) and with any applicable laws.

5.3   **Failure to satisfy conditions for exchange:**   If:

5.3.1   Physical Settlement applies; and

5.3.2   a Noteholder fails to take any of the actions referred to in paragraphs 5.1.1 to 5.1.4 within 20 Exchange Business Days after and including the Valuation Date,

then the Issuer shall be entitled to sell those Shares which it otherwise would have been obliged to deliver, and to pay the proceeds from such sale (calculated in accordance with paragraph 5.4 (*Exchange - Proceeds of sale*)) to the Noteholder.

5.4   **Proceeds of sale:**   For the purposes of paragraph 5.3 (*Exchange - Failure to satisfy conditions for exchange*), the proceeds of sale of any Shares shall be the amount which the Issuer or the Calculation Agent on its behalf actually receives as consideration for the sale of the relevant Shares together with any amounts paid by the relevant Noteholder pursuant to paragraph 5.1.2 and/or pursuant to paragraph 6 (*Expenses and taxes*), *provided that* the Issuer shall not be obliged to pay to the Noteholder any amount, calculated by the Calculation Agent, which is in excess of the amount for which such Shares could have been sold on the Exchange Date (together with any amounts paid by the relevant Noteholder pursuant to paragraph 5.1.2 and/or pursuant to paragraph 6 (*Expenses and taxes*), but after deduction of the expenses and taxes in respect of such sale).

6.   **Expenses and taxes**

As conditions precedent to exchange of any Note, the relevant Noteholder must pay to the Calculation Agent all stamp, issue, registration, transfer or other taxes and duties, including withholding taxes (if any) arising on exchange which may be determined by the Calculation Agent to be payable:

6.1.1   in the country in which the Calculation Agent's Specified Office is situated; or

6.1.2   in any other jurisdiction as a result of the issue or delivery of Shares or any other property or cash upon exchange to or to the order of the exchanging Noteholder.

7.   **Disrupted Days and Postponement**

7.1   **Valuation Date:**  If any Valuation Date is a Disrupted Day, then such Valuation Date shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day, unless each of the eight Scheduled Trading Days immediately following the Scheduled Valuation Date is a Disrupted Day.  In that case:

7.1.1   that eighth Scheduled Trading Day shall be deemed to be the Valuation Date notwithstanding the fact that such day is a Disrupted Day; and

7.1.2   the Calculation Agent shall determine its good faith estimate of the value for the Shares as of the Valuation Time on that eighth Scheduled Trading Day.

7.2   **Delayed valuation:**  If, by reason of any Disrupted Days the Valuation Date would fall on or after the Maturity Date or less than one Business Day before the Maturity Date, payment of principal and interest (if any) on the Notes otherwise due on the Maturity Date and delivery of the Exchange Amount (if any) shall be postponed until the Valuation Date has been ascertained and the Issuer has had a reasonable opportunity to effect any such payment or delivery.

7.3   **Risk of any postponement:**  The risk of any postponement of payment of the principal and/or interest (if any) and delivery of the Exchange Amount (if any) as described in this paragraph 7 (*Disrupted Days and Postponement*) shall be borne by the Noteholders, and no Noteholder shall be entitled to any payment or compensation whatsoever, in respect of such postponement or of any loss suffered or incurred by such Noteholder by reason of such postponement.

8.   **Rights Arising on Exchange**

8.1   **Dividends**:  Shares issued on exchange of a Note will be fully paid up and will rank pari passu in all respects with all other fully paid Shares outstanding on the Exchange Date, subject as provided in paragraph 8.2 (*Rights Arising on Exchange - Pre-Exchange Date Dividends*) and paragraph 8.3 (*Rights Arising on Exchange - Voting rights*), will be entitled to all rights, distributions or payments in respect of such Shares with effect from and including the Exchange Date.

8.2   **Pre-Exchange Date dividends:**  The exchanging Noteholder will not be entitled to receive any dividend or other distribution declared, paid or made, or any rights granted, on any Shares if the date on which the Shares are first traded on the Exchange ex such dividend, distribution or rights falls on or before the Exchange Date.

8.3   **Voting rights:**  The exchanging Noteholder will not be entitled to any voting rights accruing to Shareholders for which the record date for determining entitlement to voting rights precedes the Exchange Date.

9.   **Extraordinary Events:**

9.1    **Definitions**: In this paragraph 9 (*Extraordinary Events*) and paragraph 10 (*Notification of Amount, Disrupted Days, Potential Adjustment Events, Kick-In Events and Extraordinary Events*):

"**Additional Disruption Event**" means any of a Change in Law, Failure to Deliver, an Insolvency Filing, Hedging Disruption and Increased Cost of Hedging;

"**Cancellation Amount**" means the amount:

(1)    determined by the Calculation Agent using Commercially Reasonable Procedures in order to produce a commercially reasonable result and determined as of the date that the Notes are cancelled or, if that would not be commercially reasonable, as of such date following the date that the Notes are cancelled as would be commercially reasonable; and

(2)    to be paid to the Noteholders following a cancellation, being the economic equivalent of (i) the material terms of the Notes, including the payments in respect of the Notes that would, but for the cancellation, have been required on or after the date that the Notes are, or are deemed to have been, cancelled (assuming satisfaction of any applicable conditions precedent with respect to the Notes) and (ii) any option rights of the Noteholders in respect of the relevant Notes as the Calculation Agent may consider to be relevant;

and where, in determining such amount, the Calculation Agent may consider any relevant information, including, without limitation, one or more of the following types of information:

(a)    quotations (either firm or indicative) supplied by one or more third parties that may take into account the current creditworthiness of the Calculation Agent at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Calculation Agent and the third party providing the quotation;

(b)    information consisting of relevant market data in the relevant markets supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads correlation or other relevant market data in the relevant market; or

(3)    information of the types described in (a) or (b) above from internal sources (including any affiliates of the Calculation Agent) if that information is of the same type used by the Calculation Agent in the regular course of its business for the valuation of similar transactions;

"**Change in Law**" means that on or after the Trade Date (i) due to the adoption of or any change in any applicable law or regulation (including, without limitation, any tax law), or (ii) due to the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing authority), the Calculation Agent determines in good faith that (i) it has become illegal to hold, acquire or dispose of Shares, or (ii) the Issuer will incur a materially increased cost in performing its

- 20 -

obligations under these Conditions (including, without limitation, due to any increase in tax liability, decrease in tax benefit or other adverse effect on its tax position);

"**Combined Consideration**" means New Shares in combination with Other Consideration.

"**Commercially Reasonable Procedures**" means procedures which may include the following:

(1)   application of relevant market data from third parties or information from internal sources of pricing or other valuation models that are, at the time of determination of the Cancellation Amount, used by the Calculation Agent in the regular course of its business in pricing or valuing transactions between the Calculation Agent and unrelated third parties that are similar to the Notes; and

(2)   application of such valuation methods as is appropriate to the type, complexity or size of the transaction;

"**Delisting**" means that the Exchange announces that pursuant to the rules of such Exchange, the Shares cease (or will cease) to be listed, traded or publicly quoted on the Exchange for any reason (other than a Merger Event or Tender Offer) and are not immediately re-listed, re-traded or re-quoted on an exchange or quotation system located in the same country as the Exchange (or, where the Exchange is within the European Union, in any member state of the European Union);

"**Extraordinary Dividend**" means a dividend or portion thereof characterised as such by the Calculation Agent;

"**Extraordinary Event**" means an Additional Disruption Event, a Delisting, an Insolvency, a Merger Event, a Nationalisation or a Tender Offer;

"**Failure to Deliver**" means the failure of the Issuer to deliver, when due, the Shares where such failure to deliver is due to illiquidity in the market for such Shares;

"**Hedging Disruption**" means that the Hedging Party is unable, after using commercially reasonable efforts, to (i) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the equity price risk of entering into and performing its obligations with respect to the Notes or (ii) realise, recover or remit the proceeds of any such transaction(s) or asset(s);

"**Hedging Party**" means the Issuer, any affiliate or subsidiary of the Issuer or any other entity acting as hedging party on behalf of the Issuer;

"**Increased Cost of Hedging**" means that the Hedging Party would incur a materially increased (as compared with circumstances existing on the Trade Date) amount of tax, duty, expense or fee (other than brokerage commissions) to (i) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the equity price risk of entering into and performing its obligations with respect to the Notes or (ii) realise, recover or remit the proceeds of any such transaction(s) or asset(s), *provided that* any such materially increased amount that is

incurred solely due to the deterioration of the creditworthiness of the Hedging Party shall not be deemed an Increased Cost of Hedging;

"**Insolvency**" means that by reason of the voluntary or involuntary liquidation, bankruptcy, insolvency, dissolution or winding-up of or any analogous proceedings affecting the Company (i) all the Shares of the Company are required to be transferred to a trustee, liquidator or other similar official or (ii) holders of the Shares of the Company become legally prohibited from transferring them;

"**Insolvency Filing**" means that the Company institutes or has instituted against it by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, or it consents to a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official or it consents to such a petition, or it has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by a creditor and such proceeding is not dismissed, discharged, stayed or restrained in each case within fifteen days of the institution or presentation thereof;

"**Merger Date**" means the closing date of a Merger Event or, where a closing date cannot be determined under the local law applicable to such Merger Event, such other date as determined by the Calculation Agent;

"**Merger Event**" means, in respect of the Shares, any (i) reclassification or change of such Shares that results in a transfer of or an irrevocable commitment to transfer all of such Shares outstanding to another entity or person, (ii) consolidation, amalgamation, merger or binding share exchange of the Company with or into another entity or person (other than a consolidation, amalgamation, merger or binding share exchange in which the Company is the continuing entity and which does not result in a reclassification or change of all of such Shares outstanding), (iii) takeover offer, tender offer, exchange offer, solicitation, proposal or other event by any entity or person to purchase or otherwise obtain 100% of the outstanding Shares of the Company that results in a transfer of or an irrevocable commitment to transfer all such Shares (other than such Shares owned or controlled by such other entity or person), or (iv) consolidation, amalgamation, merger or binding share exchange of the Company or its subsidiaries with or into another entity in which the Company is the continuing entity and which does not result in a reclassification or change of all such Shares outstanding but results in the outstanding Shares (other than Shares owned or controlled by such other entity) immediately prior to such event collectively representing less than 50% of the outstanding Shares immediately following such event (a "**Reverse Merger**"), in each case if the Merger Date is on or before the Exchange Date;

"**Nationalisation**" means that all the Shares or all or substantially all the assets of the Company are nationalised, expropriated or are otherwise required to be transferred to any governmental agency, authority, entity or instrumentality thereof;

**"New Shares"** means ordinary or common shares, whether of the entity or person (other than the Company) involved in the Merger Event or the making of the Tender Offer or a third party, that are, or that as of the Merger Date or Tender Offer Date are promptly scheduled to be, (i) publicly quoted, traded or listed on an exchange or quotation system located in the same country as the Exchange (or, where the Exchange is within the European Union, in any member state of the European Union) and (ii) not subject to any currency exchange controls, trading restrictions or other trading limitations;

**"Other Consideration"** means cash and/or any securities (other than New Shares) or assets (whether of the entity or person (other than the Company) involved in the Merger Event or the making of the Tender Offer or a third party);

**"Potential Adjustment Event"** means any of the following:

(1)     a subdivision, consolidation or reclassification of Shares (unless resulting in a Merger Event) or, a free distribution or dividend of any Shares to existing holders by way of bonus, capitalisation or similar issue;

(2)     a distribution, issue or dividend to existing holders of the Shares of (a) such Shares or (b) other share capital or securities granting the right to payment of dividends and/or the proceeds of liquidation of the Company equally or proportionately with such payments to holders of the Shares or (c) share capital or other securities of another issuer acquired or owned (directly or indirectly) by the Company as a result of a spin-off or other similar transaction, or (d) any other type of securities, rights or warrants or other assets, in any case for payment (cash or other consideration) at less than the prevailing market price as determined by the Calculation Agent;

(3)     an Extraordinary Dividend;

(4)     a call by the Company in respect of Shares which are not fully paid;

(5)     a repurchase by the Company or any of its subsidiaries of relevant Shares whether out of profits or capital and whether the consideration for such repurchase is cash, securities or otherwise;

(6)     in respect of the Company, an event that results in any shareholder rights being distributed or becoming separated from shares of common stock or other shares of the capital stock of the Company pursuant to a shareholder rights plan or arrangement directed against hostile takeovers that provides upon the occurrence of certain events for a distribution of preferred stock, warrants, debt instruments or stock rights at a price below their market value, as determined by the Calculation Agent, *provided that* any adjustment effected as a result of such an event shall be readjusted upon any redemption of such rights; or

(7)     any other event having, in the opinion of the Calculation Agent, a diluting or concentrative effect on the theoretical value of the Shares;

**"Share-for-Combined"** means, in respect of a Merger Event or Tender Offer, that the consideration for the relevant Shares consists of Combined Consideration;

**"Share-for-Other"** means, in respect of a Merger Event or Tender Offer, that the consideration for the relevant Shares consists solely of Other Consideration;

**"Share-for-Share"** means, (i) in respect of a Merger Event or Tender Offer, that the consideration for the relevant Shares consists (or, at the option of the holder of such Shares, will consist) solely of New Shares and (ii) a Reverse Merger;

**"Tender Offer"** means a takeover offer, tender offer, exchange offer, solicitation, proposal or other event by any entity or person that results in such entity or person purchasing, or otherwise obtaining or having the right to obtain, by conversion or other means, greater than 10% and less than 100% of the outstanding voting shares of the Company, as determined by the Calculation Agent, based upon the making of filings with governmental or self-regulatory agencies or such other information as the Calculation Agent deems relevant;

**"Tender Offer Date"** means, in respect of a Tender Offer, the date on which voting shares in the amount of the applicable percentage threshold are actually purchased or otherwise obtained (as determined by the Calculation Agent).

9.2     **Potential Adjustment Events:** Following the declaration by the Company of the terms of any Potential Adjustment Event, the Calculation Agent will determine whether such Potential Adjustment Event has a diluting or concentrative effect on the theoretical value of the Shares and, if so, the Calculation Agent will determine the adjustment(s), if any, to be made to the Conditions as the Calculation Agent determines appropriate to account for that diluting or concentrative effect (including but not limited to adjustment(s) to account solely for changes in volatility, expected dividends, stock loan rate or liquidity relative to the relevant Share) and determine the effective date(s) of that adjustment(s). The Calculation Agent may (but need not) determine the appropriate adjustment(s) by reference to the adjustment(s) in respect of such Potential Adjustment Event made by an options exchange to options on the Shares traded on that options exchange.

9.3     **Merger Event or Tender Offer:** If a Merger Event or Tender Offer occurs, the Calculation Agent will take, in the case of a Merger Event, one of the actions described in paragraphs 9.3.1 to 9.3.3 or, in the case of a Tender Offer, one of the actions described in paragraphs 9.3.2 or 9.3.3:

9.3.1     (a)     in respect of each Share-for-Share Merger Event, on or after the relevant Merger Date make such adjustment(s) to these Conditions as the Calculation Agent considers appropriate to reflect the number of New Shares to which a holder of one Share immediately prior to the occurrence of the Merger Event would be entitled upon consummation of the Merger Event and the New Shares will be deemed to be Shares and the issuer thereof will be deemed the Company, respectively, and, if necessary, the Calculation Agent will adjust any other relevant provisions of these Conditions including but not limited to adjustment(s) to account solely for changes in volatility, expected dividends, stock loan or liquidity relevant to the Shares;

(b) in respect of each Share-for-Other Merger Event, on or after the relevant Merger Date, the amount of Other Consideration (as subsequently modified in accordance with any relevant terms and including the proceeds of any redemption, if applicable) to which a holder of a Share would be entitled upon consummation of the Merger Event will be applied by the Calculation Agent to determine such adjustment(s) to these Conditions as the Calculation Agent considers appropriate in respect of such Share, and, if necessary, the Calculation Agent will adjust any other relevant terms including but not limited to adjustment(s) to account solely for changes in volatility, expected dividends, stock loan or liquidity relevant to the Shares; or

(c) in respect of each Share-for-Combined Merger Event, on or after the Merger Date, the number of New Shares and the amount of Other Consideration (as subsequently modified in accordance with any relevant terms and including the proceeds of any redemption, if applicable) to which a holder of a Share would be entitled upon consummation of the Merger Event will be applied by the Calculation Agent to determine such adjustment(s) to these Conditions as the Calculation Agent considers appropriate with respect to the affected Shares and the issuer of such New Shares and, if necessary, the Calculation Agent will adjust any other relevant terms including but not limited to adjustment(s) to account solely for changes in volatility, expected dividends, stock loan or liquidity relevant to the Shares;

9.3.2 on or after the relevant Merger Date or Tender Offer Date (A) make such adjustment(s) to these Conditions as the Calculation Agent considers appropriate to account for the economic effect of such Merger Event or Tender Offer (including but not limited to adjustments to account solely for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares), which may, but need not, be determined by reference to the adjustment(s) made in respect of such Merger Event or Tender Offer by an options exchange to options on the relevant Shares traded on such options exchange and (B) determine the effective date(s) of such adjustment(s); or

9.3.3 cancel the Notes in which case the Issuer shall thereupon become obliged to pay the Cancellation Amount (if any) in respect of each Note on such day as the Calculation Agent determines.

9.4 **Merger Date or Tender Offer Date post Maturity:** Without prejudice to paragraph 7 (*Disrupted Days and Postponement*), if a Merger Date or Tender Offer Date is scheduled to be after the Valuation Date and/or Maturity Date, the Calculation Agent shall determine, with respect to the theoretical value of the Notes, the economic effect of the announcement of a potential Merger Event of Tender Offer (including, without limitation, any change in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares) from the announcement date to such Valuation Date and/or Maturity Date, as applicable. If such economic effect is material, the Calculation Agent

shall make such adjustment(s) to these Conditions as the Calculation Agent considers appropriate to reflect such economic effect.

9.5 **Nationalisation, Insolvency and Delisting:**    If a Nationalisation, Insolvency or Delisting occurs, the Calculation Agent shall:

    9.5.1    either make such adjustment(s) (if any) to the terms of the Conditions or such determination as the Calculation Agent considers appropriate; or

    9.5.2    cancel the Notes in which case the Issuer shall thereupon become obliged to pay the Cancellation Amount (if any) in respect of each Note on such day as the Calculation Agent determines;

9.6 **Additional Disruption Events:**    If an Additional Disruption Event occurs, the Calculation Agent shall make such adjustment(s) to the terms of the Conditions or such determination as the Calculation Agent considers appropriate to account for the Additional Disruption Event.

10. **Notification of Amount, Disrupted Days, Potential Adjustment Events, Kick-In Events and Extraordinary Events**

10.1 **Disrupted Days and Exchange Date:** The Calculation Agent shall as soon as reasonably practicable notify the Issuer (and the Issuer shall promptly give notice to the Noteholders in accordance with Condition 15 (*Notices*)) of the existence or occurrence of a Disrupted Day on any day which but for such Disrupted Day would have been a Valuation Date or of the occurrence of any Settlement Disruption Event on any day which but for such Settlement Disruption Event would have been the Exchange Date.

10.2 **Potential Adjustment Event or Extraordinary Event:** Upon the occurrence of a Potential Adjustment Event or Extraordinary Event, the Calculation Agent shall give notice as soon as practicable to the Issuer stating the occurrence of the Potential Adjustment Event, or Extraordinary Event, as the case may be, giving details thereof and the action proposed to be taken in relation thereto.

10.3 **Kick-In Event:** Upon the occurrence of a Kick-In Event, the Calculation Agent shall give notice as soon as practicable to the Issuer (and the Issuer shall promptly give notice to the Noteholders in accordance with Condition 15 (*Notices*)) stating the occurrence of the Kick-In Event and giving details thereof.

10.4 **Adjustments binding:** Adjustments in accordance with the foregoing sections shall be calculated by the Calculation Agent, shall be notified to the Noteholders in accordance with Condition 15 (*Notices*) and shall be (in the absence of manifest error) binding on all parties concerned. However, Noteholders should be aware that there may be, necessarily, some delay between the time at which any of the above events occur and the time at which it is reported to Noteholders.

11. **The Calculation Agent**

11.1 **Independence:** In performing its duties pursuant to the terms of this Annex, the Calculation Agent shall act independently and not as an agent of the Issuer or the

Noteholders and all estimates, calculations or determinations which it is required or permitted to make shall be made by it in its sole and absolute discretion.

11.2 **Determinations final and conclusive:** All estimates, calculations or determinations made by the Calculation Agent hereunder shall, in the absence of manifest error, wilful default or bad faith, be final and conclusive, and the Calculation Agent shall have no liability to the Issuer, the Guarantor, the Noteholders or any third party in relation to such estimates, calculations or determinations except in the case of its wilful default or bad faith.

11.3 **Transactions by the Calculation Agent:** Nothing contained herein shall prevent the Calculation Agent from dealing in the Notes or from entering into any related transaction, including without limitation any swap or hedging transactions with the Issuer, the Guarantor (or any of their respective affiliates) or any holder of the Notes (or any of its affiliates).

11.4 DTC Book-Entry Procedures and Settlement

The Notes will be book-entry (global) securities. Upon issuance, all book-entry securities will be represented by one or more fully registered global securities, without coupons. Each global security will be deposited with, or on behalf of, The Depository Trust Company ("DTC"), a securities depositary, and will be registered in the name of DTC or a nominee of DTC. DTC will thus be the only registered holder of these securities.

Purchasers of securities may only hold interests in the global Notes through DTC if they are participants in the DTC system. Purchasers may also hold interests through a securities intermediary — banks, brokerage houses and other institutions that maintain securities accounts for customers — that has an account with DTC or its nominee. DTC will maintain accounts showing the security holdings of its participants, and these participants will in turn maintain accounts showing the security holdings of their customers. Some of these customers may themselves be securities intermediaries holding securities for their customers. Thus, each beneficial owner of a book-entry security will hold that security indirectly through a hierarchy of intermediaries, with DTC at the "top" and the beneficial owner's own securities intermediary at the "bottom."

The securities of each beneficial owner of a book-entry security will be evidenced solely by entries on the books of the beneficial owner's securities intermediary. The actual purchaser of the securities will generally not be entitled to have the securities represented by the global securities registered in its name and will not be considered the owner under the declaration. In most cases, a beneficial owner will also not be able to obtain a paper certificate evidencing the holder's ownership of securities. The book-entry system for holding securities eliminates the need for physical movement of certificates and is the system through which most publicly traded common stock is held in the United States. However, the laws of some jurisdictions require some purchasers of securities to take physical delivery of their securities in definitive form. These laws may impair the ability to transfer book-entry securities.

A beneficial owner of book-entry securities represented by a global security may exchange the securities for definitive (paper) securities only if:

- DTC is unwilling or unable to continue as depositary for such global security and the Issuer does not appoint a qualified replacement for DTC within 90 days; or

- the Issuer in its sole discretion decides to allow some or all book-entry securities to be exchangeable for definitive securities in registered form.

Unless the Issuer indicates otherwise, any global security that is exchangeable will be exchangeable in whole for definitive securities in registered form, with the same terms and of an equal aggregate principal amount. Definitive securities will be registered in the name or names of the person or persons specified by DTC in a written instruction to the registrar of the securities. DTC may base its written instruction upon directions that it receives from its participants.

In the Final Terms, for book-entry securities, references to actions taken by security holders will mean actions taken by DTC upon instructions from its participants, and references to payments and notices of redemption to security holders will mean payments and notices of redemption to DTC as the registered holder of the securities for distribution to participants in accordance with DTC's procedures.

DTC is a limited purpose trust company organized under the laws of the State of New York, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered under section 17A of the U.S. Securities Exchange Act of 1934. The rules applicable to DTC and its participants are on file with the SEC.

The Issuer will not have any responsibility or liability for any aspect of the records relating to, or payments made on account of, beneficial ownership interest in the book-entry securities or for maintaining, supervising or reviewing any records relating to the beneficial ownership interests.

**Clearstream and Euroclear**

Links have been established among DTC, Clearstream, Luxembourg and Euroclear, to facilitate the initial issuance of book-entry securities and cross-market transfers of book-entry securities associated with secondary market trading.

Although DTC, Clearstream, Luxembourg and Euroclear have agreed to the procedures provided below in order to facilitate transfers, they are under no obligation to perform such procedures, and the procedures may be modified or discontinued at any time.

Clearstream, Luxembourg and Euroclear will record the ownership interests of their participants in much the same way as DTC, and DTC will record the aggregate ownership of each of the U.S. agents of Clearstream, Luxembourg and Euroclear, as participants in DTC.

When book-entry securities are to be transferred from the account of a DTC participant to the account of a Clearstream, Luxembourg participant or a Euroclear participant, the purchaser must send instructions to Clearstream, Luxembourg or Euroclear through a participant at least one Business Day prior to settlement. Clearstream, Luxembourg or Euroclear, as the case may be, will instruct its U.S. agent to receive book-entry securities against payment. After settlement, Clearstream, Luxembourg or Euroclear will credit its participant's account. Credit for the book-entry securities will appear on the next day (European time).

Because settlement is taking place during New York business hours, DTC participants can employ their usual procedures for sending book-entry securities to the relevant U.S. agent acting for the benefit of Clearstream, Luxembourg or Euroclear participants. The sale proceeds will be available to the DTC seller on the settlement date. Thus, to the DTC participant, a cross-market transaction will settle no differently than a trade between two DTC participants.

When a Clearstream, Luxembourg or Euroclear participant wishes to transfer book-entry securities to a DTC participant, the seller must send instructions to Clearstream, Luxembourg or Euroclear through a participant at least one Business Day prior to settlement. In these cases, Clearstream, Luxembourg or Euroclear will instruct its U.S. agent to transfer the book-entry securities against payment. The payment will then be reflected in the account of the Clearstream, Luxembourg or Euroclear participant the

following day, with the proceeds back-valued to the value date (which would be the preceding day, when settlement occurs in New York). If settlement is not completed on the intended value date (i.e., the trade fails), proceeds credited to the Clearstream, Luxembourg or Euroclear participant's account would instead be valued as of the actual settlement date.

12.  **Note to Noteholders**

If you purchase our Notes offered hereby, by accepting delivery of this Final Terms, you will be deemed to have represented and agreed as follows:

You understand and will expect that confirmations, agreements, term sheets, prospectuses, private placement memoranda and other offering materials, as well as other documents and information relative to investments that you may consider or make will be drafted in English.  These documents may contain the terms of a proposed offering or transaction, discussions of applicable laws and requirements, representations that you must make, and disclosures of risks, potential events, conditions and information which could affect the value, performance, term, return or other characteristics of your investment. You represent that you **or your agents acting on your behalf are** competent to read, write, speak and comprehend English with the requisite degree of proficiency to understand such concepts and documents unless you have disclosed otherwise in writing to Lehman Brothers prior to entering into a specific transaction.  You understand that by making any investment or entering into any transaction pursuant to an offering document, contract, confirmation or other document that is in English, you represent to Lehman Brothers that you have been able to read and understand that document **and waive any claim that you are unable to understand the documentation due to language differences.**  You further understand that it is your responsibility to ask any questions that you may have about any transaction or related documentation, and to be satisfied that those questions are answered to your satisfaction and the satisfaction of your advisors.

Si usted compra nuestros títulos de deuda ofrecidos por medio de la presente, al aceptar envío de este memorándum de oferta, se considerará que usted habrá declarado y acordado lo siguiente:

Usted entiende y espera que las confirmaciones, acuerdos, términos y condiciones, prospectos, memorándums de colocaciones privadas y otros folletos de oferta, así como documentos e información relativa a inversiones que usted pudiera considerar o efectuar serán redactados en inglés. Estos documentos pueden contener los términos de una oferta o transacción propuesta, discusiones sobre leyes y requerimientos aplicables, declaraciones que usted debe efectuar y exposición de riesgos, eventos potenciales, condiciones e información que podrían afectar el valor, rendimiento, plazos, retornos u otras características de su inversión. **Usted declara que, tanto usted como los representantes que actúen en su nombre**, son capaces de  leer, escribir, hablar y comprender  el idioma inglés con el grado de habilidad requerido para entender ese tipo de conceptos y documentos salvo que usted hubiera expresado lo contrario por escrito a Lehman Brothers antes de entrar en una  transacción  específica. Usted entiende que al hacer  cualquier inversión o entrar en cualquier transacción de acuerdo con una oferta

mediante un documento , contrato, confirmación u otro documento que esté en inglés, usted está declarando a Lehman Brothers que ha podido leer y comprender ese documento **y desiste de efectuar cualquier reclamo por diferencias idiomáticas, ya que usted declara estar capacitado para comprender la documentación**. Asimismo, entiende que es su reponsabilidad plantear todas las preguntas que pudiera tener acerca de cualquier transacción o documentación relativa a la misma  y estar conforme con que esas preguntas sean respondidas a su satisfacción y la satisfacción de sus consejeros.

Em caso de compra de nossos títulos de dívida oferecidos por meio do presente, ao aceitar o recebimento desse memorando de oferta, você terá prestado as seguintes declarações e assumido as seguintes obrigações:

V. Sa. reconhece e espera que que todas as confirmações, acordos, sumário de termos e condições, prospectos, memorandos de colocação privada e outros materiais relacionados à oferta, bem como outros documentos e informações relacionados ao investimento que V. Sa. Possa avaliar ou realizar sejam elaborados em língua inglesa. Tais documentos podem conter os termos de uma oferta ou operação proposta, discussões legais, requisitos e declarações exigidos de V.Sa. e divulgação de riscos, eventos possíveis, condições e informações que podem afetar a avaliação, valor, performance, prazo, retorno ou outras características do seu investimento. V.Sa. declara que V.Sa. ou os seus representantes, agindo em seu nome, são aptos a ler, escrever, falar e compreender inglês em nível suficiente para a compreensão de tais conceitos e documentos a menos que V.Sa. tenha se manifestado em sentido contrário por escrito ao Lehman Brothers anteriormente à celebração de uma determinada operação. V.Sa. compreende que, ao fazer qualquer investimento ou celebrar qualquer operação nos termos de um documento de oferta, contrato, confirmação ou outro documento em inglês, V.Sa. declara ao Lehman Brothers que V.Sa. foi capaz de ler e compreender o documento e renúncia qualquer direito de ação com base em alegação de que V.Sa. era incapaz de compreender a documentação em razão de diferenças de idioma. V.Sa. reconhece, ainda, que é sua responsabilidade levantar quaisquer questões que V.Sa. possa ter com relação a qualquer das operações ou documentos relacionados, e considerar-se satisfeito que as resposta a tais questões satisfazem as suas necessidades ou as necessidades de seus consultores.

ANNEX C

## INFORMATION ON THE UNDERLYING

**The Shares are not particularly described in these Final Terms. The information contained in this Supplement relating to the Company and the Shares consists only of extracts from or summaries of information which is publicly available. The information in this section was gathered from Bloomberg Financial Markets without independent verification. Neither the Issuer nor the Guarantor has independently verified any such information, and neither accepts any responsibility for error or omission. The Shares are publicly listed and investors may acquire such further information as they deem necessary in relation to the Shares and the Company from such publicly available information as they deem appropriate. Investors should make their own investment, hedging and trading decisions (including decisions regarding the suitability of this investment), based upon their own judgement and upon advice from such advisers as such investors deem necessary and not upon any view expressed by the Issuer or the Guarantor.**

The Shares are registered under the Securities and Exchange Act of 1934, as amended (the "Exchange Act"). Companies with securities registered under Exchange Act are required to file periodically certain financial and other information specified by the U.S. Securities and Exchange Commission (the "Commission"). Information provided to or filed with the Commission can be inspected and copied at the public reference facilities maintained by the Commission at Room 1024, 450 Fifth Street, N.W., Washington, D.C. 20549, and copies of such material can be obtained from the Public Reference Section of the Commission, 450 Fifth Street, N.W., Washington, D.C. 20549, at prescribed rates. In addition, information provided to or filed with the Commission electronically can be accessed through a website maintained by the Commission. The address of the Commission's website is http://www.sec.gov. In addition, information regarding the Shares may be obtained from other sources including, but not limited to, press releases, newspaper articles and other publicly disseminated documents. We make no representation or warranty as to the accuracy or completeness of such information.

**Dean Foods Co.**

Dean Foods Company operates as a food and beverage company in the United States. It operates in two segments, Dairy Group and WhiteWave Foods Company. The Dairy Group segment manufactures, markets, and distributes various branded and private label dairy case products, including half-and-half, whipping cream, dairy coffee creamers, and ice cream mix; ice cream and ice cream novelties; yogurt, cottage cheese, sour cream, and dairy-based dips; fruit juice, fruit-flavored drinks, and water; and butter, cheese, and eggs. It serves retailers, distributors, restaurants, hotels, foodservice outlets, schools, and governmental entities. The WhiteWave Foods Company segment produces various branded soy, dairy, and dairy-related products, such as Silk soymilk and cultured soy

products, Horizon Organic dairy products, International Delight coffee creamers, LAND O'LAKES creamers and fluid dairy products, and Rachel's Organic dairy products. This segment also sells The Organic Cow organic dairy products, White Wave and Tofu Town branded tofu, and Hershey's milks and milkshakes. It sells its products through internal sales force and independent brokers to grocery stores, club stores, natural foods stores, mass merchandisers, convenience stores, and foodservice outlets. The company was founded in 1925. It was formerly known as Suiza Foods Corporation and changed its name to Dean Foods Company in 2001. Dean Foods is headquartered in Dallas, Texas.

**Share prices USD (Quarterly high, low and closing levels)**

| Date | High | Low | Close |
|---|---|---|---|
| **2005** | | | |
| First Quarter | 30.21 | 26.93 | 29.11 |
| Second Quarter | 35.24 | 28.74 | 35.24 |
| Third Quarter | 38.86 | 34.80 | 38.86 |
| Fourth Quarter | 39.45 | 34.45 | 37.66 |
| **2006** | | | |
| First Quarter | 39.69 | 37.02 | 38.83 |
| Second Quarter | 39.79 | 34.70 | 37.19 |
| Third Quarter | 42.81 | 35.97 | 42.02 |
| Fourth Quarter | 43.51 | 39.36 | 42.28 |
| **2007** | | | |
| First Quarter | 48.31 | 41.26 | 46.74 |
| Second Quarter | 47.33 | 31.00 | 31.87 |
| Third Quarter | 31.85 | 24.30 | 25.58 |
| Fourth Quarter | 27.77 | 24.51 | 25.86 |
| **2008** | | | |
| First Quarter (through March 13) | 28.90 | 20.25 | 20.25 |

**Total Annual Dividends (net per share, in USD)**

| Year | Aggregate Dividends (USD) |
|---|---|
| 2005 | 0.00 |
| 2006 | 0.00 |
| 2007 | 15.00 |
| 2008 (through 13 March) | 0.00 |

- 32 -

Spin-Off – TreeHouse Foods Inc., 1 per 5, 1st quarter 2005.

BASE PROSPECTUS

# LEHMAN BROTHERS HOLDINGS INC.
(INCORPORATED IN THE STATE OF DELAWARE)

# LEHMAN BROTHERS TREASURY CO. B.V.
(INCORPORATED WITH LIMITED LIABILITY IN THE NETHERLANDS
AND HAVING ITS STATUTORY DOMICILE IN AMSTERDAM)

# LEHMAN BROTHERS BANKHAUS AG
(INCORPORATED IN THE FEDERAL REPUBLIC OF GERMANY)

## U.S.$100,000,000,000
## EURO MEDIUM-TERM NOTE PROGRAM
UNCONDITIONALLY AND IRREVOCABLY GUARANTEED
AS TO NOTES TO BE ISSUED BY EACH OF LEHMAN BROTHERS TREASURY CO. B.V.
AND LEHMAN BROTHERS BANKHAUS AG BY

# LEHMAN BROTHERS HOLDINGS INC.

Lehman Brothers Holdings Inc. (including when acting through its London Branch, "*LBHI*"), Lehman Brothers Treasury Co. B.V. ("*LBTCBV*") and Lehman Brothers Bankhaus AG (including when acting through its London Branch, "*LBB*") (each an "*Issuer*" and collectively, the "*Issuers*" have established a program (the "*Program*") under which they may from time to time issue medium-term notes (the "*Notes*") in series (each a "*Series*" or the "*Notes of a Series*") with each Series comprising one or more tranches (each a "*Tranche*") of Notes, outside the United States with maturities of one month or more from the date of issue and denominated in U.S. dollars or, subject to certain conditions and as provided in "*Form of the Notes*" and "*Terms and Conditions of the Notes*" herein, in other currencies or composite currencies. Each Note issued by LBTCBV or LBB will have the benefit of an unconditional and irrevocable guarantee (the "*Guarantees*") of LBHI, as guarantor thereunder (in such capacity, the "*Guarantor*"), as to all amounts of principal and premium and interest, if any, thereof and thereon due. At the date hereof, the Issuers and the Guarantor have increased the maximum principal amount of Notes which may be outstanding under the Program from the previous maximum of U.S.$60,000,000,000. The maximum principal amount of Notes outstanding may not at any time exceed U.S.$100,000,000,000, of which the maximum principal amount of Notes outstanding issued by LBB may not at any time exceed U.S.$2,000,000,000 (or, in each case, the equivalent in other currencies or composite currencies calculated as described herein); provided that the Issuers reserve the right to increase such amount from time to time.

The Notes, which may be issued at their principal amount or at a premium or discount to their principal amount, may bear interest on a fixed or floating rate basis or equity linked interest and/or interest linked to the performance of one or more reference entities or other basis or combination thereof or be issued on a fully discounted basis and not bear interest.

Notes of a Series may be issued on an unsubordinated basis or on a subordinated basis in either bearer or registered form. Notes in bearer form will initially be represented by a temporary global Note. Each temporary global Note which is intended to be issued in new global note form (a "*New Global Note*" or "*NGN*") will be deposited on or around the issue date thereof with a common safekeeper for Euroclear Bank SA/NV ("Euroclear") and Clearstream Banking, société anonyme, Luxembourg ("*Clearstream, Luxembourg*"). Each temporary global Note which is not intended to be issued in new global note form (a "*Classic Global Note*" or "*CGN*") will be deposited on or about the issue date thereof with a common depositary for Euroclear and Clearstream, Luxembourg. Notes in bearer form will not be exchangeable for Notes in registered form. Notes in registered form may initially be issued in definitive or global form and, in the latter case, the global Note will be deposited on or about the issue date thereof with either a common depositary for Euroclear and Clearstream, Luxembourg or a custodian for The Depositary Trust Company ("DTC"). Notes, in registered form will not be exchangeable for Notes in bearer form. See "Form of the Notes" and "Terms and Conditions of the Notes" herein.

Application has been made to the Irish Financial Services Regulatory Authority (the "*IFSRA*"), which is the Irish competent authority for the purpose of Directive 2003/71/EC (the "*Prospectus Directive*") for approval of this Base Prospectus (the "Base Prospectus") as a base prospectus issued in compliance with the Prospectus Directive as implemented in Ireland by the Prospectus Directive 2003/71/EC) Regulations 2005 (the "*Prospectus Regulations*") for the purpose of giving information with regard to the issue of Notes under the Program during the period of twelve months after the date hereof. Application will be made for Notes issued under the Program to be admitted to the Official List of the Irish Stock Exchange and to trading on its regulated market and on the Alternative Securities Market of the Irish Stock Exchange. Such approval relates only to the Notes which are to be admitted to trading on the EU Regulated Market of the Irish Stock Exchange or other regulated markets for the purposes of Directive 93/22/EEC or which are to be offered to the public in any Member State of the European Economic Area. Application has also been made to the Singapore Exchange Securities Trading Limited (the "*Singapore Stock Exchange*") for approval in respect of the listing and quotation on the Official List of the Singapore Stock Exchange of any Notes issued under the Program which are agreed at the time of the issue to be so listed on the Singapore Stock Exchange during the period of 12 months after the date of this Base Prospectus. The Singapore Stock Exchange assumes no responsibility for the correctness of any statements made or opinions or reports contained in this Base Prospectus. Admission of the Notes to the Official List of the Singapore Stock Exchange and quotation of the Notes on the Singapore Stock Exchange is not to be taken as an indication of the merits of the Issuers or the Guarantor, or the Notes.

Notes to be issued pursuant to the Program will have the minimum denomination specified in the relevant Final Terms or Drawdown Prospectus (each term as defined below), subject to compliance with all applicable legal and/or regulatory and/or central bank requirements.

The Program provides that Notes may also be issued on the basis that they will not be admitted to listing, trading and/or quotation by any competent authority, stock exchange and/or quotation system or that they will be admitted to listing, trading and/or quotation by any other competent authority, stock exchange and/or quotation system as may be agreed between the relevant Issuer and the relevant Dealer(s). In particular, Notes denominated in Australian dollars and issued in the domestic Australian capital markets ("*Australian Domestic Notes*") by LBTCBV or LBHI may be listed on the Australian Stock Exchange operated by ASX Limited (the "*Australian Stock Exchange*").

Neither the Notes nor the Guarantees have been, or will be, registered under the United States Securities Act of 1933, as amended (the "Securities Act"), and may include Notes in bearer form that are subject to United States tax law requirements. Subject to certain exceptions, neither the Notes nor the Guarantees may be offered, sold or delivered within the United States or to U.S. persons.

Arranger and Dealer

# LEHMAN BROTHERS

The date of this Base Prospectus is July 24, 2007.

This Base Prospectus replaces the Debt Issuance Program Prospectus dated August 9, 2006.

# INTRODUCTION

In this document, references to the *"Group"* are to Lehman Brothers Holdings Inc. and its direct and indirect subsidiaries (which include LBTCBV and LBB).

LBHI accepts responsibility for all the information contained in this Base Prospectus and declares that, having taken all reasonable care to ensure that such is the case, the information contained in this Base Prospectus is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

LBTCBV accepts responsibility for all the information contained in this Base Prospectus to the extent that such information relates to LBTCBV and declares that, having taken all reasonable care to ensure that such is the case, the information contained in this Base Prospectus which relates to LBTCBV is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

LBB accepts responsibility for all the information contained in this Base Prospectus to the extent that such information relates to LBB and declares that, having taken all reasonable care to ensure that such is the case, the information contained in this Base Prospectus which relates to LBB is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

The information relating to ISDAFIX (as set out herein) has been extracted from information displayed by Reuters and published by ISDAFIX on ISDAFIX page ISDAFIXINFO01. Each of LBHI, LBTCBV and LBB confirms that such information has been accurately reproduced and that, so far as it is aware, and is able to ascertain from information displayed by Reuters and published by ISDAFIX on ISDAFIX page ISDAFIXINFO01, no facts have been omitted which would render the reproduced information inaccurate or misleading.

This Base Prospectus must be read in conjunction with all information deemed to be incorporated by reference (see "Information Incorporated by Reference" on page 35) and shall be read and construed on the basis that such Information is so incorporated and forms part of this Base Prospectus.

This Base Prospectus (together with supplements to this Base Prospectus from time to time (each a *"Supplement"* and together the *"Supplements"*)) comprises three base prospectuses in respect of each of LBHI, LBTCBV, and LBB and in respect of LBHI as Guarantor for the purposes of Article 5.4 of the Prospectus Directive as implemented in Ireland by the Prospectus (Directive 2003/71/EC) Regulations 2005 (the *"Irish Prospectus Regulations"*).

The Dealers have not independently verified the information contained herein. Accordingly, no representation, warranty or undertaking (express or implied) is made and no responsibility or liability is accepted by the Dealers as to the accuracy or completeness at any time of this Base Prospectus or any supplement hereto.

No person is authorized to give any information or to make any representations other than those contained in this document in connection with the offering or sale of the Notes and, if given or made, such information or representations must not be relied upon as having been authorized by LBHI, LBTCBV, LBB or any Dealer. None of this Base Prospectus, any supplement, any other financial statements or any further information supplied in connection with the Notes is intended to provide the basis of any credit or other evaluation and should not be considered as a recommendation or a statement of opinion, or a report of either of those things, by LBHI, LBTCBV, LBB or the Dealers that any recipient of this Base Prospectus, any supplement, any other financial statements or any further information supplied in connection with the Notes should purchase any of the Notes. Each investor contemplating purchasing Notes should make its own independent investigation of the financial condition and affairs, and its own appraisal of the creditworthiness of the Issuers, the Guarantor and the Group. None of this Base Prospectus, any supplement, any other financial statements or any further information supplied in connection with the Notes constitutes an offer or invitation by or on behalf of any of LBHI, LBTCBV, LBB or the Dealers to any person to subscribe for, or to purchase, any of the Notes.

The delivery of this Base Prospectus does not at any time imply that the information contained herein concerning LBHI, LBTCBV, LBB or the Group is correct at any time subsequent to the date hereof or that any supplement, any other financial statements or any further information supplied in connection with the Notes is correct as of any time subsequent to the date indicated in the document containing the same. The Dealers expressly do not undertake to review the financial condition or affairs of LBHI, LBTCBV, LBB or the Group during the life of the Program. Investors should review, *inter alia*, the most recent consolidated financial statements of LBHI and the unconsolidated financial statements of LBTCBV and LBB when deciding whether or not to purchase any of the Notes.

Any investment in Notes does not have the status of a bank deposit and is not within the scope of the deposit protection scheme operated by IFSRA. The Issuers are not and will not be regulated by IFSRA as a result of issuing the Notes.

Where an Issuer wishes to issue Notes with a maturity of less than one year, it shall do so in full compliance with the notice issued by IFSRA of exemptions granted under section 8(2) of the Central Bank Act, 1971, as amended.

Copies of this Debt Issuance Program Prospectus have been filed with and approved by IFSRA as required by the Irish Prospectus Regulations.

The distribution of this Base Prospectus and the offering of the Notes in certain jurisdictions may be restricted by law. None of LBHI, LBTCBV, LBB or the Dealers represents that this Base Prospectus may be lawfully distributed, or that the Notes may be lawfully offered in compliance with any applicable registration or other requirements in any such jurisdiction, or pursuant to an exemption available thereunder, or assumes any responsibility for facilitating any such distribution or offering. Accordingly, the Notes may not be offered or sold, directly or indirectly, and none of this Base Prospectus, any supplement, any advertisement or any other offering material may be distributed or published in any jurisdiction, except under circumstances that will result in compliance with any applicable laws and regulations and each of the Dealers has represented that all offers and sales by it will be made on the same terms. Persons into whose possession this Base Prospectus comes must inform themselves about, and observe, any such restrictions. In particular, there are restrictions on the distribution of this Base Prospectus and the offer or sale of Notes in the United States, the European Economic Area, the United Kingdom, Japan, The Netherlands, Singapore, Italy and Australia. See "Subscription and Sale" herein.

**Neither the Notes nor the Guarantees have been, or will be, registered under the Securities Act, and may include Notes in bearer form that are subject to U.S. tax law requirements. Subject to certain exceptions, Notes in bearer form may not be offered, sold or delivered within the United States or to, or for the account or benefit of U.S. persons. Accordingly, the Notes are being offered and sold only (A) in registered form in the United States to qualified institutional buyers (as defined in Rule 144A under the Securities Act ("*Rule 144A*")) in reliance on Rule 144A or Section 4(2) of the Securities Act in the case of offers and sales by an affiliate of the relevant Issuer and (B) in registered or bearer form outside the United States (as such term is defined in Regulation S under the Securities Act ("Regulation S")) to non-U.S. persons in reliance on Regulation S and, in the case of Notes in bearer form, in compliance with applicable U.S. tax law requirements. Prospective purchasers are hereby notified that sellers of the Notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A. See "Subscription and Sale".**

Notwithstanding any provision herein, any person (and each employee, representative, or other agent of such person) may disclose to any and all other persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to such person relating to such tax treatment and tax structure.

## NOTICE TO NEW HAMPSHIRE RESIDENTS ONLY

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS

EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE OF NEW HAMPSHIRE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

In this Base Prospectus, unless otherwise specified or the context otherwise requires, all references to "dollars", "U.S.$" and "$" are to the currency of the United States of America, references to "pounds", "sterling" and "£" are to the currency of the United Kingdom, references to "A$" and "Australian dollars" are to the currency of the Commonwealth of Australia, references to "euro", "EUR" and "€" are to the single currency of participating member states of the European Union and references to "S$" are to the currency of Singapore.

In connection with the issue of any Tranche (as defined under "Terms and Conditions of the Notes") of Notes under the Program, the Dealer or Dealers (if any) named as the Stabilizing Manager(s) (or persons acting on behalf of any Stabilizing Manager(s)) in the applicable Final Terms may, outside Australia and on a market operated outside Australia, over-allot Notes or effect transactions with a view to supporting the market price of the Notes of the Series of which such Tranche forms part at a level higher than that which might otherwise prevail. However, there is no assurance that the Stabilizing Manager(s) (or persons acting on behalf of a Stabilizing Manager) will undertake stabilization action. Any stabilization action may begin on or after the date on which adequate public disclosure of the Final Terms of the offer of the relevant Tranche of Notes is made and, if begun, may be ended at any time, but it must end no later than the earlier of 30 days after the issue date of the relevant Tranche of Notes and 60 days after the date of the allotment of the relevant Tranche of Notes. Such stabilization must be conducted by the relevant Stabilizing Manager (or person(s) acting on behalf of any Stabilizing Manager) in accordance with all applicable laws, rules and regulations.

The language of this Base Prospectus is English. Certain legislative references and technical terms have been cited in their original language in order that the correct technical meaning may be ascribed to them under applicable law.

## TABLE OF CONTENTS

Summary Of This Base Prospectus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Risk Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Available Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Information Incorporated By Reference . . . . . . . . . . . . . . . . . . . . . . . . . . 35

General Description Of The Program . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Form Of The Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Pro Forma Final Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Terms And Conditions Of The Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Additional Descriptions In Relation To Specific Notes . . . . . . . . . . . . . . . . . . 109

Annex 1 Amendments To The Terms And Conditions Of The Notes In Respect Of
Danish Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

Annex 2 Amendments To The Terms And Conditions Of The Notes In Respect Of
Finnish Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

Annex 3 Amendments To The Terms And Conditions Of The Notes In Respect Of
Norwegian Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

Annex 4 Amendments To The Terms And Conditions Of The Notes In Respect Of
Swedish Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

Annex 5 Additional Terms And Conditions For Commodity-Linked Notes With Certain
Agricultural Products, Energy Products And Metals As A Relevant Commodity . . . . . . . 133

Annex 6 Additional Terms And Conditions For FX Notes . . . . . . . . . . . . . . . . . 149

Annex 7 Additional Terms And Conditions For Basket Linked Notes . . . . . . . . . . . . 161

Annex 8 Additional Terms And Conditions For Range Accrual Notes . . . . . . . . . . . . 164

Use Of Proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

Lehman Brothers Holdings Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

Summary Financial Information Of Lehman Brothers Holdings Inc. . . . . . . . . . . . . . 169

Lehman Brothers Treasury Co. B.V . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

Summary Financial Information Of Lehman Brothers Treasury Co. B.V. . . . . . . . . . . . 173

Lehman Brothers Bankhaus AG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

Summary Financial Information Of Lehman Brothers Bankhaus AG . . . . . . . . . . . . . 176

United States Taxation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

Netherlands Taxation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

German Taxation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

Australian Taxation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

United Kingdom Taxation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

EU Savings Directive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

Irish Taxation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

United States Employee Benefit Plan Considerations . . . . . . . . . . . . . . . . . . . 202

Subscription And Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203

General Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

## SUMMARY OF THIS BASE PROSPECTUS

*This summary must be read as an introduction to this Base Prospectus and any decision to invest in the Notes should be based on a consideration of this Base Prospectus as a whole. No civil liability will attach to the persons responsible for this summary in any Member State of the European Economic Area which has implemented the Prospectus Directive solely on the basis of this summary, including any translation thereof, unless it is misleading, inaccurate or inconsistent when read together with the other parts of this Base Prospectus. Where a claim relating to the information contained in this Base Prospectus is brought before a court in a Member State of the European Economic Area, the plaintiff may, under the national legislation of the Member State where the claim is brought, be required to bear the costs of translating the Base Prospectus before the legal proceedings are initiated.*

Issuers:

**Lehman Brothers Holdings Inc. ("*LBHI*")**

LBHI, a Delaware corporation, is the ultimate parent company of the Lehman Brothers group. Lehman Brothers' principal business activities are investment banking, capital markets and investment management.

Its global headquarters in New York and regional headquarters in London and Tokyo are complemented by offices in additional locations in North America, Europe, the Middle East, Latin America and the Asia Pacific region. Lehman Brothers, through predecessor entities, was founded in 1850.

LBHI also acts through its London Branch which is registered at Companies House with Branch Number BR005486.

Summary financial information in respect of LBHI is set out in this Base Prospectus.

**Lehman Brothers Treasury Co. B.V. ("*LBTCBV*")**

LBTCBV was incorporated in The Netherlands as a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) and it acts principally as a Netherlands finance company supporting the working capital needs of various, principally European, subsidiaries of LBHI.

Summary financial information in respect of LBTCBV is set out in this Base Prospectus.

**Lehman Brothers Bankhaus AG ("*LBB*")**

LBB was incorporated under German law as a private Stock Corporation ("*Aktiengesellschaft*"). The principal activity of LBB is to act as a commercial bank supporting the working capital and lending requirements of various institutional clients worldwide and European subsidiaries of LBHI. In addition LBB provides financial advisory services to investment banking clients in Germany and Austria.

LBB also acts through its London Branch which is registered at Companies House with Branch Number BR003960.

6

Summary financial information in respect of LBB is set out in this Base Prospectus.

| | |
|---|---|
| Guarantor: | In the case of Notes issued by LBTCBV and LBB, LBHI in each case, pursuant to a guarantee agreement dated 24 July, 2007 between the relevant Issuer and the Guarantor (as amended, restated or supplemented from time to time, each a "*Guarantee*" and together the "*Guarantees*"). |

Under the Guarantees, LBHI will unconditionally and irrevocably guarantee all amounts of principal and premium and interest (if any) on Notes issued by each of LBB and LBTCBV so that should either of LBB or LBTCBV fail to perform or procure the performance of any obligation under the Terms and Conditions of the Notes, upon written demand by the Holders, the Guarantor shall be liable to pay such amounts.

| | |
|---|---|
| Arranger: | Lehman Brothers International (Europe). |
| Dealers: | Lehman Brothers International (Europe) and Lehman Brothers Inc. pursuant to an amended and restated distribution agreement dated July 24, 2007 between themselves, the Issuers and the Guarantor (as further amended, restated or supplemented from time to time, the "*Distribution Agreement*") (together with any other dealers appointed from time to time pursuant to the Distribution Agreement, the "*Dealers*"). |
| Fiscal Agent, Principal Paying Agent, Registrar and the Exchange Agent: | The Bank of New York, acting through its London branch, as the Fiscal Agent and the Principal Paying Agent, and the Bank of New York, acting through its New York branch, as the Registrar, the agent making payments in the case of Notes registered in the name of a nominee of DTC that are denominated in currency other than U.S. dollars (the "*Exchange Agent*") and the U.S. Sub-Paying Agent, pursuant to an amended and restated fiscal agency agreement dated July 24, 2007 between, inter alia, the Fiscal Agent, the Registrar, the Issuers and the Guarantor (as further amended, restated or supplemented from time to time, the "*Fiscal Agency Agreement*") or such other agent as is specified in the relevant Final Terms. |
| Irish Listing Agent: | The Bank of New York. |
| Irish Paying Agent: | BNY Financial Services Plc. |
| New York Paying Agent: | The Bank of New York, acting through its New York branch. |
| Program Amount: | Up to U.S.$100,000,000,000 (but only up to U.S.$2,000,000,000 of such amount in respect of Notes issued by LBB) aggregate principal amount of Notes outstanding. |
| Currencies: | Subject to compliance with all applicable legal and/or regulatory and/or central bank requirements, such currencies as may be agreed between the relevant Issuer and the relevant Dealer(s). |

| | |
|---|---|
| Australian Domestic Notes: | Notes issued pursuant to the Program may include Australian Domestic Notes. Australian Domestic Notes will be issued by LBTCBV or LBHI pursuant to a deed poll to be entered into by the relevant Issuer and will be registered in uncertificated and dematerialised book-entry form with Austraclear Limited as operator of the Austraclear System (as defined in "Terms and Conditions of the Notes" herein). |
| Danish Notes: | Notes issued pursuant to the Program may include Danish Notes. Danish Notes will be issued by LBTCBV or LBB pursuant to the Fiscal Agency Agreement as supplemented by a Danish Agency Agreement with Skandinaviska Enskilda Banken A/S as Danish Issuing Agent and will be registered in uncertificated and dematerialised book-entry form with Danish Securities Centre ("*VP*"). For so long as it is a requirement of the VP Rules (as defined below), Danish Notes may not provide for any form of settlement in respect of payment of interest, principal or premium other than payment in cash. |
| Finnish Notes: | Notes issued pursuant to the Program may include Finnish Notes. Finnish Notes will be issued by LBTCBV or LBB pursuant to the Fiscal Agency Agreement as supplemented by a Finnish Issuing and Paying Agency Agreement with Svenska Handelsbanken, Branch Operation in Finland as Finnish Issuing Agent and will be registered in uncertificated and dematerialised book-entry form with the Finnish Central Securities Depository (the "*APK*"). |
| Norwegian Notes: | Notes issued pursuant to the Program may include Norwegian Notes. Norwegian Notes will be issued by LBTCBV or LBB pursuant to the Fiscal Agency Agreement as supplemented by a Norwegian Agency Agreement with DnB NOR Bank ASA as Norwegian Issuing Agent and will be registered in uncertificated and dematerialised electronic book-entry form with the Norwegian Central Securities Depository (the "*VPS*"). |
| Swedish Notes: | Notes issued pursuant to the Program may include Swedish Notes. Swedish Notes will be issued by LBTCBV or LBB pursuant to the Fiscal Agency Agreement as supplemented by a Swedish Agency Agreement with Svenska Handelsbanken as Swedish Issuing Agent and will be registered in uncertificated and dematerialised book-entry form with the Swedish Central Securities Depository (the "*VPC*"). For so long as it is a requirement of the VPC Rules (as defined below), Swedish Notes may not provide for any form of settlement in respect of payment of interest, principal or premium other than payment in cash. |
| Maturities: | Such maturities as may be agreed between the relevant Issuer and the relevant Dealer(s) and as specified in the applicable Final Terms, subject to a minimum maturity of one month or more. |

| | |
|---|---|
| Issue Price: | Notes may be issued at their principal amount, at a premium or discount to their principal amount or on a partly paid basis, as specified in the Final Terms relating to such Notes. |
| Fixed Rate Notes: | Fixed Rate Notes will bear interest which will be payable in arrears on each Interest Payment Date as may be specified in the applicable Final Terms and upon redemption or maturity and will be calculated on such basis as may be specified in the applicable Final Terms. |
| Floating Rate Notes: | Floating Rate Notes will bear interest at a rate determined on the same basis as the floating rate under a nominal interest rate swap transaction in the relevant Specified Currency governed by an agreement incorporating the ISDA Definitions, or calculated by reference to LIBOR or EURIBOR or such other reference rate appearing on the agreed screen page of a commercial quotation service or on such other basis as may be agreed between the relevant Issuer and the relevant Dealer(s) as is specified in the applicable Final Terms, in each case as adjusted by addition or subtraction of any applicable spread or by multiplication by any applicable spread multiplier. |
| Index-Linked Notes: | Notes issued pursuant to the Program may include Notes which provide for payments of principal or premium in respect of Index-Linked Redemption Amount Notes or of interest in respect of Index-Linked Interest Notes which are linked to a currency or commodity index, securities exchange or commodities exchange index or other index or as otherwise specified in the applicable Final Terms. Specified provisions regarding the manner in which such payments are to be calculated and made will be set forth in the Final Terms relating to such Notes. |
| Hybrid Rate Notes: | Notes issued pursuant to the Program may include Notes in which interest will be payable in arrears on specified Interest Payment Dates in any combination of rate bases during the term of such Notes including as Zero Coupon Notes, Fixed Rate Notes, Floating Rate Notes and/or Index-Linked Interest Notes (or calculated on any other basis in respect of rate or return), in each case as specified in the applicable Final Terms. |
| Equity-Linked and Credit-Linked Notes: | Notes issued pursuant to the Program may include Notes which provide for payments of principal, premium or interest which are linked to a single share or a basket of several shares ("*Equity-Linked Notes*"), or Notes which provide for payment upon redemption and/or return based on the credit performance of any one or more reference entities ("*Credit-Linked Notes*"), in each case as specified in the applicable Final Terms. Specified provisions regarding the manner in which such payments are to be calculated and made will be set forth in the Final Terms. In either case the Notes may provide for physical settlement with respect to certain specified obligations in accordance with the provisions of the applicable Final Terms. For the avoidance of any doubt, the |

9

Issuer will not issue equity securities (such as shares) or asset-backed securities under this Program.

**Other Provisions Relating to Floating Rate Notes and Index-Linked Notes:** Floating Rate Notes and Index-Linked Interest Notes may have a maximum interest rate, a minimum interest rate or both or neither. Interest on Floating Rate Notes and Index-Linked Interest Notes in respect of each Interest Period, as selected prior to issue by the relevant Issuer and the relevant Dealer(s), will be payable on such Interest Payment Dates specified in, or determined pursuant to, the applicable Final Terms and will be calculated on the basis of the relevant Day Count Fraction unless otherwise specified in the applicable Final Terms.

**Zero Coupon Notes:** Zero Coupon Notes will, unless otherwise specified in the relevant Final Terms, be offered and sold at a discount to their principal amount and will not bear interest.

**Dual Currency Notes:** Notes issued pursuant to the Program may include Notes as to which payments (whether in respect of principal or interest and whether at maturity or otherwise) will be made in such currencies and based upon such rate of exchange as agreed by the relevant Issuer and the relevant Dealer(s) as specified in the applicable Final Terms.

**Inflation-Linked Notes:** Notes issued pursuant to the Program may include Notes in respect of which the rate of interest applicable for one or more Interest Periods and /or the redemption amount is calculated by reference to one or more indices relating to the consumer price index or any other formula linked to a measure of inflation in one or more jurisdictions, as specified in the applicable Final Terms.

**Quanto Notes:** Notes issued pursuant to the Program may include Notes issued in a currency (the *"Quanto Currency"*) in respect of which, the rate of interest for one or more Interest Periods is calculated by reference to, among other variables, a currency exchange rate or currency exchange rates or interest rate or interest rates in respect of a currency or currencies, or an asset or assets or index or indices denominated in a currency or currencies, that is different to that of the Quanto Currency (each a *"Reference Currency"*) as specified in the applicable Final Terms. All interest amounts payable under the Notes and any amounts payable on the redemption of the Notes are paid in the Quanto Currency.

**Variable Cap Notes:** Notes issued pursuant to the Program may include Variable Cap Notes, in respect of which the rate of interest applicable for some or all of the term of the Notes is subject to a variable maximum interest rate (or cap) as specified in the applicable Final Terms. The variable maximum rate of interest (the *"Variable Cap"*) may be determined by reference to any rate, currency, index or formula (each a *"Variable Cap Factor"*), or any combination of such Variable Cap Factors.

**Rates of Interest Determined by Reference to Swap Rates:** Notes issued pursuant to the Program may include Notes in respect of which the redemption amount, rate of interest,

10

maximum rate of interest and/or minimum rate of interest is determined by reference to one or more swap rates specified in the applicable Final Terms.

Steepener Notes:

Notes issued pursuant to the Program may include Steepener Notes, in respect of which the rate of interest applicable for one or more Interest Periods is determined by reference to the difference between two swap rates specified in the applicable Final Terms, which difference may (if so specified in the applicable Final Terms) then be multiplied by a factor, subject to any minimum and/or maximum interest rates specified.

Path-Dependent Notes:

Notes issued pursuant to the Program may include Notes in respect of which, the rate of interest for one or more Interest Periods is calculated by reference to the rate of interest for one or more previous Interest Periods. The rate of interest for any Interest Period may be calculated by reference to the immediately preceding Interest Period (the *"Previous Rate"*) and one or more variables. Such variable may include a rate, a currency, an index, a formula and/or a constant. Alternatively, the rate of interest could be subject to a maximum or minimum rate of interest based upon the Previous Rate.

Switchable Notes:

Notes issued pursuant to the Program may include Notes in respect of which, for one or more Interest Periods, the rate of interest or a component of the rate of interest specified in the applicable Final Terms may, on certain dates (each an *"Exercise Date"*), change to a different rate of interest or component of the rate of interest (as the case may be) at the option (each a *"Switch Option"*) of either the Issuer and/or the Noteholder and/or a third party (the *"Switch Option Holder"*). The number of Switch Options available to the Switch Option Holder may be limited or unlimited as specified in the applicable Final Terms. The occurrence of such an event is known as a *"Switch Event"*.

Target Redemption Notes:

Notes issued pursuant to the Program may include Notes that will be redeemed if the aggregate amount of interest to be paid under the Notes (the *"Aggregate Interest Amount"*) is equal to or exceeds a target amount of interest as specified in the applicable Final Terms. Such redemption will be at an amount and on a date specified in the applicable Final Terms.

Trigger Notes:

Notes issued pursuant to the Program may include Notes in respect of which, for one or more Interest Periods, the rate of interest specified in the applicable Final Terms may convert into a different rate of interest depending upon certain events (*"Trigger Events"*) occurring on certain dates (each a *"Trigger Date"*) or within a specified period (*"Trigger Period"*) each as specified in the applicable Final Terms. Such Trigger Events may be, but are not limited to, events upon which one or more indices, formulae, currency exchange rates, constants, other factors or a combination thereof (*"Trigger Indices"*) are greater than and/or equal to

11

and/or lower than and/or equal to one or more other indices, formulae, currency exchange rates, constants, other factors or a combination thereof.

Commodity-Linked Notes:

An Issuer may offer Notes in respect of which the Rate of Interest applicable for one or more Interest Periods and/or the Final Redemption Amount or other redemption amount or the timing of payments, redemption of the Notes and/or any other economic feature, is calculated by reference to the prices of one or more commodities or combinations thereof, including certain agricultural products, energy products (including emissions), metals and plastics, as specified in the Final Terms for the relevant Notes. The relevant agricultural products, energy products (including emissions), metals or plastics and particular type(s) of such products being referenced will be as specified in the Final Terms for the relevant Notes. The price(s) of each such product being referenced may be in respect of a particular contract for the future delivery of such commodity, as may be reported on a particular exchange, screen-based service or other publication source, all as specified in the applicable Final Terms. The price may also be based on the price of the commodity for immediate delivery or for financial settlement. Such Notes may also be, but are not limited to, Index-Linked Redemption Amount or Index-Linked Interest Notes.

FX Notes:

Notes issued pursuant to the Program may include Notes ("*FX Notes*") under the terms of which:

1. such Notes are denominated in an emerging market currencies (the "*EM Currencies*"), which are currencies other than G-10 Currencies (for the purpose of this section "G-10 Currencies" means the U.S. Dollar, the Euro, the Japanese Yen, the Swiss Franc, the British Pound, the Australian Dollar, the New Zealand Dollar, the Canadian Dollar, the Norwegian Krone and the Swedish Krona);

2. in respect of one or more interest periods and/or upon redemption of the Notes on the final maturity date, the amount payable per Note is in an EM Currency or is determined by reference to a currency exchange rate (a "*Reference Exchange Rate*"); and/or

3. the timing of payments, redemption of the Notes and/or any other economic feature, is determined, by reference to one or more EM Currencies or is determined by reference to a Reference Exchange Rate.

Such Notes may also be Basket Linked Notes, Index Linked Notes, Index Linked Interest Notes, FX Linked Notes, Commodity Linked Notes, Floating Rate Notes, Dual Currency Linked Notes, Equity Linked Notes or Debt Security Linked Notes.

The Reference Exchange Rate for a currency pair ("*Currency Pair*") will be the spot exchange rate for a currency (the

"*Reference Currency*") against another currency (the "*Base Currency*") and will be expressed as: (i) a number of currency units per unit of the Base Currency; or (ii) as otherwise specified in the applicable Final Terms. A Reference Exchange Rate may be determined: (i) pursuant to a Settlement Rate Option (defined below); (ii) pursuant to an alternative price source determined by the Calculation Agent; (iii) by Calculation Agent determination; or (iv) as otherwise determined in the applicable Final Terms. For the avoidance of doubt, a Reference Exchange Rate may be either a continuously traded spot rate or a discretely determined spot rate, or both as specified in the applicable Final Terms.

The "*Settlement Rate Option*" in respect of a Currency Pair will be the rate source (or combination of rate sources) for that Currency Pair as specified in the applicable Final Terms with such amendments, if any, as shall be set out in the applicable Final Terms or such other rate source as may be specified as such in the applicable Final Terms.

Basket Linked Notes:

Notes issued pursuant to the Program may include Notes ("*Basket Linked Notes*") under the terms of which:

1.    in respect of interest accrued during one or more interest periods and/or upon redemption of the Notes, amounts payable are determined by reference to, one or more baskets (each a "*Basket*") each comprised of one or more component values (each a "*Basket Reference Value*"); and/or

2.    the timing of payments, redemption of the Notes and/or any other economic feature, is determined, by reference to one or more Baskets.

The value of a Basket (the "*Basket Value*") will be determined in accordance with the applicable Final Terms.

Basket Linked Notes including more than one Basket are referred to as "*Multiple Basket Linked Notes*". Basket Linked Notes may also be Index Linked Notes, Index Linked Interest Notes, FX Linked Notes, Commodity Linked Notes, Floating Rate Notes, Dual Currency Linked Notes, Equity Linked Notes or Debt Security Linked Notes.

A Basket shall comprise of one or more Basket Reference Values, including, but not limited to currency exchange rates (each a "*Reference Exchange Rate*"), commodity reference prices (each a "*Commodity Reference Price*"), equity prices (each an "*Equity Reference Price*"), debt security prices (each a "*Debt Reference Price*"), reference entities (each a "*Reference Entity Price*"), interest rates (each an "*Interest Rate Reference Price*"), index levels (each an "*Index Reference Price*") or any other component value as specified in the applicable Final Terms.

13

The Basket Value may be determined by reference to the performance of one or more Basket Reference Values as specified in the applicable Final Terms.

For Multiple Basket Linked Notes, the payments of interest and/or redemption amount, the timing of such payments, any redemption of the Notes and/or any other economic feature of such Notes may also be determined by reference to the best performing Basket, the worst performing Basket, the average performance of the Baskets to which the Notes are linked, the top few best or last few worst performing basket, the aggregate of, the difference between or the ratio of the Basket Value for each Basket or by reference to any other formula or any other payment mechanism, each as specified in the applicable Final Terms.

Each Basket Reference Value and/or, in respect of Multiple Basket Linked Notes, each Basket Value, may be ascribed a weighting factor (a "*Weighting*") in order to alter the influence of the performance of that Basket Reference Value or Basket Value (as the case may be). The Weighting of a Basket Reference Value or Basket Value, may be expressed as a percentage, a fraction, a decimal or in such other manner as provided in the Final Terms and may be defined in such a way that it has either an increased or decreased positive or negative influence on the value of the Notes relative to the influence exerted by other Basket Reference Values or Basket Values (as the case may be).

Payments in respect of Basket Linked Notes may additionally be determined by reference to a factor (the "**Leverage**") specified in the applicable Final Terms of such Notes. With respect to such Notes, the degree to which the Basket Value impacts upon the amount of such payments, on the timing of such payments, on the redemption of such Notes or any other economic factor, will vary according to the level of the Leverage.

Range Accrual Notes:

Notes issued pursuant to the Program may include Notes in respect of which, any interest payable for one or more Interest Periods and/or any amount payable on redemption of the Notes (as specified in the applicable Final Terms) is determined by reference to the number of days during a specified period (an "*Observation Period*") that a predetermined event or events (each a "*Fixing Event*") occurs or does not occur (as specified in the applicable Final Terms) as a proportion of the total number of days (each an "*Observation Day*") within such Observation Period (such portion, the "Index Ratio").

The Fixing Event may be, but is not limited to, the value or other function of, one or more indices, formulae, currency exchange rates, rates, commodities, debt securities, equities or other variable or a combination thereof (the "*Observable Rate*"), exceeding and/or equalling and/or being lower than and/or equalling one or more predetermined criteria (the

14

"*Strike*" or "*Strikes*"), as specified in the applicable Final Terms. The Strike may also be defined with reference to the value or other function of, one or more indices, formulae, currency exchange rates, rates, commodities, debt securities, equities or other variable or a combination thereof.

The Fixing Event may be observed on each Observation Date at a specified time or may be continually observed during the Observation Period or may be observed on such other date or time as specified in the applicable Final Terms.

The total number of days during the Observation Period in which the Fixing Event is observed may vary.

**Option Notes:**

Notes issued pursuant to this Program may include Notes in respect of which, any interest payable for one or more Interest Periods, any amount payable on redemption of the Notes, the timing of payments and/or dates on which the Notes are redeemed and/or any other economic feature of the Notes (as specified in the applicable Final Terms) may be determined by, among other things, (i) reference to one or more prices, values or levels of a reference asset or assets (each a "*Reference Asset*") exceeding and/or equalling and/or being lower than and/or equalling (or any combination thereof) one or more strike values (the "*Strike*") or (ii) reference to the difference between, or the corresponding values of, two or more prices, values or levels of such Reference Assets or (iii) such other formula specified in the applicable Final Terms. Such formula(s) may be referred to as an "*Option*".

The Reference Assets from which the value of the Option may be derived may include one or more indices, formulae, currency exchange rates, rates, commodities, debt securities, equities or other variable, option or combination thereof.

The calculation of the value of the Option may be determined by, among other things, reference to:

1.   the price, value or level of the Reference Asset(s) on a date or dates specified in the applicable Final Terms minus the price, value or level of the Strike(s). Should the difference be negative, the value will be floored at zero. Such Option may be referred to as "*Call Option*";

2.   the price, value or level of the Strike(s) minus the price, value or level of Reference Asset(s) on a date or dates specified in the applicable Final Terms. Should the difference be negative, the value will be floored at zero. Such Option may be referred to as "*Put Option*"; and/or

3.   whether the price, value or level of the Reference Asset exceeds and/or equals and/or is lower than and/or equals one or more predetermined criteria, as specified in the applicable Final Terms.

15

The prices, values or levels of the Reference Asset and/or the value of the Option may be determined on one or more dates during the term of the Notes.

The Strike may also be determined by reference to the level of one or more Reference Assets or a factor of such level or levels on a date or dates specified in the applicable Final Terms.

Form of Notes:      Notes of a Series may be issued in either bearer or registered form except that Australian Domestic Notes, Danish Notes, Finnish Notes, Norwegian Notes and Swedish Notes will be issued in registered, uncertificated and dematerialised book-entry form. Bearer Notes in global form may be issued either in Classic Global Note Form or in New Global Note Form as specified in the applicable Final Terms. Notes in registered form which are offered and sold outside the United States in reliance on Regulation S will be represented by interests in a global note in registered form (the *"Unrestricted Global Note"*), deposited with a common depositary for Euroclear and Clearstream, Luxembourg and registered in the name of such common depositary or its nominee or deposited with a custodian for DTC and registered in the name of a nominee for DTC on or about the date of issue of the relevant Tranche.

Notes which are offered and sold in the United States in reliance on Rule 144A will be represented by interests in a global note (the "Restricted Global Note") or notes (the *"Restricted Global Notes"*) in registered form, deposited with a custodian for and registered in the name of a nominee of DTC on or about the date of issue of the relevant Tranche. Interests in the global Notes in registered form will be shown on, and transfers thereof will be effected only through, records maintained by DTC and/or Euroclear and Clearstream, Luxembourg and their respective direct and indirect participants.

Denomination of Notes:      Subject to compliance with the Prospectus Directive and all applicable legal and/or regulatory and/or central bank requirements, Notes may be issued in any denomination (subject to (a) in the case of Notes to be admitted to trading on a regulated market and/or publicly offered in an EEA Member State, the minimum denomination of the Notes will be at least EUR1,000 (or nearly equivalent in any other currency on the issue date) or the Notes will give the right to acquire transferable securities or to receive a cash amount, as a consequence of their being converted or the rights conferred by them being exercised, provided that the issuer of the underlying securities is not the relevant Issuer or another entity belonging to the Lehman Brothers group; and (b) Notes issued by LBHI and having a maturity of 183 days or less having a minimum denomination of U.S.$500,000 or its equivalent.

Redemption:      Redemption for taxation reasons or as may be specified in the relevant Final Terms.

| | |
|---|---|
| Taxation: | Payments of principal, and premium, if any, and interest, if any, on the Notes will be made without deduction for or on account of United States, the United Kingdom, The Netherlands or the Federal Republic of Germany withholding taxes, save as required by law. In that event, the Issuer will, subject to certain exceptions, pay such additional amounts as will result in the Noteholders receiving such amounts as they would have received in respect of such Notes had no such deduction been required. |
| Status of the Senior Notes and Senior Guarantees; Negative Pledge: | The Senior Notes and the Senior Guarantees will constitute direct, unconditional and unsecured obligations of the relevant Issuer and Guarantor, respectively, and will rank *pari passu* in right of payment among themselves, and equally with all other unsecured and unsubordinated obligations of such Issuer and the Guarantor, respectively. |
| | The Senior Notes and the Senior Guarantees will have the benefit of a negative pledge. |
| Status of the Subordinated Notes and Subordinated Guarantees: | Subordinated Notes and Subordinated Guarantees will constitute direct, unsecured and subordinated obligations of the relevant Issuer and the Guarantor, respectively, and will rank *pari passu* among themselves and pari passu with all other present and future unsecured, unconditional and subordinated indebtedness of such Issuer and the Guarantor, respectively. |
| Passporting, Listing and Trading: | Applications have been or will be made for (1) a certificate of approval under Article 18 of the Prospectus Directive as implemented in Ireland to be issued by the IFSRA to the competent authority in each of Austria, Belgium, the Czech Republic, Denmark, Finland, France, Germany, Greece, Hungary, Italy, Luxembourg, The Netherlands, Norway, Poland, Portugal, Slovakia, Spain, Sweden and the United Kingdom and (2) Notes to be admitted during the period of twelve months after the date hereof to the Official List of the Irish Stock Exchange and to trading on its regulated market and/or to the Official List of the Singapore Stock Exchange. The Program also permits Notes to be issued on the basis that they will not be admitted to listing, trading and/or quotation by any competent authority, stock exchange and/or quotation system or to be admitted to listing, trading and/or quotation by such other or further competent authorities, stock exchanges and/or quotation systems as may be agreed between the relevant Issuer and the relevant Dealer(s) and specified in the relevant Final Terms. Australian Domestic Notes may be listed on the Australian Stock Exchange. |
| Final Terms or Drawdown Prospectus: | Notes issued under the Program may be issued either (1) pursuant to this Base Prospectus and associated Final Terms or (2) pursuant to a Drawdown Prospectus (each, a "Drawdown Prospectus") prepared in connection with a particular Tranche of Notes. |
| | For a Tranche of Notes which is the subject of Final Terms, those Final Terms will, for the purposes of that Tranche only, |

supplement the Terms and Conditions of the Notes and this Base Prospectus and must be read in conjunction with this Base Prospectus and any subsequently published supplement to this Base Prospectus. The terms and conditions applicable to any particular Tranche of Notes which is the subject of Final Terms are the Terms and Conditions of the Notes as supplemented, amended and/or replaced to the extent described in the relevant Final Terms.

The terms and conditions applicable to any particular Tranche of Notes which is the subject of a Drawdown Prospectus will be the Terms and Conditions of the Notes as supplemented, amended and/or replaced to the extent described in the relevant Drawdown Prospectus. In the case of a Tranche of Notes which is the subject of a Drawdown Prospectus, each reference in this Base Prospectus to the relevant or applicable Final Terms shall be read and construed as a reference to the relevant or applicable Drawdown Prospectus.

**Selling Restrictions:**

Each Dealer and each purchaser of Notes must observe all applicable laws and regulations in any jurisdiction in which it may offer, sell or deliver Notes or distribute this Base Prospectus or any offering material in relation to Notes.

The Base Prospectus contains a summary of certain selling restrictions in the United States, the European Economic Area, the United Kingdom, Italy, Japan, The Netherlands, Australia and Singapore. These are set out in more detail on pages 203 to 211 of this Base Prospectus.

**Governing Law:**

The Notes (save for Australian Domestic Notes) will be governed by English law. Australian Domestic Notes will be governed by the laws of New South Wales, Australia. Guarantees will be governed by the laws of the State of New York.

**Risk Factors:**

There are certain risks related to any issue of Notes under the Program which investors should ensure they fully understand. Additionally, Lehman Brothers' financial condition and results of operations may be affected by uncertain or unfavourable economic, market, legal and other conditions. These conditions include but are not limited to market and competitive risk, changes in investor sentiment, liquidity risk, changes to credit ratings, credit exposure and operational risk and legal regulatory risk. These risks are set out in more detail on pages 19 to 33 of this Base Prospectus.

## RISK FACTORS

*Prospective investors should read the entire Base Prospectus. Words and expressions defined in the "Terms and Conditions of the Notes" below or elsewhere in this Base Prospectus have the same meanings in this section. Investing in the Notes involves certain risks. Prospective investors should conduct their own thorough analysis (including their own accounting, legal and tax analysis) prior to deciding whether to invest in the Notes. In addition, prospective investors should consider, among other things, the following:*

The Issuers believe that the factors described below present the principal risks inherent in investing in the Notes issued under the Program, but the inability of the relevant Issuer to pay interest or principal on or in connection with any Notes may occur for other reasons and none of the Issuers represents that the statements below regarding the risks of holding any Notes is exhaustive.

### Risks Relating to the Notes

#### *There is no active trading market for the Notes*

Notes issued under the Program will be new securities which may not be widely distributed and for which there is currently no active trading market (unless in the case of any particular Tranche, such Tranche is to be consolidated with and form a single series with a Tranche of Notes which is already issued). If the Notes are traded after their initial issuance, they may trade at a discount to their initial offering price, depending upon, amongst other factors, currency exchange rates, prevailing interest rates, the market for similar securities, general economic conditions and the financial condition of the relevant Issuer. Although application has been made for the Notes issued under the Program to be admitted to listing on the Official List of the Irish Stock Exchange and to trading on its regulated market (within the scope of Directive 2004/39/EC on Markets in Financial Instruments), there is no assurance that such application will be accepted, that any particular Tranche of Notes will be so admitted or that an active trading market will develop. Accordingly, there is no assurance as to the development or liquidity of any trading market for any particular Tranche of Notes.

#### *The Notes may be redeemed prior to maturity*

Unless in the case of any particular Tranche of Notes the relevant Final Terms specifies otherwise, in the event that the relevant Issuer would be obliged to increase the amounts payable in respect of any Notes due to any withholding or deduction for or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed by or on behalf of the United States, The Netherlands, the Federal Republic of Germany, the United Kingdom or any other country in which such payments are regarded as being sourced, as the case may be, or any political subdivision thereof or any authority therein or thereof having power to tax, the relevant Issuer may redeem all outstanding Notes in accordance with the Terms and Conditions.

In addition, if in the case of any particular Tranche of Notes the relevant Final Terms specifies that the Notes are redeemable at the relevant Issuer's option in certain other circumstances the relevant Issuer may choose to redeem the Notes for instance at times when prevailing interest rates may be relatively low. In such circumstances an investor may not be able to reinvest the redemption proceeds in a comparable security at an effective interest rate as high as that of the relevant Notes.

#### *Because the Global Notes are held by or on behalf of Euroclear and Clearstream, Luxembourg, investors will have to rely on their procedures for transfer, payment and communication with the relevant Issuer*

Notes issued under the Program may be represented by one or more Global Notes. Such Global Notes will be deposited with a common depositary or common safekeeper for Euroclear and Clearstream, Luxembourg. Except in the circumstances described in the relevant Global Note, investors will not be entitled to receive definitive Notes. Euroclear and Clearstream, Luxembourg will maintain records of the beneficial interests in the Global Notes. While the Notes are represented by one or more Global Notes,

investors will be able to trade their beneficial interests only through Euroclear and Clearstream, Luxembourg.

While the Notes are represented by one or more Global Notes the relevant Issuer will discharge its payment obligations under the Notes by making payments to the common depositary for Euroclear and Clearstream, Luxembourg for distribution to their account holders. A holder of a beneficial interest in a Global Note must rely on the procedures of Euroclear and Clearstream, Luxembourg to receive payments under the relevant Notes. The relevant Issuer has no responsibility or liability for the records relating to, or payments made in respect of, beneficial interests in the Global Notes.

Holders of beneficial interests in the Global Notes will not have a direct right to vote in respect of the relevant Notes. Instead, such holders will be permitted to act only to the extent that they are enabled by Euroclear and Clearstream, Luxembourg to appoint appropriate proxies. Similarly, holders of beneficial interests in the Global Notes will not have a direct right under the Global Notes to take enforcement action against the relevant Issuer in the event of a default under the relevant Notes but will have to rely upon their rights under the Deed of Covenant.

### Some Notes are subordinated to most of the relevant Issuer's liabilities

If in the case of any particular Tranche of Notes the relevant Final Terms specifies that the Notes are subordinated obligations of the relevant Issuer and that Issuer is declared insolvent and a winding up is initiated, it will be required to pay the holders of senior debt and meet its obligations to all its other creditors (including unsecured creditors but excluding any obligations in respect of subordinated debt) in full before it can make any payments on the relevant Notes. If this occurs, such Issuer may not have enough assets remaining after these payments to pay amounts due under the relevant Notes.

### Loss of Investment

If, in the case of any particular Tranche of Notes, the relevant Final Terms do not specify that the Notes are wholly principal protected, there is a risk that any investor may lose the value of their entire investment or part of it and that the Notes may trade significantly below their issue price at any time prior to redemption.

### Some Notes are subject to risks associated with foreign exchange rates, particularly where an emerging market currency is involved

The performance of an investment in certain Notes may be affected either because the Notes are denominated in a currency other than the investor's 'home-currency', or because the amount payable will be affected by a foreign exchange rate. This may affect interest as well as principal payments (as applicable) under the terms of some Notes. Any variation in the exchange rates is based on a number of interrelated factors, including economic, financial and political events that Lehman Brothers cannot control. The exchange rates, which depend on the supply and demand for the relevant currencies, may be affected by political, economic, legal, accounting and tax matters specific to the countries in which such currencies are circulated as legal tender. These matters include, among other things, the possibility that exchange controls with respect to the currencies could be imposed or modified. Such value also varies with market expectations as to future exchange rates and other current and anticipated conditions. The effects of any of these factors may be particularly pronounced when one of the currencies is an emerging market currency or other currency (each an "**EM Currency**"). EM Currencies are often less liquid than, for instance, G-10 Currencies. In addition, the exchange rates may be affected by the operation of, and the fact that persons and entities (including Lehman Brothers) will be trading currencies on, interbank and interdealer foreign exchange markets in the United States, Europe and elsewhere. For the purposes of this risk factor, "**G-10 Currencies**" means the U.S. Dollar, the Euro, the Japanese Yen, the Swiss Franc, the British Pound, the Australian Dollar, the New Zealand Dollar, the Canadian Dollar, the Norwegian Krone and the Swedish Krona.

*Risks related to the structure of a particular issue of Notes*

A wide range of Notes may be issued under the Program. A number of these Notes may have features which contain particular risks for potential investors. Set out below is a description of the most common features and the risks associated with them:

*Fixed Rate Notes and Zero Coupon Notes*

Investment in Fixed Rate Notes and Zero Coupon Notes involves the risk that subsequent changes in market interest rates may adversely affect the value of the Notes.

*Index Linked Notes, Dual Currency Notes and Notes linked to Swap Rates, interest, formula or other underlying*

The Issuers may issue Notes with principal or interest determined by reference to interest or swap rates or an index or formula, to changes in the prices of securities or commodities, to movements in currency exchange rates or other factors (each, a *"Relevant Factor"*). In addition, the Issuers may issue Notes with principal or interest payable in one or more currencies which may be different from the currency in which the Notes are denominated.

Potential investors should be aware that:

(i)     the market price of such Notes may be very volatile;

(ii)    they may receive no interest;

(iii)   payment of principal or interest may occur at a different time or in a different currency than expected;

(iv)   they may lose all or a substantial portion of their principal;

(v)    a Relevant Factor may be subject to significant fluctuations that may not correlate with changes in interest rates, currencies or other indices;

(vi)   if a Relevant Factor is applied to Notes in conjunction with a multiplier greater than one or contains some other leverage factor, the effect of changes in the Relevant Factor on principal or interest payable is likely to be magnified; and

(vii)  the timing of changes in a Relevant Factor may affect the actual yield to investors, even if the average level is consistent with their expectations. In general, the earlier the change in the Relevant Factor, the greater the effect on yield.

*Partly-paid Notes*

The Issuers may issue Notes where the issue price is payable in more than one instalment. Failure to pay any subsequent instalment could result in an investor losing all of his investment.

*Notes with a multiplier, other leverage factor, caps, floors or other options*

Notes with variable interest rates can be volatile investments. If they are structured to include multipliers or other leverage factors, or caps or floors, or any combination of those features, their market values may be even more volatile than those for securities that do not include those features.

*Inverse Floating Rate Notes*

Inverse Floating Rate Notes have an interest rate equal to a fixed rate minus a rate based upon a reference rate such as LIBOR. The market values of those Notes typically are more volatile than market values of other conventional floating rate debt securities based on the same reference rate (and with otherwise comparable terms). Inverse Floating Rate Notes are more volatile because an increase in the

reference rate not only decreases the interest rate of the Notes, but may also reflect an increase in prevailing interest rates, which further adversely affects the market value of these Notes.

### Fixed/Floating Rate Notes

Fixed/Floating Rate Notes may bear interest at a rate that the relevant Issuer may elect to convert from a fixed rate to a floating rate, or from a floating rate to a fixed rate. The relevant Issuer's ability to convert the interest rate will affect the secondary market and the market value of the Notes since the relevant Issuer may be expected to convert the rate when it is likely to produce a lower overall cost of borrowing. If the relevant Issuer converts from a fixed rate to a floating rate, the spread on the Fixed/Floating Rate Notes may be less favourable than then prevailing spreads on comparable Floating Rate Notes tied to the same reference rate. In addition, the new floating rate at any time may be lower than the rates on other Notes. If the relevant Issuer converts from a floating rate to a fixed rate, the fixed rate may be lower than then prevailing rates on its Notes.

### Notes issued at a substantial discount or premium

The market values of securities issued at a substantial discount or premium from their principal amount tend to fluctuate more in relation to general changes in interest rates than do prices for conventional interest-bearing securities. Generally, the longer the remaining term of the securities, the greater the price volatility as compared to conventional interest-bearing securities with comparable maturities.

### Inflation-Linked Notes

A relevant consumer price index or other formula linked to a measure of inflation to which the Notes are linked may be subject to significant fluctuations that may not correlate with other indices. Any movement in the level of the Index may result in a reduction in the interest payable on the Notes or, in the case of Notes with a redemption amount linked to inflation, in a reduction in the amount payable on redemption which in some cases could result in Noteholders receiving back less than the amount originally invested.

The seasonal nature of an Index may result in higher or lower inflation rates being observed for any sub-period than the rate in relation to any particular Interest Period.

An Index to which interest payments and/or the redemption amount of Inflation-Linked Notes are linked is only one measure of inflation for the relevant jurisdiction, and such Index may not correlate perfectly with the rate of inflation experienced by residents in such jurisdiction.

Interest Payments and/or the redemption amount of Inflation-Linked Notes may be based on a calculation made by reference to the inflation rate for a period which has no relation to the date of payment on the Notes and therefore could be substantially different from the level of inflation at the time of the payment of interest or, as the case may be, principal on the Notes.

### Quanto Notes

The market value of the Notes will be affected by, among other things, the rate of interest payable in each Interest Period and/or the amount payable on redemption. The principal risk associated with Quanto Notes is that the rate of interest that is payable on the Notes is lower than the rate of interest usually payable in relation to the Quanto Currency.

By way of an example, the interest amount on a Quanto Note may be paid in Euro but be calculated by adding 0.25 per cent. of the nominal amount of such Note to USD-LIBOR with a designated maturity of 3 months. In this example, the Quanto Currency is Euro and the Reference Currency is United States Dollars and any increase in interest rates in respect of the Quanto Currency will not result in a corresponding increase in the rate of interest payable for an Interest Period in respect of the Notes.

The above analysis sets out just one example of how Quanto Notes may operate and the risks associated with such circumstances. It is not intended to be an exhaustive list of risks associated with Quanto Notes and additional risk factors may be associated with different coupon structures of Quanto Notes.

*Variable Cap Notes*

The market value of Variable Cap Notes will be affected by, among other things, the amount of interest payable in each Interest Period in comparison to the prevailing rates of interest available on other investments in the market at the time in question. The rate of interest payable on Variable Cap Notes is subject to a variable maximum rate of interest (a "*Variable Cap*") as specified in the Final Terms. The Variable Cap may be determined by reference to any rate, currency, security, index, formula or other factor (each a "*Variable Cap Factor*"), or any combination of such Variable Cap Factors. In the event that the Variable Cap for an Interest Period is close to or equal to zero, the rate of interest applicable in respect of the relevant Interest Period will be close to or equal to zero (unless any minimum rate of interest has been specified in the applicable Final Terms and applies, in which event the rate of interest applicable in respect of the relevant Interest Period will equal that minimum rate of interest) and the value of the Variable Cap Notes will be effected commensurately.

In addition, the Variable Cap may fluctuate independently of any fluctuation in the interest rate which would have been payable on the Notes if there had not been a Variable Cap and this may have a detrimental or positive effect on the market value of the Variable Cap Notes.

If a Variable Cap contains a leverage factor, the effects of changes in the Variable Cap on interest payable (and therefore the impact on the value of the Variable Cap Notes) is likely to be magnified.

*Steepener Notes*

The market value of Steepener Notes will be affected by, among other things, the amount of interest payable in each Interest Period. The rate of interest on Steepener Notes is obtained by taking the amount (if any) by which a designated swap rate (the "*First Swap Rate*") exceeds another designated swap rate (the "*Second Swap Rate*") and multiplying that amount by the factor (the "*Leverage Factor*") (all as specified in the applicable Final Terms), subject to any maximum and minimum rate of interest. Subject to any minimum and maximum rate of interest, as the difference between the First Swap Rate and the Second Swap Rate decreases the rate of interest payable will fall by the amount of that decrease multiplied by the relevant Leverage Factor. In the event that the First Swap Rate does not exceed the Second Swap Rate on a date which is relevant to the calculation of interest for an Interest Period, the rate of interest on the Notes for that period will equal zero or, if any minimum rate of interest has been specified in the applicable Final Terms and applies, will equal that minimum rate of interest.

*Path-Dependent Notes*

The market value of any Notes is affected by, among other things, the rate of interest payable on such Notes. The rate of interest payable on the Path-Dependent Notes in respect of an Interest Period will affect the rate of interest payable in respect of one or more subsequent Interest Periods. If the rate of interest payable on the Notes in respect of any Interest Period has a negative impact on the rate of interest payable in respect of subsequent Interest Periods, this will have a negative effect on the market value of the Path-Dependent Notes. Hence the market value of such Notes will be considerably more volatile than comparable Notes where the rate of interest for any Interest Period is determined independently from those other Interest Periods.

By way of an example, the rate of interest on Path-Dependent Notes may be calculated by using a formula as shall be specified in the applicable Final Terms. Such formula may be similar to any of the formulae in A, B or C below or as otherwise specified in the applicable Final Terms:

(A)   Previous Rate + Y * (X – 6m EURIBOR); or

(B)   Previous Rate + Y * (6m EURIBOR – X); or

(C)    6m EURIBOR + X subject to a maximum rate of interest of the Previous Rate +Y

Where:

"X" and "Y" are constants; and

"6m EURIBOR" means, in respect of any Interest Period, the rate for deposits in Euro for a period of six months which appears on Reuters Page EURIBOR01 (or any successor or replacement page) as of 11.00 a.m. Brussels time on the date specified in the applicable Final Terms.

The analysis below sets out just some of the risks associated with Path-Dependent Notes with a rate of interest calculated in respect of an Interest Period in accordance with the formulae specified in A, B or C above. It is not intended to be an exhaustive list and other risk factors may be associated with these and different coupon structures for which reference should be made to other relevant risk disclosures contained herein.

In example (A) above, the rate of interest payable on the Path-Dependent Notes is inversely correlated to the direction of 6m EURIBOR. If, in relation to any Interest Period, 6m EURIBOR increases, the rate of interest in respect of such Interest Period will decrease. Since the rate of interest for such Interest Period then forms the basis for determining the rate of interest for the subsequent Interest Period, this decrease will also have a detrimental effect on the rate of interest in respect of the subsequent Interest Periods. This, in turn, will have a negative impact on the market value of the Notes which will be leveraged compared to Notes with a comparable rate of interest but which is determined without taking into account the rate of interest applicable to the previous Interest Periods.

In example (B) above, the rate of interest payable on the Path-Dependent Notes is positively correlated to the direction of 6m EURIBOR. If, in relation to an Interest Period, 6m EURIBOR decreases, the rate of interest in respect of such Interest Period will also decrease. As in the case of example (A), since the rate of interest for such Interest Period then forms the basis for determining the rate of interest for the subsequent Interest Period, this decrease will also have a detrimental effect on the rate of interest in respect of the subsequent Interest Periods. This, in turn, will have a negative impact on the market value of the Path-Dependent Notes which are leveraged compared to Notes which pay a rate of interest which is determined without taking into account the rate of interest applicable to the previous Interest Periods.

In example (C) above, the rate of interest payable on the Path-Dependent Notes is subject to a variable maximum rate of interest (or cap) which is calculated by reference to the interest rate payable in respect of the preceding Interest Period. In such circumstances if 6m EURIBOR increases following any Interest Period, the rate of interest payable in respect of that Interest Period may cap the rate of interest in respect of the subsequent Interest Periods at a rate lower than that which would have been applicable to those subsequent Interest Periods had the rate of interest not been capped, which will have a negative effect on the maximum rate of interest payable in respect of each subsequent Interest Period. This means that a lower rate of interest for one Interest Period will have a detrimental effect on the market value of the Notes where 6m EURIBOR subsequently increases. Such effect will be leveraged compared to Notes which pay a rate of interest which is determined without taking into account the rate of interest applicable to the previous Interest Periods.

*Range Accrual Notes*

The indices, formulae, currency exchange rates, rates and other factors or combination thereof used to determine the Fixing Event and, consequently, the Index Ratio for Range Accrual Notes may be different from the Reference Rate for such Notes and may therefore fluctuate independently of such rate. This may result in the market value of the Notes falling even when the Reference Rate in respect of an Interest Period is rising. If, during the relevant Observation Period, the Fixing Event occurs only on a small number of days or does not occur at all, the Index Ratio may be very low or, as the case may be, zero and, as a result, the rate of interest payable on the Notes in respect of such Interest Period may be very low, or, as the case may be, zero (save for any minimum rate of interest specified in the applicable Final Terms). This will have a detrimental effect on the market value of the Notes.

Where the Observation Days fall in a different chronological period from the Interest Period, the indices, formulae, currency exchange rates, rates or combination thereof which were used to determine the Index Ratio may be different from those which prevail at the time at which the interest amount is being paid. This may have a detrimental effect on the market value of the Notes.

For example, the rate of interest for each Interest Period for a Range Accrual Note may be calculated by multiplying the Reference Rate by the Index Ratio for one specified Observation Period. If the Index Ratio determined by the Calculation Agent is contingent upon the number of days in the Observation Period on which USD LIBOR with a designated maturity of 6 months ("*6m USD LIBOR*") falls within a range of values set out in the relevant Final Terms and during that Observation Period the number of days in which 6m USD LIBOR is within such range is low (for example, 5 days in an Observation Period of 30 days, giving an Index Ratio equal to 5/30), then the rate of interest payable for each Interest Period in relation to such Note will be calculated by reference to such Index Ratio and any change in 6m USD LIBOR will not affect the Index Ratio in subsequent Interest Periods. In such circumstances, the rate of interest payable in respect of all Interest Periods and the market value of the Notes will be detrimentally affected in a material and significant way.

*Switchable Notes*

The rate of interest payable in respect of Switchable Notes may change adversely when a Switch Event occurs. Where the number of Switch Options available to the Switch Option Holder is limited, once the Switch Option Holder exercises the final Switch Option the rate of interest payable may convert into a rate that is below the rate that would have been payable had the Switch Option not been exercised and the initial rate of interest remained. Such rate may, in some instances, be as low as zero until the stated Maturity Date. This may result in the market value of the Switchable Notes falling even where the rate of interest payable prior to the relevant Switch Event is rising. Therefore, the performance of Switchable Notes is highly dependant on the actions of the Switch Option Holder which, in the case of the Issuer and/or a third party, may be a person or entity that has no obligation to act in the best interest of the Noteholders.

By way of example, the Switch Option Holder may exercise its Switch Option on the Exercise Date which results in the rate of interest payable for an Interest Period converting from a rate of interest equal to 6.00 per cent. annum of the nominal amount of the Notes to a rate of interest equal to EURIBOR with a designated maturity of 12 months ("*12m EURIBOR*") plus 0.50% of the nominal amount of the Notes. In this instance if 12m EURIBOR is at a low rate (for example, 2.00 per cent.) then the coupon payable in respect of the relevant Interest Period would switch from 6.00 per cent. to 12m EURIBOR + 0.50%, or 2.50%. If 12m EURIBOR remained at this rate for the remainder of the term of the Notes and the Switch Option Holder was not permitted under the terms of the Notes to switch the rate of interest payable back to the fixed rate previously payable or another rate of interest, all future interest payments would be significantly less than would have been payable had the Switch Option not been exercised. This lower rate of interest for the remainder of the term of the Notes will have a detrimental effect on the market value of the Notes. The above analysis is one example of the operation of Switchable Notes. For other Switchable Notes the rate of interest payable may switch between fixed and/or floating and/or Index-Linked and/or any combination thereof. This example is not intended to be exhaustive.

Where the Switch Option may be exercised at the option of the Issuer and/or a third party only, it may be more likely that a Switch Event occurs during a period in which the rate of interest payable to the Noteholder is increasing and where the resulting rate of interest payable following a Switch Event is lower than that which would have been payable had the Switch Event not occurred.

*Target Redemption Notes*

The automatic redemption feature of Target Redemption Notes may limit the market value of the Notes. Hence, even in a favourable market/interest environment their market value may not rise substantially above the price at which they are redeemed.

The automatic redemption may take place when the investor would not be able to reinvest the redemption proceeds at an effective interest rate as high as the interest rate on the Target Redemption Notes

being redeemed and may only be able to do so at a significantly lower rate. Potential investors should consider reinvestment risk in light of other investments available at that time.

For example, consider Notes issued under a Final Terms that specify that the Target Interest Amount is 20 per cent. of the nominal value of the Notes, that any interest calculated in excess of the Target Interest Amount will be reduced so that the Aggregate Interest Amount equals the Target Interest Amount, and that upon maturity any interest calculated for the final Interest Period may be increased so that the Aggregate Interest Amount equals the Target Interest Amount.

If on an Interest Determination Date:

(a)    the Aggregate Interest Amount as at the end of the previous Interest Period is equal to 18 per cent. of the nominal amount and the amount of interest determined to be payable in respect of the current Interest Period (save for the application of the target redemption feature) is 8 per cent. of the nominal amount, then due to the target redemption feature, the amount of interest payable would be reduced to 2 per cent. (being the Target Interest Amount less the Aggregate Interest Amount);

(b)    the Aggregate Interest Amount is equal to 10 per cent. of the nominal amount and the amount of interest determined to be payable in respect of the final Interest Period is 8 per cent. of the nominal amount, then due to the target redemption feature, the amount of interest payable would be increased to 10 per cent. (being the Target Interest Amount less the Aggregate Interest Amount).

In both of the above examples the Notes will redeem at an amount specified in the applicable Final Terms. The above analysis sets out just two examples of how the early redemption mechanism may operate for Target Redemption Notes and the risks associated with such circumstances. It is not intended to be an exhaustive list of the risks associated with Target Redemption Notes and additional risk factors may be associated with these and different redemption structures.

*Commodity-Linked Notes*

The prices of commodities may be subject to significant fluctuations. The prices of commodities may be volatile and, for example, may fluctuate substantially if natural disasters or catastrophes, such as hurricanes, fires or earthquakes, affect the supply or production of such commodities. The price of commodities may also fluctuate substantially if a conflict or war affects the supply or production of such commodities. If any interest and/or the redemption amount payable in respect of a Note is linked to the price of a Commodity, any change in the price of such commodity may result in the reduction of the amount of interest and/or the redemption amount payable. The reduction in the amount of interest payable may result, in some cases, in no interest being payable on the Notes. The reduction in the amount payable on the redemption of the Notes may result, in the case of Notes which are not principal protected, in a Noteholder receiving a smaller sum on redemption of a Note than the amount originally invested in such Note and could potentially result in the complete loss of capital. In the case of Notes where the redemption date changes based on the price of one or more commodities, any change in the price of such commodity could also result in significant change in the redemption date of the Notes.

*FX Notes*

Additional risk factors applicable to FX Notes (which may be more pronounced where the Reference Currency or Base Currency is an EM Currency) include:

–    risks of partial or complete loss of principal, subject to the level of principal protection (if any) specified in the Final Terms

26

—    risks of receiving no, or only low, payments of interest and/or payments on redemption as a result of exchange rate movements and/or (in the case of FX Notes) any condition to payment not being satisfied

—    payments of interest and/or on redemption being based on exchange rate values as of specified dates only, with exchange rate values as of other dates not being taken into account

—    Noteholders being entitled to receive payments in a specified currency only, and having no entitlement to receive the Reference Currency

—    risks of the introduction of exchange controls and/or other developments and conditions affecting the currency markets resulting in determinations of the Reference Exchange Rate on unscheduled valuation dates and/or determinations of the Settlement Rate by reference to alternative price sources and/or on a discretionary basis by the Calculation Agent and/or at a different time than would otherwise be the case and/or alternative settlement procedures including postponement of settlement until the cessation of any effect of the relevant developments and conditions

—    the right of the Issuer to appoint the Calculation Agent

—    the risk that the trading price of the Notes will fluctuate over time and may remain at levels significantly below that at which the Notes were originally issued, due to factors (including supply and demand for the Notes, the value of the Reference Currency and other factors) which may interrelate in complex ways

—    risk of variations in exchange rates for the Reference Currency (which may result from, or from the interaction of, many factors) affecting the market value of the Notes and/or that on a sale of the Notes an investor may receive less than the amount invested

—    risks that the market value of the Notes may be detrimentally affected by factors affecting the liquidity, trading value and amount payable under the Notes, including:

    •    increased volatilities of exchange rates; and/or

    •    actions of sovereign governments that could change or interfere with currency valuations, fluctuations in response to other market forces and the movement of currencies across borders; and/or

    •    changes in interest rates; and/or

    •    the effect of the time remaining to maturity decreasing on the "time premium or discount" factor; and/or

    •    hedging, trading and other transactions by Lehman Brothers through any of its affiliates affecting the exchange rates for any or all of the Reference Currency.

*Basket Linked Notes*

Additional risk factors applicable to Basket Linked Notes (which may be more pronounced where the formula for determining payments linked to Basket Value includes a leverage factor exceeding 100%) include:

    —    risks of partial or complete loss of principal, subject to the level of principal protection (if any) specified in the Final Terms

    —    risks of receiving no or low or reduced payments under the Notes as a result of movements in the Basket Reference Values and/or (in the case of 6 Basket Digital Notes (as defined below)), any condition to payment not being satisfied

- risks of favourable movements in a Basket Reference Value and/or in respect of Multiple Basket Linked Notes, a Basket Value, being offset by unfavourable movements in other Basket Reference Values or Basket Values (as the case may be)

- payments of interest and/or on redemption and/or the timing of such payments or redemption or any other economic factor being based on the Basket Reference Value levels as of specified dates only, with Basket Reference Value levels as of other dates not being taken into account

- Noteholders being entitled to receive payments in a specified currency only, and having no entitlement to receive delivery of, or any interest in, the Basket Reference Values

- the right of the Issuer to appoint the Calculation Agent (who may be an affiliate of the Issuer)

- the risk that the trading price of the Notes will fluctuate over time and may remain at levels significantly below that at which the Notes were originally issued, due to factors (including supply and demand for the Notes, the value of each Basket Reference Value and other factors) which may interrelate in complex ways

- risk of variations in Basket Reference Values (which may result from, or from the interaction of, many factors) affecting the market value of the Notes and/or that on a sale of the Notes an investor may receive less than the amount invested

- risk of Basket Value of Basket Linked Note and Multiple Basket Linked Notes, as the case may be, being affected by the Basket Reference Values which are of the same class of underlyings or for which the weighting assigned to a particular Basket Reference Value is higher than for other Basket Reference Values. Additionally, if the Basket Reference Values of the underlyings included is concentrated in a particular industry, the Basket Value will be more affected by the economic, financial and other factors affecting that industry than if the Basket Reference Values were comprised of underlyings in various industries.

*Trigger Notes*

The rate of interest payable in respect of Trigger Notes may change adversely when a Trigger Event occurs. Furthermore, the occurrence of a Trigger Event on a Trigger Date or during a Trigger Period may cause the rate of interest payable to convert into a rate that is below the rate which would have been payable had the initial rate of interest remained and may, in some instances, be as low as zero until the stated Maturity Date. This may result in the market value of the Trigger Notes falling even when the original rate of interest which is stated to be payable in respect of an Interest Period is rising.

Trigger Events may cause the rate of interest payable in respect of Trigger Notes to fall substantially even if such Trigger Events were caused by temporary market occurrences. The performance of Trigger Notes is highly dependant on the movements of the Trigger Indices over the periods around the Trigger Dates or during the Trigger Period, regardless of whether these movements represent long-term trends or not.

Trigger Notes may be structured so that a Trigger Event will occur during a period in which the rate of interest payable to the Noteholder is increasing and where the resulting rate of interest payable following a Trigger Event will be lower than that which would have been payable had the Trigger Event not occurred.

*Option Notes*

Where the Notes are linked to a Call Option and the Strike is set at the beginning of the term of the Notes (for example, on the Issue Date), any decrease in the level of the Reference Asset subsequent to that date will have a detrimental effect on the market value of the Notes and if the level of such Reference Asset falls below the level of the Strike, the amount payable on such Note may be reduced to zero. Conversely, the market value of Notes that are linked to a Put Option will decrease where the level of each Reference Asset increases relative to the level of the Strike over the term of the Notes.

Fluctuations in the value of the relevant Reference Asset will affect the value of the Notes. The risk of the loss of some or all of the amount payable on redemption means that, in order to recover and realise a return upon his/her investment, a purchaser of the Note must generally have correctly anticipated the direction, timing and magnitude of an anticipated change in the value of the Reference Asset.

The Strike or Strikes of an Option may be determined on a predetermined date or dates as specified in applicable Final Terms. The Strike may be calculated as the arithmetic or geometric average of the level of the Strike determined on each day during a specified period of days during the term of the Notes or may not be reflective of any actually realized or anticipated level of the trading level of the Reference Asset. If the Option is a Call Option and the Strike is determined as the mean of the levels of the Strike, any increase in such level over the dates or during the period during which the Strike is monitored will result in a decrease in the value of the Option. This may have a detrimental effect on the market value of the Notes. The Strike may be set significantly higher or lower than current trading levels of the Reference Asset.

The date on which the price, value or level of the Reference Asset is determined may be determined in a different period from the date on which amounts are paid under the Notes. Thus, the price, value or level of each Reference Asset which is used to determine the value of the Option may be different from such value, price or level at the time at which the relevant amount is being paid. This may have a detrimental effect on the market value of the Notes.

In relation to Option Notes with a digital payment, the payment of any interest and/or amounts on redemption which depends on the value of the Option will be conditional upon the Option meeting, exceeding or falling short of one or more criteria specified in the applicable Final Terms. Such criteria may include a requirement that the value of the Option must exceed a benchmark value by a specified threshold. With respect to such Notes, no such interest and/or Final Redemption Amount will be payable unless such condition is met on the relevant date specified in the applicable Final Terms.

Where payments in respect of Option Notes are additionally determined by reference to a leverage, scaling or multiplication factor (the "Leverage"), the degree to which the Reference Exchange Rate impacts upon the amount of such payments will vary according to the level of such Leverage.

The value of the Option or the difference in the value of the Reference Asset and the Strike Price at any time prior to maturity may be reflective of the trading price of such Note at that time. The difference between the trading price of the Note and the value of the Option will reflect, among other things, a "time value" for the Note. Such Notes pose risks with regard to time value. The time value of the Note varies with the price and/or level of the Reference Asset, as well as by a number of other interrelated factors, including the length of the period remaining to maturity (or the date on which the value of the Option is determined) and expectations concerning the value of the Reference Asset.

If further Notes relating to a particular Reference Asset are subsequently issued the supply of such Series of Notes in the market may increase, which may cause the price at which the Notes trade in the secondary market to decline.

The market value of the Notes may not have a direct relationship with the prevailing price of the Reference Asset, in that changes in the prevailing price, level or value of the Reference Asset will not necessarily result in a comparable change in the market value of the Notes.

*Transparency Directive*

Directive 2004/109/EC of the European Parliament and of the Council of 15 December 2004 on the harmonisation of transparency requirements in relation to information about issuers whose securities are admitted to trading on an EEA Regulated Market and amending Directive 2001/34/EC (the *"Transparency Directive"*) entered into force on January 20 2005. It requires member states to take measures necessary to comply with the Transparency Directive by 20 January 2007. If, as a result of the Transparency Directive or any legislation implementing the Transparency Directive, LBHI could be required to publish financial information either more regularly than it otherwise would be required to or according to accounting principles which are materially different from the accounting principles which it would otherwise use to

prepare its published financial information, LBHI may seek an alternative admission to listing, trading and/or quotation for the Notes on a different section of the Irish Stock Exchange or by such other competent authority, stock exchange and/or quotation system inside or outside the European Union as it may (with the approval of the Dealers) decide.

## Risks relating to LBHI as Issuer and Guarantor

LBHI is the ultimate parent company of the Lehman Brothers group. The Notes issued by LBHI and the Guarantees will be solely LBHI's obligations, and no other entity will have any obligation, contingent or otherwise, to make any payments in respect thereof. Because LBHI is a holding company whose primary assets consist of shares of stock or other equity interests in or amounts due from subsidiaries, almost all of its income is derived from those subsidiaries. LBHI's subsidiaries will have no obligation to pay any amount in respect of the Notes issued by LBHI or the Guarantees or to make any funds available therefor. Accordingly, LBHI will be dependent on dividends and other distributions or loans from its subsidiaries to generate the funds necessary to meet obligations with respect to the Notes issued by it and the Guarantees, including the payment of principal and interest. Due to covenants contained in certain of LBHI's debt agreements and regulations relating to capital requirements affecting certain of its more significant subsidiaries, the ability of certain subsidiaries to pay dividends and other distributions and make loans to LBHI is restricted. The notes to LBHI's financial statements included in its most recent annual report on Form 10-K set forth the amount of net assets of its subsidiaries that are restricted as to the payment of dividends to LBHI. Additionally, as an equity holder, LBHI's ability to participate in any distribution of assets of any subsidiary is subordinate to the claims of creditors of the subsidiary, except to the extent that any claims LBHI may have as a creditor of the subsidiary are judicially recognized. If these sources are not adequate, LBHI may be unable to make payments of principal or interest in respect of the Notes issued by it and the Guarantees, and a Noteholder could lose all or a part of its investment.

## Certain of Lehman Brothers' activities may adversely affect the value of the Notes

The Issuers or one or more of their affiliates may hedge their obligations under particular Notes by purchasing or selling the related currency, securities or commodities, options or futures on such currency, securities or commodities or other instruments linked to such currency, securities or commodities, and may adjust the hedge by, among other things, purchasing or selling any of the foregoing, at any time and from time to time, and by unwinding the hedge by selling any of the foregoing. The Issuers or their affiliates also may enter into, adjust and unwind hedging transactions relating to other notes whose returns are linked to the same currency, securities or commodities, or may engage in trading in currency, securities or commodities, or instruments whose returns are linked to currency, securities or commodities, to which particular Notes are linked, either for their or their affiliates' proprietary accounts, for other accounts under their management or to facilitate transactions on behalf of customers. In addition, affiliates of the Issuers may be a counterparty to hedges of their obligations under particular Notes that they may enter into from time to time. Any of these activities may adversely affect the market values or levels of a particular currency, securities or commodities and therefore the market value of the related Notes. It is possible that the Issuers or their affiliates could receive positive returns with respect to these activities while the value of the Notes may decline.

The Issuers or their affiliates also have issued, or underwritten on behalf of other issuers, and in the future may issue or underwrite, other securities or financial or derivative instruments with returns linked to changes in the level of one or more currency, securities or commodities to which particular notes may be linked. By introducing competing products into the marketplace in this manner, the Issuers or their affiliates could adversely affect the value of particular Notes and the amount payable on such Notes.

As a result of any of these transactions, potential conflicts of interest may exist between the Issuers or their affiliates and Noteholders.

30

**An affiliate of the Issuers may act as calculation agent on the Notes, creating a potential conflict of interest between the Issuers or their affiliates and Noteholders**

Affiliates of the Issuers may act as calculation agent for particular Notes, and may have discretion in computing indexes or other measures to which payments on particular Notes may be linked, including whether any interest is payable on any Range Accrual Notes for any period. The exercise of discretion by a calculation agent that is affiliated with an Issuer could adversely affect the value of particular Notes and may present the calculation agent with a conflict of interest to the extent that the determinations made by the calculation agent in respect of the particular Notes affect the payments due from the Issuer under the Notes, due to or from the Issuer or any of its affiliates under any related hedge transaction or the value of the investments held by the Issuer or any of its affiliates' proprietary or managed accounts.

### Certain Factors Affecting Lehman Brothers' Results of Operations

Lehman Brothers' financial condition and results of operations may be affected by uncertain or unfavourable economic, market, legal and other conditions. These conditions include but are not limited to:

*Market Risk*

Changes in interest and foreign exchange rates, financial instruments and real estate valuations and increases in volatility can increase credit and market risks and may also affect customer-flow-related revenues and proprietary trading revenues as well as affect the volume of debt and equity underwritings and merger and acquisition transactions.

*Competitive Environment*

All aspects of Lehman Brothers' business are highly competitive. Lehman Brothers' competitive ability depends on many factors, including its reputation, the quality of its services and advice, intellectual capital, product innovation, execution ability, pricing, sales efforts and the talent of its employees.

*Business Environment*

Concerns about geopolitical developments, oil prices and natural disasters, among other things, can affect the global financial markets. Accounting and corporate governance scandals in recent years have had a significant effect on investor confidence.

*Liquidity*

Liquidity and liquidity management are of critical importance in Lehman Brothers' industry. Liquidity could be affected by the inability to access the long-term or short-term debt, repurchase or securities-lending markets or to draw under credit facilities, whether due to factors specific to Lehman Brothers or to general market conditions. In addition, the amount and timing of contingent events, such as unfunded commitments and guarantees, could adversely affect cash requirements and liquidity. To mitigate Lehman Brothers' risks, our liquidity and funding policies have been conservatively designed to maintain sufficient liquid financial resources to continually fund Lehman Brothers' balance sheet and to meet all expected cash outflows, for one year in a stressed liquidity environment.

*Credit Ratings*

Lehman Brothers' access to the unsecured funding markets is dependent on its credit ratings. A reduction in its credit ratings could adversely affect Lehman Brothers' access to liquidity alternatives and its competitive position, and could increase the cost of funding or trigger additional collateral requirements.

*Credit Exposure*

Credit exposure represents the possibility that a counterparty will be unable to honour its contractual obligations. Although Lehman Brothers actively manage credit exposure daily as part of its risk management framework, counterparty default risk may arise from unforeseen events or circumstances.

*Operational Risk*

Operational risk is the risk of loss resulting from inadequate or failed internal or outsourced processes, people, infrastructure and technology, or from external events. Lehman Brothers seek to minimise these risks through an effective internal control environment.

*Legal, Regulatory and Reputational Risk*

The securities and financial services industries are subject to extensive regulation under both federal and state laws in the U.S. and under the laws of the many other jurisdictions in which Lehman Brothers do business. Lehman Brothers also are regulated by a number of self-regulatory organizations such as the National Association of Securities Dealers, the Municipal Securities Rulemaking Board and the National Futures Association, and by national securities and commodities exchanges, including the New York Stock Exchange. As of December 1, 2005, LBHI became regulated by the SEC as a consolidated supervised entity ("*CSE*"), and as such, LBHI are subject to group-wide supervision and examination by the SEC, and accordingly, LBHI are subject to minimum capital requirements on a consolidated basis. Violation of applicable regulations could result in legal and/or administrative proceedings, which may impose censures, fines, cease-and-desist orders or suspension of a firm, its officers or employees. The scrutiny of the financial services industry has increased over the past several years, which has led to increased regulatory investigations and litigation against financial services firms.

Legislation and rules adopted both in the U.S. and around the world have imposed substantial new or more stringent regulations, internal practices, capital requirements, procedures and controls and disclosure requirements in such areas as financial reporting, corporate governance, auditor independence, equity compensation plans, restrictions on the interaction between equity research analysts and investment banking employees and money laundering. The trend and scope of increased compliance requirements may require Lehman Brothers to invest in additional resources to ensure compliance.

The trend and scope of increased compliance requirements has increased costs necessary to ensure compliance. Our reputation is critical in maintaining our relationships with clients, investors, regulators and the general public, and is a key focus in our risk management efforts.

Lehman Brothers is involved in a number of judicial, regulatory and arbitration proceedings concerning matters arising in connection with the conduct of its business, including actions brought against Lehman Brothers and others with respect to transactions in which Lehman Brothers acted as an underwriter or financial advisor, actions arising out of its activities as a broker or dealer in securities and actions brought on behalf of various classes of claimants against many securities firms and lending institutions, including Lehman Brothers.

See Part I, Item 1A, Risk Factors, in the annual report pursuant to Section 13 or 15(d) of the Exchange Act for the fiscal year ended November 30, 2006 of LBHI filed with the SEC on Form 10-K for additional information about these and other risks inherent in our business.

## Risks relating to LBB

The risk factors set out above are not considered to affect the ability of LBB to fulfil its obligations to investors under Notes issued by it because such obligations are irrevocably and unconditionally guaranteed by LBHI pursuant to the relevant Guarantee.

**Risks relating to LBTCVB**

The risk factors set out above are not considered to affect the ability of LBTCBV to fulfil its respective obligations to investors under Notes issued by it because such obligations are irrevocably and unconditionally guaranteed by LBHI pursuant to the relevant Guarantee.

## AVAILABLE INFORMATION

LBHI files annual, quarterly and current reports, proxy statements and other information with the Securities and Exchange Commission ("SEC"). You may read and copy any document LBHI files with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at +1 800 SEC 0330 (or +1 202 551 8090). The SEC maintains an internet site that contains annual, quarterly and current reports, proxy and information statements and other information regarding issuers that file electronically with the SEC. LBHI's electronic SEC filings are available to the public at http://www.sec.gov.

LBHI's public internet site is http://www.lehman.com. LBHI makes available free of charge through its internet site, via a link to the SEC's internet site at http://www.sec.gov, its annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as soon as reasonably practicable after it electronically files such material with, or furnishes it to, the SEC. LBHI also makes available through its internet site, via a link to the SEC's internet site, statements of beneficial ownership of LBHI's equity securities filed by its directors, officers, 10 per cent. or greater shareholders and others under Section 16 of the Exchange Act.

In addition, LBHI makes available on http://www.lehman.com its most recent annual report on Form 10-K, its quarterly reports on Form 10-Q for the current fiscal year, its most recent proxy statement and its most recent annual report to stockholders, although in some cases these documents are not available on that site as soon as they are available on the SEC's site.

Copies of the materials referred to in the preceding paragraph, as well as copies of any current amendment or supplement to this Base Prospectus, may also be obtained from the persons set forth under "Information Incorporated By Reference".

So long as any of the Notes are outstanding and if LBHI ceases to be a reporting company under Section 13 or Section 15(d) of the Exchange Act, LBHI has agreed to furnish to a Holder of a Note and a prospective purchaser designated by such Holder, upon the request of such Holder in connection with a transfer or proposed transfer of such Note pursuant to Rule 144A, the information required to be delivered under Rule 144A(d)(4) under the Securities Act.

## INFORMATION INCORPORATED BY REFERENCE

The following information (the "*Information Incorporated by Reference*") has been filed with the Irish Financial Services Regulatory Authority (IFRSA) and/or the Irish Stock Exchange in connection with the Program listed on the EU Regulated Market in Luxembourg, and shall be deemed to be incorporated in, and to form part of, this Base Prospectus.

(a)     the annual report pursuant to Section 13 or 15(d) of the Exchange Act for the fiscal year ended November 30, 2005 of LBHI filed with the SEC on Form 10-K including the consolidated and unconsolidated financial statements (including the auditors' report thereon and notes thereto) of LBHI in respect of the years ended November 30, 2005 and November 30, 2004 (set out on pages 65 to 110 and F-1 to F-14, respectively).

(b)     the annual report pursuant to Section 13 or 15(d) of the Exchange Act for the fiscal year ended November 30, 2006 of LBHI filed with the SEC on Form 10-K including the audited consolidated and unconsolidated financial statements (including the auditors' report thereon and notes thereto) of LBHI in respect of the years ended November 30, 2006 and November 30, 2005 (set out on pages 72 to 120 and F-1 to F-14, respectively);

(c)     the quarterly report pursuant to Section 13 or 15(d) of the Exchange Act for the quarterly period ended February 28, 2007 of LBHI filed with the SEC on Form 10-Q including the consolidated interim quarterly financial statements of LBHI in respect of the three months ended February 28, 2006 (set out on pages 3 to 40);

(d)     the quarterly report pursuant to Section 13 or 15(d) of the Exchange Act for the quarterly period ended May 31, 2007 of LBHI filed with the SEC on Form 10-Q including the consolidated interim quarterly financial statements of LBHI in respect of the three and six months ended May 31, 2006 (set out on pages 3 to 43);

Certain of the financial data set out in the Information Incorporated by Reference in items (a) to (d) above is not audited and is derived from Lehman Brothers' internal management and accounting records or publicly available information.

(e)     the LBHI notice of 2007 Annual Meeting of Stockholders and proxy statement dated February 26, 2007 (including the details relating to LBHI's board of directors, director independence, audit committee and shareholders set out on pages 5 to 46 thereof);

(f)     the audited unconsolidated financial statements (including the auditors' report thereon and notes thereto) of LBTCBV in respect of the years ended November 30, 2006 and November 30, 2005 (set out on pages 3 to 12 and 3 to 11, respectively, of the 2006 and 2005 annual reports of LBTCBV);

(g)     the audited unconsolidated balance sheet and income statement (including the auditors' report thereon and notes thereto) of LBB in respect of the year ended November 30, 2005 (set out on pages 3 to 12 of the 2005 annual report of LBB);

(h)     the short form audit report of LBB including the audited unconsolidated financial statements (including the auditors' report thereon and notes thereto) of LBB in respect of the year ended 30 November 2006.

(i)     the auditors' limited scope review report on the cashflow statement of LBTCBV (such cash flow statement being set out on page 174 hereof);

(j)     the auditors' limited scope review report on the cashflow statement of LBB (such cash flow statement being set out on page 177 hereof);

(k)     the terms and conditions set out on pages 54 to 95 of the Debt Issuance Program Prospectus dated August 9, 2006 relating to the Program under the heading "Terms and Conditions of the Notes" (the "*2006 Conditions*") and the terms and conditions set out on pages 37 to 72 of the Debt Issuance Program Prospectus dated August 26, 2005 relating to the Program under the heading "Terms and Conditions of the Notes" (the "*2005 Conditions*"); and

(l)    the current report of LBHI dated June 12 2007 pursuant to Section 13 or 15(d) of the Exchange Act filed with the SEC on Form 8-K exhibiting LBHI's press release with respects to its earnings for its most recently completed fiscal quarter and related attachments.

The table below sets out the relevant page references for the notes to the financial statements and the auditors' reports for the financial statements referred to above:

|  | Page reference |
|---|---|
| **LBHI 2005 Financial Statements (on Form 10-K)** | |
| 1.  Cash Flow Statement | 74 |
| 2.  Notes to Financial Statements | 75-110 |
| 3.  Auditors' Report | 68 |
| **LBHI 2006 Financial Statements (on Form 10-K)** | |
| 1.  Cash Flow Statement | 80 |
| 2.  Notes to Financial Statements | 81-120 |
| 3.  Auditors' Report | 74 |
| **LBHI February 28, 2007 Quarterly Financial Statements (on Form 10-Q)** | |
| 1.  Notes to Financial Statements | 7-39 |
| 2.  Auditors' Review Report | 40 |
| **LBHI May 31, 2007 Quarterly Financial Statements (on Form 10-Q)** | |
| 1.  Notes to Financial Statements | 7-42 |
| 2.  Auditors' Review Report | 43 |
| **LBTCBV 2006 Financial Statements** | |
| 1.  Notes to Financial Statements | 6-10 |
| 2.  Auditors' Report | 12 |
| **LBTCBV 2005 Financial Statements** | |
| 1.  Notes to Financial Statements | 6-9 |
| 2.  Auditors' Report | 11 |
| **LBB 2005 Financial Statements** | |
| 1.  Notes to Financial Statements | 6-12 |
| 2.  Auditors' Report | 3 |

Any information which appears in the documents described above but which is not expressed to be incorporated by reference into this Base Prospectus is either not relevant for the investor or covered elsewhere in this Base Prospectus.

The Issuers will provide, without charge, to each person to whom a copy of this Base Prospectus has been delivered, upon the oral or written request of such person, a copy of any or all of the documents which or portions of which are incorporated herein by reference. Written or oral requests for such documents should be directed to the Issuers at their specified offices below. In addition, such documents and copies of the relevant Final Terms will be available without charge from the registered offices of the Issuers and the Irish Paying Agent in Dublin during usual business hours on any weekday (Saturdays and public holidays excepted).

Documents in relation to listed Notes other than Notes admitted to listing on the Official List of the Irish Stock Exchange and to trading on its regulated market or listed on the Singapore Stock Exchange will be available in an alternative manner as specified in the relevant Final Terms.

If the terms of the Program are modified or amended in a manner which would make this Base Prospectus, as so modified or amended, inaccurate or misleading, a new Base Prospectus will be prepared to the extent required by law.

## GENERAL DESCRIPTION OF THE PROGRAM

The applicable terms of any Notes will be agreed between the relevant Issuer and the relevant Dealer(s) prior to the issue of the Notes and will be set out in the Terms and Conditions of the Notes endorsed on, or annexed to, the Notes, as supplemented by the applicable Final Terms attached to, or endorsed on, such Notes, as more fully described under "Form of the Notes" below.

Notes issued under the Program may be issued pursuant to this Base Prospectus and associated Final Terms (*"Final Terms"*) or pursuant to a drawdown prospectus (*"Drawdown Prospectus"*) prepared in connection with a particular Tranche of Notes. Accordingly references to terms and conditions and other items being as set out in this Base Prospectus and relevant Final Terms should, as the context requires, be construed as being as set out in the relevant Drawdown Prospectus and references to Final Terms should be construed as referring to the Drawdown Prospectus as applicable.

This Base Prospectus and any supplement will only be valid for the issuing of Notes in an aggregate principal amount which, when added to the aggregate principal amount then outstanding of all Notes previously or simultaneously issued under this Program, does not exceed U.S.$100,000,000,000 (or its equivalent in other currencies). For the purpose of calculating the U.S. dollar equivalent of the aggregate principal amount of Notes issued under the Program from time to time:

(a)    the U.S. dollar equivalent of Notes denominated in another Specified Currency (as hereafter defined) shall be determined as of the date of agreement to issue such Notes (the *"Agreement Date"*) on the basis of the forward rate for the sale of the U.S. dollar against the purchase of such Specified Currency in the London foreign exchange market quoted by any leading bank selected by the relevant Issuer on the Agreement Date;

(b)    the U.S. dollar equivalent of Dual Currency Notes and Index-Linked Notes (each as hereafter defined) shall be calculated in the manner specified above by reference to the original principal amount of such Notes;

(c)    the principal amount of Zero Coupon Notes (as hereafter defined) and other Notes issued at a discount or a premium shall be deemed to be the net proceeds received by the relevant Issuer for the relevant issue of Notes; and

(d)    the face principal amount of Partly Paid Notes (as hereafter defined) will be taken into account regardless of the amount of the subscription price paid.

# FORM OF THE NOTES

The Notes may be issued from time to time in one or more Series pursuant to an Amended and Restated Fiscal Agency Agreement dated July 24, 2007 (as amended, restated or supplemented from time to time, the "*Fiscal Agency Agreement*") between, amongst others, LBHI, LBTCBV, LBB, The Bank of New York, acting through its London branch, as Fiscal Agent (together with its successors, the "*Fiscal Agent*") and Principal Paying Agent, The Bank of New York, acting through its New York branch, as Registrar, (together with its successors, the "*Registrar*"), Exchange Agent and U.S. Sub-Paying Agent, BNY Financial Services Plc as Irish paying agent and the other paying agents referred to therein (together with the Principal Paying Agent and the U.S. Sub-Paying Agent, the "*Paying Agents*", which expression shall include any additional or successor paying agents), provided that Australian Domestic Notes are issued pursuant to the Deeds Poll (as defined below). The terms of any particular Tranche (as defined under "Terms and Conditions of the Notes" below) of Notes will be set forth in a Final Terms relating to such Tranche, as described under "Final Terms" below. The statements in this section include summaries of, and are subject to, the detailed provisions of the Fiscal Agency Agreement, any calculation agency agreement entered into by the Issuer of the relevant Tranche of Notes, the Notes and any applicable Final Terms. Copies of the Fiscal Agency Agreement and each calculation agency agreement are available for inspection and copies of each Final Terms are obtainable at the specified office of the Fiscal Agent in London, being at the date hereof at 48th Floor, One Canada Square, London E14 5AL, and at the specified offices of such other Paying Agents as may be appointed from time to time. The Final Terms relating to a Note which is not admitted to listing, trading and/or quotation by any competent authority, stock exchange and/or quotation system may only be inspected by the Holder who must produce evidence satisfactory to the relevant Paying Agent as to his identity. The Holders (as defined below) of Notes other than Australian Domestic Notes and the Holders of any interest coupons ("*Coupons*"), receipts ("*Receipts*") and talons ("*Talons*") appertaining to the Notes are entitled to the benefit of, are bound by, and are deemed to have notice of, all the provisions of the Fiscal Agency Agreement applicable to them.

Notes may be issued on either an unsubordinated basis or a subordinated basis in either bearer form or registered form, except that Extendible Notes will only be issued in registered form, bearer Notes will not be issued in the Australian domestic capital markets and Australian Domestic Notes, Danish Notes, Finnish Notes, Norwegian Notes and Swedish Notes (as defined below) will be issued in registered uncertificated and dematerialised book-entry form. Unless otherwise specified in the applicable Final Terms, the Notes will be in bearer form and denominated in such denominations and integral multiples as the relevant Issuer and the relevant Dealer(s) shall agree, except that, in any case, the Notes will be in such minimum denominations as may be allowed or required from time to time by the relevant central bank (or equivalent body) or any laws or regulations applicable to the relevant Specified Currency and that (a) in the case of Notes to be admitted to trading on a regulated market within the scope of the Directive 2004/39/EC on Markets in Financial Instruments and/or publicly offered in an EEA Member State, the minimum denomination of the Notes will be at least EUR1,000 (or nearly equivalent in any other currency on the issue date) or the Notes will give the right to acquire transferable securities or to receive a cash amount, as a consequence of their being converted or the rights conferred by them being exercised, provided that the issuer of the underlying securities is not the relevant Issuer or another entity belonging to the Lehman Brothers group; (b) Notes issued by LBHI with a maturity of 183 days or less will have a minimum denomination of U.S.$500,000 or its equivalent in the currency in which the Notes are denominated. The minimum subscription price payable by each offeree for Australian Domestic Notes will be A$500,000 (or the equivalent in another currency and, in either case disregarding moneys lent by the offeror or its associates) unless the offer or invitation giving rise to the subscription otherwise does not require disclosure to investors under Part 6D.2 of the Corporations Act 2001 of Australia (the "Corporations Act"). Australian Domestic Notes issued by LBTCBV or LBHI are to be issued in registered (or inscribed) form, to be constituted by the relevant Deed Poll (as defined below) and will take the form of entries on a register maintained by the Australian Registrar as described in the relevant Final Terms.

Each Tranche of Notes in bearer form will initially be represented by a temporary global Note, or, in the case of an Issuer other than LBHI provided that such Notes have a maturity of one year or less, or for any notes that have a maturity of 183 days or less if LBHI is the Issuer, a permanent global Note, without Coupons, Receipts or Talons attached. Each global Note which is not intended to be issued in NGN form, as

specified in the applicable Final Terms, will be deposited on or around the issue date thereof with a depositary or a common depositary for Euroclear and/or Clearstream, Luxembourg and/or any other relevant clearing system and each global Note which is intended to be issued in NGN form, as specified in the applicable Final Terms, will be deposited on or around the issue date thereof with a common safekeeper for Euroclear and/or Clearstream, Luxembourg.

Notes in NGN form may only be issued through Euroclear and Clearstream, Luxembourg. Subject to this, any reference in this section "Form of the Notes" to Euroclear and/or Clearstream, Luxembourg shall, whenever the context so permits, be deemed to include a reference to any additional or alternative clearing system specified in the applicable Final Terms.

Upon deposit of such temporary global Note or permanent global Notes, as applicable, Euroclear and Clearstream, Luxembourg will credit the relevant Dealer(s) with principal amounts of Notes of such Tranche equal to the principal amount thereof for which they have paid. If so specified in the applicable Final Terms, interests in the temporary global Note of any Tranche will be exchangeable, free of charge to the Holder, for, in whole (i) interests in a permanent global Note in bearer form of such Series or (ii) definitive Notes in bearer form of such Series with, if applicable, Coupons, Receipts and/or Talons attached (as indicated in the applicable Final Terms) and (whether specified or not in the applicable Final Terms) in the case of Notes issued by LBHI, at the request of each Holder (with respect to its own Notes), in each case, on or after the date (the *"Exchange Date"*) that is the first Business Day (as defined in the Terms and Conditions of the Notes of such Tranche) following the expiration of a period of 40 days after the original issue date of the Notes of such Tranche (or, if later, the First Business Day following the expiration of the "restricted period" within the meaning of U.S. Treasury Regulations Section 1.163-5(c)(2)(i)(D)(7)). If definitive Notes in bearer form have previously been issued in exchange for an interest in a permanent global Note representing Notes of the same Series, then (unless the Notes which would continue to be represented by any such permanent global Note would be regarded by Euroclear and Clearstream, Luxembourg as fungible with any such definitive Notes in bearer form issued in partial exchange for interests in any such permanent global Notes) interest in the temporary global Note will henceforth only be exchangeable, in whole, for definitive Notes in bearer form of the same Series. Pursuant to the Fiscal Agency Agreement, the Fiscal Agent shall arrange that, where a further Tranche of Notes is issued, the Notes of such Tranche shall be assigned a common code number and International Security Identification Number (*"ISIN"*) by Euroclear and Clearstream, Luxembourg which is different from the common code and ISIN number assigned to Notes of any previously issued Tranche of the same Series until the Exchange Date of the Notes of such new Tranche and receipt by Euroclear and/or Clearstream, Luxembourg of certification of non-U.S. beneficial ownership as required by U.S. Treasury regulations in respect of the Notes of such new Tranche. References herein to the Notes of a Series shall be deemed to include any temporary or permanent global Notes, any global Notes in registered form and any definitive Notes in bearer or registered form of such Series, unless the context requires otherwise.

If:

(a)    a global Note has not been delivered or the principal amount thereof increased in accordance with the terms of a temporary global Note by 5.00 p.m. (London time) on the seventh day after the bearer has requested exchange of an interest in the temporary global Note in accordance with such terms for an interest in a global Note; or

(b)    definitive Notes in registered form have not been delivered in accordance with the terms of a temporary global Note by 5.00 p.m. (London time) on the seventh day after the bearer has requested exchange of an interest in the temporary global Note in accordance with such terms for definitive Notes in registered form; or

(c)    definitive Notes in bearer form have not been delivered in accordance with the terms of a temporary global Note by 5.00 p.m. (London time) on the thirtieth day after the bearer has requested exchange of an interest in the temporary global Note in accordance with such terms for definitive Notes in bearer form; or

(d)   a temporary global Note (or any part thereof) has become due and payable in accordance with the Conditions or the date for final redemption of a temporary global Note has occurred and, in either case, payment in full of the amount of principal falling due with all accrued interest thereon has not been made to the bearer in accordance with the terms of the temporary global Note on the due date for payment,

then the temporary global Note (including the obligation to deliver a global Note or definitive Notes (as the case may be)) will become void at 5.00 p.m. (London time) on such seventh day (in the case of (a) above or (b) above) or at 5.00 p.m. (London time) on such thirtieth day (in the case of (c) above) or at 5.00 p.m. (London time) on such due date (in the case of (d) above) and the bearer of the temporary global Note will have no further rights thereunder (but without prejudice to the rights which the bearer of the temporary global Note or others may have under a deed of covenant (as amended, supplemented or replaced from time to time, the "*Deed of Covenant*") dated July 24, 2007 executed by the Issuers. Under the Deed of Covenant, persons shown in the records of Euroclear and/or Clearstream, Luxembourg as being entitled to an interest in a temporary global Note will acquire directly against the Issuer all those rights to which they would have been entitled if, immediately before the temporary global Note became void, they had been the holders of definitive Notes in an aggregate principal amount equal to the principal amount of Notes they were shown as holding in the records of Euroclear and/or Clearstream, Luxembourg.

If so specified in the applicable Final Terms, interests in a permanent global Note in bearer form will be exchangeable free of charge to the Holder, upon not less than 60 days' notice expiring at least 30 days after the Exchange Date to the Fiscal Agent and upon the presentation thereof made at any time to or to the order of the Fiscal Agent for in whole or in part, definitive Notes in bearer form of the same Series, with, as applicable, Coupons, Receipts and/or Talons attached (as indicated in the applicable Final Terms) and (whether specified or not in the applicable Final Terms in the case of Notes issued by LBHI, at the request of each Holder (with respect to its own Notes); provided that if definitive Notes in bearer form are issued in partial exchange for an interest in such permanent global Note, such issuance shall (unless the Notes which would continue to be represented by such permanent global Note of such Series would be regarded by Euroclear and Clearstream, Luxembourg as fungible with any such definitive Notes in bearer form issued in partial exchange for interests in any such permanent global Note) give rise to the exchange of such permanent global Note in whole for, at the option of the Holders entitled thereto, definitive Notes in bearer form. In the case of Notes issued by LBTCBV or LBB, if the applicable Final Terms specifies that interests in a permanent global Note in bearer form will be exchangeable for definitive Notes in bearer form "in the limited circumstances described in the permanent global Note", then interests in the permanent global Note will be exchangeable in whole, but not in part, for definitive Notes in bearer form if (a) both Euroclear and Clearstream, Luxembourg are closed for business for a continuous period of 14 days (other than by reason of holidays, statutory or otherwise) or both Euroclear and Clearstream, Luxembourg announce their intention permanently to cease business or do in fact do so, and a replacement or replacements is or are not appointed by the relevant Issuer within 90 days from the commencement of such closure, announcement or cessation of business or (b) an Event of Default has occurred and is continuing with respect to the Notes represented by such permanent global Note.

If:

(a)   definitive Notes in bearer form have not been delivered in accordance with the terms of a permanent global Note by 5.00 p.m. (London time) on the thirtieth day after the bearer has requested exchange of the permanent global Note in accordance with such terms for definitive Notes in bearer form; or

(b)   a permanent global Note was originally issued in exchange for part only of a temporary global Note representing a Tranche of Notes and such temporary global Note becomes void in accordance with its terms; or

(c)   a permanent global Note (or any part thereof) has become due and payable in accordance with the Conditions or the date for final redemption of a permanent global Note has occurred and, in either case, payment in full of the amount of principal falling due with all accrued interest

thereon has not been made to the bearer in accordance with the terms of the permanent global Note on the due date for payment,

then the permanent global Note (including the obligation to deliver definitive Notes) will become void at 5.00 p.m. (London time) on such thirtieth day (in the case of (a) above) or at 5.00 p.m. (London time) on the date on which such temporary global Note becomes void (in the case of (b) above) or at 5.00 p.m. (London time) on such due date (in the case of (c) above) and the bearer of the permanent global Note will have no further rights thereunder (but without prejudice to the rights which the bearer of the permanent global Note or others may have under the Deed of Covenant). Under the Deed of Covenant, persons shown in the records of Euroclear and/or Clearstream, Luxembourg as being entitled to an interest in a permanent global Note will acquire directly against the Issuer all those rights to which they would have been entitled if, immediately before the permanent global Note became void, they had been the holders of definitive Notes in an aggregate principal amount equal to the principal amount of Notes they were shown as holding in the records of Euroclear and/or Clearstream, Luxembourg.

Notes in registered form may initially be issued (i) in the form of global Notes in registered form in an aggregate principal amount equal to the principal amount of the Notes of such Tranche or (ii) in the form of definitive Notes in registered form. Global Notes in registered form will be represented by global Notes in fully registered form without Coupons, Receipts or Talons and will be deposited with a common depositary for Euroclear and Clearstream, Luxembourg and/or a custodian for DTC, as the case may be, and registered in the name of such common depositary or its nominee and/or in the name of a nominee of DTC, as the case may be. Unless (i) DTC or any successor depositary notifies the relevant Issuer that it is no longer willing or able to discharge properly its responsibilities as depositary in respect of Restricted Global Note, or (ii) DTC or any successor depositary ceases to be a "clearing agency" (as defined in the U.S. Securities Exchange Act of 1934, as amended) or is at any time no longer eligible to act as such and the relevant Issuer is unable to appoint a qualified successor within 90 days of it giving notice of such ineligibility to the relevant Issuer and the Guarantor, or (iii) both Euroclear and Clearstream, Luxembourg are closed for business for a continuous period of 14 days (other than by reason of holidays, statutory or otherwise) or both Euroclear and Clearstream, Luxembourg announce an intention permanently to cease business or do in fact do so, and a replacement or replacements is or are not appointed by the relevant Issuer within 90 days from the commencement of such closure, announcement or cessation of business, or (iv) an Event of Default (as hereafter defined) has occurred and is continuing with respect to the Notes represented by such global Note in registered form, or (v) the relevant Issuer in its sole discretion notifies the Registrar that definitive Notes in registered form shall be delivered in exchange for such global Note in registered form, owners of beneficial interest in global Notes in registered form will not be entitled to have any portion of such global Note registered in their names, will not receive or be entitled to receive physical delivery of definitive Notes in registered form in exchange for their interests in a global Note in registered form and will not be considered to be the owners or holders of any Notes under the Fiscal Agency Agreement for the Notes. If so specified in the applicable Final Terms, definitive Notes in registered form will be exchangeable for, in whole or in part, interests in a global Note in registered form of the same Series upon written notification to the Registrar and surrender thereof made at any time at the office of the Registrar. Notes in registered form will not be exchangeable for Notes in bearer form.

Pursuant to the Fiscal Agency Agreement, the Agent shall arrange that, where a further Tranche of Notes is issued which is intended to form a single Series with an existing Tranche of Notes, the Notes of such further Tranche shall be assigned a temporary common code and ISIN which are different from the common code and ISIN assigned to the Notes of any other Tranche of the same Series until at least the expiry of the distribution compliance period (as defined in Regulation S under the Securities Act) applicable to the Notes of such Tranche.

Any Note sold by a Dealer to a qualified institutional buyer within the meaning of Rule 144A will be delivered in definitive registered form or, after sufficient notice to the Registrar and if the necessary arrangements are made with DTC and the Note is denominated in dollars, in book-entry form through DTC.

The following procedures shall apply with respect to Rule 144A Notes in book-entry form through DTC:

- DTC will act as securities depository for the Notes. The Notes will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered global Note will be issued for the Notes, in the aggregate principal amount of such issue, and will be deposited with DTC.

- DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC's direct participants ("*Direct Participants*") include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("*DTCC*"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("*Indirect Participants*"). The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com and www.dtc.org.

- Purchases of Notes under the DTC system must be made by or through Direct Participants, which will receive a credit for the Notes on DTC's records. The ownership interest of each actual purchaser of each Note ("*Beneficial Owner*") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Notes are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in Notes, except in the event that use of the book-entry system for the Notes is discontinued.

- To facilitate subsequent transfers, all Notes deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of Notes with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Notes; DTC's records reflect only the identity of the Direct Participants to whose accounts such Notes are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

- Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

- Redemption notices shall be sent to DTC. If less than all of the Notes within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

- Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Notes unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Issuers as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts Notes are credited on the record date (identified in a listing attached to the Omnibus Proxy).

- Redemption proceeds, distributions, and dividend payments on the Notes will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Issuers or Paying Agent, on payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Paying Agent, or the Issuers, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Issuers or the Paying Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

- DTC may discontinue providing its services as depository with respect to the Notes at any time by giving reasonable notice to the Issuers or Paying Agent. Under such circumstances, in the event that a successor depository is not obtained, definitive Note certificates are required to be printed and delivered.

- The Issuers may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, definitive Note certificates will be printed and delivered to DTC.

- The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Issuers believe to be reliable, but the Issuers take no responsibility for the accuracy thereof.

In the case of Notes issued by LBHI with an original maturity of 184 days or more, and in the case of Notes issued with an original maturity of more than one year, the following legend will appear on all global Notes in bearer form, definitive Notes in bearer form, Coupons, Receipts and Talons: "Any United States person who holds this obligation will be subject to limitations under United States income tax laws, including the limitations provided in sections 165(j) and 1287(a) of the Internal Revenue Code.".

In the case of Notes issued by LBHI with an original maturity of 183 days or less, the following legend will also appear on all global Notes, definitive Notes, Coupons, Receipts and Talons:

"By accepting this obligation, the holder represents and warrants that it is not a United States person (other than an exempt recipient described in section 6049(b)(4) of the Internal Revenue Code and the regulations thereunder) and that it is not acting for or on behalf of a United States person (other than an exempt recipient described in section 6049(b)(4) of the Internal Revenue Code and the regulations thereunder)."

LBTCBV and LBHI may issue Australian Domestic Notes.

Australian Domestic Notes:

- will be issued in registered (or inscribed) form, constituted by a Deed Poll to be executed by LBTCBV or LBHI, as the case may be, and governed by the laws of New South Wales, Australia (each a "*Deed Poll*" and together, the "*Deed Polls*") and take the form of entries on

a register to be maintained by an Australian registrar to be appointed by LBTCBV or LBHI, as the case may be, and specified in the applicable Final Terms (the *"Australian Registrar"*);

- will provide for payments of principal and interest to be made in Sydney, Australia;

- will provide for LBTCBV or LBHI, as the case may be, to submit to the jurisdiction of the courts of New South Wales, Australia and appoint such person as is specified in the applicable Final Terms as its agent for the service of process in New South Wales, Australia;

- may be listed on the Australian Stock Exchange; and

- will be eligible for lodgement into the system (*"Austraclear System"*) operated by Austraclear Limited (ABN 94 002 060 773) (*"Austraclear"*).

It is not intended LBB will issue Australian Domestic Notes.

LBTCBV or LBHI, as the case may be, will apply to Austraclear for approval for each Series of Australian Domestic Notes to be eligible for lodgement in the Austraclear System. Such approval by Austraclear is not a recommendation or endorsement by Austraclear of such Australian Domestic Notes.

If accepted for admission to the respective system, interests in Australian Domestic Notes may be held through Euroclear or Clearstream, Luxembourg. In these circumstances, entitlements in respect of holdings of interests in such Australian Domestic Notes in Euroclear would be held in the Austraclear System by Westpac Custodian Nominees Limited as nominee of, or another nominee appointed by, Euroclear while entitlements in respect of holdings of interests in such Australian Domestic Notes in Clearstream, Luxembourg would be held in the Austraclear System by ANZ Nominees Limited as nominee of, or another nominee appointed by, Clearstream, Luxembourg.

The rights of a holder of interests in Australian Domestic Notes held through Euroclear or Clearstream, Luxembourg are subject to the respective rules and regulations for accountholders of Euroclear and Clearstream, Luxembourg, the terms and conditions of agreements between Euroclear and Clearstream, Luxembourg and their respective nominee and the rules and regulations of the Austraclear System.

In addition, any transfer of interests in Australian Domestic Notes which is held through Euroclear or Clearstream, Luxembourg will, to the extent such transfer will be recorded in the Austraclear System, be subject to the Corporations Act and the requirements for minimum consideration set out in Condition 1(j) (Australian Domestic Notes) of such Notes.

Neither LBTCBV nor LBHI, as the case may be, will be responsible for the operation of the clearing arrangements which is a matter for the clearing institutions, their nominees, their participants and the investors.

## PRO FORMA FINAL TERMS

Set out below is a pro forma Final Terms which, subject to completion and amendment, will be issued in respect of issues of Notes under the Program. Text in this section appearing in italics does not form part of the Final Terms but denotes guidance for completing the Final Terms.

Final Terms dated [    ]

### [LEHMAN BROTHERS HOLDINGS INC. [acting through its London Branch] LEHMAN BROTHERS TREASURY CO. B.V./ LEHMAN BROTHERS BANKHAUS AG [acting through its London Branch]

### Issue of [Aggregate Nominal Amount of Tranche] [Title of Notes] [Guaranteed by Lehman Brothers Holdings Inc.] under the U.S.$100,000,000,000 Euro Medium-Term Note Program

The Base Prospectus referred to below (as completed by these Final Terms) has been prepared on the basis that, except as provided in sub-paragraph (ii) below, any offer of Notes in any Member State of the European Economic Area which has implemented the Prospectus Directive (2003/71/EC) (each, a "**Relevant Member State**") will be made pursuant to an exemption under the Prospectus Directive, as implemented in that Relevant Member State, from the requirement to publish a prospectus for offers of the Notes. Accordingly any person making or intending to make an offer of the Notes may only do so:

(i)     in circumstances in which no obligation arises for the Issuer or any Dealer to publish a prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus pursuant to Article 16 of the Prospectus Directive, in each case, in relation to such offer; or

(ii)     in those Public Offer Jurisdictions mentioned in Paragraph 35 of Part A below, provided such person is one of the persons mentioned in Paragraph 35 of Part A below and that such offer is made during the Offer Period specified for such purpose therein.

Neither the Issuer[, the Guarantor] nor any Dealer has authorised, nor do they authorise, the making of any offer of Notes in any other circumstances.

### PART A – CONTRACTUAL TERMS

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions set forth in the Base Prospectus dated July 24, 2007 [and the supplemental Prospectus dated [    ] which [together] constitute[s] a base prospectus for the purposes of the Prospectus Directive (Directive 2003/71/EC) (the "*Prospectus Directive*"). This document constitutes the Final Terms of the Notes described herein for the purposes of Article 5.4 of the Prospectus Directive and must be read in conjunction with such Base Prospectus [as so supplemented].

[*The following alternative language applies if the first tranche of an issue which is being increased was issued under a base prospectus with an earlier date and either (1) the Notes which are the subject of the Final Terms are not being (a) offered to the public in a Member State (other than pursuant to one or more of the exemptions set out in Article 3.2 of the Prospectus Directive) or (b) admitted to trading on a regulated market in a Member State or (2) the Conditions (as defined in the next paragraph) do not contain, by comparison with the Base Prospectus, any "significant new factor" within the meaning of Article 16.1 of the Prospectus Directive. If neither (1) nor (2) applies the Issuer will need to consider effecting the issue by means of a supplement to the Base Prospectus or a stand alone prospectus rather than by Final Terms.*]

[Terms used herein shall be deemed to be defined as such for the purposes of the Conditions (the "*Conditions*") set forth in the Base Prospectus, dated [original date] [and the supplemental Prospectus dated [    ]]. This document constitutes the Final Terms of the Notes described herein for the purposes of Article 5.4 of the Prospectus Directive (Directive 2003/71/EC) (the "*Prospectus Directive*") and must be read in conjunction with the Base Prospectus dated July 24, 2007 [and the Supplemental Prospectus dated [    ]],

which [together] constitute[s] a base prospectus for the purposes of the Prospectus Directive, save in respect of the conditions which are extracted from the Base Prospectus dated original date [and the supplemental Prospectus dated [    ]] and are attached hereto.

[*The following alternative language applies if the first tranche of an issue which is being increased was issued under a base prospectus with an earlier date and the relevant terms and conditions from that base prospectus with an earlier date were incorporated by reference in the Debt Issuance Program Prospectus.*]

[Terms used herein shall be deemed to be defined as such for the purposes of the [date] Conditions (the "*Conditions*") incorporated by reference in the Base Prospectus dated July 24, 2007. This document constitutes the Final Terms of the Notes described herein for the purposes of Article 5.4 of the Prospectus Directive (Directive 2003/71/EC) (the "*Prospectus Directive*") and must be read in conjunction with the Base Prospectus [and the Supplemental Prospectus dated [·]], which [together] constitute[s] a base prospectus for the purposes of the Prospectus Directive, save in respect of the Conditions which are set forth in the Base Prospectus dated [·] [and the supplemental Prospectus dated [·]] and incorporated by reference in the Debt Issuance Program Prospectus.

Full information on the Issuer [, the Guarantor] and the offer of the Notes is only available on the basis of the combination of these Final Terms and the Base Prospectus. [The Base Prospectus [and the supplemental Prospectus] [is/are] available for viewing [at [website]] [and] during normal business hours at [*address*] and copies may be obtained from [*address*].

[These Notes are issued in the Australian domestic capital markets and are Australian Domestic Notes. Holders of the Australian Domestic Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the Deed Poll dated [    ] executed by the Issuer constituting the Australian Domestic Notes.] [*This paragraph need only be included if the Final Terms relates to Australian Domestic Notes.*]

[These Notes are Danish Notes. Holders of the Danish Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated July 24, 2007 executed by the Issuer constituting the Danish Notes. [*This paragraph need only be included if the Final Terms relates to Danish Notes.*]

[These Notes are Finnish Notes. Holders of the Finnish Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated July 24, 2007 executed by the Issuer constituting the Finnish Notes. [*This paragraph need only be included if the Final Terms relates to Finnish Notes.*]

[These Notes are Norwegian Notes. Holders of the Norwegian Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated July 24, 2007 executed by the Issuer constituting the Norwegian Notes. [*This paragraph need only be included if the Final Terms relates to Norwegian Notes.*]

[These Notes are Swedish Notes. Holders of the Swedish Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated July 24, 2007 executed by the Issuer constituting the Swedish Notes. [*This paragraph need only be included if the Final Terms relates to Swedish Notes.*]

[*Include whichever of the following apply or specify as "Not Applicable" (N/A). Note that the numbering should remain as set out below, even if "Not Applicable" is indicated for individual paragraphs or sub-paragraphs. Italics denote guidance for completing the Final Terms.*]

[*When adding any other final terms or information (including final terms at items 9, 10, 15, 16, 17, 29 or 31 of Part A or information in relation to the interest of natural and legal persons involved in the issue/offer in Part B), consideration should be given as to whether such terms or information constitute "significant new factors" and will consequently be issued pursuant to a Drawdown Prospectus.*]

1.  [(i)] Issuer:                                      [   ]¹

    [(ii) Guarantor:                                   [   ]]

2.  [(i)] Series Number:                               [   ]

    [(ii) Tranche Number:                              [   ]

    (If fungible with an existing Series, details
    of that Series, including the date on which
    the Notes become fungible.)]

3.  Specified Currency or Currencies:                  [   ]

4.  Aggregate Nominal Amount:                          [   ] [(being the equivalent of [   ] Units)]²

    [(i)] Series:                                      [   ]

    [(ii) Tranche:                                     [   ]]

5.  Issue Price:                                       [   ] per cent. of the Aggregate Nominal Amount [plus
                                                       accrued interest from [insert date] (*if applicable*)]
                                                       [/[*amount in specified currency*] per Unit]²

6.  Specified Denomination(s) and Units

    (i) Specified Denomination(s):                     [   ] *[(i) Notes (including Notes denominated in
                                                       Sterling) in respect of which the issue proceeds are to
                                                       be accepted by the Issuer in the United Kingdom or
                                                       whose issue otherwise constitutes a contravention of
                                                       Section 19 of the FSMA and which have a maturity of
                                                       less than one year must have a minimum redemption
                                                       value of £100,000 (or its equivalent in other
                                                       currencies) and (ii) in the case of Notes to be admitted
                                                       to trading on a regulated market within the scope of
                                                       the Directive 2004/39/EC on Markets in Financial
                                                       Instruments and/or publicly offered in an EEA
                                                       Member State, the minimum denomination of the
                                                       Notes will be at least EUR1,000 (or nearly equivalent
                                                       in any other currency on the issue date) or the Notes
                                                       will give the right to acquire transferable securities or
                                                       to receive a cash amount, as a consequence of their
                                                       being converted or the rights conferred by them being
                                                       exercised, provided that the issuer of the underlying
                                                       securities is not the relevant Issuer or another entity
                                                       belonging to the Lehman Brothers group.]*

                                                       *[If the Notes will be issued in Australia, the
                                                       denominations may be any amount provided that the
                                                       minimum aggregate consideration payable by each
                                                       offeree is at least $500,000 (or the equivalent in
                                                       another currency, in either case disregarding moneys
                                                       lent by the offeror or to its associates) or the offer or
                                                       invitation otherwise does not require disclosure to
                                                       investors in accordance with Part 6D.2 of the
                                                       Corporations Act 2001 of Australia.]*

---

1.    In the case of LBHI or LBB, specify if acting through its London Branch.
2.    Insert only in case Trading in Units is specified as being applicable.

|  |  |  |
|---|---|---|
| | (ii) Calculation Amount: | [     ] |
| | (iii) Trading in Units: | [Applicable/Not Applicable] |

If Trading in Units is specified as being Applicable then the Notes will be tradeable by reference to the number of Notes being traded (each having the Specified Denomination) as opposed to the aggregate principal amount of Notes being traded.

*[Trading in Units may only be specified as being Applicable if the Notes have a single Specified Denomination.]*

| | | |
|---|---|---|
| 7. | [(i)] Issue Date: | [     ] |
| | [(ii)] Interest Commencement Date: | [Not Applicable] *[only include if date is different to the Issue Date]* |

8.  Maturity Date:

*[Fixed Rate – specify date/Floating Rate – specify Interest Payment Date falling in or nearest to month and year]*

*[If the Maturity Date is less than one year from the Issue Date, the Notes must have a minimum redemption value of £100,000 (or its equivalent in other currencies) and be sold only to "professional investors" (or another applicable exemption from Section 19 of the FSMA must be available).]*

9.  Interest Basis:

[[     ] per cent. Fixed Rate]
*[specify reference rate +/– [     ] per cent. Floating Rate]*
[Zero Coupon]
[Index-Linked Interest]
[Other (*specify*)]
(further particulars specified below)

10.  Redemption/Payment Basis:

[Redemption at par]
[Index Linked Redemption Amount]
[Dual Currency Redemption]
[Partly Paid]
[Instalment]
[Extendible]
[Other (*specify*)]

11.  Change of Interest or Redemption/Payment Basis:

[(*Specify details of any provision for convertibility of Notes into another interest or redemption/payment basis*)]

12.  Put/Call Options:

[Investor Put]
[Issuer Call]
[(further particulars specified below)]

| | | |
|---|---|---|
| 13. | [(i)]   Status of the Notes: | [Senior Notes/Subordinated Notes] |
| | [(ii)]   Status of the Guarantee: | [Senior Guarantee/Subordinated Guarantee]] |
| 14. | Method of distribution: | [Syndicated/Non-syndicated] |

48

**PROVISIONS RELATING TO INTEREST (IF ANY) PAYABLE**

| | | |
|---|---|---|
| 15. | **Fixed Rate Note Provisions** | [Applicable/Not Applicable] |
| | | (*If not applicable, delete the remaining sub-paragraphs of this paragraph*) |
| | (i) Fixed Rate[(s)] of Interest: | [   ] per cent. per annum [payable [annually/semi-annually/quarterly/monthly/other (*specify*)] in arrear] |
| | (ii) Interest Payment Date(s): | [   ] in each year up to and including the Maturity Date]/[*specify other – consider whether to adjust in accordance with a Business Day Convention – see items 15(vi) and (vii)] (NB: this will need to be amended in the case of long or short coupons*)] |
| | (iii) Fixed Coupon Amount[(s)]: | [   ] per Calculation Amount |
| | (iv) Fixed Day Count Fraction: | [30/360]/[Actual/Actual (ICMA)] [*If neither of these options applies, give details*] |
| | (v) Broken Amount(s): | [   ] per Calculation Amount, payable on the Interest Payment Date falling [in/on] [   ] |
| | (vi) Other terms relating to the method of calculating interest for Fixed Rate Notes: | [Not Applicable/*give details*] |
| | (vii) Business Day Convention: | [Floating Rate Convention/ Following Business Day Convention/Modified Following Business Day Convention/ Preceding Business Day Convention/ other (*give details*)] |
| | (viii) Option to defer interest payments: | [Not Applicable/Condition 3(e) is applicable] |
| 16. | **Floating Rate Note Provisions** | [Applicable/Not Applicable. (*If not applicable, delete the remaining sub-paragraphs of this paragraph*)] |
| | (i) Interest Period(s)/Interest Payment Date(s): | [   ] |
| | (ii) Business Day Convention: | [Floating Rate Convention/ Following Business Day Convention/Modified Following Business Day Convention/ Preceding Business Day Convention/other (*give details*)] |
| | (iii) Additional Business Centre(s) for interest accrual only (Condition 3(b)(B)): | [*If Euro is the Specified Currency and Business Days are defined only by reference to TARGET or London, specify "Not Applicable". If any other currency is the Specified Currency and Business Days are defined only by reference to London and the principal financial centre of that currency, specify "Not Applicable". Otherwise give details*] |
| | (iv) Manner in which the Rate(s) of Interest is/are to be determined: | [Screen Rate Determination/ISDA Determination/ other (*give details*)] |
| | (v) Party responsible for calculating the Rate(s) of Interest and Interest Amount(s) (if not the Fiscal Agent): | [[Name] shall be the Calculation Agent (no need to specify if the Fiscal Agent is to perform this function)] |
| | (vi) Screen Rate Determination: | |

|  | | |
|---|---|---|
| – Reference Rate: | | [*For example, LIBOR, EURO LIBOR BBA, EURIBOR or HIBOR*]] |
| – Interest Determination Date(s): | | [(*Second London business day prior to the start of each Interest Period if LIBOR (other than sterling or euro LIBOR), first day of each Interest Period if sterling LIBOR or if HK Dollars, HIBOR and the second day on which the TARGET System is open prior to the start of each Interest Period if EURIBOR or euro LIBOR*)] |
| – Relevant Screen Page: | | [*For example, Reuters page LIBOR01 for LIBOR/EURIBOR01 for EURIBOR*] |
| – Relevant Time: | | [*For example, 11.00 a.m. London time in the case of LIBOR/Brussels time in the case of EURIBOR*] |
| – Relevant Financial Centre: | | [*For example, London/Euro-zone (where Euro-zone means the region comprised of the countries whose lawful currency is the euro)*] |
| (vii) | ISDA Determination: | |
| | – Floating Rate Option: | [   ] |
| | – Designated Maturity: | [   ] |
| | – Reset Date: | [*For example, Reset Date, for USD-LIBOR-BBA should be the first day of each Interest Period*] |
| (viii) | Margin(s): | [+-][   ] per cent. per annum |
| (ix) | Multiplier: | [Not Applicable/*give details*] |
| (x) | Minimum Interest Rate: | [   ] per cent. per annum |
| (xi) | Maximum Interest Rate: | [   ] per cent. per annum |
| (xii) | Day Count Fraction: | [   ] |
| (xiii) | Fall back provisions, rounding provisions, denominator and any other terms relating to the method of calculating interest on Floating Rate Notes, if different from those set out in the Conditions: | [Not Applicable/*give details*] |
| (xiv) | Option to defer interest payments: | [Not Applicable/Condition 3(e) is applicable] |
| **17.** | **Zero Coupon Note Provisions** | [Applicable/Not Applicable] (*If not applicable, delete the remaining sub-paragraphs of this paragraph*) |
| (i) | Accrual Yield: | [   ] per cent. per annum |
| (ii) | Reference Price: | [   ] |
| (iii) | Day Count Fraction (for the purposes of Condition 5): | [   ] |

| | (iv) | Any other formula/basis of determining amount payable: | [   ] |
|---|---|---|---|
| 18. | | **Index-Linked Interest Note/Other Variable-Linked Interest Note Provisions** | [Applicable/Not Applicable]<br>(*If not applicable, delete the remaining sub-paragraphs of this paragraph*) |
| | (i) | Index/Formula/other variable: | [(*give or annex details*)] |
| | (ii) | Name and address of Calculation Agent, if any, responsible for calculating the principal and/or interest due: | [   ] |
| | (iii) | Provisions for determining Coupon where calculated by reference to Index and/or Formula and/or other variable: | [   ] |
| | (iv) | Provisions for determining Coupon where calculation by reference to Index and/or Formula and/or other variable is impossible or impracticable or otherwise disrupted: | [   ] |
| | (v) | Interest Period(s)/Interest Payment Dates: | [   ] |
| | (vi) | Business Day Convention: | [Floating Rate Convention/ Following Business Day Convention/Modified Following Business Day Convention/ Preceding Business Day Convention/ other (*give details*)] |
| | (vii) | Additional Business Centre(s) (Condition 3(b)(B)): | [*If Euro is the Specified Currency and Business Days are defined only by reference to TARGET or London, specify "Not Applicable". If any other currency is the Specified Currency and Business Days are defined only by reference to London and the principal financial centre of that currency, specify "Not Applicable". Otherwise give details*] |
| | (viii) | Minimum Interest Rate for interest accrual only (Condition 3(b)(B)): | [   ] per cent. per annum |
| | (ix) | Maximum Interest Rate: | [   ] per cent. per annum |
| | (x) | Interest Determination Date(s): | [   ] |
| | (xi) | Day Count Fraction: | [   ] |
| | (xii) | Option to defer interest payments: | [Not Applicable/Condition 3(e) is applicable] |
| 19. | | **Dual Currency Note Provisions** | [Applicable/Not Applicable]<br>(*If not applicable, delete the remaining sub-paragraphs of this paragraph*) |
| | (i) | Rate of exchange/method of calculating rate of exchange: | [*give details*] |

51

    (ii)   Name and address Calculation     [   ]
Agent, if any, responsible for
calculating the principal and/or
interest due:

    (iii)   Provisions applicable where     [   ]
calculation by reference to rate of
exchange is impossible or
impracticable:

    (iv)   Person at whose option Specified     [   ]
Currency(ies) is/are payable:

**PROVISIONS RELATING TO REDEMPTION**

20.   **Call Option**       [Applicable/Not Applicable]
*(If not applicable, delete the remaining sub-paragraphs of this paragraph)*

    (i)   Optional Redemption Date(s) (Call):   *[(Consider for Fixed Rate Notes adjustment in accordance with a Business Day Convention – see items 16(ii) and 16(iii))]*

    (ii)   Optional Redemption Amount(s) of     [   ] per Calculation Amount
each Note (Call) and method, if any,
of calculation of such amount(s):

    (iii)   If redeemable in part:

        (a)   Minimum Redemption Amount:   [   ] per Calculation Amount

        (b)   Higher Redemption Amount:   [   ] per Calculation Amount

    (iv)   Notice period (if other than as set   *(N.B. If setting notice periods which are different to those provided in the Conditions, the relevant Issuer is advised to consider the practicalities of distribution of information through intermediaries, for example, clearing systems and custodians, as well as any other notice requirements which may apply, for example, as between such Issuer and the Agent.)*
out in the Conditions):

21.   **Put Option**       [Applicable/Not Applicable]
*(If not applicable, delete the remaining sub-paragraphs of this paragraph)*

    (i)   Optional Redemption Date(s):   *[(Consider for Fixed Rate Notes adjustment in accordance with a Business Day Convention – see items 16(ii) and 16(iii))]*

    (ii)   Optional Redemption Amount(s) of     [   ] per Calculation Amount
each Note (Call) and method, if any,
of calculation of such amount(s):

    (iii)   If redeemable in part:

    (a)   Minimum Redemption Amount:   [   ] per Calculation Amount

    (b)   Higher Redemption Amount:   [   ] per Calculation Amount

|     | (iv) | Notice period (if other than as set out in the Conditions): | *(N.B. If setting notice periods which are different to those provided in the Conditions, the relevant Issuer is advised to consider the practicalities of distribution of information through intermediaries, for example, clearing systems and custodians, as well as any other notice requirements which may apply, for example, as between such Issuer and the Agent.)* |
|-----|------|---|---|

22. **Final Redemption Amount of each Note:**     [[   ] per Calculation Amount

[In cases where the Final Redemption Amount is Index-Linked or other variable-linked:

|     | (i)   | Index/Formula/variable: | [give or annex details] |
|-----|-------|---|---|
|     | (ii)  | Calculation Agent responsible for determining the Final Redemption Amount: | [   ] |
|     | (iii) | Provisions for determining Final Redemption Amount where calculated by reference to Index and/or Formula and/or other variable: | [   ] |
|     | (iv)  | Provisions for determining Final Redemption Amount where calculation by reference to Index and/or Formula and/or other variable is impossible or impracticable or otherwise disrupted: | [   ] |
|     | (v)   | Payment Date: | [   ] |
|     | (vi)  | Minimum Final Redemption Amount: | [   ] per Calculation Amount |
|     | (vii) | Maximum Final Redemption Amount: | [   ] per Calculation Amount |

23. **Early Redemption Amount of each Note**     [   ]

Early Redemption Amount(s) per Calculation Amount payable on redemption for taxation reasons or on event of default and/or the method of calculating the same (if required or if different from that set out in the Conditions):

## GENERAL PROVISIONS APPLICABLE TO THE NOTES

24. Form of Notes:     [*In the case of Notes issued by LBHI*]

[Bearer form. Interests in a temporary global Note will be exchangeable for, at the request of each Holder (with respect to its own Notes in bearer form), definitive Notes in bearer form.]

[Bearer form. Interests in a temporary global Note will be exchangeable for interests in a permanent

global Note in bearer form. Interests in a permanent global Note will be exchangeable for, at the request of each Holder (with respect to its own Notes in bearer form), definitive Notes in bearer form.]

[Registered form. Interests in a global Note in registered form will be exchangeable for definitive Notes in registered form in the limited circumstances described in the global Note. Definitive Notes in registered form will [not]³ be exchangeable for interests in a global Note in registered form.]

[Australian Domestic Notes in registered, uncertificated and dematerialised book-entry form]

[*In the case of Notes issued by LBTCBV or LBB*]

[Bearer form. Interests in a temporary global Note will be exchangeable for definitive Notes in bearer form.]

[Bearer form. Interests in a temporary global Note will be exchangeable for interests in a permanent global Note in bearer form. Interests in a permanent global Note will be exchangeable for definitive Notes in bearer form in the limited circumstances described in the permanent global Note.]

[Registered form. Interests in a global Note in registered form will be exchangeable for definitive Notes in registered form in the limited circumstances described in the global Note. Definitive Notes in registered form will [not]³ be exchangeable for interests in a global Note in registered form.]

[Australian Domestic Notes in registered, uncertificated and dematerialised book-entry form]

[*Australian Domestic Notes can not be issued by LBB*]

[*In the case of [Danish/Finnish/Norwegian/Swedish] Notes*] The Notes are [Danish/Finnish/Norwegian/ Swedish] Notes and are in uncertificated and dematerialised book-entry form.

| | |
|---|---|
| New Global Note Form: | [Applicable /Not Applicable]⁴ |
| 25. Talons for future Coupons or Receipts to be attached to Definitive Notes (and dates on which such Talons mature): | [Yes/No/Not Applicable. *If yes, give details*] |

---

3.   Delete or complete as appropriate.
4.   If "Not Applicable" is specified here ensure that "Not Applicable" is specified for Eurosystem eligibility in the relevant paragraph of section 9 of Part B of the Final Terms and if "Applicable" is specified here enure that the appropriate specification is made in respect of Eurosystem eligibility in the relevant paragraph of section 9 of Part B of the Final Terms.

26.  Details relating to Partly Paid Notes: amount of each payment comprising the Issue Price and date on which each payment is to be made and consequences (if any) of failure to pay, including any right of the Issuer to forfeit the Notes and interest due on late payment:

[Not Applicable/*give details*]

27.  Details relating to Instalment Notes: Instalment Amounts and Instalment Dates:

[Not Applicable/*give details*]

28.  Details relating to Extendible Notes:

[Not Applicable/Condition 4[(a)/(b)] applies – give details (*see Condition 4 (Extendible Notes)*)]

29.  Consolidation provisions:

[Not Applicable/The provisions [in Condition 18 (Further Issues of Notes)] [annexed to these Final Terms] apply]

30.  Other final terms:

[Not Applicable/*give details*]
(*When adding any other final terms consideration should be given as to whether such terms constitute "significant new factors" and consequently trigger the need for a supplement to the Base Prospectus under Article 16 of the Prospectus Directive.*)

## DISTRIBUTION

31.  (i)  If syndicated, names [and addresses]* of Managers [and underwriting commitments:]*

[Not Applicable/*give names, addresses and underwriting commitments*]
(*Include names and addresses of entities agreeing to underwrite the issue on a firm commitment basis and names and addresses of the entities agreeing to place the issue without a firm commitment or on a "best efforts" basis if such entities are not the same as the Managers.*)

     (ii)  Date of Syndicated Trade Agreement:

[  ]

     (iii)  Stabilizing Manager (if any):

[Not Applicable/*give name, addresses and underwriting commitments*]

32.  If non-syndicated, name and address of Dealer:

[Not Applicable/give name and address]

33.  Total commission and concession:

[  ] per cent. of the Aggregate Nominal Amount

34.  Selling restrictions:

     (i)  Additional Selling Restrictions:

[Not Applicable/give details]

35.  Non-exempt Offer:

[Not Applicable] [An offer of the Notes may be made by the Managers [and [*specify, if applicable*]] other than pursuant to Article 3(2) of the Prospectus Directive in [*specify relevant Member State(s) - which must be jurisdictions where the Base Prospectus and any supplements have been approved or passported*] ("**Public Offer Jurisdictions**") during the period from [*specify date*] until [*specify date*] ("**Offer Period**"). See further Paragraph 10 of Part B below.

55

**PURPOSE OF FINAL TERMS**

These Final Terms comprise the final terms required for issue [and] [public offer in the Public Offer Jurisdictions] [and] [admission to trading on [*specify relevant regulated market*] of the Notes described herein pursuant to the U.S.$100,000,000,000 Euro Medium-Term Note Program of Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V. and Lehman Brothers Bankhaus AG.]

**RESPONSIBILITY**

The Issuer accepts responsibility for the information contained in these Final Terms. [[*Relevant third party information*] has been extracted from [specify source]. The Issuer confirms that such information has been accurately reproduced and that, so far as it is aware, and is able to ascertain from information published by [specify source], no facts have been omitted which would render the reproduced inaccurate or misleading.]

Signed on behalf of the Issuer:

By:    ....................................................................
       Duly authorised

**PART B – OTHER INFORMATION**

1.  **LISTING**

    (i)  Listing:

    [The Irish Stock Exchange/The Singapore Exchange Securities Trading Limited/The Australian Stock Exchange/ other (*specify*)/ None]

    (ii)  Admission to Trading:

    [Application has been made for the Notes to be admitted to listing and/or trading on [the Official List of the regulated Irish Stock Exchange and to trading on its regulated market]/[the alternative securities market of the Irish Stock Exchange]/ [the Australian Stock Exchange]/ [other (*specify*))]/ with effect from [·]/ Not Applicable]

    No assurance can be given as to whether or not or when such application for listing/admission to trading will be granted.

    (*Where documenting a fungible issue need to indicate that original securities are already admitted to trading.*)

    [(iii)  Cost of admission to trading]

2.  **[RATINGS**

    Ratings:

    The Program has been rated:
    [Standard & Poor's
    Senior Debt (Long term)     A+
    Subordinated debt           A
    Senior Debt (Short term)    A-1

    An obligation rated 'A' is somewhat more susceptible to the adverse effects of changes in circumstances and economic conditions than obligations in higher-rated categories. However, the obligor's capacity to meet its financial commitment on the obligation is still strong. Negative means that a rating may be lowered. The addition of a plus (+) sign shows relative standing within the major rating categories.

    A short-term obligation rated 'A-1' is rated in the highest category by Standard & Poor's. The obligor's capacity to meet its financial commitment on the obligation is strong.

    **Moodys**
    Senior Debt (Long term)    A1
    Subordinated debt          A2
    Debt ratings (Short term)  Prime-1

    Obligations rated A are considered upper-medium grade and are subject to low credit risk. The modifier 1 indicates that the obligation ranks in the higher end of its generic rating category and the modifier 2 indicates a mid-range ranking.

    Issuers (or supporting institutions) rated Prime-1 have a superior ability to repay short-term debt obligations.

57

Fitch
Senior Debt (Long term)     AA-
Subordinated debt           A+
Senior Debt (Short term)    F1+

**Fitch**
**AA-**
Very high credit quality. 'AA' ratings denote
expectations of very low credit risk. They indicate
very strong capacity for payment of financial
commitments. This capacity is not significantly
vulnerable to foreseeable events. The modifier "-"
denotes relative status within this rating category.

**A+**
High credit quality. 'A' ratings denote expectations of
low credit risk. The capacity for payment of financial
commitments is considered strong. This capacity may,
nevertheless, be more vulnerable to changes in
circumstances or in economic conditions than is the
case for higher ratings. The modifier "+" denotes
relative status within this rating category.

**F1+**
Highest credit quality. Indicates the strongest capacity
for timely payment of financial commitments; the
added "+" denotes any exceptionally strong credit
feature.]

3.    **[INTERESTS OF NATURAL AND LEGAL PERSONS INVOLVED IN THE ISSUE/OFFER**

Need to include a description of any interest, including conflicting ones, that is material to the
issue/offer, detailing the persons involved and the nature of the interest. May be satisfied by inclusion
of the following statement:

"Save as discussed in "Subscription and Sale", so far as the Issuer is aware, no person involved in the
offer of the Notes has an interest material to the offer."]

*[(When adding any other description, consideration should be given as to whether such matters
described constitute "significant new factors" and consequently trigger the need for a supplement to
the Prospectus under Article 16 of the Prospectus Directive.)]*

4.    **REASONS FOR THE OFFER, ESTIMATED NET PROCEEDS AND TOTAL EXPENSES***

[(i)    Reasons for the offer:

*(See "Use of Proceeds" wording in the Base
Prospectus – if reasons for offer differ from making
profit and or hedging certain risks will need to include
those reasons here)]*

[(ii)]    Estimated net proceeds:           [   ]

[(iii)]    Estimated total expenses:        [   ] *[Include breakdown of expenses]*

*(If the Notes are derivative securities to which Annex
XII of the Prospectus Directive Regulation applies it is*

---

*        Not required for Notes with a denomination per unit of at least €50,000.

*only necessary to include disclosure of net proceeds
and total expenses at (ii) and (iii) above where
disclosure is included at (i) above.)*

5.  **YIELD (Fixed Rate Notes only)**

   Indication of yield:                          [   ]

   Calculated as [*include method of calculation in
   summary form*] on the Issue Date.*

   As set out above, the yield is calculated at the Issue
   Date on the basis of the Issue Price. It is not an
   indication of future yield.]

6.  **HISTORIC INTEREST RATES (Floating Rate Notes only)**

   Details of historic [LIBOR/EURIBOR/other] rates can be obtained from [Reuters].]*

7.  **PERFORMANCE OF INDEX/ FORMULA/ OTHER VARIABLE, EXPLANATION OF
    EFFECT ON VALUE OF INVESTMENT AND ASSOCIATED RISKS AND OTHER
    INFORMATION CONCERNING THE UNDERLYING (Index-linked or other variable Linked
    Notes only)**

   *Need to include details of where past and future performance and volatility of the index/formula/other
   variable can be obtained and a clear and comprehensive explanation of how the value of the
   investment is affected by the underlying and the circumstances when the risks are most evident.
   [Where the underlying is an index need to include the name of the index and a description if composed
   by the Issuer and if the index is not composed by the Issuer need to include details of where the
   information about the index can be obtained. Where the underlying is a security need to include the
   name of the issuer of the security and the ISIN code. Where the underlying is an interest rate need to
   include a description of the interest rate. Where the underlying is a basket of underlyings need to
   include the relevant weightings of each underlying in the basket. Where the underlying is not any of
   the above need to include equivalent information.*\*]

   [*Where Annex XII of the Prospectus Directive applies, include a description of: how any return on the
   derivative securities takes place, the payment or delivery date and the way such return is calculated,
   the type of underlying and details of where relevant information can be obtained, any market
   disruption or settlement disruption event and any adjustment rules with relation to events concerning
   the underlying.*]

   [*(When completing this paragraph, consideration should be given as to whether such matters
   described constitute "significant new factors" and consequently trigger the need for a supplement to
   the Prospectus under Article 16 of the Prospectus Directive.)*]

   The Issuer [intends to provide post-issuance information [*specify what information will be reported
   and where it can be obtained*]] [does not intend to provide post-issuance information].

8.  **PERFORMANCE OF RATE[S] OF EXCHANGE AND EXPLANATION OF  EFFECT ON
    VALUE OF INVESTMENT (Dual Currency Notes only)**

   [*Need to include details of where past and future performance and volatility of the relevant rate[s]
   can be obtained [and a clear and comprehensive explanation of how the value of the investment is
   affected by the underlying and the circumstances when the risks are most evident.*\*]

   [*(When completing this paragraph, consideration should be given as to whether such matters
   described constitute "significant new factors" and consequently trigger the need for a supplement to
   the Prospectus under Article 16 of the Prospectus Directive.)*]

9.  **OPERATIONAL INFORMATION**

---

*       Not required for Notes with a denomination per unit of at least €50,000.

| | | |
|---|---|---|
| ISIN Code: | [   ] | |
| Common Code: | [   ] | |
| CUSIP No.: | [   ] | |

New Global Note intended to be held in a manner which would allow Eurosystem eligibility:

[Not Applicable⁵/Yes/No]

Note that the designation "Yes" simply means that the Notes are intended upon issue to be deposited with Euroclear or Clearstream, Luxembourg as common safekeeper and does not necessarily mean that the Notes will be recognised as eligible collateral for Eurosystem monetary policy and intra-day credit operations by the Eurosystem either upon issue or at any or all times during their life. Such recognition will depend upon an appropriate application being made and upon satisfaction of the Eurosystem eligibility criteria.] To check whether an application has been successfully made see the following page on the website of the European Central Bank [insert URL] [*Include this text if "Yes" selected in which case the Notes must be issued in NGN form*]

Any clearing system(s) other than Euroclear and Clearstream, Luxembourg and the relevant identification number(s):

[Not Applicable/give name(s) and number(s)]

Delivery:

Delivery [against/free of] payment

The Aggregate Nominal Amount of Notes issued has been translated into U.S. Dollars at the rate of [   ]=$[   ] producing a sum of (for Notes not denominated in U.S. Dollars):

$[   ]

Names and addresses of Additional Paying Agent(s) (if any):

[   ]

[In the case of Australian Domestic Notes:

(i)   Notes to be listed on the Australian Stock Exchange:

[Yes/No]

(ii)   Agent for service of process in New South Wales:

[   ] of [address]

(iii)   Transfer restrictions:

Transfers of Australian Domestic Notes are restricted as provided by Condition 1(j) (Australian Domestic Notes).

(iv)   Australian Registrar:

[   ] of [*address*]

(v)   Australian Administration Agent:

[[   ] (see Condition 7(i) (Payments in respect of Australian Domestic Notes))/Not required]

The Notes will be eligible for lodgement into the Austraclear System. Distributions of principal and interest with respect to Notes held through the Austraclear System will be credited to the cash accounts of

---

5.    Specify "Not Applicable" if the Notes being issued are Classic Global Notes/CGNs.

members of the Austraclear System in accordance with the regulations and the operating manual applicable to the Austraclear System.

Interests in the Notes may be held through Euroclear and Clearstream, Luxembourg indirectly through institutions which are participants in Euroclear and Clearstream, Luxembourg. In such circumstances, Westpac Custodian Nominees Limited (as nominee of, or another nominee appointed by, Euroclear) or ANZ Nominees Limited (as nominee of, or another nominee appointed by, Clearstream, Luxembourg) would hold the interests in the Notes in the Austraclear System. Austraclear Limited will be inscribed as the Holder of such Notes and will therefore be treated by the Issuer and the Australian Registrar as the absolute owner of such Notes for all purposes.

The Issuer will not be responsible for the operation of the clearing arrangements which is a matter for the clearing institutions, their participants and the investors.]

10.    **TERMS AND CONDITIONS OF THE OFFER**

| | |
|---|---|
| Offer Price: | [Issue Price][*specify*] |
| Conditions to which the offer is subject: | [Not Applicable/*give details*] |
| Description of the application process: | [Not Applicable/*give details*] |
| Description of possibility to reduce subscriptions and manner for refunding excess amount paid by applicants: | [Not Applicable/*give details*] |
| Details of the minimum and/or maximum amount of application: | [Not Applicable/*give details*] |
| Details of the method and time limits for paying up and delivering the Notes: | [Not Applicable/*give details*] |
| Manner in and date on which results of the offer are to be made public: | [Not Applicable/*give details*] |
| Procedure for exercise of any right of pre-emption, negotiability of subscription rights and treatment of subscription rights not exercised: | [Not Applicable/*give details*] |
| Categories of potential investors to which the Notes are offered and whether tranche(s) have been reserved for certain countries: | [Not Applicable/*give details*] |
| Process for notification to applicants of the amount allotted and the indication whether dealing may begin before notification is made: | [Not Applicable/*give details*] |
| Amount of any expenses and taxes specifically charged to the subscriber or purchaser: | [Not Applicable/*give details*] |
| Name(s) and address(es), to the extent known to the Issuer, of the placers in the various countries where the offer takes place: | [None/*give details*] |

## TERMS AND CONDITIONS OF THE NOTES

*The following are the Terms and Conditions of the Notes which will be incorporated by reference in each temporary or permanent global Note in bearer form, each global Note in registered form and will be attached to each definitive Note, in the latter case, only if permitted by the relevant stock exchange or other relevant authority (if any) and agreed by the relevant Issuer and the relevant Dealer(s) at the time of issue but if not so permitted and agreed, such Terms and Conditions will be endorsed upon such definitive Note. The applicable Final Terms in relation to any Tranche of Notes may specify other terms and conditions which shall, to the extent so specified or to the extent inconsistent with such Terms and Conditions, replace or modify the following Terms and Conditions for the purpose of such Notes. The applicable Final Terms or the relevant provisions thereof will be incorporated by reference in each temporary or permanent global Note and each global Note in registered form and endorsed on each definitive Note. Reference should be made to "Form of the Notes" above for a description of the content of Final Terms which will include the definitions of certain terms used in the following Terms and Conditions or specify which of such terms are to apply in relation to the relevant Notes.*

This Note is one of a Series of Notes (the *"Notes"*) issued and to be issued pursuant to the Amended and Restated Fiscal Agency Agreement dated July 24, 2007 (as amended, supplemented or replaced from time to time, the *"Fiscal Agency Agreement"*) between, amongst others, Lehman Brothers Holdings Inc., a Delaware corporation (*"LBHI"*), Lehman Brothers Treasury Co. B.V., incorporated in The Netherlands as a private company with limited liability (*"LBTCBV"*), Lehman Brothers Bankhaus AG a company incorporated in the Federal Republic of Germany (*"LBB"*), The Bank of New York, acting through its London Branch, as fiscal agent (the *"Fiscal Agent"*, which expression shall include any successor fiscal agent) and as principal paying agent (the *"Principal Paying Agent"*), The Bank of New York, acting through its New York branch, as registrar (the *"Registrar"*), exchange agent making payments in the case of Notes registered in the name of a nominee of DTC that are denominated in currency other than U.S. Dollars (the *"Exchange Agent"*) and the U.S. sub-paying agent (the *"U.S. Sub-Paying Agent"*) and BNY Financial Services Plc (together with the Fiscal Agent in its capacity as Principal Paying Agent and the U.S. Sub-Paying Agent, the *"Paying Agents"*, which expression shall include any additional or successor paying agents), provided that Australian Domestic Notes (as defined below) are issued pursuant to the relevant Deed Poll (as defined below) as described in Condition 1(j) (Australian Domestic Notes). Unless otherwise specified in the applicable Final Terms, The Bank of New York shall act as calculation agent (The Bank of New York, or any other or additional calculation agent appointed from time to time by the Issuer, which may include any of the Dealers, the *"Calculation Agent"*) for purposes of determining, among other things, the interest rates on Floating Rate Notes, pursuant to the terms of a calculation agency agreement (the *"Calculation Agency Agreement"*) agreed to by the relevant Issuer, the Guarantor (if applicable) and the relevant Calculation Agent. The Notes (other than Australian Domestic Notes) have the benefit of a deed of covenant (as amended, supplemented or replaced from time to time, the *"Deed of Covenant"*) dated July 24, 2007, executed by the Issuers.

The Notes are to be issued by LBHI (such Notes, including when acting through its London Branch *"LBHI Notes"*) or LBTCBV (*"LBTCBV Notes"*) or LBB (including when acting through its London Branch) (*"LBB Notes"*). The applicable Final Terms will specify which of LBHI, LBTCBV or LBB is the Issuer (the *"Issuer"*). Each LBTCBV Note or LBB Note (as the case may be) shall have the benefit of an unconditional guarantee of LBHI (in such capacity, the *"Guarantor"*) as to, inter alia, the payment of principal (including premium, if any, and in the case of Zero Coupon Notes (as hereafter defined), the Accrual Yield Amount (as hereafter defined) payable in respect thereof) and interest, if any, in respect thereof, as evidenced by guarantees in respect of each of LBTCBV and LBB (in respect of each such Note, the *"Guarantee"*, and together the *"Guarantees"*) each dated July 24, 2007 as amended or supplemented from time to time, among the Guarantor and the third parties referred to therein.

Interest bearing definitive Notes in bearer form (unless otherwise indicated in the applicable Final Terms) have interest coupons (*"Coupons"*) and, if indicated in the applicable Final Terms, talons for further Coupons (*"Talons"*) attached on issue. Any reference herein to Coupons shall, unless the context otherwise requires, be deemed to include a reference to Talons. Definitive Notes in bearer form repayable in

instalments have receipts ("*Receipts*") for the payment of the instalments of principal (other than the final instalment) attached on issue.

The Final Terms in relation to this Note or the relevant provisions thereof is attached hereto, or is endorsed hereon and supplements these Terms and Conditions and may specify other terms and conditions which shall, to the extent so specified or to the extent inconsistent with these Terms and Conditions, replace or modify these Terms and Conditions. References herein to the "*applicable Final Terms*" are to the Final Terms or the relevant provisions thereof attached hereto or endorsed hereon.

As used herein, "*Series*" means each original issue of Notes together with any further issues expressed to form a single series with the original issue which are issued by the same Issuer and which are denominated in the same currency and which have the same Maturity Date, Interest Basis and interest payment dates (if any) (as all indicated in the applicable Final Terms) and the terms of which (except for the Issue Date, the Interest Commencement Date and/or the Issue Price (as indicated as aforesaid)) are otherwise identical (including whether or not the Notes are listed). As used herein, "*Tranche*" means all Notes of the same Series with the same Issue Date, Issue Price and Interest Commencement Date.

Copies of the Fiscal Agency Agreement, the form of Final Terms and each Calculation Agency Agreement are available for inspection and copies of each Final Terms are obtainable at the specified offices of the Fiscal Agent and each of the other Paying Agents, save that a Final Terms relating to an unlisted Note of any Series will only be available for inspection by a Noteholder holding one or more unlisted Notes of that Series and such Noteholder must produce evidence satisfactory to the relevant Paying Agent as to his identity. The holders of the Notes (the "*Noteholders*" or the "*Holders*", which expression shall, in relation to any registered Notes and any Notes represented by a global Note, be construed as provided in Condition 1 (Form and Transfer) below), the holders of the Receipts (the "*Receiptholders*") and the holders of the Coupons (the "*Couponholders*", which expression shall, unless the context otherwise requires, include the holders of the Talons (the "*Talonholders*")) are deemed to have notice of, and are entitled to the benefit of, all the provisions of the Fiscal Agency Agreement, the relevant Deed Poll (if applicable), the relevant Calculation Agency Agreement, if any, and the applicable Final Terms, which are binding on them. The Deed of Covenant is held by the Fiscal Agent and the Bank of New York, acting through its New York Branch as registrar (the "*Registrar*").

Words and expressions defined in the Fiscal Agency Agreement or used in the applicable Final Terms (which term as used herein means, in relation to this Note, the Final Terms attached hereto) shall have the same meanings where used in these Terms and Conditions unless the context otherwise requires or unless otherwise stated.

1.    **Form and Transfer**

(a)    *Form.* The Notes are either in bearer form or in registered form and, in the case of definitive Notes, serially numbered in the Specified Currency or Currencies and the Specified Denomination(s). This Note is a Senior Note or a Subordinated Note, as indicated in the applicable Final Terms. Notes of one Specified Denomination may not be exchanged for Notes of another Specified Denomination.

(b)    *Interest; Instalment Basis.* This Note is a Fixed Rate Note, a Floating Rate Note, a Zero Coupon Note, an Index-Linked Redemption Amount Note, an Index-Linked Interest Note, a Dual Currency Note or an Extendible Note (each as hereafter defined), depending upon the Interest Basis shown in the applicable Final Terms. If so indicated in the applicable Final Terms, this Note may combine any of the foregoing at any one time or may be one or more of the foregoing types of Note for one part of its term and one or more other of the foregoing types for another part of its term. If so indicated in the applicable Final Terms, this Note is also a Partly Paid Note and/or an Instalment Note.

(c)    *Coupons attached.* Bearer Notes in definitive form are issued with Coupons attached, unless they are Zero Coupon Notes in which case reference to Coupons and Couponholders in these Terms and Conditions are not applicable.

(d) *Transfer of Bearer Notes.* For so long as any Notes are represented by a temporary or permanent global Note in bearer form (i) such Notes will be transferable in accordance with the rules and procedures for the time being of Clearstream Banking, société anonyme, Luxembourg ("*Clearstream, Luxembourg*") and/or Euroclear Bank SA/NV ("*Euroclear*") as the case may be, and (ii) each person (other than Euroclear or Clearstream, Luxembourg) who is for the time being shown in the records of Clearstream, Luxembourg and/or Euroclear, as the case may be, as the owner of a particular nominal amount of such Notes (in which regard any certificate or other document issued by Clearstream, Luxembourg and/or Euroclear, as the case may be, as to the nominal amount of Notes standing to the account of any person shall be conclusive and binding for all purposes except in the case of manifest error) shall be treated by the Issuer, the Guarantor (if applicable), the Fiscal Agent, and any Paying Agent as a Holder of such nominal amount of Notes (and the term "*Holder*" shall be construed accordingly) for all purposes other than with respect to the payment of principal (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount (as herein defined) payable in respect thereof) and interest, if any, and any other amounts payable, on such Notes, the right to which shall be vested, as against the Issuer, the Guarantor (if applicable), the Fiscal Agent and any Paying Agent, solely in the bearer of the temporary or permanent global Note or solely in the common depositary for Euroclear and Clearstream, Luxembourg or its nominee as the Registered Holder (as defined below) of the global Note in registered form in accordance with and subject to its terms and the Fiscal Agency Agreement. References to Euroclear and/or Clearstream, Luxembourg shall, whenever the context so permits, be deemed to include a reference to any additional or alternative clearing system approved by the Issuers and the Agent. The term "*Holder*" shall also include the bearer of a definitive Note in bearer form.

(e) *Title to Definitive Notes.* Title to definitive Notes in bearer form, Coupons, Receipts and Talons will pass by delivery. The Issuer, the Guarantor (if applicable), the Fiscal Agent and any Paying Agent may (except as ordered by a court of competent jurisdiction or as required by applicable law) deem and treat the bearer of any definitive Note in bearer form, Couponholder, Receiptholder, or Talonholder as the owner thereof for all purposes (notwithstanding any notice of ownership given or any writing thereon made by anyone) whether or not such definitive Note in bearer form or Coupon, or any Coupon to which any Talon appertains, or Receipt shall be overdue.

(f) *Note register.* The Registrar shall maintain the Note register in which shall be recorded the names and addresses of Holders of global and definitive Notes in registered form, the numbers of the Notes and other details with respect to issuance, transfer and exchange of such Notes.

(g) *Transfer of Registered Notes.* All Notes in registered form presented for registration of transfer shall be surrendered to the Registrar at its specified office or at the specified office of any Paying Agent, duly endorsed or accompanied by a written instrument of transfer, in a form satisfactory to the relevant Issuer and the Registrar, duly executed by the Holder thereof or his attorney duly authorised in writing. Upon satisfaction of the above requirements for registration of transfer, and subject to such reasonable and customary regulations as the relevant Issuer may from time to time prescribe, the Registrar shall authenticate and deliver to the transferee or send by mail (at the risk of the transferee) to such address as the transferee may request, definitive Notes in registered form in the name of such transferee, for the same aggregate principal amount as shall have been transferred. Subject to any applicable requirements for minimum denomination, in the case of the transfer of any definitive Note in registered form in part the Registrar shall also authenticate and deliver to the transferor or send by mail (at the risk of the transferor) to such address as the transferor may request, definitive Notes or Notes in registered form registered in the name of the transferor, for the aggregate principal amount that was not transferred.

(h) *Sums payable on Transfer.* No service charge shall be made for any registration of transfer. However, in connection with any such registration of transfer the relevant Issuer may require payment of a sum sufficient to cover any applicable stamp, tax or any other governmental charge that may be imposed.

(i) *Owner of Registered Notes.* Prior to satisfaction of the applicable requirements for registration of transfer, the relevant Issuer, the Guarantor (if applicable), the Fiscal Agent, the Registrar and each

Paying Agent may (except as ordered by a court of competent jurisdiction or as required by applicable law) deem and treat the Holder of any registered Note as the absolute owner of such Note for the purpose of receiving payment of the principal (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, on such Note and for all other purposes whatsoever whether or not such Note shall be overdue, and none of such Issuer, the Guarantor (if applicable), the Fiscal Agent, the Registrar or any Paying Agent shall be affected by notice to the contrary. No person shall have any right to enforce any term or condition of any Note under the Contracts (Rights of Third Parties) Act 1999.

(j)    *Australian Domestic Notes*

In the case of Notes denominated in Australian dollars and issued by LBTCBV or LBHI in the Australian domestic capital markets as specified in the applicable Final Terms ("*Australian Domestic Notes*"), the following provisions of this Condition 1(j) (Australian Domestic Notes) shall apply in lieu of the foregoing provisions of this Condition 1 in the event of any inconsistency. Australian Domestic Notes will be debt obligations of LBTCBV or LBHI, as the case may be, owing under separate deeds poll to be executed by LBTCBV and LBHI (each as amended, supplemented or replaced from time to time, a "*Deed Poll*" and together, the "*Deeds Poll*") and will take the form of entries in a register (the "*Australian Register*") to be maintained by an Australian registrar to be appointed by LBTCBV or LBHI, as the case may be, as specified in the applicable Final Terms (the "*Australian Registrar*"). Australian Domestic Notes will have the benefit of the Guarantee of the Guarantor. The Fiscal Agency Agreement is not applicable to Australian Domestic Notes.

Australian Domestic Notes will not be serially numbered. Each entry in the Australian Register constitutes a separate and individual acknowledgement to the relevant Noteholder of the indebtedness of LBTCBV to the relevant Noteholder. The obligations of LBTCBV and LBHI, as the case may be, in respect of each Australian Domestic Note constitute separate and independent obligations which the Holder to whom those obligations are owed is entitled to enforce without having to join any other Holder or any predecessor in title of a Holder. No certificate or other evidence of title will be issued by or on behalf of LBTCBV or LBHI, as the case may be, to evidence title to an Australian Domestic Note unless LBTCBV or LBHI, as the case may be, determines that certificates should be made available or it is required to do so pursuant to any applicable law or regulation.

No Australian Domestic Note will be registered in the name of more than four persons. A Note registered in the name of more than one person is held by those persons as joint tenants. Australian Domestic Notes will be registered by name only without reference to any trusteeship. The person registered in the Australian Register as a Noteholder of an Australian Domestic Note will be treated by LBTCBV or LBHI, as the case may be, and the Australian Registrar as absolute owner of that Australian Domestic Note and none of LBTCBV, LBHI, the Guarantor or the Australian Registrar is, except as ordered by a court or as required by statute, obliged to take notice of any other claim to an Australian Domestic Note. For the avoidance of doubt, where an Australian Domestic Note is entered into the Austraclear System, the expression Holder includes Austraclear as operator of the Austraclear System.

Upon a person acquiring title to any Australian Domestic Note by virtue of becoming registered as the owner of that Australian Domestic Note, all rights and entitlements arising by virtue of the relevant Deed Poll in respect of that Australian Domestic Note vest absolutely in the registered owner of the Australian Domestic Note, such that no person who has previously been registered as the owner of the Australian Domestic Note has or is entitled to assert against the LBTCBV or LBHI, as the case may be, or the Australian Registrar or the registered owner of the Australian Domestic Note for the time being and from time to time any rights, benefits or entitlements in respect of the Australian Domestic Note.

Conditions 1(c) (Coupons Attached) to 1(i) (Owner of Registered Notes) inclusive do not apply to Australian Domestic Notes. Australian Domestic Notes may be transferred in whole but not part.

Australian Domestic Notes will be transferable by duly completed and (if applicable) stamped transfer and acceptance forms in the form specified by, and obtainable from, the Australian Registrar or by any other manner approved by LBTCBV or LBHI, as the case may be, and the Australian Registrar. Notes entered in the Austraclear System (as defined below) will be transferable only in accordance with the Austraclear Regulations (as defined below).

Unless the Australian Domestic Notes are lodged in the Austraclear System, application for the transfer of Australian Domestic Notes must be made by the lodgement of a transfer and acceptance form with the Australian Registrar. Each transfer and acceptance form must be accompanied by such evidence (if any) as the Australian Registrar may require to prove the title of the transferor or the transferor's right to transfer the Australian Domestic Note and be signed by both the transferor and the transferee.

The transferor of an Australian Domestic Note is deemed to remain the Holder of that Australian Domestic Note until the name of the transferee is entered in the Australian Register in respect of that Australian Domestic Note. Transfers will not be registered later than eight days prior to the Maturity Date of the Australian Domestic Note.

Australian Domestic Notes may only be transferred in, to or from Australia if (a) the aggregate consideration payable by the transferee at the time of transfer is at least A$500,000 (or the equivalent in another currency and, in either case disregarding moneys lent by the transferor or its associates) or the offer or invitation giving rise to the transfer otherwise does not require disclosure to investors in accordance with Part 6D.2 of the Corporations Act 2001 of Australia, and (b) the transfer is in compliance with all other applicable laws, regulations or directives and does not require any document to be lodged or registered with the Australian Securities and Investments Commission. Australian Domestic Notes may only be transferred between persons in a jurisdiction or jurisdictions other than Australia if (a) a transfer and acceptance form is signed outside Australia, and (b) the transfer is in compliance with the laws of the jurisdiction in which the transfer takes place. A transfer to an unincorporated association is not permitted.

Transfers will be registered without charge provided taxes, duties or other governmental charges (if any) imposed in relation to the transfer have been paid.

A person becoming entitled to an Australian Domestic Note as a consequence of the death or bankruptcy of a Holder or of a vesting order or a person administering the estate of a Holder may, upon producing such evidence as to that entitlement or status as the Australian Registrar considers sufficient, transfer the Australian Domestic Note or, if so entitled, become registered as the Holder of the Australian Domestic Note.

Where the transferor executes a transfer of less than all Australian Domestic Notes registered in its name, and the specific Australian Domestic Notes to be transferred are not identified, the Australian Registrar may register the transfer in respect of such of the Australian Domestic Notes registered in the name of the transferor as the Australian Registrar thinks fit, provided the aggregate principal amount of the Australian Domestic Notes registered as having been transferred equals the aggregate principal amount of the Australian Domestic Notes expressed to be transferred in the transfer.

If Austraclear Services Limited (ABN 28 003 284 419) is the Australian Registrar and the Australian Domestic Notes are lodged in the Austraclear System, despite any other provision of these Terms and Conditions, the Australian Domestic Notes are not transferable on the Australian Register, and LBTCBV or LBHI, as the case may be, may not, and must procure that the Australian Registrar does not, register any transfer of the Australian Domestic Notes issued by it and no member of the Austraclear System has the right to request any registration of any transfer of such Australian Domestic Notes, except:

(a)    in the case of any repurchase, redemption or cancellation (whether on or before the Maturity Date of the Australian Domestic Notes) of such Australian Domestic Notes, a transfer of the

relevant Australian Domestic Notes from Austraclear to LBTCBV or LBHI, as the case may be, may be entered in the Australian Register; and

(b)    if Austraclear exercises any power it may have under the Austraclear Regulations or these Terms and Conditions to require the relevant Australian Domestic Notes to be transferred on the Australian Register to a member of the Austraclear System, the relevant Australian Domestic Notes may be transferred on the Australian Register from Austraclear to the member of the Austraclear System.

In any of these cases, the relevant Australian Domestic Notes will cease to be held in the Austraclear System.

Where Austraclear is recorded in the Australian Register as the holder of an Australian Domestic Note, each person in whose Security Record (as defined in the Austraclear Regulations) an Australian Domestic Note is recorded is deemed to acknowledge in favour of the Australian Registrar and Austraclear that:

(a)    the Australian Registrar's decision to act as the Australian Registrar of that Australian Domestic Note does not constitute a recommendation or endorsement by the Australian Registrar or Austraclear in relation to that Australian Domestic Note, but only indicates that the holding of such Australian Domestic Note is considered by the Australian Registrar to be compatible with the performance by it of its obligations as Australian Registrar under the Agency and Registry Services Agreement (as defined in Condition 7); and

(b)    the holder of the Australian Domestic Note does not rely on any fact, matter or circumstance contrary to paragraph (a).

In this Condition 1(j) (Australian Domestic Notes):

*Austraclear* means Austraclear Limited (ABN 94 002 060 773).

*Austraclear Regulations* means the rules and regulations established by Austraclear from time to time to govern the use of the Austraclear System.

*Austraclear System* means the system operated by Austraclear for holding securities and the electronic recording and settling of transactions in those securities between members of that system.

## 2.    Status of Notes and Guarantees

(a)    *Status of Senior Notes and Senior Guarantees*

The Senior Notes and the Senior Guarantees will constitute direct, unconditional and (subject to the provisions set forth below in Condition 11 (Negative Pledge with respect to Senior Notes) and in the Fiscal Agency Agreement) unsecured obligations of the Issuer and the Guarantor, respectively, and will rank pari passu in right of payment among the Notes of such Issuer and the Guarantees, respectively, prior to the equity securities of the Issuer and the Guarantor (if applicable) and equally with all other unsecured and unsubordinated obligations of the Issuer and the Guarantor (if applicable) (subject, in the event of insolvency, to laws affecting creditors' rights generally).

(b)    *Status of Subordinated Notes and Subordinated Guarantees*

If the Notes and Guarantees are Subordinated Notes and Subordinated Guarantees, the Subordinated Notes and Subordinated Guarantees and (if applicable) the relative Coupons are direct, unsecured and subordinated obligations of the Issuer and the Guarantor (if applicable), respectively and rank pari passu among themselves and *pari passu* with all other present and future unsecured, unconditional and subordinated indebtedness of such Issuer and the Guarantor (if applicable), respectively.

The Notes and the Guarantees constituting part of the subordinated debt of an Issuer and Guarantor, respectively (the "*Subordinated Debt*"), will be subordinate and junior in the right of payment, to the

extent and in the manner set forth in Conditions 2(b), 2(c) (*Status of LBHI Subordinated Notes*) and 10(a)(x) (*Events of Default*), to all present or future Senior Debt. "*Senior Debt*" is defined to mean (a) any indebtedness for money borrowed or evidenced by bonds, notes, debentures or similar instruments, (b) any indebtedness under capitalized leases, (c) any indebtedness representing the deferred and unpaid purchase price of any property or business, and (d) all deferrals, renewals, extensions and refundings of any such indebtedness or obligation; except that the following does not constitute Senior Debt: (i) indebtedness evidenced by the Subordinated Debt, and (ii) indebtedness which is expressly made equal in right of payment with the Subordinated Debt or subordinate and subject in right of payment to the Subordinated Debt. Additionally, in the case of LBHI, the following also does not constitute Senior Debt: (x) indebtedness for goods or materials purchased in the ordinary course of business or for services obtained in the ordinary course of business or indebtedness consisting of trade payables or (y) indebtedness which is subordinated to any obligation of LBHI of the type specified in clauses (a) through (d) above. The effect of clause (y) is that LBHI may not issue or assume any indebtedness for money borrowed which is junior to the Senior Debt and senior to the Subordinated Debt. The Fiscal Agency Agreement does not limit the amount of Senior Debt or other indebtedness that may be issued.

Subordinated Notes issued by LBTCBV will be subordinated and junior in right of payment to the prior payment in full of all Senior Creditors of LBTCBV. "*Senior Creditors*" means all unsubordinated creditors of LBTCBV and all subordinated creditors of LBTCBV whose claims against LBTCBV rank or are expressed to rank ahead of the claims of the Holders of Subordinated Notes.

In respect to Subordinated Notes (Tier 2) issued by LBB, the following provisions will apply:

In the event of the dissolution, liquidation, insolvency, composition or other proceedings for the avoidance of insolvency of, or against, LBB, such obligations will be subordinated to the claims of all unsubordinated creditors of LBB so that in any such event no amounts shall be payable under such obligations until the claims of all unsubordinated creditors of LBB shall have been satisfied in full. No Holder may set off his claims arising under the Notes against any claims of LBB. No security of whatever kind is, or shall at any time be, provided by LBB or any other person securing rights of the Holders under such Notes. No subsequent agreement may limit the subordination pursuant to the provision set out in this Condition 2 or amend the Maturity Date in respect of the Notes to any earlier date or shorten any applicable notice period (*Kündigungsfrist*). If the Notes are redeemed before the Maturity Date otherwise than in the circumstances described in this Condition 2 or as a result of an early redemption according to Condition 5 (2) or repurchased by LBB otherwise than in accordance with the provisions of § 10 (5a) sentence 6 of the German Banking Act (*Kreditwesengesetz*), then the amounts redeemed or paid must be returned to LBB irrespective of any agreement to the contrary unless the amounts paid have been replaced by other liable capital (*haftendes Eigenkapital*) of at least equal status within the meaning of the German Banking Act, or the German Financial Supervisory Authority (*Bundesanstalt für Finanzdienstleistungsaufsicht*) has consented to such redemption or repurchase.

In respect to Subordinated Notes (Tier 3) issued by LBB, the following provisions will apply:

In the event of the dissolution, liquidation, insolvency, composition or other proceedings for the avoidance of insolvency of, or against, LBB, such obligations will be subordinated to the claims of all unsubordinated creditors of LBB so that in any such event no amounts shall be payable under such obligations until the claims of all unsubordinated creditors of LBB shall have been satisfied in full. No Holder may set off his claims arising under the Notes against any claims of LBB. No security of whatever kind is, or shall at any time be, provided by LBB or any other person securing rights of the Holders under such Notes. No payment in respect of the Notes (whether of principal, interest or otherwise) may be made by LBB if such payment would have the consequences that the own funds (*Eigenmittel*) of LBB would no longer meet the statutory requirements applicable from time to time, any payment made in violation of the foregoing must be repaid to LBB irrespective of any agreement to the contrary. No subsequent agreement may limit the subordination pursuant to the provisions set

out in this Condition 2 or change the Maturity Date in respect of the Notes to any earlier date or shorten any applicable notice period (*Kündigungsfrist*). If the Notes are redeemed before the Maturity Date otherwise than in the circumstances described in this Condition 2 or repurchased by LBB otherwise than in accordance with the provisions of § 10 (7) sentence 5 of the German Banking Act (*Kreditwesengesetz*), then the amounts redeemed or paid must be returned to LBB irrespective of any agreement to the contrary unless the amounts paid have been replaced by other own funds (*Eigenmittel*) of at least equal status within the meaning of the German Banking Act, or the German Financial Supervisory Authority (*Bundesanstalt für Finanzdienstleistungsaufsicht*) has consented to such redemption or repurchase.

Subject, in the case of LBHI Subordinated Notes (as defined below) to Condition 2(c) (*Status of LBHI Notes*), in the event (a) of any insolvency or bankruptcy proceedings, or any receivership, liquidation, reorganization or other similar proceedings in respect of the Issuer or the Guarantor (if applicable) or a substantial part of its property, (b) that (i) a default shall have occurred with respect to the payment of principal of or interest on or other monetary amounts due and payable on any Senior Debt or (ii) there shall have occurred an event of default (other than a default in the payment of principal of or interest or other monetary amounts due and payable) with respect to any Senior Debt, as defined therein or in the instrument under which the same is outstanding, permitting the holder or holders thereof to accelerate the maturity thereof (with notice or lapse of time, or both), and such event of default shall have continued beyond the period of grace, if any, in respect thereof, and such default or event of default shall not have been cured or waived or shall not have ceased to exist, or (c) that the principal of and accrued interest on the Subordinated Debt shall have been declared due and payable upon an Event of Default under the Fiscal Agency Agreement and such declaration shall not have been rescinded and annulled as provided therein, then the holders of all Senior Debt shall first be entitled to receive payment of the full amount unpaid thereon in cash before the holders of any of the Subordinated Debt are entitled to receive a payment on account of the principal, premium, if any, or interest, if any, on such Subordinated Debt.

(c)     *Status of LBHI Subordinated Notes*

    (i)     *Agreement to Subordinate*

        LBHI, for itself, its successors and assigns, covenants and agrees, and each Holder of Subordinated Notes issued by LBHI ("*LBHI Subordinated Notes*"), by accepting the same, likewise covenants and agrees, that the payment of the principal and interest payable in respect of the LBHI Subordinated Notes is hereby expressly subordinated, to the extent and in the manner set forth in this Condition 2(c), in right of payment to the prior payment in full of all Senior Debt.

    (ii)     *Distribution on Dissolution, Liquidation and Reorganization; Subrogation of the LBHI Subordinated Notes*

Upon any distribution of assets of LBHI upon any dissolution, winding up, liquidation or reorganization of LBHI, whether in bankruptcy, insolvency, reorganization or receivership proceedings or upon an assignment for the benefit of creditors or any other marshalling of the assets and liabilities of LBHI or otherwise (subject to the power of a court of competent jurisdiction to make other equitable provision reflecting the rights conferred in these Conditions applicable to LBHI Subordinated Notes upon the Senior Debt and the holders thereof with respect to the LBHI Subordinated Notes and the Holders thereof by a lawful plan or reorganization under applicable bankruptcy law),

    (A)     the holders of all Senior Debt shall be entitled to receive payment in full of the principal thereof, premium, if any, interest or additional amounts required in respect of certain taxes, and any interest thereon, due thereon before the Holders of the LBHI Subordinated Notes are entitled to receive any payment upon the principal of or interest on the LBHI Subordinated Notes of or interest on overdue amounts thereof; and

(B)    any payment or distribution of assets of LBHI of any kind or character, whether in cash, property or securities, to which the Holders of the LBHI Subordinated Notes or the Fiscal Agent would be entitled except for the provisions of this Condition 2(c) shall be paid by the liquidating trustee or agent or other person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or otherwise, directly to the holders of Senior Debt or their representative or representatives or to the agent, trustee or trustees under any agency agreement or indenture under which any instruments evidencing any of such Senior Debt may have been issued, ratably according to the aggregate amounts remaining unpaid on account of the principal of, premium, if any, interest or additional amounts required in respect of certain taxes, and any interest thereon, on the Senior Debt held or represented by each, to the extent necessary to make payment in full of all Senior Debt remaining unpaid, after giving effect to any concurrent payment or distribution to the holders of such Senior Debt; and

(C)    in the event that, notwithstanding the foregoing, any payment or distribution of assets of LBHI of any kind or character, whether in cash, property or securities, shall be received by the Fiscal Agent or the Holders of the LBHI Subordinated Notes before all Senior Debt is paid in full, such payment or distribution shall be paid over to the holders of such Senior Debt or their representative or representatives or to the agent, trustee or trustees under any agency agreement or indenture under which any instruments evidencing any of such Senior Debt may have been issued, ratably as aforesaid, for application to the payment of all Senior Debt remaining unpaid until all such Senior Debt shall have been paid in full, after giving effect to any concurrent payment or distribution to the holders of such Senior Debt.

Subject to the payment in full of all Senior Debt, the Holders of the LBHI Subordinated Notes shall be subrogated to the rights of the holders of Senior Debt to receive payments or distributions of cash, property or securities of LBHI applicable to Senior Debt until the principal or interest, and any interest thereon, of or on the LBHI Subordinated Notes shall be paid in full and no such payments or distributions to the Holders of the LBHI Subordinated Notes of cash, property or securities otherwise distributable to the Senior Debt shall, as between LBHI, its creditors other than the holders of Senior Debt, and the Holders of the LBHI Subordinated Notes, be deemed to be a payment by LBHI to or on account of the LBHI Subordinated Notes. It is understood that the provisions of this Condition 2(c) are and are intended solely for the purpose of defining the relative rights of the Holders of the LBHI Subordinated Notes, on the one hand, and the holders of Senior Debt, on the other hand. Nothing contained in this Condition 2(c) or elsewhere in the Fiscal Agency Agreement or in the LBHI Subordinated Notes is intended to or shall impair, as between LBHI, its creditors other than the holders of Senior Debt, and the Holders of the LBHI Subordinated Notes, the obligation of LBHI, which is unconditional and absolute, to pay to the Holders of the LBHI Subordinated Notes the principal or interest, and any interest thereon, of or on the LBHI Subordinated Notes as and when the same shall become due and payable in accordance with their terms, or to affect the relative rights of the Holders of the LBHI Subordinated Notes and creditors of LBHI other than the holders of Senior Debt, nor shall anything in the Fiscal Agency Agreement or in the LBHI Subordinated Notes prevent the Fiscal Agent or the Holder of any of the LBHI Subordinated Notes from exercising all remedies otherwise permitted by applicable law upon default under the Terms and Conditions applicable to the LBHI Subordinated Notes or the Fiscal Agency Agreement, subject to the rights, if any, under this Condition 2(c) or under the Fiscal Agency Agreement of the holders of Senior Debt in respect of cash, property or securities of LBHI received upon the exercise of any such remedy. Upon any payment or distribution of assets of LBHI referred to in this Condition 2(c), the Fiscal Agent shall be entitled to conclusively rely upon a certificate of the liquidating trustee or agent or other person making any distribution to the Fiscal Agent for the purpose of ascertaining the persons entitled to participate in such distribution, the holders of Senior Debt and other indebtedness of LBHI, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon, and all other facts pertinent thereto or to this Condition 2(c).

The Fiscal Agent, however, shall not be deemed to owe any fiduciary duty to the holders of Senior Debt. The Fiscal Agent shall not be liable to any such holder if it shall pay over or distribute to or on behalf of Holders of the LBHI Subordinated Notes or LBHI moneys or assets to which any holder of

Senior Debt shall be entitled by virtue of this Condition 2(c). The rights and claims of the Fiscal Agent under Clause 8 of the Fiscal Agency Agreement shall not be subject to the provisions of this Condition 2(c).

If the Fiscal Agent or any Holder of LBHI Subordinated Notes does not file a proper claim or proof of debt in the form required in any proceeding referred to above prior to 30 days before the expiration of the time to file such claim in such proceeding, then the holder of any Senior Debt is hereby authorized, and has the right, to file an appropriate claim or claims for or on behalf of such Holder of LBHI Subordinated Notes.

(iii)   *No Payment on LBHI Subordinated Notes in Event of Default on Senior Debt*

No payment by LBHI on account of principal or interest, and any interest thereon, of or on the LBHI Subordinated Notes shall be made unless full payment of amounts then due for principal, premium, if any, sinking funds, and interest or additional amounts on Senior Debt has been made or duly provided for in money or money's worth.

(iv)   *Payments on LBHI Subordinated Notes Permitted*

Nothing contained in the Fiscal Agency Agreement or in the LBHI Subordinated Notes shall (a) affect the obligation of LBHI to make, or prevent LBHI from making, at any time except as provided in paragraphs (ii) and (iii), payments of principal or interest, and any interest thereon, of or on the LBHI Subordinated Notes or (b) prevent the application by the Fiscal Agent of any moneys deposited with it hereunder to the payment of or on account of the principal or interest, and any interest thereon, of or on the LBHI Subordinated Notes unless the Fiscal Agent shall have received written notice of any event prohibiting the making of such payment more than two Business Days prior to the date fixed for such payment.

(v)   *Authorization of Holders of LBHI Subordinated Notes to Fiscal Agent to Effect Subordination*

Each Holder of LBHI Subordinated Notes by accepting the same authorizes and directs the Fiscal Agent on its behalf to take such action as may be necessary or appropriate to effectuate the subordination as provided in this Condition 2(c) and appoints the Fiscal Agent its attorney-in-fact for any and all such purposes.

(vi)   *Notices to Fiscal Agent*

LBHI shall give prompt written notice to the Fiscal Agent of any fact known to LBHI which would prevent the making of any payment to or by the Fiscal Agent in respect of the LBHI Subordinated Notes. Notwithstanding the provisions of this 2(c) or any other provisions of these Terms and Conditions applicable LBHI Subordinated Notes and the Fiscal Agency Agreement, neither the Fiscal Agent nor any Paying Agent shall be charged with knowledge of the existence of any Senior Debt or of any event which would prohibit the making of any payment of moneys to or by the Fiscal Agent or such Paying Agent, unless and until the Fiscal Agent or such Paying Agent shall have received written notice thereof from LBHI or from the holder of any Senior Debt or from the agent or trustee for any such holder, together with proof satisfactory to the Fiscal Agent of such holding of Senior Debt or of the authority of such trustee; provided, however, that if at least two Business Days prior to the date upon which by the terms hereof any such moneys may become payable for any purpose (including, without limitation, the payment of the principal of or interest on the LBHI Subordinated Notes, or any interest thereon) the Fiscal Agent shall not have received with respect to such moneys or the moneys deposited with it as a condition to such satisfaction and discharge the notice provided for in this paragraph (vi), then, anything herein contained to the contrary notwithstanding, the Fiscal Agent shall have full power and authority to receive such moneys and to apply the same to the purpose for which they were received, and shall not be affected by any notice to the contrary, which may be received by it on or after such two Business Days prior to such date. The Fiscal Agent shall be entitled to conclusively rely on the delivery to it of a written notice by a person representing himself to be a

holder of Senior Debt (or an agent or trustee on behalf of such holder) to establish that such a notice has been given by a holder of Senior Debt or an agent or trustee on behalf of any such holder. In the event that the Fiscal Agent determines in good faith that further evidence is required with respect to the right of any person as a holder of Senior Debt to participate in any payment or distribution pursuant to this 2(c), the Fiscal Agent may request such person to furnish evidence to the reasonable satisfaction of the Fiscal Agent as to the amount of Senior Debt held by such person, the extent to which such person is entitled to participate in such payment or distribution and any other facts pertinent to the rights of such person under this 2(c) and, if such evidence is not furnished, the Fiscal Agent may defer any payment to such person pending judicial determination as to the right of such person to receive such payment.

(vii)    *Fiscal Agent as holder of Senior Debt.*

The Fiscal Agent shall be entitled to all the rights set forth in this 2(c) in respect of any Senior Debt at any time held by it to the same extent as any other holder of Senior Debt and nothing in these Condition applicable to LBHI Subordinated Notes or in the Fiscal Agency Agreement shall be construed to deprive the Fiscal Agent of any of its rights as such holder.

(viii)    *Modification of Terms of Senior Debt.*

Any renewal or extension of the time of payment of any Senior Debt or the exercise by the holders of Senior Debt of any of their rights under any instrument creating or evidencing Senior Debt, including without limitation the waiver of default thereunder, may be made or done all without notice to or assent from Holders of the LBHI Subordinated Notes or the Fiscal Agent.

No compromise, alteration, amendment, modification, extension, renewal or other change of, or waiver, consent or other action in respect of, any liability or obligation under or in respect of, or of any of the terms, covenants or conditions of any agency agreement, indenture or other instrument under which any Senior Debt is outstanding or of such Senior Debt, whether or not such release is in accordance with the provisions of any applicable document, shall in any way alter or affect any of the provisions of this 2(c) relating to the subordination thereof.

**3.    Interest**

(a)    *Interest on Fixed Rate Notes*

Each Fixed Rate Note bears interest on its outstanding nominal amount (or, if it is a Partly Paid Note, the amount paid up) from (and including) the Interest Commencement Date at the rate(s) per annum equal to the Fixed Rate(s) of Interest payable in arrear on the Interest Payment Date(s) in each year and on the Maturity Date (if that does not fall on an Interest Payment Date).

Interest will be paid subject to and in accordance with the provisions of Condition 7 (*Payment of Principal and Interest; Paying Agents*). Interest will cease to accrue on each Fixed Rate Note (or, in the case of the redemption of part of a Note, that part only of such Note) on the due date for redemption thereof unless, upon due presentation thereof, payment of principal is improperly withheld or refused in which event interest will continue to accrue (as well after as before any judgment) until whichever is the earlier of (A) the day on which all sums due in respect of such Note up to that day are received by or on behalf of the Holder of such Note and (B) the day on which the Fiscal Agent has notified the Holder thereof (either in accordance with Condition 15 (*Notices*) or individually) of receipt of all sums due in respect thereof up to that date.

Except as provided in the applicable Final Terms, the amount of interest payable on each Interest Payment Date in respect of the Fixed Interest Period ending on such date will amount to the Fixed Coupon Amount. Payments of interest on any Interest Payment Date or the Maturity Date will, if so specified in the applicable Final Terms, amount to the Broken Amount so specified.

As used in these Terms and Conditions, the expression "*Fixed Interest Period*" means the period from (and including) an Interest Payment Date (or the Interest Commencement Date) to (but excluding) the next (or first) Interest Payment Date

If interest is required to be calculated for a period ending other than on an Interest Payment Date, such interest shall be calculated by applying the Fixed Rate of Interest to the Calculation Amount, multiplying such sum by the applicable Fixed Day Count Fraction, rounding the resultant figure to the nearest sub-unit of the relevant Specified Currency, half of any such sub-unit being rounded upwards and multiplying such rounded figure by a fraction equal to the Specified Denomination of the relevant Note divided by the Calculation Amount or otherwise in accordance with applicable market convention.

For the purposes of these Terms and Conditions:

"*Fixed Day Count Fraction*" means, in respect of the calculation of an amount for any period of time (the "*Calculation Period*"):

(i)    if "*Actual/Actual (ICMA)*" is specified in the applicable Final Terms:

    (a)    where the Calculation Period is equal to or shorter than the Regular Period during which it falls, the actual number of days in the Calculation Period divided by the product of (1) the actual number of days in such Regular Period and (2) the number of Regular Periods normally ending in any year; and

    (b)    where the Calculation Period is longer than one Regular Period, the sum of:

        (A)    the actual number of days in such Calculation Period falling in the Regular Period in which it begins divided by the product of (1) the actual number of days in such Regular Period and (2) the number of Regular Periods in any year; and

        (B)    the actual number of days in such Calculation Period falling in the next Regular Period divided by the product of (a) the actual number of days in such Regular Period and (2) the number of Regular Periods normally ending in any year;

(ii)    if "*30/360*" is specified in the applicable Final Terms, the number of days in the Calculation Period from and including the most recent Interest Payment Date (or, if none, the Interest Commencement Date) to but excluding the relevant payment date (such number of days being calculated on the basis of 12 30-day months) divided by 360; and

"*Regular Period*" means:

(i)    in the case of Notes where interest is scheduled to be paid only by means of regular payments, each period from and including the Interest Commencement Date to but excluding the first Interest Payment Date and each successive period from and including one Interest Payment Date to but excluding the next Interest Payment Date;

(ii)    in the case of Notes where, apart from the first Interest Period, interest is scheduled to be paid only by means of regular payments, each period from and including a Regular Date falling in any year to but excluding the next Regular Date, where "*Regular Date*" means the day and month (but not the year) on which any Interest Payment Date falls; and

(iii)    in the case of Notes where, apart from one Interest Period other than the first Interest Period, interest is scheduled to be paid only by means of regular payments, each period from and including a Regular Date falling in any year to but excluding the next Regular Date, where "*Regular Date*" means the day and month (but not the year) on which any Interest Payment Date falls other than the Interest Payment Date falling at the end of the irregular Interest Period.

"*sub unit*" means, with respect to any currency other than euro, the lowest amount of such currency that is available as legal tender in the country of such currency and, with respect to euro, means one cent.

(b)   *Interest on Floating Rate Notes and Index-Linked Interest Notes*

(i)   *Interest Payment Dates*

Each Floating Rate Note and Index-Linked Interest Note bears interest on its nominal amount (or, if it is a Partly Paid Note, on the amount paid up) from and including the Interest Commencement Date and such interest will be payable in arrear on either:

(A)   the Interest Payment Date(s) in each year specified in the applicable Final Terms (the period from and including the Interest Commencement Date to but excluding the first Interest Payment Date and each successive period from and including an Interest Payment Date to but excluding the next Interest Payment Date each being an "*Interest Period*"); or

(B)   if no express Interest Payment Date(s) is/are specified in the applicable Final Terms, each date (each an "*Interest Payment Date*") which falls the number of months or other period specified as the Interest Period in the applicable Final Terms after the preceding Interest Payment Date or, in the case of the first Interest Payment Date, after the Interest Commencement Date.

If a Business Day Convention is specified in the applicable Final Terms and if any Interest Payment Date would otherwise fall on a day which is not a Business Day, then, if the Business Day Convention specified is:

(1)   in any case where Interest Periods are specified in accordance with Condition 3(b)(i)(B) (Interest Payment Dates) above, the Floating Rate Convention, such Interest Payment Date shall be postponed to the next day which is a Business Day unless it would thereby fall into the next calendar month, in which event (A) such Interest Payment Date shall be brought forward to the immediately preceding Business Day and (B) each subsequent Interest Payment Date shall be the last Business Day in the month which falls the number of months or other period specified as the Interest Period in the applicable Final Terms after the preceding applicable Interest Payment Date occurred; or

(2)   the Following Business Day Convention, such Interest Payment Date shall be postponed to the next day which is a Business Day; or

(3)   the Modified Following Business Day Convention, such Interest Payment Date shall be postponed to the next day which is a Business Day unless it would thereby fall into the next calendar month, in which event such Interest Payment Date shall be brought forward to the immediately preceding Business Day; or

(4)   the Preceding Business Day Convention, such Interest Payment Date shall be brought forward to the preceding Business Day.

In these Terms and Conditions:

"*Business Day*" means for all Conditions except for Condition 7(i) (Payments in respect of Australian Domestic Notes):

(A)   in relation to any sum payable in euro, any day on which the Trans-European Automated Real-Time Gross Settlement Express Transfer (TARGET) System is open (a "*TARGET Settlement Day*") and a day on which commercial banks and

74

foreign exchange markets settle payments generally in London and each (if any) Additional Business Centre; and

(B)   in relation to any sum payable in a currency other than euro, a day on which commercial banks and foreign exchange markets settle payments generally in London, in the Principal Financial Centre of the relevant currency and in each (if any) Additional Business Centre; and

"*Principal Financial Centre*" means, in relation to any currency, the principal financial centre for that currency provided, however, that:

(i)   in relation to euro, it means the principal financial centre of such Member State of the European Communities as is selected (in the case of a payment) by the payee or (in the case of a calculation) by the Calculation Agent; and

(ii)   in relation to Australian dollars, it means either Sydney or Melbourne, as selected (in the case of a payment) by the payee or (in the case of a calculation) by the Calculation Agent.

(ii)   *Interest Payments*

Interest will be paid subject to and in accordance with the provisions of Condition 7 (Payment of Principal and Interest; Paying Agents). Interest will cease to accrue on each Floating Rate Note or Index-Linked Interest Note (or, in the case of the redemption of part of a Note, that part only of such Note) on the due date for redemption thereof unless, upon due presentation thereof, payment of principal is improperly withheld or refused in which event interest will continue to accrue (as well after as before any judgment) until whichever is the earlier of (A) the day on which all sums due in respect of such Note up to that day are received by or on behalf of the Holder of such Note and (B) the day on which the Fiscal Agent has notified the Holder thereof (either in accordance with Condition 15 (Notices) or individually) of receipt of all sums due in respect thereof up to that date.

(iii)   *Rate of Interest*

The Rate of Interest payable from time to time in respect of Floating Rate Notes and Index-Linked Interest Notes will be determined in the manner specified in the applicable Final Terms, including where the Rate of Interest is to be determined by reference to an index and/or formula or otherwise.

(A)   *ISDA Determination for Floating Rate Notes*

Where ISDA Determination is specified in the applicable Final Terms as the manner in which the Rate of Interest is to be determined, the Rate of Interest for each Interest Period will be the relevant ISDA Rate plus or minus (as indicated in the applicable Final Terms) the Margin (if any) and/or multiplied by the Multiplier (if any). For the purposes of this sub-paragraph (A), "*ISDA Rate*" for an Interest Period means a rate equal to the Floating Rate that would be determined by the Calculation Agent specified in the applicable Final Terms under an interest rate swap transaction if the Calculation Agent was acting as Calculation Agent for that swap transaction under the terms of an agreement incorporating the ISDA Definitions and under which:

(1)   the Floating Rate Option is as specified in the applicable Final Terms;

(2)   the Designated Maturity is a period specified in the applicable Final Terms; and

(3)   the relevant Reset Date is either (i) if the applicable Floating Rate Option is based on the London inter-bank offered rate (LIBOR) for a currency, the first day of that Interest Period or (ii) in any other case, as specified in the applicable Final Terms.

75

For the purposes of this sub-paragraph (A), "*Floating Rate*", "*Calculation Agent*" "*Floating Rate Option*", "*Designated Maturity*", and "*Reset Date*" have the meanings given to those terms in the ISDA Definitions, where "*ISDA Definitions*" means the ISDA 2000 Definitions (as amended and updated as at the date of issue of the first Tranche of the Notes of the relevant Series (as specified in the relevant Final Terms) as published by the International Swaps and Derivatives Association, Inc. (formerly the International Swap Dealers Association, Inc.)).

When this sub-paragraph (A) applies in respect of each relevant Interest Period, the Calculation Agent will be deemed to have discharged its obligations under Condition 3 (b)(iii) (Rate of Interest) in respect of the determination of the Rate of Interest if it has determined the Rate of Interest in respect of such Interest Period in the manner provided in this sub-paragraph (A).

(B)    *Screen Rate Determination for Floating Rate Notes*

Where Screen Rate Determination is specified in the applicable Final Terms, the Rate of Interest for each Interest Period will, subject as provided below, be either:

(1)    the offered quotation; or

(2)    the arithmetic mean (rounded if necessary to the fourth decimal place, with 0.00005 being rounded upwards) of the offered quotations;

(expressed as a percentage rate per annum) for the Reference Rate which appears or appear, as the case may be, on the Relevant Screen Page as of the Relevant Time on the relevant Interest Determination Date plus or minus (as indicated in the applicable Final Terms) the Margin (if any) and/or multiplied by the Multiplier (if any), all as determined by the Calculation Agent. If five or more such offered quotations are available on the Relevant Screen Page, the highest (or, if there is more than one such highest quotation, one only of such quotations) and the lowest (or, if there is more than one such lowest quotation, one only of such quotations) shall be disregarded by the Calculation Agent for the purpose of determining the arithmetic mean (rounded as provided above) of such offered quotations.

If, in respect of any Interest Period, the Relevant Screen Page is not available or if, in the case of (1) above, no such offered quotation appears or, in the case of (2) above, fewer than three of such offered quotations appear, in each case as at the time specified in the preceding paragraph, the Calculation Agent shall request the principal Relevant Financial Centre office of each of the Reference Banks (as defined below) to provide the Calculation Agent with its offered quotation (expressed as a percentage rate per annum) for the Reference Rate at approximately the Relevant Time on the Interest Determination Date in question. If two or more of the Reference Banks provide the Calculation Agent with such offered quotations, the Rate of Interest for such Interest Period shall be the arithmetic mean (rounded if necessary to the fourth decimal place, with 0.00005 being rounded upwards) of such offered quotations plus or minus (as appropriate) the Margin (if any), all as determined by the Calculation Agent.

If the provisions of the preceding paragraph are applicable and on the relevant Interest Determination Date one only or none of the Reference Banks provides the Calculation Agent with such offered quotations as provided in the preceding paragraph, the Rate of Interest for the relevant Interest Period shall be the rate per annum which the Calculation Agent determines as being the arithmetic mean (rounded if necessary to the fourth decimal place, with 0.00005 being rounded upwards) of the rates, as communicated to (and at the request of) the Calculation Agent by the Reference Banks or any two or more of them, at which such banks were offered, at approximately 11.00 a.m. local time in the Principal Financial Centre of the Specified Currency on such Interest Determination

Date, deposits in the Specified Currency, in an amount approximately equal to the nominal amount of the relevant Tranche, for a period equal to the relevant Interest Period plus or minus (as appropriate) the Margin (if any) or, if only one of the Reference Banks provides the Calculation Agent with such offered rates, the offered rate for deposits in the Specified Currency, in an amount approximately equal to the nominal amount of the relevant Tranche, for a period equal to the relevant Interest Period or the arithmetic mean (rounded as provided above) of the offered rates for deposits in the Specified Currency for a period equal to the relevant Interest Period, at which, at approximately 11.00 a.m. local time in the Principal Financial Centre of the Specified Currency on the relevant Interest Determination Date, any one or more banks in the Principal Financial Centre of the Specified Currency (which bank or banks is or are in the opinion of the Issuer suitable for such purpose) informs the Calculation Agent it is quoting to leading European banks plus or minus (as appropriate) the Margin (if any), provided that, if the Rate of Interest cannot be determined in accordance with the foregoing provisions of this paragraph, the Rate of Interest shall be determined as at the last preceding Interest Determination Date at which the Rate of Interest could be determined in accordance with the foregoing provisions (though substituting, where a different Margin is to be applied to the relevant Interest Period from that which applied to the last preceding Interest Period, the Margin relating to the relevant Interest Period in place of the Margin relating to that last preceding Interest Period).

In this Condition 3 (Interest), the expression *"Reference Banks"* means, in the case of (1) above, those banks whose offered rates were used to determine such quotation when such quotation last appeared on the Relevant Screen Page and, in the case of (2) above, those banks whose offered quotations last appeared on the Relevant Screen Page when no fewer than three such offered quotations appeared.

If *"BBSW"* is specified in the applicable Final Terms it shall mean the average mid rate for Bills (having the meaning that term has in the Bills of Exchange Act 1909 of Australia) having a tenor closest to the Interest Period as displayed on the "BBSW" page of the Reuters Monitor System on the first day of that Interest Period.

(iv)     *Determination of Rate of Interest and Calculation of Interest Amount*

The Calculation Agent will, at or as soon as practicable after each time at which the Rate of Interest is to be determined, determine the Rate of Interest for the relevant Interest Period. The Calculation Agent will notify the Fiscal Agent of the Rate of Interest for the relevant Interest Period as soon as practicable after calculating the same. The Fiscal Agent will calculate the amount of interest payable in respect of each Specified Denomination (each an *"Interest Amount"*) for the relevant Interest Period. Each Interest Amount shall be calculated by applying the Rate of Interest to the Calculation Amount, multiplying such sum by the relevant Day Count Fraction, rounding the resultant figure to the nearest sub-unit of the Specified Currency (half a sub-unit being rounded upwards) and multiplying such rounded figure by a fraction equal to the Specified Denomination divided by the Calculation Amount.

For the purposes of these Terms and Conditions, *"Day Count Fraction"* means, in respect of the calculation of an amount of interest for any Interest Period or for any other period of time (such Interest Period or other period, the *"Calculation Period"*), such day count fraction as may be specified in these Conditions on the relevant Final Terms and:

(A)     if *"Actual/365"* or *"Actual/Actual (ISDA)"* is specified in the applicable Final Terms, the actual number of days in the Calculation Period divided by 365 (or, if any portion of that Calculation Period falls in a leap year, the sum of (x) the actual number of days in that portion of the Calculation Period falling in a leap year

77

divided by 366 and (y) the actual number of days in that portion of the Calculation Period falling in a non-leap year divided by 365);

(B) if "*Actual/365 (Fixed)*" is specified in the applicable Final Terms, the actual number of days in the Calculation Period divided by 365;

(C) if "*Actual/360*" is specified in the applicable Final Terms, the actual number of days in the Calculation Period divided by 360;

(D) if "*Actual/Actual (ICMA)*" is specified in the applicable Final Terms:

(i) where the Calculation Period is equal to or shorter than the Regular Period during which it falls, the actual number of days in the Calculation Period divided by the product of (1) the actual number of days in such Regular Period and (2) the number of Regular Periods normally ending in any year; and

(ii) where the Calculation Period is longer than one Regular Period, the sum of:

(a) the actual number of days in such Calculation Period falling in the Regular Period in which it begins divided by the product of (1) the actual number of days in such Regular Period and (2) the number of Regular Periods in any year; and

(b) the actual number of days in such Calculation Period falling in the next Regular Period divided by the product of (1) the actual number of days in such Regular Period and (2) the number of Regular Periods normally ending in any year;

(E) if "*30/360*" is specified in the applicable Final Terms, the number of days in the Calculation Period divided by 360 (the number of days to be calculated on the basis of a year of 360 days with 12 30-day months (unless (a) the last day of the Calculation Period is the 31st day of a month but the first day of the Calculation Period is a day other than the 30th or 31st day of a month, in which case the month that includes that last day shall not be considered to be shortened to a 30-day month, or (b) the last day of the Calculation Period is the last day of the month of February, in which case the month of February shall not be considered to be lengthened to a 30-day month);

(F) if "*30E/360*" or "*Eurobond Basis*" is specified in the applicable Final Terms, the number of days in the Calculation Period divided by 360 (the number of days to be calculated on the basis of a year of 360 days with 12 30-day months, without regard to the date of the first day or last day of the Calculation Period unless, in the case of an Calculation Period ending on the Maturity Date, the Maturity Date is the last day of the month of February, in which case the month of February shall not be considered to be lengthened to a 30-day month); and

(G) if "*RBA Bond Basis*" is specified as the applicable day count fraction in the applicable Final Terms, it shall mean one divided by the number of Interest Payment Dates in a year.

(v) *Notification of Rate of Interest and Interest Amount*

The Calculation Agent will cause each Rate of Interest and Interest Amount determined by it, together with the relevant Interest Payment Date, and any other amount(s) required to be determined by it together with any relevant payment date(s) to be notified to the Paying Agents and each competent authority, stock exchange and/or quotation system (if

any) by which the Notes have then been admitted to listing, trading and/or quotation as soon as practicable after such determination but (in the case of each Rate of Interest, Interest Amount and Interest Payment Date) in any event not later than the first day of the relevant Interest Period.

(vi) *Minimum and/or Maximum Rate of Interest*

If the applicable Final Terms specifies a Minimum Interest Rate for any Interest Period, then, in the event that the Rate of Interest in respect of such Interest Period determined in accordance with the above provisions is less than such Minimum Interest Rate, the Rate of Interest for such Interest Period shall be such Minimum Interest Rate. If the applicable Final Terms specifies a Maximum Interest Rate for any Interest Period, then, in the event that the Rate of Interest in respect of such Interest Period determined in accordance with the above provisions is greater than such Maximum Interest Rate, the Rate of Interest for such Interest Period shall be such Maximum Interest Rate.

(vii) *Certificates to be Final*

All certificates, communications, opinions, determinations, calculations, quotations and decisions given, expressed, made or obtained for the purposes of the provisions of this Condition 3 (Interest), whether by the Fiscal Agent or, if applicable, the Calculation Agent, shall (in the absence of wilful default, bad faith or manifest error) be binding on the Issuer, the Guarantor (if applicable), the Fiscal Agent, the Calculation Agent (if applicable), the other Paying Agents and all Noteholders, Couponholders and Receiptholders and (in the absence as aforesaid) no liability to the Issuer, the Guarantor (if applicable), the Noteholders, the Receiptholders or the Couponholders shall attach to the Fiscal Agent or the Calculation Agent (if applicable) in connection with the exercise or non-exercise by it of its powers, duties and discretions pursuant to such provisions.

(c) *Dual Currency Notes*

In the case of Dual Currency Notes, if the rate or amount of interest fails to be determined by reference to an exchange rate, the rate or amount of interest payable shall be determined in the manner specified in the applicable Final Terms and payment shall otherwise be made in accordance with Condition 7 (Payment of Principal and Interest; Paying Agents).

(d) *Partly Paid Notes*

In the case of Partly Paid Notes (other than Partly Paid Notes which are Zero Coupon Notes) interest will accrue as aforesaid on the paid-up nominal amount of such Notes and otherwise as specified in the applicable Final Terms.

(e) *Option to Defer Interest Payments*

The applicable Final Terms will indicate whether this Condition 3(e) is applicable. If this Condition 3(e) is applicable, the Issuer can defer interest payments on the Notes for up to five years if the Notes are not in default. A deferral of interest payments cannot extend, however, beyond the Maturity Date of the Notes. The period between (a) the Interest Payment Date (the *"Reference Interest Payment Date"*) immediately preceding the first Interest Payment Date for which the Issuer has elected to defer interest pursuant to these Conditions and (b) the Interest Payment Date falling closest to the fifth anniversary of the Reference Interest Payment Date or, if earlier, the date on which all interest which has been deferred pursuant to these Conditions is paid in full at the option of the Issuer shall be referred to as a "Deferral Period". During the Deferral Period, interest will continue to accrue on the Notes, compounded on each Interest Payment Date during the Deferral Period. No interest will be due and payable on the Notes until the end of the Deferral Period except upon a redemption of the Notes during a Deferral Period. The Issuer may pay at any time all or any portion of the interest accrued to

that point during a Deferral Period. At the end of the Deferral Period or on any redemption date, the Issuer will be obligated to pay all accrued and unpaid interest. Once the Issuer makes all interest payments on the Notes, with accrued and unpaid interest, it can again defer interest payments on Notes as described above.

During any Deferral Period, if LBHI is the Issuer it will not be permitted to:

(i)     declare or pay any dividend on its shares of common stock; or

(ii)    repurchase or redeem any of its non-cumulative preferred stock or common stock at its option.

The above restriction shall not apply to:

(A)    dividends or distributions in the form of the Issuer's common stock;

(B)    any declaration of a dividend in connection with the implementation of a shareholders' rights plan, or the issuance of stock under any such plan in the future, or the redemption or repurchase of any such rights pursuant thereto; and

(C)    purchases of common stock related to the issuance of common stock or rights under any of the Issuer's benefit plans.

4.    **Extendible Notes**

(a)    The applicable Final Terms will indicate whether this Condition 4(a) is applicable. If this Condition 4(a) is applicable, this Note is a Note, the Maturity Date of which will be automatically extended for such periods and at such times as are set forth in the applicable Final Terms unless the Holder of such Note elects to terminate the automatic extension of such Note. The applicable Final Terms will set forth the periods and times for which the maturity of such Note is to be automatically renewed, the date beyond which the maturity may not be so renewed, the procedures for Noteholders to elect repayment of such Notes in the event of such renewal and other details of such Notes. Notes to which this Condition 4(a) applies may only be issued in registered form.

(b)    The applicable Final Terms will indicate whether this Condition 4(b) is applicable. If this Condition 4(b) is applicable, this Note is a Note as to which the Issuer will have the option to extend the original Maturity Date of such Note. The applicable Final Terms will set forth the number of periods for which the maturity of such Note is extendible, the date beyond which the final maturity may not be extended, the procedure for notification to the Noteholders of such extension, the procedure, if any, for Noteholders to elect repayment of such Notes in the event of such extension and other details of such Notes. Notes to which this Condition 4(b) applies may only be issued in registered form.

5.    **Zero Coupon and Inflation-Linked Notes**

(a)    The applicable Final Terms will indicate whether this Note is a Zero Coupon Note.

*Early redemption of Zero Coupon Notes*

Unless otherwise specified in the applicable Final Terms, the principal amount payable on redemption of a Zero Coupon Note at any time before the Maturity Date shall be an amount (the "*Accrual Yield Amount*") equal to the sum of:

(i)     the Reference Price; and

(ii)    the product of the Accrual Yield (compounded annually) being applied to the Reference Price from (and including) the Issue Date to (but excluding) the date fixed for redemption or (as the case may be) the date upon which the Note becomes due and payable.

Where such calculation is to be made for a period which is not a whole number of years, the calculation in respect of the period of less than a full year shall be made on the basis of such Day

Count Fraction as may be specified in the applicable Final Terms for the purposes of this Condition 5 (Zero Coupon Notes) or, if none is so specified, a Day Count Fraction of 30E/360.

*Late payment on Zero Coupon Notes:*

If the principal amount payable in respect of any Zero Coupon Note is improperly withheld or refused, the principal amount shall thereafter by an amount equal to the sum of:

(i)     the Reference Price; and

(ii)    the product of the Accrual Yield (compounded annually) being applied to the Reference Price from (and including) the Issue Date to (but excluding) whichever is the earlier of (i) the day on which all sums due in respect of such Note up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Fiscal Agent has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(b)     Notes issued pursuant to the Program may include Notes in respect of which the rate of interest applicable for one or more Interest Periods and/or the redemption amount is calculated by reference to one or more indices relating to the consumer price index or any other formula linked to a measure of inflation in one or more jurisdictions, as specified in the applicable Final Terms. Such Notes are referred to as *"Inflation-Linked Notes"*. Such Notes shall also be Index Linked Interest Notes or Index Linked Redemption Amount Notes.

Section 1.12 of the 2006 ISDA Inflation Derivatives Definitions published by the International Swaps and Derivatives Association, Inc. (the *"ISDA Inflation Definitions"*) shall be deemed incorporated by reference into this condition (provided that such terms may be amended in the applicable Final Terms).

The Final Terms for the Inflation-Linked Notes shall specify the relevant Index (or Indices) and Index Sponsor (or Index Sponsors).

For the purposes of this Base Prospectus and any Inflation-Linked Note (unless otherwise specified in the applicable Final Terms):

*"Index"* means each index specified as such in the Final Terms, or any Successor Index determined in accordance with the provisions below.

*"Index Sponsor"* means the entity that publishes or announces (directly or through an agent) the level of the relevant Index.

The applicable Final Terms of Inflation-Linked Notes shall include the following Index and Disruption Event provisions, subject to modification in respect of any particular Tranche of Inflation-Linked Notes.

*Delay of Publication*

(i)     If any level of an Index for a month which is relevant to the calculation of a payment under the Notes (a *"Relevant Level"*) has not been published or announced by the day that is five Business Days prior to the next Interest Payment Date in respect of which it is required, or as the case may be, five Business Days prior to the date scheduled for redemption of the Notes, the Calculation Agent shall determine a Substitute Index Level by using the following methodology:

(I)     if applicable, the Calculation Agent will take the same action to determine the Substitute Index Level for the Interest Payment Date as that taken by the calculation agent pursuant to the terms and conditions of the Related Bond; or

(II)    if (I) above does not result in a Substitute Index Level for the Interest Payment Date, then the Calculation Agent shall determine the Substitute Index Level as follows:

81

Substitute Index Level = Base Level x (Latest Level/Reference Level)

Where:

"*Base Level*" means the level of the Index (excluding "flash estimates") published or announced by the Index Sponsor in respect of the month which is 12 calendar months prior to the month for which the Substitute Index Level is being determined.

"*Latest Level*" means the latest level of the Index (excluding "flash estimates") published or announced by the Index Sponsor prior to the month in respect of which the Substitute Index Level is being calculated.

"*Reference Level*" means the level of the Index (excluding "flash estimates") published or announced by the Index Sponsor in respect of the month that is 12 calendar months prior to the month referred to in "Latest Level" above.

(ii)  If a Relevant Level is published or announced at any time after the day that is five Business Days prior to the next Interest Payment Date in respect of which it is required or, as the case may be, five Business Days prior to the date scheduled for redemption of the Notes, such Relevant Level will not be used in any calculations. The Substitute Index Level so determined pursuant to paragraph (i) above will be the definitive level for that month.

*Cessation of Publication*

If a level for the Index has not been published or announced for two consecutive months or the Index Sponsor announces that it will no longer continue to publish or announce the Index then the Calculation Agent shall determine a Successor Index (in lieu of any previously applicable Index) for the purposes of the Notes by using the following methodology:

(i)  if at any time (other than after an Early Redemption Event has been designated by the Calculation Agent pursuant to (v) below) a successor index has been designated by the calculation agent pursuant to the terms and conditions of the Related Bond, such successor index shall be designated a "Successor Index" for the purposes of all subsequent payment dates in relation to the Notes, notwithstanding that any other Successor Index may previously have been determined under the other sub-paragraphs of this section; or

(ii)  if, a Successor Index has not been determined under sub-paragraph (i) above and there has been no designation of an Early Redemption Event by the Calculation Agent pursuant to (v) below and a notice has been given or an announcement has been made by an Index Sponsor, specifying that an Index will be superseded by a replacement Index specified by the Index Sponsor, and the Calculation Agent determines that such replacement index is calculated using the same or substantially similar formula or method of calculation as used in the calculation of the previously applicable Index, such replacement index shall be the Index for purposes of the Notes from the date that such replacement Index comes into effect; or

(iii)  if a Successor Index has not been designated by the Calculation Agent under sub-paragraph (i) or (ii) above and there has been no designation of an Early Redemption Event by the Calculation Agent pursuant to (v) below, the Calculation Agent shall ask five leading independent dealers to state what the replacement index for the Index should be. If between four and five responses are received, and of those four or five responses, three or more leading independent dealers state the same index, this index will be deemed the "Successor Index". If three responses are received, and two or more leading independent dealers state the same index, this index will be deemed the "Successor Index", otherwise, no "Successor Index" will be determined under this sub-paragraph (iii). If fewer than three responses are received, no "Successor Index" will be determined under this sub-paragraph and the Calculation Agent will proceed to sub-paragraph (iv) hereof; or

(iv)   if no Successor Index has been deemed under sub-paragraph (i), (ii) or (iii) by the fifth
Business Day prior to an Interest Payment Date or, as the case may be, by the fifth Business
Day prior to the date scheduled for redemption of the Notes the Calculation Agent will
determine an appropriate alternative index for such date, and such index will be deemed a
"Successor Index"; or

(v)   if the Calculation Agent determines that there is no appropriate alternative index (an "Early
Redemption Event"), the Notes will be redeemed at an amount calculated by the Calculation
Agent as the Final Redemption Amount of the Notes plus any interest accrued but unpaid less
any Unwind Costs. For the purposes of this sub-section, "Unwind Costs" means the value
(determined in the currency in which the Notes are denominated) of any transfer or stamp tax
cost, any early redemption or termination cost, if any, borne by the Issuer or Calculation Agent,
as determined by the Calculation Agent, in its sole and absolute discretion, in relation to any
swap agreement, financing arrangement or other hedging transaction entered into by, or on
behalf of, the Calculation Agent or the Issuer in relation to the issuance of the Notes.

*Rebasing of the Index*

If the Calculation Agent determines that the Index has been or will be rebased at any time, the Index
as so rebased (the *"Rebased Index"*) will be used for purposes of determining the level of an Index
from the date of such rebasing; provided, however, that the Calculation Agent shall make such
adjustments as are made by the calculation agent pursuant to the terms and conditions of the Related
Bond, if any, to the past levels of the Rebased Index so that the Rebased Index levels prior to the date
of rebasing reflect the same rate of inflation as the Index before it was rebased. If there is no Related
Bond, the Calculation Agent shall make adjustments to the past levels of the Rebased Index so that
the Rebased Index levels reflect the same rate of inflation as the Index before it was rebased. Any such
rebasing shall not affect any prior payments made under the Notes.

*Material Modification Prior to Interest Payment Date*

If, on or prior to the day that is five Business Days before the next Interest Payment Date in respect
of which it is required or, as the case may be, five Business Days prior to the date scheduled for
redemption of the Notes, the Index Sponsor announces that it will make a material change to an Index
then the Calculation Agent shall make any such adjustments to the Index consistent with the
adjustments made to the Related Bond, or, if there is no Related Bond, only those adjustments
necessary for the modified Index to continue as the Index.

*Manifest Error in Publication*

If, within 30 days of publication, the Calculation Agent determines that the Index Sponsor has
corrected the level of the Index to remedy a manifest error in its original publication, the Calculation
Agent will notify the Fiscal Agent and the Noteholders in accordance with the Terms and Conditions
of the Notes of (i) that correction and (ii) the amount that is payable as a result of that correction and
the Calculation Agent will take such other action as it may deem necessary to give effect to such
correction.

*Related Bond*

The Related Bond shall be a bond specified in the Final Terms or if no bond is specified as the Related
Bond therein, the Related Bond shall be the Fallback Bond. If the bond specified to be the Related
Bond redeems or matures during the term of the Notes, the Related Bond shall be the Fallback Bond.

*Fallback Bond*

The Fallback Bond will be a bond selected by the Calculation Agent and issued by the government of
the country to whose level of inflation the Index relates and which pays a coupon or redemption

amount which is calculated by reference to the Index, with a maturity date which falls on (a) the same day as the Maturity Date (b) the next longest maturity after the Maturity Date if there is no such bond maturing on the Maturity Date, or (c) the next shortest maturity before the Maturity Date if no bond defined in (a) or (b) is selected by Calculation Agent. If the Index relates to the level of inflation in the European Monetary Union, the Calculation Agent will select an inflation-linked bond that constitutes a debt obligation of one of the governments (but not any government agency) of France, Italy, Germany or Spain which pays a coupon or redemption amount which is calculated by reference to the level of inflation in the European Monetary Union. In each case, the Calculation Agent will select the Fallback Bond from those inflation-linked bonds issued on or before the Issue Date of the Notes. If there is more than one bond maturing on the same date, the Fallback Bond shall be selected by the Calculation Agent from those bonds. If the Fallback Bond redeems the Calculation Agent will select a new Fallback Bond on the same basis, but selected from all eligible bonds in issue at the time the original Fallback Bond redeems (including any bond for which the redeemed bond is exchanged).

### Determinations by the Calculation Agent

All determinations, calculations or valuations made by the Calculation Agent under or pursuant to the terms of the Notes shall be made in its sole and absolute discretion and the Calculation Agent shall be solely responsible for the determination and calculation of any and all determinations, calculations or valuations in accordance with the terms of the Notes. All such determinations, calculations or valuations made by the Calculation Agent shall be conclusive and binding. The Calculation Agent shall not be liable for any loss, liability, cost, claim, action, demand or expense (including without limitation, any costs, charges and expenses paid or incurred in disputing or defending any of the foregoing) arising out of or in relation to or in connection with its appointment or the exercise of this functions, except such as may result from its own wilful default, negligence or bad faith or that of its officers or agents.

Nothing contained herein shall prevent the Calculation Agent from dealing in these Notes or from entering into any related transactions, including without limitation any swap or hedging transactions, with the Issuer or any holder of Notes.

6.    **Payment Currency**

(a)    *Payment in Specified Currency*

Except as provided below or in the applicable Final Terms, payment of the principal of (including premium, if any, and in the case of a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) and interest, if any, on each Note will be made in the Specified Currency of such Note (or, if the Specified Currency at the time of such payment is no longer used by the government of the country issuing such currency or for the settlement of transactions by public institutions of or within the international banking community, in such other coin or currency of the country which issued the Specified Currency which at the time of payment is used by the government of the country issuing such currency and for the settlement of transactions by public institutions of or within the international banking community).

(b)    *Specified Currency Unavailable*

Except as provided in Condition 6(a) (Payment in Specified Currency), if the Specified Currency is unavailable due to the imposition of exchange controls or other circumstances beyond the control of the Issuer, or is no longer used by the government of the country which issued such currency or for the settlement of transactions by public institutions of or within the international banking community, such Issuer will be entitled to make such payments in such coin or currency of the United States as is at the time of payment legal tender for the payment of public and private debts on the basis of the most recently available Market Exchange Rate (defined below) for such Specified Currency preceding the day on which such payment is due. Any payment made under such circumstances in U.S. dollars will not constitute an Event of Default (as defined in Condition 10 (Events of Default)) under the Notes.

"*Market Exchange Rate*" means the noon buying rate in New York City for cable transfers in non-U.S. currencies as certified for customs purposes by the Federal Reserve Bank of New York for the applicable Specified Currency.

(c)    *Redenomination of Specified Currency*

In the event of an official redenomination of the Specified Currency the obligations of the Issuer to make payments in or with reference to such currency shall, in all cases, be deemed immediately following such redenomination to be obligations to make payments in or with reference to that amount of redenominated currency representing the amount of such currency immediately before such redenomination. Except to the extent the Notes provide for Index-Linked Interest or an Index-Linked Redemption Amount in the applicable Final Terms provide for the adjustment of the amount of principal or interest payable in respect of such Notes pursuant to application of the formulas provided for in the applicable Final Terms, no adjustment will be made to any amount payable under such Notes as a result of any change in the value of the Specified Currency thereof relative to any other currency due solely to fluctuations in exchange rates.

(d)    *Determinations Conclusive*

All determinations referred to in Conditions 6(b) (Specified Currency Unavailable) or 6(c) (Redenomination of Specified Currency) above made by the Fiscal Agent shall be at its sole discretion and shall, in the absence of manifest error, be conclusive for all purposes and binding on the Issuer and all Holders of Notes and any Coupons, Receipts or Talons relating thereto. Holders of Notes and any Coupons, Receipts or Talons relating thereto shall not be entitled to make any claim whatsoever against the Issuer on account of or in relation to such determinations regardless of any errors or omissions with respect thereto which may be made by the Fiscal Agent.

## 7.    Payment of Principal and Interest; Paying Agents

(a)    *Place of Payment*

No payment of principal (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) or interest, if any, in respect of any Note in bearer form (and any Notes in registered form issued by LBHI and having a maturity of 183 days or less) will be made at an office of LBHI, LBTCBV or LBB or any agent of LBHI, LBTCBV or LBB in the United States or by check mailed to any address in the United States or by transfer to an account maintained with a bank located in the United States, except as may be permitted by United States tax law in effect at the time of such payment without detriment to LBHI, LBTCBV or LBB. Notwithstanding the foregoing, such payments may be made in U.S. dollars at an office or agency located in the United States, if (but only if) the Specified Currency is the U.S. dollar and payment of the full amount so payable in U.S. dollars at each office of the Fiscal Agent and of each Paying Agent outside the United States appointed and maintained pursuant to the Fiscal Agency Agreement is illegal or effectively precluded by exchange controls or other similar restrictions and the relevant payment is permitted by applicable U.S. law. Any payment made under such circumstances will not constitute an Event of Default under the Notes. As used in this Condition 7 (Payment of Principal and Interest; Paying Agents), "United States" means the United States of America (including the States and the District of Columbia); and its possessions include Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, Wake Island and the Northern Mariana Islands.

(b)    *Payments on Global Notes*

The principal (including premium, if any, and in the case of a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) and interest, if any, due in respect of any portion of a temporary global Note in bearer form will be paid in immediately available funds to each of Euroclear and Clearstream, Luxembourg with respect to that portion of such temporary global Note held for its account but only upon receipt by the Fiscal Agent of written certification with respect to such portion

from Euroclear or Clearstream, Luxembourg, as the case may be, delivered prior to each such date in the form required by the Fiscal Agency Agreement, dated no earlier than such payment date, which certificate must be based on certifications provided to it by its account holders as to non-U.S. beneficial ownership of interests in such temporary global Note as required by U.S. Treasury regulations and as set forth in the Fiscal Agency Agreement. Payments of principal (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, due in respect of any portion of a permanent global Note in bearer form or a global Note in registered form will be made in immediately available funds to each of Euroclear and Clearstream, Luxembourg as is appropriate with respect to the portion of such permanent global Note or a global Note in registered form, as the case may be, held for its account without certification as aforesaid. Each of Euroclear and Clearstream, Luxembourg will undertake in such circumstances to credit any such amounts received by it to the respective accounts of the persons who are the owners of such interests on the date on which such amounts are paid. Any such amounts so received by Euroclear and Clearstream, Luxembourg and not so paid shall be returned to the Fiscal Agent immediately prior to the expiration of two years after the receipt thereof.

(c)    *Payments on Definitive Bearer Notes*

Any interest on definitive Notes in bearer form (and any Notes in registered form issued by LBHI and having a maturity of 183 days or less) of a Series shall be payable by check mailed to an address outside the United States or by wire transfer to an account maintained outside the United States upon surrender of any applicable Coupon; payment of instalments of principal (if any), shall be payable by check mailed to an address outside the United States or by wire transfer to an account maintained outside the United States upon surrender of the applicable Receipt and presentation of the Note to which such Receipt relates (without which presentation such Receipt shall not be valid); and principal (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) on definitive Notes in bearer form of such Series at their maturity shall be payable by check or by wire transfer upon surrender of such Notes, in each case at such offices or agencies of the Fiscal Agent or any Paying Agent outside the United States as LBHI, LBTCBV or LBB may from time to time designate, unless LBHI, LBTCBV or LBB shall have otherwise instructed the Fiscal Agent, or additionally or alternatively, in such other manner as may be set forth or provided for in the applicable Final Terms.

(d)    *Payments on Definitive Registered Notes*

Any interest (other than interest payable at maturity or upon redemption) on definitive Notes in registered form (other than any Notes in registered form issued by LBHI and having a maturity of 183 days or less) of a Series shall be payable by check or (if a Registered Holder shall have designated an account to which payment should be made at least 15 calendar days prior to the date on which payment is due) by wire transfer, to the Holders in whose name such definitive Notes are registered (*"Registered Holders"*) at the close of business on the 15th calendar day (whether or not a Business Day) preceding the date such interest is due and any principal (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, payable at maturity or upon redemption of definitive Notes in registered form of a Series shall be payable by check or (subject as aforesaid) by wire transfer upon surrender of such Notes, to the Registered Holders, in each case at such offices or agencies of any Paying Agent as LBHI, LBTCBV or LBB may from time to time designate, unless LBHI, LBTCBV or LBB shall have otherwise instructed the Registrar, or additionally or alternatively, in such other manner as may be set forth or provided for in the applicable Final Terms. If registered Notes (other than Australian Domestic Notes) are issued, a register will be maintained in accordance with the Fiscal Agency Agreement.

(e)    *Payments on Non-Business Days*

Subject to Condition 3(b)(i) (Interest Payment Dates), if any date for payment of any amount in respect of any Note, Receipt or Coupon is not a business day, then the payment to be made on such

date may be made on the next day which is a business day, with the same force and effect as if made on the due date. As used in this Condition 7(e) (*Payments on Non-Business Days*), the term "*business day*" means any day which is both a Business Day (as defined in Condition 3 (*Interest*)) and, in the case of any Note in bearer form, a day on which commercial banks and foreign exchange markets settle payments generally in the relevant place of presentation of such Note.

(f)     *Stamp Duties, Etc.*

LBHI, LBTCBV and LBB will pay all stamp and other duties, if any, which may be imposed by the United States, The Netherlands or the Federal Republic of Germany or any political subdivision or taxing authority thereof with respect to the execution and delivery of the Fiscal Agency Agreement or the issuance of the Notes.

(g)     *Exchange of Coupons and Talons*

On and after the Interest Payment Date on which the final Coupon on any Coupon sheet matures, the Talon (if any) forming part of such Coupon sheet may be surrendered at the specified office of the Fiscal Agent or any Paying Agent in exchange for a further Coupon sheet including (if such further Coupon sheet does not include Coupons to and including the final date for the payment of interest due in respect of the Note to which it appertains) a further Talon, subject to the provisions of Condition 17 (*Prescription*). Each Talon shall, for the purposes of these Terms and Conditions, be deemed to mature on the Interest Payment Date on which the final Coupon comprised in the related Coupon sheet matures.

(h)     *Fiscal Agent, Registrar and Paying Agents*

The names of the initial Fiscal Agent, Registrar and Paying Agents and their initial specified offices are set forth below. LBHI, LBTCBV and LBB have initially designated the Fiscal Agent, acting through its principal offices in London, as its Principal Paying Agent for the Notes in bearer form. The Paying Agent located in London is also referred to herein as the "Principal Paying Agent". LBHI, LBTCBV and LBB have covenanted that until the Notes of a Series have been delivered to the Fiscal Agent or the Registrar for cancellation, or monies sufficient to pay the principal (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, on the Notes of such Series will have been made available for payment and either paid or returned to the Issuer as provided in the Notes, there will at all times be (i) a Paying Agent in a Western European city, (ii) if and for so long as the Notes of any Series are listed on the Irish Stock Exchange and/or are admitted to trading and/or quotation by any other competent authority, stock exchange and/or quotation system, a Paying Agent with a specified office in Ireland and/or in such other place as may be required by the rules of such other competent authority, stock exchange and/or quotation system and (iii) a paying agent in an EU Member State that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000 or any law implementing or complying with, or introduced in order to conform to, such Directive. A notice of any change of the Fiscal Agent, Registrar, Principal Paying Agent or Paying Agents will be given to the Holders of the Notes in accordance with Condition 15 (*Notices*).

(i)     *Payments in respect of Australian Domestic Notes*

The Australian Registrar or, depending on the identity of the Australian Registrar, an administration agent appointed by LBTCBV or LBHI, as the case may be, ("*Australian Administration Agent*") will act (through an office in Sydney) as principal paying agent for the Australian Domestic Notes pursuant to an Agency and Registry Services Agreement (as amended, supplemented or replaced from time to time, the "*Agency and Registry Services Agreement*") to be entered into between LBTCBV or LBHI, as the case may be, the Australian Registrar and (depending on the identity of the Australian Registrar) the Australian Administration Agent as described in the applicable Final Terms. If required, the Australian Administration Agent will act as the agent of LBTCBV or LBHI, as the case may be, for

certain purposes pursuant to an Issuing and Payment Administration Agreement to be entered into between LBTCBV or LBHI, as the case may be, and the Australian Administration Agent (as amended, supplemented or replaced from time to time, the "*Issuing and Payment Administration Agreement*").

For the purposes of this Condition 7(i) (Payments in respect of Australian Domestic Notes), "*Business Day*" will have the meaning given to it in the relevant Agency and Registry Services Agreement.

Payments of principal and interest will be made in Sydney in Australian dollars to the persons registered at the close of business on the relevant Record Date (as defined below) as the Holders of such Australian Domestic Notes, subject in all cases to normal banking practice and all applicable laws and regulations. Payment will be made by check drawn on the Sydney branch of an Australian bank despatched by post on the relevant payment day at the risk of the Noteholder or, at the option of the Noteholder, in the case of principal or interest, by the Australian Registrar giving in Sydney irrevocable instructions for the effecting of a transfer of the relevant funds to an Australian dollar account in Australia specified by the Noteholder to the Australian Registrar, or in any other manner in Sydney which the Australian Registrar and the Noteholder agree.

In the case of payments made by electronic transfer, payments will for all purposes be taken to be made when the Australian Registrar gives irrevocable instructions in Sydney for the making of the relevant payment by electronic transfer, being instructions which would be reasonably expected to result, in the ordinary course of banking business, in the funds transferred reaching the account of the Noteholder and, in the case of accounts maintained in Australia, reaching the account on the same day as the day on which the instructions are given.

If a check posted or an electronic transfer for which irrevocable instructions have been given by the Australian Registrar is shown, to the satisfaction of the Australian Registrar, not to have reached the Noteholder and the Australian Registrar is able to recover the relevant funds, the Australian Registrar may make such other arrangements as it thinks fit for the effecting of the payment in Sydney.

Interest will be payable in the manner specified in Condition 3 (Interest) above, to the persons who are registered as Noteholders at the close of business in Sydney on the relevant Record Date and a check will be made payable to the Noteholder (or, in the case of joint Noteholders, to the first-named) and sent to his registered address, unless instructions to the contrary are given by the Noteholder (or, in the case of joint Noteholders, by all such Noteholders) in such form as may be prescribed by the Australian Registrar. Payment of principal will be made to, or to the order of, the persons who are registered as Noteholders at the close of business in Sydney on the relevant Record Date, subject, if so directed by the Australian Registrar, to receipt from them of such instructions as the Australian Registrar may require.

If any day for payment in respect of any Australian Domestic Note is not a Business Day, such payment shall not be made until the next following day which is a Business Day, and no further interest shall be paid in respect of the delay in such payment.

Payments will be subject in all cases to any fiscal or other laws and regulations applicable thereto. None of LBTCBV or LBHI, as the case may be, or the Australian Registrar shall be liable to any Holder or other person for any commissions, costs, losses or expenses in relation to or resulting from such payments.

In this Condition 7(i) (Payments in respect of Australian Domestic Notes), "*Record Date*" means, in the case of payments of principal or interest, the close of business in Sydney on the date falling 8 calendar days before each Interest Payment Date and the Maturity Date (as the case may be).

**8.**    **Repayment, Redemption and Repurchase**

(a)    *At Maturity*

Unless previously redeemed or purchased and cancelled as specified below, each Note will be redeemed by the Issuer at its Final Redemption Amount specified in, or determined in the manner specified in, the applicable Final Terms in the relevant Specified Currency (except as otherwise provided in Condition 6 (Payment Currency)). Unless otherwise specified in the applicable Final Terms, the Final Redemption Amount shall be 100% of the Aggregate Nominal Amount outstanding of each Note.

(b)    *Instalment Notes*

If the Notes are repayable in instalments, they will be repaid in the Instalment Amounts on the Instalment Dates specified in the applicable Final Terms.

(c)    *Redemption for Tax Reasons*

The Notes may be redeemed prior to their Maturity Date for tax reasons as provided in Condition 9 (Payments of Additional Amounts; Tax Redemption).

(d)    *Redemption at the Option of the Issuer*

If so specified in the applicable Final Terms, the Issuer may, having (unless otherwise specified in the applicable Final Terms) given not more than 60 nor less than 30 days' notice to the Holders of the Notes in accordance with Condition 15 (Notices) (which notice shall be irrevocable), redeem all or only some of the Notes then outstanding on any Optional Redemption Date and at the Optional Redemption Amount(s) specified in, or determined in the manner specified in, the applicable Final Terms together with accrued interest (if any) to the date fixed for redemption (which date, in the case of Floating Rate Notes or Index-Linked Interest Notes, must be an Interest Payment Date). If the Notes are to be redeemed in part only on any date in accordance with this Condition 8(d) (Redemption at the Option of the Issuer), the Notes to be redeemed shall be in an amount at least equal to the Minimum Redemption Amount and not greater than the Higher Redemption Amount (in each case as may be specified in the applicable Final Terms) and shall be selected by the drawing of lots in such place as the Fiscal Agent (or, if any such option is being exercised in respect of Notes in registered form, the Registrar) approves and in such manner as the Fiscal Agent (or, if any such option is being exercised in respect of Notes in registered form, the Registrar) considers appropriate, subject to compliance with applicable law and the rules of each competent authority, stock exchange and/or quotation system (if any) by which the Notes have then been admitted to listing, trading and/or quotation, and the notice to Noteholders referred to in this Condition 8(d) (Redemption at the Option of the Issuer) shall specify the serial numbers of the Notes so to be redeemed.

(e)    *Redemption at the Option of the Noteholders*

If and to the extent specified in the applicable Final Terms, upon the Holder of any Note giving to the Issuer in accordance with Condition 15 (Notices) not more than 60 nor less than 30 days' notice (unless otherwise specified in the applicable Final Terms), which notice shall be irrevocable, the Issuer will, upon the expiry of such notice, redeem subject to, and in accordance with, the terms specified in the applicable Final Terms in whole or in part such Note (and, if in part, in an amount at least equal to the Minimum Redemption Amount and not greater than the Higher Redemption Amount) on the Optional Redemption Date and at the Optional Redemption Amount specified in, or determined in the manner specified in, the applicable Final Terms together with accrued interest (if any) to the date fixed for redemption. In order to exercise the option contained in this Condition 8(e) (Redemption at the Option of the Noteholders), the Holder of a Note must, not more than 60 nor less than 30 days' (unless otherwise specified in the applicable Final Terms) before the date fixed for redemption, deposit with any Paying Agent such Note together with all unmatured Coupons and

Talons relating thereto and a duly completed Put Option Notice in the form obtainable from any Paying Agent. The Paying Agent with which a Note is so deposited shall deliver a duly completed Put Option Receipt to the depositing Noteholder. No Note, once deposited with a duly completed Put Option Notice in accordance with this Condition 8(e) (Redemption at the Option of the Noteholders), may be withdrawn; provided, however, that if, prior to the date fixed for redemption, any such Note becomes immediately due and payable or, upon due presentation of any such Note on the date fixed for redemption, payment of the redemption moneys is improperly withheld or refused, the relevant Paying Agent shall mail notification thereof to the depositing Noteholder at such address as may have been given by such Noteholder in the relevant Put Option Notice and shall hold such Note at its specified office for collection by the depositing Noteholder against surrender of the relevant Put Option Receipt. For so long as any outstanding Note is held by a Paying Agent in accordance with this Condition 8(e) (Redemption at the Option of the Noteholders), the depositor of such Note and not such Paying Agent shall be deemed to be the Holder of such Note for all purposes, *provided, however, that* for so long as any Notes are represented by a temporary or permanent global Note in bearer form, the Notes to be redeemed shall be selected in accordance with the rules and procedures of Euroclear and Clearstream, Luxembourg (to be reflected in the records of Euroclear and Clearstream, Luxembourg as either a pool factor or a reduction in principal amount, at their discretion).

(f)   *Early Redemption Amounts*

For the purposes of paragraph 8(c) (Redemption for Tax Reasons) above and Conditions 9 (Repayment of Additional Amounts; Tax Redemption) and 10 (Events of Default), the Notes will be redeemed at an amount (the "*Early Redemption Amount*") calculated as follows (unless otherwise specified in the applicable Final Terms):

(i)   in the case of Notes with a Final Redemption Amount equal to the Issue Price, at the Final Redemption Amount thereof;

(ii)  in the case of Notes with a Final Redemption Amount which is or may be less or greater than the Issue Price, or which is payable in a Specified Currency other than that in which the Notes are denominated, at the amount set out in, or determined in the manner set out in, the applicable Final Terms or, if no such amount or manner is set out in the Final Terms, at their principal amount; or

(iii) in the case of Zero Coupon Notes, at their Accrual Yield Amount.

(g)   *Purchases*

The Issuer or any of its subsidiaries or affiliates may at any time purchase Notes (provided that, in the case of definitive Notes in bearer form, all unmatured Receipts and Coupons appertaining thereto are surrendered therewith) in the open market or by tender at any price. Notes purchased as aforesaid may, at the option of the purchaser thereof, be held, resold or surrendered for cancellation.

(h)   *Cancellation*

All Notes redeemed in full by the Issuer will be cancelled forthwith (together with all unmatured Receipts and Coupons surrendered therewith or attached thereto) and may not be reissued or resold.

(i)   *Procedure for Payment upon Redemption*

If notice of redemption has been given in the manner set forth herein, the Notes of a Series to be redeemed shall become due and payable on the redemption date specified in such notice and upon presentation and surrender of the Notes at the place or places specified in such notice, together with all appurtenant Coupons and Talons, if any, maturing subsequent to the redemption date, the Notes shall be paid and redeemed by the Issuer thereof at the places and in the manner and currency therein specified and at the redemption price therein specified together with accrued interest, if any, to the redemption date. If any Fixed Rate Note (other than an Index-Linked Redemption Amount Note or a

Dual Currency Note) surrendered for redemption shall not be accompanied by all appurtenant Coupons, if any, maturing after the redemption date (which expression shall include Coupons which are to be issued on exchange of Talons which will have matured on or before the relevant redemption date), such Note may be paid after deducting from the amount otherwise payable an amount equal to the face amount of all such missing Coupons (or, in the case of payment not being made in full, that proportion of the full amount of such missing unmatured Coupons which the sum so paid bears to the total amount due) or the surrender of such missing Coupon or Coupons may be waived by the Issuer, the Guarantor, if applicable, and the Fiscal Agent if they are furnished with such security or indemnity as they may require to save each of them and each other paying agent of the Issuer and, if applicable, the Guarantor harmless. If a deduction is made from the redemption price in the case of any such missing Coupon and thereafter, but prior to five years after the redemption date, the bearer of such Coupon shall surrender such Coupon at a place specified for redemption, such bearer shall be entitled to receive the amount so deducted with respect to such Coupon. Upon any Fixed Rate Note becoming due and payable prior to its Maturity Date, all unmatured Talons, if any, appertaining thereto and maturing on or after such due date will become void and no further Coupons will be issued in respect thereof. Any unmatured Coupons and Talons, whether attached to or missing from any Floating Rate Note, Dual Currency Note or Index-Linked Note surrendered for redemption, will become void at the redemption date for such Note. From and after the redemption date, if monies for the redemption of Notes called for redemption shall have been made available at the corporate trust office of the Fiscal Agent for redemption on the redemption date, the Notes called for redemption shall cease to bear interest (and in the case of Zero Coupon Notes, cease to increase the Accrual Yield Amount payable in respect thereof), and the only right of the Holders of such Notes shall be to receive payment of the redemption price together with accrued interest, if any, to the redemption date as aforesaid.

9.    **Payment of Additional Amounts; Tax Redemption**

(a)    *Additional Amounts*

The Issuer or the Guarantor, as the case may be, will pay, subject to certain exceptions set forth below and to the right of redemption as provided in Condition 9(b) (Tax Redemption) below, to a Holder of a Note, Coupon or Receipt such additional amounts ("*Additional Amounts*") as may be necessary in order that every net payment of the principal (including premium, if any, and in the case of a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) and interest, if any, on any Note, Coupon or Receipt appertaining thereto, after deduction or withholding for or on account of any present or future tax, assessment or other governmental charge imposed upon such Holder, or by reason of the making of such payments, by the country in which such Issuer or the Guarantor (as the case may be) is organized or in which such payments are regarded as being sourced, or any taxing authority thereof or therein, will not be less than the amount provided for in such Note, such Coupon or in such Receipt to be then due and payable. Neither the Issuer nor the Guarantor, as the case may be, shall be required, however, to make any payment for any Additional Amounts for or on account of:

(i)    any tax, assessment or other governmental charge which would not have been imposed but for (A) the existence of any present or former connection between such Holder (or between a fiduciary, settlor, beneficiary of, member or shareholder of, or possessor of a power over, such Holder, if such Holder is an estate, trust, partnership or corporation) and the jurisdiction in which such Issuer or the Guarantor, as the case may be, is organized or in which such payments are regarded as being sourced, including, without limitation, such Holder (or such fiduciary, settlor, beneficiary, member, shareholder or possessor) being or having been a citizen or resident or treated as a resident thereof or being or having been engaged in trade or business or present therein, or having or having had a permanent establishment therein or (B) the presentation of a Note or any Coupon or Receipt appertaining thereto for payment on a date more than 10 days after the Relevant Date (as defined below);

(ii)    any estate, inheritance, gift, sales, transfer, excise, personal property or similar tax, assessment or other governmental charge;

91

(iii) in the case of any tax imposed by the United States, any tax, assessment or other governmental charge imposed by reason of such Holder's past or present status as a passive foreign investment company, a controlled foreign corporation, a personal holding company or foreign personal holding company with respect to the United States, as a private foundation or other tax exempt organization for United States federal income tax purposes, or as a corporation which accumulates earnings to avoid United States federal income tax;

(iv) any tax, assessment or other governmental charge which is payable otherwise than by withholding from payment of principal of, or interest on, such Note, Coupon or Receipt;

(v) any tax, assessment or other governmental charge required to be withheld by any Paying Agent from any payment of principal of, or interest on, any Note, Coupon or Receipt (A) if such payment can be made without withholding by any other Paying Agent or (B) in the case of any tax imposed by the United Kingdom, which is presented for payment in the United Kingdom;

(vi) any tax, assessment or other governmental charge which would not have been imposed but for the failure to comply with certification, information, documentation or other reporting requirements concerning the nationality, residence, identity or connections with the relevant tax authority of the Holder or beneficial owner of such Note, Coupon or Receipt, if such compliance is required by statute or by regulation as a precondition to relief or exemption from such tax, assessment or other governmental charge;

(vii) in the case of any tax imposed by the United States, any tax, assessment or other governmental charge imposed on (A) interest received by a Holder or beneficial owner of a Note, Coupon or Receipt that is a 10% shareholder (as defined in Section 871 (b) (3) (B) of the United States Internal Revenue Code of 1986, as amended (the "*Code*"), and the regulations that may be promulgated thereunder) of LBHI or (B) interest that is treated as contingent interest described in Section 871(h)(4) of the Code;

(viii) any withholding or deduction imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2000 on the taxation of savings income;

(ix) a Noteholder, Receiptholder or Couponholder who would have been able to avoid such withholding or deduction by presenting the relevant Note, Receipt or Coupon to, or arranging to receive payment through, another Paying Agent in a Member State of the EU, or

(x) any combination of items (i) through (ix);

nor shall any Additional Amounts be paid to any Holder who is a fiduciary or partnership or other than the sole beneficial owner of such Note, Coupon or Receipt appertaining thereto to the extent that a beneficiary or settlor with respect to such fiduciary, or a member of such partnership or a beneficial owner thereof would not have been entitled to the payment of such Additional Amounts had such beneficiary, settlor, member or beneficial owner been the Holder of the Note or any Coupon or Receipt appertaining thereto.

The term "*Relevant Date*" means either (i) the date on which such payment first becomes due or (ii) if the full amount of the moneys payable has not been received by the Fiscal Agent on or prior to such due date, the date on which all moneys then due for payment shall have been so received and notice to that effect shall have been duly given to the Noteholders in accordance with Condition 15 (Notices).

(b)    *Tax Redemption*

Subject to the conditions described below, the Notes of any Series may be redeemed, as a whole but not in part, at the option of the Issuer (or, in the case of LBTCBV Notes and LBB Notes, at the option of the Guarantor), upon not more than 60 days' nor less than 30 days' prior notice (given in accordance with Condition 15 (Notices)) to the Holders thereof at a redemption price equal to the Early

Redemption Amount (as defined in Condition 8(f) (Early Redemption Amount)), together with interest accrued, if any, to but excluding the date fixed for redemption (which date, in the case of Floating Rate Notes or Index-Linked Interest Notes, must be an Interest Payment Date), if on the next succeeding Interest Payment Date the Issuer (or, in the case of LBTCBV Notes and LBB Notes, in the case of any payment by the Guarantor pursuant to the Guarantee, the Guarantor) determines that, as a result of any change in or amendment to the laws or treaties, or any regulations or rulings promulgated thereunder, of the country in which the Issuer or the Guarantor, as the case may be, is organized affecting taxation, or any proposed change in such laws, treaties, regulations or rulings, or any change in the official application, enforcement or interpretation of such laws, treaties, regulations or rulings (including a holding by a court of competent jurisdiction in the country in which the Issuer or the Guarantor, as the case may be, is organized affecting taxation) which change or amendment becomes effective or is proposed on or after the Issue Date of the first Tranche of Notes of that Series, or any other action predicated on such amendment or change taken by any taxing authority or court of competent jurisdiction in the country in which the Issuer or the Guarantor, as the case may be, is organized or the official proposal of such action, whether or not such action or proposal was taken or made with respect to the Issuer or the Guarantor, the Issuer or the Guarantor, as the case may be, has or will or, if the Guarantees were called, would become obligated to pay Additional Amounts on any Note, Coupon or Receipt and such obligation cannot be avoided by the Issuer or the Guarantor, as the case may be, by any reasonable measures available to it which (in the good faith opinion of the Issuer or the Guarantor, as the case may be) will not have a material adverse impact on the conduct of its business; provided that the Notes of any Series may not be so redeemed if, as of the date of an assumption of the obligations of LBTCBV or LBB (as applicable) under the Notes and under the Fiscal Agency Agreement and each Calculation Agency Agreement by any wholly-owned subsidiary of LBHI, such obligation to pay Additional Amounts arises because of the official application or interpretation of the laws or regulations affecting taxation in the country of which such wholly-owned subsidiary is organized. If the relevant Issuer or the Guarantor, as the case may be, provides an opinion of independent counsel licensed to practice law in the appropriate jurisdiction, dated as of the date of such assumption, that no obligation to pay Additional Amounts arises, then that opinion shall be final and binding, solely for purposes of this paragraph, on such Issuer, the Guarantor, the Fiscal Agent, the Registrar and the Holders of the Notes of such Series as to the law of the relevant jurisdiction at the date of such opinion.

Prior to the giving of any notice of redemption pursuant to the preceding paragraph, the Issuer shall deliver to the Fiscal Agent (and, if an option is being exercised in respect of Notes in registered form, the Registrar) (i) a certificate stating that the Issuer is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of the Issuer to so redeem have occurred and (ii) an opinion of counsel to such effect based upon such statement of facts.

In addition, no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Issuer or the Guarantor, as the case may be, would be obligated to pay Additional Amounts were a payment in respect of the Notes (or the Guarantees, as the case may be) then due.

If the Issuer (or, in the case of payments made by the Guarantor pursuant to the Guarantee, the Guarantor) determines that any payment made outside the United States by the Issuer or the Guarantor, as the case may be, or any of their paying agents of principal, interest, original issue discount or premium due in respect of any Note in bearer form, Coupon or Receipt would be, under any present or future laws or regulations of the United States, subject to any certification, information or other reporting requirement of any kind, the effect of which requirement is the disclosure to the Issuer or the Guarantor, as the case may be, any paying agent or any governmental authority of the nationality, residence or identity of a beneficial owner of such Note, Coupon or Receipt who is a United States Alien (other than such a requirement (i) that would not be applicable to a payment made by the Issuer or the Guarantor, as the case may be, or any of their paying agents (A) directly to the beneficial owner or (B) to a custodian, nominee or other agent of the beneficial owner, or (ii) that can be satisfied by such custodian, nominee or other agent certifying to the effect that such beneficial owner is a United States Alien, or (iii) that would not be applicable in the case of payment made by any other paying agent, provided that in each case referred to in clauses (i) (B) and (ii) payment by

such custodian, nominee or agent to such beneficial owner is not otherwise subject to any such requirement), the Issuer at its election will either (X) redeem the Notes, in whole, at a redemption price equal to the Early Redemption Amount, together with interest accrued, if any, to but excluding the date fixed for redemption, or (Y) if and so long as the conditions of the next succeeding paragraph are satisfied, pay the Additional Amounts specified in such paragraph; provided that if any Holder fails to present its Note, together with all appurtenant Coupons, Receipts and Talons, if any, for redemption specified in clause (X) above, such Holder will not be entitled to any Additional Amounts. The Issuer will make such determination and such election and notify the Fiscal Agent (and, if an option is being exercised in respect of Notes in registered form, the Registrar) as soon as practicable, and the Fiscal Agent (or, if an option is being exercised in respect of Notes in registered form, the Registrar) will promptly give notice thereof (the "*Determination Notice*"), stating the effective date of such certification, information or other reporting requirement, whether the Issuer has elected to redeem the Notes or to pay the Additional Amounts specified in the next succeeding paragraph, and (if applicable) the last date by which the redemption of the Notes must take place. If the Issuer elects to redeem the Notes, such redemption will take place on such date, not later than one year after the publication of the Determination Notice, as the Issuer elects by notice to the Fiscal Agent (and, if an option is being exercised in respect of Notes in registered form, the Registrar) at least 60 days before the redemption date, unless shorter notice is acceptable to the Fiscal Agent. Notwithstanding the foregoing, the Issuer will not so redeem the Notes if the Issuer subsequently determines, not less than 30 days prior to the redemption date, that subsequent payments would not be subject to any such requirement, in which case the Issuer will notify the Fiscal Agent (and, if an option is being exercised in respect of Notes in registered form, the Registrar) which will give prompt notice of such determination and any earlier redemption notice will be revoked and will have no further effect. If the Issuer elects as provided in clause (Y) above to pay Additional Amounts, and as long as the Issuer is obligated to pay such Additional Amounts, the Issuer may subsequently redeem the Notes, at any time, as a whole but not in part, at a redemption price equal to the Early Redemption Amount, together with interest accrued, if any, to but excluding the date fixed for redemption, but without reduction for United States withholding taxes discussed in this paragraph. The term "*United States Alien*" means any person that is, as to the United States, a foreign corporation, a non-resident alien individual, a non-resident alien fiduciary of a foreign estate or trust or a foreign partnership one or more of the members of which is, as to the United States, a foreign corporation, a non-resident alien individual or a non-resident alien fiduciary of a foreign estate or trust.

If and so long as certification, information or other reporting requirements referred to in the immediately preceding paragraph would be fully satisfied by payment of a backup withholding tax or similar charge, the Issuer may elect (or the Guarantor may cause the Issuer to elect, as the case may be), by so stating in the Determination Notice, to have the provisions of this paragraph apply in lieu of the provisions of the preceding paragraph. In such event, the Issuer or the Guarantor, as the case may be, will pay Additional Amounts to Holders who are United States Aliens, provided that the backup withholding tax or similar charge is not a charge which:

(i)     would not be applicable to a payment made to a custodian, nominee or other agent of the beneficial owner or which can be satisfied by such a custodian, nominee or other agent certifying to the effect that such beneficial owner is a United States Alien; provided, however, in each case that payment by such custodian, nominee or agent to such beneficial owner is not otherwise subject to any requirement referred to in this paragraph;

(ii)    is applicable only to payment by a custodian, nominee or other agent of the beneficial owner to such beneficial owner;

(iii)   would not be applicable to a payment made by any other paying agent;

(iv)    is imposed as a result of the fact that the Issuer or the Guarantor, as the case may be, or any paying agent has actual knowledge that the beneficial owner of such Note, Coupon or Receipt is a U.S. person; or

(v)     is imposed as a result of presentation of such Note, Receipt or Coupon for payment more than 10 days after the date on which such payment becomes due and payable or on which payment thereof is duly provided for, whichever occurs later.

## 10.   Events of Default

(a)   *Events of Default*

An *"Event of Default"* with respect to any Note of a particular Series shall mean any one or more of the following:

(i)     default in the payment of any interest or Additional Amounts, if any, upon any Note of that Series and any related Coupon when it becomes due and payable, and continuance of such default for a period of 30 days;

(ii)    default in the payment of the principal of (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount thereof) any Note of that Series when it becomes due and payable;

(iii)   default in the making or satisfaction of any sinking fund payment or analogous obligation when the same becomes due and payable by the terms of any Note of that Series, and continuance of such default for a period of 30 days;

(iv)    default in the observance or performance, or breach, of any other material covenants or agreements of the Issuer (or, if applicable, the Guarantor) in respect of the Notes of that Series contained in the Fiscal Agency Agreement or such Notes (other than a covenant or warranty in respect of the Notes of such Series, a default in the performance of which or the breach of which is elsewhere in this section specifically dealt with or which has expressly been included in the Fiscal Agency Agreement or such Notes solely for the benefit of Series of Notes other than that Series), and continuance of such default or breach for a period of 90 days after there has been given, by registered or certified mail, to (A) the Issuer (and LBHI, if LBTCBV or LBB is the Issuer) or, if applicable, the Guarantor and (B) the Fiscal Agent (or, in the case of Notes in registered form, the Registrar) by the Holders of at least 25% in principal amount of the Outstanding (as defined in Condition 12 (Meetings and Amendments)) Notes of that Series a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a *"Notice of Default"*;

(v)     the entry by a court having jurisdiction in the premises of (A) a decree or order for relief in respect of LBHI in an involuntary case or proceeding under any applicable U.S. federal or state bankruptcy, insolvency, reorganization or other similar law or (B) a decree or order adjudging LBHI bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of LBHI under any applicable U.S. federal or state law, or appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of LBHI or of any substantial part of its property, or ordering the winding-up or liquidation of its affairs, and the continuance of any such decree or order for relief of any such other decree or order unstayed and in effect for a period of 60 consecutive days;

(vi)    the commencement by LBHI of a voluntary case or proceeding under any applicable U.S. federal or state bankruptcy, insolvency, reorganization or other similar law or of any other case or proceeding to be adjudicated bankrupt or insolvent, or the consent by it to the entry of a decree or order for relief in respect of it in an involuntary case or proceeding under any applicable U.S. federal or state bankruptcy, insolvency, reorganization or other similar law or to the commencement of any bankruptcy or insolvency case or proceeding against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under any applicable U.S. federal or state law, or the consent by it to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee,

sequestrator or similar official of LBHI or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due, or the taking of corporate action by LBHI in furtherance of any such action;

(vii)    except as provided in Condition 13 (Assumption of Obligations) hereof, any of the Guarantees shall cease to be in full force or effect, or LBHI shall deny or disaffirm any of its obligations under any of the Guarantees;

(viii)    in the case of LBTCBV Notes, if LBTCBV applies for suspension of payment ("*surséance van betaling*") or is declared bankrupt ("*faillet verklaard*"), in both cases within the meaning of the Netherlands Bankruptcy Act ("*Faillissementswet*"), or becomes subject to analogous proceedings under the Netherlands Financial Market Supervision Act (*Wet op het financieel toezicht, the "WFT"*), or is unable to pay or shall admit in writing its inability to pay, or shall threaten to stop or suspend payment of, its debts as they fall due or shall otherwise become insolvent or applies for or consents to or suffers the appointment of an administrator, liquidator or receiver of LBTCBV or of the whole or any substantial part of the undertaking, property, assets or revenues of LBTCBV or takes any proceeding under any law for a readjustment or deferment of its obligations or any substantial part of them or makes or enters into a general assignment or an arrangement or composition with or for the benefit of its creditors, or ceases or threatens to cease to carry on all or any substantial part of its business or is wound up;

(ix)    in the case of LBB Notes, if (aa) LBB stops payments or announces that it is not in a position to meet its financial obligations; (bb) bankruptcy, composition or any insolvency proceedings are instituted against LBB which shall not have been dismissed or stayed within 60 days after institution; (cc) LBB applies for institution of such proceedings, or LBB offers or makes an arrangement for the benefit of its creditors generally, due to financial difficulties; or (dd) LBB ceases or through an official action of the Board of Directors of LBB threatens to cease to carry on business, in any case otherwise than in connection with a Reorganisation (as defined below); or

(x)    In the case of LBHI Subordinated Notes, other than as specified in Conditions 10(a)(v) and 10(a)(vi) no event or circumstance described in Conditions 10(a)(i) to 10(a)(ix) shall constitute an "*Event of Default*".

For the purposes of these Terms and Conditions, "*Reorganisation*" means a consolidation, amalgamation, merger or reorganisation of LBB with another company, and

(A)    the terms of the Reorganisation provide that:

      &minus;    the obligations of LBB under the Notes (the "*Predecessor*") are assumed by a successor company of the Predecessor which succeeds to the rights and assets of the Predecessor substantially proportionate to the liabilities of the Predecessor, and

      &minus;    such successor company does not assume any other substantial obligations or liabilities unless other rights and assets are transferred to it in approximately the same proportion as described above, and

(B)    the Reorganisation does not have any material adverse effect on the Holders or 10 per cent. or more of them.

(b)    *Automatic Rescission in Certain Circumstances*

So long as no other Event of Default has then occurred and is continuing or would result therefrom, if an Event of Default specified in paragraph (viii) shall have occurred, said Event of Default shall automatically be deemed rescinded and annulled if LBHI shall have assumed the obligations of LBTCBV or LBB (as applicable) under such Notes as referred to under Condition 13 (Assumption of Obligations) below within 30 days of the occurrence of such Event of Default.

96

(c)    *Remedies; Rescission; Waiver*

If an Event of Default with respect to Notes of any Series and any related Coupons or Receipts at the time Outstanding occurs and is continuing, then in every such case, unless the principal of all of the Notes of such Series shall have already become due and payable, the Holders of at least 25% in principal amount of the Outstanding Notes of that Series may declare the principal amount (or, if the Notes of that Series are Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) of all of the Notes of that Series to be due and payable immediately at their Early Redemption Amount, by a notice in writing to the Issuer and, if applicable, the Guarantor, and upon any such declaration such Early Redemption Amount, together with the premium, if any, accrued and unpaid interest, if any, and Additional Amounts, if any, shall become immediately due and payable.

At any time after such a declaration of acceleration with respect to Notes of any Series has been made and before a judgment or decree for payment of the money due has been obtained, the Holders of at least a majority in principal amount of Outstanding Notes of that Series, by written notice to the Issuer and, if applicable, the Guarantor, and the Fiscal Agent (or, in the case of Notes in registered form, the Registrar), may rescind and annul such declaration and its consequences if (i) the Issuer or, if applicable, the Guarantor, has paid or deposited with the Fiscal Agent a sum sufficient to pay in the Specified Currency in which the Notes of such Series are payable: (A) all overdue interest, if any, on all Notes of that Series and any related Coupons and (B) the principal of (and premium, if any, on, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) any Notes of that Series which have become due otherwise than by such declaration of acceleration and interest thereon at the Fixed Rate of Interest, Rate of Interest or Accrual Yield, as the case may be, applicable to that Series; and (ii) all Events of Default with respect to Notes of that Series, other than the non-payment of the principal of Notes of that Series, which have become due solely by such declaration of acceleration, have been cured or waived as provided below. No such rescission shall affect any subsequent default or impair any right consequent thereon.

The Holders of at least a majority in principal amount of the Outstanding Notes of any Series and any related Coupons or Receipts may on behalf of the Holders of all the Notes of such Series waive any past default hereunder with respect to such Series and its consequences, except a default (i) in the payment of the principal of (or premium, if any, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) or interest, if any, on any Note of such Series, or in the payment of any sinking fund instalment or analogous obligation with respect to the Notes of such Series, or (ii) in respect of a covenant or provision hereof which as described under Condition 12(e) (Amendments Requiring Extraordinary Resolution of Noteholders) below cannot be modified or amended without the passing of an Extraordinary Resolution (as hereafter defined) by the Holders of the Outstanding Notes of such Series affected. Upon any such waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of the Fiscal Agency Agreement and the Notes of such Series, but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

**11.    Negative Pledge with respect to Senior Notes**

Except as may be otherwise provided in the Notes of a Series and in the applicable Final Terms, so long as any Senior Note remains Outstanding and unpaid, LBHI will not, and will not permit any Designated Subsidiary (as defined below) to, directly or indirectly, create, issue, assume, incur or guarantee any indebtedness for money borrowed which is secured by a mortgage, pledge, lien, security interest or other encumbrance of any nature on any of the present or future common stock of a Designated Subsidiary unless the Senior Guarantees and the Senior Notes issued by LBHI (and, if LBHI so elects, any other indebtedness of LBHI ranking at least pari passu with the Senior Guarantees and such Senior Notes) shall be secured equally and rateably with (or prior to) such other secured indebtedness for money borrowed so long as it is outstanding. As used herein, the following terms shall have the following meanings: "*Consolidated Net Worth*" means consolidated assets minus consolidated liabilities as calculated in accordance with generally accepted accounting principles in effect in the United States from time to time; "*Designated Subsidiary*" means any present or future consolidated Subsidiary the Consolidated Net Worth of which constitutes at least

5% of the Consolidated Net Worth of LBHI; and *"Subsidiary"* means a corporation more than 50% of the outstanding voting stock of which is owned, directly or indirectly, by LBHI or by one or more other Subsidiaries, or by LBHI and one or more other Subsidiaries. For the purposes of this definition, *"voting stock"* means stock which ordinarily has voting power for the election of directors, whether at all times or only as long as no senior class of stock has such voting power by reason of any contingency.

12.  **Meetings and Amendments**

(a)  *Meetings*

A meeting of Holders of Notes of one or more Series may be called at any time and from time to time by the Issuer to make, give or take any request, demand, authorization, direction, notice, consent, waiver or other action provided by the Fiscal Agency Agreement or the Notes of such Series to be made, given or taken by Holders of Notes of such Series or to modify, amend or supplement the terms of the Notes of such Series or the Fiscal Agency Agreement as hereinafter provided. The Fiscal Agent (or, in the case of Notes in registered form, the Registrar) may at any time, and shall upon the request of the Issuer, call a meeting of Holders of Notes of one or more Series for any such purpose to be held at such time and at such place as the Issuer (and LBHI, if LBTCBV or LBB is the Issuer) shall determine. Notice of every meeting of Holders of Notes of a Series, setting forth the time and the place of such meeting and in general terms the action proposed to be taken at such meeting, shall be given as specified in Condition 15 (Notices) not less than 30 nor more than 60 days' prior to the date fixed for the meeting. In case at any time the Holders of at least 10% in aggregate principal amount of the Outstanding Notes of a Series shall have requested the Issuer to call a meeting of the Holders of Notes of such Series to make, give or take any request, demand, authorization, direction, notice, consent, waiver or other action provided by the Fiscal Agency Agreement or the Notes of such Series, by written request setting forth in reasonable detail the action proposed to be taken at the meeting, the Issuer shall call such meeting for such purposes by giving notice thereof.

(b)  *Quorum Requirements*

To be entitled to vote at any meeting of Holders of Notes of a Series, a person shall be (i) a Holder of Outstanding Notes of such Series or (ii) a person appointed by an instrument in writing as proxy for a Holder or Holders of Outstanding Notes of such Series by such Holder or Holders, which proxy need not be a Holder of Notes. The persons entitled to vote 10% in aggregate principal amount of the Outstanding Notes which may be affected by the action to be taken at such meeting, except as hereinafter provided, shall constitute a quorum for the transaction of all business referred to in the preceding paragraph. No business shall be transacted in the absence of a quorum unless a quorum is represented when the meeting is called to order. In the absence of a quorum within 30 minutes of the time appointed for any such meeting, the meeting shall, if convened at the request of the Holders of Notes (as provided above), be dissolved. In any other case the meeting may be adjourned for a period of not less than 10 days as determined by the chairman of the meeting prior to the adjournment of such meeting. In the absence of a quorum at any such adjourned meeting, such adjourned meeting may be further adjourned for a period of not less than 10 days as determined by the chairman of the meeting prior to the adjournment of such meeting. Notice of the reconvening of any adjourned meeting shall be given as provided in Condition 15 (Notices) except that notice must be given not less than five days prior to the date on which the meeting is scheduled to be reconvened. Subject to the foregoing, at the reconvening of any meeting adjourned for a lack of a quorum two or more persons who are present in person holding Notes which may be affected by the action to be taken at such meeting or who have been appointed by an instrument in writing as proxy for a Holder of such Notes by such Holder, which proxy need not be a Holder of Notes, shall constitute a quorum for the taking of any action set forth in the notice of the original meeting. Notice of the reconvening of such an adjourned meeting shall state expressly the quorum requirements for any such reconvened meeting. Any Holder of a Note who has executed an instrument in writing appointing a person as his proxy shall be deemed to be present for the purposes of determining a quorum and be deemed to have voted; provided that such Holder shall be counted as present or voting only with respect to the matters

covered by such instrument in writing (which may include authorization to vote on any other matters as may come before the meeting).

(c)     *Regulations for Meetings*

The Fiscal Agent (or, in the case of a Series of Notes in registered form, the Registrar) may make such reasonable and customary regulations as it shall deem advisable for any meeting of Holders of Notes of any Series with respect to the proof of the holding of Notes of such Series, the adjournment and chairmanship of such meeting, the appointment and duties of inspectors of votes, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall deem appropriate.

(d)     *Certain Amendments*

Any meeting of Holders of Notes at which a quorum is present may be adjourned from time to time by a vote of more than 50% in aggregate principal amount of the Outstanding Notes represented at the meeting, and the meeting may be held as so adjourned without further notice. Except as provided in paragraphs 12(e) (Amendments Requiring Extraordinary Resolution of Noteholders) and 12(f) (Amendments without the Consent of Noteholders), any modifications, amendments or waivers to the Fiscal Agency Agreement or the terms and conditions of the Notes of a Series shall require (i) the consent of the Issuer (and LBHI, if LBTCBV or LBB is the Issuer) and (ii) (A) the written consent of Holders of more than 50% in aggregate principal amount of the Outstanding Notes of such Series or (B) the approval of more than 50% of the aggregate principal amount of such Notes represented at a meeting of the Holders of Notes of such Series called in accordance with the provisions set forth above; provided that any such modification, amendment or waiver which affects the Outstanding Notes of more than one Series (as determined by the relevant Issuer (and LBHI, if LBTCBV or LBB is the Issuer)) shall require (X) the written consent of Holders of more than 50% in aggregate principal amount of the Outstanding Notes affected thereby or (Y) the approval of more than 50% of the aggregate principal amount of such Notes represented at such meeting of the Holders of Notes. Except as otherwise provided in paragraph 12(e) (Amendments Requiring Extraordinary Resolution of Noteholders), any such modification, amendment or waiver shall be conclusive and binding on all Holders of Notes, whether or not they have given such consent or were present at such meeting and whether or not notation of such modification, amendment or waiver is made upon the Notes, and on all future Holders of Notes. Any instrument given by or on behalf of any Holder of a Note in connection with any consent to any such modification, amendment or waiver shall be irrevocable once given and shall be conclusive and binding on all subsequent Holders of such Note.

(e)     *Amendments Requiring Extraordinary Resolution of Noteholders*

Notwithstanding the foregoing, no action at any meeting of Holders of Notes, and no modification, amendment, or supplement to the Notes, the Fiscal Agency Agreement or the Guarantees, may (i) change the due date for the payment of the principal of (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) or any instalment of interest, if any, on any Note of such Series, (ii) reduce the principal amount of (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) any Note of such Series, the portion of such principal amount which is payable upon acceleration of the maturity of such Note, the interest rate thereon or the premium payable upon redemption thereof, (iii) change the obligation of the Issuer or the Guarantor, as the case may be, to pay Additional Amounts on any Note of such Series, (iv) except as provided in Conditions 13 (Assumption of Obligations) and 14 (Merger or Consolidation of the Issuer or the Guarantor), modify the obligation of the Guarantor to make payment under the Guarantees, (v) change the Specified Currency in which or the required places at which payment with respect to principal (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) or interest, if any, in respect of Notes of such Series or the Guarantees related thereto is payable, (vi) impair the right to institute suit for the enforcement of any such payment on or with respect to any Note of such Series or any Coupon

or Receipt or the Guarantee, as the case may be, related thereto, (vii) amend the procedures provided for or the circumstances under which the Notes of such Series may be redeemed, (viii) reduce the proportion of the principal amount of Notes of such Series the consent of the Holders of which is necessary to modify or amend the Fiscal Agency Agreement or the terms and conditions of the Notes of such Series or the Guarantees related thereto or to make, take or give any consent, waiver or other action provided hereby or thereby to be made, taken or given, or (ix) reduce the percentage of aggregate principal amount of Notes Outstanding required for the adoption of a resolution or the quorum required at any meeting of Holders of Notes at which a resolution is adopted, in each case, unless such action or modification, amendment or supplement is approved by an extraordinary resolution (an "*Extraordinary Resolution*") as follows: (A) in the case of a Series of Notes issued only in bearer form, the quorum at any meeting of Holders of Notes for passing an Extraordinary Resolution will be any person or persons holding or representing not less than 75%, or at any such adjourned meeting not less than 25%, in aggregate principal amount of the Notes of such Series for the time Outstanding and entitled to be voted at such meeting and an Extraordinary Resolution may be passed by the affirmative vote of not less than 75% in aggregate principal amount of such Notes voted in respect of such Extraordinary Resolution; (B) in the case of a Series of Notes issued only in registered form, an Extraordinary Resolution may only be passed by the affirmative vote of the Registered Holder of each Note of such Series then Outstanding; and (C) in the case of a Series of Notes issued both in bearer and registered form, such Series will be deemed, for the purposes of determining which Extraordinary Resolution voting provisions shall apply, to have been issued only in bearer form.

(f)   *Amendments without the Consent of Noteholders*

LBHI, LBTCBV, LBB and, in the case of the Fiscal Agency Agreement, the Fiscal Agent (or, in the case of Notes in registered form, the Registrar), may agree, without the vote or consent of any Holder of Notes, Couponholder, Receiptholder or Talonholder, to any modification (except as aforesaid) of, or to any waiver or authorization of any breach or proposed breach of, any of the terms and conditions of the Notes or any other provisions of the Fiscal Agency Agreement for the purpose of (i) adding to the covenants of LBHI, LBTCBV or LBB for the benefit of the Holders of Notes, Couponholders, Receiptholders or Talonholders, (ii) surrendering any right or power conferred upon LBHI, LBTCBV or LBB which does not adversely affect the interest of any holders of Notes, Coupons, Receipts or Talons in any material respect, (iii) securing the Notes pursuant to the requirements of the Notes or otherwise for the benefit of the Holders of Notes, Coupons, Receipts or Talons, (iv) subject to the existence of the conditions set forth in Condition 7(a) (Place of Payment), permitting the payment of principal (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, in respect of Notes in bearer form in the United States, (v) evidencing the succession of another corporation to LBHI, LBTCBV or LBB as described in Condition 14 (Merger or Consolidation of the Issuer or the Guarantor) and the assumption by such successor of the covenants and obligations of LBHI or LBTCBV in the Fiscal Agency Agreement and in the Notes, Coupons, Receipts and Talons as permitted by the Notes, (vi) evidencing the assumption by LBHI of the obligations of LBTCBV or LBB under the Fiscal Agency Agreement and the Notes issued by LBTCBV or LBB or the designation by LBHI of one of its wholly-owned Subsidiaries to be the issuer of the Notes previously issued by LBTCBV or LBB, as described in Condition 13 (Assumption of Obligations), (vii) correcting or supplementing any defective provision contained in the Fiscal Agency Agreement or in the Notes, Coupons, Receipts or Talons in a manner which does not adversely affect the interest of any Holders of the Notes, Coupons, Receipts or Talons in any material respect, (viii) amending the certification requirements referred to in Condition 7 (Payment of Principal and Interest; Paying Agents) in order to allow LBHI, LBTCBV or LBB to comply with the certification requirements with respect to nationality or status as required by applicable laws, (ix) making any modification, or granting any waiver or authorization of any breach or proposed breach of, any of the terms and conditions of the Notes or any other provisions of the Fiscal Agency Agreement in any manner which LBHI, LBTCBV or LBB and, in the case of the Fiscal Agency Agreement, the Fiscal Agent (or, in the case of Notes in registered form, the Registrar) may determine and which does not adversely affect the interest of any Holders of Notes, Coupons, Receipts or Talons

in any material respect, or (x) making any modification which is of a minor or technical nature or correcting a manifest error.

(g)    *Effect of Amendments*

Notes of a Series authenticated and delivered after the effectiveness of any such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action may bear a notation in the form approved by the Fiscal Agent (or, in the case of Notes in registered form, the Registrar) and the Issuer (and LBHI, if LBTCBV or LBB is the Issuer) as to any matter provided for in such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action. New Notes of such Series modified to conform, in the opinion of the Fiscal Agent (or, in the case of Notes in registered form, the Registrar) and LBHI, to any such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action may be prepared by LBHI, LBTCBV or LBB, authenticated by the Fiscal Agent (or, in the case of Notes in registered form, the Registrar) (or any authenticating agent appointed pursuant to the Fiscal Agency Agreement) and delivered in exchange for the Outstanding Notes of such Series.

(h)    *Notes Deemed to be Outstanding*

As used herein, any Note authenticated and delivered pursuant to the Fiscal Agency Agreement shall, as of any date of determination, be deemed to be "Outstanding", except: (i) Notes theretofore cancelled by any Paying Agent, the Fiscal Agent or the Registrar or delivered to any Paying Agent, the Fiscal Agent or the Registrar for cancellation or held by the Fiscal Agent (or, in the case of Notes in registered form, the Registrar) for reissuance but not reissued by the Fiscal Agent (or, in the case of Notes in registered form, the Registrar); (ii) Notes which have been called for redemption in accordance with their terms or which have become due and payable at maturity or otherwise and with respect to which monies sufficient to pay the principal thereof (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, thereon shall have been made available to the Fiscal Agent; or (iii) Notes in lieu of or in substitution for which other Notes shall have been authenticated and delivered pursuant to the Fiscal Agency Agreement; provided, however, that in determining whether the Holders of the requisite principal amount of Outstanding Notes of a Series are present at a meeting of Holders of Notes of such Series for quorum purposes or have consented to or voted in favour of any request, demand, authorization, direction, notice, consent, waiver, amendment, modification or supplement hereunder, Notes of such Series owned directly or indirectly by LBHI, LBTCBV or LBB or any Affiliate of LBHI, LBTCBV or LBB shall be disregarded and deemed not to be Outstanding. As used herein, the term *"Affiliate"* of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with LBHI, LBTCBV or LBB. For the purposes of this definition, (i) *"control"* when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms *"controlling"* and *"controlled"* have meanings correlative to the foregoing; and (ii) *"Person"* means any individual, corporation, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

(i)    *Number of Votes*

The Holder of a Note may, at any meeting of Holders of a Series of Notes at which such Holder is entitled to vote, cast one vote for each currency unit in principal amount of the Notes held by such Holder in which such Notes are denominated. Notwithstanding the foregoing, at any meeting of Holders of more than one Series of Notes, a Holder of a Note which does not specify regular payments of interest, including, without limitation, Zero Coupon Notes, shall be entitled to one vote at any such meeting for each such currency unit of the redemption value of such Note calculated as of the date of such meeting. Where Notes are denominated in one or more currencies other than U.S. dollars, the

U.S. dollar equivalent of such Notes shall be calculated at the exchange rates prevailing in the Principal Financial Centre on the date of such meeting or, in the case of written consents or notices, on such date as LBHI shall designate for such purpose and each Holder of such a Note shall have one vote for every U.S. dollar of Notes (converted as aforesaid) which he holds.

(j)     *Written Resolutions*

A resolution in writing signed by or on behalf of all Holders of Notes of a Series who for the time being are entitled to receive notice of a meeting of Holders of Notes of that Series will take effect as if it were an Extraordinary Resolution. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Holders of Notes of that Series.

## 13.    Assumption of Obligations

LBHI or any wholly-owned Subsidiary of LBHI may assume the obligations of LBTCBV or LBB (or any corporation which shall have previously assumed the obligations of LBTCBV or LBB (as applicable) as provided in this Condition 13 (Assumption of Obligations); LBTCBV or LBB (as applicable) or such corporation in each case being referred to herein as the *"prior Issuer"*) for the due and punctual payment of the principal of (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, on and Additional Amounts, if any, in respect of the Notes issued by it and the performance of every covenant of the Fiscal Agency Agreement, the Notes and each Calculation Agency Agreement on the part of the prior Issuer to be performed or observed; provided that: (i) LBHI or such Subsidiary of LBHI, as the case may be, shall expressly assume such obligations by an amendment or supplement to the Fiscal Agency Agreement, executed by LBHI and such Subsidiary, if applicable, and delivered to the Fiscal Agent (or, in the case of Notes in registered form, the Registrar) for the benefit of the Holders of the Notes, Coupons, Receipts and Talons; (ii) if such Subsidiary assumes such obligations, LBHI shall, by such amendment or supplement, confirm that its Guarantees shall apply to such Subsidiary's obligations under the Notes, Coupons, Receipts and Talons and the Fiscal Agency Agreement and each Calculation Agency Agreement, as modified by such amendment or supplement; provided, however, that this subsection (iii) shall not apply in the event of such an assumption by a Subsidiary of LBHI, not being incorporated in The Netherlands, the long-term debt securities of which, as of the effective date of such assumption and after giving effect thereto, have a rating from Moody's Investors Service, Inc. and Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc. which is equal to or higher than those of LBHI; (iv) LBHI or such Subsidiary, as the case may be, shall confirm in such amendment or supplement that LBHI or such Subsidiary, as the case may be, will pay to the Holders such Additional Amounts as provided by, and subject to the limitations set forth in, Condition 9 (Payment of Additional Amounts; Tax Redemption) as may be necessary in order that every net payment of the principal of (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, on the Notes will not be less than the amount provided for in the Notes to be then due and payable; provided, that such obligation shall extend to any deduction or withholding for or on account of any present or future tax, assessment or governmental charge imposed upon such payment by any taxing authority of or in the country in which LBHI or any such Subsidiary is organized (it being understood that, except as aforesaid, neither LBHI nor such Subsidiary shall be obligated to make any indemnification or payments in respect of any tax consequences to any Holder of a Note or Couponholder, Receiptholder or Talonholder as a result of the assumption of rights and obligations described herein and which arise as a result of the domicile or residence of such Holder in, or connection of such Holder with, or subjection of such Holder to, any jurisdiction); and (v) immediately after giving effect to such assumption, no Event of Default and no event which, after notice or lapse of time or both, would become an Event of Default, shall have occurred and be continuing.

Upon any such assumption, LBHI or such Subsidiary, as the case may be, shall succeed to, and be substituted for, and may exercise every right and power of, the prior Issuer under the Fiscal Agency Agreement, the Notes issued by the prior Issuer and each Calculation Agency Agreement, with the same effect as if LBHI or such Subsidiary, as the case may be, had been named as the prior Issuer in the Fiscal

Agency Agreement, and the prior Issuer shall be released from all liability under the Fiscal Agency Agreement, the Notes issued by it and each Calculation Agency Agreement.

For the avoidance of doubt, no consent of any Holder of Notes is required for the transactions contemplated by this Condition 13 (Assumption of Obligations).

In the event that LBHI, during the term of this Program, no longer complies with the conditions described in clause 3.1.19 of the Distribution Agreement (as defined under "*Subscription and Sale*" below), in particular as soon as it becomes aware that it may not continue to have a positive consolidated shareholder's equity (*positief geconsolideerd eigen vermogen*) within the meaning of Section 2:373 of the Dutch Civil Code, either

(a)    the obligations of LBTCBV shall be assumed (in the manner described above) by LBHI or any wholly-owned Subsidiary of LBHI, such Subsidiary not being incorporated in The Netherlands; or

(b)    LBHI shall arrange for its substitution as guarantor of any Notes issued by LBTCBV by a different entity (the "*New Guarantor*") provided that: (i) the New Guarantor shall have a positive consolidated shareholder's equity (as defined above); (ii) the New Guarantor and LBTCBV shall belong to one group (*concern*) as defined in the WFT and (iii) LBTCBV shall be a subsidiary (*dochtermaatschappij*) of the New Guarantor within the meaning of Section 2:24a of the Dutch Civil Code; or

(c)    any Notes issued by LBTCBV shall, in addition to the existing Guarantee by LBHI, be guaranteed by a credit institution that is subject to prudential supervision in The Netherlands, another European Economic Area member state, the U.S., Canada, Japan, Australia or Switzerland.

## 14.    Merger or Consolidation of the Issuer or the Guarantor

So long as any Note remains Outstanding, neither the Issuer nor the Guarantor, if applicable, shall consolidate or amalgamate with or merge into any other corporation or convey, transfer or lease its properties and assets substantially as an entirety to any person unless: (i) the corporation formed by such consolidation or amalgamation or into which such Issuer or the Guarantor, as the case may be, is merged or the person which acquires by conveyance or transfer, or which leases, the properties and assets of such Issuer or the Guarantor, as the case may be, substantially as an entirety shall expressly assume, by an amendment to the Fiscal Agency Agreement executed and delivered to the Fiscal Agent (A) (1) in the case of a successor to an Issuer, the due and punctual payment of the principal of (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof), and interest, if any, and Additional Amounts, if any, on all of the Notes and the performance of every covenant in the Notes, each Calculation Agency Agreement and the Fiscal Agency Agreement to be performed by such Issuer and (2) in the case of a successor to LBTCBV or LBB, LBHI shall confirm that the Guarantee shall apply to the obligations of such successor under the Notes, each Calculation Agency Agreement and the Fiscal Agency Agreement; provided that this subsection (i) (A) (2) shall not apply in the event of a conveyance or transfer of the properties and assets of LBTCBV or LBB (as applicable) substantially as an entirety to any corporation, the long-term debt securities of which, as of the effective date of such conveyance or transfer and after giving effect thereto, have a rating from Moody's Investors Service, Inc. and Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc. which is equal to or higher than those of the Guarantor, so long as such corporation shall assume the obligations of LBHI under the Guarantees, the Fiscal Agency Agreement and each Calculation Agency Agreement in the manner contemplated by the following subsection (i) (B) and (B) in the case of a successor to the Guarantor, the due and punctual performance of the Guarantees and the performance of every covenant in the Fiscal Agency Agreement and each Calculation Agency Agreement on the part of the Guarantor to be performed, which assumption shall provide in each case that such corporation or person, as the case may be, shall pay to the Holder of any Note and any Couponholder, Receiptholder or Talonholder such Additional Amounts as provided by, and subject to the limitations set forth in, Condition 9 (Payment of Additional Amounts; Tax Redemption) as may be necessary in order that every net payment of the principal of (including premium, if any, and in the case of Zero Coupon

Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, will not be less than the amount provided for in the Notes to be then due and payable; provided that such obligation shall extend to any deduction or withholding for or on account of any present or future tax, assessment or governmental charge imposed upon such payment by any taxing authority of or in the country in which any such corporation or person is organized (it being understood that except as aforesaid, no such corporation or person shall be obligated to make any indemnification or payment in respect of any tax consequences to any individual Holder of a Note or Couponholder, Receiptholder or Talonholder as a result of the assumption of rights and obligations described herein and which arise as a result of the domicile or residence of such Holder in, or connection of such Holder with, or subjection of such Holder to, any jurisdiction); (ii) immediately after giving effect to such transaction, no Event of Default, and no event which, after notice or lapse of time or both, would become an Event of Default, shall have occurred and be continuing; (iii) if, as a result of any such consolidation, amalgamation or merger or such conveyance, transfer or lease, properties or assets of LBHI, LBTCBV or LBB would become subject to a mortgage, pledge, lien, security interest or other encumbrance which would not be permitted by the Fiscal Agency Agreement or the Notes, LBHI, LBTCBV or LBB or such successor corporation or person, as the case may be, shall take such steps as shall be necessary effectively to secure the Notes equally and rateably with (or prior to) all indebtedness secured thereby; and (iv) a certificate, signed by a duly authorized officer of such Issuer or the Guarantor, as the case may be, and a written opinion of counsel, each stating that such consolidation, amalgamation, merger, conveyance, transfer or lease and such document evidencing the assumption by such corporation or person complies with all conditions precedent herein provided for relating to such transaction shall have been made available for inspection by Holders of the Notes at the principal office of the Fiscal Agent and, in the case of Notes in registered form, the Registrar.

Upon any such assumption, such corporation or person, as the case may be, shall succeed to, and be substituted for, and may exercise every right and power of, such Issuer or the Guarantor, as the case may be, under the Fiscal Agency Agreement with the same effect as if such corporation or person had been named as "*Issuer*" or the "*Guarantor*", as the case may be, under the Fiscal Agency Agreement, and thereafter, except in the case of a lease, the predecessor corporation shall be relieved of all obligations and covenants under the Fiscal Agency Agreement, each Calculation Agency Agreement, the Notes, the Coupons, the Receipts and the Talons.

For the avoidance of doubt, no consent of any Holder of Notes is required for the transactions contemplated by this Condition 14 (Merger or Consolidation of the Issuer or the Guarantor).

## 15.    Notices

(a)    *Bearer Notes*

Notices to redeem Notes in bearer form and all other notices to Holders of Notes in bearer form will be valid if published (i) in one leading London daily newspaper (which is expected to be the *Financial Times*), (ii) if any Notes are admitted to trading on the Irish Stock Exchange and that exchange so require, a daily newspaper having general circulation in Dublin (which is expected to be the Irish Times) and (iii) if any Notes are listed on the Singapore Exchange Securities Trading Limited and the rules of that exchange so require, a daily English language newspaper having general circulation in Singapore (which is expected to be *The Business Times*) or, in the case of (i) or (ii), if such publication is not practicable in the opinion of the Issuer, in another leading English language daily newspaper which is approved by the Issuer with circulation in Europe. The Issuer shall also ensure that notices are duly published in a manner which complies with the rules and regulations of any other stock exchange on which the Notes are for the time being listed. Any notice published in a newspaper as aforesaid shall be deemed to have been given on the date of such publication or, if published more than once, on the date of the first such publication.

In the case of global Notes in bearer form of a Series, there may, so long as such global Notes are held in their entirety on behalf of Euroclear and Clearstream, Luxembourg, be substituted for such publication as aforesaid, the delivery of the relevant notice to Euroclear and Clearstream, Luxembourg for communication by them to Holders of Notes. Any such notice shall be deemed to have been given

to Holders of Notes three Business Days after the day on which the said notice was given to Euroclear and Clearstream, Luxembourg.

(b)   *Registered Notes*

Notices to redeem definitive Notes in registered form and all other notices to Holders of definitive Notes in registered form shall (except to the extent otherwise expressly provided) be in writing and shall be addressed to such Holders at their addresses appearing in the note register maintained pursuant to the Fiscal Agency Agreement. In the case of Notes which are listed on the Irish Stock Exchange and, if the rules of that exchange so require, such notices will also be published in a leading newspaper having general circulation in Dublin (which is expected to be the Irish Times).

In the case of global Notes in registered form of a Series, such notices shall be sent to the common depositary for Euroclear and Clearstream, Luxembourg or its nominee, as the Registered Holder, who will in turn forward such notices to Euroclear and Clearstream, Luxembourg for communication by them to Holders of such Notes. Any such notice shall be deemed to have been given to Holders of Notes three Business Days after the day on which the said notice was given to Euroclear and Clearstream, Luxembourg.

(c)   *Notices to the Issuers*

Notices given by any Holders of Notes to LBHI, LBTCBV or LBB shall be in writing and given by delivering the same: (i) in the case of LBHI, to Lehman Brothers Holdings Inc., 745 Seventh Avenue, New York, New York 10019, U.S.A., Attention: Treasurer, (ii) in the case of LBTCBV, to Lehman Brothers Treasury Co. B.V., Atrium, Strawinskylaan 3105, 1077 2X Amsterdam, The Netherlands, Attention: L. Kho and (iii) in the case of LBB, to Lehman Brothers Bankhaus AG, Rathenauplatz 1, D-60313 Frankfurt am Main, Germany, Attention: Treasury.

(d)   *Notices in respect of Australian Domestic Notes*

Notices in respect of Australian Domestic Notes will be published in a leading daily newspaper of general circulation in Australia (which is expected to be The Australian Financial Review). Any such notice will be deemed to have been given to the Holders on the date of publication.

**16.   Replacement of Notes, Coupons, Receipts and Talons**

If any Note, Coupon, Receipt or Talon is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Fiscal Agent (or, in the case of Notes in registered form, the Registrar) (and, if the Notes are then admitted to listing, trading and/or quotation by any competent authority, stock exchange and/or quotation system which requires the appointment of a Paying Agent in any particular place, the Paying Agent having its Specified Office in the place required by such competent authority, stock exchange and/or quotation system), subject to all applicable laws and competent authority, stock exchange and/or quotation system requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Issuer may reasonably require. This Condition 16 is not applicable to Australian Domestic Notes.

**17.   Prescription**

All amounts paid by the Issuer or the Guarantor, as the case may be, to a Paying Agent for payment of the principal of or premium or interest on any Note and remaining unclaimed for two years after such payment has been made shall be repaid to the Issuer or the Guarantor, as the case may be, and to the extent permitted by law, the Holder of such Note or related Coupon or Receipt thereafter may look only to the Issuer or the Guarantor, as the case may be, for payment. Definitive Notes in bearer form, Receipts and Coupons will become void unless presented for payment within periods of 10 years (in the case of principal) and 5 years (in the case of interest) from the Relevant Date (as defined in Condition 9 (Payment of Additional Amounts; Tax Redemption)). Talons will become void unless presented for exchange for a fresh Coupon

sheet within a period of 5 years from the date on which all Coupons on the Coupon sheet to which the Talon appertains have matured. Under the State of New York's statute of limitations, any legal action upon the Notes must be commenced within six years after the payment thereof is due. This Condition 17 is not applicable to Australian Domestic Notes.

## 18. Further Issues of Notes

Each original issue of Notes together with any further issues expressed to form a single series with the original issue which are issued by the same Issuer, denominated in the same currency, having the same maturity date, bearing interest, if any, on the same basis and at the same rate and the terms of which (but for the issue date, issue price and the date from which interest accrues) are otherwise identical will constitute a Series (a *"Series"* or the *"Notes of a Series"*).

## 19. Governing Law; Consent to Jurisdiction

(a) *Governing Law*

The Fiscal Agency Agreement, each Calculation Agency Agreement, the Notes (other than Australian Domestic Notes and Condition 2(b) in respect of Subordinated Notes issued by LBB), the Coupons, the Receipts, the Talons and the Deed of Covenant and all matters arising from or connected with the Fiscal Agency Agreement, each Calculation Agency Agreement, the Notes (other than Australian Domestic Notes and Condition 2(b) in respect of Subordinated Notes issued by LBB), the Coupons, the Receipts, the Talons and the Deed of Covenant are governed by, and shall be construed in accordance with, English law. Any Australian Domestic Notes, the relevant Deed Poll, the relevant Agency and Registry Services Agreement and (if required) the relevant Issuing and Payment Administration Agreement in respect of such Australian Domestic Notes are, or will be, governed by, and construed in accordance with, the laws of New South Wales, Australia. The Guarantees and all matters arising from or connected with the Guarantees, are governed by, and shall be construed in accordance with, the laws of the State of New York.

In case of Subordinated Notes issued by LBB, Condition 2(b) (Status of Subordinated Notes and Subordinated Guarantees) is governed by German law.

In the case of LBHI Subordinated Notes, Condition 2(c) (*Status of LBHI Subordinated Notes*) and all matters arising from or connected with Condition 2(c) (*Status of LBHI Subordinated Notes*), are governed by, and shall be construed in accordance with, the laws of the State of New York.

(b) *English courts*

The courts of England have exclusive jurisdiction to settle any dispute (a *"Dispute"*) arising from or connected with the Notes (other than Australian Domestic Notes).

(c) *Appropriate forum*

Each of LBHI, LBTCBV and LBB agrees that the courts of England are the most appropriate and convenient courts to settle any Dispute and, accordingly, that it will not argue to the contrary.

(d) *Rights of the Noteholders to take proceedings outside England*

Condition 20(b) (English courts) is for the benefit of the relevant Noteholders only. As a result, nothing in this Condition 20 (Governing law; Consent to jurisdiction) prevents any Noteholder from taking proceedings relating to a Dispute (*"Proceedings"*) in any other courts with jurisdiction. To the extent allowed by law, Noteholders may take concurrent Proceedings in any number of jurisdictions.

(e) *Service of process*

Each of LBHI, LBTCBV and LBB agrees that the documents which start any Proceedings and any other documents required to be served in relation to those Proceedings may be served on it by being

delivered to it at 25 Bank Street, London, E14 5LE, England or at any other address in Great Britain at which service of process may be served on it in accordance with Part XXIII of the Companies Act 1985. This Condition 20 (Governing law; Consent to jurisdiction) applies to Proceedings in England and to Proceedings elsewhere. If the appointment of the person mentioned in this Condition 20(e) (Service of Process) ceases to be effective, each of LBHI, LBTCBV and LBB shall forthwith appoint a person in England to accept service of process on its behalf in England and notify the name and address of such person to the Fiscal Agent and, failing such appointment within fifteen days, any Holder of a Note, shall be entitled to appoint such a person by written notice addressed to LBHI, LBTCBV or LBB, as the case may be, and delivered to the relevant Issuer or to the specified office of the Fiscal Agent. Nothing in this paragraph shall affect the right of any Noteholder to serve process in any other manner permitted by law.

(f)    *Australian Domestic Notes*

In respect of Australian Domestic Notes, the relevant Deed Poll, the relevant Agency and Registry Services Agreement and (if required) the relevant Issuing and Payment Administration Agreement, LBTCBV and LBHI will agree to submit to the jurisdiction of the courts of New South Wales, Australia and courts of appeal from then. LBCTCBV and LBHI will irrevocably waive any objection which it may have to the laying of the venue of any suit, action or proceedings arising out of or in connection with the Australian Domestic Notes, the relevant Deed Poll, the relevant Agency and Registry Services Agreement or any relevant Issuing and Paying Administration Agreement ("*Australian Proceedings*") in any such court and any claim that any such Australian Proceedings have been brought in an inconvenient forum and will further irrevocably agree that a judgment in any such Australian Proceedings brought in the courts of New South Wales, Australia and courts of appeal from them shall be conclusive and binding upon it and may be enforced in the courts of any other jurisdiction. LBTCBV will ensure, in respect of Australian Domestic Notes, that there is an agent for service of process in New South Wales, Australia as specified in the relevant Final Terms.

## 20.    Fiscal Agent; Registrar

The Fiscal Agency Agreement contains provisions for the indemnification of the Fiscal Agent and the Registrar and for their relief from responsibility. The Fiscal Agent, the Registrar and the Paying Agents are entitled to enter into business transactions with the Issuers without accounting for any profit resulting therefrom.

In acting under the Fiscal Agency Agreement and in connection with the Notes, Coupons, Receipts and Talons, the Fiscal Agent and the Registrar are acting solely as agents of the Issuer and do not assume any obligation towards or relationship of agency or trust for or with any Noteholder, Couponholder, Receiptholder or Talonholder, except that any funds held by the Fiscal Agent or the Registrar for payment of any sums due in respect of the Notes or any Coupons or Receipts shall be held in trust by it for the Noteholders, the Couponholders and the Receiptholders (as the case may be) until the expiration of the period set forth in Condition 17 (Prescription) and shall be applied as set forth herein, but need not be segregated from other funds held by it, except as required by law. For a description of the duties and the immunities and rights of the Fiscal Agent and the Registrar under the Fiscal Agency Agreement, reference is made to the Fiscal Agency Agreement, and the obligations of the Fiscal Agent and the Registrar to the Holder of each Note are subject to such immunities and rights.

The Fiscal Agency Agreement is not applicable to Australian Domestic Notes.

## 21.    Rounding

For the purposes of any calculations referred to in these Conditions (unless otherwise specified in these Conditions or the relevant Final Terms), (a) all percentages resulting from such calculations will be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point (with 0.000005 per cent. being rounded up to 0.00001 per cent.), (b) all United States dollar amounts used in or resulting from such calculations will be rounded to the nearest cent (with one half cent being rounded up), (c) all Japanese Yen amounts used in or resulting from such calculations will be rounded downwards to the next lower whole

Japanese Yen amount, and (d) all amounts denominated in any other currency used in or resulting from such calculations will be rounded to the nearest two decimal places in such currency, with 0.005 being rounded upwards.

**22.    Descriptive Headings**

The descriptive headings appearing in these Terms and Conditions are for convenience of reference only and shall not alter, limit or define the provisions hereof.

## ADDITIONAL DESCRIPTIONS IN RELATION TO SPECIFIC NOTES

*The following is a description of certain specific types of Notes and provides examples of types of Notes. It is not intended to be an exhaustive list of structures or types of Notes. Any Series of Notes may incorporate different components of each of the specific Notes described below and of other types of Notes described in this Base Prospectus. The descriptions in this section should be read in conjunction with the section "Terms and Conditions of the Notes".*

**Quanto Notes**

Notes issued pursuant to the Program may include Notes issued in a currency (the "*Quanto Currency*") in respect of which, the amount payable on redemption and/or the rate of interest for one or more Interest Periods is calculated by reference to, among other variables, a currency exchange rate or currency exchange rates, interest rate or interest rates in respect of a currency or currencies, or an asset or assets or index or indices denominated in a currency or currencies, that is different to that of the Quanto Currency (each a "*Reference Currency*") as specified in the applicable Final Terms. All interest amounts payable under the Notes and any amounts payable on the redemption of the Notes are paid in the Quanto Currency. Such Notes are referred to as "*Quanto Notes*". Such Notes shall also be Index-Linked Redemption Amount or Index-Linked Interest Notes.

**Variable Cap Notes and Notes in respect of which Rates of Interest are determined by Swap Rates**

Notes issued pursuant to the Program may include Notes in respect of which the amount payable on redemption and/or the rate of interest applicable for one or more Interest Periods is subject to a variable maximum interest rate (or cap) as specified in the Final Terms. The variable maximum redemption amount and/or rate of interest may be determined by reference to any rate, currency, index, formula or any other factor (each a "*Variable Cap Factor*"), or any combination of such Variable Cap Factors. Such Notes are referred to as "*Variable Cap Notes*". Such Notes shall also be Index-Linked Redemption Amount or Index-Linked Interest Notes.

In addition, Notes issued pursuant to the Program may include Notes in respect of which the redemption amount, rate of interest, the maximum rate of interest and/or the minimum rate of interest applicable for one or more Interest Periods is determined by reference to one or a combination of swap rates specified in the applicable Final Terms. Such Notes shall also be Index-Linked Redemption Amount or Index-Linked Interest Notes.

*Information relating to Swap Rates*

Swap rates are fixed rates on interest rate swaps. Commonly used benchmarks for such swap rates include (i) the service known as ISDAFIX; (ii) the service known as IFR Derivatives; and (iii) rates determined by the Calculation Agent. Notes may make reference to swap rates quoted according to market standard conventions which are swap rates for swap transactions denominated in currencies including Euro, United States Dollars, Swiss Francs, Pounds Sterling, Japanese Yen, Swedish Kroner and Polish Zloty, each of which are quoted for a variety of designated maturities and expressed as a percentage. Unless otherwise specified in the applicable Final Terms, such rates will be determined by the Calculation Agent on the relevant Interest Determination Dates. "*Interest Determination Date*" in this context means the day which is specified in the applicable Final Terms.

Swap rates relevant to a particular Note will be identified in the Final Terms by reference to the screen page (the "*Relevant Screen Page*") and, where applicable, the heading below which the relevant swap rate appears, the caption above which the relevant swap rate appears and the time (the "*Relevant Time*") as of which the relevant swap rate appears. By way of example, the annual swap rate for Euro denominated swap rates provided by ISDAFIX with a designated maturity of two years will be specified in the Final Terms as appearing on the Reuters Screen ISDAFIX2 Page (or any successor to that page) under the heading "EURIBOR Basis" and above the caption "11.00 AM Frankfurt." as of 11 a.m., Frankfurt time.

*Fallback rate*: With respect to such Notes unless otherwise specified in the applicable Final Terms, if, on any Interest Determination Date, the Calculation Agent determines in its sole and absolute discretion that a relevant swap rate:

(1)    does not appear on the Relevant Screen Page (or any successor to that page); or

(2)    for any other reason, is unavailable or cannot reasonably be calculated;

in each case as at the Relevant Time, then, in relation to the relevant Interest Determination Date, such swap rate will be the rate determined by the Calculation Agent as the rate specified in the Final Terms as being defined in Section 7.1 of the Annex to the 2000 ISDA Definitions (June 2000 version) with a Designated Maturity equivalent to the designated maturity of the original swap rate, in each case as if such rate had been elected. For the purposes of determining any Fallback rate, the ISDA Definitions shall be construed as set out in the Final Terms.

Details on historical levels of swap rates can be found on the website http://www.isda.org/fix/ historicaldata.html.

## Steepener Notes

Notes issued pursuant to the Program may include Steepener Notes, which are Notes in respect of which the rate of interest applicable for one or more Interest Periods is determined by reference to the difference (or spread) between two swap rates specified in the applicable Final Terms, which difference (or spread) may (if so specified in the applicable Final Terms) then be multiplied by a factor (the *"leverage factor"*) specified in the applicable Final Terms, subject to any minimum and/or maximum interest rates specified in the applicable Final Terms. The paragraph above contains further information relating to Swap Rates.

## Path-Dependent Notes

Notes issued pursuant to the Program may include Notes in respect of which, the rate of interest for one or more Interest Periods is calculated by reference to the rate of interest for one or more previous Interest Periods (the *"Previous Rate"*), as specified in the applicable Final Terms. The rate of interest for an Interest Period may be calculated by adding to or subtracting from the Previous Rate, or multiplying or dividing the Previous Rate by one or more variables (or any combination thereof). Such variables may include a rate, a currency, an index, a formula and/or a constant. Alternatively, the rate of interest could be subject to a maximum or minimum rate of interest based upon the Previous Rate. Such Notes are referred to as *"Path-Dependent Notes"*. Such Notes shall also be Index-Linked Redemption Amount or Index-Linked Interest Notes.

## Range Accrual Notes

Notes issued pursuant to the Program may include Notes in respect of which, (i) for one or more Interest Periods, the rate of interest specified in the applicable Final Terms is calculated by multiplying a rate, currency exchange rate, index, formula or other factor or combination thereof (each a *"Reference Rate"*) by a fraction (the *"Index Ratio"*) whose denominator is the total number of days (each an *"Observation Day"*) within a period (an *"Observation Period"*) and whose numerator is the actual number of days during that Observation Period in respect of which a predetermined event (the *"Fixing Event"*) occurs and/or (ii) the amount payable on redemption is determined by reference to the resulting rate described under (i) above. Such Notes shall also be Index-Linked Redemption Amount or Index-Linked Interest Notes.

The Fixing Event could be, but is not limited to, one or more indices, formulae, currency exchange rates, rates or a combination thereof, exceeding and/or equalling and/or becoming lower than and/or equalling a predetermined level or levels of another rate, currency, exchange rate, index, formula, or constant, as specified in the applicable Final Terms.

By way of example, the interest rate for an Interest Period on a Range Accrual Note may be calculated by multiplying the principal amount of the Notes by: (i) EURIBOR with a designated maturity of 6 months;

and (ii) the Index Ratio. The Index Ratio may be determined by: (a) calculating the number of Business Days during such Interest Period in which USD LIBOR with a designated maturity of 6 months is equal to or exceeds 2% but is less than 4%; and (b) dividing the result by the total number of days in that period.

In this instance the Interest Period and the Observation Period are the same, but in certain Range Accrual Notes, they may relate to different chronological periods and may be of different lengths. For the avoidance of doubt, the days upon which the Fixing Event is observed could be any subset of days within such Interest Period or any other Interest Period or periods, including, but not limited to, a period of one day only.

## Switchable Notes

Notes issued pursuant to the Program may include Notes in respect of which, for one or more Interest Periods, the rate of interest or a component of the rate of interest specified in the applicable Final Terms may, on certain dates (each a "*Exercise Date*"), change to a different rate of interest or component of the rate of interest or to zero (as the case may be) at the option (each a "*Switch Option*") of either the Issuer and/or the Noteholder and/ or a third party (the "*Switch Option Holder*"). The number of Switch Options available to the Switch Option Holder may be limited or unlimited as specified in the applicable Final Terms. The occurrence of such an event is known as a "*Switch Event*". Such Notes are referred to as "*Switchable Notes*". Such Notes shall also be Index-Linked Redemption Amount or Index-Linked Interest Notes.

By way of example, the Switch Option Holder may exercise its Switch Option on the Exercise Date which results in the rate of interest payable for an Interest Period converting from a rate of interest equal to 6.00 per cent. annum of the nominal amount of the Notes to a rate of interest equal to EURIBOR with a designated maturity of 12 months ("*12m EURIBOR*") plus 0.50% of the nominal amount of the Notes. In this instance if 12m EURIBOR is at a low rate (for example, 2.00 per cent.) then the coupon payable in respect of the relevant Interest Period would switch from 6.00 per cent. to 12m EURIBOR + 0.50%, or 2.50%.

The above analysis is one example of the operation of Switchable Notes. For other Switchable Notes the rate of interest payable may switch between fixed and/or floating and/or Index-Linked and/or any combination thereof. This list is not intended to be exhaustive.

## Target Redemption Notes

Notes issued pursuant to the Program may include Notes that will be redeemed if, with respect to one or more Interest Periods, the aggregate amount of interest to be paid under the Notes, that is, the amount of interest payable for an Interest Period added to all previous amounts of interest paid under the Notes (the "*Aggregate Interest Amount*") is equal to or exceeds a target amount of interest as specified in the applicable Final Terms (the "*Target Interest Amount*"). Such redemption will be at an amount and on a date specified in the applicable Final Terms. Such Notes shall also be Index-Linked Redemption Amount or Index-Linked Interest Notes.

In some instances, on an Interest Determination Date, the Aggregate Interest Amount may exceed the Target Interest Amount. In such circumstances, the Notes will be redeemed at the end of such Interest Period and, depending on the provisions in the Final Terms, the amount of interest payable in respect of that Interest Period will either be: (i) reduced to an amount such that the Aggregate Interest Amount in respect of such Interest Period is equal to the Target Interest Amount; (ii) the full amount of interest calculated for such Interest Period; or (iii) changed to a different amount of interest as specified in the applicable Final Terms.

In other circumstances, the Aggregate Interest Amount upon maturity may be lower than the Target Interest Amount. In these circumstances, the Notes will be redeemed on the scheduled maturity date and, depending on the provisions in the Final Terms, the final payment of interest will either be: (i) increased so that the Aggregate Interest Amount equals the Target Interest Amount specified in the Final Terms; or (ii) the amount of interest paid will be unchanged by the target redemption feature.

The operation of the early redemption mechanism may differ depending on the specific redemption provisions contained in the applicable Final Terms. Notes of this type are referred to as *"Target Redemption Notes"*.

**Trigger Notes**

Notes issued pursuant to the Program may include Notes in respect of which, for one or more Interest Periods, the rate of interest specified in the applicable Final Terms may convert into a different rate of interest depending upon certain events (*"Trigger Events"*) occurring on certain dates (each a *"Trigger Date"*) or during a specified period (*"Trigger Period"*) each as specified in the applicable Final Terms. Such Trigger Events may be, but are not limited to, events upon which one or more indices, formulae, currency exchange rates, constants, other factors or a combination thereof (*"Trigger Indices"*) are greater than and/or equal to and/or lower than and/or equal to one or more other indices, formulae, currency exchange rates, constants, other factors or a combination thereof. Such Notes are referred to as *"Trigger Notes"*. Such Notes may also be Index-Linked Redemption Amount or Index-Linked Interest Notes.

By way of example, the rate of interest payable for an Interest Period on a Trigger Note may switch from 12m EURIBOR plus 2.00% of the nominal amount of the Notes to 1.00 per cent. of the nominal amount of the Notes if on a Trigger Date, 12m EURIBOR is equal to or higher than 5.00 per cent. In this instance, if the Trigger Event occurs, the coupon payable in respect of an Interest Period would switch from floating to fixed.

The above analysis sets out just one example of how Trigger Notes may operate. It is not intended to be an exhaustive description of the coupon structure for Trigger Notes.

**Commodity-Linked Notes**

Notes issued pursuant to the Program may include Notes in respect of which the Rate of Interest applicable for some or all of the Interest Periods and/or the Final Redemption Amount or other redemption amount is calculated by reference to the prices of one or more commodities, including oil, as specified in the relevant Final Terms. Such Notes are referred to as *"Commodity-Linked Notes"*, and the type of commodity in respect of which the price of such Notes is linked is referred to as the *"Relevant Commodity"*, each as specified in the relevant Final Terms. Such Notes shall also be Index-Linked Redemption Amount or Index-Linked Interest Notes.

**Commodity Linked Notes with certain Agricultural Products, Energy Products and Metals as a Relevant Commodity**

Notes issued pursuant to the Program may include Notes in respect of which the Rate of Interest applicable for one or more Interest Periods and/or the Final Redemption Amount or other redemption amount or the timing of payments, redemption of the Notes and/or any other economic feature, is calculated by reference to the prices of one or more commodities, on any relevant dates, as specified in the relevant Final Terms. Commodities that may be referenced include without limitation certain agricultural products, such as cocoa, coffee, corn, livestock, orange juice, rubber, soybeans, sugar, cotton, or wheat, certain energy products, such as electricity, gas oil, unleaded gasoline, heating oil, natural gas, oil or oil products such as propane and fuel oil, emissions (including carbon emissions), certain metals, such as aluminium, aluminium alloy, copper, gold, lead, nickel, palladium, platinum, silver, tin or zinc and plastic.

By way of example, the relevant Final Terms may specify that the Final Redemption Amount of the Notes is determined as the sum of the nominal amount of each Note, and the nominal amount of each Note the greater of zero and (i) the price of coffee on a Strike Date (as specified in the Final Terms) minus the price of coffee on the Valuation Date (as specified in the Final Terms), divided by (ii) the price of coffee on the Strike Date (as specified in the Final Terms). In this instance, if the price of coffee on the Strike Date is U.S.$ 100, and the price of coffee on the Valuation Date is U.S.$ 80, then the holder of a Note will receive on redemption a Final Redemption Amount of 120 per cent.. Conversely, if the price of coffee on the Strike Date is U.S.$ 100, and the price of coffee on the Valuation Date is U.S.$ 100 or any higher amount, then the holder of a Note would receive on redemption a Final Redemption Amount of 100 per cent.

The relevant type(s) of a commodity being referenced (for example, a type of coffee such as coffee arabica or robusta coffee, or type of livestock such as feeder cattle or live cattle) will be as specified in the Final Terms for the relevant Notes. The price(s) of a particular commodity being referenced may be in respect of a particular contract for the future or immediate delivery or financial settlement of such commodity, as may be reported on a particular exchange, screen-based service or other publication source, all as specified in the Final Terms for the relevant Notes.

Commodity-Linked Notes in respect of any Commodity in the area of Agricultural Products, Energy and Metals will include provisions for the determination of the Commodity Reference Price, the designation of Disruption Events and Disruption Fallbacks (arising from such events), allowances for the corrections for published prices, and determinations by the Calculation Agent, all as set forth in the Final Terms in respect of the relevant Notes, and as described in Annex 5 below.

## FX Notes

Notes issued pursuant to the Program may include Notes ("*FX Notes*") under the terms of which:

1.  The denomination of the Notes is an emerging market currency (an "*EM Currency*"), which is a currency other than a G-10 Currency (for the purpose of this section a "*G-10 Currency*" means the U.S. Dollar, the Euro, the Japanese Yen, the Swiss Franc, the British Pound, the Australian Dollar, the New Zealand Dollar, the Canadian Dollar, the Norwegian Krone and the Swedish Krona);

2.  in respect of one or more interest periods and/or upon redemption of the Notes on the final maturity date, the amount payable per Note is in an EM Currency or is determined by reference to a currency exchange rate (a "*Reference Exchange Rate*"); and/or

3.  the timing of payments, redemption of the Notes and/or any other economic feature, is determined by reference to one or more EM Currencies or is determined by reference to a Reference Exchange Rate.

Such Notes may also be Basket Linked Notes, Index Linked Notes, Index Linked Interest Notes, FX Linked Notes, Commodity Linked Notes, Floating Rate Notes, Dual Currency Linked Notes, Equity Linked Notes or Debt Security Linked Notes.

The Reference Exchange Rate for a currency pair ("*Currency Pair*") will be the spot exchange rate for a currency (the "*Reference Currency*") against another currency (the "*Base Currency*") and will be expressed as: (i) a number of currency units per unit of the Base Currency; or (ii) as otherwise specified in the applicable Final Terms. A Reference Exchange Rate may be determined: (i) pursuant to a Settlement Rate Option (defined below); (ii) pursuant to an alternative price source determined by the Calculation Agent; (iii) by Calculation Agent determination; or (iv) as otherwise determined in the applicable Final Terms. For the avoidance of doubt, a Reference Exchange Rate may be either a continuously traded spot rate or a discretely determined spot rate, or both as specified in the applicable Final Terms.

The "*Settlement Rate Option*" in respect of a Currency Pair will be the rate source (or combination of rate sources) for that Currency Pair as specified in the applicable Final Terms (which may be by reference to any rate source for such Currency Pair described in section (C) (Settlement Rate Options Applicable to FX Notes) with such amendments, if any, as shall be set out in the applicable Final Terms or such other rate source as may be specified as such in the applicable Final Terms.

## Basket Linked Notes

Notes issued pursuant to the Program may include Notes ("*Basket Linked Notes*") under the terms of which:

1.  in respect of interest accrued during one or more interest periods and/or upon redemption of the Notes, amounts payable are determined by reference to one or more baskets (each a

*"Basket"*), each comprised of one or more component values (each a *"Basket Reference Value"*); and/or

2.  the timing of payments, redemption of the Notes and/or any other economic feature, is determined, by reference to one or more Baskets.

The value of a Basket (the *"Basket Value"*) will be determined in accordance with the applicable Final Terms. A Basket shall comprise of one or more "Basket Reference Values", including, but not limited to, currency exchange rates (each a *"Reference Exchange Rate"*), commodity reference prices (each a *"Commodity Reference Price"*), equity prices (each an *"Equity Reference Price"*), debt security prices (each a *"Debt Reference Price"*), reference entities (each a *"Reference Entity Price"*), interest rates (each an *"Interest Rate Reference Price"*), index levels (each an *"Index Reference Price"*) or any other component value as specified in the applicable Final Terms.

Basket Linked Notes including more than one Basket are referred to as *"Multiple Basket Linked Notes"*. Basket Linked Notes may also be Index Linked Notes, Index Linked Interest Notes, FX Linked Notes, Commodity Linked Notes, Floating Rate Notes, Dual Currency Linked Notes, Equity Linked Notes, Debt Security Linked Notes or other Notes.

## Option Notes

Notes issued pursuant to this Program may include Notes in respect of which, any interest payable for one or more Interest Periods, any amount payable on redemption of the Notes, the timing of payments and/or dates on which the Notes are redeemed and/or any other economic feature of the Notes (as specified in the applicable Final Terms) may be determined by, among other things, (i) reference to one or more prices, values or levels of a reference asset or assets (each a *"Reference Asset"*) exceeding and/or equalling and/or being lower than and/or equalling (or any combination thereof) one or more strike values (the "Strike") or (ii) reference to the difference between, or the corresponding values of, two or more prices, values or levels of such Reference Assets. Such formula(s) may be referred to as an *"Option"*.

The Reference Assets from which the value of the Option may be derived may include one or more indices, formulae, currency exchange rates, rates, commodities, debt securities, equities or other variable, option or combination thereof.

The calculation of the value of the Option may be determined by, among other things, reference to:

1.  the price, value or level of the Reference Asset(s) on a date or dates specified in the applicable Final Terms minus the price, value or level of the Strike(s). Should the difference be negative, the value will be floored at zero. Such Option may be referred to as *"Call Option"*;

2.  the price, value or level of the Strike(s) minus price, value or level of Reference Asset(s) on a date or dates specified in the applicable Final Terms. Should the difference be negative, the value will be floored at zero. Such Option may be referred to as *"Put Option"*; and/or

3.  whether the price, value or level of the Reference Asset exceeds and/or equals and/or is lower than and/or equals one or more predetermined criteria, as specified in the applicable Final Terms.

The above sets out just some of the methodologies that may be used to determine the value of the Option. It is not intended to be an exhaustive list and other methodologies may be used to determine such value as set out in the applicable Final Terms.

The prices, values or levels of the Reference Asset and/or the value of the Option may be determined on one or more dates during the term of the Notes.

The Strike may also be determined by reference to the level of one or more Reference Assets or a factor of such level or levels on a date or dates specified in the applicable Final Terms. For example, the Strike may be determined by reference to the level of EURIBOR with a designated maturity of 12 months measured on the issue date in respect of the Notes and will remain constant for the term of the Notes.

Alternatively, the Strike may be determined as the arithmetic or geometric average of the level of EURIBOR with a designated maturity of 12 months determined on each day during a specified period of days during the term of the Notes.

Payments, the timing of payments, redemption of the Notes and/or any other economic feature in respect of Option Notes may additionally be determined by reference to a scaling or leverage factor (the "*Leverage*") specified in the applicable final terms of such Notes. With respect to such Notes, the degree to which the value of the Option impacts upon the amount of such payments (or other economic feature of the Notes) will vary according to the level of the Leverage. The Leverage may be a constant value or may be a variable value, such as the price, value or level of a Reference Asset on a date or dates specified in the applicable Final Terms.

## Annex 1

### Amendments to the Terms and Conditions of the Notes in respect of Danish Notes

*The terms and conditions of Danish Notes shall comprise the Terms and Conditions of the Notes set forth on page 62 above (the "General Conditions") as amended by the additional terms and conditions set forth below (the "Danish Conditions"), subject to completion and/or amendment in the applicable Final Terms. In the event of any inconsistency between the General Conditions and the Danish Conditions, the Danish Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

**(A)    General**

For the purpose of this Base Prospectus, *"Danish Notes"* means any Tranche of Notes issued by LBTCBV or LBB and designated as *"Danish Notes"* in the applicable Final Terms.

The Danish Notes will be registered in uncertificated and dematerialised book-entry form with the Danish Securities Centre (*Værdipapircentralen*) (*"VP"*). Danish Notes registered in VP are negotiable instruments and not subject to any restrictions on free negotiability under Danish law. For so long as it is a requirement of the VP Rules (as defined below), Danish Notes may not provide for any form of settlement in respect of payment of interest, principal or premium other than payment in cash.

**(B)    Amendments to the Terms and Conditions in respect of the Danish Notes**

As the Danish Notes will be in uncertificated and dematerialised book-entry form, the Terms and Conditions of the Notes as so amended shall be deemed to be incorporated by reference in, and to form part of, the Deed of Covenant by which the Danish Notes are constituted.

All references to the "Fiscal Agency Agreement" shall include such agreement as may be entered into in relation to the Danish Notes (as amended, supplemented or replaced from time to time, the **"Danish Agency Agreement"**) between the Issuers, the Guarantor and Skandinaviska Enskilda Banken A/S which has its registered address at Landemaerket 10, 1014 Copenhagen K, Denmark (the **"Danish Issuing Agent"**).

**(a)    Form, Denomination and Title**

(i)    Condition 1(a) (*Form*) shall be amended to read:

"(a) *Form*. The Notes are issued in uncertificated and dematerialised book-entry form in accordance with the Danish Securities Trading Act (Da. *lov om værdipapirhandel 479/2006 (as amended)*) in each case in the Specified Currency or Currencies and Denomination(s). This Note is a Senior Note or a Subordinated Note, as indicated in the applicable Final Terms. Notes of one Specified Denomination may not be exchanged for Notes of another Specified Denomination.

The Notes shall be regarded as Registered Notes for the purposes of these Terms and Conditions save to the extent these Terms and Conditions are inconsistent with Danish laws, regulations and operating procedures applicable to and/or issued by VP (the *"VP Rules"*) and all references in these Terms and Conditions to the "Registrar" shall be deemed to be references to VP. No physical notes or certificates will be issued in respect of Notes and the provisions relating to presentation, surrendering or replacement of Notes shall not apply to the Notes.

(ii)    Condition 1(c) (*Coupons attached*) , Condition 1(d) (*Transfer of Bearer Notes*) and Condition 1(e) (*Title to Definitive Notes*) shall not apply to the Notes, save that references to Euroclear and/or Clearstream, Luxembourg shall, whenever the context so permits, be deemed to include a reference to VP.

(iii)   Condition 1(f) (*Note register*) shall be amended to read:

"(f) *Title to the Notes.* Title to the Notes shall pass by registration in the register (the "*Register*") maintained by the Registrar on behalf of the Issuer in accordance with the VP Rules. The Danish Issuing Agent is acting as account holding institute (Da. *kontoførende institut*) in relation to VP. The Issuer shall be entitled to obtain information from the Register in accordance with the VP Rules. Except as ordered by a court of competent jurisdiction or as required by law, the Holder (as defined below) of any Note shall be deemed to be and may be treated as its absolute owner for all purposes, whether or not it is overdue and regardless of any notice of ownership, trust or an interest in it, any writing on it or its theft or loss and no person shall be liable for so treating the Holder.

Settlement of purchase and sale transactions take place on registration against payment basis. Transfer of ownership of the Notes will be made in accordance with the VP Rules.

In these Terms and Conditions, "*Noteholder*" or "*Holder*" means the person in whose name a Note is registered or the person on whose book-entry securities account the Danish Notes are held (as the case may be) including any person duly authorised to act as a nominee and registered for the Notes.

(iv)   Condition 1(g) (*Transfer of Registered Notes*), Condition 1(h) (*Sums payable on Transfer*) and Condition 1(i) (*Owner of Registered Notes*) shall not apply to the Notes.

**(b)   Interest**

In Condition 3 (*Interest*), where any period is expressed to run from (and including) a particular date to (but excluding) another date, for the purposes of the Notes such period shall instead run from (but excluding) the first date to (and including) the second date.

Payments of interest shall be made in accordance with the VP Rules.

**(c)   Payment of Principal and Interest; Paying Agents**

(v)   Condition 7(b) (*Payments on Global Notes*) shall be amended to read:

"(b) *Payments in accordance with the VP Rules.* Payments of principal and/or interest in respect of the Notes shall be made to the Noteholders registered as such on the third business day (as defined by the then applicable VP Rules) before the due date for such payment, or such other business day falling closer to the due date as then may be stipulated in said rules and will be made in accordance with said rules. Such day shall be the "*Record Date*" in respect of the Notes in accordance with the VP Rules."

In respect of each Series of Notes, the Issuer shall at all times maintain a Registrar which shall be a duly authorised central securities depository under the Danish Securities Trading Act (or any successor thereto) and an Issuing Agent in Denmark duly authorised as an account holding institute under the Danish Securities Trading Act (or any successor thereto)."

(vi)   Condition 7(d) (*Payments on Definitive Registered Notes*) shall not apply to the Notes.

**(d)   Repayment Redemption and Repurchase**

(i)   The following shall be added to the end of Condition 8(d) (*Redemption at the Option of the Issuer*):

"Any such redemption shall be in accordance with the VP Rules and the notice to Noteholders shall also specify the Notes or amounts of the Notes to be redeemed or in

respect of which such option has been so exercised and the procedures for partial redemptions laid down in the VP Rules."

(ii)     The following shall be added to the end of Condition 8(e) (*Redemption at the Option of the Noteholders*):

"Any such notice from the Holder of any Notes will not be take effect against the Issuer before the date on which the relevant Notes have been transferred to the account designated by the Danish Issuing Agent and blocked for further transfer by the Danish Issuing Agent.

(iii)    The following shall be added to the end of Condition 8(i) (*Procedure for Payment upon Redemption*):

Any such redemption shall be in accordance with the VP Rules.

**(e)     Events of Default**

Condition 10(c) (*Remedies; Rescission; Waiver*) shall be deleted and replaced by the following:

"(c)    *Remedies; Rescission; Waiver*

If an Event of Default with respect to Notes of any Series at the time Outstanding occurs and is continuing, then in every such case, unless the principal of all of the Notes of such Series shall have already become due and payable, the Holders of at least 25% in principal amount of the Outstanding Notes of that Series may declare the principal amount (or, if the Notes of that Series are Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) of all of the Notes of that Series to be due and payable immediately (or on such later date on which the relevant Notes have been transferred to the account designated by the Danish Issuing Agent and blocked for further transfer by the Danish Issuing Agent) at their Early Redemption Amount, by a notice in writing to the Issuer and the Guarantor, and upon any such declaration such Early Redemption Amount, together with the premium, if any, accrued and unpaid interest, if any, and Additional Amounts, if any, shall become immediately due and payable.

At any time after such a declaration of acceleration with respect to Notes of any Series has been made and before a judgment or decree for payment of the money due has been obtained, the Holders of at least a majority in principal amount of Outstanding Notes of that Series, by written notice to the Issuer and the Guarantor and the Fiscal Agent or the Danish Issuing Agent (as the case may be), may rescind and annul such declaration and its consequences if (i) the Issuer or the Guarantor has paid or deposited with the Fiscal Agent or the Danish Issuing Agent (as the case may be) a sum sufficient to pay in the Specified Currency in which the Notes of such Series are payable:

(A) all overdue interest, if any, on all Notes of that Series and (B) the principal of (and premium, if any, on, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) any Notes of that Series which have become due otherwise than by such declaration of acceleration and interest thereon at the Fixed Rate of Interest, Rate of Interest or Accrual Yield, as the case may be, applicable to that Series; and (ii) all Events of Default with respect to Notes of that Series, other than the non-payment of the principal of Notes of that Series, which have become due solely by such declaration of acceleration, have been cured or waived as provided below. No such rescission shall affect any subsequent default or impair any right consequent thereon.

The Holders of at least a majority in principal amount of the Outstanding Notes of any Series or Receipts may on behalf of the Holders of all the Notes of such Series waive any past default hereunder with respect to such Series and its consequences, except a default (i) in the payment of the principal of (or premium, if any, and, if such Note is a

Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) or interest, if any, on any Note of such Series, or in the payment of any sinking fund instalment or analogous obligation with respect to the Notes of such Series, or (ii) in respect of a covenant or provision hereof which as described under Condition 12(e) (*Amendments Requiring Extraordinary Resolution of Noteholders*) below cannot be modified or amended without the passing of an Extraordinary Resolution (as hereafter defined) by the Holders of the Outstanding Notes of such Series affected. Upon any such waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of the Fiscal Agency Agreement or the Danish Agency Agreement (as the case may be) and the Notes of such Series, but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon."

(f)    **Meetings and Amendments**

Each reference in Condition 12 (*Meetings and Amendments*) to Notes being "authenticated" shall not apply to any Notes for so long as they are registered in uncertificated book-entry form with VP.

(g)    **Assumption of Obligations**

The following shall be added as a new sub-paragraph (v) in the first paragraph of Condition 13 (*Assumption of Obligations*) immediately following sub-paragraph (iv) after the words "any jurisdiction);":

"(v) VP, if required, has given its consent to the assumption;"

and the original sub-paragraph (v) shall be read as sub-paragraph (vi).

(h)    **Merger or Consolidation of the Issuer or the Guarantor**

The following shall be added as a new-sub paragraph (ii) in the first paragraph of Condition 14 (*Merger or Consolidation of the Issuer or the Guarantor*) immediately following the words "any jurisdiction);":

"(ii) VP, if required has given its consent to such a transaction and"

and the original sub-paragraph (ii) shall be read as sub-paragraph (iii), the original sub-paragraph (iii) shall be read as sub-paragraph (iv) and the original sub-paragraph (iv) shall be read as sub-paragraph (v).

(i)    **Notices**

The following shall be added as a new paragraph to the end of Condition 15 (*Notices*):

"Notices in respect of Danish Notes shall be in writing and shall be addressed to such Holders at their respective address appearing in the Register maintained by the Registrar in accordance with the VP Rules."

(j)    **Governing Law, Consent to Jurisdiction**

Notwithstanding Condition 19 (*Governing Law, Consent to Jurisdiction*) Danish law and jurisdiction will be applicable with regard to the registration of the Notes in VP.

Annex 2

**Amendments to the Terms and Conditions of the Notes in respect of Finnish Notes**

*The terms and conditions of Finnish Notes shall comprise the Terms and Conditions of the Notes set forth on page 62 above (the "General Conditions") as amended by the additional terms and conditions set forth below (the "Finnish Conditions"), subject to completion and/or amendment in the applicable Final Terms. In the event of any inconsistency between the General Conditions and the Finnish Conditions, the Finnish Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

(A)     **General**

For the purpose of this Base Prospectus, *"Finnish Notes"* means any Tranche of Notes issued by LBTCBV or LBB and designated as *"Finnish Notes"* in the applicable Final Terms.

The Finnish Notes will be registered in uncertificated and dematerialised book-entry form with the Finnish Central Securities Depository Ltd., Visiting Address, Urho Kekkosen katu 5 C, PO Box 1110, 00101 Helsinki, Finland (the *"APK"*). Finnish Notes registered in APK are negotiable instruments and not subject to any restrictions on free negotiability under Finnish law.

(B)     **Amendments to the Terms and Conditions in respect of the Finnish Notes**

As the Finnish Notes will be in uncertificated and dematerialised book-entry form, the Terms and Conditions of the Notes as so amended shall be deemed to be incorporated by reference in, and to form part of, the Deed of Covenant by which the Finnish Notes are constituted.

All references to the "Fiscal Agency Agreement" shall include such agreement (as amended, supplemented or replaced from time to time, the *"Finnish Issuing and Paying Agency Agreement"*) as may be entered into in relation to the Finnish Notes between the Issuers, the Guarantor and Svenska Handelsbanken, Branch Operation in Finland, Aleksanterinkatu 11, 00100 Helsinki, Finland (the *"Finnish Issuing Agent"*).

(a)     **Form and Transfer**

(i)     Condition 1(a) *(Form)* shall be amended to read:

"(a) *Form.* The Notes are in uncertificated and dematerialised book-entry form in accordance with the Finnish Act on the Book-Entry System (*Fin. laki arvo-osuusjärjestelmästä (826/1991)*) and with the Finnish Act on Book-Entry Accounts (*Fin. laki arvo-osuustileistä (827/1991)*). This Note is a Senior Note or a Subordinated Note, as indicated in the applicable Final Terms. Notes of one Specified Denomination may not be exchanged for Notes of another Specified Denomination.

The Notes shall be regarded as Registered Notes for the purposes of these Terms and Conditions save to the extent these Terms and Conditions are inconsistent with Finnish laws, regulations and operating procedures applicable to and/or issued by the APK (the *"APK Rules"*) and all references in these Terms and Conditions to the "Registrar" shall be deemed to be references to the APK. No physical Notes or certificates will be issued in respect of Notes and the provisions relating to presentation, surrendering or replacement of Notes shall not apply to the Notes.

(ii)     Condition 1(c) *(Coupons attached)* , Condition 1(d) *(Transfer of Bearer Notes)* and Condition 1(e) *(Title to Definitive Notes)* shall not apply to the Notes, save that references to Euroclear and/or Clearstream, Luxembourg shall, whenever the context so permits, be deemed to include a reference to the APK.

(iii)    Condition 1(f) (*Note register*) shall be amended to read:

"(f) *Title to the Notes.* Title to the Notes shall pass by transfer from a Noteholder's book-entry securities account to another securities book-entry account within the APK (except where the Finnish Notes are nominee-registered and are transferred from one account to another account with the same nominee). Notwithstanding any secrecy obligation, the Issuer shall be entitled to obtain information (including but not limited to information on Noteholders) from the register (the "*Register*") maintained by the Registrar on behalf of the Issuer in accordance with the APK Rules, and the APK shall be entitled to provide such information to the Issuer notwithstanding any secrecy obligation. The Issuer shall be entitled to pass such information to the Finnish Issuing Agent, Paying Agent or Fiscal Agent or to authorise such Agent to acquire such information from the APK directly. Except as ordered by a court of competent jurisdiction or as required by law, the Holder (as defined below) of any Note shall be deemed to be and may be treated as its absolute owner for all purposes, whether or not it is overdue and regardless of any notice of ownership, trust or an interest in it, any writing on it or its theft or loss and no person shall be liable for so treating the Holder.

In these Terms and Conditions, "*Noteholder*" or "*Holder*" means the person in whose name a Note is registered or the person on whose book-entry securities account the Notes are held including a nominee account holder (as the case may be)"

(iv)    Condition 1(g) (*Transfer of Registered Notes*), Condition 1(h) (*Sums payable on Transfer*) and Condition 1(i) (*Owner of Registered Notes*) shall not apply to the Notes.

**(b)    Interest**

Condition 3(d) (*Partly Paid Notes*) shall not apply to the Notes.

**(c)    Payments of Principal and Interest; Paying Agents**

(i)    Condition 7(b) (*Payments on Global Notes*) shall be amended to read:

"(b) *Payments in accordance with the APK Rules.* Payments of principal and/or interest in respect of the Notes shall be made to the Noteholders on the basis of information recorded in the relevant Noteholder's book-entry securities account on the due date in accordance with the APK Rules. Noteholders will not be entitled to any interest or other compensation for any delay after the due date in receiving the amount due as a result of the due date for payment not being a business day. In this Condition 7(b) (*Payments on Global Notes*), "*business day*" means a day, other than a Saturday or Sunday on which APK and its relevant system in which the Notes are registered are open for business in accordance with the APK Rules.

In respect of each Series of Notes, the Issuer shall at all times maintain a Registrar which shall be the duly authorised Finnish central securities depository under the Finnish Act on the Book-Entry System and a Finnish Issuing Agent duly authorised as an account operator (*Fin. tilinhoitajayhteisö*) under the Act on the Book-Entry System.

(ii)    Condition 7(d) (*Payments on Definitive Registered Notes*) and 7(g) (*Exchange of Coupons and Talons*) shall not apply to the Notes.

(iii)    The following shall be added to the end of Condition 8(i) (*Procedure for Payment upon Redemption*):

Any such redemption shall be in accordance with the APK Rules.

**(d)    Repayment, Redemption and Repurchase**

(i)    The following shall be added to the end of Condition 8(d) (*Redemption at the Option of the Issuer*):

Any such redemption shall be in accordance with the APK Rules and the notice to Noteholders shall also specify the Notes (recognizing that the Notes are not numbered or otherwise separable from each other) or amounts of the Notes to be redeemed or in respect of which such option has been so exercised and the procedures for partial redemptions laid down in the APK Rules.

(ii)    The following shall be added to the end of Condition 8(e) (*Redemption at the Option of the Noteholders*):

Any such notice from the Holder of any Note will not take effect against the Issuer before the date on which the relevant Notes have been transferred to the account designated by the Finnish Issuing Agent and blocked for further transfer by the Finnish Issuing Agent.

**(e)    Events of Default**

Condition 10(c) (*Remedies; Rescission; Waiver*) shall be deleted and replaced by the following:

"*(c)    Remedies; Rescission; Waiver*

If an Event of Default with respect to Notes of any Series at the time Outstanding occurs and is continuing, then in every such case, unless the principal of all of the Notes of such Series shall have already become due and payable, the Holders of at least 25% in principal amount of the Outstanding Notes of that Series may declare the principal amount (or, if the Notes of that Series are Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) of all of the Notes of that Series to be due and payable immediately (or on such later date on which the relevant Notes have been transferred to the account designated by the Finnish Issuing Agent and blocked for further transfer by the Finnish Issuing Agent) at their Early Redemption Amount, by a notice in writing to the Issuer and the Guarantor, and upon any such declaration such Early Redemption Amount, together with the premium, if any, accrued and unpaid interest, if any, and Additional Amounts, if any, shall become immediately due and payable.

At any time after such a declaration of acceleration with respect to Notes of any Series has been made and before a judgment or decree for payment of the money due has been obtained, the Holders of at least a majority in principal amount of Outstanding Notes of that Series, by written notice to the Issuer and the Guarantor and the Fiscal Agent or the Finnish Issuing Agent (as the case may be), may rescind and annul such declaration and its consequences if (i) the Issuer or the Guarantor has paid or deposited with the Fiscal Agent or the Finnish Issuing Agent (as the case may be) a sum sufficient to pay in the Specified Currency in which the Notes of such Series are payable:

(A) all overdue interest, if any, on all Notes of that Series and (B) the principal of (and premium, if any, on, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) any Notes of that Series which have become due otherwise than by such declaration of acceleration and interest thereon at the Fixed Rate of Interest, Rate of Interest or Accrual Yield, as the case may be, applicable to that Series; and (ii) all Events of Default with respect to Notes of that Series, other than the non-payment of the principal of Notes of that Series, which have become due solely by such declaration of acceleration, have been cured or waived as provided below. No such rescission shall affect any subsequent default or impair any right consequent thereon.

The Holders of at least a majority in principal amount of the Outstanding Notes of any Series may on behalf of the Holders of all the Notes of such Series waive any past default hereunder

with respect to such Series and its consequences, except a default (i) in the payment of the principal of (or premium, if any, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) or interest, if any, on any Note of such Series, or in the payment of any sinking fund instalment or analogous obligation with respect to the Notes of such Series, or (ii) in respect of a covenant or provision hereof which as described under Condition 12(e) (*Amendments Requiring Extraordinary Resolution of Noteholders*) below cannot be modified or amended without the passing of an Extraordinary Resolution (as hereafter defined) by the Holders of the Outstanding Notes of such Series affected. Upon any such waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of the Fiscal Agency Agreement and the Notes of such Series, but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon."

(f)    **Meetings and Amendments**

Each reference in Condition 12 (*Meetings and Amendments*) to Notes being "authenticated" shall not apply to any Notes for so long as they are registered in uncertificated book-entry form with the APK.

(g)    **Assumption of Obligations**

The following shall be added as a new sub-paragraph (v) in the first paragraph of Condition 13 (*Assumption of Obligations*) immediately following sub-paragraph (iv) after the words "any jurisdiction);":

"(v)    the APK, if required, has given its consent to the assumption;"

and the original sub-paragraph (v) shall be read as sub-paragraph (vi).

(h)    **Merger or Consolidation of the Issuer or the Guarantor**

The following shall be added as a new-sub paragraph (ii) in the first paragraph of Condition 14 (*Merger or Consolidation of the Issuer or the Guarantor*) immediately following the words "any jurisdiction);":

"(ii)    the APK, if required has given its consent to such a transaction and;"

and the original sub-paragraph (ii) shall be read as sub-paragraph (iii).

(i)    **Notices**

The following shall be added as a new paragraph to the end of Condition 15 (*Notices*):

"Notices in respect of Finnish Notes will be in writing and shall be addressed to such Holders at its address appearing in the Register maintained by the Registrar in accordance with the APK Rules."

(j)    **Governing Law, Consent to Jurisdiction**

Notwithstanding Condition 19 (*Governing Law, Consent to Jurisdiction*) Finnish law and jurisdiction will be applicable with regard to the registration of the Notes in APK.

Annex 3

**Amendments to the Terms and Conditions of the Notes in respect of Norwegian Notes**

*The terms and conditions of Norwegian Notes shall comprise the Terms and Conditions of the Notes set forth on page 62 above (the "General Conditions") as amended by the additional terms and conditions set forth below (the "Norwegian Conditions"), subject to completion and/or amendment in the applicable Final Terms. In the event of any inconsistency between the General Conditions and the Norwegian Conditions, the Norwegian Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

**(A)    General**

For the purpose of this Base Prospectus, *"Norwegian Notes"* means any Tranche of Notes issued by LBTCBV or LBB and designated as *"Norwegian Notes"* in the applicable Final Terms.

The Norwegian Notes will be registered in uncertificated and dematerialised electronic book-entry form with a Norwegian Central Securities Depository which will be Verdipapirsentralen ASA (*"VPS"*). Norwegian Notes registered in VPS are negotiable instruments and not subject to any restrictions on free negotiability under Norwegian law.

**(B)    Amendments to the Terms and Conditions in respect of the Norwegian Notes**

As the Norwegian Notes will be in uncertificated and dematerialised book-entry form, the Terms and Conditions of the Notes as so amended shall be deemed to be incorporated by reference in, and to form part of, the Deed of Covenant by which the Norwegian Notes are constituted.

All references to the "Fiscal Agency Agreement" shall include such agreement for the management of a bond and commercial paper Issuer's account in VPS (as amended, supplemented or replaced from time to time, the *"Norwegian Agency Agreement"*) as may be entered into in relation to the Norwegian Notes between the Issuers, the Guarantor and DnB NOR Bank ASA Stranden 21, 0021 Oslo, Norway (the **"Norwegian Agent"**).

**(a)    Form and Transfer**

    (i)    Condition 1(a) (*Form*) shall be amended to read:

"(a) *Form*. The Notes are issued in uncertificated and dematerialised book-entry form in accordance with the Norwegian Securities Register Act (in *Norwegian: lov om registrering av finansielle instrumenter 2002 5. juli nr. 64*). This is a Senior Note or a Subordinated Note, as indicated in the applicable Final Terms. Notes of one Specified Denomination may not be exchanged for Notes of another Specified Denomination.

The Notes shall be regarded as Registered Notes for the purposes of these Terms and Conditions save to the extent these Terms and Conditions are inconsistent with Norwegian laws, regulations and operating procedures applicable to and/or issued by VPS for the time being (the "*VPS Rules*"). No physical notes or certificates will be issued in respect of the Notes and the provisions in these Terms and Conditions relating to presentation, surrendering or replacement of such physical notes or certificates shall not apply to the Notes.

    (ii)    Condition 1(c) (*Coupons attached*), Condition 1(d) (*Transfer of Bearer Notes*) and Condition 1(e) (*Title to Definitive Notes*) shall not apply to the Notes, save that references to Euroclear and/or Clearstream, Luxembourg shall, whenever the context so permits, be deemed to include a reference to VPS.

    (iii)    Condition 1(f) (*Note register*) shall be amended to read:

124

"(f) *Title to the Notes*. Title to the Notes shall pass by registration in the register (the "*VPS Register*") maintained by the Norwegian Agent on behalf of the Issuer in accordance with the Norwegian VPS Rules. The Issuer shall be entitled to obtain information from VPS in accordance with the VPS Rules. Except as ordered by a court of competent jurisdiction or as required by law, the Holder (as defined below) of any Note shall be deemed to be and may be treated as its absolute owner for all purposes, whether or not it is overdue and regardless of any notice of ownership, trust or an interest in it and no person shall be liable for so treating the Holder.

One or more Notes may be transferred in accordance with the VPS Rules. In the case of an exercise of an option resulting in Notes of the same holding having different terms, separate Notes registered with the VPS Register shall be issued in respect of those Notes of that holding having the same terms. Such Notes shall only be issued against surrender of the existing Notes in accordance with the VPS Rules. Each new Note to be issued pursuant to the above, shall be available for delivery within three business days of receipt of the request and the surrender of the Notes for exchange. Delivery of the new Note(s) shall be made to the same VPS account on which the original Notes were registered. In this Condition 1(f) (*Title to the Notes*), "*business day*" means a day, other than a Saturday or Sunday on which VPS is open for business.

Exchange and transfer of Notes on registration, transfer, partial redemption or exercise of an option shall be effected without charge by or on behalf of the Issuer or the Norwegian Agent, but upon payment of any tax or other governmental charges that may be imposed in relation to it (or the giving of such indemnity as the Norwegian Agent may require).

No Noteholder may require the transfer of a Norwegian Note to be registered during any closed period pursuant to the then applicable VPS Rules.

In these Terms and Conditions, "*Noteholder*" or "*Holder*" means the person in whose name a Note is registered in the VPS Register and shall also include any person duly authorised to act as a nominee (in Norwegian: *forvalter*) and registered as a holder of the Norwegian Notes.

(iv) Condition 1(g) (*Transfer of Registered Notes*), Condition 1(h) (*Sums payable on Transfer*) and Condition 1(i) (*Owner of Registered Notes*) shall not apply to the Notes.

**(b)   Payments of Principal and Interest; Paying Agents**

(i) The last sentence of Condition 7(d) (*Payments on Definitive Registered Notes*) shall be deleted and replaced by the following:

If Registered Notes (other than Australian Domestic Notes, Finnish Notes, Norwegian Notes or Danish Notes) are issued, a register will be maintained in accordance with the Fiscal Agency Agreement.

(ii) A new paragraph shall be inserted in Condition 7 (*Payment of Principal and Interest; Paying Agents*) as Condition 7(j) (*Payments in respect of Norwegian Notes; Norwegian Agent*) and it shall read:

"(j) *Payments in respect of Norwegian Notes; Norwegian Agent*. Payments of principal and/or interest in respect of the Notes shall be made to the Noteholders registered as such on the fifth business day (as defined by the then applicable VPS Rules before the due date for such payment, or such other business day falling closer to the due date as then may be stipulated in the VPS Rules and will be made in accordance with said Rules. Such day shall be the "*Record Date*" in respect of the Notes in accordance with the VPS Rules.

**(c)    Repayment, Redemption, and Repurchase**

    (i)    The following shall be added as an additional paragraph to Condition 8(d) (*Redemption at the option of the Issuer*) and shall read:

        Any redemption in part must comply with the requirements of the VPS Rules and the notice to Noteholders shall also specify the Notes or amounts of the Notes to be redeemed or in respect of which such option has so been exercised and any procedures for partial redemption laid down by the VPS Rules that will be observed.

    (ii)    The following shall be added as an additional paragraph to Condition 8(e) (*Redemption at the Option of the Issuer*):

        To exercise such option or any other Noteholders' option that may be set out in the applicable Final Terms (which must be exercised in accordance with the applicable Final Terms) the Holder must register in the relevant VPS account a transfer restriction in favour of the Norwegian Agent and deliver to the Norwegian Agent a duly completed option exercise notice (the "*Exercise Notice*") in the form obtainable from the Norwegian Agent which the Issuer will provide to the Norwegian Agent on request within the notice period. An Exercise Notice will not take effect against the Issuer before the date on which the relevant Notes have been transferred to the account designated by the Norwegian Agent or blocked for further transfer by the Norwegian Agent. No Note so transferred or blocked and option exercised may be withdrawn (except as provided in the Norwegian Agency Agreement) without the prior consent of the Issuer.

    (iii)    The following shall be added to the end of Condition 8(i) (*Procedure for Payment upon Redemption*):

        Any such redemption shall be in accordance with the APK Rules.

**(d)    Events of Default**

Condition 10(c) (*Remedies; Rescission; Waiver*) shall be deleted and replaced by the following:

    (c)    *Remedies; Rescission; Waiver*

        If an Event of Default with respect to Notes of any Series at the time Outstanding occurs and is continuing, then in every such case, unless the principal of all of the Notes of such Series shall have already become due and payable, the Holders of at least 25% in principal amount of the Outstanding Notes of that Series may declare the principal amount (or, if the Notes of that Series are Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) of all of the Notes of that Series to be due and payable immediately (or on such later date on which the relevant Notes have been transferred to the account designated by the Norwegian Agent and blocked for further transfer by the Norwegian Agent the VPS Rules) at their Early Redemption Amount, by a notice in writing to the Issuer and the Guarantor, and upon any such declaration such Early Redemption Amount, together with the premium, if any, accrued and unpaid interest, if any, and Additional Amounts, if any, shall become immediately due and payable.

        At any time after such a declaration of acceleration with respect to Notes of any Series has been made and before a judgment or decree for payment of the money due has been obtained, the Holders of at least a majority in principal amount of Outstanding Notes of that Series, by written notice to the Issuer and the Guarantor and the Fiscal Agent or the Norwegian Agent (as the case may be), may rescind and annul such declaration and its consequences if (i) the Issuer or, if applicable, the Guarantor, has paid or deposited with the Fiscal Agent or the Norwegian Agent (as the case may be) a sum sufficient to pay in the Specified Currency in which the Notes of such Series are payable:

(A) all overdue interest, if any, on all Notes of that Series and (B) the principal of (and premium, if any, on, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) any Notes of that Series which have become due otherwise than by such declaration of acceleration and interest thereon at the Fixed Rate of Interest, Rate of Interest or Accrual Yield, as the case may be, applicable to that Series; and (ii) all Events of Default with respect to Notes of that Series, other than the non-payment of the principal of Notes of that Series, which have become due solely by such declaration of acceleration, have been cured or waived as provided below. No such rescission shall affect any subsequent default or impair any right consequent thereon.

The Holders of at least a majority in principal amount of the Outstanding Notes of any Series may on behalf of the Holders of all the Notes of such Series waive any past default hereunder with respect to such Series and its consequences, except a default (i) in the payment of the principal of (or premium, if any, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) or interest, if any, on any Note of such Series, or in the payment of any sinking fund instalment or analogous obligation with respect to the Notes of such Series, or (ii) in respect of a covenant or provision hereof which as described under Condition 12(e) (*Amendments Requiring Extraordinary Resolution of Noteholders*) below cannot be modified or amended without the passing of an Extraordinary Resolution (as hereafter defined) by the Holders of the Outstanding Notes of such Series affected. Upon any such waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of the Fiscal Agency Agreement or the Norwegian Agency Agreement (as the case may be) and the Notes of such Series, but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

(e)    **Meetings and Amendments**

Each reference in Condition 12 (*Meetings and Amendments*) to Notes being "authenticated" shall not apply to the Notes.

(f)    **Assumption of Obligations**

The following shall be added as a new sub-paragraph (v) in the first paragraph of Condition 13 (*Assumption of Obligations*) immediately following sub-paragraph (iv) after the words "any jurisdiction);":

"(v)    VPS, if required, has given its consent to the assumption;"

and the original sub-paragraph (v) shall be read as sub-paragraph (vi).

(g)    **Merger or Consolidation of the Issuer or the Guarantor**

The following shall be added as a new-sub paragraph (ii) in the first paragraph of Condition 14 (*Merger or Consolidation of the Issuer or the Guarantor*) immediately following the words "any jurisdiction);":

"(ii)    VPS, if required has given its consent to such a transaction; and"

and the original sub-paragraph (ii) shall be read as sub-paragraph (iii), the original sub-paragraph (iii) shall be read as sub-paragraph (iv) and the original sub-paragraph (iv) shall be read as sub-paragraph (v).

(h)    **Notices**

The following shall be added as a new paragraph to the end of Condition 15 (*Notices*):

"Notices in respect of Norwegian Notes will be in writing and shall be addressed to such Holders at address appearing in the Register maintained by the Registrar in accordance with the VPS Rules."

(i)    **Further Issues of Notes**

A new paragraph shall be inserted in Condition 18 (*Further Issues of Notes*) following the first paragraph and shall read:

Each Holder agrees and gives consent to VPS to provide the Norwegian Agent, upon request, information registered with VPS relating to the Notes and the Noteholders in order that the Norwegian Agent may provide any relevant Norwegian authorities, including the Financial Supervisory Authority of Norway (in Norwegian: *Kredittilsynet*) and the Norwegian tax authorities with any information required under applicable Norwegian laws. Such information shall include, but not be limited to, the identity of the registered holder of the Notes, the residency of the registered holder of the Notes, the number of Notes registered with the relevant holder, the address of the relevant holder, the account operator in respect of the relevant VPS account (in Norwegian: *Kontofører*) and whether or not the Notes are registered in the name of a nominee and the identity of any such nominee.

Annex 4

**Amendments to the Terms and Conditions of the Notes in respect of Swedish Notes**

*The terms and conditions of Swedish Notes shall comprise the Terms and Conditions of the Notes set forth on page 62 above (the "General Conditions") as amended by the additional terms and conditions set forth below (the "Swedish Conditions"), subject to completion and/or amendment in the applicable Final Terms. In the event of any inconsistency between the General Conditions and the Swedish Conditions, the Swedish Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

**(A)    General**

For the purpose of this Supplement, *"Swedish Notes"* means any Tranche of Notes issued by LBTCBV or LBB and designated as *"Swedish Notes"* in the applicable Final Terms.

The Swedish Notes will be registered in uncertificated and dematerialised book-entry form with a Swedish Central Securities Depository which will be VPC AB (*"VPC"*). Swedish Notes registered in VPC are negotiable instruments and not subject to any restrictions on free negotiability under Swedish law. For so long as it is a requirement of the VPC Rules (as defined below), Swedish Notes may not provide for any form of settlement in respect of payment of interest, principal or premium other than payment in cash.

**(B)    Amendments to the Terms and Conditions in respect of the Swedish Notes**

For the purposes of all Swedish Notes the Terms and Conditions of the Notes shall be amended as set forth in below in this Part B of Annex D (*Swedish Notes*) of this Supplement. Furthermore, as the Swedish Notes will be in uncertificated and dematerialised book-entry form, the Terms and Conditions of the Notes as so amended shall be deemed to be incorporated by reference in, and to form part of, the Deed of Covenant executed by the Issuers by which the Swedish Notes are constituted.

All references to the "Fiscal Agency Agreement" shall include such agreement (as amended, supplemented or replaced from time to time, the *"Swedish Agency Agreement"*) as may be entered into in relation to the Swedish Notes between the Issuers, the Guarantor and Svenska Handelsbanken, Blasieholmstorg 12, 106 70 Stockholm, Sweden (the *"Swedish Issuing Agent"*).

**(a)    Form, Denomination and Title**

   (i)    Condition 1(a) (*Form*) shall be amended to read:

   "(a) *Form.* The Notes are issued in uncertificated and dematerialised book-entry form in accordance with the Swedish Financial Instruments Accounts Act (Sw. *lag (1998:1479) om kontoföring av finansiella instrument*) in each case in the Specified Currency or Currencies and Denomination(s). This Note is a Senior Note or a Subordinated Note, as indicated in the applicable Final Terms. Notes of one Specified Denomination may not be exchanged for Notes of another Specified Denomination.

   The Notes shall be regarded as Registered Notes for the purposes of these Terms and Conditions save to the extent these Terms and Conditions are inconsistent with Swedish laws, regulations and operating procedures applicable to and/or issued by VPC (the *"VPC Rules"*) and all references in these Terms and Conditions to the "Registrar" shall be deemed to be references to VPC. No physical notes or certificates will be issued in respect of Notes and the provisions relating to presentation, surrendering or replacement of Notes shall not apply to the Notes.

   (ii)    Condition 1(c) (*Coupons attached*) , Condition 1(d) (*Transfer of Bearer Notes*) and Condition 1(e) (*Title to Definitive Notes*) shall not apply to the Notes, save that

129

references to Euroclear and/or Clearstream, Luxembourg shall, whenever the context so permits, be deemed to include a reference to VPC.

(iii) Condition 1(f) (*Note register*) shall be amended to read:

"(f) *Title to the Notes.* Title to the Notes shall pass by registration in the register (the *"Register"*) maintained by the Registrar on behalf of the Issuer in accordance with Swedish laws, regulations and the VPC Rules. The Swedish Issuing Agent is acting as account operator (*Sw. Kontoförande institute*) in relation to VPC. The Issuer shall be entitled to obtain information from the Register in accordance with the VPC Rules. Except as ordered by a court of competent jurisdiction or as required by law, the Holder (as defined below) of any Note shall be deemed to be and may be treated as its absolute owner for all purposes and no person shall be liable for so treating the Holder.

In these Terms and Conditions, *"Noteholder"* or *"Holder"* means the person in whose name a Note is registered or the person on whose book-entry securities account the Swedish Notes are held (as the case may be) including any person duly authorised to act as a nominee (*Sw. förvaltare*) and registered for the Notes.

(iv) Condition 1(g) (*Transfer of Registered Notes*), Condition 1(h) (*Sums payable on Transfer*) and Condition 1(i) (*Owner of Registered Notes*) shall not apply to the Notes.

**(b)    Interest**

In Condition 3 (*Interest*), where any period is expressed to run from (and including) a particular date to (but excluding) another date, for the purposes of the Notes such period shall instead run from (but excluding) the first date to (and including) the second date.

**(c)    Payment of Principal and Interest; Paying Agents**

(i) Condition 7(b) (*Payments on Global Notes*) shall be amended to read:

"(b) *Payments in accordance with the VPC Rules.* Payments of principal and/or interest in respect of the Notes shall be made to the Noteholders registered as such on the fifth business day (as defined by the then applicable VPC Rules) before the due date for such payment, or such other business day falling closer to the due date as then may be stipulated in said rules and will be made in accordance with said rules. Such day shall be the *"Record Date"* in respect of the Notes in accordance with the VPC Rules."

In respect of each Series of Notes, the Issuer shall at all times maintain a Registrar which shall be a duly authorised central securities depository under the Swedish Financial Instruments Accounts Act and an Issuing Agent in Sweden duly authorised as an account operator under the Swedish Financial Instruments Accounts Act."

(ii) Condition 7(d) (*Payments on Definitive Registered Notes*) shall not apply to the Notes.

**(d)    Repayment Redemption and Repurchase**

(i) The following shall be added to the end of Condition 8(d) (*Redemption at the Option of the Issuer*):

"Any such redemption shall be in accordance with the VPC Rules and the notice to Noteholders shall also specify the Notes or amounts of the Notes to be redeemed or in respect of which such option has been so exercised and the procedures for partial redemptions laid down in the VPC Rules."

(ii) The following shall be added to the end of Condition 8(e) (*Redemption at the Option of the Noteholders*):

"Any such notice from the Holder of any Notes will not take effect against the Issuer before the date on which the relevant Notes have been transferred to the account designated by the Swedish Issuing Agent and blocked for further transfer by the Swedish Issuing Agent.

(iii)    The following shall be added to the end of Condition 8(i) (*Procedure for Payment upon Redemption*):

Any such redemption shall be in accordance with the VPC Rules.

(e)    **Events of Default**

Condition 10(c) (*Remedies; Rescission; Waiver*) shall be deleted and replaced by the following:

"(c)    *Remedies; Rescission; Waiver*

If an Event of Default with respect to Notes of any Series at the time Outstanding occurs and is continuing, then in every such case, unless the principal of all of the Notes of such Series shall have already become due and payable, the Holders of at least 25% in principal amount of the Outstanding Notes of that Series may declare the principal amount (or, if the Notes of that Series are Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) of all of the Notes of that Series to be due and payable immediately (or on such later date on which the relevant Notes have been transferred to the account designated by the Swedish Issuing Agent and blocked for further transfer by the Swedish Issuing Agent) at their Early Redemption Amount, by a notice in writing to the Issuer and the Guarantor, and upon any such declaration such Early Redemption Amount, together with the premium, if any, accrued and unpaid interest, if any, and Additional Amounts, if any, shall become immediately due and payable.

At any time after such a declaration of acceleration with respect to Notes of any Series has been made and before a judgment or decree for payment of the money due has been obtained, the Holders of at least a majority in principal amount of Outstanding Notes of that Series, by written notice to the Issuer and the Guarantor and the Fiscal Agent or the Swedish Issuing Agent (as the case may be), may rescind and annul such declaration and its consequences if (i) the Issuer or the Guarantor has paid or deposited with the Fiscal Agent or the Swedish Issuing Agent (as the case may be) a sum sufficient to pay in the Specified Currency in which the Notes of such Series are payable:

(A) all overdue interest, if any, on all Notes of that Series and (B) the principal of (and premium, if any, on, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) any Notes of that Series which have become due otherwise than by such declaration of acceleration and interest thereon at the Fixed Rate of Interest, Rate of Interest or Accrual Yield, as the case may be, applicable to that Series; and (ii) all Events of Default with respect to Notes of that Series, other than the non-payment of the principal of Notes of that Series, which have become due solely by such declaration of acceleration, have been cured or waived as provided below. No such rescission shall affect any subsequent default or impair any right consequent thereon.

The Holders of at least a majority in principal amount of the Outstanding Notes of any Series may on behalf of the Holders of all the Notes of such Series waive any past default hereunder with respect to such Series and its consequences, except a default (i) in the payment of the principal of (or premium, if any, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) or interest, if any, on any Note of such Series, or in the payment of any sinking fund instalment or analogous obligation with respect to the Notes of such Series, or (ii) in respect of a covenant or provision hereof which as described under Condition 12(e) (*Amendments Requiring Extraordinary Resolution of Noteholders*) below cannot be modified or

131

amended without the passing of an Extraordinary Resolution (as hereafter defined) by the Holders of the Outstanding Notes of such Series affected. Upon any such waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of the Fiscal Agency Agreement or the Swedish Agency Agreement (as the case may be) and the Notes of such Series, but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

For the avoidance of doubt, any action to be taken by VPC pursuant to this Condition 10 (c) (*Remedies; Rescission; Waiver*), may only be taken in accordance with the VPC Rules.

(f)   **Meetings and Amendments**

Each reference in Condition 12 (*Meetings and Amendments*) to Notes being "authenticated" shall not apply to any Notes for so long as they are registered in uncertificated book-entry form with VPC.

(g)   **Assumption of Obligations**

The following shall be added as a new sub-paragraph (v) in the first paragraph of Condition 13 (*Assumption of Obligations*) immediately following sub-paragraph (iv) after the words "any jurisdiction);":

"(v) VPC, if required, has given its consent to the assumption;"

and the original sub-paragraph (v) shall be read as sub-paragraph (vi).

(h)   **Merger or Consolidation of the Issuer or the Guarantor**

The following shall be added as a new-sub paragraph (ii) in the first paragraph of Condition 14 (*Merger or Consolidation of the Issuer or the Guarantor*) immediately following the words "any jurisdiction);":

"(ii) VPC, if required has given its consent to such a transaction and"

and the original sub-paragraph (ii) shall be read as sub-paragraph (iii), the original sub-paragraph (iii) shall be read as sub-paragraph (iv) and the original sub-paragraph (iv) shall be read as sub-paragraph (v).

(i)   **Notices**

The following shall be added as a new paragraph to the end of Condition 15 (*Notices):*

"Notices in respect of Swedish Notes will be in writing and shall be addressed to such Holders at its address appearing in the Register maintained by the Registrar in accordance with the VPC Rules."

(j)   **Governing Law, Consent to Jurisdiction**

Notwithstanding Condition 19 (*Governing Law, Consent to Jurisdiction*) Swedish law and jurisdiction will be applicable with regard to the registration of the Notes in VPC.

## Annex 5

**Additional Terms and Conditions for Commodity-Linked Notes with certain Agricultural Products, Energy Products and Metals as a Relevant Commodity**

*The terms and conditions of Commodity-Linked Notes with certain Agricultural Products, Energy Products and Metals as a Relevant Commodity shall comprise the Terms and Conditions of the Notes set forth on page 62 above (the "General Conditions") and the additional terms and conditions set forth below (the "Special Conditions"), in each case subject to completion and/or amendment in the applicable Final Terms. If any such Notes are Danish Notes, Finnish Notes, Norwegian Notes or Swedish Notes then the General Conditions applicable to such Notes shall in addition be as amended as described in Annex 1, Annex 2, Annex 3 or Annex 4 above , as applicable (the "Applicable Scandinavian Conditions"). In the event of any inconsistency between the General Conditions and the Special Conditions, the Special Conditions shall prevail. If any such Notes are Danish Notes, Finnish Notes, Norwegian Notes or Swedish Notes then in the event of any inconsistency between (1) the General Conditions as amended by the Special Conditions and (2) the Applicable Scandinavian Conditions, the Applicable Scandinavian Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

1.    **Determination of a Commodity Price**

"*Commodity*" means the commodity specified in the relevant Final Terms, and if more than one commodity is so specified in the relevant Final Terms, then each such commodity.

"*Commodity Business Day*" means:

(i)    where the Commodity Reference Price is a price announced or published by an Exchange, a day that is (or, but for the occurrence of a Disruption Event, would have been) a day on which that Exchange is open for trading during its regular trading session, notwithstanding any such Exchange closing prior to its scheduled closing time; and

(ii)    where the Commodity Reference Price is not a price announced or published by an Exchange, a day that is (or, but for the occurrence of a Disruption Event, would have been) a day in respect of which the relevant Price Source published (or, but for the occurrence of a Disruption Event, would have published) a price.

"*Commodity Reference Price*" means, in respect of a Commodity, the relevant reference price for such Commodity which may be one of the following:

(i)    a reference price set out in the Annex hereto ("Certain Commodity Reference Prices") (with such amendments, if any, as shall be set out in the applicable Final Terms); or

(ii)    a reference price as specified in the relevant Final Terms where:

(A)    if that Commodity Reference Price is a price announced or published by an Exchange, the following is specified: (1) the relevant Commodity (including, if relevant, the type or grade of that Commodity, the location of delivery and any other details); (2) the relevant Unit; (3) the relevant Exchange; (4) the relevant currency in which the Specified Price is expressed; (5) the Specified Price; and, if applicable, (6) the Delivery Date, in which case the price for any relevant date will be that day's Specified Price per Unit of that Commodity on that Exchange and, if applicable, for delivery on that Delivery Date, stated in that currency, as announced or published by that Exchange on that date; and

(B)    if that Commodity Reference Price is not a price announced or published by an Exchange, the following is specified: (1) the relevant Commodity (including, if relevant, the type or grade of that Commodity, the location of delivery and any other details); (2) the relevant Unit; (3) the relevant Price Source (and, if applicable, the location in that Price Source of the Specified Price (or the prices from which the Specified Price is

calculated)); (4) the relevant currency in which the Specified Price is expressed; (5) the Specified Price; and, if applicable, (6) the Delivery Date, in which case the price for any relevant date will be that day's Specified Price per Unit of that Commodity and, if applicable, for that Delivery Date, stated in that currency, published (or shown) in the issue of that Price Source that reports prices effective on that date.

"*Delivery Date*" means, in respect of a Commodity Reference Price, the relevant date or month for delivery of the underlying Commodity (which must be a date or month reported, or capable of being determined from information reported, in or by the relevant Price Source) as follows:

(i)     if a date is, or a month and year are, specified in the relevant Final Terms, that date or that month and year;

(ii)    if a Nearby Month is specified in the relevant Final Terms, that date or the month of expiration of the relevant Futures Contract; and

(iii)   if a method is specified for the purpose of determining the Delivery Date in the relevant Final Terms, the date or the month and year determined pursuant to that method.

"*Disruption Events*" means, Commodity Valuation Date Disruption Events (see section 3 below) and/or Commodity Observation Date Disruption Events (see section 4 below), as applicable.

"*Disruption Fallbacks*" means, Commodity Valuation Date Fallbacks (see section 3 below) and/or Commodity Observation Date Fallbacks (see section 4 below), as applicable.

"*Exchange*" means the exchange or principal trading market specified in the relevant Final Terms or Commodity Reference Price and any Successor Exchange, and shall include the following, if referred to in the relevant Commodity Reference Price:

### *Exchanges and Principal Trading Markets:*

(i)     "*APX*" means the Amsterdam Power Exchange N.V., or its successor, which reports market prices on its website at www.apx.nl or its successor;

(ii)    "*CBOT*" means the Chicago Board of Trade or its successor;

(iii)   "*CME*" means the Chicago Mercantile Exchange or its successor;

(iv)    "*COMEX*" means the COMEX Division, or its successor, of the New York Mercantile Exchange, Inc. or its successor;

(v)     "*EEX*" means the European Energy Exchange AG, or its successor, which reports market prices on its website at www.eex.de or its successor;

(vi)    "*EURONEXT LIFFE*" means Euronext B.V. London International Financial Futures and Options Exchange or its successor;

(vii)   "*ICE Futures*" or "*IPE*" means ICE Futures, a wholly owned subsidiary of Intercontinental Exchange™, or its successor;

(viii)  "*KCBOT*" means the Kansas City Board of Trade or its successor;

(ix)    "*LEBA*" means The London Energy Brokers' Association or its successor;

(x)     "*LME*" means The London Metal Exchange Limited or its successor;

(xi)    "*London Gold Market*" means the market in London on which members of The London Bullion Market Association ("*LBMA*"), amongst other things, quote prices for the buying and selling of Gold;

(xii)   *"London Silver Market"* means the market in London on which members of LBMA, amongst other things, quote prices for the buying and selling of Silver;

(xiii)  *"LPPM"* means The London Platinum and Palladium Market in London on which members quote prices for the buying and selling of Platinum and Palladium;

(xiv)   *"MDEX"* means the Malaysian Derivatives Exchange or its successor;

(xv)    *"NYBOT"* means the New York Board of Trade or its successor;

(xvi)   *"NYMEX"* means the NYMEX Division, or its successor, of the New York Mercantile Exchange, Inc. or its successor;

(xvii)  *"SICOM"* means the Singapore Commodity Exchange Limited or its successor;

(xviii) *"TOCOM"* means The Tokyo Commodity Exchange or its successor;

*"Futures Contract"* means, in respect of a Commodity Reference Price, the contract for future delivery of a contract size in respect of the relevant Delivery Date relating to the Commodity referred to in that Commodity Reference Price.

*"kL"* means kiloliter.

*"Nearby Month"*, when preceded by a numerical adjective, means, in respect of a Delivery Date and any date on which a Relevant Price is to be determined, the month of expiration of the Futures Contract identified by that numerical adjective, so that, for example, (A) *"First Nearby Month"* means the month of expiration of the first Futures Contract to expire following the relevant date; (B) *"Second Nearby Month"* means the month of expiration of the second Futures Contract to expire following the relevant date; and (C) *"Sixth Nearby Month"* means the month of expiration of the sixth Futures Contract to expire following the relevant date.

*"Price Source"* means the publication (or such other origin of reference, including an Exchange) containing (or reporting) the Specified Price (or prices from which the Specified Price is calculated) specified in the relevant Commodity Reference Price or in the relevant Final Terms, and shall include the following, if referred to in the relevant Commodity Reference Price:

(i)     "APPI", which means the Asian Petroleum Price Index, or any successor report, prepared by KPMG Corporate Services Limited, Hong Kong or its successor and reported on the Energy Market Information Service or its successor;

(ii)    *"Argus"* means Argus European Natural Gas, or any successor publication, published by Argus Media Limited or its successor;

(iii)   *"Argus/McCloskey's"* and "Argus/McCloskey's Coal Price Index Report" each means the Argus/McCloskey's Coal Price Index Report, or any successor publication, published by Argus Media Limited or its successor and The McCloskey Group Limited;

(iv)    *"Dow Jones Power"* and *"Dow Jones Energy Service - Dow Jones Electricity Price Indexes"* each means the Dow Jones Energy Service - Dow Jones Electricity Price Indexes, or any successor indexes, published by Dow Jones Newswires, a division of Dow Jones & Company, Inc. or its successor;

(v)     *"globalCOAL"* means globalCOAL, or its successor, which reports market prices on its website at http://www.globalcoal.com or its successor;

(vi)    *"Heren"* means European Spot Gas Markets, or any successor publication, published by Heren Energy Ltd. or its successor;

(vii)   *"OMEL"* means the Operador del Mercado Ibérico de Energía -- Polo Español, S.A., or its successor, which reports market prices on its website at www.omel.es or its successor;

(viii) *"Platts Marketwire"* means Platts Crude Oil Marketwire, or any successor publication, published by The McGraw-Hill Companies Inc. or its successor;

(ix) *"Powernext"* means Powernext S.A., or its successor, which reports market prices on its website at www.powernext.fr or its successor;

*"Specified Price"* means, in respect of a Commodity Reference Price, any of the following prices (which must be a price reported in or by, or capable of being determined from information reported in or by, the relevant Price Source), as specified in the relevant Final Terms (and, if applicable, as of the time so specified): (A) the high price; (B) the low price; (C) the average of the high price and the low price; (D) the closing price; (E) the opening price; (F) the bid price; (G) the asked price; (H) the average of the bid price and the asked price; (I) the settlement price; (J) the official settlement price; (K) the official price; (L) the morning fixing; (M) the afternoon fixing; (N) the spot price; or (O) any other price specified in the relevant Final Terms.

*"Strike Date"* means the date as specified in the relevant Final Terms, or as otherwise determined by the Calculation Agent, in its sole discretion provided that the Commodity Valuation Date Disruption Events and Fallbacks shall apply to any Strike Date.

*"Successor Exchange"* means, in respect of a Commodity where the relevant Exchange is no longer the principal exchange or trading market for the Commodity, such other exchange or principal trading market as determined in good faith by the Calculation Agent which serves as the source of prices for the Commodity and any principal exchanges where options or futures contracts on the Commodity are traded.

*"Trade Date"* means the date as specified in the relevant Final Terms.

*"Unit"* means the unit of measure of the relevant Commodity, as specified in the relevant Commodity Reference Price or the relevant Final Terms.

## 2. Commodity Business Day Convention

If any date on which a Commodity Reference Price is to be determined is not a Commodity Business Day then (subject to application of the Disruption Events and Fallbacks) that date will be adjusted to the first following day that is a Commodity Business Day (unless otherwise specified in the relevant Final Terms).

## 3. Commodity Valuation Date Disruption Events and Fallbacks

### 3.1 Commodity Valuation Date Disruption Events

For the purposes of this Supplement and any Commodity-Linked Note (unless otherwise specified in the relevant Final Terms):

*"Commodity Valuation Date Disruption Event"* means, in respect of a relevant Commodity, an event that, if provided by the relevant Final Terms to be applicable to the Notes, would give rise, in accordance with an applicable Disruption Fallback, to an alternative basis for determining the relevant price in respect of a specified Commodity Reference Price or Price Source were the event to occur or exist on any day.

The following events, if specified in the relevant Final Terms to be applicable, shall be Commodity Valuation Date Disruption Events:

(i) *"Price Source Disruption"*, which means (A) the failure of the Price Source to announce or publish the Specified Price (or the information necessary for determining the Specified Price) for the relevant Commodity Reference Price, or (B) the temporary or permanent discontinuance or unavailability of the Price Source.

(ii) *"Trading Disruption"*, which means the material suspension of, or the material limitation imposed on, trading in the Futures Contract or the Commodity on the Exchange or in any

additional futures contract, options contract or commodity on any Exchange as determined by the Calculation Agent. For these purposes:

    (a)    a suspension of the trading in the Futures Contract or the Commodity on any Commodity Business Day shall be deemed to be material only if:

        (I)    all trading in the Futures Contract or the Commodity is suspended for the entire Commodity Business Day; or

        (II)    all trading in the Futures Contract or the Commodity is suspended subsequent to the opening of trading on the Commodity Business Day, trading does not recommence prior to the regularly scheduled close of trading in such Futures Contract or such Commodity on such Commodity Business Day and such suspension is announced less than one hour preceding its commencement; and

    (b)    a limitation of trading in the Futures Contract or the Commodity on any Commodity Business Day shall be deemed to be material only if the relevant Exchange establishes limits on the range within which the price of the Futures Contract or the Commodity may fluctuate and the closing or settlement price of the Futures Contract or the Commodity on such day is at the upper or lower limit of that range;

    (iii)    "*Disappearance of Commodity Reference Price*", which means (A) the permanent discontinuation of trading, in the relevant Futures Contract on the relevant Exchange; (B) the disappearance of, or of trading in, the relevant Commodity; or (C) the disappearance or permanent discontinuance or unavailability of the Commodity Reference Price, notwithstanding the availability of the related Price Source or the status of trading in the relevant Futures Contract or the relevant Commodity;

    (iv)    "*Material Change in Formula*", which means the occurrence since the Trade Date of a material change in the formula for or the method of calculating the relevant Commodity Reference Price; and

    (v)    "*Material Change in Content*", which means the occurrence since the Trade Date (or such other date as may be specified) of a material change in the content, composition or constitution of the Commodity or relevant Futures Contract.

If the relevant Final Terms specify that the "Additional Bullion Provisions" shall apply to any Commodity, then, in respect of such Commodity, (iv) Material Change in Formula and (v) Material Change in Content, shall not be Commodity Valuation Date Disruption Events with respect to such Commodity.

## 3.2    Commodity Valuation Date Fallbacks

The relevant Final Terms may provide that if the Calculation Agent determines that in respect of any day in respect of which a relevant price is to be determined, a Disruption Event has occurred or exists on such day (each such Commodity, an "*Affected Commodity*" and any such date, a "*Disrupted Date*"), the Calculation Agent will determine the relevant price in accordance with the first Disruption Fallback (applied in accordance with its terms) specified as being applicable in the relevant Final Terms.

The relevant Final Terms may provide that one or more Disruption Fallbacks may apply to any Disrupted Date, and that such applicable Disruption Fallbacks may apply concurrently or sequentially, in such manner as specified in the relevant Final Terms.

The following events, as are provided by the relevant Final Terms to be applicable in respect of a Disrupted Date, shall be "Disruption Fallbacks" (and the relevant Final Terms may provide for different Disruption Fallbacks to be applicable to different dates):

    (i)    "*Postponement*" which means that the relevant date will be deemed, for the purposes of the application of this Disruption Fallback only, to be the first succeeding Commodity Business

Day on which the Commodity Valuation Date Disruption Event ceases to exist, provided that, where the relevant Commodity Valuation Date Disruption Event has been in existence (measured from and including the first Disrupted Date) for 5 consecutive Commodity Business Days (or where the Maturity Date is less than 7 Commodity Business Days from the date of the first Disrupted Date, for such number of consecutive Commodity Business Days measured from and including the Disrupted Date and ending on the date which is 2 Business Days prior to the Maturity Date), the next Disruption Fallback specified in the relevant Final Terms will apply;

(ii)    *"Calculation Agent Determination"* which means that the Calculation Agent will determine the relevant price (or a method for determining a relevant price), taking into consideration the latest available quotation for the relevant Commodity Reference Price and any other information that in good faith it deems relevant.

## 4.    Commodity Observation Date Disruption Events and Fallbacks

### 4.1    Commodity Observation Date Disruption Events

For the purposes of this Supplement and any Commodity-Linked Note (unless otherwise specified in the relevant Final Terms):

*"Commodity Observation Date Disruption Event"* means, in respect of a relevant Commodity, an event that, if provided by the relevant Final Terms to be applicable to the Notes, would give rise, in accordance with an applicable Disruption Fallback, to an alternative basis for determining the relevant price in respect of a specified Commodity Reference Price or Price Source were the event to occur or exist on any relevant day. The following events, if specified in the relevant Final Terms to be applicable, shall be Commodity Observation Date Disruption Events:

(i)    *"Price Source Disruption"*, which means (A) the failure of the Price Source to announce or publish the Specified Price (or the information necessary for determining the Specified Price) for the relevant Commodity Reference Price, or (B) the temporary or permanent discontinuance or unavailability of the Price Source.

(iii)    *"Disappearance of Commodity Reference Price"*, which means (A) the permanent discontinuation of trading, in the relevant Futures Contract on the relevant Exchange; (B) the disappearance of, or of trading in, the relevant Commodity; or (C) the disappearance or permanent discontinuance or unavailability of the Commodity Reference Price, notwithstanding the availability of the related Price Source or the status of trading in the relevant Futures Contract or the relevant Commodity;

### 4.2    Commodity Observation Date Fallbacks

The relevant Final Terms may provide that if the Calculation Agent determines that in respect of a Commodity, a Commodity Observation Date Disruption Event has occurred or exists on any relevant day (each such Commodity, an *"Affected Commodity"* and any such date, a *"Disrupted Date"*), the Calculation Agent will determine the relevant price in accordance with the first Disruption Fallback (applied in accordance with its terms) specified as being applicable in the relevant Final Terms. The relevant Final Terms may provide that one or more Disruption Fallbacks may apply to any relevant date, and that such applicable Disruption Fallbacks may apply concurrently or sequentially, in such manner as specified in the relevant Final Terms.

The following events, as are provided by the relevant Final Terms to be applicable in respect of any day, shall be *"Disruption Fallbacks"* (and the relevant Final Terms may provide for different Disruption Fallbacks to be applicable to different days):

(i)    *"Preceding"* which means that for the purposes of the application of this Disruption Fallback only, the Calculation Agent will use the relevant price for such Commodity published by the

Price Source in respect of the Commodity Business Day falling immediately prior to the relevant date provided that where the relevant Commodity Observation Date Disruption Event has been in existence (measured from and including the first Disrupted Date) for 5 consecutive Commodity Business Days, the next Disruption Fallback specified in the relevant Final Terms will apply;

(ii)    "*Calculation Agent Determination*" which means that the Calculation Agent will determine the relevant price (or a method for determining a relevant price), taking into consideration the latest available quotation for the relevant Commodity Reference Price and any other information that in good faith it deems relevant.

## 5.    Commodity Early Redemption Events

The relevant Final Terms may provide that in respect of a relevant Commodity where the Calculation Agent determines that:

(i)    the Price Source has permanently ceased to announce or publish the Commodity Reference Price;

(ii)    trading in the relevant Futures Contract on the relevant Exchange has permanently ceased; or

(iii)    the Commodity Reference Price has disappeared, been permanently discontinued, or become permanently unavailable, and

the Calculation Agent determines that there is no appropriate alternative Price Source or Commodity Reference Price (as the case may be) (a "*Commodity Early Redemption Event*"), then the Notes will be redeemed at an amount calculated by the Calculation Agent as the Final Redemption Amount of the Notes plus any interest accrued but unpaid less any Unwind Costs (the "*Early Redemption Amount*"). For the purposes of this section, "*Unwind Costs*" means the value (determined in the currency in which the Notes are denominated) of any transfer or stamp tax cost, early redemption or termination cost, if any borne by the Issuer or Calculation Agent, as determined by the Calculation Agent in its sole and absolute discretion, in relation to any swap agreement, financing arrangement or other hedging transaction entered into by or on behalf of, the Calculation Agent or the Issuer in relation to the issuance of the Notes.

## 6.    Correction of Published Prices

The relevant Final Terms may provide that for the purpose of determining the relevant price for any day, if the price published or announced on a given day and used or to be used by the Calculation Agent to determine a relevant price is subsequently corrected and the correction is published or announced by the person responsible for that publication or announcement within 30 calendar days (or such other time frame as the Calculation Agent acting in its absolute discretion deems appropriate; where different time frames may be deemed appropriate for different dates) after the original publication or announcement, such corrected price shall be the relevant price, and the Calculation Agent, to the extent it deems necessary, may make such adjustments to any of the terms of the Notes that it determines in its sole and absolute discretion to account for such correction.

## 7.    Determinations by the Calculation Agent

The relevant Final Terms may provide that all determinations, calculations or valuations made by the Calculation Agent under or pursuant to the terms of the Notes shall be made in its sole and absolute discretion and the Calculation Agent shall be solely responsible for all determinations, calculations or valuations in accordance with the terms of the Notes. All such determinations, calculations or valuations made by the Calculation Agent shall be conclusive and binding on all holders of the Notes. The Calculation Agent shall not be liable for any loss, liability, cost, claim, action, demand or expense (including without limitation any costs, charges and expenses paid or incurred in disputing or defending any of the foregoing) arising out of or in relation to or in connection with its appointment or the exercise of its functions in relation to the Notes, except as such may result from its own wilful default, negligence or bad faith or that of its

officers or agents. Nothing contained herein shall prevent the Calculation Agent from dealing in the Notes or from entering into any related transactions, including without limitation, any swap or hedging transactions, with the Issuer or any holder of the Notes.

## 8. Additional Bullion Provisions

8.1    If the relevant Final Terms specify that the "Additional Bullion Provisions" shall apply to any Commodity, then, in respect of such Commodity, paragraphs 1 to 7 of this section "Additional Description of Commodity Linked Notes" shall be deemed to be amended as follows:

(i)    each reference to "Commodity Business Day" shall be deemed to be a reference to "Bullion Business Day"

8.2    The following terms and expressions shall have the following meanings in relation to any Commodity to which Notes to which the "Additional Bullion Provisions" shall apply:

"*Bullion Business Day*" means any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London and New York and (if applicable) in such Bullion Business Day Centers specified in the relevant Final Terms.

"*Bullion Business Day Centers*" means such places as may be specified in the relevant Final Terms.

"*Bullion Reference Dealers*" means, if the relevant Commodity Reference Price is "Commodity-Reference Dealers", the four major dealers that are members of the LBMA specified in the relevant Final Terms, or if no such Bullion Reference Dealers are specified, selected by the Calculation Agent, in each case, acting through their principal London offices.

"*Gold*" means gold bars or unallocated gold complying with the rules of the LBMA relating to good delivery and fineness from time to time in effect, unless otherwise specified in the relevant Final Terms.

"*Ounce*" means, in the case of Gold, a fine troy ounce, and in the case of Silver, Platinum, and Palladium, a troy ounce.

"*Palladium*" means palladium ingots or plate or unallocated palladium complying with the rules of the LPPM relating to good delivery and fineness from time to time in effect, unless otherwise specified in the relevant Final Terms.

"*Platinum*" means platinum ingots or plate or unallocated platinum complying with the rules of the LPPM relating to good delivery and fineness from time to time in effect, unless otherwise specified in the relevant Final Terms.

"*Silver*" means silver bars or unallocated silver complying with the rules of the LBMA relating to good delivery and fineness from time to time in effect, unless otherwise specified in the relevant Final Terms.

## 9. Notification of Early Redemption Events, Disruption Events and other Events

(i)    *Notice of Disruption Event*: The Calculation Agent shall as soon as reasonably practicable notify the Issuer of the existence or occurrence of a Disruption Event on any relevant date however any delay or failure to notify will not affect the application of the applicable Disruption Fallbacks.

(ii)    *Notice of Commodity Early Redemption Event*: The Calculation Agent shall as soon as reasonably practicable notify the Issuer of the occurrence of a Commodity Early Redemption Event and the Early Redemption Amount however any delay or failure to notify will not affect the application of the applicable Early Redemption provisions.

(iii) *Notice of Published Price Correction Event*: Upon the occurrence of a correction to a published price which changes the relevant price determined with respect to any date, the Calculation Agent shall as soon as reasonably practicable notify the Issuer stating the occurrence of such event, giving details of such correction and the action proposed to be taken in relation thereto.

(iv) *Notice to Noteholders*: Adjustments and calculations in accordance with the foregoing sections shall be calculated by the Calculation Agent, shall be notified to the Noteholders in accordance with Condition 15 (Notices) and shall be (in the absence of manifest error) binding on all parties concerned. However, Noteholders should be aware that there may be, necessarily, some delay between the time at which any of the above events occur and the time at which it is reported to Noteholders.

## CERTAIN COMMODITY REFERENCE PRICES

### Definitions

For the purpose of this Annex and the Commodity Reference Prices listed below (unless otherwise specified in the relevant Final Terms):

"*Delivery Date*" means any date specified as such in the applicable Final Terms.

"*Futures Contract*" means the contract for future delivery of a contract size in respect of a Delivery Date (excluding any Futures Contract that is due to expire on such date) relating to the Commodity referred to in that Commodity Reference Price.

"*Specified Price*" means any price specified as such in the applicable Final Terms.

### *Commodity Reference Prices for certain Agricultural Products:*

Cocoa

- "COCOA-NYBOT" means that the price for a relevant date will be that day's Specified Price per metric ton of deliverable grade cocoa beans on the NYBOT of the Futures Contract, stated in U.S. Dollars, as made public by the NYBOT and displayed on Reuters Screen page "0#CC:" on that relevant date.

Coffee

- "COFFEE ARABICA-NYBOT" means that the price for a relevant date will be that day's Specified Price per pound of deliverable grade washed arabica coffee on the NYBOT of the Futures Contract, stated in U.S. cents, as made public by the NYBOT and displayed on Reuters Screen page "0#KC:" on that relevant date.

- "COFFEE ROBUSTA-EURONEXT LIFFE" means that the price for a relevant date will be that day's Specified Price per tonne of deliverable grade robusta coffee on EURONEXT LIFFE of the Futures Contract, stated in U.S. Dollars, as determined by EURONEXT LIFFE and displayed on Reuters Screen page "0#LKD:" on that relevant date.

Corn

- "CORN-CBOT" means that the price for a relevant date will be that day's Specified Price per bushel of deliverable grade corn on the CBOT of the Futures Contract, stated in U.S. cents, as made public by the CBOT and displayed on Reuters Screen page "0#C:" on that relevant date.

Cotton

- "COTTON NO. 2-NYBOT" means that the price for a relevant date will that day's Specified Price per pound of deliverable grade cotton No. 2 on the NYBOT of the Futures Contract,

stated in U.S. cents, as made public by the NYBOT and displayed on Reuters Screen page "0#CT:" on that relevant date.

Livestock

- "FEEDER CATTLE-CME" means that the price for a relevant date will be that day's Specified Price per pound of deliverable grade medium and large frame #1 feeder steers on the CME of the Futures Contract, stated in U.S. cents, as made public by the CME and displayed on Reuters Screen page "0#FC:" on that relevant date.

- "LEAN HOGS-CME" means that the price for a relevant date will be that day's Specified Price per pound of deliverable grade lean value hog carcasses on the CME of the Futures Contract, stated in U.S. cents, as made public by the CME and displayed on Reuters Screen page "0#LH:" on that relevant date.

- "LIVE CATTLE-CME" means that the price for a relevant date will be that day's Specified Price per pound of deliverable grade live steers on the CME of the Futures Contract, stated in U.S. cents, as made public by the CME and displayed on Reuters Screen page "0#LC:" on that relevant date.

Orange Juice

- "FROZEN CONCENTRATED ORANGE JUICE NO. 1-NYBOT" means that the price for a relevant date will be that day's Specified Price per pound of deliverable grade orange solids on the NYBOT of the Futures Contract, stated in U.S. cents, as made public by the NYBOT and displayed on Reuters Screen page "0#OJ:" on that relevant date.

Rubber

- "RUBBER-RSS3-SICOM" means that the price for a relevant date will be that day's Specified Price per kilogram of ribbed smoked sheets grade 3 rubber on the SICOM of the Futures Contract, stated in U.S. cents, as made public by the SICOM and displayed on Reuters Screen page "0#SRU:" on that relevant date.

Soybeans

- "SOYBEAN MEAL-CBOT" means that the price for a relevant date will be that day's Specified Price per ton of deliverable grade soybean meal on the CBOT of the Futures Contract, stated in U.S. Dollars, as made public by the CBOT and displayed on Reuters Screen page "0#SM:" on that relevant date.

- "SOYBEAN OIL-CBOT" means that the price for a relevant date will be that day's Specified Price per pound of deliverable grade crude soybean oil on the CBOT of the Futures Contract, stated in U.S. cents, as made public by the CBOT and displayed on Reuters Screen page "0#BO:" on that relevant date.

- "SOYBEANS-CBOT" means that the price for a relevant date will be that day's Specified Price per bushel of deliverable grade soybeans on the CBOT of the Futures Contract, stated in U.S. cents, as made public by the CBOT and displayed on Reuters Screen page "0#S:" on that relevant date.

Sugar

- "SUGAR #11 (WORLD)-NYBOT" means that the price for a relevant date will be that day's Specified Price per pound of deliverable grade cane sugar on the NYBOT of the Futures Contract, stated in U.S. cents, as made public by the NYBOT and displayed on Reuters Screen page "0#SB:" on that relevant date.

Wheat

- "WHEAT-CBOT" means that the price for a relevant date will be that day's Specified Price per bushel of deliverable grade wheat on the CBOT of the Futures Contract, stated in U.S. cents, as made public by the CBOT and displayed on Reuters Screen page "0#W:" on that relevant date.

- "WHEAT HRW-KCBOT" means that the price for a relevant date will be that day's Specified Price per bushel of deliverable grade hard red winter wheat on the KCBOT of the Futures Contract, stated in U.S. cents, as made public by the KCBOT and displayed on Reuters Screen page "0#KW:" on that relevant date.

*Commodity Reference Prices for certain Energy Products:*

Electricity

- "ELECTRICITY-DAY-AHEAD-HOURLY-POWERNEXT" means that the price for a relevant date will be that day's Specified Price per MWh of electricity (midnight to midnight) for delivery on the RTE High Voltage Grid, stated in Euros, published by Powernext at www.powernext.fr, under the headings "Powernext Day-AheadTM (Date): Market Results: Products: Results for Powernext Day-AheadTM on: (Date): Day-ahead Base: Downloads: Prices since 26 November 2001", or any successor headings, that reports prices effective on that relevant date.

- "ELECTRICITY-DAILY PHELIX BASE SPOT-EEX" means that the price for a relevant date will be that day's Specified Price per MWh of electric energy at constant power for delivery on the Delivery Date, stated in Euros, published by the EEX at www.eex.de, under the headings "Info Center: Download: Market Date: Spot-Results Spot Market (Year): Prices: Auctionmarket: Daily Indices: Philex Day Base" or any successor headings, that reports prices effective on that relevant date.

- "ELECTRICITY-POWER INDEX-HOURLY-APX" means that the price for a relevant datewill be that days's Specified Price per MWh of electricity for delivery (midnight to midnight) on the Tennet High Voltage Grid, stated in Euros, published by the APX at www.apx.nl, under the headings "Market Results: Today's Data: Day-Ahead Market Results HUB NL: Hourly Details for the HUB NL: Price (Eur.)", or any successor headings, that reports prices effective on that relevant date.

- "ELECTRICITY-POWER INDEX-HOURLY-OMEL" means that the price for a relevant date will be that day's Specified Price per MWh of electricity for physical delivery (midnight to midnight) on the Spanish high voltage grid, stated in Euros, published by OMEL at www.omel.es, under the headings "Market results access: Market Segments: Daily market: Daily market hourly price: Precio marginal (Cent/kWh)", or any successor headings, that reports prices effective on that relevant date.

- "ELECTRICITY-SWEP-DOW JONES POWER" means that the price for a relevant date will be that day's Specified Price per MWh for the Dow Jones Swiss Electricity Price Index, stated in Swiss Francs, published by Dow Jones & Company, Inc. and displayed on Reuters Screen page 0#.DJSWEP, that displays prices effective on that relevant date.

- "ELECTRICITY-LEBA UK POWER INDEX-DAY AHEAD WINDOW-REUTERS" means that the price for a relevant date will be that day's Specified Price per MWh of electricity for delivery (2300 hours to 2300 hours) on the Delivery Date, stated in Sterling, calculated by LEBA and displayed under the headings "London Energy Brokers' Association UK Power Indices: Day Ahead Window Index EL AM 8-9 window" or any successor headings, on Reuters Screen 0#UKELINDEX=LEBA, that displays prices effective on that relevant date.

Gas Oil

- "GAS OIL-ICE" means that the price for a relevant date will be that day's Specified Price per metric ton of gas oil on ICE Futures of the Futures Contract for the Delivery Date, stated in U.S. cents, as made public by ICE Futures and displayed on Reuters Screen page "0#LGO:" on that relevant date.

Unleaded Gasoline

- "RBOB GASOLINE-NEW YORK-NYMEX" means that the price for a relevant date will be that day's Specified Price per gallon of New York Harbor RBOB unleaded gasoline on the NYMEX of the Futures Contract for the Delivery Date, stated in U.S. cents, as made public by the NYMEX and displayed on Reuters Screen page "0#HU:" on that relevant date.

Heating Oil

- "HEATING OIL-NEW YORK-NYMEX" means that the price for a relevant date will be that day's Specified Price per gallon of New York Harbor No. 2 heating oil on the NYMEX of the Futures Contract for the Delivery Date, stated in U.S. cents, as made public by the NYMEX and displayed on Reuters Screen page "0#HO:" on that relevant date.

Natural Gas

- "NATURAL GAS-MONTHLY-ICE" means that the price for a relevant date will be that day's Specified Price per therm of natural gas on ICE Futures of the monthly Futures Contract, stated in pence, as made public by ICE Futures on that relevant date.

- "NATURAL GAS-NBP MONTHLY-HEREN" means that the price for a relevant date will be that day's Specified Price per therm of natural gas for delivery on the Delivery Date, stated in pence, published under the headings "ESGM Price Assessment: NBP" in the issue of European Spot Gas Markets by Heren Energy Ltd. that reports prices effective on that relevant date.

- "NATURAL GAS-NBP-MONTH AHEAD UNWEIGHTED AVERAGE PRICE-ARGUS NAT GAS" means that the price for a relevant date will be that day's Specified Price per therm of natural gas for delivery on the Delivery Date, stated in pence, under the column NBP published under the headings "European spot gas prices: NBP" in the issue of Argus European Natural Gas by Argus Media Limited that reports prices effective on that relevant date.

- "NATURAL GAS-NBP-DAY AHEAD INDEX-HEREN" means that the price for a relevant date will be that day's Specified Price per therm of natural gas for delivery on the Delivery Date, stated in pence, published under the heading "Heren® NBP Day-Ahead Index" in the issue of European Spot Gas Markets by Heren Energy Ltd. that reports prices effective on that relevant date.

- "NATURAL GAS-NBP-DAY AHEAD-ARGUS NAT GAS" means that the price for a relevant date will be that day's Specified Price per therm of natural gas for delivery on the Delivery Date, stated in pence, under the column NBP published under the headings "European spot gas prices: NBP: Day Ahead" in the issue of Argus European Natural Gas by Argus Media Limited that reports prices effective on that relevant date.

- "NATURAL GAS-NYMEX" means that the price for a relevant date will be that day's Specified Price per MMBTU of natural gas on the NYMEX of the Futures Contract for the Delivery Date, stated in U.S. Dollars, as made public by the NYMEX and displayed on Reuters Screen page "0#NG:" on that relevant date.

Oil

- "OIL-DUBAI-PLATTS MARKETWIRE" means that the price for a relevant date will be that day's Specified Price per barrel of Dubai crude oil for delivery on the Delivery Date, stated in U.S. Dollars, published under the heading "North Sea, West African, Mediterranean spot

assessments: Dubai (delivery month)" in the issue of Platts Marketwire that reports prices effective on that relevant date.

- "OIL-TAPIS-PLATTS MARKETWIRE" means that the price for a relevant date will be that day's Specified Price per barrel of Tapis crude oil, stated in U.S. Dollars, published under the heading "Pacific Rim Spot Crude Assessments: spread vs Tapis: Tapis" in the issue of Platts Marketwire that reports prices effective on that relevant date.

- "OIL-WTI-NYMEX" means that the price for a relevant date will be that day's Specified Price per barrel of West Texas Intermediate light sweet crude oil on the NYMEX of the Futures Contract for the Delivery Date, stated in U.S. Dollars, as made public by the NYMEX and displayed on Reuters Screen page "0#CL1:" on that relevant date.

- "OIL-BRENT-ICE" means that the price for a relevant date will be that day's Specified Price per barrel of Brent blend crude oil on ICE Futures for the Delivery Date, stated in U.S. Dollars, as made public by ICE Futures on that relevant date.

- "OIL-BRENT-IPE" means that the price for a relevant date will be that day's Specified Price per barrel of Brent blend crude oil on the IPE of the Futures Contract for the Delivery Date, stated in U.S. Dollars, as made public by the IPE on that relevant date.

- "OIL-JCC PROVISIONAL" means that the price for a relevant date will be the monthly average price per kL of a basket of crude oils imported into Japan in that month, stated in Japanese Yen, which shall be known as the "Japan Crude Cocktail (Provisional)", as made public by the Japanese Ministry of Finance's Trade Statistics Reference Room. The Japan Crude Cocktail (Provisional) shall be calculated on the basis of the following formula: the total value of crude oil and raw oil imports in Japanese Yen divided by the total quantity of crude oil and raw oil in kiloliters in respect of that month as determined using the Trade Statistics (Provisional Data) obtained from the Japanese Ministry of Finance's Trade Statistics Reference Room. The Japan Crude Cocktail (Provisional) is announced before the Japan Crude Cocktail (9 Digit Provisional).

- "OIL-MIDDLE EAST-TOCOM" means that the price for a relevant date will be that day's Specified Price per kL of crude oil on the TOCOM of the Futures Contract for the Delivery Date, stated in Japanese Yen, as made public by the TOCOM on that relevant date.

Coal

- "COAL-TFS API 2-ARGUS/MCCLOSKEY'S" means that the price for a relevant date will be that day's Specified Price per tonne of steam coal 6,000 kcal/kg, up to 1% sulphur NAR basis, cif ARA, stated in U.S. Dollars, published under the heading "International Coal Indexes incorporating the TFS APITM Indices: Monthly Coal Price Indexes: TFS API 2 (cif ARA)" in the issue of Argus/McCloskey's Coal Price Index Report that reports prices effective on that relevant date.

- "COAL-TFS API 4-ARGUS/MCCLOSKEY'S" means that the price for a relevant date will be that day's Specified Price per tonne of steam coal 6,000 kcal/kg, up to 1% sulphur NAR basis, fob Richards Bay, stated in U.S. Dollars, published under the heading "International Coal Indexes incorporating the TFS APITM Indices: Monthly Coal Price Indexes: TFS API 4 (fob Richards Bay)" in the issue of Argus/McCloskey's Coal Price Index Report that reports prices effective on that relevant date.

- "COAL-NEWCASTLE-GLOBALCOAL" means that the price for a relevant date will be that day's Specified Price per tonne of steam coal, stated in U.S. Dollars, published by globalCOAL at www.globalcoal.com, under the heading "Monthly Index: NEWC Index" or any successor heading, that reports prices effective on that relevant date.

- "COAL-RICHARDS BAY-GLOBALCOAL" means that the price for a relevant date will be that day's Specified Price per tonne of steam coal, stated in U.S. Dollars, published by

globalCOAL at www.globalcoal.com, under the heading "Monthly Index: RB Index" or any successor heading, that reports prices effective on that relevant date.

***Commodity Reference Prices for certain Metals:***

Aluminum

- "ALUMINIUM-LME CASH" means that the price for a relevant date will be that day's Specified Price per tonne of high grade Primary Aluminium on the LME for the applicable Delivery Date, stated in U.S. Dollars, as determined by the LME and displayed on Bloomberg page "LOAHDY Cmdty <GO>" that displays prices effective on that relevant date.

- "ALUMINUM-COMEX" means that the price for a relevant date will be that day's Specified Price per pound of high grade primary aluminum on the COMEX of the Futures Contract for the Delivery Date, stated in U.S. Dollars, as made public by the COMEX and displayed on Reuters Screen page "0#AL:" on that relevant date.

Aluminum Alloy

- "ALUMINIUM ALLOY-LME CASH" means that the price for a relevant date will be that day's Specified Price per tonne of Aluminium Alloy on the LME for the applicable Delivery Date, stated in U.S. Dollars, as determined by the LME and displayed on Reuters Screen page "MTLE" that displays prices effective on that relevant date.

Copper

- "COPPER-COMEX" means that the price for a relevant date will be that day's Specified Price per pound of high grade copper on the COMEX of the Futures Contract for the Delivery Date, stated in U.S. cents, as made public by the COMEX and displayed on Reuters Screen page "0#HG:" on that relevant date.

- "COPPER-LME CASH" means that the price for a relevant date will be that day's Specified Price per tonne of Copper Grade A on the LME for the applicable Delivery Date, stated in U.S. Dollars, as determined by the LME and displayed on Bloomberg page "LOCADY Cmdty <GO>" that displays prices effective on that relevant date.

Gold

- "GOLD–A.M. FIX" means that the price for a relevant date will be that day's morning Gold fixing price per troy ounce of Gold for delivery in London through a member of the LBMA authorized to effect such delivery, stated in U.S. Dollars, as determined by the London Gold Market and displayed on Reuters Screen page "XAUFIXAM" that displays prices effective on that relevant date.

- "GOLD–COMEX" means that the price for a relevant date will be that day's Specified Price per troy ounce of Gold on the COMEX of the Futures Contract for the Delivery Date, stated in U.S. Dollars, as made public by the COMEX and displayed on Reuters Screen page "O#GC:" on that relevant date.

- "GOLD–P.M. FIX" means that the price for a relevant date will be that day's afternoon Gold fixing price per troy ounce of Gold for delivery in London through a member of the LBMA authorized to effect such delivery, stated in U.S. Dollars, as calculated by the London Gold Market and displayed on Reuters Screen page "XAUFIXPM" that displays prices effective on that relevant date.

- "GOLD–TOCOM" means that the price for a relevant date will be that day's Specified Price per gram of fine Gold on the TOCOM of the Futures Contract for the Delivery Date, stated in Japanese Yen, as made public by the TOCOM and displayed on Reuters Screen page "O#GL:" on that relevant date.

Lead

- "LEAD–LME CASH" means that the price for a relevant date will be that day's Specified Price per tonne of Standard Lead on the LME for the applicable Delivery Date, stated in U.S. Dollars, as determined by the LME and displayed on Bloomberg page "LOPBDY Cmdty <GO>" that displays prices effective on that relevant date.

Nickel

- "NICKEL-LME CASH" means that the price for a relevant date will be that day's Specified Price per tonne of Primary Nickel on the LME for the applicable Delivery Date, stated in U.S. Dollars, as determined by the LME and displayed on Bloomberg page "LONIDY Cmdty <GO>"that displays prices effective on that relevant date.

Palladium

- "PALLADIUM–A.M. FIX" means that the price for a relevant date will be that day's morning Palladium fixing price per troy ounce gross of Palladium for delivery in Zurich through a member of the LPPM authorized to effect such delivery, stated in U.S. Dollars, as calculated by the LPPM and displayed on Reuters Screen page "XPD-0945-FIX" that displays prices effective on that relevant date.

- "PALLADIUM–NYMEX" means that the price for a relevant date will be that day's Specified Price per troy ounce of palladium on the NYMEX of the Futures Contract for the Delivery Date, stated in U.S. Dollars, as made public by the NYMEX on that and displayed on Reuters Screen page "O#PA:" on the relevant date.

- "PALLADIUM–P.M. FIX" means that the price for a relevant date will be that day's afternoon Palladium fixing price per troy ounce gross of Palladium for delivery in Zurich through a member of the LPPM authorized to effect such delivery, stated in U.S. Dollars, as calculated by the LPPM and displayed on Reuters Screen page "XPD-1400-FIX" that displays prices effective on that relevant date.

- "PALLADIUM–TOCOM" means that the price for a relevant date will be that day's Specified Price per gram of fine palladium on the TOCOM of the Futures Contract for the Delivery Date, stated in Japanese Yen, as made public by the TOCOM and displayed on Reuters Screen page "O#JPA:" on that relevant date.

Platinum

- "PLATINUM–A.M. FIX" means that the price for a relevant date will be that day's morning Platinum fixing price per troy ounce gross of Platinum for delivery in Zurich through a member of the LPPM authorized to effect such delivery, stated in U.S. Dollars, as calculated by the LPPM and displayed on Reuters Screen page "XPT-0945-FIX:" that displays prices effective on that relevant date.

- "PLATINUM–NYMEX" means that the price for a relevant date will be that day's Specified Price per troy ounce of platinum on the NYMEX of the Futures Contract for the Delivery Date, stated in U.S. Dollars, as made public by the NYMEX and displayed on Reuters Screen page "O#PL:" on that relevant date.

- "PLATINUM–P.M. FIX" means that the price for a relevant date will be that day's afternoon Platinum fixing price per troy ounce gross of Platinum for delivery in Zurich through a member of the LPPM authorized to effect such delivery, stated in U.S. Dollars, as calculated by the LPPM and displayed on Reuters Screen page "XPT-1400-FIX" that displays prices effective on that relevant date.

- "PLATINUM–TOCOM" means that the price for a relevant date will be that day's Specified Price per gram of fine Platinum on the TOCOM of the Futures Contract for the Delivery Date,

147

stated in Japanese Yen, as made public by the TOCOM and displayed on Reuters Screen page "O#JPL:" on that relevant date.

Silver

- "SILVER–COMEX" means that the price for a relevant date will be that day's Specified Price per troy ounce of Silver on the COMEX of the Futures Contract for the Delivery Date, stated in U.S. cents, as made public by the COMEX and displayed on Reuters Screen page "O#SI:" on that relevant date.

- "SILVER–FIX" means that the price for a relevant date will be that day's Silver fixing price per troy ounce of Silver for delivery in London through a member of the LBMA authorized to effect such delivery, stated in U.S. cents, as calculated by the London Silver Market and displayed on Reuters Screen page "XAGFIX" that displays prices effective on that relevant date.

- "SILVER–TOCOM" means that the price for a relevant date will be that day's Specified Price per ten (10) grams of fine Silver on the TOCOM of the Futures Contract for the Delivery Date, stated in Japanese Yen, as made public by the TOCOM and displayed on Reuters Screen page "O#JSV:" on that relevant date.

Tin

- "TIN-LME CASH" means that the price for a relevant date will be that day's Specified Price per tonne of Tin on the LME for the Delivery Date, stated in U.S. Dollars, as determined by the LME and displayed on Bloomberg page "LOSNDY Cmdty <GO>" that displays prices effective on that relevant date.

Zinc

- "ZINC-LME CASH" means that the price for a relevant date will be that day's Specified Price per tonne of Special High Grade Zinc on the LME for the applicable Delivery Date, stated in U.S. Dollars, as determined by the LME and displayed on Bloomberg page "LOZSDY Cmdty <GO>" that displays prices effective on that relevant date.

Palm Oil

- "CPO-MDEX" means that the price for a relevant date will be that day's Specified Price per ton of deliverable crude palm oil on the MDEX of the Futures Contract, stated in Malaysian Ringgit, as made public by the MDEX and displayed on Bloomberg page "KO1 Cmdty <GO>" on that relevant date.

### Annex 6

### Additional Terms and Conditions for FX Notes

*The terms and conditions of FX Notes shall comprise the Terms and Conditions of the Notes set forth on page 62 above (the "General Conditions") and the additional terms and conditions set forth below (the "Special Conditions"), in each case subject to completion and/or amendment in the applicable Final Terms. If any such Notes are Danish Notes, Finnish Notes, Norwegian Notes or Swedish Notes then the General Conditions applicable to such Notes shall in addition be as amended as described in Annex 1, Annex 2, Annex 3 or Annex 4 above , as applicable (the "Applicable Scandinavian Conditions"). In the event of any inconsistency between the General Conditions and the Special Conditions, the Special Conditions shall prevail. If any such Notes are Danish Notes, Finnish Notes, Norwegian Notes or Swedish Notes then in the event of any inconsistency between (1) the General Conditions as amended by the Special Conditions and (2) the Applicable Scandinavian Conditions, the Applicable Scandinavian Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

(A)    **Examples of FX Notes**

*The following provisions set out specific examples of FX Notes and are not intended to be a comprehensive or exhaustive description of all of the structures which may constitute an FX Note.*

*Payments on FX Notes - Coupons*

(a)    *FX Linked Coupons*: FX Notes *may* include Notes under the terms of which an amount is payable in respect of one or more interest periods which is determined by reference to the Reference Exchange Rate (each a "*FX Linked Coupon*"). If so specified in the applicable Final Terms, the FX Linked Coupon in respect of an interest period will be calculated as being an amount per Note equal to the minimum denomination of such Note multiplied by the Performance (defined below). Payment of a FX Linked Coupon may also be subject to a requirement that the Performance exceeds or falls short of a benchmark value by a specified threshold (as specified in the applicable Final Terms).

(b)    *FX Linked Digital Coupons*: FX Notes *may* include Notes under the terms of which an amount is payable in respect of one or more interest periods which is contingent upon the Performance meeting, exceeding or falling short of one or more criteria specified in the applicable Final Terms (each a "*FX Linked Digital Coupon*"). The FX Linked Digital Coupon in respect of an interest period will be an amount determined according to the method (other than the method referred to in (a) above) specified in the applicable Final Terms.

*Payments on FX Notes - Final Redemption Amount*

*FX Final Redemption Amount*: FX Notes *may* include Notes under the terms of which the Final Redemption Amount payable at maturity of the Notes is determined by reference to the performance (the "**Performance**") of a Reference Exchange Rate (a "*FX Final Redemption Amount*"). Examples of how the FX Final Redemption Amount may be calculated are as follows:

(a)    **Method A**: The FX Final Redemption Amount will be calculated as an amount per Note equal

to:

(I)    the minimum denomination of such Note; multiplied by

(II)    (1 + Performance),

where the Performance is positive; or

(III)    (1 – the absolute value of the Performance),

149

where the Performance is negative.

(b)    **Method B**: The FX Final Redemption Amount will be calculated as an amount per Note equal to:

   (I)    the minimum denomination of such Note; multiplied by

   (II)   a percentage defined in the Final Terms as being the 'Principal Protection' level; and adding the result to

   (III)  an amount per currency unit of the nominal amount of each Note equal to the Performance (if positive) multiplied by a factor.

Payment of an FX Final Redemption Amount may also be subject to a requirement that the Performance, the Reference Exchange Rate and/or a percentage thereof, is equal to, exceeds or falls short of a benchmark value by a specified threshold (as specified in the applicable Final Terms).

*FX Digital Final Redemption Amount*: FX Notes may include Notes under the terms of which the Final Redemption Amount payable at maturity of the Notes is contingent upon the Performance and/or Reference Exchange Rate being equal to, exceeding or falling short of one or more criteria specified in the applicable Final Terms (a *"FX Digital Final Redemption Amount"*). The FX Digital Final Redemption Amount will be an amount determined according to the method specified in the applicable Final Terms.

### Principal Protection

The Final Terms of FX Notes may specify a minimum amount payable in respect of the redemption of such Notes at maturity (the "Principal Protection"). The level of Principal Protection may be expressly stated as a percentage of the nominal amount of each Note at issuance or may be inherent in the formula or formulae for determining the amount payable on the redemption of such Notes. Where there is no Principal Protection, or the level of Principal Protection of less than 100% of the nominal amount of each Note at issuance, the amount of principal that is to be repaid at redemption of the note may be less than the principal invested and in certain circumstances may be equal to zero.

### Leverage

Payments, the timing of payments, redemption of the Notes and/or any other economic feature in respect of FX Notes may additionally be determined by reference to a multiplication factor (the "**Leverage**") specified in the applicable Final Terms of such Notes. With respect to such Notes, the degree to which the Reference Exchange Rate impacts upon the amount of such payments will vary according to the level of the Leverage.

### General

Payments under FX Notes will usually be settled (unless otherwise specified in the Final Terms) in the currency in which the note is denominated (the "Specified Currency"). Such currency may be different from a Reference Currency and investors will not be legally or beneficially entitled to any amounts in (if different from the Specified Currency) a Reference Currency.

**(B)    Disruption Events and Fallback Provisions**

The relevant Final Terms may provide that the following Disruption Event and Disruption Fallback provisions apply to a particular series of FX Notes (and the applicable Final Terms may also provide for different Disruption Events and Fallback provisions to be applicable to different series of FX Notes).

The Disruption Event and Fallback provisions for FX Notes that are denominated in a G-10 Currency and/or that refer to a Reference Exchange Rate where either the Reference Currency or the Base Currency are G-10 Currencies, will be determined by the Calculation Agent acting in good faith and in a commercially reasonable manner as specified in the applicable Final Terms.

For Notes, in respect of which, the Reference Exchange Rate is not determined by reference to a Settlement Rate Option or, under the terms of which, the Reference Exchange Rate is determined on a continuous basis, that is, not at any specified time, the Disruption Event and Disruption Fallback provisions will be determined in accordance with the applicable Final Terms.

1.    **Disruption Events**

In these provisions, *"Disruption Event"* shall mean, with respect to a series of FX Notes, the occurrence as determined by the Calculation Agent in its sole and absolute discretion of any of Price Source Disruption, Dual Exchange Rate, Illiquidity, Price Materiality, Inconvertibility, Non-Transferability, Material Change in Circumstance and Additional Disruption Event, in each case if specified as applicable in the applicable Final Terms as either a Category 1 Disruption Event (each event so specified a *"Category 1 Disruption Event"*) or a Category 2 Disruption Event (each event so specified a *"Category 2 Disruption Event"*) provided that no event shall be a Disruption Event unless the Calculation Agent determines in its sole discretion that it may have a materially prejudicial effect on the Issuer's ability to effect, maintain or terminate any hedge relating to its exposure under the Notes;

For the purposes of these provisions:

*"Affected Valuation Date"* means a Valuation Date in relation to which a Disruption Event has occurred;

*"Alternative Settlement Rate Option"* with respect to a Reference Currency, means any rate source in respect of such Reference Currency, other than the Settlement Rate Option with respect to such Reference Currency;

*"Dual Exchange Rate"* means that, with respect to a Reference Currency, the currency exchange rate specified in the Settlement Rate Option applicable to that Reference Currency splits into dual or multiple currency exchange rates;

*"FX Basket Supplement"* means the Base Prospectus Supplement dated 6 September 2006.

*"Illiquidity"* means that it becomes impossible to obtain a firm quote of the Settlement Rate for a Reference Currency for the minimum amount specified in the Final Terms;

*"Non-convertibility"* means that it becomes impossible to convert generally in the currency markets a Reference Currency into the Base Currency or the Specified Currency as appropriate through customary legal channels; or to convert any Reference Currency into the Base Currency or the Specified Currency as appropriate at a rate at least as favourable as the rate for domestic institutions located in a Reference Currency Jurisdiction;

*"Non-Transferability"* means that it becomes generally impossible in the markets to deliver amounts denominated in the Base Currency or the Specified Currency as appropriate from accounts inside a Reference Currency Jurisdiction to accounts outside that Reference Currency Jurisdiction or amounts denominated in any Reference Currency between accounts inside the relevant Reference Currency Jurisdiction or to a party that is a non-resident of that Reference Currency Jurisdiction;

*"Material Change in Circumstance"* means that any event (other than any other Disruption Event or an Event of Default) has occurred and/or is in existence which is beyond the control of the Issuer or the Calculation Agent, with respect to a Reference Currency, that:

(a)    prevents, materially delays or makes it impossible for the Issuer or the Calculation Agent to fulfil any of their obligations under the Notes; or

(b)    generally makes it impossible for the Issuer or any of its affiliates through which it hedges its exposure under the Notes to continue to hedge with other market participants such exposure in its entirety or in any material part or to terminate any hedge of such exposure;

"*Price Materiality*" means the Calculation Agent determines that, with respect to a Reference Currency, the Settlement Rate Option materially differs from any quote obtained by the Calculation Agent on the currency markets;

"*Price Source Disruption*" means that it becomes impossible to obtain the Reference Exchange Rate from the pricing source with respect to a Reference Currency on any Valuation Date (or if different, the day on which rates for that Reference Currency would, in the ordinary course, be published or announced by the relevant pricing source with respect to that Valuation Date);

"*Reference Currency Jurisdiction*" with respect to any Reference Currency, means the country of which such Reference Currency is the lawful currency;

"*Settlement Rate*" means with respect to a Reference Currency and subject to any disruption event or fallback provisions, means the level of the Reference Exchange Rate for such Reference Currency, as determined by the Calculation Agent in good faith and in a commercially reasonable manner (including but not limited to making such adjustments as are necessary to published quoting conventions and/or implying the Reference Exchange Rate from one or more Settlement Rate Options in relation to a Reference Currency);

"*Valuation Date*" means each date specified as such in the applicable Final Terms.

2.    **Disruption Fallbacks**

(i)    *Category 1 Disruption Event on a Valuation Date*

If the Calculation Agent determines in its sole discretion and acting in a commercially reasonable manner that a Category 1 Disruption Event has occurred on a Valuation Date in respect of a Settlement Rate (an "*Affected Settlement Rate*"), then such Affected Settlement Rate for such Valuation Date will be the rate determined by the Calculation Agent:

(A)    using the Alternative Settlement Rate Option for the relevant Reference Currency (or, if there is more than more than one such Alternative Settlement Rate Option, following any order of such rates specified in the applicable Final Terms, using the Alternative Settlement Rate which is not, in the determination of the Calculation Agent, affected by the occurrence of a Category 1 Disruption Event); or

(B)    if there is no Alternative Settlement Rate Option for the relevant Reference Currency, or the Alternative Settlement Rate Option (or, if there is more than one Alternative Settlement Rate Option, each Alternative Settlement Rate Option), in the determination of the Calculation Agent, is affected by the occurrence of a Category 1 Disruption Event, in its sole discretion, acting in good faith and taking into account such information available to it that it deems relevant.

(ii)    *Category 2 Disruption Event*

If, at any time (the "*Determination Time*") on any day (which may but need not be a Valuation Date), the Calculation Agent determines in its sole discretion acting in a commercially reasonable manner that a Category 2 Disruption Event has occurred and is outstanding in respect of a Settlement Rate or a Reference Currency, other than in relation to any calculations or determinations under the Notes which have already been made by the Calculation Agent, then:

(A)    the Issuer will, subject to (B) and (C) below, fix the relevant Settlement Rate for such Reference Currency at the prevailing rate of exchange immediately prior to the Determination Time with such adjustment as the Calculation Agent determines is necessary to compensate the Issuer for the costs of unwinding or re-establishing any transaction required in order to hedge its exposure under the Notes; or

(B)  if at the time of such fixing (referred to in (A) above) the fixing date is not a Valuation Date and a Category 1 Disruption Event would have occurred in respect of the relevant Settlement Rate Option had such date been a Valuation Date, then, subject to (C) below, the Settlement Rate shall be determined by the Calculation Agent in accordance with the provisions of paragraph 2(i) above and such date will be treated as if it were a Valuation Date; or

(C)  if the Issuer determines that for any reason it is unable to fix the Settlement Rate for the Reference Currency as contemplated in (A) above and the Calculation Agent is unable to determine such Settlement Rate as contemplated in (B) above:

(i)  the Affected Valuation Date will be deferred until the next succeeding Business Day on which the applicable Disruption Event ceases to be outstanding, as determined by the Calculation Agent, subject as provided in (iii) below;

(ii)  if the Affected Valuation Date is postponed to a date such that the Calculation Agent determines that payment of any amount linked to the Settlement Rate in respect of the Reference Currency cannot be made on the relevant Interest Payment Date or the Redemption Date, as the case may be, in respect of that Affected Valuation Date, then such Interest Payment Date or the Redemption Date, as the case may be, will be postponed until the next date, determined by the Calculation Agent to be the first practicable date for settlement in such Reference Currency for payments from the relevant Affected Valuation Date (as so deferred); and

(iii)  where the relevant Disruption Event has remained outstanding for a period of ten consecutive Business Days (1) the relevant Affected Valuation Date will be deferred until the Business Day immediately following the expiry of such period on which date the Settlement Rate will be determined by the Calculation Agent in its sole discretion, acting in good faith and taking into account such information available to it that it deems relevant and (2) if the Affected Valuation Date is postponed to a date such that the Calculation Agent determines that payment of any amount linked to the Settlement Rate in respect of the Reference Currency cannot be made on the relevant Interest Payment Date or the Redemption Date, as the case may be, in respect of that Affected Valuation Date, then such Interest Payment Date or the Redemption Date, as the case may be, will be postponed until the next date, determined by the Calculation Agent to be the first practicable date for settlement in such Reference Currency for payments made from the Affected Valuation Date (as so deferred).

**(C)   Settlement Rate Options Applicable to FX Notes**

The Reference Exchange Rate may be calculated (or any other date specified in the relevant Final Terms) by reference to a Settlement Rate Option for that relevant Currency Pair. The relevant Settlement Rate Option with respect to any Tranche of Notes will be set out in the applicable Final Terms. The relevant Settlement Rate Option may be one of the standard Settlement Rate Options set out in the table below (with such amendments, if any, as shall be set out in the applicable Final Terms) or such other Settlement Rate Option as specified in the Final Terms.

The standard Settlement Rate Options specified below may change over time in accordance with the then prevailing market practice, or due variations in price sources details or the addition of new currencies, and the fact that a currency other than EUR or USD may become a Specified Currency.

| Code | Currency Pair | Settlement Rate Option |
|------|---------------|------------------------|
| ARS1 | USDARS | The spot rate for a Valuation Date will be the Argentine Peso/U.S. Dollar offered rate for U.S. Dollars, expressed as the amount of Argentine Pesos per one U.S. Dollar, for settlement on the same day quoted by Banco de la Nacion (in accordance with the Convertibility Law of March 27, 1991 and Regulatory Decree No. 529/91 of April 1, 1991, as may be amended from time to time) for that Valuation Date. |
| ARS2 | USDARS | The spot rate for a Valuation Date will be the Argentine Peso/U.S. Dollar Specified Rate, expressed as the amount of Argentine Pesos per one U.S. Dollar, for settlement on the same day which appears on the Reuters Screen BNAR Page at the close of business in Buenos Aires on that Valuation Date. |
| BRL1 | USDBRL | The spot rate for a Valuation Date will be the Brazilian Real/U.S. Dollar offered rate for U.S. Dollars, expressed as the amount of Brazilian Reais per one U.S. Dollar, for settlement in two Business Days reported by the Banco Central do Brasil on SISBACEN Data System under transaction code PTAX-800 ("Consulta de Cambio" or Exchange Rate Inquiry), Option 5 ("Cotacões para Contabilidade" or "Rates for Accounting Purposes") by approximately 6:00 p.m., São Paulo time, on that Valuation Date. |
| BRL2 | USDBRL | The spot rate for a Valuation Date will be the Brazilian Real/U.S. Dollar offered rate for U.S. Dollars, expressed as the amount of Brazilian Reais per one U.S. Dollar, for settlement in two Business Days reported by the Banco Central do Brasil on SISBACEN Data System under transaction code PTAX-800 ("Consulta de Cambio" or Exchange Rate Inquiry), Option 5 ("Cotacoes para Contabilidade" or Rates for Accounting Purposes), which appears on Reuters Screen BRFR Page under the caption "Dolar PTAX" at approximately 8:30 a.m., São Paulo time, on the first Business Day following that Valuation Date. |
| BRL3 | USDBRL | The spot rate for a Valuation Date will be the Brazilian Real/U.S. Dollar offered rate for U.S. Dollars, expressed as the amount of Brazilian Reais per one U.S. Dollar, for settlement in two Business Days reported by the Banco Central do Brasil on SISBACEN Data System under transaction code PTAX-800 ("Consulta de Cambio" or Exchange Rate Inquiry), Option 5 ("Cotacoes para Contabilidade" or Rates for Accounting Purposes), which appears on Reuters Screen BRFR Page under the caption "Dolar PTAX" at approximately 6:30 pm Sao Paolo time on the Valuation Date |
| CLP1 | USDCLP | The spot rate for a Valuation Date will be the Chilean Peso/U.S. Dollar observado rate, expressed as the amount of Chilean Pesos per one U.S. Dollar, for settlement on the same day reported by the Banco Central de Chile which appears on the Reuters Screen CLPOB= Page below the caption "Value" at approximately 10:00 a.m., Santiago time, on the first Business Day following that Valuation Date. |
| CLP2 | USDCLP | The spot rate for a Valuation Date will be the Chilean Peso/U.S. Dollar observado rate, expressed as the amount of Chilean Pesos per one U.S. Dollar, for settlement on the same day reported by the Banco Central de Chile which appears on the Reuters Screen BCCHILG Page under the |

caption "OBSERVADO" at approximately 10:00 a.m., Santiago time, on the first Business Day following that Valuation Date.

| | | |
|---|---|---|
| CLP3 | USDCLP | The spot rate for a Valuation Date will be the Chilean Peso/U.S. Dollar interbank rate, expressed as the amount of Chilean Pesos per one U.S. Dollar, for settlement on the same day reported by the Banco Central de Chile for the formal exchange market which appears on the Reuters Screen CLP= Page at the Specified Time on that Valuation Date. |
| COP1 | USDCOP | The spot rate for a Valuation Date will be the Colombian Peso/U.S. Dollar fixing rate, expressed as the amount of Colombian Pesos per one U.S. Dollar, for settlement on the same day reported by the Colombian Banking Superintendency as the "TASA Representative del Mercado" as of 12:00 noon, Bogota time, on the first Business Day following that Valuation Date. |
| COP2 | USDCOP | The spot rate for a Valuation Date will be the Colombian Peso/U.S. Dollar fixing rate, expressed as the amount of Colombian Pesos per one U.S. Dollar, for settlement on the same day reported by the Colombian Banking Superintendency which appears on the Reuters Screen CO/COL03 Page to the right of the caption "TCRM" ("Tasa de Cierre Representative del Mercado" or closing market price) below the heading "Hoy" at approximately 9:30 a.m., Bogota time, on the first Business Day following that Valuation Date. |
| ILS1 | USDILS | The spot rate for a Valuation Date will be the Israeli Shekel/U.S. Dollar Specified Rate, expressed as the amount of Israeli Shekels per one U.S. Dollar, for settlement in two Business Days which appears on the Reuters Screen FXIL Page at 5.00 p.m., Tel Aviv time on that Valuation Date. |
| INR1 | USDINR | The spot rate for a Valuation Date will be the Indian Rupee/U.S. Dollar reference rate, expressed as the amount of Indian Rupee per one U.S. Dollar, for settlement in two Business Days reported by the Reserve Bank of India which appears on the Reuters Screen RBIB Page at approximately 2:30 p.m., Mumbai time, or as soon thereafter as practicable, on that Valuation Date. |
| KRW1 | USDKRW | The spot rate for a Valuation Date will be the Korean Won/U.S. Dollar market average rate, expressed as the amount of Korean Won per one U.S. Dollar, for settlement in two Business Days reported by the Korea Financial Telecommunications and Clearing Corporation which appears on the Reuters Screen KFTC18 Page to the right of the caption "USD Today" that is available at approximately 5:30 p.m., Seoul time, on the Valuation Date or as soon thereafter as practicable, but in no event later than 9:00 a.m., Seoul time, on the first Business Day following the Valuation Date. |
| MXN1 | USDMXN | The spot rate for a Valuation Date will be the Mexican Peso/U.S. Dollar fixing rate, expressed as the amount of Mexican Pesos per one U.S. Dollar, for settlement in two Business Days reported by Banco de Mexico which appears on Reuters Screen MEX01 Page under the heading "USDMXNFIX=", at the close of business in Mexico City on that Valuation Date. |
| MXN2 | USDMXN | The spot rate for a Valuation Date will be the Mexican Peso/U.S. Dollar fixing rate, expressed as the amount of Mexican Pesos per one U.S. Dollar, for settlement in two Business Days reported by Banco de Mexico which |

appears on the Reuters Screen BNMX Page opposite the caption "Fix" at the close of business in Mexico City on that Valuation Date.

| PHP1 | USDPHP | The spot rate for a Valuation Date will be the Philippine Peso/U.S. Dollar morning weighted average rate for that Valuation Date, expressed as the amount of Philippine Pesos per one U.S. Dollar, for settlement in one Business Day reported by the Philippine Dealing system which appears on the Reuters Screen PDSPESO Page to the right of the caption "AM WT AVE" at approximately 12:30 p.m., Manila time, on that Valuation Date. |
|---|---|---|
| RUB1 | USDRUB | The spot rate for a Valuation Date will be the Russian Ruble/U.S. Dollar Specified Rate, expressed as the amount of Russian Rubles per one U.S. Dollar, for settlement in one Business Day, calculated by the Chicago Mercantile Exchange ("CME") and as published on CME's website, which appears on the Reuters Screen EMTA Page, at approximately 1:30 p.m., Moscow time, on that Valuation Date. |
| CNY1 | USDCNY | The spot rate for a Valuation Date will be the Chinese Renminbi/U.S. Dollar official fixing rate, expressed as the amount of Chinese Renminbi per one U.S. Dollar, for settlement in two Business Days reported by The State Administration of Foreign Exchange of the People's Republic of China, Beijing, which appears on the Reuters Screen SAEC Page opposite the symbol "USDCNY=" at approximately 5:00 p.m., Beijing time, on that Valuation Date. |
| EURCNY1 | EURCNY | The spot rate for a Valuation Date will be the Chinese Renminbi/Euro official fixing rate, expressed as the amount of Chinese Renminbi per one Euro, for settlement in two Business Days reported by The State Administration of Foreign Exchange of the People's Republic of China, Beijing, which appears on the Reuters Screen SAEC Page opposite the symbol "EURCNY=" at approximately 5:00 p.m., Beijing time, on that Valuation Date. |
| MYR1 | USDMYR | The spot rate for a Valuation Date will be the Malaysian Ringgit/U.S. Dollar spot rate at 11:00 a.m., Singapore time, expressed as the amount of Malaysian Ringgit per one U.S. Dollar, for settlement in two Business Days, reported by the Association of Banks in Singapore, which appears on the Reuters page ABSIRFIX01 to the right of the caption "Spot" under the column "MYR" at approximately 11:30 a.m., Singapore time, on that Valuation Date. |
| IDR1 | USDIDR | The spot rate for a Valuation Date will be the Indonesian Rupiah/U.S. Dollar spot rate at 11:00 a.m., Singapore time, expressed as the amount of Indonesian Rupiah per one U.S. Dollar, for settlement in two Business Days, reported by the Association of Banks in Singapore which appears on the Reuters Page ABSIRFIX01 to the right of the caption "Spot" under the column "IDR" at approximately 11:30 a.m., Singapore time, on that Valuation Date. |
| THB1 | USDTHB | The spot rate for a Valuation Date will be the Thai Baht/U.S. Dollar spot rate at 11:00 a.m., Singapore time, expressed as the amount of Thai Baht per one U.S. Dollar, for settlement in two Business Days, reported by the Association of Banks in Singapore which appears on the Reuters Page ABSIRFIX01 to the right of the caption "Spot" under the column "THB" at approximately 11:30 a.m., Singapore time, on that Valuation Date. |

| | | |
|---|---|---|
| SGD1 | USDSGD | The spot rate for a Valuation Date will be the Singapore Dollar/U.S. Dollar spot rate at 11:00 a.m., Singapore time, expressed as the amount of Singapore Dollar per one U.S. Dollar, for settlement in two Business Days, reported by the Association of Banks in Singapore which appears on the Reuters Page ABSIRFIX01 to the right of the caption "Spot" under the column "SGD" at approximately 11:30 a.m., Singapore time, on that Valuation Date. |
| TWD1 | USDTWD | The spot rate for a Valuation Date will be the Taiwanese Dollar/U.S. Dollar spot rate, expressed as the amount of Taiwanese Dollars per one U.S. Dollar, for settlement in two Business Days, reported by the Taipei Forex Inc. which appears on the Reuters Screen TAIFX1 Page under the heading "Spot" as of 11:00 a.m. Taipei time, on that Valuation Date, or if no rate appears as of 11:00 a.m., Taipei time, the rate that first appears in any of the next succeeding 15 minute intervals after such time, up to and including 12:00 noon, Taipei time on that Valuation Date. |
| CAD1 | USDCAD | The spot rate for a Valuation Date will be the Canadian Dollar/U.S. Dollar official fixing rate, expressed as the amount of Canadian Dollars per one U.S. Dollar, for settlement in one Business Day reported by the Federal Reserve Bank of New York which appears on Reuters Screen 1FED to the right of the caption "CAD" at approximately 10.00 a.m. New York time, on that Valuation Date. |
| CHF1 | USDCHF | The spot rate for a Valuation Date will be the Swiss Franc/U.S. Dollar official fixing rate, expressed as the amount of Swiss Francs per one U.S. Dollar, for settlement in two Business Days reported by the Federal Reserve Bank of New York which appears on Reuters Screen 1FED to the right of the caption "CHF" at approximately 10.00 a.m. New York time, on that Valuation Date. |
| JPY1 | USDJPY | The spot rate for a Valuation Date will be the Japanese Yen/U.S. Dollar official fixing rate, expressed as the amount of Japanese Yen per one U.S. Dollar, for settlement in two Business Days reported by the Federal Reserve Bank of New York which appears on Reuters Screen 1FED to the right of the caption "JPY" at approximately 10.00 a.m. New York time, on that Valuation Date. |
| SEK1 | USDSEK | The spot rate for a Valuation Date will be the Swedish Krona/U.S. Dollar official fixing rate, expressed as the amount of Swedish Krona per one U.S. Dollar, for settlement in two Business Days reported by the Federal Reserve Bank of New York which appears on Reuters Screen 1FED to the right of the caption "SEK" at approximately 10.00 a.m. New York time, on that Valuation Date. |
| NOK1 | USDNOK | The spot rate for a Valuation Date will be the Norwegian Krone/U.S. Dollar official fixing rate, expressed as the amount of Norwegian Krone per one U.S. Dollar, for settlement in two Business Days reported by the Federal Reserve Bank of New York which appears on Reuters Screen 1FED to the right of the caption "NOK" at approximately 10.00 a.m. New York time, on that Valuation Date. |
| DKK1 | USDDKK | The spot rate for a Valuation Date will be the Danish Krone/U.S. Dollar official fixing rate, expressed as the amount of Danish Krone per one U.S. Dollar, for settlement in two Business Days reported by the Federal Reserve Bank of New York which appears on Reuters Screen 1FED to the |

right of the caption "DKK" at approximately 10.00 a.m. New York time, on that Valuation Date.

| | | |
|---|---|---|
| EUR1 | EURUSD | The spot rate for a Valuation Date will be the U.S. Dollar/Euro official fixing rate, expressed as the amount of U.S. Dollars per one Euro, for settlement in two Business Days reported by the Federal Reserve Bank of New York which appears on Reuters Screen 1FED to the right of the caption "EUR" at approximately 10.00 a.m. New York time, on that Valuation Date. |
| InvEUR1 | EURUSD | One divided by the spot rate in X (A): <br> X(A) The spot rate for a Valuation Date will be the U.S. Dollar/Euro official fixing rate, expressed as the amount of U.S. Dollars per one Euro, for settlement in two Business Days reported by the Federal Reserve Bank of New York which appears on Reuters Screen 1FED to the right of the caption "EUR" at approximately 10.00 a.m. New York time, on that Valuation Date. |
| GBP1 | GBPUSD | The spot rate for a Valuation Date will be the U.S. Dollar/Sterling official fixing rate, expressed as the amount of U.S. Dollars per one Sterling, for settlement in two Business Days reported by the Federal Reserve Bank of New York which appears on Reuters Screen 1FED to the right of the caption "GBP" at approximately 10.00 a.m. New York time, on that Valuation Date. |
| InvGBP1 | GBPUSD | One divided by the spot rate in X (A): <br> X(A) The spot rate for a Valuation Date will be the U.S. Dollar/Sterling official fixing rate, expressed as the amount of U.S. Dollars per one Sterling, for settlement in two Business Days reported by the Federal Reserve Bank of New York which appears on Reuters Screen 1FED to the right of the caption "GBP" at approximately 10.00 a.m. New York time, on that Valuation Date. |
| AUD1 | AUDUSD | The spot rate for a Valuation Date will be the U.S. Dollar/Australian Dollar official fixing rate, expressed as the amount of U.S. Dollars per one Australian Dollar, for settlement in two Business Days reported by the Federal Reserve Bank of New York which appears on Reuters Screen 1FEE to the right of the caption "AUD" at approximately 12.00 p.m. New York time, on that Valuation Date. |
| InvAUD1 | AUDUSD | One divided by the spot rate in X (A): <br> X(A) The spot rate for a Valuation Date will be the U.S. Dollar/Australian Dollar official fixing rate, expressed as the amount of U.S. Dollars per one Australian Dollar, for settlement in two Business Days reported by the Federal Reserve Bank of New York which appears on Reuters Screen 1FEE to the right of the caption "AUD" at approximately 12.00 p.m. New York time, on that Valuation Date. |
| NZD1 | NZDUSD | The spot rate for a Valuation Date will be the U.S. Dollar / New Zealand Dollar official fixing rate, expressed as the amount of U.S. Dollars per one New Zealand Dollar, for settlement in two Business Days reported by the Federal Reserve Bank of New York which appears on Reuters Screen 1FEE to the right of the caption "NZD" at approximately 12.00 p.m. New York time, on that Valuation Date. |
| ZAR1 | USDZAR | The spot rate for a Valuation Date will be the South African Rand/U.S. Dollar official fixing rate, expressed as the amount of South African Rand |

per one U.S. Dollar, for settlement in two Business Days reported by the Federal Reserve Bank of New York which appears on Reuters Screen 1FEE to the right of the caption "ZAR" at approximately 12.00 p.m. New York time, on that Valuation Date.

EUR2   EURUSD   The spot rate for a Valuation Date will be the U.S. Dollar/Euro fixing rate, expressed as the amount of U.S. Dollar per one Euro which appears on Reuters Screen ECB37 to the right of the caption "USD" at approximately 2:15 p.m., Central European time, on that Valuation Date.

InvEUR2   EURUSD   One divided by the spot rate in X (A):
X(A) The spot rate for a Valuation Date will be the U.S. Dollar/Euro fixing rate, expressed as the amount of U.S. Dollar per one Euro which appears on Reuters Screen ECB37 to the right of the caption "USD" at approximately 2:15 p.m., Central European time, on that Valuation Date.

EURAUD1   EURAUD   The spot rate for a Valuation Date will be the Australian Dollar/Euro fixing rate, expressed as the amount of Australian Dollars per one Euro which appears on Reuters Screen ECB37 to the right of the caption "AUD" at approximately 2:15 p.m., Central European time, on that Valuation Date.

EURCAD1   EURCAD   The spot rate for a Valuation Date will be the Canadian Dollar/Euro fixing rate, expressed as the amount of Canadian Dollars per one Euro which appears on Reuters Screen ECB37 to the right of the caption "CAD" at approximately 2:15 p.m., Central European time, on that Valuation Date.

EURCHF1   EURCHF   The spot rate for a Valuation Date will be the Swiss Franc/Euro fixing rate, expressed as the amount of Swiss Francs per one Euro which appears on Reuters Screen ECB37 to the right of the caption "CHF" at approximately 2:15 p.m., Central European time, on that Valuation Date.

EURCZK1   EURCZK   The spot rate for a Valuation Date will be the Czech Koruna/Euro fixing rate, expressed as the amount of Czech Koruna per one Euro which appears on Reuters Screen ECB37 to the right of the caption "CZK" at approximately 2:15 p.m., Central European time, on that Valuation Date.

EURDKK1   EURDKK   The spot rate for a Valuation Date will be the Danish Krone/Euro fixing rate, expressed as the amount of Danish Krone per one Euro which appears on Reuters Screen ECB37 to the right of the caption "DKK" at approximately 2:15 p.m., Central European time, on that Valuation Date.

EURGBP1   EURGBP   The spot rate for a Valuation Date will be the Sterling/Euro fixing rate, expressed as the amount of Sterling per one Euro which appears on Reuters Screen ECB37 to the right of the caption "GBP" at approximately 2:15 p.m., Central European time, on that Valuation Date.

EURHUF1   EURHUF   The spot rate for a Valuation Date will be the Hungarian Forint/Euro fixing rate, expressed as the amount of Hungarian Forint per one Euro which appears on Reuters Screen ECB37 to the right of the caption "HUF" at approximately 2:15 p.m., Central European time, on that Valuation Date.

EURISK1   EURISK   The spot rate for a Valuation Date will be the Icelandic Krona/Euro fixing rate, expressed as the amount of Icelandic Krone per one Euro which appears on Reuters Screen ECB37 to the right of the caption "ISK" at approximately 2:15 p.m., Central European time, on that Valuation Date.

EURJPY1   EURJPY   The spot rate for a Valuation Date will be the Japanese Yen/Euro fixing rate, expressed as the amount of Japanese Yen per one Euro which appears

on Reuters Screen ECB37 to the right of the caption "JPY" at approximately 2:15 p.m., Central European time, on that Valuation Date.

| | | |
|---|---|---|
| EURNOK1 | EURNOK | The spot rate for a Valuation Date will be the Norwegian Krone/Euro fixing rate, expressed as the amount of Norwegian Krone per one Euro which appears on Reuters Screen ECB37 to the right of the caption "NOK" at approximately 2:15 p.m., Central European time, on that Valuation Date. |
| EURNZD1 | EURNZD | The spot rate for a Valuation Date will be the New Zealand Dollar/Euro fixing rate, expressed as the amount of New Zealand Dollars per one Euro which appears on Reuters Screen ECB37 to the right of the caption "NZD" at approximately 2:15 p.m., Central European time, on that Valuation Date. |
| EURPLN1 | EURPLN | The spot rate for a Valuation Date will be the Polish Zloty/Euro fixing rate, expressed as the amount of Polish Zloty per one Euro which appears on Reuters Screen ECB37 to the right of the caption "PLN" at approximately 2:15 p.m., Central European time, on that Valuation Date. |
| EURSKK1 | EURSKK | The spot rate for a Valuation Date will be the Slovak Koruna/Euro fixing rate, expressed as the amount of Slovak Koruna per one Euro which appears on Reuters Screen ECB37 to the right of the caption "SKK" at approximately 2:15 p.m., Central European time, on that Valuation Date. |
| EURSEK1 | EURSEK | The spot rate for a Valuation Date will be the Swedish Krona/Euro fixing rate, expressed as the amount of Swedish Krona per one Euro which appears on Reuters Screen ECB37 to the right of the caption "SEK" at approximately 2:15 p.m., Central European time, on that Valuation Date. |
| EURTRY1 | EURTRY | The spot rate for a Valuation Date will be the Turkish Lira/Euro fixing rate, expressed as the amount of Turkish Lira per one Euro which appears on Reuters Screen ECB37 to the right of the caption "TRY" at approximately 2:15 p.m., Central European time, on that Valuation Date. |
| EURZAR1 | EURZAR | The spot rate for a Valuation Date will be the South African Rand/Euro fixing rate, expressed as the amount of South African Rand per one Euro which appears on Reuters Screen ECB37 to the right of the caption "ZAR" at approximately 2:15 p.m., Central European time, on that Valuation Date. |

Annex 7

**Additional Terms and Conditions for Basket Linked Notes**

*The terms and conditions of Basket Linked Notes shall comprise the Terms and Conditions of the Notes set forth on page 62 above (the "General Conditions") and the additional terms and conditions set forth below (the "Special Conditions"), in each case subject to completion and/or amendment in the applicable Final Terms. If any such Notes are Danish Notes, Finnish Notes, Norwegian Notes or Swedish Notes then the General Conditions applicable to such Notes shall in addition be as amended as described in Annex 1, Annex 2, Annex 3 or Annex 4 above , as applicable (the "Applicable Scandinavian Conditions"). In the event of any inconsistency between the General Conditions and the Special Conditions, the Special Conditions shall prevail. If any such Notes are Danish Notes, Finnish Notes, Norwegian Notes or Swedish Notes then in the event of any inconsistency between (1) the General Conditions as amended by the Special Conditions and (2) the Applicable Scandinavian Conditions, the Applicable Scandinavian Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

**(A)    General Description of Basket Linked Notes**

*Basket*

A Basket shall comprise of one or more Basket Reference Values, including, but not limited to currency exchange rates (each a *"Reference Exchange Rate"*), commodity reference prices (each a *"Commodity Reference Price"*), equity prices (each an *"Equity Reference Price"*), debt security prices (each a *"Debt Reference Price"*), reference entities (each a *"Reference Entity Price"*), interest rates (each an *"Interest Rate Reference Price"*), index levels (each an *"Index Reference Price"*) as specified in the applicable Final Terms.

*Basket Value*

The Basket Value is calculated by reference to any combination or multiple of one or more Basket Reference Values as specified in the applicable Final Terms.

*Multiple Baskets*

For Multiple Basket Linked Notes, the payment of interest and/or the redemption amount, the timing of any payment, redemption of the Notes and/or any other economic feature of such Notes may also be determined by reference to the best performing Basket, worst performing Basket, the average performance of the Baskets to which the Notes are linked, the top few best or the last few worst performing baskets, the aggregate of or the difference between or ratio of the Basket Value for the Baskets or by reference to any other formula or any other payment mechanism, each as specified in the applicable Final Terms.

*Weighting*

Each Basket Reference Value and/or, in respect of Multiple Basket Linked Notes, each Basket Value, may be ascribed a weighting factor (a *"Weighting"*) in order to alter the influence of the performance of that Basket Reference Value or Basket Value (as the case may be). The Weighting of a Basket Reference Value or Basket Value, may be expressed as a percentage, or a fraction or in such other manner as provided in the Final Terms and may be defined in such a way that it has either an increased or decreased positive or negative influence on the value of the Notes relative to the influence exerted by other Basket Reference Values or Basket Values (as the case may be).

**(B)    Examples of Basket Linked Notes**

*The following provisions set out specific examples of Basket Linked Notes and are not intended to be a comprehensive or exhaustive description of all of the structures which may constitute a Basket Linked Note.*

### Payments on Basket Linked Notes – Coupons

*Basket Linked Coupons*: Basket Linked Notes *may* include Notes under the terms of which an amount is payable in respect of one or more interest periods which is determined by reference to one or more Basket Values (each a *"Basket Linked Coupon"*). For example, the Basket Linked Coupon in respect of an interest period may be calculated as being an amount per Note equal to the specified denomination of such Note multiplied by the Basket Value. Payment of a Basket Linked Coupon may also be subject to a requirement that one or more the Basket Values exceed or fall short of one or more benchmark values by a specified threshold (as specified in the Final Terms).

*Basket Linked Digital Coupons*: Basket Linked Notes *may* include Notes under the terms of which an amount is payable in respect of one or more interest periods which is contingent upon one or more Basket Values meeting, exceeding or falling short of one or more criteria specified in the applicable Final Terms (each a *"Basket Linked Digital Coupon"*). The Basket Linked Digital Coupon in respect of an interest period will be an amount determined according to the method specified in the applicable Final Terms.

### Payments on Basket Linked Notes – Final Redemption Amount

*Basket Linked Final Redemption Amount*: Basket Linked Notes *may* include Notes under the terms of which the Final Redemption Amount payable at maturity of the Notes is determined by reference to one or more Basket Values (a *"Basket Linked Final Redemption Amount"*). For example, the Basket Linked Final Redemption Amount may be (but is not limited to being) calculated according to the following alternative methodologies:

(a)   **Method A**: The Basket Linked Final Redemption Amount will be calculated as an amount per Note equal to:

    (I)   the specified denomination of such Note; multiplied by

    (II)   (1+ Basket Value),

        where the Basket Value is positive; or

    (III)   (1 - the absolute amount of the Basket Value),

        where the Basket Value is negative.

(b)   **Method B**: The Basket Linked Final Redemption Amount will be calculated as an amount per Note equal to:

    (I)   the specified denomination of such Note; multiplied by

    (II)   a percentage defined in the Final Terms as being the 'Principal Protection' level; and adding the result to

    (III)   an amount per currency unit of the nominal amount of each Note equal to the Basket Value (if positive).

Payment of a Basket Linked Final Redemption Amount *may* also be subject to a requirement that one or more Basket Values exceed or fall short of one or more benchmark values by a specified threshold (as specified in the Final Terms).

*Basket Linked Digital Final Redemption Amount*: Basket Linked Notes **may** include Notes under the terms of which the Final Redemption Amount payable at maturity of the Notes is contingent upon one or more Basket Values meeting, exceeding or falling short of one or more criteria specified in the applicable Final Terms (a *"Basket Linked Digital Final Redemption Amount"*). The Basket Linked Digital Final Redemption Amount will be an amount determined according to the method specified in the applicable Final Terms.

*Principal Protection*

The Final Terms of Basket Linked Notes may specify (as *"Principal Protection"*) a minimum amount payable in respect of the redemption of such Notes at maturity (usually expressed as a percentage of the nominal amount of each Note at issuance). Where no Principal Protection, or Principal Protection of less than 100 per cent. of the nominal amount of each Note at issuance is specified, the amount of principal that is to be repaid at redemption of the note may be less than the principal invested and in certain circumstances may be equal to zero.

*Leverage*

Payments, the timing of payments, redemption of the Notes and/or any other economic feature, in respect of Basket Linked Notes may additionally be determined by reference to a multiplication factor (the "Leverage") specified in the Final Terms of such Notes. With respect to such Notes, the degree to which the Basket Value impacts upon such matters will vary according to the level of the Leverage.

(C)    **Supplements**

For the purposes of the General Conditions, all references therein to an "Index" or "Indices" may be deemed to be references to "Basket Value" or "Basket Values", as the case may be, if and to the extent so specified in the applicable Final Terms.

Annex 8

**Additional Terms and Conditions for Range Accrual Notes**

*The terms and conditions of Range Accrual Notes shall comprise the Terms and Conditions of the Notes set forth on page 62 above (the "General Conditions") and the additional terms and conditions set forth below (the "Special Conditions"), in each case subject to completion and/or amendment in the applicable Final Terms. If any such Notes are Danish Notes, Finnish Notes, Norwegian Notes or Swedish Notes then the General Conditions applicable to such Notes shall in addition be as amended as described in Annex 1, Annex 2, Annex 3 or Annex 4 above, as applicable (the "Applicable Scandinavian Conditions"). In the event of any inconsistency between the General Conditions and the Special Conditions, the Special Conditions shall prevail. If any such Notes are Danish Notes, Finnish Notes, Norwegian Notes or Swedish Notes then in the event of any inconsistency between (1) the General Conditions as amended by the Special Conditions and (2) the Applicable Scandinavian Conditions, the Applicable Scandinavian Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

Notes issued pursuant to the Program may include Notes in respect of which, any interest payable for one or more Interest Periods and/or any amount payable on redemption of the Notes (as specified in the applicable Final Terms) is determined by reference to the number of days during a specified period (an "*Observation Period*") that a predetermined event or events (each a "*Fixing Event*") occurs or does not occur (as specified in the applicable Final Terms) as a proportion of the total number of days (each an "*Observation Day*") within such Observation Period (such portion, the "*Index Ratio*"). Amounts payable under Range Accrual Notes may also be determined by multiplying the Index Ratio by one or more indices, formulae, currency exchange rates, rates, commodities, debt securities, equities or other variable, option or combination thereof (each an "*Underlying Coupon*").

The calculation of the numerator component of the Index Ratio may be determined by reference to:

1.  the number of days during an Observation Period that a Fixing Event occurs;

2.  the number of days during an Observation Period before a Fixing Event occurs;

3.  the number of days during an Observation Period before a Fixing Event does not occur;

4.  the number of days during an Observation Period that no Fixing Event occurs;

5.  the number of days during an Observation Period before a Fixing Event occurs for a specified number of times; or

6.  a multiple of the number of days during an Observation Period that a Fixing Event occurs minus a multiple of the number of days that the Fixing Event does not occur in that Observation Period.

The above sets out just some of the methodologies that may be used to determine the numerator component of the Index Ratio. It is not intended to be an exhaustive list and other calculation methodologies may be used to determine such ratio as set out in the applicable Final Terms.

The Fixing Event may be, but is not limited to, the value or other function of, one or more indices, formulae, currency exchange rates, rates, commodities, debt securities, equities or other variable or a combination thereof (the "*Observable Rate*"), exceeding and/or equalling and/or being lower than and/or equalling one or more predetermined criteria (the "*Strike*" or "*Strikes*"), as specified in the applicable Final Terms. The Strike may also be defined with reference to the value or other function of, one or more indices, formulae, currency exchange rates, rates, commodities, debt securities, equities or other variable or a combination thereof.

The Fixing Event may be observed on each Observation Date at a specified time or may be continually observed during the Observation Period or may be observed on such other date or time as specified in the applicable Final Terms.

The total number of days during the Observation Period in which the Fixing Event is observed may vary. For example, if a Fixing Event:

164

(a)   occurs on an Observation Date during the Observation Period, observation of the Fixing Event may continue to be observed on each subsequent Observation Date during the Observation Period; or

(b)   does not occur on an Observation Date, the observation of the Fixing Event (and the number of days on which a Fixing Event is determined to have occurred) may cease on such date, notwithstanding the total number of Observation Days left in such Observation Period. Such Notes are referred to as *"Knock-Out Range Accrual Notes"*; or

(c)   does not occur on an Observation Date for a specified number of times, the observation of the Fixing Event (and the number of days on which a Fixing Event is determined not to have occurred) may cease on such date, notwithstanding the total number of Observation Days left in such Observation Period. Such Notes are referred to (also know as Knock-Out Range Accrual Notes).

By way of example:

1.    The interest rate for an Interest Period or amount payable on redemption of a Range Accrual Note may be calculated by reference to the number of Observation Days during an Observation Period in which USD LIBOR with a designated maturity of 6 months (the *"Observed Rate"*) is equal to or exceeds 2% but is less than 4% (together, the *"Strike"*); divided by the total number of days in that Observation Period. For the purpose of this example, the total number of Observation Days during the Observation Period is equal to 10. If on the second Observation Day during that Observation Period, the Observed Rate is outside the Strike, but is within the Strike on each other Observation Date during such period (including the first day of such period) then the Index Ratio will be calculated by dividing 9, being the number of days on which the Observed Rate was within the Strike, by 10, being the total number of Observation Days within the Observation Period, giving 0.9.

2.    For Knock-Out Range Accrual Notes referred to in (b) above, if the Index Ratio is determined by reference to the number of Observation Days during an Observation Period in which Observed Rate is within the Strike until the first Observation Day on which it is outside the Strike; divided by the total number of days in that Observation Period, if the Observed Rate was within the Strike on the first Observation Day but outside the Strike on the second Observation Date, then the Index Ratio will be calculated by dividing 1, being the number of days on which the Observed Rate was within the Strike, by 10, being the total number of Observation Days within the Observation Period, giving 0.1

The above are just two examples of how the Index Ratio may be determined and are not intended to be an exhaustive description of the operation of the structure for Range Accrual Notes.

The Observation Period and the period in which the interest payable and/or any amount payable on redemption of the Notes are determined maybe the same or they may relate to different chronological periods and may be of different lengths. For the avoidance of doubt, the days upon which the Fixing Event is observed could be any subset of days within such period or any other period or periods, including, but not limited to, a period of one day only.

## USE OF PROCEEDS

The net proceeds from each issue of Notes will be used for the general corporate purposes of the Group.

## LEHMAN BROTHERS HOLDINGS INC.

**Information about LBHI**

Lehman Brothers Holdings Inc., a Delaware corporation, was incorporated on December 29, 1983, for an indefinite term, pursuant to the General Corporation Law of the State of Delaware, U.S.A., with registration number 2024634. LBHI and its subsidiaries are collectively referred to as "Lehman Brothers". LBHI's executive offices are located at 745 Seventh Avenue, New York, New York 10019, U.S.A., and its telephone number is + 1 212 526 7000. The common stock of LBHI is listed on the New York Stock Exchange under the symbol "LEH".

The stated legal purpose of LBHI is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (as set out in article 3 of LBHI's Restated Certificate of Incorporation).

To the best of LBHI's knowledge, it is in material compliance with the applicable corporate governance regimes in the United States of America.

LBHI also acts through its London Branch which is registered at Companies House with Branch Number BR005486.

**Business Overview**

Lehman Brothers, an innovator in global finance, serves the financial needs of corporations, governments and municipalities, institutional clients and high-net-worth individuals worldwide. Lehman Brothers provides a full array of equities and fixed income sales, trading and research, investment banking services and investment management and advisory services. Its global headquarters in New York and regional headquarters in London and Tokyo are complemented by offices in additional locations in North America, Europe, the Middle East, Latin America and the Asia Pacific region. Lehman Brothers, through predecessor entities, was founded in 1850.

Through its subsidiaries, Lehman Brothers is a global market-maker in all major equity and fixed income products. To facilitate its market-making activities, Lehman Brothers is a member of all principal securities and commodities exchanges in the United States, as well as NASD, Inc., and it holds memberships or associate memberships on several principal international securities and commodities exchanges, including the London, Tokyo, Hong Kong, Frankfurt, Paris, Milan and Australian stock exchanges.

Lehman Brothers' principal business activities are investment banking, capital markets and investment management. Through its investment banking, trading, research, structuring and distribution capabilities in equity and fixed income products, Lehman Brothers continues to build on its client flow business model, which is based on its principal focus of facilitating client transactions in all major global capital markets products and services. Lehman Brothers generates client flow revenues from institutional, corporate, government and high-net-worth customers by (i) advising on and structuring transactions specifically suited to meet client needs; (ii) serving as a market maker and/or intermediary in the global marketplace, including having securities and other financial instrument products available to allow clients to adjust their portfolios and diversify risks across different market cycles; (iii) originating loans for distribution to clients in the securitisation or principals market; (iv) providing investment management and advisory services; and (iv) acting as an underwriter to clients. As part of its client-flow activities, Lehman Brothers maintains inventory positions of varying amounts across a broad range of financial instruments. In addition, Lehman Brothers also takes proprietary trading and investment positions. The financial services industry is significantly influenced by worldwide economic conditions as well as other factors inherent in the global financial markets. As a result, revenues and earnings may vary from quarter to quarter and from year to year. Lehman Brothers believes its client-flow orientation helps to mitigate overall revenue volatility.

Lehman Brothers operates in three business segments: Capital Markets, Investment Banking, and Investment Management. Financial information concerning Lehman Brothers for the fiscal years ended November 30, 2006 and 2005, including the amount of net revenues contributed by each segment in such

167

periods, is set forth in the Consolidated Financial Statements and Notes thereto which are incorporated by reference in this Base Prospectus.

**Organizational Structure**

LBHI is the ultimate parent company of the Lehman Brothers group. Since LBHI is primarily a holding company, its cash flow and consequent ability to satisfy its obligations under the Notes issued by it and under the Guarantees are dependent upon the earnings of its subsidiaries and the distribution of those earnings or dividends or loans or other payments by those subsidiaries to LBHI. Except for the other Issuers and certain other subsidiaries as issuers of Notes and other securities (and then solely with respect to the Notes and other securities issued by them), LBHI's subsidiaries will have no obligation to pay any amount in respect of Notes or to make any funds available therefor. Several of LBHI's principal subsidiaries are subject to various capital adequacy requirements promulgated by the regulatory, banking and exchange authorities of the countries in which they operate and/or to capital targets established by various ratings agencies. The requirements referred to above, and certain covenants contained in various debt agreements, may restrict LBHI's ability to withdraw capital from its subsidiaries by dividends, loans or other payments. Additionally, the ability of LBHI to participate as an equity holder in any distribution of assets of any subsidiary is generally subordinated to the claims of creditors of the subsidiary.

As disclosed in the Information Incorporated by Reference, Lehman Brothers is involved in a number of judicial, regulatory and arbitration proceedings concerning matters arising in connection with the conduct of its business, including actions brought against Lehman Brothers and others with respect to transactions in which Lehman Brothers acted as an underwriter or financial advisor, actions arising out of its activities as a broker or dealer in securities and commodities and actions brought on behalf of various classes of claimants against many securities and commodities firms, including Lehman Brothers. Although there can be no assurance as to the ultimate outcome, Lehman Brothers generally has denied, or believe it has a meritorious defense and will deny, liability in all significant cases pending against it, including the matters described in the Documents Incorporated by Reference, and it intends to defend vigorously each such case. Based on information currently available, Lehman Brothers believes the amount, or range, of reasonably possible losses in connection with the actions against it, including the matters described in the Documents Incorporated by Reference, in excess of established reserves, in the aggregate, not to be material to Lehman Brothers' consolidated financial condition or cash flows. However, losses may be material to Lehman Brothers' operating results for any particular future period, depending on the level of its income for such period.

## SUMMARY FINANCIAL INFORMATION OF LEHMAN BROTHERS HOLDINGS INC.

The following table sets forth selected consolidated financial information on LBHI as of the dates and for the periods indicated. The selected consolidated financial information as of and for the twelve month periods ended November 30, 2006 and 2005 and as of and for the three months periods ended May 31, 2007 and February 28, 2007 is extracted without material adjustment from the audited consolidated financial statements of LBHI included in LBHI's Annual Report on Form 10-K for the twelve month period ended November 30, 2006, filed with the SEC and from the unaudited consolidated financial statements of LBHI included in LBHI's Quarterly Reports on Form 10-Q for the quarters ended May 31, 2007 and February 28, 2007, respectively.

### Consolidated Statement of Income Information

| | Three months ended May 31, 2007 | Three months ended May 31, 2006 | Year ended November 30, 2006 | Year ended November 30, 2005 |
|---|---|---|---|---|
| | *(in U.S.$ millions)* | | | |
| **Revenues:** | | | | |
| Principal transactions | $2,889 | $2,589 | $9,802 | $7,811 |
| Investment banking | 1,150 | 741 | 3,160 | 2,894 |
| Commissions | 568 | 512 | 2,050 | 1,728 |
| Interest and dividends | 10,558 | 7,327 | 30,284 | 19,043 |
| Asset management and other | 414 | 346 | 1,413 | 944 |
| Total revenues | 15,579 | 11,515 | 46,709 | 32,420 |
| Interest expense | 10,067 | 7,104 | 29,126 | 17,790 |
| Net revenues | 5,512 | 4,411 | 17,583 | 14,630 |
| **Non-Interest Expenses:** | | | | |
| Compensation and benefits | 2,718 | 2,175 | 8,669 | 7,213 |
| Other expenses | 915 | 738 | 3,009 | 2,588 |
| **Total non-interest expenses** | 3,633 | 2,913 | 11,678 | 9,801 |
| Income before taxes and cumulative effect of accounting change | 1,879 | 1,498 | 5,905 | 4,829 |
| Provision for income taxes | 606 | 496 | 1,945 | 1,569 |
| Cumulative effect of accounting change | – | – | 47 | – |
| Net income | 1,273 | 1,002 | $4,007 | $3,260 |
| Net income applicable to common stock | 1,256 | 986 | $3,941 | $3,191 |
| Earnings per common share (diluted): | 2.21 | 1.69 | $6.81 | $5.43 |

**Consolidated Statement of Financial Condition Information**

**Balance Sheet Data**

| | At 30 November, 2006 | At 30 November, 2005 | At 31 May, 2007 |
|---|---|---|---|
| | *(in US$ millions)* | | |
| Total assets ............................................................................... | 503,545 | 410,063 | 605,861 |
| Net assets[1] | 268,936 | 211,424 | 337,667 |
| Short-term borrowings and current portion of long-term borrowings ............................................................... | 20,638 | 11,351 | 27,712 |
| Long-term borrowings ........................................................ | 81,178 | 53,899 | 100,819 |
| Total liabilities.......................................................................... | 484,354 | 393,269 | 584,732 |
| Total stockholders' equity ............................................................. | 19,191 | 16,794 | 21,129 |
| Total long-term capital[2] .................................................................. | 100,369 | 70,693 | 121,948 |

Notes:

1.  Net assets represent total assets excluding: (1) cash and securities segregated and on deposit for regulatory and other purposes, (2) securities received as collateral, (3) securities purchased under agreements to resell, (4) securities borrowed and (5) identifiable intangible assets and goodwill. LBHI believes net assets is a measure more useful to investors than total assets when comparing companies in the securities industry because it excludes certain assets considered to have a low-risk profile and identifiable intangible assets and goodwill. Net assets as presented are not necessarily comparable to similarly-titled measures provided by other companies in the securities industry because of different methods of calculation.

2.  Total long-term capital includes long-term borrowings (excluding any borrowings with remaining maturities of less than twelve months) and total stockholders' equity. LBHI believes total capital is useful to investors as a measure of its financial strength.

**Consolidated Stockholders' Equity of LBH**

All of the financial information below is extracted without material adjustment from the unaudited consolidated financial statements of LBHI included in LBHI's Quarterly Report on Form 10-Q for the quarter ended 28 February 2007 filed with the SEC. The following table sets forth the consolidated capitalisation of LBHI and its subsidiaries as of 30 November 2006 and 28 February 2007[1]:

|  | At 31 May, 2007 | At 30 November, 2006 |
|---|---|---|
|  | (US$ millions except share data) | |
| **Stockholders' equity:** | | |
| Preferred Stock: ............................................................................ | 1,095 | 1,095 |
| Common Stock: $0.10 par value ..................................................... | | |
| Shares authorised: 1,200,000,000 in 2007 and 2006 ....................... | | |
| Shares issued: 610,865,692 in 2007 and 609,832,302 in 2006[2] ........ | | |
| Shares outstanding: 530,153,162 in 2007 and 533,368,195 in 2006 .... | 61 | 61 |
| Additional paid-in capital.............................................................. | 9,610 | 8,727 |
| Accumulated other comprehensive income/(loss), net of tax ............. | (5) | (15) |
| Retained earnings ........................................................................... | 18,133 | 15,857 |
| Other stockholders' equity, net........................................................ | (2,205) | (1,712) |
| Common stock in treasury, at cost: 80,712,530 shares in 2007 and 76,464,107 shares in 2006 .................................................................. | (5,560) | (4,822) |
| **Total common stockholders' equity** ......................................... | 20,034 | 18,096 |
| **Total stockholders' equity** ....................................................... | 21,129 | 19,191 |

Notes:

1.   There has been no material change in the capitalisation of LBHI since 31 May 2007. For more information about LBHI's common stock and preferred stock, see the Notes to Consolidated Financial Statements included in LBHI's Annual Report on Form 10-K for the 12 months ended 30 November 2006.

2.   All shares issued are fully paid and non-assessable.

## LEHMAN BROTHERS TREASURY CO. B.V

**General**

LBTCBV was incorporated in The Netherlands on March 8, 1995 (under the Dutch Civil Code (*Burgerlijk Wetboek*)) with registration number 33267322 with the Chamber of Commerce and Industry of Amsterdam (Kamer van Koophandel en Fabrieken) as a private company with limited liability ("*besloten vennootschap met beperkte aansprakelijkheid*") for an unlimited duration. LBTCBV is a wholly-owned subsidiary of Lehman Brothers U.K. Holdings (Delaware) Inc., a company incorporated under the laws of the State of Delaware, which is in turn wholly-owned by LBHI. The principal activity of LBTCBV is to act as a Netherlands finance company supporting the working capital needs of various, principally European, subsidiaries of LBHI. LBTCBV does not have any subsidiary undertakings. LBTCBV has no employees.

The registered office and principal place of business of LBTCBV is at Strawinskylaan 3105, 1077 ZX Amsterdam, The Netherlands and the telephone number is +31 20 406 4444.

The objects for which LBTCBV was established (which can be found at article 2 of its articles of association) are to finance companies and other enterprises with which it forms a group, to borrow, to lend and to raise funds, to participate in all sorts of financial transactions including the issue of bonds, promissory notes or other securities or debt instruments, to invest in securities in the widest sense of the word, to grant guarantees, to assume liability and to grant security over its assets for the obligations of companies and other enterprises with which it forms a group and of third parties.

To the best of LBTCBV's knowledge, it is in material compliance with the applicable corporate governance regimes in The Netherlands.

**LBTCBV has share capital consisting of:**

Ordinary shares, EUR 454 par value; 7,500 authorized; 4,406 allotted, called up and fully paid.

**Directors of LBTCBV**

Set forth below are the names and the principal occupations of the current members of the Board of Management of LBTCBV:

| Name | Function of LBTCBV | Principal Outside Activities |
|---|---|---|
| Leonard M. Fuller........................ | Director | None |
| Pascale Vidalie ............................ | Director | None |
| Wolbert Kamphuijs ..................... | Director | Proxyholder of Equity Trust NV Amsterdam |
| Rumoldus de Schutter.................. | Director | Director of Equity Trust NV Amsterdam |

The business address of Leonard Fuller is Talstrasse 82, 8021 Zurich, Switzerland and the business address of Pascale Vidalie is Rathenauplatz 1, 60313 Frankfurt, Germany.

The business address of Wolbert Kamphuijs and Rumoldus de Schutter is Atrium Strawinskylaan 3105, 1077 ZX Amsterdam, The Netherlands.

There are no known conflicts of interest between any duties of the members of the Board of Management to LBTCBV and their respective private interests or other duties.

## SUMMARY FINANCIAL INFORMATION OF LEHMAN BROTHERS TREASURY CO. B.V.

### Year-End Financial Information

The following tables set forth selected financial information of LBTCBV for the periods indicated.

The selected financial information is extracted without material adjustment from the audited financial statements of LBTCBV for the year ended November 30, 2006.

### Profit and Loss Account Data

|  | Year ended November 30, 2006 | Year ended November 30, 2005 |
|---|---|---|
|  | US$ '000 | |
| Operating Income | 1,167 | – |
| Operating expense | (111) | (1,011) |
| Net Operating Income and Expense | 1,056 | (1,011) |
| Interest and similar income | 770,179 | 377,577 |
| Interest and similar expense | (748,632) | (360,742) |
| Net financial income and expense | 21,547 | 16,835 |
| Result from ordinary operations before tax | 22,603 | 15,824 |
| Tax on result from ordinary operations | (6,916) | (6,181) |
| Result form ordinary operations after tax | 15,687 | (9,643) |

### Balance Sheet Data

|  | 2006 | 2005 |
|---|---|---|
|  | US$ '000 | |
| **Assets** | | |
| **Financial Fixed Assets** | | |
| Due from group companies – amounts due more than one year | 19,080,440 | 12,872,298 |
| **Current Assets** | | |
| Due from group companies – amounts due more than one year | 3,502,636 | 2,011,003 |
| Cash at bank | 91,035 | 9,981 |
| Total Assets | 3,593,671 | 2,020,984 |
|  | 22,674,111 | 14,893,282 |
| **Shareholder's Equity and Liabilities** | | |
| **Shareholder's Equity** | | |
| Common shares – EUR 454 par value; authorised – | | |
| 7,500 shares; issued and fully paid – 4,406 shares | 2,545 | 1,088 |
| Retained earnings | 50,296 | 34,609 |
| Total Shareholder's Equity | 52,841 | 35,697 |
| **Long-Term Liabilities** | | |
| Guaranteed notes payable – amounts due after more than one year | 19,275,620 | 13,069,959 |

|  | 2006 | 2005 |
|---|---|---|
|  | US$ '000 | |
| **Current Liabilities** | | |
| Guaranteed notes payable – amounts due within one year | 3,106,544 | 1,667,762 |
| Bank overdrafts | 46,027 | 1 |
| Payable to group company | 4,566 | 10,851 |
| Accrued interest payable | 150,387 | 105,083 |
| Taxation payable | 2,350 | 1,804 |
| Other accrued liabilities | 35,776 | 2,125 |
| **Total Current Liabilities** | 3,345,650 | 1,787,626 |
| **Total Shareholder's Equity and Liabilities** | 22,674,111 | 14,893,282 |

|  | 2006 | 2005 |
|---|---|---|
|  | US$ '000 | |
| **Cash flow from operating activities** | | |
| Net profit for the year after taxation | 15,687 | 9,643 |
| Adjustment to Reconcile net income to net cash used in operating activities | | |
| Gain/(Loss) on early redemption of debt | 1,088 | (436) |
| Amortisation of Debt Discount | 16,227 | 3,409 |
| (Increase) in amounts due from group companies | (6,395,508) | (4,999,163) |
| Increase in Creditors | 73,217 | 33,080 |
| **Net cash flow from operating activities** | (6,289,289) | (4,953,467) |
| **Cash flows from financing activities** | | |
| Net Increase in issued debt | 6,322,860 | 4,963,497 |
| Net Increase/(Decrease) in Bank overdraft | 46,026 | (2,298) |
| Net Increase in share capital | 1,457 | – |
| **Net cash flow from financing activities** | 6,370,343 | 4,961,199 |
| Net cash flow, movement in cash | 81,054 | 7,732 |
| Net Cash at beginning of year | 9,981 | 2,249 |
| Net Cash at end of year | 91,035 | 9,981 |

## LEHMAN BROTHERS BANKHAUS AG

### General

LBB was incorporated under German law in Frankfurt, Germany on June 3, 1987 as a private Stock Corporation ("*Aktiengesellschaft*") for an unlimited duration and entered into the Commercial Register of the District Court in Frankfurt am Main under the number 28139 on September 14, 1987. The principal activity of LBB is to act as a commercial bank supporting the working capital and lending requirements of various institutional clients worldwide and European subsidiaries of LBHI. In addition LBB provides financial advisory services to investment banking clients in Germany and Austria. LBB does not have any subsidiaries but also acts through its branch office in London, UK which is registered at Companies House with Branch Number BR003960. LBB opened an office in Milan, Italy on August 31, 2005. LBB had an average of 80 employees during the fiscal year.

The registered office and principal place of business of LBB is at Rathenauplatz 1, 60313 Frankfurt am Main, Germany and the telephone number is + 49-69-15307-0.

The sole shareholder of LBB is LBHI. Since 1987, LBB has operated in accordance with the rules and regulations of German Corporate and Banking laws and been supervised by the Supervisory Board of LBB and controlled by the German banking regulator.

LBHI issues consolidated financial statements for the largest group of consolidated companies. The consolidated financial statements of LBHI are available from LBB.

In this fiscal year, all transactions with affiliated companies were executed on an arm's length basis consistent with transactions with third parties. No disadvantages from dealings with affiliated parties have been experienced by LBB.

LBB is a member of the Banking Association Hessen, Registered Association, the Association of Foreign Banks in Germany, Registered Association, and the Audit Association of German Banks, Registered Association. In addition, LBB participates in the Deposit Protection Fund of the Federal Association of German Banks, Registered Association.

LBB's share capital consists of 115,100 ordinary shares with a par value of EUR 512.60 per share, each of which has been allotted, called up and fully paid.

The object of LBB (which can be found at article 2 of its articles of association) is the operation of a business involving bank transactions of every type (with the exception of mortgage banking, savings and loan and investment business).

### Directors of LBB

Set forth below are the names and the principal occupations of the current members of the Board of Management of LBB, each of whose business address in their capacity as Director is Rathenauplatz 1, 60313 Frankfurt am Main, Germany. There are no conflicts of interest between any duties of the Board of Management of LBB to LBB and their private duties or other interests.

| Name | Principal Occupation with LBB | Principal Outside Activities |
| --- | --- | --- |
| Helmut Olivier......................... | Director | Member of the Supervisory Board of D. Logistics AG, Hofheim, Germany. Member of the Stock Exchange Council of Eurex Deutschland AG |
| Karl Dannenbaum .................. | Director | |

## SUMMARY FINANCIAL INFORMATION OF LEHMAN BROTHERS BANKHAUS AG

**Year-End Financial Information**

The following tables set forth selected financial information of LBB for the periods indicated.

The selected financial information is extracted without material adjustment from the audited financial statements of LBB for the year ended November 30, 2006. Financial statements of LBB are consolidated in the consolidated financial statements of LBHI.

**Balance Sheet**

| | Year ended November 30, 2006 | Year ended November 30, 2005 |
|---|---|---|
| | *(in EUR thousands)* | |
| **Assets** | | |
| Cash reserve | 6,435 | 17,488 |
| Loans and advances to banks | 110,124 | 63,564 |
| Loans and advances to customers | 9,053,395 | 4,718,200 |
| Shares and other variable-interest securities | 6,639 | 10,678 |
| Investments | 1 | 1 |
| Trust assets | 49,740 | 76,706 |
| Intangible assets | 74 | 115 |
| Property, plant and equipment | 2,981 | 3,138 |
| Other assets | 79,729 | 25,857 |
| Prepaid Expenses | 1,828 | 2,165 |
| **Total Assets** | 9,310,946 | 4,917,912 |
| **Liabilities** | | |
| Liabilities to banks | 1,379,587 | 712,814 |
| Liabilities to customers | 6,846,070 | 3,451,816 |
| Securitized liabilities | 148,913 | 82,650 |
| Trust liabilities | 49,740 | 76,706 |
| Other liabilities | 82,691 | 22,454 |
| Deferred income | 18,452 | 17,096 |
| Accruals | 45,485 | 35,286 |
| Subordinated liabilities | 201,338 | 161,241 |
| Equity | 538,669 | 357,849 |
| **Total Liabilities** | 9,310,946 | 4,917,912 |

176

**Profit and Loss Account Data**

|  | Year ended November 30, 2006 | Year ended November 30, 2005 |
|---|---|---|
|  | *(in EUR thousands)* | |
| **Expenses** | | |
| Interest expenses | (460,988) | (227,767) |
| Commission expenses | (9,716) | (5,606) |
| Net expenses from financial transactions | (7,486) | 0 |
| Administrative expenses | (44,255) | (29,702) |
| Other expenses | (9,570) | (7,336) |
| Profits transferred as a result of a profit transfer or a profit transfer agreement | 0 | (25,504) |
| Taxation | (14,887) | (12,831) |
| **Total expenses** | (546,902) | (308,746) |
| **Income** | | |
| Interest income | 554,461 | 279,063 |
| Commission income | 37,363 | 27,602 |
| Net income (loss) from financial transactions | 0 | 429 |
| Other operating income | 3,432 | 1,652 |
| **Total income** | 595,256 | 308,746 |
| **Net Profit for the year** | (48,355) | |

**Cash flow Statement**

|  | 2006 | 2005 |
|---|---|---|
|  | €'000 | |
| Profits for this period ( including pro rata profits of minority shareholders) before extraordinary results . Items not affecting payments in profits for this period and transfers to cashflow From current business | 48,355 | 25,504 |
| Depriciation, adjustments and write ups on loans and advances tangible and financial fixed assets | 657 | 1,029 |
| Increase in provisions | 43,229 | 33,935 |
| Reduction in provisions | (6,695) | (1,591) |
| Other income/ expenditure affecting payments | (3,037) | (6,681) |
| Profits or losses on disposals of financial and tangible fixed assest | 0 | 0 |
| Other adjustments (net) | 0 | 0 |
| Sub-total | 82,509 | 52,196 |

|  | *2006* | *2005* |
|---|---|---|
|  | €'000 | |

**Change in assets and liabilities relating to operating activities**

Loans and advances

| | | |
|---|---|---|
| To banks | (48,233) | (15,018) |
| To customers | (4,310,061) | (502,252) |
| Securities (other than financial investments) | 0 | 0 |
| Other assets relating to operating activities | (23,225) | 37,562 |

Liabilities

| | | |
|---|---|---|
| To Banks | 654,955 | (153,218) |
| To customers | 3,405,115 | 617,355 |
| Securitised liabilities | 65,168 | 51,057 |
| Other liabilities from current business | 24,016 | (16,844) |
| Interest and dividens received | 0 | 0 |
| Interest paid | 0 | 0 |
| Extraordinary credits | 0 | 0 |
| Extraordinary debits | 0 | 0 |
| Tax paid on earnings | (11,826) | (7,094) |
| Cashflows from current business | (161,582) | 63,745 |

Cash receipt from disposal of

| | | |
|---|---|---|
| Financial fixed assets | 0 | 0 |
| Tangible assets | 0 | 0 |

Debits from investments in

| | | |
|---|---|---|
| Financial fixed assets | 4,039 | 11,792 |
| Tangible assets | (471) | (258) |
| Credits from sales of consolidated companies and other business units | 0 | 0 |
| Debits from sales of consolidated companies and other business units | 0 | 0 |
| Changes in funds relating to other investing activities (net) | 0 | 0 |
| Cashflows from investments | 3,568 | 11,534 |
| Cash receipts from the issue of capital increases, sale of the enterprise's shares, etc. | 110,000 | 0 |
| Credits from additions to equity capital | 0 | 0 |

Dividends to proprietors and minority shareholders

| | | |
|---|---|---|
| Dividends paid | (25,504) | (55,494) |
| Other payments | 0 | (2,557) |
| Net changes in funds, capital otherwise | 62,466 | 0 |
| Cash flows from financial activity | 146,961 | (58,051) |
| Change in financial funds affecting payments | (11,053) | 17,229 |
| Change in financial funds due to exchange rates, scope of consolidation and valuions | 0 | 0 |
| Financial funds, opening balance | 17,488 | 259 |
| Financial funds, closing balance | 6,435 | 17,488 |

•   Interest received in cash 2006: EUR 527.784 k  (2005: EUR 273.180 k)

••  Interest paid in cash 2006: EUR 435.915 k  (2005:  EUR 229.350 k)

## UNITED STATES TAXATION

The following discussion is not intended or written to be used, and cannot be used by any person, for the purpose of avoiding United States Federal tax penalties, and was written to support the promotion or marketing of Notes issued under the Program. Prospective purchasers of the Notes should consult their own tax advisors regarding the application of U.S. federal income tax law, as well as any state, local, foreign or other tax laws, to the purchase, ownership and disposition of Notes in light of their particular circumstances.

The following is a general summary of material U.S. federal income and withholding tax considerations to U.S. Holders, Non-U.S. Registered Note Holders, and Non-U.S. Bearer Note Holders (each, defined below, and together, "Beneficial Owners"), of the purchase, ownership and disposition of Notes. This summary discusses only the principal United States federal income and withholding tax consequences to Beneficial Owners that purchased Notes at their original issuance and issue price and hold them as capital assets within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended (the "Code"). This summary does not address all of the U.S. federal income tax consequences that may be relevant to a Beneficial Owner in light of the Beneficial Owner's particular circumstances or to Beneficial Owners subject to special rules (including, without limitation, pension plans and other tax-exempt investors, banks, thrift institutions, insurance companies, real estate investment trusts, regulated investment companies, dealers in securities, currencies and Beneficial Owners so treated for U.S. federal income tax purposes, Beneficial Owners whose functional currency is other than the United States dollar, Beneficial Owners who hold Notes as part of a straddle, hedging or conversion transaction, Beneficial Owners liable for the alternative minimum tax and Beneficial Owners who are expatriates). In addition, this summary does not address the application to Beneficial Owners of the purchase, ownership and disposition of Notes, of state, local, or other tax laws of the United States or its political subdivisions, nor the tax law of any non-U.S. jurisdiction.

This summary is based on the Code, its legislative history, applicable U.S. Treasury Regulations, judicial authority and administrative rulings and practice in effect as of the date of this Base Prospectus any of which may be appealed, revoked or otherwise altered with retroactive effect, thereby changing the U.S. federal income tax consequences discussed below. There is no assurance that the U.S. Internal Revenue Service (the "IRS") will not take a contrary view, and no ruling from the IRS has been or will be sought.

As used herein, the term "U.S. Holder" means a beneficial owner of a Note in registered form ("Registered Note") that is, for U.S. federal income tax purposes, (i) a citizen or individual resident of the United States, (ii) a corporation or other entity (treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any State thereof or the District of Columbia, (iii) an estate whose income is subject to U.S. federal income taxation regardless of its source, (iv) a trust, if both (a) a court within the United States is able to exercise primary jurisdiction over the administration of the trust, and (b) one or more United States persons have the authority to control all substantial decisions of the trust, or (v) a trust in existence on August 20, 1996, and treated as a United States person prior to such date, that has elected to continue to be treated as a United States person. As used herein, the term "Non-U.S. Registered Note Holder" means a beneficial owner of a Registered Note that is not a "U.S. Holder". As used herein, the term "Non-U.S. Bearer Note Holder" means a beneficial owner of a Note in bearer form that is not a U.S. Holder and that purchases the Note in bearer form in compliance with the requirements of the applicable U.S. Treasury regulations ("*Bearer Note*").

U.S. federal income and withholding tax treatment of the Notes held by a partnership or other entity (that is treated as a partnership for U.S. federal income tax purposes) will depend on the activities of such partnership or other entity and the status of the partners. Partners in a partnership (or other entity that is treated as a partnership for U.S. federal income tax purposes) holding a Note should consult their own tax advisors regarding the U.S. federal income and withholding tax consequences of the acquisition, ownership and disposition of a Note by the partnership.

179

**Treatment of Notes as Indebtedness**

The following discussion addresses the U.S. federal income tax treatment of Notes that will be issued in a manner consistent with, and with characteristics that are typical of, indebtedness for U.S. federal income tax purposes. The Issuers believe that, and the following summary assumes that, unless expressly indicated below, such Notes are properly treated as indebtedness for U.S.federal income tax purposes. However, Notes that are not fully principal protected and possibly certain other Notes may be characterized as instruments other than debt for U.S. federal income tax purposes. Supplemental disclosure may be provided in connection with such Notes. Prospective purchasers of the Notes should consult their own tax advisors regarding the application of U.S. federal income tax law, as well as any state, local, foreign or other tax laws, to the purchase, ownership and disposition of Notes in light of their particular circumstances.

**Treatment of the Guarantees**

Each Note issued by LBTCBV or LBB will have the benefit of the Guarantee of LBHI as to all amounts of principal and premium and interest, if any, thereof and thereon due. Based on terms and conditions of each Guarantee, the Issuers believe, and the following summary assumes, that the Guarantees will not cause the Notes issued by LBTCBV or LBB to be treated as debt of LBHI for U.S. federal income tax purposes.

**Taxation of U.S. Holders**

**A.    Interest**

1.    General

The taxation of interest on a Note depends on whether the interest is "qualified stated interest" (as defined below). Interest that is qualified stated interest is includible in a U.S. Holder's income as ordinary income when actually or constructively received (if such U.S. Holder uses the cash method of accounting for U.S. federal income tax purposes) or when accrued (if such U.S. Holder uses an accrual method of accounting for U.S. federal income tax purposes). Interest that is not qualified stated interest is includible in a U.S. Holder's income under the rules governing "original issue discount", described below, regardless of such U.S. Holder's method of accounting.

Generally, for foreign tax credit purposes, interest on Notes issued by LBHI will be classified as income from U.S. sources while interest on Notes issued by LBTCBV or LBB will be classified as income from non-U.S. sources. To the extent that any non-U.S. income or withholding tax is imposed on interest on the Notes issued by LBTCBV or LBB in the hands of a U.S. Holder, such tax may be used either as (i) a credit that offsets the U.S. federal income tax that the U.S. Holder would owe on its income from non-U.S. sources, or (ii) a deduction that reduces the amount of income of the U.S. Holder subject to U.S. federal income tax. Prospective purchasers should consult their tax advisers concerning the applicability of the foreign tax credit and source of income rules to income attributable to Notes.

2.    Definitions

(a)    Qualified Stated Interest

Interest on a Note is "qualified stated interest" if the interest is unconditionally payable in cash or in property (other than debt instruments of the Issuer) at least annually at a single fixed rate (in the case of a Fixed Rate Note) or at a single "qualified floating rate" or "objective rate" (in the case of a Note that qualifies as a "VRDI" as defined below). If a Note that qualifies as a VRDI provides for interest other than at a single qualified floating rate or single objective rate, special rules apply to determine the portion of such interest that is treated as though it were qualified stated interest. See "4. VRDIs with Original Issue Discount".

(b)    Variable Rate Debt Instruments (VRDI), Qualified Floating Rate and Objective Rate

A Note, such as a Floating Rate Note or an Indexed Interest Note, is a variable rate debt instrument ("*VRDI*") if all four of the following conditions are met. First, the "issue price" (as defined under "Original Issue Discount") of the Note must not exceed the total noncontingent principal payments by more than an amount equal to the lesser of (i).015 multiplied by the product of the total noncontingent principal payments and the number of complete years to maturity from the issue date (or, in certain cases, its weighted average maturity) and (ii) 15% of the total noncontingent principal payments. See "7. Extendible Notes, Puts and Calls" below for determination of maturity.

Second, except as provided in the preceding paragraph, the Note must not provide for any principal payments that are contingent.

Third, the Note must provide for stated interest (compounded or paid at least annually) at (a) one or more qualified floating rates, (b) a single fixed rate and one or more qualified floating rates, (c) a single objective rate or (d) a single fixed rate and a single objective rate that is a "qualified inverse floating rate" (as defined below).

Fourth, the Note must provide that a qualified floating rate or objective rate in effect at any time during the term of the Note is set at the value of the rate on any day that is no earlier than three months prior to the first day on which that value is in effect and no later than one year following that first day. For example, a Note could not provide for an interest rate based on the LIBOR rate in effect two years prior to each Interest Payment Date.

Subject to certain exceptions, a variable rate of interest on a Note is a "qualified floating rate" if variations in the value of the rate can reasonably be expected to measure contemporaneous fluctuations in the cost of newly borrowed funds in the currency in which the Note is denominated. This includes a variable rate equal to (i) the product of an otherwise qualified floating rate and a "spread multiplier" that is greater than 0.65 but not more than 1.35 or (ii) an otherwise qualified floating rate (or the product described in clause (i)) plus or minus a spread. If the variable rate equals the product of an otherwise qualified floating rate and a single spread multiplier greater than 1.35 or less than or equal to 0.65, however, such rate generally is an objective rate. A variable rate is not considered a qualified floating rate if the variable rate is subject to a cap, floor, governor or similar restriction that is not fixed throughout the term of the Note and is reasonably expected as of the issue date to cause the yield on the Note to be significantly more or less than the expected yield determined without the restriction.

Subject to certain exceptions, an "objective rate" is a rate (other than a qualified floating rate) that is determined using a single fixed formula and that is based on objective financial or economic information that is neither within the control of the Issuer (or a related party) nor unique to the circumstances of the Issuer (or a related party). A rate is not an objective rate if it is reasonably expected that the average value of the rate during the first half of the Note's term will be either significantly less than or significantly greater than the average value of the rate during the final half of the Note's term. The IRS may designate rates other than those specified above that will be treated as objective rates. As of the date of this Base Prospectus, no such other rates have been designated. An objective rate is a "qualified inverse floating rate" if (a) the rate is equal to a fixed rate minus a qualified floating rate and (b) the variations in the rate can reasonably be expected to reflect inversely contemporaneous variations in the cost of newly borrowed funds (disregarding any caps, floors, governors or similar restrictions that would not, as described above, cause a rate to fail to be a qualified floating rate).

If interest on a Note is stated at a fixed rate for an initial period of one year or less, followed by a variable rate that is either a qualified floating rate or an objective rate for a subsequent period, and the value of the variable rate on the issue date is intended to approximate the fixed rate, the fixed rate and the variable rate together are treated as a single qualified floating rate or objective rate.

(c)    Original Issue Discount

Original issue discount is the excess, if any, of a Note's "stated redemption price at maturity" over its "issue price." A Note's "stated redemption price at maturity" is the sum of all payments provided by the Note (whether designated as interest or as principal) other than payments of qualified stated interest. The "*issue price*" of a Note is the first price at which a substantial amount of the Notes in the issuance that includes the Note is sold (excluding sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriters, placement agents or wholesalers). See "7. Extendible Notes, Puts and Calls" below for determination of maturity.

The amount of original issue discount with respect to a Note will be treated as zero if the original issue discount is less than an amount equal to 0.0025 multiplied by the product of the stated redemption price at maturity and the number of complete years to maturity (or weighted average maturity, as applicable) ("*de minimis* OID"). Generally, a U.S. Holder must include the *de minimis* OID in income as stated principal payments are made, in an amount equal to the product of the total *de minimis* OID and a fraction, the numerator of which is the amount of principal payment and denominator of which is the total stated principal amount of the Note. Generally, such *de minimis* OID will be treated as capital gain in the hands of the U.S. Holder.

3.    Fixed Rate Notes with Original Issue Discount

In the case of a Fixed Rate Note with original issue discount, the amount of original issue discount includible in the income of a U.S. Holder for any taxable year is determined under the constant yield method, as follows. First, the "yield to maturity" of the Note is computed. The yield to maturity is the discount rate that, when used in computing the present value of all interest and principal payments to be made under the Note (including payments of qualified stated interest) produces an amount equal to the issue price of the Note. The yield to maturity is constant over the term of the Note and, when expressed as a percentage, must be calculated to at least two decimal places.

Second, the term of the Note is divided into "accrual periods". Accrual periods may be of any length and may vary in length over the term of the Note, provided that each accrual period is no longer than one year and that each scheduled payment of principal or interest occurs either on the final day of an accrual period or on the first day of an accrual period.

Third, the total amount of original issue discount on the Note is allocated among accrual periods. In general, the original issue discount allocable to an accrual period equals the product of the "adjusted issue price" of the Note at the beginning of the accrual period and the yield to maturity of the Note, less the amount of any qualified stated interest allocable to the accrual period. The adjusted issue price of a Note at the beginning of the first accrual period is its issue price. Thereafter, the adjusted issue price of the Note is its issue price, increased by the amount of original issue discount previously includible in the gross income of any beneficial owner and decreased by the amount of any payment previously made on the Note other than a payment of qualified stated interest. For purposes of computing the adjusted issue price of a Note, the amount of original issue discount previously includible in the gross income of any beneficial owner is determined without regard to "premium" and "acquisition premium", as those terms are defined below under "C. Premium and Acquisition Premium".

Fourth, the "daily portions" of original issue discount are determined by allocating to each day in an accrual period its ratable portion of the original issue discount allocable to the accrual period.

A U.S. Holder includes in income in any taxable year the daily portions of original issue discount for each day during the taxable year that such U.S. Holder held Notes. Under the constant yield method described above, U.S. Holders generally are required to include in income increasingly greater amounts of original issue discount in successive accrual periods.

4.    VRDIs with Original Issue Discount

In the case of a VRDI that provides for qualified stated interest, the amount of qualified stated interest and original issue discount, if any, includible in income during a taxable year are determined under the rules applicable to Fixed Rate Notes by assuming that the variable rate is a fixed rate equal to (i) in the case of a qualified floating rate or a qualified inverse floating rate, the value, as of the issue date, of the qualified floating rate or qualified inverse floating rate, and (ii) in the case of an objective rate (other than a qualified inverse floating rate), the rate that reflects the yield that is reasonably expected for the Note. Qualified stated interest allocable to an accrual period is increased (or decreased) if the interest actually paid during an accrual period exceeds (or is less than) the interest assumed to be paid during the accrual period.

If a VRDI does not provide for qualified stated interest as described above and does not provide for a fixed rate, the amount of interest and original issue discount accruals are determined by constructing an equivalent fixed rate debt instrument, as follows.

First, a fixed rate substitute for each variable rate provided by the Note is determined. The fixed rate substitute for each qualified floating rate provided by the Note is the value of that qualified floating rate on the issue date. If the Note provides for two or more qualified floating rates with different intervals between interest adjustment dates (e.g., the 30-day commercial paper rate and quarterly LIBOR), the fixed rate substitutes are based on intervals that are equal in length (e.g., the 90-day commercial paper rate and quarterly LIBOR, or the 30-day commercial paper rate and monthly LIBOR). The fixed rate substitute for an objective rate that is a qualified inverse floating rate is the value of the qualified inverse floating rate on the issue date. The fixed rate substitute for an objective rate (other than a qualified inverse floating rate) is a fixed rate that reflects the yield that is reasonably expected for the Note.

Second, a hypothetical equivalent fixed rate debt instrument is constructed that has terms identical to those provided under the Note, except that the equivalent fixed rate debt instrument provides for the fixed rate substitutes determined in the first step, in lieu of the qualified floating rates or objective rate provided by the Note.

Third, the amount of qualified stated interest and original issue discount for the equivalent fixed rate debt instrument are determined under the rules described above for Fixed Rate Notes. These amounts are taken into account as if the U.S. Holder held the equivalent fixed rate debt instrument.

Fourth, appropriate adjustments are made for the actual values of the variable rates. In this step, qualified stated interest or original issue discount allocable to an accrual period is increased (or decreased) if the interest actually accrued or paid during the accrual period exceeds (or is less than) the interest assumed to be accrued or paid during the accrual period under the equivalent fixed rate debt instrument.

If a VRDI provides for stated interest either at one or more qualified floating rates or at a qualified inverse floating rate, and in addition provides for stated interest at a single fixed rate, the amount of interest and original issue discount accruals are determined as in the preceding four paragraphs with the modification that the VRDI is treated, for purposes of the first three steps of the determination, as if it provided for a qualified floating rate (or qualified inverse floating rate) rather than the fixed rate. The qualified floating rate (or qualified inverse floating rate) replacing the fixed rate must be such that the fair market value of the VRDI as of the issue date would be approximately the same as the fair market value of an otherwise identical debt instrument that provides for the qualified floating rate (or qualified inverse floating rate) rather than the fixed rate.

5.    Contingent Notes

Certain types of Notes (the "*Contingent Notes*"), may be taxable under the rules applicable to contingent payment debt instruments (the "*Contingent Debt Regulations*"), as follows.

First, the Issuer is required to determine, as of the issue date, the comparable yield for the Contingent Note. The comparable yield is generally the yield at which the Issuer would issue a fixed rate debt instrument with terms and conditions similar to those of the Contingent Note (including the level of subordination, term, timing of payments and general market conditions) but not taking into consideration the risk of the contingencies or the liquidity of the Contingent Note. Further, the comparable yield may not be less than the Applicable Federal Rate announced monthly by the IRS (the "*AFR*"). In certain cases where Contingent Notes are marketed or sold in substantial part to tax-exempt investors or other investors for whom the prescribed inclusion of interest is not expected to have a substantial effect on their United States tax liability, the comparable yield for the Contingent Note is, without proper evidence to the contrary, presumed to be the AFR.

Second, solely for tax purposes, the Issuer constructs a projected schedule of payments determined under the Contingent Debt Regulations for the Contingent Note (the "*Schedule*"). The Schedule is determined as of the issue date and generally remains in place throughout the term of the Contingent Note. If a right to a contingent payment is based on market information, the amount of the projected payment is the forward price of the contingent payment. If a contingent payment is not based on market information, the amount of the projected payment is the expected value of the contingent payment as of the issue date. The Schedule must produce the comparable yield determined as set forth above. Otherwise, the Schedule must be adjusted under the rules set forth in the Contingent Debt Regulations.

Third, under the usual rules applicable to Notes issued with original issue discount and based on the Schedule, the interest income on the Contingent Note for each accrual period is determined by multiplying the comparable yield of the Contingent Note (adjusted for the length of the accrual period) by the Contingent Note's adjusted issue price at the beginning of the accrual period (determined under rules set forth in the Contingent Debt Regulations). The amount so determined is then allocated on a ratable basis to each day in the accrual period that the U.S. Holder held the Contingent Note.

Fourth, appropriate adjustments are made to the interest income determined under the foregoing rules to account for any differences between the Schedule and actual contingent payments. Under the rules set forth in the Contingent Debt Regulations, interest income is generally increased (or decreased) if the actual contingent payment is more (or less) than the projected payment. Differences between the actual amounts of any contingent payments in respect of a Contingent Note made in a calendar year and the projected amounts of such payments are generally aggregated and taken into account, in the case of a positive difference, as additional interest income, or, in the case of a negative difference, first as a reduction in interest income for such year and thereafter, subject to certain limitations, as ordinary loss.

The Contingent Debt Regulations require the Issuer to provide each beneficial owner of a Contingent Note with the Schedule. If the Issuer does not create the Schedule or the Schedule is unreasonable, a U.S.Holder must set its own projected payment schedule and explicitly disclose the fact that the U.S.Holder's schedule is being used and the reason therefor. Unless otherwise prescribed by the IRS, the U.S. Holder must make such disclosure on a statement attached to the U.S. Holder's timely filed U.S. federal income tax return for the taxable year in which the Contingent Note was acquired.

6.    Election to Treat All Interest as Original Issue Discount

U.S. Holders may elect to include in gross income all interest that accrues on a Note, including any stated interest, acquisition discount, original issue discount, market discount, de minimis OID, *de minimis* market discount and unstated interest (as adjusted by amortizable bond premium and acquisition premium), by using the constant yield method described above under "Original Issue Discount." Such an election for a Note with amortizable bond premium results in a deemed election to amortize bond premium for all taxable debt instruments owned and later acquired by the U.S. Holder with amortizable bond premium and may be revoked only with the permission of the IRS. Similarly, such an election for a Note with market discount results in a deemed election to accrue

market discount in income currently for such Note and for all other debt instruments acquired by the U.S. Holder with market discount on or after the first day of the taxable year to which such election first applies, and may be revoked only with the permission of the IRS. A U.S. Holder's tax basis in a Note is increased by each accrual of the amounts treated as original issue discount under the constant yield election described in this paragraph.

The application of the foregoing rules may be different in the case of Contingent Notes. Accordingly, prospective purchasers should consult with their tax advisors with respect to the application of the market discount, acquisition premium and amortizable bond premium rules to such Notes.

7.   Extendible Notes, Puts and Calls

Generally, the maturity date of a Note will be the maturity date specified in the applicable Final Terms. However, the maturity date of a Note that provides either the Issuer or the U.S. Holder with an unconditional option or options, exercisable on one or more dates during the term of the Note, that, if exercised, requires payments to be made on the Note under an alternative payment schedule or schedules (such as an option to extend or an option to call a debt instrument at a fixed premium) will be determined under the special rules in the U.S. Treasury Regulations. Under these rules, the Issuer will be deemed to exercise or not exercise an option or combination of options in a manner that will minimize the yield on the Note while the U.S. Holder will be deemed to exercise or not exercise an option or options in a manner that will maximize the yield on the Note. In addition, depending on the terms and conditions of an Extendible Note, a U.S. Holder may be subject to other special rules under U.S. federal income tax law. **Prospective purchasers of or Extendible Notes should consult their own tax advisors regarding the application of U.S. federal income tax law such Notes.**

8.   Integration of Notes with Other Financial Instruments

Any U.S. Holder that also acquires or has acquired any financial instrument which, in combination with a Note, would permit the calculation of a single yield-to-maturity or could generally constitute a VRDI of an equivalent term, may in certain circumstances treat the Note and the financial instrument as an integrated debt instrument for purposes of the U.S. federal income tax law, with a single determination of issue price and the character and timing of income, deductions, gains and losses. For purposes of determining original issue discount, none of the payments in respect of the integrated debt instrument would be treated as qualified stated interest. Moreover, under the Contingent Debt Regulations, the IRS may require in certain circumstances that a U.S. Holder that owns a Note integrate the Note with a financial instrument held or acquired by the U.S. Holder or a related party.

9.   Maximum and Minimum Interest Rates

Certain Notes issued with adjustable interest rate, such as Floating Rate Notes, may provide for a maximum and/or minimum interest rate. In addition, certain Notes may provide for a maximum and/or minimum redemption amount. Such restriction on interest rate or redemption amount may alter the U.S. federal income tax consequences generally applicable to a U.S. Holder of purchasing, owning and disposing of a Note.

10.   Instalment Notes

Notes may be issued with instalment payment of principal through the term of the Notes. Such Note may be subject to special rules in respect of the accrual of interest. **Prospective purchasers of Instalment Notes should examine the applicable Final Terms or Supplement and consult their own tax advisors regarding the application of U.S. federal income tax law to such Notes.**

11.   Partly Paid Notes

Notes may be issued where purchasers of the Notes pay for the Notes on an instalment schedule or similar arrangement. Such Partly Paid Notes may be subject to special rules for U.S. federal income

tax purposes. **Prospective purchasers of Partly Paid Notes should examine the applicable Final Terms or Supplement and consult their own tax advisors regarding the application of U.S. federal income tax law to such Notes.**

12.    Other Notes

To the extent that Notes are issued that do not fall within the discussion set forth herein, additional discussion of the applicable U.S. federal income tax rules will be provided in the relevant Final Terms, Drawdown Prospectus or any Supplemental Prospectus. **Prospective investors should examine the applicable Final Terms of such Notes and consult their own tax advisors with respect to the purchase, ownership and disposition of such Notes.**

**B.    Premium**

If a U.S. Holder purchases a Note for an amount in excess of the sum of all amounts payable on the Note after the date of acquisition (other than payments of qualified stated interest), such U.S. Holder will be considered to have purchased such Note with "amortizable bond premium" equal in amount to such excess, and generally will not be required to include any original issue discount in income. Generally, a U.S. Holder may elect to amortize such premium as an offset to qualified stated interest income, using a constant yield method similar to that described above (see "2. Definitions — c. Original Issue Discount" above), over the remaining term of the Note (where such Note is not redeemable prior to its maturity date). In the case of Notes that may be redeemed prior to maturity, the premium is calculated assuming that the Issuer or the U.S. Holder will exercise or not exercise its redemption rights in a manner that maximizes the U.S. Holder's yield. A U.S. Holder that elects to amortize bond premium must reduce such Owner's tax basis in the Note by the amount of the premium used to offset qualified stated interest income as set forth above. An election to amortize bond premium applies to all taxable debt obligations held during or after the taxable year for which the election is made and may be revoked only with the consent of the IRS.

**C.    Early Redemptions**

Certain Notes having original issue discount may be redeemed prior to maturity through the exercise of a put or call option. Generally, proceeds received in redemption of a Note will be treated in the same manner as the sale or other taxable disposition of the Note. However, such Note may be subject to rules that differ from the general rules discussed above relating to the U.S. federal income tax treatment of original issue discount.

**D.    Sale and Other Taxable Disposition of Notes**

A U.S. Holder generally recognizes gain or loss upon the sale or other taxable disposition of a Note equal to the difference between the amount realized upon such sale or disposition and the U.S. Holder's adjusted basis in the Note. Such adjusted basis in the Note generally equals the cost of the Note, increased by original issue discount, acquisition discount previously included in respect thereof, and reduced (but not below zero) by any payments on the Note other than payments of qualified stated interest and by any premium that the U.S. Holder has taken into account. To the extent attributable to accrued but unpaid qualified stated interest, the amount realized by the U.S. Holder is treated as a payment of interest. Subject to the discussion under "Foreign Currency Notes" below, any gain or loss is capital gain or loss, except as provided under "Short-Term Notes," below. The excess of net long-term capital gains over net short-term capital losses is taxed at a lower rate than ordinary income for certain non-corporate taxpayers. The distinction between capital gain or loss and ordinary income or loss is also relevant for purposes of, among other things, limitations on the deductibility of capital losses. In addition, generally, gain upon the sale or other taxable disposition will be from U.S. sources.

Generally, a U.S. Holder must recognize any gain upon the sale, redemption or other taxable disposition of a Note that is a Contingent Note as interest income until there are no remaining contingent payments on the Note at the time of the sale, redemption or other taxable transaction. A

U.S. Holder must generally also recognize any loss upon the sale or other taxable disposition of a Note that is a Contingent Note as ordinary loss to the extent that the holder's total interest inclusions in respect of the Note exceed the total negative adjustments on the Note the holder took into account as ordinary loss and any additional loss is treated as capital loss.

E.    **Short-Term Notes**

In the case of a Note with a maturity of one year or less from its issue date (a "Short-Term Note"), no interest is treated as qualified stated interest, and therefore all interest is included in original issue discount. U.S. Holders that report income for U.S. federal income tax purposes on an accrual method and certain other U.S. Holders are required to include original issue discount in income on such Short-Term Notes on a straight-line basis, unless an election is made to accrue the original issue discount according to a constant yield method based on daily compounding.

Any other U.S. Holder of a Short-Term Note is not required to accrue original issue discount for U.S. federal income tax purposes, unless it elects to do so. In the case of a U.S. Holder that is not required, and does not elect, to include original issue discount in income currently, any gain realized on the sale, exchange or retirement of a Short-Term Note is ordinary income to the extent of the original issue discount accrued on a straight-line basis (or, if elected, according to a constant yield method based on daily compounding) through the date of sale, exchange or retirement. In addition, U.S. Holders that are not required, and do not elect, to include original issue discount in income currently are required to defer deductions for any interest paid on indebtedness incurred or continued to purchase or carry a Short-Term Note in an amount not exceeding the deferred interest income with respect to such Short-Term Note (which includes both the accrued original issue discount and accrued interest that are payable but that have not been included in gross income), until such deferred interest income is realized. A U.S. Holder of a Short-Term Note may elect to apply the foregoing rules (except for the rule characterizing gain on sale, exchange or retirement as ordinary) with respect to "acquisition discount" rather than original issue discount. Acquisition discount is the excess of the stated redemption price at maturity of the Short-Term Note over the U.S. Holder's basis in the Short-Term Note. This election applies to all obligations acquired by the taxpayer on or after the first day of the first taxable year to which such election applies, unless revoked with the consent of the IRS. A U.S. Holder's tax basis in a Short-Term Note is increased by the amount included in such U.S. Holder's income on such a Note.

F.    **Foreign Currency Notes**

Generally, except specifically discussed below, interest, original issue discount and other payments in respect of Notes denominated in, or that provide for payments determined by reference to, a currency other than the United States dollar ("*Foreign Currency Notes*") are determined in such foreign currency based on the U.S. federal income tax rules described above and translated into the United States dollar in the manners described below. Certain Foreign Currency Notes may be subject to special rules discussed in "4. Dual Currency Notes and Foreign Currency Notes that are CPDIs" below.

1.    Interest Includible In Income Upon Receipt

A payment of interest on a Foreign Currency Note that is not required to be included in income by the U.S. Holder prior to the receipt of such payment (e.g., qualified stated interest received by a cash method U.S. Holder) is includible in income by the U.S. Holder based on the United States dollar value of the foreign currency determined on the date such payment is received, regardless of whether the payment is in fact converted to United States dollars at that time. If the interest payment is not so converted, such United States dollar value is the U.S. Holder's tax basis in the foreign currency received.

2.    Interest Includible In Income Prior To Receipt

In the case of interest income on a Foreign Currency Note that is required to be included in income by the U.S. Holder prior to the receipt of payment (e.g., stated interest on a Foreign Currency Note held by an accrual basis U.S. Holder or accrued original issue discount), a U.S. Holder is required to include in income the United States dollar value of the amount of interest income that has accrued and is otherwise required to be taken into account with respect to a Foreign Currency Note during an accrual period. Unless the U.S. Holder makes the election discussed in the next paragraph, the United States dollar value of such accrued income is determined by translating such income at the average rate of exchange for the accrual period or, with respect to an accrual period that spans two taxable years, at the average rate for the portion of the accrual period within the taxable year. The average rate of exchange for the accrual period (or partial period) is the simple average of the spot exchange rates for each business day of such period (or other method if such method is reasonably derived and consistently applied). Such U.S. Holder recognizes, as ordinary gain or loss, foreign currency exchange gain or loss with respect to accrued interest income on the date such income is actually received, reflecting fluctuations in currency exchange rates between the last day of the relevant accrual period and the date of payment. The amount of gain or loss recognized equals the difference between the United States dollar value of the foreign currency payment received in respect of such accrual period determined based on the exchange rate on the date such payment is received and the United States dollar value of interest income that has accrued during such accrual period (as determined above).

Under the so-called "spot rate convention election", a U.S. Holder may, in lieu of applying the rules described in the preceding paragraph, elect to translate accrued interest income into United States dollars at the exchange rate in effect on the last day of the relevant accrual period for original issue discount, market discount or accrued interest, or in the case of an accrual period that spans two taxable years, at the exchange rate in effect on the last day of the taxable year. Additionally, if a payment of such income is actually received within five business days of the last day of the accrual period or taxable year, an electing U.S. Holder may instead translate such income into United States dollars at the exchange rate in effect on the day of actual receipt. Any such election applies to all debt instruments held by the U.S. Holder at the beginning of the first taxable year to which the election applies or thereafter acquired by the U.S. Holder and is irrevocable without the consent of the IRS.

3.    Purchase, Sale, Exchange or Retirement

A U.S. Holder that converts United States dollars to a foreign currency and immediately uses that currency to purchase a Foreign Currency Note denominated in the same foreign currency normally does not recognize gain or loss in connection with such conversion and purchase. However, a U.S. Holder that purchases a Foreign Currency Note with previously owned foreign currency does recognize ordinary income or loss in an amount equal to the difference, if any, between such U.S. Holder's tax basis in the foreign currency and the United States dollar market value of the Foreign Currency Note on the date of the purchase. A U.S. Holder's tax basis in a Foreign Currency Note (and the amount of any subsequent adjustment to such U.S. Holder's tax basis) is the United States dollar value of the foreign currency amount paid for such Foreign Currency Note (or of the foreign currency amount of the adjustment) determined on the date of such purchase or adjustment. In the case of an adjustment resulting from accrual of original issue discount or market discount, such adjustment is made at the rate at which such original issue discount or market discount is translated into United States dollars under the rules described above.

Gain or loss realized upon the sale, exchange or retirement of, or the receipt of principal on, a Foreign Currency Note, to the extent attributable to fluctuations in currency exchange rates, is generally ordinary income or loss. Gain or loss attributable to fluctuations in exchange rates equals the difference between (i) the United States dollar value of the foreign currency purchase price for such Note, determined on the date such Note is disposed of, and (ii) the United States dollar value of the foreign currency purchase price for such Note, determined on the date such U.S. Holder acquired such Note. Any portion of the proceeds of such sale, exchange or retirement attributable to accrued interest

income may result in exchange gain or loss under the rules set forth above. Such foreign currency gain or loss is recognized only to the extent of the overall gain or loss realized by a U.S. Holder on the sale, exchange or retirement of the Foreign Currency Note. In general, the source of such foreign currency gain or loss is determined by reference to the residence of the U.S. Holder or the "qualified business unit" of such U.S. Holder on whose books the Note is properly reflected. Any gain or loss realized by a U.S. Holder in excess of such foreign currency gain or loss is capital gain or loss (except to the extent of any accrued market discount not previously included in such U.S. Holder's income or, in the case of a Short-Term Note having original issue discount, to the extent of any original issue discount not previously included in such U.S. Holder's income).

The tax basis of a U.S. Holder in any foreign currency received on the sale, exchange or retirement of a Foreign Currency Note is equal to the United States dollar value of such foreign currency, determined at the time of such sale, exchange or retirement. Treasury regulations provide a special rule for purchases and sales of publicly traded securities by a cash method taxpayer under which units of foreign currency paid or received are translated into United States dollars at the spot rate on the settlement date of the purchase or sale. Accordingly, no exchange gain or loss results from currency fluctuations between the trade date and the settlement of such a purchase or sale. An accrual method taxpayer may elect the same treatment with respect to the purchase and sale of publicly traded securities provided the election is applied consistently. Such election cannot be changed without the consent of the IRS. U.S. Holders should consult their tax advisors concerning the applicability to Foreign Currency Notes of the special rules summarized in this paragraph.

Amortizable bond premium of a Foreign Currency Note is determined in the relevant foreign currency. The amount of such exchange gain or loss with respect to amortizable bond premium is determined by treating the portion of premium amortized with respect to any period as a return of principal. With respect to a U.S. Holder of a Foreign Currency Note that does not elect to amortize premium, the amount of premium, if any, is treated as a capital loss when such Note matures.

4.    Dual Currency Notes and Foreign Currency Notes that are CPDIs

The tax consequences of the acquisition of a Foreign Currency Note that is a Dual Currency Note or that is treated as a Contingent Note will be described in the relevant Final Terms or Supplement. **Prospective investors should examine the applicable Final Terms, or Supplement of Foreign Currency Notes that are Dual Currency Notes or Contingent Notes and consult their own tax advisors with respect to the purchase, ownership and disposition of such Foreign Currency Notes.**

5.    Redenomination

Under certain circumstances, a Foreign Currency Note may be redenominated in another non-U.S. currency. Generally, if such redenomination is from a legacy currency to the Euro, such redenomination is not treated as a taxable conversion for U.S. federal income tax purposes. In other circumstances, a redenomination may be treated as a taxable conversion.

6.    Tax Shelter Reporting Requirements

U.S. Treasury Regulations (the "*Tax Shelter Regulations*") intended to address so-called tax shelters and other potentially tax-motivated transactions require participants in a "reportable transaction" to disclose certain information about the transaction on IRS Form 8886 and retain information relating to the transaction. In addition, organizers and sellers of reportable transactions are required to maintain lists identifying the transaction investors and furnish to the IRS upon demand such investor information as well as detailed information regarding the transactions. A transaction may be a "reportable transaction" based upon any of several indicia, including the existence of confidentiality agreements, certain indemnity arrangements or potential for recognizing investment or other losses, including foreign currency losses, one or more of which may be present with respect to or in connection with an investment in the Notes. If a U.S. Holder participates in a "reportable transaction,"

in connection with its investment in a Note (because, for example, the U.S. Holder realizes a foreign currency loss over a threshold amount), the U.S. Holder will be treated as participating in a "reportable transaction" and will have to disclose its participation in such transaction while organizers and sellers of reportable transactions will be required to maintain lists described above.

U.S. federal backup withholding and information reporting requirements may apply to certain payments of interest on, and proceeds from the sale, retirement or other taxable disposition of a Registered Note held by a U.S. Holder. A portion of any such payment may be withheld as a backup withholding against such U.S. Holder's potential U.S. federal income tax liability if such U.S. Holder fails to establish it is exempt from these rules, furnish its correct taxpayer identification number, or otherwise fails to comply with such information reporting requirements. Corporate U.S. Holders are generally exempt from the backup withholding and information reporting requirements but may be required to comply with certification and identification requirements in order to prove their exemption. Any amounts withheld under the backup withholding rules from a payment to a U.S. Holder will be credited against such U.S. Holder's US federal income tax liability, if any, or refunded if the amount withheld exceeds such tax liability provided the required information is furnished to the IRS.

## Taxation of Non-U.S. Holders

This subsection describes the material U.S. federal income and withholding tax consequences to a Non-U.S. Holder of a Note. "*Non-U.S. Holder*" means a beneficial owner of a Note or Coupon that is, for United States federal income tax purposes: a nonresident alien individual; a foreign corporation; or an estate or trust that in either case is not subject to United States federal income tax on a net income basis on income or gain from a Note or Coupon.

This summary does not address all of the U.S. federal income and withholding tax consequences that may be relevant to a Non-U.S. Holder in light of the Non-U.S. Holder's particular circumstances including Non-U.S. Holders who hold the Note in a manner that is effectively connected with the conduct of a trade or business in the United States, are present in the United States for 183 days or more in the taxable year the Non-U.S. Holder disposes of the Note, are banks receiving interest described in Section 881(c)(3)(A) of the Code, are controlled foreign corporations related to LBHI, or are owners actually or constructively of 10% or more of the total combined voting power of all classes of stock of LBHI entitled to vote.

A.    **Principal and Interest**

Subject to the discussion of backup withholding below, payments of principal and interest (including original issue discount) with respect to a Registered Note issued by LBTCBV or LBB to a Non-U.S. Holder will be treated as non-U.S. sourced payments and will not be subject to U.S. federal income or withholding tax. Payments of principal and interest (including original issue discount) by LBHI to Non-U.S. Holders are not subject to U.S. federal income or withholding tax, provided that the interest is not contingent interest as described in Section 871(h)(4) of the Code (relating primarily to interest based on or determined by reference to income, profits, cash flow and other comparable attributes of the obligor or a party related to the obligor), and, in the case of Registered Notes (or Notes that may otherwise be characterised as not being in bearer form for U.S. Federal Income tax purposes), the Holder provides a properly completed IRS Form W-8BEN, or other such applicable form.

B.    **Sale and Other Taxable Exchange**

Subject to the discussion of backup withholding below, gain realized upon the sale or retirement or other taxable disposition of a Note by a Non-U.S. Holder is not subject to U.S. federal income or withholding tax.

**Information Reporting and Backup Withholding**

Payments on and proceeds from the sale of the Notes made outside the United States by a payor that is not a "U.S. connected person" generally will be exempt from the U.S. information reporting and backup withholding rules; however, payments on Registered Notes issued by LBHI will be subject to certain U.S. information reporting rules and may be subject to backup withholding if the Non-U.S. Holder does not provide the form described in the discussion under "Principal and Interest" above (though the same payment will not be subject to both withholding and backup withholding). A U.S. connected person, for these purposes includes but is not limited to (a) a United States person, (b) a controlled foreign corporation, (c) a United States branch of a foreign bank or foreign insurance company, (d) a foreign partnership controlled by United States persons or engaged in a United States trade or business or (e) a foreign person 50% or more of whose gross income is effectively connected with the conduct of a United States trade or business for a specified three-year period.

Backup withholding is not an additional tax. Rather amounts withheld from a payment under the backup withholding rules are credited against any U.S. federal tax liability of the Non-U.S. Holder and may entitle the Non-U.S. Holder to a refund, provided that the required information is timely furnished to the IRS.

## NETHERLANDS TAXATION

*The following summary of certain Dutch taxation matters is based on the laws and practice in force as of the date of this Base Prospectus and is subject to any changes in law and the interpretation and application thereof, which changes could be made with retroactive effect. The following summary does not purport to be a comprehensive description of all the tax considerations that may be relevant to a decision to acquire, hold or dispose of the Notes, and does not purport to deal with the tax consequences applicable to all categories of investors, some of which (such as dealers in securities) may be subject to special rules. Save as otherwise indicated, this summary only addresses the position of investors who do not have any connection with The Netherlands other than the holding of the Notes. Investors should consult their professional advisers on the tax consequences of their acquiring, holding and disposing of the Notes under the laws of their country of citizenship, residence, domicile or incorporation.*

### 1. Withholding Tax

All payments of interest and principal by the Issuer under the Notes, Coupons, Talons or Receipts can be made free of withholding or deduction for any taxes of whatsoever nature imposed, levied, withheld or assessed by The Netherlands or any political subdivision or taxing authority thereof or therein, unless the Notes qualify as debt effectively functioning as equity within the meaning of Article 10, paragraph 1 sub d of the Dutch Corporate Income Tax Act 1969 (*Wet op de vennootschapsbelasting 1969*).

### 2. Taxes on Income and Capital Gains

A holder of a Note, Coupon, Talon or Receipt who derives income from a Note, Coupon, Talon or Receipt or who realises a gain on the disposal or redemption of a Note, Coupon, Talon or Receipt will not be subject to Dutch taxation on such income or capital gains unless:

(i) the holder is, or is deemed to be, resident in The Netherlands or, where the holder is an individual, such holder has elected to be treated as, a resident of The Netherlands; or

(ii) such income or gain is attributable to an enterprise or part thereof which is either effectively managed in The Netherlands or carried on through a permanent establishment (*vaste inrichting*) or a permanent representative (*vaste vertegenwoordiger*) in The Netherlands; or

(iii) the holder is not an individual and has, directly or indirectly, a substantial interest (*aanmerkelijk belang*) or a deemed substantial interest in the Issuer and such interest does not form part of the assets of an enterprise; or

191

(iv)    the holder is an individual and has, directly or indirectly, a substantial interest (*aanmerkelijk belang*) in the Issuer or such income or gain otherwise qualifies as income from miscellaneous activities (*belastbaar resultaat uit overige werkzaamheden*) in The Netherlands as defined in the Dutch Income Tax Act 2001 (*Wet inkomstenbelasting 2001*).

## 3.    Gift, Estate or Inheritance Taxes

Dutch gift, estate or inheritance taxes will not be levied on the occasion of the transfer of a Note, Coupon, Talon or Receipt by way of gift by, or on the death of, a holder, unless:

(i)    the holder is, or is deemed to be, resident in The Netherlands for the purpose of the relevant provisions; or

(ii)    the transfer is construed as an inheritance or as a gift made by, or on behalf of, a person who, at the time of the gift or death, is or is deemed to be resident in The Netherlands for the purpose of the relevant provisions; or

(iii)   such Note, Coupon, Talon or Receipt is attributable to an enterprise or part thereof which is either effectively managed in The Netherlands or carried on through a permanent establishment or a permanent representative in The Netherlands.

## 4.    Value Added Tax

There is no Dutch value added tax payable by a holder of a Note, Coupon, Talon or Receipt in respect of payments in consideration for the issue of the Notes, Coupons, Talons or Receipts or in respect of the payment of interest or principal under the Notes, Coupons, Talons or Receipts, or the transfer of the Notes, Coupons, Talons or Receipts.

## 5.    Other Taxes and Duties

There is no Dutch registration tax, stamp duty or any other similar tax or duty payable in The Netherlands by a holder of a Note, Coupon, Talon or Receipt in respect of or in connection with the execution, delivery and/or enforcement by legal proceedings (including any foreign judgement in the courts of The Netherlands) of the Notes, Coupons, Talons or Receipts or the performance of the Issuer's obligations under the Notes, Coupons, Talons or Receipts.

## 6.    Residence

A holder of a Note, Coupon, Talon or Receipt will not be treated as a resident of The Netherlands by reason only of the holding of a Note, Coupon, Talon or Receipt or the execution, performance, delivery and/or enforcement of the Notes, Coupons, Talons or Receipts.]

## GERMAN TAXATION

**The information below is not intended as tax advice and it does not purport to describe all of the tax considerations that may be relevant to a prospective purchaser of the Notes. Prospective purchasers are urged to satisfy themselves as to the overall tax consequences of purchasing, holding and/or selling the Notes. As each Tranche of the Notes may be subject to a different tax treatment due to the specific terms of each Tranche, the following section only provides some very generic information on the possible tax treatment and has to be read in conjunction with more specific information on the taxation of each Tranche of Notes as provided in the relevant Final Terms.**

### Germany

Persons, resident in the Federal Republic of Germany are subject to income taxation (income tax or corporate income tax, as the case may be, and solidarity surcharge) on their worldwide income, regardless of its source, including interest from debentures of any kind, such as the Notes. Capital gain from the sale

of the Notes is, inter alia, taxable if (i) it falls into a category of income effectively connected to a German trade or business, (ii) such gain qualifies as deemed interest income (see below) or (iii) the sale occurs within one year after purchase of the Notes.

Where the Notes form part of the property of a German trade or business interest income and capital gains will also be subject to trade tax.

Accrued unpaid interest paid as a part of the sales price ("Accrued Interest") is deemed to be interest and taxed accordingly. Furthermore, if the Note is regarded to be a financial innovation (Finanzinnovation) within the meaning of the Income Tax Act (Einkommensteuergesetz), amounts received upon sale, transfer or redemption of a Note by an individual Holder may be regarded as taxable interest income ("Deemed Interest") in an amount equal to (i) the difference between the issue price or purchase price of the Note and the redemption amount or sale proceeds to the extent such amount is attributable to the period over which such Holder of a Note has held such Note (Besteuerung nach der Emissionsrendite), or (ii) alternatively, the difference between the proceeds from the sale or redemption and the purchase price or issue price (Besteuerung nach der Marktrendite). If the Notes form part of the property of a German trade or business, the annual increase in value of the Notes, as calculated at the time of acquisition, must be taken into account pro rata temporis as interest income.

Persons not resident nor deemed resident pursuant to German tax law are currently not subject to German income taxation with respect to interest or capital gains which they may receive under the Notes unless such income falls into a category of income from German sources such as income from the letting and leasing of German property or income effectively connected with a German trade or business, or interest is paid upon physical presentation of Coupons or Notes. Where the Notes form part of the property of a German trade or business interest income, including Accrued and Deemed Interest, and capital gains will in addition to German income tax or corporate income tax, as the case may be, and solidarity surcharge also be subject to trade tax.

The German withholding tax rules require, inter alia, withholding by a German financial institution, which term includes a German branch of a foreign financial institution but excludes a foreign branch of a German financial institution or, if no such German financial institution pays out the interest amounts, the debtor of the interest payments (i) (other than in the case of (ii) below) at a rate of 30% upon interest payments made by such German financial institution or the debtor to (a) German tax residents (i.e. persons whose residence, customary place of abode, corporate seat or principal place management is located in Germany) and (b) persons who are not resident in the Federal Republic of Germany if according to German income tax law the interest received from the Notes fall into a category of income from German sources such as income from the letting and leasing of German property or income effectively connected with a German trade or business ((a) or (b) each a "German Holder") and (ii) at a rate of 35% upon interest payments made upon presentation to a German financial institution of interest coupons (with or without the Note itself) by a German or foreign Holder (other than a foreign financial institution). Withholding tax on interest is also imposed under the same conditions on Accrued Interest and Deemed Interest. As regards Deemed Interest withholding tax will be assessed on an amount equal to the difference between the issue or purchase price of the Note and the redemption amount or sales proceeds if the Holder has kept the Note in a custodial account with the same financial institution since the time of issuance or acquisition, respectively. Otherwise withholding tax is applied to 30% of the amounts paid in partial or final redemption of the Note or the proceeds from the sale of the Note. The aforementioned tax rates are increased by the solidarity surcharge (Solidaritätszuschlag) amounting to 5.5% of the respective tax rate. The total withholding tax burden therefore amounts to 31.65% and 36.925% respectively. The withholding tax (including solidarity surcharge) is an advance payment on the income tax liability if the recipient of the interest payment is subject to German income taxation by assessment.

If the amount of interest due under or the redemption amount of the Note depends on the performance of an index or if the Note can be regarded as an equity-like investment, income and deemed income as well as capital gains and deemed capital gains may be subject to income taxation, trade tax and, even if interest on the Note is not paid out by a German financial institution, to withholding tax.

**German Tax Reform**

**Business Tax Reform Act 2008 (Unternehmensteuerreformgesetz 2008)**

On July 6, 2007, the German legislator approved the Business Tax Reform Act 2008 (*Unternehmensteuerreformgesetz 2008*) pursuant to which a new tax system will be introduced as from 1 January 2009 regarding the taxation of capital investments, shares and other financial instruments. It should be noted that with regard to different types of financial instruments different rules exist as to when the new law is applicable. The new tax system provides that, in principle, income and capital gains from the sale of financial instruments are subject to a general withholding tax rate of 25% (plus solidarity surcharge in the amount of 5.5% of such withholding tax liability and, if applicable, church tax) irrespective of the holding period. For individuals holding the financial instruments as private assets such general withholding tax will, in principle, become definitive and replace the Holder's income taxation. For individuals a deduction of expenses economically related to such financial instrument is generally not allowed. The Business Tax Reform Act 2008 (*Unternehmensteuerreformgesetz 2008*) will also have an effect on the taxation of the Holders of the Notes (in particular, German tax resident Holders, but also non-resident Holders which are subject to limited tax liability in Germany).

Regarding the withholding tax obligations of an issuer of notes, the wording of the new law provides that an issuer is obliged to withhold tax on interest if no German Disbursing Agent administers or keeps in custody the notes or executes the sale of such notes and, in each case, pays or credits the respective cash amounts. From the official reasoning of the law, it cannot be deduced that the legislator intended to extend the scope of the withholding tax obligation of an issuer of notes. Therefore, it is possible to argue that these amendments qualify as a mistake in drafting. However, because of the clear wording of the respective provision, it cannot be excluded that the Issuer might withhold German tax on interest.

In particular, with regard to the German tax consequences of an investment in the Notes under the new German tax law we recommend that a prospective noteholder consults a tax adviser.

## AUSTRALIAN TAXATION

The following is a summary of the Australian taxation treatment under the Income Tax Assessment Act of 1936 and 1997 of Australia (together "Australian Tax Act") at the date of this Base Prospectus, of payments of interest (as defined in the Australian Tax Act) on Notes to be issued by LBTCBV or LBHI under the Program and certain other matters.

This summary is not exhaustive and, in particular, does not deal with the position of certain classes of holders of Notes (including dealers in securities, custodians or other third parties who hold Notes on behalf of any holders of Notes). Prospective holders of Notes should also be aware that particular terms of issue of any Series of Notes may affect the tax treatment of that Series of Notes. The following is a general guide and should be treated with appropriate caution. The following summary may be amended, supplemented or replaced (in part or in whole) or qualified in relation to a particular issue of Notes in the applicable Final Terms.

1.    **Interest withholding tax**

So long as LBTCBV or LBHI, as the case may be, continues to be a non-resident of Australia and the Notes (including, without limitation, the Australian Domestic Notes) issued by it are not attributable to a permanent establishment of it in Australia, payments of principal and interest made under the Notes issued by it should not be subject to Australian interest withholding tax.

So long as the Guarantor continues to be a non-resident of Australia and the Guarantee is not attributable to a permanent establishment of the Guarantor in Australia, any payment by the Guarantor under the Guarantee should not be subject to Australian interest withholding tax.

2.    **Other tax matters**

Under Australian laws as presently in effect:

(a)    *bearer debenture income withholding tax* – the requirements of section 126 of the *Income Tax Assessment Act* 1936 of Australia relating to bearer debentures do not apply to debentures (which would include the Notes) issued by a non-resident body corporate which are not attributable to a permanent establishment of that body corporate in Australia; and

(b)    *death duties* – no Notes will be subject to death, estate or succession duties imposed by Australia, or by any political subdivision or authority therein having power to tax, if held at the time of death; and

(c)    *stamp duty and other taxes* – no ad valorem stamp, issue, registration or similar taxes are payable in Australia on the issue or transfer of any Notes; and

(d)    *other withholding taxes on payments in respect of Notes* – so long as LBTCBV or LBHI, as the case may be, continues to be a non-resident of Australia and does not carry on business at or through a permanent establishment in Australia, the tax file number requirements of Part VA of the *Income Tax Assessment Act* 1936 of Australia ("Tax Administration Act") and section 12-140 of the *Taxation Administration Act* 1953 of Australia should not apply in connection with Notes issued by LBTCBV or LBHI; and

(e)    supply withholding tax – payments in respect of the Notes can be made free and clear of the "supply withholding tax" imposed under section 12-190 of the Tax Administration Act; and

(f)    *goods and services tax (GST)* – neither the issue nor receipt of the Notes will give rise to a liability for GST in Australia on the basis that the supply of Notes will comprise either an input taxed financial supply or (in the case of an offshore subscriber) a GST-free supply. Furthermore, neither the payment of principal or interest by LBTCBV or LBHI, nor the disposal of the Notes, would give rise to any GST liability in Australia.

## UNITED KINGDOM TAXATION

The following is a summary of the United Kingdom withholding taxation treatment at the date hereof in relation to payments of principal and interest in respect of the Notes. The comments do not deal with other United Kingdom tax aspects of acquiring, holding or disposing of Notes. The comments are made on the assumption that the Issuers of the Notes are not resident in the United Kingdom for United Kingdom tax purposes. The comments relate only to the position of persons who are absolute beneficial owners of the Notes. Prospective Note Holders should be aware that the particular terms of issue of any series of Notes as specified in the relevant Final Terms may affect the tax treatment of that and other series of Notes. The following is a general guide and should be treated with appropriate caution. Note Holders who are in any doubt as to their tax position should consult their professional advisers. Note Holders who may be liable to taxation in jurisdictions other than the United Kingdom in respect of their acquisition, holding or disposal of the Notes are particularly advised to consult their professional advisers as to whether they are so liable (and if so under the laws of which jurisdictions), since the following comments relate only to certain United Kingdom taxation aspects of payments in respect of the Notes. In particular, Note Holders should be aware that they may be liable to taxation under the laws of other jurisdictions in relation to payments in respect of the Notes even if such payments may be made without withholding or deduction for or on account of taxation under the laws of the United Kingdom.

## A.    UK Withholding Tax on Payments of UK Source Interest

Interest on Notes issued for a term of less than one year (and which are not issued under arrangements the effect of which is to render the Notes part of a borrowing with a total term of one year or more) may be paid by the relevant Issuer without withholding or deduction for or on account of United Kingdom income tax.

Interest on Notes issued for a term of one year or more (or under arrangements the effect of which is to render the Notes part of a borrowing with a total term of one year or more) may be paid by the relevant Issuer without withholding or deduction for or on account of United Kingdom income tax except in circumstances where such interest has a United Kingdom source. Depending on the circumstances, interest on Notes may have a United Kingdom source where, for example, the Notes are issued for the purposes of a trade or other business carried on by the relevant Issuer in the United Kingdom, or are secured on assets situate in the United Kingdom or the interest is paid out of funds maintained in the United Kingdom. LBHI wishes Note Holders to be aware that interest on the Notes may be considered to have a United Kingdom source.

Interest which has a United Kingdom source ("*UK interest*") may be paid by the relevant Issuer without withholding or deduction for or on account of United Kingdom income tax if the Notes in respect of which the UK interest is paid constitute "quoted Eurobonds". Notes which carry a right to interest will constitute quoted Eurobonds provided they are and continue to be listed on a recognised stock exchange. Her Majesty's Revenue and Customs ("*HMRC*") have stated on their website that the Irish Stock Exchange and the Australian Stock Exchange has each been designated as a recognised stock exchange for these purposes, (however it has not been possible to confirm whether the Singapore Stock Exchange is a recognised stock exchange for these purposes). Notes will be treated as listed on a recognised stock exchange if (and only if) they are admitted to trading on that exchange and either they are included in the United Kingdom official list (within the meaning of Part 6 of the Financial Services and Markets Act 2000) or they are officially listed, in accordance with provisions corresponding to those generally applicable in European Economic Area states, in a country outside the United Kingdom in which there is a recognised stock exchange.

In addition, UK interest may be paid without withholding or deduction for or on account of United Kingdom income tax so long as the relevant Issuer is a "bank" for the purposes of section 878 of the Income Tax Act 2007 and so long as such payments are made by the relevant Issuer in the ordinary course of its business. The Issuers have confirmed that Lehman Brothers Bankhaus AG is a "bank" for these purposes. In accordance with published practice of HMRC, such payments will be accepted as being made by the relevant Issuer in the ordinary course of its business unless either:

(i)     the borrowing in question confirms to any of the definitions of tier 1, 2 or 3 capital adopted by the Financial Services Authority whether or not it actually counts towards tier 1, 2 or 3 capital for regulatory purposes; or

(ii)    the characteristics of the transaction giving rise to the interest are primarily attributable to an intention to avoid United Kingdom tax.

In all other cases, UK interest on the Notes may fall to be paid under deduction of United Kingdom income tax at the savings rate (currently 20 per cent.) subject to such relief as may be available under the provisions of any applicable double taxation treaty or to any other exemption which may apply.

## B.    Payments by Guarantor

If the Guarantor makes any payments in respect of interest on the Notes (or other amounts due under the Notes other than the repayment of amounts subscribed for the Notes) and either the interest on (or other amounts due under) the Notes or any payments made by the Guarantor have a United Kingdom source (and such interest, amounts or payments may depending on the circumstances have a United Kingdom source where, for example, they are secured on assets situate in the United Kingdom or they are paid out of funds maintained in the United Kingdom – LBHI wishes Note Holders to be aware that interest on the Notes may be considered to have a United Kingdom source), such payments by the Guarantor may be subject to United Kingdom withholding tax at the basic rate (currently 22 per cent.) subject to such relief as may be available under the provisions of any applicable double taxation treaty or to any other exemption which may apply. Such payments by the Guarantor may not be eligible for the exemptions described in A above.

C.    **Payments under Deed of Covenant**

Any payments made by the Issuers under the Deed of Covenant may not qualify for the exemptions from United Kingdom withholding tax described above.

D.    **Provision of Information**

Note Holders should note that where any interest on Notes is paid to them (or to any person acting on their behalf) by any Issuer acting out of a UK branch or any person in the United Kingdom acting on behalf of the relevant Issuer (a "paying agent"), or is received by any person in the United Kingdom acting on behalf of the relevant Note Holder (other than solely by clearing or arranging the clearing of a cheque) (a "collecting agent"), then the relevant Issuer, the paying agent or the collecting agent (as the case may be) may, in certain cases, be required to supply to HMRC details of the payment and certain details relating to the Note Holder (including the Note Holder's name and address). These provisions will apply whether or not the interest has been paid subject to withholding or deduction for or on account of United Kingdom income tax and whether or not the Note Holder is resident in the United Kingdom for United Kingdom taxation purposes. In certain circumstances, the details provided to HMRC may be passed by HMRC to the tax authorities of certain other jurisdictions.

For the above purposes, "interest" should be taken, for practical purposes, as including payments made by a guarantor in respect of interest on Notes.

With effect from April 6, 2008 the provisions referred to above may also apply, in certain circumstances, to payments made on redemption of any Notes where the amount payable on redemption is greater than the issue price of the Notes.

E.    **Other Rules Relating to United Kingdom Withholding Tax**

1.    Where interest has been paid under deduction of United Kingdom income tax, Note Holders who are not resident in the United Kingdom may be able to recover all or part of the tax deducted if there is an appropriate provision in any applicable double taxation treaty.

2.    The references to "interest" above mean "interest" as understood in United Kingdom tax law. The statements above do not take any account of any different definitions of "interest" or "principal" which may prevail under any other law or which may be created by the terms and conditions of the Notes or any related documentation.

3.    Notes may be issued at an issue price of less than 100 per cent. of their principal amount. Any discount element on any such Notes will not generally be subject to any United Kingdom withholding tax pursuant to the provisions mentioned above, but may be subject to reporting requirements as outlined above.

4.    Where Notes are to be, or may fall to be, redeemed at a premium, as opposed to being issued at a discount, then any such element of premium may constitute a payment of interest. Payments of interest are subject to United Kingdom withholding tax and reporting requirements as outlined above.

5.    The above description of the United Kingdom withholding tax position assumes that there will be no assumption of obligations of an Issuer of the Notes pursuant to Condition 13 or any substitution of an Issuer of the Notes and does not consider the tax consequences of any such assumption or substitution.

## EU SAVINGS DIRECTIVE

Under EC Council Directive 2003/48/EC on the taxation of savings income, each Member State is required to provide to the tax authorities of another Member State details of payments of interest or other similar income paid by a person within its jurisdiction to, or collected by such a person for, an individual resident or certain limited types of entity established in that other Member State; however, for a transitional

period, Austria, Belgium and Luxembourg may instead apply a withholding system in relation to such payments, deducting tax at rates rising over time to 35 per cent. The transitional period is to terminate at the end of the first full fiscal year following agreement by certain non-EU countries to the exchange of information relating to such payments.

A number of non-EU countries, and certain dependent or associated territories of certain Member States, have adopted similar measures (either provision of information or transitional withholding) in relation to payments made by a person within its jurisdiction to, or collected by such a person for, an individual resident or certain limited types of entity established in a Member State. In addition, the Member States have entered into provision of information or transitional withholding arrangements with certain of those dependent or associated territories in relation to payments made by a person in a Member State to, or collected by such a person for, an individual resident or certain limited types of entity established in one of those territories.

## IRISH TAXATION

### Introduction

The following is a summary of the principal Irish tax consequences for individuals and companies of ownership of the Notes based on the laws and practice of the Irish Revenue Commissioners currently in force in Ireland and may be subject to change. It deals with Noteholders who beneficially own their Notes thereon as an investment. Particular rules not discussed below may apply to certain classes of taxpayers holding Notes, such as dealers in securities, trusts etc. Note Holders should be aware that the particular terms of issue of any series of Notes as specified in the relevant Final Terms may affect the tax treatment of that and other series of Notes. The following is a general guide and should be treated with appropriate caution. The summary does not constitute tax or legal advice and the comments below are of a general nature only. Prospective investors in the Notes should consult their professional advisers on the tax implications of the purchase, holding, redemption or sale of the Notes and the receipt of interest thereon under the laws of their country of residence, citizenship or domicile. In particular, Note Holders should be aware that they may be liable to taxation under the laws of other jurisdictions in relation to payments in respect of the Notes even if such payments may be made without withholding or deduction for or on account of taxation under the laws of Ireland.

### 1.    Irish Withholding Tax on Interest Payments by the Issuer

Interest on Notes issued for a term of less than one year (and which are not issued under arrangements the effect of which is to render the Notes part of a borrowing with a total term of one year or more) may be paid by the relevant Issuer without withholding or deduction for or on account of Irish income tax.

Interest on Notes issued for a term of one year or more (or under arrangements the effect of which is to render the Notes part of a borrowing with a total term of one year or more) ("Annual Interest") may be paid by the relevant Issuer without withholding or deduction for or on account of Irish income tax except in circumstances where such interest has an Irish source. Interest on Notes may have an Irish source where, for example, the Notes are issued for the purposes of a trade or other business carried on by the relevant Issuer in Ireland, or are secured on assets situated in Ireland or the interest is paid out of funds maintained in Ireland. LBHI wishes Note Holders to be aware that interest on the Notes may be considered to have an Irish source.

Annual interest which has an Irish source ("*Irish interest*") may be paid by the relevant Issuer without withholding or deduction for or on account of Irish income tax so long as the relevant Note falls within one of the following categories:

(a)    **Interest paid on a quoted Eurobond:** A quoted Eurobond is a security which is issued by a company (such as the Issuer), is listed on a recognised stock exchange (such as the Irish Stock Exchange) and carries a right to interest. Provided that the Notes issued under this Program are

interest bearing and are listed on the Irish Stock Exchange (or any other recognised stock exchange), interest paid on them can be paid free of withholding tax provided:

(i)    the person by or through whom the payment is made is not in Ireland; or

(ii)    the payment is made by or through a person in Ireland and either:

    (A)    the Note is held in a clearing system recognised by the Irish Revenue Commissioners; (DTC, Euroclear and Clearstream, Luxembourg are, amongst others, so recognised); or

    (B)    the person who is the beneficial owner of the quoted Eurobond and who is beneficially entitled to the interest is not resident in Ireland and has made a declaration to a relevant person (such as a paying agent located in Ireland) in the prescribed form.

Thus, so long as the Notes continue to be quoted on the Irish Stock Exchange and are held in a recognised clearing system, interest on the Notes can be paid by any Paying Agent acting on behalf of the Issuer without any withholding or deduction for or on account of Irish income tax. If the Notes continue to be quoted but cease to be held in a recognised clearing system, interest on the Notes may be paid without any withholding or deduction for or on account of Irish income tax provided such payment is made through a paying agent outside Ireland.

(b)    **Interest paid on a wholesale debt instrument:** A "wholesale debt instrument" includes commercial paper (as defined in Section 246A(1) of the Taxes Consolidation Act, 1997, of Ireland (the "TCA"). In that context "commercial paper" means a debt instrument, either in physical or electronic form, relating to money in any currency, which is issued by a company, recognises an obligation to pay a stated amount, carries a right to interest or is issued at a discount or at a premium, and matures within 2 years. The exemption from Irish withholding tax applies if:

(i)    the wholesale debt instrument is held in a recognised clearing system (which includes Clearstream, DTC and Euroclear); and

(ii)    the wholesale debt instrument is of an approved denomination; and in this context an approved denomination means a denomination of not less than:

    (I)    in the case of an instrument denominated in euro, €500,000;

    (II)    in the case of an instrument denominated in United States Dollars, US$500,000; or

    (III)    in the case of an instrument denominated in a currency other than euro or United States Dollars, the equivalent in that other currency of €500,000 using the conversion rate applicable at the time the programme under which the instrument is to be issued is first publicised).

(c)    **Interest paid by a company or in the ordinary course of business to certain non-residents:**

If, for any reason, the exemptions referred to above do not apply, interest payments may still be made free of withholding tax provided that the interest is paid in the ordinary course of the Issuer's business and the Noteholder is a company which is resident in a Relevant Territory and the recipient does not receive the interest in connection with a trade or business carried on by it through a branch or agency in Ireland.

A relevant territory is a Member State of the European Union (other than Ireland) or in a country with which Ireland has a double taxation agreement in force at the time of payment.

The Issuer must be satisfied that the respective terms of the exemptions are satisfied. The test of residence in each case is determined by reference to the law of the Relevant Territory in

which the Note Holder claims to be resident. For other holders of Notes, interest may be paid free of withholding tax if the Note Holder is resident in a double tax treaty country and under the provisions of the relevant treaty with Ireland such Note Holder is exempt from Irish tax on the interest and clearance in the prescribed form has been received by the Issuer before the interest is paid.

**2.    Payments by Guarantor**

If the Guarantor makes any payments in respect of interest on the Notes (or other amounts due under the Notes other than the repayment of amounts subscribed for the Notes) and either the interest on (or other amounts due under) the Notes or any payments made by the Guarantor has an Irish source (and such interest, amounts or payments may have an Irish source where, for example, they are secured on assets situated in Ireland or they are paid out of funds maintained in Ireland. LBHI wishes Note Holders to be aware that interest on the Notes may be considered to have an Irish source), such payments by the Guarantor may be subject to Irish withholding tax at the lower rate (currently 20 per cent.) subject to the reliefs described in the preceding paragraph.

**3.    Payments under Deed of Covenant**

Any payments made by the Issuers under the Deed of Covenant may not qualify for the exemptions from Irish withholding tax described above.

**4.    Other Rules Relating to Irish Withholding Tax**

4.1    Where interest has been paid under deduction of Irish income tax, Note Holders who are not resident in Ireland may be able to recover all or part of the tax deducted if there is an appropriate provision in any applicable double taxation treaty.

4.2    The references to "interest" above mean "interest" as understood in Irish tax law. The statements above do not take any account of any different definitions of "interest" or "principal" which may prevail under any other law or which may be created by the terms and conditions of the Notes or any related documentation. Notes may be issued at an issue price of less than 100 per cent. of their principal amount. Any discount element on any such Notes will not generally be subject to any Irish withholding tax pursuant to the provisions mentioned above, but may be subject to reporting requirements as outlined above.

4.3    Where Notes are to be, or may fall to be, redeemed at a premium, as opposed to being issued at a discount, then any such element of premium may constitute a payment of interest. Payments of interest are subject to Irish withholding tax and reporting requirements as outlined above.

4.4    The above description of Irish withholding tax position assumes that there will be no assumption of obligations of an Issuer of the Notes pursuant to Condition 13 or any substitution of an Issuer of the Notes and does not consider the tax consequences of any such assumption or substitution.

**5.    Encashment Tax**

In certain circumstances, Irish tax will be required to be withheld at the standard rate of income tax (currently 20 per cent.) from Irish interest on any Note, where such Irish interest is collected or realised by a bank or encashment agent in Ireland on behalf of any Noteholder. There is an exemption from encashment tax where the beneficial owner of the interest is not resident in Ireland and has made a declaration to this effect in the prescribed form to the encashment agent or bank.

**6.    Income Tax**

Notwithstanding that a Noteholder may receive Irish interest on the Notes free of withholding tax, the Noteholder may still be liable to pay Irish income tax with respect to such interest. Ireland operates a self-assessment system in respect of income tax and any person, including a person who is neither resident nor ordinarily resident in Ireland, with Irish source income comes within its scope.

There are a number of exemptions from Irish income tax which may apply to Noteholders. First, payments of Irish interest made by the Issuer in the ordinary course of its business are exempt from income tax provided the recipient is not resident in Ireland and is a company resident in a Relevant Territory. In addition, any Irish interest which can be paid by the Issuer free of withholding tax under the quoted Eurobond exemption is exempt from income tax where the recipient is a person not resident in Ireland and is resident in a Relevant Territory. For these purposes, residence is determined under the terms of the relevant double taxation agreement or in any other case, the law of the country in which the recipient claims to be resident.

Notwithstanding these exemptions from income tax, a corporate recipient that carries on a trade in Ireland through a branch or agency in respect of which the Notes are held or attributed, may have a liability to Irish corporation tax on the interest.

Relief from Irish income tax may also be available under the specific provisions of a double tax treaty between Ireland and the country of residence of the recipient.

**7.    Capital Gains Tax**

A holder of Notes will not be subject to Irish tax on capital gains on a disposal of Notes unless such holder is either resident or ordinarily resident in Ireland or carries on a trade or business in Ireland through a branch or agency in respect of which the Notes were used or held.

**8.    Capital Acquisitions Tax**

A gift or inheritance comprising of Notes will be within the charge to capital acquisitions tax (which subject to available exemptions and reliefs, is currently levied at 20 per cent.) if either (i) the disponer or the donee/successor in relation to the gift or inheritance is resident or ordinarily resident in Ireland (or, in certain circumstances, if the disponer is domiciled in Ireland irrespective of his residence or that of the donee/successor) on the relevant date or (ii) if the Notes are regarded as property situated in Ireland (i.e. if the Notes are in bearer form and are physically located in Ireland.

## UNITED STATES EMPLOYEE BENEFIT PLAN CONSIDERATIONS

The U.S. Employee Retirement Income Security Act of 1974, as amended ("*ERISA*"), imposes certain requirements on "employee benefit plans" (as defined in Section 3(3) of ERISA) subject to ERISA, including entities such as collective investment funds and separate accounts whose underlying assets include the assets of such plans (collectively, "*ERISA Plans*") and on those persons who are fiduciaries with respect to ERISA Plans. Investments by ERISA Plans are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that an ERISA Plan's investments be made in accordance with the documents governing the ERISA Plan.

Section 406 of ERISA and Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "*Code*") prohibit certain transactions involving the assets of an ERISA Plan (as well as those plans that are not subject to ERISA but which are subject to Section 4975 of the Code, such as individual retirement accounts (together with ERISA Plans, "*Plans*")) and certain persons (referred to as "*parties in interest*" or "*disqualified persons*") having certain relationships to such Plans, unless a statutory or administrative exemption is applicable to the transaction. In general, unless otherwise permitted pursuant to a supplemental prospectus relating to any Notes, Plans may not purchase, hold or hold any interest in any Note. Each purchaser of Notes, unless otherwise provided in a supplemental prospectus, will be deemed to represent that it is not and for as long as it holds such Notes (or any interest therein) will not, be a Plan.

To the extent a purchaser of any Note (or an interest in a Note) is permitted pursuant to a supplemental prospectus, prohibited transactions within the meaning of Section 406 of ERISA or Section 4975 of the Code may arise if any Notes are acquired by a Plan with respect to which any of the Issuers, the Guarantor, the Arranger or the Dealers or any of their respective affiliates are a party in interest or a disqualified person. Certain exemptions from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code may be applicable, however, depending in part on the type of Plan fiduciary making the decision to acquire Notes and the circumstances under which such decision is made. There can be no assurance that any exemption will be available with respect to any particular transaction involving the Notes, or that, if an exemption is available, it will cover all aspects of any particular transaction. By its purchase of any Notes, or interest in a Note, to the extent permitted, whether in the case of the initial purchase or in the case of a subsequent transfer, the purchaser thereof will be deemed to have represented and agreed either that (i) it is not and for so long as it holds Notes will not be a Plan, an entity whose underlying assets include the assets of any such Plan, or a governmental or other employee benefit plan which is subject to any U.S. federal, state or local law, or foreign law, that is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code, or (ii) its purchase and holding of the Notes will not result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of such a governmental or other employee benefit plan, any such substantially similar U.S. federal, state or local law, or foreign law) for which an exemption is not available.

Governmental plans and certain church and other plans, while not subject to the fiduciary responsibility provisions of ERISA or the provisions of Section 4975 of the Code, may nevertheless be subject to state or other federal or foreign laws that are substantially similar to ERISA and the Code. Fiduciaries of any such plans should consult with their counsel before purchasing any Notes.

The foregoing discussion is general in nature and not intended to be all-inclusive. Any Plan fiduciary who proposes to cause a Plan to purchase any Notes should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and Section 4975 of the Code to such an investment, and to confirm that such investment will not constitute or result in a prohibited transaction or any other violation of an applicable requirement of ERISA.

The sale of Notes or an interest in a Note to a Plan is in no respect a representation by the Issuers, the Guarantor, the Arranger or the Dealers that such an investment meets all relevant requirements with respect to investments by Plans generally or any particular Plan, or that such an investment is appropriate for Plans generally or any particular Plan.

## SUBSCRIPTION AND SALE

Subject to the terms and conditions set out in the Amended and Restated Distribution Agreement, dated July 24, 2007 (as amended, supplemented or replaced from time to time, the "*Distribution Agreement*") between, amongst others, LBHI, LBTCBV, LBB and the Dealers named therein, the Notes may be offered from time to time on a continuing basis by the Issuers through the Dealers, which have agreed to use their reasonable best efforts to solicit purchasers of the Notes. The Issuer of a Note will pay the relevant Dealer a commission, based on the principal amounts of the Notes sold by such Dealer, depending upon maturity, for sales made through it as the Dealer.

The Issuers may also sell Notes to the Dealers as principals for their own accounts at a discount to be agreed upon at the time of sale, or the purchasing Dealer may receive from the relevant Issuer a commission or discount equivalent of that described in the preceding paragraph in the case of any such principal transaction in which no other discount is agreed. In addition, the Notes may be sold from time to time through syndicates of financial institutions, for which a Dealer shall act as lead manager. Such Notes may be resold at prevailing market prices, or at prices related thereto, at the time of such resale, as determined by the relevant Dealer.

The Issuers have reserved the right to sell Notes directly on their own behalf and have agreed with the Dealers that in such event they will comply with the restrictions described in this "Subscription and Sale" section as if they were Dealers. In the case of any sale by an Issuer directly, no commissions will be payable with respect to such sale.

The Issuers have agreed to indemnify the Dealers against certain liabilities and expenses.

The following selling restrictions may be modified by the Issuers and the relevant Dealers following a change in the relevant law, regulation or directive. Any such modification will be set out in the Final Terms issued in respect of the Series to which it is related or in a supplement to this Base Prospectus.

### United States

Neither the Notes nor the Guarantee have, or will be, registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except in certain transactions exempt from, or not subject to, the registration requirements of the Securities Act. Terms used in this paragraph have the meaning given to them by Regulation S.

Each Dealer represents, warrants and agrees that (a) except to the extent permitted under United States Treasury Regulation §1.163-5(c)(2)(i)(D) (the "*D Rules*"), (i) it has not offered or sold, and during the restricted period will not offer or sell, any Notes in bearer Form to a person who is within the United States or its possessions or to a United States person and (ii) it has not delivered and will not deliver within the United States or its possessions any Definitive Notes in bearer Form that are sold during the restricted period; (b) it has and throughout the restricted period will have in effect procedures reasonably designed to ensure that its employees or agents who are directly engaged in selling Notes in bearer Form are aware that such Notes may not be offered or sold during the restricted period to a person who is within the United States or its possessions or to a United States person, except as permitted by the D Rules; (c) if it is a United States person, it is acquiring the Notes in bearer Form for the purposes of resale in connection with their original issuance and if it retains Notes in bearer Form for its own account, it will only do so in accordance with the requirements of United States Treasury Regulation §1.163-5(c)(2)(i)(D)(6); and (d) with respect to each affiliate that acquires from it Notes in bearer Form for the purpose of offering or selling such Notes during the restricted period, such Dealer repeats and confirms the representations and agreements contained in this Subscription and Sale section. Terms used in this paragraph have the meanings given to them by the United States Internal Revenue Code and regulations thereunder, including the D Rules.

Each Dealer has severally agreed, and each further Dealer appointed under the Program will be required to agree, with the Issuers and the Guarantor (in its capacity as such) that, except as permitted by the Distribution Agreement, it will not offer, sell or deliver the Notes (a) as part of their distribution at any time or (b) otherwise until 40 days after the completion of the distribution of the Series of which such Notes are

a part, as determined and certified to the relevant Issuer by such Dealer (or, in the case of a Series of Notes sold to or through more than one Dealer, by each of such Dealers with respect to Notes of such Series purchased by or through it, in which case the relevant Issuer shall notify each such Dealer when all such Dealers have so certified), other than in accordance with Rule 903 of Regulation S or Rule 144A (or Section 4(2) of the Securities Act in the case of offers and sales by an affiliate of the relevant Issuer to qualified institutional Buyers with in the meaning of Rule 144A), and it will have sent to each Dealer to which it sells Notes during the distribution compliance period (other than resales pursuant to Rule 144A) a confirmation or other notice setting forth the restrictions on offers and sales of the Notes within the United States or to, or for the account or benefit of, U.S. persons. Each Dealer has represented and agreed that neither it, nor its affiliates nor any persons acting on its or their behalf have engaged or will engage in any directed selling efforts with respect to the Notes, and it and they have complied and will comply with the offering restrictions requirements of Regulation S. In addition, each Dealer has represented and agreed that neither it, nor its affiliates, nor any person acting on its or their behalf has engaged or will engage in any form of general solicitation or general advertising (as those terms are used in Rule 502(c) under the Securities Act) in connection with any offer or sale of Notes in the United States. Terms used in the preceding sentence have the meaning given to them by Regulation S.

In addition, until 40 days after the later of commencement of the offering of any Series of Notes and the Issue Date therefor, an offer or sale of Notes of such Series within the United States by a Dealer (whether or not participating in the offering) may violate the registration requirements of the Securities Act if such offer or sale is made otherwise than in accordance with Rule 144A.

Notwithstanding the foregoing, the Dealer may arrange for the private offer and sale of a portion of the Notes to sophisticated institutional investors in the United States under restrictions and other circumstances designed to preclude a distribution that would require registration of the Notes under the Securities Act, including delivery of a letter containing certain representations and warranties with respect to the investor and its purchase of the securities, an acceptable form of which letter will be supplied to such investors.

Each prospective Purchaser of Notes pursuant to Rule 144A or Section 4(2) of the Securities Act will, by accepting delivery of this Base Prospectus and by its purchase of such Notes, be deemed to have represented and agreed as follows:

(1)     it acknowledges that this Base Prospectus is personal to it and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire the Notes other than pursuant to Rule 144A or in offshore transactions to non-U.S. persons in accordance with Regulation S or, in the case of offers and sales by an affiliate of the relevant Issuer to qualified institutional buyers, pursuant to Section 4(2) of the Securities Act. Distribution of this Base Prospectus, or disclosure of any of its contents to any person other than such prospective purchaser and those persons, if any, retained to advise such prospective purchaser with respect thereto and other persons meeting the requirements of Rule 144A or Regulation S, is unauthorized and any disclosure of any of its contents, without the prior written consent of the Issuers, is prohibited; and

(2)     it agrees to make no photocopies of this Base Prospectus or any documents referred to herein and, if it does not purchase Notes or the offering is terminated, to return this Base Prospectus and all documents referred to herein to the Dealer or the affiliate thereof who furnished this Base Prospectus and those documents.

The Distribution Agreement provides that a Dealer nominated by a relevant Issuer may arrange for the placing of Notes in the United States to qualified institutional buyers within the meaning of Rule 144A. Each purchaser of Notes in reliance on Rule 144A or, in the case of offers and sales from an affiliate of the relevant Issuer to qualified institutional buyers, pursuant to Section 4(2) of the Securities Act will be deemed to have represented and agreed as follows:

(1)     it is a qualified institutional buyer within the meaning of Rule 144A and it is acquiring such Notes for its own account or for the account of a qualified institutional buyer and it is aware,

and each beneficial owner of such Notes has been advised, that the sale of such Notes is being made in reliance on Rule 144A or Section 4(2) of the Securities Act, as the case may be;

(2)   it understands that the Notes are being offered, and may be transferred, only in a transactions not involving any public offering within the meaning of the Securities Act. It understands that none of the Notes have been, or will be, registered under the Securities Act and it agrees, for the benefit of LBHI, the Issuers, the Guarantor, the Dealers and their affiliates that, if in the future it decides to offer, resell or otherwise transfer such Notes purchased by it, (A) any offer, sale or transfer of such Notes will be made in compliance with the Securities Act and other applicable law of the states, territories and possessions of the United States governing the offer and sale of securities and only (i) to the relevant Issuer (upon the redemption of such Notes or otherwise); (ii) outside of the United States in a transaction exempt from the registration requirements of the Securities Act pursuant to Rule 904 of Regulation S; (iii) pursuant to and in accordance with Rule 144A to an institutional investor that it reasonably believes is a qualified institutional buyer within the meaning of Rule 144A purchasing for its own account or for the account or for the account of a qualified institutional buyer whom it has informed, in each case, that the offer, resale or other transfer is being made in reliance on Rule 144A; (iv) to a Dealer; or (v) if available, pursuant to the exemption from registration under the Securities Act provided by Rule 144 thereunder and that (B) it will, and each subsequent holder is required to, notify any purchaser of these Notes from it of the transfer restrictions referred to in (A) above. It further understands that no representation can be made by LBHI, the Issuers, any Dealer or any of their respective affiliates, representatives or agents as to the availability of the exemption provided by Rule 144 for resales of the Notes; and

(3)   it understands that any Notes purchased pursuant to Rule 144A or Section 4(2) of the Securities Act will be issued in registered form in minimum denominations of $500,000 and will bear a legend to the following effect:

THIS NOTE HAS NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES. THE OFFER, SALE OR TRANSFER OF THIS NOTE IS SUBJECT TO CERTAIN CONDITIONS AND RESTRICTIONS, INCLUDING THOSE SET FORTH IN THE AMENDED AND RESTATED FISCAL AGENCY AGREEMENT DATED JULY 24, 2007 RELATING TO THIS NOTE. THE HOLDER HEREOF, BY PURCHASING OR OTHERWISE ACQUIRING THIS NOTE, ACKNOWLEDGES THAT THIS NOTE IS A "RESTRICTED SECURITY" THAT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT AND AGREES FOR THE BENEFIT OF THE ISSUER THAT (A) THIS NOTE MAY BE OFFERED, RESOLD OR OTHERWISE TRANSFERRED ONLY IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS OF THE STATES, TERRITORIES AND POSSESSIONS OF THE UNITED STATES GOVERNING THE OFFER AND SALE OF SECURITIES AND ONLY (1) TO THE ISSUER OR AN AFFILIATE OF THE ISSUER (UPON REDEMPTION HEREOF OR OTHERWISE), (2) OUTSIDE OF THE UNITED STATES IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PURSUANT TO RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, (3) PURSUANT TO AND IN ACCORDANCE WITH RULE 144A UNDER THE SECURITIES ACT (OR SECTION 4(2) OF THE SECURITIES ACT, IF THE HOLDER IS AN AFFILIATE OF THE ISSUER) TO AN INSTITUTIONAL INVESTOR THAT THE HOLDER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER WHOM THE HOLDER HAS INFORMED, IN EACH CASE, THAT THE OFFER, RESALE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A UNDER THE SECURITIES ACT, (4) TO A DEALER OR (5) IF AVAILABLE, PURSUANT TO THE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144

THEREUNDER AND THAT (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THIS NOTE FROM IT OF THE TRANSFER RESTRICTIONS REFERRED TO IN (A) ABOVE. NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF THE EXEMPTION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT FOR RESALES OF THIS NOTE. IF REQUESTED BY THE ISSUER, THE FISCAL AGENT, THE REGISTRAR OR A DEALER, ANY PURCHASER OF THIS NOTE AGREES TO PROVIDE THE INFORMATION NECESSARY TO DETERMINE WHETHER TRANSFER OF THIS NOTE IS PERMISSIBLE UNDER THE SECURITIES ACT. UNLESS OTHERWISE PROVIDED IN A SUPPLEMENTAL PROSPECTUS, IT IS DEEMED TO REPRESENT THAT IT IS NOT AND FOR SO LONG AS IT HOLDS THE NOTE OR ANY INTEREST THEREIN IT WILL NOT BE AN EMPLOYEE BENEFIT PLAN THAT IS SUBJECT TO PART 4 OF TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), A PLAN THAT IS DESCRIBED IN AND IS SUBJECT TO SECTION 4975 OF THE CODE, OR ANY ENTITY THE ASSETS OF WHICH ARE DEEMED TO CONSTITUTE THE ASSETS OF ANY "BENEFIT PLAN INVESTOR" FOR PURPOSES OF SECTION 3(42) OF ERISA.

(4)    It acknowledges that the Issuers, the Guarantor, the Dealers and their affiliates, and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements. If it is acquiring any Notes for the account of one or more qualified institutional buyers it represents that is has sole investment discretion with respect to each such account and that it has full power to make the foregoing acknowledgments, representations and agreements on behalf of each such account.

(5)    It acknowledges that, unless otherwise provided in a supplemental prospectus, it is not and for so long as it holds the Note or any interest therein it will not be an employee benefit plan that is subject to part 4 of Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan that is described in and is subject to Section 4975 of the Code, or any entity the assets of which are deemed to constitute the assets of any "benefit plan investor" for purposes of Section 3(42) of ERISA.

Each person purchasing Notes from a Dealer or through an affiliate of a Dealer pursuant to Rule 144A acknowledges that (i) it has been afforded an opportunity to request from the relevant Issuer, and to review, and it has received, all additional information considered by it to be necessary to verify the accuracy of the information herein; (ii) it has not relied on any Dealer or any person affiliated with any Dealer in connection with its investigation of the accuracy of the information contained in this Base Prospectus or its investment decision; and (iii) no person has been authorized to give any information or to make any representation concerning the relevant Issuer or the Notes other than those contained in this Base Prospectus and, if given or made, such other information or representation should not be relied upon as having been authorized by the relevant Issuer or any Dealer.

Notes represented by an interest in a Restricted Global Note may also be transferred to a person who wishes to hold such Notes in the form of an interest through an Unrestricted Global Note, but only upon receipt by the Registrar of a written certification from the transferor (in the form set out in Exhibit Q or R, as appropriate, to the Fiscal Agency Agreement) to the effect that such transfer is being made in accordance with Regulation S or Rule 144 (if available) under the Securities Act. The Issuers and the Dealers reserve the right to reject any offer to purchase, in whole or part, for any reason, or to sell less than the number of Notes which may be offered pursuant to Rule 144A. This Base Prospectus does not constitute an offer to any person in the United States or to any U.S. person other than any "qualified institutional buyer" within the meaning of Rule 144A to whom an offer has been made directly by one of the Dealers or an affiliate of one of the Dealers. Distribution of this Base Prospectus to any U.S. person or to any person within the United States, other than those persons, if any, retained to advise it with respect thereto, is unauthorized and any disclosure of any of its contents, without prior written consent of the Issuers, is prohibited.

**Public Offer Selling Restriction under the Prospectus Directive**

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "*Relevant Member State*"), each Dealer has represented and agreed, and each further Dealer appointed under the Program will be required to represent and agree, that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "*Relevant Implementation Date*") it has not made and will not make an offer of Notes which are the subject of the offering contemplated by this Base Prospectus as completed by the Final Terms in relation thereto (or which are the subject of the offering contemplated by a Drawdown Prospectus, as the case may be) to the public in that Relevant Member State except that it may, with effect from and including the Relevant Implementation Date, make an offer of such Notes to the public in that Relevant Member State:

(a)     if the Final Terms or Drawdown Prospectus in relation to the Notes specify that an offer of those Notes may be made other than pursuant to Article 3(2) of the Prospectus Directive in that Relevant Member State (a "*Non-exempt Offer*"), following the date of publication of a prospectus in relation to such Notes which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, provided that any such prospectus which is not a Drawdown Prospectus has subsequently been completed by the Final Terms contemplating such Non-exempt Offer, in accordance with the Prospectus Directive, in the period beginning and ending on the dates specified in such prospectus or Final Terms, as applicable;

(b)     at any time to legal entities which are authorised or regulated to operate in the financial markets or, if not so authorised or regulated, whose corporate purpose is solely to invest in securities;

(c)     at any time to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than EUR43,000,000; and (3) an annual net turnover of more than EUR50,000,000, as shown in its last annual or consolidated accounts;

(d)     at any time to fewer than 100 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) subject to obtaining the prior consent of the relevant Dealer or Dealers nominated by the Issuer for any such offer; or

(e)     at any time in any other circumstances falling within Article 3(2) of the Prospectus Directive,

provided that no such offer of Notes referred to in (b) to (e) above shall require the Issuer or any Dealer to publish a prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus pursuant to Article 16 of the Prospectus Directive.

For the purposes of this provision, the expression an "*offer of Notes to the public*" in relation to any Notes in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the Notes to be offered so as to enable an investor to decide to purchase or subscribe the Notes, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression **Prospectus Directive** means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

**Selling Restrictions Addressing Additional United Kingdom Securities Laws**

Each Dealer has represented and agreed and each further Dealer appointed under the Program will be required to represent and agree that:

(a)     *No deposit-taking:* in relation to any Notes having a maturity of less than one year:

(i)     it is a person whose ordinary activities involve it in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of its business; and:

    (ii)    it has not offered or sold and will not offer or sell any Notes other than to persons:

        (A)    whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses; or

        (B)    who it is reasonable to expect will acquire, hold, manage or dispose of investments (as principal or agent) for the purposes of their businesses,

where the issue of the Notes would otherwise constitute a contravention of Section 19 of the FSMA by the Issuer;

(b)    ***Financial promotion:*** it has only communicated or caused to be communicated and will only communicate or cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of section 21 of the FSMA) received by it in connection with the issue or sale of any Notes in circumstances in which section 21(1) of the FSMA does not apply to the Issuer or the Guarantor; and

(c)    ***General compliance:*** it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to any Notes in, from or otherwise involving the United Kingdom.

**Japan**

The Notes have not been and will not be registered under the Securities and Exchange Law of Japan and, accordingly, each Dealer has undertaken that it will not offer to sell any Notes directly or indirectly, in Japan or to, or for the benefit of, any Japanese Person or to others for re-offering or resale, directly or indirectly, in Japan or to any Japanese Person except under circumstances which will result in compliance with all applicable laws, regulations and ministerial guidelines promulgated by the relevant Japanese governmental and regulatory authorities and in effect at the relevant time. For the purposes of this paragraph, "*Japanese Person*" shall mean any person resident in Japan, including any corporation or other entity organised under the laws of Japan.

**Selling Restrictions Addressing Additional Netherlands Securities Laws**

1.    Any Notes (including rights representing an interest in a Note in global form) issued under the Program which have a maturity of less than twelve months and are money market instruments as referred to in Article 5:1a of the Netherlands Financial Markets Supervision Act (*Wet op het financieel toezicht* (the "**WFT**") ("**Non-PD Notes**"), that are offered anywhere in the world as far as the Notes issued by LBTCBV are concerned or offered, as part of their initial distribution, in The Netherlands as far as Non-PD Notes issued by LBHI are concerned, shall only be offered in accordance with the WFT.

2.    In addition and without prejudice to the relevant restrictions set out under (1) above, Zero Coupon Notes (as defined below) in definitive form of either LBTCBV, LBHI or LBB may only be transferred and accepted, directly or indirectly, within, from or into The Netherlands through the mediation of either the relevant Issuer or a member firm of Euronext Amsterdam N.V. in full compliance with the Dutch Savings Certificates Act (*Wet inzake Spaarbewijzen*) of 21 May 1985 (as amended) and its implementing regulations. No such mediation is required: (a) in respect of the transfer and acceptance of rights representing an interest in a Zero Coupon Note in global form or (b) in respect of the initial issue of Zero Coupon Notes in definitive form to the first holders thereof or (c) in respect of the transfer and acceptance of Zero Coupon Notes in definitive form between individuals not acting in the conduct of a business or profession, or (d) in respect of the transfer and acceptance of such Zero Coupon Notes within, from or into The Netherlands if all Zero Coupon Notes (either in definitive form or as rights representing an interest in a Zero Coupon Note in global form) of any particular Series are issued outside The Netherlands and are not distributed into The Netherlands in the course of initial distribution or immediately thereafter. As used herein "**Zero Coupon Notes**" are Notes that are in

bearer form and that constitute a claim for a fixed sum against the relevant Issuer and on which interest does not become due during their tenor or on which no interest is due whatsoever.

**Selling Restrictions Addressing Additional Italian Securities Laws**

The offering of the Notes has not been registered pursuant to the Italian securities legislation and, accordingly, each of the Dealers has represented and agreed that it has not offered or sold, and will not offer or sell, any Notes in the Republic of Italy in a solicitation to the public unless the Base Prospectus has been authorised in accordance with chapter IV of the Prospectus Directive No. 2003/71 and relevant Italian CONSOB regulations, and that sales of the Notes in the Republic of Italy shall be effected in accordance with all Italian securities, tax and exchange control and other applicable laws and regulation.

Accordingly, each of the Dealers has represented and agreed that it will not offer, sell or deliver any Notes or distribute copies of the Base Prospectus and any other document relating to the Notes in the Republic of Italy except:

(1)     to **"Professional Investors"**, as defined in Article 31.2 of CONSOB Regulation No. 11522 of 1 July 1998, as amended (**"Regulation No. 11522"**), pursuant to Article 30.2 and 100 of Legislative Decree No. 58 of 24 February 1998, as amended (**"Decree No. 58"**);

(2)     in a solicitation to the public provided that the Base Prospectus has been authorised in accordance with chapter IV of the Prospectus Directive No. 2003/71, Decree No. 58 and CONSOB Regulation No. 11971 of 14 May 1999, as amended; or

(3)     in any other circumstances where an express exemption from compliance with the solicitation restrictions applies, as provided under Decree No. 58 or CONSOB Regulation No. 11971 of 14 May 1999, as amended.

Any such offer, sale or delivery of the Notes or distribution of copies of the Base Prospectus or any other document relating to the Notes in the Republic of Italy must be:

(a)     made by investment firms, banks or financial intermediaries permitted to conduct such activities in the Republic of Italy in accordance with Legislative Decree No. 385 of 1 September 1993 as amended (**"Decree No. 385"**), Decree No. 58, CONSOB Regulation No. 11522 and any other applicable laws and regulations; and

(b)     in compliance with any other applicable notification requirement or limitation which may be imposed by CONSOB or the Bank of Italy.

**Provisions relating to the secondary market in Italy**

Investors should also note that, in any subsequent distribution of the Notes in the Republic of Italy, Article 100-bis of Decree No. 58 may require compliance with the law relating to public offers of securities. Furthermore, where the Notes are placed solely with professional investors and are then systematically resold on the secondary market at any time in the 12 months following such placing, purchasers of Notes who are acting outside of the course of their business or profession may in certain circumstances be entitled to declare such purchase void and to claim damages from any authorised person at whose premises the Notes were purchased, unless an exemption provided for under Decree No. 58 applies.

**Australia**

No prospectus or other disclosure document (as defined in the Corporations Act) in relation to the Program or any Notes has been or will be lodged with the Australian Securities and Investments Commission (**"ASIC"**). Each Dealer has represented and agreed and each further Dealer appointed under the Program will be required to represent and agree that, unless the relevant Final Terms (or a supplement to the Base Prospectus) otherwise provides, it:

(a)     has not (directly or indirectly) offered or invited applications, and will not offer or invite applications, for the issue, sale or purchase of the Notes, to or from Australia (including an offer or invitation which is received by a person in Australia); and

(b)     has not distributed or published, and will not distribute or publish, any Base Prospectus or other offering material or advertisement relating to any Notes in Australia,

unless (i) the aggregate consideration payable by each offeree is at least A$500,000 (or the equivalent in another currency and, in either case disregarding moneys lent by the offeror or its associates); (ii) the offer or invitation otherwise does not require disclosure to investors under Part 6D.2 of the Corporations Act; (iii) such action complies with all applicable laws, regulations and directives; and (iv) such action does not require any document to be lodged with ASIC.

## Singapore

Each Dealer has acknowledged that this Base Prospectus has not been and will not be registered as a prospectus with the Monetary Authority of Singapore. Accordingly, each Dealer has represented, warranted and agreed that it has not offered or sold any Notes or caused the Notes to be made the subject of an invitation for subscription or purchase and will not offer or sell any Notes or cause the Notes to be made the subject of an invitation for subscription or purchase, and has not circulated or distributed, nor will it circulate or distribute, this Base Prospectus or any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the Notes, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "*SFA*"), (ii) to a relevant person, or any person pursuant to Section 275(1A) of the SFA, and in accordance with the conditions, specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Each Dealer has further represented, warranted and agreed to notify (whether through the distribution of this Base Prospectus or otherwise) each of the following relevant persons specified in Section 275 of the SFA which has subscribed or purchased Notes from or through such Dealer, namely a person which is:

(a)     a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b)     a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor,

that shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for six months after that corporation or that trust has acquired the Notes under Section 275 of the SFA except:

(1)     to an institutional investor under Section 274 of the SFA or to a relevant person, or any person pursuant to Section 275(1A) of the SFA, and in accordance with the conditions, specified in Section 275 of the SFA;

(2)     where no consideration is given for the transfer; or

(3)     by operation of law.

## General

Each Dealer has severally agreed with the Issuers that it will observe all applicable laws and regulations in any country or jurisdiction in which it may offer, sell or deliver Notes and that it will not, directly or indirectly, offer, sell or deliver Notes or distribute or publish any prospectus, circular, advertisement or other offering material in relation to the Notes in or from any country or jurisdiction except under circumstances that will to the best of its knowledge and belief result in compliance with any applicable laws and regulations and all offers, sales and deliveries of Notes by it will be made on the foregoing terms.

Each purchaser of Notes must observe all applicable laws and regulations in any jurisdiction in which it may offer, sell, or deliver the Notes and it may not, directly or indirectly, offer, sell, resell, reoffer or deliver any Notes or distribute this Base Prospectus or any circular, advertisement or other offering material (including, without limitation, any supplement to this Base Prospectus) in any country or jurisdiction except under circumstances that will result, to the best of its knowledge and belief, in compliance with all applicable laws and regulations.

The restrictions on offerings may be modified by the agreement of the Issuers and the Dealers following a change in a relevant law, regulation or directive. Any such modification will be set forth in the relevant Final Terms or in a supplement to this Base Prospectus.

## GENERAL INFORMATION

1.  The consolidated financial statements for the years ended November 30, 2005 and November 30, 2006 of LBHI have been prepared in accordance with generally accepted accounting principles in the United States and have been reported upon without qualification for LBHI by Ernst & Young LLP, certified public accountants, which has its principal place of business at 5 Times Square, New York, New York 10036, U.S.A. Ernst & Young LLP is an independent registered public accounting firm with respect to LBHI and its subsidiaries within the meaning of the Securities Act of 1933, as amended and the applicable rules and regulations thereunder adopted by the Securities and Exchange Commission and the Public Company Accounting Oversight Board (United States) (PCAOB). The financial statements for the years ended November 30, 2005 and November 30, 2006 of LBTCBV have been prepared in accordance with generally accepted accounting principles in The Netherlands and have been reported upon without qualification by Ernst & Young Accountants, Amsterdam, certified public accountants of NIvRA (*Nederlands Instituut voor Register Accountants*), Drentestraat 20, 1083 HK Amsterdam, P.O. Box 7883, 1008 AB Amsterdam, The Netherlands. The financial statements for the years ended November 30, 2005 and November 30, 2006 of LBB have been prepared on the basis of generally accepted accounting principles in the Federal Republic of Germany and have been audited by Ernst & Young AG Wirtschaftsprüfungsgesellschaft, independent auditors of the Institut der Wirtschaftsprüfer (Institute of Public Auditors in Germany), Eschersheimer Landstr. 14, D-60322 Frankfurt am Main. Ernst & Young AG Wirtschaftsprüfungsgesellschaft issued unqualified auditor's reports thereon.

2.  Since May 31, 2007, the date to which the latest unaudited consolidated financial statements of LBHI were prepared, there has been no significant change in the consolidated financial or trading position of LBHI (which includes LBTCBV and LBB) and since November 30, 2006, the date to which the latest audited consolidated financial statements of LBHI were prepared, there has been no material adverse change in the prospects of LBHI and its subsidiaries. Since November 30, 2006, the date to which the latest audited financial statements of LBTCBV were prepared, there has been no significant change in the financial or trading position of LBTCBV, and there has been no material adverse change in the prospects of LBTCBV. Since November 30, 2006, the date to which the latest audited financial statements of LBB were prepared, there has been no significant change in the financial or trading position of LBB and there has been no material adverse change in the prospects of LBB.

3.  Except as otherwise disclosed in this Base Prospectus, neither LBHI nor any of its subsidiaries (including LBTCBV and LBB) is or has been involved in any governmental, legal or arbitration proceedings (including any such proceedings which are pending or threatened of which LBHI, LBTCBV or LBB is aware) during the 12 months before the date of this Base Prospectus which may have, or have had in the recent past, significant effects on the financial position or profitability of the Group, LBTCBV or LBB.

4.  The authority to approve issuance of debt in the Euro markets, including the issuance of the Guarantee, was delegated to the Executive Committee of the Board of Directors of LBHI pursuant to resolutions (the "Resolutions") adopted by the Board of Directors of LBHI as of September 28, 1998. The Executive Committee of the Board of Directors of LBHI, in accordance with the provisions of the Resolutions, authorized the increase in the aggregate principal amount of the Program to U.S.$100,000,000,000 and the Guarantees on the Notes issued thereunder by LBTCBV or LBB, as the case may be, on July 23, 2007. The Program was authorized pursuant to resolutions of the Board of Managing Directors of LBTCBV passed on March 31, 1995, August 12, 2002, August 19, 2003, August 17, 2004, August 17, 2005, August 3, 2006 and July 23, 2007. This Program was authorised pursuant to resolutions of the Board of Directors of LBB passed on August 18, 2003, August 18, 2004 and August 17, 2005.

5.  From the date hereof and during the lifetime of the Program copies of the following documents in physical and/or electronic form, and English translations thereof where relevant, may be inspected during normal business hours on any weekday (excluding Saturdays) at the principal place of business and registered office of LBHI (in its capacity as Issuer and as Guarantor), at the registered office of

212

LBTCBV, at the registered office of LBB, at the offices of the Fiscal Agent in London, at the office of the Irish Paying Agent in Dublin and at the office of the listing agent in Singapore referred to in this Base Prospectus:

(a)   the Restated Certificate of Incorporation and the Amended and Restated By-Laws of LBHI, the Deed of Incorporation ("*akte van oprichting*") and the amended Articles of Association ("*statuten*") of LBTCBV and the Articles of Association ("*Satzung*") of LBB;

(b)   the audited consolidated financial statements of LBHI (including the audit report thereon) for each of the years ended November 30, 2005 and November 30, 2006, together with the quarterly interim unaudited consolidated financial statements for the three months ended February 28, 2007 and for the three months ended May 31, 2007;

(c)   the audited financial statements of LBTCBV (including the audit report thereon) for the years ended November 30, 2005 and November 30, 2006. No publicly available interim financial statements financial statements are prepared by LBTCBV;

(d)   the audited financial statements of LBB (including the audit report thereon) for the years ended November 30, 2005 and November 30, 2006. No publicly available interim financial statements financial statements are prepared by LBB;

(e)   the Amended and Restated Fiscal Agency Agreement dated July 24, 2007 and any amendments or supplements thereto;

(f)   the Amended and Restated Distribution Agreement dated July 24, 2007 and any amendments or supplements thereto;

(g)   the Deed of Covenant dated July 24, 2007 and any amendments or supplements thereto;

(h)   each of the Guarantee Agreements dated July 24, 2007 and any amendments or supplements thereto;

(i)   each Calculation Agency Agreement;

(j)   each Final Terms (for issues of listed Notes);

(k)   any Drawdown Prospectus (for issues of listed notes);

(l)   the Base Prospectus and all amendments and supplements thereto; and

(m)   in the case of each issue of listed Notes subscribed pursuant to a subscription agreement, the subscription agreement (or equivalent document).

If Australian Domestic Notes are issued by LBTCBV, the relevant Deed Poll, the relevant Agency and Registry Services Agreement and (if required) the relevant Issuing and Payment Administration Agreement in relation to the Australian Domestic Notes may be inspected during normal business hours on any weekday (excluding Saturdays) at the principal place of business and registered office of LBTCBV or LBHI, as the case may be, and at the office of the Australian Registrar in Sydney, as specified in the applicable Final Terms.

6.   Regulations in Australia restrict or prohibit payments, transactions and dealings with assets having a prescribed connection with certain countries or named individuals or entities subject to international sanctions or associated with terrorism.

7.   Notes have been accepted for clearance through Euroclear and Clearstream, Luxembourg. The Common Code and the ISIN for each Series of Notes will be set out in the relevant Final Terms.

8.   The IFSRA, in its capacity as competent authority in Ireland for the purposes of the Prospectus Directive has been or will be requested to provide the following competent authorities in other Member States with a certificate of approval under Article 18 of the Prospectus Directive as implemented in Ireland:

(a)    The Financial Market Authority (FMA), which is the competent authority of Austria for the purposes of the Prospectus Directive;

(b)    The Banking, Finance and Insurance Commission, or CBFA, which is the competent authority of Belgium for the purposes of the Prospectus Directive;

(c)    The Czech National Bank, which is the competent authority of the Czech Republic for the purposes of the Prospectus Directive;

(d)    The Finanstilsynet, which is the competent authority of Denmark for the purposes of the Prospectus Directive;

(e)    The Rahoitustazkastus which is the competent authority of Finland for the purposes of the Prospectus Directive;

(f)    The Autorite des Marches Financiers (AMF), which is the competent authority of France for the purposes of the Prospectus Directive;

(g)    The German Federal Financial Supervisory Authority (Bundesanstalt für Finanzdienstleistungsaufsicht), which is the competent authority of Germany for the purposes of the Prospectus Directive;

(h)    The Capital Markets Commission (CMC), which is the competent authority of Greece for the purposes of the Prospectus Directive;

(i)    The Hungarian Financial Supervisory Authority which is the competent authority of Hungary for the purposes of the Prospectus Directive;

(j)    The Commissione Nazionale per le Società e la Borsa (Consob), which is the competent authority of Italy for the purposes of the Prospectus Directive;

(k)    The Commission de Surveillance du Secteur Financier, which is the competent authority of Luxembourg for the purposes of the Prospectus Directive;

(l)    The Stichting Autoriteit Financiële Markten, or "AFM", which is the competent authority of The Netherlands for the purposes of the Prospectus Directive;

(m)    The Kzedittilsynet, which is the competent authority of Norway for the purposes of the Prospectus Directive;

(n)    The Polish Financial Supervisory Authority which is the competent authority of Poland for the purposes of the Prospectus Directive;

(o)    The Securities Commission (CMVM), which is the competent authority of Portugal for the purposes of the Prospectus Directive;

(p)    The National Bank of Slovakia which is the competent authority of the Slovak Republic for the purposes of the Prospectus Directive;

(q)    The Comisión Nacional del Mercado de Valores, or CNMV, which is the competent authority of Spain for the purposes of the Prospectus Directive; and

(r)    The Finansinspektionen which is the competent authority of Sweden for the purposes of the Prospectus Directive;

(s)    The Financial Services Authority, which is the competent authority of the United Kingdom for the purposes of the Prospectus Directive.

In addition to the applications described above, the Issuers may, on or after the date of this Base Prospectus, make applications for one or more further certificates of approval under Article 18 of the

Prospectus Directive as implemented in Ireland to be issued by the IFSRA to the competent authority in any Member State.

9. Neither LBHI, LBTCBV nor LBB intends to publish any post issuance information in relation to any securities, index or other product underlying such Note.

**PRINCIPAL PLACE OF BUSINESS OF LBHI**

**Lehman Brothers Holdings Inc.**
745 Seventh Avenue
New York, New York 10019

**REGISTERED OFFICE OF LBTCBV**

**Lehman Brothers Treasury Co. B.V.**
Strawinskylaan 3105
1077 ZX Amsterdam

**REGISTERED OFFICE OF LBB**

**Lehman Brothers Bankhaus AG**
Rathenauplatz 1, D-60313
Frankfurt am Main

**LONDON BRANCH OF LBHI AND LBB**
25 Bank Street
London E14 5LE

**ARRANGER**

**Lehman Brothers
International (Europe)**
25 Bank Street
London E14 5LE

**DEALERS**

| | |
|---|---|
| **Lehman Brothers**<br>**International (Europe)**<br>25 Bank Street<br>London E14 5LE | **Lehman Brothers Inc.**<br>745 Seventh Avenue<br>New York, NY 10019 |

| **FISCAL AGENT, PRINCIPAL PAYING AGENT** | **REGISTRAR, EXCHANGE AGENT**<br>**AND U.S. SUB-PAYING AGENT** |
|---|---|
| **The Bank of New York, acting through**<br>**its London Branch**<br>48th Floor<br>One Canada Square<br>London E14 5AL | **The Bank of New York, acting through**<br>**its New York Branch**<br>101 Barclay Street<br>New York, New York 10028 |

**IRISH PAYING AGENT**

**BNY Financial Services Plc**
30 Herbert Street
Dublin 2
Ireland

**IRISH LISTING AGENT**

**The Bank of New York**
48th Floor
One Canada Square
London E14 5AL

## LEGAL ADVISORS TO THE ISSUERS

*as to United States Law*
**Barrett DiPaolo**
Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, New York 10019

## LEGAL ADVISORS TO THE DEALERS

| *as to English Law* | *as to Netherlands Law* | *as to United States Law* |
|---|---|---|
| **Clifford Chance LLP** | **Clifford Chance LLP** | **Clifford Chance** |
| 10 Upper Bank Street | Droogbak 1A | **US LLP** |
| London E14 5JJ | 1013 GE Amsterdam | 31 West 52nd Street |
| | | New York, NY 10019-6131 |

| *as to German law* | *as to Australian law* | *as to Singapore Law* |
|---|---|---|
| **Clifford Chance** | **Mallesons Stephen Jaques** | **Wong Partnership** |
| **Partnerschaftsgesellschaft** | Level 61 | One George Street |
| Mainzer Landstraße 46 | Governor Phillip Tower | 20th Floor |
| D-60325 Frankfurt am Main | 1 Farrer Place | Singapore 049145 |
| | Sydney NSW 2000 | |

| **AUDITORS OF LBHI** | **AUDITORS OF LBTCBV** | **AUDITORS OF LBB** |
|---|---|---|
| **Ernst & Young LLP** | **Ernst & Young Accountants, Amsterdam** | **Ernst & Young AG Wirtschaftsprüfungsgesellschaft** |
| 5 Times Square | Drentestraat 20 | Eschersheimer Landstr. 14 |
| New York | 1083 HK | D-60322 Frankfurt am Main |
| New York 10036 | Amsterdam | |

printed by **eprintfinancial**.com
tel: + 44 (0) 20 7613 1800   document number 3495

BASE PROSPECTUS SUPPLEMENT NO. 1

**LEHMAN BROTHERS HOLDINGS INC.**
*(incorporated in the State of Delaware)*

**LEHMAN BROTHERS TREASURY CO. B.V.**
*(incorporated with limited liability in The Netherlands and
having its statutory domicile in Amsterdam)*

**LEHMAN BROTHERS BANKHAUS AG**
*(incorporated in The Federal Republic of Germany)*

U.S.$100,000,000,000
Euro Medium-Term Note Program
unconditionally and irrevocably guaranteed as to the Notes to be issued by each of Lehman
Brothers Treasury Co. B.V. and Lehman Brothers Bankhaus AG by
**LEHMAN BROTHERS HOLDINGS INC.**

This Base Prospectus Supplement (the "**Supplement**") is supplemental to and must be read in conjunction with the Base Prospectus dated 24 July 2007 (the "**Base Prospectus**") prepared by Lehman Brothers Holdings Inc. ("**LBHI**"), Lehman Brothers Treasury Co. B.V. ("**LBTCBV**") and Lehman Brothers Bankhaus AG ("**LBB**") with respect to the U.S.$100,000,000,000 Euro Medium-Term Note Program (the "**Program**"). Terms defined in the Base Prospectus have the same meaning when used in this Supplement.

Application has been made to the Irish Financial Services Regulatory Authority (the "**IFSRA**"), which is the competent authority for the purpose of Directive 2003/71/EC (the "**Prospectus Directive**") and relevant implementing measures in Ireland, for approval of this Supplement as a base prospectus supplement issued in compliance with the Prospectus Directive as implemented in Ireland by the Prospectus (Directive 2003/71/EC) Regulations 2005 (the "**Prospectus Regulations**"). Application has also been made to the IFSRA to provide the competent authorities in each of Austria, Belgium, Czech Republic, Denmark, Finland, France, Germany, Greece, Hungary, Italy, Luxembourg, The Netherlands, Norway, Poland, Portugal, Slovak Republic, Spain, Sweden and the United Kingdom with a certificate of approval of this Supplement under Article 18 of the Prospectus Directive as implemented in Ireland.

Each of LBHI, LBTCBV and LBB accepts responsibility for the information contained in this Supplement and declares that, having taken all reasonable care to ensure that such is the case, the information contained in this Supplement is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect the import of such information.

This Supplement has been prepared pursuant to Article 16.1 of the Prospectus Directive.

The following information has been filed with the Irish Stock Exchange and by virtue of this Supplement shall be deemed to be incorporated in its entirety in, and form part of, the Base Prospectus:

1. The current report of LBHI dated 18 September 2007 pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 filed with the Securities and Exchange Commission on Form

8-K exhibiting LBHI's press release with respects to its earnings for its most recently completed fiscal quarter and related attachments.

This Supplement and the information incorporated by reference are available for viewing, and copies may be obtained from, the offices of the Irish Listing Agent.

With effect from the date of this Supplement, the Base Prospectus shall be amended and supplemented in the manner described in this Supplement and each reference in the Base Prospectus to "Base Prospectus" shall be read and construed as a reference to the Base Prospectus as amended and supplemented by this Supplement.  To the extent that there is any inconsistency between (a) any statement in this Supplement and (b) any statement in or incorporated by reference into the Base Prospectus, the statements in this Supplement will prevail.

Save as disclosed in this Supplement, no other significant new factor, material mistake or inaccuracy relating to information included in the Base Prospectus has arisen or been noted since the publication of the Base Prospectus.


**LEHMAN BROTHERS**

20 September 2007

## BASE PROSPECTUS SUPPLEMENT NO. 2

### LEHMAN BROTHERS HOLDINGS INC.
*(incorporated in the State of Delaware)*

### LEHMAN BROTHERS TREASURY CO. B.V.
*(incorporated with limited liability in The Netherlands and having its statutory domicile in Amsterdam)*

### LEHMAN BROTHERS BANKHAUS AG
*(incorporated in The Federal Republic of Germany)*

U.S.$100,000,000,000
Euro Medium-Term Note Program
unconditionally and irrevocably guaranteed as to the Notes to be issued by each of Lehman
Brothers Treasury Co. B.V. and Lehman Brothers Bankhaus AG by
### LEHMAN BROTHERS HOLDINGS INC.

This Base Prospectus Supplement (the **"Supplement"**) is supplemental to and must be read in conjunction with the Base Prospectus dated 24 July 2007 as already supplemented by the Base Prospectus Supplement dated 20 September 2007 (together, (the **"Base Prospectus"**) prepared by Lehman Brothers Holdings Inc. (**"LBHI"**), Lehman Brothers Treasury Co. B.V. (**"LBTCBV"**) and Lehman Brothers Bankhaus AG (**"LBB"**) with respect to the U.S.$100,000,000,000 Euro Medium-Term Note Program (the **"Program"**). Terms defined in the Base Prospectus have the same meaning when used in this Supplement.

Application has been made to the Irish Financial Services Regulatory Authority (the **"IFSRA"**), which is the competent authority for the purpose of Directive 2003/71/EC (the **"Prospectus Directive"**) and relevant implementing measures in Ireland, for approval of this Supplement as a base prospectus supplement issued in compliance with the Prospectus Directive as implemented in Ireland by the Prospectus (Directive 2003/71/EC) Regulations 2005 (the **"Prospectus Regulations"**). Application has also been made to the IFSRA to provide the competent authorities in each of Austria, Belgium, Czech Republic, Denmark, Finland, France, Germany, Greece, Hungary, Italy, Luxembourg, The Netherlands, Norway, Poland, Portugal, Slovak Republic, Spain, Sweden and the United Kingdom with a certificate of approval of this Supplement under Article 18 of the Prospectus Directive as implemented in Ireland.

Each of LBHI, LBTCBV and LBB accepts responsibility for the information contained in this Supplement and declares that, having taken all reasonable care to ensure that such is the case, the information contained in this Supplement is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect the import of such information.

This Supplement has been prepared pursuant to Article 16.1 of the Prospectus Directive.

The following information has been filed with the Irish Stock Exchange and by virtue of this Supplement shall be deemed to be incorporated in its entirety in, and form part of, the Base Prospectus:

The quarterly report for the quarter ended 31 August 2007 pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 of LBHI filed with the Securities and Exchange Commission on Form 10-Q.

This Supplement and the information incorporated by reference are available for viewing, and copies may be obtained from, the offices of the Irish Listing Agent.

With effect from the date of this Supplement, the Base Prospectus shall be amended and supplemented in the manner described in this Supplement and each reference in the Base Prospectus to "Base Prospectus" shall be read and construed as a reference to the Base Prospectus as amended and supplemented by this Supplement.  To the extent that there is any inconsistency between (a) any statement in this Supplement and (b) any statement in or incorporated by reference into the Base Prospectus, the statements in this Supplement will prevail.

Save as disclosed in this Supplement, no other significant new factor, material mistake or inaccuracy relating to information included in the Base Prospectus has arisen or been noted since the publication of the Base Prospectus.

**LEHMAN BROTHERS**

15 October 2007

## BASE PROSPECTUS SUPPLEMENT NO. 3

### LEHMAN BROTHERS HOLDINGS INC.
*(incorporated in the State of Delaware)*

### LEHMAN BROTHERS TREASURY CO. B.V.
*(incorporated with limited liability in The Netherlands and having its statutory domicile in Amsterdam)*

### LEHMAN BROTHERS BANKHAUS AG
*(incorporated in The Federal Republic of Germany)*

U.S.$100,000,000,000
Euro Medium-Term Note Program
unconditionally and irrevocably guaranteed as to the Notes to be issued by each of Lehman
Brothers Treasury Co. B.V. and Lehman Brothers Bankhaus AG by
### LEHMAN BROTHERS HOLDINGS INC.

This Base Prospectus Supplement (the **"Supplement"**) is supplemental to and must be read in conjunction with the Base Prospectus dated 24 July 2007 as already supplemented by the Base Prospectus Supplement dated 20 September 2007 and 15 October 2007 (together, (the **"Base Prospectus"**) prepared by Lehman Brothers Holdings Inc. (**"LBHI"**), Lehman Brothers Treasury Co. B.V. (**"LBTCBV"**) and Lehman Brothers Bankhaus AG (**"LBB"**) with respect to the U.S.$100,000,000,000 Euro Medium-Term Note Program (the **"Program"**). Terms defined in the Base Prospectus have the same meaning when used in this Supplement.

Application has been made to the Irish Financial Services Regulatory Authority (the **"IFSRA"**), which is the competent authority for the purpose of Directive 2003/71/EC (the **"Prospectus Directive"**) and relevant implementing measures in Ireland, for approval of this Supplement as a base prospectus supplement issued in compliance with the Prospectus Directive as implemented in Ireland by the Prospectus (Directive 2003/71/EC) Regulations 2005 (the **"Prospectus Regulations"**). Application has also been made to the IFSRA to provide the competent authorities in each of Austria, Belgium, Czech Republic, Denmark, Finland, France, Germany, Greece, Hungary, Italy, Luxembourg, The Netherlands, Norway, Poland, Portugal, Slovak Republic, Spain, Sweden and the United Kingdom with a certificate of approval of this Supplement under Article 18 of the Prospectus Directive as implemented in Ireland.

Each of LBHI, LBTCBV and LBB accepts responsibility for the information contained in this Supplement and declares that, having taken all reasonable care to ensure that such is the case, the information contained in this Supplement is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect the import of such information.

This Supplement has been prepared pursuant to Article 16.1 of the Prospectus Directive.

The following information has been filed with the Irish Stock Exchange and by virtue of this Supplement shall be deemed to be incorporated in its entirety in, and form part of, the Base Prospectus:

1. The current report of LBHI dated 13 December 2007 pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 filed with the Securities and Exchange Commission on Form 8-K exhibiting LBHI's press release with respects to its earnings for its most recently completed fiscal quarter and related attachments.

This Supplement and the information incorporated by reference are available for viewing, and copies may be obtained from, the offices of the Irish Listing Agent.

With effect from the date of this Supplement, the Base Prospectus shall be amended and supplemented in the manner described in this Supplement and each reference in the Base Prospectus to "Base Prospectus" shall be read and construed as a reference to the Base Prospectus as amended and supplemented by this Supplement. To the extent that there is any inconsistency between (a) any statement in this Supplement and (b) any statement in or incorporated by reference into the Base Prospectus, the statements in this Supplement will prevail.

Save as disclosed in this Supplement, no other significant new factor, material mistake or inaccuracy relating to information included in the Base Prospectus has arisen or been noted since the publication of the Base Prospectus.

**LEHMAN BROTHERS**

17 December 2007

2

## BASE PROSPECTUS SUPPLEMENT NO. 4

### LEHMAN BROTHERS HOLDINGS INC.
*(incorporated in the State of Delaware)*

### LEHMAN BROTHERS TREASURY CO. B.V.
*(incorporated with limited liability in The Netherlands and
having its statutory domicile in Amsterdam)*

### LEHMAN BROTHERS BANKHAUS AG
*(incorporated in The Federal Republic of Germany)*

U.S.$100,000,000,000
Euro Medium-Term Note Program
unconditionally and irrevocably guaranteed as to the Notes to be issued by each of Lehman
Brothers Treasury Co. B.V. and Lehman Brothers Bankhaus AG by
### LEHMAN BROTHERS HOLDINGS INC.

This Base Prospectus Supplement (the "**Supplement**") is supplemental to and must be read in conjunction with the Base Prospectus dated 24 July 2007 as already supplemented by the Base Prospectus Supplement dated 20 September 2007, 15 October 2007 and 17 December 2007 and (together, (the "**Base Prospectus**") prepared by Lehman Brothers Holdings Inc. ("**LBHI**"), Lehman Brothers Treasury Co. B.V. ("**LBTCBV**") and Lehman Brothers Bankhaus AG ("**LBB**") with respect to the U.S.$100,000,000,000 Euro Medium-Term Note Program (the "**Program**"). Terms defined in the Base Prospectus have the same meaning when used in this Supplement.

Application has been made to the Irish Financial Services Regulatory Authority (the "**IFSRA**"), which is the competent authority for the purpose of Directive 2003/71/EC (the "**Prospectus Directive**") and relevant implementing measures in Ireland, for approval of this Supplement as a base prospectus supplement issued in compliance with the Prospectus Directive as implemented in Ireland by the Prospectus (Directive 2003/71/EC) Regulations 2005 (the "**Prospectus Regulations**"). Application has also been made to the IFSRA to provide the competent authorities in each of Austria, Belgium, Czech Republic, Denmark, Finland, France, Germany, Greece, Hungary, Italy, Luxembourg, The Netherlands, Norway, Poland, Portugal, Slovak Republic, Spain, Sweden and the United Kingdom with a certificate of approval of this Supplement under Article 18 of the Prospectus Directive as implemented in Ireland.

Each of LBHI, LBTCBV and LBB accepts responsibility for the information contained in this Supplement and declares that, having taken all reasonable care to ensure that such is the case, the information contained in this Supplement is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect the import of such information.

This Supplement has been prepared pursuant to Article 16.1 of the Prospectus Directive.

The following information has been filed with the Irish Stock Exchange and by virtue of this Supplement shall be deemed to be incorporated in its entirety in, and form part of, the Base Prospectus:

The annual report for the fiscal year ended 30 November 2007 pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 of LBHI filed with the Securities and Exchange Commission on Form 10-K.

This Supplement and the information incorporated by reference are available for viewing, and copies may be obtained from, the offices of the Irish Listing Agent.

With effect from the date of this Supplement, the Base Prospectus shall be amended and supplemented in the manner described in this Supplement and each reference in the Base Prospectus to "Base Prospectus" shall be read and construed as a reference to the Base Prospectus as amended and supplemented by this Supplement.  To the extent that there is any inconsistency between (a) any statement in this Supplement and (b) any statement in or incorporated by reference into the Base Prospectus, the statements in this Supplement will prevail.

Save as disclosed in this Supplement, no other significant new factor, material mistake or inaccuracy relating to information included in the Base Prospectus has arisen or been noted since the publication of the Base Prospectus.

**LEHMAN BROTHERS**

05 February 2008

## BASE PROSPECTUS SUPPLEMENT NO. 5

### LEHMAN BROTHERS HOLDINGS INC.
(*incorporated in the State of Delaware*)

### LEHMAN BROTHERS TREASURY CO. B.V.
(*incorporated with limited liability in The Netherlands and
having its statutory domicile in Amsterdam*)

### LEHMAN BROTHERS BANKHAUS AG
(*incorporated in The Federal Republic of Germany*)

U.S.$100,000,000,000
Euro Medium-Term Note Program
Unconditionally and irrevocably guaranteed as to Notes to be issued by each of
Lehman Brothers Treasury Co. B.V. and Lehman Brothers Bankhaus AG by
### LEHMAN BROTHERS HOLDINGS INC.

#### Autocallable Share Basket Linked Notes

This Base Prospectus Supplement (this "**Supplement**") constitutes a supplement to and must be read in conjunction with the Base Prospectus dated 24 July 2007 (the "**Base Prospectus**") as already supplemented by the Base Prospectus Supplement dated 20 September 2007, the Base Prospectus Supplement dated 15 October 2007, the Base Prospectus Supplement dated 17 December 2007 and the Base Prospectus Supplement dated 5 February 2008 prepared by Lehman Brothers Holdings Inc. ("**LBHI**"), Lehman Brothers Treasury Co. B.V. ("**LBTBV**") and Lehman Brothers Bankhaus AG ("**LBB**") with respect to the U.S.$100,000,000,000 Euro Medium-Term Note Program (the "**Program**"). Terms defined in the Base Prospectus have the same meaning when used in this Supplement.

Application has been made to the Irish Financial Services Regulatory Authority (the "**IFSRA**"), which is the competent authority for the purpose of Directive 2003/71/EC (the "**Prospectus Directive**") and relevant implementing measures in Ireland, for approval of this Supplement as a prospectus supplement issued in compliance with the Prospectus Directive as implemented in Ireland by the Prospectus (Directive 2003/71/EC) Regulations 2005 (the "**Prospectus Regulations**"). Application has also been made to the IFSRA to provide the competent authorities in each of Austria, Belgium, the Czech Republic, Denmark, Finland, France, Germany, Greece, Hungary, Italy, Luxembourg, The Netherlands, Norway, Poland, Portugal, the Slovak Republic, Spain, Sweden and the United Kingdom with a certificate of approval under Article 18 of the Prospectus Directive as implemented in Ireland.

Notes issued pursuant to the Program may include Notes ("**Autocallable Share Basket Linked Notes**") linked to a basket of reference equities under the terms of which (i) the Notes may redeem early on one or more specific dates at a specific amount per Note if an event linked to the performance of some or all of such reference equities occurs, as further described in the applicable Final Terms and (ii) certain amounts payable in respect of such Notes, such as interest amounts or the redemption amount payable on the maturity date of the

Notes, shall be determined by reference to the performance of some or all of the reference equities comprised in such basket.

The purpose of this Supplement is to provide additional information in respect of Autocallable Share Basket Linked Notes.

Copies of this Supplement in physical and/or electronic form may be inspected during normal business hours on any weekday (excluding Saturdays and Sundays) at the principal place of business and registered office of LBHI (in its capacity as Issuer and as Guarantor), at the registered office of LBTCBV, at the registered office of LBB, at the offices of the Fiscal Agent in London, at the office of the Irish Paying Agent in Dublin and at the office of the listing agent in Singapore referred to in the Base Prospectus.

With effect from the date of this Supplement, the Base Prospectus shall be amended and supplemented in the manner described in this Supplement and each reference in the Base Prospectus to "Base Prospectus" shall be read and construed as a reference to the Base Prospectus as amended and supplemented by this Supplement. To the extent that there is any inconsistency between (a) any statement in this Supplement and (b) any statement in or incorporated by reference into the Base Prospectus, the statements in this Supplement will prevail.

Save as disclosed in this Supplement and the previously approved Supplements, no other significant new factor, material mistake or inaccuracy relating to information included in the Base Prospectus has arisen or been noted since the publication of the Base Prospectus.

Each of LBHI, LBTBV and LBB accepts responsibility for the information contained in this Supplement and declares that, having taken all reasonable care to ensure that such is the case, the information contained in this Supplement is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

**LEHMAN BROTHERS**

11 February 2008

**TABLE OF CONTENTS**

Addition To Summary In Relation To Autocallable Share Basket Linked Notes .................. 4

Addition To Risk Factors In Relation To Autocallable Share Basket Linked Notes ............. 7

Addition To Taxation In Relation To Autocallable Share Basket Linked Notes ................. 11

Information Relating To Autocallable Share Basket Linked Notes ............................... 13

Pro Forma Final Terms Applicable To Autocallable Share Basket Linked Notes ............... 42

**Addition to Summary in relation to Autocallable Share Basket Linked Notes**

In relation to Autocallable Share Basket Linked Notes, the Summary contained in the Base Prospectus is supplemented as follows:

Autocallable Share Basket Linked Notes:

Autocallable Share Basket Linked Notes are Notes linked to a basket of reference equities (each, a "**Share**" and together, the "**Shares**") under the terms of which the Notes may redeem early on one or more specific dates at a specific amount per Note (the "**Mandatory Early Redemption Amount**") if an event linked to the performance of some or all of the Shares occurs, as further described in the applicable Final Terms (a "**Mandatory Early Redemption Event**").

In addition, Autocallable Share Basket Linked Notes may provide that some or all of the interest or of the principal payable at maturity in respect of them shall be linked to the performance of some or all of the Shares.

Autocallable Share Basket Linked Notes may be capital protected or not and may redeem in cash or through the delivery of Shares ("**Physical Settlement**").

There is an additional exception to the obligation for the Issuer or the Guarantor, as the case may be, to pay Additional Amounts pursuant to Condition 9(a) of the Terms and Conditions in respect of Autocallable Share Basket Linked Notes issued by LBTBV or LBB, that are not fully principal protected and that are linked to a Basket containing one or more shares issued by a U.S. issuer.

Risk Factors:

Additional risk factors applicable to Autocallable Share Basket Linked Notes include:

- risk of partial or complete loss of principal, subject to the level of capital protection (if any) specified in the applicable Final Terms;

- risk that, if a Mandatory Early Redemption

Event occurs, a Noteholder would not be able to reinvest the redemption proceeds in a comparable security and receive a return on investment which is as high as that of the Notes;

- risk of the trading price of the Notes fluctuating over time and remaining at levels significantly below that at which the Notes were originally issued, due to factors (including supply and demand for the Notes, value of the Shares, corporate actions, macro-economic factors, adjustments and determinations made by the Calculation Agent to account for events affecting the Shares, substitution of Shares and other factors) which could interrelate in complex ways;

- risk that the Notes may be redeemed early at a value significantly below that at which the Notes were originally issued due to the occurrence of certain events affecting the Shares;

- risk that certain hedging, trading or other transactions performed by Lehman Brothers through any of its affiliates that are unrelated to the Notes but which involve directly or indirectly the Shares could present certain conflicts of interest with the interest of Noteholders by affecting the value of the Shares and consequently the value of the Notes;

- risk that some or all of the Shares would trade or close at a price which is greater than, equal to or lower than any threshold specified in the applicable Final Terms, thus affecting the amounts of interest and/or principal payable under the Notes;

- risk that, if Physical Settlement applies to the Notes, the Shares to be delivered could have a value which is less than the value of such Shares as of the Issue Date or even be valueless and that, if delivery of the relevant

Shares cannot be effected, settlement could be indefinitely postponed;

- other risks relating to certain types of Notes which may have features similar to those of Autocallable Share Basket Linked Notes, such as the risks set out in the Summary contained in the Base Prospectus in respect of Basket Linked Notes and Option Notes.

### Addition to Risk Factors in relation to Autocallable Share Basket Linked Notes

*Investors should consult their own financial, legal, accounting and tax advisors about the risks associated with an investment in Autocallable Share Basket Linked Notes, the appropriate tools to analyse that investment and the suitability of that investment to each investor's particular circumstances. No investor should purchase Autocallable Share Basket Linked Notes unless that investor understands and has sufficient financial resources to bear the price, market, liquidity, structure, redemption and other risks associated with an investment in Autocallable Share Basket Linked Notes. Certain of these risks are more explicitly described below.*

In relation to Autocallable Share Basket Linked Notes, the section entitled *Risks relating to the Notes* in the Risk Factors set out in the Base Prospectus is supplemented by the following:

#### Creditworthiness of the Issuer and Guarantor

Any person who purchases the Notes is relying upon the creditworthiness of the Issuer and, where applicable, the Guarantor and has no rights against any other person. The Notes constitute general, unsecured, unsubordinated, contractual obligations of the Issuer and of no other person. The Notes rank *pari passu* among themselves.

#### The Issue Price may not be an accurate reflection of the market value of the Notes

The Issue Price in respect of the Notes may not be an accurate reflection of the market value of the Notes. The Issue Price in respect of the Notes may take into account, among other things, the distribution fee payable to any appointed distributor of the Notes with respect to the offer and sale of the Notes. In addition, the price at which the Notes may be sold in secondary market transactions may be lower than the Issue Price.

#### Repayment of principal may be at risk and may be substantially less than the amount originally invested

The terms of Notes may specify a minimum amount payable in respect of the redemption of such Notes upon the occurrence of a Mandatory Early Redemption event and/or at maturity (the "**Capital Protection**"). The level of Capital Protection may be expressly stated as a percentage of the nominal amount of each Note at issuance or may be inherent in the formula or formulae for determining the amount payable on the redemption of such Notes. Where there is no Capital Protection, or where the level of Capital Protection is less than 100 per cent. of the nominal amount of each Note at issuance, the amount payable upon redemption of the Notes may be significantly less than the amount originally invested and in certain circumstances may be nil.

Generally, where no specific Capital Protection is specified in the applicable Final Terms, or where such Capital Protection is specified to be less than 100 per cent. of the nominal amount of each Note, the return of capital at maturity will only be protected so long as Final Price$_{Worst}$ is not, as specified in the applicable Final Terms, either (i) less than or (ii) equal to or less than either Strike Price$_{Worst}$ or, where applicable, the product of such Strike Price$_{Worst}$ and either the Barrier Percentage or the Strike Price Adjustment Percentage. If the Final Price$_{Worst}$

is less than any such percentage, an investment in the Notes will be exposed to the negative performance of the Worst Performing Shares and consequently the Final Redemption Amount, or the cash equivalent value of any Physical Settlement Amount, will be less than the amount originally invested in the Notes. Where a Barrier Percentage or Strike Price Adjustment Percentage is specified in the applicable Final Terms, prospective investors should understand that the higher any such Barrier Percentage or Strike Price Adjustment Percentage is, the more repayment of principal at maturity will be at risk.

*A Mandatory Early Redemption Event may occur*

The Notes will be automatically redeemed prior to the Maturity Date if a Mandatory Early Redemption Event occurs. The Mandatory Early Redemption Amount payable upon the occurrence of a Mandatory Early Redemption Event may be significantly less than the amount originally invested and in certain circumstances may be zero. In addition, a Noteholder may not be able to reinvest the redemption proceeds in a comparable security and receive a return on investment which is as high as that of the Notes. The Issuer is not liable for any disadvantage a Noteholder may incur in respect of the new investment or non-investment of its capital.

*Factors affecting the Shares and payments under the Notes*

Prospective investors in the Notes should be familiar with investments in the global capital market and with derivatives and the Shares generally. Changes in the price or market value of the Shares of each Share Issuer and/or changes in the circumstances of any Share Issuer may result in sudden and large fluctuations in the value of the Notes. The value of the Shares of each Share Issuer may vary over time and may increase or decrease by reference to a variety of factors, which may include, but are not limited to, changes in supply and demand relationships, corporate actions and macro economic factors. Fluctuations in the value of the Shares of any one Share Issuer may be offset or intensified by fluctuations in the value of the Shares of the other Share Issuers.

*Investing in the Notes is not the same as investing in the Shares*

Prospective investors should be aware that the market value of the Notes may not have a direct relationship with the prevailing price of the Shares, in that changes in the prevailing price of the Shares will not necessarily result in a comparable change in the market value of the Notes.

Because the amount to be repaid at maturity of the Notes is not dependant on the average value of the Shares of each Share Issuer but rather on the performance of the Worst Performing Shares, it is likely that the value of the Notes will be correlated to the performance of such Worst Performing Shares. In addition, a specific event affecting the Shares of any one Share Issuer could have an adverse effect on the value of the Notes. For example, if a Trigger Event is specified in the applicable Final Terms, the occurrence of such event in relation to the Shares of any one of the Share Issuers is likely to affect negatively the value of the Notes since it would make it more likely that the Notes are redeemed at an amount which is less than the amount originally invested in the Notes.

Finally, prospective investors should note that dividends paid to holders of the Shares of any Share Issuer will not be paid to the Issuer or to the Noteholders. The return on the Notes will thus not reflect any dividends which would be paid to investors that have made a direct investment in the Shares of any Share Issuer. Consequently, the return on the Notes may be less than the return from a direct investment in the Shares of any Share Issuer.

***Historical performance of the Shares of a Share Issuer should not be taken as an indication of the future performance of such Shares during the term of the Notes***

The Final Terms may contain historical performance of the Shares of a Share Issuer for information purposes. The actual performance of such Shares over the term of the Notes may bear little relation to the historical performance of the Shares. Fluctuations in the performance of a Share make the amount payable at maturity or upon redemption difficult to predict.

***Adjustments of the terms of the Notes and cancellation of the Notes upon the occurrence of certain events relating to the Shares***

The Calculation Agent has certain discretions to determine whether certain events, as set out in *Information Relating to Autocallable Share Basket Linked Notes* below, have occurred, and the consequences thereof.

For example, the Calculation Agent may determine that a market disruption in respect of the Shares of any Share Issuer has occurred or exists at a relevant time or that an adjustment to the terms and conditions of the Notes is required following the occurrence of a corporate action in respect of any such Shares. Any such determination may have an adverse impact on the value of the Notes.

In addition, in certain circumstances, the Issuer may be entitled to cancel the Notes and, if permitted by applicable law, pay each Noteholder an amount as determined by the Calculation Agent in its sole and absolute discretion by reference to the fair market value of the Notes less the costs incurred by the Issuer in unwinding any related hedging arrangements. Prospective investors should note that such amount may be less than the Issue Price of the Notes or the amount required to be paid for acquiring the Notes, and may even be nil.

Finally, prospective investors should note that any discretion exercised by, or any determination made by the Calculation Agent shall (in the absence of manifest error) be binding.

***Substitution of the Shares in the Share Basket***

The Calculation Agent may replace the Shares of any Share Issuer by other shares as a consequence of any one or more Extraordinary Events. Such replacement shares will, to the extent practicable, be selected from the same industry, be denominated in the same currency and have a similar market capitalisation to the relevant replaced Shares. Such substitution may have an adverse impact on the value of the Notes. Any such discretion exercised by, or any calculation made by, the Calculation Agent (in the absence of manifest error) shall be binding.

***Risk-excluding or risk-limiting transactions***

Prospective investors may not rely upon being able to enter into transactions which may exclude or limit loss exposure to the Notes during the term of the Notes. The possibility of entering into risk-excluding or risk-limiting transactions depends in particular on market conditions and the relevant underlying circumstances. Noteholders may be able to enter into such transactions only at an unfavourable market price resulting in an additional loss for such Noteholders.

Prospective investors intending to purchase Notes to hedge the market risk associated with investing in the Shares of any Share Issuer should be aware of the difficulties associated therewith. For example, the value of the Notes may not exactly correlate with the value of such Shares.

*Principal risks related to Physical Settlement*

In the event that Physical Settlement applies (as provided in the applicable Final Terms), the value of the Shares to be delivered as described herein may be less than the value of such Shares as of the issue date of the Notes, and may in fact be nil. An investor may thus sustain a total loss of the amounts invested in the Notes. In addition, if a Settlement Disruption Event occurs in respect of the Maturity Date, settlement may be indefinitely postponed if delivery of the relevant Shares cannot be effected in a commercially reasonable manner. The occurrence of such postponement may have an adverse effect on the value of an investment in the Notes.

**Addition to Taxation in relation to Autocallable Share Basket Linked Notes**

(A)    **United States Taxation**

In relation to Autocallable Share Basket Linked Notes, the section entitled **UNITED STATES TAXATION** set out in the Base Prospectus is supplemented as follows:

The following section is inserted after the section entitled "Treatment of Notes as Indebtedness" and before the section entitled "Treatment of the Guarantees":

**"Treatment of Notes as Other Than Indebtedness**

Where a Note is not fully principal protected and, therefore, may not be characterized as indebtedness for U.S. federal income tax purposes and the Notes are linked to a Basket containing one or more shares issued by a U.S. issuer, it is possible that payments of principal, interest or disposition proceeds on the Note may be characterized, in whole or in part, as U.S. source income and may be subject to U.S. income or withholding tax. Where this is the case, such payments may be made subject to U.S. withholding tax, generally at a rate of 30% or at such other rate as may be available under the provisions of any applicable double tax treaty."

(B)    **United Kingdom Taxation**

In relation to Autocallable Share Basket Linked Notes, the section entitled **UNITED KINGDOM TAXATION** set out in the Base Prospectus is supplemented as follows:

After the introductory paragraph and before section A, a new heading: **"A. UK Withholding Tax"** is inserted.

The next heading "A. UK Withholding Tax on Payments of UK Source Interest" is renumbered and replaced with **"A1. UK Withholding Tax on Payments of UK Source Interest"**.

The paragraphs after the amended title are not amended. The following section is inserted before the section entitled "B. Payments by Guarantor":

**"A2. UK Withholding Tax on Other UK Source Payments**

Where a payment on a Note does not constitute interest, and the payment has a United Kingdom source, it may be subject to United Kingdom withholding tax if, for example, it constitutes (or is treated as) an annual payment or a manufactured payment for United Kingdom tax purposes. Where a payment is subject to United Kingdom withholding tax, depending on the nature of the payment (which will be determined by, amongst other things, the terms and conditions specified by the Final Terms of the Note), the payment may fall to be made under deduction of United Kingdom tax (the rate of withholding depending on the nature of the payment), subject to any exemption from withholding which may apply and to such relief as may be available under the provisions of any applicable double tax treaty."

Paragraph 1 of the section entitled "E. Other Rules Relating to United Kingdom Withholding Tax", is amended as follows:

The words "or any other payment" are inserted after "Where interest" and before "has been paid under deduction of United Kingdom income tax".

**Information Relating to Autocallable Share Basket Linked Notes**

(A)    **General Description of Autocallable Share Basket Linked Notes**

Terms used in this paragraph shall be deemed to be defined as set out in the Terms and Conditions of the Notes. Notes issued pursuant to the Program may include Notes ("**Autocallable Share Basket Linked Notes**") linked to a Share Basket under the terms of which the Notes may redeem early on one or more Mandatory Early Redemption Dates at the applicable Mandatory Early Redemption Amount if a Mandatory Early Redemption Event occurs. In addition, Autocallable Share Basket Linked Notes may provide that Interest Amounts and/or a Final Redemption Amount linked to the performance of the Shares shall be payable on the relevant Interest Payment Dates and/or the Maturity Date. Autocallable Share Basket Linked Notes may be capital protected or not, and may redeem through Cash Settlement or Physical Settlement.

*Payments on Autocallable Share Basket Linked Notes - Interest*

*Share Basket Linked Interest Amounts*: Autocallable Share Basket Linked Notes may include Notes under the terms of which an amount is payable on specified interest payment dates which is determined by reference to the performance of some or all of the Shares in the Share Basket and whether such performance exceeds, is equal to and/or falls short of one or more specified thresholds, as specified in the applicable Final Terms. For example, the applicable Final Terms may specify that a particular Interest Amount shall be payable if on a particular Valuation Date the Closing Price$_{Worst}$ is less than the Strike Price$_{Worst}$ but greater than the Barrier Price$_{Worst}$.

*Payments on Autocallable Share Basket Linked Notes - Final Redemption Amount*

*Share Basket Linked Final Redemption Amount:* Autocallable Share Basket Linked Notes may include Notes under the terms of which the Final Redemption Amount payable at maturity of the Notes is determined by reference to the performance of all or some of the Shares in the Share Basket (the "**Share Basket Linked Final Redemption Amount**"). The Final Redemption amount may be determined in accordance with one of the following methodologies, or a combination thereof:

*Method A*

The Share Basket Linked Final Redemption Amount will be calculated as an amount per Note as follows:

(i)    If the Final Price of the Shares of each Share Issuer is (as specified in the Final Terms) either (i) greater than or (ii) equal to or greater than the corresponding Strike Price of the Shares of each such Share Issuer:

**Calculation Amount x (100% + additional percentage)**

(ii)    If the Final Price of the Shares of any Share Issuer is (as specified in the Final Terms) either (i) equal to or less than or (ii) less than the corresponding Strike Price of the Shares of such Share Issuer:

**Calculation Amount x 100%**

*Method B*

The Share Basket Linked Final Redemption Amount will be calculated as an amount per Note as follows:

(i)     If the Final Price of the Shares of each Share Issuer is (as specified in the Final Terms) either (i) greater than or (ii) equal to or greater than the corresponding Strike Price of the Shares of each such Share Issuer:

**Calculation Amount x (100% + additional percentage)**

(ii)    If the Final Price of the Shares of any Share Issuer is (as specified in the Final Terms) either (i) equal to or less than or (ii) less than the corresponding Strike Price of the Shares of such Share Issuer:

**Calculation Amount x (Final Price$_{Worst}$/Strike Price$_{Worst}$)**

*Method C*

The Share Basket Linked Final Redemption Amount will be determined as follows:

(i)     If Final Price$_{Worst}$ is (as specified in the Final Terms) either (i) greater than or (ii) greater than or equal to Adjusted Strike Price$_{Worst}$, each Note shall be redeemed at a Final Redemption Amount in the Specified Currency determined by the Calculation Agent on the Final Valuation Date as follows:

**Calculation Amount x (100% + additional percentage)**

(ii)    If Final Price$_{Worst}$ is (as specified in the Final Terms) either (i) equal to or less than or (ii) less than Adjusted Strike Price$_{Worst}$, Physical Settlement shall apply.

*Method D*

The Share Basket Linked Final Redemption Amount will be calculated as an amount per Note as follows:

(i)     If Final Price$_{Worst}$ is (as specified in the Final Terms) either (i) greater than or (ii) equal to or greater than the product of (a) the Barrier Percentage and (b) Strike Price$_{Worst}$:

**Calculation Amount x (100% + additional percentage)**

(ii)    If Final Price$_{Worst}$ is (as specified in the Final Terms) either (i) equal to or less than or (ii) less than the product of (a) the Barrier Percentage and (b) Strike Price$_{Worst}$:

**Calculation Amount x (Final Price$_{Worst}$/Strike Price$_{Worst}$)**

*Method E*

The Share Basket Linked Final Redemption Amount will be calculated as an amount per Note as follows:

(i)    If the Final Price of the Shares of each Share Issuer is (as specified in the Final Terms) either (i) greater than or (ii) equal to or greater than the corresponding Strike Price of the Shares of each such Share Issuer:

**Calculation Amount x (100% + additional percentage)**

(ii)    If Final Price$_{Worst}$ is (as specified in the Final Terms) either (i) greater than or (ii) equal to or greater than Adjusted Strike Price$_{Worst}$ but either (i) less than or (ii) equal to or less than Strike Price$_{Worst}$:

**Calculation Amount x 100%**

(iii)    If Final Price$_{Worst}$ is (as specified in the Final Terms) either (i) equal to or less than or (ii) less than Adjusted Strike Price$_{Worst}$:

**Calculation Amount x (Final Price$_{Worst}$/Adjusted Strike Price$_{Worst}$)**

*Method F*

The Share Basket Linked Final Redemption Amount will be calculated as an amount per Note as follows:

(i)    If a Trigger Event has occurred or is deemed to have occurred and Final Price$_{Worst}$ is (as specified in the Final Terms) either (i) less than or (ii) equal to or less than Strike Price$_{Worst}$:

**Calculation Amount x (Final Price$_{Worst}$/Strike Price$_{Worst}$)**

(ii)    If a Trigger Event has occurred or is deemed to have occurred and Final Price$_{Worst}$ is (as specified in the Final Terms) either (i) equal to or greater than or (ii) greater than Strike Price$_{Worst}$:

**Calculation Amount x (100% + additional percentage)**

(iii)    If a Trigger Event has not occurred or is not deemed to have occurred and Final Price$_{Worst}$ is (as specified in the Final Terms) either (i) less than or (ii) equal to or less than Strike Price$_{Worst}$:

**Calculation Amount x 100%**

(iv)    If a Trigger Event has not occurred or is not deemed to have occurred and Final Price$_{Worst}$ is (as specified in the Final Terms) either (i) equal to or greater than or (ii) greater than Strike Price$_{Worst}$:

**Calculation Amount x (100% + additional percentage)**

*Autocallable Share Basket Linked Notes - Mandatory Early Redemption*

The performance of some or all of the Shares, as recorded on particular dates, may result in the redemption of Notes prior to their scheduled maturity date because a Mandatory Early Redemption Event has occurred. If such event occurs, the Notes may be redeemed at a

premium to their nominal amount, at their nominal amount or at an amount which is less than their nominal amount, depending on the definition of the Mandatory Early Redemption Rate in the applicable Final Terms.

(B)    **Information on the Shares and the Share Issuers**

Terms used in this paragraph shall be deemed to be defined as set out in the Terms and Conditions of the Notes. The Shares to which any Autocallable Share Basket Linked Notes are linked will be shares which are included in one of the indices specified below and/or listed and/or admitted to trading on one or more stock exchanges specified below.

The Final Terms will specify in respect of the Shares of each Share Issuer (i) the name of such Share Issuer, (ii) the securities identification code thereof and (iii) the Bloomberg Code (or an indication of the page(s) of the Reuters Service and/or other source) where information about the past and further performance of the Shares and their volatility may be found.

The Shares to which any issue of Autocallable Share Basket Linked Notes are linked may be included in one (or more) of the following indices:

| Index | Bloomberg Code |
|---|---|
| CAC 40 Index | CAC |
| CECE Traded Index | CECEEUR |
| Czech Traded Index | CCTX |
| DAX Index | DAX |
| DAX MidCap Index | MDAX |
| DB India Index | DIAV |
| DivDAX Index (Price / Total Return) | DDAXK / DIVDAX |
| Dow Jones Dividend Select US Index | DJDVY |
| Dow Jones Euro STOXX 50 Index | SX5E |
| Dow Jones Euro STOXX Select Dividend Index | SD3E |
| Dow Jones Global Titans 50 Index | DJGT |
| Dow Jones Industrial Average Index | INDU |
| Dow Jones Islamic Market Titans 100 Index | IMXL |
| Dow Jones STOXX 50 PR Index | SX5P |
| Dow Jones STOXX MID 200 Index | MCXP |
| Dow Jones STOXX Select Dividend 30 Index | SD3P |
| ECPI Ethical Euro Tradable Index (Price / Total Return) | ECAPTRDP / ECAPTRDR |
| ECPI Ethical Global Tradable Index (Price / Total Return) | ECAPGTP / ECAPGTR |

| | |
|---|---|
| EPRA Euro Zone Index | EPEU |
| European Public Real Estate Index | EPRA |
| FTSE 100 Index | UKX |
| FTSE 250 Index | MCX |
| FTSE4Good Europe 50 Index | 4EU5X Index |
| FTSE/JSE Africa TOP40 IX Index | TOP40 |
| FTSE Eurofirst 80 Index | FTEF80 |
| FTSE Nordic 30 Index (EUR / SEK) | FTNOEUR / FTNOTRSK |
| FTSE Xinhua 50 Index | XIN50 |
| Hang Seng Index | HSI |
| Hang Seng China Enterprises Index | HSCEI |
| Hungarian Traded Index | CHTX |
| IBEX 35 Index | IBEX |
| KOSPI 200 Index | KOSPI2 |
| Malaysian Composite Index | KLCI |
| MSCI Malaysia Index | MXMY |
| MSCI Taiwan Index | TWY |
| NASDAQ 100 Index | NDX |
| Nikkei 225 Index | NKY |
| OMX Index | OMX |
| OMX Copenhagen 20 Index | KFX |
| Philadelphia Stock Exchange Housing Sector Index | HGX |
| Polish Traded Index | CPTX |
| Russian Depositary Index | RDX |
| S&P/ASX 200 Index | AS51 |
| S&P/TSX Composite Index | SPTSX |
| S&P 500 Index | SPX |
| S&P/ASX 200 Index | AS51 |
| S&P/ASX 200 Property Trust Index | AS51PROP |

| | |
|---|---|
| S&P Asia 50 Index | SPA50 |
| S&P BRIC 40 Index (Price / Total Return) | SPPRBRIC / SPTRBRIC |
| S&P BRIC Shariah Index (Price / Total Return / USD / EUR) | SPSHBR<br>SPSHBRT<br>SPSHBRE<br>SPSHBRET |
| S&P Dividend Growth Index (EUR / USD) | SPDGEEP / SPDGUDP |
| S&P Europe 350 Index | SPEURO |
| S&P Global 100 Index | OOI |
| S&P Global Clean Energy Index (Price / Total Return / USD / EUR) | SPGTCLEN / SPGTCLTR / SPGTCLEE / SPGTCTRE |
| S&P Global Infrastructure Index (Price / Total Return / USD / EUR) | SPGTINFR / SPGTINTR / SPGTINFE / SPGTITRE |
| S&P Global Water Index (Price / Total Return / USD / EUR) | SPGTAQUA / SPGTAQTR / SPGTAQUE / SPGTATRE |
| S&P Infrastructure Shariah Index (Price / Total Return / USD / EUR) | SPSHIF<br>SPSHIFT<br>SPSHIFE<br>SPSHIFN |
| S&P Listed Private Equity Index (Price / Total Return / USD / EUR) | SPLPEQTY / SPLPEQTR / SPLPEQTE / SPLPETRE |
| S&P MIB Index | SPMIB |
| S&P Pan Asia 50 High Dividend Index (Price / Total Return) | SPA5HDP / SPA5HDT |
| S&P South East Asia 40 Index (Price / Total Return) | SPSEA4DP / SPSEA4DT |
| Sing Properties Equity Index | SESPROP |
| Swiss Market Index - SMI | SMI |
| Tel Aviv 25 Index | TA-25 |
| TOPIX Index | TPX |
| TOPIX Real Estate Index | TPREAL |
| TSE REIT Index | TSEREIT |
| TWSE/TAIEX Index | TWSE |
| VINX 30 Index | VINX30 |

The stock exchanges to be specified in the Final Terms as Exchange for the Shares of each Share Issuer may be one or more of the stock exchanges listed in the table below, the website address of each of which is also specified below:

| Stock Exchange | Website address of Stock Exchange |
|---|---|
| American Stock Exchange – AEX | www.amex.com |
| Amsterdam Stock Exchange - Euronext-Amsterdam | www.euronext.com |
| Australian Securities Exchange - ASX | www.asx.com.au |
| Brussels Stock Exchange - Euronext-Brussels | www.euronext.com |
| Copenhagen Stock Exchange - OMX | www.omxgroup.com |
| Frankfurt Stock Exchange - Deutsche Börse | www.deutsche-boerse.com |
| Helsinki Stock Exchange – OMX | www.omxgroup.com |
| Hong Kong Stock Exchange | www.hkex.com.hk |
| Johannesburg Stock Exchange – JSE | www.jse.co.za |
| Korean Stock Exchange – KRX | www.kse.or.kr |
| Lisbon Stock Exchange - Euronext-Lisbon | www.euronext.com |
| London Stock Exchange - LSE | www.londonstockexchange.com |
| Madrid Stock Exchange – Bolsa de Madrid | www.bolsamadrid.es |
| Malaysia Stock Exchange – Bursa Malaysia | www.klse.com.my |
| Milan Stock Exchange - Borsa Italiana | www.borsaitaliana.it |
| National Association of Securities Dealers Automated Quotations - NASDAQ | www.nasdaq.com |
| New York Stock Exchange – NYSE | www.nyse.com |
| Oslo Børs – OMX | www.oslobors.no |
| Paris Stock Exchange - Euronext-Paris | www.euronext.com |
| Philadelphia Stock Exchange | www.phlx.com |
| Prague Stock Exchange | www.pse.cz |
| Singapore Stock Exchange | www.ses.com.sg |
| Stockholm Stock Exchange – OMX | www.omxgroup.com |
| SWX Swiss Exchange | www.swx.com |

| | |
|---|---|
| Taiwan Stock Exchange | www.tse.com.tw/ |
| Tel Aviv Stock Exchange - TASE | www.tase.co.il |
| Tokyo Stock Exchange | www.tse.or.jp |
| Vienna Stock Exchange – Wiener Börse | www.wienerborse.at |
| Virt-x | www.virt-x.com |
| Warsaw Stock Exchange | www.gpw.pl |
| Bombay Stock Exchange | www.bseindia.com |

(C)    **Additional Definitions, Additional or Amended Terms and Conditions and Disruption Events Applicable to Autocallable Share Basket Linked Notes**

With respect to Autocallable Share Basket Linked Notes of any Series, the Terms and Conditions of the Notes are hereby amended and, when appropriate, restated, as set forth below. The Terms and Conditions of the Notes as so amended and, when appropriate, restated, will be incorporated by reference in each temporary or permanent global Note in bearer form, each global Note in registered form and will be attached to each definitive Note, in the latter case, only if permitted by the relevant stock exchange or other relevant authority (if any) and agreed by the relevant Issuer and the relevant Dealer(s) at the time of issue, but if not so permitted and agreed, such Terms and Conditions will be endorsed upon such definitive Note.

1.    **Definitions and General Terms**

Capitalised terms used in this Supplement will have the same meaning as is given to them in the Base Prospectus, unless otherwise defined below.

The following definitions shall apply in this Supplement and shall be included in the Terms and Conditions of the Autocallable Share Basket Linked Notes of any Series, subject as otherwise provided in the applicable Final Terms:

"**Adjusted Strike Price**" means, in relation to the Shares of a Share Issuer, an amount equal to the product of (i) the relevant Strike Price Adjustment Percentage and (ii) the Strike Price of such Shares;

"**Adjusted Strike Price$_{Worst}$**" means the Adjusted Strike Price in respect of the Worst Performing Shares;

"**Barrier Percentage**" means, in relation to the Shares of a Share Issuer, the percentage specified in the applicable Final Terms;

"**Barrier Price**" means, in relation to the Shares of a Share Issuer, an amount equal to the product of (i) the relevant Barrier Percentage and (ii) the Strike Price of such Shares;

"**Barrier Price$_{Worst}$**" means, in relation to the Worst Performing Shares, an amount equal to the product of (i) the relevant Barrier Percentage and (ii) the Strike Price$_{Worst}$;

"**Calculation Agent**" means Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE, or any other entity as specified in the applicable Final Terms;

"**Cancellation Amount**" means an amount per Note in the Specified Currency:

(i)    determined by the Calculation Agent in its sole and absolute discretion acting in good faith in order to produce a commercially reasonable result and determined as of the date that the Notes are cancelled or, as the case may be, one or more Share Issuers are removed from the Share Basket or, if the Calculation Agent determines that would not be commercially reasonable, as

of such date following the date that the Notes are cancelled or, as the case may be, one or more Share Issuers are removed from the Share Basket as the Calculation Agent determines would be commercially reasonable; and

(ii)    to be paid to the Noteholders following a cancellation or removal of one or more Share Issuers from the Share Basket, being (a) the fair market value of a Note or, as the case may be, the amount of losses or gains resulting from the removal or one or more Share Issuers from the Share Basket, and (b) adjusted to account fully for any losses, expenses and costs to the Issuer (or any of its affiliates) of unwinding any underlying or related hedging and funding arrangements, all as determined by the Calculation Agent in its sole and absolute discretion;

and, in determining such amount, the Calculation Agent may in its sole and absolute discretion, consider any relevant information, including, without limitation, one or more of the following types of information:

(a)    quotations (either firm or indicative) supplied by one or more third parties that may take into account the current creditworthiness of the Calculation Agent at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Calculation Agent and the third party providing the quotation;

(b)    information consisting of relevant market data in the relevant markets supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads correlation or other relevant market data in the relevant market; or

(c)    information of the types described in (a) or (b) above from internal sources (including any affiliates of the Calculation Agent) if that information is of the same type used by the Calculation Agent in the regular course of its business for the valuation of similar transactions;

**"Cash Settlement"** has the meaning given in Condition 8(a) (*At Maturity*);

**"Clearance System"** means Euroclear and/or Clearstream, Luxembourg or any successor to any such clearance system as determined by the Calculation Agent or, if such clearance system does not or ceases to settle trades in the Shares, such other clearance system as is determined by the Calculation Agent to be the principal domestic clearance system customarily used for settling trades in the relevant Shares;

**"Clearance System Business Day"** means, in respect of a Clearance System, any day on which such Clearance System is (or but for the occurrence of a Settlement Disruption Event, would have been) open for the acceptance and execution of settlement instructions;

"**Closing Price**" means, in relation to the Shares of a Share Issuer and any Scheduled Trading Day, the price per Share in respect of such Shares on the Exchange at the Valuation Time on such day, as determined by the Calculation Agent;

"**Closing Price**ₜₒₚₛₜ" means, in relation to the Worst Performing Shares and any Scheduled Trading Day, the Closing Price in respect of such Worst Performing Shares on such day, as determined by the Calculation Agent;

"**Disrupted Day**" means any Scheduled Trading Day on which the relevant Exchange or Related Exchange fails to open for trading during its regular trading session or on which a Market Disruption Event has occurred;

"**Early Closure**" means, in respect of the Shares of a Share Issuer, the closure on any Exchange Business Day of the relevant Exchange or Related Exchange prior to its Scheduled Closing Time unless, where the price of the relevant Shares is to be determined at the Valuation Time, such earlier closing time is announced by such relevant Exchange or Related Exchange at least one hour prior to the earlier of (i) the actual closing time for the regular trading session on the relevant Exchange or Related Exchange on such Exchange Business Day and (ii) the submission deadline for orders to be entered into the relevant Exchange or Related Exchange system for execution at the Valuation Time on such Exchange Business Day;

"**Exchange**" means, in respect of the Shares of a Share Issuer, the exchange or quotation system specified as such for such Shares in the applicable Final Terms or any successor to such exchange or quotation system or any substitute exchange or quotation to which trading in such Shares has temporarily relocated, provided however that if the specified Exchange ceases to list or otherwise include the relevant Shares, the Calculation Agent will select another exchange or quotation system (if any) in relation to such Shares; and "**Exchanges**" means, as the context requires, such stock exchanges or quotation systems in respect of the Shares of all of the Share Issuers;

"**Exchange Business Day**" means any Scheduled Trading Day on which the relevant Exchange and the Related Exchange are open for trading during their respective regular trading sessions, notwithstanding any such relevant Exchange or Related Exchange closing prior to its Scheduled Closing Time;

"**Exchange Disruption**" means, in respect of the Shares of a Share Issuer, any event (other than an Early Closure) that disrupts or impairs (as determined by the Calculation Agent) the ability of market participants in general (i) to effect transactions in, or obtain market values for, such Shares on the relevant Exchange, or (ii) to effect transactions in, or obtain market values for, futures or options contracts relating to such Shares on the relevant Related Exchange;

"**Extraordinary Dividend**" means a dividend or portion thereof characterised as such by the Calculation Agent;

"**Extraordinary Event**" means a Merger Event, Tender Offer, Nationalisation, Insolvency, Delisting or Hedging Disruption (as such terms are defined in Condition 24 (*Potential Adjustment Events and Extraordinary Events*);

"**Final Price**" means in relation to the Shares of a Share Issuer, the Closing Price of such Shares on the Final Valuation Date;

"**Final Valuation Date**" means the date specified as such in the applicable Final Terms, or if such day is not a Scheduled Trading Day, the next following Scheduled Trading Day, and subject to Condition 23 (*Disrupted Days*);

"**Fractional Share Amount**" has the meaning given in Condition 25(A)(ii) (*Fractions of a Share*);

"**Initial Valuation Date**" means the date specified as such in the applicable Final Terms, or if such day is not a Scheduled Trading Day, the next following Scheduled Trading Day, and subject to Condition 23 (*Disrupted Days*);

"**Interest Payment Date**" means each date specified as such in the applicable Final Terms, subject to the relevant Business Day Convention;

"**Market Disruption Event**" means, in respect of the Shares of a Share Issuer, the occurrence or existence of (i) a Trading Disruption, (ii) an Exchange Disruption, which in either case the Calculation Agent determines is material and, where the price of the relevant Shares is to be determined at the Valuation Time, which occurs at any time during the one hour period that ends at the relevant Valuation Time, or (iii) an Early Closure;

"**Number of Shares**" means, in respect of each Note and in relation to the Shares of a Share Issuer, the number of Shares specified as such in the applicable Final Terms, provided that if no such number is specified in the applicable Final Terms in respect of the Shares of any Share Issuer, the Number of Shares in respect of such Share Issuer shall be equal to the quotient of the Aggregate Nominal Amount and the Strike Price in respect of such Shares, or shall otherwise be determined in accordance with such method as specified in the applicable Final Terms;

"**Number of Shares**$_{\text{Worst}}$" means the Number of Shares in respect of the Worst Performing Shares;

"**Performance**" means, in relation to the Shares of a Share Issuer, a value determined by the Calculation Agent in accordance with the following formula:

**Performance = Final Price/Strike Price**

"**Physical Settlement**" has the meaning given in Condition 8(a) (*At Maturity*);

"**Physical Settlement Amount**" has the meaning given Condition 25(A) (*Physical Settlement Amount*);

"**Proceeds of Sale**" has the meaning given in Condition 25(C) (*Procedure for Physical Settlement*);

"**Related Exchange**" means, in respect of the Shares of a Share Issuer, the exchange specified as such for such Shares in the applicable Final Terms, any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in futures or options contracts relating to such Shares has temporarily relocated (provided that the Calculation Agent has determined that there is comparable liquidity relative to the futures or options contracts relating to such Shares on such temporary substitute exchange or quotation system as on the original Related Exchange); and "**Related Exchanges**" means, as the context requires, such exchanges or quotation systems in respect of all or any one or more of the Shares; provided that where "**All Exchanges**" is specified as the Related Exchange in respect of the Shares of a Share Issuer in the applicable Final Terms, "**Related Exchange**" shall mean each exchange or quotation system where trading has a material effect (as determined by the Calculation Agent) on the overall market for futures or options contracts relating to such Shares;

"**Scheduled Closing Time**" means, in respect of a relevant Exchange or Related Exchange and a Scheduled Trading Day, the scheduled weekday closing time of such relevant Exchange or Related Exchange on such Scheduled Trading Day, without regard to after hours or any other trading outside of the regular trading session hours;

"**Scheduled Trading Day**" means any day on which each Exchange and each Related Exchange are scheduled to be open for trading for their respective regular trading sessions;

"**Settlement Disruption Event**" means, in respect of the Shares of a Share Issuer, an event beyond the control of the Issuer as a result of which the relevant Clearance System cannot clear the transfer of such Shares;

"**Share Basket**" means the basket of shares (each a "**Share**" and collectively the "**Shares**" which shall refer to any one or more of the Shares included in the Share Basket, as the context requires) of the companies described in the applicable Final Terms or any Replacement Share Issuer (as defined below) selected by the Calculation Agent in accordance with the terms hereof (each a "**Share Issuer**");

"**Strike Price**" means, in relation to the Shares of a Share Issuer, the Closing Price of such Shares on the Initial Valuation Date;

"**Strike Price Adjustment Percentage**" means, in relation to the Shares of a Share Issuer, the percentage specified in the applicable Final Terms;

"**Strike Price$_{Worst}$**" means the Strike Price of the Worst Performing Shares;

"**Trading Disruption**" means, in respect of the Shares of a Share Issuer, any suspension of or limitation imposed on trading by the relevant Exchange or Related Exchange or otherwise and whether by reason of movements in price exceeding limits permitted by the relevant Exchange or Related Exchange or otherwise (i) relating to the

relevant Share on the relevant Exchange, or (ii) in futures or options contracts relating to the relevant Share on the relevant Related Exchange;

"**Trigger Event**" means either a Trigger Event (Closing Observation), a Trigger Event (Intraday Observation) or such other event as specified in the applicable Final Terms;

"**Trigger Event (Closing Observation)**" means the determination by the Calculation Agent that on any Trigger Event Observation Date the Closing Price of the Shares of any Share Issuer is less than or equal to the relevant Trigger Price, as determined by the Calculation Agent;

"**Trigger Event (Intraday Observation)**" means the determination by the Calculation Agent that at any time during the regular trading session hours on any Trigger Event Observation Date the price of the Shares of any Share Issuer is less than or equal to the relevant Trigger Price, as determined by the Calculation Agent;

"**Trigger Event Observation Date**" means each Scheduled Trading Day during the Trigger Event Observation Period *provided that* if at any relevant time on any such Scheduled Trading Day there is a Market Disruption Event, as determined by the Calculation Agent in its sole and absolute discretion, then notwithstanding the fact that there is a Market Disruption Event on such Trigger Event Observation Date, the Calculation Agent shall determine in good faith and in a commercially reasonable manner whether a Trigger Event has occurred during such Market Disruption Event;

"**Trigger Event Observation Period**" means the period from and including the Initial Valuation Date to and including the Final Valuation Date;

"**Trigger Percentage**" means, in relation to the Shares of a Share Issuer, the percentage specified in the applicable Final Terms;

"**Trigger Price**" means, in relation to the Shares of a Share Issuer, an amount equal to the product of (i) the relevant Trigger Percentage and (ii) the Strike Price of such Shares;

"**Valuation Date**" means each date specified as such in the applicable Final Terms (including the Initial Valuation Date and the Final Valuation Date), or if such day is not a Scheduled Trading Day, the next following Scheduled Trading Day, and subject to Condition 23 (*Disrupted Days*);

"**Valuation Time**" means in respect of the Shares of a Share Issuer, the official close of trading on the relevant Exchange; and

"**Worst Performing Shares**" means the Shares of the Share Issuer with the lowest Performance, as determined by the Calculation Agent.

2.    **Amendments to, and Restatements of, the Terms and Conditions**

2.1    The following Condition 3(f) *Interest linked to a Share Basket* is inserted in Condition 3 (*Interest*):

"(f) *Interest linked to a Share Basket*

Interest linked to a Share Basket may become payable on each Note on any Interest Payment Date (including if so specified the Maturity Date), as may be specified in the applicable Final Terms. Any rights to payment of interest may be conditional upon the satisfaction of all such conditions as may be set forth in the applicable Final Terms.

Subject to Condition 23 (*Disrupted Days*), the Calculation Agent will, at or as soon as practicable after each Valuation Date (except the Initial Valuation Date), determine the interest linked to the Share Basket payable in respect of each Note (the "**Share Basket Linked Interest Amount**") and notify the Fiscal Agent as soon as practicable after calculating the same. Each Share Basket Linked Interest Amount shall be calculated in accordance with the formulae set forth in the applicable Final Terms and rounding the resultant figure to the nearest sub-unit of the Specified Currency (half a sub-unit being rounded upwards)."

2.2    Condition 8(a) (*At Maturity*) is hereby amended and restated as follows:

"(a)    *At Maturity*

(A)    *Final Redemption Amount*

Unless Physical Settlement applies and unless previously redeemed or purchased or cancelled as specified below, each Note will be redeemed by the Issuer at its Final Redemption Amount (the "**Final Redemption Amount**") specified in, or determined in the manner specified in, the applicable Final Terms in the relevant Specified Currency (except as otherwise provided in Condition 6 (*Payment Currency*)) ("**Cash Settlement**"). If applicable, the Calculation Agent will, on or as soon as practicable after the Final Valuation Date, determine the Final Redemption Amount of each Autocallable Share Basket Linked Note and notify the Fiscal Agent as soon as practicable after calculating the same. The Calculation Agent shall calculate the Final Redemption Amount of each Autocallable Share Basket Linked Note in accordance with the formula set forth in the applicable Final Terms and rounding the resultant figure to the nearest sub-unit of the Specified Currency (half a sub-unit being rounded upwards).

(B)    *Physical Settlement*

If the applicable Final Terms so provide, physical settlement shall apply to the Notes, in which case the Issuer shall, on the Maturity Date, deliver the Physical Settlement Amount to or to the order of each Noteholder in accordance with, and subject to, Condition 25 (*Physical Settlement*) ("**Physical Settlement**").

(C)    *Certificates to be Final*

The provisions of Condition 3(b)(vii) (*Certificates to be Final*) shall apply, *mutatis mutandis* to any certificate, communication, opinion, calculation, determination, quotation and decision given, expressed, made or obtained by the Calculation Agent for the purposes of this Condition 8 (*Repayment, Redemption and Repurchase*)."

2.3    The following Condition 8(j) (*Mandatory Early Redemption*) is inserted in Condition 8 (*Repayment, Redemption and Repurchase*):

"(j)    *Mandatory Early Redemption*

Unless the Notes have been previously redeemed or purchased and cancelled, if on any Mandatory Early Redemption Valuation Date a Mandatory Early Redemption Event occurs, then the Notes will be automatically redeemed in whole, but not in part, on the Mandatory Early Redemption Date immediately following such Mandatory Early Redemption Valuation Date and the redemption amount payable by the Issuer on such date upon redemption of each Note shall be an amount in the Specified Currency equal to the relevant Mandatory Early Redemption Amount.

As used herein:

"**Mandatory Early Redemption Amount**" means, in respect of each Mandatory Early Redemption Date, an amount equal to the product of (i) the Calculation Amount and (ii) the relevant Mandatory Early Redemption Rate relating to that Mandatory Early Redemption Date;

"**Mandatory Early Redemption Date**" means each date specified as such in the applicable Final Terms, subject in each case to adjustment in accordance with the Business Day Convention specified in the applicable Final Terms;

"**Mandatory Early Redemption Event**" means an event as further specified in the relevant Final Terms whereby the Closing Price of a specified Share or of all Shares, as the case may be, as determined by the Calculation Agent as of any Mandatory Early Redemption Valuation Date is, as specified in the relevant Final Terms, (i) "greater than", (ii) "greater than or equal to", (iii) "less than" or (iv) "less than or equal to" the Mandatory Early Redemption Price, or as the case may be, any other specified value;

"**Mandatory Early Redemption Price**" means the price per Share specified as such or otherwise determined in the applicable Final Terms;

"**Mandatory Early Redemption Rate**" means, in respect of any Mandatory Early Redemption Date, the rate specified as such in the applicable Final Terms; and

"**Mandatory Early Redemption Valuation Date**" means each Valuation Date (except the Initial Valuation Date and the Final Valuation Date, subject to Condition 23 (*Disrupted Days*).

If the Notes are interest bearing, for the avoidance of doubt, any interest amount applicable to the relevant Mandatory Early Redemption Valuation Date on which the Calculation Agent determines that a Mandatory Early Redemption Event has or is deemed to have occurred shall be payable by the Issuer notwithstanding such occurrence, but no further interest will be payable thereafter."

2.4    Condition 9(a) (*Additional Amounts*) is hereby amended as follows:

the last word of subparagraph (ix) "or" is deleted and subparagraph (x) is deleted in its entirety and replaced with the following:

"(x)    in the case of any tax imposed by the United States, any tax, assessment or other governmental charge imposed in respect of Autocallable Share Basket Linked Notes issued by LBTBV or LBB, that are not fully principal protected (which means that the Final Redemption Amount or the Physical Settlement Amount may be less than the nominal amount of the Notes) and that are linked to a Basket containing one or more shares issued by a U.S. issuer;

(xi)    any combination of items (i) through (x);"

2.5    The following Condition 23 (*Disrupted Days*) is hereby inserted into the Terms and Conditions:

"23    **Disrupted Days**

If, in respect of the Shares of any Share Issuer, any Valuation Date is a Disrupted Day, then the Valuation Date for the Shares of each Share Issuer not affected by the occurrence of a Disrupted Day shall be the scheduled Valuation Date and the Valuation Date for the Shares of each Share Issuer affected by the occurrence of a Disrupted Day shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day relating to such Shares, *provided that* such day shall not be later than, and shall be deemed to be the earlier of (i) the eighth succeeding Scheduled Trading Day and (ii) the third weekday (meaning any day other than a Saturday or a Sunday) immediately prior to the relevant Interest Payment Date, the relevant Mandatory Early Redemption Date or the Maturity Date, as the case may be, notwithstanding that such day is a Disrupted Day in respect of such Share (the "**Deemed Date**") and the Calculation Agent shall determine its good faith estimate of the value for such Shares that would have prevailed but for that Disrupted Day as of the Valuation Time on that Deemed Date."

2.6    The following Condition 24 (*Potential Adjustment Events and Extraordinary Events*) is hereby inserted into the Terms and Conditions:

"24    **Potential Adjustment Events and Extraordinary Events**

(A)    *Definitions*: In these Terms and Conditions, the following terms will have the following meaning:

(i)   **"Delisting"** means that the relevant Exchange announces that pursuant to the rules of such Exchange, the Shares of a Share Issuer cease (or will cease) to be listed, traded or publicly quoted on the relevant Exchange for any reason (other than a Merger Event or Tender Offer) and are not immediately re-listed, re-traded or re-quoted (i) in respect of any Share whose Exchange is located in the United States of America, on the New York Stock Exchange, the American Stock Exchange or the NASDAQ NMS, (ii) in respect of any Share whose Exchange is located in the European Union, in any member state of the European Union and (iii) in respect of any Share whose Exchange is located elsewhere, on an exchange or quotation system located in the same country as the Exchange;

(ii)  **"Hedging Disruption"** means that the Issuer or any of its affiliates is unable, after using commercially reasonable efforts, to (a) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the equity or other price risk (or any other relevant price risk including, but not limited to, the currency risk) of the Issuer issuing and performing its obligations with respect to the Notes, or (b) realise, recover, receive, repatriate, remit or transfer the proceeds of any such transaction(s) or asset(s);

(iii) **"Insolvency"** means that by reason of the voluntary or involuntary liquidation, bankruptcy, insolvency, dissolution or winding-up of or any analogous proceedings affecting a Share Issuer (i) all the Shares of a Share Issuer are required to be transferred to a trustee, liquidator or other similar official or (ii) holders of the Shares of a Share Issuer, become legally prohibited from transferring them;

(iv)  **"Merger Date"** means the closing date of a Merger Event or, where a closing date cannot be determined under the local law applicable to such Merger Event, such other date as determined by the Calculation Agent;

(v)   **"Merger Event"** means, as determined by the Calculation Agent in its sole discretion in respect of any relevant Shares, any (i) reclassification or change of such Shares that results in a transfer of or an irrevocable commitment to transfer all of such Shares outstanding to another entity or person, (ii) consolidation, amalgamation, merger or binding share exchange of the Share Issuer with or into another entity or person (other than a consolidation, amalgamation, merger or binding share exchange in which such Share Issuer is the continuing entity and which does not result in a reclassification or change of all of such Shares outstanding), (iii) takeover offer, tender offer, exchange offer, solicitation, proposal or other event by any entity or person to purchase or otherwise obtain 100 per cent. of the outstanding Shares of the Share Issuer that results in a transfer of or an irrevocable commitment to transfer all such Shares

(other than such Shares owned or controlled by such other entity or person), or (iv) consolidation, amalgamation, merger or binding share exchange of the Share Issuer or its subsidiaries with or into another entity in which the Share Issuer is the continuing entity and which does not result in a reclassification or change of all such Shares outstanding but results in the outstanding Shares (other than Shares owned or controlled by such other entity) immediately prior to such event collectively representing less than 50 per cent. of the outstanding Shares immediately following such event (a "**Reverse Merger**"), in each case if the Merger Date is on or before the Final Valuation Date;

(vi)   "**Nationalisation**" means that all the Shares or all or substantially all the assets of a Share Issuer are nationalised, expropriated or are otherwise required to be transferred to any governmental agency, authority, entity or instrumentality thereof;

(vii)   "**Potential Adjustment Event**" means any of the following:

(1)   a subdivision, consolidation or reclassification of Shares (unless resulting in a Merger Event) or, a free distribution or dividend of any Shares to existing holders by way of bonus, capitalisation or similar issue;

(2)   a distribution, issue or dividend to existing holders of the Shares of (a) such Shares or (b) other share capital or securities granting the right to payment of dividends and/or the proceeds of liquidation of a Share Issuer equally or proportionately with such payments to holders of such Shares or (c) share capital or other securities of another issuer acquired or owned (directly or indirectly) by the Share Issuer as a result of a spin-off or other similar transaction, or (d) any other type of securities, rights or warrants or other assets, in any case for payment (in cash or otherwise) at less than the prevailing market price as determined by the Calculation Agent;

(3)   an Extraordinary Dividend;

(4)   a call by a Share Issuer in respect of the relevant Shares which are not fully paid;

(5)   a repurchase by a Share Issuer or any of its subsidiaries of relevant Shares whether out of profits or capital and whether the consideration for such repurchase is cash, securities or otherwise;

(6)   in respect of a Share Issuer, an event that results in any shareholder rights being distributed or becoming separated from shares of common stock or other shares of the capital stock of the Share Issuer pursuant to a shareholder rights plan or arrangement directed against hostile takeovers that provides upon the occurrence

of certain events for a distribution of preferred stock, warrants, debt instruments or stock rights at a price below their market value, as determined by the Calculation Agent, provided that any adjustment effected as a result of such an event shall be readjusted upon any redemption of such rights; or

(7) any other event having, in the opinion of the Calculation Agent, a diluting or concentrative effect on the theoretical value of the Shares or of the composition of the Share Basket;

(viii) **"Tender Offer"** means a takeover offer, tender offer, exchange offer, solicitation, proposal or other event by any entity or person that results in such entity or person purchasing, or otherwise obtaining or having the right to obtain, by conversion or other means, greater than 10 per cent. and less than 100 per cent. of the outstanding Shares, as determined by the Calculation Agent, based upon the makings of filings with governmental or self-regulatory agencies or such other information as the Calculation Agent deems relevant; **"Tender Offer Date"** means, in respect of a Tender Offer, the date on which Shares in the amount of the applicable percentage threshold are actually purchased or otherwise obtained (as determined by the Calculation Agent).

(B) *Potential Adjustment Events*: Following the declaration by a Share Issuer of the terms of any Potential Adjustment Event, the Calculation Agent will, in its sole and absolute discretion, determine whether such Potential Adjustment Event has a diluting or concentrative effect on the theoretical value of the relevant Shares or on the composition of the Share Basket and, if so, the Calculation Agent in its sole and absolute discretion will determine in its sole and absolute discretion the appropriate adjustment(s), if any, to be made to the terms of the Conditions as the Calculation Agent determines appropriate to account for the Potential Adjustment Event and determine the effective date(s) of that adjustment(s) (including but not limited to adjustment(s) to account solely for changes in volatility, expected dividends, stock loan rate or liquidity relative to the relevant Share). The Calculation Agent may (but need not) determine the appropriate adjustment(s) by reference to the adjustment(s) in respect of the Potential Adjustment Event made by an options exchange to options on the Shares traded on that options exchange.

(C) *Merger Event or Tender Offer*: In respect of each Merger Event or Tender Offer, the following terms have the meanings given below:

*Share-for-Share* means, (i) in respect of a Merger Event or Tender Offer, that the consideration for the relevant Shares consists (or, at the option of the holder of such Shares, will consist) solely of New Shares and (ii) a Reverse Merger;

*Share-for-Other* means, in respect of a Merger Event or Tender Offer, that the consideration for the relevant Shares consists solely of Other Consideration;

*Share-for-Combined* means, in respect of a Merger Event or Tender Offer, that the consideration for the relevant Shares consists of Combined Consideration;

*New Shares* means ordinary or common shares, whether of the entity or person (other than the Share Issuer) involved in the Merger Event or the making of the Tender Offer or a third party, that are, or that as of the Merger Date or Tender Offer Date are promptly scheduled to be, (A) publicly quoted, traded or listed (i) in respect of the Shares of any Share Issuer which Exchange is located in the United States of America, on the New York Stock Exchange, the American Stock Exchange or the NASDAQ NMS, (ii) in respect of the Shares of any Share Issuer which Exchange is located in the European Union, in any member state of the European Union and (iii) in respect of the Shares of any Share Issuer which Exchange is located elsewhere, on an exchange or quotation system located in the same country as the Exchange and (B) not subject to any currency exchange controls, trading restrictions or other trading limitations;

*Other Consideration* means cash and/or any securities (other than New Shares) or assets (whether of the entity or person (other than the Share Issuer) involved in the Merger Event or the making of a Tender Offer or a third party); and

*Combined Consideration* means New Shares in combination with Other Consideration.

If a Merger Event or Tender Offer occurs, the Calculation Agent will in its sole and absolute discretion take any of the actions described in (1) (2) (3) and/or (4) below, as applicable:

(1)  (a)  in respect of each Share-for-Share Merger Event or, as the case may be, each Share-for-Share Tender Offer, on or after the relevant Merger Date or, as the case may be, the Tender Offer Date make such adjustment(s) the Calculation Agent acting in its sole discretion considers appropriate to reflect the number of New Shares to which a holder of one relevant Share immediately prior to the occurrence of the Merger Event or, as the case may be, the Tender Offer would be entitled upon consummation of the Merger Event or, as the case may be, the Tender Offer and the New Shares will be deemed to be the relevant Shares and the issuer thereof will be deemed the Share Issuer, respectively, and, if necessary, the Calculation Agent will adjust any other relevant terms (including, without limitation, adjustments to account for

changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares);

(b) in respect of each Share-for-Other Merger Event or, as the case may be each Share-for-Other Tender Offer, on or after the relevant Merger Date or, as the case may be, the Tender Offer Date, the amount of Other Consideration (as subsequently modified in accordance with any relevant terms and including the proceeds of any redemption, if applicable) to which a holder of one relevant Share would be entitled upon consummation of the Merger Event or, as the case may be, the Tender Offer will be applied by the Calculation Agent to determine such adjustment(s) as it acting in its sole discretion considers appropriate in respect of such Share, and, if necessary, the Calculation Agent will adjust any other relevant terms (including, without limitation, adjustments to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares); or

(c) in respect of each Share-for-Combined Merger Event or, as the case may be, each Share-for Combined Tender Offer, on or after the Merger Date or, as the case may be, the Tender Offer Date, the number of New Shares and the amount of Other Consideration (as subsequently modified in accordance with any relevant terms and including the proceeds of any redemption, if applicable) to which a holder of one of the relevant Shares would be entitled upon consummation of the Merger Event or, as the case may be, the Tender Offer will be applied by the Calculation Agent to determine such adjustment(s) as it acting in its sole discretion considers appropriate with respect to the affected Shares and the issuer of such New Shares and, if necessary, the Calculation Agent will adjust any other relevant terms (including, without limitation, adjustments to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares);

(2) if at any time the Calculation Agent determines that a Merger Event or Tender Offer has led, or would lead, to the merger, consolidation or any other combination of the Shares of two or more Share Issuers (a "**Share Issuer Merger**"), the Calculation Agent will determine which original Share Issuer or Share Issuers should cease to be treated as a Share Issuer or Share Issuers for the purpose of these Conditions (each a "**Replaced Share Issuer**") and shall be entitled to select one or more new entities (as the case may be) (each a "**Replacement Share Issuer**") to be a Share Issuer in place of the Replaced Share Issuer or Share Issuers as of a date determined by the Calculation Agent (a "**Replacement Date**"). Any Replacement Share Issuer will, to the extent practicable, be selected

from the same industry, have shares denominated in the same currency and have a similar market capitalisation to the relevant Replaced Share Issuer;

(3)   on or after the relevant Merger Date or Tender Offer Date (A) make such adjustment(s) to the exercise, interest, payment or any other terms of the Notes as the Calculation Agent determines appropriate to account for the economic effect of such Merger Event or Tender Offer (provided in the case of a Tender Offer, the Shares will not change) and (provided that no adjustments will be made to account solely for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares), which may, but need not, be determined by reference to the adjustment(s) made in respect of such Merger Event or Tender Offer by an options exchange to options on the relevant Shares traded on such options exchange and (B) determine the effective date(s) of such adjustment(s); and/or

(4)   either:

(a)   cancel the Notes in whole only and pay the Cancellation Amount (if any); or

(b)   determine which original Share Issuer or Share Issuers should cease to be treated as a Share Issuer or Share Issuers for the purpose of these Conditions and pay the Cancellation Amount (if any).

If a Merger Date or Tender Offer Date is scheduled to be after the Final Valuation Date, the Calculation Agent will determine, with respect to the theoretical value of the Notes, the economic effect of the announcement of a potential Merger Event or Tender Offer Event (including but not limited to any change in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares) from the announcement date to such Final Valuation Date, as applicable. If such economic effect is material, the Calculation Agent shall (acting in its sole and absolute discretion) adjust the terms of the Conditions to reflect such economic effect.

(D)   *Nationalisation and Insolvency*:   If a Nationalisation or Insolvency occurs, the Calculation Agent shall, in its sole and absolute discretion take any of the actions described in (1) and (2) below:

(1)   on a Nationalisation, acting in its sole and absolute discretion, either:

(a)   treat the affected Share Issuer as a Replaced Share Issuer and select a Replacement Share Issuer in the manner specified in paragraph (C) (2) above; or

(b)   make such other adjustment(s) to the terms of the Conditions or such determination as the Calculation Agent, acting in its sole and absolute discretion, considers appropriate to account for the Nationalisation;

(2)   either:

(a)   request the Issuer to cancel the Notes in whole only and pay the Cancellation Amount (if any); or

(b)   determine which original Share Issuer or Share Issuers should cease to be treated as a Share Issuer or Share Issuers for the purpose of these Conditions and request the Issuer to pay the Cancellation Amount (if any).

(E)   *Delisting*:  If a Delisting occurs, the Calculation Agent shall, in its sole and absolute discretion, take either of the actions described in (1) or (2) below:

(1)   treat the affected Share Issuer as a Replaced Share Issuer and select a Replacement Share Issuer in the manner specified in (C) (2) above; or

(2)   either:

(a)   request the Issuer to cancel the Notes in whole only and pay the Cancellation Amount (if any); or

(b)   determine which original Share Issuer or Share Issuers should cease to be treated as a Share Issuer or Share Issuers for the purpose of these Conditions and request the Issuer to pay the Cancellation Amount (if any).

(F)   *Hedging Disruption*:  If a Hedging Disruption occurs as determined by the Calculation Agent in its sole and absolute discretion, then the Calculation Agent shall either (a)(1) make such adjustment to the exercise, settlement, payment or any other terms of the Notes as the Calculation Agent in its sole and absolute discretion determines appropriate and (2) determine the effective date of that adjustment, or (b) if the Calculation Agent determines that no adjustment that it could make under (a) will produce a commercially reasonable result, notify the Issuer thereof in which event the Issuer shall redeem the Notes as of such date as the Calculation Agent shall determine by notice given to the Noteholders and in the event of such early redemption the Issuer will pay to each Noteholder the Cancellation Amount with respect to each Note held by such Noteholder.

(G)   *Valuation of Shares of Replacement Share Issuers*:  In calculating any Share Basket Linked Interest Amount, Early Redemption Amount, Mandatory Early Redemption Amount, the Final Redemption Amount or the Physical Settlement Amount, as the case may be, the Strike Price for the Replacement

Share Issuer Share shall be deemed to be the product of (a) the Closing Price of the Replacement Share Issuer Share on the relevant Replacement Date, and (b) the quotient of the relevant Strike Price for the Replaced Share Issuer Share and the Closing Price for the Replaced Share Issuer Share on the relevant Replacement Date (as adjusted by the Calculation Agent in its discretion to reflect the cost to the Issuer or any affiliate of replacing the affected Share and adjusting any associated hedging arrangements)."

2.7    The following Condition 25 (*Physical Settlement*) is hereby inserted into the Terms and Conditions:

"25    **Physical Settlement**

(A)    *Physical Settlement Amount*

(i)    Determination of Physical Settlement Amount: If Physical Settlement applies, the amount to be delivered to, or to the order of, each Noteholder in respect of each Note shall be the Number of Shares$_{Worst}$, together with any Fractional Share Amount to which a Noteholder may be entitled in accordance with paragraph (ii) below (*Fractions of a Share*), or any other amount as provided in the applicable Final Terms (the "**Physical Settlement Amount**").

(ii)    Fractions of a Share: If Physical Settlement applies and the aggregate Number of Shares$_{Worst}$ to be delivered to a Noteholder in respect of its holding of Notes is not an integral number, as determined by the Calculation Agent, the Issuer shall, on the Maturity Date, in lieu of delivery of the fractional entitlement of the Number of Shares$_{Worst}$ (the "**Fraction**"), make or procure that there is made to the relevant Noteholder a cash payment in the Specified Currency (the "**Fractional Share Amount**") as determined by the Calculation Agent in accordance with the following formula:

**Fractional Share Amount = Fraction × Final Price$_{Worst}$**

*provided that* if the Fractional Share Amount is of a *de minimis* amount, as determined by the Calculation Agent, the Noteholder shall not receive any such amount and shall not be entitled to the delivery of a fractional entitlement of the relevant Shares but shall only receive the applicable Number of Shares$_{Worst}$ rounded down to the nearest whole number of Shares.

(B)    *Delivery of Physical Settlement Amount*

(i)    *Delivery on the Maturity Date*: If Physical Settlement applies, provided that the conditions for Physical Settlement are fulfilled, the Issuer shall deliver to the Noteholder the Physical Settlement Amount through the Clearance System on the Maturity Date (or, if such day is not a Clearance System Business Day, the first succeeding Clearance System Business Day), subject as provided in this paragraph and in paragraph (C) below (*Procedure for Physical Settlement*).

(ii)    *Settlement Disruption Event*: If Physical Settlement applies and a Settlement Disruption Event prevents the Issuer from effecting delivery of any Shares on the Clearance System Business Day which would, but for the Settlement Disruption Event, have been the Maturity Date (the "**Scheduled Maturity Date**"), then the Maturity Date shall be deemed to be the first succeeding day on which delivery of the Shares can take place through the relevant Clearance System unless, in the opinion of the Issuer, a Settlement Disruption Event prevents the Issuer from delivering the Shares on each of the eight Clearance System Business Days immediately following the Scheduled Maturity Date. In that case:

    (a)    if the Calculation Agent determines that the Shares can be delivered in any other commercially reasonable manner, then payment and/or delivery of the Physical Settlement Amount, as the case may be, shall be effected on the first day on which settlement of a sale of Shares executed on that eighth Clearance System Business Day customarily would take place using such other commercially reasonable manner of delivery of the Shares (which other manner of delivery will be deemed the Clearance System for the purposes of delivery of the relevant Shares); or

    (b)    if the Calculation Agent determines that the Shares cannot be delivered in any other commercially reasonable manner, then payment and/or delivery of the Physical Settlement Amount, as the case may be, shall be postponed until such day as the Calculation Agent determines that it can be effected through the Clearance System or in any other commercially reasonable manner.

(iii)    Manner of delivery: For the avoidance of doubt, the Issuer makes no representation that the Shares will be deliverable in any particular manner.

(iv)    Risk of any postponement: The risk of any postponement of payment and/or delivery of the Physical Settlement Amount, as the case may be, as described in paragraph (ii) above (*Settlement Disruption Event*) shall be borne by the Noteholders, and no Noteholder shall be entitled to any payment whatsoever in respect of such postponement or of any loss suffered or incurred by such Noteholder by reason of such postponement.

(v)    Rights arising on Physical Settlement: For the avoidance of doubt, if Physical Settlement applies, the Noteholder shall not be entitled to receive any dividend or other distribution declared, paid or made, or any rights granted (including, but not limited to, voting rights), on any Shares prior to delivery of the relevant Shares to the Noteholder.

(C)    ***Procedure for Physical Settlement***

(i)    Settlement details and U.S. certification: If Physical Settlement applies, in order to receive the Physical Settlement Amount to which it is entitled each

Noteholder shall, within the three Business Days immediately following the Final Valuation Date:

(a)   complete, execute and deposit at the Noteholder's own expense during normal business hours with the Principal Paying Agent any documents which may be required by any of (a) the laws of England or of any part thereof, (b) the jurisdiction in which the Principal Paying Agent's specified office is then located or (c) the jurisdiction in which the Issuer is to effect delivery of the Physical Settlement Amount to, or to the order of, the Noteholder;

(b)   transfer any amount to be paid by the Noteholder pursuant to this paragraph (C) and/or under paragraph (D) below (*Expenses and taxes*) to the account of the Principal Paying Agent with Euroclear and/or Clearstream, Luxembourg;

(c)   provide to the Principal Paying Agent and the Issuer in writing details of the accounts with the Clearance System to which the Issuer is to deliver the Physical Settlement Amount and/or any other details which may be necessary in order to effect delivery of the relevant Shares and cash; and

(d)   represent in writing, delivered to the Principal Paying Agent, that such Noteholder, or the person who has the beneficial interest in that Note, is not in the United States (within the meaning of Regulation S under the United States Securities Act of 1933 (**"Regulation S"**)) and it, or such person, purchased such Note, or the beneficial interest therein, in a transaction made in accordance with Rule 903 or Rule 904 of Regulation S.

(ii)   Failure to satisfy conditions for Physical Settlement: If Physical Settlement applies and a Noteholder fails to take any of the actions referred to in paragraph (i) above (*Settlement details and U.S. certification*) within the three Business Days immediately following the Final Valuation Date, in lieu of delivery of the Shares, the Issuer shall, on the Maturity Date, pay an amount in the Specified Currency equal to the Proceeds of Sale (calculated in accordance with paragraph (iii) below (*Proceeds of sale*)), in addition to any Fractional Share Amount, to the Noteholder on the Maturity Date.

(iii)   Proceeds of sale:  For the purposes of paragraph (ii) above (*Failure to satisfy conditions for physical settlement*), **"Proceeds of Sale"** shall mean an amount in the Specified Currency which the Issuer or its affiliates on its behalf actually receives as consideration for the sale of the relevant Shares, plus any amounts paid by the relevant Noteholder and received by the Principal Paying Agent pursuant to this paragraph (C) and/or paragraph (D) below (*Expenses and taxes*), less the expenses and taxes incurred by the Issuer or by the Calculation Agent on its behalf in respect of such sale, *provided that* the Issuer shall not be obliged to pay to the Noteholder any amount, which is in excess

of the amount for which such Shares could have been sold on the Final Valuation Date, all as determined by the Calculation Agent (together with any amounts paid by the relevant Noteholder pursuant to this paragraph (C) and/or pursuant to paragraph (D) (*Expenses and taxes*), but after deduction of the expenses and taxes incurred by the Issuer or by the Calculation Agent on its behalf in respect of such sale).

(D)     ***Expenses and taxes***

As condition precedent to the delivery of the Physical Settlement Amount, the relevant Noteholder must pay to the Issuer all applicable stamp, issue, registration, transfer or other taxes and duties, including withholding taxes (if any) arising out of the delivery of the relevant Shares which may be determined by the Calculation Agent to be payable:

(i)     in the country in which the Principal Paying Agent's specified office is situated; and

(ii)    in any other jurisdiction as a result of the issue or delivery of the relevant Shares to or to the order of the Noteholder."

**Pro Forma Final Terms Applicable to Autocallable Share Basket Linked Notes**

*Set out below is a pro forma final terms which, subject to completion and amendment, will be issued in respect of issues of Autocallable Share Basket Linked Notes under the Program. Text in this section appearing in italics does not form part of the Final Terms but denotes guidance for completing the Final Terms.*

Final Terms dated [●]

**[LEHMAN BROTHERS HOLDINGS INC. [acting through its London Branch]**
**LEHMAN BROTHERS TREASURY CO. B.V./**
**LEHMAN BROTHERS BANKHAUS AG**
**[acting through its London Branch]**

**Issue of [Aggregate Nominal Amount of Tranche] [Title of Autocallable Share Basket Linked Notes]**
**[Guaranteed by Lehman Brothers Holdings Inc.]**
**under the U.S.$100,000,000,000**
**Euro Medium-Term Note Program**

**PART A – CONTRACTUAL TERMS**

The Base Prospectus referred to below (as completed by these Final Terms) has been prepared on the basis that, except as provided in sub-paragraph (ii) below, any offer of Notes in any Member State of the European Economic Area which has implemented the Prospectus Directive (2003/71/EC) (each, a "**Relevant Member State**") will be made pursuant to an exemption under the Prospectus Directive, as implemented in that Relevant Member State, from the requirement to publish a prospectus for offers of the Notes. Accordingly any person making or intending to make an offer of the Notes may only do so[:

[(i)]    in circumstances in which no obligation arises for the Issuer or any Dealer to publish a prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus pursuant to Article 16 of the Prospectus Directive, in each case, in relation to such offer]; or]

[(ii)]    in those Public Offer Jurisdictions mentioned in Paragraph 42 of Part A below, provided such person is one of the persons mentioned in Paragraph 42 of Part A below and that such offer is made during the Offer Period specified for such purpose therein.]

Neither the Issuer, the Guarantor nor any Dealer has authorised, nor do they authorise, the making of any offer of Notes in any other circumstances.

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions set forth in the Base Prospectus dated July, 24 2007 [and the Supplemental Prospectus dated [●]] which [together] constitute[s] a base prospectus for the purposes of the Prospectus Directive (Directive 2003/71/EC) (the "**Prospectus Directive**"). This document constitutes the Final Terms of the Autocallable Share Basket Linked Notes described herein for the

purposes of Article 5.4 of the Prospectus Directive and must be read in conjunction with such Base Prospectus as so supplemented.

[*The following alternative language applies if the first tranche of an issue which is being increased was issued under a base prospectus with an earlier date.*]

[Terms used herein shall be deemed to be defined as such for the purposes of the Conditions (the "**Conditions**") set forth in the Base Prospectus, dated [*original date*] [and the Supplemental Prospectus dated [•]]. This document constitutes the Final Terms of the Notes described herein for the purposes of Article 5.4 of the Prospectus Directive (Directive 2003/71/EC) (the "**Prospectus Directive**") and must be read in conjunction with the Base Prospectus dated July, 24 2007 [and the Supplemental Prospectus dated [•]], which together constitute[s] a base prospectus for the purposes of the Prospectus Directive, save in respect of the conditions which are extracted from the Base Prospectus dated [•] [and the Supplemental Prospectus dated [•]], and are attached hereto.]

[*The following alternative language applies if the first tranche of an issue which is being increased was issued under a base prospectus with an earlier date and the relevant terms and conditions from that base prospectus with an earlier date were incorporated by reference in the Base Prospectus.*]

[Terms used herein shall be deemed to be defined as such for the purposes of the [date] Conditions (the "**Conditions**") incorporated by reference in the Base Prospectus dated July, 24 2007. This document constitutes the Final Terms of the Notes described herein for the purposes of Article 5.4 of the Prospectus Directive (Directive 2003/71/EC) (the "**Prospectus Directive**") and must be read in conjunction with the Base Prospectus [and the Supplemental Prospectus dated [•]] which [together] constitute[s] a base prospectus for the purposes of the Prospectus Directive, save in respect of the conditions which are set forth in the Base Prospectus dated [•] [and the Supplemental Prospectus dated [•]] and incorporated by reference in the Base Prospectus.]

Full information on the Issuer and the offer of the Notes is only available on the basis of the combination of these Final Terms and the Base Prospectus. [The Base Prospectus [and the supplemental Prospectus] [is/are] available for viewing [at [website]] [and] during normal business hours at [address] and copies may be obtained from [*address*].

[These Notes are issued in the Australian domestic capital markets and are Australian Domestic Notes. Holders of the Australian Domestic Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the Deed Poll dated [•] executed by the Issuer constituting the Australian Domestic Notes.] [*This paragraph need only be included if the Final Terms relates to Australian Domestic Notes.*]

[These Notes are Danish Notes. Holders of the Danish Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated July 24, 2007 executed by the Issuer constituting the Danish Notes. [*This paragraph need only be included if the Final Terms relates to Danish Notes.*]

[These Notes are Finnish Notes. Holders of the Finnish Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated July 24, 2007 executed by the Issuer constituting the Finnish Notes. [*This paragraph need only be included if the Final Terms relates to Finnish Notes.*]

[These Notes are Norwegian Notes. Holders of the Norwegian Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated July 24, 2007 executed by the Issuer constituting the Norwegian Notes. [*This paragraph need only be included if the Final Terms relates to Norwegian Notes.*]]

[These Notes are Swedish Notes. Holders of the Swedish Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated July 24, 2007 executed by the Issuer constituting the Swedish Notes. [*This paragraph need only be included if the Final Terms relates to Swedish Notes.*]]

[*Include whichever of the following apply or specify as "Not Applicable" (N/A). Note that the numbering should remain as set out below, even if "Not Applicable" is indicated for individual paragraphs or sub-paragraphs. Italics denote guidance for completing the Final Terms.*]

[*When adding any other final terms or information (including final terms at items 10, 11, 16, 17, 22, 25, 26, 27, 29 or 37 of Part A or information in relation to the interest of natural and legal persons involved in the issue/offer in Part B) consideration should be given as to whether such terms or information constitute "significant new factors" and will consequently be issued pursuant to a Drawdown Prospectus.*]

References in these Final Terms to the **"Autocallable Share Basket Linked Notes Supplement"** are to the Base Prospectus Supplement dated 11 February 2008. The Conditions and definitions set out in the Autocallable Share Basket Linked Notes Supplement apply to these Notes unless otherwise set out or, as the case may be, defined in this Final Terms.

1.  [(i)]   Issuer:                 [•][1]

    [(ii)]  Guarantor:              [•]]

2.  [(i)]   Series Number:          [•]

    [(ii)]  Tranche Number:         [•]

    (If fungible with an existing Series, details of that Series, including the date on which the Notes become fungible).]

---

[1] In the case of LBHI or LBB, specify if acting through its London Branch. In the case of LBHI, additional tax advice should be sought.

3.     Specified Currency or Currencies:      [•]

4.     Aggregate Nominal Amount:      [•] [(being the equivalent of [•] Units)][2]

    [(i)]   Series:      [•]

    [(ii)]   Tranche:      [•]]

5.     Issue Price:      [•] per cent. of the Aggregate Nominal Amount [plus accrued interest from [*insert date*] *(if applicable)*][/[*amount in specified currency*] per Unit][3]

6.     Specified Denominations and Units:

    (i)   Specified Denominations:      [•]

    (ii)   Calculation Amount:      [•]

    (iii)   Trading in Units:      [Applicable/Not Applicable]

    If Trading in Units is specified as being Applicable then the Notes will be tradeable by reference to the number of Notes being traded (each having the Specified Denomination) as opposed to the aggregate principal amount of Notes being traded.

    *[Trading in Units may only be specified as being Applicable if the Notes have a single Specified Denomination.]*

7.     [(i)]   Issue Date:      [•]

    [(ii)]   Interest Commencement Date:      [Not Applicable] [*only include if date is different to the Issue Date and a Day Count Fraction is specified to be applicable*]

8.     Maturity Date:      [•], subject to the occurrence of a Mandatory Early Redemption Event and adjustment in accordance with the [Following Business Day Convention/ Modified Following Business Day

---

[2] Insert only in case Trading in Units is specified as being applicable.

[3] Insert only in case Trading in Units is specified as being applicable.

Convention/ other (*give details*)]

| | | |
|---|---|---|
| 9. | Valuation Date[s]: | [[•] (the "**Initial Valuation Date**") , [•], [•] and [•] (the "**Final Valuation Date**")] / [[•] in each [month/year] from and including [•] (the "**Initial Valuation Date**") to and including [•] (the "**Final Valuation Date**")] |
| 10. | Interest Basis: | [[•] per cent. Fixed Rate] [Share Basket Linked Interest] [Other (*specify*)] [(further particulars specified below)] |
| 11. | Redemption/Payment Basis | [Share Basket Linked Redemption. See paragraphs [*if Cash Settlement applies only:* 16, 26 and 29] [*otherwise:* 16, 26, 27 and 29] below.] [Redemption at par] [Other (*specify*)] |
| 12. | Change of Interest or Redemption/ Payment Basis: | [(*Specify details of any provision for convertibility of Notes into another interest or redemption/payment basis*)] |
| 13. | Put/Call Options: | Not Applicable |
| 14. | (i)  Status of the Notes: | Senior Notes |
| | (ii)  Status of the Guarantee: | Senior Guarantee |
| 15. | Method of distribution: | Non-syndicated |

**PROVISIONS RELATING TO THE SHARE BASKET**

| | | |
|---|---|---|
| 16. | Share Basket Provisions | Applicable |
| | (i)  Shares | [The shares of the Share Issuers specified in the Annex hereto] / [•] |
| | (ii)  Exchange(s) | [In respect of the Shares of each Share Issuer, the exchange or quotation system specified as such for such Shares in the Annex hereto] / [•] |
| | (iii)  Related Exchange(s) | [In respect of the Shares of each Share Issuer, the exchange or quotation system specified as such for such Shares in the Annex hereto] / [•] |

|      |                                    |                                                                                                                                                 |
|------|------------------------------------|-------------------------------------------------------------------------------------------------------------------------------------------------|
| (iv) | Strike Prices                      | [In respect of the Shares of each Share Issuer, the price specified as such for such Shares in the Annex hereto]/ [•]                             |
| (v)  | Number of Shares                   | [In respect of the Shares of each Share Issuer, the number specified as such for such Shares in the Annex hereto] / [Not Applicable]             |
| (vi) | Strike Price Adjustment Percentage | [•] / [Not Applicable]                                                                                                                           |
| (vii)| Barrier Percentage                 | [•] / [Not Applicable]                                                                                                                           |
| (viii)| Trigger Event                     | [Trigger Event (Closing Observation) / Trigger Event (Intraday Observation) / Other (specify) / Not Applicable]                                  |
| (ix) | Trigger Percentage                 | [•]/ [Not Applicable]                                                                                                                            |

## PROVISIONS RELATING TO INTEREST (IF ANY) PAYABLE

| 17.   | **Fixed Rate Note Provisions**                                          | [Applicable/Not Applicable] (If not applicable, delete the remaining sub-paragraphs of this paragraph)                                                                                                                                                                                 |
|-------|------------------------------------------------------------------------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| (i)   | Fixed Rate[(s)] of Interest:                                           | [•] per cent. [per annum]  [payable [annually/quarterly/monthly/other (specify)] in arrear]                                                                                                                                                                                          |
| (ii)  | Interest Payment Date(s):                                              | [•] in each year up to and including the Maturity Date]/[specify other – consider whether to adjust in accordance with a Business Day Convention – see items [17](vi) and (vii)] (NB: this will need to be amended in the case of long or short coupons)]                               |
| (iii) | Fixed Coupon Amount[(s)]:                                              | [•] per Calculation Amount                                                                                                                                                                                                                                                          |
| (iv)  | Fixed Day Count Fraction:                                             | [30/360]/[Actual/Actual (ICMA)] [If neither of these options applies, give details]                                                                                                                                                                                                 |
| (v)   | Broken Amount(s):                                                      | [•] per Calculation Amount, payable on the Interest Payment Date falling [in/on] [•]                                                                                                                                                                                                 |
| (vi)  | Other terms relating to the method of calculating interest for Fixed  | [Not Applicable/give details]                                                                                                                                                                                                                                                       |

Rate Notes:

|     |        |                                   |                                                                                                                        |
| --- | ------ | --------------------------------- | ---------------------------------------------------------------------------------------------------------------------- |
|     | (vii)  | Business Day Convention:          | [Following Business Day Convention/ Modified Following Business Day Convention/ other (*give details*)]                 |
|     | (viii) | Option to defer interest payments: | Not Applicable                                                                                                        |

| 18. | **Floating Rate Note Provisions** | Not Applicable |
| --- | --------------------------------- | -------------- |

| 19. | **Zero Coupon Note Provisions** | Not Applicable |
| --- | ------------------------------- | -------------- |

| 20. | **Index-Linked Interest Note/Other Variable-Linked Interest Note Provisions** | Not Applicable |
| --- | ----------------------------------------------------------------------------- | -------------- |

| 21. | **Dual Currency Note Provisions** | Not Applicable |
| --- | --------------------------------- | -------------- |

| 22. | **Share Basket Linked Interest Provisions** | | [Applicable/Not Applicable] *(If not applicable, delete the remaining sub-paragraphs of this paragraph)* |
| --- | --- | --- | --- |
|  | (i) | Share Basket Linked Rate[(s)] of Interest | *[insert provisions/formula for determining Share Basket Linked Rate(s) of Interest by reference to Trigger Event, Barrier Price, Strike Price, Adjusted Strike Price, Final Price, and/or alternatives]* |
|  | (ii) | Interest Payment Date(s): | *[state date(s)]* |
|  | (iii) | Share Basket Linked Interest Amount: | In respect of each Interest Payment Date and each Note, the product of (i) the Calculation Amount and (ii) the relevant Share Basket Linked Rate of Interest |
|  | (iv) | Business Day Convention: | [Following Business Day Convention/ Modified Following Business Day Convention/ other (*give details*)] |
|  | (v) | Other terms relating to the method of calculating interest, if different from those set out in the Conditions | [[•] / Not Applicable] |

## PROVISIONS RELATING TO REDEMPTION

| 23. | **Call Option** | Not Applicable |
| --- | --------------- | -------------- |

| 24. | **Put Option** | Not Applicable |
| --- | -------------- | -------------- |

| 25. | **Form of Settlement** | [Cash Settlement] |
| --- | ---------------------- | ----------------- |

[(i) Cash Settlement, if *[insert provisions/formula for determining whether Cash Settlement applies by reference to Trigger Event, Barrier Price, Strike Price, Adjusted Strike Price, Final Price, and/or alternatives]*;

(ii) Physical Settlement, if *[insert provisions/formula for determining whether Physical Settlement applies by reference to Trigger Event, Barrier Price, Strike Price, Adjusted Strike Price, Final Price, and/or alternatives]*]

| | | |
|---|---|---|
| 26. | **Final Redemption Amount** | [[•] per Calculation Amount] |

[Where the Final Redemption Amount is Share Basket Linked:

(i) Provisions for determining Final Redemption Amount where calculated by reference to the Share Basket:

[[If Cash Settlement applies, ]*insert provisions/formula for determining Final Redemption Amount by reference to Trigger Event, Barrier Price, Strike Price, Adjusted Strike Price, Final Price, and/or alternatives]*.

(ii) Other terms relating to the method of determining the Final Redemption Amount, if different from those set out in the Conditions:

[Not Applicable] [*give details*]]

| | |
|---|---|
| 27. | **Physical Settlement Amount** |

[Not Applicable][If Physical Settlement applies, the Physical Delivery Amount to be delivered in respect of each Certificate shall be calculated as set out in Condition [25]] [other formula (*give details*)]

| | |
|---|---|
| 28. | **Early Redemption Amount of each Note** |

Early Redemption Amount(s) per Calculation Amount payable on redemption for taxation reasons or on event of default and/or the method of calculating the same (if required or if different from that set out in the

In respect of each Note, an amount in the Specified Currency equal to the fair market value of such Note (disregarding credit risk of the Issuer) (which value shall be less the proportion attributable to that Note of the reasonable cost to the Issuer or any of its affiliates of unwinding

Conditions):

any related hedging arrangements) on such day as is selected by the Calculation Agent in its sole and absolute discretion (provided that such day is not more than 15 days before the date fixed for redemption of the Note).

*[If Share Basket Linked Interest Provisions are applicable or if Fixed Rate Note Provisions are applicable and no Day Count Fraction is specified: For the avoidance of doubt, no accrued interest shall be payable upon early redemption of the Notes for any reason.]*

29. **Mandatory    Early    Redemption**    Applicable
**(Condition 8(j))**

   (i)   Mandatory    Early    Redemption    *[Default Option: an event whereby the Closing Price in respect of the Shares of each Share Issuer, as determined by the Calculation Agent as of any Mandatory Early Redemption Valuation Date is greater than or equal to the Mandatory Early Redemption Price]*

        Event:

*[Other / [ ] is [greater than/greater than or equal to/less than/less than or equal to/the Mandatory Early Redemption Price as of [the/any] Mandatory Early Redemption Valuation Date]*

   (ii)   Mandatory    Early    Redemption    *[give details]*
        Price(s):

   (iii)   Mandatory    Early    Redemption    *[give details]*
        Date(s):

   (iv)   Mandatory    Early    Redemption    *[give details]*
        Rate(s):

   (v)   Business Day Convention:    [Following Business Day Convention/ Modified Following Business Day Convention/ other *(give details)*]

   (vi)   Other terms relating to the method of calculating the Mandatory Early Redemption Amount, if different    [Not Applicable / *give details*]

from those set out in the
Conditions:

**GENERAL PROVISIONS APPLICABLE TO THE NOTES**

30.    Form of Notes:

*[In the case of Notes issued by LBHI]*

[Bearer form. Interests in a temporary global Note will be exchangeable for, at the request of each Holder (with respect to its own Notes in bearer form), definitive Notes in bearer form.]

[Bearer form. Interests in a temporary global Note will be exchangeable for interests in a permanent global Note in bearer form. Interests in a permanent global Note will be exchangeable for, at the request of each Holder (with respect to its own Notes in bearer form), definitive Notes in bearer form.]

[Registered form. Interests in a global Note in registered form will be exchangeable for definitive Notes in registered form in the limited circumstances described in the global Note. Definitive Notes in registered form will [not][4] be exchangeable for interests in a global Note in registered form.]

[Australian Domestic Notes in registered, uncertificated and dematerialised book-entry form]

*[In the case of Notes issued by LBTCBV or LBB]*

[Bearer form. Interests in a temporary global Note will be exchangeable for definitive Notes in bearer form.]

[Bearer form. Interests in a temporary global Note will be exchangeable for

---

[4] Delete or complete as appropriate.

interests in a permanent global Note in bearer form. Interests in a permanent global Note will be exchangeable for definitive Notes in bearer form in the limited circumstances described in the permanent global Note.]

Registered form. Interests in a global Note in registered form will be exchangeable for definitive Notes in registered form in the limited circumstances described in the global Note. Definitive Notes in registered form will [not] be exchangeable for interests in a global Note in registered form.]

[Australian Domestic Notes in registered, uncertificated and dematerialised book-entry form]

*[Australian Domestic Notes can not be issued by LBB]*

*[In the case of [Danish/Finnish/Norwegian/Swedish] Notes]* The Notes are [Danish/Finnish/Norwegian/ Swedish] Notes and are in uncertificated and dematerialised book-entry form.

|    |    |    |
|----|----|----|
|    | New Global Note Form: | Not Applicable |
| 31. | Talons for future Coupons or Receipts to be attached to Definitive Notes (and dates on which such Talons mature): | No |
| 32. | Details relating to Partly Paid Notes: amount of each payment comprising the Issue Price and date on which each payment is to be made and consequences (if any) of failure to pay, including any right of the Issuer to forfeit the Notes and interest due on late payment: | Not Applicable |
| 33. | Details relating to Instalment Notes: Instalment Amounts and Instalment Dates: | Not Applicable |

34.  Details relating to Extendible Notes:       Not Applicable

35.  Consolidation provisions:                   [Not    Applicable/The    provisions    [in
                                                  Condition 18 (*Further Issues of Notes*)]
                                                  [annexed to these Final Terms] apply]

36.  Calculation Agent                           [Lehman Brothers International (Europe)
                                                  25 Bank Street
                                                  London E14 5LE
                                                  England/ *other - give name and address*]

37.  Other final terms:                          [Not Applicable/*give details*]
                                                  *(When adding any other final terms
                                                  consideration should be given as to
                                                  whether such terms constitute "significant
                                                  new factors" and consequently trigger the
                                                  need for a supplement to the Base
                                                  Prospectus under Article 16 of the
                                                  Prospectus Directive.)*

**DISTRIBUTION**

38.  (i)   If  syndicated,  names  [and   Not Applicable
           addresses]  of  Managers  [and
           underwriting commitments]:

     (ii)  Date of Subscription Agreement:       Not Applicable

     (iii) Stabilizing Manager (if any):         Not Applicable

39.  If non-syndicated, name and address of  [Lehman Brothers International (Europe)
     Dealer:                                      25 Bank Street
                                                  London E14 5LE
                                                  England/ *other - give name and address*]

40.  Total commission and concession:            [•] per cent. of the Aggregate Nominal
                                                  Amount / Not Applicable / *give details*

41.  Selling restrictions:

     Additional Selling Restrictions:            [Not Applicable/*give details*]

42.  Non-exempt Offer:                           [Not Applicable] [An offer of the Notes
                                                  may be made by the Managers [and
                                                  [*specify,  if  applicable*]]  other  than
                                                  pursuant to Article 3(2) of the Prospectus
                                                  Directive in [*specify relevant Member
                                                  State(s) - which must be jurisdictions
                                                  where the Base Prospectus and any*

*supplements have been approved or passported*] (**"Public Offer Jurisdictions"**) during the period from [*specify date*] until [specify date] (**"Offer Period"**). See further Paragraph [10] of Part B below.

## PURPOSE OF FINAL TERMS

These Final Terms comprise the final terms required for issue [and] [public offer in the Public Offer Jurisdictions] [and] [admission to trading on [specify relevant regulated market] of the Notes described herein pursuant to the U.S.$100,000,000,000 Euro Medium-Term Note Program of Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V. and Lehman Brothers Bankhaus AG.]

## RESPONSIBILITY

The Issuer accepts responsibility for the information contained in these Final Terms. [[*Relevant third party information*] has been extracted from [specify source]. The Issuer confirms that such information has been accurately reproduced and that, so far as it is aware, and is able to ascertain from information published by [specify source], no facts have been omitted which would render the reproduced inaccurate or misleading.]

Signed on behalf of the Issuer:

By:....................................
        *Duly authorised*

## PART B – OTHER INFORMATION

1. **LISTING**

   (i)    Listing:                 [The Irish Stock Exchange/The Singapore Exchange Securities Trading Limited/The Australian Stock Exchange Limited/ other (*specify*)/ None]

   (ii)    Admission to Trading:      [Application has been made for the Notes to be admitted to listing and/or trading on [the Official List and the regulated market of the Irish Stock Exchange]/[the alternative securities market of the Irish Stock Exchange] [the Australian Stock Exchange Limited]/ [other (*specify*)]/ with effect from [•]/ Not Applicable]

                                            [No assurance can be given as to whether or not or when such application for listing/admission to trading will be granted.]

                                            (*Where documenting a fungible issue need to indicate that original securities are already admitted to trading.*)

   [(iii) Cost of admission to trading]      [Not Applicable / *give details*]

2. **[RATINGS**

   Ratings:                          The Program has been rated:

   **[Standard & Poor's**

   | | |
   |---|---|
   | Senior Debt (Long term) | A+ |
   | Subordinated debt | A |
   | Senior Debt (Short term) | A-1 |

   An obligation rated 'A' is somewhat more susceptible to the adverse effects of changes in circumstances and economic conditions than obligations in higher-rated categories. However, the obligor's capacity to meet its financial commitment on the obligation is still strong. Negative means that a rating may be lowered. The addition of a plus (+) sign shows relative standing within the major rating

categories.

A short-term obligation rated 'A-1' is rated in the highest category by Standard & Poor's. The obligor's capacity to meet its financial commitment on the obligation is strong.

**Moodys**

| | |
|---|---|
| Senior Debt (Long term) | A1 |
| Subordinated debt | A2 |
| Debt ratings (Short term) | Prime-1 |

Obligations rated A are considered upper-medium grade and are subject to low credit risk. The modifier 1 indicates that the obligation ranks in the higher end of its generic rating category and the modifier 2 indicates a mid-range ranking.

Issuers (or supporting institutions) rated Prime-1 have a superior ability to repay short-term debt obligations.

**Fitch**

| | |
|---|---|
| Senior Debt (Long term) | AA- |
| Subordinated debt | A+ |
| Senior Debt (Short term) | F1+ |

**Fitch**

**AA-**

Very high credit quality. 'AA' ratings denote expectations of very low credit risk. They indicate very strong capacity for payment of financial commitments. This capacity is not significantly vulnerable to foreseeable events. The modifier "-" denotes relative status within this rating category.

**A+**

High credit quality. 'A' ratings denote expectations of low credit risk. The capacity for payment of financial commitments is considered strong. This capacity may, nevertheless, be more vulnerable to changes in circumstances or in economic conditions than is the case

for higher ratings. The modifier "+" denotes relative status within this rating category.

**F1+**

Highest credit quality. Indicates the strongest capacity for timely payment of financial commitments; the added "+" denotes any exceptionally strong credit feature.]

3.    **[INTERESTS OF NATURAL AND LEGAL PERSONS INVOLVED IN THE ISSUE/OFFER**

Need to include a description of any interest, including conflicting ones, that is material to the issue/offer, detailing the persons involved and the nature of the interest. May be satisfied by inclusion of the following statement:

"Save as discussed in "Subscription and Sale", so far as the Issuer is aware, no person involved in the offer of the Notes has an interest material to the offer."]

*[(When adding any other description, consideration should be given as to whether such matters described constitute "significant new factors" and consequently trigger the need for a supplement to the Prospectus under Article 16 of the Prospectus Directive.)]*

4.    **REASONS FOR THE OFFER, ESTIMATED NET PROCEEDS AND TOTAL EXPENSES**[*]

[(i)    Reasons for the offer:    [•]

*(See "Use of Proceeds" wording in the Base Prospectus – if reasons for offer differ from making profit and or hedging certain risks will need to include those reasons here.)]*

[(ii)]    Estimated net proceeds:    [•]

[(iii)]    Estimated total expenses:    [•] [Include breakdown of expenses]

*(If the Notes are derivative securities to which Annex XII of the Prospectus Directive Regulation applies it is only necessary to include disclosure of net proceeds and total expenses at (ii) and (iii) above where disclosure is included at*

---

[*] Not required for Notes with a denomination per unit of at least EUR50,000.

*(i) above.)*

5.   **YIELD (Fixed Rate Notes only)**

Indication of yield:                    [•]

Calculated as [*include method of calculation in summary form*] on the Issue Date.[*]

As set out above, the yield is calculated at the Issue Date on the basis of the Issue Price. It is not an indication of future yield.]

6.   **HISTORIC INTEREST RATES (Floating Rate Notes only)**

Details of historic [LIBOR/EURIBOR/other] rates can be obtained from Reuters.][*]

7.   **PERFORMANCE OF INDEX/FORMULA/OTHER VARIABLE, EXPLANATION OF EFFECT ON VALUE OF INVESTMENT AND ASSOCIATED RISKS AND OTHER INFORMATION CONCERNING THE UNDERLYING (Index-linked or other variable Linked Notes only)**

*Need to include details of where past and future performance and volatility of the index/formula/other variable can be obtained and a clear and comprehensive explanation of how the value of the investment is affected by the underlying and the circumstances when the risks are most evident. Where the underlying is a security need to include the name of the issuer of the security and the ISIN code. Where the .underlying is a basket of underlyings need to include the relevant weightings of each underlying in the basket. Where the underlying is not any of the above need to include equivalent information* [*]

[Details on the past and further performance as well as the volatility of the Shares can be obtained from [www.bloomberg.com under the Bloomberg Codes]/ [the websites for each Exchange as] set out for each Share in the Annex hereto.]

*[Where Annex XII of the Prospectus Directive applies, include a description of: how any return on the derivative securities takes place, the payment or delivery date and the way such return is calculated, the type of underlying and details of where relevant information can be obtained, any market disruption or settlement disruption event and any adjustment rules with relation to events concerning the underlying.]*

*[(When completing this paragraph, consideration should be given as to whether such matters described constitute "significant new factors" and consequently trigger the need for a supplement to the Prospectus under Article 16 of the Prospectus Directive.)]*

The Issuer [intends to provide post-issuance information [*specify what information will be reported and where it can be obtained*]] [does not intend to provide post-issuance information].

8. **PERFORMANCE OF RATE[S] OF EXCHANGE AND EXPLANATION OF EFFECT ON VALUE OF INVESTMENT (Dual Currency Notes only)**

*[Need to include details of where past and future performance and volatility of the relevant rate[s] can be obtained [and a clear and comprehensive explanation of how the value of the investment is affected by the underlying and the circumstances when the risks are most evident.\*]*

*[(When completing this paragraph, consideration should be given as to whether such matters described constitute "significant new factors" and consequently trigger the need for a supplement to the Prospectus under Article 16 of the Prospectus Directive.)]*

9. **OPERATIONAL INFORMATION**

| | |
|---|---|
| ISIN Code: | [•] |
| Common Code: | [•] |
| CUSIP No: | [•] |
| New Global Note intended to be held in a manner which would allow Eurosystem eligibility: | Not Applicable |
| Any clearing system(s) other than Euroclear and Clearstream, Luxembourg and the relevant identification number(s): | [Not Applicable/*give name(s) and number(s)*] |
| Delivery: | Delivery [against/free of] payment |
| The Aggregate Nominal Amount of Notes issued has been translated into U.S. Dollars at the rate of ([•]=$[ ] producing a sum of (for Notes not denominated in U.S. Dollars): | $[•] /Not Applicable |
| Names and addresses of Additional | [Not Applicable / *give details*] |

---

\* Not required for Notes with a denomination per unit of at least EUR50,000.

Paying Agent(s) (if any):

[In the case of Australian Domestic Notes:

|      |                                                              |                                                                                                    |
|------|--------------------------------------------------------------|----------------------------------------------------------------------------------------------------|
| (i)  | Notes to be listed on Australian Stock Exchange Limited:     | [Yes/No]                                                                                           |
| (ii) | Agent for service of process in new South Wales:            | [•] of [address]                                                                                   |
| (iii)| Transfer restrictions:                                       | Transfers of Australian Domestic Notes are restricted as provided by Condition 1(j) (*Australian Domestic Notes*). |
| (iv) | Australian Registrar:                                        | [•] of [*address*]                                                                                 |
| (v)  | Australian Administration Agent:                            | [[•] (see Condition 7(i) (*Payments in respect of Australian Domestic Notes*))/Not required]      |

The Notes will be eligible for lodgement into the Austraclear System. Distributions of principal and interest with respect to Notes held through the Austraclear System will be credited to the cash accounts of members of the Austraclear System in accordance with the regulations and the operating manual applicable to the Austraclear System.

Interests in the Notes may be held through Euroclear and Clearstream, Luxembourg indirectly through institutions which are participants in Euroclear and Clearstream, Luxembourg. In such circumstances, Westpac Custodian Nominees Limited (as nominee of, or another nominee appointed by, Euroclear) or ANZ Nominees Limited (as nominee of, or another nominee appointed by, Clearstream, Luxembourg) would hold the interests in the Notes in the Austraclear System. Austraclear Limited will be inscribed as the Holder of such Notes and will therefore be treated by the Issuer and the Australian Registrar as the absolute owner of such Notes for all purposes.

The Issuer will not be responsible for the operation of the clearing arrangements which is a matter for the clearing institutions, their participants and the investors.]

10.    **TERMS AND CONDITIONS OF THE OFFER**

|                                                                                                      |                                   |
|------------------------------------------------------------------------------------------------------|-----------------------------------|
| Offer Price:                                                                                         | [Issue Price][*specify*]          |
| Conditions to which the offer is subject:                                                            | [Not Applicable/*give details*]   |
| Description of the application process:                                                              | [Not Applicable/*give details*]   |
| Description of possibility to reduce subscriptions and manner for refunding excess amount paid by applicants: | [Not Applicable/*give details*]   |

Details of the minimum and/or maximum amount of application: [Not Applicable/*give details*]

Details of the method and time limits for paying up and delivering the Notes: [Not Applicable/*give details*]

Manner in and date on which results of the offer are to be made public: [Not Applicable/*give details*]

Procedure for exercise of any right of pre-emption, negotiability of subscription rights and treatment of subscription rights not exercised: [Not Applicable/*give details*]

Categories of potential investors to which the Notes are offered and whether tranche(s) have been reserved for certain countries: [Not Applicable/*give details*]

Process for notification to applicants of the amount allotted and the indication whether dealing may begin before notification is made: [Not Applicable/*give details*]

Amount of any expenses and taxes specifically charged to the subscriber or purchaser: [Not Applicable/*give details*]

Name(s) and address(es), to the extent known to the Issuer, of the placers in the various countries where the offer takes place: [None/*give details*]

**Annex to the Final Terms**

**Information relating to the Share Basket and the Share Issuers**

| 1 | Share Issuer | Bloomberg Codes | ISIN | Strike Price | Number of Shares | Exchange | Related Exchange | Website |
|---|---|---|---|---|---|---|---|---|
| [•] | [•] | [•] | [•] | [•] | [•] | [•] | [•] [All Exchanges] | [•] |
| [•] | [•] | [•] | [•] | [•] | [•] | [•] | [•] [All Exchanges] | [•] |

UK/1220111/13

250728/70-40074001

### BASE PROSPECTUS SUPPLEMENT NO. 6

### LEHMAN BROTHERS HOLDINGS INC.
*(incorporated in the State of Delaware)*

### LEHMAN BROTHERS TREASURY CO. B.V.
*(incorporated with limited liability in The Netherlands and
having its statutory domicile in Amsterdam)*

### LEHMAN BROTHERS BANKHAUS AG
*(incorporated in The Federal Republic of Germany)*

U.S.$100,000,000,000
Euro Medium-Term Note Program
Unconditionally and irrevocably guaranteed as to Notes to be issued by each of
Lehman Brothers Treasury Co. B.V. and Lehman Brothers Bankhaus AG by
### LEHMAN BROTHERS HOLDINGS INC.

#### Autocallable Index Basket Linked Notes

This Base Prospectus Supplement (this "**Supplement**") constitutes a supplement to and must be read in conjunction with the Base Prospectus dated 24 July 2007 (the "**Base Prospectus**") as already supplemented by the Base Prospectus Supplement dated 20 September 2007, the Base Prospectus Supplement dated 15 October 2007, the Base Prospectus Supplement dated 17 December 2007, the Base Prospectus Supplement dated 5 February 2008 and the Base Prospectus Supplement dated 11 February 2008 prepared by Lehman Brothers Holdings Inc. ("**LBHI**"), Lehman Brothers Treasury Co. B.V. ("**LBTBV**") and Lehman Brothers Bankhaus AG ("**LBB**") with respect to the U.S.$100,000,000,000 Euro Medium-Term Note Program (the "**Program**"). Terms defined in the Base Prospectus have the same meaning when used in this Supplement.

Application has been made to the Irish Financial Services Regulatory Authority (the "**IFSRA**"), which is the competent authority for the purpose of Directive 2003/71/EC (the "**Prospectus Directive**") and relevant implementing measures in Ireland, for approval of this Supplement as a prospectus supplement issued in compliance with the Prospectus Directive as implemented in Ireland by the Prospectus (Directive 2003/71/EC) Regulations 2005 (the "**Prospectus Regulations**"). Application has also been made to the IFSRA to provide the competent authorities in each of Austria, Belgium, the Czech Republic, Denmark, Finland, France, Germany, Greece, Hungary, Italy, Luxembourg, The Netherlands, Norway, Poland, Portugal, the Slovak Republic, Spain, Sweden and the United Kingdom with a certificate of approval under Article 18 of the Prospectus Directive as implemented in Ireland.

Notes issued pursuant to the Program may include Notes ("**Autocallable Index Basket Linked Notes**") linked to a basket of indices under the terms of which (i) the Notes may redeem early on one or more specific dates at a specific amount per Note if an event linked to the performance of some or all of such indices occurs, as further described in the applicable Final Terms and (ii) certain amounts payable in respect of such Notes, such as interest amounts or the redemption amount payable on the maturity date of the Notes, shall be

determined by reference to the performance of some or all of the indices comprised in such basket.

The purpose of this Supplement is to provide additional information in respect of Autocallable Index Basket Linked Notes.

Copies of this Supplement in physical and/or electronic form may be inspected during normal business hours on any weekday (excluding Saturdays and Sundays) at the principal place of business and registered office of LBHI (in its capacity as Issuer and as Guarantor), at the registered office of LBTCBV, at the registered office of LBB, at the offices of the Fiscal Agent in London, at the office of the Irish Paying Agent in Dublin and at the office of the listing agent in Singapore referred to in the Base Prospectus.

With effect from the date of this Supplement, the Base Prospectus shall be amended and supplemented in the manner described in this Supplement and each reference in the Base Prospectus to "Base Prospectus" shall be read and construed as a reference to the Base Prospectus as amended and supplemented by this Supplement. To the extent that there is any inconsistency between (a) any statement in this Supplement and (b) any statement in or incorporated by reference into the Base Prospectus, the statements in this Supplement will prevail.

Save as disclosed in this Supplement and the previously approved Supplements, no other significant new factor, material mistake or inaccuracy relating to information included in the Base Prospectus has arisen or been noted since the publication of the Base Prospectus.

Each of LBHI, LBTBV and LBB accepts responsibility for the information contained in this Supplement and declares that, having taken all reasonable care to ensure that such is the case, the information contained in this Supplement is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

**LEHMAN BROTHERS**

27 February 2008

**TABLE OF CONTENTS**

Addition To Summary In Relation To Autocallable Index Basket Linked Notes ................. 4

Addition To Risk Factors In Relation To Autocallable Index Basket Linked Notes ............. 7

Addition To Taxation In Relation To Autocallable Index Basket Linked Notes ................. 11

Information Relating To Autocallable Index Basket Linked Notes ............................... 13

Pro Forma Final Terms Applicable To Autocallable Index Basket Linked Notes .............. 34

**Addition to Summary in relation to Autocallable Index Basket Linked Notes**

In relation to Autocallable Index Basket Linked Notes, the Summary contained in the Base Prospectus is supplemented as follows:

| | |
|---|---|
| Autocallable Index Basket Linked Notes: | Autocallable Index Basket Linked Notes are Notes linked to a basket of indices (each, an "**Index**" and together, the "**Indices**") under the terms of which the Notes may redeem early on one or more specific dates at a specific amount per Note (the "**Mandatory Early Redemption Amount**") if an event linked to the performance of some or all of the Indices occurs, as further described in the applicable Final Terms (a "**Mandatory Early Redemption Event**"). |
| | In addition, Autocallable Index Basket Linked Notes may provide that some or all of the interest or of the principal payable at maturity in respect of them shall be linked to the performance of some or all of the Indices. |
| | Autocallable Index Basket Linked Notes may be capital protected or not. |
| | There is an additional exception to the obligation for the Issuer or the Guarantor, as the case may be, to pay Additional Amounts pursuant to Condition 9(a) of the Terms and Conditions in respect of Autocallable Index Basket Linked Notes issued by LBTBV or LBB, that are not fully principal protected and that are linked to an Index of which one or more of the Component Assets is a share issued by a U.S. issuer. |
| Risk Factors: | Additional risk factors applicable to Autocallable Index Basket Linked Notes include: |
| | - risk of partial or complete loss of principal, subject to the level of capital protection (if any) specified in the applicable Final Terms; |
| | - risk that, if a Mandatory Early Redemption Event occurs, a Noteholder would not be able |

to reinvest the redemption proceeds in a comparable security and receive a return on investment which is as high as that of the Notes;

- risk of the trading price of the Notes fluctuating over time and remaining at levels significantly below that at which the Notes were originally issued, due to factors (including supply and demand for the Notes, variations in the level of any Index, corporate actions and global economic, financial and political developments relating to components thereof (each, a "Component Asset"), adjustments and determinations made by the Calculation Agent to account for events affecting any Index or any Component Asset, replacement of any Index and other factors affecting any Index) which could interrelate in complex ways;

- risk that the Notes may be redeemed early at a value significantly below that at which the Notes were originally issued due to the occurrence of certain events affecting the Indices;

- risk that certain hedging, trading or other transactions performed by Lehman Brothers through any of its affiliates that are unrelated to the Notes but which involve directly or indirectly any Index or any Component Asset could present certain conflicts of interest with the interest of Noteholders by affecting the price of any Component Asset or the level of any Index and consequently the value of the Notes;

- risk that some or all of the Indices would close at a level which is greater than, equal to or lower than any threshold specified in the applicable Final Terms, thus affecting the amounts of interest and/or principal payable under the Notes;

- other risks relating to certain types of Notes

which may have features similar to those of Autocallable Index Basket Linked Notes, such as the risks set out in the Summary contained in the Base Prospectus in respect of Index-Linked Notes, Basket Linked Notes and Option Notes.

### Addition to Risk Factors in relation to Autocallable Index Basket Linked Notes

*Investors should consult their own financial, legal, accounting and tax advisors about the risks associated with an investment in Autocallable Index Basket Linked Notes, the appropriate tools to analyse that investment and the suitability of that investment to each investor's particular circumstances. No investor should purchase Autocallable Index Basket Linked Notes unless that investor understands and has sufficient financial resources to bear the price, market, liquidity, structure, redemption and other risks associated with an investment in Autocallable Index Basket Linked Notes. Certain of these risks are more explicitly described below.*

In relation to Autocallable Index Basket Linked Notes, the section entitled *Risks relating to the Notes* in the Risk Factors set out in the Base Prospectus is supplemented by the following:

### *Creditworthiness of the Issuer and Guarantor*

Any person who purchases the Notes is relying upon the creditworthiness of the Issuer and, where applicable, the Guarantor and has no rights against any other person. The Notes constitute general, unsecured, unsubordinated, contractual obligations of the Issuer and of no other person. The Notes rank *pari passu* among themselves.

### *The Issue Price may not be an accurate reflection of the market value of the Notes*

The Issue Price in respect of the Notes may not be an accurate reflection of the market value of the Notes. The Issue Price in respect of the Notes may take into account, among other things, the distribution fee payable to any appointed distributor of the Notes with respect to the offer and sale of the Notes. In addition, the price at which the Notes may be sold in secondary market transactions may be lower than the Issue Price.

### *Repayment of principal may be at risk and may be substantially less than the amount originally invested*

The terms of Notes may specify a minimum amount payable in respect of the redemption of such Notes upon the occurrence of a Mandatory Early Redemption event and/or at maturity (the **"Capital Protection"**). The level of Capital Protection may be expressly stated as a percentage of the nominal amount of each Note at issuance or may be inherent in the formula or formulae for determining the amount payable on the redemption of such Notes. Where there is no Capital Protection, or where the level of Capital Protection is less than 100 per cent. of the nominal amount of each Note at issuance, the amount payable upon redemption of the Notes may be significantly less than the amount originally invested and in certain circumstances may be nil.

Generally, where no specific Capital Protection is specified in the applicable Final Terms, or where such Capital Protection is specified to be less than 100 per cent. of the nominal amount of each Note, the return of capital at maturity will only be protected so long as Final Level$_{Worst}$ is not, as specified in the applicable Final Terms, either (i) less than or (ii) equal to or less than either Strike Level$_{Worst}$ or, where applicable, the product of such Strike Level$_{Worst}$ and either the Barrier Percentage or the Strike Level Adjustment Percentage. If the Final Level$_{Worst}$

is less than any such percentage, an investment in the Notes will be exposed to the negative performance of the Worst Performing Index and consequently the Final Redemption Amount will be less than the amount originally invested in the Notes. Where a Barrier Percentage or Strike Level Adjustment Percentage is specified in the applicable Final Terms, prospective investors should understand that the higher any such Barrier Percentage or Strike Level Adjustment Percentage is, the more repayment of principal at maturity will be at risk.

### A Mandatory Early Redemption Event may occur

The Notes will be automatically redeemed prior to the Maturity Date if a Mandatory Early Redemption Event occurs. The Mandatory Early Redemption Amount payable upon the occurrence of a Mandatory Early Redemption Event may be significantly less than the amount originally invested and in certain circumstances may be zero. In addition, a Noteholder may not be able to reinvest the redemption proceeds in a comparable security and receive a return on investment which is as high as that of the Notes. The Issuer is not liable for any disadvantage a Noteholder may incur in respect of the new investment or non-investment of its capital.

### Factors affecting the Indices and payments under the Notes

Prospective investors in the Notes should be familiar with investments in the global capital market and with derivatives, the Component Assets and the Indices generally. Changes in the levels of any Index may result in sudden and large fluctuations in the value of the Notes. The levels of any Index may vary over time and may increase or decrease by reference to a variety of factors, which may include, but are not limited to, corporate actions and global economic, financial and political developments relating to the relevant Component Assets. Fluctuations in the level of any one Index may be offset or intensified by fluctuations in the level of the other Indices.

### Investing in the Notes is not the same as investing in a Component Asset

Prospective investors should be aware that the market value of the Notes may not have a direct relationship with the prevailing level of any Index or price of any Component Asset, in that changes in the level of any Index or market price of any Component Asset will not necessarily result in a comparable change in the market value of the Notes.

Because the amount to be repaid at maturity of the Notes is not dependant on the average level of each Index but rather on the performance of the Worst Performing Index, it is likely that the value of the Notes will be correlated to the performance of such Worst Performing Index. In addition, a specific event affecting any one Index could have an adverse effect on the value of the Notes. For example, if a Trigger Event is specified in the applicable Final Terms, the occurrence of such event in relation to any one Index is likely to affect negatively the value of the Notes since it would make it more likely that the Notes are redeemed at an amount which is less than the amount originally invested in the Notes.

Finally, prospective investors should note that dividends paid to holders of any Component Asset will not be paid to the Issuer or to the Noteholders and will not, unless such Component Asset is comprised in an Index which is a "Total Return Index", be reflected in the level of

the relevant Index. The return on the Notes will thus generally not reflect any dividends that would be paid to investors that have made a direct investment in the relevant Component Asset. Consequently, the return on the Notes may be less than the return from a direct investment in the Component Assets comprising each Index.

***Historical levels of an Index should not be taken as an indication of the future performance of such Index during the term of the Notes***

The Final Terms may contain historical levels of an Index for information purposes. The actual performance of such Index over the term of the Notes may bear little relation to the historical levels of the Index. Fluctuations in the performance of an Index make the amount payable at maturity or upon redemption difficult to predict.

***Adjustments of the terms of the Notes and Cancellation of the Notes upon the occurrence of certain events relating to any Index***

The Calculation Agent has certain discretions to determine whether certain events, as set out in *Information Relating to Autocallable Index Basket Linked Notes* below, have occurred, and the consequences thereof.

For example, the Calculation Agent may determine that a market disruption in respect of any Index has occurred or exists at a relevant time or that an adjustment to the terms and conditions of the Notes is required following the occurrence of a correction of the level of an Index. Any such determination may have an adverse impact on the value of the Notes.

In addition, in certain circumstances, the Issuer may be entitled to cancel the Notes and, if permitted by applicable law, pay each Noteholder an amount as determined by the Calculation Agent in its sole and absolute discretion by reference to the fair market value of the Notes less the costs incurred by the Issuer in unwinding any related hedging arrangements. Prospective investors should note that such amount may be less than the Issue Price of the Notes or the amount required to be paid for acquiring the Notes, and may even be nil.

Prospective investors should note that any discretion exercised by, or any determination made by the Calculation Agent shall (in the absence of manifest error) be binding.

***Replacement of any Index***

Any Index may be replaced by a successor index in certain circumstances as set out in Condition 24 in "Information Relating to Autocallable Index Basket Linked Notes" and the performance of that successor index over time may be different from the performance of the relevant Index.

***Risk-excluding or risk-limiting transactions***

Prospective investors may not rely upon being able to enter into transactions which may exclude or limit loss exposure to the Notes during the term of the Notes. The possibility of entering into risk-excluding or risk-limiting transactions depends in particular on market conditions and the relevant underlying circumstances. Noteholders may be able to enter into

such transactions only at an unfavourable market price resulting in an additional loss for such Noteholders.

Prospective investors intending to purchase Notes to hedge the market risk associated with investing in the Indices or any Component Asset should be aware of the difficulties associated therewith. For example, the value of the Notes may not exactly correlate with the value of the Component Assets comprised in any Index.

**Addition to Taxation in relation to Autocallable Index Basket Linked Notes**

(A)    **United States Taxation**

In relation to Autocallable Index Basket Linked Notes, the section entitled UNITED STATES TAXATION set out in the Base Prospectus is supplemented as follows:

The following section is inserted after the section entitled "Treatment of Notes as Indebtedness" and before the section entitled "Treatment of the Guarantees":

"Treatment of Notes as Other Than Indebtedness

Where a Note is not fully principal protected and, therefore, may not be characterized as indebtedness for U.S. federal income tax purposes and the Notes are linked to an Index of which one or more of the Component Assets is a share issued by a U.S. issuer, it is possible that payments of principal, interest or disposition proceeds on the Note may be characterized, in whole or in part, as U.S. source income and may be subject to U.S. income or withholding tax.  Where this is the case, such payments may be made subject to U.S. withholding tax, generally at a rate of 30% or at such other rate as may be available under the provisions of any applicable double tax treaty."

(B)    **United Kingdom Taxation**

In relation to Autocallable Index Basket Linked Notes, the section entitled UNITED KINGDOM TAXATION set out in the Base Prospectus is supplemented as follows:

After the introductory paragraph and before section A, a new heading: "**A. UK Withholding Tax**" is inserted.

The next heading "A. UK Withholding Tax on Payments of UK Source Interest" is renumbered and replaced with "**A1. UK Withholding Tax on Payments of UK Source Interest**".

The paragraphs after the amended title are not amended. The following section is inserted before the section entitled "B. Payments by Guarantor":

"**A2. UK Withholding Tax on Other UK Source Payments**

Where a payment on a Note does not constitute interest, and the payment has a United Kingdom source, it may be subject to United Kingdom withholding tax if, for example, it constitutes (or is treated as) an annual payment or a manufactured payment for United Kingdom tax purposes.  Where a payment is subject to United Kingdom withholding tax, depending on the nature of the payment (which will be determined by, amongst other things, the terms and conditions specified by the Final Terms of the Note), the payment may fall to be made under deduction of United Kingdom tax (the rate of withholding depending on the nature of the payment), subject to any exemption from withholding which may apply and to such relief as may be available under the provisions of any applicable double tax treaty."

Paragraph 1 of the section entitled "E. Other Rules Relating to United Kingdom Withholding Tax", is amended as follows:

The words "or any other payment" are inserted after "Where interest" and before "has been paid under deduction of United Kingdom income tax".

Information Relating to Autocallable Index Basket Linked Notes

(A)   **General Description of Autocallable Index Basket Linked Notes**

Terms used in this paragraph shall be deemed to be defined as set out in the Terms and Conditions of the Notes. Notes issued pursuant to the Program may include Notes ("**Autocallable Index Basket Linked Notes**") linked to an Index Basket under the terms of which the Notes may redeem early on one or more Mandatory Early Redemption Dates at the applicable Mandatory Early Redemption Amount if a Mandatory Early Redemption Event occurs. In addition, Autocallable Index Basket Linked Notes may provide that Interest Amounts and/or a Final Redemption Amount linked to the performance of the Indices shall be payable on the relevant Interest Payment Dates and/or the Maturity Date. Autocallable Index Basket Linked Notes may be capital protected or not.

*Payments on Autocallable Index Basket Linked Notes - Interest*

*Index Basket Linked Interest Amounts*: Autocallable Index Basket Linked Notes may include Notes under the terms of which an amount is payable on specified interest payment dates which is determined by reference to the performance of some or all of the Indices in the Index Basket and whether such performance exceeds, is equal to and/or falls short of one or more specified thresholds, as specified in the applicable Final Terms. For example, the applicable Final Terms may specify that a particular Interest Amount shall be payable if on a particular Valuation Date the Closing Level$_{Worst}$ is less than the Strike Level$_{Worst}$ but greater than the Barrier Level$_{Worst}$.

*Payments on Autocallable Index Basket Linked Notes - Final Redemption Amount*

*Index Basket Linked Final Redemption Amount:* Autocallable Index Basket Linked Notes may include Notes under the terms of which the Final Redemption Amount payable at maturity of the Notes is determined by reference to the performance of all or some of the Indices in the Index Basket (the "**Index Basket Linked Final Redemption Amount**"). The Final Redemption amount may be determined in accordance with one of the following methodologies, or a combination thereof:

*Method A*

The Index Basket Linked Final Redemption Amount will be calculated as an amount per Note as follows:

(i)    If the Final Level of each Index is (as specified in the Final Terms) either (i) greater than or (ii) equal to or greater than the corresponding Strike Level of each such Index:

**Calculation Amount x (100% + additional percentage)**

(ii)   If the Final Level of any Index is (as specified in the Final Terms) either (i) equal to or less than or (ii) less than the corresponding Strike Level of such Index:

**Calculation Amount x 100%**

*Method B*

The Index Basket Linked Final Redemption Amount will be calculated as an amount per Note as follows:

(i)     If the Final Level of each Index is (as specified in the Final Terms) either (i) greater than or (ii) equal to or greater than the corresponding Strike Level of each such Index:

   **Calculation Amount x (100% + additional percentage)**

(ii)    If the Final Level of any Index is (as specified in the Final Terms) either (i) equal to or less than or (ii) less than the corresponding Strike Level of such Index:

   **Calculation Amount x (Final Level$_{Worst}$/Strike Level$_{Worst}$)**

*Method C*

The Index Basket Linked Final Redemption Amount will be calculated as an amount per Note as follows:

(i)     If Final Level$_{Worst}$ is (as specified in the Final Terms) either (i) greater than or (ii) equal to or greater than the product of (a) the Barrier Percentage and (b) Strike Level$_{Worst}$:

   **Calculation Amount x (100% + additional percentage)**

(ii)    If Final Level$_{Worst}$ is (as specified in the Final Terms) either (i) equal to or less than or (ii) less than the product of (a) the Barrier Percentage and (b) Strike Level$_{Worst}$:

   **Calculation Amount x (Final Level$_{Worst}$/Strike Level$_{Worst}$)**

*Method D*

The Index Basket Linked Final Redemption Amount will be calculated as an amount per Note as follows:

(i)     If the Final Level of each Index is (as specified in the Final Terms) either (i) greater than or (ii) equal to or greater than the corresponding Strike Level of each such Index:

   **Calculation Amount x (100% + additional percentage)**

(ii)    If Final Level$_{Worst}$ is (as specified in the Final Terms) either (i) greater than or (ii) equal to or greater than Adjusted Strike Level$_{Worst}$ but either (i) less than or (ii) equal to or less than Strike Level$_{Worst}$:

   **Calculation Amount x 100%**

(iii)   If Final Level$_{Worst}$ is (as specified in the Final Terms) either (i) equal to or less than or (ii) less than Adjusted Strike Level$_{Worst}$:

   **Calculation Amount x (Final Level$_{Worst}$/Adjusted Strike Level$_{Worst}$)**

*Method E*

The Index Basket Linked Final Redemption Amount will be calculated as an amount per Note as follows:

(i)     If a Trigger Event has occurred or is deemed to have occurred and Final Level$_{Worst}$ is (as specified in the Final Terms) either (i) less than or (ii) equal to or less than Strike Level$_{Worst}$:

   **Calculation Amount x (Final Level$_{Worst}$/Strike Level$_{Worst}$)**

(ii)    If a Trigger Event has occurred or is deemed to have occurred and Final Level$_{Worst}$ is (as specified in the Final Terms) either (i) equal to or greater than or (ii) greater than Strike Level$_{Worst}$:

   **Calculation Amount x (100% + additional percentage)**

(iii)   If a Trigger Event has not occurred or is not deemed to have occurred and Final Level$_{Worst}$ is (as specified in the Final Terms) either (i) less than or (ii) equal to or less than Strike Level$_{Worst}$:

   **Calculation Amount x 100%**

(iv)    If a Trigger Event has not occurred or is not deemed to have occurred and Final Level$_{Worst}$ is (as specified in the Final Terms) either (i) equal to or greater than or (ii) greater than Strike Level$_{Worst}$:

   **Calculation Amount x (100% + additional percentage)**

**Autocallable Index Basket Linked Notes - *Mandatory Early Redemption***

The performance of some or all of the Indices, as recorded on particular dates, may result in the redemption of Notes prior to their scheduled maturity date because a Mandatory Early Redemption Event has occurred. If such event occurs, the Notes may be redeemed at a premium to their nominal amount, at their nominal amount or at an amount which is less than their nominal amount, depending on the definition of the Mandatory Early Redemption Rate in the applicable Final Terms.

(B)    **Information on the Indices**

Terms used in this paragraph shall be deemed to be defined as set out in the Terms and Conditions of the Notes. The Indices to which any Autocallable Index Basket Linked Notes are linked will be one of the indices specified below. Information about an Index and about the past and the further performance of such Index and its volatility can be obtained from the website specified as such for such Index in the list below.

The Indices to which any issue of Autocallable Index Basket Linked Notes may be linked:

| Index | Bloomberg Code | Website | Index Sponsor |
|---|---|---|---|
| CAC 40 Index | CAC | www.euronext.com | Euronext Paris S.A. |
| CECE Traded Index | CECEEUR | www.wienerborse.at | Wiener Börse AG |
| Czech Traded Index | CCTX | www.wienerborse.at | Wiener Börse AG |
| DAX Index | DAX | www.deutsche-boerse.com | Deutsche Börse AG |
| DAX MidCap Index | MDAX | www.deutsche-boerse.com | Deutsche Börse AG |
| Deutsche Börse India Index | D1AV | www.deutsche-boerse.com | Deutsche Börse AG |
| DivDAX Index (Price / Total Return) | DDAXK / DIVDAX | www.deutsche-boerse.com | Deutsche Börse AG |
| Dow Jones Dividend Select US Index | DJDVY | www.djindexes.com | Dow Jones & Company |
| Dow Jones Euro STOXX 50 Index | SX5E | www.djindexes.com | STOXX Limited |
| Dow Jones Euro STOXX Select Dividend Index | SD3E | www.djindexes.com | STOXX Limited |
| Dow Jones Global Titans 50 Index | DJGT | www.djindexes.com | Dow Jones & Company |
| Dow Jones Industrial Average Index | INDU | www.djindexes.com | Dow Jones & Company |
| Dow Jones Islamic Market Titans 100 Index | IMXL | www.djindexes.com | Dow Jones & Company |

| | | | |
|---|---|---|---|
| Dow Jones STOXX 50 PR Index | SX5P | www.djindexes.com | STOXX Limited |
| Dow Jones STOXX MID 200 Index | MCXP | www.djindexes.com | STOXX Limited |
| Dow Jones STOXX Select Dividend 30 Index | SD3P | www.djindexes.com | STOXX Limited |
| ECPI Ethical Euro Tradable Index (Price / Total Return) | ECAPTRDP / ECAPTRDR | www.e-cpartners.com | E. Capital Partners |
| ECPI Ethical Global Tradable Index (Price / Total Return) | ECAPGTP / ECAPGTR | www.e-cpartners.com | E. Capital Partners |
| EPRA Eurozone Index | EPEU | www.ftse.com | FTSE International Limited |
| European Public Real Estate Index | EPRA | www.ftse.com | FTSE International Limited |
| FTSE 100 Index | UKX | www.ftse.com | FTSE International Limited |
| FTSE 250 Index | MCX | www.ftse.com | FTSE International Limited |
| FTSE4Good Europe 50 Index | 4EU5X Index | www.ftse.com | FTSE International Limited |
| FTSE/JSE Africa TOP40 IX Index | TOP40 | www.ftse.com | FTSE International Limited |
| FTSE Eurofirst 80 Index | FTEF80 | www.ftse.com | FTSE International Limited |
| FTSE Nordic 30 Index (EUR / SEK) | FTNOEUR / FTNOTRSK | www.ftse.com | FTSE International Limited |
| FTSE Xinhua 50 Index | XIN50 | www.ftse.com | FTSE International Limited |

| Hang Seng Index | HSI | www.hsi.com.hk | Hang Seng Indexes Company Limited |
|---|---|---|---|
| Hang Seng China Enterprises Index | HSCEI | www.hsi.com.hk | Hang Seng Indexes Company Limited |
| Hungarian Traded Index | CHTX | www.wienerborse.at | Wiener Börse AG |
| IBEX 35 Index | IBEX | www.bolsasymercados.es | Bolsas y Mercados Españoles |
| KOSPI 200 Index | KOSPI2 | www.kse.or.kr | Korea Exchange |
| Malaysian Composite Index | KLCI | www.klse.com | Bursa Malaysia Berhad |
| MSCI Malaysia Index | MXMY | www.msci.com/ | MSCI Barra |
| MSCI Taiwan Index | TWY | www.msci.com/ | MSCI Barra |
| NASDAQ 100 Index | NDX | www.nasdaq.com | The NASDAQ Stock Market, Inc. |
| Nikkei 225 Index | NKY | www.nni.nikkei.co.jp | Nikkei Inc. |
| OMX Index | OMX | www.omxgroup.com | OMX AB (publ) |
| OMX Copenhagen 20 Index | KFX | www.omxgroup.com | OMX AB (publ) |
| Philadelphia Stock Exchange Housing Sector Index | HGX | www.phlx.com | Philadelphia Stock Exchange |
| Polish Traded Index | CPTX | www.wienerborse.at | Wiener Börse AG |
| Russian Depositary Index | RDX | www.wienerborse.at | Wiener Börse AG |
| S&P/ASX 200 Index | AS51 | www.standardandpoors.com | The McGraw |
| S&P/TSX Composite Index | SPTSX | www.standardandpoors.com | The McGraw |

| | | | |
|---|---|---|---|
| S&P 500 Index | SPX | www.standardandpoors.com | The McGraw |
| S&P/ASX 200 Index | AS51 | www.standardandpoors.com | The McGraw |
| S&P/ASX 200 Property Trust Index | AS51PROP | www.standardandpoors.com | The McGraw |
| S&P Asia 50 Index | SPA50 | www.standardandpoors.com | The McGraw |
| S&P BRIC 40 Index (Price / Total Return) | SPPRBRIC / SPTRBRIC | www.standardandpoors.com | The McGraw |
| S&P BRIC Shariah Index (Price / Total Return / USD / EUR) | SPSHBR SPSHBRT SPSHBRE SPSHBRET | www.standardandpoors.com | The McGraw |
| S&P Dividend Growth Index (EUR / USD) | SPDGEEP / SPDGUDP | www.standardandpoors.com | The McGraw |
| S&P Europe 350 Index | SPEURO | www.standardandpoors.com | The McGraw |
| S&P Global 100 Index | OOI | www.standardandpoors.com | The McGraw |
| S&P Global Clean Energy Index (Price / Total Return / USD / EUR) | SPGTCLEN / SPGTCLTR / SPGTCLEE / SPGTCTRE | www.standardandpoors.com | The McGraw |
| S&P Global Infrastructure Index (Price / Total Return / USD / EUR) | SPGTINFR / SPGTINTR / SPGTINFE / SPGTITRE | www.standardandpoors.com | The McGraw |
| S&P Global Water Index (Price / Total Return / USD / EUR) | SPGTAQUA / SPGTAQTR / SPGTAQUE / SPGTATRE | www.standardandpoors.com | The McGraw |
| S&P Infrastructure Shariah Index (Price / Total Return / USD / EUR) | SPSHIF SPSHIFT SPSHIFE SPSHIFN | www.standardandpoors.com | The McGraw |
| S&P Listed Private Equity Index (Price / Total Return / USD / EUR) | SPLPEQTY / SPLPEQTR / SPLPEQTE / SPLPETRE | www.standardandpoors.com | The McGraw |
| S&P MIB Index | SPMIB | www.standardandpoors.com | The McGraw |
| S&P Pan Asia 50 High Dividend Index (Price / | SPA5HDP / | www.standardandpoors.com | The McGraw |

| | | | |
|---|---|---|---|
| Total Return) | SPA5HDT | | |
| S&P South East Asia 40 Index (Price / Total Return) | SPSEA4DP / SPSEA4DT | www.standardandpoors.com | The McGraw |
| Swiss Market Index - SMI | SMI | www.swx.com | SWX Swiss Exchange AG |
| Tel Aviv 25 Index | TA-25 | www.tase.co.il | Tel Aviv Stock Exchange Ltd |
| TOPIX Index | TPX | www.tse.or.jp | Tokyo Stock Exchange Group, Inc. |
| TOPIX Real Estate Index | TPREAL | www.tse.or.jp | Tokyo Stock Exchange Group, Inc. |
| TSE REIT Index | TSEREIT | www.tse.or.jp | Tokyo Stock Exchange Group, Inc. |
| TWSE/TAIEX Index | TWSE | www.tse.com.tw | Taiwan Stock Exchange Corp. |
| VINX 30 Index | VINX30 | www.omxgroup.com | OMX AB (publ) |

(C)    **Additional Definitions, Additional or Amended Terms and Conditions and Disruption Events Applicable to Autocallable Index Basket Linked Notes**

With respect to Autocallable Index Basket Linked Notes of any Series, the Terms and Conditions of the Notes are hereby amended and, when appropriate, restated, as set forth below. The Terms and Conditions of the Notes as so amended and, when appropriate, restated, will be incorporated by reference in each temporary or permanent global Note in bearer form, each global Note in registered form and will be attached to each definitive Note, in the latter case, only if permitted by the relevant stock exchange or other relevant authority (if any) and agreed by the relevant Issuer and the relevant Dealer(s) at the time of issue, but if not so permitted and agreed, such Terms and Conditions will be endorsed upon such definitive Note.

1.    **Definitions and General Terms**

Capitalised terms used in this Supplement will have the same meaning as is given to them in the Base Prospectus, unless otherwise defined below.

The following definitions shall apply in this Supplement and shall be included in the Terms and Conditions of the Autocallable Index Basket Linked Notes of any Series, subject as otherwise provided in the applicable Final Terms:

"**Adjusted Strike Level**" means, in relation to an Index, an amount equal to the product of (i) the relevant Strike Level Adjustment Percentage and (ii) the Strike Level of such Index;

"**Adjusted Strike Level$_{Worst}$**" means the Adjusted Strike Level in respect of the Worst Performing Index;

"**Barrier Level**" means, in relation to an Index, an amount equal to the product of (i) the relevant Barrier Percentage and (ii) the Strike Level of such Index;

"**Barrier Level$_{Worst}$**" means, in relation to the Worst Performing Index, an amount equal to the product of (i) the relevant Barrier Percentage and (ii) the Strike Level$_{Worst}$;

"**Barrier Percentage**" means, in relation to an Index, the percentage specified in the applicable Final Terms;

"**Calculation Agent**" means Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE, or any other entity as specified in the applicable Final Terms;

"**Cancellation Amount**" means an amount per Note in the Specified Currency:

(i)    determined by the Calculation Agent in its sole and absolute discretion acting in good faith in order to produce a commercially reasonable result and determined as of the date that the Notes are cancelled or, if the Calculation Agent determines that would not be commercially reasonable, as of such date following the date that the Notes are cancelled as the Calculation Agent determines would be commercially reasonable; and

(ii)    to be paid to the Noteholders following a cancellation, being (a) the fair market value of a Note and (b) adjusted to account fully for any losses, expenses and costs to the Issuer (or any of its affiliates) of unwinding any underlying or related hedging and funding arrangements, all as determined by the Calculation Agent in its sole and absolute discretion;

and, in determining such amount, the Calculation Agent may in its sole and absolute discretion, consider any relevant information, including, without limitation, one or more of the following types of information:

(a)    quotations (either firm or indicative) supplied by one or more third parties that may take into account the current creditworthiness of the Calculation Agent at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Calculation Agent and the third party providing the quotation;

(b)    information consisting of relevant market data in the relevant markets supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads correlation or other relevant market data in the relevant market; or

(c)    information of the types described in (a) or (b) above from internal sources (including any affiliates of the Calculation Agent) if that information is of the same type used by the Calculation Agent in the regular course of its business for the valuation of similar transactions;

"**Closing Level**" means, in relation to an Index and any Scheduled Trading Day, the closing level of such Index, as calculated and announced by the Index Sponsor at the Valuation Time on such day, as determined by the Calculation Agent;

"**Closing Level**$_{Worst}$" means, in relation to the Worst Performing Index and any Scheduled Trading Day, the Closing Level in respect of such Worst Performing Index on such day, as determined by the Calculation Agent;

"**Component Asset**" means, in relation to an Index, any security or other property which comprises such Index;

"**Disrupted Day**" means (a) except with respect to a Multi-exchange Index, any Scheduled Trading Day on which a relevant Exchange or any Related Exchange fails to open for trading during its regular trading session or on which a Market Disruption Event has occurred, and (b) with respect to any Multi-exchange Index, any Scheduled Trading Day on which (i) the Index Sponsor fails to publish the level of the Index; (ii) the Related Exchange fails to open for trading during its regular trading session or (iii) a Market Disruption Event has occurred. The Calculation Agent shall as soon as reasonably practicable under the circumstances notify the Issuer of the occurrence of a Disrupted Day on any day that, but for the occurrence of a Disrupted Day, would have been a Valuation Date. Without limiting the obligation of the Calculation Agent to

notify the Issuer as set forth in the preceding sentence, failure by the Calculation Agent to notify the Issuer of the occurrence of a Disrupted Day shall not affect the validity of the occurrence and effect of such Disrupted Day;

"**Early Closure**" means in respect of an Index the closure on any Exchange Business Day of (A)(a) in relation to an Index other than a Multi-exchange Index, any relevant Exchange relating to securities that comprise 20 per cent. or more of the level of the relevant Index, and (b) with respect to any Multi-exchange Index, the Exchange in respect of any Component Asset of such Index or (B) any Related Exchange, prior to its Scheduled Closing Time unless, where the level of the relevant Index is to be determined at the Valuation Time, such earlier closing is announced by such Exchange or Related Exchange (as the case may be) at least one hour prior to the earlier of: (i) the actual closing time for the regular trading session on such Exchange or Related Exchange (as the case may be) on such Exchange Business Day; and (ii) the submission deadline for orders to be entered into such Exchange or Related Exchange system for execution at the relevant Valuation Time on such Exchange Business Day;

"**Exchange**" means (i) in relation to an Index other than a Multi-exchange Index, each exchange or quotation system specified as such for such Index in the applicable Final Terms, any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in the securities or other property comprised in such Index has temporarily relocated (provided that the Calculation Agent has determined that there is comparable liquidity relative to the securities or other property comprised in such Index on such temporary substitute exchange or quotation system as on the original Exchange), and (ii) with respect to any Multi-exchange Index, and in respect of each Component Asset, the principal stock exchange on which such Component Asset is principally traded, as determined by the Calculation Agent;

"**Exchange Business Day**" means (a) except with respect to a Multi-exchange Index, any Scheduled Trading Day on which each Exchange and Related Exchange are open for trading during their respective regular trading sessions, notwithstanding any such Exchange or Related Exchange closing prior to its Scheduled Closing Time and (b) with respect to any Multi-exchange Index, any Scheduled Trading Day on which (i) the Index Sponsor publishes the level of the Index and (ii) the Related Exchange is open for trading during its regular trading session, notwithstanding any Exchange or the Related Exchange closing prior to its Scheduled Closing Time;

"**Exchange Disruption**" means, in respect of an Index, any event (other than an Early Closure) that disrupts or impairs (as determined by the Calculation Agent) the ability of market participants in general to effect transactions in, or obtain market values for:

(i) (a) in relation to an Index other than a Multi-exchange Index on any relevant Exchange, securities that comprise 20 per cent. or more of the level of the relevant Index, or (b) with respect to any Multi-exchange Index any Component Asset of such Index on the Exchange in respect of such Component Asset; or

(ii) futures or options contracts relating to such Index on the relevant Related Exchange;

"**Final Level**" means in relation to an Index, the Closing Level of such Index on the Final Valuation Date;

"**Final Valuation Date**" means the date specified as such in the applicable Final Terms, or if such day is not a Scheduled Trading Day, the next following Scheduled Trading Day, and subject to Condition 23 (*Disrupted Days*);

"**Hedging Disruption**" means that the Issuer or any of its affiliates is unable, after using commercially reasonable efforts, to (a) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the equity or other price risk (or any other relevant price risk including, but not limited to, the currency risk) of the Issuer issuing and performing its obligations with respect to the Notes, or (b) realise, recover, receive, repatriate, remit or transfer the proceeds of any such transaction(s) or asset(s);

"**Index Basket**" means the basket of indices (each an "**Index**" and collectively the "**Indices**" which shall refer to any one or more of the Indices included in the Index Basket, as the context requires) described in the applicable Final Terms;

"**Index Sponsor**" means each index sponsor specified as such in the applicable Final Terms, or any successor sponsor accepted by the Calculation Agent;

"**Initial Valuation Date**" means the date specified as such in the applicable Final Terms, or if such day is not a Scheduled Trading Day, the next following Scheduled Trading Day, and subject to Condition 23 (*Disrupted Days*);

"**Interest Payment Date**" means each date specified as such in the applicable Final Terms, subject to the relevant Business Day Convention;

"**Market Disruption Event**" means either:

(a)    in respect of an Index which is not a Multi-exchange Index:

    (A)    the occurrence or existence of:

        (1)    a Trading Disruption; or

        (2)    an Exchange Disruption,

    which in either case the Calculation Agent determines is material and, where the level of the relevant Index is to be determined at the Valuation Time, which occurs at any time during the one hour period that ends at the relevant Valuation Time; or

(B)   an Early Closure;

for the purposes of determining whether a Market Disruption Event in respect of an Index exists at any time, if a Market Disruption Event occurs in respect of a Component Asset at any time, then the relevant percentage contribution of that Component Asset to the level of the Index shall be based on a comparison of (i) the portion of the level of the Index attributable to that Component Asset and (ii) the overall level of the Index, in each case immediately before the occurrence of such Market Disruption Event, or

(b)   with respect to any Multi-exchange Index either:

(i)

(A)   the occurrence or existence, in respect of any Component Asset, of:

(1)   a Trading Disruption in respect of such Component Asset, which the Calculation Agent determines is material and, where the level of the relevant Index is to be determined at the Valuation Time, which occurs at any time during the one hour period that ends at the relevant Valuation Time in respect of the Exchange on which such Component Asset is principally traded;

(2)   an Exchange Disruption in respect of such Component Asset, which the Calculation Agent determines is material and, where the level of the relevant Index is to be determined at the Valuation Time, which occurs at any time during the one hour period that ends at the relevant Valuation Time in respect of the Exchange on which such Component Asset is principally traded; OR

(3)   an Early Closure in respect of such Component Asset; AND

(B)   the aggregate of all Component Assets in respect of which a Trading Disruption, an Exchange Disruption or an Early Closure occurs or exists comprises 20 per cent. or more of the level of the Index; or

(ii)   the occurrence or existence, in respect of futures or options contracts relating to the Index, of: (A) a Trading Disruption, (B) an Exchange Disruption, which in either case the Calculation Agent determines is material, at any time during the one hour period that ends at the relevant Valuation Time in respect of the Related Exchange; or (C) an Early Closure, in each case in respect of such futures or options contracts;

for the purposes of determining whether a Market Disruption Event exists in respect of a Component Asset at any time, if a Market Disruption Event occurs in respect of such Component Asset at that time, then the relevant percentage contribution of that Component Asset

to the level of the Index shall be based on a comparison of (i) the portion of the level of the Index attributable to that Component Asset to (ii) the overall level of the Index, in each case using the official opening weightings as published by the Index Sponsor as part of the market "opening data".

**"Multi-exchange Index"** means any Index in respect of which "Multi-exchange" is specified as the relevant Exchange in the applicable Final Terms;

**"Performance"** means, in relation to an Index, a value determined by the Calculation Agent in accordance with the following formula:

### Performance = Final Level/Strike Level

**"Related Exchange"** means, in relation to an Index, each exchange or quotation system specified as such for such Index in the applicable Final Terms, any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in futures or options contracts relating to such Index has temporarily relocated (provided that the Calculation Agent has determined that there is comparable liquidity relative to the futures or options contracts relating to such Index on such temporary substitute exchange or quotation system as on the original Related Exchange); provided that where **"All Exchanges"** is specified as the Related Exchange in respect of an Index in the applicable Final Terms, "Related Exchange" shall mean each exchange or quotation system where trading has a material effect (as determined by the Calculation Agent) on the overall market for futures or options contracts relating to such Index;

**"Scheduled Closing Time"** means, in respect of a relevant Exchange or Related Exchange and a Scheduled Trading Day, the scheduled weekday closing time of such relevant Exchange or Related Exchange on such Scheduled Trading Day, without regard to after hours or any other trading outside of the regular trading session hours;

**"Scheduled Trading Day"** means a day on which both:

(a)     with respect to any Index that is not a Multi-exchange Index, any day on which each relevant Exchange and each relevant Related Exchange are scheduled to be open for trading for their respective regular trading sessions; and

(b)     with respect to any Multi-exchange Index, any day on which (i) the Index Sponsor is scheduled to publish the level of such Index and (ii) the relevant Related Exchange is scheduled to be open for trading for its regular trading session;

**"Strike Level"** means, in relation to an Index, the Closing Level of such Index on the Initial Valuation Date;

"**Strike Level Adjustment Percentage**" means, in relation to an Index, the percentage specified in the applicable Final Terms;

"**Strike Level**Worst" means the Strike Level of the Worst Performing Index;

"**Trading Disruption**" means any suspension of or limitation imposed on trading by the relevant Exchange or Related Exchange or otherwise and whether by reason of movements in price exceeding limits permitted by the relevant Exchange or Related Exchange or otherwise: (A) with respect to any Index that is not a Multi-exchange Index, (i) relating to securities that comprise 20 per cent. or more of the level of the relevant Index on any relevant Exchange, or (ii) in futures or options contracts relating to the relevant Index on any relevant Related Exchange or (B) with respect to any Multi-exchange Index, (i) relating to any Component Asset on the Exchange in respect of such Component Asset; or (ii) in futures or options contracts relating to the Index on the Related Exchange;

"**Trigger Event**" means either a Trigger Event (Closing Observation), a Trigger Event (Intraday Observation) or such other event as specified in the applicable Final Terms;

"**Trigger Event (Closing Observation)**" means the determination by the Calculation Agent that on any Trigger Event Observation Date the Closing Level of any Index is less than or equal to the relevant Trigger Level, as determined by the Calculation Agent;

"**Trigger Event (Intraday Observation)**" means the determination by the Calculation Agent that at any time during the regular trading session hours on any Trigger Event Observation Date the level of any Index is less than or equal to the relevant Trigger Level, as determined by the Calculation Agent;

"**Trigger Event Observation Date**" means each Scheduled Trading Day during the Trigger Event Observation Period provided that if at any relevant time on any such Scheduled Trading Day there is a Market Disruption Event, as determined by the Calculation Agent in its sole and absolute discretion, then notwithstanding the fact that there is a Market Disruption Event on such Trigger Event Observation Date, the Calculation Agent shall determine in good faith and in a commercially reasonable manner whether a Trigger Event has occurred during such Market Disruption Event;

"**Trigger Event Observation Period**" means the period from and including the Initial Valuation Date to and including the Final Valuation Date;

"**Trigger Level**" means, in relation to an Index, an amount equal to the product of (i) the relevant Trigger Percentage and (ii) the Strike Level of such Index;

"**Trigger Percentage**" means, in relation to an Index, the percentage specified in the applicable Final Terms;

"**Valuation Date**" means each date specified as such in the applicable Final Terms (including the Initial Valuation Date and the Final Valuation Date), or if such day is

not a Scheduled Trading Day, the next following Scheduled Trading Day, and subject to Condition 23 (*Disrupted Days*);

"**Valuation Time**" means:

(a)    with respect to any Index that is not a Multi-exchange Index, the official close of trading on the relevant Exchange; and

(b)    with respect to any Multi-exchange Index, (i) for the purposes of determining whether a Market Disruption Event has occurred, (1) in respect of any Component Asset, the Scheduled Closing Time on the Exchange in respect of such Component Asset and (2) in respect of any options contracts or future contracts on the Index, the close of trading on the Related Exchange; and (ii) in all other circumstances, the time at which the official closing level of the Index is calculated and published by the Index Sponsor.

"**Worst Performing Index**" means the Index with the lowest Performance, as determined by the Calculation Agent.

2.    **Amendments to, and Restatements of, the Terms and Conditions**

2.1    The following Condition 3(f) *Interest linked to an Index Basket* is inserted in Condition 3 (*Interest*):

"(f) *Interest linked to an Index Basket*

Interest linked to an Index Basket may become payable on each Note on any Interest Payment Date (including if so specified the Maturity Date), as may be specified in the applicable Final Terms. Any rights to payment of interest may be conditional upon the satisfaction of all such conditions as may be set forth in the applicable Final Terms.

Subject to Condition 23 (*Disrupted Days*), the Calculation Agent will, at or as soon as practicable after each Valuation Date (except the Initial Valuation Date), determine the interest linked to the Index Basket payable in respect of each Note (the "**Index Basket Linked Interest Amount**") and notify the Fiscal Agent as soon as practicable after calculating the same. Each Index Basket Linked Interest Amount shall be calculated in accordance with the formulae set forth in the applicable Final Terms and rounding the resultant figure to the nearest sub-unit of the Specified Currency (half a sub-unit being rounded upwards)."

2.2    Condition 8(a) (*At Maturity*) is hereby amended and restated as follows:

"(a)   *At Maturity*

(A)   *Final Redemption Amount*

Unless previously redeemed or purchased or cancelled as specified below, each Note will be redeemed by the Issuer at its Final Redemption Amount (the "**Final Redemption Amount**") specified in, or determined in the manner specified in, the

applicable Final Terms in the relevant Specified Currency (except as otherwise provided in Condition 6 (*Payment Currency*)). If applicable, the Calculation Agent will, on or as soon as practicable after the Final Valuation Date, determine the Final Redemption Amount of each Autocallable Index Basket Linked Note and notify the Fiscal Agent as soon as practicable after calculating the same. The Calculation Agent shall calculate the Final Redemption Amount of each Autocallable Index Basket Linked Note in accordance with the formula set forth in the applicable Final Terms and rounding the resultant figure to the nearest sub-unit of the Specified Currency (half a sub-unit being rounded upwards).

(B)   *Certificates to be Final*

The provisions of Condition 3(b)(vii) (*Certificates to be Final*) shall apply, *mutatis mutandis* to any certificate, communication, opinion, calculation, determination, quotation and decision given, expressed, made or obtained by the Calculation Agent for the purposes of this Condition 8 (*Repayment, Redemption and Repurchase*)."

2.3   The following Condition 8(j) (*Mandatory Early Redemption*) is inserted in Condition 8 (*Repayment, Redemption and Repurchase*):

"(j)   *Mandatory Early Redemption*

Unless the Notes have been previously redeemed or purchased and cancelled, if on any Mandatory Early Redemption Valuation Date a Mandatory Early Redemption Event occurs, then the Notes will be automatically redeemed in whole, but not in part, on the Mandatory Early Redemption Date immediately following such Mandatory Early Redemption Valuation Date and the redemption amount payable by the Issuer on such date upon redemption of each Note shall be an amount in the Specified Currency equal to the relevant Mandatory Early Redemption Amount.

As used herein:

"**Mandatory Early Redemption Amount**" means, in respect of each Mandatory Early Redemption Date, an amount equal to the product of (i) the Calculation Amount and (ii) the relevant Mandatory Early Redemption Rate relating to that Mandatory Early Redemption Date;

"**Mandatory Early Redemption Date**" means each date specified as such in the applicable Final Terms, subject in each case to adjustment in accordance with the Business Day Convention specified in the applicable Final Terms;

"**Mandatory Early Redemption Event**" means an event as further specified in the relevant Final Terms whereby the Closing Level of a specified Index or of all Indices, as the case may be, as determined by the Calculation Agent as of any Mandatory Early Redemption Valuation Date is, as specified in the relevant Final Terms, (i) "greater than", (ii) "greater than or equal to", (iii) "less than" or (iv) "less than or equal to" the Mandatory Early Redemption Level, or as the case may be, any other specified value;

"**Mandatory Early Redemption Level**" means the level per Index specified as such or otherwise determined in the applicable Final Terms;

"**Mandatory Early Redemption Rate**" means, in respect of any Mandatory Early Redemption Date, the rate specified as such in the applicable Final Terms; and

"**Mandatory Early Redemption Valuation Date**" means each Valuation Date (except the Initial Valuation Date and the Final Valuation Date.

If the Notes are interest bearing, for the avoidance of doubt, any interest amount applicable to the relevant Mandatory Early Redemption Valuation Date on which the Calculation Agent determines that a Mandatory Early Redemption Event has or is deemed to have occurred shall be payable by the Issuer notwithstanding such occurrence, but no further interest will be payable thereafter."

2.4    Condition 9(a) (*Additional Amounts*) is hereby amended as follows:

the last word of subparagraph (ix) "or" is deleted and subparagraph (x) is deleted in its entirety and replaced with the following:

"(x)    in the case of any tax imposed by the United States, any tax, assessment or other governmental charge imposed in respect of Autocallable Index Basket Linked Notes issued by LBTBV or LBB, that are not fully principal protected (which means that the Final Redemption Amount may be less than the nominal amount of the Notes) and that are linked to an Index of which one or more of the Component Assets is a share issued by a U.S. issuer;

(xi)    any combination of items (i) through (x);"

2.5    The following Condition 23 (*Disrupted Days*) is hereby inserted into the Terms and Conditions:

"**23    Disrupted Days**

If, in respect of any Index, any Valuation Date is a Disrupted Day, then the Valuation Date for each Index not affected by the occurrence of a Disrupted Day shall be the scheduled Valuation Date and the Valuation Date for each Index affected by the occurrence of a Disrupted Day shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day relating to such Index, provided that (A) such day shall not be later than, and shall be deemed to be the earlier of (i) the eighth succeeding Scheduled Trading Day and (ii) the third weekday (meaning any day other than a Saturday or a Sunday) immediately prior to the relevant Interest Payment Date, the relevant Mandatory Early Redemption Date or the Maturity Date, as the case may be, notwithstanding that such day is a Disrupted Day in respect of such Index (the "**Deemed Date**") and (B) the Calculation Agent shall determine the level of that Index as of the Valuation Time on the Deemed Date in accordance with the formula for and method of calculating that Index last in effect prior to the occurrence of the first Disrupted Day using the Exchange traded or quoted price as of the Valuation Time on

the Deemed Date of each relevant Component Asset (or, if an event giving rise to a Disrupted Day has occurred in respect of the relevant Component Asset on the Deemed Date, its good faith estimate of the value for the relevant Component Asset as of the Valuation Time on the Deemed Date)."

2.6    The following Condition 24 (*Adjustments to the Index*) is hereby inserted into the Terms and Conditions:

"24.    **Adjustments to the Index**

24.1    Successor Index:  If the Closing Level of any Index is (i) not calculated and announced by the relevant Index Sponsor but is calculated and announced by a successor sponsor acceptable to the Calculation Agent, or (ii) replaced by a successor index using, in the determination of the Calculation Agent, the same or a substantially similar formula for and method of calculation as used in the calculation of that Index, then in each case the index (the "**Successor Index**") will be deemed to be the relevant Index.

24.2    Index Adjustment Event: If (i) on or prior to the Final Valuation Date, a relevant Index Sponsor announces that it will make a material change in the formula for or the method of calculating the relevant Index or in any other way materially modifies that Index (other than a modification prescribed in that formula or method to maintain the relevant Index in the event of changes in constituent stock and capitalisation and other routine events) (an "**Index Modification**") or permanently cancels the relevant Index and no Successor Index exists (an "**Index Cancellation**") or (ii) on any Valuation Date, an Index Sponsor fails to calculate and announce the relevant Index (an "**Index Disruption**" (provided that the Calculation Agent may, in its discretion, determine that such event instead results in the occurrence of a Disrupted Day) and together with the Index Modification and the Index Cancellation, each (an "**Index Adjustment Event**"), then the Calculation Agent shall determine if such Index Adjustment Event has a material effect on the Notes and, if so, shall make its determination for the purposes of calculating the Cancellation Amount, the Early Redemption Amount, the Mandatory Early Redemption Amount, any relevant Index Basket-Linked Interest Amount and/or the Final Redemption Amount (as the case may be) using, in lieu of a published level for the relevant Index, the level for that Index as at the relevant Valuation Date, as determined by the Calculation Agent in accordance with the formula for and method of calculating the relevant Index last in effect prior to the change, failure or cancellation, but using only those securities that comprised that Index immediately prior to that Index Adjustment Event."

2.7    The following Condition 25 (*Correction of Index*) is hereby inserted into the Terms and Conditions:

"25.   Correction of Index

In the event that the Closing Level of any Index is subsequently corrected and the correction is published by the relevant Exchange or Index Sponsor within one Settlement Cycle after the original publication, the Calculation Agent will determine the amount that is payable as a result of that correction, and, to the extent necessary, will adjust the relevant provisions to account for such correction, provided that any correction effected and published after the third weekday (meaning any day of the week except a Saturday or Sunday) prior to any Mandatory Early Redemption Date or Interest Payment Date or the Maturity Date shall be ignored.

For the purposes of this Condition, the following terms shall have the following respective meanings:

"Clearance System" means, in respect of an Index at any time, the domestic clearance system customarily used for settling trades in the relevant Component Assets at that time;

"Clearance System Business Day" means, in respect of a Clearance System, any day on which such Clearance System is (or but for the occurrence of a Settlement Disruption Event, would have been) open for the acceptance and execution of settlement instructions;

"Settlement Cycle" means, in respect of an Index, the period of Clearance System Business Days following a trade in the relevant Component Assets on the relevant Exchange in which settlement will customarily occur according to the rules of such Exchange (or if there are multiple Exchanges in respect of the relevant Index, the longest such period); and

"Settlement Disruption Event" means, in respect of an Index, an event beyond the control of the Issuer as a result of which the relevant Clearing System cannot clear the transfer of relevant Component Assets."

2.8   The following Condition 26 (*Hedging Disruption*) is hereby inserted into the Terms and Conditions:

"26.   Hedging Disruption

In the event that a Hedging Disruption occurs as determined by the Calculation Agent in its sole and absolute discretion, then the Calculation Agent shall either (a)(1) make such adjustment to the exercise, settlement, payment or any other terms of the Notes as the Calculation Agent in its sole and absolute discretion determines appropriate and (2) determine the effective date of that adjustment, or (b) if the Calculation Agent determines that no adjustment that it could make under (a) will produce a commercially reasonable result, notify the Issuer thereof in which event the Issuer shall redeem the Notes as of such date as the Calculation Agent shall determine by notice given to the Noteholders and in the event of such early redemption the Issuer will pay to each

Noteholder the Cancellation Amount with respect to each Note held by such Noteholder."

**Pro Forma Final Terms Applicable to Autocallable Index Basket Linked Notes**

*Set out below is a pro forma final terms which, subject to completion and amendment, will be issued in respect of issues of Autocallable Index Basket Linked Notes under the Program. Text in this section appearing in italics does not form part of the Final Terms but denotes guidance for completing the Final Terms.*

Final Terms dated [•]

**[LEHMAN BROTHERS HOLDINGS INC. [acting through its London Branch]**
**LEHMAN BROTHERS TREASURY CO. B.V./**
**LEHMAN BROTHERS BANKHAUS AG**
**[acting through its London Branch]**

**Issue of [Aggregate Nominal Amount of Tranche] [Title of Autocallable Index Basket**
**Linked Notes]**
**[Guaranteed by Lehman Brothers Holdings Inc.]**
**under the U.S.$100,000,000,000**
**Euro Medium-Term Note Program**

**PART A – CONTRACTUAL TERMS**

The Base Prospectus referred to below (as completed by these Final Terms) has been prepared on the basis that, except as provided in sub-paragraph (ii) below, any offer of Notes in any Member State of the European Economic Area which has implemented the Prospectus Directive (2003/71/EC) (each, a "**Relevant Member State**") will be made pursuant to an exemption under the Prospectus Directive, as implemented in that Relevant Member State, from the requirement to publish a prospectus for offers of the Notes.  Accordingly any person making or intending to make an offer of the Notes may only do so[:

[(i)]    in circumstances in which no obligation arises for the Issuer or any Dealer to publish a prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus pursuant to Article 16 of the Prospectus Directive, in each case, in relation to such offer]; or]

[(ii)]    in those Public Offer Jurisdictions mentioned in Paragraph 42 of Part A below, provided such person is one of the persons mentioned in Paragraph 42 of Part A below and that such offer is made during the Offer Period specified for such purpose therein.]

Neither the Issuer, the Guarantor nor any Dealer has authorised, nor do they authorise, the making of any offer of Notes in any other circumstances.

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions set forth in the Base Prospectus dated July 24, 2007 [and the Supplemental Prospectus dated [•]] which [together] constitute[s] a base prospectus for the purposes of the Prospectus Directive (Directive 2003/71/EC) (the "**Prospectus Directive**"). This document constitutes the Final Terms of the Autocallable Index Basket Linked Notes described herein for the

purposes of Article 5.4 of the Prospectus Directive and must be read in conjunction with such Base Prospectus as so supplemented.

*[The following alternative language applies if the first tranche of an issue which is being increased was issued under a base prospectus with an earlier date.]*

[Terms used herein shall be deemed to be defined as such for the purposes of the Conditions (the **"Conditions"**) set forth in the Base Prospectus, dated *[original date]* [and the Supplemental Prospectus dated [•]]. This document constitutes the Final Terms of the Notes described herein for the purposes of Article 5.4 of the Prospectus Directive (Directive 2003/71/EC) (the **"Prospectus Directive"**) and must be read in conjunction with the Base Prospectus dated July 24, 2007 [and the Supplemental Prospectus dated [•]], which together constitute[s] a base prospectus for the purposes of the Prospectus Directive, save in respect of the conditions which are extracted from the Base Prospectus dated [•] [and the Supplemental Prospectus dated [•]], and are attached hereto.]

*[The following alternative language applies if the first tranche of an issue which is being increased was issued under a base prospectus with an earlier date and the relevant terms and conditions from that base prospectus with an earlier date were incorporated by reference in the Base Prospectus.]*

[Terms used herein shall be deemed to be defined as such for the purposes of the [date] Conditions (the **"Conditions"**) incorporated by reference in the Base Prospectus dated July 24, 2007. This document constitutes the Final Terms of the Notes described herein for the purposes of Article 5.4 of the Prospectus Directive (Directive 2003/71/EC) (the **"Prospectus Directive"**) and must be read in conjunction with the Base Prospectus [and the Supplemental Prospectus dated [•]] which [together] constitute[s] a base prospectus for the purposes of the Prospectus Directive, save in respect of the conditions which are set forth in the Base Prospectus dated [•] [and the Supplemental Prospectus dated [•]] and incorporated by reference in the Base Prospectus.]

Full information on the Issuer and the offer of the Notes is only available on the basis of the combination of these Final Terms and the Base Prospectus. [The Base Prospectus [and the supplemental Prospectus] [is/are] available for viewing [at [website]] [and] during normal business hours at [address] and copies may be obtained from *[address]*.

[These Notes are issued in the Australian domestic capital markets and are Australian Domestic Notes. Holders of the Australian Domestic Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the Deed Poll dated [•] executed by the Issuer constituting the Australian Domestic Notes.] *[This paragraph need only be included if the Final Terms relates to Australian Domestic Notes.]*

[These Notes are Danish Notes. Holders of the Danish Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated July 24, 2007 executed by the Issuer constituting the Danish Notes. *[This paragraph need only be included if the Final Terms relates to Danish Notes.]*

[These Notes are Finnish Notes. Holders of the Finnish Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated July 24, 2007 executed by the Issuer constituting the Finnish Notes. [*This paragraph need only be included if the Final Terms relates to Finnish Notes.*]

[These Notes are Norwegian Notes. Holders of the Norwegian Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated July 24, 2007 executed by the Issuer constituting the Norwegian Notes. [*This paragraph need only be included if the Final Terms relates to Norwegian Notes.*]

[These Notes are Swedish Notes. Holders of the Swedish Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated July 24, 2007 executed by the Issuer constituting the Swedish Notes. [*This paragraph need only be included if the Final Terms relates to Swedish Notes.*]

[*Include whichever of the following apply or specify as "Not Applicable" (N/A). Note that the numbering should remain as set out below, even if "Not Applicable" is indicated for individual paragraphs or sub-paragraphs. Italics denote guidance for completing the Final Terms.*]

[*When adding any other final terms or information (including final terms at items 10, 11, 16, 17, 22, 25, 27 or 35 of Part A or information in relation to the interest of natural and legal persons involved in the issue/offer in Part B) consideration should be given as to whether such terms or information constitute "significant new factors" and will consequently be issued pursuant to a Drawdown Prospectus.*]

References in these Final Terms to the **"Autocallable Index Basket Linked Notes Supplement"** are to the Base Prospectus Supplement dated 27 February 2008. The Conditions and definitions set out in the Autocallable Index Basket Linked Notes Supplement apply to these Notes unless otherwise set out or, as the case may be, defined in this Final Terms.

| 1. | [(i)] | Issuer: | [•][1] |
| | [(ii)] | Guarantor: | [•]] |
| 2. | [(i)] | Series Number: | [•] |
| | [(ii)] | Tranche Number: | [•] |

(If fungible with an existing Series, details of that Series, including the date on which the Notes become fungible).]

---

[1] In the case of LBHI or LBB, specify if acting through its London Branch. In the case of LBB acting through its London Branch and in the case of LBHI, additional tax advice should be sought.

| | | | |
|---|---|---|---|
| 3. | Specified Currency or Currencies: | | [•] |

4.   Aggregate Nominal Amount:    [•] [(being the equivalent of [•] Units)][2]

    [(i)]   Series:    [•]

    [(ii)]   Tranche:    [•]]

5.   Issue Price:    [•] per cent. of the Aggregate Nominal Amount [plus accrued interest from [*insert date*] *(if applicable)*][/[*amount in specified currency*] per Unit][3]

6.   Specified Denominations and Units:

    (i)   Specified Denominations:    [•]

    (ii)   Calculation Amount:    [•]

    (iii)   Trading in Units:    [Applicable/Not Applicable]

If Trading in Units is specified as being Applicable then the Notes will be tradeable by reference to the number of Notes being traded (each having the Specified Denomination) as opposed to the aggregate principal amount of Notes being traded.

[*Trading in Units may only be specified as being Applicable if the Notes have a single Specified Denomination.*]

7.   [(i)]   Issue Date:    [•]

    [(ii)]   Interest Commencement Date:    [Not Applicable] [*only include if date is different to the Issue Date and a Day Count Fraction is specified to be applicable*]

8.   Maturity Date:    [•], subject to the occurrence of a Mandatory Early Redemption Event and adjustment in accordance with the [Following Business Day Convention/ Modified Following Business Day

---

[2] Insert only in case Trading in Units is specified as being applicable.

[3] Insert only in case Trading in Units is specified as being applicable.

Convention/ other (*give details*)]

9.  Valuation Date[s]:  [[•] (the "Initial Valuation Date") , [•], [•] and [•] (the "Final Valuation Date")] / [[•] in each [month/year] from and including [•] (the "Initial Valuation Date") to and including [•] (the "Final Valuation Date")]

10. Interest Basis:  [[•] per cent. Fixed Rate]

[Index Basket Linked Interest]

[Other (*specify*)]

[(further particulars specified below)]

11. Redemption/Payment Basis  [Index Basket Linked Redemption. See paragraphs 16, 26 and 28 below.]

[Redemption at par]

[Other (*specify*)]

12. Change of Interest or Redemption/ Payment Basis:  [(*Specify details of any provision for convertibility of Notes into another interest or redemption/payment basis*)]

13. Put/Call Options:  Not Applicable

14. (i)  Status of the Notes:  Senior Notes

(ii)  Status of the Guarantee:  Senior Guarantee

15. Method of distribution:  Non-syndicated

## PROVISIONS RELATING TO THE INDEX BASKET

16. **Index Basket Provisions**  Applicable

(i)  Indices:  [The Indices specified in the Annex hereto] / [•]

(ii)  Index Sponsor(s):  [In respect of each Index, the Index Sponsor specified as such for such Index in the Annex hereto] / [•]

(iii)  Exchange(s):  [In respect of each Index, the exchange or quotation system specified as such for such Index in the Annex hereto] / [•]

| (iv) | Related Exchange(s): | [In respect of each Index, the exchange or quotation system specified as such for such Index in the Annex hereto] / [•] |
| (v) | Strike Level: | [In respect of each Index, the level specified as such for such Index in the Annex hereto]/ [•] |
| (vi) | Strike Level Adjustment Percentage: | [•] / [Not Applicable] |
| (vii) | Barrier Percentage: | [•] / [Not Applicable] |
| (viii) | Trigger Event: | [Trigger Event (Closing Observation) / Trigger Event (Intraday Observation) / Other (specify) / Not Applicable] |
| (ix) | Trigger Percentage: | [•]/ [Not Applicable] |

**PROVISIONS RELATING TO INTEREST (IF ANY) PAYABLE**

| 17. | **Fixed Rate Note Provisions** | [Applicable/Not Applicable] |
| | | *(If not applicable, delete the remaining sub-paragraphs of this paragraph)* |
| (i) | Fixed Rate[(s)] of Interest: | [•] per cent. [per annum] [payable [annually/quarterly/monthly/other (specify)] in arrear] |
| (ii) | Interest Payment Date(s): | [•] in each year up to and including the Maturity Date]/[specify other – consider whether to adjust in accordance with a Business Day Convention – see items [17](vi) and (vii)] (NB: this will need to be amended in the case of long or short coupons)] |
| (iii) | Fixed Coupon Amount[(s)]: | [•] per Calculation Amount |
| (iv) | Fixed Day Count Fraction: | [30/360]/[Actual/Actual (ICMA)] |
| | | [If neither of these options applies, give details] |
| (v) | Broken Amount(s): | [•] per Calculation Amount, payable on the Interest Payment Date falling [in/on] [•] |
| (vi) | Other terms relating to the method of calculating interest for | [Not Applicable/give details] |

Fixed Rate Notes:

|  |  |  |
|---|---|---|
| (vii) | Business Day Convention: | [Following Business Day Convention/ Modified Following Business Day Convention/ other (*give details*)] |
| (viii) | Option to defer interest payments: | Not Applicable |

| 18. | **Floating Rate Note Provisions** | Not Applicable |
|---|---|---|
| 19. | **Zero Coupon Note Provisions** | Not Applicable |
| 20. | **Index-Linked Interest Note/Other Variable-Linked Interest Note Provisions** | Not Applicable |
| 21. | **Dual Currency Note Provisions** | Not Applicable |
| 22. | **Index Basket Linked Interest Provisions** | [Applicable/Not Applicable] |
|  |  | (*If not applicable, delete the remaining sub-paragraphs of this paragraph*) |

|  |  |  |
|---|---|---|
| (i) | Index Basket Linked Rate[(s)] of Interest | *[insert provisions/formula for determining Index Basket Linked Rate(s) of Interest by reference to Trigger Event, Barrier Level, Strike Level, Adjusted Strike Level, Final Level, and/or alternatives]* |
| (ii) | Interest Payment Date(s): | *[state date(s)]* |
| (iii) | Index Basket Linked Interest Amount: | In respect of each Interest Payment Date and each Note, the product of (i) the Calculation Amount and (ii) the relevant Index Basket Linked Rate of Interest |
| (iv) | Business Day Convention: | [Following Business Day Convention/ Modified Following Business Day Convention/ other (*give details*)] |
| (v) | Other terms relating to the method of calculating interest, if different from those set out in the Conditions | [[•] / Not Applicable] |

## PROVISIONS RELATING TO REDEMPTION

| 23. | **Call Option** | Not Applicable |
|---|---|---|

| | | |
|---|---|---|
| 24. | **Put Option** | Not Applicable |
| 25. | **Final Redemption Amount** | [[•] per Calculation Amount] |

[Where the Final Redemption Amount is Index Basket Linked:

| | | |
|---|---|---|
| | (i) Provisions for determining Final Redemption Amount where calculated by reference to the Index Basket: | *[insert provisions/formula for determining Final Redemption Amount by reference to Trigger Event, Barrier Level, Strike Level, Adjusted Strike Level, Final Level, and/or alternatives].* |
| | (ii) Other terms relating to the method of determining the Final Redemption Amount, if different from those set out in the Conditions: | [Not Applicable] [*give details*]] |

26. **Early Redemption Amount of each Note**

Early Redemption Amount(s) per Calculation Amount payable on redemption for taxation reasons or on event of default and/or the method of calculating the same (if required or if different from that set out in the Conditions):

In respect of each Note, an amount in the Specified Currency equal to the fair market value of such Note (disregarding credit risk of the Issuer) (which value shall be less the proportion attributable to that Note of the reasonable cost to the Issuer or any of its affiliates of unwinding any related hedging arrangements) on such day as is selected by the Calculation Agent in its sole and absolute discretion (provided that such day is not more than 15 days before the date fixed for redemption of the Note).

[*If Index Basket Linked Interest Provisions are applicable or if Fixed Rate Note Provisions are applicable and no Day Count Fraction is specified*: For the avoidance of doubt, no accrued interest shall be payable upon early redemption of the Notes for any reason.]

27. **Mandatory Early Redemption** (Condition 8(j))

Applicable

| | | |
|---|---|---|
| | (i) Mandatory Early Redemption | [*Default Option: an event whereby the Closing Level in respect of each Index, as* |

|       | Event: | *determined by the Calculation Agent as of any Mandatory Early Redemption Valuation Date is greater than or equal to the Mandatory Early Redemption Level*] |
|-------|--------|---|

[*Other* / [   ] is [greater than/greater than or equal to/less than/less than or equal to/the Mandatory Early Redemption Level as of [the/any] Mandatory Early Redemption Valuation Date]

(ii)   Mandatory   Early   Redemption Level(s):    [*give details*]

(iii)   Mandatory   Early   Redemption Date(s):    [*give details*]

(iv)   Mandatory   Early   Redemption Rate(s):    [*give details*]

(v)   Business Day Convention:    [Following   Business   Day   Convention/ Modified   Following   Business   Day Convention/ other (*give details*)]

(vi)   Other   terms   relating   to   the method   of   calculating   the Mandatory   Early   Redemption Amount, if different from those set out in the Conditions:    [Not Applicable / *give details*]

## GENERAL PROVISIONS APPLICABLE TO THE NOTES

28.   Form of Notes:    [*In the case of Notes issued by LBHI*]

[Bearer form. Interests in a temporary global Note will be exchangeable for, at the request of each Holder (with respect to its own Notes in bearer form), definitive Notes in bearer form.]

[Bearer form. Interests in a temporary global Note will be exchangeable for interests in a permanent global Note in bearer form. Interests in a permanent global Note will be exchangeable for, at the request of each Holder (with respect to its own Notes in bearer form), definitive Notes in bearer form.]

[Registered form. Interests in a global Note in registered form will be exchangeable for definitive Notes in registered form in the limited circumstances described in the global Note. Definitive Notes in registered form will [not][4] be exchangeable for interests in a global Note in registered form.]

[Australian Domestic Notes in registered, uncertificated and dematerialised book-entry form]

*[In the case of Notes issued by LBTCBV or LBB]*

[Bearer form. Interests in a temporary global Note will be exchangeable for definitive Notes in bearer form.]

[Bearer form. Interests in a temporary global Note will be exchangeable for interests in a permanent global Note in bearer form. Interests in a permanent global Note will be exchangeable for definitive Notes in bearer form in the limited circumstances described in the permanent global Note.]

Registered form. Interests in a global Note in registered form will be exchangeable for definitive Notes in registered form in the limited circumstances described in the global Note. Definitive Notes in registered form will [not]  be exchangeable for interests in a global Note in registered form.]

[Australian Domestic Notes in registered, uncertificated and dematerialised book-entry form]

*[Australian Domestic Notes can not be*

---

[4] Delete or complete as appropriate.

*issued by LBB]*

*[In       the       case       of [Danish/Finnish/Norwegian/Swedish] Notes]* The Notes are [Danish/Finnish/Norwegian/ Swedish] Notes and are in uncertificated and dematerialised book-entry form.

New Global Note Form:                  Not Applicable

29.  Talons for future Coupons or Receipts     No
     to be attached to Definitive Notes (and
     dates on which such Talons mature):

30.  Details relating to Partly Paid Notes:     Not Applicable
     amount of each payment comprising the
     Issue Price and date on which each
     payment  is  to  be  made  and
     consequences (if any) of failure to pay,
     including any right of the Issuer to
     forfeit the Notes and interest due on
     late payment:

31.  Details relating to Instalment Notes:     Not Applicable

     Instalment  Amounts  and  Instalment
     Dates:

32.  Details relating to Extendible Notes:     Not Applicable

33.  Consolidation provisions:     [Not    Applicable/The    provisions    [in
                                    Condition 18 (*Further Issues of Notes*)]
                                    [annexed to these Final Terms] apply]

34.  Calculation Agent     [Lehman Brothers International (Europe)
                           25 Bank Street
                           London E14 5LE
                           England/ *other - give name and address*]

35.  Other final terms:     [Not Applicable/*give details*]

                            *(When  adding  any  other  final  terms*
                            *consideration should be given as to whether*
                            *such  terms  constitute  "significant  new*
                            *factors" and consequently trigger the need*
                            *for a supplement to the Base Prospectus*
                            *under  Article  16  of  the  Prospectus*
                            *Directive.)*

**DISTRIBUTION**

| | | | |
|---|---|---|---|
| 36. | (i) | If syndicated, names [and addresses] of Managers [and underwriting commitments]: | Not Applicable |
| | (ii) | Date of Subscription Agreement: | Not Applicable |
| | (iii) | Stabilizing Manager (if any): | Not Applicable |
| 37. | | If non-syndicated, name and address of Dealer: | [Lehman Brothers International (Europe) 25 Bank Street London E14 5LE England/ *other - give name and address*] |
| 38. | | Total commission and concession: | [•] per cent. of the Aggregate Nominal Amount / Not Applicable / *give details* |
| 39. | | Selling restrictions: | |
| | | Additional Selling Restrictions: | [Not Applicable/*give details*] |
| 40. | | Non-exempt Offer: | [Not Applicable] [An offer of the Notes may be made by the Managers [and [*specify, if applicable*]] other than pursuant to Article 3(2) of the Prospectus Directive in [*specify relevant Member State(s) - which must be jurisdictions where the Base Prospectus and any supplements have been approved or passported*] ("**Public Offer Jurisdictions**") during the period from [*specify date*] until [specify date] ("**Offer Period**"). See further Paragraph [10] of Part B below. |

**PURPOSE OF FINAL TERMS**

These Final Terms comprise the final terms required for issue [and] [public offer in the Public Offer Jurisdictions] [and] [admission to trading on [specify relevant regulated market] of the Notes described herein pursuant to the U.S.$100,000,000,000 Euro Medium-Term Note Program of Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V. and Lehman Brothers Bankhaus AG.]

**RESPONSIBILITY**

The Issuer accepts responsibility for the information contained in these Final Terms. [[*Relevant third party information*] has been extracted from [specify source]. The Issuer confirms that such information has been accurately reproduced and that, so far as it is aware,

and is able to ascertain from information published by [specify source], no facts have been omitted which would render the reproduced inaccurate or misleading.]

Signed on behalf of the Issuer:

By:....................................
     *Duly authorised*

## PART B – OTHER INFORMATION

1.    **LISTING**

   (i)    Listing:                    [The Irish Stock Exchange/The Singapore
                                       Exchange Securities Trading Limited/The
                                       Australian Stock Exchange Limited/ other
                                       (*specify*)/ None]

   (ii)   Admission to Trading:       [Application has been made for the Notes to
                                       be admitted to listing and/or trading on [the
                                       Official List and the regulated market of the
                                       Irish Stock Exchange]/[the alternative
                                       securities market of the Irish Stock
                                       Exchange] [the Australian Stock Exchange
                                       Limited]/ [other (*specify*)]/ with effect from
                                       [●]/ Not Applicable]

                                       [No assurance can be given as to whether or
                                       not or when such application for
                                       listing/admission to trading will be granted.]

                                       (*Where documenting a fungible issue need
                                       to indicate that original securities are
                                       already admitted to trading.*)

   [(iii) Cost of admission to trading]    [Not Applicable / *give details*]

2.    [**RATINGS**

   Ratings:                          The Program has been rated:

                                       [**Standard & Poor's**

                                       Senior Debt (Long term)          A+

                                       Subordinated debt                A

                                       Senior Debt (Short term)         A-1

                                       An obligation rated 'A' is somewhat more
                                       susceptible to the adverse effects of changes
                                       in circumstances and economic conditions
                                       than obligations in higher-rated categories.
                                       However, the obligor's capacity to meet its
                                       financial commitment on the obligation is
                                       still strong. Negative means that a rating
                                       may be lowered. The addition of a plus (+)
                                       sign shows relative standing within the

major rating categories.

A short-term obligation rated 'A-1' is rated in the highest category by Standard & Poor's. The obligor's capacity to meet its financial commitment on the obligation is strong.

**Moodys**

Senior Debt (Long term)        A1

Subordinated debt              A2

Debt ratings (Short term)      Prime-1

Obligations rated A are considered upper-medium grade and are subject to low credit risk. The modifier 1 indicates that the obligation ranks in the higher end of its generic rating category and the modifier 2 indicates a mid-range ranking.

Issuers (or supporting institutions) rated Prime-1 have a superior ability to repay short-term debt obligations.

**Fitch**

Senior Debt (Long term)    AA-
Subordinated debt          A+

Senior Debt (Short term)   F1+

**Fitch**

**AA-**

Very high credit quality. 'AA' ratings denote expectations of very low credit risk. They indicate very strong capacity for payment of financial commitments. This capacity is not significantly vulnerable to foreseeable events. The modifier "-" denotes relative status within this rating category.

**A+**

High credit quality. 'A' ratings denote

expectations of low credit risk. The capacity for payment of financial commitments is considered strong. This capacity may, nevertheless, be more vulnerable to changes in circumstances or in economic conditions than is the case for higher ratings. The modifier "+" denotes relative status within this rating category.

**F1+**

Highest credit quality. Indicates the strongest capacity for timely payment of financial commitments; the added "+" denotes any exceptionally strong credit feature.]

3.    **[INTERESTS OF NATURAL AND LEGAL PERSONS INVOLVED IN THE ISSUE/OFFER**

Need to include a description of any interest, including conflicting ones, that is material to the issue/offer, detailing the persons involved and the nature of the interest. May be satisfied by inclusion of the following statement:

"Save as discussed in "Subscription and Sale", so far as the Issuer is aware, no person involved in the offer of the Notes has an interest material to the offer."]

*[(When adding any other description, consideration should be given as to whether such matters described constitute "significant new factors" and consequently trigger the need for a supplement to the Prospectus under Article 16 of the Prospectus Directive.)]*

4.    **REASONS FOR THE OFFER, ESTIMATED NET PROCEEDS AND TOTAL EXPENSES***

| [(i) | Reasons for the offer: | [•] |
|---|---|---|

*(See "Use of Proceeds" wording in the Base Prospectus – if reasons for offer differ from making profit and or hedging certain risks will need to include those reasons here.)]*

| [(ii)] | Estimated net proceeds: | [•] |
|---|---|---|
| [(iii)] | Estimated total expenses: | [•] [Include breakdown of expenses] |

---

* Not required for Notes with a denomination per unit of at least EUR50,000.

*(If the Notes are derivative securities to which Annex XII of the Prospectus Directive Regulation applies it is only necessary to include disclosure of net proceeds and total expenses at (ii) and (iii) above where disclosure is included at (i) above.)*

5.    **YIELD (Fixed Rate Notes only)**

Indication of yield:                    [•]

Calculated as [*include method of calculation in summary form*] on the Issue Date.[*]

As set out above, the yield is calculated at the Issue Date on the basis of the Issue Price. It is not an indication of future yield.]

6.    **HISTORIC INTEREST RATES (Floating Rate Notes only)**

Details of historic [LIBOR/EURIBOR/other] rates can be obtained from Reuters.][*]

7.    **PERFORMANCE OF INDEX/FORMULA/OTHER VARIABLE, EXPLANATION OF EFFECT ON VALUE OF INVESTMENT AND ASSOCIATED RISKS AND OTHER INFORMATION CONCERNING THE UNDERLYING (Index-linked or other variable Linked Notes only)**

*Need to include details of where past and future performance and volatility of the index/formula/other variable can be obtained and a clear and comprehensive explanation of how the value of the investment is affected by the underlying and the circumstances when the risks are most evident. [Where the underlying is an index need to include the name of the index and a description if composed by the Issuer and if the index is not composed by the Issuer need to include details of where the information about the index can be obtained. Where the underlying is a basket of underlyings need to include the relevant weightings of each underlying in the basket. Where the underlying is not any of the above need to include equivalent information*[*]]

[Details on the past and further performance as well as the volatility of the Indices can be obtained from [www.bloomberg.com under the Bloomberg Codes]/ [the websites for each Index Sponsor as] set out for each Index in the Annex hereto.]

*[Where Annex XII of the Prospectus Directive applies, include a description of: how any return on the derivative securities takes place, the payment or delivery date and the way such return is calculated, the type of underlying and details of where relevant information can be obtained, any market disruption or settlement disruption event and any adjustment rules with relation to events concerning the underlying.]*

*[(When completing this paragraph, consideration should be given as to whether such matters described constitute "significant new factors" and consequently trigger the need for a supplement to the Prospectus under Article 16 of the Prospectus Directive.)]*

The Issuer [intends to provide post-issuance information [*specify what information will be reported and where it can be obtained*]] [does not intend to provide post-issuance information].

8.    **PERFORMANCE OF RATE[S] OF EXCHANGE AND EXPLANATION OF EFFECT ON VALUE OF INVESTMENT (Dual Currency Notes only)**

*[Need to include details of where past and future performance and volatility of the relevant rate[s] can be obtained [and a clear and comprehensive explanation of how the value of the investment is affected by the underlying and the circumstances when the risks are most evident.*]]

*[(When completing this paragraph, consideration should be given as to whether such matters described constitute "significant new factors" and consequently trigger the need for a supplement to the Prospectus under Article 16 of the Prospectus Directive.)]*

9.    **OPERATIONAL INFORMATION**

| | |
|---|---|
| ISIN Code: | [•] |
| Common Code: | [•] |
| CUSIP No: | [•] |
| New Global Note intended to be held in a manner which would allow Eurosystem eligibility: | Not Applicable |
| Any clearing system(s) other than Euroclear and Clearstream, Luxembourg and the relevant identification number(s): | [Not Applicable/*give name(s) and number(s)*] |
| Delivery: | Delivery [against/free of] payment |
| The Aggregate Nominal Amount of Notes issued has been translated into U.S. Dollars at the rate of ([•]=$[ ] producing a sum of (for Notes not denominated in U.S. Dollars): | $[•] /Not Applicable |

---

* Not required for Notes with a denomination per unit of at least EUR50,000.

| Names and addresses of Additional Paying Agent(s) (if any): | [Not Applicable / *give details*] |
|---|---|

[In the case of Australian Domestic Notes:

| (i) | Notes to be listed on Australian Stock Exchange Limited: | [Yes/No] |
|---|---|---|
| (ii) | Agent for service of process in new South Wales: | [•] of [address] |
| (iii) | Transfer restrictions: | Transfers of Australian Domestic Notes are restricted as provided by Condition 1(j) (*Australian Domestic Notes*). |
| (iv) | Australian Registrar: | [•] of [*address*] |
| (v) | Australian Administration Agent: | [[•] (see Condition 7(i) (*Payments in respect of Australian Domestic Notes*))/Not required] |

The Notes will be eligible for lodgement into the Austraclear System. Distributions of principal and interest with respect to Notes held through the Austraclear System will be credited to the cash accounts of members of the Austraclear System in accordance with the regulations and the operating manual applicable to the Austraclear System.

Interests in the Notes may be held through Euroclear and Clearstream, Luxembourg indirectly through institutions which are participants in Euroclear and Clearstream, Luxembourg. In such circumstances, Westpac Custodian Nominees Limited (as nominee of, or another nominee appointed by, Euroclear) or ANZ Nominees Limited (as nominee of, or another nominee appointed by, Clearstream, Luxembourg) would hold the interests in the Notes in the Austraclear System. Austraclear Limited will be inscribed as the Holder of such Notes and will therefore be treated by the Issuer and the Australian Registrar as the absolute owner of such Notes for all purposes.

The Issuer will not be responsible for the operation of the clearing arrangements which is a matter for the clearing institutions, their participants and the investors.]

10.    **TERMS AND CONDITIONS OF THE OFFER**

| Offer Price: | [Issue Price][*specify*] |
|---|---|
| Conditions to which the offer is subject: | [Not Applicable/*give details*] |
| Description of the application process: | [Not Applicable/*give details*] |
| Description of possibility to reduce subscriptions and manner for refunding | [Not Applicable/*give details*] |

excess amount paid by applicants:

Details of the minimum and/or maximum amount of application:    [Not Applicable/*give details*]

Details of the method and time limits for paying up and delivering the Notes:    [Not Applicable/*give details*]

Manner in and date on which results of the offer are to be made public:    [Not Applicable/*give details*]

Procedure for exercise of any right of pre-emption, negotiability of subscription rights and treatment of subscription rights not exercised:    [Not Applicable/*give details*]

Categories of potential investors to which the Notes are offered and whether tranche(s) have been reserved for certain countries:    [Not Applicable/*give details*]

Process for notification to applicants of the amount allotted and the indication whether dealing may begin before notification is made:    [Not Applicable/*give details*]

Amount of any expenses and taxes specifically charged to the subscriber or purchaser:    [Not Applicable/*give details*]

Name(s) and address(es), to the extent known to the Issuer, of the placers in the various countries where the offer takes place:    [None/*give details*]

**Annex to the Final Terms**
**Information relating to the Index Basket**

| i | Index | Index Sponsor | Bloomberg Code | Strike Level | Exchange | Related Exchange | Website |
|---|-------|---------------|----------------|--------------|----------|------------------|---------|
| [•] | [•] | [•] | [•] | [•] | [•][Multi-exchange] | [•][All Exchanges] | [•] |
| [•] | [•] | [•] | [•] | [•] | [•][Multi-exchange] | [•][All Exchanges] | [•] |
| [•] | [•] | [•] | [•] | [•] | [•][Multi-exchange] | [•][All Exchanges] | [•] |

H
A
N
D

D
E
L
I
V
E
R
Y

FILED / RECEIVED

SEP 2 1 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

RECEIVED BY:

DATE

4:30PM

TIME