1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 08-13555-jmp

5   - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   LEHMAN BROTHERS HOLDINGS INC., ET AL.,

9

10          Debtors.

11

12   - - - - - - - - - - - - - - - - - - - - - -x

13

14                U.S. Bankruptcy Court

15                One Bowling Green

16                New York, New York

17

18                October 19, 2011

19                10:02 AM

20

21   B E F O R E:

22   HON. JAMES M. PECK

23   U.S. BANKRUPTCY JUDGE

24

25

Page 2

```
 1

 2    Debtors' Motion for Approval of a Settlement Agreement Among

 3    ESP Funding I, Ltd., U.S. Bank National Association, as

 4    Trustee, BNP Paribas, Natixis Financial Products LLC, Lehman

 5    Brothers Special Financing Inc., and Lehman Brothers Holdings

 6    Inc.

 7

 8    Debtors' Motion for Approval of Settlement Agreements with (i)

 9    Bank of America, N.A. and (ii) Merrill Lynch International and

10    Its Affiliates

11

12    Motion of Deutsche Bank AG to Enforce Settlement Approval Order

13    and to Correct Misclassification of Claims

14

15    Debtors' Motion for Approval of the Termination of the Spruce

16    CCS, LTD. Securitization

17

18    Insured Persons' Motion for an Order Modifying the Automatic

19    Stay to Allow Settlement Payment Under Directors and Officers

20    Insurance Policy to Settle the California Municipalities

21

22    Motion of Insured Persons for an Order Modifying the Automatic

23    Stay to Allow Settlement Payment Under Directors and Officers

24    Insurance Policy to Settle Equity/Debt Class Action

25
```

