# EXHIBIT F

# INVESTMENT ADVISORY AGREEMENT

INVESTMENT ADVISORY AGREEMENT (as amended from time to time, this "**Agreement**") dated as of June 1, 2007, among JPMorgan Distressed Debt Fund, Ltd., a Cayman Islands exempted company (the "**Company**"), JPMorgan Distressed Debt Master Fund, Ltd., a Cayman Islands exempted company (the "**Master Fund**") and J.P. Morgan Investment Management Inc., a corporation organized under the laws of Delaware (the "**Adviser**").

## W I T N E S S E T H :

WHEREAS, in accordance with the Memorandum and Articles of Association of the Company (as the same may be amended or restated from time to time, the "**Company Articles**") and the Memorandum and Articles of Association of the Master Fund (as the same may be amended or restated from time to time, the "**Master Fund Articles**"), the Company and the Master Fund have been organized for the purpose of investing funds in securities and other instruments and assets;

WHEREAS, the Company and the Master Fund desire to retain the Adviser to provide certain investment advisory services and desire to avail themselves of the experience, sources of information, advice, assistance and facilities available to the Adviser pursuant to the terms and subject to the conditions of this Agreement; and

WHEREAS, the Adviser is willing to provide such services under the terms and conditions set forth herein and in accordance with the Company Articles and the Master Fund Articles, each as in effect on the date hereof;

NOW, THEREFORE, in consideration of the mutual promises and undertakings hereinafter set forth, the parties hereto hereby agree as follows:

1.    *Definitions.*

(a)    The following terms shall have the following meanings for the purposes of this Agreement:

"**Adviser**" shall have the meaning set forth in the preamble to this Agreement.

"**Advisers Act**" means the Investment Advisers Act of 1940, as amended from time to time.

"**Affiliate**" of any Person means any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such Person. The term "**control**" means the possession, directly or indirectly, of the power to

direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

"**Allocation Period**" means, in respect of any Series of Shares of the Company, a period commencing as of the date on which Shares of such Series are first issued and ending at the close of business on the first to occur of the following, and thereafter commencing as of the day following the last day of the immediately preceding Allocation Period, and ending at the close of business on the next to occur of the following: (i) the last day of the Fiscal Year of the Company, (ii) each day as of which any Shares of such Series are redeemed by any Shareholder or (iii) the day as of which any Shares of such Series are transferred and the transferee of such Shares becomes a Shareholder of the Company (unless there is no change of beneficial ownership of such Shares, as determined by the Adviser in its discretion).

"**Board**" means the Company Board or the Master Fund Board, as applicable.

"**Business Day**" means any day on which commercial banks are open for the transaction of business in the State of New York and the Cayman Islands.

"**Class**" means a class of Shares issued by the Company or the Master Fund.

"**Company**" shall have the meaning set forth in the preamble to this Agreement.

"**Company Articles**" shall have the meaning set forth in the recitals of this Agreement.

"**Company Board**" means the Board of Directors of the Company, as constituted from time to time pursuant to the Company Articles.

"**Damages**" shall have the meaning set forth in Section 7(a) of this Agreement.

"**ERISA**" means the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"**Event of Default**" means (i) fraud, willful misconduct or gross negligence of the Adviser, or, at any time that the assets of the Company or the

2

CONFIDENTIAL

Master Fund, as applicable, are deemed to contain Plan Assets, violation of the fiduciary provisions of ERISA by the Adviser, in each case in connection with the performance by the Adviser of its duties as described herein, (ii) knowing and willful material breach of this Agreement by the Adviser, (iii) material breach of this Agreement (other than a knowing and willful breach) by the Adviser which the Adviser does not cure within 180 days of becoming aware, or receiving written notice from the Company or the Master Fund, as applicable, of such breach, (iv) material breach by the Adviser of any regulatory requirement to which it is subject or failure to obtain or maintain any registration, filing, approval, authorization or consent that is material to the professional activities of the Adviser which the Adviser does not cure within 180 days of becoming aware of such breach or failure; *provided* that no such cure period shall be permitted if such breach or failure would be reasonably expected to have a material adverse effect on the Company or the Master Fund, as applicable, (v) conviction of (or the pleading of guilt or no contest to) a felony by the Adviser or (vi) the bankruptcy, insolvency or liquidation of the Adviser.

