# EXHIBIT N

## Form ADV Part 2A

## Firm Brochure

# J.P. Morgan Investment Management Inc.

File No. 801-21011

270 Park Avenue, New York, NY 10017

(212)648-1999

www.jpmorgan.com

June 3, 2011

This brochure provides information about the qualifications and business practices of J.P. Morgan Investment Management Inc. ("JPMIM"). If you have any questions about the contents of this brochure, please contact us at (212)648-1999. The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission (the "SEC") or by any state securities authority.

Additional information about JPMIM, including a copy of our Form ADV Part I, is also available on the SEC's website at www.adviserinfo.sec.gov.

JPMIM is registered as an investment adviser with the SEC. Such registration does not imply a certain level of skill or training.

J.P. Morgan Investment Management Inc.

**File No. 801-21011**                                                                                          **June 3, 2011**

---

**ITEM 2**
**Material Changes**

On July 21, 2010, the SEC adopted amendments to Form ADV Part 2 (commonly referred to as the "Brochure") under the Investment Advisers Act of 1940, as amended (the "Advisers Act"), which registered investment advisers are required to deliver to their clients.  This Brochure, dated March 31, 2011, was prepared in accordance with the SEC's new requirements.   As such, this Brochure is materially different in structure from, and may include additional disclosure that was not specifically required to be disclosed in, Brochures from previous years.  However, there were no material changes to the Adviser's policies, practices or conflicts of interest since the March 31, 2010 update of JPMIM's Brochure.

In the future, Item 2 of the Brochure will include disclosure of the material changes that JPMIM made to the Brochure since its most recent annual update.

In the past, JPMIM has offered or delivered information about its advisory services and business practices to clients on at least an annual basis. Pursuant to the new SEC Rules, JPMIM will send clients a summary of any material changes to this and subsequent Brochures within 120 days following its fiscal year end. JPMIM may also provide clients with more frequent updates of any material changes to its Brochure, without charge.

Clients may request a copy of the JPMIM's current Brochure by contacting their client service representative or financial advisor.

J.P. Morgan Investment Management Inc.

File No. 801-21011                                                                                      June 3, 2011

**ITEM 3**
**Table of Contents**

Item                                                                                                    Page

1.  Cover Page…………………………………………………………………………………...0

2.  Material Changes …………………………………………………………………….............i

3.  Table of Contents ……………………………………………………………………….....ii

4.  Advisory Business
    A.  General Description of Advisory Firm ……………………………………………………...1
    B.  Description of Advisory Services ………………………………………………………………1
    C.  Availability of Customized Services for Individual Clients ………………………………......2
    D.  Wrap Fee Program ……………………………………………………………………………2
    E.  Assets Under Management  …………………………………………………………………...3

5.  Fees and Compensation
    A.  Advisory Fees and Compensation ……………………………………………………………..4
    B.  Payment of Fees …………………………………………………………………………………4
    C.  Additional Fees and Expenses …………………………………………………………………4
    D.  Prepayment of Fees …………………………………………………….......................................5
    E.  Additional Compensation and Conflicts of Interest …………………………………………5

6.  Performance-Based Fees and Side by Side Management …………………………………6

7.  Types of Clients …………………………………………………………………………….7

8.  Method of Analysis, Investment Strategies and Risk of Loss
    A. Method of Analysis and Investment Strategies …………………………………………….....8
    B. Material, Significant or Unusual Risks Relating to Investment Strategies…………………..12
    C. Risks Associated With Particular Types of Securities ……………………….......................15

9.  Disciplinary Information
    A. Criminal or Civil Proceedings …………………………………………………………………16
    B. Administrative Proceedings Before Regulatory Authorities …………………………………16
    C. Self-Regulatory Organization (SRO) Proceedings ……………………………………………16

J.P. Morgan Investment Management Inc.
File No. 801-21011                                                                June 3, 2011

**Item**                                                                                **Page**

**10. Other Financial Industry Activities and Affiliations**
    A. Broker-Dealer Registration Status ……………………………………………………17
    B. Futures Commission Merchant, Commodity Pool Operator, or
       Commodity Trading Adviser Registration Status ………………………………………17
    C. Material Relationship or Arrangements with Industry Participants ……………………17
    D. Material Conflicts of Interest Relating to Other Investment Advisers………………………19

**11.  Code of Ethics, Participation or Interest in Client Transactions, Personal**
    **Trading and Other Conflicts of Interest**
    A. Code of Ethics …………………………………………………………………………20
    B. Securities in which the Adviser or a Related Person have a Material Financial Interest………21
    C. Investing in Securities that the Adviser or a Related Person Recommends to Clients………..24
    D. Conflicts of Interest Created by Contemporaneous Trading ……………...................................25
    E. Other Conflicts of Interest……………………………………………………………………25

**12.  Brokerage Practices**
    A. Factors Considered in Selecting or Recommending Broker-Dealers for
       Client Transactions....................................................................................................27
          1. Research and Other Soft Dollar Benefits ……………………………………………28
          2. Brokerage for Client Referrals …………………………………………………………29
          3. Directed Brokerage ……………………………………………………………………29
    B. Order Aggregation …………………………………………………........................................30

**13.  Review of Accounts**
    A. Frequency and Nature of Review of Client Accounts or Financial Plans…………………………32
    B. Factors Prompting Review of Client Accounts Other than a Periodic Review…………………32
    C. Content and Frequency of Account Reports to Clients ……………………...................................32

**14.  Client Referrals and Other Compensation**
    A. Economic Benefits for Providing Services to Clients …………………………………………34
    B. Compensation to Non-Supervised Persons for Client Referrals …………………………………34

15.  **Custody** …………………………………………………………………………………35

**16.  Investment Discretion** ……………………………………………………………………36

**17.  Voting Client Securities**
    A. Policies and Procedures Relating to Voting Client Securities ……………………………………37
    B. No Authority to Vote Client Securities and Client Receipt of Proxies ……...............................38

**18.  Financial Information**
    A. Balance Sheet……………………………………………………………………………………39
    B. Financial Conditions ………………………………………………………...…………………39
    C. Bankruptcy Filings………………………………………………………………………………39

**APPENDIX A – Separate Account Fee Schedules**...............................................................40

**ITEM 4**
**Advisory Business**

### A.   General Description of Advisory Firm

J.P. Morgan Investment Management Inc. ("JPMIM" or the "Adviser") is the primary U.S. investment advisory branch of J.P. Morgan Asset Management ("JPMAM"), which is the marketing name for the asset management businesses of JPMorgan Chase & Co. ("JPMC"), a publicly traded company, and its affiliates worldwide.  JPMIM is wholly-owned by JPMorgan Asset Management Holdings Inc. which is a subsidiary of JPMC.  JPMIM was incorporated in Delaware on February 7, 1984.  JPMIM is registered with the SEC as an investment adviser pursuant to the Investment Advisers Act of 1940, as amended (the "Advisers Act").

### B.   Description of Advisory Services

JPMIM provides discretionary and non-discretionary investment management services and products to institutional and individual investors.  These products and services cover over 200 different strategies spanning the full spectrum of asset classes.  JPMIM and its asset management affiliates support multiple investment strategies in order to meet the diverse requirements of its clients' investment needs.  Major asset classes supported include equity, fixed income, cash management, currency, asset allocation, and alternative asset classes such as real estate and infrastructure, private equity and other private funds:

- Domestic Equity disciplines include core, growth, value, all cap, active extension, enhanced, long/short, quantitative and behavioral.

- International/Global Equity strategies include active extension, behavioral, core, enhanced, growth, value, and focused investment styles across multi-regional, global, regional and country specific sectors.

- Emerging Market Equity includes global core, discovery and focused strategies as well as regional and country specific strategies.

- Fixed Income strategies include a full array of strategies along the risk and return continuum, including liquidity/short duration, government, broad markets, sector specific, long duration, high yield (including distressed debt), and extended markets/alternatives.

- Cash Management solutions seek liquidity and preservation of principal using short-term strategies offered through separate accounts and money market instruments.

- Currency Management services include sophisticated passive management techniques, active management of both major and emerging market currencies, and currency as an alternative investment.

- Global Multi-Asset Group blends capital markets, strategic and tactical asset allocation, portfolio construction and active risk budgeting capabilities with one of the broadest product offerings in the industry to develop and implement optimal portfolio solutions to a wide range of client needs.

- <u>Global Real Assets</u> offers products, services and opportunities across multiple geographies (U.S., Europe and Asia), markets (public and private) and asset and property types that span the risk-reward continuum.

- <u>Private Equity</u> manages assets in two distinct and comprehensive segments of the private equity opportunity set – venture capital and corporate finance.

## C.  Availability of Customized Services for Individual Clients

JPMIM makes investments for clients in accordance with mutually agreed upon written investment guidelines and provides continuous supervision of client portfolios.  Investment services can be tailored for each client's needs and objectives and clients may impose restrictions on investing in certain securities or types of securities.  JPMIM has established procedures and controls to help ensure compliance with each client's investment guidelines and any client-imposed restrictions.  These procedures and controls include daily portfolio compliance monitoring using guideline monitoring software, pre-trade compliance review of fixed income trades, and regular group and peer review meetings designed to ensure that portfolio managers are complying with each client's investment guidelines.

## D.  Wrap Fee Programs

The Adviser serves as an investment manager in one or more "wrap fee" programs that are offered by third party and affiliated wrap fee program sponsors.  A wrap fee program is an investment advisory program under which a client pays a specified fee not based directly upon transactions in the client's account for investment advisory services and the execution of client transactions.  Wrap fee program clients may select the Adviser from a list of investment managers presented to the client by registered representatives of the sponsor.  Wrap fee program clients are typically high net worth individuals.  The program sponsor has primary responsibility for client communications and service, and the Adviser provides investment management services to the clients.  The program sponsor generally arranges for payment of the Adviser's advisory fees on behalf of the client, monitors and evaluates the Adviser's performance, executes the client's portfolio transactions and in some cases provides custodial services for the client's assets for a single fee paid by the client to the sponsor.  The Adviser receives a portion of the wrap fee for its services.

In general, the Adviser manages wrap fee accounts in a similar manner to its other accounts.  However, there are certain differences in the way JPMIM manages wrap fee accounts compared to its other client accounts, including that wrap fee accounts generally will not participate in initial public offerings due to regulatory concerns and the Adviser does not have the discretion to select broker-dealers for wrap fee accounts.  For additional information regarding the broker-dealer selection process please see Item 12.A.

The Adviser makes investment decisions regarding the selection of investments for wrap fee accounts and the total amount of securities bought and sold for such accounts without consultation with the client.  However, the Adviser's investment decisions are limited by the client's stated investment objectives, guidelines, or other instructions provided by the client.

Bundled wrap fee program clients should be aware that services comparable to those provided to a bundled program client might be available to the client at lower aggregate cost elsewhere on an

File No. 801-21011                                                                                          June 3, 2011

"unbundled" basis.  The Adviser also manages client assets in unbundled wrap fee programs.  At the clients' discretion and direction, fees may be unbundled for various services and negotiated separately by the client including, but not limited to, investment management, custody, administration and trade execution, although this fee typically covers only investment management services and not custody and brokerage services.  In unbundled arrangements the Adviser may execute transactions with broker-dealers directed by the client or selected by the Adviser.


