**Hearing Date: December 6, 2011**
**Objection Deadline: November 4, 2011**

**GIBSON, DUNN & CRUTCHER LLP**
Michael A. Rosenthal (MR-7006)
Matthew K. Kelsey (MK-3137)
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Robert B. Krakow (admitted *pro hac vice*)
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Telephone: (214) 698-3100
Facsimile: (214) 571-2900

*Attorneys for PricewaterhouseCoopers AG, Zurich,*
*as Bankruptcy Liquidator of*
*Lehman Brothers Finance AG, in Liquidation,*
*a/k/a Lehman Brothers Finance SA, in Liquidation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **Case No. 08-13555 (JMP)** |
| | : | |
| Debtors. | : | **Jointly Administered** |
| | : | |

------------------------------------------------------------------ x

**OBJECTION TO THIRD AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN
BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS**

# TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT .................................................................................. 1

II.  BACKGROUND RELATING TO LBF.......................................................................... 2

    A.   Lehman Brothers Finance AG, a/k/a Lehman Brothers Finance SA.................... 2

    B.   The Swiss Proceedings ................................................................................. 3

    C.   Role of PWC As Bankruptcy Liquidator ................................................................ 5

    D.   The U.S. Chapter 11 and Chapter 15 Proceedings................................................. 6

III. ARGUMENT ................................................................................................................ 7

    A.   Section 8.15 of the Plan Unlawfully Allows the  Plan Administrator to
        Discriminate Against LBF ................................................................................ 7

        i.    Section 8.15 of the Plan Violates Section 1123(a)(4) of the
            Bankruptcy Code ................................................................................ 8

        ii.   Section 8.15 of the Plan Violates Principles of Comity........................... 12

    B.   The Court Should Confirm that the Plan Does Not Impinge LBF's Setoff
        Rights ................................................................................................................ 15

IV.  CONCLUSION................................................................................................................ 17

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Arkansas v. Federated Dep't Stores*,
    175 B.R. 924 (S.D. Ohio 1992) ................................................................... 10, 11
*Cornfeld v. Investors Overseas Servs., Ltd.*,
    471 F. Supp. 1255 (S.D.N.Y.), *aff'd*,
    614 F.2d 1286 (2d Cir. 1979)......................................................................... 13
*Cunard S.S. Co., Ltd. v. Salen Reefer Services AB*,
    773 F.2d 452 (2d Cir. 1985)........................................................................... 13
*IIT v. Lam (In re Colorado Corp.)*,
    531 F.2d 463 (10th Cir. 1976) ....................................................................... 13
*In re Adelphia Comm'n Corp.*,
    361 B.R. 337 (S.D.N.Y. 2007)......................................................................... 8
*In re Maxwell Commc'ns Corp. plc*,
    93 F.3d 1036 (2d Cir. 1996)........................................................................... 14
*In re United Scis. of Am., Inc.*,
    893 F.2d 720 (5th Cir. 1990) ......................................................................... 15
*IRS v. Woodway Stone Co.*,
    187 B.R. 916 (W.D. Va. 1995) .................................................................... 9, 10
*Kenner Products Co. v. Societe Fonciere et Financiere Agache-Willot*,
    532 F. Supp. 478 (S.D.N.Y. 1982) ................................................................. 13
*Maxwell Commc'ns Corp. plc v. Societe Generale (In re Maxwell Commc'ns Corp. plc)*,
    93 F.3d 1036 (2d Cir. 1996)........................................................................... 13
*Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*,
    825 F.2d 709 (2d Cir. 1987)........................................................................... 12

**Statutes**
11 U.S.C. § 553 ............................................................................................... 15
11 U.S.C. §1123(a)(4)............................................................................... passim
11 U.S.C. §1129(a)(9).................................................................................... 15
11 U.S.C. §1501 .............................................................................................. 14
11 U.S.C. §1517(b) ......................................................................................... 12
11 U.S.C. §1520 .............................................................................................. 12
11 U.S.C. §1521 ................................................................................................ 6
11 U.S.C. §1521(a)(5)............................................................................ 7, 12, 15
11 U.S.C. §1521(b) ................................................................................ 7, 12, 15

**Other Authorities**
7-1123 COLLIER ON BANKRUPTCY ¶ 1123.01 .................................................. 8
H.R. Rep. No. 109-31, pt. 1 (2005), reprinted in 2005 U.S.C.C.A.N. 88.................... 13

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

PricewaterhouseCoopers AG, Zurich ("*PwC*"), in its capacity as duly authorized

Bankruptcy Liquidator and foreign representative of Lehman Brothers Finance AG, in

Liquidation, also known as Lehman Brothers Finance SA, in Liquidation, a Swiss corporation

