Hearing Date and Time: December 6, 2011 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date and Time: November 4, 2011 at 4:00 p.m. (Prevailing Eastern Time)

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Counsel for the Liquidators of Lehman Brothers Australia Limited

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | ) |
| | ) Case No. 08-13555 (JMP) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## LIMITED OBJECTION OF LIQUIDATORS OF LEHMAN BROTHERS AUSTRALIA LIMITED TO THIRD AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS

The Liquidators of Lehman Brothers Australia Limited (in liquidation) ("**LBA**"),[1] a non-debtor affiliate of Lehman Brothers Holdings Inc. ("**LBHI**") and Lehman Brothers Special Financing Inc. ("**LBSF**") and their affiliated debtors and debtors in possession (collectively, the "**Debtors**"), hereby submit this limited objection to the *Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* [Docket No. 19627], which incorporates the *Plan Supplement* dated October 25, 2011 [Docket No. 21254] (the "**Plan Supplement**") (as supplemented, the "**Plan**"), and specifically to the assumption or assumption and assignment of purported executory contracts between LBSF and (i) Saphir Finance Public Limited Co. ("**Saphir**"), (ii) Beryl Finance Limited ("**Beryl**"), and (iii) Zircon Finance Limited

---

[1] LBHI is the ultimate parent company of LBA. LBHI's bankruptcy case triggered numerous foreign insolvency proceedings and in particular led to the October 2, 2009 commencement of the liquidation of LBA under the supervision of the Federal Court of Australia (the "**Australian Proceedings**"). The Australian Proceedings are currently being carried out pursuant to Chapter 5, Part 5.4B, Division 2 of the Corporations Act 2001.

("**Zircon**") (each an "**Issuer**" and together the "**Issuers**") (this "**Limited Objection**").   In support thereof, LBA respectfully states as follows:

<u>**PRELIMINARY STATEMENT**</u>

LBA files this Limited Objection to the Plan to the extent that LBSF seeks to assume certain Swap Agreements (defined below) issued in connection with the Dante Notes Program (defined below).[2]

*First*, LBSF cannot assume the Swap Agreements (defined below) because those Agreements have been validly terminated under English law, as held by the English High Court.

*Second*, it is unclear whether LBSF seeks to assume the entire set of integrated agreements governing the Dante Notes Program or just the Swap Agreements in isolation.  To the extent LBSF seeks to assume only the Swap Agreements and not the full set of integrated agreements, such an attempt violates the Bankruptcy Code.

*Third*, even if just the Swap Agreements could be assumed, the Plan is silent about how LBSF, which has the burden of proof on this issue, will cure all relevant defaults and provide adequate assurances of future performance.

*Fourth*, in seeking to assume the Swap Agreements, LBSF is looking to circumvent the Court's Stay (defined below) of the US Adversary Proceedings (defined below) that LBSF requested in the first place while the Debtors engaged in various ADR negotiations.  The assumption of the Swap Agreements seeks to substantively alter the rights of the parties in the US Adversary Proceedings and the UK Proceedings (defined below) without any actual adjudication of the relevant issues.

---

[2] *See* Plan Supplement at Ex. 2, Pt. A, pp. 21, 115, and 140.

## BACKGROUND

The Court is familiar with the factual background of the October 2002 launch by Lehman Brothers International (Europe) of a multi-issuer secured obligation product called the "Dante Programme" (the "**Dante Notes Program**"), which was used by LBSF and other Lehman affiliates to issue various series of synthetic collateralized debt obligations (the "**Notes**") and related credit default swaps.  Under the Dante Notes Program, the Issuers sold the Notes to investors (the "**Noteholders**"), including LBA, and the proceeds of the sale were used to purchase collateral (the "**Collateral**") that secured the Issuers' obligations on the Notes.  As part of the same transaction, pursuant to certain Deeds of Accession, the Issuers entered into certain credit default swap agreements with LBSF, in the form of an ISDA Master Agreement, dated October 10, 2002 (and as Amended and Restated on July 20, 2007) between LBSF and Dante Finance Public Limited Company (the "**ISDA Master**") and certain Swap Confirmations (the "**Swap Confirmations**" and together with the ISDA Master, the "**Total Swap Agreements**"). The ISDA Master provides that the Total Swap Agreements are governed by, and are to be construed in accordance with, English law.[3]  Pursuant to the Total Swap Agreements, LBSF agreed to pay the principal and interest due under the Notes in exchange for receiving any yield generated by the Collateral.[4]  BNY Corporate Trustee Services Limited (**BNY**) is the Trustee of the Collateral provided by the Issuers to secure its obligations to LBSF and to the Noteholders.

The integrated series of documents recording the rights and obligations of the parties with respect to the Notes relevant to the Issuers are defined in this Limited Objection as the

---

[3] ISDA Master at Section 13(a) and Schedule Part 4(i).

[4]  As part of the transaction, LBHI agreed to guarantee LBSF's obligations to pay interest and principal under the relevant Total Swap Agreement.

