**<u>EXHIBIT C</u>**

PRK.500.009.0059

**SERIES PROSPECTUS**

## BERYL FINANCE LIMITED

*(incorporated with limited liability in the Cayman Islands)*

### SERIES NO: 2007-7
### AUD42,000,000

## SECOND TO DEFAULT BASKET CALLABLE CREDIT-LINKED NOTES DUE 2014

**Issue Price: 100 per cent.**

issued pursuant to the
Multi-Issuer
Secured Obligation Programme
arranged by

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

## Linklaters
ACM/KKYI

The date of this Series Prospectus is 3 April 2007.

Under the Multi-Issuer Secured Obligation Programme (the "**Programme**"), Beryl Finance Limited (the "**Issuer**") may from time to time issue Notes and other secured obligations on the terms set out in the Base Prospectus dated 21 July 2006 relating to the Programme, as supplemented by an Issuer Disclosure Annex dated 27 July 2006 in respect of the Issuer (together, the "**Base Prospectus**") as supplemented, in relation to each issue, by a Series Prospectus applicable to such issue. This Series Prospectus is the Series Prospectus applicable to the issue by the Issuer of its Series 2007-7 AUD42,000,000 Second to Default Basket Callable Credit-Linked Notes due 2014 (the "**Notes**"). Terms defined in the Base Prospectus have the same meaning in this Series Prospectus.

The obligations of the Issuer under the Notes will be secured as described in "Security Arrangements".

This Series Prospectus is supplemental to, and should be read in conjunction with, the Base Prospectus. Subject as set out below, the Issuer accepts responsibility for the information contained in this Series Prospectus. To the best of the knowledge and belief of the Issuer, the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information.

The delivery of the Series Prospectus at any time does not imply that any information contained therein is correct at any time subsequent to the date hereof. The information on page 18 in relation to the Collateral (as defined herein), the information on page 29 in relation to the Reference Entities (as defined herein) and the information on page 52 in relation to the Swap Counterparty and the Swap Guarantor has, in each case, been accurately extracted from publicly available information. So far as the Issuer is aware and is able to ascertain from information published in relation to the Reference Entities, the Collateral, the Swap Counterparty and the Swap Guarantor, no facts have been omitted which would render the reproduced information misleading.

The Notes are expected on issue to be assigned a rating of "AAA" by Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies Inc. or any successor to the rating business thereof ("S&P"), however there is no assurance that the Issuer will be able to obtain such a rating for the Notes as it is subject to S&P's information and other requirements. A security rating is not a recommendation to buy, sell or hold securities and may be subject to suspension, reduction or withdrawal at any time. A suspension, reduction or withdrawal of the rating assigned to the Notes may adversely affect the market price of the Notes. The occurrence of even one Credit Event and/or a suspension, reduction or withdrawal of the rating assigned to any Reference Entity may result in a severe reduction of the rating assigned to the Notes.

**Purchasers of Notes should note that the Notes are credit-linked to the Reference Entities. The performance of any investment in the Notes will be dependent on the Reference Entities.**

In addition to the Notes being credit-linked to the Reference Entities, holders of the Notes will also have exposure to the Collateral. Impairment of the Collateral may result in a negative rating action on the Notes.

**Purchasers of Notes should note that the Notes will redeem at zero if a Credit Event occurs with respect to each of two Reference Entities. In these circumstances, purchasers of Notes will lose all of the principal amount it has invested.**

Purchasers of Notes should conduct such independent investigation and analysis regarding the Issuer, the security arrangements and the Notes as they deem appropriate to evaluate the merits and risks of an investment in the Notes. In particular, purchasers should note that the credit risk of the Notes includes that of the Collateral, the Swap Counterparty and the Reference Entities and that the Notes allow a purchaser to obtain the stated coupon in exchange for assuming such credit risk.

The Arranger makes no representation, recommendation or warranty, express or implied, regarding the accuracy, adequacy, reasonableness or completeness of the information contained herein or in any further information, notice or other document which may at any time be supplied in connection with the Notes and accepts no responsibility or liability therefor.

The Notes will be issued on the terms set out in this Series Prospectus read together with the Base Prospectus.

A07580075/2.0/02 Apr 2007

1

PRK.500.009.0061

This Series Prospectus does not constitute, and may not be used for the purposes of, an offer or solicitation by anyone in any jurisdiction in which such offer or solicitation is not authorised or to any person to whom it is unlawful to make such offer or solicitation, and no action is being taken to permit an offering of the Notes or the distribution of this Series Prospectus or any other offering material in any jurisdiction where such action is required.

In this Series Prospectus, references to "euro", "EUR" and "€" refer to the currency introduced from the third stage of European economic and monetary union pursuant to the Treaty establishing the European Community, as amended by the Treaty on European Union, references to "USD", "US$" and "U.S. dollars" are to United States dollars, and references to "AUD" and "A$" are to Australian dollars.

PRK.500.009.0062

## Table of Contents

|  | Page |
|---|---|
| TERMS AND CONDITIONS OF THE NOTES | 4 |
| ANNEX 1 - USE OF PROCEEDS | 18 |
| ANNEX 2 - THE COLLATERAL | 19 |
| ANNEX 3 – FORM OF SWAP CONFIRMATION | 21 |
| ANNEX 4 - DESCRIPTION OF THE SWAP COUNTERPARTY AND THE SWAP GUARANTOR | 59 |

PRK.500.009.0063

## TERMS AND CONDITIONS OF THE NOTES

The terms of the Notes and additional provisions relating to their issue are as follows.

Capitalised terms used but not otherwise defined in these Conditions shall have the meanings given to such terms in the Swap Confirmation, the form of which is set out in Annex 3 hereto.

The Notes are credit-linked to the Reference Entities set out in Schedule A to the Swap Confirmation

| | | |
|---|---|---|
| 1 | Issuer: | Beryl Finance Limited. |
| 2 | Series No: | 2007-7. |
| 3 | Tranche No: | Not applicable. |
| 4 | ISIN (N.B. see paragraph 55 below for Common Code): | AU3FN0002333. |
| | Note Reference: | BRLF01. |
| 5 | Currency: | Australian Dollars ("AUD"). |
| 6 | Principal Amount of Tranche: | AUD42,000,000. |
| 7 | Issue Date: | 3 April 2007. |
| 8 | Form: | |

| | | |
|---|---|---|
| (a) | Form of Notes | Registered. The Notes will be issued in registered uncertificated (or inscribed) form. They will be debt obligations of the Issuer which are constituted by, and owing under, the Trust Deed and take the form of entries on the Register to be maintained by the Registrar. |
| (b) | Registrar | BTA Institutional Services Australia Limited (ABN 48 002 916 396) appointed as registrar pursuant to an Agency and Registry Agreement dated on or about 3 April 2007 entered into between the Issuer, the Trustee, the Registrar or any other person appointed by the Issuer to establish and maintain the Register on the Issuer's behalf from time to time. |
| (c) | Title | Title to the Registered Notes shall pass by registration in the Register.

No certificate or other evidence of title will be issued to holders of the Notes unless the Issuer determines that certificates should be available or it is required to do so pursuant to any applicable law or regulation. |
| (d) | Payments and Record Date | Notwithstanding the provisions of Condition 7(b), payments in respect of the Notes will be made to the persons whose names are entered in the Register as at 5.00pm (Sydney time) on the relevant Record Date.

Payments to persons who hold Notes through a Clearing System will be made by transfer to their relevant account in accordance with the rules and regulations of the relevant Clearing System. |

If Notes are not lodged in a Clearing System, payments will be made to the account of the registered holder noted in the Register. If no account is notified, then payments will be made by cheque mailed on the Business Day immediately preceding the relevant payment date to the registered holder at its address appearing in the Register on the Record Date.

"Clearing System" means each of the settlement systems operated by Austraclear Limited (ABN 94 002 060 773) (the "Austraclear System"), Euroclear Bank S.A./N.V. ("Euroclear") or Clearstream Banking société anonyme ("Clearstream, Luxembourg"), as the case may be.

"Record Date" means the eighth calendar day before a payment date.

|    |    |    |
|----|----|----|
| (e) | Details of any other additions (*In relation to paragraphs 8(a) to 8(d) above*) | For the purpose of the Notes only: |

(i)   The provisions of Conditions 1, 2 and 7 shall be amended and construed according to paragraphs 8(a) to 8(d) above. In case of any inconsistency between those Conditions and paragraphs 8(a) to 8(d) above, paragraphs 8(a) to 8(d) shall prevail.

(ii)  Condition 2(f) concerning closed periods immediately preceding each Record Date, shall, for the purposes of the Notes, be deleted and no such closed periods shall apply to the Notes.

(iii) Notwithstanding Condition 12, the Conditions, the Trust Deed and the Agency Agreement may subsequently be amended by the Issuer without the consent of the Noteholders, to provide for the exchange of Notes in registered form for Notes in bearer form.

| 9 | Denomination: | AUD100,000. |
|---|---|---|
| 10 | Status: | Secured and limited recourse obligations, as described under "Security Arrangements" below. |
| 11 | Interest Commencement Date: | 3 April 2007. |
| 12 | Interest Rate (including after Maturity Date): | Floating Rate. |
| 13 | Interest Payment Date(s): | 20 March, 20 June, 20 September and 20 December in each year, during the period from, and including, 20 June 2007 to, and including, the Maturity Date, subject in each case to adjustment in accordance with the Modified Following Business Day Convention, and for the avoidance of doubt, with adjustment in the interest payable as a result of such adjustment. |
| 14 | Manner in which the Interest Rate is due to be determined (Floating Rate Notes): | ISDA Determination. |

PRK.500.009.0065

| 15 | Screen Rate Determination Condition 5(c) (ii): | Not applicable. |
|---|---|---|
| 16 | ISDA Determination (Condition 5(c) (i)): | Applicable. |
| | (a)  Floating Rate Option: | AUD-BBR-BBSW. |
| | (b)  Designated Maturity: | 3 (three) months, provided that the Relevant Rate for the first Interest Accrual Period shall be determined on the basis of the linear interpolation of the Relevant Rates determined on the relevant Reset Date for Designated Maturities of two months and three months. |
| | (c)  Reset Date: | The first day of the Interest Accrual Period. |
| | (d)  ISDA Definitions: | ISDA Definitions (as defined in Condition 5(c)(i)). |
| 17 | Margin (if applicable): | Plus 0.60 per cent. |
| 18 | Rate Multiplier (if applicable): | Not applicable. |
| 19 | Maximum/Minimum Interest Rate (if applicable): | Not applicable. |
| 20 | Maximum/Minimum Instalment Amount (if applicable): | Not applicable. |
| 21 | Maximum/Minimum Redemption Amount (if applicable): | Not applicable. |
| 22 | Interest Amount (Fixed Rate Note or Variable Coupon Amount Note): | Not applicable. |
| 23 | Determination Date(s) (Condition 5(i)): | Not applicable. |
| 24 | Day Count Fraction: | Actual/365 (Fixed). |
| 25 | Interest Period Date(s) (if applicable): | 20 March, 20 June, 20 September and 20 December in each year, from, and including, 20 June 2007, to, and including, the Maturity Date, with adjustment. |
| 26 | Maturity Date: | The earliest to occur of: |

26. Maturity Date (continued):

(i) 20 September 2014, subject to adjustment in accordance with the Modified Following Business Day Convention (the "Scheduled Maturity Date");

(ii) the Second to Default Redemption Date (as defined in paragraph 38);

(iii) the Early Redemption Date (as defined in paragraph 38); and

(iv) the Issuer's Optional Redemption Date (as defined in paragraph 41).

| 27 | Redemption for Taxation Reasons permitted on days other than Interest Payment Dates: | Yes. |
|---|---|---|
| 28 | Amortisation Yield: | Not applicable. |
| 29 | Exchange (Condition 6(k)): | No. |

PRK.500.009.0066

| 30 | Mandatory Partial Redemption (in accordance with Condition 6(c)): | For the purposes of the Notes only, Condition 6(c) shall be amended by the insertion of the following words after "payment default": |
| | | "(after the expiry of any grace period specified in the terms and conditions of the Collateral in existence as at the Issue Date)". |
| 31 | Instalment Date(s) (if applicable): | Not applicable. |
| 32 | Instalment Amount(s) (if applicable): | Not applicable. |
| 33 | Unmatured Coupons to become void upon early redemption: | Yes. |
| 34 | Talons to be attached to Notes and, if applicable, the number of Interest Payment Dates between the maturity of each Talon (if applicable): | Not applicable. |
| 35 | Business Day Jurisdictions for Condition 7(h) (jurisdictions required to be open for payment): | Sydney, London, New York and Tokyo. |
| 36 | Additional steps that may only be taken following approval by an Extraordinary Resolution in accordance with Condition 12(a) (if applicable): | Not applicable. |
| 37 | Additional Fungible Issues Permitted: | Yes, subject to the Issuer having received from S&P and the Swap Counterparty each of its prior written consent to any such fungible issue. |
| 38 | Details of any other additions or variations to the Conditions (if applicable): | For the purposes of the Notes only: |

**38 (continued):**

Upon the occurrence of a Second to Default Event (the date of such occurrence, as determined by the Calculation Agent in its sole discretion, being the "Second to Default Event Date"), (i) the Issuer shall forthwith notify the Trustee, S&P and the Noteholders informing them of the occurrence of such event giving notice of the date fixed for redemption, (ii) the Issuer shall deliver the Collateral to the Swap Counterparty pursuant to the Swap Agreement and the Swap Agreement shall terminate at zero, and (iii) the Issuer will redeem all of the Notes at zero with no interest accrued from and including the previous Interest Payment Date (or, if none, the Interest Commencement Date) falling immediately prior to the Second to Default Event Date on the thirteenth Business Day following the Second to Default Event Date (the "Second to Default Redemption Date").

