## EXHIBIT D

PRK.500.009.0195

Dated 10 October 2002
as Amended and Restated on 21 July 2006

**DANTE FINANCE PUBLIC LIMITED COMPANY**
an Issuer

and

**J.P. MORGAN CORPORATE TRUSTEE SERVICES LIMITED**
as Trustee

# PRINCIPAL TRUST DEED

relating to
Multi-Issuer Secured Obligation Programme
arranged by
**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

Linklaters

Ref: 01/200/MWAF/JZD

PRK.500.009.0196

This **Principal Trust Deed** was originally made on 10 October 2002 and is amended and restated on 21 July 2006 between:

(1)     **Dante Finance Public Limited Company** (an "**Issuer**"); and

(2)     **J.P. Morgan Corporate Trustee Services Limited** (the "**Trustee**", which expression, where the context so admits, includes any other trustee for the time being of this Principal Trust Deed for any Series).

**Whereas:**

(A)     The Issuer (as defined in Schedule 7) proposes to issue from time to time secured notes to borrow, buy, sell or enter into other secured obligations in the form of loans, options, schuldscheine or swaps in accordance with the Programme Agreement (the "**Programme**").

(B)     A trust deed dated 10 October 2002 (the "**Original Principal Trust Deed**") was entered into by the parties thereto (the "**Parties**"). The Parties wish to amend and restate the Original Principal Trust Deed by entering into this amended and restated principal trust deed dated 21 July 2006 (the "**Principal Trust Deed**").

(C)     The Trustee has agreed to act as trustee of this Principal Trust Deed on the following terms and conditions.

(D)     Each Series will be constituted and secured by a Supplemental Trust Deed and any other Security Document made between the relevant Issuer, the Trustee and (if applicable) the Swap Counterparty.

(E)     It is intended that certain companies (each a "**Specified Company**") may incur Obligations pursuant to the Programme. Pursuant to the provisions of this Principal Trust Deed, any such Specified Company, by executing a Deed of Accession will agree to be bound by all the terms of this Principal Trust Deed and any other document executed in accordance with this Principal Trust Deed, and from and after execution and delivery of such Deed of Accession such Specified Company shall become and be treated as an "Issuer" for all the purposes hereof. References herein to the "Issuer" are references to the relevant Specified Company (including Dante Finance Public Limited Company) only in respect of the Notes issued by it and only in respect of the Master Documents (as defined in Schedule 7) to the extent that the Master Documents are applicable in respect of Notes issued by it, all in accordance with sub-Clauses 2.7 and 2.8, the terms of the other Master Documents and the relevant Supplemental Trust Deed.

(F)     The Trustee, being of the opinion that to do so is not materially prejudicial to the interests of the Noteholders, hereby agrees in exercise of the power conferred on it by sub-Clause 13.1 of the Original Principal Trust Deed to make the amendments to the Original Principal Trust Deed contained herein.

**This deed witnesses and it is declared as follows:**

1       **Interpretation**

1.1     **Definitions:** Capitalised terms used in this Principal Trust Deed but not defined in this Principal Trust Deed shall have the meanings given to them in Schedule 7 hereto or in the Conditions unless the context does not allow.

1.2     **Construction of Certain References:** References to:

PRK.500.009.0197

1.2.1    costs, charges, remuneration or expenses include any value added, turnover or similar tax charged in respect thereof; and

1.2.2    an action, remedy or method of judicial proceedings for the enforcement of creditors' rights include references to the action, remedy or method of judicial proceedings in jurisdictions other than England as shall most nearly approximate thereto.

**1.3**    **Headings:** Headings shall be ignored in construing this Principal Trust Deed.

**1.4**    **Contracts:** References in this Principal Trust Deed to this Principal Trust Deed or any other document are to this Principal Trust Deed or those documents as amended, supplemented or replaced from time to time in relation to the Programme and include any document that amends, supplements or replaces them.

**1.5**    **Schedules:** The Schedules are part of this Principal Trust Deed and have effect accordingly.

**1.6**    **Alternative Clearing System:** References in this Principal Trust Deed to Euroclear and/or Clearstream, Luxembourg shall, wherever the context so permits, be deemed to include reference to any additional or alternative clearing system approved by the Issuer, the Trustee and the Issuing and Paying Agent.

**2**    **Issue of Notes and Covenant to Pay**

**2.1**    **Issue of Notes:** Each Issuer may from time to time issue Notes in Tranches of one or more Series on a continuous basis with no minimum issue size in accordance with the relevant Programme Agreement. Before issuing any such Tranche, each Issuer shall give written notice or procure that such notice is given to the Trustee of the proposed issue of such Tranche, specifying the details to be included in the Final Terms or Series Prospectus in respect of the relevant Series. For each Series, any Notes created and issued pursuant to the provisions of this Clause shall be constituted by this Principal Trust Deed and the relevant Supplemental Trust Deed and secured as set out in this Principal Trust Deed and such Supplemental Trust Deed and the relevant Issuer shall execute and deliver to the Trustee in respect of each Series such a Supplemental Trust Deed (if applicable, duly stamped or denoted) containing such provisions as the Trustee shall require. A memorandum of every Supplemental Trust Deed shall be endorsed by the Trustee on Schedule 5 to this Principal Trust Deed and by the relevant Issuer on the duplicate of this Principal Trust Deed.

**2.2**    **Separate Series:** Where any Notes are issued, unless for any purposes the Trustee in its absolute discretion shall determine otherwise, all the provisions of this Principal Trust Deed shall apply separately to each Series and the expressions "**Notes**", "**Noteholders**", "**holders**", "**Coupons**", "**Conditions**", "**Mortgaged Property**", "**Receipts**", "**Talons**", "**Credit Support Document**" (as defined in the relevant Prospectus), "**Credit Enhancement Provider**", "**Swap Agreement**" and "**Swap Counterparty**" as used herein shall be construed accordingly.

**2.3**    **Covenant to Pay:** The relevant Issuer shall on any date when the Notes of any Series become due to be redeemed, in whole or in part, unconditionally pay or to the order of the Trustee to that Series in the Contractual Currency, in the case of any Contractual Currency other than euro, in the principal financial centre for the Contractual Currency and, in the case of euro, in the city in which banks have

PRK.500.009.0198

access to the TARGET system, in same day funds the Redemption Amount of the Notes of that Series becoming due for redemption on that date together with any applicable premium and shall (subject to the Conditions) until such payment (both before and after judgment) unconditionally so pay to or to the order of the Trustee as aforesaid interest on the principal amount of the Notes of such Series outstanding as set out in the Conditions (subject to sub-Clause 2.6) provided that (1) payment of any sum due in respect of the Notes of such Series made to the Issuing and Paying Agent for that Series as provided in the Agency Agreement shall, to that extent, satisfy such obligation except to the extent that there is failure in its subsequent payment to the relevant Noteholders or Couponholders of such Series under the Conditions and (2) a payment made after the due date or as a result of the Notes of such Series becoming repayable following an Event of Default shall be deemed to have been made when the full amount due has been received by the Issuing and Paying Agent or the Trustee for that Series and notice to that effect has been given to the Noteholders for that Series (if required under sub-Clause 7.1.8), except to the extent that there is failure in its subsequent payment to the relevant Noteholders or Couponholders under the Conditions. The Trustee will upon execution of the relevant Supplemental Trust Deed hold the benefit of this covenant on trust for the Noteholders and Couponholders of the relevant Series.

2.4    **Discharge:** Subject to sub-Clause 2.5, any payment to be made in respect of the Notes, Receipts or the Coupons of any Series by the relevant Issuer or the Trustee for that Series may be made as provided in the Conditions and any payment so made shall (subject to sub-Clause 2.5) to that extent be a good discharge to the relevant Issuer or the Trustee, as the case may be.

2.5    **Payment After a Default:** At any time after an Event of Default or a Potential Event of Default has occurred in respect of any Series, the Trustee may:

2.5.1    by notice in writing to the relevant Issuer and the Agents, require the Agents, until notified by the Trustee to the contrary, so far as permitted by applicable law:

(i)    to act as Agents of the Trustee under the Trust Deed and the Notes of such Series on the terms of the Agency Agreement or, in the case of the Custodian, the Custody Agreement (in each case, with consequential amendments as necessary and except that the Trustee's liability for the indemnification, remuneration and expenses of the Agents shall be limited to the amounts for the time being held by the Trustee in respect of such Series on the terms of the Trust Deed) and thereafter to hold all Notes, Certificates, Receipts, Coupons and Talons comprising such Series and, in the case of the Custodian, the Collateral and all moneys, documents and records held by them in respect of such Series to the order of the Trustee or

(ii)   to deliver all Notes, Certificates, Receipts, Coupons and Talons comprising such Series and, in the case of the Custodian, the Collateral and all moneys, documents and records held by them in respect of such Series to the Trustee or as the Trustee directs in such notice; and

PRK.500.009.0199

2.5.2    by notice in writing to the relevant Issuer require it to make all subsequent payments in respect of the Notes, Certificates, Receipts, Coupons and Talons of such Series to or to the order of the Trustee and not to the Issuing and Paying Agent.

2.6    **Rate of Interest After a Default:** If the Notes comprising any Series bear interest at a floating or other variable rate and they become immediately payable under the Conditions, the rate of interest payable in respect of them shall continue to be calculated by the Calculation Agent in accordance with the Conditions (with consequential amendments as necessary) except that the rates of interest need not be published unless the Trustee otherwise requires. The first period in respect of which interest shall be so calculable shall commence on the expiry of the Interest Period (as defined in the relevant Prospectus) during which such Notes become so repayable.

2.7    **Issues of Notes by Specified Companies:** On or prior to the issue of any Series by a Specified Company other than Dante Finance Public Limited Company, such Specified Company will execute a Supplemental Trust Deed pursuant to which such Specified Company will agree to be bound by all the terms of this Principal Trust Deed and all Related Agreements, and from and after execution and delivery of such Supplemental Trust Deed such Specified Company shall become and be treated as an "Issuer" for all the purposes hereof. References herein to the "Issuer" are references to the Specified Company in respect of any Series (including Dante Finance Public Limited Company) only in respect of the Notes of such Series issued by it and only in respect of this Principal Trust Deed to the extent that this Principal Trust Deed is applicable in respect of such Notes issued by it, all in accordance with the terms of this Principal Trust Deed and the relevant Supplemental Trust Deed. (For the avoidance of doubt, any issue of any Series by any Specified Company (including Dante Finance Public Limited Company) will be constituted by this Principal Trust Deed and the relevant Supplemental Trust Deed.)

2.8    **Rights and Liabilities of the Issuer:** The Issuer shall be bound by this Principal Trust Deed and each of the other Master Documents and Related Agreements to which it is a party only to the extent that the provisions of such documents relate to any Series of Notes issued by it and matters relating thereto. The Issuer shall not be bound by this Principal Trust Deed or any of the Master Documents and other Related Agreements to which it is a party to the extent that the provisions of such documents relate to any Series of Notes issued by any other Specified Company.

The liability of the Issuer under this Principal Trust Deed and each of the Master Documents and Related Agreements to which it is a party is several and is separate in respect of each Series of Notes issued by the Issuer. The Issuer shall not be responsible for the obligations of any other Specified Company under this Principal Trust Deed or under any of the Master Documents or other Related Agreements. The failure of the Issuer to perform its obligations in respect of any Series issued by the Issuer under this Principal Trust Deed or under any of the Master Documents and Related Agreements to which it is a party shall not release the Issuer from its obligations under this Principal Trust Deed or under any of the Master Documents or other Related Agreements in respect of any other Series issued by the Issuer and shall not release any other Specified Company from its obligations under this Principal Trust Deed or under any of the Master Documents or other Related

PRK.500.009.0200

Agreements. No Specified Company has any obligations in respect of Notes of the Series issued by any other Specified Company. The rights of the Specified Companies under this Principal Trust Deed and each of the Master Documents or other Related Agreements are also several and are also separate in respect of each Series of Notes issued by any such Specified Company.

The provisions in this Principal Trust Deed concerning costs, expenses, fees, remuneration and other financial obligations (whether arising under indemnities or otherwise) shall apply separately to each Series of Notes in respect of the costs, expenses, fees, remuneration and financial obligations which arise in respect of such Series of Notes. No such amount incurred in respect of any Series of Notes will be deducted from any amount payable to Noteholders or Couponholders, as the case may be, in respect of any other Series of Notes nor will any such amount be in any way charged to any other such holders. The provisions of this Principal Trust Deed shall be read accordingly.

**3    Form of the Notes**

3.1    **The Global Notes:** Each Series of Notes shall be represented by a Temporary Global Note or a Permanent Global Note (together "**Global Notes**") or one or more Certificates in the principal amount of the Tranche being issued. Interests in Temporary Global Notes shall be exchangeable for interests in Permanent Global Notes as set out in each Temporary Global Note. Interests in Permanent Global Notes shall be exchangeable for Definitive Notes and/or Registered Notes as set out in each Permanent Global Note.

3.2    **The Definitive Notes:** For each Series, the Definitive Notes, Receipts, Coupons and Talons shall be security printed and the Certificates shall be printed, in each case in accordance with applicable legal and stock exchange requirements substantially in the forms set out in Schedule 2. The Notes and Certificates (other than Global Certificates) shall be endorsed with the Conditions.

3.3    **Signature:** For each Series the Bearer Notes shall be signed manually or in facsimile by two directors of the Issuer and all other Notes and Certificates may be signed by an authorised signatory of the Issuer. Notes shall be authenticated by or on behalf of the Issuing and Paying Agent and Certificates shall be authenticated by or on behalf of the Registrar. Notes and Certificates on which are affixed the facsimile signature of a director or authorised signatory of the Issuer during the period that director held office or that authorised signatory was an authorised signatory may be used, even if at the time of issue of the relevant Notes and Certificates that director no longer holds office or that authorised signatory is no longer an authorised signatory. Notes and Certificates so executed and authenticated shall be or, in the case of Certificates, represent binding and valid obligations of the Issuer.

**4    Stamp Duties and Taxes**

For each Series the Issuer shall pay any stamp, issue, documentary or other taxes and duties, including interest and penalties, payable in the jurisdiction of incorporation of the Specified Company, Belgium, Luxembourg, the United Kingdom and the country of each Contractual Currency in respect of the creation, issue and offering of the Notes, Certificates, Receipts, Coupons and Talons of that Series and the execution or delivery of the Trust Deed. The Issuer shall also indemnify the Trustee, the Noteholders and the Couponholders

PRK.500.009.0201

of each Series from and against all stamp, issue, documentary or other taxes paid by any of them in any jurisdiction in connection with any action taken by or on behalf of the Trustee or, as the case may be, the Noteholders or the Couponholders to enforce the Issuer's obligations under the Trust Deed or the Notes, Certificates, Receipts, Coupons or Talons of such Series.

5    **Security**

This Clause 5 shall apply separately to the security for each Series, save as varied in respect of any Series by the relevant Supplemental Trust Deed.

5.1    **The Mortgaged Property:** The Issuer with full title guarantee and as continuing security grants in favour of the Trustee such charge and/or security interest as set out in the relevant Supplemental Trust Deed in respect of the relevant Series.

5.2    **Mortgaged Property as Continuing Security:** For each Series, the charges and/or security interest created pursuant to sub-Clause 5.1 are granted to the Trustee as continuing security (i) for the payment of all sums due under the Trust Deed and the Notes and the Coupons of such Series, and (ii) for the performance of the Issuer's obligations (if any) under certain agreements as set out in the relevant Supplemental Trust Deed in respect of such Series. The Trustee shall release from such charges any part of the Mortgaged Property when it becomes payable or deliverable to the extent that payment or delivery of it may be obtained and duly paid or made (as the case may be) to a Swap Counterparty under a Swap Agreement and/or to the holders of Notes, Coupons and Receipts. The Trustee shall also release from the charges thereby granted any sum held by the Custodian and/or Issuing and Paying Agent and/or the Registrar to meet payments due in respect of the Notes to the extent that payment of all sums due under the Trust Deed and the Notes and Coupons of the relevant Series be duly made.

5.3    **Liability in respect of Mortgaged Property:** For each Series, the Trustee shall not be responsible for, nor shall it have any liability with respect to any loss or theft or reduction in value of any of the Mortgaged Property and shall not be obliged to insure the same and shall have no responsibility or liability arising from the fact that the same will (if applicable) be held in safe custody by the Custodian or other custodian approved beforehand in writing by the Trustee. The Trustee shall not be responsible for the validity, value, sufficiency and enforceability (which the Trustee has not investigated) of the security created over the Mortgaged Property for that Series.

5.4    **Rights of the Issuer:** For each Series until any security over any of the Mortgaged Property becomes enforceable the Issuer may, with the sanction of an Extraordinary Resolution or with the prior written approval of the Trustee:

5.4.1    take such action in relation to the Mortgaged Property as it may think expedient; and

5.4.2    exercise the rights incidental to the ownership of the Mortgaged Property and, in particular (but without limitation and without responsibility for their exercise); any voting rights in respect of such property and all rights to enforce it.

The Issuer will not exercise any rights with respect to any Mortgaged Property unless it has the Trustee's consent or is directed to do so by an Extraordinary

PRK.500.009.0202

Resolution of Noteholders and, if such direction or consent is given, the Issuer will act only in accordance with such direction or consent.

5.5 **Enforcement of Security:** For each Series, the security over the Mortgaged Property shall become enforceable if (i) any amount due in respect of the Notes is not paid or delivered when due or (ii) a Swap Agreement terminates with sums due to the Swap Counterparty. In addition, if part of the principal amount of the Notes of such Series is mandatorily redeemed under Condition 6(c), the security created over that part of the Mortgaged Property which relates to such Notes and with respect to any part of a Swap Agreement to that Series which terminates as a result of such redemption shall become enforceable. In that event references herein to the Trustee exercising powers of enforcement of such security shall be read accordingly.

5.6 **Trustee taking possession of Mortgaged Property:** At any time after any security in relation to any Series of Notes shall have become enforceable in whole or in part, (i) if requested in writing by the holders of at least one-fifth in aggregate principal amount of the relevant Notes then outstanding or (ii) if directed by an Extraordinary Resolution of the holders of the Notes of such Series or (iii) if so directed in writing by the Swap Counterparty for such Series when sums the claims in respect of which are secured are due to the Swap Counterparty, (unless this would in the Trustee's opinion be contrary to the interests of the holders of Notes, Coupons or Receipts for that Series (whichever shall be the first request or direction to be given)), the Trustee shall, and otherwise in its discretion may, (in each case subject to it having been indemnified to its satisfaction against any loss, liability, cost, claim, action, demand or expense which may be incurred or made against it in connection therewith) enforce the security over the Mortgaged Property. To do this it may, at its discretion, take possession of all or part of the Mortgaged Property for that Series over which the security shall have become enforceable and may in its discretion sell, call in, collect and convert into money all or part of the Mortgaged Property in such manner and on such terms as it shall think fit. The power of sale under Section 101 of the Law of Property Act 1925 (but without the restrictions imposed by Sections 93 and 103 of such Act) shall apply and have effect on the basis that the relevant Supplemental Trust Deed constitutes a mortgage within the meaning of that Act and the Trustee is a mortgagee exercising the power of sale conferred on mortgagees by that Act with limited title guarantee.

5.7 **Discharge:** For each Series the Trustee's receipt for any moneys paid to it in relation to such Series shall discharge the person paying them and such person shall not be responsible for their application.

5.8 **Appointment of Receiver:** In relation to any Series, the Trustee may in writing appoint a receiver of all or part of the Mortgaged Property over which any security shall have become enforceable and may remove any receiver so appointed and appoint another in his place. No delay or waiver of the right to exercise these powers shall prejudice their future exercise. The following provisions shall have effect:

5.8.1 Such appointment may be made before or after the Trustee shall have taken possession of all or part of the relevant Mortgaged Property.

5.8.2 Such receiver may be vested by the Trustee with such powers and discretions as the Trustee may think expedient including, without limitation, all the powers set out in Schedule 1 to the Insolvency Act 1986 (subject to

PRK.500.009.0203

sub-Clause 18.2) and may sell, concur in selling, assign or release any of the relevant Mortgaged Property without restriction and on such terms as he may think fit and may effect any such transaction in the name or on behalf of the Issuer or otherwise.

5.8.3    Such receiver shall in the exercise of his functions conform to the regulations from time to time made by the Trustee.

5.8.4    The Trustee may from time to time fix such receiver's remuneration and direct its payment out of moneys accruing to him in respect of such Series in the exercise of his powers as such receiver.

5.8.5    The Trustee may from time to time and at any time require such receiver to give security for the due performance of his duties as receiver and may fix the nature and amount of the security to be given. The Trustee need not, however, in any case require any such security nor shall it be responsible for its adequacy or sufficiency.

5.8.6    All moneys received by such receiver shall be paid over to the Trustee unless the Trustee directs otherwise.

5.8.7    Such receiver shall be the Issuer's agent for all purposes. The Issuer alone shall be responsible for his acts, defaults and misconduct and neither the Trustee, the Noteholders nor the Swap Counterparty for such Series shall incur any liability therefor.

5.8.8    None of the Trustee, the Noteholders or the Swap Counterparty for such Series shall be responsible for any misconduct or negligence on the part of any such receiver.

5.9    **Perfecting the Security:** For each Series the relevant Issuer shall take such action as the Trustee may reasonably require (1) to perfect or protect the security created or intended to be created by or pursuant to the Trust Deed over the Mortgaged Property for that Series and (2) from time to time and at any time after the security constituted by or pursuant to the Trust Deed shall have become enforceable to facilitate the realisation of such security and the exercise of the functions of the Trustee or any receiver of any such Mortgaged Property. A certificate from the Trustee to the effect that a particular action is reasonably required by it shall be conclusive evidence of that fact.

5.10    **Ability to Borrow on Mortgaged Property:** For each Series the Trustee may raise and borrow money on the security of the Mortgaged Property for that Series or any part of it in order to defray moneys, costs, charges, losses and expenses paid or incurred by it in relation to the Trust Deed (including the costs of realising any security and the remuneration of the Trustee) or in exercise of any of the powers contained in the Trust Deed in relation to such Series. The Trustee may raise and borrow such money on such terms as it shall think fit and may secure its repayment with interest thereon by mortgaging or otherwise charging all or part of such Mortgaged Property whether or not in priority to the security constituted by or pursuant to the Trust Deed and generally in such manner and form as the Trustee shall think fit and for such purposes may take such action as it shall think fit. The Trustee shall not, however, permit such security to be used by way of stocklending before such security becomes enforceable.

PRK.500.009.0204

5.11    **Attorney:** For each Series the relevant Issuer by way of security irrevocably appoints the Trustee and every receiver of any Mortgaged Property appointed pursuant to this Principal Trust Deed to be severally its attorney (with full power of substitution) on its behalf and in its name to do anything which the Issuer ought to do under this Principal Trust Deed and generally to exercise all or any of the functions of the Trustee or any such receiver. The relevant Issuer ratifies and confirms and agrees to ratify and confirm whatever any such attorney shall do or purport to do in the exercise or purported exercise of such functions.

5.12    **Liability of Trustee:** For each Series neither the Trustee nor any such receiver or any attorney or agent of the Trustee shall by reason of taking possession of any Mortgaged Property for that Series or any other reason and whether or not as mortgagee in possession be liable to account for anything except actual receipts or be liable for any loss or damage arising from the realisation of such Mortgaged Property or from any act, default or omission in relation to such Mortgaged Property or from any exercise or non-exercise by it of any of its powers, authorities or discretions in relation to such Mortgaged Property or otherwise unless such loss or damage shall be caused by its own fraud.

5.13    **Powers additional to the Law of Property Act 1925:** The powers conferred by this Principal Trust Deed in relation to the Mortgaged Property of any Series on the Trustee or on any receiver of any such property shall be in addition to those conferred on mortgagees or receivers under the Law of Property Act 1925. If there is any ambiguity or conflict between the powers contained in such Act and those conferred by this Principal Trust Deed, the terms of this Principal Trust Deed shall prevail.

5.14    **Dealings with Trustee:** For each Series no one dealing with the Trustee or any receiver of any of the Mortgaged Property for that Series appointed by the Trustee need enquire whether any of the powers, authorities and discretions conferred by or pursuant to this Principal Trust Deed in relation to such property are or may be exercisable by the Trustee or such receiver or as to the propriety or regularity of acts purporting or intended to be in exercise of any such powers. The protection to purchasers contained in Sections 104 and 107 of the Law of Property Act 1925 shall apply to anyone dealing with the Trustee or such receiver as if the statutory powers of sale and of appointing a receiver in relation to the property hereby charged had not been varied or extended by this Principal Trust Deed.

6    **Application of Moneys received by the Trustee and Payments**

6.1    **Declarations of Trust:** For each Series, save for any moneys received in connection with the realisation or enforcement of all or part of the security constituted by or pursuant to the Supplemental Trust Deed or any other Security Document in relation to that Series, all moneys received by the Trustee in respect of the Notes of that Series or amounts payable under the Trust Deed in relation to that Series will, despite any appropriation of all or part of them by the Issuer, be held by the Trustee on trust to apply them (subject to sub-Clause 6.3):

first, in payment of all costs, charges, expenses and liabilities properly incurred by the Trustee (including remuneration payable to it) in carrying out its functions under the Trust Deed in relation to that Series;

PRK.500.009.0205

secondly, in payment of any amounts owing to the Swap Counterparty for that Series, the Custodian or the Noteholders or Couponholders in respect of the Notes or Coupons for that Series *pari passu* and rateably; and

thirdly, in payment of any balance to the Issuer for itself.

If the Trustee holds any moneys in respect of Notes or Coupons which have become void or Notes, the claims in respect of which have become prescribed under Condition 9, the Trustee will hold them on these trusts.

6.2 **Application of Moneys Received:** Subject to the provisions of each relevant Supplemental Trust Deed and sub-Clause 6.3, the Trustee shall apply all moneys received by it under this Principal Trust Deed and the relevant Supplemental Trust Deed in connection with the realisation or enforcement of the security constituted thereby and by any Other Security Document as follows:

(i) if "**Swap Counterparty Priority**" is specified in the relevant Supplemental Trust Deed:

(A) first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(b) secondly, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent and/or the Custodian;

(C) thirdly, rateably in meeting the claims (if any) of the Swap Counterparty under each Swap Agreement;

(D) fourthly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment; and

(E) fifthly, in payment of the balance (if any) to the Issuer,

provided that, if the "Swap Counterparty Priority" is expressed in the relevant Supplemental Trust Deed and Final Terms or Series Prospectus to be subject to adjustment on a Swap Counterparty default, and if and to the extent that the Swap Counterparty fails to make payments due to the Issuer under any Swap Agreement and the Issuer promptly notifies the Trustee in writing of any such failure (which notice shall be conclusive and binding), the above application of moneys shall be amended so that the claims of the Swap Counterparty will, to the extent that there has been such failure, rank after the claims (if any) of the holders of Notes, Coupons and Receipts and before the claims of the Issuer in relation to the balance (if any).

(ii) if "**Pari Passu Ranking**" is specified in the relevant Supplement Trust Deed;

PRK.500.009.0206

(A)    first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(B)    secondly, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Custodian and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent

(C)    thirdly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts and the Swap Counterparty under each Swap Agreement. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment;

(D)    fourthly, in payment of the balance (if any) to the Issuer.

(iii)    if "Noteholder Priority" is specified in the relevant Supplemental Trust Deed:

(A)    first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(B)    secondly, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Custodian and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent;

(C)    thirdly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment;

(D)    fourthly, in meeting the claims (if any) of the Swap Counterparty under each Swap Agreement; and

(E)    fifthly, in payment of the balance (if any) to the Issuer.

(iv)    if "Other Priority" is specified in the relevant Supplemental Trust Deed and Final Terms or Series Prospectus, the Trustee shall apply all moneys received by it under the provisions of the Principal Trust Deed and the relevant Supplemental Trust Deed in connection with the realisation or enforcement of the security constituted thereby, as set out in the relevant Supplemental Trust Deed and Final Terms or Series Prospectus.

6.3    **Accumulation:** If the amount of the moneys at any time available for payment in respect of any Notes of any Series under sub-Clause 6.1 or 6.2 shall be less than 10 per cent. of the principal amount of such Notes then outstanding, the Trustee may at

PRK.500.009.0207

its discretion invest such moneys. The Trustee may retain such investments and accumulate the resulting income until the investments and the accumulations, together with any other funds for the time being under its control and available for such payment, amount to at least 10 per cent. of the principal amount of such Notes then outstanding and then such investments, accumulations and funds (after deduction of, or provision for, any applicable taxes) will be applied as specified in sub-Clause 6.1 or 6.2, as the case may be.

6.4    **Investment**: Moneys held by the Trustee may be invested in its name or under its control in any investments or other assets for the time being authorised by English law for the investment by trustees of trust moneys or in any other investments, whether or not similar thereto, which may be selected by the Trustee **provided that** all such investments made by the Trustee shall be in investments denominated in the currency of such Series and, at the time of investment, in respect of each Series rated by Standard & Poor's, rated AAA by Standard & Poor's or in respect of each Series rated by Moody's, rated Aaa by Moody's (in the case of long-term investments of more than one year), A1+ by Standard & Poor's or P-1 by Moody's, as the case may be, (in the case of short-term investments of one year or less) or such alternative rating as may be advised by Standard & Poor's or Moody's, as the case may be, as being acceptable for being commensurate with the rating assigned to such Series or by placing the same on deposit in the name or under the control of the Trustee at a bank or other financial institution, including itself, if appropriate, **provided that** such bank or other financial institution shall, at the time of investment, be rated at least A1+ by Standard & Poor's or P-1 by Moody's, as the case may be. If that bank or institution is the Trustee or a subsidiary, holding or associated company of the Trustee, it need only account for an amount of interest equal to the standard amount of interest payable by it on such a deposit to an independent customer. The Trustee may at any time or times vary any such investments for or into other investments or convert any moneys so deposited into any other currency and shall not be responsible for any loss due to depreciation in value, fluctuations in exchange rates or otherwise resulting from any such investments or deposits. For the avoidance of doubt in this sub-Clause 6.4, any rating which has an "r" will not be acceptable.

6.5    **Cancellation upon Payment**: If any payment is made to the holder of any Bearer Note, Receipt or Coupon in relation to any Series in accordance with the order set out in sub-Clause 6.1 or 6.2 (and the corresponding provision in the relevant Supplemental Trust Deed), the Bearer Note, Receipt or Coupon in respect of which such payment is made shall be produced to the Trustee or the Agent by or through whom such payment is made who shall, in the case of a partial payment, cause the Bearer Note, Receipt or Coupon concerned to be endorsed with details of the amount and date of payment on such Bearer Note, Receipt or Coupon and, in the case of payment in full, cancel such Bearer Note, Receipt or Coupon and surrender it to the Issuer or the Trustee, as the case may be, and certify or procure the certification of such cancellation.

