# **EXHIBIT H**

- 1 -

```
 1
 2   UNITED STATES BANKRUPTCY COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4   Case Nos. 08-13555, 08-01420
 5   - - - - - - - - - - - - - - - - - - -x
 6   In the Matter of:
 7   LEHMAN BROTHERS HOLDINGS INC., ET AL.,
 8                   Debtors.
 9   - - - - - - - - - - - - - - - - - - -x
10   In the Matter of:
11   LEHMAN BROTHERS INC.,
12                   Debtor.
13   - - - - - - - - - - - - - - - - - - -x
14
15              U.S. Bankruptcy Court
16              One Bowling Green
17              New York, New York
18
19              June 3, 2009
20              10:04 a.m.
21
22   B E F O R E:
23   HON. JAMES M. PECK
24   U.S. BANKRUPTCY JUDGE
25
```

018

Page 103

1  in the spirit of full disclosure to the Court, I should tell
2  you that this particular transaction, which involves about
3  seventy million U.S. dollars, ninety million Australian
4  dollars, is one of about 360 similar transactions known as the
5  Dante program in Asia, Europe and Australia.
6         THE COURT: So how much is involved all together?
7         MR. MILLER: About two billion dollars, I understand
8  Your Honor, is the amount involved in those 360 transactions.
9  This issue is particularly important here, Your Honor, because
10 these documents are governed by English law. There's basically
11 two boxes on the standard ISDA forms, the 1992 and 2002 and
12 earlier agreements. You can either select the law of the
13 United States and submit to jurisdiction in the State of New
14 York or you can submit the law of England and Wales and submit
15 to jurisdiction in London.
16        It has been typical that most American based
17 transactions in North America submit to New York jurisdiction
18 and U.S. law and the rest of the world has tended to select
19 English and Wales law and London for their location.
20        We do not, in this particular proceeding, question the
21 termination itself nor do we question the issue of whether
22 English law would authorize the enforcement of these documents,
23 which are quite different structurally from typical U.S.
24 documents in other ways, reflecting the difference in law.
25        For example, the indenture and other documents are

```
IN THE HIGH COURT OF JUSTICE   Claim No HC09C01612
CHANCERY DIVISION Court 54     Claim No HC09C01931
Royal Courts of Justice
Strand
London WC2
```

Wednesday 8th July 2009

Before:

THE CHANCELLOR
LORD JUSTICE MORRITT

B E T W E E N:
PERPETUAL TRUSTEE COMPANY LIMITED                           Claimant
AND:
(1) BNY CORPORATE TRUSTEE SERVICES LIMITED
(2) LEHMAN BROTHERS SPECIAL FINANCING INC                  Defendants

B E T W E E N:
BELMONT PARK INVESTMENTS PTY LTD & OTHERS                   Claimant
AND:
(1) BNY CORPORATE TRUSTEE SERVICES LIMITED
(2) LEHMAN BROTHERS SPECIAL FINANCING INC.                 Defendants
------

MR GABRIEL MOSS QC and MR DAVID ALLISON (Instructed by Sidley Austin LLP,
Woolgate Exchange, 25 Basinghall Street, London EC2V 5HA) appeared on behalf of
Claimant, Perpetual Trustee Company Limited.

MR RICHARD SALTER QC and MR JONATHAN DAVIES-JONES (Instructed by Lawrence
Graham LLP, 4 More London Riverside, London SE1 2AU) appeared on behalf of the C
Belmont Park Investments Pty Limited.

MR MARK HOWARD QC and MR STEPHEN MIDWINTER (Instructed by Lovells LLP,
Atlantic House, Holborn Viaduct, London EC1A 2FG) appeared on behalf of the Defe
Corporate Trustee Services Limited.

