## EXHIBIT J

**1 Ch.**                **CHANCERY DIVISION.**                735

summonses.   Upon reading the one affidavit and the two summonses, the Master would have made an order to consolidate, and have saved a double set of costs.   There ought not to have been two affidavits of service ; two affidavits of the fitness of the receiver ; two affidavits of the medical superintendent ; two separate affidavits of fortune ; and a separate undertaking in each case.   They are largely mere repetition and waste of money. There is an earnest desire in the Lunacy Office to take every possible step to save costs in the cases of these small fortunes. The aggregate annual income of the ladies in this case is 58*l.* 0*s.* 1*d.*   I suppose the costs of these applications alone would amount to something like a year's income.   I think the Master was quite right.

Solicitors: *Field, Roscoe & Co., for Lambe, Carless & Son, Hereford.*

H. C. R.

---

## MANKS *v.* WHITELEY.

[1910 M. 2758.]

*Mortgage—Priority—Merger—Reconveyance and New Mortgage without Notice of Intermediate Charge—Constructive Notice—Yorkshire Registries Act, 1884 (47 & 48 Vict. c. 54)—Yorkshire Registries Amendment Act, 1885 (48 & 49 Vict. c. 26).*

In 1900 O. mortgaged land in Yorkshire to A. to secure 300*l.* and interest, and in 1901 he gave a second mortgage upon the same property to the plaintiff.   In 1905 he further charged the property to A. All these securities were registered in the Yorkshire Registry.   In 1907 O., without disclosing the plaintiff's mortgage, offered to sell his equity of redemption to the defendant W. for 450*l.*   She accepted conditionally upon finding some one to advance 300*l.* to pay off A.'s first mortgage. The defendant W. instructed her solicitor, who introduced the defendant F., who agreed to advance the 300*l.* on first mortgage.   In carrying out the transaction W.'s solicitor acted for all parties.   He did not investigate the title nor search the register.   None of the parties except O. knew of the existence of the plaintiff's second mortgage.   F. advanced the 300*l.*, which the solicitor paid to A., from whom he obtained the title deeds.   W. then paid off A.'s further charge, and the whole transaction was completed by three contemporaneous deeds: (1.) a

3 *D* 2                                                1

736                           CHANCERY DIVISION.                    [1912]

C. A.

1912

MANKS
*v.*
WHITELEY.

reconveyance by A. to O. freed from A.'s mortgage and further charge ; (2.) a conveyance by O. to W. ; and (3.) a mortgage by W. to F. :—

*Held* by Cozens-Hardy M.R. and Buckley L.J. (Fletcher Moulton L.J. dissenting), that, on the reconveyance by A. to O., A.'s mortgage and further charge were not kept alive, and the plaintiff's mortgage became a first charge on the property in priority to those of the defendants F. and W.

*Toulmin* v. *Steere* (1817) 3 Mer. 210, followed.

The subject of merger of charges considered.

*Per* Fletcher Moulton L.J. : *Toulmin* v. *Steere* was wrongly decided and ought to be overruled. At any rate the present case did not come within that decision.

Decision of Parker J. [1911] 2 Ch. 448, reversed.

THIS was an appeal from the decision of Parker J. (1)

The question raised upon the appeal was as to the priority of certain mortgages upon a property situated in the county of York and known as the "Lower Brow Farm," the equity of redemption in which, prior to the transactions which gave rise to the question, was vested in Samuel Ogden. The facts of the case are fully stated in the report in the Court below. Shortly stated they were as follows :—

On April 4, 1900, Samuel Ogden mortgaged the Lower Brow Farm to James Ackroyd to secure 300*l.* and interest. On October 16, 1901, Ogden gave a second mortgage upon the property to the plaintiff, Manks, as collateral security for two advances of 120*l.* and 380*l.* respectively which were primarily charged upon other properties belonging to Ogden. Shortly after the giving of this mortgage Manks arranged with Ogden that all payments made by Ogden to Manks should be appropriated to the payment off of the advances of 120*l.* and 380*l.* and not to the payment of interest on other sums owing by Ogden to Manks on the security of the mortgages on the other properties belonging to Ogden. This arrangement continued till August 19, 1905, when it was agreed not only that future payments should be taken on account of interest, but that such past payments as had been appropriated to capital should be reappropriated to interest. In the meantime, on March 25, 1905, Ogden had further charged the Lower Brow Farm to Ackroyd to secure the sum of 172*l.* 8*s.* 11*d.* and interest. All these charges were

(1) [1911] 2 Ch. 448.

respectively registered in the Yorkshire Land Registry at or
about the dates when they were effected. In 1907 Ackroyd
was pressing Ogden for repayment of what was due on his
mortgage and further charge. Ogden, being unable to find the
money, offered to sell the property to his daughter, the defendant
Louisa Whiteley, for 450*l.*, and she accepted the offer con-
ditionally on being able to find some one to advance the amount
required to pay off Ackroyd's first mortgage. She instructed a
solicitor named Walshaw, telling him that she had agreed to
purchase the property for 450*l.*, that Ackroyd had a mortgage on
it for 300*l.* and a small further charge, and that she desired to
pay Ackroyd off. Walshaw put the matter before another client
of his, the defendant Farrar. Farrar agreed to advance 300*l.* on
a first mortgage of the property ; and Ogden wrote to Walshaw
asking him to get the matter through as quickly as possible.
Walshaw, acting on behalf of all parties, then obtained 300*l.*
from Farrar, paid it to Ackroyd, and obtained possession of the
title deeds relating to the property. He next agreed the amount
due to Ackroyd on his further charge at 48*l.* 5*s.* 6*d.*, and this he
paid out of his firm's money, being afterwards recouped by the
defendant Louisa Whiteley. Walshaw then prepared and obtained
the execution of three deeds to carry out the transaction, all of
which were duly registered.

By the first of these deeds, dated August 16, 1907, Ackroyd, in
consideration of the payment to him of the moneys due to him
upon his mortgage and further charge, reconveyed the property
to Ogden freed and discharged from the mortgage and further
charge. By the second deed, of the same date, Ogden, in con-
sideration of 450*l.*, conveyed the property to Louisa Whiteley.
By the third deed, dated the next day, Louisa Whiteley
mortgaged the property to Farrar to secure 300*l.* and interest.
To this deed Louisa Whiteley's husband was also a party and joined
in the personal covenant to repay the 300*l.* In this transaction
none of the parties concerned, except Ogden, had any knowledge
or notice of Manks' second mortgage on the property. Ogden
alleged at the trial that this charge had been paid off, but this
was not true. Walshaw did not ask for an abstract of title nor
search the register. Having obtained the deeds and the legal

C. A.

1912

MANKS
*v.*
WHITELEY.

C. A.
1912
MANKS
*v.*
WHITELEY.

estate for Farrar, he thought it unnecessary to search on his behalf, and he was expressly told by Louisa Whiteley and her husband that he need not search so far as they were concerned.

On October 19, 1910, Manks brought this action against Mrs. Whiteley, Ogden, and Farrar for a declaration that on the execution of the reconveyance of August 16, 1907, Ackroyd's mortgages merged in the fee, and the charge given by the deed of October 16, 1901, became a first charge on the property in priority to those of the defendants Farrar and Whiteley.

Parker J. held (1) that Ackroyd's mortgage and further charge had not merged by the transaction of 1907, and that the defendant Farrar was entitled to priority over the plaintiff. Against this decision the plaintiff appealed.

*P. O. Lawrence, K.C.,* and *Richard Watson,* for the appellant. The property in question is situate in Yorkshire and is subject to the Yorkshire Registries Act, 1884 (47 & 48 Vict. c. 54), as amended by the Yorkshire Registries Amendment Act, 1885 (48 & 49 Vict. c. 26). The provision in s. 15 of the former Act, that the registration of any instrument under that Act should be deemed to constitute actual notice of such instrument, and of the fact of registration, to all persons and for all purposes whatsoever as from the date of registration, was repealed by s. 5 of the Act of 1885 on account of the inconvenience it caused to banks. But the provisions for registration continue in force and determine the priorities; s. 14 of the Act of 1884. The appellant's collateral security of October 16, 1901, was registered and Farrar had constructive notice of it. Parker J. has given Farrar priority in respect of a mortgage although on the register it has ceased to exist. Farrar and his solicitor did not search the register nor ask for an abstract, therefore he is affected by notice of the appellant's charge within s. 3, sub-s. 1 (i.), (ii.), of the Conveyancing Act, 1882: *In re Nisbet and Potts' Contract.* (2) It was their duty to search the register: *Kettlewell* v. *Watson* (3) ; Dart on Vendors and Purchasers, 7th ed. p. 1223. Ackroyd's mortgage was not kept alive and was not intended to be kept

(1) [1911] 2 Ch. 448.            (2) [1905] 1 Ch. 391.
(3) (1884) 26 Ch. D. 501.

alive. There was an absolute reconveyance and an extinguish-
ment of the debt; it was not a transfer or equivalent to a
transfer. The question to be answered is what was the intention
of the parties: *Otter* v. *Lord Vaux* (1); *In re W. Tasker &
Sons, Ld.* (2) Ogden's object was to get rid of the debt.

<div align="right">C. A.

1912

MANKS
*v.*
WHITELEY.</div>

[BUCKLEY L.J. A debtor cannot keep alive his own debt for
the purpose of defeating another creditor. The question is
whether Mrs. Whiteley and Farrar meant to keep it alive.]

The deeds themselves contradict any intention to keep the
mortgage alive. If the parties had desired to do so they might
easily have done it: *Thorne* v. *Cann.* (3) The Court only
presumes an intention to keep alive where nothing to the contrary
is shewn: *Liquidation Estates Purchase Co.* v. *Willoughby.* (4)
In the present case there was an actual extinguishment of the
debt by the conveyance to Mrs. Whiteley, which recites that the
property is free from incumbrances. So the case does not rest
on *Toulmin* v. *Steere* (5) alone.

*T. H. Carson*, K.C., and *J. G. Wood*, for Farrar. Farrar is
really in the position of an equitable transferee of Ackroyd's mort-
gage and has priority over the appellant. The result is the same
whether there were two transactions or only one. Even if it
was a sub-mortgage Farrar was in the position of Ackroyd. It
was not necessary to have a formal transfer, and for our purposes
the effect of a transfer is the same as that of a sub-mortgage.
There was no intention that Ogden's debt to Ackroyd should
merge. Ackroyd and Ogden both became trustees for Farrar
and he never consented to any merger of the mortgage debt.
Farrar is not estopped by the third deed, for he did not execute it,
and it cannot be shewn that he intended to abandon his equit-
able security. If the appellant is right he will get a first mortgage
although he only bargained for a second mortgage; and Farrar,
who meant to get a first mortgage, will be postponed to him. There
is now no merger by operation of law only of any estate the bene-
ficial interest in which would not be deemed to be merged or
extinguished in equity: s. 25, sub-s. 4, of the Judicature Act,

(1) (1856) 2 K. & J. 650; 6 D. M.
& G. 638.
(2) [1905] 2 Ch. 587, 604.

(3) [1895] A. C. 11.
(4) [1898] A. C. 321.
(5) 3 Mer. 210.

740                    CHANCERY DIVISION.              [1912]

C. A
1912
MANKS
*v.*
WHITELEY.

1873.  Courts of Equity always have regard to the intention of the parties, and in the absence of any direct evidence of intention they presume that merger was not intended if it was to the interest of the party, or even consistent with the duty of the party, that merger should not take place: *Capital and Counties Bank* v. *Rhodes* (1); *Worthington* v. *Morgan* (2); *Crosbie-Hill* v. *Sayer* (3); *Lord Gifford* v. *Lord Fitzhardinge* (4); *Phillips* v. *Gutteridge* (5); *Adams* v. *Angell.* (6)  It would be inequitable to give Manks priority over Farrar, and the form of the deeds is immaterial.  It was clearly for Farrar's benefit to keep alive the mortgage.  The Court will have regard to his intention and interest and not to the form of the deeds or the Registration Acts.

