Confirmation Hearing Date and Time: December 6, 2011 at 10:00 a.m. (prevailing Eastern time)
Confirmation Objection Deadline: November 4, 2011 at 4:00 p.m. (prevailing Eastern time)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| LEHMAN BROTHERS HOLDINGS INC., ET AL., | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF U.S. BANK NATIONAL ASSOCIATION, NOT INDIVIDUALLY BUT AS TRUSTEE, TO CONFIRMATION OF THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS**

U.S. Bank National Association, not in its individual capacity but as Trustee ("*U.S. Bank*" or the "*Trustee*"), by its undersigned attorneys, respectfully submits this objection (the "*Objection*") to the assumption of certain Swap and Derivative Agreements (as defined below) pursuant to the Third Amended Joint Chapter 11 Plan (the "*Proposed Plan*") of Lehman Brothers Holding Inc. ("*LBHI*") and its Affiliated Debtors (collectively, the "*Debtors*"), and in support thereof, respectfully states as follows:[1]

**PRELIMINARY STATEMENT**

1. The Trustee and, to the extent appropriate, U.S. Bank Trust National Association, serve as trustee, owner trustee, indenture trustee and/or administrative agent in over eight hundred transactions, many of which contain swap and derivative contracts (the "*SPV Derivatives Transactions*") involving the Debtors. In connection with the SPV Derivatives Transactions, the Debtors established, or assisted in the establishment of, numerous special

---

[1] Terms not defined herein shall have the meaning ascribed to them in the Proposed Plan and Disclosure Statement (each as defined herein).

3097184.01.12.doc

purpose vehicles (the "*SPV Counterparties*"), many of which were created under the laws of the Cayman Islands and participated in the various SPV Derivatives Transactions. A central component of many of the SPV Derivatives Transactions was a credit swap or credit derivative agreement (the "*Swap and Derivative Agreements*") between a SPV Counterparty and a Lehman entity. The 1992 ISDA agreement forms the basis of each of the Swap and Derivative Agreements.

2. Immediately following the commencement of LBHI's chapter 11 cases, which constituted an event of default under the various Swap and Derivative Agreements, the Trustee delivered a default and termination notice on behalf of many of the SPV Counterparties (collectively, the "*Early Termination Notices*") with respect to certain of the various Swap and Derivative Agreements, including, but not limited to, those listed on the attached Exhibit A.[2] The Early Termination Notices were served in accordance with the safe harbor provisions of sections 560 and 365(e)(1) of the Bankruptcy Code. Each Early Termination Notice also supplied an Early Termination Date for many of the SPV Derivative Transactions.[3] Following the termination of the Swap and Derivative Agreements, no other obligations were due to either party with respect to the terminated agreements but to determine the amounts of any termination payment due either the Debtors or the respective SPV Counterparty, and the priority of such termination payment.

3. Following the delivery of the Early Termination Notices, the Debtors filed a number of adversary proceedings. The SPV Counterparties are defendants in two of these

---

[2] Early Termination Notices were not delivered with respect to certain agreements that had previously terminated.

[3] Attached as Exhibit B is a copy of the Early Termination Notice submitted on behalf of the RACERS 2006-20AT trust. This Early Termination Notice is representative of those disseminated to the Debtors on behalf of each relevant trust. Pursuant to the Plan Supplement, the Debtors are currently seeking to assume an agreement with the RACERS 2006-20AT trust.

proceedings (the "*Adversary Proceedings*"). See Adv. Pro. No. 10-03542 and No. 10-03547. Pursuant to the Adversary Proceedings, the Debtors have asserted claims against certain SPV Counterparties for, among other things, a termination payment that the Debtors claim is due them under certain provisions of the Swap and Derivative Agreements.

