**Confirmation Date and Time: December 6, 2011 at 10:00 a.m. (prevailing Eastern time)**
**Confirmation Objection Deadline Date and Time: November 4, 2011 at 4:00 p.m.**
**(prevailing Eastern time)**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE: | CHAPTER 11 |
| LEHMAN BROTHERS HOLDINGS INC., ET AL., | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF BANK OF MONTREAL TO CONFIRMATION OF THE
THIRD AMENDED JOINT CHAPTER 11 PLAN OF
LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS
INCLUDING BUT NOT LIMITED TO THE ASSUMPTION
OF THE MASTER AGREEMENT**

James E. Spiotto (admitted *pro hac vice*)
Ann E. Acker (admitted *pro hac vice*)
Franklin H. Top III (admitted *pro hac vice*)
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois  60603
Telephone:  (312) 845-3000

Craig M. Price (CP 9039)
CHAPMAN AND CUTLER LLP
330 Madison Avenue, 34th Floor
New York, New York  10017-5010
Telephone:  (212) 655-6000

3091956.01.21.doc
1696814

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ....................................................................................................1

BACKGROUND ...........................................................................................................................8

    I.      Termination of the Master Agreement ................................................8

    II.     Debtors' Derivatives Framework ......................................................9

    III.    Treatment of BMO's Claim under the Proposed Plan ...........................................12

ARGUMENT ...............................................................................................................................13

        Debtors Cannot Assume the Master Agreement as Proposed ...........................................13

    I.      Debtors Cannot Assume the Master Agreement as Proposed ...............................13

    II.     The Debtors' Proposed Plan Fails to Meet the Requirements of Confirmation ...............................................................................16

        A.    Burden of Proof ...................................................................16

        B.    Debtors' Proposed Plan Is Not Feasible Pursuant to Section 1129(a)(11) as It Fails to Adequately Provide for the Derivatives Claims ...............................................................16

        C.    Debtors' Proposed Plan Fails under Section 1129(a)(3)...........................22

            1.    Debtors Fail to Both Properly Interpret the 1992 ISDA Agreement and Value the Disputed Claims, Actions That Are Forbidden by Law ..............................23

            2.    Debtors Have Impermissibly Attempted to Manipulate Voting ...................................................24

        D.    The Proposed Plan Fails the Best Interest Test of Section 1129(a)(7) ...............................................................26

            1.    The Derivatives Framework Fails the Best Interest of Creditors Test ...............................................27

            2.    The Proposed Plan's Injunction Provisions Violate Section 1129(a)(7) .............................................28

        E.    The Proposed Plan's Injunction Is Overreaching and Violates BMO's Property Interests, Exceeding This Court's Jurisdictional Mandate ...........................................................31

F.      Debtors' Proposed Plan Fails to Comply with
        Section 1129(a)(1) .......................................................................................33

G.      The Proposed Plan Fails to Comply with the Cramdown
        Provisions of Section 1129(b).....................................................................35

CONCLUSION .................................................................................................................37

# TABLE OF AUTHORITIES

PAGE

## CASES

*Am. Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*,
    280 F.2d 119 (2d Cir. 1960) ............................................................ 14

*Anthracite Rated Inv. (Jersey) Ltd. v. Lehman Brothers Fin. SA*, [2011]
    EWHC (ch) 1822 (Eng.) .................................................. 18, 19, 20, 23

*Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160 (2d Cir. 1979) ..................... 32

*Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning
    Corp.)*, 280 F.3d 648 (6th Cir. 2002) .......................................... 33, 34

*Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004) ............................ 24

*Drexel Burnham Lambert Trading Corp. v. Drexel Burnham Lambert
    Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d
    285 (2d Cir. 1992) ............................................................... 29

*Hanson v. First Bank of South Dakota*, 828 F.2d 1310 (8th Cir. 1987) ......... 22

*Holmes v. United States (In re Holmes)*, 301 B.R. 911 (Bankr. M.D. Ga.
    2003) ........................................................................... 17

*In re A.H. Robbins & Co.*, 828 F.2d 1023 (4th Cir. 1987) ...................... 32

*In re Bergman*, 585 F.2d 1171 (2d Cir. 1978) ................................. 17

*In re Bush Indus., Inc.*, 315 B.R. 292 (Bankr. W.D.N.Y. 2004) ................ 25

*In re Chateaugay Corp.*, 10 F.3d 944 (2d Cir. 1993 ........................... 14

*In re Clarkson*, 767 F.2d 417 (8th Cir. 1985) ................................ 17

*In re Finova Group, Inc.*, 304 B.R. 630 (D. Del. 2004) ....................... 34

*In re Greene*, 57 B.R. 272 (Bankr. S.D.N.Y. 1986) ........................... 17

*In re Hardin*, 486 F.3d 510 (9th Cir. 2007) ................................. 21

*In re Investors Fla. Aggressive Growth Fund, Ltd.*, 168 B.R. 760 (Bankr. N.D. Fla. 1994) .................................................................................... 17

*In re J. Thorpe Co.*, 308 B.R. 782 (Bankr. S.D. Tex. 2003) ........................................ 16

*In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986) ............................. 16

*In re Jorgensen*, 66 B.R. 104 (9th Cir. B.A.P. 1986) ................................................... 22

*In re Kopel*, 232 B.R. 57 (Bankr. E.D.N.Y. 1999) ....................................................... 15

*In re Leslie Faye Cos.*, 207 B.R. 764 (Bankr. S.D.N.Y. 1997) ........................ 22, 23, 26

*In re MCorp. Fin., Inc.*, 137 B.R. 219 (Bankr. S.D. Tex. 1992) .................................. 27

*In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005) .................... 29, 30

*In re Pero Bros. Farms, Inc.*, 90 B.R. 562 (Bankr. S.D. Fla. 1988) ........................... 17

*In re Pizza of Hawaii, Inc.*, 761 F.2d 1374 (9th Cir. 1985) ......................................... 21

*In re Quebecor World (USA) Inc.*, 453 B.R. 201 (Bankr. S.D.N.Y. 2011) .................. 18

*In re Quigley Co. Inc.*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010) ................... 16, 24, 26, 27

*In re Resorts Int'l, Inc.*, 145 B.R. 412 (Bankr. D. N.J. 1990) ..................................... 23

*In re Taddeo*, 685 F.2d 24 (2d Cir. 1982) .................................................................... 14

*In re Texaco Inc.*, 84 B.R. 893 (Bankr. S.D.N.Y. 1988) .............................................. 16

*In re Victory Const. Co. Inc.*, 42 B.R. 145 (Bankr. S.D. Cal. 1984) ........................... 26

*In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) ......................... 34

*In re Yates Development*, 258 B.R. 36 (Bankr. M.D. Fla. 2000) ................................. 18

*In re Young Broad. Inc.*, 430 B.R. 99 (Bankr. S.D.N.Y. 2010) .............................. 16, 17

*Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ...................................... 22

*New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86 (2d Cir. 2003) ............................... 30

*NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984) ............................................... 15, 19

*Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) .................................................................................................... 20, 31

*ReGen Capital I, Inc. v. Halperin (In re U.S. Wireless Data, Inc.)*, 547 F.3d 484 (2d Cir. 2008) .................................................................. 14

*Resorts Int'l v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394 (9th Cir. 1995) ....................................................................................................... 33

*Stern v. Marshall*, 131 S. Ct. 2594 (2011) ..................................................... 6, 20, 31, 33

*Travelers Casualty & Surety Co. of Am. v. Pacific Gas & Elec. Co.*, 594 U.S. 443 (2007) ............................................................................................ 31

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470 (N.Y. 2004) ................................................................................................................ 24

*Windels Marx Lane & Mittendorf, LLP v. Source Enters. (In re Source Enters., Inc.)*, 392 B.R. 541 (S.D.N.Y. 2008) ................................... 33

## STATUTES

11 U.S.C. § 1129 ....................................................................................... 16, 22, 26, 33, 36

11 U.S.C. § 365(b) ................................................................................................................ 13

11 U.S.C. § 541 .............................................................................................................. 28, 32

11 U.S.C. §§ 556-562 ..................................................................................................... 1, 35

## OTHER AUTHORITIES

Douglas G. Baird, *Elements of Bankruptcy* 6 (3d Cir. 2001) ....................................... 30

## TREATISES

3 COLLIER ON BANKRUPTCY para. 365.05[3] (15th ed. rev. 2008) ................................ 14

5 COLLIER ON BANKRUPTCY para. 1123.01[4] (15th ed. 1984) .................................... 34

5 COLLIER ON BANKRUPTCY para. 1129.02[11] (15th ed. 1984) .................................. 17

Bank of Montreal (*"BMO"*), by its undersigned attorneys, respectfully submits this objection (the *"Objection"*) to (i) the assumption of the Master Agreement (as defined below) and (ii) confirmation of the Third Amended Joint Chapter 11 Plan (the *"Proposed Plan"*) of Lehman Brothers Holding Inc. (*"LBHI"*) and its Affiliated Debtors (collectively, the *"Debtors"*), and in support thereof, respectfully states as follows:[1]

## PRELIMINARY STATEMENT

1.      BMO is a party with Lehman Brothers Special Financing Inc. (*"LBSF"*) to an ISDA Master Agreement (multi-currency cross-border) dated as of April 13, 1994, as amended by an Amendment to ISDA Master Agreement dated as of December 16, 1997, and as further amended or restated from time to time between the parties (the *"Master Agreement"*).  The Master Agreement was unconditionally guaranteed by LBHI.  In connection with the Master Agreement and related Credit Support Annex, BMO posted certain collateral with LBSF (the *"Posted Collateral"*).

