# EXHIBIT A



Anthracite Rated Investments (Jersey) Ltd v Lehman Brothers Finance SA (in liquidation); Fondazione Enasarco v Lehman Brothers Finance SA and another

CHANCERY DIVISION

*[2011] EWHC 1822 (Ch), (Transcript)*

**HEARING-DATES:** 4, 5, 6, 15 JULY 2011

15 JULY 2011

**CATCHWORDS:**

Bank - Banker/client relationship - Duty of bank - Derivative agreements - Bank guaranteeing investors investments through derivative agreements with issuer - Bank obtaining provision for compensation for consequence of early redemption from issuer - Bank being in event of default causing immediate early termination of derivative agreements - Issuer sustaining loss and claiming from bank - Whether automatic early termination of derivative agreement terminating whole agreement - Whether issuer entitled to pay bank - Whether rights and/or liabilities of bank on automatic early termination depending on identification of issuers' loss - ISDA Master Agreement 1992

**COUNSEL:**

M Phillips QC and S Robins for the Issuer; J Russen QC and R Foskett for the First Defendant; M Hapgood QC and J Dhillon for the Investor; J Goldring for the Second Defendant; Clifford Chance LLP; Field Fisher Waterhouse LLP; Sidley Austin LLP

**PANEL:** BRIGGS J

**JUDGMENT-1:**

BRIGGS J:

*INTRODUCTION*

[1] This judgment follows the combined trial, on agreed facts, of two closely related Pt 8 claims. The main common dispute which underlies each claim concerns the meaning and effect of early close-out provisions in two cash settled put options granted by Lehman Brothers Finance SA ("LBF") with a guarantee from its ultimate parent company Lehman Brothers Holdings Inc ("Holdings"), both of which incorporated, with similar (but not quite identical) additions and amendments, the 1992 ISDA Master Agreement. I shall refer to them as "the Derivative Agreements".

[2011] EWHC 1822 (Ch), (Transcript)

**[2]** The Derivative Agreements each formed an important part of two large and complex structures, devised and marketed by Lehman Brothers International Europe ("LBIE"). Each was in essentially similar terms. Unfortunately for the purposes of concise description, there are both relevant differences in the precise terms and substantial differences in nomenclature. In a nutshell, each structure defined and regulated the issue of instruments (variously described as Bonds and Notes) by a single purpose vehicle issuer having the following features. They were euro denominated, linked to a portfolio of underlying investments, limited recourse but secured, and principal protected. One of the structures also provided a limited degree of interest (or coupon) protection, but it is common ground that this additional feature makes no difference to the issues which I have to decide.

**[3]** The function of the Derivative Agreements in each structure was to provide that principal (and in one structure interest) protection. As investment advisers are taught to warn their clients, investment portfolios can go down in value as well as up. Principal protection is designed to ensure that (subject only to the credit risk of the principal protection provider and any guarantor of its obligations) the investor will on maturity of the instrument receive not less than its original purchase price, even if the value of the underlying portfolio has by then fallen below that level.

**[4]** Principal protection performs at least two important functions in the market. First, it enables a risk-averse investor such as a pension provider to invest in a higher risk (and therefore potentially higher return) portfolio than would otherwise be appropriate, because of the insurance against under-performance provided by the principal protection. Secondly, it enables institutional investors such as banks to invest in types of portfolio which, without principal protection, would attract a credit rating insufficiently high to satisfy Basel II capital adequacy requirements. The investor in one of the structures before the court was a pension provider for Italian workers. The investor in the other structure was a bank. In each case LBF provided the principal protection, guaranteed by Holdings, and the Derivative Agreement constituted the contractual means whereby that principal protection was provided, by a contract with the issuer and, by a charge, to the investors.

**[5]** In functional terms, the two structures were each designed to operate as follows. First, the subscription price for the instruments paid by the investor to the issuer was (subject to a deduction to which I shall return) to be used for subscription for redeemable preference shares in another single purpose vehicle ("Balco"). Balco was to apply the subscription price in the acquisition of the underlying investment portfolio consisting largely, but not entirely, of hedge fund type investments.

**[6]** Second, the issuer was to enter into the Derivative Agreement with LBF, whereby the issuer was to enjoy a put option in relation to its shares in Balco, exercisable upon final maturity of the instruments if the net proceeds of redemption of the Balco preference shares fell short of the original subscription price for the instruments. Since the put option was cash-settled, LBF would thereby become liable to make good that shortfall to the issuer.

**[7]** Third, in preparation for the redemption of the instruments upon maturity, Balco would realise the investment portfolio, and pay the net proceeds to the issuer by way of redemption of its preference shares. Upon maturity of the instruments, they would be redeemed by payment by the issuer to the investor of the proceeds of the redemption of the issuer's preference shares in Balco, together (if necessary to make good any shortfall against the original subscription price) with any payment received from LBF upon exercise of the put option in the Derivative Agreement.

**[8]** Fourth, the *quid pro quo* for the issuer's put option under the Derivative Agreement was the payment by instalments of premium to LBF, funded from cash flow derived from preference share dividend payments by Balco to the issuer. One of the structures made provision for a cash reserve for that purpose, but it was not in the event put in place.

**[9]** Fifth, the issuer's obligations, both to the investor and to LBF under the Derivative Agreement were limited recourse but secured. Thus, pursuant to a series of interrelated trust deeds, the issuer charged all its interest in its preference shares in Balco, and in the Derivative Agreement (and in any cash reserve) to a Trustee, to be held upon trust as

[2011] EWHC 1822 (Ch), (Transcript)

security, first for the issuer's obligations to LBF under the Derivative Agreement and secondly as security for the issuer's obligations to the investors. Both the trust deeds and the final terms of the instruments made provision for a reversal of priority (a "flip") as between LBF and the investors, in the event of a termination of the Derivative Agreement by reason of LBF's default.

**[10]** Thus, the principal protection to the investor consisted in form of the issuer's promise to pay, on maturity, no less than the original subscription price for the instruments. In substance it lay in the investor's security interest in the issuer's rights against LBF under the Derivative Agreement. Save only as mortgagees under a common security structure, there existed no privity between the investor and LBF. The only parties to the Derivative Agreement were the issuer and LBF. The terms of the instruments expressly excluded third party rights.

**[11]** The two series of instruments were issued in 2006 and 2007 respectively, maturing in 2017 and 2023 respectively. I shall refer to them as Series 38 and Series 26. Both structures made detailed bespoke provision for early redemption of the instruments in four specified types of circumstance, namely:

i) the occurrence of a specified tax liability affecting the issuer;

ii) termination of the Derivative Agreement "for any reason";

iii) illegality of performance of its obligations by the issuer, or illegality of its hedging arrangements; and

iv) an event of default by the issuer.

Collectively, those circumstances may loosely be described as matters sufficiently destructive of the ongoing efficacy of the structure as an investment vehicle to warrant its unwinding prior to maturity.

**[12]** Two invariable consequences of early redemption of the instruments were that the investors would lose their principal protection and that the Derivative Agreements would (to use a neutral phrase) come to an end. These two outcomes were achieved in contractual terms by the omission in the formula defining the amount of the issuer's obligation to make an early redemption payment of any requirement to pay a minimum amount equivalent to the original subscription price for the instruments, and by the insertion into the Derivative Agreement of a provision for "Mandatory Early Termination", triggered by the redemption of all outstanding instruments prior to their maturity date. Thus, even if by the time of early redemption the value of the underlying investment portfolio had fallen below the original subscription price for the instruments, the investors would be exposed to that shortfall, without recourse in respect of it either to the issuer, to LBF or to the security property.

**[13]** Mindful that early redemption of the instruments (triggering Mandatory Early Termination of the Derivative Agreements) would cut short a potentially profitable premium income stream, LBF obtained provision for it to receive compensation for the consequence of early redemption in the form of an "Early Termination Cash Settlement Amount" ("ETCSA"), to be paid by the issuer and funded from deductions which the issuer was required to make from the net proceeds of redemption of its Balco preference shares, before onward payment to the investors. The ETCSA under each structure consisted of three elements, namely (i) any arrears of premium; (ii) compensation for early termination; and (iii) LBF's costs of termination. The formula for calculation of the early termination compensation in (ii) above differed radically under each of the two structures, but the differences do not matter for present purposes.

**[14]** Separately and distinctly from Mandatory Early Termination (as summarised above) the 1992 ISDA Master Agreement contains its own detailed and (by now) well known regime for early termination including, but not limited to, early termination upon default. Section 6(e) of the 1992 Master Agreement contains a menu of four alternative formulae for early close-out payments to be made on early termination resulting from an event of default. In both the Derivative Agreements in issue, the parties chose "Second Method and Loss". In the barest outline, that formula calls

[2011] EWHC 1822 (Ch), (Transcript)

for the non-defaulting party, acting reasonably and in good faith, to identify its loss or gain arising from the early termination of the Derivative Agreement. Any such loss is to be made good by the defaulting party. Any such gain is to be paid to the defaulting party. The final sentence of the definition of "Loss" in s 14 of the 1992 Master Agreement entitles, but does not oblige, the non-defaulting party to determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*THE ISSUES*

[15] LBF suffered an event of default under each of the Derivative Agreements when, on 15 September 2008, Holdings filed for bankruptcy protection under Ch 11 of the US Bankruptcy Code in New York. Since it was LBF's Credit Support Provider (as defined in the Master Agreement) this was an Event of Default under s 5(a)(vii)(4) of the Master Agreement. Since the parties to the Derivative Agreements had elected in favour of Automatic (rather than elective) Early Termination this caused an immediate Early Termination of both Derivative Agreements. That much is common ground.

[16] Some time thereafter, both issuers claimed in correspondence to have calculated a substantial Loss as non-defaulting parties based upon quotations of relevant premium rates for substitute put options for the outstanding terms of the two Derivative Agreements. The sums claimed from LBF were Eur30 million (Series 38) and US$61.5 million odd (Series 26) respectively.

[17] LBF responded by denying those claims and claiming an entitlement to, or to an amount equivalent to, the ETCSA under each Derivative Agreement, amounting to Eur2.8 million and Eur43.74 million odd respectively. It emerged in correspondence, evidence and then legal submissions that LBF's case was based, upon a contractual entitlement to the ETCSA under the Mandatory Early Termination provisions of the Derivative Agreements or, alternatively, that identical amounts represented the issuers' gains under the Second Method and Loss methodology in ss 6(e) and 14 of the Master Agreement.

[18] The shortest route to an identification of the issues in this case is to be derived from a summary of the steps in LBF's argument, all of which are challenged *in limine* by LBF's opponents.

[19] Mr Jonathan Russen QC for LBF put its case as follows:

(1) Automatic Early Termination of the Derivative Agreement triggers an early redemption of the instruments.

(2) Early redemption of the instruments reduces the issuer's liability to the investors to an amount equivalent to the net proceeds of the realisation of the asset portfolio held by Balco, less an amount equivalent to the ETCSA.

(3) The express terms of the Derivative Agreement preserve LBF's right to receive the ETCSA upon early redemption of the instruments, notwithstanding Automatic Early Termination.

