KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800
Andrew K. Glenn
Matthew B. Stein

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LEHMAN BROTHERS HOLDINGS INC., *et al.* <br><br> Debtors. | S.D.N.Y. Bankr. <br><br> Chapter 11 <br><br> Case No. 08-13555 (JMP) |

**OBJECTION OF THE DANTE NOTEHOLDERS TO THE**
**DEBTORS' ASSUMPTION OF CERTAIN DERIVATIVE CONTRACTS**

The Dante Noteholders[1], holders of certain notes (the "Notes")[2] issued under the Dante

Finance PLC Multi-Issuer Secured Obligation Programme (the "Dante Programme"), by and

through their undersigned counsel, hereby file this objection (the "Objection") to Lehman

Brothers Special Financing Inc.'s assumption of those derivative contracts that relate to the

Dante Series (the "Dante Series Derivative Contracts") as set forth in the *Third Amended Joint*

*Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors* [Dkt. No. 19627]

---

[1]      The Dante Noteholders are:  Belmont Park Investments Pty Ltd; Ambulance Victoria; Fire and Emergency Services Superannuation Board; Belreef Holdings Pty Ltd; Broken Hill City Council; City of Swan; Eurobodalla Shire Council; G & F Yukich Superannuation Pty Ltd; Gippsland Secured Investments Ltd; G.James Australia Pty Ltd; G.James Superannuation Pty Ltd; Gosford City Council; Guyra Shire Council; Indian Pacific Limited; Lifeplan Australia Friendly Society Limited; Newcastle City Council; Orient Holdings Pty Ltd; Panorama Ridge Pty Ltd; Parkes Shire Council; Sashimi Investments Pty Ltd; Southern Finance Limited; Statewide Secured Investments Ltd; The Cootharinga Society of North Queensland; and Wingecarribee Shire Council.

[2]      The Notes held by the Dante Noteholders were issued in the following series under the Dante Programme: Saphir Finance plc Series 2004-4, Beryl Finance Limited Series 2007-7, Beryl Finance Limited Series 2008-6, Beryl Finance Limited Series 2008-14, Zircon Finance Limited Series 2007-1 Tranche A, Zircon Finance Limited Series 2007-1 Tranche B, Zircon Finance Limited Series 2007-3, Zircon Finance Limited Series 2007-9 Tranche A and Zircon Finance Limited Series 2007-9 Tranche B (collectively, the "Dante Series").  The outstanding notes under the Dante Series have a total face value of AUD 250,230,000 of which the Dante Noteholders hold Notes with a face value of AUD 104,620,000.

(the "Plan") and the *Plan Supplement*, dated October 25, 2011 [Dkt. No. 21254] (the "Plan

Supplement") filed by the above-captioned debtors and debtors-in-possession (the "Debtors").

In support of its Objection, the Dante Noteholders respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      LBSF cannot assume the Dante Series Derivative Contracts because the contracts

are not executory.  The Dante Series Derivative Contracts -- which are governed by English law

-- were terminated by their respective Issuers (as defined below) in 2008 and 2009.  The English

High Court (the "High Court") determined that these terminations were valid; LBSF conceded

that the terminations were valid in those proceedings.  While LBSF appealed certain aspects of

the judgment of the High Court, it did not appeal that part of the decision upholding termination.

2.      The terminations were also valid pursuant to U.S. bankruptcy law.  Indeed,

Sections 362(b)(17) and 560 of the Bankruptcy Code explicitly authorize the termination of swap

agreements, such as the Dante Series Derivative Contracts, during the pendency of a bankruptcy

case.  Upon termination of the Dante Series Derivative Contracts, all payment obligations of

LBSF ceased, which precludes assumption under Section 365 of the Bankruptcy Code.

3.      Finally, to the extent that LBSF seeks a determination with respect to LBSF's

interest in the Collateral securing the Dante Series Derivative Contracts, that relief can only be

obtained through an adversary proceeding, not the Plan.

4.      Accordingly, the Court must deny LBSF's attempt to assume the Dante Series

Derivative Contracts.

## STATEMENT OF FACTS

**A.**    **The Structure Of The Transactions Under The Dante Programme.**

5.    In October 2002, an English affiliate of LBSF, Lehman Brothers International

(Europe) arranged the Dante Programme by creating special-purpose entities to act as issuers

(the "Issuers") — including Saphir Finance Public Limited Co. ("Saphir"), Beryl Finance

Limited ("Beryl"), and Zircon Finance Limited ("Zircon") — of collateralized debt obligation

("CDO") in the form of the Notes and to act as parties to related swap transactions with LBSF as

the swap counterparty.  Declaration of Andrew K. Glenn, dated November 4, 2011 (the "Glenn

Decl.") at Ex. A, at 1.

