## SWAP CONFIRMATION

| | |
|---|---|
| Date: | 6 June 2007 |
| To: | Zircon Finance Limited |
| From: | Lehman Brothers Special Financing Inc. |
| Re: | Credit Derivative Transaction relating to Zircon Finance Limited Series 2007-9 Tranche A AUD30,000,000 Synthetic Portfolio Notes due 2013 |
| Reference Number: | [●] |

Dear Sirs,



The purpose of this letter agreement and the Schedules hereto (this "**Confirmation**") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "**Transaction**"). This Confirmation constitutes a "**Confirmation**" as referred to in the ISDA Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement, in each case as published by the International Swaps and Derivatives Association Inc. ("**ISDA**") (together, the "**Credit Derivatives Definitions**") and the 2000 ISDA Definitions as published by ISDA (the "**2000 Definitions**") are incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions and the 2000 Definitions, the Credit Derivatives Definitions will govern. In the event of any inconsistency between the Credit Derivatives Definitions and this Confirmation, this Confirmation will govern. In addition, the definitions and provisions set out in Schedule B hereto shall prevail in the event of any inconsistency with the Credit Derivative Definitions. In the event of any inconsistency between Schedule B hereto and sections 1 to 11 of this Confirmation, the provisions of sections 1 to 11 shall prevail.

This Confirmation supplements, forms a part of, and is subject to the ISDA Master Agreement dated as of 10 October 2002, as amended and restated on 21 July 2006, and as further amended and supplemented from time to time (the "**Agreement**") between Lehman Brothers Special Financing Inc. and Dante Finance Public Limited Company to which you have acceded under a Deed of Accession dated 20 March 2007. All provisions contained in the relevant Agreement govern this Confirmation except as expressly modified below.



In this Confirmation, the "**Notes**" refers to Zircon Finance Limited Series 2007-9 Tranche A AUD30,000,000 Synthetic Portfolio Notes due 2013 and "**Conditions**" refers to the terms and conditions of the Notes.

Capitalised terms used but not defined herein will have the meanings given to them in the Conditions.

In the event of any inconsistency between this Confirmation and the Agreement, this Confirmation shall prevail.

In this Confirmation, "**Party A**" means Lehman Brothers Special Financing Inc. and "**Party B**" means Zircon Finance Limited.

The terms of the Transaction to which this Confirmation relates are as follows:

## 1    General Terms

| | |
|---|---|
| Trade Date: | 4 June 2007 |
| Effective Date: | 6 June 2007 |

476

| | |
|---|---|
| Scheduled Termination Date: | 20 June 2013, subject to adjustment in accordance with the Business Day Convention |
| Termination Date: | The Scheduled Termination Date unless an Adjustment Reference Entity (as defined below) exists as at the Final Cut-off Date in which case the Termination Date shall be the Deferred Payment Date (or, where there is more than one Adjustment Reference Entity, the latest Deferred Payment Date to occur). |
| Floating Rate Payer A: | Zircon Finance Limited (the "Seller") |
| Fixed Rate Payer B: | Lehman Brothers Special Financing Inc. (the "Buyer") |
| Calculation Agent: | Lehman Brothers International (Europe) |
| | Any determination, calculation or selection made by the Calculation Agent under this Transaction shall be made by the Calculation Agent in a commercially reasonable manner and based on best market practice. |
| Calculation Agent City: | London |
| Business Days: | Sydney, London, Tokyo and New York |
| Business Day Convention: | Modified Following (which, subject to Section 1.4 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |

## 2    Reference Entities and Reference Obligations

| | |
|---|---|
| Reference Entity: | Each of the entities (and any Successor thereto) listed in the Reference Registry from time to time, subject to the provisions of "Successor Substitution" below; provided that, upon the occurrence of a Credit Event during the Credit Observation Period with respect to a Reference Entity, a Benchmark Obligation or the Obligations of a Reference Entity, and satisfaction of the Conditions to Settlement with respect to such Credit Event, such Reference Entity will be deemed deleted from the Reference Registry with effect from the Event Determination Date with respect to such Reference Entity (other than for the purposes of determining the relevant Cash Settlement Amount) and the Reference Registry shall be amended accordingly, subject always to the provisions regarding delivery of multiple Credit Event Notices pursuant to the "Credit Event Notice After Restructuring" provisions set out in Schedule B. |
| | For the avoidance of doubt, if an event which would otherwise constitute a Credit Event occurs prior to the commencement of the Credit Observation Period, the Reference Entity affected by such event will be deemed to be removed from the Reference Registry. For the avoidance of doubt, no Cash Settlement Amount shall be determined prior to the commencement of the Credit Observation Period. |



**477**

"Reference Registry" means the register of Reference Entities set out in Schedule A, maintained by the Calculation Agent in accordance with this Confirmation and amended from time to time in accordance with the provisions of "Successor Substitution" below, and further amended from time to time in accordance with a portfolio management agreement ("Portfolio Management Agreement") dated 6 June 2007 between Party A, Party B, the Calculation Agent and Lion Capital Management Limited (in such capacity, the "Portfolio Manager") (the form of which is set out in Exhibit B hereto) unless and until the Portfolio Manager resigns or is removed in accordance with the Portfolio Management Agreement.



Under the Portfolio Management Agreement, Party B appoints the Portfolio Manager to effect one or more Reference Portfolio Modifications. Accordingly, the Portfolio Manager shall have the right at any time to instruct Party A, Party B and the Calculation Agent pursuant to the terms of the Portfolio Management Agreement (a "Modification Instruction") that one or more Reference Entities be removed from the Reference Registry (each a "Replaced Reference Entity") and/or one or more Reference Entities be added to the Reference Registry (each a "New Reference Entity") subject to compliance with the Reference Portfolio Guidelines (as defined in the Portfolio Management Agreement) (a "Reference Portfolio Modification").

In relation to any Reference Portfolio Modification, the Calculation Agent will review the Modification Instruction with reference to the Reference Portfolio Guidelines. The Swap Counterparty will calculate for the Portfolio Manager the value of this Transaction to the Floating Rate Payer immediately after the Reference Portfolio Modification minus the value of this Transaction to the Floating Rate Payer immediately before the Reference Portfolio Modification and the amount of adjustment required to be made to the Subordination Amount so that the value of this Transaction immediately before and after the Reference Portfolio Modification will remain the same (such amount of adjustment to the Subordination Amount being the "Subordination Adjustment"). The Subordination Adjustment, if positive, shall be a "Subordination Adjustment Increase"; if negative, shall be a "Subordination Adjustment Decrease"; the sum of the Subordination Adjustment Increase and the Subordination Adjustment Decrease, as determined by the Calculation Agent on any date of determination being the "Subordination Adjustment Balance".

If, after such review, the Calculation Agent determines in its sole and absolute discretion that the Reference Portfolio Guidelines are satisfied as at the Modification Instruction Date (as defined in the Portfolio Management Agreement) and the

Portfolio Manager has confirmed the quotation and the Subordination Adjustment, the Calculation Agent shall give notice to the parties hereto and to the Portfolio Manager of such determination and it shall amend the Reference Registry accordingly with effect from the effective date of the applicable Reference Portfolio Modification. The Calculation Agent shall further amend the Reference Registry and Schedule C, as applicable, with reference to the relevant Reference Entity in respect of the appropriate Benchmark Obligation (if any) and other relevant terms as determined by the Calculation Agent in its sole and absolute discretion.

The Reference Registry shall contain the following information in respect of each Reference Entity included therein:

(i)     the credit position applicable to such Reference Entity (the "**Reference Entity Credit Position**");

(ii)    whether "Monoline" is specified as "Applicable" in respect of the relevant Reference Entity, in which case the "Additional Terms for Monolines" set forth in Schedule B hereto shall apply to such Reference Entity;

(iii)   the entity type of the relevant Reference Entity (the "**Entity Type**") which shall determine which of the standard terms set forth in Schedule C hereto (the "**Standard Terms**") apply to such Reference Entity;

(iv)    the Benchmark Obligation (if any) and its seniority applicable to the Reference Entity; and

(v)     the effective date of each Successor Substitution effected with respect to the Reference Entity and any change to the Reference Entity Credit Position resulting from any Successor Substitution.

Section 2.30 (Substitute Reference Obligation) of the Credit Derivatives Definitions shall not apply to this Transaction.



Successor Substitution:

Notwithstanding anything to the contrary herein (in particular in the terms relating to Successors set out in Schedule B), upon the occurrence of a Succession Event (as defined in Schedule B) between two or more of the Reference Entities for the time being comprised in the Reference Registry, which for the avoidance of doubt is not a Credit Event, the Calculation Agent may, by written notice to Buyer, Seller and Fitch indicating the Succession Event Date and the Succession Event Effective Date, give notice to remove one or more of those Reference Entities that are subject to the Succession Event (each, a "**Removed Succession Event Reference Entities**") from the Reference Registry, and to replace such Removed Succession Event Reference Entities with one or more entities (each an "**Added Succession Event Reference Entity**") such that the Reference Entities resulting from the Successor Substitution



shall be:

(i)    the entity which the Calculation Agent determines has been formed as a result of the Succession Event; and /or

(ii)    a number of entities chosen in accordance with the Successor Substitution Criteria.

provided that, in any case the total number of Reference Entities in the Reference Registry will be equal to the number of Reference Entities as of the Business Day prior to such Succession Event, and also, provided that such notice from the Calculation Agent will be effective two Business Days following the date the notice is sent to Buyer and Seller (the "**Succession Event Effective Date**") to remove or replace such Reference Entities from the Reference Registry. Each Added Succession Event Reference Entity will be a Reference Entity for the purposes of this Transaction and each Removed Succession Event Reference Entity will be deemed removed from the Reference Registry, in each case as of the Succession Event Effective Date. The Calculation Agent shall provide the parties hereto and Fitch with an updated Reference Registry as soon as is reasonably practicable after a Successor Substitution.

Each Added Succession Event Reference Entity shall have a Reference Entity Notional Amount equal to the sum of the Reference Entity Notional Amounts of the Removed Succession Event Reference Entities divided by the number of Added Succession Event Reference Entities, provided that the entity described in (i) above shall be ignored for the purposes of such calculation.

In the event that the Calculation Agent fails to exercise its right to remove one or more Reference Entities in accordance with the above provisions by the day which is 10 Business Days following the Succession Event Date, the provisions set out in Schedule B relating to Successors shall apply, except that if a Reference Entity becomes a Successor to another Reference Entity, such Successor Reference Entity shall be deemed to be a Reference Entity only once with respect to this Transaction, and the Reference Entity Notional Amount for such Reference Entity will be the sum of the Reference Entity Notional Amounts applicable to it and the Reference Entity to which it became a Successor prior to the Succession Event.

<table>
<tr><td>Succession Event Date:</td><td>The occurrence of a Succession Event, and the date at which such Succession Event is deemed to occur (the "**Succession Event Date**"), shall be determined by the Calculation Agent.</td></tr>
<tr><td>Successor Substitution Criteria:</td><td>Each Added Succession Event Reference Entity shall, on the date of its inclusion in the Reference Registry, have a credit rating assigned to its unsecured, senior long-term debt or deposit obligations (not supported by third party credit enhancement) by Fitch equal to or higher than the lowest credit</td></tr>
</table>





480

rating of the Removed Succession Event Reference Entities on the Business Day prior to the Succession Event Effective Date.

Each such determination shall be made by the Calculation Agent.

**Reference Obligation(s):**

In respect of each Reference Entity one or more obligations each of which is either:

(a)    the Benchmark Obligation, if any, specified for such Reference Entity in the Reference Registry; or

(b)    an obligation of the relevant Reference Entity (either directly or as provider of a Qualifying Affiliate Guarantee or, if All Guarantees is specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, any Qualifying Guarantee), as selected by the Buyer in its sole discretion on or prior to the Valuation Date and which (i) falls within the Reference Obligation Category specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, (ii) has all of the Reference Obligation Characteristics specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, (iii) is not subject to a counterclaim, defence (other than a counterclaim or defence based on the factors set forth in Section 4.1(a) to (d) of the Credit Derivatives Definitions) or right of set-off by or of the relevant Reference Entity or any applicable Underlying Obligor and (iv) in the case of a Qualifying Guarantee, other than a Qualifying Affiliate Guarantee, is capable, at the applicable Valuation Date, of immediate assertion or demand by or on behalf of the holder or holders against the relevant Reference Entity for an amount at least equal to the outstanding principal balance or Due and Payable Amount apart from the giving of any notice of non-payment or similar procedural requirement, it being understood that acceleration of an Underlying Obligation shall not be considered a procedural requirement.

For the avoidance of doubt, Reference Obligation will include any obligation of a Reference Entity as provider of a guaranty of payment, surety bond or financial guarantee insurance policy issued with respect to an underlying obligation and which is in each case unconditional but for any requirement for the beneficiary to give notice that a payment is due or any similar

procedural requirement; provided, however, that in the case of any such guaranty of payment, surety bond or financial guarantee insurance policy, such Reference Obligation shall include both such guaranty of payment, surety bond or financial guarantee insurance policy and the related Underlying Obligation.

Benchmark Obligation:

In respect of each Reference Entity, the corresponding obligation set forth under the heading "Benchmark Obligation" in the Reference Registry.

Obligation:

Any obligation of the relevant Reference Entity (either directly or as provider of a Qualifying Affiliate Guarantee or, if All Guarantees is specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity, any Qualifying Guarantee), and which (i) falls within the Obligation Category specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type and (ii) has all of the Obligation Characteristics specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type.



Obligations shall also include, in respect of each Reference Entity, the relevant Benchmark Obligation (if any) specified with respect to such Reference Entity in the Reference Registry.

All Guarantees:

Applicable with respect to a Reference Entity only if All Guarantees is specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity.

Reference Price:

100 per cent.

