**EXHIBIT G**

EXECUTION COPY

**SERIES PROSPECTUS**

## ZIRCON FINANCE LIMITED
*(incorporated with limited liability in the Cayman Islands)*
### SERIES NO: 2007-9
### Tranche A AUD30,000,000
### SYNTHETIC PORTFOLIO NOTES DUE 2013 ("TRANCHE A NOTES" OR "NOTES")

Issue Price: 100 per cent.

issued pursuant to the

Multi-Issuer

Secured Obligation Programme

arranged by

### LEHMAN BROTHERS INTERNATIONAL (EUROPE)

The date of this Series Prospectus is 6 June 2007.

Under the Multi-Issuer Secured Obligation Programme (the "**Programme**"), Zircon Finance Limited (the "**Issuer**") may from time to time issue Notes and other secured obligations on the terms set out in the Base Prospectus dated 21 July 2006 relating to the Programme, as supplemented by an Issuer Disclosure Annex dated 20 March 2007 in respect of the Issuer (together, the "**Base Prospectus**") as supplemented, in relation to each issue, by a Series Prospectus applicable to such issue. This Series Prospectus is the Series Prospectus applicable to the issue by the Issuer of its Series 2007-9 Tranche A AUD30,000,000 Synthetic Portfolio Notes due 2013 (the "**Tranche A Notes**" or the "**Notes**"). Terms defined in the Base Prospectus have the same meaning in this Series Prospectus.

The obligations of the Issuer under the Notes will be secured as described in "Security Arrangements".

This Series Prospectus is supplemental to, and should be read in conjunction with, the Base Prospectus. Subject as set out below, the Issuer accepts responsibility for the information contained in this Series Prospectus. To the best of the knowledge and belief of the Issuer, the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information.



The delivery of the Series Prospectus at any time does not imply that any information contained therein is correct at any time subsequent to the date hereof. The information on page 27 in relation to the Collateral (as defined herein), the information on page 51 in relation to the Reference Registry (as defined herein), the information on page 115 in relation to the Portfolio Manager and the information on page 114 in relation to the Swap Counterparty and the Swap Guarantor has, in each case, been accurately extracted from publicly available information. So far as the Issuer is aware and is able to ascertain from information published in relation to the Reference Registry, the Collateral, the Portfolio Manager, the Swap Counterparty and the Swap Guarantor, no facts have been omitted which would render the reproduced information misleading.

The Notes are expected on issue to be assigned a rating of "AA" by Fitch, Inc., Fitch Ratings, Ltd. and their subsidiaries and any successor or successors thereto ("Fitch"), however there is no assurance that the Issuer will be able to obtain such a rating for the Notes as it is subject to Fitch's information and other requirements. A security rating is not a recommendation to buy, sell or hold securities and may be subject to suspension, reduction or withdrawal at any time. A suspension, reduction or withdrawal of the rating assigned to the Notes may adversely affect the market price of the Notes. The occurrence of one or more Credit Events and/or a suspension, reduction or withdrawal of the rating assigned to any Reference Entity may result in a severe reduction of the rating assigned to the Notes.



**Purchasers of Notes should note that the Notes are credit-linked to the Reference Entities from time to time comprised in the Reference Registry and that the Reference Registry itself may be amended from time to time in accordance with the instructions of the Portfolio Manager pursuant to the Portfolio Management Agreement, the form of which is set out in Exhibit B to the Swap Agreement. The performance of any investment in the Notes will be dependent on the Reference Entities from time to time comprised in the Reference Registry, the composition of which will be subject to substitution in accordance with the terms of the Portfolio Management Agreement. Purchasers of Notes should note that certain substitutions in accordance with the terms of the Portfolio Management Agreement may result in a downgrade of the rating assigned to the Notes. Purchasers of Notes should also note that the Reference Registry will become static upon the termination of the Portfolio Management Agreement. The Portfolio Manager is not an Affiliate (as defined in the 2003 ISDA Credit Derivatives Definitions) of the Swap Counterparty.**

In addition to the Notes being credit-linked to the Reference Entities, holders of the Notes will also have exposure to the Collateral. Impairment of the Collateral may result in a negative rating action on the Notes.

Purchasers of Notes should conduct such independent investigation and analysis regarding the Issuer, the Portfolio Management Agreement, the security arrangements and the Notes as they deem appropriate to evaluate the merits and risks of an investment in the Notes. In particular, purchasers should note that the credit

risk of the Notes includes that of the Collateral, the Swap Counterparty and the Reference Entities and that the Notes allow a purchaser to obtain the stated coupon in exchange for assuming such credit risk. The coupon and Initial Principal Amount may be at risk if one or more Credit Events occur during the Credit Observation Period and in certain circumstances the Notes may redeem at zero. There is no active trading market for the Notes and it is highly unlikely that an active secondary market for the Notes will develop. Accordingly a lack of liquidity and price volatility may exist.

The Arranger makes no representation, recommendation or warranty, express or implied, regarding the accuracy, adequacy, reasonableness or completeness of the information contained herein or in any further information, notice or other document which may at any time be supplied in connection with the Notes and accepts no responsibility or liability therefor.

The Notes will be issued on the terms set out in this Series Prospectus read together with the Base Prospectus.

This Series Prospectus does not constitute, and may not be used for the purposes of, an offer or solicitation by anyone in any jurisdiction in which such offer or solicitation is not authorised or to any person to whom it is unlawful to make such offer or solicitation, and no action is being taken to permit an offering of the Notes or the distribution of this Series Prospectus or any other offering material in any jurisdiction where such action is required.



In this Series Prospectus, references to "USD", "US$" and "U.S. dollars" are to United States dollars and references to "AUD" and "A$" are to Australian dollars.

Pursuant to an order of the High Court of Justice in England and Wales dated 3 April 2007 with effect from 19 May 2007 (the "Court Order"), all rights and obligations of JPMorgan Chase Bank, N.A. in any capacity in relation to all documents entered into in connection with the Programme (including all the existing Series of Notes) were transferred to The Bank of New York, in the manner and to the extent provided in the Court Order.



## Table of Contents

Page

TERMS AND CONDITIONS OF THE NOTES ................................................................4

ANNEX 1 - USE OF PROCEEDS ................................................................26

ANNEX 2 - THE COLLATERAL................................................................27

ANNEX 3 – FORM OF SWAP CONFIRMATION................................................................29

Schedule A Annex 1 Reference Registry................................................................51

Schedule B Additional Definitions................................................................56

Schedule C ................................................................73

Annex A PARAGRAPH 11 of the CREDIT SUPPORT ANNEX................................................................88

Exhibit A GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC. ................................................................93

Exhibit B PORTFOLIO MANAGEMENT AGREEMENT................................................................95

Appendix A ................................................................110

ANNEX 4 - DESCRIPTION OF THE SWAP COUNTERPARTY AND THE SWAP GUARANTOR ..........114

ANNEX 5 – DESCRIPTION OF THE PORTFOLIO MANAGER ................................................................115



## TERMS AND CONDITIONS OF THE NOTES

The terms of the Tranche A Notes and additional provisions relating to their issue are as follows.

Capitalised terms used but not otherwise defined in these Conditions shall have the meanings given to such terms in the Swap Confirmation, the form of which is set out in Annex 3 hereto.

The Notes are credit-linked to the Reference Entities for the time being comprised in the Reference Registry maintained by the Calculation Agent in accordance with the Swap Confirmation.

The Reference Registry in effect as of the Issue Date is set out in Schedule A to the Swap Confirmation.

| | | |
|---|---|---|
| 1 | Issuer: | Zircon Finance Limited. |
| 2 | Series No: | 2007-9. |
| 3 | Tranche No: | Not applicable. |
| 4 | ISIN (N.B. see paragraph 55 below for Common Code): | AU3FN0002937. |
| | Note Reference: | ZCON05. |
| 5 | Currency: | Australian dollars ("AUD"). |
| 6 | Principal Amount of Tranche: | |
| | (i)  Initial Principal Amount: | AUD30,000,000. |



The Aggregate Outstanding Principal Amount (as defined below) of the Notes is subject to reduction from time to time in accordance with the provisions set out below.

(ii)  Reduction of Principal Amount:

If, at any time, the Swap Counterparty under the Swap Agreement determines that one or more Credit Events has or have occurred during the Credit Observation Period with respect to a Reference Entity, a Benchmark Obligation or an Obligation of a Reference Entity and the Conditions to Settlement with respect to such Credit Event have been satisfied by the Swap Counterparty, the aggregate Outstanding Principal Amount of the Notes (the "**Aggregate Outstanding Principal Amount**" of the Notes) will be reset by the Calculation Agent with effect from the relevant Event Determination Date with respect to such Credit Event(s) so as to equal:

(i)   the Initial Principal Amount of the Notes, minus

(ii)  the amount (if any) by which the Cumulative Loss Amount (following calculation of the Cash Settlement Amount in respect of such Credit Event(s)) exceeds the Subordination Amount, subject to a minimum of zero.

The "**Outstanding Principal Amount**" means, with respect to each Note at any time, an amount in AUD (rounded to the nearest cent with one half cent being rounded up) equal to the Aggregate Outstanding Principal Amount of the Notes, divided by the total number of Notes outstanding as at such time, as determined by the Calculation Agent in its sole

discretion.

The Calculation Agent hereunder shall determine the amount by which the Aggregate Outstanding Principal Amount is reduced and the date of such reduction in accordance with the amounts notified to it by the Calculation Agent pursuant to the Swap Agreement, whereupon the Outstanding Principal Amount of each Note shall be reduced pro rata.

The Calculation Agent shall promptly notify the Issuer, the Trustee, the Principal Paying Agent, Fitch, Inc., Fitch Ratings Ltd. and their subsidiaries and any successor or successors thereto ("Fitch") and the Swap Counterparty of any reduction of the Aggregate Outstanding Principal Amount of the Notes hereunder. Notwithstanding anything to the contrary contained in Condition 14, upon receipt of such notification from the Calculation Agent, the Principal Paying Agent shall promptly notify Noteholders of the same in accordance with the Conditions.

| 7 | Issue Date: | | 6 June 2007. |
|---|---|---|---|
| 8 | Form: | | |
| | (a) | Form of Notes | Registered. The Notes will be issued in registered uncertificated (or inscribed) form. They will be debt obligations of the Issuer which are constituted by, and owing under, the Trust Deed and take the form of entries on the Register to be maintained by the Registrar. |
| | (b) | Registrar | BTA Institutional Services Australia Limited (ABN 48 002 916 396) appointed as registrar pursuant to an Agency and Registry Agreement dated on or about 6 June 2007 entered into between the Issuer, the Trustee, the Registrar or any other person appointed by the Issuer to establish and maintain the Register on the Issuer's behalf from time to time. |
| | (c) | Title | Title to the Registered Notes shall pass by registration in the Register. |
| | | | No certificate or other evidence of title will be issued to holders of the Notes unless the Issuer determines that certificates should be available or it is required to do so pursuant to any applicable law or regulation. |
| | (d) | Payments and Record Date | Notwithstanding the provisions of Condition 7(b), payments in respect of the Notes will be made to the persons whose names are entered in the Register as at 5.00pm (Sydney time) on the relevant Record Date. |
| | | | Payments to persons who hold Notes through a Clearing System will be made by transfer to their relevant account in accordance with the rules and regulations of the relevant Clearing System. |
| | | | If Notes are not lodged in a Clearing System, payments will be made to the account of the registered holder noted in the |



Register. If no account is notified, then payments will be made by cheque mailed on the Business Day immediately preceding the relevant payment date to the registered holder at its address appearing in the Register on the Record Date.

"Clearing System" means each of the settlement systems operated by Austraclear Limited (ABN 94 002 060 773) (the "Austraclear System"), Euroclear Bank S.A./N.V. ("Euroclear") or Clearstream Banking société anonyme ("Clearstream, Luxembourg"), as the case may be.

"Record Date" means the eighth calendar day before a payment date.

|   |   |   |
|---|---|---|
| (e) | Details of any other additions (*in relation to paragraphs 8(a) to 8(d) above*) | For the purpose of the Notes only: |



(i) The provisions of Conditions 1, 2 and 7 shall be amended and construed according to paragraphs 8(a) to 8(d) above. In case of any inconsistency between those Conditions and paragraphs 8(a) to 8(d) above, paragraphs 8(a) to 8(d) shall prevail.

(ii) Condition 2(f) concerning closed periods immediately preceding each Record Date, shall, for the purposes of the Notes, be deleted and no such closed periods shall apply to the Notes.

(iii) Notwithstanding Condition 12, the Conditions, the Trust Deed and the Agency Agreement may subsequently be amended by the Issuer without the consent of the Noteholders, to provide for the exchange of Notes in registered form for Notes in bearer form.□

| 9 | Denomination: | AUD50,000. |
|---|---|---|
| 10 | Status: | Secured and limited recourse obligations, as described under "Security Arrangements" below. |
| 11 | Interest Commencement Date: | 6 June 2007. |



| 12 | Interest Rate (including after Maturity Date): | Floating Rate. |
|---|---|---|
| | (i) Interest Accrual: | Notwithstanding anything to the contrary contained in Conditions 5(a) and 5(f) and subject to the Interest Accrual Adjustment provisions set out in sub-paragraph (ii) below, in respect of each Interest Accrual Period, each Note shall bear interest on its Weighted Average Outstanding Principal Amount in respect of such Interest Accrual Period at the rate per annum (expressed as a percentage) equal to the Interest Rate, such interest being payable in arrear on each Interest Payment Date. |

The amount of interest payable per Note in respect of any Interest Payment Date shall be calculated by the Calculation Agent on the relevant Interest Calculation Date by calculating the product of (a) the Interest Rate; (b) the Weighted Average Outstanding Principal Amount of such Note for the relevant

Interest Accrual Period; and (c) the Day Count Fraction.

For the purposes hereof:

"**Business Day**" means a day (other than a Saturday or Sunday) on which commercial banks and foreign exchange markets settle payments in Sydney, London, Tokyo and New York.

"**Interest Calculation Date**" means, in respect of each Interest Payment Date, the Business Day immediately preceding such Interest Payment Date; and

"**Weighted Average Outstanding Principal Amount**" means, in respect of each Note in respect of each period for which such amount is calculated, the sum of the Outstanding Principal Amounts of such Note for each calendar day during such period, divided by the actual number of calendar days in such period.



