with the Treaty establishing the European Community, as amended by the Treaty on European Union;

(ii) the occurrence of, agreement to or announcement of any of the events described in (a)(i) to (v) due to an administrative adjustment, accounting adjustment or tax adjustment or other technical adjustment occurring in the ordinary course of business; and

(iii) the occurrence of, agreement to or announcement of any of the events described in (a)(i) to (v) in circumstances where such event does not directly or indirectly result from a deterioration in the creditworthiness or financial condition of the Reference Entity.



(c) For purposes of paragraphs (a) and (b) (above), the term Obligation shall be deemed to include Underlying Obligations for which the Reference Entity is acting as provider of a Qualifying Affiliate Guarantee or, if "All Guarantees" is specified as Applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, as provider of any Qualifying Guarantee. In the case of a Qualifying Guarantee and an Underlying Obligation, references to a Reference Entity in paragraph (a) of this definition shall be deemed to refer to the relevant Underlying Obligor and the reference to a Reference Entity in paragraph (b) of this definition shall continue to refer to such Reference Entity.



(d) With respect to a Reference Entity, unless "Multiple Holder Obligation" is specified as Not Applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, notwithstanding anything to the contrary in this definition of Restructuring the occurrence of, agreement to, or announcement of, any of the events described in (a)(i) to (v) (above) shall not be a Restructuring where the Obligation in respect of any such events is not a Multiple Holder Obligation.

"Multiple Holder Obligation" means an Obligation that (i) at the time the Credit Event Notice is delivered, is held by more than three holders that are not Affiliates of each other and (ii) with respect to which a percentage of holders (determined pursuant to the terms of the Obligation) at least equal to sixty-six-and-two-thirds is required to consent to the event which would otherwise constitute a Restructuring Credit Event, provided that (ii) above shall not apply to any Obligations which are Bonds.

| | |
|---|---|
| **Obligation Acceleration:** | means one or more Obligations in an aggregate amount of not less than the Default Requirement have become due and payable before they would otherwise have been due and payable as a result of, or on the basis of, the occurrence of a default, event of default or other similar condition or event (however described), other than a failure to make any required payment, in respect of the Reference Entity under one or more Obligations. |
| **Repudiation/Moratorium:** | means the occurrence of both of the following events: (i) an authorised officer of a Reference Entity or a Governmental Authority (x) disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, one or more Obligations in an aggregate amount of not less than the Default Requirement, or (y) declares or imposes a moratorium, standstill, roll-over or deferral, whether de facto or de jure, with respect to one or more Obligations in an aggregate amount of not less than the Default Requirement and (ii) a Failure to Pay, determined without regard to the Payment Requirement, or a Restructuring, determined without regard to the Default Requirement, with respect to any such Obligation occurs on or prior to the Repudiation/Moratorium Evaluation Date. |
| **Credit Event Notice:** | An irrevocable notice (which may be oral, including by telephone) from Buyer to Seller (with a written copy to Fitch) which describes a Credit Event that occurred during the Credit Observation Period. The Credit Event which is the subject of the Credit Event Notice need not be continuing on the date the Credit Event Notice is effective |



| | |
|---|---|
| **Credit Event Notice After Restructuring:** | With respect to a Reference Entity, notwithstanding anything to the contrary in the Credit Derivative Definitions, upon the occurrence of a Restructuring Credit Event during the term of the Transaction: |

(a) the Buyer may deliver multiple Credit Event Notices with respect to the Reference Entity to which such Credit Event applies (with a written copy to Fitch), each such Credit Event Notice setting forth the amount of the Floating Rate Payer Calculation Amount to which such Credit Event Notice applies (the "Exercise Amount");

(b) if the Buyer has delivered a Credit Event Notice that specifies an Exercise Amount that is less than the then outstanding Floating Rate Payer Calculation Amount for the Reference Entity to which such Credit Event applies, it shall be construed as if the Reference Registry contained two entries for that specific Reference Entity, one which has a Floating Rate Payer Calculation Amount equal to the Exercise Amount and, upon satisfaction of the Conditions to Settlement, will be settled in accordance with the terms herein, and the other of which will have a Floating Rate Payer Calculation Amount equal to the Floating Rate

Payer Calculation Amount outstanding prior to such Credit Event Notice minus the Exercise Amount and will continue in effect; and

(c) the Exercise Amount in connection with a Credit Event Notice describing a Restructuring must be in the amount of 1,000,000 units of the currency in which the Floating Rate Payer Calculation Amount is denominated or an integral multiple thereof.

| | |
|---|---|
| Grace Period: | means the lesser of (a) the applicable grace period with respect to payments under the relevant Obligation under the terms of such Obligation in effect as of the later of the Trade Date and the date as of which such Obligation is issued or incurred and (b) 30 calendar days. |



Grace Period Extension Date: in the event of a Potential Failure to Pay occurring on or prior to the Scheduled Termination Date, and if Grace Period Extension is specified as applicable, and the relevant Grace Period ends after the Scheduled Termination Date, the Grace Period Extension Date will be (i) in the event that the Calculation Agent determines that the Potential Failure to Pay is remedied during the Grace Period, and, in the absence of further Credit Events or further Potential Failure to Pay prior to or on the Scheduled Termination Date, the later of (A) the Scheduled Termination Date, and (B) the date which is three Business Days after the date of such remedy, or (ii) in the event that such Potential Failure to Pay is not remedied (as determined by the Calculation Agent in its sole and absolute discretion) before the expiry of the Grace Period and does not result in the occurrence of a Failure to Pay occurring prior to the expiry of the Grace Period, the date that is three Business Days following the expiry of the Grace Period.



Notice of Publicly Available Information: means an irrevocable notice from the Calculation Agent (which may be oral, including by telephone) to the Buyer and Seller (with a written copy to Fitch) that cites Publicly Available Information confirming the occurrence of the Credit Event described in the Credit Event Notice. The notice given must contain a copy, or a description in reasonable detail, of the relevant Publicly Available Information.

Event Determination Date: means the first date on which both the Credit Event Notice and the Notice of Publicly Available Information are effective.

Potential Failure to Pay: means the failure by any one of the Reference Entities to make, when and where due, any payments in an aggregate amount of not less than the Payment Requirement under one or more Obligations, without regard to any grace period or any conditions precedent to the commencement of any grace period applicable to such Obligations, in accordance with the terms of such Obligations at the time of such failure.

Potential Repudiation/Moratorium: means the occurrence of an event described in clause (i) of the

definition at Repudiation/Moratorium.

Repudiation/Moratorium Evaluation Date:

means, if a Potential Repudiation/Moratorium occurs on or prior to the Scheduled Termination Date, (i) if the Obligations to which such Potential Repudiation/Moratorium relates include Bonds, the date that is the later of (A) the date that is 60 days after the date of such Potential Repudiation/Moratorium and (B) the first payment under any such Bond after the date of such Potential Repudiation/Moratorium (or, if later, the expiration date or of any applicable Grace Period in respect of such payment date) and (ii) if the Obligations to which such Potential Repudiation/Moratorium relates do not include Bonds, the date that is 60 days after the date of such Potential Repudiation/Moratorium.

If (i) the Repudiation/Moratorium Extension Condition is satisfied and (ii) an Event Determination Date in respect of that Repudiation/Moratorium does not occur during the Notice Delivery Period, the Repudiation/Moratorium Evaluation Date will be the Termination Date (even if a Repudiation/Moratorium occurs after the Scheduled Termination Date).

Repudiation/Moratorium Extension Condition:

The "Repudiation/Moratorium Extension Condition" is satisfied by the delivery of a Repudiation/Moratorium Extension Notice and, if specified as applicable in the related Confirmation, Notice of Publicly Available Information by the Notifying Party to the other party that is effective during the period described in clause (a) of the definition of Notice Delivery Period.

Repudiation/Moratorium Extension Notice:

means an irrevocable notice (which may be by telephone) from Notifying Party to the other party that describes a Potential Repudiation/Moratorium that occurred during the Credit Observation Period. A Repudiation/Moratorium Extension Notice must contain a description in reasonable detail of the facts relevant to the determination that a Potential Repudiation/Moratorium has occurred and indicate the date of the occurrence. The Potential Repudiation/Moratorium that is the subject of the Repudiation/Moratorium Extension Notice need not be continuing on the date the Repudiation/Moratorium Extension Notice is effective. A Repudiation/Moratorium Extension Notice shall be subject to the requirements regarding notices set forth in Section 1.10 of the Credit Derivatives definitions.

Qualifying Guarantee:

means an arrangement evidenced by a written instrument pursuant to which a Reference Entity irrevocably agrees (by guarantee of payment or equivalent legal arrangement) to pay all amounts due under an obligation (the "Underlying Obligation") for which another party is the obligor (the "Underlying Obligor") and that is not at the time of the Credit Event Subordinated to any unsubordinated Borrowed Money obligation of the Underlying Obligor (with references in the

definition of Subordination to the Reference Entity deemed to refer to the Underlying Obligor). Qualifying Guarantees shall exclude any arrangement (i) structured as a surety bond, financial guarantee insurance policy, letter of credit or equivalent legal arrangement or (ii) pursuant to the terms of which the payment obligations of the Reference Entity can be discharged, reduced or otherwise altered or assigned (other than by operation of law) as a result of the occurrence or non-occurrence of an event or circumstance (other than payment). The benefit of a Qualifying Guarantee must be capable of being Delivered together with the Delivery of the Underlying Obligation.

**Qualifying Affiliate Guarantee:** means a Qualifying Guarantee provided by a Reference Entity in respect of an Underlying Obligation of a Downstream Affiliate of that Reference Entity.



**Downstream Affiliate:** means an entity whose outstanding Voting Shares were, at the date of issuance of the Qualifying Guarantee, more than 50 per cent. owned, directly or indirectly, by the Reference Entity.

**Voting Shares:** means those shares or other interests that have power to elect the board of directors or similar governing body of an entity.

**Governmental Authority:** means any de facto or de jure government (or any agency, instrumentality, ministry or department thereof), court, tribunal, administrative or other governmental authority or any other entity (private or public) charged with the regulation of the financial markets (including the central bank) of a Reference Entity or of the jurisdiction of organisation of a Reference Entity.

**Convertible Obligation:** means any obligation that is convertible, in whole or in part, into Equity Securities solely at the option of holders of such obligation or a trustee or similar agent acting for the benefit only of holders of such obligation (or the cash equivalent thereof, whether the cash settlement option is that of the issuer or of (or for the benefit of) the holders of such obligation).



**Exchangeable Obligation:** means any obligation that is exchangeable, in whole or in part, for Equity Securities solely at the option of holders of such obligation or a trustee or similar agent acting for the benefit only of holders of such obligation (or the cash equivalent thereof, whether the cash settlement option is that of the issuer or of (or for the benefit of) the holders of such obligation).

**Accreting Obligation:** means any obligation (including, without limitation, a Convertible Obligation or an Exchangeable Obligation), the terms of which expressly provide for an amount payable upon acceleration equal to the original issue price (whether or not equal to the face amount thereof) plus an additional amount or amounts (on account of original issue discount or other accruals of interest or principal not payable on a periodic basis) that will or may accrete, whether or not (A) payment of such additional

amounts is subject to a contingency or determined by reference to a formula or index, or (B) periodic cash interest is also payable.

Equity Securities:

means:

(A)    in the case of a Convertible Obligation, equity securities (including options and warrants) of the issuer of such obligation or depository receipts representing those equity securities of the issuer of such obligation together with any other property distributed to or made available to holders of those equity securities from time to time; and

(B)    in the case of an Exchangeable Obligation, equity securities (including options and warrants) of a person other than the issuer of such obligation or depositary receipts representing those equity securities of a person other than the issuer of such obligation together with any other property distributed to or made available to holders of those equity securities from time to time.

## Obligation and Reference Obligation Definitions

Borrowed Money:

with respect to any one of the Reference Entities, any one or more obligations (whether as principal or surety or otherwise) (excluding an obligation under a revolving credit arrangement for which there are no outstanding unpaid drawings in respect of principal) for the payment or repayment of borrowed money (which term shall include, without limitation, deposits and reimbursement obligations arising from drawings pursuant to letters of credit).

Bond:

means with respect to any one of the Reference Entities, any one or more obligations (whether as principal or surety or otherwise) in respect of borrowed money that is an obligation that is in the form of, or represented by, a bond, note (other than notes delivered pursuant to Loans), certificated debt security or other debt security, and shall not include any other type of borrowed money obligation.

Loan:

means with respect to any one of the Reference Entities, any one or more obligations (whether as principal or surety or otherwise) in respect of borrowed money that is an obligation that is documented by a term loan agreement, revolving loan agreement or other similar credit agreement, and shall not include any other type of borrowed money obligation.

Bond or Loan:

means any obligation that is either a Bond or a Loan.

Specified Currencies:

meaning (a) Standard Specified Currencies and (b) any additional currencies specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity

Type specified in the Reference Registry with respect to a Reference Entity.

**Standard Specified Currency:**   means an obligation payable in any of the lawful currencies of Canada, Japan, Switzerland, the United Kingdom and the United States of America and the euro (and any successor currency to any of the abovementioned currencies).

**Domestic Currency:**   means an obligation payable in the lawful currency and any successor currency of (a) the relevant Reference Entity, if the Reference Entity is a Sovereign, or (b) the jurisdiction in which the relevant Reference Entity is organised, if the Reference Entity is not a Sovereign. In no event shall Domestic Currency include any successor currency if such successor currency is the lawful currency of any of Canada, Japan, Switzerland, the United Kingdom or the United States of America or the euro (or any successor currency to any such currency).

