**EXHIBIT S**



Trinity Term
[2011] UKSC 38
*On appeal from: [2009] EWCA Civ 1160*

# JUDGMENT

## Belmont Park Investments PTY Limited (Respondent) *v* BNY Corporate Trustee Services Limited and Lehman Brothers Special Financing Inc (Appellant)

before

Lord Phillips, President
Lord Hope, Deputy President
Lord Walker
Lady Hale
Lord Mance
Lord Collins
Lord Clarke

## JUDGMENT GIVEN ON

## 27 July 2011

Heard on 1, 2 and 3 March 2011

*Appellant*
Richard Snowden QC
James Potts
(Instructed by Weil,
Gotshal & Manges)

*1st to 29th Respondents*
Richard Salter QC
Jonathan Davies-Jones
(Instructed by Lawrence
Graham LLP)

*(30th Respondent)*

*Intervener (The
Commissioners for Her
Majesty's Revenue &
Customs)*
Gregory Mitchell QC

Mark Howard QC
Stephen Midwinter
(Instructed by Hogan
Lovells International LLP)

(Instructed by HMRC
Solicitors Office)

*Intervener (The Football
Association Premier
League Limited)*
Gabriel Moss QC
Daniel Bayfield
(Instructed by
McCormicks Solicitors)

**LORD COLLINS**

**I      Introduction: the anti-deprivation rule and the pari passu principle**

1.      The anti-deprivation rule and the rule that it is contrary to public policy to contract out of pari passu distribution are two sub-rules of the general principle that parties cannot contract out of the insolvency legislation. Although there is some overlap, they are aimed at different mischiefs: Goode "Perpetual Trustee and Flip Clauses in Swap Transactions" (2011) 127 LQR 1, 3-4. The anti-deprivation rule is aimed at attempts to withdraw an asset on bankruptcy or liquidation or administration, thereby reducing the value of the insolvent estate to the detriment of creditors. The pari passu rule reflects the principle that statutory provisions for pro rata distribution may not be excluded by a contract which gives one creditor more than its proper share.

*The anti-deprivation rule*

2.      What is now described as the anti-deprivation principle dates from the 18th century, although the expression "deprivation" has been in use in this context only since the decision of Neuberger J in *Money Markets International Stockbrokers Ltd v London Stock Exchange Ltd* [2002] 1 WLR 1150. In 1812 Lord Eldon LC confirmed that a term which is "adopted with the express object of taking the case out of reach of the Bankrupt Laws" is "a direct fraud upon the Bankrupt Laws" from which a party cannot benefit: *Higinbotham v Holme* (1812) 19 Ves Jun 88, 92.

3.      Classic statements of the principle include these:

> "... the law is too clearly settled to admit of a shadow of doubt that no person possessed of property can reserve that property to himself until he shall become bankrupt, and then provide that, in the event of his becoming bankrupt, it shall pass to another and not to his creditors." (*Whitmore v Mason* (1861) 2 J & H 204, 212, per Sir William Page Wood V-C)

> "... a simple stipulation that, upon a man's becoming bankrupt, that which was his property up to the date of the bankruptcy should go over to some one else and be taken away from his creditors, is void

as being a violation of the policy of the bankrupt law" (*Ex p Jay; In re Harrison* (1880) 14 Ch D 19, 25, per James LJ).

4.      In the case of personal bankruptcy, section 306(1) of the Insolvency Act 1986 Act ("the 1986 Act") provides that a bankrupt's estate vests in the trustee in bankruptcy immediately upon his appointment and section 283(1) provides that a bankrupt's estate comprises "all property belonging to or vested in the bankrupt at the commencement of the bankruptcy; and…any property which by virtue of any of the following provisions of this Part is comprised in that estate or is treated as falling within the preceding paragraph."

5.      In the case of corporate insolvency, the insolvent company continues to be owner of its property but holds it on trust for the creditors in accordance with the provisions of the 1986 Act: *Ayerst v C & K (Construction) Ltd* [1976] AC 167. For companies, section 436 defines "Property" so that it:

> "includes money, goods, things in action, land and every description of property…and also obligations and every description of interest, whether present or future or vested or contingent, arising out of, or incidental to, property"

*The pari passu principle*

6.      In the case of personal bankruptcy, by section 328 of the 1986 Act, subject to preferential payments, and with the exception of certain deferred debts, all other debts are to be paid equally. For companies, section 107 provides that, subject to the provisions relating to preferential payments, "the company's property in a voluntary winding up [should] on the winding up be applied in satisfaction of the company's liabilities pari passu". By rule 4.181 of the Insolvency Rules 1986 (SI 1986/1925) similar provision is made for a winding up by the court. In such a winding up, the liquidator must "secure that the assets of the company are got in, realised and distributed to the company's creditors" and, subject to that, he must "take into his custody or under his control all the property and things in action to which the company is … entitled" (sections 143 and 144 of the 1986 Act).

7.      In *British Eagle International Airlines Ltd v Cie Nationale Air France* [1975] 1 WLR 758 the House of Lords by a bare majority (reversing Templeman J and a unanimous Court of Appeal [1974] 1 Lloyd's Rep 429, with Russell LJ delivering the judgment of the court) decided that a clearing house arrangement between a large number of airline companies relating to debts arising as between them was ineffective as against the liquidator of one of the companies, British

Eagle. All members of the House upheld the principle that contracting out of the pari passu provisions of what was then section 302 of the Companies Act 1948 was contrary to public policy and void. The difference between the majority and minority related largely (but not exclusively) to the question whether the arrangement resulted in no debt being due. The conclusion of the majority in the House of Lords was that, insofar as the arrangement purported to apply to debts which existed when the members of the company passed the resolution to go into creditors' voluntary liquidation, it would have amounted to contracting out of the statutory requirement that the assets owned by the company at the date of its liquidation should be available to its liquidator, who should use them to meet the company's unsecured liabilities pari passu, under what is now section 107 of the 1986 Act.

8.    The ratio of the decision was accurately stated by Peter Gibson J in *Carreras Rothmans Ltd v Freeman Mathews Treasure Ltd* [1985] Ch 207, 226, as being that "where the effect of a contract is that an asset which is actually owned by a company at the commencement of its liquidation would be dealt with in a way other than in accordance with [the statutory pari passu rule] ... then to that extent the contract as a matter of public policy is avoided."

9.    The distinction between the two sub-rules is by no means clear-cut. Several decisions which are regarded as decisions on the anti-deprivation rule could also be characterised as cases in which the parties sought to disturb pari passu distribution. *Ex p Mackay*; *Ex p Brown*; *In re Jeavons* (1873) LR 8 Ch App 643 is usually regarded as an anti-deprivation case. It involved two transactions: the first was the sale of a patent for improvements in the manufacture of armour plates by Mr Jeavons to Brown & Co and Cammell & Co in consideration of the companies paying royalties; the second was a secured loan of £12,500 from the companies to Mr Jeavons. The parties agreed that (1) the companies would keep half the royalties towards satisfying the debt, and (2) in the event of Mr Jeavons' bankruptcy, they could also keep the other half of the royalties until the debt had been fully paid. It was held that provision (1) was valid against Mr Jeavons' trustee, but provision (2) was not.

10.    James LJ said (at p 647) that provision (1) represented "a good charge upon one moiety of the royalties, because they are part of the property and effects of the bankrupt", but provision (2) "is a clear attempt to evade the operation of the bankruptcy laws" as it "provide[d] for a different distribution of his effects in the event of bankruptcy from that which the law provides". Mellish LJ said (citing *Higginbotham v Holme* 19 Ves Jun 88, 92) that the case fell within the principle that:

> "... a person cannot make it a part of his contract that, in the event of
> bankruptcy, he is then to get some additional advantage which
> prevents the property being distributed under the bankruptcy laws ..."
> (p 648)

11.    What James and Mellish LJJ said cannot be applied unconditionally, since
"a different distribution" and "additional advantage" can be obtained by lawful
charges between debtor and creditor and by subordination agreements between
creditors, and the same applies to what Lord Cross of Chelsea said about
"contracting out" generally. The reference, therefore, by James LJ to a "different
distribution of his effects in the event of bankruptcy from that which the law
provides" is an early expression of the pari passu principle. That is perhaps why
the decision was the only prior relevant decision discussed in Lord Cross' sole
speech for the majority in *British Eagle*. He said (at 780):

> "In *Ex p Mackay* 8 Ch App 643, the charge on [the] second half of
> the royalties was...an animal known to the law which on its face put
> the charge[e] in the position of a secured creditor. The court could
> only go behind it if it was satisfied – as was indeed obvious in that
> case – that it had been created deliberately in order to provide for a
> different distribution of the insolvent's property on his bankruptcy
> from that prescribed by the law."

12.    Lord Morris of Borth-y-Gest, in his dissenting speech, agreed that *Ex p
Mackay* was a case where the relevant provisions were "a clear attempt to evade
the operation of the bankruptcy laws", or "a device for defeating the bankruptcy
laws" (p 770).

13.    By the time that *International Air Transport Association v Ansett
Australia Holdings Ltd* [2008] HCA 3, (2008) 234 CLR 151 was decided by the
High Court of Australia the rules of the clearing house scheme had been modified
following the *British Eagle* decision so as to exclude any liability or right of action
for payment between member airlines. The High Court decided by a majority
(Kirby J dissenting) that the rule changes were effective to make the IATA the sole
creditor of Ansett, and that the revised system did not have the effect of
administering debts due to an insolvent company otherwise than in accordance
with the mandatory pari passu rule. In their joint judgment Gummow, Hayne,
Heydon, Crennan and Kiefel JJ also referred to *Ex p Mackay* and suggested that
Lord Cross' speech in *British Eagle* was based in part on the anti-deprivation
principle; and that there was no need for recourse to the rule that a contract which
is contrary to public policy is void, because the statute was an overriding one
which applied according to its terms: at paras 74 and 76. There is much to be said
for the observation that recourse to public policy is unnecessary for the application

of the mandatory statutory pari passu principle. There is little difference in practice between declaring a contractual provision invalid or ineffective because it is inconsistent with the statute and declaring it contrary to public policy for the same reason, but this is not the occasion for the decision in *British Eagle* to be reconsidered. Although it must be said that the decision of the minority and of the lower courts makes more sense commercially than that of the majority, there was no real disagreement on the applicable principles.

14.    But it does not follow from the fact that it is difficult in some cases to draw the line between the two categories that there are no relevant differences. The anti-deprivation rule applies only if the deprivation is triggered by bankruptcy, and has the effect of depriving the debtor of property which would otherwise be available to creditors. The pari passu rule applies irrespective of whether bankruptcy or liquidation is the trigger. There is a question whether the bona fides of the parties is equally relevant to the application of the two principles. These points will be taken up below.

15.    This is a case in which only the anti-deprivation principle is potentially applicable. The Noteholders are creditors of the Issuer. There is no question of disturbance of the pari passu rule as between the creditors of Lehman Brothers Special Financing Inc ("LBSF"). What is said, in effect, is that the parties have unlawfully extracted an asset belonging to LBSF, namely its first charge on the Collateral, and passed it to the Noteholders.

*Anti-avoidance provisions*

16.    There are anti-avoidance provisions for personal and corporate insolvency. They are relevant on this appeal because of an argument that the anti-deprivation rule dates from a time when there were anti-avoidance provisions which, if they existed at all, were in their infancy, and that consequently the need for the rule needs to be re-visited in the light of legislative developments. For personal bankruptcies, section 284 of the 1986 Act provides that where a person is adjudged bankrupt, any disposition of property made by that person in the period from the day of the presentation of the petition for the bankruptcy order is void except to the extent that it is or was made with the consent of the court, or is or was ratified by the court. There are claw-back provisions dealing with the setting aside of transactions at an undervalue and preferences in sections 339-340 of the Act.

17.    For companies, section 127 provides that "any disposition of the company's property ... made after the commencement of the winding up is, unless the court otherwise orders, void". Sections 238 and 239 enable a liquidator to apply to the court for an order to restore the position where the company has entered into a

transaction at an undervalue, or has done anything which, in the event of the company's insolvent liquidation, would put a creditor (or guarantor) of the company in a better position than he would otherwise be in. By section 423 the court may set aside transactions entered into at an undervalue at any time if they were entered into "for the purpose ... of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or ... of otherwise prejudicing the interests of such a person in relation to the claim."

## II    Background

18.    Prior to the events which form the background to this appeal, the Lehman Brothers group was the fourth largest investment bank in the United States. On 15 September 2008, Lehman Brothers Holdings Inc ("LBHI"), the parent company of the Lehman Brothers group, applied to the US Bankruptcy Court for the Southern District of New York for protection under Chapter 11 of the United States Bankruptcy Code.

19.    This appeal concerns the effect of the security arrangements in a complex series of credit swap transactions under which, in effect, investors gave credit protection to Lehman Brothers by reference to the performance of a basket of underlying obligations.

20.    The Lehman Brothers vehicles used for what was called the "Dante Programme" (named after the first special purpose vehicle ("SPV") used in the programme) were LBSF and SPVs incorporated in jurisdictions chosen for tax reasons. The programme was what was called a synthetic debt repackaged note issuance programme.

21.    At the time of the Lehman Brothers collapse in September 2008 there were 19 SPVs being used as Note issuers in the programme with a total of about 180 series of Notes with an aggregate principal amount of $12.5 billion. LBSF filed for Chapter 11 protection in the United States Bankruptcy Court for the Sothern District of New York on 3 October 2008.

22.    The documentation is complex, but, in broadest outline, the transactions in the representative example series before the court on this appeal were these:

(1)    Lehman Brothers set up an SPV ("the Issuer") in a suitable jurisdiction (in the representative example, Saphir Finance plc, incorporated in the Republic of Ireland).

(2)   Investors ("the Noteholders") subscribed for Notes issued by the Issuer. The Notes were floating rate medium-term Notes (with a seven year maturity) with a margin of 1.3% over Australian dollar denominated 3 month bills.

(3)   The Issuer used the subscription moneys to purchase government bonds or other secure investments (in the representative, triple-A rated floating rate Rabo Australia Ltd Notes guaranteed by Rabobank Nederland) ("the Collateral").

(4)   The Collateral was vested in a Trustee (in the present case BNY Corporate Trustee Services Ltd) ("the Trustee").

(5)   LBSF entered into a credit default swap agreement with the Issuer under which LBSF would pay the Issuer the amounts due by the Issuer to the Noteholders in exchange for the payment by the Issuer to LBSF of sums equal to the interest received on the Collateral.

(6)   The amount by which the sum payable under the swap agreement by LBSF exceeded the yield on the Collateral represented what has been described as the premium for credit protection insurance provided by the Noteholders.

(7)   The amount payable by LBSF to the Issuer on the maturity of the Notes (or on early redemption or termination) was the initial principal amount subscribed by the Noteholders less amounts (if any) calculated by reference to the Credit Events occurring during a specified period by reference to one or more reference entities. In return, LBSF would receive the proceeds of the Collateral.

(8)   The payment due from LBSF at maturity of the swap agreement (and also the outstanding principal amount of the Notes) could be reduced (in extreme circumstances to zero) during the term of the swap agreement (and the Notes) if Credit Events occurred and were notified in accordance with the terms of the swap agreement.

(9)   Credit protection or insurance is a misnomer because there was no requirement for LBSF to have any direct exposure to the reference portfolio (substantially the same 260 reference entities in the two tranches before the Court on the appeal): it was expressly provided that the swap did not constitute a contract of insurance and that

payments would be due in the event of Credit Events without proof of economic loss to LBSF.

(10)  There was in effect an "excess" because the notified Credit Events would lead to a reduction only if they exceeded a stated "subordination amount." In the representative example before the Court A$70m was the amount of the issue, the subordination amount was A$126m, and the Offering Circular indicated that the Notes would be reduced to zero when the cumulative losses on the reference portfolio reached A$196m.

(11)  If Credit Events did not occur the Noteholders were due to receive the full amount of the Notes, and LBSF was to put the Issuer in funds to redeem the Notes.

(12)  If Credit Events occurred, the amounts payable by LBSF and the principal amount due on the Notes were to be reduced from time to time as and when such Credit Events occurred and were notified.

(13)  Consequently the performance of the Notes was linked to the performance of the obligations of the reference entities. In effect, LBSF was speculating that sufficient Credit Events would occur for it to be required to pay less than the Noteholders had invested and to net a substantial part of the Collateral; and the Noteholders were speculating that the credit reference portfolio was safe and that any Credit Events within it would not "burn through" the net amount of the subordination amount.

