*of Corporate Insolvency Law*, para 7.11, Professor Sir Roy Goode notes that it is generally assumed that provisions for termination of leases or the hiring of chattels "or, indeed, of any kind of agreement, upon the bankruptcy or liquidation of a party" are valid. However, he also suggests that the general American bankruptcy rule, that ipso facto termination clauses are ineffective, is one which English law "could sensibly follow". He adds that it is "a matter for some astonishment that the validity of contractual provisions for termination of rights on winding-up has yet to be authoritatively determined".

173. It is relevant to note that the American bankruptcy rule invalidating ipso facto termination clauses is a product of legislation: section 365(e) of the Bankruptcy Code 1978, which was considered by The Hon James M Peck, United States Bankruptcy Judge, in his ruling in the parallel United States litigation concerning the Dante Programme. Section 365(e)) provides that:

> "an executory contract ..... may not be terminated or modified ..., and any right or obligation under such contract .... may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract .... that is conditioned on .... the commencement of a case under this title ...."

This is complemented by section 541(c) which provides that any interest of the debtor in property

> "becomes property of the estate .... notwithstanding any provision in an agreement ..... that is conditioned ... on the commencement of a case under this title ... and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property".

174. The anti-deprivation principle recognised in English case law finds a parallel in section 541. But the English case law has to date focused on deprivation of property, and has not recognised any equivalent principle to that enacted in section 365(e). Further, section 365(e) is itself qualified by the "safe harbour" provisions of section 560, which specifically protect a non-defaulting swap participant's contractual rights to liquidate, terminate or accelerate a swap agreement because of a condition of the kind specified in section 365(e)(1), that is the insolvency or financial condition of the debtor and the commencement of a bankruptcy case. District Judge Peck considered section 560 inapplicable because, he concluded, there was nothing in the ISDA Master Agreement or the Swap Agreement referring to the STD or Noteholder Priority or condition 44 of the OCS; and the provisions of the latter documentation, while dictating the means by

which the proceeds of each swap agreement would be distributed, were not part of the swap agreement. It is not for this court to go further into that conclusion, which may yet be challenged in further United States litigation. What it does suggest is that any general rule invalidating ipso facto termination clauses ought to be a matter for legislative attention, rather than novel common law development.

175. How far contracting parties may validly agree to one party terminating further performance on the bankruptcy of another was recently considered at first instance in *Lomas v JFB Firth Rixson Inc* [2010] EWHC 3372 (Ch). The case was decided after the present Court of Appeal decision. It concerned five fixed rate/floating rate swaps to which another Lehman company ("LBIE") was party. An event of default as defined in the contract documentation occurred on 15 September 2008 consisting of LBIE's entry into administration. Under section 2(a)(iii) of the ISDA Master Agreement, each party's obligation to make payment or delivery under the swaps was "subject to (1) the condition precedent that no Event of Default .... with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant transaction has occurred or been effectively designated ....". LBIE would have benefited from the continuation of the swaps to their natural expiry dates. LBIE's counterparties relied upon clause 2(a)(iii) to withhold further performance, netting off against amounts owed by LBIE the amounts they owed to LBIE but for LBIE's default. LBIE argued that the power to withhold further performance infringed the second principle. Briggs J rejected the submission. He distinguished between an asset in the form of "a chose in action, representing the quid pro quo for something already done, sold or delivered before the onset of insolvency" and a right consisting of "the quid pro quo (in whole or in part) for services yet to be rendered or something still to be supplied by the insolvent company in an ongoing contract". He held that there is "nothing contrary to insolvency law in permitting a party either to terminate or adjust what would otherwise be an ongoing relationship with the insolvent company, at the point when it goes into an insolvency process" (para 108), and that:

> "Reduced to its bare essentials, the condition precedent that there should be (inter alia) no bankruptcy event of default was a provision designed to ensure that LBIE would only receive its quid pro quo for providing an interest rate hedge for as long as it was in a financial condition to be able to do so". (para 112)

In *Lehman Brothers Special Financing Inc v Carlton Communications Ltd* [2011] EWHC 718 (Ch), Briggs J followed his previous decision and applied similar reasoning to an interest rate swap on the basis that the condition precedent in section 2(a)(iii) of the ISDA Master Agreement was valid - "to relieve the non-defaulting party from payment obligations for as long as the defaulting party is, by

reason of the bankruptcy, incapacitated from providing the promised hedge", whenever during the life of the transaction such incapacity arose (para 38).

