**EXHIBIT C**

**Copy of Debt Service Deposit Agreement Dated as of March 29, 2004 by and among AFCO Cargo PIT LLC, National City Bank of Pennsylvania and Lehman Brothers Special Financing, Inc.**

LBSF DRAFT – 4/2/04

## DEBT SERVICE DEPOSIT AGREEMENT

This Debt Service Deposit Agreement (this "Agreement") dated as of March 29, 2004 by and among AFCO CARGO PIT LLC (the "Corporation"), a Virginia limited liability company, NATIONAL CITY BANK OF PENNSYLVANIA, a body corporate and politic of the Commonwealth of Pennsylvania (the "Trustee"), and LEHMAN BROTHERS SPECIAL FINANCING INC., a Delaware corporation ("Lehman").

SECTION I.          DEFINITIONS

For purposes of this Agreement, unless the context clearly indicates otherwise, the words and terms defined in this Section I have the respective meanings given to them herein:

"Bond Payment Date" means with respect to each Delivery Date, each date identified as a "Bond Payment Date" on Exhibit A unless such date is not a Business Day, in which case "Bond Payment Date" means the immediately succeeding Business Day provided that in determining whether any such date is a Business Day no effect shall be given to clause (c) or (d) of the definition of Business Day.

"Bonds" means $6,670,000 Allegheny County Industrial Development Authority Cargo Facilities Lease Revenue Bonds, Series 2003 (AFCO Cargo PIT LLC 2003 Project).

"Burdened Party" means, (i) in the case of (A) a Corporation Event of Default or a Trustee Event of Default or (B) a termination of this Agreement by the Corporation pursuant to Section 3.1 following a redemption, defeasance or refunding of the Bonds, Lehman and (ii) in the case of a Lehman Event of Default, the Corporation.

"Business Day" means any day other than (a) a Saturday or Sunday, (b) a day on which the principal corporate trust office of the Trustee is authorized or required by law to close, (c) a day on which banking institutions in the City of New York are authorized or required by law to close, or (d) a day on which any Qualified Securities which may be delivered hereunder are not subject to delivery in the City of New York.

"Closing Date" means April 7, 2004.

"Collateral" means cash or securities issued or guaranteed by the United States Government, including United States Treasury obligations and any other obligations the timely payment of the principal of and interest on which are unconditionally guaranteed by the United States Government.

"Collateral Agent" means a party, which may be the Trustee, appointed by Lehman and consented to by the Corporation (which consent shall not be unreasonably withheld) that shall

hold any Collateral delivered by Lehman in accordance with the terms of this Agreement, as agent of the Trustee.

"Collateral Market Value" means, on any Valuation Date, (i) with respect to securities constituting Qualified Securities, the bid price for such securities as quoted by a recognized electronic pricing service selected by Lehman and acceptable to the Corporation and the Trustee as of the close of business on the immediately preceding Business Day, plus, where appropriate, any accrued interest on such securities and (ii) with respect to cash, the notional amount thereof. If a price as of the close of business is not available, the Collateral Agent shall be authorized to use the most current price information provided by any recognized pricing service. If no price is available, the Collateral Agent shall be authorized to price any security by contacting any dealer designated as a "primary dealer" by the Federal Reserve Bank of New York and relying upon any price quoted by such "primary dealer" as if it were quoted by a recognized pricing service.

"Collateralization Requirement" means, on each Valuation Date, the negative Termination Amount, if any, as if this Agreement were terminated on such Valuation Date pursuant to Section 7.03(b) hereof and the Corporation were the Burdened Party.

"Corporation Event of Default" means the occurrence of an event specified in Section 7.2 hereof.

"Coupon Payment" means, for any Qualified Security, a payment of interest which is due to be paid thereon prior to the scheduled maturity of such security.

"Dealer" means a leading dealer in the relevant markets selected by Lehman in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that Lehman applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from such dealers having an office in the same city.

"Debt Service Fund" means the 2003 Interest Payment aAccount created under the Indenture and the 2003 Principal Payment Account within designated thereunder as the AFCO Debt Service Fund.

"Default Rate" means a per annum rate equal to the lesser of (a) Three Month LIBOR plus 1% per annum, or (b) the maximum rate permitted by law.

"Delivery Date" means each date identified as a "Delivery Date" on Exhibit A unless such date is not a Business Day, in which case "Delivery Date" means the immediately succeeding Business Day.

"Delivery Notice" means a notice substantially in the form of Exhibit E or in such other form as provided by the Qualified Dealer and is reasonably acceptable to the Trustee.

"Deposit Amount" means for each Delivery Date the amount set forth in Exhibit A.

"Differential" means the amount, if any, by which the Purchase Price of any Qualified Security delivered hereunder exceeds the Market Value thereof.

"Eligible Securities" means (i) direct, full faith and credit, non-callable obligations of, the United States of America, and (ii) commercial paper rated in the highest category maintained by S&P and Moody's and issued by corporations organized and operating in the United States of America and having total assets in excess of $500,000,000.

"Financing Documents" means the Indenture and the Loan Agreement.

"Guaranteed Rate" means rate per annum equal to 3.78% assuming that the interest on the applicable security were compounded semi-annually on the basis of a year of 360 days with twelve thirty day months.

"Indenture" means the Trust Indenture dated as of September 24, 1999 between the Issuer and the Trustee, as supplemented by a First Supplemental Trust Indenture dated as of June 12, 2003 between the Issuer and the Trustee.

"Insolvent" means (i) any of the Corporation, the Trustee or Lehman as the case may be, shall (1) commence a voluntary case under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter), (2) file a petition seeking to take advantage of any other law, relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, (3) consent to any petition filed against it in an involuntary case under such bankruptcy or insolvency or other laws, (4) apply for or consent to the appointment of, or the taking of possession by, a trustee, receiver, custodian, liquidator or the like for itself or for all or a substantial part of its property, (5) admit in writing its inability to pay, or generally not be paying, its debts as they come due, (6) make a general assignment for the benefit of creditors, or (7) take any official action for the purpose of affecting any of the foregoing; or (ii) a case or other proceeding shall be commenced against any of the Corporation, the Trustee or Lehman, as the case may be, in any court of competent jurisdiction seeking (1) relief under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter) or under any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, or (2) the appointment of a trustee, receiver, custodian, liquidator or the like for the Trustee or Lehman, as the case may be, or for all or a substantial part of its property, and any such case or proceeding shall continue undismissed and unstayed for a period of 60 consecutive calendar days, or an order granting the relief requested in any such case or proceeding against such party shall be entered and shall remain in effect and unstayed for a period of 60 consecutive days.

"Issuer" means the Allegheny County Industrial Development Authority, a body corporate and politic, organized under the laws of the Commonwealth of Pennsylvania.

"LBH" means Lehman Brothers Holdings Inc., which wholly-owns and unconditionally guarantees the obligations of Lehman, and which at the time of this Agreement has long-term senior unsecured debt ratings of A by Standard & Poor's and A1 by Moody's.

"Lehman Cure Period" has the meaning specified in Section 7.3(a) hereof.

"Lehman Event of Default" means the occurrence of an event specified in Section 7.3 hereof.

"Loan Agreement" means the Loan Agreement dated as of September 24, 1999 between the Issuer and the Corporation, as supplemented by a First Supplemental Loan Agreement dated as of June 12, 2003 between the Issuer and the Corporation.

"Market Value" means with respect to any Qualified Security, the market value thereof (including accrued interest thereon) as specified by the Qualified Dealer delivering that security, provided that the Market Value of any Qualified Security shall in no event exceed the Purchase Price thereof.

"Maturity Amount" means, with respect to any Qualified Security, the amount, payable in cash, representing the principal and interest due thereon, on its maturity date (including any Coupon Payments).

"Purchase Price" means, for any Eligible Security delivered hereunder, that price for such security, as set forth in the Delivery Notice, which will produce a rate of return on such security for the period from (and including) the date of its delivery to (but excluding) its Maturity Date of the Guaranteed Rate.

"Qualified Dealer" means Lehman Brothers Inc., its successors or assigns, or any other dealer in Qualified Eligible Securities selected by Lehman.

"Qualified Securities" for any Delivery Date means Eligible Securities which, to the extent available on the open market, (i) mature as close as possible to but not later than the related Bond Payment Date and (ii) have an aggregate Purchase Price which is as close as possible to but does not exceed the related Deposit Amount.

"Specified Indebtedness" means any obligation of the Corporation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"Termination Amount" means an amount, as determined by Lehman reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers, of the amount, if any, that each such Dealer would require the Burdened Party to pay to the Dealer (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Corporation) or would pay to the Burdened Party (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Corporation) in consideration of such Dealer entering into an agreement with the Burdened Party which would have the effect of preserving for the Burdened Party the economic equivalent of its rights under this Agreement commencing on the termination date of this Agreement; provided, however, that:

(i)     if more than three quotations are provided, the Termination Amount will be the arithmetic mean of such quotations, without regard to the quotations having the highest and lowest values,

(ii)    if exactly three quotations are provided, the Termination Amount will be the quotation remaining after disregarding the highest and lowest quotations,

for purposes of clauses (i) and (ii), if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded, and

(iii)   if Lehman is unable to obtain three such quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by Lehman, to be the Burdened Party's total losses and costs (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Corporation), or gains (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Corporation) in connection with a termination of this Agreement, including any loss of bargain, cost of funding or, at the election of Lehman but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position, and

provided further, however, that in any event the Termination Amount shall also include (A) losses and costs in respect of any payment required to have been made (assuming satisfaction of each applicable condition precedent) on or before the date on which this Agreement shall be terminated or deemed terminated as provided herein and not made and (B) if such Termination Amount is being paid in connection with a termination of this Agreement following an Event of Default, hereunder, any incidental costs and expenses incurred by Lehman in connection with such termination and the enforcement of its rights hereunder (including reasonable attorneys' fees). Any determination of the Termination Amount by Lehman shall be conclusive and binding on the parties hereto absent manifest error.

"Three Month LIBOR" as of any date of determination means the rate for deposits in US dollars for a period of three months which appears on the Telerate Page 3750 as of 11:00 a.m., London time, on the day that is two Business Days before the day for which such determination is being made. If no such rate appears on the Telerate Page 3750 as of such date, Lehman may select another nationally recognized published source to determine Three Month LIBOR.

"Trustee Event of Default" means the occurrence of an event specified in Section 7.1 hereof.

"Valuation Date" means the first Business Day of each week or any other Business Day agreed to by Lehman and the Corporation.

SECTION II.          PURCHASE AGREEMENT

Section 2.1      Purchase and Sale of Qualified Securities.

(a)      Lehman shall cause a Qualified Dealer to deliver to the Trustee, on any Delivery Date, in accordance with the delivery requirements of Section 2.2 hereof, to the extent such securities are readily available in the open market, Qualified Securities selected by Lehman or the Qualified Dealer.

(b)      If Lehman causes a Qualified Dealer to deliver Qualified Securities, the Trustee shall, out of immediately available funds under the Indenture for such purpose or as otherwise provided by the Corporation, at the time of the delivery of such Qualified Securities, purchase such Qualified Securities and pay to the Qualified Dealer or Lehman, as applicable, in accordance with Section 2.2(b) hereof, an amount equal to the Purchase Price thereof.

(c)      Neither Lehman nor the Qualified Dealer is required to own any Qualified Securities at the time of Lehman's execution of this Agreement or at any time prior to the respective delivery dates thereof. The Qualified Securities, and the interest thereon, will, prior to the delivery thereof to the Trustee, be the sole property of the Qualified Dealer, and any profit or loss with respect to the holding or sale of any Qualified Securities delivered hereunder, even if purchased and identified to fulfill Lehman's obligations under this Agreement, shall, prior to such delivery, be for the sole account of the owner thereof.

