# EXHIBIT A

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT    Southern District of New York | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>LEHMAN BROTHERS SPECIAL FINANCING, INC. | Case Number:<br>08-13888 |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**YAKIMA-TIETON IRRIGATION DISTRICT**

☐ Check this box to indicate that this claim amends a previously filed claim.

Name and address where notices should be sent:
c/o Jane Pearson
Foster Pepper PLLC
1111 Third Avenue, Suite 3400, Seattle, WA 98101-3299
Telephone number:
(206) 447-4400

**Court Claim Number:**_____
*(If known)*

Filed on:_____

Name and address where payment should be sent (if different from above):
Yakima-Tieton Irrigation District
Attn: Richard Dieker
470 Camp 4 Road, Yakima WA 98908
Telephone number:
(509) 678-4101

☑ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1. **Amount of Claim as of Date Case Filed:**    $                    546,568.34
   plus additional costs, expenses and attorneys fees
   If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

   If all or part of your claim is entitled to priority, complete item 5.

   ☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

2. **Basis for Claim:**   Debt Serv Deposit Agmt    dated 12/12/1996
   (See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:**_____

   **3a. Debtor may have scheduled account as:**_____
   (See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
   Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

   **Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
   **Describe:**

   **Value of Property:**$_____    **Annual Interest Rate**_____%

   **Amount of arrearage and other charges as of time case filed included in secured claim,**

   **if any:** $_____    **Basis for perfection:**_____

   **Amount of Secured Claim:** $_____    **Amount Unsecured:** $_____

6. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

7. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

*\*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

| Date:<br>04/17/2009 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>Jane Pearson, Foster Pepper PLLC | FOR COURT USE ONLY<br><br>FILED / RECEIVED<br>APR 2 0 2009<br>EPIQ BANKRUPTCY SOLUTIONS, LLC |
|---|---|---|

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

## **NOTICE**

DUPLICATE CLAIM FILED IN LEHMAN BROTHERS SPECIAL FINANCING, INC. CASE
NO. 08-13888

## DEBT SERVICE DEPOSIT AGREEMENT

This Debt Service Deposit Agreement (this "Agreement") dated as of December 12, 1996, by and among MELLON BANK, F.S.B., as successor Trustee under the Bond Resolution, a federal savings bank with an agency office in Seattle, Washington (the "Trustee"), YAKIMA-TIETON IRRIGATION DISTRICT, an irrigation district organized and existing under the laws of the State of Washington (the "Issuer") and LEHMAN BROTHERS SPECIAL FINANCING INC., a Delaware corporation ("Lehman").

SECTION I.              DEFINITIONS

For purposes of this Agreement, unless the context clearly indicates otherwise, the words and terms defined in this Section I have the respective meanings given to them herein:

"Bond Insurer" means Financial Security Assurance Inc., a New York stock insurance company, its successors or assigns.

"Bonds" means Yakima-Tieton Irrigation District Refunding Revenue Bonds, Series 1992, issued in the original principal amount of $25,890,000.

"Bond Payment Date" means with respect to each Delivery Date, each date identified as a "Bond Payment Date" on Exhibit A unless such date is not a Business Day, in which case "Bond Payment Date" means the immediately succeeding Business Day provided that in determining whether any such date is a Business Day no effect shall be given to clause (c) or (d) of the definition of Business Day.

"Bond Resolution" means the Resolution No. 92-5 adopted by the Issuer on December 10, 1992, providing for the issuance of the Bonds.

"Burdened Party" means, (i) in the case of (A) an Issuer or Trustee Event of Default or (B) a termination of this Agreement by the Issuer pursuant to Section 3.1 following a redemption, defeasance or refunding of the Bonds, Lehman and (ii) in the case of a Lehman Event of Default, the Issuer.

"Business Day" means any day other than (a) a Saturday or Sunday, (b) a day on which the principal corporate trust office of the Trustee is authorized or required by law to close, (c) a day on which banking institutions in the City of New York are authorized or required by law to close, or (d) a day on which any Qualified Securities which may be delivered hereunder are not subject to delivery in the City of New York.

"Closing Date" means December 12, 1996.

"Coupon Payment" means, for any Qualified Security, a payment of interest which is due to be paid thereon prior to the scheduled maturity of such security.

"Debt Service Fund" means the account created under the Bond Resolution and designated thereunder as the "Principal and Interest Account".

"Default Rate" means a rate per annum equal to Three Month LIBOR plus 1% per annum.

RECEIVED JAN 2 3 1997

"Delivery Date" means each date identified as a "Delivery Date" on Exhibit A unless such date is not a Business Day, in which case "Delivery Date" means the immediately succeeding Business Day.

"Delivery Notice" means a notice substantially in the form of Exhibit E or in such other form as provided by the Qualified Dealer and is reasonably acceptable to the Trustee.

"Deposit Amount" means for each Delivery Date the amount set forth in Exhibit A.

"Differential" means the amount, if any, by which the Purchase Price of any Qualified Security delivered hereunder exceeds the Market Value thereof.

"Eligible Securities" means direct, full faith and credit, non-callable obligations of the United States of America.

"Guaranteed Rate" means a rate per annum equal to 6.10% assuming that the interest on the applicable security were compounded semi-annually on the basis of a year of 360 days with twelve thirty day months.

"Insolvent" means (i) either the Trustee or Lehman as the case may be, shall (1) commence a voluntary case under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter), (2) file a petition seeking to take advantage of any other law, relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, (3) consent to any petition filed against it in an involuntary case under such bankruptcy or insolvency or other laws, (4) apply for or consent to the appointment of, or the taking of possession by, a trustee, receiver, custodian, liquidator or the like for itself or for all or a substantial part of its property, (5) admit in writing its inability to pay, or generally not be paying, its debts as they come due, (6) make a general assignment for the benefit of creditors, or (7) take any official action for the purpose of affecting any of the foregoing; or (ii) a case or other proceeding shall be commenced against either the Trustee or Lehman, as the case may be, in any court of competent jurisdiction seeking (1) relief under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter) or under any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, or (2) the appointment of a trustee, receiver, custodian, liquidator or the like for the Trustee or Lehman, as the case may be, or for all or a substantial part of its property, and any such case or proceeding shall continue undismissed and unstayed for a period of 60 consecutive calendar days, or an order granting the relief requested in any such case or proceeding against such party shall be entered and shall remain in effect and unstayed for a period of 60 consecutive days.

"Issuer Event of Default" means the occurrence of an event specified in Section 7.2.

"Lehman Event of Default" means the occurrence of an event specified in Section 7.3.

"Market Value" means with respect to any Qualified Security, the market value thereof (including accrued interest thereon) as specified by the Qualified Dealer delivering that security, provided that the Market Value of any Qualified Security shall in no event exceed the Purchase Price thereof.

"Maturity Amount" means, with respect to any Qualified Security, the amount, payable in cash, representing the principal and interest due thereon, on its maturity date (but shall exclude any Coupon Payments).

"Purchase Price" means, for any Eligible Security delivered hereunder, that price for such security, as set forth in the Delivery Notice, which will produce a rate of return on such security for the period from (and including) the date of its delivery to (but excluding) its maturity date equal to the Guaranteed Rate.

2

"Qualified Dealer" means Lehman Brothers Inc., its successors or assigns, or any other dealer in Qualified Eligible Securities selected by Lehman and approved by the Trustee.

"Qualified Securities" for any Delivery Date means Eligible Securities which, to the extent available on the open market, (i) mature as close as possible to but not later than the related Bond Payment Date and (ii) have an aggregate Purchase Price which is as close as possible to but does not exceed the related Deposit Amount.

"Termination Amount" means an amount, as determined by Lehman reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three leading dealers in the relevant markets ("Dealers"), of the amount, if any, that each such Dealer would require the Burdened Party to pay to the Dealer (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer) or would pay to the Burdened Party (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in consideration of such Dealer entering into an agreement with the Burdened Party which would have the effect of preserving for the Burdened Party the economic equivalent of its rights under this Agreement commencing on the termination date of this Agreement; provided, however, that:

(i)    if more than three quotations are provided, the Termination Amount will be the arithmetic mean of such quotations, without regard to the quotations having the highest and lowest values,

(ii)    if exactly three quotations are provided, the Termination Amount will be the quotation remaining after disregarding the highest and lowest quotations,

for purposes of clauses (i) and (ii), if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded, and

(iii)    if Lehman is unable to obtain three such quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by Lehman, to be the Burdened Party's total losses and costs (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer), or gains (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in connection with a termination of this Agreement, including any loss of bargain, cost of funding or, at the election of Lehman but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position, and

provided further, however, that in any event the Termination Amount shall also include (A) losses and costs in respect of any payment required to have been made (assuming satisfaction of each applicable condition precedent) on or before the date on which this Agreement shall be terminated or deemed terminated as provided herein and not made and (B) if such Termination Amount is being paid in connection with a termination of this Agreement following an Event of Default, hereunder, any incidental costs and expenses incurred by Lehman in connection with such termination and the enforcement of its rights hereunder (including reasonable attorneys' fees). Any determination of the Termination Amount by Lehman shall be conclusive and binding on the parties hereto absent manifest error. Lehman shall provide such information to the Issuer of the determination of the Termination Amount to indicate the manner in which the Termination Amount was calculated.

