# EXHIBIT B-1



1740 Rutledge Avenue
Charlotte, NC 28211
Phone: (704) 442-1512
Fax: (704) 367-1599

11845 W. Olympic Blvd., Suite 540
Los Angeles, CA 90064
Phone: (310) 954-8800
Fax: (310) 954-8900

www.winters-co.com

Rick Dieker
Yakima-Tieton Irrigation District
470 Camp 4 Road
Yakima, WA 98908
Via Email: RickDieker@yvn.com

January 30, 2009

Re:    Determination of Termination Amount for Yakima-Tieton Irrigation District/ Lehman Brothers
       Special Financing Inc. Debt Service Deposit Agreement.


Dear Mr. Dieker:

Thank you for allowing Winters & Co. Advisors, LLC ("W&C") the opportunity to serve as Termination Amount Determination Agent with regard to the Debt Service Deposit Agreement (the "DSDA") originally entered into on December 12, 1996 and amended on September 24, 2003 (the "First Amendment to Debt Service Deposit Agreement") and collectively (the "Agreement"), between Yakima-Tieton Irrigation District (the "Issuer") and Lehman Brothers Special Financing Inc. ("Lehman"). Capitalized terms not defined in this letter shall have the meaning as described in the Agreement. A copy of the Agreement is attached hereto as **Attachment 1**.

W&C is an independent advisory firm with offices located in Charlotte, Los Angeles, and St. Louis. W&C specialize in providing comprehensive, independent advisory services related to interest rate-based investments (like the Agreement) for clients like Yakima-Tieton Irrigation District.

**Background**

On December 12, 1996 Yakima-Tieton Irrigation District (the "Issuer") and Lehman Brothers Special Financing Inc ("Lehman") entered into the DSDA in connection with the $25,890,000 Yakima-Tieton Irrigation District Refunding Revenue Bonds, Series 1992.

On September 24, 2003 the DSDA was amended by the First Amendment to Debt Service Deposit Agreement. The First Amendment to Debt Service Deposit Agreement, replaced the cash flows noted under Exhibit A from the DSDA (the "1996 Cash Flows") with a new Exhibit A, (the "2003 Cash Flows"). According to the First Amendment to Debt Service Deposit Agreement, the 2003 Cash Flows are reflective of the $17,220,000 Yakima-Tieton Irrigation District Refunding Revenue Bonds, Series 2003.



The First Amendment to Debt Service Deposit Agreement also states that "the value to Lehman of its investment rights with respect to the Deposit Amounts under the Agreement with respected to the 2003 Bonds (the "2003 Bonds Cash Flows") is equivalent to the value to Lehman of its investment rights with respect to the Deposit Amounts with respect to the Refunding Bonds (the "1996 Cash Flows").

Lehman performed pursuant to the Agreement through the June 30, 2008 Delivery Date. The next Delivery Date expected under the Agreement is June 30, 2009.

On October 3, 2008 Lehman filed a voluntary petition in United States Bankruptcy Court in the Southern District of New York. A copy of this filing is attached hereto as **Attachment 2**.

**The Agreement - Definitions**

The Agreement includes the following relevant Definitions:

"Burdened Party" means (i)...and (ii) in the case of a Lehman Event of Default, the Issuer.

"Default Rate" means a rate per annum equal to Three Month Libor plus 1% per annum.

"Insolvent" means: (i) either the Trustee or Lehman as the case may be, shall (1) commence a voluntary case under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter)..."

"Lehman Event of Default" means the occurrence of an event specified in Section 7.3.

"Termination Amount" means an amount, as determined by Lehman reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three leading dealers in the relevant markets ("Dealers") of the amount, if any, that each such Dealer would require the Burdened Party to pay to the Dealer (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer) or would pay the Burdened Party (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in consideration of such Dealer entering into an Agreement with the Burdened Party which would have the effect of preserving for the Burdened Party the economic equivalent of its rights under this Agreement commencing on the termination date of this Agreement; provided however, that:

> (i)    if more than three quotations are provided, the Termination Amount will be the arithmetic mean of such quotations, without regard to the quotations having the highest and lowest values,

> (ii)    if exactly three quotations are provided, the Termination Amount will be the quotation remaining after disregarding the highest and lowest quotations,

for purposes of clauses (i) and (ii), if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded, and

> (iii)    if Lehman is unable to obtain three quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by Lehman, to be the Burdened Party's total losses and costs (expressed as a positive number if the Burdened Party is Lehman and a negative number if the



Burdened Party is the Issuer) or gains (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in connection with a termination of this Agreement, including any loss of bargain, cost of funding or, at the election of Lehman but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position, and

provided further, however, that in any event the Termination Amount shall also include (A) losses and costs in respect of any payment required to have been made (assuming satisfaction of each applicable condition precedent) on or before the date on which this Agreement shall be terminated or deemed terminated as provide herein and not made and (B) if such Termination Amount is being paid in connection with a termination of this Agreement following an Event of Default, hereunder, any incidental costs and expenses incurred by Lehman in connection with such termination and the enforcement of its rights hereunder (including reasonable attorneys' fees). Any determination of the Termination Amount by Lehman shall be conclusive and binding on the parties hereto absent manifest error. Lehman shall provide such information to the Issuer  of the determination of the Termination Amount to indicate the manner in which the Termination Amount was calculated.

"Three Month LIBOR" as of any date of determination means the rate for deposits in US Dollars for a period of three months which appears on the Telerate Page 3750 as of 11:00 am, London time, on the day that is two Business Days before the day for which such determination is being made. If no such rate appears on the Telerate Page 3750 as of such date, Lehman may select another nationally recognized published source to determine Three Month LIBOR.

**The Agreement - Sections**

The Agreement includes the following relevant Sections:

Section 7.3.    Lehman Events of Default. The occurrence of any of the following events shall constitute a Lehman Event of Default:

    (a)…

    (b)…

    (c)    Lehman is at any time Insolvent.

Section 7.6.    Remedies Upon Occurrence of a Lehman Event of Default. Upon the occurrence of a Lehman Event of Default the Issuer shall have the right to:

    (a)…

    (b)…

    (c)    If such default is a default under Sections 7.3(b) or (c) hereof immediately terminate this Agreement, whereupon Lehman shall promptly determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than two Business Days



after written notice is delivered by Lehman to the Issuer that such amount is due, pay such amount, in immediately available funds, to the Issuer and (ii) if the Termination Amount is a positive number, no Termination Amount shall be due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate. Notwithstanding anything to the contrary in this Agreement, if Lehman fails to determine the Termination Amount within three Business Days of notice from the Issuer or the Trustee of the occurrence of a Lehman Event of Default then the Issuer (or if so directed by the Issuer, the Trustee) shall make such determination as if it were Lehman and the amount as so determined by the Issuer (or the Trustee) shall for purposes of this Section 7.6 be deemed the Termination Amount."

**Chronology**

- Pursuant to the Agreement, and as a result of the Lehman filing, Lehman is deemed to be Insolvent.
- The insolvency of Lehman triggered a Lehman Event of Default as per section 7.3(c).
- Pursuant to Section 7.6(c)
  - following a Lehman Event of Default the Issuer shall have the right to immediately terminate the Agreement and Lehman shall promptly determine the Termination Amount and
  - if Lehman fails to determine the Termination Amount within three Business Days of notice from the Issuer or the Trustee of the occurrence of a Lehman Event of Default then the Issuer (or if so directed by the Issuer, the Trustee) shall make such determination as if it were Lehman and the amount as so determined by the Issuer (or the Trustee) shall for purposes of this Section 7.6 be deemed the Termination Amount.
- Lehman did not promptly determine the Termination Amount pursuant to Section 7.6(c).
- The Issuer delivered the notice required under Section 7.6(c) to Lehman on November 26, 2008. A copy of the notice is attached hereto as **Attachment 3**.
- After receipt of the notice Lehman continued to fail to provide the Termination Amount.
- Pursuant to Section 7.6(c) as a result of Lehman's failure to determine the Termination Amount the Issuer shall make such determine the Termination Amount as if it were Lehman and the amount as so determined by the Issuer shall for purposes of this Section 7.6 be deemed the Termination Amount.
- Termination Amount:
  - shall be determined reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three leading dealers in the relevant markets ("Dealers"), and
  - shall be the amount, if any, that each such Dealer would require the Issuer to pay to the Dealer (expressed as a negative number) in consideration of such Dealer entering into an Agreement with the Issuer which would have the effect of preserving for the Issuer the economic equivalent of its rights under this Agreement commencing on the termination date of this Agreement.
  - if the Issuer is unable to obtain three quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by the Issuer, to be the Issuer's total losses and costs (expressed as a negative number) in connection with a termination of the Agreement,


Winters & Co. Advisors, LLC

- including any loss of bargain, cost of funding or, at the election of the Issuer but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position
- and any incidental costs and expenses incurred by the Issuer in connection with such termination and the enforcement of its rights hereunder (including reasonable attorneys' fees).

   o  Any determination of the Termination Amount by the Issuer shall be conclusive and binding on the parties hereto absent manifest error.
   o  The Issuer shall provide such information to the Lehman of the determination of the Termination Amount to indicate the manner in which the Termination Amount was calculated.

**Determination of the Termination Amount – Dealer quotations**

The Issuer hired Winters & Co. Advisors, LLC to act on the Issuer's behalf in making a determination of the Termination Amount of the Agreement. Pursuant to the definition of Termination Amount contained in the Agreement, W&C attempted to collect the requisite quotations from Dealers. To do so W&C prepared a "Request for Forward Delivery Agreement Price Quotation" that summarizes the terms of the Agreement necessary for Dealers to offer a quotation. Winters & Co. Advisors, LLC sent the Request for Forward Delivery Agreement Price Quotation to the firms listed below on January 22, 2009. A copy of the Request for Forward Delivery Agreement Price Quotation is attached hereto as **Attachment 4.**

The Request for Forward Delivery Agreement Price Quotation was sent on January 22, 2009 to thirteen (13) firms that have either provided transactions similar to the Agreement in the past, or have expressed an interest in providing transactions similar to the Agreement in the future. In addition, for the convenience of the Dealers, W&C provided the 2003 Cash Flows in Excel and made available copies of the Agreement (a copy of the Agreement to be provided to the Dealer upon request). The results of the Request for Forward Delivery Agreement Price Quotation are summarized below. All written responses received are attached hereto as **Attachment 5.**

**Name of Dealer Polled:** Response Received From Dealer

| | |
|---|---|
| **AIG Financial Products:** Declined to quote | **Rabobank:** Declined to quote |
| **Bank of America:** Declined to quote | **Royal Bank of Canada:** Declined to quote |
| **Citibank:** Declined to quote | **Sumitomo Capital Markets:** |
| **Hypoveriensbank/ Depfa:** $425,000 | **SunTrust:** Declined to quote |
| **JP Morgan Chase:** Declined to quote | **Wachovia Bank:** Declined to quote |
| **Morgan Stanley:** Declined to quote | **Wells Fargo Bank:** Declined to quote |
| **PNC Capital Markets:** Declined to quote | |

Pursuant to the Agreement, if the Issuer is unable to obtain three quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by the Issuer, to be the Issuer's total losses and costs (expressed as a negative number) in connection with a termination of the Agreement.


Winters & Co. Advisors, LLC

**Determination of the Termination Amount – Replacement of Guaranteed Rate**

The Agreement provides that Lehman will pay a Guaranteed Rate of 6.10% to the Issuer based on the 2003 Cash Flows.  On January 30, 2009  (the "Termination Amount Computation Date"), W&C computed an estimate of the earnings that the Issuer would have received under the Agreement based on the Guaranteed Rate and the remaining the 2003 Cash Flows (the "Originally Expected Earnings").

W&C has simultaneously computed an estimate of the earnings that the Issuer could expect to received on a new investment (the "Replacement Agreement") based on terms and conditions substantially similar to the Agreement but based on today's market.  The estimated earnings on the Replacement Agreement are based on estimates of the guaranteed rate likely to be available on any Replacement Agreement under current market conditions and assuming investment of the remaining the 2003 Cash Flows (the "Replacement Agreement Earnings").

The differences between the Originally Expected Earnings and the Replacement Agreement Earnings[1] were then computed (the "Earnings Difference").

The present value[2] of the resulting Earnings Difference cash flows was then computed (the "Present Value Difference").

Finally the sum of the Present Value Differences was computed as of the Termination Amount Computation Date.  The results appear in Table 1 and 2.

| Table 1 - Present Value computation of lost income – Principal Account | | | | | | |
|---|---|---|---|---|---|---|
| Deposit Date | Bond Pmnt Date | Deposit Amount | Originally Expected Earnings | Replacement Agreement Earnings | Earnings Difference | Present Value Difference |
| 6/30/2009 | 6/1/2010 | $985,000 | $55,899 | $13,619 | -$42,280.39 | -$41,445 |
| 6/30/2010 | 6/1/2011 | $1,020,000 | $57,888 | $14,110 | -$43,777.85 | -$42,276 |
| 6/30/2011 | 6/1/2012 | $1,060,000 | $60,199 | $14,656 | -$45,543.23 | -$43,328 |
| 6/30/2012 | 6/1/2013 | $1,100,000 | $62,457 | $15,216 | -$47,241.20 | -$44,277 |
| 6/30/2013 | 6/1/2014 | $1,145,000 | $65,037 | $15,830 | -$49,207.09 | -$45,436 |
| 6/30/2014 | 6/1/2015 | $1,185,000 | $67,294 | $16,389 | -$50,905.07 | -$46,306 |
| 6/30/2015 | 6/1/2016 | $1,235,000 | $70,143 | $17,085 | -$53,057.83 | -$47,549 |
| 6/30/2016 | 6/1/2017 | $1,290,000 | $73,260 | $17,836 | -$55,424.75 | -$48,933 |
| 6/30/2017 | 6/1/2018 | $1,350,000 | $76,647 | $18,668 | -$57,978.54 | -$50,428 |
| 6/30/2018 | 6/1/2019 | $1,405,000 | $79,764 | $19,432 | -$60,331.81 | -$51,697 |
| | | | $668,588 | $162,841 | | -$461,674 |

---

[1] The guaranteed rate likely to be available on any Replacement Agreement under current market conditions used is 1.50%.
[2] For purposes of determining the Present Value Difference a discount rate of 1.50% was used.

 Winters & Co. Advisors, LLC

| Table 2 - Present Value computation of lost income – Interest Account | | | | | | |
|---|---|---|---|---|---|---|
| Deposit Date | Bond Pmnt Date | Deposit Amount | Originally Expected Earnings | Replacement Agreement Earnings | Earnings Difference | Present Value Difference |
| 6/30/2009 | 12/1/2009 | $243,144.38 | $6,197 | $1,525 | -$4,672.64 | -$4,615 |
| 6/30/2010 | 6/1/2010 | $243,144.38 | $13,760 | $3,357 | -$10,402.86 | -$10,197 |
| 6/30/2010 | 12/1/2010 | $224,675.63 | $5,724 | $1,412 | -$4,312.22 | -$4,196 |
| 6/30/2010 | 6/1/2011 | $224,675.63 | $12,739 | $3,098 | -$9,640.90 | -$9,310 |
| 6/30/2011 | 12/1/2011 | $206,315.63 | $5,252 | $1,293 | -$3,958.06 | -$3,794 |
| 6/30/2012 | 6/1/2012 | $206,315.63 | $11,717 | $2,852 | -$8,865.30 | -$8,434 |
| 6/30/2012 | 12/1/2012 | $185,115.63 | $4,704 | $1,162 | -$3,541.73 | -$3,344 |
| 6/30/2012 | 6/1/2013 | $185,115.63 | $10,481 | $2,552 | -$7,929.28 | -$7,432 |
| 6/30/2013 | 12/1/2013 | $163,115.63 | $4,156 | $1,025 | -$3,131.65 | -$2,913 |
| 6/30/2013 | 6/1/2014 | $163,115.63 | $9,245 | $2,252 | -$6,993.26 | -$6,457 |
| 6/30/2014 | 12/1/2014 | $140,215.63 | $3,559 | $881 | -$2,678.04 | -$2,454 |
| 6/30/2014 | 6/1/2015 | $140,215.63 | $7,955 | $1,938 | -$6,017.14 | -$5,474 |
| 6/30/2015 | 12/1/2015 | $115,775.00 | $2,937 | $725 | -$2,212.03 | -$1,997 |
| 6/30/2015 | 6/1/2016 | $115,775.00 | $6,557 | $1,597 | -$4,960.81 | -$4,446 |
| 6/30/2016 | 12/1/2016 | $89,531.25 | $2,265 | $562 | -$1,702.50 | -$1,514 |
| 6/30/2016 | 6/1/2017 | $89,531.25 | $5,052 | $1,228 | -$3,824.28 | -$3,376 |
| 6/30/2017 | 12/1/2017 | $61,312.50 | $1,543 | $381 | -$1,161.94 | -$1,018 |
| 6/30/2017 | 6/1/2018 | $61,312.50 | $3,440 | $846 | -$2,593.89 | -$2,256 |
| 6/30/2018 | 12/1/2018 | $31,612.50 | $796 | $194 | -$602.73 | -$520 |
| 6/30/2018 | 6/1/2019 | $31,612.50 | $1,774 | $437 | -$1,337.05 | -$1,146 |
| | | | $119,854 | $29,316 | | -$84,894 |

We have also provided (under separate cover) an Excel-based model detailing the computations noted above.

Based upon the foregoing, the resulting present value earnings loss associated with the Lehman Event of Default as of the Termination Amount Computation Date is therefore estimated to be $546,568.34.

Per the Agreement, the Termination Amount shall also include:

- any loss of bargain, cost of funding or, at the election of the Issuer but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position and
- any incidental costs and expenses incurred by the Issuer in connection with such termination and the enforcement of its rights hereunder (including reasonable attorneys' fees).

