# Exhibit A



A CONTINUING CARE RETIREMENT COMMUNITY

April 23, 2009

VIA OVERNIGHT DELIVERY
Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Holdings Inc.
1271 Sixth Avenue, 40th Floor
New York, NY 10020
Attn: Derivatives Legal

Dear Sirs:

Reference is hereby made to the ISDA Master Agreement between Lehman Brothers Special Financing Inc. ("LBSF") and Jenner's Pond, Inc. ("JP") dated as of October 25, 2006 (as amended from time to time, the "Master Agreement"). All capitalized terms not otherwise defined herein shall have the meanings assigned to them in the Master Agreement.

On September 15, 2008, Lehman Brothers Holdings Inc. ("LBHI") declared bankruptcy under Chapter 11 of the United States Bankruptcy Code. LBHI is the Guarantor and Credit Support Provider to LBSF under the Agreement. Subsequently, on October 3, 2008, LBSF also declared bankruptcy under Chapter 11 of the United States Bankruptcy Code.

We hereby notify you that an Event of Default has occurred and is continuing with respect to LBHI and LBSF under, among other sections, Parts 5(a)(i), (iii) and (vii) of the Master Agreement. As the result of such occurrence and continuance, JP has the right to designate an Early Termination Date in respect of all outstanding Transactions under the Master Agreement. We hereby designate April 23, 2009, as the Early Termination Date under the Master Agreement in respect of all outstanding Transactions, including the two Confirmations dated October 25, 2006.

As the Non-defaulting party we will make the calculations contemplated by Section 6(e) of the Master Agreement on or as soon as reasonably practicable following the occurrence of the Early Termination Date and will provide to LBSF the statement required by Section 6(d)(i) of the Master Agreement.

JP hereby reserves all rights under the Master Agreement and applicable law.

Very truly yours,

JENNER'S POND, INC

By: _____
Name: Kim W. Williams
Title: Chair, Board of Directors

# EXHIBIT B

08-13555-mg    Doc 21891-1    Filed 11/10/11    Entered 11/10/11 14:01:49    Exhibit
Pg 4 of 9



A CONTINUING CARE RETIREMENT COMMUNITY

May 5th, 2009

VIA OVERNIGHT DELIVERY
Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Holdings Inc.
1271 Sixth Avenue, 40th Floor
New York, NY 10020
Attn: Derivatives Legal

Dear Sirs:

Reference is hereby made to the ISDA Master Agreement between Lehman Brothers Special Financing Inc. ("LBSF") and Jenner's Pond, Inc. ("JP") dated as of October 25, 2006 (including the Schedule and Credit Support Annex thereto and as amended from time to time, the "Master Agreement"). All capitalized terms not otherwise defined herein shall have the meanings assigned to them in the Master Agreement. All references to the Non-Defaulting Party shall mean JP, and all references to the Defaulting Party shall mean LBSF.

In a notice dated April 23, 2009, JP notified LBSF of the designation of April 23, 2009 as the Early Termination Date under the Master Agreement in respect of all outstanding Transactions.

Under the Master Agreement, Market Quotation and Second Method are the specified elections for the calculation of termination payments. In accordance with the Master Agreement, the Non-Defaulting Party has calculated the Settlement Amount of the Terminated Transactions pursuant to part (b) of the definition of "Settlement Amount" in the Master Agreement, in accordance with the Loss methodology instead of the Market Quotation methodology under the Agreement. The Non-Defaulting Party requested Market Quotations for the Terminated Transactions from the eight (8) Reference Market-makers listed on Exhibit A hereto, but no Reference Market-maker was willing to provide any Market Quotation with respect to the Terminated Transactions under the terms and conditions of the Terminated Transactions. The Non-Defaulting Party concluded, among other things, that Market Quotations could not be determined and would not, in the reasonable belief of the Non-Defaulting Party, produce a commercially reasonable result.

Settlement Amount

The Non-Defaulting Party's Loss (without reference to any Unpaid Amounts or Section 9 expenses and indemnities) with respect to the Terminated Transactions is set forth in the subsequent paragraphs. Such Loss is the amount that the Non-Defaulting Party determined in good faith and under a commercially reasonable manner to be its total losses and costs in connection with the Terminated Transactions.

