Base Prospectus

# Multi Issuer Secured Obligation Programme

Under the Multi Issuer Secured Obligation Programme (the "Programme") described in this Base Prospectus, certain companies (each a "Specified Company"), described, in the case of the company details of which are set out in the Issuer Disclosure Annex set out herein (the "Relevant Company"), in this Base Prospectus, and in the case of any other Specified Company in a separate base prospectus relating to that Specified Company (this Base Prospectus and any other such base prospectus being a "Specified Company Base Prospectus"), subject to compliance with all relevant laws, regulations and directives, may from time to time issue, borrow under, buy, sell or enter into secured obligations (the "Obligations") in the form of notes ("Notes"), loans ("Loans"), options ("Options"), schuldscheine ("Schuldscheine") or swaps ("Swaps") on the terms set out in the relevant Specified Company Base Prospectus and (in the case of Notes) in final terms ("Final Terms") or (in the case of Loans, Options, Schuldscheine or Swaps) any relevant documentation entered into in connection therewith (the "Obligation Documents"). Notes may also be issued under the Programme on terms set out in a Prospectus relating to the Notes which incorporates by reference the whole or any part of the relevant Specified Company Base Prospectus. This Base Prospectus comprises a base prospectus for the purposes of Article 5 of the Prospectus Directive (Directive 2003/71/EC).

In connection with the proposed creation of Obligations by a Specified Company (other than the First Issuer), such Specified Company will have executed a deed of accession (a "Deed of Accession") agreeing to be bound by all the terms of the principal trust deed dated 10 October 2002, as amended and restated on 22 July 2005 (the "Principal Trust Deed") entered into by the First Issuer with, inter alia, J.P. Morgan Corporate Trustee Services Limited as trustee (the "Trustee") and certain other Master Documents (as defined in the relevant Deed of Accession) and the other documents executed pursuant to or in connection with the creation of Obligations. From and after execution and delivery of a Deed of Accession, such Specified Company shall become and be treated as an "Issuer" for the purposes of the Master Documents and the relevant Specified Company Base Prospectus. References herein to "Issuer" are references to the relevant Specified Company in respect of (and only to the extent of) the Obligations created by it and in respect of the Master Documents only to the extent that it is bound by them and such references specifically exclude any other Specified Company. Each Specified Company shall be bound by the Master Documents only in respect of any Series of Obligations created by it and matters relating thereto. The liability of the Specified Companies under the Obligations, each of the Master Documents and the Obligation Documents is several and is separate in respect of each Series of Obligations. No Specified Company shall be responsible for the obligations of any other Specified Company under any Obligations created by such Specified Company or any of the Master Documents or any Obligation Document.

The Obligations will, where relevant, be created in Series (as defined in "Overview of the Programme"). Each Series of Notes will be secured by a charge on certain bonds, notes, warrants, securities or equity securities of any form, denomination, type or issuer, monoline guarantees, options, swaps, loans or any other financial obligations assigned to or assumed by the Issuer or any other agreed assets owned by the Issuer (the "Collateral") and a fixed charge on all funds held from time to time by the Custodian and/or the Issuing and Paying Agent and/or the Registrar (all as defined herein) for payments due under the Notes of such Series and may also be secured by an assignment of the relevant Issuer's rights under one or more interest rate and/or currency exchange agreements (each a "Swap Agreement") or any other Credit Enhancement Agreement (as defined under "Terms and Conditions of the Notes – Status and Non-applicability") entered into in respect of the relevant Notes, together with such additional security as may be described in the relevant Final Terms (together the "Mortgaged Property"). The obligations of each Issuer under a Swap Agreement to a counterparty to such Swap Agreement may also be secured on certain assets comprised in the Mortgaged Property. Claims against an Issuer by holders of the Notes of a particular Series and, if applicable, the counterparty to the relevant Swap Agreement will be limited to the Mortgaged Property applicable to that Series. If the net proceeds of the enforcement of the Mortgaged Property for each Series of Notes are not sufficient to make all payments due in respect of the Notes and Coupons (as defined herein) (if any) and, if applicable, to the relevant counterparty to the relevant Swap Agreement, no debt shall be owed by the Issuer in respect of any shortfall and neither the Trustee nor any such counterparty nor any holder of Notes or anyone acting on behalf of any of them may take any further action to recover such shortfalls. Obligations other than Notes will be secured in the manner described in the relevant Obligation Documents, but in each case, recourse against the Issuers in respect of such Obligations will be limited to the assets of the relevant Issuer that form the security for such Obligations. Obligations may be credit enhanced by a guarantee, insurance or other support agreement as specified in the relevant supplemental trust deed.

Notes will be issued to the Dealer specified below and any additional Dealer appointed under the Programme from time to time, which appointment may be for a specific issue or on an ongoing basis (each a "Dealer" and together the "Dealers").

The failure of a Specified Company to perform its obligations under any Obligations, under the Master Documents or any Obligation Document shall not release any other Specified Company from its obligations under any Obligation, any of the Master Documents or any Obligation Document. No security created by a Specified Company shall benefit investors in Obligations issued, bought, borrowed, sold or entered into by (or any other creditors of) any other Specified Company or the investors in any other Obligations created by such Specified Company. No payments owed by or to a Specified Company may be netted against payments owed by or to any other Specified Company. The rights of each Specified Company under each of the Master Documents are also several.

Application has been made to the Irish Financial Services Regulatory Authority as competent authority under Directive 2003/71/EC, for the Base Prospectus to be approved. Application has been made to the Irish Stock Exchange for the Notes to be admitted to the Official List and to trading on its regulated market.

Such market is a regulated market for the purposes of the Investment Services Directive 93/22/EC. However, unlisted Notes may be issued pursuant to the Programme and the Programme provides that Notes may be listed on such other stock exchange(s) (or markets of the Irish Stock Exchange) as may be specified in the relevant Final Terms. The relevant Final Terms in respect of the issue of any Notes will specify whether or not such Notes will be listed on and admitted to trading on the regulated market of the Irish Stock Exchange (or any other stock exchange or market). Other secured obligations entered into under the Programme, either Loans, Options, Schuldscheine and Swaps, cannot be listed on and admitted to trading on the regulated market of the Irish Stock Exchange.

Copies of this document in relation to the Notes to be issued during the period of 12 months from the date of this Base Prospectus have been filed with and approved by the Irish Financial Services Regulatory Authority in its capacity as competent authority in Ireland for the purposes of Directive 2003/71/EC. Such approval relates only to Notes which are to be admitted to trading on the regulated market of the Irish Stock Exchange or other regulated markets for the purposes of Directive 93/22/EC or which are to be offered to the public in any Member State of the European Economic Area. Copies of each set of Final Terms will be available at the specified office set out below of the Trustee (as defined herein) and each of the Paying Agents. In respect of those Specified Companies incorporated in Ireland, a copy of the relevant Specified Company Base Prospectus will be filed with the Irish Companies Registration Office within 14 days of approval as required by S.I. No. 324 Prospectus (Directive 2003/71/EC) Regulations 2005.

Notes in bearer form ("Bearer Notes") will initially be represented by a temporary global note (a "Temporary Global Note") or a permanent global note (a "Permanent Global Note" and together with the Temporary Global Notes, the "Global Notes"). Notes in registered form ("Registered Notes") will be represented by registered certificates (each a "Certificate"), one Certificate being issued in respect of each Noteholder's entire holding of Registered Notes of one Series. Global Notes and Certificates may be deposited on the Issue Date (as defined herein) with a common depositary on behalf of and, in the case of Registered Notes registered in the name of a nominee for Euroclear Bank S.A./N.V., as operator of the Euroclear System ("Euroclear") and Clearstream Banking, société anonyme ("Clearstream, Luxembourg"), or such other clearing system approved by the Trustee. The provisions governing the exchange of interests in Global Notes for interests in other Global Notes or for Definitive Notes are described in "Summary of Provisions Relating to the Notes while in Global Form".

Where so indicated in the Specified Company Base Prospectus relating to a Specified Company, Obligations of a Specified Company may be rated by Moody's Investors Service Limited ("Moody's") and/or Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. ("Standard & Poor's") and/or Fitch Ratings Limited ("Fitch"). Any such rating will be specified in the relevant Final Terms. Each rating will address the Specified Company's ability to perform its obligations under the terms of the Obligations and, where the amount of those obligations is calculated by reference to a credit-dependent index, the likelihood that payments will be due under the Obligations. Where the amount of the obligations is determined by reference to a market-dependent index, the ratings do not currently address the likelihood that payments will be due under the terms of the Obligations.

A rating is not a recommendation to buy, sell or hold securities or other investments and may be subject to suspension, reduction or withdrawal at any time by Moody's and/or Standard & Poor's and/or Fitch. A suspension, reduction or withdrawal of the rating assigned to the Obligations may adversely affect the market price of such Obligations.

The issue price and amount of the relevant Notes will be determined, before filing of the relevant Final Terms, based on the then prevailing market conditions.

THE OBLIGATIONS WILL BE OBLIGATIONS SOLELY OF EACH OF THE SPECIFIED COMPANIES AND WILL NOT BE GUARANTEED BY, OR BE THE RESPONSIBILITY OF, ANY OTHER ENTITY.

## Arranger and Dealer
## Lehman Brothers International (Europe)

The date of this Base Prospectus is 16 August 2005

This Base Prospectus is issued in relation to the creation by the Relevant Company of Obligations. Information relating to each Specified Company which has executed a Deed of Accession and/or any other relevant party will be contained in the relevant Specified Company Base Prospectus. A Specified Company Base Prospectus may contain information relating to more than one Specified Company. The specific terms of each Series of Notes will be set forth in Final Terms. Notes may also be issued under the Programme on terms set out in a Prospectus relating to the Notes which incorporates by reference the whole or any part of the relevant Specified Company Base Prospectus. Any such Final Terms or Prospectus will be published by being made available as described in paragraph 5 of "General Information" in the Issuer Disclosure Annex attached hereto. Each Specified Company Base Prospectus should be read and construed in conjunction with each relevant Final Terms and all other documents which are deemed to be incorporated by reference in the relevant Specified Company Base Prospectus and in the relevant Final Terms. The relevant Specified Company Base Prospectus and the relevant Final Terms, shall, save as specified herein and therein, be read and construed on the basis that such documents are so incorporated by reference and form part of the relevant Specified Company Base Prospectus and the relevant Final Terms.

The Relevant Company accepts responsibility for the information contained in this Base Prospectus. To the best of the knowledge and belief of the Relevant Company, having taken all reasonable care to ensure that such is the case, the information in this Base Prospectus is in accordance with the facts and does not omit anything likely to affect the import of such information.

No person has been authorised to give any information or to make any representation other than those contained in this Base Prospectus, each other Specified Company Base Prospectus and each set of Final Terms or any documents incorporated by reference therein in connection with the issue or sale of the Obligations and, if given or made, such information or representation must not be relied upon as having been authorised by any Issuer or any Dealer or the Arranger (as defined in "Overview of the Programme"). Neither the delivery of this Base Prospectus nor any other Specified Company Base Prospectus or set of Final Terms nor any sale made in connection therewith shall, under any circumstances, create any implication that there has been no change in the affairs of any of the Issuers since the date hereof or the date upon which this Base Prospectus or relevant other Specified Company Base Prospectus has been most recently supplemented or that there has been no adverse change in the financial position of the relevant Issuer since the date upon which this Base Prospectus or relevant other Specified Company Base Prospectus has been most recently amended or supplemented or that any other information supplied in connection with the Programme is correct as of any time subsequent to the date on which it is supplied or, if different, the date indicated in the document containing the same.

The distribution of this Base Prospectus and any other Specified Company Base Prospectus or set of Final Terms and the offering or sale of the Obligations in certain jurisdictions may be restricted by law. Persons into whose possession this Base Prospectus and any other Specified Company Base Prospectus or set of Final Terms come are required by the Issuers, the Dealers and the Arranger to inform themselves about and to observe any such restriction. The Notes have not been and will not be registered under the United States Securities Act of 1933, as amended (the "Securities Act") or with any securities regulatory authority of any state or other jurisdiction of the United States, and may include Notes in bearer form that are subject to U.S. tax law requirements. Subject to certain exceptions, the Notes may not be offered or sold or, in the case of Notes in bearer form, delivered within the United States or to, or for the account or benefit of, U.S. persons (as defined in Regulation S under the Securities Act ("Regulation S") in the case of Notes in registered form, or as defined in the U.S. Internal Revenue Code of 1986, as amended, and regulations thereunder in the case of Notes in bearer form). For a description of certain restrictions on offers and sales of Obligations and on the distribution of this Base Prospectus, see "Subscription and Sale".

Neither this Base Prospectus nor any other Specified Company Base Prospectus or set of Final Terms constitutes an offer of, or an invitation by or on behalf of the Issuers or the Dealers to invest in any Obligations.

Investors in Obligations should conduct such independent investigation and analysis regarding the Issuers, the security arrangements and the Obligations as they deem appropriate to evaluate the merits and risks of an investment in the Obligations. Investors in Obligations should have sufficient knowledge and experience in financial and business matters, and access to, and knowledge of, appropriate analytical resources, to evaluate the information contained in this Base Prospectus, each other relevant Specified Company Base Prospectus and the relevant set of Final Terms (if any) and the merits and risks of investing in the Obligations in the context of their financial position and circumstances. Prospective investors should have regard to the factors described under the section headed "Risk Factors" in this Base Prospectus. The Base Prospectus does not describe all of the risks of an investment in the Notes. The investment considerations identified in this Base Prospectus are provided as general information only and the Dealers and the Arranger disclaim any responsibility to advise investors in the Obligations of the risks and investment considerations associated therewith as they may exist at the date hereof or as they may from time to time alter.

Investors should be aware that no Specified Company is regulated by the Irish Financial Services Regulatory Authority (IFSRA) and that any investment will not have the status of a bank deposit and is therefore not within the scope of the deposit protection scheme operated by IFSRA.

None of the Dealers or the Arranger makes any representation, recommendation or warranty, express or implied, regarding the accuracy, adequacy, reasonableness or completeness of the information contained herein or in any further information, notice or other document which may at any time be supplied in connection with the Obligations and none of them accepts any responsibility or liability therefor.

None of the Dealers or the Arranger undertakes to review the financial condition or affairs of the Issuers during the life of the arrangements contemplated by this Base Prospectus, each other Specified Company Base Prospectus and each set of Final Terms nor to advise any investor or potential investor in the Obligations of any information coming to the attention of any of the Dealers or the Arranger.

In this Base Prospectus, unless otherwise specified or the context otherwise requires, references to "U.S.$" and "U.S. dollars" are to United States dollars and references to "euro" and "€" refer to the currency introduced from the third stage of European economic and monetary union pursuant to the Treaty establishing the European Community, as amended by the Treaty on European Union.

In connection with any Tranche (as defined in "Overview of the Programme"), one of the Dealers may act as a stabilising agent (the "Stabilising Agent"). The identity of the Stabilising Agent (if any) will be disclosed in the relevant Final Terms. References in the next paragraph to "this issue" are to each Tranche in relation to which a Stabilising Agent is appointed.

In connection with the issue of any Tranche (as defined in "Overview of the Programme"), the Dealer or Dealers (if any) named as the stabilising manager(s) (the "Stabilising Manager(s)") (or persons acting on behalf of any Stabilising Manager(s)) in the applicable Final Terms) may over-allot Notes (provided that, in the case of any Tranche to be listed and admitted to trading on the regulated market of the Irish Stock Exchange, the aggregate principal amount of Notes allotted does not exceed 105 per cent. of the aggregate principal amount of the relevant Tranche) or effect transactions with a view to supporting the market price of the Notes at a level higher than that which might otherwise prevail. However, there is no assurance that the Stabilising Manager(s) (or persons acting on behalf of a Stabilising Manager) will undertake stabilisation action. Any stabilisation action may begin on or after the date on which adequate public disclosure of the Prospectus of the offer of the relevant Tranche is made and, if begun, may be ended at any time, but it must end no later than the earlier of 30 days after the issue date of the relevant Tranche and 60 days after the date of the allotment of the relevant Tranche.

