with, a bank in the principal financial centre for that currency or, in the case of euro, in a city in which banks have access to the TARGET System.

(b)   *Registered Notes*

(i)   Payments of principal (which for the purposes of this Condition 7*(b)* shall include final Instalment Amounts but not other Instalment Amounts) in respect of Registered Notes shall be made against presentation and surrender of the relevant Certificates at the specified office of any of the Registrar or of the Transfer Agents and in the manner provided in paragraph (ii) below.

(ii)   Interest (which for the purpose of this Condition 7*(b)* shall include all Instalment Amounts other than final Instalment Amounts) on Registered Notes shall be paid to the person shown on the Register at the close of business on the fifteenth day before the due date for payment thereof (the "Record Date"). Payments of interest on each Registered Note shall be made in the currency in which such payments are due by cheque drawn on a bank in the principal financial centre of the country of the currency concerned and mailed to the holder (or to the first named of joint holders) of such Note at its address appearing in the Register. Upon application by the holder to the specified office of the Registrar or any Transfer Agent before the Record Date and subject as provided in paragraph *(a)* above, such payment of interest may be made by transfer to an account in the relevant currency maintained by the payee with a bank in the principal financial centre of the country of that currency or, in the case of euro, in a city in which banks have access to the TARGET System.

(c)   *Payments in the United States*

Notwithstanding the foregoing, if any Bearer Notes are denominated in U.S. dollars, payments in respect thereof may be made at the specified office of any Paying Agent in New York City in the same manner as aforesaid if (i) the Issuer shall have appointed Paying Agents with specified offices outside the United States with the reasonable expectation that such Paying Agents would be able to make payment of the amounts on the Notes in the manner provided above when due, and payment in full of such amounts at all such offices is illegal or effectively precluded by exchange controls or other similar restrictions on payment or receipt of such amounts and (ii) such payment is then permitted by United States law, without involving, in the opinion of the Issuer, any adverse tax consequence to the Issuer.

(d)   *Payments Subject to Fiscal Laws*

All payments are subject in all cases to any applicable fiscal or other laws, regulations and directives, but without prejudice to the provisions of Condition 8. No commission or expenses shall be charged to the Noteholders or Couponholders in respect of such payments.

(e)   *Appointment of Agents*

The Issuing and Paying Agent, the Paying Agents, the Registrar, the Transfer Agents, the Calculation Agent and the Disposal Agent initially appointed by the Issuer and their respective specified offices are listed below. The Issuing and Paying Agent, the Paying Agents, the Registrar, the Transfer Agents, the Calculation Agent and the Disposal Agent act solely as agents of the Issuer and do not assume any obligation or relationship of agency or trust for or with any Noteholder or Couponholder. The Issuer reserves the right at any time with the prior written approval of the Trustee to vary or terminate the appointment of the Issuing and Paying Agent, any other Paying Agent, the Registrar, any Transfer Agent, the Calculation Agent or the Disposal Agent and to appoint additional or other Paying Agents or Transfer Agents, provided that the Issuer shall at all times maintain (i) an Issuing and Paying Agent, (ii) a Registrar in relation to Registered Notes, (iii) a Transfer Agent in relation to Registered Notes having its specified office in a major European city (which shall be Dublin ), (iv) one or more

Calculation Agent(s) where the Conditions so require, (v) a Disposal Agent where the Conditions so require, (vi) a Paying Agent having its specified office in a major European city (which shall be Dublin so long as the Notes are listed on the Irish Stock Exchange) and (vii) such other agents as may be required by any other stock exchange on which the Notes may be listed, in each case as approved by the Trustee and (viii) a Paying Agent with a specified office in a European Union Member State that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any other European Union Directive implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directive or any other law introduced as a consequence of the adoption or implementation of such Directive.

In addition, the Issuer shall forthwith appoint a Paying Agent in New York City in respect of any Bearer Notes denominated in U.S. dollars in the circumstances described in paragraph (c) above.

Notice of any such change or any change of any specified office shall promptly be given to the Unmatured Coupons and Receipts and Unexchanged Talons.

(f)     *Unmatured Coupons and Receipts and Unexchanged Talons*

(i)     Unless the Notes provide that the relative Coupons are to become void upon the due date for redemption of those Notes, Bearer Notes should be surrendered for payment together with all unmatured Coupons (if any) appertaining thereto, failing which an amount equal to the face value of each missing unmatured Coupon (or, in the case of payment not being made in full, that proportion of the amount of such missing unmatured Coupon that the sum of principal so paid bears to the total principal due) shall be deducted from the Redemption Amount due for payment. Any amount so deducted shall be paid in the manner mentioned above against surrender of such missing Coupon within a period of 10 years from the Relevant Date for the payment of such principal (whether or not such Coupon has become void pursuant to Condition 9).

(ii)    If the Notes so provide, upon the due date for redemption of any Bearer Note, unmatured Coupons relating to such Note (whether or not attached) shall become void and no payment shall be made in respect of them.

(iii)   Upon the due date for redemption of any Bearer Note, any unexchanged Talon relating to such Note (whether or not attached) shall become void and no Coupon shall be delivered in respect of such Talon.

(iv)    Upon the due date for redemption of any Bearer Note that is redeemable in instalments, all Receipts relating to such Note having an Instalment Date falling on or after such due date (whether or not attached) shall become void and no payment shall be made in respect of them.

(v)     Where any Bearer Note that provides that the relative unmatured Coupons are to become void upon the due date for redemption of those Notes is presented for redemption without all unmatured Coupons and any unexchanged Talon relating to it, and where any Bearer Note is presented for redemption without any unexchanged Talon relating to it, redemption shall be made only against the provision of such indemnity as the Issuer may require.

(vi)    If the due date for redemption of any Note is not a due date for payment of interest, interest accrued from the preceding due date for payment of interest or the Interest Commencement Date, as the case may be, shall only be payable against presentation (and surrender if appropriate) of the relevant Bearer Note or Certificate representing it, as the case may be. Interest accrued on a Note that only bears interest after its Maturity Date shall be payable on redemption of such Note against presentation of the relevant Note or Certificate representing it, as the case may be.

(g)   *Talons*

On or after the Interest Payment Date for the final Coupon forming part of a Coupon sheet issued in respect of any Bearer Note, the Talon forming part of such Coupon sheet may be surrendered at the specified office of the Issuing and Paying Agent or, as it may direct, in exchange for a further Coupon sheet (and, if necessary, another Talon for a further Coupon sheet) (but excluding any Coupons that may have become void pursuant to Condition 9).

(h)   *Non-Business Days*

If any date for payment in respect of any Note, Receipt or Coupon is not a business day, the holder shall not be entitled to payment until the next following business day nor to any interest or other sum in respect of such postponed payment. In this paragraph, "business day" means a day (other than a Saturday or a Sunday) on which banks and foreign exchange markets are open for business in the relevant place of presentation, in such jurisdictions as shall be specified as "Business Day Jurisdictions" hereon and:

(i)   (in the case of a payment in a currency other than euro) where payment is to be made by transfer to an account maintained with a bank in the relevant currency, on which foreign exchange transactions may be carried on in the relevant currency in the principal financial centre of the country of such currency; or

(ii)   (in the case of a payment in euro) which is a TARGET Business Day.

## 8   Taxation

All payments of principal and interest in respect of the Notes and the Coupons shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed thereon. Any such deduction shall not be an Event of Default under Condition 10. In the event of the imposition of such withholding taxes on payments in respect of the Notes, the Issuer will use its best endeavours to arrange for its substitution as principal debtor by a company incorporated in another jurisdiction, subject to and in accordance with Condition 6*(d)*.

## 9   Prescription

Claims against the Issuer for payment in respect of the Notes, Receipts and Coupons (which, for this purpose, shall not include Talons) shall be prescribed and become void unless made within 10 years (in the case of principal) or five years (in the case of interest) from the appropriate Relevant Date in respect of them.

## 10   Events of Default

If any of the following events ("Events of Default") occurs, the Trustee at its discretion may, and if so requested by holders of at least one-fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution shall, give notice to the Issuer that the Notes are, and they shall immediately become, due and payable at their Early Redemption Amount together with accrued interest and the security constituted by the Trust Deed shall become enforceable (as provided in the Trust Deed):

(a)   if default is made for a period of 14 days or more in the payment of any sum due in respect of the Notes or any of them; or

(b)   if the Issuer fails to perform or observe any of its other obligations under the Notes or the Trust Deed and such failure continues for a period of 30 days (or such longer period as the Trustee may permit) next following the service by the Trustee on the Issuer of notice requiring the same to be remedied unless, in the opinion of the Trustee, incapable of remedy, in which case no notice shall be required; or

(c)   if an administrator shall be appointed or any order shall be made by any competent court or any resolution passed for the winding-up or dissolution of the Issuer or the appointment of an examiner,

liquidator or similar official in relation to the Issuer save for the purposes of amalgamation, merger, consolidation, reorganisation or other similar arrangement on terms previously approved by the Trustee or by an Extraordinary Resolution.

The Issuer has undertaken in the Principal Trust Deed that, on each anniversary of the date of the Principal Trust Deed and also within 14 days after any request by the Trustee, it will send to the Trustee a certificate signed by two Directors of the Issuer to the effect that, since the date of the Principal Trust Deed or, as the case may be, the date of the last such certificate, no Event of Default, Potential Event of Default or other matter required to be brought to the Trustee's attention has occurred.

## 11   Enforcement

At any time after the Notes become due and payable, the Trustee may, at its discretion and without further notice, institute such proceedings against the Issuer as it may think fit to enforce the terms of the Trust Deed, the Notes and Coupons, but it need not take any proceedings unless (i) it shall have been so directed by an Extraordinary Resolution or so requested in writing by Noteholders holding at least one-fifth in principal amount of Notes outstanding, and (ii) it shall have been indemnified to its satisfaction.

Only the Trustee may pursue the remedies available under the Trust Deed to enforce the rights of the Noteholders and Couponholders and no Noteholder or Couponholder is entitled to proceed against the Issuer unless the Trustee, having become bound to proceed in accordance with the terms of the Trust Deed, fails or neglects to do so and such failure or neglect is continuing. Having realised the security or, in the case of a partial redemption of Notes pursuant to Condition 6(c), part of the security corresponding to the proportion of Notes redeemed, and distributed the net proceeds in accordance with Condition 4, the Trustee may not take any further steps against the Issuer to recover any sum still unpaid and the Issuer will not be obliged to make any further payment in respect of any such sum and accordingly no debt shall be owed by the Issuer in respect of any such sum.

## 12   Meeting of Noteholders, Modification, Waiver and Substitution

### (a)   Meetings of Noteholders

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matter affecting their interests, including the sanctioning by Extraordinary Resolution (as defined in the Trust Deed) of a modification of any of these Conditions or any provisions of the Trust Deed or the restructuring of the Notes. Such a meeting may be convened by Noteholders holding not less than 10 per cent. in principal amount of the Notes for the time being outstanding. The quorum for any meeting convened to consider an Extraordinary Resolution shall be two or more persons holding or representing a clear majority in principal amount of the Notes for the time being outstanding, or at any adjourned meeting two or more persons being or representing Noteholders whatever the principal amount of the Notes held or represented, unless the business of such meeting includes consideration of proposals, *inter alia*, (i) to modify the details of the Mortgaged Property, the maturity of the Notes or the dates on which interest is payable on them, (ii) to reduce or cancel the principal amount of, any premium payable on redemption of, or interest on, or to vary the method of calculating the rate of interest or reducing the minimum rate of interest on, the Notes, (iii) to change the currency of payment of the Notes, (iv) to modify the Events of Default, (v) to modify the provisions concerning the quorum required at a meeting or the majority required to pass an Extraordinary Resolution or (vi) amending (i) to (v) above, in which case the necessary quorum shall be two or more persons holding or representing not less than 75 per cent., or at any adjourned meeting not less than 25 per cent., in principal amount of the Notes for the time being outstanding. Any Extraordinary Resolution duly passed shall be binding on all Noteholders (whether or not they were present at the meeting at which such resolution was passed) and on all Couponholders. A written resolution of the holders of not less than 90 per cent. in

principal amount of the Notes for the time being outstanding shall take effect as an Extraordinary Resolution.

(b)    *Modification of the Trust Deed*

The Trustee may agree, without the consent of the Noteholders or Couponholders, to (i) any modification of any of the provisions of the Trust Deed or any relevant Swap Agreement that is in its opinion of a formal, minor or technical nature or is made to correct a manifest error, and (ii) any other modification (except as mentioned in the Trust Deed), and any waiver or authorisation of any breach or proposed breach, of any of the provisions of the Trust Deed that is in the opinion of the Trustee not materially prejudicial to the interests of the Noteholders. Any such modification, authorisation or waiver shall be binding on the Noteholders and the Couponholders and, if the Trustee so requires, such modification shall be notified to the Noteholders as soon as practicable. In relation to Notes which are rated by a rating agency, the Issuer shall notify the relevant rating agency of any modification made in accordance with this Condition 12*(b)*.

