SERIES PROSPECTUS


**RUBY FINANCE PUBLIC LIMITED COMPANY**

*(incorporated with limited liability in Ireland)*

**SERIES NO: 2006-2 EUR 10,000,000 ORION ENHANCED RETURN DYNAMIC CDO CREDIT LINKED SYNTHETIC PORTFOLIO NOTES DUE 2013**


issued pursuant to the
Multi-Issuer
Secured Obligation Programme
arranged by


LEHMAN BROTHERS INTERNATIONAL (EUROPE)

Issue Price: 100 per cent.


Linklaters
01/200/DAD/MJM/APF


The date of this Series Prospectus is 28 April 2006

This Series Prospectus applicable to the issue by Ruby Finance Public Limited Company (the "**Issuer**") of its Series 2006-2 EUR 10,000,000 Orion Enhanced Return Dynamic CDO Credit Linked Synthetic Portfolio Notes due 2013 (the "**Notes**") should be read in conjunction with the Base Prospectus relating to the Issuer and the Multi-Issuer Secured Obligation Programme (the "**Programme**"), dated 16 August 2005 (the "**Base Prospectus**") (including the Accounts (as defined below)) which is deemed to be incorporated herein by reference (see "Incorporation by Reference" below). Terms defined in the Base Prospectus have the same meaning in this Series Prospectus.

The Notes have been constituted and secured pursuant to a Supplemental Trust Deed and Drawdown Agreement dated 28 April 2006 between, amongst others, the Issuer and the Trustee.

This Series Prospectus (including the information incorporated by reference herein) once filed with and approved by the Irish Financial Services Regulatory Authority, will constitute a prospectus for the purposes of Article 5 of Directive 2003/71/EC (the "**Prospectus Directive**"). This Series Prospectus is to be read in conjunction with all documents which are deemed to be incorporated herein by reference.

The obligations of the Issuer under the Notes will be secured as described in "Security Arrangements".

Subject as set out below, the Issuer accepts responsibility for the information contained in this Series Prospectus. To the best of the knowledge and belief of the Issuer, having taken all reasonable care to ensure that such is the case, the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information.

The delivery of the Series Prospectus at any time does not imply that any information contained therein is correct at any time subsequent to the date hereof. The information on page [93] in relation to the Collateral Securities (as defined herein), the information on pages [55] to [62] in relation to the Initial Reference Registry (as defined herein) and the information on page [94] in relation to the Swap Counterparty and the Swap Guarantor has, in each case, been accurately extracted from publicly available information. So far as the Issuer is aware and is able to ascertain from information published in relation to the Initial Reference Registry, the Collateral Securities, the Swap Counterparty and the Swap Guarantor, no facts have been omitted which would render the reproduced information misleading.

Application has been made to the Irish Financial Services Regulatory Authority (the "**IFSRA**") as competent authority under Directive 2003/71/EC for this Series Prospectus to be approved. Application has also been made to The Irish Stock Exchange Limited (the "**Irish Stock Exchange**") for the Notes to be admitted to the daily official list of the Irish Stock Exchange (the "**Official List**") and to be admitted to trading on the regulated market of the Irish Stock Exchange. There can be no assurance that such applications will be successful.

The Notes are expected on issue to be assigned a rating of "Baa1" by Moody's Investors Service, Inc ("**Moody's**"). However, there is no assurance that the Issuer will be able to obtain such a rating for the Notes. A security rating is not a recommendation to buy, sell or hold securities and may be subject to suspension, reduction or withdrawal at any time. A suspension, reduction or withdrawal of the rating assigned to the Notes may adversely affect the market price of the Notes. The occurrence of Credit Events and/or a suspension, reduction or withdrawal of the rating assigned to any Reference Entity may result in a severe reduction of the rating assigned to the Notes.

The Arranger makes no representation, recommendation or warranty, express or implied, regarding the accuracy, adequacy, reasonableness or completeness of the information contained herein or in any further information, notice or other document which may at any time be supplied in connection with the Notes and accepts no responsibility or liability therefor.

The Notes will be issued on the terms set out in this Series Prospectus read together with the Base Prospectus.

All payments of principal and interest by the Issuer in respect of Notes and Coupons will be made subject to any deduction for or on account of withholding taxes imposed on any such payments and taxes imposed as a result of the European Council Directive 2003/48/EC or any other European Union Directive implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directive or any other law introduced as a consequence of the adoption or implementation of such Directive.

In the event of the imposition upon the Issuer of a requirement to withhold or account for tax or the imposition of a tax in respect of its income resulting in it being unable to make the payment of the full amount due in respect of the Notes, the Issuer will, subject to the Terms and Conditions of the Notes, use all reasonable endeavours to arrange for the substitution of its obligations by a company incorporated in another jurisdiction provided that, for so long as the Notes are rated by Moody's, the Issuer shall notify Moody's and that such change shall not adversely affect any existing rating of the Notes as confirmed in writing by Moody's.

If the Issuer satisfies the Trustee that such substitution cannot be arranged, the Noteholders may elect to receive payments in respect of their Notes net of withholding or deduction for, or on account of, any taxes, failing which the Issuer shall (if applicable and subject to the consent of the Trustee) redeem all, but not some only, of the Notes at their redemption amount together with accrued interest (if any).

This Series Prospectus does not constitute, and may not be used for the purposes of, an offer or solicitation by anyone in any jurisdiction in which such offer or solicitation is not authorised or to any person to whom it is unlawful to make such offer or solicitation, and no action is being taken to permit an offering of the Notes or the distribution of this Series Prospectus or any other offering material in any jurisdiction where such action is required.

In this Series Prospectus, references to "euro", "EUR" and "€" refer to the currency introduced from the third stage of European economic and monetary union pursuant to the Treaty establishing the European Community, as amended by the Treaty on European Union, and references to "USD", "US$" and "U.S. dollars" are to United States dollars.

## Incorporation by Reference

This Series Prospectus should be read and construed in conjunction with the following documents which have been previously published or are published simultaneously with this Series Prospectus and that have been approved by IFSRA or filed with it and shall be deemed to be incorporated in, and form part of, this Series Prospectus:

(1)    the Base Prospectus;

(2)    the audited financial statements of the Issuer for the period from its incorporation on 4 February 2003 to 31 January 2004 and for the financial year ended 31 January 2005 together with the audit report thereon (the "Accounts");

save that any statement contained in any of the documents incorporated by reference in, and forming part of, this Series Prospectus shall be deemed to be modified or superseded for the purpose of this Series Prospectus to the extent that a statement contained herein modifies or supersedes such earlier statement (whether expressly, by implication or otherwise). Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Series Prospectus. This Series Prospectus must be read in conjunction with the Base Prospectus (including the Accounts) and full information on the Issuer and the offer of the Notes is only available on the basis of the combination of the provisions set out within this document and the Base Prospectus (including the Accounts).

The Base Prospectus (including the Accounts) is available for viewing at, and copies may be obtained free of charge from, the office of the Irish Paying Agent specified below.

## Table of Contents

|  | Page |
|---|---|
| RISK FACTORS | 6 |
| TERMS AND CONDITIONS OF THE NOTES | 9 |
| ANNEX 1 – FORM OF SWAP CONFIRMATION | 9 |
| USE OF PROCEEDS | 9 |
| THE COLLATERAL SECURITIES | 9 |
| DESCRIPTION OF THE SWAP COUNTERPARTY AND THE SWAP GUARANTOR | 9 |
| GENERAL INFORMATION | 9 |

## RISK FACTORS

*The purchase of Notes may involve substantial risks and is suitable only for sophisticated investors who have the knowledge and experience in financial and business matters necessary to enable them to evaluate the risks and the merits of an investment in the Notes. Before making an investment decision, prospective purchasers of Notes should consider carefully, in the light of their own financial circumstances and investment objectives, all the information set forth in this Series Prospectus and in the Base Prospectus.*

*The Issuer does not represent that the statements below regarding the risks of holding any Notes are exhaustive and the Issuer may be unable to pay interest, principal or other amounts on or in connection with any Notes for reasons other than those described below. The Issuer and the Dealers disclaim any responsibility to advise prospective investors of such risks as they exist at the date of this Series Prospectus or as they change from time to time.*

*The attention of prospectus investors is also drawn to the section headed "Risk Factors" in the Base Prospectus*

### Credit Linked Notes

The Notes are credit-linked securities linked to the creditworthiness of the Reference Entities and the performance of obligations of the Reference Entities. As at the Issue Date, the Reference Entities are the 165 entities listed in Schedule A of Annex 1 to this Series Prospectus. Investors should note that the Notes differ from ordinary debt securities issued by the Issuer in that the amount of principal and the Reserve Ledger Payment Amount payable on maturity of the Notes by the Issuer is dependent on whether one or more Credit Events in respect of the Reference Entities have occurred.

### Credit Events

The likelihood of a Credit Event occurring in respect of a Reference Entity will generally fluctuate with, among other things, the financial condition and other characteristics of the Reference Entity, general economic conditions, the condition of certain financial markets, political events, developments or trends in any particular industry and changes in prevailing interest rates. If a Credit Event occurs, the Noteholders may receive reduced principal payments under the Notes and in certain circumstances the Notes may redeem at zero.

### Principal payable

Payments of principal under the Notes may be at risk if Credit Events occur. Upon the occurrence of six Credit Events, based on the Initial Reference Registry and assuming a determination of a Final Price equal to zero with respect to each of the affected Reference Obligations, the Notes would redeem at an amount equal to the Initial Reserve Ledger Level.

### Limited Information regarding the Reference Entities

None of the Issuer, the Trustee and the Noteholders will have any right, except as specifically required under the terms of the Swap Agreement and the Notes, to receive any information regarding any Reference Entity or any Reference Obligation. The Dealer, the Swap Counterparty or their affiliates may have acquired, or during the term of the Notes may acquire, confidential information with respect to any Reference Entity or Reference Obligation and, subject to applicable law, none of them shall be under any duty to disclose such confidential information to any Noteholder. None of the Issuer, the Swap Counterparty, the Trustee or any other person on

their behalf makes any representation or warranty, express or implied, as to the credit quality of any of the Reference Entities or any of their respective Obligations. Lehman Brothers International (Europe) has used reasonable efforts to verify the names of the Reference Entities and details of the Benchmark Obligations contained in Schedule A. Such information has been verified by reference to publicly available information. However, publicly available information can be inaccurate or outdated, and as a result corrections to the details of Reference Entities and Benchmark Obligations may need to be made from time to time.

### Addition and Removal of Reference Entities

Reference Entities may be added to, or removed from, the Reference Registry (each a "Reference Registry Adjustment") in accordance with the terms of a portfolio management agreement between LRI Landesbank Rheinland-Pfalz International SA (the "Portfolio Manager"), the Calculation Agent and the Swap Counterparty dated 28 April 2006 (the "Portfolio Management Agreement"). Following a Reference Registry Adjustment, the Reference Entities in respect of which a Credit Event may be determined will be those Reference Entities contained in the Reference Registry as amended by the Reference Registry Adjustment. Losses incurred by Noteholders may be greater than if such Reference Registry Adjustment had not been made.

