Method Weighted Average Quotation has not been obtained on the 16th Valuation Business Day following the Valuation Date then the Calculation Agent will request a disinterested third party (the "**Independent Calculation Agent**") that is a dealer in transactions of the type of the Replacement Transaction to attempt to obtain two firm offer prices from at least five Dealers.

If the Independent Calculation Agent is able to obtain two firm offer prices on the 17th Valuation Business Day following the Valuation Date then the Calculation Agent shall use the lower of the two firm offer prices, provided that the Calculation Agent can also obtain the same lower firm offer price from the Dealer from whom the Independent Calculation Agent has obtained such firm offer price, to determine the Final Reference Obligation Price.

If the Independent Calculation Agent has been unable to obtain two firm offer prices on the 17th Valuation Business Day following the Valuation Date but, on the same day, has obtained one firm offer price then the Calculation Agent shall use such firm offer price, provided that the Calculation Agent can also obtain the same firm offer price from the Dealer from whom the Independent Calculation Agent has obtained such firm offer price, to determine the Final Reference Obligation Price.

In the event that firm offer prices have not been obtained in the manner prescribed above, the Independent Calculation Agent shall seek to obtain a Second Valuation Method Weighted Average Quotation at the Valuation Time on the 18th Valuation Business Day following the Valuation Date. If a Second Valuation Method Weighted Average Quotation is obtained, that Second Valuation Method Weighted Average Quotation shall be the Final Reference Obligation Price.

If the Independent Calculation Agent is unable to obtain a Second Valuation Method Weighted Average Quotation in respect of Replacement Transactions whose Floating Rate Payer Calculation Amounts are in aggregate equal to the entire Quotation Amount on such 18th Business Day following the Valuation Date, or the Calculation Agent is unable to obtain such a quotation, but the Independent Calculation Agent is able to obtain one or more firm offer prices in respect of Replacement Transactions whose Floating Rate Payer Calculation Amounts are in aggregate less than the Quotation Amount then, provided that the Calculation Agent can also obtain such firm offer prices from the Dealer or Dealers, as the case may be, from whom the Independent Calculation Agent obtained such firm offer prices, the Final Reference Obligation Price shall be a Second Valuation Method Weighted Average Quotation using such firm offer prices and an amount equal to

zero for those firm offer prices which could not be obtained (the "**Second Valuation Method Partial Weighted Average Quotation**").

If the Calculation Agent is unable to obtain any Second Valuation Method Partial Weighted Average Quotation, the Final Reference Obligation Price shall be deemed to be zero.

For the purposes of the foregoing, in the event that the Calculation Agent is required to request an Independent Calculation Agent to attempt to obtain firm offer prices pursuant to the provisions of this section, any costs associated with such request shall be borne by the Calculation Agent

For the purposes of this Second Valuation Method:

"**Replacement Transaction**" means a physically-settled single-name credit default swap transaction (on terms identical to the market convention applicable for such single-name credit default swap transaction on the Trade Date) relating to the relevant Reference Entity where:

(a)    the Floating Rate Payer Calculation Amount is equal to the Quotation Amount with respect to the relevant Reference Entity (or, where a Second Valuation Method Weighted Average Quotation is being obtained, such lesser amount greater than or approximately equal to the Minimum Quotation Amount, as may be obtained by the Calculation Agent);

(b)    the Scheduled Termination Date is the same date as the Scheduled Termination Date in respect of this Transaction;

(c)    the Fixed Rate is 0.00 per cent.;

(d)    the Conditions to Settlement have been satisfied with respect to the relevant Reference Entity; and

(e)    a Notice of Physical Settlement has been delivered specifying the same Deliverable Obligations that the Third Party has been unable to purchase or buy-in ; and

"**Second Valuation Method Weighted Average Quotation**" means, with respect to a Replacement Transaction and a Valuation Date, the weighted average of firm offer prices, expressed as a single upfront payment, and received by the Calculation Agent from Dealers at the Valuation Time, each for entering into a Replacement Transaction as a seller of credit default protection on that date where any such Replacement Transaction shall have a Floating Rate Payer Calculation Amount of as large a size as available but less than the Quotation Amount (but of a size not less than the Minimum Quotation Amount or, if firm offer prices in respect of a Floating Rate Payer Calculation Amount equal in size to the Minimum Quotation Amount are not available, firm offer prices in respect of a Floating Rate Payer Calculation Amount as near

in size as practicable to the Minimum Quotation Amount) that in aggregate are in respect of a Floating Rate Payer Calculation Amount approximately equal to the Quotation Amount. For the avoidance of doubt, any such weighted average may be lower or equal to any firm offer price obtained from any Dealer.

For the avoidance of doubt, if Hedge Settlement has not occurred on or before the first Valuation Date and, as a result, the Second Valuation Method is being applied but, on or before the date that the Final Reference Obligation Price is determined in accordance with the Second Valuation Method, Hedge Settlement occurs, then the First Valuation Method shall be applied with effect from such date as if the First Valuation Method had been applied from the first Valuation Date (save that if this would otherwise require the Calculation Agent to request the Independent Calculation Agent to obtain Bid Quotations without the Calculation Agent first having attempted to do so itself in the manner envisaged by the First Valuation Method, then the Calculation Agent shall be permitted to obtain Bid Quotations as envisaged by the First Valuation Method before requesting the Independent Calculation Agent to do so).

The Calculation Agent shall deliver a notice to Seller, the Trustee (for delivery to the Noteholders in accordance with the Conditions) and Buyer showing the Final Reference Obligation Price for each Reference Obligation on the day which is no later than 5 Business Days following each Reference Entity Valuation Date.

| Dealers: | Dealers in obligations of the type of Reference Obligations for which Bid Quotations are to be obtained, and any affiliate thereof or successor thereto. For the avoidance of doubt, the Calculation Agent or any Affiliate of the Calculation Agent may be a Dealer, provided that only one of the Calculation Agent or its Affiliates may be included in the panel of Dealers for the purposes of calculating Final Price. |

| Notices: | Notwithstanding any provisions in the Credit Derivatives Definitions relating to notification of certain matters by the Calculation Agent to the parties, the Calculation Agent shall notify the parties of the following with respect to each Reference Entity in respect of which an Event Determination Date has occurred, on the dates stated: |

(i)    selected Reference Obligations: on or before the applicable Valuation Date;

(ii)   Individual Loss Amount and Cumulative Loss Amount: on, or as soon as is reasonably practicable following, the applicable Reference Entity Valuation Date.

All notices given by Buyer, Seller or the Calculation Agent pursuant to this Transaction shall be given in writing and shall

be copied to Moody's.

## 10    Relationship Between Parties

Each of Buyer and Seller represents to the other that:

### (a)    Non-Reliance

It is acting for its own account and it is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction. It has not received from the other party any assurance or guarantee as to the expected results of this Transaction;

### (b)    Acceptance

It accepts the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the financial and other risks of this Transaction;

### (c)    Status of Parties

The other party is not acting as a fiduciary or an advisor for it in respect of this Transaction; and

### (d)    Risk Management

It has entered into this Transaction for the purpose of (i) managing its borrowings or investments, (ii) hedging its underlying assets or liabilities or (iii) in connection with its line of business.

## 11    Additional Termination Provisions

(i)    The following shall constitute Additional Termination Events for the purposes of this Transaction:

    (a)    The Notes being declared due and payable following the occurrence of an Event of Default (as defined in the Conditions) pursuant to Condition 10 *(Events of Default)*.

        For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the sole Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

    (b)    Any of the Collateral Securities becoming repayable prior to its stated date of maturity or a payment default in respect of any of the Collateral Securities prior to the Scheduled Termination Date.

        For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the sole Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

    (c)    The Notes being declared redeemable pursuant to Condition 6(d)(i) *(Redemption for Taxation and Other Reasons)* of the Notes and the Noteholders not having received, either directly or indirectly, from Buyer the amounts referred to under "Optional Payments" below.

        For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of

this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(d)    If, on the occasion of the next payment due by the Collateral Issuer in respect of any Collateral Securities, the amount that would otherwise be due and payable by the Collateral Issuer in respect of the Collateral Securities would be reduced as a result of the Collateral Issuer being required by law to withhold or account for tax.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the sole Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, upon the occurrence of such Additional Termination Event, Party A may by notice to Party B designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(e)    If:

(i)    any deductions on account of any withholding tax in respect of payments by the Swap Guarantor under the Swap Guarantee are required, by any law or regulation in existence and in force on the Effective Date and applying on such date to the Swap Guarantee, to be made in respect of any such payments; and

(ii)    in the event of a payment being made under the Swap Guarantee, and following the Swap Guarantor being notified by or on behalf of the Issuer that such deduction on account of a withholding tax is required to be made and receipt by the Swap Guarantor of reasonable evidence that such deduction is required by a law or regulation in existence and in force on the Effective Date and applying on such date to the Swap Guarantee, the Swap Guarantor does not pay such additional amount as may be necessary in order that the net amount received by Party B after the relevant deduction on account of withholding tax is equal to the amount which would have been receivable by Party B in the absence of the relevant deduction;

such failure by the Swap Guarantor to pay such additional amount shall be an Additional Termination Event.

For the purposes of such Additional Termination Event, the Affected Party shall be Buyer and this Transaction shall be the Affected Transaction.

(ii)    **Optional Payments**

If, for any reason beyond the control of Buyer or Seller the Noteholders do not receive payment under their Notes for any reason including the imposition of any withholding tax or a default or other circumstance linked to the Paying Agents, Buyer may elect to make any necessary payments to, or to the order of, the Noteholders to prevent either a redemption of the Notes for taxation reasons pursuant to Condition 6(d) of the Notes or an event of default pursuant to Condition 10 of the Notes from occurring.

## 12   Other Terms

(i)    **Non-insurance business**

Party A and Party B acknowledge and agree that this Transaction is not intended to constitute insurance business and is not a contract of insurance, assurance, suretyship or guarantee and payments may be made under this Transaction by each party independently and without proof of the economic loss (if any) of the other party.

(ii)   **Third party rights**

No person shall have any right to enforce any provision of this Transaction under the Contracts (Rights of Third Parties) Act 1999.

(iii)   **Credit Support Document. Details of any Credit Support Document**

With respect to Party A, Guarantee dated as of the date hereof by Lehman Brothers Holdings Inc. in favour of Party B as beneficiary thereof in the form attached hereto as Schedule D.

(iv)   **Credit Support Provider**

Credit Support Provider means in relation to Party A: Lehman Brothers Holdings Inc.

(v)   **Credit Support Default**

For the purpose of this Confirmation only, Section 5(a)(iii) shall apply in respect of the Credit Support Document and Credit Support Provider referred to in paragraphs 8(iii) and 8(iv) of this Confirmation.

(vi)   **Breach of Agreement**

For the purpose of this Confirmation only, Section 5(a)(ii) of the Agreement will not apply to Party B but will apply to Party A.

(vii)   **Misrepresentation**

For the purpose of this Confirmation only, Section 5(a)(iv) of the Agreement will not apply to Party B but will apply to Party A.

(viii)   **Bankruptcy**

The "Bankruptcy" provision (Section 5(a)(vii) of the Agreement) shall apply to Party A and to Party B, but with respect to Party B shall, in addition to the amendments set out in paragraph 1(e) of the Schedule to the Agreement; be amended further as follows:

(a)       Section 5(a)(vii)(2) shall take effect with the words "is declared insolvent by a court of competent jurisdiction" substituted for "becomes insolvent";

(b)       Section 5(a)(vii)(6) shall take effect with:

(i)    the deletion of the words "seeks or";

(ii)   the insertion of the words "(other than the Custodian or the Trustee each acting in its ordinary course of business prior to any insolvency or bankruptcy of Party B)" immediately after the words "or other similar official for it";

(c)       Section 5(a)(vii)(9) shall take effect with:

(i)    the insertion of the word "formal" immediately after the words "takes any"; and

(ii)   the deletion of the words "in furtherance of, or"; and

(d)       Section 5(a)(vii)(8) and (9) shall take effect with reference to the other clauses of Section 5(a)(vii) as so amended.

