SERIES PROSPECTUS

# RUBY FINANCE PUBLIC LIMITED COMPANY

*(incorporated with limited liability in Ireland)*

## SERIES NO: 2006-3 EUR 50,000,000 RIESLING CREDIT LINKED SYNTHETIC PORTFOLIO NOTES DUE 2016

issued pursuant to the
Multi-Issuer
Secured Obligation Programme
arranged by

## LEHMAN BROTHERS INTERNATIONAL (EUROPE)

Issue Price: 100 per cent.

Linklaters
01/200/MWAF/JZD/APF

The date of this Series Prospectus is 16 June 2006

This Series Prospectus applicable to the issue by Ruby Finance Public Limited Company (the "**Issuer**") of its Series 2006-3 EUR 50,000,000 RIESLING Credit Linked Synthetic Portfolio Notes due 2016 (the "**Notes**") should be read in conjunction with the Base Prospectus relating to the Issuer and the Multi-Issuer Secured Obligation Programme (the "**Programme**"), dated 16 August 2005 (the "**Base Prospectus**") (including the Accounts (as defined below)) which is deemed to be incorporated herein by reference (see "Incorporation by Reference" below). Terms defined in the Base Prospectus have the same meaning in this Series Prospectus.

The Notes have been constituted and secured pursuant to a Supplemental Trust Deed and Drawdown Agreement dated 16 June 2006 between, amongst others, the Issuer and the Trustee.

This Series Prospectus (including the information incorporated by reference herein) once filed with and approved by the Irish Financial Services Regulatory Authority, will constitute a prospectus for the purposes of Article 5 of Directive 2003/71/EC (the "**Prospectus Directive**"). This Series Prospectus is to be read in conjunction with all documents which are deemed to be incorporated herein by reference.

The obligations of the Issuer under the Notes will be secured as described in "Security Arrangements".

Subject as set out below, the Issuer accepts responsibility for the information contained in this Series Prospectus. To the best of the knowledge and belief of the Issuer, having taken all reasonable care to ensure that such is the case, the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information.

The delivery of the Series Prospectus at any time does not imply that any information contained therein is correct at any time subsequent to the date hereof. The information on page 97 in relation to the Collateral Securities (as defined herein), the information on pages 63 to 67 in relation to the Initial Reference Registry (as defined herein) and the information on page 98 in relation to the Swap Counterparty and the Swap Guarantor has, in each case, been accurately extracted from publicly available information. So far as the Issuer is aware and is able to ascertain from information published in relation to the Initial Reference Registry, the Collateral Securities, the Swap Counterparty and the Swap Guarantor, no facts have been omitted which would render the reproduced information misleading.

Application has been made to the Irish Financial Services Regulatory Authority (the "**IFSRA**") as competent authority under Directive 2003/71/EC for this Series Prospectus to be approved. Application has also been made to The Irish Stock Exchange Limited (the "**Irish Stock Exchange**") for the Notes to be admitted to the daily official list of the Irish Stock Exchange (the "**Official List**") and to be admitted to trading on the regulated market of the Irish Stock Exchange. There can be no assurance that such applications will be successful.

The Notes are expected to be assigned a rating of "Baa2" by Moody's Investors Service, Inc ("**Moody's**") after issue. However, there is no assurance that the Issuer will be able to obtain such a rating for the Notes. A security rating is not a recommendation to buy, sell or hold securities and may be subject to suspension, reduction or withdrawal at any time. A suspension, reduction or withdrawal of the rating assigned to the Notes may adversely affect the market price of the Notes. The occurrence of Credit Events and/or a suspension, reduction or withdrawal of the rating assigned to any Reference Entity may result in a severe reduction of the rating assigned to the Notes.

The Arranger makes no representation, recommendation or warranty, express or implied, regarding the accuracy, adequacy, reasonableness or completeness of the information contained herein or in any further information, notice or other document which may at any time be supplied in connection with the Notes and accepts no responsibility or liability therefor.

The Notes will be issued on the terms set out in this Series Prospectus read together with the Base Prospectus.

All payments of principal and interest by the Issuer in respect of Notes and Coupons will be made subject to any deduction for or on account of withholding taxes imposed on any such payments and taxes imposed as a result of the European Council Directive 2003/48/EC or any other European Union Directive implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directive or any other law introduced as a consequence of the adoption or implementation of such Directive.

In the event of the imposition upon the Issuer of a requirement to withhold or account for tax or the imposition of a tax in respect of its income resulting in it being unable to make the payment of the full amount due in respect of the Notes, the Issuer will, subject to the Terms and Conditions of the Notes, use all reasonable endeavours to arrange for the substitution of its obligations by a company incorporated in another jurisdiction provided that, for so long as the Notes are rated by Moody's, the Issuer shall notify Moody's and that such change shall not adversely affect any existing rating of the Notes as confirmed in writing by Moody's.

If the Issuer satisfies the Trustee that such substitution cannot be arranged, the Noteholders may elect to receive payments in respect of their Notes net of withholding or deduction for, or on account of, any taxes, failing which the Issuer shall (if applicable and subject to the consent of the Trustee) redeem all, but not some only, of the Notes at their redemption amount together with accrued interest (if any).

This Series Prospectus does not constitute, and may not be used for the purposes of, an offer or solicitation by anyone in any jurisdiction in which such offer or solicitation is not authorised or to any person to whom it is unlawful to make such offer or solicitation, and no action is being taken to permit an offering of the Notes or the distribution of this Series Prospectus or any other offering material in any jurisdiction where such action is required.

In this Series Prospectus, references to "euro", "EUR" and "€" refer to the currency introduced from the third stage of European economic and monetary union pursuant to the Treaty establishing the European Community, as amended by the Treaty on European Union, and references to "USD", "US$" and "U.S. dollars" are to United States dollars.

## Incorporation by Reference

This Series Prospectus should be read and construed in conjunction with the following documents which have been previously published or are published simultaneously with this Series Prospectus and that have been approved by IFSRA or filed with it and shall be deemed to be incorporated in, and form part of, this Series Prospectus:

(1)     the Base Prospectus;

(2)     the audited financial statements of the Issuer for the period from its incorporation on 4 February 2003 to 31 January 2004 and for the financial year ended 31 January 2005 together with the audit report thereon (the "**Accounts**");

save that any statement contained in any of the documents incorporated by reference in, and forming part of, this Series Prospectus shall be deemed to be modified or superseded for the purpose of this Series Prospectus to the extent that a statement contained herein modifies or supersedes such earlier statement (whether expressly, by implication or otherwise). Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Series Prospectus. This Series Prospectus must be read in conjunction with the Base Prospectus (including the Accounts) and full information on the Issuer and the offer of the Notes is only available on the basis of the combination of the provisions set out within this document and the Base Prospectus (including the Accounts).

The Base Prospectus (including the Accounts) is available for viewing at, and copies may be obtained free of charge from, the office of the Irish Paying Agent specified below.

**Table of Contents**

|  | Page |
|---|---|
| RISK FACTORS | 6 |
| TERMS AND CONDITIONS OF THE NOTES | 9 |
| ANNEX 1 – FORM OF SWAP CONFIRMATION | 28 |
| USE OF PROCEEDS | 96 |
| THE COLLATERAL SECURITIES | 97 |
| DESCRIPTION OF THE SWAP COUNTERPARTY AND THE SWAP GUARANTOR | 98 |
| GENERAL INFORMATION | 99 |

# RISK FACTORS

*The purchase of Notes may involve substantial risks and is suitable only for sophisticated investors who have the knowledge and experience in financial and business matters necessary to enable them to evaluate the risks and the merits of an investment in the Notes. Before making an investment decision, prospective purchasers of Notes should consider carefully, in the light of their own financial circumstances and investment objectives, all the information set forth in this Series Prospectus and in the Base Prospectus.*

*The Issuer does not represent that the statements below regarding the risks of holding any Notes are exhaustive and the Issuer may be unable to pay interest, principal or other amounts on or in connection with any Notes for reasons other than those described below. The Issuer and the Dealer disclaim any responsibility to advise prospective investors of such risks as they exist at the date of this Series Prospectus or as they change from time to time.*

*The attention of prospectus investors is also drawn to the section headed "Risk Factors" in the Base Prospectus*

## Credit Linked Notes

The Notes are credit-linked securities linked to the creditworthiness of the Reference Entities and the performance of obligations of the Reference Entities. As at the Issue Date, the Reference Entities are the 100 entities listed in Schedule A of Annex 1 to this Series Prospectus. Investors should note that the Notes differ from ordinary debt securities issued by the Issuer in that the amount of principal and interest payable on the Notes by the Issuer is dependent on whether one or more Credit Events in respect of the Reference Entities have occurred.

## Credit Events

The likelihood of a Credit Event occurring in respect of a Reference Entity will generally fluctuate with, among other things, the financial condition and other characteristics of the Reference Entity, general economic conditions, the condition of certain financial markets, political events, developments or trends in any particular industry and changes in prevailing interest rates. If a Credit Event occurs, the Noteholders may receive reduced interest and principal payments under the Notes and in certain circumstances the Notes may redeem at zero.

## Principal and Interest payable

Payments of principal and interest under the Notes may be at risk if Credit Events occur. The Notes have a Subordination Amount (initially of EUR 97,500,000) and, accordingly, the Aggregate Outstanding Nominal Amount of the Notes will not be reduced following Credit Events until the Subordination Amount has been exceeded by the Cumulative Loss Amount. Upon the occurrence of three Credit Events, based on the Initial Reference Registry and assuming a determination of a Final Price equal to zero with respect to each of the affected Reference Obligations, the Notes would redeem at zero.

## Limited Information regarding the Reference Entities

None of the Issuer, the Trustee and the Noteholders will have any right, except as specifically required under the terms of the Swap Agreement and the Notes, to receive any information regarding any Reference Entity or

any Reference Obligation. The Dealer, the Swap Counterparty or their affiliates may have acquired, or during the term of the Notes may acquire, confidential information with respect to any Reference Entity or Reference Obligation and, subject to applicable law, none of them shall be under any duty to disclose such confidential information to any Noteholder. None of the Issuer, the Swap Counterparty, the Trustee or any other person on their behalf makes any representation or warranty, express or implied, as to the credit quality of any of the Reference Entities or any of their respective Obligations. Lehman Brothers International (Europe) has used reasonable efforts to verify the names of the Reference Entities and details of the Benchmark Obligations contained in Schedule A. Such information has been verified by reference to publicly available information. However, publicly available information can be inaccurate or outdated, and as a result corrections to the details of Reference Entities and Benchmark Obligations may need to be made from time to time.

### Addition and Removal of Reference Entities

**Reference Entities may be added to, or removed from, the Reference Registry (each a "Reference Registry Adjustment") in accordance with the terms of a portfolio management agreement between LRI Landesbank Rheinland-Pfalz International SA (the "Portfolio Manager"), the Calculation Agent and the Swap Counterparty to be entered into on or around the Issue Date (the "Portfolio Management Agreement"). Following a Reference Registry Adjustment, the Reference Entities in respect of which a Credit Event may be determined will be those Reference Entities contained in the Reference Registry as amended by the Reference Registry Adjustment. Losses incurred by Noteholders may be greater than if such Reference Registry Adjustment had not been made. In consideration for LRI Landesbank Rheinland-Pfalz International SA agreeing to act as the Portfolio Manager, the Calculation Agent will pay the Portfolio Manager a Portfolio Management Fee as defined and determined pursuant to the Portfolio Management Agreement.**

### Adjustment Change

Under the terms of the Portfolio Management Agreement, the Calculation Agent will determine whether each Reference Registry Adjustment will result in an upward or downward adjustment to either the Margin or the Subordination Amount or the payment of an Additional Coupon.

### No Legal or Beneficial Interest in Obligations of the Reference Entities

Under the Swap Agreement, the Issuer will have a contractual relationship only with the Swap Counterparty and not with any obligor in respect of any Reference Obligation or any Reference Entity. Consequently, the Swap Agreement will not constitute a purchase or other acquisition or assignment of any interest in the Reference Entity or any of its obligations. The Issuer and the Trustee will have rights solely against the Swap Counterparty and will have no recourse against the Reference Entity. None of the Issuer, the Swap Counterparty, the Trustee or any other person on their behalf has undertaken any legal due diligence in respect of any of the Reference Entities.

### Interest on Early Redemption

If the Notes become subject to Early Redemption, then interest will cease to accrue on the Notes on the date of redemption and no further interest shall be payable to Noteholders after the Early Redemption Date.

**Liquidity Risk**

There is not at present an active and liquid secondary market for the Notes. There can be no assurance that a secondary market for any of the Notes will develop, or, if a secondary market does develop, that it will provide the holders of the Notes with liquidity or that it will continue for the entire life of the Notes. Accordingly, an investment in the Notes is suitable only for investors who can bear the risks associated with a lack of liquidity in the Notes and the financial and other risks associated with an investment in the Notes.

**Calculation of Unwind Costs**

On an Early Redemption of the Notes, the value of any Unwind Costs payable by the Issuer to the Swap Counterparty will be deducted from any Early Redemption Amount(s) payable to Noteholders. One element of the Unwind Costs is the termination payment due under the Swap Agreement (disregarding the balance standing to the credit of the Prepayment Account (as defined in the Swap Agreement). Such termination payment will be calculated on the basis that the Issuer has an obligation under the Swap Agreement to pay all sums due to the Swap Counterparty thereunder (without regard to the limited recourse provisions contained therein). This may reduce significantly the amount(s) payable to Noteholders following an Early Redemption Event.

**Early Redemption Events.**

The Notes may become subject to early redemption (i) if any of the Collateral becomes repayable prior to its stated date of maturity, (ii) if there is a payment default in respect of any of the Collateral as provided in Condition 6(c), (iii) for tax reasons as provided in Condition 6(d) (*Redemption for Taxation and Other Reasons*), (iv) following an event of default with respect of the Notes or (v) if the Swap Agreement is terminated for any reason.

On an early redemption of the Notes, the Noteholders shall receive the Early Redemption Amount of the Notes, which shall (except in the circumstances set out in the terms and conditions) be an amount per Note equal to the lesser of (a) the Outstanding Nominal Amount plus any accrued but unpaid interest and (b) such Note's pro rata share of (i) the proceeds of sale or realisation of any Collateral Securities, plus (if payable to the Issuer) or minus (if payable to the Swap Counterparty) (ii) the value of any unwind costs. The amount of such unwind costs shall be determined by the Calculation Agent acting in good faith and in a commercially reasonable manner and may significantly reduce the amount payable to Noteholders.

## TERMS AND CONDITIONS OF THE NOTES

The terms of the Notes and additional provisions relating to their issue are as follows.

Capitalised terms used but not otherwise defined in these Conditions shall have the meanings given to such terms in the Swap Confirmation, the form of which is set out in Annex 1 hereto.

The Notes are credit-linked to the Reference Entities for the time being comprised in the Reference Registry maintained by the Calculation Agent and the Portfolio Manager in accordance with the Swap Confirmation and a portfolio management agreement between the Swap Counterparty, the Calculation Agent and LRI Landesbank Rheinland-Pfalz International SA (the "**Portfolio Manager**") to be entered into on or around Issue Date (the "**Portfolio Management Agreement**").

The initial Reference Registry in effect as of the Trade Date (the "**Initial Reference Registry**") is set out in Schedule A to the Swap Confirmation.

| | | |
|---|---|---|
| 1 | Issuer: | Ruby Finance Public Limited Company. |
| 2 | Series No: | 2006-3. |
| 3 | Tranche No: | Not applicable. |
| 4 | ISIN (N.B. see paragraph 55 below for Common Code): | XS0256825992 |
| 5 | Currency: | euro ("**EUR**"). |
| 6 | Principal Amount of Notes admitted to trading: | |
| | (i)  Series: | EUR 50,000,000 (the "**Initial Principal Amount**"). |
| | (ii) Outstanding Nominal Amount: | The outstanding nominal amount on which the Redemption Amount will be calculated means, with respect to each Note at any time, an amount in EUR (rounded down to the nearest cent) equal to the Aggregate Outstanding Nominal Amount, divided by the total number of Notes outstanding as at such time, as determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner (the "**Outstanding Nominal Amount**"). |

"**Aggregate Outstanding Nominal Amount**" means, initially, the aggregate principal amount of Notes then outstanding. If, at any time, the Swap Counterparty under the Swap Agreement determines that one or more Credit Events has or have occurred during the Credit Observation Period and the Conditions to Settlement with respect to such Credit Event have been satisfied, the Aggregate Outstanding Nominal Amount will be reduced by the Calculation Agent with effect from the relevant Event Determination Date with respect to such Credit Event(s) so as to equal:

(i)   the Initial Principal Amount; minus

(ii)  the Mezzanine Tranche Loss,

subject to a minimum of zero.

The Calculation Agent hereunder shall determine the amount by which the Aggregate Outstanding Nominal Amount is reduced and the date of such reduction in accordance with the amounts notified to it by the Swap Calculation Agent pursuant to the Swap Agreement.

The Calculation Agent shall promptly notify the Issuer, the Trustee, the Issuing and Paying Agent, the Swap Counterparty and Moody's of any reduction of the Aggregate Outstanding Nominal Amount hereunder. Notwithstanding anything to the contrary contained in Condition 14, upon receipt of such notification from the Calculation Agent, the Issuing and Paying Agent shall promptly notify Noteholders of the same in accordance with the Conditions.

| 7 | Issue Date: | 16 June 2006. |
|---|---|---|
| 8 | Form: | Bearer. |
| 9 | Denomination: | EUR 100,000. |
| 10 | Status: | Secured and limited recourse obligations, as described under "Security Arrangements" below. |
| 11 | Interest Commencement Date: | 16 June 2006. |
| 12 | Interest Rate (including after Maturity Date): | Floating Rate. |
| | (i)    Interest Accrual: | |

Notwithstanding anything to the contrary contained in Conditions 5(a) and 5(f) but subject to the Interest Accrual Adjustment provisions set out in sub-paragraph (ii) below, in respect of each Interest Accrual Period, each Note shall bear interest on its Weighted Average Outstanding Nominal Amount in respect of such Interest Accrual Period at the rate per annum (expressed as a percentage) equal to the Interest Rate, such interest being payable in arrear on each Interest Payment Date.

The amount of interest payable in respect of any Interest Payment Date shall be calculated by the Calculation Agent on the relevant Interest Determination Date by calculating the product of (a) the Interest Rate; (b) the Weighted Average Outstanding Nominal Amount of such Note for the relevant Interest Accrual Period; and (c) the Day Count Fraction.

If as a result of a Reference Registry Adjustment, there is a Margin Adjustment, then the Margin shall be adjusted with effect from the next succeeding Interest Payment Date (or if the Margin Adjustment takes effect on an Interest Payment Date that Interest Payment Date).

For the purposes hereof:

"**Interest Determination Date**" means, in respect of each Interest Payment Date, the day that is one London and

TARGET Business Day immediately preceding such Interest Payment Date; and

"**Weighted Average Outstanding Nominal Amount**" means, in respect of each Note in respect of each period for which such amount is calculated, the sum of the Outstanding Nominal Amounts of such Note for each calendar day during such period, divided by the actual number of calendar days in such period.

(ii)  Interest Accrual Adjustment:  With respect to any Interest Payment Date, in the event that:

(a)  one or more Adjustment Reference Entities exist as at the relevant Interest Determination Date; and

(b)  the sum of the Mezzanine Loss Amount and the aggregate of the Reference Entity Notional Amount(s) in respect of all such Adjustment Reference Entities is greater than zero,

the Issuer shall, subject as provided below, pay to the holder of each Note:

(1)  the Partial Interest Amount (if any) on the relevant Interest Payment Date;

(2)  the Deferred Interest Amount(s) (if any) on the relevant Deferred Interest Payment Date(s); and

(3)  an amount equal to the interest that the Calculation Agent determines would have accrued on any such Deferred Interest Amount in the period from and including the relevant Interest Payment Date to, but excluding, the related Deferred Interest Payment Date, (together with the Deferred Interest Amount, the "**Aggregate Deferred Amount**") had such Deferred Interest Amount been accruing interest at a rate equal to the rate that the Calculation Agent determines to be the relevant then prevailing overnight borrowing rate of the Custodian (the "**Overnight Rate**") (with whom such funds will be placed) on an overnight deposit of a similar size to the relevant Deferred Interest Amount.

For the purposes hereof:

"**Adjustment Reference Entity**" means, with respect to any Interest Determination Date or the Final Cut-off Date, each Reference Entity in respect of which:

(i)  an Event Determination Date has occurred on or prior to such date, but the relevant Reference Entity Valuation Date has not occurred; and/or

(ii)  a  Potential  Failure  to  Pay  or  Potential

Repudiation/Moratorium has occurred on or prior to such date and such Potential Failure to Pay or Potential Repudiation/Moratorium has not been cured and, for the avoidance of doubt, a Credit Event has not occurred in respect of such Potential Failure to Pay or Potential Repudiation/Moratorium, in each case on or prior to such date.

"**Deferred Interest Amount**" means, in respect of any Deferred Interest Payment Date, an amount per Note in EUR (rounded down to the nearest cent and subject to a minimum of EUR 0) determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, on the relevant Deferred Interest Cut-off Date as being equal to the excess (if any) of:

(i) the amount of interest that would otherwise have been payable in respect of a Note on the immediately preceding Deferred Interest Payment Date relating to the relevant Interest Payment Date (or, in respect of the first or only Deferred Interest Payment Date relating to a particular Interest Payment Date, the amount of interest that would otherwise have been payable in respect of a Note on such Interest Payment Date) if:

(A) in the circumstances set out in paragraph (i) of the definition of "Adjustment Reference Entity", the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the relevant Event Determination Date; or

(B) in the circumstances set out in paragraph (ii) of the definition of "Adjustment Reference Entity", (i) where the Potential Failure to Pay or Potential Repudiation/Moratorium develops into an actual Failure to Pay or Repudiation/Moratorium respectively, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Failure to Pay or Potential Repudiation/Moratorium was determined by the Calculation Agent to have occurred; or (ii) where the Potential Failure to Pay or Potential Repudiation/Moratorium is subsequently cured, the relevant Potential Failure to Pay or Potential Repudiation/Moratorium had not occurred;

over:

(ii) the Deferred Interest Amount (if any) in respect of the immediately preceding Deferred Interest Payment Date

relating to the relevant Interest Payment Date (or, in respect of the first or only Deferred Interest Payment Date relating to a particular Interest Payment Date, the relevant Partial Interest Amount (if any)).

"**Deferred Interest Cut-off Date**" means, in respect of each Adjustment Reference Entity, either:

(i)    the relevant Reference Entity Valuation Date; or

(ii)   the date on which the Calculation Agent in, acting in good faith and in a commercially reasonable manner, determines that the relevant Potential Failure to Pay or Potential Repudiation/Moratorium has been cured.

"**Deferred Interest Payment Date**" means, in relation to each Interest Payment Date where an Adjustment Reference Entity exists on the related Interest Determination Date, a date in respect of each such Adjustment Reference Entity determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner (which shall be no later than the fifth London and TARGET Business Day following the relevant Deferred Interest Cut-off Date). For the avoidance of doubt, a single date may be a Deferred Interest Payment Date in relation to more than one Interest Payment Date;

"**Partial Interest Calculation Amount**" means, in respect of each Note, an amount in EUR (rounded down to the nearest cent) determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, on the relevant Interest Determination Date as being equal to the greater of:

(a)    zero; and

(b)    the Weighted Average Outstanding Nominal Amount of such Note for the relevant Interest Accrual Period, provided that for the purposes of calculating the Partial Interest Calculation Amount only, Cumulative Loss Amount shall be deemed also to include the aggregate of the Reference Entity Notional Amounts of each relevant Adjustment Reference Entity as of the relevant Event Determination Date or the date upon which a Potential Failure to Pay or Potential Repudiation/Moratorium occurred, as the case may be

"**Partial Interest Amount**" means an amount per Note in EUR (rounded down to the nearest cent and subject to a minimum of EUR 0) determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, on the relevant Interest Determination Date in accordance with the foregoing "Interest Accrual" provisions save that references therein to the Weighted Average

|  |  | Outstanding Nominal Amount of each Note shall be deemed to be references to the Partial Interest Calculation Amount. |
|---|---|---|

(iii) Additional Coupon

On each Interest Payment Date, an additional interest amount may be payable in respect of each Note equal to (i) the sum of all Additional Coupons (if any and as defined and determined in accordance with the Portfolio Management Agreement) that are payable on such Interest Payment Date in accordance with the Portfolio Management Agreement divided by (i) the number of Notes outstanding.

