## SWAP CONFIRMATION

| | |
|---|---|
| Date: | 28 April 2006 |
| To: | Ruby Finance Public Limited Company |
| From: | Lehman Brothers Special Financing Inc. |
| Re: | Credit Derivative Transactions relating to Ruby Finance Public Limited Company Series 2006-2 EUR 10,000,000 Orion Enhanced Return Dynamic CDO Credit Linked Synthetic Portfolio Notes due 2013 |

Dear Sirs,

The purpose of this letter agreement (the "**Confirmation**") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "**Transaction**"). The Transaction has been entered into in connection with issue of the Ruby Finance Public Limited Company Series 2006-2 EUR 10,000,000 Orion Enhanced Return Dynamic CDO Credit Linked Synthetic Portfolio Notes due 2013.

This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below. The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement and Additional Provisions for Physically Settled Default Swaps – Monoline Insurer as Reference Entity, published on January 21, 2005, in each case as published by the International Swaps and Derivatives Association Inc. ("**ISDA**") (together, the "**Credit Derivatives Definitions**") and the 2000 ISDA Definitions as published by ISDA (the "**2000 Definitions**") are incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions and the Confirmation, the Confirmation will govern. In addition, the definitions and provisions set out in Schedule C hereto shall prevail in the event of any inconsistency with the Credit Derivative Definitions. In the event of any inconsistency between Schedule C hereto and sections 1 to 9 of the Confirmation, the provisions of sections 1 to 9 shall prevail.

Subject to paragraph (l) of Part 1 of the Schedule to the Agreement (as defined below), the Confirmation supplements, forms a part of, and is subject to the ISDA Master Agreement dated as of 10 October 2002 and amended and restated on 22 July 2005, as amended and supplemented from time to time (the "**Agreement**") between Lehman Brothers Special Financing Inc. and Dante Finance Public Limited Company to which you have acceded under a Deed of Accession dated 22 July 2005. All provisions contained in the relevant Agreement govern the Confirmation except as expressly modified below. In this Confirmation, the "**Notes**" refers to Ruby Finance Public Limited Company Series 2006-2 EUR 10,000,000, Orion Enhanced Return Dynamic CDO Credit Linked Synthetic Portfolio Notes due 2013 and "**Conditions**" refers to the terms and conditions of the Notes.

Capitalised terms used but not defined herein will have the meanings given to them in the Conditions and in the event of any inconsistency between the Conditions and this Confirmation, this Confirmation will govern.

In the event of any inconsistency between the Confirmation and the Agreement, the Confirmation shall prevail.

In each Confirmation, "**Party A**" means Lehman Brothers Special Financing Inc. and "**Party B**" means Ruby Finance Public Limited Company.

The terms of the Transactions to which the Confirmations relate are as follows:

## 1    General Terms

| | |
|---|---|
| Trade Date: | 10 April 2006 |
| Effective Date: | 28 April 2006 |
| Scheduled Termination Date: | 20 September 2013, subject to adjustment in accordance with the Following Business Day Convention. |
| Termination Date: | The Scheduled Termination Date unless an Adjustment Reference Entity or a Notice Delivery Period Extension Event exists as at the Final Cut-off Date in which case the Termination Date shall be the Deferred Redemption Date (as defined in the Conditions) (or, where there is more than one Adjustment Reference Entity or Notice Delivery Period Extension Event, the latest Deferred Redemption Date). |
| Floating Rate Payer: | Ruby Finance Public Limited Company (the "**Seller**") |
| Fixed Rate Payer: | Lehman Brothers Special Financing Inc. (the "**Buyer**") |
| Calculation Agent: | Lehman Brothers International (Europe) |
| | Any determination, calculation or selection made by the Calculation Agent under this Transaction shall be made by the Calculation Agent in a commercially reasonable manner and based on best market practice. |
| Calculation Agent City: | London |
| Business Days: | London and TARGET. |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions and as otherwise provided in this Confirmation, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |

## 2    Reference Entities and Reference Obligations

| | |
|---|---|
| Reference Entity: | Each of the entities (and any Successor thereto) listed in the Reference Registry from time to time, subject to the provisions of "Successor Substitution" below and the provisions of a portfolio management agreement dated 28 April 2006 between LRI Landesbank Rheinland-Pfalz International SA (the "**Portfolio Manager**"), Party A and the Calculation Agent (the "**Portfolio Management Agreement**") (a copy of which has been provided to Party B); provided that, upon the occurrence of a Credit Event during the Credit Observation Period with respect to a Reference Entity, a Benchmark Obligation or one or more Obligations of a Reference Entity, and satisfaction of the Conditions to Settlement with respect to such Credit Event, such Reference Entity will be deemed deleted from the Reference Registry with effect from the Event Determination Date (subject to the provisions set out in "Final Price" in paragraph 5 below) with respect to such Reference Entity (other |

than for the purposes of determining the relevant Cumulative Loss Amount) and the Reference Registry shall be amended accordingly, subject always to the provisions regarding delivery of multiple Credit Event Notices pursuant to the "Credit Event Notice After Restructuring" provisions set out in Schedule C.

"**Reference Registry**" means the register of Reference Entities maintained by the Calculation Agent in accordance with this Confirmation (the initial form of which is set out in Schedule A) as the same may be amended time to time in accordance with the Portfolio Management Agreement. Pursuant to the Portfolio Management Agreement, Reference Entities may be added to, or removed from, the Reference Registry (each a "**Reference Registry Adjustment**") in accordance with the terms set out therein.

The Reference Registry shall contain the following information in respect of each Reference Entity included therein:

(i)  the Reference Entity Notional Amount applicable to the Reference Entity;

(ii)  the category (the "**Reference Entity Category**") applicable to the Reference Entity for the purposes of designating which of the terms set out in Schedule B are applicable to the Reference Entity;

(iii)  the Benchmark Obligation (if any) applicable to the Reference Entity;

(iv)  the seniority of the Benchmark Obligation (the "**Seniority**") (for the purposes of information only);

(v)  the effective date of each Successor Substitution or Reference Registry Adjustment effected with respect to the Reference Entity and any change to the Reference Entity Notional Amount resulting from any Successor Substitution; and

(vi)  whether such Reference Entity is a Monoline Insurer.

Section 2.30 of the Credit Derivatives Definitions shall not apply to this Transaction.

| | |
|---|---|
| Reference Entity Notional Amount applicable to each Reference Entity: | With respect to each Reference Entity, the amount specified in respect of such Reference Entity in the Reference Registry. |
| Successor Substitution: | Notwithstanding anything to the contrary herein (in particular in the terms relating to Successors set out in Schedule C), upon the occurrence of a Succession Event (as defined in Schedule C) at any time from and including the Trade Date between two or more of the Reference Entities for the time being comprised in the Reference Registry, which for the avoidance of doubt is not a Credit Event, the Calculation Agent may, by written notice to Buyer and Seller indicating the Succession Event Date |

and the Succession Event Effective Date, give notice to remove one or more of those Reference Entities that are subject to the Succession Event (the "**Removed Succession Event Reference Entities**") from the Reference Registry, and to replace such Removed Succession Event Reference Entities with one or more entities (each an "**Added Succession Event Reference Entity**") such that the Reference Entities resulting from the Successor Substitution shall be:

(i)   the entity which the Calculation Agent determines has been formed as a result of the Succession Event; and/or

(ii)  an entity or entities selected by the Calculation Agent in accordance with the Successor Substitution Criteria,

provided that such notice from the Calculation Agent will be effective two Business Days following the date the notice is sent to Buyer and Seller (the "**Succession Event Effective Date**") to remove or replace such Reference Entities from the Reference Registry. Each Added Succession Event Reference Entity will be a Reference Entity for the purposes of this Transaction and each Removed Succession Event Reference Entity will be deemed deleted from the Reference Registry, in each case as of the Succession Event Effective Date. The Calculation Agent shall provide the parties hereto and Moody's with an updated Reference Registry as soon as is reasonably practicable after a Successor Substitution.

