# **EXHIBIT C**

<u>**Class B-1 Confirmation**</u>

**DATE:**       April 10, 2007 as amended and restated on April 24, 2007

**TO:**         Penn's Landing CDO SPC, for the account of the Series 2007-1 Segregated Portfolio

**FROM:**       Lehman Brothers Special Financing Inc.

**RE:**         Credit Derivative Transaction

The purpose of this letter (this "**Confirmation**") is to confirm the terms and conditions of the Credit Derivative Transaction entered into between Lehman Brothers Special Financing Inc. ("**Party A**") and Penn's Landing CDO SPC for the account of the Series 2007-1 Segregated Portfolio ("**Party B**") on the Trade Date specified below (the "**Transaction**").  This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

1           The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions and, where so indicated in the Registry in respect of a Reference Entity, the Additional Provisions for Physically Settled Default Swaps -- Monoline Insurer as Reference Entity, published on January 21, 2005 (the "**Monoline Provisions**") and solely with respect to the Reference Entity JSC Gazprom, the Additional Provisions for LPN Reference Entities (published on October 3, 2006), each as published by the International Swaps and Derivatives Association, Inc., (collectively, the "**Credit Derivatives Definitions**") are incorporated into this Confirmation.  In the event of any inconsistency between the Credit Derivatives Definitions and this Confirmation, this Confirmation will govern.  Capitalized terms used herein but not otherwise defined herein or in the Credit Derivatives Definitions shall have the meanings ascribed to such terms in the Indenture.

2           This Confirmation supplements, forms a part of, and is subject to, the 1992 ISDA Master Agreement (Multicurrency – Cross Border) dated as of April 10, 2007, as amended and supplemented from time to time (the "**Agreement**"), between you and us.  All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

3           Party A will enter into the Transaction and exercise its rights and perform its obligations hereunder solely on its own behalf and not as agent, fiduciary or in any other capacity on behalf of Party B, the holders of the Class A Notes, the Class B-1 Notes, the Class B-2 Notes, the Class C Notes, the Class D Notes, the Class E Notes or the Class F Notes or any other person.

4           Party A may or may not have a credit exposure to any Reference Entity and may or may not have exposure to any Reference Obligation(s) or the Benchmark Obligation designated by Party A in respect of any Reference Entity.

5           The parties agree and acknowledge that the Transaction to which this Confirmation relates contemplates more than one Reference Entity and multiple Credit Event Notices, and that, accordingly, there may be more than one Credit Event and more than one Cash Settlement Amount, and that the Credit Derivatives Definitions (and in particular the provisions which modify and relate to the "Termination Date") should, for the purposes of this Confirmation, be interpreted accordingly.

6           The parties agree and acknowledge that Party B has appointed Delaware Investment Advisers (the "**Portfolio Manager**") its true and lawful agent and attorney in fact, with full power of substitution and full authority in its name, place and stead and at its expense and without any necessary further approval of Party A, in connection with the performance of its duties provided for in this Confirmation.

7           Each Reference Entity listed on the Long Reference Registry or Short Reference Registry to this Confirmation constitutes a separate confirmation for purposes of this Confirmation.  Accordingly, (i) references herein to this Confirmation and the Reference Portfolio are to a portfolio of confirmations, each of which references a single Reference Entity and (ii) a Reference Portfolio Modification constitutes a termination or partial termination of the related confirmation, or as a new confirmation, as applicable.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | March 2, 2007 |
| Effective Date: | April 10, 2007 |
| Scheduled Termination Date: | June 20, 2017 (adjusted in accordance with the Business Day Convention). |
| Termination Date: | (A) the Scheduled Termination Date; or (B) if the Contingency Amount with respect to the Class B-1 Notes is greater than zero on the Scheduled Termination Date, the last Deferred Redemption Date with respect to the Class B-1 Notes. |
| | Section 1.7 of the Credit Derivatives Definitions shall not apply in respect of this Transaction. |
| Floating Rate Payer: | Party B (the "**Seller**") |
| Fixed Rate Payer: | Party A (the "**Buyer**") |
| Calculation Agent: | Party A |
| Business Day: | London and New York. |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Valuation Business Day: | Means, in respect of each Long Reference Entity, a day on which commercial banks & foreign exchange markets are generally open to settle payments in the place or places specified in Annex F in respect of the Transaction Type specified in the Long Reference Registry opposite such Long Reference Entity. |
| Long Reference Entity: | Means, each entity specified in the registry attached hereto as Annex A (the "**Long Reference Registry**"), subject to adjustments and modifications from time to time as set forth herein. |
| Short Reference Entity: | Means, each entity specified in the registry attached hereto as Annex B (the "**Short Reference Registry**"), subject to adjustments and modifications from time to time as set forth herein. |
| Reference Entity: | Means, either a Long Reference Entity and/or a Short Reference Entity, as applicable, and collectively the "**Reference Entities**". |
| | Notwithstanding anything to the contrary, provisions relating to Reference Entities within the Credit Derivative Definitions including, without limitation Section 2.2 as modified herein, shall apply to each Long Reference Entity and Short Reference Entity as to a Reference Entity, unless otherwise specified herein. |
| Reference Registries: | Means, either the Long Reference Registry and/or the Short Reference Registry. The initial Long Reference Entities have been designated by the Portfolio Manager in the Long Reference Registry as of April 10, 2007. All information contained in the Long Reference Registry is as of April 10, |

2007. The Portfolio Administrator will be responsible for maintaining the Long Reference Registry and the Short Reference Registry. Notwithstanding anything herein to the contrary, each Long Reference Entity and each Short Reference Entity for which a Credit Event has occurred shall be deemed to have been removed from the related Reference Registry on the day upon which the Conditions to Settlement with respect to such Credit Event has been satisfied.

The Long Reference Registry and the Short Reference Registry shall contain, as to each Long Reference Entity or Short Reference Entity, the following information:

(i)     the legal name of such Long Reference Entity or Short Reference Entity;

(ii)    its Reference Entity Calculation Amount;

(iii)   its Reference Entity Calculation Percentage;

(iv)    whether the Monoline Provisions apply to such Reference Entity;

(v)     whether Restructuring applies to such Reference Entity;

(vi)    the Transaction Type applicable to such Reference Entity;

(vii)   the country in which it is domiciled or deemed domiciled (if other than the United States or a Special Jurisdiction);

(viii)  whether it is a Sovereign entity;

(ix)    its S&P Rating (as defined in Annex E attached hereto)in effect as of the date such entity was first included within such Reference Registry;

(x)     the Benchmark Obligation (if any) applicable to such Reference Entity;

(xi)    the coupon of the Benchmark Obligation (if any) of such Reference Entity;

(xii)   the maturity date of the Benchmark Obligation (if any) of such Reference Entity; and

(xiii)  the Benchmark Spread of such Reference Entity and the date upon which such Benchmark Spread was determined.

Certain information contained in the Reference Registries has been obtained by the Portfolio Administrator from the following third party sources:   Bloomberg, the website maintained by the Securities and Exchange Commission and the website maintained by S&P. While the information obtained from such sources is believed to be accurate, neither the Portfolio Administrator, Party A or any of Party A's affiliates makes any representation or warranty, expressed or implied, regarding the adequacy, correctness or completeness of the information obtained from such sources. If any of the information received from such sources is incorrect, (i) the corresponding information in the Reference Registries will likewise be incorrect, and (ii) the Reference Registries shall be amended (or deemed amended) to reflect the correct information. The Portfolio Administrator shall not be required to remove the relevant

Reference Entity from the Reference Portfolio, or the relevant Benchmark Obligation from the Reference Registry as result of such incorrect information. Neither the Portfolio Administrator, Party A nor any of Party A's affiliates shall be liable to Party B, any holder of Notes or any other Person for any losses, costs, expenses or potential lost profits resulting from or related to any such incorrect information obtained from such sources.

The Portfolio Administrator shall promptly update the Reference Registries following each Reference Portfolio Modification, Additional Issuance, Optional Reduction and Credit Event and shall provide amended copies thereof to Party A, Party B, the Trustee, the Portfolio Manager and the Rating Agency.

| | |
|---|---|
| Reference Portfolio: | All of the Long Reference Entities or Short Reference Entities included in the Long Reference Registry or Short Reference Registry (as applicable) on the relevant date of determination. |
| Reference Entity Calculation Percentage: | With respect to each Long Reference Entity and Short Reference Entity and as of the relevant date of determination, the quotient of (i) the related Reference Entity Calculation Amount, and (ii) the Long Reference Portfolio Size, expressed as a percentage, rounded to the nearest one-hundredth percent. |
| Reference Entity Calculation Amount: | The Reference Entity Calculation Amount in respect of each Reference Entity shall be the amount set forth in Annex G hereto, as adjusted from time to time in accordance with **"Adjustments," "Reference Portfolio Modifications"** and **"Credit Events"** below. |
| Class B-1 Increase Adjustment Variable: | With respect to each Additional Issuance of the Class B-1 Notes, the quotient of (a) the Aggregate Outstanding Amount of the Class B-1 Notes immediately after giving effect to such Additional Issuance, and (b) the Aggregate Outstanding Amount of the Class B-1 Notes immediately prior to giving effect to such Additional Issuance. |
| Class B-1 Reduction Adjustment Variable: | With respect to each Optional Reduction of the Class B-1 Notes, the quotient of (a) the Aggregate Outstanding Amount of the Class B-1 Notes immediately after giving effect to such Optional Reduction, and (b) the denominator of which is the Aggregate Outstanding Amount of the Class B-1 Notes immediately prior to giving effect to such Optional Reduction. |
| Long Reference Portfolio Size: | As of the relevant date of determination, the sum of the Reference Entity Calculation Amount in respect of each Long Reference Entity. |
| Adjustments: | Notwithstanding anything herein to the contrary, if an Additional Issuance of the Class B-1 Notes occurs, (i) each of the Reference Entity Calculation Amount, the Class B-1 Loss Threshold Amount, the Class B-1 Loss Cap Amount and the Class B-1 Aggregate Loss Amount as of the date of such Additional Issuance and (ii) each Reference Entity Loss Amount, Net Gain Balance and Net Loss Balance determined on or prior to the date of such Additional Issuance, shall be amended to be equal to the product of such amount and the Class B-1 Increase Adjustment Variable. |

Notwithstanding anything to the contrary, if an Optional Reduction of the Class B-1 Notes occurs, (i) each of the Reference Entity Calculation Amount, the Class B-1 Loss Threshold Amount, the Class B-1 Loss Cap

Amount and the Class B-1 Aggregate Loss Amount as of the date of such Additional Issuance and (ii) each Reference Entity Loss Amount, Net Gain Balance and Net Loss Balance determined on or prior to the date of such Additional Issuance, shall be amended to be equal to the product of such amount and the Class B-1 Reduction Adjustment Variable.

Reference Portfolio Modification:

Means, on any day on or after the Effective Date to but excluding the earlier of the Termination Date and the first Distribution Date to occur, each change or set of changes to the Reference Portfolio set forth below:

(i) (a) a Discretionary Removal / Reduction and (b) a related Long Addition / Increase;

(ii) (a) a Credit Improved Removal / Reduction and (b) a related Long Addition / Increase;

(iii) (a) a Credit Impaired Removal / Reduction and (b) a related Long Addition / Increase (if any);

(iv) a Short Addition / Increase made to replace any Short Reference Entity removed from the Reference Portfolio due to the occurrence of a Credit Event or Credit Events in respect thereof;

(v) a Short Addition / Increase; or

(vi) a Short Removal / Reduction.

The following actions will be taken in connection with each Reference Portfolio Modification:

(A) Portfolio Manager shall provide Party A, the Trustee and the Portfolio Administrator with written notice of the proposed Reference Portfolio Modification (a **"Reference Portfolio Modification Notice"**) containing the following information:

(a) The proposed effective date of such Reference Portfolio Modification (the **"Reference Portfolio Modification Date"**);

(b) with respect to each entity (or entities) subject to Long Addition / Increase or Short Addition / Increase, (I) the legal name of each such Reference Entity, (II) its Reference Entity Calculation Amount or the amount by which its Reference Entity Calculation Amount is to be increased (as applicable), (III) its Reference Entity Calculation Percentage after giving effect to such Long Addition / Increase or Short Addition / Increase, and (IV) all information that is required to be included in the Reference Registry;

(c) with respect to each entity (or entities) subject to Long Removal / Reduction or Short Removal / Reduction, (I) the legal name of each such Reference Entity, and (II) the amount by which its Reference Entity Calculation Amount is to be decreased, (III) its Reference Entity Calculation Percentage after giving effect to such Long Removal / Reduction or Short Removal / Reduction, (IV) whether the Long Removal / Reduction (if applicable) is a Discretionary Removal / Reduction, a Credit Improved Removal / Reduction or a Credit Impaired Removal; and,

(d)  a representation and warranty by the Portfolio Manager that (I) the Portfolio Change Criteria are satisfied at the time upon which such Reference Portfolio Modification Notice is delivered, (II) each proposed Long Reference Entity satisfies the Reference Entity Eligibility Criteria at the time upon which such Reference Portfolio Modification Notice is delivered (if applicable), and (III) each proposed Short Reference Entity satisfies the Reference Entity Eligibility Criteria at the time upon which such Reference Portfolio Modification Notice is delivered (if applicable).