1

2    Debtors' Motion for Authorization to Grant Limited Releases to

3    Certain Insurers Under the Directors and Officers Insurance

4    Policies

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dena Page

Page 4

1

2   A P P E A R A N C E S :

3   WEIL, GOTSHAL & MANGES LLP

4          Attorneys for Debtors

5          767 Fifth Avenue

6          New York, NY 10153

7

8   BY:   RICHARD P. KRASNOW, ESQ.

9          HARVEY MILLER, ESQ.

10          MARK BERNSTEIN, ESQ.

11

12

13   WEIL, GOTSHAL & MANGES LLP

14          Attorneys for Debtors

15          1300 Eye Street NW

16          Suite 900

17          Washington, DC 20005

18

19   BY:   SUNNY J. THOMPSON, ESQ.

20

21

22

23

24

25

Page 5

1

2   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

3        Attorneys for the Official Creditors' Committee

4        51 Madison Avenue

5        22nd Floor

6        New York, NY 10010

7

8   BY:   JAMES C. TECCE, ESQ.

9

10

11  ANDERSON KILL & OLICK, P.C.

12       Attorneys for Essex Equity Holding USA

13       1251 Avenue of the Americas

14       New York, NY 11020

15

16  BY:   TODD E. DUFFY, ESQ.

17       JOSHUA GOLD, ESQ.

18

19

20  DECHERT LLP

21       Attorneys for LBHI Outside Directors

22       1095 Avenue of the Americas

23       New York, NY 10036

24

25  BY:   ADAM J. WASSERMAN, ESQ.

Page 6

1

2    KAYE SCHOLER LLP

3          Attorneys for Stone Lion Portfolio LP, Permal Stone Lion

4                Fund Ltd., GSO Special Situations Fund LP, GSO

5                Special Situations Overseas Master Fund, Ltd.

6          425 Park Avenue

7          New York, NY 10022

8

9    BY:   MARILEE DAHLMAN, ESQ.

10

11

12   SNR DENTON US LLP

13          1221 Avenue of the Americas

14          New York, NY 10020

15

16   BY:   D. FARRINGTON YATES, ESQ.

17

18

19   HUGHES HUBBARD & REED LLP

20          Attorneys for SIPA Trustee

21          One Battery Park Plaza

22          New York, NY 10004

23

24   BY:   JEFFREY S. MARGOLIN, ESQ.

25

Page 7

1

2    MOSES & SINGER LLP

3         Attorneys for Deutsche Bank AG

4         405 Lexington Avenue

5         New York, NY 10174

6

7    BY:   CHRISTOPHER J. CARUSO, ESQ.

8         ALAN KOLOD, ESQ.

9         KENT C. KOLBIG, ESQ.

10

11

12   MILBANK, TWEED, HADLEY & MCCLOY LLP

13        Attorneys for the Official Creditors' Committee

14        One Chase Manhattan Plaza

15        New York, NY 10005

16

17   BY:   DENNIS F. DUNNE, ESQ.

18        EVAN R. FLECK, ESQ.

19        DENNIS C. O'DONNELL, ESQ.

20

21

22

23

24

25

1

2   WHITE & CASE LLP

3        1155 Avenue of the Americas

4        New York, NY 10036

5

6   BY:   ERIC K. STODOLA, ESQ.

7

8

9   LOWENSTEIN SANDLER PC

10        Attorneys for Lead Plaintiffs, Debt/Equity Class Action

11        65 Livingston Avenue

12        Roseland, NJ 07068

13

14   BY:   MICHAEL S. ETKIN, ESQ.

15

16

17   SHEARMAN & STERLING LLP

18        Attorneys for Bank of America, Merrill Lynch

19        599 Lexington Avenue

20        New York, NY 10022

21

22   BY:   FREDRIC SOSNICK, ESQ.

23

24

25

**Page 9**

1

2  AKIN GUMP STRAUSS HAUER & FELD LLP

3          Attorneys for Centerbridge

4          One Bryant Park

5          New York, NY 10036

6

7  BY:   ABID QURESHI, ESQ.

8          PHILIP C. DUBLIN, ESQ.

9

10

11  WOLLMUTH MAHER & DEUTSCH LLP

12          Attorneys for the SASCO Defendants

13          500 Fifth Avenue

14          New York, NY 10110

15

16  BY:   MICHAEL LEDLEY, ESQ.

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S
 2           THE COURT:  Be seated, please.  Good morning.
 3           Mr. Miller, how are you?
 4           MR. MILLER:  Good morning, Your Honor.  Your Honor,
 5   this is an omnibus hearing and we have seven matters on the
 6   calendar this morning.  In connection with the uncontested
 7   matters, Your Honor, the first matter will be presented by Ms.
 8   Thompson.
 9           I'm Harvey Miller, Weil, Gotshal & Manges for the
10   debtor.
11           THE COURT:  Good morning.
12           MS. THOMPSON:  Good morning.  May it please the Court,
13   Your Honor.  I'm Sunny Thompson from Weil Gotshal Manges on
14   behalf of the debtors.  We're here today on the debtors'
15   uncontested Rule 9019 motion for authorization and approval of
16   a settlement between LBSF and LBHI as credit support provider
17   on the one hand, and ESP Funding I, Ltd., an SPB, as issuer,
18   U.S. Bank National Association, as Trustee, BNP Paribas, as
19   holder of certain notes, and Natixis Financial Products LLC as
20   the advance swap counterparty on the other hand.
21           This matter was the subject of an interpleader and a
22   counterclaim avoidance action that Your Honor stayed last
23   October and the settlement was reached after ADR and the
24   mediation, and deals with notes issued under an SPB.  And this,
25   in addition, this matter involved ipso facto provision like the
```

1   one you found unenforceable in the BNY decision.  Because this

2   is an interpleader, the proposed order contains some additional

3   protections for the trustee in entering into the settlement.

4   The creditors' committee supports the settlement, and the

5   objection deadline was last week on October 12th, and no

6   objections have been filed or served on the debtors.

7        This is not the first SPB settlement that has arisen

8   out of mediation, and it's similar to the Madison Avenue

9   settlement that Your Honor approved last December.  And for the

10  reasons set forth in the papers, we ask that you approve the

11  settlement.  If Your Honor has any questions, I'm happy to

12  answer them.

13       THE COURT:  Well, there are no objections.  I've

14  reviewed the documents, including the unredacted version of the

15  settlement agreement, and I'm prepared to approve it.  But I

16  would be interested in the comments, if any, from the

17  creditors' committee in terms of the creditors' committee

18  oversight of this particular settlement.

19       MR. FLECK:  Good morning, Your Honor.  Evan Fleck of

20  Milbank Tweed on behalf of the official committee.  Your Honor,

21  as was stated, the creditors' committee did review this

22  transaction, what was involved, as it usually is, in the

23  settlement approval committee meetings, the analysis of the

24  merits of the settlement, and on the basis of that interaction

25  and the independent analysis that the committee did with its

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

                                                          Page 12

1    financial advisors, the committee believes the settlement is in

2    the best interest of the estates and does support is approval.

3           THE COURT:  Fine.  It's approved.

4           MR. MILLER:  Harvey Miller again.  Your Honor, please,

5    item 2 on the uncontested portion of the agenda is the debtors'

6    motion of September 28, 2011 pursuant to Bankruptcy Rule 9019

7    for the approval of the compromises and settlements with Bank

8    of America and Merrill Lynch International in connection with

9    derivative claims asserted by each of those entities and the

10   resolution of the controversy relating to the Bank of America

11   setoff litigation that occurred in this court.

12          The motion is uncontested, Your Honor.  The motion

13   sets out in detail the controversy between certain of the

14   debtors and the respective settlement parties.  Briefly, the

15   compromises and settlements encompass the resolution of claims

16   asserted by Bank of America and Merrill Lynch based upon

17   derivatives claims among certain of the debtors in each of the

18   seven parties.  As the Court may recall, at the commencement

19   date, Lehman entities were parties to approximately ten -- over

20   10,000 derivatives contracts based essentially on ISDA forms

21   and engaged in over 1,700,000 transactions involving a variety

22   of derivative transactions of all types and by their nature

23   very esoteric, very sophisticated, opaque and difficult to

24   unwind.  The debtors have had a dedicated workforce that has

25   spent two years in the effort to deal with claims based upon

1    derivatives that had been filed against the debtors and others

2    as to which the debtors have asserted affirmative claims.  The

3    derivative claims asserted against the debtors total over

4    seventy-five million dollars.

5         What has resulted out of this work stream is what is

6    generally described as the derivatives framework.  The

7    derivatives framework provides, one, common dates and times for

8    calculation of mid-mark values, two, a uniform approach to

9    portfolio aggregation to derivative groups that netted

10   exposures, and three, a methodology for calculation of

11   allowable charges.

12        The derivatives framework has been extremely valuable

13   in enabling the debtors to reach the resolution with bank

14   counterparties in obtaining the execution and delivery of plan

15   support agreements.  In addition, it has been material in

16   reaching the subject compromises with Bank of America and

17   Merrill Lynch.  The Bank of America compromise and settlement

18   which involves over 22,000 derivative transactions resolves,

19   one, the Bank of America primary and guaranteed derivative

20   claims consistent with the derivatives framework.  It results

21   in a total reduction of Bank of America's aggregate derivative

22   claims, both primary and those based upon guarantees by

23   approximately 4.5 billion dollars.  The remaining claims of

24   Bank of America, both the primary and the guaranteed claims are

25   in the area over 500 million dollars.  Three, it resolves the

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 14

1   setoff litigation, the nature of which and the details relating

2   to that controversy are set forth in the Court's decision in

3   November 2010 finding in favor of the debtors in connection

4   with the setoff of approximately 501 million dollars by Bank of

5   America.  In respect of this tangent of the compromise and

6   settlement with the Bank of America, the debtors will receive

7   and recover seventy-one percent of the 501 million dollars in

8   dispute, and the Bank of America will retain apply approximate

9   145 million dollars to the derivative claims.

10          In connection with the Merrill Lynch compromise, the

11  claims of Merrill Lynch are based upon derivative contracts,

12  and pursuant to the compromise, Merrill Lynch will reduce the

13  amount of its claims by approximately, in the aggregate, three

14  billion dollars.  As a result, the claims against LBSF and LBHI

15  will be reduced to approximately 1,100,000,000 dollars; against

16  LBCS and LBHI, approximately 16.7 million dollars.

17          This compromise and settlement relates to over 27,000

18  transactions.  The nature and details of the transactions among

19  the debtors and Bank of America and Merrill Lynch are set forth

20  in detail in the motion, Your Honor, and in the attached

21  declaration of Daniel Ehrmann.  The unsecured creditors'

22  committee was intimately involved and familiar with all aspects

23  of the controversies with Bank of America and Merrill Lynch and

24  has filed a statement in which the committee notes that it has

25  no objection to the approval of the settlement and that it does

Page 15

1    believe that the settlement provides meaningful benefits to the

2    administration of these debtors' cases.

3            The creditors' committee does point out, however, that

4    it does not believe there's any meaningful risk on appeal to

5    the Court's decision in connection with the setoff controversy

6    with Bank of America.  Nevertheless, Your Honor, this is an

7    integrated settlement.  And the UCC doesn't object to the

8    approval of the Bank of America settlement.

9            As the motion sets out in sufficient detail, the

10   compromise -- proposed compromises meet the standards for

11   approval under Bankruptcy Rule 9019 and the applicable

12   precedents in this circuit.  The results of the compromises are

13   well above the lowest rank of reasonableness.  The compromises

14   represent fair, reasonable exercises of prudent business

15   judgment on the part of the debtors, as witnessed by the lack

16   of objections.  And accordingly, we request, Your Honor, the

17   compromise and settlements be approved.

18           THE COURT:  I'm prepared to do that having read the

19   papers and the statement of the creditors' committee in support

20   of the settlement.  But I'll simply ask if anyone wishes to

21   comment before gaveling this down?

22           Apparently there are no comments.  It's approved.

23           MR. MILLER:  Thank you, Your Honor.

24           We now turn, Your Honor, to the contested matter

25   portion of the calendar.  Item 3 is the motion of Deutsche

1      Bank.

2            MR. KOLOD:  Good morning, Your Honor.  Alan Kolod of

3      Moses & Singer.  We've been substituted in for Bingham

4      McCutchen on this motion.  Before I reach the merits of our

5      motion, I just wanted to make a preliminary statement that puts

6      our motion in the context of overall plan confirmation, which

7      is proceeding.  I wanted to reiterate the point that we make in

8      our brief that if this Court agrees with the Deutsche Bank's

9      position on the classification of the claims, requiring them to

10     be treated like and equally to general unsecured claims, it is

11     Deutsche Bank's understanding that that will not release any

12     parties under any plan support agreements.  However, it is our

13     understanding that the plan support agreements tie the debtors'

14     hands and make it impossible for them to settle this dispute

15     because that would release parties under the plan support

16     agreements, so that we're really left with no choice but to ask

17     Your Honor to decide this dispute.  In other words, if Your

18     Honor were to agree that Deutsche Bank is correct in its

19     interpretation of the settlement agreement and the court order

20     to approve that, that would have no adverse effect on the

21     confirmation of the plan that's proceeding.

22            THE COURT:  What's the basis for your confident

23     statement that that's true?

24            MR. KOLOD:  It's based on the plan support agreement