"**Fee Calculation Date**" shall have the meaning set forth in Section 4(a) of this Agreement.

"**Fiscal Year**" means the fiscal year of the Company for financial statement and U.S. federal income tax purposes.

"**High Water Mark**" shall have the meaning set forth in Section 4(b)(iv) of this Agreement.

"**Incentive Fee**" shall have the meaning set forth in Section 4(b) of this Agreement.

"**Indemnified Person**" shall have the meaning set forth in Section 7(a) of this Agreement.

"**Initial Closing Date**" means the first date on which any Person (other than a holder of Founder Shares of the Company) becomes a Shareholder of the Company.

"**Investment**" means any investment made by the Company or the Master Fund, as applicable.

"**Investment Company Act**" means the U.S. Investment Company Act of 1940, as amended from time to time, and the rules and regulations promulgated thereunder.

"**Loss Recovery Account**" shall have the meaning set forth in Section 4(b)(iii) of this Agreement.

3

"**Management Fee**" shall have the meaning set forth in Section 4(a) of this Agreement.

"**Master Fund**" shall have the meaning set forth in the preamble to this Agreement.

"**Master Fund Articles**" shall have the meaning set forth in the recitals of this Agreement.

"**Master Fund Board**" means the Board of Directors of the Master Fund, as constituted from time to time pursuant to the Master Fund Articles.

"**Net Asset Value**" means the net asset value of the Company determined in accordance with the terms of the Offering Memorandum and the Company Articles.

"**Net Profits**" and "**Net Losses**" shall have the meaning set forth in Section 4(b)(v) of this Agreement.

"**Offering Memorandum**" means the Confidential Offering Memorandum of the Company, as amended or supplemented from time to time, relating to the offering of Shares of the Company.

"**Onshore Company**" means JPMorgan Distressed Debt Fund, LLC, a Delaware limited liability company.

"**Person**" means any individual, partnership, corporation, limited liability company, trust or other entity.

"**Plan Assets**" means the assets of a benefit plan subject to Title I of ERISA, as determined in accordance with the regulations set forth in 29 C.F.R. §2510.3-101.

"**Series**" means a series of a Class of Shares issued by the Company or the Master Fund.

"**Share**" means a participating, non-voting share of the Company or the Master Fund.

"**Shareholder**" means, at any time, any Person who is at such time a holder of Shares of the Company or the Master Fund, as applicable, and shown as such on the books and records of the Company or the Master Fund, as applicable.

(b)    Capitalized terms used herein without definition have the meanings assigned to them in the Offering Memorandum.

4

CONFIDENTIAL

2.   *Duties and Services.*

(a)   (i)   The Company Board hereby appoints J.P. Morgan Investment Management Inc. as the Adviser of the Company and, subject to Section 2(a)(iv) and Section 2(c), delegates hereby and pursuant to Article 5 and Articles 158 through 163 of the Company Articles all of the rights, duties and powers that are not expressly reserved to the Company Board pursuant to the Company Articles.

(ii)   The Master Fund Board hereby appoints J.P. Morgan Investment Management Inc. as the Adviser of the Master Fund and, subject to Section 2(a)(iv) and Section 2(c), delegates hereby and pursuant to Article 5 and Articles 173 through 177 of the Master Fund Articles all of the rights, duties and powers that are not expressly reserved to the Master Fund Board pursuant to the Master Fund Articles.

(iii)   In furtherance of such appointment and delegation, the Adviser shall have full discretion and authority to undertake and perform any and all acts deemed necessary or appropriate by it in connection with the management and administration of the Company and the Master Fund, including, but not limited to, exercising any of such rights, duties and powers and any rights, duties and powers of the Board pursuant to the Company Articles or the Master Fund Articles, as applicable.