**E.**   **Assets Under Management**

As of December 31, 2010, JPMIM had assets under management in the amounts set forth below:

- Assets managed on a **discretionary** basis              $ 674,876,302,252

- Assets managed on a **non-discretionary** basis              $ 3,768,653,032

File No. 801-21011                                                                                    June 3, 2011

---

**ITEM 5**
**Fees and Compensation**

**A.  Advisory Fees and Compensation**

The Adviser's annual investment advisory service fee is usually calculated as a percentage of the market value of the assets it manages, subject to minimum annual charges.  The Adviser usually charges a minimum annual fee for managing a portfolio.

The Adviser's fee schedules vary depending on the type of managed account and may, in certain circumstances, be subject to negotiation.  The annual fee schedules for the most often utilized investment strategies for U.S. accounts are included in Appendix A.  In certain circumstances in which the Adviser or its affiliates provide other services in addition to investment advisory services, a higher fee schedule than those shown in Appendix A may apply.  Higher fees may also apply if an account's assets are below the minimum investment level indicated in the standard fee schedule.  From time to time, and under agreed upon specific situations (which generally involve account size, investment strategy, account servicing requirements and material aspects of a client's overall relationship with the Adviser and its asset management affiliates), the Adviser may agree to lower advisory fees on a case by case basis.

Fee schedules are available upon request for other investment products within the asset classes of equity, fixed income and balanced strategies, and for other services such as those involving alternative investments, high yield, international securities, private equity, stable value, structured equity, immunization strategies, real estate, currency and foreign exchange.  Fees for such services may be higher than those for the U.S. services included in Appendix A.

The Adviser receives compensation for investment management services it provides in connection with wrap fee programs which is payable quarterly and calculated as a percentage of the assets under management of the wrap fee program.  Such compensation ranges from 25 to 80 basis points, based on investment mandate and sponsor.

**B.  Payment of Fees**

For separate accounts and for investments in funds that do not have fund-level advisory fees, clients may select to have the Adviser bill the client for fees incurred, or the client may agree to instruct its custodian to deduct advisory fees directly from the client's account.  The Adviser generally charges fees after services have been rendered, at the end of each calendar quarter, at one-fourth of the applicable annual rate.  The Adviser's fees may be paid directly by a pooled investment fund in which a client's account is invested as disclosed in the prospectuses, offering memorandum or other materials of the fund.

Wrap fee program clients should review the terms and conditions of the wrap fee program or contact the program sponsor regarding fees and billing arrangements. The Adviser does not bill wrap fee program clients or deduct fees from such clients' accounts. In general, the wrap fee program sponsor bills the program's clients or deducts fees from the client's accounts, and the program sponsor compensates the Adviser for its advisory services.

J.P. Morgan Investment Management Inc.

File No. 801-21011                                                                                    June 3, 2011

### C.   Additional Fees and Expenses

Brokerage commissions, taxes, charges and other costs related to the purchase and sale of securities for a client's account are charged to and paid from the account. See Item 12 for additional information regarding the Adviser's brokerage practices. In most cases clients establish a custody account under a separate agreement with a custodian bank, and the client will incur a separate custody fee for the custodian's services. The custodian may be an affiliate of the Adviser. If a client's account is invested in mutual funds or other pooled investment funds, the client's account will bear its pro rata share of the expenses of the fund.

### D.   Prepayment of Fees

The Adviser charges advisory fees in arrears and such fees are not paid in advance.

However, some wrap fee program sponsors require that their fees be paid in advance. In such cases, the wrap fee program sponsor will be responsible for refunds if participation in the program is terminated before the end of the billing period. Wrap fee program clients should review the terms and conditions of the wrap fee program or contact the wrap fee program sponsor regarding arrangements for refunds of pre-paid fees.

### E.   Additional Compensation and Conflicts of Interest

If a separately managed account is invested in mutual funds or other pooled investment funds, the Adviser does not receive asset-based sales charges or service fees from the sale of the fund. Where an account is invested in a mutual fund or other pooled investment vehicle, the Adviser does not receive dual level advisory fees. Typically, the Adviser does not charge an account level advisory fee for account assets invested in JPMorgan mutual funds, so that the client's account only bears the fees and expenses of the mutual fund. In some cases, the Adviser will charge the client's account an advisory fee but will offset the fee by the amount of the advisory fees of the affiliated funds in which the account is invested or the Adviser (or its affiliate, as applicable) will waive its advisory fee at the fund level.

**ITEM 6**
**Performance-Based Fees and Side by Side Management**

Clients of JPMIM pay various types of fees for investment advisory and portfolio management services. JPMIM manages portfolios that are charged an incentive or performance-based fee and portfolios that are charged fees based on a percentage of assets under management. For example, institutional account fees may be determined on a fixed rate, sliding scale or incentive basis. As part of the initial acceptance process, clients will work with JPMIM to determine the fee structure that best fits their specific needs. JPMIM's client fee structure is more fully described in Item 5.

Many large financial services firms like JPMC manage conflicts of interest in their day-to-day operations. When conflicts of interest are identified it is important to have controls in place to reduce or mitigate these conflicts. JPMIM is guided by fiduciary principles in the management of conflicts of interest. Put simply, JPMIM is expected to always act in the best interests of our clients. JPMIM's fiduciary obligation applies in every aspect of our dealings with clients regardless of the account relationship, assets under management or fee structure. JPMIM takes its fiduciary obligation very seriously.

Certain JPMIM portfolio managers manage multiple accounts including those that are charged an incentive or performance fee and those that are charged fixed fees based on percentage of assets under management. The management of portfolios that are charged different types of fees and are managed by the same portfolio manager can create a conflict of interest. For example, a portfolio manager may manage one portfolio that is charged a fixed rate based on assets under management alongside another portfolio that is charged a fee based upon investment performance of the portfolio over a specified period. This portfolio management relationship is often referred to as "side-by-side management". Side-by-side management may incentivize a portfolio manager to allocate certain investments to the portfolio that is charged a performance fee, rather than to the fixed rate portfolio, which may result in higher returns for the performance fee portfolio. By managing the portfolios in this way the portfolio manager would increase the fee received for managing the performance fee portfolio.

JPMIM portfolios are also managed according to various asset class benchmark criteria and client specific guidelines. Portfolios that share the same or similar benchmark and guidelines will generally take part in a given investment opportunity at the same time. We refer to these peer group portfolios as being "similarly managed".

The JPMIM Compliance Department has established controls to mitigate conflicts of interest such as side-by-side management. In order to do so, the JPMIM Compliance Surveillance Team maintains a Surveillance Program that is regularly reviewed and updated. The JPMIM Compliance Surveillance Team is responsible for monitoring a suite of trading surveillance reports which address conflicts of interest, including without limitation, side-by-side management and other regulatory requirements. All performance fee portfolios are specifically identified so that transactions for these accounts can be monitored.

In addition, the Adviser has implemented an Investment Director Review ("IDR") process which monitors, among other things, the portfolio management allocations of investments to accounts that portfolio managers manage side-by-side. For additional information regarding the Adviser's review process please see Item 13.A.

J.P. Morgan Investment Management Inc.

File No. 801-21011                                                                                                              June 3, 2011

---

**ITEM 7**
**Type of Clients**

The Adviser primarily provides investment advisory services to institutional clients, including:

- Corporations
- Pension plans
- Trusts
- Charitable organizations
- Insurance companies
- Investment companies (including mutual fund companies)
- Taft-Hartley plans
- Defined contribution investment plans
- Investment consultants
- Foreign governments
- State and local governments
- Supranational organizations
- Religious organizations
- Pooled investment vehicles
- Banking institutions

The Adviser also provides investment advisory services to the Private Banking division of J.P. Morgan Asset Management and certain of its clients such as high net worth individuals.

The Adviser generally requires a $10 million minimum account size for separate account mandates.  In addition, a larger minimum account balance may be required for certain types of accounts that require extensive administrative effort, while certain alternative investment products and separate account wrap fee programs may have lower minimum requirements.

**ITEM 8**

**Method of Analysis, Investment Strategies and Risk of Loss**

**A.  <u>Methods of Analysis and Investment Strategies</u>**

The Adviser utilizes different methods of analysis that are tailored for each of the investment strategies it offers its clients.  Set forth below are the primary methods of analysis that the Adviser utilizes for its significant investment strategies.

Clients should understand that investments in securities (both income and equity securities) and other assets involve a risk of loss.  Past performance of any investment strategy is not a guarantee of future results.  Clients should be prepared to bear the risk of investment losses.  See Item 8.B for additional information regarding investment risks.

<u>Equity</u>

When investing in equity securities, the Adviser's primary method of analysis is research oriented.  As part of this fundamental resource process, the Adviser typically relies on:

- Research analysts whose primary focus is to research and analyze industries and companies.

- Portfolio managers who utilize the research provided by analysts and their own investment insights to buy and sell equity securities and construct portfolios.

- Stock screening procedures, using a database of equity securities that track historical earnings, forecasted earnings and earning growth rates, free cash flow, and stock price history

In addition, the Adviser employs a disciplined approach to stock selection.  Research analysts study industry trends, competitive dynamics, quality of business franchises, financial statements, valuation and the depth of management in determining whether a security represents an attractive investment. Analysts may forecast future earnings, cash flows and dividends to ascertain whether a security is under or over valued.  For certain accounts including pooled investment vehicles, the Adviser invests in both the U.S. and outside the U.S. in real estate and real estate-related assets.

<u>Fixed Income</u>

Global debate forms the foundation of the Adviser's investment process for fixed income securities, with investment personnel of the Adviser contributing to regular strategy-setting sessions.  Each quarter, the Adviser's Investment Strategy Team – chaired by the Global Chief Investment Officer – meets to discuss the key factors driving the fixed income markets.  At these sessions, lead portfolio managers and sector specialists provide valuable insight into their specific sectors, debate factors likely to influence the markets over the coming three to six months and establish themes that will guide the Adviser's investment strategies.

8

Once investment themes have been established, the Adviser's sector specialists scan the fixed income market for investment opportunities. Each team has developed a unique approach for analyzing their sector, utilizing a combination of fundamental, quantitative and technical inputs to identify buy and sell targets. The Adviser's portfolio managers are responsible for tailoring investment strategies to each client's objectives and guidelines. Portfolio managers determine sector allocations and select securities, identified by the Adviser's sector specialists, which are suitable for each portfolio. Once constructed, the Adviser's portfolios are closely monitored by its portfolio managers, sector specialists, quantitative analysts and risk managers to ensure the portfolios comply with guidelines and that portfolio risk is appropriately managed.

In addition, the Adviser's Fixed Income Investment Strategy Team meets each quarter for a two-day strategy session to determine firm-wide interest rate and sector portfolio themes that will drive the Adviser's fixed income investments for the next 3-6 months. Such themes do not establish portfolio positions, but rather guide investments, outlining, for example, sectors to overweight or underweight. The debate is active and benefits from the distinct, global views of the JPMIM's most experienced investment personnel. The outcome of the Adviser's Fixed Income Investment Strategy Team meeting is a formal investment strategy that articulates the Adviser's economic outlook and guides its interest rate positioning, sector allocation and security selection decisions, country/currency decisions and out-of-benchmark bets. Such investment themes form the basis for investment strategy of relevant managed fixed income accounts. The quarterly meetings are supplemented by weekly meetings and other daily updates. Fluid intra-day dialogue between portfolio managers and sector specialists allows for adjustments to portfolios in response to market changes.