("*LBF*"), hereby files this objection to the *Third Amended Joint Chapter 11 Plan of Lehman*

*Brothers Holdings Inc. and Its Affiliated Debtors* (Docket No. 19627) (as amended from time to

time, the "*Plan*").[1]

## I.    PRELIMINARY STATEMENT

1.      The Plan as currently structured cannot be confirmed because it expressly

authorizes disparate treatment of creditors of the same class.  Specifically, Section 8.15 of the

Plan provides the Plan Administrator with broad discretion to refuse to make a distribution to

any of the Debtors' Non-Controlled Affiliates who intend to use the distributed proceeds to make

a distribution to any other Non-Controlled Affiliate against whom Debtors have a pending and

unresolved claim.   Were the Plan to be confirmed without modification or deletion of Section

8.15,  Non-Controlled Affiliates against whom LBF has lawful claims would be denied the

ability to satisfy those claims unless and until LBF acquiesced to Debtors' demands regarding

their claims against LBF (or obtained a final court order on the claims), and LBF would likewise

be denied the ability to satisfy claims of any of its Non-Controlled Affiliate creditors who have

not resolved to Debtors' satisfaction or by final order claims asserted against them by the

Debtors.

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to
such terms in the Plan.

2.     This transparent scheme to leverage LBF and other Affiliates to capitulate to Debtors' claim demands brazenly violates section 1123(a)(4) of the Bankruptcy Code by singling out LBF and other similarly situated creditors for significantly less favorable treatment than other creditors in their class.  In addition, Section 8.15 of the Plan violates long-settled principles of comity by attempting to use this Court to authorize the Plan Administrator to unduly interfere with liquidation proceedings in foreign jurisdictions.

3.     Section 13.5 of the Plan also appears to extinguish LBF's setoff rights in direct contravention of the Debtors' statements in the Disclosure Statement that those setoff rights are preserved by the Plan.

4.     For all of these reasons, the Plan as currently structured cannot and should not be confirmed.

## II.     BACKGROUND RELATING TO LBF

5.     The basic background facts pertaining to these chapter 11 cases are well known to the Court and will not be repeated here.

### A.     Lehman Brothers Finance AG, a/k/a Lehman Brothers Finance SA

6.     Articles of Association for LBF were filed in Switzerland on January 13, 1997. LBF's Articles of Association provide that LBF is a Swiss corporation known as both Lehman Brothers Finance AG and Lehman Brothers Finance SA.  The dual names arise from the local practice in Switzerland, a country in which both French and German are official languages, to designate LBF's corporate status both in the German nomenclature (*Aktiengesellschaft* (AG)) and the French nomenclature (*Société anonyme* (SA)).

7.     LBF is a wholly-owned subsidiary of Lehman Brothers Holdings Inc. ("**LBHI**"). Since January 22, 2001, the principal purpose of LBF has been to provide financial and financial intermediary services, including structuring, issuing and entering into derivative transactions,

and other related activities.  Prior to the commencement of the Swiss Bankruptcy (discussed

below), LBF's primary business was to engage in foreign (i.e., non-U.S.) derivative transactions.

8.    LBF maintains its registered office in Zurich, Switzerland.  LBF has no offices or

employees in the United States.  While LBF has business relationships with several U.S.-based

Lehman Brothers entities and a number of other U.S. counterparties, the bulk of LBF's debtor-

creditor relationships involve entities that are not based in the United States, including Lehman

Brothers International (Europe).  For example, as of December 1, 2008, LBF had 55 U.S.

counterparties with open positions, as compared to 612 non-U.S. counterparties with open

positions.  All of LBF's counterparties are sophisticated investors.  Historically, LBF's business

has been interconnected with the business of other Lehman Brothers entities, and LBF has been

partially dependent upon services provided by other Lehman Brothers group companies based in

the United States and the United Kingdom.  As of the Petition Date in the Debtors' Chapter 11

Cases, LBF held billions of dollars in claims against the Debtors arising from its prepetition

business relationships with Lehman Brothers entities.

**B.    The Swiss Proceedings**

9.    By order dated September 30, 2008, the Swiss Federal Banking Commission (the

"***Swiss Commission***")[2] assumed regulatory authority over LBF, as a financial intermediary.   By

the same order (the "***Observation Order***"), the Swiss Commission appointed PwC as the

Observer of LBF and directed PwC to investigate LBF's finances and other affairs.  The

_____

[2]    Effective January 1, 2009, the Swiss Commission and other regulatory bodies were merged
into the Swiss Financial Market Supervisory Authority ("***FINMA***"), which now regulates
LBF and is responsible for supervising the Swiss Bankruptcy (discussed below) pursuant to
the same rules and authorities previously administered by the Swiss Commission.  FINMA
and the Swiss Commission, as applicable, are referred to hereinafter as the Swiss
Commission.