"**Transaction Documents**," which are substantially the same throughout the Dante Notes Program.[5]

LBA is a Noteholder and currently holds the following Notes:

(i)     AUD 1,000,000 in "Endeavour" notes, issued by Saphir, series 2004-4;

(ii)    AUD 1,250,000 in "Coolangatta BBB" notes, issued by Zircon, series 2007-1;

(iii)   AUD 2,850,000 in "Coolangatta AA" notes, issued by Zircon, series 2007-1;

(iv)    AUD 972,000 in "Miami" notes, issued by Zircon, series 2007-3;

(v)     AUD 2,800,000 in "Global Bank Note" notes issued by Beryl series 2007-7; and

(vi)    AUD 8,950,000 in "Global Bank Note II" notes issued by Beryl, series 2007-10.

(together, the "**LBA Notes**").

On September 15, 2008, LBHI filed a Chapter 11 petition.  LBSF subsequently filed its own Chapter 11 petition on October 3, 2008. Following the Chapter 11 filings of LBHI and LBSF, the Issuers provided notices of termination to LBSF of the Swap Agreements relating to the LBA Notes (except for the Global Bank Note II) (**"Swap Agreements"**), setting Early Termination Dates (as defined in the ISDA Master) between March 24, 2009, and April 17, 2009.

On May 13, 2009, Perpetual Trustee Company Limited ("**Perpetual**"), which held Notes issued under a series of the Dante Notes Program (collectively referred to as the "**Mahogany Notes**") commenced proceedings in the English High Court of Justice, Chancery Division (the **"English High Court"**).  Belmont Park Investments Pty Limited and twenty-eight other

---

[5] An exemplary set of Transaction Documents pertaining to the Global Bank Note issued by Beryl series 2007-7 is attached to the Declaration of David R. Seligman in Support of Limited Objection of Liquidators of Lehman Brothers Australia Limited to Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "**Seligman Decl.**"), and includes The ISDA Master and Schedule (Seligman Decl., Ex. A); the Swap Confirmation (Seligman Decl., Ex. B); the Notes prospectus (Seligman Decl., Ex. C); the Principal Trust Deed (defined below) (Seligman Decl., Ex. D); and the Supplemental Trust Deed (defined below) (Seligman Decl., Ex. E).

4

Noteholders ("**Belmont Park**") commenced separate proceedings in the same court with respect to ten series of Notes from the Dante Note Program (the"**Belmont Park Notes**") and those proceedings were heard together with the proceedings commenced by Perpetual (collectively, the **"UK Proceedings"**).  All of the LBA Notes (except Global Bank Note II) which is not in issue here were held by the Belmont Park Noteholders.  Therefore, all of orders and declarations made by the English High Court of Justice with respect to notes held by Belmont Park, apply equally to the LBA Notes.  In the UK Proceedings, Perpetual and Belmont Park sought priority payment of the Collateral with respect to their Notes, arguing that the bankruptcy filings by LBHI and LBSF were events of default under the relevant Transaction Documents and that LBSF's contractual rights to the Collateral were subordinated to the contractual right of the Noteholders to the Collateral (the "**Flip Clause**").  LBSF intervened in the UK Proceedings and argued that it was unlawful to reverse the priorities of LBSF and Noteholders with respect to the Collateral.

The Belmont Park Notes at issue in the UK Proceedings are held in the same note series as five of the six series of Notes comprising the LBA Notes (i.e., the "Endeavour," "Coolangatta BBB," "Coolangatta AA," "Miami," and "Global Bank Note" notes), and contain virtually identical language with the sixth series of LBA Notes (i.e., the "Global Bank Note II" notes). Thus, all of the orders and declarations issued in the UK Proceedings with respect to the Belmont Park Notes apply to five of the six series of LBA Notes, and such orders and declarations interpret transactional documents that are virtually identical to the LBA Notes.

On May 20, 2009, LBSF filed an adversary proceeding [Adv. Case No. 09-1242, Docket No. 1] in the Bankruptcy Court seeking a declaratory judgment that the Flip Clauses for the Mahogany Notes of the Dante Program were unenforceable under the Bankruptcy Code as *ipso facto* clauses.  On July 28, 2009, before the Bankruptcy Court addressed the issue, the English

High Court in the UK Proceedings ruled that the chapter 11 bankruptcy filings by LBHI and LBSF both constituted an event of default under the Transaction Documents, thereby triggering the Flip Clause and giving Perpetual and Belmont Park (as Noteholders) priority claims on the Collateral.  In fact, the English High Court in the UK held that the Issuers had validly terminated to Swap Agreements, stating that "[t]he Issuer has validly and effectively terminated the Swap Agreement pursuant to section 6(a) of the ISDA Master".[6]  Although the UK Proceedings continued all the way up to an affirming decision by the Supreme Court of the United Kingdom on July 27 2011, LBSF never appealed the portion of the English High Court's order concerning the valid termination of the Swap Agreements (among others).  *See generally*, *Belmont Park Invs. PTY Ltd. v. BNY Corporate Tr. Servs. Ltd. and Lehman Bros. Special Fin. Inc* [2011] UKSC 38; *Perpetual Tr. Co. Ltd v. BNY Corporate Trustee Servs. Ltd.* [2009] EWCA Civ 1160. In the course of the UK Proceedings, counsel for LBSF admitted that the relevant swap agreements had been terminated (see *infra* pp. 8-9).