"Second to Default Event" means the satisfaction of the Conditions to Settlement under the Swap Agreement with respect to two Reference Entities.

PRK.500.009.0067

Notwithstanding anything to the contrary contained in Conditions 6 and 10, upon the occurrence of any of the events set out in Condition 6(c) and (d) and Condition 10 (the date of the relevant occurrence, as determined by the Calculation Agent in its sole discretion, being the "**Early Redemption Event Date**"), the Issuer shall forthwith notify the Trustee, S&P and the Noteholders informing them of the occurrence of such event giving notice of the date fixed for redemption, being the day falling six Business Days following the relevant Early Redemption Event Date (the "**Early Redemption Date**") and the Disposal Agent shall arrange for sale of the Collateral for settlement on the day falling on the fifth Business Days following the Early Redemption Determination Date (the "**Disposal Date**"). Upon the expiry of such notice, the Issuer shall redeem each Note at its Early Redemption Amount as set out in paragraph 44 below.

Condition 10(a) shall be amended to read as follows:

"if default is made (a) in the payment of interest in respect of the Notes or any of them for a period in excess of the sum of (i) the number of days in any grace period applicable to the payment of interest in accordance with the terms and conditions of the Collateral and (ii) three Business Days, or (b) for a period of 14 days or more in the payment of principal due in respect of the Notes or any of them; or"

Condition 10(b) shall be amended to read as follows:

"if the Issuer fails to perform or observe any of its other obligations under the Notes or the Trust Deed and such failure continues for a period of 30 days (or such longer period as the Trustee may permit) next following the service by the Trustee on the Issuer of notice requiring the same to be remedied unless, in the opinion of the Trustee, it is incapable of remedy, in which case no notice shall be required, provided that such failure to perform or observe any of its obligations will, in the sole and absolute determination of the Trustee, lead to a failure to pay any amounts due on the Notes."

Notwithstanding anything to the contrary contained in Condition 6(i) (Purchases), the Issuer may purchase the Notes so long as an equivalent notional amount of the Swap Agreement is terminated and an equivalent principal amount of the Collateral is delivered to the Swap Counterparty and/or the Noteholders or liquidated, as the case may be, by the Issuer, and the Issuer has no further liability in respect of the Notes or the Swap Agreement. For the avoidance of doubt, no cost with respect to any such purchase by the Issuer shall be borne by the remaining Noteholders. If the Issuer purchases the Notes it will notify S&P of such purchase. Condition 6(i)

shall be deemed to be amended accordingly.

Notwithstanding Condition 14, so long as the Notes are represented by a Global Note or a non-materialised form held on behalf of Austraclear System, Euroclear, Clearstream, Luxembourg or any other clearing system, notices in respect thereof may be given by their being delivered to Austraclear System, Euroclear, Clearstream, Luxembourg or such other clearing system, as the case may be. For the avoidance of doubt, such notices shall be deemed given on the date and, if applicable, at the time they are delivered to Austraclear System, Euroclear, Clearstream, Luxembourg or such other clearing system, as the case may be.

| 39 | The Agents (including any Calculation Agent and/or Issuing and Paying Agent and/or Custodian) appointed in respect of the Notes are: | **Issuing and Paying Agent and Custodian** |
| --- | --- | --- |

JPMorgan Chase Bank, N.A.
9 Thomas More Street
London E1W 1YT

Provided that the Notes are, at the relevant time, rated by S&P, if the short term senior unsecured rating of the Paying Agent or the Custodian is downgraded at any time below "A1" by S&P, the Issuer shall, within 30 calendar days appoint a replacement Paying Agent or a replacement Custodian (as the case may be) that has a rating of at least "A1" by S&P unless the Trustee has an alternative proposal which S&P confirms in writing that the then current rating of the Notes will not be reduced and the Issuer shall notify S&P of such replacement of Paying Agent or Custodian (as the case may be).

**Calculation Agent**

Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE

**Australian Paying Agent and Registrar**

BTA Institutional Services Australia Limited
(ABN 48 002 916 396)
Level 4
35 Clarence Street
Sydney
NSW 2000
Australia

**Security Arrangements**

| 40 | Mortgaged Property: | |
| --- | --- | --- |
| | (i)  Collateral: | Qualifying Assets (as defined below) in a principal amount equal to the outstanding Principal Amount of the Notes. |

The initial Collateral will comprise the proceeds of the issue of the Notes in the amount of AUD42,000,000, to be credited into the Collection Account on or about the Issue Date

PRK.500.009.0069

(excluding any accrued interest) (the "Cash Collateral").

On or about 11 April 2007, the Issuer shall use the Cash Collateral to purchase AUD42,060,000 in principal amount of Floating Rate Notes due 20 September 2014 to be issued by GE Capital Australia Funding Pty. Ltd. (the "Collateral Issuer") and guaranteed by General Electric Capital Corporation (the "GECA Notes").

Upon completion of the purchase of the GECA Notes by the Issuer and the GECA Notes being credited into the Custody Account, the GECA Notes will constitute the Collateral in respect of the Notes.

For the avoidance of doubt, the GECA Notes may be exchanged for Qualifying Assets but subject to S&P's rating confirmation as set out below.

On redemption of any Collateral, the redemption proceeds of such Collateral will be deposited by the Issuer in the Collection Account, subject to the security interest created pursuant to the Trust Deed.

The Cash Collateral will be credited into the Collection Account by the Issuer on or before the Issue Date and the GECA Notes will be acquired by the Issuer on or about 11 April 2007. The Collateral will be held by JPMorgan Chase Bank, N.A. of Trinity Tower, 9 Thomas More Street, London E1W 1YT in its capacity as Custodian pursuant to the Agency Agreement in the Collection Account or the Custody Account (being the account of the Custodian at Euroclear, Account No. 22066), as the case may be, subject to the security interest created pursuant to the Trust Deed. The Custodian shall notify the Issuer and the Calculation Agent if it becomes aware of any material amendment to the terms and conditions of the Collateral. Upon such notification from the Custodian, the Calculation Agent will notify S&P of such material amendment.

If the short-term senior unsecured rating of the provider of the Collection Account is downgraded at any time to below "A-1+" by S&P, the Issuer shall, within 30 calendar days of the downgrade, appoint a replacement Collection Account provider that has a rating assigned by S&P of at least "A-1+", unless the Trustee has an alternative proposal which S&P confirms that the then current rating of the Notes will not be reduced. The Issuer shall notify S&P of such replacement of Collection Account provider.

Pursuant to the terms of the Swap Agreement, in the event any Collateral becomes subject to mandatory redemption or otherwise ceases to be a Qualifying Asset, the Swap Counterparty shall, without the consent of the Trustee, the Noteholders or any other secured creditors in respect of the

Notes but subject to S&P's rating confirmation, have the right but not the obligation to exchange some or all of the Collateral with Qualifying Assets selected by it. Upon effecting such exchange, such Qualifying Assets shall constitute Collateral (and the issuer of such Qualifying Assets shall constitute a Collateral Issuer) which will be held subject to the charges in favour of the Trustee as set out or contemplated in the Supplemental Trust Deed. Any exchange of Collateral pursuant to the Swap Agreement shall be effected by the Custodian transferring the Collateral to the Swap Counterparty in accordance with the instructions of the Swap Counterparty and the Swap Counterparty transferring the relevant Qualifying Assets to the Custodian or to its order. The Issuer shall prepare supplementary listing particulars (if required) setting out details of such exchange and shall notify S&P, the Noteholders and other secured creditors in respect of the Notes in accordance with Condition 14.

In the event that any charges are imposed by the issuer of the Collateral in respect of the redemption of the Collateral, the Swap Counterparty shall procure that the Collateral is exchanged for other Qualifying Assets subject to the provisions set out above.

"Qualifying Assets" means in respect of any exchange of Collateral pursuant to the terms of the Swap Agreement, any security with the following characteristics:

1.
    (a)   having as of the date of transfer a credit rating assigned by S&P equal to AAA;

    (b)   maturing on or before the Scheduled Maturity Date;

    (c)   being AUD-denominated; and

    (d)   is not a structured finance product; or

2.   any AUD denominated money market fund with a credit rating assigned by S&P equal to AAAm; or

3.   AUD cash.

The Swap Counterparty shall pay all costs (including stamp duty) associated with the delivery or exchange of the Collateral for Qualifying Assets in accordance with the terms of the Swap Agreement.

(ii)  Security (order of priorities):    The Trustee shall apply all moneys received by it under the Trust Deed in connection with the realisation or enforcement of the Security constituted by the Trust Deed in the following order of priorities:

Swap Counterparty Priority unless (i) an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the ISDA Master Agreement)

PRK.500.009.0071

or (ii) a Tax Event (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the sole Affected Party (as defined in the ISDA Master Agreement), in which case Noteholder Priority shall apply.

(iii) Swap Agreement (if applicable): Under (a) a Deed of Accession dated 21 July 2006, pursuant to which the Issuer acceded to an ISDA Master Agreement and Schedule thereto dated as of 10 October 2002 and amended and restated on 21 July 2006 (together, the "**ISDA Master Agreement**") and (b) a confirmation thereto with an effective date of the Issue Date made between the Issuer and the Swap Counterparty (the "**Swap Confirmation**" and, together with the ISDA Master Agreement, the "**Swap Agreement**"), the Issuer will pay to the Swap Counterparty sums equal to interest payable in respect of the Collateral and the Swap Counterparty will pay to the Issuer amounts equal to interest payments due under the Notes.

In addition, the Issuer will make a final payment to the Swap Counterparty equal to the redemption proceeds due under the Collateral as at the date the Swap Agreement is scheduled to terminate and the Swap Counterparty will make a final payment to the Issuer equal to the Redemption Amount of the Notes.

The form of the Swap Confirmation is set out in Annex 3.

The Swap Agreement may be terminated early, (either in whole or, in certain circumstances, in part only) among other circumstances:

(i) on the due date for payment of the Notes if at any time any of the Notes becomes repayable in accordance with the Conditions prior to the Maturity Date;

(ii) at the option of one party, if there is a failure by the other party to pay any amounts due under the Swap Agreement;

(iii) if (subject as provided in the Swap Agreement) withholding taxes are imposed on payments made by the Issuer or the Swap Counterparty under the Swap Agreement or it becomes illegal for either party to perform its obligations under the Swap Agreement (see "Transfer to avoid Termination Event" below); and

(iv) if at any time there is a default or event of default that has been declared pursuant to the terms of (and as defined in) the Collateral.

Consequences of Early Termination: Upon any such early termination of the Swap Agreement, the Issuer or the Swap Counterparty may (subject as set out below and provided, in the case of certain tax events that the Issuer may first be obliged to use all reasonable endeavours to transfer its obligations) be liable to make a termination payment to the other (regardless, if applicable, of which of such parties may have caused such termination).

Such termination payment will be based on the replacement cost or gain for a swap transaction that would have the effect of preserving for the party making the determination the economic equivalent of the Swap Agreement. In all cases of early termination occurring other than by reason of a default by the Swap Counterparty or a Tax Event (as defined in the Swap Agreement) where the Swap Counterparty is the sole Affected Party (as defined in the Swap Agreement) (in either case the determination will be made by the Issuer) or illegality (in which case the party which is not the Affected Party (as defined in the ISDA Master Agreement) will make the determination (or, if there are two Affected Parties, each party will make a determination which will be averaged)), the termination payment will be determined by the Swap Counterparty on the basis of quotations received from at least five market-makers (failing which, by the Swap Counterparty or the Issuer, as aforesaid).

Regardless of which party makes the determination of the termination payment (if any), there is no assurance that the proceeds from the sale of the Collateral plus or minus, as the case may be, such termination payment will be sufficient to repay the principal amount due to be paid in respect of the Notes and any other amounts in respect thereof that are due.

Transfer to avoid Termination Event: If withholding taxes are imposed on payments made by the Issuer or the Swap Counterparty under the Swap Agreement, then the Swap Counterparty shall, at its sole option, have the right to require the Issuer:

(i) to transfer all of the Issuer's interests and obligations under the Swap Agreement together with its interests and obligations under the Notes, the Trust Deed and the Agency Agreement to another entity, whether or not in the same tax jurisdiction as the Issuer, that would not have any obligation to withhold or deduct (if the Issuer is or would be required to make such deduction or withholding) or to which the Swap Counterparty would be entitled to make payments free from the relevant deduction or withholding (if the Swap Counterparty is or would otherwise be required to make such withholding or deduction), subject to obtaining the prior written consent of the Trustee; or

(ii) to transfer the Issuer's residence for tax purposes to

PRK.500.009.0073

another jurisdiction, subject to obtaining the prior written consent of the Trustee.