7    **Covenants**

7.1    **Issuer's Covenants**: So long as any Note is outstanding, the Issuer shall:

7.1.1    **Books of Account**: keep proper books of account and, at any time after an Event of Default or Potential Event of Default has occurred or if the Trustee

PRK.500.009.0208

believes that such an event has occurred, so far as permitted by applicable law, allow the Trustee and anyone appointed by it to whom the Issuer has no reasonable objection, access to its books of account at all reasonable times during normal business hours;

7.1.2 **Notice of Events of Default:** notify the Trustee in writing immediately on becoming aware of the occurrence of any Event of Default or Potential Event of Default;

7.1.3 **Information:** so far as permitted by applicable law, give the Trustee such information as it requires to perform its functions;

7.1.4 **Financial Statements etc.:** send to the Trustee at the time of their issue and in the case of annual financial statements in any event within 180 days of the end of each financial year two copies in English of every balance sheet, profit and loss account, report or other notice, statement or circular issued (if any), or that legally or contractually should be issued, to the members or creditors (or any class of them) of the Issuer generally in their capacity as such;

7.1.5 **Certificate of Directors:** send to the Trustee on each anniversary of the date of this Principal Trust Deed, and also within 14 days of any request by the Trustee a certificate of the Issuer signed on its behalf by any two of its Directors that, having made all reasonable enquiries, to the best of the knowledge, information and belief of the Issuer as at a date (the "Certification Date") not more than five days before the date of the certificate no Event of Default or Potential Event of Default or other breach of this Principal Trust Deed or other matter required to be brought to the Trustee's attention had occurred since the Certification Date of the last such certificate or (if none) the date of this Principal Trust Deed or, if such an event had occurred, giving details of it;

7.1.6 **Notices to Noteholders:** for each Series send to the relevant Trustee the form of each notice to be given to Noteholders and, once given, two copies of each such notice, such notice to be in a form previously approved by the Trustee (such approval, unless so expressed, not to constitute approval for the purposes of Section 21 of the Financial Services and Markets Act 2000 of any such notice which is a communication within the meaning of Section 21 of the Financial Services and Markets Act 2000);

7.1.7 **Further Acts:** so far as permitted by applicable law, do such further things as may be necessary in the opinion of the Trustee to give effect to this Principal Trust Deed and each Supplemental Trust Deed;

7.1.8 **Notice of Late Payment:** forthwith upon request by the Trustee give notice to the Noteholders of any Series of any unconditional payment to the Issuing and Paying Agent or the Trustee of any sum due in respect of the Notes, the Receipts or Coupons of such Series made after the due date for such payment;

7.1.9 **Listing and Trading:** if the Notes are listed and/or admitted to trading, use all reasonable endeavours to maintain the listing of the Notes on the

PRK.500.009.0209

relevant stock exchange and/or the admission of the Notes to trading on the relevant market, however, if:

(i)    the Issuer is unable to do so, having used such endeavours;

(ii)    the Issuer determines that the provisions of the EU Transparency Obligations Directive would make the maintenance of such listing and/or admission to trading unduly onerous; or

(iii)    for any reason other than (ii) above, the maintenance of such listing and/or admission to trading is agreed by the Trustee to be unduly onerous and the Trustee is satisfied that the interests of the Noteholders would not be thereby materially prejudiced,

the Issuer will instead use all reasonable endeavours to obtain and maintain a listing of the Notes on such other stock exchange and/or admission of the Notes to trading on such other market as it may (with the consent in writing of the Trustee, in the case of (i) and (iii) above) decide.

7.1.10    **Change in Agents:** give at least 14 days' prior notice to the relevant Noteholders of any future appointment, resignation or removal of an Agent or of any change by an Agent of its specified office and not make any such appointment or removal without the Trustee's prior written approval;

7.1.11    **Agency Agreement:** comply with its obligations under the Agency Agreement executed in relation to any Series and, without prejudice to the generality of the foregoing, at all times maintain an Agent and (where relevant) a Custodian and, in respect of a Series of Registered Notes, a Registrar and a Transfer Agent and, where appropriate, a Calculation Agent in respect of such Series in each case as specified in the Conditions;

7.1.12    **Notice of Redemption:** give, in respect of any Note, notice of not less than 14 days more than the number of days' notice specified in the Conditions applicable to such Note, to the Trustee of any proposed redemption by it pursuant to the Conditions;

7.1.13    **Compliance:** in relation to each Series, comply and procure that each of the parties thereto complies with its obligations under any Swap Agreement and (if it is a party thereto) any Credit Enhancement Agreement and use its reasonable endeavours to make such amendments to the Agency Agreement, Custody Agreement or any Swap Agreement or Credit Enhancement Agreement as may be required by the Trustee;

7.1.14    **Provision of Legal Opinions:** procure the delivery of legal opinions addressed to the Trustee dated the date of such delivery, in form and content acceptable to the Trustee (i) on each occasion on which a legal opinion is given to any Dealer in relation to any Notes pursuant to the Programme Agreement from the legal adviser giving such opinion (ii) from Linklaters (or such other legal advisers acceptable to the Trustee) as to the laws of England on the date of any amendment to this Principal Trust Deed and on each Issue Date and (iii) from legal advisers acceptable to the Trustee as to such law as may be requested by the Trustee in the event of a proposed issue of such nature and having such features as might lead

PRK.500.009.0210

the Trustee properly to conclude that it would be prudent to obtain such opinions;

7.1.15    Restrictions: not, without the prior consent in writing of the Trustee:

(i)    engage in any business whatsoever, other than acquiring and holding Mortgaged Property, issuing Notes, issuing further bonds and notes (which may be consolidated and form a single series with the Notes), creating other Obligations or entering into similar limited recourse transactions, entering into related agreements and transactions and performing any act incidental to or necessary in connection with any of the foregoing;

(ii)    dispose of any Mortgaged Property or any interest therein, or create any mortgage, charge or other security interest or right of recourse in respect thereof in favour of any person (other than (a) the security referred to in Clause 5 or any similar limited recourse transaction (whether such limited recourse transaction is by means of a debt issue or by loan, option or swap) entered into by the Issuer in the future with the consent of the Trustee and any Swap Counterparty as provided below) and (b) in connection with a transfer under the Swap Agreement;

(iii)    cause or permit any Swap Agreement or Credit Enhancement Agreement or the priority of the security interests created by the Trust Deed to be amended, terminated or discharged (other than in connection with a transfer under the Swap Agreement);

(iv)    release any party to any Swap Agreement (other than in connection with a transfer under the Swap Agreement), any Credit Enhancement Agreement, the Principal Trust Deed or any Supplemental Trust Deed from any existing obligations thereunder;

(v)    have any subsidiaries (other than in connection with any substitution of the principal debtor under Clause 13);

(vi)    consent to any variation of, or exercise any powers or consent or waiver pursuant to, the terms of any Swap Agreement, any Credit Enhancement Agreement, the Conditions, the Principal Trust Deed, any Supplemental Trust Deed or any other agreement relating to the issue of the Notes any relevant documentation entered into in connection with the issue, buying, borrowing, selling or entering into of other obligations or any related transactions;

(vii)    (to the extent the same is within the control of the Issuer) consolidate or merge with any other person or convey or transfer its properties or assets substantially as an entirety to any person;

(viii)    have any employees;

(ix)    (to the extent the same is within the control of the Issuer) pay any dividends or make any distribution to its shareholders; or

(x)    open or have any interest in any account whatsoever with any bank or financial institution unless such account relates to any Notes or

PRK.500.009.0211

any Mortgaged Property, any other obligation, or any party thereto, save where such account or the Issuer's interest therein is simultaneously charged in favour of the Trustee so as to form part of such Mortgaged Property or save where such account is opened in connection with the administration and management of the Issuer and only moneys necessary to the administration and management of the Issuer are credited to such account;

(xi)  (to the extent the same is within the control of the Issuer) issue or allot shares to persons other than such shares as were in issue on the date of incorporation of the Issuer;

7.1.16  **Residence:** at all times maintain its residence outside the United Kingdom for the purposes of United Kingdom taxation and, in addition, not establish a branch, agency or place of business within the United Kingdom such as would require registration of a charge under Section 395 of the Companies Act 1985;

7.1.17  **Taxes:** at all times use its best efforts to minimise taxes and any other costs arising in connection with its activities;

7.1.18  **Collateral:** procure that Collateral forming part of the Mortgaged Property shall at all times (if required by the Conditions) be held in safe custody by the Custodian or other reputable custodian or bank approved by the Trustee;

7.1.19  **Mortgaged Property:** save as provided in the relevant Supplemental Trust Deed, any other Security Document and Final Terms or Series Prospectus procure that the Mortgaged Property for any Series (and its proceeds, if any) is at all times distinguishable from the Mortgaged Property for each other Series (and its proceeds, if any) and from its other assets;

7.1.20  **Conditions binding:** comply with, perform and observe all of the provisions of this Principal Trust Deed, any Supplemental Trust Deed and any other Security Document expressed to be binding on it. The Conditions will be binding on the Issuer and the Noteholders. The Trustee will be entitled to enforce the obligations of the Issuer under the Notes and the Conditions. The provisions contained in Schedule 2 Part C have effect in the same manner as if set forth herein; and

7.1.21  **Registration of mortgages and charges:** comply with any registration requirements in the jurisdiction of incorporation of the Specified Company (and any other jurisdiction where such registration requirements may apply) in relation to any and all mortgages or charges created by the Supplemental Trust Deed or any other Security Document securing the Notes of such Tranche or Series and, forthwith upon execution of any further instruments or documents pursuant thereto, creating or purporting to create or to perfect or to protect any security interest by the Issuer, enter in such Register, and register in any other jurisdiction where such registration may be required, details of such instrument or document.

PRK.500.009.0212

7.2    **Swap Counterparty Covenants:** In relation to any Series in respect of which there is a Swap Counterparty, such Swap Counterparty shall, by execution of the relevant Supplemental Trust Deed, covenant and agree:

7.2.1    with the Trustee and the Issuer that it will comply with and is bound by the terms of the Swap Agreement and that it will not amend the Swap Agreement without the prior written consent of the Trustee (provided that the Trustee shall agree to any amendment to the Swap Agreement to allow a transfer of the Swap Counterparty's rights and obligations under such Swap Agreement in accordance with its terms in accordance with sub-Clause 13.4); that its recourse in respect of its claims under the Swap Agreement is limited to the proceeds of the Mortgaged Property in relation to such Series as it is entitled to, as provided in the Trust Deed and no debt shall be owed by the Issuer in respect of any shortfall; and that, without prejudice to its rights to bring Enforcement Proceedings against any person other than the Issuer or to its rights to bring proceedings other than Enforcement Proceedings against any person, the Swap Counterparty may not take any Enforcement Proceedings against the Issuer; and

7.2.2    with the Trustee that all provisions of the Trust Deed as regards the entitlement of the Trustee to appoint agents and delegates, to rely upon experts' opinions and otherwise defining the rights and responsibilities of the Trustee with regard to the Mortgaged Property in relation to such Series shall also apply as between the Trustee and the Swap Counterparty.

8    **Remuneration and Indemnification of the Trustee**

8.1    **Normal Remuneration:** So long as any Notes of any Series are outstanding, the Issuer shall pay the Trustee as remuneration for its services as Trustee such sum on such dates in each case as they may from time to time agree. Such remuneration shall accrue from day to day from the date of this Principal Trust Deed. However, if any payment to a Noteholder or Couponholder of moneys due in respect of any Note, Receipts or Coupon for such Series is improperly withheld or refused, such remuneration shall again accrue as from the date of such withholding or refusal until payment to such Noteholder or Couponholder is duly made.

8.2    **Extra Remuneration:** If an Event of Default or Potential Event of Default shall have occurred in respect of any Series or if the Trustee finds it expedient or necessary or is requested by the Issuer to undertake duties that they both agree to be of an exceptional nature or otherwise outside the scope of the Trustee's normal duties under the Trust Deed, the Issuer shall pay such additional remuneration as they may agree or, failing agreement as to any of the matters in this Clause (or as to such sums referred to in sub-Clause 8.1), as determined by an international investment bank (acting as an expert) selected by the Trustee and approved by the Issuer or, failing such approval, nominated by the President for the time being of The Law Society of England and Wales. The expenses involved in such nomination and such international investment bank's fee shall be paid by the Issuer. The determination of such international investment bank shall be conclusive and binding on the Issuer, the Trustee, the Noteholders and the Couponholders.

8.3    **Expenses:** For each Series the Issuer shall also on demand by the Trustee pay or discharge all costs, charges, liabilities and expenses properly incurred by the

PRK.500.009.0213

Trustee in the preparation and execution of this Principal Trust Deed and any Supplemental Trust Deed, any other Security Document and the performance of its functions under this Principal Trust Deed and any Supplemental Trust Deed, any other Security Document including, in relation to such Series, but not limited to, legal and travelling expenses and any stamp, documentary or other taxes or duties paid by the Trustee in connection with any legal proceedings brought or contemplated by the Trustee against the Issuer to enforce any provision of the Trust Deed, the Notes, the Receipts, the Coupons or the Talons. Such costs, charges, liabilities and expenses shall:

8.3.1   in the case of payments made by the Trustee before such demand, carry interest from the date of the demand at the rate of 2 per cent. per annum over the base rate of JPMorgan Chase Bank, N.A. on the date on which the Trustee made such payments; and

8.3.2   in other cases, carry interest at such rate from 30 days after the date of the demand or (where the demand specifies that payment is to be made on an earlier date) from such earlier date.

8.4   **Indemnity:** The relevant Issuer shall indemnify the Trustee in respect of all liabilities and expenses incurred by it or by anyone appointed by it or to whom any of its functions may be delegated by it in relation to any Series in the carrying out of its functions and against any loss, liability, cost, claim, action, demand or expense (including, but not limited to, all costs, charges and expenses paid or incurred in disputing or defending any of the foregoing) that any of them may incur or that may be made against any of them arising out of or in relation to or in connection with, its appointment or the exercise of its functions. The Contracts (Rights of Third Parties) Act 1999 applies to this sub-Clause 8.4.

8.5   **Continuing Effect:** Sub-Clauses 8.3 and 8.4 shall continue in full force and effect as regards the Trustee even if it no longer is Trustee.

8.6   **Amount due to the Trustee:** At any time when any amount is due from the relevant Issuer to the Trustee under this Clause 8, the Issuer for such Series shall pay such amount to the Trustee before making payment of any amount then due to the Noteholders for such Series under the Conditions or any Swap Counterparty under any Swap Agreement in respect of such Series.

9   **Provisions Supplemental to the Trustee Act 1925 and the Trustee Act 2000**

9.1   **Advice:** The Trustee may in respect of any Series act on the opinion or advice of, or information obtained from, any expert and shall not be responsible to anyone for any loss occasioned by so acting. Any such opinion, advice or information may be sent or obtained by letter, telex or fax and the Trustee shall not be liable to anyone for acting in good faith on any opinion, advice or information purporting to be conveyed by such means even if it contains some error or is not authentic.

9.2   **Trustee to Assume Performance:** The Trustee need not notify anyone of the execution of the Trust Deed or do anything to find out if an Event of Default or Potential Event of Default has occurred in relation to any Series. Until it has actual knowledge or express notice to the contrary, the Trustee may assume that no such event has occurred and that the Issuer is performing all its obligations under the Trust Deed, the Notes, the Receipts, the Coupons and the Talons of such Series.

A06466867/2.0          18

PRK.500.009.0214

**9.3** **Resolutions of Noteholders:** The Trustee shall not be responsible for having acted in good faith on a resolution purporting to have been passed at a meeting of Noteholders in respect of which minutes have been made and signed even if it is later found that there was a defect in the constitution of the meeting or the passing of the resolution or that the resolution was not valid or binding on the Noteholders or Couponholders.

**9.4** **Certificate Signed by Directors:** If the Trustee, in the exercise of its functions, requires to be satisfied or to have information as to any fact or the expediency of any act, it may call for and accept as sufficient evidence of that fact or the expediency of that act a certificate signed on the Issuer's behalf by any two Directors of the Issuer as to that fact or to the effect that, in their opinion, that act is expedient and the Trustee need not call for further evidence and shall not be responsible for any loss occasioned by acting on such a certificate.

**9.5** **Deposit of Documents:** The Trustee may appoint as custodian, on any terms, any bank or entity whose business includes the safe custody of documents or any lawyer or firm of lawyers believed by it to be of good repute and may deposit this Trust Deed and any other documents with such custodian and pay all sums due in respect thereof. The Trustee is not obliged to appoint a custodian of securities payable to bearer.

**9.6** **Discretion:** The Trustee shall have absolute and uncontrolled discretion as to the exercise of its functions and shall not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience that may result from their exercise or non-exercise in respect of any Series.

**9.7** **Agents:** Whenever it considers it expedient in the interests of the Noteholders of any Series, the Trustee may, in the conduct of its trust business, instead of acting personally, employ and pay an agent selected by it, whether or not a lawyer or other professional person, to transact or conduct, or concur in transacting or conducting, any business and to do or concur in doing all acts required to be done by the Trustee (including the receipt and payment of money).

**9.8** **Delegation:** Whenever it considers it expedient in the interests of the Noteholders for any Series, the Trustee may delegate to any person on any terms (including power to sub-delegate) all or any of its functions.

**9.9** **Nominees:** In relation to any asset held by it under this Trust Deed, the Trustee may appoint any person to act as its nominee on any terms.

**9.10** **Forged Notes:** The Trustee shall not be liable to the Issuer or any Noteholders or Couponholder by reason of having accepted as valid or not having rejected any Note, Certificate, Receipt, Coupon or Talon purporting to be such and later found to be forged or not authentic.

**9.11** **Confidentiality:** Unless ordered to do so by a court of competent jurisdiction, the Trustee shall not be required to disclose to any Noteholder or Couponholder any confidential financial or other information made available to the Trustee by the Issuer.

**9.12** **Determinations Conclusive:** As between itself and the Noteholders and Couponholders, the Trustee may determine all questions and doubts arising in relation to any of the provisions of this Principal Trust Deed or any Supplemental

PRK.500.009.0215

Trust Deed. Such determinations, whether made upon such a question actually raised or implied in the acts or proceedings of the Trustee, shall be conclusive and shall bind the Trustee, the Noteholders and the Couponholders.

9.13   **Currency Conversion:** Where it is necessary or desirable to convert any sum from one currency to another, it shall (unless otherwise provided hereby or required by law) be converted at such rate or rates, in accordance with such method and as at such date as may reasonably be specified by the Trustee but having regard to current rates of exchange, if available. Any rate, method and date so specified shall be binding on the Issuer, the Noteholders, the Couponholders and the Swap Counterparty (if any).

9.14   **Title of the Issuer to Mortgaged Property:** The Trustee shall accept without investigation, requisition or objection such right and title as the Issuer has to any of the Mortgaged Property and shall not be bound or concerned to examine or enquire into or be liable for any defect or failure in the right or title of the Issuer to the Mortgaged Property or any part thereof whether such defect or failure was known to the Trustee or might have been discovered upon examination or enquiry and whether capable of remedy or not.

9.15   **Insurance:** The Trustee shall not be under any obligation to insure any of the Mortgaged Property or any certificate, note, bond or other evidence in respect thereof, or to require any other person to maintain any such insurance.

9.16   **Deficiency Arising from Tax:** The Trustee shall have no responsibility whatsoever to the Issuer or any Noteholder as regards any deficiency which might arise because the Trustee or Custodian is subject to any tax in respect of any of the Mortgaged Property, income therefrom or the proceeds thereof.

9.17   **Indemnity:** Without prejudice to the right of indemnity by law given to trustees and subject to the provisions of Section 192 of the Companies Act 1985, the Trustee and every receiver, attorney, manager, agent or other person appointed by the Trustee hereunder in relation to each Series shall be entitled to be indemnified out of the Mortgaged Property (in respect of such Series) in respect of all liabilities and expenses properly incurred by them or him in the execution or purported execution of the trusts hereof or of any powers, authorities or discretions vested in them or him pursuant to the Trust Deed and against all actions, proceedings, costs, claims and demands in respect of any matter or things done or omitted in any way relating to the Mortgaged Property, and the Trustee may retain any part of any moneys in its hands arising from the trusts of the Trust Deed all sums necessary to effect such indemnity and also the remuneration of the Trustee hereinbefore provided and the Trustee shall have a lien on such Mortgaged Property for all moneys payable to it under the Trust Deed or otherwise howsoever. The Contracts (Rights of Third Parties) Act 1999 applies to this sub-Clause 9.17.

9.18   **Validity of Security:** The Trustee assumes no responsibility for the validity, sufficiency or enforceability (which the Trustee has not investigated) of the security purported to be created by this Principal Trust Deed, any Supplemental Trust Deed, any other Security Document, any Swap Agreement, any pledge or other document. In addition, the Trustee has no duty to monitor the performance by the Agents or any Swap Counterparty or any Credit Enhancement Provider of their obligations to the

PRK.500.009.0216

Issuer nor is it obliged (unless indemnified to its satisfaction) to take any action which may involve the Trustee in any personal liability or expense.

**9.19**   **Payment for and Delivery of Notes:** The Trustee shall not be responsible for the receipt or application by the Issuer of the proceeds of the issue of the Notes of any Series, any exchange of such Notes or the delivery of such Notes to the persons entitled to them.

**9.20**   **Legal Opinions:** The Trustee shall not be responsible to any person for failing to request, require or receive any legal opinion relating to any Notes or for checking or commenting upon the content of any such legal opinion.

**9.21**   **Exercise of Voting Rights:** The Trustee shall not be responsible for the exercise or non-exercise of any voting rights in respect of the Collateral.

**9.22**   **Consents:** Any consent or approval given by the Trustee for the purposes of the Trust Deed may be given on such terms and subject to such conditions (if any) as the Trustee thinks fit.

**9.23**   **Swap Counterparty:** In acting as Trustee under the Trust Deed in respect of Notes of any Series the Trustee shall not assume any duty or responsibility to any Swap Counterparty or any Credit Enhancement Provider (other than to pay to such Swap Counterparty any moneys received and payable to it for it and to act in accordance with the provisions of Conditions 4(b) and 4(f)) and shall have regard solely to the interests of the Noteholders of such Series and shall not be obliged to act on any directions of the Swap Counterparty if this would in the Trustee's opinion be contrary to the interests of the Noteholders of such Series.

**9.24**   **Determination or Calculation by the Trustee:** For each Series, if the Issuing and Paying Agent does not at any time for any reason so determine the Interest Rate or calculate the Interest Amount for an Interest Accrual Period, the Trustee shall do so and such determination or calculation shall be deemed to have been made by the Issuing and Paying Agent. In doing so, the Trustee shall apply the provisions of Condition 5, with any necessary consequential amendments, to the extent that, in its opinion, it can do so, and, in all other respects it shall do so in such manner as it shall deem fair and reasonable in all the circumstances.

**9.25**   **Rating and Rating Agencies:** The Trustee assumes no responsibility for the rating of the Notes of any Series or for providing information to, or soliciting information from, any rating agency.

**9.26**   **Swap Counterparty Certificates:** The Trustee may call for (and the Issuer will use its best endeavours to procure the delivery of) and rely on certificates of any authorised person on behalf of the Swap Counterparty as to amounts owed to it.

**9.27**   **Responsibility for agents etc.:** If the Trustee exercises reasonable care in selecting any custodian, agent, delegate or nominee appointed under this sub-Clause 9.28 (an "**Appointee**"), it will not have any obligation to supervise the Appointee or be responsible for any loss, liability, cost, claim, action, demand or expense incurred by reason of the Appointee's misconduct or default or the misconduct or default of any substitute appointed by the Appointee.

**10**   **Trustee liable for Negligence**

PRK.500.009.0217

Section 1 of the Trustee Act 2000 shall not apply to any functions of the Trustee under this Trust Deed, provided that if the Trustee fails to show the degree of care and diligence required of it as trustee, nothing in the Trust Deed shall, having regard to the provisions hereof conferring on the Trustee powers, authorities and discretions, relieve or indemnify it from or against any liability that would otherwise attach to it in respect of any negligence, default, breach of duty or breach of trust of which it may be guilty.

**11    Waiver, Consents and Proof of Default**

   **11.1    Waiver:** The Trustee may, in respect of the Notes of each Series, without the consent of the Noteholders or Couponholders of such Series and without prejudice to its rights in respect of any subsequent breach, from time to time and at any time, if in its opinion the interests of the Noteholders of such Series will not be materially prejudiced thereby, waive or authorise, on such terms as seem expedient to it, any breach or proposed breach by the Issuer of this Principal Trust Deed, any other Security Document or any relevant Supplemental Trust Deed or the Conditions or any relevant Swap Agreement or determine that an Event of Default or Potential Event of Default shall not be treated as such provided that the Trustee shall not do so in contravention of an express direction given by an Extraordinary Resolution or a request made pursuant to Condition 10. No such direction or request shall affect a previous waiver, authorisation or determination. Any such waiver, authorisation or determination shall be binding on the Noteholders and the Couponholders of such Series and, if the Trustee so requires, shall be notified to the Noteholders of such Series as soon as practicable.

   **11.2    Consents:** For each Series, in giving any consent under the Trust Deed the Trustee may require the Issuer to agree to such modifications or additions to the provisions of the Trust Deed as the Trustee may deem expedient in the interests of the Noteholders of such Series.

   **11.3    Proof of Default:** Proof that the Issuer has failed to pay a sum due to the holder of any one Note, Receipt or Coupon shall (unless the contrary be proved) be sufficient evidence that it has made the same default as regards all other Notes, Receipts or Coupons of the same Series that are then payable.

**12    Trustee not precluded from entering into Contracts**

The Trustee and any other person, whether or not acting for itself, may acquire, hold or dispose of any Note, Receipt, Coupon, Talon or other security (or any interest therein) of the Issuer of such Series or any other person, may enter into or be interested in any contract or transaction with any such person and may act on, or as depositary or agent for, any committee or body of holders of any securities of any such person in each case with the same rights as it would have had if the Trustee were not acting as Trustee and need not account for any profit.

**13    Modification and Substitution**

   **13.1    Modification:** The Trustee may, in respect of each Series, agree without the consent of the Noteholders or Couponholders to any modification to this Principal Trust Deed or any Supplemental Trust Deed or Swap Agreement which is, in the opinion of the Trustee, of a formal, minor or technical nature or to correct a manifest error. The Trustee may also so agree to any modification to this Principal Trust Deed or any Supplemental Trust Deed or Swap Agreement that is in its opinion not

PRK.500.009.0218

materially prejudicial to the interests of the Noteholders of such Series, but such power does not extend to any such modification as is mentioned in the proviso to paragraph 2 of Schedule 3.

**13.2** **Substitution:**

13.2.1    The Trustee may, without the consent of the holders of the Notes, Coupons, Receipts or Talons but subject to the consent of the relevant Swap Counterparty, agree to the substitution, in place of the Issuer, or any previous substituted company, as the principal debtor under this Principal Trust Deed and any Supplemental Trust Deed, any other Security Document, the Notes, Receipts, Coupons and Talons in respect of any one or more series, of any other company (incorporated in any jurisdiction) (the "**Substituted Issuer**"), provided that:

(i)    the outstanding ratings of any Notes issued by the Issuer are not adversely affected as confirmed in writing by the appropriate rating agency;

(ii)    a deed is executed or an undertaking given by the Substituted Issuer to the Trustee in a form satisfactory to the Trustee, agreeing to be bound by this Principal Trust Deed, any other Security Document, any relevant Supplemental Trust Deed and by the Notes, Receipts, Coupons and Talons of the relevant Series (with any consequential amendments which may be appropriate) as if the Substituted Issuer had been named herein and in the Notes, Receipts, Coupons and Talons of such Series as the principal debtor in place of the Issuer;

(iii)    the Substituted Issuer acquires the Issuer's equity of redemption in the relevant Mortgaged Property (if any) or otherwise assumes all rights, obligations and liabilities in relation to the Mortgaged Property, acknowledges the security created in respect thereof pursuant to the relevant Supplemental Trust Deed, any other Security Document, and takes all such action as the Trustee may require so that each such security constitutes a valid legal charge, pledge or other security interest as was originally created by the Issuer for the obligations of the Substituted Issuer;

(iv)    if any two Directors of the Substituted Issuer certify that the Substituted Issuer will be solvent immediately after the time at which the said substitution is to be effected, the Trustee need not have regard to the financial condition, profits or prospects of such Substituted Issuer or compare the same with those of the Issuer;

(v)    the Trustee is satisfied that (I) all necessary governmental and regulatory approvals and consents necessary for or in connection with the assumption by the Substituted Issuer of liability as principal debtor in respect of, and of its obligations under, the Notes, Receipts, Coupons, Talons and any Swap Agreement have been obtained and (II) such approvals and consents are at the time of substitution in full force and effect;

PRK.500.009.0219

(vi)    the Issuer and the Substituted Issuer execute and the Issuer procures that the Swap Counterparty executes such other deeds, documents and instruments (if any) as the Trustee may require in order that such substitution is fully effective and complies with such other requirements in the interests of the holders of the Notes, Receipts, Coupons and Talons as the Trustee may direct;

(vii)   In connection with any proposed substitution of the Issuer, the Trustee may, without the consent of the holders of such Notes, Receipts, Coupons or Talons agree to a change of the law from time to time governing the Notes and Coupons and/or this Principal Trust Deed and/or any relevant Supplemental Trust Deed, provided that such change of governing law is not, in the opinion of the Trustee, materially prejudicial to the interests of such Noteholders and Couponholders in respect of the Mortgaged Property;

(viii)  a legal opinion satisfactory to the Trustee is provided concerning any proposed substitution.

13.2.2  Upon the execution of such documents and compliance with such requirements as are referred to in sub-Clause 13.2.1, the Substituted Issuer shall be deemed to be named as the Issuer in this Principal Trust Deed (insofar as it affects the relevant Series), any other Security Documents, the relevant Supplemental Trust Deed, and the relevant Notes, Receipts, Coupons or Talons, all of which shall thereupon be deemed to be amended in such manner as is necessary to give effect thereto. Agreement by the Trustee to such substitution shall operate to release the Issuer from all of its obligations as principal debtor in respect of the relevant Series under this Principal Trust Deed, any other Security Document, and the relevant Supplemental Trust Deed. Not later than 14 days after the execution of any such undertaking and such other deeds, documents and instruments as aforesaid and compliance with the said requirements of the Trustee the Substituted Issuer shall, unless the Trustee agrees otherwise, give notice thereof to the relevant Noteholders.

13.3    **Change in tax residence:** The Trustee may agree to or require, without the consent of the Noteholders or the Couponholders, the change in the place of residence of the Issuer for taxation purposes, provided that:

13.3.1  the Trustee is satisfied that (a) all governmental and regulatory approvals and consents necessary for or in connection with the change by the Issuer of its place of tax residence have been obtained and (b) such approvals and consents are at the time of change in full force and effect;

13.3.2  the Issuer executes such other deeds, documents and instruments (if any) as the Trustee may require in order that such change in place of tax residence is fully effective and complies with such other requirements in the interest of the Noteholders as the Trustee may direct;

13.3.3  in connection with any proposed change in the place of tax residence of the Issuer, the Trustee may, without the consent of the Noteholders or the Couponholders agree to a change of the law from time to time governing such Notes and Coupons and/or this Principal Trust Deed and/or any

PRK.500.009.0220

relevant Supplemental Trust Deed, provided that such change of governing law is not, in the opinion of the Trustee, materially prejudicial to the interests of such Noteholders in respect of the Mortgaged Property;

13.3.4    such change shall not adversely affect any existing rating of any Notes issued by the Issuer as confirmed in writing by the appropriate rating agency; and

13.3.5    a legal opinion satisfactory to the Trustee is provided concerning any change in the place of tax residence of the Issuer.

13.4    **Transfer under the Swap Agreement:** In relation to any outstanding Notes which are rated, the Trustee shall agree to a transfer of any Swap Counterparty's rights and obligations under any Swap Agreement in accordance with its terms and shall agree to any amendment to such Swap Agreement to allow such transfer, provided that the transferee Swap Counterparty has obtained a rating for its obligations under such Swap Agreement at least equal to that obtained by the transferor Swap Counterparty in relation to its obligations under such Swap Agreement from Standard & Poor's and/or Moody's and/or Fitch, if applicable, or from any other statistical rating organisation generally recognised by banks, securities houses and investors in the euro-markets.

14    **Appointment, Retirement and Removal of the Trustee**

14.1    **Appointment:** The Issuer has the power of appointing new Trustees but no one may be so appointed unless previously approved by an Extraordinary Resolution of the relevant Noteholders. A trust corporation shall at all times be a Trustee and may be the sole Trustee.