MR RICHARD SNOWDEN QC and MR JAMES POTTS (Instructed by Weil Gotshal & Manges
LLP, One South Place, London EC2M 2WG) appeared on behalf of the Defendant Lehm
Brothers Special Financing Inc..
------

Daily transcript by:
John Larking Verbatim Reporters
91 Temple Chambers, 3- 7 Temple Avenue, London EC4
Tel: 0207 404 7464    Fax:  0207 404 7443

PROCEEDINGS
DAY TWO

Perpetual Trustee v BNY/Lehman - Belmont v BNY/Lehman - 8 July 2009

SHEET 2   PAGE 2

1 Wednesday 8th July 2009
2 (10.00 am)
3 MR SNOWDEN: My Lord, some short and I hope
4 quick housekeeping. You should have in front of you I
5 hope on your bench a copy of the Insolvency Act 2000
6 which I would suggest goes into our authorities bundle
7 at tab 24. There is also an official report of the Hong
8 Kong case which includes the headnote which I will not
9 be going to immediately for reasons that will become
10 apparent in a minute, but if your Lordship wants to put
11 that in behind or in place of what is in tab 22.
12 THE CHANCELLOR: 22.
13 MR SNOWDEN: Yes. That is probably more, as your
14 Lordship observed, helpful to have one with the
15 headnote.
16 THE CHANCELLOR: I will give you that one back.
17 MR SNOWDEN: There are some figures which were
18 discussed yesterday, and if I can simply hand up two
19 pieces of paper. The first of the list is our estimate of
20 who is in the money or out of the money in relation to
21 the Belmont series of swaps, i.e. the swaps in which
22 Belmont is interested. The number at the bottom is
23 around about the figure I gave you of US$140 million.
24 THE CHANCELLOR: That is due to the swap
25 counterparties.

PAGE 3

1 MR SNOWDEN: That is due to LBSF. These are
2 approximate only and it is just to give your Lordship an
3 order of magnitude. There is also a sheet of paper
4 which gives details of a point which I made en passant
5 yesterday and which is taken up I think in a
6 supplemental statement we have had overnight from Mr
7 Salter's clients I think, which simply makes good the
8 point that in relation to some of the notes the collateral
9 was purchased using contributions from both LBSF and
10 the note holders. That is not the case in relation to all
11 but it is the case in relation to some. I think the
12 numbers do match or do tally with Mr Salter's evidence
13 but it is a point of detail.
14 THE CHANCELLOR: You mentioned a further
15 witness statement which I have not seen.
16 MR SNOWDEN: No, I only saw it this morning and I
17 have not really done anything other than glance at it but
18 I think it is Mr Salter's document and I think it is not
19 relevant for any of the points of principle. It is a
20 detailed point.
21 THE CHANCELLOR: Yes.
22 MR SNOWDEN: Can I give your Lordship some
23 references to where the various payment provisions are
24 to be found in the swap agreement, as I understand it. I
25 am still going to give your Lordship I hope a piece of

PAGE 4

1 paper which actually explains what are some dreadfully
2 complicated clauses but can I just give you the
3 references now so that I have done it. In bundle E2, and
4 I am not going to ask your Lordship at the moment to
5 turn them up because I think it would be wasteful of
6 time, the payment obligations we think are set out in
7 paragraphs 3 and 4 of the swap at tab 12 pages 635 to
8 641. We will give your Lordship a piece of paper, we
9 hope, which actually tries to make sense of those four in
10 due course when it has been verified by those who are
11 familiar with it.
12 Can I also remedy one omission on my part and show
13 your Lordship the two letters which defaulted the
14 swaps. I did not do that when I was going through the
15 documents and I should have done. It is in the
16 Perpetual bundle, C1, at page 174. It is a letter, form of
17 early termination notice served on 1st December 2008
18 and you will see that it constitutes formal written notice
19 of the existence of an event of default under the ISDA
20 master and it relies upon the filing by LBSF for chapter
21 11 on 3rd October 2008. That is the second substantive
22 paragraph. In relation to Belmont, a similar document
23 in the Belmont bundles at C2 tab 10 page 538 in the
24 small numbers in the bottom right hand corner. You
25 will see that there is a termination of the swap and you