It has been held in *Battison* v. *Hobson* (7) that ss. 7 and 14 of the Act of 1884 give to equitable mortgagees by deposit priority over registered assurances even though they do not register a memorandum of their charge.  If an equitable transfer or sub-mortgage is registered the transferee has a corresponding priority.  Here the mortgage was registered and the transfer to Farrar is protected by the first words of s. 14.  Under the latter part of the section if we have an equitable sub-mortgage or transfer we come before Manks, who claims under Ogden.  Registration alters the date, it does not alter the effect of the deed.

We had no notice of Manks' deed; we took every proper precaution, and the Conveyancing Act does not increase the liability to constructive notice.  Registration is not notice.

*T. J. C. Tomlin,* for Mrs. Whiteley.  Farrar is entitled to priority over the appellant.  The word "merger" is used inaccurately in this case.  The question is whether the debt has been extinguished.  The onus is on the appellant to shew that with knowledge of the benefit of keeping it alive Mrs. Whiteley intended to extinguish the debt.

[COZENS-HARDY M.R. referred to his judgment in *In re W. Tasker & Sons, Ld.* (8)]

(1) [1903] 1 Ch. 631, 652.
(2) (1849) 16 Sim. 547.
(3) [1908] 1 Ch. 866.
(4) [1899] 2 Ch. 32.
(5) (1859) 4 De G. & J. 531.
(6) (1877) 5 Ch. D. 634.
(7) [1896] 2 Ch. 403.
(8) [1905] 2 Ch. 587, 604.

**1 Ch.**        CHANCERY DIVISION.        741

That was a different case altogether. It was really a case of ultra vires.

[BUCKLEY L.J. How can there be presumption of an intention to keep alive the debt where there is no knowledge of the charge against which protection is necessary ?]

If a first mortgage is paid off without knowledge of the existence of a mesne incumbrance there is nevertheless a presumption in favour of the payer that he intended to keep the debt alive, if in fact it is for his benefit to do so : *Burrell* v. *Earl of Egremont.* (1) See also *Gokuldoss Gopaldoss* v. *Rambux Seochand.* (2)

Where the owner of an estate in fee pays off a charge there is a presumption against him that he intends to destroy it, but if there is any reason for keeping it alive, such as the existence of another incumbrance, equity will not destroy it even if there be no expressed intention to keep it alive : *Adams* v. *Angell.* (3) In that case *Toulmin* v. *Steere* (4) was distinguished. See also *Grice* v. *Shaw* (5) and *Forbes* v. *Moffatt.* (6)

In *Thorne* v. *Cann* (7) Lord Macnaghten says : " Nothing, I think, is better settled than this, that when the owner of an estate pays charges on the estate which he is not personally liable to pay, the question whether those charges are to be considered as extinguished or as kept alive for his benefit is simply a question of intention. You may find the intention in the deed, or you may find it in the circumstances attending the transaction, or you may presume an intention from considering whether it is or is not for his benefit that the charge should be kept on foot." The same reasoning was applied in *Liquidation Estates Purchase Co.* v. *Willoughby.* (8)

In *Ingle* v. *Vaughan Jenkins* (9) the principle was applied by Farwell J. to the merger of leases, and he there approved the proposition stated in Lewin on Trusts, 10th ed. p. 889, namely, that " The principle by which the Court is guided is the

(1) (1844) 7 Beav. 205, 232.         (5) (1852) 10 Hare, 76.
(2) (1884) L. R. 11 Ind. Ap. 126.    (6) (1811) 18 Ves. 384, 392.
(3) 5 Ch. D. 634.                     (7) [1895] A. C. 11, 18.
(4) 3 Mer. 210.                       (8) [1898] A. C. 321.
                (9) [1900] 2 Ch. 368.

742                              CHANCERY DIVISION.                        [1912]

<div style="float:left">
C. A.

1912

MANKS

*v.*

WHITELEY.
</div>

*intention ;* and in the absence of express intention, either in the
instrument or by parol, the Court looks to the *benefit of the
person in whom the two estates become vested."*

Parker J. in *Crosbie-Hill* v. *Sayer* (1) expresses an opinion
which is strongly in favour of Mrs. Whiteley's contention.
There he says : " Even in the case of a purchase of an equity of
redemption, when the first mortgagee is at the same time paid off
and joins in a conveyance of the property to the purchaser, so
that questions of merger arise, it will require strong evidence of
contrary intention to preclude the Court from holding that the
first mortgage debt is still alive for the purpose of protecting the
purchaser of the equity of redemption from mesne incumbrances,
whether at the time of purchase he knows of such incumbrances
or otherwise."

Again, in *Liquidation Estates Purchase Co.* v. *Willoughby,*
before the Court of Appeal (2), Lindley L.J. says : " If,
indeed, there were some unknown mesne incumbrancer who
would be let in as a first incumbrancer if Norton's charge
were not treated as subsisting, it may be that, notwithstanding
*Toulmin* v. *Steere* (3), it could be so treated.    But why ?
Because in that case the purchaser would not have got what he
bargained for, namely, the property free from incumbrances, and
it would be manifestly unjust to allow a third party to avail
himself of the terms of a deed to which he is a stranger in order
to defeat the real intentions of the parties to it.    It is on this
ground that the Courts have gone a long way, and very properly,
to prevent a second or a third incumbrancer from obtaining a
priority by a mere accident, and at the expense of other people
who never intended to benefit him."    That I submit exactly fits
this case.    Here the second incumbrancer is seeking to take
advantage of a pure mistake as to facts and thereby to secure a
benefit at the expense of the respondents to this appeal.    And
Parker J. in *Crosbie-Hill* v. *Sayer* (1) says much the same
thing : " It would not, in my opinion, be just to allow the first
two defendants, who were not parties to the transaction, to avail
themselves of it in order to defeat the real intention of the parties,

(1) [1908] 1 Ch. 866, 877, 879.        (2) [1896] 1 Ch. 726, 735.
(3) 3 Mer. 210.

obtaining priority for themselves by a mere accident and at the expense of other people who never intended to benefit them." The same principle is expressed by James L.J. in *Stevens* v. *Mid Hants Ry. Co.* (1)  The appellant is no more entitled to come in and take advantage of a mistake than of a fraud.

Again, omission to search the register does not operate as constructive notice.  There is no duty to search.  With regard to Farrar, even if he was bound to search, it would be only in respect of Ogden's title down to Ackroyd's mortgage and Ackroyd's subsequent title under the mortgage down to the time of the advance of the 300*l.*  Such a search would not have revealed the plaintiff's mortgage.  No doubt, if Mrs. Whiteley were bound to search, a complete search on her behalf down to August 16, 1907, would have disclosed the plaintiff's charge, but failure to search did not affect her with notice of all that search might have revealed : *Kettlewell* v. *Watson* (2); *Hodgson* v. *Dean* (3); *Wiseman* v. *Westland* (4); *Morecock* v. *Dickins.* (5)  Registration of an instrument is not deemed to constitute actual notice thereof. Sect. 15 of the Yorkshire Registries Act, 1884 (47 & 48 Vict. c. 54), which made it so, was repealed the following year by s. 5 of the Act 48 & 49 Vict. c. 26.

*Richard Watson* in reply.

*Cur. adv. vult.*

March 18.  COZENS-HARDY M.R.  This appeal, which has been argued with great ability on both sides, raises a question as to the priority of certain mortgages.  Before dealing with the particular facts, it will be convenient to state certain general principles which, in my opinion, must be accepted as law.  When a mortgagee receives payment of his debt the legal consequences vary according to the situation of the parties and other circumstances.  If the payer is a stranger, and nothing more happens, he stands in the place of the mortgagee, and is equitably entitled to the debt, and can claim to have a transfer of the mortgage.  If the payer is himself the mortgagor, the debt cannot be kept alive by him

(1) (1873) L. R. 8 Ch. 1064, 1070.     (3) (1825) 2 S. & S. 221.
(2) 26 Ch. D. 501.                      (4) (1826) 1 Y. & J. 117.
                  (5) (1768) Amb. 678.

744                         CHANCERY DIVISION.                    [1912]

C. A.

1912

MANKS
*v.*
WHITELEY.

Cozens-
Hardy M.R.

against his own subsequent incumbrancer : *Otter* v. *Lord Vaux*. (1)
The payment off enures for the benefit of the subsequent incum-
brancer. If the payer is tenant for life of the mortgaged estate,
there is a presumption that he intends to keep the charge alive
for his own benefit, whatever the form of the transaction may
be : *Burrell* v. *Earl of Egremont*. (2)   To rebut this presumption
there must be clear evidence of actual intention to merge the
charge for the benefit of the inheritance.   If the payer is owner
in fee of the mortgaged estate, and the debt is not his own debt,
the presumption is that he does not intend to keep the charge
alive for his own benefit.   To rebut this presumption there must
be evidence of actual intention to keep it alive.   If the owner of
the equity of redemption sells the estate, with the concurrence of
the mortgagee, the purchaser can keep the charge alive, even
though the owner could not.   But according to *Toulmin* v.
*Steere* (3) there is a presumption that the purchaser does not
intend to keep it alive.   In *Toulmin* v. *Steere* (3) it was held that
the purchaser had constructive notice but no actual notice of the
subsequent incumbrance.   But I cannot think the decision
turned upon that circumstance.   Constructive notice was impor-
tant because it defeated a defence of purchase for value with the
legal estate, but otherwise it was of no moment.   In every case
of purchase the purchaser intends to get the property free from
incumbrances, and he takes a covenant, more or less limited,
against incumbrances.   It might well have been held that these
circumstances were sufficient to establish an intention to keep
alive a debt which the purchaser is paying off.   But *Toulmin* v.
*Steere* (3), which was decided by a great judge, Sir William
Grant, in 1817, is opposed to this view, and I do not think any
Court, short of the House of Lords, ought now to decline to
follow it.

There are to be found in the authorities phrases which suggest
that the test whether a charge is to be kept alive is simply this :
is it for the benefit of the payer that it should be kept alive ?   I
do not think this is correct.   It must always be for the benefit of
the payer that a charge which might avail against unknown

(1) 2 K. & J. 650; 6 D. M. & G.         (2) 7 Beav. 205.
638.                                     (3) 3 Mer. 210.

incumbrances should be kept alive, and there would be no place
for a presumption depending upon the position of the payer.
Nor is it easy, in the absence of any evidence, and in contradiction
of the form of the documents, to discover any intention to protect
himself against an incumbrance of whose existence he had no
knowledge. Unless such intention can be proved at the time
when the payment was made, it is irrelevant to say at a future
date that he certainly would have kept it alive if he had been
aware of the danger. It remains to apply these principles to the
facts of the present case.

   On April 4, 1900, Ogden mortgaged the Lower Brow Farm to
Ackroyd to secure 300*l.* and interest. Ackroyd thus got the legal
estate. On October 16, 1901, Ogden gave a charge upon this
property, with other property, to the plaintiff Manks. Ogden
alleged at the trial that this charge had been paid off, but this
was not true. On March 25, 1905, Ogden gave a further charge
to Ackroyd. In 1907 Ogden was being pressed by Ackroyd for
repayment of what was due on his two securities. Ogden offered
to sell the property to his daughter, the defendant Mrs. Whiteley,
for 450*l.*, and she agreed to buy if she could find somebody to
advance the money required to pay off Ackroyd's 300*l.* mortgage.
The defendant Farrar found 300*l.* under circumstances which I
must explain hereafter; and the transaction was completed by
three deeds, all of which were prepared by Walshaw, who acted as
solicitor for Ogden, Mrs. Whiteley, and Farrar. By the first deed,
dated August 16, 1907, Ackroyd, in consideration of the payment
of all moneys secured by his mortgage and further charge, recon-
veyed the property to Ogden. By the second deed, also dated
August 16, Ogden, in consideration of 450*l.*, conveyed the property
to Mrs. Whiteley. By the third deed, dated August 17, 1907,
Mrs. Whiteley mortgaged the property to Farrar to secure 300*l.*
and interest. Now, so far as the case depends solely upon the
effect of those three deeds, I feel no doubt that Ackroyd's
charge was not kept alive for the benefit of Farrar. Ackroyd
was paid off by Ogden, not by Farrar. If the first and second
deeds had been combined in one deed, so that Ogden with the
concurrence of Ackroyd conveyed to Mrs. Whiteley, the same
result would have followed. Nor does it make any difference

C. A.
1912
MANKS
*v.*
WHITELEY.

Cozens-
Hardy M.R.