4.    Pursuant to the Plan Supplement, filed on October 28, 2011 (the "*Plan Supplement*"), the Debtors have now determined to assume certain of the Swap and Derivative Agreements. See Plan Agreement, Ex. 2.[4] However, pursuant to the section 365 of the Bankruptcy Code, the Debtors may only assume "executory" contracts. Because: (i) many of the Swap and Derivative Agreements either previously terminated pursuant to their terms or have been terminated in accordance with their express terms and in accordance with the safe harbor provisions of the Bankruptcy Code and (ii) no additional duties are owed by the parties to the Swap and Derivative Agreements with the exception of settling the amounts outstanding thereunder with respect to a termination payment, the Swap and Derivative Agreements are not executory agreements capable of being assumed pursuant to section 365 of the Bankruptcy Code. As a result, the Debtors' request to assume such agreements must be denied. To the extent this Court finds these agreements to be executory, the Debtors must cure any outstanding defaults, and their ability to assume such contracts should be limited solely to their contractual right to receive a net termination payment.

**BACKGROUND**

---

[4]    Debtors have also recently filed their Motion Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code to Establish Procedures for the Consensual Amendment and Assumption of Certain Prepetition Derivatives Contracts, filed on October 25, 2011 (the "*Procedures Motion*") [Docket No. 21297]. As noted, Trustee previously delivered a termination notice to Debtors for many of the Swap and Derivative Agreements. Other agreements terminated pursuant to their terms. As a result, the Swap and Derivative Agreements should not be included among the derivative agreements that are the subject of the procedures established pursuant to the Procedures Motion. Trustee reserves its rights to argue that such agreements may not be assumed pursuant to such procedures on the same grounds included herein.

5. The SPV Derivatives Transactions for which the Trustee serves as trustee, owner trustee, indenture trustee and/or administrative agent primarily consist of three different types of financial transactions marketed by Debtors. The first type involves collateralized debt obligation transactions, in which loans and notes of third parties were sold to an SPV Counterparty, which financed such purchase through the issuance of separate notes and/or certificates to investors. The notes issued by the SPV Counterparty were to provide a return of interest and principal to the holders in accordance with the terms of a waterfall contained in the governing documents. A credit derivative transaction is a central feature of these transactions with a Lehman entity purchasing the risk protection thereunder.

6. In a second type of transaction, a SPV Counterparty was created to issue various tranches of certificates to fund its purchase of mortgage loans from a Lehman-related entity. Some of the various tranches are supported by swap agreements, between the applicable special purpose entity or trust and a Debtor entity as counterparties. In some cases, these are interest rate swaps; in other cases, these swaps take on the risk of non-payment of certain amounts due and owing a particular tranche of certificates.

7. In a third type of transaction, known as a RACERs transaction, the SPV Counterparty is a trust which was created to buy an underlying asset and designed to enhance the return from the underlying asset in some manner. One of the Debtors serves as the counterparty in these transactions in connection with a derivative contract.

8. With respect to each type of transaction, the rights and obligations of the SPV Counterparties, the Trustee and the holders of the notes and/or certificates are each specifically set forth in the governing documents. While various Debtor entities are parties to the various Swap and Derivative Agreements with the SPV Counterparties, the Debtors are not parties to the various indentures and/or trust agreements.

9. In performing its obligations under the various SPV Derivatives Transactions, the Trustee relies upon the specific terms of the governing documents and upon directions, instructions, and indemnities with respect to all of the actions it takes in connection with such trusts. The Trustee has no monetary interest in the underlying transactions themselves or in the SPV Counterparties (with the exception of the Trustee's fees, costs and expenses in connection with its service under the relevant governing documents).

10. The Trustee previously filed a Proof of Claim prior to the bar date with respect to each of the SPV Derivatives Transactions.

11. On August 31, 2011, the Debtors filed their Proposed Plan and Disclosure Statement for Third Amended Chapter 11 Plan (the "*Disclosure Statement*").

12. Pursuant to section 11.1 of the Proposed Plan:

> all executory contracts and unexpired leases that exist between a Debtor and any person or entity shall be deemed rejected by such Debtor, as of the Effective Date, except for any executory contract or unexpired lease . . . (c) that is specifically designated in the Plan Supplement as a contract or lease to be assumed by the Debtor.

13. In addition, section 11.2 of the Proposed Plan provides that:

> [e]ntry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (a) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed or assumed and assigned pursuant to the Plan.