2.      Immediately following the commencement of these chapter 11 cases, which served as an event of default under the Master Agreement, BMO delivered a default and termination notice with respect to the Master Agreement.[2]  In January 2009, BMO supplied Debtors with the Statement of Calculation (as defined below), setting forth the amounts owed to BMO after taking into account a setoff against the Posted Collateral held by LBSF.  BMO, as the non-defaulting party, calculated the amount outstanding using a valuation methodology consistent with the Master Agreement.  Using such methodology, BMO initially calculated that

---

[1]      Terms not defined herein shall have the meanings ascribed to them in the Proposed Plan and Disclosure Statement (each as defined herein).

[2]      Such notices were delivered in compliance with the safe harbor provisions of the U.S. Bankruptcy Code. *See* 11 U.S.C. §§ 556-562 (derivatives safe harbor provisions allowing for post-petition termination). However, the Master Agreement is included in the list of non-terminated prepetition derivatives contracts in the Plan Supplement defined below.

Debtors owed BMO approximately $22,636,598.75, plus costs and interest. This amount does not include any substitute securities that BMO may have been obligated to purchase to replace certain Posted Collateral.

3.      Pursuant to the Plan Supplement, filed on October 28, 2011 (the *"Plan Supplement"*), it appears that Debtors have now determined to assume the Master Agreement. (*See* Plan Supplement, p. 342 [Docket No. 21254].)  To the extent the Master Agreement is deemed an executory contract, for assumption to be proper, section 365 of the Bankruptcy Code requires that Debtors cure all amounts outstanding pursuant to the Master Agreement.  Despite this fact, the Plan Supplement does not list a cure amount or indicate the method by which the Master Agreement will be valued.  (As of the time of filing, BMO was not in receipt of any "cure" letter.)  The Court should not allow the assumption of the Master Agreement under these circumstances, and BMO objects to any attempt by Debtors to assume such agreement, unless Debtors specifically agree to value the amounts outstanding thereunder in a manner consistent with the valuation methodology required by the already-terminated Master Agreement and the other express terms thereof.  In assuming the Master Agreement, Debtors must assume the contract as a whole and may not simply cherry pick those provisions that best suit their interests.[3]

4.      A determination of the proper valuation methodology is critical to BMO, as well as other derivatives counterparties.  It appears that rather than utilize the valuation methodology consistent with the express terms of the Master Agreement, Debtors apparently have previously determined to use a different, unprecedented methodology, the mid market valuation method (the *"Mid Market Valuation Method"*), in calculating the amounts owing upon termination with

---

[3]      BMO asserts that Debtors waived any right to impose a non-contractual valuation scheme by determining to assume the contract.  Pursuant to section 365 of the Bankruptcy Code, Debtors must act consistent with the express terms in order to assume an agreement.

respect to their derivatives transactions.  First set forth in the Derivatives Claims Settlement Framework dated as of May 27, 2011 (the *"Derivatives Framework"*), it comes as no surprise that this methodology strongly favors Debtors' interests over those of their derivatives counterparties.  However, notwithstanding its use by Debtors, the imposition of the Mid Market Valuation Method on all derivatives transactions fails to comply with the express terms of many, if not all, of Debtors' various derivatives agreements, including the Master Agreement.[4]  While Debtors still cling to the idea that they may be able to force this unique, self-declared valuation methodology on all derivatives parties, Debtors' use of this method already has been discredited by an English court examining this very issue.

5.    This is not an insignificant issue and contains serious implications with respect to Debtors' ability to confirm the Proposed Plan.  The determination of the proper valuation methodology for Debtors' terminated derivatives transactions would result in a swing of potentially billions of dollars in aggregate for all non-settling derivatives claimants.  Indeed, LBSF has contended that application of the Mid Market Valuation Method would result in a substantial payment by BMO to LBSF if Debtors prevail in compelling the use of their self-chosen valuation methodology instead of a Claim in favor of BMO of at least $22 million plus fees and expenses pursuant to the Calculation Statement.[5]  Debtors are parties to a large number of similar derivatives transactions, all of which also must resolve this issue before such Claims may be determined on a final basis.

6.    In addition, Debtors have entered into settlement agreements regarding other large derivatives transactions with a number of large counterparties (the so-called *"Big Bank*

---

[4]    The 1992 ISDA agreement forms the basis of the Master Agreement and many, if not all, of Debtors' other various derivatives transactions.  As discussed in detail below, the Mid Market Valuation methodology is inconsistent with the terms of the 1992 ISDA agreement.

[5]    BMO does not concede that LBSF's calculation is the correct amount even if the Mid Market Valuation Method is applied.

Counterparties"). Such settlement agreements resolved approximately $9.6 billion of Claims against Debtors' estates, in exchange for Allowed Claims of approximately $6.2 billion. (Disclosure Statement at 51 [Docket No. 19630].) As noted in the Disclosure Statement, each of these settlement agreements contains a most favored nation ("*MFN*") clause. A number of Big Bank Counterparties have refused to settle using the Mid Market Valuation Method. As a result, if and when there is a determination that Debtors cannot impose the Mid Market Valuation Method on the derivatives counterparties and the Debtors choose to settle with non-settling Big Bank Counterparties based on such determination, the result will likely require substantial additional payments to the settling Big Bank Counterparties. In fact, given the amounts involved, even a relatively small valuation increase could result in additional Claims involving hundreds of millions of dollars.

7.      While the Proposed Plan does hold back amounts for Disputed Claims, the Proposed Plan does not provide for the payment of such additional amounts to the settling Big Bank Counterparties should any amounts become due and owing pursuant to the MFN clauses. Furthermore, to the extent such Claims are deemed secured Claims, pursuant to the terms of the Proposed Plan such amounts must be paid in full in cash. Such Claims are not included within the ambit of Disputed Claims under the Proposed Plan, and no reserve has been made to pay such Claims. Because Debtors' Proposed Plan fails to account for, or make any holdback provisions for, potentially billions of dollars of additional Claims for all derivatives claimants, which may be required to be paid in full in cash, the Proposed Plan is unworkable as drafted. As a result, the Court should find that the Proposed Plan does not satisfy the feasibility requirements of section 1129(a)(11).

8.      Likewise, the Proposed Plan fails to pass the "good faith" test of section 1129(a)(3) and is forbidden by law. As an initial matter, under New York law, a

contracting party cannot unilaterally establish contractual provisions inconsistent with the governing terms of the contract. This is exactly what Debtors propose to do through the Derivatives Framework. (If Debtors do not intend to impose the Derivatives Framework on BMO's Claim but instead will be governed by the terms of the ISDA, they can easily stipulate to this.) Further, it is clear that Debtors have agreed to settle a number of the largest Claims of their derivatives counterparties – those of the settling Big Bank Counterparties – in order to obtain their support for the Proposed Plan and effectively manipulate the voting required pursuant to section 1126. In return for settling their Claims, the settling Big Bank Counterparties received an increase of 11.25 percent above the values set forth in the Derivatives Framework, as well as gained the benefit of the MFN clauses. Debtors have not agreed to settle any additional Claims on such advantageous terms, and there can be no guarantee Debtors will make any such offers in the future. Instead, Debtors appear to be insisting that all other derivatives counterparties are only entitled to the flawed value set forth in the Derivatives Framework. Applicable law does not allow Debtors to favor certain creditors over others in order to gain their acceptance. As a result, the Court should find that Debtors' Proposed Plan fails to meet the "good faith" requirements of section 1129(a)(3).

9.      Further, Debtors' Proposed Plan violates the "best interest of creditors" test of section 1129(a)(7). Pursuant to section 1129(a)(7), creditors rejecting a plan may not receive in a chapter 11 plan less than they would were a debtor to be liquidated under a hypothetical chapter 7 plan. As an initial matter, Debtors' refusal to follow a valuation methodology consistent with the 1992 ISDA agreement, and the insistence on imposing their own valuation methodology as set forth in the Derivatives Framework, will likely cause Debtors to hold back insufficient amounts to cover all Disputed Claims. Further, the Injunction provisions of section 13.5 cut off creditors' rights to pursue their property from non-debtor parties. With regard to

BMO, the Injunction appears to prevent it from seeking the return of its Posted Collateral, which is not property of Debtors' estates post-termination. As a result, BMO and other creditors would likely receive more were Debtors to be liquidated under a hypothetical chapter 7 plan.

10.     In addition, approving the Injunction contained in Debtors' Proposed Plan would cause this Court to exceed its jurisdictional mandate, violating Article III of the U.S. Constitution. Specifically, the Injunction would serve to cut off BMO's state law property rights to the Posted Collateral. There is no question that the Posted Collateral is BMO's property. To the extent BMO is prohibited from offsetting its Claim against the amount of the Posted Collateral, or the Posted Collateral is not valued consistent with the express terms of the Master Agreement, BMO should not be enjoined by the Proposed Plan from pursuing legal action against any non-debtor parties that may have appropriated the Posted Collateral to obtain possession of this property.[6] As reiterated in the recent U.S. Supreme Court decision of *Stern v. Marshall*, a Bankruptcy Court may not make determinations on issues falling outside of its "core" jurisdiction, which includes precluding creditors from pursuing non-debtor parties in relation to their state law property rights, especially where such property is not property of a debtor's estate. 131 S. Ct. 2594 (2011).