(4) Alternatively to (3), (if Automatic Early Termination precludes a subsequent Mandatory Early Termination) the issuer makes a gain by reason of Early Termination of the Derivative Agreement equivalent to the amount of the ETCSA, which it is entitled on early redemption to deduct from the net proceeds of sale of the investment portfolio, but not obliged to pay to the investors.

(5) In any event, the ETCSA constitutes the agreed pre-estimate of loss/gain arising from the combination of Automatic Early Termination of the Derivative Agreement and early redemption of the instruments.

(6) Accordingly the issuer's attempt to calculate Loss by reference to the cost of a replacement transaction is unreasonable, because it produces a fictitious loss widely at variance with the issuer's real gain.

[2011] EWHC 1822 (Ch), (Transcript)

**[20]** The case of the issuers (and the assignee investor under Series 26) is as follows:

(1) Automatic Early Termination of the Derivative Agreement never triggers an early redemption of the instruments, nor does any form of early termination which is itself triggered by LBF's default.

(2) Even if Automatic Early Termination of the Derivative Agreements would otherwise have triggered an early redemption of the instruments, the issuers and their investors have rearranged their affairs so as to avoid that outcome. The issuers will not therefore be able to deduct an amount equivalent to the ETCSA from the amounts payable to the investors.

(3) Automatic Early Termination of the Derivative Agreement necessarily precludes Mandatory Early Termination at any later date. Accordingly LBF has no contractual right to receive the ETCSA.

(4) In the events which have happened the issuers make no such gain as LBF alleges.

(5) The ETCSA is in principle irrelevant to the calculation of the issuers' loss on Automatic Early Termination arising from LBF's default.

(6) Calculation of Loss by reference to the cost of a replacement transaction is conferred as of right upon the non-defaulting party, and sanctioned by a succession of recent cases in the Court of Appeal and the Commercial Court as the appropriate measure for calculating the non-defaulting party's loss of bargain.

**[21]** The determination of the issues thus identified calls for a much closer scrutiny of the complex contractual frameworks than I have thus far outlined. Although no one suggested that the differences between the two structures, still less their different nomenclature, should make any difference to the outcome, I shall, in order to avoid a lack of precision, focus in detail upon one of the two structures and describe the other only where it differs to any material extent. I have found it marginally more convenient to focus upon the second in time of the two structures, namely Series 26, under which Anthracite Rated Investments (Cayman) Ltd ("ARIC") was the issuer and the Italian pension provider Fondazione Enasarco ("Enasarco") was the sole investor.

**[22]** It is also necessary to describe in some detail the different routes taken by the issuers and investors under each structure to avoid, or provide a practicable alternative to, early redemption of the instruments following the failure of the Lehman Brothers Group which, of course, included both LBF, Holdings and LBIE.

*THE FACTS*

*Series 26*

**[23]** On 14 December 2007 ARIC issued a series of Eur780,470,000 principal protected notes maturing on 14 June 2023 ("the Notes"). The issue of the Notes constituted Series 26 of a $10 billion secured euro medium term note programme issued by ARIC, the Cayman Islands incorporated special purpose vehicle for a structure designed and marketed by LBIE.

**[24]** Enasarco, a provider of compulsory pensions to Italian workers, subscribed for the whole of the Series 26 Notes on the issue date.

**[25]** The terms and conditions of the Notes were originally set out in a base prospectus ("the Base Prospectus") dated 13 December 2007, as supplemented and amended by the final terms of the Notes ("the Final Terms") contained in an amended and restated offering circular for the Notes ("the Offering Circular").

[2011] EWHC 1822 (Ch), (Transcript)

[26] The relevant Derivative Agreement, described in the Series 26 documentation as the "Principal Protection Transaction" was also made on 14 December 2007 between LBF as Party A and ARIC as Party B. Its bespoke terms appear in a confirmation of that date ("the Confirmation") which incorporated by reference a standard form ISDA 1992 Master Agreement ("the Master Agreement") and a Schedule thereto ("the Schedule"), both made between the same parties on 29 April 2005 and amended and restated on 22 December 2006. I shall, notwithstanding its definition in the Series 26 documentation, continue to refer to it as the Derivative Agreement.

[27] The Confirmation provided for the sale by LBF to ARIC of a single European automatic put option over ARIC's shares in Balco (acquired by subscription of the proceeds of the issue of the Notes), at a strike price equivalent, in relation to the whole of the Series 26 Notes, to the original subscription payment by Enasarco, namely Eur780,470,000. The option was expressed to expire on the sixth business day before the maturity date of the Notes. LBF's obligation was, upon expiry, to pay the amount (if any) by which the strike price exceeded the aggregate redemption proceeds actually received from Balco by ARIC in respect of its preference shares. LBF sold the put option to ARIC for a premium of 1.4% per annum of the outstanding average principal amount of the Notes, reducing after eight years to 1.03% per annum, and payable quarterly. Being a European option, the put option could only be exercised on, and not before, the expiration date.

[28] Under the heading "Early Termination" the Confirmation provided that Mandatory Early Termination was "Applicable", and that ARIC would pay the ETCSA to LBF on the Mandatory Early Termination Date. That was defined as "The Early Redemption Date as specified in the Offering Circular".

[29] The Confirmation then set out a detailed definition of the ETCSA. Alternative formulae were prescribed according to whether or not the Cash Reserve had been established pursuant to the terms of the Notes. Since it was not in fact established, the operative formula is as follows:
    "Where the Mandatory Early Termination Date occurs prior to the Cash Reserve first equalling the Cash Reserve Target Amount, the aggregate of (i) if the Mandatory Early Termination Date occurs after the Effective Date, Premium accrued from and including the last Premium accrued from and including the last Premium Payment Date preceding the Mandatory Early Termination Date (or, if no Premium Payment Dates have occurred, the Effective Date) to but excluding the Mandatory Early Termination Date, (ii) an amount equal to 4% of the initial principal amount of the Notes being redeemed and (iii) the internal and external costs of Party A incurred in connection with terminating this Transaction (in whole or in part and taking into account hedging losses), as determined by the Calculation Agent."

The "Effective Date" referred to in that formula was defined as the first date upon which the Balco preference shares were purchased by ARIC. The Calculation Agent was LBIE.

[30] The Schedule to the Master Agreement provided, so far as is relevant for present purposes, as follows. First, in Pt 1, it dis-applied to ARIC various standard form Events of Default prescribed in the Master Agreement. Secondly, it elected for Automatic Early Termination pursuant to s 6(a) of the Master Agreement in relation to bankruptcy default by LBF, but not ARIC. Thirdly, it elected the Second Method and Loss for the purposes of s 6(e) of the Master Agreement, in relation to payments on Early Termination.

[31] Part 4(g) of the Schedule identified Holdings as LBF's Credit Support Provider. Part 5(o) dis-applied or amended various of the bankruptcy events of default in relation to ARIC, but not to LBF. Finally, Pt 5(q), headed "Limited Recourse" contained an acknowledgement by LBF that its "sole recourse" against ARIC in respect of any payment to be made under the Derivative Agreement was to be "to the net proceeds of the sale or realisation of the assets of Party B in relation to the Notes as may be available after payment of all prior ranking creditors".

[32] The election in favour of Automatic Early Termination in the Schedule brought into effect the following relevant part of s 6(a) of the Master Agreement:

[2011] EWHC 1822 (Ch), (Transcript)

"If, however, 'Automatic Early Termination' is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur . . . as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in section 5(a)(vii)(4) . . . ."

That provision was triggered on 15 December 2008, because the commencement of Ch 11 proceedings in relation to Holdings was an Event of Default in relation to LBF pursuant to s 5(a)(vii)(4).

Section 6(c)(ii) of the Master Agreement provides that:
    "Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to section 6(e)."

[33] Because of the parties' selection of Second Method and Loss in the Schedule, the payment to be made on Early Termination was, pursuant to s 6(e)(i)(4) to be as follows:
    "If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party."

The term of art "Loss" is defined in s 14 of the Master Agreement as follows:
    "*Loss* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or re-establishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets."

[34] The provision in the Confirmation that Mandatory Early Termination should be "Applicable" incorporated by reference arts 16 and 17 of the 2000 ISDA Definitions. Article 16.1 provided as follows:
    "16.1. Mandatory Early Termination. In respect of a Swap Transaction to which 'Mandatory Early Termination' is specified to be applicable:
    (a) the party which is out-of-the-money will pay to the party which is in-the-money, subject to any applicable condition precedent, the absolute value of the Cash Settlement Amount, determined in accordance with the provisions of Article 17 of these 2000 Definitions, on the Mandatory Early Termination Date; and
    (b) with effect from the Mandatory Early Termination Date, the Notional Amount in respect of the Swap Transaction will be reduced to zero and (other than the amount, if any, payable pursuant to the provisions of subsection (a) above) neither party will be required to make any further payments in respect of that Swap Transaction."

Article 17 provided that the Cash Settlement Amount should be the amount (if any) agreed between the parties; ie in the present case, the ETCSA as provided for in the Confirmation.

[35] I must turn now to the relevant detailed terms of the Series 26 Notes. The Base Prospectus (dated 13 December

[2011] EWHC 1822 (Ch), (Transcript)

2007) set out, under the heading Terms and Conditions of the Notes, a set of sixteen standard conditions ("the Conditions") applicable to the Notes, subject to amendment or variation in the Final Terms (also unhelpfully called "Terms and Conditions of the Notes") set out in the amended and restated Offering Circular dated 31 January 2008. I shall refer to them as "the Final Terms". For present purposes the Conditions are relevant to interpretation (if at all) more because of those which are removed by the Final Terms, than because of those which survive. Nonetheless, the following deserve mention.

[36] Condition 4 relates primarily to the Mortgaged Property. Condition 4(d) noted that the Trust Deed required that the net proceeds of the realisation or enforcement of the security should be applied in meeting claims of the Trustee, LBF and the Noteholders. Condition 4(e) provided that there was to be no recourse by the Noteholders, LBF or the Trustee against ARIC in relation to any shortfall between the proceeds of the realisation of the security and ARIC's obligations under the Notes, or under the Derivative Agreement.

[37] The general introduction to the Conditions (on p 14 of the Base Prospectus) provided that "The Noteholders . . . are bound by and are deemed to have notice of all the provisions of the Trust Deed . . . ." Condition 6(h) recognised, subject to certain irrelevant restrictions, the *prima facie* right of the issuer to purchase (ie buy back) Notes in the open market.

[38] Condition 10, headed Events of Default, provided that the Trustee might in its discretion, and was required if so directed by the Noteholders, give notice that the Notes were to be immediately due and repayable, and the security enforceable, in three specified Events of Default. The first was default for a period of 14 days or more in payment of any sum due in respect of the Notes. The second was a failure by the issuer to perform any of its other obligations under the Notes or the Trust Deed, subject to provision for remedy upon notice. The third was the winding up or dissolution of the issuer, save for the purpose of some reconstruction or similar arrangement on terms approved by the Trustee.