6.    The Notes were sold to investors, including the Dante Noteholders, and the

Issuers used the sale proceeds to purchase collateral (the "Collateral"), which was then pledged

to BNY Corporate Trustee Services Ltd. ("BNY") (as collateral trustee) to secure the Issuers'

obligations under the Notes.  Glenn Decl. at Ex. B at § 2.1; Ex. C at § 1.4.  Additionally, in

connection with the issuance of each series of Notes, the Issuers entered into a swap agreement

with LBSF (LBHI is not a party to these agreements), pursuant to the ISDA Master Agreement,

whereby LBSF agreed to pay amounts equal to the interest and principal due under the Notes in

exchange for any yield generated by, and the final principal repayment of, the Collateral.[3]  Glenn

Decl. at Ex. D.  Thus, the Collateral served two purposes — it secured the Issuer's obligations to

the noteholders under the Notes and it secured the Issuer's obligations to LBSF under the swap

agreements.  Glenn Decl. at Ex. B at § 5.5; Ex. C at § 5.3.  The shared Collateral highlights the

critical link and interdependence between the swap agreement and the Notes.

---

[3]    As part of the transaction, LBHI was the Credit Support Provider and agreed to guarantee LBSF's
obligations to pay interest and principal under the swap agreement.  Glenn Decl. at Ex. E at § 10(iv).

7.    This interdependence is further demonstrated by the terms of the transaction

documents (the "Transaction Documents") for each series of Notes that established the Dante

Programme.  The key Transaction Documents, which are all governed by English law, are as

follows:

(a)    ISDA Master Agreement.  The ISDA Master Agreement was entered into
between Dante Finance Public Limited Company and LBSF on October 10, 2002.
Attached to the ISDA Master Agreement are Schedules that further document the
relationship between the two parties to the ISDA Master Agreement.  The ISDA
Master Agreement has been amended and restated from time to time in relation to
its application to particular swaps as specified in the relevant Swap Confirmation
for each series.  A copy of the ISDA Master Agreement is attached to the Glenn
Declaration at Exhibit D.  A copy of the Schedules is attached to the Glenn
Declaration at Exhibit F.

(b)    Swap Confirmation.  The Swap Confirmation supplements the ISDA Master
Agreement for the purpose of a specific series and swap agreement.  The ISDA
Master Agreement, the Schedules and the Swap Confirmation are collectively
referred to as the "Swap Agreement."  A copy of one of the Swap Confirmation
agreements is attached to the Glenn Declaration at Exhibit E.

(c)    Principal Trust Deed.  The Principal Trust Deed was entered into by Dante
Finance Public Limited Company and BNY on October 10, 2002 and was
amended and restated on July 18, 2008.  The Principal Trust Deed governs the
treatment of the Collateral and is applicable to each series as amended by the
Supplemental Trust Deed relating to that series.  A copy of the Principal Trust
Deed is attached to the Glenn Declaration at Exhibit B.

(d)    Supplemental Trust Deed.  The Supplemental Trust Deed is specific to a
particular series of Notes and governs the treatment of the Collateral, including its
application in prescribed circumstances.  A copy of one of the Supplemental Trust
Deeds is attached to the Glenn Declaration at Exhibit C.

(e)    Notes.  The Notes are governed by the Principal Trust Deed, the Supplemental
Trust Deed and the specific Terms and Conditions of the Notes which were
attached to the prospectus sent to potential investors.  A copy of one of the Terms
and Conditions of the Notes is included at page 4 of the respective Series
Prospectus, which is attached to the Glenn Declaration at Exhibit G.

Specifically, the ISDA Master Agreement incorporates the provisions of the trust documents

governing the application and payment of the Collateral.  Part 5(g) of the Schedules to the ISDA

Master Agreement provides:

> In relation to each Transaction, each party confirms that it is bound
> by the terms of the Trust Deed and that the terms of such Trust
> Deed prevail to the extent they conflict with terms relating to such
> Transaction.

Glenn Decl. at Ex. F at Part 5(g). Part 5(a) of the Schedule defines Trust Deed as "the principal trust deed dated 10 October 2002 as amended and restated on 18 July 2008 and as further amended and updated from time to time." Glenn Decl. at Ex. F at Part 5(a). The Principal Trust Deed references and incorporates the terms of the Supplemental Trust Deed including those terms relating to the application and priority of distributions of the Collateral for each particular series of Notes. Glenn Decl. at Ex. B at § 6.1, 6.2, 6.3. The Supplemental Trust Deed incorporates the terms of the Principal Trust Deed and references the Notes, providing that they are governed by the conditions set out in the Principal Trust Deed as modified by the series prospectus. Glenn Decl. at Ex. C at § 2.1, 4, 5.1, 5.3, 5.5, 5.6. Thus, the Transaction Documents for each series of Notes constitutes a single set of integrated agreements, none of which could exist without the other.