Subordination Amount:

On any date of determination, the sum of AUD315,000,000 and the then applicable Subordination Adjustment Balance.

Notional Amount:

AUD30,000,000.

Outstanding Notional Amount:



With respect to any day, the Notional Amount less the Mezzanine Tranche Loss (as defined below) as of that day, subject to a minimum of zero.

Mezzanine Loss Amount:

Cumulative Loss Amount minus the Subordination Amount

Mezzanine Tranche Loss:

The greater of:

(a)    the Mezzanine Loss Amount; and

(b)    zero.

Cumulative Loss Amount:

With respect to any day, the aggregate of all Cash Settlement Amounts calculated with respect to the Transaction from, and including the Trade Date, to and including such day a Cumulative Loss Amount is calculated.

482

3    **Buyer Payments**

(a)    **Buyer Payments 1**

| Fixed Rate Payer Calculation Amount: | Subject as provided below, and unless the Fixed Rate Payer Payment Adjustment provisions below apply to a Fixed Rate Payer Calculation Period, the Weighted Average Outstanding Notional Amount with respect to a Fixed Rate Payer Calculation Period, calculated by the Calculation Agent. |

"Weighted Average Outstanding Notional Amount" means the amount calculated by the Calculation Agent on the Business Day immediately preceding each Fixed Rate Payer Payment Date with respect to the immediately preceding Fixed Rate Payer Calculation Period by adding together the Outstanding Notional Amounts for each calendar day during such period and dividing such amount by the actual number of calendar days in such period. For the avoidance of doubt, in the event that, with respect to a Fixed Rate Payer Calculation Period, the Outstanding Notional Amount is reduced as a result of an increase in the amount of the Mezzanine Tranche Loss, such reduced Outstanding Notional Amount shall be used to calculate the Weighted Average Outstanding Notional Amount (for the purposes of calculating the 'Fixed Rate Payer Calculation Amount') as of, and from, each such Event Determination Date which resulted in a reduction of the Outstanding Notional Amount.



Fixed Rate Payer Calculation Period:    Section 2.9 of the Credit Derivatives Definitions shall apply, except that the final Fixed Rate Payer Calculation Period will end on, but exclude, the Scheduled Termination Date, and for the avoidance of doubt, such dates shall be adjusted in accordance with the Business Day Convention.

Fixed Rate Payer Payment Dates:    20 March, 20 June, 20 September and 20 December of each year commencing on 20 September 2007 and ending on, but excluding, the Scheduled Termination Date, subject in each case to adjustment in accordance with the Business Day Convention, and subject to the Fixed Rate Payer Payment Adjustment provisions below.

Fixed Rate:    In respect of all Fixed Rate Payer Payment Dates:

(i)    AUD-BBR-BBSW plus 1.05 per cent. per annum; and

0.12 per cent. per annum. (being the Portfolio Management Fees (as defined in the Portfolio Management Agreement) payable by the Issuer to the Portfolio Manager pursuant to the Portfolio Management Agreement); and

0.05 per cent. per annum (being the Performance Fees (as defined in the Portfolio Management Agreement) payable by the Issuer to the Portfolio Manager pursuant to the Portfolio Management Agreement, but only in the event

483

that the rating of the Notes by Fitch as of the Business Day immediately preceding the relevant Fixed Rate Payer Payment Date is A+ or above),

provided that in the event the Portfolio Management Agreement is terminated under Clause 8.1 of the Portfolio Management Agreement, the Fixed Rate Payer shall pay an amount equal to the pro rata amount of the Portfolio Management Fees and Performance Fees (if any) accrued up to and including the date of such termination on the next following Interest Payment Date.

"AUD-BBR-BBSW" means "AUD-BBR-BBSW" as defined in the 2000 Definitions with a "Designated Maturity" of three (3) months and the "Reset Date" being the day which is the first day of the Fixed Rate Payer Calculation Period, provided that for the first Interest Accrual Period such rate shall be determined on the basis of the linear interpolation of the rate determined on the relevant Reset Date for Designated Maturities of three months and four months.



| | |
|---|---|
| Fixed Rate Day Count Fraction: | Actual/365 (Fixed). |
| Fixed Rate Payer Payment Adjustment: | With respect to any Fixed Rate Payer Payment Date, in the event that: |

(a)  (i)  an Event Determination Date has occurred with respect to a Reference Entity on, or prior to, the Business Day prior to a Fixed Rate Payer Payment Date but the relevant Reference Entity Valuation Date with respect to such Reference Entity has not occurred; and/or



(ii)  a Potential Failure to Pay has occurred with respect to a Reference Entity on or prior to the Business Day prior to a Fixed Rate Payer Payment Date and such Potential Failure to Pay has not been cured on or prior to the Business Day prior to such Fixed Rate Payer Payment Date; and/or

(iii)  a Potential Repudiation/Moratorium has occurred with respect to a Reference Entity on or prior to the Business Day prior to a Fixed Rate Payer Payment Date and such Potential Repudiation/Moratorium has not ceased to exist on or prior to the Business Day prior to such Fixed Rate Payer Payment Date;

(each Reference Entity referred to in paragraphs (i), (ii) and (iii) above an "**Adjustment Reference Entity**"); and

(b)  the sum of the Mezzanine Loss Amount and the aggregate of all Reference Entity Notional Amount(s) in respect of all the relevant Adjustment Reference Entities is greater than zero,


484

the Fixed Amount payable in respect of such Fixed Rate Payer Payment Date shall be paid in accordance with the following:

(A) Buyer shall pay an amount (the "Partial Fixed Amount") on the Fixed Rate Payer Payment Date calculated in accordance with Section. 5.1(b) of the Credit Derivatives Definitions but referencing the Interim Calculation Amount instead of the Fixed Rate Payer Calculation Amount; and

(B) Buyer shall pay an amount (the "Deferred Fixed Amount"), in respect of each Adjustment Reference Entity, on the third (3rd) Business Day (the "Deferred Fixed Rate Payment Date") following:

(1) the final Reference Entity Valuation Date on which all Final Prices have been determined; or

(2) if appropriate, the date that the Calculation Agent determines that all Potential Failure to Pay have been cured; or

(3) if appropriate, the date that the Calculation Agent determines that all Potential Repudiation/Moratorium have ceased to exist,

equal to the excess (if any) of:

(i) the Fixed Amount that would otherwise have been payable on the relevant Fixed Rate Payer Payment Date if

(A) in the circumstances set out in sub-paragraph (a)(i) of "Fixed Rate Payer Payment Adjustment" above, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the relevant Event Determination Date;

(B) in the circumstances set out in sub-paragraph (a)(ii) of "Fixed Rate Payer Payment Adjustment" above, (i) where the Potential Failure to Pay develops into an actual Failure to Pay, the Final Price in respect of the relevant Adjustment Reference Entity .had actually been determined on the date on which such Potential Failure to Pay was determined by the Calculation Agent to have occurred; or (ii) where the Potential Failure to Pay is subsequently cured, the relevant Potential Failure to Pay had not occurred; or





(C) in the circumstances set out in sub-paragraph (a)(iii) of "Fixed Rate Payer Payment Adjustment" above, (i) where the Potential Repudiation/Moratorium develops into an actual Repudiation/Moratorium, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Repudiation/Moratorium was determined by the Calculation Agent to have occurred; or (ii) where the Potential Repudiation/Moratorium subsequently ceases to exist, the relevant Potential Repudiation/ Moratorium had not occurred,

over

(ii) the relevant Partial Fixed Amount (if any) paid on the relevant Fixed Rate Payer Payment Date.

(C) Buyer shall pay an additional amount equal to interest accrued in the period from and including the Fixed Rate Payer Payment Date to, but excluding, the Deferred Fixed Rate Payer Payment Date, at a rate equal to the O/N Rate (as defined in the Conditions) for each day during such period, on an amount equal to the Deferred Fixed Amount which shall be paid on such Deferred Fixed Rate Payer Payment Date.

**Interim Calculation Amount:** Subject as provided below, the Fixed Rate Payer Calculation Amount (without adjusting the Outstanding Notional Amount with respect to an Adjustment Reference Entity except as provided below) for the relevant Fixed Rate Payer Calculation Period except that the Weighted Average Outstanding Notional Amount shall be calculated on the basis that the Reference Entity Notional Amount of each Adjustment Reference Entity is added to the Cumulative Loss Amount as of each Event Determination Date or the date upon which a Potential Failure to Pay or a Potential Repudiation/Moratorium (as applicable) occurred. For the avoidance of doubt, in the event that the amount calculated in accordance with this provision is zero or a negative number the "Interim Calculation Amount" will be deemed to be zero.

## (b)    Buyer Payments 2

**Buyer Final Payment:** In addition to the Fixed Amounts payable in accordance with the provisions set out above, Buyer shall pay to Seller:

(ii) the Buyer Final Payment Amount on the Scheduled Termination Date and the Deferred Payment Date, as the





case may be; and

(iii) an amount equal to the aggregate amount of the Unpaid Performance Fees in respect of all Fixed Rate Payer Payment Dates on the Scheduled Termination Date,

For the purposes hereof:

"Unpaid Performance Fees" means, in respect of each Fixed Rate Payment Date, an amount determined by the Calculation Agent equal to the product of (i) 0.05 per cent. per annum; (ii) the Weighted Average Outstanding Notional Amount; (iii) the number of Notes outstanding; and (iv) the Day Count Fraction, which is calculated as the Performance Fees (as defined in the Portfolio Management Agreement) but not payable to the Portfolio Manager given that the rating of the Notes by Fitch as of the Business Day immediately prior to the relevant Interest Payment Date is below A+.

For the purpose of determining the Unpaid Performance Fees in respect of each Fixed Rate Payer Payment Date, in the event that the Fixed Rate Payer Payment Adjustment provisions (as set out in paragraph 3 above) are applicable, references to the Weighted Average Outstanding Notional Amount shall be deemed to be references to the Interim Calculation Amount (as defined in paragraph 3 above) without subsequent adjustment.



**Buyer Final Payment Amount:**

An amount in AUD determined by the Calculation Agent in its sole discretion as being equal to the greater of:

(a) the Outstanding Notional Amount as at the Final Cut-off Date; and

(b) AUD 0.

For the purposes hereof if:

(i) an Adjustment Reference Entity exists as at the Final Cut-off Date; and

(ii) the sum of the Mezzanine Loss Amount and the aggregate of all Reference Entity Notional Amounts in respect of all relevant Adjustment Reference Entities is greater than zero,



the Buyer Final Payment Amount shall be:

(i) the Interim Calculation Amount (if any) on the Scheduled Termination Date;

(ii) the Deferred Termination Amount on the Deferred Payment Date; and

(iii) interest accrued in the period from and including the Scheduled Termination Date to, but excluding, the related Deferred Termination Date, at a rate equal to the O/N Rate on an amount equal to the Deferred Termination Amount which shall be paid on such related Deferred Termination Date.

For the purposes hereof:

"**Deferred Termination Amount**" means, in respect of each Deferred Payment Date and its related Adjustment Reference Entity, an amount in AUD (rounded to the nearest cent with one half cent being rounded up and subject to a minimum of AUD 0) determined by the Calculation Agent in its sole discretion on the relevant Deferred Payment Cut-off Date as being equal to the excess (if any) of:



(i) the Buyer Final Payment that would otherwise have been payable on the Scheduled Termination Date if:

(A) in the circumstances set out in sub-paragraph (a)(i) of "Fixed Rate Payer Payment Adjustment" above, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the relevant Event Determination Date;

(B) in the circumstances set out in sub-paragraph (a)(ii) of "Fixed Rate Payer Payment Adjustment" above, (i) where the Potential Failure to Pay develops into an actual Failure to Pay, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Failure to Pay was determined by the Calculation Agent to have occurred; or (ii) where the Potential Failure to Pay is subsequently cured, the relevant Potential Failure to Pay had not occurred; or



(C) in the circumstances set out in sub-paragraph (a)(iii) of "Fixed Rate Payer Payment Adjustment" above, (i) where the Potential Repudiation/Moratorium develops into an actual Repudiation/Moratorium, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Repudiation/Moratorium was determined by the Calculation Agent to have occurred; or (ii) where the Potential Repudiation/Moratorium subsequently ceases to exist, the relevant Potential Repudiation/ Moratorium had not occurred;

over

(ii) the Interim Calculation Amount (if any) on the Scheduled Termination Date;

"**Deferred Payment Cut-off Date**" means, in respect of each Adjustment Reference Entity in respect of which a Deferred Termination Amount may be payable, as determined by the Calculation Agent in its sole discretion:

(A) the final Reference Entity Valuation Date on which all

Final Prices have been determined; or

(B) if appropriate, the date that the Calculation Agent determines that all Potential Failure to Pay have been cured; or

(C) if appropriate, the date that the Calculation Agent determines that all Potential Repudiation/Moratorium have ceased to exist,

whichever is applicable.

"**Deferred Payment Date**" means, in respect of each Adjustment Reference Entity, the third Business Day following the Deferred Payment Cut-off Date.

Final Cut-off Date:

The Business Day immediately prior to Scheduled Termination Date.



## 4    Seller Payments

### (a)    Seller Payments 1

Interim Seller Payments:

In addition to the Seller Final Payment payable in accordance with the provisions set out below, during the period from, and including, the Effective Date to, and including, the Scheduled Termination Date, on each day that any interest and other payments and distributions of cash (other than any payments in the nature of principal payments) and other property are scheduled to be received under the Collateral, Seller will transfer to Buyer an amount equal to the aggregate amount scheduled to be received from the Collateral Issuer in respect of the Collateral.

"**Collateral**" shall bear the meaning given to such term in the Conditions. "**Collateral Issuer**" means the issuer of any Collateral.



### (b)    Seller Payments 2

Seller Final Payment:

In addition to the Interim Seller Payments payable in accordance with the provisions set out above, Seller shall pay to Buyer the Seller Final Payment Amount on the Scheduled Termination Date.