(ii)  Interest Accrual Adjustment:

With respect to any Interest Payment Date, in the event that, in respect of any Interest Accrual Period and its related Interest Calculation Date:

(a)  (i)  an Event Determination Date has occurred with respect to a Reference Entity on or prior to such Interest Determination Date but the relevant Reference Entity Valuation Date with respect to such Reference Entity has not occurred; and/or

(ii)  a Potential Failure to Pay has occurred with respect to a Reference Entity on or prior to such Interest Calculation Date and such Potential Failure to Pay has not been cured on or prior to such Interest Calculation Date; and/or

(iii)  a Potential Repudiation/Moratorium has occurred with respect to a Reference Entity on or prior to such Interest Calculation Date and such Potential Repudiation/Moratorium has not ceased to exist on or prior to such Interest Calculation Date;

(each Reference Entity referred to in sub-paragraphs (i), (ii) and (iii) above, an "**Adjustment Reference Entity**"); and

(b)  the sum of the Mezzanine Loss Amount and the aggregate of all Reference Entity Notional Amount(s) in respect of all the relevant Adjustment Reference Entities is greater than zero, the Issuer shall, subject as provided below, pay to the holder of each Note:

(1)  the Partial Interest Amount (if any) on the relevant Interest Payment Date;

(2)  the Deferred Interest Amount (if any) in respect of each such Adjustment Reference Entity on the Deferred Interest Payment Date; and

(3)   the interest accrued in respect of the period from and including the relevant Interest Payment Date to, but excluding, the related Deferred Interest Payment Date, at a rate equal to the O/N Rate, for each day (an "O/N Rate Day") during such period on an amount equal to the Deferred Interest Amount which shall be paid on such related Deferred Interest Payment Date.

"O/N Rate" means AUD-BBR-BBSW with a Designated Maturity of overnight for which the Reset Date in respect of each O/N Rate Day shall be deemed to be the same day as the O/N Rate Day. Terms used in this paragraph, but not defined in the paragraph above, shall have the meaning given to them in the 2000 ISDA Definitions Annex.

For the purposes hereof:



"Deferred Interest Amount" means, in respect of each Note on a Deferred Interest Payment Date and its related Adjustment Reference Entity, an amount in AUD (rounded to the nearest cent with one half cent being rounded up and subject to a minimum of AUD 0) determined by the Calculation Agent in its sole discretion on the relevant Deferred Interest Cut-off Date as being equal to the excess (if any) of:

(i)   the amount of interest that would otherwise have been payable on the relevant Interest Payment Date if:

(A)   in the circumstances set out in sub-paragraph (a)(i) of paragraph 12(ii) above, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the relevant Event Determination Date;



(B)   in the circumstances set out in sub-paragraph (a)(ii) of paragraph 12(ii) above, (i) where the Potential Failure to Pay develops into an actual Failure to Pay, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Failure to Pay was determined by the Calculation Agent to have occurred; or (ii) where the Potential Failure to Pay is subsequently cured, the relevant Potential Failure to Pay had not occurred; or

(C)   in the circumstances set out in sub-paragraph (a)(iii) of paragraph 12(ii) above, (i) where the Potential Repudiation/Moratorium develops into an actual Repudiation/Moratorium, the Final Price

in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Repudiation/Moratorium was determined by the Calculation Agent to have occurred; or (ii) where the Potential Repudiation/Moratorium subsequently ceases to exist, the relevant Potential Repudiation/ Moratorium had not occurred;

over:

(ii) the relevant Partial Interest Amount (if any) paid on the relevant Interest Payment Date;

"**Deferred Interest Cut-off Date**" means, in respect of each Adjustment Reference Entity as determined by the Calculation Agent in its sole discretion:

(A) the final Reference Entity Valuation Date on which all Final Prices have been determined;

(B) the date that all Potential Failure to Pay have been cured; or

(C) the date that all Potential Repudiation/Moratorium have ceased to exist,

whichever is applicable.

"**Deferred Interest Payment Date**" means, in respect of each Adjustment Reference Entity, the third Business Day following the Deferred Interest Cut-off Date;



"**Interim Calculation Amount**" means, in respect of each Note and in respect of each Interest Accrual Period, an amount in AUD (rounded to the nearest cent with one half cent being rounded up) determined by the Calculation Agent in its sole discretion on the relevant Interest Calculation Date as being equal to the Weighted Average Outstanding Principal Amount of such Note for such Interest Accrual Period, except that the Weighted Average Outstanding Principal Amount shall be calculated on the basis that the Reference Entity Notional Amount of each Adjustment Reference Entity is added to the Cumulative Loss Amount as of each Event Determination Date or the date upon which a Potential Failure to Pay or Potential Repudiation/Moratorium (as applicable) occurred.



For the avoidance of doubt, in the event that the amount calculated in accordance with this provision is zero or a negative number, the "Interim Calculation Amount" will be deemed to be zero; and

"**Partial Interest Amount**" means, in respect of each Note on each Interest Payment Date in respect of which an Adjustment Reference Entity exists, an amount in AUD (rounded to the nearest cent with one half cent being rounded

up and subject to a minimum of AUD 0) determined by the Calculation Agent in its sole discretion on the Interest Calculation Date in accordance with the foregoing "Interest Rate" provisions save that references therein to the Weighted Average Outstanding Principal Amount of each Note shall be deemed to be references to the Interim Calculation Amount (as defined above) of such Note.

| | | |
|---|---|---|
| 13 | Interest Payment Date(s): | 20 March, 20 June, 20 September and 20 December in each year, commencing on 20 September 2007, subject in each case to adjustment in accordance with the Modified Following Business Day Convention, for the avoidance of doubt, with adjustment in the interest payable as a result of such adjustment. |
| 14 | Manner in which the Interest Rate is due to be determined (Floating Rate Notes): | ISDA Determination. |
| 15 | Screen Rate Determination Condition 5(c) (ii): | Not applicable. |
| 16 | ISDA Determination (Condition 5(c) (i)): | Applicable. |
| | (a)  Floating Rate Option: | AUD-BBR-BBSW. |
| | (b)  Designated Maturity: | 3 (three) months, provided that the Relevant Rate for the first Interest Accrual Period shall be determined on the basis of the linear interpolation of the Relevant Rates determined on the relevant Reset Date for Designated Maturities of three months and four months. |
| | (c)  Reset Date: | The first day of the Interest Accrual Period. |
| | (d)  ISDA Definitions: | ISDA Definitions (as defined in Condition 5(c)(i)). |
| 17 | Margin (if applicable): | Plus 1.05 per cent. per annum. |
| 18 | Rate Multiplier (if applicable): | Not applicable. |
| 19 | Maximum/Minimum Interest Rate (if applicable): | Not applicable. |
| 20 | Maximum/Minimum Instalment Amount (if applicable): | Not applicable. |
| 21 | Maximum/Minimum Redemption Amount (if applicable): | Not applicable. |
| 22 | Interest Amount (Fixed Rate Note or Variable Coupon Amount Note): | Not applicable. |
| 23 | Determination Date(s) (Condition 5(i)): | Not applicable. |
| 24 | Day Count Fraction: | Actual/365 (Fixed). |
| 25 | Interest Period Date(s) (if applicable): | 20 March, 20 June, 20 September and 20 December in each year, commencing on 20 September 2007, with adjustment. |
| 26 | Maturity Date: | The earliest to occur of: |



(i)    20 June 2013, subject to adjustment in accordance with the Modified Following Business Day Convention (the "**Scheduled Maturity Date**") unless an Adjustment Reference Entity (as defined in paragraph 12(ii) above) exists as at the Final Cut-off Date (as defined in paragraph 43 below) in which case the Maturity Date shall be the Deferred Redemption Date;

(ii)    the Early Redemption Date (as defined in paragraph 38); and

(iii)    the Zero Principal Amount Redemption Date.

For the purposes hereof:

"**Zero Principal Amount Redemption Date**" means the Event Determination Date upon which the Aggregate Outstanding Principal Amount is reduced to zero.



| 27 | Redemption for Taxation Reasons permitted on days other than Interest Payment Dates: | Yes. |
|----|----|----|
| 28 | Amortisation Yield: | Not applicable. |
| 29 | Exchange (Condition 6(k)): | No. |
| 30 | Mandatory Partial Redemption (in accordance with Condition 6(c)): | For the purposes of the Notes only, Condition 6(c) shall be amended by the insertion of the following words after "payment default" in place of the original words contained in brackets: "(after the expiry of any grace period specified in the terms and conditions of the Collateral in existence as at the Issue Date)". |
| 31 | Instalment Date(s) (if applicable): | Not applicable. |
| 32 | Instalment Amount(s) (if applicable): | Not applicable. |



| 33 | Unmatured Coupons to become void upon early redemption: | Yes. |
|----|----|----|
| 34 | Talons to be attached to Notes and, if applicable, the number of Interest Payment Dates between the maturity of each Talon (if applicable): | Not applicable. |
| 35 | Business Day Jurisdictions for Condition 7(h) (jurisdictions required to be open for payment): | Sydney, London, Tokyo and New York. |

| 36 | Additional steps that may only be taken following approval by an Extraordinary Resolution in accordance with Condition 12(a) (if applicable): | Not applicable. |
|----|----|----|
| 37 | Additional Fungible Issues Permitted: | Yes, subject to the Issuer having received from the Swap Counterparty its prior written consent to any such fungible issue and confirmation from Fitch that there is no downgrade to the rating assigned to the Notes. |
| 38 | Details of any other additions or variation s to the Conditions (if applicable): | For the purposes of the Notes only: Notwithstanding anything to the contrary contained in Conditions 6 and 10, upon the occurrence of any of the events set out in Condition 6(c) and (d) and Condition 10 (the date of the relevant occurrence, as determined by the Calculation Agent in its sole discretion, being the "**Early Redemption Event Date**"), the Issuer shall forthwith notify the Trustee, Fitch and the Noteholders informing them of the occurrence of such event giving notice of the date fixed for redemption, being the day falling six Business Days following the relevant Early Redemption Event Date (the "**Early Redemption Date**"). Upon the expiry of such notice, the Issuer shall redeem each Note at its Early Redemption Amount as set out in paragraph 44 below. |



Condition 10(a) shall be amended to read as follows:

"if default is made (a) in the payment of interest in respect of the Notes or any of them for a period in excess of the sum of (i) the number of days in any grace period applicable to the payment of interest in accordance with the terms and conditions of the Collateral and (ii) three Business Days, or (b) for a period of 14 days or more in the payment of principal due in respect of the Notes or any of them; or"

Condition 10(b) shall be amended to read as follows:

"if the Issuer fails to perform or observe any of its other obligations under the Notes or the Trust Deed and such failure continues for a period of 30 days (or such longer period as the Trustee may permit) next following the service by the Trustee on the Issuer of notice requiring the same to be remedied unless, in the opinion of the Trustee, it is incapable of remedy, in which case no notice shall be required, provided that such failure to perform or observe any of its obligations will be an Event of Default only if such failure by the Issuer to perform or observe any of its obligations will in the sole and absolute determination of the Trustee, lead to a failure to pay any amounts due on the Notes."

Notwithstanding anything to the contrary contained in Condition 6(i) (Purchases), the Issuer may purchase the Notes so long as an equivalent notional amount of the Swap Agreement is terminated and an equivalent principal amount

of the Collateral is delivered to the Swap Counterparty and/or the Noteholders or liquidated, as the case may be, by the Issuer, and the Issuer has no further liability in respect of the purchased Notes or the terminated portion of the Swap Agreement. No cost with respect to any such purchase by the Issuer shall be borne by the remaining Noteholders. If the Issuer purchases the Notes it will notify Fitch of such purchase. Condition 6(i) shall be deemed to be amended accordingly.

Notwithstanding Condition 14, so long as the Notes are represented by a Global Note or a non-materialised form held on behalf of Euroclear, Clearstream International or any other clearing system (including but not limited to Austraclear), notices in respect thereof may be given by their being delivered to Euroclear, Clearstream International or such other clearing system, as the case may be. For the avoidance of doubt, such notices shall be deemed given on the date and, if applicable, at the time they are delivered to Euroclear, Clearstream International or such other clearing system, as the case may be.

Notwithstanding any provisions in the terms of the Notes, upon the withdrawal of the rating assigned to the Notes, there shall be no further obligation to notify Fitch in respect of any events occurring thereafter pursuant to the terms of the Notes.

For the purpose of the Notes only, Condition 4(b)(i) shall be amended as follows:



"(i)     if "*Swap Counterparty Priority*" is specified in the relevant Supplemental Trust Deed:

(a)     first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(b)     secondly, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Registrar and/or the Custodian and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent;



(c)     thirdly, rateably in meeting the claims (if any) of the Swap Counterparty under each Swap Agreement;

(d)     fourthly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to

each party entitled to such payment;

(e)   fifthly, rateably in meeting the claims (if any) of the Portfolio Manager under the Portfolio Management Agreement; and

(f)   sixthly, in payment of the balance (if any) to the Issuer,

provided that, if the "Swap Counterparty Priority" is expressed in the relevant Supplemental Trust Deed and Final Terms to be subject to adjustment on a Swap Counterparty default, and if and to the extent that the Swap Counterparty fails to make payments due to the Issuer under any Swap Agreement and the Issuer promptly notifies the Trustee in writing of any such failure (which notice shall be conclusive and binding), the above application of moneys shall be amended so that the claims of the Swap Counterparty will, to the extent that there has been such failure, rank after the claims (if any) of the Portfolio Manager and before the claims of the Issuer in relation to the balance (if any)."

For the purpose of the Notes only, Condition 4 (b)(iii) shall be amended as follows:

"(iii)   if "Noteholder Priority" is specified in the relevant Supplemental Trust Deed:

(a)   first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(b)   secondly, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Registrar and/or the Custodian and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent;

(c)   thirdly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment;

(d)   fourthly, rateably in meeting the claims (if any) of the Portfolio Manager under the Portfolio Management Agreement;





(e)    fifthly, in meeting the claims (if any) of the Swap Counterparty under each Swap Agreement; and

(f)    sixthly, in payment of the balance (if any) to the Issuer."

39    The Agents (including any Calculation Agent and/or Issuing and Paying Agent and/or Custodian) appointed in respect of the Notes are:

**Issuing and Paying Agent and Custodian**

The Bank of New York
One Canada Square
London E14 5AL

**Calculation Agent**

Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE

**Australian Paying Agent and Registrar**

BTA Institutional Services Australia Limited
(ABN 48 002 916 396)
Level 4
35 Clarence Street
Sydney
NSW 2000
Australia

**Security Arrangements**

40    Mortgaged Property:

(i)    Collateral:

Qualifying Assets (as defined below) in a principal amount equal to the Aggregate Outstanding Principal Amount of the Notes.

The initial Collateral will comprise the proceeds of the issue of the Notes in the amount of AUD30,000,000, to be credited into the Collection Account on or about the Issue Date (excluding any accrued interest) (the "**Cash Collateral**").

On or about 12 June 2007, the Issuer shall use the Cash Collateral to purchase AUD30,000,000 in principal amount of Floating Rate Notes due 20 June 2013 to be issued by GE Capital Australia Funding Pty. Ltd. (the "**Collateral Issuer**") and guaranteed by General Electric Capital Corporation (the "**GECA Notes**").

Upon completion of the purchase of the GECA Notes by the Issuer and the GECA Notes being credited into the Custody Account, the GECA Notes will constitute the Collateral in respect of the Notes.

For the avoidance of doubt, the GECA Notes may be exchanged for Qualifying Assets but subject to Fitch's rating confirmation as set out below.

On redemption of any Collateral, the redemption proceeds of such Collateral will be deposited by the Issuer in the

Collection Account, subject to the security interest created pursuant to the Trust Deed.