**Subordinated:**   means an obligation that is subordinated to an obligation that is Not Subordinated.

**Not Subordinated:**   means an obligation that is not subordinated to: (i) the Benchmark Obligation specified for the relevant Reference Entity in the Reference Registry or (ii) if no Benchmark Obligation is specified for the relevant Reference Entity, any unsubordinated Borrowed Money obligation of the relevant Reference Entity. For the purposes of determining whether an obligation satisfies the "Not Subordinated" Obligation Characteristic or Reference Obligation Characteristic, the ranking in priority of payment of the Benchmark Obligation shall be determined as of the later of: (1) the Trade Date and (2) the date on which such obligation was issued or incurred and shall not reflect any change to such ranking after such later date.

**Not Contingent:**   means any obligation having as of the relevant Valuation Date and all times thereafter an outstanding principal balance or, in the case of obligations that are not Borrowed Money, a Due and Payable Amount, that pursuant to the terms of such obligation may not be reduced as a result of the occurrence or non-occurrence of an event or circumstance (other than payment). A Convertible Obligation, an Exchangeable Obligation and an Accreting Obligation shall satisfy the Not Contingent Reference Obligation Characteristic if such Convertible Obligation, Exchangeable Obligation or Accreting Obligation otherwise meets the requirements of the preceding sentence so long as, in the case of a Convertible Obligation or an Exchangeable Obligation, the right (A) to convert or exchange such obligation or (B) to require the issuer to purchase or redeem such obligation (if the issuer has exercised or may exercise the right to pay the purchase or redemption price, in whole or in part, in Equity Securities) has not been exercised (or such exercise has been effectively rescinded) on or before

the relevant Valuation Date.

Transferable:     means an obligation that is transferable to institutional investors without any contractual, statutory or regulatory restriction, provided that none of the following shall be considered contractual, statutory or regulatory restrictions:

(A) contractual, statutory or regulatory restrictions that provide for eligibility for resale pursuant to Rule 144A or Regulation S promulgated under the United States Securities Act of 1933, as amended (and any contractual, statutory or regulatory restrictions promulgated under the laws of any jurisdiction having a similar effect in relation to the eligibility for resale of an obligation); or

(B) restrictions on permitted investments such as statutory or regulatory investment restrictions on insurance companies and pension funds,

provided that such characteristics shall be applicable only in respect of obligations that are Bonds.



Maximum Maturity 30 years:     means an obligation that has a remaining maturity from the Valuation Date of not greater than 30 years.

Not Bearer:     means any obligation that is not a bearer instrument unless interests with respect to such bearer instrument are cleared via the Euroclear system, Clearstream, Luxembourg or any other internationally recognised clearing system provided that such characteristic shall be applicable only in respect of obligations that are Bonds.

Not Sovereign Lender:     means any obligation that is not primarily owed to a Sovereign or Supranational Organisation, including, without limitation, obligations generally referred to as "Paris Club Debt".

Not Domestic Law:     means any obligation that is not governed by the laws of (A) the relevant Reference Entity, if such Reference Entity is a Sovereign, or (B) the jurisdiction or organisation of the relevant Reference Entity, if such Reference Entity is not a Sovereign.

Not Domestic Issuance:     means any obligation other than an obligation that was, at the time the relevant obligation was issued (or reissued, as the case may be) or incurred, intended to be offered for sale primarily in the domestic market of the relevant Reference Entity. Any obligation that is registered or qualified for sale outside the domestic market of the relevant Reference Entity (regardless of whether such obligation is also registered or qualified for sale within the domestic market of the relevant Reference Entity) shall be deemed not to be intended for sale primarily in the domestic market of the Reference Entity.

Not Domestic Currency:     means any obligation that is payable in a currency other than the Domestic Currency.

Assignable Loan:     means a Loan that is, as of the Valuation Date, capable of being assigned or novated to, at a minimum, commercial banks or

financial institutions (irrespective of their jurisdiction of organisation) that are not then a lender or a member of the relevant lending syndicate, without the consent of the relevant Reference Entity or the guarantor, if any, of such Loan (or the consent of the applicable borrower if the Reference Entity is guaranteeing such Loan) or any agent, provided that such characteristics shall be applicable only in respect of obligations that are Loans.

Consent Required Loan:    means a Loan that is, as of the Event Determination Date, capable of being assigned or novated with the consent of the relevant Reference Entity or the guarantor, if any, of such Loan (or the consent of the relevant borrower if the Reference Entity is guaranteeing such Loan) or any agent, provided that such characteristics shall be applicable only in respect of obligations that are Loans.



In the event that any Reference Obligation is a Loan which is a Consent Required Loan, the Calculation Agent will only be permitted to use a Bid Quotation from a Dealer to determine the Final Reference Obligation Price of such Reference Obligation if the Calculation Agent provided such Dealer with the information reasonably required by that Dealer to give such Bid Quotation. For the sake of clarity, information which may be reasonably requested by such Dealer (and which shall be provided by the Calculation Agent if requested in respect of such Bid Quotation) may include any of the following:

(1)    the name of the debtor;

(2)    the governing law;

(3)    guarantee (existence and description);

(4)    surety (existence and description);

(5)    description of the covenants;

(6)    maturity and amortisation profile;

(7)    coupon;

(8)    revolver or term loan;

(9)    drawn or not; and

(10)    the effective date of the loan.

**Certain additional definitions with respect to Restructuring**

"**Restructuring Maturity Limitation Date**" means, with respect to a Reference Entity for which Restructuring Maturity Limitation is specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, the date that is the earlier of (x) 30 months following the Restructuring Date and (y) the latest final maturity date of any Restructured Bond or Loan, provided, however, that under no circumstances shall the Restructuring Maturity Limitation Date be earlier than the Scheduled Termination Date or later than 30 months following the Scheduled Termination Date and, if it is, it shall be deemed to be the Scheduled Termination Date or 30 months following the Scheduled Termination Date, as the case may be.

"**Restructuring Date**" means, with respect to a Restructured Bond or Loan, the date on which a Restructuring is legally effective in accordance with the terms of the documentation governing such Restructuring.

"**Restructured Bond or Loan**" means an Obligation which is a Bond or Loan and in respect of which the Restructuring that is the subject of a Credit Event Notice has occurred.

"**Eligible Transferee**" means each of the following:

(a)

     (i)          any bank or other financial institution;

     (ii)         an insurance or reinsurance company;

     (iii)       a mutual fund, unit trust or similar collective investment vehicle (other than an entity specified in clause (c)(i) below); and

     (iv)      a registered or licensed broker or dealer (other than a natural person or proprietorship);

     provided, however, in each case that such entity has total assets of at least USD500 million;

(b)    an Affiliate of an entity specified in the preceding clause (a);

(c)    each of a corporation, partnership proprietorship, organisation, trust or other entity

     (i)          that is an investment vehicle (including, without limitation, any hedge fund, issuer of collateralised debt obligations, commercial paper conduit or other special purpose vehicle) that (1) has total assets of at least USD100 million or (2) is one of a group of investment vehicles under common control or management having, in the aggregate, total assets of at least USD100 million; or

     (ii)        that has total assets of at least USD500 million; or

     (iii)       the obligations of which under an agreement, contract, or transaction are guaranteed or otherwise supported by a letter of credit or keepwell, support, or other agreement by an entity described in clauses (a), (b), (c)(ii) or (d); and

(d)    a Sovereign, Sovereign Agency or Supranational Organisation;

All references in this definition of USD include equivalent amounts in other currencies.

"**Fully Transferable Obligation**" means, with respect to a Reference Entity for which Fully Transferable Obligation is specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, a Reference Obligation that is either Transferable, in the case of Bonds, or capable of being assigned or novated to all Eligible Transferees without the consent of any person being required, in the case of any Reference Obligation other than Bonds. For purposes of determining whether a Reference Obligation is Transferable or is capable of being assigned or novated to Eligible Transferees, such determination shall be made as of the Valuation Date for the portion of the Reference Obligation to be valued on such Valuation Date, taking into account only the terms of the Reference Obligation and any related transfer or consent documents which have been obtained by the Issuer.

Any requirement that notification of transfer of a Reference Obligation be provided to a trustee, fiscal agent, administrative agent, clearing agent or paying agent for any Reference Obligation shall not be considered to be a requirement for consent for purposes of the definitions of Restructuring Maturity Limitation and Fully Transferable Obligation.

"**Modified Restructuring Maturity Limitation Date**" means, with respect to a Reference Entity for which Modified Restructuring Maturity Limitation is specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such

Reference Entity, the date that is the later of (x) the Scheduled Termination Date and (y) 60 months following the Restructuring Date in the case of a Restructured Bond or Loan, or 30 months following the Restructuring Date in the case of all other Reference Obligations.

"**Modified Eligible Transferee**" means any bank, financial institution or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities and other financial assets.

"**Conditionally Transferable Obligation**" means, with respect to a Reference Entity for which Conditionally Transferable Obligation is specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, a Reference Obligation that is either Transferable, in the case of Bonds, or capable of being assigned or novated to all Modified Eligible Transferees without the consent of any person being required, in the case of any Reference Obligation other than Bonds, provided, however, that a Reference Obligation other than Bonds will be a Conditionally Transferable Obligation notwithstanding that consent of the Reference Entity or the guarantor, if any, of a Reference Obligation other than Bonds (or the consent of the relevant obligor if a Reference Entity is guaranteeing such Reference Obligation) or any agent is required for such novation, assignment or transfer so long as the terms of such Reference Obligation provide that such consent may not be unreasonably withheld or delayed. Any requirement that notification of novation, assignment or transfer of a Reference Obligation be provided to a trustee, fiscal agent, administrative agent, clearing agent or paying agent for a Reference Obligation shall not be considered to be a requirement for consent for purposes of this definition.

For purposes of determining whether a Reference Obligation satisfies the requirements of the definition of Conditionally Transferable Obligation, such determination shall be made as of the Valuation Date for the portion of the Reference Obligation to be valued on such Valuation Date, taking into account only the terms of the Reference Obligation and any related transfer or consent documents which have been obtained by the Issuer.

### Certain definitions relating to Successors

(a)     In relation to a Reference Entity that is not a Sovereign, "**Successor**" means the entity or entities, if any, determined as set forth below:



(i)        if an entity directly or indirectly succeeds to 75 per cent. or more of the Relevant Obligations of the Reference Entity by way of a Succession Event, that entity will be the sole Successor;

(ii)       if one entity directly or indirectly succeeds to more than 25 per cent. (but less than 75 per cent.) of the Relevant Obligations of the Reference Entity by way of a Succession Event, and not more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, the entity that succeeds to more than 25 per cent. of the Relevant Obligations will be the sole Successor;

(iii)      if more than one entity each directly or indirectly succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity by way of a Succession Event, and not more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, the entities that succeed to more than 25 per cent. of the Relevant Obligations will each be Successors;

(iv)      if one or more entities each directly or indirectly succeed to more than 25 per cent. of the Relevant Obligations of the Reference Entity by way of a Succession Event, and more than

25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, each such entity and the Reference Entity will be Successors;

(v)     if one or more entities directly or indirectly succeed to a portion of the Relevant Obligations of the Reference Entity by way of a Succession Event, but no entity succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity and the Reference Entity continues to exist, there will be no Successor and the Reference Entity and the Transaction will not be changed in any way as a result of the Succession Event; and

(vi)    if one or more entities directly or indirectly succeed to a portion of the Relevant Obligations of the Reference Entity by way of a Succession Event, but no entity succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity and the Reference Entity ceases to exist, the entity which succeeds to the greatest percentage of Relevant Obligations (or, if two or more entities succeed to an equal percentage of Relevant Obligations, the entity from among those entities which succeeds to the greatest percentage of obligations) of the Reference Entity will be the sole Successor.



The Calculation Agent will be responsible for determining, as soon as reasonably practicable after it becomes aware of the relevant Succession Event (but no earlier than 14 days after the legally effective date of the Succession Event), and with effect from the legally effective date of the Succession Event, whether the relevant thresholds set forth above have been met, or which entity qualifies under paragraph (a)(vi) above, as applicable. In calculating the percentages used to determine whether the relevant thresholds set forth above have been met, or which entity qualifies under paragraph (a)(vi) above, as applicable, the Calculation Agent shall use, in respect of each applicable Relevant Obligation included in such calculation, the amount of the liability in respect of such Relevant Obligation listed in the Best Available Information.

(b)     "Succession Event" means an event such as a merger, consolidation, amalgamation, transfer of assets or liabilities, demerger, spin-off or other similar event in which one entity succeeds to the obligations of another entity, whether by operation of law or pursuant to any agreement. Notwithstanding the foregoing, "Succession Event" shall not include an event in which the holders of obligations of the Reference Entity exchange such obligations for the obligations of another entity, unless such exchange occurs in connection with a merger, consolidation, amalgamation, transfer of assets or liabilities, demerger, spin-off or other similar event.



(c)     Where, pursuant to Section (a) above, one or more Successors have been identified in relation to a particular Reference Entity:

(i)     each such Successor will be a Reference Entity (a "Successor Reference Entity") for the purposes of this Transaction (and, for the avoidance of doubt, the original Reference Entity shall cease to be a Reference Entity except where it is a Successor Reference Entity); and

(ii)    the Floating Rate Payer Calculation Amount in respect of each such Successor Reference Entity shall be the Floating Rate Payer Calculation Amount in respect of the original Reference Entity divided by the number of Successor Reference Entities.