(14)  The Collateral was charged by the Issuer in favour of the Trustee to secure its obligations to LBSF under the swap agreement and to the Noteholders under the terms and conditions of the Notes.

(15)  The claims of LBSF and the Noteholders were limited to the Collateral and they had no right of recourse against the Issuer.

(16)  The respective priorities of LBSF under the swap agreement and the Noteholders were described as "Swap Counterparty Priority" and "Noteholder Priority."

(17)  The respective priorities of LBSF and the Noteholders depended on

whether there had been an Event of Default under the swap agreement, which included the institution by LBSF (or LBHI as LBSF's "Credit Support Provider" under the swap agreement) of proceedings in insolvency or bankruptcy (such as filing for Chapter 11 protection).

(18) If there were no such Event of Default, then LBSF would have priority in relation to the Collateral, but if there were an Event of Default in respect of which LBSF (or LBHI) was the "Defaulting Party," the Noteholders would have priority over LBSF.

23.     The central issue in the proceedings and the appeal is the validity of those provisions for alteration of priority. The practical importance of the question is that under the terms of the swap, in the event of its early termination, it was to be unwound with certain "Unwind Costs" payable either to LBSF or to the Issuer. The Unwind Costs represented the market assessment of the amount either LBSF or the Issuer were expected to receive under the swap were it to run to maturity. The commercial purpose was to reflect the value of the swap in the market place as at the point of termination.

24.     Since, following the financial crisis, many more Credit Events were expected to occur in the future, the Unwind Costs (representing a payment for the future losses) would be due to LBSF. If Swap Counterparty Priority subsists LBSF would be entitled to recourse to the Collateral towards satisfaction of its claims. But if the Noteholders have priority, the Collateral would be exhausted in repayment of the Notes where Credit Events did not occur before termination so as to reduce the amount due on the Notes and to make some of the Collateral available to LBSF.

## III    The litigation

25.     The first 29 respondents (which will for convenience be called "the Belmont respondents" after the first respondent, Belmont Park Investments Pty Ltd, or "the Noteholders", depending on the context) are Australian companies, institutions, authorities and charities who are Noteholders in ten series of Notes, nine of which are involved in this appeal. After 15 September 2008, periodic payments due to the Noteholders were not made. The same applied in respect of other Note series under the Dante Programme, including two series held by Perpetual Trustee Co Ltd ("Perpetual").

26.     The total outstanding under those nine series of Notes is approximately A\$250.23m (approximately £155m) of which the Belmont respondents account for

approximately A$91.1m. The contractual documentation differs between the various Belmont series, but the parties are content for the court to consider the Saphir 2004-4 Note documentation as, for relevant purposes, representative, and the documentation before the court has included the documents relating to two tranches. The facts set out below relate to those tranches. There are minor differences in relation to some other series, but they are immaterial for present purposes.

27.    On 15 September 2008, LBHI filed for Chapter 11 protection under the US Bankruptcy Code, and on 3 October 2008, LBSF filed for Chapter 11 protection.

28.    Later in 2008 or in March/April 2009, following directions by the Noteholders, the Trustee caused the Issuer to terminate the swap agreement. The swap termination notices served in respect of the Notes relied on the event of default constituted by LBSF's Chapter 11 filing and reserved all rights, claims and defences in relation to all other Events of Default. On 6 May 2009, the Trustee issued Condition 10 notices declaring the Notes to be due and payable at their Early Redemption Amount.

29.    LBSF's position was that the effect of the provisions for a change in priority on default was unlawfully to deprive LBSF of property to which it is entitled in its bankruptcy, because they purported to modify the priority which was enjoyed over Collateral by LBSF in favour of the Noteholders after an insolvency event; and changed the allocation of Unwind Costs in favour of the Noteholders to exclude payment to LBSF.

30.    In May and June 2009 respectively Perpetual and the Belmont respondents issued Part 8 Claims in England against the Trustee for orders designed to procure the realisation of the Collateral held by the Trustee in respect of each of the series of Notes held by them respectively and the application of the Collateral and its proceeds in favour of the Noteholders in priority to any claim of LBSF as Swap Counterparty in accordance with the contractual provisions. LBSF was subsequently joined as a party.

31.    Proceedings were also commenced (but not by the Belmont respondents) against the Trustee by LBSF (and other Lehman entities) in the United States Bankruptcy Court for the Southern District of New York claiming a declaration that the provisions in the Note issues held by Perpetual modifying LBSF's rights to a priority distribution solely as a result of a Chapter 11 filing were unenforceable because they were clauses which sought, in breach of the United States Bankruptcy Code, to modify contractual relationships due to a filing of a bankruptcy petition ("ipso facto clauses").

32.     On 28 July 2009 Sir Andrew Morritt C found that the contractual provisions
were effective as a matter of English law and, in particular, did not offend the anti-
deprivation rule; alternatively, if the provisions were capable of offending the anti-
deprivation rule, the rule was not engaged because an alternative Event of Default
(the Chapter 11 filing by LBHI) had occurred prior to the Chapter 11 filing by
LBSF, and consequently the Chapter 11 filing did not deprive LBSF of any
property: *Perpetual Trustee Co Ltd v BNY Corporate Trustee Services Ltd* [2009]
EWHC 1912 (Ch), [2009] 2 BCLC 400. On 6 November 2009 Sir Andrew Morritt
C's judgment was upheld by the Court of Appeal ([2009] EWCA Civ 1160, [2010]
Ch 347).

33.     Following communications between the High Court in England and the
Bankruptcy Court in New York, it was agreed that, in order to limit potential
conflict between decisions in the two jurisdictions, relief would be limited to
declaratory relief: *Perpetual Trustee Co Ltd v BNY Corporate Trustee Services Ltd*
[2009] EWHC 2953 (Ch), [2010] 2 BCLC 237; *Re Lehman Brothers Holdings Inc*,
422 BR 407 (US Bankruptcy Court, SDNY, 2010).

34.     In January 2010 Judge Peck, sitting in the US Bankruptcy Court for the
Southern District of New York, granted summary judgment in favour of LBSF on
its application for a declaration that the provisions in the Perpetual documentation
were ineffective because they were in breach of the US Bankruptcy Code: *Re
Lehman Brothers Holdings Inc*, 422 BR 407 (US Bankruptcy Court, SDNY,
2010).

35.     Permission was granted by this court to LBSF to appeal from the decision
of the Court of Appeal. The Trustee was given leave by the United States District
Court to appeal from Judge Peck's decision. But before the appeal to the United
States District Court, or the appeal to this court, were heard, the proceedings in
relation to the Notes held by Perpetual were settled and the appeals were
withdrawn. This appeal consequently concerns the Notes held by the Belmont
respondents only.

**IV     The contractual provisions**

36.     All of the documents are expressly governed by English law. The relevant
provisions of the documentation are set out in an appendix to the judgments on this
appeal, but for present purposes the following account of the crucial provisions
should be sufficient.

37.     The Notes are governed by: (1) a Principal Trust Deed (the "Principal Trust

Deed") between Dante Finance plc ("Dante"), the first issuer under the programme, and the Trustee under which the Dante Programme was established, which has effect in relation to any specific Note issue as amended by the Supplemental Trust Deed and Drawdown Agreement relating to that issue; (2) a Supplemental Trust Deed and Drawdown Agreement ("the Supplemental Trust Deed") made between the Issuer, the Trustee (together with its associated custodian and paying agent), LBSF (described as the swap counterparty) and the Lehman company which arranged the Dante Programme, Lehman Brothers International (Europe); and (3) the Terms and Conditions of the Notes ("the Terms and Conditions") which appeared in a schedule to the Principal Trust Deed and which were also supplemented or amended by additional terms were attached to the prospectus sent to potential investors.

38.    The credit default swap agreement ("the Swap Agreement") is constituted by: (1) an ISDA Master Agreement, including the Schedule (and Credit Support Annex) ("the ISDA Master Agreement") between Dante and LBSF (to which the Issuer subsequently acceded); and (2) a Swap Confirmation between LBSF and the relevant Issuer.

*The Principal Trust Deed*

39.    Clause 5.5 of the Principal Trust Deed provides that:

> "... the security ... shall become enforceable if (i) any amount due in respect of the Notes is not paid or delivered when due or (ii) a Swap Agreement terminates with sums due to the Swap Counterparty [ie, LBSF]...."

40.    Clause 6.1 of the Principal Trust Deed provides that moneys received, otherwise than in connection with the realisation or enforcement of the security, are to be held by the Trustee, after payment of the Trustee's costs, on trust to pay, first, the amounts due to LBSF, the Noteholders and others pari passu, and, secondly, the amounts due to the Issuer.

41.    Clause 6.2 of the Principal Trust Deed directs the Trustee:

> "... [to] apply all moneys received by it under the Principal Trust Deed and the relevant Supplemental Trust Deed in connection with the realisation or enforcement of the security ... as follows"

and goes on to provide that "Swap Counterparty Priority" means that the claims of LBSF are payable in priority to the claims of the Noteholders, whereas "Noteholder Priority" means the converse, in each case after providing for payment of certain specified costs and charges. The priority which is to apply in any particular case is that specified in the Supplemental Trust Deed.

*The Supplemental Trust Deed*

42.    Clause 5.2 contains a charge by the Issuer "as continuing security in favour of the Trustee" over the Collateral and other property representing it from time to time.

43.    Clause 5.3 provides that such security is

"granted to the Trustee as trustee for itself and/or the holders of Notes and [LBSF] the Custodian and the Paying Agents as continuing security (i) for the payment of all sums due under the Trust Deed and the Notes, (ii) for the performance of the Issuer's obligations (if any) under the Swap Agreement ..."

44.    Clause 5.5 provides that:

"The Trustee shall apply all moneys received by it under this Deed in connection with the realisation or enforcement of the Mortgaged Property as follows: Swap Counterparty Priority unless ... an Event of Default (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the Swap Agreement) ... in which case Noteholder Priority shall apply."

45.    Clause 8.3 provides:

"[LBSF] hereby agrees that, if an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and [LBSF] is the Defaulting Party (as defined in the ISDA Master Agreement) ... and Unwind Costs are payable by the Issuer to [LBSF], the Issuer shall apply the net proceeds from the sale or realisation of the Collateral (1) first in redeeming the Notes in an amount as set out in the Conditions and (2) thereafter, in payment of such Unwind Costs to [LBSF]."

*Terms and Conditions*

46.   The second paragraph of Condition 44 ("Condition 44.2") provides:

"... if an Event of Default (as defined in the ISDA Master Agreement ...) occurs under the Swap Agreement and [LBSF] is the Defaulting Party (as defined in the ISDA Master Agreement) ...",

the Early Redemption Amount payable on each Note is to be equal to:

"(i) such Note's pro rata share of the proceeds ... from the sale or realisation of the Collateral ... plus (ii) (but only if payable to the Issuer) the amount of any applicable Unwind Costs divided by the total number of Notes outstanding; provided that if the amount determined pursuant to sub-paragraphs (i) and (ii) above results in an Excess Amount (as defined above), such Excess Amount shall be payable by way of an additional payment of interest on each Note. In the event that Unwind Costs are payable by the Issuer to the Swap Counterparty, the Issuer shall apply the net proceeds from the sale or realisation of the Collateral as aforesaid (1) first in redeeming each Note in an amount equal to its Outstanding Principal Amount as of the Early Redemption Date plus the Accrued Early Redemption Interest Amount and (2) thereafter, in payment of such Unwind Costs to the Swap Counterparty."

*The ISDA Master Agreement*

47.   Section 5 of the ISDA Master Agreement defines an "Event of Default" as being: "[t]he occurrence [of certain specified events] at any time with respect to [LBSF], or if applicable, any Credit Support Provider" of LBSF. According to paragraph 9(iv) of the Swap Confirmation, the Credit Support Provider is LBHI, the ultimate parent of LBSF. The defined Events of Default include (i) failure to pay any sums due under the ISDA Master Agreement (if such failure is not remedied after three local business days' notice of such failure), and (ii) the institution by LBSF or by LBHI of any proceedings "seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights ...".

48.   Section 6 of the ISDA Master Agreement deals with early termination and provides that:

"If at any time an Event of Default with respect to a party (the 'Defaulting Party') has occurred and is then continuing, the other party ... may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions ..."

## V    The decisions of Sir Andrew Morritt C and the Court of Appeal

*LBSF's position*

49.    LBSF's position is, in summary, that the rights under the Swap Agreement and the rights created over the Collateral to secure them were property of LBSF within the meaning of the Insolvency Act 1986 and formed part of LBSF's insolvent estate. At the time of its filing for bankruptcy on 3 October 2008 (and at the Early Termination Date), LBSF was "in the money" under each of the Swap Agreements. LBSF had existing contractual rights which, on final maturity or if the Issuer elected to terminate the Swap Agreement early, would result in a right to payment to LBSF from the Issuer. That was so whether or not LBSF was the Defaulting Party under the Swap Agreement. It was illegitimate to provide for the alteration of those rights in reliance on LBSF's bankruptcy so as to deprive LBSF of the benefit of its first priority right of recourse to the Collateral.

50.    When the Issuer elected to terminate the Swap Agreements it did so expressly in reliance upon LBSF having filed for bankruptcy on 3 October 2008. That termination gave rise to a debt payable by the Issuer to LBSF and which is charged on the Collateral. The effect of the disputed clauses was to deprive LBSF of property to which it was entitled in its bankruptcy: Clause 5.5 of the Supplemental Trust Deed removed the senior ranking rights which LBSF had to the proceeds of sale of the Collateral and instead LBSF was given second ranking rights which ranked behind the claims of the Noteholders in some instances, and even further behind the Portfolio Manager in other transactions; by Condition 44.2 of the Terms and Conditions of the Notes, the amount due to LBSF in respect of its claim under the terminated Swap Agreement was disregarded when determining what the Issuer should pay to Noteholders on early redemption of the Notes. The result of the offending provisions was that the Collateral was treated as being freed from the charge to secure the debt to LBSF and was simply divided up among the Noteholders in proportion to their original subscriptions.

51.    The fundamental change brought about by the operation of these clauses depends upon the Issuer having elected to terminate the Swap Agreement in reliance on LBSF's bankruptcy. The security for the obligations owed to LBSF

under the Swap Agreement cannot validly be altered in reliance on LBSF's bankruptcy, and offends against the anti-deprivation rule. Consequently, the provisions are void and unenforceable under English law.

52.    On the Noteholders' alternative case, that the Event of Default occurred on 15 September 2008, when LBHI filed for Chapter 11 protection, LBSF says that Clause 5.5 and the concepts of Swap Counterparty Priority and Noteholder Priority only have relevance in relation to events taking place after the Collateral has been sold. The parties could not have intended any permanent changes in the operation of Clause 5.5 and Condition 44.2 to have occurred unless and until the service of a notice by the Non-defaulting Party to terminate the Swap Agreement.

*Sir Andrew Morritt C*

53.    Sir Andrew Morritt C decided that Clause 5.5 of the STD was not contrary to public policy. The Collateral was bought by the Issuer with the money subscribed by the Noteholders. It was not derived directly or indirectly from LBSF. The court should not be astute to interpret commercial transactions so as to invalidate them, particularly when doubt might be cast on other long-standing commercial arrangements. As long as the Swap Agreement was being performed it was appropriate for LBSF to have security for the obligations of the Issuer in priority to security in respect of the Issuer's obligations to the Noteholders, but the intention of all parties was that the priority afforded to LBSF was conditional on LBSF continuing to perform the Swap Agreement. Such beneficial interest by way of security as LBSF had in the Collateral was, as to its priority, always limited and conditional, and could never have passed to a liquidator or trustee in bankruptcy free from those limitations and conditions as to its priority. Alternatively, LBSF was a Defaulting Party on 15 September 2008 when LBHI filed for Chapter 11 protection, and the anti-deprivation rule was not engaged if deprivation occurred on a ground other than bankruptcy of the entity alleged to be unlawfully deprived.