176. I would accept that the forfeiture of contractual rights on the bankruptcy of the party enjoying them is in some circumstances capable of constituting a deprivation of property within the principle precluding evasion of the bankruptcy law. This is so not only with accrued rights, but may also be the case with other rights, as, for example, where the bankrupt has performed his part before going bankrupt or the right can fairly be treated as independent of any as yet unperformed obligation. I question, even at common law, whether an insured who enjoys third party liability cover for a period on a claims made basis and goes bankrupt part way through that period could properly be deprived of the benefit of such cover in respect of claims arising from his activities prior to his bankruptcy. To that extent, section 1(3) of the Third Parties (Rights against Insurers) Act 1930 may well have done no more than reflect what would have been held to be the common law.

177. However, Mr Snowden advanced propositions which would mean that any provision for termination on bankruptcy, which would deprive the trustee or liquidator of the opportunity of continuing the contract and so the bankrupt estate of future potential advantage, would infringe the principle. There is in my opinion no basis for any such rule. Where a contract provides for the performance in the future of reciprocal obligations, the performance of each of which is the quid pro quo of the other, I see nothing objectionable or evasive about a provision entitling one party to terminate if the other becomes bankrupt. That is particularly so, having regard to the purpose and character of the present transaction, viewed rather more broadly than the Court of Appeal did in its detailed reasoning.

178. As Sir Andrew Morritt C stated, in the passage quoted in paragraph 135 of this judgment, the transaction provided LBSF with a benefit, which can loosely be described as credit insurance, in return for which LBSF was to pay interest to Saphir for the benefit of the Noteholders at a rate higher than the Rabo Bank rate. Under an insurance in return for the payment periodically of premium, it is natural that the one should be made conditional upon the other. Just so, under the present transaction, it is natural that payment of the interest should be made a condition of LBSF benefitting. Mr Snowden submits that this raises no problem, since LBSF could only obtain continuing benefit under the present transaction by confirming it and continuing to credit Saphir with the full amount of the interest due until expiry. No doubt that is so. It is what LBSF would have wished to be able to do, since the transaction was probably already profitable from its viewpoint, it could not become less so and it was certainly predicted that it would become more so. Hence the present litigation. But the submission misses the point. Had the transaction neither given rise, nor appeared likely to give rise, to credit events exceeding the subordination amount, LBSF could and would have disclaimed it.

Saphir would then have been left to prove in LBSF's liquidation for the benefit of the Noteholders for such percentage of the already outstanding and future interest payments as they could recover. In LBSF's liquidation, therefore, the position would be one way. Saphir (and through it the Noteholders) could only lose. That is a risk that no insurer would ordinarily run. Nor is a conventional right to determine on LBSF's default of assistance to Saphir or Noteholders in this situation. There will be no default unless LBSF would lose money by continuing the contract.

179. I see no reason therefore why the law should preclude a commercial party in the position of Saphir (acting for the benefit of Noteholders) from insisting that it would only provide the desired cover so long as LBSF was able, whatever the predicted outcome of the transaction, to perform its part in full. The purpose and effect of such a provision is not to evade the bankruptcy law. It is to protect the natural interest of any contracting party, and particularly someone who is providing in effect credit insurance, that it should not find itself having to perform to its disadvantage, without being able to enforce performance if this would be to its advantage. It is a prudent limitation on the duration and operation of the contract. The result reached by Briggs J in *Lomas v JFB Firth Rixson Inc* was correct in relation to the mutual contractual obligations with which he was concerned.

180. For reasons I have already explained, no different result can follow in the present case, where, although a prior right over the collateral may be more obviously identifiable as property within the principle precluding evasion of the bankruptcy law, it is no more than collateral for (and indeed the measure of liability under) a chose in action. It would be curious if termination of the right to future performance of the chose in action was itself permissible, but became impermissible if collateral had been provided for its performance. This is particularly so in the present case where the collateral and the cause of action are effectively indistinguishable.