Section 2.2      Delivery; Payment.

(a)      All Qualified Securities delivered hereunder shall be delivered to the Trustee to the account specified in Section 9.1 hereof, in such manner as at the time is generally acceptable for delivery of Qualified Securities. All Qualified Securities delivered hereunder shall be delivered to the Trustee on a "delivery versus payment" basis.

(b)      (i)      Lehman shall cause the Qualified Dealer to give the Trustee at least two Business Days prior notice of the delivery of any Qualified Securities which are in book-entry form and at least two Business Days notice of any Qualified Securities which are being delivered in certificated form. Any such notice shall specify the Maturity Amount, the Purchase Price, the Market Value and the Differential if available, the Bond Payment Date, the CUSIP Number and the security to be delivered and shall be in substantially the form of the Delivery Notice. The Trustee may conclusively rely on the specification by the Qualified Dealer of the Market Value, the Purchase Price and the Maturity Amount of a Qualified Security.

(ii)      Concurrently with the delivery of any Qualified Securities, unless otherwise directed by Lehman in writing, the Trustee shall, subject to clause (iii) below, pay the Qualified Dealer delivering such Qualified Securities, in its individual capacity, the Market Value thereof, and to the Qualified Dealer as agent for Lehman, the Differential, if any.

(iii)    Lehman may in the Delivery Notice, direct the Trustee to pay (A) to the Qualified Dealer, the Market Value of any Qualified Securities delivered to the Trustee hereunder, and (B) to Lehman, the Differential, if any.  Any such payment to Lehman shall be at Lehman's account as set forth in the Delivery Notice.

(iv)    All payments to be made hereunder (either to Lehman or the Qualified Dealer) shall be made in immediately available funds from the Debt Service Fund by means of a bank or Federal funds wire.

(c)    The Trustee and the Corporation have been advised by Lehman that the Maturity Amount for any Qualified Security delivered hereunder shall, in almost all cases, exceed the Market Value thereof.

Section 2.3    Subsequent Deliveries.    If any Qualified Securities delivered by a Qualified Dealer pursuant to Section 2.1 hereof (A) mature prior to the Bond Payment Date for which such Qualified Securities were delivered or (B) have a Coupon Payment, Lehman shall have the right, upon at least two Business Days prior written notice to the Trustee in the form of the Delivery Notice, to cause a Qualified Dealer to deliver to the Trustee, at any time on or after the maturity date of such Qualified Securities (or, as applicable, on or after the interest payment date of such Coupon Payment) but prior to the date which is one Business Day before such Bond Payment Date, other Qualified Securities, provided that the Purchase Price thereof does not exceed the Maturity Amount of the securities which have so matured (or, as applicable, the amount of the Coupon Payment.)  Any such deliveries by the Qualified Dealer shall conform to the requirements of Section 2.2(a).  Upon the delivery by the Qualified Dealer of such Qualified Securities, the Trustee shall pay the Purchase Price thereof in the manner required by Section 2.2(b)(ii).

Section 2.4    Late Delivery; Failure to Deliver.

(a)    If Lehman fails to cause a Qualified Dealer to deliver Qualified Securities as required hereunder by 2:00 p.m. New York City time on any Deposit Date or during the Lehman Cure Period, the Trustee shall, on each such date, invest the related Deposit Amount on an overnight basis in Eligible Investments (as defined in the Indenture) and if Lehman's failure continues beyond the Lehman Cure Period, the Trustee shall, at the Corporation's written direction, invest the related Deposit Amount in Eligible Investments with the longest possible maturities, provided such maturities are not later than the related Bond Payment Date.

(b)    Except as provided in Section 7.3 hereof, no failure on Lehman's part to cause a Qualified Dealer to deliver Qualified Securities hereunder shall terminate or affect Lehman's right to cause future sales of Qualified Securities in accordance with this Agreement.

Section 2.5    Direction by Corporation to Trustee.    The Corporation hereby irrevocably instructs the Trustee and the Trustee agrees to take the actions and to make the purchases required hereby.

Section 2.6     Lehman Downgrade.

(a)     If during the term of this Agreement the long-term senior unsecured debt ratings of LBH are suspended, withdrawn or fall below the "A" category by either Standard & Poor's or Moody's (in any such case, a "Lehman Downgrade"), Lehman shall provide written notice to the Corporation and the Trustee within five Business Days of such Lehman Downgrade.

(b)     Upon a Lehman Downgrade, Lehman shall undertake any of the following remedies within thirty days of such Lehman Downgrade:

(i)     assign and transfer all of this Agreement and its interests hereunder with consent of the Corporation (such consent not to be unreasonably withheld or delayed), provided that in all such instances of transfer the transferee shall assume all of the rights and obligations of Lehman hereunder;

(ii)     have obligations of Lehman hereunder guaranteed by an entity with the consent of the Corporation (such consent not to be unreasonably withheld or delayed); or

(iii)     deliver collateral to the Collateral Agent comprised of Collateral that the Collateral Market Value of the Collateral shall be maintained at 105% of the negative Termination Amount as of each Valuation Date.

(c)     If Lehman has not taken any of the remedies contemplated in (b) above within thirty days after a Lehman Downgrade, the Corporation may terminate this Agreement by giving written notice thereof to Lehman with a copy to the Trustee, whereupon Lehman shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one Business Day after written notice that such amount is due, pay such amount, in immediately available funds, to the Corporation and (ii) if the Termination Amount is a positive number, no Termination Amount shall be due.  If any such amount is not paid when due, Lehman shall pay interest on such amount for each date such amount is due but not paid at the Default Rate.

## SECTION III.     DEFEASANCE OR REFUNDING

Section 3.1     Defeasance or Refunding.

(a)     The Corporation may, by giving Lehman at least fifteen Business Days prior notice, but without the consent of Lehman, cause the Issuer to redeem, defease, repurchase, or refund the Bonds as provided in the Indenture, provided that if the Corporation takes any such action (i) if the Termination Amount is a positive number, the Corporation shall pay or cause the Trustee to pay to Lehman in immediately available funds the Termination Amount and (ii) if the Termination Amount is a negative number, Lehman shall pay such amount to the Trustee.  If the Termination Amount is payable pursuant to this Section 3.1, the party owing such amount shall pay such amount promptly but by no later than the later of (A) one Business Day after receipt of

notice of the Termination Amount from Lehman or (B) the date of such redemption, defeasance or refunding. Such payment shall be made in immediately available funds, to or at the direction of the party to whom such Termination Amount is due.

(b)   Immediately upon payment of the Termination Amount in accordance with this Section 3.1 this Agreement shall terminate. The Corporation agrees that it shall not cause the Issuer to redeem, defease, refund or repurchase the Bonds unless it shall have sufficient funds to pay any Termination Amount which may be due as provided herein.

(c)   If pursuant to clause (a) above this Agreement would be terminated in connection with the issuance of bonds to refund the Bonds (the "Refunding Bonds") and a Termination Amount would be payable to Lehman, the Corporation may, by written notice to Lehman, request that Lehman continue this Agreement and have such Agreement apply to the Refunding Bonds. Lehman agrees that if it receives such a request it shall agree to so continue this Agreement with respect to the Refunding Bonds and the Bonds remaining outstanding after such refunding, provided that:

(i)   Lehman receives such request (together with all relevant details relating thereto) at least 30 days in advance of the issuance of the Refunding Bonds;

(ii)   on or prior to the date the Bonds are to be refunded (the "Refunding Date") the Corporation and the trustee of the Refunding Bonds enter into such amendments of this Agreement with Lehman (the "Amended Agreement") as are necessary to have this Agreement pertain to the deposit amounts, deposit dates and bond payment dates applicable to the Refunding Bonds and to any Bonds which remain outstanding after giving effect to such refunding (the "Amended Cash Flows");

(iii)   if as determined on the Refunding Date, the Termination Amount payable to Lehman in respect to the Deposit Amounts, Deposit Dates and Bond Payment Dates which would be remaining hereunder on such date, assuming that the Bonds were not then refunded (the "Original Cash Flows") would be greater than the Termination Amount to Lehman of its investment rights with respect to the Amended Cash Flows, the Corporation shall on or before the Refunding Date pay to Lehman the amount of such difference;

(iv)   the last Deposit Date under the Amended Agreement is no later than the last Deposit Date hereunder;

(v)   the Refunding Bonds have a credit rating at least equivalent to the credit rating of the Bonds without giving effect to any bond insurance or any other credit enhancement and are secured by revenues at least equivalent to the assets securing the Bonds; and

(vi)   Lehman receives any opinions and other assurances it may reasonably request to assure that the protections afforded it hereunder will continue under the Amended Agreement.

If the conditions described in paragraphs (i) through (vi) are satisfied but the Termination Amount which would be payable to Lehman for its investment rights with respect to the Amended Cash Flows would be greater than the Termination Amount which would be payable to Lehman for its investment rights with respect to the Original Cash Flows, Lehman may, at its option, pay the Corporation the amount of such difference or retain investment rights only with respect to such portion of the Amended Cash Flows as would have a Termination Amount equal to the Termination Amount of the Original Cash Flows.

SECTION IV.        REPRESENTATIONS AND WARRANTIES

Section 4.1    Representations and Warranties.    Each party hereto represents and warrants to the other parties hereto at all times during the term of this Agreement that:

(a)    it is duly organized and validly existing under the laws of its jurisdiction, incorporation or establishment;

(b)    it has the power to enter into and perform its obligations under this Agreement (including, in the case of the Corporation, to pay the Termination Amount in accordance herewith and, including, in the case of the Corporation or the Trustee, to enter into and perform its obligations under the Indenture and the other Financing Documents to which it is a party);

(c)    this Agreement has been duly authorized, executed and delivered by it and, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of it enforceable against it in accordance with the terms hereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law;

(d)    its execution and delivery of this Agreement and its performance of its obligations hereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws (or equivalent organizational documents), or any other agreement (including in the case of the Corporation and the Trustee, the Indenture or other Financing Documents to which it is a party), instrument, law, ordinance, regulation, judgment, injunction or order applicable to it or any of its property;

(e)    there is no proceeding pending or threatened against it at law or in equity, or before any governmental instrumentality or in any arbitration, which would materially impair its ability to perform its obligations under this Agreement, and there is no such proceeding pending against it which purports or is likely to affect the legality, validity or enforceability of the Agreement;

(f)    in the case of the Corporation:

(i)    all Deposit Dates, Bond Payment Dates and Deposit Amounts as indicated on Exhibit A of this Agreement are true and correct in all respects;

(ii)    it has delivered to Lehman its most recent annual audited statement of financial condition and its most recent quarterly unaudited statement of financial condition and the Corporation has not experienced since the date of its last published financial statement any material adverse change in its business, assets, operations or financial condition;

(iii)    it has not nor does it anticipate that there shall be any occurrence or existence of (1) a default, event of default or other similar condition or event (however described and including any such conditions or events which will become events of default with the passing of time or the giving of notice) in respect of the Corporation under one or more agreements or instruments relating to any Specified Indebtedness of the Corporation which has resulted in any Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by the Corporation in making one or more payments on the due date thereof under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(iv)    it is solvent and has, and will have after giving effect to this Agreement, sufficient capital to conduct its business and to pay its debts as they become due;

(v)    it is not subject to any administrative, governmental or other investigation, special review or order, or pending order or similar event, and

(h)    in the case of each of the Corporation and the Trustee:

(i)    each of the Financing Documents to which it is a party has been duly authorized, executed and delivered by it,

(ii)    assuming the due authorization, execution and delivery thereof by the other parties thereto, the Indenture and the other Financing Documents to which it is a party constitute legal, valid and binding obligations of it, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law,

(iii)    the Indenture and the other Financing Documents to which it is a party are in full force and effect on the date hereof and no amendment, waiver or course of dealing has amended or terminated any of the terms thereof since the original execution and delivery of the Indenture and the other Financing Documents to which it is a party, except such as may have been delivered to Lehman pursuant to Section 6.1(d) hereof, and

(iv)    no "event of default" or event which would with the passage of time or the giving of notice constitute an event of default has occurred and is continuing under any of the Financing Documents to which it is a party.