"Three Month LIBOR" as of any date of determination means the rate for deposits in US dollars for a period of three months which appears on the Telerate Page 3750 as of 11:00 a.m., London time, on the day that is two Business Days before the day for which such determination is being made. If no such rate appears on the Telerate Page 3750 as of such date, Lehman may select another nationally recognized published source to determine Three Month LIBOR.

"Trustee Event of Default" means the occurrence of an event specified in Section 7.1.

## SECTION II    PURCHASE AGREEMENT

Section 2.1    Purchase and Sale of Qualified Securities.

(a)    Lehman shall cause a Qualified Dealer to deliver to the Trustee, on any Delivery Date, in accordance with the delivery requirements of Section 2.2 hereof, to the extent such securities are readily available in the open market, Qualified Securities selected by Lehman or the Qualified Dealer.

(b)    If Lehman causes a Qualified Dealer to deliver Qualified Securities, the Trustee shall, out of immediately available funds under the Bond Resolution for such purpose or as otherwise provided by the Issuer, at the time of the delivery of such Qualified Securities, purchase such Qualified Securities and pay to the Qualified Dealer or Lehman, as applicable, in accordance with Section 2.2(b) hereof, an amount equal to the Purchase Price thereof.

(c)    Neither Lehman nor the Qualified Dealer is required to own any Qualified Securities at the time of Lehman's execution of this Agreement or at any time prior to the respective delivery dates thereof. The Qualified Securities, and the interest thereon, will, prior to the delivery thereof to the Trustee, be the sole property of the Qualified Dealer, and any profit or loss with respect to the holding or sale of any Qualified Securities delivered hereunder, even if purchased and identified to fulfill Lehman's obligations under this Agreement, shall, prior to such delivery, be for the sole account of the owner thereof.

(d)    Any Qualified Securities delivered to the Trustee (including interest thereon) as provided herein shall constitute part of the "trust estate" under the Bond Resolution.

Section 2.2    Delivery; Payment.

(a)    All Qualified Securities delivered hereunder shall be delivered to the Trustee to the account specified in Section 10.1 hereof, in such manner as at the time is generally acceptable for delivery of Qualified Securities. All Qualified Securities delivered hereunder shall be delivered to the Trustee on a "delivery versus payment" basis.

(b)    (i)    Lehman shall cause the Qualified Dealer to give the Trustee at least two Business Days prior notice of the delivery of any Qualified Securities which are in book-entry form and at least two Business Days notice of any Qualified Securities which are being delivered in certificated form. Any such notice shall specify the Maturity Amount, the Purchase Price, the Market Value and the Differential if available, the Bond Payment Date, the CUSIP Number and the security to be delivered and shall be in substantially the form of the Delivery Notice. The Trustee may conclusively rely on the specification by the Qualified Dealer of the Market Value, the Purchase Price and the Maturity Amount of a Qualified Security.

(ii)    Concurrently with the delivery of any Qualified Securities, unless otherwise directed by Lehman in writing, the Trustee shall, subject to clause (iii) below, pay the Qualified Dealer delivering such Qualified Securities, in its individual capacity, the Market Value thereof, and to the Qualified Dealer as agent for Lehman, the Differential, if any, the total of such Market Value and Differential being equal to the Maturity Amount for such Qualified Securities. The Maturity Amount to be paid by the Trustee pursuant to this Section 2.2(b)(ii) shall be made in a single wire to the Qualified Dealer, and the Trustee is under no obligation and has no duty to verify the portion of such payment which represents the Market Value or the Differential.

(iii)   Lehman may, in the Delivery Notice, direct the Trustee to pay (A) to the Qualified Dealer, the Market Value of any Qualified Securities delivered to the Trustee hereunder, and (B) to Lehman, the Differential, if any. Any such payment to Lehman shall be at Lehman's account as set forth in Section 10.1 hereof.

(iv)   All payments to be made hereunder (either to Lehman or the Qualified Dealer) shall be made in immediately available funds from the Debt Service Fund by means of a bank or Federal funds wire.

(c)   The Trustee and the Issuer have been advised by Lehman that the Maturity Amount for any Qualified Security delivered hereunder shall, in almost all cases, exceed the Market Value thereof.

Section 2.3   Subsequent Deliveries. If any Qualified Securities delivered by a Qualified Dealer pursuant to Section 2.1 hereof (A) mature prior to the Bond Payment Date for which such Qualified Securities were delivered or (B) have a Coupon Payment, Lehman shall have the right, upon at least two Business Days prior written notice to the Trustee in the form of the Delivery Notice, to cause a Qualified Dealer to deliver to the Trustee, at any time on or after the maturity date of such Qualified Securities (or, as applicable, on or after the interest payment date of such Coupon Payment) but prior to the date which is one Business Day before such Bond Payment Date, other Qualified Securities, provided that the Purchase Price thereof does not exceed the Maturity Amount of the securities which have so matured (or, as applicable, the amount of the Coupon Payment.) Any such deliveries by the Qualified Dealer shall conform to the requirements of Section 2.2(a). Upon the delivery by the Qualified Dealer of such Qualified Securities, the Trustee shall pay the Purchase Price thereof in the manner required by Section 2.2(b)(ii).

Section 2.4   Failure to Deliver. If in connection with any Delivery Date a Lehman Event of Default occurs, in addition to the rights set forth in Section 7.3 hereof, the Issuer shall have the right to invest the related Deposit Amount in any manner permitted under the Bond Resolution.

Section 2.5   Direction by Issuer to Trustee. The Issuer hereby irrevocably instructs the Trustee, and the Trustee agrees to enter into this Agreement, to take the actions and to make the purchases required hereby to the extent funds described in Section 2.1(b) hereof are actually received by the Trustee.

SECTION III.   DEFEASANCE OR REFUNDING

Section 3.1   Defeasance or Refunding.

(a)   The Issuer may, by giving Lehman at least fifteen (15) Business Days prior notice, but without the consent of Lehman redeem, defease, repurchase, or refund the Bonds as provided in the Bond Resolution, provided that if the Issuer takes any such action, the Issuer shall pay or cause the Trustee to pay to Lehman in immediately available funds the Termination Amount by no later than the later of (A) one Business Day after receipt of notice of the Termination Amount from Lehman or (B) the date of such redemption, defeasance or refunding. Such payment shall be made in immediately available funds, to or at the direction of Lehman.

(b)   Immediately upon payment of the Termination Amount in accordance with this Section 3.1 this Agreement shall terminate. The Issuer agrees that it shall not redeem, defease, refund or repurchase the Bonds unless it shall have sufficient funds to pay any Termination Amount which may be due as provided herein.

(c)     If pursuant to clause (a) above this Agreement would be terminated in connection with a refunding of the Bonds and a Termination Amount would be payable to Lehman or the Issuer, the Issuer may, by written notice to Lehman, request that Lehman continue this Agreement and have it apply to such refunding bonds the proceeds of which are used to refund the Bonds or in connection with such refunding (the "Refunding Bonds"). Lehman agrees that if it receives such a request it shall agree to so continue this Agreement with respect to the Refunding Bonds and the Bonds remaining outstanding after such refunding, with no Termination Amount being owed by the Issuer or Lehman, provided that:

(i)     Lehman receives such request (together with all relevant details relating thereto) at least 15 days in advance of the issuance of the Refunding Bonds;

(ii)     on or prior to the date the Bonds are to be refunded (the "Refunding Date") the Issuer and the trustee of the Refunding Bonds (the "Refunding Trustee") enter into such amendments of this Agreement with Lehman (the "Amended Agreement") as are necessary to have this Agreement pertain to the deposit amounts, deposit dates and bond payment dates applicable to the Refunding Bonds and to any Bonds which remain outstanding after giving effect to such refunding (the "Amended Cash Flows"); provided, however, each such Deposit Amount corresponding to the appropriate Delivery Date and Bond Payment Date of the Amended Cash Flows shall not exceed each original Deposit Amount corresponding to the appropriate Delivery Date and Bond Payment Date, and provided further, if the Refunding Trustee is not the Trustee, the Trustee shall be discharged hereunder upon execution of the Amended Agreement;

(iii)     the Delivery Dates and Bond Payment Dates of the Amended Agreement remain unchanged from the original Delivery Dates and Bond Payment Dates;

(iv)     the Refunding Bonds have a credit rating at least equivalent to the credit rating of the Bonds without giving effect to any bond insurance and are secured by revenues at least equivalent to the Bonds; and

(v)     Lehman receives any opinions and other assurances it may reasonably request to assure that the protections afforded it hereunder will continue under the Amended Agreement.