These additional costs must be added to the estimated loss noted above to compute a final Termination Amount.

 Winters & Co. Advisors, LLC

**Disclosure**

Our engagement is not assignable and will terminate upon acceptance by the Issuer of a final copy of this report.  W&C will not serve as record repository, and offers no assurances that any records will be retained by us.  As a result, we strongly encourage storage of a copy of this information.

In the event of an examination of the Issuer related to the investment described herein by any governmental agency, or dispute related to the investment or finding described herein of by any other party, Issuer agrees to promptly notify us.  We will not pay the costs of any defense of the Issuer related to such examination or dispute, or the cost of any settlement that the Issuer may elect.

Our Form ADV is available on our website: www.winters-co.com.

Thank you for allowing Winters & Co. Advisors, LLC to be of service.

Sincerely,

*Winters & Co. Advisors, LLC*

Winters & Co. Advisors, LLC



**Attachment 1**

Debt Service Deposit Agreement (the "DSDA") originally entered into on December 12,
1996 and amended on September 24, 2003 (the "First Amendment to Debt Service
Deposit Agreement") and collectively (the "Agreement"), between Yakima-Tieton
Irrigation District (the "Issuer") and Lehman Brothers Special Financing Inc ("Lehman").

EXECUTION COPY

## FIRST AMENDMENT TO
## DEBT SERVICE DEPOSIT AGREEMENT

### W I T N E S S E T H

     This FIRST AMENDMENT TO DEBT SERVICE DEPOSIT AGREEMENT (this "First Amendment") dated as of September 24, 2003 is made by and among YAKIMA-TIETON IRRIGATION DISTRICT, an irrigation district organized and existing under the laws of the State of Washington (the "Issuer"), J.P. MORGAN TRUST COMPANY, NATIONAL ASSOCIATION, a national banking association as trustee for the 2003 Bonds (defined herein) (the "Trustee"), and successor trustee to Mellon Bank, F.S.B. (the "Original Trustee") and LEHMAN BROTHERS SPECIAL FINANCING INC., a Delaware corporation ("Lehman"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement (as defined below).

     WHEREAS, Lehman, the Issuer and the Original Trustee have previously entered into a Debt Service Deposit Agreement dated as of December 12, 1996 (the "Agreement"), relating to those Bonds as described in the Agreement;

     WHEREAS, all of the Refunding Bonds referenced in the Agreement are being refunded with the proceeds of the Issuer's $17,220,000 Revenue Refunding Bonds, 2003 (the "2003 Bonds");

     WHEREAS, in connection with such refunding, the value to Lehman of its investment rights with respect to the Deposit Amounts under the Agreement with respect to the 2003 Bonds (the "2003 Bonds Cash Flows") is equivalent to the value to Lehman of its investment rights with respect to the Deposit Amounts with respect to the Refunding Bonds (the "1996 Cash Flows");

     WHEREAS, the Issuer requests that the 2003 Bonds Cash Flows be invested pursuant to the terms of the Agreement;

     WHEREAS, Lehman agrees to invest such 2003 Bonds Cash Flows pursuant to the terms of the Agreement;

     NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties agree that the Agreement shall be and hereby is amended as follows:

     FIRST:     Amendment to Exhibit A. Exhibit A attached to the First Amendment is hereby deleted in its entirety and replaced with Exhibit A hereto which shall, for all purposes of the Agreement and the First Amendment, become Exhibit A to the Agreement.

     SECOND:     No Payment to Lehman. Lehman and the Issuer agree that no amount shall be due to Lehman pursuant to Section 3.1 of the Agreement.

     THIRD:     Definitions. Section I of the Agreement shall be amended as follows:

     (a) "Bonds" means the 2003 Bonds.

     (b) "Bond Resolution" means the Resolution No. 2003-6 adopted by the Issuer on September 11, 2003, providing for the issuance of the 2003 Bonds.

(c) "Debt Service Fund" means the account created under the Bond Resolution and designated thereunder as the "Principal and Interest Account."

FOURTH:    Assignment, Assumption and Release. J. P. Morgan Trust Company, National Association, as successor trustee to the Original Bonds (the "Assignor") hereby assigns and delegates to the Trustee all its rights, duties and obligations under the Agreement and the Trustee hereby accepts such assignment and delegation and assumes such rights, duties and obligations. Assignor and the Trustee intend this assignment to be an assignment of Assignor's rights, duties and obligations under the Agreement effective on the date hereof. Each of the Issuer and Lehman hereby consents to such assignment.

FIFTH:    Effect on Agreement. Except as expressly amended by this First Amendment, the Agreement is in all respects ratified and confirmed and the terms, provisions and conditions thereof are and shall remain in full force and effect. All references to the Agreement contained therein from and after the date hereof shall be deemed to be a reference to the Agreement as further amended by this First Amendment.

SIXTH:    Governing Law. THIS FIRST AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES.

SEVENTH:    Headings. The headings of the paragraphs contained in this First Amendment are provided for convenience only. They form no part of this First Amendment and shall not affect its construction or interpretation.

EIGHTH:    Counterparts. This First Amendment may be executed in counterparts by the parties hereto, and each such counterpart shall be considered an original and all such counterparts shall constitute one and the same instrument.

2

IN WITNESS WHEREOF, the Issuer, Assignor, the Trustee and Lehman have caused this First Amendment to Debt Service Deposit Agreement to be executed by their respective duly authorized officers, as of the date referenced above.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:   T. Courtney Jenkins
Title:    Vice President

J. P. MORGAN TRUST COMPANY, NATIONAL ASSOCIATION, AS ASSIGNOR

By: _____
Name:  DONALD P. MORTON
Title:  ASSISTANT VICE PRESIDENT

J. P. MORGAN TRUST COMPANY, NATIONAL ASSOCIATION, AS TRUSTEE

By: _____
Name:  DONALD P. MORTON
Title:  ASSISTANT VICE PRESIDENT

YAKIMA-TIETON IRRIGATION DISTRICT

By: _____
Name:
Title:

3

EXHIBIT A

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Deposit Date* | Bond Payment Date* | Deposit Amount | Deposit Date* | Bond Payment Date* | Deposit Amount |
| 06/30/04 | 06/01/05 | $850,000.00 | 06/30/04 | 12/01/04 | $307,444.38 |
| 06/30/05 | 06/01/06 | $875,000.00 | 06/30/04 | 06/01/05 | $307,444.38 |
| 06/30/06 | 06/01/07 | $895,000.00 | 06/30/05 | 12/01/05 | $296,819.38 |
| 06/30/07 | 06/01/08 | $925,000.00 | 06/30/05 | 06/01/06 | $296,819.38 |
| 06/30/08 | 06/01/09 | $950,000.00 | 06/30/06 | 12/01/06 | $285,881.88 |
| 06/30/09 | 06/01/10 | $985,000.00 | 06/30/06 | 06/01/07 | $285,881.88 |
| 06/30/10 | 06/01/11 | $1,020,000.00 | 06/30/07 | 12/01/07 | $272,456.88 |
| 06/30/11 | 06/01/12 | $1,060,000.00 | 06/30/07 | 06/01/08 | $272,456.88 |
| 06/30/12 | 06/01/13 | $1,100,000.00 | 06/30/08 | 12/01/08 | $258,581.88 |
| 06/30/13 | 06/01/14 | $1,145,000.00 | 06/30/08 | 06/01/09 | $258,581.88 |
| 06/30/14 | 06/01/15 | $1,185,000.00 | 06/30/09 | 12/01/09 | $243,144.38 |
| 06/30/15 | 06/01/16 | $1,235,000.00 | 06/30/09 | 06/01/10 | $243,144.38 |
| 06/30/16 | 06/01/17 | $1,290,000.00 | 06/30/10 | 12/01/10 | $224,675.63 |
| 06/30/17 | 06/01/18 | $1,350,000.00 | 06/30/10 | 06/01/11 | $224,675.63 |
| 06/30/18 | 06/01/19 | $1,405,000.00 | 06/30/11 | 12/01/11 | $206,315.63 |
| | | | 06/30/11 | 06/01/12 | $206,315.63 |
| | | | 06/30/12 | 12/01/12 | $185,115.63 |
| | | | 06/30/12 | 06/01/13 | $185,115.63 |
| | | | 06/30/13 | 12/01/13 | $163,115.63 |
| | | | 06/30/13 | 06/01/14 | $163,115.63 |
| | | | 06/30/14 | 12/01/14 | $140,215.63 |
| | | | 06/30/14 | 06/01/15 | $140,215.63 |
| | | | 06/30/15 | 12/01/15 | $115,775.00 |
| | | | 06/30/15 | 06/01/16 | $115,775.00 |
| | | | 06/30/16 | 12/01/16 | $89,531.25 |
| | | | 06/30/16 | 06/01/17 | $89,531.25 |
| | | | 06/30/17 | 12/01/17 | $61,312.50 |
| | | | 06/30/17 | 06/01/18 | $61,312.50 |
| | | | 06/30/18 | 12/01/18 | $31,612.50 |
| | | | 06/30/18 | 06/01/19 | $31,612.50 |

\*    If any Deposit Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

## DEBT SERVICE DEPOSIT AGREEMENT

This Debt Service Deposit Agreement (this "Agreement") dated as of December 12, 1996, by and among MELLON BANK, F.S.B., as successor Trustee under the Bond Resolution, a federal savings bank with an agency office in Seattle, Washington (the "Trustee"), YAKIMA-TIETON IRRIGATION DISTRICT, an irrigation district organized and existing under the laws of the State of Washington (the "Issuer") and LEHMAN BROTHERS SPECIAL FINANCING INC., a Delaware corporation ("Lehman").

SECTION I.        DEFINITIONS

For purposes of this Agreement, unless the context clearly indicates otherwise, the words and terms defined in this Section I have the respective meanings given to them herein:

"Bond Insurer" means Financial Security Assurance Inc., a New York stock insurance company, its successors or assigns.

"Bonds" means Yakima-Tieton Irrigation District Refunding Revenue Bonds, Series 1992, issued in the original principal amount of $25,890,000.

"Bond Payment Date" means with respect to each Delivery Date, each date identified as a "Bond Payment Date" on Exhibit A unless such date is not a Business Day, in which case "Bond Payment Date" means the immediately succeeding Business Day provided that in determining whether any such date is a Business Day no effect shall be given to clause (c) or (d) of the definition of Business Day.

"Bond Resolution" means the Resolution No. 92-5 adopted by the Issuer on December 10, 1992, providing for the issuance of the Bonds.

"Burdened Party" means, (i) in the case of (A) an Issuer or Trustee Event of Default or (B) a termination of this Agreement by the Issuer pursuant to Section 3.1 following a redemption, defeasance or refunding of the Bonds, Lehman and (ii) in the case of a Lehman Event of Default, the Issuer.

"Business Day" means any day other than (a) a Saturday or Sunday, (b) a day on which the principal corporate trust office of the Trustee is authorized or required by law to close, (c) a day on which banking institutions in the City of New York are authorized or required by law to close, or (d) a day on which any Qualified Securities which may be delivered hereunder are not subject to delivery in the City of New York.

"Closing Date" means December 12, 1996.

"Coupon Payment" means, for any Qualified Security, a payment of interest which is due to be paid thereon prior to the scheduled maturity of such security.

"Debt Service Fund" means the account created under the Bond Resolution and designated thereunder as the "Principal and Interest Account".

"Default Rate" means a rate per annum equal to Three Month LIBOR plus 1% per annum.

Mellon/YTIR (FSA)

RECEIVED JAN 2 3 1997

"Delivery Date" means each date identified as a "Delivery Date" on Exhibit A unless such date is not a Business Day, in which case "Delivery Date" means the immediately succeeding Business Day.

"Delivery Notice" means a notice substantially in the form of Exhibit E or in such other form as provided by the Qualified Dealer and is reasonably acceptable to the Trustee.

"Deposit Amount" means for each Delivery Date the amount set forth in Exhibit A.

"Differential" means the amount, if any, by which the Purchase Price of any Qualified Security delivered hereunder exceeds the Market Value thereof.

"Eligible Securities" means direct, full faith and credit, non-callable obligations of, the United States of America.

"Guaranteed Rate" means a rate per annum equal to 6.10% assuming that the interest on the applicable security were compounded semi-annually on the basis of a year of 360 days with twelve thirty day months.

"Insolvent" means (i) either the Trustee or Lehman as the case may be, shall (1) commence a voluntary case under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter), (2) file a petition seeking to take advantage of any other law, relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, (3) consent to any petition filed against it in an involuntary case under such bankruptcy or insolvency or other laws, (4) apply for or consent to the appointment of, or the taking of possession by, a trustee, receiver, custodian, liquidator or the like for itself or for all or a substantial part of its property, (5) admit in writing its inability to pay, or generally not be paying, its debts as they come due, (6) make a general assignment for the benefit of creditors, or (7) take any official action for the purpose of affecting any of the foregoing; or (ii) a case or other proceeding shall be commenced against either the Trustee or Lehman, as the case may be, in any court of competent jurisdiction seeking (1) relief under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter) or under any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, or (2) the appointment of a trustee, receiver, custodian, liquidator or the like for the Trustee or Lehman, as the case may be, or for all or a substantial part of its property, and any such case or proceeding shall continue undismissed and unstayed for a period of 60 consecutive calendar days, or an order granting the relief requested in any such case or proceeding against such party shall be entered and shall remain in effect and unstayed for a period of 60 consecutive days.

"Issuer Event of Default" means the occurrence of an event specified in Section 7.2.

"Lehman Event of Default means the occurrence of an event specified in Section 7.3.

"Market Value" means with respect to any Qualified Security, the market value thereof (including accrued interest thereon) as specified by the Qualified Dealer delivering that security, provided that the Market Value of any Qualified Security shall in no event exceed the Purchase Price thereof.

"Maturity Amount" means, with respect to any Qualified Security, the amount, payable in cash, representing the principal and interest due thereon, on its maturity date (but shall exclude any Coupon Payments).

"Purchase Price" means, for any Eligible Security delivered hereunder, that price for such security, as set forth in the Delivery Notice, which will produce a rate of return on such security for the period from (and including) the date of its delivery to (but excluding) its maturity date equal to the Guaranteed Rate.

"Qualified Dealer" means Lehman Brothers Inc., its successors or assigns, or any other dealer in Qualified Eligible Securities selected by Lehman and approved by the Trustee.

"Qualified Securities" for any Delivery Date means Eligible Securities which, to the extent available on the open market, (i) mature as close as possible to but not later than the related Bond Payment Date and (ii) have an aggregate Purchase Price which is as close as possible to but does not exceed the related Deposit Amount.

"Termination Amount" means an amount, as determined by Lehman reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three leading dealers in the relevant markets ("Dealers"), of the amount, if any, that each such Dealer would require the Burdened Party to pay to the Dealer (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer) or would pay to the Burdened Party (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in consideration of such Dealer entering into an agreement with the Burdened Party which would have the effect of preserving for the Burdened Party the economic equivalent of its rights under this Agreement commencing on the termination date of this Agreement; provided, however, that:

     (i)    if more than three quotations are provided, the Termination Amount will be the arithmetic mean of such quotations, without regard to the quotations having the highest and lowest values,

     (ii)    if exactly three quotations are provided, the Termination Amount will be the quotation remaining after disregarding the highest and lowest quotations,

for purposes of clauses (i) and (ii), if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded, and

     (iii)    if Lehman is unable to obtain three such quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by Lehman, to be the Burdened Party's total losses and costs (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer), or gains (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in connection with a termination of this Agreement, including any loss of bargain, cost of funding or, at the election of Lehman but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position, and

provided further, however, that in any event the Termination Amount shall also include (A) losses and costs in respect of any payment required to have been made (assuming satisfaction of each applicable condition precedent) on or before the date on which this Agreement shall be terminated or deemed terminated as provided herein and not made and (B) if such Termination Amount is being paid in connection with a termination of this Agreement following an Event of Default, hereunder, any incidental costs and expenses incurred by Lehman in connection with such termination and the enforcement of its rights hereunder (including reasonable attorneys' fees). Any determination of the Termination Amount by Lehman shall be conclusive and binding on the parties hereto absent manifest error. Lehman shall provide such information to the Issuer of the determination of the Termination Amount to indicate the manner in which the Termination Amount was calculated.

"Three Month LIBOR" as of any date of determination means the rate for deposits in US dollars for a period of three months which appears on the Telerate Page 3750 as of 11:00 a.m., London time, on the day that is two Business Days before the day for which such determination is being made. If no such rate appears on the Telerate Page 3750 as of such date, Lehman may select another nationally recognized published source to determine Three Month LIBOR.



"Trustee Event of Default" means the occurrence of an event specified in Section 7.1.

SECTION II  .  PURCHASE AGREEMENT

Section 2.1    Purchase and Sale of Qualified Securities.

(a)    Lehman shall cause a Qualified Dealer to deliver to the Trustee, on any Delivery Date, in accordance with the delivery requirements of Section 2.2 hereof, to the extent such securities are readily available in the open market, Qualified Securities selected by Lehman or the Qualified Dealer.

(b)    If Lehman causes a Qualified Dealer to deliver Qualified Securities, the Trustee shall, out of immediately available funds under the Bond Resolution for such purpose or as otherwise provided by the Issuer, at the time of the delivery of such Qualified Securities, purchase such Qualified Securities and pay to the Qualified Dealer or Lehman, as applicable, in accordance with Section 2.2(b) hereof, an amount equal to the Purchase Price thereof.