2000 GREENBRIAR LANE • WEST GROVE, PA 19390
PHONE: 610.869.6801 • TOLL-FREE: 1.888.536.6377 • FAX: 610.869.6149 • www.jennerspond.org

In accordance with the terms of the Master Agreement, in determining its Loss the Non-Defaulting Party took into consideration not only the economic terms of the transaction but also its loss of bargain, cost of funding, and replacement costs. The Non-Defaulting Party incurred substantial Loss resulting from the Termination of the Transactions because the Master Agreement was structured to include, but was not limited to, the following key and material terms: (a) Unsecured general obligation whereby JP provided no security interests in its assets or revenues to LBSF, nor was JP under any obligation to Post Collateral throughout the term of the Transactions; (b) Unilateral Credit Support Annex whereby only LBSF would be required to post collateral; (c) Single Additional Termination Event against JP relating to its liquidity at a threshold which was significantly less burdensome to JP than what was provided to other creditors under the credit facility to which the Terminated Transactions relate; (d) long dated maturity of July 2033 with no optional termination rights, puts or market tear-ups by LBSF, and (e) Cross-default threshold of $10 million which is set at a very high percentage of JP net assets compared with a cross-default threshold of $250,000 under the credit facility to which the Terminated Transactions relate (the provisions of clauses (a) through (e) are hereby collectively referenced as the "Key and Material Terms of the Master Agreement"). As evidenced by the failure to obtain Market Quotations, unsuccessful negotiations with several potential counterparties that deal with not-for-profit issuers, and LBSF's inability to transfer the Master Agreement to a qualified counterparty within a reasonable time period, we deemed that there was no available market to replace the Master Agreement on terms consistent with the Key and Material Terms of the Master Agreement. Additionally, JP's credit profile, 501(c)(3) not-for-profit corporate structure, and its lack of a public credit rating, further confounded the ability of JP to find a replacement counterparty with terms consistent with the Key and Material Terms of the Master Agreement.

Notwithstanding current market conditions which are marked by significant illiquidity, lack of credit being offered by financial institutions, and significantly wider credit spreads, JP was ultimately able to secure an actionable quotation for a new on-market swap from a single leading Reference Market-maker (hereby referenced as the "Actionable Replacement Swap"). The Actionable Replacement Swap was structured to provide JP with terms as reasonably similar to the Key and Material Terms of the Master Agreement as possible given current market conditions. However, in order for JP to avoid pledging any security interest in its assets or revenues (consistent with provision (a) in the Key and Material Terms of the Master Agreement), the Actionable Replacement Swap counterparty required that JP purchase a swaption that provided a cap on the maximum negative mark-to-market. Moreover, under the Actionable Replacement Swap, the counterparty required a Cross-default Threshold of $2,000,000, a bi-lateral Credit Support Annex, and the same covenants set forth in the related credit agreement. Each such term was more burdensome to JP relative to the Key and Material Terms of the Master Agreement. Additionally, the fixed rate offered by the Actionable Replacement Swap counterparty was higher than the Fixed Rates under the Master Agreement due to the requirement by the counterparty that JP purchase a swaption to keep the mark-to-market value of the Actionable Replacement Swap below a specified threshold. The fixed rate of the Actionable Replacement Swap incorporated the cost of purchasing the required swaption and a non-Section 9 advisory and structuring expense payable to a financial advisor retained by JP. As the Fixed Rate Payer, and because the fixed rate offered under the Actionable Replacement Swap was higher than the Fixed Rates under the Master Agreement, the Non-Defaulting Party has determined in a commercially reasonable manner that, the Defaulting Party would owe a Settlement Amount equal to the present value difference between the fixed rate provided under the Actionable Replacement Swap and the Fixed Rates under the Master Agreement. The present value was calculated using a discount rate equal to the Non-Defaulting Party's cost of funds which is 10.00% as of the date hereof. The Non-Defaulting Party did not take into account the economic