# TABLE OF CONTENTS

Page

SUPPLEMENTARY INFORMATION ................................................................................................. 5

OVERVIEW OF THE PROGRAMME ............................................................................................... 6

RISK FACTORS ............................................................................................................................. 14

TERMS AND CONDITIONS OF THE NOTES ............................................................................... 22

SUMMARY OF PROVISIONS RELATING TO THE NOTES WHILE IN GLOBAL FORM ...................... 52

USE OF PROCEEDS ...................................................................................................................... 57

FORM OF FINAL TERMS ............................................................................................................. 58

SUBSCRIPTION AND SALE ......................................................................................................... 68

## SUPPLEMENTARY INFORMATION

With respect to any Notes issued by an Issuer and listed and admitted to trading on the regulated market of the Irish Stock Exchange, the relevant Issuer will agree to comply with any undertakings given by it from time to time to the Irish Stock Exchange in connection with such listed Notes and, without prejudice to the generality of the foregoing, each Issuer will, so long as any of its Notes remains outstanding and listed and admitted to trading on such market, in the event of any material adverse change in the financial condition of the relevant Issuer which is not reflected in the relevant Specified Company Base Prospectus, prepare a supplement to the relevant Specified Company Base Prospectus or publish a new base prospectus as may be required by the Prospectus (Directive 2003/71/EC) Regulations 2005 for use in connection with any subsequent issue of Notes to be listed and admitted to trading on the regulated market of the Irish Stock Exchange.

If the terms of the Programme are modified or amended in a manner which would make a Specified Company Base Prospectus, as so modified or amended, inaccurate or misleading, a new base prospectus will be prepared.

## OVERVIEW OF THE PROGRAMME

The following overview is qualified in its entirety by the remainder of this Base Prospectus and (a) in relation to Obligations which take the form of Notes, the relevant Final Terms relating to the Series of which such Notes are a part, and (b) in relation to other forms of Obligations, the Obligation Documents.

| | |
|---|---|
| **Issuer:** | The Specified Company that is described in the Issuer Disclosure Annex set out herein and (save for the First Issuer) which has executed a Deed of Accession. References herein to the "Issuer" are references to the relevant Specified Company in respect of (and only to the extent of) the Obligations created by it and in respect of the Master Documents to the extent that it is bound by them and such references specifically exclude any other Specified Company. Information relating to each Specified Company will be contained in this Base Prospectus, in the case of the Specified Company that is described in the Issuer Disclosure Annex set out herein, and the relevant other Specified Company Base Prospectus in the case of any other Specified Company. In the case of any Specified Company, the relevant Specified Company Base Prospectus and the relevant Final Terms should be read and construed together. |
| **Description:** | Multi Issuer Secured Obligation Programme. Pursuant to the Master Documents, Specified Companies may issue Obligations which take the form of Notes, Loans, Options, Schuldscheine or Swaps under the Programme on a several basis. |
| **Arranger:** | Lehman Brothers International (Europe) |
| **Mortgaged Property:** | The Notes of each Series will be secured in the manner set out in Condition 4 of the Terms and Conditions of the Notes, as the case may be, including a first fixed charge on certain Collateral and on all funds held from time to time by the Custodian and/or the Issuing and Paying Agent, as the case may be, insofar as such funds relate to that Series. Each Series of Notes may also be secured by an assignment of the relevant Issuer's rights under a Swap Agreement or a Credit Enhancement Agreement (each as defined in the Terms and Conditions of the Notes), as the case may be, together with such additional security as may be described in the relevant Final Terms. |
| | Obligations other than Notes will be secured in the manner described in the relevant Obligation Documents. |
| | One or more Series of Notes and/or other Obligations may be secured on the same Mortgaged Property to the extent and on the terms set out in the relevant Final Terms and/or Obligation Documents. |
| **Early Termination of Swap Agreements:** | Swap Agreements may be terminated early: |
| | (a)  if withholding taxes are imposed on payments made by the relevant Issuer or the Swap Counterparty, as the case may be; or |

(b)    at the option of one party, if there is a failure by the other party to pay any amounts due, or to comply with or perform any obligation under the Swap Agreement; or

(c)    at the option of the Swap Counterparty under the Swap Agreement, if an event of default under the Terms and Conditions of the Notes occurs; or

(d)    upon the occurrence of certain other events with respect to either party to the Swap Agreement, including a breach of a representation, insolvency, merger without an assumption of the obligations in respect of the Swap Agreement or changes in law resulting in illegality.

In any of the above events, the Notes will be redeemed early and the Collateral will be realised. On the occurrence of any of the events referred to above, a termination payment will be due to be paid by the relevant Issuer to the Swap Counterparty or to the relevant Issuer by the Swap Counterparty in respect of the Swap Agreement.

Unless provided otherwise in the relevant Final Terms there is no guarantee that upon any such termination the funds realised from the disposal of the Collateral plus or minus (as the case may be) the termination payment due in respect of the Swap Agreement will be sufficient to pay, in full, amounts owing to the Noteholders. To the extent any such shortfall arises, the relevant Issuer will not be obliged to make any further payment to meet any such shortfall and accordingly no debt shall be owed by the relevant Issuer in respect of any such shortfall. No other assets of the relevant Issuer will be available to meet such shortfall. The Swap Counterparty shall not be entitled to institute, or join with any other person in bringing, instituting or joining, insolvency proceedings (whether court based or otherwise) in relation to the relevant Issuer.

The termination payment in respect of the Swap Agreement will be based on the replacement cost or gain for a swap transaction with the same financial terms as the Swap Agreement, without regard to the contingency of a default in respect of the Collateral. In all cases of early termination, the termination payment will be determined on the basis of quotations received from the leading dealers in the relevant market (failing which, by the Swap Counterparty) in accordance with the terms of the Swap Agreement.

**Credit Enhancement:**    Obligations may be issued with the benefit of monoline guarantees or other forms of credit enhancement as specified in the relevant Final Terms.

**Dealers:**    Lehman Brothers International (Europe)

The Issuers may from time to time appoint additional dealers either in respect of one or more Tranches of Notes or in respect

of the whole Programme or terminate the appointment of any dealer under the Programme. References in this Base Prospectus to "Permanent Dealers" are to Lehman Brothers International (Europe) and to such additional persons that are appointed as dealers in respect of the whole Programme (and whose appointment has not been terminated) and to "Dealers" are to all Permanent Dealers and all persons appointed as a dealer in respect of one or more Tranches of Notes.

|  |  |
|---|---|
| **Trustee:** | J.P. Morgan Corporate Trustee Services Limited or such other trustee as may be appointed in relation to the relevant Series. |
| **Issuing and Paying Agent:** | JPMorgan Chase Bank, N.A. |
| **Paying and Transfer Agent:** | J.P. Morgan Bank (Ireland) PLC |

**Method of Issue of Notes:**

The Notes will be issued in series (each a "Series") having one or more settlement or issue dates and on terms otherwise identical (or, in relation to interest-bearing Notes, identical other than in respect of the first payment of interest); the Notes of each Series being intended to be interchangeable with all other Notes of that Series (if applicable). Each Series may be issued in tranches (each a "Tranche") and may have different settlement or issue dates. The specific terms of each Tranche (which will be supplemented, where necessary, with supplemental terms and conditions and, save in respect of the settlement or issue date, issue price, first payment of interest and principal amount of the Tranche (if applicable), will be identical to the terms of other Tranches of the same Series) will be set out in the relevant Final Terms. Further Notes may be issued as part of an existing Series only in accordance with the Terms and Conditions of the relevant Notes.

Obligations other than Notes will be created in the manner described in the relevant Obligation Documents.

**Issue Price of Notes:**

Notes may be issued at their principal amount or at a discount or premium to their principal amount. Partly-paid Notes may be issued, the issue price of which will be payable in two or more instalments.

**Form of Obligations:**
**(a) Notes:**

Notes may be issued in bearer form only ("Bearer Notes"), in bearer form exchangeable for Registered Notes ("Exchangeable Bearer Notes") or in registered form only ("Registered Notes"). Each Tranche of Bearer Notes and Exchangeable Bearer Notes will initially be represented by a temporary Global Note if such Notes are being issued in compliance with the D Rules (as defined in "Overview of the Programme - Selling Restrictions"), otherwise each Tranche will be represented by a Permanent Global Note. Permanent Global Notes will be exchangeable for Definitive Notes in the limited circumstances set out thereon. See "Summary of Provisions Relating to the Notes while in Global Form". Registered Notes will be represented by Certificates, one Certificate being issued in respect of each Noteholder's entire holding of Registered Notes

|  | of one Series. Certificates representing Registered Notes that are registered in the name of a nominee for one or more clearing systems are referred to as "Global Certificates". |
|---|---|
| **(b) Loans, Options, Schuldscheine and Swaps:** | Obligations may also be in the form of Loans, Options, Schuldscheine or Swaps the terms of which will have the same effect as an equivalent Series of Notes. |
| **Currencies:** | Subject to compliance with all relevant laws, regulations and directives, Obligations may be denominated in such currency or currencies as the Issuer and the relevant Dealer(s) (if any) so agree. |
| **Maturities:** | Subject to compliance with all relevant laws, regulations and directives, any maturity between one year and perpetuity. |
| **Denomination of Notes:** | Definitive Notes will be in such denominations as may be specified in the relevant Final Terms save that in the case of any Notes that are to be admitted to trading on a regulated market within the European Economic Area or offered to the public in a Member State of the European Economic Area in circumstances which require publication under the Prospectus Directive (Directive 2003/71/EC), the minimum denomination shall be €50,000 (or its equivalent any other currency as at the date of issue of the Notes). |
| **Fixed Interest Rate Notes:** | Fixed interest will be payable in arrear on the date or dates in each year specified in the relevant Final Terms. |
| **Floating Rate Notes:** | Floating Rate Notes will bear interest set separately for each Series by reference to LIBOR, LIBID, LIMEAN or EURIBOR (or such other benchmark as may be specified in the relevant Final Terms) as adjusted for any applicable margin. Interest periods will be specified in the relevant Final Terms. |
| **Zero Coupon Notes:** | Zero Coupon Notes may be issued at their principal amount or at a discount to it and will not bear interest. |
| **Variable Coupon Amount Notes:** | The relevant Final Terms, issued in respect of each issue of variable coupon amount Notes will specify the basis for calculating the amounts of interest payable, which may be by reference to a stock index or formula or as otherwise provided in the relevant Final Terms. The relevant Final Terms, will also specify the Calculation Agent in respect of such issue of variable coupon amount Notes. |
| **Interest Periods and Interest Rates for the Notes:** | The length of the interest periods for Notes and the applicable interest rate or its method of calculation may differ from time to time or be constant for any Series of Notes. Notes may have a maximum interest rate, a minimum interest rate or both. The use of interest accrual periods permits Notes to bear interest at different rates in the same interest period. All such information will be set out in the relevant Final Terms. |
| **Other Obligations:** | Loans or Schuldscheine may be interest bearing or non-interest bearing and Options or Swaps may provide for one or more periodic payments. |

| | |
|---|---|
| **Variable Redemption Amount Notes:** | The relevant Final Terms issued in respect of each issue of variable redemption amount Notes will specify the basis for calculating the redemption amounts payable, which may be by reference to a stock index or formula or as otherwise provided in the relevant Final Terms. The relevant Final Terms will also specify the Calculation Agent in respect of such issue of variable redemption amount Notes. |
| **Redemption of Notes by Instalments:** | The relevant Final Terms issued in respect of each issue of Notes that are redeemable in two or more instalments will set out the dates on which, and the amounts in which, such Notes may be redeemed. |
| **Other Notes:** | Terms applicable to high-interest Notes, low-interest Notes, step-up Notes, step-down Notes, dual-currency Notes, reverse dual-currency Notes, optional dual-currency Notes, partly-paid Notes and any other type of Note that the relevant Issuer, the Trustee and any Dealer or Dealers may agree to issue under the Programme will be set out in the relevant Final Terms. |
| **Optional Redemption of Notes:** | The relevant Final Terms issued in respect of each issue of Notes will state whether such Notes may be redeemed prior to their stated maturity at the option of the Issuer or the Noteholder (either in whole or in part), and if so the terms applicable to such redemption. |
| **Mandatory Redemption of Notes:** | If all or some of the Collateral relating to a Series of Notes becomes repayable prior to its stated maturity or there is a payment default in respect of any such Collateral, the Notes of that Series shall become repayable in whole or in part. See "Terms and Conditions of the Notes - Redemption, Purchase and Options". |
| **Exchange:** | The relevant Final Terms issued in respect of each issue of Notes will state whether the holder of such Notes may exchange its Notes for the Net Asset Amount (as defined under "Terms and Conditions of the Notes - Redemption, Purchase and Options"). In such case the relevant Issuer may satisfy its exchange obligation (even if physical delivery is not requested by the holder) by delivering to, or to the order of such Noteholder the attributable Collateral and/or attributable rights (each as defined under "Terms and Conditions of the Notes - Redemption, Purchase and Options"). |
| **Status of Notes:** | The Notes of each Series will be secured limited-recourse obligations of the Issuer, ranking *pari passu* without any preference among themselves and secured in the manner described in "Terms and Conditions of the Notes - Mortgaged Property, Realisation of Mortgaged Property and Restrictions", as the case may be. Recourse in respect of any Series of Notes will be limited to the Mortgaged Property relating to that Series. Claims of Noteholders and, if applicable, any counterparty to a Swap Agreement shall rank in accordance with the priorities specified in the relevant Supplemental Trust Deed. |

Notes may constitute either subordinated or unsubordinated obligations of the relevant Issuer. The terms relating to issues of subordinated Notes will be set out in the relevant Final Terms.

**Status of other Obligations:** Loans, Options, Schuldscheine and Swaps will be limited-recourse obligations of the Issuer secured in the manner described in the relevant Obligation Documents. Loans and Schuldscheine may constitute either subordinated or unsubordinated obligations of the relevant Issuer as described in the relevant Obligation Documents.

**Restrictions and covenants:** So long as any of the Obligations of a relevant Issuer remain outstanding, such Issuer will not, *inter alia*:

(a) engage in any business whatsoever, other than acquiring and holding Mortgaged Property, issuing Notes or creating other Obligations or entering into a similar limited-recourse transaction, entering into related agreements and transactions and performing any act incidental to or necessary in connection with any of the foregoing;

(b) dispose of any Mortgaged Property or any interest therein, or create any mortgage, charge or other security interest or right of recourse in respect thereof in favour of any person (other than (x) the security referred to above or any similar limited-recourse transaction (whether such limited-recourse transaction is by means of a debt issue or by loan, option or swap) entered into by the relevant Issuer in the future with the consent of the Trustee and the Swap Counterparty as provided below and (y) in connection with a transfer under the Swap Agreement);

(c) cause or permit the Swap Agreement or Credit Enhancement Agreement to which it is party or the priority of the security interests created by the Trust Deed to be amended, terminated or discharged (other than in connection with a transfer under the Swap Agreement);

(d) release any party to the Swap Agreement (other than in connection with a transfer under the Swap Agreement), any Credit Enhancement Agreement or the Trust Deed from any existing obligations thereunder;

(e) have any subsidiaries (other than in connection with any substitution of the principal debtor under the Obligations);

(f) consent to any variation of, or exercise any powers or consent or waiver pursuant to, the terms of the Swap Agreement or Credit Enhancement Agreement, the conditions of the Notes, the Trust

Deed or any other agreement relating to the issue of the Notes, any Obligation Document constituting any other Obligation or any related transactions;

(g)    (to the extent the same is within the control of the relevant Issuer) consolidate or merge with any other person or convey or transfer its properties or assets substantially as an entirety to any person;

(h)    have any employees;

(i)    (to the extent the same is within the control of the relevant Issuer) pay any dividends or make any distribution to its shareholders;

(j)    open or have any interest in any account whatsoever with any bank or financial institution unless such account relates to the Notes or the Mortgaged Property (as defined in the Trust Deed), any other Obligation or any party thereto, save where such account or the relevant Issuer's interest therein is simultaneously charged in favour of the Trustee so as to form part of the Mortgaged Property or save where such account is opened in connection with the administration and management of the Issuer and only moneys necessary to the administration and management of the Issuer are credited to such account; or

(k)    (to the extent the same is within the control of the Issuer) issue or allot shares to persons other than such shares as were in issue on the date of the issuer's incorporation.