(c)    *Substitution*

The Trust Deed contains provisions permitting the Trustee to agree, subject to such amendment of the Trust Deed and such other conditions as the Trustee may require including the transfer of the Mortgaged Property and subject to the consent of the relevant Swap Counterparty, but without the consent of the Noteholders or the Couponholders, to the substitution of any other company in place of the Issuer, or of any previous substituted company, as principal debtor under the Trust Deed and the Notes provided that, in relation only to Notes which are rated by a rating agency, the Issuer shall notify the appropriate rating agency and that such change shall not adversely affect any existing rating of the Notes as confirmed in writing by the appropriate rating agency. In the case of such a substitution the Trustee may agree, without the consent of the Noteholders or the Couponholders, to a change of the law governing the Notes, the Receipts, the Coupons, the Talons and/or the Trust Deed provided that such change (i) would not in the opinion of the Trustee be materially prejudicial to the interests of the Noteholders and (ii) in relation only to Notes rated by a rating agency, shall not adversely affect any existing rating of the Notes as confirmed in writing by the appropriate rating agency. Under the Trust Deed, the Trustee may agree or require the Issuer to procure the substitution as principal debtor under the Trust Deed of a company incorporated in some other jurisdiction in the event of the Issuer becoming subject to any form of tax on its income or payments in respect of the Notes.

(d)    *Entitlement of the Trustee*

In connection with the exercise of its functions (including but not limited to those referred to in this Condition) the Trustee shall have regard to the interests of the Noteholders as a class and shall not have regard to the consequences of such exercise for individual Noteholders or Couponholders and the Trustee shall not be entitled to require, nor shall any Noteholder or Couponholder be entitled to claim, from the Issuer any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders or Couponholders.

(e)    *Retirement or Removal of the Trustee*

The Trustee may retire on giving three months' written notice to the Issuer and the Noteholders may remove the Trustee by Extraordinary Resolution. However, if the Trustee is a sole trust corporation then any such retirement or removal shall not be effective until a successor Trustee is appointed.

## 13   Replacement of Notes, Certificates, Receipts, Coupons and Talons

If a Note, Certificate, Receipt, Coupon or Talon is lost, stolen, mutilated, defaced or destroyed, it may be replaced, subject to applicable laws, regulations and stock exchange regulations, at the specified office of the

Paying Agent in the Republic of Ireland (in the case of Bearer Notes, Receipts, Coupons or Talons) and of the Registrar (in the case of Certificates) or such other Paying Agent, as the case may be, as may from time to time be designated by the Issuer for the purpose and notice of whose designation is given to Noteholders, in each case on payment by the claimant of the fees and costs incurred in connection therewith and on such terms as to evidence, security and indemnity (which may provide, *inter alia*, that if the allegedly lost, stolen or destroyed Note, Certificate, Receipt, Coupon or Talon is subsequently presented for payment or, as the case may be, for exchange for further Coupons, there shall be paid to the Issuer on demand the amount payable by the Issuer in respect of such Notes, Certificates, Receipts, Coupons or further Coupons) and otherwise as the Issuer may require. Mutilated or defaced Notes, Certificates, Receipts, Coupons or Talons must be surrendered before replacements will be issued.

## 14    Notices

Notices to the holders of Registered Notes shall be mailed to them at their respective addresses in the Register and deemed to have been given on the fourth weekday (being a day other than a Saturday or a Sunday) after the date of mailing. Notices to the holders of Bearer Notes shall be valid if published in a daily newspaper of general circulation in London (which is expected to be the *Financial Times*) and (so long as the Notes are listed on a stock exchange and the rules of that stock exchange so require) in any such other newspaper in which publication is so required by the rules of that stock exchange (which, in the case of Notes listed on the Irish Stock Exchange, is expected to be the *Irish Times*). If in the opinion of the Trustee any such publication is not practicable, notice shall be validly given if published in another leading daily English language newspaper with general circulation in Europe. Any such notice shall be deemed to have been given on the date of such publication or, if published more than once or on different dates, on the first date on which publication is made, as provided above.

Couponholders shall be deemed for all purposes to have notice of the contents of any notice given to the holders of Bearer Notes in accordance with this Condition.

## 15    Indemnification and Obligations of the Trustee

The Trust Deed contains provisions for the indemnification of the Trustee and for its relief from responsibility including for the exercise of any voting rights in respect of the Mortgaged Property, for the validity, sufficiency and enforceability (which the Trustee has not investigated) of the security created over the Mortgaged Property and for taking proceedings to enforce repayment unless indemnified to its satisfaction. The Trustee and any affiliate is entitled to enter into business transactions with the Issuer, any issuer or guarantor (where applicable) of any of the Mortgaged Property, any Swap Counterparty or any of their subsidiary, holding or associated companies without accounting to the Noteholders for profit resulting therefrom.

The Trustee is exempted from liability with respect to any loss or theft or reduction in value of the Mortgaged Property, from any obligation to insure or to procure the insuring of the Mortgaged Property and from any claim arising from the fact that the Mortgaged Property will be held in safe custody by the Custodian or other custodian approved in writing by the Trustee (in each case, if applicable).

The Trust Deed provides that in acting as Trustee under this Trust Deed the Trustee shall not, in respect of Notes of any Series, assume any duty or responsibility to any Swap Counterparty (other than to pay to any Swap Counterparty any moneys received and payable to it and to act in accordance with the provisions of Condition 4) or any Credit Enhancement Provider and shall have regard solely to the interests of the Noteholders and shall not be obliged to act on any directions of the Swap Counterparty if this would in the Trustee's opinion be contrary to the interests of the Noteholders or Couponholders.

**16   Governing Law and Jurisdiction**

    *(a)*    *Governing Law*

        The Trust Deed, the Notes, the Receipts, the Coupons and the Talons are governed by, and shall be construed in accordance with, English law.

    *(b)*    *Jurisdiction*

        The Courts of England are to have jurisdiction to settle any disputes that may arise out of or in connection with the Trust Deed, any Notes, Receipts, Coupons or Talons and accordingly any legal action or proceedings arising out of or in connection with the Trust Deed, any Notes, Receipts, Coupons or Talons ("Proceedings") may be brought in such courts.

    *(c)*    *Service of Process*

        The Issuer has irrevocably appointed Lehman Brothers International (Europe) as its agent in England to receive, for it and on its behalf, service of process in any Proceedings in England.

**17   Contracts (Rights of Third Parties) Act 1999**

No person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999 except to the extent (if any) that the Notes expressly provide for such Act to apply to any of their terms.

SUMMARY OF PROVISIONS RELATING TO THE NOTES WHILE IN GLOBAL FORM

### Initial Issue of Notes

Upon the initial deposit of a Global Note with a common depositary for Euroclear and Clearstream, Luxembourg (the "Common Depositary") or registration of Registered Notes in the name of any nominee for Euroclear and Clearstream, Luxembourg and delivery of the relative Global Certificate to the Common Depositary, in the case of a Tranche intended to be cleared through Euroclear and/or Clearstream, Luxembourg, Euroclear or Clearstream, Luxembourg will credit each subscriber with a principal amount of Notes equal to the principal amount thereof for which it has subscribed and paid. Tranches intended to be delivered outside a clearing system shall be delivered as agreed between the relevant Issuer and the relevant Dealer.

### Relationship of Accountholders with Clearing Systems

Each of the persons shown in the records of Euroclear, Clearstream, Luxembourg or any other clearing system as the holder of a Note represented by a Global Note or a Global Certificate must look solely to Euroclear, Clearstream, Luxembourg or such clearing system (as the case may be) for his share of each payment made by the relevant Issuer to the bearer of such Global Note or the holder of such Global Certificate, as the case may be, and in relation to all other rights arising under the Global Notes or Global Certificates, subject to and in accordance with the respective rules and procedures of Euroclear, Clearstream, Luxembourg or such clearing system (as the case may be). Such persons shall have no claim directly against the relevant Issuer in respect of payments due on the Notes for so long as the Notes are represented by such Global Note or Global Certificate and such obligations of the relevant Issuer will be discharged by payment to the bearer of such Global Note or the holder of such Global Certificate, as the case may be, in respect of each amount so paid. So long as the Notes are represented by a temporary Global Note, permanent Global Note or Global Certificate and the relevant clearing system(s) so permit, the Notes shall be tradeable only in principal amounts of at least the specified denomination (or if more than one specified denomination, the lowest specified denomination) and integral multiples of the Tradeable Amount specified in the relevant Final Terms.

### Exchange

1.  *Temporary Global Notes*

    Each Temporary Global Note will be exchangeable, free of charge to the holder, on or after its Exchange Date in whole or in part upon certification as to non-U.S. beneficial ownership in the form set out in the Agency Agreement for interests in a Permanent Global Note.

    Each Temporary Global Note that is also an Exchangeable Bearer Note will be exchangeable for Registered Notes in accordance with the Conditions in addition to any Permanent Global Note for which it may be exchangeable and, before its Exchange Date, will also be exchangeable in whole or in part for Registered Notes only.

2.  *Global Notes*

    Each Permanent Global Note will be exchangeable, free of charge to the holder, on or after its Exchange Date in whole but not, except as provided below, in part for Definitive Notes or, in the case of (iii) below, Registered Notes:

(i)     unless principal in respect of any Notes is not paid when due, by the relevant Issuer giving notice to the Noteholders, the Issuing and Paying Agent and the Trustee of its intention to effect such exchange;

(ii)    if the relevant Final Terms provide that such Permanent Global Note is exchangeable at the request of the holder, by the holder giving notice to the Issuing and Paying Agent of its election for such exchange;

(iii)   if the Permanent Global Note is an Exchangeable Bearer Note, by the holder giving notice to the Issuing and Paying Agent of its election to exchange the whole or a part of such Permanent Global Note for Registered Notes; and

(iv)   otherwise, if the Permanent Global Note is held on behalf of Euroclear or Clearstream, Luxembourg or any other clearing system and any such clearing system is closed for business for a continuous period of 14 days (other than by reason of holidays, statutory or otherwise) or announces an intention permanently to cease business or in fact does so.

In the event that the a Global Note is exchanged for Definitive Notes, such Definitive Notes shall be issued in the specified denomination(s) only. Noteholders who hold Notes in the relevant clearing system in amounts that are not integral multiples of a specified denomination may need to purchase or sell, on or before the relevant Exchange Date, a principal amount of Notes such that their holding is an integral multiple of a specified denomination.

3.    *Global Certificates*

If the relevant Final Terms state that the Notes are to be represented by a permanent Global Certificate on issue, transfers of the holding of Notes represented by any Global Certificate pursuant to the Conditions may only be made in part:

(i)    if the Notes represented by the Global Certificate are held on behalf of Euroclear or Clearstream, Luxembourg or any other clearing system and any such clearing system is closed for business for a continuous period of 14 days (other than by reason of holidays, statutory or otherwise) or announces an intention permanently to cease business or does in fact do so; or

(ii)    with the consent of the relevant Issuer;

provided that, in the case of the first transfer of part of a holding pursuant to (i) above, the Registered Holder has given the Registrar not less than 30 days' notice at its specified office of the Registered Holder's intention to effect such transfer.

4.    *Partial Exchange of Permanent Global Notes*

For so long as a Permanent Global Note is held on behalf of a clearing system and only if the rules of that clearing system permit, such Permanent Global Note will be exchangeable in part on one or more occasions (1) for Registered Notes if the Global Note is an Exchangeable Bearer Note and the part submitted for exchange is to be exchanged for Registered Notes, or (2) for Definitive Notes if so provided in, and in accordance with, the Conditions (which will be set out in the relevant Final Terms).

5.    *Delivery of Notes*

On or after any due date for exchange, the holder of a Global Note may surrender such Global Note or, in the case of a partial exchange, present it for endorsement to or to the order of the Issuing and Paying Agent. In exchange for any Global Note, or the part thereof to be exchanged, the relevant Issuer will (i) in the case of a Temporary Global Note exchangeable for a Permanent Global Note, deliver or procure the delivery of a Permanent Global Note in an aggregate principal amount equal to that of the whole or the part of the Temporary Global Note that is being exchanged or, in the case of a subsequent exchange, endorse or procure the endorsement of a Permanent Global Note to reflect such exchange or

(ii) in the case of a Permanent Global Note exchangeable for Definitive Notes or Registered Notes, deliver, or procure the delivery of, an equal aggregate principal amount of duly executed and authenticated Definitive Notes and/or Certificates, as the case may be. In this Base Prospectus, "Definitive Notes" means, in relation to any Permanent Global Note, the definitive Bearer Notes for which such Permanent Global Note may be exchanged (if appropriate, having attached to them all Coupons and Receipts in respect of interest or Instalment Amounts that have not already been paid on the Global Note and a Talon). Definitive Notes will be security printed and Certificates will be printed in accordance with any applicable legal and stock exchange requirements in or substantially in the form set out in the Schedules to the Principal Trust Deed. On exchange in full of each Permanent Global Note, the relevant Issuer will, if the holder so requests, procure that it is cancelled and returned to the holder together with the relevant Definitive Notes.