### Reserve Ledger Level Change

Under the terms of the Portfolio Management Agreement, the Calculation Agent will determine whether each Reference Registry Adjustment will result in an upward or downward adjustment to the Reserve Ledger Level. Any downward adjustment will reduce the Reserve Ledger Payment Amount payable on maturity of the Notes.

### No Legal or Beneficial Interest in Obligations of the Reference Entities

Under the Swap Agreement, the Issuer will have a contractual relationship only with the Swap Counterparty and not with any obligor in respect of any Reference Obligation or any Reference Entity. Consequently, the Swap Agreement will not constitute a purchase or other acquisition or assignment of any interest in the Reference Entity or any of its obligations. The Issuer and the Trustee will have rights solely against the Swap Counterparty and will have no recourse against the Reference Entity. None of the Issuer, the Swap Counterparty, the Trustee or any other person on their behalf has undertaken any legal due diligence in respect of any of the Reference Entities.

### Interest on Early Redemption

If the Notes become subject to Early Redemption, then interest will cease to accrue on the Notes on the date of redemption and no further interest shall be payable to Noteholders after the Early Redemption Date.

### Liquidity Risk

There is not at present an active and liquid secondary market for the Notes. There can be no assurance that a secondary market for any of the Notes will develop, or, if a secondary market does develop, that it will provide the holders of the Notes with liquidity or that it will continue for the entire life of the Notes. Accordingly, an investment in the Notes is suitable only for investors who can bear the risks associated with a lack of liquidity in the Notes and the financial and other risks associated with an investment in the Notes.

**Calculation of Unwind Costs**

On an Early Redemption of the Notes, the value of any Unwind Costs payable by the Issuer to the Swap Counterparty will be deducted from any Early Redemption Amount(s) payable to Noteholders. One element of the Unwind Costs is the termination payment due under the Swap Agreement (disregarding the balance standing to the credit of the Prepayment Account (as defined in the Swap Agreement). Such termination payment will be calculated on the basis that the Issuer has an obligation under the Swap Agreement to pay all sums due to the Swap Counterparty thereunder (without regard to the limited recourse provisions contained therein). This may reduce significantly the amount(s) payable to Noteholders following an Early Redemption Event.

**Early Redemption Events.**

The Notes may become subject to early redemption (i) if any of the collateral becomes repayable prior to its stated date of maturity, (ii) if there is a payment default in respect of any of the collateral as provided in Condition 6(c), (iii) for tax reasons as provided in Condition 6(d) (*Redemption for Taxation and Other Reasons*), (iv) following an event of default with respect of the Notes or (v) if the Swap Agreement is terminated for any reason.

On an early redemption of the Notes, the Noteholders shall receive the Early Redemption Amount of the Notes, which shall (except in the circumstances set out in the terms and conditions) be an amount per Note equal to the lesser of (a) the Outstanding Nominal Amount plus any accrued but unpaid interest and (b) such Note's pro rata share of (i) the proceeds of sale or realisation of any Collateral Securities, plus (if payable to the Issuer) or minus (if payable to the Swap Counterparty) (ii) the value of any unwind costs. The amount of such unwind costs shall be determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, and may significantly reduce the amount payable to Noteholders.

## TERMS AND CONDITIONS OF THE NOTES

The terms of the Notes and additional provisions relating to their issue are as follows.

Capitalised terms used but not otherwise defined in these Conditions shall have the meanings given to such terms in the Swap Confirmation, the form of which is set out in Annex 1 hereto.

The Notes are credit-linked to the Reference Entities for the time being comprised in the Reference Registry maintained by the Calculation Agent and the Portfolio Manager in accordance with the Swap Confirmation and a portfolio management agreement between the Counterparty, the Calculation Agent and LRI Landesbank Rheinland-Pfalz International SA (the "**Portfolio Manager**") dated 28 April 2006 (the "**Portfolio Management Agreement**").

The initial Reference Registry in effect as of the Trade Date (the "**Initial Reference Registry**") is set out in Schedule A to the Swap Confirmation.

| | | |
|---|---|---|
| 1 | Issuer: | Ruby Finance Public Limited Company. |
| 2 | Series No: | 2006-2. |
| 3 | Tranche No: | Not applicable. |
| 4 | ISIN (N.B. see paragraph 55 below for Common Code): | XS0251736517 |
| 5 | Currency: | euro ("**EUR**"). |
| 6 | Principal Amount of Notes admitted to trading: | |
| | (i)  Series: | EUR 10,000,000 (the "**Initial Principal Amount**"). |
| | (ii) Outstanding Nominal Amount: | The outstanding nominal amount on which the Redemption Amount will be calculated means, with respect to each Note at any time, an amount in EUR (rounded down to the nearest cent) equal to the Aggregate Outstanding Nominal Amount, divided by the total number of Notes outstanding as at such time, as determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner (the "**Outstanding Nominal Amount**"). |

"**Aggregate Outstanding Nominal Amount**" means, initially, the aggregate principal amount of Notes then outstanding. If, at any time, the Swap Counterparty under the Swap Agreement determines that one or more Credit Events has or have occurred during the Credit Observation Period and the Conditions to Settlement with respect to such Credit Event have been satisfied, the Aggregate Outstanding Nominal Amount will be reduced by the Calculation Agent with effect from the relevant Event Determination Date with respect to such Credit Event(s) so as to equal the Initial Principal Amount minus the Cumulative Loss Amount, subject to a minimum of zero.

The Calculation Agent hereunder shall determine the amount by which the Aggregate Outstanding Nominal Amount is

reduced and the date of such reduction in accordance with the amounts notified to it by the Swap Calculation Agent pursuant to the Swap Agreement.

The Calculation Agent shall promptly notify the Issuer, the Trustee, the Issuing and Paying Agent, the Swap Counterparty and Moody's of any reduction of the Aggregate Outstanding Nominal Amount hereunder. Notwithstanding anything to the contrary contained in Condition 14, upon receipt of such notification from the Calculation Agent, the Issuing and Paying Agent shall promptly notify Noteholders of the same in accordance with the Conditions.

| | | |
|---|---|---|
| 7 | Issue Date: | 28 April 2006. |
| 8 | Form: | Bearer. |
| 9 | Denomination: | EUR 100,000. |
| 10 | Status: | Secured and limited recourse obligations, as described under "Security Arrangements" below. |
| 11 | Interest Commencement Date: | 28 April 2006. |
| 12 | Interest Rate (including after Maturity Date): | Floating Rate. For the avoidance of doubt, each Note bears interest on its full outstanding principal amount in accordance with Condition 5 (without any reduction on account of the occurrence of Credit Events). |
| 13 | Interest Payment Date(s): | 20 March, 20 June, 20 September and 20 December in each year, commencing on 20 June 2006 (short first coupon) and ending on the Scheduled Maturity Date (each a "**Scheduled Interest Payment Date**"), subject in each case to adjustment in accordance with the Following Business Day Convention, for which the relevant Business Days shall be London and TARGET Business Days. |
| 14 | Manner in which the Interest Rate is due to be determined (Floating Rate Notes): | ISDA Determination. |
| 15 | Screen Rate Determination Condition 5(c) (ii): | Not applicable. |
| 16 | ISDA Determination (Condition 5(c) (i)): | |
| | (a)  Floating Rate Option: | EUR-EURIBOR-Telerate |
| | (b)  Designated Maturity: | 3 months, provided that in respect of the first Interest Accrual Period, the ISDA Rate shall be determined by the Calculation Agent through the use of straight line interpolation by reference to two rates based on the Floating Rate Option specified hereon, one of which shall be determined as if the Designated Maturity were the period of time for which rates are available next shorter than the length of the first Interest Accrual Period and the other of which shall be determined as |

|    |    | if the Designated Maturity were the period of time for which rates are available next longer than the length of the first Interest Accrual Period. |
|----|----|----|
|    | (c)  Reset Date: | The first day of the Interest Accrual Period. |
|    | (d)  ISDA Definitions: | ISDA Definitions (as defined in Condition 5(i)). |
| 17 | Margin (if applicable): | Plus 1.50 per cent. per annum. |
| 18 | Rate Multiplier (if applicable): | Not applicable. |
| 19 | Maximum/Minimum Interest Rate (if applicable): | Not applicable. |
| 20 | Maximum/Minimum Instalment Amount (if applicable): | Not applicable. |
| 21 | Maximum/Minimum Redemption Amount (if applicable): | Not applicable. |
| 22 | Interest Amount (Fixed Rate Note or Variable Coupon Amount Note): | Not applicable. |
| 23 | Determination Date(s) (Condition 5(i)): | Not applicable. |
| 24 | Day Count Fraction: | Actual/360. |
| 25 | Interest Period Date(s) (if applicable): | Not applicable. |
| 26 | Maturity Date: | 20 September 2013, subject to adjustment in accordance with the Following Business Day Convention, for which the relevant Business Days shall be London and TARGET Business Days (the "**Scheduled Maturity Date**") unless an Adjustment Reference Entity or a Notice Delivery Period Extension Event (each as defined in and determined in accordance with the Swap Agreement) exists as at the Final Cut-off Date, in which case the Maturity Date shall be the Deferred Redemption Date (or, where there is more than one Adjustment Reference Entity or Notice Delivery Period Extension Event in existence on the Final Cut-off Date, the last Deferred Redemption Date to occur). |
| 27 | Redemption for Taxation Reasons permitted on days other than Interest Payment Dates: | Yes. |
| 28 | Amortisation Yield: | Not applicable. |
| 29 | Exchange (Condition 6(k)): | No. |
| 30 | Mandatory Redemption (in accordance with Condition 6(c)): | See paragraph 44 below. |
| 31 | Instalment Date(s) (if applicable): | Not applicable. |
| 32 | Instalment Amount(s) (if applicable): | Not applicable. |

| | | |
|---|---|---|
| 33 | Unmatured Coupons to become void upon early redemption: | Yes. |
| 34 | Talons to be attached to Notes and, if applicable, the number of Interest Payment Dates between the maturity of each Talon (if applicable): | Not applicable. |
| 35 | Business Day Jurisdictions for Condition 7(h) (jurisdictions required to be open for payment): | London and TARGET. |
| 36 | Additional steps that may only be taken following approval by an Extraordinary Resolution in accordance with Condition 12(a) (if applicable): | Not applicable. |
| 37 | Additional Fungible Issues Permitted: | Yes, subject to the Issuer having received from the Swap Counterparty its prior written consent to any such fungible issue. |
| 38 | Details of any other additions or variations to the Conditions (if applicable): | For the purposes of the Notes only: |

(i)  Notwithstanding anything to the contrary contained in Conditions 6 and 10, upon the occurrence of any of the events set out in Condition 6(c) and (d) and Condition 10 (each such occurrence an "**Early Redemption Event**" and the date of the relevant occurrence, as determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, being the "**Early Redemption Event Date**"), the Issuer shall forthwith notify the Trustee, the Noteholders and Moody's of the occurrence of such event and the date fixed for redemption, being a day falling no later than six London and TARGET Business Days following the relevant Early Redemption Event Date (the "**Early Redemption Date**"). The Issuer shall redeem each Note on the Early Redemption Date at its Early Redemption Amount as set out in paragraph 44 below.