(ix)   **Transfer to avoid Tax Event**

For the purposes of this Confirmation only, paragraph (j)(iv) of Part 5 of the Schedule to the Agreement shall be replaced by the following:

"(iv) In addition, the following provision shall be inserted as Section 6(b)(v):

"(v) Transfer to Avoid Tax Event. If a Tax Event or a Tax Event Upon Merger occurs with respect to Party A or Party B, Party A shall have the right:

(i)   to require Party B to transfer all of its interests and obligations under this Agreement and the Transaction, together with its interests and obligations under the Securities, the Notes, the Programme Agreement, the Trust Deed and the Agency Agreement to another entity, whether or not in the same tax jurisdiction as Party B, which would not have any obligation to withhold or deduct (if Party B is or would be required to make such deduction or withholding) or to which Party A would (but for Part 5(i) of the Schedule) be entitled to make payments free from the relevant deduction or withholding (if Party A is or would otherwise be required to make such withholding or deduction), subject to obtaining the prior written consent of the Trustee; or

(ii)  to require Party B to transfer its residence for tax purposes to another jurisdiction, subject to obtaining the prior written consent of the Trustee; or

(iii) to transfer all of Party A's interests and obligations under this Agreement and the relevant Transaction, together with its interests and obligations (if any) under the Securities, the Notes, the Programme Agreement, the Trust Deed and the Agency Agreement to another entity, whether or not in the same tax jurisdiction as Party A, which would not have any obligation to withhold or deduct (if Party A is or would be required to make such deduction or withholding) or to which Party B would (but for Part 5(i) of the Schedule) be entitled to make payments free from the relevant deduction or withholding (if Party B is or would otherwise be required to make such withholding or deduction), subject to obtaining the prior written consent of the Trustee; or

(iv)  to transfer its residence for tax purposes to another jurisdiction, subject to obtaining the prior written consent of the Trustee;

provided that, in the case of a Tax Event Upon Merger, if the relevant withholding or deduction applies to payments required to be made by Party A to Party B under this Transaction (and Party B is the Burdened Party and not the Affected Party), Party A shall, until such time as a transfer as envisaged by paragraphs (i) to (iv) above is effected, be required in respect of any such payment to pay to Party B such additional amount as may be necessary in order that the net amount received by Party B, after the relevant deduction or withholding, is equal to the amount that would have been receivable by Party B in the absence of the relevant deduction or withholding.

If Party B or Party A (as the case may be) is unable to transfer its interests to another party or to transfer its tax residence in accordance with the preceding provisions prior to the 30th day following the date of imposition of such withholding taxes or, if earlier, the 10th day prior to the first day on which either party would otherwise be required to make a payment net of withholding taxes, Party A (whether it is Party A or Party B which is the Affected Party in respect of the Tax Event or Tax Event Upon Merger) or (in the case of Tax Event Upon Merger only), Party B (where Party B is the Burdened Party with respect to the Tax Event Upon Merger) may, notwithstanding Section 6(b)(iv), designate a day not earlier than such day as an Early Termination Date in respect of the Transaction. For the avoidance of doubt, if, in the case of Tax Event Upon Merger only, Party A fails to pay to Party B any additional amount as required by the immediately preceding paragraph such failure shall constitute a "Failure to Pay" by Party A for the purposes of the Agreement. ".

(x)  **Payments on Early Termination**

For the purposes of determining a "Market Quotation" in respect of the Swap Agreement, the definition of "Market Quotation" shall be modified as follows (but, unless modified by paragraphs (a) to (b) below, shall otherwise apply):

(a)  For the purposes of determining the termination payment under the Swap Agreement, the Calculation Agent shall seek quotations from at least 4 Reference Market-makers (one of which may be the Calculation Agent or its affiliate).

(b)  For the avoidance of doubt, the termination payment under the Swap Agreement shall be calculated on the basis that Party B has an obligation to pay all sums due to the Swap Counterparty hereunder, without regard to the limited recourse provisions contained herein.

(xi)  **Tax Event upon Merger**

If this Transaction is terminated following the occurrence of a Tax Event Upon Merger and Party B is the Burdened Party and not the Affected Party and on the relevant Early Termination Date the Long Term Credit Rating of Party A's Credit Support Provider by Moody's is at or above A1 and the Short Term Credit Rating of Party A's Credit Support Provider is at or above P-1, then an amount equal to the Note Exposure on such Early Termination Date shall be deemed to be an Unpaid Amount owing to Party B in respect of such termination.

(xii)  **Additional Termination Event**

If this Transaction is terminated following the occurrence of an Additional Termination Event under paragraph 11(i)(e) Party B is the Burdened Party and not the Affected Party and on the relevant Early Termination Date the Long Term Credit Rating of Party A's Credit Support Provider by Moody's is at or above A1 and the Short Term Credit Rating of Party A's Credit Support Provider is at or above P-1, then an amount equal to the Note Exposure on such Early Termination Date shall be deemed to be an Unpaid Amount owing to Party B in respect of such termination.

## 13   Account Details

| | |
|---|---|
| Account details of Buyer: | Bank Of America, Frankfurt |
| | BOFADEFX |
| | 14735038 |
| | Account of Lehman Brothers Inc |
| | FFC LBSF |
| Account details of Seller: | JPMorgan AG, Frankfurt |
| | Swift: CHASDEFX |
| | Account: JPMorgan Chase Bank London, N.A. |
| | Account Number: 6231400604 |
| | Ref: Ruby Finance Public Limited Company Series 2006-2 |

This Confirmation shall be governed by and construed in accordance with English law.

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us by facsimile.

Yours faithfully,

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By:

Name:

Title:


**LEHMAN BROTHERS INTERNATIONAL (EUROPE)** hereby agrees to perform its obligations as Calculation Agent set out herein.

By:

Name:

Title:


Confirmed as of the date first above written:

**RUBY FINANCE PUBLIC LIMITED COMPANY**

By:

Name:

Title:

EXHIBIT B

## Schedule A
## Reference Registry

The following is a summary of the Reference Entities constituting the Reference Registry and does not provide information with respect to all material characteristics of the Reference Entities. Potential investors in the Notes should make their own complete independent investigation, as they, in their sole judgment, deem appropriate when evaluating the Reference Entities.

| No. | Reference Entity | Benchmark Obligation Isin/Cusip | Benchmark Obligation Maturity | Benchmark Obligation Coupon | Reference Entity Notional Amount (EUR) | Seniority (state if Subordinated) | Reference Entity Category |
|---|---|---|---|---|---|---|---|
| 1 | AKZO NOBEL N.V. | XS0170265341 | 14/06/2011 | 4.25% | 1,660,440 | | EUROPEAN CORPORATE |
| 2 | ALLTEL CORPORATION | US020039DB64 | 01/07/2012 | 7% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 3 | ALTADIS, SA | XS0176838372 | 02/10/2013 | 5.125% | 1,660,440 | | EUROPEAN CORPORATE |
| 4 | AT&T INC. | US78387GAK94 | 15/08/2012 | 5.875% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 5 | AUTOSTRADE S.P.A. | XS0193947271 | 09/06/2014 | 5% | 1,660,440 | | EUROPEAN CORPORATE |
| 6 | AVIVA PLC | XS0066877258 | 20/06/2016 | 9.5% | 1,660,440 | | EUROPEAN CORPORATE |
| 7 | AXA | XS0130738213 | 18/06/2013 | 6% | 1,660,440 | | EUROPEAN CORPORATE |
| 8 | AEGON N.V. | US007924AD52 | 15/08/2006 | 8% | 1,660,440 | Subordinated | SUBORDINATED EUROPEAN INSURANCE |
| 9 | AIR PRODUCTS AND CHEMICALS, INC. | XS0091SXBGS1 | 07/09/2007 | 6.724999% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 10 | AKTIEBOLAGET ELECTROLUX | XS0126231199 | 20/03/2008 | 6% | 1,660,440 | | EUROPEAN CORPORATE |
| 11 | ALCOA INC. | US13817AD35 | 01/06/2011 | 6.5% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 12 | ALLIANZ AKTIENGESELLSCHAFT | XS0148887564 | 31/05/2022 | 6.13% | 1,660,440 | Subordinated | SUBORDINATED EUROPEAN INSURANCE CORPORATE |
| 13 | ALTRIA GROUP, INC. | US02209SAA15 | 04/11/2013 | 7% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 14 | AMBAC ASSURANCE CORPORATION | XS0124212738 | 22/02/2021 | 5.9% | 1,660,440 | | NORTH AMERICAN CORPORATE / MONOLINE |
| 15 | AMERICAN EXPRESS COMPANY | US025816AQ27 | 15/07/2013 | 4.875% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 16 | AMERICAN INTERNATIONAL GROUP, INC. | US026874AP25 | 09/11/2031 | 0% | 1,660,440 | | NORTH AMERICAN CORPORATE |

55

A06174460/1.0/28 Apr 2006

| No. | Reference Entity | Benchmark Obligation Isin/Cusip | Benchmark Obligation Maturity | Benchmark Obligation Coupon | Reference Entity Notional Amount (EUR) | Seniority (state if Subordinated) | Reference Entity Category |
|---|---|---|---|---|---|---|---|
| 17 | AUTOZONE, INC. | US053332A.C61 | 15/10/2012 | 5.875% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 18 | AVON PRODUCTS, INC. | US054303AM47 | 15/11/2009 | 7.15% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 19 | BASF AG | DE0008046718 | 08/07/2010 | 3.5% | 1,660,440 | | EUROPEAN CORPORATE |
| 20 | BANCA POPOLARE DI MILANO SOC. COOP. A.R.L. | XS0131739665 | 29/06/2011 | 7.625% | 1,660,440 | | EUROPEAN CORPORATE |
| 21 | BARCLAYS BANK PLC | XS0125133644 | 08/03/2011 | 5.75% | 1,660,440 | Subordinated | EUROPEAN CORPORATE |
| 22 | BLOCK FINANCIAL CORPORATION | US093652AC83 | 30/10/2014 | 5.125% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 23 | BNP PARIBAS | XS0132682823 | 25/07/2011 | 5.12988% | 1,660,440 | Subordinated | EUROPEAN CORPORATE |
| 24 | BOOTS GROUP PLC | XS0097335318 | 26/05/2009 | 5.5% | 1,660,440 | | EUROPEAN CORPORATE |
| 25 | BRITISH AMERICAN TOBACCO P.L.C. | XS0094703799 | 25/02/2009 | 4.875% | 1,660,440 | | EUROPEAN CORPORATE |
| 26 | BRITISH TELECOMMUNICATIONS PUBLIC LIMITED COMPANY | XS0123684887 | 15/02/2011 | 7.125% | 1,660,440 | | EUROPEAN CORPORATE |
| 27 | BRUNSWICK CORPORATION | US117043AF61 | 15/12/2006 | 6.75% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 28 | BANCA INTESA S.P.A. | XS0147222540 | 08/05/2014 | 5.85% | 1,660,440 | Subordinated | EUROPEAN CORPORATE |
| 29 | BANK OF AMERICA CORPORATION | US060505AC97 | 15/01/2011 | 7.40% | 1,660,440 | Subordinated | NORTH AMERICAN CORPORATE |
| 30 | BAYER AKTIENGESELLSCHAFT | XS0145758040 | 10/04/2012 | 6% | 1,660,440 | | EUROPEAN CORPORATE |
| 31 | BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT | XS0162732951 | 20/02/2013 | 4.625% | 1,660,440 | | EUROPEAN CORPORATE |
| 32 | BELLSOUTH CORPORATION | US0798G0AB83 | 15/10/2011 | 6% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 33 | BERKSHIRE HATHAWAY INC. | US084664AD30 | 15/10/2013 | 4.625% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 34 | BERTELSMANN AG | XS0169240164 | 03/06/2010 | 4.625% | 1,660,440 | | EUROPEAN CORPORATE |
| 35 | CARREFOUR | FR0000480991 | 26/05/2010 | 6.125% | 1,660,440 | | EUROPEAN CORPORATE |
| 36 | CIT GROUP INC. | US125581AB41 | 02/04/2012 | 7.75% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 37 | CNOOC LIMITED | US17469AA25 | 08/03/2012 | 6.375% | 1,660,440 | | ASIA CORPORATE |
| 38 | COMPAGNIA ASSICURATRICE UNIPOL S.P.A. | XS0137017134 | 15/06/2021 | 7% | 1,660,440 | Subordinated | SUBORDINATED EUROPEAN INSURANCE CORPORATE |