13   Interest Payment Date(s):

20 March, 20 June, 20 September and 20 December in each year, commencing on 20 September 2006 (long first coupon) and ending on the earlier of (i) the Scheduled Maturity Date, (ii) the Early Redemption Date and (iii) the date on which the Aggregate Outstanding Nominal Amount reduces to zero (each a "**Scheduled Interest Payment Date**"), subject in each case to adjustment in accordance with the Following Business Day Convention, for which the relevant Business Days shall be London and TARGET Business Days.

14   Manner in which the Interest Rate is due to be determined (Floating Rate Notes):

ISDA Determination.

15   Screen Rate Determination Condition 5(c) (ii):

Not applicable.

16   ISDA Determination (Condition 5(c) (i)):

(a)   Floating Rate Option:

EUR-EURIBOR-Telerate

(b)   Designated Maturity:

3 months, provided that in respect of the first Interest Accrual Period, the Interest Rate shall be determined by the Calculation Agent through the use of straight line interpolation by reference to two rates based on the Floating Rate Option specified hereon, one of which shall be determined as if the Designated Maturity were the period of time for which rates are available next shorter than the length of the first Interest Accrual Period and the other of which shall be determined as if the Designated Maturity were the period of time for which rates are available next longer than the length of the first Interest Accrual Period.

(c)   Reset Date:

The first day of the Interest Accrual Period.

(d)   ISDA Definitions:

ISDA Definitions (as defined in Condition 5(i)).

17   Margin (if applicable):

Initially plus 5.30 per cent. per annum and thereafter plus 5.30 per cent. plus the Net Margin Adjustment.

"**Net Margin Adjustment**" means as of any Interest Payment Date, the net percentage (which may be positive or negative)

|  |  | resulting from aggregating all Margin Adjustments (which may be positive or negative) that have occurred on or prior to such day (if any and as defined and determined in accordance with the Portfolio Management Agreement). |
|---|---|---|
| 18 | Rate Multiplier (if applicable): | Not applicable. |
| 19 | Maximum/Minimum Interest Rate (if applicable): | Not applicable. |
| 20 | Maximum/Minimum Instalment Amount (if applicable): | Not applicable. |
| 21 | Maximum/Minimum Redemption Amount (if applicable): | Not applicable. |
| 22 | Interest Amount (Fixed Rate Note or Variable Coupon Amount Note): | Not applicable. |
| 23 | Determination Date(s) (Condition 5(i)): | Not applicable. |
| 24 | Day Count Fraction: | Actual/360. |
| 25 | Interest Period Date(s) (if applicable): | Not applicable. |
| 26 | Maturity Date: | Subject to the occurrence of an Early Redemption Event (as defined in paragraph 38 below), the earlier to occur of: |

(i)   20 June 2016, subject to adjustment in accordance with the Following Business Day Convention, for which the relevant Business Days shall be London and TARGET Business Days (the "**Scheduled Maturity Date**") unless an Adjustment Reference Entity or a Notice Delivery Period Extension Event (each as defined in and determined in accordance with the Swap Agreement) exists as at the Final Cut-off Date, in which case the Maturity Date shall be the Deferred Redemption Date (or, where there is more than one Adjustment Reference Entity or Notice Delivery Period Extension Event in existence on the Final Cut-off Date, the last Deferred Redemption Date to occur); and

(ii)   the Zero Nominal Amount Redemption Date.

For the purposes hereof:

"**Zero Nominal Amount Redemption Date**" means the Reference Entity Valuation Date on which it is determined that the Aggregate Outstanding Nominal Amount is reduced to zero as of the relevant Event Determination Date.

| 27 | Redemption for Taxation Reasons permitted on days other than Interest Payment Dates: | Yes. |
|----|----|----|
| 28 | Amortisation Yield: | Not applicable. |
| 29 | Exchange (Condition 6(k)): | No. |
| 30 | Mandatory Redemption (in accordance with Condition 6(c)): | See paragraph 44 below. |
| 31 | Instalment Date(s) (if applicable): | Not applicable. |
| 32 | Instalment Amount(s) (if applicable): | Not applicable. |
| 33 | Unmatured Coupons to become void upon early redemption: | Yes. |
| 34 | Talons to be attached to Notes and, if applicable, the number of Interest Payment Dates between the maturity of each Talon (if applicable): | Not applicable. |
| 35 | Business Day Jurisdictions for Condition 7(h) (jurisdictions required to be open for payment): | London and TARGET. |
| 36 | Additional steps that may only be taken following approval by an Extraordinary Resolution in accordance with Condition 12(a) (if applicable): | Not applicable. |
| 37 | Additional Fungible Issues Permitted: | Yes, subject to the Issuer having received from the Swap Counterparty its prior written consent to any such fungible issue. |
| 38 | Details of any other additions or variations to the Conditions (if applicable): | For the purposes of the Notes only: |

(i)    Notwithstanding anything to the contrary contained in Conditions 6 and 10, upon the occurrence of any of the events set out in Condition 6(c) and (d) and Condition 10 (each such occurrence an "**Early Redemption Event**" and the date of the relevant occurrence, as determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, being the "**Early Redemption Event Date**"), the Issuer shall forthwith notify the Trustee, the Noteholders and Moody's of the occurrence of such event and the date fixed for redemption, being a day falling no later than six London and TARGET Business Days following the relevant Early Redemption Event Date (the "**Early Redemption Date**"). The Issuer shall redeem each Note on the Early Redemption Date at its Early Redemption Amount as set out in paragraph 44 below.

(ii) Notwithstanding Condition 14, so long as the Notes are represented by a Global Note held on behalf of Euroclear, Clearstream, Luxembourg or any other clearing system, notices in respect thereof may be given by their being delivered to Euroclear, Clearstream, Luxembourg or such other clearing system, as the case may be. For the avoidance of doubt, such notices shall be deemed given on the date and, if applicable, at the time they are delivered to Euroclear, Clearstream, Luxembourg or such other clearing system, as the case may be.

39   The Agents (including any Calculation Agent and/or Issuing and Paying Agent and/or Custodian) appointed in respect of the Notes are:

**Issuing and Paying Agent and Custodian**

JPMorgan Chase Bank, N.A.
Trinity Tower,
9 Thomas More Street,
London E1W 1YT

**Irish Paying Agent**

J.P. Morgan Bank (Ireland) p.l.c.
JPMorgan House
International Financial Services Centre
Dublin 1
Ireland

**Calculation Agent**

Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE

**Listing Agent**

A&L Listing Limited
International Financial Services Centre
North Wall Quay
Dublin 1
Ireland

**Security Arrangements**

40   Mortgaged Property:

(i)   Collateral:

EUR 50,000,000 in principal amount of EUR 50,000,000 Floating Rate Public Pfandbriefe due 2016 issued by Hypothekenbank in Essen AG on 16 June 2006 (ISIN: DE000HBE0HS1) (the "**Collateral Securities**").

The Collateral will be held by JPMorgan Chase Bank, N.A. of Trinity Tower, 9 Thomas More Street, London E1W 1YT in its capacity as Custodian pursuant to the Agency Agreement in the Custody Account (being the account of the Custodian at Euroclear, Account No. 22066) subject to the security interest created pursuant to the Trust Deed. The

|  | | Custodian shall notify the Issuer and the Calculation Agent if it becomes aware of any material amendment to the terms and conditions of the Collateral Securities. |
|---|---|---|

If the rating of the Custodian or the Issuing and Paying Agent is downgraded at any time below "P-1" by Moody's in respect of its short term, unsecured, unsubordinated and unguaranteed debt obligations the Issuer shall, within 30 calendar days appoint a replacement Custodian or, as the case may be, Issuing and Paying Agent that has a rating of at least "P-1" by Moody's unless the Trustee has an alternative proposal which Moody's confirms will mean that the then current rating of the Notes will not be reduced.

(ii)    Prepayment Account:

The Issuer shall establish on or prior to the Issue Date an account (the "**Prepayment Account**") with the Custodian in London, into which the Issuer will deposit any Prepayment Fixed Rate Payer Payment Amounts and any Additional Prepayment Fixed Rate Payer Payment Amounts received under the Swap Agreement. All monies deposited from time to time in the Prepayment Account shall be held by the Custodian as part of the Mortgaged Property and shall be applied for the purposes herein provided.

(iii)   Security (order of priorities):

The Trustee shall apply all moneys received by it under the Trust Deed in connection with the realisation or enforcement of the Security constituted by the Trust Deed in the following order of priorities:

Swap Counterparty Priority unless (i) an Event of Default (as defined in the Swap Agreement) occurs and the Swap Counterparty is the Defaulting Party (as defined in the Swap Agreement) or (ii) a Tax Event upon Merger (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty is the sole Affected Party (as defined in the Swap Agreement), or (iii) an Additional Termination Event occurs pursuant to the Swap Agreement and the Swap Counterparty is the Affected Party (as defined in the Swap Agreement), in which case Noteholder Priority shall apply.

(iv)   Swap Agreement (if applicable):

Under (a) a Deed of Accession dated 22 July 2005, pursuant to which the Issuer acceded to an ISDA Master Agreement, and Schedule thereto dated as of 10 October 2002 and amended and restated on 22 July 2005 (together, the "**ISDA Master Agreement**") and (b) a confirmation thereto with an effective date of the Issue Date made between the Issuer and the Swap Counterparty (the "**Swap Confirmation**" and, together with the ISDA Master Agreement, the "**Swap Agreement**"), the Issuer will pay to the Swap Counterparty sums equal to interest payable in respect of the Collateral (if any) and the Swap Counterparty will pay to the Issuer the

amounts equal to the Interest Amounts due under the Notes. In addition, the Issuer will make a final payment equal to the redemption proceeds of the Collateral Securities to the Swap Counterparty on the Scheduled Maturity Date and the Swap Counterparty will make a final payment to the Issuer equal to the Redemption Amount due under the Notes.

The form of the Swap Confirmation is set out in Annex 1.

The Swap Agreement may be terminated early (either in whole or, in certain circumstances, in part only) among other circumstances:

(i)    on the due date for payment of the Notes if at any time any of the Notes becomes repayable in accordance with the Conditions prior to the Maturity Date;

(ii)    at the option of one party, if there is a failure by the other party to pay any amounts due under the Swap Agreement;

(iii)    if (subject as provided in the Swap Agreement) withholding taxes are imposed on payments made by the Issuer or the Swap Counterparty under the Swap Agreement or it becomes illegal for either party to perform its obligations under the Swap Agreement (see "Transfer to avoid Termination Event" below);

(iv)    if at any time there is a default pursuant to the terms of the Collateral Securities as determined by the Swap Calculation Agent;

(v)    if the amount that would otherwise be due and payable by the Collateral Issuer in respect of the Collateral Securities would be reduced as a result of the Collateral Issuer being required by law to withhold or account for tax.

**Consequences of Early Termination:**

Upon any such early termination of the Swap Agreement, the Issuer or the Swap Counterparty may (subject as set out below and provided, in the case of certain tax events, that the Issuer may first be obliged to use all reasonable endeavours to transfer its obligations) be liable to make a termination payment to the other (regardless, if applicable, of which of such parties may have caused such termination).

Such termination payment will be based on the replacement cost or gain for a swap transaction that would have the effect of preserving for the party making the determination the economic equivalent of the Swap Agreement. In all cases of early termination occurring other than by reason of a default by the Swap Counterparty or an Additional Termination Event (as defined in the Swap Agreement) where the Swap Counterparty is the sole Affected Party (as defined in the

Swap Agreement) or a Tax Event upon Merger (as defined in the Swap Agreement) where the Swap Counterparty is the sole Affected Party (in which case the determination will be made by the Issuer) or an Illegality (as defined in the Swap Agreement) (in which case the party which is not the Affected Party will make the determination (or, if there are two Affected Parties, each party will make a determination which will be averaged)), the termination payment will be determined by the Swap Counterparty on the basis of quotations received from at least four reference market-makers (failing which, by the Swap Counterparty or the Issuer, as aforesaid).

Regardless of which party makes the determination of the termination payment (if any), there is no assurance that the proceeds from the sale of the Collateral Securities plus or minus, as the case may be, such termination payment will be sufficient to repay the principal amount due to be paid in respect of the Notes and any other amounts in respect thereof that are due.

**Transfer to avoid Termination Event:**

If withholding taxes are imposed on payments made by the Issuer or the Swap Counterparty under the Swap Agreement, then the Swap Counterparty shall, at its sole option, have the right:

(i)   to require the Issuer to transfer all of the Issuer's interests and obligations under the Swap Agreement together with its interests and obligations under the Notes, the Programme Agreement, the Trust Deed and the Agency Agreement to another entity, whether or not in the same tax jurisdiction as the Issuer, that would not have any obligation to withhold or deduct (if the Issuer is or would be required to make such deduction or withholding) or to which the Swap Counterparty would be entitled to make payments free from the relevant deduction or withholding (if the Swap Counterparty is or would otherwise be required to make such withholding or deduction), subject to obtaining the prior written consent of the Trustee;

(ii)  to require the Issuer to transfer the Issuer's residence for tax purposes to another jurisdiction, subject to obtaining the prior written consent of the Trustee;

(iii) to transfer all of the Swap Counterparty's interests and obligations under the Swap Agreement together with its interests and obligations (if any) under the Notes, the Programme Agreement, the Trust Deed and the Agency Agreement to another entity, whether or not in the same tax jurisdiction as the Swap Counterparty, which would

not have any obligation to withhold or deduct (if the Swap Counterparty is or would be required to make such deduction or withholding) or to which the Issuer would be entitled to make payments free from the relevant deduction or withholding (if the Issuer is or would otherwise be required to make such withholding or deduction), subject to obtaining the prior written consent of the Trustee; or

(iv) to transfer the Swap Counterparty's residence for tax purposes to another jurisdiction, subject to obtaining the prior written consent of the Trustee,

provided that, in the case of a Tax Event Upon Merger, if the relevant withholding or deduction applies to payments required to be made by the Swap Counterparty to the Issuer under the Swap Agreement (and the Issuer is the Burdened Party and not the Affected Party), the Swap Counterparty shall, until such time as a transfer as envisaged by paragraphs (i) to (iv) above is effected, be required in respect of any such payment to pay to the Issuer such additional amount as may be necessary in order that the net amount received by the Issuer after the relevant deduction or withholding, is equal to the amount that would have been receivable by the Issuer in the absence of the relevant deduction or withholding.

If the Issuer or the Swap Counterparty as the case may be is unable to transfer its interests to another party or to transfer its tax residence in accordance with the preceding provisions prior to the 30th day following the date of imposition of such withholding taxes or, if earlier, the 10th day prior to the first date on which it or the Swap Counterparty would otherwise be required to make a payment net of withholding taxes, the Swap Counterparty (whether it is the Swap Counterparty or the Issuer which is the Affected Party in respect of the Tax Event or Tax Event Upon Merger) or (in the case of Tax Event Upon Merger only), the Issuer (where the Issuer is the Burdened Party with respect to the Tax Event Upon Merger) may terminate the swap transaction under the Swap Agreement. If the Issuer transfers its interests and obligations or residence for tax purposes, it shall notify Moody's of such transfer.

In the third line of Condition 6(d)(i), the following words shall be inserted immediately after the word "income":

"(other than any tax required by law to be withheld or deducted by the Swap Counterparty in respect of any payment made to the Issuer under the Swap Agreement)".

| | |
|---|---|
| Swap Counterparty(ies): | Lehman Brothers Special Financing Inc. |
| Swap Guarantor (if applicable): | Lehman Brothers Holdings Inc. whose registered address is |

|  | at Suite 400, Wilmington, Delaware 19808, U.S.A. |
|---|---|
| Details of Credit Support Document (if applicable): | (i) The obligations of the Swap Counterparty under .... Swap Agreement are unconditionally and irrevocably guaranteed by Lehman Brothers Holdings Inc. pursuant to a guarantee dated 16 June 2006 issued in favour of the Issuer (the "**Swap Guarantee**"). |
|  | (ii) Pursuant to the Swap Agreement, the Swap Counterparty shall pay any Prepayment Fixed Rate Payer Payment Amounts and any Additional Prepayment Fixed Rate Payer Payment Amounts to the Issuer. |
|  | (iii) The Prepayment Fixed Rate Payer Payment Amounts and any Additional Prepayment Fixed Rate Payer Payment Amounts will be deposited in the Prepayment Account which will be secured by the Issuer in favour of the Trustee on behalf of the Noteholders and the Swap Counterparty to secure the payment obligations of the Issuer under the Notes and the Swap Agreement. |
|  | (iv) If an Event of Default (as defined in the Swap Agreement) occurs which leads to an Early Redemption Event and the Swap Counterparty is the Defaulting Party, the Issuer may use the Prepayment Account Balance and the net liquidation proceeds from the realisation of the Collateral Securities to pay to Noteholders the applicable Early Redemption Amount before paying any amounts due to the Swap Counterparty. |
| Credit Support Provider: | With respect to the Swap Counterparty, Lehman Brothers Holdings Inc. |

**Provisions relating to Redemption**

| 41 | Call Option (Condition 6(e)): | Not applicable. |
|---|---|---|
| 42 | Put Option (Condition 6(f)): | Not applicable. |
| 43 | Redemption Amount: | Subject to the existence of an Adjustment Reference Entity or a Notice Delivery Period Extension Event as at the Final Cut-off Date, unless previously redeemed or purchased and cancelled, the Redemption Amount payable in respect of each Note on the Scheduled Maturity Date shall be an amount in EUR, determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, equal to the greater of: |

(a) such Note's Outstanding Nominal Amount as at the Final Cut-off Date; and

(b) EUR 0.

For the avoidance of doubt, in satisfaction of its obligations

hereunder the Issuer shall use the proceeds received under the Swap Agreement and the Prepayment Account Balance to fund the Redemption Amount.

For the purposes hereof:

"**Final Cut-off Date**" means the London and TARGET Business Day immediately preceding the Scheduled Maturity Date.

If:

(a)  an Adjustment Reference Entity or a Notice Delivery Period Extension Event exists as at the Final Cut-off Date; and

(b)  the sum of the Mezzanine Loss Amount and the aggregate of the Reference Entity Nominal Amount(s) in respect of all relevant Adjustment Reference Entities and/or all Reference Entities in respect of which a Notice Delivery Period Extension Event exists is greater than zero,

the Redemption Amount in respect of each Note shall be:

(i)  the Partial Redemption Amount (if any) on the Scheduled Maturity Date;

(ii)  each Deferred Redemption Amount on the relevant Deferred Redemption Date; and

(iii)  additional interest in an amount equal to interest accrued on the Deferred Redemption Amount at the Overnight Rate in the period from and including the Scheduled Maturity Date to, but excluding, the related Deferred Redemption Date.

For the purposes hereof:

"**Deferred Redemption Amount**" means, in respect of any Deferred Redemption Date, an amount per Note in EUR (rounded down to the nearest cent and subject to a minimum of EUR 0) determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, on the relevant Deferred Redemption Cut-off Date as being equal to the excess (if any) of:

(i)  the Redemption Amount that would otherwise have been payable on the preceding Deferred Redemption Date (or, in respect of the first or only Deferred Redemption Date, the Scheduled Maturity Date) if:

(A)  in the circumstances set out in paragraph (i) of the definition of "Adjustment Reference Entity", the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the relevant Event Determination

Date; or

(B)     in the circumstances set out in paragraph (ii) of the definition of "Adjustment Reference Entity", (i) where the Potential Failure to Pay or Potential Repudiation/Moratorium develops into an actual Failure to Pay or Repudiation/Moratorium, as the case may be, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Failure to Pay or Potential Repudiation/Moratorium was determined by the Calculation Agent to have occurred; or (ii) where the Potential Failure to Pay or Potential Repudiation/Moratorium is subsequently cured, the relevant Potential Failure to Pay or Potential Repudiation/Moratorium had not occurred; or

(C)     in the circumstances that a Notice Delivery Period Extension Event existed as at the Final Cut-off Date and an Event Determination Date occurs on or prior to the Notice Delivery Period Extension Date, the Final Price in respect of the relevant Reference Entity had actually been determined on the Scheduled Maturity Date; or

(D)     in the circumstances that a Notice Delivery Period Extension Event existed as at the Final Cut-off Date and an Event Determination Date does not occur on or prior to the Notice Delivery Period Extension Date, the relevant Notice Delivery Period Extension Event had not occurred,

over

(ii)     the Deferred Redemption Amount in respect of the preceding Deferred Redemption Date (or, in respect of the first or only Deferred Redemption Date, the Partial Redemption Amount);

"**Deferred Redemption Cut-off Date**" means, in respect of each relevant Adjustment Reference Entity or Notice Delivery Period Extension Event, as the case may be, the date determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, as the later of:

(A)     the relevant Reference Entity Valuation Date; or

(B)     the date that the relevant Potential Failure to Pay or Potential Repudiation/Moratorium has been cured.

(C)     (where an Event Determination Date has not occurred prior to the Notice Delivery Period Extension Date) the

Notice Delivery Period Extension Date; or

(D) (where an Event Determination Date occurs prior to the Notice Delivery Period Extension Date) the date on which the relevant Final Price is determined;

"**Deferred Redemption Date**" means, in respect of each Adjustment Reference Entity and each Notice Delivery Period Extension Event in existence on the Final Cut-off Date, a date determined, acting in good faith and in a commercially reasonable manner, of the Calculation Agent (which shall be no later than the fifth London and TARGET Business Day following the relevant Deferred Redemption Cut-off Date);

"**Partial Redemption Amount**" means an amount per Note in EUR (rounded down to the nearest cent and subject to a minimum of EUR 0) determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, on the Final Cut-off Date as being equal to (i) the Aggregate Outstanding Nominal Amount on the Final Cut-off Date less the aggregate of the Reference Entity Notional Amounts of each Adjustment Reference Entity in existence on the Final Cut-off Date and each Reference Entity in respect of which a Notice Delivery Period Extension Event exists on the Final Cut-off Date, divided by (ii) the total number of Notes outstanding at such time.

| 44 | Early Redemption Amount(s) payable on mandatory redemption (Condition 6(c)), redemption for taxation and other reasons (Condition 6(d)), an event of default (Condition 10) and/or the method of calculating the same (if required or if different from that set out in the Conditions): | Subject as provided below, an amount per Note in EUR (rounded down to the nearest cent and subject to a minimum of EUR 0) determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, as being equal to the lesser of (A) such Note's Outstanding Nominal Amount plus any accrued but unpaid interest on such Note and (B) such Note's *pro rata* share of the proceeds (net of any deductions on account of taxes or otherwise) from the sale or realisation of the Collateral on behalf of the Issuer by the Disposal Agent pursuant to the Supplemental Trust Deed and Drawdown Agreement, plus (if payable to the Issuer) or minus (if payable to the Swap Counterparty) the amount of any applicable Unwind Costs divided by the total number of Notes outstanding. |
|---|---|---|

Notwithstanding the above, if an Event of Default (as defined in the Swap Agreement) occurs and the Swap Counterparty is the Defaulting Party (as defined in the Swap Agreement) or a Tax Event Upon Merger occurs and the Swap Counterparty is the sole Affected Party (as defined in the Swap Agreement) or if an Additional Termination Event occurs under paragraph 11(i)(e) of the Swap Confirmation, the Early Redemption Amount shall be an amount in EUR (rounded down to the

nearest cent and subject to a minimum of EUR 0) determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, as being equal to such Note's Outstanding Nominal Amount plus any accrued but unpaid interest thereon. In the event that Unwind Costs are payable by the Issuer to the Swap Counterparty, the Issuer shall apply the net proceeds from the sale or realisation of the Collateral and the Prepayment Account Balance as aforesaid (1) first in redeeming each Note in an amount equal to Early Redemption Amount and (2) thereafter, in payment of such Unwind Costs to the Swap Counterparty.

For the purposes hereof:

"**Unwind Costs**" means the value of (i) the termination payment due from or, as the case may be, to the Swap Counterparty under the Swap Agreement in respect of the termination of the Swap Agreement (as determined by reference to the Reference Registry as at the date of such termination) and (ii) any transfer or stamp tax costs, early redemption or termination cost (howsoever defined), if any, incurred by the Issuer or the Swap Counterparty or the Trustee, as determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, in relation to any swap agreement, financing arrangement or other hedging transaction entered into by or on behalf of the Issuer or the Swap Counterparty in relation to the issue of the Notes and the Swap Agreement. For purposes of determining the Unwind Costs, the termination payment due to or from the Swap Counterparty shall be determined without reference to the Prepayment Account Balance.