Each Added Succession Event Reference Entity shall have a Reference Entity Notional Amount selected by the Calculation Agent such that the sum of the Reference Entity Notional Amounts of the Added Succession Event Reference Entities shall be equal to the sum of the Reference Entity Notional Amounts of the Removed Succession Event Reference Entities.

For the avoidance of doubt, the Reference Entity Category of any Added Succession Event Reference Entity or Successor will be selected by the Calculation Agent acting in a commercially reasonable manner.

| | |
|---|---|
| Succession Event Date: | The occurrence of a Succession Event, and the date at which such Succession Event is deemed to occur (the "**Succession Event Date**"), shall be determined by the Calculation Agent. |
| Successor Substitution Criteria: | The Added Succession Event Reference Entities shall, on the date of their inclusion in the Reference Registry, have an average Moody's Rating assigned to their unsecured, senior long-term debt or deposit obligations (not supported by third party credit enhancement), equal to or higher than the lowest such credit rating of the Removed Succession Event Reference Entities on the Business Day prior to the Succession Event Date, provided that such Moody's Rating shall not be lower than Baa2. |

For the avoidance of doubt, the parties may agree such other changes to this Transaction which are necessary to preserve the economics thereof, provided that Moody's confirm in writing that such changes do not negatively affect the rating of the Notes.

Each such determination shall be made by the Calculation Agent.

**"Moody's"** means Moody's Investors Service (or any successor to the rating business thereof);

**"Moody's Rating"** means, with respect to any Reference Entity, the rating determined as follows:

(a)   the Reference Entity long term senior unsecured rating from Moody's;

(b)   in the event that the Moody's Rating cannot be determined in accordance with paragraph (a) above, but the Reference Entity has a long term issuer rating from Moody's, such rating;

(c)   in the event that the Moody's Rating cannot be determined in accordance with paragraph (a) or (b) above, but the Reference Entity has long term bank deposit rating from Moody's, such rating;

(d)   in the event that the Moody's Rating cannot be determined in accordance with paragraph (a), (b) or (c) above, but the Reference Entity has a long term corporate family rating (formerly senior implied rating as re-named by Moody's on 13th June 2005) from Moody's:

(i)    such rating if it is Baa3 or above

(i)    one subcategory below such rating if it is below Baa3;

(e)   in the event that the Moody's Rating cannot be determined in accordance with paragraph (a), (b), (c), or (d) above but the Reference Entity has a subordinated obligation rating from Moody's, then the Moody's Rating of such Reference Entity shall be:

(i) one subcategory above such rating if such rating is B1 or above

(ii) two subcategories above such rating if such rating is below B1;

(f)   in the event that the Moody's Rating cannot be determined in accordance with paragraph (a), (b), (c), (d) or (e) above, but the Reference Entity has an insurance financial strength rating from Moody's, then the Moody's Rating of such Reference Entity shall be one subcategory below such rating;

(g)   in the event that the Moody's Rating cannot be determined in accordance with paragraph (a), (b), (c), (d), (e) or (f) above, if the Reference Entity has a short term rating from

Moody's, the corresponding long term senior unsecured rating from Moody's in accordance with the table below:

| Short term Moody's rating | Long term Moody's rating |
| --- | --- |
| P-1 | A2 |
| P-2 | Baa2 |
| P-3 | Baa3 |

(h) if the Reference Entity is not rated by Moody's, a confidential credit estimate may be requested from Moody's and the Moody's Rating shall be such confidential credit estimate;

(i) if a Moody's Rating cannot be determined in accordance with paragraphs (a), (b), (c), (d), (e), (f) or (g), but a security or obligation of the Reference Entity is rated by Moody's and no Moody's Rating for such Reference Entity is obtained pursuant to paragraph (h) above, then the Moody's Rating of such Reference Entity shall be determined as follows:

    (i) if there is a rating from Moody's on a senior unsecured obligation of such Reference Entity, then the Moody's Rating of such Reference Entity shall equal such rating; or

    (ii) if there is a rating from Moody's on a subordinated obligation of such Reference Entity, then the Moody's Rating of such Reference Entity shall be one subcategory above such rating; or

(j) if the Reference Entity does not have a long term senior unsecured rating from Moody's as described in paragraphs (a), (b), (c), (d), (e) or (f) and the Reference Entity does not have a short term rating from Moody's as described in paragraph (g) and no security or obligation of the Reference Entity is rated by Moody's and no Moody's Rating for such Reference Entity is obtained pursuant to paragraph (h) above, but if the Reference Entity has an S&P Rating, then the Moody's Rating of such Reference Entity will be:

    (i) on subcategory below the Moody's equivalent of the S&P Rating if such rating is "BBB-" or higher; or

    (ii) two subcategories below the Moody's equivalent of the S&P Rating if such rating is "BB+" or lower;

provided however that (i) no Reference Entity may be given a Moody's Rating based on an S&P Rating if such Reference Entity has no outstanding debt that is currently paying a coupon and (ii) if a debt security or obligation of the Reference Entity has been in default during the past two years, the Moody's Rating of such Reference Entity will be "Ca".

Any Reference Entity that has been placed on credit watch by Moody's for possible upgrade or downgrade by one or more ratings sub-categories shall be treated as having a Moody's Rating that is, respectively, one ratings sub-category higher or one ratings sub-category lower, than the Moody's Rating which would otherwise apply, unless Moody's otherwise advises that such higher or lower rating is not required; and

"**S&P**" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. (or any successor to the rating business thereof);

"**S&P Rating**" means the then current rating of the relevant entity by S&P.

**Reference Obligation(s):** In respect of each Reference Entity listed in the Reference Registry one or more obligations each of which is either:

(a) the Benchmark Obligation, if any, specified for such Reference Entity; or

(b) an obligation of the relevant Reference Entity (either directly or as provider of any Qualifying Affiliate Guarantee or, if All Guarantees is specified as "Applicable" in Schedule B with respect to Reference Entities of the same Reference Entity Category as such Reference Entity, as provider of any Qualifying Guarantee), as selected by the Calculation Agent, acting in good faith and in a commercially reasonable manner, on or prior to the Valuation Date and which (i) falls within the Reference Obligation Category specified below, (ii) has all of the Reference Obligation Characteristics specified below, (iii) is not subject to a counterclaim, defence (other than a counterclaim or defence based on the factors set forth in Section 4.1(a) to (d) of the Credit Derivatives Definitions) or right of set-off by or of the relevant Reference Entity or any applicable Underlying Obligor and (iv) in the case of a Qualifying Guarantee, other than a Qualifying Affiliate Guarantee, is capable, at the applicable Valuation Date, of immediate assertion or demand by or on behalf of the holder or holders against the relevant Reference Entity for an amount at least equal to the outstanding principal balance or Due and Payable Amount apart from the giving of any notice of non-payment or similar procedural requirement, it being understood that acceleration of an Underlying Obligation shall not be considered a procedural requirement.

"**Benchmark Obligation**" means, in respect of each Reference Entity, the obligation (if any) specified as such in the Reference Registry.

**Reference Obligation Category:** With respect to each Reference Entity of a particular Reference Entity Category, the Reference Obligation Category specified in

Schedule B with respect to Reference Entities of such Reference Entity Category.

| | |
|---|---|
| Reference Obligation Characteristics: | With respect to each Reference Entity of a particular Reference Entity Category, the Reference Obligation Characteristic(s) specified in Schedule B with respect to Reference Entities of such Reference Entity Category. |

For the avoidance of doubt, "Assignable Loan" and "Consent Required Loan" shall not apply to Reference Obligations which are Bonds.