(B)  the Portfolio Administrator shall calculate whether the relevant Portfolio Change Criteria are satisfied (such determination of whether the Portfolio Change Criteria are satisfied shall be made as of the time such Reference Portfolio Modification Notice is delivered by the Portfolio Manager) and shall provide written notice of its determination to Party A, Party B, the Trustee, the Portfolio Manager and the Rating Agency;

(C)  the Portfolio Manager shall solicit Party A for (a) a Trading Adjustment in respect of the Reference Portfolio Modification, and (b) a Benchmark Spread and Delta in respect of each Reference Entity (or proposed Reference Entity) relating to such Reference Portfolio Modification;

(D)  if the Portfolio Manager solicits Party A at or prior to 9a.m. New York time on a New York Business Day, Party A shall, *provided unless* any material market events have occurred as determined in the sole judgment of Party A, acting in a commercially reasonable manner, provide Portfolio Manager with the Trading Adjustment, Benchmark Spread and Delta(s) at or prior to 5p.m. on such day (except, if the Portfolio Manager expressly requests that Party A provide the Trading Adjustment, Benchmark Spread and Delta(s) prior to 5p.m., in which case Party A will provide the Trading Adjustment, Benchmark Spread and Delta(s) at the time requested, but in no event shall Party A be required to provide the Trading Adjustment, Benchmark Spread and Delta(s) prior to 2p.m.); *provided further*, if Portfolio Manager solicits Party A at any time after 9a.m. on a New York Business Day, Party A shall have until 5p.m. New York time on the following New York Business Day to respond (except, if the Portfolio Manager expressly requests that Party A provide the Trading Adjustment, Benchmark Spread and Delta(s) prior to 5p.m. on the following New York Business Day, in which case Party A will provide the Trading Adjustment, Benchmark Spread and Delta(s) at the time requested, but in no event shall Party A be required to provide the Trading Adjustment, Benchmark Spread and Delta(s) prior to 2p.m. on the following New York Business Day);

(E)  unless any material market events have occurred as determined in the sole judgment of Party A, acting in a commercially reasonable manner, upon receipt of the Trading Adjustment, Benchmark Spread and Delta(s), the Portfolio Manager must notify Party A, the Trustee and the Portfolio Administrator in writing if it intends to make such Reference Portfolio Modification by 10a.m. New York time on the immediately following New York Business Day; *provided*, if any material market events have occurred in the sole judgment of Party A,

acting in a commercially reasonable manner, any such Trading Adjustment shall be void;

(F)   if the Portfolio Manager chooses not to make such Reference Portfolio Modification on the basis of the Trading Adjustment received from Party A, the Portfolio Manager shall have the right, but not the obligation, to obtain firm quotations for Spread Transactions in respect of the Reference Entities relating to such Reference Portfolio Modification (each such firm quotation obtained by Portfolio Manager in relation to such Reference Portfolio Notification, an "**Indicative Quotation**"). The Portfolio Manager shall notify Party A of any such Indicative Quotation and Party A shall provide the Portfolio Manager with a new Trading Adjustment on the basis of such Indicative Quotation; provided that Party A shall not be obliged to provide the Portfolio Manager with more than one new Trading Adjustment on the basis of an Indicative Quotation, on any day. To the extent that Party A chooses to provide a new Trading Adjustment, the Portfolio Manager must notify Party A, the Trustee and the Portfolio Administrator in writing if it intends to make such Reference Portfolio Modification by 10a.m. New York time on the New York Business Day immediately following the day upon which it receives such new Trading Adjustment from Party A; and

(G)   if such notice states that the Portfolio Manager has decided to make such Reference Portfolio Modification, the Reference Portfolio Modification shall be effective on the proposed Reference Portfolio Modification Date specified within the related Reference Portfolio Modification Notice, provided that the Portfolio Administrator has provided written confirmation that the relevant Portfolio Change Criteria are satisfied as of the time such Reference Portfolio Modification Notice was delivered by the Portfolio Manager, and the Portfolio Administrator shall amend and redistribute the Reference Registries as of such date and shall provide written notice to Party A, Party B, the Portfolio Manager, and the Trustee of the revised Loss Threshold Amount as well as any other information requested by the Portfolio Manager.

Portfolio Change Criteria:   Means, with respect to each Reference Portfolio Modification proposed by the Portfolio Manager, each of the following conditions must be satisfied:

(i)   with respect to clauses (i), (ii), (iii) and (vi) in the definition of Reference Portfolio Modification, for each Reference Entity subject to Removal / Reduction (a) a Credit Event has not occurred and a Credit Event Notice with respect to such Reference Entity has not been delivered, or (b) a Potential Failure to Pay or Potential Repudiation / Moratorium has not occurred or is not continuing with respect to such Reference Entity;

(ii)   with respect to clauses (i) through (iii) in the definition of Reference Portfolio Modification, and subject to clause (ix) below:

(a) the aggregate of the Reference Entity Calculation Amount for each Long Reference Entity to be added to the Reference Portfolio and the amount(s) by which the Reference Entity Calculation Amount of an existing Long Reference Entity (or Long Reference Entities) is to be increased (each, pursuant to Long Addition / Increase); is equal to

(b) the aggregate of the amount(s) by which the Reference Entity Calculation Amount of an existing Long Reference Entity (or Long Reference Entities) is to be decreased (pursuant to Long Removal / Reduction);

(iii) the Reference Portfolio Guidelines are satisfied or the level of compliance with each Reference Portfolio Guideline is maintained or improved after giving effect to such Reference Portfolio Modification;

(iv) if any Class of Notes is rated by S&P, the S&P SROC CDO Evaluator Test (as set forth in Annex D) is satisfied or the S&P SROC obtained after giving effect to such Reference Portfolio Modification is higher than the S&P SROC prior to such Reference Portfolio Modification;

(v) if a Modification Restriction Condition exists, Party A's prior written consent to such Reference Portfolio Modification is obtained on or prior to the Reference Portfolio Modification Date (provided that Party A's prior written consent is not required with respect to a Reference Portfolio Modification pursuant to clause (iii) in the definition of Reference Portfolio Modification);

(vi) with respect to each Long Addition / Increase, (a) the Reference Entity Eligibility Criteria is satisfied at the time the related Reference Portfolio Modification Notice is delivered, and (b) the 10 year bid side spread for a Spread Transaction quoted by Party A in respect of each Long Reference Entity subject to Addition / Increase is less than or equal to 7.50% per annum;

(vii) with respect to clause (ii) in the definition of Reference Portfolio Modification, (a) the Reference Portfolio Modification Date in respect of the related Long Addition / Increase must be the same as the Reference Portfolio Modification Date in respect of the Credit Improved Removal / Reduction, and (b) the absolute value of aggregate change in the Reference Entity Calculation Percentage of each Long Reference Entity removed or reduced in connection with Credit Improved Removal / Reductions within any twelve-month period must be less than or equal to 20.00%;

(viii) with respect to clause (iii) in the definition of Reference Portfolio Modification, the Portfolio Manager must use its commercially reasonable best efforts to make a Long Addition / Increase to the Reference Portfolio during the period from the Reference Portfolio Modification Date in respect of such Credit Impaired Removal / Reduction to (and including) the 20th Business Day following the Reference Portfolio Modification Date in respect of such Credit Impaired Removal / Reduction;

(ix) with respect to clause (i) in the definition of Reference Portfolio Modification, (a) a Ratings Downgrade Event has not occurred and is not continuing, (b) the Reference Portfolio Modification Date in respect of the related Long Addition / Increase must occur on the Reference Portfolio Modification Date in respect of the Discretionary Removal / Reduction, and (c) the absolute value of aggregate change in the Reference Entity Calculation Percentage of each Long Reference Entity removed or reduced in connection with

Discretionary Removal / Reductions within any twelve-month period must be less than or equal to 20.00%;

(x)   with respect to each Short Addition / Increase, (a) the Reference Entity Eligibility Criteria is satisfied as of the date upon which the related Reference Portfolio Modification Notice is delivered, (b) the 10 year ask spread quoted by Party A in respect of each Reference Entity subject to a Short Addition / Increase is less than or equal to 5.00% per annum, (c) with respect to a Short Addition / Increase relating to clause (iv) in the definition of Reference Portfolio Modification, the related Trading Adjustment has been provided prior to the proposed Reference Portfolio Modification Date in respect of such Short Addition / Increase, and (d) as of the date of determination, the Reference Entity Calculation Percentage of each Short Reference Entity must be less than or equal to 1.00%;

With respect to clause (iii) above, compliance with the Reference Portfolio Guidelines shall be measured by comparing the level of compliance immediately *prior* to making the Removal / Reduction to the level of compliance immediately *after* giving effect to the related Addition / Increase; *provided that*, with respect to an Addition / Increase to replace a Reference Entity that was removed from the Reference Portfolio or due to an occurrence of a Credit Event, the level of compliance shall be measured by comparing the level of compliance immediately *prior* to making such Addition / Increase to the level of compliance immediately *after* giving effect to such Addition / Increase.

**Reference Portfolio Guidelines:**

(i)   the Reference Entity Calculation Percentage for any Reference Entity with a S&P Rating (as defined in Annex E hereto) of "BBB-" or higher does not exceed 2.00%;

(ii)   the Reference Entity Calculation Percentage for any Reference Entity with a S&P Rating lower than "BBB-" does not exceed 1.50%;

(iii)   the aggregate of the Reference Entity Calculation Percentages of Reference Entities with a S&P Rating lower than "BBB-" does not exceed 5.00%; *provided* that if the related Reference Entity subject to Removal / Reduction (if applicable) had an S&P Rating below "BBB-" at the time of such Removal / Reduction, the Reference Entity subject to Addition / Increase may be of the same (or higher) S&P Rating as the Reference Entity subject to Removal / Reduction; and

(iv)   the aggregate of the Reference Entity Calculation Percentages of Reference Entities domiciled in any single country outside the United States does not exceed 20.00%.

**Long Addition / Increase:**

Means, either (i) the addition of a Long Reference Entity (or Long Reference Entities) to the Long Reference Registry, and/or (ii) an increase to the Reference Entity Calculation Amount(s) of an existing Long Reference Entity (or Long Reference Entities).

**Short Addition / Increase:**

Means, the addition of a Short Reference Entity (or Short Reference Entities) to the Short Reference Registry, and/or (ii) an increase to the Reference Entity Calculation Amount(s) of an existing Short Reference Entity (or Short Reference Entities).

**Addition / Increase:**

Means, a Long Addition / Increase and/or a Short Addition / Increase, as applicable.

| | |
|---|---|
| Reference Entity Eligibility Criteria: | Means with respect to each Long Reference Entity subject to a Long Addition / Increase and each Short Reference Entity subject to Short Addition / Increase, each of the following conditions: |

(i) such Reference Entity has a S&P Rating of at least "BB-"; *provided*, that if the a Reference Entity subject to Removal / Reduction (if applicable) had an S&P Rating below "BB-" at the time of such Removal / Reduction, the Reference Entity subject to Addition / Increase may be of the same (or higher) S&P Rating as the Reference Entity subject to Removal / Reduction;

(ii) such Reference Entity is not a Credit Impaired Reference Entity or a Reference Entity in respect of which either (a) a Credit Event Notice has been delivered, or (b) Potential Failure to Pay or Potential Repudiation / Moratorium has occurred and is continuing; and

(iii) such Reference Entity is not a special purpose vehicle incorporated for the sole purpose of issuing asset backed securities or other structured finance securities which are secured by, or represent a derivative interest in, a specified pool of assets, including but not limited to credit card receivables, auto loans, auto leases, equipment leases, residential and commercial mortgages, corporate debt or sovereign debt obligations.

| | |
|---|---|
| Long Removal / Reduction: | Means either a Discretionary Removal/ Reduction, Credit Improved Removal / Reduction, or a Credit Impaired Removal / Reduction. |
| Short Removal / Reduction: | Means either the removal of a Short Reference Entity from the Short Reference Registry (including, as required in connection with the occurrence of a Credit Event with respect to any Short Reference Entity) or a reduction in the Reference Entity Calculation Amount of any Short Reference Entity. |
| Removal / Reduction: | Means, a Long Removal / Reduction and/or a Short Removal / Reduction, as applicable. |
| Discretionary Removal / Reduction: | Means either the removal of any Long Reference Entity (other than a Credit Impaired Reference Entity or a Credit Improved Reference Entity) from the Long Reference Registry or a reduction in the Reference Entity Calculation Amount of any Long Reference Entity (other than a Credit Impaired Reference Entity or a Credit Improved Reference Entity). |
| Credit Improved Removal / Reduction: | Means either the removal of a Credit Improved Reference Entity from the Reference Portfolio or a reduction in the Reference Entity Calculation Amount of a Credit Improved Reference Entity. |

A **"Credit Improved Reference Entity"** is any Long Reference Entity which, in the reasonable business judgment of the Portfolio Manager, has significantly improved in credit quality since the date it was first included in the Reference Portfolio; *provided*, if a Ratings Downgrade Event has occurred and is continuing on the date upon which such Reference Portfolio Modification Notice is delivered with respect to such Credit Improved Removal / Reduction, such Long Reference Entity must satisfy the Credit Improved Criteria to be considered a Credit Improved Reference Entity.