25     that Deutsche Bank itself has signed.  And I'm sure if I'm

1      incorrect about that, I'll be corrected.

2             THE COURT:  So do I understand that Deutsche Bank has

3      signed a plan support agreement but at the same time is

4      pressing the current motion seeking reclassification of its

5      claims.  Can you explain that to me?

6             MR. KOLOD:  Yes, there is an express provision in the

7      plan support agreement that excludes this issue and permits

8      Deutsche Bank to defend against the misclassification of its

9      claims.  So that's carved out of the plan support agreement.

10            THE COURT:  Okay.

11            MR. KOLOD:  Now, I'd also like to point out that

12     there's some urgency to the decision of this motion because of

13     the November 4th voting deadline on the plan.  The LCPI claim

14     at issue -- there are two claims at issue on this motion.  The

15     LCPI claim is a billion dollar claim that represents nearly a

16     third of all of the claims that would be in the LCPI general

17     unsecured claim class, class 4A, if the claim were properly

18     classified.  Thus, the inability of these claims to vote in

19     that class could have an adverse effect on the acceptance on

20     that class of the plan.

21            Now, we've gone through this at great length in our

22     motion and reply papers, but just to set a stage, it's our

23     position and it's evident from paragraph 12 of the settlement

24     agreement which was approved by Your Honor and incorporated

25     into Your Honor's approval order, that the settlement agreement

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 18

1    provides four separate types of relief with respect to the two

2    claims at issue.  First, it allows them as nonpriority

3    unsecured claims against LCPI and LBHI.  Second, it eliminates

4    all defenses to those claims.  Third, it expressly protects

5    them from any claim that would have the effect of subordinating

6    their treatment to the treatment of other unsecured -- general

7    unsecured claims.  And fourth, and this is a somewhat unusual

8    feature, it expressly provides the treatment that those claims

9    will receive under a plan confirmed in these cases.  The

10   settlement and the court order requires that the claims receive

11   what I'll use as an abbreviation, like and equal treatment to

12   other general unsecured claims.  Now, I can read the actual

13   language that's in the settlement agreement and the court

14   order.  I'll do that once, and then afterwards, I'll just refer

15   to the like and equal treatment requirement.  But the

16   settlement agreement, paragraph 12(k) and this Court's order

17   approving it provides that the allowed claims "shall be treated

18   in a like manner to that of other general unsecured claims

19   against LBHI and LCPI and receive treatment and distribution on

20   account of such claims equal to that of other general unsecured

21   claims against LBHI and LCPI."  That's the like and equal

22   treatment provision.

23        Now, it's clear from both the motion and the response

24   by the debtors that this settlement agreement incorporating

25   those provisions was very heavily negotiated, and that it went

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 19

1    beyond the mere allowance of the claims as nonpriority

2    unsecured claims, but it expressly provided how they were to be

3    treated.  But at the time that this treatment provision was

4    negotiated, there were no plans on file, and there were no

5    defined terms.  There were no definitions that one could point

6    to and say we will be treated in this class.  So the parties

7    had to write something not using defined terms but using

8    concepts.  And the concept they agreed upon was the claims

9    would be treated like and equal to general unsecured claims.

10           Now, the premise of the agreement is that it's

11   possible to identify which class in a plan, with respect to a

12   debtor, is a general unsecured class and to identify what the

13   treatment is in a plan for general unsecured creditors.  Now,

14   obviously, there was some risk -- it was moral risk at that

15   time -- that the debtors would attempt to frustrate the

16   agreement in bad faith by manipulating their drafting of plan

17   class definitions.  Fortunately, and I think it's a testament

18   to their integrity, in the draft of their initial plan, the

19   debtors did not do that.  They very clearly drafted the plan to

20   identify the class of general unsecured claims.  In fact, this

21   is as visible as a beacon on a dark night.  The class is

22   actually named "general unsecured claims".  But that's more

23   than just a formal name.  It's a description of the claims in

24   that class and the treatment being provided for those claims.

25           Now, I believe the burden is on the debtors -- under

1    the case law, the burden is on the debtors to justify the

2    treatment they're providing and the classification they're

3    providing in their plan, and the way they're classifying the

4    Deutsche Bank claims.  Furthermore, Section 1122(a) prohibits

5    the placing of claims in any class receiving dissimilar

6    treatment to that class, and since these claims are general

7    unsecured claims and are to be treated like and equal to

8    general unsecured claims, they cannot be classified with claims

9    that are not receiving treatment as general unsecured claims.

10   Now, after the Boston Post Road decision of the Second Circuit

11   and Judge Gonzalez's decision in Young Broadcasting, and

12   there's a decision in the Western District, In re Appleridge

13   Retirement Community, it's clear that the burden is on the

14   debtor, not on the movant to show that the classification is

15   wrong, but on the debtor to show that the classification is

16   proper and appropriate.

17          So I think we now have to turn to the response that

18   the debtors submitted to see whether they provided any

19   justification for what we say is a misclassification.  And I'm

20   going to go through several sentences in the response,

21   specifically.  I'm referring, particularly, to page --

22          MR. MILLER:  Your Honor, please.  I'm not clear on

23   what's happening here.  Is this an objection to the

24   classification under the plan, which is a confirmation

25   objection, or is this a hearing as to the misclassification of

 1    one particular claim?

 2            THE COURT:  It's a hearing on the classification of

 3    one particular claim, and we're not having a confirmation --

 4            MR. KOLOD:  That's correct, Your Honor.

 5            THE COURT:  -- objection at the moment.

 6            MR. KOLOD:  I'm not going there.

 7            THE COURT:  Whether or not it might be more

 8    appropriately lodged at the time of confirmation remains to be

 9    seen, and it's certainly in the back of my mind as I'm hearing

10    this.  So you may want to, at some point in your argument,

11    comment as to why we're doing this now, as opposed to at the

12    time of confirmation.  But continue with your argument.

13            You were seeking to castigate certain things stated by

14    the debtors in their papers, just as a reminder of where you

15    were.

16            MR. KOLOD:  Thank you, Your Honor.  The reason -- I'll

17    just go back.  The reason we're raising this now is because of

18    the voting issue, the November 4th voting deadline.  We think

19    this issue, if possible, should be resolved prior to the

20    deadline for casting votes within various classes.  That is the

21    reason for the urgency.

22            THE COURT:  Just so we're clear on something here

23    about timing, I know you're substitute counsel for Bingham,

24    which was the original law firm that brought the motion, and

25    you weren't privy, as a result, to a conversation that took

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 22

1    place among counsel and the Court having to do with the

2    scheduling of this particular motion, but I'll tell you, if you

3    don't know it.  There was a request made by your client to

4    accelerate the timing of the hearing on this matter so that it

5    would be heard on a date earlier than today's omnibus hearing

6    date.  That request was opposed by debtors' counsel.  And

7    during the course of the telephone conversation, I recall

8    raising some concerns as to why Deutsche Bank waited until this

9    point in the case to be bringing on a motion of this sort.

10   Surely, there was actual knowledge of the classification

11   question at around the time of the disclosure statement was

12   being heard for approval.  Yet Deutsche Bank, to the best of my

13   recollection, did not make any objection at that time

14   concerning classification.  There were any number of other

15   objections made at the time of the disclosure statement

16   hearing, including one that I prominently recall made by the

17   Centerbridge, having to do with the adequacy of disclosure.

18   All of those objections were overruled and deemed to be

19   confirmation objections.

20          So one of the clouds that you need to dispel here is

21   why this is a today emergency for your client as opposed to a

22   yesterday problem which should have been solved then, not now.

23   That's question one.  And there's another timing problem that

24   we have.  Why are we dealing with this today, as opposed to at

25   the time of confirmation, since it seems to be, in effect, a

08-13555-mg   Doc 21239   Filed 10/21/11   Entered 10/25/11 15:49:50   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 23 of 79

Page 23

1   confirmation objection?  But I don't want you to lose your

2   place.

3            MR. KOLOD:  Okay, but again, I want to point out that

4   Deutsche Bank wants to support the plan and has agreed to

5   support the plan, other than this issue.  If this issue is

6   resolved and Deutsche Bank is permitted to vote in the general

7   unsecured class where it belongs, it will vote in favor.  So

8   let me thank you for reminding me of my place.

9            THE COURT:  But what happens -- just, since you

10  brought that up, let's just say for the sake of discussion that

11  this is not resolved today.  Is Deutsche Bank obliged, under

12  the plan support agreement, to vote in support of the plan in

13  its present class?

14           MR. KOLOD:  That's an issue that we would have to

15  address.  I don't believe we've addressed that internally.

16           THE COURT:  Okay, I've asked a controversial question.

17           MR. KOLOD:  Now, Your Honor, turning to the response,

18  and again, I'm looking particularly at pages 7 through 12 of

19  the response, I think what we will see as to the debtors'

20  position on these claims is that, number one, they do not

21  believe there was any difference between an unsecured claim and

22  a general unsecured claim.  The whole premise of their argument

23  is that those two phrases have exactly the same meaning, that

24  the word "general" has no meaning whatsoever.  And I'll

25  demonstrate that in their response.

1    Secondly, it's clear from their response, and I think

2    the factual discussion that they put in pages 7 through 12 is

3    very candid and very honest.  I don't think there's anything in

4    the factual description that is in any way misleading about

5    what happened.  It makes the picture very clear.  At the time

6    that they drafted their initial plan, which was within a few

7    months after Court approval of the settlement, there was no

8    financial incentive to do anything other than classify the

9    claims properly, to do it the right way.  And I think the

10   drafting and the plan classification at that point was

11   extremely probative of what they understood the settlement to

12   mean.

13        The third point is that their initial disclosure

14   statement expressly stated that they had agreed that these were

15   general unsecured claims, and that's why they were being

16   classified in the class of general unsecured claims.  That's in

17   the disclosure statement.

18        Fourth, it's clear that when they got pressure from

19   other creditors to rejigger the distributions, they classified

20   the claims in classes which are inappropriate by the very

21   definitions of those classes, and we'll look at the definitions

22   of affiliated claims to see that.

23        And finally, in paragraph 29 of the response, we'll

24   see that they state exactly what they're doing, what their

25   position is.  They're classifying the Deutsche Bank claims not

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 25

1    as general unsecured claims but as unsecured claims contrary to

2    the terms of the settlement.

3            Your Honor, may I approach the bench?

4            THE COURT:  Sure.

5            MR. KOLOD:  We have excerpts from the two disclosure

6    statements -- the initial and the first amended -- that list

7    the classes.  And I think this is important to the discussion.

8    Now, in the response -- first, in page 8 of Lehman's response,

9    paragraph 20, halfway through that paragraph, they have the

10   sentence, "General unsecured claims against LBHI, likewise,

11   were divided into twenty-three subclasses."  All right?  So

12   they state in their response that in the initial plan, there

13   were twenty-three subclasses of general unsecured claims.  Now,

14   if you look to pages 6, 7, 8, and 9 of the disclosure statement

15   excerpt which I've handed up to the Court, you'll see the

16   twenty-three classes; we've numbered them in the margins.  They

17   ignore the priority nontax claims, the secured claims, classes

18   1 and 2, and the equity interest claims.  And the remaining

19   classes are the unsecured claims classes.  And class 3 and

20   class 5 are the senior unsecured claims class and the

21   subordinated unsecured claims class.  So it's clear that these

22   twenty-three classes are all of the unsecured classes,

23   including senior and subordinated classes.  And the

24   distributions for those classes range between zero and, I think

25   at that time, 17.4 percent.  So they're saying that each of

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 26