(iv)   Notwithstanding the general delegations set forth in this Section 2(a) and any other rights, duties or powers granted or delegated to the Adviser pursuant to this Agreement, the Company Articles or the Master Fund Articles, the Adviser shall at all times conduct the business of the Company and the Master Fund in a manner consistent with the terms and conditions set forth in the Offering Memorandum. Without limiting the generality of the foregoing, the Adviser shall obtain the prior approval of the Company Board or the Master Fund Board, as applicable, in respect of any matter for the which the terms and conditions of the Offering Memorandum require such approval.

(b)   In furtherance of the appointment and delegation set forth in Section 2(a) above, each of the Company and the Master Fund hereby appoints the Adviser, and the Adviser hereby agrees, to direct and manage the investment and reinvestment of the cash, securities and other properties comprising the assets of the Company and the Master Fund (including any such assets of the Master Fund directly or indirectly attributable to Shares of the Master Fund owned by the Onshore

5

Company). Subject to the Company Articles, the Master Fund Articles and the investment guidelines set forth in the Offering Memorandum, the Adviser may take any of the following actions at its discretion:

     (i)    identifying and evaluating investment opportunities, selecting and determining Investments and causing the Company and the Master Fund to make Investments, including, without limitation, (v) analyzing and investigating investment opportunities, (w) structuring Investments, (x) identifying bank, institutional and other sources of financing for Investments, (y) negotiating the terms of, and supervising the preparation, review and execution by the Company and the Master Fund of, all documents required to consummate Investments and (z) supervising and directing the investment, purchase, hedging, retention, exchange and reinvestment of Investments, with full authority and at its discretion, in accordance with the Company Articles and the Master Fund Articles, as applicable;

     (ii)    identifying and evaluating the timing and method of sale or other disposition of Investments, selecting and determining Investments to be sold or otherwise disposed of, and causing the Company and the Master Fund to sell or otherwise dispose of Investments, including, without limitation, (v) analyzing and investigating disposition strategies, (w) structuring the sale or other disposition of Investments, (x) identifying interested counterparties and arranging appropriate introductions, (y) negotiating the terms of, and preparing, reviewing and executing on behalf of the Company and the Master Fund, all documents required to sell or otherwise dispose of Investments and (z) supervising and directing the exchange or reinvestment of Investments, with full authority and at its discretion, in accordance with the Company Articles and the Master Fund Articles, as applicable; and

     (iii)    cooperating with the Company and the Master Fund or their respective designee in the performance of certain activities on behalf of the Company or the Master Fund, including, without limitation, (x) preparing and causing to be prepared reports, statements and other information for the Company, the Master Fund and the Shareholders of the Company and the Master Fund, (y) preparing notices from the Company and the Master Fund to the Shareholders of the Company and the Master Fund and (z) maintaining records and accounts with respect to the investment activities of the Company and the Master Fund.

CONFIDENTIAL                    JPMAFF-LBHI00001676

In addition to the services of its own staff, the Adviser may arrange for, coordinate and pay for the services of consultants and other professionals (including, without limitation, its Affiliates, accountants and attorneys) for the Company and the Master Fund as deemed necessary or desirable by the Adviser in its sole discretion; *provided* that the Adviser shall not be relieved of any of its duties pursuant to this Section 2(b) regardless of the performance of any services by third parties, and the Adviser shall be solely responsible for the fees and expenses payable to any such third party (subject to reimbursement by the Company or the Master Fund, as applicable).

(c)     The Adviser acknowledges that the activities of the Adviser hereunder are subject to the ongoing oversight and review of the Company Board and the Master Fund Board and that the Company Board and the Master Fund Board are responsible for setting general policies with respect to the Company and the Master Fund. The Adviser hereby agrees to cooperate with the Company Board and the Master Fund Board by providing, and responding to reasonable requests for, reasonably available information regarding the activities of the Company and the Master Fund and the Adviser in connection therewith, attending and participating in meetings at reasonable locations and upon reasonable notice thereof and otherwise as reasonably necessary to permit the Company Board and the Master Fund Board to exercise such oversight, review and policymaking functions.