## Global Real Assets

When making global real asset investments, the Adviser makes investment decisions based upon a variety of factors, including, without limitation, a fulsome macro and micro research analysis and a quantitative financial analysis. Such factors ensure the performance viability of the proposed investment and its compatibility with a client's investment strategy and objectives. Prior to making an investment, the Adviser requires the approval of Investment Committee, whose review includes consideration of the following factors: cash flow and debt assumptions; return models; property history; location analysis; investment proposal; transaction structure (equity/debt); investment strengths and weaknesses; tenant analysis; replacement cost analysis; research assessment; comparable sales and lease analysis; and investment recommendation.


## Global Tactical Asset Allocation Strategy

For certain accounts, the Adviser employs a global tactical asset allocation strategy. This strategy is a model-driven, active investment strategy. The Adviser identifies various asset classes that may be appropriate for a portfolio (such as stocks, bonds, real estate, commodities, cash or cash alternatives) and establishes for the portfolio both a range and a targeted percentage to allocate to various asset classes. Using quantitative models and advanced risk management techniques, the Adviser rebalances and adjusts the portfolio's asset classes and market sector weightings from time to time. The Adviser has a qualitative team that supervises and implements the investment and risk management process.

J.P. Morgan Investment Management Inc.

File No. 801-21011                                                                                  June 3, 2011

**Private Equity**

Successful private equity investing depends to a large degree on the ability to attract and develop a steady flow of quality investment opportunities, and to select investments that will provide superior risk adjusted returns from these opportunities.  When making private equity investments, the Adviser takes a bottom-up approach designed to assess the probability of a sponsor's future success, and focuses on the track record and reputation of the principals, their investment thesis and investment strategy, the sponsor's decision making process and the sponsor's relevant past performance.

- **Partnerships**

  The investment selection process for partnership investments requires initial screening of new proposals, introductory meetings and extensive due diligence.  The areas of focus during the due diligence phase of the selection process are summarized below:

| Area | Key criteria |
| --- | --- |
| Background of individuals | • Relevant experience/reputation of individuals<br>• Extent to which backgrounds are complementary<br>• Experience as a team |
| Status of General Partner | • Governance<br>• Turnover of principals<br>• Vesting of partners<br>• Disciplined investment process<br>• Overall staffing and office infrastructure<br>• Communications with limited partners |
| Deal flow | • Sources of deal flow<br>• Ability to generate proprietary deals<br>• Volume and quality |
| Performance track record | • Portfolio and deal by deal performance analyses<br>• Pattern of successful deals<br>• Invest consistent with stated strategy<br>• Valuation methodology<br>• Distribution policy |

| Investment strategy | • Changes from previous partnerships |
| --- | --- |
| | • Differentiation of investment thesis |
| | • Attractiveness of investment focus |
| | • Deal selection process |
| | • Depth and quality of due diligence |
| | • Quality of individual investments |
| | • Deal management/involvement of general partner |
| | • Exit strategy |
| Terms of proposed partnership | • Changes from previous partnerships |
| | • Management fees, carried interest structure, "claw back" |
| | • "Key person" provisions |
| | • Allocation of other fees (transaction fees, director's fees, etc.) |
| | • Size consistent with capacity to generate deal flow |
| | • General partner investment |
| | • Conflicts of interest |
| | • Creation of advisory committee |
| | • Co-investment policy for general and limited partners |

After a potential investment initially has been approved, the deal team and the investment vehicle's legal counsel will work with the general partner and its counsel on the review and, when appropriate, negotiation of the partnership agreement. At this stage, areas of focus for the deal team will include management fees, distribution policy, clawback provisions and ERISA and other legal and tax issues. After the partnership agreement and other legal documents have been reviewed and, when appropriate, successfully negotiated, the investment will be presented to the Adviser for final approval. A consensus of the senior investment professionals of the private equity group of the Adviser is required to approve an investment.

• **Direct Company Investments**

Direct investment opportunities in companies are expected primarily to be co-investments sourced through the Adviser's relationships with partnership sponsors. The Adviser's direct investment selection process is designed to capitalize on the due diligence work performed by the general partners. Although a general partner's due diligence will not be a substitute for the Adviser's own assessment of the opportunity, the Adviser will benefit from the general partner's work and expertise in the sector and thus free up time and resources for the Adviser to focus its efforts on aspects of the investment that are of particular interest or concern.

The deal team pursuing a direct investment opportunity will prepare an investment memorandum detailing the material aspects of the investment, including the company's business description, industry analysis, investment considerations, description of the transaction and features of the security being issued, management, financial analysis (historical and projected financials, return

analysis, sensitivity analyses), and legal, environmental and other contingent liability analysis. Investments will be discussed and analyzed with appropriate members of the management team, and will be subject to final approval by consensus of the senior investment professionals of the private equity group of the Adviser.

The most important investment criteria for direct investments will be the projected returns, the attractiveness of the industry, the company's relative position in its industry, valuation, depth of the management team, type of security issued, and the alignment of interests with the general partner.

## B.  Material, Significant, or Unusual Risks Relating to Investment Strategies

The Adviser uses a variety of investment strategies depending on the requirements of the client and the investment guidelines associated with the client's account.  All strategies are subject to management risk and an account or fund may not achieve its objective if the Adviser's expectations regarding particular securities or markets are not met.  The Adviser discloses the risk factors for a particular strategy to the client, and in the case of pooled investment funds, discloses the risk factors associated with the fund's investment strategy in the prospectus, offering memorandum or other materials of the fund.

Set forth below are certain material risk factors that are often associated with the investment strategies and types of investments relevant to most of the Adviser's clients.  The information included in this brochure does not include every potential risk associated with each investment strategy or applicable to a particular client account.  Clients are urged to ask questions regarding risk factors applicable to a particular strategy or investment product, read all product-specific risk disclosures and determine whether a particular investment strategy or type of security is suitable for their account in light of their circumstances, investment objectives and financial situation.

**Equity Securities Risk.**  Certain strategies invest in equity securities (such as stocks) that are more volatile and carry more risks than some other forms of investment.  The price of equity securities may rise or fall, sometimes rapidly or unpredictably, because of economic or political changes or changes in a company's financial condition.  These price movements may result from factors affecting individual companies, sectors or industries selected for a portfolio or the securities market as a whole, such as changes in economic or political conditions.

**Fixed Income Securities Risk.**  Certain strategies invest in fixed income securities that will change in value based on changes in interest rates and are subject to the risk that an issuer or counterparty will fail to make payments when due or default.  Several other risk factors can change the financial standing of a borrower, and thus the perceived capacity to repay, that are solely based on the industry in which that borrower operates.  Some of these risks include political events like regulatory changes or tax law modifications, changes in consumer preferences, changes in technology, or in some cases the price and availability of substitute products.  Each of these kinds of events, while not greatly impacting the general economy, can be a cause of lower market valuations and capital losses for loans to borrowers in industries affected by these changes.  If rates rise, the value of these investments drops.

**Asset-Backed, Mortgage-Related and Mortgage-Backed Securities Risk.**  Certain strategies invest in mortgage-related and asset-backed securities including so-called "sub-prime mortgages" that are subject to certain other risks including prepayment extension and call risks.  Since mortgage borrowers have the right to prepay principal in excess of scheduled payments, there is a risk that borrowers will exercise this

J.P. Morgan Investment Management Inc.

option when interest rates are low to take advantage of lower refinancing rates. When that happens, the mortgage holder will need to reinvest the returned capital at the lower prevailing yields. This prepayment risk, as well as the risk of a bond being called, can cause capital losses. Conversely, when rates rise significantly, there is a risk that prepayments will slow to levels much lower than anticipated when the mortgage was originally purchased. In this instance, the risk that the life of the mortgage security is extended can also cause capital losses, as the mortgage holder needs to wait longer for capital to be returned and reinvested at higher prevailing yields. Mortgage-related and asset-backed securities may decline in value, face valuation difficulties, be more volatile and/or be illiquid.

**Index Funds Risk.** Index funds are not actively managed and are designed to track the performance and holdings of a specified index. Securities may be purchased, held and sold by an index fund or an account following an index strategy at times when an actively managed fund would not do so. There is also the risk that the underlying performance of an index fund may deviate from the performance of the index.

**Foreign Securities and Emerging Markets Risk.** Strategies that invest in foreign currencies and foreign issuers are subject to additional risks including political and economic risks, greater volatility, civil conflicts and war, currency fluctuations, higher transaction costs, delayed settlement, possible foreign controls on investment, expropriation and nationalization risks, liquidity risks, and less stringent investor protection and disclosure standards of foreign markets. These risks are magnified in countries in "emerging markets."

**High Yield Securities Risk.** Certain strategies invest in securities and instruments that are issued by companies that are highly leveraged, less creditworthy or financially distressed. These investments (known as junk bonds) are considered to be speculative and are subject to greater risk of loss, greater sensitivity to interest rate and economic changes, valuation difficulties, and potential illiquidity.

**Smaller Companies Risk.** Certain strategies invest in securities of smaller companies. Investments in smaller, newer companies may be riskier than investments in larger, more established companies. Securities of smaller companies tend to be less liquid than securities of larger companies. In addition, small companies may be more vulnerable to economic, market and industry changes. Because economic events have a greater impact on smaller companies, there may be greater and more frequent changes in their stock price. This may cause unexpected and frequent decreases in the value of an account's investments. Finally, emerging companies in certain sectors may not be profitable and may not realize earning profits in the foreseeable future.

**Short Strategy Risk.** A primary risk of some strategies is to invest in common stock considered to be attractive and to sell short securities considered to be unattractive. This strategy involves complex securities transactions that require the investment portfolio to borrow securities. The investment portfolio may not be able to borrow a security it wishes to sell short or may have to purchase a borrowed security in the market to return it to the lender at a disadvantageous time or price. Losses on short sales are potentially unlimited because there is no upward limit on the price a borrowed security could attain.

**Commodity Risk.** Certain strategies have exposure to commodities. Exposure to commodities, commodities-related securities and derivatives may subject an investment portfolio to greater volatility than investments in traditional securities, particularly if the instruments involve leverage. The value of commodity linked investments may be affected by changes in overall market movements, commodity index volatility, changes in interest rates, or factors affecting a particular industry or commodity.

**Derivatives Risk.**   Certain strategies may use derivatives.   Derivatives may be riskier than other investments because they may be more sensitive to changes in economic and market conditions and could result in losses that significantly exceed the original investment.  Many derivatives create leverage thereby causing the investment portfolio to be more volatile than it would be if it had not used derivatives. Derivatives also expose an investment portfolio to counterparty risk (the risk that the derivative counterparty will not fulfill its contractual obligation), including credit risk of the derivative counterparty.

**Real Estate Securities Risk.**   Certain strategies may invest in real estate securities, including REITs, that are subject to the same risks as direct investments in real estate and mortgages, and their value will depend on the value of the underlying real estate interests.  These risks include default, prepayments, changes in value resulting from changes in interest rates and demand for real and rental property, and the management skill and credit-worthiness of REIT issuers.   The Fund will indirectly bear its proportionate share of expenses, including management fees, paid by each REIT in which it invests in addition to the expenses of the Fund.

**Private Equity Specific Risks.**  The structure of private equity investment vehicles presents certain risks, apart from the portfolios of investments, of which investors should be aware.