Observation Order prohibited LBF's board of directors and officers from causing LBF to take any legal actions without PwC's approval, and tasked PwC to protect LBF's creditors and marshal its assets.

10.     On October 17, 2008, PwC issued a report to the Swiss Commission pursuant to the Observation Order recommending the liquidation of LBF.  On October 29, 2008, the Swiss Commission issued an order (the "*Wind-Up Order*") appointing PwC as Liquidator of LBF with sole authority to act on LBF's behalf, and prohibiting LBF's board of directors and officers from taking any legal actions on the company's behalf.  The Wind-Up Order also commenced the liquidation, i.e. the orderly winding up, of LBF pursuant to (i) article 23 quinquies of the Swiss Federal Act on Banks and Savings Banks; (ii) article 36a of the Swiss Federal Act on Stock Exchanges and Securities Dealers; and (iii) article 739, *et seq.*, of the Swiss Federal Code of Obligations.  In addition, the Wind-Up Order provided that the wind-up could be converted to a bankruptcy proceeding upon a finding that there was no possibility of restructuring LBF.

11.     In its capacity as Liquidator, PwC, after conducting an initial investigation of LBF's affairs, determined in late November 2008 that LBF was very likely to be insolvent and that a restructuring was unlikely.  PwC informed the Swiss Commission of these findings and, on December 2, 2008, requested that the wind-up be converted to a bankruptcy proceeding.  On December 19, 2008, the Swiss Commission issued an order (the "*Swiss Order for Relief*") commencing a Swiss "*Bankenkonkurs*," or bank/security dealer bankruptcy proceeding (the "*Swiss Bankruptcy*") for LBF pursuant to Swiss law, specifically (i) article 33, *et seq.*, of the Swiss Federal Act on Banks and Savings Banks; (ii) the Swiss Commission's Ordinance on Bankruptcy of Banks and Securities Dealers; (iii) article 36a of the Swiss Federal Act on Stock

Exchanges and Securities Dealers; and (iv) the Swiss Federal Debt Enforcement and Bankruptcy

Act (the "*Swiss Governing Laws*"),[3] and appointing PwC as Bankruptcy Liquidator of LBF.

## C.    Role of PWC As Bankruptcy Liquidator

12.    Pursuant to the Wind-Up Order, PwC as Liquidator took over most functions, and

in particular, all operational functions, of LBF's board of directors.  On December 22, 2008,

which was the effective date of the Swiss Order for Relief, PwC became the Bankruptcy

Liquidator of LBF.  Thus, since October 29, 2008, by authority of the Swiss Commission, PwC

has operated LBF to a large extent independently of prior management, and has been and

remains obligated to protect the interests of LBF's creditors and equity holders. PwC is tasked

with investigating LBF's affairs, preserving assets for the benefit of creditors and equity holders,

and collecting receivables and liquidating the assets of LBF for the benefit of all creditors and

equity holders.

13.    Although PwC's authority as Bankruptcy Liquidator is expressly provided for by

Swiss law and the Swiss Order for Relief, only the Swiss Commission (and, in certain instances,

the appropriate Swiss courts) are empowered to issue necessary orders in connection with the

Swiss Bankruptcy.[4]  PwC, in its capacity as the Bankruptcy Liquidator of LBF, remains subject

to supervision by the Swiss Commission with respect to all actions to be taken in the course of

the Swiss Bankruptcy.

---

[3]  The Swiss Commission has held that LBF is subject to the Swiss laws governing the bankruptcy and liquidation of banks and securities dealers, which incorporate by reference the general provisions of the Swiss insolvency law.

[4]  The Bankruptcy Liquidator cannot issue orders in connection with the Swiss Bankruptcy.

**D.    The U.S. Chapter 11 and Chapter 15 Proceedings**

14.    On October 3, 2008, Chief Restructuring Officer of LBHI authorized the filing of a chapter 11 petition in the Bankruptcy Court on behalf of LBF (under the name Lehman Brothers Finance SA).[5]  However, neither the board of directors of LBF nor PWC, which had before such date been appointed as Observer of LBF (with the right to approve any such filing) in the proceedings then pending in Switzerland, approved the filing of a chapter 11 case in the United States.

15.    Given LBF's limited connections to the U.S., PwC believed that the Swiss Bankruptcy would be the most efficient and appropriate forum for the administration of LBF's assets, and that dismissal of the chapter 11 case was in the best interests of LBF and its stakeholders.  Thus, PwC filed a motion to dismiss the chapter 11 case concurrently with a petition (the "*Chapter 15 Petition*") seeking (i) recognition of the Swiss Bankruptcy as a "foreign main proceeding," and of PwC as the "foreign representative" of LBF under chapter 15 of the Bankruptcy Code; and (ii) additional relief under section 1521 of the Bankruptcy Code.