On January 25, 2010, in the midst of the appellate proceedings in the UK courts, this Court held that the Flip Clauses concerning the Mahogany Notes were unenforceable "ipso facto" clauses (the "**US Perpetual Decision**").  On September 21, 2010, the District Court for the Southern District of New York granted BNY's motion for leave to appeal the US Perpetual Decision, but prior to the hearing of that appeal a settlement was reached between LBSF and BNY.

On September 14, 2010, LBSF commenced an adversary proceeding [Case No. 10-03545, Docket No. 1] in the Bankruptcy Court against BNY (the "**US Adversary Proceedings**") seeking, among other things, declaratory relief based on the US Perpetual Decision with respect

---

[6] *Perpetual Trustee Co. Ltd. v. BNY Corporate Trustee Services Ltd.*, [2009] EWHC 1912 (Ch) (Seligman Decl., Ex. G)

to the rights of LBSF in relation to the Collateral held as security for many other series of notes, including the LBA Notes, the Belmont Park Notes, and other Notes, which had not been included in the previously-settled US Perpetual Notes Proceedings.  On October 20, 2010, the US Adversary Proceedings were stayed for 9 months (the "**Stay**").  On June 16, 2011, the Stay was extended to January 20, 2012.

On September 1, 2011, the Debtors filed the Plan which provides that any executory contracts that are not either the subject of a motion to assume or included on the Plan Supplement will be deemed rejected.  Plan at Art. XI, cl. 11.1.  The Plan further provides that the Debtors will cure any defaults for any contracts that they assume.  *Id.* at cl. 11.3.  On October 25, 2011, the Debtors filed the Plan Supplement containing a schedule of derivative contracts that the Debtors intend to assume.  *See* Plan Supplement at Ex. 2, Pt. A.  The schedule specifically lists each of the Issuers involved in the LBA Notes and Swap Agreements and asserts that the Debtors "intend to assume all derivative contracts" with these parties.  *Id.*

## LIMITED OBJECTION

### I.    The Swap Agreements Cannot Be Assumed Because They Have Been Terminated.

Simply put, the Swap Agreements have been validly terminated by the relevant Issuers of the LBA Notes pursuant to English law.   Because the Swap Agreements have been validly terminated, the legal effect is that there is no contract left to assume.  *See Robinson v. Chicago Hous. Auth.*, 54 F.3d 316, 324 (7th Cir. 1995) (holding that lease which terminated under nonbankruptcy law is not assumable under section 365); *Erickson v. Polk*, 921 F.2d 200 (8th Cir. 1990) (finding that bankruptcy estate does not include lease which terminated post-petition).

Here, the Issuers delivered notices to LBSF pursuant to the Section 6(a) ISDA Master terminating the Swap Agreements and setting Early Termination Dates (as defined in the ISDA

Master) between March 24, 2009, and April 17, 2009.   Copies of the termination notices in respect of the LBA Notes are attached to the Seligman Decl. as Exhibit F.

Clause 5(a)(vii) of the ISDA Master provides that an event of default (as defined in the ISDA Master, an "**Event of Default**") will occur if at any time a party: becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts; institutes a proceeding of insolvency or bankruptcy; or becomes subject to the appointment of a trustee for all or substantially all its assets.  Seligman Decl., Ex. A at 6-7.  Clause 6(a) of the ISDA Master provides that upon the occurrence of an Event of Default, the non-defaulting party may send notice designating a day as an "Early Termination Date" (as defined in the ISDA Master) with respect to all outstanding transactions under the Swap Agreements.  Seligman Decl., Ex. A at 9.  If such an Early Termination Date is designated, clause 6(e) and (d) of the ISDA Master then requires that a final payment be made according to the applicable calculation method. Seligman Decl., Ex. A at 10.

The Chapter 11 filings of LBHI and LBSF gave rise to Events of Default under clause 5(a)(vii) of the ISDA Master.  Indeed, the English High Court of Justice specifically held that "[T]he Issuer has validly and effectively terminated the Swap Agreement pursuant to section 6(a) of the ISDA Master."  Seligman Decl., Ex. G at 2.  The English High Court held that "[t]wo Events of Default, as defined in section 5(a)(vii)(4) of the ISDA Master . . ., have occurred namely:

(i)     "On 15th September 2008, the commencement of a case under Chapter 11 of the US Bankruptcy Code by Lehman Brothers Holding Inc; and

(ii)    On 3rd October 2008, the commencement of a case under Chapter 11 of the US Bankruptcy Code by the Second Defendant [LBSF]."