If the Issuer is unable to transfer its interests to another party or to transfer its tax residence in accordance with the preceding provisions prior to the 30th day following the date of imposition of such withholding taxes or, if earlier, the 10th day prior to the first date on which it or the Swap Counterparty would otherwise be required to make a payment net of withholding taxes, the Swap Counterparty may terminate the swap transaction under the Swap Agreement. If the Issuer transfers its interests and obligations or residence for tax purposes, it shall notify S&P of such transfer.

| | |
|---|---|
| Swap Counterparty(ies): | Lehman Brothers Special Financing Inc. |
| Swap Guarantor (if applicable): | Lehman Brothers Holdings Inc. |
| (i)  Details of Credit Support Document (if applicable): | The obligations of the Swap Counterparty under the Swap Agreement are unconditionally and irrevocably guaranteed by Lehman Brothers Holdings Inc. pursuant to a guarantee dated 3 April 2007 issued in favour of the Issuer (the "Swap Guarantee"). |
| (ii)  Credit Support Provider: | With respect to the Swap Counterparty, Lehman Brothers Holdings Inc. |
| (iii) Collection Account: | The Issuer shall establish on or prior to the Issue Date an account (the "Collection Account") with the Custodian in London, into which the Issuer will deposit (a) the proceeds of the issue of the Notes, (b) the redemption proceeds of any Collateral and (c) each payment received by it pursuant to the Swap Agreement and from which (i) any purchase of Collateral shall be made, (ii) all distributions of principal and interest in respect of the Notes shall be paid to the Issuing and Paying Agent for payment to Noteholders on the due dates for payment therefor and (iii) all payments due to the Swap Counterparty under the Swap Agreement shall be made. All monies deposited from time to time in the Collection Account shall be held by the Custodian as part of the Mortgaged Property and shall be applied for the purposes herein provided. |

**Provisions relating to Redemption**

41    Call Option (Condition 6(e)):

Upon the exercise by the Swap Counterparty of the Swap Counterparty Option (as defined below), the Issuer shall redeem the Notes in whole but not in part, at the outstanding Principal Amount plus accrued interest (as determined by the Calculation Agent and rounded to the nearest cent (with one half cent being rounded up)) on any Interest Payment Date which is scheduled to fall on or about 20 March 2010, 20 March 2011, 20 March 2012, 20 March 2013 or 20 March 2014 (the date of such redemption being the "Issuer's Optional Redemption Date"), by giving not less than five

| | | |
|---|---|---|
| | | Business Days' prior written notice to the Noteholders. |
| | | "**Swap Counterparty Option**" means the option of the Swap Counterparty, as provided in the Swap Agreement, to terminate the Swap Agreement in whole but not in part, by giving not less than five Business Days' notice to the Issuer. |
| 42 | Put Option (Condition 6(f)): | Not applicable. |
| 43 | Redemption Amount: | Par, subject to the occurrence of a Second to Default Event, mandatory redemption as specified in Condition 6(c), redemption for taxation and other reasons as specified in Condition 6(d) or an event of default as specified in Condition 10. |
| 44 | Early Redemption Amount(s) payable on mandatory redemption (Condition 6(c)), redemption for taxation and other reasons (Condition 6(d)) or an event of default (Condition 10) and/or the method of calculating the same (if required or if different from that set out in the Conditions): | Subject as provided in the immediately succeeding paragraph below, in respect of each Note, an amount in AUD (rounded to the nearest cent (with one half cent being rounded up) and subject to a minimum of AUD 0) determined by the Calculation Agent in its sole discretion and acting in good faith as being equal to (i) such Note's *pro rata* share of the proceeds (net of any deductions on account of taxes or otherwise) from the sale or realisation of the Collateral on behalf of the Issuer by the Disposal Agent pursuant to the Supplemental Trust Deed and Drawdown Agreement, plus (if payable to the Issuer) or minus (if payable to the Swap Counterparty) (ii) the amount of any applicable Unwind Costs divided by the total number of Notes outstanding; provided that if the amount determined pursuant to sub-paragraphs (i) and (ii) above exceeds (the amount of any such excess being the "**Excess Amount**") such Note's outstanding Principal Amount as of the Early Redemption Date together with interest accrued from, and including, the immediately preceding Interest Payment Date (or if the Early Redemption Date falls in the initial Interest Accrual Period, from, and including, the Issue Date) to, but excluding, such Early Redemption Date (such interest being the "**Accrued Early Redemption Interest Amount**"), such Excess Amount shall be payable by way of an additional payment of interest on each Note. |
| | | Notwithstanding the above, if an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the ISDA Master Agreement) or if a Tax Event (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the sole Affected Party (as defined in the ISDA Master Agreement), the Early Redemption Amount in respect of each Note shall be an amount in AUD (rounded to the nearest cent (with one half cent being rounded up) and subject to a minimum of AUD0) determined by the Calculation Agent in its sole discretion as being equal to (i) such Note's pro rata |

PRK.500.009.0075

share of the proceeds (net of any deductions on account of taxes or otherwise) from the sale or realisation of the Collateral on behalf of the Issuer by the Disposal Agent pursuant to the Supplemental Trust Deed and Drawdown Agreement, plus (ii) (but only if payable to the Issuer) the amount of any applicable Unwind Costs divided by the total number of Notes outstanding; provided that if the amount determined pursuant to sub-paragraphs (i) and (ii) above results in an Excess Amount (as defined above), such Excess Amount shall be payable by way of an additional payment of interest on each Note. In the event that Unwind Costs are payable by the Issuer to the Swap Counterparty, the Issuer shall apply the net proceeds from the sale or realisation of the Collateral as aforesaid (1) first in redeeming each Note in an amount equal to its outstanding Principal Amount as of the Early Redemption Date plus the Accrued Early Redemption Interest Amount and (2) thereafter, in payment of such Unwind Costs to the Swap Counterparty.

In the event that (i) at the time of the occurrence of an Event of Default (as defined in the ISDA Master Agreement) under the Swap Agreement and the Swap Counterparty being the Defaulting Party, or (ii) at the time of the occurrence of an Additional Termination Event as described in paragraph 11(h)(iv)(D) and paragraph 11(h)(v)(B) of the Credit Support Annex, the Collateral consists of securities which do not fall within paragraph 2 or 3 of the definition of Qualifying Assets, then payment of the Early Redemption Amount shall be satisfied by (i) delivery of a Collateral Delivery Amount of Collateral, (ii) payment of the Accrued Early Redemption Interest Amount, and (iii) (but only if payable to the Issuer) payment of the amount of any applicable Unwind Costs divided by the total number of Notes outstanding.

Such delivery shall be at the risk of the Noteholders.

For the purposes hereof:

"Collateral Delivery Amount" means, in respect of each Note, the principal amount of the Collateral, divided by the number of Notes outstanding.

"Unwind Costs" means the value of (i) the termination payment due from or, as the case may be, to the Swap Counterparty under the Swap Agreement in respect of the termination of the Swap Agreement (as determined by reference to the Reference Entities as at the date of such termination) and (ii) any transfer or stamp tax costs, early redemption or termination cost (howsoever defined), if any, incurred by the Issuer, the Swap Counterparty or the Trustee, as determined by the Calculation Agent in its sole and absolute discretion, in relation to any swap agreement (but, for the avoidance of doubt, not including the Swap

Agreement), financing arrangement or other hedging transaction entered into by or on behalf of the Issuer or the Swap Counterparty in relation to the issue of the Notes and the Swap Agreement.

**Provisions applicable to Global Notes**

| | | |
|---|---|---|
| 45 | Notes to be represented on issue by: | Non-materialised form evidenced by inscription into the relevant Register. |
| 46 | Applicable TEFRA exemption: | D Rules. |
| 47 | Global Note exchangeable for Definitive Notes at the request of the holder: | Not applicable. |
| 48 | Exchange Date: | Not applicable. |

**Provisions relating only to the sale, listing and rating of the Notes**

| | | |
|---|---|---|
| 49 | Details of any additions or variations to the selling restrictions: | Any on-sale of the Notes by Noteholders shall be made in compliance with all applicable selling restrictions. |
| 50 | Listing: | None. |
| 51 | Dealer's Commission: | Not applicable. |
| 52 | Net Proceeds of issue: | AUD42,000,000. |
| 53 | Method of issue of Notes: | Individual Dealer. |
| 54 | The following Dealer is subscribing the Notes: | Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE, United Kingdom, an investment bank engaged in, *inter alia*, underwriting new securities issues and trading in fixed income financial instruments. |
| 55 | Common Code (N.B. See paragraph 4 above for ISIN): | Not applicable. |
| 56 | Rating: | A rating of "AAA" is expected to be assigned by S&P. However, there is no assurance that the Issuer will be able to obtain such a rating for the Notes as it is subject to S&P's information and other requirements. A security rating is not a recommendation to buy, sell or hold securities and may be subject to suspension, reduction or withdrawal at any time. A suspension, reduction or withdrawal of the rating assigned to the Notes may adversely affect the market price of the Notes. |

PRK.500.009.0077

## ANNEX 1 - USE OF PROCEEDS

The net proceeds of the issue of the Notes, which are expected to amount to AUD42,000,000, will be applied by the Issuer on or about 11 April 2007 the Issue Date to fund the purchase of the GECA Notes as Collateral (as described in Annex 2).

PRK.500.009.0078

## ANNEX 2 - THE COLLATERAL

*The following information relating to the Collateral intended to be purchased on or about 11 April 2007 is a summary only of certain terms and conditions of such Collateral and has, save for the "Collateral", "Listing", "Maturity", "Business Days" and "Method of Origination/Creation" sections below, been extracted from the programme offering documents relating to the Collateral. None of the Issuer, the Arranger, the Trustee, the Agents or the Swap Counterparty has verified, or accepts any liability whatsoever for the accuracy of, such information and prospective investors of the Notes should make their own independent investigations and enquiries into the Collateral and the Collateral Issuer.*

The initial Collateral will comprise the proceeds of the issue of the Notes in the amount of AUD42,000,000, to be credited into the Collection Account on or about the Issue Date (excluding any accrued interest) (the "Cash Collateral"). On or about 11 April 2007, the Issuer shall use the Cash Collateral to purchase a principal amount of AUD42,000,000 Floating Rate Notes due 20 September 2014 to be issued by GE Capital Australia Funding Pty. Ltd. and guaranteed by General Electric Capital Corporation, details of which are set out below.

| | |
|---|---|
| **Collateral Issuer** | GE Capital Australia Funding Pty. Ltd. |
| **Registered Address** | 572 Swan Street, Richmond, Victoria 3121, Australia |
| **Country of Incorporation** | Australia |
| **Nature of Business** | GE Capital Australia Funding Pty. Ltd. is primarily engaged in obtaining financing in public markets to fund the operations of affiliated operating companies in Australia, principally by way of loans to such affiliated companies. |
| **Guarantor** | General Electric Capital Corporation |
| **Collateral** | AUD42,000,000 in principal amount of an issue of Floating Rate Notes due 20 September 2014 issued by the Collateral Issuer and guaranteed by General Electric Capital Corporation (the "GECA Notes") (ISIN: XS0293418777). |
| **Listing** | None |
| **Governing Law** | The laws of the State of New York, United States of America |
| **Maturity** | 20 September 2014 |
| **Business Days** | Sydney, Melbourne, London and New York |
| **Method of Origination/Creation** | The Collateral is issued pursuant to a prospectus dated 12 May 2006 and the final terms to be dated on or about 11 April 2007 in relation to the GECA Notes (together, the "Collateral Offering Documents"). Copies of the Collateral Offering Documents are available for inspection during usual business hours on any weekday (Saturdays, Sundays and public holidays excepted) at the registered office of the Issuer and at the specified offices of the Issuing and Paying Agent. |

Pursuant to the terms of the Swap Agreement, in the event the Collateral becomes subject to mandatory redemption or otherwise ceases to be a Qualifying Asset, the Swap Counterparty shall, without the consent of the Trustee, the Noteholders or any other secured creditors in respect of the Notes but subject to S&P's rating confirmation, have the right but not the obligation to exchange some or all of the Collateral with Qualifying

PRK.500.009.0079

Assets selected by it. Upon effecting such exchange, such Qualifying Assets shall constitute Collateral (and the issuer of such Qualifying Assets shall constitute a Collateral Issuer) which will be held subject to the charges in favour of the Trustee as set out or contemplated in the Supplemental Trust Deed. Any exchange of Collateral pursuant to the Swap Agreement shall be effected by the Custodian transferring the Collateral to the Swap Counterparty in accordance with the instructions of the Swap Counterparty and the Swap Counterparty transferring the relevant Qualifying Assets to the Custodian or to its order. The Issuer shall prepare supplementary listing particulars (if required) setting out details of such exchange and shall notify S&P, the Noteholders and other secured creditors in respect of the Notes in accordance with Condition 14.

In the event that any charges are imposed by the issuer of the Collateral in respect of the redemption of the Collateral, the Swap Counterparty shall procure that the Collateral is exchanged for other Qualifying Assets subject to the provisions set out above.

"**Qualifying Assets**" means, in respect of any exchange of Collateral pursuant to the terms of the Swap Agreement, any security with the following characteristics:

1.  (a)    having as of the date of transfer a credit rating assigned by S&P equal to AAA;

    (b)    maturing on or before the Scheduled Maturity Date;

    (c)    being AUD-denominated; and

    (d)    is not a structured finance product; or

2.    any AUD denominated money market fund with a credit rating assigned by S&P equal to AAAm; or

3.    AUD cash.

The Swap Counterparty shall pay all costs (including stamp duty) associated with the delivery or exchange of the Collateral for Qualifying Assets in accordance with the terms of the Swap Agreement.

### ANNEX 3 – FORM OF SWAP CONFIRMATION

*In addition to the description of the Swap Agreement set out in paragraph 40(iii), the form of the Swap Confirmation is as set out below.*

### SWAP CONFIRMATION

| | |
|---|---|
| Date: | 3 April 2007 |
| To: | Beryl Finance Limited |
| From: | Lehman Brothers Special Financing Inc. |
| Re: | Credit Derivative Transaction relating to Beryl Finance Limited Series 2007-7 AUD42,000,000 Second to Default Basket Callable Credit-Linked Notes due 2014 |
| Ref: | 635024L |

Dear Sirs,

The purpose of this letter agreement and the Schedule hereto (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement, in each case as published by the International Swaps and Derivatives Association Inc. ("ISDA") (together, the "Credit Derivatives Definitions") and the 2000 ISDA Definitions as published by ISDA (the "2000 Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions and the 2000 Definitions, the Credit Derivatives Definitions will govern. In the event of any inconsistency between the Credit Derivatives Definitions and this Confirmation, this Confirmation will govern. In addition, the definitions and provisions set out in Schedule B hereto shall prevail in the event of any inconsistency with the Credit Derivative Definitions. In the event of any inconsistency between Schedule B hereto and sections 1 to 12 of this Confirmation, the provisions of sections 1 to 12 shall prevail.