14.2    **Retirement and Removal:** Any Trustee may retire in respect of any Series at any time on giving at least three months' written notice to the Issuer without giving any reason or being responsible for any costs occasioned by such retirement and the relevant Noteholders may by Extraordinary Resolution remove any Trustee provided that the retirement or removal of a sole trust corporation shall not be effective until a trust corporation is appointed as successor Trustee. If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, the Issuer shall use all reasonable endeavours to procure that another trust corporation be appointed as Trustee and if it does not procure the appointment of a new trustee within 30 days of the expiry of the Trustee notice referred to in this Clause, the Trustee shall be entitled to procure forthwith a new trustee acting on the same or substantially the same terms at the Trustee.

14.3    **Co-Trustees:** The Trustee may, despite sub-Clause 14.1, by written notice to the Issuer appoint anyone to act as an additional trustee jointly with the Trustee:

14.3.1    if the Trustee considers the appointment to be in the interests of the Noteholders and/or the Couponholders;

14.3.2    to conform with a legal requirement, restriction or condition in a jurisdiction in which a particular act is to be performed; or

14.3.3    to obtain a judgment or to enforce a judgment or any provision of this Principal Trust Deed or any Supplemental Trust Deed in any jurisdiction.

PRK.500.009.0221

Subject to the provisions of this Principal Trust Deed and/or any relevant Supplemental Trust Deed the Trustee may confer on any person so appointed such functions as it thinks fit. The Trustee may by written notice to the Issuer and that person, remove that person. At the Trustee's request, the Issuer shall forthwith do all things as may be required to perfect such appointment or removal and it irrevocably appoints the Trustee as its attorney in its name and on its behalf to do so.

14.4    **Competence of a Majority of Trustees:** If there are more than two Trustees the majority of them shall be competent to perform the Trustee's functions provided the majority includes a trust corporation.

14.5    **Merger:** Any corporation into which the Trustee may be merged or converted, any corporation with which the Trustee may be consolidated, amalgamated or any corporation resulting from any merger, amalgamation, conversion or consolidation to which the Trustee shall be a party, any corporation to which the Trustee shall sell or otherwise transfer all or substantially all of its assets or any corporation to which the Trustee shall sell or otherwise transfer all or substantially all of its corporate trust business, shall, to the extent permitted by applicable law, be the relevant successor Trustee under this Principal Trust Deed without the execution or delivery of any papers or any further act on the part of the parties hereto whereupon the Issuer and such successor shall acquire and become subject to the same rights and obligations between themselves as if they had entered into an agreement in the form *mutatis mutandis* of this Principal Trust Deed. Notice of any such merger, amalgamation, conversion, consolidation, sale or transfer shall forthwith be given by the Trustee to the Issuer and, as soon as practicable, to the Noteholders in accordance with Condition 14.

15    **Notes held in Clearing Systems and Couponholders**

15.1    **Notes held in Clearing Systems:** If, and so long as, any Global Note is, or any Notes represented by a Global Certificate are, held on behalf of a clearing system, in considering the interests of Noteholders, the Trustee may have regard to any information provided to it by such clearing system or its operator as to the identity (either individually or by category) of its accountholders or participants with entitlements to any such Global Note or the Registered Notes and may consider such interests on the basis that such accountholders or participants were the holder(s) thereof.

15.2    **Couponholders:** No notices need be given to Couponholders. They shall be deemed to have notice of the contents of any notice given to Noteholders. Even if it has express notice to the contrary, in exercising any of its functions by reference to the interests of the Noteholders, the Trustee shall assume that the holder of each Note is the holder of all Receipts, Coupons and Talons relating to it.

16    **Currency Indemnity**

16.1    **Currency of Account and Payment:** The Contractual Currency is the sole currency of account and payment for all sums payable by the Issuer under or in connection with the Trust Deed, the Notes, the Receipts and the Coupons, including damages.

16.2    **Extent of Discharge:** An amount received or recovered in a currency other than the Contractual Currency (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the insolvency, winding-up or dissolution of

PRK.500.009.0222

the Issuer or otherwise), by the Trustee or any Noteholder or Couponholder in respect of any sum expressed to be due to it from the Issuer shall only discharge the Issuer to the extent of the Contractual Currency amount that the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).

16.3    **Indemnity:** If that Contractual Currency amount is less than the Contractual Currency amount expressed to be due to the recipient under the Trust Deed, the Notes, the Receipts or the Coupons, the Issuer shall indemnify it against any loss sustained by it as a result. In any event, the Issuer shall indemnify the recipient against the cost of making any such purchase.

16.4    **Indemnity Separate:** The indemnities in this Clause 16 and in sub-Clauses 8.4 and 9.17 constitute separate and independent obligations from the other obligations in this Trust Deed, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by the Trustee and/or any Noteholder or Couponholder or Swap Counterparty and shall continue in full force and effect despite any judgment, order, claim or proof for a liquidated amount in respect of any sum due under this Trust Deed, the Notes, the Receipts and/or the Coupons or any other judgment or order.

17    **Communications**

17.1    **Method:** Each communication under this Principal Trust Deed shall be made by telex, fax or otherwise in writing. Each communication or document to be delivered to any party under this Principal Trust Deed shall be sent to that party at the telex, fax number or address, and marked for the attention of the person (if any), from time to time designated by that party to each other party for the purpose of this Principal Trust Deed.

The initial telephone number, telex number, fax number, address and person so designated by each party to this Principal Trust Deed are set out below:

The Issuer

telephone:                 00 353 1 874 0777

fax:                       00 353 1 874 3050

address:                   AIB International Centre
                           International Financial Services Centre
                           Dublin 1

attention:                 The Directors


Trustee

telephone:                 + 44 20 7777 5422

fax:                       +44 20 7777 5410

address:                   Trinity Tower
                           9 Thomas More Street
                           London  E1W 1YT

PRK.500.009.0223

attention:                                    Manager, Trust Administration

In the case of communications to any other Specified Company, the communication details
shall be as specified in the relevant Supplemental Trust Deed.

**17.2    Deemed Receipt:** Any communication from any party to any other under this
Principal Trust Deed shall be effective, (if by telex) when a confirmed answerback is
received at the end of the transmission, (if by fax) when good receipt is confirmed by
the recipient following enquiry by the sender and (if in writing) when delivered,
except that a communication received outside normal business hours shall be
deemed to be received on the next business day in the city in which the recipient is
located.

## 18    Enforcement and Non-recourse

**18.1    Enforcement:** Only the Trustee may enforce the rights of the holders of Notes,
Coupons, Receipts and Talons and/or the Swap Counterparty against the relevant
Issuer, whether the same arise under general law, this Principal Trust Deed, any
Supplemental Trust Deed, the Notes, the Coupons, the Receipts or Talons (if any) or
otherwise, and the holders of Notes, Coupons, Receipts and Talons and/or the Swap
Counterparty shall not be entitled to proceed directly against that Issuer unless the
Trustee, having become bound to proceed in accordance with the terms of this Trust
Deed, fails or neglects to do so.

**18.2    Non-Recourse:** The Trustee, Swap Counterparty (if any) and the holders of Notes,
Coupons, Receipts and Talons shall have recourse only to the Mortgaged Property
in respect of the relevant Series and, the Trustee having realised the same, the
Trustee, Swap Counterparty (if any) and the holders of Notes, Coupons, Receipts or
Talons, or anyone acting on behalf of any of them shall not be entitled to take any
further steps against the Issuer to recover any further sum and no debt shall be
owed to any of such persons by the Issuer in respect of any such further sum. In
particular, neither the Trustee, Swap Counterparty (if any) nor any holder of Notes,
Coupons, Receipts or Talons shall be entitled to institute, or join with any other
person in bringing, instituting or joining, insolvency proceedings (whether court
based or otherwise) in relation to the Issuer, nor shall any of them have any claim in
respect of any sum arising in respect of the Mortgaged Property for any other
Series.

## 19    Contracts (Rights of Third Parties) Act 1999

A person who is not a party to this Principal Trust Deed has no rights, whether under the
Contracts (Rights of Third Parties) Act 1999 or otherwise, to enforce any term of this
Principal Trust Deed except that and to the extent (if any) that this Principal Trust Deed
expressly provides for that Act to apply to any of its terms.

## 20    Governing Law and Jurisdiction

**20.1    Governing Law:** This Principal Trust Deed, the Notes, the Coupons, the Talons and
the Receipts shall be governed by and construed in accordance with English law.

**20.2    Jurisdiction:** The courts of England are to have jurisdiction to settle any disputes
that may arise out of or in connection with this Principal Trust Deed, any
Supplemental Trust Deed, the Notes, the Receipts, the Coupons or the Talons and
accordingly any legal action or proceedings arising out of or in connection with this

PRK.500.009.0224

Principal Trust Deed, any Supplemental Trust Deed, the Notes, the Receipts, the Coupons or the Talons ("**Proceedings**") may be brought in such courts. The Issuer irrevocably submits to the jurisdiction of such courts and waives any objections to Proceedings in such courts on the ground of venue or on the ground that the Proceedings have been brought in an inconvenient forum. This submission is for the benefit of the Trustee and the holders of Notes, Receipts, Coupons and Talons and shall not limit the right of any of them to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not).

20.3   **Service of Process:** The Issuer irrevocably appoints Lehman Brothers International (Europe) to receive, for it and on its behalf, service of process in any Proceedings in England. Such service shall be deemed completed on delivery to such process agent (whether or not it is forwarded to and received by the Issuer). If for any reason such process agent ceases to be able to act as such or no longer has an address in England the Issuer irrevocably agrees to appoint a substitute process agent acceptable to the Trustee and shall immediately notify the Trustee of such appointment. Nothing shall affect the right to serve process in any other manner permitted by law.

21     **Counterparts**

This Principal Trust Deed may be executed in counterparts which when taken together shall constitute one and the same instrument.

PRK.500.009.0225

### Schedule 1
### Part A
### Form of Temporary Global Note

THIS TEMPORARY GLOBAL NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933 (THE "SECURITIES ACT"). NEITHER THIS TEMPORARY GLOBAL NOTE NOR ANY PORTION HEREOF MAY BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO ANY U.S. PERSON UNLESS AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT IS AVAILABLE.

ANY UNITED STATES PERSON WHO HOLDS THIS OBLIGATION WILL BE SUBJECT TO LIMITATIONS UNDER THE UNITED STATES INCOME TAX LAWS, INCLUDING THE LIMITATIONS PROVIDED IN SECTIONS 165(j) AND 1287(a) OF THE INTERNAL REVENUE CODE.

### [SPECIFIED COMPANY]
### [•]
### Registered Office: [•]
### [REGISTERED NUMBER]

### MULTI-ISSUER SECURED OBLIGATION PROGRAMME

### Temporary Global Note No: [    ]

This Temporary Global Note is issued in respect of the Notes (the "Notes") of the Tranche(s) and Series specified in the Second Schedule hereto of [Specified Company] (the "Issuer").

1    **Interpretation and Definitions**

References in this Global Note to the "Conditions" are to the Terms and Conditions applicable to the Notes (which are in the form set out in Schedule 2 Part C to the principal trust deed dated 10 October 2002 between the Issuer and J.P. Morgan Corporate Trustee Services Limited as Trustee as amended and restated on 21 July 2006 (the "Principal Trust Deed") (as amended or supplemented by the Supplemental Trust Deed dated the date hereof (the Principal Trust Deed and the Supplemental Trust Deed together being the "Trust Deed")), as such form is supplemented and/or modified and/or superseded by the provisions of this Temporary Global Note (including the supplemental definitions and any modifications or additions set out in the Second Schedule hereto), which in the event of any conflict shall prevail). Other capitalised terms used in this Temporary Global Note shall have the meanings given to them in the Conditions or the Trust Deed.

2    **Aggregate Principal Amount**

The aggregate principal amount from time to time of this Temporary Global Note shall be an amount equal to the aggregate principal amount of the Notes as shall be shown by the latest entry in the fourth column of the First Schedule hereto, which shall be completed by or on behalf of the Issuing and Paying Agent upon (i) the issue of the Notes represented hereby, (ii) the exchange of the whole or a part of this Temporary Global Note for a corresponding interest in a Permanent Global Note or Registered Notes, (iii) the redemption or purchase and cancellation of Notes represented hereby and/or (iv) in the case of partly-paid Notes,

PRK.500.009.0226

the forfeiture of Notes represented hereby in accordance with the Conditions relating to such Partly-paid Notes, all as described below.

**3    Promise to Pay**

Subject as provided herein, the Issuer, for value received, hereby promises to pay to the bearer of this Temporary Global Note, upon presentation and (when no further payment is due in respect of this Temporary Global Note) surrender of this Temporary Global Note, on the Maturity Date (or on such earlier date as the Redemption Amount may become repayable in accordance with the Conditions) the Redemption Amount in respect of the aggregate principal amount of Notes represented by this Temporary Global Note and (unless this Temporary Global Note does not bear interest) to pay interest in respect of such aggregate principal amount of Notes from the Interest Commencement Date in arrear at the rates, in the amounts and on the dates for payment provided for in the Conditions together with such other sums and additional amounts (if any) as may be payable under the Conditions, in accordance with the Conditions.

**4    Exchange**

If this Temporary Global Note is an Exchangeable Bearer Note, this Temporary Global Note may be exchanged in whole or from time to time in part for one or more Registered Notes in accordance with the Conditions on or after the Issue Date but before the Exchange Date (as defined below) by its presentation to the Issuing and Paying Agent. On or after the Exchange Date, the outstanding principal amount of this Temporary Global Note may be exchanged in accordance with the next paragraph.

Subject as provided in the Conditions applicable to Partly-paid Notes, on or after the first day following the expiry of 40 days after the Issue Date (the "**Exchange Date**"), this Temporary Global Note may be exchanged (free of charge to the holder) in whole or from time to time in part by its presentation and, on exchange in full, surrender to or to the order of the Issuing and Paying Agent for interests in a Permanent Global Note and (if this Temporary Global Note is an Exchangeable Bearer Note), in each case, for Registered Notes in an aggregate principal amount equal to the principal amount of this Temporary Global Note submitted for exchange; provided that, there shall have been Certification with respect to such principal amount submitted for such Certification (as defined below) with respect to such principal amount submitted for such exchange dated no earlier than the Exchange Date.

"**Certification**" means the presentation to the Issuing and Paying Agent of a certificate or certificates with respect to one or more interests in this Temporary Global Note, signed by Euroclear or Clearstream, Luxembourg, substantially to the effect set out in Schedule 4 to the Agency Agreement to the effect that it has received a certificate or certificates substantially to the effect set out in Schedule 3 to the Agency Agreement with respect thereto and that no contrary advice as to the contents thereof has been received by Euroclear or Clearstream, Luxembourg, as the case may be.

Upon the whole or a part of this Temporary Global Note being exchanged for a Permanent Global Note, such Permanent Global Note shall be exchangeable in accordance with its terms for Definitive Notes or Registered Notes.

The Definitive Notes or the Certificates representing the Registered Notes for which this Temporary Global Note or a Permanent Global Note may be exchangeable shall be duly

PRK.500.009.0227

executed and authenticated, shall, in the case of Definitive Notes, have attached to them all
Coupons (and, where appropriate, Talons) in respect of interest, and all Receipts in respect
of Instalment Amounts, that have not already been paid on this Temporary Global Note or
the Permanent Global Note, as the case may be, shall be security printed or, in the case of
Certificates, printed in accordance with applicable legal and stock exchange requirements
and shall be substantially in the form set out in the Schedules to the Trust Deed as
supplemented and/or modified and/or superseded by the terms of the Second Schedule
hereto.

Certificates issued upon exchange for Registered Notes shall not be Global Certificates
unless the holder so requests and certifies to the Issuing and Paying Agent that it is, or is
acting as a nominee for, Clearstream, Luxembourg, Euroclear and/or any other clearing
system.

On any exchange of a part of this Temporary Global Note for an equivalent interest in a
Permanent Global Note or for Registered Notes, as the case may be, the portion of the
principal amount hereof so exchanged shall be endorsed by or on behalf of the Issuing and
Paying Agent in the First Schedule hereto, whereupon the principal amount hereof shall be
reduced for all purposes by the amount so exchanged and endorsed.

## 5    Benefit of Conditions

Except as otherwise specified herein, this Temporary Global Note is subject to the
Conditions and the Trust Deed and, until the whole of this Temporary Global Note is
exchanged for Definitive Notes or Registered Notes, the holder of this Temporary Global
Note shall in all respects be entitled to the same benefits as if it were the holder of the
Permanent Global Note (or the relevant part of it) for which it may be exchanged and as if
such Permanent Global Note had been issued on the Issue Date.

## 6    Payments

No person shall be entitled to receive any payment in respect of the Notes represented by
this Temporary Global Note that falls due after an Exchange Date for such Notes, unless
upon due presentation of this Temporary Global Note for exchange, delivery (or, in the case
of a subsequent exchange, due endorsement of) a Permanent Global Note or delivery of
Certificates is improperly withheld or refused by or on behalf of the Issuer or the Issuer does
not perform or comply with any of its obligations under the Permanent Global Note.

Payments due in respect of this Temporary Global Note before the Exchange Date shall
only be made in relation to such principal amount of this Temporary Global Note with
respect to which there shall have been Certification dated no earlier than such due date for
payment.

Any payments that are made in respect of this Temporary Global Note shall be made to its
holder against presentation and (if no further payment falls to be made on it) surrender of it
at the specified office of the Issuing and Paying Agent or of any other Paying Agent provided
for in the Conditions.

If any payment in full of principal is made in respect of any Note represented by this
Temporary Global Note, the portion of this Temporary Global Note representing such Note
shall be cancelled and the amount so cancelled shall be endorsed by or on behalf of the
Issuing and Paying Agent in the First Schedule hereto (such endorsement being *prima facie*

PRK.500.009.0228

evidence that the payment in question has been made) whereupon the principal amount hereof shall be reduced for all purposes by the amount so cancelled and endorsed.

If any other payments are made in respect of the Notes represented by this Temporary Global Note, a record of each such payment shall be endorsed by or on behalf of the Issuing and Paying Agent on an additional schedule hereto (such endorsement being *prima facie* evidence that the payment in question has been made). The second exception to Condition 6(d)(i) and Condition 7(e) will apply to the Definitive Notes only.

## 7   Cancellation

Cancellation of any Note represented by this Temporary Global Note that is required by the Conditions to be cancelled (other than upon its redemption) shall be effected by reduction in the principal amount of this Temporary Global Note representing such Note on its presentation to or to the order of the Issuing and Paying Agent for endorsement in the First Schedule hereto, whereupon the principal amount hereof shall be reduced for all purposes by the amount so cancelled and endorsed.

## 8   Notices

Notwithstanding Condition 14, notices in respect of the Notes represented by this Temporary Global Note may be given by their being delivered (so long as this Temporary Global Note is held on behalf of Euroclear, Clearstream, Luxembourg or any other clearing system) to Euroclear, Clearstream, Luxembourg or such other clearing system, as the case may be. No provisions of this Temporary Global Note shall alter or impair the obligation of the Issuer to pay the principal and premium of and interest on the Notes when due in accordance with the Conditions. This Temporary Global Note shall not be valid or become obligatory for any purpose until authenticated by or on behalf of the Issuing and Paying Agent. This Temporary Global Note shall be governed by and construed in accordance with the laws of England.

**In witness whereof** the Issuer has caused this Temporary Global Note to be duly signed on its behalf.

Dated as of the Issue Date.

[SPECIFIED COMPANY]


By:


By:



**Certificate of Authentication of the Issuing and Paying Agent**

This Temporary Global Note is authenticated by or on behalf of the Issuing and Paying Agent

[•] as Issuing and Paying Agent

By:

---

PRK.500.009.0229

Authorised Signatory

For the purposes of authentication only.

PRK.500.009.0230

**The First Schedule**

**Principal Amount of Notes Represented by this Temporary Global Note**

The following (i) issues of Notes initially represented by this Temporary Global Note, (ii) exchanges of the whole or a part of this Temporary Global Note for interest in a Permanent Global Note or for Registered Notes, and/or (iii) cancellations or forfeitures of interests in this Temporary Global Note have been made, resulting in the principal amount of this Global Note specified in the latest entry in the fourth column:

| Date | Amount of increase/ decrease in principal amount of this Global Note | Reason for decrease in principal amount of this Temporary Global Note (exchange, cancellation or forfeiture) | Principal amount of this Temporary Global Note on issue or following such decrease | Notation made by or on behalf of the Issuing and Paying Agent |
|---|---|---|---|---|

PRK.500.009.0231

## The Second Schedule

[Insert the provisions of the relevant Final Terms or Series Prospectus that relate to the Conditions
or the Global Note as the Second Schedule]

PRK.500.009.0232

Schedule 1
Part B
Form of Permanent Global Note

[SPECIFIED COMPANY]
[•]
Registered Office: [•]
[•]
(Incorporated with limited liability in [•])

MULTI-ISSUER SECURED OBLIGATION PROGRAMME

Permanent Global Note No:

This Global Note is issued in respect of the Notes (the "Notes") of the Tranche(s) and Series specified in the Third Schedule hereto of [SPECIFIED COMPANY] (the "Issuer").

1    Interpretation and Definitions

References in this Global Note to the "Conditions" are to the Terms and Conditions applicable to the Notes, which are in the form set out in Schedule 2 Part C to the principal trust deed dated 10 October 2002 between the Issuer and J.P. Morgan Corporate Trustee Services Limited as Trustee as amended and restated on 21 July 2006 (the "Principal Trust Deed") (as amended or supplemented by the Supplemental Trust Deed dated the date hereof (the Principal Trust Deed and the Supplemental Trust Deed together being the "Trust Deed")) , as such form is supplemented and/or modified and/or superseded by the provisions of this Global Note (including the supplemental definitions and any modifications or additions set out in the Third Schedule hereto), which in the event of any conflict shall prevail). Other capitalised terms used in this Global Note shall have the meanings given to them in the Conditions or the Trust Deed.

2    Aggregate Principal Amount

The aggregate principal amount from time to time of this Global Note shall be an amount equal to the aggregate principal amount of the Notes as shall be shown by the latest entry in the fourth column of the First Schedule hereto, which shall be completed by or on behalf of the Issuing and Paying Agent upon (i) the exchange of the whole or a part of a Temporary Global Note initially representing the Notes for a corresponding interest herein (in the case of Notes represented by a Temporary Global Note upon issue) (ii) the issue of the Notes represented hereby, (iii) the exchange of the whole or, where the limited circumstances so permit, a part of this Global Note for Definitive Notes or Registered Notes, (iv) the redemption or purchase and cancellation of Notes represented hereby and/or (v) in the case of Partly-paid Notes, the forfeiture of Notes represented hereby in accordance with the Conditions relating to such Partly-paid Notes, all as described below.

3    Promise to Pay

Subject as provided herein, the Issuer, for value received, hereby promises to pay to the bearer of this Global Note, upon presentation and (when no further payment is due in

PRK.500.009.0233

respect of this Global Note) surrender of this Global Note, on the Maturity Date (or on such earlier date as the Redemption Amount may become repayable in accordance with the Conditions) the Redemption Amount in respect of the aggregate principal amount of Notes represented by this Global Note and (unless this Global Note does not bear interest) to pay interest in respect of such aggregate principal amount of Notes from the Interest Commencement Date in arrear at the rates, in the amounts and on the dates for payment provided for in the Conditions together with such other sums and additional amounts (if any) as may be payable under the Conditions, in accordance with the Conditions.

## 4    Exchange

This Global Note is exchangeable (free of charge to the holder) on or after the Exchange Date in whole but not, except as provided in the next paragraph, in part for Definitive Notes or (if this Global Note is an Exchangeable Bearer Note) Registered Notes represented by the Certificates described below:

(a)    if this Global Note is an Exchangeable Bearer Note, by the holder hereof giving notice to the Issuing and Paying Agent of its election to exchange the whole or a part of this Global Note for Registered Notes; or

(b)    if this Global Note is held on behalf of Euroclear or Clearstream, Luxembourg or any other clearing system (an "Alternative Clearing System") and any such clearing system is closed for business for a continuous period of 14 days (other than by reason of holidays, statutory or otherwise) or announces an intention permanently to cease business or does in fact do so.

This Global Note is exchangeable in part (provided, however, that if this Global Note is held by or on behalf of Euroclear and/or Clearstream, Luxembourg, the rules of Euroclear and/or Clearstream, Luxembourg, as the case may be, so permit) (i) if this Global Note is an Exchangeable Bearer Note and the part hereof submitted for exchange is to be exchanged for Registered Notes or (ii) if so provided, and in accordance with, the Conditions relating to Partly-paid Notes.

"**Exchange Date**" means a day falling not less than 60 days, or in the case of an exchange for Registered Notes five days, after that on which the notice requiring exchange is given and on which banks are open for business in the city in which the specified office of the Issuing and Paying Agent is located and, except in the case of exchange pursuant to (d) above, in the cities in which Euroclear and Clearstream, Luxembourg or, if relevant, the Alternative Clearing System, are located.

Subject as provided in the Conditions applicable to Partly-paid Notes, any such exchange may be effected on or after an Exchange Date by the holder of this Global Note surrendering this Global Note or, in the case of a partial exchange, presenting it for endorsement to or to the order of the Issuing and Paying Agent.

In exchange for this Global Note, or part thereof to be exchanged, the Issuer shall deliver, or procure the delivery of, duly executed and authenticated Definitive Notes and/or (if this Global Note is an Exchangeable Bearer Note) Certificates in an aggregate principal amount equal to the principal amount of this Global Note submitted for exchange (if appropriate, having attached to them all Coupons (and, where appropriate, Talons) in respect of interest, and all Receipts in respect of Instalment Amounts, that have not already been paid on this Global Note), security printed or, in the case of Certificates, printed in accordance with any applicable legal and stock exchange requirements and substantially in the form set out in

PRK.500.009.0234

Schedule 2 to the Trust Deed as supplemented and/or modified and/or superseded by the terms of the Third Schedule hereto.

Certificates issued upon exchange for Registered Notes shall not be Global Certificates unless the holder so requests and certifies to the Issuing and Paying Agent that it is, or is acting as a nominee for, Clearstream, Luxembourg, Euroclear and/or an Alternative Clearing System.

On any exchange of a part of this Global Note the portion of the principal amount hereof so exchanged shall be endorsed by or on behalf of the Issuing and Paying Agent in the First Schedule hereto, whereupon the principal amount hereof shall be reduced for all purposes by the amount so exchanged and endorsed.

5    **Benefit of Conditions**

Except as otherwise specified herein, this Global Note is subject to the Conditions and the Trust Deed and, until the whole of this Global Note is exchanged for Definitive Notes or Registered Notes, the holder of this Global Note shall in all respects be entitled to the same benefits as if it were the holder of the Definitive Notes for which it may be exchanged and as if such Definitive Notes had been issued on the Issue Date.

6    **Payments**

No person shall be entitled to receive any payment in respect of the Notes represented by this Global Note that falls due after an Exchange Date for such Notes, unless upon due presentation of this Global Note for exchange, delivery of Definitive Notes or Certificates is improperly withheld or refused by or on behalf of the Issuer or the Issuer does not perform or comply with any one or more of what are expressed to be its obligations under any Definitive Notes.

Payments in respect of this Global Note shall be made to its holder against presentation and (if no further payment falls to be made on it) surrender of it at the specified office of the Issuing and Paying Agent or of any other Paying Agent provided for in the Conditions. A record of each such payment shall be endorsed on the First or Second Schedule hereto, as appropriate, by the Issuing and Paying Agent or by the relevant Paying Agent, for and on behalf of the Issuing and Paying Agent, which endorsement shall (until the contrary is proved) be *prima facie* evidence that the payment in question has been made. The second exception to Condition 6(d)(i) and Condition 7(e) will apply to the Definitive Notes only.

7    **Prescription**

Claims in respect of principal and interest (as each is defined in the Conditions) in respect of this Global Note shall become void unless it is presented for payment within a period of 10 years (in the case of principal) and five years (in the case of interest) from the appropriate Relevant Date.

8    **Meetings**

The holder of this Global Note shall (unless this Global Note represents only one Note) be treated as two persons for the purposes of any quorum requirements of a meeting of Noteholders and, at any such meeting, as having one vote in respect of each integral currency unit of the specified currency of the Notes.

PRK.500.009.0235

9   **Cancellation**

Cancellation of any Note represented by this Global Note that is required by the Conditions to be cancelled (other than upon its redemption) shall be effected by reduction in the principal amount of this Global Note representing such Note on its presentation to or to the order of the Issuing and Paying Agent for endorsement in the First Schedule hereto, whereupon the principal amount hereof shall be reduced for all purposes by the amount so cancelled and endorsed.

10   **Purchase**

Notes may only be purchased by the Issuer if they are purchased together with the right to receive all future payments of interest and Instalment Amounts (if any) thereon.

11   **Issuer's Options**

Any option of the Issuer provided for in the Conditions shall be exercised by the Issuer giving notice to the Noteholders within the time limits set out in and containing the information required by the Conditions, except that the notice shall not be required to contain the serial numbers of Notes drawn in the case of a partial exercise of an option and accordingly no drawing of Notes shall be required.

12   **Noteholders' Options**

Any option of the Noteholders provided for in the Conditions may be exercised by the holder of this Permanent Global Note giving notice to the Issuing and Paying Agent within the time limits relating to the deposit of Notes with a Paying Agent set out in the Conditions substantially in the form of the notice available from any Paying Agent, except that the notice shall not be required to contain the serial numbers of the Notes in respect of which the option has been exercised, and stating the principal amount of Notes in respect of which the option is exercised and at the same time presenting this Permanent Global Note to the Issuing and Paying Agent, or to a Paying Agent acting on behalf of the Issuing and Paying Agent, for notation accordingly in the Fourth Schedule hereto.

13   **Notices**

Notwithstanding Condition 14, notices in respect of the Notes represented by this Global Note may be given by their being delivered (so long as this Global Note is held on behalf of Euroclear, Clearstream, Luxembourg or any other clearing system) to Euroclear, Clearstream, Luxembourg or such other clearing system, as the case may be.

14   **Negotiability**

This Global Note is a bearer document and negotiable and accordingly:

(a)   is freely transferable by delivery and such transfer shall operate to confer upon the transferee all rights and benefits appertaining hereto and to bind the transferee with all obligations appertaining hereto pursuant to the Conditions;

(b)   the holder of this Global Note is and shall be absolutely entitled as against all previous holders to receive all amounts by way of Redemption Amount interest or otherwise payable in respect of this Global Note and the Issuer has waived against such holder and any previous holder of this Global Note all rights of set-off or

PRK.500.009.0236

counterclaim that would or might otherwise be available to it in respect of the obligations evidenced by this Global Note; and

(c)    payment upon due presentation of this Global Note as provided herein shall operate as a good discharge against such holder and all previous holders of this Global Note.

No provisions of this Global Note shall alter or impair the obligation of the Issuer to pay the principal and premium of and interest on the Notes when due in accordance with the Conditions.

This Global Note shall not be valid or become obligatory for any purpose until authenticated by or on behalf of the Issuing and Paying Agent.

This Global Note shall be governed by and construed in accordance with the laws of England.

In witness whereof the Issuer has caused this Global Note to be duly signed on its behalf.

Dated as of the Issue Date.

[SPECIFIED COMPANY]

By:

**Certificate of Authentication of the Issuing and Paying Agent**

This Global Note is authenticated by or on behalf of the Issuing and Paying Agent

JPMorgan Chase Bank, N.A. as Issuing and Paying Agent

By:

Authorised Signatory

For the purposes of authentication only.

ANY UNITED STATES PERSON WHO HOLDS THIS OBLIGATION WILL BE SUBJECT TO LIMITATIONS UNDER THE UNITED STATES INCOME TAX LAWS, INCLUDING THE LIMITATIONS PROVIDED IN SECTIONS 165(j) AND 1287(a) OF THE INTERNAL REVENUE CODE.