PAGE 5

1 will see that again reference is made to the bankruptcy
2 filing. Actually, I think that is the request of the
3 trustees to terminate but it includes a notice to
4 terminate. It includes a draft of the termination notice
5 and the termination notice is at tab 12 in the form that
6 was requested in the letter I have just shown you.
7 THE CHANCELLOR: Does it have a date?
8 MR SNOWDEN: There is a fax transmission date. I
9 seems to be in April.
10 MR SALTER: The effective date is stated in the ante-
11 penultimate paragraph, 17th April.
12 MR SNOWDEN: I think what seems to have occurred
13 is that it was served purely by fax on 15th 16th April
14 but with the effective date this year, 17th April this
15 year, 2009, and again your Lordship sees in the
16 paragraph in the middle of the page the event referred to
17 as the event of default is the filing by LBSF of the
18 chapter 11 proceedings on 3rd October.
19 My Lord, en passant I will mention that yesterday I
20 mentioned by analogy the EU regulation and the
21 position that would, we say, occur under regulation 4.2.
22 I think Mr Moss popped up and drew your Lordship's
23 attention to a number of other clauses in clause 4.2.
24 Can I just say that there would clearly be a dispute
25 between Mr Moss and myself were this case taking

John Larking Verbatim Reporters

Perpetual Trustee v BNY/Lehman - Belmont v BNY/Lehman - 9 July 2009

SHEET 1   PAGE 1

```
IN THE HIGH COURT OF JUSTICE    Claim No HC09C01612
CHANCERY DIVISION Court 54      Claim No HC09C01931
Royal Courts of Justice
Strand
London WC2

Thursday 9th July 2009

Before:

THE CHANCELLOR
LORD JUSTICE MORRITT

B E T W E E N:
PERPETUAL TRUSTEE COMPANY LIMITED              Claimant
AND:
(1) BNY CORPORATE TRUSTEE SERVICES LIMITED
(2) LEHMAN BROTHERS SPECIAL FINANCING INC     Defendants

B E T W E E N:
BELMONT PARK INVESTMENTS PTY LTD & OTHERS      Claimant
AND:
(1) BNY CORPORATE TRUSTEE SERVICES LIMITED
(2) LEHMAN BROTHERS SPECIAL FINANCING INC.    Defendants
    ------
```

MR GABRIEL MOSS QC and MR DAVID ALLISON (Instructed by Sidley Austin LLP, Woolgate Exchange, 25 Basinghall Street, London EC2V 5HA) appeared on behalf of the Claimant, Perpetual Trustee Company Limited.

MR RICHARD SALTER QC and MR JONATHAN DAVIES-JONES (Instructed by Lawrence Graham LLP, 4 More London Riverside, London SE1 2AU) appeared on behalf of the Claimant Belmont Park Investments Pty Limited.

MR MARK HOWARD QC and MR STEPHEN MIDWINTER (Instructed by Lovells LLP, Atlantic House, Holborn Viaduct, London EC1A 2FG) appeared on behalf of the Defendant BNY Corporate Trustee Services Limited.

MR RICHARD SNOWDEN QC and MR JAMES POTTS (Instructed by Weil Gotshal & Manges LLP, One South Place, London EC2M 2WG) appeared on behalf of the Defendant Lehman Brothers Special Financing Inc..
    ------
Daily transcript by:
John Larking Verbatim Reporters
91 Temple Chambers, 3- 7 Temple Avenue, London EC4
Tel: 0207 404 7464    Fax:  0207 404 7443