746                          CHANCERY DIVISION.                    [1912]

C. A.
1912
MANKS
v.
WHITELEY.

Cozens-
Hardy M.R.

that all these deeds were part of one transaction. It is, however, contended, and with good reason, that we are entitled to look outside the deeds for the purpose of ascertaining the intention. Now it appears that Walshaw, who was first instructed by Mrs. Whiteley, the intending purchaser, consulted an old client, Farrar, who agreed to find 300*l.* on first mortgage. Ogden urged Walshaw to get the matter through as quickly as possible. Walshaw did not ask for an abstract or investigate the title, nor did he search the Yorkshire Registry. If it be material, I think both Mrs. Whiteley and Farrar had constructive notice of the plaintiff's charge. Walshaw induced Ackroyd to let him have possession of the title deeds on payment of 300*l.*, although Ackroyd was entitled to 348*l.* in respect of his two securities. He obviously wanted the title deeds in order to enable him to prepare the three deeds. The 300*l.* paid to Ackroyd was in fact obtained from Farrar. It is urged that Farrar thus became in equity transferee pro tanto of Ackroyd's mortgage, and that Ackroyd thereupon was trustee of the mortgage debt for Farrar to the extent of 300*l.*, and that nothing has happened to deprive him of this equitable right. I am unable to assent to this. It may be that it would have been a breach of trust if Ackroyd, without any authority from Farrar, had reconveyed to Ogden. But with Farrar's authority, and indeed by Farrar's direction, Ackroyd was entitled to do what he did. Farrar is bound by the acts of his solicitor Walshaw. He accepted the three deeds in the form in which they were drawn by his own solicitor, the effect of which was that, to his knowledge and with his approval, Ogden obtained an absolute release and he (Farrar) obtained a new mortgage with a new covenantor. There never was any bargain between Farrar and Ackroyd for the transfer to Farrar of part of Ackroyd's debt. The 300*l.* was paid to Walshaw as Mrs. Whiteley's solicitor in anticipation of the mortgage which Mrs. Whiteley was to give, and did give, to Farrar. This was the security and the only security for which Farrar bargained. The case of Mrs. Whiteley, who found the balance (48*l.*) due to Ackroyd, is still more difficult to sustain. It can make no difference that it was in the first instance paid by her solicitor Walshaw, who was subsequently put in funds by his client Mrs. Whiteley.

A good deal of argument was addressed to us upon the York-
shire Registries Act, 1884, but I think it sufficient to say that,
even if, which may be open to question, Farrar could have relied
upon the doctrine of tacking if the property had been in Lincoln-
shire, s. 16 of the Act precludes the assertion of any such right.

The case to my mind presents unusual difficulties, and I
confess that my opinion has varied from time to time. It is
not without hesitation that I differ from the very careful and
elaborate judgment of Parker J., and the views expressed by
Fletcher Moulton L.J. in the judgment he is about to read, but
upon the whole I think the plaintiff should rank first and not
second, and that the decree should be altered accordingly.

FLETCHER MOULTON L.J.  This appeal has been argued on
both sides with great ability and elaboration, and the exact
conditions under which certain principles of equity are applicable
and their effect when applied have been examined by the counsel
in the light of very numerous cases.

To my mind the length of the argument and much of the
apparent difficulty of the case have been due to its having been
thought necessary to discuss these matters in the abstract,
whereas in my opinion the concrete facts of the case lead directly
to a conclusion which is in close conformity with what is obviously
just and which is not dependent on the answers given to the
abstract questions.

I shall therefore begin by setting out all such facts as are
necessary for my decision.

The question to be decided relates to the priority of the various
charges on a property known as " the Lower Brow Farm." In
the year 1900 this property belonged to a man of the name of
Ogden, who on April 4, 1900, mortgaged the freehold to James
Ackroyd to secure 300l. and interest. On October 16, 1901,
Ogden charged the property by way of second mortgage to the
plaintiff, Manks, as collateral security for two advances of 120l.
and 380l. respectively which were primarily charged upon other
properties belonging to Ogden. Shortly after the giving of this
mortgage an arrangement was made between Ogden and Manks
by which all payments made by Ogden to Manks should be

C. A.

1912

MANKS
v.
WHITELEY.

Cozens-
Hardy M.R.

748                    CHANCERY DIVISION.                **[1912]**

C. A.
1912
MANKS
*v.*
WHITELEY.
Fletcher
Moulton L.J.

appropriated to the payment off of these advances of 120*l.* and 380*l.*, and not to the payment of interest on other sums owing to Manks by Ogden which were secured by mortgage on other properties belonging to Ogden. This arrangement continued till August 19, 1905, when it was agreed between them not only that future payments should be taken on account of interest, but that these past payments which had been appropriated to capital should be reappropriated to the payment of interest. But in the meantime, on March 25, 1905, Ogden had further charged the Lower Brow Farm in favour of Ackroyd to secure the sum of 172*l.* 8*s.* 11*d.* and interest.

The property was situated in the county of York, and the three charges were respectively registered in the Yorkshire Land Register at or about the dates when they were made.

Accordingly in July, 1907, immediately before the transactions took place to which this case relates, the priorities of the charges on the property were as follows. Ackroyd was the holder of the first mortgage for 300*l.* and interest. The plaintiff Manks came second with a charge for so much of the sums of 120*l.* and 380*l.* as had not been discharged by the payments made by Ogden to him in the interim. The later charge to Ackroyd came third, and was for so much of the 172*l.* 8*s.* 11*d.* as had not been discharged by payments by Ogden to Ackroyd. Next came a charge to Manks for such of the interim payments to him by Ogden as were made prior to August 19, 1905. These payments, as I have said, had originally been appropriated to the payments of the charges of 120*l.* and 380*l.*, but had subsequently by arrangement between the plaintiff Manks and Ogden been reappropriated to interest, but this arrangement being later in date than the second charge to Ackroyd could not affect the position of the latter or the amount or priority of the charge to him. Then Ogden came last of all as the owner of the equity of redemption subject to all the above charges. The exact amount due to the plaintiff Manks on the above-mentioned second mortgage does not appear from the evidence, but, as will be seen presently, the amount due on August 16, 1907, to Ackroyd on his later charge had been reduced by payment from 172*l.* 8*s.* 11*d.* and interest to the sum of 44*l.* 16*s.* 5*d.*

C. A.

1912

MANKS
*v.*
WHITELEY.

Fletcher
Moulton L.J.

In 1907 Ackroyd was pressing Ogden for repayment, and to enable him to find the money Ogden offered to sell the property to his daughter Louisa Whiteley, one of the defendants. The purchase price was nominally 450*l.*, but Ogden was already in debt to his daughter to an amount which would with the amount of his debts to Ackroyd approximately make up that sum. The proposition, therefore, took the form that the daughter should take the property in return for freeing Ogden from his debts to Ackroyd and forgoing Ogden's debt to herself. Mrs. Whiteley was willing to accept the offer provided that some one could be found to provide the 300*l.* secured by the first mortgage to Ackroyd. Her solicitor, Walshaw, had as a client the defendant Farrar, and proposed the matter to him. Farrar examined the property and agreed to find the 300*l.* on first mortgage. He thereupon gave that sum to his solicitor, Walshaw, who on July 25, 1907, paid it to Ackroyd and took from him the deeds of the property. The date of this payment is fixed by what has been termed the "completion account" and is confirmed by the evidence of Farrar. It therefore preceded the execution of the deeds to which I am about to refer.

I have no hesitation whatever in drawing the conclusion that in handing the 300*l.* to Ackroyd Mr. Walshaw was acting on behalf of his client Farrar (who had only consented to lend the money on first mortgage), and that he took up and thereafter held the deeds on behalf of his client in respect of that advance. The effect of this is that from and after that date Farrar stood in the shoes of Ackroyd, so far as that charge of 300*l.* was concerned, and Ogden was no longer a debtor to Ackroyd in respect of that sum. The essential condition having thus been secured by Farrar finding the 300*l.* on first mortgage, Mrs. Whiteley accepted Ogden's offer, and it only remained to carry out the rest of the transaction.

Considered as a whole that transaction was in its essence a very simple one. Ogden was to give up all his interest in the property to his daughter in return for being freed from his debts to his daughter and to Ackroyd. Ackroyd was to be paid off entirely. This was to be effected now that Farrar had taken the position of first mortgagee for 300*l.* by Mrs. Whiteley (or rather

C. A.
1912

MANKS
v.
WHITELEY.

Fletcher
Moulton L.J.

Mr. and Mrs. Whiteley) finding the money to pay what remained due upon Ackroyd's charges and giving Farrar their covenant to repay the 300*l.*  It was in its nature a transaction entirely between the parties and affected in no way the rights of outsiders.  We now come to that which has given rise to all this litigation.  Had the transaction been carried out by a single deed to which all were parties purporting to effect their whole intention no question could have arisen.  Unfortunately the lawyer employed indulged in what I cannot term otherwise than a piece of stupid ingenuity.  No doubt a single deed properly drawn up so as to effect the whole intention of the parties must have been of a somewhat special form requiring care in drafting, and he thought he saw a way of carrying out the transaction which entailed only the use of deeds of common form.  He therefore drew up and got the respective parties (excepting Farrar) to execute three several deeds, namely, one to which Ackroyd and Ogden were the parties, which purported to reconvey to Ogden the rights which Ackroyd possessed in return for the payment by Ogden of the whole of the sums due on the two charges, secondly, one which purported to convey the property (free from Ackroyd's charges) to Mrs. Whiteley, and thirdly, a mortgage by Mrs. Whiteley, as beneficial owner of the whole property, to Farrar to secure the 300*l.*  To this deed Mr. Whiteley was also a party and joined in the personal covenant to repay the 300*l.*  This last deed was never executed by Farrar, but was of course handed to him after execution by Mrs. Whiteley. All these three deeds were executed at the same time and beyond question were component parts of a single transaction.

The trouble which has arisen through this mode of carrying out the transaction is as follows.  None of the parties, excepting Ogden, knew of the existence of Manks' second mortgage. Ogden excuses his not having told them of it by asserting that he thought that it had been discharged out of certain insurance moneys which came into Manks' hands, but it is admitted that this was not the case.  Manks now contends in this action that by the first of the above deeds the interest of Ackroyd, who was first and third mortgagee, was conveyed to Ogden and became merged in the equity of redemption, and that therefore his charge

becomes the first charge on the property and takes priority over
the charge to Farrar for 300*l.*, and over what is left of the third
charge to Ackroyd, the beneficial interest in which passed to
Mrs. Whiteley.

A more unmeritorious claim it is impossible to imagine. The
transaction was one which in its entirety could give neither in
law nor in equity any additional rights to Manks, nor had he in
justice any claim whatever to benefit by it. But he seeks to
establish his claim by selecting one of the deeds by which the
transaction was carried out and claiming a right to treat it as if
it were an independent and separate transaction which must be
assumed to have taken full effect before anything further was
done, an assumption which is absolutely contrary to the reality
of the matter. He then contends that his charge is entitled to
priority on the principle of certain cases which he contends lay
down that the owner of an equity of redemption who has acquired
the interest of his first mortgagee by payment of the mortgage
debt may not set up as against the second mortgagee that debt
which he has thus paid off. In my opinion this ingenious con-
tention which aims at obtaining for the plaintiff a wholly
unmerited advantage is unsound both in fact and law.