14. Moreover, the notice of the Confirmation Hearing (as defined in the Proposed Plan) directs that:

> [i]f you are a Counterparty to an executory contract or unexpired lease to be assumed or assumed and assigned by the Debtors, you must file and serve any objection to the assumption or the cure amounts listed by the Debtors on the above-referenced schedule by the Plan Objection Deadline.

5

15.  As noted above, the Debtors filed the Plan Supplement on October 28, 2011. Pursuant to the Plan Supplement, the Debtors have now determined to assume many of the Swap and Derivative Agreements as well as certain other contracts.

## ARGUMENT

**I. The Swap and Derivative Agreements are Not Executory Contracts Capable of Being Assumed Pursuant to Section 365 of the Bankruptcy Code**

16.  Section 365 of the Bankruptcy Code authorizes a debtor in possession to "assume or reject any *executory* contract or unexpired lease," subject to the court's approval. 11 U.S.C. § 365(a) (emphasis added). As a result, only executory contracts may be assumed by a chapter 11 debtor. The legislative history of section 365 states that "[t]hough there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides." H.R. Rep. No. 95-595, at 347 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6303; *accord NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 522 n. 6 (1984). An executory contract has also been held to be an agreement "in which a party binds itself to perform at some time in the future." *First Intl. Bank of Israel, Ltd. v. L. Blankstein & Son, Inc.*, 59 N.Y.2d 436, 443 (1983).

17.  In this instance, the Swap and Derivative Agreements are not executory. As noted above, such agreements have either previously terminated or were properly terminated by the Trustee in accordance with both the terms of the underlying agreement and in accordance with the safe harbor provisions of the Bankruptcy Code. Owing to their termination, there is no future performance required under the agreements by either party, with the exception of liquidating the amount payable as a termination value.

18.  However, the obligation to pay money at some future date does not make a contract executory. *See In re Chateaugay Corp.*, 130 B.R. 162, 165–166 (Bankr. S.D.N.Y. 1991) ("A debtor's obligation to pay money, standing alone, is insufficient to render a contract

6

executory"); *In re Masters, Inc.*, 141 B.R. 13, 17 (Bankr. E.D.N.Y.), *aff'd*, 149 B.R. 289 (E.D.N.Y. 1992) ("[A] contract is not executory where the only obligation of a party . . . is the payment of money'") (citation omitted); *see also In re Helm*, 335 B.R. 528, 535 (Bankr. S.D.N.Y. 2006) ("[W]here one party has fully performed, and awaits only payment by the other party . . . an agreement is not executory, as performance is complete, with only payment owed") (citation omitted); *but see* Lehman Bros. Spec. Fin. v. BNY Corp. Tr. Servs. (In re Lehman Brothers Holdings, Inc.), 422 Bankr. 407, 416 (Bankr. S.D.N.Y. 2010) (finding terminated ISDA agreement to be executory where both parties had continuing obligations to pay).

19. Each of the various Swap and Derivative Agreements are governed by New York law. The New York Supreme Court in *Controladora* makes this point clearly and concisely, holding "[o]nce terminated, the ISDA Agreement was not, and could not be, executory." *JPMorgan Chase Bank, N.A. v. Controladora Comercial Mexicana S.A.B. De C.V.*, 920 N.Y.S.2d 241 (Sup. Ct. 2010). As noted above, the 1992 ISDA agreement serves as the basis of each of the Swap and Derivative Agreements.

## II. Debtors Must Cure Any Outstanding Defaults

20. Notwithstanding their termination, to the extent that such agreements are determined to be executory and capable of assumption, pursuant to section 365 of the Bankruptcy Code the Debtors must cure, or provide adequate assurance that the Debtors will promptly cure, any and all outstanding defaults. As a result, the Debtors must cure any and all defaults under the Swap and Derivative Agreements with respect of their performance due to the SPV Counterparties, as well as pay any and all fees, costs and expenses incurred by the Trustee in connection with the preservation and protection of their respective interests, on behalf of the investors in the various SPV Counterparties, in the Swap and Derivative Agreements. In curing

any and all outstanding defaults, the Debtors must comply with the express terms of the underlying agreement. In doing so, the Trustee asserts that the Swap and Derivative Agreements require, where applicable, that all such calculations must be made as of the Early Termination Date.