11.     Likewise, Debtors' Proposed Plan fails to comply with section 1129(a)(1) of the Bankruptcy Code because it fails to adhere to sections 524(e) and 1123(a)(4). Specifically, the Proposed Plan contains Injunction provisions that violate section 524(e) because they discharge liabilities of non-debtors. Secondly, Debtors' Proposed Plan violates section 1123(a)(4) because it treats the settling Big Bank Counterparties differently than it treats the other derivatives claimants. As noted above, Debtors have given the settling Big Bank Counterparties 11.25 percent more than the amount to which they were entitled under the Derivatives Framework.

---

[6]     Further, BMO may wish to pursue in a Claim against Debtors the interest that has accrued on the Posted Collateral.

Should Debtors follow the Derivatives Framework with respect to the other derivatives claimants in the same class, inequality within the class will exist, violating section 1123(a)(4).[7]

12.    Finally, as the Court is aware, any litigation to determine the proper valuation methodology to be utilized pursuant to the Master Agreement and the 1992 ISDA agreement will almost certainly take years to complete. By the time such litigation is resolved, should BMO and the other non-settling derivatives counterparties prevail regarding the use of their chosen valuation methodology, they are to be paid in full using amounts in the Disputed Claims Holdback. However, given Debtors' refusal to abide by the express terms of the Master Agreement, it is unlikely that Debtors would hold back sufficient funds to cover BMO's Claims or those of similarly situated derivatives counterparties. Significant amounts will likely also be due to the Big Bank Counterparties, some of whom could be secured creditors. Furthermore, in the interim period, junior creditors will have received payments on their Claims before senior creditors are paid in full. As a result, the Proposed Plan fails to satisfy the requirements of section 1129(b), which requires that senior creditors be paid in full prior to any distributions being made to junior creditors. Finally, the Proposed Plan violates the derivatives safe harbor provisions of the Bankruptcy Code, which require that parties be able to terminate and settle their Claims post-petition in a manner consistent with the terms of the underlying agreement.

13.    For each of the above reasons, as further detailed below, Debtors have failed to: (i) meet the requirements of section 365 to assume the Master Agreement and (ii) carry their burden of showing that the Proposed Plan meets the requirements for confirmation. As a result, the Court should not confirm the Proposed Plan.

---

[7]    Debtors' Proposed Plan apparently places BMO and the other derivatives claimants who hold claims against LBSF in Class 4A. (Proposed Plan at 34-35.)

# BACKGROUND

## I.    Termination of the Master Agreement

14.    Pursuant to the terms of the Master Agreement, the commencement of the chapter 11 case by the Guarantor LBHI on September 15, 2008, constituted an Event of Default. (Master Agreement § 5(a)(vii)(4).)    On September 16, 2008, pursuant to section 6(a) of the Master Agreement, BMO gave notice of default and termination to Debtors and designated September 17, 2008, as the Early Termination Date under the Master Agreement.

15.    On September 30, 2008, pursuant to the terms of the applicable Credit Support Annex, BMO, as Pledgor, delivered a notice to Debtors in which BMO demanded the return of the Posted Collateral from Debtors.    Pursuant to the terms of the Credit Support Annex, LBSF was holding BMO's Posted Collateral, which consisted of bonds and other securities having a value of approximately $101,200,000.    While the Master Agreement gave Debtors use of the Posted Collateral, under the terms of the Credit Support Annex such use was lost following a default and Early Termination.[8]

16.    Thereafter, on January 5, 2009, pursuant to section 6(d)(i) of the Master Agreement, BMO provided LBSF and LBHI with the Statement of Calculation of the amount due by LBSF to BMO under the Master Agreement (the *"Statement of Calculation"*).    In accordance with the terms of the 1992 ISDA agreement, as the non-defaulting party, BMO calculated the amounts outstanding consistent with the valuation methodology contained in the Master Agreement.

---

[8]    Any funds or securities held by LBSF or LBHI relating to the Posted Collateral are not property of Debtors' estates but are property of BMO, and that possession or assertion of rights over such funds, property or collateral by LBSF does not transform such funds, property, collateral or proceeds thereof into property of Debtors' estates.    Therefore, Debtors have no legitimate legal right to hold or prevent the transfer of such funds, property, collateral or the proceeds thereof to BMO under the terms of the relevant documents.

17.     As set forth in the Statement of Calculation, in accordance with section 6(d) of the Master Agreement, BMO calculated the amount payable under section 6(e) of the Master Agreement by BMO to LBSF in the amount of $78,563,401.25 (the *"Amount Payable"*).

18.     Pursuant to paragraph 8(b)(iv)(A) of the Credit Support Annex, BMO offset the Amount Payable against the value of the Posted Collateral.  As a result, according to BMO's calculation, LBSF and LBHI remained liable for the return of the balance of the Posted Collateral in the amount of $22,636,598.75, plus interest and expenses as provided for in the Master Agreement.

19.     As a result, as of the Early Termination Date, according to BMO's calculation, the net amount due and owing by LBSF to BMO under the terms of the Master Agreement after the offset of the Amount Payable against the value of the Posted Collateral was $22,636,598.75.  This amount does not include any substitute securities that BMO may have been obligated to purchase to replace the Posted Collateral.  This amount also does not reflect fees and expenses of BMO (including but not limited to internal fees of BMO and attorneys' fees) pursuant to section 11 of the Master Agreement and section 10 of the Credit Support Annex or any amounts from Debtors for interest with respect to BMO's Posted Collateral.

## II.    Debtors' Derivatives Framework

20.     Debtors are party to numerous derivatives transactions involving billions of dollars.  In order to resolve certain of these Claims, Debtors proposed a common settlement approach, the Derivatives Framework, for the allowance of derivatives Claims of the Big Bank Counterparties.

21.     Rather than rely on the valuation method selected by the various parties that was consistent with their various agreements, in the Derivatives Framework Debtors committed that

they would determine values using the Mid Market Valuation Method for each trade as of the trade valuation date.  Specifically, Debtors expressed that they:

> will rely on internal legacy data and industry-standard market data acquired from reputable third-party market data vendors, such as Bloomberg, MarkIt, ICAP and New Oak, and will consider information provided by Big Bank Counterparties, in the development of these values.

(Derivatives Framework § 2.2.a.)

22.    Contrary to Debtors' decision to impose the Mid Market Valuation Method in the Derivatives Framework to determine the transaction's value, section 6(e) of the Master Agreement contains a menu of two alternative payment methods for early close-out payments to be made on Early Termination resulting from an event of default.  BMO and LBSF previously selected the Market Quotation Valuation Method to govern the Master Agreement should an Early Termination occur.  It should be noted that under the Master Agreement, the "Loss" Method applies if fewer than three quotes are provided or if a market quotation would not produce a commercially reasonable result.[9]  This formula calls for the non-defaulting party (in this instance, BMO), acting reasonably and in good faith, to identify its loss or gain arising from the Early Termination of the derivatives transaction.

23.    In addition, with regard to replacement trades, the Derivatives Framework states that:

> [I]f a Big Bank Counterparty provides sufficient evidence to the Debtors to demonstrate that it replaced specific trades with new trades on the Trade Valuation Date, such Replacement Trade value shall constitute the Adjusted Value for such trades as long as (i) the Replacement Trades are on identical material and economic terms, (ii) the replacement approach and the replacement value with respect to such Replacement Trades were on commercially reasonable terms and (iii) adequate documentation or information

---

[9]    The period shortly after September 15, 2008, was extraordinary and not capable of providing a commercially reasonable result by quotation.

supporting the Replacement Trades has been provided to the
Debtors by May 25, 2011.

(Derivatives Framework § 2.2.a.)

24.    In the Derivatives Framework, Debtors admit that the Big Bank Counterparties disagreed with certain tenets of the valuation methodology chosen by Debtors and assert that their Claims should be allowed in amounts in excess of the Proposed Framework Value.  (*See* Derivatives Framework at 3.)  Nonetheless, a number of the Big Bank Counterparties did settle their Claims with Debtors, agreeing to accept the proposed Derivatives Framework value plus an additional 11.25 percent increase over such value.  However, not all Big Bank Counterparties agreed arguing, like BMO, that the Derivatives Framework should not apply.

25.    To guarantee that they receive the same treatment as any other settling Big Bank Counterparty in the future, each of the settlement agreements with the Big Bank Counterparties contains a so-called MFN clause.  (*See* Disclosure Statement at 50-51 [Docket No. 19630]; Bank of America (*"BOA"*) Settlement Agreement § 13 [Docket No. 20367 at Ex. A].)  Pursuant to these MFN provisions, if Debtors enter into a settlement with a non-settled Big Bank Counterparty under any circumstance deviating from the Derivatives Framework and include Framework Values in a manner more favorable than the treatment received by the settling Big Bank Counterparty, the settling Big Bank Counterparty's Claims would automatically be increased by the proportion that a non-settling Big Bank Counterparty's Claims are allowed in excess of the Framework Value.  (*See* BOA Settlement Agreement § 13(a) [Docket No. 20367 at Ex. A]; Merrill Settlement Agreement § 12(a) [Docket No. 20367 at Ex. B].)