[39] Of much greater importance for present purposes are certain of the Final Terms, included within the Offering Circular. Its Transaction Summary contained a useful diagram of the Series 26 structure. I have copied it as Figure 1 below:

*Figure 1*

[EDITOR'S NOTE: A diagram appeared at this point which could not be reproduced for electronic purposes. Please see original.]

[40] Final Term 10 specified 14 June 2023 as the Scheduled Maturity Date. Final Term 11 provided that the Maturity Date was to be the Scheduled Maturity Date, subject to postponement in the event of late receipt by the issuer of the proceeds of the redemption of the Balco shares.

[41] By Final Term 16, the Redemption Amount (payable on the Maturity Date) was defined as follows "In relation to each Note the Redemption Amount shall be an amount equal to NAV, plus any balance standing to the account of the Cash Reserve, subject to a minimum of the Minimum Redemption Amount." "NAV" was defined as meaning the net asset value of Balco in relation to the preference shares. The Minimum Redemption Amount was defined, by reference to the defined term "Denomination" as meaning, in effect, the original subscription price for the Notes.

[42] Final Term 19 made detailed provision for early redemption of the Notes. Its text is set out in a rather illogical order. For clarity I shall begin with a full recitation of the relevant parts of the definition of "Early Redemption Event":

"'Early Redemption Event' means the occurrence in the determination of the Calculation Agent of any of the following events:

(i) if the Issuer on the occasion of the next payment due in respect of the Notes would be, or expects at any time to be, required by law to withhold or account for tax on any payment to be made by it on or in connection with the Notes or would suffer, or expects at any time to suffer, or the Balanced Company would suffer, or is expected at any time to

[2011] EWHC 1822 (Ch), (Transcript)

suffer, tax in respect of its Income or its Investments or receivables (including, in the case of the Balanced Company, on holding or liquidating any item comprising part of the Fixed Income portfolio or the Equity Portfolio, each as defined in the Offering Circular); or

(ii) if (x) the Principal Protection Agreement is terminated in whole for any reason or (y) the Issuer satisfies the Trustee that the performance of its obligations under the Notes or that any arrangements made to hedge its position under the Notes have or will become unlawful, illegal or otherwise prohibited in whole or in part as a result of compliance with any applicable present or future law, rule, regulation, judgment, order or directive of any governmental, administrative, legislative or judicial authority or power, on in the interpretation thereof; or

(iii) an Event of Default occurs and the Notes are declared to be immediately due and repayable in accordance with condition 10."

As will appear, that part of the definition in sub-paragraph (ii)(x) is the provision about which there has been the most intensive debate as to its meaning. I will call it "para (ii)(x)".

**[43]** Final Term 19 begins as follows:

"If an Early Redemption Event is determined by the Calculation Agent to have occurred, the Issuer shall forthwith request the Balanced Company to realise:

(i) any Bond Assets held by the Issuer at such time; and

(ii) any Balanced Company Shares and the Cash Reserve held by the Issuer at such time."

The text then dis-applied provisions of Condition 6, and set out an alternative regime for early redemption from which, therefore, the bespoke regime in Final Term 19 must be regarded as having been a deliberate and carefully planned departure.

**[44]** The remainder of Final Term 19 is taken up with a detailed definition of the "Early Redemption Amount", the relevant parts of which I set out below:

"'Early Redemption Amount' means, subject as provided below, an amount equal to:

(i) (a) the cash realisation proceeds received from the Balanced Company in respect of the redemption of the Balanced Company Shares plus the realisation proceeds from the Bond Assets (if any) net of any expenses incurred in connection with the realisation of the [sic] such assets and (b) in the case of an Early Redemption Event occurring prior to the Bond Assets Unwind date, physical delivery of any Bond Assets which the Issuer is not able to realise and which are delivered to Noteholders as described above; less

(ii) any internal or external costs or expenses incurred by or on behalf of the Issuer or the Principal Protection Provider in connection with the redemption of the Notes (including, without limitation, in connection with the redemption of the Balanced Company Shares and including, without limitation, any accrued but unpaid premium due to the Principal Protection Provider under the Principal Protection Agreement and the cost of unwinding the Principal Protection Agreement (taking into account hedging losses incurred as a consequence of the Early Redemption of the Notes));

. . .

If the Notes are redeemed in full pursuant to the occurrence of an Early Redemption Event at any time, the Cash Reserve shall be reduced by an amount equal as a proportion of the Cash Reserve to the proportion that the number of Notes outstanding immediately prior to such early redemption. The amount by which the Cash Reserve is so reduced shall be paid to the Principal Protection Provider under the Principal Protection Agreement in priority to any amounts or payments that may be due to the Noteholders at such time. Where such an early redemption of Notes occurs prior to the Cash Reserve first equalling the Cash Reserve Target Amount, an amount equal to 4% of the initial principal amount of the Notes shall be due to the Principal Protection Provider under the Principal Protection Agreement and, to the extent the Cash Reserve is insufficient, any such shortfall shall be satisfied and paid to the Principal Protection Provider out of the proceeds of redemption of Balanced Company Shares and/or Bond Assets held by the Issuer and the amount payable to Noteholders reduced accordingly."

[2011] EWHC 1822 (Ch), (Transcript)

No Cash Reserve having been duly established, it is the second part of that final paragraph, making provision for the 4% of the principal amount of the Notes, which prevails in the present circumstances. Comparison between the definition of Early Redemption Amount and the definition of the ETCSA under the Confirmation shows that the amounts which the issuer was to deduct from the net proceeds of redemption of the Balco shares on early redemption of the Notes was designed to fund its payment of the ETCSA to LBF.

**[45]** Final Term 23 identified LBIE as the Calculation Agent. Final Term 26 summarised the Mortgaged Property, but in a way which adds nothing to the more detailed provisions of the Trust Deed. In substance, it identified the Balco shares, the Cash Reserve (if any) and ARIC's rights under the Derivative Agreement.

**[46]** Final Term 27, headed "Priority of Interests in Mortgaged Property" provides as follows:

"Subject as provided below, the Trustee shall apply all moneys received by it in connection with the realisation or enforcement of the Mortgaged Property as follows:

(a) first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in relation to the Notes in preparing and executing the trusts under the Supplemental Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(b) secondly, in meeting the claims (if any) of Lehman Commercial Paper, Inc, under the Issuer Credit Facility;

(c) thirdly, in meeting the claims (if any) of the Derivative Counterparty under the Derivative Agreement;

(d) fourthly, rateably in meeting the claims (if any) of the holders of Notes. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them pro rata on the basis of the amount due to each party entitled to such payment; and

(e) fifthly, in payment of the balance (if any) to the Issuer.

Provided that if an Event of Default or a Tax Event upon Merger occurs under the Principal Protection Agreement in respect of which the Principal Protection Provider is the Defaulting Party or, as the case may be, the sole Affected Party (each as defined in the Principal Protection Agreement) the claims (if any) of the holders of Notes shall take priority over the claims (if any) of the Principal Protection Provider. And further provided that the right of the Principal Protection Provider to be paid Date [sic] from the Cash Reserve an amount equal, as a proportion of the Cash Reserve, to the proportion that the number of Notes being redeemed bears to the total number of Notes and in priority to any payments being made to Noteholders shall be limited to the realisation proceeds of the Cash Reserve, except where the redemption occurs prior to the Cash Reserve first equalling the Cash Reserve Target Amount."

**[47]** Final Term 28(1) provided that for as long as Enasarco remained the 100% holder of the Notes, it should have specified rights to give directions to Balco in relation to the management of the underlying investment portfolio, subject to compliance with certain investment guidelines, and to the approval of the Balco Calculation Agent (also LBIE) not to be unreasonably withheld.

**[48]** The final main part of the structure underlying Series 26 consisted of the security provisions, regulated by a series of interlocking trust deeds. They consist of a Principal Trust Deed dated 30 April 2001, a Deed of Amendment dated 13 December 2007 and a Supplemental Trust Deed relating specifically to Series 26 dated 14 December 2007. Each were made between ARIC, defined as "Issuer" but in reality as settlor and HSBC Trustee (CI) Ltd as Trustee. LBF and LBIE were (among others) added as parties to the Supplemental Trust Deed. No issue of interpretation arose as to the terms of any of them. For present purposes it is sufficient to note the following. First, cl 5.5 of the Principal Trust Deed (as amended and restated) in the Deed of Amendment contains, at cl 7.1.11, a covenant by ARIC in relation to each Series to comply with its obligations under the Derivative Agreement. Thus, a breach by ARIC of the Derivative Agreement would, *ipso facto,* be a breach of the Trust Deed, qualifying as an Event of Default under Condition 10 of the Base Prospectus.

**[49]** Secondly, cl 5.9 of the Supplemental Trust Deed contained the same provisions as to priority between (*inter alia*) ARIC and LBF in relation to enforcement against the Mortgaged Property as are set out in Final Term 27, including the reversal of priority or "flip" in favour of ARIC in the event of a default under the Derivative Agreement in respect of

[2011] EWHC 1822 (Ch), (Transcript)

which LBF was the defaulting party.

*EVENTS FOLLOWING AUTOMATIC EARLY TERMINATION OF THE DERIVATIVE AGREEMENT*

[50] Both Holdings and LBIE went into a form of insolvency process on 15 September 2008. LBF entered special bankruptcy proceedings in Switzerland on 22 December 2008.

[51] One consequence of the entry of LBIE into administration was that it ceased to perform the functions of Calculation Agent under the terms of the Series 26 Notes so that, whether or not the Automatic Early Termination of the Derivative Agreement amounted to an Early Redemption Event within the meaning of Final Term 19, LBIE did not issue any determination that such an event had occurred.

[52] By letter dated 16 September 2009, ARIC provided LBF with a statement which specified that its "Loss" under the Derivative Agreement was US$61,507,902, while reserving its right to make an additional claim for expenses. The Loss calculation was based upon a quotation obtained from Credit Suisse International for a replacement transaction, based upon a premium rate of 1.8% (compared with LBF's rate of 1.43% falling to 1.03% after eight years) and a net present value of the premium stream of Eur160,313,424, from which ARIC deducted the net present value of the premium stream which would have been payable to LBF but for the termination of the Derivative Agreement of Eur111,122,566. The difference of Eur49,190,858 converted into the US dollar amount claimed, using an exchange rate of 1.3303 euros to 1 US dollar. On the same day ARIC filed a claim in LBF's Swiss bankruptcy for the Swiss franc equivalent of its loss, and a proof for the same amount in Holdings' Ch 11 insolvency.

[53] Two days later ARIC and Enasarco entered into a Deed of Purchase and Cancellation whereby ARIC agreed to purchase all the Notes from Enasarco and then cancel them, in exchange for a transfer to Enasarco of its preference shares in Balco, and an assignment of its claims against LBF under the Derivative Agreement. I was told on instructions that this arrangement included, or was accompanied by, an indemnity from Enasarco to ARIC against any net liability to LBF which might be established by reason of a determination in LBF's favour of the issues now raised in these proceedings.

[54] A consequence of the Deed of Purchase and Cancellation was that Enasarco rather than ARIC is the Claimant in the Pt 8 claim against LBF arising out of the Series 26 Notes, although ARIC has been added as a second Defendant, and is a co-defendant with Enasarco to LBF's Pt 20 claim for a declaration as to its entitlement to the ETCSA, or an equivalent amount.