8.    Critically, and as affirmed by the highest court in the United Kingdom, the commencement of a bankruptcy case by *either* LBSF or LBHI constitutes an event of default by LBSF under the Transaction Documents.[4] Glenn Decl. at Ex. D at § 5(a)(vii); Ex. E at § 10(iv). On September 18, 2008, LBHI filed its Chapter 11 petition, thus automatically triggering an event of default under the Swap Agreement. Eighteen days later, on October 3, 2008, LBSF also filed for chapter 11 protection, constituting a second and independent event of default under the Swap Agreement.

---

[4]    The Transaction Documents provide that under "Swap Counterparty Priority," LBSF is entitled to priority over the noteholders; under "Noteholder Priority" the noteholders are entitled to priority over LBSF (the foregoing priority clauses are referred to herein as the "Priority Clauses"). Glenn Decl. at Ex. C at §§ 5.5.1, 5.5.2. If no event of default has occurred under the Swap Agreement in which LBSF is the "Defaulting Party," Swap Counterparty Priority applies (i.e., LBSF recovers first); if such an event of default has occurred, however, Noteholder Priority applies (and the noteholders would recover first). Glenn Decl. at Ex. C at § 5.5.

9.      Accordingly, between November 28, 2008 and December 3, 2008, the Dante

Noteholders, in respect of the each of the Dante Series except for Beryl 2008-14, gave notice to

BNY of the occurrence of an event of default.  *See, e.g.,* Glenn Decl. at Ex. H.  The notice

requested that BNY enforce its rights over the Collateral by requesting the relevant Issuer to give

a termination notice to LBSF in respect of the Swap Agreement corresponding to each of the

Dante Series.  *See, e.g., id.*  On December 22, 2008, BNY caused the Issuer to give notice to

terminate the Swap Agreement with respect of the Zircon 2007-9B issue.  Glenn Decl. at Ex. I.

On March 20, 2009 and March 24, 2009, the Dante Noteholders passed resolutions to ratify or

authorize swap termination in each of the Dante Series.  *See, e.g.,* Glenn Decl. at Ex. J.  On

March 24, 2009 for one series and April 16, 2009 for the other series comprising the Dante

Series, BNY caused the remaining Issuers in respect of the Dante Series to give notice to LBSF

terminating the Swap Agreements.  Glenn Decl. at Ex. K.  On May 6, 2009, the Trustee issued

notices in respect of each of the Dante Series except for Beryl 2008-14 declaring the notes to be

due and payable.  Glenn Decl. at Ex. L.  On September 27, 2010, the Issuer of Beryl 2008-14

notified holders of those Notes that the date fixed for redemption of the Beryl 2008-14 Notes was

April 27, 2009.  Glenn Decl. at Ex. M.

**B.      Noteholders Commence Proceedings In England
To Enforce Their Senior Rights To The Collateral.**

10.      The Transaction Documents, as noted above, are governed by English law with

the parties having submitted themselves to the jurisdiction of the English courts.  Glenn Decl. at

Ex. B at §§ 20.1, 20.2; Ex. C at §§ 13.1, 13.2; Ex. D at §§13(a), 13(b); Ex. E. at § 11.

Accordingly, on May 13, 2009, Perpetual Trustees Limited (a holder of CDOs in two series of

Notes issued under the Dante Programme) commenced an action in the High Court seeking to

require BNY to distribute the Collateral in respect of certain series of Notes pursuant to

Noteholder Priority in accordance with the Transaction Documents and to redeem their Notes, which had also been accelerated following a similar process. Glenn Decl. at Ex. N at ¶ 3. In a separate action, on June 9, 2009, other noteholders, including certain of the Dante Noteholders, commenced an action in the High Court seeking the same relief in respect of their Notes. Glenn Decl. at Ex. O. The two proceedings were consolidated, and LBSF was permitted to intervene to challenge the enforceability of the "Noteholder Priority" provision. Glenn Decl. at Ex. P; Ex. N at ¶ 2.

11.      By judgment issued on July 28, 2009, the Chancellor of the English High Court (who is the most senior judge in the High Court at first instance) ruled in favor of the noteholders and against LBSF. Glenn Decl. at Ex. N; Ex. Q. The High Court found as a matter of English law that: (i) separate events of default under the relevant Swap Agreements for which LBSF was the defaulting party had occurred on September 15, 2008 and October 3, 2008 corresponding to the bankruptcy filings of LBHI and LBSF; (ii) each Issuer validly and effectively terminated each Swap Agreement; (iii) the Priority Clauses were valid, effective and enforceable as a matter of English law notwithstanding the fact that the default was triggered by a bankruptcy filing; and (iv) in any event, Noteholder Priority had been triggered automatically when LBHI filed Chapter 11 on September 15, 2008. Glenn Decl. at Ex. N at ¶¶ 24, 45, 49, 55; Ex. Q at ¶¶ 1(1), 1(2), 1(3), 2(3). The High Court expressly rejected LBSF's arguments that the Priority Clauses (specifically the Noteholder Priority clause) were invalid under English law and that LBSF's subsequent bankruptcy filing had any effect on the parties' rights. Glenn Decl. at Ex. N at ¶¶ 45-55; Ex. Q at ¶ 2(3).