Seller Final Payment Amount:

An amount equal to the amount standing to the credit of the Collection Account (as defined in the Conditions) on the Scheduled Termination Date.

## 5    Provisions relating to Credit Events

Floating Rate Payer Calculation Amount:

The Reference Entity Notional Amount.

Reference Entity Notional Amount:

For each of the 142 Reference Entities, an amount equal to the Notional Portfolio Size multiplied by the Reference Entity Credit Position set forth in respect of such Reference Entity in

| | |
|---|---|
| | the Reference Registry. |
| Notional Portfolio Size: | AUD7,500,000,000. |
| Conditions to Settlement: | Credit Event Notice |

|  |  |  |
|---|---|---|
| | Notifying Party: | Buyer |
| Notice of Publicly Available Information: | Applicable. | |

If a Credit Event Notice contains the information required in the Notice of Publicly Available Information such Credit Event Notice shall be deemed to be both a Credit Event Notice and a Notice of Publicly Available Information.

| | |
|---|---|
| Public Sources: | Applicable |
| Specified Number: | Two |

| | |
|---|---|
| Credit Observation Period: | The period from and including the Trade Date to and including the Scheduled Termination Date. |
| Credit Events: | With respect to each Reference Entity for the time being comprised in the Reference Registry, the Credit Events specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity. |
| Obligation Category: | With respect to each Reference Entity for the time being comprised in the Reference Registry, the Obligation Category specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity. |
| Obligation Characteristics: | With respect to each Reference Entity for the time being comprised in the Reference Registry, the Obligation Characteristics specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity. |
| Excluded Obligations: | None. |

## 6   Calculation of Cash Settlement Amounts

| | |
|---|---|
| Settlement Method: | Cash Settlement in accordance with the Credit Derivative Definitions, as modified by the following terms: |

Notwithstanding anything to the contrary contained in the Credit Derivative Definitions (including without limitation Section 7.1 (*Cash Settlement*)) following the occurrence of an Event Determination Date in respect of a Reference Entity, the Calculation Agent shall determine the applicable Cash Settlement Amount.

For the avoidance of doubt, Seller shall not pay Buyer the Cash Settlement Amount, if any, with respect to such Reference Entity but the amount of each Cash Settlement Amount will be

added to the Cumulative Loss Amount which will in turn be used to determine, *inter alia*, the reduction, if any, in the Outstanding Notional Amount payable by Buyer on the Scheduled Termination Date.

Final Reference Obligation Price:

The price of the Reference Obligation expressed as a percentage, determined in accordance with the Valuation Method.

Final Price:

The Final Reference Obligation Price or, if there is more than one Reference Obligation, the Final Price shall be the weighted average of the Final Reference Obligation Prices (as weighted by the Reference Entity Notional Amount) expressed as a percentage.

Valuation Date:

Single Valuation Date.

Single Valuation Date:

Any Valuation Business Day selected by the Calculation Agent in its sole discretion falling on or after the thirtieth (30th) calendar day following the Event Determination Date provided that, if an Event Determination Date has occurred and the valuation date or physical settlement date, howsoever expressed (the "**Hedge Settlement Date**") in respect of any credit derivatives transaction or other hedging transaction (each a "**Hedging Transaction**") entered into by or on behalf of Party A in relation to the hedging of its obligations under the Transaction has been delayed in accordance with, or on terms similar to, the provisions of Section 9.9 and Section 9.10 of the Credit Derivatives Definitions (such occurrence, the "**Hedging Transaction Delay**"), then the Valuation Date will be any Valuation Business Day selected by the Calculation Agent occurring no later than the third Valuation Business Day after the Hedge Settlement Date. In the case of an Adjustment Reference Entity existing on the Final Cut-off Date, the Valuation Date shall be deemed to be the Final Cut-off Date.



Valuation Business Day:

Any Business Day which is also a Business Day in the market, as determined by the Calculation Agent in its sole discretion, on which credit default swaps in respect of the relevant Reference Entity are primarily traded.

Valuation Time:

11:00 a.m. London, New York or (as applicable) Tokyo time, as determined by the Calculation Agent by reference to the market in which credit default swaps for such Reference Entity are primarily traded.

Bid Quotation:

With respect to each Reference Obligation selected by the Calculation Agent in respect of the relevant Reference Entity and a Valuation Date, means each firm bid quotation obtained from a Dealer at the Valuation Time for an amount selected by the Calculation Agent which is not greater than the Reference Entity Notional Amount of such Reference Entity.

Weighted Average Quotation:

With respect to each Reference Obligation selected by the Calculation Agent in respect of the relevant Reference Entity

491

and a Valuation Date, the weighted average of firm quotations obtained from Dealers at the Valuation Time each for an amount with an outstanding principal balance not greater than the Reference Entity Notional Amount of such Reference Entity nor less than USD1,000,000, that in aggregate are equal to or greater than the Reference Entity Notional Amount. For the avoidance of doubt, any such weighted average may be lower or equal to any firm quotation obtained from any Dealer.

Settlement Currency:    AUD

Reference Entity Valuation Date:    In respect of the relevant Reference Entity, the date on which the Final Price is determined in respect of such Reference Entity.

Valuation Method:    The highest Bid Quotation with respect to a Valuation Date obtained on the same Valuation Business Day by the Calculation Agent in accordance with the following:

(iv) the Calculation Agent shall attempt to obtain Bid Quotations from at least five Dealers (or if one of such Dealers is the Calculation Agent or an Affiliate of the Calculation Agent, then six Dealers) on the Valuation Date; and

(v) if at least three Bid Quotations are not available on the Valuation Date, the Calculation Agent shall continue to attempt to obtain three Bid Quotations on each of the days which are 1, 2, 10, 11, 12, 20, 21 and 22 Valuation Business Days following the Valuation Date (the "**Extended Valuation Dates**").

In the event that at least three Bid Quotations cannot be obtained on an Extended Valuation Date which falls on or before the 22nd Valuation Business Day following the Valuation Date, the Calculation Agent shall seek to obtain a Weighted Average Quotation at the Valuation Time on the 23rd Valuation Business Day following the Valuation Date. If a Weighted Average Quotation is obtained, that Weighted Average Quotation shall be the Final Reference Obligation Price.

In the event that (a) at least three Bid Quotations have not been obtained on or before the 22nd Valuation Business Day following the Valuation Date and (b) the Weighted Average Quotation has not been obtained on the 23rd Valuation Business Day following the Valuation Date, the Final Reference Obligation Price with respect to the Reference Obligation shall be deemed to be zero.

The Calculation Agent shall deliver a notice to the Trustee (for delivery to the Noteholders in accordance with the Conditions) and Buyer (with a written copy to Fitch) showing the Final Reference Obligation Price for each Reference Obligation on

the day which is no later than 5 Business Days following each Reference Entity Valuation Date.

Dealers:    Dealers in obligations of the type of Reference Obligations for which Bid Quotations are to be obtained, and any affiliate thereof or successor thereto. For the avoidance of doubt, the Calculation Agent or any Affiliate of the Calculation Agent may be a Dealer, provided that only one of the Calculation Agent or its Affiliates may be included in the panel of six Dealers for the purposes of calculating the Final Price.

Notices:    Notwithstanding any provisions in the Credit Derivatives Definitions relating to notification of certain matters by the Calculation Agent to the parties, the Calculation Agent shall notify the parties and Fitch of the following with respect to each Reference Entity in respect of which an Event Determination Date has occurred, on the dates stated:

(vi)    selected Reference Obligations: notified to the parties on or before the applicable Valuation Date; and

(vii)   Cash Settlement Amount: notified by the Calculation Agent to the parties (with a written copy to Fitch) on, or as soon as is reasonably practicable following, the applicable Reference Entity Valuation Date.



## 7  Exchange of Collateral

In the event that any Collateral becomes subject to mandatory redemption or otherwise ceases to be a Qualifying Asset, Party A may on any Business Day by notice inform Party B and Fitch that it wishes to transfer to Party B Qualifying Assets specified in that notice in exchange for certain Collateral specified in that notice and held by Party B on such date. Subject to Fitch's rating confirmation, Party A will be obliged to transfer such Qualifying Assets to Party B promptly following such notice and Party B will be obliged to transfer to Party A securities and/or cash equivalent to the Collateral so specified upon receipt of such Qualifying Assets. Party B's obligation to transfer to Party A such equivalent securities and/or cash shall not in any event exceed the aggregate amount of all the Collateral held by it on such date.

In the event that any charges are imposed by the issuer of the Collateral in respect of the redemption of the Collateral, the Swap Counterparty shall procure that the Collateral is exchanged for other Qualifying Assets subject to the provisions set out above.

"**Qualifying Assets**" means, in respect of any exchange of Collateral pursuant to the terms of this Transaction, any security with the following characteristics:

1.    (a)    having as of the date of transfer a credit rating assigned by Fitch equal to AAA;

    (b)    maturing on or before the Scheduled Maturity Date;

    (c)    being AUD-denominated; and

    (e)    is not a structured finance product; or

2.    any AUD denominated money market fund with a credit rating assigned by Fitch equal to V-1+; or

3.    AUD cash.

Party A shall pay all costs (including stamp duty) associated with the delivery or exchange of the Collateral for Qualifying Assets in accordance with the terms of this Confirmation.

## 8    Relationship Between Parties

Each of Buyer and Seller represents to the other that:

(a)    **Non-Reliance**

It is acting for its own account and it is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction. It has not received from the other party any assurance or guarantee as to the expected results of this Transaction;

(b)    **Acceptance**

It accepts the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the financial and other risks of this Transaction;



(c)    **Status of Parties**

The other party is not acting as a fiduciary or an advisor for it in respect of this Transaction; and

(d)    **Risk Management**

It has entered into this Transaction for the purpose of (i) managing its borrowings or investments, (ii) hedging its underlying assets or liabilities or (iii) in connection with its line of business.

(e)    **Eligible Person**

It is as of the Trade Date an Eligible Person and it agrees that it shall not novate, transfer or assign this Transaction to any person which has not represented that it is an Eligible Person; provided, however, a failure to comply with the terms of the preceding clause shall not constitute an Event of Default pursuant to Section 5(a)(ii) or Section 5(a)(iv) in the absence of willful misconduct. As used herein, an **"Eligible Person"** is an entity which is both (1) a **"qualified institutional buyer"** (as defined in Rule 144A under the United States Securities Act of 1933, as amended) and (2) a **"Qualified Purchaser"** (within the meaning of Section 2(a)(51)(A) of the United States Investment Company Act of 1940, as amended, and the rules and regulations thereunder). Each of Buyer and Seller agrees and acknowledges that the representation set out in this paragraph shall be deemed to be amended, varied or supplemented and restated as subsequently published by ISDA.

## 9    Additional Termination Provisions

(i)    The following shall constitute Additional Termination Events for the purposes of this Transaction:

(a)    The Notes being declared due and payable following the occurrence of an Event of Default (as defined in the Conditions) under the terms thereof.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the sole Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

494

(b)    A default or event of default that has been declared pursuant to the terms of (and as defined in the terms of) the Collateral prior to the Scheduled Termination Date.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the sole Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(c)    The Notes being declared redeemable pursuant to the Seller being required by law to withhold or account for tax or would suffer tax in respect of its income so that it would be unable to make payment of the full amount due and the Noteholders not having received, either directly or indirectly, from Buyer the amounts referred to under "Optional Payments" below.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.



(ii)    **Optional Payments:** If, for any reason beyond the control of Buyer or Seller the Noteholders do not receive payment under their Notes for any reason including the imposition of any withholding tax or a default or other circumstance linked to the Paying Agents, Buyer may elect to make any necessary payments to, or to the order of, the Noteholders to prevent either a redemption of the Notes for taxation reasons pursuant to Condition 6(d) of the Notes or an event of default pursuant to Condition 10 of the Notes from occurring.

## 10    Other Terms

(i)    **Non-insurance business**

Party A and Party B acknowledge and agree that this Transaction is not intended to constitute insurance business and is not a contract of insurance, assurance, suretyship or guarantee and payments may be made under this Transaction by each party independently and without proof of the economic loss (if any) of the other party.



(ii)    **Third party rights**

No person shall have any right to enforce any provision of this Transaction under the Contracts (Rights of Third Parties) Act 1999.

(iii)    **Credit Support Document.**

Credit Support Document means in relation to Party A: the Guarantee dated as of the date hereof by Lehman Brothers Holdings Inc. in favour of Party B as beneficiary thereof in the form attached hereto as Exhibit A.

(iv)    **Credit Support Provider**

Credit Support Provider means in relation to Party A: Lehman Brothers Holdings Inc.

(v)    **Credit Support Annex**

Party A and Party B agree that the provisions of the ISDA Credit Support Annex, as supplemented by the Elections and Variables attached hereto as Annex A shall apply to this Transaction.

(vi)        Misrepresentation

For the purpose of this Confirmation only, Section 5(a)(iv) of the Agreement will not apply to Party B.

(vii)       Breach of Agreement

For the purpose of this Confirmation only, Section 5(a)(ii) of the Agreement will not apply to Party B.

(viii)      Bankruptcy

For the purposes of this Confirmation only, Sections 5(a)(vii)(2) and 5(a)(vii)(9) will not apply to Party B.

For the purposes of this Confirmation and Party B only, Section 5(a)(vii)(4) will be amended with the insertion of the following wording immediately following the end of that Section:

", other than any such proceeding initiated by Party A or any of its affiliates"

For the purposes of this Confirmation and Party B only, Section 5(a)(vii)(6) will be amended as follows:



(i)     the wordings "seeks or" will be deleted from that Section; and

(ii)    the wording ", other than the appointment of the Trustee, the Custodian (each as defined in the Conditions) or other analogous parties" will be inserted immediately following the end of that Section.