The Cash Collateral will be credited into the Collection Account by the Issuer on or before the Issue Date and the GECA Notes will be acquired by the Issuer on or about 12 June 2007. The Collateral will be held by The Bank of New York of One Canada Square, London E14 5AL in its capacity as Custodian pursuant to the Agency Agreement in the Collection Account or the Custody Account (being the account of the Custodian at Euroclear, Account No. 14037), as the case may be, subject to the security interest created pursuant to the Trust Deed. The Custodian shall notify the Issuer and the Calculation Agent if it becomes aware of any material amendment to the terms and conditions of the Collateral. Upon such notification from the Custodian, the Calculation Agent will notify Fitch of such material amendment.



If the short-term senior unsecured rating of the provider of the Collection Account, the Paying Agent or the Custodian is downgraded at any time to below "F1" by Fitch, the Issuer shall, within 30 calendar days of the downgrade, appoint a replacement Collection Account provider, a replacement Paying Agent or a replacement Custodian (as the case may be) that has a rating assigned by Fitch of at least "F1", unless the Trustee has an alternative proposal which Fitch confirms that the then current rating of the Notes will not be reduced. The Issuer shall notify Fitch of such replacement of Collection Account provider, the Paying Agent or the Custodian (as the case may be).

Pursuant to the terms of the Swap Agreement, in the event any Collateral becomes subject to mandatory redemption or otherwise ceases to be a Qualifying Asset, the Swap Counterparty shall, without the consent of the Trustee, the Noteholders or any other secured creditors in respect of the Notes but subject to Fitch's rating confirmation, have the right but not the obligation to exchange some or all of the Collateral with Qualifying Assets selected by it. Upon effecting such exchange, such Qualifying Assets shall constitute Collateral (and the issuer of such Qualifying Assets shall constitute a Collateral Issuer) which will be held subject to the charges in favour of the Trustee as set out or contemplated in the Supplemental Trust Deed. Any exchange of Collateral pursuant to the Swap Agreement shall be effected by the Custodian transferring the Collateral to the Swap Counterparty in accordance with the instructions of the Swap Counterparty and the Swap Counterparty transferring the relevant Qualifying Assets to the Custodian or to its order.

The Issuer shall prepare supplementary listing particulars (if required) setting out details of such exchange and shall notify Fitch, the Noteholders and other secured creditors in respect of the Notes in accordance with Condition 14.

In the event that any charges are imposed by the issuer of the Collateral in respect of the redemption of the Collateral, the Swap Counterparty shall procure that the Collateral is exchanged for other Qualifying Assets subject to the provisions set out above.

"**Qualifying Assets**" means in respect of any exchange of Collateral pursuant to the terms of the Swap Agreement, any security with the following characteristics:

1.　(a)　having as of the date of transfer a credit rating assigned by Fitch equal to AAA;

　　(b)　maturing on or before the Scheduled Maturity Date;

　　(c)　being AUD-denominated; and

　　(d)　is not a structured finance product; or

2.　any AUD denominated money market fund with a credit rating assigned by Fitch equal to V-1+; or

3.　AUD cash.

The Swap Counterparty shall pay all costs (including stamp duty) associated with the delivery or exchange of the Collateral for Qualifying Assets in accordance with the terms of the Swap Agreement.

(ii) Security (order of priorities):　The Trustee shall apply all moneys received by it under the Trust Deed in connection with the realisation or enforcement of the Security constituted by the Trust Deed in the following order of priorities:

Swap Counterparty Priority unless (i) an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the ISDA Master Agreement); or (ii) a Tax Event (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the sole Affected Party (as defined in the ISDA Master Agreement); or (iii) an Additional Termination Event as described in paragraph 11(h)(iv)(a), paragraph 11(h)(iv)(d) or paragraph 11(h)(v)(b) of the Credit Support Annex occurs, in which case Noteholder Priority shall apply.

(iii) Swap Agreement (if applicable)　Under (a) a Deed of Accession dated 20 March 2007, pursuant to which the Issuer acceded to an ISDA Master Agreement and Schedule thereto dated as of 10 October 2002, as amended and restated on 21 July 2006, (together, the "**ISDA Master Agreement**") and (b) a confirmation thereto with an effective date of the Issue Date made between the

Issuer and the Swap Counterparty (the "Swap Confirmation" and, together with the ISDA Master Agreement, the "Swap Agreement"), the Issuer will pay to the Swap Counterparty sums equal to interest payable in respect of the Collateral and the Swap Counterparty will pay to the Issuer interest amounts (including any Deferred Interest Amounts and any overnight interest accrued on any Deferred Redemption Amounts) equal to payments due under the Notes.

In addition, the Issuer will make a final payment to the Swap Counterparty equal to the redemption proceeds due under the Collateral as at the date the Swap Agreement is scheduled to terminate and the Swap Counterparty will make a final payment to the Issuer equal to the Redemption Amount (including any Deferred Redemption Amount) of the Notes.

The form of the Swap Confirmation is set out in Annex 3.

The Swap Agreement may be terminated early (either in whole or, in certain circumstances, in part only) in certain circumstances, including but not limited to:



(i)     on the due date for payment of the Notes if at any time any of the Notes becomes repayable in accordance with the Conditions prior to the Maturity Date;

(ii)    at the option of one party, if there is a failure by the other party to pay any amounts due under the Swap Agreement;

(iii)   if (subject as provided in the Swap Agreement) withholding taxes are imposed on payments made by the Issuer or the Swap Counterparty under the Swap Agreement or it becomes illegal for either party to perform its obligations under the Swap Agreement (see "Transfer to avoid Termination Event" below); and



(iv)    if at any time there is a default or event of default that has been declared pursuant to the terms of (and as defined in the terms of ) the Collateral.

Consequences of Early Termination:     Upon any such early termination of the Swap Agreement, the Issuer or the Swap Counterparty may (subject as set out below and provided, in the case of certain tax events that the Issuer may first be obliged to use all reasonable endeavours to transfer its obligations) be liable to make a termination payment to the other (regardless, if applicable, of which of such parties may have caused such termination).

Such termination payment will be based on the replacement cost or gain for a swap transaction that would have the effect of preserving for the party making the determination the economic equivalent of the Swap Agreement. In all cases of early termination occurring other than by reason of a default by the Swap Counterparty or a Tax Event (as defined in the

Swap Agreement) where the Swap Counterparty is the sole Affected Party (as defined in the Swap Agreement) (in either case the determination will be made by the Issuer) or illegality (in which case the party which is not the Affected Party (as defined in the ISDA Master Agreement) will make the determination (or, if there are two Affected Parties, each party will make a determination which will be averaged)), the termination payment will be determined by the Swap Counterparty on the basis of quotations received from at least five market-makers (failing which, by the Swap Counterparty or the Issuer, as aforesaid).

Regardless of which party makes the determination of the termination payment (if any), there is no assurance that the proceeds from the sale or redemption of the Collateral plus or minus, as the case may be, such termination payment will be sufficient to repay the principal amount due to be paid in respect of the Notes and any other amounts in respect thereof that are due.



| Transfer to avoid Termination Event: | If withholding taxes are imposed on payments made by the Issuer or the Swap Counterparty under the Swap Agreement, then the Swap Counterparty shall, at its sole option, have the right to require the Issuer: |

(i)   to transfer all of the Issuer's interests and obligations under the Swap Agreement together with its interests and obligations under the Notes, the Trust Deed and the Agency Agreement to another entity, whether or not in the same tax jurisdiction as the Issuer, that would not have any obligation to withhold or deduct (if the Issuer is or would be required to make such deduction or withholding) or to which the Swap Counterparty would be entitled to make payments free from the relevant deduction or withholding (if the Swap Counterparty is or would otherwise be required to make such withholding or deduction), subject to obtaining the prior written consent of the Trustee; or

(ii)   to transfer the Issuer's residence for tax purposes to another jurisdiction, subject to obtaining the prior written consent of the Trustee.

If the Issuer is unable to transfer its interests to another party or to transfer its tax residence in accordance with the preceding provisions prior to the 30th day following the date of imposition of such withholding taxes or, if earlier, the 10th day prior to the first date on which it or the Swap Counterparty would otherwise be required to make a payment net of withholding taxes, the Swap Counterparty may terminate the swap transaction under the Swap Agreement. If the Issuer transfers its interests and obligations or residence for tax purposes, it shall notify Fitch of such transfer.

| | | |
|---|---|---|
| Swap Counterparty(ies): | | Lehman Brothers Special Financing Inc. |
| Swap Guarantor (if applicable): | | Lehman Brothers Holdings Inc. |
| (i) | Details of Credit Support Document (if applicable): | The obligations of the Swap Counterparty under the Swap Agreement are unconditionally guaranteed by Lehman Brothers Holdings Inc. pursuant to a guarantee dated 6 June 2007, issued in favour of the Issuer (the "Swap Guarantee"). |
| (ii) | Credit Support Provider: | With respect to the Swap Counterparty, Lehman Brothers Holdings Inc. |
| (iii) | Collection Account: | The Issuer shall establish on or prior to the Issue Date an account (the "Collection Account") with the Custodian in London, into which the Issuer will deposit (a) the proceeds of the issue of the Notes, (b) the redemption proceeds of any Collateral and (c) each payment received by it pursuant to the Swap Agreement and from which (i) any purchase of Collateral shall be made, (ii) all distributions of principal and interest in respect of the Notes shall be paid to the Issuing and Paying Agent for payment to Noteholders on the due dates for payment therefor and (iii) all payments due to the Swap Counterparty under the Swap Agreement shall be made. All monies deposited from time to time in the Collection Account shall be held by the Custodian as part of the Mortgaged Property and shall be applied for the purposes herein provided. |

Any monies held in the Collection Account in respect of any Deferred Interest Amount and/or any Deferred Redemption Amount shall accrue interest at a rate equal to the rate that the Custodian would pay to an independent customer on an overnight deposit of a similar size to the relevant Deferred Interest Amount or Deferred Redemption Amount, as the case may be, for a period equal to the period from and including the relevant Payment Date to, but excluding, the related Deferred Interest Payment Date or the Deferred Redemption Date, as the case may be.

**Provisions relating to Redemption**

| | | |
|---|---|---|
| 41 | Call Option (Condition 6(e)): | Not applicable. |
| 42 | Put Option (Condition 6(f)): | Not applicable. |
| 43 | Redemption Amount: | Subject to the existence of an Adjustment Reference Entity as provided above, unless previously redeemed or purchased and cancelled, the Redemption Amount payable in respect of each Note on the Scheduled Maturity Date shall be an amount in AUD determined by the Calculation Agent in its sole discretion as being equal to the greater of: |

(a)    such Note's Outstanding Principal Amount as at the Final Cut-off Date; and

(b)    AUD 0.

For the purposes hereof:

"**Final Cut-off Date**" means the Business Day immediately prior to the Scheduled Maturity Date.

In addition to the Redemption Amount, the Issuer shall pay to the Noteholders in respect of each Note an amount equal to the pro rata amount of the aggregate Unpaid Performance Fees in respect of all Interest Payment Dates.

If

(a)     an Adjustment Reference Entity exists as at the Final Cut-off Date; and

(b)     the sum of the Mezzanine Loss Amount and the aggregate of the Reference Entity Notional Amount in respect of each relevant Adjustment Reference Entity is greater than zero,

the Redemption Amount in respect of each Note shall be:

(i)     the Interim Calculation Amount (if any) on the Interest Payment Date falling on the Scheduled Maturity Date;

(ii)    the Deferred Redemption Amount on the Deferred Redemption Date.

(iii)   interest accrued in the period from and including the Scheduled Maturity Date to, but excluding, the Deferred Redemption Date, at the O/N Rate on an amount equal to the Deferred Redemption Amount which shall be paid on the Deferred Redemption Date.

For the avoidance of doubt, the determination of the Unpaid Performance Fees in respect of each Interest Payment Date will not be subject to the above adjustments.

For the purposes hereof:

"**Deferred Redemption Amount**" means, in respect of each Note on the Deferred Redemption Date and its related Adjustment Reference Entity, an amount in AUD (rounded to the nearest cent with one half cent being rounded up and subject to a minimum of AUD 0) determined by the Calculation Agent in its sole discretion on the Deferred Redemption Cut-off Date as being equal to the excess (if any) of

(i)     the Redemption Amount that would otherwise have been payable on the Scheduled Maturity Date in respect of which the relevant Reference Entity was an Adjustment Reference Entity if:

(A)   in the circumstances set out in sub-paragraph (a)(i) of paragraph 12(ii) above, the Final Price in respect of the relevant Adjustment Reference





Entity had actually been determined on the relevant Event Determination Date;

(B) in the circumstances set out in sub-paragraph (a)(i) of paragraph 12(ii) above, (i) where the Potential Failure to Pay develops into an actual Failure to Pay, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Failure to Pay was determined by the Calculation Agent to have occurred; or (ii) where the Potential Failure to Pay is subsequently cured, the relevant Potential Failure to Pay had not occurred; or

(C) in the circumstances set out in sub-paragraph (a)(ii) of paragraph 12(ii) above, (i) where the Potential Repudiation/Moratorium develops into an actual Repudiation/Moratorium, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Repudiation/Moratorium was determined by the Calculation Agent to have occurred; or (ii)_where the Potential Repudiation/Moratorium subsequently ceases to exist, the relevant Potential Repudiation/ Moratorium had not occurred;

over

(ii) the Interim Calculation Amount (if any) on the Interest Payment Date falling on the Scheduled Maturity Date;



"**Deferred Redemption Cut-off Date**" means, in respect of each Adjustment Reference Entity as determined by the Calculation Agent in its sole discretion:

(A) the final Reference Entity Valuation Date on which all Final Prices have been determined;

(B) the date that all Potential Failure to Pay have been cured; or

(C) the date that all Potential Repudiation/Moratorium have ceased to exist,

whichever is applicable.

"**Deferred Redemption Date**" means, in respect of each Adjustment Reference Entity, the third Business Day following the Deferred Redemption Cut-off Date.

"**Unpaid Performance Fees**" means, in respect of each Interest Payment Date, an amount determined by the Calculation Agent equal to the product of (i) 0.05 per cent. per annum; (ii) the Weighted Average Outstanding Principal Amount of a Note; (iii) the number of Notes outstanding; and

(iv) the Day Count Fraction, which is calculated as the Performance Fees (as defined in the Portfolio Management Agreement) but not payable to the Portfolio Manager given that the rating of the Notes by Fitch as of the relevant Interest Calculation Date is below A+.