(d)     "Relevant Obligations" means the Obligations constituting Bonds and Loans of the Reference Entity outstanding immediately prior to the effective date of the Succession Event, excluding any debt obligations outstanding between the Reference Entity and any of its Affiliates, as determined by the Calculation Agent. The Calculation Agent will determine the entity which succeeds to such Relevant Obligations on the basis of the Best Available Information. If the date on which the Best Available Information becomes available or is filed precedes the legally effective date of the relevant Succession Event, any assumptions as to the allocation of obligations between or among entities contained in the

Best Available Information will be deemed to have been fulfilled as of the legally effective date of the Succession Event, whether or not this is in fact the case.

(e)    "Best Available Information" means:

(i)    in the case of a Reference Entity which files information with its primary securities regulator or primary stock exchange that includes unconsolidated, pro forma financial information which assumes that the relevant Succession Event has occurred or which provides such information to its shareholders, creditors or other persons whose approval of the Succession Event is required, that unconsolidated, pro forma financial information and, if provided subsequently to the provision of unconsolidated, pro forma financial information but before the Calculation Agent makes its determination for the purposes of the definition of "Successor", other relevant information that is contained in any written communication provided by the Reference Entity to its primary securities regulator, primary stock exchange, shareholders, creditors or other persons whose approval of the Succession Event is required; or

(ii)    in the case of a Reference Entity which does not file with its primary securities regulators or primary stock exchange, and which does not provide to shareholders, creditors or other persons whose approval of the Succession Event is required, the information contemplated in (i) above, the best publicly available information at the disposal of the Calculation Agent to allow it to make a determination for the purposes of the definition of "Successor".

Information which is made available more than 14 days after the legally effective date of the Succession Event shall not constitute Best Available Information.

(f)    In relation to a Sovereign Reference Entity, "Successor" means any direct or indirect successor(s) to that Reference Entity irrespective of whether such successor(s) assumes any of the obligations of such Reference Entity.

"Sovereign" means any state, political subdivision or government, or any agency, instrumentality, ministry, department or other authority (including, without limiting the foregoing, the central bank) thereof.



### Additional Terms For Monolines

(a)    **Qualifying Policy.** "Qualifying Policy" means a financial guaranty insurance policy or similar financial guarantee pursuant to which a Reference Entity irrevocably guarantees or insures all Instrument Payments (as defined below) of an instrument that constitutes Borrowed Money (modified as set forth below) (the "Insured Instrument") for which another party (including a special purpose entity or trust) is the obligor (the "Insured Obligor"). Qualifying Policies shall exclude any arrangement (i) structured as a surety bond, letter of credit or equivalent legal arrangement or (ii) pursuant to the express contractual terms of which the payment obligations of the Reference Entity can be discharged or reduced as a result of the occurrence or non-occurrence of an event or circumstance (other than the payment of Instrument Payments). The benefit of a Qualifying Policy must be capable of being Delivered together with the Delivery of the Insured Instrument.

"Instrument Payments" means (A) in the case of any Insured Instrument that is in the form of a pass-through certificate or similar funded beneficial interest, (x) the specified periodic distributions in respect of interest or other return on the Certificate Balance on or prior to the ultimate distribution of the Certificate Balance and (y) the ultimate distribution of the Certificate Balance on or prior to a specified date and (B) in the case of any other Insured Instrument, the scheduled payments of principal and interest, in the case of both (A) and (B) (1) determined without regard to limited recourse or reduction provisions of the type described in paragraph (d) below and (2) excluding sums in respect of



default interest, indemnities, tax gross-ups, make-whole amounts, early redemption premiums and other similar amounts (whether or not guaranteed or insured by the Qualifying Policy).

"**Certificate Balance**" means, in the case of an Insured Instrument that is in the form of a pass-through certificate or similar funded beneficial interest, the unit principal balance, certificate balance or similar measure of unreimbursed principal investment.

(b)    **Obligation and Reference Obligation.** Sections 2.14(a) and 2.15(a) of the Definitions are hereby amended by adding "or Qualifying Policy" after "or as provider of a Qualifying Affiliate Guarantee".

(c)    **Interpretation of Provisions.** In the case of a Reference Entity in respect of which Monoline is specified as applicable in Reference Registry, in the event that an Obligation or a Reference Obligation is a Qualifying Policy, the terms of Section 2.21(d) of the Definitions (which shall for the purpose of this Transaction be construed so that references therein to Deliverable Obligations, Deliverable Obligation Category and Deliverable Obligation Characteristics shall be deemed to be references to Reference Obligations, Reference Obligation Category and Reference Obligation Characteristics respectively) will apply, with references to the Qualifying Guarantee, the Underlying Obligation and the Underlying Obligor deemed to include the Qualifying Policy, the Insured Instrument and the Insured Obligor, respectively, except that:



(i)     the Obligation Category Borrowed Money and the Obligation Category and Reference Obligation Category Bond shall be deemed to include distributions payable under an Insured Instrument in the form of a pass-through certificate or similar funded beneficial interest, the Reference Obligation Category Bond shall be deemed to include such an Insured Instrument, and the terms "obligation" and "obligor" as used in the 2003 ISDA Credit Derivatives Definitions in respect of such an Insured Instrument shall be construed accordingly;

(iii)    references in the definitions of Assignable Loan and Consent Required Loan to the guarantor and guaranteeing shall be deemed to include the insurer and insuring, respectively;

(iv)    neither the Qualifying Policy nor the Insured Instrument must satisfy on the relevant date the Reference Obligation Characteristic of Accelerated or Matured, whether or not that characteristic is otherwise specified as applicable herein;



(v)     if the Assignable Loan, Consent Required Loan, Direct Loan Participation or Transferable Reference Obligation Characteristics are specified herein and if the benefit of the Qualifying Policy is not transferred as part of any transfer of the Insured Instrument, the Qualifying Policy must be transferable at least to the same extent as the Insured Instrument; and

(vi)    with respect to an Insured Instrument in the form of a pass-through certificate or similar funded beneficial interest, the term "outstanding principal balance" shall mean the outstanding Certificate Balance and "maturity", as such term is used in the Maximum Maturity Reference Obligation Characteristic, shall mean the specified date by which the Qualifying Policy guarantees or insures, as applicable, that the ultimate distribution of the Certificate Balance will occur.

(d)    **Not Contingent.** An Insured Instrument will not be regarded as failing to satisfy the Not Contingent Reference Obligation Characteristic solely because such Insured Instrument is subject to provisions limiting recourse in respect of such Insured Instrument to the proceeds of specified assets (including proceeds subject to a priority of payments) or reducing the amount of any Instrument Payments owing under such Insured Instrument, provided that such provisions are not applicable to the Qualifying Policy by the terms thereof and the Qualifying Policy continues to guarantee or insure, as applicable,

the Instrument Payments that would have been required to be made absent any such limitation or reduction.

(e) **Deliver.** For purposes of Section 8.2 of the Definitions, "Deliver" with respect to an obligation that is a Qualifying Policy means to Deliver both the Insured Instrument and the benefit of the Qualifying Policy (or a custodial receipt issued by an internationally recognized custodian representing an interest in such an Insured Instrument and the related Qualifying Policy), and "Delivery" and "Delivered" will be construed accordingly.

(f) **Provisions for Determining a Successor.** Section 2.2(c) of the Definitions is hereby amended by adding "or insurer" after "or guarantor".

(g) **Substitute Reference Obligation.** Section 2.30 of the Definitions is hereby amended by adding "or Qualifying Policy" after "or as provider of a Qualifying Affiliate Guarantee" in the definition of Substitute Reference Obligation and paragraph (b) thereof. For purposes of Section 2.30(a)(ii)(B) and Section 1.14(b)(ii) of the Definitions, references to the Qualifying Guarantee and the Underlying Obligation shall be deemed to include the Qualifying Policy and the Insured Instrument, respectively.



(h) **Other Provisions.** For purposes of Sections 2.15(a)(ii), 4.1, 8.2, 9.1 and 9.2(a) of the Definitions, references to the Underlying Obligation and the Underlying Obligor shall be deemed to include Insured Instruments and the Insured Obligor, respectively.

## Schedule C

The standard terms relating to each Entity Type are set out in this Schedule C.

### STANDARD TERMS FOR WESTERN EUROPEAN ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Applicable

Multiple Holder Obligation: Applicable

| | |
|---|---|
| Grace Period Extension | Not Applicable |
| Obligation | |
| | Obligation Category:        Borrowed Money |
| | Obligation Characteristics:   None |
| Reference Obligation | |
| | Reference Obligation Category:        Bond or Loan |

Reference Obligation Characteristics:
Not Subordinated
Specified Currency – Standard Specified Currencies
Not Contingent
Assignable Loan
Consent Required Loan
Transferable
Maximum Maturity 30 years
Not Bearer

Exclude Accrued Interest

## STANDARD TERMS FOR WESTERN EUROPEAN INSURANCE ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

        Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

        Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

        Multiple Holder Obligation: Applicable

| | |
|---|---|
| Grace Period Extension: | Not Applicable |
| Obligation | |
| | Obligation Category: | Borrowed Money |
| | Obligation Characteristics: | None |



| | | |
|---|---|---|
| Reference Obligation | | |
| | Reference Obligation Category: | Bond or Loan |
| | Reference Obligation Characteristics: | Not Subordinated |
| | | Specified Currency – Standard Specified Currencies |
| | | Not Contingent |
| | | Assignable Loan |
| | | Consent Required Loan |
| | | Transferable |
| | | Maximum Maturity 30 years |
| | | Not Bearer |
| | Exclude Accrued Interest | |

## STANDARD TERMS FOR AUSTRALIAN AND NEW ZEALAND ENTITIES

All Guarantees                          Applicable

Credit Events                           Bankruptcy

                                        Failure to Pay

                                        Restructuring

    Restructuring Maturity Limitation and Fully Transferable Obligation: Applicable

    Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

    Multiple Holder Obligation: Applicable

Grace Period Extension                  Not Applicable

Obligation



    Obligation Category:                Borrowed Money

    Obligation Characteristics:         None

Reference Obligation

    Reference Obligation Category:      Bond or Loan

    Reference Obligation Characteristics:   Not Subordinated
Specified Currency – Standard
   Specified Currencies, plus AUD and
   NZD
Not Contingent
Assignable Loan
Consent Required Loan
Transferable
Maximum Maturity 30 years
Not Bearer

    Exclude Accrued Interest

STANDARD TERMS FOR JAPANESE ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Not Applicable

Section 3.9 of the Credit Derivatives Definitions shall not apply.

| | |
|---|---|
| Grace Period Extension | Not Applicable |
| Obligation | |



| | |
|---|---|
| Obligation Category: | Borrowed Money |
| Obligation Characteristics: | Not Subordinated |
| Reference Obligation | |
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard Specified Currencies |
| | Not Contingent |
| | Assignable Loan |
| | Consent Required Loan |
| | Transferable |
| | Maximum Maturity 30 years |
| | Not Bearer |
| Exclude Accrued Interest | |

## STANDARD TERMS FOR SINGAPOREAN ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

    Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

    Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

    Multiple Holder Obligation: Applicable

Repudiation/Moratorium (applicable only to Sovereigns)

| | |
|---|---|
| Grace Period Extension | Not Applicable |



**Obligation**

| | |
|---|---|
| Obligation Category: | Bond or Loan |
| Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard |
| | Specified Currencies, plus SGD |
| | Not Sovereign Lender |

**Reference Obligation**

| | |
|---|---|
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard |
| |   Specified Currencies, plus SGD |
| | Not Sovereign Lender |
| | Not Contingent |
| | Assignable Loan |
| | Transferable |
| | Maximum Maturity 30 years |
| | Not Bearer |
| Exclude Accrued Interest | |

## STANDARD TERMS FOR ASIA SOVEREIGN

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Failure to Pay |

Restructuring

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Applicable

Repudiation/Moratorium

Grace Period Extension    Not Applicable

Obligation



Obligation Category:    Bond or Loan

Obligation Characteristics:
Not Subordinated
Not Sovereign Lender
Not Domestic Currency
Not Domestic Issuance
Not Domestic Law

Reference Obligation

Reference Obligation Category:    Bond or Loan

Reference Obligation Characteristics:
Not Subordinated
Specified Currency – Standard
Specified Currencies
Not Sovereign Lender
Not Domestic Law
Not Contingent
Not Domestic Issuance
Assignable Loan
Transferable
Maximum Maturity 30 years
Not Bearer

Exclude Accrued Interest

## STANDARD TERMS FOR ASIAN ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Applicable

| | |
|---|---|
| Grace Period Extension | Not Applicable |



**Obligation**

| | |
|---|---|
| Obligation Category: | Bond or Loan |
| Obligation Characteristics: | Not Subordinated |
| | Not Sovereign Lender |
| | Not Domestic Currency |
| | Not Domestic Issuance |
| | Not Domestic Law |

**Reference Obligation**

| | |
|---|---|
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency -- Standard Specified Currencies |
| | Not Sovereign Lender |
| | Not Domestic Law |
| | Not Contingent |
| | Not Domestic Issuance |
| | Assignable Loan |
| | Transferable |
| | Maximum Maturity 30 years |
| | Not Bearer |
| Exclude Accrued Interest | |