*Court of Appeal*

54.    In the Court of Appeal [2009] EWCA Civ 1160, [2010] Ch 347 Lord Neuberger of Abbotsbury MR's conclusion that the provisions were valid relied to a large extent on the fact that the Collateral was acquired with money provided by the Noteholders and that the change in priorities was included to ensure that the Noteholders were repaid out of those assets: at para 67. In particular he relied on these matters (at para 61 et seq): (a) so long as there was no risk of default, the Noteholders were prepared for LBSF to have priority when it came to unwinding the transaction; (b) the scheme provided, and was sold on the basis that, if LBSF or LBHI defaulted so that they could not, or did not, pay the interest and the capital

on the Notes, then it would be the Noteholders who would have priority both in relation to repayment and in relation to the Unwind Costs; (c) the effect of the "flips" would not be to entitle the Noteholders to more than they had subscribed, and, if there was no shortfall, LBSF would not have been out of pocket as a result of the "flips". The right granted to LBSF was a security right over assets purchased with the Noteholders' money, and, from the very inception, the priority, and the extent of the benefits, enjoyed by LBSF in respect of the security were contingent upon there being no Event of Default.

55.    He agreed with Sir Andrew Morritt C's conclusion on the LBHI point. Longmore LJ agreed with Lord Neuberger MR.

56.    Patten LJ thought that the anti-deprivation rule did not apply because (at paras 135-136):

> "The reversal of the order of priority under clause 5.5 was always a facet of the security designed to regulate the competing interests over the collateral of LBSF and the noteholders. To say that its operation in the event of the company's bankruptcy constitutes the removal of an asset from the liquidation is to confuse the security itself with the operation of its terms in the events prescribed by the charge. LBSF retains the same asset as it had before its bankruptcy and is free to deal with any recoveries for the benefit of its general creditors in accordance with the applicable statutory regime. ...

> ... Condition 44 is said to have the effect of increasing the amount payable to noteholders in the event of LBSF being the defaulting party under the swap agreement by diverting to the noteholders moneys which would otherwise have been payable to it in order to discharge the issuers' liability for unwind costs. ... Although the amount of the security available to meet LBSF's claims is obviously reduced in the event of a shortfall in the value of the security over what it would have been had no event of default occurred, that is simply a function of the change in priority which was always a feature of the security which the company enjoyed."

57.    Lord Neuberger MR, while not disagreeing, had some reservations about this approach (paras 66-68), particularly because the authorities did not support the view that arrangements which were an original feature of the transaction were insulated from the anti-deprivation rule.

## VI    The principles

58.    Lord Neuberger MR rightly pointed out in his judgment (at para 32) in these proceedings that it was not easy to identify the precise nature or limits of the anti-deprivation rule. He was echoing what he had said as Neuberger J in *Money Markets International Stockbrokers Ltd v London Stock Exchange Ltd* [2002] 1 WLR 1150, para 87, a decision which contained the first full judicial analysis of the principles: at paras 117-118.

59.    The rule has existed for nearly 200 years, and it is therefore necessary to look at the development of the rule to see what its nature and limits are. All but one of the relevant cases prior to the decision of the House of Lords in *British Eagle International Airlines Ltd v Cie Nationale Air France* [1975] 1 WLR 758 on the pari passu principle are cases of personal bankruptcy. The principal decisions are *Whitmore v Mason* (1861) 2 J & H 204 (Sir William Page Wood V-C); *Ex p Mackay; Ex p Brown; In re Jeavons* (1873) LR 8 Ch App 643 (CA); *Ex p Jay; In re Harrison* (1880) 14 Ch D 19 (CA); *Ex p Newitt; In re Garrud* (1881) 16 Ch D 522 (CA); *Ex p Barter; Ex p Black; In re Walker* (1884) 26 Ch D 510 (CA); *In re Detmold; Detmold v Detmold* (1889) 40 Ch D 585 (North J); *Borland's Trustee v Steel Bros & Co Ltd* [1901] 1 Ch 279 (Farwell J); *In re Johns, Worrell v Johns* [1928] Ch 737 (Tomlin J); *Bombay Official Assignee v Shroff* (1932) 48 TLR 443 (PC); and *In re Apex Supply Co Ltd* [1942] Ch 108 (Simonds J) (the sole liquidation case).

*The anti-deprivation rule applied*

60.    The anti-deprivation rule was applied to invalidate contractual provisions in the following decisions. In none of them did it matter whether the provision was in a contract from the inception of the relationship. *Whitmore v Mason* 2 J & H 204 is a classic case of the application of the anti-deprivation rule. It was concerned with a provision in a partnership deed that, in the event of the "bankruptcy or insolvency" of a partner, an account was to be taken, and the bankrupt partner was to lose his interest in the partnership assets (mines in Portugal) at a market valuation (save that his interest in a mining lease was to be excluded from the valuation). Sir William Page Wood V-C accepted the assignee's argument ( at p 207) that the exclusion of the lease was void because it was "an attempt to evade the rule in bankruptcy, which provides that, upon an act of bankruptcy being committed, all the property of the bankrupt vests in his assignees", and held that, insofar as it related to the lease, the provision was void as being "in fraud of the bankrupt laws" (at p 213), because

"... the law is too clearly settled to admit of a shadow of doubt that no person possessed of property can reserve that property to himself until he shall become bankrupt, and then provide that, in the event of his becoming bankrupt, it shall pass to another and not to his creditors." (p 212)

61.    So also in *Ex p Mackay* LR 8 Ch App 643, 648, discussed above, the agreement that the lender could keep the royalties in the event of the borrower's bankruptcy was an unlawful "additional advantage". This, like several of the other decisions, is really about an unsuccessful attempt to create a charge. It was applied in *Ex p Williams*; *In re Thompson* (1877) LR 7 Ch D 138 (sham rent intended to give lender additional security of distraining on chattels).

62.    In *Ex p Jay* 14 Ch D 19 a clause in an agreement for a lease between a landowner and a builder (under which the builder was to build 40 houses on land in Waltham Cross) provided that, until the lease had actually been granted, in the event that the builder was in default of any of his obligations or became bankrupt, any materials on the land should be forfeited to the landowner. A few weeks later the builder granted a charge over the materials, but it was not registered as a bill of sale. At a time before the builder had completed the development or any lease had been granted, and when the builder was not in default of any of his obligations, he was made bankrupt. A dispute arose between his trustee in bankruptcy and the landowner over a quantity of building materials which the builder had brought onto the land. The Court of Appeal held that the provisions of the agreement purporting to forfeit such building materials to the landowner were void as being a violation of the policy of the bankruptcy law, and that the building materials were the property of the trustee.

63.    In *Ex p Barter* 26 Ch D 510 a shipbuilding contract provided that, if at any time the builder should cease working on the ship for 14 days, or should allow the time for completion and delivery of the ship to expire for one month without it having been completed and ready for delivery, or in the event of the bankruptcy or insolvency of the builder, the buyer could cause the ship to be completed, and could employ materials belonging to the builder as should be then on his premises. It was held that the clause was void as against the trustee in his bankruptcy as being an attempt to control the user after bankruptcy of property vested in the bankrupt at the date of the bankruptcy, and as depriving the trustee of the right to elect whether he would complete the ship or not as might seem most advantageous for the creditors under the bankruptcy. This decision is an application of a general principle that the bankrupt's property vests in the trustee, and its user cannot be contractually controlled.

64.    *In re Johns, Worrell v Johns* [1928] Ch 737, concerned an arrangement

between mother and son, whereby the amount repayable by the son in respect of periodic loans made by the mother (which could not exceed £650, and might be as little as £10, in all) was to increase from £650 to £1,650 (plus interest) in the event of the son's bankruptcy. Tomlin J said that the principle was that a "person cannot make it a part of his contract that, in the event of bankruptcy, he is then to get some additional advantage which prevents the property being distributed under the bankruptcy laws" (quoting *Ex p Williams*; *In re Thompson* 7 Ch D 138, 143) and described the agreement as "a deliberate device to secure that more money should come to the mother if the son went bankrupt, than would come to her if he did not; and, that being so, ... the device is bad" (p 748). The agreement would also have offended the pari passu principle, because the claim of the mother's estate in the insolvent estate would have increased.

*The principle not infringed*

65.    The anti-deprivation principle did not apply in the following decisions. These decisions are particularly important for the light which they throw on the limits of the principle.

66.    *Ex p Newitt* 16 Ch D 522 was decided by the same Court of Appeal which had decided *Ex p Jay* a year earlier. This was also a case of a bankrupt builder. The provision for forfeiture operated on breach and not on bankruptcy, and was held to be valid. The bankrupt builder had broken the terms of his agreement with the landowner and it was provided in the agreement that the chattels would be forfeited to the landowner "as and for liquidated damages", whereas in *Ex p Jay* the builder was not in breach of contract, and the right to forfeit was expressed to be triggered, inter alia, on the builder becoming bankrupt. James LJ said (at p 531)

> "Another point taken before us, which does not appear to have been really argued before the judge of the county court, was this - that the seizure was not made in sufficient time, that it was not made before the filing of the liquidation petition. To my mind it is immaterial at what particular moment the seizure was made. The broad general principle is that the trustee in a bankruptcy takes all the bankrupt's property, but takes it subject to all the liabilities which affected it in the bankrupt's hands, unless the property which he takes as the legal personal representative of the bankrupt is added to by some express provision of the bankrupt law. There is no such provision applicable to the present case. The building agreement provides, in effect, that in a certain event certain property of the builder may be taken by the landowner in full satisfaction of the agreement. It appears to me analogous to a sale of property with a power of repurchase in a certain event."

67.    The relevance of this decision lies in the effect of a provision for forfeiture on an event other than bankruptcy which takes place after bankruptcy, and it will be necessary to revert to it.

68.    In *In re Detmold* 40 Ch D 585 a marriage settlement provided that income on the property in the settlement (originating from the husband) should pass to the wife for life in the event of an alienation by, or the bankruptcy of, the husband. The provision was held valid against the husband's trustee in bankruptcy, on the ground that it had been triggered by the alienation effected as the result of the appointment of a judgment creditor as receiver (by way of equitable execution) of the income on the property in the settlement, prior to the commencement of the bankruptcy two months later. *In re Detmold* is an illustration of a provision held valid because, though it worked a deprivation, it did so *prior* to the onset of bankruptcy even though it was also expressed to operate on bankruptcy.

69.    In *Borland's Trustee v Steel Bros & Co Ltd* [1901] 1 Ch 279 Mr Borland was a shareholder in Steel Brothers & Co Ltd. Its articles of association contained pre-emption rights, the effect of which was that on a shareholder becoming bankrupt, he had, on receiving a transfer notice from the directors, to transfer his shares to a manager or assistant at a fair value calculated in accordance with the articles. Mr. Borland's trustee in bankruptcy claimed that the transfer articles were void because, among other reasons, the articles constituted a fraud upon the bankruptcy laws, and could not prevail when bankruptcy had supervened, since the effect was that the trustee in bankruptcy was forced to part with the shares at something less than their true value, with the result that the asset was not fully available for creditors.

70.    The argument was rejected. Farwell J started with the principle that "a simple stipulation that upon a man's becoming bankrupt that which was his property up to the date of the bankruptcy should go over to some one else and be taken away from his creditors, is void as being a violation of the policy of the bankrupt law" (at p 290, quoting *Ex p Jay* 14 Ch D 19, 25). The basis of the decision was that there was a commercial arrangement. The provisions were inserted bona fide and constituted a fair agreement for the purposes of the business of the company and were binding equally upon all persons who came in as shareholders. There was no suggestion of fraudulent preference of one over another. There was nothing obnoxious to the bankruptcy law in a clause which provided that if a man became bankrupt he should sell his shares. The price was a fixed sum for all persons alike, and no difference in price arose in the case of bankruptcy. The purpose was that there should be in the company, if it were so desired, none but managers and workers in Burma. There was nothing repugnant in the way in which the value of the shares was to be ascertained. It would have been different if there were any provision in the articles compelling persons to sell their shares in the event of bankruptcy at something less than the price that they would

have otherwise obtained, since such a provision would be repugnant to the bankruptcy law (p 291).

71.    In *Bombay Official Assignee v Shroff* 48 TLR 443 the bankrupt had been a registered broker in the Bombay Broker's Hall, an unincorporated association. The rules of that association permitted only those "holding ... a card" to enter the hall and conduct business. The rules also allowed the directors to declare a member a defaulter. Following the bankrupt's failure to pay funds owing to other members, he was declared a defaulter, his card and right of membership was forfeited. About a week later, he was declared bankrupt. The official assignee contended (relying on *Whitmore v Mason* 2 J & H 204 and *In re Borland's Trustee* [1901] 1 Ch 279) that his card and/or right of membership of the association or the value thereof vested in him as the assignee in the insolvency, because among other reasons, "if the effect of the rules be that the proceeds of sale of the insolvent's card do not enure for the benefit of the general body of his creditors the rules are contrary to the law of insolvency." Lord Blanesburgh, speaking for the Board, said (at p 446):

> "It being agreed ... that the rules of this association are entirely innocent of any design to evade the law of insolvency, it may be that even these cases, although cases of a company and a partnership, are more favourable to the [association] than to the [official assignee] ... [T]he real answer to this contention of the [official assignee] [is] in the nature and character of the association as they have described it whereby in the case of a defaulting member who is expelled from the association no interest in his card remains in himself, and none can pass to his assignee, whether his expulsion does or does not take place before the commencement of his insolvency."

72.    The decision of the Privy Council was applied by Neuberger J in *Money Markets International Stockbrokers Ltd v London Stock Exchange Ltd* [2002] 1 WLR 1150. The claimant was a member of the stock exchange and defaulted on its obligations. Under provisions in the articles of association of the stock exchange its share was transferred away and the claimant lost its membership. Neuberger J held the anti-deprivation rule did not apply because the share was incapable of uncontrolled transfer and was closely connected with a right in respect of which a deprivation provision was effective, viz membership of the exchange.

73.    In *In re Apex Supply Co Ltd* [1942] Ch 108 a hire purchase agreement provided that if the hirer should go into liquidation, and the owner should retake possession, the hirer would pay a sum by way of compensation for depreciation. Applying *Ex p Mackay* and *In re Johns*, Simonds J held that the provision for the payment of compensation was not a fraud on the bankruptcy laws as giving the owner company an undue advantage in the event of the hirer company going into

liquidation. The provision was not a deliberate device to secure that more money went to the creditor: "it would be extravagant ... to suggest that this clause is aimed at defeating the bankruptcy laws or at providing for a distribution differing from that which the bankruptcy laws permit" (at p 114).

### *The limits of the anti-deprivation rule*

#### *Good faith and commercial arrangements*

74.    The first question is whether absence of good faith, or an intention to obtain an advantage over creditors in the bankruptcy, is an essential element for application of the principle.

75.    From the earliest days of the rule, it has been based on the notion of a fraud, or "a direct fraud" (Lord Eldon LC in *Higinbotham v Holme* 19 Ves Jun 88, 92), on the bankruptcy laws, and that decision was taken to be authority for the proposition that where a person settles property in such a way that his interest determines on his bankruptcy "that is evidence of an intention to defraud his creditors": *In re Stephenson; Ex p Brown* [1897] 1 QB 638, 640, per Vaughan Williams J. The overall effect of the authorities is that, where the anti-deprivation rule has applied, it has been an almost invariably expressed element that the party seeking to take advantage of the deprivation was intending to evade the bankruptcy rules; but that where it has not applied, the good faith or the commercial sense of the transaction has been a substantial factor. By contrast, in the leading *pari passu* principle case, *British Eagle* [1975] 1 WLR 758, it was held by the majority that it did not matter that the clearing transaction was a sensible commercial arrangement not intended to circumvent the *pari passu* principle. Although Lord Morris of Borth-y-Gest (at p 763) placed weight in his dissenting speech on the fact that there was "no trace in the scheme of any plan to divert money in the event of a liquidation" his conclusion was not based on the absence of bad faith. The basis of his reasoning was that transactions had taken place and services had been rendered on the basis that clearance would follow; it was not open to the liquidator to seek to alter ex post facto the contractual arrangements pursuant to which the airlines had supplied services to British Eagle; and the effect of the clearing was that no sum was due: p 763-764.