*Timing*

181. The further question (the second identified in paragraph 161 above) is whether, in this case, the loss did occur upon LBSF's insolvency, bearing in mind that there was an event of default affecting its parent, LBHI, which occurred some two weeks before LBSF was subject to Chapter 11 proceedings. In view of the conclusions I have already reached, this question does not require decision. Saphir and BNY submit that the replacement of Swap Counterparty Priority by Noteholder Priority was and is, under clause 5.5, the automatic result of the occurrence of any Event of Default. Whether anyone acts on the Event of Default, and whether the collateral is realised or enforced in relation to the Event of Default is immaterial. Even though the event of default passes unnoticed and even if it is

cured, Noteholder Priority persists. Here, there was an event of default, consisting of LBHI's Chapter II bankruptcy on 15 September 2008, that no-one had ever acted upon. Nonetheless, they submit, that is sufficient to ensure Noteholder Priority in respect of the event of default which was acted upon, LBSF's Chapter 11 bankruptcy, which occurred on 3 October 2008.

182. I prefer to reserve my position on the correctness of these submissions. The contrary argument is that they do not marry with the general scheme effected by the documentation as a whole. As already emphasised, clauses 5.5 and 8.3 and condition 44 of the OCS are all expressly and solely concerned with situations where Saphir or BNY is applying moneys received in connection with the realisation or enforcement of the collateral. It is in that context only that it is agreed that, if "an Event of Default .... occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party ...." or a tax event occurs, then Noteholder rather than Swap Counterparty Priority will apply. Mr Salter accepts that the only situation in which the difference between Swap Counterparty and Noteholder Priority is relevant or comes into operation is where there has been early termination. The sole purpose of the "flip" is to deal with Unwind Costs in the manner indicated in clause 8.3 and condition 44, in other words to avoid Saphir and through it the Noteholders having actually to bear the burden of any future credit events in excess of the subordination amount which might on Early Termination be taken into account to their disadvantage in calculating the Unwind Costs. A past event of default which has not been acted upon will have no connection with any early termination or with the realisation or enforcement of the collateral in any circumstances.

183. The natural inference of clause 5.5 and especially clause 8.3, confirmed by the present tense "occurs", is that they contemplate an Event of Default connected with the realisation and enforcement of the collateral. The reference in clause 5.5 to a Defaulting Party is a reference to clause 6(a) of the ISDA Master Agreement, which deals with Early Termination following an Event of Default, and requires not more than 20 days notice "specifying the relevant Event of Default" and designating "a day" not earlier than the day such notice is effective as an Early Termination Event in respect of all outstanding Transactions. The requirement to specify the "relevant" Event of Default suggests that Early Termination is to work itself out by reference to the Event of Default so specified. Condition 44, one of the conditions to which clause 8.3 refers, is concerned with Early Redemption Amounts payable under the notes in various circumstances, but its second paragraph makes specific provision for the Early Redemption Amount payable when an Event of Default occurs under the swap and LBSF is the Defaulting Party, as well as for Unwind Costs. These are defined as meaning the value of the termination payment due from or to LBSF under the swap. Again, the inference is that Early Termination under the swap works itself out by reference to a specific Event of Default. The alternative is that an Event of Default which has perhaps not

even been detected and certainly has not been acted upon can dictate priority if there should at any subsequent date be Early Termination not involving any further default on the part of the Swap Counterparty. On the actual termination, Saphir and the Noteholders could then avoid having to credit any Unwind Costs otherwise due to LSBF in respect of anticipated future credit events. The justification for such an analysis would seem questionable, when the swap will, by definition, have been satisfactorily performed in the meanwhile and LBSF will not have been responsible for its actual termination. Accordingly, since it is unnecessary for the decision in this case, I prefer not to express any view on the second issue.

*Conclusion*

184.   For the reasons I have given in relation to the first issue, I would dismiss the appeal.


**LORD PHILLIPS, LORD HOPE, LADY HALE AND LORD CLARKE**


185.   For the reasons given by Lord Collins and Lord Walker, with which we are in agreement, we too would dismiss this appeal.