## SECTION V.         COVENANTS AND ACKNOWLEDGMENTS

Section 5.1    Covenants. Each of Lehman, the Corporation and the Trustee covenants to the other parties to this Agreement that so long as it shall have any obligations under this Agreement it shall:

(a)    maintain in full force and effect all authorizations and agreements of and exemptions, consents, licenses, actions or approvals by, and all filings with or notices to, any governmental or other authority that are required to be obtained or made by such party with respect to this Agreement and will use all reasonable efforts to obtain or make any that may become necessary in the future;

(b)    comply in all material respects with all applicable laws, rules, regulations and orders to which it may be subject if failure so to comply could materially impair its ability to perform its obligations under this Agreement; and

(c)    if it is the Corporation or the Trustee, not enter into any amendment or modification of the Indenture or other Financing Documents to which it is a party which could impair its ability to perform its obligations to Lehman hereunder except nothing contained hereunder shall restrict the Corporation's ability to issue additional bonds under the Indenture; and

(d)    if it is the Corporation, the Corporation agrees that, during the term of this Agreement, it shall deliver to Lehman its most recently available statement of financial condition (both audited and unaudited) as such are issued.

Section 5.2    Role of Lehman; Independent Judgment. The Corporation acknowledges and agrees that in connection with its decision to enter into this Agreement and its subsequent negotiation and execution of this Agreement, (i) neither Lehman, nor any of its directors, officers, employees, agents or affiliates (each of the foregoing, including Lehman, a "Lehman Party") has acted as a fiduciary  or financial or investment advisor to or agent or other representative of the Corporation, (ii) the Corporation has, to the extent it has deemed necessary, consulted with its own legal, tax, regulatory, accounting, financial and investment advisors in determining the suitability and appropriateness of this Agreement as well as in negotiating the specific terms hereof and has not relied upon any advice from any Lehman Party, with respect to such matters; the Corporation understands the terms, conditions and risks of this Agreement and is capable of assuming such risks; and (iii) the terms and conditions of this Agreement have been individually negotiated by it and the Trustee and are the result of arms-length negotiations among Lehman, the Trustee and the Corporation.

Section 5.3    No Liability.  Each of the Corporation and the Trustee agrees that no Lehman Party shall be liable or responsible for:  (i) the payment of any amounts owing on or with respect to the Bonds; (ii) the Trustee's use or application of any moneys payable to the Trustee hereunder; (iii) any acts or omissions of the Corporation or the Trustee under, or with respect to, the Bonds or the Indenture or any related document; or (iv) determining whether the Corporation or the Trustee is in compliance with any applicable statute, regulation or law, the Bonds, the Indenture or any other related document.

Section 5.4    Fixed Rate of Return.  The Corporation has entered into this Agreement for purposes of managing its borrowings or investments by increasing the predictability of its cash flow from earnings on its investments and not for purposes of speculation.  The Corporation understands that in consideration of entering into this Agreement on the Closing Date it is foregoing its right to receive investment earnings on the Deposit Amounts deposited in the debt service fund in the future and that by accepting the Guaranteed Rate the Corporation has minimized the risks resulting from fluctuations in interest rates during the term of this Agreement but also has foregone the possibility of receiving greater returns on such amounts from such fluctuations.

Section 5.5    Termination Amount.  Each of  Tthe Corporation and the Trustee understands that if under any of the circumstances provided herein (including upon the occurrence of a redemption or a defeasance of the Bonds on or prior to the last Deposit Date), a Termination Amount would be due Lehman, the size of such Termination Amount will vary depending, in large part, on prevailing interest rates at the time such Termination Amount is calculated.  In certain market conditions the amount of the Termination Amount owed to Lehman by the Corporation or the Trustee could be substantial.  The Trustee shall have no liability to make any Termination Amount payment to Lehman.

Section 5.6    Fees and Commissions.  The Corporation acknowledges that Lehman shall pay $6,000 to Investment Management Advisory Group, Inc., on behalf of the Corporation, as a bidding agent's fee for services provided by Investment Management Advisory Group, Inc. to the Corporation.

## SECTION VI.         CONDITIONS PRECEDENT

Section 6.1    Conditions Precedent.

On or prior to the Closing Date the following shall occur:

(a)    delivery to Lehman and the Corporation of an opinion of counsel to the Trustee, in the form of Exhibit B;

(b)    delivery to Lehman and the Trustee of an opinion of counsel to the Corporation, in substantially the form of Exhibit D;

    (c)    delivery to Lehman by the Corporation of a copy of the official statement for the Bonds;

    (d)    delivery to Lehman by the Corporation of true and correct copies of the Financing Documents as in full force and effect on the date hereof;

    (e)    delivery to the Trustee and Corporation of an opinion of inside counsel to Lehman, in the form of Exhibit C; and

    (f)    delivery to Lehman of a certified copy of any resolution or resolutions of the Corporation pursuant to which the Corporation is authorized to enter into this Agreement.

## SECTION VII.    DEFAULTS; TERMINATION

Section 7.1    <u>Trustee Events of Default</u>. The occurrence of any of the following events shall constitute a Trustee Event of Default:

    (a)    the Trustee shall fail for any reason, other than that the Corporation has failed to deposit the related Deposit Amount, to purchase, at the Purchase Price therefor, any Qualified Securities delivered by the Qualified Dealer in accordance with this Agreement; and such default is not cured within 5 days provided that the Trustee shall pay to Lehman the Loss Amount (as defined in Section 7.7 herein);

    (b)    the Trustee shall default in the performance of any other covenant or obligation under this Agreement and such default is not cured within ten Business Days of written notice thereof from Lehman or the Corporation; or

    (c)    any representation or warranty of the Trustee contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made.

Section 7.2    <u>Corporation Events of Default</u>. The occurrence of any of the following events shall constitute a Corporation Event of Default:

    (a)    the Corporation shall fail to make the Deposit Amount or the Trustee for any other reason shall fail to purchase, at the Purchase Price thereof, any Qualified Securities delivered by the Qualified Dealer in accordance herewith;

    (b)    the Corporation shall default in the performance of any covenant or obligation under this Agreement, other than as described in clause (a) above and such default is not cured within ten Business Days of written notice thereof from Lehman or the Trustee;

    (c)    any representation or warranty of the Corporation contained in this Agreement proves to have been incorrect, false or misleading in any material respect;

(d)    the Corporation is Insolvent;

(e)    the Corporation consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if an entity such as an organization, board, commission authority, agency or body succeeds to the principal functions of, or powers and duties granted, to the Corporation) and, at the time of such consolidation, amalgamation, merger or transfer either (i) the resulting or surviving or transferee entity fails to assume all the obligations of the Corporation under this Agreement or by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement or (ii) the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of the Corporation; or

(f)    the Corporation shall default with respect to the Bonds and/or any Specified Indebtedness.

Section 7.3    Lehman Events of Default.  The occurrence of any of the following events shall constitute a Lehman Event of Default:

(a)    Lehman shall fail, on any Deposit Date, to cause a Qualified Dealer to deliver Qualified Securities and such failure is not cured within five Business Days after written notice thereof to Lehman from the Trustee or the Corporation (the "Lehman Cure Period");

(b)    any representation or warranty of Lehman contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made; or

(c)    Lehman is at any time Insolvent.

Section 7.4    Remedies Upon Occurrence of Trustee Event of Default.  Upon the occurrence of a Trustee Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Delivery Date and which have not theretofore been delivered to and purchased by the Trustee and, subject to Section 8.2, make written demand for the payment of its losses (calculated in accordance with Section 7.7) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    immediately terminate this Agreement by giving written notice thereof to the Trustee with a copy to the Corporation and, subject to Section 8.2, (i) if the Termination Amount is a positive number, make written demand upon the Trustee for the payment of the Termination Amount, and (ii) if the Termination Amount is a negative number, pay such Termination Amount to the Corporation.

Notwithstanding anything to the contrary herein, Lehman agrees not to terminate this Agreement as a result of a Trustee Event of Default under Section 7.1 if (i) such Trustee Event of Default has been cured, (ii) the Trustee has tendered its resignation as Trustee under the Indenture, (iii) the Trustee has been replaced by a successor trustee in accordance with the Indenture and this Agreement within sixty (60) days of occurrence of the Trustee Event of Default, and (iv) the Trustee pays to Lehman its Loss Amount (calculated in accordance with Section 7.7) from and including the first date on which the Trustee Event of Default shall occur up to and excluding the date on which Trustee Event of Default shall have been cured.

If the Termination Amount is payable pursuant to this Section 7.4(b) the party owing such amount shall promptly, but by no later than one Business Day after notice that such amount is due from the party to whom such Termination Amount is due, pay such amount, in immediately available funds, to the party to whom such Termination Amount is due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due and not paid at the Default Rate. Any amounts payable pursuant to Section 7.7 hereof shall be payable upon demand as provided therein.

Section 7.5    Remedies Upon Occurrence of Corporation Event of Default. Upon the occurrence of a Corporation Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Delivery Date and which have not theretofore been delivered to and purchased by the Trustee and make written demand for the payment of its losses (calculated in accordance with Section 7.7) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    immediately terminate this Agreement by giving written notice thereof to the Corporation with a copy to the Trustee, and (i) if the Termination Amount is a positive number, make written demand upon the Corporation for the payment of the Termination Amount and (ii) if the Termination Amount is a negative number, pay such amount to the Corporation.

If a Termination Amount is payable pursuant to clause (b) above, the party owing such amount shall promptly, but by no later than one Business Day after written notice that such amount is due from the party to whom such Termination Amount is due, pay such amount, in immediately available funds, to or at the direction of the party to whom such Termination Amount is due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate.

Section 7.6    Remedies Upon Occurrence of Lehman Event of Default. Upon the occurrence of a Lehman Event of Default, the Corporation shall have the right to:

(a)    if such default is a default under Section 7.3(a), apply the Deposit Amount to purchase Eligible Investments in accordance with Section 2.4 hereof and make written demand for the payment of its losses in connection therewith, calculated as provided in Section 7.7(b);

(b)      if such default is a default under Section 7.3(a) and Lehman has failed to pay the Corporation's losses (as described in Section 7.7(b)) upon written demand therefor, immediately terminate this Agreement by giving written notice thereof to Lehman with a copy to the Trustee; and

(c)      if such default is a default under Sections 7.3(b) or (c) hereof or if Lehman has failed to pay the Corporation's losses as specified in Section 7.6(b) above, immediately terminate this Agreement by giving written notice thereof to Lehman with a copy to the Trustee, whereupon Lehman shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one Business Day after written notice that such amount is due, pay such amount, in immediately available funds, to the Corporation and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Corporation of the Termination Amount in which case the Corporation shall promptly, but no later than one Business Day after notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate. Notwithstanding anything to the contrary in this Agreement, if Lehman fails to determine the Termination Amount within three Business Days of notice from the Corporation or the Trustee of the occurrence of a Lehman Event of Default then the Corporation (or if so directed by the Corporation, the Trustee) shall make such determination as if it were Lehman and the amount as so determined by the Corporation (or the Trustee) shall for purposes of this Section 7.6 be deemed the Termination Amount.