SECTION IV.          REPRESENTATIONS AND WARRANTIES

Section 4.1     Representations and Warranties.  Each party hereto represents and warrants to the other parties hereto that:

(a)     it is duly organized and validly existing under the laws of its jurisdiction, incorporation or establishment;

(b)     it has the power to enter into and perform its obligations under this Agreement (including, in the case of the Issuer, to pay the Termination Amount in accordance herewith and, including, in the case of the Issuer or the Trustee, to enter into and/or perform its obligations under the Bond Resolution);

(c)     this Agreement has been duly authorized, executed and delivered by it and, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of it enforceable against it in accordance with the terms hereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law;

(d)    its execution and delivery of this Agreement and its performance of its obligations hereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws (or equivalent organizational documents), or any other agreement (including in the case of the Issuer and the Trustee, the Bond Resolution), instrument, law, ordinance, regulation, judgment, injunction or order applicable to it or any of its property;

(e)    all consents, authorizations and approvals requisite for its execution, delivery and performance of this Agreement have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority or regulatory body is required for such execution, delivery or performance;

(f)    there is no proceeding pending or threatened against it at law or in equity, or before any governmental instrumentality or in any arbitration, which would materially impair its ability to perform its obligations under this Agreement, and there is no such proceeding pending against it which purports or is likely to affect the legality, validity or enforceability of the Agreement;

(g)    in the case of the Issuer:

(i)    the amount specified in Exhibit A hereto for each Delivery Date as the Deposit Amount therefor is the amount the Issuer is required to deposit into the Debt Service Fund pursuant to Section 6.02 of the Bond Resolution on such Delivery Date,

(ii)    it is not entitled to claim, and shall not assert any claim, with respect to itself or its revenues, assets or property (irrespective of the use or intended use thereof), of immunity on the grounds of sovereignty or similar grounds from suit, jurisdiction of any court, relief by way of injunction, order for specific performance or for recovery of property, attachment of its assets (whether before or after judgment, in aid of execution, or otherwise) and execution or enforcement of any judgment to which it or its revenues or assets or property might otherwise be entitled in any suit, action or proceeding relating to this Agreement in the courts of any jurisdiction, nor may there be attributed to the Issuer or its revenues, assets or property any such immunity (nor shall such attribution be claimed by the Issuer),

(iii)    its obligation to make payments of the Deposit Amount to the Trustee on each Delivery Date constitute revenue obligations payable out of the Net Revenue of the Issuer (as defined in the Bond Resolution),

(iv)    the Issuer has entered into this Agreement for purposes of managing its borrowings or investments by increasing the predictability of its cash flow from earnings on its investments and not for purposes of speculation, and

(v)    the Bond Resolution has been duly authorized, executed and delivered by it,

(vi)    the Bond Resolution constitutes legal, valid and binding obligations of it, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law,

(vii)    the Bond Resolution is in full force and effect on the date hereof and no amendment, waiver or course of dealing has amended or terminated any of the terms thereof since the original execution and

delivery of the Bond Resolution, except such as may have been delivered to Lehman pursuant to Section 6.1(d) hereof,

(viii)    no "event of default" or event which would with the passage of time or the giving of notice constitute an event of default has occurred and is continuing under the Bond Resolution, and

(ix)    the Issuer has not entered into any agreements providing for the forward delivery of Eligible Securities or for the investment of funds held in the Debt Service Fund under the Bond Resolution except for this Agreement.

## SECTION V.          COVENANTS

Section 5.1    Covenants. Each of Lehman, the Issuer and the Trustee covenants to the other parties to this Agreement that so long as it shall have any obligations under this Agreement it shall:

(a)    maintain in full force and effect all authorizations and agreements of and exemptions, consents, licenses, actions or approvals by, and all filings with or notices to, any governmental or other authority that are required to be obtained or made by such party with respect to this Agreement and will use all reasonable efforts to obtain or make any that may become necessary in the future;

(b)    comply in all material respects with all applicable laws, rules, regulations and orders to which it may be subject if failure so to comply could materially impair its ability to perform its obligations under this Agreement; and

(c)    if it is the Issuer or the Trustee, not enter into any amendment or modification of the Bond Resolution which could impair its ability to perform its obligations to Lehman hereunder, except that nothing contained herein shall restrict the Issuer's ability to issue additional bonds under the Bond Resolution.

Section 5.2    Additional Covenants of Issuer. In addition to its covenants under Section 5.1, the Issuer covenants to the other parties to this Agreement that so long as it shall have any obligations hereunder:

(a)    on or before each Delivery Date it shall make payments into the Debt Service Fund in such amounts as are necessary to cause the related Deposit Amounts to be available in immediately available funds into the Debt Service Fund on each Delivery Date; and

(b)    it shall, if Lehman fails to cause the Qualified Dealer to deliver Qualified Securities on any Delivery Date, direct the Trustee to invest the related Deposit Amount on an overnight basis in Eligible Securities (as defined in the Bond Resolution) and if such failure becomes a Lehman Event of Default under Section 7.3(a), the Issuer shall direct the Trustee to invest the related Deposit Amount in Eligible Securities in the manner permitted by the Bond Resolution

## SECTION VI  .          CONDITIONS PRECEDENT

Section 6.1    Conditions Precedent.    The performance of the obligations of the parties hereunder are conditioned upon satisfaction of the following conditions:

(a)    delivery to Lehman and Issuer of an opinion of counsel to the Trustee substantially in the form of Exhibit B;

(b)    delivery to Lehman and Trustee of an opinion of counsel to the Issuer, in the form of Exhibit D;

(c)    delivery to Lehman by the Issuer of a copy of the official statement for the Bonds;

(d)    delivery by Lehman to the Issuer, the Trustee and the Bond Insurer an opinion of nationally recognized bankruptcy counsel to Lehman;

(e)    delivery by Lehman to the Issuer and Trustee of an opinion of inside counsel to Lehman, in the form of Exhibit C; and

(f)    delivery to Lehman of a copy of any consent received by the Issuer to enter in to this Agreement.


SECTION VII.        DEFAULTS; TERMINATION

Section 7.1    Trustee Events of Default. The occurrence of any of the following events shall constitute a Trustee Event of Default:

(a)    the Trustee shall fail for any reason, other than that the Issuer has failed to deposit the related Deposit Amount in immediately available funds, to purchase for two Business Days, at the Purchase Price therefor, any Qualified Securities delivered by the Qualified Dealer in accordance with this Agreement, provided, however, that the Trustee shall pay Lehman for its losses as calculated in Section 7.7 from the date of such failure until such Qaulified Securities are delivered hereunder;

(b)    the Trustee shall default in the performance of any other covenant or obligation under this Agreement and such default is not cured within 5 Business Days of notice thereof from Lehman or the Issuer; or

(c)    any representation or warranty of the Trustee contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made.

Section 7.2    Issuer Events of Default. The occurrence of any of the following events shall constitute an Issuer Event of Default:

(a)    the Issuer shall fail to make the Deposit Amount or the Trustee for any other reason shall fail to purchase, at the Purchase Price thereof, any Qualified Securities delivered by the Qualified Dealer in accordance herewith;

(b)    the Issuer shall default in the performance of any covenant or obligation under, or incorporated by reference in, this Agreement, other than as described in clause (a) above and such default is not cured within five Business Days of notice thereof from Lehman or the Trustee;

(c)    any representation or warranty of the Issuer contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made;

(d)    the Issuer (1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts

as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 60 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6)(A) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets or (B)(I) there shall be appointed or designated with respect to it, an entity such as an organization, board, commission, authority, agency or body to monitor, review, oversee, recommend or declare a financial emergency or similar state of financial distress with respect to it or (II) there shall be declared or introduced or proposed for consideration by it or by any legislative or regulatory body with competent jurisdiction over it, the existence of a state of financial emergency or similar state of financial distress in respect of it; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 60 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts;

(e)    the interest and principal outstanding under the Bonds shall be declared due and payable at any time prior to the scheduled maturity thereof (other than pursuant to scheduled mandatory redemptions under Section 5.02 of the Bond Resolution or pursuant to a permitted refunding under Section 15 of the Bond Resolution);

(f)    there shall be an investment of amounts in the Debt Service Fund other than pursuant to this Agreement (except as permitted under Section 5.2(b) hereof); or

(g)    the Issuer consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if an entity such as an organization, board, commission authority, agency or body succeeds to the principal functions of, or powers and duties granted, to the Issuer) and, at the time of such consolidation, amalgamation, merger or transfer either (i) the resulting or surviving or transferee entity fails to assume all the obligations of the Issuer under this Agreement or by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement or (ii) the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of the Issuer.