(c)    Neither Lehman nor the Qualified Dealer is required to own any Qualified Securities at the time of Lehman's execution of this Agreement or at any time prior to the respective delivery dates thereof. The Qualified Securities, and the interest thereon, will, prior to the delivery thereof to the Trustee, be the sole property of the Qualified Dealer, and any profit or loss with respect to the holding or sale of any Qualified Securities delivered hereunder, even if purchased and identified to fulfill Lehman's obligations under this Agreement, shall, prior to such delivery, be for the sole account of the owner thereof.

(d)    Any Qualified Securities delivered to the Trustee (including interest thereon) as provided herein shall constitute part of the "trust estate" under the Bond Resolution.

Section 2.2    Delivery; Payment.

(a)    All Qualified Securities delivered hereunder shall be delivered to the Trustee to the account specified in Section 10.1 hereof, in such manner as at the time is generally acceptable for delivery of Qualified Securities. All Qualified Securities delivered hereunder shall be delivered to the Trustee on a "delivery versus payment" basis.

(b)    (i)    Lehman shall cause the Qualified Dealer to give the Trustee at least two Business Days prior notice of the delivery of any Qualified Securities which are in book-entry form and at least two Business Days notice of any Qualified Securities which are being delivered in certificated form. Any such notice shall specify the Maturity Amount, the Purchase Price, the Market Value and the Differential if available, the Bond Payment Date, the CUSIP Number and the security to be delivered and shall be in substantially the form of the Delivery Notice. The Trustee may conclusively rely on the specification by the Qualified Dealer of the Market Value, the Purchase Price and the Maturity Amount of a Qualified Security.

(ii)    Concurrently with the delivery of any Qualified Securities, unless otherwise directed by Lehman in writing, the Trustee shall, subject to clause (iii) below, pay the Qualified Dealer delivering such Qualified Securities, in its individual capacity, the Market Value thereof, and to the Qualified Dealer as agent for Lehman, the Differential, if any, the total of such Market Value and Differential being equal to the Maturity Amount for such Qualified Securities. The Maturity Amount to be paid by the Trustee pursuant to this Section 2.2(b)(ii) shall be made in a single wire to the Qualified Dealer, and the Trustee is under no obligation and has no duty to verify the portion of such payment which represents the Market Value or the Differential.

Mellon/YTIR (FSA)                                 4

(iii)    Lehman may, in the Delivery Notice, direct the Trustee to pay (A) to the Qualified Dealer, the Market Value of any Qualified Securities delivered to the Trustee hereunder, and (B) to Lehman, the Differential, if any. Any such payment to Lehman shall be at Lehman's account as set forth in Section 10.1 hereof.

(iv)    All payments to be made hereunder (either to Lehman or the Qualified Dealer) shall be made in immediately available funds from the Debt Service Fund by means of a bank or Federal funds wire.

(c)    The Trustee and the Issuer have been advised by Lehman that the Maturity Amount for any Qualified Security delivered hereunder shall, in almost all cases, exceed the Market Value thereof.

Section 2.3    Subsequent Deliveries. If any Qualified Securities delivered by a Qualified Dealer pursuant to Section 2.1 hereof (A) mature prior to the Bond Payment Date for which such Qualified Securities were delivered or (B) have a Coupon Payment, Lehman shall have the right, upon at least two Business Days prior written notice to the Trustee in the form of the Delivery Notice, to cause a Qualified Dealer to deliver to the Trustee, at any time on or after the maturity date of such Qualified Securities (or, as applicable, on or after the interest payment date of such Coupon Payment) but prior to the date which is one Business Day before such Bond Payment Date, other Qualified Securities, provided that the Purchase Price thereof does not exceed the Maturity Amount of the securities which have so matured (or, as applicable, the amount of the Coupon Payment.) Any such deliveries by the Qualified Dealer shall conform to the requirements of Section 2.2(a). Upon the delivery by the Qualified Dealer of such Qualified Securities, the Trustee shall pay the Purchase Price thereof in the manner required by Section 2.2(b)(ii).



Section 2.4    Failure to Deliver. If in connection with any Delivery Date a Lehman Event of Default occurs, in addition to the rights set forth in Section 7.3 hereof, the Issuer shall have the right to invest the related Deposit Amount in any manner permitted under the Bond Resolution.

Section 2.5    Direction by Issuer to Trustee. The Issuer hereby irrevocably instructs the Trustee, and the Trustee agrees to enter into this Agreement, to take the actions and to make the purchases required hereby to the extent funds described in Section 2.1(b) hereof are actually received by the Trustee.

SECTION III.    DEFEASANCE OR REFUNDING

Section 3.1    Defeasance or Refunding.

(a)    The Issuer may, by giving Lehman at least fifteen (15) Business Days prior notice, but without the consent of Lehman redeem, defease, repurchase, or refund the Bonds as provided in the Bond Resolution, provided that if the Issuer takes any such action, the Issuer shall pay or cause the Trustee to pay to Lehman in immediately available funds the Termination Amount by no later than the later of (A) one Business Day after receipt of notice of the Termination Amount from Lehman or (B) the date of such redemption, defeasance or refunding. Such payment shall be made in immediately available funds, to or at the direction of Lehman.

(b)    Immediately upon payment of the Termination Amount in accordance with this Section 3.1 this Agreement shall terminate. The Issuer agrees that it shall not redeem, defease, refund or repurchase the Bonds unless it shall have sufficient funds to pay any Termination Amount which may be due as provided herein.

(c)    If pursuant to clause (a) above this Agreement would be terminated in connection with a refunding of the Bonds and a Termination Amount would be payable to Lehman or the Issuer, the Issuer may, by written notice to Lehman, request that Lehman continue this Agreement and have it apply to such refunding bonds the proceeds of which are used to refund the Bonds or in connection with such refunding (the "Refunding Bonds"). Lehman agrees that if it receives such a request it shall agree to so continue this Agreement with respect to the Refunding Bonds and the Bonds remaining outstanding after such refunding, with no Termination Amount being owed by the Issuer or Lehman, provided that:

(i)    Lehman receives such request (together with all relevant details relating thereto) at least 15 days in advance of the issuance of the Refunding Bonds;

(ii)    on or prior to the date the Bonds are to be refunded (the "Refunding Date") the Issuer and the trustee of the Refunding Bonds (the "Refunding Trustee") enter into such amendments of this Agreement with Lehman (the "Amended Agreement") as are necessary to have this Agreement pertain to the deposit amounts, deposit dates and bond payment dates applicable to the Refunding Bonds and to any Bonds which remain outstanding after giving effect to such refunding (the "Amended Cash Flows"); provided, however, each such Deposit Amount corresponding to the appropriate Delivery Date and Bond Payment Date of the Amended Cash Flows shall not exceed each original Deposit Amount corresponding to the appropriate Delivery Date and Bond Payment Date, and provided further, if the Refunding Trustee is not the Trustee, the Trustee shall be discharged hereunder upon execution of the Amended Agreement;

(iii)    the Delivery Dates and Bond Payment Dates of the Amended Agreement remain unchanged from the original Delivery Dates and Bond Payment Dates;

(iv)    the Refunding Bonds have a credit rating at least equivalent to the credit rating of the Bonds without giving effect to any bond insurance and are secured by revenues at least equivalent to the Bonds; and

(v)    Lehman receives any opinions and other assurances it may reasonably request to assure that the protections afforded it hereunder will continue under the Amended Agreement.

SECTION IV.        REPRESENTATIONS AND WARRANTIES

Section 4.1    Representations and Warranties.  Each party hereto represents and warrants to the other parties hereto that:

(a)    it is duly organized and validly existing under the laws of its jurisdiction, incorporation or establishment;

(b)    it has the power to enter into and perform its obligations under this Agreement (including, in the case of the Issuer, to pay the Termination Amount in accordance herewith and, including, in the case of the Issuer or the Trustee, to enter into and/or perform its obligations under the Bond Resolution);

(c)    this Agreement has been duly authorized, executed and delivered by it and, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of it enforceable against it in accordance with the terms hereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law;

(d)    its execution and delivery of this Agreement and its performance of its obligations hereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws (or equivalent organizational documents), or any other agreement (including, in the case of the Issuer and the Trustee, the Bond Resolution), instrument, law, ordinance, regulation, judgment, injunction or order applicable to it or any of its property;

(e)    all consents, authorizations and approvals requisite for its execution, delivery and performance of this Agreement have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority or regulatory body is required for such execution, delivery or performance;

(f)    there is no proceeding pending or threatened against it at law or in equity, or before any governmental instrumentality or in any arbitration, which would materially impair its ability to perform its obligations under this Agreement, and there is no such proceeding pending against it which purports or is likely to affect the legality, validity or enforceability of the Agreement;

(g)    in the case of the Issuer:

(i)    the amount specified in Exhibit A hereto for each Delivery Date as the Deposit Amount therefor is the amount the Issuer is required to deposit into the Debt Service Fund pursuant to Section 6.02 of the Bond Resolution on such Delivery Date,

(ii)    it is not entitled to claim, and shall not assert any claim, with respect to itself or its revenues, assets or property (irrespective of the use or intended use thereof), of immunity on the grounds of sovereignty or similar grounds from suit, jurisdiction of any court, relief by way of injunction, order for specific performance or for recovery of property, attachment of its assets (whether before or after judgment, in aid of execution, or otherwise) and execution or enforcement of any judgment to which it or its revenues or assets or property might otherwise be entitled in any suit, action or proceeding relating to this Agreement in the courts of any jurisdiction, nor may there be attributed to the Issuer or its revenues, assets or property any such immunity (nor shall such attribution be claimed by the Issuer),

(iii)    its obligation to make payments of the Deposit Amount to the Trustee on each Delivery Date constitute revenue obligations payable out of the Net Revenue of the Issuer (as defined in the Bond Resolution),

(iv)    the Issuer has entered into this Agreement for purposes of managing its borrowings or investments by increasing the predictability of its cash flow from earnings on its investments and not for purposes of speculation, and

(v)    the Bond Resolution has been duly authorized, executed and delivered by it,

(vi)    the Bond Resolution constitutes legal, valid and binding obligations of it, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law,

(vii)    the Bond Resolution is in full force and effect on the date hereof and no amendment, waiver or course of dealing has amended or terminated any of the terms thereof since the original execution and



delivery of the Bond Resolution, except such as may have been delivered to Lehman pursuant to Section 6.1(d) hereof,

(viii)    no "event of default" or event which would with the passage of time or the giving of notice constitute an event of default has occurred and is continuing under the Bond Resolution, and

(ix)    the Issuer has not entered into any agreements providing for the forward delivery of Eligible Securities or for the investment of funds held in the Debt Service Fund under the Bond Resolution except for this Agreement.

## SECTION V.    COVENANTS

Section 5.1    <u>Covenants</u>.  Each of Lehman, the Issuer and the Trustee covenants to the other parties to this Agreement that so long as it shall have any obligations under this Agreement it shall:

(a)    maintain in full force and effect all authorizations and agreements of and exemptions, consents, licenses, actions or approvals by, and all filings with or notices to, any governmental or other authority that are required to be obtained or made by such party with respect to this Agreement and will use all reasonable efforts to obtain or make any that may become necessary in the future;

(b)    comply in all material respects with all applicable laws, rules, regulations and orders to which it may be subject if failure so to comply could materially impair its ability to perform its obligations under this Agreement; and

(c)    if it is the Issuer or the Trustee, not enter into any amendment or modification of the Bond Resolution which could impair its ability to perform its obligations to Lehman hereunder, except that nothing contained herein shall restrict the Issuer's ability to issue additional bonds under the Bond Resolution.

Section 5.2    <u>Additional Covenants of Issuer</u>.  In addition to its covenants under Section 5.1, the Issuer covenants to the other parties to this Agreement that so long as it shall have any obligations hereunder:

(a)    on or before each Delivery Date it shall make payments into the Debt Service Fund in such amounts as are necessary to cause the related Deposit Amounts to be available in immediately available funds into the Debt Service Fund on each Delivery Date; and

(b)    it shall, if Lehman fails to cause the Qualified Dealer to deliver Qualified Securities on any Delivery Date, direct the Trustee to invest the related Deposit Amount on an overnight basis in Eligible Securities (as defined in the Bond Resolution) and if such failure becomes a Lehman Event of Default under Section 7.3(a), the Issuer shall direct the Trustee to invest the related Deposit Amount in Eligible Securities in the manner permitted by the Bond Resolution.

## SECTION VI .    CONDITIONS PRECEDENT

Section 6.1    <u>Conditions Precedent</u>.    The performance of the obligations of the parties hereunder are conditioned upon satisfaction of the following conditions:

(a)    delivery to Lehman and Issuer of an opinion of counsel to the Trustee substantially in the form of Exhibit B;

(b)    delivery to Lehman and Trustee of an opinion of counsel to the Issuer, in the form of Exhibit D;

(c)    delivery to Lehman by the Issuer of a copy of the official statement for the Bonds;

(d)    delivery by Lehman to the Issuer, the Trustee and the Bond Insurer an opinion of nationally recognized bankruptcy counsel to Lehman;

(e)    delivery by Lehman to the Issuer and Trustee of an opinion of inside counsel to Lehman, in the form of Exhibit C; and

(f)    delivery to Lehman of a copy of any consent received by the Issuer to enter in to this Agreement.

SECTION VII.    DEFAULTS; TERMINATION

Section 7.1    Trustee Events of Default.  The occurrence of any of the following events shall constitute a Trustee Event of Default:

(a)    the Trustee shall fail for any reason, other than that the Issuer has failed to deposit the related Deposit Amount in immediately available funds, to purchase for two Business Days, at the Purchase Price therefor, any Qualified Securities delivered by the Qualified Dealer in accordance with this Agreement, provided, however, that the Trustee shall pay Lehman for its losses as calculated in Section 7.7 from the date of such failure until such Qualified Securities are delivered hereunder;

(b)    the Trustee shall default in the performance of any other covenant or obligation under this Agreement and such default is not cured within 5 Business Days of notice thereof from Lehman or the Issuer; or

(c)    any representation or warranty of the Trustee contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made.

Section 7.2    Issuer Events of Default.  The occurrence of any of the following events shall constitute an Issuer Event of Default:

(a)    the Issuer shall fail to make the Deposit Amount or the Trustee for any other reason shall fail to purchase, at the Purchase Price thereof, any Qualified Securities delivered by the Qualified Dealer in accordance herewith;

(b)    the Issuer shall default in the performance of any covenant or obligation under, or incorporated by reference in, this Agreement, other than as described in clause (a) above and such default is not cured within five Business Days of notice thereof from Lehman or the Trustee;

(c)    any representation or warranty of the Issuer contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made;

(d)    the Issuer (1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts

as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 60 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6)(A) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets or (B)(I) there shall be appointed or designated with respect to it, an entity such as an organization, board, commission, authority, agency or body to monitor, review, oversee, recommend or declare a financial emergency or similar state of financial distress with respect to it or (II) there shall be declared or introduced or proposed for consideration by it or by any legislative or regulatory body with competent jurisdiction over it, the existence of a state of financial emergency or similar state of financial distress in respect of it; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 60 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts;

     (e)    the interest and principal outstanding under the Bonds shall be declared due and payable at any time prior to the scheduled maturity thereof (other than pursuant to scheduled mandatory redemptions under Section 5.02 of the Bond Resolution or pursuant to a permitted refunding under Section 15 of the Bond Resolution);

     (f)    there shall be an investment of amounts in the Debt Service Fund other than pursuant to this Agreement (except as permitted under Section 5.2(b) hereof); or

     (g)    the Issuer consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if an entity such as an organization, board, commission authority, agency or body succeeds to the principal functions of, or powers and duties granted, to the Issuer) and, at the time of such consolidation, amalgamation, merger or transfer either (i) the resulting or surviving or transferee entity fails to assume all the obligations of the Issuer under this Agreement or by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement or (ii) the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of the Issuer.

     Section 7.3    Lehman Events of Default.  The occurrence of any of the following events shall constitute a Lehman Event of Default:

     (a)    Lehman shall fail to cause a Qualified Dealer to deliver Qualified Securities on any Delivery Date and such failure shall continue for two Business Days after written notice thereof to Lehman from the Trustee or the Issuer;

     (b)    any representation or warranty of Lehman contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made; or

     (c)    Lehman is at any time Insolvent.

Section 7.4    <u>Remedies Upon Occurrence of Trustee Event of Default</u>.    Upon the occurrence of a Trustee Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Delivery Date and which have not theretofore been delivered to and purchased by the Trustee and, subject to Section 8.2, make demand for the payment of its losses (calculated in accordance with Section 7.7) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    immediately terminate this Agreement by giving written notice thereof to the Trustee with a copy to the Issuer and, subject to Section 8.2, if the Termination Amount is a positive number, make demand upon the Trustee for the payment of the Termination Amountand (ii) if the Termination Amount is a negative number, no Termination Amount shall be due.

If the Termination Amount is payable pursuant to this Section 7.4(b), the party owing such amount shall promptly, but by no later than two Business Days after written notice that such amount is due from Lehman, pay such amount, in immediately available funds, to the party to whom such Termination Amount is due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due and not paid at the Default Rate. Any amounts payable pursuant to Section 7.7 shall be payable upon demand as provided therein.

Notwithstanding anything to the contrary in this Agreement, the Trustee shall have no direct liability to Lehman hereunder except to the extent, if any, that the losses incurred by Lehman upon a Trustee Event of Default are caused by the Trustee's negligence or wilful misconduct or by a breach of its covenant contained in Section 5.1(c) hereof or by a breach of the Trustee's representations and warranties hereunder.