costs of the materially different provisions that exist in the Actionable Replacement Swap (as described above) from the Key and Material Terms of the Master Agreement relating to the Terminated Transactions. The Settlement Amount takes into account only the present value difference between the fixed rates payable by JP under the Actionable Replacement Swap and the Terminated Transactions. Given the higher cost and likelihood of non-recovery of the Loss amount, JP elected to not execute the Actionable Replacement Swap. Subsequent to the determination of the Settlement Amount, JP did execute an interest rate swap transaction (hereby referenced as the "Actual Replacement Swap"). However, because the terms and conditions of the Actual Replacement Swap were substantially different and significantly more burdensome to JP than the Key and Material Terms of the Master Agreement, the Actual Replacement Swap was not utilized in calculating the Settlement Amount. The Non-Defaulting Party reserves all rights under the Master Agreement, the Terminated Transactions, and applicable law to modify the calculation of Loss in the future to take into account the materially differing terms and provisions of the Actionable Replacement Swap and the Actual Replacement Swap with the Key Terms and Provisions of the Master Agreement.

Based solely on the method of calculating Loss set forth in the immediately preceding paragraph, the Non-Defaulting Party has determined that its Loss on the Terminated Transactions is USD 1,219,923.

Unpaid Amounts

There are Unpaid Amounts owing by the Defaulting Party to the Non-Defaulting Party in relation to the Terminated Transactions, which are equal to USD 8,431. Such unpaid amounts reflect the periodic net settlement due by LBSF on 11/1/08, subject to adjustment in accordance with the convention established in the Master Agreement.

There are Unpaid Amounts owing by the Non-Defaulting Party to the Defaulting Party in relation to the Terminated Transactions, which are equal to USD 476,513. Such unpaid amounts reflect the periodic net settlement due by JP on December 1, 2008; January 1, 2009; February 1, 2009; March 1, 2009; and April 1, 2009, subject to adjustment in accordance with the convention established in the Master Agreement.

Note that JP paid LBSF the periodic net settlement due by JP on October 1, 2008, subject to adjustment in accordance with the convention established in the Master Agreement, which was subsequent to the LBSF Event of Default but prior to the Early Termination Date. Accordingly such amount is not included in the forgoing calculations.

Since we did not receive payment instructions from the Calculation Agent, the Unpaid Amounts were determined by us in good faith based on the terms of the Master Agreement.

Out of Pocket and Section 9 Expenses and Indemnities

The Non-Defaulting Party has already incurred and may incur additional reasonable out-of-pocket expenses, including legal fees, as a result of the enforcement and protection of its rights under the Agreement. According to Section 9 of the Agreement, the Non-Defaulting Party is entitled to indemnity against all of such out-of-pocket expenses. The out-of-pocket fees and expenses payable include legal fees, trustee fees, and tax consultant fees. The Non-Defaulting Party has estimated these fees and expenses to be in the amount of USD 75,000.

Accordingly, the amount calculated for the purposes of Section 6(d) of the Agreement is as follows:

| | |
|---|---|
| Settlement Amount: | USD 1,219,923 |
| Reasonable out-of-pocket expenses incurred by the Non-Defaulting Party: | USD 75,000 |
| Unpaid Amounts owing by the Defaulting Party: | USD 8,431 |
| Less Unpaid Amounts owing by the Non-Defaulting Party: | USD 476,513 |
| TOTAL: | USD 826,841 |

Under the provisions provided under the Master Agreement, JP is hereby exercising its right to set-off and, as such, the net amount due and payable by the Defaulting Party to the Non-Defaulting Party as of the Early Termination Date is USD 826,841 plus accrued interest at the Applicable Rate from the Early Termination Date to the date on which payment is made by the Defaulting Party. Based on prevailing market conditions the Applicable Rate as of the date hereof is 11.00%.

JP hereby reserves all rights under the Master Agreement and applicable law.

Very truly yours,

JENNER'S POND, INC

By: *[signature]*
Name: Kim W. Williams
Title: Chair of the Board of Directors

Appendix A

Market Quotation Reference Market-makers[1]

Wells Fargo
Bank of America
JP Morgan Chase
Deutsche Bank
PNC
US Bank
Morgan Stanley
Barclays Capital

---

[1] Entities listed above reflect the generic name of the particular Reference Market-maker and not the specific legal entity that each firm transacts business. It should be assumed the Market Quotation, if available, would be provided by the relevant legal entity that conducts business for such type of transaction.