See "Terms and Conditions of the Notes - Mortgaged Property, Realisation of Mortgaged Property and Restrictions".

| | |
|---|---|
| **Cross Default:** | None. |
| **Withholding Tax:** | All payments of principal and interest by the Issuers in respect of Notes, Coupons, Loans and Schuldscheine will be made subject to any deduction for or on account of withholding taxes imposed on any such payments and taxes imposed as a result of the European Council Directive 2003/48/EC or any other European Union Directive on the taxation of savings implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000 or any law implementing or complying with, or introduced in order to conform to, such Directive or any other law introduced as a consequence of the adoption or implementation of such Directive. |

In the event of the imposition upon the Issuer of a requirement to withhold or account for tax or the imposition of a tax in respect of its income resulting in it being unable to make the payment of the full amount due in respect of the Notes, the

relevant Issuer will, subject to the Terms and Conditions of the Notes, use all reasonable endeavours to arrange for the substitution of its obligations by a company incorporated in another jurisdiction provided that, in relation to Notes which are rated, the Issuer shall notify the appropriate rating agency and that such change shall not adversely affect any existing rating of the Notes as confirmed in writing by the appropriate rating agency.

If the Issuer satisfies the Trustee that such substitution cannot be arranged, the Noteholders of each Series of Notes may elect to receive payments in respect of their particular Series net of withholding or deduction for, or on account of, any taxes, failing which the Issuer shall (if applicable and subject to the consent of the Trustee) redeem all, but not some only, of the Notes of that Series at their redemption amount together with accrued interest (if any).

**Governing Law:**      English

**Listing of Notes:**      Application has been made for certain Notes to be listed and admitted to trading on the regulated market of the Irish Stock Exchange. In addition, application may be made for certain series of Notes to be listed on any other exchange. As specified in the relevant Final Terms, a Series of Notes may be unlisted.

**Rating:**      The Programme is not rated but it is anticipated that Obligations to be issued under the Programme may be rated by Moody's and/or Standard & Poor's and/or Fitch. Where a Series of Notes is rated, such rating will be specified in the relevant Final Terms. A rating is not a recommendation to buy, sell or hold securities and may be subject to suspension, reduction or withdrawal at any time by the assigning rating agency.

**Selling Restrictions:**      United States, EEA, United Kingdom, Republic of Ireland, Luxembourg, Spain, Italy, Japan and any other restrictions relevant to any Series.

Each Specified Company will be Category 1 for the purposes of Regulation S under the Securities Act ("Regulation S").

The Notes will be issued in compliance with U.S. Treas. Reg. §1.163-5(c)(2)(i)(C) (the "C Rules") unless (i) the relevant Final Terms state that Notes are issued in compliance with U.S. Treas. Reg. §1.1.163-5(c)(2)(i)(D) (the "D Rules") or (ii) the Notes are issued other than in compliance with the C Rules or the D Rules but in circumstances in which the Notes will not constitute "registration required obligations" under the United States Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA") which circumstances will be referred to in the relevant Final Terms, as a transaction to which TEFRA is not applicable.

## RISK FACTORS

*The purchase of Notes may involve substantial risks and is suitable only for sophisticated investors who have the knowledge and experience in financial and business matters necessary to enable them to evaluate the risks and the merits of an investment in the Notes. Before making an investment decision, prospective purchasers of Notes should consider carefully, in the light of their own financial circumstances and investment objectives, all the information set forth in this Base Prospectus and, in particular, the considerations set forth below and in the applicable Final Terms.*

*The Issuer does not represent that the statements below regarding the risks of holding any Notes are exhaustive and the Issuer may be unable to pay interest, principal or other amounts on or in connection with any Notes for reasons other than those described below. The Issuer and the Dealers disclaim any responsibility to advise prospective investors of such risks as they exist at the date of this Base Prospectus or as they change from time to time.*

### General

This Base Prospectus identifies in general terms certain information that a prospective investor should consider prior to making an investment in the Notes. However, a prospective investor should conduct its own thorough analysis (including its own accounting, legal and tax analysis) prior to deciding whether to invest in any Notes issued under the Programme as any evaluation of the suitability for an investor of an investment in Notes issued under the Programme depends upon a prospective investor's particular financial and other circumstances, as well as on specific terms of the relevant Notes and, if it does not have experience in financial, business and investment matters sufficient to permit it to make such a determination, it should consult with its financial adviser prior to deciding to make an investment on the suitability of any Notes. This Base Prospectus is not, and does not purport to be, investment advice.

In particular, each prospective investor in Notes must determine, based on its own independent review and such professional advice as it deems appropriate under the circumstances, that its acquisition of the Notes (i) is fully consistent with its (or if it is acquiring the Notes in a fiduciary capacity, the beneficiary's) financial needs, objectives and condition, (ii) complies and is fully consistent with all investment policies, guidelines and restrictions applicable to it (whether acquiring the Notes as principal or in a fiduciary capacity) and (iii) is a fit, proper and suitable investment for it (or, if it is acquiring the Notes in a fiduciary capacity, for the beneficiary), notwithstanding the clear and substantial risks inherent in investing in or holding the Notes.

Each prospective investor in Notes should have sufficient financial resources and liquidity to bear all of the risks of an investment in the relevant Notes, including where principal or interest is payable in one or more currencies, or where the currency for principal or interest payments is different from the potential investor's currency.

Investment activities of certain investors are subject to investment laws and regulations, or review or regulation by certain authorities. Each prospective investor should therefore consult its legal advisers to determine whether and to what extent (i) the Notes are legal investments for it, (ii) if relevant, the Notes can be used as underlying securities for various types of borrowing and (iii) other restrictions apply to its purchase or, if relevant, pledge of any Notes. Financial institutions should consult their legal advisers or the appropriate regulators to determine the appropriate treatment of Notes under any applicable risk-based capital or similar rules.

### Factors that may affect the Issuer's ability to fulfil its obligations under Notes issued under the Programme

*The Issuer is a special purpose vehicle*

The Issuer's sole business is the raising of money by issuing notes or other obligations for the purposes of purchasing assets and entering into related derivatives and other contracts. The Issuer has covenanted not to have any subsidiaries or employees, consolidate or merge with any other person or issue any shares (other than such shares as were in issue on the date of its incorporation). As such, the Issuer has, and will have, no assets other than its issued and paid-up share capital, such fees (as agreed) payable to it in connection with the issue of Notes or entry into other obligations from time to time and any Mortgaged Property and any other assets on which Notes or other obligations are secured. There is no day to day management of the business of the Issuer.

*Regulation of the Issuer by any regulatory authority*

The Issuer is not required to be licensed, registered or authorised under any current securities, commodities or banking laws of its jurisdiction of incorporation and will operate without supervision by any authority in any jurisdiction. There is no assurance, however, that regulatory authorities in one or more jurisdictions would not take a contrary view regarding the applicability of any such laws to the Issuer. The taking of a contrary view by such regulatory authority could have an adverse impact on the Issuer or the holders of the Notes.

Any investment in the Notes does not have the status of a bank deposit and is not within the scope of any deposit protection scheme.

*Preferred creditors under Irish law*

Certain Specified Companies are Irish companies. Under Irish law, upon an insolvency of an Irish company, when applying the proceeds of assets subject to fixed security which may have been realised in the course of a liquidation or receivership, the claims of a limited category of preferential creditors will take priority over the claims of creditors holding the relevant fixed security. These preferred claims include the remuneration, costs and expenses properly incurred by any examiner of the company (which may include any borrowings made by an examiner to fund the company's requirements for the duration of his appointment) which have been approved by the Irish courts (see "Examinership" below).

In relation to the disposal of assets of any Irish tax resident company which are subject to security, a person entitled to the benefit of the security may be liable for tax in relation to any capital gains made by the company on a disposal of those assets on exercise of the security.

*Examinership*

Examinership is a court procedure available under the Irish Companies (Amendment) Act 1990, as amended to facilitate the survival of Irish companies in financial difficulties.

Where the Issuer is an Irish company, the Issuer, the directors of the Issuer, a contingent, prospective or actual creditor of the Issuer, or shareholders of the Issuer holding, at the date of presentation of the petition, not less than one-tenth of the voting share capital of the Issuer are each entitled to petition the court for the appointment of an examiner. The examiner, once appointed, has the power to set aside contracts and arrangements entered into by the company after his appointment and, in certain circumstances, can avoid a negative pledge given by the company prior to his appointment. Furthermore, he may sell assets the subject of a fixed charge. However, if such power is exercised he must account to the holders of the fixed charge for the amount realised and discharge the amount due to them out of the proceeds of sale.

During the period of protection, the examiner will compile proposals for a compromise or scheme of arrangement to assist the survival of the company or the whole or any part of its undertaking as a going concern. A scheme of arrangement may be approved by the Irish High Court when at least one class of creditors has voted in favour of the proposals and the Irish High Court is satisfied that such proposals are fair and equitable in relation to any class of members or creditors who have not accepted the proposals and whose interests would be impaired by implementation of the scheme of arrangement.

In considering proposals by the examiner, it is likely that secured and unsecured creditors would form separate classes of creditors. In the case of the Issuer, if the Trustee represented the majority in number and

value of claims within the secured creditor class (which would be likely given the restrictions agreed to by the Issuer in the Conditions), the Trustee would be in a position to reject any proposal not in favour of the Noteholders. The Trustee would also be entitled to argue at the Irish High Court hearing at which the proposed scheme of arrangement is considered that the proposals are unfair and inequitable in relation to the Noteholders, especially if such proposals included a writing down of the value of amounts due by the Issuer to the Noteholders. The primary risks to the holders of Notes if an examiner were to be appointed to the Issuer are as follows:

(i)     the potential for a scheme of arrangement to be approved involving the writing down of the debt owed by the Issuer to the Noteholders as secured by the Trust Deed;

(ii)    the potential for the examiner to seek to set aside any negative pledge in the Notes prohibiting the creation of security or the incurring of borrowings by the Issuer to enable the examiner to borrow to fund the Issuer during the protection period; and

(iii)   in the event that a scheme of arrangement is not approved and the Issuer subsequently goes into liquidation, the examiner's remuneration and expenses (including certain borrowings incurred by the examiner on behalf of the Issuer and approved by the Irish High Court) will take priority over the monies and liabilities which from time to time are or may become due, owing or payable by the Issuer to the Noteholders.

### Risks related to the structure of a particular issue of Notes

A wide range of Notes may be issued under the Programme. A number of these Notes may have features which contain particular risks for potential investors. Set out below is a description of certain such features. Potential purchasers of Notes should be aware that the range of Notes that may be issued under the Programme is such that the following statements are not exhaustive with respect to the types of Notes that may be issued under the Programme and any particular Series of Notes may have additional risks associated with it that are not described below.

*Variable Coupon Amount Notes*

The Issuer may issue Notes with principal or interest determined by reference to an index or formula, to changes in the prices of securities or commodities, to movements in currency exchange rates or other factors (each, a "Relevant Factor"). In addition, the Issuer may issue Notes with principal or interest payable in one or more currencies which may be different from the currency in which the Notes are denominated. Potential investors should be aware that:

(i)     the market price of such Notes may be volatile;

(ii)    they may receive no interest;

(iii)   payment of principal or interest may occur at a different time or in a different currency than expected;

(iv)    the amount of principal payable at redemption may be less than the nominal amount of such Notes or even zero;

(v)     a Relevant Factor may be subject to significant fluctuations that may not correlate with changes in interest rates, currencies or other indices;

(vi)    if a Relevant Factor is applied to Notes in conjunction with a multiplier greater than one or contains some other leverage factor, the effect of changes in the Relevant Factor on principal or interest payable likely will be magnified; and

(vii)   the timing of changes in a Relevant Factor may affect the actual yield to investors, even if the average level is consistent with their expectations. In general, the earlier the change in the Relevant Factor, the greater the effect on yield.

*Partly-paid Notes*

The Issuer may issue Notes where the issue price is payable in more than one instalment. Failure to pay any subsequent instalment could result in an investor losing all of its investment.

*Notes issued at a substantial discount or premium*

The Issuer may issue Notes at either a substantial discount or premium. The market values of securities issued at a substantial discount or premium to their nominal amount tend to fluctuate more in relation to general changes in interest rates than do prices for conventional interest-bearing securities. Generally, the longer the remaining term of the securities, the greater the price volatility as compared to conventional interest-bearing securities with comparable maturities.

## Risks relating to the Notes generally

Set out below is a brief description of certain risks relating to the Notes generally:

*Limited recourse obligations*

The Notes are direct, secured, limited recourse obligations of the Issuer payable solely out of the assets charged by the Issuer in favour of the Trustee on behalf of the Noteholders and other secured parties. The Issuer will have no other assets or sources of revenue available for payment of any of its obligations under the Notes. The Noteholders will have no right to take title to, or possession of, the charged assets unless the Trustee, having become bound to do so, fails or neglects to take action against the Issuer and such failure or neglect is continuing. No assurance can be made that the proceeds available for and allocated to the repayment of the Notes at any particular time will be sufficient to cover all amounts that would otherwise be due and payable in respect of the Notes. If the proceeds of the realisation of the charged assets received by the Trustee for the benefit of the Noteholders prove insufficient to make payments on the Notes, no other assets will be available for payment of the shortfall, and, following distribution of the proceeds of such realisation, the Issuer will have no further obligation to pay any amounts in respect of such shortfall and accordingly no debt will be owed by the Issuer in respect of any such shortfall.

Further, the Trustee and the Noteholders will not be entitled at any time to institute, or join with any other person in bringing, instituting or joining, insolvency proceedings (whether court based or otherwise) in relation to the Issuer.

No person other than the Issuer will be obliged to make payments on the Notes.

*Taxation and no gross up*

Each Noteholder will assume and be solely responsible for any and all taxes of any jurisdiction or governmental or regulatory authority, including, without limitation, any state or local taxes or other like assessment or charges that may be applicable to any payment to it in respect of the Notes. In the event that any withholding tax or deduction for tax is imposed on payments of interest on the Notes, the Noteholders will not be entitled to receive grossed-up amounts to compensate for such withholding tax and no Event of Default shall occur as a result of any such withholding or deduction.

*Modification, waivers and substitution*

The conditions of the Notes contain provisions for calling meetings of Noteholders to consider matters affecting their interests generally. These provisions permit defined majorities to bind all Noteholders including Noteholders who did not attend and vote at the relevant meeting and Noteholders who voted in a manner contrary to the majority.

The Trustee may, in certain circumstances, without the consent of Noteholders, (i) agree to any modification of, or the waiver or authorisation of any breach or proposed breach of, any of the provisions of Notes or (ii) determine without the consent of the Noteholders that any Event of Default or potential Event of Default shall

not be treated as such or (iii) agree to the substitution of another company as principal debtor under any Notes in place of the Issuer.

*Early Redemption for tax or legal reasons*

The Issuer may for specified tax or legal reasons, as detailed in Condition 6(d), upon giving notice to Noteholders, redeem all Notes earlier than the Maturity Date. If the Issuer redeems Notes early in such circumstances, the Issuer will, if and to the extent permitted by applicable law, pay each Noteholder the Early Redemption Amount on the date specified in the Conditions. Such Early Redemption Amount is not principally protected and will be calculated in accordance with the Conditions.

*Priority of claims*

The ranking of the relative claims of, *inter alios*, the Noteholders and the Swap Counterparty (if any) over the Mortgaged Property will be specified in the applicable Final Terms. The claims of the Swap Counterparty (if any) may rank senior to those of Noteholders. The claims of the Trustee for its fees and expenses rank senior to the claims of the Noteholders.

*Change of law*

The Conditions of the Notes are governed by English law in effect as at the date of issue of the relevant Notes. No assurance can be given as to the impact of any possible judicial decision or change to English law or administrative practice after the date of issue of the relevant Notes.