6.    *Exchange Date*

"Exchange Date" means (i) in the case of a Temporary Global Note, the first day following the expiry of 40 days after the Issue Date and (ii) in the case of a Permanent Global Note, a day falling not less than 60 days or, in the case of an exchange for Registered Notes, five days, after that on which the notice requiring exchange is given and on which banks are open for business in the city in which the specified office of the Issuing and Paying Agent is located and, other than in the case of 2 (iv) above, in the city in which the relevant clearing system is located.

## Amendments to Conditions

The Global Notes and Global Certificates contain provisions that apply to the Notes that they represent, some of which modify the effect of the terms and conditions of the Notes set out in this Base Prospectus. The following is a summary of certain of those provisions:

1.    *Payments*

No payment falling due after the Exchange Date will be made on any Global Note unless exchange for an interest in a Permanent Global Note is improperly withheld or refused. Payments on any Temporary Global Note issued in compliance with the D Rules before the Exchange Date will only be made against presentation of certificates as to non-U.S. beneficial ownership in the form set out in the Agency Agreement. All payments in respect of Notes represented by a Global Note will be made against surrender of that Global Note to or to the order of the Issuing and Paying Agent or such other Paying Agent as shall have been notified to the Noteholders for such purpose. A record of each payment so made will be endorsed on each Global Note, which endorsement will be *prima facie* evidence that such payment has been made in respect of the Notes. The second exception to Condition 6(d)(i) (if the requirement to withhold or account for tax set out in Condition 6(d)(i) arises as a result of the presentation for payment of any Bearer Note, Receipt or Coupon by or on behalf of a holder who would have been able to avoid such withholding or deducting by presenting the relevant Bearer Note, Receipt or Coupon to another Paying Agent in a Member State of the European Union then Condition 6(d)(i) shall not apply) and Condition 7(e) will apply to the Definitive Notes only.

2.    *Prescription*

Claims against the relevant Issuer in respect of Notes that are represented by a Permanent Global Note will become void unless it is presented for payment within a period of 10 years (in the case of principal) and five years (in the case of interest) from the appropriate Relevant Date (as defined in the Conditions).

3.    *Meetings*

The holder of a Permanent Global Note or of the Notes represented by a Global Certificate shall (unless such Permanent Global Note or Global Certificate represents only one Note) be treated as

being two persons for the purposes of any quorum requirements of a meeting of Noteholders and, at any such meeting, the holder of a Permanent Global Note shall be treated as having one vote in respect of each integral currency unit of the specified currency of the Notes for which such Global Note may be exchanged. (All holders of Registered Notes are entitled to one vote in respect of each Note comprising such Noteholder's holding, whether or not represented by a Global Certificate.)

4.    *Cancellation*

Cancellation of any Note represented by a Permanent Global Note that is required by the Conditions to be cancelled (other than upon its redemption) will be effected by reduction in the principal amount of the relevant Permanent Global Note.

5.    *Purchase*

Notes represented by a Global Note may only be purchased (if so permitted) by the Issuer if they are purchased together with the rights to receive all future payments of interest and Instalment Amounts (if any) thereon.

6.    *Options*

Any option of the Issuer provided for in the Conditions of any Notes, while such Notes are represented by a Permanent Global Note, shall be exercised by the relevant Issuer giving notice to the Noteholders within the time limits set out in and containing the information required by the Conditions, except that the notice shall not be required to contain the serial numbers of Notes drawn in the case of a partial exercise of an option and accordingly no drawing of Notes shall be required.

7.    *Issuer's Option*

Any option of the Issuer provided for in the Conditions of any Notes, while such Notes are represented by a Permanent Global Note, shall be exercised by the relevant Issuer giving notice to the Noteholders within the time limits set out in and containing the information required by the Conditions, except that the notice shall not be required to contain the serial numbers of Notes drawn in the case of a partial exercise of an option and accordingly no drawing of Notes shall be required. In the event that any option of the Issuer is exercised in respect of some but not all of the Notes, the rights of accountholders with a clearing system will be governed by the standard procedures of Euroclear, Clearstream, Luxembourg or any other clearing system (as the case may be).

8.    *Noteholders' Options*

Any option of the Noteholders provided for in the Conditions of any Notes, while such Notes are represented by a Permanent Global Note, may be exercised by the holder of the Permanent Global Note giving notice to the Issuing and Paying Agent within the time limits relating to the deposit of Notes with a Paying Agent set out in the Conditions, substantially in the form of the notice available from any Paying Agent, except that the notice shall not be required to contain the serial numbers of the Notes in respect of which the option has been exercised, and stating the principal amount of Notes in respect of which the Option is exercised and at the same time presenting the Permanent Global Note to the Issuing and Paying Agent, or to a Paying Agent acting on behalf of the Issuing and Paying Agent, for notation.

9.    *Trustee's Powers*

In considering the interests of Noteholders while any Global Note is held on behalf of, or Registered Notes are registered in the name of any nominee for, a clearing system, the Trustee may have regard to any information provided to it by such clearing system or its operator as to the identity (either individually or by category) of its accountholders with entitlements to such Global Note or Registered Notes and may consider such interests as if such accountholders were the holders of the Notes represented by such Global Note or Global Certificate.

A05340159    - 55 -

10.    *Notices*

So long as any Notes are represented by a Global Note and such Global Note is held on behalf of a clearing system, notices to the holders of Notes of that Series may be given by delivery of the relevant notice to that clearing system for communication by it to entitled accountholders in substitution for publication, as required by the Conditions, or by delivery of the relevant notice to the holder of the Global Note.

11.    *Partly-paid Notes*

The provisions relating to partly-paid Notes are not set out in this Base Prospectus, but will be contained in the relevant Final Terms and thereby in the Global Notes. For so long as any instalments of the subscription moneys due from the holder of partly-paid Notes are overdue, no interest in a Permanent Global Note representing such Notes may be exchanged for Definitive Notes. In the event that any Noteholder fails to pay any instalment due on any partly-paid Notes within the time specified, the relevant Issuer may be entitled to forfeit such Notes and shall have no further obligation to their holder in respect of them.

## USE OF PROCEEDS

The net proceeds of each Series will be used by the relevant Issuer to purchase the Collateral, pay for or enter into any Swap Agreement or Credit Enhancement Agreement and in meeting certain expenses and fees payable in connection with the operations of such Issuer and the issue of the Notes as set out in the relevant Final Terms, relating to such Tranche.

FORM OF FINAL TERMS

**Final Terms dated [●]**

**[Name of Issuer]**
*(incorporated with limited liability in [insert country of incorporation])*

**[Title of relevant Tranche of Notes (specifying type and nominal amount of Notes) (the "Notes")]
issued pursuant to the
Multi Issuer Secured Obligation Programme
arranged by
Lehman Brothers International (Europe)**

**PART A – CONTRACTUAL TERMS, LISTING AND RATING**

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions set forth in the Base Prospectus dated [●] [and the Supplemental Prospectus dated [●]] which [together] constitute[s] a base prospectus for the purposes of the Directive 2003/71/EC (the "**Prospectus Directive**"). This document constitutes the Final Terms of the Notes described herein for the purposes of Article 5.4 of the Prospectus Directive and must be read in conjunction with such Base Prospectus [as so supplemented]. Full information on *[name of Issuer]* (the "**Issuer**") and the offer of the Notes is only available on the basis of the combination of these Final Terms and the Base Prospectus. [The Base Prospectus [and the Supplemental Prospectus] [is] [are] available for viewing at [address] and copies may be obtained from [address].]

*The following alternative language applies if the first Tranche of an issue which is being increased was issued under a Base Prospectus with an earlier date.*

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions (the "**Conditions**") set forth in the Base Prospectus dated [original date] which constitutes a base prospectus for the purposes of the Prospectus Directive (Directive 2003/71/EC) (the "**Prospectus Directive**"). This document constitutes the Final Terms of the Notes described herein for the purposes of Article 5.4 of the Prospectus Directive and must be read in conjunction with the Base Prospectus dated [current date] [and the Supplemental Prospectus dated [●]] which [together] constitute[s] a base prospectus for the purposes of the Prospectus Directive, save in respect of the Conditions which are extracted from the Base Prospectus dated [original date] and are attached hereto. Full information on *[insert name of issuer]* (the "**Issuer**") and the offer of the Notes is only available on the basis of the combination of these Final Terms and the Base Prospectuses dated [original date] and [current date] [and the Supplemental Prospectus[es] dated [●] and [●]]. [The Base Prospectuses are available for viewing at [address] and copies may be obtained from [address].]

*[Include whichever of the following apply or specify as "Not Applicable" (N/A). Note that the numbering should remain as set out below, even if "Not Applicable" is indicated for individual paragraphs or sub-paragraphs. Italics denote guidance for completing the Final Terms.]*

**Provisions appearing on the face of the [Notes/Certificates]**

| | | | |
|---|---|---|---|
| 1 | Issuer: | [ | ] |
| 2 | Series No: | [ | ] |
| 3 | Tranche No: | [ | ] |
| 4 | ISIN (N.B. see Clause 55 for Common Code): | [ | ] |
| 5 | Currency: | [ | ] |

| | | | |
|---|---|---|---|
| 6 | Principal Amount of Notes admitted to trading: | | |
| | [(i)] Series; | | |
| | [(ii) Tranche; | [ | ] |
| | | [ | ]] |
| 7 | (i) Issue Date: | [ | ] |
| | (ii) [Date [Board] approval for issuance of Notes obtained: | [ | ]] |

**Provisions appearing on the back of the [Notes/Certificates]**

| | | | |
|---|---|---|---|
| 8 | Form: | [Bearer/Exchangeable Bearer/Registered] | |
| 9 | (i) Denomination(s) (*): | [ | ] |
| | (ii) Tradeable Amount: | [ | ] |
| 10 | Status: | Secured and limited-recourse obligations, as described under "Security Arrangements" below | |
| | | [Subordinated/unsubordinated obligations] [*if former, insert relevant subordination provisions*] | |
| 11 | Interest Commencement Date: | [ | ] |
| 12 | Interest Rate (including after Maturity Date): | [[ ] per cent. per annum/ Floating Rate/Zero Coupon/[*other*]] | |
| 13 | Interest Payment Date(s): | [ ] [, subject to adjustment in accordance with the [Following/ Modified Following/ Preceding] Business Day Convention for which the Business Day[s] [is/are] [*specify cities*]] | |
| 14 | Manner in which the Interest Rate is due to be determined (Floating Rate Notes): | [Screen Rate Determination/ISDA Determination/*other (give details)*] | |
| 15 | Screen Rate Determination Condition 5(c) (ii): | | |
| *(a)* | Relevant Time (Floating Rate Notes): | [ | ] |
| *(b)* | Interest Determination Date (Floating Rate Notes): | [[ ] [TARGET] Business Days in [*specify city*] for [*specify currency*] prior to] [the first day in each Interest Period/each Interest Payment Date] | |
| *(c)* | Primary Source for Floating Rate: | [*specify relevant screen page or "Reference Banks"*] | |
| *(d)* | Reference Banks: | [*specify four*] | |
| *(e)* | Relevant Financial Centre (Floating Rate Notes): | [*The financial centre most closely connected to the Benchmark - specify if not London*] | |
| *(f)* | Benchmark: | [LIBOR, LIBID, LIMEAN, EURIBOR *or other benchmark*] | |
| *(g)* | Representative Amount (Floating Rate Notes): | [*Specify if screen or Reference Bank quotes are to be given in respect of a transaction of a specified notional amount*] | |

| | | |
|---|---|---|
| *(h)* | Relevant Currency (Floating Rate Notes): | *[Specify if not currency of denomination]* |
| *(i)* | Effective Date (Floating Rate Notes): | *[Specify if quotes are not to be obtained with effect from commencement of Interest Period]* |
| *(j)* | Specified Duration (Floating Rate Notes): | *[Specify period for quote, if not duration of Interest Period]* |
| 16 | ISDA Determination (Condition 5(c) (i)): | |
| *(a)* | Floating Rate Option: | [•] |
| *(b)* | Designated Maturity: | [•] |
| *(c)* | Reset Date: | [•] |
| *(d)* | ISDA Definitions: (if different from those set out in the Conditions) | [•] |
| 17 | Margin (if applicable): | [    ] per cent. per annum |
| 18 | Rate Multiplier (if applicable): | [                              ] |
| 19 | Maximum/Minimum Interest Rate (if applicable): | [    ] per cent. per annum |
| 20 | Maximum/Minimum Instalment Amount (if applicable): | [                              ] |
| 21 | Maximum/Minimum Redemption Amount (if applicable): | [                              ] |
| 22 | Interest Amount (Fixed Rate Note or Variable Coupon Amount Note): | *[Specify amount of interest due in respect of each denomination on each Interest Payment Date or, if applicable, a formula for calculating such amounts]* |
| 23 | Determination Date(s): (Condition 5(i)) | *(Consider if day count fraction for euro denominated fixed rate issues should be on an Actual/Actual-ISDA or Actual/Actual -ISMA basis* |
| | | *[Insert day(s) and month(s) on which interest is normally paid (if more than one, then insert such dates in the alternative)] in each year* |
| 24 | Day Count Fraction: | [                              ] |
| 25 | Interest Period Date(s) (if applicable): | [                              ] |
| 26 | Redemption Amount (including early redemption): | [Principal Amount/*[other]*] |
| 27 | Maturity Date: | [    ] [, subject to adjustment in accordance with the [Following/Modified Following/Preceding] Business Day Convention for which the Business Day[s] [is/are] [*specify cities*]]/[The Interest Payment Date falling in [*specify month and year*]] |
| 28 | Redemption for Taxation Reasons permitted on days other than Interest Payment Dates: | [Yes/No] |
| 29 | Amortisation Yield: | [    ] per cent. per annum |
| 30 | Terms of redemption at the option of the Issuer or | [                              ] |