(ii)  Notwithstanding Condition 14, so long as the Notes are represented by a Global Note held on behalf of Euroclear, Clearstream, Luxembourg or any other clearing system, notices in respect thereof may be given by their being delivered to Euroclear, Clearstream, Luxembourg or such other clearing system, as the case may be. For the avoidance of doubt, such notices shall be deemed given on the date and, if applicable, at the time they are delivered to Euroclear, Clearstream,

Luxembourg or such other clearing system, as the case may be.

39   The Agents (including any Calculation Agent and/or Issuing and Paying Agent and/or Custodian) appointed in respect of the Notes are:

**Issuing and Paying Agent and Custodian**

JPMorgan Chase Bank, N.A.
Trinity Tower,
9 Thomas More Street,
London E1W 1YT

**Irish Paying Agent**

J.P. Morgan Bank (Ireland) p.l.c.
JPMorgan House
International Financial Services Centre
Dublin 1
Ireland

**Calculation Agent**

Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE

**Listing Agent**

A&L Listing Limited
International Financial Services Centre
North Wall Quay
Dublin 1
Ireland

**Security Arrangements**

40   Mortgaged Property:

(i)   Collateral:

EUR 10,000,000 in principal amount of EUR 10,000,000 Floating Rate Note Public Pfandbriefe due 2013 issued by LRP Landesbank Rheinland-Pfalz on 28 April 2006 (ISIN: DE000LRP00K3) (the "**Collateral Securities**").

The Collateral will be held by JPMorgan Chase Bank, N.A. of Trinity Tower, 9 Thomas More Street, London E1W 1YT in its capacity as Custodian pursuant to the Agency Agreement in the Custody Account (being the account of the Custodian at Euroclear, Account No. 22066) subject to the security interest created pursuant to the Trust Deed. The Custodian shall notify the Issuer and the Calculation Agent if it becomes aware of any material amendment to the terms and conditions of the Collateral Securities.

If the rating of the Custodian or the Issuing and Paying Agent is downgraded at any time below "P-1" by Moody's in respect of its short term, unsecured, unsubordinated and

unguaranteed debt obligations the Issuer shall, within 30 calendar days appoint a replacement Custodian or, as the case may be, Issuing and Paying Agent that has a rating of at least "P-1" by Moody's unless the Trustee has an alternative proposal which Moody's confirms will mean that the then current rating of the Notes will not be reduced.

(ii)   Prepayment Account:

The Issuer shall establish on or prior to the Issue Date an account (the "**Prepayment Account**") with the Custodian in London, into which the Issuer will deposit any Prepayment Fixed Rate Payer Payment Amounts and any Additional Prepayment Fixed Rate Payer Payment Amounts received under the Swap Agreement. All monies deposited from time to time in the Collection Account shall be held by the Custodian as part of the Mortgaged Property and shall be applied for the purposes herein provided.

(iii)  Security (order of priorities):

The Trustee shall apply all moneys received by it under the Trust Deed in connection with the realisation or enforcement of the Security constituted by the Trust Deed in the following order of priorities:

Swap Counterparty Priority unless (i) an Event of Default (as defined in the Swap Agreement) occurs and the Swap Counterparty is the Defaulting Party (as defined in the Swap Agreement) or (ii) a Tax Event upon Merger (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty is the sole Affected Party (as defined in the Swap Agreement), or (iii) an Additional Termination Event occurs pursuant to the Swap Agreement and the Swap Counterparty is the Affected Party (as defined in the Swap Agreement), in which case Noteholder Priority shall apply.

(iv)  Swap Agreement (if applicable):

Under (a) a Deed of Accession dated 22 July 2005, pursuant to which the Issuer acceded to an ISDA Master Agreement, and Schedule thereto dated as of 10 October 2002 and amended and restated on 22 July 2005 (together, the "**ISDA Master Agreement**") and (b) a confirmation thereto with an effective date of the Issue Date made between the Issuer and the Swap Counterparty (the "**Swap Confirmation**" and, together with the ISDA Master Agreement, the "**Swap Agreement**"), the Issuer will pay to the Swap Counterparty sums equal to interest payable in respect of the Collateral (if any) and the Swap Counterparty will pay to the Issuer the amounts equal to the Interest Amounts due under the Notes. In addition, the Issuer will make a final payment equal to the redemption proceeds of the Collateral Securities to the Swap Counterparty on the Scheduled Maturity Date and the Swap Counterparty will make a final payment to the Issuer equal to the Redemption Amount due under the Notes.

The form of the Swap Confirmation is set out in Annex 1.

The Swap Agreement may be terminated early (either in whole or, in certain circumstances, in part only) among other circumstances:

(i)   on the due date for payment of the Notes if at any time any of the Notes becomes repayable in accordance with the Conditions prior to the Maturity Date;

(ii)  at the option of one party, if there is a failure by the other party to pay any amounts due under the Swap Agreement;

(iii) if (subject as provided in the Swap Agreement) withholding taxes are imposed on payments made by the Issuer or the Swap Counterparty under the Swap Agreement or it becomes illegal for either party to perform its obligations under the Swap Agreement (see "Transfer to avoid Termination Event" below);

(iv)  if at any time there is a default pursuant to the terms of the Collateral Securities as determined by the Swap Calculation Agent;

(v)   if the amount that would otherwise be due and payable by the Collateral Issuer in respect of the Collateral Securities would be reduced as a result of the Collateral Issuer being required by law to withhold or account for tax.

**Consequences of Early Termination:**

Upon any such early termination of the Swap Agreement, the Issuer or the Swap Counterparty may (subject as set out below and provided, in the case of certain tax events, that the Issuer may first be obliged to use all reasonable endeavours to transfer its obligations) be liable to make a termination payment to the other (regardless, if applicable, of which of such parties may have caused such termination).

Such termination payment will be based on the replacement cost or gain for a swap transaction that would have the effect of preserving for the party making the determination the economic equivalent of the Swap Agreement. In all cases of early termination occurring other than by reason of a default by the Swap Counterparty or an Additional Termination Event (as defined in the Swap Agreement) where the Swap Counterparty is the sole Affected Party (as defined in the Swap Agreement) or a Tax Event upon Merger (as defined in the Swap Agreement) where the Swap Counterparty is the sole Affected Party (in which case the determination will be made by the Issuer) or an Illegality (as defined in the Swap Agreement) (in which case the party which is not the

Affected Party will make the determination (or, if there are two Affected Parties, each party will make a determination which will be averaged)), the termination payment will be determined by the Swap Counterparty on the basis of quotations received from at least four reference market-makers (failing which, by the Swap Counterparty or the Issuer, as aforesaid).

Regardless of which party makes the determination of the termination payment (if any), there is no assurance that the proceeds from the sale of the Collateral Securities plus or minus, as the case may be, such termination payment will be sufficient to repay the principal amount due to be paid in respect of the Notes and any other amounts in respect thereof that are due.

**Transfer to avoid Termination Event:**

If withholding taxes are imposed on payments made by the Issuer or the Swap Counterparty under the Swap Agreement, then the Swap Counterparty shall, at its sole option, have the right:

(i)   to require the Issuer to transfer all of the Issuer's interests and obligations under the Swap Agreement together with its interests and obligations under the Notes, the Programme Agreement, the Trust Deed and the Agency Agreement to another entity, whether or not in the same tax jurisdiction as the Issuer, that would not have any obligation to withhold or deduct (if the Issuer is or would be required to make such deduction or withholding) or to which the Swap Counterparty would be entitled to make payments free from the relevant deduction or withholding (if the Swap Counterparty is or would otherwise be required to make such withholding or deduction), subject to obtaining the prior written consent of the Trustee;

(ii)  to require the Issuer to transfer the Issuer's residence for tax purposes to another jurisdiction, subject to obtaining the prior written consent of the Trustee;

(iii) to transfer all of the Swap Counterparty's interests and obligations under the Swap Agreement together with its interests and obligations (if any) under the Notes, the Programme Agreement, the Trust Deed and the Agency Agreement to another entity, whether or not in the same tax jurisdiction as the Swap Counterparty, which would not have any obligation to withhold or deduct (if the Swap Counterparty is or would be required to make such deduction or withholding) or to which the Issuer would be entitled to make payments free from the relevant deduction or withholding (if the Issuer is or

would otherwise be required to make such withholding or deduction), subject to obtaining the prior written consent of the Trustee; or

(iv) to transfer the Swap Counterparty's residence for tax purposes to another jurisdiction, subject to obtaining the prior written consent of the Trustee,

provided that, in the case of a Tax Event Upon Merger, if the relevant withholding or deduction applies to payments required to be made by the Swap Counterparty to the Issuer under the Swap Agreement (and the Issuer is the Burdened Party and not the Affected Party), the Swap Counterparty shall, until such time as a transfer as envisaged by paragraphs (i) to (iv) above is effected, be required in respect of any such payment to pay to the Issuer such additional amount as may be necessary in order that the net amount received by the Issuer after the relevant deduction or withholding, is equal to the amount that would have been receivable by the Issuer in the absence of the relevant deduction or withholding.

If the Issuer or the Swap Counterparty as the case may be is unable to transfer its interests to another party or to transfer its tax residence in accordance with the preceding provisions prior to the 30th day following the date of imposition of such withholding taxes or, if earlier, the 10th day prior to the first date on which it or the Swap Counterparty would otherwise be required to make a payment net of withholding taxes, the Swap Counterparty (whether it is the Swap Counterparty or the Issuer which is the Affected Party in respect of the Tax Event or Tax Event Upon Merger) or (in the case of Tax Event Upon Merger only), the Issuer (where the Issuer is the Burdened Party with respect to the Tax Event Upon Merger) may terminate the swap transaction under the Swap Agreement. If the Issuer transfers its interests and obligations or residence for tax purposes, it shall notify Moody's of such transfer.

In the third line of Condition 6(d)(i), the following words shall be inserted immediately after the word "income":

"(other than any tax required by law to be withheld or deducted by the Swap Counterparty in respect of any payment made to the Issuer under the Swap Agreement)".

| | |
|---|---|
| Swap Counterparty(ies): | Lehman Brothers Special Financing Inc. |
| Swap Guarantor (if applicable): | Lehman Brothers Holdings Inc. whose registered address is at Suite 400, Wilmington, Delaware 19808, U.S.A. |
| Details of Credit Support Document (if applicable): | (i) The obligations of the Swap Counterparty under the Swap Agreement are unconditionally and irrevocably guaranteed by Lehman Brothers Holdings Inc. |

pursuant to a guarantee dated 28 April 2006 issued in favour of the Issuer (the "**Swap Guarantee**").

(ii) Pursuant to the Swap Agreement, the Swap Counterparty shall pay any Prepayment Fixed Rate Payer Payment Amounts and any Additional Prepayment Fixed Rate Payer Payment Amounts to the Issuer..