A0617446/0/1.028 Apr 2006

| No. | Reference Entity | Benchmark Obligation Isin/Cusip | Benchmark Obligation Maturity | Benchmark Obligation Coupon | Reference Entity Notional Amount (EUR) | Seniority (state if Subordinated) | Reference Entity Category |
|---|---|---|---|---|---|---|---|
| 39 | CONOCOPHILLIPS | US2025CAE49 | 15/10/2012 | 4.75% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 40 | CARGILL, INCORPORATED | US14781AC86 | 01/10/2025 | 7.375% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 41 | CENTRICA PLC | XS013767381 | 02/11/2012 | 5.875% | 1,660,440 | | EUROPEAN CORPORATE |
| 42 | CENTURYTEL, INC. | US156700AG13 | 15/08/2012 | 7.875% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 43 | CHEVRONTEXACO CORPORATION | US166760AB48 | 15/02/2008 | 3.375% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 44 | CIBA SPECIALTY CHEMICALS HOLDING INC. | XS008589935 | 24/04/2013 | 6.5% | 1,660,440 | | EUROPEAN CORPORATE |
| 45 | CITIGROUP INC. | US172967BC45 | 18/01/2011 | 6.5% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 46 | COCA-COLA ENTERPRISES INC. | US19121QBJ28 | 15/08/2011 | 6.125% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 47 | CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. | US209111DE04 | 01/05/2010 | 8.125% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 48 | CONTINENTAL AKTIENGESELLSCHAFT | XS013972069 | 05/12/2008 | 6.875% | 1,660,440 | | EUROPEAN CORPORATE |
| 49 | COUNTRYWIDE FINANCIAL CORPORATION | US22372AE46 | 08/02/2031 | 0% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 50 | DSG INTERNATIONAL PLC | XS015763562 | 15/11/2012 | 6.125% | 1,660,440 | | EUROPEAN CORPORATE |
| 51 | DAIMLERCHRYSLER AG | US233835AA55 | 01/09/2009 | 7.2% | 1,660,440 | | EUROPEAN CORPORATE |
| 52 | DANAHER CORPORATION | US235851AB82 | 15/10/2008 | 6% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 53 | DEUTSCHE TELEKOM AG | XS014896559 | 29/05/2012 | 8.125% | 1,660,440 | | EUROPEAN CORPORATE |
| 54 | E. I. DU PONT DE NEMOURS AND COMPANY | US263344BN84 | 30/04/2014 | 4.875% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 55 | E.ON AG | XS014857B262 | 29/05/2009 | 5.75% | 1,660,440 | | EUROPEAN CORPORATE |
| 56 | EDP - ENERGIAS DE PORTUGAL, S.A. | XS012699O778 | 28/03/2011 | 5.875% | 1,660,440 | | EUROPEAN CORPORATE |
| 57 | ELECTRICITE DE FRANCE SERVICE NATIONAL | FR0000481152 | 25/10/2010 | 5.75% | 1,660,440 | | EUROPEAN CORPORATE |
| 58 | ENDESA, S.A. | XS016287B903 | 21/02/2013 | 5.375% | 1,660,440 | | EUROPEAN CORPORATE |

57

A06174460/1.0/28 Apr 2006

| No. | Reference Entity | Benchmark Obligation Isin/Cusip | Benchmark Obligation Maturity | Benchmark Obligation Coupon | Reference Entity Notional Amount (EUR) | Seniority (state if Subordinated) | Reference Entity Category |
|---|---|---|---|---|---|---|---|
| 59 | ENEL S.P.A. | X50170342868 | 12/06/2013 | 4.25% | 1,660,440 | | EUROPEAN CORPORATE |
| 60 | ENERGIE BADEN-WUERTTEMBERG AKTIENGESELLSCHAFT | X50143722451 | 28/02/2012 | 5.875% | 1,660,440 | | EUROPEAN CORPORATE |
| 61 | ESSENT N.V. | X50170641426 | 25/06/2013 | 4.5% | 1,660,440 | | EUROPEAN CORPORATE |
| 62 | EUROPEAN AERONAUTIC DEFENCE AND SPACE COMPANY EADS N.V. | X50163822488 | 03/03/2010 | 4.625% | 1,660,440 | | EUROPEAN CORPORATE |
| 63 | FPL GROUP CAPITAL INC | US302570AL58 | 01/06/2009 | 7.375% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 64 | FRANCE TELECOM | FR0000471948 | 28/01/2013 | 7.25% | 1,660,440 | | EUROPEAN CORPORATE |
| 65 | FEDERAL HOME LOAN MORTGAGE CORPORATION | US31344AEW03 | 21/03/2011 | 5.88% | 1,660,440 | Subordinated | NORTH AMERICAN CORPORATE |
| 66 | FEDERAL NATIONAL MORTGAGE ASSOCIATION | US31359MNU35 | 01/08/2012 | 5.25% | 1,660,440 | Subordinated | NORTH AMERICAN CORPORATE |
| 67 | FINANCIAL SECURITY ASSURANCE INC | X50112914907 | 29/06/2015 | 6.11% | 1,660,440 | Subordinated | NORTH AMERICAN CORPORATE / MONOLINE |
| 68 | FORTUM OYJ | X50180180985 | 19/11/2010 | 4.625% | 1,660,440 | | EUROPEAN CORPORATE |
| 69 | GAS NATURAL SDG, S.A. | X50107330143 | 10/02/2010 | 6.125% | 1,660,440 | | EUROPEAN CORPORATE |
| 70 | GROUPE AUCHAN | FR0010075531 | 04/05/2011 | 4.125% | 1,660,440 | | EUROPEAN CORPORATE |
| 71 | GUS PLC | X50162820228 | 12/12/2013 | 5.625% | 1,660,440 | | EUROPEAN CORPORATE |
| 72 | GANNETT CO., INC. | US36472SAC59 | 01/04/2012 | 6.375% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 73 | GENERAL ELECTRIC CAPITAL CORPORATION | US36962GXY42 | 15/06/2012 | 6% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 74 | H.J. HEINZ COMPANY | US423074AG80 | 15/03/2008 | 6% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 75 | HANSON PLC | US411352AA50 | 27/09/2010 | 7.875% | 1,660,440 | | EUROPEAN CORPORATE |
| 76 | HELLENIC TELECOMMUNICATIONS ORGANISATION SOCIETE ANONYME | X50173549659 | 05/08/2013 | 5% | 1,660,440 | | EUROPEAN CORPORATE |

A0617446v01.0/28 Apr 2006

| No. | Reference Entity | Benchmark Obligation Isin/Cusip | Benchmark Obligation Maturity | Benchmark Obligation Coupon | Reference Entity Notional Amount (EUR) | Seniority (state if Subordinated) | Reference Entity Category |
|---|---|---|---|---|---|---|---|
| 77 | HSBC BANK PLC | XS0164883992 | 18/03/2016 | 4.25% | 1,660,440 | | EUROPEAN CORPORATE |
| 78 | HUTCHISON WHAMPOA LIMITED | USG46712XAC41 | 16/02/2011 | 7% | 1,660,440 | Subordinated | ASIA CORPORATE |
| 79 | IBERDROLA, SOCIEDAD ANONIMA | XS0097762065 | 25/05/2009 | 4.5% | 1,660,440 | | EUROPEAN CORPORATE |
| 80 | INVESTOR AKTIEBOLAG | XS0143736162 | 05/03/2012 | 6.125% | 1,660,440 | | EUROPEAN CORPORATE |
| 81 | JPMORGAN CHASE & CO. | US46625HBH21 | 15/03/2009 | 3.5% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 82 | KELDA GROUP PLC | XS0109437441 | 17/04/2031 | 6.625% | 1,660,440 | | EUROPEAN CORPORATE |
| 83 | KINGFISHER PLC | XS0178322474 | 15/12/2014 | 5.625% | 1,660,440 | | EUROPEAN CORPORATE |
| 84 | KOHL'S CORPORATION | US500255AM62 | 01/03/2011 | 6.3% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 85 | KONINKLIJKE DSM N.V. | XS0165297AR93 | 15/05/2009 | 6.75% | 1,660,440 | | EUROPEAN CORPORATE |
| 86 | KONINKLIJKE KPN N.V. | US7806641AG12 | 01/10/2010 | 8% | 1,660,440 | | EUROPEAN CORPORATE |
| 87 | L'AIR LIQUIDE SOCIETE ANONYME A DIRECTOIRE ET CONSEIL DE SURVEIL | FR0000487936 | 28/12/2011 | 5.25% | 1,660,440 | | EUROPEAN CORPORATE |
| 88 | LEGAL & GENERAL GROUP PLC | XS0193391873 | 18/12/2006 | 2.75% | 1,660,440 | | EUROPEAN CORPORATE |
| 89 | LIMITED BRANDS, INC. | US532716AH08 | 01/12/2012 | 6.125% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 90 | LINDE AKTIENGESELLSCHAFT | DE0002465952 | 14/06/2007 | 6.375% | 1,660,440 | | EUROPEAN CORPORATE |
| 91 | LLOYDS TSB BANK PLC | XS0145620281 | 08/07/2014 | 5.875% | 1,660,440 | Subordinated | EUROPEAN CORPORATE |
| 92 | MBIA INC. | US5262CAF77 | 01/10/2028 | 6.625% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 93 | MGIC INVESTMENT CORPORATION | US552845AF69 | 15/03/2007 | 6% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 94 | MCDONALD'S CORPORATION | US58013MDM38 | 15/04/2011 | 6% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 95 | MERCK & CO., INC. | US589331AE71 | 01/12/2028 | 5.95% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 96 | MERRILL LYNCH & CO., INC. | US590188JP48 | 17/02/2009 | 6% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 97 | METLIFE, INC. | US59156RAC25 | 01/12/2011 | 6.125% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 98 | MORGAN STANLEY | US617446HC69 | 01/04/2012 | 6.6% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 99 | MUENCHENER RUECKVERSICHERUNGS-GESELLSCHAFT | XS0166965797 | 21/06/2023 | 6.75% | 1,660,440 | Subordinated | SUBORDINATED EUROPEAN INSURANCE CORPORATE |

59

A061744601.0/28 Apr 2006

AKTIENGESELLSCHAFT IN

| No. | Reference Entity | Benchmark Obligation Isin/Cusip | Benchmark Obligation Maturity | Benchmark Obligation Coupon | Reference Entity Notional Amount (EUR) | Seniority (state if Subordinated) | Reference Entity Category |
|---|---|---|---|---|---|---|---|
| 100 | N.V. NUON | XS020846253 | 17/12/2014 | 4.125% | 1,660,440 | | EUROPEAN CORPORATE |
| 101 | NUCOR CORPORATION | US6703464AC90 | 01/10/2012 | 4.875% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 102 | NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION | US637432CU74 | 01/03/2012 | 7.25% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 103 | NESTLE S.A. | XS0149994232 | 25/09/2007 | 4.75% | 1,660,440 | | EUROPEAN CORPORATE |
| 104 | NEW YORK TIMES COMPANY, THE | US6501111AD94 | 15/03/2010 | 4.5% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 105 | OLD MUTUAL PUBLIC LIMITED COMPANY | XS0145936919 | 10/04/2007 | 6% | 1,660,440 | | EUROPEAN CORPORATE |
| 106 | PEARSON PLC | GB0006777725 | 13/06/2008 | 10.5% | 1,660,440 | | EUROPEAN CORPORATE |
| 107 | PEUGEOT SA | FR0000487159 | 27/09/2011 | 5.875% | 1,660,440 | | EUROPEAN CORPORATE |
| 108 | PPG INDUSTRIES, INC. | US6693506AY35 | 15/08/2009 | 7.05% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 109 | REED ELSEVIER PLC | XS0133458728 | 31/07/2008 | 5.75% | 1,660,440 | | EUROPEAN CORPORATE |
| 110 | REUTERS GROUP PLC | XS0180277393 | 19/11/2010 | 4.625% | 1,660,440 | | EUROPEAN CORPORATE |
| 111 | RWE AKTIENGESELLSCHAFT | XS0147030554 | 26/10/2012 | 6.125% | 1,660,440 | | EUROPEAN CORPORATE |
| 112 | RADIAN GROUP INC. | US750236AB78 | 01/06/2011 | 7.75% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 113 | RADIOSHACK CORPORATION | US750438AB90 | 15/05/2011 | 7.375% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 114 | ROHM AND HAAS COMPANY | US775371AR80 | 15/07/2009 | 7.4% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 115 | RYDER SYSTEM, INC. | US783549AZ16 | 01/12/2025 | 6.95% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 116 | SANOFI-AVENTIS | XS0172128675 | 15/09/2010 | 4.25% | 1,660,440 | | EUROPEAN CORPORATE |
| 117 | SES GLOBAL | XS0180191164 | 19/11/2008 | 4.5% | 1,660,440 | | EUROPEAN CORPORATE |
| 118 | SINGAPORE TELECOMMUNICATIONS LIMITED | USY7985SAC46 | 01/12/2011 | 6.375% | 1,660,440 | | SINGAPORE CORPORATE |
| 119 | SLM CORPORATION | US78442FBA40 | 27/08/2012 | 5.125% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 120 | SONY CORPORATION | JP343500B199 | 20/09/2011 | 1.32% | 1,660,440 | | JAPAN CORPORATE |
| 121 | STATOIL ASA | XS0059213547 | 30/06/2011 | 5.125% | 1,660,440 | | EUROPEAN CORPORATE |
| 122 | SUEZ | FR0000495848 | 13/10/2009 | 5.875% | 1,660,440 | | EUROPEAN CORPORATE |