For the purposes of determining the termination payment under the Swap Agreement, the Calculation Agent shall seek quotations from at least 4 reference market-makers (one of which may be the Calculation Agent or its affiliate).

For the avoidance of doubt, the termination payment under the Swap Agreement shall be calculated on the basis that the Issuer has an obligation to pay all sums due to the Swap Counterparty thereunder, without regard to the limited recourse provisions contained therein.

If the date on which the Notes are due to be redeemed is not a Scheduled Interest Payment Date, the Calculation Agent shall determine the interest deemed to have accrued in respect of the Notes in the period from and including the immediately preceding Scheduled Interest Payment Date and ending on (but excluding) the date on which such Notes are due to be redeemed, by reference to the Fixed Amount that would be payable under the Swap Agreement if such date were a Fixed

Rate Payer Payment Date.

**Provisions applicable to Global Notes**

| | | |
|---|---|---|
| 45 | Notes to be represented on issue by: | Temporary Global Note. |
| 46 | Applicable TEFRA exemption: | D Rules. |
| 47 | Global Note exchangeable for Definitive Notes at the request of the holder: | No. |
| 48 | Exchange Date: | Not applicable. |

**Provisions relating only to the sale, listing and rating of the Notes**

49   Details of any additions or variations to the selling restrictions:   Not Applicable

50   (i)   Listing and Admission to trading:   Application has been made to the IFSRA as competent authority under Directive 2003/71/EC for this Series Prospectus to be approved. Application has also been made to the Irish Stock Exchange for the Notes to be admitted to the Official List of the Irish Stock Exchange and to be admitted to trading on its regulated market.

Where notices are given by or on behalf of the Issuer in accordance with these Conditions, such notice shall, to the extent required by the Irish Stock Exchange, also be given to the Companies Announcements Office of the Irish Stock Exchange.

(ii)   Estimate of total expenses related to admission to trading:   All such expenses are to be met by the Arranger and will not be deducted from the net proceeds of the issue of the Notes.

51   Dealer's Commission:   Not applicable.

52   Net Proceeds of issue:   EUR 50,000,000.

53   Method of issue of Notes:   Individual Dealer.

54   The following Dealer is subscribing the Notes:   Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE, United Kingdom, an investment bank engaged in, *inter alia*, underwriting new securities issues and trading in fixed income financial instruments.

55   Common Code (N.B. See paragraph 4 above for ISIN):   25682599.

56   Rating:   Yes.

A rating of "Baa2", as determined with regard to the Trade Date, is expected to be assigned by Moody's after issue. Neither the Issuer nor the Swap Counterparty makes any representation as to any rating determined with regard to any day other than the Trade Date.

### ANNEX 1 – FORM OF SWAP CONFIRMATION

*The form of the Swap Confirmation is as set out below.*

### SWAP CONFIRMATION

Date:                16 June 2006

To:                  Ruby Finance Public Limited Company

From:                Lehman Brothers Special Financing Inc.

Re:                  Credit Derivative Transactions relating to Ruby Finance Public Limited
                     Company Series 2006-3 EUR 50,000,000 RIESLING Credit Linked Synthetic
                     Portfolio Notes due 2016

Dear Sirs,

The purpose of this letter agreement (the "**Confirmation**") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "**Transaction**"). The Transaction has been entered into in connection with issue of the Ruby Finance Public Limited Company Series 2006-3 EUR 50,000,000 RIESLING Credit Linked Synthetic Portfolio Notes due 2016.

This Confirmation constitutes a "**Confirmation**" as referred to in the ISDA Master Agreement specified below. The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement and Additional Provisions for Physically Settled Default Swaps – Monoline Insurer as Reference Entity, published on January 21, 2005, in each case as published by the International Swaps and Derivatives Association Inc. ("**ISDA**") (together, the "**Credit Derivatives Definitions**") and the 2000 ISDA Definitions as published by ISDA (the "**2000 Definitions**") are incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions and the Confirmation, the Confirmation will govern. In addition, the definitions and provisions set out in Schedule C hereto shall prevail in the event of any inconsistency with the Credit Derivative Definitions. In the event of any inconsistency between Schedule C hereto and sections 1 to 13 of the Confirmation, the provisions of sections 1 to 13 shall prevail.

Subject to paragraph (l) of Part 1 of the Schedule to the Agreement (as defined below), the Confirmation supplements, forms a part of, and is subject to the ISDA Master Agreement dated as of 10 October 2002 and amended and restated on 22 July 2005, as amended and supplemented from time to time (the "**Agreement**") between Lehman Brothers Special Financing Inc. and Dante Finance Public Limited Company to which you have acceded under a Deed of Accession dated 22 July 2005. All provisions contained in the relevant Agreement govern the Confirmation except as expressly modified below. In this Confirmation, the "**Notes**" refers to Ruby Finance Public Limited Company Series 2006-3 EUR 50,000,000 RIESLING Credit Linked Synthetic Portfolio Notes due 2016 and "**Conditions**" refers to the terms and conditions of the Notes.

Capitalised terms used but not defined herein will have the meanings given to them in the Conditions and in the event of any inconsistency between the Conditions and this Confirmation, this Confirmation will govern.

In the event of any inconsistency between the Confirmation and the Agreement, the Confirmation shall prevail.

In each Confirmation, "**Party A**" means Lehman Brothers Special Financing Inc. and "**Party B**" means Ruby Finance Public Limited Company.

The terms of the Transactions to which this Confirmation relates are as follows:

## 1    General Terms

| | |
|---|---|
| Trade Date: | 24 May 2006 |
| Effective Date: | 16 June 2006 |
| Scheduled Termination Date: | 20 June 2016, subject to adjustment in accordance with the Following Business Day Convention. |
| Termination Date: | The Scheduled Termination Date unless an Adjustment Reference Entity or a Notice Delivery Period Extension Event exists as at the Final Cut-off Date in which case the Termination Date shall be the Deferred Redemption Date (as defined in the Conditions) (or, where there is more than one Adjustment Reference Entity or Notice Delivery Period Extension Event, the latest Deferred Redemption Date). |
| Floating Rate Payer: | Ruby Finance Public Limited Company (the "**Seller**") |
| Fixed Rate Payer: | Lehman Brothers Special Financing Inc. (the "**Buyer**") |
| Calculation Agent: | Lehman Brothers International (Europe) |
| | Any determination, calculation or selection made by the Calculation Agent under this Transaction shall be made by the Calculation Agent in a commercially reasonable manner and based on best market practice. |
| Calculation Agent City: | London |
| Business Days: | London and TARGET. |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions and as otherwise provided in this Confirmation, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |

## 2    Reference Entities and Reference Obligations

| | |
|---|---|
| Reference Entity: | Each of the entities (and any Successor thereto) listed in the Reference Registry from time to time, subject to the provisions of "Successor Substitution" below and the provisions of a portfolio management agreement to be entered into on or around the Issue Date between LRI Landesbank Rheinland-Pfalz International SA (the "**Portfolio Manager**"), Party A and the Calculation Agent (the "**Portfolio Management Agreement**") (a copy of which has been provided to Party B); provided that, upon the occurrence of a Credit Event during the Credit Observation Period with respect to a Reference Entity, a Benchmark Obligation or one or more Obligations of a Reference Entity, and satisfaction of the Conditions to Settlement with respect to such Credit Event, such Reference Entity will be deemed deleted from the Reference Registry with effect from the Event Determination Date (subject |

to the provisions set out in "Final Price" in paragraph 9 below) with respect to such Reference Entity (other than for the purposes of determining the relevant Cumulative Loss Amount) and the Reference Registry shall be amended accordingly, subject always to the provisions regarding delivery of multiple Credit Event Notices pursuant to the "Credit Event Notice After Restructuring" provisions set out in Schedule C.

"**Reference Registry**" means the register of Reference Entities maintained by the Calculation Agent in accordance with this Confirmation (the initial form of which is set out in Schedule A) as the same may be amended time to time in accordance with the Portfolio Management Agreement. Pursuant to the Portfolio Management Agreement, Reference Entities may be added to, or removed from, the Reference Registry (each a "**Reference Registry Adjustment**") in accordance with the terms set out therein.

The Portfolio Management Agreement requires the Portfolio Manager to, *inter alia*, specify whether a proposed change in the Reference Registry is to result in (a) an increase or decrease in the Margin (a "**Margin Adjustment**") (b) the payment of an additional amount of interest on the Notes on the next following Interest Payment Date (the aggregate amount payable in respect of the Notes being an "**Additional Coupon**") or (c) an increase or decrease to the Subordination Amount (a "**Subordination Adjustment**").

Upon a Reference Registry Adjustment taking place in accordance with the Portfolio Management Agreement, the Calculation Agent shall, in accordance with the Portfolio Management Agreement, calculate the applicable Margin Adjustment, Additional Coupons or Subordination Adjustment, as the case may be, which shall amount to the equivalent of the sum of the net economic benefits or costs to Party A incurred as a result of the Reference Registry Adjustment (which shall include the benefit or cost to Party A of adjusting the hedges and/or any reserves held against this Transaction as a consequence of the Reference Registry Adjustment in accordance with Party A's then prevailing modelling and reserving policies) as determined by the Calculation Agent in a commercially reasonable manner, as calculated by its standard proprietary model, using its standard assumptions and as would be done in its day-to-day business with other credit derivative transactions.

The Reference Registry shall contain the following information in respect of each Reference Entity included therein:

(i)   the Reference Entity Notional Amount applicable to the Reference Entity;

(ii)  the category (the "Reference Entity Category") applicable

to the Reference Entity for the purposes of designating which of the terms set out in Schedule B are applicable to the Reference Entity;

(iii) the Benchmark Obligation (if any) applicable to the Reference Entity;

(iv) the seniority of the Benchmark Obligation (the "**Seniority**") (for the purposes of information only);

(v) the effective date of each Successor Substitution or Reference Registry Adjustment effected with respect to the Reference Entity and any change to the Reference Entity Notional Amount resulting from any Successor Substitution; and

(vi) whether such Reference Entity is a Monoline Insurer.

Section 2.30 of the Credit Derivatives Definitions shall not apply to this Transaction.

| | |
|---|---|
| Reference Entity Notional Amount applicable to each Reference Entity: | With respect to each Reference Entity, the amount specified in respect of such Reference Entity in the Reference Registry. |
| Successor Substitution: | If a Succession Event occurs between two or more Reference Entities (the "**Merged Reference Entities**") (as determined by the Calculation Agent acting in good faith and in a commercially reasonable manner), the Calculation Agent may by no later than 3:00 p.m. London time on any Business Day following such Succession Event, deliver a notice (the "**Merger Successor Notice**") to the Portfolio Manager, with copies to the Swap Counterparty and the Issuer, advising that the Merged Reference Entities are to be removed from the Reference Registry and replaced (each a "**Replacement**") with a Successor with a Reference Entity Notional Amount of the aggregate Reference Entity Notional Amounts of the Merged Reference Entities immediately prior to such Succession Event (the "**Interim Successor RENA**").

Within a period of two calendar weeks (the "**Succession Period**") of receipt of the Merger Successor Notice, the Portfolio Manager undertakes to use its commercially reasonable efforts to reduce the Interim Successor RENA to an amount equal to or lower than the greatest Reference Entity Nominal Amount of the Merged Reference Entities immediately prior to the Succession Event (the "**Original Maximum RENA**") in accordance with the procedure for Adjustments (as defined in the Portfolio Management Agreement) under the Portfolio Management Agreement. For the avoidance of doubt, any calculations in respect of Adjustments made within the Succession Period shall take into account and neutralize the economic benefit or loss to the Swap Counterparty resulting from the relevant Succession Event. Each Replacement and any adjustments to the Interim Successor RENA pursuant to |

this paragraph shall be effective as of the Succession Event Date.

In the event that the Interim Successor RENA has not been reduced to an amount equal to or lower than the Original Maximum RENA within the Succession Period, the Calculation Agent may deliver a notice ("**Merger Substitution Notice**") to the Portfolio Manager, with copies to the Swap Counterparty and the Issuer, advising that the Interim Successor RENA is to be reduced to the Original Maximum RENA and detailing two or more new Reference Entities (the "**Merger Replacement Reference Entities**") to replace each of the other Merged Reference Entities.

Within one hour of receipt of the Merger Substitution Notice (provided that such notice is received before 5:00 p.m. (London time) on a Business Day and if a notice is received after 5:00 p.m. (London time) such notice shall be deemed to be received at 9:00 a.m. (London time) on the following Business Day), the Portfolio Manager may direct the Calculation Agent to select one or more of the proposed Merger Replacement Reference Entities specified in the Merger Substitution Notice to be substituted for the Merged Reference Entities in the Reference Registry with effect from the Succession Event Date.

If the Calculation Agent does not receive a direction from the Portfolio Manager within the required time, the Calculation Agent shall (a) amend the Reference Registry by (i) reducing the Interim Successor RENA of the Successor to the Original Maximum RENA and (ii) including such other Merger Replacement Reference Entities chosen by it in its absolute discretion from the names specified in the relevant Merger Substitution Notice; and (b) give notice of such changes to the Portfolio Manager, the Issuer, the Swap Counterparty and Moody's and the changes referred to in (i) and (ii) shall be effective as of the Succession Event Date.

The Calculation Agent shall not specify a Merger Replacement Reference Entity in any Merger Substitution Notice unless the Moody's Rating of the Merger Replacement Reference Entity is equal to or greater than the lowest equivalent credit rating of any of the Merged Reference Entities, as of the Business Day prior to the date of the Succession Event.

"**Moody's**" means Moody's Investors Services (or any successor to the rating business thereof);

"**Moody's Rating**" means, with respect to any Reference Entity, the rating determined as follows;

(a)     the Reference Entity long term senior unsecured rating from Moody's;

(b)     in the event that the Moody's Rating cannot be determined in accordance with paragraph (a) above, but

the Reference Entity has a long term issuer rating from Moody's, such rating;

(c)     in the event that the Moody's Rating cannot be determined in accordance with paragraph (a) and (b) above, but the Reference Entity has a long term bank deposit rating from Moody's, such rating;

(d)     in the event that the Moody's Rating cannot be determined in accordance with paragraph (a), (b) or (c) above, but the Reference Entity has a long term corporate family rating (formerly senior implied rating as re-named by Moody's on 13th June 2005) from Moody's:

(i)     such rating if it is Baa3 or above;

(ii)    one subcategory below such rating if it is below Baa3;

(e)     in the event that the Moody's Rating cannot be determined in accordance with paragraph (a), (b), (c) or (d) above but the Reference Entity has a subordinated obligation rating from Moody's, then the Moody's Rating of such Reference Entity shall be:

(i)     one subcategory above such rating if such rating is B1 or above;

(ii)    two subcategories above such rating if such rating is below B1;

(f)     in the event that the Moody's Rating cannot be determined in accordance with paragraph (a), (b), (c), (d) or (e) above, but the Reference Entity has an insurance financial strength rating from Moody's, then the Moody's Rating of such Reference Entity shall be one subcategory below such rating:

(g)     in the event that the Moody's Rating cannot be determined in accordance with paragraph (a), (b), (c), (d), (e) or (f) above, if the Reference Entity has a short term rating from Moody's, the corresponding long term senior unsecured rating from Moody's in accordance with the table below:

| Short term Moody's rating | Long term Moody's rating |
| --- | --- |
| P 1 | A2 |
| P 2 | Baa2 |
| P 2 | Baa3 |

(h)     if the Reference Entity is not rated by Moody's, a confidential credit estimate may be requested from Moody's and the Moody's Rating shall be such confidential credit estimate;

(i)    if a Moody's Rating cannot be determined in accordance with paragraphs (a), (b), (c), (d), (e), (f) or (g), but a security or obligation of the Reference Entity is rated by Moody's and no Moody's Rating for such Reference Entity is obtained pursuant to paragraph (h) above, then the Moody's Rating of such Reference Entity shall be determined as follows:

    (i)    if there is a rating from Moody's on a senior unsecured obligation of such Reference Entity, then the Moody's Rating of such Reference Entity such equal such rating; or

    (ii)    if there is a rating from Moody's on a subordinated obligation of such Reference Entity, then the Moody's Rating of such Reference Entity shall be one subcategory above such rating; or

(j)    if the Reference Entity does not have a long term senior unsecured rating from Moody's as described in paragraphs (a), (b), (c), (d), (e) or (f) and the Reference Entity does not have a short term rating from Moody's as described in paragraph (g) and no security or obligation of the Reference Entity is rated by Moody's and no Moody's Rating for such Reference Entity is obtained pursuant to paragraph (h) above, but if the Reference Entity has an S&P Rating, then the Moody's Rating of such Reference Entity will be:

    (i)    on subcategory below the Moody's equivalent of the S&P Rating if such rating is "BBB" or higher; or

    (ii)    two subcategories below the Moody's equivalent of the S&P Rating if such rating is "BB+" or lower;

    provided however that (i) no Reference Entity may be given a Moody's Rating based on an S&P Rating if such Reference Entity has no outstanding debt that is currently paying a coupon and (ii) if a debt security or obligation of the Reference Entity has been in default during the past two years, the Moody's Rating of such Reference Entity will be "Ca".

Any Reference Entity that has been placed on credit watch by Moody's for possible upgrade or downgrade by one or more ratings subcategories shall be treated as having a Moody's Rating that is, respectively, one ratings subcategory higher or one ratings subcategory lower, than the Moody's Rating which would otherwise apply, unless Moody's otherwise advises that such higher or lower rating is not required; and

"**S&P**" means Standard & Poor's Rating Services, a division of

The McGraw Hill Companies, Inc. (or any successor to the rating business thereof);

"**S&P Rating**" means the then current rating of the relevant entity by S&P.

Succession Event Date:

The occurrence of a Succession Event, and the date at which such Succession Event is deemed to occur (the "**Succession Event Date**"), shall be determined by the Calculation Agent.

Reference Obligation(s):

In respect of each Reference Entity listed in the Reference Registry one or more obligations each of which is either:

(a) the Benchmark Obligation, if any, specified for such Reference Entity; or

(b) an obligation of the relevant Reference Entity (either directly or as provider of any Qualifying Affiliate Guarantee or, if All Guarantees is specified as "Applicable" in Schedule B with respect to Reference Entities of the same Reference Entity Category as such Reference Entity, as provider of any Qualifying Guarantee), as selected by the Calculation Agent, acting in good faith and in a commercially reasonable manner, on or prior to the Valuation Date and which (i) falls within the Reference Obligation Category specified below, (ii) has all of the Reference Obligation Characteristics specified below, (iii) is not subject to a counterclaim, defence (other than a counterclaim or defence based on the factors set forth in Section 4.1(a) to (d) of the Credit Derivatives Definitions) or right of set-off by or of the relevant Reference Entity or any applicable Underlying Obligor and (iv) in the case of a Qualifying Guarantee, other than a Qualifying Affiliate Guarantee, is capable, at the applicable Valuation Date, of immediate assertion or demand by or on behalf of the holder or holders against the relevant Reference Entity for an amount at least equal to the outstanding principal balance or Due and Payable Amount apart from the giving of any notice of non-payment or similar procedural requirement, it being understood that acceleration of an Underlying Obligation shall not be considered a procedural requirement.

"**Benchmark Obligation**" means, in respect of each Reference Entity, the obligation (if any) specified as such in the Reference Registry.

With respect to each Reference Entity of a particular Reference Entity Category, the Reference Obligation Category specified in Schedule B with respect to Reference Entities of such Reference Entity Category.

Reference Obligation Category:

With respect to each Reference Entity of a particular Reference Entity Category, the Reference Obligation Characteristic(s) specified in Schedule B with respect to Reference Entities of such

Reference Entity Category.

Reference Obligation Characteristics:

For the avoidance of doubt, "Assignable Loan" and "Consent Required Loan" shall not apply to Reference Obligations which are Bonds.

If "Assignable Loan" and "Consent Required Loan" are specified as Reference Obligation Characteristics, the Reference Obligations may include any Loan that satisfies either one of such Reference Obligation Characteristics (and all the other applicable Reference Obligation Characteristics).

"Transferable" shall only apply to Reference Obligations that are not Loans.

References in Section 2.21 of the Credit Derivatives Definitions to "Deliverable Obligations", "Deliverable Obligation Category" and "Deliverable Obligation Characteristics" shall be deemed to be references to "Reference Obligations", "Reference Obligation Category" and "Reference Obligation Characteristics" respectively.

Obligations:

(a)    any obligation of the relevant Reference Entity (either directly or as provider of any Qualifying Affiliate Guarantee or, if All Guarantees is specified as "Applicable" in Schedule B with respect to Reference Entities of the same Reference Entity Category as such Reference Entity, as provider of any Qualifying Guarantee) which is described by the Obligation Category and which has the Obligation Characteristics specified in Schedule B with respect to Reference Entities of the same Reference Entity Category as such Reference Entity, in each case as of the date of the event which constitutes the Credit Event which is the subject of the Credit Event Notice; and

(b)    the relevant Benchmark Obligation (if any).

All Guarantees:

With respect to each Reference Entity of a particular Reference Entity Category, as specified in Schedule B with respect to Reference Entities of such Reference Entity Category.

Reference Price:

100 per cent.

Subordination Amount:

Initially EUR 97,500,000 and thereafter EUR 97,500,000 plus the Net Subordination Adjustment.

"**Net Subordination Adjustment**" means, on any day, the net amount (which may be positive or negative) resulting from aggregating all Subordination Adjustments (which may be positive or negative) which have been determined prior to such day.

Notional Amount:

EUR 50,000,000

Outstanding Notional Amount:

With respect to any day, the Notional Amount less the Mezzanine Tranche Loss (as defined below) as of that day subject to a

|  | minimum of zero. |
| Mezzanine Loss Amount: | Cumulative Loss Amount minus the Subordination Amount. |
| Mezzanine Tranche Loss: | The greater of: |
|  | (i)   the Mezzanine Loss Amount; and |
|  | (ii)   zero. |
| Cumulative Loss Amount: | With respect to any day, the aggregate of all Individual Loss Amounts calculated with respect to the Transaction from, and including the Trade Date, to and including such day a Cumulative Loss Amount is calculated. |
| Individual Loss Amount: | In relation to each Reference Entity in respect of which an Event Determination Date has occurred, the greater of: |
|  | (i)   zero; and |
|  | (ii)   Reference Entity Notional Amount x (100% - Final Price) |

## 3   Buyer Payments 1

| Fixed Rate Payer Calculation Amount: | Subject as provided below, the Weighted Average Outstanding Notional Amount with respect to a Fixed Rate Payer Calculation Period, calculated by the Calculation Agent. |
|  | **"Weighted Average Outstanding Notional Amount"** means the amount calculated by the Calculation Agent on the Business Day immediately preceding each Fixed Rate Payer Payment Date with respect to the immediately preceding Fixed Rate Payer Calculation Period by adding together the Outstanding Notional Amounts for each calendar day during such period and dividing such amount by the actual number of calendar days in such period. For the avoidance of doubt, in the event that, with respect to a Fixed Rate Payer Calculation Period, the Outstanding Notional Amount is reduced as a result of an increase in the amount of the Mezzanine Tranche Loss, such reduced Outstanding Notional Amount shall be used to calculate the Weighted Average Outstanding Notional Amount (for the purposes of calculating the "Fixed Rate Payer Calculation Amount") as of, and from, each such Event Determination Date which resulted in a reduction of the Outstanding Notional Amount. |
| Fixed Rate Payer Calculation Period: | Section 2.9 of the Credit Derivatives Definitions shall apply, except that the final Fixed Rate Payer Calculation Period will end on, but exclude, the Scheduled Termination Date. |
| Fixed Rate Payer Payment Dates: | 20 March, 20 June, 20 September and 20 December in each year commencing on 20 September 2006 and ending on the Scheduled Termination Date, in each case subject to adjustment in accordance with the Following Business Day Convention. |
| Fixed Rate: | EURIBOR plus, on any day, the Margin (as defined in the |

Conditions)).