If "Assignable Loan" and "Consent Required Loan" are specified as Reference Obligation Characteristics, the Reference Obligations may include any Loan that satisfies either one of such Reference Obligation Characteristics (and all the other applicable Reference Obligation Characteristics).

"Transferable" shall only apply to Reference Obligations that are not Loans.

References in Section 2.21 of the Credit Derivatives Definitions to "Deliverable Obligations", "Deliverable Obligation Category" and "Deliverable Obligation Characteristics" shall be deemed to be references to "Reference Obligations", "Reference Obligation Category" and "Reference Obligation Characteristics" respectively.

**Obligations:**

(a) any obligation of the relevant Reference Entity (either directly or as provider of any Qualifying Affiliate Guarantee or, if All Guarantees is specified as "Applicable" in Schedule B with respect to Reference Entities of the same Reference Entity Category as such Reference Entity, as provider of any Qualifying Guarantee) which is described by the Obligation Category and which has the Obligation Characteristics specified in Schedule B with respect to Reference Entities of the same Reference Entity Category as such Reference Entity, in each case as of the date of the event which constitutes the Credit Event which is the subject of the Credit Event Notice; and

(b) the relevant Benchmark Obligation (if any).

| | |
|---|---|
| All Guarantees: | With respect to each Reference Entity of a particular Reference Entity Category, as specified in Schedule B with respect to Reference Entities of such Reference Entity Category. |
| Reference Price: | 100 per cent. |
| Notional Amount: | EUR 10,000,000. |
| Cumulative Loss Amount: | With respect to any day, the aggregate of all Individual Loss Amounts calculated with respect to the Transaction from, and including the Trade Date, to and including such day a |

Cumulative Loss Amount is calculated, subject to a maximum equal to the Notional Amount.

**Individual Loss Amount**

In relation to each Reference Entity in respect of which an Event Determination Date has occurred, the greater of:

(i)     zero; and

(ii)    Reference Entity Notional Amount x (100% - Final Price)

## 3     Buyer Payments 1

**Fixed Rate Payer Calculation Amount:**

EUR 10,000,000.

**Fixed Rate Payer Calculation Period:**

Section 2.9 of the Credit Derivatives Definitions shall apply, except that the final Fixed Rate Payer Calculation Period will end on, but exclude, the Scheduled Termination Date.

**Fixed Rate Payer Payment Dates:**

20 March, 20 June, 20 September and 20 December in each year commencing on 20 June 2006 and ending on the Scheduled Termination Date, in each case subject to adjustment in accordance with the Following Business Day Convention.

**Fixed Rate:**

EURIBOR plus 1.50 per cent. per annum.

**"EURIBOR"** means "EUR-EURIBOR-Telerate" as defined in the 2000 Definitions with a 'Designated Maturity' of three months and the 'Reset Date' being the day which is the first day of the Fixed Rate Payer Calculation Period and where Linear Interpolation is applicable in respect of the first Calculation Period (being the Fixed Rate Payer Calculation Period commencing on the Effective Date).

**Fixed Rate Day Count Fraction:**

Actual/360

## 4     Buyer Payments 2

**Prepayment Fixed Rate Payer Payment Amount:**

The amount by which (i) the Prepayment Fixed Rate Payer Calculation Requirement, exceeds (ii) the Prepayment Account Balance.

**Prepayment Fixed Rate Payer Calculation Requirement:**

Zero, unless the Long Term Credit Rating of the Credit Support Provider is below A1 or the Short Term Credit Rating of the Credit Support Provider is below P-1 on such Prepayment Fixed Rate Payer Payment Date, in which case it shall be equal to the sum of (i) the Note Exposure and (ii) the Swap Exposure.

**Prepayment Fixed Rate Payer Payment Dates:**

Friday of each calendar week, commencing on the Effective Date and ending on the Scheduled Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

**Additional Prepayment Fixed**

In addition to any Prepayment Fixed Rate Payer Payment

| | |
|---|---|
| Rate Payer Payment Amount: | Amount payable on such Prepayment Fixed Rate Payer Payment Date, if a Rating Event exists on the Additional Prepayment Fixed Rate Payer Date, the Fixed Rate Payer shall pay an additional amount equal to the Swap Exposure within 30 calendar days of such relevant Additional Fixed Rate Payer Date. |
| Additional Prepayment Fixed Rate Payer Dates: | Friday of each calendar week, commencing on the Effective Date and ending on the Scheduled Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |

For the purposes hereof:

**"Aggregate Outstanding Nominal Amount"** shall bear the meaning given to such term in the Conditions.

**"Long Term Credit Rating"** means the rating assigned by Moody's in respect of long term unsecured and unsubordinated debt obligations (not supported by third party credit enhancement).

**"Note Exposure"** means an amount equal to (i) the Aggregate Outstanding Nominal Amount, less (ii) an amount equal to 95% of the market value of the Collateral Securities, as determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, subject to a minimum of zero. For the avoidance of doubt, no reduction of the Aggregate Outstanding Nominal Amount of the Notes shall be made to reflect Credit Events in respect of which a Final Price has not been determined or in respect of which Potential Failures to Pay have not been cured (and have not resulted in the occurrence of a Credit Event) as of such Prepayment Fixed Rate Payer Date.

**"Prepayment Account"** shall bear the meaning given to such term in the Conditions.

**"Prepayment Account Balance"** means, on any day, the balance standing to the credit of the Prepayment Account.

**"Rating Event"** means the Long Term Credit Rating of the Credit Support Provider is below A3 or the Short Term Credit Rating of the Credit Support Provider is below P-2.

**"Short Term Credit Rating"** means the rating assigned by Moody's in respect of short term unsecured and unsubordinated debt obligations (not supported by third party credit enhancement).

**"Swap Exposure"** means an amount equal to (i) the Fixed Amounts payable by the Fixed Rate Payer pursuant to "Buyer Payments 1" for the next two succeeding Fixed Rate Payer Payment Dates, less (ii) the next two succeeding Seller Interim Payments (if any) payable by the Floating Rate Payer. The

Swap Exposure shall be determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, using the floating rate prevailing on the relevant Prepayment Fixed Rate Payer Payment Date or Additional Prepayment Fixed Rate Payer Payment Date, as the case may be.

## 5    Buyer Payments 3

**Buyer Final Payment:**

In addition to the Fixed Amounts payable in accordance with the provisions set out above and subject as provided below, Buyer shall pay to Seller the Buyer Final Payment Amount on the Scheduled Termination Date;

**Buyer Final Payment Amount:**

An amount in EUR determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, as being equal to the greater of:

(a)    (i)  the Outstanding Nominal Amount of the Notes as at the Final Cut-off Date; plus

(ii) an amount equal to the Reserve Ledger Level (as defined below) as at the Final Cut-off Date; less

(iii) the Prepayment Account Balance.

(b)    EUR 0.

**Buyer Final Payment Adjustment:**

If an Adjustment Reference Entity or a Notice Delivery Period Extension Event exists at the Final Cut-off Date, the Buyer Final Payment Amount shall be:

(a)    the Partial Final Payment on the Fixed Rate Payer Payment Date falling on the Scheduled Termination Date;

(b)    each Deferred Final Amount on the relevant Deferred Payment Date; and

(c)    an amount equal to the rate that the Calculation Agent determines would have accrued on any such Deferred Final Amount in the period from (and including) the Scheduled Termination Date to (but excluding) the relevant Deferred Payment Date, had such Deferred Final Amount been accruing interest at a rate equal to a rate (the **"Prevailing Rate"**) that the Calculation Agent determines to be the prevailing rate that it would pay on an overnight deposit of a similar size to the relevant Deferred Final Amount, which shall be paid on such Deferred Payment Date.