**"Credit Improved Criteria"** means, with respect to any Long Reference Entity, as of any date of determination, the occurrence of either of the

following: (i) the upgrade or placement by S&P of such Reference Entity on its credit watch list for upgrade by one or more sub-categories from the rating in effect on the date such Long Reference Entity was first included in the Reference Portfolio or (ii) the Benchmark Spread with respect to such Long Reference Entity has decreased 10% or more since the date on which such Long Reference Entity was first included in the Reference Portfolio.

Credit Impaired Removal / Reduction:

Means either the removal of a Credit Impaired Reference Entity from the Reference Portfolio or a reduction in the Reference Entity Calculation Amount of a Credit Impaired Reference Entity.

A **"Credit Impaired Reference Entity"** is any Long Reference Entity which, in the reasonable business judgment of the Portfolio Manager, has a significant risk of declining in credit quality or, with the passage of time, suffering a Credit Event; *provided* that if a Ratings Downgrade Event has occurred and is continuing on the date upon which such Reference Portfolio Modification Notice is delivered with respect to such Credit Impaired Removal / Reduction, such Long Reference Entity must satisfy the Credit Impaired Criteria to be considered a Credit Impaired Reference Entity.

**"Credit Impaired Criteria"** means, with respect to any Long Reference Entity, as of any date of determination, the occurrence of either of the following: (i) the downgrade or placement by S&P of such Long Reference Entity on its credit watch list for downgrade by one or more sub-categories from the rating in effect on the date such Long Reference Entity was first included in the Reference Portfolio or (ii) the Benchmark Spread with respect to such Long Reference Entity has increased 10% or more since the date on which such Long Reference Entity was first included in the Reference Portfolio.

Reference Obligation(s):

In respect of each Long Reference Entity for which a Credit Event Notice has been delivered, Party A must deliver a separate notice to the Portfolio Manager (with a copy to Party B, the Trustee and the Portfolio Administrator) (each, a **"Reference Obligation Identification Notice"**). Each Reference Obligation Identification Notice must identify either (i) the obligation, if any, specified for such Reference Entity in the Long Reference Registry (each, a **"Benchmark Obligation"**), or (ii) an obligation or obligations of such Reference Entity (each of (i) and (ii), a **"Reference Obligation"**). Each obligation identified under clause (ii) must satisfy the Reference Obligation Category and the Reference Obligation Characteristics at the time of its designation. For purposes of this Confirmation, Benchmark Obligations may include obligations issued by an affiliate of a Long Reference Entity included in the Reference Portfolio. Benchmark Obligations may be subordinated to other obligations of the Reference Entity, if so designated in the Reference Registries.

The aggregate of the Reference Obligation Notional Amounts of Reference Obligations designated by Party A in respect of a Reference Entity may not exceed the Reference Entity Calculation Amount of such Reference Entity.

The definitions of Section 2.20 of the Credit Derivatives Definitions shall apply to each Reference Obligation as if it were a Deliverable Obligation.

Party A must deliver each Reference Obligation Identification Notice no later than the Valuation Business Day immediately preceding the relevant Valuation Date.

Each Reference Obligation Identification Notice must contain a description of each applicable Reference Obligation and its Reference Obligation Notional Amount that is sufficient for purposes of determining the Final Price of such Reference Obligation pursuant to the provisions contained herein.

A Reference Obligation, other than a Benchmark Obligation which shall always be considered to be an eligible Reference Obligation, that satisfies the Reference Obligation Category and the Reference Obligation Characteristics at the time of designation will continue to be an eligible Reference Obligation even if it does not fall into the Reference Obligation Category or lacks any or all Reference Obligation Characteristics at any time thereafter.

The provisions of Section 2.2(d) and Section 2.30 of the Definitions shall not apply to a Reference Obligation (other than a Benchmark Obligation designated by Party A).

For the purposes of the provisions of Section 2.2(d) and Section 2.30 of the Credit Derivatives Definitions, a Benchmark Obligation shall constitute a Reference Obligation under such Sections.

| | |
|---|---|
| Reference Obligation Notional Amount: | With respect to each Reference Obligation, the amount, expressed in U.S. dollars, specified as such in the relevant Reference Obligation Identification Notice. |
| Reference Obligation Category: | In respect of each Long Reference Entity, the Reference Obligation Category (i) will be based on the Transaction Type specified in the Long Reference Registry opposite such Long Reference Entity, and (ii) will be specified for such Transaction Type in the matrix attached hereto in Annex F (the "**Credit Event Matrix**"). Each Benchmark Obligation will be deemed to satisfy the Reference Obligation Category. |
| Reference Obligation Characteristics: | In respect of each Long Reference Entity, the Reference Obligation Characteristics (i) will be based on the Transaction Type specified in the Long Reference Registry opposite such Long Reference Entity, and (ii) will be specified for such Transaction Type in the Credit Event Matrix. Each Benchmark Obligation will be deemed to satisfy the Reference Obligation Characteristics. |

**Fixed Payments:**

| | |
|---|---|
| Class B-1 Fixed Amount: | The positive difference between (A) the Class B-1 Interest Distribution Amount relating to the immediately succeeding Payment Date or the first Distribution Date to occur (as and to the extent applicable and without duplication), and (B) an amount equal to the Class B-1 Relevant Proportion on such Payment Date or Distribution Date of the interest due and payable with respect to the Permitted Long-Term Investment during the Accrual Period with respect to such Payment Date or Distribution Date (as applicable). |
| Class B-1 Relevant Proportion: | The proportion which the Aggregate Outstanding Amount of the Class B-1 Notes bears to the aggregate of (i) the Aggregate Outstanding Amount of the Class A Notes, (ii) the Aggregate Outstanding Amount of the Class B-1 Notes and Class B-2 Notes, (iii) Aggregate Outstanding Amount of the |

Class C Notes, (iv) Aggregate Outstanding Amount of the Class D Notes, (v) the Aggregate Outstanding Amount of the Class E Notes and (vi) the Aggregate Outstanding Amount of the Class F Notes.

Party A Additional Payments:

On each Deferred Interest Payment Date, Party A shall pay to Party B an amount equal to the Class B-1 Deferred Interest Amount (if any) with respect to the Class B-1 Notes.

Fixed Rate Payer Payment Dates:

The Business Day immediately preceding (as and to the extent applicable and without duplication) (i) each Payment Date and (ii) the first Distribution Date to occur.

Section 2.10 of the Credit Derivatives Definitions shall not apply in respect of this Transaction.

Collateral Requirements:

On the Effective Date, Party A shall post $749,325 with the Trustee (the "**Credit Swap Posted Amount**") in cash or AAAm rated (by S&P) money market instruments.

The Credit Swap Posted Amount will be held by the Trustee on behalf of Party B, pursuant to the terms of the Series Indenture, until the first Distribution Date to occur (the "**Posted Amount Release Date**"). The Credit Swap Posted Amount together with any interest accrued thereon shall be released to Party A on the Posted Amount Release Date.

There will be a proportional increase of the Credit Swap Posted Amount in connection with an Additional Issuance with respect to the Class B-1 Notes.

There will be a proportional reduction of the Credit Swap Posted Amount in connection with (i) an Optional Reduction of the Class B-1 Notes, and (ii) any reduction in the Aggregate Outstanding Amount of the Class B-1 Notes following the determination of a Cash Settlement Amount hereunder. An amount equal to such reduction shall be released to Party A on the date of such Optional Reduction or the date on which such Cash Settlement Amount is determined.

Neither Party B nor the Trustee may take any actions with respect to the Credit Swap Posted Amount (or any interest earned thereon) unless Party A fails to pay to Party B any amounts owed to Party B under this Transaction (a "**Failure to Fund**"). Upon a Failure to Fund, Party B may exercise its remedies under the Agreement, including liquidating the Credit Swap Posted Amount. Party B shall apply the proceeds of any such liquidation toward Interest Collections for distribution in accordance with the Priority of Payments; *provided that* any liquidation proceeds in excess of the amounts owed by Party A shall be paid by Party B to Party A and shall not be available to make any payments in respect of the Notes.

**Floating Payment:**

Floating Rate Payer Calculation Amount:

In respect of each Long Reference Entity for which a Credit Event has occurred and the Conditions to Settlement have been satisfied, the Reference Entity Calculation Amount of such Long Reference Entity.

**Terms relating to Settlement:**

Conditions to Settlement:

In respect of each Reference Entity:

Credit Event Notice

Notifying Party: Buyer, with respect to Long Reference Entities

Seller, with respect to Short Reference Entities

Notice of Publicly Available Information: Applicable

For the avoidance of doubt, the parties agree that the "Conditions to Settlement" may be satisfied more than once in respect of this Transaction, but only once with respect to any Reference Entity, except pursuant to Section 3.9 of the Credit Derivatives Definitions, when applicable and as modified herein.

The Conditions to Settlement with respect to a Reference Entity may be satisfied on any day during the period from (and including) the Effective Date through (and including) the end of the Notice Delivery Period.

A copy of each Credit Event Notice as required with respect to Long Reference Entities shall be sent by Party A to the Trustee, the Portfolio Manager, the Portfolio Administrator and Rating Agency promptly following the delivery thereof to Party B.

A copy of each Credit Event Notice as required with respect to Short Reference Entities shall be sent by Party A to the Portfolio Manager, Party B, the Trustee, the Portfolio Administrator and Rating Agency.

Credit Events:

In respect of each Reference Entity, the Credit Events (i) will be based on the Transaction Type specified in the Long Reference Registry or Short Reference Registry (as applicable) opposite such Reference Entity, and (ii) will be specified for such Transaction Type in the Credit Event Matrix. The Credit Events may include one or more of the following: (i) Bankruptcy, (ii) Failure to Pay, (iii) Obligation Acceleration, (iv) Repudiation/Moratorium, and (v) Restructuring (if specified as applicable in the Long Reference Registry or Short Reference Registry (as applicable)).

Obligation(s):

Obligation Category:

In respect of each Reference Entity, the Obligation Category (i) will be based on the Transaction Type specified in the Long Reference Registry or Short Reference Registry (as applicable) opposite such Reference Entity, and (ii) will be specified for such Transaction Type in the Credit Event Matrix. Each Benchmark Obligation will be deemed to satisfy the Obligation Category.

Obligation Characteristics:

In respect of each Reference Entity, the Obligation Characteristics (i) will be based on the Transaction Type specified in the Long Reference Registry or Short Reference Registry (as applicable) opposite such Reference Entity, and (ii) will be specified for such Transaction Type in the Credit Event Matrix. Each Benchmark Obligation will be deemed to satisfy the Obligation Characteristics.

**Settlement Terms:**

Settlement Method:                    With respect to each Long Reference Entity, Cash Settlement, as modified herein.

                                      With respect to each Short Reference Entity, Settlement shall not apply and Party A shall provide a Trading Adjustment no later than the 5th Business Day following the date upon which the Conditions to Settlement are satisfied.

Terms Relating
  to Cash Settlement:

Valuation Date:                       The provisions of Sections 7.7(a) and (b) of the Credit Derivatives Definitions shall not apply to this Transaction and are replaced with the following:

                                      "Valuation Date" means any Valuation Business Day designated by the Calculation Agent between (and including) the 30th and the 120th Valuation Business Day following the relevant Event Determination Date.

                                      If the aggregate of the Reference Obligation Notional Amounts of Reference Obligations designated by Party A in respect of a Reference Entity do not exceed $25,000,000, Single Valuation Date (as defined in Section 7.8(a) of the Credit Derivatives Definitions); otherwise Multiple Valuation Dates (as defined in Section 7.8(b) of the Credit Derivatives Definitions).    The aggregate of the Reference Obligation Notional Amounts of Reference Obligations designated by Party A shall not be less than $1,000,000. If Multiple Valuation Dates applies, the total number of Valuation Dates shall be two (2).