```
 1   those classes is a general unsecured claim, which is not true.

 2   It's clear that those are unsecured claims, not general

 3   unsecured claims.

 4        Now, if you look at paragraph 21 of the response, they

 5   quote from their own disclosure statement with respect to that

 6   initial plan, and they state, "The Lehman parties also agree

 7   that certain claims of Bankhaus with respect to other

 8   participations will be allowed as general unsecured claims

 9   against LCPI and LBHI."  So they've said correctly what their

10   obligation is.

11        Now, if you then move to page 10 of their response,

12   paragraph 27, they now describe the first amendment to the

13   plan.  And in the very last line on that page, in paragraph 27,

14   they say, "Similarly, general unsecured claims against LBHI

15   were divided into fourteen subclasses."  So they're saying that

16   there are fourteen subclasses of general unsecured claims in

17   the first amended plan.  And again, if you look at our plan

18   excerpt -- excuse me, our disclosure statement excerpt, pages

19   5, 6, 7 and 8, once again, you will see the fourteen classes.

20   They eliminate the first two, which are not unsecured classes,

21   and the last, which is the equity class, and that leaves

22   fourteen classes.  And among those fourteen classes are senior

23   unsecured claims, senior intercompany claims, senior affiliate

24   guarantee claims, senior third-party guarantee claims, senior

25   third-party LBT, LBSN guarantee claims.  And then going to
```

Page 27

```
 1    classes 10A and 10B, subordinated class 10A claims,

 2    subordinated class 10B claims, subordinated class 10C claims,

 3    and then class 11 is Section 510(b) claims against LBH.  And

 4    the recoveries for those various unsecured classes again ranged

 5    from zero to 21.4 percent.

 6         So the debtors clearly are denying that there's any

 7    difference in meaning between unsecured and general unsecured

 8    claims.  But otherwise, in their response, they never attempt

 9    to explain what that difference is or provide any definition or

10    explanation for the meaning of general unsecured claims.

11         Now, the second point about the first amended plan,

12    which is in their paragraph 27 on page 11 is that that was

13    supported by the creditors' committee.  Now, if you look at how

14    they try to distinguish away their plan treatment, they say

15    that at that point in the plan process, and this is in the last

16    line of paragraph 20, the initial plan presented distinctions

17    without a difference.  So they're saying it didn't matter, so

18    pay no attention to how we interpreted the settlement agreement

19    immediately after it was entered into.  But we take a different

20    view of that.  Essentially, what they're saying is that prior

21    to their being put under pressure by other creditors classes,

22    at a point in time immediately after the settlement was entered

23    into and approved, they applied it as they understood it to be

24    written and this is what their conclusion was:  that the

25    Deutsche Bank claims belonged in the classes of general
```

1    unsecured claims at LCPI and LBHI.

2         Now, let's address what happened, according to the

3    response, how this changed and why it's changed.  At the end of

4    paragraph 27 of their response and the beginning of paragraph

5    28, they explain that they came under pressure from creditors

6    groups who wanted to file other plans, and they engaged in

7    negotiations with them, and then they amended the plan to

8    change the treatment of the Deutsche Bank plan.  And in their

9    disclosure statement, they explain the basis for that change in

10   treatment.  And this is quoted in paragraph 28 at page 11 of

11   their response.  The second sentence:  "Since" --

12        MR. MILLER:  Just so the record's clear, Your Honor,

13   the word "pressure" doesn't appear in that paragraph

14   whatsoever.

15        THE COURT:  Okay.

16        MR. KOLOD:  That's correct.  It --

17        THE COURT:  I think the record's clear.  The document

18   that appears in the ECF system says what it says.

19        MR. KOLOD:  It speaks for itself.

20        THE COURT:  And counsel is in the midst of his

21   advocacy piece.

22        MR. KOLOD:  Now, looking at the quoted language in

23   their response from the second amended disclosure statement,

24   they state, "Since such claims" -- referring to the two

25   Deutsche Bank claims, "Since such claims are based on a

Page 29

1    contractual obligation of LCPI to an affiliate, the debtors

2    have included the allowed claim as a claim of an affiliate,"

3    and then it goes on, "and the debtors have included the allowed

4    guarantee claim" -- suddenly, the word "allowed guarantee

5    claim" appears for the first time -- "the allowed guarantee

6    claim against LBHI in LBHI class 4B as a senior affiliate

7    guarantee claim."  Now, there's nothing in here about they're

8    treating them this way because they're general unsecured

9    classes.  What they're saying is they're ignoring the

10   settlement, they're ignoring what it requires, and instead,

11   they're looking behind the settlement at the original claims,

12   what they say that the fact that they are based on contractual

13   obligations of affiliates.  And they're saying that justifies

14   the classification as affiliate claims.

15           However, if you look at section 1.3 of their plan, the

16   second amended plan, they define affiliate claims.  And they

17   define them as, in the case of LBHI, any claim asserted by an

18   affiliate.  And with respect to subsidiary debtors, any claim

19   asserted by an affiliate of that subsidiary debtor.  There's no

20   reference to the origin of the claims or what the claim is

21   based on.  It's a question of who is asserting the claim.

22   Deutsche Bank is not an affiliate, and Deutsche Bank is the

23   party who is asserting these claims.  They are not within the

24   meaning of affiliate claims.

25           Now, with respect to their attempt to define the LBHI

08-13555-mg    Doc 21239    Filed 10/21/11    Entered 10/25/11 15:49:50    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 30 of 79

Page 30

1    claim as a guarantee claim, I would point out that the order of

2    this Court which incorporated the settlement provided that that

3    claim was allowed and accepted and was defined as a general

4    unsecured claim and was defined as a security and collateral

5    agreement claim.  It wasn't defined as a guarantee claim, but a

6    security and collateral agreement claim.  And the transcript of

7    the hearing, which we quote in the motion, explains why.  That

8    was the title of the agreement; it was not a guarantee.  But

9    there was litigation about that which was resolved by the

10   settlement.  And counsel at the hearing before Your Honor which

11   is quoted in the transcript portion quoted in the motion stated

12   that this settlement resolves the question of whether or not

13   this is a guarantee by essentially sidestepping it and allowing

14   the claim as a general unsecured claim.  So there's no basis

15   for their attempting to characterize it as a guarantee claim.

16          Now, finally, looking at page 29 of their response --

17   excuse me, paragraph 29 of their response on page 12, they

18   admit exactly what they're doing here.  After the first

19   sentence, they say they filed the current plan, and then they

20   say "The Chapter 11 plan classifies the LCPI claim as an

21   allowed and accepted nonpriority unsecured claim of an

22   affiliate."  The word "general" unsecured claim, the word

23   "general" has vanished from their description of what they did.

24   And they go on to say, "The LBHI claim is classified as an

25   allowed and accepted nonpriority unsecured guarantee claim of

08-13555-mg   Doc 21239   Filed 10/21/11   Entered 10/25/11 15:49:50   Main Document
Pg 31 of 79
LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 31

1    an affiliate."  Again, the word "general" has vanished from

2    their description of what they are trying to do or what they

3    have done.

4              And then they go on to say that "These claims are

5    provided the same treatment provided to other allowed and

6    accepted nonpriority unsecured claims in the respective

7    classes."  Where did those words, "in the respective classes"

8    come from?  They are not in the settlement agreement and they

9    are not in Your Honor's order.  This is their attempt to

10   rewrite and reinterpret the settlement agreement.  Essentially

11   what they've said is general has no meaning; we can pick any

12   unsecured class that we can justify, and they didn't pick the

13   right one because these are affiliate claims, and we can put

14   them in that, and as long as we treat them the same as that

15   class, that's all our obligation was.  They don't have to get

16   the treatment that other general unsecured claims get.  That is

17   simply wrong; it's contrary to the agreement.

18             Now, I think what they've done is essentially make the

19   agreement evaporate.  It doesn't exist.  They simply made it

20   vanish and done what they thought was expedient in terms of

21   satisfying their other creditors.

22             Now, again, coming back to the question of burden,

23   because they have the burden to justify what they did, what

24   evidence have they presented that general unsecured claim has

25   the same meaning as plain unsecured claims?  Not a word.  There

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 32

1     is nothing in their response that explains why unsecured claims

2     and general unsecured claim have the same meaning and you can

3     just ignore the word "general".  Second, what evidence have

4     they presented that the LCPI or the LBHI claims of Deutsche

5     Bank are asserted by an affiliate, which is the definition of

6     an affiliate claim?  Not a bit of evidence.  There is no --

7     this is clearly contrary to the facts.  These claims are not

8     asserted by affiliates.

9          THE COURT:  Can I stop you there?  And really it's a

10    point of clarification.  My understanding is that Deutsche Bank

11    acquired the Bankhaus claims pursuant to the acquisition

12    agreement which is characterized in the debtors' paper.  And in

13    your reply, you say I shouldn't even pay attention to that

14    because you view that as a distraction.  But it's correct,

15    isn't it, that Deutsche Bank acquired an affiliate claim, the

16    claim of Bankhaus and stands in the same capacity as its

17    assignor with respect to that claim.  You can't improve your

18    position just because Deutsche Bank is not an affiliate of the

19    debtors.

20         MR. KOLOD:  Well, Your Honor, I think --

21         THE COURT:  So I don't understand your argument;

22    that's my point.

23         MR. KOLOD:  All right.  I think the question has a

24    slightly complicated answer, but I think it has a very clear

25    answer.  First of all, they defined their own classes.  They

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 33

1    say, we can define our classes, and they define their classes.

2    And what they say is that the class consists of claims asserted

3    by the affiliates.  Right?  What that means to me is that if

4    one of those affiliates acquired a claim from a third party

5    against one of the debtors and asserted that claim, that claim

6    would be subject to the same treatment in that class, and that

7    once they transfer the claim and it is asserted by a different

8    party, then it is no longer being asserted by an affiliate.

9           THE COURT:  This is why they have too many lawyers in

10   the room.  It's an interesting argument.

11          MR. KOLOD:  Well, I think, now, the next question is

12   why are they treating this class differently than general

13   unsecured claim?  This is really the key point.  They have to

14   explain what the justification for the worse treatment is,

15   because they are treating it worse than the general unsecured

16   claim class.  Once you understand why they think they can treat

17   those claims worse, then you can decide whether the Deutsche

18   Bank claims falls into that criteria or falls outside of it.

19   They never bothered to explain the justification for the worse

20   treatment, the lesser treatment.  And so it is impossible to

21   really get to the question of are these affiliate or not

22   affiliate claims, other than to go by the definition that

23   doesn't cover these claims.

24          So third point, what evidence have they presented that

25   the LBHI claim is a guarantee claim?  No evidence.  They just

Page 34

1    call it that, and that's contrary to the settlement agreement

2    and it's contrary to what was stated in court on the

3    transcript.  It is not a guarantee agreement.

4         What evidence have they presented that the claims are

5    being treated like and equal to general unsecured claim?  No

6    evidence whatsoever.  They just ignore them.  They say,

7    essentially, they're being treated like unsecured claims, and

8    that's all you're entitled to.  You're entitled to equal

9    treatment in whatever class of unsecured claims we drop you

10   into.

11        So the response is completely devoid of any

12   justification for what they're doing here.  We cannot

13   understand what they're doing, other than they're asserting the

14   right to do whatever they see fit as long as they're treating

15   this class of -- which is -- a class into which we don't

16   belong -- as long as they're treating everyone in that class

17   the same way.

18        Now, is it really true that the concept of a general

19   unsecured claim has no meaning whatsoever, that it's exactly

20   the same as an unsecured claim, and that no bankruptcy lawyer

21   knows what a general unsecured claim is?  I don't think that's

22   correct.  I think it's very clear what the understanding of

23   general unsecured claims is in bankruptcy court.  It's

24   essentially the pool of unsecured claims after you remove

25   claims that have unique rights or advantages or disadvantages

1    and risks, and either increase their value and entitle them to

2    better treatment or decrease their value and entitle them to

3    worse treatment.  That's what the class of general unsecured

4    claims means.  And so what that means for drafting purposes is

5    that if you look at how the class of general unsecured claims

6    is defined in general practice, it's almost invariably a

7    catchall class that includes either all claims or all unsecured

8    claims.  And then it takes out the claims that either get

9    better treatment or worse treatment.  And that is the standard

10   drafting approach to general unsecured claim.

11             THE COURT:  I hear what you're saying.  Is that based

12   upon some empirical evidence that you've collected?

13             MR. KOLOD:  Well, yes, we have looked at dozens of

14   plans, and every plan has its unique features, but I think

15   that's the common theme.

16             THE COURT:  So you're saying that the lowercase g

17   general as used in the settlement agreement necessarily carries

18   with it secondary meaning?

19             MR. KOLOD:  It has a meaning.  It is a phrase with

20   meaning.

21             THE COURT:  I'm using the term "secondary" meaning in

22   a trademark sense, a word in which the common parlance of

23   bankruptcy practitioners carries with it a special connotation,

24   is that correct?

25             MR. KOLOD:  That's correct, yes.

08-13555-mg    Doc 21239    Filed 10/21/11    Entered 10/25/11 15:49:50    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 36 of 79

Page 36

 1            THE COURT:  Okay.

 2            MR. KOLOD:  Now, so I said what I think the criteria

 3    is for the general unsecured claim.  Let's look at how this

 4    debtor, or these debtors defined general unsecured claim,

 5    because the definition is set out in section 1.60 of the plan.

 6    And they do exactly what I said.  "A general unsecured claim

 7    means, in the case of LBHI, any claim" -- any claim "other than

 8    administrative expense" -- and it goes up, "priority," better

 9    treatment, "priority nontax," better treatment, "secured," that

10    has collateral, it's not an unsecured claim, "senior

11    unsecured," better treatment, "senior affiliate," better

12    treatment, "senior affiliate (sic)," better treatment, "senior

13    third-party guarantee claimant", better treatment or worse, in

14    this case it depends, "affiliate claim," worse treatment,

15    "third party guarantee claim," worse treatment, "subordinated

16    claim," worse treatment, "or a Section 510(b) claim," worse

17    treatment.  And then with respect to the subsidiary debtors,

18    they say the same thing.  Any claim -- any claims, it's the

19    catchall -- "Any claim other than the administrative expense,

20    priority, priority nontax, secured, or an affiliate claim,"

21    because those are the classes that are either getting worse or

22    better treatment than the general unsecured claims.  And that

23    is exactly what we would expect.  That is the meaning in common

24    parlance of general unsecured claim.

25            So it's clear that Lehman, in their second amended

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 37