(d)     The Adviser may at any time or from time to time recommend to the Company Board or the Master Fund Board that the Company or the Master Fund establish, issue, offer and accept payments in respect of additional Classes or Series of Shares containing such terms and conditions, including with respect to the payment of fees, redemption rights, or otherwise, as determined by the Board upon the recommendation of the Adviser (to be sold to such Persons as determined by the Adviser, including members, officers, principals, directors or employees of the Adviser or any of its Affiliates).

(e)     The Adviser shall comply with (i) all of the terms and conditions of the Company Articles, the Master Fund Articles and the Offering Memorandum affecting the duties and functions that have been expressly delegated to it thereunder and hereunder, (ii) the instructions and directions of the Company Board and the Master Fund Board in connection with the activities of the Adviser in respect of the Company and the Master Fund, as applicable, to the extent that they do not conflict with applicable laws and regulations, including, to the extent applicable, the laws of the United States and the Cayman Islands and (iii) all

7

CONFIDENTIAL                    JPMAFF-LBHI00001677

applicable laws and regulations; *provided* that the Adviser shall not be bound to comply with any amendment or supplement to the Company Articles, the Master Fund Articles or the Offering Memorandum until it has received written notice thereof and until it has received a copy of the amendment or supplement from the Company or the Master Fund, as applicable. The Adviser shall perform its obligations hereunder with reasonable care and in good faith, using a degree of skill and attention no less than that which the Adviser exercises with respect to comparable assets that it manages for others, and in a reasonable and prudent manner. At any time that the assets of the Company or the Master Fund are deemed to contain Plan Assets, (i) the Adviser shall be a fiduciary under ERISA with respect to such assets to the extent that the Adviser exercises any authority or discretion with respect to such assets, as described under ERISA Section 3(21) and (ii) the Adviser shall act in accordance with the rules and standards of ERISA with respect to such assets.

(f)    Except as expressly authorized herein and in accordance with the Company Articles and the Master Fund Articles, the Adviser shall not be authorized to manage the affairs of, act in the name of or bind the Company or the Master Fund in any manner whatsoever.

(g)    The Adviser shall not engage in any transaction for the Company or the Master Fund that would require the Company's or the Master Fund's consent under Section 206(3) of the Advisers Act, except with the prior written consent of the Company or the Master Fund and, to the extent required by applicable law or regulation, the consent of the Shareholders of the Company or the Master Fund, as applicable.

(h)    The Adviser shall maintain adequate records relating to Investments and to the services performed hereunder, and such records shall be accessible for inspection (and making copies thereof and taking extracts therefrom) by the Company and the Master Fund during normal business hours upon notice to the Adviser.

(i)    The Adviser shall do or cause to be done all things reasonably necessary to preserve, renew and keep in full force and effect the rights, licenses, permits, privileges, registrations, filings, approvals, authorizations or consents material to the conduct of the Adviser's business.

3.    *Independent Contractor.* The Adviser shall for all purposes herein be deemed to be an independent contractor with respect to the Company and the Master Fund. The Adviser shall not, by reason of its duties and functions hereunder, be deemed to be acting as a partner of, or to be engaged in a joint venture with, the Company or the Master Fund.