### Long-term commitment required
A commitment is a long-term investment.  The expected term of each investment vehicle can be up to fifteen years.   The investment vehicles may draw down the capital commitments of investors at any time during their term.   There will be a substantial period of time during which investors may be obligated to provide capital without receiving any return and regardless of the performance of the investment vehicles.  Investors should be willing to hold their interests until the liquidation of the investment vehicles.

### Lack of control by investors
Investors will not have the ability to select, veto or cause the sale or other disposition of any investments by the investment vehicles or to determine the timing of any takedown, distribution or liquidation of the investment vehicles.

### Illiquidity; Restrictions on transfer and withdrawal
An investment in the investment vehicles will be highly illiquid.   Except in certain very limited circumstances investors will not be permitted to transfer their interests without the prior written consent of the Board of Managers of the relevant investment vehicle, which may be granted or withheld in its sole discretion.  The transferability of interests in the investment vehicles also will be subject to certain restrictions contained in the substantive documents and restrictions on resale imposed under applicable securities laws.

### Penalty for default
An investor that defaults in any payment with respect to its capital commitment to an investment vehicle will be subject to substantial penalties, including for each event of default a reduction in its interest in such investment vehicle corresponding to a reduction in its capital contributions (but not below zero) by an amount equal to 25 percent of its capital commitment.

### Diversification risk
Each investment vehicle may make only a limited number of investments and, as a consequence, the aggregate return on investments may be substantially adversely affected by the unfavorable performance of one or a small number of the investments.

***Risks of corporate finance and venture capital investments***

Investments made in connection with acquisition transactions are subject to a variety of special risks, including the risk that the acquiring company has paid too much for the acquired business, the risk of unforeseen liabilities, the risks associated with new or unproven management or new business strategies and the risk that the acquired business will not be successfully integrated with existing businesses or produce the expected synergies.

Venture companies may be in a conceptual or early stage of development, may not have a proven operating history, may have products that are not yet developed or ready to be marketed or that have no established market.

Companies may face significant fluctuations in operating results, may need to engage in acquisitions or divestitures of assets in order to compete successfully or survive financially, may be operating at a loss, may be engaged in a rapidly changing business with products subject to a substantial risk of obsolescence, may require substantial additional capital to support their operations, to finance expansion or to maintain their competitive position, or otherwise may have a weak financial condition.

Companies may be highly leveraged and, as a consequence, subject to restrictive financial and operating covenants. The leverage may impair the ability of these companies to finance their future operations and capital needs. As a result, these companies may lack the flexibility to respond to changing business and economic conditions, or to take advantage of business opportunities.

Companies may face intense competition, including competition from companies with far greater financial resources, more extensive development, manufacturing, marketing and other capabilities, and a larger number of qualified managerial and technical personnel.

**C.   Risks Associated With Particular Types of Securities**

See Item 8.B for a summary of the risks associated with certain types of securities and asset classes.

J.P. Morgan Investment Management Inc.

File No. 801-21011                                                    June 3, 2011

---

**ITEM 9**
**Disciplinary Information**

**A.  Criminal or Civil Proceedings**

The Adviser has no material civil or criminal actions to report.

**B.  Administrative Proceedings Before Regulatory Authorities**

The Adviser has no material administrative proceedings before the SEC, any other federal regulatory agency, any state regulatory agency, or any foreign financial regulatory authority to report.

**C.  Self-Regulatory Organization (SRO) Proceedings**

The Adviser has no material SRO disciplinary proceedings to report.

J.P. Morgan Investment Management Inc.

---

## ITEM 10
## Other Financial Industry Activities and Affiliations

### A.  Broker-Dealer Registration Status

Some of JPMIM's management persons are registered with the Financial Industry Regulatory Authority ("FINRA") as representatives of an affiliated broker-dealer.

### B.  Futures Commission Merchant, Commodity Pool Operator, or Commodity Trading Adviser Registration Status

The Adviser is registered with the Commodity Futures Trading Commission ("CFTC") as a commodity trading advisor and commodity pool operator.  The Adviser filed a notice of claim for exemption pursuant to CFTC Rule 4.7.  Rule 4.7 exempts a commodity trading advisor and a commodity pool operator who files a notice of claim for exemption from having to provide a CFTC-mandated Disclosure Document to certain highly accredited clients known as qualified eligible participants ("QEPs") who consent to their accounts being Rule 4.7 exempt QEP accounts.  The Adviser filed the Rule 4.7 notice of claim for exemption in April 1995.  Accordingly, the Adviser is exempt from the requirement to provide a Disclosure Document with respect to its Rule 4.7 exempt QEP accounts.

In accordance with Rule 4.7, the Adviser must prominently display the following CFTC-specified disclosure statement in this brochure.

PURSUANT TO AN EXEMPTION FROM THE COMMODITY FUTURES  TRADING COMMISSION IN CONNECTION WITH ACCOUNTS OF QUALIFIED ELIGIBLE PERSONS, THIS BROCHURE IS NOT REQUIRED TO BE, AND HAS NOT BEEN, FILED WITH THE COMMODITY FUTURES  TRADING COMMISSION.  THE COMMODITY FUTURES TRADING COMMISSION DOES NOT PASS UPON THE MERITS OF PARTICIPATING IN A TRADING PROGRAM OR UPON THE ADEQUACY OR ACCURACY OF COMMODITY TRADING ADVISOR DISCLOSURE. CONSEQUENTLY, THE COMMODITY FUTURES TRADING COMMISSION HAS NOT REVIEWED OR APPROVED THIS TRADING PROGRAM OR BROCHURE.

In addition, many of JPMIM's management persons are registered with the National Futures Association ("NFA") as Associated Persons of JPMIM.

### C.  Material Relationships or Arrangements with Industry Participants

The Adviser is part of a large financial services firm. In connection with providing investment advisory services to its clients, the Adviser may use the products or services of its affiliates or other related persons, as described below.

The Adviser intends to use J.P. Morgan Institutional Investments Inc., an affiliated broker-dealer registered with FINRA, to facilitate the distribution of certain pooled investment funds.

The Adviser has been granted an exemption by the SEC under Section 17(a) of the Investment Company Act of 1940, as amended (the "Investment Company Act") in order to trade certain money market

investments with J.P. Morgan Securities LLC ("JPMS").  The Adviser been in compliance with the SEC exemptive order and has controls in place to monitor its ongoing compliance with the exemptive order.

Emerging market debt securities may be valued using market quotations provided by Emerging Market Research ("EMR"), a pricing product supplied by JPMS, a related person of the Adviser.  EMR is an industry standard for end of day price evaluations used by buy-side firms.  All institutional clients of JPMS are provided access to EMR at no charge and the prices reflected are the same prices used to price the securities that comprise the JPMorgan Emerging Markets Bond Indices.

J.P. Morgan Pricing Direct Inc. ("Pricing Direct") is an approved pricing vendor and an affiliate of the Adviser.  Pricing Direct is used as a secondary pricing source for credit default swaps ("CDS") and for daily pricing of fixed income securities.  Pricing Direct has an evaluation methodology for fixed income and CDS that is widely relied upon within the industry.  The Adviser currently pays for the valuations received from Pricing Direct and we anticipate continuing to pay for such service.  Proper controls are in place to compare and review for any significant pricing differences among prices received from Pricing Direct and those from secondary sources.

JPMC and its related persons have an indirect interest in electronic communication networks and alternative trading systems (collectively "ECNs"), although these interests do not rise to a level of causing the ECNs to be a related person of the Adviser.  The Adviser may from time to time execute client trades through ECNs in which related persons may hold an indirect interest.  A related person may receive indirect proportionate compensation based upon its ownership percentage in relation to the transaction fees charged by the ECNs.  The Adviser will execute through an ECN in which a related person receives compensation only in situations where the Adviser reasonably believes it to be in the best interests of clients and the requirements of applicable law have been satisfied.  From time to time, the Adviser may utilize execution platforms for foreign currency type transactions through ECNs in which it may have an equity interest.  As discussed in further detail in Item 12, the Adviser intends to ensure the transactions described above are subject to the Adviser's duty of best execution.

The Adviser is the primary adviser to the U.S. mutual funds complex known as the JPMorgan Funds.  The Adviser also serves as advisor and sub-advisor to various open-end and closed-end investment management companies sponsored by the Adviser and other registered investment advisors.  The Adviser also serves as advisor to various U.S. private funds and numerous unregistered investment companies and pooled funds organized or formed under the laws of various countries.  For certain accounts, the Adviser may invest client assets on a discretionary basis in any of the funds referred to above.  In general, client assets invested in these funds will be excluded from the calculation of investment management fees payable to the Adviser.  Furthermore, with the prior consent of a client, the client's free cash balances may automatically be invested in shares of an affiliated money market fund.  In those cases, clients are advised that the value of the money market fund shares will be included both for determining the Adviser's investment management fee and the Adviser's management fee as advisor to the affiliated money market fund.

From time to time, the Adviser or its related persons may act as a general partner or special limited partner of a limited partnership, or managing member or special member of a limited liability company to which the Adviser serves as an advisor or sub-advisor.  The Adviser and related persons may solicit the Adviser's clients to invest in such limited partnerships or limited liability companies, for which the Adviser or a related person may receive compensation.  The Adviser may provide services to unregistered funds in which a related person may be acting as a general partner or managing member.

From time to time, related persons of the Adviser may serve as a director of a non-US investment company for which the Adviser may solicit clients to invest.  For a list of such funds, please refer to Section 7.B of Schedule D in Form ADV Part I.

JPMorgan Asset Management (Japan) Limited and JPMorgan Funds (Asia) Limited (the "Participating Affiliates") are affiliates of the Adviser and may indirectly provide investment advice to the Adviser's clients.  The Participating Affiliates are not registered as investment advisers under the Advisers Act.  Certain personnel listed in the Adviser's Brochure Supplement are employed by the Participating Affiliate and may indirectly provide investment advice to clients in specialties for which they have particular expertise.  All such personnel are under the overall supervision of the Adviser's Board of Directors in respect of their work for the Adviser and its clients.  The Participating Affiliates may recommend to its clients, or invest on behalf of its clients, in securities that are the subject of recommendations to U.S. clients of the Adviser.

The Adviser is an investment advisor to J.P. Morgan Private Investments, Inc. ("JPMPI") a registered investment advisor.  The Adviser may provide investment management services to certain JPMPI clients.

The Adviser utilizes J.P. Morgan Futures Inc. as a future commission merchant for clearing purposes only and transactions are not executed with this affiliate.

The Adviser provides investment advisory services to JPMorgan Chase Bank, N.A., which may act as an investment manager of trust and other institutional accounts.  The Adviser also provides investment management services to clients of affiliated registered investment advisors, and/or related persons, who are utilizing the Adviser's portfolio and/or trading platform for certain investment product mandates.

The Adviser may recommend its affiliated investment advisers to clients and may invest, with client consent, in funds managed by its affiliates.  These affiliated investment advisers include Highbridge Capital Management LLC, J.P. Morgan Alternative Asset Management Inc., and Security Capital Research & Management Incorporated.  In order to avoid conflicts of interest in such scenarios, the Advisor has agreed to waive its advisory fees when investing in funds managed by its affiliates.

The Adviser acts as advisor, sub-advisor, and/or as marketing agent for a series of unit-linked pooled funds of J.P. Morgan Life Assurance Limited, a United Kingdom insurance company and wholly-owned subsidiary of JPMC.