16.    This Court granted the motion to dismiss the chapter 11 case and entered an *Order Granting Recognition of Foreign Main Proceeding and Related Relief Under Chapter 15*, dated March 12, 2009 (Case No. 09-10583, Docket No. 24) (the "*Chapter 15 Order*").  For more than two years, PwC and others involved in the Swiss Bankruptcy have been relying on the Chapter 15 Order's recognition of the Swiss Bankruptcy as the "foreign main proceeding" and directive that PwC be "entrusted with the administration, realization and distribution of all of

---

[5]  The chapter 11 case was pending in this Court as Case No. 08-13887 (JMP).

6

LBF's assets located within the territorial jurisdiction of the United States, along with LBF's other worldwide assets, pursuant to section § 1521(a)(5) and 1521(b)." Chapter 15 Order ¶¶ 2, 6.

## III.    ARGUMENT

**A.    Section 8.15 of the Plan Unlawfully Allows the
Plan Administrator to Discriminate Against LBF**

17.    According to the Debtors' Disclosure Statement, the Plan is designed to "expedite…Distributions to holders of Allowed Claims." Disclosure Statement at 57. Despite the Debtors' expressed intention to accelerate recoveries to creditors, the Plan actually meaningfully impedes the ability of LBF (and other similarly situated creditors) to receive distributions from the Debtors' estates by conditioning distributions to the Debtors' Non-Controlled Affiliates upon the resolution to the Debtors' satisfaction of the claims they have asserted against LBF and other Non-Controlled Affiliates. Specifically, Section 8.15 of the Debtors' Plan provides that the Plan Administrator may withhold a distribution to a Non-Controlled Affiliate if that entity, in its own foreign bankruptcy proceeding, intends to make a distribution to LBF before the Debtors' claims dispute with LBF is resolved. Section 8.15 provides:

> Except as otherwise agreed by the Debtors and a Non-Controlled Affiliate or with respect to LBT or LBSN, the Plan Administrator may determine, in its sole discretion, to withhold all or a portion of a Distribution to a Non-Controlled Affiliate if such Distribution would be distributed by such Non-Controlled Affiliate to satisfy a Claim of a different Non-Controlled Affiliate against which a Debtor has a Claim but the latter Non-Controlled Affiliate has refused to honor such Claim of a Debtor without subordination, reduction or offset unless (a) otherwise agreed to by the Plan Administrator or (b) the priority and amount of a Debtor's Claim against the latter Non-Controlled Affiliate has been determined by Final Order.

18.    To illustrate, assume that LBF has an uncontested claim against Lehman Brothers (Luxembourg) Equity Finance S.A. ("Luxembourg") and that Lehman Brothers Japan, Inc.

("Japan") has an uncontested claim against LBF. Section 8.15 gives the Plan Administrator the

discretion, for so long as Debtors have unresolved claims against LBF and Japan, to refuse to

make a distribution to Luxembourg if Luxembourg intends to use the proceeds to satisfy LBF's

claim, and to refuse to make a distribution to LBF if LBF intends to use the proceeds to pay

Japan in their respective foreign bankruptcy proceedings.

19.    The Court plainly cannot confirm the Plan unless the Debtors eliminate Section

8.15. Section 8.15 of the Plan violates section 1123(a)(4) of the Bankruptcy Code because it

provides for disparate treatment of certain Non-Controlled Affiliates by empowering the Plan

Administrator to withhold Distributions to such Non-Controlled Affiliates pending resolution of

a claims dispute between the Debtors and a third party who may be entitled to a distribution from

those Non-Controlled Affiliates' foreign proceedings. Moreover, Section 8.15 of the Plan

violates well-settled principles of comity by asking this Court to give the Plan Administrator

such authority, which would enable the Plan Administrator to interfere with the foreign

proceedings of Non-Controlled Affiliates by impairing the foreign authorities' ability to make

timely distributions in those foreign proceedings.

### i.    Section 8.15 of the Plan Violates Section 1123(a)(4) of the Bankruptcy Code

20.    Section 1123(a)(4) of the Bankruptcy Code provides that:

> [n]otwithstanding any otherwise applicable non-bankruptcy law, a
> plan shall— ... (4) provide the same treatment for each claim or
> interest of a particular class, unless the holder of a particular claim
> or interest agrees to a less favorable treatment of such particular
> claim or interest....