Seligman Decl., Ex G at 2.  Because of the substantial similarity between the parties and claims in the UK Proceedings, and because LBSF had a complete opportunity to litigate their interests

8

in the English courts, LBSF is collaterally stopped from now asserting that the Swap Agreements are not terminated as a matter of English law. *See Scheiner v. Wallace*, 832 F. Supp. 687, 695 (S.D.N.Y. 1993) (holding that collateral estoppel of English decision had preclusive effect when "the pleadings, parties and claims reveal[ed] significant similarities" and "Plaintiffs had a full and fair opportunity in the English Action to litigate" the claim); *Fairchild, Arabatzis & Smith, Inc. v. Prometco (Produce & Metals) Co., Ltd.*, 470 F. Supp. 610, 616 (S.D.N.Y. 1979) (plaintiff was barred from raising claim where plaintiff had litigated and lost such claim in prior British action). What is more, these holdings by the English High Court are *res judicata* on the matter of termination of the Swap Agreements under English law. *See Scheiner*, 832 F. Supp. at 695 (judgment of English court may be pled as *res judicata* in domestic court).

Even the Debtors have admitted in open court on a number of occasions including in the United States (in the course of the proceedings giving rise to the US Perpetual Decision) and in the United Kingdom that the Notes within the Dante Series, which are identical for all intents and purposes, have been validly terminated:

- On June 3, 2009, counsel for the Debtors said, regarding of the Mahogany Notes in the Dante Notes Program:

  > We do not, in this particular proceeding, question the termination itself, nor do we question the issue of whether English law would authorize the enforcement of these documents, which are quite different structurally from typical U.S. documents in other ways, reflecting the difference in law.

  Transcript of Hearing at p. 103, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. June 3, 2009) (statement of Mr. Ralph Miller).

- "It is a letter, form of early termination notice served on 1st December 2008 and you will see that it constitutes formal written notice of the existence of an event of default

9

under the ISDA master."    Transcript of Hearing at p. 4, *Perpetual Trustee Co. Ltd. v.
BNY Corporate Trustee Services Ltd.*, Case No. HC09C01913 (EWHC July 8, 2009)
(statement of Mr. Snowden QC, U.K. counsel for LBSF).

- "[Y]ou cannot enforce over the collateral until you have terminated the swap. […]  But
  the critical thing that has happened in this case is that the swap was terminated as a
  result of the bankruptcy of LBSF."    Transcript of Hearing at pp. 155-56, *Perpetual
  Trustee Co. Ltd. v. BNY Corporate Trustee Services Ltd.*, Case No. HC09C01913
  (EWHC July 9, 2009) (statement of Mr. Snowden QC, U.K. counsel for LBSF).

Seligman Decl., Ex. H.  Because the UK Proceedings have settled this issue, the Debtors cannot
now say otherwise in this jurisdiction.[7]

Not only have the Swap Agreements been validly terminated under English law, but the
termination of the Swap Agreements was entirely consistent with the exception to the automatic
stay contained in section 560 of the Bankruptcy Code.  11 U.S.C. § 560 (excepting termination
of swap agreements from the automatic stay).  As the District Court recently held in affirming
this Court's ruling in *Swedbank AB (PUBL) v. Lehman Bros. Holdings Inc.*, Case No. 10-4532
(NRB) (S.D.N.Y. Jan. 27, 2011):

---

[7] The raising of the issue of the termination of the Swap Agreements in this Limited Objection does not constitute
consent to re-open this issue.  The issue, as far as LBA is concerned, is subject to the doctrine of *res judicata* and/or
collateral estoppel, and LBA reserves its rights to seek relief in the UK Courts if assertions are made to the contrary
concerning the termination of the Swap Agreements and in relation to questions of English law generally.  Although
this Court declined to give preclusive effect to the English High Court's decision as to the enforceability of the Flip
Clause with respect to the Notes at issue in the *Perpetual* case, that was due to this Court's concern that the English
High Court did not consider the implications of the Bankruptcy Code (US Perpetual Decision, 407 B.R at pp. 417-
18).  However, here the issue of termination of the Swap Agreements under English law has been definitively
determined by the English High Court and does not implicate any provision of the Bankruptcy Code.  Bankruptcy
courts generally defer to non-bankruptcy law with respect to issues of contract interpretation.  *See, e.g., In re Schott,*
282 B.R. 1, 7 (B.A.P. 10th Cir. 2002) (stating that in construing and interpreting contracts, the court must look to
nonbankruptcy law) (citing *Butner v. United States,* 440 U.S. 48, 55 (1979) (same)).  In fact, this Court also stated
that the Swap Agreement with respect to the Perpetual Notes had been terminated (US Perpetual Decision, 407 B.R.
at p. 414 (". . . such termination obligated [the issuer] to redeem the Notes")).

> [Bankruptcy Code Section 560] makes clear that a swap participant may exercise any contractual rights to terminate and net out a swap agreement in the event the other party files a bankruptcy petition, notwithstanding the automatic stay and trustee avoidance provisions of the Bankruptcy Code . . . .  The intent of this provision is to permit either the non-debtor swap participant or the trustee to terminate a swap agreement, so that a swap agreement may continue after the bankruptcy petition is filed only by mutual consent of both the non-debtor swap participant and the trustee.
>
> In other words, Congress intended that section 560 would enable parties to swap agreements to terminate those transactions.