This Confirmation supplements, forms a part of, and is subject to the ISDA Master Agreement dated as of 10 October 2002 and amended and restated on 21 July 2006, and as further amended and supplemented from time to time (the "Agreement") between Lehman Brothers Special Financing Inc. and Dante Finance Public Limited Company to which you have acceded under a Deed of Accession dated 21 July 2006. All provisions contained in the relevant Agreement govern this Confirmation except as expressly modified below.

In this Confirmation, the "Notes" refers to Beryl Finance Limited Series 2007-7 AUD42,000,000 Second to Default Basket Callable Credit-Linked Notes due 2014 and "Conditions" refers to the terms and conditions of the Notes.

Capitalised terms used but not defined herein will have the meanings given to them in the Conditions.

In the event of any inconsistency between this Confirmation and the Agreement, this Confirmation shall prevail.

In this Confirmation, "Party A" means Lehman Brothers Special Financing Inc. and "Party B" means Beryl Finance Limited.

PRK.500.009.0081

The terms of the Transaction to which this Confirmation relates are as follows:

| 1 | **General Terms** | |
|---|---|---|
| | Trade Date: | 28 March 2007. |
| | Effective Date: | 3 April 2007. |
| | Scheduled Termination Date: | 20 September 2014, subject to adjustment in accordance with the Business Day Convention. |
| | Termination Date: | The earlier of (i) the Scheduled Termination Date, (ii) the Second to Default Settlement Date as defined in paragraph 6 and (iii) the Optional Termination Date as defined in paragraph 7. |
| | Floating Rate Payer: | Beryl Finance Limited (the "Seller"). |
| | Fixed Rate Payer: | Lehman Brothers Special Financing Inc. (the "Buyer"). |
| | Calculation Agent: | Lehman Brothers International (Europe). |
| | | Any determination, calculation or selection made by the Calculation Agent under this Transaction shall be made by the Calculation Agent (as the case may be) in a commercially reasonable manner and based on best market practice. |
| | Calculation Agent City: | London. |
| | Business Days: | Sydney, London, New York and Tokyo. |
| | Business Day Convention: | Modified Following (which, subject to Section 1.4 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |

| 2 | **Reference Entities** | |
|---|---|---|
| | Reference Entity: | Each of the entities (and any Successor thereto) listed in the Schedule A, subject to the provisions of "Successor Substitution" below; provided that, upon the occurrence of a Credit Event during the Credit Observation Period with respect to a Reference Entity, a Benchmark Obligation or the Obligations of a Reference Entity, and satisfaction of the Conditions to Settlement with respect to such Credit Event, such Reference Entity will be deemed removed with effect from the Event Determination Date with respect to such Reference Entity. |
| | | Each Reference Entity has been designated as a particular "Entity Type" in Schedule A. References to "Standard Terms" mean, in respect of a Reference Entity, the corresponding standard terms specified for such Entity Type in Schedule C. |
| | | Section 2.30 (Substitute Reference Obligation) of the Credit Derivatives Definitions shall not apply to this Transaction. |
| | Successor Substitution: | Notwithstanding anything to the contrary herein (in particular in the terms relating to Successors set out in Schedule B), upon the occurrence of a Succession Event (as defined in Schedule |

B) between two or more of the Reference Entities, which for the avoidance of doubt is not a Credit Event, the Calculation Agent may, by written notice to Buyer, Seller and S&P indicating the Succession Event Date and the Succession Event Effective Date, give notice to remove one or more of those Reference Entities that are subject to the Succession Event (each, a "**Removed Succession Event Reference Entity**") from the Reference Registry, and to replace such Removed Succession Event Reference Entities with one or more entities (each, an "**Added Succession Event Reference Entity**") such that the Reference Entities resulting from the Successor Substitution shall be:

(i)    the entity which the Calculation Agent determines has been formed as a result of the Succession Event; and /or

(ii)    a number of entities chosen in accordance with the Successor Substitution Criteria.

provided that, in any case the total number of Reference Entities will be equal to the number of Reference Entities as of the Business Day prior to such Succession Event, and also, provided that such notice from the Calculation Agent will be effective two Business Days following the date the notice is sent to Buyer and Seller (the "**Succession Event Effective Date**") to remove or replace such Reference Entities. Each Added Succession Event Reference Entity will be a Reference Entity for the purposes of this Transaction and each Removed Succession Event Reference Entity will be deemed deleted, in each case as of the Succession Event Effective Date. The Calculation Agent shall provide the parties hereto and S&P with an updated list of Reference Entities as soon as is reasonably practicable after a Successor Substitution.

In the event that the Calculation Agent fails to exercise its right to remove one or more Reference Entities in accordance with the above provisions by the day which is three Business Days following the Succession Event Date, the provisions set out in Schedule B relating to Successors shall apply, except that if a Reference Entity becomes a Successor to another Reference Entity, such Successor Reference Entity shall be deemed to be a Reference Entity only once with respect to this Transaction.

Succession Event Date:    The occurrence of a Succession Event, and the date at which such Succession Event is deemed to occur (the "**Succession Event Date**"), shall be determined by the Calculation Agent.

Successor Substitution Criteria:    Each Added Succession Event Reference Entity shall, on the date of its inclusion, be a financial intermediary, broker, dealer or investment house as defined by S&P domiciled in any Group of 7 (G7) country (or any country that becomes a member of G7 if G7 expands its membership) and result in the S&P Scenario Default Rate for the portfolio equal to or less than the

PRK.500.009.0083

S&P Scenario Default Rate before such substitution.

"**S&P Scenario Default Rate**" means, as of any date, an estimate of the cumulative default rate, given the initial rating scenario and assuming equal weighting of Reference Entities, for the pool of Reference Obligations included in the Swap Confirmation and as amended from time to time, determined by application of the latest version of the S&P CDO Evaluator on the website of S&P at such time.

"**S&P CDO Evaluator**" means a dynamic, analytical computer programme developed by S&P and used to determine the credit risk of a portfolio of debt securities.

For the purposes of information only, a summary of the S&P credit rating input guideline in respect of the S&P CDO Evaluator are attached hereto as Schedule D.

Each such determination shall be made by the Calculation Agent.

| | |
|---|---|
| Benchmark Obligation: | In respect of each Reference Entity, the corresponding obligation set forth under the heading "Benchmark Obligation" in Schedule A. |
| Obligation: | Any obligation of the relevant Reference Entity (either directly or as provider of a Qualifying Affiliate Guarantee or, if All Guarantees is specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity, any Qualifying Guarantee), and which (i) falls within the Obligation Category specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type and (ii) has all of the Obligation Characteristics specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type. |
| | Obligations shall also include, in respect of each Reference Entity, the relevant Benchmark Obligation (if any) specified with respect to such Reference Entity. |
| All Guarantees: | Applicable with respect to a Reference Entity only if All Guarantees is specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity. |
| Notional Amount: | AUD42,000,000. |

## 3    Buyer Payments

### (a)    Buyer Payments 1

| | |
|---|---|
| Fixed Rate Payer Calculation Amount: | The outstanding Notional Amount. |
| Fixed Rate Payer Calculation Period: | Section 2.9 of the Credit Derivatives Definitions shall apply, except that the final Fixed Rate Payer Calculation Period will end on, but exclude, the Termination Date, and for the avoidance of doubt, such dates shall be adjusted in accordance |

PRK.500.009.0084

with the Business Day Convention.

| | |
|---|---|
| Fixed Rate Payer Payment Dates: | 20 March, 20 June, 20 September and 20 December in each year during the period from, and including, 20 June 2007 to, and including, the Termination Date, subject to the Business Day Convention. |
| Fixed Rate Payer Period End Dates: | 20 March, 20 June, 20 September and 20 December in each year during the period from, and including, 20 June 2007 to, and including, the Termination Date subject to the Business Day Convention. |
| Fixed Rate: | AUD-BBR-BBSW plus 0.60 per cent. |
| | "AUD-BBR-BBSW" means "AUD-BBR-BBSW" as defined in the 2000 Definitions with a "Designated Maturity" of three (3) months (except in respect of the first Fixed Rate Payer Calculation Period, for which the Relevant Rate shall be the linear interpolation of the Relevant Rates for Designated Maturities of two months and three months) and the "Reset Date" being the day which is the first day of the Fixed Rate Payer Calculation Period. |
| Fixed Rate Day Count Fraction: | Actual/365 (Fixed). |

**(b)  Buyer Payments 2**

| | |
|---|---|
| Buyer Final Payment: | In addition to the Fixed Amounts payable in accordance with the provisions set out above, Buyer shall pay to Seller the Buyer Final Payment Amount on the Scheduled Termination Date. |
| Buyer Final Payment Amount: | The outstanding Notional Amount. |

**4    Seller Payments**

**(a)    Seller Payments 1**

| | |
|---|---|
| Interim Seller Payments: | In addition to the Seller Final Payment payable in accordance with the provisions set out below, during the period from, and including, the Effective Date to, and including, the Scheduled Termination Date, on each day (an "Interim Seller Payment Date") any principal, interest and other payments and distributions of cash and other property are scheduled to be received under the Collateral, Seller will promptly thereafter transfer to Buyer an amount equal to the aggregate amount so scheduled to be received from the Collateral Issuer in respect of the Collateral. |
| | "Collateral" shall bear the meaning given to such term in the Conditions. "Collateral Issuer" means the issuer of any Collateral. |

**(b)    Seller Payments 2**

| | |
|---|---|
| Seller Final Payment: | In addition to the Interim Seller Payments payable in |

PRK.500.009.0085

|  | accordance with the provisions set out above, Seller shall pay to Buyer the Seller Final Payment Amount on the Scheduled Termination Date. |
|---|---|
| Seller Final Payment Amount: | An amount equal to the aggregate redemption amount due and payable by the Collateral Issuer on the Scheduled Termination Date in respect of the Collateral. |

## 5  Provisions relating to Credit Events

| Conditions to Settlement: | Credit Event Notice |
|---|---|

|  | Notifying Party: | Buyer |
|---|---|---|
|  | Notice of Publicly Available Information: | Applicable. |

If a Credit Event Notice contains the information required in the Notice of Publicly Available Information such Credit Event Notice shall be deemed to be both a Credit Event Notice and a Notice of Publicly Available Information.

|  | Public Sources: | Applicable |
|---|---|---|
|  | Specified Number: | Two |

Notwithstanding anything to the contrary in the Credit Derivatives Definitions, no more than one Credit Event Notice can be delivered in respect of a Reference Entity.

| Credit Observation Period: | The period from and including the Trade Date to and including the Scheduled Termination Date. |
|---|---|
| Credit Events: | With respect to each Reference Entity, one or more of Bankruptcy, Failure to Pay or Restructuring. |
| Obligation Category: | With respect to each Reference Entity, the Obligation Category specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity. |
| Obligation Characteristics: | With respect to each Reference Entity, the Obligation Characteristics specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity. |
| Excluded Obligations: | None. |

## 6  Settlement upon the occurrence of a Second to Default Event

Notwithstanding anything to the contrary in the Credit Derivative Definitions (including without limitation Section 7.1 (*Cash Settlement*)), upon the occurrence of a Second to Default Event (the date of such occurrence, as determined by the Calculation Agent in its sole discretion, being the "Second to Default Event Date") (i) Party A shall make no further payments in respect of this Transaction from the preceding Fixed Rate Payer Payment Date (or if none, the Effective Date); (ii) Party B shall deliver the Collateral (as defined in the Conditions) to Party A no later than the thirteenth Business Day following the Second to Default Event Date (the "Second to Default Settlement Date"); (iii) the Swap Agreement shall terminate at zero on the Second to Default Settlement Date with no payment from Party A to Party B.

For the avoidance of doubt, Party B shall not pay Party A any Cash Settlement Amount, if any, with respect to a Credit Event in respect of any of the Reference Entities.

"**Second to Default Event**" means the satisfaction of the Conditions to Settlement with respect to two Reference Entities.

## 7   Exchange of Collateral

In the event that any Collateral becomes subject to mandatory redemption or otherwise ceases to be a Qualifying Asset, Party A may on any Business Day by notice inform Party B and S&P that it wishes to transfer to Party B Qualifying Assets specified in that notice in exchange for certain Collateral specified in that notice and held by Party B on such date. Subject to S&P's rating confirmation, Party A will be obliged to transfer such Qualifying Assets to Party B promptly following such notice and Party B will be obliged to transfer to Party A securities and/or cash equivalent to the Collateral so specified upon receipt of such Qualifying Assets. Party B's obligation to transfer to Party A such equivalent securities and/or cash shall not in any event exceed the aggregate amount of all the Collateral held by it on such date.

In the event that any charges are imposed by the issuer of the Collateral in respect of the redemption of the Collateral, the Swap Counterparty shall procure that the Collateral is exchanged for other Qualifying Assets subject to the provisions set out above.

"**Qualifying Assets**" means, in respect of any exchange of Collateral pursuant to the terms of this Transaction, any security with the following characteristics:

1.   (a)   having as of the date of transfer a credit rating assigned by S&P equal to AAA;

     (b)   maturing on or before the Scheduled Maturity Date;

     (c)   being AUD-denominated; and

     (d)   is not a structured finance product; or

2.   any AUD denominated money market fund with a credit rating assigned by S&P equal to AAAm; or

3.   AUD cash.

Party A shall pay all costs (including stamp duty) associated with the delivery or exchange of the Collateral for Qualifying Assets in accordance with the terms of this Confirmation.