PRK.500.009.0237

## The First Schedule

### Principal Amount of Notes Represented by this Global Note

The following (i) issues of Notes initially represented by this Global Note, (ii) exchanges of interests in a Temporary Global Note for interests in this Global Note, (iii) exchanges of the whole or a part of this Global Note for Definitive Notes or for Registered Notes, (iv) cancellations or forfeitures of interests in this Global Note and/or (v) payments of the Redemption Amount in respect of this Global Note have been made, resulting in the principal amount of this Global Note specified in the latest entry in the fourth column:

| Date | Amount of increase/ decrease in principal amount of this Global Note | Reason for increase/decrease in principal amount of this Global Note (initial issue, exchange, cancellation, forfeiture or payment, stating amount of payment made) | Principal amount of this Temporary Global Note following such increase/decrease | Notation made by or on behalf of the Issuing and Paying Agent |
|---|---|---|---|---|

PRK.500.009.0238

## The Second Schedule

### Payments of Interest

The following payments of interest or Interest Amount in respect of this Global Note have been made:

| Due date of payment | Date of payment | Amount of interest | Notation made by or on behalf of the Issuing and Paying Agent |
|---|---|---|---|

PRK.500.009.0239

## The Third Schedule

[Insert the provisions of the relevant Final Terms or Series Prospectus that relate to the Conditions for the Global Note as the Third Schedule]

PRK.500.009.0240

## The Fourth Schedule

### Exercise of Noteholders' Option

The following exercises of the option of the Noteholders provided for in the Conditions have been made in respect of the stated principal amount of this Permanent Global Note:

| Date of exercise | Principal amount of this Permanent Global Note in respect of which exercise is made | Date on which exercise of such option is effective | Notation made by or on behalf of the Issuing and Paying Agent |
|---|---|---|---|

PRK.500.009.0241

**Schedule 1**
**Part C**
**Form of Global Certificate**

**[SPECIFIED COMPANY]**
**[•]**
**Registered Office: [•]**
**[REGISTERED NUMBER]**

**Secured Obligation Programme**

**GLOBAL CERTIFICATE**

**Global Certificate No. [•]**

Registered Holder: .......................................................................................

Address of Registered Holder: .......................................................................................

.......................................................................................

.......................................................................................

Principal amount of Notes
represented by this
Global Certificate: .......................................................................................

This Global Certificate is issued in respect of the principal amount specified above of the Notes (the "Notes") of the Tranche and Series specified in the Schedule hereto of [Specified Company] (the "Issuer"). This Global Certificate certifies that the Registered Holder (as defined above) is registered as the holder of such principal amount of the Notes.

1       **Interpretation and Definitions**

References in this Global Certificate to the "Conditions" are to the Terms and Conditions applicable to the Notes (which are in the form set out in Schedule 2 Part C to the Principal Trust Deed (as amended or supplemented by the Supplemental Trust Deed dated the date hereof, the "Trust Deed") dated 21 July 2006 between the Issuer and J.P. Morgan Corporate Trustee Services Limited as trustee, as such form is supplemented and/or modified and/or superseded by the provisions of this Global Certificate (including the supplemental definitions and any modifications or additions set out in the Schedule hereto), which in the event of any conflict shall prevail).

Other capitalised terms used in this Global Certificate shall have the meanings given to them in the Conditions or the Trust Deed.

2       **Promise to Pay**

The Issuer, for value received, hereby promises to pay to the Registered Holder upon presentation and (when no further payment is due in respect of the Notes represented by this Global Certificate) surrender of this Global Certificate on the Maturity Date (or on such earlier date as the Redemption Amount may become repayable in accordance with the

PRK.500.009.0242

Conditions) the Redemption Amount in respect of the Notes represented by this Global Certificate and (unless the Notes represented by this Certificate do not bear interest) to pay interest in respect of such Notes from the Interest Commencement Date in arrear at the rates, in the amounts and on the dates for payment provided for in the Conditions together with such other sums and additional amounts (if any) as may be payable under the Conditions, in accordance with the Conditions.

For the purposes of this Global Certificate, (a) the Registered Holder is bound by the provisions of the Agency Agreement, (b) the Issuer certifies that the Registered Holder is, at the date hereof, entered in the Register as the holder of the Notes represented by this Global Certificate, (c) this Global Certificate is evidence of entitlement only, (d) title to the Notes represented by this Global Certificate passes only on due registration on the Register, and (e) only the Registered Holder is entitled to payments in respect of the Notes represented by this Global Certificate.

3    **Transfer of Notes Represented by Permanent Global Certificates**

If the Schedule hereto states that the Notes are to be represented by a permanent Global Certificate on issue, transfers of the holding of Notes represented by this Global Certificate pursuant to Condition 2(b) may only be made in part:

(i)     if the Notes represented by this Global Certificate are held on behalf of Euroclear or Clearstream, Luxembourg or any other clearing system (an "**Alternative Clearing System**") and any such clearing system is closed for business for a continuous period of 14 days (other than by reason of holidays, statutory or otherwise) or announces an intention permanently to cease business or does in fact do so; or

(ii)    with the consent of the Issuer,

provided that, in the case of the first transfer of part of a holding pursuant to (i) above, the Registered Holder has given the Registrar not less than 30 days' notice at its specified office of the Registered Holder's intention to effect such transfer. Where the holding of Notes represented by this Global Certificate is only transferable in its entirety, the Certificate issued to the transferee upon transfer of such holding shall be a Global Certificate. Where transfers are permitted in part, Certificates issued to transferees shall not be Global Certificates unless the transferee so requests and certifies to the Registrar that it is, or is acting as a nominee for, Clearstream, Luxembourg, Euroclear and/or an Alternative Clearing System.

4    **Meetings**

The Registered Holder shall (unless this Global Certificate represents only one Note) be treated as two persons for the purposes of any quorum requirements of a meeting of Noteholders and at any such meeting as having one vote in respect of each integral currency unit of the specified currency of the Notes.

This Global Certificate shall not become valid or obligatory for any purpose until the certificate of authentication hereon shall have been duly signed by or on behalf of the Registrar.

In witness whereof the Issuer has caused this Global Certificate to be signed on its behalf.

Dated as of the Issue Date.

PRK.500.009.0243

[[SPECIFIED COMPANY]

By:

### Certificate of Authentication of the Registrar

This Global Certificate is authenticated by or on behalf of the Registrar.

[•] as Registrar

By:

Authorised Signatory

For the purposes of authentication only.

PRK.500.009.0244

### Form of Transfer.

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers to

......................................................................

.....................................................................

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS OF TRANSFEREE)

[    ] principal amount of the Notes represented by this Global Certificate, and all rights under them.

Dated...............................

Signed...........................                    Certifying Signature ....................................

Notes:

(I)     The signature of the person effecting a transfer shall conform to a list of duly authorised
        specimen signatures supplied by the Registered Holder or (if such signature corresponds
        with the name as it appears on the face of this Global Certificate) be certified by a notary
        public or a recognised bank or be supported by such other evidence as a Transfer Agent or
        the Registrar may reasonably require.

(ii)    A representative of the Noteholder should state the capacity in which he signs e.g. executor.

PRK.500.009.0245

## Schedule

[Insert the provisions of the relevant Final Terms or Series Prospectus that relate to the Conditions or the Global Certificate as the Schedule.]

PRK.500.009.0246

**Schedule 2**
**Part A**
**Form of Bearer Note**

On the front:

[Denomination]          [ISIN]          [Series]          [Certif. No.]

[Currency and denomination]

**[SPECIFIED COMPANY]**
**[•]**
**Registered Office [•]**
**[REGISTERED NUMBER]**

**MULTI-ISSUER SECURED OBLIGATION PROGRAMME**

**Series No. [•]**

**[Title of Issue]**

This Note forms one of the Series of Notes referred to above (the "**Notes**") of [Specified Company] (the "Issuer") designated as specified in the title hereof.

The Notes are subject to the Terms and Conditions (the "**Conditions**") endorsed hereon and are issued subject to, and with the benefit of, the Principal Trust Deed and Supplemental Trust Deed referred to in the Conditions.

Expressions defined in the Conditions have the same meanings in this Note.

The Issuer for value received hereby promises to pay to the bearer of this Note, on presentation and (when no further payment is due in respect of this Note) surrender of this Note on the Maturity Date (or on such earlier date as the Redemption Amount may become repayable in accordance with the Conditions) the Redemption Amount and (unless this Note does not bear interest) to pay interest from the Interest Commencement Date in arrear at the rates, in the amounts and on the dates for payment provided for in the Conditions together with such other sums and additional amounts (if any) as may be payable under the Conditions, in accordance with the Conditions.

This Note shall not become valid or obligatory for any purpose until the certificate of authentication hereon shall have been duly signed by or on behalf of the Issuing and Paying Agent.

PRK.500.009.0247

**In witness** whereof the Issuer has caused this Note to be signed on its behalf.

Dated as of the Issue Date.

[SPECIFIED COMPANY]

By:

### Certificate of Authentication of the Issuing and Paying Agent

This Note is authenticated by or on behalf of the Issuing and Paying Agent.

[•] as Issuing and Paying Agent

By:

Authorised Signatory

For the purposes of authentication only.

ANY UNITED STATES PERSON WHO HOLDS THIS OBLIGATION WILL BE SUBJECT TO LIMITATIONS UNDER THE UNITED STATES INCOME TAX LAWS, INCLUDING THE LIMITATIONS PROVIDED IN SECTIONS 165(j) AND 1287(a) OF THE INTERNAL REVENUE CODE.

PRK.500.009.0248

On the back:

### Terms and Conditions of the Notes

[The Terms and Conditions that are set out in Schedule 2 Part C to the Principal Trust Deed as amended by and incorporating any additional provisions forming part of such Terms and Conditions and set out in the relevant Final Terms or Series Prospectus shall be set out here.]

### Issuing and Paying Agent and Transfer Agent

[•]

### Attention: Manager, [•]

### Paying and Transfer Agent

[•]

### Attention: Manager, [•]

PRK.500.009.0249

**Schedule 2**
**Part B**
**Form of Certificate**

On the front:

**[SPECIFIED COMPANY]**
**[•]**

**Registered office [•]**

**MULTI-ISSUER SECURED OBLIGATION PROGRAMME**

**Series No. [•]**

**[Title of issue]**

This Certificate certifies that the Registered Holder (as defined below) is registered as the holder of [principal amount] of Notes of the Series of Notes referred to above (the "**Notes**") of [Specified Company] (the "**Issuer**"), designated as specified in the title hereof. The Notes are subject to the Terms and Conditions (the "**Conditions**") endorsed hereon and are issued subject to, and with the benefit of, the Principal Trust Deed and Supplemental Trust Deed referred to in the Conditions. Expressions defined in the Conditions have the same meanings in this Certificate.

The Issuer, for value received, hereby promises to pay to [          ] of [          ] (the "**Registered Holder**") upon presentation and (when no further payment is due in respect of the Note(s) represented by this Certificate) surrender of this Certificate on the Maturity Date (or on such earlier date as the Redemption Amount may become repayable in accordance with the Conditions) the Redemption Amount in respect of the Notes represented by this Certificate and (unless the Note(s) represented by this Certificate do not bear interest) to pay interest in respect of such Notes from the Interest Commencement Date in arrear at the rates, in the amounts and on the dates for payment provided for in the Conditions together with such other sums and additional amounts (if any) as may be payable under the Conditions, in accordance with the Conditions.

For the purposes of this Certificate, (a) the Registered Holder is bound by the provisions of the Agency Agreement, (b) the Issuer certifies that the Registered Holder is, at the date hereof, entered in the Register as the holder of the Note(s) represented by this Certificate, (c) this Certificate is evidence of entitlement only, (d) title to the Note(s) represented by this Certificate passes only on due registration on the Register, and (e) only the Registered Holder is entitled to payments in respect of the Note(s) represented by this Certificate.

This Certificate shall not become valid or obligatory for any purpose until the certificate of authentication hereon shall have been duly signed by or on behalf of the Registrar.

In witness whereof the Issuer has caused this Certificate to be signed on its behalf.

Dated as of the Issue Date.

[SPECIFIED COMPANY]

By:

PRK.500.009.0250

**Certificate of Authentication of the Registrar**

This Certificate is authenticated by or on behalf of the Registrar.

[•] as Registrar

By:

Authorised Signatory

For the purposes of authentication only.

PRK.500.009.0251

On the back:

### Terms and Conditions of the Notes

[The Conditions that are set out in Schedule 2 Part C to the Principal Trust Deed as amended or supplemented by and incorporating any additional provisions forming part of such Terms and Conditions and set out in the relevant Final Terms or Series Prospectus shall be set out here.]

PRK.500.009.0252

## Form of Transfer

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers to

.................................................................

.................................................................

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS OF TRANSFEREE)

[        ] principal amount of the Notes represented by this Certificate, and all rights under them.

Dated...........................

Signed...........................                    Certifying Signature.............................

**Notes:**

(i)     The signature of the person effecting a transfer shall conform to a list of duly authorised specimen signatures supplied by the Registered Holder or (if such signature corresponds with the name as it appears on the face of this Certificate) be certified by a notary public or a recognised bank or be supported by such other evidence as a Transfer Agent or the Registrar may reasonably require.

(ii)    A representative of the Noteholder should state the capacity in which he signs e.g. executor.

**Issuing and Paying Agent and Transfer Agent**

[•]

**Paying and Transfer Agent**

[•]

PRK.500.009.0253

## Schedule 2
## Part C
### TERMS AND CONDITIONS OF THE NOTES

*The following is the text of the terms and conditions that, subject to completion and amendment and as supplemented or varied in accordance with the provisions of the relevant Final Terms in relation to a particular Series of Notes, shall be applicable to the Notes in definitive form (if any) issued in exchange for the Global Note(s) representing each Series. Either (i) the full text of these terms and conditions together with the relevant provisions of the Final Terms or (ii) these terms and conditions, as so completed, amended, supplemented or varied (and subject to simplification by the deletion of non-applicable provisions), shall be endorsed on such Bearer Notes or on the Certificates relating to such Registered Notes. All capitalised terms that are not defined in these Conditions will have the meanings given to them in the Principal Trust Deed and/or the relevant Supplemental Trust Deed. Those definitions will be endorsed on the Definitive Notes or Certificates, as the case may be. References in the conditions to "Notes" are to the Notes of one Series of a relevant Issuer only, not to all Notes that may be issued under the Programme and references to the "Issuer" are to the Specified Company that is stipulated as such in the relevant Final Terms.*

*These Conditions may be amended, modified, or varied in relation to any Series of Notes by the terms of the relevant Supplemental Trust Deed in relation to such Series. Italicised text set out herein does not form part of the Conditions and is set out for information purposes only.*

The Notes are constituted and secured by a relevant supplemental trust deed (the "relevant Supplemental Trust Deed"), dated the date of issue of the Notes (the "Issue Date"), between the Issuer, J.P. Morgan Corporate Trustee Services Limited (the "Trustee", which expression shall include all persons for the time being the trustee or trustees under the Trust Deed (as defined below)) as trustee for, *inter alia*, the Noteholders (as defined below) and, if applicable, the persons specified therein as a Swap Counterparty (as defined in Condition 3(a)). The relevant Supplemental Trust Deed is supplemental to a principal trust deed dated 10 October 2002 as amended and restated on 21 July 2006 and made between Dante Finance plc (the "First Issuer") and the Trustee (the "Principal Trust Deed", which expression shall include any amendments or supplements thereof and together with the relevant Supplemental Trust Deed, the "Trust Deed"). These terms and conditions include summaries of, and are subject to, the detailed provisions of the Trust Deed, which includes the form of the Bearer Notes, Certificates, Receipts, Coupons and Talons referred to below. An agency agreement dated 10 October 2002 as amended and restated on 21 July 2006 has been entered into in relation to the Notes between the First Issuer, the Trustee, JPMorgan Chase Bank, N.A. as, *inter alia*, initial issuing and paying agent and as custodian and the other agents named in it (as amended or supplemented as at the Issue Date, the "Agency Agreement"). The issuing and paying agent, the custodian, the paying agents, the registrar, the transfer agents and the calculation agent(s) for the time being (if any) are referred to below respectively as the "Issuing and Paying Agent", the "Custodian", the "Paying Agents" (which expression shall include the Issuing and Paying Agent), the "Registrar", and the "Transfer Agents" (which expression shall include the Registrar). A Programme Agreement dated 10 October 2002 as amended and restated on 21 July 2006 has been entered into in relation to the Notes between the First Issuer and Lehman Brothers International (Europe) as Dealer (the "Dealer") and where appropriate as Arranger (the "Arranger") in relation to a particular series, the Trustee, the Issuing and Paying Agent and Registrar (the "Programme Agreement"). The Issuer (save for the First Issuer) has acceded to the Principal Trust Deed, the Agency Agreement and the Programme

PRK.500.009.0254

Agreement pursuant to a Deed of Accession dated on or before the Issue Date. Copies of the Principal Trust Deed, the Agency Agreement and the Programme Agreement are available for inspection during usual business hours, at the principal office of the Trustee (presently at Trinity Tower, 9 Thomas More Street, London E1W 1YZ) and at the specified offices of the Paying Agents and the Transfer Agents.

The Noteholders, the holders (the "Couponholders") of the interest coupons (the "Coupons") appertaining to interest bearing Bearer Notes and, where applicable in the case of such Notes, talons for further Coupons (the "Talons") and the holders of the receipts for the payment of instalments of principal (the "Receipts") relating to Bearer Notes of which the principal is payable in instalments are entitled to the benefit of, are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and are deemed to have notice of those provisions applicable to them of the Agency Agreement and the Programme Agreement.

Under the Principal Trust Deed the Issuer may also borrow under, buy, sell or enter into other secured obligations in the form of loans ("Loans"), options ("Options"), schuldscheine ("Schuldscheine") or swaps ("Swaps") (each, including the obligations under the Notes, an "Obligation").

References in these Conditions to "Mortgaged Property" are to the assets and agreements comprising the mortgaged property upon which the Notes are secured as described in the Final Terms.

*Full details of the relevant Mortgaged Property will be set out in the relevant Final Terms.*

If so specified in the relevant Supplemental Trust Deed, the Issuer has, in relation to the Notes, entered into one or more derivative transactions confirmed in a Swap Agreement (as defined in Condition 3(a)) with a Swap Counterparty with an effective date as of the Issue Date.

1    Form, Denomination and Title

The Notes are issued in bearer form ("Bearer Notes", which expression includes Notes that are specified to be Exchangeable Bearer Notes), in registered form ("Registered Notes") or in bearer form exchangeable for Registered Notes ("Exchangeable Bearer Notes") in each case in the denomination(s) shown thereon provided that in the case of any Notes which are to be admitted to trading on a regulated market within the European Economic Area or offered to the public in a Member State of the European Economic Area in circumstances which require the publication of a Prospectus under the Prospectus Directive (Directive 2003/71/EC), the minimum denomination shall be €50,000 (or its equivalent in any other currency as at the date of issue of those Notes).

All Registered Notes shall have the same denomination. Where Exchangeable Bearer Notes are issued, the Registered Notes for which they are exchangeable shall have the same denomination as the lowest denomination of Exchangeable Bearer Notes.

So long as the Notes are represented by a temporary Global Note, permanent Global Note or Global Certificate and the relevant clearing system(s) so permit, the Notes shall be tradeable only in principal amounts of at least the denomination shown (or if more than one denomination, the lowest denomination) provided hereon and integral multiples of the Tradeable Amounts provided in the relevant Final Terms.

Bearer Notes are serially numbered and are issued with Coupons (and, where appropriate, a Talon) attached, save in the case of Notes that do not bear interest in which case references to interest (other than in relation to interest due after the Maturity Date (as

PRK.500.009.0255

defined in the relevant Final Terms )), Coupons and Talons in these Conditions are not applicable. Any Bearer Note the principal amount of which is redeemable in instalments is issued with one or more Receipts attached.

Registered Notes are represented by registered certificates ("Certificates") and, save as provided in Condition 2(c), each Certificate shall represent the entire holding of Registered Notes by the same holder.

Title to the Bearer Notes and the Receipts, Coupons and Talons shall pass by delivery. Title to the Registered Notes shall pass by registration in the register that the Issuer shall procure to be kept by the Registrar in accordance with the provisions of the Agency Agreement (the "Register"). Except as ordered by a court of competent jurisdiction or as required by law, the holder (as defined below) of any Note, Receipt, Coupon or Talon shall be and may be treated as its absolute owner for all purposes whether or not it is overdue and regardless of any notice of ownership, trust or an interest in it, any writing on it (or on the Certificate representing it) or its theft or loss (or that of the related Certificate) and no person shall be liable for so treating the holder.

In these Conditions, "Noteholder" means the bearer of any Bearer Note and the Receipts relating to it or the person in whose name a Registered Note is registered (as the case may be), "holder" (in relation to a Note, Receipt, Coupon or Talon) means the bearer of the Bearer Note, Receipt, Coupon or Talon or the person in whose name a Registered Note is registered (as the case may be) and capitalised terms have the meanings given to them herein, the absence of any such meaning indicating that such term is not applicable to the Notes.

## 2   Exchanges of Exchangeable Bearer Notes and Transfers of Registered Notes

(a)   *Exchange of Exchangeable Bearer Notes*

Subject as provided in Condition 2(f), Exchangeable Bearer Notes may be exchanged for the same principal amount of Registered Notes at the request in writing of the relevant Noteholder and upon surrender of each Exchangeable Bearer Note to be exchanged, together with all unmatured Receipts, Coupons and Talons relating to it, at the specified office of any Transfer Agent; provided, however, that where an Exchangeable Bearer Note is surrendered for exchange after the Record Date (as defined in Condition 7(b)) for any payment of interest, the Coupon in respect of that payment of interest need not be surrendered with it. Registered Notes may not be exchanged for Bearer Notes. Bearer Notes of one denomination may not be exchanged for Bearer Notes of another denomination. Bearer Notes that are not Exchangeable Bearer Notes may not be exchanged for Registered Notes.

(b)   *Transfer of Registered Notes*

One or more Registered Notes may be transferred upon the surrender (at the specified office of the Registrar or any Transfer Agent) of the Certificate representing such Registered Notes to be transferred, together with the form of transfer endorsed on such Certificate duly completed and executed and any other evidence as the Registrar or Transfer Agent may reasonably require. In the case of a transfer of part only of a holding of Registered Notes represented by one Certificate, a new Certificate shall be issued to the transferee in respect of the part transferred and a further new Certificate in respect of the balance of the holding not transferred shall be issued to the transferor. All transfers of Notes and entries on the Register will be

PRK.500.009.0256

made in accordance with the detailed regulations concerning transfers of Notes scheduled to the Agency Agreement. The regulations may be changed by the Issuer, with the prior written approval of the Registrar and the Trustee. A copy of the current regulations will be made available by the Registrar to any Noteholder upon request.

(c)    *Exercise of Options or Partial Redemption in Respect of Registered Notes*

In the case of an exercise of an Issuer's option in respect of, or a partial redemption of, a holding of Registered Notes represented by a single Certificate, a new Certificate shall be issued to the holder to reflect the exercise of such option or in respect of the balance of the holding not redeemed. In the case of a partial exercise of an option resulting in Registered Notes of the same holding having different terms, separate Certificates shall be issued in respect of those Notes of that holding that have the same terms. New Certificates shall only be issued against surrender of the existing Certificates to the Registrar or any Transfer Agent.

(d)    *Delivery of New Certificates*

Each new Certificate to be issued pursuant to Conditions 2(a), (b) or (c) shall be available for delivery within five business days of receipt of the request for exchange, form of transfer or Exercise Notice or surrender of the Certificate for exchange. Delivery of the new Certificate(s) shall be made at the specified office of the Registrar or of the Transfer Agent (as the case may be) to whom delivery or surrender of such request for exchange, form of transfer, Exercise Notice or Certificate shall have been made or, at the option of the holder making such delivery or surrender as aforesaid and as specified in the relevant request for exchange, form of transfer, Exercise Notice or otherwise in writing, be mailed by uninsured post at the risk of the holder entitled to the new Certificate to such address as may be so specified, unless such holder requests otherwise and pays in advance to the Registrar or Transfer Agent the costs of such other method of delivery and/or such insurance as it may specify. In this Condition 2(d), "business day" means a day, other than a Saturday or Sunday, on which banks are open for business in the place of the specified office of the relevant Transfer Agent or the Registrar.

(e)    *Exchange Free of Charge*

Exchange and transfer of Notes and Certificates on registration, transfer, exercise of an option or partial redemption shall be effected without charge by or on behalf of the Issuer, the Registrar or the Transfer Agents, but upon payment of any tax or other governmental charges that may be imposed in relation to it (or the giving of such indemnity as the Registrar or the relevant Transfer Agent may require).

(f)    *Closed Periods*

No Noteholder may require the transfer of a Registered Note to be registered or an Exchangeable Bearer Note to be exchanged for one or more Registered Note(s) (i) during the period of 15 days ending on the due date for redemption of, or payment of any Instalment Amount (as defined in the relevant Final Terms) in respect of, that Note, (ii) during the period of 15 days prior to any date on which Notes may be called for redemption by the Issuer at its option pursuant to Condition 6(e), (iii) after any such Note has been called for redemption or (iv) during the period of seven days ending on (and including) any Record Date. An Exchangeable Bearer Note

PRK.500.009.0257

called for redemption may, however, be exchanged for one or more Registered
Note(s) in respect of which the Certificate is simultaneously surrendered not later
than the relevant Record Date.

3    **Status and Non applicability**

(a)    *Status*

The Notes are secured, limited-recourse obligations of the Issuer, ranking *pari passu*
without any preference among themselves, which are secured in the manner
described in Condition 4 and recourse in respect of which is limited in the manner
described in Condition 11. In connection with the issue of the Notes there may be
executed one or more derivative agreements (each a "Swap Agreement") between
the Issuer and one or more swap counterparties (each a "Swap Counterparty") and
one or more credit enhancement agreements (each a "Credit Enhancement
Agreement") as further described in the relevant Supplemental Trust Deed.

(b)    *Non applicability*

Where no reference is made in the relevant Supplemental Trust Deed to any Swap
Agreement or Credit Enhancement Agreement, references in these Terms and
Conditions to any such document or agreement and to any Swap Counterparty, as
the case may be, shall not be applicable.

4    **Mortgaged Property, Realisation of Mortgaged Property and Restrictions**

(a)    *Mortgaged Property*

The Notes will be secured pursuant to the relevant Supplemental Trust Deed. The
form of the Mortgaged Property may comprise some or all of the assets and
assignments set out below.

(b)    *Secured Assets*

The obligations of the Issuer under the Trust Deed, the Notes and the Coupons are
secured by a first fixed charge over certain bonds, warrants, notes, receivables or
equity securities of any form, denomination, type or issuer, monoline guarantees,
options, swaps, loans or any other financial obligations assigned to or assumed by
the Issuer or any other agreed assets owned by the Issuer as specified in the
relevant Supplemental Trust Deed (the "Collateral") and a first fixed charge on all
funds held from time to time by the Custodian and/or by the Issuing and Paying
Agent and/or the Registrar for payment of principal and interest on the Notes or of
amounts due under the Swap Agreement. If so specified in the relevant
Supplemental Trust Deed, the obligations of the Issuer under any Swap Agreement
are also secured by a first fixed charge over the Collateral. Unless otherwise
specified in the relevant Supplemental Trust Deed, the Collateral is held by the
Custodian on behalf of the Issuer subject to the charges set out in the Trust Deed. If
so specified in the relevant Supplemental Trust Deed, under the terms of the
relevant Swap Agreement the Swap Counterparty may require all or part of the
Collateral to be transferred to it as security for the performance of the Issuer's
obligations to the Swap Counterparty under the terms of the Swap Agreement on
terms that the Swap Counterparty will be required to return equivalent collateral or
the market value thereof to the Issuer on or before the termination of such Swap

PRK.500.009.0258

Agreement (subject to any enforcement of such security). In such circumstances the security over the Collateral in respect of the Issuer's obligations under the Trust Deed, the Notes and the Coupons will be over the Issuer's rights against the Swap Counterparty in relation to the Collateral as aforesaid.

If so specified in the relevant Supplemental Trust Deed, the Issuer's obligations under the Trust Deed, the Notes and the Coupons are also secured by an assignment by way of security of the Issuer's rights under the Swap Agreement and/or the Credit Enhancement Agreement in favour of the Trustee for itself and for the benefit of the holders of the Notes, Coupons and Receipts.

Additionally, the obligations of the Issuer may be secured pursuant to a security document other than the Trust Deed (an "Other Security Document") as specified in the relevant Supplemental Trust Deed.

The Trustee shall (subject to the provisions of the relevant Supplemental Trust Deed and to sub-Clause 6.3 of the Principal Trust Deed) apply all moneys received by it under the provisions of the Principal Trust Deed and the relevant Supplemental Trust Deed in connection with the realisation or enforcement of the security constituted thereby and by any relevant Other Security Document:

(i)     if "Swap Counterparty Priority" is specified in the relevant Supplemental Trust Deed:

     (a)    first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

     (b)    secondly, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Custodian and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent;

     (c)    thirdly, rateably in meeting the claims (if any) of the Swap Counterparty under the relevant Swap Agreement(s);

     (d)    fourthly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them pro rata on the basis of the amount due to each party entitled to such payment; and

     (e)    fifthly, in payment of the balance (if any) to the Issuer,

provided that, if the "Swap Counterparty Priority" is expressed in the relevant Supplemental Trust Deed and Final Terms to be subject to adjustment on a Swap Counterparty default, and if and to the extent that the Swap Counterparty fails to make payments due to the Issuer under any Swap Agreement and the Issuer promptly notifies the Trustee in writing of any such failure (which notice shall be conclusive and binding), the above application of moneys shall be amended so that the claims of the Swap Counterparty will, to the extent that there has been such failure, rank after

PRK.500.009.0259

the claims (if any) of the holders of Notes, Coupons and Receipts and before the claims of the Issuer in relation to the balance (if any).

(ii)     if "Pari Passu Ranking" is specified in the relevant Supplemental Trust Deed:

(a)     first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(b)     secondly, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Custodian and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent;

(c)     thirdly, rateably in meeting the claims (if any) of the Swap Counterparty under the relevant Swap Agreement(s) and the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment; and

(d)     fourthly, in payment of the balance (if any) to the Issuer.

(iii)    if "Noteholder Priority" is specified in the relevant Supplemental Trust Deed:

(a)     first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(b)     secondly, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Custodian and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent;

(c)     thirdly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment;

(d)     fourthly, in meeting the claims (if any) of the Swap Counterparty under the relevant Swap Agreement(s); and

(e)     fifthly, in payment of the balance (if any) to the Issuer.

(iv)     if "Other Priority" is specified in the relevant Supplemental Trust Deed and Final Terms, the Trustee shall apply all moneys received by it under the provisions of the Principal Trust Deed and the relevant Supplemental Trust Deed in connection with the realisation or enforcement of the security

PRK.500.009.0260

constituted thereby, as set out in the relevant Supplemental Trust Deed and Final Terms.

*The applicable priority and ranking provisions in respect of each Series of Notes will be disclosed in the Final Terms.*

*To the extent that a Swap Counterparty fails to make payments due to the Issuer under any relevant Swap Agreement, the Issuer would be unable to meet its obligations when due in respect of the Notes. In such event the Swap Agreement would be terminated and the Notes would become repayable together with interest accrued in accordance with Condition 10.*

(c)     *Shareholdings*

*Details of the issued shares and the shareholders of the Issuer are as set out in the Issuer Disclosure Annex.*

If specified in the relevant Supplemental Trust Deed, the Issuer has entered into one or more Swap Agreements with the Swap Counterparty under which:

(i)     the Issuer will (subject to the terms thereof) make payments to the Swap Counterparty, on receipt by the Issuer of sums receivable by the Issuer on the Mortgaged Property; and

(ii)    the Swap Counterparty will make payments towards or equal to the obligations of the Issuer in respect of amounts due on the Notes.