PROCEEDINGS
DAY THREE

John Larking Verbatim Reporters

Perpetual Trustee v BNY/Lehman - Belmont v BNY/Lehman - 9 July 2009

SHEET 40   PAGE 154

1 effect to a judgment that the clauses are
2 unenforceable as a matter of public policy and
3 that is all we ask your Lordship to do in this
4 case. You can simply strike through the
5 offending flip clauses. Ansett was quite a
6 different case because the point that was being
7 made there is if you strike through the
8 clearing house arrangement that had been
9 carefully constructed so that there were no
10 debts between the airlines inter se and they
11 all just owed their debts to the central
12 clearing house, if you struck it down you would
13 actually have to (to make any sort of
14 commercial sense of it) actually erect new
15 contractual relations between the airlines, and
16 that is what the judge thought was beyond the
17 scope of the anti-deprivation principle. But
18 we are not into that position here.
19 So far as identification of what the property
20 of LBSF was, my Lord, it is quite clear, as
21 your Lordship in fact pointed out in argument
22 to Mr Moss, that from the start LBSF has had a
23 security interest in the collateral. Your
24 Lordship referred, and I do not think I need
25 take you to it at the moment, to clause 5.2 of

PAGE 155

1 the principal trust deed and clause 5.3 again.
2 That created, as your Lordship indicated,
3 obviously a continuing security from the off.
4 THE CHANCELLOR: But the nature of the priority
5 of that interest depended upon a future event?
6 MR SNOWDEN: My Lord, as we will see, the
7 priority depended, what happened is that the
8 event, the insolvency, altered -
9 THE CHANCELLOR: The event is the event of
10 default.
11 MR SNOWDEN: My Lord, the event that was an
12 essential part - I will come on to Mr Salter's
13 point in a little while, but the essential
14 trigger for the operation of the flip clause as
15 to the entitlement to proceeds of enforcement
16 was the termination of the swap, which was tied
17 inestimably or it was tied directly to the
18 bankruptcy, because you cannot enforce until
19 the swap is terminated. This is the critical
20 point. The rights we are talking about are the
21 rights to enforcement of the security over the
22 collateral and you cannot enforce over the
23 collateral until you have terminated the swap.
24 My Lord, in fact that is exactly of course what
25 has happened. I mean, there are other events,

PAGE 156

1 of course, that could have given rise to it but
2 that is a separate point and Mr Justice
3 Neuberger (as he then was) dealt with that in
4 Money Markets. The fact that there are other
5 potential events does not mean that the
6 principle does not apply; it does, and I will
7 come back to that in a moment. But the
8 critical thing that has happened in this case
9 is that the swap was terminated as a result of
10 the bankruptcy of LBSF. You have seen the
11 termination notices. That made the security
12 enforceable. It was not enforceable before
13 that. On enforcement our priorities, our
14 interests, have been rendered less valuable by
15 being put behind the noteholders. In the same
16 way as in ex parte Mackay, the operation of the
17 proviso attached a springing security to the
18 right to receive the royalties and that was
19 struck down; the operation of the flip clauses
20 here in effect just attaches, if you like, a
21 springing priority or effectively it just
22 elevates another security interest above our
23 security interest and therefore renders our
24 security interest less valuable. It is a
25 precise analogy with ex parte Mackay on the

PAGE 157

1 sort of springing security point. In the same
2 way as it certainly could not be said, for
3 example, that on the bankruptcy of LBSF another
4 person would suddenly get a right in priority
5 to LBSF, that is what happened in ex parte
6 Mackay, in priority to A's trustee in
7 bankruptcy receiving the royalty stream,
8 somebody else was ostensibly inserted to get
9 that benefit by way of a springing security.
10 In essence it really is no different; the
11 principle is precisely the same. Because we
12 have a security the entire time, the principle
13 is engaged, and all the attempts that my
14 learned friends both attempted as it were to
15 redraft, as they might have wished it to be,
16 the clauses like clause 5.5 and indeed
17 condition 44, to try and characterise them as
18 being determinable interests, with respect, my
19 Lord, that simply ignores the wording of the
20 clause and the way that they operate. They are
21 all drafted in terms of condition subsequent.
22 It is swap counter priority unless something
23 happens.
24 My Lord, if I can make a number of slightly
25 peripheral points that Mr Salter made, he first

John Larking Verbatim Reporters