To my mind the true position of the Lower Brow Farm at
the time that these deeds were being drafted and executed was
that Farrar was first mortgagee in respect of the 300*l.* advanced
by him, and had been so ever since the payment of the 300*l.* on
July 25. I confess that this appears to me to be incontestable.
The evidence shews that he only agreed to advance the 300*l.* on
first mortgage, that this was known to all the parties, that he
paid the money for the purpose to Mr. Walshaw, who was his own
solicitor, and that Mr. Walshaw himself paid it direct to Ackroyd
and "took up the deeds" which Ackroyd held in virtue of the
first mortgage for that sum. I can imagine no plainer or more .
unmistakable transaction. The money had been paid to Mr.
Walshaw to be put on the property on first mortgage, and any
other interpretation of the transaction imputes an act of pro-
fessional misbehaviour to him which was not suggested in cross-
examination in the Court below and which we ought therefore
not to permit to be made here upon no evidence whatever. By

C. A.

1912

MANKS
*v.*
WHITELEY.

Fletcher
Moulton L.J

C. A.
1912

MANKS
*v.*
WHITELEY.

Fletcher
Moulton L.J.

virtue of this transaction the first charge for 300*l.* which Ackroyd had previously possessed passed to Farrar. This being so, the position of Farrar necessarily remained unchanged by the reconveyance by Ackroyd to Ogden. It is perfectly true that the words purport to convey the land in fee simple to Samuel Ogden, but the deed did not and could not do that, because there was an outstanding first charge of 300*l.* in Farrar. The consequence is that Samuel Ogden never became under that deed the owner of the whole of the interest of Ackroyd, but only of such portion of it as had not passed to Farrar.

Counsel for the appellant attempted to raise a difficulty as to the legal effect of the transaction with Farrar on the ground that the payment which was made to Ackroyd on his account was only 300*l.*, which was the principal sum due on the mortgage, whereas by the completion account it appears that at that date a small sum of 3*l.* 14*s.* 3*d.* was due on account of interest from April 4 to July 25. It was suggested therefore that this prevented Farrar from obtaining the position of first mortgagee. I am ashamed of having to notice so trumpery a point, but it illustrates the type of technicalities by which the appellant seeks to inflict what to my mind is substantial injustice on the respondents. There is no substance whatever in the objection. By the mortgage deed the interest was payable half-yearly on April 4 and October 4. It had been duly paid up to the preceding April. There was therefore no interest due and payable at the date when Farrar paid the 300*l.*, and I have no doubt whatever that the true effect of the transaction was that he became first mortgagee in the place of Ackroyd, but that to the extent of the apportioned interest to the date of the payment he would be trustee for Ackroyd, and on receiving the half-year's interest on the next October 4 must have paid it over to Ackroyd if Ackroyd had not received it direct from Ogden. As a matter of fact Ackroyd received it in account on August 16, so that the point (which concerned nobody but the parties themselves) never arose. But even if we do not take this obvious and natural interpretation of the transaction and seek out some highly technical explanation the ultimate result will be the same. The position of Farrar

cannot be less favourable than if we take the transaction to be that Ackroyd gave to him a charge of 300*l.* on his own first charge of 300*l.* plus the interest that had accrued but had not become payable, or that the parties agreed that Ackroyd's first mortgage should be turned into a contributory mortgage in which Farrar owned 300*l.* and Ackroyd 3*l.* 14*s.* 3*d.* These and all other possible interpretations of the transactions which are consistent with the facts leave Farrar with an outstanding charge for 300*l.*, either directly as a first charge on the property or indirectly as a first charge on the interest of the first mortgagee, and therefore make it impossible that any deed between Ogden and Ackroyd could pass to Ogden the whole of the interest that Ackroyd originally had or affect in any way the priority of Farrar's charge.

The transaction with Farrar illustrates how important it is to consider the facts of this case and not to discuss in the abstract the principles of equity which it is suggested are applicable to it. The greater part of the argument was devoted to the question whether Ogden could keep alive the charge of his first mortgagee after paying off the first mortgage and getting a reconveyance of the estate, and if he could do so whether it was incumbent on the defendants to shew an intention on his part so to keep it alive. But in my opinion there is no question of whether or not Ogden could by virtue of an intention so to do keep alive such an interest, or whether he had or expressed such an intention. Under the circumstances of this case it remained alive whether he intended it or not, because it was in the hands of Farrar and never passed to Ogden. The consequence is that in spite of the absolute language of the reconveyance this is not a case in which the owner of the equity of redemption in fact acquired the interest of the first mortgagee by the payment off of a mortgage debt and a reconveyance of the estate. In my opinion this suffices to decide the main point at issue. Ogden conveyed all that he had got to his daughter, but he could not convey that which he did not possess, namely, the outstanding first charge to Farrar. Mrs. Whiteley purported to mortgage the property to Farrar as beneficial owner, but in fact she was only beneficial owner subject to this charge. But inasmuch as that charge was

C. A.

1912

MANKS
*v.*
WHITELEY.

Fletcher
Moulton L.J.

C. A.

1912

MANKS

*v.*

WHITELEY.

Fletcher
Moulton L.J.

already in Farrar's hands the defect in her title was of no importance. The effect of the execution of that deed by Mrs. Whiteley and her husband was, and was intended to be, that Farrar obtained their personal covenant to pay the 300*l*. But none of these things either was meant to take away his position as owner of the first charge for 300*l*. or operated in law to deprive him of it.

But the above is not the only answer to the plaintiff's claim. It is in my opinion bad on grounds of much more general application, and I shall proceed to examine them.

The perverse ingenuity of the lawyer led him to carry out the transaction between the parties by three deeds instead of doing it, as he might have done, by one single deed. But these deeds were all executed at the same time. There is not the slightest evidence as to which was physically executed first, and if the appellant's contention rests on the hypothesis that the reconveyance by Ackroyd was executed earlier in time than the other two deeds, he has not proved his case. For all we know the conveyance by Ogden to his daughter may have been first executed, and upon the subsequent execution of the reconveyance from Ackroyd the interest acquired by Ogden thereunder would at once pass to his daughter and not rest in him, so that he never would have become the owner of the interest of the first mortgagee. I say this not for the purpose of raising the contention that this was the order in which the deeds were executed, for there is no more evidence that they were executed in this order than in any other, or in fact that any one of them was completely executed before the execution of any other. But I say it to emphasize the principle that where several deeds form part of one transaction and are contemporaneously executed they have the same effect for all purposes such as are relevant to this case as if they were one deed. Each is executed on the faith of all the others being executed also and is intended to speak only as part of the one transaction, and if one is seeking to make equities apply to the parties they must be equities arising out of the transaction as a whole. It is not open to third parties to treat each one of them as a deed representing a separate and independent transaction for the purpose of claiming rights which would

only accrue to them if the transaction represented by the selected
deed was operative separately.  In other words, the principles of
equity deal with the substance of things, which in such a case is
the whole transaction, and not with unrealities such as the hypo-
thetical operation of one of the deeds by itself without the others.
Now it is quite clear that in the present case the whole transaction
was a substitution of Farrar for Ackroyd as first mortgagee for
300*l*., and Mrs. Whiteley (or Mrs. Whiteley and her husband) for
Ackroyd as owner of the further charge to which he was entitled,
and of Mrs. Whiteley for Ogden as owner of the equity of
redemption, and by such a redistribution of interests the position
of the appellant could not be altered in any way either for better
or worse.

This conclusion may be arrived at in another way which is
more in accordance with the lines of the argument presented to
us.  The appellant contended that there was a strict rule in
equity (enunciated in the case of *Otter* v. *Lord Vaux* (1) ) that if
the owner of an estate who has mortgaged it to a first and second
mortgagee pays off the mortgage debt to the first mortgagee and
obtains a reconveyance, the second mortgage becomes a first
charge because he cannot set up his own debt which he has paid
off against his own creditor the second mortgagee.  I shall
examine later on the cases on which this doctrine rests, but I
wish to point out in limine that in order that this principle may
apply the mortgagor must have become the beneficial owner of
the interest of the first mortgagee.  That is both necessary and
sufficient.  The principle is applicable even though the recon-
veyance may be to a trustee for him if he is the beneficial owner.
But no one would say that it would be applicable if it could be
shewn that the reconveyance to the owner of the equity of
redemption was to him as a trustee for a third party, so that
beneficially the interest of the first mortgagee passed to his
cestui que trust, though nominally the reconveyance was to him.
It is evident that the very root and reason of the equity would be
absent in such a case.  In setting up the charge he would not
be setting up his own debt which he had paid off, but he would
be setting up that which beneficially belonged to a third person

C. A.

1912

MANKS
*v.*
WHITELEY.

Fletcher
Moulton L.J.

(1) 2 K. & J. 650; 6 D. M. & G. 638.

C. A.

1912

MANKS
*v.*
WHITELEY.

Fletcher
Moulton L J.

and therefore could equitably be set up against the claims of the second mortgagee. Therefore we must ascertain whether the owner of the equity of redemption becomes the beneficial owner of the interest of the first mortgagee before we can learn whether the equity is applicable.

I have referred to the case where the owner of the equity of redemption takes a transfer to himself as trustee for a third person. But exactly the same conclusions would follow if it were conveyed to him not beneficially but for defined purposes only, as for instance where he was to be a mere conduit pipe by which it was to pass to those persons who were to become its beneficial owners. The test is whether without a breach of contract or a breach of faith he could deal with the property as his own. If he can treat it as his own without breach of contract or faith, then equity will prevent his using it so as to put himself in a position of advantage as contrasted with his second mortgagee. But if he cannot treat it as his own without a breach of contract or of faith, equity will not interfere with him. To do so would be to make him treat it as being his own, that is to say, to hold him bound to commit such a breach of contract or of faith, and against such a doctrine one's intellect and conscience alike revolt.

If I am right in this delimitation of the equity its application to the present case is clear. These deeds, as I have said, form part of one transaction and were executed each on the faith of the other two being executed. Even assuming that there was a reconveyance to Ogden of the whole of the interest of the first mortgagee, it is clear that Ogden would have been committing the grossest breach of faith if instead of transferring it to his daughter for the purpose of Farrar's mortgage he had proceeded to treat himself as the beneficial owner of it. Similarly if the deed really conveyed the fee simple to her from her father she would have been committing the grossest breach of faith if she had proceeded to deal with it as property beneficially owned by her without regard to Farrar. The proposed equity therefore applies in neither of these cases. Those who purported to acquire property by either of these two deeds did so only for the purposes of the entire transaction and not as beneficial owners.

**1 Ch.**                CHANCERY DIVISION.                        757

I do not think it necessary to deal with the suggestion that the
defendants are bound by the recitals and language of the deeds
and that the appellant can avail himself of them for this pur-
pose. Deeds create estoppels between the parties only and no
outsider can avail himself of them.

Before examining the authorities which were cited in support
of the contentions of the parties in this case, it is desirable to
dispose of that portion of the argument that depends on the
existence of the Yorkshire Register. It was contended on behalf
of the appellant that Farrar and Mrs. Whiteley were bound to
examine the register, and that not having done so they must be
taken to have constructive notice of all that they would have
found there had they in fact searched it, and that therefore they
must both be taken to have had constructive notice of the charge
on the property to Manks.