21.     On October 27, 2011, the Debtor sent each SPV Counterparty a Cure Amount Notice (the *"Notice"*), advising them of (i) the Debtors intention to assume the relevant contracts and (ii) the amount to be paid by the applicable Debtor to cure the relevant agreement. Many of the Notices with respect to the Swap and Derivative Agreements specify a cure amount of $0. With the exception of certain fees and expenses outstanding to the Trustee, the Trustee does not currently believe any amounts to be outstanding by either party with respect to the Swap and Derivative Agreements, with the exception of certain termination fees, the payment of which is currently the subject of litigation. However, the Notice did not give the Trustee ample time to audit these cure amounts prior to the November 4, 2011 plan objection deadline. Owing to the large number of Swap and Derivative Agreement being assumed by the Debtors, until given adequate opportunity to review each Swap and Derivative Agreement to determine the appropriate cure amount as compared to the amount contained in the Notice, the Trustee must generally object to the Debtors' calculations at this time.

22.     In addition, to the extent the Debtors now assert that the Swap and Derivative Agreements are not terminated, no termination payments should be due and owing with respect to the Adversary Proceedings. The Debtors cannot assert on the one hand that they are due amounts owing because of an early termination – whether it be on account of the amounts outstanding as of the Early Termination Date or on account of a termination fee being due – and, on the other hand, seek to assume the Swap and Derivative Agreements as executory contracts. However, to the extent that the Debtors assert that the agreements have been terminated and such

8

agreements are found to be executory agreements, the Debtors recovery, if any, should be limited to the express requirements of the underlying agreements, which provide only for the payment of the fees and expenses of the Trustee and the payment of a termination payment in certain circumstances.

23. Furthermore, many of the Swap and Derivative Agreements explicitly required that the obligations of Lehman Brothers Special Finance Inc. be guaranteed by LBHI. In order to assume the Swap and Derivative Agreements, the Debtors must comply with all of their express terms thereof. It is certain that a debtor may not "cherry pick" among the provisions of an executory contract to seek out the provisions it finds beneficial and cast off those it finds burdensome. Instead, executory contracts must be assumed or rejected in full. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984) ("Should the debtor-in-possession elect to assume the executory contract . . . it assumes the contract *cum onere*."). Furthermore, a debtor "cannot simply retain the favorable and excise the burdensome provisions of an agreement." *In re Kopel*, 232 B.R. 57, 63-64 (Bankr. E.D.N.Y. 1999). As a result, in order to properly cure the Swap and Derivative Agreements, the Debtors must also assume the related guarantee agreements with LBHI.

24. As a result, because the Swap and Derivative Agreements have been terminated in accordance with their terms and applicable law, and are therefore not executory contracts capable of being assumed pursuant to section 365, the Court should not authorize their assumption pursuant to the Debtors' Proposed Plan. To the extent the Court determines that these agreements are in, in fact, executory, the Debtors must cure each of the Swap and Derivative Agreements pursuant to its express terms, and where applicable, liquidate the amounts payable as of the Early Termination Date. Furthermore, owing to the express provisions of the

9

underlying agreements, the Debtors should be strictly limited to their rights, if any, to a net termination payment after taking into account the fees and expenses of the Trustee.

## CONCLUSION

WHEREFORE, Trustee requests that the Court enter an order: (i) denying Debtors' request to assume the Swap and Derivative Agreements, or (ii) limiting the Debtor's rights with respect to any assumption where the Swap and Deriviative Agreement has been terminated and (iii) granting Trustee such other and further relief to which it is entitled.

Dated: November __, 2011

                                              Respectfully submitted,

                                              U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE

                                              By: _____
                                                           One of Its Attorneys

James E. Spiotto (admitted *pro hac vice*)
Ann E. Acker (admitted *pro hac vice*)
Franklin H. Top, III (admitted *pro hac vice*)
James Heiser (JH 3660)
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois 60603
Telephone: (312) 845-3000

Craig M. Price (CP 9039)
CHAPMAN AND CUTLER LLP
330 Madison Avenue, 34th Floor
New York, New York 10017-5010
Telephone: (212) 655-6000

11