26.    Further, pursuant to the Disclosure Statement, Debtors state that derivatives Claims would total approximately $10.3 billion.  While it is difficult to determine, it appears from the Proposed Plan and Disclosure Statement that this amount assumes that the non-settled Claims are resolved using Debtors' chosen valuation methodology and the MFN clauses are not

activated.  Such an estimation is a fallacy given Debtors' apparent proposed method for settling derivatives Claims is inconsistent with the valuation provisions in both the Master Agreement and the 1992 ISDA agreement.  As a result, the settlement of any Big Bank Counterparty Claims pursuant to the express terms of the Master Agreement and the 1992 ISDA agreement will likely result in liability significantly greater than the $10.3 billion cited by Debtors in the Disclosure Statement, requiring Debtors to provide significantly increased amounts than those budgeted for in the Proposed Plan.

**III.    Treatment of BMO's Claim under the Proposed Plan**

27.    On August 31, 2011, Debtors filed their Proposed Plan and Disclosure Statement for Third Amended Chapter 11 Plan (the *"Disclosure Statement"*).

28.    Prior to the filing of the Proposed Plan and Disclosure Statement, on September 21, 2009, BMO filed a Proof of Claim with respect to both the Claim as against LBSF and a Claim based on the Guarantee as against LBHI.  As noted above, BMO posted collateral worth $101,200,000 with LBSF in connection with the Master Agreement.  BMO asserted a Claim for the difference between the value of the Posted Collateral and the Amount Payable, which it calculated to be $22,636,598.75, plus additional fees and expenses.  It is certain, pursuant to the Master Agreement and the Credit Support Annex, that Debtors have no right to the Posted Collateral following a default and Early Termination and that such Posted Collateral may be offset against any amounts outstanding following an Early Termination.

29.    As also noted above, pursuant to the Plan Supplement, Debtors have now determined to assume the Master Agreement, as well as certain other derivatives contracts.  Notwithstanding the requirements of section 365 of the Bankruptcy Code, Debtors have not set forth the cure amounts in the Plan Supplement.

## ARGUMENT

### I.    Debtors Cannot Assume the Master Agreement as Proposed

30.    Debtors have recently filed their Motion Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code to Establish Procedures for the Consensual Amendment and Assumption of Certain Prepetition Derivatives Contracts, filed on October 25, 2011 (the *"Procedures Motion"*) [Docket No. 21297], whereby Debtors have stated that they intend to establish procedures to assume certain non-terminated derivatives contracts.  As noted, BMO previously delivered a termination notice to Debtors.  To the extent that the Master Agreement is to be included in that group, BMO reserves its rights to argue that, with respect to curing the Master Agreement, such agreement must be valued in accordance with its express terms and alternatively that such agreement is not at this time an executory contract capable of assumption.[10]

31.    In connection with the assumption of any agreement, pursuant to section 365 of the Bankruptcy Code, a debtor must:

> (1) cure the default, or provide adequate assurance that it will promptly cure it; (2) compensate, or provide adequate assurance that the trustee will promptly compensate, the non-debtor party to the contract for any actual monetary loss caused by the debtor's default; and (3) provide adequate assurance of future performance under the contract.

11 U.S.C. § 365(b)(1)(A)-(C).

32.    The first requirement confers priority status on claims of default arising under an assumed contract.  *See id.* § 365(b)(1)(A); *cf. In re Chateaugay Corp.*, 10 F.3d 944, 954 (2d Cir.

---

[10]    BMO also reserves its rights to assert that the Master Agreement is not executory and capable of being assumed pursuant to section 365 of the Bankruptcy Code.  *See JPMorgan Chase Bank, N.A. v. Controladora Comercial Mexicana S.A.B. De C.V.*, 920 N.Y.S.2d 241 (Sup. Ct. 2010) (noting "[o]nce terminated, [an] ISDA Agreement was not, and could not be, executory."); *but see LBSF v. BNY Corporate Trustee Serv. Ltd.*, 422 B.R. 407, 415-16 (Bankr. S.D.N.Y. 2010) (holding opposite).  In this instance, however, the facts are distinguishable from those presented in *LBSF v. BNY*, where this Court found that because both LBSF and BNY had unsatisfied contractual obligations with respect to payment, the contract was executory.

1993); *Am. Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119, 124 (2d Cir. 1960).  The resolution of these claims, generally referred to as "cure claims," strives to restore the "debtor-creditor relationship … to pre-default conditions," *In re Taddeo*, 685 F.2d 24, 26-27 (2d Cir. 1982), bringing the contract back into compliance with its terms. *See ReGen Capital I, Inc. v. Halperin (In re U.S. Wireless Data, Inc.)*, 547 F.3d 484, 489 (2d Cir. 2008) (finding cure not necessary where creditor failed to file timely proof of claim) (quoting 3 COLLIER ON BANKRUPTCY para. 365.05[3], at 365-54 (15th ed. rev. 2008)).

33.    Despite the fact that the Master Agreement has been terminated, BMO does not object in theory to Debtors' determination to assume the Master Agreement and cure the obligations outstanding thereunder if the assumption requires the cure of the defaults under the Master Agreement.   As noted above, pursuant to the Statement of Calculation, BMO has previously calculated and informed Debtors of the Amount Payable in connection with the express terms of the Master Agreement.   In addition, in connection with the Statement of Calculation, BMO has set off the Amount Payable against the value of the Posted Collateral. Debtors have not set forth in the Plan Supplement the amounts that they believe are outstanding with respect to the Master Agreement.  Nor have they indicated how the Posted Collateral will be valued, or if they will agree to set off the Posted Collateral against the Amount Payable, as required by the Master Agreement.  In addition, Debtors have not agreed that they will value the amounts outstanding under the Master Agreement using the valuation methodology consistent with the express terms of the Master Agreement or that they intend to use the Mid Market Valuation Method that they have sought to impose in valuing the Claims pursuant to the Derivatives Framework.[11]

---

[11]      As of the time of filing this Objection, BMO has not received any Cure Notice from Debtors.

34.    In addition, the Master Agreement explicitly requires LBSF's obligations thereunder be guaranteed by LBHI.  (Master Agreement § 4(a) (requiring the delivery of any document specified in the schedule) and § 4(b) (requiring reasonable effort to maintain any Credit Support Document); Schedule to the Master Agreement § 3(b) (requiring LBSF delivery of credit support document) and §§ 4(f) and (g) (designating Guarantee of LBHI as credit support document).)  As a result, to properly cure the Master Agreement, Debtors must also assume the related LBHI Guarantee.  Debtors, however, have not sought to assume the related LBHI Guarantee here.  Debtors may not cherry pick among provisions of the Master Agreement to seek out provisions they find beneficial and cast off those they find burdensome.  Instead, executory contracts must be assumed or rejected in full.  *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984) ("Should the debtor-in-possession elect to assume the executory contract . . . it assumes the contract cum onere.").  Furthermore, Debtors "cannot simply retain the favorable and excise the burdensome provisions of an agreement."  *In re Kopel*, 232 B.R. 57, 63-64 (Bankr. E.D.N.Y. 1999).  Thus, the Court may not approve the assumption of the Master Agreement here, where Debtors, despite the Master Agreement's express terms, have not sought to assume the LBHI Guarantee.

35.    Until Debtors agree to (1) value the amounts outstanding pursuant to the express terms of the Master Agreement, rather than pursuant to terms they have self-created, and (2) assume the related LBHI Guarantee, Debtors will not have satisfied the requirements to "cure" the Master Agreement pursuant to section 365 and cannot assume such agreement.  As a result, BMO objects to any attempt by Debtors to assume and cure the Master Agreement that does not comply with the express terms thereof.

II.    **The Debtors' Proposed Plan Fails to Meet the Requirements of Confirmation**

A.    **Burden of Proof**

36.    The proponent of a chapter 11 plan bears the burden of establishing that the plan meets each requirement of section 1129 of the Bankruptcy Code. *In re Quigley Co., Inc.*, 437 B.R. 102, 125 (Bankr. S.D.N.Y. 2010) (*citing In re J. Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003)); *see also In re Young Broad. Inc.*, 430 B.R. 99, 128 (Bankr. S.D.N.Y. 2010). Further, the plan proponent must show by a preponderance of the evidence that its plan complies with the Bankruptcy Code's confirmation requirements. *Quigley*, 437 B.R. at 125.

37.    Because Debtors fail to meet their burden of proving that the Proposed Plan meets all the requirements of section 1129, confirmation must be denied.

B.    **Debtors' Proposed Plan Is Not Feasible Pursuant to Section 1129(a)(11) as It Fails to Adequately Provide for the Derivatives Claims**

38.    Section 1129(a)(11) requires the Court to find Debtors' Proposed Plan "feasible" as a condition precedent to confirmation. Specifically, the Bankruptcy Court must find that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).

39.    The feasibility test set forth in section 1129(a)(11) requires the Court to determine independently whether the Proposed Plan is workable and has a reasonable likelihood of success. *See In re Texaco Inc.*, 84 B.R. 893, 910 (Bankr. S.D.N.Y. 1988); *In re Johns-Manville Corp.*, 68 B.R. 618, 635 (Bankr. S.D.N.Y. 1986). Indeed:

> [T]he purpose of the feasibility test is 'to prevent confirmation of visionary schemes which promise creditors and equity holders more under a proposed plan than the debtor can possibly attain after confirmation. . . . [W]here the financial realities do not support the proposed plan's projections or where proposed assumptions are unreasonable, confirmation should be denied.'