*SERIES 38*

[55] For reasons already given, I shall confine my description of the facts relevant to this separate structure and Derivative Agreement to those which differ materially from the account given in relation to Series 26. The instruments in this series, described as "Bonds", were issued in four tranches commencing on 29 March 2006 for an aggregate subscription price of Eur200 million and acquired in total by HSH Nordbank SA, but subsequently assigned to HSH Nordbank AG ("Nordbank"). The issuer was Anthracite Rated Investments (Jersey) Ltd ("ARIJ"), the Claimant in this Pt 8 claim. The Series 38 Bonds were issued pursuant to a Base Prospectus dated 30 November 2006 and Final Terms originally dated 29 March 2006 and (most recently) amended and restated on 16 November 2007. The essential structure whereby the subscription price was invested in preference shares in a (different) Balco, to be used in the acquisition of an investment portfolio, differed in no material respect from the structure of Series 26. As 100% holder of the Bonds, Nordbank was afforded similar rights in relation to the management of that portfolio to those afforded to Enasarco under Series 26. The maturity date for the Bonds was 29 March 2017.

[56] Leaving aside differences in nomenclature, there were two main differences in the structure of Series 38, compared with Series 26. The first was that the Derivative Agreement was designed to provide a measure of interest protection as

[2011] EWHC 1822 (Ch), (Transcript)

well as principal protection. This took the form of the inclusion of an additional 32 put options expiring on interest payment dates. It has not been suggested that this distinction is of any consequence for present purposes.

**[57]** The second main difference lies in the formula and mechanics for payment of the early termination compensation element of the ETCSA, and the corresponding deductible (in the definition of Early Redemption Amount) from the redemption proceeds of the preference shares in Balco from which it was intended to be funded. The terms of the Bonds made no provision for the establishment of a Cash Reserve, nor for a flat 4% payment to LBF in lieu. Instead, both the Confirmation and Final Term 18 (corresponding with Final Term 19 under Series 26) made provision for a "Discount" to be deductible and then payable to LBF on a sliding scale reducing to zero before the maturity date for the Bonds, the detail of which is of no consequence.

**[58]** Apart from those specific differences, and leaving aside differences in language and nomenclature, Series 38 may for all relevant purposes be assumed to be substantially the same in its terms and structure as Series 26.

**[59]** Save to the extent necessary to accommodate the Discount rather than the Cash Reserve or 4% in lieu as part of the ETCSA, the terms of the Derivative Agreement were the same as those in relation to Series 26. The Derivative Agreement consisted of a Master Agreement dated 29 March 2006, amended and restated on 11 December 2006, a Schedule dated and amended and restated on the same dates, and a confirmation originally dated 29 March 2006 and amended and restated on 26 July 2006 and then 16 November 2007. There were, as I have described, put options in relation both to interest and principal. The provisions as to Automatic Early Termination, Mandatory Early Termination, Events of Default and Loss were all substantially the same. The premium income payable to LBF was of course different, but that difference does not matter.

**[60]** The trust deeds regulating the security provided under the Series 38 structure consisted of a Principal Trust Deed dated 10 October 2001, amended and restated on 30 November 2006 and a Supplemental Trust Deed, specific to Series 38, dated 29 March 2006, amended and restated on 11 December 2006. The trustee was again HSBC Trustee (CI) Ltd and the settlor, described as "Issuer", was ARIJ. LBF and LBIE were (among others) added as parties to the Supplemental Trust Deed. The trust structure differed in no relevant respect from that which I have described in relation to Series 26.

*EVENTS FOLLOWING AUTOMATIC EARLY TERMINATION*

**[61]** Automatic Early Termination of the Derivative Agreement under Series 38 occurred, of course, on the same day and for the same reasons as in relation to Series 26. As Calculation Agent, LBIE was similarly disabled from determining that an Early Redemption Event had occurred under final Term 18.

**[62]** ARIJ calculated its Loss in September 2009 in the sum of Eur30 million, again by reference to the estimated cost of obtaining a replacement transaction on terms similar to the Derivative Agreement as at the Early Termination Date.

**[63]** On 14 October 2010, ARIJ, HSBC, Balco and Nordbank entered into a Second Supplemental Trust Deed, designed to permit and facilitate a redemption of ARIJ's preference shares in Balco and the transfer to Nordbank of the redemption proceeds (together with certain illiquid assets in the underlying investment portfolio) subject to a deduction of Eur10 million to fund any potential liability of ARIJ to LBF under the Derivative Agreement. The payment by ARIJ to Nordbank was expressed to be made not by way of redemption or purchase of the Bonds, but by way of interim distribution on account, leaving the Bonds at least theoretically on foot, and in the hope that a further distribution might be made upon a successful outcome to this litigation. Thus ARIJ and Nordbank have, albeit by a different route, sought to provide against the early redemption of the Bonds while, at the same time, passing back the proceeds of the realisation of the underlying investment portfolio to Nordbank.

*ANALYSIS OF THE ISSUES*

[2011] EWHC 1822 (Ch), (Transcript)

[64] In the remainder of this judgment I shall revert to the detailed terms and nomenclature of Series 26, save where significant differences in the structure of Series 38 requires me to do otherwise. Logically, the first issue is whether the Automatic Early Termination of the Derivative Agreement on 15 December 2008 was an Early Redemption Event pursuant to Final Term 19.

*EARLY REDEMPTION EVENT?*

[65] For LBF, Mr Russen pointed to the simplicity and apparent clarity of the relevant part of the definition of Early Redemption Event in para (ii)(x) of Final Term 19, which provides that an Early Redemption Event occurs if "The Principal Protection Agreement is terminated in whole for any reason." It was common ground that the Derivative Agreement had been terminated and that, he said, was the end of the matter.

[66] Mr Phillips and Mr Hapgood for ARIJ and Enasarco respectively advanced a barrage of reasons for a contrary conclusion. The deployment of those submissions, and Mr Russen's answers to them, took up more than half the three day oral hearing. They may be summarised as follows:

(1) There was no Early Redemption Event because the Calculation Agent (LBIE) had made no such determination.

(2) The use of the passive verb "is terminated" was inapt to describe Automatic (rather than elective) Early Termination. Thus para (ii)(x) applied only where the Derivative Agreement was terminated by a party serving notice to that effect, rather than pursuant to its own internal mechanisms.

(3) On its true construction, para (ii)(x) was inapplicable to any determination of the Derivative Agreement which arose by reason of LBF's default (whether automatically or upon election by ARIC). As the oral hearing progressed, this proved to be Mr Phillips' and Mr Hapgood's main submission.

(4) An interpretation which, by giving rise to an Early Redemption Event, collapsed the structure of the Notes due merely to a default by LBF would be a commercial absurdity. It would be a case of the tail wagging the dog. This was forcefully argued by Mr Phillips.

(5) It was a commercial absurdity for the failure of the Derivative Agreement to lead to the automatic failure of the structure of the Notes, by early redemption. The court should be driven to an interpretation which (however worded) allows the issuer and the investor a choice in the matter, for example to preserve the structure with replacement principal protection. This was Mr Hapgood's preferred commercial interpretation.

(6) Any interpretation which gave rise to the combination of an early redemption of the Notes under Final Term 19 and an Early Termination of the Derivative Agreement under which LBF was the defaulting party would produce irreconcilable conflicts within the terms and conditions of the Notes, and in particular the security structure, which the alternative interpretation at (3) above would avoid.

[67] I start by reminding myself of the principles applicable to the interpretation of contractual documentation of this type, my attention having been drawn to *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 All ER 98, [1998] 1 BCLC 493, [1998] 1 WLR 896; *Attorney General of Belize and others v Belize Telecom Ltd and another* [2009] UKPC 10, [2009] 2 All ER 1127, [2009] 1 WLR 1988; *Chartbrook Ltd and another v Persimmon Homes Ltd and another* [2009] UKHL 38, [2009] AC 1101, [2009] 4 All ER 677 and *Re Sigma Finance Corp* [2009] UKSC 2, [2010] 1 All ER 571, [2009] NLJ 1550. Generally, the court's task is to ascertain the meaning which the instrument would convey to a reasonable person having all the background knowledge which would reasonably be available to the audience to whom the instrument is addressed. In the case of a simple bilateral contract, the audience will simply be the parties to the contract. But this formulation is applicable to instruments generally, whether contracts,

[2011] EWHC 1822 (Ch), (Transcript)

trust deeds, articles of association or even legislation: see *Belize Telecom* at para 16. The "instrument" in the present case is the Offering Circular. The author is the issuer (ie ARIC) although it was in all probability drafted by lawyers at the direction of LBIE, which marketed the Notes. Its audience included prospective (and actual) investors including, but not necessarily limited to Enasarco since, even if the Notes were all to be issued to Enasarco (as the Final Terms acknowledge) they were nonetheless capable of being sold on, in whole or in part. The audience also included LBF, Holdings and the Trustee.

**[68]** Specific aspects of the general principles in the cases to which I have referred are, it seems to me, of particular relevance for present purposes. The first is that the meaning which a document would convey to a reasonable addressee is not the same as the meaning of its words:

"The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean. The background may not merely enable the reasonable man to choose between the possible meanings of words which are ambiguous but even (as occasionally happens in ordinary life) to conclude that the parties must, for whatever reason, have used the wrong words or syntax."

See the *ICS* case per Lord Hoffmann at p 913. The potential for uncertainty created by that dictum is qualified by Lord Hoffmann's acknowledgment that:

"The 'rule' that words should be given their 'natural and ordinary meaning' reflects the common sense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents."

The documentation which includes Final Term 19 is, plainly, of the utmost formality.

**[69]** Secondly, the ascertainment of the meaning of a particular provision in a complex instrument requires constant attention to the context and purposes of the overall scheme of which it forms part, and an awareness that "even the most skilled drafters sometimes fail to see the wood for the trees". See *Re Sigma Finance Corp* at para 12.

**[70]** Finally, there is an important difference between a conclusion that the ordinary or grammatical meaning of the language of a particular provision leads to a conclusion that flouts business common sense, and the subjection of a complex and carefully prepared scheme to reinterpretation on the grounds of mere fairness or enhanced reasonableness. The former is legitimate but the latter is not. In *Belize Telecom*, at para 16, Lord Hoffmann said that:

"The court has no power to improve upon the instrument which it is called upon to construe, whether it be a contract, a statute or articles of association. It cannot introduce terms to make it fairer or more reasonable. It is concerned only to discover what the instrument means."

In *Chartbrook,* at para 20 he said:

"It is of course true that the fact that a contract may appear to be unduly favourable to one of the parties is not a sufficient reason for supposing that it does not mean what it says. The reasonable addressee of the instrument has not been privy to the negotiations and cannot tell whether a provision favourable to one side was not in exchange for some concession elsewhere or simply a bad bargain."