12.    By judgment issued on November 6, 2009, the English Court of Appeal dismissed LBSF's appeal and affirmed the High Court's ruling.[5]  Glenn Decl. at Ex. R.  By judgment dated July 27, 2011, the Supreme Court of the United Kingdom affirmed the judgments of the High Court and the English Court of Appeal.  Glenn Decl. at Ex. S.

**C.    The Dante Adversary Proceeding.**

13.    On September 14, 2010, LBSF commenced an adversary proceeding (the "Dante Adversary Proceeding") wherein LBSF contends, contrary to the holdings of the English courts, that Swap Counterparty Priority applies as a matter of U.S. bankruptcy law with respect to the remaining Notes.  Case No. 10-03545, *Complaint*, Dkt. No. 1.  The Dante Adversary Proceeding is currently stayed pursuant to an order of this Court.  Case No. 08-13555, Dkt. Nos. 12199, 17763.

**D.    Proposed Assumption of the Transaction Documents.**

14.    On September 1, 2011, the Debtors filed the Plan, which provides, in pertinent part, that:

> Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between a Debtor and any person or entity shall be deemed rejected by such Debtor, as of the Effective Date, except for any executory contract or unexpired lease . . . (c) that is specifically designated in the Plan Supplement as a contract or lease to be assumed by the Debtor . . . .

Plan, Art. XI, cl. 11.1.  Subsequently, on October 25, 2011, the Debtors filed the Plan Supplements containing a schedule of derivative contracts that the Debtors intend to assume. Plan Supplement at Ex. 2, Part A.  The Plan Supplement specifically designated each of the Dante Series Derivative Contracts for assumption.  *Id.*

---

[5]    LBSF did not appeal the High Court's finding that the Swap Agreements were terminated with the result, under English law, that they are bound by its decision and have foregone any right to challenge the finding.

# ARGUMENT

## I.

## THE DANTE NOTEHOLDERS HAVE THE SAME ECONOMIC INTEREST IN THE CDO AS LBSF.

15.     The Dante Noteholders — as the economic stakeholders with the authority to direct or veto any action of the defendant trustees who in turn have the power to direct or veto action of the Issuers (as is evidenced by the trustees' direction to the Issuers to terminate the Swap Agreements) — are parties in interest pursuant to Section 1109 of the Bankruptcy Code and have the unconditional right to raise, appear and be heard "on any issue in a case under [Chapter 11 of the Bankruptcy Code.]"  11 U.S.C. § 1109(b).  This includes a debtor's attempt to assume a contract as part of its plan of reorganization.  See *In re Embrace Sys. Corp.*, 178 B.R. 112, 120 (Bankr. W.D. Mich. 1995) (holding that creditor had right to object to debtor's assumption of contract with third party).

16.     Additionally, the assumption of the Dante Series Derivative Contracts directly impacts the Dante Noteholders' interest in the Collateral, which secures the respective Issuer's obligations to both the Dante Noteholders and LBSF.  *See* Glenn Decl., Ex. B at § 6.2 (providing for the application of monies received by the trustee in connection with the realization or enforcement of the underlying security).  Indeed, the English courts held, based upon their interpretation of the Swap Agreements (again, which are governed by English law) that as a result of the occurrence of two events of default by LBSF under the Swap Agreements and the fact that "[t]he Issuer has validly and effectively terminated the Swap Agreement" pursuant to the Swap Agreements, the "Notes [held by the Dante Noteholders] have become due and payable . . . ."  Glenn Decl., Ex. Q at 1(3), 2(1).  Thus, the English courts held that Dante Noteholders have a vested interest in the Collateral.

17.    As explained in detail below, authorizing LBSF to assume the Dante Series Derivative Contracts without the participation of the Dante Noteholders would potentially deprive them of their vested property rights without due process while disregarding the judgments of three English courts, including the Supreme Court of the United Kingdom. *See In re James Wilson*, 965 F.2d 160, 169 (7th Cir. 1992) (holding "that anyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains"); *In re* Wells, 227 B.R. 553, 559 (M.D. Fla. 1998) (holding that any party with a "pecuniary interest, practical stake or legally protected interest that could be affected by the bankruptcy proceeding" is entitled to be heard).