## 11    Account Details

Account details of Buyer:          Australia & New Zealand Banking Group, Melbourne (ANZBAU3M)

A/C 265041 00001

A/C Lehman Brothers Inc./BNF/IFO Lehman Brothers Special Financing Inc.

Account details of Seller:         JP Morgan Chase Bank, N.A. Brisbane (CHASAU2X)
BSB Code: 214-400
A/C 10048091
A/C BTAISAL Paying Agent Account
Ref: Zircon Finance Ltd Series 2007-9 Tranche A



This Confirmation shall be governed by and construed in accordance with English law.

496

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us by facsimile.

Yours faithfully,

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By:

Name:

Title:


**LEHMAN BROTHERS INTERNATIONAL (EUROPE)** hereby agrees to perform its obligations as Calculation Agent set out herein.

By:

Name:



Title:


Confirmed on the date first above written:

**ZIRCON FINANCE LIMITED**

By:

Name:

Title:

497

## Schedule A
### Annex 1
### Reference Registry

(as of 6 June 2007)

| Reference Entity | Bench Mark Obligation | | | | Reference Entity Notional Amount | Reference Entity Type | Monoline |
|---|---|---|---|---|---|---|---|
| | ISIN | Coupon | Maturity | Seniority | | | |
| Archer-Daniels-Midland Company | US039483AJ11 | 8.125% | 01/06/2012 | Senior | 0.714% | North American | |
| AIFUL CORPORATION | JP310504B356 | 1.740% | 28/05/2013 | Senior | 0.714% | Japanese | |
| American International Group, Inc. | US026874AT47 | 4.250% | 15/05/2013 | Senior | 0.714% | North American | |
| KZO Nobel N.V. | XS0170265341 | 4.250% | 14/06/2011 | Senior | 0.714% | Western European | |
| DIS SA | XS0176838372 | 5.125% | 02/10/2013 | Senior | 0.714% | Western European | |
| Ambac Assurance Corporation | * No Ref Ob * | * No Ref Ob * | * No Ref Ob * | Senior | 0.714% | North American | Monoline |
| Aon Corporation | US037389AS27 | 7.375% | 14/12/2012 | Senior | 0.714% | North American | |
| ArvinMeritor, Inc. | US043353AA92 | 8.750% | 01/03/2012 | Senior | 0.714% | North American | |
| American Axle & Manufacturing, Inc. | US02406PAE07 | 5.250% | 11/02/2014 | Senior | 0.714% | North American | |
| Bank of America Corporation | US060505AG97 | 7.400% | 15/01/2011 | Subordinate | 0.714% | North American | |
| BARCLAYS BANK PLC | XS0187033864 | 4.500% | 04/03/2019 | Subordinate | 0.714% | Western European | |
| B A S F Aktiengesellschaft | DE0008846718 | 3.500% | 08/07/2010 | Senior | 0.714% | Western European | |
| BRUNSWICK CORPORATION | US117043AG45 | 7.125% | 01/08/2027 | Senior | 0.714% | North American | |
| Black & Decker ration | US091797AJ96 | 7.125% | 01/06/2011 | Senior | 0.714% | North American | |
| ire Hathaway Inc. | US084664AD30 | 4.625% | 15/10/2013 | Senior | 0.714% | North American | |
| The Bear Stearns Companies Inc. | US073902KF49 | 5.300% | 30/10/2015 | Senior | 0.714% | North American | |
| JSC "Bank TuranAlem" | USN89065AF89 | 8.000% | 24/03/2014 | Senior | 0.714% | Russian | |
| Beazer Homes USA, Inc. | US07556QAJ40 | 6.500% | 15/11/2013 | Senior | 0.357% | North American High Yield | |
| Citigroup Inc. | US172967AZ49 | 7.250% | 01/10/2010 | Subordinate | 0.714% | North American | |
| CARREFOUR | FR0000480691 | 6.125% | 26/05/2010 | Senior | 0.714% | Western European | |
| Countrywide Home Loans, Inc. | US22237LPA43 | 4.000% | 22/03/2011 | Senior | 0.714% | North American | |
| Chemtura Corporation | US163893AA87 | 6.875% | 01/06/2016 | Senior | 0.714% | North American | |
| Centrica Plc | XS0137672381 | 5.875% | 02/11/2012 | Senior | 0.714% | Western European | |

498

| CIT Group Inc. | US125581AB41 | 7.750% | 02/04/2012 | Senior | 0.714% | North American | |
| CITADEL FINANCE LTD | US17285RAA86 | 6.250% | 15/12/2011 | Senior | 0.714% | North American | |
| Con-way Inc. | US12612WAA27 | 8.875% | 01/05/2010 | Senior | 0.714% | North American | |
| Capital One Financial Corporation | US14040HAJ41 | 6.250% | 15/11/2013 | Senior | 0.714% | North American | |
| Continental Aktiengesellschaft | XS0139722069 | 6.875% | 05/12/2008 | Senior | 0.714% | Western European | |
| Costco Wholesale Corporation | * No Ref Ob * | * No Ref Ob * | * No Ref Ob * | Senior | 0.714% | North American | |
| COMPASS GROUP PLC | XS0148362501 | 6.375% | 29/05/2012 | Senior | 0.714% | Western European | |
| Credit Suisse Group | XS0118485670 | 6.625% | 05/10/2010 | Subordinate | 0.714% | Western European | |
| Computer Sciences Corporation | US205363AE42 | 7.375% | 15/06/2011 | Senior | 0.714% | North American | |
| Centex Corporation | US152312AQ77 | 5.250% | 15/06/2015 | Senior | 0.714% | North American | |
| ...SCHE BANK ...ENGESELLSCHAFT | US251529AF04 | 7.500% | 25/04/2009 | Subordinate | 0.714% | Western European | |
| DEXIA CREDIT LOCAL | XS0093833282 | 5.500% | 21/01/2009 | Senior | 0.714% | Western European | |
| D.R. Horton, Inc. | US23331AAX72 | 5.375% | 15/06/2012 | Senior | 0.714% | North American | |
| The Dow Chemical Company | US260543BR36 | 6.000% | 01/10/2012 | Senior | 0.714% | North American | |
| Deutsche Post AG | DE0009279042 | 5.125% | 04/10/2012 | Senior | 0.714% | Western European | |
| Darden Restaurants, Inc. | US237194AB19 | 7.125% | 01/02/2016 | Senior | 0.714% | North American | |
| DSG INTERNATIONAL PLC | XS0157632562 | 6.125% | 15/11/2012 | Senior | 0.714% | Western European | |
| Koninklijke DSM N.V. | XS0235117891 | 4.000% | 10/11/2015 | Senior | 0.714% | Western European | |
| ERP Operating Limited Partnership | US26884AAM53 | 6.950% | 02/03/2011 | Senior | 0.714% | North American | |
| Eaton Corporation | US278058AW21 | 7.650% | 15/11/2029 | Senior | 0.714% | North American | |
| ... n Corporation | US30161NAA90 | 6.750% | 01/05/2011 | Senior | 0.714% | North American | |
| ...ial Guaranty Insurance ...pany | * No Ref Ob * | * No Ref Ob * | * No Ref Ob * | Senior | 0.714% | North American | Monoline |
| Federal Home Loan Mortgage Corporation | US3134A4EW03 | 5.875% | 21/03/2011 | Subordinate | 0.714% | North American | |
| Federal National Mortgage Association | US31359MNU35 | 5.250% | 01/08/2012 | Subordinate | 0.714% | North American | |
| Fortune Brands, Inc. | US349631AF84 | 6.250% | 01/04/2008 | Senior | 0.714% | North American | |
| Financial Security Assurance Inc. | * No Ref Ob * | * No Ref Ob * | * No Ref Ob * | Senior | 0.714% | North American | Monoline |
| Gannett Co., Inc. | US364725AC59 | 6.375% | 01/04/2012 | Senior | 0.714% | North American | |
| GMAC LLC | US370425SE16 | 6.875% | 28/08/2012 | Senior | 0.714% | North American | |
| Genworth Financial, Inc. | US37247DAE67 | 5.750% | 15/06/2014 | Senior | 0.714% | North American | |
| The Goldman Sachs Group, Inc. | US38141GEU40 | 6.250% | 15/01/2017 | Subordinate | 0.714% | North American | |
| GlobalSantaFe Corporation | US37943TAB44 | 5.000% | 15/02/2013 | Senior | 0.714% | North American | |

499

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| EXPERIAN FINANCE PLC | XS0162820228 | 5.625% | 12/12/2013 | Senior | 0.714% | Western European | |
| Hannover Rueckversicherung AG | XS0187043079 | 5.750% | 26/02/2024 | Subordinate | 0.714% | Western European Insurance | |
| The Governor and Company of the Bank of Scotland | XS0139647001 | 5.125% | 05/12/2013 | Subordinate | 0.714% | Western European | |
| HEALTH CARE PROPERTY INVESTORS, INC. | US421915EB13 | 6.450% | 25/06/2012 | Senior | 0.714% | North American | |
| HSBC Finance Corporation | US441812JY13 | 7.000% | 15/05/2012 | Senior | 0.714% | North American | |
| Hovnanian Enterprises, Inc. | US442488AQ54 | 6.500% | 15/01/2014 | Senior | 0.357% | North American High Yield | |
| BLOCK FINANCIAL CORPORATION | US093662AC83 | 5.125% | 30/10/2014 | Senior | 0.714% | North American | |
| International Game Technology | US459902AP73 | 2.600% | 15/12/2036 | Senior | 0.714% | North American | |
| Penney Company, Inc. | US708130AA74 | 8.000% | 01/03/2010 | Senior | 0.714% | North American High Yield | |
| Johnson & Johnson | US478160AM65 | 3.800% | 15/05/2013 | Senior | 0.714% | North American | |
| JPMorgan Chase & Co. | US46625HAJ95 | 6.750% | 01/02/2011 | Subordinate | 0.714% | North American | |
| Kaupthing banki hf. | XS0194805429 | 3mEuribor+0.65% | 30/06/2014 | Subordinate | 0.714% | Western European | |
| KB Home | US48666KAF66 | 7.750% | 01/02/2010 | Subordinate | 0.357% | North American High Yield | |
| KINGFISHER PLC | XS0178322474 | 5.625% | 15/12/2014 | Senior | 0.714% | Western European | |
| Kimberly-Clark Corporation | US494368AQ68 | 6.875% | 15/02/2014 | Senior | 0.714% | North American | |
| Koninklijke KPN N.V. | US780641AG12 | 8.000% | 01/10/2010 | Senior | 0.714% | Western European | |
| Kohl's Corporation | US500255AM62 | 6.300% | 01/03/2011 | Senior | 0.714% | North American | |
| Lennar Corporation | US526057AG99 | 5.950% | 01/03/2013 | Senior | 0.714% | North American | |
| Liz Claiborne, Inc. | XS0260255160 | 5.000% | 08/07/2013 | Senior | 0.714% | North American | |
| LLOYDS TSB BANK plc | XS0145620281 | 5.875% | 08/07/2014 | Subordinate | 0.714% | Western European | |
| Lowe's Companies, Inc. | US548661CA38 | 8.250% | 01/06/2010 | Senior | 0.714% | North American | |
| Limited Brands, Inc. | US532716AH08 | 6.125% | 01/12/2012 | Senior | 0.714% | North American | |
| Southwest Airlines Co. | US844741AV08 | 6.500% | 01/03/2012 | Senior | 0.714% | North American | |
| LANXESS Aktiengesellschaft | XS0222550880 | 4.125% | 21/06/2012 | Senior | 0.714% | Western European | |
| Masco Corporation | US574599AX44 | 5.875% | 15/07/2012 | Senior | 0.714% | North American | |
| MBIA Insurance Corporation | * No Ref Ob * | * No Ref Ob * | * No Ref Ob * | Senior | 0.714% | North American | Monoline |
| Merrill Lynch & Co., Inc. | US5901884M72 | 6.050% | 16/05/2016 | Subordinate | 0.714% | North American | |
| MARSH & McLENNAN COMPANIES, INC. | US571748AM43 | 5.375% | 15/07/2014 | Senior | 0.714% | North American | |
| AXA | XS0130738213 | 6.000% | 18/06/2013 | Senior | 0.714% | Western European | |
| Motorola, Inc. | US620076AK59 | 6.500% | 01/09/2025 | Senior | 0.714% | North American | |