For the purpose of determining the Unpaid Performance Fees in respect of each Interest Payment Date, in the event that the Interest Accrual Adjustment provisions (as set out in paragraph 12(ii) above) are applicable, references to the Weighted Average Outstanding Principal Amount of each Note shall be deemed to be references to the Interim Calculation Amount (as defined in paragraph 12(ii) above) without subsequent adjustment.

| 44 | Early Redemption Amount(s) payable on mandatory redemption (Condition 6(c)), redemption for taxation and other reasons (Condition 6(d)) or an event of default (Condition 10) and/or the method of calculating the same (if required or if different from that set out in the Conditions): | Subject as provided in the immediately succeeding paragraph below, in respect of each Note, an amount in AUD (rounded to the nearest cent with one half cent being rounded up and subject to a minimum of AUD 0) determined by the Calculation Agent in its sole discretion and acting in good faith as being equal to (i) such Note's pro rata share of the proceeds (net of any deductions on account of taxes or otherwise) from the sale or redemption of the Collateral on behalf of the Issuer by the Disposal Agent on the day which is 3 Business Days following the Early Redemption Event Date and pursuant to the Supplemental Trust Deed and Drawdown Agreement, plus (if payable to the Issuer) or minus (if payable to the Swap Counterparty) (ii) the amount of any applicable Unwind Costs divided by the total number of Notes outstanding; provided that if the amount determined pursuant to sub-paragraphs (i) and (ii) above exceeds (the amount of any such excess being the "**Excess Amount**") such Note's Outstanding Principal Amount as of the Early Redemption Date together with interest accrued from, and including, the immediately preceding Interest Payment Date (or if the Early Redemption Date falls in the initial Interest Accrual Period, from, and including, the Issue Date) to, but excluding, such Early Redemption Date (such interest being the "**Accrued Early Redemption Interest Amount**"), such Excess Amount shall be payable by way of an additional payment of interest on each Note. |



Notwithstanding the above and subject to the exercise of the Noteholders' right as set out in the following paragraph, if an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the ISDA Master Agreement) or if a Tax Event (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the sole Affected Party (as defined in the ISDA Master Agreement), the Early Redemption

Amount in respect of each Note shall be an amount in AUD (rounded down to the nearest cent and subject to a minimum of AUD 0) determined by the Calculation Agent in its sole discretion as being equal to (i) such Note's pro rata share of the proceeds (net of any deductions on account of taxes or otherwise) from the sale or redemption of the Collateral on behalf of the Issuer by the Disposal Agent pursuant to the Supplemental Trust Deed and Drawdown Agreement, plus (ii) (but only if payable to the Issuer) the amount of any applicable Unwind Costs divided by the total number of Notes outstanding; provided that if the amount determined pursuant to sub-paragraphs (i) and (ii) above results in an Excess Amount (as defined above), such Excess Amount shall be payable by way of an additional payment of interest on each Note. In the event that Unwind Costs are payable by the Issuer to the Swap Counterparty, the Issuer shall apply the net proceeds from the sale or redemption of the Collateral as aforesaid (1) first in redeeming each Note in an amount equal to its Outstanding Principal Amount as of the Early Redemption Date plus the Accrued Early Redemption Interest Amount and (2) thereafter, in payment of such Unwind Costs to the Swap Counterparty.



In the event that (i) at the time of the occurrence of an Event of Default (as defined in the ISDA Master Agreement) under the Swap Agreement and the Swap Counterparty being the Defaulting Party or, (ii) at the time of the occurrence of an Additional Termination Event as described in paragraph 11(h)(iv)(a), paragraph 11(h)(iv)(d) or paragraph 11(h)(v)(b) of the Credit Support Annex, the Collateral consists of securities which do not fall within paragraph 2 or 3 of the definition of Qualifying Assets, then unless 100 per cent. of the Noteholders give notice to the Issuer opposing to physical settlement, the Issuer shall satisfy the payment of the Early Redemption Amount on or before the third Business Day following the Early Redemption Event Date by (i) delivery of a Collateral Delivery Amount of Collateral, (ii) payment of the Accrued Early Redemption Interest Amount, and (iii) (but only if payable to the Issuer) payment of the amount of any applicable Unwind Costs divided by the total number of Notes outstanding. Such delivery shall be at the risk of the Noteholders.



For the purposes hereof:

"Collateral Delivery Amount" means, in respect of each Note, the outstanding principal amount of the Collateral, divided by the number of Notes outstanding.

"Unwind Costs" means the value of (i) the termination payment due from or, as the case may be, to the Swap Counterparty under the Swap Agreement in respect of the

termination of the Swap Agreement (as determined by reference to the Reference Registry as at the date of such termination) and (ii) any transfer or stamp tax costs, early redemption or termination cost (howsoever defined), if any, incurred by the Issuer or the Trustee, as determined by the Calculation Agent in its sole and absolute discretion, in relation to any swap agreement (but, for the avoidance of doubt, not including the Swap Agreement), financing arrangement or other hedging transaction entered into by or on behalf of the Issuer in relation to the issue of the Notes.

**Provisions applicable to Global Notes**

| 45 | Notes to be represented on issue by: | Non-materialised form evidenced by inscription into the relevant Register. |
| 46 | Applicable TEFRA exemption: | Not applicable. |
| 47 | Global Note exchangeable for Definitive Notes at the request of the holder: | Not applicable. |
| 48 | Exchange Date: | Not applicable. |



**Provisions relating only to the sale, listing and rating of the Notes**

| 49 | Details of any additions or variations to the selling restrictions: | Any on-sale of the Notes by Noteholders shall be made in compliance with all applicable selling restrictions. |
| 50 | Listing: | None. |
| 51 | Dealer's Commission | Not applicable. |
| 52 | Net Proceeds of issue | AUD30,000,000. |
| 53 | Method of issue of Notes: | Individual Dealer. |
| 54 | The following Dealer is subscribing the Notes: | Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE, United Kingdom, an investment bank engaged in, *inter alia*, underwriting new securities issues and trading in fixed income financial instruments. |
| 55 | Common Code (N.B. See paragraph 4 above for ISIN): | Not applicable. |
| 56 | Rating: | A rating of "AA" is expected to be assigned by Fitch. However, there is no assurance that the Issuer will be able to obtain such the rating for the Notes as it is subject to Fitch's information and other requirements. A security rating is not a recommendation to buy, sell or hold securities and may be subject to suspension, reduction or withdrawal at any time. A suspension, reduction or withdrawal of the rating assigned to the Notes may adversely affect the market price of the Notes. Certain substitutions in accordance with the terms of the Portfolio Management Agreement may also result in a downgrade of the rating assigned to the Notes. |

### ANNEX 1 - USE OF PROCEEDS

The net proceeds of the issue of the Notes, which are expected to amount to AUD30,000,000, will be applied by the Issuer on or about 12 June 2007 to fund the purchase of the Collateral (as described in Annex 2).





## ANNEX 2 - THE COLLATERAL

*The following information relating to the Collateral intended to be purchased on or about 12 June 2007 is a summary only of certain terms and conditions of such Collateral and has, save for the "Collateral", "Listing", "Maturity", "Business Days" and "Method of Origination/Creation" sections below, been extracted from the programme offering documents relating to the Collateral. None of the Issuer, the Arranger, the Trustee, the Agents or the Swap Counterparty has verified, or accepts any liability whatsoever for the accuracy of, such information and prospective investors of the Notes should make their own independent investigations and enquiries into the Collateral and the Collateral Issuer.*

The initial Collateral will comprise the proceeds of the issue of the Notes in the amount of AUD30,000,000, to be credited into the Collection Account on or about the Issue Date (excluding any accrued interest) (the "**Cash Collateral**"). On or about 12 June 2007, the Issuer shall use the Cash Collateral to purchase a principal amount of AUD30,000,000 Floating Rate Notes due 20 June 2013 to be issued by GE Capital Australia Funding Pty. Ltd. and guaranteed by General Electric Capital Corporation, details of which are set out below.



| | |
|---|---|
| **Collateral Issuer** | GE Capital Australia Funding Pty. Ltd. |
| **Registered Address** | 572 Swan Street, Richmond, Victoria 3121, Australia |
| **Country of Incorporation** | Australia |
| **Nature of Business** | GE Capital Australia Funding Pty. Ltd. is primarily engaged in obtaining financing in public markets to fund the operations of affiliated operating companies in Australia, principally by way of loans to such affiliated companies. |
| **Guarantor** | General Electric Capital Corporation |
| **Collateral** | AUD30,000,000 in principal amount of an issue of Floating Rate Notes due 20 June 2013 to be issued by the Collateral Issuer and guaranteed by General Electric Capital Corporation (the "**GECA Notes**"). |
| **Listing** | None |
| **Governing Law** | The laws of the State of New York, United States of America |
| **Maturity** | 20 June 2013 |
| **Business Days** | Sydney, Melbourne, London, New York and TARGET |
| **Method of Origination/Creation** | The Collateral is to be issued pursuant to a prospectus dated 12 May 2006 and the final terms to be dated on or about 12 June 2007 in relation to the GECA Notes (together, the "**Collateral Offering Documents**"). Copies of the Collateral Offering Documents are available for inspection during usual business hours on any weekday (Saturdays, Sundays and public holidays excepted) at the registered office of the Issuer and at the specified offices of the Issuing and Paying Agent. |



Pursuant to the terms of the Swap Agreement, in the event the Collateral becomes subject to mandatory redemption or otherwise ceases to be a Qualifying Asset, the Swap Counterparty shall, without the consent of the Trustee, the Noteholders or any other secured creditors in respect of the Notes but subject to Fitch's rating confirmation, have the right but not the obligation to exchange some or all of the Collateral with Qualifying Assets selected by it. Upon effecting such exchange, such Qualifying Assets shall constitute Collateral (and the issuer of such Qualifying Assets shall constitute a Collateral Issuer) which will be held subject to the

charges in favour of the Trustee as set out or contemplated in the Supplemental Trust Deed. Any exchange of Collateral pursuant to the Swap Agreement shall be effected by the Custodian transferring the Collateral to the Swap Counterparty in accordance with the instructions of the Swap Counterparty and the Swap Counterparty transferring the relevant Qualifying Assets to the Custodian or to its order. The Issuer shall prepare supplementary listing particulars (if required) setting out details of such exchange and shall notify Fitch, the Noteholders and other secured creditors in respect of the Notes in accordance with Condition 14.

In the event that any charges are imposed by the issuer of the Collateral in respect of the redemption of the Collateral, the Swap Counterparty shall procure that the Collateral is exchanged for other Qualifying Assets subject to the provisions set out above.

"**Qualifying Assets**" means, in respect of any exchange of Collateral pursuant to the terms of the Swap Agreement, any security with the following characteristics:



1.  (a)  having as of the date of transfer a credit rating assigned by Fitch equal to AAA;

    (b)  maturing on or before the Scheduled Maturity Date;

    (c)  being AUD-denominated; and

    (d)  is not a structured finance product; or

2.  any AUD denominated money market fund with a credit rating assigned by Fitch equal to V-1+; or

3.  AUD cash.

The Swap Counterparty shall pay all costs (including stamp duty) associated with the delivery or exchange of the Collateral for Qualifying Assets in accordance with the terms of the Swap Agreement.



## ANNEX 3 – FORM OF SWAP CONFIRMATION

In addition to the description of the Swap Agreement set out in paragraph 40(iii), the form of the Swap Confirmation is as set out below.

## SWAP CONFIRMATION

| | |
|---|---|
| Date: | 6 June 2007 |
| To: | Zircon Finance Limited |
| From: | Lehman Brothers Special Financing Inc. |
| Re: | Credit Derivative Transaction relating to Zircon Finance Limited Series 2007-9 Tranche A AUD30,000,000 Synthetic Portfolio Notes due 2013 |
| Reference Number: | [●] |



Dear Sirs,

The purpose of this letter agreement and the Schedules hereto (this "**Confirmation**") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "**Transaction**"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement, in each case as published by the International Swaps and Derivatives Association Inc. ("**ISDA**") (together, the "**Credit Derivatives Definitions**") and the 2000 ISDA Definitions as published by ISDA (the "**2000 Definitions**") are incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions and the 2000 Definitions, the Credit Derivatives Definitions will govern. In the event of any inconsistency between the Credit Derivatives Definitions and this Confirmation, this Confirmation will govern. In addition, the definitions and provisions set out in Schedule B hereto shall prevail in the event of any inconsistency with the Credit Derivative Definitions. In the event of any inconsistency between Schedule B hereto and sections 1 to 11 of this Confirmation, the provisions of sections 1 to 11 shall prevail.



This Confirmation supplements, forms a part of, and is subject to the ISDA Master Agreement dated as of 10 October 2002, as amended and restated on 21 July 2006, and as further amended and supplemented from time to time (the "**Agreement**") between Lehman Brothers Special Financing Inc. and Dante Finance Public Limited Company to which you have acceded under a Deed of Accession dated 20 March 2007. All provisions contained in the relevant Agreement govern this Confirmation except as expressly modified below.

In this Confirmation, the "**Notes**" refers to Zircon Finance Limited Series 2007-9 Tranche A AUD30,000,000 Synthetic Portfolio Notes due 2013 and "**Conditions**" refers to the terms and conditions of the Notes.

Capitalised terms used but not defined herein will have the meanings given to them in the Conditions.

In the event of any inconsistency between this Confirmation and the Agreement, this Confirmation shall prevail.

In this Confirmation, "**Party A**" means Lehman Brothers Special Financing Inc. and "**Party B**" means Zircon Finance Limited.

The terms of the Transaction to which this Confirmation relates are as follows:

1    **General Terms**

| | |
|---|---|
| Trade Date: | 4 June 2007 |
| Effective Date: | 6 June 2007 |
| Scheduled Termination Date: | 20 June 2013, subject to adjustment in accordance with the Business Day Convention |
| Termination Date: | The Scheduled Termination Date unless an Adjustment Reference Entity (as defined below) exists as at the Final Cut-off Date in which case the Termination Date shall be the Deferred Payment Date (or, where there is more than one Adjustment Reference Entity, the latest Deferred Payment Date to occur). |
| Floating Rate Payer A: | Zircon Finance Limited (the "Seller") |
| Fixed Rate Payer B: | Lehman Brothers Special Financing Inc. (the "Buyer") |
| Calculation Agent: | Lehman Brothers International (Europe) |
| | Any determination, calculation or selection made by the Calculation Agent under this Transaction shall be made by the Calculation Agent in a commercially reasonable manner and based on best market practice. |
| Calculation Agent City: | London |
| Business Days: | Sydney, London, Tokyo and New York |
| Business Day Convention: | Modified Following (which, subject to Section 1.4 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |



2    **Reference Entities and Reference Obligations**

| | |
|---|---|
| Reference Entity: | Each of the entities (and any Successor thereto) listed in the Reference Registry from time to time, subject to the provisions of "Successor Substitution" below; provided that, upon the occurrence of a Credit Event during the Credit Observation Period with respect to a Reference Entity, a Benchmark Obligation or the Obligations of a Reference Entity, and satisfaction of the Conditions to Settlement with respect to such Credit Event, such Reference Entity will be deemed deleted from the Reference Registry with effect from the Event Determination Date with respect to such Reference Entity (other than for the purposes of determining the relevant Cash Settlement Amount) and the Reference Registry shall be amended accordingly, subject always to the provisions regarding delivery of multiple Credit Event Notices pursuant to the "Credit Event Notice After Restructuring" provisions set out in Schedule B. |
| | For the avoidance of doubt, if an event which would otherwise constitute a Credit Event occurs prior to the commencement of the Credit Observation Period, the Reference Entity affected by |

such event will be deemed to be removed from the Reference Registry. For the avoidance of doubt, no Cash Settlement Amount shall be determined prior to the commencement of the Credit Observation Period.