## STANDARD TERMS FOR NORTH AMERICAN ENTITIES

| | |
|---|---|
| All Guarantees | Not Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Applicable

| | |
|---|---|
| Grace Period Extension | Not Applicable |
| Obligation | |



| | |
|---|---|
| Obligation Category: | Borrowed Money |
| Obligation Characteristics: | None |
| Reference Obligation | |
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard Specified Currencies |
| | Not Contingent |
| | Assignable Loan |
| | Consent Required Loan |
| | Transferable |
| | Maximum Maturity 30 years |
| | Not Bearer |
| Exclude Accrued Interest | |

## STANDARD TERMS FOR NORTH AMERICAN HIGH YIELD ENTITIES

| | |
|---|---|
| All Guarantees | Not Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| Grace Period Extension | Not Applicable |
| Obligation | |

| | | |
|---|---|---|
| | Obligation Category: | Borrowed Money |
| | Obligation Characteristics: | None |

Reference Obligation

| | | |
|---|---|---|
| | Reference Obligation Category: | Bond or Loan |
| | Reference Obligation Characteristics: | Not Subordinated |
| | | Specified Currency – Standard |
| | | Specified Currencies |
| | | Not Contingent |
| | | Assignable Loan |
| | | Consent Required Loan |
| | | Transferable |
| | | Maximum Maturity 30 years |
| | | Not Bearer |

Exclude Accrued Interest



## STANDARD TERMS FOR EMERGING MARKET SOVEREIGNS**

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Failure to Pay |
| | Obligation Acceleration |
| | Repudiation/ Moratorium |
| | Restructuring |

    Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

    Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

    Multiple Holder Obligation: Not Applicable

| | |
|---|---|
| Grace Period Extension | Applicable |
| Obligation | |



| | |
|---|---|
| Obligation Category: | Bond |
| Obligation Characteristics: | Not Subordinated |
| | Not Domestic Currency |
| | Not Domestic Law |
| | Not Domestic Issuance |

**Reference Obligation**

| | |
|---|---|
| Reference Obligation Category: | Bond |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard Specified Currencies |
| | Not Domestic Law |
| | Not Contingent |
| | Not Domestic Issuance |
| | Transferable |
| | Not Bearer |

        Exclude Accrued Interest

---

** Additional Provisions for the Russian Federation (August 13, 2004) will apply to the Russian Federation Reference Entity.

## STANDARD TERMS FOR RUSSIAN ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Obligation Acceleration |
| | Repudiation/Moratorium |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Not Applicable with respect to Obligation Category of "Bonds"; Applicable with respect to Obligation Category of "Loans".



| | |
|---|---|
| Grace Period Extension | Applicable |
| Obligation | |

| | |
|---|---|
| Obligation Category: | Bond or Loan |
| Obligation Characteristics: | Not Subordinated |
| | Not Domestic Currency |
| | Not Domestic Law |
| | Not Domestic Issuance |

Reference Obligation

| | |
|---|---|
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard |
| | Specified Currencies |
| | Not Domestic Law |
| | Not Contingent |
| | Not Domestic Issuance |
| | Transferable |
| | Not Bearer |
| | Assignable Loan |
| | Consent Required Loan |

Exclude Accrued Interest

## STANDARD TERMS FOR EMERGING MARKETS ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Obligation Acceleration |
| | Repudiation/Moratorium |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Not Applicable

| | |
|---|---|
| Grace Period Extension | Applicable |
| Obligation | |

| | |
|---|---|
| Obligation Category: | Bond or Loan |
| Obligation Characteristics: | Not Subordinated |
| | Not Domestic Currency |
| | Not Domestic Law |
| | Not Domestic Issuance |

Reference Obligation

| | |
|---|---|
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard Specified Currencies |
| | Not Domestic Law |
| | Not Contingent |
| | Not Domestic Issuance |
| | Transferable |
| | Not Bearer |
| | Assignable loan |
| | Consent required loan |

Exclude Accrued Interest



## STANDARD TERMS FOR LATIN AMERICAN ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| |    Grace Period Extension: Applicable |

Obligation Acceleration

Repudiation/Moratorium

Restructuring

   Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

   Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

   Multiple Holder Obligation: Not Applicable

**Obligation**

| | |
|---|---|
| Obligation Category: | Bond or Loan |
| Obligation Characteristics: | Not Subordinated |
| | Not Domestic Currency |
| | Not Domestic Law |
| | Not Domestic Issuance |

**Reference Obligation**

| | |
|---|---|
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard Specified Currencies |
| | Not Domestic Law |
| | Not Contingent |
| | Not Domestic Issuance |
| | Transferable |
| | Not Bearer |
| | Assignable Loan |
| | Consent Required Loan |

Exclude Accrued Interest



## STANDARD TERMS FOR KAZAKHSTAN ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Obligation Acceleration |
| | Repudiation/Moratorium |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Not Applicable

| | |
|---|---|
| Grace Period Extension | Not Applicable |
| Obligation | |

| | |
|---|---|
| Obligation Category: | Bond or Loan |
| Obligation Characteristics: | Not Subordinated |
| | Not Domestic Currency |
| | Not Domestic Law |
| | Not Domestic Issuance |

Reference Obligation

| | |
|---|---|
| Reference Obligation Category: | Bond or Loan |
| Reference Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard |
| | Specified Currencies |
| | Not Domestic Law |
| | Not Contingent |
| | Not Domestic Issuance |
| | Transferable |
| | Not Bearer |
| | Assignable Loan |
| | Consent Required Loan |

Exclude Accrued Interest

For the avoidance of doubt, "Assignable Loan" and "Consent Required Loan" shall not apply to Obligations, which are Bonds.

Obligations that are in the form of a "Loan" need only satisfy one of the characteristics "Assignable Loan" and "Consent Required Loan".





Annex A
## PARAGRAPH 11
of the
## CREDIT SUPPORT ANNEX

to the Schedule to the ISDA Master Agreement

dated as of 10 October 2002 (as amended and restated on 21 July 2006)

between

Lehman Brothers Special Financing Inc.     and     Zircon Finance Limited
("Party A")     ("Party B")

pursuant to a Deed of Accession dated 20 March 2007

## Paragraph 11. Elections and Variables

(a)  *Base Currency and Eligible Currency.*

    (i)  "Base Currency" means AUD.

    (ii)  "Eligible Currency" means the Base Currency and each other currency specified here: none.

(b)  *Credit Support Obligations.*

    (i)  *Delivery Amount, Return Amount and Credit Support Amount.*

        (a)  "*Delivery Amount*" has the meaning specified in Paragraph 2(a) except that the Transferee shall be deemed to have made a demand on each Valuation Date.

        (b)  "*Return Amount*" has the meaning specified in Paragraph 2(b).

        (c)  "*Credit Support Amount*" has the meaning specified in Paragraph 10.

    (ii)  *Eligible Credit Support.* The following items will qualify as "*Eligible Credit Support*" for the party specified:



| | | Party A | Party B | Valuation Percentage |
|---|---|---|---|---|
| (A) | Cash in an Eligible Currency. | X | X | 100% |
| (B) | AUD denominated government debt obligations assigned with a credit rating of "AAA" by Fitch (as defined below). | X | X | As agreed with Fitch |
| (C) | AUD denominated money market funds with a credit rating assigned by Fitch (or its successor) equal to "V-1+". | X | X | 100% |

    (iii)  *Thresholds.*

        (a)  "*Independent Amount*" means with respect to Party A and to Party B: not applicable.

        (b)  "*Threshold*" means with respect to Party A: zero
           "*Threshold*" means with respect to Party B: infinity

       (c)   *"Minimum Transfer Amount"* means with respect to Party A: AUD1

           *"Minimum Transfer Amount"* means with respect to Party B: AUD1

       (d)   *Rounding.* Not Applicable.

(c)   *Valuation and Timing.*

    (i)   *"Valuation Agent"* means Party A.

    (ii)   *"Valuation Date"* means: 6 June 2007 and, thereafter, Friday of each week, provided that if such day is not a day on which commercial banks are open for business in London, the Valuation Date shall be the immediately following day on which commercial banks are open for business in London.

    (iii)   *"Valuation Time"* means:

       [X] the close of business in the place of location of the Valuation Agent on the Valuation Date or date of calculation, as applicable;

       [ ] the close of business on the Local Business Day immediately preceding the Valuation Date or date of calculation, as applicable;

*provided* that the calculations of Value and Exposure will, as far as practicable, be made as of approximately the same time on the same date.

    (iv)   *"Notification Time"* means 1:00 p.m., London time, on a Local Business Day.

(d)   *Exchange Date.* *"Exchange Date"* has the meaning specified in Paragraph 3(c)(ii).

(e)   *Dispute Resolution.*

    (i)   *"Resolution Time"* means 1:00 p.m., London time, on the Local Business Day following the date on which the notice is given that gives rise to a dispute under Paragraph 4.

    (ii)   *Value.* For the purpose of Paragraphs 4(a)(4)(i)(C) and 4(a)(4)(ii), the Value of the outstanding Credit Support Balance or of any transfer of Eligible Credit Support or Equivalent Credit Support, as the case may be, will be calculated by Party A reasonably and in good faith.

    (iii)   *Alternative.* The provisions of Paragraph 4 will apply.

(f)   *Distributions and Interest Amount.*

    (i)   *Interest Rate.* Not Applicable. The definition of "Interest Amount" in Paragraph 10 shall be amended as follows:

       "Interest Amount" means, with respect to an Interest Period, the aggregate sum of the Base Currency Equivalents of the amounts of interest accrued in such Interest Period on the principal amount of the portion of the Credit Support Balance comprised of cash in such currency, as determined by the Valuation Agent.

    (ii)   *Transfer of Interest Amount.* The transfer of the Interest Amount will be made on each Valuation Date.

    (iii)   *Alternative to Interest Amount.* The provisions of Paragraph 5(c)(ii) will apply.

(g)   *Addresses for Transfers.*

Party A: As notified by the parties from time to time.

Party B: As notified by the parties from time to time.




Account details of Transferee:

National Australia Bank, Melbourne (NATAAU3303X)
BSB 083043
A/C The Bank of New York Brussels (IRVTBEBB)
Attn: Corporate Trust
Ref: AU3FN0002937 Zircon 2007-9 Tranche A

(h)    *Other Provisions.*

    (i)    *Scope*

        This Annex relates to the Transaction (the "**Swap Transaction**") between Party A and Party B with an Effective Date of 6 June 2007 relating to Zircon Finance Limited Series 2007-9 Tranche A AUD30,000,000 Synthetic Portfolio Notes due 2013 (the "**Tranche A Notes**" or the "**Notes**"). The provisions of the Agreement shall apply both to the Swap Transaction and the Transaction evidenced by the Annex so that the Agreement, the Confirmation relating to the Swap Transaction and this Annex form a single agreement.



    (ii)    *Exposure*

        The definition of "Exposure" shall be deleted and replaced with the following:

        ""*Exposure*" means, (i) with respect to Party A, zero; (ii) with respect to Party B on a Valuation Date, and subject to Paragraph 4 in the case of a dispute, zero, unless the Credit Rating of Party A's Credit Support Provider by Fitch is below "A"/"F1", in which case it shall mean the amount (expressed as a positive number) equal to the Swap Premium Exposure."

    (iii)    *Additional definitions for calculating Exposure*

        For the purposes herein, the following definitions shall apply:

        "*Aggregate Outstanding Principal Amount*" shall bear the meaning given to such term in the Series Prospectus with respect to the Notes;

        "*Credit Rating*" means the rating assigned in respect of short term or long term (as applicable) unsecured and unsubordinated debt obligations (not supported by third party credit enhancement);

        "*Fitch*" means Fitch, Inc., Fitch Ratings Ltd. and their subsidiaries and any successor or successors thereto; and

        "*Swap Premium Exposure*" means the amount equal to the sum of (1) the Fixed Amount payable by Party A under the Swap Transaction on the next succeeding Fixed Rate Payer Payment Date, and (2) the Grace Period Amount, where "*Grace Period Amount*" means an amount equal to: (x) the Aggregate Outstanding Principal Amount of the Notes, multiplied by (y) the Fixed Rate under the Swap Transaction, multiplied by (z) 11/365 (Fixed). For the purposes of calculating the Swap Premium Exposure: (i) the Fixed Amount and the Grace Period Amount shall be calculated as of each Valuation Date; (ii) the Aggregate Outstanding Principal Amount on each day of the Fixed Rate Payer Calculation Period following the relevant Valuation Date shall be equal to the Aggregate Outstanding Principal Amount as of such Valuation Date; and (iii) no reduction of the Aggregate Outstanding Principal Amount shall be made to reflect Credit Events in respect of which Potential Failure to Pay which have not been cured or Potential Repudiation/Moratorium which have not ceased to occur

(and not resulted in the occurrence of a Credit Event) still exist (in each case) as of such Valuation Date.

(iv) *Additional Termination Event; Transfer of additional Eligible Credit Support*

    (a) The failure by Party A to transfer the Eligible Credit Support to Party B in respect of any Valuation Date shall constitute on Additional Termination Event where Party A is the Affected Party and the Swap Transaction and the Transaction for which this Annex constitutes the Confirmation shall be the Affected Transactions.

    (b) Without prejudice to the calculation of Party B's Exposure, upon each occurrence of a Rating Event and while such Rating Event is continuing, Party A shall transfer Eligible Credit Support (or such other items as may be satisfactory to the Trustee and Fitch) in an amount satisfactory to the Trustee and Fitch (acting reasonably and in good faith) within 10 calendar days of such Rating Event. Such amount of Eligible Credit Support shall be an Independent Amount for the purposes of this Annex (unless otherwise agreed) and shall be calculated and maintained as agreed between Party A, the Trustee and Fitch.