76.    To take first the cases in which the anti-deprivation rule was held to apply: in *Whitmore v Mason* 2 J & H 204 the exclusion of the lease on bankruptcy of the partner was void and Sir William Page Wood V-C said that "no one can be allowed to derive benefit from a contract that is in fraud of the bankrupt laws" (p 213). In *Ex p Mackay* LR 8 Ch App 643, 647, James LJ said that the provision was an ineffective charge and was "a clear attempt to evade the operation of the

bankruptcy laws" as it "provide[d] for a different distribution of his effects in the event of bankruptcy from that which the law provides". As Lord Cross of Chelsea said of *Ex p Mackay* in *British Eagle* [1975] 1 WLR 758, 780: "The court could only go behind [the transaction] if it was satisfied – as was indeed obvious in that case – that it had been created deliberately in order to provide for a different distribution of the insolvent's property on his bankruptcy from that prescribed by the law;" and Lord Morris agreed that *Ex p Mackay* was a case where the relevant provisions were "a clear attempt to evade the operation of the bankruptcy laws", or "a device for defeating the bankruptcy laws" (p 770). In *Ex p Jay* 14 Ch D 19, the case of the housebuilder's materials, there was no mention of evasive intent, but that was probably because it was obvious that the intention was to ensure that the property did not go to the trustee. In *In re Johns, Worrell v Johns* (the case of the increase of the debt on bankruptcy) the agreement was described [1928] Ch 737, 748) as "a deliberate device to secure that more money should come to the mother, if the son went bankrupt, than would come to her if he did not..."

77.    By contrast, where the anti-deprivation rule was held not to apply, good faith and the commercial sense of the transaction have been important factors. In *Borland's Trustee v Steel Bros & Co Ltd* [1901] 1 Ch 279 (the case of pre-emption rights on bankruptcy) Farwell J relied specifically on the fact that the provisions were inserted bona fide and constituted a fair agreement for the purposes of the business of the company, and that there was no suggestion of fraudulent preference. So also in *Bombay Official Assignee v Shroff* 48 TLR 443 (forfeiture of membership of the Bombay Broker's Hall) Lord Blanesburgh (at p 446) referred to the fact that it had been agreed that the rules of the association were "entirely innocent of any design to evade the law of insolvency..." Again, in *In re Apex Supply Co Ltd* [1942] Ch 108 (the hire purchase case) Simonds J accepted that the provision was not a deliberate device to secure that more money went to the creditor and that "it would be extravagant ... to suggest that this clause is aimed at defeating the bankruptcy laws or at providing for a distribution differing from that which the bankruptcy laws permit." (p 114).

78.    Thus there is an impressive body of opinion from some of the most distinguished judges that, in the case of the anti-deprivation rule, a deliberate intention to evade the insolvency laws is required. That conclusion is not affected by the decision in *British Eagle* [1975] 1 WLR 758. The pari passu rule is clear. Parties cannot contract out of it. That is why, by contrast with the anti-deprivation cases, Lord Cross was able to accept (p 772) that the clearing house was a commercial arrangement which was for the mutual advantage of the airlines, but that the power to go behind agreements, the result of which were repugnant to the insolvency legislation, was not confined to cases in which the dominant purpose was to evade its operation. It was irrelevant that the airlines had "good business reasons for entering" into the arrangements and "did not direct their minds to the question how the arrangements might be affected by the insolvency of one or more

of [them]" (p 780).

79.     That does not mean, of course, that a subjective intention is required, or that there will not be cases so obvious that an intention can be inferred, as in *Ex p Jay*. But it does suggest that in borderline cases a commercially sensible transaction entered into in good faith should not be held to infringe the anti-deprivation rule. Although he did not accept that absence of good faith was a necessary element, Neuberger J suggested in *Money Markets International Stockbrokers Ltd v London Stock Exchange Ltd* [2002] 1 WLR 1150, para 103 that if a deprivation provision, which might otherwise be held to be valid, could be shown to have been entered into by the parties with the intention of depriving creditors of their rights on an insolvency, then that might be sufficient to justify holding invalid the provision when it would not otherwise have been held invalid.

*Anti-deprivation rule does not apply if the deprivation takes place for reasons other than bankruptcy*

80.     By contrast with the pari passu principle, it is well established that if the deprivation takes place for reasons other than bankruptcy, the anti-deprivation rule does not apply. In *British Eagle* [1975] 1 WLR 758 the clearing house system was ineffective to avoid the pari passu principle, even though it applied throughout irrespective of whether the airlines went into liquidation. But the position is different with regard to the anti-deprivation rule, which is intended to operate only where provision is made for deprivation on bankruptcy. Thus in *Ex parte Jay* 14 Ch D 19 (the case of the builder's materials) both Brett and Cotton LJJ accepted (p 26) that if forfeiture had taken place on the builder's breach (as the provision envisaged) then it would have been valid: "It appears that there was no default on the debtor's part up to the filing of the petition, and the [owner] cannot, therefore, succeed except by virtue of the provision for forfeiture on bankruptcy, and according to the authorities such a stipulation is void"(Brett LJ) and "One of the two events is not hit by the decided cases"(Cotton LJ). In *Ex p Barter* 26 Ch D 510 (shipbuilding materials) the contract provided for events other than bankruptcy in which the property could be seized, but it was held that it was the bankruptcy which was the basis of the powers of control exercised by the buyers: p 519.

81.     So also in *In re Detmold* 40 Ch D 585 (marriage settlement providing that income on the property in the settlement, originating from the husband, should pass to the wife for life in the event of an alienation by, or the bankruptcy of, the husband) the provision was held valid against the husband's trustee in bankruptcy, on the ground that it had been triggered by the alienation effected as the result of the appointment of a judgment creditor as receiver (by way of equitable execution) of the income on the property in the settlement:

"... [T]he limitation of the life interest to the settlor was validly determined by the fact that, in consequence of the order appointing the receiver, he ceased to be entitled to receive the income. This took place before the commencement of the bankruptcy, and, therefore, the forfeiture is valid as against the trustee in the bankruptcy" (p 588 per North J).

82.    In *Ex p Newitt* 16 Ch D 522 (as has been seen, like *Ex p Jay*, a case of a bankrupt builder) the provision for forfeiture was on breach and not on bankruptcy and was held to be valid. The controversial point in the case is that the forfeiture took place after bankruptcy, but it is not clear when the breach occurred. In the present case the Court of Appeal expressed the view (obiter) that the anti-deprivation rule would apply in such circumstances and that once bankruptcy commences, deprivation on any grounds would be impermissible: paras 93-94 and 161-163 per Lord Neuberger MR and Patten LJ. They considered (echoing what Neuberger J had said in *Money Markets International Stockbrokers Ltd v London Stock Exchange Ltd* [2002] 1 WLR 1150, para 105) that the decision in *Ex p Newitt* 16 Ch D 522 could not survive *British Eagle*.

83.    Whether *Ex p Newitt* was correctly decided does not arise for decision on this appeal. It was cited, with apparent approval, by Harman J in *Jennings' Trustee v King* [1952] Ch 899, 911. It was not mentioned in any of the phases of the litigation in *British Eagle* [1975] 1 WLR 758 other than in the dissenting speech of Lord Morris (at p 771), who used it in support of the proposition that a right in a contract is not defeated by the commission of an act of bankruptcy before the contractual right is exercised. The view of the majority was that the netting-off in the clearing house which occurred after the liquidation was ineffective, and consequently the majority must be taken to have rejected the proposition. But it does not follow that the principle identified by Lord Morris is no longer good law in the context of the anti-deprivation rule. On the facts of *Ex p Newitt*, however, the pari passu principle as well as the anti-deprivation principle may have been engaged, and it may be that the right to forfeiture after bankruptcy or liquidation was not the type of equity to which a trustee or liquidator would take subject. In either of those cases, the forfeiture would not have been effective.

*Determinable and defeasible interests and "flawed assets"*

84.    The law reporter, Mr Clement Swanston, summarised some of the early cases in a note to his report of the decision of Lord Eldon LC in *Wilson v Greenwood* (1818) 1 Swans 471, 485, and his summary was quoted with approval in *Whitmore v Mason* 2 J & H 204, 209-210 by Sir William Page Wood V-C, by the Court of Appeal in *Ex p Barter* 26 Ch D 510, 519, and by Stirling J in *Mackintosh v Pogose* [1895] 1 Ch 505, 511. Mr Swanston said:

"The general distinction seems to be, that the owner of property may, on alienation, qualify the interest of his alienee, by a condition to take effect on bankruptcy; but cannot, by contract or otherwise, qualify his own interest by a like condition, determining or controlling it in the event of his own bankruptcy, to the disappointment or delay of his creditors ..."

85.    In *Whitmore v Mason* 2 J & H 204, 212 Sir William Page Wood V-C distinguished the exclusion of the lease on the partnership account to be taken on bankruptcy from "the ordinary condition in a demise of land, that in the event of the tenant becoming bankrupt the land shall revert to the landlord." This reflected the old rule that a provision for forfeiture of a lease on winding up did not contravene the principle since it was merely a qualification of the lessee's estate: *Roe d Hunter v Galliers* (1787) 2 Term Rep 133. A provision of this kind is common form in most leases and is recognised by sections 146(7), (9) and (10) of the Law of Property Act 1925. By providing for limited relief against the operation of such clauses, the legislation implicitly endorses the validity of such provisions at common law. The lease cases show that such a provision is regarded by the law as effective to bring the lease to an end whether the lease is expressed (a) to run "until bankruptcy" or (b) as a lease with "a proviso for forfeiture" in that event. The result has not depended upon linguistic differences of expression, and section 146(7) of the 1925 Act proceeds on the basis that no difference is to be drawn between the two situations.

86.    So also licences of intellectual property expressed to determine (or to be determinable on notice) on bankruptcy of the licensee are valid; and interests under protective trusts granted by the settlor to a beneficiary until the beneficiary's bankruptcy: Lewin on Trusts, 18th ed (2008), para 5-135; and section 33 of the Trustee Act 1925.

87.    The distinction for the purposes of insolvency law is between an interest determinable on bankruptcy/liquidation and an absolute interest which is made defeasible on bankruptcy/liquidation by a condition subsequent. A determinable interest is an interest the quantum of which is limited by the stipulated event, so that the occurrence of that event marks the end of the duration of the interest, whereas a defeasible interest is one which is granted outright and then forfeited. As Professor Sir Roy Goode points out in his comment (2011) 127 LQR 1, 8 on the decision of the Court of Appeal in this case, the difference between a determinable interest, limited to last until bankruptcy, and an interest forfeitable on bankruptcy as a condition subsequent, turning as it does on fine verbal distinctions, has been categorised as "little short of disgraceful to our jurisprudence" when applied to a "rule professedly founded on considerations of public policy" (quoting *In re King's Trust* (1892) 29 LR Ir 401, 410, per Porter MR, a case on the rule against repugnancy, which is offended by forfeiture but not by termination).

88.    Professor Sir Roy Goode rightly accepts (ibid) that the principle that a determination clause is not an attempt to remove an asset from the company but simply a delineation of the quantum of the asset or the duration of the transferee's entitlement is too well established to be dislodged otherwise than by legislation. That is particularly so for these reasons. It would go far beyond the judicial function to hold that the distinction is indefensible. To hold that both types of determination are contrary to the anti-deprivation principle would be thoroughly destructive of commercial expectations in many areas. So also to say that both types of determination are valid would at a stroke do away with a 200 year old principle, which could only be justified if the mischief which the anti-deprivation rule seeks to remedy were adequately covered by statute. No doubt to some extent the anti-avoidance provisions go some way to dealing with the mischief, but they cover different ground and contain time limitations which do not constrain the common law rule.

89.    But it does not follow that any proprietary right which is expressed to determine or change on bankruptcy is outside the anti-deprivation rule, still less that a deprivation which has been provided for in the transaction from the outset is valid. If it were so, then the anti-deprivation rule would have virtually no content. This is the "flawed asset" theory, the idea that, where it is an inherent feature of an asset from the inception of its grant that it can be taken away from the grantee (whether in the event of his insolvency or otherwise), the law will recognise and give effect to such a provision. If that theory were generally applicable, it would represent such an easy way of avoiding the application of the principle, that the principle would be left with little value: *Money Markets International Stockbrokers Ltd v London Stock Exchange Ltd* [2002] 1 WLR 1150, at paras 91-92, per Neuberger J.

90.    The theory is also inconsistent with most of the cases in which the principle has been applied: see especially *Whitmore v Mason* 2 J & H 204; *Ex p Mackay* LR 8 Ch App 643; *Ex p Jay* 14 Ch D 19; *Ex p Barter* 26 Ch D 510. To the extent that this idea underpins Patten LJ's judgment in the present case (which is by no means certain), it should not be accepted because it would empty the basic rule of any substantive content.

91.    For the same reason the answer cannot be found by characterising or describing the right as limited by the condition. If it were possible to characterise LBSF's right as "a right to be repaid in priority to the Noteholders when there was not at the date of termination an Event of Default in relation to which it was the Defaulting Party" then it would have been possible so to characterise the rights in cases in which the rule has been applied: eg an interest in the partnership mine if not bankrupt (*Whitmore v Mason*); or a right to royalties if not bankrupt *(Ex p Mackay)*.

*Acquisition of property with own assets*

92.　In *Whitmore v Mason* 2 J & H 204, 214-215 Sir William Page Wood V-C said:

> "If his co-partners had advanced a definite sum of money on account of his share, then the property might have been considered to the extent of the money so advanced by them, as identically their money; but this has not been done."

93.　Sir William Page Wood V-C's statement was based on a marriage settlement case, *Lester v Garland* (1832) 5 Sim 205, which confirmed a long line of cases which had established that the wife's portion would be protected in the event of the husband's bankruptcy:

> "A variety of cases, beginning with the case of *Lockyer v. Savage* [(1732) 2 Str 947], which was decided about 100 years ago, have established that, though there cannot be a settlement of the husband's own estates so as to make his life interest cease in the event of his becoming a bankrupt, in order that the benefit of the estate might be given to the wife or children of the marriage, yet the wife's estate may be so settled." (p 222)

94.　As Stirling J put it in *Mackintosh v Pogose* [1895] 1 Ch 505, 511:

> "... it has long been established that if husband and wife both bring property into such a settlement [viz, a marriage settlement], a trust of the income of the wife's property in favour of the husband until his bankruptcy is good, while a similar trust of the income of the husband's property is bad .."

The basis of the rule was that

> "the courts treated the property of the husband as being in substance the property of the wife ... [and] as the identical property brought by her into settlement" (at 514-515).

95.   In *Higinbotham v Holme* 19 Ves Jun 88, 92-93, Lord Eldon LC distinguished the case of the settlement by the bankrupt husband on himself of a life interest, from, firstly,

> "the case of the wife's property limited until the bankruptcy of her husband; that is, where she reserves a power over her own property",

and, secondly,

> "the case of a lease made determinable by the bankruptcy of the lessee: that is a reservation by the owner of the property of a power over it."

96.   The marriage settlement cases are not far removed from the category of determinable and defeasible interests or "flawed assets," but they do suggest that the source of the assets is an important element in determining whether there has been a fraud on the bankruptcy laws. Lord Neuberger MR's conclusion [2010] Ch 347, para 64 was that *Whitmore v Mason* is authority for the view that the anti-deprivation rule may have no application to the extent that the person in whose favour the deprivation of the asset takes effect can show that the asset, or the insolvent person's interest in the asset, was acquired with his money.

97.   That conclusion is supported by the very frequent formulation of the anti-deprivation rule in terms of the bankrupt's "own property." Thus in *Holmes v Penney* (1863) 3 K & J 90, 102, Sir William Page Wood V-C stated the general principle as being that

> "a trader cannot, even for valuable consideration, *settle his own property* in such a manner as that he should take an interest in it until his bankruptcy, and afterwards, it should be held in trust for his wife and children." (emphasis added)

and there are many similar references in the older cases to the settlement or disposition of the bankrupt's own property: eg *In re Detmold* 40 Ch D 585, 588 per North J; *In re Stephenson* [1897] 1 QB 638, 640 per Vaughan Williams J; *In re Halstead, Ex P Richardson* [1917] 1 KB 695, 709 per Warrington LJ.

98.   The anti-deprivation rule of course only applies where the bankrupt's own property is in issue, and these dicta do not show that the rule has no application where the source of the bankrupt's asset is the person to whom it is to go on

bankruptcy. Nor would it be right for there to be a general and universally applicable exception to the general rule based simply on the source of the assets. But if the source of the assets is the person to whom they are to go on bankruptcy that may well be an important, and sometimes decisive, factor in a conclusion that the transaction was a commercial one entered into in good faith and outside the scope of the anti-deprivation rule.