**Appendix**

**The Principal Trust Deed**

1. Clause 5.1:

    "The Issuer with full title guarantee and as continuing security grants in favour of the Trustee such charge and/or security interest as set out in the relevant Supplemental Trust Deed in respect of the relevant Series."

2. Clause 5.2:

    "For each Series, the charges and/or security interest created pursuant to sub-Clause 5.1 are granted to the Trustee as continuing security (i) for the payment of all sums due under the Trust Deed and the Notes and the Coupons of such Series, and (ii) for the performance of the Issuer's obligations (if any) under certain agreements as set out in the relevant Supplemental Trust Deed in respect of such Series. The Trustee shall release from such charges any part of the Mortgaged Property when it becomes payable or deliverable to the extent that payment or delivery of it may be obtained and duly paid or made (as the case may be) to a Swap Counterparty under a Swap Agreement and/or to the holders of Notes, Coupons and Receipts ..."

3. Clause 5.5:

    "... the security ... shall become enforceable if (i) any amount due in respect of the Notes is not paid or delivered when due or (ii) a Swap Agreement terminates with sums due to the Swap Counterparty [ie LBSF]."

4. Clause 5.6 provides that:

    "at any time after any security ... shall have become enforceable ... the Trustee shall ... (... subject to it having been indemnified to its satisfaction ...) enforce the security over the Mortgaged Property"

if so directed by the Noteholders in certain specified circumstances, or otherwise at its discretion.

5.  Clause 6.1 provides that moneys, received otherwise than in connection with the realisation or enforcement of the security, are to be held by the Trustee, after payment of the Trustee's costs, on trust to pay, first, the amounts due to LBSF, the Noteholders and others *pari passu*, and, secondly, the amounts due to the issuer.

6.  Clause 6.2 directs the Trustee:

> "... [to] apply all moneys received by it under this Principal Trust Deed and the relevant Supplemental Trust Deed in connection with the realisation or enforcement of the security ... as follows"

and went on to provide that "Swap Counterparty Priority" means that the claims of LBSF are payable in priority to the claims of the Noteholders, whereas "Noteholder Priority" means the converse, in each case after providing for payment of certain specified costs and charges. The priority which is to apply in any particular case is that specified in the Supplemental Trust Deed.

7.  Clause 7.2:

> "In relation to any Series in respect of which there is a Swap Counterparty, such Swap Counterparty shall, by execution of the relevant Supplemental Trust Deed, covenant and agree:

7.2.1:

> ...that its recourse in respect of its claims under the Swap Agreement is limited to the proceeds of the Mortgaged Property in relation to such Series as it is entitled to, as provided in the Trust Deed and no debt shall be owed by the Issuer in respect of any shortfall ..."

8.  Schedule 2 Part C contains terms and conditions of the Notes to be applied to all Notes of any series, subject to the terms of the relevant Supplemental Trust Deed and the Terms and Conditions in the Note series prospectus.

9.   Condition 10 of Part C of Schedule 2 provides that in certain events (including default for a specified period by the issuer in payment under the Notes) the Trustee may, and if requested by holders of at least one-fifth in principal amount of the Notes or if directed by an Extraordinary Resolution of the Noteholders must, give notice to the issuer that the Notes are, and shall immediately become, due and payable at their Early Redemption Amount (a "Condition 10 notice").

10.   Condition 6(d)(ii) of Part C of Schedule 2 also provides for the early redemption of the Notes if a Swap Agreement is terminated. In that event, the issuer is required to give the Trustee, the Noteholders and LBSF notice, at the expiration of which the Notes are to be redeemed at their Early Redemption Amount. Condition 6(d)(ii) was amended by Condition 38 in the Terms and Conditions – (below, para 17)

**The Supplemental Trust Deed**

11.   Clause 5.2 contains a charge by the issuer "as continuing security in favour of the Trustee" over the Collateral and other property representing it from time to time.

12.   Clause 5.3 provides that such security is "granted to the Trustee as trustee for itself and/or the holders of Notes, and [LBSF], the Custodian and the Paying Agents as continuing security (i) for the payment of all sums due under the Trust Deed and the Notes, (ii) for the performance of the Issuer's obligations (if any) under the Swap Agreement ..."