Section 7.7      Loss Amount if Failed or Late Purchase.

(a)      Subject to Section 8.2, if the Trustee fails to purchase any Qualified Securities delivered by a Qualified Dealer in accordance with this Agreement and provided that Lehman has not exercised its right to terminate this Agreement as provided herein (in which case the Termination Amount shall be due), the Trustee, in the case of a Trustee Event of Default under Section 7.1(a) or the Corporation under any other circumstances, shall pay to Lehman as liquidated damages for its losses and not as a penalty, on demand by Lehman, the sum of (w) interest on the Purchase Price of such Qualified Securities for each day from and including the delivery date thereof to but excluding the date on which such securities are resold to a third party or to the Trustee, (x) the excess, if any, of the Purchase Price of such Qualified Securities over the amount received by the Qualified Dealer upon such resale of the securities (the "Shortfall Amount"),(y) interest on the Shortfall Amount from and including the resale date to but excluding the date on which the Trustee or the Corporation, as applicable, compensates Lehman for its losses as described herein, and (z) any incidental costs and expenses incurred by Lehman in connection with the Trustee's failure to so purchase such Qualified Securities. Interest shall accrue at a rate per annum equal to the Default Rate for purposes of clauses (w) and (y).

(b)      If there is a Lehman Event of Default as described in Section 7.3(a) hereof, the amount of losses payable by Lehman upon demand therefor pursuant to Section 7.6(a) shall equal the excess, if any, of (i) interest the Trustee would have earned on the related Deposit Amount had the Deposit Amount been invested in Qualified Securities at the Guaranteed Rate

(the "Guaranteed Interest") over (ii) the interest the Trustee actually earned by investing the related Deposit Amount in Eligible Investments in accordance with Section 2.4 hereof (or if the Trustee fails to invest such Deposit Amount in Eligible Investments in accordance with Section 2.4, the amount of interest the Trustee would have earned on such Deposit Amount had the Trustee complied with the requirements of Section 2.4 hereof).

Section 7.8    Application of Excess Funds.  The Corporation hereby directs the Trustee and the Trustee agrees that if at any time any amounts are due Lehman from the Corporation in connection with a Corporation Event of Default, the Trustee shall, upon demand from Lehman, and without further direction or instruction from the Corporation, apply any funds available under the Indenture which are not subject to the lien of the Indenture (including any funds which would otherwise be released to the Corporation) to the payment of such amounts.

Section 7.9    Limited Rights Against the Debt Service Fund.  Neither Lehman nor any Qualified Dealer shall have any right to any amounts held in the Debt Service Fund except as expressly provided herein upon the delivery of a Qualified Security in accordance with this Agreement.

Section 7.10   No Waiver; Remedies Cumulative.  No failure or delay on any party's part in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy.  Such party's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law, this Agreement or otherwise.  None of the terms or provisions of this Agreement may be waived, modified or amended except in a writing duly signed by the Trustee, the Corporation and Lehman.

SECTION VIII.      THE TRUSTEE

Section 8.1    Acceptance by Trustee  By execution and delivery of this Agreement, the Trustee accepts its duties and obligations hereunder, as an addition to its duties and obligations as Trustee under the Indenture.

Section 8.2    Liability of the Trustee; Consultation with Legal Counsel.

(a)    The Trustee shall not be liable to any person for any action taken or neglected to be taken in performing or attempting to perform its obligations hereunder or preserving or seeking to preserve the funds it maintains under the Indenture or to purchase the Qualified Securities tendered pursuant to this Agreement, except for actions arising from its negligence or willful misconduct or for a breach of its representations or warranties or from a breach of its covenant under Section 5.1(c).

(b)    The Trustee may consult with counsel reasonably satisfactory to it with respect to any question relating to its duties or responsibilities hereunder or otherwise in connection herewith and, except as expressly provided herein, shall not be liable for any action taken,

suffered, or omitted by the Trustee in good faith upon the advice of such counsel. The Trustee may act through its officers, employees, agents and attorneys.

Section 8.3    Payment of Trustee Fees.    Lehman has no liability or responsibility for payment of the Trustee's fees or expenses for its services hereunder, including any such fees or expenses arising out of or in connection with the liquidation of the Qualified Securities as provided herein.

Section 8.4    Trustee Cooperation.

(a)    The Trustee shall not act in contravention of its obligations hereunder or invest amounts in the Debt Service Fund other than pursuant to this Agreement.

(b)    The Trustee shall not make any payments or distributions from the Debt Service Fund other than payments or distributions (i) required by this Agreement, (ii) to pay principal of, redemption premium and interest on the Bonds or (iii) to the extent not inconsistent with the terms of this Agreement, to make payments required by the Indenture.

Section 8.5    Successor Trustee.    If the Trustee shall resign or be discharged from its duties and obligations under the Indenture, the Corporation shall cause the Issuer to appoint a successor Trustee pursuant to the terms of the Indenture; provided, however, the successor trustee shall be reasonably acceptable to Lehman. provided further, however, no such consent of Lehman shall be required if the Trustee shall be succeeded by a successor trustee by operation of a merger or sale of the Trustee. The Corporation agrees that if the Trustee fails for any reason to perform its duties to Lehman under this Agreement in accordance with the terms hereof, or is at any time Insolvent or breaches in any material respect its representations and warranties to Lehman hereunder, the Corporation shall promptly, upon request of Lehman, use good faith efforts to cause the Issuer to appoint a successor Trustee acceptable to Lehman.

SECTION IX.    MISCELLANEOUS

Section 9.1    Notices.    All notices, demands or other communications hereunder shall be given or made in writing and shall be delivered personally, or sent by certified or registered mail, postage prepaid, return receipt requested, or overnight delivery service, telex or telecopy to the party to whom they are directed at the following addresses, or at such other addresses as may be designated by notice from such party to all other parties:

To Lehman:

Lehman Brothers Special Financing Inc.
745 Seventh Avenue, 5th Floor
New York, NY  10019
Attention:  Municipal Financial Products - Middle Office
Telephone:    212-526-2240

Fax:          646-758-2988


To the Trustee:

National City Bank of Pennsylvania
National City Center
20 Stanwix Street, 16th Floor
Pittsburgh, PA 15222-4802
Attention:      Corporate Trust Department - Robert P. Pavolvic
Telephone:    412-644-8136
Fax:            412-644-7971

[DELIVERY INSTRUCTIONS FOR BOOK-ENTRY GOVERNMENT OBLIGATIONS]
Federal Reserve Bank of Cleveland, Ohio
National City CLE / Trust
ABA # 041000124
Sub A/C: 1050
A/C # P13328037
Further Credit: ACIDA-AFCO Cargo 03 DSRF

[DELIVERY INSTRUCTIONS FOR DTC]
DTC Member # 2316
A/C:


To the Corporation:

AFCO Cargo PIT LLC c/o Aviation Facilities Company, Inc.
7600 Colshire Drive –Suite –240
McLean, VA 22102
Attention:      Mr. Daniel Ungerleider
Telephone:    703-288-8590
Fax:            703-902-2901
Corporation Tax I.D. #: 54-1912443

Any notice, demand or other communication given in a manner prescribed in this Section shall be deemed to have been delivered on receipt.

Section 9.2    Binding Effect; Transfer.  This Agreement shall be binding upon and inure to the benefit of the Trustee, the Corporation and Lehman and upon their respective permitted successors and transferees.  Lehman shall be entitled to transfer all or any portion of this Agreement and its interests hereunder, to any subsidiary or affiliate of Lehman, or to any office, branch or subsidiary of any affiliate of Lehman upon notice to the Corporation and the Trustee, and Lehman shall otherwise be able to transfer all or any portion of this Agreement only with the

written consent of the Corporation (such consent not to be unreasonably withheld or delayed) and written notice to the Trustee; provided, however, that such consent shall not be required if such transfer is to any entity rated at least an "A-", "A3", or "A-" by Standard & Poor's Ratings Service ("S&P"), Moody's Investors Service, Inc. ("Moody's") or Fitch, Inc., respectively, and provided further that in all such instances of transfer the transferee shall assume all of the rights and obligations of Lehman hereunder.  Neither the Corporation nor the Trustee may transfer this Agreement without the prior written consent of Lehman and the other party hereto, provided, however, the Trustee may transfer this Agreement to any successor trustee as permitted under the Indenture.

Section 9.3    Limitation.  Nothing expressed or implied herein is intended or shall be construed to confer upon any person, firm or corporation other than the parties hereto, any right, remedy or claim by reason of this Agreement or any term hereof, and all terms contained herein shall be for the sole and exclusive benefit of the parties hereto, and their successors and permitted transferees.

Section 9.4    Severability.  If one or more provisions of this Agreement or the applicability of any such provisions to any set of circumstances shall be determined to be invalid or ineffective for any reason, such determination shall not affect the validity and enforceability of the remaining provisions or the applicability of the same provisions or any of the remaining provisions to other circumstances.

Section 9.5    Amendments, Changes and Modifications.  This Agreement may be amended or any of its terms modified only by a written document authorized, executed and delivered by each of the parties hereto.

Section 9.6    Counterparts.  This Agreement may be executed in one or more counterparts and when each party hereto has executed at least one counterpart, this Agreement shall become binding on all parties and such counterparts shall be deemed to be one and the same document.

Section 9.7    Termination.  Unless earlier terminated pursuant to Sections 3.1, 7.4, 7.5 or 7.6 hereof, this Agreement shall terminate on the later of the last Bond Payment Date set forth in Exhibit A and the date on which Lehman, the Trustee and the Corporation have satisfied all of their obligations hereunder.

Section 9.8    Entire Agreement.  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

Section 9.9    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law principles.

IN WITNESS WHEREOF, the Trustee, the Corporation and Lehman have caused this Debt Service Deposit Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

AFCO CARGO PIT LLC
BY: AVIATION FACILITIES COMPANY, INC., MANAGER

By: _Pel S Lingerlader_

Name: Daniel S. Ungerleider

Title: Vice President & CFO

NATIONAL CITY BANK OF PENNSYLVANIA, AS TRUSTEE

By:_____

Name:

Title:

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____

Name:

Title:

 

IN WITNESS WHEREOF, the Trustee, the Corporation and Lehman have caused this Debt Service Deposit Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

AFCO CARGO PIT LLC
BY: AVIATION FACILITIES COMPANY, INC., MANAGER


By:_____
Name:
Title:


NATIONAL CITY BANK OF PENNSYLVANIA, AS TRUSTEE

By: *Robert P. Pavlovic*
Name: Robert P. Pavlovic
Title: Assistant Vice President


LEHMAN BROTHERS SPECIAL FINANCING INC.


By:_____
Name:
Title:

DSDA:

22

IN WITNESS WHEREOF, the Trustee, the Corporation and Lehman have caused this Debt Service Deposit Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

AFCO CARGO PIT LLC
BY: AVIATION FACILITIES COMPANY, INC., MANAGER


By:_____
Name:
Title:



NATIONAL CITY BANK OF PENNSYLVANIA, AS TRUSTEE


By:_____
Name:
Title:



LEHMAN BROTHERS SPECIAL FINANCING INC.