Section 7.3    Lehman Events of Default.    The occurrence of any of the following events shall constitute a Lehman Event of Default:

(a)    Lehman shall fail to cause a Qualified Dealer to deliver Qualified Securities on any Delivery Date and such failure shall continue for two Business Days after written notice thereof to Lehman from the Trustee or the Issuer;

(b)    any representation or warranty of Lehman contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made; or

(c)    Lehman is at any time Insolvent.

Section 7.4    <u>Remedies Upon Occurrence of Trustee Event of Default</u>.   Upon the occurrence of a Trustee Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Delivery Date and which have not theretofore been delivered to and purchased by the Trustee and, subject to Section 8.2, make demand for the payment of its losses (calculated in accordance with Section 7.7) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    immediately terminate this Agreement by giving written notice thereof to the Trustee with a copy to the Issuer and, subject to Section 8.2, if the Termination Amount is a positive number, make demand upon the Trustee for the payment of the Termination Amountand (ii) if the Termination Amount is a negative number, no Termination Amount shall be due.

If the Termination Amount is payable pursuant to this Section 7.4(b), the party owing such amount shall promptly, but by no later than two Business Days after written notice that such amount is due from Lehman, pay such amount, in immediately available funds, to the party to whom such Termination Amount is due.  If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due and not paid at the Default Rate.  Any amounts payable pursuant to Section 7.7 shall be payable upon demand as provided therein.

Notwithstanding anything to the contrary in this Agreement, the Trustee shall have no direct liability to Lehman hereunder except to the extent, if any, that the losses incurred by Lehman upon a Trustee Event of Default are caused by the Trustee's negligence or wilful misconduct or by a breach of its covenant contained in Section 5.1(c) hereof or by a breach of the Trustee's representations and warranties hereunder.

Section 7.5    <u>Remedies Upon Occurrence of Issuer Event of Default</u>.   Upon the occurrence of an Issuer Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Delivery Date and which have not theretofore been delivered to and purchased by the Trustee and make demand for the payment of its losses (calculated in accordance with Section 7.7) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    immediately terminate this Agreement by giving written notice thereof to the Issuer with a copy to the Trustee, and (i) if the Termination Amount is a positive number, make demand upon the Issuer for the payment of the Termination Amount and (ii) if the Termination Amount is a negative number, no Termination Amount shall be due.

If a Termination Amount is payable pursuant to this Section 7.5(b), the party owing such amount shall promptly, but by no later than two Business Days after written notice that such amount is due from the party to whom such Termination Amount is due, pay such amount, in immediately available funds, to or at the direction of the party to whom such Termination Amount is due.  If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate.  Any amounts payable pursuant to Section 7.7 shall be payable upon demand as provided therein.

Section 7.6    <u>Remedies Upon Occurrence of Lehman Event of Default</u>.   Upon the occurrence of a Lehman Event of Default, the Issuer shall have the right to:

(a)    if such default is a default under Section 7.3(a), cause a qualified dealer selected by the Issuer or the Trustee to sell to the Trustee the Qualified Securities which were to be delivered and which have not yet been delivered to the Trustee and make demand for the payment of its losses in connection therewith, calculated as provided in Section 7.7;

(b)    if such default is a default under Section 7.3(a) and there has previously been such a default, and Lehman has failed to pay the Issuer's losses (as described in Section 7.7), immediately terminate this Agreement by giving written notice thereof to Lehman with a copy to the Trustee; and

(c)    if such default is a default under Sections 7.3(b) or (c) hereof, immediately terminate this Agreement; whereupon Lehman shall promptly determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than two Business Days after written notice is delivered by Lehman to the Issuer that such amount is due, pay such amount, in immediately available funds, to the Issuer and (ii) if the Termination Amount is a positive number, no Termination Amount shall be due.  If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate.  Notwithstanding anything to the contrary in this Agreement, if Lehman fails to determine the Termination Amount within three Business Days of notice from the Issuer or the Trustee of the occurrence of a Lehman Event of Default then the Issuer (or if so directed by the Issuer, the Trustee) shall make such determination as if it were Lehman and the amount as so determined by the Issuer (or the Trustee) shall for purposes of this Section 7.6 be deemed the Termination Amount.

Section 7.7    <u>Loss Amount if Failed or Late Purchase</u>.

(a)    Subject to Section 8.2, if the Trustee fails to purchase any Qualified Securities delivered by a Qualified Dealer in accordance with this Agreement and provided that Lehman has not exercised its right to terminate this Agreement as provided herein (in which case the Termination Amount shall be due), the Trustee, in the case of a Trustee Event of Default under Section 7.1(a) or the Issuer under any other circumstances, shall pay to Lehman as liquidated damages for its losses and not as a penalty, on demand by Lehman, the sum of (w) interest on the Purchase Price of such Qualified Securities for each day from and including the delivery date thereof to but excluding the date on which such securities are resold to a third party or to the Trustee, (x) the excess, if any, of the Purchase Price of such Qualified Securities over the amount received by the Qualified Dealer upon such resale of the securities (the "Shortfall Amount"), (y) interest on Shortfall Amount from and including the resale date to but excluding the date on which the Trustee or the Issuer, as applicable, compensates Lehman for its losses as described herein, and (z) any reasonable incidental costs and expenses shown to have been incurred by Lehman in connection with the Trustee's failure to so purchase such Qualified Securities. Interest shall accrue at a rate per annum equal to the Default Rate for purposes of clauses (w) and (y).

(b)    If Lehman fails to deliver any Qualified Securities in accordance with this Agreement and provided that the Issuer has not exercised its right to terminate this Agreement as provided herein (in which case the Termination Amount shall be due) the amount of losses that shall be payable on demand against Lehman upon the occurrence of a Lehman Event of Default under Section 7.3(a) shall be the excess, if any, of the interest the Trustee would have earned on the related Deposit Amount had the Deposit Amount been invested at the Guaranteed Rate (the "Guaranteed Interest") over the amount of the interest the Trustee actually earned by investing the related Deposit Amount in Eligible Securities as provided by Section 5.2(c) hereof; provided that if the Trustee fails to invest such Deposit Amount in Eligible Securities as provided by Section 5.2(c), the amount of losses payable by Lehman shall be equal to the excess, if any, of the Guaranteed Interest over an amount equal to the interest the Trustee would have earned based on the prevailing rates for Eligible Securities at such time (as

determined by the Trustee in consultation with Lehman) had the Trustee invested such Deposit Amount in Eligible Securities as provided in Section 5.2(c).

Section 7.8    Limited Rights Against the Debt Service Fund.    Lehman agrees and acknowledges that (i) neither Lehman nor any Qualified Dealer has any right, title or interest in or to any securities, cash or other property held in the Debt Service Fund or by the Trustee, including without limitation the Qualified Securities, except to the extent expressly provided in this Agreement with respect to payments in connection with the delivery of Qualified Securities, (ii) the Trustee shall not be obligated to pay the Purchase Price of any Qualified Securities from funds other than immediately available funds held in the Debt Service Fund and (iii) any payments required to be made to Lehman by the Issuer under this Agreement shall constitute general unsecured obligations of the Issuer.

Section 7.9    No Waiver: Remedies Cumulative.    No failure or delay on Lehman's part in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy. Lehman's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law, this Agreement or otherwise. None of the terms or provisions of this Agreement may be waived, modified or amended except in a writing duly signed by the Trustee, the Issuer and Lehman.

SECTION VIII.    THE TRUSTEE

Section 8.1    Acceptance by Trustee    By execution and delivery of this Agreement, the Trustee accepts its duties and obligations hereunder, as an addition to its duties and obligations as Trustee under the Bond Resolution.

Section 8.2    Liability of the Trustee: Consultation with Legal Counsel.

(a)    The Trustee shall not be liable to any person for any action taken or neglected to be taken in performing or attempting to perform its obligations hereunder or preserving or seeking to preserve the funds it maintains under the Bond Resolution or to purchase the Qualified Securities tendered pursuant to this Agreement, except for actions arising from its gross negligence or willful misconduct or for a breach of its representations or warranties or from a breach of its covenant under Section 5.1(e).