Section 7.5    <u>Remedies Upon Occurrence of Issuer Event of Default</u>.    Upon the occurrence of an Issuer Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Delivery Date and which have not theretofore been delivered to and purchased by the Trustee and make demand for the payment of its losses (calculated in accordance with Section 7.7) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    immediately terminate this Agreement by giving written notice thereof to the Issuer with a copy to the Trustee, and (i) if the Termination Amount is a positive number, make demand upon the Issuer for the payment of the Termination Amount and (ii) if the Termination Amount is a negative number, no Termination Amount shall be due.

If a Termination Amount is payable pursuant to this Section 7.5(b), the party owing such amount shall promptly, but by no later than two Business Days after written notice that such amount is due from the party to whom such Termination Amount is due, pay such amount, in immediately available funds, to or at the direction of the party to whom such Termination Amount is due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate. Any amounts payable pursuant to Section 7.7 shall be payable upon demand as provided therein.

Section 7.6    <u>Remedies Upon Occurrence of Lehman Event of Default</u>.    Upon the occurrence of a Lehman Event of Default, the Issuer shall have the right to:

(a)    if such default is a default under Section 7.3(a), cause a qualified dealer selected by the Issuer or the Trustee to sell to the Trustee the Qualified Securities which were to be delivered and which have not yet been delivered to the Trustee and make demand for the payment of its losses in connection therewith, calculated as provided in Section 7.7;

(b)    if such default is a default under Section 7.3(a) and there has previously been such a default, and Lehman has failed to pay the Issuer's losses (as described in Section 7.7), immediately terminate this Agreement by giving written notice thereof to Lehman with a copy to the Trustee; and

*Is Termination Amount due?*

(c)    if such default is a default under Sections 7.3(b) or (c) hereof, immediately terminate this Agreement; whereupon Lehman shall promptly determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than two Business Days after written notice is delivered by Lehman to the Issuer that such amount is due, pay such amount, in immediately available funds, to the Issuer and (ii) if the Termination Amount is a positive number, no Termination Amount shall be due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date *3mo* such amount is due but not paid at the Default Rate. Notwithstanding anything to the contrary in this Agreement, *LIBOR+1%* if Lehman fails to determine the Termination Amount within three Business Days of notice from the Issuer or the Trustee of the occurrence of a Lehman Event of Default then the Issuer (or if so directed by the Issuer, the Trustee) shall make such determination as if it were Lehman and the amount as so determined by the Issuer (or the Trustee) shall for purposes of this Section 7.6 be deemed the Termination Amount.

Section 7.7    Loss Amount if Failed or Late Purchase.

(a)    Subject to Section 8.2, if the Trustee fails to purchase any Qualified Securities delivered by a Qualified Dealer in accordance with this Agreement and provided that Lehman has not exercised its right to terminate this Agreement as provided herein (in which case the Termination Amount shall be due), the Trustee, in the case of a Trustee Event of Default under Section 7.1(a) or the Issuer under any other circumstances, shall pay to Lehman as liquidated damages for its losses and not as a penalty, on demand by Lehman, the sum of (w) interest on the Purchase Price of such Qualified Securities for each day from and including the delivery date thereof to but excluding the date on which such securities are resold to a third party or to the Trustee, (x) the excess, if any, of the Purchase Price of such Qualified Securities over the amount received by the Qualified Dealer upon such resale of the securities (the "Shortfall Amount"), (y) interest on the Shortfall Amount from and including the resale date to but excluding the date on which the Trustee or the Issuer, as applicable, compensates Lehman for its losses as described herein, and (z) any reasonable incidental costs and expenses shown to have been incurred by Lehman in connection with the Trustee's failure to so purchase such Qualified Securities. Interest shall accrue at a rate per annum equal to the Default Rate for purposes of clauses (w) and (y).

(b)    If Lehman fails to deliver any Qualified Securities in accordance with this Agreement and provided that the Issuer has not excercised its right to terminate this Agreement as provided herein (in which case the Termination Amount shall be due) the amount of losses that shall be payable on demand against Lehman upon the occurrence of a Lehman Event of Default under Section 7.3(a) shall be the excess, if any, of the interest the Trustee would have earned on the related Deposit Amount had the Deposit Amount been invested at the Guaranteed Rate (the "Guaranteed Interest") over the amount of the interest the Trustee actually earned by investing the related Deposit Amount in Eligible Securities as provided by Section 5.2(e) hereof; provided that if the Trustee fails to invest such Deposit Amount in Eligible Securities as provided by Section 5.2(e), the amount of losses payable by Lehman shall be equal to the excess, if any, of the Guaranteed Interest over an amount equal to the interest the Trustee would have earned based on the prevailing rates for Eligible Securities at such time (as

determined by the Trustee in consultation with Lehman) had the Trustee invested such Deposit Amount in Eligible Securities as provided in Section 5.2(c).

Section 7.8 <u>Limited Rights Against the Debt Service Fund</u>. Lehman agrees and acknowledges that (i) neither Lehman nor any Qualified Dealer has any right, title or interest in or to any securities, cash or other property held in the Debt Service Fund or by the Trustee, including without limitation the Qualified Securities, except to the extent expressly provided in this Agreement with respect to payments in connection with the delivery of Qualified Securities, (ii) the Trustee shall not be obligated to pay the Purchase Price of any Qualified Securities from funds other than immediately available funds held in the Debt Service Fund and (iii) any payments required to be made to Lehman by the Issuer under this Agreement shall constitute general unsecured obligations of the Issuer.

Section 7.9 <u>No Waiver; Remedies Cumulative</u>. No failure or delay on Lehman's part in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy. Lehman's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law, this Agreement or otherwise. None of the terms or provisions of this Agreement may be waived, modified or amended except in a writing duly signed by the Trustee, the Issuer and Lehman.


SECTION VIII.        THE TRUSTEE

Section 8.1 <u>Acceptance by Trustee</u>. By execution and delivery of this Agreement, the Trustee accepts its duties and obligations hereunder, as an addition to its duties and obligations as Trustee under the Bond Resolution.

Section 8.2 <u>Liability of the Trustee; Consultation with Legal Counsel</u>.

(a)        The Trustee shall not be liable to any person for any action taken or neglected to be taken in performing or attempting to perform its obligations hereunder or preserving or seeking to preserve the funds it maintains under the Bond Resolution or to purchase the Qualified Securities tendered pursuant to this Agreement, except for actions arising from its gross negligence or willful misconduct or for a breach of its representations or warranties or from a breach of its covenant under Section 5.1(c).

(b)        The Trustee may consult with counsel reasonably satisfactory to Lehman and the Issuer with respect to any question relating to its duties or responsibilities hereunder or otherwise in connection herewith and, except as expressly provided herein, shall not be liable for any action taken, suffered, or omitted by the Trustee in good faith upon the advice of such counsel. The Trustee may act through its officers, employees, agents and attorneys.

Section 8.3        Payment of Trustee Fees. Lehman has no liability or responsibility for payment of the Trustee's fees or expenses for its services hereunder, including any such fees or expenses arising out of or in connection with the liquidation of the Qualified Securities as provided herein.

Mellon/YTIX (FSA)                              13

Section 8.4    Trustee Cooperation.

(a)    The Trustee shall not act in contravention of its obligations hereunder or invest amounts in the Debt Service Fund other than pursuant to this Agreement.

(b)    The Trustee shall not make any payments or distributions from the Debt Service Fund other than payments or distributions (i) required by this Agreement, or (ii) to pay principal of, redemption premium and interest on the Bonds.

Section 8.5    Successor Trustee.  If the Trustee shall resign or be discharged from its duties and obligations under the Bond Resolution, the Issuer shall appoint a successor Trustee pursuant to the terms of the Bond Resolution; provided, however, the successor trustee shall be reasonably acceptable to Lehman.  The Issuer agrees that if the Trustee fails for any reason to perform its duties to Lehman under this Agreement in accordance with the terms hereof, or is at any time Insolvent or breaches in any material respect its representations and warranties to Lehman hereunder, the Issuer shall promptly, upon request of Lehman, appoint a successor Trustee acceptable to Lehman.

Section 8.6    Confirmation of Trustee Right to Indemnification.  The Issuer hereby confirms the Trustee's rights under Sections 9.04(p) and 9.07 of the Bond Resolution in consideration for the Trustee's execution of this Agreement and its undertaking of duties and obligations hereunder.  The provisions of Section 9.07 are hereby incorporated herein by reference.

SECTION IX.    MISCELLANEOUS

Section 9.1    Notices.  All notices, demands or other communications hereunder shall be given or made in writing and shall be delivered personally, or sent by certified or registered mail, postage prepaid, return receipt requested, or overnight delivery service, telex or telecopy to the party to whom they are directed at the following addresses, or at such other addresses as may be designated by notice from such party to all other parties:

To Lehman:

Lehman Brothers Special Financing Inc.
3 World Financial Center, 7th Floor
New York, NY  10285
Attention: Senior Vice President
Telephone:  212- 526-7133
FAX:  212- 528-6923

To the Trustee:

Mellon Bank, F.S.B.
1111 3rd Avenue, Suite 2230
Seattle, WA  98101
Attention:  Corporate Trust Group
Telephone:  206-223-0540, ext. 222
FAX:  206-223-0545

Mellon/YTIR (FSA)                              14

[FOR DELIVERY OF BOOK-ENTRY GOVERNMENT OBLIGATIONS]

BOS SAFE DEP/CUST
ABA: 011001234
Ref# 03041

To the Issuer:

Yakima-Tieton Irrigation District
470 Camp 4 Road
Yakima, WA 98908
Attention: Manager
Telephone: 509-678-4101
FAX: 509-678-5730

To the Bond Insurer:

Financial Security Assurance Inc.
350 Park Avenue
New York, NY 10022-6022
Attention: Managing Director – Surveillance — Re: Policy No. 20220
Phone: 212-826-0100
FAX: 212-339-3529

In each case in which notice or other communication refers to an event of default or with respect to which failure on the part of the Bond Insurer to respond shall be deemed to constitute consent or acceptance, then a copy of such notice or other communication shall also be sent to the attention of General Counsel and shall be marked to indicate "URGENT MATERIAL ENCLOSED."

Any notice, demand or other communication given in a manner prescribed in this Section shall be deemed to have been delivered on receipt.

Section 9.2    Binding Effect; Transfer. This Agreement shall be binding upon the Trustee, the Issuer and Lehman and upon their respective permitted successors and transferees. Lehman shall be entitled to transfer all or any portion of this Agreement and its interests and obligations hereunder, to any subsidiary or affiliate of Lehman, or to any office, branch or subsidiary of any affiliate of Lehman and upon notice to the Issuer, the Bond Insurer and the Trustee, and Lehman shall otherwise be able to transfer all or any portion of this Agreement only with the consent of the Issuer and the Bond Insurer (such consent not to be unreasonably withheld or delayed if such transfer is to any entity rated at least an "A-", "A3", or "A-" by Standard & Poor's, a division of the McGraw-Hill Companies, ("Standard & Poor's"), Moody's Investors Service, Inc. ("Moody's") or Fitch Investors Service, L.P. ("Fitch"), respectively) and notice to the Trustee; provided, however, that in all such instances the transferee shall assume all of the rights and obligations of Lehman hereunder. The Trustee may not transfer this Agreement without the prior written consent of Lehman.

Section 9.3    Limitation. Nothing expressed or implied herein is intended or shall be construed to confer upon any person, firm or corporation other than the parties hereto, any right, remedy or claim by reason of this Agreement or any term hereof, and all terms contained herein shall be for the sole and exclusive benefit of the parties hereto, and their successors and permitted transferees.

Mellon/YTIK (FSA)                                                            15

Section 9.4    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law principles.

Section 9.5    Submission to Jurisdiction.  Lehman, the Trustee and the Issuer each hereby irrevocably submits to the non-exclusive jurisdiction of any court of the State of New York or the United States District Court for the Southern District of the State of New York for the purpose of any suit, action or other proceeding arising out of this Agreement, or any of the agreements or transactions contemplated hereby, at the election of the party initiating any such suit, action or other proceeding, which is brought by or against Lehman, the Trustee or the Issuer, and the parties each hereby irrevocably agrees that all claims in respect of any such suit, action or proceeding may be heard and determined by any such court.

Section 9.6    Role of Lehman.

(a)    It is expressly understood and agreed that in performing its obligations hereunder, Lehman is not acting as a fiduciary, agent or other representative for the holders of the Bonds or for any other person, that Lehman has made no investigation with respect to the tax-exempt status of the Bonds, and that neither Lehman nor any of its directors, officers, employees, agents or affiliates shall be liable or responsible for: (i) the payment of any amounts owing on or with respect to the Bonds; (ii) the use or application by the Trustee of any moneys payable to the Trustee hereunder; (iii) any acts or omissions of the Issuer or the Trustee under, or with respect to, the validity, tax exemption or enforceability of, the Bonds, or the Bond Resolution ; or (iv) the Trustee's performance of its obligations under the Bond Resolution or any other agreement or instrument with respect to the Bonds. Without limiting the foregoing, Lehman shall have no duty to ascertain whether the Trustee is in compliance with any applicable statute, regulation or law, or the Bond Resolution.

(b)    The Issuer acknowledges that the economic terms of this Agreement have been individually negotiated by it and that, to the extent it has deemed necessary, it has consulted with its own legal, tax and investment advisors regarding its decision to enter into this Agreement.  The Issuer understands that in entering this Agreement pursuant to which it is agreeing upon the rate of return it will receive during the term of this Agreement on amounts held in the Debt Service Fund and thereby minimizing the risks resulting from fluctuations in interest rates during the term hereof it is also foregoing the possibility of receiving greater returns on such amounts from such fluctuations.

Section 9.7    Counterparts.  This Agreement may be executed in one or more counterparts and when each party hereto has executed at least one counterpart, this Agreement shall become binding on all parties and such counterparts shall be deemed to be one and the same document.

Section 9.8    Severability.  If one or more provisions of this Agreement or the applicability of any such provisions to any set of circumstances shall be determined to be invalid or ineffective for any reason, such determination shall not affect the validity and enforceability of the remaining provisions or the applicability of the same provisions or any of the remaining provisions to other circumstances.

Section 9.9    Amendments. Changes and Modifications.  This Agreement may be amended or any of its terms modified only by a written document authorized, executed and delivered by each of the parties hereto.

Section 9.10    Termination.  Unless earlier terminated pursuant to Section 3.1, 7.4, 7.5, or 7.6 hereof, this Agreement shall terminate on the later of the last Bond Payment Date set forth in Exhibit A and the date on which the Trustee and the Issuer have satisfied all of their obligations hereunder.

IN WITNESS WHEREOF, the Trustee, the Issuer and Lehman have caused this Debt Service Deposit Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

MELLON BANK, F.S.B, AS TRUSTEE

By: _____
Name:    Robert R. Meyer
Title:    Vice President

YAKIMA-TIETON IRRIGATION DISTRICT

By: _____
Name:    DONNG JOHNSON
Title:    PRESIDENT.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:    T. Courtney Jenkins
Title:    Vice President

Mellon/YTIR (FSA)                              17

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 12/13/96 | 06/01/97 | $540,000.00 | 12/13/96 | 06/01/97 | $730,643.75 |
| 06/30/97 | 06/01/98 | $565,000.00 | 06/30/97 | 12/01/97 | $717,548.75 |
| 06/30/98 | 06/01/99 | $595,000.00 | 06/30/97 | 06/01/98 | $717,548.75 |
| 06/30/99 | 06/01/00 | $625,000.00 | 06/30/98 | 12/01/98 | $703,282.50 |
| 06/30/00 | 06/01/01 | $660,000.00 | 06/30/98 | 06/01/99 | $703,282.50 |
| 06/30/01 | 06/01/02 | $695,000.00 | 06/30/99 | 12/01/99 | $687,812.50 |
| 06/30/02 | 06/01/03 | $735,000.00 | 06/30/99 | 06/01/00 | $687,812.50 |
| 06/30/03 | 06/01/04 | $775,000.00 | 06/30/00 | 12/01/00 | $670,937.50 |
| 06/30/04 | 06/01/05 | $820,000.00 | 06/30/00 | 06/01/01 | $670,937.50 |
| 06/30/05 | 06/01/06 | $870,000.00 | 06/30/01 | 12/01/01 | $652,622.50 |
| 06/30/06 | 06/01/07 | $920,000.00 | 06/30/01 | 06/01/02 | $652,622.50 |
| 06/30/07 | 06/01/08 | $975,000.00 | 06/30/02 | 12/01/02 | $632,988.75 |
| 06/30/08 | 06/01/09 | $1,035,000.00 | 06/30/02 | 06/01/03 | $632,988.75 |
| 06/30/09 | 06/01/10 | $1,100,000.00 | 06/30/03 | 12/01/03 | $611,857.50 |
| 06/30/10 | 06/01/11 | $1,165,000.00 | 06/30/03 | 06/01/04 | $611,857.50 |
| 06/30/11 | 06/01/12 | $1,240,000.00 | 06/30/04 | 12/01/04 | $589,188.75 |
| 06/30/12 | 06/01/13 | $1,315,000.00 | 06/30/04 | 06/01/05 | $589,188.75 |
| 06/30/13 | 06/01/14 | $1,395,000.00 | 06/30/05 | 12/01/05 | $564,998.75 |
| 06/30/14 | 06/01/15 | $1,480,000.00 | 06/30/05 | 06/01/06 | $564,998.75 |
| 06/30/15 | 06/01/16 | $1,570,000.00 | 06/30/06 | 12/01/06 | $539,333.75 |
| 06/30/16 | 06/01/17 | $1,670,000.00 | 06/30/06 | 06/01/07 | $539,333.75 |
| 06/30/17 | 06/01/18 | $1,775,000.00 | 06/30/07 | 12/01/07 | $512,193.75 |
| 06/30/18 | 06/01/19 | $1,885,000.00 | 06/30/07 | 06/01/08 | $512,193.75 |
| | | | 06/30/08 | 12/01/08 | $482,334.38 |
| | | | 06/30/08 | 06/01/09 | $482,334.38 |
| | | | 06/30/09 | 12/01/09 | $450,637.50 |
| | | | 06/30/09 | 06/01/10 | $450,637.50 |
| | | | 06/30/10 | 12/01/10 | $416,950.00 |
| | | | 06/30/10 | 06/01/11 | $416,950.00 |
| | | | 06/30/11 | 12/01/11 | $381,271.88 |
| | | | 06/30/11 | 06/01/12 | $381,271.88 |
| | | | 06/30/12 | 12/01/12 | $343,296.88 |
| | | | 06/30/12 | 06/01/13 | $343,296.88 |
| | | | 06/30/13 | 12/01/13 | $303,025.00 |
| | | | 06/30/13 | 06/01/14 | $303,025.00 |
| | | | 06/30/14 | 12/01/14 | $259,780.00 |
| | | | 06/30/14 | 06/01/15 | $259,780.00 |
| | | | 06/30/15 | 12/01/15 | $213,900.00 |
| | | | 06/30/15 | 06/01/16 | $213,900.00 |
| | | | 06/30/16 | 12/01/16 | $165,230.00 |

\*      If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| | | | 06/30/16 | 06/01/17 | $165,230.00 |
| | | | 06/30/17 | 12/01/17 | $113,460.00 |
| | | | 06/30/17 | 06/01/18 | $113,460.00 |
| | | | 06/30/18 | 12/01/18 | $58,435.00 |
| | | | 06/30/18 | 06/01/19 | $58,435.00 |

\* If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

A-2

<u>EXHIBIT B</u>

[LETTERHEAD OF COUNSEL TO TRUSTEE]

December 12, 1996

Yakima-Tieton Irrigation District
Yakima, WA

Lehman Brothers Special Financing Inc.
New York, NY

Financial Security Assurance Inc.
New York, NY

Re:    $25,890,000 Yakima-Tieton Irrigation District Refunding Revenue Bonds, Series 1992

Ladies and Gentlemen:

We have acted as counsel to Mellon Bank, F.S.B., as Trustee (the "Trustee") in connection with the execution and delivery by the Trustee of the Debt Service Deposit Agreement dated as of December 12, 1996 (the "Debt Service Deposit Agreement") by and among the Trustee, Yakima-Tieton Irrigation District (the "Issuer") and Lehman Brothers Special Financing Inc. ("Lehman"). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Debt Service Deposit Agreement.