*Integral multiples of less than €50,000*

Although Notes which are admitted to trading on a regulated market within the European Economic Area or offered to the public in a Member State of the European Economic Area in circumstances which require the publication of a prospectus under the Prospectus Directive are required to have a minimum denomination of €50,000 (or its equivalent in any other currency as at the date of issue of the relevant Notes), it is possible that the Notes may be traded in the clearing systems in amounts in excess of €50,000 (or its equivalent) that are not integral multiples of €50,000 (or its equivalent). In such a case, should definitive Notes be required to be issued, Noteholders who hold Notes in the relevant clearing system in amounts that are not integral multiples of a specified denomination may need to purchase or sell, on or before the relevant Exchange Date, a principal amount of Notes such that their holding is an integral multiple of a specified denomination.

*Provision of Information*

Neither the Issuer, the Trustee, the Dealers nor any affiliate of such persons makes any representation as to the credit quality of any Swap Counterparty, Swap Guarantor, Credit Support Provider or obligor of any Collateral. Any of such persons may have acquired, or during the term of the Notes may acquire, non-public information with respect to any Swap Counterparty, Swap Guarantor, Credit Support Provider or obligor of any Collateral. None of such persons is under any obligation to make such information directly available to Noteholders. None of such persons is under any obligation to make available any information relating to, or keep under review on the Noteholders' behalf, the business, financial conditions, prospects, creditworthiness or state of affairs of the obligors of the Collateral or conduct any investigation or due diligence into the obligors of the Collateral.

## Risks relating to the Collateral

*No investigations*

Unless otherwise specified in the applicable Final Terms, no investigations, searches or other enquiries will be made by or on behalf of the Issuer or the Trustee in respect of the Collateral and no representations or warranties, express or implied, will be given by the Issuer, the Dealer, the Trustee or any other person on their behalf in respect of the Collateral.

*Collateral*

Depending on the nature of Collateral in respect of the relevant Notes, Noteholders may be exposed to the market price of the Collateral. The Issuer may have to fund its payments by the sale of Collateral at a market value and the nominal amount of the Collateral will be reduced by the principal amount of the Collateral sold. The market price of the Collateral will generally fluctuate with, among other things, the liquidity and volatility of the financial markets, general economic conditions, domestic and international political events, developments or trends in a particular industry and the financial condition of the issuer of the Collateral.

*Early Redemption for Collateral default*

If, in respect of any Notes, any of the Collateral becomes repayable prior to its stated date of maturity for whatever reason or (unless the Trustee otherwise agrees) there is a payment default (after the expiry of any grace period specified in the terms and conditions of the Collateral in existence as at the later of the issue date of the Notes and the date on which such Collateral was issued) in respect of any of the Collateral, the Issuer shall give notice to the Trustee and Noteholders and upon expiry of such Notes shall redeem the Notes in whole or in part on the basis set out in Condition 6(c). The Notes are not principal protected in such circumstances and the amount payable to Noteholders will be calculated in accordance with the Conditions.

## Risks relating to the counterparties

*Reliance on creditworthiness of other parties*

If a Swap Agreement is entered into by the Issuer in connection with the Notes, the ability of the Issuer to meet its obligations under the Notes may depend on the receipt by it of payments under the Swap Agreement. Consequently, in such circumstances, the Issuer is exposed to the ability of the Swap Counterparty (if any) and, failing which, of the Swap Guarantor (if any) to perform their obligations in respect of the Swap Agreement (if any).

The receipt by the Issuer of payments under a Swap Agreement may also be dependent on the timely payment by the Issuer of its obligations under that Swap Agreement. The ability of the Issuer to make timely payment of its obligations under the relevant Swap Agreement may depend on receipt by it of the scheduled payments under the Collateral. Consequently, the Issuer may also be exposed to the ability of the issuer of the Collateral to perform its payment obligations.

If acquired, Collateral will be held in an account of, and in the name of, the Custodian. Where Collateral consists of assets other than securities, it may be held in the name of or under the control of the Custodian or in such other manner as is approved by the Trustee. The Custodian may be responsible under the Agency Agreement for receiving payments on the Collateral and remitting them as may be required in the context of the relevant Notes.

*Trustee conflicts of interest*

In connection with the exercise of its functions, the Trustee shall have regard to the interests of the Noteholders as a class and shall not have regard to the consequences of such exercise for individual Noteholders or Couponholders and the Trustee shall not be entitled to require, nor shall any Noteholder or Couponholder be entitled to claim, from the Issuer any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders or Couponholders.

In acting as Trustee under the Trust Deed, the Trustee shall not, in respect of Notes of any Series, assume any duty or responsibility to any Swap Counterparty (other than to pay to any Swap Counterparty any moneys received and payable to it and to act in accordance with the provisions of Condition 4) or any Credit Enhancement Provider and shall have regard solely to the interests of the Noteholders and shall not be obliged to act on any directions of the Swap Counterparty if this would in the Trustee's opinion be contrary to the interests of the Noteholders or Couponholders.

*Business relationships and capacity of Lehman Brothers International (Europe)*

A05340159                                                    - 19 -

The Issuer, Lehman Brothers International (Europe) and any of its affiliates may have existing or future business relationships with any Swap Counterparty, Swap Guarantor, Credit Enhancement Provider or obligor of any Collateral (including, but not limited to, lending, depository, risk management, advisory and banking relationships), and will pursue actions and take steps that they deem or it deems necessary or appropriate to protect their or its interests arising therefrom without regard to the consequences for a Noteholder. In addition, the Issuer, Lehman Brothers International (Europe) and any of its affiliates may make a market or hold positions in respect of any of the Collateral relating to any particular transaction. From time to time, Lehman Brothers International (Europe) and its affiliates may own significant amounts of Notes issued under the Programme.

Lehman Brothers International (Europe) and its affiliates may act in a number of capacities in respect of Notes issued under the Programme including, without limitation, Dealer, Calculation Agent, Swap Counterparty, Swap Guarantor and Disposal Agent. Lehman Brothers International (Europe) and its affiliates acting in such capacities in connection with such Notes shall have only the duties and responsibilities expressly agreed to by such entities in the relevant capacity and shall not, by virtue of acting in any other capacity, be deemed to have other duties or responsibilities or be deemed to hold a standard of care other than as expressly provided with respect to each such capacity. Lehman Brothers International (Europe) and its affiliates in their various capacities in connection with the Notes may enter into business dealings, from which they may derive revenues and profits in addition to any fees, without any duty to account therefor.

*Legality of purchase*

None of the Issuer, the Trustee, Lehman Brothers International (Europe) nor any affiliate of such persons has or assumes responsibility for the lawfulness of the acquisition of the Notes by a prospective purchaser of the Notes (whether for its own account or for the account of any third party), whether under the laws of the jurisdiction of its incorporation or the jurisdiction in which it operates (if different), or for compliance by that prospective purchaser (or any such third party) with any law, regulation or regulatory policy applicable to it.

### Risks related to the market generally

Set out below is a brief description of certain market risks:

*The secondary market generally*

Notes may have no established trading market when issued, and one may never develop. If a market does develop, it may not be liquid. Therefore, investors may not be able to sell their Notes easily or at prices that will provide them with a yield comparable to similar investments that have a developed secondary market. This is particularly the case for Notes that are especially sensitive to interest rate, currency or market risks, are designed for specific investment objectives or strategies or have been structured to meet the investment requirements of limited categories of investors. These types of Notes generally would have a more limited secondary market and more price volatility than conventional debt securities. Illiquidity may have a severely adverse effect on the market value of Notes.

*Exchange rate risks and exchange controls*

The Issuer will pay principal and interest on Notes issued under the Programme in the currency for such Notes. This presents certain risks relating to currency conversions if an investor's financial activities are denominated principally in a currency or currency unit (the "Investor's Currency") other than the specified currency. These include the risk that exchange rates may significantly change (including changes due to devaluation of the specified currency or revaluation of the Investor's Currency) and the risk that authorities with jurisdiction over the Investor's Currency may impose or modify exchange controls. An appreciation in the value of the Investor's Currency relative to the specified currency would decrease (1) the Investor's Currency-equivalent yield on the Notes, (2) the Investor's Currency equivalent value of the principal payable on the Notes and (3) the Investor's Currency equivalent market value of the Notes.

Government and monetary authorities may impose (as some have done in the past) exchange controls that could adversely affect an applicable exchange rate. As a result, investors may receive less interest or principal than expected, or no interest or principal.

*Interest rate risks*

Investment in Notes issued under the Programme may involve the risk that subsequent changes in market interest rates may adversely affect the value of the Notes.

*Credit ratings may not reflect all risks*

One or more independent credit rating agencies may assign credit ratings to an issue of Notes. The ratings may not reflect the potential impact of all risks related to structure, market, additional factors discussed above, and other factors that may affect the value of the Notes. A credit rating is not a recommendation to buy, sell or hold securities and may be revised or withdrawn by the rating agency at any time.

TERMS AND CONDITIONS OF THE NOTES

*The following is the text of the terms and conditions that, subject to completion and amendment and as supplemented or varied in accordance with the provisions of the relevant Final Terms in relation to a particular Series of Notes, shall be applicable to the Notes in definitive form (if any) issued in exchange for the Global Note(s) representing each Series. Either (i) the full text of these terms and conditions together with the relevant provisions of the Final Terms or (ii) these terms and conditions, as so completed, amended, supplemented or varied (and subject to simplification by the deletion of non-applicable provisions), shall be endorsed on such Bearer Notes or on the Certificates relating to such Registered Notes. All capitalised terms that are not defined in these Conditions will have the meanings given to them in the Principal Trust Deed and/or the relevant Supplemental Trust Deed. Those definitions will be endorsed on the Definitive Notes or Certificates, as the case may be. References in the conditions to "Notes" are to the Notes of one Series of a relevant Issuer only, not to all Notes that may be issued under the Programme and references to the "Issuer" are to the Specified Company that is stipulated as such in the relevant Final Terms.*

*These Conditions may be amended, modified, or varied in relation to any Series of Notes by the terms of the relevant Supplemental Trust Deed in relation to such Series. Italicised text set out herein does not form part of the Conditions and is set out for information purposes only.*

The Notes are constituted and secured by a relevant supplemental trust deed (the "relevant Supplemental Trust Deed"), dated the date of issue of the Notes (the "Issue Date"), between the Issuer, J.P. Morgan Corporate Trustee Services Limited (the "Trustee", which expression shall include all persons for the time being the trustee or trustees under the Trust Deed (as defined below) as trustee for, *inter alia*, the Noteholders (as defined below) and, if applicable, the persons specified therein as a Swap Counterparty (as defined in Condition 3(a)). The relevant Supplemental Trust Deed is supplemental to a principal trust deed dated 10 October 2002 as amended and restated on 22 July 2005 and made between Dante Finance plc (the "First Issuer") and the Trustee (the "Principal Trust Deed", which expression shall include any amendments or supplements thereof and together with the relevant Supplemental Trust Deed, the "Trust Deed"). These terms and conditions include summaries of, and are subject to, the detailed provisions of the Trust Deed, which includes the form of the Bearer Notes, Certificates, Receipts, Coupons and Talons referred to below. An agency agreement dated 10 October 2002 as amended and restated on 22 July 2005 has been entered into in relation to the Notes between the First Issuer, the Trustee, JPMorgan Chase Bank, N.A. as, *inter alia*, initial issuing and paying agent and as custodian and the other agents named in it (as amended or supplemented as at the Issue Date, the "Agency Agreement"). The issuing and paying agent, the custodian, the paying agents, the registrar, the transfer agents and the calculation agent(s) for the time being (if any) are referred to below respectively as the "Issuing and Paying Agent", the "Custodian", the "Paying Agents" (which expression shall include the Issuing and Paying Agent), the "Registrar", and the "Transfer Agents" (which expression shall include the Registrar). A Programme Agreement dated 10 October 2002 as amended and restated on 22 July 2005 has been entered into in relation to the Notes between the First Issuer and Lehman Brothers International (Europe) as Dealer (the "Dealer") and where appropriate as Arranger (the "Arranger") in relation to a particular series, the Trustee, the Issuing and Paying Agent and Registrar (the "Programme Agreement"). The Issuer (save for the First Issuer) has acceded to the Principal Trust Deed, the Agency Agreement and the Programme Agreement pursuant to a Deed of Accession dated on or before the Issue Date. Copies of the Principal Trust Deed, the Agency Agreement and the Programme Agreement are available for inspection during usual business hours, at the principal office of the Trustee (presently at Trinity Tower, 9 Thomas More Street, London E1W 1YZ) and at the specified offices of the Paying Agents and the Transfer Agents.

The Noteholders, the holders (the "Couponholders") of the interest coupons (the "Coupons") appertaining to interest bearing Bearer Notes and, where applicable in the case of such Notes, talons for further Coupons (the "Talons") and the holders of the receipts for the payment of instalments of principal (the "Receipts") relating to Bearer Notes of which the principal is payable in instalments are entitled to the benefit of, are bound by,

and are deemed to have notice of, all the provisions of the Trust Deed and are deemed to have notice of those provisions applicable to them of the Agency Agreement and the Programme Agreement.

Under the Principal Trust Deed the Issuer may also borrow under, buy, sell or enter into other secured obligations in the form of loans ("Loans"), options ("Options"), schuldscheine ("Schuldscheine") or swaps ("Swaps") (each, including the obligations under the Notes, an "Obligation").

References in these Conditions to "Mortgaged Property" are to the assets and agreements comprising the mortgaged property upon which the Notes are secured as described in the Final Terms.

*Full details of the relevant Mortgaged Property will be set out in the relevant Final Terms.*

If so specified in the relevant Supplemental Trust Deed, the Issuer has, in relation to the Notes, entered into one or more interest rate and currency exchange transactions confirmed in a Swap Agreement (as defined in Condition 3(a)) with a Swap Counterparty with an effective date as of the Issue Date.

## 1    Form, Denomination and Title

The Notes are issued in bearer form ("Bearer Notes", which expression includes Notes that are specified to be Exchangeable Bearer Notes), in registered form ("Registered Notes") or in bearer form exchangeable for Registered Notes ("Exchangeable Bearer Notes") in each case in the denomination(s) shown thereon provided that in the case of any Notes which are to be admitted to trading on a regulated market within the European Economic Area or offered to the public in a Member State of the European Economic Area in circumstances which require the publication of a Prospectus under the Prospectus Directive (Directive 2003/71/EC), the minimum denomination shall be €50,000 (or its equivalent in any other currency as at the date of issue of those Notes).

All Registered Notes shall have the same denomination. Where Exchangeable Bearer Notes are issued, the Registered Notes for which they are exchangeable shall have the same denomination as the lowest denomination of Exchangeable Bearer Notes.

*So long as the Notes are represented by a temporary Global Note, permanent Global Note or Global Certificate and the relevant clearing system(s) so permit, the Notes shall be tradeable only in principal amounts of at least the denomination shown (or if more than one denomination, the lowest denomination) provided hereon and integral multiples of the Tradeable Amounts provided in the relevant Final Terms.*

Bearer Notes are serially numbered and are issued with Coupons (and, where appropriate, a Talon) attached, save in the case of Notes that do not bear interest in which case references to interest (other than in relation to interest due after the Maturity Date (as defined in the relevant Final Terms )), Coupons and Talons in these Conditions are not applicable. Any Bearer Note the principal amount of which is redeemable in instalments is issued with one or more Receipts attached.

Registered Notes are represented by registered certificates ("Certificates") and, save as provided in Condition 2(c), each Certificate shall represent the entire holding of Registered Notes by the same holder.

Title to the Bearer Notes and the Receipts, Coupons and Talons shall pass by delivery. Title to the Registered Notes shall pass by registration in the register that the Issuer shall procure to be kept by the Registrar in accordance with the provisions of the Agency Agreement (the "Register"). Except as ordered by a court of competent jurisdiction or as required by law, the holder (as defined below) of any Note, Receipt, Coupon or Talon shall be deemed to be and may be treated as its absolute owner for all purposes whether or not it is overdue and regardless of any notice of ownership, trust or an interest in it, any writing on it (or on the Certificate representing it) or its theft or loss (or that of the related Certificate) and no person shall be liable for so treating the holder.