A05340159                                    - 60 -

|    | description of any other Issuer's option (if applicable): |    |    |
|----|----|----|----|
| 31 | Issuer's Option Period (if applicable): | [ | ] |
| 32 | Terms of redemption at the option of the Noteholder or description of any other Noteholder's option (if applicable): | [ | ] |
| 33 | Noteholder's Option Period (if applicable): | [ | ] |
| 34 | Exchange (Condition 6(k)): | [Yes/No] | |
| 35 | Partial Redemption - Method for Condition 6(c): | Method [A/B] | |
| 36 | Instalment Date(s) (if applicable): | [ | ] |
| 37 | Instalment Amount(s) (if applicable): | [ | ] |
| 38 | Unmatured Coupons to become void upon early redemption: | [Yes/No] | |
| 39 | Talons to be attached to Notes and, if applicable, the number of Interest Payment Dates between the maturity of each Talon (if applicable): | [No/Yes, maturing every [ ] Interest Payment Dates] | |
| 40 | Business Day Jurisdictions for Condition 7(h) (jurisdictions required to be open for payment): | [ | ] |
| 41 | Additional steps that may only be taken following approval by an Extraordinary Resolution in accordance with Condition 12(a) (if applicable): | [ | ] |
| 42 | Additional Fungible Issues Permitted | [Yes/No] | |
| 43 | Details of any other additions or variations to the Conditions (if applicable): | [ | ] |
| 44 | The Agents (including any Calculation Agent and/or Issuing and Paying Agent and/or Custodian) appointed in respect of the Notes are: | [*List Agents* and *their specified offices*] | |

**Provisions applicable to Global Notes and Certificates**

| 45 | Notes to be represented on issue by: | [Global Note/Global Certificate] | |
|----|----|----|----|
| 46 | Applicable TEFRA exemption: | [C Rules/D Rules/not applicable] [*specify, if yes*] | |
| 47 | Global Note exchangeable for Definitive Notes at the request of the holder: | [ | ] |
| 48 | Exchange Date: | | |

**Provisions relating only to the sale, listing and rating of the Notes**

| 49 | Details of any additions or variations to the selling restrictions: | [ | ] |
|----|----|----|----|
| 50 | (i) Listing: | [ | ] |
|    | (ii) Admission to trading: | [Application may been made for the Notes to be admitted to trading on the regulated marked of the Irish Stock Exchange with effect from [●]][Not applicable] | |
|    | (iii) Estimate of total expenses related to | [ | ] |

admission to trading:

| | | | |
|---|---|---|---|
| 51 | Dealer's Commission: | [ | ] |
| 52 | Net Proceeds of issue: | [] | |
| 53 | Method of issue of Notes: | [Individual Dealer/Syndicated Issue] | |
| 54 | The following Dealer(s) [is/are] subscribing the Notes: | *[Insert legal name(s) of Dealer(s)]* | |
| 55 | Common Code (N.B. See Clause 4 for ISIN): | [ | ] |
| 56 | Rating: | [Yes/No] *[If yes specify rating and give name of rating agency]* | |
| 57 | The aggregate principal amount of Notes issued has been translated into U.S.$ at the rate of [          ], producing a sum of (for Notes not denominated in U.S.$): | U.S.$[          ] | |

**The Security Arrangements**

58    Mortgaged Property

(i)    Securities:

*[Give brief description of assets being secured: (N.B. If Listed Notes and securities are also listed, state type, pool size, legal jurisdiction, amount of Securities, method and date of origination and of acquisition by Issuer, name and address of originator, country of incorporation, nature of business, exchange on which Securities are listed, maturity, any guarantor). (N.B. If Listed Notes and Securities not listed or guaranteed by listed entity, attach full terms and conditions of Securities to Final Terms; additional information may also be required and the stock exchange should be consulted at an early stage.)]*

(ii)    Security (order of priorities):

*The Trustee shall apply all moneys received by it under the Trust Deed in connection with the realisation or enforcement of the Security constituted by the Trust Deed in the following order of priorities:*

[Swap Counterparty Priority/Swap Counterparty Priority (subject to adjustment on Swap Counterparty default)/*Pari Passu* Priority/Noteholder Priority/Other Priority]

(iii)    Swap (if applicable):

[Under an ISDA Master Agreement dated [•] and a confirmation thereto with an effective date of the Issue Date including any applicable guarantee, made between the Issuer and the Swap Counterparty, the Issuer will pay to the Swap Counterparty [[an amount equal to the net subscription moneys for the Notes payable to the Issuer] and sums equal to [interest and principal payable] in respect of the Securities

and the Swap Counterparty will pay to the Issuer [an amount equal to the net sum payable by the Issuer for the purchase of the Securities and sums equal to the interest payable to the Noteholders under the Notes and the Redemption Amount]] [set out other/additional payment provisions]. Except as stated below, the Swap will terminate on the Maturity Date.

[The Swap may be terminated early, (either in whole or, in certain circumstances, in part only) among other circumstances

(i)     on the due date for payment of the Notes if at any time any of the Notes becomes repayable in accordance with the Conditions prior to the Maturity Date/on the date on which a date is set for redemption of the Notes if a date is set for redemption in accordance with the Conditions prior to the Maturity Date;

(ii)    at the option of one party, if there is a failure by the other party to pay any amounts due under the Swap;

(iii)   if (subject as provided in the Swap) withholding taxes are imposed on payments made by the Issuer or the Swap Counterparty under the Swap or it becomes illegal for either party to perform its obligations under the Swap (see "Transfer to avoid Termination Event" below);

(iv)    upon the occurrence of certain other events with respect to either party to the Swap, including insolvency.

Consequences of Early Termination:

Upon any such early termination of the Swap, the Issuer or the Swap Counterparty may (subject as set out below and provided, in the case of certain tax events that the Issuer may first be obliged to use all reasonable endeavours to transfer its obligations) be liable to make a termination payment to the other (regardless, if applicable, of which of such parties may have caused such termination). [In circumstances where some or all of the Notes are required by a Noteholder to be redeemed by the Issuer pursuant to Condition 6(f), no termination payment will be due by either party to the other in respect of the termination,

in whole or in part, as the case may be, of the Swap.

Such termination payment will [(other than [describe any circumstances where termination payments not calculated in accordance with ISDA or where a termination payment is not payable (e.g. on exercise of the put option pursuant to Condition 6(f) as to which, see wording in square brackets at end of previous paragraph))] be based on the replacement cost or gain for a swap transaction that would have the effect of preserving for the party making the determination the economic equivalent of the Swap. In all cases of early termination occurring other than by reason of a default by the Swap Counterparty (in which case the determination will be made by the Issuer) or illegality (in which case the party which is not the Affected Party (as defined in the Swap) will make the determination (or, if there are two Affected Parties, each party will make a determination which will be averaged)), the termination payment will be determined by the Swap Counterparty on the basis of quotations received from at least three market-makers (failing which, by the Swap Counterparty or the Issuer, as aforesaid, based upon loss).

Regardless of which party makes the determination of the termination payment (if any), there is no assurance that the proceeds from the sale of the Securities plus or minus, as the case may be, such termination payment will be sufficient to repay the principal amount due to be paid in respect of the Notes and any other amounts in respect thereof that are due.]

*[Insert summary of further termination provisions]*

|  |  |  |
|---|---|---|
| Swap Counterparty(ies): | | *[Give name(s) and address(es) of institutions]* |
| Swap Guarantor (if applicable): | | *[Give name and address of institution]* |
| (i) | Details of Credit Support Document (if applicable): | *[Give details and/or date and nature of agreement and any other relevant items]* |
| (ii) | Credit Support Provider: | *[Give name(s) and address(es) of institutions]* |

**Provisions relating to Redemption**

| 59 | Call Option (Condition 6(e)) | Applicable/Not Applicable] |
|---|---|---|
| | | *(If not applicable, delete the remaining sub-paragraphs of this paragraph 24)* |

|        |                                                                                      |                         |
|--------|--------------------------------------------------------------------------------------|-------------------------|
| (i)    | Optional Redemption Date(s):                                                         | [•]                     |
| (ii)   | Early Redemption Amount(s) and method, if any, of calculation of such amount(s):      | [•]                     |
| (iii)  | If redeemable in part:                                                                | [•]                     |
| (a)    | minimum nominal amount to be redeemed:                                               | [•]                     |
| (b)    | maximum nominal amount to be redeemed:                                               | [•]                     |
| (iv)   | Description of any other Issuer's option:                                            | [•]                     |
| (v)    | Notice period (if other than as set out in the Conditions):                          | [•]                     |

60    Put Option:

[Applicable/Not Applicable]

*(If not applicable, delete the remaining sub-paragraphs of this paragraph 60)*

|        |                                                                                      |       |
|--------|--------------------------------------------------------------------------------------|-------|
| (i)    | Date(s) for Redemption by Noteholders:                                               | [•]   |
| (ii)   | Early Redemption Amount(s) upon redemption at option of Noteholders and method, if any, of calculation of such amount(s): | [•]   |
| (iii)  | Noteholders' Option Period:                                                          | [•]   |
| (iv)   | Description of any other Noteholders' option:                                        | [•]   |
| (v)    | Notice period (if other than as set out in the Conditions):                          | [•]   |

61    Repayable Assets:

All Securities / Defaulting and/or repayable Securities only]

62    Final Redemption Amount:

[Nominal amount / Other / See Appendix]

63    Early Redemption Amount

| (i) | Early Redemption Amount(s) payable on mandatory redemption (Condition 6(c)), redemption for taxation and other reasons (Condition 6(d)) or an event of default (Condition 10) and/or the method of calculating the same (if required or if different from that set out in the Conditions): | [•] *[Excess funds?]* |
| (ii) | Unmatured Coupons to become void upon early redemption (Bearer Notes only) (Condition 7(f)): | [Yes/No/Not Applicable] |

**Listing and admission to trading application**

These Final Terms comprise the final terms required to list and have admitted to trading the issue of Notes described herein pursuant to the Multi Issuer Secured Obligation Programme.

**Responsibility**

The Issuer accepts responsibility for the information contained in these Final Terms. [● has been extracted from ●.  The Issuer confirms that such information has been accurately reproduced and that, so far as it is aware, and is able to ascertain from information published by ●, no facts have been omitted which would render the reproduced inaccurate or misleading.]

Acceptance on behalf of the Issuer of the terms of the
Final Terms


For and on behalf of

*[Name of Issuer]]*

By ...................................................

**PART B – OTHER INFORMATION**

1    **[Risk Factors**

*[Include any product specific risk factors which are not covered under "Risk Factors" in the Base Prospectus.]*

2    **[Notification**

The *[Irish Financial Services Regulatory Authority]*, which is the Irish competent authority for the purpose of the Prospectus Directive, [has been requested to provide/has provided - include first alternative for an issue which is contemporaneous with the establishment or update of the Programme and the second alternative for subsequent issues] the *[include names of competent authorities of host Member States]* with a certificate of approval attesting that the Base Prospectus has been drawn up in accordance with the Prospectus Directive.]