(ii) The Prepayment Fixed Rate Payer Payment Amounts and any Additional Prepayment Fixed Rate Payer Payment Amounts will be deposited in the Prepayment Account which will be secured by the Issuer in favour of the Trustee on behalf of the Noteholders and the Swap Counterparty to secure the payment obligations of the Issuer under the Notes and the Swap Agreement.

(iii) If an Event of Default (as defined in the Swap Agreement) occurs which leads to an Early Redemption Event and the Swap Counterparty is the Defaulting Party, the Issuer may use the Prepayment Account Balance and the net liquidation proceeds from the realisation of the Collateral Securities to pay to Noteholders the applicable Early Redemption Amount before paying any amounts due to the Swap Counterparty.

Credit Support Provider: With respect to the Swap Counterparty, Lehman Brothers Holdings Inc.

**Provisions relating to Redemption**

41 Call Option (Condition 6(e)): Not applicable.

42 Put Option (Condition 6(f)): Not applicable.

43 Redemption Amount: Subject to the existence of an Adjustment Reference Entity or a Notice Delivery Period Extension Event as at the Final Cut-off Date, unless previously redeemed or purchased and cancelled, the Redemption Amount payable in respect of each Note on the Scheduled Maturity Date shall be an amount in EUR, determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, equal to the greater of:

(a) (i) such Note's Outstanding Nominal Amount as at the Final Cut-off Date; plus

  (ii) additional interest in an amount equal to the Reserve Ledger Level (as defined in the Swap Agreement) as at the Final Cut-off Date (the "**Reserve Ledger Payment Amount**") divided by the number of Notes outstanding; and

(b) EUR 0.

For the avoidance of doubt, in satisfaction of its obligations hereunder the Issuer shall use the proceeds received under the Swap Agreement and the Prepayment Account Balance to fund the Redemption Amount.

For the purposes hereof:

"**Final Cut-off Date**" means the London and TARGET Business Day immediately preceding the Scheduled Maturity Date.

If an Adjustment Reference Entity or a Notice Delivery Period Extension Event exists as at the Final Cut-off Date, the Redemption Amount in respect of each Note shall be:

(i)     the Partial Redemption Amount (if any) on the Scheduled Maturity Date;

(ii)    each Deferred Redemption Amount on the relevant Deferred Redemption Date; and

(iii)   additional interest in an amount equal to interest accrued on the Deferred Redemption Amount at the Prevailing Rate (as defined in the Swap Agreement) in the period from and including the Scheduled Maturity Date to, but excluding, the related Deferred Redemption Date.

For the purposes hereof:

"**Deferred Redemption Amount**" means, in respect of any Deferred Redemption Date, an amount per Note in EUR (rounded down to the nearest cent and subject to a minimum of EUR 0) determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, on the relevant Deferred Redemption Cut-off Date as being equal to the excess (if any) of:

(i)     the Redemption Amount that would otherwise have been payable on the preceding Deferred Redemption Date (or, in respect of the first or only Deferred Redemption Date, the Scheduled Maturity Date) if:

(A)     in the circumstances set out in paragraph (i) of the definition of "Adjustment Reference Entity", the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the relevant Event Determination Date; or

(B)     in the circumstances set out in paragraph (ii) of the definition of "Adjustment Reference Entity", (i) where the Potential Failure to Pay develops into an actual Failure to Pay, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such

Potential Failure to Pay was determined by the Calculation Agent to have occurred; or (ii) where the Potential Failure to Pay is subsequently cured, the relevant Potential Failure to Pay had not occurred; or

(C)   in the circumstances that a Notice Delivery Period Extension Event existed as at the Final Cut-off Date and an Event Determination Date occurs on or prior to the Notice Delivery Period Extension Date, the Final Price in respect of the relevant Reference Entity had actually been determined on the Scheduled Maturity Date; or

(D)   in the circumstances that a Notice Delivery Period Extension Event existed as at the Final Cut-off Date and an Event Determination Date does not occur on or prior to the Notice Delivery Period Extension Date, the relevant Notice Delivery Period Extension Event had not occurred,

over

(ii)   the Deferred Redemption Amount in respect of the preceding Deferred Redemption Date (or, in respect of the first or only Deferred Redemption Date, the Partial Redemption Amount);

"**Deferred Redemption Cut-off Date**" means, in respect of each relevant Adjustment Reference Entity or Notice Delivery Period Extension Event, as the case may be, the date determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, as the later of:

(A)   the relevant Reference Entity Valuation Date; or

(B)   the date that the relevant Potential Failure to Pay has been cured,

(C)   (where an Event Determination Date has not occurred prior to the Notice Delivery Period Extension Date) the Notice Delivery Period Extension Date; or

(D)   (where an Event Determination Date occurs prior to the Notice Delivery Period Extension Date) the date on which the relevant Final Price is determined;

"**Deferred Redemption Date**" means, in respect of each Adjustment Reference Entity and each Notice Delivery Period Extension Event in existence on the Final Cut-off Date, a date determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, (which

shall be no later than the fifth London and TARGET Business Day following the relevant Deferred Redemption Cut-off Date);

"**Partial Redemption Amount**" means an amount per Note in EUR (rounded down to the nearest cent and subject to a minimum of EUR 0) determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, on the Final Cut-off Date as being equal to (i) (a) the Aggregate Outstanding Nominal Amount on the Final Cut-off Date less the aggregate of the Reference Entity Notional Amounts of each Adjustment Reference Entity in existence on the Final Cut-off Date and each Reference Entity in respect of which a Notice Delivery Period Extension Event exists on the Final Cut-off Date, plus (b) additional interest in an amount equal to the Reserve Ledger Level as at the Final Cut-off Date, divided by (ii) the total number of Notes outstanding at such time.

| 44 | Early Redemption Amount(s) payable on mandatory redemption (Condition 6(c)), redemption for taxation and other reasons (Condition 6(d)), an event of default (Condition 10) and/or the method of calculating the same (if required or if different from that set out in the Conditions): | Subject as provided below, an amount per Note in EUR (rounded down to the nearest cent and subject to a minimum of EUR 0) determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, and acting in good faith as being equal to the lesser of (A) such Note's Outstanding Nominal Amount plus any accrued but unpaid interest on such Note and (B) such Note's *pro rata* share of the proceeds (net of any deductions on account of taxes or otherwise) from the sale or realisation of the Collateral on behalf of the Issuer by the Disposal Agent pursuant to the Supplemental Trust Deed and Drawdown Agreement, plus (if payable to the Issuer) or minus (if payable to the Swap Counterparty) the amount of any applicable Unwind Costs divided by the total number of Notes outstanding. |
|---|---|---|

Notwithstanding the above, if an Event of Default (as defined in the Swap Agreement) occurs and the Swap Counterparty is the Defaulting Party (as defined in the Swap Agreement) or a Tax Event Upon Merger occurs and the Swap Counterparty is the sole Affected Party (as defined in the Swap Agreement) or if an Additional Termination Event occurs under paragraph 11(I)(e) of the Swap Confirmation, the Early Redemption Amount shall be an amount in EUR (rounded down to the nearest cent and subject to a minimum of EUR 0) determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, as being equal to such Note's outstanding principal amount plus any accrued but unpaid interest thereon. In the event that Unwind Costs are payable by the Issuer to the Swap Counterparty, the Issuer shall apply the net proceeds from the sale or realisation of the

Collateral and the Prepayment Account Balance as aforesaid (1) first in redeeming each Note in an amount equal to Early Redemption Amount and (2) thereafter, in payment of such Unwind Costs to the Swap Counterparty.

For the purposes hereof:

**"Unwind Costs"** means the value of (i) the termination payment due from or, as the case may be, to the Swap Counterparty under the Swap Agreement in respect of the termination of the Swap Agreement (as determined by reference to the Reference Registry as at the date of such termination) and (ii) any transfer or stamp tax costs, early redemption or termination cost (howsoever defined), if any, incurred by the Issuer or the Swap Counterparty or the Trustee, as determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, in relation to any swap agreement, financing arrangement or other hedging transaction entered into by or on behalf of the Issuer or the Swap Counterparty in relation to the issue of the Notes and the Swap Agreement. For purposes of determining the Unwind Costs, the termination payment due to or from the Swap Counterparty shall be determined without reference to the the Prepayment Account Balance.

For the avoidance of doubt, the termination payment due to or from the Swap Counterparty shall take into account the Swap Counterparty's obligation under the Swap Agreement to pay to the Issuer on or about the Scheduled Maturity Date an amount equal to the Reserve Ledger Payment Amount.

For the purposes of determining the termination payment under the Swap Agreement, the Calculation Agent shall seek quotations from at least 4 reference market-makers (one of which may be the Calculation Agent or its affiliate).

For the avoidance of doubt, the termination payment under the Swap Agreement shall be calculated on the basis that the Issuer has an obligation to pay all sums due to the Swap Counterparty thereunder, without regard to the limited recourse provisions contained therein.

If the date on which the Notes are due to be redeemed is not a Scheduled Interest Payment Date, the Calculation Agent shall determine the interest deemed to have accrued in respect of the Notes in the period from and including the immediately preceding Scheduled Interest Payment Date and ending on (but excluding) the date on which such Notes are due to be redeemed, by reference to the Fixed Amount that would be payable under the Swap Agreement if such date were a Fixed Rate Payer Payment Date.

**Provisions applicable to Global Notes**

| | | |
|---|---|---|
| 45 | Notes to be represented on issue by: | Temporary Global Note. |
| 46 | Applicable TEFRA exemption: | D Rules. |
| 47 | Global Note exchangeable for Definitive Notes at the request of the holder: | No. |
| 48 | Exchange Date: | Not applicable. |

**Provisions relating only to the sale, listing and rating of the Notes**

49    Details of any additions or variations to the selling restrictions:    Not Applicable

50    (i)    Listing and Admission to trading:    Application has been made to the IFSRA as competent authority under Directive 2003/71/EC for this Series Prospectus to be approved. Application has also been made to the Irish Stock Exchange for the Notes to be admitted to the Official List of the Irish Stock Exchange and to be admitted to trading on its regulated market.

Where notices are given by or on behalf of the Issuer in accordance with these Conditions, such notice shall, to the extent required by the Irish Stock Exchange, also be given to the Companies Announcements Office of the Irish Stock Exchange.

(ii)    Estimate of total expenses related to admission to trading:    All such expenses are to be met by the Arranger and will not be deducted from the net proceeds of the issue of the Notes.

51    Dealer's Commission:    Not applicable.

52    Net Proceeds of issue:    EUR 10,000,000.

53    Method of issue of Notes:    Individual Dealer.

54    The following Dealer is subscribing the Notes:    Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE, United Kingdom, an investment bank engaged in, *inter alia*, underwriting new securities issues and trading in fixed income financial instruments.