| No. | Reference Entity | Benchmark Obligation Isin/Cusip | Benchmark Obligation Maturity | Benchmark Obligation Coupon | Reference Entity Notional Amount (EUR) | Seniority (state if Subordinated) | Reference Entity Category |
|---|---|---|---|---|---|---|---|
| 123 | SARA LEE CORPORATION | US80311TCF75 | 19/06/2008 | 6.15% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 124 | SECURITAS AB | XS0126389062 | 14/03/2008 | 6.125% | 1,660,440 | | EUROPEAN CORPORATE |
| 125 | SIEMENS AKTIENGESELLSCHAFT | XS0131224155 | 04/07/2011 | 5.75% | 1,660,440 | | EUROPEAN CORPORATE |
| 126 | SOLVAY | BE0374557404 | 27/06/2018 | 4.625% | 1,660,440 | | EUROPEAN CORPORATE |
| 127 | STORA ENSO OYJ | US86210MAA45 | 15/05/2011 | 7.375% | 1,660,440 | | EUROPEAN CORPORATE |
| 128 | SVENSKA CELLULOSA AKTIEBOLAGET SCA | XS0149915653 | 25/06/2007 | 5.375% | 1,660,440 | | EUROPEAN CORPORATE |
| 129 | SWISS REINSURANCE COMPANY | CH0012491335 | 29/06/2015 | 4% | 1,660,440 | | EUROPEAN CORPORATE |
| 130 | SYNGENTA AG | XS0132121715 | 10/07/2006 | 5.5% | 1,660,440 | | EUROPEAN CORPORATE |
| 131 | TELECOM CORPORATION OF NEW ZEALAND LIMITED | XS0140346171 | 14/12/2011 | 6.75% | 1,660,440 | | NEW ZEALAND CORPORATE |
| 132 | TELECOM ITALIA SPA | XS0142531903 | 01/02/2012 | 6.25% | 1,660,440 | | EUROPEAN CORPORATE |
| 133 | TELEFONICA, S.A. | XS0162367880 | 14/02/2013 | 5.125% | 1,660,440 | | EUROPEAN CORPORATE |
| 134 | TELENOR ASA | XS0158765064 | 05/12/2012 | 5.875% | 1,660,440 | | EUROPEAN CORPORATE |
| 135 | TELSTRA CORPORATION LIMITED | XS0131858838 | 29/06/2011 | 6.375% | 1,660,440 | | AUSTRALIA CORPORATE |
| 136 | TESCO PLC | XS0159012847 | 13/04/2010 | 4.75% | 1,660,440 | | EUROPEAN CORPORATE |
| 137 | THALES | XS0196403025 | 22/07/2011 | 4.375% | 1,660,440 | | EUROPEAN CORPORATE |
| 138 | THE BOC GROUP PLC | XS0146567580 | 29/04/2009 | 5.875% | 1,660,440 | | EUROPEAN CORPORATE |
| 139 | THE ROYAL BANK OF SCOTLAND PUBLIC LIMITED COMPANY | XS0128842571 | 10/03/2013 | 6% | 1,660,440 | Subordinated | EUROPEAN CORPORATE |
| 140 | THOMSON | FR0000188369 | 01/01/2008 | 1% | 1,660,440 | | EUROPEAN CORPORATE |
| 141 | TELEKOM AUSTRIA AKTIENGESELLSCHAFT | XS0172844283 | 22/07/2013 | 5% | 1,660,440 | | EUROPEAN CORPORATE |
| 142 | TELIASONERA AKTIEBOLAG | XS0101443538 | 10/09/2010 | 5.5% | 1,660,440 | | EUROPEAN CORPORATE |
| 143 | THE ALLSTATE CORPORATION | US020002AK77 | 01/12/2009 | 7.2% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 144 | THE BEAR STEARNS COMPANIES INC. | US0735902BR87 | 07/12/2009 | 7.625% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 145 | THE GOLDMAN SACHS GROUP, INC. | US38141GBU76 | 15/01/2012 | 6.6% | 1,660,440 | | NORTH AMERICAN CORPORATE |

A061744601.028 Apr 2006

| No. | Reference Entity | Benchmark Obligation Isin/Cusip | Benchmark Obligation Maturity | Benchmark Obligation Coupon | Reference Entity Notional Amount (EUR) | Seniority (state if Subordinated) | Reference Entity Category |
|---|---|---|---|---|---|---|---|
| 146 | THE PMI GROUP, INC. | US69344MAE12 | 15/07/2021 | 2.5% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 147 | STANDARD LIFE ASSURANCE CO | XS0151267522 | 12/07/2022 | 6.375% | 1,660,440 | Subordinated | SUBORDINATED EUROPEAN INSURANCE CORPORATE |
| 148 | TIME WARNER INC. | US00184AAF21 | 01/05/2012 | 6.875% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 149 | TRIBUNE COMPANY | US88604KAG31 | 06/10/2008 | 5.5% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 150 | UNITED UTILITIES PLC | US91311QAA31 | 01/04/2008 | 6.45% | 1,660,440 | | EUROPEAN CORPORATE |
| 151 | UST INC. | US902911AM82 | 15/07/2012 | 6.625% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 152 | UNILEVER N.V. | US9047G64AG27 | 01/11/2010 | 7.125% | 1,660,440 | | EUROPEAN CORPORATE |
| 153 | UNITED PARCEL SERVICE, INC. | US911308AB04 | 01/04/2030 | 8.375% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 154 | VALEO | FR0010007468 | 01/01/2011 | 2.375% | 1,660,440 | | EUROPEAN CORPORATE |
| 155 | VEOLIA ENVIRONNEMENT | XS0142249555 | 01/02/2012 | 5.875% | 1,660,440 | | EUROPEAN CORPORATE |
| 156 | VODAFONE GROUP PUBLIC LIMITED COMPANY | XS0283TTAG22 | 15/02/2010 | 7.75% | 1,660,440 | | EUROPEAN CORPORATE |
| 157 | VOLKSWAGEN AKTIENGESELLSCHAFT | XS0168882495 | 22/05/2013 | 4.875% | 1,660,440 | | EUROPEAN CORPORATE |
| 158 | VATTENFALL AKTIEBOLAG | XS0109778190 | 31/03/2010 | 6% | 1,660,440 | | EUROPEAN CORPORATE |
| 159 | VERIZON COMMUNICATIONS INC. | US92344GAL05 | 01/12/2010 | 7.25% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 160 | VOLVO AB | XS0106998270 | 09/02/2007 | 6% | 1,660,440 | | EUROPEAN CORPORATE |
| 161 | WASHINGTON MUTUAL, INC. | US939322AL70 | 15/01/2009 | 4% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 162 | WELLS FARGO & COMPANY | US94974BAZ31 | 29/10/2010 | 3.98% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 163 | WHIRLPOOL CORPORATION | US963320AK24 | 01/05/2010 | 8.6% | 1,660,440 | | NORTH AMERICAN CORPORATE |
| 164 | WOLTERS KLUWER N.V. | XS0181273342 | 27/01/2014 | 5.125% | 1,660,440 | | EUROPEAN CORPORATE |
| 165 | XL CAPITAL LTD | US98372PAP53 | 15/09/2014 | 5.25% | 1,660,440 | | NORTH AMERICAN CORPORATE |

A06174460/1.0/28 Apr 2006

## Schedule B
## Applicable Reference Entity Category Terms

### CORPORATES

| | North American Corporate | European Corporate | Australia/NZ Corporate | Japan Corporate | Singapore Corporate | Asia Corporate | Emerging European Corporate | Latin American Corporate |
|---|---|---|---|---|---|---|---|---|
| **Conditions to Settlement** | Not Applicable<br>Notice of Publicly Available Information Applicable | Applicable<br>Notice of Publicly Available Information Applicable | Applicable<br>Notice of Publicly Available Information Applicable | Applicable<br>Section 3.9 of the Definitions shall be excluded<br>Section 3.3 of the Definitions shall be amended by replacing "Greenwich Mean Time" with "Tokyo time"<br>Notice of Publicly Available Information Applicable | Applicable<br>Notice of Publicly Available Information Applicable | Applicable<br>Notice of Publicly Available Information Applicable | Applicable<br>Notice of Publicly Available Information Applicable | Applicable<br>Notice of Publicly Available Information Applicable |
| **Credit Events** | Bankruptcy<br>Failure to Pay<br>Restructuring, if specified as applicable in the relevant Confirmation<br>Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Bankruptcy<br>Failure to Pay<br>Restructuring<br>Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation Applicable | Bankruptcy<br>Failure to Pay<br>Restructuring<br>Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Bankruptcy<br>Failure to Pay<br>Restructuring<br>Maturity Limitation and Fully Transferable Obligation Applicable | Bankruptcy<br>Failure to Pay<br>Payment Requirement: If the Floating Rate Payer Calculation Amount is in JPY, JPY 100,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay. In all other cases, USD 1,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay.<br>Restructuring<br>Multiple Holder Obligation: Not Applicable<br>Default Requirement: If the Floating Rate Payer Calculation Amount is in JPY, JPY 1,000,000,000 or its equivalent in the relevant | Bankruptcy<br>Failure to Pay<br>Restructuring | Bankruptcy<br>Failure to Pay<br>Restructuring | Bankruptcy<br>Failure to Pay<br>Grace Period Ext.: Applicable<br>Obligation Acceleration<br>Repudiation/<br>Moratorium<br>Restructuring<br>Multiple Holder Obl.: Not Applicable |

63

A06174460/1.0/28 Apr 2006

| | Obligation Category | Obligation Characteristics | Deliverable Obligation Category | Deliverable Obligation Characteristics |
|---|---|---|---|---|
| | Borrowed Money | None | Bond or Loan | Not Subordinated, Specified Currency, Not Contingent, Assignable Loan, Consent Required Loan, Transferable, Maximum Maturity: 30 years, Not Bearer |
| | Borrowed Money | None | Bond or Loan | Not Subordinated, Specified Currency, Not Contingent, Assignable Loan, Consent Required Loan, Transferable, Maximum Maturity: 30 years, Not Bearer |
| | Borrowed Money | None | Bond or Loan | Not Subordinated, Specified Currency, Standard Specified Currencies & Domestic Currency, Not Contingent, Assignable Loan, Consent Required Loan, Transferable, Maximum Maturity: 30 years, Not Bearer |
| Obligation Currency as of the occurrence of the relevant Credit Event. In all other cases, USD 10,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event. | Borrowed Money | None | Bond or Loan | Not Subordinated, Specified Currency, Standard Specified Currencies & Domestic Currency, Not Contingent, Assignable Loan, Consent Required Loan, Transferable, Maximum Maturity: 30 years, Not Bearer |
| | Borrowed Money | Not Subordinated | Bond or Loan | Not Subordinated, Specified Currency, Standard Specified Currencies & Domestic Currency, Not Sovereign Lender, Not Domestic Currency, Not Sovereign Issuance, Not Domestic Law |
| | Borrowed Money | | Bond or Loan | Not Subordinated, Specified Currency, Not Sovereign Lender, Not Contingent, Not Domestic Currency, Not Domestic Issuance, Not Domestic Law |
| | Borrowed Money | None. | Bond or Loan | Not Subordinated, Specified Currency, Not Contingent, Assignable Loan, Consent Required Loan, Transferable, Maximum Maturity: 30 years, Not Bearer |
| | Bond | | Bond | Not Subordinated, Specified Currency, Not Domestic Currency, Not Contingent, Not Domestic Law, Transferable, Maximum Maturity, Not Bearer, Not Domestic Issuance |

| DISRUPTION EVENTS/FALLBACKS | MARKET DISRUPTION EVENTS | SETTLEMENT PRICE DISRUPTION | ADDITIONAL MARKET DISRUPTION EVENTS | TAX DISRUPTION | DUAL EXCHANGE RATE | ADJUSTMENT | SUBORDINATE INDEX ADJUSTMENTS | ADDITIONAL DISRUPTION EVENTS |
|---|---|---|---|---|---|---|---|---|
| Not Applicable unless otherwise specified as Applicable in the relevant Confirmation | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Not Applicable |
| Additional Identical... (Consequences... 4.8, 3.8.9) | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Disruption Event... Change in Law... Hedging Disruption... 14.2(b)(i) | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |

65

## SOVEREIGNS



| | | | | | |
|---|---|---|---|---|---|
| Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable |
| Failure to Pay<br>Repudiation/Moratorium<br>Restructuring | Failure to Pay<br>Gross Period Extension: Applicable<br>Obligation Acceleration<br>Repudiation/Moratorium<br>Restructuring<br>Multiple Holder Obligation: Not Applicable | Failure to Pay<br>Repudiation/Moratorium<br>Restructuring<br>Restructuring Maturity Limitation and Fully Transferable Obligation: Applicable | Failure to Pay<br>Repudiation/Moratorium<br>Restructuring<br>Restructuring Maturity Limitation and Fully Transferable Obligation: Applicable | Failure to Pay<br>Repudiation/Moratorium<br>Restructuring | Failure to Pay<br>Gross Period Extension: Applicable<br>Obligation Acceleration<br>Repudiation/Moratorium<br>Restructuring<br>Multiple Holder Obligation: Not Applicable |
| Bond or Loan | Bond | Borrowed Money | Borrowed Money | Borrowed Money | Bond or Loan | Bond |
| Not Subordinated<br>Not Sovereign Lender<br>Not Domestic Currency<br>Not Domestic Law<br>Not Domestic Issuance | Not Subordinated<br>Not Domestic Currency<br>Not Domestic Law<br>Not Domestic Issuance | None | None | Not Subordinated<br>Specified Currency:<br>Standard Specified Currencies & Domestic Currency<br>Not Sovereign Lender | Not Subordinated<br>Not Domestic Currency<br>Not Domestic Law<br>Not Domestic Issuance |