**"EURIBOR"** means "EUR-EURIBOR-Telerate" as defined in the 2000 Definitions with a 'Designated Maturity' of three months and the 'Reset Date' being the day which is the first day of the Fixed Rate Payer Calculation Period and where Linear Interpolation is applicable in respect of the first Calculation Period (being the Fixed Rate Payer Calculation Period commencing on the Effective Date).

| | |
|---|---|
| Fixed Rate Day Count Fraction: | Actual/360 |
| Additional Fixed Amount: | On each Fixed Rate Payer Payment Date, Party A shall pay to Party B an amount equal to the aggregate of the Additional Coupons (if any) payable by Party B in respect of the Notes on such date. |
| Fixed Rate Payer Payment Adjustment: | With respect to any Fixed Rate Payer Payment Date, in the event that: |

(a)     one or more Adjustment Reference Entities exist as at the Business Day immediately preceding such Fixed Rate Payer Payment Date; and

(b)     the sum of the Mezzanine Loss Amount and the aggregate of the Reference Entity Notional Amount(s) in respect of all such Adjustment Reference Entities is greater than zero,

the Fixed Amount payable in respect of such Fixed Rate Payer Payment Date shall be paid in accordance with the following:

(i)     Buyer shall pay the Partial Fixed Amount (if any) on the relevant Fixed Rate Payer Payment Date;

(ii)     Buyer shall pay the Deferred Fixed Amount(s) (if any) on the related Deferred Fixed Amount Payment Date(s); and

(iii)     Buyer shall pay an amount equal to the interest that the Calculation Agent determines would have accrued on any such Deferred Fixed Amount in the period from and including the relevant Fixed Rate Payer Payment Date to, but excluding, the related Deferred Fixed Amount Payment Date, had such Deferred Fixed Amount been accruing interest at a rate equal to the Overnight Rate and which shall be paid on such related Deferred Fixed Amount Payment Date.

For the purposes hereof:

**"Adjustment Reference Entity"** means, with respect to any Fixed Rate Payer Payment Date or the Final Cut-off Date, each Reference Entity in respect of which:

(i)     an Event Determination Date has occurred on or prior to such date, but the relevant Reference Entity Valuation Date has not occurred; and/or

(ii)  a Potential Failure to Pay or Potential Repudiation/Moratorium has occurred on or prior to such date and such Potential Failure to Pay or Potential Repudiation/Moratorium has not been cured and, for the avoidance of doubt, a Credit Event has not occurred in respect of such Potential Failure to Pay or Potential Repudiation/Moratorium, in each case on or prior to such date.

"**Deferred Fixed Amount**" means, in respect of any Deferred Fixed Amount Payment Date, an amount per Note in EUR (rounded down to the nearest cent and subject to a minimum of EUR 0) determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, on the relevant Deferred Fixed Amount Cut-off Date as being equal to the excess (if any) of:

(i)  the Deferred Fixed Amount that would otherwise have been payable on the immediately preceding Deferred Fixed Amount Payment Date relating to the relevant Fixed Rate Payer Payment Date (or, in respect of the first or only Deferred Fixed Amount Payment Date relating to a particular Fixed Rate Payer Payment Date, the Fixed Amount that would otherwise have been payable on such Fixed Rate Payer Payment Date) if:

    (A)  in the circumstances set out in paragraph (i) of the definition of "Adjustment Reference Entity", the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the relevant Event Determination Date; or

    (B)  in the circumstances set out in paragraph (ii) of the definition of "Adjustment Reference Entity", (i) where the Potential Failure to Pay or Potential Repudiation/Moratorium develops into an actual Failure to Pay or Repudiation/Moratorium respectively, the Final Price in respect of the relevant Adjustment Reference Entity had actually been determined on the date on which such Potential Failure to Pay or Potential Repudiation/Moratorium was determined by the Calculation Agent to have occurred; or (ii) where the Potential Failure to Pay or Potential Repudiation/Moratorium is subsequently cured, the relevant Potential Failure to Pay or Potential Repudiation/Moratorium had not occurred;

over:

(ii)  the Deferred Fixed Amount (if any) in respect of the immediately preceding Deferred Fixed Amount Payment

Date relating to the relevant Fixed Rate Payer Payment Date (or in respect of the first or only Deferred Fixed Amount Payment Date relating to a particular Fixed Rate Payer Payment Date, the relevant Partial Fixed Amount (if any)).

"**Deferred Fixed Amount Cut-off Date**" means, in respect of each Adjustment Reference Entity, either:

(i)    the relevant Reference Entity Valuation Date; or

(ii)   the date on which the Calculation Agent, acting in good faith and in a commercially reasonable manner, determines that the relevant Potential Failure to Pay or Potential Repudiation/Moratorium has been cured.

"**Deferred Fixed Amount Payment Date**" means, in relation to each Fixed Rate Payer Payment Date where an Adjustment Reference Entity exists on the immediately preceding Business Day, a date in respect of each such Adjustment Reference Entity determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner (which shall be no later than the fifth London and TARGET Business Day following the relevant Deferred Fixed Amount Cut-off Date). For avoidance of doubt, a single date may be a Deferred Fixed Rate Payer Payment Date in relation to more than one Fixed Rate Payer Payment Date;

"**Interim Calculation Amount**" means, in respect of the relevant Fixed Rate Payer Calculation Period, an amount in EUR (rounded down to the nearest cent) determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, on the Business Day immediately preceding the relevant Fixed Rate Payer Payment Date as being equal to the greater of:

(a)    zero; and

(b)    the Weighted Average Outstanding Notional Amount for such Fixed Rate Payer Calculation Period, provided that for the purposes of calculating the Interim Calculation Amount only, Cumulative Loss Amount shall be deemed also to include the aggregate of the Reference Entity Notional Amounts of each relevant Adjustment Reference Entity as of the relevant Event Determination Date or the date upon which a Potential Failure to Pay or Potential Repudiation/Moratorium occurred, as the case may be.

"**Partial Fixed Amount**" means, in respect of each Fixed Rate Payer Payment Date where an Adjustment Reference Entity exists on the immediately preceding Business Day, an amount (rounded down to the nearest cent and subject to a minimum of EUR 0) determined by the Calculation Agent in accordance with the foregoing "Buyer Payments" provisions as being the

Fixed Amount that would be payable if the Weighted Average Outstanding Notional Amount was deemed to be equal to the Interim Calculation Amount.

## 4   Buyer Payments 2

| | |
|---|---|
| Prepayment Fixed Rate Payer Payment Amount: | The amount by which (i) the Prepayment Fixed Rate Payer Calculation Requirement, exceeds (ii) the Prepayment Account Balance. |
| Prepayment Fixed Rate Payer Calculation Requirement: | Zero, unless the Long Term Credit Rating of the Credit Support Provider is below A1 or the Short Term Credit Rating of the Credit Support Provider is below P-1 on such Prepayment Fixed Rate Payer Payment Date, in which case it shall be equal to the sum of (i) the Note Exposure and (ii) the Swap Exposure. |
| Prepayment Fixed Rate Payer Payment Dates: | Friday of each calendar week, commencing on the Effective Date and ending on the Scheduled Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Additional Prepayment Fixed Rate Payer Payment Amount: | In addition to any Prepayment Fixed Rate Payer Payment Amount payable on such Prepayment Fixed Rate Payer Payment Date, if a Rating Event exists on the Additional Prepayment Fixed Rate Payer Date, the Fixed Rate Payer shall pay an additional amount equal to the Swap Exposure within 30 calendar days of such relevant Additional Prepayment Fixed Rate Payer Date. |
| Additional Prepayment Fixed Rate Payer Dates: | Friday of each calendar week, commencing on the Effective Date and ending on the Scheduled Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |

For the purposes hereof:

"**Aggregate Outstanding Nominal Amount**" shall bear the meaning given to such term in the Conditions.

"**Long Term Credit Rating**" means the rating assigned by Moody's in respect of long term unsecured and unsubordinated debt obligations (not supported by third party credit enhancement).

"**Note Exposure**" means an amount equal to (i) the Aggregate Outstanding Nominal Amount, less (ii) an amount equal to 95% of the market value of the Collateral Securities, as determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, subject to a minimum of zero. For the avoidance of doubt, no reduction of the Aggregate Outstanding Nominal Amount of the Notes shall be made to reflect Credit Events in respect of which a Final Price has not been determined or in respect of which Potential Failures to Pay or Potential Repudiation/Moratoria have not been cured

(and have not resulted in the occurrence of a Credit Event) as of such Prepayment Fixed Rate Payer Date.

"**Prepayment Account**" shall bear the meaning given to such term in the Conditions.

"**Prepayment Account Balance**" means, on any day, the balance standing to the credit of the Prepayment Account.

"**Rating Event**" means the Long Term Credit Rating of the Credit Support Provider is below A3 or the Short Term Credit Rating of the Credit Support Provider is below P-2.

"**Short Term Credit Rating**" means the rating assigned by Moody's in respect of short term unsecured and unsubordinated debt obligations (not supported by third party credit enhancement).

"**Swap Exposure**" means an amount equal to (i) the Fixed Amounts payable by the Fixed Rate Payer pursuant to "Buyer Payments 1" for the next two succeeding Fixed Rate Payer Payment Dates, less (ii) the next two succeeding Seller Interim Payments (if any) payable by the Floating Rate Payer. The Swap Exposure shall be determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, using the floating rate prevailing on the relevant Prepayment Fixed Rate Payer Payment Date or Additional Prepayment Fixed Rate Payer Payment Date, as the case may be.

## 5    Buyer Payments 3

| | |
|---|---|
| Buyer Final Payment: | In addition to the Fixed Amounts payable in accordance with the provisions set out above and subject as provided below, Buyer shall pay to Seller the Buyer Final Payment Amount on the Scheduled Termination Date; |
| Buyer Final Payment Amount: | An amount in EUR determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, as being equal to the greater of: |

(a)    (i)    the Aggregate Outstanding Nominal Amount of the Notes as at the Final Cut-off Date; less

(ii)    the Prepayment Account Balance.

(b)    EUR 0.

Buyer Final Payment Adjustment:    If:

(a)    an Adjustment Reference Entity or a Notice Delivery Period Extension Event exists at the Final Cut-off Date; and

(b)    the sum of the Mezzanine Loss Amount and the aggregate of the Reference Entity Notional Amounts of each Adjustment Reference Entity and each Reference

Entity in respect of which a Notice Delivery Period Extension Event exists is greater than zero,

the Buyer Final Payment Amount shall be:

(i)     the Partial Final Payment on the Fixed Rate Payer Payment Date falling on the Scheduled Termination Date;

(ii)    each Deferred Final Amount on the relevant Deferred Payment Date; and

(iii)   an amount equal to the interest that the Calculation Agent determines would have accrued on any such Deferred Final Amount in the period from (and including) the Scheduled Termination Date to (but excluding) the relevant Deferred Payment Date, had such Deferred Final Amount been accruing interest at a rate equal to the Overnight Rate.

For the purposes hereof:

**"Deferred Final Amount"** means, in respect of any Deferred Payment Date, an amount in EUR (rounded down to the nearest cent and subject to a minimum of EUR 0) determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, on the Deferred Payment Cut-off Date as being equal to the excess (if any) of:

(i)     the Buyer Final Payment that would otherwise have been payable on the preceding Deferred Payment Date (or, in respect of the first or only Deferred Payment Date, the Scheduled Termination Date) if:

(A)    in the circumstances set out in sub-paragraph (i) of the definition of "Adjustment Reference Entity", the Individual Loss Amount in respect of the relevant Reference Obligation had actually been determined on the relevant Event Determination Date; or

(B)    in the circumstances set out in sub-paragraph (ii) of the definition of "Adjustment Reference Entity", (i) where the Potential Failure to Pay or Potential Repudiation/Moratorium develops into an actual Failure to Pay or Repudiation/Moratorium, as the case may be, the Individual Loss Amount in respect of the relevant Reference Obligation had actually been determined on the date on which such Potential Failure to Pay or Potential Repudiation/Moratorium was determined by the Calculation Agent to have occurred; or (ii) where the Potential Failure to Pay or Potential Repudiation/Moratorium is subsequently cured, the relevant Potential Failure to Pay or Potential Repudiation/Moratorium had not occurred; or

(C) in the circumstances that a Notice Delivery Period Extension Event existed as at the Final Cut-off Date and an Event Determination Date occurs on or prior to the Notice Delivery Period Extension Date, the Individual Loss Amount in respect of the relevant Reference Obligation had actually been determined on the Scheduled Termination Date; or

(D) in the circumstances that a Notice Delivery Period Extension Event existed as at the Final Cut-off Date and an Event Determination Date does not occur on or prior to the Notice Delivery Period Extension Date, the relevant Notice Delivery Period Extension Event had not occurred,

over the Deferred Final Amount in respect of the preceding Deferred Final Date (or, in respect of the first or only Deferred Final Date, the Partial Final Payment);

"**Deferred Payment Cut-off Date**" means, in respect of each relevant Adjustment Reference Entity or Notice Delivery Period Extension Event existing at the Final Cut-off Date, as determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, the earlier of:

(A) the date on which the relevant Final Price is determined;

(B) the date that the relevant Potential Failure to Pay or Potential Repudiation/Moratorium has been cured;

(C) (where an Event Determination Date occurs prior to the Notice Delivery Period Extension Date) the date on which the relevant Individual Loss Amount is determined; or

(D) (where an Event Determination Date has not occurred prior to the Notice Delivery Period Extension Date) the Notice Delivery Period Extension Date,

whichever is applicable.

"**Deferred Payment Date**" means, in respect of each relevant Adjustment Reference Entity or Notice Delivery Period Extension Event existing at the Final Cut-off Date, a date determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, (which shall be no later than the fifth Business Day following the relevant Deferred Payment Cut-off Date).

"**Partial Final Payment**" means an amount determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, on the Final Cut-off Date as being equal to the Aggregate Outstanding Nominal Amount of the Notes on the Final Cut-off Date less the aggregate of the Reference Entity Notional Amounts of each Adjustment Reference Entity

and each Reference Entity in respect of which a Notice Delivery Period Extension Event exists as at the Final Cut-off Date.

## 6   Seller Payments 1

Seller Interim Payments:

In addition to the Seller Final Payments payable in accordance with the provisions set out below, during the period from, and including, the Effective Date to, and including, the Scheduled Termination Date, on each day that is a coupon payment date under the Collateral Securities, Seller will pay to Buyer an amount equal to the aggregate coupon amount due and payable by the Collateral Issuer on such date in respect of the Collateral Securities.

"**Collateral Securities**" shall bear the meaning given to such term in the Conditions. "**Collateral Issuer**" means the issuer of any Collateral Securities.

## 7   Seller Payments 2

Seller Final Payment:

In addition to the Seller Interim Payments payable in accordance with the provisions set out above, Seller shall pay to Buyer the Seller Final Payment Amount on the Scheduled Termination Date.

Seller Final Payment Amount:

An amount equal to the aggregate redemption amount due and payable on the Scheduled Termination Date by the Collateral Issuer in respect of the Collateral Securities.

## 8   Provisions relating to Credit Events

Floating Rate Payer Calculation Amount:

The Reference Entity Notional Amount specified in the Reference Registry with respect to the relevant Reference Entity.

Conditions to Settlement:

Credit Event Notice

Notifying Party:                    Buyer

Notice of Publicly Available        Applicable.
Information:

If a Credit Event Notice contains the information required in the Notice of Publicly Available Information such Credit Event Notice shall be deemed to be both a Credit Event Notice and a Notice of Publicly Available Information as set out in Schedule E - Exhibit 1.

If events have occurred which entitle Buyer to serve a Credit Event Notice in respect of a Reference Entity and Buyer has entered into other credit default swap transactions in relation to that Reference Entity and has served a credit event notice (or

equivalent) in respect of such Reference Entity, then Buyer shall also serve a Credit Event Notice in respect of such Reference Entity under this Transaction.

Public Sources:                          Applicable

Specified Number:                        Two

In respect of any Reference Entity, for which the Reference Entity Category is Japan Corporate: Section 3.9 of the Definitions shall be excluded. Section 3.3 of the Definitions shall be amended by replacing "Greenwich Mean Time" with "Tokyo time".

Credit Observation Period:    The period from and including the Trade Date to and including the later of:

(a)    the Scheduled Termination Date; and

(b)    the Grace Period Extension Date, if:

(i)    the Credit Event that is the subject of the Credit Event Notice is a Failure to Pay that occurs after the Scheduled Termination Date; and

(ii)    the related Potential Failure to Pay occurs on or prior to the Scheduled Termination Date; and

(c)    the Repudiation/Moratorium Evaluation Date, if:

(i)    the Credit Event that is the subject of the Credit Event Notice is a Repudiation/Moratorium that occurs after the Scheduled Termination Date; and

(ii)    the related Potential Repudiation/Moratorium occurs on or prior to the Scheduled Termination Date.

Credit Events:    With respect to each Reference Entity of a particular Reference Entity Category for the time being comprised in the Reference Registry, the credit events specified in Schedule B with respect to Reference Entities of such Reference Entity Category.

If an occurrence would otherwise constitute a Credit Event, such occurrence will constitute a Credit Event whether or not such occurrence arises directly or indirectly from or is subject to a defence based upon: (a) any lack or alleged lack of authority or capacity of a Reference Entity to enter into any Obligation or, as applicable, an Underlying Obligor to enter into an Underlying Obligation, (b) any actual or alleged unenforceability, illegality, impossibility or invalidity with respect to any Obligation or, as applicable, any Underlying Obligation, however described, (c) any applicable law, order, regulation, decree or notice, however described, or the promulgation of, or any change in, the interpretation by any court, tribunal, regulatory authority or similar administrative or judicial body with competent or apparent jurisdiction of any applicable law, order, regulation, decree or notice, however,

described, or (d) the imposition of, or any change in, any exchange controls, capital restrictions or any other similar restrictions imposed by any monetary or other authority, however described.

9   **Calculation of Settlement Amounts**

| | |
|---|---|
| Settlement Method: | Cash Settlement in accordance with the Credit Derivative Definitions, as modified by the following terms: |

Notwithstanding anything to the contrary contained in the Credit Derivative Definitions (including without limitation Section 7.1 (*Cash Settlement*)) following the occurrence of an Event Determination Date in respect of a Reference Entity, the Calculation Agent shall determine the applicable Cumulative Loss Amount.

Notwithstanding anything to the contrary contained in Section 7.1 of the Credit Derivatives Definitions, Seller shall not pay Buyer the Individual Loss Amount or Cash Settlement Amount, if any, with respect to such Reference Entity, but the Cumulative Loss Amount will be used to determine, *inter alia*, the reduction in the Buyer Final Payment Amount.

Cash Settlement Date:
In respect of each Reference Entity in respect of which an Event Determination Date has occurred, the date determined by the Calculation Agent falling no later than 5 Business Days following the calculation of the Final Price in respect of such Reference Entity. Section 7.3 (*Cash Settlement Date*) of the Credit Derivatives Definitions shall be deemed deleted.

Final Reference Obligation Price:
The price of the Reference Obligation expressed as a percentage, determined in accordance with the relevant Valuation Method (subject to a minimum of zero and a maximum of 100 per cent.) provided that, in respect of a Reference Obligation, if the Final Price is 100 per cent., the relevant Reference Entity shall be deemed to be added to the Reference Registry again with effect from such Valuation Date and the Credit Observation Period in respect of such Reference Entity shall be deemed to commence on, and include, such Valuation Date (and for the avoidance of doubt, another Event Determination Date may occur in respect of such Reference Entity during such Credit Observation Period).

Final Price:
The Final Reference Obligation Price or, if there is more than one Reference Obligation, the Final Price shall be the weighted average of the Final Reference Obligation Prices (as weighted by dividing the Quotation Amount in respect of each such Reference Obligation by the aggregate of such Quotation Amounts) expressed as a percentage, provided that, in respect of a Reference Entity, if the Final Price is 100 per cent., the relevant Reference Entity shall be deemed to be added to the

Reference Registry again with effect from the relevant Valuation Date and the Credit Observation Period in respect of such Reference Entity shall be deemed to commence on, and include, such Valuation Date (and for the avoidance of doubt, another Event Determination Date may occur in respect of such Reference Entity during such Credit Observation Period).

| | |
|---|---|
| Valuation Date: | Single Valuation Date: |
| | Any Valuation Business Day selected by the Calculation Agent, acting in good faith and in a commercially reasonable manner, during the period from, and including, the thirtieth (30th) Valuation Business Day following the Event Determination Date to, and including, the seventy-second (72nd) Valuation Business Day following the Event Determination Date. |
| Hedge Settlement: | The occurrence of the valuation date or physical settlement date, howsoever expressed, in respect of any credit derivatives transaction or other hedging transaction entered into by or on behalf of Buyer in relation to the hedging of its obligations under the Transaction (the "**Hedge Transaction**"). |
| Valuation Business Day: | With respect to each Reference Entity of a particular Reference Entity Category, a business day determined by reference to the jurisdiction where default swap trading for such Reference Entity is effected (as determined by the Calculation Agent). |
| Valuation Time: | 11:00 a.m. on the applicable Valuation Business Day |
| Bid Quotation: | With respect to each Reference Obligation selected by the Calculation Agent in respect of a Reference Entity and a Valuation Date, each firm bid quotation obtained from a Dealer at the Valuation Time for an amount (the "**Quotation Amount**") selected by the Calculation Agent which is not greater than the Reference Entity Notional Amount. |
| Minimum Quotation Amount: | USD 1,000,000. |
| Weighted Average Quotation: | With respect to each Reference Obligation selected by the Calculation Agent in respect of a Reference Entity and a Valuation Date, the weighted average of firm quotations obtained from Dealers at the Valuation Time each for an amount with an outstanding principal balance of as large a size as available but less than the Quotation Amount (but of a size not less than the Minimum Quotation Amount or, if quotations of a size equal to the Minimum Quotation Amount are not available, quotations as near in size as practicable to the Minimum Quotation Amount) that in aggregate are approximately equal to the Quotation Amount. For the avoidance of doubt, any such weighted average may be lower or equal to any firm quotation obtained from any Dealer. |
| Settlement Currency: | EUR |
| Reference Entity Valuation Date: | In respect of a Reference Entity, the date on which the Final |

Price is determined in respect of such Reference Entity.

| | |
|---|---|
| Valuation Method: | If Hedge Settlement has occurred on or before the relevant Valuation Date, the First Valuation Method shall apply and if Hedge Settlement has not occurred on or before the relevant Valuation Date, the Second Valuation Method shall apply. |
| First Valuation Method: | The highest Bid Quotation with respect to a Valuation Date obtained on the same Valuation Business Day by the Calculation Agent in accordance with the following: |

(i) the Calculation Agent shall attempt to obtain Bid Quotations from at least five Dealers (or at least six Dealers where one of such Dealers is the Calculation Agent or any Affiliate of the Calculation Agent) on the Valuation Date; and

(ii) if at least three Bid Quotations are not available on the Valuation Date, the Calculation Agent shall continue to attempt to obtain three Bid Quotations on the days which are 1, 2, 10, 11, 12 and 15 Valuation Business Days following the Valuation Date.

In the event that three Bid Quotations have not been obtained on or before the 15th Valuation Business Day following the Valuation Date, the Calculation Agent shall seek to obtain a Weighted Average Quotation at the Valuation Time on the 16th Valuation Business Day following the Valuation Date. If a Weighted Average Quotation is obtained, that Weighted Average Quotation shall be the Final Reference Obligation Price.

In the event that (a) at least three Bid Quotations have not been obtained on or before the 15th Valuation Business Day following the Valuation Date and (b) the Weighted Average Quotation has not been obtained on the 16th Valuation Business Day following the Valuation Date then the Calculation Agent will request a disinterested third party (the "**Independent Calculation Agent**") that is a dealer in obligations of the type of the Reference Obligation to attempt to obtain two Bid Quotations from at least five Dealers.

If the Independent Calculation Agent is able to obtain two Bid Quotations on the 17th Valuation Business Day following the Valuation Date then the Calculation Agent shall use the highest of the two Bid Quotations, provided that the Calculation Agent can also obtain the same highest Bid Quotation from the Dealers from whom the Independent Calculation Agent has obtained such Bid Quotation, to determine the Final Reference Obligation Price.

If the Independent Calculation Agent has been unable to obtain two Bid Quotations on the 17th Valuation Business Day following the Valuation Date but, on the same day, has obtained

one Bid Quotation then the Calculation Agent shall use such Bid Quotation, provided that the Calculation Agent can also obtain the same Bid Quotation from the Dealer from whom the Independent Calculation Agent has obtained such Bid Quotation, to determine the Final Reference Obligation Price.