For the purposes hereof:

**"Deferred Final Amount"** means, in respect of any Deferred Payment Date, an amount in EUR (rounded down to the nearest cent and subject to a minimum of EUR 0) determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, on the Deferred Payment Cut-off Date as being equal to the excess (if any) of:

(i)   the Buyer Final Payment that would otherwise have been payable on the preceding Deferred Payment Date (or, in respect of the first or only Deferred Payment Date, the Scheduled Termination Date) if:

(A)   in the circumstances set out in sub-paragraph (i) of the definition of "Adjustment Reference Entity", the Individual Loss Amount in respect of the relevant Reference Obligation had actually been determined prior to such preceding Deferred Payment Date (or, as the case may be, the Scheduled Termination Date); or

(B)   in the circumstances set out in sub-paragraph (ii) of the definition of "Adjustment Reference Entity", (i) where the Potential Failure to Pay develops into an actual Failure to Pay, the Individual Loss Amount in respect of the relevant Reference Obligation had actually been determined prior to such preceding Deferred Payment Date (or, as the case may be, the Scheduled Termination Date); or (ii) where the Potential Failure to Pay is subsequently cured, the relevant Potential Failure to Pay had not occurred; or

(C)   in the circumstances that a Notice Delivery Period Extension Event existed as at the Final Cut-off Date and an Event Determination Date occurs on or prior to the Notice Delivery Period Extension Date, the Individual Loss Amount in respect of the relevant Reference Obligation had actually been determined on the Scheduled Termination Date; or

(E)   in the circumstances that a Notice Delivery Period Extension Event existed as at the Final Cut-off Date and an Event Determination Date does not occur on or prior to the Notice Delivery Period Extension Date, the relevant Notice Delivery Period Extension Event had not occurred,

over

the Deferred Final Amount in respect of the preceding Deferred Final Date (or, in respect of the first or only Deferred Final Date, the Partial Final Payment);

"**Deferred Payment Cut-off Date**" means, in respect of each relevant Adjustment Reference Entity or Notice Delivery Period Extension Event existing at the Final Cut-off Date, as determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, the earlier of:

the date on which the relevant Final Price is determined;

the date that the relevant Potential Failure to Pay has been cured;

(where an Event Determination Date occurs prior to the Notice Delivery Period Extension Date) the date on which the relevant Individual Loss Amount is determined; or

ᵢ (where an Event Determination Date has not occurred prior to the Notice Delivery Period Extension Date) the Notice Delivery Period Extension Date,

whichever is applicable; and

**"Deferred Payment Date"** means, in respect of each relevant Adjustment Reference Entity or Notice Delivery Period Extension Event existing at the Final Cut-off Date, a date determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner (which shall be no later than the fifth Business Day following the relevant Deferred Payment Cut-off Date).

**"Partial Final Payment"** means an amount determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, on the Final Cut-off Date as being equal to:

(a) the Outstanding Nominal Amount of the Notes on the Final Cut-off Date less the aggregate of the Reference Entity Notional Amounts of each Adjustment Reference Entity and each Reference Entity in respect of which a Notice Delivery Period Extension Event exists as at the Final Cut-off Date; plus

(b) the Reserve Ledger Level as at the Scheduled Termination Date.

Reserve Ledger: **"Reserve Ledger Level"** means, in respect of any day, an amount determined by the Calculation Agent equal to:

(i) the Initial Reserve Ledger Level; plus

(ii) the sum of the Reserve Ledger Credit Amounts in respect of each Reserve Ledger Credit Date to and including such date; plus

(iii) the sum of all Reserve Ledger Credit Adjustments in respect of each Deferred Reserve Ledger Credit Date to and including such date; plus

(iv) the sum of all Reserve Ledger Increases to and including such date; minus

(v) the sum of all Reserve Ledger Decreases to and including such date.

**"Initial Reserve Ledger Level"** means EUR 1,201,806.

**"Reserve Ledger Credit Date"** means 20 September in each year from and including 20 September 2007 to and including the Scheduled Termination Date, in each case adjusted in accordance with the Following Business Day Convention.

**"Reserve Ledger Credit Amount"** means, in respect of each Reserve Ledger Credit Date, an amount determined by the Calculation Agent on the London and TARGET Business Day preceding such Reserve Ledger Credit Date equal to:

(a) (i) the Notional Amount less (ii) the Cumulative Loss

Amount and the aggregate of the Reference Entity Notional Amounts in respect of each Adjustment Reference Entity (if any) in existence as at such date; multiplied by

(b)   8.50 per cent. per annum; multiplied by

(c)   the actual number of days in the period from and including the preceding Reserve Ledger Credit Date (or in respect of the first Reserve Ledger Credit Date, the Effective Date) to but excluding the relevant Reserve Ledger Credit Date divided by 360.

"**Adjustment Reference Entity**" means, with respect to any Reserve Ledger Credit Date or the Final Cut-off Date, each Reference Entity in respect of which:

(i)    an Event Determination Date has occurred on or prior to such date, but the relevant Reference Entity Valuation Date has not occurred; and/or

(ii)   a Potential Failure to Pay has occurred on or prior to such date and such Potential Failure to Pay has not been cured and, for the avoidance of doubt, a Credit Event has not occurred in respect of such Potential Failure to Pay on or prior to such date.

"**Reserve Ledger Credit Adjustment**" means, in respect of any Reserve Ledger Credit Date, an amount in EUR determined by the Calculation Agent, acting in good faith and in a commercially reasonable manner, as being equal to the excess (if any) of:

(i)    the Reserve Ledger Credit Amount that would otherwise have been determined in respect of such Reserve Ledger Credit Date if:

(A)   in the circumstances set out in paragraph (i) of the definition of "Adjustment Reference Entity", the Final Price in respect of the relevant Adjustment Reference Entity had been determined prior to such Reserve Ledger Credit Date; or

(B)   in the circumstances set out in paragraph (ii) of the definition of "Adjustment Reference Entity", (i) where the Potential Failure to Pay develops into an actual Failure to Pay, the Final Price in respect of the relevant Adjustment Reference Entity had been determined prior to the relevant Reserve Ledger Credit Date; or (ii) where the Potential Failure to Pay is subsequently cured, the relevant Potential Failure to Pay had not occurred;

over:

(ii)   the Reserve Ledger Credit Amount that was actually determined in respect of such Reserve Ledger Credit Date.

"**Deferred Reserve Ledger Credit Date**" means, in respect of each Adjustment Reference Entity, a date determined by the

Calculation Agent, acting in good faith and in a commercially reasonable manner, which shall be no later than the fifth London and TARGET Business Day following either:

(i)    the relevant Reference Entity Valuation Date; or

(ii)   the date on which the Calculation Agent, acting in good faith and in a commercially reasonable manner, determines that the relevant Potential Failure to Pay has been cured.

"**Reserve Ledger Increases**" means, in respect of an Adjustment (as defined in the Portfolio Management Agreement), an amount equal to the Reserve Ledger Level Change (as defined and determined in accordance with the Portfolio Management Agreement) if such Reserve Ledger Level Change is a positive amount.

"**Reserve Ledger Decreases**" means, in respect of an Adjustment (as defined in the Portfolio Management Agreement), an amount equal to the absolute value of the Reserve Ledger Level Change (as defined and determined in accordance with the Portfolio Management Agreement) if such Reserve Ledger Level Change is a negative amount.

## 6    Seller Payments 1

Seller Interim Payments:

In addition to the Seller Final Payments payable in accordance with the provisions set out below, during the period from, and including, the Effective Date to, and including, the Scheduled Termination Date, on each day that is a coupon payment date under the Collateral Securities, Seller will pay to Buyer an amount equal to the aggregate coupon amount due and payable by the Collateral Issuer on such date in respect of the Collateral Securities.