                                      The Calculation Agent shall attempt to obtain Full Quotations with respect to the Valuation Date from five or more Independent Dealers. If the Calculation Agent is unable to obtain two or more Full Quotations on the Valuation Date from Independent Dealers, then on the 7th Valuation Business Day following the Valuation Date the Calculation Agent shall attempt to obtain Full Quotations with respect to such day from five or more Independent Dealers and, if two or more Full Quotations are not available on such day from Independent Dealers, then on the 15th Valuation Business Day following the Valuation Date, the Calculation Agent shall attempt to obtain Full Quotations with respect to such day from five or more Independent Dealers.

                                      For purposes of obtaining Full Quotations from Independent Dealers on the 7th Valuation Business Day following the Valuation Date, the Calculation Agent shall attempt to obtain two or more Full Quotations from Independent Dealers that were not solicited on the Valuation Date (and, if the Calculation Agent elects to obtain Full Quotations from only five Independent Dealers on such day, such new Independent Dealers shall replace those Independent Dealers (if any) who did not submit Full Quotations on the Valuation Date).

                                      If Full Quotations have been requested from the requisite number of Independent Dealers on the Valuation Date or any other applicable day, the Calculation Agent shall also be permitted to obtain Full Quotations from Party A and its affiliates on such date or day.

If multiple Reference Obligations have been designated in a Reference Obligation Identification Notice, the Calculation Agent shall attempt to obtain Full Quotations on the Valuation Date and each applicable date thereafter for the Reference Obligations as a whole (rather than the individual components).

If two or more Full Quotations for the related Reference Obligation are not available from Independent Dealers on the 15th Valuation Business Day following the Valuation Date, then the Calculation Agent must select an Independent Dealer to determine the Independently Estimated Price within five (5) Valuation Business Days after such day. The Independently Estimated Price must be determined by such Independent Dealer within ten (10) Valuation Business Days after such day.

Notwithstanding anything herein to the contrary, if the Valuation Date or any other date on which the Calculation Agent is required to attempt to obtain Full Quotations is not also a Business Day, the Calculation Agent shall request Full Quotations on the next following Business Day.

| | |
|---|---|
| Valuation Time: | Any time during the hours that Dealers customarily quote prices for the relevant Reference Obligation(s) |
| Quotation Method: | Bid |
| Quotation Amount: | (A) the Reference Obligation Notional Amount of the relevant Reference Obligation (as specified in the related Reference Obligation Identification Notice); or |
| | (B) if multiple Reference Obligations of such Long Reference Entity are specified in the related Reference Obligation Identification Notice, the aggregate of the Reference Obligation Notional Amounts of such Reference Obligations (as specified in the related Reference Obligation Identification Notice). |
| Quotations: | Exclude Accrued Interest |
| Valuation Method: | If Single Valuation Date applies, Highest. |
| | If Multiple Valuation Dates applies, weighted average of the Highest. |
| | Section 7.5(b)(ii) of the Credit Derivatives Definitions is hereby amended by inserting the word "Full" before the word "Quotation". |
| Dealers: | ABN Amro Holding NV, Barclays Bank PLC, BNP Paribas, Royal Bank of Scotland, Societe Generale, Citigroup Global Markets Inc., JP Morgan Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Credit Suisse First Boston Inc., Deutsche Bank, AG, Bear Stearns & Co. Inc., Prudential Securities Inc., Morgan Stanley & Co. Incorporated, Goldman, Sachs & Co. and Salomon Smith Barney Inc., Lehman Brothers International (Europe), UBS AG, Dresdner Bank AG, and any affiliate thereof. Additional dealers may be selected from time to time by mutual agreement between the Calculation Agent and the Portfolio Manager. |
| Independent Dealers: | Any Dealer that is not affiliated with any other Dealer; *provided that* Party A and its affiliates shall not be considered Independent Dealers. |
| Final Price: | (a) If Single Valuation Date applies and two or more Full Quotations for the related Reference Obligation(s) are received from Independent |

Dealers on the Valuation Date or any other applicable day, the Final Price shall be the Highest Full Quotation (expressed as a percentage rounded to four decimal places) obtained by the Calculation Agent from all Dealers on such date or day;

(b)    if Multiple Valuation Dates applies and two or more Full Quotations for the related Reference Obligation(s) are received from Independent Dealers on each Valuation Date or other applicable days, the Final Price shall be the weighted average of the Highest Full Quotations (expressed as a percentage rounded to four decimal places) obtained by the Calculation Agent from all Dealers on such Valuation Dates or such other days; and

(c)    if two or more Full Quotations for the related Reference Obligation are not available from Independent Dealers on the 15th Valuation Business Day following the Valuation Date, then the Final Price shall be the Independently Estimated Price.

The first sentence of Section 7.4 of the Credit Derivatives Definitions shall not apply to this Transaction.

| | |
|---|---|
| Independently Estimated Price: | In respect of the relevant Reference Obligation, a price (expressed as a percentage rounded to four decimal places, exclusive of accrued interest) determined by any Independent Dealer selected by the Calculation Agent on such basis as the Independent Dealer considers fair and reasonable under the circumstances; *provided that* if multiple Reference Obligations have been designated in a Reference Obligation Identification Notice, the Independently Estimated Price shall be the price for the Reference Obligations in the aggregate (rather than the individual components). |
| Settlement Currency: | The lawful currency of the United States of America ("USD" or "$" or "US$"). |
| Reference Entity Loss Amount: | In respect of each Long Reference Entity for which a Credit Event has occurred and the Conditions to Settlement have been satisfied, an amount equal to the greater of (i) the product of (A) the Reference Price *minus* the Final Price and (B) the Reference Entity Calculation Amount with respect to such Long Reference Entity (or, if such Credit Event is Restructuring, the Exercise Amount specified in the Credit Event Notice with respect to such Reference Entity), and (ii) zero, as adjusted from time to time in accordance with **"Adjustments"** above. |
| Final Valuation Notice: | In respect of a Credit Event relating to a Long Reference Entity for which the Conditions to Settlement have been satisfied, the Calculation Agent shall provide written notification to Party B, the Trustee, the Portfolio Manager, the Portfolio Administrator and the Rating Agency of the Final Price and the related Reference Entity Loss Amount no later than the earlier of (i) three (3) Valuation Business Days following the determination of such Final Price, and (ii) the first Distribution Date to occur, in each case, as evidenced by the Trustee's prompt written acknowledgment of receipt thereof.<br><br>Each Final Valuation Notice shall identify the Reference Obligation(s) used and include a list of the Full Quotations obtained (including the date the Full Quotation was obtained but not the identity of any of the Dealers). |

Each Final Valuation Notice shall include a written computation in reasonable detail showing the Calculation Agent's calculation of (i) the Final Price and the related Reference Entity Loss Amount, (ii) the Class B-1 Aggregate Loss Amount on the date of delivery of such Final Valuation Notice (increased to reflect such Reference Entity Loss Amount), (iii) the Net Loss Balance, (iv) the Net Gain Balance and (v) the relevant Class B-1 Cash Settlement Amount (after giving effect to the increase in Aggregate Loss Amount as provided in clause (ii) above).

The Final Valuation Notice shall include a representation and warranty that the Full Quotations were obtained (a) consistent with the terms of this Confirmation, (b) on the applicable Valuation Date or day, and (c) in respect of the Reference Obligation(s) specified in the related Reference Obligation Identification Notice.

| | |
|---|---|
| Class B-1 Aggregate Loss Amount: | On the date on which a Final Valuation Notice is delivered to Party B, or on the Reference Portfolio Modification Date, an amount equal to the sum of (x) the Reference Entity Loss Amount specified in such Final Valuation Notice, *plus* (y) the aggregate of the Reference Entity Loss Amounts specified in prior Final Valuation Notices which were delivered to Party B. On the Effective Date, the Class B-1 Aggregate Loss Amount shall be zero. |
| Class B-1 Loss Threshold Amount: | $1,255,500,000, as adjusted from time to time in accordance with **"Adjustments"** above. |
| Class B-1 Loss Cap Amount: | $1,525,500,000, as adjusted from time to time in accordance with **"Adjustments"** above. |
| Class B-1 Cash Settlement Amount: | On the date on which a Final Valuation Notice which relates to the Class B-1 Notes is delivered to Party B, an amount equal to: |

(i)    if the Class B-1 Aggregate Loss Amount on such date is less than or equal to the Class B-1 Loss Threshold Amount, zero;

(ii)   if the Class B-1 Aggregate Loss Amount on such date is greater than the Class B-1 Loss Threshold Amount but less than the sum of the Class B-1 Loss Threshold Amount and the Class B-1 Loss Cap Amount, (A) the Class B-1 Aggregate Loss Amount *minus* (B) the sum of (x) the Class B-1 Loss Threshold Amount and (y) the aggregate of any Class B-1 Cash Settlement Amounts determined prior to such date of delivery; and

(iii)  if the Class B-1 Aggregate Loss Amount on such date is greater than or equal to the sum of the Class B-1 Loss Threshold Amount and the Class B-1 Loss Cap Amount, (A) the Class B-1 Loss Cap Amount *minus* (B) the aggregate of any Class B-1 Cash Settlement Amounts determined prior to such date of delivery.

The Calculation Agent shall notify Party A and Party B of the Class B-1 Cash Settlement Amount on (a) each date upon which a Final Valuation Notice is delivered, (b) the Reference Portfolio Modification Date, and (c) each date upon which Party A provides a Trading Adjustment relating to a Credit Event in respect of a Short Reference Entity.

| | |
|---|---|
| Actions With Respect to<br>Class B-1 Cash Settlement Amounts: | On the date on which a Class B-1 Cash Settlement Amount is determined, the Aggregate Outstanding Amount of the Class B-1 Notes shall be |

reduced by an amount equal to such Class B-1 Cash Settlement Amount until that the Aggregate Outstanding Amount of the Class B-1 Notes is reduced to zero.

Class B-1 Cash Settlement Date:    The Scheduled Termination Date and each Deferred Redemption Date.

On the Scheduled Termination Date, Party B shall pay to Party A an amount equal to the sum of the aggregate of the Class B-1 Cash Settlement Amounts (if any) that have been determined on or prior to the Scheduled Termination Date and on each Deferred Redemption Date occurring after the Scheduled Termination Date Party B shall pay to Party A an amount equal to the aggregate of the Class B-1 Cash Settlement Amounts (if any) that have been determined in the period from (but excluding) the immediately preceding Deferred Redemption Date, or in the case of the first Deferred Redemption Date to occur, the Scheduled Termination Date, to (and including) such Deferred Redemption Date (each such amount, the **"Class B-1 Credit Protection Payment Amount"**).

The provisions of Section 7.2 of the Credit Derivatives Definitions shall not apply to this Transaction.

**Additional Terms:**

**Terms Relating to Reference Portfolio Modifications:**

**"Benchmark Spread"** means, with respect to a Long Reference Entity or a Short Reference Entity, as of the date of determination, the difference of (i) the 10 year bid side spread for the related Spread Transaction, and (ii) the 10 year bid side spread for a Spread Index Transaction, each such spread quoted by Party A, expressed as a percentage per annum.

**"Delta"** means, with respect to a Long Reference Entity or a Short Reference Entity and a Reference Portfolio Modification, a hedge ratio between such Reference Entity and the Reference Portfolio after giving effect to such proposed Reference Portfolio Modification, as determined by Party A, acting in a commercially reasonable manner.

**"Modification Restriction Condition"** means, that as of the date of determination, the sum of (i) Class E Aggregate Loss Amount and (ii) the Net Loss Balance minus the Net Gain Balance with respect to the Class E Notes, expressed as a percentage of the Class E Long Reference Portfolio Size, is greater than the Modification Restriction Threshold.

**"Modification Restriction Threshold"** means 2.3%.

**"Net Gain Balance"** means, when used with respect to a Class of Notes as of the date of determination, the sum of each positive Trading Adjustment provided by Party A with respect to such Class of Notes and the related Reference Portfolio Modification or Credit Event relating to a Short Reference Entity that is effective on or prior such date.

**"Net Loss Balance"** means, when used with respect to a Class of Notes as of the date of determination, the absolute value of the sum of each negative Trading Adjustment provided by Party A with respect to such Class of Notes and the related Reference Portfolio Modification or Credit Event relating to a Short Reference Entity that is effective on or prior such date.

**"Ratings Downgrade Event"** means the rating of any Class of Notes has been reduced by S&P by two or more rating subcategories from the rating

in effect on the Effective Date or withdrawn by S&P (unless it subsequently has been upgraded or reinstated to at least one rating below the rating assigned on the Effective Date).

"**Special Jurisdiction**" means the Cayman Islands, Bermuda, the Netherlands Antilles, the Channel Islands or any other sovereign jurisdiction that is commonly used as a place of organization and, as determined by the Portfolio Manager, generally imposes no or nominal tax on the income of special purpose vehicles.