```
 1    plan, deliberately decided not to classify, to take us out of
 2    the general unsecured claim class, and classify us as
 3    disadvantaged unsecured claims of affiliates that are treated
 4    worse than general unsecured claims.  And in this case, they're
 5    treated 100,000,000 dollars worse.  But there's nothing in
 6    their response that explains or justifies that worse treatment.
 7    There's nothing about these claims, particularly after the
 8    settlement agreement and the court order that entitles them or
 9    should impose on them worse treatment than what they bargained
10    for, which is treatment along with -- like and equal to the
11    general unsecured claims.  That treatment, either they have to
12    justify that different treatment, or it's discriminatory and
13    improper.  Either the worse treatment has some justification,
14    which we'd like to know what it is and why it applies to us, or
15    those classes are simply not being classified as general
16    unsecured claim classes; they're classified otherwise.  But
17    they can't have it both ways.  They either have to explain it
18    or they have to treat us as general un -- explain and justify
19    it and defend treating us differently, or they have to treat us
20    like general unsecured classes.
21         We've provided an explanation.  I think it's a cogent,
22    sensible, coherent explanation of what the settlement agreement
23    means, what it plainly means on its face.  One can live in this
24    world without every term being a defined term.  There is an
25    English language that has meanings that we use in everyday
```

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 38

1     approach, and in fact, I was wondering how Mr. --

2              MR. MILLER:  Miller's my name.

3              MR. KOLOD:  I know that.  I was wondering how debtors'

4     counsel, Mr. Miller, was going to signify capital letters as he

5     spoke because the whole argument turns on which words have

6     capital letters and which ones don't.  But anyway --

7              THE COURT:  I'm not sure if that's true, because --

8     and I'm not quibbling with you but making a comment -- the

9     settlement agreement was fashioned long before there was a plan

10    poised for confirmation and long before there was a negotiation

11    that included creditors; apparently even your own client was

12    sufficiently engaged in this process to execute a plan support

13    agreement.  So there's an awful lot going on in the plan

14    formulation process that's behind the curtain and obscured from

15    my personal view.  But what I take to be the debtors' principal

16    argument is that, sure, they entered into a settlement

17    agreement with Bankhaus and did so in good faith but had a lot

18    of flexibility as proponent of a plan.  What you're saying, in

19    effect, is that they didn't have flexibility, and that there

20    was only one way that they could classify your claim properly,

21    and that is a defined term, General Unsecured Claim, all

22    capitalized letter.

23             MR. KOLOD:  That's not quite what I said, Your Honor.

24             THE COURT:  Okay, I've said what I've said.  Now you

25    can tell me why I'm wrong.

Page 39

1          MR. KOLOD:  What I'm saying is that there was an

2    agreement that this claim would be treated like and equal to

3    the general unsecured claims it has to each of the debtors and

4    so one then had -- they are correct that we didn't get involved

5    with classification in the sense that we didn't restrict their

6    ability to create classes.  They were free to create classes.

7          But what this settlement provided was at the end of

8    the day, after they created all their classes, you would point

9    to the class of the treatment of general unsecured claims and

10   you would put this claim in it.  That was the agreement that

11   the parties reached, that we would be treated like and equal to

12   other general unsecured claims.  So then you do have to go

13   through this identification process, and it might have been

14   difficult, but it isn't difficult because the first two plans

15   that they filed after the entered into this agreement made it

16   very clear -- and the third plan still makes it very clear --

17   which is the general unsecured class, which they happen to call

18   it general unsecured, but they could have called it anything,

19   and it still would be apparent that it is the general unsecured

20   class.  It's the catchall class from which you take out claims

21   that are being treated better or worse.

22          So we did not restrict their ability to classify.

23   What we did was get their agreement, or the administrator got

24   their agreement as to how they would be treated after the dust

25   settled when they created all these classes.

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 40

1          THE COURT:  Now, let me just break in for one second

2     and ask a clarifying question because you're using the pronoun

3     "we" and then you clarified it to say "the administrator".  The

4     reality here is that Deutsche Bank bought into this after the

5     fact, had no direct involvement in negotiation of the

6     settlement agreement, and bought a claim -- bought two

7     claims -- with the expectation that it would be treated like

8     and equal to the treatment of general unsecured claims and

9     presumably went through a process of internal evaluation of

10    whether or not it was a good purchase and decided to do that.

11    So you come here as an advocate for a claims acquirer that does

12    what many parties did throughout this bankruptcy case, made a

13    business judgment as to whether or not a particular acquisition

14    of a claim was sensible at the time.

15          Now, you've been accused in the papers filed by the

16    debtors of having a client who has buyer's remorse with respect

17    to the claims acquired.  And in your responsive papers, you

18    said that's something that I should completely disregard; that

19    has nothing to do with this.  Correct?

20          MR. KOLOD:  Correct.  We would like you to enforce the

21    terms of the settlement agreement as written and as approved by

22    Your Honor.

23          THE COURT:  Okay, but here's really my question.  How

24    do you know the truth of what you're asserting here, other than

25    that of anybody who's looking at a distance, removed from the

Page 41

```
 1    actual negotiations, as to what the documents say and then

 2    fashioning a creative argument?

 3             MR. KOLOD:  I know that what I'm saying is correct

 4    because when we bought the claims from the administrator, he

 5    stated in writing that that was what it meant, number one.

 6    Number two, I know that my interpretation is correct because

 7    the debtors' first two plans, when they weren't under pressure,

 8    comported entirely with the settlement agreement and explained

 9    in the disclosure statements why, because that's what they had

10    agreed to do.  And I know what I'm saying is correct because

11    the response provides no justification for what they're doing,

12    no explanation, no compliance with the definition of affiliated

13    class, no compliance with the definition of general unsecured

14    claims.  It's -- and it requires them, when they try to state

15    the settlement agreement, it requires them to rewrite the

16    settlement agreement in some way to show that they're complying

17    with it, either by leaving out the word "general" or by adding

18    the words, all they agreed was to put us in some unsecured

19    class and treat is like people in that class.  That's why I

20    know this interpretation is the correct one.  And I also know

21    from years of practice as a bankruptcy lawyer what we mean when

22    we talk about "GUCS", general unsecured claims.  This is what

23    we mean.  So that's my answer, Your Honor.