CONFIDENTIAL                    JPMAFF-LBHI00001678

4.    *Fees.*

REDACTED

CONFIDENTIAL          JPMAFF-LBHI00001679

REDACTED

10

CONFIDENTIAL    JPMAFF-LBHI00001680

REDACTED

5. *Other Authority.*

(a)   The Adviser shall use its reasonable best efforts to operate the Company and the Master Fund in such a way that (i) neither the Company nor the Master Fund will be an "investment company" required to register under the Investment Company Act, (ii) the Adviser and its Affiliates will be in compliance with the Advisers Act, (iii) the Adviser and its Affiliates will be in compliance with ERISA to the extent, and at any time, that the assets of the Company and the Master Fund are deemed to include Plan Assets and (iv) each of the Company, the Master Fund, the Adviser and their respective Affiliates will be in compliance with any material law, rule, regulation, executive order or policy applicable to the Company, the Master Fund, the Adviser and any such Affiliates (including, without limitation, any anti-money laundering laws, the USA PATRIOT ACT of 2001 or any privacy laws). Any action taken by the Adviser pursuant to this Section 5(a) shall not require the approval of the Company Board, the Master Fund Board or any Shareholder.

(b)   The Adviser is hereby authorized to take any action it has determined in good faith to be necessary or desirable, in order for (i) the Company and the Master Fund not to be in violation of the Investment Company Act, (ii) the Adviser and its Affiliates not to be in violation of the Advisers Act, (iii) the Adviser and its Affiliates to be in compliance with ERISA to the extent, and at any time, that the assets of the Company

11

or the Master Fund are deemed to constitute Plan Assets, (iv) each of the Company, the Company Board, the Master Fund, the Master Fund Board, the Adviser and their respective Affiliates not to be in violation of any law, rule, regulation, executive order or policy applicable to the Company, the Master Fund, the Adviser or any such Affiliates (including, without limitation, any anti-money laundering laws, the USA PATRIOT ACT of 2001 or any privacy laws) or (v) the prevention, at any time during the term of the Company, of any participation by a Shareholder in the Company's or the Master Fund's affairs that would be materially detrimental to the business or commercial reputation of the Company, any Director, the Master Fund, the Onshore Company, the Adviser or their respective Affiliates, including without limitation a determination by the Adviser that such further participation could cause information regarding the Company, the Master Fund, the Onshore Company or any such other entity or Affiliate or other matters of the Company to become available to the public, including (A) subject to the Company Articles and the Master Fund Articles, making or procuring structural, operating or other changes in the Company by amending the Company Articles or the Master Fund Articles or otherwise (*provided* that any such amendment to cure any violation of law, rule, regulation, executive order or policy may only be made if, in the reasonable determination of the Adviser, the making of such amendment is necessary or advisable to cure such violation), (B) requiring the sale in whole or in part of any Investment or other asset, (C) "freezing the account" of any Shareholder or requiring the sale or transfer of any or all of the Shares of a Shareholder or otherwise causing a withdrawal in whole or in part of any Person as a Shareholder of the Company or (D) dissolving the Company. Any action taken by the Adviser pursuant to this Section 5(b) shall not require the approval of the Company Board or the Master Fund Board.

6. *Other Activities*.

(a) Each of the Company and the Master Fund acknowledges and agrees that the Adviser (acting in a capacity other than as investment adviser of the Company or the Master Fund) or any of its Affiliates may engage in any and all of the activities of the type or character described or contemplated in this Section 6, whether or not such activities have or could have an effect on the Company's or the Master Fund's affairs or on any Investment, and that no such activity will in and of itself constitute a breach of any duty owed by the Adviser (acting in a capacity other than as investment adviser of the Company or the Master Fund) or any of its Affiliates to the Company or the Master Fund. Without limiting the generality of any of the foregoing, each of the Company and the Master Fund acknowledges and agrees that:

12

CONFIDENTIAL                    JPMAFF-LBHI00001682

(i)    The Adviser and its Affiliates are engaged in the business of making investments in securities and other financial instruments for their own account and for the account of other clients, by way of collective investment vehicles and otherwise, and that investment opportunities may be allocated to other clients in addition to or in lieu of the Company or the Master Fund.