**D.   Material Conflicts of Interest Relating to Other Investment Advisers**

JPMIM uses the advisory services of unaffiliated investment advisers for some of the JPMorgan Funds however JPMIM does not receive compensation from the unaffiliated investment advisers for this arrangement.  In addition, JPMIM pays the unaffiliated investment advisors for their sub-advisory services a portion of the advisory fees JPMIM receives from the client.  As a result, JPMIM clients do not incur additional fees as a result of these relationships.  JPMIM does not recommend or select unaffiliated investment advisers for its other clients, and does not have business relationships with other investment advisers that create a material conflict of interest.  See Item 10.C for a discussion of relationships that JPMIM has with other investment advisers that are subsidiaries of JPMC.

---

**ITEM 11**

**Code of Ethics, Participation or Interest in Client Transactions and Personal Trading, Other Conflicts of Interest**

## A.  Code of Ethics

The JPMC Code of Conduct (the "Code of Conduct") is a collection of rules and policy statements intended to assist JPMC employees and directors in making decisions about their conduct in relation to the firm's business.  The Code of Conduct applies to all JPMC employees (including employees of JPMIM) and all employees are required to comply with its terms as a condition of continued employment. In addition, JPMIM employees must adhere to the JPMAM Code of Ethics (the "Code of Ethics"), which establishes more stringent standards than the Code of Conduct and reflects the fiduciary obligations of JPMIM and its supervised persons.  JPMIM and its registered investment advisory affiliates have adopted the Code of Ethics pursuant to Rule 204A-1 under the Advisers Act.  A copy of the Code of Ethics is available free of charge upon request by contacting your client service representative or financial advisor.

The Code of Ethics requires JPMAM's employees and other supervised persons to place the interests of JPMAM clients before their own personal interests at all times and to avoid any actual or potential conflict of interest.  All real or potential conflicts of interest must be disclosed to the Compliance Department, including those resulting from an employee's business or personal relationships with customers, suppliers, business associates, or competitors of JPMC, or with other JPMC employees.   Certain transactions or activities may be restricted by the Code of Conduct, the Code of Ethics or Compliance policies.  The Code of Ethics contains policies and procedures relating to:

- Personal trading policies, including reporting and pre-clearance requirements for certain personnel of the Adviser.

- Confidentiality obligations with respect to clients and compliance with policies, procedures and training requirements regarding securities laws, privacy, the Bank Secrecy Act, anti-money laundering and related matters.

- Conflicts of interest, including policies relating to restrictions on trading in securities of clients and suppliers, gifts and entertainment, political and charitable contributions and outside business activities.

In general, the personal trading rules under the Code of Ethics require that accounts of employees and associated persons be maintained with a designated broker and that all trades in reportable securities for such accounts be pre-cleared and monitored by compliance personnel.  The Code of Ethics also prohibits certain types of trading activity, such as short-term and speculative trades.  Employees of the Adviser generally must obtain approval prior to engaging in all security transactions, including those issued in private placements.  In addition, certain employees of the Adviser may not be permitted to buy or sell securities issued by JPMC in certain periods throughout the year prior to and following announcement of quarterly earnings.  Certain "Access Persons" (generally defined as persons with access to non-public information regarding the Adviser's recommendations to clients or purchases or sales of securities for client accounts and advised funds) are prohibited from executing personal trades in a security or similar instrument five business days (typically seven calendar days) before and after a client or fund managed by that Access Person transacts in that security or similar instrument.

File No. 801-21011                                                                                June 3, 2011

JPMC is a global financial services firm that provides a variety of services for, and advice to, many types of clients.  While providing such services, some divisions of JPMC, such as investment banking and the Adviser's private equity business, routinely have access to confidential information, some or all of which may be material, non-public information, (i.e., "inside information").  In order to prevent the flow of inside information from a so-called "insider" area to a "public" area of JPMC, JPMC has established informational barriers that seek to prohibit anyone in an insider area from communicating any non-public information, to anyone in a public area.  In order to prevent the inadvertent flow of such information, employees in insider areas are generally physically segregated from employees in public areas. Furthermore, the Adviser safeguards investment research and analysis on which its investment decisions are based to prevent "front running" (i.e., the misuse of such information prior to the execution of a trade on behalf of clients).  However, subject to certain constraints, employees of the Adviser generally may discuss "best practices" or topics of a general, non-confidential nature with other employees of the Adviser and other parts of JPMC.

From time to time, the Adviser and its employees may acquire inside information from non-JPMC sources.  However the inside information may be obtained, in compliance with JPMC's information sharing policies and insider trading policy, the Adviser and its employees are prohibited from using such information to buy or sell securities until such information has been disclosed to the public or is no longer material.

In addition, as part of a global financial services firm, as a result of applicable law and/or other conflicts of interest concepts, the Adviser may be precluded from effecting or recommending transactions in certain client portfolios.  As a result, from time to time, client portfolios managed by the Adviser may be precluded from acquiring, or disposing of, certain securities or instruments.  This includes, but is not limited to, the securities issued by JPMC.  However, with respect to voting proxies on behalf of the Adviser's clients, the Adviser, as a fiduciary, will vote proxies independently and in the best interests of its clients, as described below.

In certain circumstances, the Adviser may conclude that certain transactions in a particular security need to be restricted and therefore, the security may be placed on a so-called "restricted list" and/or "watch list". While the security is on the restricted list and/or watch list, the Adviser may prohibit purchases, sales or all transactions in the security.  The reasons for placing a security on the restricted list and/or watch list include, but are not limited to: (i) preventing the Adviser from exceeding regulatory investment limitations with respect to the securities of companies in certain regulated industries, such as insurance companies and public utilities; (ii) avoiding a concentration in any particular security; (iii) buttressing an information barrier by preventing the appearance of impropriety in connection with trading decisions or recommendations; and (iv) preventing the use or appearance of the use of inside information.

## B.  Securities in Which Adviser or a Related Person Have a Material Financial Interest

The Adviser may purchase or sell for client accounts securities in which it, or related persons, has a financial interest.  The Adviser's related persons may issue recommendations on securities held by the Adviser's client portfolios that may be contrary to investment activities of the Adviser.  Additionally, employees of the Adviser, or its related persons, may hold the same or similar securities as client portfolios, and from time to time may recommend such securities for purchase or sale in clients' portfolios in the normal course of business.  Similarly, employees of the Adviser and its related persons who maintain private equity interests may hold the same or similar interest as client portfolios.  The Adviser has established informational barriers and has adopted various policies and safeguards in order to

J.P. Morgan Investment Management Inc.

address conflicts of interest that may arise from such activities.  For additional information regarding such informational barriers, policies and safeguards, please see Item 11.A.

The Adviser may, from time to time, and subject to applicable law, cause a client's account to buy or sell securities or assets from a related person of the Adviser (a principal transaction),  subject to receipt of the client's consent, if the Adviser reasonably believes the transactions will be in the best interests of the client.  The Adviser will notify the client that the trade will be conducted on a principal basis with a related person and obtain the client's consent prior to the completion of the transaction.  Before entering into a principal transaction with a related person, the Adviser will attempt to obtain competitive quotes from non-related persons that the Adviser reasonably believes are in a position to quote favorable prices for the transaction.

If permitted in writing by a client, and if in the client's best interest, the Adviser or its related persons may on occasion, lend securities held in a client's account to a related person, subject to applicable law and the disclosure and consent policies described above.

If permitted in writing by a client, from time to time the Adviser may effect client transactions on an agency basis in securities and futures and options through affiliated broker/dealers when, in the Adviser's judgment, the transactions are consistent with its duty of best execution.  The Adviser's affiliate may be entitled to receive a commission for effecting these transactions.  These transactions may be effected through affiliated firms even though the total commission for the transaction may exceed the commission charged by another unaffiliated firm for the same transaction.

In addition, in some instances a security to be sold by one client account may independently be considered appropriate for purchase by another client account.  In such cases, the Adviser may cause the security to be "crossed" or transferred directly between the relevant accounts at an independently determined market price and without incurring brokerage commissions, although customary custodian fees and transfer fees may be incurred (no part of which will be received by the Adviser).  No such transactions will be effected unless the Adviser determines that the transaction is in the best interest of each client account and permitted by applicable law.

Furthermore, the Adviser's related persons may provide futures execution/or clearing services for a fee.  For certain institutional accounts the Adviser or a related person may execute client directed orders through a related person on an agency basis.  In such cases, the Adviser or related person will be acting in a fiduciary capacity and the other related person will receive normal consideration for services rendered.  Please see Item 12.A.3 for additional information regarding conflicts of interest associated with directed brokerage.

The trading practices of the Adviser and its related persons may conflict with the trading activities of the Adviser's clients and/or the clients of its advisory affiliates.  For example, the Adviser manages separate accounts which hold securities of non-public companies distributions of securities received as a result of direct or indirect investments in non-public companies.   In the course of managing these separate accounts, the Adviser may be the recipient of research from the Adviser's advisory affiliates and possibly related persons.

The Adviser may invest in direct private equity offerings which involve an advisory affiliate and/or related person who are participants in the offering.  Although clients of the Adviser may participate in the same offering at the same purchase price as the Adviser, advisory affiliates and/or related persons may sell prior to, and at a higher price than the Adviser's clients.  Similarly, the Adviser may participate in such

offerings at a higher price than advisory affiliates and/or related persons that may already hold an equity position in the issuer.  Such investments may provide a return of capital for an existing investment by a related person.  In order to address potential conflicts of interest arising from such activities, the Adviser has created a process for direct investing which includes a requirement to pre-clear direct investments with the Conflicts Office.

In the ordinary course of business, and subject to compliance with applicable regulations, the Adviser or related persons may provide the initial funding necessary to establish new funds for the purpose of developing new investment strategies and products.  These "seeded" funds may be in the form of registered investment companies, private funds such as partnerships, limited liability companies or separate accounts and may invest in the same securities as other client accounts.  The Adviser expects that such investments will be redeemed from time to time as permitted by the governing documentation of such funds and applicable regulations.  As a result of the infusion of seed capital from the Adviser or related person, the manager may be precluded from buying or selling certain securities, including, but not limited to, IPOs.  These funds and accounts may, and frequently do, invest in the same securities as client accounts.  The Adviser's policy is to treat such accounts in the same manner as client accounts for purposes of trading allocation.

The Adviser or related person may, from time to time, make a proprietary investment in U.S. or non-U.S. pooled investment vehicles that may also include client assets managed by the Adviser or another unaffiliated entity.  Such investment may also involve the Adviser receiving representation on the pooled investment's board of directors, advisory committee or other similar position, in accordance with JPMIM policy, and the Adviser's participation in general operating activities.  Additionally, the Adviser's employees may invest in accounts managed by the Adviser and to the extent applicable, the Adviser's employees may benefit from the investment performance of those funds and accounts.  In order to mange conflicts of interest that arise in connection with such activity, the Adviser requires all employees to report their participation on the board of directors, advisory committee or other similar position to the JPMC corporate secretary and the Compliance Department.  The Compliance Department is responsible for monitoring the activities of employees holding such positions for compliance with JPMIM policies.