11 U.S.C. § 1123(a)(4) (emphasis added). This section "restates a cardinal principle of

bankruptcy law, namely that creditors of the same class have a right to equality of treatment." 7-

1123 COLLIER ON BANKRUPTCY ¶ 1123.01 (15th ed. rev. 2011). *See also In re Adelphia*

*Comm'ns Corp.*, 361 B.R. 337, 363-64 (S.D.N.Y. 2007) (finding that plan provision violated

section 1123(a)(4) where only class members that voted for the plan received exculpation, even though all creditors in the class were given the same choice between voting or not voting for the plan).

21.    Section 8.15 violates section 1123(a)(4) by giving the Plan Administrator unbridled authority to treat claims in the same class differently by withholding distributions to some members of the class without their consent while making distributions to other members of that class.[6] Courts have rejected similar attempts to discriminate among similarly situated creditors based upon the existence of an unresolved dispute with the debtors.

22.    For instance, in *IRS v. Woodway Stone Co.*, the bankruptcy court confirmed a plan that forced the IRS to wait for payment pending the outcome of an adversary proceeding while other claimants in the same class as the IRS received full satisfaction of their claims.  187 B.R. 916, 918-19 (W.D. Va. 1995).  The district court reversed and held that the plan could not be confirmed.  *Id.* at 919.  In so ruling, the district court noted that the bankruptcy court had believed that compelling reasons existed to treat the IRS's claim differently from those of other creditors in its class, including the fact that holding up confirmation until adjudication of the adversary proceeding involving the IRS's claim was expected to waste both time and money.  *Id.* at 918 n. 1-2.  Nevertheless, the district court held that the plan clearly violated 1123(a)(4) because the delay in payment to the IRS constituted different and less favorable treatment than

---

[6]    To the extent that the Plan Administrator withholds payments to all of the members of a particular class of Affiliate Claims that rejects the Plan, Section 8.15 of the Plan may also violate section 1129(b) by unfairly discriminating against the members of that class.

other creditors in the same class had received.[7] *Id.* at 918-19 ("The IRS never agreed to wait for payment on its claim while other secured creditors…began receiving satisfaction of their claims on June 10, 1994. … As a secured creditor, the IRS was entitled to the same treatment that other creditors in the same class received by the bankruptcy court. The confirmed plan however failed to meet the requirements of 11 U.S.C. § 1123(a)(4).").

23. Similar to the plan in *Woodway Stone*, the Plan proposes to empower the Plan Administrator to delay Distributions to Non-Controlled Affiliates, including LBF and those against whom LBF has claims—pending resolution of any claim disputes the Debtors might have in the various foreign bankruptcy proceedings. LBF has not consented, and will not consent, to such disparate treatment. Indeed, the Plan is worse than the plan the *Woodway Stone* court determined to be unconfirmable in that, here, there are no compelling reasons—such as expediting the conclusion of the chapter 11 cases to minimize cost and delay—to justify withholding a distribution to LBF. Rather, Section 8.15 is a transparent attempt, at the expense of LBF and its creditors, to give the Plan Administrator tactical leverage in negotiations with LBF and its creditors, who dispute the validity of the Debtors' claims asserted against them.

24. Likewise, in *Arkansas v. Federated Department Stores*, the court rejected the debtors' attempt to withhold distributions from certain states because those states intended to redistribute the funds to claimants according to each state's own unclaimed property law. *See* 175 B.R. 924, 933 (S.D. Ohio 1992). The debtors were concerned that distribution under the states' unclaimed property laws would be at odds with the priority scheme and claims resolution process established by the Bankruptcy Code. The court held that the debtors were not permitted

---

[7] Significantly, the district court found that the pending adversary proceeding did not render the IRS's claim "contingent." *Id.* at 918 n. 1.

to withhold payments in this way, and that each state was entitled to receive its rightful

distribution from the debtors' estates, irrespective of how such state intended to dispose of its

share of the estates' distribution.  *Id.*  In so holding, the court noted that "[u]nder § 1123(a)(4) [of

the Bankruptcy Code], the Debtors have an obligation only to treat the States the same as other

creditors in the same class.  Section 1123(a)(4) does not purport to place any limitations on

creditors as to how funds may be distributed after the creditors receive them."  *Id.* (emphasis

added).

25.    Section 8.15 is plainly designed to delay distributions to Non-Controlled

Affiliates which hold valid claims against the Debtors simply because they might use the

proceeds of those distributions to satisfy the lawful claims of others such as LBF before LBF

settles all of its outstanding disputes with the Debtors.  But, as *Federated Department Stores*

instructs, section 1123(a)(4) does not empower a debtor to withhold distributions simply because

the debtor does not approve of how that creditor will subsequently dispose of its distribution.