*Id.* (citing House Report No. 101–484, 1990 U.S.C.C.A.N. 223); *see generally* 5–560 COLLIER ON BANKRUPTCY ¶ 560.LH (2010); see also Tucker, S. *Interest Rate Swaps and the 1990 Amendments to the United States Bankruptcy Code: A Measure of Certainty Within Swap Market Contracts*, 1991 UTAH L. REV. 581 at 614 (1991) ("Perhaps the most important language within section 560 is that which provides that the termination of a swap shall not otherwise be limited by the Code.  This language…effectively eliminates a trustee's ability to assume or reject swap contracts under section 365(a)."").  In light of the above, it is clear that the Swap Agreements have been terminated, and thus cannot be assumed.

The Court may only confirm the Plan if it complies with all of the applicable provisions of chapter 11.  11 U.S.C. § 1129(a).  Additionally, the Debtors' ability to assume any executory contract is explicitly "subject to the court's approval."  11 U.S.C. § 365(a).  The Court has a duty to, *sua sponte*, deny the confirmation of the Debtors' Plan or (likely more appropriate) strike the attempted assumption of the Swap Agreements if these requirements are not met.  *See, e.g., In re Duval Manor Assocs.*, 203 B.R. 42, 45 (E.D. Pa. 1996) ("Objections need not have been raised where, as here, the judge had an independent duty to determine that these statutory [confirmation] requirements had been met."); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 423 (Bankr. S.D. Tex. 2009) (finding that bankruptcy court has discretion to strike, *sua sponte*,

plan provisions that do not comply with applicable law); *In re Caldwell*, 76 B.R. 643, 643 (Bankr. E.D. Tenn. 1987) (confirmation denied by bankruptcy court *sua sponte*).

LBA is aware that in the US Perpetual Decision this Court held that the relevant transactional documents with respect to the Perpetual Notes constituted executory contracts under the Second Circuit's functional test (thereby finding that the provisions of Section 365 were applicable) (US Perpetual Decision, 407 B.R. at pp. 415-16). Even if this Court were to hold similarly here, i.e., that the Swap Agreements (and the entirety of the Transactional Documents) are executory contracts, and even if this Court were to further hold that the Swap Agreements were capable of being assumed, such an assumption still does not - and cannot - invalidate or alter in any way the termination of those Swap Agreements pursuant to their terms and in accordance with English law, which has been determined definitively by the English High Court and which is not subject to any limitation under the Bankruptcy Code, given the safe-harbor provisions of section 560 of the Bankruptcy Code.

## II.    The Swap Agreements Cannot be Assumed Without the Other Transactional Documents Being Assumed.

The Plan and the Plan Supplement are unclear whether LBSF intends to assume just the relevant Swap Agreements or all of the related and integrated Transactional Documents. The Plan Supplement provides in relevant part that "The Debtors intend to assume all derivatives contracts with each counterparty set forth on Exhibit 2, Part A." Plan Supplement at Ex. 2, Pt. A. In the Plan Supplement the Debtors assert their intent to assume all derivative contracts[8] with the following counterparties:

(i)    Beryl Finance Limited Series 2007-7

---

[8] "Unless a specific derivatives contract is noted for a specific counterparty, the Debtors intend to assume all derivatives contracts with each counterparty." Plan Supplement at Ex. 2, Pt. A. No specific derivatives contract is noted for any of the counterparties listed in this Limited Objection. *See generally*, *id.*

      (ii)     Beryl Finance Limited Series 2007-10;

      (iii)    Saphire Finance PLC 2004-4;

      (iv)    Zircon Finance Ltd Series 2007-1; and

      (v)     Zircon Finance Limited Series 2007-3.

*Id.* The Plan Supplement further provides that:

> For purposes of this Exhibit 2, Part A, derivatives contracts are contracts in which the contractual obligations and values are keyed to one or more underlying assets or indices of asset values. In most cases, the derivatives contracts are "securities contracts," "repurchase agreements," or ***"swap agreements" as defined in the Bankruptcy Code*** and, in some cases, were governed by a "master netting agreement" as defined in the Bankruptcy Code.

*Id.* (emphasis added).

It would appear that the Debtors recognize that any "swap agreements" that are listed as assumed contracts include all related documents, which in the case of the Swap Agreements would include all of the relevant Transactional Documents. This is because the Bankruptcy Code defines "swap agreement" as "any agreement, ***including the terms and conditions incorporated by reference in such agreement*** which is . . . [among other things] a total return, credit spread or credit swap." 11 U.S.C. § 101(53B)(i)(VI) (emphasis added). Further, "swap agreement" also includes "a master agreement . . . ***together with all supplements to any such master agreement***." §101(53B)(v) (emphasis added). Here, the Transactional Documents include the ISDA Master, Deeds of Accession and Swap Confirmations, which are included within the Bankruptcy Code's definition of a "swap agreement." Moreover, as discussed below the Transaction Documents include the Principal Trust Deed, Supplemental Trust Deeds, the Terms and Conditions for the Notes, the ISDA Master, and the Swap Confirmations, and thus are also included within the Bankruptcy Code's definition of "swap agreement." See 11 U.S.C. § 101(53B). The Principal Trust Deed is incorporated by reference into the Swap Agreements

(Seligman Decl., Ex. A at 27) and the Supplemental Trust Deeds are incorporated by reference into the Principal Trust Deed (Seligman Decl., Ex. D at 9 *et seq*).