## 8   Optional Termination

Party A may, by giving not less than five Business Days' notice to Party B prior to the Optional Termination Date, terminate this Transaction in whole but not in part in respect of the Notional Amount (the "**Termination Option**") on any Fixed Rate Payer Payment Date which is scheduled to fall on or about 20 March 2010, 20 March 2011, 20 March 2012, 20 March 2013 or 20 March 2014 (the date of such termination being the "**Optional Termination Date**"). The Termination Option may be exercised by oral notice (and such oral notice to be confirmed in writing promptly thereafter, provided that failure to do so will not vitiate such original oral notice) from Party A to Party B.

Upon the exercise of the Termination Option, the rights and obligations of the parties under this Transaction shall cease and no further amounts shall be payable by either party except for the following:

(a)   On the Optional Termination Date, Party B shall deliver the Collateral (as defined in the Conditions) to Party A; and

(b)   On the Optional Termination Date and following Party B's delivery of the Collateral as referred to in (a) above, Party A shall pay to Party B an amount equal to the outstanding Notional Amount and such

PRK.500.009.0087

Fixed Amount (determined and rounded by the Calculation Agent in its sole and absolute discretion) as is payable by Party A hereunder in respect of the outstanding Notional Amount calculated on the basis of a Fixed Rate Payer Calculation Period from (and including) the immediately preceding Fixed Rate Payer Payment Date to (but excluding) the Optional Termination Date (as determined by the Calculation Agent and rounded to the nearest cent (with one half cent being rounded up)).

## 9    Relationship Between Parties

Each of Buyer and Seller represents to the other that:

### (a)    Non-Reliance

It is acting for its own account and it is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction. It has not received from the other party any assurance or guarantee as to the expected results of this Transaction;

### (b)    Acceptance

It accepts the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the financial and other risks of this Transaction;

### (c)    Status of Parties

The other party is not acting as a fiduciary or an advisor for it in respect of this Transaction;

### (d)    Risk Management

It has entered into this Transaction for the purpose of (i) managing its borrowings or investments, (ii) hedging its underlying assets or liabilities or (iii) in connection with its line of business; and

## 10    Additional Termination Provisions

(i)    The following shall constitute Additional Termination Events for the purposes of this Transaction:

(a)    The Notes being declared due and payable following the occurrence of an Event of Default (as defined in the Conditions) under the terms thereof.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the sole Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(b)    A default under the terms of the Collateral prior to the Scheduled Termination Date.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the sole Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(c)    The Notes being declared redeemable on the occasion of the next scheduled Interim Seller Payment Date or the Scheduled Termination Date being required by law to withhold or account for tax or would suffer tax in respect of its income so that it would be unable to

make payment of the full amount due and the Noteholders not having received, either directly or indirectly, from Buyer the amounts referred to under "Optional Payments" below.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(ii) **Optional Payments:** If, for any reason beyond the control of Buyer or Seller the Noteholders do not receive payment under their Notes for any reason including the imposition of any withholding tax or a default or other circumstance linked to the Paying Agents, Buyer may elect to make any necessary payments to, or to the order of, the Noteholders to prevent either a redemption of the Notes for taxation reasons pursuant to Condition 6(d) of the Notes or an event of default pursuant to Condition 10 of the Notes from occurring.

## 11   Other Terms

(i) **Non-insurance business**

Party A and Party B acknowledge and agree that this Transaction is not intended to constitute insurance business and is not a contract of insurance, assurance, suretyship or guarantee and payments may be made under this Transaction by each party independently and without proof of the economic loss (if any) of the other party.

(ii) **Third party rights**

No person shall have any right to enforce any provision of this Transaction under the Contracts (Rights of Third Parties) Act 1999.

(iii) **Credit Support Document. Details of any Credit Support Document**

With respect to Party A, Guarantee dated as of the date hereof by Lehman Brothers Holdings Inc. in favour of Party B as beneficiary thereof in the form attached hereto as Exhibit A.

(iv) **Credit Support Provider**

Credit Support Provider means in relation to Party A: Lehman Brothers Holdings Inc.

(v) **Credit Support Annex**

Party A and Party B agree that the provisions of the ISDA Credit Support Annex attached hereto as Annex A shall apply to this Transaction.

(vi) **Misrepresentation**

For the purpose of this Confirmation only, Section 5(a)(iv) of the Agreement will not apply to either Party A or Party B.

(vii) **Breach of Agreement**

For the purpose of this Confirmation only, Section 5(a)(ii) of the Agreement will not apply to Party B.

(viii) **Bankruptcy**

For the purposes of this Confirmation only, section 5(a)(vii)(2) will not apply to Party B.

PRK.500.009.0089

## 12   Account Details

| | |
|---|---|
| Account details of Buyer: | Australia & New Zealand Banking Group, Melbourne (ANZBAU3M) |
| | A/C 265041 00001 |
| | A/C Lehman Brothers Inc./BNF/IFO Lehman Brothers Special |
| | Financing Inc. |
| Account details of Seller: | JP Morgan Chase Bank, N.A. Brisbane (CHASAU2) |
| | A/C 10048091 |
| | A/C JP Morgan Institutional Services Australia Ltd Paying Agency |
| | Account/BNF/IFO Beryl Finance Ltd Series 2007-7 |

This Confirmation shall be governed by and construed in accordance with English law.

PRK.500.009.0090

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us by facsimile.

Yours faithfully,

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By:

Name:

Title:

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)** hereby agrees to perform its obligations as Calculation Agent set out herein.

By:

Name:

Title:

Confirmed on the date first above written:

**BERYL FINANCE LIMITED**

By:

Name:

Title:

---

A07580075/2.0/02 Apr 2007

PRK.500.009.0091

### Schedule A
### Reference Entities

(as of 3 April 2007)

| Reference Entity | Benchmark Obligation | | | Entity Type |
| --- | --- | --- | --- | --- |
| | CUSIP/ISIN | Coupon (%) | Maturity | |
| JPMorgan Chase & Co. | US46625HAJ95 | 6.750% | 1 February 2011 | North American |
| Morgan Stanley | US61748AAE64 | 4.750% | 1 April 2014 | North American |
| Bank of America Corporation | US060505AG97 | 7.400% | 15 January 2011 | North American |
| Citigroup Inc. | US172967AZ49 | 7.250% | 1 October 2010 | North American |
| The Goldman Sachs Group, Inc. | US38141GEU40 | 5.625% | 15 January 2017 | North American |
| Deutsche Bank Aktiengesellschaft | DE0008516428 | 5.375% | 27 March 2012 | Western European |
| The Bear Stearns Companies Inc. | US073902PN28 | 5.550% | 22 January 2017 | North American |
| Merrill Lynch & Co., Inc. | US5901884M72 | 6.050% | 16 May 2016 | North American |

PRK.500.009.0092

## Schedule B
## Additional Definitions

### Definitions relating to Credit Events

| | |
|---|---|
| Bankruptcy: | means a Reference Entity (a) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (b) becomes insolvent or is unable to pay its debts or fails or admits in writing in a judicial, regulatory or administrative proceeding or filing its inability generally to pay its debts as they become due; (c) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (d) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (i) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (ii) is not dismissed, discharged, stayed or restrained in each case within thirty calendar days of the institution or presentation thereof; (e) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (f) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (g) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within thirty calendar days thereafter; or (h) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (a) to (g) (inclusive). |
| Default Requirement: | USD10,000,000 or its equivalent in any other currency. |
| Failure to Pay: | means, after the expiration of any applicable (or deemed) Grace Period (after the satisfaction of any conditions precedent to the commencement of such Grace Period), the failure by a Reference Entity to make, when and where due, any payments in an aggregate amount of not less than the Payment Requirement under one or more Obligations, in accordance with the terms of such Obligations at the time of such failure. |
| Payment Requirement: | USD1,000,000 or its equivalent in any other currency. |

PRK.500.009.0093

Restructuring:

(a) Restructuring means that, with respect to one or more Obligations, including as a result of an Obligation Exchange, and in relation to an aggregate amount of not less than the Default Requirement, any one or more of the following events occurs in a form that binds all holders of such Obligation, is agreed between the Reference Entity or a Governmental Authority and a sufficient number of holders of such Obligation to bind all holders of the Obligation or is announced (or otherwise decreed) by a Reference Entity or a Governmental Authority in a form that binds all holders of such Obligation, and such event is not expressly provided for under the terms of such Obligation in effect as of the later of the Trade Date and the date as of which such Obligation is issued or incurred:

(i) a reduction in the rate or amount of interest payable or the amount of scheduled interest accruals;

(ii) a reduction in the amount of principal or premium payable at maturity or at scheduled redemption dates; or

(iii) a postponement or other deferral of a date or dates for either (A) the payment or accrual of interest or (B) the payment of principal or premium.

"Permitted Currency" means (i) the legal tender of any Group of 7 (G7) country (or any country that becomes a member of G7 if G7 expands its membership); or (ii) the legal tender of any country which, as of the date of such change, is a member of the Organisation for Economic Cooperation and Development and has a local currency long-term debt rating of either "AAA" or higher assigned to it by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. or any successor to the rating business thereof, "Aaa" or higher assigned to it by Moody's Investors Service, Inc. or any successor to the rating business thereof or "AAA" or higher assigned to it by Fitch Ratings Limited or any successor to the rating business thereof.

(b) Notwithstanding the provisions of (a), above, none of the following shall constitute a Restructuring:

(i) the payment in euros of interest or principal in relation to an Obligation denominated in a currency of a Member State of the European Union that adopts or has adopted the single currency in accordance with the Treaty establishing the European Community, as amended by the Treaty on European Union;

(ii) the occurrence of, agreement to or announcement of any of the events described in (a)(i) to (v) due to an administrative adjustment, accounting adjustment or tax adjustment or other technical adjustment occurring in the ordinary course of business; and

(iii) the occurrence of, agreement to or announcement of any of the events described in (a)(i) to (v) in circumstances where such event does not directly or indirectly result from a deterioration in the creditworthiness or financial condition of the Reference Entity.

(c) For purposes of paragraphs (a) and (b) (above), the term Obligation shall be deemed to include Underlying Obligations for which the Reference Entity is acting as provider of a Qualifying Affiliate Guarantee or, if "All Guarantees" is specified as Applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in Schedule A with respect to such Reference Entity, as provider of any Qualifying Guarantee. In the case of a Qualifying Guarantee and an Underlying Obligation, references to a Reference Entity in paragraph (a) of this definition shall be deemed to refer to the relevant Underlying Obligor and the reference to a Reference Entity in paragraph (b) of this definition shall continue to refer to such Reference Entity.

(d) With respect to a Reference Entity, unless "Multiple Holder Obligation" is specified as Not Applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in Schedule A with respect to such Reference Entity, notwithstanding anything to the contrary in this definition of Restructuring the occurrence of, agreement to, or announcement of, any of the events described in (a)(i) to (v) (above) shall not be a Restructuring where the Obligation in respect of any such events is not a Multiple Holder Obligation.

"Multiple Holder Obligation" means an Obligation that (i) at the time the Credit Event Notice is delivered, is held by more than three holders that are not Affiliates of each other and (ii) with respect to which a percentage of holders (determined pursuant to the terms of the Obligation) at least equal to sixty-six-and-two-thirds is required to consent to the event which would otherwise constitute a Restructuring Credit Event, provided that (ii) above shall not apply to any Obligations which are Bonds.

Credit Event Notice:    An irrevocable notice (which may be oral, including by telephone) from Buyer to Seller (with a written copy to S&P) which describes a Credit Event that occurred during the Credit Observation Period. The Credit Event which is the subject of

PRK.500.009.0095

|  | the Credit Event Notice need not be continuing on the date the Credit Event Notice is effective. |
|---|---|
| Grace Period: | means the lesser of (a) the applicable grace period with respect to payments under the relevant Obligation under the terms of such Obligation in effect as of the later of the Trade Date and the date as of which such Obligation is issued or incurred and (b) 30 calendar days. |
| Grace Period Extension Date: | in the event of a Potential Failure to Pay occurring on or prior to the Scheduled Termination Date, and if Grace Period Extension is specified as applicable, and the relevant Grace Period ends after the Scheduled Termination Date, the Grace Period Extension Date will be (i) in the event that the Calculation Agent determines that the Potential Failure to Pay is remedied during the Grace Period, and, in the absence of further Credit Events or further Potential Failures to Pay prior to or on the Scheduled Termination Date, the later of (A) the Scheduled Termination Date, and (B) the date which is three Business Days after the date of such remedy, in which case no additional interest will be payable for the period from the Scheduled Termination Date to such date, or (ii) in the event that such Potential Failure to Pay is not remedied (as determined by the Calculation Agent in its sole and absolute discretion) before the expiry of the Grace Period, the date that is three Business Days following the expiry of the Grace Period. |
| Notice of Publicly Available Information: | means an irrevocable notice from the Calculation Agent (which may be oral, including by telephone) to the Buyer and Seller (with a written copy to S&P) that cites Publicly Available Information confirming the occurrence of the Credit Event described in the Credit Event Notice. The notice given must contain a copy, or a description in reasonable detail, of the relevant Publicly Available Information. |
| Event Determination Date: | means the first date on which both the Credit Event Notice and the Notice of Publicly Available Information are effective. |
| Qualifying Guarantee: | means an arrangement evidenced by a written instrument pursuant to which a Reference Entity irrevocably agrees (by guarantee of payment or equivalent legal arrangement) to pay all amounts due under an obligation (the "Underlying Obligation") for which another party is the obligor (the "Underlying Obligor"). Qualifying Guarantees shall exclude any arrangement (i) structured as a surety bond, financial guarantee insurance policy, letter of credit or equivalent legal arrangement or (ii) pursuant to the terms of which the payment obligations of the Reference Entity can be discharged, reduced or otherwise altered or assigned (other than by operation of law) as a result of the occurrence or non-occurrence of an event or circumstance (other than payment). The benefit of a Qualifying Guarantee must be capable of being Delivered |

together with the Delivery of the Underlying Obligation.