*The terms of each Swap Agreement will, if applicable, be set out in the relevant Final Terms.*

*Swap Agreements may provide that the Swap Counterparty may transfer its rights and obligations under a Swap Agreement, as described in the relevant Supplemental Trust Deed, provided that, in relation to Notes that are rated by a rating agency, such transfer shall not adversely affect any existing rating of the Notes of that Series as confirmed in writing by the appropriate rating agency. The Trust Deed provides that, subject as provided therein, the Trustee shall agree to a transfer of the Swap Counterparty's rights and obligations under such Swap Agreement and shall agree to any amendment to such Swap Agreement to allow such transfer in such circumstances.*

(d)     *Disposal Agent*

If so specified in the relevant Supplemental Trust Deed, the Disposal Agent will act as disposal agent in relation to the disposal of the Collateral. Unless otherwise provided in the relevant Supplemental Trust Deed, the Disposal Agent may itself make an offer to purchase the Collateral.

(e)     *Realisation of the Mortgaged Property upon Enforcement*

In the event of the security over the Mortgaged Property constituted under the relevant Supplemental Trust Deed or by an Other Security Document becoming enforceable either in whole or in part, the Trustee may at its discretion and shall if so required in writing by the holders of at least one fifth in aggregate principal amount of the Notes then outstanding (as defined in the Trust Deed) or if so directed by an Extraordinary Resolution (as defined in the Trust Deed) of the holders of the Notes, or, if sums are due to any Swap Counterparty (except in the case where action may

PRK.500.009.0261

be taken against any Swap Counterparty), if so directed in writing by any such Swap Counterparty, but without liability as to the consequence of such action on individual holders of Notes, Receipts or Coupons enforce the security. To do so it may, in its discretion, realise all or a part of the Collateral in a proportion equal to the proportion of the principal amount of the Notes which are subject to such acceleration, terminate any Swap Agreement *pro rata* in accordance with its terms and exercise any rights under a Credit Enhancement Agreement, provided that the Trustee shall not be required to take any action that would involve the Trustee in personal liability or expense unless indemnified to its satisfaction. On being so directed by the Trustee, the Disposal Agent shall use its reasonable endeavours to solicit offers from third parties to purchase the Collateral in accordance with the terms of the relevant Supplemental Trust Deed.

(f)     *Application of Proceeds*

The Trust Deed requires that the net proceeds of the security, after deduction of the Trustee's expenses and remuneration and other amounts due to the Trustee and the Paying Agents and/or the Custodian and/or the Transfer Agent and/or the Calculation Agent and/or the Disposal Agent and any taxes required to be paid prior to any such application, be applied in meeting claims of any Swap Counterparty and of the holders of the Notes, Receipts and Coupons, as specified in the relevant Supplemental Trust Deed.

(g)     *Shortfall after Application of Proceeds*

If the net proceeds of realisation of the Mortgaged Property becoming enforceable under paragraph (f) above are not sufficient for the Issuer to make all payments due in respect of the Notes and the Coupons and for the Issuer to meet its obligations in respect of the termination of any relevant Swap Agreement, the other assets of the Issuer will not be available for payment of any shortfall arising therefrom. Any such shortfall shall be borne by the holders of Notes, Coupons and Receipts and any Swap Counterparty as specified in the relevant Supplemental Trust Deed. The Issuer will not be obliged to make any further payment in excess of the net proceeds and accordingly no debt shall be owed by the Issuer in respect of any such shortfall remaining after realisation of the Mortgaged Property and application of the proceeds in accordance with the Trust Deed. None of the Trustee or any Swap Counterparty or any Noteholder may take any further action to recover such shortfall.

Failure to make any payment in respect of any such shortfall shall in no circumstances constitute an Event of Default under Condition 10.

(h)     *Issuer's Rights as Holder of the Mortgaged Property*

The Issuer may, with the prior written consent of the Trustee or as directed by an Extraordinary Resolution of the Noteholders, (i) take such action in relation to the Mortgaged Property as it thinks expedient and (ii) exercise the rights incidental to the ownership of the Mortgaged Property. In particular, the Issuer may exercise (without responsibility for such exercise) any voting rights in respect of such property and all rights to enforce it. The Issuer will not exercise any rights with respect to the Mortgaged Property unless it has the Trustee's consent or is directed by an Extraordinary Resolution of the holders of the Notes and, if such direction or consent is given, the Issuer will act only in accordance with such direction or consent.

PRK.500.009.0262

(i)   *Restrictions on Further Issues and Transactions*

The Issuer shall be at liberty from time to time (without the consent of the Noteholders or the Couponholders, but provided that the Trustee is satisfied that the restrictions contained in this Condition will be complied with) to issue further bonds and notes (which may be consolidated and form a single series with the Notes if issued in accordance with paragraph (j) of this Condition) and to borrow under, buy, sell or enter into other secured Obligations in the form of Loans, Options, Schuldscheine or Swaps. Such further bonds, notes and other secured Obligations (other than those obligations that are not, in the opinion of the Trustee, material in the context thereof and in respect of which another party has made arrangements to discharge the Issuer from claims related thereto) must be secured (save in the case of (i) such further bonds or notes forming a single series with the Notes or other existing bonds, notes or other secured Obligations and (ii) Obligations which, at the time of their issue or effective date, provide that other Obligations may be secured upon the same assets as those on which such Obligations are secured) on assets of the Issuer other than the Mortgaged Property or the assets on which such other Obligations of the Issuer are secured or the Issuer's share capital and on terms in substantially the form contained in these Conditions and that provide for the extinction of all claims in respect of such bonds, notes and related Obligations after application of the proceeds of enforcement of the security over the assets on which such further bonds, notes and related Obligations are secured (or arrangements have been entered into that, to the satisfaction of the Trustee, have a like result). In addition, where the Issuer has issued other bonds and/or notes which have been rated by a particular rating agency ("Old Rated Securities") and proposes to issue and further bonds and/or notes which are not to be rated by that rating agency ("New Unrated Securities") then, provided that such Old Rated Securities and their related ratings remain outstanding, then the ratings of the Old Rated Securities must not be adversely affected by the issue of the New Unrated Securities, as confirmed in writing by the appropriate rating agency. Any further securities forming a single series with the outstanding securities of any series (including the Notes) constituted and secured by the Trust Deed or any deed supplemental and/or any Other Security Document to it shall, and any other securities may (with the prior written consent of the Trustee), be constituted and secured by the Trust Deed and/or any Other Security Document. The Trust Deed contains provisions for convening a single meeting of the Noteholders and the holders of securities of other series where the Trustee so decides.

(j)   *Restrictions on Fungible Issues*

The Issuer, if permitted under the Conditions, may from time to time (without the consent of the Noteholders or the Couponholders, but provided that the Trustee is satisfied that the restrictions contained in this Condition will be complied with) issue further bonds and notes that have, when issued, the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest thereon and any amendments made pursuant to (iii) below) and that are consolidated and form a single series with the Notes; provided that (unless otherwise approved by an Extraordinary Resolution (as defined in the Trust Deed) of the Noteholders), (i) the Issuer provides additional security for such new bonds or notes that comprises assets that are fungible with, and have the same proportionate composition as, the Mortgaged Property in respect of the relevant existing Notes

PRK.500.009.0263

and that has an aggregate principal amount at least equal to the principal amount of such existing security multiplied by a fraction, the numerator of which is the aggregate principal amount of such new bonds or notes and the denominator of which is the aggregate principal amount of the existing Notes; (ii) the Issuer enters into an additional or supplemental swap agreement or credit enhancement agreement varying the terms of the Swap Agreement or, as applicable, the Credit Enhancement Agreement to take account of the new bonds or notes on terms no less favourable than those of the Swap Agreement or, as applicable, the Credit Enhancement Agreement; and, in relation to Notes which are rated by a rating agency, (iii) in the case of an issue of portfolio credit linked notes, the Issuer amends the terms and conditions of the Notes to preserve the economic effect of a holding of the Notes (including, without limitation, by amending the Reference Entity Notional Amount, the Subordination Amount and, where applicable, by amending any Factor (howsoever such terms are defined in the relevant terms and conditions)) in each case solely so as to preserve the economic effect of a holding of the Notes, such amendments to be determined by the Calculation Agent and notified to the Issuer and (iv) such further bonds and notes shall not adversely affect any existing rating of the Notes as confirmed in writing by the appropriate rating agency. Upon issue of such new bonds or notes, the Notes and such new bonds or notes shall form a single series and be secured on the Mortgaged Property relating to the Notes and such additional security. Such further bonds or notes shall be constituted and secured by a further relevant supplemental trust deed.

(k)    *Restrictions on Indebtedness*

Save as provided above, so long as any of the Notes remains outstanding, the Issuer, without the prior written consent of the Trustee, shall not incur any other indebtedness for borrowed moneys or engage in any other business (other than acquiring and holding the Mortgaged Property in respect of each Series, creating further Obligations, as provided for in this Condition 4, entering into related transactions, subject to Condition 4(i) and performing any act incidental to or necessary in connection with the foregoing), shall not have any subsidiaries (except in connection with the substitution of the Issuer as principal obligor under the Notes) and shall not dispose of the Mortgaged Property or any part thereof or interest therein (other than in connection with a substitution of the Swap Counterparty).

(l)    *Covenants*

The Issuer has covenanted in the Principal Trust Deed that it will not, without the prior written consent of the Trustee, *inter alia*:

(i)    engage in any business whatsoever, other than acquiring and holding Mortgaged Property, issuing Notes or issuing further bonds and notes (which may be consolidated and form a single series with the Notes) or creating other Obligations or entering into similar limited-recourse transactions, entering into related agreements and transactions and performing any act incidental to or necessary in connection with any of the foregoing;

(ii)    dispose of the Mortgaged Property or any interest therein, or create any mortgage, charge or other security interest or right of recourse in respect thereof in favour of any person (other than (x) the security referred to above

PRK.500.009.0264

or any similar limited-recourse transaction (whether such limited-recourse transaction is by means of a debt issue or by loan, option or swap) entered into by the Issuer in the future with the consent of the Trustee and the Swap Counterparty as provided below and (y) in connection with a transfer under the Swap Agreement);

(iii)   cause or permit the Swap Agreements or Credit Enhancement Agreements or the priority of the security interests created by the Trust Deed to be amended, terminated or discharged (other than in connection with a transfer under the Swap Agreement);

(iv)   release any party to the Swap Agreement (other than in connection with a transfer under the Swap Agreement), any Credit Enhancement Agreement, the Principal Trust Deed or any Supplemental Trust Deed from any existing obligations thereunder;

(v)   have any subsidiaries (other than in connection with any substitution of the obligor under the Notes and the Trust Deed);

(vi)   consent to any variation of, or exercise any powers or consent or waiver pursuant to, the terms of the Swap Agreements, any Credit Enhancement Agreement, the Conditions, the Principal Trust Deed, any Supplemental Trust Deed or other agreement relating to the issue of the Notes, any relevant documentation entered into in connection with the creation of other Obligations or any related transactions;

(vii)   (to the extent the same is within the control of the Issuer) consolidate or merge with any other person or convey or transfer its properties or assets substantially as an entirety to any person;

(viii)   have any employees;

(ix)   (to the extent the same is within the control of the Issuer) pay any dividends or make any distribution to its shareholders;

(x)   open or have any interest in any account whatsoever with any bank or financial institution unless such account relates to the Notes or any Mortgaged Property (as will be defined in the Trust Deed), any other Obligation or any party thereto, save where such account or the Issuer's interest therein is simultaneously charged in favour of the Trustee so as to form part of the Mortgaged Property or save where such account is opened in connection with the administration and management of the Issuer and only moneys necessary to the administration and management of the Issuer are credited to such account; or

(xi)   (to the extent the same is within the control of the Issuer) issue or allot shares to persons other than such shares as were in issue on the date of the incorporation of the Issuer.

5   **Interest and Other Calculations**

(a)   *Interest Rate and Accrual*

Each Note bears interest on its outstanding principal amount from the Interest Commencement Date (as defined in the relevant Final Terms) at the rate per annum

PRK.500.009.0265

(expressed as a percentage) equal to the Interest Rate, such interest being payable in arrear on each Interest Payment Date.

Interest shall cease to accrue on each Note on the due date for redemption unless, upon due presentation, payment of principal is improperly withheld or refused, in which event interest shall continue to accrue (as well after as before judgment) at the Interest Rate in the manner provided in this Condition 5 to the Relevant Date. As used in these Conditions, "Relevant Date" in respect of any Note, Receipt or Coupon means the date on which payment in respect of it first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which payment in full of the amount outstanding is made or (if earlier) the date seven days after that on which notice is duly given to the Noteholders that, upon further presentation of the Note (or relative Certificate), Receipt or Coupon being made in accordance with the Conditions, such payment will be made, provided that payment is in fact made upon such presentation.

(b)     *Business Day Convention*

If any date referred to in these Conditions that is specified to be subject to adjustment in accordance with a Business Day Convention would otherwise fall on a day that is not a Business Day, then, if the Business Day Convention specified is (i) the Floating Rate Business Day Convention, such date shall be postponed to the next day that is a Business Day unless it would thereby fall into the next calendar month, in which event (A) such date shall be brought forward to the immediately preceding Business Day and (B) each subsequent such date shall be the last Business Day of the month in which such date would have fallen had it not been subject to adjustment, (ii) the Following Business Day Convention, such date shall be postponed to the next day that is a Business Day, (iii) the Modified Following Business Day Convention, such date shall be postponed to the next day that is a Business Day unless it would thereby fall into the next calendar month, in which event such date shall be brought forward to the immediately preceding Business Day or (iv) the Preceding Business Day Convention, such date shall be brought forward to the immediately preceding Business Day.

(c)     *Interest Rate on Floating Rate Notes*

If the Interest Rate is specified as being Floating Rate, the Interest Rate for each Interest Accrual Period shall be determined in the manner specified hereon and the provisions below relating to either ISDA Determination or Screen Rate Determination shall apply, depending upon which is specified hereon:

(i)     ISDA Determination for Floating Rate Notes

Where ISDA Determination is specified hereon as the manner in which the Interest Rate is to be determined, the Interest Rate for each Interest Accrual Period shall be determined by the Calculation Agent as a rate equal to the relevant ISDA Rate. For the purposes of this sub-paragraph (i), "ISDA Rate" for an Interest Accrual Period means a rate equal to the Floating Rate that would be determined by the Calculation Agent under a Swap Transaction under the terms of an agreement incorporating the ISDA Definitions and under which:

(a)     the Floating Rate Option is as specified hereon;

PRK.500.009.0266

(b)    the Designated Maturity is a period specified hereon; and

(c)    the relevant Reset Date is the first day of that Interest Accrual Period unless otherwise specified hereon.

For the purposes of this sub-paragraph (i), "Floating Rate", "Calculation Agent", "Floating Rate Option", "Designated Maturity", "Reset Date" and "Swap Transaction" have the meanings given to those terms in the ISDA Definitions.

(ii)    Screen Rate Determination for Floating Rate Notes

A.    Where Screen Rate Determination is specified hereon as the manner in which the Interest Rate is to be determined, the Interest Rate for each Interest Accrual Period will, subject as provided below and to Condition 5(e) be either:

(1)    the offered quotation; or

(2)    the arithmetic mean of the offered quotations,

(expressed as a percentage rate per annum) for the Reference Rate which appears or appear, as the case may be, on the Relevant Screen Page as at either 11.00 a.m. (London time in the case of LIBOR or Brussels time in the case of EURIBOR) on the Interest Determination Date in question as determined by the Calculation Agent. If five or more of such offered quotations are available on the Relevant Screen Page, the highest (or, if there is more than one such highest quotation, one only of such quotations) and the lowest (or, if there is more than one such lowest quotation, one only of such quotations) shall be disregarded by the Calculation Agent for the purpose of determining the arithmetic mean of such offered quotations.

If the Reference Rate from time to time in respect of Floating Rate Notes is specified hereon as being other than LIBOR or EURIBOR, the Interest Rate in respect of such Notes will be determined as provided hereon.

B.    if the Relevant Screen Page is not available or if sub paragraph (A)(1) above applies and no such offered quotation appears on the Relevant Screen Page or if sub paragraph (A)(2) above applies and fewer than three such offered quotations appear on the Relevant Screen Page in each case as at the time specified above, subject as provided below, the Calculation Agent shall request, if the Reference Rate is LIBOR, the principal London office of each of the Reference Banks or, if the Reference Rate is EURIBOR, the principal Euro-zone office of each of the Reference Banks, to provide the Calculation Agent with its offered quotation (expressed as a percentage rate per annum) for the Reference Rate if the Reference Rate is LIBOR, at approximately 11.00 a.m. (London time), or if the Reference Rate is EURIBOR, at approximately 11.00 a.m. (Brussels time) on the Interest Determination Date in question. If two or more of the Reference Banks provide the Calculation

PRK.500.009.0267

Agent with such offered quotations, the Interest Rate for such Interest Period shall be the arithmetic mean of such offered quotations as determined by the Calculation Agent; and

C.   if paragraph (B) above applies and the Calculation Agent determines that fewer than two Reference Banks are providing offered quotations, subject as provided below, the Interest Rate shall be the arithmetic mean of the rates per annum (expressed as a percentage) as communicated to (and at the request of) the Calculation Agent by the Reference Banks or any two or more of them, at which such banks were offered, if the Reference Rate is LIBOR, at approximately 11.00 a.m. (London time) or, if the Reference Rate is EURIBOR, at approximately 11.00 a.m. (Brussels time) on the relevant Interest Determination Date, deposits in the Relevant Currency for a period equal to that which would have been used for the Reference Rate by leading banks in, if the Reference Rate is LIBOR, the London inter-bank market or, if the Reference Rate is EURIBOR, the Euro-zone inter-bank market, as the case may be, or, if fewer than two of the Reference Banks provide the Calculation Agent with such offered rates, the offered rate for deposits in the Relevant Currency for a period equal to that which would have been used for the Reference Rate, or the arithmetic mean of the offered rates for deposits in the Relevant Currency for a period equal to that which would have been used for the Reference Rate, at which, if the Reference Rate is LIBOR, at approximately 11.00 a.m. (London time) or, if the Reference Rate is EURIBOR, at approximately 11.00 a.m. (Brussels time), on the relevant Interest Determination Date, any one or more banks (which bank or banks is or are in the opinion of the Trustee and the Issuer suitable for such purpose) informs the Calculation Agent it is quoting to leading banks in, if the Reference Rate is LIBOR, the London inter-bank market or, if the Reference Rate is EURIBOR, the Euro-zone inter-bank market, as the case may be, provided that, if the Interest Rate cannot be determined in accordance with the foregoing provisions of this paragraph, the Interest Rate shall be determined as at the last preceding Interest Determination Date (though substituting, where a different Margin or Maximum or Minimum Interest Rate is to be applied to the relevant Interest Accrual Period from that which applied to the last preceding Interest Accrual Period, the Margin or Maximum or Minimum Interest Rate relating to the relevant Interest Accrual Period), in place of the Margin or Maximum or Minimum Interest Rate relating to that last preceding Interest Accrual Period.

(d)   *Interest Rate on Zero Coupon Notes*

Where a Note the Interest Rate of which is specified to be Zero Coupon is repayable prior to the Maturity Date and is not paid when due, the amount due and payable prior to the Maturity Date shall be the Redemption Amount (as defined in the relevant Final Terms) of such Note. As from the Maturity Date, the Interest Rate for

PRK.500.009.0268

any overdue principal of such a Note shall be a rate per annum (expressed as a percentage) equal to the Amortisation Yield (as set out in Condition 6(b)).

(e)  *Margin, Maximum/Minimum Interest Rates, Instalment Amounts and Redemption Amounts and Rounding*

(i)  If any Margin is specified hereon (either (x) generally, or (y) in relation to one or more Interest Accrual Periods), an adjustment shall be made to all Interest Rates, in the case of (x), or the Interest Rates for the specified Interest Accrual Periods, in the case of (y), calculated in accordance with (c) above by adding (if a positive number) or subtracting the absolute value (if a negative number) of such Margin, subject always to the next paragraph.

(ii)  If any Maximum or Minimum Interest Rate, Instalment Amount or Redemption Amount is specified hereon, then any Interest Rate, Instalment Amount or Redemption Amount shall be subject to such maximum or minimum, as the case may be.

(iii)  For the purposes of any calculations required pursuant to these Conditions (unless otherwise specified), (x) all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one hundred thousandth of a percentage point (with halves being rounded up), (y) all figures shall be rounded to seven significant figures (with halves being rounded up) and (z) all currency amounts that fall due and payable shall be rounded to the nearest unit of such currency (with halves being rounded up), save in the case of yen, which shall be rounded down to the nearest yen, and in the case of euro, which shall be rounded down to the nearest €0.01. For these purposes "unit" means the lowest amount of such currency that is available as legal tender in the country(ies) of such currency.

(f)  *Calculations*

The amount of interest payable in respect of any Note for any period shall be calculated by multiplying the product of the Interest Rate and the outstanding principal amount of such Note by the Day Count Fraction, unless an Interest Amount (or a formula for its calculation) is specified in respect of such period, in which case the amount of interest payable in respect of such Note for such period shall equal such Interest Amount (or be calculated in accordance with such formula). Where any Interest Period comprises two or more Interest Accrual Periods, the amount of interest payable in respect of such Interest Period shall be the sum of the amounts of interest payable in respect of each of those Interest Accrual Periods.

(g)  *Determination and Publication of Interest Rates, Interest Amounts, Redemption Amounts and Instalment Amounts*

The Calculation Agent shall, as soon as practicable on each Interest Determination Date or such other time on such date as the Calculation Agent may be required to calculate any Redemption Amount or Instalment Amount, obtain any quote or make any determination or calculation, determine the Interest Rate and calculate the Interest Amounts in respect of each denomination of the Notes for the relevant Interest Accrual Period, calculate the Redemption Amount or Instalment Amount,

PRK.500.009.0269

obtain such quote or make such determination or calculation, as the case may be, and cause the Interest Rate and the Interest Amounts for each Interest Period and the relevant Interest Payment Date and, if required to be calculated, the Redemption Amount or any Instalment Amount to be notified to the Trustee, the Issuer, each of the Paying Agents, the Noteholders, any other Calculation Agent appointed in respect of the Notes that is to make a further calculation upon receipt of such information and, if the Notes are listed on a stock exchange and the rules of such exchange so require, such exchange as soon as possible after their determination but in no event later than (i) the commencement of the relevant Interest Period, if determined prior to such time, in the case of notification to such exchange of an Interest Rate and Interest Amount, or (ii) in all other cases, the fourth Business Day after such determination. Where any Interest Payment Date or Interest Period Date is subject to adjustment pursuant to Condition 5(b), the Interest Amounts and the Interest Payment Date so published may subsequently be amended (or appropriate alternative arrangements made with the consent of the Trustee by way of adjustment) without notice in the event of an extension or shortening of the Interest Period. If the Notes become due and payable under Condition 10, the accrued interest and the Interest Rate payable in respect of the Notes shall nevertheless continue to be calculated as previously in accordance with this Condition but no publication of the Interest Rate or the Interest Amount so calculated need be made unless the Trustee otherwise requires. The determination of each Interest Rate, Interest Amount, Redemption Amount and Instalment Amount, the obtaining of each quote and the making of each determination or calculation by the Calculation Agent(s) shall (in the absence of manifest error) be final and binding upon all parties. No Noteholders shall (in the absence aforesaid) be entitled to proceed against the Reference Banks, the Calculation Agent, the Trustee or any of them in connection with the exercise or non exercise by them of their powers, duties and discretions under this Condition 5.

(h)     *Determination or Calculation by Trustee*

If the Calculation Agent does not at any time for any reason determine or calculate the Interest Rate for an Interest Period or any Interest Amount, Instalment Amount or Redemption Amount, the Trustee shall do so (or shall appoint an agent on its behalf to do so) and such determination or calculation shall be deemed to have been made by the Calculation Agent. In doing so, the Trustee shall apply the foregoing provisions of this Condition, with any necessary consequential amendments, to the extent that, in its opinion, it can do so, and, in all other respects it shall do so in such manner as it shall deem fair and reasonable in all the circumstances.

(i)     *Definitions*

In these Conditions, unless the context otherwise requires, the following defined terms shall have the meanings set out below:

"Business Day" means:

(i)     in the case of a specified currency other than euro, a day (other than a Saturday or Sunday) on which commercial banks and foreign exchange markets settle payments in the principal financial centre for that currency; and/or

PRK.500.009.0270

(ii)     in the case of euro, a day on which the TARGET system is open (a "TARGET Business Day"); and/or

(iii)    in the case of a specified currency and/or one or more specified financial centres, a day (other than a Saturday or a Sunday) on which commercial banks and foreign exchange markets settle payments in the specified currency or, if none is specified, generally in each of the financial centres so specified (which, in the case of Australian dollars, shall be Melbourne and Sydney).

"Day Count Fraction" means, in respect of the calculation of an amount of interest on any Note for any period of time (whether or not constituting an Interest Period, the "Calculation Period"):

(i)      if "Actual/365" or "Actual/Actual   ISDA" is specified hereon, the actual number of days in the Calculation Period divided by 365 (or, if any portion of that Calculation Period falls in a leap year, the sum of (A) the actual number of days in that portion of the Calculation Period falling in a leap year divided by 366 and (B) the actual number of days in that portion of the Calculation Period falling in a non leap year divided by 365; provided that no adjustment shall be made for any portion of a Calculation Period falling in a leap year in the case of Notes denominated in Japanese yen or any other currency specified hereon);

(ii)     if "Actual/365 (Fixed)" is specified hereon, the actual number of days in the Calculation Period divided by 365;

(iii)    if "Actual/360" is specified hereon, the actual number of days in the Calculation Period divided by 360;

(iv)     if "30/360", "360/360" or "Bond Basis" is specified hereon, the number of days in the Calculation Period divided by 360 (the number of days to be calculated on the basis of a year of 360 days with 12 30 day months (unless (a) the last day of the Calculation Period is the 31st day of a month but the first day of the Calculation Period is a day other than the 30th or 31st day of a month, in which case the month that includes that last day shall not be considered to be shortened to a 30 day month, or (b) the last day of the Calculation Period is the last day of the month of February, in which case the month of February shall not be considered to be lengthened to a 30 day month)); and

(v)      if "30E/360" or "Eurobond Basis" is specified hereon, the number of days in the Calculation Period divided by 360 (the number of days to be calculated on the basis of a year of 360 days with 12 30 day months, without regard to the date of the first day or last day of the Calculation Period unless, in the case of a Calculation Period ending on the Maturity Date, the Maturity Date is the last day of the month of February, in which case the month of February shall not be considered to be lengthened to a 30 day month); and

(vi)     if "Actual/Actual ICMA" is specified hereon:

(a)      if the Calculation Period is equal to or shorter than the Determination Period during which it falls, the number of days in the Calculation Period divided by the product of (x) the number of days

PRK.500.009.0271

in such Determination Period and (y) the number of Determination Periods normally ending in any year; and

(b)   if the Calculation Period is longer than one Determination Period, the sum of:

(x)   the number of days in such Calculation Period falling in the Determination Period in which it begins divided by the product of (1) the number of days in such Determination Period and (2) the number of Determination Periods normally ending in any year; and

(y)   the number of days in such Calculation Period falling in the next Determination Period divided by the product of (1) the number of days in such Determination Period and (2) the number of Determination Periods normally ending in any year

where:

"Determination Date" means the date specified as such hereon or, if none is so specified, the Interest Payment Date.

"Determination Period" means the period from and including a Determination Date in any year to but excluding the next Determination Date.

"Euro zone" means the region comprised of Member States of the European Union that adopt the single currency in accordance with the Treaty establishing the European Community, as amended by the Treaty on European Union.

"Interest" shall be deemed to include all Interest Amounts and all other amounts payable pursuant to Condition 5 or any amendment or supplement to it.

"Interest Accrual Period" means the period beginning on (and including) the Interest Commencement Date and ending on (but excluding) the first Interest Period Date and each successive period beginning on (and including) an Interest Period Date and ending on (but excluding) the next succeeding Interest Period Date.

"Interest Amount" means the amount of interest payable in respect of each denomination of the Notes.

"Interest Commencement Date" means the Issue Date or such other date as may be specified herein.

"Interest Determination Date" means, with respect to an Interest Rate and Interest Accrual Period, the date specified as such hereon or, if none is so specified, (i) the first day of such Interest Accrual Period if the Relevant Currency is Sterling or (ii) the day falling two Business Days in London for the Relevant Currency prior to the first day of such Interest Accrual Period if the Relevant Currency is neither Sterling nor euro or (iii) the day falling two TARGET Business Days prior to the first day of such Interest Accrual Period if the Relevant Currency is euro.

"Interest Period" means the period beginning on (and including) the Interest Commencement Date and ending on (but excluding) the first Interest Payment Date and each successive period beginning on (and including) an Interest Payment Date and ending on (but excluding) the next succeeding Interest Payment Date.

PRK.500.009.0272

"Interest Period Date" means each Interest Payment Date unless otherwise specified hereon.

"Interest Rate" means the rate of interest payable from time to time in respect of this Note and that is either specified or calculated in accordance with the provisions hereon.

"ISDA Definitions" means the 2000 ISDA Definitions (as amended or supplemented from time to time) published by the International Swaps and Derivatives Association, Inc., unless otherwise specified hereon.

"Principal" shall be deemed to include any premium payable in respect of the Notes, all Instalment Amounts, Redemption Amounts, Amortised Face Amounts and all other amounts in the nature of principal payable pursuant to Condition 6 or any amendment or supplement to it.

"Reference Banks" means, in the case of a determination of LIBOR, the principal London office of four major banks in the London inter-bank market and, in the case of a determination of EURIBOR, the principal Euro-zone office of four major banks in the Euro-zone inter-bank market, in each case selected by the Calculation Agent or as specified hereon.

"Reference Rate" means the rate specified as such hereon.

"Relevant Currency" means the currency specified hereon or, if none is specified, the currency in which the Notes are denominated.

"Relevant Screen Page" means such page, section, caption, column or other part of a particular information service as may be specified hereon.

"TARGET System" means the Trans European Automated real-time Gross Settlement Express Transfer (TARGET) System or any successor thereto.

(j)    *Calculation Agent*

The Issuer shall procure that there shall at all times be one or more Calculation Agents if provision is made for them hereon and for so long as any Note is outstanding (as defined in the Trust Deed). Where more than one Calculation Agent is appointed in respect of the Notes, references in these Conditions to the Calculation Agent shall be construed as each Calculation Agent performing its respective duties under the Conditions. If the Calculation Agent is unable or unwilling to act as such or if the Calculation Agent fails duly to establish the Interest Rate for an Interest Period or Interest Accrual Period or to calculate any Interest Amount, Instalment Amount or the Redemption Amount or to comply with any other requirement, the Issuer shall (with the prior written approval of the Trustee) appoint a leading bank or investment banking firm engaged in the inter bank market (or, if appropriate, money, swap or over-the-counter index options market) that is most closely connected with the calculation or determination to be made by the Calculation Agent (acting through its principal London office or any other office actively involved in such market) to act as such in its place. The Calculation Agent may not resign its duties without a successor having been appointed as aforesaid.

6    **Redemption, Purchase and Options**

(a)    *Redemption by Instalments and Final Redemption*

PRK.500.009.0273

(i)    Unless previously redeemed or purchased and cancelled as provided in this Condition 6, each Note that provides for Instalment Dates and Instalment Amounts shall be partially redeemed on each Instalment Date at the related Instalment Amount specified hereon. The outstanding principal amount of each such Note shall be reduced by the Instalment Amount (or, if such Instalment Amount is calculated by reference to a proportion of the principal amount of such Note, such proportion) for all purposes with effect from the related Instalment Date, unless payment of the Instalment Amount is improperly withheld or refused, in which case, such amount shall remain outstanding until the Relevant Date relating to such Instalment Amount.