So far as Farrar is concerned no question as to the effect of
the entries in the register can in my opinion arise. He deduces
his title from that of Ackroyd, whose charge he paid off, taking
over the deeds. Even if he had a duty to search the register it
would only be in respect of Ogden's title down to Ackroyd's
mortgage and Ackroyd's title under the mortgage afterwards
down to the date of his payment of the 300*l.* to him. The
register would have disclosed nothing on such a search, there-
fore no constructive notice can be attributed to him by reason
of his not having in fact searched it. With regard to Mrs.
Whiteley the case is different. She was taking over the equity
of redemption, and therefore the search on her behalf—if obligatory
at all—should have been a complete search down to August 16,
1907, and would have disclosed the charge to Manks. But upon
the decisions it is clear that as purchaser she was under no
obligation to search the register under the penalty of being
affected with notice of all that such a search would have dis-
closed. In *Morecock* v. *Dickins* (1), in 1768, Lord Camden
recognized this as a rule already well established and refused to
alter it. This rule has been followed ever since : see *Hodgson* v.
*Dean* (2) ; *Wiseman* v. *Westland.* (3)   Of course if a purchaser has

C. A.

1912

MANKS
*v.*
WHITELEY.

Fletcher
Moulton L.J.

(1) Amb. 678.              (2) 2 S. & S. 221.
(3) 1 Y. & J. 117.

CHANCERY DIVISION.          **[1912]**

C. A.

1912

MANKS
*v.*
WHITELEY.

Fletcher
Moulton L.J.

in fact searched any portion of the register he is affected with notice of that which appears therein just in the same way as he would be affected by facts which came to his knowledge through any other channel, and if therefore he learns from the memorials in the register that deeds exist affecting the property, he is bound to take the reasonable precaution of ascertaining what those deeds contain: see *Battison* v. *Hobson* (1) and *Kettlewell* v. *Watson.* (2)   But those decisions do not establish any obligation to examine the register, they only relate to the consequences of having in fact done so.

It follows, therefore, that there is nothing in the fact of the entries in the Yorkshire Register which establishes constructive notice to any of the parties of the existence of the mortgage to Manks, and it is admitted that neither Farrar nor Mr. or Mrs. Whiteley had any knowledge of that charge.   Counsel for the appellant attempted to turn this to the advantage of their client. They contend that it is incumbent on the defendants to shew an actual intention to keep alive the charges, and that if no one knew of the existence of the charge to Manks except Ogden, and if Ogden believed that it had been discharged by payment, there could not have been any actual intention on the part of any one of them to keep alive the charge to the first mortgagee to protect themselves against it.   I shall therefore examine the cases which deal with the general principles applied by equity in such cases in order to test the soundness of this contention, although for the reasons already given I am of opinion that the special facts of the case are sufficient to support the decision of the learned judge with regard to the position of Farrar's charge, which is the substantial point in issue.

We start with the law laid down in the case of *Otter* v. *Lord Vaux* (3) that a mortgagor purchasing the interest of the first mortgagee cannot set up the anterior charge so paid off against a second mortgage.   This is not laid down in that case as being new law, but as being old and well recognized.   Indeed the Lord Chancellor (Lord Cranworth) when the case came before him on appeal said: " The general principle, that a mortgagor cannot set up against his

(1) [1896] 2 Ch. 403.                (3) 2 K. & J. 650; 6 D. M. & G.
(2) 26 Ch. D. 501.                       638, 642.

own incumbrancer any other incumbrance created by himself, is a proposition that I think has never been controverted." The reason of this is obvious, but if there were any doubt as to the basis of the doctrine it would be set at rest by the careful judgment of the Vice-Chancellor (Sir W. Page Wood) when the case was heard before him in the first instance. It is evident that in the minds of both these eminent judges the critical fact was that the two incumbrances were created by the mortgagor and embodied obligations on his part to discharge the two debts, and that therefore he could not be allowed to set up the fact that he had fulfilled the one obligation to shield himself in any way from the performance of the other.

This definite and sound principle became associated with one of a very different character by reason of the unfortunate decision in *Toulmin* v. *Steere.* (1) In that case a person who was not the original mortgagor purchased the equity of redemption and paid off the first mortgage in ignorance of the existence of a second mortgage, and it was held that this came under the same rule, and that the first mortgage was merged in the fee simple so that the second mortgage was raised into the position of a first mortgage. It is clear that such a case possesses none of the features which justify the rule laid down in *Otter* v. *Lord Vaux.* (2) The purchaser is not the mortgagor and the mortgage debts are not obligations incurred by him, and there is no reason why the two properties represented by the interest of the first mortgagee and the equity of redemption should not cumulatively exist in one and the same person without merger. And I can see no ground for extending the doctrine of compulsory merger beyond the class of cases to which the decision in *Otter* v. *Lord Vaux* (2) relates, for in all other cases it does nothing but work injustice. The idea of voluntary merger is ridiculous where the existence of mesne incumbrances is known, because no one would voluntarily permit a merger which would let in mesne incumbrances. It is therefore a decision the sole effect of which is to give an advantage *to incumbrances the existence of which is concealed from or* unknown to the parties dealing with the property whether that is due to their own fault or not.

C. A.

1912

MANKS

*v.*

WHITELEY.

Fletcher
Moulton L.J.

(1) 3 Mer. 210.            (2) 2 K. & J. 650; 6 D. M. & G. 638.

760                          CHANCERY DIVISION.                    **[1912]**

C. A.

1912

MANKS
*v.*
WHITELEY.

Fletcher
Moulton L.J.

This does not seem to me to be in accordance with the aims or principles of equity, and I am of opinion therefore that *Toulmin* v. *Steere* (1) was wrongly decided. Doubt has been thrown upon it by most eminent judges and in all Courts, and indeed it has scarcely ever been referred to without some marks of disapproval. In my opinion it would have been much better that it should have been formally reconsidered years ago and overruled. The effect of the decision has only been to confuse the Courts in dealing with the equities which arise when there is formally a possibility of merger either in estates or in charges.

Putting aside therefore the decision in *Toulmin* v. *Steere* (1), the current of cases is in favour of the doctrine that, excepting in such cases as are represented by *Otter* v. *Lord Vaux* (2), the rule is that which is enunciated by Parker J. in his judgment in this case as follows (3) : " If the benefit of a charge on property and the property subject to the charge vest in the same person, then, as a general rule, equity will treat the charge as kept alive or merged according to whether it be of advantage or of no advantage to the person in whom the two interests are vested that the charge should be kept alive. But in either case clear proof of intention to the contrary will displace the general rule."

The most striking example of this is to be found in such cases as *Burrell* v. *Earl of Egremont* (4) where a life tenant pays off an incumbrance on the property. It is presumed that he does not intend to free the inheritance because it is not to his advantage so to do, and unless there is positive evidence that the intention was to do so the charge on the inheritance is supposed to be kept alive for his benefit. The same principle was applied by Knight Bruce and Turner L.JJ. in the case of *Phillips* v. *Gutteridge* (5), and in the case of estates (which are governed by the same rule as charges) by the Court of Appeal in the case of *Capital and Counties Bank* v. *Rhodes* (6), approving of the decision of Farwell J. in *Ingle* v. *Vaughan Jenkins*. (7) But the two most important authorities in this respect are two cases in the House

(1) 3 Mer. 210.
(2) 2 K. & J. 650; 6 D. M. & G. 638.
(3) [1911] 2 Ch. 458.

(4) 7 Beav. 205.
(5) 4 De G. & J. 531.
(6) [1903] 1 Ch. 631.
(7) [1900] 2 Ch. 368.

**1 ·Ch.**          CHANCERY DIVISION.                    ·761

of Lords, *Thorne* v. *Cann* (1) and *Liquidation Estates Purchase*   C. A.
*Co.* v. *Willoughby* (2), which will need separate consideration.      1912

In *Thorne* v. *Cann* (1) the facts were somewhat complicated, but   MANKS
so far as they affect the present case they may be stated as   *v.*
follows.  Searle purchased the equity of redemption of some   WHITELEY.
freehold hereditaments from the trustee in bankruptcy of Piller.   Fletcher
Piller had previously mortgaged the land to a Miss Arnold for   Moulton L.J.
1000*l.*, and subsequently to Forwood.  Miss Arnold wished to be
paid off, and accordingly Searle obtained 1000*l.* from his bank
and paid her off, taking the deeds and depositing them in his
own name at the bank.  A month or two afterwards Cann took
an assignment of the security thus held by the bank to secure
an advance of 900*l.* made by him to Searle.  It was contended
that the security had been merged in the equity of redemption
when Searle paid off Miss Arnold.  But their Lordships held
that it was not so.  In his speech Lord Macnaghten says (3):
" Nothing, I think, is better settled than this, that when the
owner of an estate pays charges on the estate which he is not
personally liable to pay, the question whether those charges are
to be considered as extinguished or as kept alive for his benefit
is simply a question of intention.  You may find the intention
in the deed, or you may find it in the circumstances attending
the transaction, or you may presume an intention from con-
sidering whether it is or is not for his benefit that the charge
should be kept on foot."

In that case their Lordships were of opinion that the intention
that the charge should be kept alive might be inferred from the
deed by which Miss Arnold transferred her interest to Searle.
But they also thought that the circumstances of the transaction
shewed that intention.  Lord Macnaghten pointed out that the
dealings with the bank and the negotiations with Cann com-
menced before Miss Arnold was paid off, and added : " These
dealings and transactions would have been simply a fraud on
the part of Searle if it had not been his intention to keep the
charge alive."

In the present case the negotiations with Farrar and the

(1) [1895] A. C. 11.              (2) [1898] A. C. 321.
(3) [1895] A. C. 18, 19.

762                              CHANCERY DIVISION.                    **[1912]**

C. A.

1912

MANKS

*v.*

WHITELEY.

Fletcher
Moulton L.J.

advance by him took place more than three weeks before the
execution of the deeds of August 16, and they would have merited
in an even stronger degree to be stigmatized as " simply a fraud "
on the part of Ogden and Mrs. Whiteley if it had not been their
intention to keep the charge alive.

The facts in *Liquidation Estates Purchase Co.* v. *Willoughby* (1)
were also complicated. Norton was the owner of a charge for
6200*l.* upon a sum of 12,000*l.* which was the share to which
Kennedy was entitled in certain funds. He duly gave notice of
this charge to the trustee who held these funds. Notwithstanding
this notice the trustee paid 5122*l.* direct to Kennedy and also
conveyed to him property worth 5000*l.* on account of his share.
Lord Windsor then took from Kennedy an assignment of what
was due to Kennedy out of the funds. Subsequently the Liqui-
dation Estates Purchase Company acquired the interests of both
Norton and Lord Windsor. It is clear that these payments
direct to Kennedy could not prejudice Norton's charge, which
remained wholly unsatisfied. Those interested in sharing the
funds subject to the original charge to Kennedy contended,
however, that Norton's charge on being acquired by the company
who owned Lord Windsor's interest became merged in it, so that
the total amount for which the funds were liable in respect of
Kennedy's charge was only the 12,000*l.* of the original charge to
him. But the House of Lords decided against this contention.
In other words they held that the two properties, Norton's
charge and Lord Windsor's charge, were independent claims
and could be enforced separately. Here the wrongful payments
to Kennedy operated much as an intermediate charge would have
operated. They were good as against Lord Windsor but not as
against Norton. The House of Lords held that there was no
merger, and Lord Herschell and Lord Macnaghten shew clearly
that it sufficed for that purpose that it was against the interest
of the purchaser that there should be any such merger. Lord
Herschell says (2) : " If it were necessary to hold that Norton's
right was kept alive under the conveyance of 1893, there appears
to me ample reason for so holding, inasmuch as it would be
obviously for the benefit of the appellant company to keep alive

(1) [1898] A. C. 321.                    (2) [1898] A. C. 335.