*Young Broad.*, 430 B.R. at 128 (quoting *In re Investors Fla. Aggressive Growth Fund, Ltd.*, 168

B.R. 760, 765 (Bankr. N.D. Fla. 1994)).

40.    The key element of feasibility is whether there exists the reasonable probability

that the provisions of the Proposed Plan can be performed.  As the court in *In re Clarkson*, 767

F.2d 417 (8th Cir. 1985), stated:

> [T]he Second Circuit has declared that the feasibility test
> contemplates "the probability of actual performance of the
> provisions of the plan … [t]he test is whether the things which are
> to be done after confirmation can be done as a practical matter …"

*Id.* at 420 (*quoting In re Bergman*, 585 F.2d 1171, 1179 (2d Cir. 1978)); *In re Greene*, 57 B.R.

272, 277-78 (Bankr. S.D.N.Y. 1986).

41.    Although on the face of section 1129(a)(11) it would appear that the applicability

of the feasibility requirement is limited for liquidating plans such as Debtors' Proposed Plan,

COLLIER ON BANKRUPTCY notes:

> [A]lthough simply labeling a liquidating plan as such does not
> exempt such a plan from the requirements of section 1129(a)(11),
> it does mean that there is less emphasis on future performance.
> Even with such a reduced emphasis, however, the plan proponent
> must still show that the liquidation proposed in the plan is feasible.

COLLIER para. 1129.02[11]; *Holmes v. United States (In re Holmes)*, 301 B.R. 911, 914 (Bankr.

M.D. Ga. 2003) ("Although 1129(a)(11) recognizes the possibility of liquidating plans, a planned

liquidation does not create an exception to the feasibility requirement.  Even liquidating plans

must be feasible."); *but see In re Pero Bros. Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla.

1988) (noting, without providing reasoning, that feasibility requirements do not apply to

liquidating plans).

42.    In *Holmes*, a court found a liquidating plan not feasible where the plan assumed

the IRS would accept an offer in compromise, but the plan proponent had not shown the court

that the IRS would accept such an offer.  *Id.* at 915.  Likewise, in another case, *In re Yates*

*Development*, a court found a plan had not satisfied section 1129(a)(11) because the basic economic assumption of the plan was that another court would invalidate a penalty clause in a contract held by the debtor. 258 B.R. 36, 44 (Bankr. M.D. Fla. 2000).

43.    In this instance, Debtors' Proposed Plan is not practically workable as it assumes that derivatives counterparties will agree to the values set forth in the Derivatives Framework, which is inconsistent with the terms of the 1992 ISDA agreement that Debtors seek to assume. In addition, as noted above, Debtors have chosen to settle a number of derivatives Claims with the Big Bank Counterparties using this inconsistent valuation methodology. Such settlements determined billions of dollars in derivatives Claims. However, other courts reviewing this same issue have held that Debtors' attempts to impose a single valuation methodology, contrary to the valuation methodology selected by the non-defaulting party, does not comply with the terms of the 1992 ISDA agreement. *See Anthracite Rated Inv. (Jersey) Ltd. v. Lehman Brothers Fin. SA*, [2011] EWHC (ch) 1822 (Eng.) (a copy of which is attached hereto as Exhibit A).

44.    Importantly, the *Anthracite* case highlights the importance of marketplace predictability in interpreting agreements such as the 1992 ISDA agreement. *See id.* ¶¶ 114, 123. As the English court notes, given the ubiquitous nature of the 1992 ISDA agreement, it is critical that its terms be applied uniformly throughout courts. *Id.* "It is axiomatic that it should, as far as possible, be interpreted in a way that serves the objectives of clarity, certainty, and predictability, so that the very large number of parties using it should know where they stand." *Id.* ¶ 114 (quoting English case law). Indeed, because of the importance of documentation such as the 1992 ISDA agreement in the marketplace, the U.S. Congress approved the safe harbor provisions of sections 556-562 of the Bankruptcy Code. *See In re Quebecor World (USA) Inc.*, 453 B.R. 201, 204 (Bankr. S.D.N.Y. 2011) (discussing Congressional intent). As this Court noted in *Quebecor* with respect to agreements such as the 1992 ISDA agreement, certain of the safe

harbor provisions are geared so that "[p]arties to such contracts know at the time of entering into them that the subject transactions are covered by an applicable safe harbor and are protected from bankruptcy risks.  Such agreements are structured and priced with that immunity in mind." *Id*. at 205, n.3.

45.    While the *Anthracite* case does not govern this issue in the United States, no matter the jurisdiction, the interpretation of the 1992 ISDA agreement should be the same.  It is certain that the 1992 ISDA agreement holds that the valuation methodology selected by the parties should be used in the event of an Early Termination.  Furthermore, its terms are clear that the agreement does not allow the defaulting party – in this case, LBSF – to impose a methodology on its own terms.  Parties seeking to assume a contract cannot cherry pick only those terms that favor them, but rather must accept the contract as a whole.  *See Bildisco*, 465 U.S. at 531.  In addition, to the extent that the Big Bank Counterparties' derivatives Claims are similarly based on the 1992 ISDA agreement, the valuation methodology imposed by Debtors will not be applicable.

46.    Pursuant to section 8.4 of the Proposed Plan, Debtors intend to hold back certain amounts of cash with respect to Disputed Claims.  Specifically, section 8.4 states that Debtors will hold back:

> [A]n amount equal to the *least* of (a) the filed amount of such Disputed Claim, (b) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Disputed Claim, and (c) such other amount as may be agreed upon by the holder of such Disputed Claim and the Plan Administrator.

Proposed Plan § 8.4 (emphasis added).

47.    To the extent the Plan Administrator seeks to estimate BMO's Claim for plan purposes, rather than cure it in accordance with its express terms in the first instance, BMO intends to assert that the Disputed Claims Holdback should be the full amount of its Claim

- 19 -

determined using a valuation methodology consistent with the Master Agreement. BMO will object to any attempt by Debtors to use the Mid Market Valuation Method, or any other valuation technique, in order to value BMO's Claim. Furthermore, to the extent that the parties seek to adjudicate the cure amount outstanding with respect to BMO's Claim, BMO intends to pursue all of its rights under the law and in equity so as to have the Claim valued in a manner consistent with the express terms of the Master Agreement. Given the decision in *Anthracite*, as well as the plain language of the Master Agreement, BMO believes that it will be successful in upholding its calculation of the amount of its Claim against Debtors.[12]

48.    Because the 1992 ISDA agreement forms the basis of the Master Agreement, any determination that the non-defaulting party may select the valuation methodology will affect all similarly situated derivatives counterparties. Also important, given the inclusion of the MFN clauses and the relative size of the Claims with the Big Bank Counterparties, to the extent such derivatives transactions are also based on the 1992 ISDA agreement, a determination that the Mid Market Valuation Method cannot be forced on Creditors may drastically affect the amounts required to be paid to the Big Bank Counterparties. As noted above, the MFN clauses would be triggered should Debtors settle any Claims with a Big Bank Counterparty using a valuation method which provides for greater recoveries than the Derivatives Framework. Such amounts due to the Big Bank Counterparties pursuant to the MFN clauses will not qualify as "Disputed Claims" pursuant to the definition of such term included in the Proposed Plan.[13]   Given the

---

[12]    While the Proposed Plan intends to have the Bankruptcy Court preside over the estimation process, BMO expressly reserves its rights to argue that the Bankruptcy Court does not have jurisdiction to determine the underlying state law issues with regard to the contractual valuation dispute between Debtors and BMO. *See Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) (finding that Article I judges did not have constitutional authority to adjudicate certain "private" issues); *accord Stern v. Marshall*, 131 S. Ct. 2594 (2011) (same).

[13]    BMO reserves its rights to argue that any amounts that become due and owing to the Big Bank Counterparties pursuant to the MFN clauses are not "Disputed Claims" under the Proposed Plan.

potential costs associated with any adjustments that may be required to be made with respect to the Claims of the Big Bank Counterparties, Debtors' estates would therefore have insufficient funds remaining to pay such additional Claims.  This would make the Proposed Plan as a whole unworkable and/or impractical.

49.    Courts have often held that where a debtor fails to plan for, or set aside, amounts that may potentially come due, such plans do not meet the feasibility requirements of 1129(a)(11).  *See In re Hardin*, 486 F.3d 510, 515 (9th Cir. 2007) (finding that a plan that did not reserve an allowance for a claim on appeal was not feasible under section 1129(a)(11)); *In re Pizza of Hawaii, Inc*., 761 F.2d 1374, 1382 (9th Cir. 1985) (finding that a plan was not feasible where it did not provide for the possibility that a party would recover a large judgment against the debtor in a civil action).

50.    Without an actual estimation of the size of the potential liability related to a change in the amounts owing to the Big Bank Counterparties pursuant to the MFN clauses, it is impossible to determine the amount that must be held back to pay such Claims if and when they come due.  Provisions for such amounts, however, are necessary to ensure that the Proposed Plan may be fully effectuated.

51.    Furthermore, the Proposed Plan's Disputed Claims Holdback also renders the Proposed Plan not feasible.  Specifically, the amount set aside for Disputed Claims effectively constitutes a cap on the recovery of creditors holding Disputed Claims in contrast to creditor recovery on undisputed Claims.  Indeed, because of the great differences between Debtors' proposed Derivatives Framework and the actual text of the 1992 ISDA agreement, it is conceivable that with respect to derivatives Claims, the disputes could proceed for years.  Because Debtors will seek to have derivatives claims estimated based on their flawed valuation methodology, it is more than a theoretical possibility that creditors holding Disputed Claims

would be entitled to amounts exceeding those contained in the Disputed Claims Holdback. Without properly valuing these derivatives Claims in the first instance in a manner consistent with the clear terms of the 1992 ISDA agreement, the derivatives counterparties may be entitled to much more than is available to them in the future.