**[71]** I confess to having found it initially difficult to suspend my disbelief that the phrase "is terminated in whole for any reason" could actually have the very much more restricted meaning for which Mr Phillips and Mr Hapgood have contended, namely "is terminated by notice for any reason other than a default by LBF". But the combined effect of their submissions, and in particular the last one, has made the ascertainment of the meaning of this part of Final Term 19 much more difficult than I had initially appreciated. I shall therefore address their submissions in a little detail.

**[72]** I am not impressed by the submission based upon the absence of an actual determination by LBIE as Calculation Agent. It is well settled that where the working out of a formula regulating the parties' rights under an agreement depends upon something to be done by a third party, the formula, and the rights dependent upon its implementation, do

[2011] EWHC 1822 (Ch), (Transcript)

not fall to the ground merely because that party declines or is unable to act. *In extremis*, the court will step in and perform the relevant function: see *Sudbrook Trading Estate Ltd v Eggleton* [1983] 1 AC 444, [1981] 3 All ER 105, [1981] 3 WLR 361. LBIE's descent into administration strikes me as a good example of the type of machinery breakdown which the House of Lords held could be remedied by the court, so as to avoid the destruction of the parties' bargain.

**[73]** I am no more impressed by the second submission, based upon the supposedly inappropriate use of the passive "is terminated" as a description of automatic termination, rather than termination by notice. It is in my view in no sense a misnomer to describe the Derivative Agreement as being "terminated" rather than "terminating" where the operative cause is LBF's default, merely because the parties have pre-elected Automatic Early Termination in such an event. The point appears to me to be an attempted misuse of the discredited grammatical process of linguistic interpretation.

**[74]** It is in fact apparent from looking elsewhere in this complex structure that the drafter used the active and passive versions of the verb to terminate indiscriminately. Mr Phillips' theory was that the drafter used the active "terminates" to describe Automatic Early Termination and the passive "is terminated" to describe elective Early Termination. But in cl 5.5 of the Principal Trust Deed as amended and restated on 13 December 2007, the security was stated to become enforceable if "(ii) a Derivative Agreement terminates with sums due to the Derivative Counterparty." (*ie LBF*)

**[75]** That provision was obviously designed to enable LBF to enforce its prior security on an Early Termination of the Derivative Agreement where ARIC was the defaulting party. Yet the active is used in circumstances where LBF had no right whatsoever to rely upon Automatic (rather than elective) Early Termination.

**[76]** As a second example, in the description of the Derivative Agreement (described as the Redemption Amount and Coupon Protection Agreement) immediately following the Final Terms of Series 38 it is stated that:

"In the event of an early redemption of Bonds in whole or in part, the Redemption Amount and Coupon Protection Agreement will be terminated proportionality and an amount in respect of such termination, equal to the aggregate Discount for all the Bonds so redeemed, will be payable by the Issuer to the Redemption Amount and Coupon Protection Provider."

That is a user-friendly description of Mandatory Early Termination of the Derivative Agreement coupled with payment of the ETCSA, following early redemption of the Bonds. It is wholly automatic, yet the drafter uses the passive "will be terminated".

**[77]** The third submission, that termination of the Derivative Agreement constitutes an Early Redemption Event only if it arises otherwise than by LBF's default is much the most formidable of those advanced by Mr Phillips and Mr Hapgood, but it stands and falls upon the validity of the three following submissions relied upon to justify it, and upon considerations militating the other way. The starting point is to look more closely at the consequences of this submission being correct. The Schedule and Confirmation in the Derivative Agreement exclude most of the standard Party B (ie ARIC) Events of Default under the Master Agreement. This third submission would therefore, if correct, confine the effect of para (ii)(x) of Final Term 19 to a very small sub-class of events giving rise to early termination of the Derivative Agreement. Furthermore, Mr Phillips and Mr Hapgood were unable to identify any event which would qualify under their construction as an Event of Default by ARIC (rather than LBF) which would not also give rise to a breach by ARIC of Condition 10, and therefore an Event of Default under para (iii) of Final Term 19. This is because Condition 10 would be triggered by a failure by ARIC to comply with its obligations under the Trust Deed, and those included a covenant by ARIC to comply with its obligations under the Derivative Agreement. Paragraph (ii)(x) of Final Term 19 would therefore be, on the Claimants' construction, not merely very limited in scope, but also redundant.

**[78]** More seriously, if an Early Redemption Event is not triggered under Final Term 19 by a termination of the Derivative Agreement due to LBF's default, then the structure of the Notes contained no provision whereby the Notes could be redeemed early, even at the election of the Noteholders acting unanimously, or by any requisite majority

(under the detailed provisions for majority decision-making in the Trust Deed). It would not convert a regime for automatic early redemption upon the failure of the Derivative Agreement into a regime for elective early redemption. Unless the issuer, the trustee and the investors could all agree otherwise, the Notes would continue until final maturity, wholly bereft of principal protection after the Early Termination of the Derivative Agreement.

**[79]** Against that analysis, I have not been persuaded by either Mr Phillips' or Mr Hapgood's submissions based upon supposed commercial absurdity. Taking Mr Phillips' submission first, he said that it was ridiculous to think that the Noteholders would subject themselves to the enforced collapse of the investment structure underlying the Notes merely because of the failure of the principal protection afforded by the Derivative Agreement. On the contrary, they would naturally wish to continue with the underlying investment structure, with replacement principal protection from some other derivative counterparty in the event of LBF's default. To allow the failure of the Derivative Agreement to destroy the underlying investment structure would be to let the tail wag the dog.

**[80]** I disagree. The basis upon which investors were invited to subscribe for fifteen year Notes backed by a relatively high risk investment portfolio was that the Notes would, throughout their life, have the benefit of principal protection from Lehman Brothers. In fact LBF defaulted within a year of the issue of Series 26. The structure contained no mechanism enabling the issuer to replace the Derivative Agreement with LBF by a replacement agreement with some other counterparty. Furthermore, since the likely reason for any default by LBF would be insolvency (including the insolvency of Holdings as Credit Support Provider) the notion that the Loss provisions of the Master Agreement triggered by Early Termination would yield a sum sufficient to enable the issuer to buy alternative principal protection, is, at least in commercial rather than purely theoretical terms, unreal. It is, nearly three years after the Lehman collapse, still uncertain what if any dividend LBF or Holdings will pay to unsecured creditors, and the earliest payment date may still be years away.

**[81]** It is in any event in my view wrong to characterise the principal protection afforded by the Derivative Agreement as the mere tail of a dog. Neither Nordbank nor Enasarco subscribed for the instruments in order to obtain the benefit of the asset management skills and judgment of the Lehman Group, in relation to the underlying portfolio. As I have described, both structures preserved substantial asset management rights for their respective investors (while they remained owners of 100% of each Series), subject only to a form of veto designed no doubt to avoid causing unplanned exposure to LBF under the Derivative Agreement. As far as I can ascertain, the Lehman backe

**JUDGMENT-2:**

d principal protection formed an important part of the structure both to Nordbank and to Enasarco. It enabled Nordbank to invest in a portfolio with a risk reward profile which would not otherwise have satisfied the Basel II requirements. It enabled Enasarco to seek to obtain long-term investment reward for its pensioners without incurring unacceptable downside risk. These aspects of the importance to the investors of the principal protection afforded by the Derivative Agreements are fully verified by the unchallenged evidence.

**[82]** Faced with a choice between an interpretation of Final Term 19 (or 18) that left the investor saddled with a medium term instrument bereft of principal protection, with no internal mechanism enabling the issuer to put in place replacement protection, let alone fund its cost in the event of LBF's insolvency, or an interpretation under which LBF's failure enabled the investors to recover their investments by early redemption, and choose their own substitute (for LBF) for the future, it seems to me at least equally likely in commercial terms that the investors would prefer the latter, rather than the former. Likelihood is, of course, not the relevant test. But that analysis demonstrates, at least to me, that Mr Phillips' submission based upon commercial absurdity must be rejected.

**[83]** Mr Hapgood's commercial absurdity submission was rather more subtle. He submitted that the real vice of an interpretation of Final Term 19 under which a failure of the Derivative Agreement due to LBF's default led inevitably to early redemption was that it deprived the investors of the choice whether or not to allow the failure of principal protection to give rise to an unwinding of their investment. He pointed out that principal protection might fail at a late

stage in the life of the issue, at a time when the underlying portfolio was worth substantially more than the original subscription price, so that the investors might well prefer to continue with the profitable portfolio, rather than risk a diminution in value occasioned by its enforced liquidation. In short, the commercial absurdity in LBF's interpretation of Final Term 19 was its automatic rather than elective effect, in terms of early redemption.

[84] There is real force in that submission. With the benefit of hindsight, and in particular the valuation and liquidity difficulties affecting hedge fund portfolios of the type in issue which followed (whether or not caused by) the Lehman collapse, I can envisage that many commercial minds would think that an elective rather than mandatory approach to early redemption would be better, more reasonable, and even fairer.

[85] The trouble with Mr Hapgood's submission is that his proposed construction of Final Term 19 does not bring about an elective regime for early redemption. It merely substitutes one mandatory consequence of LBF's default (automatic early redemption) for another (no early redemption). At no time during the hearing, or in the parties' skeleton arguments, was any interpretation of para (ii)(x) put forward which would in fact remedy the commercial infelicity which Mr Hapgood identifies. Furthermore, Conditions 6(e) and (f) would have done just that, but they were expressly dis-applied by Final Term 19. The choice of automatic rather than elective early redemption appears therefore to have been deliberate.

[86] There is in my judgment an alternative escape from what Mr Hapgood fairly describes as the surprising rigidity of the link between early redemption and Early Termination of the Derivative Agreement. It lies in an appreciation of the liberty enjoyed by the investors, the issuer and the Trustee, acting together, to prevent the Early Termination of the Derivative Agreement leading to actual early redemption, by agreeing, as in fact they have done in both the present cases, alterations to their relationship which produce a different result after the happening of the Early Redemption Event. As I shall explain, the liberty of those parties to the structure to agree alterations to it is of course subject to LBF's security rights. But it is precisely where the Derivative Agreement terminates because of LBF's default that its security rights are postponed to those of the investors under the security structure. Postponement of LBF's security rights does not entirely remove them, but it makes them easier for the issuer and the investors to work around.

[87] I refer to the parties other than LBF as having a "liberty" rather than a right to take steps which avoid an Early Redemption Event turning into actual early redemption, because no such provision is expressed anywhere in the structure. It is simply a liberty which the structure does not prohibit, save where LBF's security rights would otherwise be infringed. Furthermore, against the possibility that the instruments under each series might not be held 100% by a single investor, the terms of each issue, and in particular, the Trust Deeds contain detailed provision enabling a community of investors to participate in amendments to the scheme, by resolutions passed at meetings subject to appropriate rules as to quorum and majority vote.

[88] If that is, as I conceive, the real safety valve which protects the investors from the apparent rigidities of the link between Early Termination of the Derivative Agreement and early redemption of the instruments, then I consider that it works better as a means of avoiding (by consent, or by the requisite majority) what would otherwise be an early redemption than as a means for avoiding what (on the Claimants' interpretation) would otherwise be the inevitable continuation of the instruments to maturity, without principal protection. In short, it provides for a winding-up rather than the perpetuation of the structure where an important part of it has fallen away, where the parties cannot agree some other acceptable means for its continuation.