18.    Thus, the Dante Noteholders have standing to be heard on this matter.

## II.

### THE COURT MUST DENY LBSF'S ATTEMPT TO ASSUME THE DANTE SERIES DERIVATIVE CONTRACTS BECAUSE THE CONTRACTS WERE VALIDLY TERMINATED AND ARE NOT EXECUTORY CONTRACTS

19.    The Dante Series Derivative Contracts are not executory contracts. Indeed, because such contracts were validly terminated, LBSF no longer has any obligations to perform. Accordingly, as a matter of law, LBSF cannot assume the Dante Series Derivative Contracts.

**A.    The Issuers' Termination of the Dante Series Derivative Contracts Were Valid.**

20.    The Issuers validly terminated the Dante Series Derivative Contracts pursuant to the terms of the Transaction Documents, despite the fact that such termination occurred subsequent to LBSF's bankruptcy filing, because: (i) such termination was pursuant to English law, which governs the Transaction Documents, and has been upheld by the English courts; and (ii) such termination was within the safe harbor of Section 560 of the Bankruptcy Code.

1.    **The Supreme Court of the United Kingdom**
      **Upheld the Validity of the Termination.**

21.    The High Court held that "[t]he Issuer has validly terminated the Swap

Agreement pursuant to section 6(a) of the said ISDA Master Agreement." Glenn Decl., Ex. Q at

1(3). This finding was not appealed by LBSF and the High Court's decision in relation to the

consequences of termination and the priority upon distribution of the Collateral was subsequently

upheld by both the English Court of Appeal and the Supreme Court of the United Kingdom.

Courts in this Circuit have held that "[i]f a final judgment is reached first in the foreign court, it

can then be pled as *res judicata* in the domestic court." *Alesayi Bev. Corp. v. Canada Dry

Corp.*, 947 F. Supp. 658, 664 (S.D.N.Y. 1996); *see also China Trade & Dev. Corp. v. M.V.

Choong Yong*, 837 F.2d 33, 36 (2d Cir. 1987); *Scheiner v. Wallace*, 832 F. Supp. 687, 693

(S.D.N.Y. 1993). The English courts' determination of the valid termination is binding on the

Court under the doctrine of *res judicata. See Ackerman v. Ackerman*, 676 F.2d 898, 905-06 (2d

Cir. 1982) (recognizing preclusive effect of English judgment).

22.    Even if the decision of the English courts were not binding, the Court should still

adopt its conclusions based upon the principal of comity. Comity has been defined by the U.S.

Supreme Court as "the recognition which one nation allows within its Territory to the legislative,

executive, or judicial acts of another nation, having due regard both to international duty and

convenience and to the rights of its own citizens, or of other persons who are under the

protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895). Specifically, "[u]nder the

principles of international comity, United States courts ordinarily refuse to review acts of foreign

governments and defer to proceedings taking place in foreign countries, allowing those acts and

proceedings to have extraterritorial effect in the United States." *Sea Trade Co., Ltd. v.

FleetBoston Fin. Corp.*, 2008 U.S. Dist. LEXIS 67221 (S.D.N.Y. Sept. 4, 2008). This holds true

where the foreign court is a court of competent jurisdiction and the laws and public policy of the

forum state and the rights of its residents will not be violated. *See Cunard S.S. Co. Ltd. V. Salen*

*Reefer Servs. AB*, 773 F.2d 452, 457 (2d Cir. 1985).

23.     Courts in the United States customarily defer to English courts.  This is because

"[t]he laws of the United Kingdom share the same common law tradition of [the United States']

system of jurisprudence.  The federal courts have repeatedly granted comity to foreign

proceedings where the foreign proceeding was in the United Kingdom or in a country whose

laws were derived from the United Kingdom's laws." *In re Brierley*, 145 B.R. 151, 162 n.5

(Bankr. S.D.N.Y. 1992).  Likewise, the Second Circuit Court of Appeals concluded that a U.S.

Bankruptcy Court should defer in the interest of comity to the English courts, finding that

"[b]ecause of the strong British connection to the present dispute, it follows that England has a

stronger interest that the United States in applying its own . . . law to these actions." *Maxwell*

*Communication Corp. plc v. Société Générale plc*, 93 F.3d 1036, 1052 (2d Cir. 1996).  This

reasoning is particularly applicable here where the Transaction Documents at issue are all

governed by English law.  Moreover, "[t]he principles of comity are particularly appropriately

applied in the bankruptcy context because of the challenges posed by transnational insolvencies.

. . ." *Stonington Partners v. Lernout & Hauspie Speech Prods. N.V.*, 310 F.3d 118, 125 (3d Cir.

2002); *see also Diorinou v. Mezitis*, 237 F.3d 133, 142 (2d Cir. 2001) (stating that "American

courts will normally accord considerable deference to foreign adjudications as a matter of

comity.").

24.     Here, the Dante Programme involved securities transactions governed by English

law, with submission to the jurisdiction of the English Courts, with BNY and the Collateral

located in the U.K.  The only U.S. link to the transactions was the fact that LBSF and LBHI are

entities organized under U.S. law. Nonetheless, these Debtors structured the Dante Programme under English law, and they should therefore be bound by English law.