500

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Morgan Stanley | US61748AAE64 | 4.750% | 01/04/2014 | Subordinate | 0.714% | North American | |
| Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen | XS0166965797 | 6.750% | 21/06/2023 | Subordinate | 0.714% | Western European Insurance | |
| WENDEL INVESTISSEMENT | XS0185010401 | 5.000% | 16/02/2011 | Senior | 0.714% | Western European | |
| Noble Corporation | USG65422AA86 | 5.875% | 01/06/2013 | Senior | 0.714% | North American | |
| Nestle S.A. | XS0144994232 | 4.750% | 25/09/2007 | Senior | 0.714% | Western European | |
| NIKE, Inc. | US653922AH77 | 5.150% | 15/10/2015 | Senior | 0.714% | North American | |
| Novartis AG | XS0158284801 | 3.750% | 06/12/2007 | Senior | 0.714% | Western European | |
| NORFOLK SOUTHERN CORPORATION | US655844AE88 | 7.700% | 15/05/2017 | Senior | 0.714% | North American | |
| BT PLC | XS0169287124 | 5.250% | 30/09/2013 | Senior | 0.714% | Western European | |
| Pitney Bowes Inc. | US724479AF75 | 4.625% | 01/10/2012 | Senior | 0.714% | North American | |
| PCCW-HKT TELEPHONE LIMITED | US69319CAA27 | 7.750% | 15/11/2011 | Senior | 0.714% | Asian | |
| Pfizer Inc. | US717081AQ68 | 4.650% | 01/03/2018 | Senior | 0.714% | North American | |
| Pulte Homes, Inc. | US745867AL56 | 7.875% | 01/08/2011 | Senior | 0.714% | North American | |
| The PMI Group, Inc. | US69344MAH43 | 6.000% | 15/09/2016 | Senior | 0.714% | North American | |
| PPG Industries, Inc. | US693506AY35 | 7.050% | 15/08/2009 | Senior | 0.714% | North American | |
| Ryder System, Inc. | US783549AZ16 | 6.950% | 01/12/2025 | Senior | 0.714% | North American | |
| THE ROYAL BANK OF SCOTLAND PUBLIC LIMITED COMPANY | * No Ref Ob * | * No Ref Ob * | * No Ref Ob * | Subordinate | 0.714% | Western European | |
| Radian Group Inc. | US750236AB78 | 7.750% | 01/06/2011 | Senior | 0.714% | North American | |
| RENTOKIL INITIAL PLC | XS0249085852 | 5.750% | 31/03/2016 | Senior | 0.714% | Western European | |
| Prudential Capital, LLC | US76113BAR06 | 6.500% | 17/04/2013 | Senior | 0.714% | North American | |
| ReinsuranceRe Holdings Ltd. | US75968NAB73 | 5.875% | 15/02/2013 | Senior | 0.714% | North American | |
| R.R. Donnelley & Sons Company | US257867AM36 | 4.950% | 01/04/2014 | Senior | 0.714% | North American | |
| Republic Services, Inc. | US760759AA83 | 7.125% | 15/05/2009 | Senior | 0.714% | North American | |
| Russian Federation | XS0114288789 | 2.250% | 31/03/2030 | Senior | 0.714% | Russian | |
| SPRINT NEXTEL CORPORATION | US852060AS17 | 8.375% | 15/03/2012 | Senior | 0.714% | North American | |
| SANOFI-AVENTIS | XS0176128675 | 4.250% | 15/09/2010 | Senior | 0.714% | Western European | |
| BANCO SANTANDER CENTRAL HISPANO, S.A. | XS0125754324 | 6.000% | 14/03/2011 | Subordinate | 0.714% | Western European | |
| Sberbank | XS0253322886 | 6.480% | 15/05/2013 | Senior | 0.714% | Russian | |
| iStar Financial Inc. | US45031UAB70 | 6.000% | 15/12/2010 | Senior | 0.714% | North American | |
| Siemens Aktiengesellschaft | XS0131224155 | 5.750% | 04/07/2011 | Senior | 0.714% | Western | |

501

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | European | |
| Sara Lee Corporation | US803111AMS6 | 6.125% | 01/11/2032 | Senior | 0.714% | North American | |
| SOCIETE GENERALE | XS0110673950 | 6.625% | 27/04/2015 | Subordinate | 0.714% | Western European | |
| Standard Pacific Corp. | US85375CAN11 | 6.875% | 15/05/2011 | Senior | 0.357% | North American High Yield | |
| STMicroelectronics N.V. | XS0173918011 | 0.000% | 05/07/2013 | Senior | 0.714% | Western European | |
| The Stanley Works | US854616AJ88 | 4.900% | 01/11/2012 | Senior | 0.714% | North American | |
| TELUS CORPORATION | US87971MAC73 | 8.000% | 01/06/2011 | Senior | 0.714% | North American | |
| TELSTRA CORPORATION LIMITED | XS0131858838 | 6.375% | 29/06/2011 | Senior | 0.714% | North American | |
| TELECOM CORPORATION OF NEW ZEALAND LIMITED | XS0140346171 | 6.750% | 14/12/2011 | Senior | 0.714% | North American | |
| TELECOM ITALIA SPA | XS0184373925 | 5.375% | 29/01/2019 | Senior | 0.714% | Western European | |
| ...JX Companies, Inc. | US872540AH26 | 7.450% | 15/12/2009 | Senior | 0.714% | North American | |
| TeliaSonera Aktiebolag | XS0101443538 | 5.500% | 10/09/2010 | Senior | 0.714% | Western European | |
| TOYOTA MOTOR CORPORATION | JP363340A296 | 1.330% | 20/09/2012 | Senior | 0.714% | Japanese | |
| Texas Instruments Incorporated | * No Ref Ob * | * No Ref Ob * | * No Ref Ob * | Senior | 0.714% | North American | |
| UBS AG | CH0009367886 | 3.500% | 27/08/2008 | Senior | 0.714% | Western European | |
| Unilever N.V. | US904764AG27 | 7.125% | 01/11/2010 | Senior | 0.714% | Western European | |
| United Parcel Service, Inc. | US911308AB04 | 8.375% | 01/04/2030 | Senior | 0.714% | North American | |
| UST Inc. | US902911AM82 | 6.625% | 15/07/2012 | Senior | 0.714% | North American | |
| VINCI | XS0151548616 | 5.875% | 22/07/2009 | Senior | 0.714% | Western European | |
| ...erizon Communications | US92344GAW69 | 4.900% | 15/09/2015 | Senior | 0.714% | North American | |
| ...HOVIA CORPORATION | US929771AL77 | 5.625% | 15/12/2008 | Subordinate | 0.714% | North American | |
| Whirlpool Corporation | US963320AH94 | 7.750% | 15/07/2016 | Senior | 0.714% | North American | |
| Washington Mutual, Inc. | US939322AV52 | 5.250% | 15/09/2017 | Senior | 0.714% | North American | |
| Waste Management, Inc. | US94106LAK52 | 7.375% | 01/08/2010 | Senior | 0.714% | North American | |
| The Western Union Company | US959802AA70 | 5.930% | 01/10/2016 | Senior | 0.714% | North American | |
| Weyerhaeuser Company | US962166BP84 | 6.750% | 15/03/2012 | Senior | 0.714% | North American | |
| XL Capital Assurance Inc. | * No Ref Ob * | * No Ref Ob * | * No Ref Ob * | Senior | 0.714% | North American | Monoline |
| EXXON MOBIL CORPORATION | US607059AT90 | 8.625% | 15/08/2021 | Senior | 0.714% | North American | |
| JSC Vneshtorgbank | XS0197141285 | LIBOR+2.9% | 30/07/2007 | Senior | 0.714% | Russian | |
| | XS0182007830 | 6.880% | 11/12/2008 | | | | |
| | XS0202919667 | 7.500% | 12/10/2011 | | | | |

502

| | | | | | |
|---|---|---|---|---|---|
| US92909MAA80 | 7.500% | 12/10/2011 | | | |
| XS0223715920 | 6.250% | 30/06/2035 | | | |
| US92909MAB63 | 6.250% | 30/06/2035 | | | |
| XS0239043655 | LIBOR+0.75% | 21/09/2007 | | | |
| US92909MAC47 | LIBOR+0.75% | 21/09/2007 | | | |
| XS0244105283 | 4.250% | 15/02/2016 | | | |





Schedule B
Additional Definitions

## Definitions relating to Credit Events

Bankruptcy:

means a Reference Entity (a) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (b) becomes insolvent or is unable to pay its debts or fails or admits in writing in a judicial, regulatory or administrative proceeding or filing its inability generally to pay its debts as they become due; (c) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (d) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (i) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (ii) is not dismissed, discharged, stayed or restrained in each case within thirty calendar days of the institution or presentation thereof; (e) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (f) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (g) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within thirty calendar days thereafter; or (h) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (a) to (g) (inclusive).



Default Requirement:

USD 10,000,000 or its equivalent in any other currency.

Failure to Pay:

means, after the expiration of any applicable (or deemed) Grace Period (after the satisfaction of any conditions precedent to the commencement of such Grace Period), the failure by a Reference Entity to make, when and where due, any payments in an aggregate amount of not less than the Payment Requirement under one or more Obligations, in accordance with the terms of such Obligations at the time of such failure.

Payment Requirement:

USD 1,000,000 or its equivalent in any other currency.

Restructuring:

(a)   Restructuring means that, with respect to one or more



Obligations and in relation to an aggregate amount of not less than the Default Requirement, any one or more of the following events occurs in a form that binds all holders of such Obligation, is agreed between the Reference Entity or a Governmental Authority and a sufficient number of holders of such Obligation to bind all holders of the Obligation or is announced (or otherwise decreed) by a Reference Entity or a Governmental Authority in a form that binds all holders of such Obligation, and such event is not expressly provided for under the terms of such Obligation in effect as of the later of the Trade Date and the date as of which such Obligation is issued or incurred:

(i)     a reduction in the rate or amount of interest payable or the amount of scheduled interest accruals;



(ii)    a reduction in the amount of principal or premium payable at maturity or at scheduled redemption dates;

(iii)   a postponement or other deferral of a date or dates for either (A) the payment or accrual of interest or (B) the payment of principal or premium;

(iv)    a change in the ranking in priority of payment of any Obligation, causing the Subordination of such Obligation to any other Obligation; or

(v)     any change in the currency or composition of any payment of interest or principal to any currency which is not a Permitted Currency.

"Permitted Currency" means (i) the legal tender of any Group of 7 (G7) country (or any country that becomes a member of G7 if G7 expands its membership); or (ii) the legal tender of any country which, as of the date of such change, is a member of the Organisation for Economic Cooperation and Development and has a local currency long-term debt rating of either AAA or higher assigned to it by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. or any successor to the rating business thereof, Aaa or higher assigned to it by Moody's Investors Service Inc. or any successor to the rating business thereof or AAA or higher assigned to it by Fitch Ratings Limited or any successor to the rating business thereof.



(b)  Notwithstanding the provisions of (a), above, none of the following shall constitute a Restructuring:

(i)     the payment in euros of interest or principal in relation to an Obligation denominated in a currency of a Member State of the European Union that adopts or has adopted the single currency in accordance with the Treaty establishing the European Community, as amended by the Treaty on European Union;

505

(ii) the occurrence of, agreement to or announcement of any of the events described in (a)(i) to (v) due to an administrative adjustment, accounting adjustment or tax adjustment or other technical adjustment occurring in the ordinary course of business; and

(iii) the occurrence of, agreement to or announcement of any of the events described in (a)(i) to (v) in circumstances where such event does not directly or indirectly result from a deterioration in the creditworthiness or financial condition of the Reference Entity.

(c) For purposes of paragraphs (a) and (b) (above), the term Obligation shall be deemed to include Underlying Obligations for which the Reference Entity is acting as provider of a Qualifying Affiliate Guarantee or, if "All Guarantees" is specified as Applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, as provider of any Qualifying Guarantee. In the case of a Qualifying Guarantee and an Underlying Obligation, references to a Reference Entity in paragraph (a) of this definition shall be deemed to refer to the relevant Underlying Obligor and the reference to a Reference Entity in paragraph (b) of this definition shall continue to refer to such Reference Entity.

(d) With respect to a Reference Entity, unless "Multiple Holder Obligation" is specified as Not Applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, notwithstanding anything to the contrary in this definition of Restructuring the occurrence of, agreement to, or announcement of, any of the events described in (a)(i) to (v) (above) shall not be a Restructuring where the Obligation in respect of any such events is not a Multiple Holder Obligation.

"Multiple Holder Obligation" means an Obligation that (i) at the time the Credit Event Notice is delivered, is held by more than three holders that are not Affiliates of each other and (ii) with respect to which a percentage of holders (determined pursuant to the terms of the Obligation) at least equal to sixty-six-and-two-thirds is required to consent to the event which would otherwise constitute a Restructuring Credit Event, provided that (ii) above shall not apply to any Obligations which are Bonds.

Obligation Acceleration:

means one or more Obligations in an aggregate amount of not less than the Default Requirement have become due and payable before they would otherwise have been due and payable as a result of, or on the basis of, the occurrence of a default, event of default or other similar condition or event




506

(however described), other than a failure to make any required payment, in respect of the Reference Entity under one or more Obligations.

**Repudiation/Moratorium:** means the occurrence of both of the following events: (i) an authorised officer of a Reference Entity or a Governmental Authority (x) disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, one or more Obligations in an aggregate amount of not less than the Default Requirement, or (y) declares or imposes a moratorium, standstill, roll-over or deferral, whether de facto or de jure, with respect to one or more Obligations in an aggregate amount of not less than the Default Requirement and (ii) a Failure to Pay, determined without regard to the Payment Requirement, or a Restructuring, determined without regard to the Default Requirement, with respect to any such Obligation occurs on or prior to the Repudiation/Moratorium Evaluation Date.



**Credit Event Notice:** An irrevocable notice (which may be oral, including by telephone) from Buyer to Seller (with a written copy to Fitch) which describes a Credit Event that occurred during the Credit Observation Period. The Credit Event which is the subject of the Credit Event Notice need not be continuing on the date the Credit Event Notice is effective

**Credit Event Notice After Restructuring:** With respect to a Reference Entity, notwithstanding anything to the contrary in the Credit Derivative Definitions, upon the occurrence of a Restructuring Credit Event during the term of the Transaction:

(a) the Buyer may deliver multiple Credit Event Notices with respect to the Reference Entity to which such Credit Event applies (with a written copy to Fitch), each such Credit Event Notice setting forth the amount of the Floating Rate Payer Calculation Amount to which such Credit Event Notice applies (the "**Exercise Amount**");

(b) if the Buyer has delivered a Credit Event Notice that specifies an Exercise Amount that is less than the then outstanding Floating Rate Payer Calculation Amount for the Reference Entity to which such Credit Event applies, it shall be construed as if the Reference Registry contained two entries for that specific Reference Entity, one which has a Floating Rate Payer Calculation Amount equal to the Exercise Amount and, upon satisfaction of the Conditions to Settlement, will be settled in accordance with the terms herein, and the other of which will have a Floating Rate Payer Calculation Amount equal to the Floating Rate Payer Calculation Amount outstanding prior to such Credit Event Notice minus the Exercise Amount and will continue in effect; and

(c) the Exercise Amount in connection with a Credit Event Notice describing a Restructuring must be in the amount of 1,000,000 units of the currency in which the Floating

507

Rate Payer Calculation Amount is denominated or an integral multiple thereof.