"**Reference Registry**" means the register of Reference Entities set out in Schedule A, maintained by the Calculation Agent in accordance with this Confirmation and amended from time to time in accordance with the provisions of "Successor Substitution" below, and further amended from time to time in accordance with a portfolio management agreement ("**Portfolio Management Agreement**") dated 6 June 2007 between Party A, Party B, the Calculation Agent and Lion Capital Management Limited (in such capacity, the "**Portfolio Manager**") (the form of which is set out in Exhibit B hereto) unless and until the Portfolio Manager resigns or is removed in accordance with the Portfolio Management Agreement.



Under the Portfolio Management Agreement, Party B appoints the Portfolio Manager to effect one or more Reference Portfolio Modifications. Accordingly, the Portfolio Manager shall have the right at any time to instruct Party A, Party B and the Calculation Agent pursuant to the terms of the Portfolio Management Agreement (a "**Modification Instruction**") that one or more Reference Entities be removed from the Reference Registry (each a "**Replaced Reference Entity**") and/or one or more Reference Entities be added to the Reference Registry (each a "**New Reference Entity**") subject to compliance with the Reference Portfolio Guidelines (as defined in the Portfolio Management Agreement) (a "**Reference Portfolio Modification**").



In relation to any Reference Portfolio Modification, the Calculation Agent will review the Modification Instruction with reference to the Reference Portfolio Guidelines. The Swap Counterparty will calculate for the Portfolio Manager the value of this Transaction to the Floating Rate Payer immediately after the Reference Portfolio Modification minus the value of this Transaction to the Floating Rate Payer immediately before the Reference Portfolio Modification and the amount of adjustment required to be made to the Subordination Amount so that the value of this Transaction immediately before and after the Reference Portfolio Modification will remain the same (such amount of adjustment to the Subordination Amount being the "**Subordination Adjustment**"). The Subordination Adjustment, if positive, shall be a "**Subordination Adjustment Increase**"; if negative, shall be a "**Subordination Adjustment Decrease**"; the sum of the Subordination Adjustment Increase and the Subordination Adjustment Decrease, as determined by the Calculation Agent on any date of determination being the "**Subordination Adjustment Balance**".

If, after such review, the Calculation Agent determines in its sole and absolute discretion that the Reference Portfolio Guidelines are satisfied as at the Modification Instruction Date (as defined in the Portfolio Management Agreement) and the Portfolio Manager has confirmed the quotation and the Subordination Adjustment, the Calculation Agent shall give notice to the parties hereto and to the Portfolio Manager of such determination and it shall amend the Reference Registry accordingly with effect from the effective date of the applicable Reference Portfolio Modification. The Calculation Agent shall further amend the Reference Registry and Schedule C, as applicable, with reference to the relevant Reference Entity in respect of the appropriate Benchmark Obligation (if any) and other relevant terms as determined by the Calculation Agent in its sole and absolute discretion.

The Reference Registry shall contain the following information in respect of each Reference Entity included therein:

(i)  the credit position applicable to such Reference Entity (the "**Reference Entity Credit Position**");

(ii)  whether "Monoline" is specified as "Applicable" in respect of the relevant Reference Entity, in which case the "Additional Terms for Monolines" set forth in Schedule B hereto shall apply to such Reference Entity;

(iii)  the entity type of the relevant Reference Entity (the "**Entity Type**") which shall determine which of the standard terms set forth in Schedule C hereto (the "**Standard Terms**") apply to such Reference Entity;

(iv)  the Benchmark Obligation (if any) and its seniority applicable to the Reference Entity; and

(v)  the effective date of each Successor Substitution effected with respect to the Reference Entity and any change to the Reference Entity Credit Position resulting from any Successor Substitution.

Section 2.30 (Substitute Reference Obligation) of the Credit Derivatives Definitions shall not apply to this Transaction.

Successor Substitution:  Notwithstanding anything to the contrary herein (in particular in the terms relating to Successors set out in Schedule B), upon the occurrence of a Succession Event (as defined in Schedule B) between two or more of the Reference Entities for the time being comprised in the Reference Registry, which for the avoidance of doubt is not a Credit Event, the Calculation Agent may, by written notice to Buyer, Seller and Fitch indicating the Succession Event Date and the Succession Event Effective Date, give notice to remove one or more of those Reference Entities that are subject to the Succession Event (each, a "**Removed Succession Event Reference Entities**") from the Reference Registry, and to replace such Removed Succession

Event Reference Entities with one or more entities (each an "**Added Succession Event Reference Entity**") such that the Reference Entities resulting from the Successor Substitution shall be:

(i)    the entity which the Calculation Agent determines has been formed as a result of the Succession Event; and /or

(ii)    a number of entities chosen in accordance with the Successor Substitution Criteria,

provided that, in any case the total number of Reference Entities in the Reference Registry will be equal to the number of Reference Entities as of the Business Day prior to such Succession Event, and also, provided that such notice from the Calculation Agent will be effective two Business Days following the date the notice is sent to Buyer and Seller (the "**Succession Event Effective Date**") to remove or replace such Reference Entities from the Reference Registry. Each Added Succession Event Reference Entity will be a Reference Entity for the purposes of this Transaction and each Removed Succession Event Reference Entity will be deemed removed from the Reference Registry, in each case as of the Succession Event Effective Date. The Calculation Agent shall provide the parties hereto and Fitch with an updated Reference Registry as soon as is reasonably practicable after a Successor Substitution.

Each Added Succession Event Reference Entity shall have a Reference Entity Notional Amount equal to the sum of the Reference Entity Notional Amounts of the Removed Succession Event Reference Entities divided by the number of Added Succession Event Reference Entities, provided that the entity described in (i) above shall be ignored for the purposes of such calculation.

In the event that the Calculation Agent fails to exercise its right to remove one or more Reference Entities in accordance with the above provisions by the day which is 10 Business Days following the Succession Event Date, the provisions set out in Schedule B relating to Successors shall apply, except that if a Reference Entity becomes a Successor to another Reference Entity, such Successor Reference Entity shall be deemed to be a Reference Entity only once with respect to this Transaction, and the Reference Entity Notional Amount for such Reference Entity will be the sum of the Reference Entity Notional Amounts applicable to it and the Reference Entity to which it became a Successor prior to the Succession Event.

Succession Event Date:    The occurrence of a Succession Event, and the date at which such Succession Event is deemed to occur (the "**Succession Event Date**"), shall be determined by the Calculation Agent.

Successor Substitution Criteria:    Each Added Succession Event Reference Entity shall, on the date of its inclusion in the Reference Registry, have a credit

rating assigned to its unsecured, senior long-term debt or deposit obligations (not supported by third party credit enhancement) by Fitch equal to or higher than the lowest credit rating of the Removed Succession Event Reference Entities on the Business Day prior to the Succession Event Effective Date.

Each such determination shall be made by the Calculation Agent.

**Reference Obligation(s):**    In respect of each Reference Entity one or more obligations each of which is either:

(a)    the Benchmark Obligation, if any, specified for such Reference Entity in the Reference Registry; or



(b)    an obligation of the relevant Reference Entity (either directly or as provider of a Qualifying Affiliate Guarantee or, if All Guarantees is specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, any Qualifying Guarantee), as selected by the Buyer in its sole discretion on or prior to the Valuation Date and which (i) falls within the Reference Obligation Category specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, (ii) has all of the Reference Obligation Characteristics specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, (iii) is not subject to a counterclaim, defence (other than a counterclaim or defence based on the factors set forth in Section 4.1(a) to (d) of the Credit Derivatives Definitions) or right of set-off by or of the relevant Reference Entity or any applicable Underlying Obligor and (iv) in the case of a Qualifying Guarantee, other than a Qualifying Affiliate Guarantee, is capable, at the applicable Valuation Date, of immediate assertion or demand by or on behalf of the holder or holders against the relevant Reference Entity for an amount at least equal to the outstanding principal balance or Due and Payable Amount apart from the giving of any notice of non-payment or similar procedural requirement, it being understood that acceleration of an Underlying Obligation shall not be considered a procedural requirement.



For the avoidance of doubt, Reference Obligation will include any obligation of a Reference Entity as provider of a guaranty of payment, surety bond or financial guarantee insurance policy issued with respect to an underlying obligation and which is in

| | |
|---|---|
| | each case unconditional but for any requirement for the beneficiary to give notice that a payment is due or any similar procedural requirement; provided, however, that in the case of any such guaranty of payment, surety bond or financial guarantee insurance policy, such Reference Obligation shall include both such guaranty of payment, surety bond or financial guarantee insurance policy and the related Underlying Obligation. |
| Benchmark Obligation: | In respect of each Reference Entity, the corresponding obligation set forth under the heading "Benchmark Obligation" in the Reference Registry. |
| Obligation: | Any obligation of the relevant Reference Entity (either directly or as provider of a Qualifying Affiliate Guarantee or, if All Guarantees is specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity, any Qualifying Guarantee), and which (i) falls within the Obligation Category specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type and (ii) has all of the Obligation Characteristics specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type. |
| | Obligations shall also include, in respect of each Reference Entity, the relevant Benchmark Obligation (if any) specified with respect to such Reference Entity in the Reference Registry. |
| All Guarantees: | Applicable with respect to a Reference Entity only if All Guarantees is specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity. |
| Reference Price: | 100 per cent. |
| Subordination Amount: | On any date of determination, the sum of AUD315,000,000 and the then applicable Subordination Adjustment Balance. |
| Notional Amount: | AUD30,000,000. |
| Outstanding Notional Amount: | With respect to any day, the Notional Amount less the Mezzanine Tranche Loss (as defined below) as of that day, subject to a minimum of zero. |
| Mezzanine Loss Amount: | Cumulative Loss Amount minus the Subordination Amount |
| Mezzanine Tranche Loss: | The greater of: |
| | (a)  the Mezzanine Loss Amount; and |
| | (b)  zero. |
| Cumulative Loss Amount: | With respect to any day, the aggregate of all Cash Settlement Amounts calculated with respect to the Transaction from, and including the Trade Date, to and including such day a Cumulative Loss Amount is calculated. |

3    **Buyer Payments**

(a)    **Buyer Payments 1**

| | |
|---|---|
| Fixed Rate Payer Calculation Amount: | Subject as provided below, and unless the Fixed Rate Payer Payment Adjustment provisions below apply to a Fixed Rate Payer Calculation Period, the Weighted Average Outstanding Notional Amount with respect to a Fixed Rate Payer Calculation Period, calculated by the Calculation Agent. |
| | "**Weighted Average Outstanding Notional Amount**" means the amount calculated by the Calculation Agent on the Business Day immediately preceding each Fixed Rate Payer Payment Date with respect to the immediately preceding Fixed Rate Payer Calculation Period by adding together the Outstanding Notional Amounts for each calendar day during such period and dividing such amount by the actual number of calendar days in such period. For the avoidance of doubt, in the event that, with respect to a Fixed Rate Payer Calculation Period, the Outstanding Notional Amount is reduced as a result of an increase in the amount of the Mezzanine Tranche Loss, such reduced Outstanding Notional Amount shall be used to calculate the Weighted Average Outstanding Notional Amount (for the purposes of calculating the 'Fixed Rate Payer Calculation Amount') as of, and from, each such Event Determination Date which resulted in a reduction of the Outstanding Notional Amount. |
| Fixed Rate Payer Calculation Period: | Section 2.9 of the Credit Derivatives Definitions shall apply, except that the final Fixed Rate Payer Calculation Period will end on, but exclude, the Scheduled Termination Date, and for the avoidance of doubt, such dates shall be adjusted in accordance with the Business Day Convention. |
| Fixed Rate Payer Payment Dates: | 20 March, 20 June, 20 September and 20 December of each year commencing on 20 September 2007 and ending on, but excluding, the Scheduled Termination Date, subject in each case to adjustment in accordance with the Business Day Convention, and subject to the Fixed Rate Payer Payment Adjustment provisions below. |
| Fixed Rate: | In respect of all Fixed Rate Payer Payment Dates: |
| | (i)  AUD-BBR-BBSW plus 1.05 per cent. per annum; and |
| | (ii)  0.12 per cent. per annum. (being the Portfolio Management Fees (as defined in the Portfolio Management Agreement) payable by the Issuer to the Portfolio Manager pursuant to the Portfolio Management Agreement); and |
| | (iii)  0.05 per cent. per annum (being the Performance Fees (as defined in the Portfolio Management Agreement) payable by the Issuer to the Portfolio Manager pursuant to the Portfolio Management Agreement, but only in the event |

that the rating of the Notes by Fitch as of the Business Day immediately preceding the relevant Fixed Rate Payer Payment Date is A+ or above),

provided that in the event the Portfolio Management Agreement is terminated under Clause 8.1 of the Portfolio Management Agreement, the Fixed Rate Payer shall pay an amount equal to the pro rata amount of the Portfolio Management Fees and Performance Fees (if any) accrued up to and including the date of such termination on the next following Interest Payment Date.

"AUD-BBR-BBSW" means "AUD-BBR-BBSW" as defined in the 2000 Definitions with a "Designated Maturity" of three (3) months and the "Reset Date" being the day which is the first day of the Fixed Rate Payer Calculation Period, provided that for the first Interest Accrual Period such rate shall be determined on the basis of the linear interpolation of the rate determined on the relevant Reset Date for Designated Maturities of three months and four months.



| | |
|---|---|
| Fixed Rate Day Count Fraction: | Actual/365 (Fixed). |
| Fixed Rate Payer Payment Adjustment: | With respect to any Fixed Rate Payer Payment Date, in the event that: |

(a)  (i)  an Event Determination Date has occurred with respect to a Reference Entity on, or prior to, the Business Day prior to a Fixed Rate Payer Payment Date but the relevant Reference Entity Valuation Date with respect to such Reference Entity has not occurred; and/or

(ii)  a Potential Failure to Pay has occurred with respect to a Reference Entity on or prior to the Business Day prior to a Fixed Rate Payer Payment Date and such Potential Failure to Pay has not been cured on or prior to the Business Day prior to such Fixed Rate Payer Payment Date; and/or



(iii)  a Potential Repudiation/Moratorium has occurred with respect to a Reference Entity on or prior to the Business Day prior to a Fixed Rate Payer Payment Date and such Potential Repudiation/Moratorium has not ceased to exist on or prior to the Business Day prior to such Fixed Rate Payer Payment Date;

(each Reference Entity referred to in paragraphs (i), (ii) and (iii) above an "**Adjustment Reference Entity**"); and

(b)  the sum of the Mezzanine Loss Amount and the aggregate of all Reference Entity Notional Amount(s) in respect of all the relevant Adjustment Reference Entities is greater than zero,

the Fixed Amount payable in respect of such Fixed Rate Payer Payment Date shall be paid in accordance with the following:

(A) Buyer shall pay an amount (the "**Partial Fixed Amount**") on the Fixed Rate Payer Payment Date calculated in accordance with Section 5.1(b) of the Credit Derivatives Definitions but referencing the Interim Calculation Amount instead of the Fixed Rate Payer Calculation Amount; and

(B) Buyer shall pay an amount (the "**Deferred Fixed Amount**"), in respect of each Adjustment Reference Entity, on the third (3rd) Business Day (the "**Deferred Fixed Rate Payment Date**") following:

(1) the final Reference Entity Valuation Date on which all Final Prices have been determined; or

(2) if appropriate, the date that the Calculation Agent determines that all Potential Failure to Pay have been cured; or

(3) if appropriate, the date that the Calculation Agent determines that all Potential Repudiation/Moratorium have ceased to exist,

equal to the excess (if any) of:

(i) the Fixed Amount that would otherwise have been payable on the relevant Fixed Rate Payer Payment Date if

(A) in the circumstances set out in sub-paragraph (a)(i) of "Fixed Rate Payer Payment Adjustment" above, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the relevant Event Determination Date;

(B) in the circumstances set out in sub-paragraph (a)(ii) of "Fixed Rate Payer Payment Adjustment" above, (i) where the Potential Failure to Pay develops into an actual Failure to Pay, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Failure to Pay was determined by the Calculation Agent to have occurred; or (ii) where the Potential Failure to Pay is subsequently cured, the relevant Potential Failure to Pay had not occurred; or




(C)    in the circumstances set out in sub-paragraph (a)(iii) of "Fixed Rate Payer Payment Adjustment" above, (i) where the Potential Repudiation/Moratorium develops into an actual Repudiation/Moratorium, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Repudiation/Moratorium was determined by the Calculation Agent to have occurred; or (ii) where the Potential Repudiation/Moratorium subsequently ceases to exist, the relevant Potential Repudiation/ Moratorium had not occurred,

over

(ii)    the relevant Partial Fixed Amount (if any) paid on the relevant Fixed Rate Payer Payment Date.