    (c) In the event that Party A and Party B fail to reach the agreement contemplated in sub-paragraph (b) above within such 10 calendar day period Party A shall effect a Permitted Transfer or procure a Permitted Guarantee.

    (d) The failure by Party A to procure a Permitted Guarantee or effect a Permitted Transfer contemplated by sub-paragraph (c) above shall constitute an Additional Termination Event where Party A is the Affected Party and the Swap Transaction and the Transaction for which this Annex constitutes the Confirmation shall be the Affected Transactions.

For the purposes herein:

"*Permitted Guarantee*" means a guarantee or indemnity from an entity with a Required Rating in respect of Party A's obligations under the Swap Transaction in a form and substance reasonably satisfactory to the Trustee and the Issuer and on substantially the same terms as the Credit Support Document relating to the Swap Transaction;

"*Permitted Transfer*" means a transfer of all of Party A's rights and obligations with respect to the Swap Transaction to another entity which has (or whose obligations under the Swap Transaction are unconditionally and irrevocably guaranteed by an entity which has) a Required Rating;

"*Rating Event*" means the Credit Rating by Fitch of Party A's Credit Support Provider falls below the Required Ratings; and

"*Required Rating*" means a Credit Rating by Fitch of "F2" or above and "BBB+" or above.

(v) *Delivery of legal opinion*

    (a) In the event that Party A transfers Eligible Credit Support to Party B pursuant to Paragraph 11(h)(iv) above, Party A agrees to provide to Fitch within 10 calendar days of the occurrence of the Rating Event a legal opinion from its external legal advisers in form and substance reasonably satisfactory to Fitch (acting reasonably and in good faith), such opinion confirming, but not limited to, that the Eligible Credit Support so transferred shall not be required to be repaid, reimbursed or otherwise disgorged by the Issuer, otherwise than in accordance with the terms of this Annex or the Swap Transaction.





(b)   The failure of Party A to provide such legal opinion within such 10 calendar day period shall constitute an Additional Termination Event where Party A is the Affected Party and the Swap Transaction and the Transaction for which this Annex constitutes the Confirmation shall be the Affected Transactions.

(vi)   *Single Transferor*

Notwithstanding anything contained in this Annex, Party A only shall be a Transferor and Party B only shall be a Transferee.

(vii)   *No set-off*

Notwithstanding any set-off right between Party A and Party B, whether now or hereafter in existence, each of Party A and Party B agrees that, subject as provided in this Agreement, all payments required to be made by it under this Transaction shall be made without set-off and that it shall not withhold payment or delivery under this Transaction in respect of any default by the other party under any agreement other than this Agreement or any amount relating to any agreement other than this Agreement between the other party on the one hand and it on the other. For the avoidance of doubt, references in this paragraph to "this Agreement" include the ISDA Master Agreement.



Signed for and on behalf of          Signed for and on behalf of
**Lehman Brothers Special Financing Inc.**          **Zircon Finance Limited**



By:                                   By:

Name: _____             Name: _____

Date:  6 June 2007 _____             Date:  6 June 2007 _____

Exhibit A

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and ZIRCON FINANCE LIMITED ("Party B") have, pursuant to a Deed of Accession dated 20 March 2007, entered into a Master Agreement dated as of 10 October 2002, as amended and restated on 21 July 2006 (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement for the Transaction evidenced by a Confirmation dated 6 June 2007 relating to the Series 2007-9 Tranche A AUD30,000,000 Synthetic Portfolio Notes due 2013 of Party B (the "2007-9 Tranche A Transaction"). For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:



(a)     The Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under the 2007-9 Tranche A Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)     Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)     Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability of the Agreement against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defence of a guarantor (excluding the defence of payment or statute of limitations, neither of which are waived); provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement.



(d)     This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect the Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)     Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)     Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against



Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.



By: _____

Title: _____

Date: 6 June 2007

**Exhibit B**

## PORTFOLIO MANAGEMENT AGREEMENT

Dated 6 June 2007

ZIRCON FINANCE LIMITED

and

LEHMAN BROTHERS SPECIAL FINANCING INC.

and

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

and

LION CAPITAL MANAGEMENT LIMITED
(Company Registration No. 198601745D)



PORTFOLIO MANAGEMENT AGREEMENT

in relation to the Zircon Finance Limited Series 2007-9 Tranche A AUD30,000,000 Synthetic Portfolio Notes
due 2013

THIS AGREEMENT is made on 6 June 2007

BETWEEN:

(1)  ZIRCON FINANCE LIMITED (the "Issuer");

(2)  LEHMAN BROTHERS SPECIAL FINANCING INC. (the "Swap Counterparty");

(3)  LEHMAN BROTHERS INTERNATIONAL (EUROPE) (the "Calculation Agent"); and

(4)  LION CAPITAL MANAGEMENT LIMITED (the "Portfolio Manager").

Whereas:

(A)  The Issuer has issued Series 2007-9 Tranche A AUD30,000,000 Synthetic Portfolio Notes due 2013 (the "Notes") pursuant to its Multi-Issuer Secured Obligation Programme.

(B)  The Swap Counterparty has entered into a portfolio credit default swap (the "Swap Agreement") with the Issuer on the terms set out in a swap confirmation dated 6 June 2007 in connection with the issue of the Notes.



(C)  Pursuant to the terms and conditions of the Notes (the "Terms and Conditions") and the Swap Agreement, the Calculation Agent will maintain a registry of Reference Entities (as defined in the Terms and Conditions) from time to time (the "Reference Registry") and the Portfolio Manager may direct the Calculation Agent to amend the Reference Registry.

(D)  The Issuer wishes to engage the Portfolio Manager to provide the services described herein in relation to the Reference Registry and the Portfolio Manager agrees to perform such services.

(E)  The Portfolio Manager has agreed to enter into this Agreement.

IT IS AGREED as follows:

1   **Interpretation**

1.1  Terms used, but not defined, in this Agreement shall have the meanings given to them in the Terms and Conditions and the Swap Agreement.

1.2  For the purpose of this Agreement:

"Fitch" means Fitch, Inc., Fitch Ratings Ltd. and their subsidiaries and any successor or successors thereto; and



2   **Rights of the Portfolio Manager**

2.1  The Portfolio Manager may instruct the Swap Counterparty and the Issuer to effect one or more Reference Portfolio Modifications in accordance with the provisions of this Agreement. The Portfolio Manager agrees, in exercising its rights hereunder, to act in good faith with reasonable skills, care and diligence and subject to the terms and conditions of this Agreement.

2.2  The Portfolio Manager shall as soon as practicable notify the Issuer, the Swap Counterparty and the Calculation Agent (with a copy of such notice to Fitch) if a material adverse change in its business and operations has occurred or is continuing such that, as a result of such change, the Portfolio Manager no longer has the capacity or the competence to perform its obligations as Portfolio Manager hereunder.

2.3  In consideration of the services rendered by the Portfolio Manager hereunder and subject to Clause 2.4 below, the Issuer shall pay to the Portfolio Manager as soon as practicable following receipt of such amounts from the Swap Counterparty on the relevant Interest Payment Date pursuant to the Swap Agreement an amount equal to:

2.3.1    in respect of all Interest Payment Dates of the Notes, the product of (i) 0.12 per cent. per annum; (ii) the Weighted Average Outstanding Principal Amount of a Note; (iii) the number of Notes outstanding; and (iv) the Day Count Fraction (the "Portfolio Management Fees"),

provided that in the event that the Interest Accrual Adjustment provisions (as set out in paragraph 12(ii) of the Terms and Conditions) are applicable, the Issuer shall, subject as provided below, pay to the Portfolio Manager:

(a)    the Partial Fees (if any) as soon as practicable following receipt of such amounts from the Swap Counterparty on the relevant Interest Payment Date pursuant to the Swap Agreement; and

(b)    the Deferred Fees (if any) in respect of each such Adjustment Reference Entity as soon as practicable following receipt of such amounts from the Swap Counterparty on the Deferred Interest Payment Date pursuant to the Swap Agreement; and

2.3.2    in respect of all Interest Payment Dates of the Notes where the rating of the Notes by Fitch as of the relevant Interest Calculation Date is A+ or above (the "Performance Criteria"), the product of (i) 0.05 per cent. per annum; (ii) the Weighted Average Outstanding Principal Amount of a Note; (iii) the number of Notes outstanding; and (iv) the Day Count Fraction (the "Performance Fees", and together with the Portfolio Management Fees, the "Fees"). In the event that the Performance Criteria is not met as of the Interest Calculation Date in respect of the relevant Interest Payment Date, the Performance Fees will not be payable by the Issuer to the Portfolio Manager. An amount equal to the aggregate amount of such unpaid amount (the "Unpaid Performance Fees") for all Interest Payment Dates of the Notes will be paid by the Issuer to the Noteholders on the Maturity Date of the Notes in accordance with the Terms and Conditions.

For the purposes of this Clause 2.3:

"Deferred Fees" means, in respect of each Deferred Interest Payment Date and its related Adjustment Reference Entity, an amount in AUD (rounded to the nearest cent with one half cent being rounded up and subject to a minimum of AUD 0) determined by the Calculation Agent in its sole discretion on the relevant Deferred Fees Cut-off Date as being equal to the excess (if any) of:

(i)    the amount of Portfolio Management Fees that would otherwise have been payable on the relevant Interest Payment Date if:

(a)    in the circumstances set out in sub-paragraph (a)(i) of paragraph 12(ii) of the Terms and Conditions, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the relevant Event Determination Date;

(b)    in the circumstances set out in sub-paragraph (a)(ii) of paragraph 12(ii) of the Terms and Conditions, (i) where the Potential Failure to Pay develops into an actual Failure to Pay, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Failure to Pay was determined by the Calculation Agent to have occurred; or (ii) where the Potential Failure to Pay is subsequently cured, the relevant Potential Failure to Pay had not occurred; or

(c)    in the circumstances set out in sub-paragraph (a)(iii) of paragraph 12(ii) of the Terms and Conditions, (i) where the Potential Repudiation/Moratorium develops into an actual Repudiation/Moratorium, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential




Repudiation/Moratorium was determined by the Calculation Agent to have occurred; or (ii) where the Potential Repudiation/Moratorium subsequently ceases to exist, the relevant Potential Repudiation/ Moratorium had not occurred;

over:

(ii)    the relevant Partial Fees (if any) paid on the relevant Interest Payment Date;

"**Deferred Fees Cut-off Date**" means, in respect of each Adjustment Reference Entity, as determined by the Calculation Agent in its sole discretion:

(i)    the final Reference Entity Valuation Date on which all Final Prices have been determined;

(ii)    the date that all Potential Failures to Pay have been cured; or

(iii)    the date that all Potential Repudiation/Moratorium have ceased to exist,

whichever is applicable.

"**Deferred Interest Payment Date**" means, in respect of each Adjustment Reference Entity, the third Business Day following the Deferred Fees Cut-off Date;



"**Interim Calculation Amount**" means, in respect of each Note and in respect of each Interest Accrual Period, an amount in AUD (rounded to the nearest cent with one half cent being rounded up) determined by the Calculation Agent in its sole discretion on the relevant Interest Calculation Date as being equal to the Weighted Average Outstanding Principal Amount of such Note for such Interest Accrual Period, except that the Weighted Average Outstanding Principal Amount shall be calculated on the basis that the Reference Entity Notional Amount of each Adjustment Reference Entity is added to the Cumulative Loss Amount as of each Event Determination Date or the date upon which a Potential Failure to Pay or Potential Repudiation/Moratorium (as applicable) occurred.

For the avoidance of doubt, in the event that the amount calculated in accordance with this provision is zero or a negative number, the "Interim Calculation Amount" will be deemed to be zero; and

"**Partial Fees**" means, in respect of each Interest Payment Date in respect of which an Adjustment Reference Entity exists, an amount in AUD (rounded to the nearest cent with one half cent being rounded up and subject to a minimum of AUD 0) determined by the Calculation Agent in its sole discretion on the Interest Calculation Date in accordance with Clause 2.3.1 above save that references therein to the Weighted Average Outstanding Principal Amount of each Note shall be deemed to be references to the Interim Calculation Amount (as defined above) of such Note.



2.4    In the event that the Portfolio Management Agreement is terminated pursuant to Clause 8.1 below, the Issuer shall pay to the Portfolio Manager the pro rata amount of the Fees accrued up to and including the date of such termination as soon as practicable after receipt of such amounts from the Swap Counterparty pursuant to the Swap Agreement.

2.5    The Portfolio Manager (i) does not assume any fiduciary duty or responsibility with regard to the Issuer, the Calculation Agent or the Swap Counterparty and (ii) does not guarantee or otherwise assume any responsibility for the performance of the Notes, or the performance by any third party of any contract entered into on behalf of the Issuer under this Agreement.