*Provision operating on insolvency (as distinct from bankruptcy/liquidation)*

99.     This point does not arise for decision on this appeal. The only potentially relevant Events of Default are the Chapter 11 filings by LBSF and LBHI. The point was considered in *Whitmore v Mason* 2 J & H 204, where it was held that it did not matter that under the partnership deed the account was to be taken in the event of bankruptcy or insolvency, and insolvency had occurred before any act of bankruptcy:

> "A bankrupt is usually insolvent before he commits an act of bankruptcy. First he becomes insolvent, and then bankrupt; and if that construction were to prevail the bankrupt laws might, in all cases, be defeated." (p 215)

*Executory contracts*

100.     It is a very common provision in commercial contracts that performance may be withheld in the case of the other party's bankruptcy or liquidation. In *Lomas v JFB Firth Rixson Inc* [2010] EWHC 3372 (Ch) interest swap counterparties withheld payments due to Lehman Brothers International (Europe) in reliance on a provision of the ISDA Master Agreement that a party's payment obligations were subject to the condition precedent that there was no continuing Event of Default with respect to the other party. On the question whether the anti-deprivation principle applied, Briggs J considered that the authorities justified a distinction between (a) cases where the asset of the insolvent company was a chose in action representing the quid pro quo for something already done, sold or delivered before the onset of insolvency; and (b) cases where the right in question consists of the quid pro quo (in whole or in part) for services yet to be to be rendered or something still to be supplied by the insolvent company in an ongoing contract. He held that in the former situation the court would more readily hold that the anti-deprivation rule applied. This decision was distinguished in *Folgate London Market Ltd v Chaucer Insurance plc* [2011] EWCA Civ 328, where there was a contractual provision for a right of indemnity to be terminated in the event of liquidation: it was a naked attempt to provide that the obligation to pay was to

be extinguished if payment would be available for creditors generally in the event
of insolvency: para 22.

101.   The Swap Agreement in the present case is subject to the same provision,
but its effect is not in issue in these proceedings. Accordingly the important and
difficult question of the extent to which payment obligations in executory contracts
are affected by the anti-deprivation rule does not arise on this appeal, and since it
is a live issue in other proceedings it is best not to express a view on it, except to
say that accrued property rights such as debts must be at least capable of being
caught by the rule.

## VII   Conclusions

102.   It would go well beyond the proper province of the judicial function to
discard 200 years of authority, and to attempt to re-write the case law in the light
of modern statutory developments. The anti-deprivation rule is too well-
established to be discarded despite the detailed provisions set out in modern
insolvency legislation, all of which must be taken to have been enacted against the
background of the rule.

103.   As has been seen, commercial sense and absence of intention to evade
insolvency laws have been highly relevant factors in the application of the anti-
deprivation rule. Despite statutory inroads, party autonomy is at the heart of
English commercial law. Plainly there are limits to party autonomy in the field
with which this appeal is concerned, not least because the interests of third party
creditors will be involved. But, as Lord Neuberger stressed [2010] Ch 347, para
58, it is desirable that, so far as possible, the courts give effect to contractual terms
which parties have agreed. And there is a particularly strong case for autonomy in
cases of complex financial instruments such as those involved in this appeal.

104.   No doubt that is why, except in the case of a blatant attempt to deprive a
party of property in the event of liquidation (*Folgate London Market Ltd v
Chaucer Insurance plc* [2011] EWCA Civ 328), the modern tendency has been to
uphold commercially justifiable contractual provisions which have been said to
offend the anti-deprivation rule: *Money Markets International Stockbrokers Ltd v
London Stock Exchange Ltd* [2002] 1 WLR 1150; *Lomas v JFB Firth Rixson Inc*
[2010] EWHC 3372 (Ch); and the judgments of Sir Andrew Morritt C and the
Court of Appeal in these proceedings. The policy behind the anti-deprivation rule
is clear, that the parties cannot, on bankruptcy, deprive the bankrupt of property
which would otherwise be available for creditors. It is possible to give that policy a
common sense application which prevents its application to bona fide commercial

transactions which do not have as their predominant purpose, or one of their main purposes, the deprivation of the property of one of the parties on bankruptcy.

105.   Except in the case of well-established categories such as leases and licences, it is the substance rather than the form which should be determinant. Nor does the fact that the provision for divestment has been in the documentation from the beginning give the answer, nor that the rights in property in question terminate on bankruptcy, as opposed to being divested. Nor can the answer be found in categorising or characterising the property as "property subject to divestment on bankruptcy."

106.   If the anti-deprivation principle is essentially directed to intentional or inevitable evasion of the principle that the debtor's property is part of the insolvent estate, and is applied in a commercially sensitive manner, taking into account the policy of party autonomy and the upholding of proper commercial bargains, these conclusions on the present appeal follow.

107.   The answer is not to be found in the Noteholders' argument that (a) LBSF's property was a beneficial interest under a trust, of which it was one of a number of beneficiaries (Clause 5.3 of the STD) and that (b) LBSF retains its beneficial interest under the trust to this day. The fact that the security interests were held by the Trustee is not determinative. The court has to look to the substance of the matter, which is that LBSF had a security interest, the content and extent of which altered when it filed for Chapter 11 protection. Nor is it to be found in the fact that the potential for change in priority was in the documentation from the beginning, nor in the "flawed asset" argument or variant of it, that the security interest, or the right under the trust to have the trust property administered in accordance with Swap Counterparty Priority, was inherently qualified or limited, because it applied only for so long as there had been no Event of Default under the Swap Agreement for which the Swap Counterparty was the Defaulting Party.

108.   The answer is to be found in the fact that this was a complex commercial transaction entered into in good faith. Although, as a matter of law, the security was provided by the Issuer out of funds raised from the Noteholders, the substance of the matter is that the security was provided by the Noteholders and subject to a potential change in priorities.

109.   The security was in commercial reality provided by the Noteholders to secure what was in substance their own liability, but subject to terms, including the provisions for Noteholder Priority and Swap Counterparty Priority, in a complex commercial transaction entered into in good faith. There has never been any suggestion that those provisions were deliberately intended to evade insolvency

law. That is obvious in any event from the wide range of non-insolvency circumstances capable of constituting an Event of Default under the Swap Agreement.

110.    The Offering Circular Supplement emphasised that, in addition to the Notes being credit-linked to the reference portfolio, Noteholders would also have exposure to the Collateral, and impairment of the Collateral might result in a negative rating action on the Notes. The document went on:

> "Purchasers of Notes should conduct such independent investigation and analysis regarding the Issuer, the security arrangements and the Notes as they deem appropriate to evaluate the merits and risks of an investment in the Notes. In particular, purchasers should note that the credit risk of the Notes includes that of the Collateral, the Swap Counterparty and the Reference Entities and that the Notes allow a purchaser to obtain the stated coupon in exchange for assuming such credit risk. The coupon and Initial Principal Amount may be at risk if one or more Credit Events occur and in certain circumstances the Notes may redeem at zero."

111.    There were three main risks for Noteholders: (1) Credit Event risk, that is, the risk that Credit Events might occur and be notified under the Swap Agreement, reducing the amount payable by the Issuer; (2) Collateral risk, being the risk that the Collateral might default or decline in value (a more likely eventuality in modern conditions than it might have seemed in 2004); and (3) LBSF risk, being the risk that LBSF might not be in a position to provide sufficient funds to the Issuer for it to pay the Noteholders interest or principal. The documents were intended to regulate the delicate relationship between Noteholders' risk and LBSF's risk.

112.    The Noteholder Priority provisions were intended to deal with LBSF risk. The fact that, in certain circumstances, the change in priority would lead to a (possibly unanticipated) benefit to the Noteholders and to the loss of LBSF's security rights in the Collateral in respect of Unwind Costs does not unravel this highly complex transaction.

113.    These transactions were designed, arranged and marketed by the Lehman group. The investors who bought the Notes were in the main not banks. In the case of the Belmont Noteholders they were Australian local authorities, pension funds, private investment companies and private individuals. There was evidence that the fact that the Noteholders would have priority over the Collateral in the event of

LBSF's insolvency was a very material factor in obtaining Triple A credit ratings which enabled Lehman to market the Notes.

114.    For these reasons Sir Andrew Morritt C and the Court of Appeal were right to find that the key provisions were valid and enforceable.

## VIII    The LBHI point

115.    This point does not arise in view of the conclusion that the Noteholders are right on the main point. LBHI filed for Chapter 11 relief on 15 September 2008. If that was an Event of Default on that date for the purposes of Clause 5.5 of the STD and Condition 44 of the Terms and Conditions, then Noteholder Priority replaced Swap Counterparty Priority and Condition 44.2 replaced Condition 44.1. If that occurred before, and not because of, LBSF's filing for Chapter 11 relief, the anti-deprivation rule would not be engaged because the change in LBSF's priority would not have been because of its filing, but because of LBHI's filing. The anti-deprivation rule has no application where an entity is deprived by a person of its property prior to bankruptcy and on grounds which do not depend upon bankruptcy. Sir Andrew Morritt C and the Court of Appeal accepted that the Noteholders were right on this point.

116.    LBSF's position was as follows: (1) Clause 5.5 of the STD and Condition 44.2 of the Terms and Conditions, and the concepts of Swap Counterparty Priority and Noteholder Priority, only had relevance in relation to events taking place after the Collateral has been sold. (2) Condition 44.2 of the Notes prescribed how the Early Redemption Amount payable to Noteholders on an Early Redemption Date was to be calculated. (3) But Early Redemption could only take place after service of a notice by the Issuer following termination of the swap transaction or service of a notice by the Issuer to accelerate the Notes following an Event of Default. (4) On the true interpretation of the arrangement, the parties could not have intended any permanent changes in the operation of Clause 5.5 and Condition 44.2 to have occurred unless and until the service of a notice by the non-Defaulting Party to terminate the Swap Agreement. (5) Clause 5.5 and Condition 44.2 operated with respect to the payments which would be due to LBSF and the Noteholders on early termination of the swap transaction and Early Redemption of the Notes. (6) Neither of those events would occur automatically upon an Event of Default occurring under the Swap Agreement: each required the service of a notice by the Issuer terminating the Swap Agreement. (7) Part 1(h) of the Schedule to the ISDA Master Agreement contained the option for the contracting parties to select Automatic Early Termination ("AET") of their Swap Agreement. (8) If AET was selected, termination of the swap was deemed to occur automatically on the occurrence of a specified number of Events of Default, including bankruptcy. (9) The AET option was not taken in respect of any of the Swap Agreements in issue

in this case. (10) The result was that the mere happening of an Event of Default based upon bankruptcy was plainly not intended to, and did not, result in the automatic termination of the Swap transaction. (11) Parties to a swap agreement need to know, with certainty, a number of fundamental matters. They need, for example, to know whether or not the transaction is still operative or has been terminated; if it has been terminated, they need to know with certainty when it terminated, and which of them is the Defaulting Party and which is not. (12) In the absence of AET, it is the service of a notice under section 6(a) which fixes those rights and obligations.

117.    In my judgment, Sir Andrew Morritt C and the Court of Appeal were right on this point. The combined effect of section 5 of the ISDA Master Agreement and paragraph 9(iv) of the Swap Confirmation is that the institution by LBHI (a "Credit Support Provider") of proceedings for Chapter 11 relief is an Event of Default. The direction to the Trustee in Clause 5.5 of the STD is to apply Noteholder Priority if an Event of Default has occurred under the Swap Agreement and the Swap Counterparty is the Defaulting Party. For this purpose LBSF is the Defaulting Party: section 6(a) of the ISDA Master Agreement. Condition 44.2 of the Terms and Conditions provides that if an Event of Default has occurred under the Swap Agreement and the Swap Counterparty is the Defaulting Party, then, where Unwind Costs are payable by the Issuer to the Swap Counterparty, the Issuer is to apply the Collateral proceeds first in redeeming the Notes.

118.    Consequently the priorities were fixed on the happening of the Event of Default. There is nothing in the documents to require a notice of termination for this purpose, by contrast with the procedure in clause 6(a) of the ISDA Master Agreement for early termination. Under clause 5.5 of the Principal Trust Deed the security became enforceable when any amount due in respect of the Notes was not paid.

119.    LBSF in effect asks the court to write in a further condition that notice of termination has been given in respect of that Event of Default. This would be unnecessary and contrary to principle. The fact that it might make more commercial sense (to LBSF's benefit) should yield to the following considerations: first, the documents were prepared and marketed by Lehman Brothers, who could reasonably have been expected to ensure that their interests were adequately protected. Secondly, the Notes were bearer instruments intended to be widely marketed, and it is particularly important in such circumstances for the documents themselves to be capable of being relied on in the market. In this connection it is worthy of note that the Offering Circular Supplement itself (under "Security Arrangements") substantially repeated clause 5.5 of the STD. Noteholders were entitled to rely on the documents as presented to them.

120.    I would therefore dismiss the appeal.


**LORD WALKER**

121.    I gratefully acknowledge Lord Collins' summary of the complicated documentation in this case, and his comprehensive survey of the authorities on the anti-deprivation rule. Between them Lord Collins in his judgment in this Court, and Lord Neuberger of Abbotsbury MR in his judgment in the Court of Appeal (*Perpetual Trustee Co Ltd v BNY Corporate Trustee Services Ltd* [2010] EWCA Civ 1160, [2010] Ch 347) have analysed the cases most thoroughly. What emerges from the analysis is that the rule is a general principle of public policy which (in the traditional phrase) prevents a fraud on the insolvency statutes: as Lord Rodger of Earlsferry put it in *R v J* [2004] UKHL 42, [2005] 1 AC 562, para 64,

> "The notion of a fraud upon an Act, acting in fraudem legis, is ancient. Although the outer limits of the doctrine remain notoriously difficult to define, this case at least falls squarely within its scope."

122.    There is a good deal of common ground between Lord Collins and Lord Neuberger. Where they differ in their analysis I respectfully prefer the view taken by Lord Collins, and I am hesitant about adding anything that might in any way obscure the clarity of his judgment. What follows should be read as no more than footnotes.


123.    The outer limits of the anti-deprivation rule are indeed difficult to define. There are some reasonably well demarcated areas in which it is clear that the principle does not apply. One is the grant of a lease, in which the reservation of a power of re-entry and forfeiture in the event of bankruptcy is standard practice, is unquestionably valid, and is recognised by statute. This is noted by Lord Collins (paras 84 and 85) and Lord Neuberger MR (para 64), citing *Whitmore v Mason* (1861) 2 J & H 204, 209-210, and *Ex p Barter; Ex p Black; In re Walker* (1884) 26 Ch D 510, 519-520.


124.    Another area in which the principles are well established is in the law of trusts. This was, in the early days of the anti-deprivation rule, the area in which most of the relevant cases were decided, the earliest notable decision being that of Lord Eldon LC in *Higinbotham v Holme* (1812) 19 Ves Jun 88, where by a marriage settlement the husband conveyed land which he owned to trustees in trust for himself for life "unless he shall embark in trade, and in the life of his wife become bankrupt" (as happened a few years later). Lord Eldon LC stated (at pp 92-93),

"It is not competent to a party, giving a consideration for a contract, that is a direct fraud upon the Bankrupt Laws, to have the benefit of it. I cannot assimilate this to the case of the wife's property limited until the bankruptcy of her husband; that is, where she reserves a power over her own property; or to the case of a lease made determinable by the bankruptcy of the lessee: that is a reservation by the owner of the property of a power over it . . ."

But (as Lord Eldon implies in that passage) a settlor can validly settle his own property so as to confer on another person an interest terminable on the bankruptcy of that other person. That also has received statutory recognition in the statutory protective trusts in section 33 of the Trustee Act 1925, subsection (3) of which provides that the section does not operate to validate any trust which would, if contained in the instrument creating the trust, be liable to be set aside.

125.   A further much more limited exception has been made for assets (in particular, shares in an incorporated professional or business association) which are closely linked with professional or business activities for which bankruptcy is a disqualification: *Bombay Official Assignee v Shroff* (1932) 48 TLR 443; *Money Markets International Stockbrokers Ltd v London Stock Exchange Ltd* [2002] 1 WLR 1150.