13.   Clause 5.5:

> "The Trustee shall apply all moneys received by it under this Deed in connection with the realisation or enforcement of the Mortgaged Property as follows: Swap Counterparty Priority unless ... an Event of Default (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the Swap Agreement) ... in which case Noteholder Priority shall apply...."

14.   Clause 8.3:

"...[LBSF] hereby agrees that, if an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and [LBSF] is the Defaulting Party (as defined in the ISDA Master Agreement) ... and Unwind Costs are payable by the Issuer to [LBSF], the Issuer shall apply the net proceeds from the sale or realisation of the Collateral (1) first in redeeming the Notes in an amount as set out in the Conditions and (2) thereafter, in payment of such Unwind Costs to [LBSF]."

**Terms and Conditions**

15.  The prospectus to which the Terms and Conditions are attached points out that the Notes are "credit-linked" to the reference entities (ie the securities whose credit was being, in effect, insured). The prospectus also points out that the Noteholders have exposure to the value of the Collateral so that "Impairment of the Collateral may result in a negative rating action on the Notes".

16.  Condition 6 of the Terms and Conditions as set out in Schedule 2 to the Supplemental Trust Deed contains the details of how and by how much the principal amount due on the Notes is reducible in the event of credit events affecting a reference entity.

17.  Condition 38 in the Terms and Conditions specifies or refers to certain events which can give rise to early redemption of the Notes including termination in whole or in part of the relevant Swap Agreement (see Condition 6(d)(ii) in Part C of Schedule 2 to the Principal Trust Deed) and default in payment of any interest due for the period specified in the Condition (which period varies from each series of Notes). If any such event occurs, Condition 38 requires the relevant issuer to serve a notice notifying the Trustee, the relevant rating agency and the Noteholders, of the occurrence of the event and giving notice of the date fixed for redemption of the Notes. In the event of such a notice being served the Notes become redeemable at their Early Redemption Amount.

18.  Condition 40 (ii), headed "Security Arrangements," provides for the Trustee to apply all moneys received by it

"... in the following order of priorities:

Swap Counterparty Priority unless (i) an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the ISDA Master Agreement) or (ii) a Tax Event (as defined in the ISDA

Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the sole Affected Party (as defined in the ISDA Master Agreement), in which case Noteholder Priority shall apply."

19. Condition 44 deals with the determination of the Early Redemption Amounts referred to in Conditions 6(d) and 10 of Part C of Schedule 2 to the Principal Trust Deed. It also includes a definition of "Unwind Costs", being the amount due to or, as the case may be, from LBSF, by way of termination payment under the relevant Swap Agreement at its early termination. That amount is to be assessed in accordance with the provisions of the relevant Swap Agreement including by reference to quotations taken in the market, when the relevant Swap Agreement terminates, for what a third party would pay to enter into a swap arrangement on similar terms, or, alternatively, what the issuer would have to pay a third party to enter into such a swap arrangement.

20. The first paragraph of Condition 44 ("Condition 44.1") provides that "Subject to the immediately succeeding paragraph below ..." the Early Redemption Amount payable on each Note is to be the amount equal to:

> "(i) such Note's pro rata share of the proceeds ... from the sale or realisation of the Collateral ... plus (if payable to the Issuer) or minus (if payable to [LBSF]) (ii) the amount of any applicable Unwind Costs ..."

21. Under Condition 44.1, if termination occurs early, an Early Redemption Amount is to be calculated, and if Unwind Costs are payable under the swap to LBSF on termination, they are to be deducted when calculating any amount which would be due to the Noteholders, and if such Unwind Costs are payable to the Issuer, they are to be added to the amount payable to the Noteholders. Condition 44.1 continues:

> "provided that if the amount determined pursuant to sub-paragraphs (i) and (ii) above exceeds (the amount of any such excess being the 'Excess Amount') such Note's Outstanding Principal Amount as of the Early Redemption Date together with interest accrued from, and including, the immediately preceding Interest Payment Date ... to, but excluding, such Early Redemption Date (such interest being the 'Accrued Early Redemption Interest Amount') and, such Excess Amount shall be payable by way of an additional payment of interest on each Note."