By: _____
Name: T. Courtney Jenkins
Title:    Vice President

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 04/20/04 | 09/01/04 | $133,333.33 | 04/20/04 | 09/01/04 | $184,919.81 |
| 05/20/04 | 09/01/04 | $16,666.67 | 05/20/04 | 09/01/04 | $92,459.90 |
| 06/20/04 | 09/01/04 | $16,666.67 | 06/20/04 | 09/01/04 | $92,459.90 |
| 07/20/04 | 09/01/04 | $16,666.67 | 07/20/04 | 09/01/04 | $92,459.90 |
| 08/20/04 | 09/01/04 | $16,666.67 | 08/20/04 | 09/01/04 | $92,459.90 |
| 09/20/04 | 09/01/05 | $19,166.67 | 09/20/04 | 03/01/05 | $91,452.61 |
| 10/20/04 | 09/01/05 | $19,166.67 | 10/20/04 | 03/01/05 | $91,452.61 |
| 11/20/04 | 09/01/05 | $19,166.67 | 11/20/04 | 03/01/05 | $91,452.61 |
| 12/20/04 | 09/01/05 | $19,166.67 | 12/20/04 | 03/01/05 | $91,452.61 |
| 01/20/05 | 09/01/05 | $19,166.67 | 01/20/05 | 03/01/05 | $91,452.61 |
| 02/20/05 | 09/01/05 | $19,166.67 | 02/20/05 | 03/01/05 | $91,452.61 |
| 03/20/05 | 09/01/05 | $19,166.67 | 03/20/05 | 09/01/05 | $91,452.61 |
| 04/20/05 | 09/01/05 | $19,166.67 | 04/20/05 | 09/01/05 | $91,452.61 |
| 05/20/05 | 09/01/05 | $19,166.67 | 05/20/05 | 09/01/05 | $91,452.61 |
| 06/20/05 | 09/01/05 | $19,166.67 | 06/20/05 | 09/01/05 | $91,452.61 |
| 07/20/05 | 09/01/05 | $19,166.67 | 07/20/05 | 09/01/05 | $91,452.61 |
| 08/20/05 | 09/01/05 | $19,166.67 | 08/20/05 | 09/01/05 | $91,452.61 |
| 09/20/05 | 09/01/06 | $21,666.67 | 09/20/05 | 03/01/06 | $90,273.45 |
| 10/20/05 | 09/01/06 | $21,666.67 | 10/20/05 | 03/01/06 | $90,273.45 |
| 11/20/05 | 09/01/06 | $21,666.67 | 11/20/05 | 03/01/06 | $90,273.45 |
| 12/20/05 | 09/01/06 | $21,666.67 | 12/20/05 | 03/01/06 | $90,273.45 |
| 01/20/06 | 09/01/06 | $21,666.67 | 01/20/06 | 03/01/06 | $90,273.45 |
| 02/20/06 | 09/01/06 | $21,666.67 | 02/20/06 | 03/01/06 | $90,273.45 |
| 03/20/06 | 09/01/06 | $21,666.67 | 03/20/06 | 09/01/06 | $90,273.45 |
| 04/20/06 | 09/01/06 | $21,666.67 | 04/20/06 | 09/01/06 | $90,273.45 |
| 05/20/06 | 09/01/06 | $21,666.67 | 05/20/06 | 09/01/06 | $90,273.45 |
| 06/20/06 | 09/01/06 | $21,666.67 | 06/20/06 | 09/01/06 | $90,273.45 |
| 07/20/06 | 09/01/06 | $21,666.67 | 07/20/06 | 09/01/06 | $90,273.45 |
| 08/20/06 | 09/01/06 | $21,666.67 | 08/20/06 | 09/01/06 | $90,273.45 |
| 09/20/06 | 09/01/07 | $22,500.00 | 09/20/06 | 03/01/07 | $88,915.11 |
| 10/20/06 | 09/01/07 | $22,500.00 | 10/20/06 | 03/01/07 | $88,915.11 |
| 11/20/06 | 09/01/07 | $22,500.00 | 11/20/06 | 03/01/07 | $88,915.11 |
| 12/20/06 | 09/01/07 | $22,500.00 | 12/20/06 | 03/01/07 | $88,915.11 |
| 01/20/07 | 09/01/07 | $22,500.00 | 01/20/07 | 03/01/07 | $88,915.11 |
| 02/20/07 | 09/01/07 | $22,500.00 | 02/20/07 | 03/01/07 | $88,915.11 |

\*    If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 03/20/07 | 09/01/07 | $22,500.00 | 03/20/07 | 09/01/07 | $88,915.11 |
| 04/20/07 | 09/01/07 | $22,500.00 | 04/20/07 | 09/01/07 | $88,915.11 |
| 05/20/07 | 09/01/07 | $22,500.00 | 05/20/07 | 09/01/07 | $88,915.11 |
| 06/20/07 | 09/01/07 | $22,500.00 | 06/20/07 | 09/01/07 | $88,915.11 |
| 07/20/07 | 09/01/07 | $22,500.00 | 07/20/07 | 09/01/07 | $88,915.11 |
| 08/20/07 | 09/01/07 | $22,500.00 | 08/20/07 | 09/01/07 | $88,915.11 |
| 09/20/07 | 09/01/08 | $23,333.33 | 09/20/07 | 03/01/08 | $87,514.07 |
| 10/20/07 | 09/01/08 | $23,333.33 | 10/20/07 | 03/01/08 | $87,514.07 |
| 11/20/07 | 09/01/08 | $23,333.33 | 11/20/07 | 03/01/08 | $87,514.07 |
| 12/20/07 | 09/01/08 | $23,333.33 | 12/20/07 | 03/01/08 | $87,514.07 |
| 01/20/08 | 09/01/08 | $23,333.33 | 01/20/08 | 03/01/08 | $87,514.07 |
| 02/20/08 | 09/01/08 | $23,333.33 | 02/20/08 | 03/01/08 | $87,514.07 |
| 03/20/08 | 09/01/08 | $23,333.33 | 03/20/08 | 09/01/08 | $87,514.07 |
| 04/20/08 | 09/01/08 | $23,333.33 | 04/20/08 | 09/01/08 | $87,514.07 |
| 05/20/08 | 09/01/08 | $23,333.33 | 05/20/08 | 09/01/08 | $87,514.07 |
| 06/20/08 | 09/01/08 | $23,333.33 | 06/20/08 | 09/01/08 | $87,514.07 |
| 07/20/08 | 09/01/08 | $23,333.33 | 07/20/08 | 09/01/08 | $87,514.07 |
| 08/20/08 | 09/01/08 | $23,333.33 | 08/20/08 | 09/01/08 | $87,514.07 |
| 09/20/08 | 09/01/09 | $24,166.67 | 09/20/08 | 03/01/09 | $86,070.32 |
| 10/20/08 | 09/01/09 | $24,166.67 | 10/20/08 | 03/01/09 | $86,070.32 |
| 11/20/08 | 09/01/09 | $24,166.67 | 11/20/08 | 03/01/09 | $86,070.32 |
| 12/20/08 | 09/01/09 | $24,166.67 | 12/20/08 | 03/01/09 | $86,070.32 |
| 01/20/09 | 09/01/09 | $24,166.67 | 01/20/09 | 03/01/09 | $86,070.32 |
| 02/20/09 | 09/01/09 | $24,166.67 | 02/20/09 | 03/01/09 | $86,070.32 |
| 03/20/09 | 09/01/09 | $24,166.67 | 03/20/09 | 09/01/09 | $86,070.32 |
| 04/20/09 | 09/01/09 | $24,166.67 | 04/20/09 | 09/01/09 | $86,070.32 |
| 05/20/09 | 09/01/09 | $24,166.67 | 05/20/09 | 09/01/09 | $86,070.32 |
| 06/20/09 | 09/01/09 | $24,166.67 | 06/20/09 | 09/01/09 | $86,070.32 |
| 07/20/09 | 09/01/09 | $24,166.67 | 07/20/09 | 09/01/09 | $86,070.32 |
| 08/20/09 | 09/01/09 | $24,166.67 | 08/20/09 | 09/01/09 | $86,070.32 |
| 09/20/09 | 09/01/10 | $27,500.00 | 09/20/09 | 03/01/10 | $84,591.15 |
| 10/20/09 | 09/01/10 | $27,500.00 | 10/20/09 | 03/01/10 | $84,591.15 |
| 11/20/09 | 09/01/10 | $27,500.00 | 11/20/09 | 03/01/10 | $84,591.15 |
| 12/20/09 | 09/01/10 | $27,500.00 | 12/20/09 | 03/01/10 | $84,591.15 |
| 01/20/10 | 09/01/10 | $27,500.00 | 01/20/10 | 03/01/10 | $84,591.15 |

\*    If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 02/20/10 | 09/01/10 | $27,500.00 | 02/20/10 | 03/01/10 | $84,591.15 |
| 03/20/10 | 09/01/10 | $27,500.00 | 03/20/10 | 09/01/10 | $84,591.15 |
| 04/20/10 | 09/01/10 | $27,500.00 | 04/20/10 | 09/01/10 | $84,591.15 |
| 05/20/10 | 09/01/10 | $27,500.00 | 05/20/10 | 09/01/10 | $84,591.15 |
| 06/20/10 | 09/01/10 | $27,500.00 | 06/20/10 | 09/01/10 | $84,591.15 |
| 07/20/10 | 09/01/10 | $27,500.00 | 07/20/10 | 09/01/10 | $84,591.15 |
| 08/20/10 | 09/01/10 | $27,500.00 | 08/20/10 | 09/01/10 | $84,591.15 |
| 09/20/10 | 09/01/11 | $30,000.00 | 09/20/10 | 03/01/11 | $82,727.09 |
| 10/20/10 | 09/01/11 | $30,000.00 | 10/20/10 | 03/01/11 | $82,727.09 |
| 11/20/10 | 09/01/11 | $30,000.00 | 11/20/10 | 03/01/11 | $82,727.09 |
| 12/20/10 | 09/01/11 | $30,000.00 | 12/20/10 | 03/01/11 | $82,727.09 |
| 01/20/11 | 09/01/11 | $30,000.00 | 01/20/11 | 03/01/11 | $82,727.09 |
| 02/20/11 | 09/01/11 | $30,000.00 | 02/20/11 | 03/01/11 | $82,727.09 |
| 03/20/11 | 09/01/11 | $30,000.00 | 03/20/11 | 09/01/11 | $82,727.09 |
| 04/20/11 | 09/01/11 | $30,000.00 | 04/20/11 | 09/01/11 | $82,727.09 |
| 05/20/11 | 09/01/11 | $30,000.00 | 05/20/11 | 09/01/11 | $82,727.09 |
| 06/20/11 | 09/01/11 | $30,000.00 | 06/20/11 | 09/01/11 | $82,727.09 |
| 07/20/11 | 09/01/11 | $30,000.00 | 07/20/11 | 09/01/11 | $82,727.09 |
| 08/20/11 | 09/01/11 | $30,000.00 | 08/20/11 | 09/01/11 | $82,727.09 |
| 09/20/11 | 09/01/12 | $32,916.67 | 09/20/11 | 03/01/12 | $80,688.03 |
| 10/20/11 | 09/01/12 | $32,916.67 | 10/20/11 | 03/01/12 | $80,688.03 |
| 11/20/11 | 09/01/12 | $32,916.67 | 11/20/11 | 03/01/12 | $80,688.03 |
| 12/20/11 | 09/01/12 | $32,916.67 | 12/20/11 | 03/01/12 | $80,688.03 |
| 01/20/12 | 09/01/12 | $32,916.67 | 01/20/12 | 03/01/12 | $80,688.03 |
| 02/20/12 | 09/01/12 | $32,916.67 | 02/20/12 | 03/01/12 | $80,688.03 |
| 03/20/12 | 09/01/12 | $32,916.67 | 03/20/12 | 09/01/12 | $80,688.03 |
| 04/20/12 | 09/01/12 | $32,916.67 | 04/20/12 | 09/01/12 | $80,688.03 |
| 05/20/12 | 09/01/12 | $32,916.67 | 05/20/12 | 09/01/12 | $80,688.03 |
| 06/20/12 | 09/01/12 | $32,916.67 | 06/20/12 | 09/01/12 | $80,688.03 |
| 07/20/12 | 09/01/12 | $32,916.67 | 07/20/12 | 09/01/12 | $80,688.03 |
| 08/20/12 | 09/01/12 | $32,916.67 | 08/20/12 | 09/01/12 | $80,688.03 |
| 09/20/12 | 09/01/13 | $35,833.33 | 09/20/12 | 03/01/13 | $78,441.67 |
| 10/20/12 | 09/01/13 | $35,833.33 | 10/20/12 | 03/01/13 | $78,441.67 |
| 11/20/12 | 09/01/13 | $35,833.33 | 11/20/12 | 03/01/13 | $78,441.67 |
| 12/20/12 | 09/01/13 | $35,833.33 | 12/20/12 | 03/01/13 | $78,441.67 |