(b)    The Trustee may consult with counsel reasonably satisfactory to Lehman and the Issuer with respect to any question relating to its duties or responsibilities hereunder or otherwise in connection herewith and, except as expressly provided herein, shall not be liable for any action taken, suffered, or omitted by the Trustee in good faith upon the advice of such counsel. The Trustee may act through its officers, employees, agents and attorneys.

Section 8.3    Payment of Trustee Fees.    Lehman has no liability or responsibility for payment of the Trustee's fees or expenses for its services hereunder, including any such fees or expenses arising out of or in connection with the liquidation of the Qualified Securities as provided herein.

Section 8.4     Trustee Cooperation.

(a)     The Trustee shall not act in contravention of its obligations hereunder or invest amounts in the Debt Service Fund other than pursuant to this Agreement.

(b)     The Trustee shall not make any payments or distributions from the Debt Service Fund other than payments or distributions (i) required by this Agreement, or (ii) to pay principal of, redemption premium and interest on the Bonds.

Section 8.5     Successor Trustee.   If the Trustee shall resign or be discharged from its duties and obligations under the Bond Resolution, the Issuer shall appoint a successor Trustee pursuant to the terms of the Bond Resolution; provided, however, the successor trustee shall be reasonably acceptable to Lehman. The Issuer agrees that if the Trustee fails for any reason to perform its duties to Lehman under this Agreement in accordance with the terms hereof, or is at any time Insolvent or breaches in any material respect its representations and warranties to Lehman hereunder, the Issuer shall promptly, upon request of Lehman, appoint a successor Trustee acceptable to Lehman.

Section 8.6     Confirmation of Trustee Right to Indemnification.   The Issuer hereby confirms the Trustee's rights under Sections 9.04(p) and 9.07 of the Bond Resolution in consideration for the Trustee's execution of this Agreement and its undertaking of duties and obligations hereunder. The provisions of Section 9.07 are hereby incorporated herein by reference.


SECTION IX.     MISCELLANEOUS

Section 9.1     Notices.   All notices, demands or other communications hereunder shall be given or made in writing and shall be delivered personally, or sent by certified or registered mail, postage prepaid, return receipt requested, or overnight delivery service, telex or telecopy to the party to whom they are directed at the following addresses, or at such other addresses as may be designated by notice from such party to all other parties:

> To Lehman:
>
> Lehman Brothers Special Financing Inc.
> 3 World Financial Center, 7th Floor
> New York, NY 10285
> Attention: Senior Vice President
> Telephone: 212- 526-7133
> FAX: 212- 528-6923
>
> To the Trustee:
>
> Mellon Bank, F.S.B.
> 1111 3rd Avenue, Suite 2230
> Seattle, WA 98101
> Attention: Corporate Trust Group
> Telephone: 206-223-0540, ext. 222
> FAX: 206-223-0545

[FOR DELIVERY OF BOOK-ENTRY GOVERNMENT OBLIGATIONS]

BOS SAFE DEP/CUST
ABA: 011001234
Ref# 03041

<u>To the Issuer:</u>

Yakima-Tieton Irrigation District
470 Camp 4 Road
Yakima, WA  98908
Attention:  Manager
Telephone:  509-678-4101
FAX:  509-678-5730

<u>To the Bond Insurer:</u>

Financial Security Assurance Inc.
350 Park Avenue
New York, NY  10022-6022
Attention:  Managing Director - Surveillance -- Re:  Policy No. 20220
Phone:  212-826-0100
FAX:  212-339-3529

In each case in which notice or other communication refers to an event of default or with respect to which failure on the part of the Bond Insurer to respond shall be deemed to constitute consent or acceptance, then a copy of such notice or other communication shall also be sent to the attention of General Counsel and shall be marked to indicate "URGENT MATERIAL ENCLOSED."

Any notice, demand or other communication given in a manner prescribed in this Section shall be deemed to have been delivered on receipt.

Section 9.2    <u>Binding Effect: Transfer</u>.  This Agreement shall be binding upon the Trustee, the Issuer and Lehman and upon their respective permitted successors and transferees.  Lehman shall be entitled to transfer all or any portion of this Agreement and its interests and obligations hereunder, to any subsidiary or affiliate of Lehman, or to any office, branch or subsidiary of any affiliate of Lehman and upon notice to the Issuer, the Bond Insurer and the Trustee, and Lehman shall otherwise be able to transfer all or any portion of this Agreement only with the consent of the Issuer and the Bond Insurer (such consent not to be unreasonably withheld or delayed if such transfer is to any entity rated at least an "A-", "A3", or "A-" by Standard & Poor's, a division of the McGraw-Hill Companies, ("Standard & Poor's"), Moody's Investors Service, Inc. ("Moody's") or Fitch Investors Service, L.P. ("Fitch"), respectively) and notice to the Trustee; provided, however, that in all such instances the transferee shall assume all of the rights and obligations of Lehman hereunder. The Trustee may not transfer this Agreement without the prior written consent of Lehman.

Section 9.3    <u>Limitation</u>.    Nothing expressed or implied herein is intended or shall be construed to confer upon any person, firm or corporation other than the parties hereto, any right, remedy or claim by reason of this Agreement or any term hereof, and all terms contained herein shall be for the sole and exclusive benefit of the parties hereto, and their successors and permitted transferees.

Section 9.4   Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law principles.

Section 9.5   Submission to Jurisdiction.  Lehman, the Trustee and the Issuer each hereby irrevocably submits to the non-exclusive jurisdiction of any court of the State of New York or the United States District Court for the Southern District of the State of New York for the purpose of any suit, action or other proceeding arising out of this Agreement, or any of the agreements or transactions contemplated hereby, at the election of the party initiating any such suit, action or other proceeding, which is brought by or against Lehman, the Trustee or the Issuer, and the parties each hereby irrevocably agrees that all claims in respect of any such suit, action or proceeding may be heard and determined by any such court.

Section 9.6   Role of Lehman.

(a)     It is expressly understood and agreed that in performing its obligations hereunder, Lehman is not acting as a fiduciary, agent or other representative for the holders of the Bonds or for any other person, that Lehman has made no investigation with respect to the tax-exempt status of the Bonds, and that neither Lehman nor any of its directors, officers, employees, agents or affiliates shall be liable or responsible for: (i) the payment of any amounts owing on or with respect to the Bonds; (ii) the use or application by the Trustee of any moneys payable to the Trustee hereunder; (iii) any acts or omissions of the Issuer or the Trustee under, or with respect to, the validity, tax exemption or enforceability of, the Bonds, or the Bond Resolution ; or (iv) the Trustee's performance of its obligations under the Bond Resolution or any other agreement or instrument with respect to the Bonds. Without limiting the foregoing, Lehman shall have no duty to ascertain whether the Trustee is in compliance with any applicable statute, regulation or law, or the Bond Resolution.

(b)     The Issuer acknowledges that the economic terms of this Agreement have been individually negotiated by it and that, to the extent it has deemed necessary, it has consulted with its own legal, tax and investment advisors regarding its decision to enter into this Agreement. The Issuer understands that in entering this Agreement pursuant to which it is agreeing upon the rate of return it will receive during the term of this Agreement on amounts held in the Debt Service Fund and thereby minimizing the risks resulting from fluctuations in interest rates during the term hereof it is also foregoing the possibility of receiving greater returns on such amounts from such fluctuations.

Section 9.7   Counterparts.  This Agreement may be executed in one or more counterparts and when each party hereto has executed at least one counterpart, this Agreement shall become binding on all parties and such counterparts shall be deemed to be one and the same document.

Section 9.8   Severability.  If one or more provisions of this Agreement or the applicability of any such provisions to any set of circumstances shall be determined to be invalid or ineffective for any reason, such determination shall not affect the validity and enforceability of the remaining provisions or the applicability of the same provisions or any of the remaining provisions to other circumstances.

Section 9.9   Amendments. Changes and Modifications.  This Agreement may be amended or any of its terms modified only by a written document authorized, executed and delivered by each of the parties hereto.

Section 9.10   Termination.  Unless earlier terminated pursuant to Section 3.1, 7.4, 7.5, or 7.6 hereof, this Agreement shall terminate on the later of the last Bond Payment Date set forth in Exhibit A and the date on which the Trustee and the Issuer have satisfied all of their obligations hereunder.