In rendering this opinion, we have examined, among other things, copies of the Debt Service Deposit Agreement and the Bond Resolution.

In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the federal laws of the United States of America and the laws of the State of [STATE OF TRUSTEE] (the "State").

Based upon the foregoing examination and review, we are of the opinion that:

(i)    The Trustee has full legal right, power and authority to enter into the Debt Service Deposit Agreement.

(ii)    The Debt Service Deposit Agreement has been duly authorized, executed and delivered by the Trustee.

(iii)    The stipulation of New York law as the governing law of the Debt Service Deposit Agreement is enforceable under State law.

B-1

(iv)    Assuming for purposes of the opinion expressed in this paragraph (iv) that State law and New York law are the same, the Debt Service Deposit Agreement is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(v)    The execution and delivery by the Trustee of the Debt Service Deposit Agreement and the performance of its obligations thereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws, or the Bond Resolution, or, to the best of our knowledge, any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

B-2

<div align="right">EXHIBIT C</div>

<div align="center">[LETTERHEAD OF COUNSEL TO LEHMAN</div>

December 12, 1996

Yakima-Tieton Irrigation District
Yakima, WA

Mellon Bank, F.S.B., as Trustee
Seattle, WA

Financial Security Assurance Inc.
New York, NY

Re:     $25,890,000 Yakima-Tieton Irrigation District Refunding Revenue Bonds, Series 1992

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc. ("Lehman") in connection with the execution and delivery by Lehman of the Debt Service Deposit Agreement dated as of December 12, 1996 (the "Debt Service Deposit Agreement") by and among Lehman, Mellon Bank, F.S.B., as Trustee (the "Trustee") and Yakima-Tieton Irrigation District (the "Issuer"). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Debt Service Deposit Agreement.

In connection with the opinions expressed below, I have examined, or have had examined on my behalf, a copy of the Debt Service Deposit Agreement executed by Lehman and such other agreements, instruments, documents and records of Lehman and certificates and statements by public officials and officers of Lehman as I have deemed necessary or appropriate as a basis for the opinions hereinafter expressed.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.      Lehman is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has the corporate power and authority to execute and deliver the Debt Service Deposit Agreement and to perform its obligations thereunder.

2.      The Debt Service Deposit Agreement has been duly and validly authorized, executed and delivered by Lehman and constitutes the legal, valid and binding obligation of Lehman, enforceable against Lehman in accordance with its terms.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

<div align="center">C-1</div>

A.    My opinion in paragraph 2 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B.    I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the State of New York, the United States of America and the General Corporation Law of the State of Delaware.

C.    My opinions are limited to the present laws and to the facts as they presently exist. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.    This letter is rendered to you in connection with the Debt Service Deposit Agreement and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose. This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman Brothers Inc., except that you many furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Lehman, (iii) pursuant to the order or any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Debt Service Deposit Agreement.

E.    I have assumed with your permission (i) the genuineness of all signatures by the Trustee, (ii) the authenticity of documents submitted to me as originals and the conformity with the original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Debt Service Deposit Agreement by each party other than Lehman.

Very truly yours,

C-2

EXHIBIT D

[LETTERHEAD OF COUNSEL OF ISSUER]

December 12, 1996

Mellon Bank, F.S.B., as Trustee
Seattle, WA

Lehman Brothers Special Financing Inc.
New York, NY

Financial Security Assurance Inc.
New York, NY

Re:    $25,890,000 Yakima-Tieton Irrigation District Refunding Revenue Bonds, Series 1992

Ladies and Gentlemen:

We have acted as counsel to Yakima-Tieton Irrigation District (the "Issuer") in connection with its execution and delivery of the Debt Service Deposit Agreement dated as of December 12, 1996 (the "Debt Service Deposit Agreement"), by and among Lehman, Mellon Bank, F.S.B., as Trustee (the "Trustee") and the Issuer and its execution and delivery of the Bond Resolution (as defined in the Debt Service Deposit Agreement. Capitalized terms used herein and not defined herein have the respective meanings given to them in the Debt Service Deposit Agreement.

In rendering this opinion, we have examined, among other things, copies of the Debt Service Deposit Agreement and the Bond Resolution.

In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the laws of the State of Washington (the "State").

Based upon the foregoing examination and review, we are of the opinion that:

(i)    The Issuer has full legal right, power and authority to enter into the Debt Service Deposit Agreement and adopt the Bond Resolution and to authorize and direct the Trustee, pursuant to the Debt Service Deposit Agreement, to make purchases of the Qualified Eligible Securities in accordance with the terms therein.

(ii)    The Debt Service Deposit Agreement and the Bond Resolution have been duly authorized, executed and delivered by the Issuer.

(iii)    The stipulation of New York law as the governing law of the Debt Service Deposit Agreement is enforceable under the laws of the State.

(iv)    Assuming for purposes of the opinion expressed in this paragraph (iv) that State law and New York law are the same, each of the Debt Service Deposit Agreement and the Bond Resolution is a legal, valid and binding obligation of the Issuer, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(v)    The Issuer's execution and delivery of the Debt Service Deposit Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under the Bond Resolution, or, to the best of our knowledge, any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(vi)    All consents, authorizations and approvals requisite for the Issuer's execution, delivery and performance of the Debt Service Deposit Agreement have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority or regulatory body is required for such execution, delivery or performance.

(vii)    The Issuer is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject to in any suit, action or proceedings relating to this Agreement in the courts of any jurisdiction and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

## Lehman Brothers Special Financing Inc.
### Notice of Tender
### Under the Debt Service Deposit Agreement
### Dated as of:

To:         _____, as Trustee
            Attention:
            Fax:
            Phone:

From:       Lehman Brothers Inc.
            Attention:
            Fax:
            Phone:

Date:       [_____]

Re:         [_____]

**Date and Price**
Purchase Date:                          [_____]
Specified Purchase Price:               [_____]

**Specific Government Obligations**

| Cusip | Type | Maturity | Coupon | Face Amount | Maturity Amount | Accrued Interest |
|-------|------|----------|--------|-------------|-----------------|------------------|
| [_____] | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |

**Delivery vs Payment (Book Entry Delivery)**

    On the Purchase Date, LBI will deliver Face value  [_____] [BILLS/NOTES] maturing [_____]

                        [_____]
                        [_____]
                        [_____]
                        [_____]
                                Re:
                        [_____]

On the Purchase Date, LBI will receive [_____]

            Chase NYC/Lehman
            ABA Number 021-000-021
            Account Number 066206877



**Attachment 2**

October 3, 2008 Lehman Brothers Special Financing Inc. voluntary petition in United
States Bankruptcy Court in the Southern District of New York.

(Official Form 1) (1/08)

| United States Bankruptcy Court<br>Southern District of New York | Voluntary Petition |
| --- | --- |

| Name of Debtor (if individual, enter Last, First, Middle):<br>**Lehman Brothers Special Financing Inc.** | Name of Joint Debtor (Spouse) (Last, First, Middle):<br>**N/A** |
| --- | --- |
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): **N/A** |
| Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete EIN (if<br>more than one, state all): **EIN # 11-2751029** | Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete EIN (if more<br>than one, state all): **N/A** |
| Street Address of Debtor (No. and Street, City, and State):<br>**745 Seventh Avenue**<br>**New York, New York** | Street Address of Joint Debtor (No. and Street, City, and State): **N/A** |
| ZIP CODE **10019** | ZIP CODE |
| County of Residence or of the Principal Place of Business: **New York** | County of Residence or of the Principal Place of Business: **N/A** |
| Mailing Address of Debtor (if different from street address): **N/A**<br>ZIP CODE | Mailing Address of Joint Debtor (if different from street address): **N/A**<br>ZIP CODE |
| Location of Principal Assets of Business Debtor (if different from street address above):<br>ZIP CODE | |

**Type of Debtor**
(Form of Organization)
(Check one box.)
- ☐ Individual (includes Joint Debtors)
  *See Exhibit D on page 2 of this form.*
- ☒ Corporation (includes LLC and LLP)
- ☐ Partnership
- ☐ Other (If debtor is not one of the above
  entities, check this box and state type of
  entity below.)
_____

**Nature of Business**
(Check one box.)
- ☐ Health Care Business
- ☐ Single Asset Real Estate as defined in
  11 U.S.C. § 101 (51B)
- ☐ Railroad
- ☐ Stockbroker
- ☐ Commodity Broker
- ☐ Clearing Bank
- ☒ Other
**Financial Services**
(Check box, if applicable.)
- ☐ Debtor is a tax-exempt organization
  under Title 26 of the United States
  Code (the Internal Revenue Code).

**Chapter of Bankruptcy Code Under Which
the Petition is Filed** (Check one box)
- ☐ Chapter 7
- ☐ Chapter 9
- ☒ Chapter 11
- ☐ Chapter 12
- ☐ Chapter 13
- ☐ Chapter 15 Petition for Recognition of a Foreign
  Main Proceeding
- ☐ Chapter 15 Petition for Recognition of a Foreign
  Nonmain Proceeding

**Nature of Debts** (Check one box)
- ☐ Debts are primarily consumer
  debts, defined in 11 U.S.C. §
  101(8) as "incurred by an
  individual primarily for a personal,
  family, or household purpose."
- ☒ Debts are primarily business
  debts.

**Chapter 11 Debtors**
Check one box:
- ☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).
- ☒ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).
Check if:
- ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to
  insiders or affiliates) are less than $2,190,000.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Check all applicable boxes:
- ☐ A plan is being filed with this petition.
- ☐ Acceptances of the plan were solicited prepetition from one or more classes of
  creditors, in accordance with 11 U.S.C. § 1126(B).

**Filing Fee** (Check one box)
- ☒ Full Filing Fee attached
- ☐ Filing Fee to be paid in installments (applicable to individuals only)
  Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee
  except in installments. Rule 1006(b). See Official Form 3A.
- ☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must attach signed application for
  the court's consideration. See Official Form 3B.

| **Statistical/Administrative Information** | THIS SPACE IS FOR COURT USE<br>ONLY |
| --- | --- |
| ☒ Debtor estimates that funds will be available for distribution to unsecured creditors.<br>☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for<br>distribution to unsecured creditors. | |

Estimated Number of Creditors (Consolidated with affiliates)

| 1-49 | 50-99 | 100-199 | 200-999 | 1,000-5,000 | 5,001-10,000 | 10,001-25,000 | 25,001-50,000 | 50,001-100,000 | Over 100,000 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

Estimated Assets (Consolidated with affiliates)

| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | $100,000,001 to $500 million | $500,000,001 to $1 billion | More than $1 billion |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

Estimated Liabilities (Consolidated with affiliates)

| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | $100,000,001 to $500 million | $500,000,001 to $1 billion | More than $1 billion |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

(Official Form 1) (1/08)

FORM B1, Page 2

| Voluntary Petition<br>*(This page must be completed and filed in every case)* | Name of Debtor(s): **Lehman Brothers Special Financing Inc.** | |
|---|---|---|
| **All Prior Bankruptcy Case Filed Within Last 8 Years** (If more than two, attach additional sheet.) | | |
| Location<br>Where Filed:  **N/A** | Case Number: **N/A** | Date Filed: **N/A** |
| Location<br>Where Filed:  **N/A** | Case Number:<br>**N/A** | Date Filed:<br>**N/A** |
| **Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor** (If more than one, attach additional sheet.) | | |
| Name of Debtor:   **(see schedule 1 attached hereto)** | Case Number: | Date Filed: |
| District: | Relationship: | Judge: **Peck** |

<table>
<tr>
<td colspan="2"><div align="center"><b>Exhibit A</b></div><br>(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>☐   Exhibit A is attached and made a part of this petition.</td>
<td><div align="center"><b>Exhibit B</b><br><i>(To be completed if debtor is an individual whose debts are primarily consumer debts.)</i></div>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I have delivered to the debtor the notice required by § 342(b).<br><br>X<br>_____<br>Signature of Attorney for Debtor(s)              Date</td>
</tr>
</table>

| **Exhibit C** |
|---|
| Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?<br>☐  Yes, and Exhibit C is attached and made a part of this petition.<br>☒  No. **(see exhibit attached hereto)** |

| **Exhibit D**<br>**NOT APPLICABLE** |
|---|
| (To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)<br>☐   Exhibit D completed and signed by the debtor is attached and made a part of this petition.<br>If this is a joint petition:<br>☐   Exhibit D also completed and signed by the joint debtor is attached and made a part of this petition. |

| **Information Regarding the Debtor - Venue**<br>(Check any applicable box.) |
|---|
| ☒  Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.<br>☒  There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.<br>☐  Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District. |

| **Certification by a Debtor Who Resides as a Tenant of Residential Property**<br>(*Check all applicable boxes*)<br>**NOT APPLICABLE** |
|---|
| ☐  Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)<br><br>_____<br>(Name of landlord that obtained judgment)<br><br>_____<br>(Address of landlord)<br><br>☐  Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and<br><br>☐  Debtor has included with this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.<br><br>☐  Debtor certifies that he/she has served the Landlord with this certification. (11 U.S.C. § 362(1)). |

| (Official Form 1) (1/08) | |
|---|---|
| | FORM B1, Page 3 |
| **Voluntary Petition** <br> *(This page must be completed and filed in every case)* | Name of Debtor(s): **Lehman Brothers Special Financing Inc.** |

## Signatures

| Signature(s) of Debtor(s) (Individual/Joint) | Signature of a Foreign Representative |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct. <br><br> [If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7. <br><br> [If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. § 342(b). <br><br> I request relief in accordance with the chapter of title 11, United States Code, specified in this petition. <br><br> X_____ <br> Signature of Debtor <br> X_____ <br> Signature of Joint Debtor <br><br> _____ <br> Telephone Number (if not represented by attorney) <br><br> _____ <br> Date | I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition. <br><br> (Check only one box.) <br><br> ☐   I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by 11 U.S.C. § 1515 are attached. <br><br> ☐   Pursuant to 11 U.S.C. § 1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached. <br><br> X_____ <br> (Signature of Foreign Representative) <br><br> _____ <br> (Printed Name of Foreign Representative) <br><br> _____ <br> Date |

| Signature of Attorney* | Signature of Non-Attorney Bankruptcy Petition Preparer |
|---|---|
| <br> X **/s/ Shai Y. Waisman** <br> Signature of Attorney for Debtor(s) <br> **Harvey R. Miller, Esq.** <br> **Richard P. Krasnow, Esq.** <br> **Lori R. Fife, Esq.** <br> **Shai Y. Waisman, Esq.** <br> **Jacqueline Marcus, Esq.** <br> Printed Name of Attorney for Debtor(s) <br> **Weil, Gotshal & Manges LLP** <br> Firm Name <br> **767 Fifth Avenue** <br> Address <br> **New York, New York 10153** <br><br> **212-310-8000** <br> Telephone Number <br> **October 3, 2008** <br> Date <br> * In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect. | I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19B is attached. <br><br> _____ <br> Printed Name and title, if any, of Bankruptcy Petition Preparer <br><br> _____ <br> Social-Security number (If the bankruptcy petition preparer is not an individual, state the Social-Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.) <br><br> Address <br><br> x_____ <br><br> _____ <br> Date <br> Signature of bankruptcy petition preparer or officer, principal, responsible person, or partner whose Social-Security number is provided above. <br> Names and Social-Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual: <br> If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person. <br> *A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156.* |

| Signature of Debtor (Corporation/Partnership) | |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor. <br><br> The debtor requests the relief in accordance with the chapter of title 11, United States Code, specified in this petition. <br><br><br> x **/s/ Bryan Marsal** <br> Signature of Authorized Individual <br><br> **Bryan Marsal** <br> Printed Name of Authorized Individual <br><br> **Chief Restructuring Officer** <br> Title of Authorized Individual <br><br> **October 3, 2008** <br> Date | |

### Schedule 1 to Chapter 11 Petition

Each of the affiliated entities listed below (including the debtor in this chapter 11 case) filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court").

| Debtor Name | Case No. | Date Filed | Relationship | Judge |
|---|---|---|---|---|
| Lehman Brothers Holdings Inc. | 08-13555 (JMP) | September 15, 2008 | Indirect Parent | Peck |
| LB 745 LLC | 08-13600 (JMP) | September 17, 2008 | Affiliate | Peck |
| PAMI Statler Arms LLC | 08-13664 (JMP) | September 23, 2008 | Affiliate | Peck |
| Lehman Brothers Commodity Services Inc. | | | Affiliate | Peck |
| Lehman Brothers Finance SA | | | Affiliate | Peck |

## CERTIFICATE OF RESOLUTIONS

I, Bryan Marsal, a duly authorized officer of Lehman Brothers Special Financing Inc., a Delaware corporation (the "Company"), hereby certify that at a special meeting of the Board of Directors (the "Board") for the Company, duly called and held on October 3, 2008, the following resolutions were adopted in accordance with the requirements of the Delaware General Corporation Law and that these resolutions have not been modified or rescinded and are still in full force and effect as of the current date.