In these Conditions, "Noteholder" means the bearer of any Bearer Note and the Receipts relating to it or the person in whose name a Registered Note is registered (as the case may be), "holder" (in relation to a Note, Receipt, Coupon or Talon) means the bearer of the Bearer Note, Receipt, Coupon or Talon or the person in

whose name a Registered Note is registered (as the case may be) and capitalised terms have the meanings given to them herein, the absence of any such meaning indicating that such term is not applicable to the Notes.

## 2   Exchanges of Exchangeable Bearer Notes and Transfers of Registered Notes

### (a)   *Exchange of Exchangeable Bearer Notes*

Subject as provided in Condition 2(f), Exchangeable Bearer Notes may be exchanged for the same aggregate principal amount of Registered Notes at the request in writing of the relevant Noteholder and upon surrender of each Exchangeable Bearer Note to be exchanged, together with all unmatured Receipts, Coupons and Talons relating to it, at the specified office of any Transfer Agent; provided, however, that where an Exchangeable Bearer Note is surrendered for exchange after the Record Date (as defined in Condition 7(b)) for any payment of interest, the Coupon in respect of that payment of interest need not be surrendered with it. Registered Notes may not be exchanged for Bearer Notes. Bearer Notes of one denomination may not be exchanged for Bearer Notes of another denomination. Bearer Notes that are not Exchangeable Bearer Notes may not be exchanged for Registered Notes.

### (b)   *Transfer of Registered Notes*

One or more Registered Notes may be transferred upon the surrender (at the specified office of the Registrar or any Transfer Agent) of the Certificate representing such Registered Notes to be transferred, together with the form of transfer endorsed on such Certificate duly completed and executed and any other evidence as the Registrar or Transfer Agent may reasonably require. In the case of a transfer of part only of a holding of Registered Notes represented by one Certificate, a new Certificate shall be issued to the transferee in respect of the part transferred and a further new Certificate in respect of the balance of the holding not transferred shall be issued to the transferor.

### (c)   *Exercise of Options or Partial Redemption in Respect of Registered Notes*

In the case of an exercise of an Issuer's option in respect of, or a partial redemption of, a holding of Registered Notes represented by a single Certificate, a new Certificate shall be issued to the holder to reflect the exercise of such option or in respect of the balance of the holding not redeemed. In the case of a partial exercise of an option resulting in Registered Notes of the same holding having different terms, separate Certificates shall be issued in respect of those Notes of that holding that have the same terms. New Certificates shall only be issued against surrender of the existing Certificates to the Registrar or any Transfer Agent.

### (d)   *Delivery of New Certificates*

Each new Certificate to be issued pursuant to Conditions 2(a), (b) or (c) shall be available for delivery within five business days of receipt of the request for exchange, form of transfer or Exercise Notice or surrender of the Certificate for exchange. Delivery of the new Certificate(s) shall be made at the specified office of the Registrar or of the Transfer Agent (as the case may be) to whom delivery or surrender of such request for exchange, form of transfer, Exercise Notice or Certificate shall have been made or, at the option of the holder making such delivery or surrender as aforesaid and as specified in the relevant request for exchange, form of transfer, Exercise Notice or otherwise in writing, be mailed by uninsured post at the risk of the holder entitled to the new Certificate to such address as may be so specified, unless such holder requests otherwise and pays in advance to the Registrar or Transfer Agent the costs of such other method of delivery and/or such insurance as it may specify. In this Condition 2(d), "business day" means a day, other than a Saturday or Sunday, on which banks are open for business in the place of the specified office of the relevant Transfer Agent or the Registrar.

(e)     *Exchange Free of Charge*

Exchange and transfer of Notes and Certificates on registration, transfer, exercise of an option or partial redemption shall be effected without charge by or on behalf of the Issuer, the Registrar or the Transfer Agents, but upon payment of any tax or other governmental charges that may be imposed in relation to it (or the giving of such indemnity as the Registrar or the relevant Transfer Agent may require).

(f)     *Closed Periods*

No Noteholder may require the transfer of a Registered Note to be registered or an Exchangeable Bearer Note to be exchanged for one or more Registered Note(s) (i) during the period of 15 days ending on the due date for redemption of, or payment of any Instalment Amount (as defined in the relevant Final Terms) in respect of, that Note, (ii) during the period of 15 days prior to any date on which Notes may be called for redemption by the Issuer at its option pursuant to Condition 6(e), (iii) after any such Note has been called for redemption or (iv) during the period of seven days ending on (and including) any Record Date. An Exchangeable Bearer Note called for redemption may, however, be exchanged for one or more Registered Note(s) in respect of which the Certificate is simultaneously surrendered not later than the relevant Record Date.

## 3     Status and Non-applicability

(a)     *Status*

The Notes are secured, limited-recourse obligations of the Issuer, ranking *pari passu* without any preference among themselves, which are secured in the manner described in Condition 4 and recourse in respect of which is limited in the manner described in Condition 11. In connection with the issue of the Notes there may be executed one or more interest rate and/or currency exchange agreements (each a "Swap Agreement") between the Issuer and one or more swap counterparties (each a "Swap Counterparty") and one or more credit enhancement agreements (each a "Credit Enhancement Agreement") as further described in the relevant Supplemental Trust Deed.

(b)     *Non-applicability*

Where no reference is made in the relevant Supplemental Trust Deed to any Swap Agreement or Credit Enhancement Agreement, references in these Terms and Conditions to any such document or agreement and to any Swap Counterparty, as the case may be, shall not be applicable.

## 4     Mortgaged Property, Realisation of Mortgaged Property and Restrictions

(a)     *Mortgaged Property*

The Notes will be secured pursuant to the relevant Supplemental Trust Deed. The form of the Mortgaged Property may comprise some or all of the assets and assignments set out below.

(b)     *Secured Assets*

The obligations of the Issuer under the Trust Deed, the Notes and the Coupons are secured by a first fixed charge over certain bonds, warrants, notes, receivables or equity securities of any form, denomination, type or issuer, monoline guarantees, options, swaps, loans or any other financial obligations assigned to or assumed by the Issuer or any other agreed assets owned by the Issuer as specified in the relevant Supplemental Trust Deed (the "Collateral") and a first fixed charge on all funds held from time to time by the Custodian and/or by the Issuing and Paying Agent and/or the Registrar for payment of principal and interest on the Notes or of amounts due under the Swap Agreement. If so specified in the relevant Supplemental Trust Deed, the obligations of the Issuer under

any Swap Agreement are also secured by a first fixed charge over the Collateral. Unless otherwise specified in the relevant Supplemental Trust Deed, the Collateral is held by the Custodian on behalf of the Issuer subject to the charges set out in the Trust Deed. If so specified in the relevant Supplemental Trust Deed, under the terms of the Swap Agreement the Swap Counterparty may require all or part of the Collateral to be transferred to it as security for the performance of the Issuer's obligations to the Swap Counterparty under the terms of the Swap Agreement on terms that the Swap Counterparty will be required to return equivalent collateral or the market value thereof to the Issuer on or before the termination of the Swap Agreement (subject to any enforcement of such security). In such circumstances the security over the Collateral in respect of the Issuer's obligations under the Trust Deed, the Notes and the Coupons will be over the Issuer's rights against the Swap Counterparty in relation to the Collateral as aforesaid.

If so specified in the relevant Supplemental Trust Deed, the Issuer's obligations under the Trust Deed, the Notes and the Coupons are also secured by an assignment by way of security of the Issuer's rights under the Swap Agreement and/or the Credit Enhancement Agreement in favour of the Trustee for itself and for the benefit of the holders of the Notes, Coupons and Receipts.

Additionally, the obligations of the Issuer may be secured pursuant to a security document other than the Trust Deed (an "Other Security Document") as specified in the relevant Supplemental Trust Deed.

The Trustee shall (subject to the provisions of the relevant Supplemental Trust Deed and to sub-Clause 6.3 of the Principal Trust Deed) apply all moneys received by it under the provisions of the Principal Trust Deed and the relevant Supplemental Trust Deed in connection with the realisation or enforcement of the security constituted thereby and by any relevant Other Security Document:

(i)     *if "Swap Counterparty Priority" is specified in the relevant Supplemental Trust Deed:*

    (a)   first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

    (b)   secondly, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Custodian and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent;

    (c)   thirdly, rateably in meeting the claims (if any) of the Swap Counterparty under each Swap Agreement;

    (d)   fourthly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment; and

    (e)   fifthly, in payment of the balance (if any) to the Issuer,

provided that, if the "Swap Counterparty Priority" is expressed in the relevant Supplemental Trust Deed and Final Terms to be subject to adjustment on a Swap Counterparty default, and if and to the extent that the Swap Counterparty fails to make payments due to the Issuer under any Swap Agreement and the Issuer promptly notifies the Trustee in writing of any such failure (which notice shall be conclusive and binding), the above application of moneys shall be amended so that the claims of the Swap Counterparty will, to the extent that there has been such failure, rank after the claims (if any) of the holders of Notes, Coupons and Receipts and before the claims of the Issuer in relation to the balance (if any).

(ii)　　*if "Pari Passu Ranking" is specified in the relevant Supplemental Trust Deed:*

(a)　first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(b)　secondly, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Custodian and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent;

(c)　thirdly, rateably in meeting the claims (if any) of the Swap Counterparty under each Swap Agreement and the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment; and

(d)　fourthly, in payment of the balance (if any) to the Issuer.

(iii)　　*if "Noteholder Priority" is specified in the relevant Supplemental Trust Deed:*

(a)　first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(b)　secondly, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Custodian and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent;

(c)　thirdly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment;

(d)　fourthly, in meeting the claims (if any) of the Swap Counterparty under each Swap Agreement; and

(e)　fifthly, in payment of the balance (if any) to the Issuer.

(iv)　　if *"Other Priority"* is specified in the relevant Supplemental Trust Deed and Final Terms, the Trustee shall apply all moneys received by it under the provisions of the Principal Trust Deed and the relevant Supplemental Trust Deed in connection with the realisation or enforcement of the security constituted thereby, as set out in the relevant Supplemental Trust Deed and Final Terms.

*The applicable priority and ranking provisions in respect of each Series of Notes will be disclosed in the Final Terms.*

*To the extent that a Swap Counterparty fails to make payments due to the Issuer under any Swap Agreement, the Issuer would be unable to meet its obligations when due in respect of the Notes. In such event the Swap Agreement would be terminated and the Notes would become repayable together with interest accrued in accordance with Condition 10.*

(c)　　*Shareholdings*

*Details of the issued shares and the shareholders of the Issuer are as set out in the Issuer Disclosure Annex.*

If specified in the relevant Supplemental Trust Deed, the Issuer has entered into one or more Swap Agreements with the Swap Counterparty under which:

(i)     the Issuer will (subject to the terms thereof) make payments to the Swap Counterparty, on receipt by the Issuer of sums receivable by the Issuer on the Mortgaged Property; and

(ii)    the Swap Counterparty will make payments towards or equal to the obligations of the Issuer in respect of amounts due on the Notes.

*The terms of each Swap Agreement will, if applicable, be set out in the relevant Final Terms.*

*Swap Agreements may provide that the Swap Counterparty may transfer its rights and obligations under a Swap Agreement, as described in the relevant Supplemental Trust Deed, provided that, in relation to Notes that are rated by a rating agency, such transfer shall not adversely affect any existing rating of the Notes of that Series as confirmed in writing by the appropriate rating agency. The Trust Deed provides that, subject as provided therein, the Trustee shall agree to a transfer of the Swap Counterparty's rights and obligations under such Swap Agreement and shall agree to any amendment to such Swap Agreement to allow such transfer in such circumstances.*

(d)    *Disposal Agent*

If so specified in the relevant Supplemental Trust Deed, the Disposal Agent will act as disposal agent in relation to the disposal of the Collateral. Unless otherwise provided in the relevant Supplemental Trust Deed, the Disposal Agent may itself make an offer to purchase the Collateral.

(e)    *Realisation of the Mortgaged Property upon Enforcement*

In the event of the security over the Mortgaged Property constituted under the relevant Supplemental Trust Deed or by an Other Security Document becoming enforceable either in whole or in part, the Trustee may at its discretion and shall if so required in writing by the holders of at least one-fifth in aggregate principal amount of the Notes then outstanding (as defined in the Trust Deed) or if so directed by an Extraordinary Resolution (as defined in the Trust Deed) of the holders of the Notes, or, if sums are due to any Swap Counterparty (except in the case where action may be taken against any Swap Counterparty), if so directed in writing by any such Swap Counterparty, but without liability as to the consequence of such action on individual holders of Notes, Receipts or Coupons enforce the security. To do so it may, in its discretion, realise all or a part of the Collateral in a proportion equal to the proportion of the principal amount of the Notes which are subject to such acceleration, terminate any Swap Agreement *pro rata* in accordance with its terms and exercise any rights under a Credit Enhancement Agreement, provided that the Trustee shall not be required to take any action that would involve the Trustee in personal liability or expense unless indemnified to its satisfaction. On being so directed by the Trustee, the Disposal Agent shall use its reasonable endeavours to solicit offers from third parties to purchase the Collateral in accordance with the terms of the relevant Supplemental Trust Deed.

(f)    *Application of Proceeds*

The Trust Deed requires that the net proceeds of the security, after deduction of the Trustee's expenses and remuneration and other amounts due to the Trustee and the Paying Agents and/or the Custodian and/or the Transfer Agent and/or the Calculation Agent and/or the Disposal Agent and any taxes required to be paid prior to any such application, be applied in meeting claims of any Swap Counterparty and of the holders of the Notes, Receipts and Coupons, as specified in the relevant Supplemental Trust Deed.

(g) *Shortfall after Application of Proceeds*

If the net proceeds of realisation of the Mortgaged Property becoming enforceable under paragraph (f) above are not sufficient for the Issuer to make all payments due in respect of the Notes and the Coupons and for the Issuer to meet its obligations in respect of the termination of any Swap Agreement, the other assets of the Issuer will not be available for payment of any shortfall arising therefrom. Any such shortfall shall be borne by the holders of Notes, Coupons and Receipts and any Swap Counterparty as specified in the relevant Supplemental Trust Deed. The Issuer will not be obliged to make any further payment in excess of the net proceeds and accordingly no debt shall be owed by the Issuer in respect of any such shortfall remaining after realisation of the Mortgaged Property and application of the proceeds in accordance with the Trust Deed. None of the Trustee or any Swap Counterparty or any Noteholder may take any further action to recover such shortfall.

Failure to make any payment in respect of any such shortfall shall in no circumstances constitute an Event of Default under Condition 10.

(h) *Issuer's Rights as Holder of the Mortgaged Property*

The Issuer may, with the prior written consent of the Trustee or as directed by an Extraordinary Resolution of the Noteholders, (i) take such action in relation to the Mortgaged Property as it thinks expedient and (ii) exercise the rights incidental to the ownership of the Mortgaged Property. In particular, the Issuer may exercise (without responsibility for such exercise) any voting rights in respect of such property and all rights to enforce it. The Issuer will not exercise any rights with respect to the Mortgaged Property unless it has the Trustee's consent or is directed by an Extraordinary Resolution of the holders of the Notes and, if such direction or consent is given, the Issuer will act only in accordance with such direction or consent.