3    **[Interests of Natural and Legal Persons Involved in the [Issue/Offer]**

"Save as discussed in ["*Subscription and Sale*" in the Base Prospectus], so far as the Issuer is aware, no person involved in the offer of the Notes has an interest material to the offer."]

4    **[Reasons for the Offer, Estimated Net Proceeds and Total Expenses**

| | |
|---|---|
| Reasons for the offer | [●] |
| | *(See "Use of Proceeds" wording in Base Prospectus.)* |
| Estimated net proceeds: | [●] |
| | *(If proceeds are intended for more than one use will need to split out and present in order of priority. If proceeds insufficient to fund all proposed uses state amount and sources of other funding.)* |
| Estimated total expenses: | [●] *[Include breakdown of expenses]* ] |

5    **[*Fixed Rate Notes only* – Yield**

| | |
|---|---|
| Indication of yield: | [●] |

A05340159
- 66 -

[As set out above, the] [The] yield is calculated at the Issue Date on the basis of the Issue Price. It is not an indication of future yield. ]

6   [*Index-linked or other variable-linked Notes only* – **Performance of Index/Formula/Other Variable, Explanation of Effect on Value of Investment and Associated Risks and Other Information concerning the Underlying**

*Need to include details of where past and future performance and volatility of the index/formula/other variable can be obtained. Where the underlying is an index need to include the name of the index and a description if composed by the Issuer and if the index is not composed by the Issuer need to include details of where the information about the index can be obtained. Where the underlying not and index need to include equivalent information*

7   [*Dual Currency Notes only* - **PERFORMANCE OF RATE[S] OF EXCHANGE**

*Need to include details of where past and future performance and volatility of the relevant rate[s] can be obtained.*

8   [*Alternative clearing system]*

[Any clearing system(s) other than Euroclear Bank S.A./N.V. and Clearstream Banking Societe Anonyme and the relevant identification number(s):]     [Not Applicable/*give name(s), address(es) and number(s)*]

## SUBSCRIPTION AND SALE

Subject to the terms and on the conditions contained in the Programme Agreement the Notes will be offered on a continuous basis by the Issuers to Lehman Brothers International (Europe) and/or such dealer(s) (each a "Dealer") as may be appointed from time to time in respect of any Series of Notes pursuant to the Programme Agreement. The Notes may be resold at prevailing market prices, or at prices relating thereto, at the time of such resale, as determined by the relevant Dealer.

The name or names of the Dealer or Dealers with respect to the Notes, the Issue Price of the Notes and, if listed, any commissions payable in respect thereof will be specified in the relevant Final Terms.

The Notes have not been and will not be registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons, except in certain transactions exempt from the registration requirements of the Securities Act. Each Dealer has agreed and each further Dealer appointed under the Programme will be required to agree that, except as permitted by the Programme Agreement, it will not offer, sell or, in the case of Bearer Notes, deliver Notes (i) as part of their distribution at any time or (ii) otherwise until 40 days after the completion of the distribution of an identifiable tranche of which such Notes are a part (the "Distribution Compliance Period"), as determined and certified by the Issuing and Paying Agent to such Dealer (or, in the case of an identifiable tranche of Notes sold to or through more than one Dealer, by the lead manager in respect of that tranche to such Dealer), within the United States or to, or for the account or benefit of, U.S. persons, and it will have sent to each Dealer to which it sells Notes during the Distribution Compliance Period a confirmation or other notice setting out the restrictions on offers and sales of the Notes within the United States or to, or for the account or benefit of, U.S. persons. Terms used in this paragraph have the meanings given to them by Regulation S.

In addition, until 40 days after the commencement of the offering of any identifiable tranche of Notes, an offer or sale of Notes within the United States by any dealer not participating in the offering may violate the registration requirements of the Securities Act.

Bearer Notes are subject to U.S. tax law requirements and may not be offered, sold or delivered within the United States or its possessions or to a United States person, except in certain transactions permitted by U.S. tax regulations. Terms used in this paragraph have the meanings given to them by the U.S. Internal Revenue Code and regulations thereunder.

In relation to Notes which have a maturity of 12 months or more from their date of issue and which are not to be admitted to trading on the regulated market of the Irish Stock Exchange (or other regulated market for the purposes of the Prospectus Directive) and have denominations of less than €50,000, in relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a Relevant Member State), each Dealer has represented and agreed, and each further Dealer appointed under the Programme will be required to represent and agree, that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the Relevant Implementation Date) it has not made and will not make an offer of Notes to the public in that Relevant Member State except that it may, with effect from and including the Relevant Implementation Date, make an offer of Notes to the public in that Relevant Member State:

(a)    in (or in Germany, where the offer starts within) the period beginning on the date of publication of a prospectus in relation to those Notes which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive and ending on the date which is 12 months after the date of such publication;

(b)    at any time to legal entities which are authorised or regulated to operate in the financial markets or, if not so authorised or regulated, whose corporate purpose is solely to invest in securities;

(c)    at any time to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

(d)    at any time in any other circumstances which do not require the publication by the Issuer of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of Notes to the public" in relation to any Notes in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the Notes to be offered so as to enable an investor to decide to purchase or subscribe the Notes, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression Prospectus Directive means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

Each Dealer has represented and agreed that:

(i)    in relation to any Notes which have a maturity of less than one year, (a) it is a person whose ordinary activities involve it in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of its business and (b) it has not offered or sold and will not offer or sell any Notes other than to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or who it is reasonable to expect will acquire, hold, manage or dispose of investments (as principal or agent) for the purposes of their businesses where the issue of the Notes would otherwise constitute a contravention of section 19 of the Financial Services and Markets Act 2000 (the "FSMA");

(ii)    it has only communicated or caused to be communicated and will only communicate or cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of section 21 of the FSMA received by it in connection with the issue or sale of any Notes in circumstances in which section 21(1) of the FSMA does not apply to the Issuer; and

(iii)    it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to such Notes in, from or otherwise involving the United Kingdom.

Each Dealer has represented and agreed that:

(1)    Each Dealer has not and will not offer or sell any Notes other than in compliance with the EU Directive 2003/6/EC on insider dealing and market manipulation, S.I. No. 324 2005 and any applicable implementing legislation and rules.

(2)    To the extent applicable, it will not underwrite the issue of or place the Notes otherwise than in conformity with the provisions of the Irish Investment Intermediaries Act, 1995 (as amended), including, without limitation, Sections 9, 23 (including any advertising restrictions made thereunder) and Section 37 (including any codes of conduct issued thereunder) of the provisions of the Irish Investor Compensation Act, 1998, including, without limitation, Section 21.

(3)    No Notes will be offered or sold with a maturity of less than 12 months except in full compliance with the Irish Financial Services Regulatory Authority Notice BJD C 01/02

Each Dealer has represented and agreed that no public offerings or sales of Notes or any distribution of any offering material relating to the Notes may be made in or from Luxembourg, except for the Notes in respect of which the requirements of Luxembourg law concerning public offerings of securities in Luxembourg have been fulfilled.

The Dealer has acknowledged that the Notes, Loans, Options, Schuldscheine or Swaps may not be offered or sold in Spain nor any document or offer material may be distributed in Spain or targeted to Spanish resident

investors save in compliance and in accordance with the requirements set out in Law 24/1988 of the Spanish Securities Market, as amended.

Each Dealer has agreed that no offering of Notes or distribution of any offering materials relating to the Notes will be made in Italy unless the requirements of Italian law concerning the offering of securities have been complied with, including (i) the requirements of Article 94 and seq. of Legislative Decree no. 58 of 24th February, 1998 and CONSOB Regulation no. 11971 of 14th May, 1999, (ii) Article 129 of Legislative Decree No. 385 and the implementing instructions of the Bank of Italy (pursuant to which the issue, trading or placement of securities in Italy is subject to prior notification to the Bank of Italy, unless an exemption, depending, *inter alia*, on the amount of the issue and the characteristics of the securities, applies) and (iii) all other Italian securities, tax and exchange controls and any other applicable laws and regulations, all as amended from time to time.

The Obligations have not been and will not be registered under the Securities and Exchange Law of Japan (the "Securities and Exchange Law"). Accordingly, each of the Dealers has represented and agreed that it has not, directly or indirectly, offered or sold and will not, directly or indirectly, offer or sell any Obligations in Japan or to a resident of Japan except pursuant to an exemption from the registration requirements of, and otherwise in compliance with the Securities and Exchange Law and other relevant laws and regulations of Japan. As used in this paragraph, "resident of Japan" means any person resident in Japan, including any corporation or other entity organised under the laws of Japan.

These selling restrictions may be modified by the agreement of the Issuers and the Dealers following a change in a relevant law, regulation or directive. Any such modification will be set out in the relevant Final Terms or Obligation Documents issued in respect of the issue of Obligations to which it relates.

No action has been taken in any jurisdiction that would permit a public offering of any of the Obligations, or possession or distribution of this Base Prospectus, any other Specified Company Base Prospectus or any Final Terms or any other offering material, in any country or jurisdiction where action for that purpose is required.

Each Dealer has agreed that it will, to the best of its knowledge, comply with all relevant laws, regulations and directives in each jurisdiction in which it purchases, offers, sells or delivers Obligations or has in its possession or distributes this Base Prospectus, any other Specified Company Base Prospectus or any Final Terms or any other offering material and neither the Issuers nor any other Dealer shall have responsibility therefor.

**ISSUER DISCLOSURE ANNEX**

# Ruby Finance plc (the "Issuer")

*(incorporated with limited liability in the Republic of Ireland)*

## Multi Issuer Secured Obligation Programme

Under the Multi Issuer Secured Obligation Programme (the "Programme") described in pages 1 to 70 of the Base Prospectus dated 16 August 2005 relating to the Programme Ruby Finance plc (the "Company" or the "Issuer"), incorporated with limited liability in the Republic of Ireland, subject to compliance with all relevant laws, regulations and directives, may from time to time issue, borrow under, buy, sell or enter into secured obligations ("Obligations") in the form of notes ("Notes"), loans ("Loans"), options ("Options"), schuldscheins ("Schuldscheins") or swaps ("Swaps") on the terms set out in the Base Prospectus, as supplemented by (in the case of Notes) final terms or (in the case of Loans, Options, Schuldscheins or Swaps) any relevant documentation entered into in connection therewith (the "Obligation Documents").

This Issuer Disclosure Annex together with pages 1 to 70 of the Base Prospectus dated 16 August 2005 relating to the Programme and any documents which are deemed to be incorporated by reference herein comprises a base prospectus relating to the Issuer (the "Base Prospectus"). This Issuer Disclosure Annex forms part of the Base Prospectus and must be read and construed in conjunction with the rest of the Base Prospectus, and all other documents which are deemed to be incorporated by reference in the Base Prospectus. The Base Prospectus has been created for the purposes of providing information on the Issuer and Obligations.

Application has been made to the Irish Financial Services Regulatory Authority as competent authority under Directive 2003/71/EC, for the Base Prospectus to be approved. Application has been made to the Irish Stock Exchange for the Notes to be admitted to the Official List and to trading on its regulated market.

The Issuer accepts responsibility for the information contained in the Base Prospectus. To the best of the knowledge and belief of the Issuer, having taken all reasonable care to ensure that such is the case, the information in the Base Prospectus is in accordance with the facts and does not omit anything likely to affect the import of such information.

**Arranger and Dealer**
**Lehman Brothers International (Europe)**

The date of this Issuer Disclosure Annex is 16 August 2005

## Table of Contents

RISK FACTORS.................................................................................................2

DESCRIPTION OF RUBY FINANCE PLC.............................................................5

TAXATION .....................................................................................................8

GENERAL INFORMATION................................................................................11

## RISK FACTORS

*The purchase of Notes may involve substantial risks and is suitable only for sophisticated investors who have the knowledge and experience in financial and business matters necessary to enable them to evaluate the risks and the merits of an investment in the Notes. Before making an investment decision, prospective purchasers of Notes should consider carefully, in the light of their own financial circumstances and investment objectives, all the information set forth in the Base Prospectus and, in particular, the considerations set forth below and in the section of the Base Prospectus dated 16 August 2005 headed "Risk Factors" and in the applicable Final Terms. The considerations set forth below repeat certain considerations set forth in the section of the Base Prospectus dated 16 August 2005 headed "Risk Factors".*

*The Issuer does not represent that the statements below regarding risks associated with the Issuer are exhaustive and the Issuer may be unable to pay interest, principal or other amounts on or in connection with any Notes for reasons other than those described below (and other than those described in the section of the Base Prospectus dated 16 August 2005 headed "Risk Factors"). The Issuer and the Dealers disclaim any responsibility to advise prospective investors of such risks as they exist at the date of this Base Prospectus or as they change from time to time.*

### General

This Base Prospectus identifies in general terms certain information that a prospective investor should consider prior to making an investment in the Notes. However, a prospective investor should conduct its own thorough analysis (including its own accounting, legal and tax analysis) prior to deciding whether to invest in any Notes issued under the Programme as any evaluation of the suitability for an investor of an investment in Notes issued under the Programme depends upon a prospective investor's particular financial and other circumstances, as well as on specific terms of the relevant Notes and, if it does not have experience in financial, business and investment matters sufficient to permit it to make such a determination, it should consult with its financial adviser prior to deciding to make an investment on the suitability of any Notes. This Base Prospectus is not, and does not purport to be, investment advice.