55    Common Code (N.B. See paragraph 4 above for ISIN):    25173651.

56    Rating:    Yes.

A rating of "Baa1", as determined with regard to the Trade Date, is expected to be assigned by Moody's. Neither the Issuer nor the Swap Counterparty makes any representation as to any rating determined with regard to any day other than the Trade Date.

## ANNEX 1 – FORM OF SWAP CONFIRMATION

*The form of the Swap Confirmation is as set out below.*

### SWAP CONFIRMATION

| | |
|---|---|
| Date: | 28 April 2006 |
| To: | Ruby Finance Public Limited Company |
| From: | Lehman Brothers Special Financing Inc. |
| Re: | Credit Derivative Transactions relating to Ruby Finance Public Limited Company Series 2006-2 EUR 10,000,000 Orion Enhanced Return Dynamic CDO Credit Linked Synthetic Portfolio Notes due 2013 |

Dear Sirs,

The purpose of this letter agreement (the "**Confirmation**") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "**Transaction**"). The Transaction has been entered into in connection with issue of the Ruby Finance Public Limited Company Series 2006-2 EUR 10,000,000 Orion Enhanced Return Dynamic CDO Credit Linked Synthetic Portfolio Notes due 2013.

This Confirmation constitutes a "**Confirmation**" as referred to in the ISDA Master Agreement specified below. The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement and Additional Provisions for Physically Settled Default Swaps – Monoline Insurer as Reference Entity, published on January 21, 2005, in each case as published by the International Swaps and Derivatives Association Inc. ("**ISDA**") (together, the "**Credit Derivatives Definitions**") and the 2000 ISDA Definitions as published by ISDA (the "**2000 Definitions**") are incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions and the Confirmation, the Confirmation will govern. In addition, the definitions and provisions set out in Schedule C hereto shall prevail in the event of any inconsistency with the Credit Derivative Definitions. In the event of any inconsistency between Schedule C hereto and sections 1 to 9 of the Confirmation, the provisions of sections 1 to 9 shall prevail.

Subject to paragraph (l) of Part 1 of the Schedule to the Agreement (as defined below), the Confirmation supplements, forms a part of, and is subject to the ISDA Master Agreement dated as of 10 October 2002 and amended and restated on 22 July 2005, as amended and supplemented from time to time (the "**Agreement**") between Lehman Brothers Special Financing Inc. and Dante Finance Public Limited Company to which you have acceded under a Deed of Accession dated 22 July 2005. All provisions contained in the relevant Agreement govern the Confirmation except as expressly modified below. In this Confirmation, the "**Notes**" refers to Ruby Finance Public Limited Company Series 2006-2 EUR 10,000,000, Orion Enhanced Return Dynamic CDO Credit Linked Synthetic Portfolio Notes due 2013 and "**Conditions**" refers to the terms and conditions of the Notes.

Capitalised terms used but not defined herein will have the meanings given to them in the Conditions and in the event of any inconsistency between the Conditions and this Confirmation, this Confirmation will govern.

In the event of any inconsistency between the Confirmation and the Agreement, the Confirmation shall prevail.

In each Confirmation, "**Party A**" means Lehman Brothers Special Financing Inc. and "**Party B**" means Ruby Finance Public Limited Company.

The terms of the Transactions to which the Confirmations relate are as follows:

## 1   General Terms

| | |
|---|---|
| Trade Date: | 10 April 2006 |
| Effective Date: | 28 April 2006 |
| Scheduled Termination Date: | 20 September 2013, subject to adjustment in accordance with the Following Business Day Convention. |
| Termination Date: | The Scheduled Termination Date unless an Adjustment Reference Entity or a Notice Delivery Period Extension Event exists as at the Final Cut-off Date in which case the Termination Date shall be the Deferred Redemption Date (as defined in the Conditions) (or, where there is more than one Adjustment Reference Entity or Notice Delivery Period Extension Event, the latest Deferred Redemption Date). |
| Floating Rate Payer: | Ruby Finance Public Limited Company (the "**Seller**") |
| Fixed Rate Payer: | Lehman Brothers Special Financing Inc. (the "**Buyer**") |
| Calculation Agent: | Lehman Brothers International (Europe) |
| | Any determination, calculation or selection made by the Calculation Agent under this Transaction shall be made by the Calculation Agent in a commercially reasonable manner and based on best market practice. |
| Calculation Agent City: | London |
| Business Days: | London and TARGET. |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions and as otherwise provided in this Confirmation, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |

## 2   Reference Entities and Reference Obligations

| | |
|---|---|
| Reference Entity: | Each of the entities (and any Successor thereto) listed in the Reference Registry from time to time, subject to the provisions of "Successor Substitution" below and the provisions of a portfolio management agreement dated 28 April 2006 between LRI Landesbank Rheinland-Pfalz International SA (the "**Portfolio Manager**"), Party A and the Calculation Agent (the "**Portfolio Management Agreement**") (a copy of which has been provided to Party B); provided that, upon the occurrence of a Credit Event during the Credit Observation Period with respect to a Reference Entity, a Benchmark Obligation or one or more Obligations of a Reference Entity, and satisfaction of the Conditions to Settlement with respect to such Credit Event, |

such Reference Entity will be deemed deleted from the Reference Registry with effect from the Event Determination Date (subject to the provisions set out in "Final Price" in paragraph 5 below) with respect to such Reference Entity (other than for the purposes of determining the relevant Cumulative Loss Amount) and the Reference Registry shall be amended accordingly, subject always to the provisions regarding delivery of multiple Credit Event Notices pursuant to the "Credit Event Notice After Restructuring" provisions set out in Schedule C.

"**Reference Registry**" means the register of Reference Entities maintained by the Calculation Agent in accordance with this Confirmation (the initial form of which is set out in Schedule A) as the same may be amended time to time in accordance with the Portfolio Management Agreement. Pursuant to the Portfolio Management Agreement, Reference Entities may be added to, or removed from, the Reference Registry (each a "**Reference Registry Adjustment**") in accordance with the terms set out therein.

The Reference Registry shall contain the following information in respect of each Reference Entity included therein:

(i)    the Reference Entity Notional Amount applicable to the Reference Entity;

(ii)   the category (the "**Reference Entity Category**") applicable to the Reference Entity for the purposes of designating which of the terms set out in Schedule B are applicable to the Reference Entity;

(iii)  the Benchmark Obligation (if any) applicable to the Reference Entity;

(iv)   the seniority of the Benchmark Obligation (the "**Seniority**") (for the purposes of information only);

(v)    the effective date of each Successor Substitution or Reference Registry Adjustment effected with respect to the Reference Entity and any change to the Reference Entity Notional Amount resulting from any Successor Substitution; and

(vi)   whether such Reference Entity is a Monoline Insurer.

Section 2.30 of the Credit Derivatives Definitions shall not apply to this Transaction.

| | |
|---|---|
| Reference Entity Notional Amount applicable to each Reference Entity: | With respect to each Reference Entity, the amount specified in respect of such Reference Entity in the Reference Registry. |
| Successor Substitution: | Notwithstanding anything to the contrary herein (in particular in the terms relating to Successors set out in Schedule C), upon the occurrence of a Succession Event (as defined in Schedule C) at any time from and including the Trade Date between two |

or more of the Reference Entities for the time being comprised in the Reference Registry, which for the avoidance of doubt is not a Credit Event, the Calculation Agent may, by written notice to Buyer and Seller indicating the Succession Event Date and the Succession Event Effective Date, give notice to remove one or more of those Reference Entities that are subject to the Succession Event (the "**Removed Succession Event Reference Entities**") from the Reference Registry, and to replace such Removed Succession Event Reference Entities with one or more entities (each an "**Added Succession Event Reference Entity**") such that the Reference Entities resulting from the Successor Substitution shall be:

(i)    the entity which the Calculation Agent determines has been formed as a result of the Succession Event; and/or

(ii)   an entity or entities selected by the Calculation Agent in accordance with the Successor Substitution Criteria,

provided that such notice from the Calculation Agent will be effective two Business Days following the date the notice is sent to Buyer and Seller (the "**Succession Event Effective Date**") to remove or replace such Reference Entities from the Reference Registry. Each Added Succession Event Reference Entity will be a Reference Entity for the purposes of this Transaction and each Removed Succession Event Reference Entity will be deemed deleted from the Reference Registry, in each case as of the Succession Event Effective Date. The Calculation Agent shall provide the parties hereto and Moody's with an updated Reference Registry as soon as is reasonably practicable after a Successor Substitution.

Each Added Succession Event Reference Entity shall have a Reference Entity Notional Amount selected by the Calculation Agent such that the sum of the Reference Entity Notional Amounts of the Added Succession Event Reference Entities shall be equal to the sum of the Reference Entity Notional Amounts of the Removed Succession Event Reference Entities.

For the avoidance of doubt, the Reference Entity Category of any Added Succession Event Reference Entity or Successor will be selected by the Calculation Agent acting in a commercially reasonable manner.

| | |
|---|---|
| Succession Event Date: | The occurrence of a Succession Event, and the date at which such Succession Event is deemed to occur (the "**Succession Event Date**"), shall be determined by the Calculation Agent. |
| Successor Substitution Criteria: | The Added Succession Event Reference Entities shall, on the date of their inclusion in the Reference Registry, have an average Moody's Rating assigned to their unsecured, senior long-term debt or deposit obligations (not supported by third party credit enhancement), equal to or higher than the lowest |

such credit rating of the Removed Succession Event Reference Entities on the Business Day prior to the Succession Event Date, provided that such Moody's Rating shall not be lower than Baa2.

For the avoidance of doubt, the parties may agree such other changes to this Transaction which are necessary to preserve the economics thereof, provided that Moody's confirm in writing that such changes do not negatively affect the rating of the Notes.

Each such determination shall be made by the Calculation Agent.