A0617446011.0/28 Apr 2006

| | Bond or Loan | Bond | Bond or Loan | Bond or Loan | Bond or Loan | Bond or Loan | Bond | Bond or Loan |
|---|---|---|---|---|---|---|---|---|
| Reference Obligation Characteristics | Not Subordinated Specified Currency Not Sovereign Lender Not Contingent Not Domestic Law Not Domestic Issuance Assignable Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Not Contingent Not Domestic Law Not Contingent Not Domestic Issuance Not Bearer | Specified Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency; Standard Specified Currencies & Domestic Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency; Standard Specified Currencies & Domestic Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Specified Currencies & Domestic Currency Not Contingent Assignable Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Not Contingent Transferable Not Bearer | Specified Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer |
| Mod R | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable |
| Mod Mod R | Not Applicable | Not Applicable | Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Applicable |
| | Not Applicable | Applicable if the Reference Entity is the Russian Federation, otherwise Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| | Not Applicable | Applicable if the Reference Entity is the Republic of Hungary, otherwise Not Applicable | | | | | | |

67

**Schedule C**
**Additional Definitions and Provisions**

**Definitions relating to Credit Events**

Bankruptcy:

means a Reference Entity (a) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (b) becomes insolvent or is unable to pay its debts or fails or admits in writing in a judicial, regulatory or administrative proceeding or filing its inability generally to pay its debts as they become due; (c) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (d) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (i) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (ii) is not dismissed, discharged, stayed or restrained in each case within thirty calendar days of the institution or presentation thereof; (e) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (f) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (g) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within thirty calendar days thereafter; or (h) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (a) to (g) (inclusive).

Failure to Pay:

means, after the expiration of any applicable (or deemed) Grace Period (after the satisfaction of any conditions precedent to the commencement of such Grace Period), the failure by a Reference Entity to make, when and where due, any payments in an aggregate amount of not less than the Payment Requirement under one or more Obligations, in accordance with the terms of such Obligations at the time of such failure.

Restructuring:

(a)    Restructuring means that, with respect to one or more

Obligations, including as a result of an Obligation Exchange, and in relation to an aggregate amount of not less than the Default Requirement, any one or more of the following events occurs in a form that binds all holders of such Obligation, is agreed between the Reference Entity or a Governmental Authority and a sufficient number of holders of such Obligation to bind all holders of the Obligation or is announced (or otherwise decreed) by a Reference Entity or a Governmental Authority in a form that binds all holders of such Obligation, and such event is not expressly provided for under the terms of such Obligation in effect as of the later of the Trade Date and the date as of which such Obligation is issued or incurred:

(i)   a reduction in the rate or amount of interest payable or the amount of scheduled interest accruals;

(ii)  a reduction in the amount of principal or premium payable at maturity or at scheduled redemption dates;

(iii) a postponement or other deferral of a date or dates for either (A) the payment or accrual of interest or (B) the payment of principal or premium;

(iv)  a change in the ranking in priority of payment of any Obligation, causing the Subordination of such Obligation to any other Obligation; or

(v)   any change in the currency or composition of any payment of interest or principal to any currency which is not a Permitted Currency.

"**Permitted Currency**" means (i) the legal tender of any Group of 7 (G7) country (or any country that becomes a member of G7 if G7 expands its membership); or (ii) the legal tender of any country which, as of the date of such change, is a member of the Organisation for Economic Cooperation and Development and has a local currency long-term debt rating of either "AAA" or higher assigned to it by Standard and Poor's, a division of The McGraw-Hill Companies, Inc. or any successor to the rating business thereof, "Aaa" or higher assigned to it by Moody's Investors Service, Inc. or any successor to the rating business thereof or "AAA" or higher assigned to it by Fitch Ratings or any successor to the rating business thereof.

(b)   Notwithstanding the provisions of (a), above, none of the following shall constitute a Restructuring:

(i)   the payment in euros of interest or principal in relation to an Obligation denominated in a currency of a Member State of the European Union that adopts

or has adopted the single currency in accordance with the Treaty establishing the European Community, as amended by the Treaty on European Union;

(ii) the occurrence of, agreement to or announcement of any of the events described in (a)(i) to (v) due to an administrative adjustment, accounting adjustment or tax adjustment or other technical adjustment occurring in the ordinary course of business; and

(iii) the occurrence of, agreement to or announcement of any of the events described in (a)(i) to (v) in circumstances where such event does not directly or indirectly result from a deterioration in the creditworthiness or financial condition of the Reference Entity.

(c) For purposes of paragraphs (a) and (b) (above), the term Obligation shall be deemed to include Underlying Obligations for which the Reference Entity is acting as provider of any Qualifying Guarantee. In the case of a Qualifying Guarantee and an Underlying Obligation, references to a Reference Entity in paragraph (a) of this definition shall be deemed to refer to the relevant Underlying Obligor and the reference to a Reference Entity in paragraph (b) of this definition shall continue to refer to such Reference Entity.

(d) With respect to a Reference Entity, notwithstanding anything to the contrary in this definition of Restructuring the occurrence of, agreement to, or announcement of, any of the events described in (a)(i) to (v) (above) shall not be a Restructuring where the Obligation in respect of any such events is not a Multiple Holder Obligation unless "Multiple Holder Obligation: Not Applicable" is specified in Schedule B in respect of Reference Entities of the same Reference Entity Category as such Reference Entity.

"**Multiple Holder Obligation**" means an Obligation that (i) at the time of the event which constitutes a Restructuring Credit Event, is held by more than three holders that are not Affiliates of each other and (ii) with respect to which a percentage of holders (determined pursuant to the terms of the Obligation as in effect on the date of such event) at least equal to sixty-six-and-two-thirds is required to consent to the event which constitutes a Restructuring Credit Event, provided that (ii) above shall not apply to any Obligations which are Bonds.

Obligation Exchange:    means the mandatory transfer (other than in accordance with the terms in effect as of the later of the Trade Date or date of

issuance of the relevant Obligation) of any securities, obligations or assets to holders of Obligations in exchange for such Obligations. When so transferred, such securities, obligations or assets will be deemed to be Obligations.

Payment Requirement: In respect of each Reference Entity for which the Reference Entity Category is specified to be Japan Corporate, JPY 100,000,000. In all other cases, USD 1,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay or Potential Failure to Pay.

Default Requirement: In respect of each Reference Entity for which the Reference Entity Category is specified to be Japan Corporate, JPY 1,000,000,000. In all other cases, USD 10,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event.

Credit Event Notice: means an irrevocable written notice from Buyer to Seller (with a copy to Moody's, provided that delivery of such copy shall not be required to satisfy the Credit Event Notice Condition to Settlement) which describes a Credit Event that occurred during the Credit Observation Period. The Credit Event which is the subject of the Credit Event Notice need not be continuing on the date the Credit Event Notice is effective.

Credit Event Notice After Restructuring: With respect to a Reference Entity, notwithstanding anything to the contrary in the Credit Derivative Definitions or herein, upon the occurrence of a Restructuring Credit Event during the term of the Transaction:

(a) the Buyer may deliver multiple Credit Event Notices with respect to the Reference Entity to which such Credit Event applies, each such Credit Event Notice setting forth the amount of the Floating Rate Payer Calculation Amount to which such Credit Event Notice applies (the "**Exercise Amount**");

(b) if the Buyer has delivered a Credit Event Notice that specifies an Exercise Amount that is less than the Floating Rate Payer Calculation Amount for the Reference Entity to which such Credit Event applies, it shall be construed as if the Reference Registry contained two entries for that specific Reference Entity, one which has a Floating Rate Payer Calculation Amount equal to the Exercise Amount and, upon satisfaction of the Conditions to Settlement, will be settled in accordance with the terms herein, and the other of which will have a Floating Rate Payer Calculation Amount equal to the Floating Rate Payer Calculation Amount outstanding prior to such Credit Event Notice minus the Exercise Amount and will continue in effect; and

(c)  the Exercise Amount in connection with a Credit Event Notice describing a Restructuring must be in the amount of 1,000,000 units of the currency in which the Floating Rate Payer Calculation Amount is denominated or an integral multiple thereof.

Event Determination Date:  means the date falling within the Notice Delivery Period on which both the Credit Event Notice and the Notice of Publicly Available Information have been delivered to the Issuer.

Grace Period:  means the lesser of (a) the applicable grace period with respect to payments under the relevant Obligation under the terms of such Obligation in effect as of the later of the Trade Date and the date as of which such Obligation is issued or incurred and (b) 30 calendar days.

Grace Period Extension Date:  means the date that is the number of days in the applicable Grace Period after the date of the relevant Potential Failure to Pay.

Notice Delivery Period:  means the period from and including the Trade Date to and including the later of: (a) the Scheduled Maturity Date; (b) the date that is fourteen calendar days after the Grace Period Extension Date if (i) the Credit Event that is the subject of the Credit Event Notice is a Failure to Pay that occurred after the Scheduled Maturity Date and (ii) the Potential Failure to Pay with respect to such Failure to Pay occurred on or prior to the Scheduled Maturity Date; and (c) the Notice Delivery Period Extension Date if the Credit Event that is the subject of the Credit Event Notice is a Credit Event in respect of which a Notice Delivery Period Extension Event was continuing on the Scheduled Maturity Date.

Notice Delivery Period Extension Date:  means the date that is fourteen calendar days after the Scheduled Maturity Date.

Notice Delivery Period Extension Event:  means that the Calculation Agent, acting in good faith and in a commercially reasonable manner, determines that (a) either a Credit Event has occurred or may have occurred during the Credit Observation Period in respect of a Reference Obligation and (b) an Event Determination Date has not occurred in respect of (i) such Credit Event or (ii) such Reference Obligation.

Notice of Publicly Available Information:  means an irrevocable written notice from the Calculation Agent to the Buyer and Seller (with a copy to Moody's) that cites Publicly Available Information confirming the occurrence of the Credit Event described in the Credit Event Notice. The notice given must contain a copy, or a description in reasonable detail, of the relevant Publicly Available Information.

Potential Failure to Pay:  means the failure by any one of the Reference Entities to make, when and where due, any payments in an aggregate amount of

|  | not less than the Payment Requirement under one or more Obligations without regard to any grace period or any conditions precedent to the commencement of any grace period applicable to such Obligations in accordance with the terms of such Obligations at the time of such failure. |
|---|---|
| Qualifying Guarantee: | means an arrangement evidenced by a written instrument pursuant to which a Reference Entity irrevocably agrees (by guarantee of payment or equivalent legal arrangement) to pay all amounts due under an obligation (the **"Underlying Obligation"**) for which another party is the obligor (the **"Underlying Obligor"**). Qualifying Guarantees shall exclude any arrangement (i) structured as a surety bond, financial guarantee insurance policy, letter of credit or equivalent legal arrangement or (ii) pursuant to the terms of which the payment obligations of the Reference Entity can be discharged, reduced or otherwise altered or assigned (other than by operation of law) as a result of the occurrence or non-occurrence of an event or circumstance (other than payment). The benefit of a Qualifying Guarantee must be capable of being Delivered together with the Delivery of the Underlying Obligation. |
| Qualifying Affiliate Guarantee: | means a Qualifying Guarantee provided by a Reference Entity in respect of an Underlying Obligation of a Downstream Affiliate of that Reference Entity. |
| Downstream Affiliate: | means an entity whose outstanding Voting Shares were, at the date of issuance of the Qualifying Guarantee, more than 50 per cent. owned, directly or indirectly, by the Reference Entity. |
| Voting Shares: | means those shares or other interests that have power to elect the board of directors or similar governing body of an entity. |