In the event that Bid Quotations have not been obtained in the manner prescribed above, the Independent Calculation Agent shall seek to obtain a Weighted Average Quotation at the Valuation Time on the 18th Valuation Business Day following the Valuation Date. If a Weighted Average Quotation is obtained, that Weighted Average Quotation shall be the Final Reference Obligation Price.

If the Independent Calculation Agent is unable to obtain a Weighted Average Quotation for the entire Quotation Amount on such 18th Business Day following the Valuation Date, or the Calculation Agent is unable to obtain the same Full Quotation, but the Independent Calculation Agent is able to obtain one or more quotations in an aggregate amount less than the Quotation Amount then, provided that the Calculation Agent can also obtain such quotations from the Dealer or Dealers, as the case may be, from whom the Independent Calculation Agent obtained such quotation or quotations, the Final Reference Obligation Price shall be a Weighted Average Quotation using such quotations and an amount equal to zero for those quotations which could not be obtained (the "**Partial Weighted Average Quotation**").

If the Independent Calculation Agent is unable to obtain any Partial Weighted Average Quotation, the Final Reference Obligation Price shall be deemed to be zero.

For the purposes of the foregoing, in the event that the Calculation Agent is required to request an Independent Calculation Agent to attempt to obtain Bid Quotations pursuant to the provisions of this section, any costs associated with such request shall be borne by the Calculation Agent.

Second Valuation Method:    The Calculation Agent shall, on the relevant Valuation Date, select at least five Dealers (or at least six Dealers where one of such Dealers is the Calculation Agent or any Affiliate of the Calculation Agent) and request from each such Dealer a firm offer price, expressed as a single upfront payment, for entering into a Replacement Transaction as a seller of credit default protection on that date.

If at least three firm offer prices are received by the Calculation Agent from any Dealer, the Final Reference Obligation Price with respect to the Reference Obligation shall be an amount equal to (a) 100%, less (b) the lowest firm offer price expressed as a percentage of the Quotation Amount.

If at least three firm offer prices are not available on the Valuation Date, the Calculation Agent shall continue to attempt to obtain at least three firm offer prices on the days which are 1, 2, 10, 11, 12 and 15 Valuation Business Days following the Valuation Date.

In the event that at least three firm offer prices have not been obtained on or before the 15th Valuation Business Day following the Valuation Date, the Calculation Agent shall seek to obtain a Second Valuation Method Weighted Average Quotation at the Valuation Time on the 16th Valuation Business Day following the Valuation Date. If a Second Valuation Method Weighted Average Quotation is obtained, that Second Valuation Method Weighted Average Quotation shall be the Final Reference Obligation Price.

In the event that (a) at least three firm offer prices have not been obtained on or before the 15th Valuation Business Day following the Valuation Date and (b) the Second Valuation Method Weighted Average Quotation has not been obtained on the 16th Valuation Business Day following the Valuation Date then the Calculation Agent will request a disinterested third party (the "**Independent Calculation Agent**") that is a dealer in transactions of the type of the Replacement Transaction to attempt to obtain two firm offer prices from at least five Dealers.

If the Independent Calculation Agent is able to obtain two firm offer prices on the 17th Valuation Business Day following the Valuation Date then the Calculation Agent shall use the lower of the two firm offer prices, provided that the Calculation Agent can also obtain the same lower firm offer price from the Dealer from whom the Independent Calculation Agent has obtained such firm offer price, to determine the Final Reference Obligation Price.

If the Independent Calculation Agent has been unable to obtain two firm offer prices on the 17th Valuation Business Day following the Valuation Date but, on the same day, has obtained one firm offer price then the Calculation Agent shall use such firm offer price, provided that the Calculation Agent can also obtain the same firm offer price from the Dealer from whom the Independent Calculation Agent has obtained such firm offer price, to determine the Final Reference Obligation Price.

In the event that firm offer prices have not been obtained in the manner prescribed above, the Independent Calculation Agent shall seek to obtain a Second Valuation Method Weighted Average Quotation at the Valuation Time on the 18th Valuation Business Day following the Valuation Date. If a Second Valuation Method Weighted Average Quotation is obtained, that

Second Valuation Method Weighted Average Quotation shall be the Final Reference Obligation Price.

If the Independent Calculation Agent is unable to obtain a Second Valuation Method Weighted Average Quotation in respect of Replacement Transactions whose Floating Rate Payer Calculation Amounts are in aggregate equal to the entire Quotation Amount on such 18th Business Day following the Valuation Date, or the Calculation Agent is unable to obtain such a quotation, but the Independent Calculation Agent is able to obtain one or more firm offer prices in respect of Replacement Transactions whose Floating Rate Payer Calculation Amounts are in aggregate less than the Quotation Amount then, provided that the Calculation Agent can also obtain such firm offer prices from the Dealer or Dealers, as the case may be, from whom the Independent Calculation Agent obtained such firm offer prices, the Final Reference Obligation Price shall be a Second Valuation Method Weighted Average Quotation using such firm offer prices and an amount equal to zero for those firm offer prices which could not be obtained (the "**Second Valuation Method Partial Weighted Average Quotation**").

If the Calculation Agent is unable to obtain any Second Valuation Method Partial Weighted Average Quotation, the Final Reference Obligation Price shall be deemed to be zero.

For the purposes of the foregoing, in the event that the Calculation Agent is required to request an Independent Calculation Agent to attempt to obtain firm offer prices pursuant to the provisions of this section, any costs associated with such request shall be borne by the Calculation Agent

For the purposes of this Second Valuation Method:

"**Replacement Transaction**" means a physically-settled single-name credit default swap transaction (on terms identical to the market convention applicable for such single-name credit default swap transaction on the Trade Date) relating to the relevant Reference Entity where:

(a)    the Floating Rate Payer Calculation Amount is equal to the Quotation Amount with respect to the relevant Reference Entity (or, where a Second Valuation Method Weighted Average Quotation is being obtained, such lesser amount greater than or approximately equal to the Minimum Quotation Amount, as may be obtained by the Calculation Agent);

(b)    the Scheduled Termination Date is the same date as the Scheduled Termination Date in respect of this Transaction;

(c)   the Fixed Rate is 0.00 per cent.;

(d)   the Conditions to Settlement have been satisfied with respect to the relevant Reference Entity; and

(e)   a Notice of Physical Settlement has been delivered specifying the same Deliverable Obligations that the Third Party has been unable to purchase or buy-in ; and

"**Second Valuation Method Weighted Average Quotation**" means, with respect to a Replacement Transaction and a Valuation Date, the weighted average of firm offer prices, expressed as a single upfront payment, and received by the Calculation Agent from Dealers at the Valuation Time, each for entering into a Replacement Transaction as a seller of credit default protection on that date where any such Replacement Transaction shall have a Floating Rate Payer Calculation Amount of as large a size as available but less than the Quotation Amount (but of a size not less than the Minimum Quotation Amount or, if firm offer prices in respect of a Floating Rate Payer Calculation Amount equal in size to the Minimum Quotation Amount are not available, firm offer prices in respect of a Floating Rate Payer Calculation Amount as near in size as practicable to the Minimum Quotation Amount) that in aggregate are in respect of a Floating Rate Payer Calculation Amount approximately equal to the Quotation Amount. For the avoidance of doubt, any such weighted average may be lower or equal to any firm offer price obtained from any Dealer.

For the avoidance of doubt, if Hedge Settlement has not occurred on or before the first Valuation Date and, as a result, the Second Valuation Method is being applied but, on or before the date that the Final Reference Obligation Price is determined in accordance with the Second Valuation Method, Hedge Settlement occurs, then the First Valuation Method shall be applied with effect from such date as if the First Valuation Method had been applied from the first Valuation Date (save that if this would otherwise require the Calculation Agent to request the Independent Calculation Agent to obtain Bid Quotations without the Calculation Agent first having attempted to do so itself in the manner envisaged by the First Valuation Method, then the Calculation Agent shall be permitted to obtain Bid Quotations as envisaged by the First Valuation Method before requesting the Independent Calculation Agent to do so).

The Calculation Agent shall deliver a notice to Seller, the Trustee (for delivery to the Noteholders in accordance with the Conditions) and Buyer showing the Final Reference Obligation Price for each Reference Obligation on the day which is no later than 5 Business Days following each Reference Entity Valuation Date.

| Dealers: | Dealers in obligations of the type of Reference Obligations for which Bid Quotations are to be obtained, and any affiliate thereof or successor thereto. For the avoidance of doubt, the Calculation Agent or any Affiliate of the Calculation Agent may be a Dealer, provided that only one of the Calculation Agent or its Affiliates may be included in the panel of Dealers for the purposes of calculating Final Price. |
| Notices: | Notwithstanding any provisions in the Credit Derivatives Definitions relating to notification of certain matters by the Calculation Agent to the parties, the Calculation Agent shall notify the parties of the following with respect to each Reference Entity in respect of which an Event Determination Date has occurred, on the dates stated: |

(i)    selected Reference Obligations: on or before the applicable Valuation Date;

(ii)   Individual Loss Amount and Cumulative Loss Amount: on, or as soon as is reasonably practicable following, the applicable Reference Entity Valuation Date.

All notices given by Buyer, Seller or the Calculation Agent pursuant to this Transaction shall be given in writing and shall be copied to Moody's.

## 10    Relationship Between Parties

Each of Buyer and Seller represents to the other that:

**(a)    Non-Reliance**

It is acting for its own account and it is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction. It has not received from the other party any assurance or guarantee as to the expected results of this Transaction;

**(b)    Acceptance**

It accepts the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the financial and other risks of this Transaction;

**(c)    Status of Parties**

The other party is not acting as a fiduciary or an advisor for it in respect of this Transaction; and

**(d)    Risk Management**

It has entered into this Transaction for the purpose of (i) managing its borrowings or investments, (ii) hedging its underlying assets or liabilities or (iii) in connection with its line of business.

## 11    Additional Termination Provisions

(i)    The following shall constitute Additional Termination Events for the purposes of this Transaction:

(a)     The Notes being declared due and payable following the occurrence of an Event of Default (as defined in the Conditions) pursuant to Condition 10 *(Events of Default)*.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the sole Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(b)     Any of the Collateral Securities becoming repayable prior to its stated date of maturity or a payment default in respect of any of the Collateral Securities prior to the Scheduled Termination Date.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the sole Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(c)     The Notes being declared redeemable pursuant to Condition 6(d)(i) *(Redemption for Taxation and Other Reasons)* of the Notes and the Noteholders not having received, either directly or indirectly, from Buyer the amounts referred to under "Optional Payments" below.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(d)     If, on the occasion of the next payment due by the Collateral Issuer in respect of any Collateral Securities, the amount that would otherwise be due and payable by the Collateral Issuer in respect of the Collateral Securities would be reduced as a result of the Collateral Issuer being required by law to withhold or account for tax.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the sole Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, upon the occurrence of such Additional Termination Event, Party A may by notice to Party B designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(e)     If:

(i)     any deductions on account of any withholding tax in respect of payments by the Swap Guarantor under the Swap Guarantee are required, by any law or regulation in existence and in force on the Effective Date and applying on such date to the Swap Guarantee, to be made in respect of any such payments; and

(ii)    in the event of a payment being made under the Swap Guarantee, and following the Swap Guarantor being notified by or on behalf of the Issuer that such deduction on account of a withholding tax is required to be made and receipt by the Swap Guarantor of reasonable evidence that such deduction is required by a law or regulation in existence and in force on the Effective Date and applying on such date to the Swap Guarantee, the Swap Guarantor does not pay such additional amount as may be necessary in order that the net amount received by Party B after the relevant deduction

on account of withholding tax is equal to the amount which would have been receivable by Party B in the absence of the relevant deduction;

such failure by the Swap Guarantor to pay such additional amount shall be an Additional Termination Event.

For the purposes of such Additional Termination Event, the Affected Party shall be Buyer and this Transaction shall be the Affected Transaction.

(ii)     **Optional Payments**

If, for any reason beyond the control of Buyer or Seller the Noteholders do not receive payment under their Notes for any reason including the imposition of any withholding tax or a default or other circumstance linked to the Paying Agents, Buyer may elect to make any necessary payments to, or to the order of, the Noteholders to prevent either a redemption of the Notes for taxation reasons pursuant to Condition 6(d) of the Notes or an event of default pursuant to Condition 10 of the Notes from occurring.

## 12    Other Terms

(i)     **Non-insurance business**

Party A and Party B acknowledge and agree that this Transaction is not intended to constitute insurance business and is not a contract of insurance, assurance, suretyship or guarantee and payments may be made under this Transaction by each party independently and without proof of the economic loss (if any) of the other party.

(ii)     **Third party rights**

No person shall have any right to enforce any provision of this Transaction under the Contracts (Rights of Third Parties) Act 1999.

(iii)     **Credit Support Document. Details of any Credit Support Document**

With respect to Party A, Guarantee dated as of the date hereof by Lehman Brothers Holdings Inc. in favour of Party B as beneficiary thereof in the form attached hereto as Schedule D.

(iv)     **Credit Support Provider**

Credit Support Provider means in relation to Party A: Lehman Brothers Holdings Inc.

(v)     **Credit Support Default**

For the purpose of this Confirmation only, Section 5(a)(iii) shall apply in respect of the Credit Support Document and Credit Support Provider referred to in paragraphs 12(iii) and 12(iv) of this Confirmation.

(vi)     **Breach of Agreement**

For the purpose of this Confirmation only, Section 5(a)(ii) of the Agreement will not apply to Party B but will apply to Party A.

(vii)     **Misrepresentation**

For the purpose of this Confirmation only, Section 5(a)(iv) of the Agreement will not apply to Party B but will apply to Party A.

(viii)  **Bankruptcy**

The "Bankruptcy" provision (Section 5(a)(vii) of the Agreement) shall apply to Party A and to Party B, but with respect to Party B shall, in addition to the amendments set out in paragraph 1(e) of the Schedule to the Agreement, be amended further as follows:

(a)     Section 5(a)(vii)(2) shall take effect with the words "is declared insolvent by a court of competent jurisdiction" substituted for "becomes insolvent";

(b)     Section 5(a)(vii)(6) shall take effect with:

(i)    the deletion of the words "seeks or";

(ii)   the insertion of the words "(other than the Custodian or the Trustee each acting in its ordinary course of business prior to any insolvency or bankruptcy of Party B)" immediately after the words "or other similar official for it";

(c)     Section 5(a)(vii)(9) shall take effect with:

(i)    the insertion of the word "formal" immediately after the words "takes any"; and

(ii)   the deletion of the words "in furtherance of, or"; and

(d)     Section 5(a)(vii)(8) and (9) shall take effect with reference to the other clauses of Section 5(a)(vii) as so amended.

(ix)   **Transfer to avoid Tax Event**

For the purposes of this Confirmation only, paragraphs (iii) and (iv) of Part 5 of the Schedule to the Agreement shall be replaced by the following:

" (iii) Section 6(b)(ii), third paragraph will be replaced by the following:

"Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of (i) the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed and (ii) the Trustee; and the confirmation of the relevant rating agency that the rating of the Notes will not be adversely affected."

(iv) In addition, the following provision shall be inserted as Section 6(b)(v):

"(v) Transfer to Avoid Tax Event. If a Tax Event or a Tax Event Upon Merger occurs with respect to Party A or Party B, Party A shall have the right:

(i)    to require Party B to transfer all of its interests and obligations under this Agreement and the Transaction, together with its interests and obligations under the Securities, the Notes, the Programme Agreement, the Trust Deed and the Agency Agreement to another entity, whether or not in the same tax jurisdiction as Party B, which would not have any obligation to withhold or deduct (if Party B is or would be required to make such deduction or withholding) or to which Party A would (but for Part 5(i) of the Schedule) be entitled to make payments free from the relevant deduction or withholding (if Party A is or would otherwise be required to make such withholding or deduction), subject to obtaining the prior written consent of the Trustee; or

(ii)   to require Party B to transfer its residence for tax purposes to another jurisdiction, subject to obtaining the prior written consent of the Trustee; or

(iii) to transfer all of Party A's interests and obligations under this Agreement and the relevant Transaction, together with its interests and obligations (if any) under the Securities, the Notes, the Programme Agreement, the Trust Deed and the Agency Agreement to another entity, whether or not in the same tax jurisdiction as Party A, which would not have any obligation to withhold or deduct (if Party A is or would be required to make such deduction or withholding) or to which Party B would (but for Part 5(i) of the Schedule) be entitled to make payments free from the relevant deduction or withholding (if Party B is or would otherwise be required to make such withholding or deduction), subject to obtaining the prior written consent of the Trustee; or

(iv) to transfer its residence for tax purposes to another jurisdiction, subject to obtaining the prior written consent of the Trustee;

provided that, in the case of a Tax Event Upon Merger, if the relevant withholding or deduction applies to payments required to be made by Party A to Party B under this Transaction (and Party B is the Burdened Party and not the Affected Party), Party A shall, until such time as a transfer as envisaged by paragraphs (i) to (iv) above is effected, be required in respect of any such payment to pay to Party B such additional amount as may be necessary in order that the net amount received by Party B, after the relevant deduction or withholding, is equal to the amount that would have been receivable by Party B in the absence of the relevant deduction or withholding.

If Party B or Party A (as the case may be) is unable to transfer its interests to another party or to transfer its tax residence in accordance with the preceding provisions prior to the 30th day following the date of imposition of such withholding taxes or, if earlier, the 10th day prior to the first day on which either party would otherwise be required to make a payment net of withholding taxes, Party A (whether it is Party A or Party B which is the Affected Party in respect of the Tax Event or Tax Event Upon Merger) or (in the case of  Tax Event Upon Merger only), Party B (where Party B is the Burdened Party with respect to the Tax Event Upon Merger) may, notwithstanding Section 6(b)(iv), designate a day not earlier than such day as an Early Termination Date in respect of the Transaction. For the avoidance of doubt, if, in the case of Tax Event Upon Merger only, Party A fails to pay to Party B any additional amount as required by the immediately preceding paragraph such failure shall constitute a "Failure to Pay" by Party A for the purposes of the Agreement. ".

(x)    **Payments on Early Termination**

For the purposes of determining a "Market Quotation" in respect of the Swap Agreement, the definition of "Market Quotation" shall be modified as follows (but, unless modified by paragraphs (a) to (b) below, shall otherwise apply):

(a)    For the purposes of determining the termination payment under the Swap Agreement, the Calculation Agent shall seek quotations from at least 4 Reference Market-makers (one of which may be the Calculation Agent or its affiliate).

(b)    For the avoidance of doubt, the termination payment under the Swap Agreement shall be calculated on the basis that Party B has an obligation to pay all sums due to the Swap Counterparty hereunder, without regard to the limited recourse provisions contained herein.

(xi)    **Tax Event upon Merger**

If this Transaction is terminated following the occurrence of a Tax Event Upon Merger in respect of either Party A or its Credit Support Provider and Party B is the Burdened Party and not the Affected Party and on the relevant Early Termination Date the Long Term Credit Rating of Party A's Credit

Support Provider by Moody's is at or above A1 and the Short Term Credit Rating of Party A's Credit Support Provider is at or above P-1, then an amount equal to the Note Exposure on such Early Termination Date shall be deemed to be an Unpaid Amount owing to Party B in respect of such termination.

(xii)  For the purposes of this Confirmation only, paragraph (j) of Part 1 of the Schedule to the Agreement shall be replaced by the following:

"**Termination Currency.** "Termination Currency" means the currency selected by the Non-defaulting Party or the party which is not the Affected Party, as the case may be, or where there is more than one Affected Party, EUR. If the currency selected is not freely available the Termination Currency shall be U.S. dollars."

(xiii)  For the purposes of this Confirmation only, paragraph (a)(iii) of Part 2 of the Schedule to the Agreement shall be replaced by the following:

"(iii) the satisfaction of the agreement of the other party contained in Section 4(d);

provided that it shall not be a breach of this representation where reliance is placed on Clause (ii) above, and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.".

(xiv)  For the purposes of this Confirmation only, the words "where they first appear in the second line of Section 3(a)(ii)" after the words "second and fourth line of Section 3(a)(ii)" shall be deleted from paragraph (b) of Part 5 of the Schedule to the Agreement.

(xv)  If, following the redemption of the Notes in accordance with the Conditions, Party B has paid all amounts due to Noteholders under the Conditions and to the Trustee, Paying Agents, Custodian, Calculation Agent, and Disposal Agent under the Trust Deed, Agency Agreement and Programme Agreement and to Party A in respect of this Transaction (excluding any obligation under this paragraph 12(xv) but including, without limitation, any amount payable to Party A purusant to Section 6 of the Agreement following the designation of an Early Termination Date hereunder), Party B shall promptly pay to Party A an amount equal to the lesser of (a) the aggregate of (i) the Unpaid Amount which was deemed owed to Party B under paragraph 12(xi) above and (ii) the Prepayment Account Balance and (b) the remaining balance (if any) of the Mortgaged Property (or the proceeds of realisation or enforcement thereof and including, without limitation, any amounts paid to Party B pursuant to paragraph 4 above). The obligation of Party B pursuant to this paragraph 12 (xv) shall continue notwithstanding the designation of an Early Termination Date in accordance with Section 6 of this Agreement and shall not be taken into account for the purposes of determining any payment required to be made by either Party A or Party B pursuant to Section 6.

## 13   Account Details

Account details of Buyer:      Bank of America, Frankfurt

BOFADEFX

14735038

Account of Lehman Brothers Inc

FFC LBSF

EXHIBIT C

Account details of Seller:        JPMorgan AG, Frankfurt

Swift: CHASDEFX

Account: JPMorgan Chase Bank London, N.A.

Account Number: 6231400604

Ref: Ruby Finance Public Limited Company Series 2006-3

This Confirmation shall be governed by and construed in accordance with English law.

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us by facsimile.