"**Collateral Securities**" shall bear the meaning given to such term in the Conditions. "**Collateral Issuer**" means the issuer of any Collateral Securities.

## 7    Seller Payments 2

Seller Final Payment:

In addition to the Seller Interim Payments payable in accordance with the provisions set out above, Seller shall pay to Buyer the Seller Final Payment Amount on the Scheduled Termination Date.

Seller Final Payment Amount:

An amount equal to the aggregate redemption amount due and payable on the Scheduled Termination Date by the Collateral Issuer in respect of the Collateral Securities.

## 8    Provisions relating to Credit Events

Floating Rate Payer Calculation

| | |
|---|---|
| Amount: | The Reference Entity Notional Amount specified in the Reference Registry with respect to the relevant Reference Entity. |
| Conditions to Settlement: | Credit Event Notice |

| | |
|---|---|
| Notifying Party: | Buyer |
| Notice of Publicly Available Information: | Applicable. |

If a Credit Event Notice contains the information required in the Notice of Publicly Available Information such Credit Event Notice shall be deemed to be both a Credit Event Notice and a Notice of Publicly Available Information as set out in Schedule E - Exhibit 1.

If events have occurred which entitle Buyer to serve a Credit Event Notice in respect of a Reference Entity and Buyer has entered into other credit default swap transactions in relation to that Reference Entity and has served a credit event notice (or equivalent) in respect of such Reference Entity, then Buyer shall also serve a Credit Event Notice in respect of such Reference Entity under this Transaction.

| | |
|---|---|
| Public Sources: | Applicable |
| Specified Number: | Two |

In respect of any Reference Entity, for which the Reference Entity Category is Japan Corporate: Section 3.9 of the Definitions shall be excluded. Section 3.3 of the Definitions shall be amended by replacing "Greenwich Mean Time" with "Tokyo time".

| | |
|---|---|
| Credit Observation Period: | The period from and including the Trade Date to and including the later of: |

(a)   the Scheduled Termination Date; and

(b)   the Grace Period Extension Date, if:

    (i)   the Credit Event that is the subject of the Credit Event Notice is a Failure to Pay that occurs after the Scheduled Termination Date; and

    (ii)   the related Potential Failure to Pay occurs on or prior to the Scheduled Termination Date.

| | |
|---|---|
| Credit Events: | With respect to each Reference Entity of a particular Reference Entity Category for the time being comprised in the Reference Registry, the credit events specified in Schedule B with respect to Reference Entities of such Reference Entity Category. |

If an occurrence would otherwise constitute a Credit Event, such occurrence will constitute a Credit Event whether or not such occurrence arises directly or indirectly from or is subject to a defence based upon: (a) any lack or alleged lack of authority or capacity of a Reference Entity to enter into any

Obligation or, as applicable, an Underlying Obligor to enter into an Underlying Obligation, (b) any actual or alleged unenforceability, illegality, impossibility or invalidity with respect to any Obligation or, as applicable, any Underlying Obligation, however described, (c) any applicable law, order, regulation, decree or notice, however described, or the promulgation of, or any change in, the interpretation by any court, tribunal, regulatory authority or similar administrative or judicial body with competent or apparent jurisdiction of any applicable law, order, regulation, decree or notice, however, described, or (d) the imposition of, or any change in, any exchange controls, capital restrictions or any other similar restrictions imposed by any monetary or other authority, however described.

9    **Calculation of Settlement Amounts**

| | |
|---|---|
| Settlement Method: | Cash Settlement in accordance with the Credit Derivative Definitions, as modified by the following terms: |
| | Notwithstanding anything to the contrary contained in the Credit Derivative Definitions (including without limitation Section 7.1 (*Cash Settlement*)) following the occurrence of an Event Determination Date in respect of a Reference Entity, the Calculation Agent shall determine the applicable Cumulative Loss Amount. |
| | Notwithstanding anything to the contrary contained in Section 7.1 of the Credit Derivatives Definitions, Seller shall not pay Buyer the Individual Loss Amount or Cash Settlement Amount, if any, with respect to such Reference Entity, but the Cumulative Loss Amount will be used to determine, *inter alia*, the reduction in the Buyer Final Payment Amount. |
| Cash Settlement Date: | In respect of each Reference Entity in respect of which an Event Determination Date has occurred, the date determined by the Calculation Agent falling no later than 5 Business Days following the calculation of the Final Price in respect of such Reference Entity. Section 7.3 (*Cash Settlement Date*) of the Credit Derivatives Definitions shall be deemed deleted. |
| Final Reference Obligation Price: | The price of the Reference Obligation expressed as a percentage, determined in accordance with the relevant Valuation Method (subject to a minimum of zero and a maximum of 100 per cent.) provided that, in respect of a Reference Obligation, if the Final Price is 100 per cent., the relevant Reference Entity shall be deemed to be added to the Reference Registry again with effect from such Valuation Date and the Credit Observation Period in respect of such Reference Entity shall be deemed to commence on, and including, such Valuation Date (and for the avoidance of doubt, another Event Determination Date may occur in respect of such Reference |

Entity during such Credit Observation Period).

| | |
|---|---|
| Final Price: | The Final Reference Obligation Price or, if there is more than one Reference Obligation, the Final Price shall be the weighted average of the Final Reference Obligation Prices (as weighted by dividing the Quotation Amount in respect of each such Reference Obligation by the aggregate of such Quotation Amounts) expressed as a percentage, provided that, in respect of a Reference Entity, if the Final Price is 100 per cent., the relevant Reference Entity shall be deemed to be added to the Reference Registry again with effect from the relevant Valuation Date and the Credit Observation Period in respect of such Reference Entity shall be deemed to commence on, and including, such Valuation Date (and for the avoidance of doubt, another Event Determination Date may occur in respect of such Reference Entity during such Credit Observation Period). |
| Valuation Date: | Single Valuation Date: |
| | Any Valuation Business Day selected by the Calculation Agent, acting in good faith and in a commercially reasonable manner, during the period from, and including, the thirtieth (30th) Valuation Business Day following the Event Determination Date to, and including, the seventy-second (72nd) Valuation Business Day following the Event Determination Date. |
| Hedge Settlement: | The occurrence of the valuation date or physical settlement date, howsoever expressed, in respect of any credit derivatives transaction or other hedging transaction entered into by or on behalf of Buyer in relation to the hedging of its obligations under the Transaction (the "**Hedge Transaction**"). |
| Valuation Business Day: | With respect to each Reference Entity of a particular Reference Entity Category, a day on which commercial banks and foreign exchange markets are generally open to settle payments in the place or places specified as such in Schedule B with respect to Reference Entities of such Reference Entity Category. |
| Valuation Time: | 11:00 a.m. in the city in which credit default swap trading for the relevant Reference Entity is effected, as determined by the Calculation Agent. |
| Bid Quotation: | With respect to each Reference Obligation selected by the Calculation Agent in respect of a Reference Entity and a Valuation Date, each firm bid quotation obtained from a Dealer at the Valuation Time for an amount (the "**Quotation Amount**") selected by the Calculation Agent which is not greater than the Reference Entity Notional Amount. |
| Minimum Quotation Amount: | USD 1,000,000. |
| Weighted Average Quotation: | With respect to each Reference Obligation selected by the Calculation Agent in respect of a Reference Entity and a Valuation Date, the weighted average of firm quotations |

obtained from Dealers at the Valuation Time each for an amount with an outstanding principal balance of as large a size as available but less than the Quotation Amount (but of a size not less than the Minimum Quotation Amount or, if quotations of a size equal to the Minimum Quotation Amount are not available, quotations as near in size as practicable to the Minimum Quotation Amount) that in aggregate are approximately equal to the Quotation Amount. For the avoidance of doubt, any such weighted average may be lower or equal to any firm quotation obtained from any Dealer.

| | |
|---|---|
| Settlement Currency: | EUR |
| Reference Entity Valuation Date: | In respect of a Reference Entity, the date on which the Final Price is determined in respect of such Reference Entity. |
| Valuation Method: | If Hedge Settlement has occurred on or before the relevant Valuation Date, the First Valuation Method shall apply and if Hedge Settlement has not occurred on or before the relevant Valuation Date, the Second Valuation Method shall apply. |
| First Valuation Method: | The highest Bid Quotation with respect to a Valuation Date obtained on the same Valuation Business Day by the Calculation Agent in accordance with the following: |

(i) the Calculation Agent shall attempt to obtain Bid Quotations from at least five Dealers (or at least six Dealers where one of such Dealers is the Calculation Agent or any Affiliate of the Calculation Agent) on the Valuation Date; and

(ii) if at least three Bid Quotations are not available on the Valuation Date, the Calculation Agent shall continue to attempt to obtain three Bid Quotations on the days which are 1, 2, 10, 11, 12 and 15 Valuation Business Days following the Valuation Date.