Notwithstanding anything herein to the contrary, the Portfolio Manager may specify any Reference Entity to be domiciled in any country even if its jurisdiction of organization does not otherwise qualify as such country; provided that such specification is made in good faith and is reasonable in light of the primary location of such Reference Entity's assets or business or other factors, such as the issuer's revenues are earned primarily in such country.

"**Spread Index Transaction**" means a portfolio credit derivative transaction referencing the most recent series of (i) Dow Jones CDX.NA.IG or (ii) any other credit spread index of similar liquidity selected by the Portfolio Manager and approved by the Rating Agency.

In quoting a spread for any Spread Index Transaction, Party A will not be acting as agent, fiduciary or in any other capacity on behalf of Party B, the holders of the Notes or any other person.

"**Spread Transaction**" means, with respect to each Reference Entity or proposed Reference Entity, a single name credit derivative transaction in respect of such Reference Entity.

In quoting a spread for any Spread Transaction, Party A will not be acting as agent, fiduciary or in any other capacity on behalf of Party B, the holders of the Notes or any other person.

"**Trading Adjustment**" means, with respect to a Reference Portfolio Modification proposed by the Portfolio Manager and a Credit Event with respect to a Short Reference Entity, a positive or negative USD amount provided by Party A, acting in a commercially reasonable manner.

In providing any Trading Adjustment, (i) Party A will be acting solely for its own benefit and not as agent, fiduciary or in any other capacity on behalf of Party B, the holders of the Notes or any other person; (ii) Party A is not obligated to consider the interests of Party B or the holders of the Notes in quoting any Trading Adjustment; and (iii) a Trading Adjustment provided by Party A may not be in the interest of, and may be directly adverse to the interest of Party B and the holders of the Notes.

In connection with each Reference Portfolio Modification by the Portfolio Manager, the Trading Adjustments for this Transaction will be made such that the mark-to-market value of the Transaction to Party A prior to the Reference Portfolio Modification is equal to (i) the mark-to-market value of the Transaction to Party A after the Reference Portfolio Modification minus (ii) any trading costs relating to the Party A's hedging transactions in respect of such Portfolio Modification.

If Party A decides to change its model or makes a material change in the assumptions used in its model, it can notify the Portfolio Manager of the

changes and assist the Portfolio Manager in understanding and implementing the changes into the Portfolio Manager's models.

**Modifications to Certain Defined Terms and Provisions Related to Determinations of a Successor:**

In respect of this Transaction:

(i)  Sections 2.2(a)(i) and (ii) of the Credit Derivatives Definitions shall be amended by the deletion of the words "for the entire Credit Derivative Transaction" at the end of those sections and their replacement with the words "with respect to that Reference Entity";

(ii)  Sections 2.2(a)(iii) and (iv) of the Credit Derivatives Definitions shall be amended by the deletion of the words "for a New Credit Derivative Transaction determined in accordance with the provisions of Section 2.2(e)" at the end of those sections and their replacement with the words "with respect to that Reference Entity";

(iii)  Section 2.2(d) of the Credit Derivatives Definitions shall be amended by:

(a)  the deletion from sub-section (i) of the words "Credit Derivative Transaction" and their replacement with the words "Reference Entity";

(b)  the insertion in sub-section (iii) of the words "specified in relation to the relevant Reference Entity" after the words "the Reference Obligation"; and

(c)  the deletion following sub-section (iii) of the words "Credit Derivative Transaction" and their replacement with the word "Successor";

(iv)  Section 2.2(e) of the Credit Derivatives Definitions shall be replaced in its entirety by the following: "Where, pursuant to Section 2.2 (a) above, one or more Successors have been identified in relation to a particular Reference Entity:"

(a)  each such Successor will be a Reference Entity (a "Successor Reference Entity") for the purposes of this Credit Derivative Transaction (and, for the avoidance of doubt, the original Reference Entity shall cease to be a Reference Entity except where it is a Successor Reference Entity); and

(b)  the Reference Entity Calculation Amount in respect of each such Successor Reference Entity shall be the Reference Entity Calculation Amount in respect of the original Reference Entity divided by the number of Successor Reference Entities."

**Merger of Reference Entity and Seller:**

Section 2.31 of the Credit Derivatives Definitions shall not apply in respect of this Transaction.

Modifications to Definition of
   Not Subordinated:

In respect of this Transaction, Section 2.19(b)(i)(A) of the Credit Derivatives Definitions shall be amended by the insertion of (a) the words "of the relevant Reference Entity" immediately after the words "most senior Reference Obligation" in the second line thereof; (b) the words "with respect to such Reference Entity" immediately after the words "Reference Obligation is specified" in the third line thereof; and (c) the word "relevant" immediately before the words "Reference Entity" in the fifth line thereof.

If (A) a Benchmark Obligation is specified in the Long Reference Registry (or Short Reference Registry (as applicable)), (B) a Credit Event occurs with respect to a Reference Entity, and (C) the Reference Obligation(s) identified by Party A in the applicable Reference Obligation Identification Notice is not the Benchmark Obligation of such Reference Entity, Section 2.19(b)(i)(A) of the Credit Derivatives Definitions shall be further amended by deleting the words "the most senior Reference Obligation" in the second line thereof and replacing such words with "the Benchmark Obligation of the relevant Reference Entity".

Modifications to Certain
   Defined Terms
   and Provisions Related
   to Determinations in respect
   of Restructuring:

In respect of this Transaction, Section 3.9 of the Credit Derivatives Definitions shall be deleted in its entirety and replaced by the following language: "Upon the occurrence of a Restructuring Credit Event with respect to a Reference Entity during the Term of the Credit Derivative Transaction:

(a) the Notifying Party may deliver multiple Credit Event Notices with respect to such Reference Entity, each such Credit Event Notice setting forth the amount of the Reference Entity Calculation Amount for such Reference Entity to which such Credit Event Notice applies (the "Exercise Amount");

(b) if the Notifying Party has delivered a Credit Event Notice that specifies an Exercise Amount that is less than the then Reference Entity Calculation Amount for such Reference Entity (after taking into account any previous Exercise Amounts in relation to such Reference Entity), upon satisfaction of the Conditions to Settlement with respect to the Credit Event specified in such Credit Event Notice, settlement will occur in accordance with the applicable Settlement Method as if the Reference Entity Calculation Amount were the Exercise Amount with respect to such Reference Entity, and upon satisfaction of such Conditions to Settlement, without prejudice to the foregoing provisions of this paragraph, the Reference Entity Calculation Amount will be an amount equal to the Reference Entity Calculation Amount outstanding prior to such Credit Event Notice *minus* the Exercise Amount to which the current Credit Event Notice relates;

(c) the Exercise Amount in connection with any Credit Event Notice describing a Credit Event in relation to a Reference Entity other than a Restructuring must be equal to the then outstanding Reference Entity Calculation Amount for such Reference Entity (and not a portion thereof); and

(d) the Exercise Amount in connection with a Credit Event Notice describing a Restructuring must be in the amount that is at least 1,000,000 units of the Settlement Currency or an integral multiple thereof or an amount equal to the Reference Entity Calculation Amount less the sum of each prior Exercise Amount (if any) with respect to such Reference Entity."

**Amendment to Section 9.1 of the Credit Derivatives Definitions:**

Additional Representations:

Section 9.1 of the Credit Derivatives Definitions is hereby amended by adding the following additional representations to such Section:

"(c) Buyer and Seller shall each be deemed to represent to the other party on the Trade Date that:

(i) it is duly authorized to enter into this Transaction.

(ii) it understands the risks of this Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom.

(iii) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into this Transaction is appropriate for such party in light of its financial capabilities and objectives.

(iv) it is acting for its own account and it has made its own independent decisions to enter into the Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the Transaction, it being understood that information and explanations related to the terms and conditions of the Transaction shall not be considered investment advice or a recommendation to enter into the Transaction. It has not received from the other party any assurance or guarantee as to the expected results of the Transaction.

(v) it is capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Transaction.

(vi) it is capable of assuming, and assumes, the financial and other risks of the Transaction.

(vii) the other party is not acting as a fiduciary for or an adviser to it in respect of the Transaction.

(viii) it is acting as principal in respect of this Confirmation and the Transaction and not as agent or in any other capacity, fiduciary or otherwise.

(ix) that upon due execution and delivery of this Confirmation, such Confirmation shall constitute its legal, valid and binding obligation, enforceable in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or in law)."

**Interpretation;**
   **No Need to Suffer a Loss:**

Interpretation:

Each reference to the singular shall include the plural and vice versa.

No Need to Suffer a Loss:

Neither Party A nor any of its affiliates need suffer any loss or provide evidence of any loss as a result of the occurrence of a Credit Event, and the payments to be made by Party B with respect to this Transaction are not conditional on Party A (or any of its affiliates) sustaining or being exposed to a risk of loss. The payments to be made by Party B with respect to this Transaction are due from Party B whether or not Party A (or any of its affiliates) actually suffers a loss.

Additional Provisions:

See Annex C attached hereto for additional provisions that apply to this Transaction.

**Certain Additional Defined Terms:**

Aggregate Outstanding Amount:

Means, when used with respect to any Class of Notes, (i) the outstanding principal amount of such Notes on the Closing Date, plus (ii) the principal amount of any Notes added in connection with an Additional Issuance of such Class of Notes, minus (iii)(a) the aggregate amount of principal payments paid in respect of such Notes pursuant to the Priority of Payments, (b) the Cash Settlement Amounts as of the relevant date of determination in respect of such Class of Notes, and (c) the outstanding principal amount of the Notes of such Class redeemed in connection with an Optional Reduction.

Class B-1 Notes:

$270,000,000 Notes issued by Party B and the Co-Issuer under the Indenture.

Co-Issuer:

Penn's Landing CDO LLC.

Indenture:

The Series Indenture and the Standard Terms, collectively.

New York Business Day:

A day on which commercial banks and foreign exchange markets settle payments in The City of New York.

Person:

An individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), bank, unincorporated association or government or any agency or political subdivision thereof.

Portfolio Administrator:

U.S. Bank National Association

Series Indenture:

The Series Indenture, dated as of April 10, 2007, as amended and restated on April 24, 2007, among Party B, the Co-Issuer and the Trustee, which supplements and incorporates the Standard Terms.

| Standard Terms: | The Standard Terms for Indentures, dated as of April 10, 2007. |
|---|---|
| Trustee: | U.S. Bank National Association |

**Notice and Account Details:**

Telephone and
Facsimile Numbers and
Contact Details for
Notices:

Party A:

Lehman Brothers Special Financing Inc.
Telephone Number: (212) 526-5410
Facsimile Number: (646) 758 2170
Attn: Eric Del Monaco

With a copy of all notices to:

Transaction Management
Telephone Number: 212-526-9610
Facsimile Number: 212-834-0961
Attn: Kahyeong Lee

Party B:

Penn's Landing CDO SPC, for the account of the Series 2007-1 Segregated
Portfolio

c/o Maples Finance Limited
P.O. Box 1093GT
Queensgate House
South Church Street
Grand Cayman, Cayman Islands
Facsimile Number: (345) 945-7100
Attn: The Directors

With a copy of all notices to:

U.S. Bank National Association, as Trustee
1 Federal Street, 3rd Floor
Mail Station EX-MA-FED
Boston, Massachusetts 02110
Telephone Number: (617) 603-6479/6480
Facsimile Number: (503) 258-5975
Attn: Corporate Trust Services/CDO Administration

Portfolio Administrator:

U.S. Bank National Association
1 Federal Street
3rd Floor Mail Station EX-MA-FED
Boston, Massachusetts 02110
Attn: CDO Trust Services – 801 Grand CDO SPC, for the Account of the
Series 2006-2 Segregated Portfolio
Telephone Number: (617) 603-6444
Facsimile Number: (866) 856-3442

Portfolio Manager

Delaware Investment Advisers
2005 Market Street, 40th Floor
Philadelphia, PA 19103
Attentionn: Tom Chow / Sam Priyadarshi
Facimiilie: 215-255-1296

Telephone: 215-255-1531 / 215-255-1649
Email: chowt1@delinvest.com / spriyadarshi@delinvest.com
With copies to:    See Yeng Quek (syquek@delinvest.com)
                   Brian Celements (brian.clements@lfg.com)
                   Caroline Neal (caroline.neal@lfg.com)

**Account Details:**

Payments to Party A

Account for payments:    Lehman Brothers Inc. (SLHIUS3X)
                         with further credit to Lehman Brothers Special Financing
                         (SLHIUS3S)
                         The Chase Manhattan Bank, New York
                         A/C Lehman Brothers Special Financing
                         A/C # 066-143-543

Payments to Party B
Account for payments:    U.S. Bank National Association
                         Minneapolis, MN
                         ABA # 091-000-022
                         DDA Account # 173103321464
                         Account # 112136-200
                         Name: Penn's Landing Payment Account