24             THE COURT:  All right.

25             MR. KOLOD:  Now, in paragraph 34 of the response,
```

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 42

1    Lehman explains what it can't do, what they admit they can't

2    do.  And they say the settlement agreement evidences that the

3    debtor agreed that the Bankhaus claims would not be singled out

4    for unfavorable treatment.  That's exactly what they're doing.

5    They've singled us out for unfavorable treatment relative to

6    general unsecured creditors.  Plain and simple, that's what

7    they've done.

8         Your Honor, I think it's clear that the response has

9    failed to carry the burden that rests on the debtors to justify

10   their treatment of these claims and that Deutsche Bank is

11   entitled to the relief we seek in our motion and our wherefore

12   clause.  And I haven't gotten into whether the administrator's

13   statements of intent are relevant or not, and I think I would

14   like to save time in the reply to deal with questions that Mr.

15   Miller may raise in an attempt to resuscitate his argument.

16        Thank you very much.

17        THE COURT:  Okay, before you sit down and before I

18   hear from Mr. Miller, I raised some concerns early in your

19   argument about timing, which you really haven't addressed, and

20   it's a difficult series of questions because it goes to why

21   this is being pressed now, at this hearing, in October, as

22   opposed to earlier, and why it's being pressed now, as opposed

23   to later, at the time of confirmation.

24        MR. KOLOD:  Your Honor, it clearly can -- the same

25   issues can be raised at confirmation.  I don't think there's

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 43

1    any question about that.  I simply am not in a position because

2    of my recent involvement in this, to -- maybe I can get an

3    answer, but I just don't know the answer to why -- or what was

4    raised previously, so I can't answer that part of the question.

5            I can say that the reason we asked Your Honor to

6    decide it now is because of the voting deadline.  Your Honor is

7    free to determine whether that is a sufficient and valid

8    reason.  That is the reason.  We would like to be able to vote

9    these claims in favor of the plan in the appropriate classes.

10   So that's the reason.  Thank you.

11           THE COURT:  Okay.  I understand.  Thank you.

12           MR. MILLER:  Harvey Miller for the debtors.  If Your

13   Honor please, I would like to put this motion into context with

14   all due deference to substitute counsel.  But when this motion

15   was made, Your Honor, it was in the nature of a summary

16   judgment motion.  The motion was that if you just take the

17   settlement agreement, and you look at the settlement agreement

18   without anything else, you'd have to come to the conclusion the

19   classification is wrong.  Now the argument has switched.  The

20   argument has switched in with the kind of statements that there

21   is a burden on the debtors -- no burden on the moving party.

22   Now, when you talk about burden, Your Honor, Your Honor

23   pinpointed it:  they weren't there in negotiations in December

24   of 2009.  It was the administrator that was there.  It was the

25   debtors that were there.  And there is nothing in connection

Page 44

1    with this motion, any statement by the administrator as to what

2    occurred in connection with this settlement agreement.  The

3    administrator is noisily absent in these proceedings, Your

4    Honor.

5         Now, going to the statement that there is a universal

6    definition of general unsecured creditors, I've been practicing

7    in this field, Your Honor, for fifty-two years.  I even

8    remember the Act of 1898.

9         THE COURT:  I think you get the award for the longest-

10   running career in the room.

11        MR. MILLER:  I'm not finished yet.  I'm not finished.

12   The term general unsecured creditor simply means a nonpriority

13   unsecured creditor.  It has no secondary meaning.  Now, in

14   terms of what Your Honor pointed out, Deutsche Bank acquired a

15   claim.  It purchased a claim, and where is Mr. -- Deutsche

16   Bank's proof that when this settlement agreement was

17   negotiated, it was unequivocally agreed that they would get the

18   highest recovery of a general unsecured creditor, that the

19   debtors could not classify -- that the debtors could not

20   classify on the basis of affiliate and guarantee claims?

21   There's nothing in this agreement that even talks about that.

22   There are no restrictions in the agreement on the debtors'

23   right to classify.  The essence of the argument that's being

24   made, Your Honor, is that all general unsecured creditors have

25   to be in the same class, that you can't classify general

Page 45

1    unsecured creditors into different classes.  And I respectfully

2    submit, Your Honor, that is not the law in this circuit, and

3    hasn't been the law in this circuit for a long, long time,

4    going all the way back to the First National Bank of Herkimer

5    v. Poland and has been accepted in this circuit without any

6    question.

7            So what do we have to do, Your Honor?  Let's look at

8    what happened in this case.  Deutsche Bank, as a sophisticated

9    creditor, a sophisticated entity, an institution, decided to

10   purchase these claims, and obviously, Your Honor, there was a

11   pricing issue.  How much are they going to pay Bankhaus, the

12   administrator, to purchase these claims?  And in that equation,

13   in that calculation, the question is what's going to happen to

14   this claim?  How is this claim going to be treated in the

15   Chapter 11 cases?  So you have to look at, Your Honor, the

16   assignment agreements and see what the assignment agreements

17   and significant provisions in the assignment agreements

18   provide.  And one of the significant provisions, Your Honor --

19   just give me a moment -- in section 8.2 of the assignment

20   agreement which says -- and again, I love the comment, "For the

21   avoidance of doubt, purchaser, Deutsche Bank, acknowledges that

22   it bears the risk subject only to the insolvency

23   administrator's express representations and undertakings made

24   in the assignment agreement, that the claims may be affected by

25   a plan of reorganization," -- what's the significance of that

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 46

1    phrase, Your Honor?  That the plan of reorganization may

2    classify, may treat unsecured creditors differently in

3    different classes, and any stuff from the consolidation of the

4    debtors, "and/or any other treatment imposed in the context of

5    the U.S. proceedings."  Well, counsel points out that you must

6    give effect to every word of every agreement.  What is the

7    effect of these words?  That there could be a plan of

8    reorganization that treated these claims in separate classes,

9    provided different treatment in separate classes, as long as

10   the treatment within the class was equal among those

11   participants in the class.

12        Then, Your Honor, the issue of the status of these

13   claims must have been significant because in section 8.3, the

14   insolvency administrator acknowledges and confirms that his

15   intention and understanding of the status and treatment of the

16   claims in entering into the settlement agreement were that (and

17   his understanding of the debtors' intentions and understandings

18   in entering into the settlement agreement was that), one, the

19   LCPI claim will be classified and treated as an allowed and

20   accepted general unsecured creditor," lower case, equal to all

21   other general unsecured creditors against LCPI and a similar

22   provision for the LBHI claim.  After these acknowledgements and

23   representations, then there's another paragraph in 8.3, and it

24   says for the avoidance of doubt, again, "The insolvency

25   administrator shall not be liable if his understanding of the

Page 47

1    status and the treatment of the claims, and in particular the

2    insolvency administrator's understanding of the debtors'

3    intentions and understandings was incorrect."  So on the right

4    hand, they got an acknowledgement and confirmation from the

5    insolvency administrator of what his intentions were and what

6    he thought the intentions of the debtors were, and then on the

7    left hand was a disagreement.  They took it away.  So there is

8    no acknowledgement and representation because he's not assuming

9    any personal liability.  Those are very significant provisions.

10         Then, the insolvency -- and then 8.4, there's a

11   provision that the insolvency administrator unconditionally and

12   irrevocably covenants and undertakes (ii) upon a reasonable

13   request of the purchaser to use its reasonable endeavors to

14   assist the purchaser" -- Deutsche Bank -- "in defending any

15   attempts by the debtors, the bankruptcy court, or any third

16   parties to characterize or treat the claims in a manner which

17   is contrary to the administrator's intentions as defined above

18   or the settlement order.  Well, where is the administrator?

19   He's not here, Your Honor.  He's not involved in this

20   proceeding at all.  And what is the significance of those

21   provisions?  There was an issue as to what would be the status

22   of these claims.  It was a significant issue, because when you

23   look at the assignment agreement, and Your Honor may recall,

24   Centerbridge filed an objection to the disclosure statement.

25   They attached to the objection a copy, an unexecuted copy of

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 48

1    the assignment agreement.  That unexecuted copy of the

2    assignment agreement doesn't include section 8.4(ii) which I

3    just read to the Court, which imposed an obligation on the

4    administrator to defend these claims should there be

5    proceedings in this court.  Apparently they didn't ask the

6    insolvency administrator to attend this hearing.

7          Then, Your Honor, think about it in the context.

8    They're having this very strenuous negotiation.  Pricing is

9    very important to traders -- how much am I going to pay for

10   these claims?  And, they ask the administrator to confirm what

11   are the intentions of the debtor.  This is not a case, Your

12   Honor, where there's a dead debtor -- there was nobody to talk

13   to.  They could have picked up the telephone and called the

14   debtor -- what were the intentions of this agreement?  That did

15   not happen.

16         The reasons why it did not happen?  We can all

17   speculate, Your Honor, but it is clear from all the documents

18   that there was an existing question as what would be the

19   status, the classification, and the treatment under any plan of

20   reorganization that might be proposed in this case in respect

21   to these claims.  And it had to go into the pricing issues.

22         So --

23         THE COURT:  Mr. Miller, I hear all that you're saying

24   about the pricing issue, and I even asked a question earlier

25   that suggested some sensitivity to that point.  But it's not

08-13555-mg    Doc 21239    Filed 10/21/11    Entered 10/25/11 15:49:50    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 49 of 79

Page 49

1    clear to me that that's terribly relevant in as much as the

2    real question becomes how properly should the settlement

3    agreement be interpreted and how much flexibility does the

4    debtor have, and in reference to that I have a question that

5    you can either answer now or sometime during your remarks.

6    Does the debtor take the position that the settlement agreement

7    is clear and unambiguous on its face as to what it means in

8    terms of the treatment of the administrator's claim, or is it

9    the debtors' position that it is a subject worthy of the taking

10   of evidence on the basis of ambiguity as to what the document

11   says on its face that would lead to a further hearing, perhaps

12   with testimony, by those parties who actually negotiated the

13   language of the settlement agreement?

14         MR. MILLER:  My first position, Your Honor, is that

15   the document is clear and unambiguous.  It did not limit the

16   debtors in any respect in terms of classification; there's

17   nothing in the agreement that does that.  There's nothing in

18   the agreement that says that the claim of Bankhaus -- now it's

19   Bankhaus before we get to Deutsche Bank -- that the claim of

20   Bankhaus will get the highest recovery of any general unsecured

21   creditor class under the plan.  There is nothing in that

22   agreement that says that.  If we're just going to look at the

23   four corners of the agreement, there are no restrictions.  It

24   could have been very easy, Your Honor, to have written in a

25   clause that said under any circumstances, the recovery on the

Page 50

1    Bankhaus claims must be equal to the highest recovery of any

2    general unsecured creditor.  It doesn't say that.  There is

3    nothing in this agreement.

4           I wasn't there, Your Honor; I don't know what was

5    negotiated there.  I know what the agreement says, and the

6    original motion that was filed here -- the prime motion --

7    said, just look at the agreement, the four corners of the

8    agreement, and that's what we were looking at.

9           Now, substitute counsel says we have a burden of

10   proof.  It's not our motion, Your Honor.  So my first position,

11   Your Honor, is that the agreement is clear and unambiguous in

12   favor of the debtors.  There was nothing in this agreement that

13   specified that Bankhaus -- not Deutsche Bank -- that Bankhaus

14   was going to get the highest recovery of any class of general

15   unsecured creditors.  It's not in the agreement.  There's

16   nothing in the agreement that prohibited or limited the ability

17   of the debtor to classify creditors by appropriate

18   justifications for different classifications.

19          And there are many plans, Your Honor, in which

20   affiliate claims are classified separately.  And the fact that

21   Deutsche Bank bought the claims -- as you pointed out, Your

22   Honor, they took a business risk.  They say in the

23   agreements -- they're sophisticated, they bear all the risk.

24   It doesn't change the basic nature and character of the claim.

25          So, on my first position, Your Honor, the agreement is

08-13555-mg   Doc 21239   Filed 10/21/11   Entered 10/25/11 15:49:50   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 51 of 79

Page 51

1    clear and unambiguous.  The debtors have this flexibility.

2    Remember, this was December 2009.  The case was young -- maybe

3    not thriving, but it was young.  Nobody knew what the

4    classifications ought to be.  Even the first plan, as Your

5    Honor may recall -- I think Your Honor referred to it as a

6    placeholder.  It was just a plan that was filed to try and get

7    another sixty days of exclusivity.  Even the second amended

8    plan -- I mean, the first amended plan -- in January of 2011 --

9    all the negotiations were were with the creditors committee.

10   Counsel keeps referring to pressure from other creditors.  We

11   didn't say there was pressure; we just said there were

12   negotiations with other creditors, which is what you're

13   supposed to do in Chapter 11.

14          So, yes, I believe, Your Honor, that the agreement --

15   the settlement agreement is clear and unambiguous in terms of

16   the primary issue here -- is Deutsche Bank as an assignee of

17   Bankhaus entitled to the highest recovery of any class of

18   unsecured creditors?  And I would submit to Your Honor, the

19   settlement agreement doesn't provide for that.

20          And then, certainly, Your Honor, if Your Honor finds

21   there are ambiguities, maybe an evidentiary hearing is

22   appropriate.  In terms of voting on the plan, Your Honor, the

23   way we construed the PSA, the Plan Support Agreement, Deutsche

24   Bank is obligated to vote in favor of the plan, and the

25   debtors, Your Honor, are not concerned about whether the LCPI

1    plan is in whatever class -- whatever class.  We believe the

2    plan will be accepted either way and that Deutsche Bank is

3    obligated to vote in favor of the plan.  So I don't think

4    that's a big issue, Your Honor.

5          And I believe, Your Honor, we have to look at the

6    ancillary documents, the documents under which they bought

7    these claims.  The fact that there was an issue in their mind,

8    and in the mind of -- certainly it was in their mind, and they

9    compelled the administrator to make that acknowledgement and

10   confirmation.  And then he got weak-kneed about it and said no,

11   no, I'll make the acknowledgement and confirmation, but I don't

12   want any personal liability if it turns out to be incorrect.

13         So, I have to say, Your Honor, I think the agreement

14   is clear and unambiguous in terms of no restrictions on the

15   debtor in terms of classification.  And, again, Your Honor,

16   it's Deutsche Bank's burden to establish to Your Honor that

17   they have a good case, and I don't believe they have, Your

18   Honor.  They're a sophisticated investor.  They assume the

19   risk.  They say that they examine the documents.  They

20   consulted with attorneys.  Even at the very last minute, they

21   changed the form of the assignment agreement.  The purchaser,

22   Deutsche Bank, put in this provision that you, Mr.

23   Administrator, if we request it, you have to come in and defend

24   our claims.  The administrator's not here, Your Honor.  There's

25   nothing from the administrator as to what happened.

08-13555-mg   Doc 21239   Filed 10/21/11   Entered 10/25/11 15:49:50   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 53 of 79

Page 53

1          So, on the basis of the agreement, we have to

2    conclude, Your Honor, that there were no restrictions on the

3    debtors.  And what the debtors are doing are complying exactly

4    with the settlement agreement.  Deutsche Bank as the assignee

5    of Bankhaus is getting the exact same treatment of everybody in

6    that class, both as to the LCPI claim and as to the LBHI claim.

7          And I'm a little mystified by counsel's reference

8    to -- there's no -- we haven't proved there was a guarantee

9    claim?  Well, Bankhaus took the position there was a guarantee.

10   There was a guarantee document; the question as to whether it

11   was authorized or not was resolved in the settlement agreement.

12   But it's a guarantee claim.  They bought the guarantee claim,

13   and our pleading, Your Honor, tracks the language of the

14   settlement agreement exactly -- what they got was an allowed