(ii)    The Adviser and its Affiliates, and any officer or employee of the Adviser or any such Affiliate, shall be required to devote only such time to the affairs of the Company and the Master Fund as the Adviser determines in its reasonable discretion may be necessary or appropriate to manage and operate the Company and the Master Fund, and each such Person, to the extent not otherwise directed by the Adviser, shall be free to serve and may be compensated by any other Person or enterprise in any capacity (including serving the Company or the Master Fund in any capacity other than as a representative of the Adviser) that it may deem appropriate in its discretion.

(iii)    The Adviser and its Affiliates shall have the right to provide financial, consulting and other services to, and to receive compensation from, any entity which is the issuer of an Investment (whether before or after or in connection with the making of the applicable Investment).  Such compensation may include, without limitation, financial advisory fees, placement fees, financing or commitment fees or expense reimbursement.  In addition, the Adviser (acting in a capacity other than as investment adviser of the Company or the Master Fund) and each Affiliate of the Adviser shall have the right, subject to the Advisers Act and ERISA and the rules promulgated thereunder, to purchase property (including securities) from, to sell property (including securities) or lend funds or securities to, or otherwise to deal with, any entity which is the issuer of an Investment (whether before or after or in connection with the making of the applicable Investment). The Company and the Master Fund further acknowledge and agree that the performance of such services, the purchase or sale of such property, the lending of such funds or securities, such other dealings, or the receipt of such fees may give rise to conflicts of interest between, on the one hand, the Company or the Master Fund, and on the other hand, the Adviser (acting in a capacity other than as investment adviser of the Company or the Master Fund) or its Affiliates, and that any such fees or other compensation will not be shared with the Company or the Master Fund.

13

7.    *Exculpation and Indemnification.*

(a)    To the fullest extent permitted by applicable law, none of the Adviser or any of its officers, directors, members, principals, shareholders, representatives, partners, managers, employees, agents or Affiliates, nor any officers, directors, members, principals, shareholders, representatives, partners, managers, employees or agents of any such Affiliates (each, an "**Indemnified Person**") shall be liable to the Company or to the Master Fund for any losses, claims, damages, liabilities, judgments, demands, charges or expenses (collectively, "**Damages**") arising from any act or omission performed or omitted by it in connection with this Agreement or the Company's or the Master Fund's business or affairs, except for any such Damages determined by final judgment of a court of competent jurisdiction to have been primarily attributable to (i) such Indemnified Person's gross negligence or willful misconduct or (ii) at any time that the assets of the Company or the Master Fund are deemed to contain Plan Assets, violation of the fiduciary standard imposed by ERISA.  Notwithstanding the foregoing provisions of this Section 7(a) or any other provision of this Agreement, no provision of this Agreement shall constitute a waiver or limitation of any unwaivable rights, if any, of the Company, the Master Fund or any Shareholder under the U.S. Federal or state securities laws.

(b)    The Company and the Master Fund, as applicable, shall to the fullest extent permitted by applicable law indemnify and hold harmless each Indemnified Person against any Damages to which such Indemnified Person may become subject in connection with any matter arising out of or in connection with this Agreement or the Company's or the Master Fund's business or affairs, except for any such Damages determined by final judgment of a court of competent jurisdiction to have been primarily attributable to (i) such Indemnified Person's gross negligence or willful misconduct or (ii) at any time that the assets of the Company or the Master Fund are deemed to contain Plan Assets, violation of the fiduciary standard imposed by ERISA.  If any Indemnified Person becomes involved in any capacity in any action, proceeding or investigation in connection with any matter arising out of or in connection with this Agreement or the Company's or the Master Fund's business or affairs, the Company or the Master Fund, as applicable, will periodically (not less frequently than each month) reimburse the Indemnified Person for its reasonable legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith; *provided* that such Indemnified Person shall agree promptly to repay to the Company or the Master Fund, as applicable, the amount of any such reimbursed expenses paid to it to the extent that it shall ultimately be