If permitted by a client's investment objectives, and subject to compliance with applicable law, the Adviser may purchase securities for client accounts during an underwriting or other offering of such securities in which a broker-dealer affiliate of the Adviser acts as a manager, co-manager, underwriter or placement agent.  The Adviser's affiliate may receive a benefit in the form of management, underwriting or other fees.  Affiliates of the Adviser may also act in other capacities in such offerings and the affiliate may receive a fee, compensation, or other benefit for such services.  If the client's account is subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA") participation in these offerings may require the Adviser or its affiliates to comply with the conditions of one or more class or individual prohibited transaction exemptions issued by the Department of Labor.

From time to time, the Adviser or its affiliates may be current investors in companies that offer securities to the Adviser, and may receive a direct or indirect benefit, as a selling shareholder, return of capital or otherwise, from the purchase by the Adviser's clients in such offerings.  In addition, employees of the Adviser, or its related persons, may serve as directors, officers, or in other capacities in which they may receive direct or indirect compensation for companies in which the Adviser may purchase securities.  Further, for certain purposes, affiliates of the Adviser may be deemed affiliates of issuer companies in which the Adviser may purchase securities in public offerings.  Therefore, an investment in such issuers may be deemed an investment in an affiliate.  Accordingly, the Adviser will receive advisory fees on the portion of client holdings invested in such affiliated issuers.

File No. 801-21011                                                                                                    June 3, 2011

Purchases involving affiliated broker-dealers, or other affiliates of the Adviser, must comply with the Advisers Act, the Investment Company Act and any other applicable laws or prohibited transaction exemptions.

In addition, the Adviser may, subject to applicable law, participate in structured fixed income offerings of securities in which a related person may serve as trustee, depositor, originator, service agent or other service provider, on behalf of issuer in which fees will be paid to such related person.  The related person may act as originator of loans or receivables for the structured fixed income offerings in which the Adviser may invest for clients.  Participations in such offerings may directly or indirectly relieve obligations of a related person.

From time to time and subject to applicable law, the Adviser may invest in fixed income or equity instruments or other securities that represent a direct or indirect interest in securities of the Adviser or one of its affiliates.  The Adviser will receive advisory fees on the portion of client holdings invested in such instruments or other securities, and may be entitled to vote or otherwise exercise rights and take actions with respect to such instruments or other securities on behalf of its clients.  Generally, such activity occurs when a client account targets the returns of certain indices in which the securities of the Adviser or one of its affiliates is a key component.  The Adviser has implemented certain guidelines for rebalancing a client's portfolio when it involves the purchase or sale of the securities of the Adviser or one of its affiliates and minimizes the level of investment in securities of the Adviser and its affiliates.  In addition, the Adviser utilizes a third party proxy voting firm to vote shares of the securities of the Adviser or one of its affiliates that are held in a client account.

When permitted by applicable law and a client's investment guidelines, and when considered by the Adviser to be in the client's best interest, the Adviser may invest the assets of the client in various collective investment vehicles and other securities investment vehicles with respect to which the Adviser or its affiliates may receive compensation for advisory, administration, trust or other services.  When required by law, client consent will be obtained with respect to these investments.  Also, the Adviser may waive its investment advisory fee with respect to assets invested in the fund or investment vehicle.

### C.  Investing in Securities That the Adviser or a Related Person Recommends to Clients

The Adviser or one of its related persons may, for its own account, buy or sell securities or other instruments that the Adviser has recommended to clients or purchased or sold for its clients.  The Adviser has established informational barriers and has adopted various policies and safeguards in order to address conflicts of interest that may arise from such activities.  For additional information regarding such informational barriers, policies and safeguards, please see Item 11.A.

### D.  Conflicts of Interest Created by Contemporaneous Trading

The Adviser and its related persons may recommend securities to clients that the Adviser and its related persons may also purchase or sell.  In order to address potential conflicts of interest arising from such activities, including employee front-running at the expense of client accounts, the Adviser restricts employees with access to nonpublic information regarding such securities from executing personal trades in a security or similar instrument five business days (typically seven calendar days) before and after a client or fund managed by that employee transacts in that security or similar instrument.  In addition, the Adviser has implemented monitoring systems to ensure compliance with this restriction.

J.P. Morgan Investment Management Inc.

File No. 801-21011                                                                                     June 3, 2011

## E. Other Conflicts of Interest

The potential for conflicts of interest exists when the Adviser's portfolio managers manage accounts with similar investment objectives and strategies. Potential conflicts may include, for example, conflicts in the allocation of investment opportunities for similar accounts.

Responsibility for managing the Adviser's client portfolios is organized according to investment strategies within asset classes. Generally, client portfolios with similar strategies are managed by portfolio managers in the same portfolio management group using the same objectives, approach and philosophy. Therefore, portfolio holdings, relative position sizes and industry and sector exposures tend to be similar across similar portfolios, which reduce the potential for conflicts of interest.

The Adviser may receive more compensation with respect to certain similar accounts or may receive compensation based in part on the performance of some of its similar accounts. Potential conflicts of interest may arise with the allocation of securities transactions and allocation of limited investment opportunities, particularly for accounts that allow for the use of leverage. In certain instances portfolio managers may manage accounts' with less restrictive investment guidelines allowing for the use of leverage. In such accounts the portfolio manager generally will allocate securities based on the account's market value inclusive of the desired leverage, causing a potential conflict of interest. Allocations of aggregated trades, particularly trade orders that were only partially completed due to limited availability and allocation of investment opportunities generally, could raise a potential conflict of interest, as the Adviser may have an incentive to allocate securities that are expected to increase in value to favored accounts. New issue offerings, in particular, are frequently of limited availability. A potential conflict of interest also may be perceived to arise if transactions in one account closely follow related transactions in a different account, such as when a purchase increases the value of securities previously purchased by another account, or when a sale in one account lowers the sale price received in a sale by a second account. If the Adviser manages accounts that engage in short sales of securities of the type in which similar accounts invest, the Adviser could be seen as harming the performance of one account for the benefit of the accounts engaging in short sales if the short sales cause the market value of the securities to fall.

The Adviser has established policies and procedures designed to manage the conflicts described above. The Adviser has allocation and order aggregation practices in place designed to achieve fair and equitable allocation and execution of investment opportunities among its client accounts over time and are designed to comply with the securities laws and other applicable regulations. See Item 12.B for a description of these practices. The Adviser monitors a variety of areas, including compliance with account guidelines, review of IPO and new issue allocation decisions, compliance with the Code of Ethics, and a review of any material discrepancy in the performance of similar accounts.

From time to time, the Adviser may have clients who, through the normal course of the investment process, may own different classes of securities by the same issuer. Consequently, in the event of default or bankruptcy by the issuer, the Adviser may be involved in negotiations on behalf of holders of different classes of securities. As such, the Adviser will continue to act in the best interest of its clients, irrespective of the client's holdings and ability to recoup the value of their original investment.

The Adviser utilizes the services of affiliated pricing vendors for assistance with the pricing of certain securities. For additional information regarding affiliated pricing vendors see Item 10.C. In addition, securities for which market quotations are not readily available or for which market quotations are

deemed to be unreliable, are fair valued in accordance with established policies and procedures.   Fair value situations could include, but are not limited to:

- a significant event that affects the value of a security;

- illiquid securities;

- securities that have defaulted or are de-listed from an exchange and are no longer trading; or

- any other circumstance in which it is determined that market quotations do not accurately reflect the value of the security.

File No. 801-21011                                                                                          June 3, 2011

---

## ITEM 12
### Brokerage Practices

### A.  Factors Considered in Selecting or Recommending Broker-Dealers for Client Transactions

The Adviser's primary objective in broker-dealer selection is to execute orders for its clients in accordance with its duty of best execution.  In selecting a broker-dealer, the Adviser considers a number of factors including, but not limited to,

- the price per unit of the security;

- the broker's execution capabilities;

- the commissions charged;

- the broker's reliability for prompt, accurate confirmations and on-time delivery of securities;

- the broker-dealer firm's financial condition;

- the broker's ability to provide access to public offerings; and

- the quality of research services provided.

The Adviser is responsible for determining that the level of commission paid for each trade is reasonable in light of the executions received.  Commissions on brokerage transactions are subject to negotiation. Negotiated commissions take into account the difficulty involved in execution, the extent of the broker's commitment, if any, of its own capital and the amount of capital involved in a transaction.

One part of obtaining best execution is minimizing counterparty risk.  The Adviser's Risk Management Department is responsible for:

(1) setting risk policies and procedures worldwide;

(2) monitoring implementation of these policies and procedures;

(3) reviewing and approving all proposed trading counterparties;

(4) setting credit limits for certain activities with an approved counterparty; and

(5) monitoring credit exposures to counterparties.

In an effort to monitor and minimize counterparty risk, the Risk Management Department communicates the list of approved counterparties to the trading desks globally and , relies heavily on proprietary research performed by the Adviser's global team of credit and research analysts to make its counterparty assessments.  Monitoring credit exposures is an ongoing responsibility and the Adviser adjusts limitations on exposure to counterparties  as circumstances change.

For wrap fee program accounts, the Adviser may have discretion to select brokers or dealers other than the wrap fee program sponsor or its affiliates when necessary to fulfill its duty to seek to achieve best execution of transactions for its clients' accounts.  However, brokerage commissions and other charges

for transactions not effected through the sponsor or its affiliates may be charged to the client in addition to the "bundled" fee being paid by the client.  The Adviser is not in a position to negotiate commission rates with the wrap fee program sponsor or its affiliates on behalf of its separately managed account clients, and has a limited ability to monitor or evaluate the trade execution quality for such clients or to influence the nature and quality of the services the clients obtain from the wrap fee program sponsor or its affiliates.

1.   **Research and Other Soft Dollar Benefits.**

As noted in Item 12.A above, the Adviser's primary objective in broker-dealer selection is to be consistent with its duty of best execution of orders for its clients.  "Best execution" does not mean the lowest commission and involves a number of factors.  One of the factors includes the quality and availability of research and other services that a broker can provide.

The Adviser participates in certain soft dollar arrangements with various broker-dealers in the course of its business in order to obtain third party research, market data services, and proprietary broker-dealer research.  With respect to U.S. equity trades, the Adviser has entered into soft dollar arrangements that are structured as Client Commission Arrangements ("CCAs"). CCAs are agreements between the Adviser and the broker in which the executing broker allocates a portion of brokerage commissions to a pool of "credits" that the Adviser may use to pay for eligible brokerage and research services. Most often the research obtained with CCA credits is third party research.  However, the Adviser may receive proprietary research where broker-dealers typically incorporate the cost of such research into their commission structure.  Many brokers do not assign a hard dollar value to the research they provide, but rather bundle the cost of such research into their commission structure.

When the Adviser uses client brokerage commissions to obtain research or other services, the Adviser receives a benefit because it does not have to produce or pay for the research, products or services.  The Adviser may have an incentive to select a broker-dealer in order to obtain research, products or other services rather than to obtain the lowest price for execution.  JPMIM's practice is to establish CCAs only with those broker-dealers with whom it has established strong trading relationships, with whom it has negotiated favorable terms, and who have demonstrated a commitment to providing best execution.

Under the Adviser's soft dollar policy, the services obtained must fall within the safe harbor requirements of Section 28(e) of the Securities Exchange Act of 1934.  Section 28(e) requires that research services obtained with client brokerage commissions provide lawful and appropriate assistance in the performance of the investment decision-making process, and the amount of client commissions paid must be reasonable in light of the value of products or services provided by the broker-dealer.