Moreover, unlike the circumstances in *Federated Department Stores*, where the debtors voiced a

reasonable concern about assuring ultimate parity and equitable treatment of similarly situated

creditors, here, Section 8.15 appears to be nothing more than an attempt by the Debtors to gain

added leverage in their negotiations with respect to disputed claims in foreign proceedings.[8]

The Court should not sanction this unlawful scheme.

---

[8]    The mere proposal of Section 8.15 has been a valuable bargaining chip for the Debtors, who
have to date released at least 28 foreign affiliates from Section 8.15's chains to induce those
foreign affiliates to enter into settlement agreements.

ii.    **Section 8.15 of the Plan Violates Principles of Comity**

26.    LBF is the subject of its own liquidation proceeding in Switzerland. That proceeding has been recognized by this Court as a "foreign main proceeding" within the meaning of 11 U.S.C. § 1517(b). Chapter 15 Order ¶ 2. Pursuant to the Chapter 15 Order, PwC was recognized as the "duly appointed foreign representative of LBF" and "entrusted with the administration, realization and distribution of all of LBF's assets located within the territorial jurisdiction of the United States, along with LBF's other worldwide assets, pursuant to section § 1521(a)(5) and 1521(b)." *Id.* at ¶¶ 3, 6. Moreover, the Chapter 15 Order provides that "[t]he provisions of section 11 U.S.C. § 1520 shall be effective, without interruption, immediately upon the entry of this Order…." *Id.* at ¶ 4. Other than the Chapter 15 Case, no case with respect to LBF is pending under the Bankruptcy Code.

27.    The Debtors cite no authority for the proposition that the Plan can undermine the Chapter 15 Order by giving the Plan Administrator the authority to delay distributions in the Swiss Bankruptcy by withholding distributions to LBF on account of actions taken (or not taken) in an unrelated foreign proceeding. Indeed, no such authority exists. After all, authorizing the Plan Administrator to withhold distributions to LBF in the manner contemplated by Section 8.15 of the Plan would violate firmly established principles of comity, undermine the purpose and intent of chapter 15, and frustrate future efforts to secure the cooperation in international insolvencies.

28.    "American courts have long recognized the particular need to extend comity to foreign bankruptcy proceedings." *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709,

12

713 (2d Cir. 1987) (citations omitted).[9]  "Consequently, American courts have consistently

recognized the interest of foreign courts in liquidating or winding up the affairs of their own

domestic business entities." *Cunard S.S. Co., Ltd. v. Salen Reefer Services AB*, 773 F.2d 452,

458 (2d Cir. 1985) (citing, among other authorities, *IIT v. Lam (In re Colorado Corp.)*, 531 F.2d

463, 468 (10th Cir. 1976); *Kenner Products Co. v. Societe Fonciere et Financiere Agache-*

*Willot*, 532 F. Supp. 478, 479 (S.D.N.Y. 1982); *Cornfeld v. Investors Overseas Servs., Ltd.*, 471

F. Supp. 1255, 1259-60 (S.D.N.Y.), *aff'd*, 614 F.2d 1286 (2d Cir. 1979)).  As noted by the

Second Circuit:

> Comity is especially important in the context of the Bankruptcy Code for two
> reasons.  First, deference to foreign insolvency proceedings will, in many cases,
> facilitate equitable, orderly, and systematic distribution of the debtor's assets.
> Second, Congress explicitly recognized the importance of the principles of
> international comity in transnational insolvency situations when it revised the
> bankruptcy laws.[10]

*Maxwell Commc'ns Corp. plc v. Societe Generale (In re Maxwell Commc'ns Corp. plc)*, 93 F.3d

1036, 1048 (2d Cir. 1996) (quotations and citations omitted).  This policy of cooperation and

deference was expressly adopted by Congress when it enacted chapter 15 of the Bankruptcy

---

[9]  Many of the cases cited herein were decided in the context of old section 304 of the
Bankruptcy Code.  Nonetheless, the legislative history of chapter 15 makes it clear that these
cases should still be consulted.  *See, e.g.*, H.R. Rep. No. 109-31, pt. 1, at 119 (2005),
reprinted in 2005 U.S.C.C.A.N. 88, 181 ("While section 304 [was] repealed and replaced by
chapter 15, access to the jurisprudence which developed under section 304 is preserved....").

[10]  The referenced revision is the addition of section 304 with the adoption of the Bankruptcy
Code in 1978.  Congress reiterated the importance of comity in transnational situations with
the adoption of new chapter 15 in 2005.  *See, e.g.*, H.R. Rep. No. 109-31, pt. 1, at 109 (2005),
reprinted in 2005 U.S.C.C.A.N. 88, 172 ("Although the case law construing section 304
makes it clear that comity is the central consideration, its physical placement as one of six
factors in subsection (c) of section 304 is misleading, since those factors are essentially
elements of the grounds for granting comity.  Therefore, in subsection (2) of [section 1507],
comity is raised to the introductory language to make it clear that it is the central concept to
be addressed.").