To the extent, however, that the Debtors purport to assume the Swap Agreements only, without assuming the related Transactional Documents, then the Plan's assumption of just the Swap Agreement violates section 365 of the Bankruptcy Code. It is well-settled that the Debtors must either assume the entire contract "*cum onere*" or reject the entire contract, shedding obligations as well as benefits. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984); *see also* COLLIER ¶ 365.03. The assumption of an executory contract involves an assumption of all the burdens and benefits of the agreement. The Debtors do not have the discretion or privilege of assuming the features of the contract that benefit the estate and rejecting elements that provide no benefit. *See e.g., Matter of Wabash Valley Power Ass'n Inc.*, 72 F.3d 1305, 1310 (7th Cir. 1996) ("Under 11 U.S.C. § 365, an entire contract must be assumed including any burdensome provisions that it may have").

"Where an executory contract contains several agreements, the debtor may not choose to reject some agreements within the contract and not others." *Stewart Title Guaranty Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) (citing *In re Cutters, Inc.,* 104 B.R. 886, 888 (Bankr. M.D. Tenn. 1989); *see also In re Abitibibowater Inc.*, 418 B.R. 815, 823 (Bankr. D. Del. 2009) ("all of the contracts that comprise an integrated agreement must either be assumed or rejected, since they all make up one contract"); *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1226 (6th Cir. 1995) ("must assume both the benefits and the burdens of the contract"); *In re Nitec Paper Corp.*, 43 B.R. 492, 498 (S.D.N.Y. 1984) ("A contract assumed in bankruptcy is accompanied by all its provisions, and conditions. It may not be assumed in part and rejected in part.").

Here, the Swap Agreements are not "stand alone" contracts capable of fully determining the rights of the parties, but rather they are part of a larger transaction that constitutes the "contract" for the purposes of sections 365(a) and 1123(b). The use of multiple documents is common in derivatives transactions and the result, as here, is that the documents are not free-standing, but rather form one single agreement. In this case, the Transaction Documents include multiple cross-references and interconnections, such as the following:

- The ISDA Master states that "In relation to each Transaction, each party confirms that it is bound by the terms of the Trust Deed and that the terms of such Trust Deed prevail to the extent they conflict with terms relating to such Transaction" (Seligman Decl., Ex. A at 27);

- The ISDA Master defines "Trust Deed" as "the principal trust deed dated 10 October 2002 as amended and restated on 18 July 2008 and as further amended and updated from time to time" (the "**Principal Trust Deed**") (Seligman Decl., Ex. A at 27);

- The Principal Trust Deed expressly incorporate any supplement (the "**Supplemental Trust Deeds**") (Seligman Decl., Ex. D at 9 *et seq*);

- LBSF is a party to the Supplemental Trust Deeds, which provide that "the terms of the Principal Trust Deed shall apply to this [Supplemental Trust] Deed as if they were set out herein and the ***Principal Trust Deed shall be read and construed, in relation to the Notes, as one document with this [Supplemental Trust] Deed.***" (emphasis added) (Seligman Decl., Ex. E at 4);

- The Notes include a form of Swap Confirmation, identifying LBSF and the Issuer as parties, and include a description of LBSF as swap counterpary and LBHI as guarantor (Seligman Decl., Ex. C at 21 and 59);

- The Swap Confirmation provides for an "Additional Termination Event" under the Swap Agreements if the Notes are declared due and payable following an Event of Default under the Notes or if the Notes are redeemed for tax reasons (Seligman Decl., Ex. B at 8);

- The Notes determine "Early Redemption Amounts" with specific reference to Events of Default under the ISDA Master (Seligman Decl., Ex. C at 15-17); and

- The first component of "Buyer Payment 1" under the Swap Confirmation is such that LBSF has to pay an amount to the Issuer under the Swap Agreement that equals the amount of interest the Issuer is required to pay on the Notes as specified in the Series Prospectus/Offering Circular Supplement (Seligman Decl., Ex. B at 4-5; Ex. C at 5-6).

Thus, each "set" of Transaction Documents records a single integrated commercial transaction: the issuing of a secured obligation note program in which investors subscribed for Notes issued by an Issuer and a corresponding Swap Agreement. The Swap Agreements only came into existence because of the subscription by the Noteholders for the Notes and are an integral part of the transaction. Without this subscription, there would be no need for the Swap Agreements and that is the very reason the Swap Agreements refer to and incorporate the Supplemental Trust Deeds. Simply put, without consideration of the terms of all of the Transaction Documents taken as a whole, it is impossible to discern the full spectrum of each party's rights under the Swap Agreements. As noted above, the Transaction Documents are governed by and are to be construed as a matter of English law, which provides that:

> where several deeds form part of one transaction and are contemporaneously executed they have the same effect for all purposes such that are relevant to this case as if they were one deed...It is not open to third parties to treat each one of them as a deed representing a separate and independent transaction for the purpose of claiming rights which would only accrue to them if the transaction represented by the selected deed was operative separately. In other words, the principles of equity deal with the substance of things, which in such a case is the whole transaction . . . .[9]

Thus, to the extent that the Debtors do not assume the entirety of the Transaction Documents to which the Debtors are a party, including the Supplemental Trust Deeds, but rather only the Swap Agreements themselves, the Debtors are seeking to assume only part of the entire contract. By not assuming the Supplemental Trust Deeds, the Debtors will have failed to assume the entire contract and, therefore, the Supplemental Trust Deeds are deemed to be rejected by the

---

[9]*Manks v Whiteley* [1912] 1 Ch. 735 at 754; see also *Smith v. Chadwick* (1882) 20 Ch.D. 27 at 62-63 ("documents that are executed contemporaneously with, or shortly after, the primary document to be construed may be relied upon as an aid to construction . . . . Where the transaction is in truth one transaction, all the contracts may be read together for the purpose of determining their legal effect. In such cases, it may be a mere question of semantics whether there is one agreement or two or more interlinked agreements . . . .") (Seligman Decl., Ex. J).

16

operation of Article 11.1 of the Plan, which can only constitute a deemed rejection of the entire contract.

### III.    LBA Reserves its Rights with respect to Cure and Adequate Assurance as to the Debtors' Future Performance.

Even if the Swap Agreements could be assumed (which they cannot), the Debtors may not assume an executory contract on which there has been a default unless the Debtors comply with these well-settled requirements:

> (i)    cure the default or provide adequate assurance that the default will be promptly cured;
>
> (ii)    compensate or provide adequate assurance that it will promptly compensate the other party for any pecuniary loss to the party resulting from the default; and
>
> (iii)    provide adequate assurance of future performance under the contract.

11 U.S.C. § 365(b); *see also Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309-10 (5th Cir. 1985) (noting requirement of providing adequate assurance of future performance); *Pieco, Inc. v. Atlantic Computer Sys., Inc. (In re Atlantic Computer Sys., Inc.)*, 173 B.R. 844, 857 (S.D.N.Y. 1994) ("Section 365(b)(1) requires that any default must be cured, or adequate assurance of such cure provided, before an executory contract or unexpired lease may be assumed.").

Section 11.3 of the Plan provides that within thirty days of the Effective Date the Debtors will cure undisputed defaults under executory contracts that the Debtors assume.  This section also provides that the Debtors will cure any disputed defaults that are required to be cured within thirty days of a Final Order determining the Debtors' liability.[10]  The Plan is silent on the provision of adequate assurance.

---

[10] *See also* Plan Supplement, Ex. 2, p. 1.

The Debtors have not paid any amounts due under Section 2(a)(i) of the ISDA Master since October 3, 2008.  The Debtors carry the burden of proof with respect to cure and adequate assurance.  11 U.S.C. § 365(b); *In re F.W. Rest. Assocs., Inc.*, 190 B.R. 143, 147 (Bankr. D. Conn. 1995) ("the Debtor-in-Possession then bears the burden of proof on the issues of prompt cure and adequate assurance of future performance").  LBA estimates, without in any way restricting its rights, that the amount due by LBSF under the Swap Agreements since October 3, 2008, without taking into account unpaid interest and costs could be at least AUD 8.5million.  If the Swap Agreements were to be assumed, the Debtors must set aside sufficient funds to cover cure payments and otherwise ensure that all their obligations can be fulfilled over the life of these agreements.  Given that this Plan is essentially a plan of liquidation, an escrow maybe appropriate.

Without in any way agreeing that the Swap Agreements or other Transaction Documents are, in fact, current and valid executory contracts that can be assumed, LBA reserves its rights to challenge the appropriate amounts required to cure LBSF's defaults under the relevant agreements, and also to challenge whether adequate assurance of future performance has been provided.

## IV.    The Assumption of the Swap Agreements Circumvents The Stay.

LBA also observes that by purporting to assume the Swap Agreements, LBSF appears to be attempting to circumvent the Stay in force until January 20, 2012.  The Stay was granted to allow the Debtors the opportunity to attempt to resolve disputes concerning swap transactions with parties through the SPV Derivatives ADR procedures.[11]  LBA is not aware of any of efforts

---

[11] Alternative Dispute Resolution Procedures Order for Affirmative Claims of the Debtors Under Derivatives Transactions with Special Purpose Vehicle Counterparties [Docket No. 14789].

on the Debtors' part to date to engage in the SPV Derivatives ADR procedures with respect to any Dante Notes Program Notes.

The supposed purpose of the Stay has been to maintain the status quo of the US Adversary Proceedings, to allow the Debtors to focus their efforts on various initiatives and confirm a plan.   However, the purported assumption of the Swap Agreements seeks to substantively alter the rights of affected parties in the US Adversary Proceedings without allowing them the opportunity to litigate their rights to the Collateral in those proceedings.