| | |
|---|---|
| Qualifying Affiliate Guarantee: | means a Qualifying Guarantee provided by a Reference Entity in respect of an Underlying Obligation of a Downstream Affiliate of that Reference Entity. |
| Downstream Affiliate: | means an entity whose outstanding Voting Shares were, at the date of issuance of the Qualifying Guarantee, more than 50 per cent. owned, directly or indirectly, by the Reference Entity. |
| Voting Shares: | means those shares or other interests that have power to elect the board of directors or similar governing body of an entity. |
| Governmental Authority: | means any de facto or de jure government (or any agency, instrumentality, ministry or department thereof), court, tribunal, administrative or other governmental authority or any other entity (private or public) charged with the regulation of the financial markets (including the central bank) of a Reference Entity or of the jurisdiction of organisation of a Reference Entity. |
| Convertible Obligation: | means any obligation that is convertible, in whole or in part, into Equity Securities solely at the option of holders of such obligation or a trustee or similar agent acting for the benefit only of holders of such obligation (or the cash equivalent thereof, whether the cash settlement option is that of the issuer or of (or for the benefit of) the holders of such obligation). |
| Exchangeable Obligation: | means any obligation that is exchangeable, in whole or in part, for Equity Securities solely at the option of holders of such obligation or a trustee or similar agent acting for the benefit only of holders of such obligation (or the cash equivalent thereof, whether the cash settlement option is that of the issuer or of (or for the benefit of) the holders of such obligation). |
| Accreting Obligation: | means any obligation (including, without limitation, a Convertible Obligation or an Exchangeable Obligation), the terms of which expressly provide for an amount payable upon acceleration equal to the original issue price (whether or not equal to the face amount thereof) plus an additional amount or amounts (on account of original issue discount or other accruals of interest or principal not payable on a periodic basis) that will or may accrete, whether or not (A) payment of such additional amounts is subject to a contingency or determined by reference to a formula or index, or (B) periodic cash interest is also payable. |
| Equity Securities: | means: |
| | (A)     in the case of a Convertible Obligation, equity securities (including options and warrants) of the issuer of such obligation or depositary receipts representing those equity securities of the issuer of such obligation together with any other property distributed to or made available to holders of those |

PRK.500.009.0097

equity securities from time to time; and

| | |
|---|---|
| (B) | in the case of an Exchangeable Obligation, equity securities (including options and warrants) of a person other than the issuer of such obligation or depositary receipts representing those equity securities of a person other than the issuer of such obligation together with any other property distributed to or made available to holders of those equity securities from time to time. |

## Obligation Definitions

| | |
|---|---|
| Borrowed Money: | with respect to any one of the Reference Entities, any one or more obligations (whether as principal or surety or otherwise) (excluding an obligation under a revolving credit arrangement for which there are no outstanding unpaid drawings in respect of principal) for the payment or repayment of borrowed money (which term shall include, without limitation, deposits and reimbursement obligations arising from drawings pursuant to letters of credit). |
| Bond: | means with respect to any one of the Reference Entities, any one or more obligations (whether as principal or surety or otherwise) in respect of borrowed money that is an obligation that is in the form of, or represented by, a bond, note (other than notes delivered pursuant to Loans) certificated debt security or other debt security, and shall not include any other type of borrowed money obligation. |
| Loan: | means with respect to any one of the Reference Entities, any one or more obligations (whether as principal or surety or otherwise) in respect of borrowed money that is an obligation that is documented by a term loan agreement, revolving loan agreement or other similar credit agreement, and shall not include any other type of borrowed money obligation. |
| Bond or Loan: | means any obligation that is either a Bond or a Loan. |
| Specified Currencies: | meaning (a) Standard Specified Currencies and (b) any additional currencies specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in Schedule A with respect to a Reference Entity. |
| Standard Specified Currency: | means an obligation payable in any of the lawful currencies of Canada, Japan, Switzerland, United Kingdom and the United States of America and the euro (and any successor currency to any of the abovementioned currencies). |
| Domestic Currency: | means an obligation payable in the lawful currency and any successor currency of (a) the relevant Reference Entity, if the Reference Entity is a Sovereign, or (b) the jurisdiction in which the relevant Reference Entity is organised, if the Reference |

PRK.500.009.0098

|  | Entity is not a Sovereign. In no event shall Domestic Currency include any successor currency if such successor currency is the lawful currency of any of Canada, Japan, Switzerland, the United Kingdom or the United States of America or the euro (or any successor currency to any such currency). |
|---|---|
| Subordinated: | means an obligation that is subordinated to an obligation that is Not Subordinated. |
| Not Subordinated: | means an obligation that is not subordinated to: (i) the Benchmark Obligation specified for the relevant Reference Entity in Schedule A or (ii) if no Benchmark Obligation is specified for the relevant Reference Entity, any unsubordinated Borrowed Money obligation of the relevant Reference Entity. For the purposes of determining whether an obligation satisfies the "Not Subordinated" Obligation Characteristic or Reference Obligation Characteristic, the ranking in priority of payment of the Benchmark Obligation shall be determined as of the later of: (1) the Trade Date and (2) the date on which such obligation was issued or incurred and shall not reflect any change to such ranking after such later date. |
| Not Contingent: | means any obligation having as of the relevant Event Determination Date and all times thereafter an outstanding principal balance or, in the case of obligations that are not Borrowed Money, a Due and Payable Amount, that pursuant to the terms of such obligation may not be reduced as a result of the occurrence or non-occurrence of an event or circumstance (other than payment). A Convertible Obligation, an Exchangeable Obligation and an Accreting Obligation shall satisfy the Not Contingent Reference Obligation Characteristic if such Convertible Obligation, Exchangeable Obligation or Accreting Obligation otherwise meets the requirements of the preceding sentence so long as, in the case of a Convertible Obligation or an Exchangeable Obligation, the right (A) to convert or exchange such obligation or (B) to require the issuer to purchase or redeem such obligation (if the issuer has exercised or may exercise the right to pay the purchase or redemption price, in whole or in part, in Equity Securities) has not been exercised (or such exercise has been effectively rescinded) on or before the relevant Event Determination Date. |
| Transferable: | means an obligation that is transferable to institutional investors without any contractual, statutory or regulatory restriction, provided that none of the following shall be considered contractual, statutory or regulatory restrictions:<br><br>(A) contractual, statutory or regulatory restrictions that provide for eligibility for resale pursuant to Rule 144A or Regulation S promulgated under the United States Securities Act of 1933, as amended (and any contractual, statutory or regulatory restrictions promulgated under the laws of any jurisdiction having a similar effect in relation |

PRK.500.009.0099

to the eligibility for resale of an obligation); or

(B) restrictions on permitted investments such as statutory or regulatory investment restrictions on insurance companies and pension funds,

provided that such characteristics shall be applicable only in respect of obligations that are Bonds.

**Maximum Maturity 30 years:** means an obligation that has a remaining maturity from the Event Determination Date of not greater than 30 years.

**Not Bearer:** means any obligation that is not a bearer instrument unless interests with respect to such bearer instrument are cleared via the Euroclear system, Clearstream, Luxembourg or any other internationally recognised clearing system provided that such characteristic shall be applicable only in respect of obligations that are Bonds.

**Not Sovereign Lender:** means any obligation that is not primarily owed to a Sovereign or Supranational Organisation, including, without limitation, obligations generally referred to as "Paris Club Debt".

**Not Domestic Law:** means any obligation that is not governed by the laws of (A) the relevant Reference Entity, if such Reference Entity is a Sovereign, or (B) the jurisdiction or organisation of the relevant Reference Entity, if such Reference Entity is not a Sovereign.

**Not Domestic Issuance:** means any obligation other than an obligation that was, at the time the relevant obligation was issued (or reissued, as the case may be) or incurred, intended to be offered for sale primarily in the domestic market of the relevant Reference Entity. Any obligation that is registered or qualified for sale outside the domestic market of the relevant Reference Entity (regardless of whether such obligation is also registered or qualified for sale within the domestic market of the relevant Reference Entity) shall be deemed not to be intended for sale primarily in the domestic market of the Reference Entity.

**Not Domestic Currency:** means any obligation that is payable in a currency other than the Domestic Currency.

**Assignable Loan:** means a Loan that is, as of the Event Determination Date, capable of being assigned or novated to (a) any third party or (b) at a minimum, commercial banks or financial institutions (irrespective of their jurisdiction or organisation) that are not then a lender or a member of the relevant lending syndicate, without the consent of the relevant Reference Entity or the guarantor, if any, of such Loan (or the consent of the applicable borrower if the Reference Entity is guaranteeing such Loan) or any agent, provided that such characteristics shall be applicable only in respect of obligations that are Loans.

**Consent Required Loan:** means a Loan that is, as of the Event Determination Date, capable of being assigned or novated with the consent of the relevant Reference Entity or the guarantor, if any, of such Loan

(or the consent of the relevant borrower if the Reference Entity is guaranteeing such Loan) or any agent, provided that such characteristics shall be applicable only in respect of obligations that are Loans.

## Certain additional definitions with respect to Restructuring

"**Restructuring Maturity Limitation Date**" means, with respect to a Reference Entity for which Restructuring Maturity Limitation is specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, the date that is the earlier of (x) 30 months following the Restructuring Date and (y) the latest final maturity date of any Restructured Bond or Loan, provided, however, that under no circumstances shall the Restructuring Maturity Limitation Date be earlier than the Scheduled Termination Date or later than 30 months following the Scheduled Termination Date and, if it is, it shall be deemed to be the Scheduled Termination Date or 30 months following the Scheduled Termination Date, as the case may be.

"**Restructuring Date**" means, with respect to a Restructured Bond or Loan, the date on which a Restructuring is legally effective in accordance with the terms of the documentation governing such Restructuring.

"**Restructured Bond or Loan**" means an Obligation which is a Bond or Loan and in respect of which the Restructuring that is the subject of a Credit Event Notice has occurred.

"**Eligible Transferee**" means each of the following:

(a)

    (i)      any bank or other financial institution;

    (ii)      an insurance or reinsurance company;

    (iii)      a mutual fund, unit trust or similar collective investment vehicle (other than an entity specified in clause (c)(i) below); and

    (iv)      a registered or licensed broker or dealer (other than a natural person or proprietorship);

    provided, however, in each case that such entity has total assets of at least USD500 million;

(b)      an Affiliate of an entity specified in the preceding clause (a);

(c)      each of a corporation, partnership proprietorship, organisation, trust or other entity

    (i)      that is an investment vehicle (including, without limitation, any hedge fund, issuer of collateralised debt obligations, commercial paper conduit or other special purpose vehicle) that (1) has total assets of at least USD100 million or (2) is one of a group of investment vehicles under common control or management having, in the aggregate, total assets of at least USD100 million; or

    (ii)      that has total assets of at least USD500 million; or

    (iii)      the obligations of which under an agreement, contract, or transaction are guaranteed or otherwise supported by a letter of credit or keepwell, support, or other agreement by an entity described in clauses (a), (b), (c)(ii) or (d); and

(d)      a Sovereign, Sovereign Agency or Supranational Organisation;

All references in this definition of USD include equivalent amounts in other currencies.

"**Fully Transferable Obligation**" means, with respect to a Reference Entity for which Fully Transferable Obligation is specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the

PRK.500.009.0101

Entity Type specified in the Reference Registry with respect to such Reference Entity, a Reference Obligation that is either Transferable, in the case of Bonds, or capable of being assigned or novated to all Eligible Transferees without the consent of any person being required, in the case of any Reference Obligation other than Bonds. For purposes of determining whether a Reference Obligation is Transferable or is capable of being assigned or novated to Eligible Transferees, such determination shall be made as of the Valuation Date for the portion of the Reference Obligation to be valued on such Valuation Date, taking into account only the terms of the Reference Obligation and any related transfer or consent documents which have been obtained by the Issuer.

Any requirement that notification of transfer of a Reference Obligation be provided to a trustee, fiscal agent, administrative agent, clearing agent or paying agent for any Reference Obligation shall not be considered to be a requirement for consent for purposes of the definitions of Restructuring Maturity Limitation and Fully Transferable Obligation.

"**Modified Restructuring Maturity Limitation Date**" means, with respect to a Reference Entity for which Modified Restructuring Maturity Limitation is specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, the date that is the later of (x) the Scheduled Termination Date and (y) 60 months following the Restructuring Date in the case of a Restructured Bond or Loan, or 30 months following the Restructuring Date in the case of all other Reference Obligations.

"**Modified Eligible Transferee**" means any bank, financial institution or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities and other financial assets.

"**Conditionally Transferable Obligation**" means, with respect to a Reference Entity for which Conditionally Transferable Obligation is specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, a Reference Obligation that is either Transferable, in the case of Bonds, or capable of being assigned or novated to all Modified Eligible Transferees without the consent of any person being required, in the case of any Reference Obligation other than Bonds, provided, however, that a Reference Obligation other than Bonds will be a Conditionally Transferable Obligation notwithstanding that consent of the Reference Entity or the guarantor, if any, of a Reference Obligation other than Bonds (or the consent of the relevant obligor if a Reference Entity is guaranteeing such Reference Obligation) or any agent is required for such novation, assignment or transfer so long as the terms of such Reference Obligation provide that such consent may not be unreasonably withheld or delayed. Any requirement that notification of novation, assignment or transfer of a Reference Obligation be provided to a trustee, fiscal agent, administrative agent, clearing agent or paying agent for a Reference Obligation shall not be considered to be a requirement for consent for purposes of this definition.