(ii)    Unless previously redeemed, purchased and cancelled as provided below, each Note shall be finally redeemed on the Maturity Date specified hereon at its Redemption Amount (which, unless otherwise provided herein, is its principal amount) or, in the case of a Note falling within paragraph (i) above, its final Instalment Amount. Notes with no final maturity date will only be redeemable or repayable in accordance with the following provisions of this Condition 6 or Condition 10.

(b)    *Early Redemption of Zero Coupon Notes*

(i)    The Redemption Amount payable in respect of any Note that does not bear interest prior to the Maturity Date, the Redemption Amount of which is not linked to an index and/or a formula, upon redemption of such Note pursuant to Condition 6(d) or upon it becoming due and payable as provided in Condition 10 shall be the Amortised Face Amount (calculated as provided below) of such Note.

(ii)    Subject to the provisions of sub paragraph (iii) below, the Amortised Face Amount of any such Note shall be the scheduled Redemption Amount of such Note on the Maturity Date discounted at a rate per annum (expressed as a percentage) equal to the Amortisation Yield (which, if none is shown hereon, shall be such rate as would produce an Amortised Face Amount equal to the issue price of the Notes if they were discounted back to their issue price on the Issue Date) compounded annually. Where such calculation is to be made for a period of less than one year, it shall be made on the basis of the Day Count Fraction shown hereon.

(iii)    If the Redemption Amount payable in respect of any such Note upon its redemption pursuant to Condition 6(d) or upon it becoming due and payable as provided in Condition 10 is not paid when due, the Redemption Amount due and payable in respect of such Note shall be the Amortised Face Amount of such Note as defined in sub paragraph (ii) above, except that such sub-paragraph shall have effect as though the reference therein to the date on which the Note becomes due and payable were replaced by a reference to the Relevant Date. The calculation of the Amortised Face Amount in accordance with this sub paragraph shall continue to be made (as well after as before judgment) until the Relevant Date, unless the Relevant Date falls on or after the Maturity Date, in which case the amount due and payable shall be the scheduled Redemption Amount of such Note on the Maturity Date together with any interest that may accrue in accordance with Condition 5(d).

(c)    *Mandatory Redemption*

Subject to the terms of the relevant Supplemental Trust Deed, if any of the Collateral becomes repayable prior to its stated date of maturity for whatever reason or (unless the Trustee otherwise agrees) there is a payment default (after the expiry of any grace period specified in the terms and conditions of the Collateral in existence as at the later of the Issue Date and the date on which such Collateral was issued) in respect of any of the Collateral, a proportion of the principal amount of the Notes outstanding equal to the proportion of the Collateral comprised by the Collateral repaid or in respect of which there is a default will become immediately repayable. The Issuer shall forthwith give not more than 45 nor less than 30 Business Days' prior notice (or such other notice period as indicated in the relevant Supplemental Trust Deed) to the Trustee and the Noteholders (which notice shall be irrevocable) and upon expiry of such notice the Issuer will redeem either, as the case may be, all of the Notes at their Early Redemption Amount together with accrued interest or, in the case of a redemption in part, either (x) some of the Notes at their Early Redemption Amount together with accrued interest (if redemption is to be effected in accordance with Partial Redemption    Method A (as specified in the relevant Supplemental Trust Deed)) or (y) all of the Notes on a *pro rata* basis in an aggregate principal amount equal to that of the Collateral repaid or in respect of which there is a default (if redemption is to be effected in accordance with Partial Redemption Method B (as specified in the relevant Supplemental Trust Deed)), failing which all of the Notes shall become repayable and the security constituted by the relevant Supplemental Trust Deed and/or any Other Security Document shall become enforceable and the Trustee will take such action as is provided in Condition 4. In this Condition "Business Day" means a day on which commercial banks and foreign exchange markets are open in the cities specified in the relevant Supplemental Trust Deed.

(d)    *Redemption for Taxation and Other Reasons*

(i)    If the Issuer, on the occasion of the next payment due in respect of the Notes or Coupons, would be required by law to withhold or account for tax or would suffer tax in respect of its income so that it would be unable to make payment of the full amount due, the Issuer shall so inform the Trustee, shall use its best endeavours to arrange the substitution of a company incorporated in another jurisdiction approved by the Trustee as the principal debtor (provided that, in relation to Notes rated by a rating agency, the Issuer shall notify the appropriate rating agency and that such substitution shall not adversely affect any existing rating of the Notes as confirmed in writing by the appropriate rating agency) and if it is unable to arrange such substitution before the next payment is due in respect of the Notes it shall convene a meeting of the Noteholders at which it shall propose an Extraordinary Resolution amending the Conditions to provide for payment net of withholding tax or for payment net of withholding tax at a rate in excess of the then current rate of withholding, as the case may be. In the event of such Extraordinary Resolution not being passed either at such meeting or at any adjournment thereof, the Issuer shall (not later than the seventh day following such meeting (or any adjournment thereof)) redeem all but not some only of the Notes at their Early Redemption Amount together with interest (if any) accrued to the date fixed for

PRK.500.009.0275

redemption unless the Trustee certifies to the Issuer that, in its absolute discretion, it considers that it is in the best interests of the Noteholders that the Notes not be so redeemed or an Extraordinary Resolution of the Noteholders otherwise directs; or

(ii)   If a Swap Agreement is terminated in whole for any reason then the Issuer shall forthwith give not more than 45 nor less than 15 days' notice (or such other notice period as indicated in the relevant Supplemental Trust Deed) to the Trustee, the Noteholders and the Swap Counterparty (which notice shall be irrevocable), and on the expiry of such notice shall redeem all but not some only of the Notes at their Early Redemption Amount together with any interest accrued to the date fixed for redemption. Such notice shall be given promptly upon the termination of the relevant Swap Agreement and such redemption made, unless the Trustee shall certify to the Issuer that it considers in its absolute discretion that it is in the best interests of the holders of the Notes that such notice and redemption be delayed or not given or made, as the case may be, or an Extraordinary Resolution of the holders of the Notes shall otherwise direct.

Notwithstanding the foregoing, if the requirement to withhold or account for tax set out in Condition 6(d)(i) arises as a result of:

(i)    a withholding or deduction imposed on a payment by or on behalf of the relevant Issuer to an individual required to be made pursuant to European Council Directive 2003/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directive or any other law introduced as a consequence of the adoption or implementation of such Directive; or

(ii)   the presentation for payment of any Bearer Note, Receipt or Coupon by or on behalf of a holder who would have been able to avoid such withholding or deduction by presenting the relevant Bearer Note, Receipt or Coupon to another Paying Agent in a Member State of the European Union

then Condition 6(d)(i) shall not apply. The relevant Issuer shall deduct such taxes from the amounts payable to such Noteholder, all other Noteholders shall receive the due amounts payable to them and the Notes shall not be redeemed. Any such deduction shall not constitute an Event of Default under Condition 10.

(e)    *Redemption at the Option of the Issuer*

If so specified in the relevant Supplemental Trust Deed, the Issuer may, on giving not more than 45 nor less than 30 days' notice (or such other notice period as indicated in the relevant Supplemental Trust Deed) to the Noteholders and the Trustee (which notice shall be irrevocable) redeem all or, if so provided in the relevant Supplemental Trust Deed, some of the Notes at the Early Redemption Amount on the Issuer's Optional Redemption Date or Dates so provided in the relevant Supplemental Trust Deed. Upon expiration of such notice, the Issuer shall be bound to redeem the Notes at their Early Redemption Amount, together, if appropriate, with interest accrued to, but excluding, such date or dates of redemption.

PRK.500.009.0276

(f)     *Redemption at the Option of Noteholders*

If so specified in the relevant Supplemental Trust Deed, the Issuer shall, at the option of the holder of any Note, redeem such Note on the date or dates so provided at its Early Redemption Amount together with interest accrued to the date fixed for redemption.

To exercise such option the holder must deposit (in the case of Bearer Notes) such Note (together with all unmatured Receipts and Coupons and unexchanged Talons) with any Paying Agent or (in the case of Registered Notes) the Certificate representing such Note(s) with the Registrar or any Transfer Agent at its specified office, together with a duly completed option exercise notice ("Exercise Notice") in the form obtainable from any Paying Agent, the Registrar or any Transfer Agent (as applicable) within the Noteholders' Option Period as specified in the Final Terms. No Note or Certificate so deposited and option exercised may be withdrawn (except as provided in the Agency Agreement) without the prior consent of the Issuer.

(g)     *Early Redemption Amount*

Unless otherwise specified in the relevant Supplemental Trust Deed, the Early Redemption Amount payable upon a redemption of any Note pursuant to Condition 6 (c), (d), (e), (f) and (k) and Condition 10 shall be an amount, determined by the Calculation Agent in its absolute discretion, equal to the Recovery Fraction of the principal amount of the Note (or, if applicable, the part of the Note) being redeemed (the "Early Redemption Amount").

Where:

"Counterparty" means each party (other than the Issuer) to a Credit Enhancement Agreement.

"Credit Enhancement Termination Payment" means the total amount payable to the Issuer by a Counterparty (being a positive number) on the termination of (or as the case may be, the *pro rata* portion of) any related Credit Enhancement Agreement.

"Recovery Amount" means the amount received by or on behalf of the Issuer upon the sale of the Collateral (or, if applicable the *pro rata* portion of the Collateral) after the deduction of all costs, fees, charges, taxes and expenses of or incurred by the Issuer or, if applicable, the Disposal Agent in connection with the sale of the relevant Collateral and the early redemption of the Notes plus, if a positive number, the aggregate amount of, or minus, if a negative number, the aggregate amount of the Swap Termination Payment and/or the Credit Enhancement Termination Payment.

"Recovery Fraction" means a fraction of which the numerator is the Recovery Amount and the denominator is the aggregate principal amount of the Notes falling due for redemption.

"Swap Termination Payment" means the amount payable to the Issuer by the Swap Counterparty (in which case, it shall be a positive number) or by the Issuer to the Swap Counterparty (in which case, it shall be a negative number) on the termination of (or, as the case may be, the *pro rata* portion of) the related Swap Agreement.

(h)     *Notice of Redemption and Drawings*

PRK.500.009.0277

All Notes in respect of which any notice of redemption is given under this Condition shall be redeemed on the date specified in such notice in accordance with this Condition. In the case of a partial redemption if the relevant Supplemental Trust Deed specifies "Partial Redemption   Method A", then the notice shall also contain the certificate numbers of the Notes to be redeemed, which shall have been drawn in such place as the Trustee may approve and in such manner as it deems appropriate, subject to compliance with any applicable laws and stock exchange requirements. If the relevant Supplemental Trust Deed specifies "Partial Redemption Method B", then each Note will be redeemed on a *pro rata* basis.

(i)     *Purchases*

If the Issuer has satisfied the Trustee that it has made arrangements for the purchase of the Notes and, to the extent that the Notes will be surrendered for cancellation, it has made arrangements for the realisation of no more than the equivalent proportion of the Collateral, which transaction will leave the Issuer with no net liabilities in respect thereof, it may at any time purchase Notes (provided that they are purchased together with all unmatured Coupons and Talons related to them) in the open market or otherwise at any price.

(j)     *Cancellation*

The Issuer may, but shall not be obliged to, surrender for cancellation all Notes purchased by or on behalf of it, in the case of Bearer Notes, by surrendering each such Note together with all unmatured Receipts and Coupons and all unexchanged Talons to, or to the order of, the Issuing and Paying Agent and, in the case of Registered Notes, by surrendering the Certificate representing such Notes to the Registrar and, in each case, shall, together with all Notes redeemed by the Issuer, be cancelled forthwith (together with all unmatured Receipts and Coupons and unexchanged Talons attached thereto or surrendered therewith). Any Notes so surrendered for cancellation may not be reissued or resold and the obligations of the Issuer in respect of any such Notes shall be discharged.

(k)     *Exchange*

If so specified in the relevant Supplemental Trust Deed, any holder may at its option (subject to, if so specified in the Supplemental Trust Deed, the consent of each relevant Counterparty) exchange any or all of its Notes for (i) an amount (the "Net Asset Amount") calculated by the Issuer, equal to the then market value of such proportion of the Collateral (the "attributable Collateral") or, as the case may be, the Issuer's rights in respect thereof (the "attributable rights") or (ii) physical delivery ("Physical Delivery") of such proportion of the Collateral itself, in each case as equals the proportion (rounded down to the nearest whole number) which the Notes to be exchanged bears to the total principal amount outstanding of the Notes (less the costs of such valuation) adjusted as appropriate by the value realised or cost incurred, as the case may be, as a result of the termination of any Swap Agreement and/or Credit Enhancement Agreement, or part thereof in accordance with this Condition 6(k). To exercise such option, the holder shall, if the Notes are in bearer form, deposit the relevant Notes (together with all (if any) unmatured Coupons or Talons appertaining thereto) or, if the Notes are in registered form, deposit the Certificate representing the Notes at the office of Register, together with written notice that such option is to be exercised and (if the holder has elected for Physical

PRK.500.009.0278

Delivery, where available) a delivery instruction form (a "Delivery Instruction Form") substantially in the form set out in the Agency Agreement (and available upon request from the specified office of any Paying Agent or Transfer Agent during normal office hours). The Issuing and Paying Agent will forthwith notify the Issuer, each Counterparty, each Swap Counterparty, the Custodian, the Disposal Agent, the Registrar and the Trustee of receipt of such written notice. Each Counterparty and each Swap Counterparty shall forthwith notify the Issuer, the Trustee, the Custodian and the Issuing and Paying Agent (who shall then notify the relevant holder) of the net sum payable by such Counterparty and by, or, as the case may be, to such Swap Counterparty on termination of the relevant part of the relevant Credit Enhancement Agreement or Swap Agreement, as appropriate. The part of the relevant Credit Enhancement Agreement or, as the case may be, the relevant Swap Agreement to be terminated will be the *pro rata* amount thereof corresponding to that proportion of the Notes to be exchanged. The calculation of the Net Asset Amount in accordance with this Condition 6(k) shall be binding on the relevant holder(s) in the absence of manifest error. Any such Net Asset Amount shall be payable to the holder at the specified office of any Paying Agent or Transfer Agent at which the relevant Notes were deposited on the twentieth calendar day after such deposit (the "Delivery Date") or (if the holder has elected for Physical Delivery) (subject to receipt of a Delivery Instruction form) delivered on, or as soon as practicable after, the Settlement Date to the account at Euroclear Bank S.A./N.V. as operator of the Euroclear System ("Euroclear") or Clearstream Banking, société anonyme ("Clearstream, Luxembourg" and, together with Euroclear and/or any alternative clearing system agreed by the Trustee, the "Clearing Systems") (or in such other manner as shall be provided in the relevant Supplemental Trust Deed) as specified in the relevant Delivery Instruction Form.

Notwithstanding the foregoing provisions of this Condition 6(k), the Issuer may, at its discretion, elect to satisfy the obligations hereunder by delivery to the relevant holder of the attributable Collateral or, as the case may be, by assignment to the relevant holder of the attributable rights even though the holder may not have elected for Physical Delivery. In any such case, the Issuer will procure that, subject to any payment due from the holder to the Swap Counterparty being made, the relevant attributable Collateral is delivered to the holder (or to any other place or account specified in the written notice referred to above) or, as the case may be, the relevant attributable rights are assigned to the holder on the Delivery Date and shall use all reasonable endeavours to procure that any payment being due from the relevant Counterparty and/or relevant Swap Counterparty to the holder on termination of the relevant Credit Enhancement Agreement and/or relevant Swap Agreement or part thereof is duly made.

Accountholders at the Clearing Systems will be required to give an irrevocable instruction to the relevant Clearing System, as the case may be, in respect of such delivery in the form prescribed by the relevant Clearing System (which may be in a form other than that set out in the Agency Agreement), not later than 10.00 a.m. Brussels or Luxembourg time, as the case may be (or, in the case of an instruction to Euroclear via EUCLID or EUCLID 90, 11.00 a.m. Brussels time), on the Clearing Business Day prior to the Delivery Date.

No interest will be payable with respect to Notes deposited for exchange pursuant to this Condition in respect of the period from the date of issue of the Notes (in the

PRK.500.009.0279

case of exchange prior to the first due date for the payment of interest on the Note)
or the previous date for the payment of interest on the Note (in any other case) to
the date of such exchange.

The relevant Supplemental Trust Deed will contain provisions for the release of the
relevant Mortgaged Property for which Notes have been exchanged from the
remaining charges upon them.

In these Conditions:

"Clearing Business Day" means a day on which Euroclear or Clearstream,
Luxembourg, as the case may be, is open for the acceptance and execution of
settlement instructions other than a day on which Euroclear or Clearstream,
Luxembourg, as the case may be, is scheduled to close prior to its regular weekday
closing time.

"delivered" means the satisfaction of any obligation of the Issuer to complete all
matters necessary to transfer the relevant Net Asset Amount to the relevant
Noteholder (or the first-named of joint holders) with full title guarantee. Accordingly,
and for the avoidance of doubt, there shall be no obligation on the Issuer to concern
itself with any formalities or requirements that shall be placed on the relevant
Noteholder (or the first-named of joint holders) as the transferee of the relevant Net
Asset Amount in connection with the acquisition by such Noteholder of the relevant
Net Asset Amounts.

"Recovery Value" means the value, expressed as a percentage, of a claim against
the obligor in respect of the relevant Collateral, as determined by the Swap
Counterparty acting in good faith and in a commercially reasonable manner and by
way of example but without limitation, the Swap Counterparty may in making this
determination, take account of the mean of the market prices of all securities issued
by the relevant obligor, disregarding any securities which have a market price which
is at an artificially inflated level.

"Settlement Date" means the Delivery Date, except and to the extent that (i) a
Settlement Disruption Event prevents delivery of the relevant Net Asset Amount on
that day, (ii) pursuant to the terms of the relevant Swap Agreement and due to an
event (the "Impossibility Event") beyond the control of the Swap Counterparty it is
impossible (including due to market illiquidity) or illegal for the Swap Counterparty to
deliver to the Issuer any Net Asset Amount, in which event the Settlement Date shall
be postponed to the next following day after receipt by the Issuer of the relevant Net
Asset Amount, provided that if by the 31st calendar day following the original
Settlement Date the Impossibility Event is still continuing, the Notes shall become
immediately repayable at their Early Redemption Amount and (iii) due to
circumstances beyond the control of the Swap Counterparty the market price of any
or all Net Asset Amount is at an artificially inflated level, in which event the Swap
Counterparty may, in full satisfaction of its obligation to deliver the relevant Net Asset
Amount, pay to the Issuer, on the Settlement Date, the True Value of the relevant
Net Asset Amount. In the case of (ii) and to such extent, the Settlement Date will be
the first succeeding day (if such day is after the Delivery Date) on which settlement
of that Net Asset Amount can take place through Euroclear or Clearstream,
Luxembourg unless a Settlement Disruption Event prevents delivery in accordance
with the relevant Delivery Instruction form on each of the ten (10) Clearing Business

PRK.500.009.0280

Days immediately following that Delivery Date. In that case, (A) to the extent, as determined by the Calculation Agent, that the relevant Net Asset Amount can be delivered in any other commercially reasonable manner, then the Settlement Date will be the first day on which settlement of a sale of the relevant Net Asset Amount executed on that tenth (10th) Clearing Business Day customarily would take place using such other commercially reasonable manner of delivery, and (B) to the extent, as determined by the Calculation Agent, that the relevant Net Asset Amount cannot be delivered in any other commercially reasonable manner, then the Settlement Date will be postponed until such delivery can be effected through Euroclear or Clearstream, Luxembourg or, as determined by the Calculation Agent, in any other commercially reasonable manner. If a Settlement Disruption Event applies to a part only of the relevant Net Asset Amount, the Settlement Date shall be postponed, in accordance with the above provisions, in respect of the affected part of the relevant Net Asset Amount only. No additional amounts will be payable by the Issuer by virtue of any delay of the Settlement Date by virtue of a Settlement Disruption Event. In the case of (iii) the determination as to whether the market price of the Collateral is at an "artificially inflated level" will be made by the Swap Counterparty acting in good faith and in a commercially reasonable manner and, by way of example but without limitation, such market price will be considered to be at an artificially inflated level if due to a default or prospect of default by the obligor in relation to the relevant Collateral, there is an increase in demand for the Collateral caused principally by contractual obligations to deliver such Net Asset Amount upon the occurrence of such a default or prospect of default.

"Settlement Disruption Event" means an event beyond the control of the Issuer as a result of which the Clearing Systems cannot, in the determination of the Calculation Agent, deliver all or any part of the relevant Net Asset Amount.

"True Value" means, in relation to any particular securities, an amount equal to the product of the Recovery Value of the particular securities and the aggregate principal amount of such securities.

## 7    Payments and Talons

(a)    *Bearer Notes*

Payments of principal and interest in respect of Bearer Notes shall, subject as mentioned below, be made against presentation and surrender of the relevant Receipts (in the case of payments of Instalment Amounts other than on the due date for redemption and provided that the Receipt is presented for payment together with its relative Note), Notes (in the case of all other payments of principal and, in the case of interest, as specified in Condition 7(f)(vi)) or Coupons (in the case of interest, save as specified in Condition 7(f)(vi)), as the case may be, at the specified office of any Paying Agent by a cheque payable in the currency in which such payment is due drawn on, or, at the option of, and on three Business Days' notice from, the holder, by transfer to an account denominated in that currency with, a Bank. "Bank" means a bank in the principal financial centre for that currency or, in the case of euro, in a city in which banks have access to the TARGET System.

(b)    *Registered Notes*

PRK.500.009.0281

(i) Payments of principal (which for the purposes of this Condition 7(b) shall include final Instalment Amounts but not other Instalment Amounts) in respect of Registered Notes shall be made against presentation and surrender of the relevant Certificates at the specified office of any of the Registrar or of the Transfer Agents and in the manner provided in paragraph (ii) below.

(ii) Interest (which for the purpose of this Condition 7(b) shall include all Instalment Amounts other than final Instalment Amounts) on Registered Notes shall be paid to the person shown on the Register at the close of business on the fifteenth day before the due date for payment thereof (the "Record Date"). Payments of interest on each Registered Note shall be made in the currency in which such payments are due by cheque drawn on a Bank i and mailed to the holder (or to the first named of joint holders) of such Note at its address appearing in the Register. Upon application by the holder to the specified office of the Registrar or any Transfer Agent before the Record Date, such payment of interest may be made by transfer to an account in the relevant currency maintained by the payee with a Bank.

(c) *Payments in the United States*

Notwithstanding the foregoing, if any Bearer Notes are denominated in U.S. dollars, payments in respect thereof may be made at the specified office of any Paying Agent in New York City in the same manner as aforesaid if (i) the Issuer shall have appointed Paying Agents with specified offices outside the United States with the reasonable expectation that such Paying Agents would be able to make payment of the amounts on the Notes in the manner provided above when due, and payment in full of such amounts at all such offices is illegal or effectively precluded by exchange controls or other similar restrictions on payment or receipt of such amounts and (ii) such payment is then permitted by United States law, without involving, in the opinion of the Issuer, any adverse tax consequence to the Issuer.

(d) *Payments Subject to Fiscal Laws*

All payments are subject in all cases to any applicable fiscal or other laws, regulations and directives, but without prejudice to the provisions of Condition 8. No commission or expenses shall be charged to the Noteholders or Couponholders in respect of such payments.

(e) *Appointment of Agents*

The Issuing and Paying Agent, the Paying Agents, the Registrar, the Transfer Agents, the Calculation Agent and the Disposal Agent initially appointed by the Issuer and their respective specified offices are listed below. The Issuing and Paying Agent, the Paying Agents, the Registrar, the Transfer Agents, the Calculation Agent and the Disposal Agent act solely as agents of the Issuer and do not assume any obligation or relationship of agency or trust for or with any Noteholder or Couponholder. The Issuer reserves the right at any time with the prior written approval of the Trustee to vary or terminate the appointment of the Issuing and Paying Agent, any other Paying Agent, the Registrar, any Transfer Agent, the Calculation Agent or the Disposal Agent and to appoint additional or other Paying Agents or Transfer Agents, provided that the Issuer shall at all times maintain (i) an Issuing and Paying Agent, (ii) a Registrar in relation to Registered Notes, (iii) a

PRK.500.009.0282

Transfer Agent in relation to Registered Notes having its specified office in a major European city (which shall be Dublin ), (iv) one or more Calculation Agent(s) where the Conditions so require, (v) a Disposal Agent where the Conditions so require, (vi) a Paying Agent having its specified office in a major European city (which shall be Dublin so long as the Notes are listed on the Irish Stock Exchange) and (vii) such other agents as may be required by any other stock exchange on which the Notes may be listed, in each case as approved by the Trustee and (viii) a Paying Agent with a specified office in a European Union Member State that will not be obliged to withhold or deduct tax pursuant to any law implementing European Council Directive 2003/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000.

In addition, the Issuer shall forthwith appoint a Paying Agent in New York City in respect of any Bearer Notes denominated in U.S. dollars in the circumstances described in paragraph (c) above.

Notice of any such change or any change of any specified office shall promptly be given to the Unmatured Coupons and Receipts and Unexchanged Talons.

(f)     *Unmatured Coupons and Receipts and Unexchanged Talons*

(i)      Unless the Notes provide that the relative Coupons are to become void upon the due date for redemption of those Notes, Bearer Notes should be surrendered for payment together with all unmatured Coupons (if any) appertaining thereto, failing which an amount equal to the face value of each missing unmatured Coupon (or, in the case of payment not being made in full, that proportion of the amount of such missing unmatured Coupon that the sum of principal so paid bears to the total principal due) shall be deducted from the Redemption Amount due for payment. Any amount so deducted shall be paid in the manner mentioned above against surrender of such missing Coupon within a period of 10 years from the Relevant Date for the payment of such principal (whether or not such Coupon has become void pursuant to Condition 9).

(ii)     If the Notes so provide, upon the due date for redemption of any Bearer Note, unmatured Coupons relating to such Note (whether or not attached) shall become void and no payment shall be made in respect of them.

(iii)    Upon the due date for redemption of any Bearer Note, any unexchanged Talon relating to such Note (whether or not attached) shall become void and no Coupon shall be delivered in respect of such Talon.

(iv)     Upon the due date for redemption of any Bearer Note that is redeemable in instalments, all Receipts relating to such Note having an Instalment Date falling on or after such due date (whether or not attached) shall become void and no payment shall be made in respect of them.

(v)      Where any Bearer Note that provides that the relative unmatured Coupons are to become void upon the due date for redemption of those Notes is presented for redemption without all unmatured Coupons and any unexchanged Talon relating to it, and where any Bearer Note is presented for redemption without any unexchanged Talon relating to it, redemption

PRK.500.009.0283

shall be made only against the provision of such indemnity as the Issuer may require.

(vi)   If the due date for redemption of any Note is not a due date for payment of interest, interest accrued from the preceding due date for payment of interest or the Interest Commencement Date, as the case may be, shall only be payable against presentation (and surrender if appropriate) of the relevant Bearer Note or Certificate representing it, as the case may be. Interest accrued on a Note that only bears interest after its Maturity Date shall be payable on redemption of such Note against presentation of the relevant Note or Certificate representing it, as the case may be.

(g)   *Talons*

On or after the Interest Payment Date for the final Coupon forming part of a Coupon sheet issued in respect of any Bearer Note, the Talon forming part of such Coupon sheet may be surrendered at the specified office of the Issuing and Paying Agent or, as it may direct, in exchange for a further Coupon sheet (and, if necessary, another Talon for a further Coupon sheet) (but excluding any Coupons that may have become void pursuant to Condition 9).

(h)   *Non-Business Days*

If any date for payment in respect of any Note, Receipt or Coupon is not a business day, the holder shall not be entitled to payment until the next following business day nor to any interest or other sum in respect of such postponed payment. In this paragraph, "business day" means a day (other than a Saturday or a Sunday) on which banks and foreign exchange markets are open for business in the relevant place of presentation, in such jurisdictions as shall be specified as "Business Day Jurisdictions" hereon and:

(i)   (in the case of a payment in a currency other than euro) where payment is to be made by transfer to an account maintained with a bank in the relevant currency, on which foreign exchange transactions may be carried on in the relevant currency in the principal financial centre of the country of such currency; or

(ii)   (in the case of a payment in euro) which is a TARGET Business Day.

**8   Taxation**

All payments of principal and interest in respect of the Notes and the Coupons shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed thereon. Any such deduction shall not be an Event of Default under Condition 10. In the event of the imposition of such withholding taxes on payments in respect of the Notes, the Issuer will use its best endeavours to arrange for its substitution as principal debtor by a company incorporated in another jurisdiction, subject to and in accordance with Condition 6(d).

**9   Prescription**

Claims against the Issuer for payment in respect of the Notes, Receipts and Coupons (which, for this purpose, shall not include Talons) shall be prescribed and become void

PRK.500.009.0284

unless made within 10 years (in the case of principal) or five years (in the case of interest) from the appropriate Relevant Date in respect of them.

## 10   Events of Default

If any of the following events ("Events of Default") occurs, the Trustee at its discretion may, and if so requested by holders of at least one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution shall, give notice to the Issuer that the Notes are, and they shall immediately become, due and payable at their Early Redemption Amount together with accrued interest and the security constituted by the Trust Deed shall become enforceable (as provided in the Trust Deed):

(a)   if default is made for a period of 14 days or more in the payment of any sum due in respect of the Notes or any of them; or

(b)   if the Issuer fails to perform or observe any of its other obligations under the Notes or the Trust Deed and such failure continues for a period of 30 days (or such longer period as the Trustee may permit) next following the service by the Trustee on the Issuer of notice requiring the same to be remedied unless, in the opinion of the Trustee, incapable of remedy, in which case no notice shall be required; or

(c)   if an administrator shall be appointed or any order shall be made by any competent court or any resolution passed for the winding up or dissolution of the Issuer or the appointment of an examiner, liquidator or similar official in relation to the Issuer save for the purposes of amalgamation, merger, consolidation, reorganisation or other similar arrangement on terms previously approved by the Trustee or by an Extraordinary Resolution.

The Issuer has undertaken in the Principal Trust Deed that, on each anniversary of the date of the Principal Trust Deed and also within 14 days after any request by the Trustee, it will send to the Trustee a certificate signed by two Directors of the Issuer to the effect that, since the date of the Principal Trust Deed or, as the case may be, the date of the last such certificate, no Event of Default, Potential Event of Default or other matter required to be brought to the Trustee's attention has occurred.

## 11   Enforcement

At any time after the Notes become due and payable, the Trustee may, at its discretion and without further notice, institute such proceedings against the Issuer as it may think fit to enforce the terms of the Trust Deed, the Notes and Coupons, but it need not take any proceedings unless (i) it shall have been so directed by an Extraordinary Resolution or so requested in writing by Noteholders holding at least one fifth in principal amount of Notes outstanding, and (ii) it shall have been indemnified to its satisfaction.

Only the Trustee may pursue the remedies available under the Trust Deed to enforce the rights of the Noteholders and Couponholders and no Noteholder or Couponholder is entitled to proceed against the Issuer unless the Trustee, having become bound to proceed in accordance with the terms of the Trust Deed, fails or neglects to do so and such failure or neglect is continuing. Having realised the security or, in the case of a partial redemption of Notes pursuant to Condition 6(c), part of the security corresponding to the proportion of Notes redeemed, and distributed the net proceeds in accordance with Condition 4, the Trustee may not take any further steps against the Issuer to recover any sum still unpaid

PRK.500.009.0285

and the Issuer will not be obliged to make any further payment in respect of any such sum and accordingly no debt shall be owed by the Issuer in respect of any such sum.