**1 Ch.**          CHANCERY DIVISION.                    763

Norton's interest, so that they might not be affected by any
transactions of Kennedy subsequent to his assignment to Norton,
and prior to his assignment to Lord Windsor." In this case the
House of Lords was reversing the decision of the majority of the
Court of Appeal on certain grounds special to that case. But on
the general question which concerns us here the judgment of the
majority of the Court of Appeal was left untouched, and two
passages in that judgment (which was read by Lindley L.J.)
seem to me to have an important bearing on the present case. He
says (1): "If, indeed, there were some unknown incumbrancer
who would be let in as a first incumbrancer if Norton's charge
were not treated as subsisting, it may be that, notwithstanding
*Toulmin* v. *Steere* (2), it could be so treated. But why? Because
in that case the purchaser would not have got what he bar-
gained for, namely, the property free from incumbrances, and it
would be manifestly unjust to allow a third party to avail himself
of the terms of a deed to which he is a stranger in order to
defeat the real intentions of the parties to it. It is on this
ground that the Courts have gone a long way, and very properly,
to prevent a second or third incumbrancer from obtaining a
priority by a mere accident, and at the expense of other people
who never intended to benefit him." It would be difficult,
in my opinion, to find language which more aptly describes that
which the appellant is seeking to do in this case. In another
passage he says that having regard to the decision in *Thorne* v.
*Cann* (3), in a case where a purchaser of an estate pays off a charge
on it without shewing an intention to keep it alive, it is perhaps
safe to say (4), "If its continuance as an existing charge is
beneficial to him, it will be treated in equity as subsisting, unless
an intention to the contrary can be inferred from the terms of
the purchase deed or from other legitimate evidence."

These and many other decisions leave no doubt in my mind that
the Court will not permit the doctrine of merger to be applied
where it would do injustice. At the same time they illustrate
forcibly the mischief done by a wrong decision. Although judges
in the cases which bear on this question do not conceal their

C. A.

1912

MANKS
*v.*
WHITELEY.

Fletcher
Moulton L.J.

(1) [1896] 1 Ch. 735.              (3) [1895] A. C. 11.
(2) 3 Mer. 210.                   (4) [1896] 1 Ch. 734.

764                          CHANCERY DIVISION.                    [1912]

C. A.
1912
MANKS
v.
WHITELEY.
———
Fletcher
Moulton L.J.

disapprobation of the decision of *Toulmin* v. *Steere* (1), their natural desire not to overrule a decision, except in a case where they must choose between doing so and working injustice, has led them to seize on special features in the various cases which have enabled them to come to the right conclusions without formally overruling it. The consequence has been that the real basis of the principle and its proper formulation do not so clearly appear from the language of the decisions as would otherwise be the case. In my opinion Parker J. in his decision in this case and in the case of *Crosbie-Hill* v. *Sayer* (2) has correctly indicated both the origin and the limits of the principle. At common law the merger of estates took place by operation of law without regard to the injustice caused thereby. Equity interfered both with regard to the merger of interests which were recognized by common law and those which are equally real but were at that date recognized only by equity itself. That estates and interests in estates which were quite distinct and could exist in separate hands should mutually destroy one another wholly or partially when they came into the same hands was absurd and unjust when that destruction affected substance and not merely form. Its operation was to lessen the beneficial interest of the owner and thereby to make a gift of a portion of it to some third person. Equity set itself to remedy this anomaly. It never presumes in favour of a gift. If the intention to give exists and the gift is completed it will recognize it, but it requires the intention to be proved, and the onus of proving it rests on the party who claims under it. It applied this simple and equitable principle to merger and it did nothing more. This appears to me to reconcile all the cases. The test whether the merger is or is not beneficial to the owner of the interests is merely another form of saying whether or not it would in substance be a gift to the third party who has given no consideration for the advantage he gains thereby. If that is so the third party must prove the intention to give. Such cases as *Otter* v. *Lord Vaux* (3) do not militate against this principle. Equity does not regard the man who is merely performing his

(1) 3 Mer. 210.                        (3) 2 K. & J. 650; 6 D. M. & G.
(2) [1908] 1 Ch. 866.                  638.

**1 Ch.**           **CHANCERY DIVISION.**         **765**

own obligation and thus removing the charge which was created to secure that performance as making a gift to his other creditors. So far as I know this principle, which I consider to be sound, will reconcile all the decisions except those which stand or fall with *Toulmin* v. *Steere* (1), which I hold to have been wrongly decided, and it gets rid of the crowning absurdity of all, which is exemplified in the present case, namely, that a man is in greater danger from an equitable charge of which he has no notice than from one of which he has notice, because he can have had no conscious intention with regard to the former, seeing that he did not know of its existence. Applied to the present case this principle leaves no doubt as to the right conclusion. In the first place merger would operate as a gift to the appellant as far as regards the first charge of 300*l.* That charge stood before all the charges to the appellant. It would also operate as a gift to the appellant in so far as it would put the later charge of Ackroyd (which was acquired by Mrs. Whiteley) behind that charge to the plaintiff which depended on the reappropriation of past payments to interest instead of capital. There is not the slightest evidence of any intention to make these gifts. The parties interested did not even know of the existence of the charges which they would thus prefer. I am therefore of opinion that merger is not established with regard to either of these charges, and that the judgment of Parker J. is right on all points, and that this appeal should be dismissed with costs.

BUCKLEY L.J. In July, 1907, Ackroyd held the first mortgage of April 4, 1900, for 300*l.* on the Lower Brow Farm property, and a further charge of March 25, 1905, on the same property. The amount due on the latter had at that time been reduced to a sum of about 48*l.* On July 13, 1907, Ogden, the mortgagor, wrote to Walshaw, his solicitor, sending him a notice which Ackroyd had served requiring repayment, and asking Walshaw to get the affair settled as soon as he could. Ogden had arranged with his daughter Louisa Whiteley to sell the property to her for 450*l.* To enable her to carry out that purchase she wanted to find some one to advance 300*l.* to pay off Ackroyd's first mortgage.

C. A.

1912

MANKS
*v.*
WHITELEY.

Fletcher
Moulton L.J.

(1) 3 Mer. 210.

766    CHANCERY DIVISION.    [1912]

C. A.
1912
MANKS
*v.*
WHITELEY.

Buckley L.J.

In this state of things Mr. and Mrs. Whiteley instructed the same solicitor, Walshaw. He had already for years acted for Farrar. In that which followed Walshaw was acting for all the following parties, namely, Ogden, Mr. and Mrs. Whiteley, and Farrar. On July 25, 1907, the amounts due to Ackroyd were 303*l*. 14*s*. 3*d*. on the first mortgage and 44*l*. 16*s*. 5*d*. on the second charge. Walshaw obtained 300*l*. from Farrar, paid it to Ackroyd, and obtained the deeds. Upon Walshaw's evidence it is not, I think, at all clear that in obtaining the deeds he obtained them otherwise than by way of loan from Ackroyd in order to enable him to prepare the necessary instruments to carry out the arrangement. At any rate Ackroyd had not received what was due to him. There was a balance of 3*l*. 14*s*. 3*d*. on the first mortgage and a balance of 44*l*. 16*s*. 5*d*. on the second charge which had not been paid and for which he was still entitled to hold the deeds. The transaction was certainly not one of equitable transfer of Ackroyd's rights as mortgagee. It is not established that in paying the 300*l*. to Ackroyd Walshaw was acting for Farrar. The better view, I think, is that Mrs. Whiteley was borrowing the money from Farrar on the terms that she should give him a first mortgage for it upon the property, and that when Walshaw handed the money to Ackroyd he was acting for Mrs. Whiteley. If so, the case is plain. I will, however, for the purpose of the rest of this judgment assume that Walshaw in paying Ackroyd was acting for Farrar. Upon this hypothesis Farrar, no doubt, who paid the money, would as between himself and Ackroyd be entitled to possession of the deeds as security for the 300*l*. The true effect of the transaction, I think, then was that Ackroyd remained as against the land the mortgagee, and Farrar as between himself and Ackroyd became sub-mortgagee of the whole debt owing to Ackroyd, but by way of security for 300*l*. only.

So far as the instruments which the parties executed are concerned there is no room for doubt as to the transaction. Walshaw agreed with Dewhurst, Ackroyd's solicitor, the amount of the arrears of interest upon the 300*l*. and of the balance due in respect of the further charge. Walshaw paid that amount, and thereupon Ackroyd by the deed of August 16, 1907, reconveyed the property

to Ogden freed and discharged from all principal moneys and interest secured by the deeds of April 4, 1900, and March 25, 1905. By deed of even date Ogden conveyed to Mrs. Whiteley by an instrument which recited that Ogden was seised in fee free from incumbrances, and Mrs. Whiteley and her husband mortgaged to Farrar by a deed dated August 17 which recited that the wife was seised in fee free from incumbrances and as beneficial owner conveyed the land to Farrar in fee by way of mortgage, Mrs. Whiteley and her husband jointly and severally covenanting with Farrar to pay 300*l.* In such a transaction as this the word "merger," although frequently used in the cases, is not a strictly accurate expression. The debt of 300*l.* owing from Ogden to Ackroyd cannot merge in a debt of 300*l.* owing from Whiteley to Farrar. When the owner of a term acquires the reversion in fee the term merges because its continued existence is impossible. Under the altered circumstances the term is swallowed by the reversion. No such state of facts arises in a case of the present kind. The question is not whether the one debt and charge merges in the other debt and charge, but whether the former debt and charge are extinguished and a new debt and charge created in their stead. The mere fact that a new debt is created does not shew that the old debt is destroyed. But the fact that a new debt is created is material in determining upon the whole transaction whether the old debt is kept alive or not. The question here is, I think, whether the defendants or any of them can say that the debt and security of April 4, 1900, which unquestionably are gone at law, are in equity kept alive to protect Mrs. Whiteley or Farrar or either of them against the plaintiff's incumbrance of October 16, 1901.

Where a charge upon a settled estate is paid off by the tenant for life it is presumed that his intention is to keep the charge alive to protect himself against any subsequent incumbrance which may exist, whether he knows of it or not. It is not necessary that he should declare his intention to keep the charge alive. It is for his benefit that it should be kept alive against subsequent incumbrances, if any, and equity therefore presumes an intention on his part so to do. But if the remainderman in fee or in tail pays off the charge the presumption is the other way.

CHANCERY DIVISION.                    **[1912]**

C. A

1912

MANKS
*v.*
WHITELEY.

Buckley L.J.

If the remainderman declares his intention to keep the charge alive and the debt is not his own debt he can keep it alive, but if he does not so declare the charge is gone. The argument we have heard has been concerned to establish that this is only true if he knows of the subsequent incumbrance. It is said that if he does not know of it, it must be presumed in the absence of evidence of intention that he intended to keep the charge alive against subsequent incumbrances, if any, of which he had not knowledge. I know of no authority to that effect, and in principle it seems to me to be wrong. If he does not declare an intention the presumption is that he does not intend to keep the charge alive when he does know of the subsequent incumbrance. Why should absence of knowledge raise the presumption when ex hypothesi no reason for the intention exists ? Where the remainderman pays off the charge it is necessary that he should declare his intention. It is impossible to predicate affirmatively or actively an intention to protect himself against a charge of which upon the hypothesis he had no knowledge. In *Burrell* v. *Earl of Egremont* (1) Lord Langdale (who was dealing with the case of a tenant for life) puts the hypothetical case of its being necessary to shew intention otherwise than by legal presumption and says " the plaintiffs could not have proved that he intended to continue a charge, the existence of which, as a primary charge, was unknown." Where as in the case of the tenant for life the intention is to be presumed, the case is totally different from that of the remainderman where the intention has to be proved. In the former case knowledge is not, in the latter knowledge is, as it seems to me, a necessary factor in determining whether the intention to keep the charge alive exists or not. The principles applicable to the case of a purchaser are not, I think, those applicable to the case of a tenant for life. Upon the authorities they are rather those applicable to the case of a remainderman. *Toulmin* v. *Steere* (2) must, I think, be reviewed, if at all, in the House of Lords. In this Court it must be accepted as being the law.