52.    As a result, because the Proposed Plan fails to take into account potentially billions of dollars in additional amounts that may be owed to both: (i) the settling Big Bank Counterparties and (ii) holders of Disputed Claims, the Proposed Plan is unworkable and therefore fails to comply with the requirements of section 1129(a)(11).

### C.    Debtors' Proposed Plan Fails under Section 1129(a)(3)

53.    In addition to being not feasible, Debtors' Proposed Plan has not been proposed in good faith, incorporates provisions forbidden by law and should be rejected.  Pursuant to section 1129(a)(3) of the Bankruptcy Code, a court may only confirm a plan if it "has been proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3); *see also In re Leslie Faye Cos*., 207 B.R. 764, 780-81 (Bankr. S.D.N.Y. 1997).

54.    In the Second Circuit, good faith is determined based on a showing that "the plan was proposed with 'honesty and good intentions'" and with a basis that the plan's proposal can be effected.  *Kane v. Johns-Manville Corp*., 843 F.2d 636, 649 (2d Cir. 1988).  A plan is generally proposed in good faith "if there is a likelihood that the plan will achieve a result consistent with the standards prescribed in the Code."  *Hanson v. First Bank of South Dakota*, 828 F.2d 1310, 1315 (8th Cir. 1987).  Good faith should be viewed under a totality of the circumstances test and "requires a fundamental fairness in dealing with one's creditors."  *In re Jorgensen*, 66 B.R. 104, 109 (9th Cir. B.A.P. 1986).

55.    Although "good faith" is not defined in the Bankruptcy Code, courts have defined bad faith as:

the opposite of "**good faith**," generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not promoted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. The term "bad faith" is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of [a] dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will.

*Leslie Faye*, 207 B.R. at 781 (quoting *In re Resorts Int'l, Inc*., 145 B.R. 412, 469 (Bankr. D. N.J. 1990)) (emphasis in original).

### 1.    Debtors Fail to Both Properly Interpret the 1992 ISDA Agreement and Value the Disputed Claims, Actions That Are Forbidden by Law

56.    In this instance, Debtors have formulated their Proposed Plan based on a refusal to fulfill their contractual duty – by purposefully ignoring the very clear terms of the 1992 ISDA agreement. As noted above, it is certain that the Mid Market Valuation Method may not be imposed on non-defaulting derivatives counterparties, and other courts have already held that Debtors may not impose a valuation methodology, but must use the one selected by the non-defaulting party. *See Anthracite Rated Inv. (Jersey) Ltd. v. Lehman Brothers Fin. SA*, [2011] EWHC (ch) 1822 (Eng.). That this misreading is purposeful is supported by the fact that Debtors stand to save millions of dollars, if not potentially billions of dollars, by ignoring what are otherwise clear contract terms. Such action is contrary to the established law of contract in which contractual parties – especially sophisticated, counseled businesspeople negotiating commercial instruments – are entitled to the benefit of their bargain and to have the clear terms of the agreement between them applied to any dispute.[14]  *See, e.g., Vermont Teddy Bear Co. v.*

---

[14]    In addition, Debtors' failure to seek to assume the related LBHI Guarantee is contrary to law. Specifically, the Master Agreement explicitly requires LBSF's obligations thereunder to be guaranteed by LBHI. (Master Agreement § 4(a) (requiring the delivery of any document specified in the schedule) and § 4(b) (requiring reasonable effort to maintain any Credit Support Document); Schedule to the Master Agreement § 3(b) (requiring LBSF delivery of credit support document) and §§ 4(f) and (g) (designating Guarantee of LBHI as credit support document).)  As discussed, *supra*, by not seeking to assume the LBHI Guarantee,

*538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (N.Y. 2004) ("When interpreting contracts, we have repeatedly applied the 'familiar and eminently sensible proposition of law [] that, when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms.'").  Simply put, a "court may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Id.* (internal citations omitted).

57.    Furthermore, by failing to comply with the clear terms of the 1992 ISDA agreement, Debtors are failing to set aside sufficient funds to pay the holders of Disputed Claims with respect to the derivatives transactions.   Only if Debtors value such transactions in accordance with the clear terms of the 1992 ISDA agreement and use a valuation methodology consistent with the one chosen by the various non-defaulting parties will the necessary amount be set aside to cover such future liabilities.  In failing to set aside the amounts that are clearly due and owing to their derivatives counterparties based on the chosen valuation methodologies, Debtors are not fulfilling their duties owed to their creditors.

58.    As a result, because the Proposed Plan both: (i) is based on a purposeful rejection of the 1992 ISDA agreement and an unwillingness to comply with its clear contract terms, and (ii) fails to account for the proper amounts owing creditors with Disputed Claims, the Court should find that the Proposed Plan was not proposed in good faith and is contrary to law.

## 2.    Debtors Have Impermissibly Attempted to Manipulate Voting

59.    In addition, "[a]mong other things, good faith provides 'a check on the debtor's intentional impairment of claims.'" *Quigley*, 437 B.R. at 125 (quoting *Combustion Eng'g, Inc.*, 391 F.3d 190, 246 (3d Cir. 2004)).  Specifically, section 1129(a)(3) "speaks more to the process

---

Debtors' Proposed Plan violates the terms of the Master Agreement and is contrary to New York contract law.  (Schedule to Master Agreement § 4(h) (providing document governed by New York Law).)

of plan development than to the content of the plan." *Id.* (quoting *In re Bush Indus., Inc.*, 315 B.R. 292, 304 (Bankr. W.D.N.Y. 2004)). Thus, a plan proponent may not wrongfully manipulate the voting process to assure that a plan will be confirmed for the benefit of itself and other parties. *Id.* at 126.

60.    Indeed, it is bad faith for a debtor to single out creditors for better treatment to facilitate acceptance of the Proposed Plan. *See id.* at 127-33 (rejecting a plan where the plan proponents settled just enough asbestos claims to assure plan acceptance). "It is always more difficult … to negotiate with an organized class of creditors than with creditors individually. 'Divide and conquer' is cheaper." *Id.* at 129.

61.    Here, pursuant to the Derivatives Framework, Debtors have settled with a number of the Big Bank Counterparties at a significant premium over their chosen Mid Market Valuation Method, which Debtors intend to impose on other derivatives counterparties.[15]  Specifically, Debtors have agreed to pay the settling Big Bank Counterparties 11.25 percent over the Derivatives Framework valuation. There is no guarantee that Debtors will offer to settle on similar terms with any other party. Rather, Debtors appear to be insisting that other creditors' derivatives Claims be valued using the Derivatives Framework value alone. In addition, as an extra incentive to ensure that these parties would vote to accept the Proposed Plan, the Settlement Agreements include MFN clauses to ensure that if other non-settling Big Bank Counterparties settle in the future with Debtors for the amounts contracted for under the 1992 ISDA agreement, that the settling Big Bank Counterparties would receive equal treatment.

62.    Thus, to satisfy the settling Big Bank Counterparties and to encourage their acceptance of the Proposed Plan, Debtors proposed a plan that would allow the settling Big Bank Counterparties to gain from the hard work, time and energy of the non-settling Big Bank

---

[15]    BMO does not allege that the settling Big Bank Counterparties were complicit in Debtors' attempt to impermissibly manipulate voting.

Counterparties should those counterparties successfully negotiate a settlement consistent with the express terms of the 1992 ISDA agreement. (*See* Debtors' Motion for Approval of Settlement Agreement with (I) Bank of America, N.A. and (II) Merrill Lynch International and Its Affiliates at 10, Ex. A, thereto, at 4 (noting existence of Plan Support Agreement); and Ex. B, thereto, at 3 (noting same) [Docket No. 20367] ("In addition, the Settled Counterparties have agreed to support the Debtors' Plan."); Order Approving Settlement Agreement with Bank of America, N.A. [Docket No. 21030].) Such an arrangement is not allowable under section 1129(a)(3).

63.     As a result, for all of the above reasons, Debtors' Proposed Plan does not meet the requirements of section 1129(a)(3) and cannot be confirmed.

### D.     The Proposed Plan Fails the Best Interest Test of Section 1129(a)(7)

64.     Because BMO would receive more in a hypothetical chapter 7 liquidation than it likely would receive under the Proposed Plan, the Proposed Plan violates the "best interest of creditors" test of section 1129(a)(7) of the Bankruptcy Code. Section 1129(a)(7) requires that each creditor either: (a) accept the plan or (b) receive not less than it would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. 11 U.S.C. § 1129(a)(7). This provision has become known as the "best interest of creditors" test. *Leslie Faye*, 207 B.R. at 787. Pursuant to this test, a court "must find that each [dissenting] creditor will receive or retain value that is not less than the amount he would receive if the debtor were liquidated." *Id*. (quoting *In re Victory Const. Co. Inc.*, 42 B.R. 145, 151 (Bankr. S.D. Cal. 1984)). The test applies to the individual creditor and not to the whole. *Id*.