[89] That conclusion accords with the automatic way in which the circumstances described in paras (i) and (ii) (y) of the definition of Early Redemption Event also operate, in circumstances related to tax or illegality of performance. Like failure of the Derivative Agreement, they are also events which, unless the parties can agree otherwise, are agreed to give rise to an automatic winding up of the structure.

[90] Mr Hapgood's final submission was that, on LBF's interpretation, Final Term 19 gave rise to conflicts with other

parts of the structure and in particular the security provisions. He gave four examples. I shall deal only with the two of them which I found persuasive. The first was that under the definition of Early Redemption Amount in Final Term 19, ARIC is required to deduct costs of LBF which include its costs of unwinding the Derivative Agreement . . . "taking into account hedging losses incurred as a consequence of the Early Redemption of the Notes".

[91] This deductible is of course intended to put ARIC in funds with which to pay amounts due to LBF. It is expressly included as part of the ETCSA under the Confirmation and forms an elective part of the non-defaulting party's calculation of Loss under s 14 of the Master Agreement. Mr Hapgood's point was that in the event of an early redemption triggered by LBF's default under the Derivative Agreement, Loss would be calculated by reference to ARIC's loss (including hedging losses) and LBF's right would be limited to receiving ARIC's gain, rather than claiming for its own hedging losses. The drafter of Final Term 19 must have assumed, says Mr Hapgood, that an Early Redemption Event would not be triggered by LBF's default under the Derivative Agreement.

[92] I accept Mr Hapgood's submission that there is an apparent tension, in the sense that, if early redemption was inevitably triggered by any Early Termination of the Derivative Agreement, circumstances could arise in which LBF could not claim its hedging losses. But to allow that tension to subvert what I conceive to be the plain meaning of para (ii)(x) in the same Final Term would indeed be to allow the tail to wag the dog. The reference to hedging losses as a deduction from the Early Redemption Amount in Final Term 19 is to hedging losses incurred not as a consequence of the Early Termination of the Derivative Agreement, but of the early redemption of the Notes which, if the Derivative Agreement has not already terminated, gives rise to Mandatory Early Termination, and a payment to LBF of the ETCSA. The drafter is plainly thinking, at that point in this complicated provision, of deductions sufficient to fund the ETCSA itself. The sensible resolution of the tension identified by Mr Hapgood is not to rewrite the definition of Early Redemption Event, but to include, by implication or interpretation, the phrase "if applicable" after "taking into account" in the sentence upon which Mr Hapgood relies.

[93] More seriously, Mr Hapgood points to the final paragraph of Final Term 19, which provides (in summary) that either the Cash Reserve, or the 4% early redemption compensation in lieu, would be payable to LBF in priority to any redemption payment made by ARIC to the Noteholders. In the event of an Early Redemption triggered by LBF's default, such priority would directly conflict with the reversed priority as between LBF and the Noteholders which, both under Final Term 27 and the Trust Deeds, produces the opposite result. Again, Mr Hapgood submits that the drafter of this last paragraph of final Term 19 must have assumed that LBF's default under the Derivative Agreement could not trigger early redemption of the Notes.

[94] This was perhaps Mr Hapgood's best shot. To Mr Phillips' dismay, no equivalent provision appeared in Final Term 18 relating to Series 38. But the question remains whether the resolution of that apparent conflict within the series 26 Final Terms requires a radical writing down of the ambit of para (ii)(x), so as to prevent a collapse of the principal protection part of the structure from being even capable of bringing about an unwinding of the structure as a whole by early redemption. In my judgment it does not. The present question of interpretation is whether the phrase "the Principal Protection Agreement is terminated in whole for any reason" means that the collapse of the principal protection afforded by the Derivative Agreement was, like a relevant tax event or an illegality of performance, to be an occasion for the unwinding of the structure as a whole, subject to the safety valve constituted by the parties' liberty to preserve it by an agreed amendment. In my judgment that is the clear meaning of that provision.

[95] It is perhaps understandable that, when formulating the last part of Final Term 19 the drafter may have lost sight of the wood for the trees, in the sense that, although most of the circumstances giving rise to Early Redemption would entitle LBF to rely on its priority as against the Noteholders, one of them, namely Early Termination of the Derivative Agreement due to its default, would not. In my judgment the solution to that apparent mix-up is, by interpretation or implied term simply to read into that last paragraph a phrase recognising that it is, of course, subject to any priority flip which might be occasioned by such a default. It is comforting, but by no means decisive, that the phrase "for any reason" in para (ii)(x) entirely accords with that analysis. Nonetheless, my main reasons for concluding that LBF's

interpretation on this point is to be preferred arises from my perception that it better accords with the structure and purposes of the two transactions, understood as a whole, than the interpretation for which the Claimants contend.

**[96]** I conclude therefore that the Automatic Early Termination of the Derivative Agreement is, under both structures, an Early Redemption Event, notwithstanding that it is triggered by LBF's default.

*MANDATORY EARLY TERMINATION?*

**[97]** The issue under this heading is whether a Mandatory Early Termination Date under the Derivative Agreements occurred by reason of the occurrence of an Early Redemption Event under the Final Terms, thereby triggering a contractual entitlement of LBF to be paid the ETCSA. Notwithstanding indications in the evidence that LBF was minded to abandon its affirmative case under this issue, Mr Russen persisted in it at trial, along the following lines:

(1) The provisions relating to Mandatory Early Termination in the Confirmations under the Derivative Agreements constituted formulae for the triggering of contractual payments by the issuers to LBF, rather than a separate regime for termination.

(2) Those contractual entitlements were specifically preserved by s 6(c)(ii) of the Master Agreements, notwithstanding the occurrence of an Early Termination Date.

(3) The clear intent displayed by each structure as a whole was that an Early Redemption Event in relation to the Notes (or Bonds) would in due course lead to the occurrence of a Mandatory Early Termination Date under the Derivative Agreements, and thereby trigger LBF's entitlement to the ETCSA.

(4) It was for that purpose irrelevant that the powder trail leading to that outcome was set alight by Automatic Early Termination of the Derivative Agreements due to LBF's default.

**[98]** In my judgment that analysis, and the conclusion contended for, is clearly wrong. My reasons follow.

**[99]** First and foremost, the parties having chosen to provide for LBF's entitlement to the ETCSA upon the happening of a particular type of termination of the Derivative Agreement, those provisions are, almost by definition, inapplicable in circumstances where the Derivative Agreement has already terminated. There cannot, as Mr Phillips and Mr Hapgood submitted, be two successive terminations of the same agreement.

**[100]** Secondly, and notwithstanding the ingenuity of the argument, I do not consider that s 6(c)(ii) of the Master Agreement has, or could ever have, the effect of preserving LBF's contingent entitlement to the ETCSA. The obvious purpose of s 6(c)(ii) is that, upon Early Termination, the parties' on-going mutual obligations are entirely replaced by a single close-out payment, reflecting the fact that the Derivative Agreement has come to an end. The phrase "without prejudice to the other provisions of this Agreement" may be applicable to provisions which are not, by their nature, brought to an end on termination (such as a liability to pay outstanding arrears of premium incurred prior to Early Termination). They have no application to provisions which are triggered by some later termination event which, of itself, necessarily assumes that Early Termination has not already occurred.

**[101]** In that context, the Mandatory Early Termination Date cannot occur at the same time as Early Termination (where relied upon as the trigger for an Early Redemption Event). Pursuant to the Confirmation it occurs only on the Final Redemption Date as defined in Final Term 19. That is five business days after the realisation of all the outstanding Balco preference shares. It is plain from Final Term 19 that this will necessarily occur some time after the happening of the Early Redemption Event triggered by Early Termination of the Derivative Agreement, because the event must first be determined as such by the Calculation Agent, and the underlying portfolio must then be realised so as to fund the redemption of the Balco preference shares.

[2011] EWHC 1822 (Ch), (Transcript)

**[102]** Thirdly, the Mandatory Early Termination Date has not yet been reached in relation to either Derivative Agreement, even though, on my interpretation, an Early Redemption Event has occurred under the Final Terms in each structure. This is because, as I have described, the respective issuer, investor and Trustee under each structure have so re-arranged their affairs as to provide for a different outcome, as they are *prima facie* at liberty to do, if LBF thereby suffers no infringement of its security rights. The Notes under Series 26 were bought back and cancelled by ARIC. This arguably involved an infringement of LBF's postponed security rights because the Balco preference shares were transferred to Enasarco. Since however Enasarco agreed to indemnify ARIC in respect of any successful claim by LBF, it did not cause LBF any real prejudice, and Mr Russen did not suggest that the purchase and cancellation was therefore invalid. Although the investment portfolio underlying Series 38 was itself realised, and the Balco preference shares redeemed, the proceeds were used not to fund early redemption of the Bonds, but to make an interim distribution. This did not (other than perhaps purely technically) infringe LBF's security rights because a sufficient fund (namely Eur10 million) was left behind, with which to enable ARIJ to make any payment to LBF which might fall due as the result of this litigation.

**[103]** In reaching those conclusions I have taken into account, but not in the end accepted, the following submission by Mr Russen. He said that Final Term 19 plainly provided, as a consequence of an Early Redemption Event however caused, that ARIC would deduct out of the proceeds of the redemption of the Balco shares an amount calculated on a basis clearly designed to put it in funds for the payment to LBF of the ETCSA. Since on both sides' interpretation of para (ii)(x) an Early Redemption Event could be triggered by some form of Early Termination of the Derivative Agreement, the parties cannot be taken as having intended that an Early Termination, (regardless of its cause) should thereby render the Mandatory Early Termination regime, including payment of the ETCSA, permanently redundant. Why, he asked rhetorically, should the parties have intended ARIC to be left with the windfall constituted by the aggregate of those deductions, if the equivalent ETCSA could never then become payable to LBF? It was, he submitted, irrelevant for the purposes of interpretation that the issuers and investors had, after the event, rearranged their affairs so as to provide for that windfall to be payable to the investors (subject in the case of Series 38 to a reserve, and in the case of Series 26 to an indemnity sufficient to enable the issuer to meet LBF's claim if successful).

**[104]** I recognise the force of that submission. The drafter does appear to have constructed a formula for the Early Redemption Amount in Final Term 19 which reflects an unconscious assumption that ARIC needed to be put in funds to pay the ETCSA to LBF. Under most of the circumstances triggering an Early Redemption Event that would undoubtedly be so. Where the trigger was a tax event, supervening illegality or a default by ARIC under Condition 10 which was not itself an Event of Default under the relevant Derivative Agreement, an ETCSA would in due course ordinarily become payable, precisely because nothing would in the meantime have brought about an earlier termination of the Derivative Agreement. It is indeed plain that the ETCSA was intended to be LBF's compensation for an early termination of the Derivative Agreement brought about by an original cause consisting of the early redemption of the Notes, where s 6 of the Master Agreement would provide no formula by way of compensation for Early Termination.