25.     Thus, this Court should defer to the conclusion already reached by the English courts, including the Supreme Court of the United Kingdom, and find that the Dante Series Derivative Contracts were validly terminated.

**2.     <u>Sections 362(b)(17) and 560 of the Bankruptcy Code Authorize Termination</u>.**

26.     Termination of a swap agreement is expressly exempt from the automatic stay and from any prohibition on the enforcement of *ipso facto* clauses during the pendency of a bankruptcy case. Specifically, Section 362(b)(17) of the Bankruptcy Code provides that the automatic stay does <u>not</u> apply to:

> the exercise by a swap participant of ***any contractual right*** (as defined in section 560) under ***any*** security agreement or arrangement of other credit enhancement forming a part of or related to ***any*** swap agreement, or of ***any contractual right*** (as defined in section 560) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with one or more such agreements, including any master agreement for such agreements.

11 U.S.C. § 362(b)(17) (emphasis added).

27.     Here, the Issuers, each a party to a Swap Agreement for a respective series of Notes, are a swap participant (designated as "Party B" under the swap) and terminated the swap agreements pursuant to clause 6(a) of the ISDA Master Agreement.

28.     Section 560 of the Bankruptcy Code, which operates in tandem with the automatic stay exception discussed above, provides:

> The exercise of ***any contractual right*** of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements ***because of a condition of the kind specified in section 365(e)(1) of this title*** [an *ipso facto* clause] or to offset or net out any termination values or payment amounts arising under or in connection with the

termination, liquidation, or acceleration of one or more swap agreements *shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title*. . . .

11 U.S.C. § 560 (emphasis added).

29.    Thus, sections 362(b)(17) and 560 of the Bankruptcy Code provide a "safe-harbor" that "allows persons dealing with a debtor in commodity contracts, forward contracts and similar instruments to enforce *ipso facto* default provisions contained in those contracts and liquidate their positions *vis-a-vis* the debtor notwithstanding section 362(a) (providing for automatic stay) and section 365(e)(1) (neutralizing *ipso facto* default provisions) of the Code." *Mirant Americas Energy Marketing , L.P. v. Kern Oil & Refining Co. (In re Mirant Corp.)*, 310 B.R. 548, 553-54 (Bankr. N.D. Tex. 2004).

30.    Section 560's exception to the unenforceability of *ipso facto* clauses extends to contract rights related to the entire Swap Agreement.  As the leading treatise on bankruptcy law states, the intended purpose of the statute is to allow for the continuation of "normal business practices" and the avoidance of "cherry picking" particular provisions.  *See 5 Collier on Bankruptcy* P 560.04[2].  Section 560 contemplates that the underlying termination and liquidation provisions of the swap would still apply, as "Section 560 does not independently furnish such rights." *Id.*

31.    The Congressional record indicates that Congress meant to permit the enforcement of all contract rights notwithstanding the bankruptcy of a counterparty:

Section 5(a)(2) [of the Financial Netting Improvements Act of 2006] amends section 362(b) of the US Bankruptcy Code to protect enforcement, free from the automatic stay, of collateral, setoff or netting provisions in commodity contracts, forward contracts, securities contracts, repurchase agreements or swap agreements and in master netting agreements and security agreements or arrangements or other credit enhancements related to one or more swap agreements or master netting agreements. . . . The [automatic stay] provisions protect the

14

exercise of "contractual rights" as defined in Sections 555, 556, 559, or 560, as appropriate, which include not only rights evidenced by agreements between the parties, but other rights as set forth in those definitions.

H.R. Rep. No. 109-648, at 7 (2006) (emphasis added). The Congressional report added that "[section 560] means that these contractual rights are not to be interfered with by any court proceeding under the Code, including a stay otherwise authorized by Code Section 105." S. Rep. 101-285, at 10 (1990). Moreover, "section 560 makes clear that a swap participant may exercise any contractual rights to terminate and net out a swap agreement in the event the other party files a bankruptcy petition . . . ." H.R. Rep. 101-484, at 6 (1990).

32.    Thus, read together, sections 362(b)(17) and 560 of the Bankruptcy Code preserve a swap participant's ability to enforce its contractual rights without any interference from the Bankruptcy Court. The plain language of the statutes and the legislative history make clear that neither the automatic stay nor the prohibition against enforcement of *ipso facto* clauses applies to interfere with the proper enforcement of the Priority Clauses.

33.    Therefore, based upon sections 362(b)(17)) and 560 of the Bankruptcy Code, the termination of the Swap Agreements by the Issuers were valid.