Grace Period:

means the lesser of (a) the applicable grace period with respect to payments under the relevant Obligation under the terms of such Obligation in effect as of the later of the Trade Date and the date as of which such Obligation is issued or incurred and (b) 30 calendar days.

Grace Period Extension Date:

in the event of a Potential Failure to Pay occurring on or prior to the Scheduled Termination Date, and if Grace Period Extension is specified as applicable, and the relevant Grace Period ends after the Scheduled Termination Date, the Grace Period Extension Date will be (i) in the event that the Calculation Agent determines that the Potential Failure to Pay is remedied during the Grace Period, and, in the absence of further Credit Events or further Potential Failure to Pay prior to or on the Scheduled Termination Date, the later of (A) the Scheduled Termination Date, and (B) the date which is three Business Days after the date of such remedy, or (ii) in the event that such Potential Failure to Pay is not remedied (as determined by the Calculation Agent in its sole and absolute discretion) before the expiry of the Grace Period and does not result in the occurrence of a Failure to Pay occurring prior to the expiry of the Grace Period, the date that is three Business Days following the expiry of the Grace Period.

Notice of Publicly Available Information:

means an irrevocable notice from the Calculation Agent (which may be oral, including by telephone) to the Buyer and Seller (with a written copy to Fitch) that cites Publicly Available Information confirming the occurrence of the Credit Event described in the Credit Event Notice. The notice given must contain a copy, or a description in reasonable detail, of the relevant Publicly Available Information.



Event Determination Date:

means the first date on which both the Credit Event Notice and the Notice of Publicly Available Information are effective.

Potential Failure to Pay:

means the failure by any one of the Reference Entities to make, when and where due, any payments in an aggregate amount of not less than the Payment Requirement under one or more Obligations, without regard to any grace period or any conditions precedent to the commencement of any grace period applicable to such Obligations, in accordance with the terms of such Obligations at the time of such failure.

Potential Repudiation/Moratorium:

means the occurrence of an event described in clause (i) of the definition at Repudiation/Moratorium.

Repudiation/Moratorium Evaluation Date:

means, if a Potential Repudiation/Moratorium occurs on or prior to the Scheduled Termination Date, (i) if the Obligations to which such Potential Repudiation/Moratorium relates include Bonds, the date that is the later of (A) the date that is 60 days after the date of such Potential Repudiation/Moratorium and (B) the first payment under any such Bond after the date of



508

such Potential Repudiation/Moratorium (or, if later, the expiration date or of any applicable Grace Period in respect of such payment date) and (ii) if the Obligations to which such Potential Repudiation/Moratorium relates do not include Bonds, the date that is 60 days after the date of such Potential Repudiation/Moratorium.

If (i) the Repudiation/Moratorium Extension Condition is satisfied and (ii) an Event Determination Date in respect of that Repudiation/Moratorium does not occur during the Notice Delivery Period, the Repudiation/Moratorium Evaluation Date will be the Termination Date (even if a Repudiation/ Moratorium occurs after the Scheduled Termination Date).



Repudiation/Moratorium Extension Condition:

The "Repudiation/Moratorium Extension Condition" is satisfied by the delivery of a Repudiation/Moratorium Extension Notice and, if specified as applicable in the related Confirmation, Notice of Publicly Available Information by the Notifying Party to the other party that is effective during the period described in clause (a) of the definition of Notice Delivery Period.

Repudiation/Moratorium Extension Notice:

means an irrevocable notice (which may be by telephone) from Notifying Party to the other party that describes a Potential Repudiation/Moratorium that occurred during the Credit Observation Period. A Repudiation/Moratorium Extension Notice must contain a description in reasonable detail of the facts relevant to the determination that a Potential Repudiation/Moratorium has occurred and indicate the date of the occurrence. The Potential Repudiation/Moratorium that is the subject of the Repudiation/Moratorium Extension Notice need not be continuing on the date the Repudiation/Moratorium Extension Notice is effective. A Repudiation/Moratorium Extension Notice shall be subject to the requirements regarding notices set forth in Section 1.10 of the Credit Derivatives definitions.



Qualifying Guarantee:

means an arrangement evidenced by a written instrument pursuant to which a Reference Entity irrevocably agrees (by guarantee of payment or equivalent legal arrangement) to pay all amounts due under an obligation (the "**Underlying Obligation**") for which another party is the obligor (the "**Underlying Obligor**") and that is not at the time of the Credit Event Subordinated to any unsubordinated Borrowed Money obligation of the Underlying Obligor (with references in the definition of Subordination to the Reference Entity deemed to refer to the Underlying Obligor). Qualifying Guarantees shall exclude any arrangement (i) structured as a surety bond, financial guarantee insurance policy, letter of credit or equivalent legal arrangement or (ii) pursuant to the terms of which the payment obligations of the Reference Entity can be discharged, reduced or otherwise altered or assigned (other than by operation of law) as a result of the occurrence or non-

509

occurrence of an event or circumstance (other than payment). The benefit of a Qualifying Guarantee must be capable of being Delivered together with the Delivery of the Underlying Obligation.

Qualifying Affiliate Guarantee:    means a Qualifying Guarantee provided by a Reference Entity in respect of an Underlying Obligation of a Downstream Affiliate of that Reference Entity.

Downstream Affiliate:    means an entity whose outstanding Voting Shares were, at the date of issuance of the Qualifying Guarantee, more than 50 per cent. owned, directly or indirectly, by the Reference Entity.

Voting Shares:    means those shares or other interests that have power to elect the board of directors or similar governing body of an entity.



Governmental Authority:    means any de facto or de jure government (or any agency, instrumentality, ministry or department thereof), court, tribunal, administrative or other governmental authority or any other entity (private or public) charged with the regulation of the financial markets (including the central bank) of a Reference Entity or of the jurisdiction of organisation of a Reference Entity.

Convertible Obligation:    means any obligation that is convertible, in whole or in part, into Equity Securities solely at the option of holders of such obligation or a trustee or similar agent acting for the benefit only of holders of such obligation (or the cash equivalent thereof, whether the cash settlement option is that of the issuer or of (or for the benefit of) the holders of such obligation).

Exchangeable Obligation:    means any obligation that is exchangeable, in whole or in part, for Equity Securities solely at the option of holders of such obligation or a trustee or similar agent acting for the benefit only of holders of such obligation (or the cash equivalent thereof, whether the cash settlement option is that of the issuer or of (or for the benefit of) the holders of such obligation).



Accreting Obligation:    means any obligation (including, without limitation, a Convertible Obligation or an Exchangeable Obligation), the terms of which expressly provide for an amount payable upon acceleration equal to the original issue price (whether or not equal to the face amount thereof) plus an additional amount or amounts (on account of original issue discount or other accruals of interest or principal not payable on a periodic basis) that will or may accrete, whether or not (A) payment of such additional amounts is subject to a contingency or determined by reference to a formula or index, or (B) periodic cash interest is also payable.

Equity Securities:    means:

(A)    in the case of a Convertible Obligation, equity securities (including options and warrants) of the issuer of such obligation or depositary receipts representing those equity securities of the issuer of

such obligation together with any other property distributed to or made available to holders of those equity securities from time to time; and

(B)    in the case of an Exchangeable Obligation, equity securities (including options and warrants) of a person other than the issuer of such obligation or depositary receipts representing those equity securities of a person other than the issuer of such obligation together with any other property distributed to or made available to holders of those equity securities from time to time.

## Obligation and Reference Obligation Definitions

Borrowed Money:

with respect to any one of the Reference Entities, any one or more obligations (whether as principal or surety or otherwise) (excluding an obligation under a revolving credit arrangement for which there are no outstanding unpaid drawings in respect of principal) for the payment or repayment of borrowed money (which term shall include, without limitation, deposits and reimbursement obligations arising from drawings pursuant to letters of credit).

Bond:

means with respect to any one of the Reference Entities, any one or more obligations (whether as principal or surety or otherwise) in respect of borrowed money that is an obligation that is in the form of, or represented by, a bond, note (other than notes delivered pursuant to Loans), certificated debt security or other debt security, and shall not include any other type of borrowed money obligation.

Loan:

means with respect to any one of the Reference Entities, any one or more obligations (whether as principal or surety or otherwise) in respect of borrowed money that is an obligation that is documented by a term loan agreement, revolving loan agreement or other similar credit agreement, and shall not include any other type of borrowed money obligation.

Bond or Loan:

means any obligation that is either a Bond or a Loan.

Specified Currencies:

meaning (a) Standard Specified Currencies and (b) any additional currencies specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to a Reference Entity.

Standard Specified Currency:

means an obligation payable in any of the lawful currencies of Canada, Japan, Switzerland, the United Kingdom and the United States of America and the euro (and any successor currency to any of the abovementioned currencies).

Domestic Currency:

means an obligation payable in the lawful currency and any successor currency of (a) the relevant Reference Entity, if the Reference Entity is a Sovereign, or (b) the jurisdiction in which

511

the relevant Reference Entity is organised, if the Reference Entity is not a Sovereign. In no event shall Domestic Currency include any successor currency if such successor currency is the lawful currency of any of Canada, Japan, Switzerland, the United Kingdom or the United States of America or the euro (or any successor currency to any such currency).

Subordinated:

means an obligation that is subordinated to an obligation that is Not Subordinated.

Not Subordinated:

means an obligation that is not subordinated to: (i) the Benchmark Obligation specified for the relevant Reference Entity in the Reference Registry or (ii) if no Benchmark Obligation is specified for the relevant Reference Entity, any unsubordinated Borrowed Money obligation of the relevant Reference Entity. For the purposes of determining whether an obligation satisfies the "Not Subordinated" Obligation Characteristic or Reference Obligation Characteristic, the ranking in priority of payment of the Benchmark Obligation shall be determined as of the later of: (1) the Trade Date and (2) the date on which such obligation was issued or incurred and shall not reflect any change to such ranking after such later date.



Not Contingent:

means any obligation having as of the relevant Valuation Date and all times thereafter an outstanding principal balance or, in the case of obligations that are not Borrowed Money, a Due and Payable Amount, that pursuant to the terms of such obligation may not be reduced as a result of the occurrence or non-occurrence of an event or circumstance (other than payment). A Convertible Obligation, an Exchangeable Obligation and an Accreting Obligation shall satisfy the Not Contingent Reference Obligation Characteristic if such Convertible Obligation, Exchangeable Obligation or Accreting Obligation otherwise meets the requirements of the preceding sentence so long as, in the case of a Convertible Obligation or an Exchangeable Obligation, the right (A) to convert or exchange such obligation or (B) to require the issuer to purchase or redeem such obligation (if the issuer has exercised or may exercise the right to pay the purchase or redemption price, in whole or in part, in Equity Securities) has not been exercised (or such exercise has been effectively rescinded) on or before the relevant Valuation Date.



Transferable:

means an obligation that is transferable to institutional investors without any contractual, statutory or regulatory restriction, provided that none of the following shall be considered contractual, statutory or regulatory restrictions:

(A) contractual, statutory or regulatory restrictions that provide for eligibility for resale pursuant to Rule 144A or Regulation S promulgated under the United States Securities Act of 1933, as amended (and any contractual, statutory or regulatory restrictions promulgated under the

512

laws of any jurisdiction having a similar effect in relation to the eligibility for resale of an obligation); or

(B)  restrictions on permitted investments such as statutory or regulatory investment restrictions on insurance companies and pension funds,

provided that such characteristics shall be applicable only in respect of obligations that are Bonds.

Maximum Maturity 30 years:    means an obligation that has a remaining maturity from the Valuation Date of not greater than 30 years.

Not Bearer:    means any obligation that is not a bearer instrument unless interests with respect to such bearer instrument are cleared via the Euroclear system, Clearstream, Luxembourg or any other internationally recognised clearing system provided that such characteristic shall be applicable only in respect of obligations that are Bonds.



Not Sovereign Lender:    **means any obligation that is not primarily owed to a Sovereign or Supranational Organisation, including, without limitation, obligations generally referred to as "Paris Club Debt".**

Not Domestic Law:    means any obligation that is not governed by the laws of (A) the relevant Reference Entity, if such Reference Entity is a Sovereign, or (B) the jurisdiction or organisation of the relevant Reference Entity, if such Reference Entity is not a Sovereign.

Not Domestic Issuance:    means any obligation other than an obligation that was, at the time the relevant obligation was issued (or reissued, as the case may be) or incurred, intended to be offered for sale primarily in the domestic market of the relevant Reference Entity. Any obligation that is registered or qualified for sale outside the domestic market of the relevant Reference Entity (regardless of whether such obligation is also registered or qualified for sale within the domestic market of the relevant Reference Entity) shall be deemed not to be intended for sale primarily in the domestic market of the Reference Entity.



Not Domestic Currency:    means any obligation that is payable in a currency other than the Domestic Currency.

Assignable Loan:    means a Loan that is, as of the Valuation Date, capable of being assigned or novated to, at a minimum, commercial banks or financial institutions (irrespective of their jurisdiction of organisation) that are not then a lender or a member of the relevant lending syndicate, without the consent of the relevant Reference Entity or the guarantor, if any, of such Loan (or the consent of the applicable borrower if the Reference Entity is guaranteeing such Loan) or any agent, provided that such characteristics shall be applicable only in respect of obligations that are Loans.

Consent Required Loan:    means a Loan that is, as of the Event Determination Date, capable of being assigned or novated with the consent of the relevant Reference Entity or the guarantor, if any, of such Loan

(or the consent of the relevant borrower if the Reference Entity is guaranteeing such Loan) or any agent, provided that such characteristics shall be applicable only in respect of obligations that are Loans.