(C)    Buyer shall pay an additional amount equal to interest accrued in the period from and including the Fixed Rate Payer Payment Date to, but excluding, the Deferred Fixed Rate Payer Payment Date, at a rate equal to the O/N Rate (as defined in the Conditions) for each day during such period, on an amount equal to the Deferred Fixed Amount which shall be paid on such Deferred Fixed Rate Payer Payment Date.



Interim Calculation Amount:    Subject as provided below, the Fixed Rate Payer Calculation Amount (without adjusting the Outstanding Notional Amount with respect to an Adjustment Reference Entity except as provided below) for the relevant Fixed Rate Payer Calculation Period except that the Weighted Average Outstanding Notional Amount shall be calculated on the basis that the Reference Entity Notional Amount of each Adjustment Reference Entity is added to the Cumulative Loss Amount as of each Event Determination Date or the date upon which a Potential Failure to Pay or a Potential Repudiation/Moratorium (as applicable) occurred. For the avoidance of doubt, in the event that the amount calculated in accordance with this provision is zero or a negative number the "Interim Calculation Amount" will be deemed to be zero.



(b)    **Buyer Payments 2**

Buyer Final Payment:    In addition to the Fixed Amounts payable in accordance with the provisions set out above, Buyer shall pay to Seller:

(i)    the Buyer Final Payment Amount on the Scheduled Termination Date and the Deferred Payment Date, as the

case may be; and

(ii) an amount equal to the aggregate amount of the Unpaid Performance Fees in respect of all Fixed Rate Payer Payment Dates on the Scheduled Termination Date,

For the purposes hereof:

"Unpaid Performance Fees" means, in respect of each Fixed Rate Payment Date, an amount determined by the Calculation Agent equal to the product of (i) 0.05 per cent. per annum; (ii) the Weighted Average Outstanding Notional Amount; (iii) the number of Notes outstanding; and (iv) the Day Count Fraction, which is calculated as the Performance Fees (as defined in the Portfolio Management Agreement) but not payable to the Portfolio Manager given that the rating of the Notes by Fitch as of the Business Day immediately prior to the relevant Interest Payment Date is below A+.

For the purpose of determining the Unpaid Performance Fees in respect of each Fixed Rate Payer Payment Date, in the event that the Fixed Rate Payer Payment Adjustment provisions (as set out in paragraph 3 above) are applicable, references to the Weighted Average Outstanding Notional Amount shall be deemed to be references to the Interim Calculation Amount (as defined in paragraph 3 above) without subsequent adjustment.



**Buyer Final Payment Amount:**   An amount in AUD determined by the Calculation Agent in its sole discretion as being equal to the greater of:

(a) the Outstanding Notional Amount as at the Final Cut-off Date; and

(b) AUD 0.

For the purposes hereof if:

(i) an Adjustment Reference Entity exists as at the Final Cut-off Date; and



(ii) the sum of the Mezzanine Loss Amount and the aggregate of all Reference Entity Notional Amounts in respect of all relevant Adjustment Reference Entities is greater than zero,

the Buyer Final Payment Amount shall be:

(i) the Interim Calculation Amount (if any) on the Scheduled Termination Date;

(ii) the Deferred Termination Amount on the Deferred Payment Date; and

(iii) interest accrued in the period from and including the Scheduled Termination Date to, but excluding, the related Deferred Termination Date, at a rate equal to the O/N Rate on an amount equal to the Deferred Termination Amount which shall be paid on such related Deferred Termination Date.

For the purposes hereof:

"**Deferred Termination Amount**" means, in respect of each Deferred Payment Date and its related Adjustment Reference Entity, an amount in AUD (rounded to the nearest cent with one half cent being rounded up and subject to a minimum of AUD 0) determined by the Calculation Agent in its sole discretion on the relevant Deferred Payment Cut-off Date as being equal to the excess (if any) of:



(i) the Buyer Final Payment that would otherwise have been payable on the Scheduled Termination Date if:

(A) in the circumstances set out in sub-paragraph (a)(i) of "Fixed Rate Payer Payment Adjustment" above, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the relevant Event Determination Date;

(B) in the circumstances set out in sub-paragraph (a)(ii) of "Fixed Rate Payer Payment Adjustment" above, (i) where the Potential Failure to Pay develops into an actual Failure to Pay, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Failure to Pay was determined by the Calculation Agent to have occurred; or (ii) where the Potential Failure to Pay is subsequently cured, the relevant Potential Failure to Pay had not occurred; or



(C) in the circumstances set out in sub-paragraph (a)(iii) of "Fixed Rate Payer Payment Adjustment" above, (i) where the Potential Repudiation/Moratorium develops into an actual Repudiation/Moratorium, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Repudiation/Moratorium was determined by the Calculation Agent to have occurred; or (ii) where the Potential Repudiation/Moratorium subsequently ceases to exist, the relevant Potential Repudiation/ Moratorium had not occurred;

over

(ii) the Interim Calculation Amount (if any) on the Scheduled Termination Date;

"**Deferred Payment Cut-off Date**" means, in respect of each Adjustment Reference Entity in respect of which a Deferred Termination Amount may be payable, as determined by the Calculation Agent in its sole discretion:

(A) the final Reference Entity Valuation Date on which all

Final Prices have been determined; or

(B) if appropriate, the date that the Calculation Agent determines that all Potential Failure to Pay have been cured; or

(C) if appropriate, the date that the Calculation Agent determines that all Potential Repudiation/Moratorium have ceased to exist,

whichever is applicable.

"**Deferred Payment Date**" means, in respect of each Adjustment Reference Entity, the third Business Day following the Deferred Payment Cut-off Date.

Final Cut-off Date:

The Business Day immediately prior to Scheduled Termination Date.



### 4    Seller Payments

### (a)    Seller Payments 1

Interim Seller Payments:

In addition to the Seller Final Payment payable in accordance with the provisions set out below, during the period from, and including, the Effective Date to, and including, the Scheduled Termination Date, on each day that any interest and other payments and distributions of cash (other than any payments in the nature of principal payments) and other property are scheduled to be received under the Collateral, Seller will transfer to Buyer an amount equal to the aggregate amount scheduled to be received from the Collateral Issuer in respect of the Collateral.

"**Collateral**" shall bear the meaning given to such term in the Conditions. "**Collateral Issuer**" means the issuer of any Collateral.



### (b)    Seller Payments 2

Seller Final Payment:

In addition to the Interim Seller Payments payable in accordance with the provisions set out above, Seller shall pay to Buyer the Seller Final Payment Amount on the Scheduled Termination Date.

Seller Final Payment Amount:

An amount equal to the amount standing to the credit of the Collection Account (as defined in the Conditions) on the Scheduled Termination Date.

### 5    Provisions relating to Credit Events

Floating Rate Payer Calculation Amount:

The Reference Entity Notional Amount.

Reference Entity Notional Amount:

For each of the 142 Reference Entities, an amount equal to the Notional Portfolio Size multiplied by the Reference Entity Credit Position set forth in respect of such Reference Entity in

the Reference Registry.

| | |
|---|---|
| Notional Portfolio Size: | AUD7,500,000,000. |
| Conditions to Settlement: | Credit Event Notice |

|   |   |   |
|---|---|---|
| | Notifying Party: | Buyer |

Notice of Publicly Available Information: Applicable.

If a Credit Event Notice contains the information required in the Notice of Publicly Available Information such Credit Event Notice shall be deemed to be both a Credit Event Notice and a Notice of Publicly Available Information.

|   |   |
|---|---|
| Public Sources: | Applicable |
| Specified Number: | Two |

Credit Observation Period: The period from and including the Trade Date to and including the Scheduled Termination Date.



Credit Events: With respect to each Reference Entity for the time being comprised in the Reference Registry, the Credit Events specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity.

Obligation Category: With respect to each Reference Entity for the time being comprised in the Reference Registry, the Obligation Category specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity.

Obligation Characteristics: With respect to each Reference Entity for the time being comprised in the Reference Registry, the Obligation Characteristics specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity.

Excluded Obligations: None.

## 6    Calculation of Cash Settlement Amounts

Settlement Method: Cash Settlement in accordance with the Credit Derivative Definitions, as modified by the following terms:

Notwithstanding anything to the contrary contained in the Credit Derivative Definitions (including without limitation Section 7.1 (*Cash Settlement*)) following the occurrence of an Event Determination Date in respect of a Reference Entity, the Calculation Agent shall determine the applicable Cash Settlement Amount.

For the avoidance of doubt, Seller shall not pay Buyer the Cash Settlement Amount, if any, with respect to such Reference Entity but the amount of each Cash Settlement Amount will be

added to the Cumulative Loss Amount which will in turn be used to determine, *inter alia*, the reduction, if any, in the Outstanding Notional Amount payable by Buyer on the Scheduled Termination Date.

**Final Reference Obligation Price:**  The price of the Reference Obligation expressed as a percentage, determined in accordance with the Valuation Method.

**Final Price:**  The Final Reference Obligation Price or, if there is more than one Reference Obligation, the Final Price shall be the weighted average of the Final Reference Obligation Prices (as weighted by the Reference Entity Notional Amount) expressed as a percentage.

**Valuation Date:**  Single Valuation Date.

**Single Valuation Date:**  Any Valuation Business Day selected by the Calculation Agent in its sole discretion falling on or after the thirtieth (30th) calendar day following the Event Determination Date provided that, if an Event Determination Date has occurred and the valuation date or physical settlement date, howsoever expressed (the "**Hedge Settlement Date**") in respect of any credit derivatives transaction or other hedging transaction (each a "**Hedging Transaction**") entered into by or on behalf of Party A in relation to the hedging of its obligations under the Transaction has been delayed in accordance with, or on terms similar to, the provisions of Section 9.9 and Section 9.10 of the Credit Derivatives Definitions (such occurrence, the "**Hedging Transaction Delay**"), then the Valuation Date will be any Valuation Business Day selected by the Calculation Agent occurring no later than the third Valuation Business Day after the Hedge Settlement Date. In the case of an Adjustment Reference Entity existing on the Final Cut-off Date, the Valuation Date shall be deemed to be the Final Cut-off Date.

**Valuation Business Day:**  Any Business Day which is also a Business Day in the market, as determined by the Calculation Agent in its sole discretion, on which credit default swaps in respect of the relevant Reference Entity are primarily traded.

**Valuation Time:**  11:00 a.m. London, New York or (as applicable) Tokyo time, as determined by the Calculation Agent by reference to the market in which credit default swaps for such Reference Entity are primarily traded.

**Bid Quotation:**  With respect to each Reference Obligation selected by the Calculation Agent in respect of the relevant Reference Entity and a Valuation Date, means each firm bid quotation obtained from a Dealer at the Valuation Time for an amount selected by the Calculation Agent which is not greater than the Reference Entity Notional Amount of such Reference Entity.

**Weighted Average Quotation:**  With respect to each Reference Obligation selected by the Calculation Agent in respect of the relevant Reference Entity

and a Valuation Date, the weighted average of firm quotations obtained from Dealers at the Valuation Time each for an amount with an outstanding principal balance not greater than the Reference Entity Notional Amount of such Reference Entity nor less than USD1,000,000, that in aggregate are equal to or greater than the Reference Entity Notional Amount. For the avoidance of doubt, any such weighted average may be lower or equal to any firm quotation obtained from any Dealer.

| | |
|---|---|
| Settlement Currency: | AUD |
| Reference Entity Valuation Date: | In respect of the relevant Reference Entity, the date on which the Final Price is determined in respect of such Reference Entity. |
| Valuation Method: | The highest Bid Quotation with respect to a Valuation Date obtained on the same Valuation Business Day by the Calculation Agent in accordance with the following: |

(i) the Calculation Agent shall attempt to obtain Bid Quotations from at least five Dealers (or if one of such Dealers is the Calculation Agent or an Affiliate of the Calculation Agent, then six Dealers) on the Valuation Date; and

(ii) if at least three Bid Quotations are not available on the Valuation Date, the Calculation Agent shall continue to attempt to obtain three Bid Quotations on each of the days which are 1, 2, 10, 11, 12, 20, 21 and 22 Valuation Business Days following the Valuation Date (the "**Extended Valuation Dates**").

In the event that at least three Bid Quotations cannot be obtained on an Extended Valuation Date which falls on or before the 22nd Valuation Business Day following the Valuation Date, the Calculation Agent shall seek to obtain a Weighted Average Quotation at the Valuation Time on the 23rd Valuation Business Day following the Valuation Date. If a Weighted Average Quotation is obtained, that Weighted Average Quotation shall be the Final Reference Obligation Price.

In the event that (a) at least three Bid Quotations have not been obtained on or before the 22nd Valuation Business Day following the Valuation Date and (b) the Weighted Average Quotation has not been obtained on the 23rd Valuation Business Day following the Valuation Date, the Final Reference Obligation Price with respect to the Reference Obligation shall be deemed to be zero.

The Calculation Agent shall deliver a notice to the Trustee (for delivery to the Noteholders in accordance with the Conditions) and Buyer (with a written copy to Fitch) showing the Final Reference Obligation Price for each Reference Obligation on the day which is no later than 5 Business Days following each

|  |  |
|---|---|
|  | Reference Entity Valuation Date. |
| Dealers: | Dealers in obligations of the type of Reference Obligations for which Bid Quotations are to be obtained, and any affiliate thereof or successor thereto. For the avoidance of doubt, the Calculation Agent or any Affiliate of the Calculation Agent may be a Dealer, provided that only one of the Calculation Agent or its Affiliates may be included in the panel of six Dealers for the purposes of calculating the Final Price. |
| Notices: | Notwithstanding any provisions in the Credit Derivatives Definitions relating to notification of certain matters by the Calculation Agent to the parties, the Calculation Agent shall notify the parties and Fitch of the following with respect to each Reference Entity in respect of which an Event Determination Date has occurred, on the dates stated: |



(i)     selected Reference Obligations: notified to the parties on or before the applicable Valuation Date; and

(ii)    Cash Settlement Amount: notified by the Calculation Agent to the parties (with a written copy to Fitch) on, or as soon as is reasonably practicable following, the applicable Reference Entity Valuation Date.