2.6    Nothing herein shall prevent the Portfolio Manager or any of its Affiliates from engaging in any lawful business, or from rendering services of any kind to or investing or dealing in obligations of or credit or other risks in respect of any Reference Entity, or any affiliates of any Reference Entity, the Noteholders or any other person or entity. Without prejudice to the generality of the foregoing, the Portfolio Manager, its Affiliates and the directors, officers, employees and agents of the Portfolio Manager or its Affiliates may, among other things:

2.6.1   serve as directors (whether supervisory or managing), partners, officers, employees, agents, nominees or signatories for any Reference Entity provided, that such activity is undertaken by such person in good faith and in the reasonable opinion of such person, is not undertaken with the intent to create a material adverse effect on the Reference Registry;

2.6.2   receive fees for services of any nature rendered to any Reference Entity provided that such activity may only be undertaken by such persons if it is undertaken by such person in good faith and in the reasonable opinion of such person, is not undertaken with the intent to create a material adverse effect on the Reference Registry;

2.6.3   be a secured or unsecured creditor of or hold an equity interest in any Reference Entity;

2.6.4   invest for its own account in any Reference Entity or Reference Entities;

2.6.5   serve as a member of any "creditors' committee" in respect of any Reference Entity which has defaulted;

2.6.6   act as the adviser or investment adviser to any other person, entity or fund; and

2.6.7   maintain other relationships with any Reference Entity or any of their Affiliates.



## 3   Reference Portfolio Modification

3.1   The Portfolio Manager may, on any Modification Business Day (as defined below) during the term of this Agreement, request to the Swap Counterparty and the Issuer that one or more Reference Entities be removed from the Reference Registry and/or one or more new Reference Entities be added to the Reference Registry, provided that the Calculation Agent determines that all the Reference Portfolio Guidelines (as defined in Clause 3.4 below) are met (each such amendment, a "**Reference Portfolio Modification**"), by notifying (the "**Modification Instruction**") the Calculation Agent, the Issuer and the Swap Counterparty (which notice, if oral, shall be followed as soon as practicably by confirmation in writing). The Modification Instruction shall contain:

3.1.1   the legal name of each Reference Entity to be removed from the Reference Registry (the "**Replaced Reference Entity**");

3.1.2   in respect of each Replaced Reference Entity, the legal name of the Reference Entity to be added to the Reference Registry (such entity, the "**New Reference Entity**");



3.1.3   the Benchmark Obligation of the New Reference Entity and the seniority of such Benchmark Obligation;

3.1.4   the Reference Entity Credit Position of each Replaced Reference Entity and each New Reference Entity;

3.1.5   a request for the Swap Counterparty to amend the Swap Agreement in accordance with Clauses 3.1.1 to 3.1.4 above and calculate the amount of adjustment required to be made to the Subordination Amount so that the value of the credit swap transaction under the Swap Agreement (the "**Credit Swap**") before and after the Reference Portfolio Modification will remain the same (such amount of adjustment to the Subordination Amount being the "**Subordination Adjustment**"); and

3.1.6   a statement whether the request pursuant to Clause 3.1.5 above is subject to a minimum Subordination Adjustment Increase or a maximum Subordination Adjustment Decrease in relation to the relevant Reference Portfolio Modification.

3.2   A Modification Instruction received before 12.00 noon Hong Kong time on any business day in Hong Kong and each city where credit default swaps in respect of the Replaced and New Reference Entities are primarily traded (each such day, a "**Modification Business Day**") shall be deemed to be received

on such date and a Modification Instruction received after 12.00 noon Hong Kong time on any Modification Business Day shall be deemed to be received on the succeeding Modification Business Day (as applicable, the "**Modification Instruction Date**").

3.3    The Portfolio Manager will not make a Modification Instruction unless it reasonably believes that, after the proposed Reference Portfolio Modification is effected, the Notes will be in compliance with the Reference Portfolio Guidelines (other than in the event that a Guideline Waiver has been given pursuant to Clause 3.6 below) or, if the Notes are not in compliance with the Reference Portfolio Guidelines immediately prior to such Reference Portfolio Modification, such Reference Portfolio Modification will not increase the extent of that non-compliance.

3.4    Subject to Clause 3.6, on the Modification Instruction Date, the Calculation Agent shall, acting in good faith and in a commercially reasonable manner determine whether the criteria set out in Appendix A to this Agreement (the "**Reference Portfolio Guidelines**") are satisfied in respect of the proposed Reference Portfolio Modification.



3.5    Subject to Clause 3.6, if, in respect of the proposed Reference Portfolio Modification, the Calculation Agent determines that all of the Reference Portfolio Guidelines (as modified by Clause 3.3 above) are satisfied, the Calculation Agent shall on the next Modification Business Day after the Modification Instruction Date (the "**Modification Date**") (but in no event later than 12.00 noon Hong Kong time on such date), notify the Portfolio Manager, the Swap Counterparty, Fitch and the Issuer whether the Reference Portfolio Modification has been effected (as the case may be, subject to the conditions applicable to it pursuant to Clause 3.1.6) and the amount of any Subordination Adjustment, (such notice, the "**Modification Information Notice**"; which notice, if oral, shall be followed as soon as practicably by confirmation in writing). The Subordination Adjustment, if positive, shall be a "**Subordination Adjustment Increase**"; if negative, shall be a "**Subordination Adjustment Decrease**"; the sum of the Subordination Adjustment Increase and the Subordination Adjustment Decrease, as determined by the Calculation Agent on any date of determination being the "**Subordination Adjustment Balance**". The Modification Information Notice shall specify:

3.5.1    the names of the Replaced Reference Entity and the New Reference Entity;

3.5.2    the Benchmark Obligation and its seniority in respect of the New Reference Entity;

3.5.3    the Reference Entity Credit Position of each Replaced Reference Entity and each New Reference Entity;

3.5.4    the relevant Entity Type; and

3.5.5    the relevant Subordination Adjustment.



3.6    The Portfolio Manager may request a waiver of any or all of the Reference Portfolio Guidelines in Appendix A in relation to a proposed Reference Portfolio Modification, which waiver shall be deemed to be approved upon the written consent by the holders of not less than two-thirds of the Outstanding Principal Amount of the Notes (each, a "**Guideline Waiver**"). Upon obtaining any Guideline Waiver, the Portfolio Manager shall deliver written notice of such Guideline Waiver to the Issuer, the Swap Counterparty and the Calculation Agent (and, if the Notes are rated by Fitch at the relevant time, with a copy to Fitch) together with the Modification Instruction. Upon receipt of a notice of a Guideline Waiver, the Calculation Agent shall, for the purposes of making a determination in respect of such proposed Reference Portfolio Modification pursuant to Clauses 3.4 and 3.5, disregard any or all of the Reference Portfolio Guidelines in Appendix A which were waived. The Portfolio Manager acknowledges that effecting a Reference Portfolio Modification pursuant to a Guideline Waiver may cause the rating assigned to the Notes to be subject to downgrade or withdrawal.

3.7 · If any of the Reference Portfolio Guidelines are not satisfied in respect of a proposed Reference Portfolio Modification, the Calculation Agent will notify the Portfolio Manager and the Swap Counterparty of such fact and the relevant circumstances, on the next Modification Business Day after the Modification Instruction Date, but in no event later than 12.00 noon Hong Kong time on such date (which notice, if oral, shall be followed as soon as practicably by confirmation in writing).

3.8 Following each Reference Portfolio Modification, the Swap Counterparty will send the revised Reference Registry to Fitch together with any other information requested by Fitch.

3.9 For the avoidance of doubt (i) the Calculation Agent, the Issuer, the Portfolio Manager (subject to the terms of this Agreement) and the Swap Counterparty shall have no liability whatsoever for the consequences of any Reference Portfolio Modification or compliance with the Reference Portfolio Guidelines, (ii) if the Calculation Agent or the Portfolio Manager refuses to allow a Reference Portfolio Modification on the basis that the relevant Reference Portfolio Guidelines have not been met, then such determination shall be conclusive and binding on all parties in all circumstances without liability to the Swap Counterparty, the Portfolio Manager (subject to the terms of this Agreement) or the Calculation Agent, and (iii) no Reference Portfolio Modification, once agreed to between the Calculation Agent and the Portfolio Manager, can be set aside on the basis that, as a factual matter, the Reference Portfolio Guidelines were not satisfied. During the term of this Agreement, the Swap Counterparty shall provide the Portfolio Manager with the mid market spreads for each Reference Entity, as required and available on a best efforts basis. Notwithstanding the aforesaid, at the request of the Portfolio Manager, the Swap Counterparty shall, or shall procure that its agents shall, provide to the Portfolio Manager such information, reports and other data (but only to the extent such information, reports or data are within such party's possession and subject to any duties of confidentiality by which such party may be bound) as may reasonably be required by the Portfolio Manager to enable the Portfolio Manager to carry out its duties in accordance with the terms of this Agreement.

3.10 The Portfolio Manager shall provide a monthly report on the 10th business day of every month during the term of the Notes to the Issuer, the Calculation Agent and the Swap Counterparty (and, if the Notes are rated by Fitch at the relevant time, with a copy to Fitch), which shall contain the following particulars for the relevant month:



3.10.1 a comparison of the Reference Registry on the Issue Date of the Notes with the then current Reference Registry in terms of the ratings and spreads of the Reference Entities;

3.10.2 a description of any change in the ratings of the Reference Entities in the Reference Registry;

3.10.3 a description of any modification of the Reference Registry and the reasons for such modification;

3.10.4 a description of any Subordination Adjustment;

3.10.5 a statement that the modification made to the Reference Registry is in compliance with the requirements as set out in this Agreement;

3.10.6 a comparison of the Subordination Amount against the Fitch Rating Loss Rate; and

3.10.7 details of all the existing Reference Entities in the Reference Registry.

3.11 Notwithstanding Clause 3.10, the Portfolio Manager shall not be responsible for, and does not represent or warrant, the accuracy or completeness of any data provided by any third party including those set out in the monthly reports (the "Third Party Data") and shall have no liability for the

contents, adequacy, any errors, inaccuracies or omissions of any Third Party Data so long as it has exercised reasonable care in accurately reproducing the Third Party Data.

## 4    Delegation and Transfer

4.1    The Portfolio Manager may delegate its duties under this Agreement to its Affiliates (as defined in the 2003 ISDA Credit Derivatives Definitions) only, and may take advice from third parties, provided, however, that (i) the Portfolio Manager shall not be relieved of any of its duties or obligations hereunder as a result of such delegation to or employment of third parties, (ii) the Portfolio Manager shall be solely responsible for the fees and expenses payable to any such third party, (iii) in the case of delegation, the Portfolio Manager shall notify the Issuer, the Swap Counterparty, Fitch and the Calculation Agent of such arrangements, and (iv) the Issuer shall only be obliged to pay the Portfolio Management Fees and the Bonus Portfolio Management Fees under Clause 2.3 to the Portfolio Manager but not to its delegates.

4.2    The Portfolio Manager may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the Issuer, the Swap Counterparty and the Calculation Agent (such consent not to be unreasonably withheld) and the prior consultation with Fitch that such assignment or transfer will not have an adverse impact on the rating of the Notes.



## 5    Conflicts of Interest

5.1    The parties to this Agreement acknowledge and agree that the Portfolio Manager and its Affiliates may:

5.1.1    have proprietary interests in, and may manage or advise accounts or investment funds that have investment criteria similar or dissimilar to those of the Reference Registry, the Issuer, the Calculation Agent and the Swap Counterparty and/or which engage in transactions in the same types of securities and investments as the Issuer, the Calculation Agent and the Swap Counterparty and as a result may compete with the Issuer, the Calculation Agent and the Swap Counterparty for appropriate investment opportunities; and

5.1.2    have interests in, or may enter into derivatives transactions relating to, any Reference Entities, including any proposed Replaced Reference Entity, or any instruments linked to the performance of the Reference Entities, including the Notes.



5.2    The parties to this Agreement acknowledge and agree that from time to time at the Portfolio Manager's discretion, any of its managing directors, directors, officers or other of its employees engaged in advisory activities outside the scope of this Agreement (the "Advisory Personnel") may consult with managing directors, directors, officers and employees in proprietary trading or other business areas of the Portfolio Manager and its Affiliates (the "Proprietary Personnel"), or act on and form investment policy committees comprised of such Advisory Personnel, and the performance by such Advisory Personnel of their obligations related to their consultation with the Portfolio Manager could conflict with their areas of primary responsibility. In connection with their activities with the Portfolio Manager, the Advisory Personnel may receive information regarding the Portfolio Manager's proposed investment activities which is not generally available to the public. However, there will be no obligation on the part of such Advisory Personnel to make any such information available for use by the Proprietary Personnel providing advice for the purpose of this Agreement. In addition, the Portfolio Manager and its Affiliates will be under no obligation to make available any research or analysis prior to its public dissemination.

5.3    Notwithstanding anything in this Agreement, in exercising its powers and duties under this Agreement, the Portfolio Manager shall not be required to, and shall not be responsible for any failure to, make any recommendations or take any action whatsoever in relation to the Reference Registry in circumstances

where to do so may, in its reasonable opinion, give rise to, constitute or result in a breach of any of the provisions of any insider dealing legislation or other laws of any nature whatsoever to which it, its Affiliates or the Calculation Agent or the Swap Counterparty or the Issuer are subject or any confidentiality agreement or undertaking which is binding on its or its Affiliates. No warranty is given by the Portfolio Manager as to the performance of the Reference Entities or the losses that may be suffered in respect of the performance of the Reference Entities.

6    **Expenses**

The Portfolio Manager shall be responsible for all of the expenses incurred in performing its obligations under this Agreement.

7    **Obligations and Acknowledgement of Portfolio Manager**

7.1    The Portfolio Manager shall not knowingly take any action which would:

7.1.1    result in the Issuer, the Swap Counterparty or the Calculation Agent being in breach of the terms of the Swap Agreement; or

7.1.2    have a material adverse effect on the Reference Registry.