126.   It is hard to see how much of the old learning about marriage settlements can be applied to a highly sophisticated commercial transaction such as that now before the court. But the old cases leave us in no doubt that among the landed gentry in the 18th and 19th centuries (especially before the Married Women's Property Act 1882) marriage, if not a commercial transaction, had financial implications which were taken very seriously. In *Lester v Garland* (1832) 5 Sim 205, for instance, the wife (who was under 21) was entitled under her uncle's will to a legacy of £1,000 contingently on attaining full age, and the legacy would on her marriage vest in her husband; this legacy, and a further £4,000 paid by her father to her husband, was treated as if it had been settled by the wife, and not by the husband, so as to accelerate the wife's interest in that part of the settled property on his bankruptcy. The Court of Chancery was there looking at what happened as a matter of substance rather than form.

127.   *Lester v Garland* was considered in a commercial context in *Whitmore v Mason* 2 J & H 204. In that case the bankrupt, Mr Smith, had been a partner in a firm that had a 50-year lease of mines in Portugal. Mr Smith had paid in one-thirteenth of the firm's capital of £6,500. The impugned provision of the partnership deed directed that on a partner's bankruptcy his interest in the lease should be discounted in the taking of a partnership account. It is instructive to look at the report of counsel's arguments. The argument for the partners was that

partnership deeds were exceptional, and that such a provision was frequently inserted in them. Mr Rolt QC argued "In forming a partnership each partner is making a bargain with the rest, and is entitled to stipulate for such advantages as he can obtain from the rest"; and he referred by way of analogy to a lease (p 209). After the Vice-Chancellor had made a discouraging reference to *Wilson v Greenwood* (1818) 1 Swans 471 Mr Giffard QC, following, argued that even on the rule as stated in Mr Swanston's note to *Wilson v Greenwood* (at p 485) "the rule would allow two co-partners, part owners of a mine, to limit their shares to each other until bankruptcy, and then over; and the limitation over would be valid." (p 210)

128.    That is the context of the Vice-Chancellor's dictum at pp 214-215:

> "If his co-partners had advanced a definite sum of money on account of his share, then the property might have been considered to the extent of the money so advanced by them, as identically their money; but this has not been done."

The Vice-Chancellor had already rejected Mr Giffard's over-ingenious argument. His dictum implies that it might have been different if Mr Smith had introduced no partnership capital of his own, and had merely covenanted to perform his partnership obligations, including paying off the initial advance of capital from his partners.

129.    This suggests, putting it more generally, that even in fully commercial transactions, if the bankrupt was not in substance the provider of the asset of which he is to be divested, the anti-deprivation rule may not apply. If a party to a transaction brings to it nothing but his own covenant, like a tenant under a lease, the property interest which he takes is what the landlord agrees to grant him. The maxim "cujus est dare ejus est disponere" (mentioned by the Vice-Chancellor 2 J & H 204, 212-213 in relation to a lease) is not restricted to gratuitous dispositions.

130.    Briggs J, who has wide experience of litigation relating to interest rate swaps, seems to have taken a similar view in *Lomas v JFB Firth Rixson Inc (International Swaps and Derivatives Association Inc Intervening)* [2010] EWHC 3372 (Ch), 21 December 2010 (a case on facts very much closer to those of this appeal). Having referred to *Ex p Mackay; Ex p Brown; In re Jeavons* (1873) LR 8 Ch App 643, *British Eagle International Airlines Ltd v Cie Nationale Air France* [1975] 1 WLR 758 and the judgment of the Court of Appeal in this case as each concerned with a chose in action with a built-in "flaw" triggered by bankruptcy, Briggs J observed (paras 108-110):

"Where the asset of the insolvent company is a chose in action representing the quid pro quo for something already done, sold or delivered before the onset of insolvency, then the court will be slow to permit the insertion, even ab initio, of a flaw in that asset triggered by the insolvency process. By contrast, where the right in question consists of the quid pro quo (in whole or in part) for services yet to be rendered or something still to be supplied by the insolvent company in an ongoing contract, then the court will readily permit the insertion, ab initio, of such a flaw, there being nothing contrary to insolvency law in permitting a party either to terminate or adjust what would otherwise be an ongoing relationship with the insolvent company, at the point when it goes into an insolvency process.

Examples of the former type are the royalty stream in *Ex p Mackay*, which was the quid pro quo for a patent sold outright by the person who later became bankrupt, and the debt owed by Air France to British Eagle, which was for services already rendered by British Eagle to Air France prior to the commencement of its winding up.

Familiar examples of the latter category are leases and licences, where the right to enjoy the underlying asset accrues over time, in exchange, also over time, for payment of rent or fees, and which have always been terminable on bankruptcy without infringing the rule: see *Perpetual* [2010] Ch 347, para 64."

Briggs J then went on to refer to the security right enjoyed by LBSF.

131.   This proposed test inevitably lacks precision, but it is in my respectful opinion a valuable contribution to the search for principle in this area. Moreover the more contrived and unconventional the chose in action is (unconventional, that is, outside the bizarre world of swaps) the stronger are the arguments for taking the chose in action as the parties have fashioned it.

132.   I am therefore inclined to give some weight to asking what it is that the bankrupt has brought to the transaction, so long as that is looked at as a matter of substance, and contrived arrangements or analyses (such as that suggested by counsel in *Whitmore v Mason*) are disregarded. In this case the noteholders were, as a matter of substance, the only party who contributed real assets – in many cases the pension funds of hard-working Australian citizens. LBSF contributed only promises, and then proved unable to perform them. Its only proprietary interest was under a charge to secure sums that might become due to it on due performance of its obligations.

133.    But these are, as I have said, only footnotes. The essential ground of the decision is set out in para 108 of the judgment of Lord Collins, with which I am in full agreement.

134.    I also agree with Lord Collins on what he refers to as the LBHI point. I would therefore dismiss this appeal on both grounds.

## LORD MANCE

*Introduction*

135.    This appeal concerns a Lehman Brothers product called the Dante Programme. Sir Andrew Morrit C outlined its essential elements ([2009] EWHC 1912 (Ch); [2009] 2 BCLC 400, para 1) in a description adopted by the Court of Appeal ([2009] EWCA Civ 1160; [2010] Ch 347, para 5):

> "(1) the issue of notes ['the notes'] to investors by a special purpose vehicle ("the issuer") formed by a Lehman company in a tax friendly jurisdiction;
>
> (2) the purchase by the issuer with the subscription money paid for the notes of government bonds or other secure investments ("the collateral") vested in a trust corporation;
>
> (3) a swap agreement entered into by a Lehman company and the issuer under which the Lehman company paid the issuer the amounts due by the issuer to the noteholders in exchange for sums equal to the yield on the collateral;
>
> (4) the amount by which the sum payable under the swap agreement by the Lehman company exceeded the yield on the collateral represented the premium for the, in effect, credit insurance provided by the noteholders;
>
> (5) the amount payable by the Lehman company to the issuer on the maturity of the notes (or on early redemption or termination) was the initial principal amount subscribed by the investors less amounts calculated by reference to events defined as credit events occurring

during a specified period by reference to one or more reference entities, thereby giving effect to the effective insurance aspect of the programme;

(6) the collateral was charged by the issuer in favour of the trust corporation to secure its obligations to the noteholders and the Lehman company on terms which changed their respective priorities on the occurrence of certain specified events, including the insolvency of the Lehman company,

(7) each of the transactions summarised above (except the purchase of the collateral) is governed by English law."

In the absence of any insurable interest, the description credit insurance is, on any view, colloquial or commercial rather than strictly legal.

136.   Under the particular tranche of the representative series put before the Supreme Court, the issuer was Saphir Finance plc ("Saphir"), the Lehman company which was Saphir's counter-party in the swap was Lehman Brothers Special Financing Inc ("LBSF") and the trust corporation was BNY Corporate Trustee Services Ltd ("BNY"). The notes were issued in July 2004 and were due to mature after seven years. The amount expressed to be payable by the issuer to LBSF on their maturity was an amount equal to the amount realised from the collateral (which would be netted off against the amount payable by LBSF to the issuer as mentioned in point (5) above, giving a net sum payable one way or the other). As a result of non-recourse clauses, Saphir was not itself liable to either the Noteholders or LBSF beyond the amount realised by the collateral. The collateral was highly secure, consisting of A$40m triple A rated floating notes issued by Rabo Australia Ltd and guaranteed by Rabobank Nederland. Due to its floating rate, the value of the collateral would not alter significantly, upwards or downwards. The reference entities were at least double A rated, the credit events which might trigger a reduction in the amounts (capital, and as a result interest) due under the notes were of some severity, and the Noteholders had the further protection of a "subordination amount" of A$72m (over 50% higher than the Standard & Poor's recommended level): only after that amount had been "burned through" by losses resulting from credit events would the amounts outstanding under the notes reduce, leading also to a reduction in the total payable thereon by way of interest. The reference entities were not entities with which LBSF necessarily had any financial relation, and the extent to which the programme or this tranche covered, directly or indirectly, any actual market exposure of LBSF is unclear.

137.   The attraction for Noteholders was an interest rate on their notes of 1.30% above that earned by the Rabo collateral. If there were no credit events at all, then during the period of their notes the Noteholders would receive interest at this uplifted rate on the notes' face value (their only effective security in respect of the 1.30% uplift being LBSF), and on the notes' maturity they would receive repayment in full via Saphir from LBSF. In return, LBSF would receive via Saphir during the period of the notes an amount equivalent to the interest payable on the Rabo collateral and on maturity the value of the collateral (less minor trustee, etc. fees). If there were duly notified credit events giving rise to losses above the subordination level, the downside for Noteholders was that the amount outstanding on their notes, and so also the interest payable from time to time, would be reduced (even to zero). In that event, LBSF would on maturity receive credit in the full value of the collateral, while crediting correspondingly less to Saphir for the benefit of the Noteholders, thereby making a "credit insurance" recovery. With the hindsight of the credit crisis of 2007 onwards, it can be seen that, however safe a bet the transaction may have appeared in July 2004, its timing was unfortunate.

138.   The contract documentation is of a purgatorial complexity fitting the programme's name. The judgments below have set out many detailed provisions, and the Appendix contains the most salient. These defined and regulated, in particular, the consequences of an "Event of Default" in respect of which LBSF was the "Defaulting Party", and provided for early termination (clauses 5 and 6 of the ISDA Master Agreement). In the event, there were two relevant Events of Default, one consisting of the commencement on 15 September 2008 of Chapter 11 proceedings involving Lehman Brothers Holdings Inc ("LBHI" - LBSF's parent and guarantor in the transaction) and the second consisting of the commencement on 3 October 2008 of such proceedings in respect of LBSF itself. The latter Event of Default led Saphir on 24 March 2009 to give notice specifying that Event of Default only and designating 24 March 2009 as an early termination date in respect of the swap.

139.   This appeal concerns the provisions governing an Event of Default and/or "Early Termination". In summary, on Early Termination, the Noteholders were to be paid by Saphir their share of the outstanding amount of the notes, that is the face value reduced by reference to any credit events which had already occurred and had been duly notified after they had burned through the subordination amount. The swap was to be unwound by making a market-based estimation of any credit events likely to occur during the remaining period of the notes, and by taking into account on the other side the future interest payments which LBSF would have had to make, had the transaction run to maturity. A balance, described as Unwind Costs, was thus to be struck, one way or the other, to unwind the swap (clauses 5.5 and 8.3 of the Supplemental Trust Deed ("STD"), read with condition 44 of the Offering Circular Supplement ("OCS")). In the absence of any Event of Default involving LBSF as the Defaulting Party, the result on early termination

was to mirror in effect that which it was estimated would exist on maturity (clauses 5.5 and 8.3 of the STD and condition 44 of the OCS). In the case of a balance due to the issuer (which would in practice only occur, as a result of the interest rate uplift of 1.30%, where there were no or few credit event losses above the subordination amount), the Noteholders would receive its benefit. In the event of a balance due to LBSF, the Noteholders would suffer diminution in their recovery by reference to both past and estimated further credit events in excess of the subordinated amount; on the other side of the coin, LBSF would be covered and secured via Saphir out of the collateral in respect of losses from both past and estimated future credit events.

140.    In the case of an Event of Default where LBSF was the Defaulting Party, a different scheme was to apply. The Noteholders were to continue to be entitled to be paid their share of the outstanding amount of the notes, that is their face value reduced by reference to any credit events which had already occurred and been duly notified. The swap was to be unwound, and a balance of Unwind Costs struck, in the same way as where there had been no default. In the case of a balance struck favouring Saphir, the Noteholders' position was to be as before. In the case of a balance struck in favour of LBSF, the Noteholders were to be entitled to first recovery. LBSF was to remain entitled to the balance struck in its favour, but only after Saphir had, out of the collateral, satisfied the Noteholders' prior claim to recovery of their share of the outstanding value of the notes (STD, clauses 5.5 and 8.3 and OCS, condition 44). Since the value of the collateral was not envisaged or intended to increase, and since there was no recourse against Saphir itself, LBSF's entitlement to the balance struck in its favour was more theoretical than practical. The collateral would be exhausted in (a) meeting any past credit losses in excess of the subordination amount incurred prior to early termination and (b) paying the Noteholders the outstanding amount of their notes. There would be nothing left to meet estimated future credit losses (reflected in the Unwind Costs), if they were not deducted by Saphir from the amount payable to Noteholders and passed on by way of a correspondingly increased payment out of the collateral to LBSF.

*The present dispute*

141.    This change (or "flip" as it has been called), between the positions where there has not been and where there has been an Event of Default with LBSF the Defaulting Party, gives rise to the present appeal. LBSF is the appellant. The respondents are Belmont Park Investments Pty Ltd, a Noteholder, 28 other Australian charities and public bodies who are also Noteholders, and BNY. The primary issue is whether the loss by LBSF in such an event of its priority in respect of future estimated credit losses is invalidated by a principle (which I can conveniently call an anti-deprivation principle), preventing a person from being deprived of his, her or its property upon insolvency. There is a further issue

whether, on the facts of this case, the loss did occur upon LBSF's insolvency, bearing in mind that there was an Event of Default affecting its parent, LBHI, which occurred some two weeks before LBSF was subject to Chapter 11 proceedings. In this connection, the parties disagree as to whether the occurrence of an Event of Default (here, that involving LBHI on 15 September 2008) automatically introduces Noteholder Priority as opposed to Swap Counterparty Priority, or whether priority depends upon the giving of notice, and the realisation or enforcement of the collateral, pursuant to a particular Event of Default (here, the notice given on 24th March 2009 relying on the Event of Default relating to LBSF).

142.    The starting point of LBSF's case is the wide definition of "property" in section 436 of the Insolvency Act 1986 to include:

> "money, goods, things in action, land and every description of property … and also obligations and every description of interest, whether present or future or vested or contingent, arising out of, or incidental to, property".

LBSF's case is that, prior to its insolvency, it had property in the form of a present, future or contingent interest in the collateral, securing a prior claim to Unwind Costs due to it on termination, that it was deprived of the claim and/or collateral upon or by reason of its insolvency, and that such a deprivation is invalid as contrary to the policy of the insolvency legislation.

143.    Neither of the courts below has accepted LBSF's case. Sir Andrew Morritt C noted five points ([2009] 2 BCLC 400, para 45): the money used by the issuer to buy the collateral derived from the Noteholders, not LBSF; the courts should not be astute to upset commercial transactions; it was appropriate for LBSF to have prior security over the collateral only so long as it continued to perform the swap; LBSF's priority had never extended to a time after the event of default in respect of which it was the defaulting party; and LSBF's prior security was thus always limited and conditional. In the Court of Appeal, Patten LJ [2010] Ch 347, para 135 considered that, whether or not the date for determining priority under clause 5.5 of the STD was 15 September 2008 or 24 March 2009:

> "the only interest or property which [LBSF] ever enjoyed in the collateral was a charge granted by [Saphir] on the terms of the [STD]. That security interest remains part of the property of [LBSF] unchanged by the event of its bankruptcy. The reversal of the order of priority under clause 5.5 was always a facet of the security designed to regulate the competing interests over the collateral of LBSF and the Noteholders. To say that its operation in the event of

the company's bankruptcy constitutes the removal of an asset from the liquidation is to confuse the security itself with the operation of its terms in the events prescribed by the charge. LBSF retains the same asset as it had before its bankruptcy and is free to deal with any recoveries for the benefit of its general creditors in accordance with the applicable statutory regime".