22. The second paragraph of Condition 44 ("Condition 44.2") provides:

"Notwithstanding the above, if an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and [LBSF] is the Defaulting Party (as defined in the ISDA Master Agreement) ...",

the Early Redemption Amount payable on each Note was to be equal to:

"(i) such Note's pro rata share of the proceeds ... from the sale or realisation of the Collateral ... plus (ii) (but only if payable to the Issuer) the amount of any applicable Unwind Costs divided by the total number of Notes outstanding; provided that if the amount determined pursuant to sub-paragraphs (i) and (ii) above results in an Excess Amount (as defined above), such Excess Amount shall be payable by way of an additional payment of interest on each Note. In the event that Unwind Costs are payable by the Issuer to the Swap Counterparty, the Issuer shall apply the net proceeds from the sale or realisation of the Collateral as aforesaid (1) first in redeeming each Note in an amount equal to its Outstanding Principal Amount as of the Early Redemption Date plus the Accrued Early Redemption Interest Amount and (2) thereafter, in payment of such Unwind Costs to the Swap Counterparty."

**The ISDA Master Agreement**

23. Section 5 of the ISDA Master Agreement defines an "Event of Default" as being: "[t]he occurrence [of certain specified events] at any time with respect to [LBSF], or if applicable, any Credit Support Provider" of [LBSF]. According to paragraph 9(iv) of the Swap Confirmation, the Credit Support Provider is LBHI, the ultimate parent of LBSF.

24. The defined Events of Default include (i) failure to pay any sums due under the ISDA Master Agreement (if such failure is not remedied after three Local Business Days' notice of such failure), and (ii) the institution by LBSF or by LBHI of any proceedings "seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights ...".

25. Section 6 of the ISDA Master Agreement deals with early termination and provides that:

> "(a) **Right to Terminate Following Event of Default.** If at any time an Event of Default with respect to a party (the 'Defaulting Party') has occurred and is then continuing, the other party ... may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions ..."

26. In all cases, the parties selected "Second Method" and "Market Quotation" as the valuation mechanisms for the Swaps. In addition, in all cases, the parties did not select Automatic Early Termination (AET) of the Swap Agreements under Part 1(h) of the Schedule to the ISDA Master Agreement, which would have resulted in the Swaps being deemed automatically to have terminated on the occurrence of specified Events of Default, including bankruptcy. However, in the Swap Confirmations for all cases the parties did specify certain events (such as the Notes being declared due and payable) which would be "Additional Termination Events" upon the occurrence of which an Early Termination Date for the Swap would immediately occur.

27. Part 5(g) of the Schedule to the ISDA Master Agreement provides:

> "In relation to each Transaction, each party confirms that it is bound by the terms of the Trust Deed and that the terms of such Trust Deed prevail to the extent they conflict with terms relating to such Transaction. [LBSF] agrees that its recourse against [the Issuer] in respect of the relevant Transaction is limited to the assets on which the liabilities of [the Issuer] under the relevant Transaction are secured pursuant to the Trust Deed and that its right to enforce the Security created by [the Issuer] over those assets is limited as provided in the Trust Deed. If the net proceeds of realisation of the Security are insufficient to meet all claims secured thereon, the obligations of [the Issuer] in respect thereof will be limited to such net proceeds and accordingly no debt shall be owed by [the Issuer] in respect of any shortfall remaining after realisation of the Security and application of the proceeds in accordance with the Trust Deed ..."

**Swap confirmation**

28. Paragraph 9 of the Swap Confirmation includes an acknowledgment by the issuer and LBSF that the transaction was not intended to constitute insurance business so that payments by each party under the transaction were independent

and not dependent on proof of economic loss of the other.

29.  The "credit protection" provided to LBSF under the Swap Agreement related to the occurrence of "Credit Events" in relation to the Reference Entities set out in the Swap Confirmation.

30.  The payment obligations of the Buyer (LBSF) and Seller (issuer) are specified in paragraphs 3 and 4 of the Swap Confirmation.