\*    If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 01/20/13 | 09/01/13 | $35,833.33 | 01/20/13 | 03/01/13 | $78,441.67 |
| 02/20/13 | 09/01/13 | $35,833.33 | 02/20/13 | 03/01/13 | $78,441.67 |
| 03/20/13 | 09/01/13 | $35,833.33 | 03/20/13 | 09/01/13 | $78,441.67 |
| 04/20/13 | 09/01/13 | $35,833.33 | 04/20/13 | 09/01/13 | $78,441.67 |
| 05/20/13 | 09/01/13 | $35,833.33 | 05/20/13 | 09/01/13 | $78,441.67 |
| 06/20/13 | 09/01/13 | $35,833.33 | 06/20/13 | 09/01/13 | $78,441.67 |
| 07/20/13 | 09/01/13 | $35,833.33 | 07/20/13 | 09/01/13 | $78,441.67 |
| 08/20/13 | 09/01/13 | $35,833.33 | 08/20/13 | 09/01/13 | $78,441.67 |
| 09/20/13 | 09/01/14 | $38,750.00 | 09/20/13 | 03/01/14 | $75,988.03 |
| 10/20/13 | 09/01/14 | $38,750.00 | 10/20/13 | 03/01/14 | $75,988.03 |
| 11/20/13 | 09/01/14 | $38,750.00 | 11/20/13 | 03/01/14 | $75,988.03 |
| 12/20/13 | 09/01/14 | $38,750.00 | 12/20/13 | 03/01/14 | $75,988.03 |
| 01/20/14 | 09/01/14 | $38,750.00 | 01/20/14 | 03/01/14 | $75,988.03 |
| 02/20/14 | 09/01/14 | $38,750.00 | 02/20/14 | 03/01/14 | $75,988.03 |
| 03/20/14 | 09/01/14 | $38,750.00 | 03/20/14 | 09/01/14 | $75,988.03 |
| 04/20/14 | 09/01/14 | $38,750.00 | 04/20/14 | 09/01/14 | $75,988.03 |
| 05/20/14 | 09/01/14 | $38,750.00 | 05/20/14 | 09/01/14 | $75,988.03 |
| 06/20/14 | 09/01/14 | $38,750.00 | 06/20/14 | 09/01/14 | $75,988.03 |
| 07/20/14 | 09/01/14 | $38,750.00 | 07/20/14 | 09/01/14 | $75,988.03 |
| 08/20/14 | 09/01/14 | $38,750.00 | 08/20/14 | 09/01/14 | $75,988.03 |
| 09/20/14 | 09/01/15 | $43,750.00 | 09/20/14 | 03/01/15 | $73,331.78 |
| 10/20/14 | 09/01/15 | $43,750.00 | 10/20/14 | 03/01/15 | $73,331.78 |
| 11/20/14 | 09/01/15 | $43,750.00 | 11/20/14 | 03/01/15 | $73,331.78 |
| 12/20/14 | 09/01/15 | $43,750.00 | 12/20/14 | 03/01/15 | $73,331.78 |
| 01/20/15 | 09/01/15 | $43,750.00 | 01/20/15 | 03/01/15 | $73,331.78 |
| 02/20/15 | 09/01/15 | $43,750.00 | 02/20/15 | 03/01/15 | $73,331.78 |
| 03/20/15 | 09/01/15 | $43,750.00 | 03/20/15 | 09/01/15 | $73,331.78 |
| 04/20/15 | 09/01/15 | $43,750.00 | 04/20/15 | 09/01/15 | $73,331.78 |
| 05/20/15 | 09/01/15 | $43,750.00 | 05/20/15 | 09/01/15 | $73,331.78 |
| 06/20/15 | 09/01/15 | $43,750.00 | 06/20/15 | 09/01/15 | $73,331.78 |
| 07/20/15 | 09/01/15 | $43,750.00 | 07/20/15 | 09/01/15 | $73,331.78 |
| 08/20/15 | 09/01/15 | $43,750.00 | 08/20/15 | 09/01/15 | $73,331.78 |
| 09/20/15 | 09/01/16 | $47,500.00 | 09/20/15 | 03/01/16 | $70,306.78 |
| 10/20/15 | 09/01/16 | $47,500.00 | 10/20/15 | 03/01/16 | $70,306.78 |
| 11/20/15 | 09/01/16 | $47,500.00 | 11/20/15 | 03/01/16 | $70,306.78 |

\*     If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 12/20/15 | 09/01/16 | $47,500.00 | 12/20/15 | 03/01/16 | $70,306.78 |
| 01/20/16 | 09/01/16 | $47,500.00 | 01/20/16 | 03/01/16 | $70,306.78 |
| 02/20/16 | 09/01/16 | $47,500.00 | 02/20/16 | 03/01/16 | $70,306.78 |
| 03/20/16 | 09/01/16 | $47,500.00 | 03/20/16 | 09/01/16 | $70,306.78 |
| 04/20/16 | 09/01/16 | $47,500.00 | 04/20/16 | 09/01/16 | $70,306.78 |
| 05/20/16 | 09/01/16 | $47,500.00 | 05/20/16 | 09/01/16 | $70,306.78 |
| 06/20/16 | 09/01/16 | $47,500.00 | 06/20/16 | 09/01/16 | $70,306.78 |
| 07/20/16 | 09/01/16 | $47,500.00 | 07/20/16 | 09/01/16 | $70,306.78 |
| 08/20/16 | 09/01/16 | $47,500.00 | 08/20/16 | 09/01/16 | $70,306.78 |
| 09/20/16 | 09/01/17 | $51,666.67 | 09/20/16 | 03/01/17 | $67,014.59 |
| 10/20/16 | 09/01/17 | $51,666.67 | 10/20/16 | 03/01/17 | $67,014.59 |
| 11/20/16 | 09/01/17 | $51,666.67 | 11/20/16 | 03/01/17 | $67,014.59 |
| 12/20/16 | 09/01/17 | $51,666.67 | 12/20/16 | 03/01/17 | $67,014.59 |
| 01/20/17 | 09/01/17 | $51,666.67 | 01/20/17 | 03/01/17 | $67,014.59 |
| 02/20/17 | 09/01/17 | $51,666.67 | 02/20/17 | 03/01/17 | $67,014.59 |
| 03/20/17 | 09/01/17 | $51,666.67 | 03/20/17 | 09/01/17 | $67,014.59 |
| 04/20/17 | 09/01/17 | $51,666.67 | 04/20/17 | 09/01/17 | $67,014.59 |
| 05/20/17 | 09/01/17 | $51,666.67 | 05/20/17 | 09/01/17 | $67,014.59 |
| 06/20/17 | 09/01/17 | $51,666.67 | 06/20/17 | 09/01/17 | $67,014.59 |
| 07/20/17 | 09/01/17 | $51,666.67 | 07/20/17 | 09/01/17 | $67,014.59 |
| 08/20/17 | 09/01/17 | $51,666.67 | 08/20/17 | 09/01/17 | $67,014.59 |
| 09/20/17 | 09/01/18 | $56,250.00 | 09/20/17 | 03/01/18 | $63,427.61 |
| 10/20/17 | 09/01/18 | $56,250.00 | 10/20/17 | 03/01/18 | $63,427.61 |
| 11/20/17 | 09/01/18 | $56,250.00 | 11/20/17 | 03/01/18 | $63,427.61 |
| 12/20/17 | 09/01/18 | $56,250.00 | 12/20/17 | 03/01/18 | $63,427.61 |
| 01/20/18 | 09/01/18 | $56,250.00 | 01/20/18 | 03/01/18 | $63,427.61 |
| 02/20/18 | 09/01/18 | $56,250.00 | 02/20/18 | 03/01/18 | $63,427.61 |
| 03/20/18 | 09/01/18 | $56,250.00 | 03/20/18 | 09/01/18 | $63,427.61 |
| 04/20/18 | 09/01/18 | $56,250.00 | 04/20/18 | 09/01/18 | $63,427.61 |
| 05/20/18 | 09/01/18 | $56,250.00 | 05/20/18 | 09/01/18 | $63,427.61 |
| 06/20/18 | 09/01/18 | $56,250.00 | 06/20/18 | 09/01/18 | $63,427.61 |
| 07/20/18 | 09/01/18 | $56,250.00 | 07/20/18 | 09/01/18 | $63,427.61 |
| 08/20/18 | 09/01/18 | $56,250.00 | 08/20/18 | 09/01/18 | $63,427.61 |
| 09/20/18 | 09/01/19 | $61,250.00 | 09/20/18 | 03/01/19 | $59,513.54 |
| 10/20/18 | 09/01/19 | $61,250.00 | 10/20/18 | 03/01/19 | $59,513.54 |