IN WITNESS WHEREOF, the Trustee, the Issuer and Lehman have caused this Debt Service Deposit Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

MELLON BANK, F.S.B, AS TRUSTEE

By: _____
Name:   Robert R. Meyer
Title:    Vice President


YAKIMA-TIETON IRRIGATION DISTRICT

By: _____
Name:  DONALD JOHNSON
Title:  PRESIDENT


LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:    T. Courtney Jenkins
Title:     Vice President

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 12/13/96 | 06/01/97 | $540,000.00 | 12/13/96 | 06/01/97 | $730,643.75 |
| 06/30/97 | 06/01/98 | $565,000.00 | 06/30/97 | 12/01/97 | $717,548.75 |
| 06/30/98 | 06/01/99 | $595,000.00 | 06/30/97 | 06/01/98 | $717,548.75 |
| 06/30/99 | 06/01/00 | $625,000.00 | 06/30/98 | 12/01/98 | $703,282.50 |
| 06/30/00 | 06/01/01 | $660,000.00 | 06/30/98 | 06/01/99 | $703,282.50 |
| 06/30/01 | 06/01/02 | $695,000.00 | 06/30/99 | 12/01/99 | $687,812.50 |
| 06/30/02 | 06/01/03 | $735,000.00 | 06/30/99 | 06/01/00 | $687,812.50 |
| 06/30/03 | 06/01/04 | $775,000.00 | 06/30/00 | 12/01/00 | $670,937.50 |
| 06/30/04 | 06/01/05 | $820,000.00 | 06/30/00 | 06/01/01 | $670,937.50 |
| 06/30/05 | 06/01/06 | $870,000.00 | 06/30/01 | 12/01/01 | $652,622.50 |
| 06/30/06 | 06/01/07 | $920,000.00 | 06/30/01 | 06/01/02 | $652,622.50 |
| 06/30/07 | 06/01/08 | $975,000.00 | 06/30/02 | 12/01/02 | $632,988.75 |
| 06/30/08 | 06/01/09 | $1,035,000.00 | 06/30/02 | 06/01/03 | $632,988.75 |
| 06/30/09 | 06/01/10 | $1,100,000.00 | 06/30/03 | 12/01/03 | $611,857.50 |
| 06/30/10 | 06/01/11 | $1,165,000.00 | 06/30/03 | 06/01/04 | $611,857.50 |
| 06/30/11 | 06/01/12 | $1,240,000.00 | 06/30/04 | 12/01/04 | $589,188.75 |
| 06/30/12 | 06/01/13 | $1,315,000.00 | 06/30/04 | 06/01/05 | $589,188.75 |
| 06/30/13 | 06/01/14 | $1,395,000.00 | 06/30/05 | 12/01/05 | $564,998.75 |
| 06/30/14 | 06/01/15 | $1,480,000.00 | 06/30/05 | 06/01/06 | $564,998.75 |
| 06/30/15 | 06/01/16 | $1,570,000.00 | 06/30/06 | 12/01/06 | $539,333.75 |
| 06/30/16 | 06/01/17 | $1,670,000.00 | 06/30/06 | 06/01/07 | $539,333.75 |
| 06/30/17 | 06/01/18 | $1,775,000.00 | 06/30/07 | 12/01/07 | $512,193.75 |
| 06/30/18 | 06/01/19 | $1,885,000.00 | 06/30/07 | 06/01/08 | $512,193.75 |
| | | | 06/30/08 | 12/01/08 | $482,334.38 |
| | | | 06/30/08 | 06/01/09 | $482,334.38 |
| | | | 06/30/09 | 12/01/09 | $450,637.50 |
| | | | 06/30/09 | 06/01/10 | $450,637.50 |
| | | | 06/30/10 | 12/01/10 | $416,950.00 |
| | | | 06/30/10 | 06/01/11 | $416,950.00 |
| | | | 06/30/11 | 12/01/11 | $381,271.88 |
| | | | 06/30/11 | 06/01/12 | $381,271.88 |
| | | | 06/30/12 | 12/01/12 | $343,296.88 |
| | | | 06/30/12 | 06/01/13 | $343,296.88 |
| | | | 06/30/13 | 12/01/13 | $303,025.00 |
| | | | 06/30/13 | 06/01/14 | $303,025.00 |
| | | | 06/30/14 | 12/01/14 | $259,780.00 |
| | | | 06/30/14 | 06/01/15 | $259,780.00 |
| | | | 06/30/15 | 12/01/15 | $213,900.00 |
| | | | 06/30/15 | 06/01/16 | $213,900.00 |
| | | | 06/30/16 | 12/01/16 | $165,230.00 |

\*     If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

| Principal Account | | | Interest Account | | |
| --- | --- | --- | --- | --- | --- |
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| | | | 06/30/16 | 06/01/17 | $165,230.00 |
| | | | 06/30/17 | 12/01/17 | $113,460.00 |
| | | | 06/30/17 | 06/01/18 | $113,460.00 |
| | | | 06/30/18 | 12/01/18 | $58,435.00 |
| | | | 06/30/18 | 06/01/19 | $58,435.00 |

\* If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

EXHIBIT B

[LETTERHEAD OF COUNSEL TO TRUSTEE]

December 12, 1996

Yakima-Tieton Irrigation District
Yakima, WA

Lehman Brothers Special Financing Inc.
New York, NY

Financial Security Assurance Inc.
New York, NY

Re:    $25,890,000 Yakima-Tieton Irrigation District Refunding Revenue Bonds, Series 1992

Ladies and Gentlemen:

We have acted as counsel to Mellon Bank, F.S.B., as Trustee (the "Trustee") in connection with the execution and delivery by the Trustee of the Debt Service Deposit Agreement dated as of December 12, 1996 (the "Debt Service Deposit Agreement") by and among the Trustee, Yakima-Tieton Irrigation District (the "Issuer") and Lehman Brothers Special Financing Inc. ("Lehman"). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Debt Service Deposit Agreement.

In rendering this opinion, we have examined, among other things, copies of the Debt Service Deposit Agreement and the Bond Resolution.

In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the federal laws of the United States of America and the laws of the State of [STATE OF TRUSTEE] (the "State").

Based upon the foregoing examination and review, we are of the opinion that:

(i)    The Trustee has full legal right, power and authority to enter into the Debt Service Deposit Agreement.

(ii)    The Debt Service Deposit Agreement has been duly authorized, executed and delivered by the Trustee.

(iii)    The stipulation of New York law as the governing law of the Debt Service Deposit Agreement is enforceable under State law.

B-1

(iv)    Assuming for purposes of the opinion expressed in this paragraph (iv) that State law and New York law are the same, the Debt Service Deposit Agreement is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(v)    The execution and delivery by the Trustee of the Debt Service Deposit Agreement and the performance of its obligations thereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws, or the Bond Resolution, or, to the best of our knowledge, any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

B-2

<u>EXHIBIT C</u>

[LETTERHEAD OF COUNSEL TO LEHMAN]

December 12, 1996

Yakima-Tieton Irrigation District
Yakima, WA

Mellon Bank, F.S.B., as Trustee
Seattle, WA

Financial Security Assurance Inc.
New York, NY

Re:     $25,890,000 Yakima-Tieton Irrigation District Refunding Revenue Bonds, Series 1992

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc.("Lehman") in connection with the execution and delivery by Lehman of the Debt Service Deposit Agreement dated as of December 12, 1996 (the "Debt Service Deposit Agreement") by and among Lehman, Mellon Bank, F.S.B., as Trustee (the "Trustee") and Yakima-Tieton Irrigation District (the "Issuer"). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Debt Service Deposit Agreement.

In connection with the opinions expressed below, I have examined, or have had examined on my behalf, a copy of the Debt Service Deposit Agreement executed by Lehman and such other agreements, instruments, documents and records of Lehman and certificates and statements by public officials and officers of Lehman as I have deemed necessary or appropriate as a basis for the opinions hereinafter expressed.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.      Lehman is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has the corporate power and authority to execute and deliver the Debt Service Deposit Agreement and to perform its obligations thereunder.

2.      The Debt Service Deposit Agreement has been duly and validly authorized, executed and delivered by Lehman and constitutes the legal, valid and binding obligation of Lehman, enforceable against Lehman in accordance with its terms.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

C-1

A.    My opinion in paragraph 2 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B.    I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the State of New York, the United States of America and the General Corporation Law of the State of Delaware.

C.    My opinions are limited to the present laws and to the facts as they presently exist. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.    This letter is rendered to you in connection with the Debt Service Deposit Agreement and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose. This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman Brothers Inc., except that you many furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Lehman, (iii) pursuant to the order or any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Debt Service Deposit Agreement.

E.    I have assumed with your permission (i) the genuineness of all signatures by the Trustee, (ii) the authenticity of documents submitted to me as originals and the conformity with the original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Debt Service Deposit Agreement by each party other than Lehman.