RESOLVED, that in the judgment of the Board, it is desirable and in the best interests of the Company, its creditors, employees, and other interested parties that a petition be filed by the Company seeking relief under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

RESOLVED, that each of the President, Chief Executive Officer, Senior Vice President, Vice President, Secretary, Assistant Secretary, Treasurer, Assistant Treasurer, Managing Director, and Assistant Controller (each such officer or designee being an "Authorized Person" and all being the "Authorized Persons") are hereby authorized, empowered and directed, in the name, and on behalf of the Company, to execute and verify petitions and amendments thereto under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case") and to cause the same to be filed in the United States Bankruptcy Court for the Southern District of New York at such time or in such other jurisdiction as such Authorized Person executing the same shall determine.

RESOLVED, that the law firm of Weil, Gotshal & Manges LLP is hereby engaged as attorneys for the Company under a general retainer in the Chapter 11 Case, subject to any requisite bankruptcy court approval.

RESOLVED, that each Authorized Person, and such other officers of the Company as the Authorized Persons shall from time to time designate, and any employees or agents (including counsel) designated by or directed by any such officers, be, and each hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to execute and file all petitions, schedules, motions, lists, applications, pleadings and other papers, and to take and perform any and all further acts and deeds which he or she deems necessary, proper or desirable in connection with the Chapter 11 Case, with a view to the successful prosecution of such case.

RESOLVED, that each Authorized Person, and such other officers of the Company as the Authorized Persons shall from time to time designate, be, and each hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to engage and retain all assistance by legal counsel, accountants, financial advisors, restructuring advisors, and other professionals in connection with the Chapter 11 Case, with a view to the successful prosecution of such case.

RESOLVED, that each Authorized Person, and such other officers of the Company as the Authorized Persons shall from time to time designate, and any employees or agents (including counsel) designated by or directed by any such officers, be, and each hereby is, authorized, empowered and directed, in the name and on behalf of

the Company, to cause the Company to enter into, execute deliver, certify, file and/or record, and perform such agreements, instruments, motions, affidavits, applications for approvals or ruling of governmental or regulatory authorities, certificates or other documents, and to take such other action as in the judgment of such person shall be or become necessary, proper, and desirable to effectuate a successful reorganization of the business of the Company.

RESOLVED, that in connection with the Chapter 11 Case, each Authorized Person, and such other officers of the Company as the Authorized Persons shall from time to time designate, be, and each hereby is, authorized and empowered on behalf of and in the name of the Company, to negotiate, execute, deliver, and perform or cause the performance of any notes, guarantees, security agreements, other agreements, consents, certificates or instruments as such person considers necessary, appropriate, desirable, or advisable to effectuate borrowings or other financial arrangements, such determination to be evidenced by such execution or taking of such action.

RESOLVED, each Authorized Person, and such other officers of the Company as the Authorized Persons shall from time to time designate, be, and each hereby is, authorized, empowered and directed, in the name and on behalf of the Company, and any such actions heretofore taken by any of them are hereby ratified, confirmed and approved in all respects: (i) to negotiate, execute, deliver and/or file any and all of the agreements, documents and instruments referenced herein, and such other agreements, documents and instruments and assignments thereof as may be required or as such officers deem appropriate or advisable, or to cause the negotiation, execution and delivery thereof, in the name and on behalf of the Company, as the case may be, in such form and substance as such officers may approve, together with such changes and amendments to any of the terms and conditions thereof as such officers may approve, with the execution and delivery thereof on behalf of the Company by or at the direction of such officers to constitute evidence of such approval, (ii) to negotiate, execute, deliver and/or file, in the name and on behalf of the Company, any and all agreements, documents, certificates, consents, filings, and applications relating to the resolutions adopted and matters ratified or approved herein and the transactions contemplated thereby, and amendments and supplements to any of the foregoing, and to take such other action as may be required or as such officers deem appropriate or advisable in connection therewith, and (iii) to do such other things as may be required, or as may in their judgment be appropriate or advisable, in order to effectuate fully the resolutions adopted and matters ratified or approved herein and the consummation of the transactions contemplated hereby.

RESOLVED, that, any and all past actions heretofore taken by officers of the Company in the name and on behalf of the Company in furtherance of any or all of the preceding resolutions be, and the same hereby are, ratified, confirmed, and approved.

IN WITNESS WHEREOF, I have set my hand this 3rd day of October, 2008.

/s/ Bryan Marsal

Signature

By: Bryan Marsal

Title: Chief Restructuring Officer

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------x
                          :

In re                    :    Chapter 11 Case No.
                          :

Lehman Brothers Special Financing Inc.,  :    08-_____ (JMP)
                          :

        Debtor.          :
                          :

--------------------------------------------------------------x

## LIST OF CREDITORS HOLDING
## <u>THE THIRTY LARGEST UNSECURED CLAIMS</u>[1]

        Following is the list of creditors, as of September 15, 2008, holding the thirty (30) largest unsecured claims against the Debtor and its affiliates.[2]

        The list of creditors has been prepared in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure. This list does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of title 11 of the United States Code, or (ii) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the thirty (30) largest unsecured claims. Please note that the list of creditors below consists of the top thirty (30) largest unsecured claims against Lehman Brothers Holdings Inc. and its debtor and non-debtor affiliates on a consolidated basis.

| | *(2)* | *(3)* | *(4)* | *(5)* |
|---|---|---|---|---|
| *Name of creditor and complete mailing address, including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed, or subject to setoff[3]* | *Estimated amount of claim as of September 16, 2008 (if secured also state value of security)* |

---

[1] Refer to list included with the chapter 11 petition of the Debtor's affiliate, Lehman Brothers Holdings Inc., Case No. 08-13555 (JMP).

[2] This information herein shall not constitute an admission of liability by, nor is it binding on, the Debtor. Nothing herein shall affect the Debtor's right to challenge the amount or characterization of any claim at a later date. The list sets forth the creditors holding claims against the Debtor and its consolidated affiliates, including non-debtor affiliates. As soon as information regarding the creditors of the Debtor is available, an updated list will be filed.

[3] All claims are subject to reconciliations, credits, and adjustments, which are not reflected on this list.

**DECLARATION UNDER PENALTY OF PERJURY:**

I, the undersigned authorized officer of Lehman Brothers Special

Financing Inc., named as the debtor in this case (the "Debtor"), declare under penalty of

perjury that I have read the foregoing list of creditors holding the thirty (30) largest

unsecured claims against the Debtor and that it is true and correct to the best of my

information and belief.

Dated:  October 3, 2008

/s/ Bryan Marsal
Signature

By: Bryan Marsal

Title: Chief Restructuring Officer

NY2:\1921141\01\156D101!.DOC\58399.0003

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                         :

In re                               :       Chapter 11 Case No.
                                     :

Lehman Brothers Special Financing Inc.,   :       08-_____ (JMP)
                                     :

                 Debtor.             :
                                     :

-------------------------------------------------------------x

## LIST OF CREDITORS[1]

      Contemporaneously herewith, the Debtor has filed a motion (the "Applicability Motion") for an order directing that certain orders in the jointly administered chapter 11 cases of Lehman Brothers Holdings Inc. be made applicable to the Debtor's chapter 11 case. On September 15, 2008, Lehman Brothers Holdings Inc. filed a motion[2] requesting a waiver of the requirement for filing a list of creditors pursuant to sections 105(a), 342(a), and 521(a)(1) of title 11 of the United States Code, Rules 1007(a) and 2002(a), (f), and (l) of the Federal Rules of Bankruptcy Procedure, and Rule 1007-1 of the Local Bankruptcy Rules for the Southern District of New York, and General Orders M-133, M-137, M-138, and M-192 of the United States Bankruptcy Court for the Southern District of New York.  Upon entry of the order approving the Applicability Motion, the Debtor proposes to furnish its list of creditors to a claims and noticing agent to be engaged by the Debtor.

      The list of creditors will contain only those creditors whose names and addresses were maintained in the Debtor's database or were otherwise ascertainable by the Debtor.  The schedule of liabilities to be subsequently filed should be consulted for a list of the Debtor's creditors that is comprehensive and current as of the date of the commencement of this case.

---

[1] The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtor.

[2] The motion was granted and an order entered on September 16, 2008 [Docket No. 52].

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
: 
In re                                                                     :          Chapter 11 Case No.
                                                                          :
Lehman Brothers Special Financing Inc.,            :          08-_____ (JMP)
                                                                          :
            Debtor.                                                :
                                                                          :
-------------------------------------------------------------x

## EXHIBIT "C" TO VOLUNTARY PETITION

1.   Identify and briefly describe all real or personal property owned by or in possession of the debtor that, to the best of the debtor's knowledge, poses or is alleged to pose a threat of imminent and identifiable harm to the public health or safety (attach additional sheets if necessary):

> The Debtor does not believe it owns or possesses any real or personal property that poses or is alleged to pose a threat of imminent and identifiable harm to the public health or safety.  To the extent the Debtor has an interest in such property, to the best of the Debtor's knowledge, the Debtor is in compliance with all applicable laws, including, without limitation, all environmental laws and regulations.

2.   With respect to each parcel of real property or item of personal property identified in question 1, describe the nature and location of the dangerous condition, whether environmental or otherwise, that poses or is alleged to pose a threat of imminent and identifiable harm to the public health or safety (attach additional sheets if necessary):

> The Debtor is not aware of any real or alleged dangerous conditions existing on or related to any real or personal property owned or possessed by the Debtor.



**Attachment 3**

November 26, 2008 Termination Notice relating to the Debt Service Deposit Agreement
with Yakima-Tieton Irrigation District, Yakima County, Washington.

# *YAKIMA-TIETON IRRIGATION DISTRICT*

| TELEPHONE | OFFICE, TIETON HEADQUARTERS | FAX |
|---|---|---|
| COWICHE | 470 CAMP 4 ROAD | COWICHE |
| (509)678-4101 | YAKIMA, WA  98908 | (509)678-5730 |

**VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED**

November 26, 2008

To:    Lehman Brothers Special Financing Inc.
       745 Seventh Avenue
       New York, NY 10019
       Attention:  Municipal Financial Products – Middle Office
              Telephone: 212-526-2240
              Fax:   646-758-2988

Re:    **TERMINATION NOTICE
       relating to the Debt Service Deposit Agreement with
       Yakima-Tieton Irrigation District, Yakima County, Washington**

Ladies and Gentlemen:

This letter constitutes notice to Lehman Brothers Special Financing Inc. ("Lehman") by the Yakima-Tieton Irrigation District (the "Issuer") of Issuer's exercise of its right to terminate its Debt Service Deposit Agreement (identified below), pursuant to Section 7.6(c) of that Agreement, due to a Lehman Event of Default under Section 7.3(c) of the Agreement.

The Issuer entered into a Debt Service Deposit Agreement dated as of December 12, 1996 (the "DSDA"), by and among the Issuer, Mellon Bank, F.S.B. (as trustee), and Lehman, which was subsequently amended by the First Amendment to Debt Service Deposit Agreement, dated as of September 24, 2003, by and among the Issuer, Lehman, and J.P. Morgan Trust Company, National Association, as successor trustee (the "Trustee"). The DSDA relates to deposits to be made by the Issuer in the Debt Service Fund for the Issuer's Refunding Revenue Bonds, 2003 (the "2003 Bonds"). Copies of the DSDA and the First Amendment (together, the "Agreement") are attached to this letter. Capitalized terms used in this letter have the definitions as provided in the Agreement.

Under the Agreement, the Issuer is required to deliver cash to the Trustee for deposit in the Issuer's Debt Service Fund on the Deposit Dates (referred to as Delivery Dates in the DSDA) and in the Deposit Amounts set forth in Exhibit A to the First Amendment. The remaining Deposit Dates are each June 30 in the years 2009 through 2018, inclusive. Lehman is then required to cause a Qualified Dealer to deliver Eligible Securities, that are also Qualified Securities, for purchase by the Trustee on any Deposit Date on a "delivery versus payment basis"

*Yakima Valley  -  -  -   "Fruit Bowl of the Nation"*

at Purchase Prices which will produce a rate of return on such securities for the periods from (and including) their respective dates of delivery to (but excluding) their respective maturity dates equal to the Guaranteed Rate of 6.10% per annum, assuming semiannual compounding on the basis of a 360-day year of twelve 30-day months. Lehman delivered Qualified Securities to the Trustee on the most recent Deposit Date (Delivery Date) of June 30, 2008. The next Deposit Date (Delivery Date) on which Lehman would be required to deliver Qualified Securities to the Trustee is June 30, 2009.

Section 7.3(c) of the Agreement provides that it shall constitute a Lehman Event of Default if Lehman is at any time Insolvent. The Agreement defines the term Insolvent, in part, to include commencement of a voluntary case under federal bankruptcy laws. Lehman has commenced such a voluntary bankruptcy case, which is pending in the United States Bankruptcy Court, Southern District of New York, under the caption *In re* LEHMAN BROTHERS HOLDINGS INC., *et al.* Debtors. Chapter 11 Case No. 08-12555 (JMP) (Jointly Administered) (the "Lehman Chapter 11 Case"). Lehman therefore is Insolvent within the meaning of the Agreement.

The Agreement constitutes a derivatives contract that is exempt from the automatic stay provisions of the federal Bankruptcy Code (11 U.S.C. §362) as either a "securities contract" within the meaning of 11 U.S.C. §741(7), or a "swap agreement" within the meaning of 11 U.S.C. §101(53B). Pursuant to the Bankruptcy Code, 11 U.S.C. §§555 and 560, the Issuer's exercise of its contractual right under the Agreement to cause the termination of the Agreement because of Lehman's Insolvency is not stayed, avoided or otherwise limited by any provisions of the Bankruptcy Code or court order in the Lehman Chapter 11 Case.

Under Section 7.6(c) of the Agreement, upon the occurrence of a Lehman Event of Default consisting of Insolvency (as defined in Section 7.3(c) of the Agreement), the Issuer has the right to terminate the Agreement. Upon notice of termination, Lehman must promptly determine the Termination Amount and if the Termination Amount is a negative number, Lehman must promptly, but no later than two Business Days after written notice is delivered by Lehman to the Issuer that such amount is due, pay such amount in immediately available funds.

If Lehman fails to determine the Termination Amount within three Business Days after notice from the Issuer of the occurrence of a Lehman Event of Default, then the Issuer shall make such determination as if it were Lehman, and under the Agreement, the amount as so determined by the Issuer shall be deemed the Termination Amount.

By this letter, the Issuer is giving notice to Lehman pursuant to Section 7.6(c) of the Agreement of the occurrence of a Lehman Event of Default and the Issuer's exercise of its right to terminate the Agreement.   The Issuer therefore requests Lehman to determine the Termination Amount pursuant to Section 7.6(c) of the Agreement and to notify the Issuer of the amount due from Lehman to the Issuer as the Termination Amount within three Business Days from the receipt by Lehman of this letter.

Very truly yours,

YAKIMA-TIETON IRRIGATION DISTRICT

By _Richard Dieker_____

  Secretary-Manager


✓ Copy:  The Bank of New York Mellon Trust Company, N.A.
     Attention: Kathleen Graves
     601 Union Street, Suite 520
     Seattle WA 98101
     Telephone: 206-667-8910
     Fax:  206-667-8905

  Copy:  Financial Security Assurance, Inc.
     350 Park Avenue
     New York, NY 10022-6022
     Attn: Managing Director – Surveillance
     Re: Policy No. 201706-N
     Telephone: 212-826-0100
     Fax: 212-339-3556

50952640.2

 Winters & Co. Advisors, LLC

**Attachment 4**

January 22, 2009 Request for Forward Delivery Agreement Price Quotation.

## Phil Murphy

| | |
|---|---|
| **From:** | Chris Winters [cwinters@winters-co.com] |
| **Sent:** | Thursday, January 22, 2009 4:12 PM |
| **Cc:** | 'Phil Murphy' |
| **Subject:** | Request for Quote |
| **Attachments:** | YTID FPA Termination RFQ v2.doc; CF for Bid Form.xls |

Attached please find the Request for Quote associated with a terminated Lehman forward delivery agreement. As further described in the Request, please provide the amount that you would need to be paid to assume Lehman's position in this trade. The cash flows are described in the Request, and for your convenience also in the attached Excel file.