(i) *Restrictions on Further Issues and Transactions*

The Issuer shall be at liberty from time to time (without the consent of the Noteholders or the Couponholders, but provided that the Trustee is satisfied that the restrictions contained in this Condition will be complied with) to issue further bonds and notes (which may be consolidated and form a single series with the Notes if issued in accordance with paragraph (j) of this Condition) and to borrow under, buy, sell or enter into other secured Obligations in the form of Loans, Options, Schuldscheine or Swaps. Such further bonds, notes and other secured Obligations (other than those obligations that are not, in the opinion of the Trustee, material in the context thereof and in respect of which another party has made arrangements to discharge the Issuer from claims related thereto) must be secured (save in the case of (i) such further bonds or notes forming a single series with the Notes or other existing bonds, notes or other secured Obligations and (ii) Obligations which, at the time of their issue or effective date, provide that other Obligations may be secured upon the same assets as those on which such Obligations are secured) on assets of the Issuer other than the Mortgaged Property or the assets on which such other Obligations of the Issuer are secured or the Issuer's share capital and on terms in substantially the form contained in these Conditions and that provide for the extinction of all claims in respect of such bonds, notes and related Obligations after application of the proceeds of enforcement of the security over the assets on which such further bonds, notes and related Obligations are secured (or arrangements have been entered into that, to the satisfaction of the Trustee, have a like result). Any further securities forming a single series with the outstanding securities of any series (including the Notes) constituted and secured by the Trust Deed or any deed supplemental and/or any Other Security Document to it shall, and any other securities may (with the prior written consent of the Trustee), be constituted and secured by the Trust Deed and/or any Other Security Document. The Trust Deed contains provisions for convening a single meeting of the Noteholders and the holders of securities of other series where the Trustee so decides.

(j)    *Restrictions on Fungible Issues*

The Issuer, if permitted under the Conditions, may from time to time (without the consent of the Noteholders or the Couponholders, but provided that the Trustee is satisfied that the restrictions contained in this Condition will be complied with) issue further bonds and notes that have, when issued, the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest thereon and any amendments made pursuant to (iii) below) and that are consolidated and form a single series with the Notes; provided that (unless otherwise approved by an Extraordinary Resolution (as defined in the Trust Deed) of the Noteholders), (i) the Issuer provides additional security for such new bonds or notes that comprises assets that are fungible with, and have the same proportionate composition as, the Mortgaged Property in respect of the relevant existing Notes and that has an aggregate principal amount at least equal to the principal amount of such existing security multiplied by a fraction, the numerator of which is the aggregate principal amount of such new bonds or notes and the denominator of which is the aggregate principal amount of the existing Notes; (ii) the Issuer enters into an additional or supplemental swap agreement or credit enhancement agreement varying the terms of the Swap Agreement or, as applicable, the Credit Enhancement Agreement to take account of the new bonds or notes on terms no less favourable than those of the Swap Agreement or, as applicable, the Credit Enhancement Agreement; and, in relation to Notes which are rated by a rating agency, (iii) in the case of an issue of portfolio credit linked notes, the Issuer amends the terms and conditions of the Notes to preserve the economic effect of a holding of the Notes (including, without limitation, by amending the Reference Entity Notional Amount, the Subordination Amount and, where applicable, by amending any Factor (howsoever such terms are defined in the relevant terms and conditions)) in each case solely so as to preserve the economic effect of a holding of the Notes, such amendments to be determined by the Calculation Agent and notified to the Issuer and (iv) such further bonds and notes shall not adversely affect any existing rating of the Notes as confirmed in writing by the appropriate rating agency. Upon issue of such new bonds or notes, the Notes and such new bonds or notes shall form a single series and be secured on the Mortgaged Property relating to the Notes and such additional security. Such further bonds or notes shall be constituted and secured by a further relevant supplemental trust deed.

(k)    *Restrictions on Indebtedness*

Save as provided above, so long as any of the Notes remains outstanding, the Issuer, without the prior written consent of the Trustee, shall not incur any other indebtedness for borrowed moneys or engage in any other business (other than acquiring and holding the Mortgaged Property in respect of each Series, creating further Obligations, as provided for in this Condition 4, entering into related transactions, subject to Condition 4*(i)* and performing any act incidental to or necessary in connection with the foregoing), shall not have any subsidiaries (except in connection with the substitution of the Issuer as principal obligor under the Notes) and shall not dispose of the Mortgaged Property or any part thereof or interest therein (other than in connection with a substitution of the Swap Counterparty).

(l)    *Covenants*

The Issuer has covenanted in the Principal Trust Deed that it will not, without the prior written consent of the Trustee, *inter alia*:

(i)    engage in any business whatsoever, other than acquiring and holding Mortgaged Property, issuing Notes or issuing further bonds and notes (which may be consolidated and form a single series with the Notes) or creating other Obligations or entering into similar limited-recourse transactions, entering into related agreements and transactions and performing any act incidental to or necessary in connection with any of the foregoing;

(ii)    dispose of the Mortgaged Property or any interest therein, or create any mortgage, charge or other security interest or right of recourse in respect thereof in favour of any person (other

than (x) the security referred to above or any similar limited-recourse transaction (whether such limited-recourse transaction is by means of a debt issue or by loan, option or swap) entered into by the Issuer in the future with the consent of the Trustee and the Swap Counterparty as provided below and (y) in connection with a transfer under the Swap Agreement);

(iii)     cause or permit the Swap Agreements or Credit Enhancement Agreements or the priority of the security interests created by the Trust Deed to be amended, terminated or discharged (other than in connection with a transfer under the Swap Agreement);

(iv)     release any party to the Swap Agreement (other than in connection with a transfer under the Swap Agreement), any Credit Enhancement Agreement, the Principal Trust Deed or any Supplemental Trust Deed from any existing obligations thereunder;

(v)      have any subsidiaries (other than in connection with any substitution of the obligor under the Notes and the Trust Deed);

(vi)     consent to any variation of, or exercise any powers or consent or waiver pursuant to, the terms of the Swap Agreements, any Credit Enhancement Agreement, the Conditions, the Principal Trust Deed, any Supplemental Trust Deed or other agreement relating to the issue of the Notes, any relevant documentation entered into in connection with the creation of other Obligations or any related transactions;

(vii)    (to the extent the same is within the control of the Issuer) consolidate or merge with any other person or convey or transfer its properties or assets substantially as an entirety to any person;

(viii)   have any employees;

(ix)     (to the extent the same is within the control of the Issuer) pay any dividends or make any distribution to its shareholders;

(x)      open or have any interest in any account whatsoever with any bank or financial institution unless such account relates to the Notes or any Mortgaged Property (as will be defined in the Trust Deed), any other Obligation or any party thereto, save where such account or the Issuer's interest therein is simultaneously charged in favour of the Trustee so as to form part of the Mortgaged Property or save where such account is opened in connection with the administration and management of the Issuer and only moneys necessary to the administration and management of the Issuer are credited to such account; or

(xi)     (to the extent the same is within the control of the Issuer) issue or allot shares to persons other than such shares as were in issue on the date of the incorporation of the Issuer.

## 5    Interest and Other Calculations

### (a)    *Interest Rate and Accrual*

Each Note bears interest on its outstanding principal amount from the Interest Commencement Date (as defined in the relevant Final Terms) at the rate per annum (expressed as a percentage) equal to the Interest Rate, such interest being payable in arrear on each Interest Payment Date.

Interest shall cease to accrue on each Note on the due date for redemption unless, upon due presentation, payment of principal is improperly withheld or refused, in which event interest shall continue to accrue (as well after as before judgment) at the Interest Rate in the manner provided in this Condition 5 to the Relevant Date. As used in these Conditions, "Relevant Date" in respect of any Note, Receipt or Coupon means the date on which payment in respect of it first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which payment in full of

the amount outstanding is made or (if earlier) the date seven days after that on which notice is duly given to the Noteholders that, upon further presentation of the Note (or relative Certificate), Receipt or Coupon being made in accordance with the Conditions, such payment will be made, provided that payment is in fact made upon such presentation.

*(b)*    *Business Day Convention*

If any date referred to in these Conditions that is specified to be subject to adjustment in accordance with a Business Day Convention would otherwise fall on a day that is not a Business Day, then, if the Business Day Convention specified is (i) the Floating Rate Business Day Convention, such date shall be postponed to the next day that is a Business Day unless it would thereby fall into the next calendar month, in which event (A) such date shall be brought forward to the immediately preceding Business Day and (B) each subsequent such date shall be the last Business Day of the month in which such date would have fallen had it not been subject to adjustment, (ii) the Following Business Day Convention, such date shall be postponed to the next day that is a Business Day, (iii) the Modified Following Business Day Convention, such date shall be postponed to the next day that is a Business Day unless it would thereby fall into the next calendar month, in which event such date shall be brought forward to the immediately preceding Business Day or (iv) the Preceding Business Day Convention, such date shall be brought forward to the immediately preceding Business Day.

*(c)*    *Interest Rate on Floating Rate Notes*

If the Interest Rate is specified as being Floating Rate, the Interest Rate for each Interest Accrual Period shall be determined in the manner specified hereon and the provisions below relating to either ISDA Determination or Screen Rate Determination shall apply, depending upon which is specified hereon:

(i)    ISDA Determination for Floating Rate Notes

Where ISDA Determination is specified hereon as the manner in which the Interest Rate is to be determined, the Interest Rate for each Interest Accrual Period shall be determined by the Calculation Agent as a rate equal to the relevant ISDA Rate. For the purposes of this sub-paragraph (i), "ISDA Rate" for an Interest Accrual Period means a rate equal to the Floating Rate that would be determined by the Calculation Agent under a Swap Transaction under the terms of an agreement incorporating the ISDA Definitions and under which:

(a)    the Floating Rate Option is as specified hereon;

(b)    the Designated Maturity is a period specified hereon; and

(c)    the relevant Reset Date is the first day of that Interest Accrual Period unless otherwise specified hereon.

For the purposes of this sub-paragraph (i), "Floating Rate", "Calculation Agent", "Floating Rate Option", "Designated Maturity", "Reset Date" and "Swap Transaction" have the meanings given to those terms in the ISDA Definitions.

(ii)    Screen Rate Determination for Floating Rate Notes

Where Screen Rate Determination is specified hereon as the manner in which the Interest Rate is to be determined, the Interest Rate for each Interest Accrual Period shall be determined by the Calculation Agent at or about the Relevant Time on the Interest Determination Date in respect of each Interest Accrual Period in accordance with the following:

(A)    if the Primary Source for the Floating Rate is a Page, subject as provided below, the Interest Rate shall be:

(x)    the Relevant Rate (where such Relevant Rate on such Page is a composite quotation or is customarily supplied by one entity); or

(y)    the arithmetic mean of the Relevant Rates of the persons whose Relevant Rates appear on that Page, in each case appearing on such Page at the Relevant Time on the Interest Determination Date;

(B)    if the Primary Source for the Floating Rate is Reference Banks or if sub-paragraph (A)(x) above applies and no Relevant Rate appears on the Page at the Relevant Time on the Interest Determination Date or if sub-paragraph (A)(y) above applies and fewer than two Relevant Rates appear on the Page at the Relevant Time on the Interest Determination Date, subject as provided below, the Interest Rate shall be the arithmetic mean of the Relevant Rates that each of the Reference Banks is quoting to major banks in the Relevant Financial Centre at the Relevant Time on the Interest Determination Date, as determined by the Calculation Agent;

(C)    if paragraph (B) above applies and the Calculation Agent determines that fewer than two Reference Banks are so quoting Relevant Rates, subject as provided below, the Interest Rate shall be the arithmetic mean of the rates per annum (expressed as a percentage) that the Calculation Agent determines to be the rates (being the nearest equivalent to the Benchmark) in respect of a Representative Amount of the Relevant Currency that at least two out of five leading banks selected by the Calculation Agent in the principal financial centre of the country of the Relevant Currency or, if the Relevant Currency is euro, in the Euro-zone as selected by the Calculation Agent (the "Principal Financial Centre") are quoting at or about the Relevant Time on the date on which such banks would customarily quote such rates for a period commencing on the Effective Date for a period equivalent to the Specified Duration (x) to leading banks carrying on business in Europe, or (if the Calculation Agent determines that fewer than two of such banks are so quoting to leading banks in Europe) (y) to leading banks carrying on business in the Principal Financial Centre; except that, if fewer than two of such banks are so quoting to leading banks in the Principal Financial Centre, the Interest Rate shall be the Interest Rate determined on the previous Interest Determination Date (after readjustment for any difference between any Margin, Rate Multiplier or Maximum or Minimum Interest Rate applicable to the preceding Interest Accrual Period and to the relevant Interest Accrual Period).

(d)    *Interest Rate on Zero Coupon Notes*

Where a Note the Interest Rate of which is specified to be Zero Coupon is repayable prior to the Maturity Date and is not paid when due, the amount due and payable prior to the Maturity Date shall be the Redemption Amount (as defined in the relevant Final Terms) of such Note. As from the Maturity Date, the Interest Rate for any overdue principal of such a Note shall be a rate per annum (expressed as a percentage) equal to the Amortisation Yield (as set out in Condition 6(b)).

(e)    *Margin, Maximum/Minimum Interest Rates, Instalment Amounts and Redemption Amounts, Rate Multipliers, and Rounding*

(i)    If any Margin or Rate Multiplier is specified hereon (either (x) generally, or (y) in relation to one or more Interest Accrual Periods), an adjustment shall be made to all Interest Rates, in the case of (x), or the Interest Rates for the specified Interest Accrual Periods, in the case of (y), calculated in accordance with (c) above by adding (if a positive number) or subtracting the absolute value (if a negative number) of such Margin or multiplying by such Rate Multiplier, subject always to the next paragraph.

(ii)      If any Maximum or Minimum Interest Rate, Instalment Amount or Redemption Amount is specified hereon, then any Interest Rate, Instalment Amount or Redemption Amount shall be subject to such maximum or minimum, as the case may be.

(iii)     For the purposes of any calculations required pursuant to these Conditions (unless otherwise specified), (x) all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point (with halves being rounded up), (y) all figures shall be rounded to seven significant figures (with halves being rounded up) and (z) all currency amounts that fall due and payable shall be rounded to the nearest unit of such currency (with halves being rounded up), save in the case of yen, which shall be rounded down to the nearest yen, and in the case of euro, which shall be rounded down to the nearest €0.01. For these purposes "unit" means the lowest amount of such currency that is available as legal tender in the country(ies) of such currency.

*(f)   Calculations*

The amount of interest payable in respect of any Note for any period shall be calculated by multiplying the product of the Interest Rate and the outstanding principal amount of such Note by the Day Count Fraction, unless an Interest Amount (or a formula for its calculation) is specified in respect of such period, in which case the amount of interest payable in respect of such Note for such period shall equal such Interest Amount (or be calculated in accordance with such formula). Where any Interest Period comprises two or more Interest Accrual Periods, the amount of interest payable in respect of such Interest Period shall be the sum of the amounts of interest payable in respect of each of those Interest Accrual Periods.

*(g)   Determination and Publication of Interest Rates, Interest Amounts, Redemption Amounts and Instalment Amounts*

As soon as practicable after the Relevant Time on each Interest Determination Date or such other time on such date as the Calculation Agent may be required to calculate any Redemption Amount or Instalment Amount, obtain any quote or make any determination or calculation, it shall determine the Interest Rate and calculate the amount of interest payable (the "Interest Amounts") in respect of each denomination of the Notes for the relevant Interest Accrual Period, calculate the Redemption Amount or Instalment Amount, obtain such quote or make such determination or calculation, as the case may be, and cause the Interest Rate and the Interest Amounts for each Interest Period and the relevant Interest Payment Date and, if required to be calculated, the Redemption Amount or any Instalment Amount to be notified to the Trustee, the Issuer, each of the Paying Agents, the Noteholders, any other Calculation Agent appointed in respect of the Notes that is to make a further calculation upon receipt of such information and, if the Notes are listed on a stock exchange and the rules of such exchange so require, such exchange as soon as possible after their determination but in no event later than (i) the commencement of the relevant Interest Period, if determined prior to such time, in the case of notification to such exchange of an Interest Rate and Interest Amount, or (ii) in all other cases, the fourth Business Day after such determination. Where any Interest Payment Date or Interest Period Date is subject to adjustment pursuant to Condition 5(b), the Interest Amounts and the Interest Payment Date so published may subsequently be amended (or appropriate alternative arrangements made with the consent of the Trustee by way of adjustment) without notice in the event of an extension or shortening of the Interest Period. If the Notes become due and payable under Condition 10, the accrued interest and the Interest Rate payable in respect of the Notes shall nevertheless continue to be calculated as previously in accordance with this Condition but no publication of the Interest Rate or the Interest Amount so calculated need be made unless the Trustee otherwise requires. The determination of each Interest Rate, Interest Amount, Redemption Amount and Instalment Amount, the obtaining of each quote and the making of each determination or calculation by the Calculation Agent(s) shall (in the absence of manifest error) be final and binding upon all parties. No Noteholders shall (in the

absence aforesaid) be entitled to proceed against the Reference Banks, the Calculation Agent, the Trustee or any of them in connection with the exercise or non-exercise by them of their powers, duties and discretions under this Condition 5.