In particular, each prospective investor in Notes must determine, based on its own independent review and such professional advice as it deems appropriate under the circumstances, that its acquisition of the Notes (i) is fully consistent with its (or if it is acquiring the Notes in a fiduciary capacity, the beneficiary's) financial needs, objectives and condition, (ii) complies and is fully consistent with all investment policies, guidelines and restrictions applicable to it (whether acquiring the Notes as principal or in a fiduciary capacity) and (iii) is a fit, proper and suitable investment for it (or, if it is acquiring the Notes in a fiduciary capacity, for the beneficiary), notwithstanding the clear and substantial risks inherent in investing in or holding the Notes.

Each prospective investor in Notes should have sufficient financial resources and liquidity to bear all of the risks of an investment in the relevant Notes, including where principal or interest is payable in one or more currencies, or where the currency for principal or interest payments is different from the potential investor's currency.

Investment activities of certain investors are subject to investment laws and regulations, or review or regulation by certain authorities. Each prospective investor should therefore consult its legal advisers to determine whether and to what extent (i) the Notes are legal investments for it, (ii) if relevant, the Notes can be used as underlying securities for various types of borrowing and (iii) other restrictions apply to its purchase or, if relevant, pledge of any Notes. Financial institutions should consult their legal advisers or the appropriate regulators to determine the appropriate treatment of Notes under any applicable risk-based capital or similar rules.

2

*The Issuer is a special purpose vehicle*

The Issuer's sole business is the raising of money by issuing notes or other obligations for the purposes of purchasing assets and entering into related derivatives and other contracts. The Issuer has covenanted not to have any subsidiaries or employees, consolidate or merge with any other person or issue any shares (other than such shares as were in issue on the date of its incorporation). As such, the Issuer has, and will have, no assets other than its issued and paid-up share capital, such fees (as agreed) payable to it in connection with the issue of Notes or entry into other obligations from time to time and any Mortgaged Property and any other assets on which Notes or other obligations are secured. There is no day to day management of the business of the Issuer.

*Regulation of the Issuer by any regulatory authority*

The Issuer is not required to be licensed, registered or authorised under any current securities, commodities or banking laws of its jurisdiction of incorporation and will operate without supervision by any authority in any jurisdiction. There is no assurance, however, that regulatory authorities in one or more jurisdictions would not take a contrary view regarding the applicability of any such laws to the Issuer. The taking of a contrary view by such regulatory authority could have an adverse impact on the Issuer or the holders of the Notes.

Any investment in the Notes does not have the status of a bank deposit and is not within the scope of any deposit protection scheme.

*Preferred creditors under Irish law*

Under Irish law, upon an insolvency of an Irish company, when applying the proceeds of assets subject to fixed security which may have been realised in the course of a liquidation or receivership, the claims of a limited category of preferential creditors will take priority over the claims of creditors holding the relevant fixed security. These preferred claims include the remuneration, costs and expenses properly incurred by any examiner of the company (which may include any borrowings made by an examiner to fund the company's requirements for the duration of his appointment) which have been approved by the Irish courts (see "Examinership" below).

In relation to the disposal of assets of any Irish tax resident company which are subject to security, a person entitled to the benefit of the security may be liable for tax in relation to any capital gains made by the company on a disposal of those assets on exercise of the security.

*Examinership*

Examinership is a court procedure available under the Irish Companies (Amendment) Act 1990, as amended to facilitate the survival of Irish companies in financial difficulties.

The Issuer, the directors of the Issuer, a contingent, prospective or actual creditor of the Issuer, or shareholders of the Issuer holding, at the date of presentation of the petition, not less than one-tenth of the voting share capital of the Issuer are each entitled to petition the court for the appointment of an examiner. The examiner, once appointed, has the power to set aside contracts and arrangements entered into by the company after his appointment and, in certain circumstances, can avoid a negative pledge given by the company prior to his appointment. Furthermore, he may sell assets the subject of a fixed charge. However, if such power is exercised he must account to the holders of the fixed charge for the amount realised and discharge the amount due to them out of the proceeds of sale.

During the period of protection, the examiner will compile proposals for a compromise or scheme of arrangement to assist the survival of the company or the whole or any part of its undertaking as a going concern. A scheme of arrangement may be approved by the Irish High Court when at least one class of creditors has voted in favour of the proposals and the Irish High Court is satisfied that such proposals are fair and equitable in relation to any class of members or creditors who have not accepted the proposals and whose interests would be impaired by implementation of the scheme of arrangement.

3

In considering proposals by the examiner, it is likely that secured and unsecured creditors would form separate classes of creditors. In the case of the Issuer, if the Trustee represented the majority in number and value of claims within the secured creditor class (which would be likely given the restrictions agreed to by the Issuer in the Conditions), the Trustee would be in a position to reject any proposal not in favour of the Noteholders. The Trustee would also be entitled to argue at the Irish High Court hearing at which the proposed scheme of arrangement is considered that the proposals are unfair and inequitable in relation to the Noteholders, especially if such proposals included a writing down of the value of amounts due by the Issuer to the Noteholders. The primary risks to the holders of Notes if an examiner were to be appointed to the Issuer are as follows:

(i)     the potential for a scheme of arrangement to be approved involving the writing down of the debt owed by the Issuer to the Noteholders as secured by the Trust Deed;

(ii)    the potential for the examiner to seek to set aside any negative pledge in the Notes prohibiting the creation of security or the incurring of borrowings by the Issuer to enable the examiner to borrow to fund the Issuer during the protection period; and

(iii)   in the event that a scheme of arrangement is not approved and the Issuer subsequently goes into liquidation, the examiner's remuneration and expenses (including certain borrowings incurred by the examiner on behalf of the Issuer and approved by the Irish High Court) will take priority over the monies and liabilities which from time to time are or may become due, owing or payable by the Issuer to the Noteholders.

## DESCRIPTION OF THE COMPANY

### General

Ruby Finance plc was registered and incorporated in Ireland on 4 February 2003 under the Irish Companies Acts 1963 - 2001 (as amended), registration number 366880. Ruby Finance plc has been established as a special purpose vehicle for the purpose of issuing asset backed securities. Ruby Finance plc has been incorporated for an indefinite period. The Registered Office of Ruby Finance plc is at AIB International Centre, International Financial Services Centre, Dublin 1, telephone number 00 353 1 874 0777. The authorised share capital of Ruby Finance plc is Euro 40,000 divided into 40,000 ordinary shares of Euro 1 each, all of which have been issued and fully paid up. 39,994 of the issued ordinary shares are held by Mourant & Co. Trustee Limited as share trustee (the "Share Trustee") and the remaining six are held by six nominee shareholders which hold such shares on trust for the Share Trustee. Under the terms of a declaration of trust (the "Declaration of Trust") dated on or about 18 March 2003 the Share Trustee holds all the issued shares held directly or indirectly by it on trust for the holders of Notes and counterparties to other Transactions until all payments in respect of such Notes and other Transactions have been duly made and thereafter on trust for one or more Qualified Charities (as defined in the Declaration of Trust). The Share Trustee has no beneficial interest in and derives no benefit (other than its fees for acting as Share Trustee) from its holding of the shares of Ruby Finance plc.

### Business

Ruby Finance plc has not engaged, since its incorporation, in any activities other than those incidental to its incorporation under the Irish Companies Acts 1963-2001, the accession to the Programme, the authorisation and issue of the existing Notes and Notes, the matters referred to or contemplated in the Base Prospectus and the authorisation, execution, delivery and performance of the other documents to which it is or will be a party and matters which are incidental or ancillary to the foregoing. The principal objects of Ruby Finance plc are set forth in Clause 3.1 of its Memorandum of Association and include, *inter alia*, the management of financial assets, the purchase, transfer of, investment in and acquisition of, by any means of loans, bonds or other obligations, including the extension of credit and any security therefore and the raising and borrowing of money and the granting of security over its assets for such purposes. So long as any of the Obligations of Ruby Finance plc remain outstanding, Ruby Finance plc will not, *inter alia*, (a) enter into any business whatsoever, other than acquiring Mortgaged Property, issuing Notes or creating other Obligations or entering into a similar limited recourse transaction, entering into related agreements and transactions and performing any act incidental to or in connection with the foregoing, (b) have any subsidiaries, (c) have any employees or (d) dispose of any Mortgaged Property or any interest therein or create any mortgage, charge or security interest or right of recourse in respect thereof in favour of any person (other than contemplated by the Base Prospectus).

### Directors

The Directors of the Company are as follows:

| Name | Principal Occupation |
|---|---|
| Adrian Wrafter | Financial Consultant |
| Daniel McGing | Chartered Accountant |

The business address of Adrian Wrafter is 1 Riverside Drive, Rathfarnham, Dublin 14 and the business address of Daniel McGing is 25 Beechcourt, Ballinclea Road, Killiney, Co. Dublin.

AIB International Financial Services Limited of AIB International Centre, International Financial Services Centre, Dublin 1, is the administrator of the Company. Its duties include the provision of certain administrative and related services including acting as company secretary. The appointment of the administrator may be terminated and the administrator may retire upon 90 days' written notice subject to the appointment of an alternative administrator.

The Company has established a bank account with Allied Irish Banks plc at AIB International Centre, IFSC, Dublin 1.

## Financial Statements

The Company published its first financial statements in respect of the period ending on 31 January 2004 and filed them with the Companies Registration Office. The Company intends to publish financial statements in respect of the period ending on 31 January 2005. Any future published financial statements prepared by the Company (which will, in each case, be in respect of the period ending on 31 January) will be available from the registered office of the Company. The auditors of the Company, KPMG, Chartered Accountants and Registered Auditors at 5 George's Dock, IFSC, Dublin 1, are authorised and regulated by the Institute of Chartered Accountants in Ireland for designated investment business.

Except as disclosed in this Base Prospectus, there has been no material adverse change in the financial position or prospects of Ruby Finance plc since the date of its last published audited financial statements, being those for the financial year ended 31 January 2004.

## Rating

Obligations of Ruby Finance plc may be rated by Moody's Investors Service Limited ("Moody's"). Any such rating will be specified in the relevant Final Terms. Each rating will address Ruby Finance plc's ability to perform its obligations under the terms of the Obligations and, where the amount of those obligations is calculated by reference to a credit-dependent index, the likelihood that payments will be due under the Obligations. Where the amount of the obligations is determined by reference to a market-dependent index, the ratings do not currently address the likelihood that payments will be due under the terms of the Obligations.

A rating is not a recommendation to buy, sell or hold securities or other investments and may be subject to suspension, reduction or withdrawal at any time by Moody's. A suspension, reduction or withdrawal of the rating assigned to the Obligations may adversely affect the market price of such Obligations.

## DOCUMENTS INCORPORATED BY REFERENCE

This Base Prospectus should be read and construed in conjunction with the audited annual financial statements of Ruby Finance plc for the period from its incorporation on 4 February 2003 to 31 January 2004 together with the audit report thereon, which have been previously published or are published simultaneously with this Base Prospectus and which have been approved by the Irish Stock Exchange or filed with it or with the Irish Financial Services Regulatory Authority. Such documents shall be deemed to be incorporated in, and form part of this Base Prospectus, save that any statement contained in a document which is deemed to be incorporated by reference herein shall be deemed to be modified or superseded for the purpose of this Base Prospectus to the extent that a statement contained herein modifies or supersedes such earlier statement (whether expressly, by implication or otherwise). Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Base Prospectus.

## TAXATION
## REPUBLIC OF IRELAND

The following is a summary based on the laws and practices currently in force in Ireland regarding the tax position of investors beneficially owning their Notes and should be treated with appropriate caution. Particular rules may apply to certain classes of taxpayers holding Notes. The summary does not constitute tax or legal advice and the comments below are of a general nature only. Prospective investors in the Notes should consult their professional advisers on the tax implications of the purchase, holding, redemption or sale of the Notes and the receipt of interest thereon under the laws of their country of residence, citizenship or domicile.