"**Moody's**" means Moody's Investors Service (or any successor to the rating business thereof);

"**Moody's Rating**" means, with respect to any Reference Entity, the rating determined as follows:

(a)  the Reference Entity long term senior unsecured rating from Moody's;

(b)  in the event that the Moody's Rating cannot be determined in accordance with paragraph (a) above, but the Reference Entity has a long term issuer rating from Moody's, such rating;

(c)  in the event that the Moody's Rating cannot be determined in accordance with paragraph (a) or (b) above, but the Reference Entity has long term bank deposit rating from Moody's, such rating;

(d)  in the event that the Moody's Rating cannot be determined in accordance with paragraph (a), (b) or (c) above, but the Reference Entity has a long term corporate family rating (formerly senior implied rating as re-named by Moody's on 13th June 2005) from Moody's:

(i)  such rating if it is Baa3 or above

(i)  one subcategory below such rating if it is below Baa3;

(e)  in the event that the Moody's Rating cannot be determined in accordance with paragraph (a), (b), (c), or (d) above but the Reference Entity has a subordinated obligation rating from Moody's, then the Moody's Rating of such Reference Entity shall be:

(i)  one subcategory above such rating if such rating is B1 or above

(ii)  two subcategories above such rating if such rating is below B1;

(f)  in the event that the Moody's Rating cannot be determined in accordance with paragraph (a), (b), (c), (d) or (e) above, but the Reference Entity has an insurance financial strength rating from Moody's, then the Moody's Rating of

such Reference Entity shall be one subcategory below such rating;

(g) in the event that the Moody's Rating cannot be determined in accordance with paragraph (a), (b), (c), (d), (e) or (f) above, if the Reference Entity has a short term rating from Moody's, the corresponding long term senior unsecured rating from Moody's in accordance with the table below:

| Short term Moody's rating | Long term Moody's rating |
| --- | --- |
| P-1 | A2 |
| P-2 | Baa2 |
| P-3 | Baa3 |

(h) if the Reference Entity is not rated by Moody's, a confidential credit estimate may be requested from Moody's and the Moody's Rating shall be such confidential credit estimate;

(i) if a Moody's Rating cannot be determined in accordance with paragraphs (a), (b), (c), (d), (e), (f) or (g), but a security or obligation of the Reference Entity is rated by Moody's and no Moody's Rating for such Reference Entity is obtained pursuant to paragraph (h) above, then the Moody's Rating of such Reference Entity shall be determined as follows:

(i) if there is a rating from Moody's on a senior unsecured obligation of such Reference Entity, then the Moody's Rating of such Reference Entity shall equal such rating; or

(ii) if there is a rating from Moody's on a subordinated obligation of such Reference Entity, then the Moody's Rating of such Reference Entity shall be one subcategory above such rating; or

(j) if the Reference Entity does not have a long term senior unsecured rating from Moody's as described in paragraphs (a), (b), (c), (d), (e) or (f) and the Reference Entity does not have a short term rating from Moody's as described in paragraph (g) and no security or obligation of the Reference Entity is rated by Moody's and no Moody's Rating for such Reference Entity is obtained pursuant to paragraph (h) above, but if the Reference Entity has an S&P Rating, then the Moody's Rating of such Reference Entity will be:

(i) on subcategory below the Moody's equivalent of the S&P Rating if such rating is "BBB-" or higher; or

(ii) two subcategories below the Moody's equivalent of the S&P Rating if such rating is "BB+" or lower;

provided however that (i) no Reference Entity may be

given a Moody's Rating based on an S&P Rating if such Reference Entity has no outstanding debt that is currently paying a coupon and (ii) if a debt security or obligation of the Reference Entity has been in default during the past two years, the Moody's Rating of such Reference Entity will be "Ca".

Any Reference Entity that has been placed on credit watch by Moody's for possible upgrade or downgrade by one or more ratings sub-categories shall be treated as having a Moody's Rating that is, respectively, one ratings sub-category higher or one ratings sub-category lower, than the Moody's Rating which would otherwise apply, unless Moody's otherwise advises that such higher or lower rating is not required; and

"**S&P**" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. (or any successor to the rating business thereof);

"**S&P Rating**" means the then current rating of the relevant entity by S&P.

| Reference Obligation(s): | In respect of each Reference Entity listed in the Reference Registry one or more obligations each of which is either: |

(a)   the Benchmark Obligation, if any, specified for such Reference Entity; or

(b)   an obligation of the relevant Reference Entity (either directly or as provider of any Qualifying Affiliate Guarantee or, if All Guarantees is specified as "Applicable" in Schedule B with respect to Reference Entities of the same Reference Entity Category as such Reference Entity, as provider of any Qualifying Guarantee), as selected by the Calculation Agent, acting in good faith and in a commercially reasonable manner, on or prior to the Valuation Date and which (i) falls within the Reference Obligation Category specified below, (ii) has all of the Reference Obligation Characteristics specified below, (iii) is not subject to a counterclaim, defence (other than a counterclaim or defence based on the factors set forth in Section 4.1(a) to (d) of the Credit Derivatives Definitions) or right of set-off by or of the relevant Reference Entity or any applicable Underlying Obligor and (iv) in the case of a Qualifying Guarantee, other than a Qualifying Affiliate Guarantee, is capable, at the applicable Valuation Date, of immediate assertion or demand by or on behalf of the holder or holders against the relevant Reference Entity for an amount at least equal to the outstanding principal balance or Due and Payable Amount apart from the giving of any notice of non-payment or similar procedural requirement, it being

|  | understood that acceleration of an Underlying Obligation shall not be considered a procedural requirement. |
|---|---|
|  | **"Benchmark Obligation"** means, in respect of each Reference Entity, the obligation (if any) specified as such in the Reference Registry. |
| Reference Obligation Category: | With respect to each Reference Entity of a particular Reference Entity Category, the Reference Obligation Category specified in Schedule B with respect to Reference Entities of such Reference Entity Category. |
| Reference Obligation Characteristics: | With respect to each Reference Entity of a particular Reference Entity Category, the Reference Obligation Characteristic(s) specified in Schedule B with respect to Reference Entities of such Reference Entity Category. |
|  | For the avoidance of doubt, "Assignable Loan" and "Consent Required Loan" shall not apply to Reference Obligations which are Bonds. |
|  | If "Assignable Loan" and "Consent Required Loan" are specified as Reference Obligation Characteristics, the Reference Obligations may include any Loan that satisfies either one of such Reference Obligation Characteristics (and all the other applicable Reference Obligation Characteristics). |
|  | "Transferable" shall only apply to Reference Obligations that are not Loans. |
|  | References in Section 2.21 of the Credit Derivatives Definitions to "Deliverable Obligations", "Deliverable Obligation Category" and "Deliverable Obligation Characteristics" shall be deemed to be references to "Reference Obligations", "Reference Obligation Category" and "Reference Obligation Characteristics" respectively. |
| Obligations: | (a)  any obligation of the relevant Reference Entity (either directly or as provider of any Qualifying Affiliate Guarantee or, if All Guarantees is specified as "Applicable" in Schedule B with respect to Reference Entities of the same Reference Entity Category as such Reference Entity, as provider of any Qualifying Guarantee) which is described by the Obligation Category and which has the Obligation Characteristics specified in Schedule B with respect to Reference Entities of the same Reference Entity Category as such Reference Entity, in each case as of the date of the event which constitutes the Credit Event which is the subject of the Credit Event Notice; and |
|  | (b)  the relevant Benchmark Obligation (if any). |
| All Guarantees: | With respect to each Reference Entity of a particular Reference |

|  | Entity Category, as specified in Schedule B with respect to Reference Entities of such Reference Entity Category. |
|---|---|
| Reference Price: | 100 per cent. |
| Notional Amount: | EUR 10,000,000. |
| Cumulative Loss Amount: | With respect to any day, the aggregate of all Individual Loss Amounts calculated with respect to the Transaction from, and including the Trade Date, to and including such day a Cumulative Loss Amount is calculated, subject to a maximum equal to the Notional Amount. |
| Individual Loss Amount | In relation to each Reference Entity in respect of which an Event Determination Date has occurred, the greater of: |

(i) zero; and

(ii) Reference Entity Notional Amount x (100% - Final Price)

## 3   Buyer Payments 1

| Fixed Rate Payer Calculation Amount: | EUR 10,000,000. |
|---|---|
| Fixed Rate Payer Calculation Period: | Section 2.9 of the Credit Derivatives Definitions shall apply, except that the final Fixed Rate Payer Calculation Period will end on, but exclude, the Scheduled Termination Date. |
| Fixed Rate Payer Payment Dates: | 20 March, 20 June, 20 September and 20 December in each year commencing on 20 June 2006 and ending on the Scheduled Termination Date, in each case subject to adjustment in accordance with the Following Business Day Convention. |
| Fixed Rate: | EURIBOR plus 1.50 per cent. per annum. |
|  | "EURIBOR" means "EUR-EURIBOR-Telerate" as defined in the 2000 Definitions with a 'Designated Maturity' of three months and the 'Reset Date' being the day which is the first day of the Fixed Rate Payer Calculation Period and where Linear Interpolation is applicable in respect of the first Calculation Period (being the Fixed Rate Payer Calculation Period commencing on the Effective Date). |
| Fixed Rate Day Count Fraction: | Actual/360 |

## 4   Buyer Payments 2

| Prepayment Fixed Rate Payer Payment Amount: | The amount by which (i) the Prepayment Fixed Rate Payer Calculation Requirement, exceeds (ii) the Prepayment Account Balance. |
|---|---|
| Prepayment Fixed Rate Payer Calculation Requirement: | Zero, unless the Long Term Credit Rating of the Credit Support Provider is below A1 or the Short Term Credit Rating of the Credit Support Provider is below P-1 on such Prepayment Fixed Rate Payer Payment Date, in which case it shall be equal |

| | |
|---|---|
| | to the sum of (i) the Note Exposure and (ii) the Swap Exposure. |
| Prepayment Fixed Rate Payer Payment Dates: | Friday of each calendar week, commencing on the Effective Date and ending on the Scheduled Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Additional Prepayment Fixed Rate Payer Payment Amount: | In addition to any Prepayment Fixed Rate Payer Payment Amount payable on such Prepayment Fixed Rate Payer Payment Date, if a Rating Event exists on the Additional Prepayment Fixed Rate Payer Date, the Fixed Rate Payer shall pay an additional amount equal to the Swap Exposure within 30 calendar days of such relevant Additional Fixed Rate Payer Date. |
| Additional Prepayment Fixed Rate Payer Dates: | Friday of each calendar week, commencing on the Effective Date and ending on the Scheduled Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |

For the purposes hereof:

"**Aggregate Outstanding Nominal Amount**" shall bear the meaning given to such term in the Conditions.

"**Long Term Credit Rating**" means the rating assigned by Moody's in respect of long term unsecured and unsubordinated debt obligations (not supported by third party credit enhancement).

"**Note Exposure**" means an amount equal to (i) the Aggregate Outstanding Nominal Amount, less (ii) an amount equal to 95% of the market value of the Collateral Securities, as determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, subject to a minimum of zero. For the avoidance of doubt, no reduction of the Aggregate Outstanding Nominal Amount of the Notes shall be made to reflect Credit Events in respect of which a Final Price has not been determined or in respect of which Potential Failures to Pay have not been cured (and have not resulted in the occurrence of a Credit Event) as of such Prepayment Fixed Rate Payer Date.

"**Prepayment Account**" shall bear the meaning given to such term in the Conditions.

"**Prepayment Account Balance**" means, on any day, the balance standing to the credit of the Prepayment Account.

"**Rating Event**" means the Long Term Credit Rating of the Credit Support Provider is below A3 or the Short Term Credit Rating of the Credit Support Provider is below P-2.

"**Short Term Credit Rating**" means the rating assigned by

Moody's in respect of short term unsecured and unsubordinated debt obligations (not supported by third party credit enhancement).

"**Swap Exposure**" means an amount equal to (i) the Fixed Amounts payable by the Fixed Rate Payer pursuant to "Buyer Payments 1" for the next two succeeding Fixed Rate Payer Payment Dates, less (ii) the next two succeeding Seller Interim Payments (if any) payable by the Floating Rate Payer. The Swap Exposure shall be determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, using the floating rate prevailing on the relevant Prepayment Fixed Rate Payer Payment Date or Additional Prepayment Fixed Rate Payer Payment Date, as the case may be.