**Reference Obligation Definitions**

| Borrowed Money: | means with respect to any one of the Reference Entities, any one or more obligations (excluding an obligation under a revolving credit arrangement for which there are no outstanding unpaid drawings in respect of principal) for the payment or repayment of borrowed money (which term shall include, without limitation, deposits and reimbursement obligations arising from drawings pursuant to letters of credit). |
|---|---|
| Bond: | means with respect to any one of the Reference Entities, any one or more obligations of a type included in the definition of "Borrowed Money" that is in the form of, or represented by, a bond, note (other than notes delivered pursuant to Loans) certificated debt security or other debt security, and shall not include any other type of Borrowed Money. |
| Loan: | means with respect to any one of the Reference Entities, any one or more obligations of a type included in the definition of |

|  | "Borrowed Money" that is documented by a term loan agreement, revolving loan agreement or other similar credit agreement, and shall not include any other type of Borrowed Money. |
| --- | --- |
| Bond or Loan: | means any obligation that is either a Bond or a Loan. |
| Specified Currencies: | means an obligation that is payable in the currency or currencies specified as such in Schedule B with respect to Reference Entities of the same Reference Entity Category as the Reference Entity. |
| Standard Specified Currency: | means any of the lawful currencies of Canada, Japan, Switzerland, United Kingdom and the United States of America and the euro (and any successor currency to any of the abovementioned currencies). |
| Not Subordinated: | means an obligation that is not Subordinated to: (i) the Benchmark Obligation specified for the relevant Reference Entity in the Reference Registry or (ii) if no Benchmark Obligation is specified for the relevant Reference Entity, any unsubordinated Borrowed Money obligation of the relevant Reference Entity. For the purposes of determining whether an obligation satisfies the "Not Subordinated" Reference Obligation Characteristic, the ranking in priority of payment of the Benchmark Obligation shall be determined as of the later of: (1) the Trade Date and (2) the date on which such obligation was issued or incurred and shall not reflect any change to such ranking after such later date. |
| Not Contingent: | means any obligation having as of the relevant Valuation Date and all times thereafter an outstanding principal balance or, in the case of obligations that are not Borrowed Money, a Due and Payable Amount, that pursuant to the terms of such obligation may not be reduced as a result of the occurrence or non-occurrence of an event or circumstance (other than payment). A Convertible Obligation, an Exchangeable Obligation and an Accreting Obligation shall satisfy the Not Contingent Reference Obligation Characteristic if such Convertible Obligation, Exchangeable Obligation or Accreting Obligation otherwise meets the requirements of the preceding sentence so long as, in the case of a Convertible Obligation or an Exchangeable Obligation, the right (A) to convert or exchange such obligation or (B) to require the issuer to purchase or redeem such obligation (if the issuer has exercised or may exercise the right to pay the purchase or redemption price, in whole or in part, in Equity Securities) has not been exercised (or such exercise has been effectively rescinded) on or before the relevant Valuation Date. |
| Transferable: | means an obligation that is transferable to institutional investors without any contractual, statutory or regulatory restriction, |

provided that none of the following shall be considered contractual, statutory or regulatory restrictions:

(A) contractual, statutory or regulatory restrictions that provide for eligibility for resale pursuant to Rule 144A or Regulation S promulgated under the United States Securities Act of 1933, as amended (and any contractual, statutory or regulatory restrictions promulgated under the laws of any jurisdiction having a similar effect in relation to the eligibility for resale of an obligation); or

(B) restrictions on permitted investments such as statutory or regulatory investment restrictions on insurance companies and pension funds,

provided that such characteristics shall be applicable only in respect of obligations that are Bonds.

| | |
|---|---|
| Maximum Maturity 30 years: | means an obligation that has a remaining maturity from the Valuation Date of not greater than 30 years. |
| Not Bearer: | means any obligation that is not a bearer instrument unless interests with respect to such bearer instrument are cleared via the Euroclear system, Clearstream International SA or any other internationally recognised clearing system provided that such characteristic shall be applicable only in respect of obligations that are Bonds. |
| Assignable Loan: | means a Loan that is, as of the Valuation Date, capable of being assigned or novated to, at a minimum, commercial banks or financial institutions (irrespective of their jurisdiction of organisation) that are not then a lender or a member of the relevant lending syndicate, without the consent of the relevant Reference Entity or the guarantor, if any, of such Loan (or the consent of the applicable borrower if the Reference Entity is guaranteeing such Loan) or any agent, provided that such characteristics shall be applicable only in respect of obligations that are Loans. |
| Consent Required Loan: | means a Loan that is, as of the Valuation Date, capable of being assigned or novated with the consent of the relevant Reference Entity or the guarantor, if any, of such Loan (or the consent of the relevant borrower if the Reference Entity is guaranteeing such Loan) or any agent, provided that such characteristics shall be applicable only in respect of obligations that are Loans. |

In the event that any Reference Obligation is a Loan which is a Consent Required Loan, the Calculation Agent will only be permitted to use a Bid Quotation from a Dealer to determine the Final Reference Obligation Price of such Reference Obligation if the Calculation Agent provided such Dealer with the information reasonably required by that Dealer to give such Bid Quotation. For the sake of clarity, information which may be reasonably requested by such Dealer (and which shall be

provided by the Calculation Agent if requested in respect of such Bid Quotation) may include any of the following:

(1)    the name of the debtor;

(2)    the governing law;

(3)    guarantee (existence and description);

(4)    surety (existence and description);

(5)    description of the covenants;

(6)    maturity and amortisation profile;

(7)    coupon;

(8)    revolver or term loan;

(9)    drawn or not; and

(10)    the effective date of the loan.

## Additional terms relating to Restructuring

If "Modified Restructuring Applicable" or "Restructuring Maturity Limitation and Fully Transferable Obligation Applicable" is specified in Schedule B in respect of Reference Entities of the same Reference Entity Category as a Reference Entity that is the subject of a Credit Event Notice and Restructuring is the only Credit Event specified in the Credit Event Notice, then a Reference Obligation may be selected by the Calculation Agent to value in respect of such Reference Entity only if it (i) is a Fully Transferable Obligation and (ii) has a final maturity date not later than the Restructuring Maturity Limitation Date.

If "Modified Modified Restructuring Applicable" or "Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation Applicable" is specified in Schedule B in respect of Reference Entities of the same Reference Entity Category as a Reference Entity that is the subject of a Credit Event Notice and Restructuring is the only Credit Event specified in the Credit Event Notice, then a Reference Obligation may be selected by the Calculation Agent to value in respect of such Reference Entity only if it (i) is a Conditionally Transferable Obligation and (ii) has a final maturity date not later than the applicable Modified Restructuring Maturity Limitation Date.

"**Restructuring Maturity Limitation Date**" means the date that is the earlier of (x) 30 months following the Restructuring Date and (y) the latest final maturity date of any Restructured Bond or Loan, provided, however, that under no circumstances shall the Restructuring Maturity Limitation Date be earlier than the Scheduled Termination Date or later than 30 months following the Scheduled Termination Date and, if it is, it shall be deemed to be the Scheduled Termination Date or 30 months following the Scheduled Termination Date, as the case may be.

"**Restructuring Date**" means, with respect to a Restructured Bond or Loan, the date on which a Restructuring is legally effective in accordance with the terms of the documentation governing such Restructuring.

"**Restructured Bond or Loan**" means an Obligation which is a Bond or Loan and in respect of which the Restructuring that is the subject of a Credit Event Notice has occurred.

"**Eligible Transferee**" means each of the following:

(a)

(i)    any bank or other financial institution;

(ii)    an insurance or reinsurance company;

(iii)    a mutual fund, unit trust or similar collective investment vehicle (other than an entity specified in clause (c)(i) below); and

(iv)    a registered or licensed broker or dealer (other than a natural person or proprietorship);

provided, however, in each case that such entity has total assets of at least USD500 million;

(b)    an Affiliate of an entity specified in the preceding clauses (a);

(c)    each of a corporation, partnership proprietorship, organisation, trust or other entity

(i)    that is an investment vehicle (including, without limitation, any hedge fund, issuer of collateralised debt obligations, commercial paper conduit or other special purpose vehicle) that (1) has total assets of at least USD100 million or (2) is one of a group of investment vehicles under common control or management having, in the aggregate, total assets of at least USD100 million; or

(ii)    that has total assets of at least USD500 million; or

(iii)    the obligations of which under an agreement, contract, or transaction are guaranteed or otherwise supported by a letter of credit or keepwell, support, or other agreement by an entity described in clauses (a), (b), (c)(ii) or (d); and

(d)    a Sovereign, Sovereign Agency or Supranational Organisation;

All references in this definition of USD include equivalent amounts in other currencies.

"**Fully Transferable Obligation**" means a Reference Obligation that is either Transferable, in the case of Bonds, or capable of being assigned or novated to all Eligible Transferees without the consent of any person being required, in the case of any Reference Obligation other than Bonds. For purposes of determining whether a Reference Obligation is Transferable or is capable of being assigned or novated to Eligible Transferees, such determination shall be made as of the Valuation Date for the portion of the Reference Obligation to be valued on such Valuation Date, taking into account only the terms of the Reference Obligation and any related transfer or consent documents which have been obtained by the Issuer.

Any requirement that notification of novation, assignment or transfer of a Reference Obligation be provided to a trustee, fiscal agent, administrative agent, clearing agent or paying agent for any Reference Obligation shall not be considered to be a requirement for consent for purposes of the definitions of Restructuring Maturity Limitation and Fully Transferable Obligation.

"**Modified Restructuring Maturity Limitation Date**" means, with respect to a Reference Obligation, the date that is the later of (x) the Scheduled Termination Date and (y) 60 months following the Restructuring Date in the case of a Restructured Bond or Loan, or 30 months following the Restructuring Date in the case of all other Reference Obligations.

"**Modified Eligible Transferee**" means any bank, financial institution or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities and other financial assets.

"**Conditionally Transferable Obligation**" means a Reference Obligation that is either Transferable, in the case of Bonds, or capable of being assigned or novated to all Modified Eligible Transferees without the consent of any person being required, in the case of any Reference Obligation other than Bonds, provided, however, that a Reference Obligation other than Bonds will be a Conditionally Transferable Obligation notwithstanding that consent of the Reference Entity or the guarantor, if any, of a Reference Obligation other than Bonds (or the consent of the relevant obligor if a Reference Entity is guaranteeing such Reference Obligation) or any agent is required for such novation, assignment or transfer so long as the terms of such

Reference Obligation provide that such consent may not be unreasonably withheld or delayed. Any requirement that notification of novation, assignment or transfer of a Reference Obligation be provided to a trustee, fiscal agent, administrative agent, clearing agent or paying agent for a Reference Obligation shall not be considered to be a requirement for consent for purposes of this definition.

For purposes of determining whether a Reference Obligation satisfies the requirements of the definition of Conditionally Transferable Obligation, such determination shall be made as of the Valuation Date for the portion of the Reference Obligation to be valued on such Valuation Date, taking into account only the terms of the Reference Obligation and any related transfer or consent documents which have been obtained by the Issuer.

**Additional terms relating to Successors**

(a)    In relation to a Reference Entity that is not a Sovereign, "**Successor**" means the entity or entities, if any, determined as set forth below:

    (i)    if an entity directly or indirectly succeeds to 75 per cent. or more of the Relevant Obligations of the Reference Entity by way of a Succession Event, that entity will be the sole Successor;

    (ii)    if one entity directly or indirectly succeeds to more than 25 per cent. (but less than 75 per cent.) of the Relevant Obligations of the Reference Entity by way of a Succession Event, and not more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, the entity that succeeds to more than 25 per cent. of the Relevant Obligations will be the sole Successor;

    (iii)    if more than one entity each directly or indirectly succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity by way of a Succession Event, and not more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, the entities that succeed to more than 25 per cent. of the Relevant Obligations will each be Successors;

    (iv)    if one or more entities each directly or indirectly succeed to more than 25 per cent. of the Relevant Obligations of the Reference Entity by way of a Succession Event, and more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, each such entity and the Reference Entity will be Successors;

    (v)    if one or more entities directly or indirectly succeed to a portion of the Relevant Obligations of the Reference Entity by way of a Succession Event, but no entity succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity and the Reference Entity continues to exist, there will be no Successor and the Reference Entity and the Transaction will not be changed in any way as a result of the Succession Event; and

    (vi)    if one or more entities directly or indirectly succeed to a portion of the Relevant Obligations of the Reference Entity by way of a Succession Event, but no entity succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity and the Reference Entity ceases to exist, the entity which succeeds to the greatest percentage of Relevant Obligations (or, if two or more entities succeed to an equal percentage of Relevant Obligations, the entity from among those entities which succeeds to the greatest percentage of obligations) of the Reference Entity will be the sole Successor.

The Calculation Agent will be responsible for determining, as soon as reasonably practicable after it becomes aware of the relevant Succession Event (but no earlier than 14 days after the legally effective

date of the Succession Event), and with effect from the legally effective date of the Succession Event, whether the relevant thresholds set forth above have been met, or which entity qualifies under paragraph (a)(vi) above, as applicable. In calculating the percentages used to determine whether the relevant thresholds set forth above have been met, or which entity qualifies under paragraph (a)(vi) above, as applicable, the Calculation Agent shall use, in respect of each applicable Relevant Obligation included in such calculation, the amount of the liability in respect of such Relevant Obligation listed in the Best Available Information.