Yours faithfully,

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By:

Name:

Title:


**LEHMAN BROTHERS INTERNATIONAL (EUROPE)** hereby agrees to perform its obligations as Calculation Agent set out herein.

By:

Name:

Title:


Confirmed as of the date first above written:

**RUBY FINANCE PUBLIC LIMITED COMPANY**

By:

Name:

Title:

EXHIBIT C

## Schedule A
## Reference Registry

*The following is a summary of the Reference Entities constituting the Reference Registry and does not provide information with respect to all material characteristics of the Reference Entities. Potential investors in the Notes should make their own complete independent investigation, as they, in their sole judgment, deem appropriate when evaluating the Reference Entities.*

| No. | Reference Entity | Benchmark Obligation Isin/Cusip | Benchmark Obligation Maturity | Benchmark Obligation Coupon | Reference Notional Amount (EUR) | Entity Amount | Seniority (state if Subordinated) | Reference Entity Category | Category |
|---|---|---|---|---|---|---|---|---|---|
| 1 | ABN AMRO BANK N.V. | NL0000118024 | 28/06/2010 | 6.25% | | 50,000,000 | Subordinated | EUROPEAN | Corporate |
| 2 | AIR PRODUCTS AND CHEMICALS, INC. | US00915XBG51 | 07/09/2007 | 6.725% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 3 | AKZO NOBEL N.V. | XS0170265341 | 14/06/2011 | 4.25% | | 50,000,000 | | EUROPEAN | Corporate |
| 4 | ALLIANZ AKTIENGESELLSCHAFT | XS0148887564 | 31/05/2022 | 6.125% | | 50,000,000 | Subordinated | EUROPEAN | Corporate |
| 5 | ALLTEL CORPORATION | US020039D964 | 01/07/2012 | 7% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 6 | AMBAC FINANCIAL GROUP, INC. | US023139AA61 | 01/08/2011 | 9.375% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 7 | AMERICAN EXPRESS COMPANY | US025816AC27 | 15/07/2013 | 4.875% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 8 | ARCHER-DANIELS-MIDLAND COMPANY | US039483AJ11 | 01/06/2012 | 8.125% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 9 | ASSICURAZIONI GENERALI - SOCIETA PER AZIONI | XS0114161796 | 20/07/2010 | 6.15% | | 50,000,000 | | EUROPEAN | Corporate |
| 10 | AT&T INC. | US78387GAK94 | 15/08/2012 | 5.875% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 11 | AVIVA PLC | XS0068677258 | 20/06/2016 | 9.5% | | 50,000,000 | | EUROPEAN | Corporate |
| 12 | AVON PRODUCTS, INC. | US054303AM47 | 15/11/2009 | 7.15% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 13 | B A S F AKTIENGESELLSCHAFT | DE0008846718 | 08/07/2010 | 3.5% | | 50,000,000 | | EUROPEAN | Corporate |
| 14 | BANCO BILBAO VIZCAYA ARGENTARIA, SOCIEDAD ANONIMA | XS0108324202 | 25/02/2010 | 6.375% | | 50,000,000 | Subordinated | EUROPEAN | Corporate |
| 15 | BANCO SANTANDER CENTRAL HISPANO, S.A. | XS0125754324 | 14/03/2011 | 6% | | 50,000,000 | Subordinated | EUROPEAN | Corporate |
| 16 | BANK OF AMERICA CORPORATION | US33901AAA60 | 01/12/2009 | 7.375% | | 50,000,000 | Subordinated | NORTH AMERICAN | Corporate |
| 17 | BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT | XS0162732951 | 20/02/2013 | 4.625% | | 50,000,000 | | EUROPEAN | Corporate |

63

A06343142/1.0/16 Jun 2006

| No. | Reference Entity | Benchmark Obligation Isin/Cusip | Benchmark Obligation Maturity | Benchmark Obligation Coupon | Reference Notional (EUR) Entity Amount | Seniority (state if Subordinated) | Reference Entity Category | Category |
|---|---|---|---|---|---|---|---|---|
| 18 | BELLSOUTH CORPORATION | US079860AB83 | 15/10/2011 | 6% | 50,000,000 | | NORTH AMERICAN | Corporate |
| 19 | BNP PARIBAS | XS0132682823 | 25/07/2011 | 5.6% | 50,000,000 | Subordinated | EUROPEAN | Corporate |
| 20 | BP P.L.C. | XS0205367997 | 15/12/2008 | 3.375% | 50,000,000 | | EUROPEAN | Corporate |
| 21 | BRISTOL-MYERS SQUIBB COMPANY | US110122AG36 | 01/10/2011 | 5.75% | 50,000,000 | | NORTH AMERICAN | Corporate |
| 22 | CANON INC. | JP324280PPB5 | 19/12/2008 | 1.3% | 50,000,000 | | JAPAN | Corporate |
| 23 | CARGILL, INCORPORATED | US141781AC66 | 01/10/2025 | 7.375% | 50,000,000 | | NORTH AMERICAN | Corporate |
| 24 | CARREFOUR | FR0000480691 | 26/05/2010 | 6.125% | 50,000,000 | | EUROPEAN | Corporate |
| 25 | CATERPILLAR INC. | US149123BH31 | 01/05/2011 | 6.55% | 50,000,000 | | NORTH AMERICAN | Corporate |
| 26 | CENTRICA PLC | XS0137672381 | 02/11/2012 | 5.875% | 50,000,000 | | EUROPEAN | Corporate |
| 27 | CHEVRONTEXACO CORPORATION | US166760AB48 | 15/02/2008 | 3.375% | 50,000,000 | | NORTH AMERICAN | Corporate |
| 28 | CITIGROUP INC. | US172967A249 | 01/10/2010 | 7.25% | 50,000,000 | Subordinated | NORTH AMERICAN | Corporate |
| 29 | COCA-COLA ENTERPRISES INC. | US191219BJ28 | 15/08/2011 | 6.125% | 50,000,000 | | NORTH AMERICAN | Corporate |
| 30 | COUNTRYWIDE HOME LOANS, INC. | US22237LMY55 | 15/07/2009 | 5.625% | 50,000,000 | | NORTH AMERICAN | Corporate |
| 31 | DANAHER CORPORATION | US235851AB82 | 15/10/2008 | 6% | 50,000,000 | | NORTH AMERICAN | Corporate |
| 32 | BARCLAYS BANK PLC | XS0153116495 | 07/12/2006 | 4.875% | 50,000,000 | | EUROPEAN | Corporate |
| 33 | DEUTSCHE BANK AKTIENGESELLSCHAFT | DE0008516428 | 27/03/2012 | 5.375% | 50,000,000 | Subordinated | EUROPEAN | Corporate |
| 34 | DIAGEO PLC | US25243EAA10 | 01/11/2009 | 7.25% | 50,000,000 | | EUROPEAN | Corporate |
| 35 | E.I. DU PONT DE NEMOURS AND COMPANY | US263534BN84 | 30/04/2014 | 4.875% | 50,000,000 | | NORTH AMERICAN | Corporate |
| 36 | E.ON AG | XS0148578262 | 29/05/2009 | 5.75% | 50,000,000 | | EUROPEAN | Corporate |
| 37 | ELECTRICITE DE FRANCE | FR0000481152 | 25/10/2010 | 5.75% | 50,000,000 | | EUROPEAN | Corporate |
| 38 | ELI LILLY AND COMPANY | US532457AN86 | 01/01/2016 | 6.57% | 50,000,000 | | NORTH AMERICAN | Corporate |
| 39 | ENEL S.P.A. | XS0170342868 | 12/06/2013 | 4.25% | 50,000,000 | | EUROPEAN | Corporate |
| 40 | EUROPEAN AERONAUTIC DEFENCE AND SPACE COMPANY EADS N.V. | XS0163822488 | 03/03/2010 | 4.625% | 50,000,000 | | EUROPEAN | Corporate |
| 41 | FEDERAL HOME LOAN MORTGAGE CORPORATION | US3134A4HF43 | 15/09/2011 | 5.5% | 50,000,000 | | NORTH AMERICAN | Corporate |

64

A06343142/1.0/16 Jun 2006

| No. | Reference Entity | Benchmark Obligation Isin/Cusip | Benchmark Obligation Maturity | Benchmark Obligation Coupon | Reference Notional (EUR) | Entity Amount | Seniority (state if Subordinated) | Reference Entity Category | Category |
|---|---|---|---|---|---|---|---|---|---|
| 42 | FEDERAL NATIONAL MORTGAGE ASSOCIATION | US31359MRX38 | 09/06/2033 | 5.5% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 43 | FORTIS N.V. | XS0096324925 | 07/04/2009 | 4.625% | | 50,000,000 | | EUROPEAN | Corporate |
| 44 | FORTUM OYJ | XS0180180985 | 19/11/2010 | 4.625% | | 50,000,000 | | EUROPEAN | Corporate |
| 45 | FRANCE TELECOM | FR0000471948 | 28/01/2013 | 7.25% | | 50,000,000 | | EUROPEAN | Corporate |
| 46 | GANNETT CO., INC. | US364725AC59 | 01/04/2012 | 6.375% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 47 | GAZ DE FRANCE (G.D.F.), SERVICE NATIONAL | FR0000472334 | 19/02/2018 | 5.125% | | 50,000,000 | | EUROPEAN | Corporate |
| 48 | GENERAL ELECTRIC CAPITAL CORPORATION | US369622GYY42 | 15/06/2012 | 6% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 49 | GLAXOSMITHKLINE PLC | XS0166419795 | 15/04/2008 | 3.375% | | 50,000,000 | | EUROPEAN | Corporate |
| 50 | HONDA MOTOR CO., LTD. | JP385468A2C9 | 20/12/2007 | 0.47% | | 50,000,000 | | JAPAN | Corporate |
| 51 | HONEYWELL INTERNATIONAL INC. | US438516AK21 | 01/03/2010 | 7.5% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 52 | IBERDROLA, S.A. | XS0097762065 | 26/05/2009 | 4.5% | | 50,000,000 | | EUROPEAN | Corporate |
| 53 | ING BANK N.V. | NL0000113140 | 04/01/2013 | 5.25% | | 50,000,000 | Subordinated | EUROPEAN | Corporate |
| 54 | INTERNATIONAL BUSINESS MACHINES CORPORATION | US459200BA86 | 29/11/2012 | 4.75% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 55 | INTERNATIONAL LEASE FINANCE CORPORATION | US459745EZ45 | 15/03/2009 | 6.375% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 56 | JOHNSON & JOHNSON | US478160AK00 | 01/09/2009 | 6.625% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 57 | JPMORGAN CHASE & CO. | US46625HAL42 | 15/08/2006 | 5.625% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 58 | KELDA GROUP PLC | XS0109437441 | 17/04/2031 | 6.625% | | 50,000,000 | | EUROPEAN | Corporate |
| 59 | KONINKLIJKE DSM N.V. | USN65297AR93 | 15/05/2009 | 6.75% | | 50,000,000 | | EUROPEAN | Corporate |
| 60 | MBIA INC. | US55262CAF77 | 01/10/2028 | 6.625% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 61 | MCDONALD'S CORPORATION | US58013MDM38 | 15/04/2011 | 6% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 62 | MEDTRONIC, INC. | US585055AB27 | 15/09/2021 | 1.25% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 63 | MERRILL LYNCH & CO., INC. | US590188JP48 | 17/02/2009 | 6% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 64 | MGIC INVESTMENT CORPORATION | US552845AF69 | 15/03/2007 | 6% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 65 | MORGAN STANLEY | US617446HC69 | 01/04/2012 | 6.5% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 66 | NOKIA OYJ | LN039817 | 07/06/2006 | | | 50,000,000 | | EUROPEAN | Corporate |

65

A06343142/1.0/16 Jun 2006

| No. | Reference Entity | Benchmark Obligation Isin/Cusip | Benchmark Obligation Maturity | Benchmark Obligation Coupon | Reference Notional Amount (EUR) | Entity Amount | Seniority (state if Subordinated) | Reference Entity Category | Category |
|---|---|---|---|---|---|---|---|---|---|
| 67 | LEGAL & GENERAL GROUP PLC | XS0139391873 | 18/12/2006 | 2.75% | | 50,000,000 | | EUROPEAN | Corporate |
| 68 | PFIZER INC. | US717081AQ68 | 01/03/2018 | 4.65% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 69 | PRUDENTIAL PUBLIC LIMITED COMPANY | XS0098874598 | 11/05/2009 | 5.5% | | 50,000,000 | | EUROPEAN | Corporate |
| 70 | RADIAN GROUP INC. | US750236A878 | 01/06/2011 | 7.75% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 71 | RWE AKTIENGESELLSCHAFT | XS0147030554 | 26/10/2012 | 6.125% | | 50,000,000 | | EUROPEAN | Corporate |
| 72 | SAN PAOLO IMI BANK SA | XS0186189154 | 25/02/2011 | 3.054% | | 50,000,000 | | EUROPEAN | Corporate |
| 73 | SANOFI-AVENTIS | XS0176128675 | 15/09/2010 | 4.25% | | 50,000,000 | | EUROPEAN | Corporate |
| 74 | SHARP CORPORATION | JP3359608569 | 20/08/2012 | 0.97% | | 50,000,000 | | JAPAN | Corporate |
| 75 | SIEMENS AKTIENGESELLSCHAFT | XS0131224155 | 04/07/2011 | 5.75% | | 50,000,000 | | EUROPEAN | Corporate |
| 76 | SINGAPORE TELECOMMUNICATIONS LIMITED | USY79985AC46 | 01/12/2011 | 6.375% | | 50,000,000 | | SINGAPOREAN | Corporate |
| 77 | SOCIETE GENERALE | XS0110673850 | 27/04/2015 | 6.625% | | 50,000,000 | Subordinated | EUROPEAN | Corporate |
| 78 | SOLVAY | BE0374557404 | 27/06/2018 | 4.625% | | 50,000,000 | | EUROPEAN | Corporate |
| 79 | SONY CORPORATION | JP343500B199 | 20/09/2011 | 1.52% | | 50,000,000 | | JAPAN | Corporate |
| 80 | STATOIL ASA | XS009921547 | 30/06/2011 | 5.125% | | 50,000,000 | | EUROPEAN | Corporate |
| 81 | TARGET CORPORATION | US87612EAH99 | 01/03/2012 | 5.875% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 82 | TELECOM CORPORATION OF NEW ZEALAND LIMITED | XS0140346171 | 14/12/2011 | 6.75% | | 50,000,000 | | AUSTRALIA/NEW ZEALAND | Corporate |
| 83 | TELIASONERA AKTIEBOLAG | XS0101443538 | 10/09/2010 | 5.5% | | 50,000,000 | | EUROPEAN | Corporate |
| 84 | TESCO PLC | XS0159012847 | 13/04/2010 | 4.75% | | 50,000,000 | | EUROPEAN | Corporate |
| 85 | TEXAS INSTRUMENTS INCORPORATED | US882508AG91 | 01/04/2007 | 8.75% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 86 | THE BEAR STEARNS COMPANIES INC. | US073902BR87 | 07/12/2009 | 7.625% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 87 | THE GOLDMAN SACHS GROUP, INC. | US38141GBU76 | 15/01/2012 | 6.6% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 88 | THE HOME DEPOT, INC. | US437076AL65 | 15/09/2009 | 3.75% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 89 | THE PMI GROUP, INC. | US69344MAE12 | 15/07/2021 | 2.5% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 90 | THE PROCTER & GAMBLE COMPANY | US742718DA47 | 15/08/2014 | 4.95% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 91 | THE TOKYO ELECTRIC POWER | JP358580A351 | 30/05/2013 | 0.675% | | 50,000,000 | | JAPAN | Corporate |

A06343142/1.0/16 Jun 2006

| No. | Reference Entity | Benchmark Obligation Isin/Cusip | Benchmark Obligation Maturity | Benchmark Obligation Coupon | Reference Notional (EUR) | Entity Amount | Seniority (state if Subordinated) | Reference Entity Category | Category |
|---|---|---|---|---|---|---|---|---|---|
| 92 | TOTAL SA COMPANY, INCORPORATED | FR0000207003 | 25/10/2008 | 6.75% | | 50,000,000 | | EUROPEAN | Corporate |
| 93 | TOYOTA MOTOR CORPORATION | JP363340A296 | 20/09/2012 | 1.33% | | 50,000,000 | | JAPAN | Corporate |
| 94 | UBS AG | CH0009367886 | 27/08/2008 | 3.5% | | 50,000,000 | | EUROPEAN | Corporate |
| 95 | UNILEVER N.V. | US904764AG27 | 01/11/2010 | 7.125% | | 50,000,000 | | EUROPEAN | Corporate |
| 96 | UST INC. | US902911AM62 | 15/07/2012 | 6.625% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 97 | VATTENFALL AKTIEBOLAG | XS0109778190 | 31/03/2010 | 6% | | 50,000,000 | | EUROPEAN | Corporate |
| 98 | VODAFONE GROUP PUBLIC LIMITED COMPANY | US92857TAG22 | 15/02/2010 | 7.75% | | 50,000,000 | | EUROPEAN | Corporate |
| 99 | WACHOVIA CORPORATION | US929903AA06 | 01/11/2006 | 4.95% | | 50,000,000 | | NORTH AMERICAN | Corporate |
| 100 | WAL-MART STORES, INC. | US931142BE24 | 10/08/2009 | 6.875% | | 50,000,000 | | NORTH AMERICAN | Corporate |

A/063431421/1.0/16 Jun 2006

## Schedule B
## Applicable Reference Entity Category Terms

### CORPORATES

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **All Guarantees / Conditions to Settlement** | Not Applicable

Notice of Publicly Available Information Applicable | Applicable

Notice of Publicly Available Information Applicable | Applicable

Notice of Publicly Available Information Applicable | Applicable

Notice of Publicly Available Information Applicable | Applicable

Section 3.9 of the Definitions shall be excluded

Section 3.3 of the Definitions shall be amended by replacing "Greenwich Mean Time" with "Tokyo time"

Notice of Publicly Available Information Applicable | Applicable

Notice of Publicly Available Information Applicable | Applicable

Notice of Publicly Available Information Applicable | Applicable

Notice of Publicly Available Information Applicable |
| **Credit Events** | Bankruptcy

Failure to Pay

Restructuring, if specified as applicable in the relevant Confirmation

Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Bankruptcy

Failure to Pay

Restructuring

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation Applicable | Bankruptcy

Failure to Pay

Restructuring

Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Bankruptcy

Failure to Pay

Restructuring

Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Bankruptcy

Failure to Pay

Payment Requirement: If the Floating Rate Payer Calculation Amount is in JPY, JPY 100,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay. In all other cases, USD 1,000,000 or its equivalent in | Bankruptcy

Failure to Pay

Restructuring | Bankruptcy

Failure to Pay

Restructuring | Bankruptcy

Failure to Pay

Grace Period Ext. Applicable

Obligation Acceleration

Repudiation/ Moratorium

Restructuring

Multiple Holdco Obl.: Not Applicable |

68

A/63431142/1.0/16 Jun 2006

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay. Restructuring Multiple Holder Obligation: Not Applicable Default Requirement If the Floating Rate Payer Calculation Amount is in JPY, JPY 1,000,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event. In all other cases, USD 10,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event. | | | | |
| **Obligation Category:** | Borrowed Money | Borrowed Money | Borrowed Money | Borrowed Money | Borrowed Money | Borrowed Money | Bond or Loan | Borrowed Money | |
| **Obligation Characteristics:** | None | None | None | None | Not Subordinated | Not Subordinated Specified Currency-Standard Specified Currencies & Domestic Currency Not Sovereign Lender | Not Subordinated Not Sovereign Lender Not Domestic Currency Not Domestic Issuance Not Domestic Law | None | Not Subordinated Not Domestic Currency Not Domestic Law Not Domestic Issuance |
| **Reference Obligation** | Bond or Loan | Bond or Loan | Bond or Loan | Bond or Loan | Bond or Loan | Bond or Loan | Bond or Loan | Bond or Loan | Bond |

69

A063431142/1.0/16 Jun 2006

| Categories | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Reference Obligation Characteristics | Not Subordinated Specified Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency: Standard Specified Currencies & Domestic Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency: Standard Specified Currencies & Domestic Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency: Standard Specified Currencies & Domestic Currency Not Sovereign Lender Not Contingent Assignable Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Not Sovereign Lender Not Domestic Law Not Contingent Issuance Assignable Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Not Domestic Law Not Contingent Not Domestic Issuance Transferable Not Bearer |
| Delivery Limitation | Not Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Not Applicable |
| Additional Provision for Physically-Settled Default Swaps – Monoline Insurer as Reference Entity (January 21, 2005) | Not Applicable unless otherwise specified as Applicable in the relevant Confirmation | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provision for the Russian Federation (August 13, 2004) | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for the Republic of Hungary (February 14, 2005) | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |

A/06343142/1.0/16 Jun 2006

# SOVEREIGNS

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **All Guarantees:** | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable |
| **Conditions to Settlement:** | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable |
| | | Section 3.9 of the Definitions shall be excluded by replacing "Greenwich Mean Time" with "Tokyo time". Notice of Publicly Available Information Applicable | | | | | |
| **Credit Event:** | Failure to Pay Repudiation/Moratorium Restructuring | Failure to Pay Grace Period Extension: Applicable Obligation Acceleration Repudiation/Moratorium Restructuring Multiple Holder Obligation Not Applicable | Failure to Pay Payment Requirement If the Floating Rate Payer Calculation Amount is in JPY, JPY 100,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay. In all other cases, USD 1,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay. Repudiation/Moratorium Restructuring Multiple Holder Obligation Not Applicable Default Requirement If the Floating Rate Payer Calculation Amount is in JPY, JPY 1,000,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event. In all other cases, USD 10,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event. | Failure to Pay Repudiation/Moratorium Restructuring Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Failure to Pay Repudiation/Moratorium Restructuring Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Failure to Pay Repudiation/Moratorium Restructuring | Failure to Pay Grace Period Extension: Applicable Obligation Acceleration Repudiation/Moratorium Restructuring Multiple Holder Obligation Not Applicable | Failure to Pay Repudiation/Moratorium Restructuring |

A06343142/1.0/16 Jun 2006

| Obligation Category | Bond or Loan | Bond | Borrowed Money | Bond or Loan | Borrowed Money | Borrowed Money | Bond or Loan | Bond | Borrowed Money |
|---|---|---|---|---|---|---|---|---|---|
| Obligation Characteristics | Not Subordinated; Not Sovereign Lender; Not Domestic Currency; Not Domestic Law; Not Domestic Issuance | Not Subordinated; Not Domestic Currency; Not Domestic Law; Not Domestic Issuance | None | Not Subordinated; Not Domestic Currency; Not Domestic Law; Not Domestic Issuance | None | None | Not Subordinated; Specified Currency; Standard Specified Currencies & Domestic Currency; Not Sovereign Lender | Not Subordinated; Not Domestic Currency; Not Domestic Law; Not Domestic Issuance | None |
| Reference Obligation Category | Bond or Loan | Bond | Bond or Loan | Bond or Loan | Bond or Loan | Bond or Loan | Bond or Loan | Bond | Bond or Loan |
| Reference Obligation Characteristics | Not Subordinated; Specified Currency; Not Sovereign Lender; Not Domestic Law; Not Contingent; Not Domestic Issuance; Assignable Loan; Transferable; Maximum Maturity: 30 years; Not Bearer | Not Subordinated; Specified Currency; Not Domestic Law; Not Contingent; Not Domestic Issuance; Transferable; Not Bearer | Specified Currency; Not Contingent; Assignable Loan; Consent Required Loan; Transferable; Maximum Maturity: 30 years; Not Bearer | Not Subordinated; Specified Currency; Standard Specified Currencies & Domestic Currency; Not Contingent; Assignable Loan; Consent Required Loan; Transferable; Maximum Maturity: 30 years; Not Bearer | Not Subordinated; Specified Currency; Standard Specified Currencies & Domestic Currency; Not Contingent; Assignable Loan; Consent Required Loan; Transferable; Maximum Maturity: 30 years; Not Bearer | Not Subordinated; Specified Currency; Standard Specified Currencies & Domestic Currency; Not Sovereign Lender; Not Contingent; Assignable Loan; Transferable; Maximum Maturity: 30 years; Not Bearer | Not Subordinated; Specified Currency; Specified Currencies & Domestic Currency; Not Sovereign Lender; Not Contingent; Assignable Loan; Transferable; Maximum Maturity: 30 years; Not Bearer | Not Subordinated; Specified Currency; Not Domestic Currency; Not Domestic Law; Not Contingent; Not Domestic Issuance; Transferable; Not Bearer | Specified Currency; Not Contingent; Assignable Loan; Consent Required Loan; Transferable; Maximum Maturity: 30 years; Not Bearer |
| Excluded | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable |
| Delivery Limitation | Applicable | Not Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Not Applicable | Applicable |
| Additional Provisions for the Russian Federation (August 12, 2004) | Not Applicable | Applicable (the Reference Entity is the Russian Federation, otherwise Not Applicable) | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for the Republic of Hungary (February 14, 2005) | Not Applicable | Applicable (the Reference Entity is the Republic of Hungary, otherwise Not Applicable) | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |

A/6343142/1.0/16 Jun 2006

**Schedule C**
**Additional Definitions and Provisions**

**Definitions relating to Credit Events**

Bankruptcy:

means a Reference Entity (a) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (b) becomes insolvent or is unable to pay its debts or fails or admits in writing in a judicial, regulatory or administrative proceeding or filing its inability generally to pay its debts as they become due; (c) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (d) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (i) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (ii) is not dismissed, discharged, stayed or restrained in each case within thirty calendar days of the institution or presentation thereof; (e) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (f) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (g) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within thirty calendar days thereafter; or (h) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (a) to (g) (inclusive).

Failure to Pay:

means, after the expiration of any applicable (or deemed) Grace Period (after the satisfaction of any conditions precedent to the commencement of such Grace Period), the failure by a Reference Entity to make, when and where due, any payments in an aggregate amount of not less than the Payment Requirement under one or more Obligations, in accordance with the terms of such Obligations at the time of such failure.

Repudiation/Moratorium: means the occurrence of both of the following events: (i) an authorised officer of a Reference Entity or a Governmental Authority (x) disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, one or more Obligations in an aggregate amount of not less than the Default Requirement, or (y) declares or imposes a moratorium, standstill, roll-over or deferral, whether *de facto* or *de jure*, with respect to one or more Obligations in an aggregate amount of not less than the Default Requirement and (ii) a Failure to Pay, determined without regard to the Payment Requirement, or a Restructuring, determined without regard to the Default Requirement, with respect to any such Obligation occurs on or prior to the Repudiation/Moratorium Evaluation Date.