In the event that three Bid Quotations have not been obtained on or before the 15th Valuation Business Day following the Valuation Date, the Calculation Agent shall seek to obtain a Weighted Average Quotation at the Valuation Time on the 16th Valuation Business Day following the Valuation Date. If a Weighted Average Quotation is obtained, that Weighted Average Quotation shall be the Final Reference Obligation Price.

In the event that (a) at least three Bid Quotations have not been obtained on or before the 15th Valuation Business Day following the Valuation Date and (b) the Weighted Average Quotation has not been obtained on the 16th Valuation Business Day following the Valuation Date then the Calculation Agent will request a disinterested third party (the "**Independent Calculation Agent**") that is a dealer in obligations of the type of the Reference Obligation to attempt to obtain two Bid

Quotations from at least five Dealers.

If the Independent Calculation Agent is able to obtain two Bid Quotations on the 17th Valuation Business Day following the Valuation Date then the Calculation Agent shall use the highest of the two Bid Quotations, provided that the Calculation Agent can also obtain the same highest Bid Quotation from the Dealers from whom the Independent Calculation Agent has obtained such Bid Quotation, to determine the Final Reference Obligation Price.

If the Independent Calculation Agent has been unable to obtain two Bid Quotations on the 17th Valuation Business Day following the Valuation Date but, on the same day, has obtained one Bid Quotation then the Calculation Agent shall use such Bid Quotation, provided that the Calculation Agent can also obtain the same Bid Quotation from the Dealer from whom the Independent Calculation Agent has obtained such Bid Quotation, to determine the Final Reference Obligation Price.

In the event that Bid Quotations have not been obtained in the manner prescribed above, the Independent Calculation Agent shall seek to obtain a Weighted Average Quotation at the Valuation Time on the 18th Valuation Business Day following the Valuation Date. If a Weighted Average Quotation is obtained, that Weighted Average Quotation shall be the Final Reference Obligation Price.

If the Independent Calculation Agent is unable to obtain a Weighted Average Quotation for the entire Quotation Amount on such 18th Business Day following the Valuation Date, or the Calculation Agent is unable to obtain the same Full Quotation, but the Independent Calculation Agent is able to obtain one or more quotations in an aggregate amount less than the Quotation Amount then, provided that the Calculation Agent can also obtain such quotations from the Dealer or Dealers, as the case may be, from whom the Independent Calculation Agent obtained such quotation or quotations, the Final Reference Obligation Price shall be a Weighted Average Quotation using such quotations and an amount equal to zero for those quotations which could not be obtained (the "**Partial Weighted Average Quotation**").

If the Independent Calculation Agent is unable to obtain any Partial Weighted Average Quotation, the Final Reference Obligation Price shall be deemed to be zero.

For the purposes of the foregoing, in the event that the Calculation Agent is required to request an Independent Calculation Agent to attempt to obtain Bid Quotations pursuant to the provisions of this section, any costs associated with such request shall be borne by the Calculation Agent.

Second Valuation Method:    The Calculation Agent shall, on the relevant Valuation Date, select at least five Dealers (or at least six Dealers where one of

such Dealers is the Calculation Agent or any Affiliate of the Calculation Agent) and request from each such Dealer a firm offer price, expressed as a single upfront payment, for entering into a Replacement Transaction as a seller of credit default protection on that date.

If at least three firm offer prices are received by the Calculation Agent from any Dealer, the Final Reference Obligation Price with respect to the Reference Obligation shall be an amount equal to (a) 100%, less (b) the lowest firm offer price expressed as a percentage of the Quotation Amount.

If at least three firm offer prices are not available on the Valuation Date, the Calculation Agent shall continue to attempt to obtain at least three firm offer prices on the days which are 1, 2, 10, 11, 12 and 15 Valuation Business Days following the Valuation Date.

In the event that at least three firm offer prices have not been obtained on or before the 15th Valuation Business Day following the Valuation Date, the Calculation Agent shall seek to obtain a Second Valuation Method Weighted Average Quotation at the Valuation Time on the 16th Valuation Business Day following the Valuation Date. If a Second Valuation Method Weighted Average Quotation is obtained, that Second Valuation Method Weighted Average Quotation shall be the Final Reference Obligation Price.

In the event that (a) at least three firm offer prices have not been obtained on or before the 15th Valuation Business Day following the Valuation Date and (b) the Second Valuation Method Weighted Average Quotation has not been obtained on the 16th Valuation Business Day following the Valuation Date then the Calculation Agent will request a disinterested third party (the "**Independent Calculation Agent**") that is a dealer in transactions of the type of the Replacement Transaction to attempt to obtain two firm offer prices from at least five Dealers.

If the Independent Calculation Agent is able to obtain two firm offer prices on the 17th Valuation Business Day following the Valuation Date then the Calculation Agent shall use the lower of the two firm offer prices, provided that the Calculation Agent can also obtain the same lower firm offer price from the Dealer from whom the Independent Calculation Agent has obtained such firm offer price, to determine the Final Reference Obligation Price.

If the Independent Calculation Agent has been unable to obtain two firm offer prices on the 17th Valuation Business Day following the Valuation Date but, on the same day, has obtained one firm offer price then the Calculation Agent shall use such firm offer price, provided that the Calculation Agent can also obtain the same firm offer price from the Dealer from whom the

Independent Calculation Agent has obtained such firm offer price, to determine the Final Reference Obligation Price.

In the event that firm offer prices have not been obtained in the manner prescribed above, the Independent Calculation Agent shall seek to obtain a Second Valuation Method Weighted Average Quotation at the Valuation Time on the 18th Valuation Business Day following the Valuation Date. If a Second Valuation Method Weighted Average Quotation is obtained, that Second Valuation Method Weighted Average Quotation shall be the Final Reference Obligation Price.

If the Independent Calculation Agent is unable to obtain a Second Valuation Method Weighted Average Quotation in respect of Replacement Transactions whose Floating Rate Payer Calculation Amounts are in aggregate equal to the entire Quotation Amount on such 18th Business Day following the Valuation Date, or the Calculation Agent is unable to obtain such a quotation, but the Independent Calculation Agent is able to obtain one or more firm offer prices in respect of Replacement Transactions whose Floating Rate Payer Calculation Amounts are in aggregate less than the Quotation Amount then, provided that the Calculation Agent can also obtain such firm offer prices from the Dealer or Dealers, as the case may be, from whom the Independent Calculation Agent obtained such firm offer prices, the Final Reference Obligation Price shall be a Second Valuation Method Weighted Average Quotation using such firm offer prices and an amount equal to zero for those firm offer prices which could not be obtained (the **"Second Valuation Method Partial Weighted Average Quotation"**).