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
    Name:
    Title:

Confirmed as of the date first written:

PENN'S LANDING CDO SPC, for the account of the
Series 2007-1 Segregated Portfolio

By: _____
    Name:
    Title:

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
    Name:
    Title:

Confirmed as of the date first written:

PENN'S LANDING CDO SPC, for the account of the
Series 2007-1 Segregated Portfolio

By:_____
    Name:
    Title:    **Wendy Ebanks**
              Director

# LEHMAN BROTHERS

## ANNEX A

### The Long Reference Registry — Class B-1 Notes

| Reference Entity | Restructuring | Transaction Type | Reference Entity Calculation Amount | S&P Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity | Monoline Provisions | Subordination |
|---|---|---|---|---|---|---|---|---|---|
| AKZO Nobel N.V. | Applicable | European Corporate | 269,607,843 | Chemical/Plastics | XS0170265341 | 4.25% | 6/14/2011 | | |
| Ambac Assurance Corporation | Applicable | North American Corporate | 269,607,843 | Insurance | XS0124212738 | 5.90% | 2/22/2021 | Applicable | |
| Anglo American plc | Applicable | European Corporate | 269,607,843 | Nonferrous metals/minerals | XS0177703732 | 5.13% | 12/15/2010 | | |
| Archer-Daniels-Midland Company | Applicable | North American Corporate | 269,607,843 | Farming/agriculture | US039483AJ11 | 8.13% | 6/1/2012 | | |
| AT&T Inc. | Applicable | North American Corporate | 269,607,843 | Telecommunications/cellular communications | US78387GAK94 | 5.88% | 8/15/2012 | | |
| Avon Products, Inc. | Applicable | North American Corporate | 269,607,843 | Cosmetics/toiletries | US054303AM47 | 7.15% | 11/15/2009 | | |
| Baker Hughes Incorporated | Applicable | North American Corporate | 269,607,843 | Oil and Gas | US057224AS65 | 6.00% | 2/15/2009 | | |
| BARRICK GOLD CORPORATION | Applicable | North American Corporate | 269,607,843 | Nonferrous metals/minerals | US725906AH40 | 6.38% | 3/1/2033 | | |
| Berkshire Hathaway Inc. | Applicable | North American Corporate | 269,607,843 | Conglomerates | US084664AD30 | 4.63% | 10/15/2013 | | |
| BNP PARIBAS | Applicable | European Corporate | 269,607,843 | Financial Intermediaries | XS0159590610 | 5.25% | 12/17/2012 | | Subordinate |
| Boston Properties Inc. | Applicable | North American Corporate | 269,607,843 | REITS | US101012RAB06 | 6.25% | 1/15/2013 | | |
| BOUYGUES | Applicable | European Corporate | 269,607,843 | Conglomerates | FR0000048171 | 5.88% | 5/15/2009 | | |
| Bristol-Myers Squibb Company | Applicable | North American Corporate | 269,607,843 | Drugs | US110122AG36 | 5.75% | 10/1/2011 | | |
| Cargill, Incorporated | Applicable | North American Corporate | 269,607,843 | Farming/agriculture | US141781AC86 | 7.38% | 10/1/2025 | | |
| CARREFOUR | Applicable | European Corporate | 269,607,843 | Food/drug retailers | FR0000480691 | 6.13% | 5/26/2010 | | |
| Centrica Plc | Applicable | European Corporate | 269,607,843 | Utilities | XS0137672381 | 5.88% | 11/22/2012 | | |
| CIT Group Inc. | Applicable | North American Corporate | 269,607,843 | Financial Intermediaries | US125581AB41 | 7.75% | 4/2/2012 | | |
| Citigroup Inc. | Applicable | North American Corporate | 269,607,843 | Financial Intermediaries | US172967BC45 | 6.50% | 1/18/2011 | | |
| Clariant AG | Applicable | European Corporate | 269,607,843 | Chemical/Plastics | CH0010519475 | 4.25% | 3/15/2008 | | |
| Coca-Cola Enterprises Inc. | Applicable | North American Corporate | 269,607,843 | Beverage and Tobacco | US191219BJ28 | 6.13% | 8/15/2011 | | |
| Consolidated Edison Company of New York, Inc. | Applicable | North American Corporate | 269,607,843 | Utilities | US209111DE04 | 8.13% | 5/1/2010 | | |
| Countrywide Home Loans, Inc. | Applicable | North American Corporate | 269,607,843 | Financial Intermediaries | US222237LPA43 | 4.00% | 3/22/2011 | | |
| Danaher Corporation | Applicable | North American Corporate | 269,607,843 | Industrial Equipment | US235851AB82 | 6.00% | 10/15/2008 | | |

A-1

30775-00042 NY:2152065.3

| Reference Entity | Restructuring | Transaction Type | Reference Entity Calculation Amount | S&P Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity | Monoline Provisions | Subordination |
|---|---|---|---|---|---|---|---|---|---|
| Dell Inc. | Applicable | North American Corporate | 269,607,843 | Electronics/electric | US2470251AD11 | 6.55% | 4/15/2008 | | |
| DEUTSCHE BANK AKTIENGESELLSCHAFT | Applicable | European Corporate | 269,607,843 | Financial Intermediaries | DE0008516428 | 5.38% | 3/27/2012 | | Subordinate |
| DIAGEO PLC | Applicable | European Corporate | 269,607,843 | Beverage and Tobacco | US25243EAA10 | 7.25% | 11/1/2009 | | |
| Diamond Offshore Drilling, Inc. | Applicable | North American Corporate | 269,607,843 | Oil and Gas | US25271CAC64 | 0.00% | 6/6/2020 | | |
| Duke Capital LLC | Applicable | North American Corporate | 269,607,843 | Oil and Gas | US26459RAJ59 | 6.25% | 2/15/2013 | | |
| E.ON AG | Applicable | European Corporate | 269,607,843 | Utilities | XS0148578262 | 5.75% | 5/29/2009 | | |
| Eaton Corporation | Applicable | North American Corporate | 269,607,843 | Industrial Equipment | US278058AW21 | 7.65% | 11/15/2029 | | |
| Emerson Electric Co. | Applicable | North American Corporate | 269,607,843 | Industrial Equipment | US291011AM63 | 7.13% | 8/15/2010 | | |
| Federal Home Loan Mortgage Corporation | Applicable | North American Corporate | 269,607,843 | U.S. Agency (Explicitly Guaranteed) | US3134A4EW03 | 5.88% | 3/21/2011 | | Subordinate |
| Federal National Mortgage Association | Applicable | North American Corporate | 269,607,843 | U.S. Agency (Explicitly Guaranteed) | US31359MNU35 | 5.25% | 8/1/2012 | | Subordinate |
| Financial Security Assurance Inc | Applicable | North American Corporate | 269,607,843 | Insurance | XS0121914907 | 6.11% | 6/29/2015 | Applicable | |
| GAZPROM | Applicable | Emerging European Corporate | 269,607,843 | Oil and Gas | XS0146655104 | 9.13% | 4/25/2007 | | |
| General Electric Capital Corporation | Applicable | North American Corporate | 269,607,843 | Conglomerates | US36962GYY42 | 6.00% | 6/15/2012 | | |
| GlobalSantaFe Corporation | Applicable | North American Corporate Subordinated | 269,607,843 | Oil and Gas | US379437ABA4 | 5.00% | 2/15/2013 | | |
| Hannover Rueckversicherung AG | Applicable | European Insurance Corporate | 269,607,843 | Insurance | XS0187043079 | 5.75% | 2/26/2024 | | Subordinate |
| HANSON PLC | Applicable | European Corporate | 269,607,843 | Conglomerates | US411352AA50 | 7.88% | 9/27/2010 | | |
| HELLENIC TELECOMMUNICATIONS ORGANISATION SOCIETE ANONYME | Applicable | European Corporate | 269,607,843 | Telecommunications/cellular communications | XS0173549659 | 5.00% | 8/5/2013 | | |
| Ingersoll-Rand Company | Applicable | North American Corporate | 269,607,843 | Industrial Equipment | US456866AG74 | 9.00% | 8/15/2021 | | |
| International Lease Finance Corporation | Applicable | North American Corporate | 269,607,843 | Equipment leasing | US459745EZA5 | 6.38% | 3/15/2009 | | |
| Johnson & Johnson | Applicable | North American Corporate | 269,607,843 | Drugs | US478160AM65 | 3.80% | 5/15/2013 | | |
| Johnson Controls, Inc. | Applicable | North American Corporate | 269,607,843 | Automotive | US478366AG24 | 7.13% | 7/15/2017 | | |
| JPMorgan Chase & Co. | Applicable | North American Corporate | 269,607,843 | Financial Intermediaries | US46625HCE80 | 4.75% | 3/1/2015 | | |
| KELDA GROUP PLC | Applicable | European Corporate | 269,607,843 | Utilities | XS0109437441 | 6.63% | 4/17/2031 | | |
| Kimberly-Clark Corporation | Applicable | North American Corporate | 269,607,843 | Cosmetics/toiletries | US494368AQ68 | 6.88% | 2/15/2014 | | |

A-2

30775-00042 NY:2152065.3

| Reference Entity | Restructuring | Transaction Type | Reference Entity Calculation Amount | S&P Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity | Monoline Provisions | Subordination |
|---|---|---|---|---|---|---|---|---|---|
| Kingdom of Thailand | Applicable | Asia Sovereign | 269,607,843 | Sovereign | US88322XAC53 | 7.75% | 4/15/2007 | | |
| L'AIR LIQUIDE SOCIETE ANONYME A DIRECTOIRE ET CONSEIL DE SURVEILLANCE POUR L'ETUDE ET L'EXPLOITATION DES PROCEDES GEORGES CLAUDE | Applicable | European Corporate | 269,607,843 | Chemical/Plastics | FR0000487936 | 5.25% | 12/28/2011 | | Subordinate |
| LEGAL & GENERAL GROUP PLC | Applicable | European Corporate | 269,607,843 | Insurance | XS0121464779 | 5.88% | 12/11/2031 | | |
| Lowe's Companies, Inc. | Applicable | North American Corporate | 269,607,843 | Retailers (except food and drug) | US548661CA38 | 8.25% | 6/1/2010 | | |
| MBIA Insurance Corporation | Applicable | North American Corporate | 269,607,843 | Insurance | US55266MCH51 | 5.38% | 10/6/2010 | Applicable | |
| Merrill Lynch & Co., Inc. | Applicable | North American Corporate | 269,607,843 | Brokers/Dealers/Investment houses | US59018IP48 | 6.00% | 2/17/2009 | | |
| MGIC Investment Corporation | Applicable | North American Corporate | 269,607,843 | Insurance | US552845AF69 | 6.00% | 3/15/2007 | | |
| Morgan Stanley | Applicable | North American Corporate | 269,607,843 | Brokers/Dealers/Investment houses | US617446HC69 | 6.60% | 4/1/2012 | | |
| Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen | Applicable | Subordinated European Insurance Corporate | 269,607,843 | Insurance | XS0166965797 | 6.75% | 6/21/2023 | | |
| NATIONAL GRID TRANSCO PLC | Applicable | European Corporate | 269,607,843 | Utilities | XS0133729771 | 6.13% | 8/23/2011 | | |
| NORFOLK SOUTHERN CORPORATION | Applicable | North American Corporate | 269,607,843 | Rail Industries | US655844AB88 | 7.70% | 5/15/2017 | | |
| Novartis AG | Applicable | European Corporate | 269,607,843 | Drugs | XS0158284801 | 3.75% | 12/6/2007 | | |
| NUCOR CORPORATION | Applicable | North American Corporate | 269,607,843 | Steel | US670346AC90 | 4.88% | 10/1/2012 | | |
| Pfizer Inc. | Applicable | North American Corporate | 269,607,843 | Drugs | US717081AQ68 | 4.65% | 3/1/2018 | | |
| Pitney Bowes Inc. | Applicable | North American Corporate | 269,607,843 | Business Equipment and Services | US724479AF75 | 4.63% | 10/1/2012 | | |
| PPG Industries, Inc. | Applicable | North American Corporate | 269,607,843 | Chemical/Plastics | US693506AY35 | 7.05% | 8/15/2009 | | |
| Residential Capital Corporation | Applicable | North American Corporate | 269,607,843 | Financial Intermediaries | US76113BAR06 | 6.50% | 4/17/2013 | | |
| REUTERS GROUP PLC | Applicable | European Corporate | 269,607,843 | Business Equipment and Services | XS0180277393 | 4.63% | 11/19/2010 | | |
| RIO TINTO LIMITED | Applicable | Australia Corporate | 269,607,843 | Nonferrous metals/minerals | US767201AB24 | 2.63% | 9/30/2008 | | |
| ROLLS-ROYCE plc | Applicable | European Corporate | 269,607,843 | Aerospace and Defense | XS0188009004 | 4.50% | 3/16/2011 | | |
| Russian Federation | Applicable | Emerging European & Middle Eastern Sovereign | 269,607,843 | Sovereign | XS0114288789 | 7.50% | 3/31/2030 | | |
| SANOFI-AVENTIS | Applicable | European Corporate | 269,607,843 | Drugs | XS0176128675 | 4.25% | 9/15/2010 | | |
| SCHNEIDER ELECTRIC SA | Applicable | European Corporate | 269,607,843 | Electronics/electric | XS0260896542 | 4.50% | 1/17/2014 | | |