15   and accepted non-priority unsecured claim.  And there is no

16   defined term in the agreement:  general unsecured claim means a

17   claim that gets the highest recovery under the plan.  And I

18   submit to Your Honor that's fatal to Deutsche Bank's position

19   in this case.

20         So, I say to Your Honor, the agreement is unambiguous

21   in favor of the debtors.  There hasn't been any proof -- there

22   hasn't even been an affidavit by the administrator, to the

23   contrary, and he was the person that was there.  So they have

24   totally failed in proof, Your Honor, and with all due respect,

25   the motion should be denied.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 54

1        THE COURT:  Okay.  Thank you.  Any further comment on

2   this?

3        MR. KOLOD:  Yes, thank you, Your Honor.

4        First of all, Mr. Miller and the response, repeatedly

5   insist that Deutsche Bank is seeking treatment as the

6   highest -- the treatment afforded the highest unsecured claim.

7   And I would point out that that treatment is provided to the

8   senior unsecured claims in the LBI and LCPI class.  We've never

9   asked for treatment as the highest unsecured claim -- that's a

10  complete misrepresentation of our position.  But it's the

11  position that Mr. Miller is forced into because he refuses to

12  acknowledge the difference between an unsecured claim and a

13  general unsecured claim.

14       And I'd also point out that Mr. Miller, you know, in

15  his fifty plus years of practice didn't say that as far as he

16  is concerned, senior claims -- senior unsecured claims and

17  subordinated unsecured claims are also just general unsecured

18  claims.  And that's the position that they have to take and

19  have taken in their papers in order to make their argument.

20       With respect to the administrator -- and I think I

21  agree with Mr. Miller that our initial position is that the

22  agreement is unambiguous and further, that the burden was on

23  them to show that they complied with the agreement in their

24  classification.  And I don't think they did that as I went on

25  at great length about -- I don't think they did that in any

08-13555-mg   Doc 21239   Filed 10/21/11   Entered 10/25/11 15:49:50   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 55 of 79

Page 55

1    respect.  But if there are any issues, those issues are what

2    does general unsecured claim mean, which classes or which

3    class, is a general unsecured claim class, and, as I said, I

4    think they had the burden of proof on that.

5         But we did put in evidence in the form of the

6    statements by the administrator as to what his understanding

7    was that it didn't include affiliated claims.  He was not

8    negotiating for treatment as an affiliated claim or an insider

9    claim, which is common, and the debtors didn't -- you know, as

10   Mr. Miller said, it's very common to treat affiliated or

11   insider claims differently in a plan or at least to separately

12   classify them for voting purposes.  Why didn't Mr. Miller's

13   client negotiate for that provision?  Why is the burden on the

14   administrator who negotiated for treatment as a general

15   unsecured claim?  Why is the burden on him to say, but not as

16   some other claim that's not general unsecured as opposed to

17   their having said, no, you cannot be treated as a general

18   unsecured claim, you are an affiliate claim and that is how you

19   are going to be treated.  So I think that argument really cuts

20   the other way.

21        Now, with respect to the -- again, while I'll call

22   them representations but they're technically not

23   representations, they're statements of understanding.  The

24   administrator's representations to Deutsche Bank were, this is

25   my understanding of what we negotiated.  It's not what the

08-13555-mg    Doc 21239    Filed 10/21/11    Entered 10/25/11 15:49:50    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 56 of 79

Page 56

1    agreement says -- he wasn't saying, this is what the agreement

2    says.  He's saying, this is my understanding, so if there is

3    any ambiguity about the agreement, I will testify that this is

4    my understanding that would resolve that ambiguity.  And he's

5    also saying that I believe that the debtors have the same

6    understanding.  And, now, he's a witness -- if he's called,

7    he's a witness.  And if there is an evidentiary hearing, he

8    will be called and he will cooperate.  He's saying that this is

9    what I would testify as a witness, and I don't want to have

10   personal --

11            MR. MILLER:  With all due respect, that's not what

12   he's saying.

13            MR. KOLOD:  He covenanted that he would hear and

14   cooperate.

15            MR. MILLER:  Counselor's testifying.

16            THE COURT:  We're not -- at this point, this is just

17   argument, and I'm not accepting any statement of counsel as to

18   what Dr. Frege or his representatives will be saying if called

19   as a witness and subjected to withering cross examination.

20            MR. KOLOD:  And I'm not making -- all I'm doing is

21   summarizing the agreement that Mr. Miller is making such a big

22   deal about.  What I'm saying is, he says --

23            THE COURT:  Actually, you're both making a big deal

24   about it, and you're the first one to make a big deal about it

25   in your opening statements.  You're saying that there are

Page 57

1    handcuffs on the debtor as a result of this agreement.

2              MR. KOLOD:  No, no, just --

3              THE COURT:  Yes, you are.  You're saying that this

4    agreement limits the ability of the debtor to classify the

5    claims acquired by Deutsche Bank and the administrator because

6    those claims have to be given treatment that is like and equal

7    to the treatment of general unsecured claims.  That's your

8    argument in a nutshell, correct?

9              MR. KOLOD:  Yeah, it is correct.  That is correct.

10   Right -- what I mean by not handcuff -- it doesn't handcuff

11   their ability to create classes.  It does handcuff their

12   ability to treat us --

13             THE COURT:  It handcuffs their ability to treat the

14   Deutsche Bank claim in a way that is less favorable --

15             MR. KOLOD:  Correct.

16             THE COURT:  -- than general unsecured claims as a

17   defined term in the plan.

18             MR. KOLOD:  -- than general unsecured claims which

19   happens to be the defined class of general unsecured claims,

20   that's -- that's our position.  Yes, absolutely.

21             Now, you know, if the agreement is ambiguous on the

22   meaning of general unsecured claims, we think that that cuts

23   against the debtor because they have the burden here, and they

24   presented no evidence.  They quibble, they, you know --

25   frankly, Deutsche Bank's reading of the agreement six months

08-13555-mg    Doc 21239    Filed 10/21/11    Entered 10/25/11 15:49:50    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 58 of 79

Page 58

1    later, the settlement agreement, and what it interpreted at, is

2    irrelevant.

3         But there's nothing in that assignment agreement that

4    states how they interpreted it.  What they were doing was

5    protecting themselves against reneging, and the way they

6    protected themselves against reneging was not getting a

7    restatement of what the agreement meant but getting a statement

8    of the intention of the party who negotiated it, who they're

9    acquiring it from, and his understanding of the other side's

10   understanding of the agreement, and his agreement that he would

11   cooperate and testify to that effect.

12        Now, yes, he's -- he said I don't want to be

13   personally liable, but why should any witness be personally

14   liable?  He's going to be under oath, and he's going to testify

15   under pain of perjury.  So, he doesn't need to have personal

16   liability if it turns out that Your Honor doesn't agree with a

17   position.

18        So there's nothing surprising about that.

19        THE COURT:  Well, this is the unexpressed subjective

20   intent of a foreign administrator concerning his understanding

21   of how a plan under U.S. law might treat his claim.  I'm not

22   sure what that means.

23        MR. KOLOD:  Your Honor, I think that's probably --

24   that may well be correct.  All I'm saying is, that if there is

25   a question of ambiguity then one has to look for other

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 59

1    evidence.  And I think the kinds of evidence that one would

2    look for is the common usage of the term general unsecured in

3    bankruptcy practice.  You'd get expert testimony on that point;

4    you might try to find out whether Lehman and the administrator

5    do have admissible evidence on the question of intent -- they

6    may or may not.  We would have to take discovery to find that

7    out.  And then you'd have to have testimony as to which class

8    or in each debtors' case, is the general unsecured class.

9    Those would all be the types of evidence that would come up in

10    the -- if there were a hearing on any disputed facts.  We're

11    not saying there needs to be because we think they've

12    completely failed to justify what they've done.  It's

13    inconsistent with the agreement, and the way Mr. Miller

14    repeatedly described it, it's just -- they've just disregarded

15    what that agreement says.  They've just eliminated that entire

16    paragraph -- that Paragraph 12K.  And they've gone about

17    treating these as unsecured affiliated claims even though

18    they're not affiliated claims, or at best -- you don't have to

19    decide this, I think there's a very good argument that they are

20    not affiliated claims within the definition, and they would not

21    be affected, for example, by substantive consolidation.  That

22    if Bankhaus and LCPI were -- or the other debtors were

23    substantively consolidated, that would have no effect on that

24    claim that was previously transferred.

25            But this is all for another day.  My only point is

1    that they didn't deal with any of these issues in a way that

2    would explain why they're putting us in a class that's getting

3    lousier treatment than their contract on its face provides for.

4    So, again, I think, Your Honor, that the assignment agreement

5    is really a sideshow; it isn't relevant.  What the

6    administrator might testify is relevant, and I would also note

7    that nowhere in their response, is there any statement as to

8    what their witnesses would testify about intent.  They are not

9    disputing the correctness of those statements in the assignment

10   agreement about intent.  They are not providing a different

11   statement of intent; Mr. Miller disclaimed any personal

12   knowledge of intent.  The debtors have completely avoided the

13   question of what they thought the intent of the agreement is,

14   so they failed to present any evidence on that.  They haven't

15   created an issue of factor on that.

16           So, again, I don't -- I think there's no need for a

17   hearing, but again, Your Honor is the one who will decide

18   whether there is an ambiguity, whether there is a need for

19   testimony, and I've pointed out the issues on which we would

20   want to present testimony if Your Honor goes that way.  So,

21   thank you, Your Honor.

22           THE COURT:  Okay.

23           MR. MILLER:  I just want to make -- I just have a

24   point.  I just want to clarify one thing so it's clear to

25   counsel.

08
08-13555-mg   Doc 21239   Filed 10/21/11   Entered 10/25/11 15:49:50   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 61 of 79

Page 61

1          I unequivocally make the statement that all of the

2     unsecured claims listed in the third amended claim are all

3     general unsecured claims, notwithstanding titles of affiliate

4     claims whatsoever.  General unsecured claims is not a

5     universally defined term.  That's the opposition.

6          Second, Your Honor, Mr. Kolod said we have to show

7     justification for what we did?  Not at this hearing, Your

8     Honor.  We have the right to classify, and we classify that we

9     believe the classifications are appropriate.  He just made a

10    statement that under the settlement agreement they can even be

11    affected by substantive consolidation.  Yet, Your Honor, if you

12    look at the settlement agreement -- I think it's in 8.4 -- it

13    specifically says substantive consolidation can affect those

14    claims.  You can't change the basis of this claim that it's the

15    Bankhaus claims, it's not the Deutsche Bank claim.

16         And, again, Your Honor, their position when they made

17    this motion was that the document is unambiguous.  Intent is

18    irrelevant if you're looking at the agreement and the words of

19    the agreement, and under the words of the agreement, Your

20    Honor, there were no restrictions on the debtors.  And there

21    was no requirement of a particular type of recovery other than

22    it be in the class of general unsecured claims.

23         THE COURT:  Okay.  Thank you.

24         MR. KOLOD:  Just one clarification -- just

25    very brief --

1          THE COURT:  It's almost 11:30 --

2          MR. KOLOD:  I'm sorry.

3          THE COURT:  -- and we're still on Item 3.

4          MR. KOLOD:  With respect to substantive consolidation,

5    the settlement agreement does say that if the guarantor -- what

6    they call the guarantor -- if Lehman Holdings and LCPI are

7    consolidated, that they reserve the right to say that there is

8    no LCPI -- there's only a single claim instead of two claims.

9    Okay?  That is in the agreement.  But if the obligor and the

10   obligee -- you know, if Bankhaus and LCPI are consolidated, the

11   obligor and the obligee and the claim has previously been

12   transferred -- sold to a third party under well-established

13   case law -- that would not affect whether the claim

14   disappeared.

15          Obviously, if you merge two companies, then claims

16   between them disappear because there's no one to pay.  But if

17   the claims have been sold out, and so that -- I just want to

18   point out that the settlement agreement does not reserve that

19   right.  It doesn't subject the administrator to that risk.  It

20   only deals with the parent/subsidiary issue.  Thank you.

21          THE COURT:  All right.  There are a number of parties

22   who joined in the position of Deutsche Bank.  The debtors filed

23   a response indicating that the joinders, as that term was

24   defined in their papers, didn't really have a standing to

25   appear and be heard.  I think I've heard enough on the subject;

Page 63

1    I don't want to make a determination on standing, but I'm

2    asking just in the interests of giving everybody an opportunity

3    to say they don't need to speak.  If it's true that parties who

4    joined in the papers are prepared to rest on the position

5    expressed by Deutsche Bank's counsel -- if there is some urgent

6    need to say something, I can then deal with the standing issue.

7         Fine.  Since I've heard no comment, I will rely upon

8    the papers that have been filed in reference to the joinders

9    and I'm going to take a ten-minute break.  There are multiple

10   reasons for that, but I don't have to express why.

11        (Recess from 11:31 a.m. to 11:45 a.m.)

12        THE COURT:  Be seated, please.

13        It was a very interesting argument.  The key to this

14   dispute is a document that in Paragraph 12K both parties claim

15   to be plain and unambiguous.  I don't know if that's true or

16   not.  The treatment of general unsecured claims as provided

17   under a settlement agreement entered into before the first plan

18   has been formulated, is almost by definition a hypothetical

19   exercise.

20        I believe that one side, Deutsche Bank, here takes the

21   position that the term general unsecured claims, carries with

22   it a secondary meaning that is generally understood by

23   bankruptcy practitioners in the United States who engage in

24   Chapter 11 practice.  And, at least, the debtor takes the

25   position that that's true only up to a point -- it's just

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 64

1    English -- and that the debtor has completed and unfettered

2    flexibility to formulate plan treatment in its discretion.

3            I don't need to decide this question today, and I'm

4    not going to.  I believe that the issues raised by Deutsche

5    Bank in its motion amount to a preemptive confirmation

6    objection.  And, so, I'm going to deny today's motion without

7    prejudice to Deutsche Bank's right to ask the very same issue

8    at confirmation and to challenge its treatment as holder of the

9    acquired Bankhaus claims.

10           I'm not determining now whether or not the language is

11   or is not unambiguous, but it does seem to me that if the

12   parties wish to more effectively present their position at the

13   time of confirmation, they may want to at least consider

14   delving more deeply into what the parties actually meant when

15   they wrote the words that they wrote at the time that they

16   wrote those words.

17           As far as the voting process that we're now engaged

18   in, I treat the representations of counsel as accurate, namely

19   that Deutsche Bank has executed a plan support agreement which

20   carved out the issue which we have been confronting today and

21   that the issue as to whether or not voting is required despite

22   issues concerning classification represents a matter that is

23   subject to further review.  I don't believe, given the

24   circumstances, that there is any pressing need for me to decide

25   the question today.  Deutsche Bank will either cast its vote in

08-13555-mg   Doc 21239   Filed 10/21/11   Entered 10/25/11 15:49:50   Main Document
Pg 65 of 79
LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 65

1    support of the plan because it's required to do so, or it will

2    not cast its vote in support of the plan and expose itself to

3    potential liability for not doing so.  That's not my problem.

4         And as far as the plan process is concerned, while the

5    claims are certainly significant in amount, in the context of

6    the claim that we have in this case, it will not, based upon

7    the representations of Mr. Miller, tilt the balance one way or

8    the other.  For that reason, this is something I do not need to

9    decide today, and I am not deciding today except to deny the

10   motion without prejudice.

11        MR. MILLER:  Thank you, Your Honor.

12        MR. KOLOD:  Thank you.

13        MR. MILLER:  We're up to Item 4, Your Honor, on the