14

determined that such Indemnified Person is not entitled to be indemnified by the Company or the Master Fund in connection with such action, proceeding or investigation, as provided in the exceptions contained in the immediately preceding sentence.  If for any reason (other than the gross negligence or willful misconduct of such Indemnified Person) the foregoing indemnification is unavailable to such Indemnified Person, or insufficient to hold it harmless, then the Company or the Master Fund, as applicable, shall contribute to the amount paid or payable by such Indemnified Person as a result of such loss, claim, damage, liability, judgment, demand, charge or expense in such proportion as is appropriate to reflect the relative benefits received by the Company or the Master Fund, on the one hand, and the Indemnified Person on the other hand or, if such allocation is not permitted by applicable law or regulation, to reflect not only the relative benefits referred to above but also any other relevant equitable considerations.

(c)     The Adviser acting under this Agreement shall not be liable to the Company or the Master Fund for breach of fiduciary duty for its good faith reliance on the provisions of this Agreement, to the fullest extent permitted by applicable law. The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of the Adviser otherwise existing at law or in equity, are agreed by the Company and the Master Fund to modify to that extent such other duties and liabilities of the Adviser, to the fullest extent permitted by applicable law.

8.     *Certain Limitations.*

(a)     It is expressly agreed that the duties of the Adviser and the services to be provided by the Adviser pursuant to this Agreement are limited to those duties and services specifically set forth in Section 2 hereof and that the Adviser has no other duties, express or implied (including fiduciary duties), to the Company or the Master Fund, except as otherwise provided by law.

(b)     The Adviser shall in no event be obligated to provide any services to the Company or the Master Fund to the extent that such services, in the sole discretion of the Adviser, may not comply with, or could cause the Adviser or any of its Affiliates to violate, any law, regulation, order or decree applicable to any of them.

9.     *Term and Termination.*  The term of this Agreement shall commence on the date hereof and shall continue until the earliest of:

(a)     the completion of the liquidation of the Company and the Master Fund;

15

(b)    the termination date set forth in a notice of termination delivered by any of the Company, the Master Fund or the Adviser to the other parties hereto not less than 60 days prior to the termination date set forth therein, *provided* that any such termination shall have been approved prior to the date of delivery of such notice by Shareholders of the Company or the Master Fund, as applicable, holding a majority of the Shares of the Company or the Master Fund then outstanding; and

(c)    the termination date set forth in a notice of termination delivered by the Company or the Master Fund to the Adviser, which date shall be:

(i)    not less than 30 days prior to the termination date set forth therein if the Company or the Master Fund has determined that an event described in part (iii) or (iv) of the definition of Event of Default has occurred; or

(ii)    immediately, if the Company or the Master Fund has determined that an event described in part (i), (ii), (v) or (vi) of the definition of Event of Default has occurred.

(d)    Upon the termination of this Agreement at any time and for any reason, the Company and the Master Fund shall as promptly thereafter as possible cause the name of the Company and the Master Fund to be changed so that "JPMorgan" or any variation, permutation or likeness thereof, or any reference or allusion to the Adviser or any of its Affiliates, shall be removed.

10.    *Assignment.* No party hereto may, directly or indirectly, assign all or any part of its respective rights and duties under this Agreement to any Person without the prior written consent of the other parties hereto. Notwithstanding the foregoing, the Adviser shall not assign any of its rights or duties hereunder except with such approvals as may be required under the Advisers Act.

11.    *Notices Generally.* All notices, requests and other communications to any party hereunder shall be in writing (including telecopy, e-mail or similar writing) and shall be given:

16

(i)     If to the Company, at:

        JPMorgan Distressed Debt Fund, Ltd.
        c/o JPMorgan Asset Management
        245 Park Avenue
        New York, New York 10167
        United States



(ii)    If to the Master Fund, at:

        JPMorgan Distressed Debt Master Fund, Ltd.
        c/o JPMorgan Asset Management
        245 Park Avenue
        New York, New York 10167
        United States



(iii)   If to the Adviser, at:

        J.P. Morgan Investment Management, Inc.
        c/o JPMorgan Asset Management
        245 Park Avenue
        New York, New York 10167
        United States



or to such other address, telecopy number or electronic mail address as such party
may hereafter specify for the purpose by notice to the other parties hereto.  Each
such notice, request or other communication shall be effective (x) if given by
telecopy, when such telecopy is transmitted to the telecopy number specified in
this Section 11 and the appropriate telecopy confirmation is received, or if given
by e-mail, when such e-mail is transmitted to the URL specified in this Section 11
and the appropriate e-mail confirmation receipt (or a subsequent e-mail or other
written communication from the addressee of the e-mail) is received by the sender
of such e-mail, (y) if sent by mail, seven days after such notice is deposited in the
mails with first class postage prepaid, addressed to the address specified in this
Section 11 or (z) if given by any other means, when delivered at the address
specified in this Section 11.  Each party may rely and shall be protected in acting

17

upon any written instruction or communication believed by it to be genuine and to have been signed by the other party or parties.

12. *Entire Agreement.* This Agreement constitutes the entire agreement and understanding among the parties hereto and supersedes any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.

13. *Amendment; Waiver.* Except as provided otherwise herein, this Agreement may not be amended, nor may any rights hereunder be waived, except by an instrument in writing signed by the party sought to be charged with such amendment or waiver and, in each case, the written approval of the parties hereto.

14. *Governing Law.* This Agreement shall be construed in accordance with and governed by the laws of the State of New York, without giving effect to the provisions, policies or principles thereof relating to choice or conflict of laws.

15. *Forum Selection; Service of Process.*

(a) To the fullest extent permitted by law, the parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement shall only be brought in the Federal courts located in the County of New York in the State of New York or the State courts located in the County of New York in the State of New York and not in any other State or Federal courts located in the United States of America or any court in any other country, and each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.

(b) Nothing in this Section shall affect any right of the Company, the Master Fund or the Adviser to serve process in any manner permitted by law.

**(c) EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

18

CONFIDENTIAL    JPMAFF-LBHI00001688

16.     *Parties in Interest.*  Except as set forth in Section 7 above, this Agreement shall be binding upon and inure solely to the benefit of each party hereto and their respective legal representatives, heirs, successors and assigns, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person, any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

17.     *Counterparts.*  This Agreement may be executed either directly or by an attorney-in-fact, in any number of counterparts, each of which shall constitute an original, but all of which upon delivery when taken together shall constitute a single contract.

18.     *Severability.*  In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, such provisions shall be severed from the rest of the Agreement to the extent they are invalid, illegal or unenforceable, and the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

19.     *Survival.*  The provisions of Section 7 above shall survive termination of this Agreement for any reason.

20.     *Miscellaneous.*  To the fullest extent permitted by law, no failure on the part of either party to exercise, and no delay on its part in exercising, any right or remedy under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

21.     *Headings.*  The section and other headings contained in this Agreement are for reference only and are not intended to describe, interpret, define or limit the scope or intent of this Agreement or any provision hereof.

22.     *Gender and Number.*  Whenever required by the context hereof, the singular shall include the plural and the plural shall include the singular. The neuter gender shall include the feminine and masculine genders.

**[Remainder of Page Intentionally Blank]**

19

IN WITNESS WHEREOF, the undersigned have hereto set their hands as of the day and year first above written.

JPMORGAN DISTRESSED DEBT
FUND, LTD.

By: _____
    Name:  Warren Keens
    Title:   Director

By: _____
    Name:  Linburgh Martin
    Title:   Director

By: _____
    Name:  John Sutlic
    Title:   Director

JPMORGAN DISTRESSED DEBT
MASTER FUND, LTD.

By: _____
    Name:  Warren Keens
    Title:   Director

By: _____
    Name:  Linburgh Martin
    Title:   Director

By: _____
    Name:  John Sutlic
    Title:   Director

J.P. MORGAN INVESTMENT
MANAGEMENT INC.

By: _____
    Name: James A. Sexton
    Title: Managing Director