For "mixed use" services (i.e., the service constitutes both eligible research or brokerage service and ineligible service), the Adviser will make a reasonable allocation between the research and non-research cost of the service according to the users and/or service, so that only the portion that assists in eligible research and brokerage services may be obtained using CCA credits and the portion which provides other assistance is paid for by the Adviser.

While the Adviser generally seeks the most favorable price in placing its orders, an account may not always pay the lowest price available, but generally orders are executed within a competitive range.  The Adviser may select brokers who charge a higher commission than other brokers, if the Adviser determines in good faith that the commission is reasonable in relation to the brokerage and research services the broker provides.  Additionally, while adhering to its duties of good faith and best execution,

the Adviser's equity group regularly reviews the soft dollar benefits it receives from each of its broker-dealers and establishes a target amount to spend on services from each broker-dealer.

The types of research services that the Adviser receives with client brokerage commissions include:

- research as to the value of securities;

- the advisability of investing in, purchasing, or selling securities;

- the availability of securities or purchasers or sellers of securities;

- analyses and reports concerning issuers, industries, securities, economic factors and trends, portfolio strategy, and the performance of accounts; and

- market data, stock quotes, last sale prices, and trading volumes.

Research services are received electronically and also in the form of seminars, written reports, telephone contacts, and personal meetings with sell side security analysts, economists and senior issuer representatives.

The brokerage services the Adviser receives include not only the execution of trades but also incidental functions that may include post-trade matching, exchange of messages among broker-dealers, custodians, and institutions and broker-dealers, and routing settlement instructions to custodian banks and broker-dealers' clearing agents.

The research obtained from CCA credits is used to benefit all of the Adviser's clients and is not used only for the client accounts that generated the credits and is not allocated to client accounts proportionately to the credits the accounts generate.  The Adviser may share research reports, including those that have been provided through the use of soft dollars, with advisory affiliates and related persons, including offshore affiliated advisers.

### 2.  Brokerage for Client Referrals

The Adviser does not select broker-dealers in order to receive client referrals.  The factors used by the Adviser in selecting broker-dealers in order to execute trades are described in Item 12.A.

### 3.  Directed Brokerage

The Adviser does not recommend, request or require that clients direct transactions through a specified broker-dealer.  Under certain conditions, the Adviser may accept written direction from a client, including those participating in wrap fee programs, to direct brokerage commissions from that client's account to specific brokers in return for services provided by the brokers to the client.  Due to the Adviser's overall objective in effecting client transactions consistent with its duty of best execution, the Adviser generally will accept direction only with respect to a limited percentage of certain clients' overall trades on a "best efforts" basis.  Consequently, the Adviser generally will not enter client orders with a directed broker when a pending order with a different broker in the same security is the broker providing best execution. Certain fixed income accounts may experience sequencing delays in order to meet client directed brokerage requests, which may impact the Adviser's ability to achieve best execution on behalf of such

clients.  For fixed income clients who have requested directed brokerage, the clients may lose certain benefits, such as volume discounts that the Adviser may have obtained for its non-directed accounts in a combined order.

## B.  Order Aggregation

The Adviser may, but need not, aggregate or "bunch" orders for accounts over which it has investment discretion in circumstances in which the Adviser believes that bunching will result in a more favorable overall execution.  Where appropriate and practicable, the Adviser will allocate such bunched orders at the average price of the aggregated order.  The Adviser may bunch a client's trades with trades of other clients and with trades of pooled vehicles in which the Adviser's personnel have a beneficial interest pursuant to an allocation process that the Adviser, in good faith, considers to be fair and equitable to all clients over time.

The Adviser has allocation and order aggregation practices in place that are designed to promote fair and equitable allocation and execution of investment opportunities among its client accounts over time and are designed to comply with the securities laws and other applicable regulations.  The Adviser believes that these practices are designed to reasonably ensure that accounts are treated in a fair and equitable manner over time.  In general, orders involving the same investment opportunity are aggregated on a continual basis throughout each trading day, consistent with the Adviser's duty of best execution for its clients.  Transactions for wrap fee program accounts are generally not included in the aggregation process because their transactions are executed through a broker-dealer selected by the wrap fee program sponsor.  If aggregated trades are fully executed, participating accounts will be allocated their requested allotment on an average price basis.  In some instances, trading restrictions imposed by client guidelines may preclude the aggregation of trades, in which case, the aggregated trades will be executed in advance of the trade for the client account that is precluded from participating in the trade aggregation.  With regard to equity securities, including public offerings that receive substantial interest and are frequently oversubscribed, partially completed orders generally will be allocated among participating accounts on a pro-rata average price basis, subject to certain limited exceptions in the U.S.  One such exception provides that if an allocation results in a de minimis allocation relative to the size of the account or its investment strategy, the allocation may be reallocated to other participating accounts.  With respect to certain asset classes (e.g., cash and fixed income) and in certain other circumstances (e.g., participating accounts that have a dedicated, specialized investment strategy, such as small cap, high yield, emerging markets, or other specialized strategies) there may be an exception to pro-rata allocations and these situations may be given priority in the allocation process with respect to certain securities that are included in their investment mandate.  Non-pro-rata allocations for money market instruments and fixed income securities are based upon a disciplined process for allocating securities with similar duration, credit quality, risk/return profiles and liquidity so that fair and equitable allocation will occur over time in the good faith judgment of the Adviser.

 The similarity of guidelines and objectives for many accounts in combination with thin markets, price volatility or lack of liquidity in the market may require that a block order be filled in multiple executions extending over several days.  To promote fair and equitable allocation over time each account is allocated shares on a pro-rata basis to their original order.  In certain circumstances the pro rata distribution of the order could result in a client receiving an allocation that is too small to justify the fixed transaction costs and custody costs associated with being included in the transaction.  In these circumstances the traders may exclude small orders until such time as 50% of the total order is complete.  At this stage the small orders will be executed.  Under this process smaller orders will lag in the early part of the order but will be

100% filled before the completion of the total order.  In certain circumstances the trader may override the individual amounts which would be automatically allocated to each account.

Examples of these are where a limit order applies, or to avoid a mismatch with a contingent trade.  The Adviser's policy regarding securities allocations requires portfolio managers to use reasonable judgment consistent with fiduciary duties to clients in making any non-pro rata allocations that are in the best interest of the affected clients.  Trade allocations are reviewed by Compliance on a post trade basis.

For purposes of seeking to achieve best execution, the Adviser may coordinate portfolio management and trading activities among clients of the Adviser and clients of advisory affiliates and related persons that utilize the Adviser's trading desk.  These activities will be executed through the Adviser's appropriate trading desk in accordance with the Adviser's trading policies and procedures.  These procedures include trade allocations, securities of new issues, cross trading, directed brokerage and soft dollar activities.  Indications of interest for new issue securities will be aggregated for clients of the Adviser and appropriate clients of advisory affiliates and related persons, and will be allocated in a manner that is intended to be fair and equitable in accordance with the Adviser's allocation policy.  As a result of the Adviser's trading arrangements, the Adviser's clients may receive less shares of a new issue of securities where there is participation by clients of advisory affiliates and related persons in such new issues.

From time to time, the Adviser may execute various trading strategies for certain clients that may conflict with the trading activities of other clients, as well as clients of advisory affiliates and related persons (e.g., buy and sell in the same security), or involve the separation of orders in the same security that would otherwise be executed on an aggregated basis.  From time to time, and subject to change, the Adviser has implemented trade order volume controls for clients' related persons who have received the Adviser's research information in order to minimize potential market impact execution costs of trading the same securities outside of the Adviser's trading desk.  Similar controls have been implemented for the Adviser's and advisory affiliates' wrap fee program accounts that participate in aggregated trades.  In the course of monitoring the above noted trading activities the Adviser attempts to objectively ensure that all clients, as well as clients of advisory affiliates and related persons, are treated fair and equitably over time.

---

**ITEM 13**
**Review of Accounts**

**A.**  **Frequency and Nature of Review of Client Accounts or Financial Plans**

The Adviser regularly reviews all client accounts and utilizes product group specific review processes and supervisory personnel which may differ across its various product groups in order to more appropriately serve its clients.  The Adviser's portfolio managers are generally responsible for the daily management and review of the accounts under their supervision.

Each of product group conducts performance reviews of its portfolio managers' accounts.  Such reviews examine compliance with clients' investment objectives and account guidelines, and the Adviser's current investment processes and practices.  An account review is formal in nature and is conducted by a team which consists of portfolio managers and individuals from other appropriate functional areas.  Each account is reviewed at least once per calendar year.

The Adviser has created proprietary investment management systems to assist it in the management of client accounts.  In addition to such systems, the Adviser maintains portfolio compliance monitoring systems to monitor client accounts. For daily trading strategies such as equity and fixed income, the portfolio compliance monitoring systems analyze the underlying positions for accounts and provide a daily review of positions data against various rules-based compliance tests, applicable to client specific guidelines and restrictions, and product and regulatory requirements.

With respect to private equity, the Adviser's investment process emphasizes participation on the advisory boards of the partnership investments and active monitoring (both formal and informal) of investments.

The information in this brochure does not include all the specific review features associated with each investment strategy or applicable to a particular client account.  Clients are urged to ask questions regarding the Adviser's review process applicable to a particular strategy or investment product, read all product-specific disclosures and determine whether a particular investment strategy or type of security is suitable for their account in light of their circumstances, investment objectives and financial situation.

**B.**  **Factors Prompting Review of Client Accounts Other than a Periodic Review**

Industry factors, market developments, statutory and regulatory changes and any issues that may have been identified with respect to a client account trigger reviews of the effected client accounts.  Events that trigger reviews of client accounts are generally directed to the attention of the Chief Investment Officer, Chief Operating Officer and/or Investment Director.

**C.**  **Content and Frequency of Account Reports to Clients**

The Adviser provides regular written reports to clients that are tailored to the type of investments included in the client's account.  Each of the Adviser's clients receives at least one of the following types of account reports:

J.P. Morgan Investment Management Inc.

- A monthly or quarterly Statement of Assets including a description of each asset with cost and current market values.

- A Statement of Transactions (typically monthly), detailing account activity

- Quarterly Performance Reports are received by most clients.

- Quarterly and annual audited financial statements which include a portfolio overview, investment vehicle summary and schedule of investments.

Clients generally have the option of receiving these reports via postal mail, e-mail, fax or online via our secure client website.

In addition, the Adviser typically meets with each client at least annually to review investment strategy, performance and administrative matters.

With respect to wrap fee program clients, the wrap fee program sponsor has primary responsibility for client contact and reporting.

J.P. Morgan Investment Management Inc.

**ITEM 14**
**Client Referrals and Other Compensation**

**A.   Economic Benefits for Providing Services to Clients**

In connection with providing investment advisory services to its clients, the Adviser does not receive sales awards, prizes or other economic benefits from someone who is not a client.

**B.   Compensation to Non-Supervised Persons for Client Referrals**

The Adviser has compensated, and may continue to compensate, affiliated and non-affiliated persons for client referrals in accordance with Rule 206(4)-3 under the Advisers Act.   The compensation paid generally consists of a cash payment computed as a percentage of the Adviser's advisory fee, although other methods of computation may be used.

J.P. Morgan Investment Management Inc.