Code. *See, e.g.*, 11 U.S.C. § 1501 ("The purpose of [chapter 15] is to...provide effective

mechanisms for dealing with cases of cross-border insolvency with the objectives of—(1)

cooperation between—(A) courts of the United States...and (B) the courts and other competent

authorities of foreign countries involved in cross-border insolvency cases....").

29.     If approved, Section 8.15's discriminatory treatment of foreign debtors such as

LBF would cause lasting damage to America's long-standing efforts to facilitate cooperation

among authorities involved in cross-border insolvency cases.  The Second Circuit has

admonished courts to avoid inflicting such damage:

> It should be remembered that the interest of the system as a
> whole—that of promoting a friendly intercourse between the
> sovereignties,—also furthers American self-interest, especially
> where the workings of international trade and commerce are
> concerned.
>
> We recognize that forbearance and goodwill in the conduct of
> international bankruptcies is an ideal not easily achieved in the
> near-term. Many commentators advocate centralized
> administration of each insolvency under one country's laws, which
> could require a multi-lateral treaty or, even, a greater degree of
> harmonization of the commercial laws throughout the world. In the
> meanwhile, bankruptcy courts may best be able to effectuate the
> purposes of the bankruptcy law by cooperating with foreign courts
> on a case-by-case basis. Congress contemplated this approach
> when it provided for 'ancillary' proceedings under 11 U.S.C. §
> 304. Although comity analysis admittedly does not yield the
> commercial predictability that might eventually be achieved
> through uniform rules, it permits the courts to reach workable
> solutions and to overcome some of the problems of a disordered
> international system. ... [T]he interests of the affected forums and
> the mutual interest of all nations in smoothly functioning
> international law counsel against the application of United States
> law in the present case.

*Maxwell Commc'ns Corp. plc*, 93 F.3d at 1050.

30.     The Second Circuit's admonition rings especially true here, where the U.S. court

has already recognized the foreign proceeding as being the "foreign main proceeding" and has

already entrusted the foreign-court-appointed liquidator "with the administration, realization and

distribution of all of LBF's assets located within the territorial jurisdiction of the United States,

along with LBF's other worldwide assets, pursuant to section § 1521(a)(5) and 1521(b)."

Chapter 15 Order ¶¶ 2, 6.  If the Court were to now put its imprimatur on Section 8.15 of the

Plan and authorize the Plan Administrator to hold-up the distribution process of the Swiss

Bankruptcy on account of the posturing of various parties in yet another foreign proceeding, such

a ruling would unduly interfere with the rights and responsibilities entrusted by the Court to PwC

as liquidator and also be harmful to the interests of the United States in promoting international

cooperation in insolvency administration.[11]

**B.    The Court Should Confirm that the Plan Does Not Impinge LBF's Setoff Rights**

   31.   Section 8.10 of the Plan expressly preserves the Debtors' right to "setoff against

or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such

_____

[11] The breadth of Section 8.15 of the Plan also violates section 1129(a)(9) of the Bankruptcy
Code.  Section 1129(a)(9) mandates that a chapter 11 plan must provide for the payment in
full in cash of administrative priority claims on the effective date of the Plan.  To the extent
that Section 8.15 of the Plan permits the Plan Administrator to hold back a "Distribution" to
a Non-Controlled Affiliate on account of its administrative expense claim to set off a claim
the Debtors have against a separate Non-Controlled Affiliate, the Plan is not confirmable
because it does not provide for the payment in full in cash of all administrative expense
claims.

Moreover, it appears that Section 8.15 of the Plan violates section 553 of the Bankruptcy
Code by allowing the Plan Administrator to effectuate an illegal triangular setoff.  *See, e.g.,*
*In re United Scis. of Am., Inc.*, 893 F.2d 720, 723 (5th Cir. 1990) ("[T]he mutuality
requirement [of section 553] is designed to protect against 'triangular' set-off; for example,
where the creditor attempts to set off its debt to the debtor with the latter's debt to a third
party.") (citations omitted).  Here, Section 8.15 of the Plan seems to give the Plan
Administrator, at its sole discretion, the ability to setoff debts owed by the Debtors to one
Non-Controlled Affiliate against the claims the Debtors have against a different Non-
Controlled Affiliate.  This is precisely the kind of triangular setoff that the mutuality
requirement of section 553(a) of the Bankruptcy Code is designed to protect against.

Claim any Claims of any nature whatsoever that the Debtor may have against the claimant...."