## V.    LBA has Standing to Object to the Plan and the Assumption of the Swap Agreements.

The Debtors elsewhere in these Chapter 11 cases have argued that LBA lacked standing to intervene in an adversary proceeding.[12]   The Debtors also have argued that LBA lacked standing to object to the Debtors' request to extend the Stay.[13]   However, the Debtors' previous arguments concerning standing are not germane in the present context because the Second Circuit has recognized that the availability of standing under section 1109(b) varies depending upon the context and the specific sections of the Bankruptcy Code at issue.   *See e.g., In re Teligent*, 640 F.3d 53, 61 (2d Cir. 2011) (noting different interpretations of "party in interest" based on context); *Doral Center Inc. v. Ionosphere Clubs, Inc. (In re Ionosphere Clubs, Inc.)*, 208 B.R. 812, 815 (S.D.N.Y. 1997) (recognizing same).   The Debtors' arguments in both previous instances were based on the fact that LBA was not a party to the US Adversary Proceeding in which it was, respectively, seeking to intervene or object to the extension of the

---

[12] See Plaintiff Lehman Brothers Special Financing Inc.'s Opposition to Motions of "Dante Noteholders" and the Liquidators of Lehman Brothers Australia Limited to Intervene, Case No. 10-3545 [Docket No. 13] (Bankr. S.D.N.Y. Feb. 9, 2011).  That issue is currently on appeal to the Second Circuit.

[13] *See* Omnibus Reply in Support of Debtors Motion to Extend Stay of Avoidance Actions and Grant Certain Related Relief [Docket No. 17602], pars. 18-27.

Stay.  Unlike in those situations, here LBA is objecting to a plan of reorganization, is a creditor of both LBSF and LBHI, and is therefore properly before the Court.[14]

Also, unlike the previous situations in which the Debtors have argued that LBA lacked standing, the standards for who may be parties in interest under Bankruptcy Code section 362(d) or Bankruptcy Rule 7024(a) are not the same as for who may be a party in interest to object to a plan of reorganization.  See *In re Ionosphere Clubs, Inc.*, 208 B.R. 812, 814 (S.D.N.Y. 1997) (holding that non-creditor holder of purchase option on land leased by Chapter 11 debtor was "party in interest" and had standing to object to plan modification); *In re Esmizadeh*, 272 B.R. 377, 383-85 (Bankr. E.D.N.Y. 2002) (non-creditor occupant was "party in interest" and had standing to object to trustee's motion to assume and assign lease); *see also In re Teligent, Inc.*, 417 B.R. 197, 210 (Bankr. S.D.N.Y. 2009) *aff'd sub nom. In re Telignet Servs., Inc.*, Case No. 09-09674 (PKC), 2010 WL 2034509 (S.D.N.Y. May 13, 2010) *aff'd sub nom. In re Teligent, Inc.*, 640 F.3d 53 (2d Cir. 2011) ("[Section 1109(b)] has been interpreted to mean that anyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains.") (internal quotations omitted); *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 74 (Bankr. S.D.N.Y. 2009) ("It is generally understood that 'a pecuniary interest. . . directly affected by the bankruptcy proceeding' provides standing under § 1109(b).") (quoting *Nintendo Co. v. Patten (In re Alpex Computer Corp.)*, 71 F.3d 353, 356 (10th Cir.1995)); Collier ¶ 1109.01 ("The general theory behind [section 1109] is that anyone holding a direct financial stake in the outcome of the case should have an opportunity . . . to participate in the adjudication of any issue that may ultimately shape the disposition of his or her interest.").

---

[14] In addition to three other proofs of claim filed by LBA, LBA's Claim No. 63500 involves the Swap Agreements which LBSF is now attempting to assume.  Seligman Decl., Ex. I.

Regardless of whether LBA or others have standing to object, the Court has a duty to, *sua sponte*, deny the confirmation of the Debtors' Plan or to strike the attempted assumption of the Swap Agreements, if the Plan does not comply with all of the applicable provisions of chapter 11, including sections 365 and 1129(a).  *See* 11 U.S.C. §§ 365, 1129(a); *In re Duval Manor Assocs.*, 203 B.R. at 45; *In re Cypresswood Land Partners, I*, 409 B.R. at 423; *In re Caldwell*, 76 B.R. at 643.

## RESERVATION OF RIGHTS

LBA expressly reserves its right to amend, modify, or supplement this Limited Objection prior to the hearing on confirmation of the Plan, to introduce evidence supporting this Limited Objection, to be heard at a hearing with respect to this Limited Objection, and to file additional and/or supplemental objections.  Moreover, any failure to object herein to any provision set forth in the Plan, or the omission of any provision from the Plan, shall not be deemed an acceptance thereof.

## CONCLUSION

Wherefore, for the foregoing reasons, LBA respectfully requests that the Court remove the Swap Agreements from Part A of Exhibit 2 of the Plan Supplement and grant such other relief as is just and proper.

Dated:  New York, New York
      November 4, 2011

Respectfully submitted,

/s/ *David R. Seligman*

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Counsel for the Liquidators of Lehman Brothers Australia Limited*