For purposes of determining whether a Reference Obligation satisfies the requirements of the definition of Conditionally Transferable Obligation, such determination shall be made as of the Valuation Date for the portion of the Reference Obligation to be valued on such Valuation Date, taking into account only the terms of the Reference Obligation and any related transfer or consent documents which have been obtained by the Issuer.

### Certain definitions relating to Successors

(a)     In relation to a Reference Entity that is not a Sovereign, "Successor" means the entity or entities, if any, determined as set forth below:

(i)   if an entity directly or indirectly succeeds to 75 per cent. or more of the Relevant Obligations of the Reference Entity by way of a Succession Event, that entity will be the sole Successor;

(ii)   if one entity directly or indirectly succeeds to more than 25 per cent. (but less than 75 per cent.) of the Relevant Obligations of the Reference Entity by way of a Succession Event, and not more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, the entity that succeeds to more than 25 per cent. of the Relevant Obligations will be the sole Successor;

(iii)   if more than one entity each directly or indirectly succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity by way of a Succession Event, and not more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, the entities that succeed to more than 25 per cent. of the Relevant Obligations will each be Successors;

(iv)   if one or more entities each directly or indirectly succeed to more than 25 per cent. of the Relevant Obligations of the Reference Entity by way of a Succession Event, and more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, each such entity and the Reference Entity will be Successors;

(v)   if one or more entities directly or indirectly succeed to a portion of the Relevant Obligations of the Reference Entity by way of a Succession Event, but no entity succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity and the Reference Entity continues to exist, there will be no Successor and the Reference Entity and the Transaction will not be changed in any way as a result of the Succession Event; and

(vi)   if one or more entities directly or indirectly succeed to a portion of the Relevant Obligations of the Reference Entity by way of a Succession Event, but no entity succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity and the Reference Entity ceases to exist, the entity which succeeds to the greatest percentage of Relevant Obligations (or, if two or more entities succeed to an equal percentage of Relevant Obligations, the entity from among those entities which succeeds to the greatest percentage of obligations) of the Reference Entity will be the sole Successor.

The Calculation Agent will be responsible for determining, as soon as reasonably practicable after it becomes aware of the relevant Succession Event (but no earlier than 14 days after the legally effective date of the Succession Event), and with effect from the legally effective date of the Succession Event, whether the relevant thresholds set forth above have been met, or which entity qualifies under paragraph (a)(vi) above, as applicable. In calculating the percentages used to determine whether the relevant thresholds set forth above have been met, or which entity qualifies under paragraph (a)(vi) above, as applicable, the Calculation Agent shall use, in respect of each applicable Relevant Obligation included in such calculation, the amount of the liability in respect of such Relevant Obligation listed in the Best Available Information.

(b)   "Succession Event" means an event such as a merger, consolidation, amalgamation, transfer of assets or liabilities, demerger, spin-off or other similar event in which one entity succeeds to the obligations of another entity, whether by operation of law or pursuant to any agreement. Notwithstanding the foregoing, "Succession Event" shall not include an event in which the holders of obligations of the Reference Entity exchange such obligations for the obligations of another entity, unless such exchange occurs in connection with a merger, consolidation, amalgamation, transfer of assets or liabilities, demerger, spin-off or other similar event.

PRK.500.009.0103

(c)     Where, pursuant to Section (a) above, one or more Successors have been identified in relation to a particular Reference Entity, each such Successor will be a Reference Entity (a "**Successor Reference Entity**") for the purposes of this Transaction (and, for the avoidance of doubt, the original Reference Entity shall cease to be a Reference Entity except where it is a Successor Reference Entity).

(d)     "**Relevant Obligations**" means the Obligations constituting Bonds and Loans of the Reference Entity outstanding immediately prior to the effective date of the Succession Event, excluding any debt obligations outstanding between the Reference Entity and any of its Affiliates, as determined by the Calculation Agent. The Calculation Agent will determine the entity which succeeds to such Relevant Obligations on the basis of the Best Available Information. If the date on which the Best Available Information becomes available or is filed precedes the legally effective date of the relevant Succession Event, any assumptions as to the allocation of obligations between or among entities contained in the Best Available Information will be deemed to have been fulfilled as of the legally effective date of the Succession Event, whether or not this is in fact the case.

(e)     "**Best Available Information**" means:

   (i)      in the case of a Reference Entity which files information with its primary securities regulator or primary stock exchange that includes unconsolidated, pro forma financial information which assumes that the relevant Succession Event has occurred or which provides such information to its shareholders, creditors or other persons whose approval of the Succession Event is required, that unconsolidated, pro forma financial information and, if provided subsequently to the provision of unconsolidated, pro forma financial information but before the Calculation Agent makes its determination for the purposes of the definition of "Successor", other relevant information that is contained in any written communication provided by the Reference Entity to its primary securities regulator, primary stock exchange, shareholders, creditors or other persons whose approval of the Succession Event is required; or

   (ii)     in the case of a Reference Entity which does not file with its primary securities regulators or primary stock exchange, and which does not provide to shareholders, creditors or other persons whose approval of the Succession Event is required, the information contemplated in (i) above, the best publicly available information at the disposal of the Calculation Agent to allow it to make a determination for the purposes of the definition of "Successor".

Information which is made available more than 14 days after the legally effective date of the Succession Event shall not constitute Best Available Information.

(f)     In relation to a Sovereign Reference Entity, "**Successor**" means any direct or indirect successor(s) to that Reference Entity irrespective of whether such successor(s) assumes any of the obligations of such Reference Entity.

"**Sovereign**" means any state, political subdivision or government, or any agency, instrumentality, ministry, department or other authority (including, without limiting the foregoing, the central bank) thereof.

PRK.500.009.0104

## Schedule C

The standard terms relating to each Entity Type are set out in this Schedule C.

## STANDARD TERMS FOR WESTERN EUROPEAN ENTITIES

| | | |
|---|---|---|
| All Guarantees | Applicable | |
| Credit Events | Bankruptcy | |
| | Failure to Pay | |
| | Restructuring | |
| | Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable | |
| | Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Applicable | |
| | Multiple Holder Obligation: Applicable | |
| Grace Period | Not Applicable | |
| Obligation | | |
| | Obligation Category: | Borrowed Money |
| | Obligation Characteristics: | None |
| Reference Obligation | | |
| | Reference Obligation Category: | Bond or Loan |
| | Reference Obligation Characteristics: | Not Subordinated |
| | | Specified Currency – Standard Specified Currencies |
| | | Not Contingent |
| | | Assignable Loan |
| | | Consent Required Loan |
| | | Transferable |
| | | Maximum Maturity 30 years |
| | | Not Bearer |
| | Exclude Accrued Interest | |

PRK.500.009.0105

## STANDARD TERMS FOR NORTH AMERICAN ENTITIES

| | | |
|---|---|---|
| All Guarantees | Not Applicable | |
| Credit Events | Bankruptcy | |
| | Failure to Pay | |
| | Restructuring | |
| | Restructuring Maturity Limitation and Fully Transferable Obligation: Applicable | |
| | Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable | |
| | Multiple Holder Obligation: Applicable | |
| Grace Period | Not Applicable | |
| Obligation | | |
| | Obligation Category: | Borrowed Money |
| | Obligation Characteristics: | None |
| Reference Obligation | | |
| | Reference Obligation Category: | Bond or Loan |
| | Reference Obligation Characteristics: | Not Subordinated |
| | | Specified Currency – Standard Specified Currencies |
| | | Not Contingent |
| | | Assignable Loan |
| | | Consent Required Loan |
| | | Transferable |
| | | Maximum Maturity 30 years |
| | | Not Bearer |
| | Exclude Accrued Interest | |

PRK.500.009.0106

## STANDARD TERMS FOR AUSTRALIAN AND NEW ZEALAND ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Applicable

| | |
|---|---|
| Grace Period | Not Applicable |
| Obligation | |
| Obligation Category: | Borrowed Money |
| Obligation Characteristics: | None |
| Reference Obligation | |
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |

Specified Currency – Standard Specified Currencies, plus AUD and NZD

Not Contingent

Assignable Loan

Consent Required Loan

Transferable
Maximum Maturity 30 years
Not Bearer

Exclude Accrued Interest

PRK.500.009.0107

## STANDARD TERMS FOR JAPANESE ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

        Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

        Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

        Multiple Holder Obligation: Not Applicable

Section 3.9 of the Credit Derivatives Definitions shall not apply.

| | |
|---|---|
| Grace Period | Not Applicable |
| Obligation | |
| | Obligation Category:      Borrowed Money |
| | Obligation Characteristics:      Not Subordinated |
| Reference Obligation | |
| | Reference Obligation Category:      Bond or Loan |
| | Reference Obligation Characteristics:      Not Subordinated |

                                                    Specified Currency – Standard Specified Currencies

                                                  Not Contingent

                                                  Assignable Loan Consent Required Loan

                                                  Transferable Maximum Maturity 30 years Not Bearer

Exclude Accrued Interest

## STANDARD TERMS FOR SINGAPOREAN ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Applicable

| | |
|---|---|
| Grace Period | Not Applicable |
| Obligation | |

| | |
|---|---|
| Obligation Category: | Bond or Loan |
| Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard Specified Currencies, plus SGD |
| | Not Sovereign Lender |

**Reference Obligation**

| | |
|---|---|
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard Specified Currencies, plus SGD |
| | Not Sovereign Lender |
| | Not Contingent |
| | Assignable Loan |
| | Transferable |
| | Maximum Maturity 30 years |
| | Not Bearer |

Exclude Accrued Interest

PRK.500.009.0109

## STANDARD TERMS FOR ASIAN ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Applicable

| | |
|---|---|
| Grace Period | Not Applicable |
| Obligation | |

| | |
|---|---|
| Obligation Category: | Bond or Loan |
| Obligation Characteristics: | Not Subordinated |
| | Not Sovereign Lender |
| | Not Domestic Currency |
| | Not Domestic Issuance |
| | Not Domestic Law |

Reference Obligation

| | |
|---|---|
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard |
| | Specified Currencies |
| | Not Sovereign Lender |
| | Not Domestic Law |
| | Not Domestic Currency |
| | Not Contingent |
| | Not Domestic Issuance |
| | Assignable Loan |
| | Transferable |
| | Maximum Maturity 30 years |
| | Not Bearer |

Exclude Accrued Interest

PRK.500.009.0110

## Schedule D

## S&P CDO Evaluator

If a reference entity, or a guarantor who unconditionally and irrevocably guarantees a reference obligation or any pari passu ranked obligation, is rated by S&P, the rating shall be the foreign currency long-term issuer credit rating (ICR) assigned by S&P to the reference entity or guarantor (as applicable), unless such reference entity or guarantor is on the public creditwatch list for negative or positive implications, in which case the rating shall be one subcategory below or above respectively the current S&P ICR of such reference entity or guarantor;

If a reference entity or guarantor is not rated by S&P but is publicly rated by Moody's Investors Service, Inc. ("Moody's"), then the S&P Rating of such reference entity or guarantor shall be (A) one subcategory below the S&P equivalent of the foreign currency senior unsecured rating assigned by Moody's if such reference entity or guarantor is rated "Baa3" or higher by Moody's and (B) two subcategories below the S&P equivalent of the foreign currency senior unsecured rating assigned by Moody's if such reference entity or guarantor is rated "Ba1" or lower by Moody's.

The above S&P credit rating input guideline in CDO Evaluator shall be subject to any modification by S&P at its discretion from time to time.

PRK.500.009.0111

Annex A

# PARAGRAPH 11
## of the
## CREDIT SUPPORT ANNEX

to the Schedule to the ISDA Master Agreement

dated as of 10 October 2002 (as amended and restated on 21 July 2006

between

**Lehman Brothers Special Financing Inc.**    and        **Beryl Finance Limited ("Party B")**
**("Party A")**

pursuant to a Deed of Accession dated 21 July 2006

**Paragraph 11. Elections and Variables**

(a)        *Base Currency and Eligible Currency.*

    (i)    "Base Currency" means AUD.

    (ii)    "Eligible Currency" means the Base Currency and each other currency specified here: none.

(b)        *Credit Support Obligations.*

    (i)    *Delivery Amount, Return Amount and Credit Support Amount.*

        (A) *"Delivery Amount"* has the meaning specified in Paragraph 2(a) except that the Transferee shall be deemed to have made a demand on each Valuation Date.

        (B) *"Return Amount"* has the meaning specified in Paragraph 2(b).

        (C) *"Credit Support Amount"* has the meaning specified in Paragraph 10.

    (ii)    *Eligible Credit Support.* The following items will qualify as *"Eligible Credit Support"* for the party specified:

|     |     | Party A | Party B | Valuation Percentage |
|-----|-----|:-------:|:-------:|:--------------------:|
| (A) | Cash in an Eligible Currency. | X | X | 100% |
| (B) | AUD denominated government debt obligations with a maturity of one year or less assigned a credit rating of "AAA" by S&P (as defined below). | X | X | 98% |
| (C) | AUD denominated government debt obligations with a remaining maturity of more than one year but less than ten years assigned a credit rating of "AAA" by S&P. | X | X | 86% |
| (D) | AUD denominated money market funds with a credit rating equal to "AAAm" by S&P. | X | X | 100% |

    (iii)     *Thresholds.*

        (A) *"Independent Amount"* means with respect to Party A and to Party B: not applicable.

        (B) *"Threshold"* means with respect to Party A: zero
           *"Threshold"* means with respect to Party B: not applicable

        (C) *"Minimum Transfer Amount"* means with respect to Party A: AUD1
           *"Minimum Transfer Amount"* means with respect to Party B: AUD1

        (D) *Rounding.* Not Applicable.