12   **Meeting of Noteholders, Modification, Waiver and Substitution**

(a)   *Meetings of Noteholders*

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matter affecting their interests, including the sanctioning by Extraordinary Resolution (as defined in the Trust Deed) of a modification of any of these Conditions or any provisions of the Trust Deed or the restructuring of the Notes. Such a meeting may be convened by Noteholders holding not less than 10 per cent. in principal amount of the Notes for the time being outstanding. The quorum for any meeting convened to consider an Extraordinary Resolution shall be two or more persons holding or representing a clear majority in principal amount of the Notes for the time being outstanding, or at any adjourned meeting two or more persons being or representing Noteholders whatever the principal amount of the Notes held or represented, unless the business of such meeting includes consideration of proposals, *inter alia*, (i) to modify the details of the Mortgaged Property, the maturity of the Notes or the dates on which interest is payable on them, (ii) to reduce or cancel the principal amount of, any premium payable on redemption of, or interest on, or to vary the method of calculating the rate of interest or reducing the minimum rate of interest on, the Notes, (iii) to change the currency of payment of the Notes, (iv) to modify the Events of Default, (v) to modify the provisions concerning the quorum required at a meeting or the majority required to pass an Extraordinary Resolution or (vi) amending (i) to (v) above, in which case the necessary quorum shall be two or more persons holding or representing not less than 75 per cent., or at any adjourned meeting not less than 25 per cent., in principal amount of the Notes for the time being outstanding. Any Extraordinary Resolution duly passed shall be binding on all Noteholders (whether or not they were present at the meeting at which such resolution was passed) and on all Couponholders. A written resolution of the holders of not less than 90 per cent. in principal amount of the Notes for the time being outstanding shall take effect as an Extraordinary Resolution.

(b)   *Modification of the Trust Deed*

The Trustee may agree, without the consent of the Noteholders or Couponholders, to (i) any modification of any of the provisions of the Trust Deed or any relevant Swap Agreement that is in its opinion of a formal, minor or technical nature or is made to correct a manifest error, and (ii) any other modification (except as mentioned in the Trust Deed), and any waiver or authorisation of any breach or proposed breach, of any of the provisions of the Trust Deed that is in the opinion of the Trustee not materially prejudicial to the interests of the Noteholders. Any such modification, authorisation or waiver shall be binding on the Noteholders and the Couponholders and, if the Trustee so requires, such modification shall be notified to the Noteholders as soon as practicable. In relation to Notes which are rated by a rating agency, the Issuer shall notify the relevant rating agency of any modification made in accordance with this Condition 12(b).

(c)   *Substitution*

PRK.500.009.0286

The Trust Deed contains provisions permitting the Trustee to agree, subject to such amendment of the Trust Deed and such other conditions as the Trustee may require including the transfer of the Mortgaged Property and subject to the consent of the relevant Swap Counterparty, but without the consent of the Noteholders or the Couponholders, to the substitution of any other company in place of the Issuer, or of any previous substituted company, as principal debtor under the Trust Deed and the Notes provided that, in relation only to Notes which are rated by a rating agency, the Issuer shall notify the appropriate rating agency and that such change shall not adversely affect any existing rating of the Notes as confirmed in writing by the appropriate rating agency. In the case of such a substitution the Trustee may agree, without the consent of the Noteholders or the Couponholders, to a change of the law governing the Notes, the Receipts, the Coupons, the Talons and/or the Trust Deed provided that such change (i) would not in the opinion of the Trustee be materially prejudicial to the interests of the Noteholders and (ii) in relation only to Notes rated by a rating agency, shall not adversely affect any existing rating of the Notes as confirmed in writing by the appropriate rating agency. Under the Trust Deed, the Trustee may agree or require the Issuer to procure the substitution as principal debtor under the Trust Deed of a company incorporated in some other jurisdiction in the event of the Issuer becoming subject to any form of tax on its income or payments in respect of the Notes.

(d)    *Entitlement of the Trustee*

In connection with the exercise of its functions (including but not limited to those referred to in this Condition) the Trustee shall have regard to the interests of the Noteholders as a class and shall not have regard to the consequences of such exercise for individual Noteholders or Couponholders and the Trustee shall not be entitled to require, nor shall any Noteholder or Couponholder be entitled to claim, from the Issuer any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders or Couponholders.

(e)    *Retirement or Removal of the Trustee*

The Trustee may retire on giving three months' written notice to the Issuer and the Noteholders may remove the Trustee by Extraordinary Resolution. However, if the Trustee is a sole trust corporation then any such retirement or removal shall not be effective until a successor Trustee is appointed.

13    **Replacement of Notes, Certificates, Receipts, Coupons and Talons**

If a Note, Certificate, Receipt, Coupon or Talon is lost, stolen, mutilated, defaced or destroyed, it may be replaced, subject to applicable laws, regulations and stock exchange regulations, at the specified office of the Paying Agent in the Republic of Ireland (in the case of Bearer Notes, Receipts, Coupons or Talons) and of the Registrar (in the case of Certificates) or such other Paying Agent, as the case may be, as may from time to time be designated by the Issuer for the purpose and notice of whose designation is given to Noteholders, in each case on payment by the claimant of the fees and costs incurred in connection therewith and on such terms as to evidence, security and indemnity (which may provide, *inter alia*, that if the allegedly lost, stolen or destroyed Note, Certificate, Receipt, Coupon or Talon is subsequently presented for payment or, as the case may be, for exchange for further Coupons, there shall be paid to the Issuer on demand the amount payable by the Issuer in respect of such Notes, Certificates, Receipts, Coupons or further

PRK.500.009.0287

Coupons) and otherwise as the Issuer may require. Mutilated or defaced Notes, Certificates, Receipts, Coupons or Talons must be surrendered before replacements will be issued.

**14   Notices**

Notices to the holders of Registered Notes shall be mailed to them at their respective addresses in the Register and deemed to have been given on the fourth weekday (being a day other than a Saturday or a Sunday) after the date of mailing. Notices to the holders of Bearer Notes shall be valid if published in a daily newspaper of general circulation in London (which is expected to be the *Financial Times*) and (so long as the Notes are listed on a stock exchange and the rules of that stock exchange so require) in any such other newspaper in which publication is so required by the rules of that stock exchange (which, in the case of Notes listed on the Irish Stock Exchange, is expected to be the *Irish Times*). If in the opinion of the Trustee any such publication is not practicable, notice shall be validly given if published in another leading daily English language newspaper with general circulation in Europe. Any such notice shall be deemed to have been given on the date of such publication or, if published more than once or on different dates, on the first date on which publication is made, as provided above.

Couponholders shall be deemed for all purposes to have notice of the contents of any notice given to the holders of Bearer Notes in accordance with this Condition.

**15   Indemnification and Obligations of the Trustee**

The Trust Deed contains provisions for the indemnification of the Trustee and for its relief from responsibility including for the exercise of any voting rights in respect of the Mortgaged Property, for the validity, sufficiency and enforceability (which the Trustee has not investigated) of the security created over the Mortgaged Property and for taking proceedings to enforce repayment unless indemnified to its satisfaction. The Trustee and any affiliate is entitled to enter into business transactions with the Issuer, any issuer or guarantor (where applicable) of any of the Mortgaged Property, any Swap Counterparty or any of their subsidiary, holding or associated companies without accounting to the Noteholders for profit resulting therefrom.

The Trustee is exempted from liability with respect to any loss or theft or reduction in value of the Mortgaged Property, from any obligation to insure or to procure the insuring of the Mortgaged Property and from any claim arising from the fact that the Mortgaged Property will be held in safe custody by the Custodian or other custodian approved in writing by the Trustee (in each case, if applicable).

The Trust Deed provides that in acting as Trustee under this Trust Deed the Trustee shall not, in respect of Notes of any Series, assume any duty or responsibility to any Swap Counterparty (other than to pay to any Swap Counterparty any moneys received and payable to it and to act in accordance with the provisions of Condition 4) or any Credit Enhancement Provider and shall have regard solely to the interests of the Noteholders and shall not be obliged to act on any directions of the Swap Counterparty if this would in the Trustee's opinion be contrary to the interests of the Noteholders or Couponholders.

**16   Governing Law and Jurisdiction**

(a)   *Governing Law*

PRK.500.009.0288

The Trust Deed, the Notes, the Receipts, the Coupons and the Talons are governed by, and shall be construed in accordance with, English law.

(b)  *Jurisdiction*

The Courts of England are to have jurisdiction to settle any disputes that may arise out of or in connection with the Trust Deed, any Notes, Receipts, Coupons or Talons and accordingly any legal action or proceedings arising out of or in connection with the Trust Deed, any Notes, Receipts, Coupons or Talons ("Proceedings") may be brought in such courts.

(c)  *Service of Process*

The Issuer has irrevocably appointed Lehman Brothers International (Europe) as its agent in England to receive, for it and on its behalf, service of process in any Proceedings in England.

## 17    Contracts (Rights of Third Parties) Act 1999

No person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999 except to the extent (if any) that the Notes expressly provide for such Act to apply to any of their terms.

PRK.500.009.0289

**Schedule 2**
**Part D**
**Form of Coupon**

On the front:

**[SPECIFIED COMPANY]**

**MULTI-ISSUER SECURED OBLIGATION PROGRAMME**

Series No. [            ]

[Title of issue]

Coupon for [[set out amount due, if known]/the amount] due on [the Interest Payment Date falling in]* [            ], [            ].

[Coupon relating to Note in the principal amount of [            ]]**

This Coupon is payable to bearer (subject to the Conditions endorsed on the Note to which this Coupon appertains, which shall be binding upon the holder of this Coupon whether or not it is for the time being attached to such Note) at the specified offices of the Issuing and Paying Agent and the Paying Agents set out on the reverse hereof (or any other Issuing and Paying Agent or further or other Paying Agents or specified offices duly appointed or nominated and notified to the Noteholders).

[If the Note to which this Coupon appertains shall have become due and payable before the Maturity Date of this Coupon, this Coupon shall become void and no payment shall be made in respect of it.]***

ANY UNITED STATES PERSON WHO HOLDS THIS OBLIGATION WILL BE SUBJECT TO LIMITATIONS UNDER THE UNITED STATES INCOME TAX LAWS, INCLUDING THE LIMITATIONS PROVIDED IN SECTIONS 165(j) AND 1287(a) OF THE INTERNAL REVENUE CODE.

[SPECIFIED COMPANY]

By:

[Cp. No.    ]        [Denomination]        [ISIN]        [Series]        [Certif. No.]

PRK.500.009.0290

On the back:

**Issuing and Paying Agent**

[•]


**Paying Agent**

[•]

Attention: [•]

[*Only necessary where Interest Payment Dates are subject to adjustment in accordance with a Business Day Convention; otherwise the particular Interest Payment Date should be specified.]

[**Only required for Coupons relating to Floating Rate or Variable Coupon Amount Notes that are issued in more than one denomination.]

[***Delete if Coupons are not to become void upon early redemption of Note.]

PRK.500.009.0291

**Schedule 2**
**Part E**
**Form of Talon**

On the front:

[SPECIFIED COMPANY]

MULTI-ISSUER SECURED OBLIGATION PROGRAMME

Series No. [•]

[Title of issue]

Talon for further Coupons falling due on [the Interest Payment Dates falling in]*[                    ]
[                    ].

[Talon relating to Note in the principal amount of [                    ]]**

After all the Coupons appertaining to the Note to which this Talon appertains have matured, further Coupons (including if appropriate a Talon for further Coupons) shall be issued at the specified office of the Issuing and Paying Agent set out on the reverse hereof (or any other Issuing and Paying Agent or specified office duly appointed or nominated and notified to the Noteholders) upon production and surrender of this Talon.

If the Note to which this Talon appertains shall have become due and payable before the original due date for exchange of this Talon, this Talon shall become void and no exchange shall be made in respect of it.

ANY UNITED STATES PERSON WHO HOLDS THIS OBLIGATION WILL BE SUBJECT TO LIMITATIONS UNDER THE UNITED STATES INCOME TAX LAWS, INCLUDING THE LIMITATIONS PROVIDED IN SECTIONS 165(j) AND 1287(a) OF THE INTERNAL REVENUE CODE.

[SPECIFIED COMPANY]

By:

[Talon No.]                    [ISIN]                    [Series]                    [Certif. No.]

PRK.500.009.0292

On the back:

**Issuing and Paying Agent**

[●]


**Paying Agent**

[●]


[* The maturity dates of the relevant Coupons should be set out if known, otherwise reference should be made to the months and years in which the Interest Payment Dates fall due.]

[** Only required where the Series comprises Notes of more than one denomination.]

PRK.500.009.0293

Schedule 2
Part F
Form of Receipt

[SPECIFIED COMPANY]

MULTI-ISSUER SECURED OBLIGATION PROGRAMME

Series No. [          ]

Receipt for the sum of [                    ] being the instalment of principal payable in accordance with the Terms and Conditions endorsed on the Note to which this Receipt appertains (the "Conditions") on [                ].

This Receipt is issued subject to and in accordance with the Conditions which shall be binding upon the holder of this Receipt (whether or not it is for the time being attached to such Note) and is payable at the specified office of any of the Paying Agents set out on the reverse of the Note to which this Receipt appertains (and/or any other or further Paying Agents and/or specified offices as may from time to time be duly appointed and notified to the Noteholders).

This Receipt must be presented for payment together with the Note to which it appertains. If the Note to which this Receipt appertains shall have become due and payable on or before the Maturity Date of this Receipt, this Receipt shall become void and no payment shall be made in respect of it. The Issuer shall have no obligation in respect of this Receipt if it is presented without the Note to which it appertains.

ANY UNITED STATES PERSON WHO HOLDS THIS OBLIGATION WILL BE SUBJECT TO LIMITATIONS UNDER THE UNITED STATES INCOME TAX LAWS, INCLUDING THE LIMITATIONS PROVIDED IN SECTIONS 165(j) AND 1287(a) OF THE INTERNAL REVENUE CODE.

[SPECIFIED COMPANY]

By:

PRK.500.009.0294

## Schedule 3

## Provisions for Meetings of Noteholders

### Interpretation

1   In this Schedule:

    1.1   references to a meeting are to a meeting of Noteholders and include, unless the context otherwise requires, any adjournment;

    1.2   "agent" means a holder of a voting certificate or a proxy for, or representative of, a Noteholder;

    1.3   "block voting instruction" means an instruction issued in accordance with paragraphs 8 to 14;

    1.4   "Extraordinary Resolution" means a resolution passed at a meeting duly convened and held in accordance with this Principal Trust Deed by a majority of at least 75 per cent of the votes cast;

    1.5   "voting certificate" means a certificate issued in accordance with paragraphs 5, 6, 7 and 14;

    1.6   references to persons representing a proportion of the Notes are to Noteholders or agents holding or representing in the aggregate at least that proportion in principal amount of the Notes for the time being outstanding.

### Powers of meetings

2   A meeting shall, subject to the Conditions and without prejudice to any powers conferred on other persons by this Principal Trust Deed, have power by Extraordinary Resolution:

    2.1   to sanction any proposal by the Issuer or the Trustee for any modification, abrogation, variation or compromise of, or arrangement in respect of, the rights of the Noteholders and/or the Couponholders against the Issuer, whether or not those rights arise under this Principal Trust Deed ;

    2.2   to sanction the exchange or substitution for the Notes of, or the conversion of the Notes into, shares, bonds or other obligations or securities of the Issuer or any other entity;

    2.3   to assent to any modification of the Trust Deed, the Notes, the Receipts, the Talons or the Coupons proposed by the Issuer or the Trustee;

    2.4   to authorise anyone to concur in and do anything necessary to carry out and give effect to an Extraordinary Resolution;

    2.5   to give any authority, direction or sanction required to be given by Extraordinary Resolution;

    2.6   to appoint any persons (whether Noteholders or not) as a committee or committees to represent the Noteholders' interests and to confer on them any powers or discretions which the Noteholders could themselves exercise by Extraordinary Resolution;

PRK.500.009.0295

2.7     to approve a proposed new Trustee and to remove a Trustee;

2.8     to approve the substitution of any entity for the Issuer (or any previous substitute) as principal debtor under the Trust Deed; and

2.9     to discharge or exonerate the Trustee from any liability in respect of any act or omission for which it may become responsible under the Trust Deed, the Notes, the Receipts, the Talons or the Coupons,

provided that the special quorum provisions in paragraph 19 shall apply to any Extraordinary Resolution (a "special quorum resolution") for the purpose of sub-paragraph 2.2 or 2.8 or for the purpose of making a modification to the Trust Deed, the Notes, the Receipts, the Talons or the Coupons which would have the effect of:

(i)     modifying the details of the Mortgaged Property, the maturity of the Notes or the dates on which interest is payable on them or

(ii)     reducing or cancelling the principal amount of, any premium payable on redemption of, or interest on, or varying the method of calculating the rate of interest or reducing the minimum rate of interest on, the Notes or

(iii)     changing the currency of payment of the Notes or

(iv)     modifying the Events of Default or

(v)     modifying the provisions in this Schedule concerning the quorum required at a meeting or the majority required to pass an Extraordinary Resolution or

(vi)     amending this proviso.

A resolution in writing signed by or on behalf of the holders of not less than 90 per cent. in principal amount of the Notes who for the time being are entitled to receive notice of a meeting in accordance with the provisions herein contained shall for all purposes be as valid and effectual as an Extraordinary Resolution passed at a meeting of such Noteholders duly convened and held in accordance with the provisions herein contained. Such resolution in writing may be contained in one document or in several documents in like form each signed by or on behalf of one or more Noteholders.

## 3    Convening a meeting

The Issuer or the Trustee may at any time convene a meeting. If it receives a written request by Noteholders holding at least 10 per cent. in principal amount of the Notes for the time being outstanding and is indemnified to its satisfaction against all costs and expenses, the Trustee shall convene a meeting.

Every meeting shall be held at a time and place approved by the Trustee.

4     At least 21 days' notice (exclusive of the day on which the notice is given and of the day of the meeting) shall be given to the Noteholders.

A copy of the notice shall be given by the party convening the meeting to the other parties.

The notice shall specify the day, time and place of meeting and, unless the Trustee otherwise agrees, the nature of the resolutions to be proposed and shall explain how Noteholders may appoint proxies or representatives, obtain voting certificates and use block voting instructions and the details of the time limits applicable.

---

PRK.500.009.0296

**5**   **Arrangements for voting**

If a holder of a Bearer Note wishes to obtain a voting certificate in respect of it for a meeting, he must deposit it for that purpose at least 48 hours before the time fixed for the meeting with a Paying Agent or to the order of a Paying Agent with a bank or other depositary nominated by the Paying Agent for the purpose. The Paying Agent shall then issue a voting certificate in respect of it.

**6**   A voting certificate shall:

**6.1**   be a document in the English language;

**6.2**   be dated;

**6.3**   specify the meeting concerned and the serial numbers of the Notes deposited; and

**6.4**   entitle, and state that it entitles, its bearer to attend and vote at that meeting in respect of those Notes.

**7**   Once a Paying Agent has issued a voting certificate for a meeting in respect of a Note, it shall not release the Note until either:

**7.1**   the meeting has been concluded; or

**7.2**   the voting certificate has been surrendered to the Paying Agent.

**8**   If a holder of a Bearer Note wishes the votes attributable to it to be included in a block voting instruction for a meeting, then, at least 48 hours before the time fixed for the meeting, (i) he must deposit the Note for that purpose with a Paying Agent or to the order of a Paying Agent with a bank or other depositary nominated by the Paying Agent for the purpose and (ii) he or a duly authorised person on his behalf must direct the Paying Agent how those votes are to be cast. The Paying Agent shall issue a block voting instruction in respect of the votes attributable to all Notes so deposited.

**9**   A block voting instruction shall:

**9.1**   be a document in the English language;

**9.2**   be dated;

**9.3**   specify the meeting concerned;

**9.4**   list the total number and serial numbers of the Notes deposited, distinguishing with regard to each resolution between those voting for and those voting against it;

**9.5**   certify that such list is in accordance with Notes deposited and directions received as provided in paragraphs 8, 11 and 14; and

**9.6**   appoint a named person (a "proxy") to vote at that meeting in respect of those Notes and in accordance with that list. A proxy need not be a Noteholder.

**10**   Once a Paying Agent has issued a block voting instruction for a meeting in respect of the votes attributable to any Notes:

**10.1**   it shall not release the Notes, except as provided in paragraph 11, until the meeting has been concluded; and

PRK.500.009.0297

**10.2**    the directions to which it gives effect may not be revoked or altered during the 48 hours before the time fixed for the meeting.

**11**    If the receipt for a Note deposited with a Paying Agent in accordance with paragraph 8 is surrendered to the Paying Agent at least 48 hours before the time fixed for the meeting, the Paying Agent shall release the Note and exclude the votes attributable to it from the block voting instruction.

**12**    Each block voting instruction shall be deposited at least 24 hours before the time fixed for the meeting at such place as the Trustee shall designate or approve, and in default it shall not be valid unless the chairman of the meeting decides otherwise before the meeting proceeds to business.

If the Trustee requires, a notarially certified copy of each block voting instruction shall be produced by the proxy at the meeting but the Trustee need not investigate or be concerned with the validity of the proxy's appointment.

**13**    A vote cast in accordance with a block voting instruction shall be valid even if it or any of the Noteholders' instructions pursuant to which it was executed has previously been revoked or amended, unless written intimation of such revocation or amendment is received from the relevant Paying Agent by the Issuer or the Trustee at its registered office or by the chairman of the meeting in each case at least 24 hours before the time fixed for the meeting.

**14**    No Note may be deposited with or to the order of a Paying Agent at the same time for the purposes of both paragraph 5 and paragraph 8 for the same meeting.

### Representations

**15**    A holder of a Registered Note may, by an instrument in writing in the form available from the specified office of a Transfer Agent in the English language executed by or on behalf of the holder and delivered to the Transfer Agent at least 24 hours before the time fixed for a meeting, appoint any person (a "**proxy**") to act on his behalf in connection with that meeting. A proxy need not be a Noteholder.

**15.1**    A corporation which holds a Registered Note may by delivering to a Transfer Agent at least 24 hours before the time fixed for a meeting a certified copy of a resolution of its directors or other governing body (with, if it is not in English, a certified translation into English) authorise any person to act as its representative (a "**representative**") in connection with that meeting.

### Chairman

**16**    The chairman of a meeting shall be such person as the Trustee may nominate in writing, but if no such nomination is made or if the person nominated is not present within 15 minutes after the time fixed for the meeting the Noteholders or agents present shall choose one of their number to be chairman, failing which the Issuer may appoint a chairman. The chairman need not be a Noteholder or agent. The chairman of an adjourned meeting need not be the same person as the chairman of the original meeting.

### Attendance

**17**    The following may attend and speak at a meeting:

**17.1**    Noteholders and agents;

PRK.500.009.0298

17.2    the chairman;

17.3    the Issuer and the Trustee (through their respective representatives) and their respective financial and legal advisers;

17.4    the Dealers and their advisers.

No-one else may attend or speak.

**Quorum and Adjournment**

18    No business (except choosing a chairman) shall be transacted at a meeting unless a quorum is present at the commencement of business. If a quorum is not present within 15 minutes from the time initially fixed for the meeting, it shall, if convened on the requisition of Noteholders or if the Issuer and the Trustee agree, be dissolved.

In any other case it shall be adjourned until such date, not less than 14 nor more than 42 days later, and time and place as the chairman may decide.

If a quorum is not present within 15 minutes from the time fixed for a meeting so adjourned, the meeting shall be dissolved.

19    Two or more Noteholders or agents present in person shall be a quorum:

19.1    in the cases marked "No minimum proportion" in the table below, whatever the proportion of the Notes which they represent;

19.2    in any other case, only if they represent the proportion of the Notes shown by the table below.

| COLUMN 1 | COLUMN 2 | COLUMN 3 |
|---|---|---|
| Purpose of meeting | Any meeting except one referred to in column 3 | Meeting previously adjourned though want of a quorum |
| | Required proportion | Required proportion |
| To pass a special quorum resolution | 75 per cent. | 25 per cent. |
| To pass any other Extraordinary Resolution | A clear majority | No minimum proportion |
| Any other purpose | 10 per cent. | No minimum proportion |

20    The chairman may with the consent of (and shall if directed by) a meeting adjourn the meeting from time to time and from place to place. Only business which could have been transacted at the original meeting may be transacted at a meeting adjourned in accordance with this paragraph or paragraph 18.

21    At least 10 days' notice of a meeting adjourned through want of a quorum shall be given in the same manner as for an original meeting and that notice shall state the quorum required at the adjourned meeting. No notice need, however, otherwise be given of an adjourned meeting.

PRK.500.009.0299

## Voting

22    Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Trustee or one or more persons representing 2 per cent. of the Notes.

23    Unless a poll is demanded a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact without proof of the number or proportion of the votes cast in favour of or against it.

24    If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs. The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken. A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.

25    A poll demanded on the election of a chairman or on a question of adjournment shall be taken at once.

26    On a show of hands every person who is present in person and who produces a Bearer Note, a Certificate of which he is the registered holder or a voting certificate or is a proxy or representative has one vote. On a poll every such person has one vote for each Note so produced or represented by the voting certificate so produced or for which he is a proxy or representative.

Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.

27    In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

## Effect and Publication of an Extraordinary Resolution

28    An Extraordinary Resolution shall be binding on all the Noteholders, whether or not present at the meeting, and on all the Couponholders and each of them shall be bound to give effect to it accordingly. The passing of such a resolution shall be conclusive evidence that the circumstances justify its being passed. The Issuer shall give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days but failure to do so shall not invalidate the resolution.

## Minutes

29    Minutes shall be made of all resolutions and proceedings at every meeting and, if purporting to be signed by the chairman of that meeting or of the next succeeding meeting, shall be conclusive evidence of the matters in them. Until the contrary is proved every meeting for which minutes have been so made and signed shall be deemed to have been duly convened and held and all resolutions passed or proceedings transacted at it to have been duly passed and transacted.

## Trustee's Power to Prescribe Regulations

30    Subject to all other provisions in this Trust Deed the Trustee may without the consent of the Noteholders prescribe such further regulations regarding the holding of meetings and attendance and voting at them as it in its sole discretion determines including (without

PRK.500.009.0300

limitation) such requirements as the Trustee thinks reasonable to satisfy itself that the persons who purport to make any requisition in accordance with this Trust Deed are entitled to do so and as to the form of voting certificates or block voting instructions so as to satisfy itself that persons who purport to attend or vote at a meeting are entitled to do so.

31    The holder of a Global Note or Global Certificate shall (unless such Global Note or Global Certificate represents only one Note) be treated as two persons for the purposes of any quorum requirements of a meeting of Noteholders.

32    The foregoing provisions of this Schedule shall have effect subject to the following provisions:

32.1    meetings of Noteholders of separate Series will normally be held separately. However, the Trustee may from time to time determine that meetings of Noteholders of separate Series shall be held together;

32.2    a resolution that in the opinion of the Trustee affects one Series alone shall be deemed to have been duly passed if passed at a separate meeting of the Noteholders of the Series concerned;

32.3    a resolution that in the opinion of the Trustee affects the Noteholders of more than one Series but does not give rise to a conflict of interest between the Noteholders of the different Series concerned shall be deemed to have been duly passed if passed at a single meeting of the Noteholders of the relevant Series provided that for the purposes of determining the votes a Noteholder is entitled to cast pursuant to paragraph 26, each Noteholder shall have one vote in respect of each U.S.$1,000 principal amount of Notes held, converted, if such Notes are not denominated in U.S. dollars, in accordance with sub-Clause 9.12;

32.4    a resolution that in the opinion of the Trustee affects the Noteholders of more than one Series and gives or may give rise to a conflict of interest between the Noteholders of the different Series concerned shall be deemed to have been duly passed only if it shall be duly passed at separate meetings of the Noteholders of the relevant Series;

32.5    to all such meetings as aforesaid all the preceding provisions of this Schedule shall *mutatis mutandis* apply as though references therein to Notes and to Noteholders were references to the Notes and Noteholders of the Series concerned.

PRK.500.009.0301

**Schedule 4**

**Form of Supplemental Trust Deed**

Dated [ISSUE DATE]

[SPECIFIED COMPANY]

- and -

[•]

- and -

[•]

- and -

[PAYING/TRANSFER AGENT]

[- and -]

[SWAP COUNTERPARTY]

[- and -]

[COUNTERPARTY]

**SUPPLEMENTAL TRUST DEED**

in respect of

**[NEW ISSUER]**
**[SPECIFIED COMPANY]**
Series [•] [currency and amount]
[description of the Notes]
issued pursuant to the Multi-Issuer Secured Obligation Programme

**arranged by**
**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

Linklaters                                   Linklaters

One Silk Street
London EC2Y 8HQ

Telephone (44-20) 7456 2000
Facsimile (44-20) 7456 2222

A06466867/2.0                    106

PRK.500.009.0302

**This Supplemental Trust Deed** is made on [ISSUE DATE] between:

(1)    [SPECIFIED COMPANY] (the "Issuer");

(2)    [•] (the "Trustee", which expression shall, wherever the context so admits, include all persons for the time being the trustee or trustees of this Supplemental Trust Deed);

(3)    [•] as Issuing and Paying Agent and Custodian; [and]

(4)    [PAYING/TRANSFER AGENT] as Paying Agent and Transfer Agent[./;and]

(5)    [SWAP COUNTERPARTY] of [ADDRESS] (the "Swap Counterparty")[./;and]

(6)    [COUNTERPARTY] of [ADDRESS] (the "Counterparty")]

**Whereas:**

(A)    [The Issuer] and the Trustee are parties to a trust deed dated [•] (the "**Principal Trust Deed**") establishing a programme for the issuance from time to time of secured notes.

(B)    [Pursuant to sub-Clause 2.7 of the Principal Trust Deed, the] [The] Issuer has authorised and determined to issue Series [   ] [currency and amount] [description of the Notes] to be constituted and secured as set out below.]

(C)    The Issuing and Paying Agent[,/and] the Paying Agent [and the Swap Counterparty] have each resolved to enter into this Supplemental Trust Deed for the purposes set out below.

**Now this deed witnesses and it is hereby declared as follows:**

1    **Definitions**

1.1    **Principal Trust Deed:** Expressions defined in the Principal Trust Deed shall have the same meanings when used herein save to the extent supplemented or modified hereby.

1.2    **Additional Definitions:** The following expressions shall have the following meanings:

["**Credit Enhancement Agreement**" means the [guarantee] [specify other document] dated [ISSUE DATE] [between] [of] [the provider of the credit enhancement agreement] (the "**Credit Enhancement Provider**") [and the Issuer]]

["**Custodian Account**": means the account of the Custodian with [details] [(account number [   ] sub account [   ])];]

["**Custody Agreement**" means [complete if separate agreement to Agency Agreement];]

["**Final Terms**" means the Final Terms dated [ISSUE DATE] specifying the relevant issue details of the Notes, the form of which appears as the Schedule hereto]

"**Mortgaged Property**" means the Collateral, the Agency Agreement, the Custody Agreement, the Swap Agreement] and the other assets and/or agreements from time to time charged in the manner set out herein and in Clause 5 of the Principal Trust Deed;

PRK.500.009.0303

"**Notes**" means the Series [    ] [currency and amount] [description of the Notes] of the Issuer hereby constituted or the amount thereof for the time being outstanding and includes the Global Note to be issued in respect thereof;

"**Obligation**" means an obligation and duty of the Issuer under the Trust Deed, each Note and the Swap Agreement;

["**Securities**" means [Securities in Schedule [•] hereto]]

["**Securities Agreement**" means the agreement with an effective date of [ISSUE DATE] between the Issuer and the Counterparty under which the Issuer has agreed to [DETAILS] [;/ and]

["**Series Prospectus**" means the prospectus dated [ISSUE DATE] specifying the relevant issue details of the Notes, the form of which appears as the Schedule hereto]

["**Swap Agreement**"] means the ISDA Master Agreement with an effective date of [ISSUE DATE] between the Issuer and the Swap Counterparty under which the Issuer has agreed to [DETAILS] against payment by the Swap Counterparty of [DETAILS]]

## 2    Incorporation by Reference

Except as otherwise provided herein, the terms of the Principal Trust Deed shall apply to this Supplemental Trust Deed as if they were set out herein and the Principal Trust Deed shall be read and construed, in relation to the Notes, as one document with this Supplemental Trust Deed.