As matter of fact the way in which this transaction was carried out (a matter which I agree in itself does not determine

(1) 7 Beav. 205, 232.          (2) 3 Mer. 210.

the question) plainly establishes, I think, upon the question of
intention that all parties intended to do that which in fact the
deeds did. It was intended that Ogden should cease to be liable
to Ackroyd (a fact which is, I agree, not alone sufficient, for the
debt might have been preserved against the land while the
personal liability of the mortgagor was released). But not only
was Ogden's personal liability to be destroyed, but the debt itself
as against the land was to be destroyed also. Farrar, who by
paying the 300*l.* had obtained such rights as sub-mortgagee as I
have stated, and Mrs. Whiteley, who as to the balance of what
was due to Ackroyd presumably became in a position similar to
that of Farrar as regards that security, gave up those rights, and
Farrar accepted a new mortgage debt and a new security as
bought with his money, and Mrs. Whiteley accepted the equity
of redemption subject to Farrar's debt as that which was bought
with the 48*l.* and the balance of the purchase-money.

A contention has been adduced, and it is I think that upon
which the learned judge proceeded, that when Farrar paid his
300*l.* he became entitled in equity to the benefit of the mortgage
of 1900, and that Ackroyd became a trustee for him and could
not by the deed of August 16 pass the property to Ogden free
from that incumbrance, and that consequently that deed and the
subsequent deeds had not, because they could not have, the
operation which upon their face they appear to carry. This
contention is answered, I think, by saying that all parties
through Walshaw were carrying out a transaction which all were
approving, and that Farrar was content that Ackroyd should
reconvey, as he was by the deed of August 16 expressed to
reconvey, free from incumbrances, because as part of the same
transaction Farrar was going to take that which he did take,
namely, a new mortgage from Mrs. Whiteley, the purchaser.
The transaction is, I think, consistent with only one intention on
the part of all parties, namely, that the debt and security of 1900
should be extinguished and a new debt and security of 1907
should be created. It results, in my judgment, that those entitled
to the security of October 16, 1901, take the benefit of the
discharge of the mortgage of 1900 and now are entitled to a
declaration that the security of October 16, 1901, became, and

C. A.

1912

MANKS
*v.*
WHITELEY.

Buckley L.J.

CHANCERY DIVISION.             **[1912]**

C. A.       now is, the first charge.  If A., B., and C. are successive mort-

1912       gagees of X. the contract between B. and X. includes that if X.

MANKS      pays off A. then B. shall come first.  There is nothing unmeri-

*v.*        torious in a claim to the benefit thus enjoyed.

WHITELEY

      Solicitors: *Burn & Berridge, for G. H. Manks, Elland ; R. F. & C. L. Smith, for Spencer, Clarkson & Co., Keighley ; Williamson, Hill & Co., for Walshaw & Son, Halifax.*

                                                                G. A. S.

WARRING-                     *In re* PYKE.
TON J.

1912                 BIRNSTINGL *v.* BIRNSTINGL.

*Feb.* 22, 23,                    [1911  P.  2468]
27.

*Tenant for Life and Remainderman—Will—Construction—Residuary Devise and Bequest—Trust to sell and convert—Power to postpone—Power to Trustees to pay for Repairs out of Capital or Income—" Rents, dividends and interest and other produce thereof " pending Conversion to be deemed Income—Lease by Testator—Repairing Covenants—Breach—Dilapidations —Damages recovered by Trustees—Capital or Income—Settled Land Act, 1882 (45 & 46 Vict. c. 38), s. 53.*

Testator by his will devised and bequeathed his residuary real and personal estate to his trustees upon trust for sale and conversion with power to suspend conversion for such period as they should judge expedient, and pending the conversion of his real estate to pay for repairs either out of capital or income, and he provided that for the purposes of enjoyment and transmission under the trusts therein contained his real and personal estate should be considered as money from the time of his decease and that the " rents, dividends and interest and other produce thereof " respectively to accrue due after his decease and until the actual sale, conversion, and getting in thereof should be deemed the annual income thereof.  The testator then directed his trustees to hold the proceeds of his residuary estate, after payment thereout of his debts and funeral and testamentary expenses, upon trust to divide the same into certain shares, some of which he settled.

At his death the testator was entitled to a freehold theatre which was subject to a lease granted by him.  The lease contained certain repairing covenants by the lessee.  The lessee did not perform these covenants, and some years after the testator's death the trustees brought an action against him for breach of covenant and recovered a certain sum of money by way of damages :—

All England Official Transcripts (1997-2008)

# Wolsey Securities Ltd v Abbeygate Management Services (Hampton) Ltd

*Contract - Construction - Contractual term - Joint venture agreement - Defendant guarantor - Whether ancillary documents forming part of agreement - Whether defendant liable for payment of charges under agreement*

[2007] EWCA Civ 423, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

**COURT OF APPEAL (CIVIL DIVISION)**

**AULD, LONGMORE, TOULSON LJJ**

**21 MARCH, 3 MAY 2007**

**3 MAY 2007**

R Griffiths Esq QC and D Falkowski Esq for the Appellant

C Parker Esq for the Respondent

Layton; Howell-Jones Partnership

**LONGMORE LJ:**

*INTRODUCTION*

**[1]** This is an appeal from a judgment of Jack J in which he refused to give summary judgment under Pt 24 of the CPR for the Claimant against the Defendants in the sum of £97,762.42 inclusive of interest but, on the Defendants' cross-application, made a declaration in their favour. The Claimants are Wolsey Securities Ltd ("Wolsey") and the Defendants are Abbeygate Management Services (Hampton) Ltd ("Abbeygate Management"). Wolsey sue Abbeygate Management as the guarantors of Abbeygate Securities Ltd ("the Company") under a joint venture agreement ("the JVA") made between the three parties dated 22 November 2000. The venture was the construction of a block of flats at Lansdown Road London SW20. It was unprofitable and the Company is now in liquidation. The Company was incorporated or acquired for the purpose of carrying out the development. It had no assets of its own. The funds to carry out the development were to come from a loan to the Company by the Bank of Ireland and from a loan facility granted by Wolsey under the terms of a facility letter from Wolsey to the Company which was annexed to the joint venture agreement. PKF were the Company's auditors. By cl 10.3 of the agreement Abbeygate Management guaranteed that the Company would perform its obligations under the agreement. The sum of £88,845.16 and interest is alleged to be due pursuant to that guarantee.

**[2]** In the JVA Abbeygate Securities is referred to as "the Company", "the Bank" is the Bank of Ireland and the "Joint Venturers" are the Company and Wolsey. The provisions of the JVA which are particularly relevant to the dispute are as follows:

| Clause 1 | Definitions |
|---|---|
| "The Cash Flow Appraisals" | the Cash Flow Appraisals marked A and B copies of which are bound up within as Annexe 1; |
| "the Facility Letter" | Wolsey's Facility Letter a copy of which is bound up within as Annex 2; |
| "Management Charge" | the payment to be made for management services assistance and guidance throughout the course of the Development as shown on the Cash Flow Appraisal; |

| "Wolsey's Facility" | the provision of financial facilities in accordance with the Facility Letter |

*"CLAUSE 2: THE COMPANY'S AGREEMENTS*

2.12 To repay to Wolsey all monies that Wolsey shall have advanced in pursuance of Wolsey's Facility And (sic) all monies advanced to the Company whether in pursuance of the Bank's Facility or Wolsey's Facility shall be used exclusively for the purpose of carrying out the Development in accordance with the terms of this Agreement.

2.13 If the Company shall be unable to satisfy the condition of any facility letter issued by the Bank as to the valuation of the Site and the Development so that the amount of the facility offered shall be less than £2,200,000 then the Company and Wolsey shall provide in equal shares the deficit in the Bank's facility required to complete the purchase of the Site provided that the Site shall be offered for resale on the open market and sold to the highest or other bid received as shall be agreed by the Joint Venturers unless they shall both agree that the Development shall continue with each party paying and contributing one-half of the deficit in the Bank's facility required to fund the cost of the Development.

*CLAUSE 4: WOLSEY'S AGREEMENTS*

4.1 To provide Wolsey's Facility in accordance with the Facility Letter.

4.2 If at any time during the continuance of the Development the Company shall contravene any of the provisions of this Agreement or any of the deeds entered into in pursuance hereof or any of the terms and provisions of the Banks Facility or as the case may be Wolsey's Facility which shall result in the Bank and/or Wolsey making written demand for repayment of monies advanced then Wolsey shall be under no continuing obligation to the Company to provide or procure any further finance facilities whatsoever.

*CLAUSE 5: MUTUAL AGREEMENT*

5.4 The company will open a separate bank account with the Bank and such account shall be in the name of the Company and shall be operated by two signatories in every instance one of the signatories being an officer of the Company and other signatory being an officer of Wolsey. All receipts of the Company relating to the Development including the draw down of the Bank Facility and Wolsey's Facility shall be paid into such Bank Account and all payments due to be made in connection with the Development or otherwise pursuant to the Agreement shall be paid out of the Bank Account.

*CLAUSE 8 DISTRIBUTION OF RECEIPTS.*

8.1 All monies received by the Company and arising out of the Joint Venture shall subject as stated above be applied in the following priority -

8.1.1 Repayment to the Bank of all monies borrowed from the Bank for the Site including all interest commitment fees and banking charges paid to the Bank;

8.1.2 Repayment to Wolsey of Wolsey's Facility and any other monies incurred by or properly due to Wolsey in respect of the Development other than Wolsey's share of profits (if any);

8.1.3 Repayment to Wolsey and the Company pari passu the amounts (if any) which they shall respectively advance pursuant to clause 2.13 and/or 6.1 together with interest thereon at 3% above Bank of Scotland base rate from time to time from the date or dates of such advance to the date of repayment.

8.3 The payment of all Management Charges due to Wolsey.

8.4 The payment of any corporation tax on the profits of the Development.

8.5 All other costs charges and expenses mutually agreed by the Joint Venturers as properly incurred by the Joint Venture in the carrying out and the completion of the Development.

*CLAUSE 9 PROFITS AND LOSSES*

9.1 The Net Profits or Net Losses of the Joint Venture shall be calculated by deducting from the total receipts of the Joint Venture the payments made in pursuance of the preceding clause.

9.2 The Net Profits or Net Losses of the Joint Venture shall be as certified in writing to the Joint Venturers by the Company's Auditors (whose fees shall be a joint venture expense).

9.3 The net profits of the Joint Venture shall be divided equally between the Company and Wolsey and such net profits earned (if any) will be distributed as and when available equally between the Company and Wolsey in equal proportions and the final distribution of profits to the Joint Venturers in equal shares will be made within twenty eight days of the completion of the sale of the last Unit to be sold.

9.4 In the event of any net losses these will also be shared by the Joint Venturers equally and any losses accrued shall be settled within twenty-eight days of completion of the last Unit to be sold.

*CLAUSE 10 GUARANTEES*

10.3 The Guarantor as primary obligor hereby agrees with and guarantees to Wolsey and as a continuing security therefore that the Company will duly observe and perform the obligations on the part of the Company herein contained and that the Guarantor will indemnify Wolsey in respect of all losses damages costs and expenses sustained by Wolsey through the default of the Company in failing to perform any of its said obligations herein contained . . . .

*CLAUSE 13 GENERAL*

13.2 This Agreement and Wolsey's Facility constitute the entire agreement between the parties relating to the Development and supersedes and replace all previous agreements and arrangements between the parties relating thereto."

**[3]** As the definition provisions stated, Cash Flow Appraisals marked A and B formed Annex 1 of the Agreement, and the Facility Letter formed Annex 2. The Facility Letter was signed by both the Company and by Abbeygate Management stating they accepted the offer thereby made.

**[4]** Pursuant to cl 9.2 the auditors PKF on 13 September 2004 certified the Net Losses of the Joint Venture as £167,207 but they went rather further than that by saying as follows:

"Based on the adjusted net loss for the joint venture, we consider that Wolsey would owe Abbeygate £83,603.50, being its 50% share of the loss if other amounts owing to Wolsey were paid.