65.     The express language of section 1129(a)(7) requires a court to consider "the value of the property that each dissenting creditor will *retain* under the plan and in the hypothetical chapter 7." *Quigley*, 437 B.R. at 144-45 (emphasis added). In *Quigley*, for instance, because the claimants in question were required to release the debtor's parent corporation from its derivative

liability related to asbestos claims, the court determined that the creditors would fare better in a hypothetical chapter 7 liquidation where they would not be enjoined from seeking redress from the debtor's parent. *Id*. Because the *Quigley* plan prevented the plan objectors from pursuing their claims against a non-debtor, the court found that the plan in question violated the Bankruptcy Code's "best interest of creditors" test and was not capable of confirmation. *Id*.

66.    In the event a creditor objects to the plan, the "best interest of creditors" test requires "a comparison between the distributions under the plan and in a hypothetical chapter case." *Quigley*, 437 B.R. at 144. Further, the debtor's liquidation analysis must be based on actual evidence and not on assumptions or speculation. *In re MCorp. Fin., Inc.*, 137 B.R. 219, 228 (Bankr. S.D. Tex. 1992). Here, for the reasons to follow, because BMO would receive more in a hypothetical chapter 7 liquidation, the Proposed Plan is not confirmable.

### 1.    The Derivatives Framework Fails the Best Interest of Creditors Test

67.    The Proposed Plan is prefaced on the acceptance by holders of derivatives Claims of the valuation methodology set forth in the Derivatives Framework. As noted above, in reality, the Derivatives Framework uses a flawed valuation methodology, self-created by Debtors, that conflicts with the controlling terms of the 1992 ISDA agreement and Debtors' efforts to assume the contract post-termination.

68.    As a result, the Derivatives Framework's Mid Market Valuation Method drastically undervalues the Claims of parties using the 1992 ISDA agreement, and such parties would receive a greater distribution under a hypothetical chapter 7 plan that valued such claims using a valuation methodology consistent with the 1992 ISDA agreement. This is true notwithstanding the fact that Debtors are seeking to assume the Master Agreement. In curing the amounts outstanding, should Debtors value such amounts using their self-created valuation methodology, rather than the methodology required by the express terms of the Master

- 27 -

Agreement, BMO would likely be required to pay amounts to Debtors rather than receive a payment on account of the Posted Collateral.  In addition, until BMO's Claim for amounts outstanding is resolved, BMO's Claim will likely fall within the ambit of a Disputed Claim. Although Debtors' Proposed Plan establishes a holdback for Disputed Claims, it is apparent to BMO that Debtors will request this Court to estimate the holdback based on the Derivatives Framework analysis.  Under this analysis, insufficient amounts will be held back, and if BMO succeeds in having a valuation methodology consistent with the Master Agreement implemented, there will likely be insufficient amounts in the Disputed Claims Holdback to pay BMO the full amount of its Claim.  As a result, BMO would receive substantially less than were it to receive in a distribution under a hypothetical chapter 7 case based on a valuation consistent with the express terms of the Master Agreement.

69.    Furthermore, given Debtors' stance to date, any litigation with respect to this issue may take years to reach a final determination.  Because no holdback provisions have been made for the amounts due under the MFN clauses, should the estate pay out under the Proposed Plan, the Big Bank Counterparties, many of whom may be secured creditors, will likely receive much less than they would have pursuant to a hypothetical chapter 7 plan in which Debtors complied with the specific terms of the 1992 ISDA agreement.  This is contrary to the requirements of section 1129(a)(7).

### 2.    The Proposed Plan's Injunction Provisions Violate Section 1129(a)(7)

70.    In addition to the Disputed Claims Holdback provisions not being in the best interests of creditors, the Injunction provision of Debtors' Proposed Plan shares this infirmity.  It is certain that the Posted Collateral is BMO's property and not part of Debtors' estates.  *See* 11 U.S.C. § 541 (defining property of the estate).  Despite this fact, section 13.5 of Debtors'

Proposed Plan requests that this Court authorize an Injunction that would cut off BMO's rights with respect to its property. Specifically, section 13.5 provides:

> Except [as otherwise provided] … all entities who have held, hold or may hold Claims against or Equity Interests in any or all of the Debtors … are permanently enjoined, on or and after the Effective Date … from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, [and] … (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or allowed by the Plan …

(Proposed Plan § 13.5.)

71.    The Second Circuit has held that a court should not approve a non-debtor release in a plan of reorganization unless it finds "truly unusual circumstances" that render the release important to the plan's success. *In re Metromedia Fiber Network, Inc*., 416 F.3d 136, 143 (2d Cir. 2005). While in certain rare situations a court may enjoin a creditor from pursuing a third party if "the injunction plays an important part in the debtor's reorganization plan," such is not the case here. *Drexel Burnham Lambert Trading Corp. v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992); *see also Metromedia*, 416 F.3d at 141. Such limited circumstances, which are not applicable here, include where: (1) "the estate received substantial consideration; [(2)] the enjoined claims were 'channeled' to a settlement fund rather than extinguished; [(3)] the enjoined claim would indirectly impact the debtor's reorganization 'by way of indemnity or contribution'; and [(4)] the plan otherwise provided for full payment of the enjoined claims." *Metromedia*, 416 F.3d at 142 (internal citations omitted). In addition, a court may approve a third-party release where the affected creditors consent. *Id*. Although the Released Parties would receive substantial consideration from the estates through the Proposed Plan's Injunction provisions, creditors such

as BMO have received no such consideration, and BMO does not consent to releasing any party who is either responsible for the misplacement of its Posted Collateral or currently holding such property.

72.    As noted in *Metromedia*, unless the Bankruptcy Code specifically authorizes a third-party release, such as pursuant to section 524(g), "section 105(a) does not allow the bankruptcy court 'to create substantive rights that are otherwise unavailable under applicable law.'" 416 F.3d at 142 (quoting *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 92 (2d Cir. 2003)). "Any 'power that a judge enjoys under section 105 must derive ultimately from some other provisions of the Bankruptcy Code.'" *Id*. (quoting Douglas G. Baird, *Elements of Bankruptcy* 6 (3d Cir. 2001)).

73.    In this instance, as drafted, the Injunction provisions would cause BMO to receive less than it would otherwise receive in a hypothetical chapter 7 liquidation where BMO would retain the right to pursue the non-debtor parties responsible for the misplacement of its Posted Collateral, or even pursue the return of its Posted Collateral were it to discover its location. Furthermore, Debtors have not stated in the Proposed Plan or the Plan Supplement that BMO will be authorized to set off the Amount Payable as against the Posted Collateral. BMO does not wish to be in a position where Debtors refuse to allow it to offset the value of the Posted Collateral against the Amount Payable or drastically undervalue such Posted Collateral, while at the same time being precluded from seeking the return of its property. Such a result would be unjust and unfair to BMO and other similarly situated creditors.

74.    For all of the above reasons, Debtors have failed the "best interest of creditors" test of section 1129(a)(7) and their Proposed Plan should be rejected.

E.    **The Proposed Plan's Injunction Is Overreaching and Violates BMO's Property Interests, Exceeding This Court's Jurisdictional Mandate**

75.    Furthermore, as noted above, the Proposed Plan seeks to have this Court approve an Injunction that cuts off BMO's state law property rights to the Posted Collateral.  Such an action falls outside the jurisdiction permitted to the Court under Article III of the U.S. Constitution.  *Stern v. Marshall*, 131 S. Ct. 2594, 2616 (2011); *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 80-86 (1982).  In *Stern*, the U.S. Supreme Court reiterated its prior holding in *Northern Pipeline* that while Congress may constitutionally grant bankruptcy courts authority over "core" bankruptcy matters, Congress may not grant Article I bankruptcy courts the power to render final decisions over matters not directly connected to the Bankruptcy Code.  *Stern*, 131 S. Ct. at 2609-610.

76.    The Supreme Court further reiterated in *Stern*, "'[p]roperty interests are created and defined by state law' and '[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.'"  *Stern*, 131 S. Ct. at 2616 (*quoting Travelers Casualty & Surety Co. of Am. v. Pacific Gas & Elec. Co.*, 594 U.S. 443, 451 (2007)).  Under *Stern*, a Bankruptcy Court may not finally determine a "state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim . . . ."  131 S. Ct. at 2611.  Thus, *Stern* holds that the Court lacks the authority to render decisions in non-core matters that are independent of federal bankruptcy law.

77.    In this case, the language of Debtors' indefinite and broad Injunction provision appears to frustrate the ability of creditors to continue to pursue their property outside the bankruptcy estate.  As noted above, Debtors have not stated in the Proposed Plan or the Plan Supplement that BMO will be authorized to set off the Amount Payable against the Posted Collateral.  In addition, Debtors have not set forth the cure amounts in the Proposed Plan or the

Plan Supplement.  The Proposed Plan's Injunction would likely block BMO's attempts to obtain possession of the Posted Collateral should the Master Agreement not be cured in a manner consistent with the express terms of the Master Agreement or BMO not be allowed to set off the Posted Collateral as against the Amount Payable as required therein.  It would also prohibit other derivatives counterparties from similarly seeking their property deposited with Debtors.  Such an Injunction is injurious to BMO and similarly situated creditors because under the Bankruptcy Code there is no basis for the Plan Administrator to assert the automatic stay beyond the Effective Date of the Proposed Plan to deny any party its right to its property.  *See, e.g., Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1168 (2d Cir. 1979) (noting that "when the debtor is in the position of assailant rather than victim, the potential for abuse of that purpose is manifest").  Indeed, "[o]ur system of laws universally frowns on a party that would use the stay as both a sword and a shield." *In re A.H. Robbins & Co.*, 828 F.2d 1023, 1026 (4th Cir. 1987).