**[105]** It is however commercially absurd to think that the parties intended, in the event of an Early Termination of the Derivative Agreement, to confer upon LBF first, rights to a payment under s 6(e) of the Master Agreement, and then a right to receive the ETCSA shortly thereafter, when the Early Redemption Event triggered by Early Termination had matured into an Early Redemption Date, and therefore a Mandatory Early Termination Date under the Derivative Agreement. Take, for example, an Early Termination brought about by a default on the part of ARIC. That would immediately trigger LBF's right to compensation for its Loss under s 6(e). On both parties' interpretations of Early Termination Event that would ordinarily lead to an Early Redemption Date, the occurrence of a Mandatory Early Termination Date and a liability of ARIC to pay, in addition, the ETCSA to LBF.

**[106]** The position is only slightly less absurd on an Early Termination of the Derivative Agreement due to LBF's default. If premium rates for a replacement transaction had by then fallen, then under s 6(e) LBF might well be entitled to payment of ARIC's gain (since a replacement transaction would be cheaper than the Derivative Agreement itself),

and yet in due course LBF would also become entitled to payment of the ETCSA.

[107] Mr Russen sought to deal with these absurdities by submitting that, wherever the structure as a whole provided for LBF to receive the ETCSA, that necessarily override any additional or inconsistent provision for close-out payment on Early Termination which might be triggered by the same underlying facts. That was, indeed, a major theme in his submissions as a whole. The main difficulty with it is that if (as he submitted and I have indeed concluded) any form of Early Termination of the Derivative Agreement always triggered an Early Redemption Event, and a consequential right for LBF to receive the ETCSA, it is difficult to see for what conceivable purpose the parties consciously chose Second Method and Loss in the Schedule to both Derivative Agreements, rather than merely deleting them as inapplicable.

[108] Mr Russen's only (and I am afraid rather lame) response to that difficulty was that the Schedules appeared to have been prepared earlier than the Confirmations in relation to each Derivative Agreement, at a time when, perhaps, the parties had yet to focus on this point. Not only was that analysis not supported by the factual chronology, but it is in my view misconceived in principle. The structure of complex transactions such as these must be viewed as a whole, regardless of the dates of preparation of different parts of them, if only because the drafter of the last part to be prepared must be taken to have looked at his handiwork alongside other parts of the structure already in existence, to check that they worked in tandem.

[109] The answer therefore to this conundrum is simply to recognise that the drafter of Final Term 19 was in at least this respect wearing blinkers in failing to appreciate that, on any interpretation of para (ii)(x), an Early Redemption Amount might become payable to the Noteholder after an earlier termination of the Derivative Agreement, with the result that no ETCSA would ever be payable to LBF, and the additional result that LBF might in truth either be liable to make a close-out payment to ARIC, or entitled to receive from ARIC, some wholly different and possibly larger payment, for which Final Term 19 provided no sufficient deduction as a funding mechanism. In any case where a close-out between ARIC and LBF under s 6 of the Master Agreement produced either a payment due to ARIC, or a payment from ARIC smaller than the ETCSA, this would cause no funding difficulty, but rather create a windfall. If a payment due on Early Termination to LBF under s 6 of the Master Agreement exceeded the amount of the ETCSA (as well it might if, for example, it arose from ARIC's default and LBF incurred a very large loss in closing-out an associated hedge) then ARIC would indeed be underfunded under Final Term 19, but LBF would recover in full out of the proceeds of the redemption of the Balco shares pursuant to its priority under the security structure. As the facts of the two present cases have shown, the occurrence of what might otherwise have been a windfall is by no means beyond the wit of the parties other than LBF to resolve, as they have indeed done by arranging for it to be paid, subject to LBF's claims, to the investors.

[110] I had thought during the early part of the oral hearing that to recognise a liberty of the parties other than LBF to put, as it were, a foot in the door between the occurrence of an Early Redemption Event and the happening of an Early Redemption Date, and therefore a Mandatory Early Termination Date, could risk unfairly and un-commercially depriving LBF of its ETCSA, even in a case where (there being no Early Termination of the Derivative Agreement) it was *prima facie* clearly entitled to it. But Mr Hapgood easily persuaded me that this was not so. In such a case, the insertion of any such "foot in the door" would simply leave the Derivative Agreement running on, as between the issuer and LBF, with LBF continuing to earn its contracted premium stream, for the early cutting short of which ETCSA was intended to be a rough and ready form of compensation.

[111] I have therefore concluded, without difficulty, that LBF is not, in either case, contractually entitled to receive the ETCSA, since no Mandatory Early Termination Date has occurred, or could ever occur, after Automatic Early Termination of the Derivative Agreements.

*CALCULATION OF LOSS UNDER S 6(E) OF THE MASTER AGREEMENT*

[112] My analysis thus far leads me to the conclusion that the rights and/or liabilities of LBF arising from the Automatic

[2011] EWHC 1822 (Ch), (Transcript)

Early Termination of the Derivative Agreements do, as the Claimants assert, depend upon the identification of the issuers' Loss as defined by s 14 of the Master Agreement, taking such account (if any) as is appropriate of the fact that in each case an Early Redemption Event has occurred under the Final Terms of the instruments, but not an Early Redemption Date, or a Mandatory Early Termination Date under the Confirmations. There is no logical consecutive order in which to deal with the remaining issues. Since however it is for the issuers as non-defaulting parties to identify their loss, and since they have chosen to do so by a technique (replacement transaction quotation) which they are *prima facie* entitled to adopt, I consider that the burden lies on LBF to persuade the court that the use of that technique is unreasonable. There is no challenge to the issuers' good faith.

**[113]** It is therefore convenient to begin with an outline of LBF's case that the issuers' use of a replacement transaction quotation was unreasonable. It may, I hope without any unfairness, be summarised as follows:

   (1) The issuers' Loss (or gain) is to be determined as at the Early Termination Date, ie 15 December 2008, or so soon as reasonably practicable thereafter.

   (2) Early Redemption Events occurred in relation to both Series on the same day.

   (3) Viewed from that date, and without benefit of hindsight, this would in the ordinary course lead to early redemption of the instruments after deductions by the issuers sufficient to fund the payment of the ETCSA to LBF. I will call it the ETCSA Deduction Fund.

   (4) Since the ETCSA would not as a matter of contract be due to LBF, the ETCSA Deduction Fund would represent a windfall gain to the issuers arising from the Early Termination of the Derivative Agreements. It would not be contractually due to the investors.

   (5) The subsequent choice of the issuers to pay the ETCSA Deduction Fund to the investors was irrelevant to any determination of Loss as at the Early Redemption Date.

   (6) The amount of the ETCSA was in any event a genuine pre-estimate of loss by the parties to the Derivative Agreement, by reference to which the radically different result achieved by the use of a replacement transaction quotation is manifestly unreasonable.

   (7) The impossibility within the relevant structures of erecting a replacement for the Derivative Agreements as principal protection for the investors is, of itself, a sufficient reason to treat the use of a replacement transaction quotation as unreasonable.

*THE LEGAL PRINCIPLES*

**[114]** The exercise called for in order to resolve the remaining issues is, in substance, the interpretation of standard form provisions of the Master Agreement which have been in widespread and constant use since 1992, and their application to particular facts arising from the embodiment of the Master Agreement in two complex bespoke structures. In *Lomas and others v JFB Firth Rixson Inc and others* [2010] EWHC 3372 (Ch), at para 53, [2011] 2 BCLC 120, [2011] NLJR 27, I said:

"The ISDA Master Agreement is one of the most widely used forms of agreement in the world. It is probably the most important standard market agreement used in the financial world. English law is one of the two systems of law most commonly chosen for the interpretation of the Master Agreement, the other being New York law. It is axiomatic that it should, as far as possible, be interpreted in a way that serves the objectives of clarity, certainty and predictability, so that the very large number of parties using it should know where they stand: see *Scandinavian Trading Tanker Co v Flota Petrolera Ecuatoriana* [1983] 1 QB 529 ('the Scaptrade') per Robert Goff LJ at 540."

*Lomas v Firth Rixson* is subject to a pending appeal, and has (I believe) been reviewed by the Supreme Court in a case still awaiting judgment. Subject to those uncertainties, I adhere to that view.

**[115]** Nonetheless, (as recognised in para 54 of *Lomas v Firth Rixson*) the 1992 Master Agreement has come to be incorporated into a bewildering variety of different types of derivative transactions, so that caution needs to be exercised against a slavish assumption that the meaning of a particular provision of the Master Agreement in one type of transaction is necessarily to be transported lock stock and barrel as its precise meaning in some very different type of transaction. To a large extent the Master Agreement caters for this internally. For example, the definition of Settlement Amount in s 14 provides in terms that where the use of a Market Quotation would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result, the Settlement Amount is to be determined by reference to that party's Loss. As a further example, the definition of Loss itself expressly contemplates that the method chosen by the non-defaulting party, including the use of replacement transaction quotations, may be inapplicable if it produces an unreasonable result. Thus the overriding control tests of commerciality and reasonableness provide a measure of flexibility within the Master Agreement sufficient to enable it to be applied across a wide range of different types of transaction, in an infinitely variable combination of different circumstances.

**[116]** A significant body of recent case law has developed in relation to the interpretation and application both of Loss and Market Quotation under the 1992 Master Agreement. The decisions to which I was referred are *Australia & New Zealand Banking Group Ltd v Soci[#233]t[#233] G[#233]n[#233]rale* [2000] CLC 833 (CA); *Peregrine Fixed Income Ltd v Robinson Department Store Public Co Ltd* [2000] CLC 1328; *Britannia Bulk plc v Pioneer Navigation Ltd and others* [2011] EWHC 692 (Comm); and *Pioneer Freight Futures Co Ltd v TMT Asia Ltd* [2011] EWHC 778 (Comm). Those authorities establish the following broad propositions:

(1) Loss and Market Quotation are, although different formulae, aimed at achieving broadly the same result, so that outcomes derived from one may be usefully tested by way of cross-check by reference to the other: see per Mance LJ in the *Australia* case at paras 2, 15 and 22. This derived from a concession in that case, but has subsequently been reaffirmed after adversarial argument in the *Peregrine* case at para 30, in the *Britannia Bulk* case at paras 44 to 46 and 51, and in the *Pioneer* case at paras 98 and 105. It is one of those sensible concessions which has hardened into hornbook law.

(2) The identification of the non-defaulting party's loss of bargain arising from the termination of the Derivative Transaction requires a "clean" rather than "dirty" market valuation of the lost transaction. This means that the loss of bargain must be valued on an assumption that, but for termination, the transaction would have proceeded to a conclusion, and that all conditions to its full performance by both sides would have been satisfied, however improbable that assumption may be in the real world: see in the *Australia* case at paras 5, 22 to 27 and 30-31, the *Britannia Bulk* case at paras 11 to 14 and 34-35, and in the *Pioneer* case at paras 112 to 117.

(3) The termination payment formulae under s 6(e) are not to be equated with, or interpreted rigidly in accordance with, the quantification of damages at common law for breach of contract. They are methods of calculating close-out positions on the termination of a derivative transaction or series of transactions: see the *Britannia Bulk* case per Flaux J at para 37. This is, in particular, because the Second Method works both ways, and may lead to a close-out payment due to the defaulting party.