**B.    Termination By The Dante Noteholders Voided All Payment Requirements, Left LBSF Without Any Continuing Obligations And Rendered The Swap Agreements Non-Executory.**

34.    Upon termination of the Swap Agreements and following the passage of the designated "Early Termination Date" pursuant to clause 6(a) of the ISDA Master Agreement, Section 6(c)(ii) provides that "no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement." The termination of these payment obligations precludes a finding that the swap agreements are executory.

15

35.     Section 365 of the Bankruptcy Code provides that a debtor can assume or reject executory contracts. 11 U.S.C. § 365(a). While the Bankruptcy Code does not define what constitutes an executory contract, the Second Circuit has stated that an executory contract is a contract "on which performance remains due to some extent on both sides." *COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 379 (2d Cir. 2008) (citing *Eastern Air Lines, Inc. v. Ins. Co. of Pa. (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992 (2d Cir. 1996).

36.     Prior to termination, each Swap Agreement imposed obligations on LBSF and the relevant Issuer to make payments to each other from time to time. These mutual obligations meant that the Swap Agreements constituted executory contracts. These required payments are listed in the respective Swap Confirmations, and so are all payments required to be made under Section 2(a)(i) of the ISDA Master Agreement. Section 2(a)(i) provides that each party "will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement." Glenn Decl. at Ex. D. Section 6(c)(ii) provides that "[u]pon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement," Glenn Decl. at Ex. D. Accordingly, because no obligations exist under Section 2(a)(i) upon termination, there is no longer any requirement to make **any** of the payment obligations provided for in the respective swap confirmations.

37.     This termination of payment obligations remains true despite Section 9(c) of the ISDA Master Agreement. While that provision states generally that "the obligations of the parties under this Agreement will survive the termination of any Transaction," the provision is

modified by stating that such survival is "[w]ithout prejudice to Sections 2(a)(iii) and 6(c)(ii)" of the ISDA Master Agreement.  Glenn Decl., Ex. D.

38.    Therefore, upon effective termination, the payment stoppage provided for in Section 6(c)(ii) remains applicable notwithstanding termination, and the only remaining obligation is the Issuer's obligation, as the non-defaulting party, to make calculations of the early termination amount under Section 6 of the ISDA Master Agreement and then for payment of that early termination amount by the applicable party.  The early termination amount is akin to liquidated damages as the calculation of such amount is designed to determine the replacement value of the swap transaction.  Accordingly, the sole remaining obligation is the obligation of one party — the party who is "out of the money" — to pay the other party — the party who is "in the money."  Here, LBSF claims to be "in the money."

39.    As a matter of law, if the sole remaining obligation under a contract is to make a payment, the contract is not executory.  *See, e.g. In re Grayson-Robinson Stores, Inc.*, 321 F.2d 500, 502 (2d Cir. 1963) (guaranty agreement is not executory because "the contract between them was executed except for the guarantor's obligation to pay upon default of the lessee."); *In re Calpine Corp.*, 2008 Bankr. LEXIS 2152, at *15 (Bankr. S.D.N.Y. Aug. 4, 2008) (holding that a contract was not executory where only performance remaining was payment); *In re Chateaugay Corp.*, 102 B.R. 335, 347 (Bankr. S.D.N.Y. 1989) (holding that payment obligation is insufficient to render contract executory); *see also In re Digicon, Inc.*, 71 Fed. Appx. 442 (5th Cir. 2003) ("A contract is not executory if the only performance required by one side is the payment of money.").

40.    Accordingly, the Swap Agreements can no longer be considered executory contracts subject to assumption by LBSF.

## III.

### LBSF CANNOT ASSUME THE OTHER PRINCIPAL TRANSACTION DOCUMENTS

41.    The Plan Supplement does not specify which agreements LBSF is seeking to assume.   The Plan Supplement provides only that "unless a specific derivative contract is noted for a specific counterparty, the Debtors intend to assume all derivatives contracts with each counterparty set forth on Exhibit 2, Part A." *See* Plan Supplement at Exhibit 2.  The Plan Supplement also provides that "derivatives contracts are contracts in which the contractual obligations and values are keyed to one or more underlying assets or indices of asset values." *Id.* Yet, it is unclear whether the Debtors intend to assume only the Swap Agreements or all contracts that are related to Swap Agreements, including the Principal Trust Deed and the Supplemental Trust Deed, which are integral to the operation of the Swap Agreements. Nonetheless, the result is the same:  LBSF is unable to assume any of the "Transaction Documents" including the Swap Agreements, Principal Trust Deed or the Supplemental Trust Deed.

42.    As stated above, the Transaction Documents comprise a single integrated agreement corresponding to each individual series of Notes issued under the Dante Programme. The agreements are not divisible or independent from each other.  To the contrary, each of the Transaction Documents specifically incorporates and references the other Transaction Documents.  As an example:

- Part 5(g) of the Schedules incorporates the terms of the Principal Trust Deed.
- The Principal Trust Deed incorporates the terms of the Supplemental Trust Deed, including those terms relating to the application and priority of distributions of the Collateral for each particular series of Notes.
- Part 10(i)(a) of the Swap Confirmation provides for an Additional Termination Event under the Swap Agreement if the Notes are declared due and payable following an event of default under the Notes.