In the event that any Reference Obligation is a Loan which is a Consent Required Loan, the Calculation Agent will only be permitted to use a Bid Quotation from a Dealer to determine the Final Reference Obligation Price of such Reference Obligation if the Calculation Agent provided such Dealer with the information reasonably required by that Dealer to give such Bid Quotation. For the sake of clarity, information which may be reasonably requested by such Dealer (and which shall be provided by the Calculation Agent if requested in respect of such Bid Quotation) may include any of the following:

(1)    the name of the debtor;

(2)    the governing law;

(3)    guarantee (existence and description);

(4)    surety (existence and description);

(5)    description of the covenants;

(6)    maturity and amortisation profile;

(7)    coupon;

(8)    revolver or term loan;

(9)    drawn or not; and

(10)    the effective date of the loan.

### Certain additional definitions with respect to Restructuring



"**Restructuring Maturity Limitation Date**" means, with respect to a Reference Entity for which Restructuring Maturity Limitation is specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, the date that is the earlier of (x) 30 months following the Restructuring Date and (y) the latest final maturity date of any Restructured Bond or Loan, provided, however, that under no circumstances shall the Restructuring Maturity Limitation Date be earlier than the Scheduled Termination Date or later than 30 months following the Scheduled Termination Date and, if it is, it shall be deemed to be the Scheduled Termination Date or 30 months following the Scheduled Termination Date, as the case may be.

"**Restructuring Date**" means, with respect to a Restructured Bond or Loan, the date on which a Restructuring is legally effective in accordance with the terms of the documentation governing such Restructuring.

"**Restructured Bond or Loan**" means an Obligation which is a Bond or Loan and in respect of which the Restructuring that is the subject of a Credit Event Notice has occurred.

"**Eligible Transferee**" means each of the following:

(a)

(i)    any bank or other financial institution;

(ii)    an insurance or reinsurance company;

514

(iii)    a mutual fund, unit trust or similar collective investment vehicle (other than an entity specified in clause (c)(i) below); and

(iv)    a registered or licensed broker or dealer (other than a natural person or proprietorship);

provided, however, in each case that such entity has total assets of at least USD500 million;

an Affiliate of an entity specified in the preceding clause (a);

each of a corporation, partnership proprietorship, organisation, trust or other entity

(i)    that is an investment vehicle (including, without limitation, any hedge fund, issuer of collateralised debt obligations, commercial paper conduit or other special purpose vehicle) that (1) has total assets of at least USD100 million or (2) is one of a group of investment vehicles under common control or management having, in the aggregate, total assets of at least USD100 million; or

(ii)    that has total assets of at least USD500 million; or



(iii)    the obligations of which under an agreement, contract, or transaction are guaranteed or otherwise supported by a letter of credit or keepwell, support, or other agreement by an entity described in clauses (a), (b), (c)(ii) or (d); and

a Sovereign, Sovereign Agency or Supranational Organisation;

All references in this definition of USD include equivalent amounts in other currencies.

**"Fully Transferable Obligation"** means, with respect to a Reference Entity for which Fully Transferable Obligation is specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, a Reference Obligation that is either Transferable, in the case of Bonds, or capable of being assigned or novated to all Eligible Transferees without the consent of any person being required, in the case of any Reference Obligation other than Bonds. For purposes of determining whether a Reference Obligation is Transferable or is capable of being assigned or novated to Eligible Transferees, such determination shall be made as of the Valuation Date for the portion of the Reference Obligation to be valued on such Valuation Date, taking into account only the terms of the Reference Obligation and any related transfer or consent documents which have been obtained by the Issuer.

Any requirement that notification of transfer of a Reference Obligation be provided to a trustee, fiscal agent, administrative agent, clearing agent or paying agent for any Reference Obligation shall not be considered to be a requirement for consent for purposes of the definitions of Restructuring Maturity Limitation and Fully Transferable Obligation.

**"Modified Restructuring Maturity Limitation Date"** means, with respect to a Reference Entity for which Modified Restructuring Maturity Limitation is specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, the date that is the later of (x) the Scheduled Termination Date and (y) 60 months following the Restructuring Date in the case of a Restructured Bond or Loan, or 30 months following the Restructuring Date in the case of all other Reference Obligations.

**"Modified Eligible Transferee"** means any bank, financial institution or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities and other financial assets.

**"Conditionally Transferable Obligation"** means, with respect to a Reference Entity for which Conditionally Transferable Obligation is specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, a Reference Obligation that is either Transferable, in the case of Bonds, or capable of being assigned or novated to all Modified Eligible Transferees without the consent of any person being required, in the case of any Reference Obligation other than Bonds, provided, however, that a Reference Obligation other than Bonds will be a

515

Conditionally Transferable Obligation notwithstanding that consent of the Reference Entity or the guarantor, if any, of a Reference Obligation other than Bonds (or the consent of the relevant obligor if a Reference Entity is guaranteeing such Reference Obligation) or any agent is required for such novation, assignment or transfer so long as the terms of such Reference Obligation provide that such consent may not be unreasonably withheld or delayed. Any requirement that notification of novation, assignment or transfer of a Reference Obligation be provided to a trustee, fiscal agent, administrative agent, clearing agent or paying agent for a Reference Obligation shall not be considered to be a requirement for consent for purposes of this definition.

For purposes of determining whether a Reference Obligation satisfies the requirements of the definition of Conditionally Transferable Obligation, such determination shall be made as of the Valuation Date for the portion of the Reference Obligation to be valued on such Valuation Date, taking into account only the terms of the Reference Obligation and any related transfer or consent documents which have been obtained by the Issuer.

### Certain definitions relating to Successors



(b)    In relation to a Reference Entity that is not a Sovereign, "**Successor**" means the entity or entities, if any, determined as set forth below:

(v)    if an entity directly or indirectly succeeds to 75 per cent. or more of the Relevant Obligations of the Reference Entity by way of a Succession Event, that entity will be the sole Successor;

(vi)    if one entity directly or indirectly succeeds to more than 25 per cent. (but less than 75 per cent.) of the Relevant Obligations of the Reference Entity by way of a Succession Event, and not more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, the entity that succeeds to more than 25 per cent. of the Relevant Obligations will be the sole Successor;

(vii)    if more than one entity each directly or indirectly succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity by way of a Succession Event, and not more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, the entities that succeed to more than 25 per cent. of the Relevant Obligations will each be Successors;



(viii)    if one or more entities each directly or indirectly succeed to more than 25 per cent. of the Relevant Obligations of the Reference Entity by way of a Succession Event, and more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, each such entity and the Reference Entity will be Successors;

(ix)    if one or more entities directly or indirectly succeed to a portion of the Relevant Obligations of the Reference Entity by way of a Succession Event, but no entity succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity and the Reference Entity continues to exist, there will be no Successor and the Reference Entity and the Transaction will not be changed in any way as a result of the Succession Event; and

(x)    if one or more entities directly or indirectly succeed to a portion of the Relevant Obligations of the Reference Entity by way of a Succession Event, but no entity succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity and the Reference Entity ceases to exist, the entity which succeeds to the greatest percentage of Relevant Obligations (or, if two or more entities succeed to an equal percentage of Relevant Obligations, the entity from among those entities which succeeds to the greatest percentage of obligations) of the Reference Entity will be the sole Successor.

The Calculation Agent will be responsible for determining, as soon as reasonably practicable after it becomes aware of the relevant Succession Event (but no earlier than 14 days after the legally effective date of the Succession Event), and with effect from the legally effective date of the Succession Event,

516

whether the relevant thresholds set forth above have been met, or which entity qualifies under paragraph (a)(vi) above, as applicable. In calculating the percentages used to determine whether the relevant thresholds set forth above have been met, or which entity qualifies under paragraph (a)(vi) above, as applicable, the Calculation Agent shall use, in respect of each applicable Relevant Obligation included in such calculation, the amount of the liability in respect of such Relevant Obligation listed in the Best Available Information.

"Succession Event" means an event such as a merger, consolidation, amalgamation, transfer of assets or liabilities, demerger, spin-off or other similar event in which one entity succeeds to the obligations of another entity, whether by operation of law or pursuant to any agreement. Notwithstanding the foregoing, "Succession Event" shall not include an event in which the holders of obligations of the Reference Entity exchange such obligations for the obligations of another entity, unless such exchange occurs in connection with a merger, consolidation, amalgamation, transfer of assets or liabilities, demerger, spin-off or other similar event.

Where, pursuant to Section (a) above, one or more Successors have been identified in relation to a particular Reference Entity:



(xi)     each such Successor will be a Reference Entity (a "Successor Reference Entity") for the purposes of this Transaction (and, for the avoidance of doubt, the original Reference Entity shall cease to be a Reference Entity except where it is a Successor Reference Entity); and

(xii)    the Floating Rate Payer Calculation Amount in respect of each such Successor Reference Entity shall be the Floating Rate Payer Calculation Amount in respect of the original Reference Entity divided by the number of Successor Reference Entities.

"Relevant Obligations" means the Obligations constituting Bonds and Loans of the Reference Entity outstanding immediately prior to the effective date of the Succession Event, excluding any debt obligations outstanding between the Reference Entity and any of its Affiliates, as determined by the Calculation Agent. The Calculation Agent will determine the entity which succeeds to such Relevant Obligations on the basis of the Best Available Information. If the date on which the Best Available Information becomes available or is filed precedes the legally effective date of the relevant Succession Event, any assumptions as to the allocation of obligations between or among entities contained in the Best Available Information will be deemed to have been fulfilled as of the legally effective date of the Succession Event, whether or not this is in fact the case.

"Best Available Information" means:



(i)      in the case of a Reference Entity which files information with its primary securities regulator or primary stock exchange that includes unconsolidated, pro forma financial information which assumes that the relevant Succession Event has occurred or which provides such information to its shareholders, creditors or other persons whose approval of the Succession Event is required, that unconsolidated, pro forma financial information and, if provided subsequently to the provision of unconsolidated, pro forma financial information but before the Calculation Agent makes its determination for the purposes of the definition of "Successor", other relevant information that is contained in any written communication provided by the Reference Entity to its primary securities regulator, primary stock exchange, shareholders, creditors or other persons whose approval of the Succession Event is required; or

(ii)     in the case of a Reference Entity which does not file with its primary securities regulators or primary stock exchange, and which does not provide to shareholders, creditors or other persons whose approval of the Succession Event is required, the information contemplated in (i) above, the best publicly available information at the disposal of the Calculation Agent to allow it to make a determination for the purposes of the definition of "Successor".

Information which is made available more than 14 days after the legally effective date of the Succession Event shall not constitute Best Available Information.

517

In relation to a Sovereign Reference Entity, "Successor" means any direct or indirect successor(s) to that Reference Entity irrespective of whether such successor(s) assumes any of the obligations of such Reference Entity.

"Sovereign" means any state, political subdivision or government, or any agency, instrumentality, ministry, department or other authority (including, without limiting the foregoing, the central bank) thereof.

### Additional Terms For Monolines

(c)     Qualifying Policy. "Qualifying Policy" means a financial guaranty insurance policy or similar financial guarantee pursuant to which a Reference Entity irrevocably guarantees or insures all Instrument Payments (as defined below) of an instrument that constitutes Borrowed Money (modified as set forth below) (the "Insured Instrument") for which another party (including a special purpose entity or trust) is the obligor (the "Insured Obligor"). Qualifying Policies shall exclude any arrangement (i) structured as a surety bond, letter of credit or equivalent legal arrangement or (ii) pursuant to the express contractual terms of which the payment obligations of the Reference Entity can be discharged or reduced as a result of the occurrence or non-occurrence of an event or circumstance (other than the payment of Instrument Payments). The benefit of a Qualifying Policy must be capable of being Delivered together with the Delivery of the Insured Instrument.



"Instrument Payments" means (A) in the case of any Insured Instrument that is in the form of a pass-through certificate or similar funded beneficial interest, (x) the specified periodic distributions in respect of interest or other return on the Certificate Balance on or prior to the ultimate distribution of the Certificate Balance and (y) the ultimate distribution of the Certificate Balance on or prior to a specified date and (B) in the case of any other Insured Instrument, the scheduled payments of principal and interest, in the case of both (A) and (B) (1) determined without regard to limited recourse or reduction provisions of the type described in paragraph (d) below and (2) excluding sums in respect of default interest, indemnities, tax gross-ups, make-whole amounts, early redemption premiums and other similar amounts (whether or not guaranteed or insured by the Qualifying Policy).

"Certificate Balance" means, in the case of an Insured Instrument that is in the form of a pass-through certificate or similar funded beneficial interest, the unit principal balance, certificate balance or similar measure of unreimbursed principal investment.

**Obligation and Reference Obligation.** Sections 2.14(a) and 2.15(a) of the Definitions are hereby amended by adding "or Qualifying Policy" after "or as provider of a Qualifying Affiliate Guarantee".