## 7    Exchange of Collateral

In the event that any Collateral becomes subject to mandatory redemption or otherwise ceases to be a Qualifying Asset, Party A may on any Business Day by notice inform Party B and Fitch that it wishes to transfer to Party B Qualifying Assets specified in that notice in exchange for certain Collateral specified in that notice and held by Party B on such date. Subject to Fitch's rating confirmation, Party A will be obliged to transfer such Qualifying Assets to Party B promptly following such notice and Party B will be obliged to transfer to Party A securities and/or cash equivalent to the Collateral so specified upon receipt of such Qualifying Assets. Party B's obligation to transfer to Party A such equivalent securities and/or cash shall not in any event exceed the aggregate amount of all the Collateral held by it on such date.



In the event that any charges are imposed by the issuer of the Collateral in respect of the redemption of the Collateral, the Swap Counterparty shall procure that the Collateral is exchanged for other Qualifying Assets subject to the provisions set out above.

"Qualifying Assets" means, in respect of any exchange of Collateral pursuant to the terms of this Transaction, any security with the following characteristics:

1.    (a)    having as of the date of transfer a credit rating assigned by Fitch equal to AAA;

       (b)    maturing on or before the Scheduled Maturity Date;

       (c)    being AUD-denominated; and

       (e)    is not a structured finance product; or

2.    any AUD denominated money market fund with a credit rating assigned by Fitch equal to V-1+; or

3.    AUD cash.

Party A shall pay all costs (including stamp duty) associated with the delivery or exchange of the Collateral for Qualifying Assets in accordance with the terms of this Confirmation.

8    **Relationship Between Parties**

Each of Buyer and Seller represents to the other that:

(a)    **Non-Reliance**

It is acting for its own account and it is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction. It has not received from the other party any assurance or guarantee as to the expected results of this Transaction;

(b)    **Acceptance**

It accepts the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the financial and other risks of this Transaction;

(c)    **Status of Parties**

The other party is not acting as a fiduciary or an advisor for it in respect of this Transaction; and



(d)    **Risk Management**

It has entered into this Transaction for the purpose of (i) managing its borrowings or investments, (ii) hedging its underlying assets or liabilities or (iii) in connection with its line of business.

(e)    **Eligible Person**

It is as of the Trade Date an Eligible Person and it agrees that it shall not novate, transfer or assign this Transaction to any person which has not represented that it is an Eligible Person; provided, however, a failure to comply with the terms of the preceding clause shall not constitute an Event of Default pursuant to Section 5(a)(ii) or Section 5(a)(iv) in the absence of willful misconduct. As used herein, an "**Eligible Person**" is an entity which is both (1) a "**qualified institutional buyer**" (as defined in Rule 144A under the United States Securities Act of 1933, as amended) and (2) a "**Qualified Purchaser**" (within the meaning of Section 2(a)(51)(A) of the United States Investment Company Act of 1940, as amended, and the rules and regulations thereunder). Each of Buyer and Seller agrees and acknowledges that the representation set out in this paragraph shall be deemed to be amended, varied or supplemented and restated as subsequently published by ISDA.



9    **Additional Termination Provisions**

(i)    The following shall constitute Additional Termination Events for the purposes of this Transaction:

(a)    The Notes being declared due and payable following the occurrence of an Event of Default (as defined in the Conditions) under the terms thereof.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the sole Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(b)    A default or event of default that has been declared pursuant to the terms of (and as defined in the terms of) the Collateral prior to the Scheduled Termination Date.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the sole Affected Transaction. Notwithstanding anything to the

contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(c)    The Notes being declared redeemable pursuant to the Seller being required by law to withhold or account for tax or would suffer tax in respect of its income so that it would be unable to make payment of the full amount due and the Noteholders not having received, either directly or indirectly, from Buyer the amounts referred to under "Optional Payments" below.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(ii)    **Optional Payments:** If, for any reason beyond the control of Buyer or Seller the Noteholders do not receive payment under their Notes for any reason including the imposition of any withholding tax or a default or other circumstance linked to the Paying Agents, Buyer may elect to make any necessary payments to, or to the order of, the Noteholders to prevent either a redemption of the Notes for taxation reasons pursuant to Condition 6(d) of the Notes or an event of default pursuant to Condition 10 of the Notes from occurring.



## 10    Other Terms

### (i)    Non-insurance business

Party A and Party B acknowledge and agree that this Transaction is not intended to constitute insurance business and is not a contract of insurance, assurance, suretyship or guarantee and payments may be made under this Transaction by each party independently and without proof of the economic loss (if any) of the other party.

### (ii)    Third party rights

No person shall have any right to enforce any provision of this Transaction under the Contracts (Rights of Third Parties) Act 1999.

### (iii)    Credit Support Document.

Credit Support Document means in relation to Party A: the Guarantee dated as of the date hereof by Lehman Brothers Holdings Inc. in favour of Party B as beneficiary thereof in the form attached hereto as Exhibit A.

### (iv)    Credit Support Provider

Credit Support Provider means in relation to Party A: Lehman Brothers Holdings Inc.

### (v)    Credit Support Annex

Party A and Party B agree that the provisions of the ISDA Credit Support Annex, as supplemented by the Elections and Variables attached hereto as Annex A shall apply to this Transaction.

### (vi)    Misrepresentation

For the purpose of this Confirmation only, Section 5(a)(iv) of the Agreement will not apply to Party B.

(vii)   **Breach of Agreement**

For the purpose of this Confirmation only, Section 5(a)(ii) of the Agreement will not apply to Party B.

(viii)  **Bankruptcy**

For the purposes of this Confirmation only, Sections 5(a)(vii)(2) and 5(a)(vii)(9) will not apply to Party B.

For the purposes of this Confirmation and Party B only, Section 5(a)(vii)(4) will be amended with the insertion of the following wording immediately following the end of that Section:

", other than any such proceeding initiated by Party A or any of its affiliates"

For the purposes of this Confirmation and Party B only, Section 5(a)(vii)(6) will be amended as follows:

(i)   the wordings "seeks or" will be deleted from that Section; and

(ii)   the wording ", other than the appointment of the Trustee, the Custodian (each as defined in the Conditions) or other analogous parties" will be inserted immediately following the end of that Section.



## 11   Account Details

| | |
|---|---|
| Account details of Buyer: | Australia & New Zealand Banking Group, Melbourne (ANZBAU3M) |
| | A/C 265041 00001 |
| | A/C Lehman Brothers Inc./BNF/IFO Lehman Brothers Special Financing Inc. |
| Account details of Seller: | JP Morgan Chase Bank, N.A. Brisbane (CHASAU2X) |
| | BSB Code: 214-400 |
| | A/C 10048091 |
| | A/C BTAISAL Paying Agent Account |
| | Ref: Zircon Finance Ltd Series 2007-9 Tranche A |

This Confirmation shall be governed by and construed in accordance with English law.



Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us by facsimile.

Yours faithfully,

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By:

Name:

Title:


**LEHMAN BROTHERS INTERNATIONAL (EUROPE)** hereby agrees to perform its obligations as Calculation Agent set out herein.

By:

Name:



Title:


Confirmed on the date first above written:

**ZIRCON FINANCE LIMITED**

By:

Name:

Title:



Schedule A

Annex 1

Reference Registry

(as of 6 June 2007)

| Reference Entity | Bench Mark Obligation | | | Seniority | Reference Entity Notional Amount | Reference Entity Type | Monoline |
|---|---|---|---|---|---|---|---|
| | ISIN | Coupon | Maturity | | | | |
| Archer-Daniels-Midland Company | US039483AJ11 | 8.125% | 01/06/2012 | Senior | 0.714% | North American | |
| AIFUL CORPORATION | JP310504B356 | 1.740% | 28/05/2013 | Senior | 0.714% | Japanese | |
| American International Group, Inc. | US026874AT47 | 4.250% | 15/05/2013 | Senior | 0.714% | North American | |
| AKZO Nobel N.V. | XS0170265341 | 4.250% | 14/06/2011 | Senior | 0.714% | Western European | |
| ADIS SA | XS0176838372 | 5.125% | 02/10/2013 | Senior | 0.714% | Western European | |
| Ambac Assurance Corporation | * No Ref Ob * | * No Ref Ob * | * No Ref Ob * | Senior | 0.714% | North American | Monoline |
| Aon Corporation | US037389AS27 | 7.375% | 14/12/2012 | Senior | 0.714% | North American | |
| ArvinMeritor, Inc. | US043353AA92 | 8.750% | 01/03/2012 | Senior | 0.714% | North American | |
| American Axle & Manufacturing, Inc. | US02406PAE07 | 5.250% | 11/02/2014 | Senior | 0.714% | North American | |
| Bank of America Corporation | US060505AG97 | 7.400% | 15/01/2011 | Subordinate | 0.714% | North American | |
| BARCLAYS BANK PLC | XS0187033864 | 4.500% | 04/03/2019 | Subordinate | 0.714% | Western European | |
| B A S F Aktiengesellschaft | DE0008846718 | 3.500% | 08/07/2010 | Senior | 0.714% | Western European | |
| BRUNSWICK CORPORATION | US117043AG45 | 7.125% | 01/08/2027 | Senior | 0.714% | North American | |
| The Black & Decker Corporation | US091797AJ96 | 7.125% | 01/06/2011 | Senior | 0.714% | North American | |
| Berkshire Hathaway Inc. | US084664AD30 | 4.625% | 15/10/2013 | Senior | 0.714% | North American | |
| The Bear Stearns Companies | US073902KF49 | 5.300% | 30/10/2015 | Senior | 0.714% | North American | |
| Bank TuranAlem" | USN89065AF89 | 8.000% | 24/03/2014 | Senior | 0.714% | Russian | |
| Beazer Homes USA, Inc. | US07556QAJ40 | 6.500% | 15/11/2013 | Senior | 0.357% | North American High Yield | |
| Citigroup Inc. | US172967AZ49 | 7.250% | 01/10/2010 | Subordinate | 0.714% | North American | |
| CARREFOUR | FR0000480691 | 6.125% | 26/05/2010 | Senior | 0.714% | Western European | |
| Countrywide Home Loans, Inc. | US22237LPA43 | 4.000% | 22/03/2011 | Senior | 0.714% | North American | |
| Chemtura Corporation | US163893AA87 | 6.875% | 01/06/2016 | Senior | 0.714% | North American | |
| Centrica Plc | XS0137672381 | 5.875% | 02/11/2012 | Senior | 0.714% | Western European | |
| CIT Group Inc. | US125581AB41 | 7.750% | 02/04/2012 | Senior | 0.714% | North American | |
| CITADEL FINANCE LTD | US17285RAA86 | 6.250% | 15/12/2011 | Senior | 0.714% | North American | |
| Con-way Inc. | US12612WAA27 | 8.875% | 01/05/2010 | Senior | 0.714% | North American | |
| Capital One Financial | US14040HAJ41 | 6.250% | 15/11/2013 | Senior | 0.714% | North American | |