7.2    The Portfolio Manager acknowledges that it has received a copy of the Swap Agreement.

8    **Term and Termination**

8.1    This Agreement shall become effective on the date hereof and shall continue in full force and effect until the earliest occurrence of any of the following events, upon which this Agreement shall terminate:

8.1.1    the termination of the Swap Agreement;

8.1.2    the resignation of the Portfolio Manager upon 30 days' prior written notice to the Issuer, the Swap Counterparty and the Calculation Agent (such notice to be copied to Fitch) or immediately if the resignation of the Portfolio Manager results from a material change in the laws or regulations applicable to the Portfolio Manager's performance of its obligations under this Agreement which renders such performance to be a violation of such modified laws or regulations; and

8.1.3    the termination of the Portfolio Manager's appointment for cause upon 30 days' prior written notice from the Issuer (such notice to be copied to Fitch). For purposes of determining "cause" for the purpose of this Clause 8.1.3, such term shall mean any one of the following events:

(i)    wilful and intentional breach by the Portfolio Manager of any provision of this Agreement;

(ii)    breach by the Portfolio Manager of any provision of this Agreement that has a material adverse effect on the Issuer and the failure to cure such breach within 30 days' of becoming aware (or receiving notice) of it;

8.1.4    the Portfolio Manager is wound up or dissolved or there is appointed over it or a substantial part of its assets a receiver, administrator, administrative receiver, trustee or similar officer; or the Portfolio Manager (i) admits in writing its inability to pay its debts as they become due and payable, or makes a general assignment for the benefit of, or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Portfolio Manager or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without



such authorization, consent or application against the Portfolio Manager and continue unstayed for 30 consecutive days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Portfolio Manager without such authorization, application or consent and are approved as properly instituted and remain unstayed for 30 consecutive days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains unstayed for 30 consecutive days;

8.1.5    the occurrence of an act by the Portfolio Manager that constitutes fraud or criminal activity in the performance of its obligations under this Agreement or the indictment of the Portfolio Manager for a criminal offence materially related to investment-related business, which has a material adverse effect on the Issuer;

8.1.6    the Portfolio Manager consolidates or amalgamates with, or merges with or into, or transfers all or substantially all of its assets to, another Person and either (i) at the time of such consolidation, amalgamation, merger or transfer, the resulting, surviving or transferee Person fails to or cannot assume all the obligations of the Portfolio Manager under this Agreement or (ii) the resulting, surviving or transferee Person lacks the legal capacity to perform the obligations of the Portfolio Manager under this Agreement under which the Portfolio Manager acts as an agent on behalf of the Issuer; or

8.1.7    the termination of the Portfolio Manager's appointment approved by a resolution passed by the holders of not less than two-thirds of the Outstanding Principal Amount of the Notes and upon 30 days' written notice from the Issuer to the Portfolio Manager of such resolution.

8.2    Clauses 9, 10, and 14 shall survive the termination of this Agreement.

8.3    For the avoidance of doubt, upon the resignation or removal of the Portfolio Manager pursuant to Clauses 8.1.2 to 8.1.6 above or otherwise, no further changes shall be made to the Reference Registry, except as otherwise provided in the Swap Agreement.

## 9    Indemnity

9.1    The Portfolio Manager shall indemnify and hold harmless the Issuer, the Swap Counterparty and the Calculation Agent from and against any and all losses, liabilities, damages, expenses and claims to which either of them may become subject:

9.1.1    by reason of acts or omissions constituting bad faith, wilful misconduct, breach of contract, negligence or reckless disregard of its obligations in the performance of its duties under this Agreement ; or

9.1.2    with respect to any information provided in writing to the Issuer, the Swap Counterparty or the Calculation Agent by the Portfolio Manager expressly for the inclusion in the Series Prospectus, any marketing materials or offer documents in relation to the Notes and this Agreement, such information containing any untrue statement of material fact or omitting to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; or

9.1.3    by reason of any other material breach by the Portfolio Manager of this Agreement.

9.2    The Calculation Agent shall indemnify and hold harmless the Portfolio Manager from and against any and all losses, liabilities, damages, expenses and claims to which it may become subject by reason of



acts or omissions constituting bad faith, wilful misconduct or negligence of the Calculation Agent in the performance of its obligations under this Agreement in determining whether the Reference Portfolio Guidelines have been met.

## 10   Confidentiality

10.1   The Portfolio Manager shall keep confidential any and all information obtained in connection with the services rendered hereunder and shall not disclose any such information to third parties which are not its Affiliates, except to the extent permitted with the prior written consent of the Swap Counterparty or as required by law, regulation, court order or the rules, regulations or request of any stock exchange or in connection with any judicial process regarding any legal action or proceeding arising out of or related to this Agreement or as requested by any governmental or quasi-governmental authority, self-regulatory organisation, body or official or to its professional advisors and auditors or such information as shall have been publicly disclosed other than in violation of this Agreement.



10.2   Notwithstanding Clause 10.1, the Portfolio Manager shall be permitted to disclose (to the extent reasonably necessary for purposes of marketing its services as a portfolio manager) the following information:

10.2.1   that it is the portfolio manager of the Reference Registry;

10.2.2   the tranche size, maturity and coupon of the Notes, and the relevant attachment and detachment points;

10.2.3   the rating of the Notes as at the Issue Date, the then current rating of the Notes and any other historical ratings of such Notes;

10.2.4   the number of credit events and/or change in subordination which has occurred in relation to the Notes; and

10.2.5   the role of Lehman Brothers International (Europe) as the Arranger of the Notes and the role of Lehman Brothers Special Financing Inc. as the Swap Counterparty.

## 11   No Partnership or Joint Venture



Nothing contained in this Agreement (a) shall constitute the Calculation Agent, the Issuer, the Swap Counterparty and the Portfolio Manager, members of any partnership, joint venture, association, syndicate, unincorporated business or other separate entity, (b) shall be construed to impose any liability as such on any of them or (c) shall be deemed to confer on any of them any express, implied or apparent authority to incur any obligation or liability on behalf of the other.

## 12   Representations and Warranties

12.1   The Portfolio Manager hereby represents and warrants as of the date of this Agreement, and is deemed to represent and warrant as of each Modification Instruction Date, to the Issuer, the Swap Counterparty and the Calculation Agent as follows:

12.1.1   The Portfolio Manager has been duly organised and is validly existing under Singapore law.

12.1.2   The Portfolio Manager has corporate capacity and power to enter into and to perform its obligations under this Agreement and has taken all necessary corporate action to execute, deliver and perform this Agreement.

12.1.3   The entry into and performance of this Agreement by the Portfolio Manager does not violate any applicable law or its own constitutional documents and no consent, license, approval or authorisation of, or registration or filings with, any governmental authority in relation to the entry into and performance of this Agreement.

12.2    The Issuer hereby represents and warrants as of the date of this Agreement, and is deemed to represent and warrant as of each Modification Instruction Date, to the Swap Counterparty, the Calculation Agent and the Portfolio Manager as follows:

    12.2.1    The Issuer has been duly organised and is validly existing under Cayman Islands law.

    12.2.2    The Issuer has corporate capacity and power to enter into and to perform its obligations under this Agreement and has taken all necessary corporate action to execute, deliver and perform this Agreement.

    12.2.3    The entry into and performance of this Agreement by the Issuer does not violate any applicable law or its own constitutional documents and no consent, license, approval or authorisation of, or registration or filings with, any governmental or other authority in relation to the entry into and performance of this Agreement.

## 13    Limited Recourse and Non Petition



The parties to this Agreement shall have recourse against the Issuer only to sums derived from the Mortgaged Property, and the Trustee having realised the same, the parties to this Agreement or anyone acting on behalf of any of them shall not be entitled to take any further steps against the Issuer to recover any sum still unpaid and all sums due but still unpaid shall be extinguished. In particular, the parties to this Agreement shall not be entitled to petition or take any other step for the winding up of the Issuer, nor shall any of them have any claim in respect of any sum arising in respect of the Mortgaged Property for any other Series of Notes.

## 14    Notices

Any notice, demand, consent or notification in any form to be given hereunder may be orally communicated or sent by facsimile transmission. Any oral communication shall be confirmed in writing by the notifying party no later than one Business Day (in the applicable business centre) from the receipt of such oral communication. Any such notice, demand, consent or notification shall be made or given to the following address or to such other address as may from time to time be notified (in accordance with this clause) by the relevant party to the others:

if to the Swap Counterparty:    Lehman Brothers Special Financing Inc.
    745 Seventh Avenue
    New York, NY 10019



    *Modification Instructions:*

| | |
|---|---|
| Fax: | (852) 2372-5832 |
| Telephone: | (852) 2252-6832 |
| Attention: | Saurabh Upadhyay/Teck How Tay |

    *All other notices:*

| | |
|---|---|
| Fax: | (852) 2372-5832 |
| Attention: | Structured Credit Trading |

if to the Calculation Agent:    Lehman Brothers International (Europe)
    25 Bank Street
    London E14 5LE

    *Modification Instructions:*

    Care of: Lehman Brothers Special Financing Inc.
    Structured Credit Trading, CDO Trading (as set out above)

Structured Credit Trading

*All other notices*:

| | |
|---|---|
| Fax: | (852) 2372-5832 |
| Attention: | Structured Credit Trading |

if to the Portfolio Manager:       Lion Capital Management Limited

| | |
|---|---|
| Fax: | (65) 6417 6801 |
| Telephone: | (65) 6417 6800 |
| Attention: | Kon Chee Keat/Goh Soo May |

if to the Issuer:       c/o Walkers SPV Limited
Walker House
87 Mary Street
George Town
Grand Cayman KY1-9002
Cayman Islands



| | |
|---|---|
| Fax: | 1-345-945-3727 |
| Telephone: | 1-345 945 4757 |
| Attention: | Directors |

if to Fitch:       Fitch Ratings
Level 43, AMP Centre
50 Bridge Street
Sydney NSW 2000

| | |
|---|---|
| Email: | Australia.Surveillance@fitchratings.com |
| | hongkong.cdosurveillance@fitchratings.com |
| Tel: | 612-82560300 |
| Fax: | 612-82560301 |



For the avoidance of doubt, a Modification Instruction, a Modification Information Notice and any notice required to be given pursuant to Clause 3.7, including in each case copies thereof, may be given by oral communication and confirmed in writing as described above.

## 15    Governing Law

15.1    **Governing Law:** This Agreement shall be governed by and construed in accordance with English Law.

15.2    **Jurisdiction:** The courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and accordingly any legal action or proceedings arising out of or in connection with this Agreement ("**Proceedings**") may be brought in such courts. The Issuer irrevocably submits to the jurisdiction of such courts and waives any objections to Proceedings in such courts on the ground of venue or on the ground that the Proceedings have been brought in an inconvenient forum. This submission is for the benefit of each of the other parties hereto and the holders of Notes shall not limit the right of any of them to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not).

15.3    **Service of Process:** This Agreement is governed by, and shall be construed in accordance with, English law. The Portfolio Manager hereby irrevocably and unconditionally submits to the jurisdiction

of the Courts of England for all purposes in relation to this Agreement and waives any objections on the ground of venue or forum non convenience or on similar grounds.

## 16  Descriptive Headings

The descriptive headings in this Agreement are for convenience of reference only and shall not define or limit the provisions hereof.

## 17  Counterparts

This Agreement may be executed in separate counterparts and by each party separately on a separate counterpart, and each such counterpart, when so executed, shall be an original. Such counterparts shall together constitute one and the same instrument.

## 18  Contracts (Rights of Third Parties) Act 1999

A person who is not party to this Agreement has no right, whether under the Contracts (Rights of Third Parties) Act 1999 or otherwise, to enforce any term of this Agreement except that and to the extent (if any) that this Agreement expressly provides for that Act to apply to any of its terms.



## 19  Amendments

Any term of this Agreement may only be amended or waived with the written consent executed by all parties to this Agreement.

## 20  Invalidity

If any provision in this Agreement shall be held to be illegal, invalid or unenforceable, in whole or in part, under any enactment or rule of law, such provision or part shall to that extent be deemed not to form part of this Agreement but the legality, validity and enforceability of the remainder of this Agreement shall not be affected.

## 21  Entire Agreement

This Agreement supersedes any previous written or oral agreement between the parties in relation to the matters dealt with in this Agreement and contains the whole agreement between the parties relating to the subject matter of this Agreement at the date hereof to the exclusion of any terms implied by law which may be excluded by contract. In this Clause 21, "this Agreement" includes all documents entered into pursuant to this Agreement.



## 22  Process Agent

The Issuer irrevocably appoints Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE to receive, for them and on their behalf, service of process in any legal action or proceedings in England arising out of or in connection with this Agreement. If for any reason a process agent ceases to be able to act as such or no longer has an address in England, the Issuer irrevocably agrees to appoint a substitute process agent acceptable to the Swap Counterparty and shall immediately notify the Swap Counterparty and the Calculation Agent of such appointment. Nothing in this Agreement shall affect the right to serve process in any other manner permitted by law.

Signed by the authorised representatives of the parties:

**ZIRCON FINANCE LIMITED**
as Issuer


By: _____


**LEHMAN BROTHERS SPECIAL FINANCING INC.**
as Swap Counterparty



By: _____


**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**
as Calculation Agent


By: _____


**LION CAPITAL MANAGEMENT LIMITED**
as Portfolio Manager


By: _____

## Appendix A

### Reference Portfolio Guidelines

The "Reference Portfolio Guidelines" applicable with respect to a Reference Portfolio Modification are the following:

(a)    the Reference Entity Calculation Percentage for any Reference Entity does not exceed 1.00 per cent.;

(b)    the aggregate Reference Entity Calculation Percentage of Reference Entities in each industry (other than the Banking& Finance) does not exceed 15.0 per cent.;

(c)    the aggregate Reference Entity Calculation Percentage of Reference Entities in Banking& Finance does not exceed 40.0 per cent.;

"**Reference Entity Calculation Percentage**" means, for each Reference Entity included in the Reference Registry, as of any date of determination, the Reference Entity Notional Amount of that Reference Entity divided by the aggregate of the Reference Entity Notional Amounts of all Reference Entities included in the Reference Registry, each as of such date, expressed as a percentage rounded to the nearest one-hundredth of one per cent.; and



(d)    the Fitch Guidelines are complied with.