144.   Patten LJ applied similar reasoning (in para 136) to condition 44 of the Offering Supplementary Circular, holding that

"the operation of condition 44 does not give to the Noteholders more than the right to recover the whole of the sums due under the Notes in priority to any claim over the collateral by LBSF for the Unwind Costs. It simply adjusts the balances on early termination to ensure that the Noteholders are paid the whole of what is due to them in priority to the sums payable to LBSF. If there is no shortfall in the security LBSF will recover the sums due to it in full. Condition 44 does not therefore remove an asset from LBSF. Nor does it give to the Noteholders security over an asset in which they previously had no interest. It merely regulates the order in which the company and the Noteholders are entitled to be recouped out of the security. Although the amount of the security available to meet LBSF's claims is obviously reduced in the event of a shortfall in the value of the security over what it would have been had no Event of Default occurred, that is simply a function of the change in priority which was always a feature of the security which the company enjoyed."

145.   In para 174, Patten LJ summarised his view as being that:

"it is not possible to strike down the provisions of clause 5.5 and condition 44 merely because their operation may affect the value of the security available to LBSF in the event of a shortfall. There is nothing in the English authorities which supports the extension of the anti-deprivation principle to encompass transactions which do not alter the property of the insolvent company in the asset in question ...."

He also expressed doubt (paras 171-173) whether, in the light of the statutory provisions for setting aside transactions in insolvency, there was any scope for any anti-deprivation principle, apart from that applied by the House of Lords in *British Eagle International Airlines Ltd v Cie Nationale Air France* [1975] 1 WLR 758

which precludes a disposition of property in insolvency otherwise than pari passu
in accordance with the legislative scheme.

146.   Lord Neuberger of Abbotsbury MR, with whose reasoning Longmore LJ
concurred, identified a number of features as supporting the Chancellor's decision:
first, and it appears most importantly in his view, he stressed that the collateral has
been funded by the Noteholders' money (paras 61-64); second, from the very
outset the scheme provided and was marketed on the basis that, if LBSF or LBHI
defaulted, the Noteholders would have priority; third, LBSF retained their right to
be paid, did not lose any vested asset and would merely rank behind rather than
ahead of the Noteholders in relation to the collateral, and not be out of pocket "if
there was no shortfall" (paras 61 and 63-64); fourth, a charge or provision for
repayment, while not identical to a lease or licence, "has features of similarity ...
and differs from ownership" (para 64).

147.   The Master of the Rolls saw Patten LJ as having decided the case

> "on the simple basis that the 'flip', that is, the reversal of the order of
> priority against a company as the holder of a charge, in favour of
> another chargee over the same assets, cannot be caught by the rule,
> even if it operates after the liquidation of the company, at least if
> such a reversal was an original feature of the company's charge when
> it was granted." (para 66)

He said that he had considerable sympathy with that view, but preferred to rest his
conclusion on a more limited ground, namely that:

> "in addition to the facts relied on by Patten LJ, the assets over which
> the charge exists were acquired with money provided by the chargee
> in whose favour the 'flip' operates, and that the 'flip' was included
> merely to ensure, as far as possible, that that chargee is repaid out of
> those assets all that he provided (together with interest), before the
> company receives any money from those assets pursuant to its
> charge".

He thought that, without these additional facts:

> "there may be room for argument that, in the absence of these
> additional facts, the arrangement in this case would have fallen foul
> of the analysis in *Ex p Mackay* 8 Ch App 643 (which was arguably
> approved in the *British Eagle* case ...), on the basis that the right in

that case to retain the second half of the royalties in the event of bankruptcy was, like the 'flip' provisions here, an original feature of the contractual arrangement, and the right to recoup money under a change in priority to another chargee is every bit as much of an asset as the right to moneys (in the form of royalties) arising in the future. There is also a danger that the simple analysis adopted by Patten LJ could, in the light of the very limited circumstances in which the court will hold a transaction to be a sham, make it very easy to dress up sale transactions in such a way as to enable the rule to be circumvented". (para 67)

*An anti-deprivation principle?*

148.   I am satisfied that there are, and ought to be, two principles in this area. One is the principle applied in *British Eagle*, which precludes a bankrupt from agreeing to distribute his, her or its property other than pari passu in bankruptcy (although it does not preclude creditors from agreeing inter se on the distribution inter se of their pari passu shares: *In re Maxwell Communications Corpn plc* [1993] 1 WLR 1402). The other is a concurrent principle, whereby dispositions of property on bankruptcy may be invalidated as being in fraud or an evasion of the bankruptcy laws. The only challenge to the former principle has been in written submissions made by The Premier League as interveners (closely related to pending proceedings brought against it by Her Majesty's Revenue and Customs). I see no basis for any fundamental challenge to the principle, and I shall in view of the pending proceedings say nothing about particular issues which may arise there about the scope of the principle or its application to direct payment clauses such as those discussed in paragraph 6-11 of Professor Sir Roy Goode's *Principles of Corporate Insolvency Law*, 3rd ed (2005). It is the latter principle which is in issue on this appeal. This, an anti-deprivation principle, was examined and applied by Lord Eldon in *Higinbotham v Holme* (1812) 19 Ves Jun 88, and in a series of later cases, such as *Lester v Garland* (1832) 5 Sim 205, *Whitmore v Mason* (1861) 2 J & H 204, *Ex p Mackay; Ex p Brown; In re Jeavons* (1873) LR 8 Ch App 643 (CA), *Ex p Jay; In re Harrison* (1880) 14 Ch D 19 (CA), *Ex p Barter; Ex p Black; In re Walker* (1884) LR 26 Ch D 510 (CA) and *In re Johns; Worrell v Johns* [1928] Ch 737 and, more recently, *Mayhew v King* [2010] EWHC 1121 (Ch). It was recognised and considered, without adverse comment, by the Privy Council in *Bombay Official Assignee v Shroff* (1932) 48 TLR 443 and by the House of Lords in *British Eagle* [1975] 1 WLR 758. Section 33(1)(ii) of the Trustee Act 1925 also assumes the existence of such a principle.

149.   While the two principles are conceptually distinct, they are quite closely allied. *British Eagle* addresses what happens in bankruptcy. An anti-deprivation principle addresses what happens on bankruptcy. If contracting out of the statutory rule requiring pari passu distribution in bankruptcy is impermissible, it would be

surprising if there were no concurrent principle capable of invalidating certain dispositions which, by removing property from the bankrupt on bankruptcy, had the same ultimate effect. The general principle of pari passu distribution in bankruptcy would otherwise easily be evaded, as the court observed in *Ex p Mackay* LR 8 Ch App 643. It is also unsurprising that the facts of some of the authorities (eg *Whitmore v Mason* 2 J & H 204 and *Ex p Mackay*) might plausibly have been analysed as falling within either principle. Further, it is clear that there is no conceptual difference between removing specific property from the bankrupt estate for no consideration (*Whitmore v Mason*), increasing the security given to a particular creditor (*Ex p Mackay*) and increasing the bankrupt estate's liability to a particular creditor (*In re Johns* [1928] Ch 737). All these fall within the anti-deprivation principle.

150.    The existence in the Insolvency Act 1986 of other provisions protecting the interests of creditors in bankruptcy does not supersede or make redundant an anti-deprivation principle. First, the 1986 Act must have been enacted against the background of the case law establishing that certain deprivations on bankruptcy are impermissible and void. Second, the statutory provisions cover different ground. Section 127 concerns dispositions after the commencement of the winding up, section 238 transactions at an undervalue and section 239 preferences. Sections 238 and 239 only avoid transactions within specified periods ending with the onset of insolvency (from six months to two years). Section 423 requires proof of both a transaction at an undervalue and a specific intent to put assets beyond the reach of or prejudice a potential claimant. These provisions have their own historical antecedents, dating back to the Fraudulent Conveyances Act 1571 (13 Eliz 1, c 5) and the doctrine of fraudulent preference formulated by Lord Mansfield in 1768 (see *Alderson v Temple* (1768) 4 Burr 2235 and later incorporated in statutory form in the Companies Act 1862 (25 & 26 Vict, c 89)).

151.    The more difficult question concerns the character of transaction and the state of mind which will attract the operation of the anti-deprivation principle. In my opinion, the court has to make an objective assessment of the purpose and effect of the relevant transaction or provision in bankruptcy, when considering whether it amounts to an illegitimate evasion of the bankruptcy law or has a legitimate commercial basis in other considerations. The references in the cases to "fraud" of the bankruptcy law are not to fraud in a strict sense or even to conduct which is morally opprobrious. Equity took a broader approach to "fraud": Snell's Equity, 32nd ed (2010), para 8-001; and see eg the cases on fraudulent concealment preventing the running of a limitation period: *Kitchen v Royal Air Force Association* [1958] 1 WLR 563; *Tito v Waddell (No 2)* [1977] Ch 106, 245B-C. Counsel for the unsuccessful wife in *Higinbotham v Holme* 19 Ves Jun 88 made the distinction between actual and other fraud clear when he said, at p 90, that the settlement "being free from objection for want of consideration or upon actual fraud" could only be represented as a fraud upon the bankruptcy law in one of two

ways, either on the basis of (the then existing, but in that case irrelevant and since the Insolvency Act 1985 finally abolished) doctrine of reputed ownership "or by considering it as a subtraction from the creditors of his estate, which he enjoys and possesses for every other purpose".

152.   In a number of the old authorities, a conclusion that the anti-deprivation principle applied was expressed in terms referring to an express or deliberate object of evading the bankruptcy law. Lord Eldon LC in *Higinbotham v Holme* and the Court of Appeal in *Ex p Mackay* LR 8 Ch App 643 based themselves on an analysis of the transaction which led them to conclude that the "express object" was to take the case out of the reach of the bankruptcy laws. The palpably artificial scheme in *In re Johns* [1928] Ch 737 was described as "a deliberate device to secure that more money should come to the mother, if the son went bankrupt, than would come to her if he did not" (p 748). In dicta in *British Eagle* [1975] 1 WLR 758, 780, Lord Cross of Chelsea said that existences of a charge in *Ex p Mackay* meant that "The court could only go behind it if it was satisfied – as was indeed obvious in that case – that it had been created deliberately in order to provide for a different distribution of the insolvent's property on his bankruptcy from that prescribed by the law".

153.   Other cases have however stated an anti-deprivation principle in terms focusing on the character of the transaction or provision, identified objectively. In a note to *Wilson v Greenwood* (1818) 1 Swans 471 (another decision of Lord Eldon) which was subsequently quoted by Lord Hatherley LC in argument in *Whitmore v Mason* 2 J & H 204, 209-210 and by Fry LJ in *Ex p Barter* LR 26 Ch D 510, 519-520, Mr Swanston stated simply that "the owner of property may, on alienation, qualify the interest of his alienee by a condition to take effect on bankruptcy; but cannot by contract or otherwise qualify his own interest by a like condition, determining or controlling it in the event of his own bankruptcy, to the disappointment or delay of his creditors". That is an objective test. In *Ex p Jay* 14 Ch D 19 a building owner demised land to a builder for 99 years, with detailed covenants to build thereon within certain times and subject to a power of distress and entry in case of either default in performance or bankruptcy or insolvency on the part of the builder, in either of which cases all the builder's improvements, plant and chattels on site were to be forfeited to the building owner. There was a commercial advantage behind the forfeiture provision, and Bacon CJ in fact said at first instance that "There was no fraud, but a transaction perfectly consistent with the speculation into which both parties had entered, that the materials brought upon the land were to be used in constructing the buildings" (p 23). But the Court of Appeal held that (there having been, prior to the bankruptcy, no default which could by itself have triggered the forfeiture) the forfeiture was void in the event that happened, of its being triggered by the builder's bankruptcy.

154.   In *Ex p Barter* 26 Ch D 510, a similar point arose under a shipbuilding
contract, which entitled the owners, in various events including the builders'
cessation of work for 14 days or bankruptcy or insolvency, to take possession of
the vessel and complete it using such of the builders' materials as were on their
premises intended for use in completion. The builders went bankrupt and the
owners claimed the right to use their materials. In justification, they argued
strenuously the question was "whether at the time when the contract was entered
into the parties intended to defeat the bankruptcy law; – whether it was an honest
or a dishonest contract" (p 515), and the clause was for the builders' benefit since
completion of the ship would reduce their bankrupt estate's liability. The Court of
Appeal noted that the latter argument was fallacious, since the effect of the clause
was to transfer to the owner the trustee's right to elect whether or not to complete.
The court went on to reject the owner's case without reference to any state of
mind, on the simple basis of the rule stated by Mr Swanston. To similar effect is,
as Neuberger J noted in *Money Markets International Stockbrokers Ltd v London
Stock Exchange Ltd* [2002] 1 WLR 1150, para 102, a passage in the judgment of
Farwell J in *Borland's Trustee v Steel Bros & Co Ltd* [1901] 1 Ch 279, 291. In the
*Borland's* case, Farwell J, while accepting that the second principle did not apply
to provisions compelling sale of shares on bankruptcy at their fair value, added that
a provision compelling their sale at something less than the price they would
otherwise obtain "would be repugnant to the bankruptcy law". The reasoning of
Lord Blanesburgh in *Bombay Official Assignee v Shroff* 48 TLR 443, 446, to
which Neuberger J also referred is, as I see it, equivocal and the judgment went off
on another point.

155.   An objective approach is also consistent with authorities which show that
what matters is whether the deprivation was triggered by bankruptcy, and that, if it
is, it is irrelevant that there was also events other than bankruptcy, which if they
had occurred would have triggered deprivation, but which did not in fact occur. In
*Higinbotham v Holme* 19 Ves Jun 88 there was a settlement by a prospective
husband of moneys on trust for the husband unless and until he should, during his
wife's lifetime, die or become bankrupt in which case she should receive an
annuity. The annuity in favour of the wife was held void as regards the period
between the husband's bankruptcy and death, but Lord Eldon made clear that it
would still be payable as and from the date when her husband later died. In *Ex p
Jay* 14 Ch D 19 and *Ex p Barter* 26 Ch D 510 the relevant clauses authorised
forfeiture of the builder's materials on certain defaults in performance as well as
on bankruptcy, but no such other events had occurred prior to the builders'
bankruptcy, upon which the clauses were actually operated. *In re Detmold;
Detmold v Detmold* (1889) 40 Ch D 585, a settlor made a marriage settlement
settling income on himself for life or until "he shall become bankrupt, or shall
assign, charge, or incumber the said income, or shall do or suffer something
whereby the same ... would through his act, default, or by operation or process of
law ... become vested in or payable to some other person ...". A judgment creditor
obtained the appointment of a receiver over the income on 19 July 1888 and on 29

July 1888 the settler was adjudicated bankrupt. The wife's interest vested on the appointment of the receiver and was held valid as against the creditors.

156.   In *Whitmore v Mason* 2 J & H 204, the fact that the trigger for the anti-deprivation principle is bankruptcy was ingeniously invoked in an argument that, since the clause purportedly removing property from the bankrupt partner's estate was expressed to take effect in the event of "bankruptcy or insolvency", it therefore "took effect in this case immediately the partner was unable to pay his debts, and consequently before any act of bankruptcy under which his assignees could claim"; but Page Wood V-C gave the argument short shrift, saying that a bankrupt is usually insolvent before he commits an act of bankruptcy and "if that construction were to prevail, the bankrupt laws might, in all cases, be defeated" (p 215). In contrast, in *Ex p Newitt; In re Garrud* (1881) 16 Ch D 522 the clause in a building lease entitled the building owner to re-enter, and provided for forfeiture on re-entry of the builder's materials by way of liquidated damages, if the builder defaulted in fulfilling the agreement. The builder defaulted but, on one view of the facts, there was no re-entry and forfeiture prior to bankruptcy. The Court of Appeal held that, since the trustee in bankruptcy took possession subject to any pre-existing rights, the right to re-enter and forfeit could be exercised even after the bankruptcy. In the present case, Lord Neuberger MR and Patten LJ [2010] Ch 347, paras 93, 163 thought that the decision in *In re Newitt* cannot survive *British Eagle* [1975] 1 WLR 758, in so far as it held that a right to forfeit could be exercised after bankruptcy. But it is unnecessary in this case to consider whether that is correct.