\*    If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 11/20/18 | 09/01/19 | $61,250.00 | 11/20/18 | 03/01/19 | $59,513.54 |
| 12/20/18 | 09/01/19 | $61,250.00 | 12/20/18 | 03/01/19 | $59,513.54 |
| 01/20/19 | 09/01/19 | $61,250.00 | 01/20/19 | 03/01/19 | $59,513.54 |
| 02/20/19 | 09/01/19 | $61,250.00 | 02/20/19 | 03/01/19 | $59,513.54 |
| 03/20/19 | 09/01/19 | $61,250.00 | 03/20/19 | 09/01/19 | $59,513.54 |
| 04/20/19 | 09/01/19 | $61,250.00 | 04/20/19 | 09/01/19 | $59,513.54 |
| 05/20/19 | 09/01/19 | $61,250.00 | 05/20/19 | 09/01/19 | $59,513.54 |
| 06/20/19 | 09/01/19 | $61,250.00 | 06/20/19 | 09/01/19 | $59,513.54 |
| 07/20/19 | 09/01/19 | $61,250.00 | 07/20/19 | 09/01/19 | $59,513.54 |
| 08/20/19 | 09/01/19 | $61,250.00 | 08/20/19 | 09/01/19 | $59,513.54 |
| 09/20/19 | 09/01/20 | $67,916.67 | 09/20/19 | 03/01/20 | $55,240.11 |
| 10/20/19 | 09/01/20 | $67,916.67 | 10/20/19 | 03/01/20 | $55,240.11 |
| 11/20/19 | 09/01/20 | $67,916.67 | 11/20/19 | 03/01/20 | $55,240.11 |
| 12/20/19 | 09/01/20 | $67,916.67 | 12/20/19 | 03/01/20 | $55,240.11 |
| 01/20/20 | 09/01/20 | $67,916.67 | 01/20/20 | 03/01/20 | $55,240.11 |
| 02/20/20 | 09/01/20 | $67,916.67 | 02/20/20 | 03/01/20 | $55,240.11 |
| 03/20/20 | 09/01/20 | $67,916.67 | 03/20/20 | 09/01/20 | $55,240.11 |
| 04/20/20 | 09/01/20 | $67,916.67 | 04/20/20 | 09/01/20 | $55,240.11 |
| 05/20/20 | 09/01/20 | $67,916.67 | 05/20/20 | 09/01/20 | $55,240.11 |
| 06/20/20 | 09/01/20 | $67,916.67 | 06/20/20 | 09/01/20 | $55,240.11 |
| 07/20/20 | 09/01/20 | $67,916.67 | 07/20/20 | 09/01/20 | $55,240.11 |
| 08/20/20 | 09/01/20 | $67,916.67 | 08/20/20 | 09/01/20 | $55,240.11 |
| 09/20/20 | 09/01/21 | $73,333.33 | 09/20/20 | 03/01/21 | $50,478.13 |
| 10/20/20 | 09/01/21 | $73,333.33 | 10/20/20 | 03/01/21 | $50,478.13 |
| 11/20/20 | 09/01/21 | $73,333.33 | 11/20/20 | 03/01/21 | $50,478.13 |
| 12/20/20 | 09/01/21 | $73,333.33 | 12/20/20 | 03/01/21 | $50,478.13 |
| 01/20/21 | 09/01/21 | $73,333.33 | 01/20/21 | 03/01/21 | $50,478.13 |
| 02/20/21 | 09/01/21 | $73,333.33 | 02/20/21 | 03/01/21 | $50,478.13 |
| 03/20/21 | 09/01/21 | $73,333.33 | 03/20/21 | 09/01/21 | $50,478.13 |
| 04/20/21 | 09/01/21 | $73,333.33 | 04/20/21 | 09/01/21 | $50,478.13 |
| 05/20/21 | 09/01/21 | $73,333.33 | 05/20/21 | 09/01/21 | $50,478.13 |
| 06/20/21 | 09/01/21 | $73,333.33 | 06/20/21 | 09/01/21 | $50,478.13 |
| 07/20/21 | 09/01/21 | $73,333.33 | 07/20/21 | 09/01/21 | $50,478.13 |
| 08/20/21 | 09/01/21 | $73,333.33 | 08/20/21 | 09/01/21 | $50,478.13 |
| 09/20/21 | 09/01/22 | $79,583.33 | 09/20/21 | 03/01/22 | $45,329.17 |

\*    If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 10/20/21 | 09/01/22 | $79,583.33 | 10/20/21 | 03/01/22 | $45,329.17 |
| 11/20/21 | 09/01/22 | $79,583.33 | 11/20/21 | 03/01/22 | $45,329.17 |
| 12/20/21 | 09/01/22 | $79,583.33 | 12/20/21 | 03/01/22 | $45,329.17 |
| 01/20/22 | 09/01/22 | $79,583.33 | 01/20/22 | 03/01/22 | $45,329.17 |
| 02/20/22 | 09/01/22 | $79,583.33 | 02/20/22 | 03/01/22 | $45,329.17 |
| 03/20/22 | 09/01/22 | $79,583.33 | 03/20/22 | 09/01/22 | $45,329.17 |
| 04/20/22 | 09/01/22 | $79,583.33 | 04/20/22 | 09/01/22 | $45,329.17 |
| 05/20/22 | 09/01/22 | $79,583.33 | 05/20/22 | 09/01/22 | $45,329.17 |
| 06/20/22 | 09/01/22 | $79,583.33 | 06/20/22 | 09/01/22 | $45,329.17 |
| 07/20/22 | 09/01/22 | $79,583.33 | 07/20/22 | 09/01/22 | $45,329.17 |
| 08/20/22 | 09/01/22 | $79,583.33 | 08/20/22 | 09/01/22 | $45,329.17 |
| 09/20/22 | 09/01/23 | $86,250.00 | 09/20/22 | 03/01/23 | $39,733.33 |
| 10/20/22 | 09/01/23 | $86,250.00 | 10/20/22 | 03/01/23 | $39,733.33 |
| 11/20/22 | 09/01/23 | $86,250.00 | 11/20/22 | 03/01/23 | $39,733.33 |
| 12/20/22 | 09/01/23 | $86,250.00 | 12/20/22 | 03/01/23 | $39,733.33 |
| 01/20/23 | 09/01/23 | $86,250.00 | 01/20/23 | 03/01/23 | $39,733.33 |
| 02/20/23 | 09/01/23 | $86,250.00 | 02/20/23 | 03/01/23 | $39,733.33 |
| 03/20/23 | 09/01/23 | $86,250.00 | 03/20/23 | 09/01/23 | $39,733.33 |
| 04/20/23 | 09/01/23 | $86,250.00 | 04/20/23 | 09/01/23 | $39,733.33 |
| 05/20/23 | 09/01/23 | $86,250.00 | 05/20/23 | 09/01/23 | $39,733.33 |
| 06/20/23 | 09/01/23 | $86,250.00 | 06/20/23 | 09/01/23 | $39,733.33 |
| 07/20/23 | 09/01/23 | $86,250.00 | 07/20/23 | 09/01/23 | $39,733.33 |
| 08/20/23 | 09/01/23 | $86,250.00 | 08/20/23 | 09/01/23 | $39,733.33 |
| 09/20/23 | 09/01/24 | $130,000.00 | 09/20/23 | 03/01/24 | $33,658.33 |
| 10/20/23 | 09/01/24 | $130,000.00 | 10/20/23 | 03/01/24 | $33,658.33 |
| 11/20/23 | 09/01/24 | $130,000.00 | 11/20/23 | 03/01/24 | $33,658.33 |
| 12/20/23 | 09/01/24 | $130,000.00 | 12/20/23 | 03/01/24 | $33,658.33 |
| 01/20/24 | 09/01/24 | $130,000.00 | 01/20/24 | 03/01/24 | $33,658.33 |
| 02/20/24 | 09/01/24 | $130,000.00 | 02/20/24 | 03/01/24 | $33,658.33 |
| 03/20/24 | 09/01/24 | $130,000.00 | 03/20/24 | 09/01/24 | $33,658.33 |
| 04/20/24 | 09/01/24 | $130,000.00 | 04/20/24 | 09/01/24 | $33,658.33 |
| 05/20/24 | 09/01/24 | $130,000.00 | 05/20/24 | 09/01/24 | $33,658.33 |
| 06/20/24 | 09/01/24 | $130,000.00 | 06/20/24 | 09/01/24 | $33,658.33 |
| 07/20/24 | 09/01/24 | $130,000.00 | 07/20/24 | 09/01/24 | $33,658.33 |
| 08/20/24 | 09/01/24 | $130,000.00 | 08/20/24 | 09/01/24 | $33,658.33 |

\*    If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 09/20/24 | 09/01/25 | $36,250.00 | 09/20/24 | 03/01/25 | $24,961.46 |
| 10/20/24 | 09/01/25 | $36,250.00 | 10/20/24 | 03/01/25 | $24,961.46 |
| 11/20/24 | 09/01/25 | $36,250.00 | 11/20/24 | 03/01/25 | $24,961.46 |
| 12/20/24 | 09/01/25 | $36,250.00 | 12/20/24 | 03/01/25 | $24,961.46 |
| 01/20/25 | 09/01/25 | $36,250.00 | 01/20/25 | 03/01/25 | $24,961.46 |
| 02/20/25 | 09/01/25 | $36,250.00 | 02/20/25 | 03/01/25 | $24,961.46 |
| 03/20/25 | 09/01/25 | $36,250.00 | 03/20/25 | 09/01/25 | $24,961.46 |
| 04/20/25 | 09/01/25 | $36,250.00 | 04/20/25 | 09/01/25 | $24,961.46 |
| 05/20/25 | 09/01/25 | $36,250.00 | 05/20/25 | 09/01/25 | $24,961.46 |
| 06/20/25 | 09/01/25 | $36,250.00 | 06/20/25 | 09/01/25 | $24,961.46 |
| 07/20/25 | 09/01/25 | $36,250.00 | 07/20/25 | 09/01/25 | $24,961.46 |
| 08/20/25 | 09/01/25 | $36,250.00 | 08/20/25 | 09/01/25 | $24,961.46 |
| 09/20/25 | 09/01/26 | $39,166.67 | 09/20/25 | 03/01/26 | $22,152.08 |
| 10/20/25 | 09/01/26 | $39,166.67 | 10/20/25 | 03/01/26 | $22,152.08 |
| 11/20/25 | 09/01/26 | $39,166.67 | 11/20/25 | 03/01/26 | $22,152.08 |
| 12/20/25 | 09/01/26 | $39,166.67 | 12/20/25 | 03/01/26 | $22,152.08 |
| 01/20/26 | 09/01/26 | $39,166.67 | 01/20/26 | 03/01/26 | $22,152.08 |
| 02/20/26 | 09/01/26 | $39,166.67 | 02/20/26 | 03/01/26 | $22,152.08 |
| 03/20/26 | 09/01/26 | $39,166.67 | 03/20/26 | 09/01/26 | $22,152.08 |
| 04/20/26 | 09/01/26 | $39,166.67 | 04/20/26 | 09/01/26 | $22,152.08 |
| 05/20/26 | 09/01/26 | $39,166.67 | 05/20/26 | 09/01/26 | $22,152.08 |
| 06/20/26 | 09/01/26 | $39,166.67 | 06/20/26 | 09/01/26 | $22,152.08 |
| 07/20/26 | 09/01/26 | $39,166.67 | 07/20/26 | 09/01/26 | $22,152.08 |
| 08/20/26 | 09/01/26 | $39,166.67 | 08/20/26 | 09/01/26 | $22,152.08 |
| 09/20/26 | 09/01/27 | $42,083.33 | 09/20/26 | 03/01/27 | $19,116.67 |
| 10/20/26 | 09/01/27 | $42,083.33 | 10/20/26 | 03/01/27 | $19,116.67 |
| 11/20/26 | 09/01/27 | $42,083.33 | 11/20/26 | 03/01/27 | $19,116.67 |
| 12/20/26 | 09/01/27 | $42,083.33 | 12/20/26 | 03/01/27 | $19,116.67 |
| 01/20/27 | 09/01/27 | $42,083.33 | 01/20/27 | 03/01/27 | $19,116.67 |
| 02/20/27 | 09/01/27 | $42,083.33 | 02/20/27 | 03/01/27 | $19,116.67 |
| 03/20/27 | 09/01/27 | $42,083.33 | 03/20/27 | 09/01/27 | $19,116.67 |
| 04/20/27 | 09/01/27 | $42,083.33 | 04/20/27 | 09/01/27 | $19,116.67 |
| 05/20/27 | 09/01/27 | $42,083.33 | 05/20/27 | 09/01/27 | $19,116.67 |
| 06/20/27 | 09/01/27 | $42,083.33 | 06/20/27 | 09/01/27 | $19,116.67 |
| 07/20/27 | 09/01/27 | $42,083.33 | 07/20/27 | 09/01/27 | $19,116.67 |