Very truly yours,

C-2

**EXHIBIT D**

[LETTERHEAD OF COUNSEL OF ISSUER]

December 12, 1996

Mellon Bank, F.S.B., as Trustee
Seattle, WA

Lehman Brothers Special Financing Inc.
New York, NY

Financial Security Assurance Inc.
New York, NY

Re:    $25,890,000 Yakima-Tieton Irrigation District Refunding Revenue Bonds, Series 1992

Ladies and Gentlemen:

We have acted as counsel to Yakima-Tieton Irrigation District (the "Issuer") in connection with its execution and delivery of the Debt Service Deposit Agreement dated as of December 12, 1996 (the "Debt Service Deposit Agreement"), by and among Lehman, Mellon Bank, F.S.B., as Trustee (the "Trustee") and the Issuer and its execution and delivery of the Bond Resolution (as defined in the Debt Service Deposit Agreement. Capitalized terms used herein and not defined herein have the respective meanings given to them in the Debt Service Deposit Agreement.

In rendering this opinion, we have examined, among other things, copies of the Debt Service Deposit Agreement and the Bond Resolution.

In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the laws of the State of Washington (the "State").

Based upon the foregoing examination and review, we are of the opinion that:

(i)    The Issuer has full legal right, power and authority to enter into the Debt Service Deposit Agreement and adopt the Bond Resolution and to authorize and direct the Trustee, pursuant to the Debt Service Deposit Agreement, to make purchases of the Qualified Eligible Securities in accordance with the terms therein.

(ii)    The Debt Service Deposit Agreement and the Bond Resolution have been duly authorized, executed and delivered by the Issuer.

D-1

(iii)    The stipulation of New York law as the governing law of the Debt Service Deposit Agreement is enforceable under the laws of the State.

(iv)    Assuming for purposes of the opinion expressed in this paragraph (iv) that State law and New York law are the same, each of the Debt Service Deposit Agreement and the Bond Resolution is a legal, valid and binding obligation of the Issuer, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(v)    The Issuer's execution and delivery of the Debt Service Deposit Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under the Bond Resolution, or, to the best of our knowledge, any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(vi)    All consents, authorizations and approvals requisite for the Issuer's execution, delivery and performance of the Debt Service Deposit Agreement have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority or regulatory body is required for such execution, delivery or performance.

(vii)    The Issuer is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject to in any suit, action or proceedings relating to this Agreement in the courts of any jurisdiction and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

## Lehman Brothers Special Financing Inc.
### Notice of Tender
### Under the Debt Service Deposit Agreement
### Dated as of:

To: _____, as Trustee
         Attention:
         Fax:
         Phone:

From:    Lehman Brothers Inc.
         Attention:
         Fax:
         Phone:

Date:    [_____]

Re:      [_____]

**Date and Price**
Purchase Date:                          [_____]
Specified Purchase Price:               [_____]

**Specific Government Obligations**

| Cusip | Type | Maturity | Coupon | Face Amount | Maturity Amount | Accrued Interest |
|-------|------|----------|--------|-------------|-----------------|------------------|
| [_____] | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |

**Delivery vs Payment (Book Entry Delivery)**

On the Purchase Date, LBI will deliver Face value [_____] [BILLS/NOTES] maturing [_____]

[_____]
[_____]
[_____]
[_____]
                    Re:
[_____]

On the Purchase Date, LBI will receive [_____]

         Chase NYC/Lehman
         ABA Number 021-000-021
         Account Number 066206677

EXECUTION COPY

## FIRST AMENDMENT TO
### DEBT SERVICE DEPOSIT AGREEMENT

## W I T N E S S E T H

This FIRST AMENDMENT TO DEBT SERVICE DEPOSIT AGREEMENT (this "First Amendment") dated as of September 24, 2003 is made by and among YAKIMA-TIETON IRRIGATION DISTRICT, an irrigation dstrict organized and existing under the laws of the State of Washington (the "Issuer"), J.P. MORGAN TRUST COMPANY, NATIONAL ASSOCIATION, a national banking association as trustee for the 2003 Bonds (defined herein) (the "Trustee"), and successor trustee to Mellon Bank, F.S.B. (the "Original Trustee") and LEHMAN BROTHERS SPECIAL FINANCING INC., a Delaware corporation ("Lehman"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement (as defined below).

**WHEREAS,** Lehman, the Issuer and the Original Trustee have previously entered into a Debt Service Deposit Agreement dated as of December 12, 1996 (the "Agreement"), relating to those Bonds as described in the Agreement;

**WHEREAS,** all of the Refunding Bonds referenced in the Agreement are being refunded with the proceeds of the Issuer's $17,220,000 Revenue Refunding Bonds, 2003 (the "2003 Bonds");

**WHEREAS,** in connection with such refunding, the value to Lehman of its investment rights with respect to the Deposit Amounts under the Agreement with respect to the 2003 Bonds (the "2003 Bonds Cash Flows") is equivalent to the value to Lehman of its investment rights with respect to the Deposit Amounts with respect to the Refunding Bonds (the "1996 Cash Flows");

**WHEREAS,** the Issuer requests that the 2003 Bonds Cash Flows be invested pursuant to the terms of the Agreement;

**WHEREAS,** Lehman agrees to invest such 2003 Bonds Cash Flows pursuant to the terms of the Agreement;

**NOW, THEREFORE,** in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties agree that the Agreement shall be and hereby is amended as follows:

FIRST:    Amendment to Exhibit A. Exhibit A attached to the First Amendment is hereby deleted in its entirety and replaced with Exhibit A hereto which shall, for all purposes of the Agreement and the First Amendment, become Exhibit A to the Agreement.

SECOND:    No Payment to Lehman. Lehman and the Issuer agree that no amount shall be due to Lehman pursuant to Section 3.1 of the Agreement.

THIRD:    Definitions. Section I of the Agreement shall be amended as follows:

(a) "Bonds" means the 2003 Bonds.

(b) "Bond Resolution" means the Resolution No. 2003-6 adopted by the Issuer on September 11, 2003, providing for the issuance of the 2003 Bonds.

(c) "Debt Service Fund" means the account created under the Bond Resolution and designated thereunder as the "Principal and Interest Account."

FOURTH:   Assignment, Assumption and Release. J. P. Morgan Trust Company, National Association, as successor trustee to the Original Bonds (the "Assignor") hereby assigns and delegates to the Trustee all its rights, duties and obligations under the Agreement and the Trustee hereby accepts such assignment and delegation and assumes such rights, duties and obligations. Assignor and the Trustee intend this assignment to be an assignment of Assignor's rights, duties and obligations under the Agreement effective on the date hereof. Each of the Issuer and Lehman hereby consents to such assignment.

FIFTH:   Effect on Agreement. Except as expressly amended by this First Amendment, the Agreement is in all respects ratified and confirmed and the terms, provisions and conditions thereof are and shall remain in full force and effect. All references to the Agreement contained therein from and after the date hereof shall be deemed to be a reference to the Agreement as further amended by this First Amendment.

SIXTH:   Governing Law. THIS FIRST AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES.

SEVENTH:   Headings. The headings of the paragraphs contained in this First Amendment are provided for convenience only. They form no part of this First Amendment and shall not affect its construction or interpretation.

EIGHTH:   Counterparts. This First Amendment may be executed in counterparts by the parties hereto, and each such counterpart shall be considered an original and all such counterparts shall constitute one and the same instrument.

2

09/24/2003   12:13   LEHMAN → 912125200384   NO.365   P01

IN WITNESS WHEREOF, the Issuer, Assignor, the Trustee and Lehman have caused this First Amendment to Debt Service Deposit Agreement to be executed by their respective duly authorized officers, as of the date referenced above.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____

Name:   T. Courtney Jenkins

Title:    Vice President

J. P. MORGAN TRUST COMPANY, NATIONAL ASSOCIATION, AS ASSIGNOR

By: _____

Name:   DONALD P. MORTON

Title:    ASSISTANT VICE PRESIDENT

J. P. MORGAN TRUST COMPANY, NATIONAL ASSOCIATION, AS TRUSTEE

By: _____

Name:   DONALD P. MORTON

Title:    ASSISTANT VICE PRESIDENT

YAKIMA-TIETON IRRIGATION DISTRICT

By: _____

Name:

Title:

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Deposit Date* | Bond Payment Date* | Deposit Amount | Deposit Date* | Bond Payment Date* | Deposit Amount |
| 06/30/04 | 06/01/05 | $850,000.00 | 06/30/04 | 12/01/04 | $307,444.38 |
| 06/30/05 | 06/01/06 | $875,000.00 | 06/30/04 | 06/01/05 | $307,444.38 |
| 06/30/06 | 06/01/07 | $895,000.00 | 06/30/05 | 12/01/05 | $296,819.38 |
| 06/30/07 | 06/01/08 | $925,000.00 | 06/30/05 | 06/01/06 | $296,819.38 |
| 06/30/08 | 06/01/09 | $950,000.00 | 06/30/06 | 12/01/06 | $285,881.88 |
| 06/30/09 | 06/01/10 | $985,000.00 | 06/30/06 | 06/01/07 | $285,881.88 |
| 06/30/10 | 06/01/11 | $1,020,000.00 | 06/30/07 | 12/01/07 | $272,456.88 |
| 06/30/11 | 06/01/12 | $1,060,000.00 | 06/30/07 | 06/01/08 | $272,456.88 |
| 06/30/12 | 06/01/13 | $1,100,000.00 | 06/30/08 | 12/01/08 | $258,581.88 |
| 06/30/13 | 06/01/14 | $1,145,000.00 | 06/30/08 | 06/01/09 | $258,581.88 |
| 06/30/14 | 06/01/15 | $1,185,000.00 | 06/30/09 | 12/01/09 | $243,144.38 |
| 06/30/15 | 06/01/16 | $1,235,000.00 | 06/30/09 | 06/01/10 | $243,144.38 |
| 06/30/16 | 06/01/17 | $1,290,000.00 | 06/30/10 | 12/01/10 | $224,675.63 |
| 06/30/17 | 06/01/18 | $1,350,000.00 | 06/30/10 | 06/01/11 | $224,675.63 |
| 06/30/18 | 06/01/19 | $1,405,000.00 | 06/30/11 | 12/01/11 | $206,315.63 |
| | | | 06/30/11 | 06/01/12 | $206,315.63 |
| | | | 06/30/12 | 12/01/12 | $185,115.63 |
| | | | 06/30/12 | 06/01/13 | $185,115.63 |
| | | | 06/30/13 | 12/01/13 | $163,115.63 |
| | | | 06/30/13 | 06/01/14 | $163,115.63 |
| | | | 06/30/14 | 12/01/14 | $140,215.63 |
| | | | 06/30/14 | 06/01/15 | $140,215.63 |
| | | | 06/30/15 | 12/01/15 | $115,775.00 |
| | | | 06/30/15 | 06/01/16 | $115,775.00 |
| | | | 06/30/16 | 12/01/16 | $89,531.25 |
| | | | 06/30/16 | 06/01/17 | $89,531.25 |
| | | | 06/30/17 | 12/01/17 | $61,312.50 |
| | | | 06/30/17 | 06/01/18 | $61,312.50 |
| | | | 06/30/18 | 12/01/18 | $31,612.50 |
| | | | 06/30/18 | 06/01/19 | $31,612.50 |

\*     If any Deposit Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

## *YAKIMA-TIETON IRRIGATION DISTRICT*

| TELEPHONE | OFFICE, TIETON HEADQUARTERS | FAX |
|---|---|---|
| COWICHE | 470 CAMP 4 ROAD | COWICHE |
| (509)678-4101 | YAKIMA, WA  98908 | (509)678-5730 |

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

November 26, 2008

To:    Lehman Brothers Special Financing Inc.
       745 Seventh Avenue
       New York, NY 10019
       Attention:  Municipal Financial Products – Middle Office
              Telephone: 212-526-2240
              Fax:    646-758-2988

Re:    **TERMINATION NOTICE**
       **relating to the Debt Service Deposit Agreement with**
       **Yakima-Tieton Irrigation District, Yakima County, Washington**

Ladies and Gentlemen:

This letter constitutes notice to Lehman Brothers Special Financing Inc. ("Lehman") by the Yakima-Tieton Irrigation District (the "Issuer") of the Issuer's exercise of its right to terminate its Debt Service Deposit Agreement (identified below), pursuant to Section 7.6(c) of that Agreement, due to a Lehman Event of Default under Section 7.3(c) of the Agreement.

The Issuer entered into a Debt Service Deposit Agreement dated as of December 12, 1996 (the "DSDA"), by and among the Issuer, Mellon Bank, F.S.B. (as trustee), and Lehman, which was subsequently amended by the First Amendment to Debt Service Deposit Agreement, dated as of September 24, 2003, by and among the Issuer, Lehman, and J.P. Morgan Trust Company, National Association, as successor trustee (the "Trustee"). The DSDA relates to deposits to be made by the Issuer in the Debt Service Fund for the Issuer's Refunding Revenue Bonds, 2003 (the "2003 Bonds"). Copies of the DSDA and the First Amendment (together, the "Agreement") are attached to this letter. Capitalized terms used in this letter have the definitions as provided in the Agreement.

Under the Agreement, the Issuer is required to deliver cash to the Trustee for deposit in the Issuer's Debt Service Fund on the Deposit Dates (referred to as Delivery Dates in the DSDA) and in the Deposit Amounts set forth in Exhibit A to the First Amendment. The remaining Deposit Dates are each June 30 in the years 2009 through 2018, inclusive. Lehman is then required to cause a Qualified Dealer to deliver Eligible Securities, that are also Qualified Securities, for purchase by the Trustee on any Deposit Date on a "delivery versus payment basis"

*Yakima Valley  -  -  -   "Fruit Bowl of the Nation"*

at Purchase Prices which will produce a rate of return on such securities for the periods from (and including) their respective dates of delivery to (but excluding) their respective maturity dates equal to the Guaranteed Rate of 6.10% per annum, assuming semiannual compounding on the basis of a 360-day year of twelve 30-day months. Lehman delivered Qualified Securities to the Trustee on the most recent Deposit Date (Delivery Date) of June 30, 2008. The next Deposit Date (Delivery Date) on which Lehman would be required to deliver Qualified Securities to the Trustee is June 30, 2009.

Section 7.3(c) of the Agreement provides that it shall constitute a Lehman Event of Default if Lehman is at any time Insolvent. The Agreement defines the term Insolvent, in part, to include commencement of a voluntary case under federal bankruptcy laws. Lehman has commenced such a voluntary bankruptcy case, which is pending in the United States Bankruptcy Court, Southern District of New York, under the caption *In re* LEHMAN BROTHERS HOLDINGS INC., *et al.* Debtors. Chapter 11 Case No. 08-12555 (JMP) (Jointly Administered) (the "Lehman Chapter 11 Case"). Lehman therefore is Insolvent within the meaning of the Agreement.

The Agreement constitutes a derivatives contract that is exempt from the automatic stay provisions of the federal Bankruptcy Code (11 U.S.C. §362) as either a "securities contract" within the meaning of 11 U.S.C. §741(7), or a "swap agreement" within the meaning of 11 U.S.C. §101(53B). Pursuant to the Bankruptcy Code, 11 U.S.C. §§555 and 560, the Issuer's exercise of its contractual right under the Agreement to cause the termination of the Agreement because of Lehman's Insolvency is not stayed, avoided or otherwise limited by any provisions of the Bankruptcy Code or court order in the Lehman Chapter 11 Case.

Under Section 7.6(c) of the Agreement, upon the occurrence of a Lehman Event of Default consisting of Insolvency (as defined in Section 7.3(c) of the Agreement), the Issuer has the right to terminate the Agreement. Upon notice of termination, Lehman must promptly determine the Termination Amount and if the Termination Amount is a negative number, Lehman must promptly, but no later than two Business Days after written notice is delivered by Lehman to the Issuer that such amount is due, pay such amount in immediately available funds.

If Lehman fails to determine the Termination Amount within three Business Days after notice from the Issuer of the occurrence of a Lehman Event of Default, then the Issuer shall make such determination as if it were Lehman, and under the Agreement, the amount as so determined by the Issuer shall be deemed the Termination Amount.

By this letter, the Issuer is giving notice to Lehman pursuant to Section 7.6(c) of the Agreement of the occurrence of a Lehman Event of Default and the Issuer's exercise of its right to terminate the Agreement. The Issuer therefore requests Lehman to determine the Termination Amount pursuant to Section 7.6(c) of the Agreement and to notify the Issuer of the amount due from Lehman to the Issuer as the Termination Amount within three Business Days from the receipt by Lehman of this letter.

Very truly yours,

YAKIMA-TIETON IRRIGATION DISTRICT

By _Richard Dieken_

    Secretary-Manager

✓ Copy:  The Bank of New York Mellon Trust Company, N.A.
         Attention: Kathleen Graves
         601 Union Street, Suite 520
         Seattle WA 98101
         Telephone: 206-667-8910
         Fax:  206-667-8905

Copy:  Financial Security Assurance, Inc.
       350 Park Avenue
       New York, NY 10022-6022
       Attn: Managing Director – Surveillance
       Re: Policy No. 201706-N
       Telephone: 212-826-0100
       Fax: 212-339-3556