If you are not able to provide a quote, I would appreciate it if you could send me an email telling me that.

Best regards, Chris

Chris Winters
Winters & Co. Advisors, LLC
11845 W. Olympic Blvd. Ste 540
Los Angeles CA 90064
Tel: (310) 954-8800
Fax: (310) 954-8900
Cell: (310) 739-3720
Email: cwinters@winters-co.com

The information contained herein is based on sources that Winters & Co. Advisors, LLC believes to be reliable, but does not represent that it is accurate or complete. All prices, yields and opinions are subject to change due to market forces and other conditions. This communication is not to be considered an offer to purchase or sell any securities referenced herein nor an offer to enter into or terminate any transaction described herein. Additional information is available on request. The information contained in this message is intended only for the personal confidential use of the designated recipient. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately.

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

Email management, archiving & monitoring technology powered by Smarsh, Inc.

 Winters & Co. Advisors, LLC

11845 W. Olympic Blvd., Suite 540 Los Angeles, CA  90064
Phone:  (310) 954-8800    Fax:  (310) 954-8900

1740 Rutledge Avenue, Charlotte, NC  28211
Phone:  (704) 442-1512    Fax:  (704) 367-1599

2309 Ossenfort Road, St. Louis, MO  63038
Phone:  (636) 273-9440    Fax:  (801) 469-0453

www.winters-co.com

## Request for Forward Delivery Agreement
## Price Quotation

The Yakima-Tieton Irrigation District has sold $25,890,000 of Irrigation District Revenue Refunding Bonds Series 1992 (the "Bonds"). The Bond Resolution for the Bonds created the Principal and Interest Account which was invested with Lehman Brother Special Financing Inc. ("LBSFI") pursuant to a forward delivery agreement ("FDA"), the determination of the termination price through a market quotation based process is the subject of this quotation request.

Please direct any questions to Phil Murphy at (704) 442-1512 or Chris Winters at (310) 954-8800.

| | | |
|---|---|---|
| *Date:* | January 22, 2009 | Draft: 2 |
| *Issue:* | $25,890,000 Yakima-Tieton Irrigation District Refunding Revenue Bonds Series 1992 | |
| *Dates:* | Quotation Date and Time:  January 26, 2009 at 11:30 EST Quotation "Settlement" Date:  January 28, 2009 | |
| *Trustee and Paying Agent:* | Mellon Bank F.S.B. | |
| *FDA Rate:* | 6.10% | |
| *Insurer:* | None | |
| *Documentation:* | The LBSFI FDA and First Amendment are available upon request. | |
| *Borrower:* | Yakima-Tieton Irrigation District | |
| *Maturity Date:* | June 30, 2018 | |
| *Initial Amount:* | Principal and Interest Account:   $1,467,163.76 | |
| *Type of Investment:* | Forward delivery agreement for Deliverable Securities that mature on or before the date that funds are needed to make a debt service payment. | |

- 1 -


Winters & Co. Advisors, LLC

| Cash Flows: | Funds will be available to purchase Deliverable Securities and need to be available to make debt service payments as shown below (the cash flows are also being sent in Excel for your convenience): |
| --- | --- |

| Principal Account | | | | Interest Account | | |
| --- | --- | --- | --- | --- | --- | --- |
| Deposit Date | Payment Date | Amount | | Deposit Date | Payment Date | Amount |
| 6/30/2009 | 6/1/2010 | $985,000 | | 6/30/2009 | 12/1/2009 | $243,144.38 |
| 6/30/2010 | 6/1/2011 | $1,020,000 | | 6/30/2009 | 6/1/2010 | $243,144.38 |
| 6/30/2011 | 6/1/2012 | $1,060,000 | | 6/30/2010 | 12/1/2010 | $224,675.63 |
| 7/2/2012 | 6/1/2013 | $1,100,000 | | 6/30/2010 | 6/1/2011 | $224,675.63 |
| 7/1/2013 | 6/1/2014 | $1,145,000 | | 6/30/2011 | 12/1/2011 | $206,315.63 |
| 6/30/2014 | 6/1/2015 | $1,185,000 | | 6/30/2011 | 6/1/2012 | $206,315.63 |
| 6/30/2015 | 6/1/2016 | $1,235,000 | | 6/30/2012 | 12/1/2012 | $185,115.63 |
| 6/30/2016 | 6/1/2017 | $1,290,000 | | 6/30/2012 | 6/1/2013 | $185,115.63 |
| 6/30/2017 | 6/1/2018 | $1,350,000 | | 6/30/2013 | 12/1/2013 | $163,115.63 |
| 7/2/2018 | 6/1/2019 | $1,405,000 | | 6/30/2013 | 6/1/2014 | $163,115.63 |
| **Total** | | **$11,775,000** | | 6/30/2014 | 12/1/2014 | $140,215.63 |
| | | | | 6/30/2014 | 6/1/2015 | $140,215.63 |
| | | | | 6/30/2015 | 12/1/2015 | $115,775.00 |
| | | | | 6/30/2015 | 6/1/2016 | $115,775.00 |
| | | | | 6/30/2016 | 12/1/2016 | $89,531.25 |
| | | | | 6/30/2016 | 6/1/2017 | $89,531.25 |
| | | | | 6/30/2017 | 12/1/2017 | $61,312.50 |
| | | | | 6/30/2017 | 6/1/2018 | $61,312.50 |
| | | | | 6/30/2018 | 12/1/2018 | $31,612.50 |
| | | | | 6/30/2018 | 6/1/2019 | $31,612.50 |
| | | | | **Total** | | **$2,921,627.56** |

| Deliverable Securities: | Direct full faith and credit , non-callable obligations of the United States of America. |
| --- | --- |
| Interest Payment Day Count: | The interest payments shall be computed on the basis of a 30-day month and a 360-day year (30/360). |
| Business Days: | New York |
| Form of Quotation: | Please provide the dollar amount that you would need to receive in order to accept assignment of the LBSFI FDA subject to the terms described herein. |



| | |
|---|---|
| *Quotation:* | Quotations should be e-mailed to Phil Murphy or Chris Winters (pmurphy @winters-co.com or cwinters@winters-co.com) or faxed using the Quotation Response Form, attached hereto as Exhibit A, no later than the time noted above. |
| *Governing Law:* | New York law, venue and jurisdiction govern the agreement guarantee and enforceability opinion. |
| *Bidding Agent Fee:* | No fees are payable in connection with this Request for Price Quotation. |
| *Bidding Agent Role:* | All parties acknowledge that Winters & Co. Advisors, LLC ("W&C") is acting solely as a bidding agent for the Price Quotation which is the subject of this document and is not acting in any other capacity or any other role for any party involved in the transaction or underlying bond issue. |

We will attempt to conduct all Price Quotations and collections fairly. We will not:

1) Provide any assurances that every possible bidder has been solicited;
2) Investigate the veracity of any certifications provided by any other party;
3) Provide assurances that the Price Quotation procedures comply with any applicable law, including federal tax law;

Our engagement is not assignable and will terminate upon calculation of the Termination Amount. We will not serve as record repository, and offer no assurances that any records will be retained by us. In the event of an examination of the Borrower related to the investment described herein by any governmental agency the Borrower agrees to promptly notify us. We will not pay the costs of any defense of the Borrower related to such examination or the cost of any settlement that the Borrower Provider may elect. Our Form ADV is available on our website: www.winters-co.com.



**EXHIBIT A**

**BID RESPONSE FORM**

$25,890,000 Yakima-Tieton Irrigation District Refunding Revenue Bonds Series 1992

Name of Entity Providing Quotation: _____

Credit Ratings: Moody's _____ S&P_____

Quotation Price:        $_____

**Notes/Conditions:**_____
_____
_____
_____
_____

**Name:**        _____    **Title:**_____
**Telephone:**    _____    **Date:**_____

**Please return this form via fax or email to: Chris Winters, Winters & Co. Advisors, LLC**
**(310) 954-8900 or cwinters@winters-co.com**

| Principal Account | | | | Interest Account | | |
|---|---|---|---|---|---|---|
| Deposit Date | Payment Date | Amount | | Deposit Date | Payment Date | Amount |
| 6/30/2009 | 6/1/2010 | $985,000 | | 6/30/2009 | 12/1/2009 | $243,144.38 |
| 6/30/2010 | 6/1/2011 | $1,020,000 | | 6/30/2009 | 6/1/2010 | $243,144.38 |
| 6/30/2011 | 6/1/2012 | $1,060,000 | | 6/30/2010 | 12/1/2010 | $224,675.63 |
| 7/2/2012 | 6/1/2013 | $1,100,000 | | 6/30/2010 | 6/1/2011 | $224,675.63 |
| 7/1/2013 | 6/1/2014 | $1,145,000 | | 6/30/2011 | 12/1/2011 | $206,315.63 |
| 6/30/2014 | 6/1/2015 | $1,185,000 | | 6/30/2011 | 6/1/2012 | $206,315.63 |
| 6/30/2015 | 6/1/2016 | $1,235,000 | | 6/30/2012 | 12/1/2012 | $185,115.63 |
| 6/30/2016 | 6/1/2017 | $1,290,000 | | 6/30/2012 | 6/1/2013 | $185,115.63 |
| 6/30/2017 | 6/1/2018 | $1,350,000 | | 6/30/2013 | 12/1/2013 | $163,115.63 |
| 7/2/2018 | 6/1/2019 | $1,405,000 | | 6/30/2013 | 6/1/2014 | $163,115.63 |
| | | | | 6/30/2014 | 12/1/2014 | $140,215.63 |
| | | | | 6/30/2014 | 6/1/2015 | $140,215.63 |
| | | | | 6/30/2015 | 12/1/2015 | $115,775.00 |
| | | | | 6/30/2015 | 6/1/2016 | $115,775.00 |
| | | | | 6/30/2016 | 12/1/2016 | $89,531.25 |
| | | | | 6/30/2016 | 6/1/2017 | $89,531.25 |
| | | | | 6/30/2017 | 12/1/2017 | $61,312.50 |
| | | | | 6/30/2017 | 6/1/2018 | $61,312.50 |
| | | | | 6/30/2018 | 12/1/2018 | $31,612.50 |
| | | | | 6/30/2018 | 6/1/2019 | $31,612.50 |



**Attachment 5**

Responses Received to
January 22, 2009 Request for Forward Delivery Agreement Price Quotation.

## Chris Winters

| | |
|---|---|
| **From:** | Chris.Toft@aigfpc.com |
| **Sent:** | Thursday, January 22, 2009 1:22 PM |
| **To:** | cwinters@winters-co.com |
| **Subject:** | RE: Request for Quote |

Hi Chris -
No-can-do.

Thanks
Chris

**From:** Chris Winters [mailto:cwinters@winters-co.com]
**Sent:** Thursday, January 22, 2009 4:12 PM
**Cc:** 'Phil Murphy'
**Subject:** Request for Quote

Attached please find the Request for Quote associated with a terminated Lehman forward delivery agreement. As further described in the Request, please provide the amount that you would need to be paid to assume Lehman's position in this trade. The cash flows are described in the Request, and for your convenience also in the attached Excel file.

If you are not able to provide a quote, I would appreciate it if you could send me an email telling me that.

Best regards, Chris

Chris Winters
Winters & Co. Advisors, LLC
11845 W. Olympic Blvd. Ste 540
Los Angeles CA 90064
Tel: (310) 954-8800
Fax: (310) 954-8900
Cell: (310) 739-3720
Email: cwinters@winters-co.com

The information contained herein is based on sources that Winters & Co. Advisors, LLC believes to be reliable, but does not represent that it is accurate or complete. All prices, yields and opinions are subject to change due to market forces and other conditions. This communication is not to be considered an offer to purchase or sell any securities referenced herein nor an offer to enter into or terminate any transaction described herein. Additional information is available on request. The information contained in this message is intended only for the personal confidential use of the designated recipient. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately.

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

Email management, archiving & monitoring technology powered by Smarsh, Inc.

1/30/2009

## Chris Winters

**From:**    Ward, Carrie A [Carrie.A.Ward@bankofamerica.com]
**Sent:**    Friday, January 23, 2009 6:29 AM
**To:**    Chris Winters
**Subject:** RE: Request for Quote

Chris,

We will not be able to provide a quote.

thanks,
Carrie

Carrie Ward
Bank of America, N.A
Global Derivative Products
Ph: 704-386-3286
Fax: 704-602-5884
Email: carrie.a.ward@bankofamerica.com

Any information contained in or attached to this e-mail is intended solely for the use of the intended recipient(s) and may contain information that is confidential or legally privileged. If you are not an intended recipient of this e-mail, please notify the sender of the delivery error and then please delete and destroy all copies and attachments, and be advised that any review or dissemination of, or the taking of any action in reliance on, the information contained in or attached to this e-mail is expressly prohibited. See http://www.bankofamerica.com/emaildisclaimer for further important information on confidentiality, the risks inherent in electronic communication (including the possibility that e-mail messages cannot be guaranteed to be secure or free of errors or viruses), some of our policies regarding transactions and pricing and certain other matters.

**From:** Chris Winters [mailto:cwinters@winters-co.com]
**Sent:** Thursday, January 22, 2009 4:12 PM
**Cc:** 'Phil Murphy'
**Subject:** Request for Quote

Attached please find the Request for Quote associated with a terminated Lehman forward delivery agreement. As further described in the Request, please provide the amount that you would need to be paid to assume Lehman's position in this trade. The cash flows are described in the Request, and for your convenience also in the attached Excel file.

If you are not able to provide a quote, I would appreciate it if you could send me an email telling me that.

Best regards, Chris

Chris Winters
Winters & Co. Advisors, LLC
11845 W. Olympic Blvd. Ste 540
Los Angeles CA 90064

1/30/2009

## Chris Winters

| | |
|---|---|
| **From:** | Leffler, Mike [mike.leffler@citi.com] |
| **Sent:** | Friday, January 23, 2009 8:22 AM |
| **To:** | Chris Winters |
| **Cc:** | *MSD Fp Swap Middle Office |

**Subject:** RE: Request for Quote

Chris,

Thanks for showing this to us, but we are going to pass.

Mike

---

Mike Leffler
Vice President
Financial Products and Strategies Group
Municipal Securities Division
Citi
390 Greenwich Street, 2nd Floor
New York, NY 10013
(w) 212-723-6018
(f) 212-723-8642
mike.leffler@citi.com

The information in this message and attachments ("Message") may be confidential or otherwise protected by law. If you are not an intended recipient, please immediately notify the sender, delete all copies of the Message, and do not disclose or make improper use of it. Electronic messages are not secure or error free, may contain viruses and may be delayed or tampered with, and the sender is not liable for any such occurrences. The sender reserves the right to monitor, record and retain electronic messages.

IRS Circular 230 Disclosure: Citigroup, Inc., its affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its affiliates. This email and any attachments are not intended or written to be used, and cannot be used or relied upon, by any such taxpayer for the purpose of avoiding tax penalties. Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

---

**From:** Chris Winters [mailto:cwinters@winters-co.com]
**Sent:** Thursday, January 22, 2009 4:12 PM
**Cc:** 'Phil Murphy'
**Subject:** Request for Quote

Attached please find the Request for Quote associated with a terminated Lehman forward delivery agreement. As further described in the Request, please provide the amount that you would need to be paid to assume Lehman's position in this trade. The cash flows are described in the Request, and for your convenience also in the attached Excel file.

If you are not able to provide a quote, I would appreciate it if you could send me an email telling me that.

Best regards, Chris

1/30/2009

**Chris Winters**

| | |
|---|---|
| **From:** | Smith, David [David.Smith@DePfa.com] |
| **Sent:** | Thursday, January 29, 2009 1:50 PM |
| **To:** | Chris Winters |
| **Subject:** | RE: Request for Quote |

I came up with $425,000

---

**From:** Chris Winters [mailto:cwinters@winters-co.com]
**Sent:** Thursday, January 29, 2009 4:44 PM
**To:** Smith, David
**Cc:** 'Phil Murphy'
**Subject:** FW: Request for Quote

Can you provide a quote for this? If not, please let me know via email.

Thanks, Chris

---

**From:** Chris Winters [mailto:cwinters@winters-co.com]
**Sent:** Thursday, January 22, 2009 1:12 PM
**Cc:** 'Phil Murphy'
**Subject:** Request for Quote

Attached please find the Request for Quote associated with a terminated Lehman forward delivery agreement. As further described in the Request, please provide the amount that you would need to be paid to assume Lehman's position in this trade. The cash flows are described in the Request, and for your convenience also in the attached Excel file.

If you are not able to provide a quote, I would appreciate it if you could send me an email telling me that.

Best regards, Chris

Chris Winters
Winters & Co. Advisors, LLC
11845 W. Olympic Blvd. Ste 540
Los Angeles CA 90064
Tel: (310) 954-8800
Fax: (310) 954-8900
Cell: (310) 739-3720
Email: cwinters@winters-co.com

The information contained herein is based on sources that Winters & Co. Advisors, LLC believes to be reliable, but does not represent that it is accurate or complete. All prices, yields and opinions are subject to change due to market forces and other conditions. This communication is not to be considered an offer to purchase or sell any securities referenced herein nor an offer to enter into or terminate any transaction described herein. Additional information is available on request. The information contained in this message is intended only for the personal confidential use of the designated recipient. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately.