*(h)*    *Determination or Calculation by Trustee*

If the Calculation Agent does not at any time for any reason determine or calculate the Interest Rate for an Interest Period or any Interest Amount, Instalment Amount or Redemption Amount, the Trustee shall do so (or shall appoint an agent on its behalf to do so) and such determination or calculation shall be deemed to have been made by the Calculation Agent. In doing so, the Trustee shall apply the foregoing provisions of this Condition, with any necessary consequential amendments, to the extent that, in its opinion, it can do so, and, in all other respects it shall do so in such manner as it shall deem fair and reasonable in all the circumstances.

*(i)*    *Definitions*

In these Conditions, unless the context otherwise requires, the following defined terms shall have the meanings set out below:

"Business Day" means:

(i)    in the case of a specified currency other than euro, a day (other than a Saturday or Sunday) on which commercial banks and foreign exchange markets settle payments in the principal financial centre for that currency; and/or

(ii)    in the case of euro, a day on which the TARGET system is open (a "TARGET Business Day"); and/or

(iii)    in the case of a specified currency and/or one or more specified financial centres, a day (other than a Saturday or a Sunday) on which commercial banks and foreign exchange markets settle payments in the specified currency or, if none is specified, generally in each of the financial centres so specified (which, in the case of Australian dollars, shall be Melbourne and Sydney).

"Day Count Fraction" means, in respect of the calculation of an amount of interest on any Note for any period of time (whether or not constituting an Interest Period, the "Calculation Period"):

(i)    if "Actual/365" or "Actual/Actual- ISDA" is specified hereon, the actual number of days in the Calculation Period divided by 365 (or, if any portion of that Calculation Period falls in a leap year, the sum of (A) the actual number of days in that portion of the Calculation Period falling in a leap year divided by 366 and (B) the actual number of days in that portion of the Calculation Period falling in a non-leap year divided by 365; provided that no adjustment shall be made for any portion of a Calculation Period falling in a leap year in the case of Notes denominated in Japanese yen or any other currency specified hereon);

(ii)    if "Actual/365 (Fixed)" is specified hereon, the actual number of days in the Calculation Period divided by 365;

(iii)    if "Actual/360" is specified hereon, the actual number of days in the Calculation Period divided by 360;

(iv)    if "30/360", "360/360" or "Bond Basis" is specified hereon, the number of days in the Calculation Period divided by 360 (the number of days to be calculated on the basis of a year of 360 days with 12 30-day months (unless (a) the last day of the Calculation Period is the 31st day of a month but the first day of the Calculation Period is a day other than the 30th or 31st day of a month, in which case the month that includes that last day shall not be considered to be shortened to a 30-day month, or (b) the last day of the Calculation Period is

the last day of the month of February, in which case the month of February shall not be considered to be lengthened to a 30-day month); and

(v)  if "30E/360" or "Eurobond Basis" is specified hereon, the number of days in the Calculation Period divided by 360 (the number of days to be calculated on the basis of a year of 360 days with 12 30-day months, without regard to the date of the first day or last day of the Calculation Period unless, in the case of a Calculation Period ending on the Maturity Date, the Maturity Date is the last day of the month of February, in which case the month of February shall not be considered to be lengthened to a 30-day month); and

(vi)  if "Actual/Actual- ISMA" is specified hereon:

(a)  if the Calculation Period is equal to or shorter than the Determination Period during which it falls, the number of days in the Calculation Period divided by the product of (x) the number of days in such Determination Period and (y) the number of Determination Periods normally ending in any year; and

(b)  if the Calculation Period is longer than one Determination Period, the sum of:

(x)  the number of days in such Calculation Period falling in the Determination Period in which it begins divided by the product of (1) the number of days in such Determination Period and (2) the number of Determination Periods normally ending in any year; and

(y)  the number of days in such Calculation Period falling in the next Determination Period divided by the product of (1) the number of days in such Determination Period and (2) the number of Determination Periods normally ending in any year

where:

"Determination Period" means the period from and including a Determination Date in any year to but excluding the next Determination Date.

"Effective Date" means, with respect to any Floating Rate to be determined on an Interest Determination Date, the date specified as such hereon or, if none is so specified, the first day of the Interest Accrual Period to which such Interest Determination Date relates.

"Euro-zone" means the region comprised of Member States of the European Union that adopt the single currency in accordance with the Treaty establishing the European Community, as amended by the Treaty on European Union.

"Interest" shall be deemed to include all Interest Amounts and all other amounts payable pursuant to Condition 5 or any amendment or supplement to it.

"Interest Accrual Period" means the period beginning on (and including) the Interest Commencement Date and ending on (but excluding) the first Interest Period Date and each successive period beginning on (and including) an Interest Period Date and ending on (but excluding) the next succeeding Interest Period Date.

"Interest Commencement Date" means the Issue Date or such other date as may be specified herein.

"Interest Determination Date" means, with respect to an Interest Rate and Interest Accrual Period, the date specified as such hereon or, if none is so specified, (i) the first day of such Interest Accrual Period if the Relevant Currency is Sterling or (ii) the day failing two Business Days in London for the Relevant Currency prior to the first day of such Interest Accrual Period if the Relevant Currency is neither Sterling nor euro or (iii) the day falling two TARGET Business Days prior to the first day of such Interest Accrual Period if the Relevant Currency is euro.

"Interest Period" means the period beginning on (and including) the Interest Commencement Date and ending on (but excluding) the first Interest Payment Date and each successive period beginning on (and including) an Interest Payment Date and ending on (but excluding) the next succeeding Interest Payment Date.

"Interest Period Date" means each Interest Payment Date unless otherwise specified hereon.

"Interest Rate" means the rate of interest payable from time to time in respect of this Note and that is either specified or calculated in accordance with the provisions hereon.

"ISDA Definitions" means the 2000 ISDA Definitions (as amended or supplemented from time to time) published by the International Swaps and Derivatives Association, Inc., unless otherwise specified hereon.

"Page" means such page, section, caption, column or other part of a particular information service (including, but not limited to, the Reuters Markets 3000 ("Reuters") and Telerate ("Telerate")) as may be specified for the purpose of providing a Relevant Rate, or such other page, section, caption, column or other part as may replace it on that information service or on such other information service, in each case as may be nominated by the person or organisation providing or sponsoring the information appearing there for the purpose of displaying rates or prices comparable to that Relevant Rate.

"Principal" shall be deemed to include any premium payable in respect of the Notes, all Instalment Amounts, Redemption Amounts, Amortised Face Amounts and all other amounts in the nature of principal payable pursuant to Condition 6 or any amendment or supplement to it.

"Reference Banks" means the institutions specified as such hereon or, if none, four major banks selected by the Calculation Agent in the inter-bank market (or, if appropriate, money, swap or over-the-counter index options market) that is most closely connected with the Benchmark (which if EURIBOR is the relevant Benchmark, shall be the Euro-Zone).

"Relevant Currency" means the currency specified hereon or, if none is specified, the currency in which the Notes are denominated.

"Relevant Financial Centre" means, with respect to any Floating Rate to be determined on an Interest Determination Date, the financial centre as may be specified as such hereon or, if none is so specified, the financial centre with which the relevant Benchmark is most closely connected (which, in the case of EURIBOR, shall be the Euro-zone) or, if none is so connected, London.

"Relevant Rate" means the Benchmark for a Representative Amount of the Relevant Currency for a period (if applicable or appropriate to the Benchmark) equal to the Specified Duration commencing the Effective Date.

"Relevant Time" means, with respect to any Interest Determination Date, the local time in the Relevant Financial Centre specified hereon or, if none is specified, the local time in the Relevant Financial Centre at which it is customary to determine bid and offered rates in respect of deposits in the Relevant Currency in the inter-bank market in the Relevant Financial Centre and for this purpose "local time" means with respect to Euro-Zone, as a Relevant Financial Centre, Central European Time.

"Representative Amount" means, with respect to any Floating Rate to be determined on an Interest Determination Date, the amount specified as such hereon as being representative for a single transaction in the relevant market at the time.

"Specified Duration" means, with respect to any Floating Rate to be determined on an Interest Determination Date, the duration specified hereon or, if none is specified, a period of time equal to the relative Interest Accrual Period, ignoring any adjustment pursuant to Condition 5(b).

"TARGET System" means the Trans-European Automated real-time Gross Settlement Express Transfer (TARGET) System or any successor thereto.

(j)   *Calculation Agent and Reference Banks*

The Issuer shall procure that there shall at all times be four Reference Banks (or such other number as may be required) with offices in the Relevant Financial Centre and one or more Calculation Agents if provision is made for them hereon and for so long as any Note is outstanding (as defined in the Trust Deed). If any Reference Bank (acting through its relevant office) is unable or unwilling to continue to act as a Reference Bank, then the Issuer shall (with the prior written approval of the Trustee) appoint another Reference Bank with an office in the Relevant Financial Centre to act as such in its place. Where more than one Calculation Agent is appointed in respect of the Notes, references in these Conditions to the Calculation Agent shall be construed as each Calculation Agent performing its respective duties under the Conditions. If the Calculation Agent is unable or unwilling to act as such or if the Calculation Agent fails duly to establish the Interest Rate for an Interest Period or to calculate any Interest Amount, Instalment Amount or the Redemption Amount or to comply with any other requirement, the Issuer shall (with the prior written approval of the Trustee) appoint a leading bank or investment banking firm engaged in the inter-bank market (or, if appropriate, money, swap or over-the-counter index options market) that is most closely connected with the calculation or determination to be made by the Calculation Agent (acting through its principal London office or any other office actively involved in such market) to act as such in its place. The Calculation Agent may not resign its duties without a successor having been appointed as aforesaid.

## 6   Redemption, Purchase and Options

(a)   *Redemption by Instalments and Final Redemption*

(i)   Unless previously redeemed or purchased and cancelled as provided in this Condition 6, each Note that provides for Instalment Dates and Instalment Amounts shall be partially redeemed on each Instalment Date at the related Instalment Amount specified hereon. The outstanding principal amount of each such Note shall be reduced by the Instalment Amount (or, if such Instalment Amount is calculated by reference to a proportion of the principal amount of such Note, such proportion) for all purposes with effect from the related Instalment Date, unless payment of the Instalment Amount is improperly withheld or refused on presentation of the related Receipt, in which case, such amount shall remain outstanding until the Relevant Date relating to such Instalment Amount.

(ii)   Unless previously redeemed, purchased and cancelled as provided below, each Note shall be finally redeemed on the Maturity Date specified hereon at its Redemption Amount (which, unless otherwise provided herein, is its principal amount) or, in the case of a Note falling within paragraph (i) above, its final Instalment Amount. Notes with no final maturity date will only be redeemable or repayable in accordance with the following provisions of this Condition 6 or Condition 10.

(b)   *Early Redemption of Zero Coupon Notes*

(i)   The Redemption Amount payable in respect of any Note that does not bear interest prior to the Maturity Date, the Redemption Amount of which is not linked to an index and/or a formula, upon redemption of such Note pursuant to Condition 6*(d)* or upon it becoming due and payable as provided in Condition 10 shall be the Amortised Face Amount (calculated as provided below) of such Note.

(ii)   Subject to the provisions of sub-paragraph (iii) below, the Amortised Face Amount of any such Note shall be the scheduled Redemption Amount of such Note on the Maturity Date discounted at a rate per annum (expressed as a percentage) equal to the Amortisation Yield (which, if none is shown hereon, shall be such rate as would produce an Amortised Face Amount equal to the issue price of the Notes if they were discounted back to their issue

price on the Issue Date) compounded annually. Where such calculation is to be made for a period of less than one year, it shall be made on the basis of the Day Count Fraction shown hereon.

(iii)    If the Redemption Amount payable in respect of any such Note upon its redemption pursuant to Condition 6(d) or upon it becoming due and payable as provided in Condition 10 is not paid when due, the Redemption Amount due and payable in respect of such Note shall be the Amortised Face Amount of such Note as defined in sub-paragraph (ii) above, except that such sub-paragraph shall have effect as though the reference therein to the date on which the Note becomes due and payable were replaced by a reference to the Relevant Date. The calculation of the Amortised Face Amount in accordance with this sub-paragraph shall continue to be made (as well after as before judgment) until the Relevant Date, unless the Relevant Date falls on or after the Maturity Date, in which case the amount due and payable shall be the scheduled Redemption Amount of such Note on the Maturity Date together with any interest that may accrue in accordance with Condition 5(d).

(c)    *Mandatory Redemption*

Subject to the terms of the relevant Supplemental Trust Deed, if any of the Collateral becomes repayable prior to its stated date of maturity for whatever reason or (unless the Trustee otherwise agrees) there is a payment default (after the expiry of any grace period specified in the terms and conditions of the Collateral in existence as at the later of the Issue Date and the date on which such Collateral was issued) in respect of any of the Collateral, a proportion of the principal amount of the Notes outstanding equal to the proportion of the Collateral comprised by the Collateral repaid or in respect of which there is a default will become immediately repayable. The Issuer shall forthwith give not more than 45 nor less than 30 Business Days' prior notice (or such other notice period as indicated in the relevant Supplemental Trust Deed) to the Trustee and the Noteholders (which notice shall be irrevocable) and upon expiry of such notice the Issuer will redeem either, as the case may be, all of the Notes at their Early Redemption Amount together with accrued interest or, in the case of a redemption in part, either (x) some of the Notes at their Early Redemption Amount together with accrued interest (if redemption is to be effected in accordance with Partial Redemption - Method A (as specified in the relevant Supplemental Trust Deed)) or (y) all of the Notes on a *pro rata* basis in an aggregate principal amount equal to that of the Collateral repaid or in respect of which there is a default (if redemption is to be effected in accordance with Partial Redemption - Method B (as specified in the relevant Supplemental Trust Deed)), failing which all of the Notes shall become repayable and the security constituted by the relevant Supplemental Trust Deed and/or any Other Security Document shall become enforceable and the Trustee will take such action as is provided in Condition 4. In this Condition "Business Day" means a day on which commercial banks and foreign exchange markets are open in the cities specified in the relevant Supplemental Trust Deed.

(d)    *Redemption for Taxation and Other Reasons*

(i)    If the Issuer, on the occasion of the next payment due in respect of the Notes or Coupons, would be required by law to withhold or account for tax or would suffer tax in respect of its income so that it would be unable to make payment of the full amount due, the Issuer shall so inform the Trustee, shall use its best endeavours to arrange the substitution of a company incorporated in another jurisdiction approved by the Trustee as the principal debtor (provided that, in relation to Notes rated by a rating agency, the Issuer shall notify the appropriate rating agency and that such substitution shall not adversely affect any existing rating of the Notes as confirmed in writing by the appropriate rating agency) and if it is unable to arrange such substitution before the next payment is due in respect of the Notes it shall convene a meeting of the Noteholders at which it shall propose an Extraordinary Resolution amending the Conditions to provide for payment net of withholding tax or for

payment net of withholding tax at a rate in excess of the then current rate of withholding, as the case may be. In the event of such Extraordinary Resolution not being passed either at such meeting or at any adjournment thereof, the Issuer shall (not later than the seventh day following such meeting (or any adjournment thereof)) redeem all but not some only of the Notes at their Early Redemption Amount together with interest (if any) accrued to the date fixed for redemption unless the Trustee certifies to the Issuer that, in its absolute discretion, it considers that it is in the best interests of the Noteholders that the Notes not be so redeemed or an Extraordinary Resolution of the Noteholders otherwise directs; or

(ii)     If a Swap Agreement is terminated in whole for any reason then the Issuer shall forthwith give not more than 45 nor less than 15 days' notice (or such other notice period as indicated in the relevant Supplemental Trust Deed) to the Trustee, the Noteholders and the Swap Counterparty (which notice shall be irrevocable), and on the expiry of such notice shall redeem all but not some only of the Notes at their Early Redemption Amount together with any interest accrued to the date fixed for redemption. Such notice shall be given promptly upon the termination of the relevant Swap Agreement and such redemption made, unless the Trustee shall certify to the Issuer that it considers in its absolute discretion that it is in the best interests of the holders of the Notes that such notice and redemption be delayed or not given or made, as the case may be, or an Extraordinary Resolution of the holders of the Notes shall otherwise direct.