### Withholding Tax

In general, tax at the standard rate of income tax (currently 20 per cent), is required to be withheld from payments of Irish source interest. However, an exemption from withholding on interest payments exists under Section 64 of the Taxes Consolidation Act, 1997 (the "**1997 Act**") for certain securities ("**quoted Eurobonds**") issued by a body corporate (such as the Issuer) which are in bearer form, interest bearing and quoted on a recognised stock exchange (which would include the Irish Stock Exchange).

Any interest paid on such quoted Eurobonds can be paid free of withholding tax provided:

1    the person by or through whom the payment is made is not in Ireland; or

2    the payment is made by or through a person in Ireland, and either:

    2.1    the quoted Eurobond is held in a clearing system recognised by the Irish Revenue Commissioners (Euroclear and Clearstream, Luxembourg are so recognised), or

    2.2    the person who is the beneficial owner of the quoted Eurobond and who is beneficially entitled to the interest is not resident in Ireland and has made a declaration to a relevant person (such as an Irish paying agent) in the prescribed form.

So long as the Notes are in bearer form (whether as Global Notes or as Notes in definitive form), are quoted on a recognised stock exchange and are held in Euroclear and/or Clearstream, Luxembourg, interest on the Notes can be paid by the Issuer and any paying agent acting on behalf of the Issuer without any withholding or deduction for or on account of Irish income tax.

If, for any reason, the quoted Eurobond exemption referred to above ceases to apply, the Issuer can still pay interest on the Notes free of withholding tax provided it is a "qualifying company" (within the meaning of Section 110 of the 1997 Act) and provided the interest is paid to a person resident in a "relevant territory" (i.e. a member state of the European Union (other than Ireland) or in a country with which Ireland has a double taxation agreement). For this purpose, residence is determined by reference to the law of the country in which the recipient claims to be resident. This exemption from withholding tax will not apply, however, if the interest is paid to a company in connection with a trade or business carried on by it through a branch or agency located in Ireland.

In certain circumstances, Irish tax will be required to be withheld at the standard rate from interest on any quoted Eurobond, where such interest is collected by a bank in Ireland on behalf of any Noteholder who is Irish resident.

### Taxation of Noteholders

Notwithstanding that a Noteholder may receive interest on the Notes free of withholding tax, the Noteholder may still be liable to pay Irish income tax. Interest paid on the Notes may have an Irish source and therefore be within the charge to Irish income tax and levies. Ireland operates a self assessment system in respect of income tax and any person, including a person who is neither resident nor ordinarily resident in Ireland, with Irish source income comes within its scope.

However, interest on the Notes will be exempt from Irish income tax if the recipient of the interest is resident in a relevant territory provided either (i) the Notes are quoted Eurobonds and are exempt from withholding tax as set out above (ii) in the event of the Notes ceasing to be quoted Eurobonds, if the Issuer is a qualifying company within the meaning of Section 110 of the 1997 Act, or if the Issuer has ceased to be a qualifying company, the recipient of the interest is a company.

Notwithstanding these exemptions from income tax, a corporate recipient that carries on a trade in Ireland through a branch or agency in respect of which the Notes are held or attributed, may have a liability to Irish corporation tax on the interest.

Interest on the Notes which does not fall within the above exemptions may be within the charge to Irish income tax.

**Capital Gains Tax**

A holder of Notes will be subject to Irish tax on capital gains on a disposal of Notes unless such holder is neither resident nor ordinarily resident in Ireland and does not carry on a trade in Ireland through a branch or agency in respect of which the Notes are used or held.

**Capital Acquisitions Tax**

A gift or inheritance comprising of Notes will be within the charge to capital acquisitions tax if either (i) the disponer or the donee/successor in relation to the gift or inheritance is resident or ordinarily resident in Ireland (or, in certain circumstances, if the disponer is domiciled in Ireland irrespective of his residence or that of the donee/successor) or (ii) if the Notes are regarded as property situate in Ireland. Bearer notes are generally regarded as situated where they are physically located at any particular time, but the Notes may be regarded as situated in Ireland regardless of their physical location as they are secured over Irish property, and they themselves secure a debt due by an Irish resident debtor. Accordingly, if such Notes are comprised in a gift or inheritance, the gift or inheritance may be within the charge to tax regardless of the residence status of the disponer or the donee/successor.

**Stamp Duty**

No stamp duty or similar tax is imposed in Ireland on the issue (on the basis of an exemption provided for in Section 85(2)(c) to the Stamp Duties Consolidation Act, 1999 provided the proceeds of the Notes are used in the course of the Issuer's business), transfer or redemption of the Notes whether they are represented by Global Notes or Definitive Notes.

**EU Savings Directive**

On 3 June, 2003 the Council of the European Union (ECOFIN) adopted a directive regarding the taxation of interest income. Each EU Member State must implement the directive by enacting legislation that requires paying agents (within the meaning of the directive) established within its territory to provide to the relevant competent authority details of interest payments made to any individual and certain intermediate entities resident in another EU Member State or a territory being a dependent or associated territory of a Member State (Reportable Territory).

The competent authority of the EU Member State of the paying agent (within the meaning of the directive) is then required to communicate this information to the competent authority of the Reportable Territory of which the beneficial owner of the interest is a resident.

Austria, Belgium and Luxembourg may opt instead to withhold tax from interest payments within the meaning of the directive.

Member States must apply the respective provisions with effect from 1 July, 2005. Ireland has implemented the directive into national law. Any Irish paying agent making an interest payment on behalf of the Issuer after 1 July 2005 to an individual, and certain residual entities defined in the 1997 Act, resident in another Reportable Territory will have to provide details of the payment to the Irish Revenue Commissioners who in turn will provide such information to the competent authorities of the Reportable Territory of residence of the individual or residual entity concerned.

# GENERAL INFORMATION

1   The accession to the Programme by Ruby Finance plc has been authorised pursuant to a resolution of the board of directors of Ruby Finance plc passed on 22 July 2005.

2   Each Bearer Note, Receipt, Coupon and Talon will bear the following legend: "Any United States person who holds this obligation will be subject to limitations under the United States income tax laws, including the limitations provided in Sections 165(j) and 1287(a) of the Internal Revenue Code".

3   Notes may be accepted for clearance through the Euroclear and Clearstream, Luxembourg systems. The Common Code and the International Securities Identification Number (ISIN) (if any) for each Series of Notes will, if applicable, be set out in the relevant Final Terms.

4   It is expected that each Tranche of Notes which is to be listed and admitted to trading on the regulated market of the Irish Stock Exchange will be admitted separately as and when issued, subject only to the issue of a Global Note or Notes initially representing the Notes of such Tranche. The listing of the Programme in respect of Notes was granted on 22 July 2005.

5   For so long as Notes may be issued pursuant to this Base Prospectus and are outstanding, copies of the following documents will be available during usual business hours on any weekday (Saturdays and public holidays excepted) for inspection in physical form at the registered office of Ruby Finance plc and at the specified offices of the Issuing and Paying Agent and Irish Paying Agent:

    (a)   the Memorandum and Articles of Association of Ruby Finance plc;

    (b)   the Trust Deed (which includes the form of the Global Notes, the definitive Bearer Notes, the Certificates, the Coupons, the Receipts and the Talons);

    (c)   the Agency Agreement;

    (d)   the Declaration of Trust;

    (e)   the Deed of Accession signed by Ruby Finance plc;

    (f)   the Swap Agreements (if any) entered into from time to time;

    (g)   the Credit Enhancement Agreements (if any) entered into from time to time;

    (h)   a copy of this Base Prospectus together with any other document required or permitted to be published by the rules of the Irish Stock Exchange;

    (i)   the Final Terms relating to each Series of Notes listed on a stock exchange; and

    (j)   the financial statements of Ruby Finance plc for each of the two years preceding the publication of the Base Prospectus or, if such financial statements have not been published, financial statements in respect of such periods as have been published (if any).

6   Ruby Finance plc has published financial statements since the dates of its incorporation, and has prepared audited annual financial statements.

7   Ruby Finance plc has obtained or will obtain all necessary consents, approvals and authorisations in connection with the issue and performance of the Obligations issued by it.

8   Except as disclosed in this Base Prospectus, Ruby Finance plc has not been involved in any governmental, legal or arbitration proceedings (including any such proceedings which are pending or threatened of which Ruby Finance plc is aware) during the 12 months preceding the date of this Base Prospectus which may have

or have had in the recent past significant effects, in the context of the issue of Notes, on the financial position or profitability of Ruby Finance plc.

9    Ruby Finance plc does not intend to provide post issuance transaction information regarding securities to be admitted to trading and the performance of underlying collateral, unless otherwise specified in the applicable Final Terms.

**REGISTERED OFFICE OF THE ISSUER**
AIB International Centre,
International Financial Services Centre,
Dublin 1

**TRUSTEE**
J.P. Morgan Corporate Trustee Services Limited
Trinity Tower
9 Thomas More Street
London E1W 1YT

**ISSUING AND PAYING AGENT, TRANSFER AGENT, CUSTODIAN AND REGISTRAR**
JPMorgan Chase Bank, N.A.
Trinity Tower
9 Thomas More Street
London E1W 1YT

**PAYING AND TRANSFER AGENT**
J.P. Morgan Bank (Ireland) plc
JPMorgan House
International Financial Services Centre
Dublin 1

**ARRANGER AND DEALER**
Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE

**CALCULATION AGENT, DISPOSAL AGENT AND PURCHASE AGENT**
Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE

**LISTING AGENT FOR THE PROGRAMME**
A&L Listing Limited
25/28 North Wall Quay
International Financial Services Centre
Dublin 1

**AUDITOR OF THE ISSUER**
KPMG
5 George's Dock
IFSC
Dublin 1

**LEGAL ADVISERS**

*to the Issuers*
*as to Irish law*

*to the Dealers and the Trustee*
*as to English law*

**A&L Goodbody**
International Financial Services Centre
North Wall Quay
Dublin 1

**Linklaters**
One Silk Street
London EC2Y 8HQ

CONFORMED COPY

Dated 22 July 2005

**ANGIOLIERI FINANCE PUBLIC LIMITED COMPANY**
**AQUAMARINE FINANCE PUBLIC LIMITED COMPANY**
**BERYL FINANCE LIMITED**
**BOCCACCIO FINANCE PUBLIC LIMITED COMPANY**
**DIAMOND FINANCE PUBLIC LIMITED COMPANY**
**GMG FINANCE LIMITED**
**JUPITER QUARTZ FINANCE PLC**
**ONYX FUNDING LIMITED**
**PEARL FINANCE PUBLIC LIMITED COMPANY**
**PETRARCA FINANCE PUBLIC LIMITED COMPANY**
**QUARTZ FINANCE PUBLIC LIMITED COMPANY**
**RUBY FINANCE PUBLIC LIMITED COMPANY**
**SAPHIR FINANCE PUBLIC LIMITED COMPANY**
**TOPAZ FINANCE LIMITED**
**J.P. MORGAN CORPORATE TRUSTEE SERVICES LIMITED**
**JPMORGAN CHASE BANK, N.A.**
**J.P. MORGAN BANK (IRELAND) PLC**
**LEHMAN BROTHERS SPECIAL FINANCING INC.**
**LEHMAN BROTHERS FINANCE S.A.**

and

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

# DEED OF ACCESSION

In respect of accession to the
Multi Issuer Secured Obligation Programme of
Danta Finance plc and other Specified Companies
arranged by
**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

Linklaters

Ref: 01/200/MWAF/JZD

This Deed of Accession is made on 22 July 2005 between:

(1)   ANGIOLIERI FINANCE PUBLIC LIMITED COMPANY ("ANGIOLIERI"), AQUAMARINE
      FINANCE PUBLIC LIMITED COMPANY, BERYL FINANCE LIMITED ("BERYL"),
      BOCCACCIO FINANCE PUBLIC LIMITED COMPANY ("BOCCACCIO"), DIAMOND
      FINANCE PUBLIC LIMITED COMPANY ("DIAMOND"), GMG FINANCE LIMITED ("GMG"),
      JUPITER QUARTZ FINANCE PLC ("JUPITER"), ONYX FUNDING LIMITED ("ONYX"),
      PEARL FINANCE PUBLIC LIMITED COMPANY ("PEARL"), PETRARCA FINANCE PUBLIC
      LIMITED COMPANY ("PETRARCA"), QUARTZ FINANCE PUBLIC LIMITED COMPANY
      ("QUARTZ"), RUBY FINANCE PUBLIC LIMITED COMPANY ("RUBY"), SAPHIR FINANCE
      PUBLIC LIMITED COMPANY (FORMERLY KNOWN AS CHALK FINANCE PUBLIC
      LIMITED COMPANY) ("SAPHIR") AND TOPAZ FINANCE LIMITED ("TOPAZ") (each an
      "Issuer" and together the "Issuers");

(2)   J.P. MORGAN CORPORATE TRUSTEE SERVICES LIMITED (the "Trustee");

(3)   JPMORGAN CHASE BANK, N.A. (the "Issuing and Paying Agent");

(4)   J.P. MORGAN BANK (IRELAND) PLC (the "Paying Agent" and, together with the Issuing and
      Paying Agent, the "Agents");

(5)   LEHMAN BROTHERS SPECIAL FINANCING, INC. ("LBSF");

(6)   LEHMAN BROTHERS FINANCE S.A. ("LBF"); and

(7)   LEHMAN BROTHERS INTERNATIONAL (EUROPE) (in its capacity as calculation agent, the
      "Calculation Agent" and, in its capacity as dealer under the Programme, the "Dealer").