## 5    Buyer Payments 3

Buyer Final Payment:

In addition to the Fixed Amounts payable in accordance with the provisions set out above and subject as provided below, Buyer shall pay to Seller the Buyer Final Payment Amount on the Scheduled Termination Date;

Buyer Final Payment Amount:

An amount in EUR determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, as being equal to the greater of:

(a)    (i) the Outstanding Nominal Amount of the Notes as at the Final Cut-off Date; plus

(ii) an amount equal to the Reserve Ledger Level (as defined below) as at the Final Cut-off Date; less

(iii) the Prepayment Account Balance.

(b)    EUR 0.

Buyer Final Payment Adjustment:

If an Adjustment Reference Entity or a Notice Delivery Period Extension Event exists at the Final Cut-off Date, the Buyer Final Payment Amount shall be:

(a)    the Partial Final Payment on the Fixed Rate Payer Payment Date falling on the Scheduled Termination Date;

(b)    each Deferred Final Amount on the relevant Deferred Payment Date; and

(c)    an amount equal to the rate that the Calculation Agent determines would have accrued on any such Deferred Final Amount in the period from (and including) the Scheduled Termination Date to (but excluding) the relevant Deferred Payment Date, had such Deferred Final Amount been accruing interest at a rate equal to a rate (the "**Prevailing Rate**") that the Calculation Agent determines to be the prevailing rate that it would pay on an overnight deposit of a similar size to the relevant Deferred Final

Amount, which shall be paid on such Deferred Payment Date.

For the purposes hereof:

"**Deferred Final Amount**" means, in respect of any Deferred Payment Date, an amount in EUR (rounded down to the nearest cent and subject to a minimum of EUR 0) determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, on the Deferred Payment Cut-off Date as being equal to the excess (if any) of:

(i) the Buyer Final Payment that would otherwise have been payable on the preceding Deferred Payment Date (or, in respect of the first or only Deferred Payment Date, the Scheduled Termination Date) if:

  (A) in the circumstances set out in sub-paragraph (i) of the definition of "Adjustment Reference Entity", the Individual Loss Amount in respect of the relevant Reference Obligation had actually been determined prior to such preceding Deferred Payment Date (or, as the case may be, the Scheduled Termination Date); or

  (B) in the circumstances set out in sub-paragraph (ii) of the definition of "Adjustment Reference Entity", (i) where the Potential Failure to Pay develops into an actual Failure to Pay, the Individual Loss Amount in respect of the relevant Reference Obligation had actually been determined prior to such preceding Deferred Payment Date (or, as the case may be, the Scheduled Termination Date); or (ii) where the Potential Failure to Pay is subsequently cured, the relevant Potential Failure to Pay had not occurred; or

  (C) in the circumstances that a Notice Delivery Period Extension Event existed as at the Final Cut-off Date and an Event Determination Date occurs on or prior to the Notice Delivery Period Extension Date, the Individual Loss Amount in respect of the relevant Reference Obligation had actually been determined on the Scheduled Termination Date; or

  (E) in the circumstances that a Notice Delivery Period Extension Event existed as at the Final Cut-off Date and an Event Determination Date does not occur on or prior to the Notice Delivery Period Extension Date, the relevant Notice Delivery Period Extension Event had not occurred,

over

the Deferred Final Amount in respect of the preceding Deferred

Final Date (or, in respect of the first or only Deferred Final Date, the Partial Final Payment);

"**Deferred Payment Cut-off Date**" means, in respect of each relevant Adjustment Reference Entity or Notice Delivery Period Extension Event existing at the Final Cut-off Date, as determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, the earlier of:

(A)  the date on which the relevant Final Price is determined;

(B)  the date that the relevant Potential Failure to Pay has been cured;

(C)  (where an Event Determination Date occurs prior to the Notice Delivery Period Extension Date) the date on which the relevant Individual Loss Amount is determined; or

(D)  (where an Event Determination Date has not occurred prior to the Notice Delivery Period Extension Date) the Notice Delivery Period Extension Date,

whichever is applicable; and

"**Deferred Payment Date**" means, in respect of each relevant Adjustment Reference Entity or Notice Delivery Period Extension Event existing at the Final Cut-off Date, a date determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner (which shall be no later than the fifth Business Day following the relevant Deferred Payment Cut-off Date).

"**Partial Final Payment**" means an amount determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, on the Final Cut-off Date as being equal to:

(a)  the Outstanding Nominal Amount of the Notes on the Final Cut-off Date less the aggregate of the Reference Entity Notional Amounts of each Adjustment Reference Entity and each Reference Entity in respect of which a Notice Delivery Period Extension Event exists as at the Final Cut-off Date; plus

(b)  the Reserve Ledger Level as at the Scheduled Termination Date.

Reserve Ledger:

"**Reserve Ledger Level**" means, in respect of any day, an amount determined by the Calculation Agent equal to:

(i)  the Initial Reserve Ledger Level; plus

(ii)  the sum of the Reserve Ledger Credit Amounts in respect of each Reserve Ledger Credit Date to and including such date; plus

(iii)  the sum of all Reserve Ledger Credit Adjustments in respect of each Deferred Reserve Ledger Credit Date to and including such date; plus

(iv) the sum of all Reserve Ledger Increases to and including such date; minus

(v) the sum of all Reserve Ledger Decreases to and including such date.

"**Initial Reserve Ledger Level**" means EUR 1,201,806.

"**Reserve Ledger Credit Date**" means 20 September in each year from and including 20 September 2007 to and including the Scheduled Termination Date, in each case adjusted in accordance with the Following Business Day Convention.

"**Reserve Ledger Credit Amount**" means, in respect of each Reserve Ledger Credit Date, an amount determined by the Calculation Agent on the London and TARGET Business Day preceding such Reserve Ledger Credit Date equal to:

(a) (i) the Notional Amount less (ii) the Cumulative Loss Amount and the aggregate of the Reference Entity Notional Amounts in respect of each Adjustment Reference Entity (if any) in existence as at such date; multiplied by

(b) 8.50 per cent. per annum; multiplied by

(c) the actual number of days in the period from and including the preceding Reserve Ledger Credit Date (or in respect of the first Reserve Ledger Credit Date, the Effective Date) to but excluding the relevant Reserve Ledger Credit Date divided by 360.

"**Adjustment Reference Entity**" means, with respect to any Reserve Ledger Credit Date or the Final Cut-off Date, each Reference Entity in respect of which:

(i) an Event Determination Date has occurred on or prior to such date, but the relevant Reference Entity Valuation Date has not occurred; and/or

(ii) a Potential Failure to Pay has occurred on or prior to such date and such Potential Failure to Pay has not been cured and, for the avoidance of doubt, a Credit Event has not occurred in respect of such Potential Failure to Pay on or prior to such date.

"**Reserve Ledger Credit Adjustment**" means, in respect of any Reserve Ledger Credit Date, an amount in EUR determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, as being equal to the excess (if any) of:

(i) the Reserve Ledger Credit Amount that would otherwise have been determined in respect of such Reserve Ledger Credit Date if:

(A) in the circumstances set out in paragraph (i) of the definition of "Adjustment Reference Entity", the Final

Price in respect of the relevant Adjustment Reference Entity had been determined prior to such Reserve Ledger Credit Date; or

(B)    in the circumstances set out in paragraph (ii) of the definition of "Adjustment Reference Entity", (i) where the Potential Failure to Pay develops into an actual Failure to Pay, the Final Price in respect of the relevant Adjustment Reference Entity had been determined prior to the relevant Reserve Ledger Credit Date; or (ii) where the Potential Failure to Pay is subsequently cured, the relevant Potential Failure to Pay had not occurred;

over:

(ii)    the Reserve Ledger Credit Amount that was actually determined in respect of such Reserve Ledger Credit Date.

"**Deferred Reserve Ledger Credit Date**" means, in respect of each Adjustment Reference Entity, a date determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, which shall be no later than the fifth London and TARGET Business Day following either:

(i)    the relevant Reference Entity Valuation Date; or

(ii)    the date on which the Calculation Agent, acting in good faith and in a commercially reasonable manner, determines that the relevant Potential Failure to Pay has been cured.

"**Reserve Ledger Increases**" means, in respect of an Adjustment (as defined in the Portfolio Management Agreement), an amount equal to the Reserve Ledger Level Change (as defined and determined in accordance with the Portfolio Management Agreement) if such Reserve Ledger Level Change is a positive amount.

"**Reserve Ledger Decreases**" means, in respect of an Adjustment (as defined in the Portfolio Management Agreement), an amount equal to the absolute value of the Reserve Ledger Level Change (as defined and determined in accordance with the Portfolio Management Agreement) if such Reserve Ledger Level Change is a negative amount.

6    **Seller Payments 1**

Seller Interim Payments:                In addition to the Seller Final Payments payable in accordance with the provisions set out below, during the period from, and including, the Effective Date to, and including, the Scheduled Termination Date, on each day that is a coupon payment date under the Collateral Securities, Seller will pay to Buyer an amount equal to the aggregate coupon amount due and payable by the Collateral Issuer on such date in respect of the Collateral

Securities.

"**Collateral Securities**" shall bear the meaning given to such term in the Conditions. "**Collateral Issuer**" means the issuer of any Collateral Securities.

## 7    Seller Payments 2

| | |
|---|---|
| Seller Final Payment: | In addition to the Seller Interim Payments payable in accordance with the provisions set out above, Seller shall pay to Buyer the Seller Final Payment Amount on the Scheduled Termination Date. |
| Seller Final Payment Amount: | An amount equal to the aggregate redemption amount due and payable on the Scheduled Termination Date by the Collateral Issuer in respect of the Collateral Securities. |

## 8    Provisions relating to Credit Events

Floating Rate Payer Calculation Amount:    The Reference Entity Notional Amount specified in the Reference Registry with respect to the relevant Reference Entity.

Conditions to Settlement:    Credit Event Notice

Notifying Party:    Buyer

Notice of Publicly Available Information:    Applicable.

If a Credit Event Notice contains the information required in the Notice of Publicly Available Information such Credit Event Notice shall be deemed to be both a Credit Event Notice and a Notice of Publicly Available Information as set out in Schedule E - Exhibit 1.

If events have occurred which entitle Buyer to serve a Credit Event Notice in respect of a Reference Entity and Buyer has entered into other credit default swap transactions in relation to that Reference Entity and has served a credit event notice (or equivalent) in respect of such Reference Entity, then Buyer shall also serve a Credit Event Notice in respect of such Reference Entity under this Transaction.

Public Sources:    Applicable

Specified Number:    Two

In respect of any Reference Entity, for which the Reference Entity Category is Japan Corporate: Section 3.9 of the Definitions shall be excluded. Section 3.3 of the Definitions shall be amended by replacing "Greenwich Mean Time" with "Tokyo time".