(b)　　"**Succession Event**" means an event such as a merger, consolidation, amalgamation, transfer of assets or liabilities, demerger, spin-off or other similar event in which one entity succeeds to the obligations of another entity, whether by operation of law or pursuant to any agreement. Notwithstanding the foregoing, "Succession Event" shall not include an event in which the holders of obligations of the Reference Entity exchange such obligations for the obligations of another entity, unless such exchange occurs in connection with a merger, consolidation, amalgamation, transfer of assets or liabilities, demerger, spin-off or other similar event.

(c)　　Where, pursuant to Section (a) above, one or more Successors have been identified in relation to a particular Reference Entity:

(i)　　each such Successor will be a Reference Entity (a "**Successor Reference Entity**") for the purposes of this Transaction (and, for the avoidance of doubt, the original Reference Entity shall cease to be a Reference Entity except where it is a Successor Reference Entity); and

(ii)　　the Floating Rate Payer Calculation Amount in respect of each such Successor Reference Entity shall be the Floating Rate Payer Calculation Amount in respect of the original Reference Entity divided by the number of Successor Reference Entities.

(d)　　"**Relevant Obligations**" means the Obligations constituting Bonds and Loans of the Reference Entity outstanding immediately prior to the effective date of the Succession Event, excluding any debt obligations outstanding between the Reference Entity and any of its Affiliates, as determined by the Calculation Agent. The Calculation Agent will determine the entity which succeeds to such Relevant Obligations on the basis of the Best Available Information. If the date on which the Best Available Information becomes available or is filed precedes the legally effective date of the relevant Succession Event, any assumptions as to the allocation of obligations between or among entities contained in the Best Available Information will be deemed to have been fulfilled as of the legally effective date of the Succession Event, whether or not this is in fact the case.

(e)　　"**Best Available Information**" means:

(i)　　in the case of a Reference Entity which files information with its primary securities regulator or primary stock exchange that includes unconsolidated, pro forma financial information which assumes that the relevant Succession Event has occurred or which provides such information to its shareholders, creditors or other persons whose approval of the Succession Event is required, that unconsolidated, pro forma financial information and, if provided subsequently to the provision of unconsolidated, pro forma financial information but before the Calculation Agent makes its determination for the purposes of the definition of "Successor", other relevant information that is contained in any written communication provided by the Reference Entity to its primary securities regulator, primary stock exchange, shareholders, creditors or other persons whose approval of the Succession Event is required; or

(ii)　　in the case of a Reference Entity which does not file with its primary securities regulators or primary stock exchange, and which does not provide to shareholders, creditors or other

persons whose approval of the Succession Event is required, the information contemplated in (i) above, the best publicly available information at the disposal of the Calculation Agent to allow it to make a determination for the purposes of the definition of "Successor".

Information which is made available more than 14 days after the legally effective date of the Succession Event shall not constitute Best Available Information.

(f)   In relation to a Sovereign Reference Entity, "**Successor**" means any direct or indirect successor(s) to that Reference Entity irrespective of whether such successor(s) assumes any of the obligations of such Reference Entity.

"**Sovereign**" means any state, political subdivision or government, or any agency, instrumentality, ministry, department or other authority (including, without limiting the foregoing, the central bank) thereof.

For the avoidance of doubt, the Calculation Agent may determine a Succession Event has occurred in relation to a Reference Entity at any time during the Credit Observation Period.

## Additional terms relating to Monoline Insurers

The following additional terms relating to Monoline Insurers shall apply to a Reference Entity in respect of which "Monoline" is specified in the Reference Registry (and in each case its Successor) and each such Reference Entity shall be a "Monoline Insurer" for these purposes.

"**Qualifying Policy**" means a financial guaranty insurance policy or similar financial guarantee pursuant to which a Reference Entity irrevocably guarantees or insures all Instrument Payments (as defined below) of an instrument that constitutes Borrowed Money (modified as set forth below) (the "Insured Instrument") for which another party (including a special purpose entity or trust) is the obligor (the "Insured Obligor"). Qualifying Policies shall exclude any arrangement (i) structured as a surety bond, letter of credit or equivalent legal arrangement or (ii) pursuant to the express contractual terms of which the payment obligations of the Reference Entity can be discharged or reduced as a result of the occurrence or non-occurrence of an event or circumstance (other than the payment of Instrument Payments). The benefit of a Qualifying Policy must be capable of being Delivered together with the Delivery of the Insured Instrument.

"**Instrument Payments**" means (A) in the case of any Insured Instrument that is in the form of a pass-through certificate or similar funded beneficial interest, (x) the specified periodic distributions in respect of interest or other return on the Certificate Balance on or prior to the ultimate distribution of the Certificate Balance and (y) the ultimate distribution of the Certificate Balance on or prior to a specified date and (B) in the case of any other Insured Instrument, the scheduled payments of principal and interest, in the case of both (A) and (B) (1) determined without regard to limited recourse or reduction provisions of the type described in "Not Contingent" below and (2) excluding sums in respect of default interest, indemnities, tax gross-ups, make-whole amounts, early redemption premiums and other similar amounts (whether or not guaranteed or insured by the Qualifying Policy).

"**Certificate Balance**" means, in the case of an Insured Instrument that is in the form of a pass-through certificate or similar funded beneficial interest, the unit principal balance, certificate balance or similar measure of unreimbursed principal investment.

### Obligations and Reference Obligation

In respect of any Reference Entity which is a Monoline Insurer, the definitions of Obligations and Reference Obligations are hereby amended by adding "or Qualifying Policy" after "or as provider of any Qualifying Affiliate Guarantee".

**Interpretation of Provisions**

In the Event that an Obligation or a Reference Obligation is a Qualifying Policy, the terms of Section 2.21(d) (which shall for the purpose of this Transaction be construed so that references therein to Deliverable Obligations, Deliverable Obligation Category and Deliverable Obligation Characteristics shall be deemed to be references to Reference Obligations, Reference Obligation Category and Reference Obligation Characteristics respectively) will apply, with references to the Qualifying Guarantee, the Underlying Obligation and the Underlying Obligor deemed to include the Qualifying Policy, the Insured Instrument and the Insured Obligor, respectively, except that:

(i)     the Obligation Category Borrowed Money and the Obligation Category and Reference Obligation Category Bond shall be deemed to include distributions payable under an Insured Instrument in the form of a pass-through certificate or similar funded beneficial interest, the Reference Obligation Category Bond shall be deemed to include such an Insured Instrument, and the terms "obligation" and "obligor" as used in the 2003 ISDA Credit Derivatives Definitions in respect of such an Insured Instrument shall be construed accordingly;

(ii)    references in the definitions of Assignable Loan and Consent Required Loan to the guarantor and guaranteeing shall be deemed to include the insurer and insuring, respectively;

(iii)   neither the Qualifying Policy nor the Insured Instrument must satisfy on the relevant date the Reference Obligation Characteristic of Accelerated or Matured, whether or not the characteristic is otherwise specified as applicable herein;

(iv)    if the Assignable Loan, Consent Required Loan, Direct Loan Participation or Transferable Reference Obligation Characteristics are specified herein and if the benefit of the Qualifying Policy is not transferred as part of any transfer of the Insured Instrument, the Qualifying Policy must be transferable at least to the same extent as the Insured Instrument;

(v)     with respect to an Insured Instrument in the form of a pass-through certificate or similar funded beneficial interest, the term "outstanding principal balance" shall mean the outstanding Certificate Balance and "maturity", as such term is used in the Maximum Maturity Reference Obligation Characteristic, shall mean the specified date by which the Qualifying Policy guarantees or insures, as applicable, that the ultimate distribution of the Certificate Balance will occur; and

(vi)    for the avoidance of doubt, the amendments to Section 2.21(d) provided in the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions shall not be construed to apply to Qualifying Policies and Insured Instruments.

**Not Contingent**

An Insured Instrument will not be regarded as failing to satisfy the Not Contingent Reference Obligation Characteristic solely because such Insured Instrument is subject to provisions limiting recourse in respect of such Insured Instrument to the proceeds of specified assets (including proceeds subject to a priority of payments) or reducing the amount of any Instrument Payments owing under such Insured Instrument, provided that such provisions are not applicable to the Qualifying Policy by the terms thereof and the Qualifying Policy continues to guarantee or insure, as applicable, the Instrument Payments that would have been required to be made absent any such limitation or reduction.

**Restructuring**

With respect to an Insured Instrument that is in the form of a pass-through certificate or similar funded beneficial interest or a Qualifying Policy with respect thereto, paragraphs (a)(i) to (v) of "Restructuring" above are hereby amended to read as follows:

(i)      a reduction in the rate or amount of the Instrument Payments described in clause (A)(x) of the definition thereof that are guaranteed or insured by the Qualifying Policy;

(ii)     a reduction in the amount of the Instrument Payments described in clause (A)(y) of the definition thereof that are guaranteed or insured by the Qualifying Policy;

(iii)    a postponement or other deferral of a date or dates for either (A) the payment or accrual of the Instrument Payments described in clause (A)(x) of the definition thereof or (B) the payment of the Instrument Payments described in clause (A)(y) of the definition thereof, in each case that are guaranteed or insured by the Qualifying Policy;

(iv)    a change in the ranking in priority of payment of (A) any Obligation under a Qualifying Policy in respect of Instrument Payments, causing the Subordination of such Obligation to any other Obligation or (B) any Instrument Payments, causing the Subordination of such Insured Instrument to any other instrument in the form of a pass-through certificate or similar funded beneficial interest issued by the Insured Obligor, it being understood that, for this purpose, Subordination will be deemed to include any such change that results in a lower ranking under a priority of payments provision applicable to the relevant Instrument Payments; or

(v)     any change in the currency or composition of any payment of Instrument Payments that are guaranteed or insured by the Qualifying Policy to any currency which is not a Permitted Currency.

Paragraph (b)(iii) of "Restructuring" above is hereby amended by adding "or, in the case of Qualifying Policy and an Insured Instrument, where (A) the Qualifying Policy continues to guarantee or insure, as applicable, that the same Instrument Payments will be made on the same dates on which the Qualifying Policy guaranteed or insured that such Instrument Payments would be made prior to such event and (B) such event is not a change in the ranking in the priority of payment of the Qualifying Policy" after "Reference Entity".

"Restructuring" above is hereby amended by the insertion of paragraph (e) as follows:

For purposes of paragraphs (a), (b) and (d), the term Obligation shall be deemed to include Insured Instruments for which the Reference Entity is acting as provider of a Qualifying Policy. In the case of a Qualifying Policy and an Insured Instrument, references to the Reference Entity in paragraph (a) shall be deemed to refer to the Insured Obligor and the reference to the Reference Entity in paragraph (b) shall continue to refer to the Reference Entity.

**Fully Transferable Obligation and Conditionally Transferable Obligation**
In the event that a Fully Transferable Obligation or Conditionally Transferable Obligation is a Qualifying Policy, the Insured Instrument must meet the requirements of the relevant definition and, if the benefit of the Qualifying Policy is not transferred as part of any transfer of the Insured Instrument, the Qualifying Policy must be transferable at least to the same extent as the Insured Instrument. References in the definition of Conditionally Transferable Obligation to the guarantor and guaranteeing shall be deemed to include the insurer and insuring, respectively. With respect to an Insured Instrument in the form of a pass-through certificate or similar funded beneficial interest, the term "final maturity date", as such term is used in the definition of Restructuring Maturity Limitation Date, shall mean the specified date by which the Qualifying Policy guarantees or insures, as applicable, that the ultimate distribution of the Certificate Balance will occur.

**Other Provisions**
In respect of any provision relating to any Reference Entity which is a Monoline Insurer, references to the Underlying Obligation and the Underlying Obligor shall be deemed to include Insured Instruments and the Insured Obligor, respectively. For the purposes of Section 1.14(b)(ii), references to Qualifying Guarantee and the Underlying Obligation shall be deemed to include the Qualifying Policy and the Insured Instrument, respectively.

Section 2.2(c) of the 2003 ISDA Credit Derivatives Definitions shall be amended by inserting the following words "or insurer" after the words "or guarantor".

**Deliver**

For the purposes of Section 8.2, "Deliver" with respect to an obligation that is a Qualifying Policy means to Deliver both the Insured Instrument and the benefit of the Qualifying Policy (or a custodial receipt issued by an internationally recognized custodian representing an interest in such an Insured Instrument and the related Qualifying Policy), and "Delivery" and "Delivered" will be construed accordingly.

**Schedule D**

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and RUBY FINANCE PUBLIC LIMITED COMPANY ("Party B") have, pursuant to a Deed of Accession dated 22 July 2005 entered into a Master Agreement dated as of 10 October 2002 and amended and restated on 22 July 2005 (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). On This Guarantee is a Credit Support Document as contemplated in the Agreement for the Transactions evidenced by the Confirmation dated 28 April 2006 relating to the Series 2006-2 EUR 10,000,000 Orion Enhanced Return Dynamic CDO Credit Linked Synthetic Portfolio Notes due 2013 of Party B (the "Series 2006-2Transaction"). For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)     Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under the Series 2006-2 Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)     Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)     Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability thereof against Party A (other than as a result of the unenforceability of the Agreement against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived); provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement.