Restructuring: (a) Restructuring means that, with respect to one or more Obligations, including as a result of an Obligation Exchange, and in relation to an aggregate amount of not less than the Default Requirement, any one or more of the following events occurs in a form that binds all holders of such Obligation, is agreed between the Reference Entity or a Governmental Authority and a sufficient number of holders of such Obligation to bind all holders of the Obligation or is announced (or otherwise decreed) by a Reference Entity or a Governmental Authority in a form that binds all holders of such Obligation, and such event is not expressly provided for under the terms of such Obligation in effect as of the later of the Trade Date and the date as of which such Obligation is issued or incurred:

(i) a reduction in the rate or amount of interest payable or the amount of scheduled interest accruals;

(ii) a reduction in the amount of principal or premium payable at maturity or at scheduled redemption dates;

(iii) a postponement or other deferral of a date or dates for either (A) the payment or accrual of interest or (B) the payment of principal or premium;

(iv) a change in the ranking in priority of payment of any Obligation, causing the Subordination of such Obligation to any other Obligation; or

(v) any change in the currency or composition of any payment of interest or principal to any currency which is not a Permitted Currency.

"**Permitted Currency**" means (i) the legal tender of any Group of 7 (G7) country (or any country that becomes a member of G7 if G7 expands its membership); or (ii) the legal tender of any country which, as of the date of such change, is a member of the Organisation for Economic

Cooperation and Development and has a local currency long-term debt rating of either "AAA" or higher assigned to it by Standard and Poor's, a division of The McGraw-Hill Companies, Inc. or any successor to the rating business thereof, "Aaa" or higher assigned to it by Moody's Investors Service, Inc. or any successor to the rating business thereof or "AAA" or higher assigned to it by Fitch Ratings or any successor to the rating business thereof.

(b)   Notwithstanding the provisions of (a), above, none of the following shall constitute a Restructuring:

(i)   the payment in euros of interest or principal in relation to an Obligation denominated in a currency of a Member State of the European Union that adopts or has adopted the single currency in accordance with the Treaty establishing the European Community, as amended by the Treaty on European Union;

(ii)   the occurrence of, agreement to or announcement of any of the events described in (a)(i) to (v) due to an administrative adjustment, accounting adjustment or tax adjustment or other technical adjustment occurring in the ordinary course of business; and

(iii)   the occurrence of, agreement to or announcement of any of the events described in (a)(i) to (v) in circumstances where such event does not directly or indirectly result from a deterioration in the creditworthiness or financial condition of the Reference Entity.

(c)   For purposes of paragraphs (a) and (b) (above), the term Obligation shall be deemed to include Underlying Obligations for which the Reference Entity is acting as provider of any Qualifying Guarantee. In the case of a Qualifying Guarantee and an Underlying Obligation, references to a Reference Entity in paragraph (a) of this definition shall be deemed to refer to the relevant Underlying Obligor and the reference to a Reference Entity in paragraph (b) of this definition shall continue to refer to such Reference Entity.

(d)   With respect to a Reference Entity, notwithstanding anything to the contrary in this definition of Restructuring the occurrence of, agreement to, or announcement of, any of the events described in (a)(i) to (v) (above) shall not be a Restructuring where the Obligation in respect of any such events is not a Multiple Holder Obligation unless "Multiple Holder Obligation: Not Applicable" is

specified in Schedule B in respect of Reference Entities of the same Reference Entity Category as such Reference Entity.

"**Multiple Holder Obligation**" means an Obligation that (i) at the time of the event which constitutes a Restructuring Credit Event, is held by more than three holders that are not Affiliates of each other and (ii) with respect to which a percentage of holders (determined pursuant to the terms of the Obligation as in effect on the date of such event) at least equal to sixty-six-and-two-thirds is required to consent to the event which constitutes a Restructuring Credit Event, provided that (ii) above shall not apply to any Obligations which are Bonds.

| | |
|---|---|
| Obligation Exchange: | means the mandatory transfer (other than in accordance with the terms in effect as of the later of the Trade Date or date of issuance of the relevant Obligation) of any securities, obligations or assets to holders of Obligations in exchange for such Obligations. When so transferred, such securities, obligations or assets will be deemed to be Obligations. |
| Payment Requirement: | In respect of each Reference Entity for which the Reference Entity Category is specified to be Japan Corporate, JPY 100,000,000. In all other cases, USD 1,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay or Potential Failure to Pay. |
| Default Requirement: | In respect of each Reference Entity for which the Reference Entity Category is specified to be Japan Corporate, JPY 1,000,000,000. In all other cases, USD 10,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event. |
| Credit Event Notice: | means an irrevocable written notice from Buyer to Seller (with a copy to Moody's, provided that delivery of such copy shall not be required to satisfy the Credit Event Notice Condition to Settlement) which describes a Credit Event that occurred during the Credit Observation Period. The Credit Event which is the subject of the Credit Event Notice need not be continuing on the date the Credit Event Notice is effective. |
| Credit Event Notice After Restructuring: | With respect to a Reference Entity, notwithstanding anything to the contrary in the Credit Derivative Definitions or herein, upon the occurrence of a Restructuring Credit Event during the term of the Transaction: |

(a)   the Buyer may deliver multiple Credit Event Notices with respect to the Reference Entity to which such Credit Event applies, each such Credit Event Notice setting forth the amount of the Floating Rate Payer Calculation Amount to which such Credit Event Notice applies (the

"**Exercise Amount**");

(b)   if the Buyer has delivered a Credit Event Notice that specifies an Exercise Amount that is less than the Floating Rate Payer Calculation Amount for the Reference Entity to which such Credit Event applies, it shall be construed as if the Reference Registry contained two entries for that specific Reference Entity, one which has a Floating Rate Payer Calculation Amount equal to the Exercise Amount and, upon satisfaction of the Conditions to Settlement, will be settled in accordance with the terms herein, and the other of which will have a Floating Rate Payer Calculation Amount equal to the Floating Rate Payer Calculation Amount outstanding prior to such Credit Event Notice minus the Exercise Amount and will continue in effect; and

(c)   the Exercise Amount in connection with a Credit Event Notice describing a Restructuring must be in the amount of 1,000,000 units of the currency in which the Floating Rate Payer Calculation Amount is denominated or an integral multiple thereof.

| | |
|---|---|
| Event Determination Date: | means the date falling within the Notice Delivery Period on which both the Credit Event Notice and the Notice of Publicly Available Information have been delivered to the Issuer. |
| Grace Period: | means the lesser of (a) the applicable grace period with respect to payments under the relevant Obligation under the terms of such Obligation in effect as of the later of the Trade Date and the date as of which such Obligation is issued or incurred and (b) 30 calendar days. |
| Grace Period Extension Date: | means the date that is the number of days in the applicable Grace Period after the date of the relevant Potential Failure to Pay. |
| Notice Delivery Period: | means the period from and including the Trade Date to and including the later of: (a) the Scheduled Maturity Date; (b) the date that is fourteen calendar days after the Grace Period Extension Date if (i) the Credit Event that is the subject of the Credit Event Notice is a Failure to Pay that occurred after the Scheduled Maturity Date and (ii) the Potential Failure to Pay with respect to such Failure to Pay occurred on or prior to the Scheduled Maturity Date; and (c) the Notice Delivery Period Extension Date if the Credit Event that is the subject of the Credit Event Notice is a Credit Event in respect of which a Notice Delivery Period Extension Event was continuing on the Scheduled Maturity Date. |
| Notice Delivery Period Extension Date: | means the date that is fourteen calendar days after the Scheduled Maturity Date. |

| Notice Delivery Period Extension Event: | means that the Calculation Agent, acting in good faith and in a commercially reasonable manner, determines that (a) either a Credit Event has occurred or may have occurred during the Credit Observation Period in respect of a Reference Obligation and (b) an Event Determination Date has not occurred in respect of (i) such Credit Event or (ii) such Reference Obligation. |
|---|---|
| Notice of Publicly Available Information: | means an irrevocable written notice from the Calculation Agent to the Buyer and Seller (with a copy to Moody's) that cites Publicly Available Information confirming the occurrence of the Credit Event described in the Credit Event Notice. The notice given must contain a copy, or a description in reasonable detail, of the relevant Publicly Available Information. |
| Potential Repudiation/Moratorium: | means the occurrence of an event described in clause (i) of the definition of Repudiation/Moratorium. |
| Repudiation/Moratorium Evaluation Date: | means (i) if the Obligations to which such Potential Repudiation/Moratorium relates include Bonds, the date that is the later of (A) the date that is 60 days after the date of such Potential Repudiation/Moratorium and (B) the first payment date under any such Bond after the date of such Potential Repudiation/Moratorium (or, if later, the expiration date of any applicable Grace Period in respect of such payment date) and (ii) if the Obligations to which such Potential Repudiation/Moratorium relates do not include Bonds, the date that is 60 days after the date of such Potential Repudiation/Moratorium. |
| Potential Failure to Pay: | means the failure by any one of the Reference Entities to make, when and where due, any payments in an aggregate amount of not less than the Payment Requirement under one or more Obligations without regard to any grace period or any conditions precedent to the commencement of any grace period applicable to such Obligations in accordance with the terms of such Obligations at the time of such failure. |
| Qualifying Guarantee: | means an arrangement evidenced by a written instrument pursuant to which a Reference Entity irrevocably agrees (by guarantee of payment or equivalent legal arrangement) to pay all amounts due under an obligation (the "**Underlying Obligation**") for which another party is the obligor (the "**Underlying Obligor**"). Qualifying Guarantees shall exclude any arrangement (i) structured as a surety bond, financial guarantee insurance policy, letter of credit or equivalent legal arrangement or (ii) pursuant to the terms of which the payment obligations of the Reference Entity can be discharged, reduced or otherwise altered or assigned (other than by operation of law) as a result of the occurrence or non-occurrence of an event or circumstance (other than payment). The benefit of a |

|  | Qualifying Guarantee must be capable of being Delivered together with the Delivery of the Underlying Obligation. |
|---|---|
| Qualifying Affiliate Guarantee: | means a Qualifying Guarantee provided by a Reference Entity in respect of an Underlying Obligation of a Downstream Affiliate of that Reference Entity. |
| Downstream Affiliate: | means an entity whose outstanding Voting Shares were, at the date of issuance of the Qualifying Guarantee, more than 50 per cent. owned, directly or indirectly, by the Reference Entity. |
| Voting Shares: | means those shares or other interests that have power to elect the board of directors or similar governing body of an entity. |

## Reference Obligation Definitions

| Borrowed Money: | means with respect to any one of the Reference Entities, any one or more obligations (excluding an obligation under a revolving credit arrangement for which there are no outstanding unpaid drawings in respect of principal) for the payment or repayment of borrowed money (which term shall include, without limitation, deposits and reimbursement obligations arising from drawings pursuant to letters of credit). |
|---|---|
| Bond: | means with respect to any one of the Reference Entities, any one or more obligations of a type included in the definition of "Borrowed Money" that is in the form of, or represented by, a bond, note (other than notes delivered pursuant to Loans) certificated debt security or other debt security, and shall not include any other type of Borrowed Money. |
| Loan: | means with respect to any one of the Reference Entities, any one or more obligations of a type included in the definition of "Borrowed Money" that is documented by a term loan agreement, revolving loan agreement or other similar credit agreement, and shall not include any other type of Borrowed Money. |
| Bond or Loan: | means any obligation that is either a Bond or a Loan. |
| Specified Currencies: | means an obligation that is payable in the currency or currencies specified as such in Schedule B with respect to Reference Entities of the same Reference Entity Category as the Reference Entity. |
| Standard Specified Currency: | means any of the lawful currencies of Canada, Japan, Switzerland, United Kingdom and the United States of America and the euro (and any successor currency to any of the abovementioned currencies). |
| Not Subordinated: | means an obligation that is not Subordinated to: (i) the Benchmark Obligation specified for the relevant Reference Entity in the Reference Registry or (ii) if no Benchmark Obligation is specified for the relevant Reference Entity, any |

unsubordinated Borrowed Money obligation of the relevant Reference Entity. For the purposes of determining whether an obligation satisfies the "Not Subordinated" Reference Obligation Characteristic, the ranking in priority of payment of the Benchmark Obligation shall be determined as of the later of: (1) the Trade Date and (2) the date on which such obligation was issued or incurred and shall not reflect any change to such ranking after such later date.

Not Contingent:     means any obligation having as of the relevant Valuation Date and all times thereafter an outstanding principal balance or, in the case of obligations that are not Borrowed Money, a Due and Payable Amount, that pursuant to the terms of such obligation may not be reduced as a result of the occurrence or non-occurrence of an event or circumstance (other than payment). A Convertible Obligation, an Exchangeable Obligation and an Accreting Obligation shall satisfy the Not Contingent Reference Obligation Characteristic if such Convertible Obligation, Exchangeable Obligation or Accreting Obligation otherwise meets the requirements of the preceding sentence so long as, in the case of a Convertible Obligation or an Exchangeable Obligation, the right (A) to convert or exchange such obligation or (B) to require the issuer to purchase or redeem such obligation (if the issuer has exercised or may exercise the right to pay the purchase or redemption price, in whole or in part, in Equity Securities) has not been exercised (or such exercise has been effectively rescinded) on or before the relevant Valuation Date.

Transferable:     means an obligation that is transferable to institutional investors without any contractual, statutory or regulatory restriction, provided that none of the following shall be considered contractual, statutory or regulatory restrictions:

(A)   contractual, statutory or regulatory restrictions that provide for eligibility for resale pursuant to Rule 144A or Regulation S promulgated under the United States Securities Act of 1933, as amended (and any contractual, statutory or regulatory restrictions promulgated under the laws of any jurisdiction having a similar effect in relation to the eligibility for resale of an obligation); or

(B)   restrictions on permitted investments such as statutory or regulatory investment restrictions on insurance companies and pension funds,

provided that such characteristics shall be applicable only in respect of obligations that are Bonds.

Maximum Maturity 30 years:     means an obligation that has a remaining maturity from the Valuation Date of not greater than 30 years.

Not Bearer:     means any obligation that is not a bearer instrument unless

interests with respect to such bearer instrument are cleared via the Euroclear system, Clearstream International SA or any other internationally recognised clearing system provided that such characteristic shall be applicable only in respect of obligations that are Bonds.

Assignable Loan:

means a Loan that is, as of the Valuation Date, capable of being assigned or novated to, at a minimum, commercial banks or financial institutions (irrespective of their jurisdiction of organisation) that are not then a lender or a member of the relevant lending syndicate, without the consent of the relevant Reference Entity or the guarantor, if any, of such Loan (or the consent of the applicable borrower if the Reference Entity is guaranteeing such Loan) or any agent, provided that such characteristics shall be applicable only in respect of obligations that are Loans.

Consent Required Loan:

means a Loan that is, as of the Valuation Date, capable of being assigned or novated with the consent of the relevant Reference Entity or the guarantor, if any, of such Loan (or the consent of the relevant borrower if the Reference Entity is guaranteeing such Loan) or any agent, provided that such characteristics shall be applicable only in respect of obligations that are Loans.

In the event that any Reference Obligation is a Loan which is a Consent Required Loan, the Calculation Agent will only be permitted to use a Bid Quotation from a Dealer to determine the Final Reference Obligation Price of such Reference Obligation if the Calculation Agent provided such Dealer with the information reasonably required by that Dealer to give such Bid Quotation. For the sake of clarity, information which may be reasonably requested by such Dealer (and which shall be provided by the Calculation Agent if requested in respect of such Bid Quotation) may include any of the following:

(1)   the name of the debtor;

(2)   the governing law;

(3)   guarantee (existence and description);

(4)   surety (existence and description);

(5)   description of the covenants;

(6)   maturity and amortisation profile;

(7)   coupon;

(8)   revolver or term loan;

(9)   drawn or not; and

(10)  the effective date of the loan.

**Additional terms relating to Restructuring**

If "Modified Restructuring Applicable" or "Restructuring Maturity Limitation and Fully Transferable Obligation Applicable" is specified in Schedule B in respect of Reference Entities of the same Reference Entity Category as a Reference Entity that is the subject of a Credit Event Notice and Restructuring is the only Credit Event specified in the Credit Event Notice, then a Reference Obligation may be selected by the Calculation Agent to value in respect of such Reference Entity only if it (i) is a Fully Transferable Obligation and (ii) has a final maturity date not later than the Restructuring Maturity Limitation Date.

If "Modified Modified Restructuring Applicable" or "Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation Applicable" is specified in Schedule B in respect of Reference Entities of the same Reference Entity Category as a Reference Entity that is the subject of a Credit Event Notice and Restructuring is the only Credit Event specified in the Credit Event Notice, then a Reference Obligation may be selected by the Calculation Agent to value in respect of such Reference Entity only if it (i) is a Conditionally Transferable Obligation and (ii) has a final maturity date not later than the applicable Modified Restructuring Maturity Limitation Date.

"**Restructuring Maturity Limitation Date**" means the date that is the earlier of (x) 30 months following the Restructuring Date and (y) the latest final maturity date of any Restructured Bond or Loan, provided, however, that under no circumstances shall the Restructuring Maturity Limitation Date be earlier than the Scheduled Termination Date or later than 30 months following the Scheduled Termination Date and, if it is, it shall be deemed to be the Scheduled Termination Date or 30 months following the Scheduled Termination Date, as the case may be.

"**Restructuring Date**" means, with respect to a Restructured Bond or Loan, the date on which a Restructuring is legally effective in accordance with the terms of the documentation governing such Restructuring.

"**Restructured Bond or Loan**" means an Obligation which is a Bond or Loan and in respect of which the Restructuring that is the subject of a Credit Event Notice has occurred.

"**Eligible Transferee**" means each of the following:

(a)

    (i)      any bank or other financial institution;

    (ii)     an insurance or reinsurance company;

    (iii)    a mutual fund, unit trust or similar collective investment vehicle (other than an entity specified in clause (c)(i) below); and

    (iv)    a registered or licensed broker or dealer (other than a natural person or proprietorship);

    provided, however, in each case that such entity has total assets of at least USD500 million;

(b)    an Affiliate of an entity specified in the preceding clauses (a);

(c)    each of a corporation, partnership proprietorship, organisation, trust or other entity

    (i)      that is an investment vehicle (including, without limitation, any hedge fund, issuer of collateralised debt obligations, commercial paper conduit or other special purpose vehicle) that (1) has total assets of at least USD100 million or (2) is one of a group of investment vehicles under common control or management having, in the aggregate, total assets of at least USD100 million; or

    (ii)     that has total assets of at least USD500 million; or

(iii)    the obligations of which under an agreement, contract, or transaction are guaranteed or otherwise supported by a letter of credit or keepwell, support, or other agreement by an entity described in clauses (a), (b), (c)(ii) or (d); and

(d)    a Sovereign, Sovereign Agency or Supranational Organisation;

All references in this definition of USD include equivalent amounts in other currencies.

"**Fully Transferable Obligation**" means a Reference Obligation that is either Transferable, in the case of Bonds, or capable of being assigned or novated to all Eligible Transferees without the consent of any person being required, in the case of any Reference Obligation other than Bonds. For purposes of determining whether a Reference Obligation is Transferable or is capable of being assigned or novated to Eligible Transferees, such determination shall be made as of the Valuation Date for the portion of the Reference Obligation to be valued on such Valuation Date, taking into account only the terms of the Reference Obligation and any related transfer or consent documents which have been obtained by the Issuer.

Any requirement that notification of novation, assignment or transfer of a Reference Obligation be provided to a trustee, fiscal agent, administrative agent, clearing agent or paying agent for any Reference Obligation shall not be considered to be a requirement for consent for purposes of the definitions of Restructuring Maturity Limitation and Fully Transferable Obligation.

"**Modified Restructuring Maturity Limitation Date**" means, with respect to a Reference Obligation, the date that is the later of (x) the Scheduled Termination Date and (y) 60 months following the Restructuring Date in the case of a Restructured Bond or Loan, or 30 months following the Restructuring Date in the case of all other Reference Obligations.

"**Modified Eligible Transferee**" means any bank, financial institution or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities and other financial assets.

"**Conditionally Transferable Obligation**" means a Reference Obligation that is either Transferable, in the case of Bonds, or capable of being assigned or novated to all Modified Eligible Transferees without the consent of any person being required, in the case of any Reference Obligation other than Bonds, provided, however, that a Reference Obligation other than Bonds will be a Conditionally Transferable Obligation notwithstanding that consent of the Reference Entity or the guarantor, if any, of a Reference Obligation other than Bonds (or the consent of the relevant obligor if a Reference Entity is guaranteeing such Reference Obligation) or any agent is required for such novation, assignment or transfer so long as the terms of such Reference Obligation provide that such consent may not be unreasonably withheld or delayed. Any requirement that notification of novation, assignment or transfer of a Reference Obligation be provided to a trustee, fiscal agent, administrative agent, clearing agent or paying agent for a Reference Obligation shall not be considered to be a requirement for consent for purposes of this definition.

For purposes of determining whether a Reference Obligation satisfies the requirements of the definition of Conditionally Transferable Obligation, such determination shall be made as of the Valuation Date for the portion of the Reference Obligation to be valued on such Valuation Date, taking into account only the terms of the Reference Obligation and any related transfer or consent documents which have been obtained by the Issuer.

**Additional terms relating to Successors**

(a)    In relation to a Reference Entity that is not a Sovereign, "**Successor**" means the entity or entities, if any, determined as set forth below:

(i)    if an entity directly or indirectly succeeds to 75 per cent. or more of the Relevant Obligations of the Reference Entity by way of a Succession Event, that entity will be the sole Successor;

(ii)    if one entity directly or indirectly succeeds to more than 25 per cent. (but less than 75 per cent.) of the Relevant Obligations of the Reference Entity by way of a Succession Event, and not more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, the entity that succeeds to more than 25 per cent. of the Relevant Obligations will be the sole Successor;

(iii)    if more than one entity each directly or indirectly succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity by way of a Succession Event, and not more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, the entities that succeed to more than 25 per cent. of the Relevant Obligations will each be Successors;

(iv)    if one or more entities each directly or indirectly succeed to more than 25 per cent. of the Relevant Obligations of the Reference Entity by way of a Succession Event, and more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, each such entity and the Reference Entity will be Successors;

(v)    if one or more entities directly or indirectly succeed to a portion of the Relevant Obligations of the Reference Entity by way of a Succession Event, but no entity succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity and the Reference Entity continues to exist, there will be no Successor and the Reference Entity and the Transaction will not be changed in any way as a result of the Succession Event; and

(vi)    if one or more entities directly or indirectly succeed to a portion of the Relevant Obligations of the Reference Entity by way of a Succession Event, but no entity succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity and the Reference Entity ceases to exist, the entity which succeeds to the greatest percentage of Relevant Obligations (or, if two or more entities succeed to an equal percentage of Relevant Obligations, the entity from among those entities which succeeds to the greatest percentage of obligations) of the Reference Entity will be the sole Successor.

The Calculation Agent will be responsible for determining, as soon as reasonably practicable after it becomes aware of the relevant Succession Event (but no earlier than 14 days after the legally effective date of the Succession Event), and with effect from the legally effective date of the Succession Event, whether the relevant thresholds set forth above have been met, or which entity qualifies under paragraph (a)(vi) above, as applicable. In calculating the percentages used to determine whether the relevant thresholds set forth above have been met, or which entity qualifies under paragraph (a)(vi) above, as applicable, the Calculation Agent shall use, in respect of each applicable Relevant Obligation included in such calculation, the amount of the liability in respect of such Relevant Obligation listed in the Best Available Information.

(b)    "**Succession Event**" means an event such as a merger, consolidation, amalgamation, transfer of assets or liabilities, demerger, spin-off or other similar event in which one entity succeeds to the obligations of another entity, whether by operation of law or pursuant to any agreement. Notwithstanding the foregoing, "Succession Event" shall not include an event in which the holders of obligations of the Reference Entity exchange such obligations for the obligations of another entity, unless such exchange occurs in connection with a merger, consolidation, amalgamation, transfer of assets or liabilities, demerger, spin-off or other similar event.

(c)     Where, pursuant to Section (a) above, one or more Successors have been identified in relation to a particular Reference Entity:

   (i)      each such Successor will be a Reference Entity (a "**Successor Reference Entity**") for the purposes of this Transaction (and, for the avoidance of doubt, the original Reference Entity shall cease to be a Reference Entity except where it is a Successor Reference Entity); and

   (ii)     the Floating Rate Payer Calculation Amount in respect of each such Successor Reference Entity shall be the Floating Rate Payer Calculation Amount in respect of the original Reference Entity divided by the number of Successor Reference Entities.