If the Calculation Agent is unable to obtain any Second Valuation Method Partial Weighted Average Quotation, the Final Reference Obligation Price shall be deemed to be zero.

For the purposes of the foregoing, in the event that the Calculation Agent is required to request an Independent Calculation Agent to attempt to obtain firm offer prices pursuant to the provisions of this section, any costs associated with such request shall be borne by the Calculation Agent

For the purposes of this Second Valuation Method:

**"Replacement Transaction"** means a physically-settled single-name credit default swap transaction (on terms identical to the market convention applicable for such single-name credit default swap transaction on the Trade Date) relating to the relevant Reference Entity where:

(a)  the Floating Rate Payer Calculation Amount is equal to the Quotation Amount with respect to the relevant Reference Entity (or, where a Second Valuation Method Weighted Average Quotation is being obtained, such lesser

amount greater than or approximately equal to the Minimum Quotation Amount, as may be obtained by the Calculation Agent);

(b)   the Scheduled Termination Date is the same date as the Scheduled Termination Date in respect of this Transaction;

(c)   the Fixed Rate is 0.00 per cent.;

(d)   the Conditions to Settlement have been satisfied with respect to the relevant Reference Entity; and

(e)   a Notice of Physical Settlement has been delivered specifying the same Deliverable Obligations that the Third Party has been unable to purchase or buy-in ; and

"**Second Valuation Method Weighted Average Quotation**" means, with respect to a Replacement Transaction and a Valuation Date, the weighted average of firm offer prices, expressed as a single upfront payment, and received by the Calculation Agent from Dealers at the Valuation Time, each for entering into a Replacement Transaction as a seller of credit default protection on that date where any such Replacement Transaction shall have a Floating Rate Payer Calculation Amount of as large a size as available but less than the Quotation Amount (but of a size not less than the Minimum Quotation Amount or, if firm offer prices in respect of a Floating Rate Payer Calculation Amount equal in size to the Minimum Quotation Amount are not available, firm offer prices in respect of a Floating Rate Payer Calculation Amount as near in size as practicable to the Minimum Quotation Amount) that in aggregate are in respect of a Floating Rate Payer Calculation Amount approximately equal to the Quotation Amount. For the avoidance of doubt, any such weighted average may be lower or equal to any firm offer price obtained from any Dealer.

For the avoidance of doubt, if Hedge Settlement has not occurred on or before the first Valuation Date and, as a result, the Second Valuation Method is being applied but, on or before the date that the Final Reference Obligation Price is determined in accordance with the Second Valuation Method, Hedge Settlement occurs, then the First Valuation Method shall be applied with effect from such date as if the First Valuation Method had been applied from the first Valuation Date (save that if this would otherwise require the Calculation Agent to request the Independent Calculation Agent to obtain Bid Quotations without the Calculation Agent first having attempted to do so itself in the manner envisaged by the First Valuation Method, then the Calculation Agent shall be permitted to obtain Bid Quotations as envisaged by the First Valuation Method before requesting the Independent Calculation Agent to do so).

The Calculation Agent shall deliver a notice to Seller, the Trustee (for delivery to the Noteholders in accordance with the Conditions) and Buyer showing the Final Reference Obligation

|  | Price for each Reference Obligation on the day which is no later than 5 Business Days following each Reference Entity Valuation Date. |
|---|---|
| Dealers: | Dealers in obligations of the type of Reference Obligations for which Bid Quotations are to be obtained, and any affiliate thereof or successor thereto. For the avoidance of doubt, the Calculation Agent or any Affiliate of the Calculation Agent may be a Dealer, provided that only one of the Calculation Agent or its Affiliates may be included in the panel of Dealers for the purposes of calculating Final Price. |
| Notices: | Notwithstanding any provisions in the Credit Derivatives Definitions relating to notification of certain matters by the Calculation Agent to the parties, the Calculation Agent shall notify the parties of the following with respect to each Reference Entity in respect of which an Event Determination Date has occurred, on the dates stated: |

(i)  selected Reference Obligations: on or before the applicable Valuation Date;

(ii)  Individual Loss Amount and Cumulative Loss Amount: on, or as soon as is reasonably practicable following, the applicable Reference Entity Valuation Date.

All notices given by Buyer, Seller or the Calculation Agent pursuant to this Transaction shall be given in writing and shall be copied to Moody's.

## 10    Relationship Between Parties

Each of Buyer and Seller represents to the other that:

(a)    **Non-Reliance**

It is acting for its own account and it is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction. It has not received from the other party any assurance or guarantee as to the expected results of this Transaction;

(b)    **Acceptance**

It accepts the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the financial and other risks of this Transaction;

(c)    **Status of Parties**

The other party is not acting as a fiduciary or an advisor for it in respect of this Transaction; and

(d)    **Risk Management**

It has entered into this Transaction for the purpose of (i) managing its borrowings or investments, (ii) hedging its underlying assets or liabilities or (iii) in connection with its line of business.

**11    Additional Termination Provisions**

(i)    The following shall constitute Additional Termination Events for the purposes of this Transaction:

(a)    The Notes being declared due and payable following the occurrence of an Event of Default (as defined in the Conditions) pursuant to Condition 10 *(Events of Default)*.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the sole Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(b)    Any of the Collateral Securities becoming repayable prior to its stated date of maturity or a payment default in respect of any of the Collateral Securities prior to the Scheduled Termination Date.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the sole Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(c)    The Notes being declared redeemable pursuant to Condition 6(d)(i) *(Redemption for Taxation and Other Reasons)* of the Notes and the Noteholders not having received, either directly or indirectly, from Buyer the amounts referred to under "Optional Payments" below.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(d)    If, on the occasion of the next payment due by the Collateral Issuer in respect of any Collateral Securities, the amount that would otherwise be due and payable by the Collateral Issuer in respect of the Collateral Securities would be reduced as a result of the Collateral Issuer being required by law to withhold or account for tax.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the sole Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, upon the occurrence of such Additional Termination Event, Party A may by notice to Party B designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(e)    If:

(i)    any deductions on account of any withholding tax in respect of payments by the Swap Guarantor under the Swap Guarantee are required, by any law or regulation in existence and in force on the Effective Date and applying on such date to the Swap Guarantee, to be made in respect of any such payments; and

(ii)    in the event of a payment being made under the Swap Guarantee, and following the Swap Guarantor being notified by or on behalf of the Issuer that such deduction on account of a withholding tax is required to be made and receipt by the Swap Guarantor of reasonable evidence that such deduction is required by a law or regulation in existence and in force on the Effective Date and applying on such date to the Swap Guarantee, the Swap Guarantor does not pay such additional amount as may be necessary in order that the net amount received by Party B after the relevant deduction on account of withholding tax is equal to the amount which would have been receivable by Party B in the absence of the relevant deduction;

such failure by the Swap Guarantor to pay such additional amount shall be an Additional Termination Event.

For the purposes of such Additional Termination Event, the Affected Party shall be Buyer and this Transaction shall be the Affected Transaction.

(ii)    **Optional Payments**

If, for any reason beyond the control of Buyer or Seller the Noteholders do not receive payment under their Notes for any reason including the imposition of any withholding tax or a default or other circumstance linked to the Paying Agents, Buyer may elect to make any necessary payments to, or to the order of, the Noteholders to prevent either a redemption of the Notes for taxation reasons pursuant to Condition 6(d) of the Notes or an event of default pursuant to Condition 10 of the Notes from occurring.

## 12    Other Terms

(i)    **Non-insurance business**

Party A and Party B acknowledge and agree that this Transaction is not intended to constitute insurance business and is not a contract of insurance, assurance, suretyship or guarantee and payments may be made under this Transaction by each party independently and without proof of the economic loss (if any) of the other party.

(ii)    **Third party rights**

No person shall have any right to enforce any provision of this Transaction under the Contracts (Rights of Third Parties) Act 1999.