A-3

30775-00042 NY:2152065.3

| Reference Entity | Restructuring | Transaction Type | Reference Entity Calculation Amount | S&P Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity | Monoline Provisions | Subordination |
|---|---|---|---|---|---|---|---|---|---|
| Siemens Aktiengesellschaft | Applicable | European Corporate | 269,607,843 | Conglomerates | XS0131224155 | 5.75% | 7/4/2011 | | |
| SINGTEL OPTUS PTY LIMITED | Applicable | Australia Corporate | 269,607,843 | Telecommunications/cellular communications | USQ19460AC00 | 8.00% | 6/22/2010 | | Subordinate |
| SLM Corporation | Applicable | North American Corporate | 269,607,843 | Financial Intermediaries | US78442FAB40 | 5.13% | 8/27/2012 | | |
| SOCIETE GENERALE | Applicable | European Corporate | 269,607,843 | Financial Intermediaries | XS0110673950 | 6.63% | 4/27/2015 | | |
| South Africa | Applicable | Emerging European & Middle Eastern Sovereign | 269,607,843 | Sovereign | US836205AD62 | 8.50% | 6/23/2017 | | |
| Starwood Hotels & Resorts Worldwide, Inc. | Applicable | North American Corporate | 269,607,843 | Lodging and Casinos | US85590AAD63 | 7.88% | 5/1/2012 | | |
| State of Qatar | Applicable | Emerging European & Middle Eastern Sovereign | 269,607,843 | Sovereign | XS0113419690 | 9.75% | 6/15/2030 | | |
| STMicroelectronics N.V. | Applicable | European Corporate | 269,607,843 | Electronics/electric | XS0173918011 | 0.00% | 7/5/2013 | | |
| SYNGENTA AG | Applicable | European Corporate | 269,607,843 | Farming/agriculture | XS0217939494 | 4.13% | 4/22/2015 | | |
| TELECOM CORPORATION OF NEW ZEALAND LIMITED | Applicable | New Zealand Corporate | 269,607,843 | Telecommunications/cellular communications | XS0140346171 | 6.75% | 12/4/2011 | | |
| TeliaSonera Aktiebolag | Applicable | European Corporate | 269,607,843 | Telecommunications/cellular communications | XS0101443538 | 5.50% | 9/10/2010 | | |
| TELSTRA CORPORATION LIMITED | Applicable | European Corporate | 269,607,843 | Telecommunications/cellular communications | XS0131858838 | 6.38% | 6/29/2011 | | |
| TELUS CORPORATION | Applicable | North American Corporate | 269,607,843 | Telecommunications/cellular communications | US87971MAC73 | 8.00% | 6/1/2011 | | |
| The Bear Stearns Companies Inc. | Applicable | North American Corporate | 269,607,843 | Brokers/Dealers/Investment houses | US073902KF49 | 5.30% | 10/30/2015 | | |
| The Dow Chemical Company | Applicable | North American Corporate | 269,607,843 | Chemical/Plastics | US260543BR36 | 6.00% | 10/1/2012 | | |
| The Goldman Sachs Group, Inc. | Applicable | North American Corporate | 269,607,843 | Brokers/Dealers/Investment houses | US38141GBU76 | 6.60% | 1/15/2012 | | |
| The Home Depot, Inc. | Applicable | North American Corporate | 269,607,843 | Retailers (except food and drug) | US437076AL65 | 3.75% | 9/15/2009 | | |
| THE NEW YORK TIMES COMPANY | Applicable | North American Corporate | 269,607,843 | Publishing | US65011QAG73 | 4.61% | 9/26/2012 | | |
| The PMI Group, Inc. | Applicable | North American Corporate | 269,607,843 | Insurance | US69344MAH43 | 6.00% | 9/15/2016 | | |
| THE ROYAL BANK OF SCOTLAND PUBLIC LIMITED COMPANY | Applicable | European Corporate | 269,607,843 | Financial Intermediaries | XS0128842571 | 6.00% | 5/10/2013 | | Subordinate |
| The TJX Companies, Inc. | Applicable | North American Corporate | 269,607,843 | Retailers (except food and drug) | US872540AH26 | 7.45% | 12/15/2009 | | |

A-4

| Reference Entity | Restructuring | Transaction Type | Reference Entity Calculation Amount | S&P Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity | Monoline Provisions | Subordination |
|---|---|---|---|---|---|---|---|---|---|
| THOMSON | Applicable | European Corporate | 269,607,843 | Electronics/electric | FR0000188369 | 1.00% | 1/1/2008 | | |
| TNT N.V. | Applicable | European Corporate | 269,607,843 | Surface Transport | NL0000117190 | 3.88% | 6/1/2015 | | |
| Unilever N.V. | Applicable | European Corporate | 269,607,843 | Food Products | US9047G4AG27 | 7.13% | 11/1/2010 | | |
| United Parcel Service, Inc. | Applicable | North American Corporate | 269,607,843 | Surface Transport | US911308AB04 | 8.38% | 4/1/2030 | | |
| UNITED UTILITIES PLC | Applicable | European Corporate | 269,607,843 | Utilities | US91311QAC96 | 6.88% | 8/15/2028 | | |
| Verizon Communications Inc. | Applicable | North American Corporate | 269,607,843 | Telecommunications/cellular communications | US92344GAW69 | 4.90% | 9/15/2015 | | |
| Washington Mutual, Inc. | Applicable | North American Corporate | 269,607,843 | Financial Intermediaries | US939322AV52 | 5.25% | 9/15/2017 | | |
| Wells Fargo & Company | Applicable | North American Corporate | 269,607,843 | Financial Intermediaries | US949746NA59 | 5.56% | 10/28/2015 | | |
| WESTPAC BANKING CORPORATION | Applicable | Australia Corporate | 269,607,843 | Financial Intermediaries | XS0156885302 | 5.88% | 4/29/2018 | | Subordinate |
| WPP Group plc. | Applicable | European Corporate | 269,607,843 | Business Equipment and Services | XS0313030032 | 6.00% | 6/18/2008 | | |
| Zurich Insurance Company | Applicable | European Insurance Subordinated Corporate | 269,607,843 | Insurance | XS0177601811 | 5.75% | 10/2/2023 | | Subordinate |

A-5

**LEHMAN BROTHERS**

**ANNEX B**

**The Short Reference Registry**

No Short Reference Entities exist as of the Effective Date.

**LEHMAN BROTHERS**

**ANNEX C**

**Additional Terms**

(a) **Additional Agreements.** Each party agrees as set out below for so long as either party has or may have any obligation under this Transaction:

      (i)     The Seller acknowledges and agrees that this Transaction constitutes a credit default swap transaction and, accordingly, the Buyer may, following the occurrence of a Credit Event in respect of a Reference Entity and subject to the terms specified herein, demand and receive payment in full of the appropriate Cash Settlement Amount on the date such amount shall be payable without being required to make any prior demand or to take prior proceedings against the relevant Reference Entity or any other person which is a surety for or which has granted the Buyer any form of credit protection or credit insurance or entered into any credit default swap or similar transaction with the Buyer in respect of such Reference Entity. The Buyer shall be under no obligation to account to the Seller or to any of its affiliates for any payment or sums, if any, recovered from a Reference Entity or any third party.

      (ii)    Each party, the Calculation Agent and their respective affiliates may, whether by virtue of the types of relationships described herein or otherwise, at the date hereof or at any time hereafter, be in possession of information in relation to any Reference Entity that is or may be material in the context of this Transaction and that may or may not be publicly available or known to the aforementioned persons. Apart from the obligations of the Calculation Agent set out in this Confirmation, this Transaction does not create any obligation on the part of any such person or its affiliates to disclose to the other party any such relationship or information (whether or not confidential).

      (iii)   The parties agree that, in entering into this Transaction, neither the Buyer nor the Seller intends to enter into a contract of surety, guarantee, insurance, assurance or indemnity, and the parties' obligations hereunder are not conditional or dependent upon or subject to the Buyer having any title, ownership or interest (whether legal, equitable or economic) in any Reference Entity.

      (iv)   The parties shall be obliged to perform this Transaction without regard to whether the Buyer or any affiliate of the Buyer has any credit exposure in respect of a Reference Entity. Neither the Buyer nor any of its affiliates need suffer any loss or provide evidence of any loss as a result of the occurrence of a Credit Event, and the payments to be made by the Seller under this Transaction are not conditional on the Buyer (or any of its affiliates) sustaining or being exposed to a risk of loss.

      (v)    The Seller acquires no rights, either direct or indirect or by way of subrogation, against any Reference Entity or in respect of any Reference Obligation thereof as a result of entering into or performing its obligations under this Transaction.

(b) **The Calculation Agent.**

   (1) The Calculation Agent shall be responsible for:

      (i)     Determining a successor as Calculation Agent (if necessary) after agreement with the Seller;

      (ii)    Determining a Successor to any Reference Entity in accordance with the Definitions, as modified herein;

      (iii)   Obtaining Full Quotations in accordance with the Confirmation;

      (iv)   Selecting Dealers where required in accordance with the Confirmation;

      (v)    Determining Reference Entity Loss Amounts, Final Prices, Class B-1 Cash Settlement Amounts and each Class B-1 Credit Protection Payment Amount;

(vi)     Determining (i) a hypothetical Reference Entity Loss Amount for each Class B-1 Adjustment Reference Entity based on a Final Price of zero, and (ii) a hypothetical Class B-1 Cash Settlement Amount for such Class B-1 Adjustment Reference Entity;

(vii)     Determining any Class B-1 Adjustment Amount, any Class B-1 Adjustment Reference Entity, the Contingency Amount with respect to the Class B-1 Notes, the Contingency Cash Settlement Amount with respect to the Class B-1 Notes, any relevant Deferred Interest Cut-off Date, any relevant Deferred Redemption Cut-off Date, any relevant Deferred Redemption Date, any Deferred Redemption Amount with respect to the Class B-1 Notes and the Outstanding Adjustment Amount with respect to each Class B-1 Adjustment Reference Entity; and

(viii)     To the extent not provided for by sub-paragraphs (i) to (vii) above, making the calculations and determinations and giving the notices as set out and contemplated hereunder.

(2)   Whenever the Calculation Agent is required to act or to exercise judgment, it shall do so in good faith and in a commercially reasonable manner. Its calculations and determinations shall be binding in the absence of bad faith or manifest error.

(3)   Each party agrees that the Calculation Agent is not acting as a fiduciary for or as an advisor to either party in respect of its duties as Calculation Agent in connection with this Transaction.

(4)   In connection with any requests for quotations or estimates pursuant to the provisions set forth in this Confirmation under "Settlement Terms", the Calculation Agent: (a) may, but shall not be required to, inform the relevant Dealers of the Publicly Available Information in its possession regarding the occurrence and the nature of the relevant Credit Event; and (b) shall not disclose any information that would give rise to a contravention by the Buyer of its obligations under applicable secrecy laws.

## ANNEX D

### S&P SROC CDO Evaluator Test

**S&P SROC CDO Evaluator Test** is used to determine the credit risk of the Reference Portfolio, and will be satisfied if, after giving effect to a proposed Reference Portfolio Modification, the S&P SROC is a positive figure greater than or equal to 100%, or if the S&P SROC immediately prior to the Reference Portfolio Modification is less than 100%, such Reference Portfolio Modification does not cause the S&P SROC to be a smaller percentage. This will be determined using the S&P CDO Evaluator. This tests whether the remaining subordination of the tranche is greater than the minimum subordination determined using the S&P CDO Evaluator.

**"S&P SROC"** means, as of the date of determination, a percentage calculated as follows:

$$= (A - B*A) / (A - C)$$

A =    the sum of the Reference Entity Calculation Amounts of each Reference Entity included in the Reference Portfolio

B =    the S&P Scenario Loss Rate (expressed as a percentage)

C =    the greater of (a) the Loss Threshold Amount, *minus* the Aggregate Loss Amount, minus, the aggregate of the Loss Adjustment Amounts *minus* the Net Loss Balance (after giving effect the Trading Adjustment provided by Party A), *plus* the Net Gain Balance (after giving effect the Trading Adjustment provided by Party A), and (b) zero

**"Loss Adjustment Amount"** means, for each Reference Entity in respect of which the Conditions to Settlement have been satisfied but the related Final Price has not been determined as of such date, the (a) the Reference Entity Calculation Amount for such Reference Entity and (b) 100% minus the S&P assumed recovery rate for the relevant Reference Entity, based on the prevailing S&P CDO Evaluator.