14   agenda.

15        MR. BERNSTEIN:  Good morning, Your Honor.  Mark

16   Bernstein from Weil, Gotshal on behalf of Lehman Chapter 11

17   debtors.  The next item on the agenda is a motion to terminate

18   the Spruce securitization.  Spruce CCS, LTD., is a special

19   purpose vehicle that was formed to hold participations and

20   commercial loans.  Spruce has two current classes of

21   outstanding notes -- one class of mezzanine notes which is held

22   by LBHI, one class of subordinated notes which is held by LCPI.

23        Based on the debtors' projections, they expect that

24   certain of these loans -- the underlying loans -- will be

25   repaid in the near future in sufficient amounts to enable

08-13555-mg   Doc 21239   Filed 10/21/11   Entered 10/25/11 15:49:50   Main Document
Pg 66 of 79
LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 66

1    Spruce to repay the mezzanine notes in full, leaving only the

2    subordinated notes outstanding.  When that happens, LCPI will

3    seek to terminate the securitization documents and the

4    securitization in full, to enable it to efficiently manage the

5    loans and maximize the value of the loans without certain

6    restrictions or limitations included in the securitization

7    documents.

8         The debtors have submitted a declaration of David

9    Walsh of Alvarez & Marsal in support of the fact that it will

10   enable the debtors to maximize the value by terminating the

11   securitization.

12        One response was filed to this motion by Centerbridge

13   seeking certain reservations of rights.  As Your Honor may

14   remember, LBHI purchased these mezzanine notes from Bankhaus in

15   a prior transaction in April of this year.  And in the order

16   approving that purchase, LCPI reserved its rights to assert

17   that a corporate opportunity for it to purchase the notes was

18   usurped by LBHI.  Centerbridge just wanted to make sure that

19   nothing in this order had any effect or impact on that

20   reservation of rights and it doesn't as these notes are being

21   repaid in accordance with the terms of securitization.

22        So, we have agreed with Centerbridge to add certain

23   language to the order to make that fact clear, which says just

24   that -- that this order shall have no impact on the reservation

25   of rights set forth in the fourth decretal paragraph of the

Page 67

1    order that approved the Bankhaus purchase.  Inclusion of that

2    language has resolved the Centerbridge objection and as a

3    result, this actually is going forward uncontested today.

4            I'll be happy to answer any questions Your Honor has.

5    If not, we respectfully request Your Honor grant the motion to

6    terminate the Spruce securitization.

7            THE COURT:  I'll grant the motion, but I'd like to

8    just have it confirmed by counsel for Centerbridge whom I see

9    sitting in the front row, that the form of order that has been

10   crafted is satisfactory and resolves the objection.

11           MR. DUBLIN:  It's still good morning -- good morning,

12   Your Honor.  Phil Dublin, Aakim Gump, on behalf of Centerbridge

13   and the inclusion of this language does resolve our issues.

14   Thank you.

15           THE COURT:  Fine.  Okay.  It's approved.

16           MR. BERNSTEIN:  Thank you, Your Honor.  The next

17   motion is a motion filed by Dechert so I'll turn the podium

18   over to someone from Dechert to handle it.

19           MR. WASSERMAN:  May it please the Court, my name is

20   Adam Wasserman of Dechert for the current and former outside

21   directors of LBHI and --

22           THE COURT:  Do we need tech support for the

23   microphone?

24           MR. WASSERMAN:  I was going to say -- luckily, I'm

25   short.

1              THE COURT:  There you go.

2              MR. WASSERMAN:  So, as this Court well knows, on at

3    least ten prior occasions, I have applied for a comfort order

4    lifting the automatic stay to the extent necessary to commit

5    the insurers to pay settlements and/or legal fees from the LBHI

6    DNO policies.  Most recently, we came before the Court last

7    month in connection with the New Jersey comfort order which was

8    granted.  Here today, the current and/or former LBHI's officers

9    and directors, including members of the current board of

10   directors, seeks similar relief in connection with the 1.05

11   million dollar settlement that was reached in securities

12   related actions that have been brought by six California

13   municipalities.

14             We have outlined in our papers the various reasons why

15   we believe that this comfort order is appropriate.  I am not

16   going to take the Court's time right now if I don't need to

17   note those reasons, but what I will say is that despite this

18   Court's ruling last month in connection with the New Jersey

19   comfort order, the Essex plaintiffs for what is now the third

20   time have filed what is the essentially the same limited

21   objection to the comfort motion.  And for the reasons that I

22   will quickly discuss, we believe that motion should be denied.

23             First, it seems that --

24             THE COURT:  You mean the objection should be denied.

25             MR. WASSERMAN:  -- I'm sorry, that the objection

Page 69

1    should be denied.  Yes, Your Honor.  Thank you.

2           The Essex plaintiffs' limited objection seems to be

3    premised on the fact that the insured defendants have

4    supposedly asked this Court to make a determination that the

5    insurance proceeds from the settlement should be attributed to

6    the 2007/2008 policy.  This is essentially the same issue that

7    they raised the last time in connection with the New Jersey

8    motion.

9           First, Your Honor, as you know, we have not asked for

10   this relief.  Indeed, the Court last month in connection with

11   the Essex objection on the New Jersey comfort order, stated,

12   and I will quote:  "One thing is clear.  The motion itself is a

13   motion for what we conveniently describe as a comfort order

14   that authorizes party's interest to proceed with the proposed

15   settlement but in no way constitutes a determination as to the

16   underlying coverage issues.  Even had there been no objection

17   by the Essex plaintiff, the grant of this motion would have not

18   constituted and does not constitute a determination of any

19   coverage issues."

20          THE COURT:  I think I said that very well.

21          MR. WASSERMAN:  I think you did, and what you said

22   even better that's one of the reasons why that would have been

23   a waste of time.

24          So, we believe that the -- as the Court said, last

25   month and holds just as true today.  Second, as we've said in

1    our papers and we've said previously, we believe that Essex

2    lacks standing to make this motion.  And, third, as we've said

3    in our papers and we said last time, no one is claiming, not

4    even Essex, that the California municipality cases are not

5    covered by the 2007 or 2008 policies.  It's essentially an

6    academic question which has been raised by the objectors.

7            So, unless the Court has any further questions, I will

8    rest at this time.

9            THE COURT:  I don't have any questions.  Does Essex

10   wish to say anything?

11           MR. DUFFY:  Good morning, Your Honor.  Todd Duffy,

12   Anderson Kill & Olick for Essex Holdings USA, LLC.  I promise

13   to be extremely brief here.

14           Our objections are the same -- Mr. Wasserman has

15   stated them correctly, but as Mr. Wasserman will I'm sure

16   agree, one, simply because he's asserting that he's not asking

17   for that relief in the last motion it wasn't clear to us that

18   he wasn't asking for that relief in this motion.  We are happy

19   to put a limited objection in that we wanted to be clear that

20   no one can misuse this order in a future proceeding.  And it's

21   that simple.

22           Thank you, Your Honor.

23           THE COURT:  Okay.  The motion is granted, and I

24   incorporate by reference the statement made last month

25   indicating that the comfort order in no way constitutes a

08-13555-mg   Doc 21239   Filed 10/21/11   Entered 10/25/11 15:49:50   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 71 of 79

Page 71

1    determination of coverage issues.  The Essex limited objection

2    is overruled.

3             MR. WASSERMAN:  Thank you, Your Honor.  I will now

4    turn to the next motion on the calendar which is the comfort

5    motion in connection with the debt equity class action.  I

6    think I can now say that on eleven prior occasions here, you

7    have seemingly granted these types of motions and this is very

8    similar to what we have before -- again, I represent the

9    directors and officers who are seeking this type of relief in

10   the comfort order and actually the settlement that was

11   related -- or that was reached in connection with the

12   securities action brought by the plaintiffs in the debt equity

13   class action.

14            This class action was brought by plaintiffs under the

15   securities act against certain of the directors and officers as

16   well as under the exchange act with claims against certain

17   other officers.  This settlement has settled what is billions

18   of dollars in alleged claims for nine million dollars.  Not

19   only does this settlement benefit the directors and officers,

20   but it also has a benefit to the estate.  Among other things,

21   it provides a release by the equity debt class of the debtors

22   as to certain claims relating to the debt equity class action,

23   and it also provides for a disallowance of certain groups and

24   complaints that have been filed against the debtors once

25   certain conditions have been completed.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 72

1       As we've discussed in our moving papers, this

2   settlement is contingent upon the Court granting this comfort

3   motion and granting the comfort order.  Just so that there's no

4   confusion, there have actually been a couple of orders which

5   have been put before the Court in connection with this motion.

6   The last was filed yesterday; we have given copies also to

7   counsel for the estate.  What this does is it gives --

8   essentially updates the order to reflect the fact that whereas

9   before it was based on a term sheet, in this instance, a

10   settlement agreement was signed on Friday.

11       There are currently -- or there were two objections

12   and one reservation of rights in connection with this motion.

13   To first address the reservations and rights which was by the

14   ERISA plaintiffs, I just want to say two short things.  First,

15   just to bring the Court up to speed, the District Court, Judge

16   Kaplan, has recently granted our motion to dismiss that case

17   with prejudice, though that said, the ERISA plaintiffs have

18   appealed.

19       That said, while we disagree with the plaintiffs about

20   the nature of their rights, they are certainly free to reserve

21   them here today.

22       As far as the other two motions for the -- I'm sorry,

23   the other two objections, there was an objection by the SASCO

24   defendants and I can represent here today and I think it can be

25   confirmed by counsel for the SASCO defense that that objection

08-13555-mg    Doc 21239    Filed 10/21/11    Entered 10/25/11 15:49:50    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 73 of 79

Page 73

1    is being withdrawn.

2           And then the third objection is the limited objection

3    by Essex, and we will make the same statements that we made

4    just a couple of weeks ago.

5           And unless the Court has any further questions, I will

6    rest.

7           THE COURT:  Okay.  Should I do this in order, that

8    would be the ERISA plaintiffs first, if they have anything to

9    say?  Is anybody here representing them?

10          Under the reservation of rights, as referenced by

11   counsel from Dechert will be sufficient?  The SASCO objection

12   is withdrawn -- Mr. Duffy, shall I -- is the --

13          MR. LEDLEY:  Yes, Your Honor, Michael Ledley from

14   Wollmuth Maher & Deutsch for the SASCO defendants.  I was just

15   going to agree with my friend, Mr. Wasserman, and we've reached

16   an agreement with the movants which resolves our objection and

17   we are withdrawing it.

18          THE COURT:  Fine.  And then, Mr. Duffy, shall we just

19   incorporate your comments from the last version?

20          MR. DUFFY:  That would be terrific, Your Honor.  Thank

21   you both.

22          THE COURT:  Fine.  We'll incorporate his comments,

23   we'll incorporate my comments and the motion is granted.

24          MR. DUFFY:  Thank you, Your Honor.

25          MR. KRASNOW:  Good morning, Your Honor.  Richard

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 74

1    Krasnow, Weil, Gotshal & Manges, on behalf of the debtors.  I

2    will be addressing the last item on this morning's calendar and

3    the last matter on the calendar relating to directors and

4    officers settlements.

5           This is a motion by the debtors seeking authorization

6    to Section 363 to accede to the request of the insurers which

7    will be making settlement payments in connection with the New

8    Jersey settlement and the debt equity settlement, to grant them

9    releases solely in respect of the payments that they would be

10   making under those settlements.

11          The debtors have concluded that it is reasonable and

12   appropriate to grant the insurers' releases because of the

13   benefits they will be reaping through the consummation of the

14   settlement with the elimination of the indemnification claims

15   or primary claims which while we may dispute them, nonetheless,

16   are being resolved by the payments made by -- with other

17   people's money and without the necessity for us to litigate

18   them here beyond or proceeding by Section 363 rather than 9019,

19   because while we are releasing claims, in fact the debtors have

20   no claims under these policies against the insurers.

21          And Your Honor will recall, there are two sides to the

22   policies in question.  Side A as to which the sole

23   beneficiaries are the current and former officers, directors

24   and employees.  The only claims that the debtors could have

25   would be on the Side B, which is limited to a reimbursement

Page 75

1   claim which has secondary priority to claims under Side A.  We,

2   the debtors, have no claim under Side B with respect to these

3   particular actions in this particular payment.

4        So, if you will -- we'll not settling the dispute

5   because there is none, which again is the reason why we

6   proceeded under 363 rather than 9019.

7        Your Honor, once again, Essex has elected to file an

8   objection to a DNO-related motion.  It is premised on the same

9   contentions that they made in respect to the other motions,

10  that somehow we have requested some determination by the Court

11  with respect to coverage.  If that is a motion before the

12  Court, it's not one that we filed and we just wanted the

13  defense to be considered by the Court today.  Your Honor, we

14  adopt the arguments, if you will, that were made by Mr.

15  Wasserman in response to that objection and request that the

16  Court make the same ruling and grant the motion.

17        Thank you.

18        THE COURT:  Thank you.

19        Mr. Duffy, do you incorporate your same remarks or do

20  you have some new ones?

21        MR. DUFFY:  I do, Your Honor.  I do incorporate them

22  on this motion.

23        THE COURT:  All right.  Fine.  And once again, the

24  limited objection of Essex is overruled.  The motion to grant

25  releases in connection with the New Jersey debt equity

Page 76

1    litigation of the affected insurers is granted.

2              MR. KRASKOW:   Thank you, Your Honor.   I believe that

3    concludes the calendar for this morning.

4              THE COURT:   Fine.   We are then adjourned and you can

5    hand up the forms of order to my clerks.   Thank you.

6              See you next time.

7              MR. KRASKOW:   Thank you, Your Honor.

8         (Whereupon these proceedings were concluded at 12:06 PM)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 77

1

2                                    **I N D E X**

3

4                                      RULINGS

5                                                        Page      Line

6    Debtors' Motion for Approval of a Settlement    12        3

7    Agreement Among ESP Funding I, Ltd., U.S.

8    Bank National Association, as Trustee, BNP

9    Paribas, Natixis Financial Products LLC,

10   Lehman Brothers Special Financing Inc., and

11   Lehman Brothers Holdings Inc. Granted

12

13   Debtors' Motion for Approval of Settlement      15        22

14   Agreements with (i) Bank of America, N.A.

15   and (ii) Merrill Lynch International and Its

16   Affiliates Approved

17

18   Motion of Deutsche Bank to Enforce Settlement  65        10

19   Approval Order and Correct Misclassification

20   of Claims, denied without prejudice

21

22   Debtors' Motion for Approval of Termination     67        15

23   of the Spruce CCS, LTD., Securitization

24   granted

25

Page 78

| | | | |
|---|---|---|---|
| 1 | Motion of Insured Persons for Order Modifying | 71 | 2 |
| 2 | the Automatic Stay to Allow Settlement | | |
| 3 | Payment Under Directors and Officers | | |
| 4 | Insurance Policy to Settle the California | | |
| 5 | Municipalities granted; Limited Objection of | | |
| 6 | Essex Equity Holdings USA, LLC, overruled | | |
| 7 | | | |
| 8 | Motion of Insured Persons for an Order | 73 | 22 |
| 9 | Modifying the Automatic Stay to Allow | | |
| 10 | Settlement Payment Under Directors and | | |
| 11 | Officers Insurance Policy to Settle | | |
| 12 | Equity/Debt Class Action, granted | | |
| 13 | Debtors' Motion for Authorization to Grant | 76 | 1 |
| 14 | Limited Releases to Certain Insurers Under | | |
| 15 | the Directors and Officers Insurance | | |
| 16 | Policies granted; Limited Objection of | | |
| 17 | Creditor Essex Equity Holdings USA, LLC, | | |
| 18 | overruled | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

1

2                    C E R T I F I C A T I O N

3

4    I, Dena Page, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6
       Dena          Digitally signed by Dena Page
                     DN: cn=Dena Page, o, ou,
7      Page          email=digital1@veritext.com,
                     c=US
                     Date: 2011.10.21 16:59:25
8    _____ -04'00'_____

9    DENA PAGE

10

11   Also transcribed by:   SHARON MEYER

12

13   Veritext

14   200 Old Country Road

15   Suite 580

16   Mineola, NY 11501

17

18   Date:  October 21, 2011

19

20

21

22

23

24

25