**ITEM 15**
**Custody**

For certain accounts, the Adviser is deemed to have custody of the client's assets because it, or a related person, holds client funds or securities either directly or indirectly.  Clients will receive account statements at least quarterly directly from their broker-dealer, bank or other qualified custodian.  Upon receipt, clients should carefully review the statements.  Clients will also receive Statements of Assets from the Adviser on a monthly basis.  Clients are urged to compare these statements with those received from their qualified custodian.  If there is a significant difference in the information provided, clients should contact their Client Service Manager immediately.

J.P. Morgan Investment Management Inc.

**ITEM 16**
**Investment Discretion**

As described in Item 4.B, the Adviser provides both discretionary and non-discretionary investment management services.  When the Adviser accepts discretionary authority to manage the securities and other assets of client accounts, the Adviser's authority is set forth in an investment advisory, investment management or other written agreement with the client.  The Adviser's discretionary authority is subject to the provisions of the agreement with the client, including the objectives and investment guidelines the client establishes for the account.

**ITEM 17**
**Voting Client Securities**

**A.  Policies and Procedures Relating to Voting Client Securities**

If the Adviser has been appointed as discretionary investment manager for a client, the agreement between the Adviser and the client will usually grant the Adviser the authority to vote the proxies of the securities held in the client's portfolio.  As a fiduciary, the Adviser must act in the best interest of the client including with respect to proxy voting activities.  To ensure that the proxies are voted in the best interests of its clients, JPMAM has adopted detailed proxy voting procedures ("Procedures") pursuant to Rule 206(4)-6 under the Advisers Act that incorporate detailed proxy guidelines ("Guidelines") for voting proxies on specific types of issues.

Most routine proxy matters will be voted in accordance with the Guidelines, which have been developed with the objective of encouraging corporate action that enhances shareholder value.  Because proxy proposals and individual company facts and circumstances may vary, the Adviser may not always vote proxies in accordance with the Guidelines.

The Adviser has retained an independent proxy voting service to vote in situations where a material conflict may exist.  This includes voting any JPMC securities and shares of JPMorgan mutual funds held in any JPMAM client accounts.

In situations in which the Guidelines recommend a case-by-case analysis or where a vote contrary to the independent proxy voting service recommendation is considered appropriate, the Procedures require a certification and review process to be completed by appropriate investment professionals. That process is designed to identify actual or potential material conflicts of interest and ensure that the proxy vote is cast in the best interests of clients.

To oversee and monitor the proxy-voting process, JPMAM has established a proxy committee and appointed a proxy administrator in each global location where proxies are voted.  The proxy committee is composed of a representative of the Proxy Administrator, senior business officers of the Adviser and representatives of each of the Legal, Compliance and Risk Management Departments.  The proxy committee will meet periodically to review general proxy-voting matters, review and approve the Guidelines annually, and provide advice and recommendations on general proxy-voting matters as well as on specific voting issues.

In order to maintain the integrity and independence of the Adviser's  investment processes and decisions, including proxy voting decisions, and to protect the Adviser's decisions form influences that could lead to a vote other than in the clients' best interests, JPMC (including JPMIM) adopted a Safeguard Policy, and established formal informational barriers designed to restrict the flow of information from JPMC's securities, lending, investment banking and other divisions to JPMAM investment professionals.  Material conflicts of interest are further avoided by voting in accordance with the Adviser's predetermined Guidelines.   Examples of material conflicts of interest that could arise include without limitation circumstances in which: (i) management of a JPMIM client or prospective client, distributor or prospective distributor of its investment management products, or critical vendor, is soliciting proxies and failure to vote in favor of management may harm JPMIM's relationship with such company and materially impact JPMIM's business; or (ii) a personal relationship between a JPMIM officer and management of a company or other proponent of a proxy proposal could impact the Adviser's voting decisions.

Depending on the nature of the conflict of interest, the Adviser, in the course of addressing the conflict, may elect to take one or more of the following measures, or other appropriate action:

- Removing certain Adviser personnel from the proxy voting process;

- "walling off" personnel with knowledge of the conflict to ensure that such personnel do not influence the relevant proxy vote;

- Voting in accordance with the applicable Guidelines, if any, if the application of the Guidelines would objectively result in the casting of a proxy vote in a predetermined manner; or

- Deferring the vote to the Independent Voting Service, if any, that will vote in accordance with its own recommendation.

The resolution of all potential and actual material conflict issues will be documented in order to demonstrate that the Adviser acted in the best interests of its clients.

Clients may obtain a copy of JPMAM's Proxy Voting Procedures and information about how the Adviser voted the client's proxies by contacting their client service representative or financial advisor.

**B.   No Authority to Vote Client Securities and Client Receipt of Proxies**

Some clients do not grant proxy voting authority to the Adviser, in which case the right to vote client securities is retained by the client or other designated person.  In such situations the client will generally receive proxies or other solicitations from the client's custodian or transfer agent.

File No. 801-21011                                                                                    June 3, 2011

---

**ITEM 18**
**Financial Information**

**A.  Balance Sheet**

Pursuant to SEC instructions, the Adviser is not required to include its balance sheet as part of this brochure.

**B.  Financial Conditions Likely to Impair Ability to Meet Contractual Commitments to Clients**

The Adviser is not subject to any financial condition that is reasonably likely to impair its ability to meet contractual commitments to clients.

**C.  Bankruptcy Filings**

The Adviser has not been the subject of a bankruptcy petition at any time during the past ten years.

File No. 801-21011                                                                                    June 3, 2011

---

**APPENDIX A**
**Separate Account Fee Schedules**

**Fixed Income**

| Short Term Fixed Income (Liquidity, Managed Reserves, and Short Duration) | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| First | $ 50,000,000 | .20% |
| Next | $ 50,000,000 | .15% |
| Next | $ 100,000,000 | .125% |
| Next | $ 100,000,000 | .10% |
| Next | $ 200,000,000 | .08% |
| Next | $ 500,000,000 | .06% |
| Minimum investment: $50,000,000 | | |

| Intermediate/Core Bond/ Core Plus Fixed Income | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| First | $ 75,000,000 | .30% |
| Next | $ 75,000,000 | .25% |
| Next | $ 150,000,000 | .225% |
| Next | Balance | .15% |
| Minimum investment: $50,000,00 | | |

| Mortgage Backed Securities | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| | Total balance | .25% |
| Minimum investment: $100,000,000 | | |

| High Yield Bond | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| First | $ 50,000,000 | .50% |
| Next | $ 50,000,000 | .40% |
| Next | $ 100,000,000 | .35% |
| Next | $ 300,000,000 | .30% |
| Next | Balance | .25% |
| Minimum investment: $50,000,000 | | |

J.P. Morgan Investment Management Inc.

File No. 801-21011                                                                          June 3, 2011

Government Bond/

| Intermediate Government | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| First | $ 75,000,000 | .25% |
| Next | $ 75,000,000 | .20% |
| Next | $ 100,000,000 | .15% |
| Next | Balance | .10% |
| Minimum investment: $50,000,000 | | |

| Stable Value | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| | Total balance | .30% |
| Minimum investment $50,000,000 | | |

Long Duration   Fixed Income

| (Investment Grade) | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| First | $ 75,000,000 | .25% |
| Next | $ 75,000,000 | .225% |
| Next | $ 150,000,000 | .175% |
| Next | Balance | .15% |
| Minimum investment: $50,000,000 | | |

| Inflation Managed Bond | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| First | $ 75,000,000 | .35% |
| Next | $ 75,000,000 | .25% |
| Next | $ 150,000,000 | .225% |
| Next | Balance | .15% |
| Minimum investment: $100,000,000 | | |

| Currency (Developed Markets) | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| First | $ 50,000,000 | .30% |
| Next | $ 150,000,000 | .20% |
| Next | Balance | .10% |
| Minimum investment: $50,000,000 | | |

Emerging Markets Debt (EMD)

| External Sovereign/Corporate Debt | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| First | $ 50,000,000 | .60% |
| Next | Balance | .40% |
| Minimum investment: $50,000,000 | | |

J.P. Morgan Investment Management Inc.

File No. 801-21011                                                                                  June 3, 2011

| Local Currency  EMD | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| First | $  50,000,000 | .70% |
| Next | Balance | .50% |
| Minimum investment $100,000,000 | | |

## US Equity

| Large Cap Core/Large Cap Value | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| First | $  25,000,000 | .60% |
| Next | Balance | .40% |
| Minimum investment $25,000,000 | | |

| Large Cap Core 130/30 | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| | Total Balance | .85% |
| Minimum investment $250,000,000 | | |

| Analyst Large Cap Core | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| First | $  25,000,000 | .50% |
| Next | Balance | .40% |
| Minimum investment: $25,000,000 | | |

| Large Cap Value 130/30 | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| First | $ 100,000,000 | .85% |
| Next | Balance | .70% |
| Minimum investment $100,000,000 | | |

| Large Cap Growth | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| First | $  50,000,000 | .60% |
| Next | Balance | .50% |
| Minimum investment $25,000,000 | | |

| *REI 150 (Research Enhanced Index) | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| First | $  25,000,000 | .30% |
| Next | Balance | .25% |
| Minimum investment: $25,000,000 | | |

| *Research Market Neutral | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| First | $  50,000,000 | .100% |
| Next | $ 100,000,000 | .90% |
| Next | Balance | .80% |
| Minimum investment $50,000,000 | | |

J.P. Morgan Investment Management Inc.

File No. 801-21011                                                                                      June 3, 2011

*Research 130/30                      Assets Under Management        Fee as a % of Assets
First                                      $  50,000,000                         .65%
Next                                      Balance                              .60%
Minimum investment: $50,000,000


Intrepid Growth                        Assets Under Management        Fee as a % of Assets
First                                      $  50,000,000                         .60%
Next                                      Balance                              .50%
Minimum investment $25,000,000


Intrepid Value                          Assets Under Management        Fee as a % of Assets
First                                      $  50,000,000                         .60%
Next                                      Balance                              .40%
Minimum investment $25,000,000


Dynamic 130/30                        Assets Under Management        Fee as a % of Assets
First                                      $  50,000,000                         .80%
Next                                      Balance                              .70%
Minimum Investment $25,000,000


Mid Cap Value                          Assets Under Management        Fee as a % of Assets
First                                      $  25,000,000                         .70%
Next                                      $  25,000,000                         .60%
Next                                      Balance                              .50%
Minimum investment $25,000,000


Small Cap Active Core/
Small Cap Active Growth              Assets Under Management        Fee as a % of Assets
First                                      $  25,000,000                         .90%
Next                                      Balance                              .75%
Minimum Investment $25,000,000


QDV Small Cap Core                    Assets Under Management        Fee as a % of Assets
First                                      $  50,000,000                         .65%
Next                                      Balance                              .55%
Minimum investment $25,000,000


Structured TMV Small Cap Value     Assets Under Management        Fee as a % of Assets
First                                      $  50,000,000                         .65%
Next                                      Balance                              .45%
Minimum investment $25,000,000

J.P. Morgan Investment Management Inc.

| All Cap Growth | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| First | $  25,000,000 | .85% |
| Next | Balance | .75% |
| Minimum investment $25,000,000 | | |

| All Cap Value | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| First | $  25,000,000 | .85% |
| Next | Balance | .75% |
| Minimum investment $50,000,000 | | |

| US Real Estate Securities (REITS) | Assets Under Management | Fee as a % of Assets |
|---|---|---|
| First | $  50,000,000 | .65% |
| Next | Balance | .60% |
| Minimum investment $10,000,000 | | |