The Disclosure Statement indicates that the setoff rights of Affiliates are also preserved by

stating that "Affiliates, including Debtors and Debtor-Controlled Entities, are permitted to setoff

their Guarantee Claims, to the extent Allowed, against any claims LBHI has against such

Affiliate, in accordance with applicable law." Disclosure Statement at 70. Section 13.5 of the

Plan, however, appears to extinguish these very same setoff rights. Section 13.5 states as

follows:

> Except as expressly provided in the Plan, the Confirmation Order,
> or a separate order of the Bankruptcy Court, all entities who have
> held, hold or may hold Claims against or Equity Interests in any or
> all of the Debtors and other parties in interest (whether proof of
> such Claims or Equity Interests has been filed or not)...are
> permanently enjoined, on and after the Effective Date, solely with
> respect to any Claims and Causes of Action which are extinguished
> or released pursuant to the Plan from ... (iv) asserting any right of
> setoff, directly or indirectly, against any obligation due the
> Released Parties or the property of any of the Released Parties,
> except as contemplated or allowed by the Plan....

The "Released Parties" include the Debtors. *See* Section 1.136 of the Plan.

32.     LBF raised this issue in its objection to the Disclosure Statement. *See* Docket No.

19172. To resolve LBF's objection, the Debtors added the following language to the Disclosure

Statement: "LBF believes that the foregoing representation notwithstanding, section 13.5 of the

Plan impinges upon the setoff rights of non-Debtor Affiliates. The Debtors disagree with LBF's

position." Disclosure Statement at 70. Despite those assurances, the Debtors did not amend the

Plan to clarify that LBF's setoff rights are preserved.

33.     If the Debtors were allowed to disavow their prior assurances and claim that the

Plan does extinguish LBF's setoff rights, the Plan cannot be confirmed. Section 553 of the

Bankruptcy Code expressly provides that, with listed exceptions not relevant here, "this title does

not affect the right of any creditor to offset a mutual debt...." Since the Plan must "compl[y]
with the applicable provisions of" the Bankruptcy Code, the Plan cannot be confirmed if it
purports to extinguish LBF's setoff rights. 11 U.S.C. § 1129(a)(1). Moreover, setoff claims are
classified as Secured Claims under the Plan and therefore they must be treated equally with other
Secured Claims which are not extinguished in order for the Plan to be confirmed. *See* 11 U.S.C.
§ 1123(a)(4). Similarly, with respect to holders of setoff claims such as LBF who have not voted
to accept the Plan, the Plan cannot be confirmed if those setoff rights are extinguished because
such setoff rights would be preserved in a chapter 7 liquidation and therefore the Plan does not
satisfy the best interests of the creditors test. *See* 11 U.S.C. § 1129(a)(7).

34. This Court should expressly hold the Debtors to their word by including a proviso
in any confirmation order which clarifies that LBF's setoff rights are not extinguished by Section
13.5. Alternatively (or in addition), the Court should rule that the Debtors are estopped ever
arguing that LBF's setoff rights are extinguished by the Plan under principles of judicial
estoppel. *See, e.g., New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("'Where a party
assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he
may not thereafter, simply because his interests have changed, assume a contrary position,
especially if it be to the prejudice of the party who has acquiesced in the position formerly taken
by him.'") (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)).

## IV.    CONCLUSION

35. Section 8.15 of the Plan violates section 1123(a)(4) of the Bankruptcy Code and
principles of comity by discriminating against similarly situated creditors and by interfering in
the conduct of foreign bankruptcy proceedings. Unless and until Section 8.15 is deleted or
suitably amended to end its discriminatory and unlawful impact, the Plan is not confirmable.

17

WHEREFORE, LBF respectfully requests that the Court (i) refuse to approve the

Plan, unless Section 8.15 is deleted in its entirety, (ii) confirm that the Plan does not impinge

LBF's setoff rights, and (iii) grant such other and further relief as the Court may deem proper.

Dated:    New York, New York
          November 4, 2011

**GIBSON, DUNN & CRUTCHER LLP**

By:  /s/ Michael A. Rosenthal
Michael A. Rosenthal (MR-7006)
Matthew K. Kelsey (MK-3137)
200 Park Avenue
New York, New York 10166
Telephone:  (212) 351-4000
Facsimile:  (212) 715-8000

Robert B. Krakow (admitted *pro hac vice*)
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75209
Telephone:  (214) 698-3100
Facsimile:  (214) 571-2934

*Attorneys for PricewaterhouseCoopers AG, Zurich, as*
*Bankruptcy Liquidator of Lehman Brothers Finance*
*AG, in Liquidation, a/k/a Lehman Brothers Finance SA,*
*in Liquidation*