(c) *Valuation and Timing.*

    (i)    *"Valuation Agent"* means Party A.

    (ii)   *"Valuation Date"* means: 3 April 2007 and, thereafter, Friday of each week, provided that if such day is not a day on which commercial banks are open for business in London, the Valuation Date shall be the immediately following day on which commercial banks are open for business in London.

    (iii)  *"Valuation Time"* means:

        [X] the close of business in the place of location of the Valuation Agent on the Valuation Date or date of calculation, as applicable;

        [ ] the close of business on the Local Business Day immediately preceding the Valuation Date or date of calculation, as applicable;

*provided* that the calculations of Value and Exposure will, as far as practicable, be made as of approximately the same time on the same date.

    (iv)  *"Notification Time"* means 1:00 p.m., London time, on a Local Business Day.

(d)   *Exchange Date.* *"Exchange Date"* has the meaning specified in Paragraph 3(c)(ii).

(e)   *Dispute Resolution.*

    (i)    *"Resolution Time"* means 1:00 p.m., London time, on the Local Business Day following the date on which the notice is given that gives rise to a dispute under Paragraph 4.

    (ii)   *Value.* For the purpose of Paragraphs 4(a)(4)(i)(C) and 4(a)(4)(ii), the Value of the outstanding Credit Support Balance or of any transfer of Eligible Credit Support or Equivalent Credit Support, as the case may be, will be calculated by Party A reasonably and in good faith.

    (iii)  *Alternative.* The provisions of Paragraph 4 will apply.

(f)    *Distributions and Interest Amount.*

    (i)    *Interest Rate.* Not Applicable. The definition of "Interest Amount" in Paragraph 10 shall be amended as follows:

       "Interest Amount" means, with respect to an Interest Period, the aggregate sum of the Base Currency Equivalents of the amounts of interest accrued in such Interest Period on the principal amount of the portion of the Credit Support Balance comprised of cash in such currency, as determined by the Valuation Agent.

    (ii)   *Transfer of Interest Amount.* The transfer of the Interest Amount will be made on each Valuation Date.

    (iii)  *Alternative to Interest Amount.* The provisions of Paragraph 5(c)(ii) will apply.

(g)   *Addresses for Transfers.*

PRK.500.009.0113

Party A: As notified by the parties from time to time.

Party B: As notified by the parties from time to time.

Account details of Transferee:

Australia and New Zealand Banking Group Ltd (ANZBAU3MXXX)
A/C 21803200001
A/C JP Morgan Chase Bank, N.A., London
Ref: Beryl Finance Limited 2007-7

(h) **Other Provisions.**

   (i) **Scope**

   This Annex relates to the Transaction (the "Swap Transaction") between Party A and Party B with an Effective Date of 3 April 2007 relating to Beryl Finance Limited Series 2007-7 AUD42,000,000 Second to Default Basket Callable Credit-Linked Notes due 2014 (the "Notes"). The provisions of the Agreement shall apply both to the Swap Transaction and the Transaction evidenced by the Annex so that the Agreement, the Confirmation relating to the Swap Transaction and this Annex form a single agreement.

   (ii) **Exposure**

   The definition of "Exposure" shall be deleted and replaced with the following:

   "**"Exposure"** means, with respect to Party B on a Valuation Date, and subject to Paragraph 4 in the case of a dispute, zero, unless the Credit Rating of Party A's Credit Support Provider by S&P is below "A-1+", in which case it shall mean the amount (expressed as a positive number) equal to the sum of (i) the Costs Exposure and (ii) the Swap Premium Exposure."

   (iii) **Additional definitions for calculating Exposure**

   For the purposes herein, the following definitions shall apply:

   "*Costs Exposure*" means the following amounts:

   For all Valuation Dates falling from, and including 3 April 2007, to but excluding 20 June 2007, AUD89,000;

   For all Valuation Dates falling from, and including 20 June 2007, to but excluding the Scheduled Termination Date of the Swap Agreement, AUD42,000;

   For the avoidance of doubt, Costs Exposure includes an amount, reasonably estimated by the Calculation Agent, equal to any transfer or stamp tax or other costs, if any, which would be incurred by Party B, in relation to the delivery of the Collateral pursuant to (and as defined in) the terms and conditions of the Notes.

   "*Credit Rating*" means the rating assigned in respect of short term or long term (as the case may be) unsecured and unsubordinated debt obligations (not supported by third party credit enhancement) of the relevant party;

   "*Principal Amount*" shall bear the meaning given to such term in the Series Prospectus with respect to the Notes.

   "*S&P*" means Standard and Poor's Ratings Services, a division of The McGraw-Hill Companies Inc. or any successor to the rating business thereof; and

   "*Swap Premium Exposure*" means the amount equal to the sum of (1) the Fixed Amount payable by Party A under the Swap Transaction on the next succeeding Fixed Rate Payer

Payment Date, and (2) the Grace Period Amount, where *"Grace Period Amount"* means an amount equal to: (x) the outstanding Principal Amount of the Notes, multiplied by (y) the Fixed Rate under the Swap Transaction, multiplied by (z) 11/360. For the purposes of calculating the Swap Premium Exposure: (i) the Fixed Amount and the Grace Period Amount shall be calculated as of each Valuation Date; and (ii) the outstanding Principal Amount on each day of the Fixed Rate Payer Calculation Period following the relevant Valuation Date shall be equal to the outstanding Principal Amount as of such Valuation Date.

*(iv)  Transfer of additional Eligible Credit Support; legal opinion delivery; Additional Termination Event*

(A) The failure by Part A to transfer the Eligible Credit Support to Party B in respect of any Valuation Date shall constitute an Additional Termination Event where Party A is the Affected Party and the Swap Transaction and the Transaction for which this Annex constitutes the Confirmation shall be the Affected Transactions.

(B) Without prejudice to the calculation of Party B's Exposure, upon each occurrence of a Rating Event and while such Rating Event is continuing, Party A shall transfer Eligible Credit Support (or such other items as may be satisfactory to the Trustee and S&P) in an amount satisfactory to the Trustee and S&P (acting reasonably and in good faith) within 10 calendar days of such Rating Event. Such amount of Eligible Credit Support shall be an Independent Amount for the purposes of this Annex (unless otherwise agreed) and shall be calculated and maintained as agreed between Party A, the Trustee and S&P.

(C) In the event that Party A and Party B fail to reach the agreement contemplated in sub-paragraph (B) above within such 10 calendar day period Party A shall effect a Permitted Transfer or procure a Permitted Guarantee.

(D) The failure by Party A to procure a Permitted Guarantee or effect a Permitted Transfer contemplated by sub-paragraph (C) above shall constitute an Additional Termination Event where Party A is the Affected Party and the Swap Transaction and the Transaction for which this Annex constitutes the Confirmation shall be the Affected Transactions.

For the purposes herein:

*"Permitted Guarantee"* means a guarantee or indemnity from an entity with a Required Rating in respect of Party A's obligations under the Swap Transaction in a form and substance reasonably satisfactory to the Trustee and the Issuer and on substantially the same terms as the Credit Support Document relating to the Swap Transaction;

*"Permitted Transfer"* means a transfer of all of Party A's rights and obligations with respect to the Swap Transaction to another entity which has (or whose obligations under the Swap Transaction are unconditionally and irrevocably guaranteed by an entity which has) a Required Rating;

*"Rating Event"* means the Credit Rating by S&P of Party A's Credit Support Provider falls below the Required Ratings; and

*"Required Rating"* means a Credit Rating by S&P of "A-2"/"BBB+" or above.

PRK.500.009.0115

#### (v)   *Delivery of legal opinion*

(A)   In the event that Party A transfers Eligible Credit Support to Party B pursuant to Paragraph 11(h)(iv) above, Party A agrees to provide to S&P within 10 calendar days of the occurrence of the Rating Event a legal opinion from its external legal advisers in form and substance reasonably satisfactory to S&P (acting reasonably and in good faith), such opinion confirming, but not limited to, that the Eligible Credit Support so transferred shall not be required to be repaid, reimbursed or otherwise disgorged by the Issuer, otherwise than in accordance with the terms of this Annex or the Swap Transaction.

(B)   The failure of Party A to provide such legal opinion within such 10 calendar day period shall constitute an Additional Termination Event where Party A is the Affected Party and the Swap Transaction and the Transaction for which this Annex constitutes the Confirmation shall be the Affected Transactions.

#### (vi)   *Single Transferor*

Notwithstanding anything contained in this Annex, Party A only shall be a Transferor and Party B only shall be a Transferee.

#### (vii)   *No set-off*

Notwithstanding any set-off right between Party A and Party B, whether now or hereafter in existence, each of Party A and Party B agrees that, subject as provided in this Agreement, all payments required to be made by it under this Transaction shall be made without set-off and that it shall not withhold payment or delivery under this Transaction in respect of any default by the other party under any agreement other than this Agreement or any amount relating to any agreement other than this Agreement between the other party on the one hand and it on the other. For the avoidance of doubt, references in this paragraph to "this Agreement" include the ISDA Master Agreement.

Signed for and on behalf of
**Lehman Brothers Special Financing Inc.**

By:

Name: _____

Date:   3 April 2007 _____

Signed for and on behalf of
**Beryl Finance Limited**

By:

Name: _____

Date:   3 April 2007 _____

**Exhibit A**

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and BERYL FINANCE LIMITED ("Party B") have, pursuant to a Deed of Accession dated 21 July 2006, entered into a Master Agreement dated as of 10 October 2002 and amended and restated on 21 July 2006 (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement for the Transaction evidenced by a Confirmation dated 3 April 2007 relating to the Series 2007-7 AUD42,000,000 Second to Default Basket Callable Credit-Linked Notes due 2014 of Party B (the "2007-7 Transaction"). For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)     Subject to the provisions herein, the Guarantor hereby unconditionally and irrevocably guarantees to Party B the due and punctual payment of all amounts payable by Party A under the 2007-7 Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)     Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)     Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability of the Agreement against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defence of a guarantor (excluding the defence of payment or statute of limitations, neither of which are waived); provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement.

(d)     This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect the Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)     Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

A07580075/2.0/02 Apr 2007

PRK.500.009.0117

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Title: _____

Date: 3 April 2007 _____

## ANNEX 4 – DESCRIPTION OF THE SWAP COUNTERPARTY
## AND THE SWAP GUARANTOR

**Lehman Brothers Special Financing Inc.**

Lehman Brothers Special Financing Inc. (the "Swap Counterparty") was incorporated under the laws of the State of Delaware of the United States of America on 17 August 1984.

The principal executive office of the Swap Counterparty is located at 745 Seventh Avenue, New York, New York 10019, U.S.A. The Swap Counterparty's registered office in the State of Delaware is located at 1013 Centre Road, Wilmington, Delaware 19805, U.S.A.

The Swap Counterparty is engaged in the fixed income and currency, swaps and derivatives business. The Swap Counterparty's principal activities are to provide a wide range of derivative products including interest rate, currency, credit and mortgage derivatives.

The Swap Counterparty is a wholly-owned subsidiary of Lehman Brothers Inc.

**Lehman Brothers Holdings Inc.**

Lehman Brothers Holdings Inc. (the "Swap Guarantor") was incorporated under the laws of the State of Delaware of the United States of America on 29 December 1983.

The principal executive office of the Swap Guarantor is located at 745 Seventh Avenue, New York, New York 10019. The Swap Guarantor's registered office in the State of Delaware is located at 1013 Centre Road, Wilmington, Delaware 19805, U.S.A.

The Swap Guarantor is a holding company that is primarily engaged in funding activities. Through its U.S. and non-U.S. subsidiaries and affiliates it provides equity and fixed income sales, trading and research, investment banking, mortgage, private equity and private client services on a global basis. The Swap Guarantor provides these products and services to a wide array of clients, including corporations, governments and municipalities, institutional clients, and high-net-worth individuals.

The Swap Guarantor funds its activities through a combination of master notes, commercial paper, bank credit facilities and other money market related instruments, medium and long-term debt, and an unsecured flexible cash capital facility.

The common stock of the Swap Guarantor is listed on the New York Stock Exchange.

PRK.500.009.0119

### REGISTERED OFFICE OF THE ISSUER

**Walkers SPV Limited**
Walker House
87 Mary Street, George Town
Grand Cayman KY1-9002
Cayman Islands


### TRUSTEE

**BNY Corporate Trustee Services Limited (formerly known as J.P. Morgan Corporate Trustee Services Limited)**
One Canada Square
London E14 5AL


### SWAP COUNTERPARTY

**Lehman Brothers Special Financing Inc.**
745 Seventh Avenue
New York
New York 10019
U.S.A.


### ISSUING AND PAYING AGENT AND CUSTODIAN

**JPMorgan Chase Bank, N.A.**
Trinity Tower
9 Thomas More Street
London E1W 1YT


### AUSTRALIAN PAYING AGENT AND REGISTRAR

**BTA Morgan Institutional Services Australia Limited**
**(ABN 48 002 916 396)**
Level 4
35 Clarence Street
Sydney, NSW 2000
Australia


### CALCULATION AGENT

**Lehman Brothers International (Europe)**
25 Bank Street
London E14 5LE


### LEGAL ADVISERS

| *to the Issuer*<br>*as to Cayman Islands law* | *to the Arranger and the Trustee*<br>*as to English law* |
|---|---|
| **Walkers**<br>Walker House<br>87 Mary Street KY1-9001<br>George Town , Grand Cayman<br>Cayman Islands | **Linklaters**<br>10th Floor, Alexandra House<br>Chater Road<br>Central<br>Hong Kong |

---

A07580075/2.0/02 Apr 2007