## 3    Amount and Status of Notes

3.1    **Amount:** The aggregate principal amount of the Notes is limited to [DETAILS].

3.2    **Status:** The Notes and Coupons constitute secured and limited recourse obligations of the Issuer, secured as provided below.

## 4    Form of the Notes

The Notes will be [Bearer]/[Registered] Notes represented by the Global [Note/Certificate issued in the principal amount of [DETAILS]. [The Global Note will be exchangeable for Definitive Notes in the circumstances set out therein.]

## 5    Security and Covenants

5.1    **Security:** The Issuer hereby creates security over the Mortgaged Property comprising the assets and agreements described in the Schedule hereto in accordance with the provisions of Clause 5 of the Principal Trust Deed [in addition to the [security interest] created under [other security document]].

5.2    **The Mortgaged Property:** Without prejudice to the generality of sub-Clause 5.1, the Issuer with full title guarantee and as continuing security for the benefit of the holders of Notes, Coupons [and the Swap Counterparty] hereby:

PRK.500.009.0304

5.2.1   charges and assigns by way of first fixed charge in favour of the Trustee, the Securities and all rights and sums and other property and assets derived therefrom and all rights against the Custodian in respect thereof;

5.2.2   assigns by way of security in favour of the Trustee all rights, title and interest under the [Swap Agreement,] [Securities Agreement,] and [Credit Enhancement Agreement] and any sums received thereunder;

5.2.3   charges by way of first fixed charge in favour of the Trustee (a) all sums held by the Agent and/or the Custodian and/or the Registrar to meet payments due in respect of the Notes and (b) any sums received under the [Swap Agreement,] [Securities Agreement,] and [Credit Enhancement Agreement]; and

5.2.4   assigns by way of security in favour of the Trustee all rights, title and interest under the Agency Agreement and all sums derived therefrom in respect of the Notes, including all rights against the Custodian under the Custody Agreement in respect of the Securities.

5.3   **Benefit of Security:** The security created pursuant to sub-Clauses 5.1 and 5.2 is granted to the Trustee as trustee for itself and/or the holders of Notes, Coupons and the Swap Counterparty as continuing security (i) for the payment of all sums due under the Trust Deed and the Notes and Coupons, (ii) for the performance of the Issuer's obligations (if any) under the Swap Agreement, (iii) for the payment of all claims of the Custodian (for reimbursement in respect of payments properly made to any party of sums receivable in respect of the Securities in discharge of an Obligation) and (iv) for the payment of all claims of the Issuing and Paying Agent (for reimbursement in respect of payments properly made to any person in discharge of an Obligation).

None of the Swap Counterparty, the Issuing and Paying Agent or the Custodian shall benefit from the security in respect of which it is itself the party that owes an obligation to the Issuer pursuant to the Securities or the Swap Agreement.

5.4   **Covenants:**

5.4.1   [The Swap Counterparty covenants with the Trustee in the terms of sub-Clause 7.2 of the Principal Trust Deed and agrees to comply with and be subject to all other applicable provisions of the Principal Trust Deed.]

5.4.2   [The Issuer covenants with the Trustee to promptly give notice to the Credit Enhancement Provider of the assignment by way of security of the Issuer's rights under the Credit Enhancement Agreement and to use its reasonable endeavours to procure that the Credit Enhancement Provider acknowledges such notice.]

5.5   **Securities:** The Issuer confirms that it has, or there has been on its behalf, delivered to the Custodian Account on or before the date hereof, the Securities.

5.6   **Covenant to pay:** The Trustee hereby agrees to hold the covenant set out in sub-Clause 2.3 of the Principal Trust Deed on trust for the holders of the Notes[, the Coupons] [and the Receipts].

5.7   **Notice and Acknowledgement:** The Trustee hereby gives notice and each of the Agents, [Counterparty] [and the Swap Counterparty] hereby acknowledges that it

PRK.500.009.0305

has notice of the assignment by way of security by the Issuer of all of its rights under the Agency Agreement, [Securities Agreement,] [Custody Agreement,] [and Swap Agreement] and consents to any further assignment by way of security by the Issuer of such rights to any successor Trustee under this Supplemental Trust Deed.

5.8     **Application of Moneys Received:** The Trustee shall apply all moneys received by it under this Supplemental Trust Deed in connection with the realisation or enforcement of the Mortgaged Property as follows: [DETAILS].

5.9     **Payments:** The Issuer and the Issuing and Paying Agent hereby agree in accordance with the provisions of sub-Clause 4.1 of the Agency Agreement that payments in respect of the Notes shall be made on a "prior-day" basis, and that the provisions of sub-Clause 4.1.2 of the Agency Agreement are amended so that the Issuer shall transfer the amounts required in respect of any particular payment at least • Business Day[s] prior to the date on which that payment in respect of the Notes becomes due.]

6     **[OTHER PROVISIONS - EG SUBORDINATION]**

7     **Communications**

Communications under this Supplemental Trust Deed shall be made in accordance with Clause 17 of the Principal Trust Deed.

The telephone number, fax number, address and person designated by the Issuer are set out below:

telephone: [ ]
telex:      [ ]
fax:        [ ]
address:    [ ]
attention:  [The Directors].

[The telephone number, fax number, address and person designated by the Swap Counterparty are set out below:

telephone:     [ ]
telex:    [ ]
fax:   [ ]
address: [ ]
attention:     [ ]]

The telephone number, fax number, address and person designated by the Trustee are set out below:

telephone:     [•]
telex:    [•]
fax:   [•]
           address:    [•]
attention:     [•]

The telephone number, fax number, address and person designated by the Custodian are set out below:

PRK.500.009.0306

telephone:   [•]
telex:       [•]
fax:         [•]
address:     [•]
attention:   [•]

**8      Contracts (Rights of Third Parties) Act 1999**

A person who is not a party to this Supplemental Trust Deed has no right, whether under the Contracts (Rights of Third Parties) Act 1999 or otherwise, to enforce any term of this Supplemental Trust Deed except that and to the extent (if any) that this Supplemental Trust Deed expressly provides for that Act to apply to any of its terms.

**9      Governing Law and Jurisdiction**

9.1     **Governing Law:** This Supplemental Trust Deed shall be governed by and construed in accordance with English Law.

9.2     **Jurisdiction:** The courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Supplemental Trust Deed, the Principal Trust Deed, the Notes, the Receipts, the Talons or the Coupons and accordingly any legal action or proceedings arising out of or in connection with this Supplemental Trust Deed, the Principal Trust Deed, the Notes, the Receipts, the Talons or the Coupons ("Proceedings") may be brought in such courts. [[The Issuer irrevocably submits to the jurisdiction of such courts and waives any objection on the ground that the Proceedings have been brought in an inconvenient forum.] [The Swap Counterparty irrevocably submits to the jurisdiction of such courts and waives any objections to Proceedings in such courts on the ground of venue or on the ground that the Proceedings have been brought in an inconvenient forum.] [This submission is] [These submissions are] for the benefit of each of the other party[ies] to this Supplemental Trust Deed and the holders of Notes, Coupons, Receipts and Talons and shall not limit the right of any of them to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not).]

9.3     **Service of Process:** [The Issuer irrevocably appoints [   ] of [   ] as its agent to receive, for it and on its behalf, service of process in any Proceedings in England [and the][.]] [The Swap Counterparty irrevocably appoints [   ] of [   ] as its agent to receive, for it and on its behalf, service of process in any Proceedings in England.] Such service shall be deemed completed on delivery to such process agent (whether or not it is forwarded to and received by the Issuer). If for any reason such process agent ceases to be able to act as such or no longer has an address in England the Swap Counterparty irrevocably agrees to appoint a substitute process agent acceptable to the Trustee, and to deliver to the Trustee a copy of the new agent's acceptance of that appointment, within 30 days. Nothing shall affect the right to serve process in any other manner permitted by law.]

PRK.500.009.0307

**Schedule**

**Form of Final Terms or Series Prospectus**

[RELEVANT FINAL TERMS OR SERIES PROSPECTUS TO BE INSERTED]

PRK.500.009.0308



**In witness** whereof this Supplemental Trust Deed has been executed as a deed as of the date stated at the beginning.

**[SPECIFIED COMPANY]**

By:


**[•]**

By:


**[PAYING/TRANSFER AGENT]**

By:


**[SWAP COUNTERPARTY]**

By:


**[COUNTERPARTY]**

By:

PRK.500.009.0309

### Schedule 5
### Memorandum of Supplemental Trust Deeds

| Date | Parties | Principal Amount of Series | Title of Series | Final Maturity Date |
|------|---------|---------------------------|-----------------|---------------------|
| | | | | |

PRK.500.009.0310

### Schedule 6
### Form of Deed of Accession

This Deed is made on [•] between:

(1)    [ISSUER] (the "Issuer");

(2)    J.P. MORGAN CORPORATE TRUSTEE SERVICES LIMITED (the "Trustee");

(3)    JPMORGAN CHASE BANK, N.A. (the "Issuing and Paying Agent");

(4)    J.P. MORGAN BANK (IRELAND) PLC (the "Paying Agent" and, together with the Issuing and Paying Agent, the "Agents");

(5)    LEHMAN BROTHERS SPECIAL FINANCING, INC. ("LBSF");

(6)    LEHMAN BROTHERS FINANCE S.A. ("LBF"); and

(7)    LEHMAN BROTHERS INTERNATIONAL (EUROPE) (in its capacity as calculation agent, the "Calculation Agent" and, in its capacity as dealer under the Programme, the "Dealer").

**Whereas:**

Dante Finance Public Limited Company ("Dante") and the Trustee are parties to a trust deed dated 10 October 2002 as amended and restated on 21 July 2006 (the "Principal Trust Deed") establishing the Multi-Issuer Secured Obligation Programme (the "Programme") for the issuance from time to time of secured notes to which the Issuer wishes to accede as set out below.

**Now this deed witnesses and it is hereby declared as follows:**

1      **Definitions**

"Agency Agreement" means the agency agreement dated 10 October 2002, between Dante, the Trustee and the Agents as amended and restated on 21 July 2006;

"LBF Swap" means an ISDA Master Agreement (including the Schedule thereto) between Dante and LBF dated 10 October 2002, as amended and restated on 21 July 2006; and

"LBSF Swap" means an ISDA Master Agreement (including the Schedule thereto) between Dante and LBSF dated 10 October 2002, as amended and restated on 21 July 2006

"Master Documents" means the Agency Agreement, the Programme Agreement and the Principal Trust Deed; and

"Programme Agreement" means the programme agreement dated 10 October 2002, between Dante and the Dealer as amended and restated on 21 July 2006.

2      **Accession**

2.1    With effect from the date of this Deed, the Issuer hereby agrees to become and be treated as an "Issuer" for all purposes set out in the Master Documents and agrees to assume all rights, obligations and liabilities of an "Issuer" as set out in the Master Documents and each of the other parties to this Deed (in each capacity in which it is a party to one or more of the Master Documents) agrees to the Issuer becoming and

PRK.500.009.0311

being treated as an "Issuer" for such purposes and assuming the rights, obligations and liabilities of an "Issuer" as set out in the Master Documents.

2.2    With effect from the date of this Accession Deed, the Issuer hereby agrees to become and be treated as "Party B" for all purposes of the LBF Swap and the LBSF Swap and agrees to assume all rights, obligations and liabilities of "Party B" as set out in the LBF Swap and the LBSF Swap and LBF and LBSF (in the capacity in which it is a party to the LBF Swap and the LBSF Swap respectively) agrees to the Issuer becoming and being treated as "Party B" for such purposes and assuming the rights, obligations and liabilities of "Party B" as set out in the LBF Swap and the LBSF Swap.

## 3    Counterparts

This Deed of Accession may be executed in counterparts which when taken together shall constitute one and the same instrument.

## 4    Contracts (Rights of Third Parties) Act 1999

A person who is not a party to this Deed of Accession has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Deed of Accession.

## 5    Governing Law

This Deed of Accession shall be governed by and construed in accordance with English law.

PRK.500.009.0312

In witness whereof this Deed has been executed as a deed as of the date stated at the beginning.

**[ISSUER]**

By:

By:

**J.P. MORGAN CORPORATE TRUSTEE SERVICES LIMITED**

By:

**JPMORGAN CHASE BANK, N.A.**

By:

SIGNED, SEALED AND DELIVERED

for and on behalf of **J.P. MORGAN BANK (IRELAND) PLC** by its lawfully appointed attorney

in the presence of:-

**LEHMAN BROTHERS SPECIAL FINANCING, INC.**

By:

**LEHMAN BROTHERS FINANCE S.A.**

By:

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By:

PRK.500.009.0313

PRK.500.009.0314

## Schedule 7
## Definitions

"**Agency Agreement**" means the agency agreement relating to the Programme dated 10 October 2002 as amended and restated on 21 July 2006 between the Issuer, the Trustee, JPMorgan Chase Bank, N.A. as initial Issuing and Paying Agent and the Paying Agent mentioned in it

"**Agents**" means the Issuing and Paying Agent, the other Paying Agents, the Calculation Agent, the Registrar, the other Transfer Agents and the Custodian or any of them.

"**Arranger**" means Lehman Brothers International (Europe) and shall include any additional or replacement arranger appointed, and exclude any Arranger whose appointment has terminated, pursuant to Clause 14 of the Programme Agreement.

"**Base Prospectus**" means, the base prospectus relating to the Company and the Programme as from time to time amended, supplemented or replaced and which shall include those documents incorporated in it by reference (but shall not include any information or documents replaced or superceded by any information subsequently included or incorporated).

"**Bearer Note**" means a Note that is in bearer form, and includes any replacement Bearer Note issued pursuant to the Conditions and any Global Note.

"**Calculation Agent**" means any person named as such in the Conditions or any Successor Calculation Agent.

"**Certificate**" means a registered certificate representing one or more Registered Notes of the same Series and, save as provided in the Conditions, comprising the entire holding by a Noteholder of his Registered Notes of that Series and, save in the case of Global Certificates, being substantially in the form set out in Schedule 2 of the Principal Trust Deed.

"**Common Depositary**" means, in relation to a Series, a depositary common to Euroclear and Clearstream, Luxembourg.

"**Conditions**" means in respect of the Notes of each Series the terms and conditions applicable thereto which shall be substantially in the form set out in Schedule 2 to the Principal Trust Deed as modified, with respect to any Notes represented by a Global Certificate or a Global Note, by the provisions of such Global Certificate or Global Note, shall incorporate any additional provisions forming part of such terms and conditions set out in the Final Terms or Series Prospectus(es) relating to the Notes of that Series and shall be endorsed on the Definitive Notes subject to amendment and completion as referred to in the first paragraph of Schedule 2 Part C of the Principal Trust Deed and any reference to a particularly numbered Condition shall be construed accordingly.

"**Contracts**" means the Programme Agreement, the Agency Agreement and the Trust Deed in relation to any Syndicated Issue, the related Subscription Agreement and any further agreements entered into in relation to a Series.

"**Contractual Currency**" means, in relation to any payment obligation arising under any Note, the currency in which that payment obligation is expressed and, in relation to Clause 8 of the Principal Trust Deed, United States dollars or such other currency as may be agreed between the Issuer and the Trustee from time to time.

"**Counterparty**" means the counterparty to any Securities Agreement as specified in the Supplemental Trust Deed.

PRK.500.009.0315

"Coupons" means the bearer coupons relating to interest bearing Bearer Notes or, as the context may require, a specific number of them and includes any replacement coupons issued pursuant to the Conditions and, where the context may require, any Talons.

"Credit Enhancement Agreement" means the agreement or undertaking described as such in the Supplemental Trust Deed.

"Credit Enhancement Provider" means the person specified to be such in the relevant Supplemental Trust Deed.

"Dealer" means Lehman Brothers International (Europe) and includes each other person who has been, or, for the purposes of Clause 2 of the Programme Agreement, who is subsequently, appointed as a Dealer pursuant to Clause 14 of the Programme Agreement (but excludes each person who has ceased to be a Dealer pursuant to Clause 14 of the Programme Agreement or whose appointment has lapsed pursuant to its terms).

"Deed of Accession" means a deed of accession substantially in the form set out in Schedule 6 of the Principal Trust Deed between a Specified Company, the Trustee, the Issuing and Paying Agent, the Transfer Agent, the Custodian and the Calculation Agent pursuant to which the relevant Specified Company agrees to become bound by each of the Master Documents as an "Issuer" therein in respect of any Series issued by it.

"Definitive Note" means a Bearer Note in definitive form having, where appropriate, Coupons, Receipt(s) and/or a Talon attached on issue and, unless the context requires otherwise, means a Certificate (other than a Global Certificate) and includes any replacement Note or Certificate issued pursuant to the Conditions.

"directive" includes any present or future directive, regulation, request, requirement, rule or credit restraint programme of any relevant agency, authority, central bank, department, government, legislature, minister, ministry, official, public or statutory corporation, self-regulating organisation or stock exchange.

"Disposal Agent" means in relation to any Series, any person named as such in the Conditions or the relevant Supplemental Trust Deed.

"Enforcement Proceedings" means, in relation to action taken against any person, any distress, attachment, execution or other legal process levied, enforced or sued out on or against any part of the property, assets or revenues of that person, any action or petition for the winding up of that person, for an administration order in respect of that person or for the appointment by a court of any official or officer over or in respect of any part of the property, assets or revenues of that person or any other action that under the laws of any relevant jurisdiction has an analogous effect to any of the actions referred to above.

"Euroclear" means Euroclear Bank S.A./N.V., as operator of the Euroclear System.

"Event of Default" means an event described in Condition 10.

"Exchange Notice" means the notice in the form or substantially in the form set out in Schedule 1 Part B of the Agency Agreement or such other form of notice referred to in or annexed to the relevant Supplemental Trust Deed.

"Exchangeable Bearer Note" means a Bearer Note that is exchangeable in accordance with its terms for a Registered Note.

PRK.500.009.0316

"**Exercise Notice**" means the notice in or substantially in the form set out in Schedule 1 Part A of the Agency Agreement or such other form of notice referred to in or annexed to the relevant Supplemental Trust Deed.

"**Extraordinary Resolution**" in relation to the Noteholders, has the meaning set out in Schedule 3 of the Principal Trust Deed.

"**Final Terms**" means, in relation to a Series Tranche, the Final Terms issued specifying the relevant issue details of such Tranche, substantially in the form set out in the Base Prospectus and which in the case of Notes to be listed and admitted to trading on a regulated market constitute final terms of the Notes for the purpose of Article 5(4) of the Prospectus Directive.

"**Fitch**" means Fitch Ratings Ltd.

"**Global Certificate**" means a Certificate substantially in the form set out in Schedule 1 Part C of the Principal Trust Deed representing Registered Notes of one or more Tranches of the same Series that are registered in the name of a nominee for Euroclear, Clearstream, Luxembourg and/or any other clearing system

"**Global Note**" means a Temporary Global Note and/or a Permanent Global Note as the context may require

"**holder**" in relation to a Note, Receipt, Coupon or Talon, and "**Couponholder**" and "**Noteholder**" have the meanings given to them in the Conditions

"**Irish Stock Exchange**" means The Irish Stock Exchange Limited

"**Issue Date**" means, in relation to each Tranche, the date on which the Notes of that Tranche have been issued or, if not yet issued, the date agreed for their issue between the Issuer and the Relevant Dealer(s)

"**Issuer**" means Dante Finance Public Limited Company and any other Specified Company as the context requires as set out in sub-Clause 2.7

"**Issuing and Paying Agent**" means the person named as such in the Conditions or any Successor Issuing and Paying Agent in each case at its specified office

"**Lead Manager**" means, in relation to a Syndicated Issue, the Relevant Dealer specified as such in the related Subscription Agreement

"**Listing Agent**" means A&L Listing Limited (or its replacement Irish Stock Exchange listing agent) and any other listing agent appointed in relation to any listing of Notes on any other Stock Exchange

"**Master Documents**" means the Programme Agreement, the Principal Trust Deed, and the Agency Agreement

"**Moody's**" means Moody's Investors Service Limited

"**Mortgaged Property**" means the assets and agreements comprising the mortgaged property on which the Notes of a Series are secured, all as specified in the relevant Supplemental Trust Deed and Final Terms or Series Prospectus

"**Notes**" means the notes to be issued by the Issuer pursuant to the Programme Agreement, constituted by the Trust Deed and for the time being outstanding or, as the context may require, a specific number of them

PRK.500.009.0317

"**outstanding**" means, in relation to the Notes of a Series, all the Notes issued except (a) those that have been redeemed in accordance with the Conditions, (b) those in respect of which the date for redemption has occurred and the redemption moneys (including all interest accrued on such Notes to the date for such redemption and any interest payable after such date) have been duly paid to the Trustee or to the Issuing and Paying Agent as provided in Clause 2 of the Principal Trust Deed and remain available for payment against presentation and surrender of Notes, Certificates, Receipts and/or Coupons, as the case may be, (c) those that have become void or in respect of which claims have become prescribed, (d) those that have been purchased and cancelled as provided in the Conditions, (e) those mutilated or defaced Bearer Notes that have been surrendered in exchange for replacement Bearer Notes, (f) (for the purpose only of determining how many Notes are outstanding and without prejudice to their status for any other purpose) those Bearer Notes alleged to have been lost, stolen or destroyed and in respect of which replacement Notes have been issued, (g) those Exchangeable Bearer Notes that have been exchanged for Registered Notes, and (h) any Global Note to the extent that it shall have been exchanged for one or more Definitive Notes, pursuant to its provisions; provided that for the purposes of (1) ascertaining the right to attend and vote at any meeting of the Noteholders, (2) the determination of how many Notes are outstanding for the purposes of the Conditions and Schedule 3 of the Principal Trust Deed and (3) the exercise of any discretion, power or authority that the Trustee is required, expressly or impliedly, to exercise in or by reference to the interests of the Noteholders, those Notes that are beneficially held by or on behalf of the Issuer and not cancelled shall (unless no longer so held) be deemed not to remain outstanding

"**Paying Agents**" means the persons (including the Issuing and Paying Agent) referred to as such in the Conditions or any Successor Paying Agents in each case at their respective specified offices

"**Permanent Dealers**" means all Dealers other than those appointed as such solely in respect of one or more specified Tranches

"**Permanent Global Note**" means a Global Note representing Bearer Notes of one or more Tranches of the same Series, either on issue or upon exchange of a Temporary Global Note, or part of it, and which shall be substantially in the form set out in Schedule 1, Part B

"**Potential Event of Default**" means an event or circumstance that could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 10 become an Event of Default

"**Principal Trust Deed**" means this principal trust deed dated 10 October 2002 as amended and restated on 21 July 2006 between the Issuer and the Trustee

"**Programme**" means the Multi Issuer Secured Obligation Programme arranged by Lehman Brothers International (Europe)

"**Programme Agreement**" means the Programme Agreement relating to the Programme dated 10 October 2002 as amended and restated on 21 July 2006 between the Issuer and Lehman Brothers International (Europe)

"**Prospectus**" means, in the case of each Specified Company, the relevant Base Prospectus and in relation to any Tranche, the Final Terms together with the relevant Base Prospectus or, in relation to a Tranche in respect of which a Series Prospectus has been prepared, the Series Prospectus, in each case including all supplements thereto or replacements therefor and such documents as are from time to time incorporated therein by reference (but not including any information or documents replaced or superceded by any information subsequently included or incorporated)

PRK.500.009.0318

"Prospectus Directive" means Directive 2003/71/EC

"Purchase Information" means, in relation to any Tranche that is not a Syndicated Issue, the terms of such Notes and of their issue agreed between the Issuer and the Relevant Dealer pursuant to this Agreement

"Receipts" means the receipts for the payment of instalments of principal in respect of Bearer Notes of which the principal is repayable in instalments or, as the context may require, a specific number of them and includes any replacement Receipts issued pursuant to the Conditions

"Redemption Amount" has the meaning given to it in the Conditions

"Register" means the register maintained by the Registrar

"Registered Note" means a Note in registered form

"Registrar" means the person named as such in the Conditions or any Successor Registrar in each case at its specified office

"Related Agreement" means any agreement entered into by the Issuer relating to a Series which is referred to in, or contemplated by, this Trust Deed or any Supplemental Trust Deed

"Relevant Dealer(s)" means, in relation to any Tranche, the Dealer or Dealers with or through whom an agreement to issue Notes has been concluded, or is being negotiated, by the relevant Issuer

"Securities" means one or more transferable securities issued by or representing obligations of one or more persons as specified in the Supplemental Trust Deed

"Securities Act" means the United States Securities Act of 1933

"Securities Agreement" has the meaning specified in the Supplemental Trust Deed

"Series" means a series of Notes comprising one or more Tranches, whether or not issued on the same date, that (except in respect of the first payment of interest and their issue price) have identical terms on issue and are expressed to have the same series number

"Series Prospectus" means any prospectus relating to a Specified Company and a Tranche (including, without limitation to the generality of the foregoing, a prospectus which incorporates by reference all or part of the relevant Base Prospectus) but excluding a prospectus consisting of the relevant Base Prospectus and Final Terms

"Specified Company" means Dante Finance Public Limited Company and such other company as has executed and delivered a Deed of Accession agreeing to be bound by each of the Master Documents and any other document executed in accordance with a Master Document;

"specified office" means, in relation to a Paying Agent, the Registrar or a Transfer Agent the office identified with its name at the end of the Conditions or any other office approved by the Trustee and notified to Noteholders pursuant to sub-Clause 7.1.10 of the Principal Trust Deed

"Standard & Poor's" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc.

"Stock Exchanges" means the Irish Stock Exchange and/or, subject as provided in sub-Clause 6.1 of the Programme Agreement, such other stock exchange on which any Notes may be listed or whose market on which the Notes may be admitted to trading

---

PRK.500.009.0319

"**Subscription Agreement**" means an agreement between two or more Relevant Dealers and the Issuer made pursuant to sub-Clause 2.2 of the Programme Agreement

"**Successor**" means, in relation to an Agent such other or further person as may from time to time be appointed by the Issuer as such Agent with the written approval of, and on terms approved in writing by, the Trustee and notice of whose appointment is given to Noteholders pursuant to Clause 7.1.6 of the Principal Trust Deed

"**Supplemental Trust Deed**" means a supplemental trust deed dated the Issue Date between the Issuer, the Trustee and (if applicable) the Swap Counterparty substantially in the form set out in Schedule 4 of the Principal Trust Deed

"**Swap Agreement**" means, in relation to any Series, any interest rate and/or currency exchange agreement entered into by the Issuer and a Swap Counterparty in relation to that Series

"**Swap Counterparty**" means the counterparty to any Swap Agreement entered into by the Issuer in relation to that Series as specified in the related Supplemental Trust Deed

"**Syndicated Issue**" means an issue of Notes pursuant to sub-Clause 2.2 of the Programme Agreement

"**Talons**" mean talons for further Coupons or, as the context may require, a specific number of them and includes any replacement Talons issued pursuant to the Conditions

"**TARGET System**" means the Trans-European Automated Real-Time Gross Settlement Express Transfer (TARGET) System or any successor thereto

"**Temporary Global Note**" means a Global Note representing Bearer Notes of one or more Tranches of the same Series on issue and which shall be substantially in the form set out in Schedule 1, Part A

"**Trade Date**" means each date on which the Issuer concludes an agreement with one or more Relevant Dealers for the issue and sale of Notes pursuant to Clause 2 of the Programme Agreement which, in the case of a Syndicated Issue, shall be the execution date of the relevant Subscription Agreement

"**Trade Time**" means the time on the Trade Date at which the agreement for the issue and sale of Notes is entered into

"**Tranche**" means in relation to a Series, those Notes of that Series which are issued on the same date

"**Transaction**" means any financial transaction entered into by the Issuer, not involving the issue of Notes and not involving the guarantee by it, or its becoming obligated for, the debts of any other person or entity, but including, without limitation, the incurring by the Issuer of indebtedness in forms other than the Notes, and swaps and options, where the obligations of the Issuer in respect thereof are limited to the proceeds of enforcement of the security over the assets of the Issuer on which such obligations are secured pursuant to a Supplemental Trust Deed

"**Transfer Agents**" means the persons (including the Registrar) referred to as such in the Conditions or any Successor Transfer Agents in each case at their specified offices

"**trust corporation**" means a trust corporation (as defined in the Law of Property Act 1925) or a corporation entitled to act as a trustee pursuant to applicable foreign legislation relating to trustees

"**Trust Deed**" means, in relation to a Tranche of Notes, this Principal Trust Deed and the relevant Supplemental Trust Deed constituting the Notes and any Other Security Document

---

A06466867/2.0                                    124

PRK.500.009.0320

"**Trustee**" means J.P. Morgan Corporate Trustee Services Limited or any replacement appointed as trustee under the Trust Deed in relation to one or more Series

"**Warranty Date**" means each Trade Date, each Issue Date, each date of any Base Prospectus or Prospectus or on which any Base Prospectus or Prospectus or any of the Contracts is amended, supplemented or replaced.

PRK.500.009.0321

**In witness** whereof this Trust Deed has been executed as a deed on the date stated at the beginning.

**SIGNED, SEALED AND DELIVERED for and on behalf of DANTE FINANCE PUBLIC LIMITED COMPANY** by its lawfully appointed attorney

in the presence of

Witness Signature:

Address:

Occupation:

**J.P. MORGAN CORPORATE TRUSTEE SERVICES LIMITED (as Trustee)**

By:

Authorised Signatory

Authorised Signatory

PRK.500.009.0322

## TABLE OF CONTENTS

1    Interpretation ......................................................................................................... 1

2    Issue of Notes and Covenant to Pay .......................................................................... 2

3    Form of the Notes ..................................................................................................... 5

4    Stamp Duties and Taxes ........................................................................................... 5

5    Security ..................................................................................................................... 6

6    Application of Moneys received by the Trustee and Payments ............................... 9

7    Covenants ................................................................................................................. 12

8    Remuneration and Indemnification of the Trustee ................................................ 17

9    Provisions Supplemental to the Trustee Act 1925 and the Trustee Act 2000 ............... 18

10   Trustee liable for Negligence ................................................................................... 21

11   Waiver, Consents and Proof of Default .................................................................... 22

12   Trustee not precluded from entering into Contracts ............................................... 22

13   Modification and Substitution .................................................................................. 22

14   Appointment, Retirement and Removal of the Trustee ........................................... 25

15   Notes held in Clearing Systems and Couponholders ............................................... 26

16   Currency Indemnity .................................................................................................. 26

17   Communications ....................................................................................................... 27

18   Enforcement and Non-recourse ............................................................................... 28

19   Contracts (Rights of Third Parties) Act 1999 ........................................................... 28

20   Governing Law and Jurisdiction ............................................................................... 28

21   Counterparts ............................................................................................................ 29

Schedule 1 Part A Form of Temporary Global Note ........................................................ 30

Schedule 1 Part B Form of Permanent Global Note ........................................................ 37

PRK.500.009.0323

Schedule 1 Part C Form of Global Certificate ........................................................................ 46

Schedule 2 Part A Form of Bearer Note ............................................................................... 52

Schedule 2 Part B Form of Certificate .................................................................................. 55

Schedule 2 Part C TERMS AND CONDITIONS OF THE NOTES .......................................... 59

Schedule 2 Part D Form of Coupon ...................................................................................... 95

Schedule 2 Part E Form of Talon ......................................................................................... 97

Schedule 2 Part F Form of Receipt ...................................................................................... 99

Schedule 3  Provisions for Meetings of Noteholders ........................................................... 100

Schedule 4  Form of Supplemental Trust Deed .................................................................... 107

Schedule 5 Memorandum of Supplemental Trust Deeds ....................................................... 116

Schedule 6 Form of Deed of Accession ............................................................................... 117

Schedule 7 Definitions ....................................................................................................... 121