In summary, we consider the amount due from Abbeygate to Wolsey is as follows:

Amounts outstanding in relation to Wolsey facility: 95,719.00

Management charge relating to the facility letter: 70,727.00

Management charge provided for in the cash flow appraisal: 172,448.6

Less: Wolsey's share of the Net Loss of the joint venture: 6,002.66

(83,603.50)

88,845.16"

It was this final figure of £88,845.16 for which the Claimants sued and it can be seen that, although the claim included a small part of the outstanding loan, it was substantially for what were called "management charges". These charges were divided into those "relating to the facility letter" and those "provided for in the cash flow appraisal". Abbeygate Management accepted that they were liable for the Company's failure to pay the small outstanding part of the loan but said that they were not liable for either part of the management charges. Since the management charges were due pursuant to the Facility Letter, the parties crystallised the essential issue they wished the judge to decide as being whether the JVA and the Facility Letter constituted one agreement or two separate agreements. If they were one agreement, Abbeygate Management accepted, subject to any other defence they might have, that they would be liable for the management charges whereas, if they were two separate agreements, Wolsey accepted that Abbeygate Management were not liable for the management charges. The judge held that the agreements were two separate agreements and accordingly made a declaration that the Defendants were not liable for the management charges. Hence this appeal.

[5] The second category of management charges (those provided for in the cash flow appraisal) were defined in the JVA and were expressly to be deducted from receipts in order to arrive at a final figure for net profits or net losses (para 8.3). The first category of management charges, described by PKF, as relating to the facility letter were a form of interest, albeit interest which only became payable if receipts from the joint venture did not materialise at the time or to the extent expected by the parties under the cash flow appraisal arrangements annexed to the JVA. They are not explained in the JVA but are explained in the Facility Letter which (contrary to some of the submissions made at the hearing) appears to me to cover both sets of management charges. It is time to set out the relevant provisions of the Facility Letter.

[6] Clause 1 provided for the amount of the loan to be advanced under it (inclusive of interest thereon and other charges due to the Lender) to be such sums as shall from time to time be required in accordance with the Cash Flow Appraisal. Other material provisions are:

"1.5 *Management Charges*

For the purposes of calculating interest the expression 'Outstanding Balances' shall mean any sums of money owed to the Lender under this facility or the Agreement in excess of the amount expected to be due in accordance with the site Cash Flow Appraisal at the end of each month until all monies due to the Lender shall have been repaid. The Management charge shall be payable equal to the interest which shall be deemed to accrue on any Outstanding Balances at the Bank of Ireland Base Rate plus 2.5%

The Management charge will (subject to the final sentence of this paragraph) be calculated and shall accrue on a daily basis

on the Outstanding Balances on the Borrower's account with the Lender as from the first date on which the Borrower draws down all or any part of the loan in terms of paragraph 1.2 hereof. Prior to the end of each calendar quarter the Lender will send to the Borrower a statement showing the Management charge due in respect of such period. Since each statement will be issued prior to the end of the period to which it relates, the interest rates by reference to which the Management charge is calculated applicable to the days intervening between the date of the relevant statement and the end of the relevant period will be estimated by the Lender and an accounting for any resultant inaccuracy in any statement will be included in the statement for the period next following.

Quarterly management charges will be accumulated by the Lender and form part of any Outstanding Balances until proceeds from the sales of the dwellings are available to meet such management charge. In the event of such sales not materialising in accordance with the Cash Flow Appraisal the Management charge for the relevant period will nevertheless be due and payable.

4.3 Without prejudice to the enforceability of the obligations of the Borrower and the rights of the Lender strictly in accordance with the terms of paragraphs 1.5 and 4.4 hereof, the Lender shall be entitled (but not bound) to debit to the Borrower's loan account (and thus add to the principal of the loan then outstanding) any management charge which shall be due by the Borrower and shall not be paid by the Borrower in terms of paragraph 1.5 hereof and any such management charge so debited if comprising the whole or a part of an Outstanding Balance shall bear interest at the rates by reference to which that management charge is calculated until payment, as from the date of termination of the period in respect of which such management charge is due.

4.4 Without prejudice to the Lender's right to require repayment thereof on demand at any time, all sums due and that may become due to the Lender by the Borrower including accrued interest and all other charges due to the Lender, will become immediately payable upon the occurrence of one or more of the following events:

4.4.1 if the Borrower shall contravene or default in fulfilment of or be in breach of any of the provisions, conditions and warranties contained herein or in any document entered into in pursuance hereof or the Agreement

4.4.2 if an 'Insolvency Event' shall occur'

4.4.3 if (without prejudice to the enforceability of the obligations of the Borrower strictly in accordance with the terms of paragraph 1.5 hereof) the Borrower shall fail to make payment to the Lender of any management charge due hereunder within fourteen days of the same becoming due."

The Facility Letter was then signed by Wolsey and, for their respective rights and interests, by both the Company and Abbeygate Management Services Ltd.

**[7]** It is not elegant draftsmanship to have two quite separate charges described as "Management Charges" but it is tolerably clear that that was the intention of the parties. The interest aspect is called "The Management Charge" and is dealt with in the first two paragraphs of cl 1.5. The third paragraph then refers to "Quarterly management charges"; this phrase may, as Wolsey submitted, refer solely to the management charges defined in the JVA but must on any view include them, since the phrase is "management charges" in the plural. Clause 4.3 then refers to the entitlement of the Lender to debit to the Borrower's loan account "any management charge" and must, therefore, refer to both sets of management charges to the extent that any such charge has become due at any particular time.

*THE SUBMISSIONS*

**[8]** In the light of this lengthy introduction the parties' submissions can be stated shortly. Mr Griffiths QC for Wolsey submitted that the JVA and the Facility Letter were one composite agreement and that Abbeygate Management guaranteed any default of the Company under either document; Mr Parker for the Defendants submitted that the Defendants only guaranteed the obligations under the JVA in which their guarantee was contained, not any obligation of the Company under the separate agreement contained in the Facility Letter.

*DECISION*

**[9]** The question whether there was one agreement or two agreements is, to my mind, a purely semantic question. I would incline to the view that since the Facility Letter was annexed to the JVA there was in truth only one composite agreement. But whether there was one agreement or two agreements, there can be no doubt that since the Facility Letter is, at the very least, referred to in the JVA, both the JVA and the Facility Letter have to be interpreted in the light of each other.

**[10]** In so doing it is fair enough to observe that the guarantee is contained in the JVA and so one would expect the guarantee to apply to the obligations set out in the JVA rather than the obligations set out in the Facility Letter; but the JVA obligations have to be interpreted in accordance with the Facility Letter.

**[11]** When, therefore, one sees that the JVA by cl 2.12 obliges the Company to repay to Wolsey all monies that Wolsey shall have advanced in pursuance of Wolsey's Facility and that cl 4.3 of the Facility Letter entitles Wolsey to debit to the Company's loan account "any management charge" it is impossible to resist the conclusion that as and when Wolsey do in fact debit any management charge to the Company's loan account, the amount in the loan account (including any management charge) is part of the advance which, by cl 2.12 of the JVA it is the Company's obligation to repay. To the extent that that repayment has not been made, the Defendants as guarantors must be liable.

**[12]** The only substantial argument which Mr Parker could advance against this conclusion was that (as held by the Judge) it could never have been intended that the management charges should be deducted from the receipts in order to arrive at final net sums for the purpose of ascertaining whether there was profit or loss on the joint venture while, at the same time, constituting an item for which the Company (and, therefore,) Abbeygate Management, as guarantor could be liable. But this argument proves too much because on that view the Company would not be liable to repay the amount of the original loan either which it is conceded that the Company must do.

**[13]** This consideration led Mr Parker to adopt a more sophisticated argument (not, I think, advanced to the judge) that cl 2.12 referred to "all monies that Wolsey shall have advanced" meaning only the amount of the initial loan and not the management charges as well. With a little assistance from one member of the court, he sought to point out the distinction between the phrase "all monies advanced" which the Company had to repay pursuant to cl 2.12 and the cl 8.1.2 deduction which was defined as "repayment . . . . of Wolsey's Facility and any other money incurred by or properly due to Wolsey in respect of the Development". This latter phrase was said to be apt to cover management charges by way of interest which therefore could not have been intended to come within cl 2.12.

**[14]** This is ingenious but cannot be correct. Once management charges have been debited to the Company's loan account they must constitute "monies . . . advanced . . . in pursuance of Wolsey's Facility". If, of course, they have not been so debited then it could well be the case that they will not form part of the Facility but will nevertheless have to be deducted for the purpose of cl 8.1.2. In that limited sense Mr Parker's distinction between the wordings of cl 2.12 and 8.1.2 may have some force.

**[15]** The judge decided that Wolsey, as a joint venturer, should be sharing the risk if the joint venture made a loss and that they should not, therefore, be able to recoup the management charges. But the fact is that Wolsey have shared the loss by submitting to a deduction from their claim in the sum of £83,603.50.

**[16]** The parties agreed before the judge that what would assist them most was to have an answer to a question of construction. The judge defined that question in para 9 of his judgment as being: "whether for the purpose of the guarantee the Facility Letter is part of the Joint Venture Agreement or a separate contract". The judge concluded that the Facility Letter was a separate contract and, accordingly, the Defendants never guaranteed that Wolsey would receive either form of management charge. In para 2 of his order, he made a declaration in the following terms:

> "that the Defendant is not liable to the Claimant under the joint venture agreement dated 22 November 2000 for the management charge relating to the facility letter or the management charge provided for in the cash flow appraisal."

**[17]** For my part, for the reasons given, I do not think that it was correct to make such a declaration. I would accordingly allow the appeal against para 2 of the judge's order and, if my Lords agree, would substitute a

declaration in the following terms viz:

> "That management charges are in principle payable by Abbeygate Securities Ltd and thus by the Defendants, as their guarantors, save to the extent that such charges shall not have been debited to Abbeygate Securities Ltd's loan account."

[18] Further than that I do not think it would be appropriate to go. No evidence has been put before the court as to whether such charges were debited to the Company's loan account; nor was any argument addressed to the judge or to us as to whether, if they had not been so debited at the time of the initiation of the proceedings or of the hearing before the judge, they could be so debited at a later stage. All that is for the future. The judge was invited to deal only with the question of construction as were we in oral argument. Although we have been presented with other possible issues since the conclusion of the argument, I would not propose to do more than vary para 2 of the order of the judge as set out above. To the extent indicated I would allow this appeal.


**TOULSON LJ:**

[19] On the narrow issue whether the JVA and the facility letter formed a single or separate agreements (which was central to the way in which the case was presented before Jack J), I am inclined to regard them as separate but inter-related. However, I do not think it necessary or helpful to say more about that, because what matters is their combined effect. I am in entire agreement with Longmore LJ that they have to be interpreted in the light of each other. I also agree with his analysis of the combined effect of cl 2.12 of the JVA and clauses 1.5 and 4.3 of the facility letter (which does not appear to have been canvassed before Jack J).

[20] The contractual provisions about management charges are less than clear, but I agree with Longmore LJ that "any management charge" in cl 4.3 of the facility letter must embrace any form of management charge due from the company.

[21] In summary, I am in full agreement with Longmore LJ as to the substance of the guarantee obligations undertaken by Abbeygate Management. Accordingly I agree that the judge's declaration should be set-aside and a declaration substituted in the terms proposed by Longmore LJ. I too would allow this appeal to that extent, and I agree that we should go no further.


**AULD LJ:**

[22] I also agree with my Lord's, Longmore LJ's, conclusion, for the reasons he gives, that the JVA and the Facility Letter are to be interpreted in the light of each other and that a declaration in the form he proposes should be substituted for that made by the judge.

*Appeal allowed.*