78.    The non-debtor releases here would effectively prevent BMO from pursuing its state-law property rights with respect to the Posted Collateral should Debtors not offset the Posted Collateral as against the Amount Payable at a mutually agreed-upon amount.  Although the Posted Collateral was in the hands of Debtors prepetition, it remains the property of BMO. Section 13.5 of the Proposed Plan would effectively preclude BMO from pursuing any action against a non-debtor related to this property.  Debtors have no interest in the Posted Collateral, and this property falls outside the definition of "property of the estate" in section 541 of the Bankruptcy Code.  11 U.S.C. § 541.  Thus, as the Posted Collateral has no relation to the Bankruptcy proceeding, this Court lacks the authority necessary to preclude BMO from proceeding with any state-law action it may have against non-debtors for return of the Posted Collateral.

79.    For these reasons, section 13.5 of the Proposed Plan exceeds this Court's jurisdictional authority as further defined in *Stern*, and the Proposed Plan should not be confirmed.

### F.    Debtors' Proposed Plan Fails to Comply with Section 1129(a)(1)

80.    Debtors' Proposed Plan also fails under section 1129(a)(1) of the Bankruptcy Code.  Section 1129(a)(1) requires a plan to adhere "with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1129(a)(1); *Resorts Int'l v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401 (9th Cir. 1995), *cert denied*, 517 U.S. 1243 (1996).  As an initial matter, Debtors' Proposed Plan fails to comply with section 524(e) of the Bankruptcy Code.  "Without exception, . . . § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors." *Id.*; *but see Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 657-68 (6th Cir. 2002) (questioning *Lowenschuss*, but noting non-debtor injunction only appropriate in "unusual circumstances").  Here, the section 13.5 Injunction provisions of the Proposed Plan clearly conflict with section 524(e).  Debtors' Proposed Plan apparently releases the Released Parties, many of whom are non-debtors, from liability.  Such an act is impermissible under section 524(e) and is in violation of section 1129(a)(1).

81.    In addition, Debtors' Proposed Plan violates section 1123(a)(4) of the Bankruptcy Code.  Section 1123(a)(4) requires that claimants in the same class be treated equally and provides, "[n]otwithstanding any other applicable nonbankruptcy law, a plan shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest . . . ." 11 U.S.C. § 1123(a)(4); *see also Windels Marx Lane & Mittendorf, LLP v. Source Enters. (In re Source Enters., Inc.)*, 392 B.R. 541, 556 (S.D.N.Y. 2008) (discussing provision but finding no dissimilar treatment).  Although not defined in the Bankruptcy Code, courts have clearly found

that section 1123(a)(4) prohibits different percentage settlements to members of the same class as well as unequal consideration tendered for equal payment.  *See, e.g., Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 659-60 (6th Cir. 2002) (finding plan violated section 1123(a)(4) where governmental entities in same class were treated differently); *In re Finova Group, Inc.*, 304 B.R. 630, 637 (D. Del. 2004) (noting section 1124(a)(4) requires equal treatment and that a creditor in a class may not receive additional benefits above another class member); *see also* 5 COLLIER ON BANKRUPTCY para. 1123.01[4] at 1123-7 (15th ed. 1984).

82.    The situation here is not unlike the one in *In re Washington Mutual, Inc.*, in which a court upheld a section 1123(a)(4) objection where the debtor proposed to treat large creditors in a class differently from smaller creditors.  442 B.R. 314, 361 (Bankr. D. Del. 2011).  In that case, the court found the debtors had violated section 1123(a)(4) where only members of a particular class holding claims valued over $2 million were given the option of participating in a rights offering to purchase stock in the reorganized debtor.  *Id*. at 360.  The plan supporters argued that this unequal treatment was permissible because it was needed to avoid the administrative burden of issuing stock to smaller holders – those with claims under $2 million – and also because the rights offering was of no value.  *Id*.  The court rejected these arguments, noting that "nothing in section 1123(a)(4) . . . would permit discrimination for administrative convenience," and, further, that the debtors had not proven there was no value in the offering.  *Id*.

83.    Here, the Big Bank Counterparties – the large claimholders – are receiving significantly better treatment than the other derivatives claimants.  Specifically, Debtors are allowing the Big Bank Counterparty Claims at the Derivatives Framework value plus an additional 11.25 percent.  (*See* Debtors' Motion for Approval of Settlement Agreement with (I) Bank of America, N.A. and (II) Merrill Lynch International and Its Affiliates at 9

[Docket No. 20367]; Order Approving Settlement Agreement with Bank of America, N.A. [Docket No. 21030].)  They are also receiving the benefit of the MFN clauses.  Such treatment is inequitable as to the other members of the derivatives claimants' class, whose Claims Debtors likely will argue should be valued only at the Derivatives Framework value, without any additional amounts and without similar MFN clauses.  Such treatment is inequitable and elevates some Claims in the class above those of other claimants.  Such disparate treatment may only be cured by placing the settling Big Bank Counterparties in their own unique class.

84.    Lastly, the Proposed Plan violates the safe harbor provisions of the Bankruptcy Code.  Such provisions guarantee that a derivatives contract may be terminated post-petition and the parties be guaranteed their rights under the applicable agreement.  *See* 11 U.S.C. §§ 556-562 (safe harbor provisions).  In this instance, the Master Agreement requires that the non-defaulting party value the amounts outstanding.  The Mid Market Valuation Method that likely will be imposed on BMO and other parties is inconsistent with the express terms of the Master Agreement, and if Debtors assert that it applies to establish a "cure" amount, would violate section 365, which requires a contract be "cured" pursuant to its express terms.  This same infirmity applies to Debtors' failure to return the Posted Collateral and assume the LBHI Guarantee.

85.    For the above reasons, Debtors' Proposed Plan fails to adhere to the Bankruptcy Code and is not confirmable pursuant to section 1129(a)(1).

### G.    The Proposed Plan Fails to Comply with the Cramdown Provisions of Section 1129(b)

86.    Finally, section 1129(b)(1) grants the Bankruptcy Court the power to confirm a plan despite the rejection of the plan by a class of claimants – commonly known as a cramdown. Before a debtor can invoke section 1129(b)(1) to cram down on a dissenting class, however, the plain and unambiguous language of section 1129(b)(1) requires that the plan proponent prove

- 35 -

that all applicable provisions of section 1129(a), except section 1129(a)(8), are met.  Because, as discussed above, Debtors' Proposed Plan fails to meet many of section 1129(a)'s requirements, the Court cannot consider cramdown under section 1129(b)(1).

87.    Even if the Court were to find that Debtors meet all of the requirements of section 1129(a) with the exception of section 1129(a)(8), Debtors' Proposed Plan should not be crammed down on dissenting creditors because it is neither fair nor equitable.  To be fair and equitable, the Bankruptcy Code requires that a chapter 11 plan provide that any dissenting class be paid in full before holders of any junior claim or interest receive or retain any property under the plan.  11 U.S.C. § 1129(b)(2)(B).  No plan that violates this requirement – known as the absolute priority rule – can be confirmed over the objection of a creditor.

88.    While the Proposed Plan may on its face appear to adhere to the basic tenets of the absolute priority rule, because of Debtors' choice to: (i) impose a valuation methodology in the Derivatives Framework that is inconsistent with the express terms of the 1992 ISDA agreement and (ii) agree to the MFN clauses contained in the Big Bank Counterparty settlement agreements, it is not certain whether senior creditors would be paid in full prior to junior creditors receiving distributions.  As an initial matter, it may take years for the non-settling derivatives claimants and Debtors to adjudicate their Claims, including any disputes regarding cure amounts.  Further, should Debtors settle with the non-settling Big Bank Counterparties based on the terms of the 1992 ISDA agreement, the MFN provisions in the Big Bank Counterparty Settlement Agreements would be triggered, significantly increasing Debtors' derivatives liability.  Finally, Debtors cannot cram down with respect to property, such as the Posted Collateral, that is not property of the estates.

89.    By failing to set aside sufficient funds to pay the Claims of both (i) the holders of Disputed Claims and (ii) the Big Bank Counterparties should the MFN clauses be triggered,

Debtors have created a situation in which junior creditors may be paid prior to their senior creditors being paid in full.  Such a proposition is barred by section 1129(b).

## CONCLUSION

WHEREFORE, BMO requests that the Court enter an order: (i) denying Debtors' request to assume the Master Agreement unless such agreement is cured in accordance with the express terms thereof, (ii) denying confirmation of the Proposed Plan as provided for in this Objection, and (iii) granting BMO such other and further relief to which it is entitled.

Dated:  November 4, 2011

Respectfully submitted,

BANK OF MONTREAL


By: _____s/ Craig M. Price_____
One of Its Attorneys


James E. Spiotto (admitted *pro hac vice*)
Ann E. Acker (admitted *pro hac vice*)
Franklin H. Top III (admitted *pro hac vice*)
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois  60603
Telephone:  (312) 845-3000

Craig M. Price (CP 9039)
CHAPMAN AND CUTLER LLP
330 Madison Avenue, 34th Floor
New York, New York  10017-5010
Telephone:  (212) 655-6000