**[117]** The extended definition of Loss in s 14 of the 1992 Master Agreement nonetheless uses certain words and phrases which were, I think, intended to be illuminated by reference to the general common law (or New York law) meaning. For present purposes the relevant phrase is "loss of bargain". It is precisely for the purpose of identifying the non-defaulting party's loss of bargain that Market Quotation requires, and Loss permits, the use of quotations for replacement transactions. This methodology precisely reflects the principle by then well established at common law, namely that where damages are sought for loss of bargain occasioned by the breach (leading to termination) of a commercial contract then, subject only to the availability of a market for the obtaining of a replacement contract, the

[2011] EWHC 1822 (Ch), (Transcript)

cost of such a replacement contract as at the breach date is likely to prove the most reliable yardstick for measuring the Claimant's loss of bargain: see in particular *Golden Strait Corp v Nippon Yusen Kubishika Kaisha* [2007] UKHL 12, [2007] 2 AC 353, [2007] 3 All ER 1 in which, at para 20, Lord Bingham approved the following dictum of Toulson J in *Dampskibsselskabet "Norden" A/S v Andre & Cie SA* [2003] EWHC 84 (Comm), [2003] 1 Lloyd's Rep 287, at 292 "The availability of a substitute market enables a market valuation to be made of what the innocent party has lost, and a line thereby to be drawn under the transaction."

**[118]** The value of being able to draw a line under the transaction by the use of a breach date basis of valuation of the Claimant's loss is that, save in special cases, for example where the Claimant is locked into a disadvantageous position by reason of the breach, it provides a neat and precise distinction between matters relevant to the Claimant's loss of bargain and matters such as his subsequent dealings, which are for his own risk and benefit and therefore in principle irrelevant to the damage flowing from the Defendant's breach. There is a penetrating analysis of these principles in McGregor on Damages (18th ed) at paras 7-106 to 7-168 which suggests that, in certain respects, they are no longer to be regarded as beyond question. Nonetheless the continuing vitality of the principle upheld in the *Golden Strait* case, in the context of derivatives governed by the ISDA Master Agreement, appears to have been resolutely affirmed by the four ISDA cases to which I have referred, not least because of the requirement laid down in all four of them to "value clean". On its face, the determination of Loss is required to be made as at the Early Termination Date, which broadly corresponds with the breach date used by the common law.

*ANALYSIS*

**[119]** Armed with those principles, I turn to examine Mr Russen's carefully crafted submissions, to the effect that the Claimants' use of quotations for replacement transactions is unreasonable. His first two propositions, that the determination is to be made (if practicable) as at the Early Termination Date, and that an Early Termination Event occurred on the same day are, in my view, correct. In fact, both the Issuers calculated their Loss nearly a year after the Early Termination Date, and ARIC used a quotation obtained on 6 May 2009. It may be that issues could arise as to whether the market chaos following the Lehman collapse rendered an immediate calculation of Loss impracticable, but I am not asked to resolve any such issues. For present purposes I accept in principle Mr Russen's submission that the requirement to determine loss as soon as practicable after the Early Termination Date means that the steps later taken by the issuers to avoid actual redemption of the instruments after the Early Redemption Event are, subject to one point, irrelevant to the determination. My only reservation is that they demonstrate, albeit after the event, that it could not have been said on the Early Termination Date that the simultaneous occurrence of an Early Redemption Event was bound inevitably to lead to an Early Redemption Date.

**[120]** I also accept the gist of Mr Russen's third and fourth submissions, namely that, viewed from 15 September 2008, when the Derivative Agreements terminated, it appeared likely that the instruments would be redeemed early, with the issuers making deductions from the net proceeds of the realisation of the Balco preference shares sufficient to fund the ETCSA, but without in fact being under any liability to pay the ETCSA Deduction Fund to LBF, or to anyone else. Viewed strictly from that perspective, the likely outcome applying the rule for remoteness of damage in *Hadley v Baxendale* (1854) 23 LJ Ex 179, 9 Exch 341, 18 Jur 358, was that the issuer would stand to make a windfall gain, approximately equivalent to the ETCSA, by virtue of the Automatic Early Termination of the Derivative Agreements, by comparison with the "no gain - no loss" outcome for the issuers which would be expected to flow from the running of the instruments, together with the Derivative Agreements, to their maturity dates.

**[121]** In my judgment that is the wrong perspective from which to view the matter, for a number of reasons. The first is that, as between the issuers and LBF, the Derivative Agreements were separate and distinct bargains between them, with their own legal consequences, rather than merely integral parts of a wider bargain between the investors, the issuers and LBF. As already noted, the terms of the instruments expressly excluded third party rights, and LBF was not a party to them. Similarly, the investors were not contracting parties to the Derivative Agreements, albeit that the issuers entered into them for the investors' ultimate benefit.

**[122]** Thus, the provisions of s 6(e) of the Master Agreements (and the definition of Loss in s 14) gave the issuers distinct contractual rights to contingent early close-out payments from LBF which were expressed to include payment for loss of bargain. I consider it to be irrelevant to the determination of loss of bargain in that context that the terms of the instruments may have failed to make provision for the issuers to transfer to the investors anything received from LBF by way of loss of bargain, in circumstances where Automatic Early Termination of the Derivative Agreements also led to actual early redemption of the instruments. That failure, which the issuers and the investors have, in different ways, in fact put right, falls squarely within the *res inter alios acta* category of dealings between the non-defaulting party and third parties which ought not in principle to affect the quantum of the non-defaulting party's Loss.

**[123]** Secondly, it is nothing to the point that the Derivative Agreements did in fact form part of a complex structure designed to underpin the instruments as attractive marketable securities. The fact is that the issuers and LBF chose to contract on ISDA terms, and decided to embody a well used standard formula for compensation on early close-out. Part of the purpose of the design of the structure, by LBIE, was to enable its associated company LBF to make money by providing the principal protection on those terms. In those circumstances I consider that it lies ill in the mouth of LBF (through its liquidator) now to categorise as unreasonable a determination of the close-out payment by the issuers which identifies their loss of bargain by the conventional route of ascertaining the price of a replacement transaction in an apparently ready market, *a fortiori* where that method is a right (but not an obligation) conferred upon the non-defaulting party by the express terms of the definition of Loss in s 14.

**[124]** Thirdly, I consider that Mr Russen's perspective runs counter to the "value clean" approach to the calculation of the s 6(e) close-out payment established by the authorities which I have reviewed, the first and most authoritative of which was reported more than five years before the making of the two Derivative Agreements in issue. It is not so much that Mr Russen's perspective fails to assume, as the basis for the determination, that the Derivative Agreements would have run their course to maturity. Rather it is that his formulation seeks to introduce into the determination of Loss extraneous considerations about the contractual structure of the instruments, as between the issuers and the investors, which have no role to play in the determination process.

**[125]** Fourthly, any attempt to rely upon principles of remoteness enshrined in *Hadley v Baxendale* seems to me to founder in the present case upon the uncomfortable fact that neither of the issuers did in the end receive the windfall which Mr Russen sought to identify. The rules for remoteness in *Hadley v Baxendale* (and later cases) are primarily designed to identify which of the innocent party's actual losses ought to fall within the confines imposed by the law upon recovery of damages from the contract breaker. In the present case the starting point for Mr Russen's submission that the issuers made a gain did not in fact occur at all, however likely it may have appeared as at the date of termination of the Derivative Agreements.

**[126]** Finally, the provisions of s 6(e) of the Master Agreement are not in substance about the recovery of damages at common law. They provide a contractual formula for the determination by the non-defaulting party of a close-out payment where the Derivative Agreement comes to an early end. True it is that the incorporation of the phrase "loss of bargain" has led to common law principles about the use of the cost of obtaining a replacement transaction to become the normal, and indeed expressly available, method of determination of that head of Loss (or gain). But that limited incursion of common law principles is not in my view a warranty for the wholesale dis-application of the close-out formula, in favour of some more general application of the common law.

**[127]** Mr Russen's next submission was that the ETCSA was, in both cases, the contractually agreed pre-estimate of loss (or gain) in any circumstances in which (as here) Early Termination of the Derivative Agreements triggered an Early Redemption Event. I reject that submission for the following reasons. First, the ETCSA is, to the extent that it is a pre-estimate of anything, a formula directed to identifying LBF's Loss, rather than the Loss (including gain) of the issuer, where the Derivative Agreement terminates due to LBF's default. It is a formula quite simply directed at the wrong party's Loss. Furthermore, it is by no means axiomatic that, in relation to derivatives, one party's loss

[2011] EWHC 1822 (Ch), (Transcript)

approximates to the other party's gain.

**[128]** Secondly, the ETCSA is only a contractual compensation formula when there occurs not merely an Early Redemption Event, but also an Early Redemption Date and consequent Mandatory Early Termination of the Derivative Agreement. That has not occurred in the present case, and the ETCSA is therefore of no relevance to the determination of the issuers' Loss pursuant to the Derivative Agreements.

**[129]** Mr Russen's final submission was that the cost of a replacement transaction was unreasonable as a measure of Loss because no such transaction would or could ever be put in place. But that is, in my judgment, a classic example of "valuing dirty" rather than clean, ie by reference to the real world following default, rather than the hypothetical world called for by the authorities on s 6 of the Master Agreement to which I have referred.

*OUTCOME*

**[130]** The result of the foregoing analysis needs to be expressed in the form of answers to the issues specifically raised by each of the Pt 8 Claim Forms. The issues are now identified in the Statements of Agreed Facts and Issues.

*SERIES 26*

**[131]** Taking the issues as listed in para 55 of the Statement of Agreed Facts and Issues relating to that structure, the answers are as follows:

(1) Yes.

(2) Yes.

(3) Not applicable.

(4) No.

(5) No.

(6) No.

(7) Yes, but see below.

(8) No, but see below.

**[132]** I do not regard Issues (7) and (8) as having been entirely happily framed. In my view, the purchase and cancellation of the Notes in September 2009 did not take place pursuant to any power or provision in Condition 6(h) of the Notes. That condition was designed to qualify what would otherwise have been the complete liberty of ARIC, as issuer, to re-purchase Notes in the market, in circumstances where there was not a single owner of all of them. In the present case the Notes were all purchased by ARIC from Enasarco as the sole owner of all of them, pursuant to an inherent liberty to do so which, for as long as there was a single Noteholder, was unconstrained by any provisions of the Conditions or the Final Terms, provided only that LBF's security rights were not infringed. On the particular facts of the present two cases, and for the reasons already given, they were not. My answers to issues (7) and (8) should therefore be understood subject to that qualification, and should not be assumed to be of any wider application.

*SERIES 38*

[2011] EWHC 1822 (Ch), (Transcript)

**[133]** I resolve the issues set out in para 54 of the Statement of Agreed Facts and Issues in this case as follows:

(1) Yes.

(2) Yes.

(3) No.

(4) No.

(5) No.

(6) No.

**DISPOSITION:**
Judgment accordingly.

**LOAD-DATE:** October 4, 2011