Glenn Decl., Ex. F; Ex. B; Ex. E. Accordingly, LBSF must assume all the Transaction

Documents if they intend to assume any particular one.

43.      Even if the Transaction Documents are considered separately, LBSF is unable to

assume either the Principal Trust Deed or the Supplemental Trust Deed. LBSF cannot assume

the Principal Trust Deed for the simple reason that it is not a party to the Principal Trust Deed.

LBSF cannot assume the Supplemental Trust Deed, even though LBSF is a party to the

agreement, because LBSF never had any obligations to act or perform under the agreement.

Accordingly, pursuant to the executory contract case law discussed above, even if the Court were

to examine the Supplemental Trust Deed separate from the Swap Agreement, it is not an

executory contract that can be assumed.

IV.

### LBSF CANNOT ASSUME THE CONTRACTS AS A MEANS TO OBTAIN THE RELIEF SOUGHT IN THE DANTE ADVERSARY PROCEEDING

44.      The assumption of an executory contract cannot be used to obtain what is in

reality declaratory judgment relief that a debtor is currently seeking in a pending adversary

proceeding. Bankruptcy Rule 7001 provides that "[a]n adversary proceeding is governed by the

rules of this Part VII. An adversary proceeding is: . . . (2) a proceeding to determine the validity,

priority, or extent of a lien or other interest in property . . . (9) a proceeding to obtain a

declaratory judgment relating to any of the foregoing . . . ." Fed. R. Bankr. P. 7001. Here, LBSF

commenced the Dante Adversary Proceeding on September 14, 2010 seeking, in part, a

declaratory judgment that (i) the enforcement of the Priority Clauses improperly modified

LBSF's interest in the Collateral as a result of the bankruptcy filing and that such Priority

Clauses constitute unenforceable *ipso facto* clauses and (ii) any action to enforce the Priority

Clauses as a result of a bankruptcy filing violates the automatic stay.

45.     While the relief sought in the Dante Adversary Proceeding is distinct from the assumption of the underlying Dante Series Derivative Contracts, the underlying legal analysis is quite similar.  In particular, both the Dante Adversary Proceeding and the instant assumption attempt by LBSF necessitate a determination of the applicability of the safe harbor provision in Section 560 of the Bankruptcy Code, the separateness of LBHI's bankruptcy filing as an independent event of default, and whether the Swap Agreement is even an executory contract — all of which are addressed above.  Accordingly, a determination that LBSF is entitled to assume the Dante Series Derivative Contracts cannot moot any continued dispute in the Dante Adversary Proceeding.  To permit a contrary result would be an impermissible end-run around the adversary proceeding requirement.  *See In re Harry C. Partridge, Jr. & Sons, Inc.*, 43 B.R. 669, 672 (Bankr. S.D.N.Y. 1984) ("An action to obtain a declaratory judgment relating to such a contract dispute is expressly delineated in Bankruptcy Rule 7001(9) as an adversary proceeding . . . .").  In *In re Harry C. Partridge, Jr. & Sons,* in connection with its motion to assume an executory contract, the debtor also sought an order that it had not defaulted on that contract.  The court held that such a determination could only be obtained by commencing an adversary proceeding.  *Id.*  Similarly, here, as part of its attempt to assume the Dante Series Derivative Contracts, LBSF apparently is seeking a determination that either (i) the Dante Series Derivative Contracts were not validly terminated, (ii) Sections 362(a)(17) and 560 of the Bankruptcy Code are inapplicable with respect to the payment terms of the Swap Agreement, and (iii) LBHI's bankruptcy filing was not a separate and independent event of default.  Based upon the Southern District of New York's holding in *Harry C. Partridge, Jr. &* Sons, a judgment with respect to these issues must result from an adversary proceeding.  Without such a determination of these issues, the Court cannot determine whether the contracts remain executory.  Accordingly, at best,

20

the Court must stay its determination of whether LBSF can assume the Dante Series Derivative

Contracts pending the resolution of the Dante Adversary Proceeding.

## **CONCLUSION**

Accordingly, for the reasons set forth above, the Dante Noteholders respectfully request

that the Court deny LBSF's attempt to assume the Dante Series Derivative Contracts.

Dated: New York, New York
       November 4, 2011

                                    Respectfully submitted,

                                    KASOWITZ, BENSON, TORRES
                                    & FRIEDMAN LLP

                                    By:/s/ Andrew K. Glenn
                                        Andrew K. Glenn
                                        Matthew B. Stein
                                        1633 Broadway
                                        New York, New York 10019
                                        (212) 506-1700

                                    *Counsel to the Dante Noteholders*