**Interpretation of Provisions.** In the case of a Reference Entity in respect of which Monoline is specified as applicable in Reference Registry, in the event that an Obligation or a Reference Obligation is a Qualifying Policy, the terms of Section 2.21(d) of the Definitions (which shall for the purpose of this Transaction be construed so that references therein to Deliverable Obligations, Deliverable Obligation Category and Deliverable Obligation Characteristics shall be deemed to be references to Reference Obligations, Reference Obligation Category and Reference Obligation Characteristics respectively) will apply, with references to the Qualifying Guarantee, the Underlying Obligation and the Underlying Obligor deemed to include the Qualifying Policy, the Insured Instrument and the Insured Obligor, respectively, except that:

    (xiii)    the Obligation Category Borrowed Money and the Obligation Category and Reference Obligation Category Bond shall be deemed to include distributions payable under an Insured Instrument in the form of a pass-through certificate or similar funded beneficial interest, the Reference Obligation Category Bond shall be deemed to include such an Insured Instrument, and the terms "obligation" and "obligor" as used in the 2003 ISDA Credit Derivatives Definitions in respect of such an Insured Instrument shall be construed accordingly;

    (iii)    references in the definitions of Assignable Loan and Consent Required Loan to the guarantor and guaranteeing shall be deemed to include the insurer and insuring, respectively;

518

(iv) neither the Qualifying Policy nor the Insured Instrument must satisfy on the relevant date the Reference Obligation Characteristic of Accelerated or Matured, whether or not that characteristic is otherwise specified as applicable herein;

(v) if the Assignable Loan, Consent Required Loan, Direct Loan Participation or Transferable Reference Obligation Characteristics are specified herein and if the benefit of the Qualifying Policy is not transferred as part of any transfer of the Insured Instrument, the Qualifying Policy must be transferable at least to the same extent as the Insured Instrument; and

(vi) with respect to an Insured Instrument in the form of a pass-through certificate or similar funded beneficial interest, the term "outstanding principal balance" shall mean the outstanding Certificate Balance and "maturity", as such term is used in the Maximum Maturity Reference Obligation Characteristic, shall mean the specified date by which the Qualifying Policy guarantees or insures, as applicable, that the ultimate distribution of the Certificate Balance will occur.



**Not Contingent.** An Insured Instrument will not be regarded as failing to satisfy the Not Contingent Reference Obligation Characteristic solely because such Insured Instrument is subject to provisions limiting recourse in respect of such Insured Instrument to the proceeds of specified assets (including proceeds subject to a priority of payments) or reducing the amount of any Instrument Payments owing under such Insured Instrument, provided that such provisions are not applicable to the Qualifying Policy by the terms thereof and the Qualifying Policy continues to guarantee or insure, as applicable, the Instrument Payments that would have been required to be made absent any such limitation or reduction.

**Deliver.** For purposes of Section 8.2 of the Definitions, "Deliver" with respect to an obligation that is a Qualifying Policy means to Deliver both the Insured Instrument and the benefit of the Qualifying Policy (or a custodial receipt issued by an internationally recognized custodian representing an interest in such an Insured Instrument and the related Qualifying Policy), and "Delivery" and "Delivered" will be construed accordingly.

**Provisions for Determining a Successor.** Section 2.2(c) of the Definitions is hereby amended by adding "or insurer" after "or guarantor".

**Substitute Reference Obligation.** Section 2.30 of the Definitions is hereby amended by adding "or Qualifying Policy" after "or as provider of a Qualifying Affiliate Guarantee" in the definition of Substitute Reference Obligation and paragraph (b) thereof. For purposes of Section 2.30(a)(ii)(B) and Section 1.14(b)(ii) of the Definitions, references to the Qualifying Guarantee and the Underlying Obligation shall be deemed to include the Qualifying Policy and the Insured Instrument, respectively.



**Other Provisions.** For purposes of Sections 2.15(a)(ii), 4.1, 8.2, 9.1 and 9.2(a) of the Definitions, references to the Underlying Obligation and the Underlying Obligor shall be deemed to include Insured Instruments and the Insured Obligor, respectively.

## Schedule C

The standard terms relating to each Entity Type are set out in this Schedule C.

### STANDARD TERMS FOR WESTERN EUROPEAN ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Applicable

Multiple Holder Obligation: Applicable



| | |
|---|---|
| Grace Period Extension | Not Applicable |
| Obligation | |

| | |
|---|---|
| Obligation Category: | Borrowed Money |
| Obligation Characteristics: | None |

**Reference Obligation**

| | | |
|---|---|---|
| Reference Obligation Category: | | Bond or Loan |
| Reference Obligation Characteristics: | | Not Subordinated Specified Currency – Standard Specified Currencies Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity 30 years Not Bearer |

Exclude Accrued Interest

520

## STANDARD TERMS FOR WESTERN EUROPEAN INSURANCE ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Applicable

| | |
|---|---|
| Grace Period Extension: | Not Applicable |
| Obligation | |



| | |
|---|---|
| Obligation Category: | Borrowed Money |
| Obligation Characteristics: | None |

Reference Obligation

| | | |
|---|---|---|
| Reference Obligation Category: | | Bond or Loan |
| Reference Obligation Characteristics: | | Not Subordinated |
| | | Specified Currency - Standard Specified Currencies |
| | | Not Contingent |
| | | Assignable Loan |
| | | Consent Required Loan |
| | | Transferable |
| | | Maximum Maturity 30 years |
| | | Not Bearer |

Exclude Accrued Interest

521

## STANDARD TERMS FOR AUSTRALIAN AND NEW ZEALAND ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Applicable

| | |
|---|---|
| Grace Period Extension | Not Applicable |
| Obligation | |



| | |
|---|---|
| Obligation Category: | Borrowed Money |
| Obligation Characteristics: | None |
| Reference Obligation | |

| | |
|---|---|
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard Specified Currencies, plus AUD and NZD |
| | Not Contingent |
| | Assignable Loan |
| | Consent Required Loan |
| | Transferable |
| | Maximum Maturity 30 years |
| | Not Bearer |

Exclude Accrued Interest

522

## STANDARD TERMS FOR JAPANESE ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Not Applicable

Section 3.9 of the Credit Derivatives Definitions shall not apply.



| | |
|---|---|
| Grace Period Extension | Not Applicable |
| Obligation | |

| | |
|---|---|
| Obligation Category: | Borrowed Money |
| Obligation Characteristics: | Not Subordinated |

Reference Obligation

| | |
|---|---|
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard Specified Currencies |
| | Not Contingent |
| | Assignable Loan |
| | Consent Required Loan |
| | Transferable |
| | Maximum Maturity 30 years |
| | Not Bearer |

Exclude Accrued Interest

## STANDARD TERMS FOR SINGAPOREAN ENTITIES

All Guarantees                     Applicable

Credit Events                      Bankruptcy

Failure to Pay

Restructuring

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Applicable

Repudiation/Moratorium (applicable only to Sovereigns)



Grace Period Extension             Not Applicable
Obligation

| Obligation Category: | Bond or Loan |
| --- | --- |
| Obligation Characteristics: | Not Subordinated<br>Specified Currency – Standard Specified Currencies, plus SGD<br>Not Sovereign Lender |

Reference Obligation

| Reference Obligation Category: | Bond or Loan |
| --- | --- |
| Reference Obligation Characteristics: | Not Subordinated<br>Specified Currency – Standard Specified Currencies, plus SGD<br>Not Sovereign Lender<br>Not Contingent<br>Assignable Loan<br>Transferable<br>Maximum Maturity 30 years<br>Not Bearer |

Exclude Accrued Interest

524

## STANDARD TERMS FOR ASIA SOVEREIGN

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Applicable

Repudiation/Moratorium

| | |
|---|---|
| Grace Period Extension | Not Applicable |



Obligation

| | |
|---|---|
| Obligation Category: | Bond or Loan |
| Obligation Characteristics: | Not Subordinated |
| | Not Sovereign Lender |
| | Not Domestic Currency |
| | Not Domestic Issuance |
| | Not Domestic Law |

Reference Obligation

| | |
|---|---|
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard Specified Currencies |
| | Not Sovereign Lender |
| | Not Domestic Law |
| | Not Contingent |
| | Not Domestic Issuance |
| | Assignable Loan |
| | Transferable |
| | Maximum Maturity 30 years |
| | Not Bearer |

Exclude Accrued Interest

## STANDARD TERMS FOR ASIAN ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Applicable



| | |
|---|---|
| Grace Period Extension | Not Applicable |
| Obligation | |

| | |
|---|---|
| Obligation Category: | Bond or Loan |
| Obligation Characteristics: | Not Subordinated |
| | Not Sovereign Lender |
| | Not Domestic Currency |
| | Not Domestic Issuance |
| | Not Domestic Law |

Reference Obligation

| | |
|---|---|
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard Specified Currencies |
| | Not Sovereign Lender |
| | Not Domestic Law |
| | Not Contingent |
| | Not Domestic Issuance |
| | Assignable Loan |
| | Transferable |
| | Maximum Maturity 30 years |
| | Not Bearer |
| | Exclude Accrued Interest |

526

STANDARD TERMS FOR NORTH AMERICAN ENTITIES

| | |
|---|---|
| All Guarantees | Not Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Applicable

| | |
|---|---|
| Grace Period Extension | Not Applicable |
| Obligation | |



Obligation Category:          Borrowed Money

Obligation Characteristics:    None

Reference Obligation

Reference Obligation Category:    Bond or Loan

Reference Obligation Characteristics:    Not Subordinated
Specified Currency – Standard Specified Currencies
Not Contingent
Assignable Loan
Consent Required Loan
Transferable
Maximum Maturity 30 years
Not Bearer

Exclude Accrued Interest

527

## STANDARD TERMS FOR NORTH AMERICAN HIGH YIELD ENTITIES

| | |
|---|---|
| All Guarantees | Not Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| Grace Period Extension | Not Applicable |
| Obligation | |

|  | Obligation Category: | Borrowed Money |
|---|---|---|
| | Obligation Characteristics: | None |

Reference Obligation



| | Reference Obligation Category: | Bond or Loan |
|---|---|---|
| | Reference          Obligation Characteristics: | Not Subordinated |
| | | Specified Currency  –  Standard Specified Currencies |
| | | Not Contingent |
| | | Assignable Loan |
| | | Consent Required Loan |
| | | Transferable |
| | | Maximum Maturity 30 years |
| | | Not Bearer |
| | Exclude Accrued Interest | |

528

## STANDARD TERMS FOR EMERGING MARKET SOVEREIGNS**

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Failure to Pay |
| | Obligation Acceleration |
| | Repudiation/ Moratorium |
| | Restructuring |

      Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

      Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

      Multiple Holder Obligation: Not Applicable

| | |
|---|---|
| Grace Period Extension | Applicable |
| Obligation | |

| | |
|---|---|
| Obligation Category: | Bond |
| Obligation Characteristics: | Not Subordinated |
| | Not Domestic Currency |
| | Not Domestic Law |
| | Not Domestic Issuance |

Reference Obligation

| | |
|---|---|
| Reference Obligation Category: | Bond |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard Specified Currencies |
| | Not Domestic Law |
| | Not Contingent |
| | Not Domestic Issuance |
| | Transferable |
| | Not Bearer |

Exclude Accrued Interest

** Additional Provisions for the Russian Federation (August 13, 2004) will apply to the Russian Federation Reference Entity.

529

## STANDARD TERMS FOR RUSSIAN ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Obligation Acceleration |
| | Repudiation/Moratorium |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Not Applicable with respect to Obligation Category of "Bonds"; Applicable with respect to Obligation Category of "Loans".



| | |
|---|---|
| Grace Period Extension | Applicable |
| Obligation | |

| | |
|---|---|
| Obligation Category: | Bond or Loan |
| Obligation Characteristics: | Not Subordinated |
| | Not Domestic Currency |
| | Not Domestic Law |
| | Not Domestic Issuance |

Reference Obligation

| | |
|---|---|
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard |
| | Specified Currencies |
| | Not Domestic Law |
| | Not Contingent |
| | Not Domestic Issuance |
| | Transferable |
| | Not Bearer |
| | Assignable Loan |
| | Consent Required Loan |

Exclude Accrued Interest

530

## STANDARD TERMS FOR EMERGING MARKETS ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Obligation Acceleration |
| | Repudiation/Moratorium |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Not Applicable



**Grace Period Extension** Applicable

**Obligation**

| | |
|---|---|
| Obligation Category: | Bond or Loan |
| Obligation Characteristics: | Not Subordinated |
| | Not Domestic Currency |
| | Not Domestic Law |
| | Not Domestic Issuance |

**Reference Obligation**



| | |
|---|---|
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard Specified Currencies |
| | Not Domestic Law |
| | Not Contingent |
| | Not Domestic Issuance |
| | Transferable |
| | Not Bearer |
| | Assignable loan |
| | Consent required loan |

Exclude Accrued Interest

## STANDARD TERMS FOR LATIN AMERICAN ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| |    Grace Period Extension: Applicable |
| | Obligation Acceleration |
| | Repudiation/Moratorium |
| | Restructuring |

    Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

    Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

    Multiple Holder Obligation: Not Applicable



**Obligation**

| | |
|---|---|
| Obligation Category: | Bond or Loan |
| Obligation Characteristics: | Not Subordinated |
| | Not Domestic Currency |
| | Not Domestic Law |
| | Not Domestic Issuance |

**Reference Obligation**

| | |
|---|---|
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard Specified Currencies |
| | Not Domestic Law |
| | Not Contingent |
| | Not Domestic Issuance |
| | Transferable |
| | Not Bearer |
| | Assignable Loan |
| | Consent Required Loan |

Exclude Accrued Interest

532

## STANDARD TERMS FOR KAZAKHSTAN ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Obligation Acceleration |
| | Repudiation/Moratorium |
| | Restructuring |

    Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

    Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation:  Not Applicable

    Multiple Holder Obligation: Not Applicable

 Grace Period Extension    Not Applicable
Obligation

| | |
|---|---|
| Obligation Category: | Bond or Loan |
| Obligation Characteristics: | Not Subordinated |
| | Not Domestic Currency |
| | Not Domestic Law |
| | Not Domestic Issuance |

Reference Obligation

| | |
|---|---|
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard |
| | Specified Currencies |
| | Not Domestic Law |
| | Not Contingent |
| | Not Domestic Issuance |
| | Transferable |
| | Not Bearer |
| | Assignable Loan |
| | Consent Required Loan |

Exclude Accrued Interest

533

For the avoidance of doubt, "Assignable Loan" and "Consent Required Loan" shall not apply to Obligations, which are Bonds.

Obligations that are in the form of a "Loan" need only satisfy one of the characteristics "Assignable Loan" and "Consent Required Loan".





534