| Corporation | | | | | | | |
|---|---|---|---|---|---|---|---|
| Continental Aktiengesellschaft | XS0139722069 | 6.875% | 05/12/2008 | Senior | 0.714% | Western European | |
| Costco Wholesale Corporation | * No Ref Ob * | * No Ref Ob * | * No Ref Ob * | Senior | 0.714% | North American | |
| COMPASS GROUP PLC | XS0148362501 | 6.375% | 29/05/2012 | Senior | 0.714% | Western European | |
| Credit Suisse Group | XS0118485670 | 6.625% | 05/10/2010 | Subordinate | 0.714% | Western European | |
| Computer Sciences Corporation | US205363AE42 | 7.375% | 15/06/2011 | Senior | 0.714% | North American | |
| Centex Corporation | US152312AQ77 | 5.250% | 15/06/2015 | Senior | 0.714% | North American | |
| DEUTSCHE BANK AKTIENGESELLSCHAFT | US251529AF04 | 7.500% | 25/04/2009 | Subordinate | 0.714% | Western European | |
| DEXIA CREDIT LOCAL | XS0093833282 | 5.500% | 21/01/2009 | Senior | 0.714% | Western European | |
| D.R. Horton, Inc. | US23331AAX72 | 5.375% | 15/06/2012 | Senior | 0.714% | North American | |
| The Dow Chemical Company | US260543BR36 | 6.000% | 01/10/2012 | Senior | 0.714% | North American | |
| Deutsche Post AG | DE0009279042 | 5.125% | 04/10/2012 | Senior | 0.714% | Western European | |
| Darden Restaurants, Inc. | US237194AB19 | 7.125% | 01/02/2016 | Senior | 0.714% | North American | |
| DSG INTERNATIONAL PLC | XS0157632562 | 6.125% | 15/11/2012 | Senior | 0.714% | Western European | |
| Koninklijke DSM N.V. | XS0235117891 | 4.000% | 10/11/2015 | Senior | 0.714% | Western European | |
| ERP Operating Limited Partnership | US26884AAM53 | 6.950% | 02/03/2011 | Senior | 0.714% | North American | |
| Eaton Corporation | US278058AW21 | 7.650% | 15/11/2029 | Senior | 0.714% | North American | |
| Exelon Corporation | US30161NAA90 | 6.750% | 01/05/2011 | Senior | 0.714% | North American | |
| Financial Guaranty Insurance Company | * No Ref Ob * | * No Ref Ob * | * No Ref Ob * | Senior | 0.714% | North American | Monoline |
| Federal Home Loan Mortgage Corporation | US3134A4EW03 | 5.875% | 21/03/2011 | Subordinate | 0.714% | North American | |
| Federal National Mortgage Association | US31359MNU35 | 5.250% | 01/08/2012 | Subordinate | 0.714% | North American | |
| Fortune Brands, Inc. | US349631AF84 | 6.250% | 01/04/2008 | Senior | 0.714% | North American | |
| Financial Security Assurance | * No Ref Ob * | * No Ref Ob * | * No Ref Ob * | Senior | 0.714% | North American | Monoline |
| Gannett Co., Inc. | US364725AC59 | 6.375% | 01/04/2012 | Senior | 0.714% | North American | |
| GMAC LLC | US370425SE16 | 6.875% | 28/08/2012 | Senior | 0.714% | North American | |
| Genworth Financial, Inc. | US37247DAE67 | 5.750% | 15/06/2014 | Senior | 0.714% | North American | |
| The Goldman Sachs Group, Inc. | US38141GEU40 | 6.250% | 15/01/2017 | Subordinate | 0.714% | North American | |
| GlobalSantaFe Corporation | US37943TAB44 | 5.000% | 15/02/2013 | Senior | 0.714% | North American | |
| EXPERIAN FINANCE PLC | XS0162820228 | 5.625% | 12/12/2013 | Senior | 0.714% | Western European | |
| Hannover Rueckversicherung AG | XS0187043079 | 5.750% | 26/02/2024 | Subordinate | 0.714% | Western European Insurance | |
| The Governor and Company of the Bank of Scotland | XS0139647001 | 5.125% | 05/12/2013 | Subordinate | 0.714% | Western European | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| HEALTH CARE PROPERTY INVESTORS, INC. | US421915EB13 | 6.450% | 25/06/2012 | Senior | 0.714% | North American | |
| HSBC Finance Corporation | US4411812JY13 | 7.000% | 15/05/2012 | Senior | 0.714% | North American | |
| Hovnanian Enterprises, Inc. | US442488AQ54 | 6.500% | 15/01/2014 | Senior | 0.357% | North American High Yield | |
| BLOCK FINANCIAL CORPORATION | US093662AC83 | 5.125% | 30/10/2014 | Senior | 0.714% | North American | |
| International Game Technology | US459902AP73 | 2.600% | 15/12/2036 | Senior | 0.714% | North American | |
| J. C. Penney Company, Inc. | US708130AA74 | 8.000% | 01/03/2010 | Senior | 0.714% | North American High Yield | |
| Johnson & Johnson | US478160AM65 | 3.800% | 15/05/2013 | Senior | 0.714% | North American | |
| JPMorgan Chase & Co. | US46625HAJ95 | 6.750% | 01/02/2011 | Subordinate | 0.714% | North American | |
| Kaupthing banki hf. | XS0194805429 | 3mEuribor+0.65% | 30/06/2014 | Subordinate | 0.714% | Western European | |
| KB Home | US48666KAF66 | 7.750% | 01/02/2010 | Subordinate | 0.357% | North American High Yield | |
| KINGFISHER PLC | XS0178322474 | 5.625% | 15/12/2014 | Senior | 0.714% | Western European | |
| Kimberly-Clark Corporation | US494368AQ68 | 6.875% | 15/02/2014 | Senior | 0.714% | North American | |
| Koninklijke KPN N.V. | US780641AG12 | 8.000% | 01/10/2010 | Senior | 0.714% | Western European | |
| Kohl's Corporation | US500255AM62 | 6.300% | 01/03/2011 | Senior | 0.714% | North American | |
| Lennar Corporation | US526057AG99 | 5.950% | 01/03/2013 | Senior | 0.714% | North American | |
| Liz Claiborne, Inc. | XS0260255160 | 5.000% | 08/07/2013 | Senior | 0.714% | North American | |
| LLOYDS TSB BANK plc | XS0145620281 | 5.875% | 08/07/2014 | Subordinate | 0.714% | Western European | |
| Lowe's Companies, Inc. | US548661CA38 | 8.250% | 01/06/2010 | Senior | 0.714% | North American | |
| Limited Brands, Inc. | US532716AH08 | 6.125% | 01/12/2012 | Senior | 0.714% | North American | |
| Southwest Airlines Co. | US844741AV08 | 6.500% | 01/03/2012 | Senior | 0.714% | North American | |
| LANXESS Aktiengesellschaft | XS0222550880 | 4.125% | 21/06/2012 | Senior | 0.714% | Western European | |
| Masco Corporation | US574599AX44 | 5.875% | 15/07/2012 | Senior | 0.714% | North American | |
| MBIA Insurance Corporation | * No Ref Ob * | * No Ref Ob * | * No Ref Ob * | Senior | 0.714% | North American | Monoline |
| Merrill Lynch & Co., Inc. | US5901884M72 | 6.050% | 16/05/2016 | Subordinate | 0.714% | North American | |
| MARSH & McLENNAN COMPANIES, INC. | US571748AM43 | 5.375% | 15/07/2014 | Senior | 0.714% | North American | |
| AXA | XS0130738213 | 6.000% | 18/06/2013 | Senior | 0.714% | Western European | |
| Motorola, Inc. | US620076AK59 | 6.500% | 01/09/2025 | Senior | 0.714% | North American | |
| Morgan Stanley | US61748AAE64 | 4.750% | 01/04/2014 | Subordinate | 0.714% | North American | |
| Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen | XS0166965797 | 6.750% | 21/06/2023 | Subordinate | 0.714% | Western European Insurance | |
| WENDEL INVESTISSEMENT | XS0185010401 | 5.000% | 16/02/2011 | Senior | 0.714% | Western European | |
| Noble Corporation | USG65422AA86 | 5.875% | 01/06/2013 | Senior | 0.714% | North American | |
| Nestle S.A. | XS0144994232 | 4.750% | 25/09/2007 | Senior | 0.714% | Western European | |
| NIKE, Inc. | US653922AH77 | 5.150% | 15/10/2015 | Senior | 0.714% | North American | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Novartis AG | XS0158284801 | 3.750% | 06/12/2007 | Senior | 0.714% | Western European | |
| NORFOLK SOUTHERN CORPORATION | US655844AE88 | 7.700% | 15/05/2017 | Senior | 0.714% | North American | |
| NEXT PLC | XS0169287124 | 5.250% | 30/09/2013 | Senior | 0.714% | Western European | |
| Pitney Bowes Inc. | US724479AF75 | 4.625% | 01/10/2012 | Senior | 0.714% | North American | |
| PCCW-HKT TELEPHONE LIMITED | US69319CAA27 | 7.750% | 15/11/2011 | Senior | 0.714% | Asian | |
| Pfizer Inc. | US717081AQ56 | 4.650% | 01/03/2018 | Senior | 0.714% | North American | |
| Pulte Homes, Inc. | US745867AL56 | 7.875% | 01/08/2011 | Senior | 0.714% | North American | |
| The PMI Group, Inc. | US69344MAH43 | 6.000% | 15/09/2016 | Senior | 0.714% | North American | |
| PPG Industries, Inc. | US693506AY35 | 7.050% | 15/08/2009 | Senior | 0.714% | North American | |
| Ryder System, Inc. | US783549AZ16 | 6.950% | 01/12/2025 | Senior | 0.714% | North American | |
| THE ROYAL BANK OF SCOTLAND PUBLIC LIMITED COMPANY | * No Ref Ob * | * No Ref Ob * | * No Ref Ob * | Subordinate | 0.714% | Western European | |
| Radian Group Inc. | US750236AB78 | 7.750% | 01/06/2011 | Senior | 0.714% | North American | |
| ROKIL INITIAL PLC | XS0249085852 | 5.750% | 31/03/2016 | Senior | 0.714% | Western European | |
| Residential Capital, LLC | US76113BAR06 | 6.500% | 17/04/2013 | Senior | 0.714% | North American | |
| RenaissanceRe Holdings Ltd. | US75968NAB73 | 5.875% | 15/02/2013 | Senior | 0.714% | North American | |
| R.R. Donnelley & Sons Company | US257867AM36 | 4.950% | 01/04/2014 | Senior | 0.714% | North American | |
| Republic Services, Inc. | US760759AA83 | 7.125% | 15/05/2009 | Senior | 0.714% | North American | |
| Russian Federation | XS0114288789 | 2.250% | 31/03/2030 | Senior | 0.714% | Russian | |
| SPRINT NEXTEL CORPORATION | US852060AS17 | 8.375% | 15/03/2012 | Senior | 0.714% | North American | |
| SANOFI-AVENTIS | XS0176128675 | 4.250% | 15/09/2010 | Senior | 0.714% | Western European | |
| BANCO SANTANDER CENTRAL HISPANO, S.A. | XS0125754324 | 6.000% | 14/03/2011 | Subordinate | 0.714% | Western European | |
| Sberbank | XS0253322886 | 6.480% | 15/05/2013 | Senior | 0.714% | Russian | |
| iStar Financial Inc. | US45031UAB70 | 6.000% | 15/12/2010 | Senior | 0.714% | North American | |
| Siemens Aktiengesellschaft | XS0131224155 | 5.750% | 04/07/2011 | Senior | 0.714% | Western European | |
| Zee Corporation | US803111AM56 | 6.125% | 01/11/2032 | Senior | 0.714% | North American | |
| SOCIETE GENERALE | XS0110673950 | 6.625% | 27/04/2015 | Subordinate | 0.714% | Western European | |
| Standard Pacific Corp. | US85375CAN11 | 6.875% | 15/05/2011 | Senior | 0.357% | North American High Yield | |
| STMicroelectronics N.V. | XS0173918011 | 0.000% | 05/07/2013 | Senior | 0.714% | Western European | |
| The Stanley Works | US854616AJ88 | 4.900% | 01/11/2012 | Senior | 0.714% | North American | |
| TELUS CORPORATION | US87971MAC73 | 8.000% | 01/06/2011 | Senior | 0.714% | North American | |
| TELSTRA CORPORATION LIMITED | XS0131858838 | 6.375% | 29/06/2011 | Senior | 0.714% | North American | |
| TELECOM CORPORATION OF NEW ZEALAND LIMITED | XS0140346171 | 6.750% | 14/12/2011 | Senior | 0.714% | North American | |
| TELECOM ITALIA SPA | XS0184373925 | 5.375% | 29/01/2019 | Senior | 0.714% | Western European | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| The TJX Companies, Inc. | US872540AH26 | 7.450% | 15/12/2009 | Senior | 0.714% | North American | |
| TeliaSonera Aktiebolag | XS0101443538 | 5.500% | 10/09/2010 | Senior | 0.714% | Western European | |
| TOYOTA MOTOR CORPORATION | JP363340A296 | 1.330% | 20/09/2012 | Senior | 0.714% | Japanese | |
| Texas Instruments Incorporated | * No Ref Ob * | * No Ref Ob * | * No Ref Ob * | Senior | 0.714% | North American | |
| UBS AG | CH0009367886 | 3.500% | 27/08/2008 | Senior | 0.714% | Western European | |
| Unilever N.V. | US904764AG27 | 7.125% | 01/11/2010 | Senior | 0.714% | Western European | |
| United Parcel Service, Inc. | US911308AB04 | 8.375% | 01/04/2030 | Senior | 0.714% | North American | |
| UST Inc. | US902911AM82 | 6.625% | 15/07/2012 | Senior | 0.714% | North American | |
| VINCI | XS0151548616 | 5.875% | 22/07/2009 | Senior | 0.714% | Western European | |
| Verizon Communications Inc. | US92344GAW69 | 4.900% | 15/09/2015 | Senior | 0.714% | North American | |
| WACHOVIA CORPORATION | US929771AL77 | 5.625% | 15/12/2008 | Subordinate | 0.714% | North American | |
| Whirlpool Corporation | US963320AH94 | 7.750% | 15/07/2016 | Senior | 0.714% | North American | |
| Washington Mutual, Inc. | US939322AV52 | 5.250% | 15/09/2017 | Senior | 0.714% | North American | |
| Waste Management, Inc. | US94106LAK52 | 7.375% | 01/08/2010 | Senior | 0.714% | North American | |
| The Western Union Company | US959802AA70 | 5.930% | 01/10/2016 | Senior | 0.714% | North American | |
| Weyerhaeuser Company | US962166BP84 | 6.750% | 15/03/2012 | Senior | 0.714% | North American | |
| XL Capital Assurance Inc. | * No Ref Ob * | * No Ref Ob * | * No Ref Ob * | Senior | 0.714% | North American | Monoline |
| EXXON MOBIL CORPORATION | US607059AT90 | 8.625% | 15/08/2021 | Senior | 0.714% | North American | |
| JSC Vneshtorgbank | XS0197141285 | LIBOR+2.9% | 30/07/2007 | Senior | 0.714% | Russian | |
| | XS0182007830 | 6.880% | 11/12/2008 | | | | |
| | XS0202919667 | 7.500% | 12/10/2011 | | | | |
| | US92909MAA80 | 7.500% | 12/10/2011 | | | | |
| | XS0223715920 | 6.250% | 30/06/2035 | | | | |
| | US92909MAB63 | 6.250% | 30/06/2035 | | | | |
| | XS0239043655 | LIBOR+0.75% | 21/09/2007 | | | | |
| | US92909MAC47 | LIBOR+0.75% | 21/09/2007 | | | | |
| | XS0244105283 | 4.250% | 15/02/2016 | | | | |

### Schedule B
### Additional Definitions

**Definitions relating to Credit Events**

Bankruptcy: 

means a Reference Entity (a) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (b) becomes insolvent or is unable to pay its debts or fails or admits in writing in a judicial, regulatory or administrative proceeding or filing its inability generally to pay its debts as they become due; (c) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (d) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (i) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (ii) is not dismissed, discharged, stayed or restrained in each case within thirty calendar days of the institution or presentation thereof; (e) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (f) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (g) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within thirty calendar days thereafter; or (h) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (a) to (g) (inclusive).



Default Requirement:

USD 10,000,000 or its equivalent in any other currency.

Failure to Pay:

means, after the expiration of any applicable (or deemed) Grace Period (after the satisfaction of any conditions precedent to the commencement of such Grace Period), the failure by a Reference Entity to make, when and where due, any payments in an aggregate amount of not less than the Payment Requirement under one or more Obligations, in accordance with the terms of such Obligations at the time of such failure.

Payment Requirement: USD 1,000,000 or its equivalent in any other currency.

Restructuring:

(a) Restructuring means that, with respect to one or more Obligations and in relation to an aggregate amount of not less than the Default Requirement, any one or more of the following events occurs in a form that binds all holders of such Obligation, is agreed between the Reference Entity or a Governmental Authority and a sufficient number of holders of such Obligation to bind all holders of the Obligation or is announced (or otherwise decreed) by a Reference Entity or a Governmental Authority in a form that binds all holders of such Obligation, and such event is not expressly provided for under the terms of such Obligation in effect as of the later of the Trade Date and the date as of which such Obligation is issued or incurred:

(i) a reduction in the rate or amount of interest payable or the amount of scheduled interest accruals;

(ii) a reduction in the amount of principal or premium payable at maturity or at scheduled redemption dates;

(iii) a postponement or other deferral of a date or dates for either (A) the payment or accrual of interest or (B) the payment of principal or premium;

(iv) a change in the ranking in priority of payment of any Obligation, causing the Subordination of such Obligation to any other Obligation; or

(v) any change in the currency or composition of any payment of interest or principal to any currency which is not a Permitted Currency.

"Permitted Currency" means (i) the legal tender of any Group of 7 (G7) country (or any country that becomes a member of G7 if G7 expands its membership); or (ii) the legal tender of any country which, as of the date of such change, is a member of the Organisation for Economic Cooperation and Development and has a local currency long-term debt rating of either AAA or higher assigned to it by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. or any successor to the rating business thereof, Aaa or higher assigned to it by Moody's Investors Service Inc. or any successor to the rating business thereof or AAA or higher assigned to it by Fitch Ratings Limited or any successor to the rating business thereof.

(b) Notwithstanding the provisions of (a), above, none of the following shall constitute a Restructuring:

(i) the payment in euros of interest or principal in relation to an Obligation denominated in a currency of a Member State of the European Union that adopts or has adopted the single currency in accordance