The Fitch Guidelines (DPG) specify that:

(a)    in the event that the effect of the contemplated Reference Portfolio Modification is such that its execution would result in the Fitch Risk Tranche Current Credit Enhancement Level exceeding the Fitch Risk Tranche Rating Loss Rate consistent with a tranche rating of up to one notch below the Fitch rating of the relevant tranche of the Notes on the Issue Date, then the Fitch DPG Test will not be applied;

(b)    in the event that the effect of the contemplated Reference Portfolio Modification is such that its execution would not result in the Fitch Risk Tranche Current Credit Enhancement Level equalling or exceeding the Fitch Risk Tranche Rating Loss Rate consistent with a tranche rating of up to one notches below the Fitch rating of the relevant tranche of the Notes on the Issue Date, then in the event that the effect of the contemplated Reference Portfolio Modification is such that its execution would result in the Fitch Risk Tranche Current Credit Enhancement Level exceeding the Fitch Risk Tranche Rating Loss Rate consistent with a tranche rating of two notches below the Fitch rating of the relevant tranche of the Notes on the Issue Date, the Fitch DPG Test will be applied save in the case of a Reference Portfolio Modification the effect of which would decrease the absolute value of the Reference Entity Credit Position of a Credit Risk Reference Entity; and



(c)    in the event that the effect of the contemplated Reference Portfolio Modification is such that its execution would result in the Fitch Risk Tranche Current Credit Enhancement Level being below the Fitch Risk Tranche Rating Loss Rate consistent with a tranche rating of two notches below the Fitch rating of the relevant tranche of the Notes on the Issue Date, then no Reference Portfolio Modification may be executed save if the execution thereof would result in the Rating Implied of the relevant tranche of the Notes being at least one notch higher than the Rating Implied of the relevant tranche of the Notes before the contemplated Reference Portfolio Modification.

The aforementioned Reference Portfolio Guidelines (a), (b), (c) and (d) and Fitch Guidelines (DPG) (a), (b) and (c) above may be disapplied subject to approval by the holders of at least two-thirds of the Outstanding Principal Amount of the Notes.



"**Credit Risk Reference Entity**" means, if applicable, with respect to any Reference Entity:

(a) any Reference Entity which, in the Portfolio Manager's reasonable judgement (which shall not be called into question as a result of subsequent events), has a significant risk of materially declining in credit quality; or

(b) any Reference Entity which since it was added to the relevant Reference Registry has been downgraded or placed on credit watch for possible downgrade by one or more rating notch by any Rating Agency.

"**Rating Implied**" means the highest attainable rating indicated by the Fitch Default VECTOR Model for the Fitch Risk Tranche Current Credit Enhancement Level.

"**Fitch Default VECTOR Model**" means the version of Fitch's proprietary computer programme available from time to time at www.fitchratings.com. The Fitch Default VECTOR Model calculates the cumulative loss rate of a pool of Reference Entities consistent with a specified benchmark rating level (the "**Rating Loss Rate**") by considering the number of Reference Entities in the Reference Registry, the country, asset type and industry concentration in the Reference Portfolio and the Fitch Rating.



"**Fitch Dynamic Portfolio Guidelines (DPG) Test**" means the test which will be satisfied with respect to a Reference Registry on any date of a Reference Portfolio Modification if the Fitch Rating Cushion (such Fitch Rating Cushion being measured only in respect of those Series of Notes which are rated by Fitch and which reference such Reference Registry) calculated on such date on the Reference Portfolio after taking into account the contemplated Reference Portfolio Modification is either:

(a) greater than or equal to zero if such Fitch Rating Cushion calculated as at the date of the Reference Portfolio Modification before taking into account the contemplated Reference Portfolio Modification is greater than or equal to zero, or

(b) if such Fitch Rating Cushion is negative, not lower than the Fitch Rating Cushion calculated as at the date of the Reference Portfolio Modification prior to the contemplated Reference Portfolio Modification and the Risk Tranche Current Credit Enhancement after the contemplated Reference Portfolio Modification is consistent with a rating equal to or higher than the then current rating of the relevant tranche of Notes prior to the contemplated Reference Portfolio Modification.

The Fitch DPG test outlined above must be applied in accordance with Fitch's then prevailing emerging market CDO criteria as well as Fitch's then current criteria with respect to short positions.



For the avoidance of doubt, the compliance or otherwise of the Reference Registry with the Fitch DPG Test on any date does not imply any affirmation, upgrade or downgrade of the then current ratings assigned by Fitch.

"**Fitch Recovery Rate**" means, with respect to any Reference Entity, the recovery rate percentage as stated in the Fitch Default VECTOR Model.

"**Fitch Rating Cushion**" means (i) the Fitch Risk Tranche Current Credit Enhancement Level minus (ii) the Fitch Risk Tranche Rating Loss Rate.

"**Fitch Risk Tranche Current Credit Enhancement Level**" means on any date, the number, expressed as a percentage of the Notional Amount, equal to the quotient of (i) the Loss Threshold minus the Accumulated Loss Amount divided by (ii) the Notional Amount.

"**Fitch Risk Tranche Rating Loss Rate**" means on any date, the number equal to the Rating Loss Rate expressed as a percentage and calculated on such date from the Fitch Default VECTOR Model based on the Reference Registry as at such date and consistent with the Fitch rating of the relevant tranche of the Notes on the Issue Date.



"**Loss Threshold**" means the Subordination Amount.

"**Accumulated Loss Amount**" means the aggregate of all Reference Entity Notional Amount(s) in respect of all relevant Adjustment Reference Entities existing on such day plus the Cumulative Loss Amount as of such day.

"**Rating Agency**" means Moody's Investors Service Ltd. ("Moody's") and/or Fitch Ratings Ltd. ("Fitch"), and/or Standard & Poor's Rating Services, a division of the McGraw-Hill Companies, Inc. ("Standard & Poor's").

"**Fitch Rating**" means, in respect of any Reference Entity, (in the following order of progression):

(i)     if the Reference Entity is publicly rated by Fitch, such *public rating* assigned by Fitch;

(ii)    if the Reference Entity has not been assigned a *public rating* by Fitch, the Fitch Rating of such Reference Entity shall be the shadow rating assigned by Fitch, as requested by the Substitution Agent;



(iii)   if the Reference Entity has not been assigned a *public rating* or shadow rating (at the request of the Portfolio Manager) by Fitch but is publicly rated investment grade by both Moody's and S&P, the Fitch equivalent of the lowest of the public ratings assigned by Moody's and S&P, unless otherwise advised by Fitch in which case the Fitch Rating shall be the rating advised;

(iv)    if the Reference Entity has not been assigned a *public rating* or shadow rating (at the request of the Portfolio Manager) by Fitch but is publicly rated sub-investment grade by both Moody's and S&P, the rating as defined and applied in the Fitch Default Vector Model using a default probability equivalent to the mid-point of the *public ratings* assigned by Moody's and S&P, unless otherwise advised by Fitch in which case the Fitch Rating shall be the rating advised; or

(v)     if the Reference Entity has not been assigned a *public rating* or shadow rating (at the request of the Portfolio Manager) by Fitch and does not fall within paragraph (iv) above but is publicly rated by Moody's and/or S&P, the Fitch equivalent of the lowest *public rating*, unless otherwise advised by Fitch in which case the Fitch Rating shall be the rating advised.

Where any Reference Entity is placed on watch for a possible downgrade by Fitch, Moody's or S&P, the *public rating* assigned thereto shall be deemed to be the rating which is one sub-category lower than the *public rating* assigned thereto, unless otherwise advised by Fitch in which case the Fitch Rating shall be the rating advised.



Where any Reference Entity is placed on watch for a possible upgrade by Fitch, Moody's or S&P, the *public rating* assigned thereto shall be deemed to be the rating which is one sub-category higher than the *public rating* assigned thereto, unless otherwise advised by Fitch in which case the Fitch Rating shall be the rating advised.

References to "**public rating**" above shall be references to the following:

(i)     for reference entities rated by Fitch, excluding insurance firms, the *public rating* corresponds to the Issuer Default Rating ("**IDR**");

(ii)    for a Fitch rated financial guaranty insurance (*monoline*) operating entity, the *public rating* is given by the Insurer Financial Strength Rating ("**IFS Rating**");

(iii)   for all other types of insurance entities rated by Fitch the appropriate *public rating* is that assigned to the unsubordinated unsecured financial obligations of the insurer. In the latter case, IFS Ratings tend to be above the ratings of the unsubordinated unsecured financial obligations of the insurer and in addition reflect the ability of the insurer to meet its *non-defaultable (contingent)* obligations such as life & health, property & casualty policies underwritten.; and

(iv)   where no *public rating* corresponding to the IDR or IFS Rating, where appropriate, is available then the benchmark probability of default rating is given by the *public rating* assigned to the reference entity in respect of its unsubordinated unsecured financial obligations.

Any senior unsecured *public rating* of the reference entity is considered with reference to a foreign currency senior unsecured debt rating that may be assigned to the reference entity.





## ANNEX 4 - DESCRIPTION OF THE SWAP COUNTERPARTY
## AND THE SWAP GUARANTOR

**Lehman Brothers Special Financing Inc.**

Lehman Brothers Special Financing Inc. (the "Swap Counterparty") was incorporated under the laws of the State of Delaware of the United States of America on 17 August 1984.

The principal executive office of the Swap Counterparty is located at 745 Seventh Avenue, New York, New York 10019, U.S.A. The Swap Counterparty's registered office in the State of Delaware is located at 1013 Centre Road, Wilmington, Delaware 19805, U.S.A.

The Swap Counterparty is engaged in the fixed income and currency, swaps and derivatives business. The Swap Counterparty's principal activities are to provide a wide range of derivative products including interest rate, currency, credit and mortgage derivatives.

The Swap Counterparty is a wholly-owned subsidiary of Lehman Brothers Inc.



**Lehman Brothers Holdings Inc.**

Lehman Brothers Holdings Inc. (the "Swap Guarantor") was incorporated under the laws of the State of Delaware of the United States of America on 29 December 1983.

The principal executive office of the Swap Guarantor is located at 745 Seventh Avenue, New York, New York 10019. The Swap Guarantor's registered office in the State of Delaware is located at 1013 Centre Road, Wilmington, Delaware 19805, U.S.A.

The Swap Guarantor is a holding company that is primarily engaged in funding activities. Through its U.S. and non-U.S. subsidiaries and affiliates it provides equity and fixed income sales, trading and research, investment banking, mortgage, private equity and private client services on a global basis. The Swap Guarantor provides these products and services to a wide array of clients, including corporations, governments and municipalities, institutional clients, and high-net-worth individuals.

The Swap Guarantor funds its activities through a combination of master notes, commercial paper, bank credit facilities and other money market related instruments, medium and long-term debt, and an unsecured flexible cash capital facility.



The common stock of the Swap Guarantor is listed on the New York Stock Exchange.

## ANNEX 5 – DESCRIPTION OF THE PORTFOLIO MANAGER

Lion Capital Management Limited ("**Lion Capital**") was created from the merger of the asset management businesses of OCBC Asset Management Limited and Straits Lion Asset Management Limited in September 2005.

With total assets under management of over S$33 billion (as at 30 April 2007) and a staff strength of over 130, Lion Capital offers a comprehensive suite of investment products covering a wide range of asset classes. Clients of Lion Capital include statutory boards, government-linked companies and agencies, public and private companies, charitable organisations, endowment funds and individual investors.

Lion Capital is also involved in Asian hedge funds through its 65%-owned subsidiary Lion Fairfield Capital Management Limited.





## REGISTERED OFFICE OF THE ISSUER

Walkers SPV Limited
Walker House
87 Mary Street
George Town
Grand Cayman KY1-9002
Cayman Islands

## TRUSTEE

BNY Corporate Trustee Services Limited (formerly known as J.P. Morgan Corporate Trustee Services Limited)
One Canada Square
London E14 5AL

## SWAP COUNTERPARTY

Lehman Brothers Special Financing Inc.
745 Seventh Avenue
New York
New York 10019
U.S.A.

## ISSUING AND PAYING AGENT AND CUSTODIAN

The Bank of New York
One Canada Square
London E14 5AL

## AUSTRALIAN PAYING AGENT AND REGISTRAR

BTA Morgan Institutional Services Australia Limited
(ABN 48 002 916 396)
Level 4
35 Clarence Street
Sydney
NSW 2000
Australia

## CALCULATION AGENT

Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE

## PORTFOLIO MANAGER

Lion Capital Management Limited
One George Street
#08-01 Singapore 049145

## LEGAL ADVISERS

*to the Issuer*
*as to Cayman Islands law*

**Walkers**
Walker House
87 Mary Street
George Town , Grand Cayman KY1-9001
Cayman Islands

*to the Arranger*
*as to English law*

**Simmons & Simmons**
35th Floor, Cheung Kong Center
2 Queen's Road Central
Hong Kong