157.   A further point is that it may be possible to sever a transaction or provision which infringes the anti-deprivation principle, avoiding it only to the extent that it has this character. This is indicated by *Lester v Garland* 5 Sim 205 (where a husband's provision that moneys settled on himself should on his bankruptcy go to his wife and children was held valid as to 15 sixty-sixths, on the basis that so much of the moneys derived from her father and could be treated as coming from her, and void as to the rest). Lord Eldon's indication in *Higinbotham v Holme* 19 Ves Jun 88 that it was only in the period between the settlor's bankruptcy and death that the creditors would take priority over the wife is in the same sense.

158.   Mr Swanston's note to *Wilson v Greenwood* 1 Swans 471 covers two categories of situation: first, the owner of property may, on alienation, qualify the interest of his alienee by a condition to take effect on bankruptcy; the anti-deprivation principle does not prevent it; but, secondly, he cannot by contract or otherwise qualify his own interest by a condition, determining or controlling it in the event of his own bankruptcy. A straightforward instance of the first situation is provided by the protective trust, within the meaning of section 33 of the Trustee Act 1925, created by a third party: *Money Markets International Stockbrokers Ltd* [2002] 1 WLR 1150, paras 47-49, and Sir Roy Goode, "Perpetual Trustee and Flip

Clauses in Swap Transactions" [2011] LQR 1, 8. Provisions for the forfeiture of leases on a tenant's bankruptcy were seen as falling within the same category (*Whitmore v Mason*, 2 J & H 204, 212-213). This was despite their mutual aspect (perhaps because it was assumed that landlords could dictate their own terms). Such provisions are now recognised as valid in section 146(9) of the Law of Property Act 1925. A straightforward instance of the second situation is the settlement by a person of his own property on terms depriving him (and so his creditors) of it upon his bankruptcy. Early examples are *Higinbotham v Holme* 19 Ves Jun 88 and *Lester v Garland* 5 Sim 205.

159.   Contractual situations present more difficulty. As Mr Swanston's note makes clear, the fact that two contracting parties have agreed a provision does not make it valid. The autonomy of contracting parties cannot axiomatically prevail over the interests of third party creditors in bankruptcy. By the same token, it can be no answer to a suggestion of evasion of the bankruptcy law that the provision for deprivation was in the contractual arrangements from the outset. That will commonly be the case (and was so in many of the cases, eg *Whitmore v Mason* 2 J & H 204, *Ex p Mackay* LR 8 Ch App 643, *Ex p Jay* 14 Ch D 19 and *Ex p Barter* LR 26 Ch D 510). However, it is reasonably clear that Mr Swanston's note was focusing on contracts affecting a pre-existing property interest. Even in that connection, the note would, read literally and generally, go too far, as the position regarding leases shows.

160.   Where the property interest arises out of or in close connection with the relevant contract providing for its determination on bankruptcy, it may be easier to suggest a real commercial or other basis for the deprivation provision, and correspondingly more difficult to invoke the anti-deprivation principle. Thus, in *Borland's Trustee* [1901] 1 Ch 279 the purpose of the requirement, that any holder of the company's shares who became bankrupt should sell them at a specified price, was that the company should remain under the control of its managers and workers in Burma. There was, Farwell LJ said, at p 291, "nothing repugnant to any bankruptcy law in such a provision as that". Turning to the price, he said that there was also nothing repugnant in that, since it was a fair value, although there would have been, had the obligation been to sell the shares at a lesser price (p 291). In the *Money Markets International Stockbrokers Ltd* case [2002] 1 WLR 1150, Neuberger J identified deprivation provisions operating on bankruptcy in relation to valueless assets or to assets ownership of which depends upon the personal characteristics of their owner as likely also to fall outside the second principle. He noted that it was presumably on this basis that the loss of membership of the relevant stock exchange on bankruptcy had not been challenged in *Bombay Official Assignee v Schroff* 48 TLR 443 or in *Money Markets*. In the former case, Lord Blanesburgh said, at p 445, that "if such an organisation is to attain its ends membership must plainly be a personal thing, incapable of uncontrolled transfer: expulsion from membership must normally follow default or misconduct: upon

expulsion all interest of the defaulting member in the property of the organisation must cease". In *Money Markets*, Neuberger J extended this approach to an ancillary asset in the form of a share in the London Stock Exchange which was liable to rescission for no consideration on bankruptcy. It is unnecessary to engage with the detail of the case or its outcome, but the conclusion that assets which are ancillary to a personal right may be forfeited on bankruptcy is understandable, although I believe that the terms of forfeiture might require particular consideration if there was nothing personal about the assets themselves and they were detachable and separately alienable.

161.    The existence of a contractual scheme, which is said to create the relevant property interest, but at the same time to include provisions providing for its illegitimate deprivation on bankruptcy, raises several questions: First, how far did the scheme confer any property interest on the subsequently bankrupt party? Second, how far did it deprive him of any such property on bankruptcy? Third, in so far as it did deprive him of any such property on bankruptcy, did this amount to an illegitimate evasion of the anti-deprivation principle? The first question is exemplified by the difference between the majority and minority in *British Eagle* as to whether the International Air Transport Association ("IATA") arrangements then in force had given rise to any indebtedness between IATA members, and by the conclusion of the majority of the High Court of Australia in *International Air Transport Association v Ansett Australia Holdings Ltd* [2008] HCA 3, (2008) 234 CLR 151 that the modified IATA arrangements did not do so.

162.    The parallel issue in the present case is whether the swap between Saphir and LBSF gave LBSF any property in the form of either or both of a contractual right to priority in respect of Unwind Costs and a proprietary interest in the collateral to secure such Unwind Costs. In answering that question, it is necessary to examine the terms and effect of the contractual arrangements, summarised above. There can be a fine distinction between arrangements conferring a limited or determinable benefit and arrangements conferring a larger benefit but making it forfeitable in circumstances including bankruptcy. Such a distinction has also been examined in the context of the common law rule of repugnancy which prevents a condition subsequent from being attached to an outright gift. The court was invited to sweep away any such distinction, at least in the present context. Mr Snowden made the invitation on the basis that limited or determinable interests should be assimilated with conditions subsequent, rendering the termination potentially invalid in all cases; Mr Salter and Mr Howard made it on the opposite basis that conditions subsequent should be assimilated with limited or determinable interests, and party autonomy given effect in all such situations.

163.    In the context of the rule against repugnancy, the distinction between limited or determinable interests and conditions subsequent has been regularly criticised - although, one notes, with few positive suggestions as to what might

replace it. Porter MR *In re King's Trust* (1892) 29 LR Ir 401, 410 thought it "little short of disgraceful to our jurisprudence" that in reference to a rule professedly founded on public policy there should be a distinction between a gift of an annuity for life coupled with a proviso for cessation if the donee married (treated as giving a life interest) and a gift until he marries (treated as giving an interest only until marriage). Porter MR's criticism appealed, in similar contexts, to Pennycuick V-C *In re Sharp's Settlement Trusts* [1973] Ch 331, 340G and to Rattee J *In re Scientific Investment Pension Plan Trusts* [1999] Ch 53, 59F-G, as well as to Professor Sir Roy Goode (*Principles of Corporate Insolvency Law*, 3rd ed, pp 186-187 and (2011) 127 LQR 1, 8. However, all of these authorities have taken the distinction as well-established and one which has to be accepted, and either of the extremes embraced by Mr Snowden on the one hand and Mr Salter and Mr Howard on the other could have far-reaching implications. But I think that there is some scope for looking at the substance, rather than the form, when considering whether an agreement confers a limited or determinable interest or amounts to a condition subsequent depriving the bankrupt of property on bankruptcy. This would be consistent with the first instance decision in *Mayhew v King* [2010] EWHC 1121 (Ch), which no-one challenged before the Supreme Court, and which was upheld by the Court of Appeal after the hearing before the Supreme Court, sub nom *Folgate London Market Ltd (formerly Towergate Stafford Knight Co Ltd) v Chaucer Insurance plc* [2011] EWCA Civ 328. The broker's undertaking by the settlement agreement in that case to indemnify the lorry owners (Millbank Trucks Ltd) against their liability to Mr Mayhew - as to 85% up to £1 m, and as to 100% above £1 m – clearly reflected effective acceptance of a pre-existing exposure to the lorry owners in negligence, and the clause limiting or terminating that agreement upon the lorry owners' bankruptcy can have had no commercial or other object, except to prevent the lorry owners continuing to have the benefit of the indemnity to meet the claims of Mr Mayhew and/or their other creditors in whatever way would ordinarily follow in the event of such a bankruptcy. (In fact the lorry owners' administrators had assigned the benefit of the indemnity to the lorry owners' insurance company which had had under section 151 of the Road Traffic Act 1988 to meet Mr Mayhew's claim against the lorry owners.)

164.    Professor Worthington in "Insolvency Deprivation, Public Policy and Priority Flip Clauses" (2010) 7 International Corporate Rescue 28, 36 also criticises a distinction which hangs on the form of words or "wafer-thin differences in language", but herself advances a more substantive distinction between necessarily time-limited interests (like leases) and others. I do not accept that distinction, which would have its own incongruities: a 999-year lease is to all practical intents a permanent interest, and it is hard to see, in its potential termination in say 900 years, any relevance to the question whether its termination on the tenant's bankruptcy should be permissible; a distinction between such a lease and a permanent licence is equally unconvincing.

165.   In *Ansett* (2008) 234 CLR 151, paras 151 to 179 Kirby J (dissenting) was, if necessary, prepared to look behind or through the parties' actual contractual arrangements, in order to identify a deprivation of property in a contractual scheme which as a matter of law eliminated any indebtedness between IATA members at any time. That must, I think, also go too far and appears to me inconsistent with the assumption of both the majority and the minority in *British Eagle*. Courts cannot rewrite or review contractual arrangements to give them an effect contrary to the substance of what the parties have agreed, even though this means that the bankrupt has less property than would otherwise be the case before and when he becomes bankrupt.

*Analysis*

166.   In the present case, the first question is whether LBSF had, under the contractual arrangements, any relevant property, whether limited and determinable or forfeitable. The parties' submissions have focused on the difference in priorities in relation to the collateral between the situations of Swap Counterparty Priority and Noteholder Priority. As a matter of contract, as Patten LJ noted, LBSF retained the right to recover any Unwind Costs payable to it in either situation. But the priority accorded to this right, as against both Saphir and the collateral, depended upon which form of priority applied: see in particular clauses 5.5 and 8.3 of the Supplemental Trust Deed, as well as the Conditions of the OCS referred to in clause 8.3. Since there was by agreement no recourse against Saphir except to the extent covered by the collateral, the real right was against the collateral, to the extent that the collateral was sufficient to enable payment. Since the collateral's value would remain stable, priority was essential to the effectiveness of the right. References in the Court of Appeal judgments (see paras 144 and 146 above) to there being "no shortfall" in the collateral might suggest that the present dispute arises from some problem with the collateral and its performance. Far from it. The expectation of notified credit events in excess of the subordination amount, giving rise to Unwind Costs payable to LBSF, coupled with provision that no deduction should be made for such Unwind Costs from the amounts payable to Saphir and the Noteholders, simply meant that the total claims against the collateral exceeded any value that it was ever contemplated that the collateral could or would have.

167.   The reality is therefore that, if Unwind Costs were payable to LBSF, but the transaction was closed by payment to Saphir and so the Noteholders out of the collateral of the current value of the notes, without reduction for such Unwind Costs, LBSF would have no effective right to recover such Unwind Costs. The difference between Swap Counterparty Priority and Noteholder Priority is a difference between different priority contractual rights against Saphir secured by different priority rights against the collateral held by BNY. In reality, however, it amounts to a difference between having a right and having no effective right. The collateral on which most of the argument in this case has focused is a more visible

form of property than a bare claim, but a bare contractual claim is also a form of property. If Saphir, as LBSF's contractual counterparty, had been liable without limit and good financially, the difference in priority over the collateral would have had no significance. But here there was an effective limit on Saphir's liability as counterparty, consisting of the value of the collateral. Hence, the focus on the significance of priority in respect of the collateral.

168.    On one reading of paras 135, 136 and 174 of his judgment, Patten LJ took the view that the only asset that LBSF ever had was security over the collateral, and that Swap Counterparty Priority did not involve a different form of property interest to Noteholder Priority. For the reasons I have given, I do not accept that analysis. The two types of priority over the collateral involve different property interests, but so too do the two types of contractual priority created by the parties' arrangements.    However, these paragraphs in Patten LJ's judgment also point towards a different truth. The collateral was acquired by Saphir and given to BNY as trustee expressly to await events. All the relevant provisions relating to priority are expressly relevant only "in connection with the realisation or enforcement" of the collateral: clause 6.2 of the Principal Trust Deed, clauses 5.5 and 8.3 of the STD and condition 44 of the OCS. What events occurred determined who acquired priority. As it happened, the relevant event was one of default, with LBSF the Defaulting Party, and priority fell accordingly to be given to the Noteholders. Prior to the occurrence of an event determining which form of priority was to apply, I do not consider that LBSF could be said to enjoy either. This is a conclusion which is equally applicable to the question whether LBSF could be regarded as having been deprived of property in the form of a contractual right to priority. It follows that the occurrence of an event determining that Noteholder Priority applied did not deprive LBSF of any previous property in the form of Swap Counterparty Priority. The event prevented LBSF from acquiring Swap Counterparty Priority, rather than deprived it of such Priority. I add that, even if it were right to regard LBSF as having enjoyed property in the form of Swap Counterparty Priority "unless" an event of default occurred with LBSF being the defaulting party, the case would fall within the category of interests limited to last until a certain event, rather than that of interests forfeitable upon a certain event. These conclusions also correspond, as I see it, with the Chancellor's pithy reasoning: see para 143 above.

169.    If a contrary answer were given to the first question identified in paragraph 161 above, the second question, how far LBSF was deprived of such property on bankruptcy, would arise. That involves in this case the issue about the trigger and timing of any deprivation identified in paragraph 141 above. I will leave that issue for the moment, and assume that there was a deprivation by reason of a switch in priority on LBSF's bankruptcy. The third question is then whether this amounted to an illegitimate evasion of the anti-deprivation principle.

170.    In answering this third question in the Court of Appeal [2010] Ch 347, Lord Neuberger attached considerable significance to the fact that the Noteholders put up the money with which Saphir purchased the collateral held by BNY as trustee. Lord Neuberger referred to *Whitmore v Mason* 2 J & H 204, where partners had agreed that, on the bankruptcy of any one of them, his interest in partnership mines and premises, except for one specified lease, grant and concession, should be valued and paid to him. The exception was held invalid, but Page-Wood V-C, after referring to *Lester v Garland*, said that "If his co-partners had advanced a definite sum of money on account of his share, then the property might have been considered to the extent of the money so advanced by them, as identically their money" (pp 214-215). This generous dictum, derived from old authority decided in an era in which wives could not own separate property, is a tenuous basis for enabling a particular creditor to stipulate for priority in his debtor's bankruptcy, without having previously taken any security.

171.    In any event, the dictum is in my view difficult to apply to the facts of the present case, involving not an out-and-out contribution to marriage or another venture, but security in respect of complex contractual arrangements. First, it was the essence of the transaction that the collateral should stand as neutral security for (indeed as the limit of) potential indebtedness of Saphir to either LBSF or the Noteholders. The case cannot be approached on the basis that the Noteholders had an inherent or pre-existing right either to contractual priority or to the collateral. Their rights depended upon the terms agreed in the documentation. Secondly, although the reality in this case is that LBSF would never be paid unless it retained priority over the collateral, one can imagine a case where there was no collateral, but a simple contractual provision depriving LBSF of the right to payment (or subordinating its right to payment to those of others, in such a way that it would not in practice be paid) in the case of a default where LBSF was the defaulting party. The present problem could not then be solved by enquiring into the source of the collateral, since there would be none. Yet it is difficult to think that the answer to the present problem turns on whether or not there was collateral. For these reasons, I would not subscribe to the line of reasoning suggested in paragraphs 92-98 of Lord Collins' judgment. If one is assuming, as I presently am, that LBSF had a first priority property right to recover Unwind Costs payable to it and that it was deprived of this and the collateral securing it upon its bankruptcy, some other justification for this deprivation must be found than the fact that the Noteholders funded the security.

172.    Accordingly, bearing in mind the reality that the difference in priority over the collateral amounts to a difference between having and not having any right to recover Unwind Costs, it is I think instructive to start by considering to what extent English bankruptcy law permits contracting parties to agree that one shall have the right to terminate or vary the priority of rights, as well as security in respect of rights, under a contract upon the bankruptcy of the other. In *Principles*