\*   If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 08/20/27 | 09/01/27 | $42,083.33 | 08/20/27 | 09/01/27 | $19,116.67 |
| 09/20/27 | 09/01/28 | $45,416.67 | 09/20/27 | 03/01/28 | $15,855.21 |
| 10/20/27 | 09/01/28 | $45,416.67 | 10/20/27 | 03/01/28 | $15,855.21 |
| 11/20/27 | 09/01/28 | $45,416.67 | 11/20/27 | 03/01/28 | $15,855.21 |
| 12/20/27 | 09/01/28 | $45,416.67 | 12/20/27 | 03/01/28 | $15,855.21 |
| 01/20/28 | 09/01/28 | $45,416.67 | 01/20/28 | 03/01/28 | $15,855.21 |
| 02/20/28 | 09/01/28 | $45,416.67 | 02/20/28 | 03/01/28 | $15,855.21 |
| 03/20/28 | 09/01/28 | $45,416.67 | 03/20/28 | 09/01/28 | $15,855.21 |
| 04/20/28 | 09/01/28 | $45,416.67 | 04/20/28 | 09/01/28 | $15,855.21 |
| 05/20/28 | 09/01/28 | $45,416.67 | 05/20/28 | 09/01/28 | $15,855.21 |
| 06/20/28 | 09/01/28 | $45,416.67 | 06/20/28 | 09/01/28 | $15,855.21 |
| 07/20/28 | 09/01/28 | $45,416.67 | 07/20/28 | 09/01/28 | $15,855.21 |
| 08/20/28 | 09/01/28 | $45,416.67 | 08/20/28 | 09/01/28 | $15,855.21 |
| 09/20/28 | 09/01/29 | $49,166.67 | 09/20/28 | 03/01/29 | $12,335.42 |
| 10/20/28 | 09/01/29 | $49,166.67 | 10/20/28 | 03/01/29 | $12,335.42 |
| 11/20/28 | 09/01/29 | $49,166.67 | 11/20/28 | 03/01/29 | $12,335.42 |
| 12/20/28 | 09/01/29 | $49,166.67 | 12/20/28 | 03/01/29 | $12,335.42 |
| 01/20/29 | 09/01/29 | $49,166.67 | 01/20/29 | 03/01/29 | $12,335.42 |
| 02/20/29 | 09/01/29 | $49,166.67 | 02/20/29 | 03/01/29 | $12,335.42 |
| 03/20/29 | 09/01/29 | $49,166.67 | 03/20/29 | 09/01/29 | $12,335.42 |
| 04/20/29 | 09/01/29 | $49,166.67 | 04/20/29 | 09/01/29 | $12,335.42 |
| 05/20/29 | 09/01/29 | $49,166.67 | 05/20/29 | 09/01/29 | $12,335.42 |
| 06/20/29 | 09/01/29 | $49,166.67 | 06/20/29 | 09/01/29 | $12,335.42 |
| 07/20/29 | 09/01/29 | $49,166.67 | 07/20/29 | 09/01/29 | $12,335.42 |
| 08/20/29 | 09/01/29 | $49,166.67 | 08/20/29 | 09/01/29 | $12,335.42 |
| 09/20/29 | 09/01/30 | $52,916.67 | 09/20/29 | 03/01/30 | $8,525.00 |
| 10/20/29 | 09/01/30 | $52,916.67 | 10/20/29 | 03/01/30 | $8,525.00 |
| 11/20/29 | 09/01/30 | $52,916.67 | 11/20/29 | 03/01/30 | $8,525.00 |
| 12/20/29 | 09/01/30 | $52,916.67 | 12/20/29 | 03/01/30 | $8,525.00 |
| 01/20/30 | 09/01/30 | $52,916.67 | 01/20/30 | 03/01/30 | $8,525.00 |
| 02/20/30 | 09/01/30 | $52,916.67 | 02/20/30 | 03/01/30 | $8,525.00 |
| 03/20/30 | 09/01/30 | $52,916.67 | 03/20/30 | 09/01/30 | $8,525.00 |
| 04/20/30 | 09/01/30 | $52,916.67 | 04/20/30 | 09/01/30 | $8,525.00 |
| 05/20/30 | 09/01/30 | $52,916.67 | 05/20/30 | 09/01/30 | $8,525.00 |
| 06/20/30 | 09/01/30 | $52,916.67 | 06/20/30 | 09/01/30 | $8,525.00 |

\*   If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 07/20/30 | 09/01/30 | $52,916.67 | 07/20/30 | 09/01/30 | $8,525.00 |
| 08/20/30 | 09/01/30 | $52,916.67 | 08/20/30 | 09/01/30 | $8,525.00 |
| 09/20/30 | 09/01/31 | $57,083.33 | 09/20/30 | 03/01/31 | $4,423.96 |
| 10/20/30 | 09/01/31 | $57,083.33 | 10/20/30 | 03/01/31 | $4,423.96 |
| 11/20/30 | 09/01/31 | $57,083.33 | 11/20/30 | 03/01/31 | $4,423.96 |
| 12/20/30 | 09/01/31 | $57,083.33 | 12/20/30 | 03/01/31 | $4,423.96 |
| 01/20/31 | 09/01/31 | $57,083.33 | 01/20/31 | 03/01/31 | $4,423.96 |
| 02/20/31 | 09/01/31 | $57,083.33 | 02/20/31 | 03/01/31 | $4,423.96 |
| 03/20/31 | 09/01/31 | $57,083.33 | 03/20/31 | 09/01/31 | $4,423.96 |
| 04/20/31 | 09/01/31 | $57,083.33 | 04/20/31 | 09/01/31 | $4,423.96 |
| 05/20/31 | 09/01/31 | $57,083.33 | 05/20/31 | 09/01/31 | $4,423.96 |
| 06/20/31 | 09/01/31 | $57,083.33 | 06/20/31 | 09/01/31 | $4,423.96 |
| 07/20/31 | 09/01/31 | $57,083.33 | 07/20/31 | 09/01/31 | $4,423.96 |
| 08/20/31 | 09/01/31 | $57,083.33 | 08/20/31 | 09/01/31 | $4,423.96 |

\*       If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

**EXHIBIT B**

[LETTERHEAD OF COUNSEL TO TRUSTEE]

[Date]

[Corporation]

Lehman Brothers Special Financing Inc.
New York, NY

Re:    NAME OF BONDS

Ladies and Gentlemen:

We have acted as counsel to _____ (the "Trustee") in connection with the execution and delivery by the Trustee of the Debt Service Deposit Agreement, dated as of _____ (the "Agreement") by and among the Trustee, _____ (the "Corporation") and Lehman Brothers Special Financing Inc. ("Lehman"). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

In rendering this opinion, we have examined, among other things, copies of the Agreement and the Indenture.

In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the federal laws of the United States of America and the laws of the State of [STATE OF TRUSTEE] (the "State").*

Based upon the foregoing examination and review, we are of the opinion that:

(i)    The Trustee has full legal right, power and authority to enter into the Agreement.

(ii)    The Agreement has been duly authorized, executed and delivered by the Trustee.

(iii)    The stipulation of New York law as the governing law of the Agreement is enforceable under State law.

(iv)    Assuming for purposes of the opinion expressed in this paragraph (iv) that State law and New York law are the same, the Agreement is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(v)    The execution and delivery by the Trustee of the Agreement and the performance of its obligations thereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws, or the Indenture, or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(vi)    The Indenture is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

**EXHIBIT C**

[LETTERHEAD OF COUNSEL TO LEHMAN

[Date]

[Corporation]

[Trustee]

Re:    <u>NAME OF BONDS</u>

Ladies and Gentlemen:

      I have acted as counsel to Lehman Brothers Special Financing Inc. ("Lehman") in connection with the execution and delivery by Lehman of the Debt Service Deposit Agreement dated as of __ _____ (the "Agreement") by and among Lehman, _____, as Trustee (the "Trustee") and _____ (the "Corporation").    Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

      In connection with the opinions expressed below, I have examined, or have had examined on my behalf, a copy of the Agreement executed by Lehman and such other agreements, instruments, documents and records of Lehman and certificates and statements by public officials and officers of Lehman as I have deemed necessary or appropriate as a basis for the opinions hereinafter expressed.

      Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.    Lehman is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has the corporate power and authority to execute and deliver the Agreement and to perform its obligations thereunder.

2.    The Agreement has been duly and validly authorized, executed and delivered by Lehman and each constitutes the legal, valid and binding obligation of Lehman, enforceable against Lehman in accordance with its terms.

      The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.      My opinion in paragraph 2 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B.      I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the State of New York, the United States of America and the General Corporation Law of the State of Delaware.

C.      My opinions are limited to the present laws and to the facts as they presently exist. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.      This letter is rendered to you in connection with the Agreement and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose. This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman, except that you many furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Lehman, (iii) pursuant to the order or any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Agreement.

E.      I have assumed with your permission (i) the genuineness of all signatures by the Trustee and the Corporation, (ii) the authenticity of documents submitted to me as originals and the conformity with the original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Agreement by each party other than Lehman.

The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal liability in connection with the said opinions.

Very truly yours,

**EXHIBIT D**

[LETTERHEAD OF COUNSEL OF CORPORATION]

_____

[Trustee]

Lehman Brothers Special Financing Inc.
New York, NY

Re:    [NAME OF BONDS]

Ladies and Gentlemen:

    I have acted as counsel to _____ (the    "Corporation")    in connection with its execution and delivery of the Debt Service Deposit Agreement dated as of ___ _____ (the "Agreement"), by and among Lehman, _____ _____, as Trustee (the "Trustee") and the Corporation and its execution and delivery of the Loan Agreement (as defined in the Deposit Agreement). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

    In rendering this opinion, we have examined, among other things, copies of the Agreement and the Financing Documents.

    In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

    In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the laws of [State of Corporation] (the "State").

    Based upon the foregoing examination and review, we are of the opinion that:

    (i)    The Corporation has full legal right, power and authority to enter into the Agreement and the Indenture and to authorize and direct the Trustee, pursuant to the Agreement, to make purchases of the Qualified Securities in accordance with the terms therein.

    (ii)    The Agreement and the Indenture have been duly authorized, executed and delivered by the Corporation.

(iii)    The stipulation of New York law as the governing law of the Agreement is enforceable under the laws of the State.

(iv)    Assuming for purposes of the opinion expressed in this paragraph (iv) that State law and New York law are the same, the Agreement is a legal, valid and binding obligation of the Corporation, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(v)    The Corporation's execution and delivery of the Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under the Loan Agreement, or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(vi)    All consents, authorizations and approvals requisite for the Corporation's execution, delivery and performance of the Debt Service Deposit Agreement have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority or regulatory body is required for such execution, delivery or performance.

(vii)    The Loan Agreement is a legal, valid and binding obligation of the Corporation, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

**Lehman Brothers Special Financing Inc.**
**Notice of Tender**
**Under the Debt Service Deposit Agreement**
**Dated as of:**

To:   _____, as Trustee
       Attention:
       Fax:
       Phone:

From:   Lehman Brothers Inc.
       Attention:
       Fax:
       Phone:

Date:   [_____]

Re:   [_____]

**Date and Price**
**Purchase Date:**   [_____]
**Specified Purchase Price:**   [_____]

**Specific Government Obligations**

| Cusip | Type | Maturity | Coupon | Face Amount | Maturity Amount | Accrued Interest |
|-------|------|----------|--------|-------------|-----------------|------------------|
| [_____] | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |

**Delivery vs Payment (Book Entry Delivery)**

    On the Purchase Date, LBI will deliver Face value  [_____]  [BILLS/NOTES] maturing [_____]

        [_____]
        [_____]
        [_____]
        [_____]
               Re:
        [_____]

On the Purchase Date, LBI will receive [_____]

        JPMorgan Chase/Lehman
        ABA: 021000021
        A/C #066206677