-----------------------------------------------------------------------------------------------------
This e-mail and any files transmitted with it are confidential and intended solely for the use of the addressee(s).
If you have received this e-mail in error please notify the sender immediately and delete this message from your system.
It is possible for any data transmitted by email to be delayed, deliberately altered or accidentally corrupted
or intercepted and so for this reason neither DEPFA BANK plc nor any of its subsidiaries or affiliates accepts
any responsibility for any such delay, alteration, corruption or for any breach of confidence or other damage
that may arise as a result of the use of email. Although DEPFA BANK plc operates anti-virus programmes
it cannot guarantee viruses will not be passed. Replies to such email may be monitored for operational or business reasons.
-----------------------------------------------------------------------------------------------------

1/30/2009

## Chris Winters

| | |
|---|---|
| **From:** | david.m.hand@jpmchase.com |
| **Sent:** | Thursday, January 29, 2009 1:57 PM |
| **To:** | Chris Winters |
| **Cc:** | 'Phil Murphy' |
| **Subject:** | Re: Request for Quote |

JPM will not be able to provide a quote on this transaction.

--------------------------
Sent from my BlackBerry Wireless Handheld

----- Original Message -----
**From:** "Chris Winters" [cwinters@winters-co.com]
**Sent:** 01/29/2009 01:44 PM PST
**To:** David Hand
**Cc:** "'Phil Murphy'" <pmurphy@winters-co.com>
**Subject:** FW: Request for Quote

Can you provide a quote for this? If not, please respond via email.

Best regards, Chris

**From:** Chris Winters [mailto:cwinters@winters-co.com]
**Sent:** Thursday, January 22, 2009 1:12 PM
**Cc:** 'Phil Murphy'
**Subject:** Request for Quote

Attached please find the Request for Quote associated with a terminated Lehman forward delivery agreement. As further described in the Request, please provide the amount that you would need to be paid to assume Lehman's position in this trade. The cash flows are described in the Request, and for your convenience also in the attached Excel file.

If you are not able to provide a quote, I would appreciate it if you could send me an email telling me that.

Best regards, Chris

Chris Winters
Winters & Co. Advisors, LLC
11845 W. Olympic Blvd. Ste 540
Los Angeles CA 90064
Tel: (310) 954-8800
Fax: (310) 954-8900
Cell: (310) 739-3720
Email: cwinters@winters-co.com

The information contained herein is based on sources that Winters & Co. Advisors, LLC believes to be reliable, but does not represent that it is accurate or complete. All prices, yields and opinions are subject to change due to market forces and other conditions. This communication is not to be considered an offer to

## Chris Winters

**From:** Hasterok, Jeffrey (GCM) [Jeffrey.Hasterok@morganstanley.com]
**Sent:** Thursday, January 22, 2009 1:27 PM
**To:** Chris Winters
**Subject:** RE: Request for Quote

We'll pass, thanks for the look.

**Jeffrey Hasterok, Vice President**
Morgan Stanley | Global Capital Markets
1585 Broadway | Floor 04
New York, NY 10036
Phone: +1 212 761-6280
Mobile: +1 914 218-1785 or +1 773 793-9007
Fax: +1 212 507-1039
Jeffrey.Hasterok@morganstanley.com

---

**From:** Chris Winters [mailto:cwinters@winters-co.com]
**Sent:** Thursday, January 22, 2009 4:12 PM
**Cc:** 'Phil Murphy'
**Subject:** Request for Quote

Attached please find the Request for Quote associated with a terminated Lehman forward delivery agreement. As further described in the Request, please provide the amount that you would need to be paid to assume Lehman's position in this trade. The cash flows are described in the Request, and for your convenience also in the attached Excel file.

If you are not able to provide a quote, I would appreciate it if you could send me an email telling me that.

Best regards, Chris

Chris Winters
Winters & Co. Advisors, LLC
11845 W. Olympic Blvd. Ste 540
Los Angeles CA 90064
Tel: (310) 954-8800
Fax: (310) 954-8900
Cell: (310) 739-3720
Email: cwinters@winters-co.com

The information contained herein is based on sources that Winters & Co. Advisors, LLC believes to be reliable, but does not represent that it is accurate or complete. All prices, yields and opinions are subject to change due to market forces and other conditions. This communication is not to be considered an offer to purchase or sell any securities referenced herein nor an offer to enter into or terminate any transaction described herein. Additional information is available on request. The information contained in this message is intended only for the personal confidential use of the designated recipient. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately.

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

Email management, archiving & monitoring technology powered by Smarsh, Inc.

No virus found in this incoming message.
Checked by AVG.
Version: 7.5.552 / Virus Database: 270.10.12/1908 - Release Date: 1/21/2009 9:15 PM

1/30/2009

## Chris Winters

| | |
|---|---|
| From: | adam.goff@pnc.com |
| Sent: | Thursday, January 22, 2009 3:22 PM |
| To: | cwinters@winters-co.com |
| Subject: | Fw: Request for Quote |

Chris,

Kyle forwarded me the deal referenced below.  Appreciate the opportunity but PNC will pass
on this one.  Thanks.  Adam

---

Adam C. Goff
Director, Derivatives Trading Group
PNC Capital Markets LLC
412.762.8426
----- Forwarded by Adam Goff/CorpBank/PGH/PNC on 01/22/2009 06:17 PM -----

<table>
<tr><td>Richard<br>Patino/CorpBank/P<br>HL/PNC</td><td></td><td>To</td></tr>
<tr><td></td><td>Adam Goff/CorpBank/PGH/PNC@PNC</td><td></td></tr>
<tr><td>01/22/2009 05:15<br>PM</td><td>Rick Pierce/CorpBank/PGH/PNC</td><td>cc</td></tr>
<tr><td></td><td></td><td>Subject</td></tr>
<tr><td></td><td>Fw: Request for Quote</td><td></td></tr>
</table>

Adam:

Take a look at the attached.

*************************************
Kyle Patino, CAIA
Managing Director, Derivatives Trading Group PNC Capital Markets, LLC 1600 Market Street,
21st Floor Philadelphia, Pennsylvania 19103
(t)  215.585.1204
(f)  215.585.1205
(c)  267.320.4727
kyle.patino@pnc.com

----- Forwarded by Richard Patino/CorpBank/PHL/PNC on 01/22/2009 05:13 PM
-----

<table>
<tr><td>"Chris Winters"<br>&lt;cwinters@winters<br>-co.com&gt;</td><td></td><td>To</td></tr>
<tr><td>01/22/2009 04:12<br>PM</td><td></td><td>cc</td></tr>
<tr><td></td><td>"'Phil Murphy'"<br>&lt;pmurphy@winters-co.com&gt;</td><td></td></tr>
<tr><td></td><td></td><td>Subject</td></tr>
</table>

1

## Chris Winters

| | |
|---|---|
| **From:** | Ngo, D (Diana) [Diana.Ngo@rabobank.com] |
| **Sent:** | Thursday, January 22, 2009 1:16 PM |
| **To:** | 'Chris Winters' |
| **Cc:** | Gallagher, J (John) |
| **Subject:** | RE: Request for Quote |

Chris - We can't provide a quote for FDAs.

Thanks -
Diana

Diana Ngo
Rabobank International
245 Park Avenue, 37th Floor
New York, New York 10167
(212) 808-2553  Municipal GIC Desk
(212) 808-2579  Fax
(212) 916-7800  Main

---

**From:** Chris Winters [mailto:cwinters@winters-co.com]
**Sent:** Thursday, January 22, 2009 4:12 PM
**Cc:** 'Phil Murphy'
**Subject:** Request for Quote

Attached please find the Request for Quote associated with a terminated Lehman forward delivery agreement. As further described in the Request, please provide the amount that you would need to be paid to assume Lehman's position in this trade. The cash flows are described in the Request, and for your convenience also in the attached Excel file.

If you are not able to provide a quote, I would appreciate it if you could send me an email telling me that.

Best regards, Chris

Chris Winters
Winters & Co. Advisors, LLC
11845 W. Olympic Blvd. Ste 540
Los Angeles CA 90064
Tel: (310) 954-8800
Fax: (310) 954-8900
Cell: (310) 739-3720
Email: cwinters@winters-co.com

The information contained herein is based on sources that Winters & Co. Advisors, LLC believes to be reliable, but does not represent that it is accurate or complete. All prices, yields and opinions are subject to change due to market forces and other conditions. This communication is not to be considered an offer to purchase or sell any securities referenced herein nor an offer to enter into or terminate any transaction described herein. Additional information is available on

1/30/2009

**Chris Winters**

From:     Levy, Jonathan S [Jonathan.Levy@rbccm.com]
Sent:     Thursday, January 22, 2009 1:14 PM
To:       Chris Winters
Cc:       Phil Murphy
Subject:  RE: Request for Quote

We are not providing quotes on forward delivery agreements.  Thanks.

From: Chris Winters [mailto:cwinters@winters-co.com]
Sent: Thursday, January 22, 2009 4:12 PM
Cc: 'Phil Murphy'
Subject: Request for Quote

Attached please find the Request for Quote associated with a terminated Lehman forward delivery agreement. As further described in the Request, please provide the amount that you would need to be paid to assume Lehman's position in this trade. The cash flows are described in the Request, and for your convenience also in the attached Excel file.

If you are not able to provide a quote, I would appreciate it if you could send me an email telling me that.

Best regards, Chris

Chris Winters
Winters & Co. Advisors, LLC
11845 W. Olympic Blvd. Ste 540
Los Angeles CA 90064
Tel: (310) 954-8800
Fax: (310) 954-8900
Cell: (310) 739-3720
Email: cwinters@winters-co.com

The information contained herein is based on sources that Winters & Co. Advisors, LLC believes to be reliable, but does not represent that it is accurate or complete. All prices, yields and opinions are subject to change due to market forces and other conditions. This communication is not to be construed as an offer to purchase or sell any securities referenced herein nor an offer to enter into or terminate any transaction described herein. Additional information is available on request. The information contained in this message is intended only for the personal confidential use of the designated recipient. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately.

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

Email management, archiving & monitoring technology powered by Sinura, Inc.

This E-Mail (including any attachments) may contain privileged or confidential information.  It is intended only for the addressee(s) indica

The sender does not waive any of its rights, privileges or other protections respecting this information.

Any distribution, copying or other use of this E-Mail or the information it contains, by other than an intended recipient, is not sanctioned

If you received this E-Mail in error, please delete it and advise the sender (by return E-Mail or otherwise) immediately.

This E-Mail (including any attachments) has been scanned for viruses.

It is believed to be free of any virus or other defect that might affect any computer system into which it is received and opened.

However, it is the responsibility of the recipient to ensure that it is virus free.

The sender accepts no responsibility for any loss or damage arising in any way from its use.

E-Mail received by or sent from RBC Capital Markets is subject to review by Supervisory personnel.

Such communications are retained and may be produced to regulatory authorities or others with legal rights to the information.

IRS CIRCULAR 230 NOTICE:  TO COMPLY WITH U.S. TREASURY REGULATIONS, WE ADVISE YOU THAT ANY U.S. FEDERAL TAX ADVISE INCLUDED IN THIS COMMUNIC

No virus found in this incoming message.
Checked by AVG.
Version: 7.5.552 / Virus Database: 270.10.12/1928 - Release Date: 1/21/2009 9:35 PM

1/30/2009

## Chris Winters

| | |
|---|---|
| **From:** | Tarek Imran [imran@smbc-cm.com] on behalf of SMBCCap [smbccap@smbc-cm.com] |
| **Sent:** | Thursday, January 29, 2009 2:05 PM |
| **To:** | Chris Winters |
| **Cc:** | 'Phil Murphy' |
| **Subject:** | Re: FW: Request for Quote |

SMBC Capital Markets is not currently able to put a price on this transaction.

Tarek Imran/CM/NY/SMBC

01/28/2009 12:21 PM

To "Chris Winters" <cwinters@winters-co.com>

cc "Phil Murphy" <pmurphy@winters-co.com>

Subject Re: Request for Quote

SMBC Capital Markets is not currently able to put a price on this transaction.

++++++++++++++++++++++
Tarek Imran
Senior Vice President
SMBC Capital Markets, Inc. (A Subsidiary of Sumitomo Mitsui Banking Corporation)
SMBC Securities, Inc.
277 Park Avenue
New York, NY 10172
imran@smbc-cm.com
212 224 5108 - telephone
212 224 4960 - fax

"Chris Winters" <cwinters@winters-co.com>

01/22/2009 04:12 PM

To

cc "Phil Murphy" <pmurphy@winters-co.com>

Subject Request for Quote

Attached please find the Request for Quote associated with a terminated Lehman forward delivery agreement. As further described in the Request, please provide the amount that you would need to be paid to assume Lehman's position in this trade. The cash flows are described in the Request, and for your convenience also in the attached Excel file.

If you are not able to provide a quote, I would appreciate it if you could send me an email telling me that.

1/30/2009

## Chris Winters

**From:**    Howerton.Taylor [Taylor.Howerton@SunTrust.com] on behalf of munideriv
         [munideriv@SunTrust.com]

**Sent:**    Friday, January 23, 2009 8:50 AM

**To:**      Chris Winters

**Subject:** RE: Request for Quote

Chris- unfortunately we wouldn't be able to participate.

Thanks

Taylor Howerton
Tax-Exempt Financial Risk Managment
SunTrust Robinson Humphrey
Phone (404) 926-5735
Mobile (404) 493-3690
Fax (404) 926-5750
taylor.howerton@suntrust.com

Live Solid. Bank Solid.

**From:** Chris Winters [mailto:cwinters@winters-co.com]
**Sent:** Thursday, January 22, 2009 4:12 PM
**Cc:** 'Phil Murphy'
**Subject:** Request for Quote

Attached please find the Request for Quote associated with a terminated Lehman forward delivery agreement. As
further described in the Request, please provide the amount that you would need to be paid to assume Lehman's
position in this trade. The cash flows are described in the Request, and for your convenience also in the attached
Excel file.

If you are not able to provide a quote, I would appreciate it if you could send me an email telling me that.

Best regards, Chris

Chris Winters
Winters & Co. Advisors, LLC
11845 W. Olympic Blvd. Ste 540
Los Angeles CA 90064
Tel: (310) 954-8800
Fax: (310) 954-8900
Cell: (310) 739-3720
Email: cwinters@winters-co.com

The information contained herein is based on sources that Winters & Co. Advisors, LLC believes to be reliable, but does not represent that it is accurate or
complete. All prices, yields and opinions are subject to change due to market forces and other conditions. This communication is not to be considered an offer to
purchase or sell any securities referenced herein nor an offer to enter into or terminate any transaction described herein. Additional information is available on
request. The information contained in this message is intended only for the personal confidential use of the designated recipient. If the reader of this message is
not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error
and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us
immediately.

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material.
Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than

## Chris Winters

| | |
|---|---|
| **From:** | Cook, Aaron [aaron.cook@wachovia.com] |
| **Sent:** | Friday, January 23, 2009 10:53 AM |
| **To:** | Chris Winters |
| **Cc:** | Rogers, Casey |

**Subject:** Lehman FPA

Chris – Wachovia will not be providing a market quote on the Lehman FPA unwind for Yakima Teton Irrigation District.

Thanks.

Aaron Cook
Municipal Derivatives
704-383-5485

This communication is for informational purposes only, is not an offer, solicitation, recommendation or commitment for any transaction or to buy or sell any security or other financial product, and is not intended as investment advice or as a confirmation of any transaction. Any market price, indicative value, estimate, view, opinion, data or other information herein is not warranted as to completeness or accuracy, is subject to change without notice, and Wachovia accepts no liability for its use or to update or keep it current. Any views or opinions are those of the individual sender, not necessarily of Wachovia Bank, N.A. or its affiliates.

No virus found in this outgoing message.
Checked by AVG.
Version: 7.5.524 / Virus Database: 270.4.0/1508 - Release Date: 6/18/2008 9:08 PM

No virus found in this incoming message.
Checked by AVG.
Version: 7.5.552 / Virus Database: 270.10.12/1910 - Release Date: 1/22/2009 6:28 PM

1/30/2009

## Chris Winters

| | |
|---|---|
| **From:** | MuniDerivatives@wellsfargo.com |
| **Sent:** | Friday, January 23, 2009 9:01 AM |
| **To:** | cwinters@winters-co.com |
| **Cc:** | pmurphy@winters-co.com |
| **Subject:** | RE: Request for Quote |

Hi Chris,

Unfortunately we're not involved in this market, so I won't be able to help.  Thanks for checking in.

John

---

**From:** Chris Winters [mailto:cwinters@winters-co.com]
**Sent:** Thursday, January 22, 2009 1:12 PM
**Cc:** 'Phil Murphy'
**Subject:** Request for Quote

Attached please find the Request for Quote associated with a terminated Lehman forward delivery agreement. As further described in the Request, please provide the amount that you would need to be paid to assume Lehman's position in this trade. The cash flows are described in the Request, and for your convenience also in the attached Excel file.

If you are not able to provide a quote, I would appreciate it if you could send me an email telling me that.

Best regards, Chris


Chris Winters
Winters & Co. Advisors, LLC
11845 W. Olympic Blvd. Ste 540
Los Angeles CA 90064
Tel: (310) 954-8800
Fax: (310) 954-8900
Cell: (310) 739-3720
Email: cwinters@winters-co.com

The information contained herein is based on sources that Winters & Co. Advisors, LLC believes to be reliable, but does not represent that it is accurate or complete. All prices, yields and opinions are subject to change due to market forces and other conditions. This communication is not to be considered an offer to purchase or sell any securities referenced herein nor an offer to enter into or terminate any transaction described herein. Additional information is available on request. The information contained in this message is intended only for the personal confidential use of the designated recipient. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately.

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

Email management, archiving & monitoring technology powered by Smarsh, Inc.
No virus found in this incoming message.
Checked by AVG.
Version: 7.5.552 / Virus Database: 270.10.12/1910 - Release Date: 1/22/2009 6:28 PM

1/30/2009