Notwithstanding the foregoing, if the requirement to withhold or account for tax set out in Condition 6(d)(i) arises as a result of:

(i)     a withholding or deduction imposed on a payment by or on behalf of the relevant Issuer to an individual required to be made pursuant to European Council Directive 2003/48/EC or any other European Union Directive implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directive or any other law introduced as a consequence of the adoption or implementation of such Directive; or

(ii)     the presentation for payment of any Bearer Note, Receipt or Coupon by or on behalf of a holder who would have been able to avoid such withholding or deduction by presenting the relevant Bearer Note, Receipt or Coupon to another Paying Agent in a Member State of the European Union

then Condition 6(d)(i) shall not apply. The relevant Issuer shall deduct such taxes from the amounts payable to such Noteholder, all other Noteholders shall receive the due amounts payable to them and the Notes shall not be redeemed. Any such deduction shall not constitute an Event of Default under Condition 10.

(e)     *Redemption at the Option of the Issuer*

If so specified in the relevant Supplemental Trust Deed, the Issuer may, on giving not more than 45 nor less than 30 days' notice (or such other notice period as indicated in the relevant Supplemental Trust Deed) to the Noteholders and the Trustee (which notice shall be irrevocable) redeem all or, if so provided in the relevant Supplemental Trust Deed, some of the Notes at the Early Redemption Amount on the Issuer's Optional Redemption Date or Dates so provided in the relevant Supplemental Trust Deed. Upon expiration of such notice, the Issuer shall be bound to redeem the Notes at their Early Redemption Amount, together, if appropriate, with interest accrued to, but excluding, such date or dates of redemption.

(f)     *Redemption at the Option of Noteholders*

If so specified in the relevant Supplemental Trust Deed, the Issuer shall, at the option of the holder of any Note, redeem such Note on the date or dates so provided at its Early Redemption Amount together with interest accrued to the date fixed for redemption.

To exercise such option the holder must deposit (in the case of Bearer Notes) such Note (together with all unmatured Receipts and Coupons and unexchanged Talons) with any Paying Agent or (in the case of Registered Notes) the Certificate representing such Note(s) with the Registrar or any Transfer Agent at its specified office, together with a duly completed option exercise notice ("Exercise Notice") in the form obtainable from any Paying Agent, the Registrar or any Transfer Agent (as applicable) within the Noteholders' Option Period as specified in the Final Terms. No Note or Certificate so deposited and option exercised may be withdrawn (except as provided in the Agency Agreement) without the prior consent of the Issuer.

(g)     *Early Redemption Amount*

Unless otherwise specified in the relevant Supplemental Trust Deed, the Early Redemption Amount payable upon a redemption of any Note pursuant to Condition 6 (c), (d), (e), (f) and (k) and Condition 10 shall be an amount, determined by the Calculation Agent in its absolute discretion, equal to the Recovery Fraction of the principal amount of the Note (or, if applicable, the part of the Note) being redeemed (the "Early Redemption Amount").

Where:

"Counterparty" means each party (other than the Issuer) to a Credit Enhancement Agreement.

"Credit Enhancement Termination Payment" means the total amount payable to the Issuer by a Counterparty (being a positive number) on the termination of (or as the case may be, the *pro rata* portion of) any related Credit Enhancement Agreement.

"Recovery Amount" means the amount received by or on behalf of the Issuer upon the sale of the Collateral (or, if applicable the *pro rata* portion of the Collateral) after the deduction of all costs, fees, charges, taxes and expenses of or incurred by the Issuer or, if applicable, the Disposal Agent in connection with the sale of the relevant Collateral and the early redemption of the Notes plus, if a positive number, the aggregate amount of, or minus, if a negative number, the aggregate amount of the Swap Termination Payment and/or the Credit Enhancement Termination Payment.

"Recovery Fraction" means a fraction of which the numerator is the Recovery Amount and the denominator is the aggregate principal amount of the Notes falling due for redemption.

"Swap Termination Payment" means the amount payable to the Issuer by the Swap Counterparty (in which case, it shall be a positive number) or by the Issuer to the Swap Counterparty (in which case, it shall be a negative number) on the termination of (or, as the case may be, the *pro rata* portion of) the related Swap Agreement.

(h)     *Notice of Redemption and Drawings*

All Notes in respect of which any notice of redemption is given under this Condition shall be redeemed on the date specified in such notice in accordance with this Condition. In the case of a partial redemption if the relevant Supplemental Trust Deed specifies "Partial Redemption - Method A", then the notice shall also contain the certificate numbers of the Notes to be redeemed, which shall have been drawn in such place as the Trustee may approve and in such manner as it deems appropriate, subject to compliance with any applicable laws and stock exchange requirements. If the relevant Supplemental Trust Deed specifies "Partial Redemption - Method B", then each Note will be redeemed on a *pro rata* basis.

A05340159                                     - 41 -

(i)    *Purchases*

If the Issuer has satisfied the Trustee that it has made arrangements for the purchase of the Notes and, to the extent that the Notes will be surrendered for cancellation, it has made arrangements for the realisation of no more than the equivalent proportion of the Collateral, which transaction will leave the Issuer with no net liabilities in respect thereof, it may at any time purchase Notes (provided that they are purchased together with all unmatured Coupons and Talons related to them) in the open market or otherwise at any price.

(j)    *Cancellation*

The Issuer may, but shall not be obliged to, surrender for cancellation all Notes purchased by or on behalf of it, in the case of Bearer Notes, by surrendering each such Note together with all unmatured Receipts and Coupons and all unexchanged Talons to, or to the order of, the Issuing and Paying Agent and, in the case of Registered Notes, by surrendering the Certificate representing such Notes to the Registrar and, in each case, shall, together with all Notes redeemed by the Issuer, be cancelled forthwith (together with all unmatured Receipts and Coupons and unexchanged Talons attached thereto or surrendered therewith). Any Notes so surrendered for cancellation may not be reissued or resold and the obligations of the Issuer in respect of any such Notes shall be discharged.

(k)    *Exchange*

If so specified in the relevant Supplemental Trust Deed, any holder may at its option (subject to, if so specified in the Supplemental Trust Deed, the consent of each relevant Counterparty) exchange any or all of its Notes for (i) an amount (the "Net Asset Amount") calculated by the Issuer, equal to the then market value of such proportion of the Collateral (the "attributable Collateral") or, as the case may be, the Issuer's rights in respect thereof (the "attributable rights") or (ii) physical delivery ("Physical Delivery") of such proportion of the Collateral itself, in each case as equals the proportion (rounded down to the nearest whole number) which the Notes to be exchanged bears to the total principal amount outstanding of the Notes (less the costs of such valuation) adjusted as appropriate by the value realised or cost incurred, as the case may be, as a result of the termination of any Swap Agreement and/or Credit Enhancement Agreement, or part thereof in accordance with this Condition 6(k). To exercise such option, the holder shall, if the Notes are in bearer form, deposit the relevant Notes (together with all (if any) unmatured Coupons or Talons appertaining thereto) or, if the Notes are in registered form, deposit the Certificate representing the Notes at the office of Register, together with written notice that such option is to be exercised and (if the holder has elected for Physical Delivery, where available) a delivery instruction form (a "Delivery Instruction Form") substantially in the form set out in the Agency Agreement (and available upon request from the specified office of any Paying Agent or Transfer Agent during normal office hours). The Issuing and Paying Agent will forthwith notify the Issuer, each Counterparty, each Swap Counterparty, the Custodian, the Disposal Agent, the Registrar and the Trustee of receipt of such written notice. Each Counterparty and each Swap Counterparty shall forthwith notify the Issuer, the Trustee, the Custodian and the Issuing and Paying Agent (who shall then notify the relevant holder) of the net sum payable by such Counterparty and by, or, as the case may be, to such Swap Counterparty on termination of the relevant part of the relevant Credit Enhancement Agreement or Swap Agreement, as appropriate. The part of the relevant Credit Enhancement Agreement or, as the case may be, the relevant Swap Agreement to be terminated will be the *pro rata* amount thereof corresponding to that proportion of the Notes to be exchanged. The calculation of the Net Asset Amount in accordance with this Condition 6(k) shall be binding on the relevant holder(s) in the absence of manifest error. Any such Net Asset Amount shall be payable to the holder at the specified office of any Paying Agent or Transfer Agent at which the relevant Notes were deposited on the twentieth calendar day after such deposit (the "Delivery Date") or (if the holder has elected for Physical Delivery) (subject to receipt of a Delivery Instruction form) delivered on, or as soon as practicable after, the Settlement Date to the account at Euroclear Bank S.A./N.V. as operator of

the Euroclear System ("Euroclear") or Clearstream Banking, société anonyme ("Clearstream, Luxembourg" and, together with Euroclear and/or any alternative clearing system agreed by the Trustee, the "Clearing Systems") (or in such other manner as shall be provided in the relevant Supplemental Trust Deed) as specified in the relevant Delivery Instruction Form.

Notwithstanding the foregoing provisions of this Condition 6(k), the Issuer may, at its discretion, elect to satisfy the obligations hereunder by delivery to the relevant holder of the attributable Collateral or, as the case may be, by assignment to the relevant holder of the attributable rights even though the holder may not have elected for Physical Delivery. In any such case, the Issuer will procure that, subject to any payment due from the holder to the Swap Counterparty being made, the relevant attributable Collateral is delivered to the holder (or to any other place or account specified in the written notice referred to above) or, as the case may be, the relevant attributable rights are assigned to the holder on the Delivery Date and shall use all reasonable endeavours to procure that any payment being due from the relevant Counterparty and/or relevant Swap Counterparty to the holder on termination of the relevant Credit Enhancement Agreement and/or relevant Swap Agreement or part thereof is duly made.

Accountholders at the Clearing Systems will be required to give an irrevocable instruction to the relevant Clearing System, as the case may be, in respect of such delivery in the form prescribed by the relevant Clearing System (which may be in a form other than that set out in the Agency Agreement), not later than 10.00 a.m. Brussels or Luxembourg time, as the case may be (or, in the case of an instruction to Euroclear via EUCLID or EUCLID 90, 11.00 a.m. Brussels time), on the Clearing Business Day prior to the Delivery Date.

No interest will be payable with respect to Notes deposited for exchange pursuant to this Condition in respect of the period from the date of issue of the Notes (in the case of exchange prior to the first due date for the payment of interest on the Note) or the previous date for the payment of interest on the Note (in any other case) to the date of such exchange.

The relevant Supplemental Trust Deed will contain provisions for the release of the relevant Mortgaged Property for which Notes have been exchanged from the remaining charges upon them.

In these Conditions:

"Clearing Business Day" means a day on which Euroclear or Clearstream, Luxembourg, as the case may be, is open for the acceptance and execution of settlement instructions other than a day on which Euroclear or Clearstream, Luxembourg, as the case may be, is scheduled to close prior to its regular weekday closing time.

"delivered" means the satisfaction of any obligation of the Issuer to complete all matters necessary to transfer the relevant Net Asset Amount to the relevant Noteholder (or the first-named of joint holders) with full title guarantee. Accordingly, and for the avoidance of doubt, there shall be no obligation on the Issuer to concern itself with any formalities or requirements that shall be placed on the relevant Noteholder (or the first-named of joint holders) as the transferee of the relevant Net Asset Amount in connection with the acquisition by such Noteholder of the relevant Net Asset Amounts.

"Recovery Value" means the value, expressed as a percentage, of a claim against the obligor in respect of the relevant Collateral, as determined by the Swap Counterparty acting in good faith and in a commercially reasonable manner and by way of example but without limitation, the Swap Counterparty may in making this determination, take account of the mean of the market prices of all securities issued by the relevant obligor, disregarding any securities which have a market price which is at an artificially inflated level.

"Settlement Date" means the Delivery Date, except and to the extent that (i) a Settlement Disruption Event prevents delivery of the relevant Net Asset Amount on that day, (ii) pursuant to the terms of the relevant Swap Agreement and due to an event (the "Impossibility Event") beyond the control of the

Swap Counterparty it is impossible (including due to market illiquidity) or illegal for the Swap Counterparty to deliver to the Issuer any Net Asset Amount, in which event the Settlement Date shall be postponed to the next following day after receipt by the Issuer of the relevant Net Asset Amount, provided that if by the 31st calendar day following the original Settlement Date the Impossibility Event is still continuing, the Notes shall become immediately repayable at their Early Redemption Amount and (iii) due to circumstances beyond the control of the Swap Counterparty the market price of any or all Net Asset Amount is at an artificially inflated level, in which event the Swap Counterparty may, in full satisfaction of its obligation to deliver the relevant Net Asset Amount, pay to the Issuer, on the Settlement Date, the True Value of the relevant Net Asset Amount. In the case of (ii) and to such extent, the Settlement Date will be the first succeeding day (if such day is after the Delivery Date) on which settlement of that Net Asset Amount can take place through Euroclear or Clearstream, Luxembourg unless a Settlement Disruption Event prevents delivery in accordance with the relevant Delivery Instruction form on each of the ten (10) Clearing Business Days immediately following that Delivery Date. In that case, (A) to the extent, as determined by the Calculation Agent, that the relevant Net Asset Amount can be delivered in any other commercially reasonable manner, then the Settlement Date will be the first day on which settlement of a sale of the relevant Net Asset Amount executed on that tenth (10th) Clearing Business Day customarily would take place using such other commercially reasonable manner of delivery, and (B) to the extent, as determined by the Calculation Agent, that the relevant Net Asset Amount cannot be delivered in any other commercially reasonable manner, then the Settlement Date will be postponed until such delivery can be effected through Euroclear or Clearstream, Luxembourg or, as determined by the Calculation Agent, in any other commercially reasonable manner. If a Settlement Disruption Event applies to a part only of the relevant Net Asset Amount, the Settlement Date shall be postponed, in accordance with the above provisions, in respect of the affected part of the relevant Net Asset Amount only. No additional amounts will be payable by the Issuer by virtue of any delay of the Settlement Date by virtue of a Settlement Disruption Event. In the case of (iii) the determination as to whether the market price of the Collateral is at an "artificially inflated level" will be made by the Swap Counterparty acting in good faith and in a commercially reasonable manner and, by way of example but without limitation, such market price will be considered to be at an artificially inflated level if due to a default or prospect of default by the obligor in relation to the relevant Collateral, there is an increase in demand for the Collateral caused principally by contractual obligations to deliver such Net Asset Amount upon the occurrence of such a default or prospect of default.

"Settlement Disruption Event" means an event beyond the control of the Issuer as a result of which the Clearing Systems cannot, in the determination of the Calculation Agent, deliver all or any part of the relevant Net Asset Amount.

"True Value" means, in relation to any particular securities, an amount equal to the product of the Recovery Value of the particular securities and the aggregate principal amount of such securities.

## 7  Payments and Talons

### (a)  Bearer Notes

Payments of principal and interest in respect of Bearer Notes shall, subject as mentioned below, be made against presentation and surrender of the relevant Receipts (in the case of payments of Instalment Amounts other than on the due date for redemption and provided that the Receipt is presented for payment together with its relative Note), Notes (in the case of all other payments of principal and, in the case of interest, as specified in Condition 7(f)(vi)) or Coupons (in the case of interest, save as specified in Condition 7(f)(vi)), as the case may be, at the specified office of any Paying Agent by a cheque payable in the currency in which such payment is due drawn on, or, at the option of, and on three Business Days' notice from, the holder, by transfer to an account denominated in that currency