Whereas:

(A)   Dante Finance Public Limited Company ("Dante") and the Trustee are parties to a trust deed
      dated 10 October 2002, as amended and restated on 11 February 2005 (the "Principal Trust
      Deed") establishing the Multi-Issuer Secured Obligation Programme (the "Programme") for
      the issuance from time to time of secured notes.

(B)   Angiolieri, Boccaccio and Petrarca all acceded to the Programme by executing deeds of
      accession dated 10 October 2002, Diamond, Pearl, Quartz, Ruby and Saphir acceded to the
      Programme by executing deeds of accession dated 11 February 2003, 7 January 2003,
      12 March 2003 and 9 April 2003, respectively, Onyx acceded to the Programme by executing a
      deed of accession dated 23 March 2004, GMG acceded to the Programme by executing a
      deed of accession dated 10 May 2004, Jupiter acceded to the Programme by executing a
      deed of accession dated 4 June 2004, Topaz acceded to the Programme by executing a deed
      of accession dated 14 June 2004, Aquamarine acceded to the Programme by executing a
      deed of accession dated 2 September 2004 and Beryl acceded to the Programme by
      executing a deed of accession dated 1 February 2005 (each an "Original Deed of
      Accession").

(C)   Pursuant to their respective Original Deeds of Accession, each Issuer agreed to become and
      be treated as an "Issuer" for all purposes as set out in the Original Master Documents (or, as
      the case may be, the Existing Master Documents) and agreed to assume all the rights,
      obligations and liabilities of an "Issuer" as set out in the Original Master Documents (or, as the
      case may be, the Existing Master Documents) and each of the Other Parties (in the capacity to
      which they were a party to the Original Master Documents (or, as the case may be, the

(D)    Existing Master Documents)) agreed to each Issuer becoming and being treated as an "Issuer" for such purposes and assuming the rights, obligations and liabilities of an "Issuer" as set out in the Original Master Documents (or, as the case may be, the Existing Master Documents).

(D)    Pursuant to their respective Original Deeds of Accession each Issuer also agreed to become and be treated as "Party B" for all purposes of the Original LBF Swap and the Original LBSF Swap (or, as the case may be, Existing LBF Swap and Existing LBSF Swap) and agreed to assume all the rights, obligations and liabilities of "Party B" as set out in the Original LBF Swap and the Original LBSF Swap (or, as the case may be, Existing LBF Swap and Existing LBSF Swap) and LBF and LBSF (in the capacity in which it is a party to the Original LBF Swap and the Original LBSF Swap (or, as the case may be, Existing LBF Swap and Existing LBSF Swap), respectively) agreed to the Issuer becoming and being treated as "Party B" for such purposes and assuming the rights, obligations and liabilities of "Party B" as set out in the Original LBF Swap and the Original LBSF Swap (or, as the case may be, Existing LBF Swap and Existing LBSF Swap).

(E)    Certain of the Original Master Documents, Original LBF Swap and Original LBSF Swap were amended and restated on 30 January 2004 and/or 11 February 2005 and further deeds of accession were entered into on 30 January 2004 and 11 February 2005.

(F)    On 22 July 2005 Dante, the Other Parties, LBSF and LBF wish to update the Programme by amending and restating the Existing Master Documents, the Existing LBF Swap and the Existing LBSF Swap by entering into the Master Documents, the LBF Swap and the LBSF Swap and the Issuers wish to accede to such amended and restated documents as set out below.

Now this deed witnesses and it is hereby declared as follows:

1    **Definitions**

"Agency Agreement" means the agency agreement dated 10 October 2002, between Dante, the Trustee, the Calculation Agent and the Agents as amended and restated on 22 July 2005;

"Existing Agency Agreement" means the agency agreement dated 10 October 2002, as amended and restated on 30 January 2004, between Dante, the Trustee, the Calculation Agent and the Agents;

"Existing LBF Swap" means an ISDA Master Agreement (including the Schedule thereto) dated 10 October 2002, between Dante and LBF, as amended and restated on 30 January 2004;

"Existing LBSF Swap" means an ISDA Master Agreement (including the Schedule thereto) dated 10 October 2002, between Dante and LBSF, as amended and restated on 30 January 2004;

"Existing Master Documents" means, the Existing Agency Agreement, the Existing Programme Agreement, and the Existing Principal Trust Deed;

"Existing Principal Trust Deed" means the principal trust deed dated 10 October 2002, as amended and restated on 11 February 2005, between Dante and the Trustee;

"Existing Programme Agreement" means the programme agreement dated 10 October 2002, as amended and restated on 30 January 2004, between Dante and the Dealer;

"LBF Swap" means an ISDA Master Agreement (including the Schedule thereto) dated 10 October 2002, between Dante and LBF, as amended and restated on 22 July 2005;

"LBSF Swap" means an ISDA Master Agreement (including the Schedule thereto) dated 10 October 2002, between Dante and LBSF, as amended and restated on 22 July 2005;

"Master Documents" means the Agency Agreement, the Programme Agreement, and the Principal Trust Deed;

"Original Agency Agreement" means the agency agreement dated 10 October 2002, between Dante, the Trustee, the Calculation Agent and the Agents;

"Original LBF Swap" means an ISDA Master Agreement (including the Schedule thereto) dated 10 October 2002, between Dante and LBF;

"Original LBSF Swap" means an ISDA Master Agreement (including the Schedule thereto) dated 10 October 2002, between Dante and LBSF;

"Original Master Documents" means, the Original Agency Agreement, the Original Programme Agreement, and the Original Principal Trust Deed;

"Original Programme Agreement" means the programme agreement dated 10 October 2002, between Dante and the Dealer;

"Original Principal Trust Deed" means the principal trust deed dated 10 October 2002, between Dante and the Trustee; and

"Other Parties" means the Trustee, the Agents, the Calculation Agent and the Dealer;

"Principal Trust Deed" means the principal trust deed dated 10 October 2002, between Dante and the Trustee, as amended and restated on 22 July 2005; and

"Programme Agreement" means the programme agreement dated 10 October 2002, between Dante, the Trustee, the Issuing and Paying Agent and the Dealer as amended and restated on 22 July 2005.

2    **Accession**

2.1    With effect from the date of this Deed of Accession, each Issuer hereby severally agrees to become and be treated as an "Issuer" for all purposes set out in the Master Documents and agrees to assume all rights, obligations and liabilities of an "Issuer" as set out in the Master Documents and each of the Other Parties (in each capacity in which it is a party to one or more of the Master Documents) agrees to each of the Issuers becoming and being treated as an "Issuer" for such purposes and assuming the rights, obligations and liabilities of an "Issuer" as set out in the Master Documents.

2.2    With effect from the date of this Deed of Accession, each Issuer hereby severally agrees to become and be treated as "Party B" for all purposes of the LBF Swap and the LBSF Swap and agrees to assume all rights, obligations and liabilities of "Party B" as set out in the LBF Swap and the LBSF Swap and LBF and LBSF (in the capacity in which it is a party to the LBF Swap and the LBSF Swap, respectively) agrees to the Issuer becoming and being treated as "Party B" for such purposes and assuming the rights, obligations and liabilities of "Party B" as set out in the LBF Swap and the LBSF Swap.

**3    Counterparts**

This Deed of Accession may be executed in counterparts which when taken together shall constitute one and the same instrument.

**4    Contracts (Rights of Third Parties) Act 1999**

A person who is not a party to this Deed of Accession has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Deed of Accession.

**5    Governing Law**

This Deed of Accession shall be governed by and construed in accordance with English law.

In witness whereof this Deed of Accession has been executed as a deed as of the date stated at the beginning.

**SIGNED, SEALED AND DELIVERED** for and on behalf of **ANGIOLIERI FINANCE PUBLIC LIMITED COMPANY**

by its lawfully appointed attorney:    HUW MERRIMAN

In the presence of:    ADDIE UGBENNE

Witness signature:
Address:
Occupation:

**SIGNED, SEALED AND DELIVERED** for and on behalf of **AQUAMARINE FINANCE PUBLIC LIMITED COMPANY**

by its lawfully appointed attorney:    HUW MERRIMAN

In the presence of:    ADDIE UGBENNE

Witness signature:
Address:
Occupation:

**EXECUTED AS A DEED** for and on behalf of **BERYL FINANCE LIMITED**

by its lawfully appointed attorney:    HUW MERRIMAN

In the presence of:    ADDIE UGBENNE

Witness signature:
Address:
Occupation:

**SIGNED, SEALED AND DELIVERED** for and on behalf of **BOCCACCIO FINANCE PUBLIC LIMITED COMPANY**

by its lawfully appointed attorney:      HUW MERRIMAN

In the presence of:      ADDIE UGBENNE

Witness signature:
Address:
Occupation:


**SIGNED, SEALED AND DELIVERED** for and on behalf of **DIAMOND FINANCE PUBLIC LIMITED COMPANY**

by its lawfully appointed attorney:      HUW MERRIMAN

In the presence of:      ADDIE UGBENNE

Witness signature:
Address:
Occupation:


**SIGNED, SEALED AND DELIVERED** for and on behalf of **PEARL FINANCE PUBLIC LIMITED COMPANY**

by its lawfully appointed attorney:      HUW MERRIMAN

In the presence of:      ADDIE UGBENNE

Witness signature:
Address:
Occupation:


A05266320/1.1a/12 Aug 2005

**SIGNED, SEALED AND DELIVERED** for and on behalf of GMG FINANCE LIMITED

by its lawfully appointed attorney:    HUW MERRIMAN

in the presence of:    ADDIE UGBENNE

Witness signature:
Address:
Occupation:

**EXECUTED AS A DEED** for and on behalf of JUPITER QUARTZ FINANCE PLC

by its lawfully appointed attorney:    HUW MERRIMAN

in the presence of:    ADDIE UGBENNE

Witness signature:
Address:
Occupation:

**EXECUTED AS A DEED** for and on behalf of ONYX FUNDING LIMITED

by its lawfully appointed attorney:    HUW MERRIMAN

in the presence of:    ADDIE UGBENNE

Witness signature:
Address:
Occupation:

SIGNED, SEALED AND DELIVERED for and on behalf of PETRARCA FINANCE PUBLIC LIMITED COMPANY

by its lawfully appointed attorney:    HUW MERRIMAN

In the presence of:    ADDIE UGBENNE

Witness signature:
Address:
Occupation:


SIGNED, SEALED AND DELIVERED for and on behalf of QUARTZ FINANCE PUBLIC LIMITED COMPANY

by its lawfully appointed attorney:    HUW MERRIMAN

In the presence of:    ADDIE UGBENNE

Witness signature:
Address:
Occupation:


SIGNED, SEALED AND DELIVERED for and on behalf of RUBY FINANCE PUBLIC LIMITED COMPANY

by its lawfully appointed attorney:    HUW MERRIMAN

In the presence of:    ADDIE UGBENNE

Witness signature:
Address:
Occupation:


A05266320/1.1a/12 Aug 2005

**SIGNED, SEALED AND DELIVERED** for and on behalf of SAPHIR FINANCE PUBLIC LIMITED COMPANY

by its lawfully appointed attorney:    HUW MERRIMAN

in the presence of:    ADDIE UGBENNE

Witness signature:
Address:
Occupation:

**EXECUTED AS A DEED** for and on behalf of TOPAZ FINANCE LIMITED

by its lawfully appointed attorney:    HUW MERRIMAN

in the presence of:    ADDIE UGBENNE

Witness signature:
Address:
Occupation:

**J.P. MORGAN CORPORATE TRUSTEE SERVICES LIMITED**

By:        JENNY PENNELL

**JPMORGAN CHASE BANK, N.A.**

By:        JENNY PENNELL

**J.P. MORGAN BANK (IRELAND) PLC**

By:        ANNE DANHAIVE

A05288320/1.1a/12 Aug 2005

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By:      CAROLYN MELENDEZ


**LEHMAN BROTHERS FINANCE S.A.**

By:      BARBARA GROB


         NADIA CASSANOVA


**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By:      TIKI MACLENNAN


In the presence of:      ADDIE UGBENNE


A05285320/1.1a/12 Aug 2005