Credit Observation Period:    The period from and including the Trade Date to and including

the later of:

(a)  the Scheduled Termination Date; and

(b)  the Grace Period Extension Date, if:

    (i)  the Credit Event that is the subject of the Credit Event Notice is a Failure to Pay that occurs after the Scheduled Termination Date; and

    (ii)  the related Potential Failure to Pay occurs on or prior to the Scheduled Termination Date.

**Credit Events:**  With respect to each Reference Entity of a particular Reference Entity Category for the time being comprised in the Reference Registry, the credit events specified in Schedule B with respect to Reference Entities of such Reference Entity Category.

If an occurrence would otherwise constitute a Credit Event, such occurrence will constitute a Credit Event whether or not such occurrence arises directly or indirectly from or is subject to a defence based upon: (a) any lack or alleged lack of authority or capacity of a Reference Entity to enter into any Obligation or, as applicable, an Underlying Obligor to enter into an Underlying Obligation, (b) any actual or alleged unenforceability, illegality, impossibility or invalidity with respect to any Obligation or, as applicable, any Underlying Obligation, however described, (c) any applicable law, order, regulation, decree or notice, however described, or the promulgation of, or any change in, the interpretation by any court, tribunal, regulatory authority or similar administrative or judicial body with competent or apparent jurisdiction of any applicable law, order, regulation, decree or notice, however, described, or (d) the imposition of, or any change in, any exchange controls, capital restrictions or any other similar restrictions imposed by any monetary or other authority, however described.

## 9    Calculation of Settlement Amounts

**Settlement Method:**  Cash Settlement in accordance with the Credit Derivative Definitions, as modified by the following terms:

Notwithstanding anything to the contrary contained in the Credit Derivative Definitions (including without limitation Section 7.1 (*Cash Settlement*)) following the occurrence of an Event Determination Date in respect of a Reference Entity, the Calculation Agent shall determine the applicable Cumulative Loss Amount.

Notwithstanding anything to the contrary contained in Section 7.1 of the Credit Derivatives Definitions, Seller shall not pay Buyer the Individual Loss Amount or Cash Settlement Amount, if any, with respect to such Reference Entity, but the

|  | Cumulative Loss Amount will be used to determine, *inter alia*, the reduction in the Buyer Final Payment Amount. |
|---|---|
| Cash Settlement Date: | In respect of each Reference Entity in respect of which an Event Determination Date has occurred, the date determined by the Calculation Agent falling no later than 5 Business Days following the calculation of the Final Price in respect of such Reference Entity. Section 7.3 (*Cash Settlement Date*) of the Credit Derivatives Definitions shall be deemed deleted. |
| Final Reference Obligation Price: | The price of the Reference Obligation expressed as a percentage, determined in accordance with the relevant Valuation Method (subject to a minimum of zero and a maximum of 100 per cent.) provided that, in respect of a Reference Obligation, if the Final Price is 100 per cent., the relevant Reference Entity shall be deemed to be added to the Reference Registry again with effect from such Valuation Date and the Credit Observation Period in respect of such Reference Entity shall be deemed to commence on, and including, such Valuation Date (and for the avoidance of doubt, another Event Determination Date may occur in respect of such Reference Entity during such Credit Observation Period). |
| Final Price: | The Final Reference Obligation Price or, if there is more than one Reference Obligation, the Final Price shall be the weighted average of the Final Reference Obligation Prices (as weighted by dividing the Quotation Amount in respect of each such Reference Obligation by the aggregate of such Quotation Amounts) expressed as a percentage, provided that, in respect of a Reference Entity, if the Final Price is 100 per cent., the relevant Reference Entity shall be deemed to be added to the Reference Registry again with effect from the relevant Valuation Date and the Credit Observation Period in respect of such Reference Entity shall be deemed to commence on, and including, such Valuation Date (and for the avoidance of doubt, another Event Determination Date may occur in respect of such Reference Entity during such Credit Observation Period). |
| Valuation Date: | Single Valuation Date: |
|  | Any Valuation Business Day selected by the Calculation Agent, acting in good faith and in a commercially reasonable manner, during the period from, and including, the thirtieth (30th) Valuation Business Day following the Event Determination Date to, and including, the seventy-second (72nd) Valuation Business Day following the Event Determination Date. |
| Hedge Settlement: | The occurrence of the valuation date or physical settlement date, howsoever expressed, in respect of any credit derivatives transaction or other hedging transaction entered into by or on behalf of Buyer in relation to the hedging of its obligations under the Transaction (the **"Hedge Transaction"**). |

| | |
|---|---|
| Valuation Business Day: | With respect to each Reference Entity of a particular Reference Entity Category, a day on which commercial banks and foreign exchange markets are generally open to settle payments in the place or places specified as such in Schedule B with respect to Reference Entities of such Reference Entity Category. |
| Valuation Time: | 11:00 a.m. in the city in which credit default swap trading for the relevant Reference Entity is effected, as determined by the Calculation Agent. |
| Bid Quotation: | With respect to each Reference Obligation selected by the Calculation Agent in respect of a Reference Entity and a Valuation Date, each firm bid quotation obtained from a Dealer at the Valuation Time for an amount (the "**Quotation Amount**") selected by the Calculation Agent which is not greater than the Reference Entity Notional Amount. |
| Minimum Quotation Amount: | USD 1,000,000. |
| Weighted Average Quotation: | With respect to each Reference Obligation selected by the Calculation Agent in respect of a Reference Entity and a Valuation Date, the weighted average of firm quotations obtained from Dealers at the Valuation Time each for an amount with an outstanding principal balance of as large a size as available but less than the Quotation Amount (but of a size not less than the Minimum Quotation Amount or, if quotations of a size equal to the Minimum Quotation Amount are not available, quotations as near in size as practicable to the Minimum Quotation Amount) that in aggregate are approximately equal to the Quotation Amount. For the avoidance of doubt, any such weighted average may be lower or equal to any firm quotation obtained from any Dealer. |
| Settlement Currency: | EUR |
| Reference Entity Valuation Date: | In respect of a Reference Entity, the date on which the Final Price is determined in respect of such Reference Entity. |
| Valuation Method: | If Hedge Settlement has occurred on or before the relevant Valuation Date, the First Valuation Method shall apply and if Hedge Settlement has not occurred on or before the relevant Valuation Date, the Second Valuation Method shall apply. |
| First Valuation Method: | The highest Bid Quotation with respect to a Valuation Date obtained on the same Valuation Business Day by the Calculation Agent in accordance with the following: |

(i)    the Calculation Agent shall attempt to obtain Bid Quotations from at least five Dealers (or at least six Dealers where one of such Dealers is the Calculation Agent or any Affiliate of the Calculation Agent) on the Valuation Date; and

(ii)    if at least three Bid Quotations are not available on the Valuation Date, the Calculation Agent shall continue to

attempt to obtain three Bid Quotations on the days which are 1, 2, 10, 11, 12 and 15 Valuation Business Days following the Valuation Date.

In the event that three Bid Quotations have not been obtained on or before the 15th Valuation Business Day following the Valuation Date, the Calculation Agent shall seek to obtain a Weighted Average Quotation at the Valuation Time on the 16th Valuation Business Day following the Valuation Date. If a Weighted Average Quotation is obtained, that Weighted Average Quotation shall be the Final Reference Obligation Price.

In the event that (a) at least three Bid Quotations have not been obtained on or before the 15th Valuation Business Day following the Valuation Date and (b) the Weighted Average Quotation has not been obtained on the 16th Valuation Business Day following the Valuation Date then the Calculation Agent will request a disinterested third party (the "**Independent Calculation Agent**") that is a dealer in obligations of the type of the Reference Obligation to attempt to obtain two Bid Quotations from at least five Dealers.

If the Independent Calculation Agent is able to obtain two Bid Quotations on the 17th Valuation Business Day following the Valuation Date then the Calculation Agent shall use the highest of the two Bid Quotations, provided that the Calculation Agent can also obtain the same highest Bid Quotation from the Dealers from whom the Independent Calculation Agent has obtained such Bid Quotation, to determine the Final Reference Obligation Price.

If the Independent Calculation Agent has been unable to obtain two Bid Quotations on the 17th Valuation Business Day following the Valuation Date but, on the same day, has obtained one Bid Quotation then the Calculation Agent shall use such Bid Quotation, provided that the Calculation Agent can also obtain the same Bid Quotation from the Dealer from whom the Independent Calculation Agent has obtained such Bid Quotation, to determine the Final Reference Obligation Price.

In the event that Bid Quotations have not been obtained in the manner prescribed above, the Independent Calculation Agent shall seek to obtain a Weighted Average Quotation at the Valuation Time on the 18th Valuation Business Day following the Valuation Date. If a Weighted Average Quotation is obtained, that Weighted Average Quotation shall be the Final Reference Obligation Price.

If the Independent Calculation Agent is unable to obtain a Weighted Average Quotation for the entire Quotation Amount on such 18th Business Day following the Valuation Date, or the Calculation Agent is unable to obtain the same Full Quotation,

but the Independent Calculation Agent is able to obtain one or more quotations in an aggregate amount less than the Quotation Amount then, provided that the Calculation Agent can also obtain such quotations from the Dealer or Dealers, as the case may be, from whom the Independent Calculation Agent obtained such quotation or quotations, the Final Reference Obligation Price shall be a Weighted Average Quotation using such quotations and an amount equal to zero for those quotations which could not be obtained (the "**Partial Weighted Average Quotation**").

If the Independent Calculation Agent is unable to obtain any Partial Weighted Average Quotation, the Final Reference Obligation Price shall be deemed to be zero.

For the purposes of the foregoing, in the event that the Calculation Agent is required to request an Independent Calculation Agent to attempt to obtain Bid Quotations pursuant to the provisions of this section, any costs associated with such request shall be borne by the Calculation Agent.

Second Valuation Method:

The Calculation Agent shall, on the relevant Valuation Date, select at least five Dealers (or at least six Dealers where one of such Dealers is the Calculation Agent or any Affiliate of the Calculation Agent) and request from each such Dealer a firm offer price, expressed as a single upfront payment, for entering into a Replacement Transaction as a seller of credit default protection on that date.

If at least three firm offer prices are received by the Calculation Agent from any Dealer, the Final Reference Obligation Price with respect to the Reference Obligation shall be an amount equal to (a) 100%, less (b) the lowest firm offer price expressed as a percentage of the Quotation Amount.

If at least three firm offer prices are not available on the Valuation Date, the Calculation Agent shall continue to attempt to obtain at least three firm offer prices on the days which are 1, 2, 10, 11, 12 and 15 Valuation Business Days following the Valuation Date.

In the event that at least three firm offer prices have not been obtained on or before the 15th Valuation Business Day following the Valuation Date, the Calculation Agent shall seek to obtain a Second Valuation Method Weighted Average Quotation at the Valuation Time on the 16th Valuation Business Day following the Valuation Date. If a Second Valuation Method Weighted Average Quotation is obtained, that Second Valuation Method Weighted Average Quotation shall be the Final Reference Obligation Price.

In the event that (a) at least three firm offer prices have not been obtained on or before the 15th Valuation Business Day following the Valuation Date and (b) the Second Valuation