(d)     This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof and for the avoidance of doubt this Guarantee will remain in effect until all payment obligations of Party A under the 2006-2 Transaction have been fully performed notwithstanding such termination.

(e)     Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded

or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)     Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Title: _____

Date: _____

Schedule E - Exhibit 1

Form of Credit Event Notice and Notice of Publicly Available Information

[●]

Ruby Finance Public Limited Company
AIB International Centre
International Financial Services Centre
Dublin 1
Ireland
Attention:      [Valerie Barlow]
Tel:             +353 1 641 7671
Fax:             +353 1 874 3050
Email:           IFSSEC.team@aib.ie; [Valerie.M.Barlow@aib.ie]

JP Morgan Corporate Trustee Services Limited
Trinity Tower
9 Thomas More Street
London E1W 1YT
Attention:       [Iain Mills; Stuart Dawkin; Michael Whelan]
Fax:             [+44 207 777 5450]
Email            [iain.mills@chase.com; stuart.x.dawkin@jpmorgan.com; Michael.ITS.Whelan@chase.com]

Moody's Investors Service Ltd.
2 Minster Court
Mincing Lane
London EC2R 7XB
Attention:       Beryl Marjolin
Fax:             +44 207 [●]
Email:           beryl.marjolin@moodys.com

CREDIT EVENT NOTICE AND
NOTICE OF PUBLICLY AVAILABLE INFORMATION

Re:     The Credit Derivative Transaction relating to Ruby Finance Public Limited Company Series 2006-2 EUR
10,000,000 Orion Enhanced Return Dynamic CDO Credit-Linked Synthetic Portfolio Notes due 2013 (the
"Notes") referencing [●], under which Lehman Brothers Special Financing Inc. has bought credit protection from
Ruby Finance Public Limited Company.

In accordance with the terms of the Notes, the Aggregate Outstanding Nominal Amount may be reduced upon the occurrence of Credit Events to one or more of the Reference Entities listed in the Reference Registry.

Dear Sir or Madam:

Reference is made to the Credit Derivative Transaction described above (the "**Transaction**"). Capitalized terms used and not otherwise defined in this letter shall have the meanings given them in the Series Prospectus or the Confirmation, as context requires.

This letter is our Credit Event Notice to you that [●] occurred with respect to [●] on or about [●], when [●].

This letter also comprises our Notice of Publicly Available Information with respect to this Credit Event. Accordingly, we provide the Publicly Available Information attached hereto.

Nothing in this letter shall be construed as a waiver of any rights we may have with respect to the Transaction.

If you have any questions regarding this matter, please contact [Tiki Maclennan] at [0207 102 1569].

**Exhibit 2 - Form of Final Valuation Notice**

[●]

Ruby Finance Public Limited Company
AIB International Centre
International Financial Services Centre
Dublin 1
Ireland
Attention: [Anne Flood; Valerie Barlow; Laura Morgan]
Tel: +353 1 641 7671
Fax: +353 1 874 3050

Lehman Brothers Special Financing Inc.
745 Seventh Avenue
New York
NY 10019
Attention: [●]
Tel: +44 20 7 [●]
Fax: +44 20 7[●]

JPMorgan Chase Bank
Trinity Tower
9 Thomas More Street
London E1W 1YT
Attention: [Iain Mills; Stuart Dawkin; Michael Whelan]

JP Morgan Corporate Trustee Services Limited
Trinity Tower
9 Thomas More Street
London E1W 1YT
Attention: [Iain Mills; Stuart Dawkin; Michael Whelan]
Fax: + [44 20 7777 5410]

Moody's Investors Service Ltd.
2 Minster Court
Mincing Lane
London EC2R 7XB
Attention: Beryl Marjolin
Fax: +44 207 [●]
Email: beryl.marjolin@moodys.com

**Re:    Credit Derivative Transaction relating to Ruby Finance Public Limited Company Series 2006-2 EUR 10,000,000 Orion Enhanced Return Dynamic CDO Credit Linked Synthetic Portfolio Notes due 2013**

The ISIN Number of the Notes is XS0251736517. The Notes reference, *inter alios*, [●]. In accordance with the terms of the Notes, the Aggregate Outstanding Principal Amount may be reduced upon the occurrence of Credit Events in respect of one or more Reference Obligations. Capitalised terms used but not defined in this notice shall have the meanings given to them in the Series Prospectus for the Notes.

FINAL VALUATION NOTICE

The details of the Reference Obligation selected for determining the Final Price are as follows:

Reference Entity:              [●]

Quotation Amount:              [●]

Reference Obligation:          [●].

This is to notify you that on the Valuation Date ([●]) the Calculation Agent requested and received a Firm Bid Quotation for the Reference Obligation from the following Dealers in accordance with the [First/Second] Valuation Method:

[●]                    [●]
[●]                    [●]
[●]                    [●]
[●]                    [●]
[●]                    [●]

Accordingly, by taking the [●] Bid Quotation:

Final Price:                        [●]

The Individual Loss Amount is:      [●]

The Cumulative Loss Amount is:      [●]

The Cash Settlement Amount is [●][zero since the Cumulative Loss Amounts do not exceed the Subordination Amount].

In respect of the Notes, the Aggregate Outstanding Principal Amount is [not] subject to reduction in whole or in part since the Cumulative Loss Amount is [less/more] than the Subordination Amount (EUR [●]).

The Reference Entity with respect to [●] is deemed deleted from the Reference Registry and the Reference Registry is amended accordingly.

Please contact [•] (Tel: [44 20 •]) if you require further assistance with the terms of this notice.

Yours sincerely,

Lehman Brothers International (Europe)
(as Calculation Agent)


By:_____
Name:
Title:

## USE OF PROCEEDS

The net proceeds of the issue of the Notes, which are expected to be EUR 10,000,000, will be applied by the Issuer on the Issue Date to fund the purchase of the Collateral Securities (as described in "The Collateral Securities").

## THE COLLATERAL SECURITIES

*The following information relating to the Collateral Securities is a summary only of certain terms and conditions of such Collateral Securities and has, save as provided below, been extracted from the pricing supplement relating to the Collateral Securities. None of the Issuer, the Arranger, the Trustee, the Agents or the Swap Counterparty has verified, or accepts any liability whatsoever for the accuracy of, such information and prospective investors of the Notes should make their own independent investigations and enquiries into the Collateral Securities and the Collateral Issuer.*

| | |
|---|---|
| **Collateral Issuer** | LRP Landesbank Rheinland-Pfalz |
| **Registered address** | Grosse Bleiche 54-56 |
| | 55116 Mainz |
| | Germany |
| **Country of incorporation** | Germany |
| **Nature of business** | The Collateral Issuer engages in all financial service activities obtaining finance in the capital markets, which funds the operations of affiliated companies. |
| **Collateral Securities** | EUR 10,000,000 in principal amount of Euro 10,000,000 Floating Rate Note Public Pfandbriefe due 2013 issued by the Collateral Issuer on 28 April 2006 (ISIN: DE000LRP00K3). |
| **Listing** | Frankfurt Stock Exchange |
| **Governing law** | German law |
| **Maturity** | 20 September 2013 |
| **Business days** | TARGET |
| **Method of origination/creation** | The Collateral Securities were issued pursuant to a global note dated 12 April 2006 (the "**Collateral Global Note**"). Copies of the Collateral Global Note are available for inspection during usual business hours on any weekday (Saturdays, Sundays and public holidays excepted) at the registered office of the Issuer and at the specified offices of the Issuing and Paying Agent and the Irish Paying Agent. |

## DESCRIPTION OF THE SWAP COUNTERPARTY AND THE SWAP GUARANTOR

**Lehman Brothers Special Financing Inc.**

Lehman Brothers Special Financing Inc. (the "**Swap Counterparty**") was incorporated under the laws of the State of Delaware of the United States of America on 17 August 1984.

The principal executive office of the Swap Counterparty is located at 745 Seventh Avenue, New York, New York 10019, U.S.A. The Swap Counterparty's registered office in the State of Delaware is located at Suite 400, Wilmington, Delaware 19808, U.S.A.

The Swap Counterparty is engaged in the fixed income and currency, swaps and derivatives business. The Swap Counterparty's principal activities are to provide a wide range of derivative products including interest rate, currency, credit and mortgage derivatives.

The Swap Counterparty is a wholly-owned subsidiary of Lehman Brothers Inc.

**Lehman Brothers Holding Inc.**

Lehman Brothers Holding Inc. (the "**Swap Guarantor**") was incorporated under the laws of the State of Delaware of the United States of America on 29 December 1983.

The principal executive office of the Swap Guarantor is located at 745 Seventh Avenue, New York, New York 10019. The Swap Guarantor's registered office in the State of Delaware is located at Suite 400, Wilmington, Delaware 19808, U.S.A.

The Swap Guarantor is a holding company that is primarily engaged in funding activities. Through its U.S. and non-U.S. subsidiaries and affiliates it provides equity and fixed income sales, trading and research, investment banking, mortgage, private equity and private client services on a global basis. The Swap Guarantor provides these products and services to a wide array of clients, including corporations, governments and municipalities, institutional clients, and high-net-worth individuals.

The Swap Guarantor funds its activities through a combination of master notes, commercial paper, bank credit facilities and other money market related instruments, medium and long-term debt, and an unsecured flexible cash capital facility.

The common stock of the Swap Guarantor is listed on the New York Stock Exchange.

## GENERAL INFORMATION

1.  Application has been made to the Irish Financial Services Regulatory Authority as competent authority under Directive 2003/71/EC for this Series Prospectus to be approved. Application has also been made to The Irish Stock Exchange Limited for the Notes to be admitted to the daily official list of the Irish Stock Exchange and to be admitted to trading on the regulated market of the Irish Stock Exchange. There can be no assurance that such applications will be successful.

2.  From the date of this Series Prospectus and for so long as the Notes remain outstanding, the following documents will be available for inspection in physical format during usual business hours on any weekday (Saturdays, Sundays and public holidays excepted) at the Issuer's registered office and the specified offices of the Irish Paying Agent. Copies of the documents referred to below may be obtained free of charge from the specified offices of the Irish Paying Agent:

    (1)    this Series Prospectus;

    (2)    the Supplemental Trust Deed and Drawdown Agreement in relation to the Notes; and

    (3)    the Collateral Global Note .

3.  The issue of the Notes was authorised by a resolution of the board of directors of the Issuer passed on 28 April 2006.

4.  Except as disclosed in this Series Prospectus, the Issuer has not been involved in any governmental, legal or arbitration proceedings (including any such proceedings which are pending or threatened of which the Issuer is aware) during the 12 months preceding the date of this Series Prospectus which may have or have had in the recent past significant effects, in the context of the issue of the Notes, on the financial position or profitability of the Issuer.

5.  Save as discussed in *"Subscription and Sale"* in the Base Prospectus, so far as the Issuer is aware, no person involved in the offer of the Notes has an interest material to the offer.

6.  Except as disclosed in this Series Prospectus, there has been no material adverse change in the financial position or prospects of the Issuer since the date of its last published audited financial statements, being those for the financial year ended 31 January 2005.

## REGISTERED OFFICE OF THE ISSUER

AIB International Centre
International Financial Services Centre
Dublin 1
Ireland

## TRUSTEE

J.P. Morgan Corporate Trustee Services Limited
Trinity Tower
9 Thomas More Street
London E1W 1YT

## SWAP COUNTERPARTY

Lehman Brothers Special Financing Inc.
Suite 400
Wilmington
Delaware 19808
U.S.A.

| ISSUING AND PAYING AGENT AND CUSTODIAN | IRISH PAYING AGENT |
|---|---|
| JPMorgan Chase Bank, N.A. | J.P. Morgan Bank (Ireland) p.l.c. |
| Trinity Tower | JPMorgan House |
| 9 Thomas More Street | International Financial Services Centre |
| London E1W 1YT | Dublin 1 |
| | Ireland |

| CALCULATION AGENT | LISTING AGENT |
|---|---|
| Lehman Brothers International (Europe) | A&L Listing Limited |
| 25 Bank Street | International Financial Services Centre |
| London E14 5LE | North Wall Quay |
| | Dublin 1 |
| | Ireland |

## LEGAL ADVISERS

| *to the Issuer* | *to the Arranger* |
| *as to Irish law* | *as to English law* |
|---|---|
| A&L Goodbody Solicitors | Linklaters |
| International Financial Services Centre | One Silk Street |
| North Wall Quay | London EC2Y 8HQ |
| Dublin 1 | |
| Ireland | |