(d)     "**Relevant Obligations**" means the Obligations constituting Bonds and Loans of the Reference Entity outstanding immediately prior to the effective date of the Succession Event, excluding any debt obligations outstanding between the Reference Entity and any of its Affiliates, as determined by the Calculation Agent. The Calculation Agent will determine the entity which succeeds to such Relevant Obligations on the basis of the Best Available Information. If the date on which the Best Available Information becomes available or is filed precedes the legally effective date of the relevant Succession Event, any assumptions as to the allocation of obligations between or among entities contained in the Best Available Information will be deemed to have been fulfilled as of the legally effective date of the Succession Event, whether or not this is in fact the case.

(e)     "**Best Available Information**" means:

   (i)      in the case of a Reference Entity which files information with its primary securities regulator or primary stock exchange that includes unconsolidated, pro forma financial information which assumes that the relevant Succession Event has occurred or which provides such information to its shareholders, creditors or other persons whose approval of the Succession Event is required, that unconsolidated, pro forma financial information and, if provided subsequently to the provision of unconsolidated, pro forma financial information but before the Calculation Agent makes its determination for the purposes of the definition of "Successor", other relevant information that is contained in any written communication provided by the Reference Entity to its primary securities regulator, primary stock exchange, shareholders, creditors or other persons whose approval of the Succession Event is required; or

   (ii)     in the case of a Reference Entity which does not file with its primary securities regulators or primary stock exchange, and which does not provide to shareholders, creditors or other persons whose approval of the Succession Event is required, the information contemplated in (i) above, the best publicly available information at the disposal of the Calculation Agent to allow it to make a determination for the purposes of the definition of "**Successor**".

Information which is made available more than 14 days after the legally effective date of the Succession Event shall not constitute Best Available Information.

(f)     In relation to a Sovereign Reference Entity, "**Successor**" means any direct or indirect successor(s) to that Reference Entity irrespective of whether such successor(s) assumes any of the obligations of such Reference Entity.

"**Sovereign**" means any state, political subdivision or government, or any agency, instrumentality, ministry, department or other authority (including, without limiting the foregoing, the central bank) thereof.

For the avoidance of doubt, the Calculation Agent may determine a Succession Event has occurred in relation to a Reference Entity at any time during the Credit Observation Period.

**Additional terms relating to Monoline Insurers**

The following additional terms relating to Monoline Insurers shall apply to a Reference Entity in respect of which "Monoline" is specified in the Reference Registry (and in each case its Successor) and each such Reference Entity shall be a "Monoline Insurer" for these purposes.

"**Qualifying Policy**" means a financial guaranty insurance policy or similar financial guarantee pursuant to which a Reference Entity irrevocably guarantees or insures all Instrument Payments (as defined below) of an instrument that constitutes Borrowed Money (modified as set forth below) (the "Insured Instrument") for which another party (including a special purpose entity or trust) is the obligor (the "Insured Obligor"). Qualifying Policies shall exclude any arrangement (i) structured as a surety bond, letter of credit or equivalent legal arrangement or (ii) pursuant to the express contractual terms of which the payment obligations of the Reference Entity can be discharged or reduced as a result of the occurrence or non-occurrence of an event or circumstance (other than the payment of Instrument Payments). The benefit of a Qualifying Policy must be capable of being Delivered together with the Delivery of the Insured Instrument.

"**Instrument Payments**" means (A) in the case of any Insured Instrument that is in the form of a pass-through certificate or similar funded beneficial interest, (x) the specified periodic distributions in respect of interest or other return on the Certificate Balance on or prior to the ultimate distribution of the Certificate Balance and (y) the ultimate distribution of the Certificate Balance on or prior to a specified date and (B) in the case of any other Insured Instrument, the scheduled payments of principal and interest, in the case of both (A) and (B) (1) determined without regard to limited recourse or reduction provisions of the type described in "Not Contingent" below and (2) excluding sums in respect of default interest, indemnities, tax gross-ups, make-whole amounts, early redemption premiums and other similar amounts (whether or not guaranteed or insured by the Qualifying Policy).

"**Certificate Balance**" means, in the case of an Insured Instrument that is in the form of a pass-through certificate or similar funded beneficial interest, the unit principal balance, certificate balance or similar measure of unreimbursed principal investment.

**Obligations and Reference Obligation**

In respect of any Reference Entity which is a Monoline Insurer, the definitions of Obligations and Reference Obligations are hereby amended by adding "or Qualifying Policy" after "or as provider of any Qualifying Affiliate Guarantee".

**Interpretation of Provisions**

In the Event that an Obligation or a Reference Obligation is a Qualifying Policy, the terms of Section 2.21(d) (which shall for the purpose of this Transaction be construed so that references therein to Deliverable Obligations, Deliverable Obligation Category and Deliverable Obligation Characteristics shall be deemed to be references to Reference Obligations, Reference Obligation Category and Reference Obligation Characteristics respectively) will apply, with references to the Qualifying Guarantee, the Underlying Obligation and the Underlying Obligor deemed to include the Qualifying Policy, the Insured Instrument and the Insured Obligor, respectively, except that:

(i)     the Obligation Category Borrowed Money and the Obligation Category and Reference Obligation Category Bond shall be deemed to include distributions payable under an Insured Instrument in the form of a pass-through certificate or similar funded beneficial interest, the Reference Obligation Category Bond shall be deemed to include such Insured Instrument, and the terms "obligation" and "obligor" as used in the 2003 ISDA Credit Derivatives Definitions in respect of such an Insured Instrument shall be construed accordingly;

(ii)    references in the definitions of Assignable Loan and Consent Required Loan to the guarantor and guaranteeing shall be deemed to include the insurer and insuring, respectively;

(iii)    neither the Qualifying Policy nor the Insured Instrument must satisfy on the relevant date the Reference Obligation Characteristic of Accelerated or Matured, whether or not the characteristic is otherwise specified as applicable herein;

(iv)    if the Assignable Loan, Consent Required Loan, Direct Loan Participation or Transferable Reference Obligation Characteristics are specified herein and if the benefit of the Qualifying Policy is not transferred as part of any transfer of the Insured Instrument, the Qualifying Policy must be transferable at least to the same extent as the Insured Instrument;

(v)    with respect to an Insured Instrument in the form of a pass-through certificate or similar funded beneficial interest, the term "outstanding principal balance" shall mean the outstanding Certificate Balance and "maturity", as such term is used in the Maximum Maturity Reference Obligation Characteristic, shall mean the specified date by which the Qualifying Policy guarantees or insures, as applicable, that the ultimate distribution of the Certificate Balance will occur; and

(vi)    for the avoidance of doubt, the amendments to Section 2.21(d) provided in the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions shall not be construed to apply to Qualifying Policies and Insured Instruments.

**Not Contingent**

An Insured Instrument will not be regarded as failing to satisfy the Not Contingent Reference Obligation Characteristic solely because such Insured Instrument is subject to provisions limiting recourse in respect of such Insured Instrument to the proceeds of specified assets (including proceeds subject to a priority of payments) or reducing the amount of any Instrument Payments owing under such Insured Instrument, provided that such provisions are not applicable to the Qualifying Policy by the terms thereof and the Qualifying Policy continues to guarantee or insure, as applicable, the Instrument Payments that would have been required to be made absent any such limitation or reduction.

**Restructuring**

With respect to an Insured Instrument that is in the form of a pass-through certificate or similar funded beneficial interest or a Qualifying Policy with respect thereto, paragraphs (a)(i) to (v) of "Restructuring" above are hereby amended to read as follows:

(i)    a reduction in the rate or amount of the Instrument Payments described in clause (A)(x) of the definition thereof that are guaranteed or insured by the Qualifying Policy;

(ii)    a reduction in the amount of the Instrument Payments described in clause (A)(y) of the definition thereof that are guaranteed or insured by the Qualifying Policy;

(iii)    a postponement or other deferral of a date or dates for either (A) the payment or accrual of the Instrument Payments described in clause (A)(x) of the definition thereof or (B) the payment of the Instrument Payments described in clause (A)(y) of the definition thereof, in each case that are guaranteed or insured by the Qualifying Policy;

(iv)    a change in the ranking in priority of payment of (A) any Obligation under a Qualifying Policy in respect of Instrument Payments, causing the Subordination of such Obligation to any other Obligation or (B) any Instrument Payments, causing the Subordination of such Insured Instrument to any other instrument in the form of a pass-through certificate or similar funded beneficial interest issued by the Insured Obligor, it being understood that, for this purpose, Subordination will be deemed to include

any such change that results in a lower ranking under a priority of payments provision applicable to the relevant Instrument Payments; or

(v)    any change in the currency or composition of any payment of Instrument Payments that are guaranteed or insured by the Qualifying Policy to any currency which is not a Permitted Currency.

Paragraph (b)(iii) of "Restructuring" above is hereby amended by adding "or, in the case of Qualifying Policy and an Insured Instrument, where (A) the Qualifying Policy continues to guarantee or insure, as applicable, that the same Instrument Payments will be made on the same dates on which the Qualifying Policy guaranteed or insured that such Instrument Payments would be made prior to such event and (B) such event is not a change in the ranking in the priority of payment of the Qualifying Policy" after "Reference Entity".

"Restructuring" above is hereby amended by the insertion of paragraph (e) as follows:

For purposes of paragraphs (a), (b) and (d), the term Obligation shall be deemed to include Insured Instruments for which the Reference Entity is acting as provider of a Qualifying Policy. In the case of a Qualifying Policy and an Insured Instrument, references to the Reference Entity in paragraph (a) shall be deemed to refer to the Insured Obligor and the reference to the Reference Entity in paragraph (b) shall continue to refer to the Reference Entity.

### Fully Transferable Obligation and Conditionally Transferable Obligation

In the event that a Fully Transferable Obligation or Conditionally Transferable Obligation is a Qualifying Policy, the Insured Instrument must meet the requirements of the relevant definition and, if the benefit of the Qualifying Policy is not transferred as part of any transfer of the Insured Instrument, the Qualifying Policy must be transferable at least to the same extent as the Insured Instrument. References in the definition of Conditionally Transferable Obligation to the guarantor and guaranteeing shall be deemed to include the insurer and insuring, respectively. With respect to an Insured Instrument in the form of a pass-through certificate or similar funded beneficial interest, the term "final maturity date", as such term is used in the definition of Restructuring Maturity Limitation Date, shall mean the specified date by which the Qualifying Policy guarantees or insures, as applicable, that the ultimate distribution of the Certificate Balance will occur.

### Other Provisions

In respect of any provision relating to any Reference Entity which is a Monoline Insurer, references to the Underlying Obligation and the Underlying Obligor shall be deemed to include Insured Instruments and the Insured Obligor, respectively. For the purposes of Section 1.14(b)(ii), references to Qualifying Guarantee and the Underlying Obligation shall be deemed to include the Qualifying Policy and the Insured Instrument, respectively.

Section 2.2(c) of the 2003 ISDA Credit Derivatives Definitions shall be amended by inserting the following words "or insurer" after the words "or guarantor".

### Deliver

For the purposes of Section 8.2. "Deliver" with respect to an obligation that is a Qualifying Policy means to Deliver both the Insured Instrument and the benefit of the Qualifying Policy (or a custodial receipt issued by an internationally recognized custodian representing an interest in such an Insured Instrument and the related Qualifying Policy), and "Delivery" and "Delivered" will be construed accordingly.

### Schedule D
### GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("**Party A**") and RUBY FINANCE PUBLIC LIMITED COMPANY ("**Party B**") have, pursuant to a Deed of Accession dated 22 July 2005, entered into a Master Agreement dated as of 10 October 2002 and amended and restated on 22 July 2005 (the "**Master Agreement**"), pursuant to which Party A and Party B have entered into a confirmation which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "**Agreement**"). This Guarantee is a Credit Support Document as contemplated in the Agreement evidenced by the Confirmation dated 16 June 2006 relating to the Series 2006-3 EUR 50,000,000 RIESLING Credit Linked Synthetic Portfolio Notes due 2016 of Party B (the "**Transaction**"). For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("**Guarantor**"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under the Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability thereof against Party A (other than as a result of the unenforceability of the Agreement against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional transactions under the Master Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived); provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more transactions pursuant to the Master Agreement.

(d)    This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of transactions entered into prior to the termination hereof and for the avoidance of doubt this Guarantee will remain in effect until all payment obligations of Party A under the Transaction have been fully performed notwithstanding such termination.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

A06343142/

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Title: _____

Date: _____

**Schedule E – Exhibit 1**

**Form of Credit Event Notice and Notice of Publicly Available Information**

[●]

Ruby Finance Public Limited Company
AIB International Centre
International Financial Services Centre
Dublin 1
Ireland
Attention:      [Valerie Barlow]
Tel:            +353 1 641 7671
Fax:            +353 1 874 3050
Email:          IFSSEC.team@aib.ie; [Valerie.M.Barlow@aib.ie]

JP Morgan Corporate Trustee Services Limited
Trinity Tower
9 Thomas More Street
London E1W 1YT
Attention:      [Iain Mills; Stuart Dawkin; Michael Whelan]
Fax:            [+44 207 777 5450]
Email           [iain.mills@chase.com; stuart.x.dawkin@jpmorgan.com; Michael.ITS.Whelan@chase.com]

Moody's Investors Service Ltd.
2 Minster Court
Mincing Lane
London EC2R 7XB
Attention:      Beryl Marjolin
Fax:            +44 207 [●]
Email:          beryl.marjolin@moodys.com

**CREDIT EVENT NOTICE AND**
**NOTICE OF PUBLICLY AVAILABLE INFORMATION**

Re:      The Credit Derivative Transaction relating to Ruby Finance Public Limited Company Series 2006-3 EUR 50,000,000 RIESLING Credit Linked Synthetic Portfolio Notes due 2016 (the "**Notes**") referencing [●], under which Lehman Brothers Special Financing Inc. has bought credit protection from Ruby Finance Public Limited Company.

In accordance with the terms of the Notes, the Aggregate Outstanding Nominal Amount may be reduced upon the occurrence of Credit Events to one or more of the Reference Entities listed in the Reference Registry.

EXHIBIT C

Dear Sir or Madam:

Reference is made to the Credit Derivative Transaction described above (the "**Transaction**"). Capitalized terms used and not otherwise defined in this letter shall have the meanings given them in the Series Prospectus or the Confirmation, as context requires.

This letter is our Credit Event Notice to you that [●] occurred with respect to [●] on or about [●], when [●].

This letter also comprises our Notice of Publicly Available Information with respect to this Credit Event. Accordingly, we provide the Publicly Available Information attached hereto.

Nothing in this letter shall be construed as a waiver of any rights we may have with respect to the Transaction.

If you have any questions regarding this matter, please contact [Tiki Maclennan] at [0207 102 1569].

### Exhibit 2 - Form of Final Valuation Notice

[●]

Ruby Finance Public Limited Company
AIB International Centre
International Financial Services Centre
Dublin 1
Ireland
Attention: [Anne Flood; Valerie Barlow; Laura Morgan]
Tel: +353 1 641 7671
Fax: +353 1 874 3050

Lehman Brothers Special Financing Inc.
745 Seventh Avenue
New York
NY 10019
Attention: [●]
Tel: +44 20 7 [●]
Fax: +44 20 7[●]

JPMorgan Chase Bank
Trinity Tower
9 Thomas More Street
London E1W 1YT
Attention: [Iain Mills; Stuart Dawkin; Michael Whelan]

JP Morgan Corporate Trustee Services Limited
Trinity Tower
9 Thomas More Street
London E1W 1YT
Attention: [Iain Mills; Stuart Dawkin; Michael Whelan]
Fax: + [44 20 7777 5410]

Moody's Investors Service Ltd.
2 Minster Court
Mincing Lane
London EC2R 7XB
Attention: Beryl Marjolin
Fax: +44 207 [●]
Email: beryl.marjolin@moodys.com

Re:   **Credit Derivative Transaction relating to Ruby Finance Public Limited Company Series 2006-3 EUR 50,000,000 RIESLING Credit Linked Synthetic Portfolio Notes due 2016**

The ISIN Number of the Notes is XS0256825992. The Notes reference, *inter alios*, [●]. In accordance with the terms of the Notes, the Aggregate Outstanding Principal Amount may be reduced upon the occurrence of Credit Events in respect of one or more Reference Obligations. Capitalised terms used but not defined in this notice shall have the meanings given to them in the Series Prospectus for the Notes.

FINAL VALUATION NOTICE

The details of the Reference Obligation selected for determining the Final Price are as follows:

Reference Entity:              [●]

Quotation Amount:             [●]

Reference Obligation:         [●].

This is to notify you that on the Valuation Date ([●]) the Calculation Agent requested and received a Firm Bid Quotation for the Reference Obligation from the following Dealers in accordance with the [First/Second] Valuation Method:

[●]                  [●]
[●]                  [●]
[●]                  [●]
[●]                  [●]
[●]                  [●]

Accordingly, by taking the [●] Bid Quotation:

Final Price:                    [●]

The Individual Loss Amount is:      [●]

The Cumulative Loss Amount is:      [●]

In respect of the Notes, the Aggregate Outstanding Principal Amount is [not] subject to reduction in whole or in part since the Cumulative Loss Amount is [less/more] than the Subordination Amount (EUR [●]).

The Reference Entity with respect to [●] is deemed deleted from the Reference Registry and the Reference Registry is amended accordingly.

Please contact [●] (Tel: [44 20 ●]) if you require further assistance with the terms of this notice.

Yours sincerely,

Lehman Brothers International (Europe)
(as Calculation Agent)

By:_____
Name:
Title:

## USE OF PROCEEDS

The net proceeds of the issue of the Notes, which are expected to be EUR 50,000,000, will be applied by the Issuer on the Issue Date to fund the purchase of the Collateral Securities (as described in "The Collateral Securities").

## THE COLLATERAL SECURITIES

*The following information relating to the Collateral Securities is a summary only of certain terms and conditions of such Collateral Securities and has, save as provided below, been extracted from the pricing supplement relating to the Collateral Securities. None of the Issuer, the Arranger, the Trustee, the Agents or the Swap Counterparty has verified, or accepts any liability whatsoever for the accuracy of, such information and prospective investors of the Notes should make their own independent investigations and enquiries into the Collateral Securities and the Collateral Issuer.*

| | |
|---|---|
| **Collateral Issuer** | Hypothekenbank in Essen AG |
| **Registered address** | Gildehofstrasse 1 |
| | 45127 Essen |
| | Germany |
| **Country of incorporation** | Germany |
| **Nature of business** | The Collateral Issuer engages in all financial service activities obtaining finance in the capital markets, which funds the operations of affiliated companies. |
| **Collateral Securities** | EUR 50,000,000 in principal amount of EUR 50,000,000 Floating Rate Public Pfandbriefe due 2016 issued by the Collateral Issuer on 16 June 2006 (ISIN: DE000HBE0HS1). |
| **Listing** | Luxembourg Stock Exchange |
| **Governing law** | German law |
| **Maturity** | 20 June 2016 |
| **Business days** | TARGET |
| **Method of origination/creation** | The Collateral Securities were issued as final terms dated 16 June 2006 (the "**Collateral Final Terms**") pursuant to the Collateral Issuer's EUR 30,000,000,000 Essen Hyp Debt Issuance Programme. Copies of the Collateral Final Terms are available for inspection during usual business hours on any weekday (Saturdays, Sundays and public holidays excepted) at the registered office of the Issuer and at the specified offices of the Issuing and Paying Agent and the Irish Paying Agent. |

## DESCRIPTION OF THE SWAP COUNTERPARTY AND THE SWAP GUARANTOR

### Lehman Brothers Special Financing Inc.

Lehman Brothers Special Financing Inc. (the "**Swap Counterparty**") was incorporated under the laws of the State of Delaware of the United States of America on 17 August 1984.

The principal executive office of the Swap Counterparty is located at 745 Seventh Avenue, New York, New York 10019, U.S.A. The Swap Counterparty's registered office in the State of Delaware is located at Suite 400, Wilmington, Delaware 19808, U.S.A.

The Swap Counterparty is engaged in the fixed income and currency, swaps and derivatives business. The Swap Counterparty's principal activities are to provide a wide range of derivative products including interest rate, currency, credit and mortgage derivatives.

The Swap Counterparty is a wholly-owned subsidiary of Lehman Brothers Inc.

### Lehman Brothers Holding Inc.

Lehman Brothers Holding Inc. (the "**Swap Guarantor**") was incorporated under the laws of the State of Delaware of the United States of America on 29 December 1983.

The principal executive office of the Swap Guarantor is located at 745 Seventh Avenue, New York, New York 10019. The Swap Guarantor's registered office in the State of Delaware is located at Suite 400, Wilmington, Delaware 19808, U.S.A.

The Swap Guarantor is a holding company that is primarily engaged in funding activities. Through its U.S. and non-U.S. subsidiaries and affiliates it provides equity and fixed income sales, trading and research, investment banking, mortgage, private equity and private client services on a global basis. The Swap Guarantor provides these products and services to a wide array of clients, including corporations, governments and municipalities, institutional clients, and high-net-worth individuals.

The Swap Guarantor funds its activities through a combination of master notes, commercial paper, bank credit facilities and other money market related instruments, medium and long-term debt, and an unsecured flexible cash capital facility.

The common stock of the Swap Guarantor is listed on the New York Stock Exchange.

## GENERAL INFORMATION

1.    Application has been made to the Irish Financial Services Regulatory Authority as competent authority under Directive 2003/71/EC for this Series Prospectus to be approved. Application has also been made to The Irish Stock Exchange Limited for the Notes to be admitted to the daily official list of the Irish Stock Exchange and to be admitted to trading on the regulated market of the Irish Stock Exchange. There can be no assurance that such applications will be successful.

2.    From the date of this Series Prospectus and for so long as the Notes remain outstanding, the following documents will be available for inspection in physical format during usual business hours on any weekday (Saturdays, Sundays and public holidays excepted) at the Issuer's registered office and the specified offices of the Irish Paying Agent. Copies of the documents referred to below may be obtained free of charge from the specified offices of the Irish Paying Agent:

    (1)      this Series Prospectus;

    (2)      the Supplemental Trust Deed and Drawdown Agreement in relation to the Notes; and

    (3)      the Collateral Final Terms.

3.    The issue of the Notes was authorised by a resolution of the board of directors of the Issuer passed on 15 June 2006.

4.    Except as disclosed in this Series Prospectus, the Issuer has not been involved in any governmental, legal or arbitration proceedings (including any such proceedings which are pending or threatened of which the Issuer is aware) during the 12 months preceding the date of this Series Prospectus which may have or have had in the recent past significant effects, in the context of the issue of the Notes, on the financial position or profitability of the Issuer.

5.    Save as discussed in *"Subscription and Sale"* in the Base Prospectus, so far as the Issuer is aware, no person involved in the offer of the Notes has an interest material to the offer.

6.    Except as disclosed in this Series Prospectus, there has been no material adverse change in the financial position or prospects of the Issuer since the date of its last published audited financial statements, being those for the financial year ended 31 January 2005.

**REGISTERED OFFICE OF THE ISSUER**

AIB International Centre
International Financial Services Centre
Dublin 1
Ireland

**TRUSTEE**

**J.P. Morgan Corporate Trustee Services Limited**
Trinity Tower
9 Thomas More Street
London E1W 1YT

**SWAP COUNTERPARTY**

**Lehman Brothers Special Financing Inc.**
Suite 400
Wilmington
Delaware 19808
U.S.A.

| | |
|---|---|
| **ISSUING AND PAYING AGENT AND CUSTODIAN** | **IRISH PAYING AGENT** |
| **JPMorgan Chase Bank, N.A.** | **J.P. Morgan Bank (Ireland) p.l.c.** |
| Trinity Tower | JPMorgan House |
| 9 Thomas More Street | International Financial Services Centre |
| London E1W 1YT | Dublin 1 |
| | Ireland |
| **CALCULATION AGENT** | **LISTING AGENT** |
| **Lehman Brothers International (Europe)** | **A&L Listing Limited** |
| 25 Bank Street | International Financial Services Centre |
| London E14 5LE | North Wall Quay |
| | Dublin 1 |
| | Ireland |

**LEGAL ADVISERS**

| | |
|---|---|
| *to the Issuer* | *to the Arranger* |
| *as to Irish law* | *as to English law* |
| **A&L Goodbody Solicitors** | **Linklaters** |
| International Financial Services Centre | One Silk Street |
| North Wall Quay | London EC2Y 8HQ |
| Dublin 1 | |
| Ireland | |

A06343142/