(iii)    **Credit Support Document. Details of any Credit Support Document**

With respect to Party A, Guarantee dated as of the date hereof by Lehman Brothers Holdings Inc. in favour of Party B as beneficiary thereof in the form attached hereto as Schedule D.

(iv)    **Credit Support Provider**

Credit Support Provider means in relation to Party A: Lehman Brothers Holdings Inc.

(v)    **Credit Support Default**

For the purpose of this Confirmation only, Section 5(a)(iii) shall apply in respect of the Credit Support Document and Credit Support Provider referred to in paragraphs 8(iii) and 8(iv) of this Confirmation.

(vi)    **Breach of Agreement**

For the purpose of this Confirmation only, Section 5(a)(ii) of the Agreement will not apply to Party B but will apply to Party A.

(vii)  **Misrepresentation**

For the purpose of this Confirmation only, Section 5(a)(iv) of the Agreement will not apply to Party B but will apply to Party A.

(viii)  **Bankruptcy**

The "Bankruptcy" provision (Section 5(a)(vii) of the Agreement) shall apply to Party A and to Party B, but with respect to Party B shall, in addition to the amendments set out in paragraph 1(e) of the Schedule to the Agreement, be amended further as follows:

(a)  Section 5(a)(vii)(2) shall take effect with the words "is declared insolvent by a court of competent jurisdiction" substituted for "becomes insolvent";

(b)  Section 5(a)(vii)(6) shall take effect with:

   (i)  the deletion of the words "seeks or";

   (ii)  the insertion of the words "(other than the Custodian or the Trustee each acting in its ordinary course of business prior to any insolvency or bankruptcy of Party B)" immediately after the words "or other similar official for it";

(c)  Section 5(a)(vii)(9) shall take effect with:

   (i)  the insertion of the word "formal" immediately after the words "takes any"; and

   (ii)  the deletion of the words "in furtherance of, or"; and

(d)  Section 5(a)(vii)(8) and (9) shall take effect with reference to the other clauses of Section 5(a)(vii) as so amended.

(ix)  **Transfer to avoid Tax Event**

For the purposes of this Confirmation only, paragraph (j)(iv) of Part 5 of the Schedule to the Agreement shall be replaced by the following:

"(iv) In addition, the following provision shall be inserted as Section 6(b)(v):

"(v) Transfer to Avoid Tax Event. If a Tax Event or a Tax Event Upon Merger occurs with respect to Party A or Party B, Party A shall have the right:

   (i)  to require Party B to transfer all of its interests and obligations under this Agreement and the Transaction, together with its interests and obligations under the Securities, the Notes, the Programme Agreement, the Trust Deed and the Agency Agreement to another entity, whether or not in the same tax jurisdiction as Party B, which would not have any obligation to withhold or deduct (if Party B is or would be required to make such deduction or withholding) or to which Party A would (but for Part 5(i) of the Schedule) be entitled to make payments free from the relevant deduction or withholding (if Party A is or would otherwise be required to make such withholding or deduction), subject to obtaining the prior written consent of the Trustee; or

(ii)     to require Party B to transfer its residence for tax purposes to another jurisdiction, subject to obtaining the prior written consent of the Trustee; or

(iii)     to transfer all of Party A's interests and obligations under this Agreement and the relevant Transaction, together with its interests and obligations (if any) under the Securities, the Notes, the Programme Agreement, the Trust Deed and the Agency Agreement to another entity, whether or not in the same tax jurisdiction as Party A, which would not have any obligation to withhold or deduct (if Party A is or would be required to make such deduction or withholding) or to which Party B would (but for Part 5(i) of the Schedule) be entitled to make payments free from the relevant deduction or withholding (if Party B is or would otherwise be required to make such withholding or deduction), subject to obtaining the prior written consent of the Trustee; or

(iv)     to transfer its residence for tax purposes to another jurisdiction, subject to obtaining the prior written consent of the Trustee;

provided that, in the case of a Tax Event Upon Merger, if the relevant withholding or deduction applies to payments required to be made by Party A to Party B under this Transaction (and Party B is the Burdened Party and not the Affected Party), Party A shall, until such time as a transfer as envisaged by paragraphs (i) to (iv) above is effected, be required in respect of any such payment to pay to Party B such additional amount as may be necessary in order that the net amount received by Party B, after the relevant deduction or withholding, is equal to the amount that would have been receivable by Party B in the absence of the relevant deduction or withholding.

If Party B or Party A (as the case may be) is unable to transfer its interests to another party or to transfer its tax residence in accordance with the preceding provisions prior to the 30th day following the date of imposition of such withholding taxes or, if earlier, the 10th day prior to the first day on which either party would otherwise be required to make a payment net of withholding taxes, Party A (whether it is Party A or Party B which is the Affected Party in respect of the Tax Event or Tax Event Upon Merger) or (in the case of Tax Event Upon Merger only) Party B (where Party B is the Burdened Party with respect to the Tax Event Upon Merger) may, notwithstanding Section 6(b)(iv), designate a day not earlier than such day as an Early Termination Date in respect of the Transaction. For the avoidance of doubt, if, in the case of Tax Event Upon Merger only, Party A fails to pay to Party B any additional amount as required by the immediately preceding paragraph such failure shall constitute a "Failure to Pay" by Party A for the purposes of the Agreement. ".

(x)     **Payments on Early Termination**

For the purposes of determining a "Market Quotation" in respect of the Swap Agreement, the definition of "Market Quotation" shall be modified as follows (but, unless modified by paragraphs (a) to (b) below, shall otherwise apply):

(a)     For the purposes of determining the termination payment under the Swap Agreement, the Calculation Agent shall seek quotations from at least 4 Reference Market-makers (one of which may be the Calculation Agent or its affiliate).

(a)     For the avoidance of doubt, the termination payment under the Swap Agreement shall be calculated on the basis that Party B has an obligation to pay all sums due

to the Swap Counterparty hereunder, without regard to the limited recourse provisions contained herein.

(xi)    **Tax Event upon Merger**

If this Transaction is terminated following the occurrence of a Tax Event Upon Merger and Party B is the Burdened Party and not the Affected Party and on the relevant Early Termination Date the Long Term Credit Rating of Party A's Credit Support Provider by Moody's is at or above A1 and the Short Term Credit Rating of Party A's Credit Support Provider is at or above P-1, then an amount equal to the Note Exposure on such Early Termination Date shall be deemed to be an Unpaid Amount owing to Party B in respect of such termination.

(xii)    **Additional Termination Event**

If this Transaction is terminated following the occurrence of an Additional Termination Event under paragraph 11(i)(e) Party B is the Burdened Party and not the Affected Party and on the relevant Early Termination Date the Long Term Credit Rating of Party A's Credit Support Provider by Moody's is at or above A1 and the Short Term Credit Rating of Party A's Credit Support Provider is at or above P-1, then an amount equal to the Note Exposure on such Early Termination Date shall be deemed to be an Unpaid Amount owing to Party B in respect of such termination.

## 13    Account Details

Account details of Buyer:    Bank Of America, Frankfurt
BOFADEFX
14735038
Account of Lehman Brothers Inc
FFC LBSF

Account details of Seller:    JPMorgan AG, Frankfurt

Swift: CHASDEFX

Account: JPMorgan Chase Bank London, N.A.

Account Number: 6231400604

Ref: Ruby Finance Public Limited Company Series 2006-2

This Confirmation shall be governed by and construed in accordance with English law.

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us by facsimile.

Yours faithfully,

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By:

Name:

Title:

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)** hereby agrees to perform its obligations as Calculation Agent set out herein.

By:

Name:

Title:

Confirmed as of the date first above written:

**RUBY FINANCE PUBLIC LIMITED COMPANY**

By:

Name:

Title