**"S&P CDO Evaluator"** is a dynamic, analytical computer program developed by S&P to determine the credit risk of a portfolio of debt securities and provided to the Buyer and Portfolio manager by S&P, as such program may be modified by S&P from time to time.

**"S&P Scenario Loss Rate"** means, as of any date, an estimate of the current cumulative loss rate, for the reference entities in the reference portfolio and as amended from time to time, consistent with the initial rating by S&P with respect to the notes, determined by the application of the S&P CDO Evaluator.

## ANNEX E

### S&P Rating

**"S&P Rating"** means the S&P Rating of any Reference Entity shall be determined as follows: *provided, however,* if such Reference Entity is (x) on watch for upgrade by S&P it shall be treated as upgraded by one rating subcategory or (y) on watch for downgrade by S&P it shall be treated as downgraded by one rating subcategory:

(i)     if there is a foreign currency issuer credit rating issued by S&P for such Reference Entity, (or rating on a guarantor who unconditionally and irrevocably guarantees the obligations of such Reference Entity), then the S&P Rating of such Reference Entity shall be such rating;

(ii)    if there is no foreign currency issuer credit rating, provided that a sovereign rating assigned by S&P to the country in which such entity is domiciled is "AA-" or above, then the S&P Rating shall be the local currency issuer credit rating for such Reference Entity;

(iii)   if there is not a foreign currency issuer credit rating issued by S&P for such Reference Entity, or, provided that a sovereign rating assigned by S&P to the country in which such entity is domiciled is "AA-" or above, a local currency issuer credit rating for such Reference Entity, but there is a rating by S&P on a senior unsecured obligation of the issuer, then the S&P Rating of such Reference Entity shall be such rating;

(iv)    if there is not a foreign currency issuer credit rating issued by S&P for such Reference Entity, or, provided that a sovereign rating assigned by S&P to the country in which such entity is domiciled is "AA-" or above, a local currency issuer credit rating for such Reference Entity, or a rating on a senior unsecured obligation of the issuer by S&P, but there is a rating by S&P on a senior secured obligation of the issuer,  then the S&P Rating of such Reference Entity shall be one subcategory below such rating if such rating is higher than "BB+" or two subcategories below such rating if such rating is "BB+" or lower;

(v)     if there is not a foreign currency issuer credit rating issued by S&P for such Reference Entity, or, provided that a sovereign rating assigned by S&P to the country in which such entity is domiciled is "AA-" or above, a local currency issuer credit rating for such Reference Entity, or a rating on a senior unsecured obligation, or a rating on a senior secured obligation of the issuer by S&P, but there is a rating by S&P on a subordinated obligation of the issuer, then the S&P Rating of such Reference Entity shall be one subcategory above such rating if such rating is higher than "BB+"  or two subcategories above such rating if such rating is "BB+" or lower;

(vi)    if clauses (i) through (v) do not apply but there is a Moody's Rating for such Reference Entity, then the S&P Rating of such Reference Entity, shall be (1) one subcategory below the S&P equivalent of the Moody's Rating if such rating is higher than "Ba1" by Moody's or (2) two subcategories below the S&P equivalent of the Moody's Rating if such rating is  "Ba1" or lower by Moody's;

(vii)   if the Reference Entity does not have a published rating from Moody's and S&P, then the S&P Rating of such Reference Entity shall be "CCC-";

provided that, (x) if the Reference Entity is a US Agency (Federal National Mortgage Association and Federal Home Loan Mortgage Corporation) with Reference Obligation characteristic of senior unsecured or senior secured, then the S&P Rating of such Reference Entity shall be its senior unsecured rating, (y) if the Reference Entity is a US Agency with Reference Obligation characteristic of subordinated, then the

S&P Rating of such Reference Entity shall be four subcategories below its senior unsecured rating for Federal National Mortgage Association and three subcategories below its senior unsecured rating for Federal Home Loan Mortgage Corporation.

**LEHMAN BROTHERS**

ANNEX F

Credit Event Matrix

F-1

| | NORTH AMERICAN | EUROPEAN | AUSTRALIA | NEW ZEALAND | JAPAN |
|---|---|---|---|---|---|
| Transaction Type / Business Days | If the Floating Rate Payer Calculation Amount is denominated in: USD: London, New York & TARGET; EUR: London, New York & TARGET; GBP: London; JPY: London & Tokyo; CHF: London & Zurich | If the Floating Rate Payer Calculation Amount is denominated in: EUR: London & TARGET; USD: London & New York; GBP: London; JPY: London & Tokyo; CHF: London & Zurich | If the Floating Rate Payer Calculation Amount is denominated in: USD: London, New York & Sydney; AUD: London, New York & Sydney; EUR: London, New York, TARGET & Sydney | If the Floating Rate Payer Calculation Amount is denominated in: USD: London, New York & Auckland; AUD: London, New York & Auckland; EUR: London, New York, Sydney & Auckland; NZD: London, New York & Auckland | If the Floating Rate Payer Calculation Amount is denominated in: JPY: London, New York & Tokyo; USD: London, New York & Tokyo; EUR: London, New York, TARGET & Tokyo |
| | Not Applicable | Not Applicable | Applicable | Applicable | Applicable |
| | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Section 3.3 of the Definitions shall be amended by replacing "Greenwich Mean Time" with "Tokyo time". Notice of Publicly Available Information Applicable |
| Credit Events | Bankruptcy; Failure to Pay; Restructuring (if specified as applicable in the relevant Confirmation); Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Bankruptcy; Failure to Pay; Restructuring; Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation Applicable | Bankruptcy; Failure to Pay; Restructuring; Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Bankruptcy; Failure to Pay; Restructuring; Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Bankruptcy; Failure to Pay; Payment Requirement: If the Floating Rate Payer Calculation Amount is in JPY, JPY 100,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay. In all other cases, USD 1,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay. Restructuring; Multiple Holder Obligation: Not Applicable; Default Requirement: If the Floating Rate Payer Calculation Amount is in JPY, JPY 1,000,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event. In all other cases, USD 10,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event. |
| Obligation Category | Borrowed Money | Borrowed Money | Borrowed Money | Borrowed Money | Borrowed Money |
| Obligation Characteristics | None | None | None | None | Not Subordinated |
| Deliverable Obligation Category | Bond or Loan | Bond or Loan | Bond or Loan | Bond or Loan | Bond or Loan |
| Deliverable Obligation Characteristics | Not Subordinated; Specified Currency; Not Contingent; Assignable Loan; Consent Required Loan; Transferable; Maximum Maturity: 30 years; Not Bearer | Not Subordinated; Specified Currency; Not Contingent; Assignable Loan; Consent Required Loan; Transferable; Maximum Maturity: 30 years; Not Bearer | Not Subordinated; Specified Currency: Standard Specified Currencies & Domestic Currency; Not Contingent; Assignable Loan; Consent Required Loan; Transferable; Maximum Maturity: 30 years; Not Bearer | Not Subordinated; Specified Currency: Standard Specified Currencies & Domestic Currency; Not Contingent; Assignable Loan; Consent Required Loan; Transferable; Maximum Maturity: 30 years; Not Bearer | Not Subordinated; Specified Currency; Not Contingent; Assignable Loan; Consent Required Loan; Transferable; Maximum Maturity: 30 years; Not Bearer |
| | Applicable | Applicable | Applicable | Applicable | Applicable |
| | Not Applicable unless otherwise specified as Applicable in the relevant Confirmation | Not Applicable | Not Applicable | Not Applicable | Applicable |
| | Applicable unless otherwise specified as Applicable in the relevant Confirmation | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| | Not Applicable unless otherwise specified as Applicable in the relevant Confirmation | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| | Not Applicable unless otherwise specified as Applicable in the relevant Confirmation | Not Applicable | Not Applicable | Not Applicable | Not Applicable |

F-2

All references to "Definitions" mean the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions, and the 2005 Matrix Supplement to the 2003 ISDA Credit Derivatives Definitions, as published by the International Swaps and Derivatives Association, Inc. Capitalized terms used in this Credit Derivatives Physical Settlement Matrix and not defined herein have the meanings given to them in the Definitions.

30775-00042 NY:2152065.3

| | AUSTRALIA/NEW ZEALAND CORPORATE | ASIA CORPORATE | EMERGING EUROPEAN & MIDDLE EASTERN CORPORATE | LATIN AMERICA CORPORATE | SUBORDINATED EUROPEAN INSURANCE CORPORATE |
|---|---|---|---|---|---|
| Transaction Type | | | | | |
| Business Days | If the Floating Rate Payer Calculation Amount is denominated in USD: London, New York & Singapore. EUR: London, New York, TARGET & Singapore | If the Floating Rate Payer Calculation Amount is denominated in USD: London, New York. EUR: London, New York & TARGET | If the Floating Rate Payer Calculation Amount is denominated in USD: London, New York. EUR: London, New York, Target | If the Floating Rate Payer Calculation Amount is denominated in USD: London & New York. EUR: London, New York & TARGET | If the Floating Rate Payer Calculation Amount is denominated in USD: London & New York. EUR: London, New York & TARGET |
| | Applicable | Applicable | Applicable | Applicable | Applicable |
| | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable |
| Credit Events | Bankruptcy; Failure to Pay; Restructuring | Bankruptcy; Failure to Pay; Restructuring | Bankruptcy; Failure to Pay; Grace Period Extension: Applicable; Obligation Acceleration; Repudiation/Moratorium; Restructuring; Multiple Holder Obligation: a) Not Applicable with respect to Obligation Category "Bonds"; b) Applicable with respect to Obligation Category "Loans" | Bankruptcy; Failure to Pay; Grace Period Extension: Applicable; Obligation Acceleration; Repudiation/Moratorium; Restructuring; Multiple Holder Obligation: Not Applicable | Bankruptcy; Failure to Pay; Grace Period Extension: Applicable; Obligation Acceleration; Repudiation/Moratorium; Restructuring |
| Obligation Category | Bond or Loan | Bond or Loan | Bond or Loan | Bond | Bond or Loan |
| Obligation Characteristics | Not Subordinated; Specified Currency: Standard Specified Currencies; Domestic Currency; Not Sovereign Lender | Not Subordinated; Not Domestic Currency; Not Domestic Issuance; Not Domestic Law | Not Subordinated; Not Domestic Law; Not Domestic Currency; Not Domestic Issuance | Not Subordinated; Not Domestic Currency; Not Domestic Law; Not Domestic Issuance | Not Subordinated; Not Domestic Currency; Not Domestic Law; Not Domestic Issuance |
| Deliverable Obligation Category | Bond or Loan | Bond or Loan | Bond or Loan | Bond | Bond or Loan |
| Deliverable Obligation Characteristics | Not Subordinated; Specified Currency: Standard Specified Currencies; Domestic Currency; Not Sovereign Lender; Not Contingent; Assignable Loan; Transferable; Maximum Maturity: 30 years; Not Bearer | Not Subordinated; Specified Currency; Not Sovereign Lender; Not Contingent; Not Domestic Law; Not Domestic Issuance; Assignable Loan; Transferable; Maximum Maturity: 30 years; Not Bearer | Not Subordinated; Specified Currency; Not Domestic Law; Not Contingent; Not Domestic Issuance; Transferable; Not Bearer; Assignable Loan; Consent Required Loan | Not Subordinated; Specified Currency; Not Sovereign Lender; Not Domestic Law; Not Contingent; Not Domestic Issuance; Transferable; Not Bearer | Not Subordinated; Specified Currency; Not Sovereign Lender; Not Domestic Law; Not Contingent; Not Domestic Issuance; Assignable Loan; Consent Required Loan; Transferable; Not Bearer |
| | Applicable | Applicable | Applicable | Applicable | Applicable |
| | Applicable | Applicable | Not Applicable | Not Applicable | Not Applicable |
| | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |

* All references to "Definitions" mean the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions, and the 2005 Matrix Supplement to the 2003 ISDA Credit Derivatives Definitions, as published by the International Swaps and Derivatives Association, Inc. Capitalized terms ...

F-3

F-4

065.3

LEHMAN BROTHERS

ANNEX G

| Class of Notes | Size of the Reference Portfolio | Loss Threshold Amount | | Loss Cap Amount | | Reference Entity Calculation Amount | |
|---|---|---|---|---|---|---|---|
| Class B-1 Notes | $27,000,000,000 | $1,255,500,000 | 4.65% | $1,525,500,000 | 5.65% | $264,705,882 | 0.98% |

F-1