BOTH (A) A QUALIFIED INSTITUTIONAL BUYER AND A QUALIFIED PURCHASER OR (B) AN ACCREDITED INVESTOR AND A QUALIFIED PURCHASER, AT THE TIME OF ACQUISITION OF THIS NOTE TO SELL THIS NOTE TO A PERSON WHO IS (A) A QUALIFIED INSTITUTIONAL BUYER AND A QUALIFIED PURCHASER, (B) BOTH AN ACCREDITED INVESTOR AND A QUALIFIED PURCHASER (*PROVIDED, THAT* IN THE CASE OF ANY TRANSFER PURSUANT TO THIS CLAUSE (B), SUCH HOLDER OR THE TRANSFEREE HAS PROVIDED AN OPINION OF COUNSEL TO EACH OF THE TRUSTEE AND THE ISSUER THAT SUCH TRANSFER MAY BE MADE PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT, OR (C) NEITHER A U.S. PERSON (AS DEFINED IN REGULATION S) NOR A U.S. RESIDENT (WITHIN THE MEANING OF THE INVESTMENT COMPANY ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF REGULATION S.

THE INITIAL PURCHASER OF THIS NOTE WILL BE REQUIRED TO DELIVER A SUBSCRIPTION AGREEMENT AND EACH TRANSFEREE OF THIS NOTE WILL BE REQUIRED TO DELIVER A TRANSFER CERTIFICATE IN THE FORM REQUIRED BY THE INDENTURE.

ANY PURPORTED TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE PURCHASER OR TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE CO-ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

(xii)    Credit Swap Counterparty. The Transferee acknowledges that the Credit Swap Counterparty will enter into the Credit Swaps and exercise its rights and perform its obligations thereunder solely on its own behalf and not as agent, fiduciary or in any other capacity on behalf of the Issuer, the holders of the Notes or any other Person. The Transferee understands and acknowledges that (i) the interests of the Credit Swap Counterparty under the Credit Swaps may be adverse to the interests of the Issuer and the Noteholders, (ii) in selecting Reference Entities and Reference Obligations, declaring Credit Events and taking other actions permitted or required to be taken by the Credit Swap Counterparty under the Credit Swaps, the Credit Swap Counterparty will act within the parameters established under the Credit Swaps, however, any actions taken by the Credit Swap Counterparty will be in the Credit Swap Counterparty's own best interests, as determined by the Credit Swap Counterparty in its sole judgment, and any such action may not be in the interest of, and may be directly adverse to, the Issuer and the Noteholders, and (iii) the Credit Swap Counterparty is not obligated to consider the interests of the Issuer or the Noteholders in selecting Reference Entities or Reference Obligations, declaring Credit Events or taking other actions permitted or required to be taken by the Credit Swap Counterparty under the Credit Swaps.

6

(xiii)   Due Authorization; Capability. If the Transferee is not a natural person, the Transferee has the power and authority to enter into each agreement required to be executed and delivered by or on behalf of the Transferee in connection with its purchase of Notes and to perform its obligations thereunder and consummate the transactions contemplated thereby, and the person signing any such documents on behalf of the Transferee has been duly authorized to execute and deliver such documents and each other document required to be executed and delivered by the Transferee in connection with its purchase of Notes. If the Transferee is an individual, the Transferee has all requisite legal capacity to acquire and hold the Notes and to execute, deliver and comply with the terms of each of the documents required to be executed and delivered by the Transferee in connection with the subscription for the Notes. Such execution, delivery and compliance by the Transferee does not conflict with, or constitute a default under, any instruments governing the Transferee, any applicable law, regulation or order, or any material agreement to which the Transferee is a party or by which the Transferee is bound.

(xiv)   Permanent Address. If the Transferee's permanent address is located in the United States, the Transferee was offered the Notes in the state of such Transferee's permanent address and intends that the securities law of that state govern the Transferee's subscription for the Notes.

(xv)   Certain Tax Matters. The Transferee understands that any Co-Issuer, Trustee or Paying Agent shall require certification acceptable to it (i) as a condition to the payment of principal of and interest on any Notes without, or at a reduced rate of, U.S. withholding or backup withholding tax, and (ii) to enable each Co-Issuer, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold from payments in respect of such Notes or the Holder of such Notes under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation. Such certification may include U.S. federal income tax forms (such as IRS Form W-8BEN (Certification of Foreign Status of Beneficial Owner), Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms). In addition, any Co-Issuer, Trustee or Paying Agent may require certification acceptable to it to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets. Each Transferee agrees to provide any certification requested pursuant to this paragraph and to update or replace such form or certification in accordance with its terms or its subsequent amendments.

(xvi)   Tax Treatment. The Issuer intends, and each Transferee hereby agrees that for purposes of U.S. federal income tax, to treat the Notes in a manner consistent with the statements described in the Offering Memorandum under the heading "Certain U.S. Federal Income Tax Considerations", and such Transferee will take no action inconsistent with such treatment, unless required by law.

30775-00042 NY:2112494.3

(xvii)  *Tax Transfer Restrictions.*

1.   The Transferee agrees that it will not (A) acquire, sell, transfer, assign, pledge or otherwise dispose of any of its Notes (or any interest therein that is described in Treasury Regulations Section 1.7704-1(a)(2)(i)(B)) on or through (x) a United States national, regional or local securities exchange, (y) a foreign securities exchange or (z) an interdealer quotation system that regularly disseminates firm buy or sell quotations by identified brokers or dealers (including, without limitation, the National Association of Securities Dealers Automated Quotation System) ((x), (y) and (z), collectively, an "Exchange") or (B) cause any of its Notes or any interest therein to be marketed on or through an Exchange.

2.   The Transferee agrees that it will not enter into any financial instrument payments on which, or the value of which, is determined in whole or in part by reference to the Notes, or the Issuer (including the amount of Issuer distributions or interest on the Notes, the value of the Issuer's assets, or the result of the Issuer's operations), or any contract that otherwise is described in Treasury Regulations Section 1.7704-1(a)(2)(i)(B), without the consent of the holders of a majority of the Notes.

3.   If the Transferee is a partnership, grantor trust or S corporation, less than 50% of the value of any person's interest in such partnership, grantor trust or S corporation is attributable to the Transferee's interest in the Issuer, or the Note Registrar otherwise determines that transfer to such partnership, grantor trust, or S Corporation will not cause the Issuer to be unable to rely on the "private placement" safe harbor of Treasury Regulation Section 1.7704-1(h).

4.   The Transferee agrees to be bound by the restrictions and conditions set forth in the Indenture and acknowledge and agree that it may not directly or indirectly assign, participate, pledge, hypothecate, rehypothecate, exchange or otherwise dispose of or transfer in any manner (each a "Transfer") its interest in the Notes unless: (A) the Transferee signs a Transfer Certificate and (B) such Transfer does not violate Section 2.3 of the Standard Terms.  Any purported Transfer that does not satisfy the above mentioned conditions shall be null, void and of no effect.

30775-00042 NY:2112494.3

5.      The Transferee agrees that the Note Registrar shall monitor all transfers of Notes so that the aggregate number of Noteholders is limited to 90 or fewer Noteholders. In monitoring such transfers, the Note Registrar shall rely solely and exclusively (without any duty to make further inquiry, including without any duty to inquire whether a Noteholder holds for the account of one or more other persons) on (i) information provided to it by Lehman Brothers Inc. on the Closing Date with respect to the number of Noteholders on the Closing Date and (ii) and any transfer certificates received by the Note Registrar subsequent to the Closing Date pursuant to the terms of the Indenture.

The Transferee understand that the representations, warranties and covenants contained in paragraph (17) are intended to permit the Issuer to rely, if necessary, on the "private placement" safe harbor from classification as a publicly traded partnership in U.S. Treasury Regulations Section 1.7704-1(h).

(xviii)  Reliance on Representations, etc. The Transferee acknowledges that the Co-Issuers, the Managers and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements and agrees that, if any of the acknowledgements, representations or warranties made or deemed to have been made by it in connection with its purchase of the Notes are no longer accurate, the Transferee will promptly notify the Co-Issuers and the Managers.

TRANSFEREE

By:_____

        Name:

        Title:

Dated: _____, _____

| Taxpayer Identification Number: | Address for Notices: |
|---|---|
| Wire Instructions for Payments: | |
| Bank: | |
| Address: | |
| Bank ABA #: | Tel: |
| Account No.: | Fax: |
| FAO: | Attn.: |
| Attention: | |
| Information for Transfer: | |
| Net Monies: | Trade Date: |

9

| CUSIP number: | Settlement Date: |
|---|---|
| Settlement Instructions: (DTC, Euroclear, or Account Number) | |

| Registered Name (if Nominee): | |
|---|---|

cc: PENN'S LANDING CDO LLC

30775-00042 NY:2112494.3

**EXHIBIT B-2**

**FORM OF TRANSFER CERTIFICATE FOR TRANSFERS FROM GLOBAL NOTE TO GLOBAL NOTE**

See Attached

FORM OF TRANSFER CERTIFICATE
FOR TRANSFER FROM A RULE 144A GLOBAL NOTE
OR A REGULATION S GLOBAL NOTE
TO A RULE 144 GLOBAL NOTE

(Transfers pursuant to Section 2.3 of the Standard Terms for Indentures)

U.S. Bank National Association
One Federal Street
3rd Floor
Boston, Massachusetts 02110

Re:     PENN'S LANDING CDO Limited
        SPC, for the account of the Series
        2007-1 Segregate Portfolio
        [Class A Floating Rate Notes due 2017]
        [Class B Floating Rate Notes due 2017]
        [Class C Floating Rate Notes due 2017]
        [Class D Floating Rate Notes due 2017]
        [Class E Floating Rate Notes due 2017]
        [Class F Floating Rate Notes due 2017]
        (the "Notes")

Reference is hereby made to the Series Indenture (the "Series Indenture"), dated as of April 10, 2007, among PENN'S LANDING CDO Limited SPC, for the account of the Series 2007-1 Segregated Portfolio (the "Issuer"), PENN'S LANDING CDO LLC (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers") and U.S. Bank National Association, as trustee (the "Trustee"), which supplements and incorporates the Standard Terms for Indentures (the "Standard Terms" and, together with the Series Indenture, the "Indenture"), dated as of April 10, 2007, among the Co-Issuers and the Trustee. Capitalized terms used but not defined herein shall have the meanings assigned to them pursuant to the Indenture.

This letter relates to the U.S. $[_____] aggregate principal amount of the [Class A Floating Rate Notes][Class B Floating Rate Notes][Class C Floating Rate Notes][Class D Floating Rate Notes][Class E Floating Rate Notes] [Class F Floating Rate Notes] due 2017 (the "Notes") in the name of _____ (the "Transferor") to effect the transfer of the Notes in exchange for an equivalent number of Notes in the name of _____ (the "Transferee").

In connection with such request, and in respect of such Notes, the Transferee does hereby certify that such Notes are being transferred (i) in accordance with the applicable transfer restrictions set forth in the Indenture and (ii) pursuant to an exemption from registration under the United States Securities Act of 1933, as amended (the "Securities Act"), and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction. In addition, the Transferor hereby represents, warrants and covenants for the benefit of the Issuer and the Trustee that:

> Investor Status. The Transferee represents and warrants that it is purchasing an interest in a Rule 144A Global Note for its own account or one or more accounts with respect to which it exercises sole investment discretion, in each case in minimum denominations of $500,000 and integral multiples of $1,000 in excess thereof, and

1

both it and each such account (if any) (i) is both a Qualified Institutional Buyer and a Qualified Purchaser, (ii) is not a dealer of the type described in paragraph (a)(1)(ii) of Rule 144A unless it owns and invests on a discretionary basis not less than $25,000,000 in securities of issuers that are not affiliated to it, (iii) was not formed for the purpose of investing in the Issuer or the Co-Issuer (except where each beneficial owner of the Transferee is a Qualified Purchaser) and (iv) shall provide written notice to any transferee that any transferee taking delivery of the Note or interest therein in accordance with Rule 144A must satisfy the foregoing qualifications.

(xix)    Securities Law Limitations on Resale. The Transferee agrees on its own behalf and on behalf of any account for which it is purchasing an interest in a Rule 144A Global Note to offer, sell or otherwise transfer such interest only (i) in the required minimum denominations, and (ii)(A) in the United States, only in the form of an interest in a Rule 144A Global Note to a Qualified Purchaser that the transferor reasonably believes is a Qualified Institutional Buyer, purchasing for its own account or one or more accounts with respect to which it exercises sole investment discretion, each of which is a Qualified Purchaser that the transferor reasonably believes is a Qualified Institutional Buyer, to whom notice is given that the resale, pledge or other transfer is being made in reliance on the exemption from Securities Act registration provided by Rule 144A thereof, and none of which are (x) a dealer of the type described in paragraph (a)(1)(ii) of Rule 144A unless it owns and invests on a discretionary basis not less than $25,000,000 in securities of issuers that are not affiliated to it, or (y) formed for the purpose of investing in the Issuer or the Co-Issuer (except where each beneficial owner of the Transferee is a Qualified Purchaser), or (B) outside the United States in the form of an interest in a Regulation S Global Note, to a person that is neither a U.S. Person nor a U.S. Resident in an offshore transaction in accordance with Regulation S under the Securities Act. The Transferee agrees to provide notice of such transfer restrictions to any subsequent transferee.

(xx)    Minimum Denominations. The Transferee agrees that no interest in a Rule 144A Global Note may be sold, pledged or otherwise transferred in a denomination of less than $500,000 and integral multiples of $1,000 in excess thereof.

(xxi)    Additional Legend. Each Transferee or transferee of a Note taking delivery in the form of an interest in a Rule 144A Global Note in reliance on the exemption from Securities Act registration provided by Rule 144A thereof understands and agrees that an additional legend in substantially the following form will be placed on each Note representing an interest in a Rule 144A Global Note:

AN INTEREST IN THIS NOTE MAY ONLY BE HELD BY A PERSON THAT (I) IS BOTH A QUALIFIED INSTITUTIONAL BUYER AND A QUALIFIED PURCHASER, (II) IS NOT A DEALER OF THE TYPE DESCRIBED IN PARAGRAPH (A)(1)(II) OF RULE 144A UNLESS IT OWNS AND INVESTS ON A DISCRETIONARY BASIS NOT LESS THAN $25,000,000 IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED TO IT, (III) WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE ISSUER OR THE CO-ISSUER (EXCEPT WHERE EACH BENEFICIAL OWNER OF THE

2

PURCHASER IS A QUALIFIED PURCHASER) AND (IV) SHALL PROVIDE WRITTEN NOTICE TO ANY TRANSFEREE THAT ANY TRANSFEREE TAKING DELIVERY OF THIS NOTE OR INTEREST THEREIN IN ACCORDANCE WITH RULE 144A MUST SATISFY THE FOREGOING QUALIFICATIONS.

(xxii)   Limitation on Resale of Interests in Rule 144A Global Notes. The Transferee understands and agrees that before a Note in the form of an interest in a Rule 144A Global Note may be offered, sold, pledged or otherwise transferred to a transferee that takes delivery in the form of an interest in a Regulation S Global Note, the transferee shall be required to provide the Trustee with a transfer certificate in the form provided herein and in the Indenture and such other certificates and other information as the Issuer, any Manager or the Trustee may reasonably require to confirm that the proposed transfer complies with the transfer restrictions contained in this Offering Memorandum, in the legend placed on the Notes and in the Indenture.

(xxiii)  No Governmental Approval. The Transferee understands that the Notes have not been approved or disapproved by the SEC or any other governmental authority or agency of any jurisdiction, nor has the SEC or any other governmental authority or agency passed upon the accuracy or adequacy of the Offering Memorandum. Any representation to the contrary is a criminal offense.

(xxiv)   Transferee  Sophistication;  Non-Reliance;  Suitability;  Access  to Information. The Transferee (i) has such knowledge and experience in financial and business matters that the Transferee is capable of evaluating the merits and risks (including for tax, legal, regulatory, accounting and other financial purposes) of its prospective investment in the Notes, (ii) is financially able to bear such risk, (iii) in making such investment is not relying on the advice or recommendations of the Managers, the Co-Issuers or any of their respective affiliates (or any representative of any of the foregoing) and (iv) has determined that an investment in the Notes is suitable and appropriate for it. The Transferee has received, and has had an adequate opportunity to review the contents of, the Offering Memorandum. The Transferee has had access to such financial and other information concerning the Co-Issuers and the Notes as it has deemed necessary to make its own independent decision to purchase such Notes, including the opportunity, at a reasonable time prior to its purchase of such Notes, to ask questions and receive answers concerning the Co-Issuers and the terms and conditions of the offering of the Notes.

(xxv)    Limited Liquidity. The Transferee understands that there is no market for the Notes and that no assurance can be given as to the liquidity of any trading market for the Notes and that it is unlikely that a trading market for the Notes will develop. It further understands that, although the Managers may from time to time make a market in the Notes, the Managers are under no obligation to do so and, following the commencement of any market-making, may discontinue the same at any time. Accordingly, the Transferee must be prepared to hold the Notes until the legal final maturity date of the Notes.

30775-00042 NY:2112494.3

(xxvi) Investment Company Act. The Transferee agrees that no sale, pledge or other transfer of a Note (or any interest therein) may be made if such transfer would have the effect of requiring either of the Co-Issuers or the Collateral to register as an investment company under the Investment Company Act.

(xxvii) ERISA. The transferee (i) is not using funds to effect the purchase of the Notes that constitute assets of a "Benefit Plan Investor" (as defined in the Plan Asset Regulation of the United States Department of Labor, 29 C.F.R. Section 2510.3-101(f) (the "Plan Asset Regulation")), including but not limited to any insurance company acting on behalf of its general account, any insurance company separate account and any collective investment fund and (ii) is not a person exercising discretionary authority or control over the Issuer's assets or who provides investment advice to the Issuer for a direct or indirect fee or any affiliate of any such person (any such person, a "Controlling Person"). The transferee understands and agrees that the information supplied above will be utilized to determine whether Benefit Plan Investors own less than 25% of the Notes as determined under the Plan Asset Regulation after disregarding Notes held by Controlling Persons both upon the original issuance of the Notes and upon any subsequent transfer of Notes for any reason. The transferee agrees to provide prompt written notice to each of the Issuer and the Trustee of any change in the information supplied above and further information regarding its status upon written request by the Issuer or the Trustee to such transferee. The transferee further acknowledges and agrees that the Indenture will entitle the Issuer to require such holder to dispose of its Notes as soon as practicable following such notification by such holder.

The representations to be made pursuant to this subsection (8) shall be deemed made on each day from the date the Transferee makes such representations through and including the date on which such Transferee disposes of its interests in the Notes.

(xxviii) Certain Transfers Void. The Transferee agrees that (i) any sale, pledge or other transfer of a Note (or any interest therein) made in violation of the transfer restrictions contained in the Indenture, or made based upon any false or inaccurate representation made by the Transferee or a subsequent Transferee to the Co-Issuers, will be void and of no force or effect and (ii) none of the Co-Issuers, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of a Note (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation.

(xxix) Cayman Islands. The Transferee is not a member of the public in the Cayman Islands.

(xxx) Legend. The Transferee understands and agrees that a legend in substantially the following form will be placed on each certificate representing a Note of each Class unless the Issuer determines otherwise in compliance with applicable law:

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER RELEVANT JURISDICTION, AND MAY BE RESOLD, PLEDGED OR

4

OTHERWISE TRANSFERRED ONLY (A)(1) TO A QUALIFIED PURCHASER (AS DEFINED IN THE INDENTURE) WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), PURCHASING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, EACH OF WHICH IS A QUALIFIED PURCHASER THAT THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER, AND NONE OF WHICH ARE (X) A DEALER OF THE TYPE DESCRIBED IN PARAGRAPH (a)(1)(ii) OF RULE 144A UNLESS IT OWNS AND INVESTS ON A DISCRETIONARY BASIS NOT LESS THAN $25,000,000 IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED TO IT, OR (Y) FORMED FOR THE PURPOSE OF INVESTING IN THE ISSUER OR THE CO-ISSUER (EXCEPT WHERE EACH BENEFICIAL OWNER IS A QUALIFIED PURCHASER), TO WHOM NOTICE IS GIVEN THAT THE RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY RULE 144A, (2) TO A PERSON THAT IS BOTH AN ACCREDITED INVESTOR AND A QUALIFIED PURCHASER, IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT (*PROVIDED, THAT* IN THE CASE OF ANY TRANSFER PURSUANT TO THIS CLAUSE (2), THE TRANSFEROR OR THE TRANSFEREE HAS PROVIDED AN OPINION OF COUNSEL TO EACH OF THE TRUSTEE AND THE CO-ISSUERS THAT SUCH TRANSFER MAY BE MADE PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT), OR (3) TO A PERSON WHO IS NEITHER A U.S. PERSON (AS DEFINED IN REGULATION S) NOR A U.S. RESIDENT (WITHIN THE MEANING OF THE INVESTMENT COMPANY ACT), PURCHASING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, EACH OF WHICH IS NEITHER A U.S. PERSON NOR A U.S. RESIDENT, IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR RULE 904 (AS APPLICABLE) OF REGULATION S UNDER THE SECURITIES ACT ("REGULATION S"), IN EACH CASE IN A PRINCIPAL AMOUNT OF NOT LESS THAN $250,000 AND INTEGRAL MULTIPLES OF $1,000 IN EXCESS THEREOF FOR THE PURCHASER AND FOR EACH ACCOUNT FOR WHICH IT IS ACTING, (B) IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND (C) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ANY OTHER RELEVANT JURISDICTION. NEITHER OF THE CO-ISSUERS HAS BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"). NO TRANSFER OF THIS NOTE

5

(OR ANY INTEREST HEREIN) MAY BE MADE (AND NEITHER THE TRUSTEE NOR THE NOTE REGISTRAR WILL RECOGNIZE ANY SUCH TRANSFER) IF (1) SUCH TRANSFER WOULD BE MADE TO A TRANSFEREE WHO IS EITHER A U.S. PERSON (AS DEFINED IN REGULATION S) OR A U.S. RESIDENT (WITHIN THE MEANING OF THE INVESTMENT COMPANY ACT) THAT IS NOT (A) BOTH AN ACCREDITED INVESTOR AND A QUALIFIED PURCHASER, OR (B) BOTH A QUALIFIED INSTITUTIONAL BUYER AND A QUALIFIED PURCHASER, (2) SUCH TRANSFER WOULD HAVE THE EFFECT OF REQUIRING EITHER OF THE CO-ISSUERS OR THE COLLATERAL TO REGISTER AS AN INVESTMENT COMPANY UNDER THE INVESTMENT COMPANY ACT, (3) AFTER GIVING EFFECT TO SUCH TRANSFER, 25% OR MORE OF THE RELEVANT CLASS OF NOTES, AS DETERMINED UNDER THE PLAN ASSET REGULATION OF THE UNITED STATES DEPARTMENT OF LABOR, 29 C.F.R. SECTION 2510.3-101(f) AFTER DISREGARDING NOTES OF SUCH CLASS HELD BY CONTROLLING PERSONS, WOULD BE HELD BY BENEFIT PLAN INVESTORS (EITHER DIRECTLY OR THROUGH AN INSURANCE COMPANY GENERAL ACCOUNT) OR (4) SUCH TRANSFER WOULD BE MADE TO A PERSON THAT IS OTHERWISE UNABLE TO MAKE THE CERTIFICATIONS AND REPRESENTATIONS REQUIRED BY THE APPLICABLE TRANSFER CERTIFICATE ATTACHED AS AN EXHIBIT TO THE INDENTURE. ACCORDINGLY, AN INVESTOR IN THIS NOTE MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THE CO-ISSUERS MAY REQUIRE ANY HOLDER OF THIS NOTE WHO IS A U.S. PERSON (AS DEFINED IN REGULATION S) OR A U.S. RESIDENT (WITHIN THE MEANING OF THE INVESTMENT COMPANY ACT) WHO IS DETERMINED NOT TO HAVE BEEN BOTH (A) A QUALIFIED INSTITUTIONAL BUYER AND A QUALIFIED PURCHASER OR (B) AN ACCREDITED INVESTOR AND A QUALIFIED PURCHASER, AT THE TIME OF ACQUISITION OF THIS NOTE TO SELL THIS NOTE TO A PERSON WHO IS (A) A QUALIFIED INSTITUTIONAL BUYER AND A QUALIFIED PURCHASER, (B) BOTH AN ACCREDITED INVESTOR AND A QUALIFIED PURCHASER (*PROVIDED*, *THAT* IN THE CASE OF ANY TRANSFER PURSUANT TO THIS CLAUSE (B), SUCH HOLDER OR THE TRANSFEREE HAS PROVIDED AN OPINION OF COUNSEL TO EACH OF THE TRUSTEE AND THE ISSUER THAT SUCH TRANSFER MAY BE MADE PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT, OR (C) NEITHER A U.S. PERSON (AS DEFINED IN REGULATION S) NOR A U.S. RESIDENT (WITHIN THE MEANING OF THE INVESTMENT COMPANY ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF REGULATION S.

6

THE INITIAL PURCHASER OF THIS NOTE WILL BE REQUIRED TO DELIVER A SUBSCRIPTION AGREEMENT AND EACH TRANSFEREE OF THIS NOTE WILL BE REQUIRED TO DELIVER A TRANSFER CERTIFICATE IN THE FORM REQUIRED BY THE INDENTURE.

ANY PURPORTED TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE PURCHASER OR TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE CO-ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

(xxxi) Credit Swap Counterparty. The Transferee acknowledges that the Credit Swap Counterparty will enter into the Credit Swaps and exercise its rights and perform its obligations thereunder solely on its own behalf and not as agent, fiduciary or in any other capacity on behalf of the Issuer, the holders of the Notes or any other Person. The Transferee understands and acknowledges that (i) the interests of the Credit Swap Counterparty under the Credit Swaps may be adverse to the interests of the Issuer and the Noteholders, (ii) in selecting Reference Entities and Reference Obligations, declaring Credit Events and taking other actions permitted or required to be taken by the Credit Swap Counterparty under the Credit Swaps, the Credit Swap Counterparty will act within the parameters established under the Credit Swaps, however, any actions taken by the Credit Swap Counterparty will be in the Credit Swap Counterparty's own best interests, as determined by the Credit Swap Counterparty in its sole judgment, and any such action may not be in the interest of, and may be directly adverse to, the Issuer and the Noteholders, and (iii) the Credit Swap Counterparty is not obligated to consider the interests of the Issuer or the Noteholders in selecting Reference Entities or Reference Obligations, declaring Credit Events or taking other actions permitted or required to be taken by the Credit Swap Counterparty under the Credit Swaps.

(xxxii) Due Authorization; Capability. If the Transferee is not a natural person, the Transferee has the power and authority to enter into each agreement required to be executed and delivered by or on behalf of the Transferee in connection with its purchase of Notes and to perform its obligations thereunder and consummate the transactions contemplated thereby, and the person signing any such documents on behalf of the Transferee has been duly authorized to execute and deliver such documents and each other document required to be executed and delivered by the Transferee in connection with its purchase of Notes. If the Transferee is an individual, the Transferee has all requisite legal capacity to acquire and hold the Notes and to execute, deliver and comply with the terms of each of the documents required to be executed and delivered by the Transferee in connection with the subscription for the Notes. Such execution, delivery and compliance by the Transferee does not conflict with, or constitute a default under, any instruments governing the Transferee, any applicable law, regulation or order, or any material agreement to which the Transferee is a party or by which the Transferee is bound.

7

(xxxiii)Permanent Address. If the Transferee's permanent address is located in the United States, the Transferee was offered the Notes in the state of such Transferee's permanent address and intends that the securities law of that state govern the Transferee's subscription for the Notes.

(xxxiv)Certain Tax Matters. The Transferee understands that any Co-Issuer, Trustee or Paying Agent shall require certification acceptable to it (i) as a condition to the payment of principal of and interest on any Notes without, or at a reduced rate of, U.S. withholding or backup withholding tax, and (ii) to enable each Co-Issuer, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold from payments in respect of such Notes or the Holder of such Notes under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation. Such certification may include U.S. federal income tax forms (such as IRS Form W-8BEN (Certification of Foreign Status of Beneficial Owner), Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms). In addition, any Co-Issuer, Trustee or Paying Agent may require certification acceptable to it to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets. Each Transferee agrees to provide any certification requested pursuant to this paragraph and to update or replace such form or certification in accordance with its terms or its subsequent amendments.

(xxxv) Tax Treatment. The Issuer intends, and each Transferee hereby agrees that for purposes of U.S. federal income tax, to treat the Notes in a manner consistent with the statements described in the Offering Memorandum under the heading "Certain U.S. Federal Income Tax Considerations", and such Transferee will take no action inconsistent with such treatment, unless required by law.

(xxxvi)*Tax Transfer Restrictions.*

6.      The Transferee agrees that it will not (A) acquire, sell, transfer, assign, pledge or otherwise dispose of any of its Notes (or any interest therein that is described in Treasury Regulations Section 1.7704-1(a)(2)(i)(B)) on or through (x) a United States national, regional or local securities exchange, (y) a foreign securities exchange or (z) an interdealer quotation system that regularly disseminates firm buy or sell quotations by identified brokers or dealers (including, without limitation, the National Association of Securities Dealers Automated Quotation System) ((x), (y) and (z), collectively, an "Exchange") or (B) cause any of its Notes or any interest therein to be marketed on or through an Exchange.

8

7.  The Transferee agrees that it will not enter into any financial instrument payments on which, or the value of which, is determined in whole or in part by reference to the Notes, or the Issuer (including the amount of Issuer distributions or interest on the Notes, the value of the Issuer's assets, or the result of the Issuer's operations), or any contract that otherwise is described in Treasury Regulations Section 1.7704-1(a)(2)(i)(B), without the consent of the holders of a majority of the Notes.

8.  If the Transferee is a partnership, grantor trust or S corporation, less than 50% of the value of any person's interest in such partnership, grantor trust or S corporation is attributable to the Transferee's interest in the Issuer, or the Note Registrar otherwise determines that transfer to such partnership, grantor trust, or S Corporation will not cause the Issuer to be unable to rely on the "private placement" safe harbor of Treasury Regulation Section 1.7704-1(h).

9.  The Transferee agrees to be bound by the restrictions and conditions set forth in the Indenture and acknowledge and agree that it may not directly or indirectly assign, participate, pledge, hypothecate, rehypothecate, exchange or otherwise dispose of or transfer in any manner (each a "Transfer") its interest in the Notes unless: (A) the Transferee signs a Transfer Certificate and (B) such Transfer does not violate Section 2.3 of the Standard Terms.  Any purported Transfer that does not satisfy the above mentioned conditions shall be null, void and of no effect.

10. The Transferee agrees that the Note Registrar shall monitor all transfers of Notes so that the aggregate number of Noteholders is limited to 90 or fewer Noteholders. In monitoring such transfers, the Note Registrar shall rely solely and exclusively (without any duty to make further inquiry, including without any duty to inquire whether a Noteholder holds for the account of one or more other persons) on (i) information provided to it by Lehman Brothers Inc. on the Closing Date with respect to the number of Noteholders on the Closing Date and (ii) and any transfer certificates received by the Note Registrar subsequent to the Closing Date pursuant to the terms of the Indenture.

30775-00042 NY:2112494.3

The Transferee understand that the representations, warranties and covenants contained in paragraph (19) are intended to permit the Issuer to rely, if necessary, on the "private placement" safe harbor from classification as a publicly traded partnership in U.S. Treasury Regulations Section 1.7704-1(h).

(xxxvii)    Reliance on Representations, etc. The Transferee acknowledges that the Co-Issuers, the Managers and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements and agrees that, if any of the acknowledgements, representations or warranties made or deemed to have been made by it in connection with its purchase of the Notes are no longer accurate, the Transferee will promptly notify the Co-Issuers and the Managers.

TRANSFEREE

By:_____

Name:_____

Title:_____

Dated: _____, _____

| Taxpayer Identification Number: | Address for Notices: |
|---|---|
| Wire Instructions for Payments: | |
| Bank: | |
| Address: | |
| Bank ABA #: | Tel: |
| Account No.: | Fax: |
| FAO: | Attn.: |
| Attention: | |
| Information for Transfer: | |
| Net Monies: | Trade Date: |
| CUSIP number: | Settlement Date: |
| Settlement Instructions: (DTC, Euroclear, or Account Number) | |

| Registered Name (if Nominee): | |
|---|---|

cc: PENN'S LANDING CDO LLC

10

FORM OF TRANSFER CERTIFICATE
FOR TRANSFER FROM A RULE 144A GLOBAL NOTE
OR A REGULATION S GLOBAL NOTE
TO A REGULATION S GLOBAL NOTE

(Transfers pursuant to Section 2.3 of the Standard Terms for Indentures)

U.S. Bank National Association
One Federal Street
3rd Floor
Boston, Massachusetts 02110

    Re:    PENN'S LANDING CDO Limited
             SPC, for the account of the Series
             2007-1 Segregate Portfolio
             [Class A Floating Rate Notes due 2017]
             [Class B Floating Rate Notes due 2017]
             [Class C Floating Rate Notes due 2017]
             [Class D Floating Rate Notes due 2017]
             [Class E Floating Rate Notes due 2017]
             [Class F Floating Rate Notes due 2017]
             (the "Notes")

Reference is hereby made to the Series Indenture (the "Series Indenture"), dated as of April 10, 2007, among PENN'S LANDING CDO Limited SPC, for the account of the Series 2007-1 Segregated Portfolio (the "Issuer"), PENN'S LANDING CDO LLC (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers") and U.S. Bank National Association, as trustee (the "Trustee"), which supplements and incorporates the Standard Terms for Indentures (the "Standard Terms" and, together with the Series Indenture, the "Indenture"), dated as of April 10, 2007, among the Co-Issuers and the Trustee. Capitalized terms used but not defined herein shall have the meanings assigned to them pursuant to the Indenture.

This letter relates to the U.S. $[_____] aggregate principal amount of the [Class A Floating Rate Notes][Class B Floating Rate Notes][Class C Floating Rate Notes][Class D Floating Rate Notes][Class E Floating Rate Notes] [Class F Floating Rate Notes] due 2017 (the "Notes") in the name of _____ (the "Transferor") to effect the transfer of the Notes in exchange for an equivalent number of Notes in the name of _____ (the "Transferee").

In connection with such request, and in respect of such Notes, the Transferee does hereby certify that such Notes are being transferred (i) in accordance with the applicable transfer restrictions set forth in the Indenture and (ii) pursuant to an exemption from registration under the United States Securities Act of 1933, as amended (the "Securities Act"), and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction. In addition, the Transferor hereby represents, warrants and covenants for the benefit of the Issuer and the Trustee that:

            **Non-U.S. Person and Non-U.S. Resident Status.** The Transferee is neither a U.S. Person nor a U.S. Resident purchasing for its own account or one or more accounts, each of which is neither a U.S. Person nor a U.S. Resident, and as to each of which the Transferee exercises sole investment discretion, in an offshore transaction in

accordance with Regulation S, and is aware that the sale of the Notes to it is being made in reliance on the exemption from registration provided by Regulation S.

(xxxviii)    Securities Law Limitations on Resale. The Transferee agrees on its own behalf and on behalf of any account for which it is purchasing an interest in a Regulation S Global Note to offer, sell or otherwise transfer such interest only (i) in the required minimum denominations, and (ii)(A) outside the United States in the form of an interest in a Regulation S Global Note, to a person that is neither a U.S. Person nor a U.S. Resident in an offshore transaction in accordance with Regulation S under the Securities Act, or (B) in the United States, only in the form of an interest in a Rule 144A Global Note to a Qualified Purchaser that the transferor reasonably believes is a Qualified Institutional Buyer, purchasing for its own account or one or more accounts with respect to which it exercises sole investment discretion, each of which is a Qualified Purchaser that the transferor reasonably believes is a Qualified Institutional Buyer, to whom notice is given that the resale, pledge or other transfer is being made in reliance on the exemption from Securities Act registration provided by Rule 144A thereof, and none of which are (x) a dealer of the type described in paragraph (a)(1)(ii) of Rule 144A unless it owns and invests on a discretionary basis not less than $25,000,000 in securities of issuers that are not affiliated to it, or (y) formed for the purpose of investing in the Issuer or the Co-Issuer (except where each beneficial owner of the Transferee is a Qualified Purchaser). The Transferee agrees to provide notice of such transfer restrictions to any subsequent transferee.

(xxxix)    Minimum Denominations. The Transferee agrees that no interest in a Regulation S Global Note may be sold, pledged or otherwise transferred in a denomination of less than $500,000 and integral multiples of $1,000 in excess thereof.

(xl)    Additional Legend for Notes under Regulation S. Each Transferee or transferee of a Note taking delivery in the form of an interest in a Regulation S Global Note in accordance with Regulation S understands and agrees that an additional legend in substantially the following form will be placed on each Note representing an interest in a Regulation S Global Note:

AN INTEREST IN THIS NOTE MAY NOT BE HELD BY A PERSON THAT IS A U.S. PERSON (AS DEFINED IN REGULATION S) OR A U.S. RESIDENT (WITHIN THE MEANING OF THE INVESTMENT COMPANY ACT) AT ANY TIME. IN ADDITION, AN INTEREST IN THIS NOTE MAY ONLY BE HELD THROUGH EUROCLEAR OR CLEARSTREAM AT ANY TIME.

(xli)    Limitation on Resale of Interests in Regulation S Global Notes under Regulation S. The Transferee understands and agrees that before a Note in the form of an interest in a Regulation S Global Note may be offered, sold, pledged or otherwise transferred to a transferee that takes delivery in the form of an interest in a Rule 144A Global Note, the transferee shall be required to provide the Trustee with a transfer certificate in the form provided herein and in the Indenture and such other certificates and other information as the Issuer, any Manager or the Trustee may reasonably require to confirm that the proposed transfer complies with the transfer

restrictions contained in this Offering Memorandum, in the legend placed on the Notes and in the Indenture.

(xlii)   No Governmental Approval. The Transferee understands that the Notes have not been approved or disapproved by the SEC or any other governmental authority or agency of any jurisdiction, nor has the SEC or any other governmental authority or agency passed upon the accuracy or adequacy of the Offering Memorandum. Any representation to the contrary is a criminal offense.

(xliii)  Transferee   Sophistication;   Non-Reliance;   Suitability;   Access   to Information. The Transferee (i) has such knowledge and experience in financial and business matters that the Transferee is capable of evaluating the merits and risks (including for tax, legal, regulatory, accounting and other financial purposes) of its prospective investment in the Notes, (ii) is financially able to bear such risk, (iii) in making such investment is not relying on the advice or recommendations of the Managers, the Co-Issuers or any of their respective affiliates (or any representative of any of the foregoing) and (iv) has determined that an investment in the Notes is suitable and appropriate for it.  The Transferee has received, and has had an adequate opportunity to review the contents of, the Offering Memorandum. The Transferee has had access to such financial and other information concerning the Co-Issuers and the Notes as it has deemed necessary to make its own independent decision to purchase such Notes, including the opportunity, at a reasonable time prior to its purchase of such Notes, to ask questions and receive answers concerning the Co-Issuers and the terms and conditions of the offering of the Notes.

(xliv)   Limited Liquidity. The Transferee understands that there is no market for the Notes and that no assurance can be given as to the liquidity of any trading market for the Notes and that it is unlikely that a trading market for the Notes will develop. It further understands that, although the Managers may from time to time make a market in the Notes, the Managers are under no obligation to do so and, following the commencement of any market-making, may discontinue the same at any time. Accordingly, the Transferee must be prepared to hold the Notes until the legal final maturity date of the Notes.

(xlv)    Investment Company Act. The Transferee agrees that no sale, pledge or other transfer of a Note (or any interest therein) may be made if such transfer would have the effect of requiring either of the Co-Issuers or the Collateral to register as an investment company under the Investment Company Act.

(xlvi)   ERISA. The transferee (i) is not using funds to effect the purchase of the Notes that constitute assets of a "Benefit Plan Investor" (as defined in the Plan Asset Regulation of the United States Department of Labor, 29 C.F.R. Section 2510.3-101(f) (the "Plan Asset Regulation")), including but not limited to any insurance company acting on behalf of its general account, any insurance company separate account and any collective investment fund and (ii) is not a person exercising discretionary authority or control over the Issuer's assets or who provides investment advice to the Issuer for a direct or indirect fee or any affiliate of any such person (any such person, a "Controlling Person"). The transferee understands and agrees that the information supplied above will be utilized to determine whether

Benefit Plan Investors own less than 25% of the Notes as determined under the Plan Asset Regulation after disregarding Notes held by Controlling Persons both upon the original issuance of the Notes and upon any subsequent transfer of Notes for any reason. The transferee agrees to provide prompt written notice to each of the Issuer and the Trustee of any change in the information supplied above and further information regarding its status upon written request by the Issuer or the Trustee to such transferee. The transferee further acknowledges and agrees that the Indenture will entitle the Issuer to require such holder to dispose of its Notes as soon as practicable following such notification by such holder.

The representations to be made pursuant to this subsection (8) shall be deemed made on each day from the date the Transferee makes such representations through and including the date on which such Transferee disposes of its interests in the Notes.

(xlvii) Certain Transfers Void. The Transferee agrees that (i) any sale, pledge or other transfer of a Note (or any interest therein) made in violation of the transfer restrictions contained in the Indenture, or made based upon any false or inaccurate representation made by the Transferee or a subsequent Transferee to the Co-Issuers, will be void and of no force or effect and (ii) none of the Co-Issuers, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of a Note (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation.

(xlviii) Cayman Islands. The Transferee is not a member of the public in the Cayman Islands.

(xlix) Legend. The Transferee understands and agrees that a legend in substantially the following form will be placed on each certificate representing a Note of each Class unless the Issuer determines otherwise in compliance with applicable law:

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER RELEVANT JURISDICTION, AND MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A)(1) TO A QUALIFIED PURCHASER (AS DEFINED IN THE INDENTURE) WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), PURCHASING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, EACH OF WHICH IS A QUALIFIED PURCHASER THAT THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER, AND NONE OF WHICH ARE (X) A DEALER OF THE TYPE DESCRIBED IN PARAGRAPH (a)(1)(ii) OF RULE 144A UNLESS IT OWNS AND INVESTS ON A DISCRETIONARY BASIS NOT LESS THAN $25,000,000 IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED TO IT, OR (Y) FORMED FOR THE PURPOSE OF INVESTING IN THE ISSUER

OR THE CO-ISSUER (EXCEPT WHERE EACH BENEFICIAL OWNER IS A QUALIFIED PURCHASER), TO WHOM NOTICE IS GIVEN THAT THE RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY RULE 144A, (2) TO A PERSON THAT IS BOTH AN ACCREDITED INVESTOR AND A QUALIFIED PURCHASER, IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT (*PROVIDED, THAT* IN THE CASE OF ANY TRANSFER PURSUANT TO THIS CLAUSE (2), THE TRANSFEROR OR THE TRANSFEREE HAS PROVIDED AN OPINION OF COUNSEL TO EACH OF THE TRUSTEE AND THE CO-ISSUERS THAT SUCH TRANSFER MAY BE MADE PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT), OR (3) TO A PERSON WHO IS NEITHER A U.S. PERSON (AS DEFINED IN REGULATION S) NOR A U.S. RESIDENT (WITHIN THE MEANING OF THE INVESTMENT COMPANY ACT), PURCHASING FOR ITS OWN ACCOUNT OR ONE OR MORE ACCOUNTS WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, EACH OF WHICH IS NEITHER A U.S. PERSON NOR A U.S. RESIDENT, IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR RULE 904 (AS APPLICABLE) OF REGULATION S UNDER THE SECURITIES ACT ("REGULATION S"), IN EACH CASE IN A PRINCIPAL AMOUNT OF NOT LESS THAN $250,000 AND INTEGRAL MULTIPLES OF $1,000 IN EXCESS THEREOF FOR THE PURCHASER AND FOR EACH ACCOUNT FOR WHICH IT IS ACTING, (B) IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND (C) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ANY OTHER RELEVANT JURISDICTION. NEITHER OF THE CO-ISSUERS HAS BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"). NO TRANSFER OF THIS NOTE (OR ANY INTEREST HEREIN) MAY BE MADE (AND NEITHER THE TRUSTEE NOR THE NOTE REGISTRAR WILL RECOGNIZE ANY SUCH TRANSFER) IF (1) SUCH TRANSFER WOULD BE MADE TO A TRANSFEREE WHO IS EITHER A U.S. PERSON (AS DEFINED IN REGULATION S) OR A U.S. RESIDENT (WITHIN THE MEANING OF THE INVESTMENT COMPANY ACT) THAT IS NOT (A) BOTH AN ACCREDITED INVESTOR AND A QUALIFIED PURCHASER, OR (B) BOTH A QUALIFIED INSTITUTIONAL BUYER AND A QUALIFIED PURCHASER, (2) SUCH TRANSFER WOULD HAVE THE EFFECT OF REQUIRING EITHER OF THE CO-ISSUERS OR THE COLLATERAL TO REGISTER AS AN INVESTMENT COMPANY UNDER THE INVESTMENT COMPANY ACT, (3) AFTER GIVING EFFECT TO SUCH TRANSFER, 25% OR MORE OF THE RELEVANT CLASS OF NOTES, AS DETERMINED UNDER THE PLAN ASSET REGULATION OF THE UNITED STATES

DEPARTMENT OF LABOR, 29 C.F.R. SECTION 2510.3-101(f) AFTER DISREGARDING NOTES OF SUCH CLASS HELD BY CONTROLLING PERSONS, WOULD BE HELD BY BENEFIT PLAN INVESTORS (EITHER DIRECTLY OR THROUGH AN INSURANCE COMPANY GENERAL ACCOUNT) OR (4) SUCH TRANSFER WOULD BE MADE TO A PERSON THAT IS OTHERWISE UNABLE TO MAKE THE CERTIFICATIONS AND REPRESENTATIONS REQUIRED BY THE APPLICABLE TRANSFER CERTIFICATE ATTACHED AS AN EXHIBIT TO THE INDENTURE. ACCORDINGLY, AN INVESTOR IN THIS NOTE MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THE CO-ISSUERS MAY REQUIRE ANY HOLDER OF THIS NOTE WHO IS A U.S. PERSON (AS DEFINED IN REGULATION S) OR A U.S. RESIDENT (WITHIN THE MEANING OF THE INVESTMENT COMPANY ACT) WHO IS DETERMINED NOT TO HAVE BEEN BOTH (A) A QUALIFIED INSTITUTIONAL BUYER AND A QUALIFIED PURCHASER OR (B) AN ACCREDITED INVESTOR AND A QUALIFIED PURCHASER, AT THE TIME OF ACQUISITION OF THIS NOTE TO SELL THIS NOTE TO A PERSON WHO IS (A) A QUALIFIED INSTITUTIONAL BUYER AND A QUALIFIED PURCHASER, (B) BOTH AN ACCREDITED INVESTOR AND A QUALIFIED PURCHASER (*PROVIDED, THAT* IN THE CASE OF ANY TRANSFER PURSUANT TO THIS CLAUSE (B), SUCH HOLDER OR THE TRANSFEREE HAS PROVIDED AN OPINION OF COUNSEL TO EACH OF THE TRUSTEE AND THE ISSUER THAT SUCH TRANSFER MAY BE MADE PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT, OR (C) NEITHER A U.S. PERSON (AS DEFINED IN REGULATION S) NOR A U.S. RESIDENT (WITHIN THE MEANING OF THE INVESTMENT COMPANY ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF REGULATION S.

THE INITIAL PURCHASER OF THIS NOTE WILL BE REQUIRED TO DELIVER A SUBSCRIPTION AGREEMENT AND EACH TRANSFEREE OF THIS NOTE WILL BE REQUIRED TO DELIVER A TRANSFER CERTIFICATE IN THE FORM REQUIRED BY THE INDENTURE.

ANY PURPORTED TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE PURCHASER OR TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE CO-ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

(l)    Credit Swap Counterparty. The Transferee acknowledges that the Credit Swap Counterparty will enter into the Credit Swaps and exercise its rights and perform its

obligations thereunder solely on its own behalf and not as agent, fiduciary or in any other capacity on behalf of the Issuer, the holders of the Notes or any other Person. The Transferee understands and acknowledges that (i) the interests of the Credit Swap Counterparty under the Credit Swaps may be adverse to the interests of the Issuer and the Noteholders, (ii) in selecting Reference Entities and Reference Obligations, declaring Credit Events and taking other actions permitted or required to be taken by the Credit Swap Counterparty under the Credit Swaps, the Credit Swap Counterparty will act within the parameters established under the Credit Swaps, however, any actions taken by the Credit Swap Counterparty will be in the Credit Swap Counterparty's own best interests, as determined by the Credit Swap Counterparty in its sole judgment, and any such action may not be in the interest of, and may be directly adverse to, the Issuer and the Noteholders, and (iii) the Credit Swap Counterparty is not obligated to consider the interests of the Issuer or the Noteholders in selecting Reference Entities or Reference Obligations, declaring Credit Events or taking other actions permitted or required to be taken by the Credit Swap Counterparty under the Credit Swaps.

(li)     Due Authorization; Capability. If the Transferee is not a natural person, the Transferee has the power and authority to enter into each agreement required to be executed and delivered by or on behalf of the Transferee in connection with its purchase of Notes and to perform its obligations thereunder and consummate the transactions contemplated thereby, and the person signing any such documents on behalf of the Transferee has been duly authorized to execute and deliver such documents and each other document required to be executed and delivered by the Transferee in connection with its purchase of Notes. If the Transferee is an individual, the Transferee has all requisite legal capacity to acquire and hold the Notes and to execute, deliver and comply with the terms of each of the documents required to be executed and delivered by the Transferee in connection with the subscription for the Notes. Such execution, delivery and compliance by the Transferee does not conflict with, or constitute a default under, any instruments governing the Transferee, any applicable law, regulation or order, or any material agreement to which the Transferee is a party or by which the Transferee is bound.

(lii)    Permanent Address. If the Transferee's permanent address is located in the United States, the Transferee was offered the Notes in the state of such Transferee's permanent address and intends that the securities law of that state govern the Transferee's subscription for the Notes.

(liii)   Certain Tax Matters. The Transferee understands that any Co-Issuer, Trustee or Paying Agent shall require certification acceptable to it (i) as a condition to the payment of principal of and interest on any Notes without, or at a reduced rate of, U.S. withholding or backup withholding tax, and (ii) to enable each Co-Issuer, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold from payments in respect of such Notes or the Holder of such Notes under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation. Such certification may include U.S. federal income tax

forms (such as IRS Form W-8BEN (Certification of Foreign Status of Beneficial Owner), Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms). In addition, any Co-Issuer, Trustee or Paying Agent may require certification acceptable to it to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets.   Each Transferee agrees to provide any certification requested pursuant to this paragraph and to update or replace such form or certification in accordance with its terms or its subsequent amendments.

(liv)    Tax Treatment. The Issuer intends, and each Transferee hereby agrees that for purposes of U.S. federal income tax, to treat the Notes in a manner consistent with the statements described in the Offering Memorandum under the heading "Certain U.S. Federal Income Tax Considerations", and such Transferee will take no action inconsistent with such treatment, unless required by law.

(lv)    *Tax Transfer Restrictions.*

11.    The Transferee agrees that it will not (A) acquire, sell, transfer, assign, pledge or otherwise dispose of any of its Notes (or any interest therein that is described in Treasury Regulations Section 1.7704-1(a)(2)(i)(B)) on or through (x) a United States national, regional or local securities exchange, (y) a foreign securities exchange or (z) an interdealer quotation system that regularly disseminates firm buy or sell quotations by identified brokers or dealers (including, without limitation, the National Association of Securities Dealers Automated Quotation System) ((x), (y) and (z), collectively, an "Exchange") or (B) cause any of its Notes or any interest therein to be marketed on or through an Exchange.

12.    The Transferee agrees that it will not enter into any financial instrument payments on which, or the value of which, is determined in whole or in part by reference to the Notes, or the Issuer (including the amount of Issuer distributions or interest on the Notes, the value of the Issuer's assets, or the result of the Issuer's operations), or any contract that otherwise is described in Treasury Regulations Section 1.7704-1(a)(2)(i)(B), without the consent of the holders of a majority of the Notes.

13.    If the Transferee is a partnership, grantor trust or S corporation, less than 50% of the value of any person's interest in such partnership, grantor trust or S corporation is attributable to the Transferee's interest in the Issuer, or the

Note Registrar otherwise determines that transfer to such partnership, grantor trust, or S Corporation will not cause the Issuer to be unable to rely on the "private placement" safe harbor of Treasury Regulation Section 1.7704-1(h).

14. The Transferee agrees to be bound by the restrictions and conditions set forth in the Indenture and acknowledge and agree that it may not directly or indirectly assign, participate, pledge, hypothecate, rehypothecate, exchange or otherwise dispose of or transfer in any manner (each a "Transfer") its interest in the Notes unless: (A) the Transferee signs a Transfer Certificate and (B) such Transfer does not violate Section 2.3 of the Standard Terms. Any purported Transfer that does not satisfy the above mentioned conditions shall be null, void and of no effect.

15. The Transferee agrees that the Note Registrar shall monitor all transfers of Notes so that the aggregate number of Noteholders is limited to 90 or fewer Noteholders. In monitoring such transfers, the Note Registrar shall rely solely and exclusively (without any duty to make further inquiry, including without any duty to inquire whether a Noteholder holds for the account of one or more other persons) on (i) information provided to it by Lehman Brothers Inc. on the Closing Date with respect to the number of Noteholders on the Closing Date and (ii) and any transfer certificates received by the Note Registrar subsequent to the Closing Date pursuant to the terms of the Indenture.

The Transferee understand that the representations, warranties and covenants contained in paragraph (19) are intended to permit the Issuer to rely, if necessary, on the "private placement" safe harbor from classification as a publicly traded partnership in U.S. Treasury Regulations Section 1.7704-1(h).

(lvi) Reliance on Representations, etc. The Transferee acknowledges that the Co-Issuers, the Managers and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements and agrees that, if any of the acknowledgements, representations or warranties made or deemed to have been made by it in connection with its purchase of the Notes are no longer accurate, the Transferee will promptly notify the Co-Issuers and the Managers.

TRANSFEREE

By:_____
    Name:

Title: _____

Dated: _____, _____

| Taxpayer Identification Number: | Address for Notices: |
|---|---|
| Wire Instructions for Payments: | |
| Bank: | |
| Address: | |
| Bank ABA #: | Tel: |
| Account No.: | Fax: |
| FAO: | Attn.: |
| Attention: | |
| Information for Transfer: | |
| Net Monies: | Trade Date: |
| CUSIP number: | Settlement Date: |
| Settlement Instructions: (DTC, Euroclear, or Account Number) | |

| Registered Name (if Nominee): | |
|---|---|

cc: PENN'S LANDING CDO LLC

AMENDED AND RESTATED SERIES INDENTURE, dated as of April 24, 2007 (this "**Series Indenture**"), amending and restating the series indenture dated as of April 10, 2007, among PENN'S LANDING CDO SPC (the "**Company**") for the account of the Series 2007-1 Segregated Portfolio (the "**Issuer**"), a segregated portfolio company incorporated in the Cayman Islands with limited liability, PENN'S LANDING CDO LLC, a special purpose limited liability company formed under the laws of the State of Delaware (the "**Co-Issuer**"; the Issuer and the Co-Issuer are collectively referred to hereinafter as the "**Co-Issuers**"), and U.S. BANK NATIONAL ASSOCIATION, a national banking association, as Trustee and Portfolio Administrator (the "**Trustee**" and the "**Portfolio Administrator**").

## WITNESSETH:

WHEREAS, the Issuer desires to pledge the assets of the Issuer in favor of the Trustee on the Closing Date pursuant to this Series Indenture, which is supplemented by and incorporates by reference the Standard Terms for Indentures, dated as of April 10, 2007 (the "**Standard Terms**" and, together with this Series Indenture, the "**Indenture**"), and provide for the issuance of the Notes, which will be secured by the assets of the CDO Issuer;

WHEREAS, the Issuer is entering into the Indenture and the Trustee is accepting the trusts created hereby, for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged;

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants expressed herein and for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## GRANTING CLAUSES

The Issuer hereby Grants to the Trustee, for the benefit of the Secured Parties, all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, all accounts, general intangibles, payment intangibles, securities accounts, chattel paper, instruments, investment property, money (as such terms are defined in the UCC), and any and all other property of any type or nature owned by it, including but not limited to:

(a)    the Permitted Investments including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto, which the Issuer causes to be delivered to the Trustee (directly or through a Securities Intermediary or bailee) on the Closing Date, all payments made or to be made thereon or with respect thereto, and Permitted Short-Term Investments including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto, which are delivered to the Trustee (directly or through a Securities Intermediary or bailee) on any date on or after the Closing Date pursuant to the terms hereof and all payments made or to be made thereon or with respect thereto;

(b)    the Third Party Custodian Agreement, and the Issuer's rights thereunder with respect to the Posted Collateral;

(c)     the Class A Credit Swap and the Issuer's rights thereunder, and all payments made or to be made thereon or with respect thereto (including the Class A Fixed Amount) and any collateral granted to the Issuer thereunder;

(d)     the Class B-1 Credit Swap and the Issuer's rights thereunder, and all payments made or to be made thereon or with respect thereto (including the Class B-1 Fixed Amount) and any collateral granted to the Issuer thereunder;

(e)     the Class B-2 Credit Swap and the Issuer's rights thereunder, and all payments made or to be made thereon or with respect thereto (including the Class B-2 Fixed Amount) and any collateral granted to the Issuer thereunder;

(f)     the Class C Credit Swap and the Issuer's rights thereunder, and all payments made or to be made thereon or with respect thereto (including the Class C Fixed Amount) and any collateral granted to the Issuer thereunder;

(g)     the Class D Credit Swap and the Issuer's rights thereunder, and all payments made or to be made thereon or with respect thereto (including the Class D Fixed Amount) and any collateral granted to the Issuer thereunder;

(h)     the Class E Credit Swap and the Issuer's rights thereunder, and all payments made or to be made thereon or with respect thereto (including the Class E Fixed Amount) and any collateral granted to the Issuer thereunder;

(i)     (g)     the Class F Credit Swap and the Issuer's rights thereunder, and all payments made or to be made thereon or with respect thereto (including the Class F Fixed Amount) and any collateral granted to the Issuer thereunder

(j)     the Portfolio Management Agreement and the Issuer's rights thereunder, and all payments made or to be made thereon or with respect thereto and any collateral granted to the Issuer thereunder;

(k)     the Interest Collections Payment Account, the Principal Collections Payment Account, the Credit Swap Posted Amount Account and any other account of the Issuer, Permitted Short-Term Investments purchased with funds on deposit in said accounts, and all funds deposited therein and financial assets and investment property credited thereto and income from the investment of funds therein, including any part thereof which consists of general intangibles or investment property (each as defined in the UCC) relating thereto;

(l)     all Cash and Money delivered to the Trustee for the benefit of the Secured Parties (directly or through a Securities Intermediary or bailee);

(m)     all securities, loans, investments and agreements of any nature in which the Issuer has an interest, including any part thereof which consists of general intangibles or investment property (each as defined in the UCC) relating thereto; and

2

(n)     all Proceeds, accessions, profits, income, benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of the property of the Issuer described in the preceding clauses;

but excluding, in each case, any asset situated in the Cayman Islands including, without limitation, (i) the Excepted Property and (ii) the Administration Agreement and the Issuer's rights thereunder) (clauses (a) through (m) above, with the exclusion of (i) and (ii) above, the **"Collateral"**).

Such Grants are made in trust, to secure the Notes equally and ratably without prejudice, priority or distinction among the Notes by reason of difference in time of issuance or otherwise, except as expressly provided in this Indenture, and to secure (i) the payment of all amounts due on the Notes in accordance with their terms, (ii) the payment of all other sums payable under this Indenture, (iii) compliance with the provisions of this Indenture, and each related document, all as provided herein and therein and (iv) all other Secured Obligations.

Except to the extent otherwise provided in this Indenture, this Indenture shall constitute a security agreement under the laws of the State of New York applicable to agreements made and to be performed therein, for the benefit of the Secured Parties. Upon the occurrence and during the continuation of any Event of Default hereunder, and in addition to any other rights available under this Indenture or any other instruments included in the Collateral held for the benefit and security of the Secured Parties or otherwise available at law or in equity but subject to the terms hereof, the Trustee shall have all rights and remedies of a secured party on default under the laws of the State of New York and other applicable law to enforce the assignments and security interests contained herein and, in addition, shall have the right, subject to compliance with any mandatory requirements of applicable law and the terms of this Indenture, to sell or apply any rights and other interests assigned or pledged hereby in accordance with the terms hereof at public and private sale.

The Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof.

Section 1. <u>Incorporation of Standard Terms.</u>

All of the provisions of the Standard Terms including, but not limited to, terms defined therein, a copy of which is attached hereto as <u>Appendix A</u>, are herein incorporated by reference in their entirety, such that this Series Indenture and the Standard Terms form a single agreement between the parties. In the event of any inconsistency between the provisions of this Series Indenture and the provisions of the Standard Terms, this Series Indenture will prevail for purposes of the Notes. All capitalized terms used and not defined herein shall have the meaning ascribed thereto in the Standard Terms.

Section 2. <u>Definitions.</u>

The following terms shall have the meanings provided below:

3

"**30/360**": means the number of days in the Accrual Period in respect of which payment is being made divided by 360 (the number of days to be calculated on the basis of a year of 360 days with 12 30-day months (unless (i) the last day of the Accrual Period is the 31st day of a month but the first day of the Accrual Period is a day other than the 30th or 31st day of a month, in which case the month that includes that last day shall not be considered to be shortened to a 30-day month or (ii) the last day of the Accrual Period is the last day of the month of February, in which case the month of February shall be considered to be lengthened to a 30-day month)).

"**Account**":   Any of the Interest Collections Payment Account, the Principal Collections Payment Account, the Credit Swap Posted Amount Account or any other account of the Issuer or in which the Issuer has any interest.

"**Accrual Period**":   Shall mean (i) with respect to the Initial Payment Date in respect of the Class A Notes, the Class B-1 Notes, the Class B-2 Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes, the period from and including the Closing Date to but excluding the Initial Payment Date, (ii) with respect to each Payment Date thereafter (other than the Scheduled Final Payment Date), the period from and including the immediately preceding Payment Date to but excluding such Payment Date, (iii) with respect to the Scheduled Final Payment Date, the period from and including the immediately preceding Payment Date to but excluding the Scheduled Final Payment Date, and (iv) with respect to the Early Termination Payment Date (if any), the period from and including the immediately preceding Payment Date to but excluding the Early Termination Payment Date.

"**Additional Event of Default**":   The meaning specified in <u>Section 4(s)</u>.

"**Additional Issuance**":   The meaning specified in <u>Section 4(q)</u>.

"**Adjustment Amount**":   When used with respect to (i) the Class A Notes and each Class A Adjustment Reference Entity, shall mean the related Class A Adjustment Amount, (ii) the Class B-1 Notes and each Class B-1 Adjustment Reference Entity, shall mean the related Class B-1 Adjustment Amount, (iii) the Class B-2 Notes and each Class B-2 Adjustment Reference Entity, shall mean the related Class B-2 Adjustment Amount, (iv) the Class C Notes and each Class C Adjustment Reference Entity, shall mean the related Class C Adjustment Amount, (v) the Class D Notes and each Class D Adjustment Reference Entity, shall mean the related Class D Adjustment Amount, (vi) the Class E Notes and each Class E Adjustment Reference Entity, shall mean the related Class E Adjustment Amount and (vii) the Class F Notes and each Class F Adjustment Reference Entity, shall mean the related Class F Adjustment Amount.

"**Adjustment Reference Entity**":   When used with respect to (i) the Class A Notes, shall mean any Class A Adjustment Reference Entity, (ii) the Class B-1 Notes, shall mean any Class B-1 Adjustment Reference Entity, (iii) the Class B-2 Notes, shall mean any Class B-2 Adjustment Reference Entity, (iv) the Class C Notes, shall mean any Class C Adjustment Reference Entity, (v) the Class D Notes, shall mean any Class D Adjustment Reference Entity, (vi) the Class E Notes, shall mean any Class E Adjustment Reference Entity, and (vii) the Class F Notes, shall mean any Class F Adjustment Reference Entity.

30775-00042 NY:2152055.4

"**Affected Party**": The meaning specified in the Credit Swaps.

"**Aggregate Loss Amount**": Either the Class A Aggregate Loss Amount, Class B-1 Aggregate Loss Amount, Class B-2 Aggregate Loss Amount, Class C Aggregate Loss Amount, Class D Aggregate Loss Amount, Class E Aggregate Loss Amount or Class F Aggregate Loss Amount, as applicable.

"**Aggregate Outstanding Amount**": When used with respect to any Class of Notes, (i) the outstanding principal amount of such Notes on the Closing Date, *plus* (ii) the principal amount of any Notes added in connection with an Additional Issuance of such Class of Notes, *minus* (iii)(A) the aggregate amount of principal payments paid in respect of such Notes pursuant to the Priority of Payments, (B) the aggregate amount of principal reductions in respect of such Class of Notes pursuant to Section 4(b), Section 4(c), Section 4(d), Section 4(e), Section 4(f) or Section 4(g) (as applicable), and (C) the outstanding principal amount of the Notes of such Class redeemed in connection with an Optional Reduction.

"**Bank**": U.S. Bank National Association, a national banking association, in its individual capacity and not as Trustee, until a successor Person shall have become Trustee pursuant to the provisions of this Indenture, and then "Bank" shall mean such successor Person in its individual capacity and not as Trustee.

"**Base Management Fee**": means the fees payable to the Portfolio Manager on a Payment Date or Distribution Date with respect to the Notes, which shall be paid in Dollars in an amount equal to the product of (a) the Management Fee Rate with respect to each Class of Notes; (b) the Weighted Average Outstanding Principal Amount in respect of such Class (calculated in the same manner in which the Weighted Average Outstanding Principal Amount is determined to pay interest on such Class); and (c) the actual number of days elapsed in such Accrual Period divided by 360.

"**Business Day**": A day on which commercial banks and foreign exchange markets settle payments in each of London, New York and any other city in which the Corporate Trust Office is located and, in the case of the final payment of principal of any Note, in the place of presentation of such Note.

"**Calculation Agent**": The meaning specified in Section 11(a).

"**Cash Settlement Amount**": When used with respect to (i) the Class A Notes and the Class A Credit Swap, shall mean a Class A Cash Settlement Amount, (ii) the Class B-1 Notes and the Class B-1 Credit Swap, shall mean a Class B-1 Cash Settlement Amount, (iii) the Class B-2 Notes and the Class B-2 Credit Swap, shall mean a Class B-2 Cash Settlement Amount, (iv) the Class C Notes and the Class C Credit Swap, shall mean a Class C Cash Settlement Amount, (v) the Class D Notes and the Class D Credit Swap, shall mean a Class D Cash Settlement Amount, (vi) the Class E Notes and the Class E Credit Swap, shall mean a Class E Cash Settlement Amount or (vii) the Class F Notes and the Class F Credit Swap, shall mean a Class F Cash Settlement Amount.

5

"**Class**":  As the context requires, all of the Class A Notes, the Class B-1 Notes, the Class B-2 Notes, the Class C Notes, the Class D Notes, the Class E Notes or the Class F Notes.

"**Class A Adjustment Amount**":  The meaning specified in Section 3(c)(ii).

"**Class A Adjustment Reference Entity**":  The meaning specified in Section 3(c)(ii).

"**Class A Aggregate Loss Amount**":  The meaning specified in the Class A Credit Swap.

"**Class A Cash Settlement Amount**":  The meaning specified in the Class A Credit Swap.

"**Class A Credit Protection Payment Amount**":  The meaning specified in the Class A Credit Swap.

"**Class A Credit Swap**":  The meaning specified in the definition of "Credit Swaps".

"**Class A Deferred Interest Amount**":  In respect of the Class A Notes on a Deferred Interest Payment Date and the related Class A Adjustment Reference Entity, an amount determined by the Credit Swap Calculation Agent in its sole discretion, acting in a commercially reasonable manner, on the relevant Deferred Interest Cut-off Date as being equal to the excess (if any) of:

(i)    the amount of interest that would otherwise have been payable in respect of the Class A Notes on the relevant Payment Date or the Scheduled Final Payment Date (without duplication) if:

(A) in the circumstances set out in sub-paragraph (a)(1) of Section 3(c)(ii), the relevant Final Price in respect of such Class A Adjustment Reference Entity had actually been determined under the Class A Credit Swap on the relevant Event Determination Date; or

(B) in the circumstances set out in sub-paragraphs (a)(2) or (a)(3) of Section 3(c)(ii), where the Potential Failure to Pay or the Potential Repudiation/Moratorium develops into an actual Failure to Pay or Repudiation/Moratorium (as the case may be), the relevant Final Price in respect of such Class A Adjustment Reference Entity had actually been determined under the Class A Credit Swap on the date on which such Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) was determined by the Credit Swap Calculation Agent to have occurred; or

(C) in the circumstances set out in sub-paragraphs (a)(2) or (a)(3) of Section 3(c)(ii), where the relevant Potential Failure to Pay or Potential Repudiation/Moratorium is subsequently cured, the Class A Adjustment Amount

6

in respect of such Class A Adjustment Reference Entity had actually been zero on the date on which such Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) was determined by the Credit Swap Calculation Agent to have occurred;

*minus*:

(ii)    the Class A Interest Distribution Amount (if any) paid on such payment date.

"**Class A Fixed Amount**": The meaning specified in the Class A Credit Swap.

"**Class A Interest Distribution Amount**": The meaning specified in Section 3(c)(i).

"**Class A Note Interest Rate**": The meaning specified in Section 3(b).

"**Class A Notes**": The Class A Floating Rate Notes due on the Scheduled Final Payment Date.

"**Class A Relevant Proportion**": The proportion which the Aggregate Outstanding Amount of the Class A Notes bears to the aggregate of (i) the Aggregate Outstanding Amount of the Class A Notes, (ii) the Aggregate Outstanding Amount of the Class B-1 Notes, (iii) the Aggregate Outstanding Amount of the Class B-2 Notes, (iv) the Aggregate Outstanding Amount of the Class C Notes, (v) the Aggregate Outstanding Amount of the Class D Notes (vi) the Aggregate Outstanding Amount of the Class E Notes and (vii) the Aggregate Outstanding Amount of the Class F Notes.

"**Class A Scheduled Final Payment Date Redemption Amount**": The meaning specified in Section 4(a)(ii).

"**Class B Adjustment Amount**": The meaning specified in Section 3(d)(ii).

"**Class B-1 Adjustment Reference Entity**": The meaning specified in Section 3(d)(ii).

"**Class B-1 Aggregate Loss Amount**": The meaning specified in the Class B-1 Credit Swap.

"**Class B-1 Cash Settlement Amount**": The meaning specified in the Class B-1 Credit Swap.

"**Class B-1 Credit Protection Payment Amount**": The meaning specified in the Class B-1 Credit Swap.

"**Class B-1 Credit Swap**": The meaning specified in the definition of "Credit Swaps".

7

"**Class B-1 Deferred Interest Amount**": In respect of the Class B-1 Notes on a Deferred Interest Payment Date and the related Class B-1 Adjustment Reference Entity, an amount determined by the Credit Swap Calculation Agent in its sole discretion, acting in a commercially reasonable manner, on the relevant Deferred Interest Cut-off Date as being equal to the excess (if any) of:

(i) the amount of interest that would otherwise have been payable in respect of the Class B-1 Notes on the relevant Payment Date or the Scheduled Final Payment Date (without duplication) if:

(A) in the circumstances set out in sub-paragraph (a)(1) of Section 3(d)(ii), the relevant Final Price in respect of such Class B-1 Adjustment Reference Entity had actually been determined under the Class B-1 Credit Swap on the relevant Event Determination Date; or

(B) in the circumstances set out in sub-paragraphs (a)(2) or (a)(3) of Section 3(d)(ii), where the Potential Failure to Pay or the Potential Repudiation/Moratorium develops into an actual Failure to Pay or Repudiation/Moratorium (as the case may be), the relevant Final Price in respect of such Class B-1 Adjustment Reference Entity had actually been determined under the Class B-1 Credit Swap on the date on which such Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) was determined by the Credit Swap Calculation Agent to have occurred; or

(C) in the circumstances set out in sub-paragraphs (a)(2) or (a)(3) of Section 3(d)(ii), where the relevant Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) is subsequently cured, the Class B-1 Adjustment Amount in respect of such Class B-1 Adjustment Reference Entity had actually been zero on the date on which such Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) was determined by the Credit Swap Calculation Agent to have occurred;

*minus*:

(ii) the Class B-1 Interest Distribution Amount (if any) paid on such payment date.

"**Class B-1 Fixed Amount**": The meaning specified in the Class B-1 Credit Swap.

"**Class B-1 Interest Distribution Amount**": The meaning specified in Section 3(d)(i).

"**Class B-1 Note Interest Rate**": The meaning specified in Section 3(b).

"**Class B-1 Notes**": The Class B-1 Floating Rate Notes due on the Scheduled Final Payment Date.

8

"**Class B-1 Relevant Proportion**": The proportion which the Aggregate Outstanding Amount of the Class B-1 Notes bears to the aggregate of (i) the Aggregate Outstanding Amount of the Class A Notes, (ii) the Aggregate Outstanding Amount of the Class B-1 Notes, (iii) the Aggregate Outstanding Amount of the Class B-2 Notes, (iv) the Aggregate Outstanding Amount of the Class C Notes, (v) the Aggregate Outstanding Amount of the Class D Notes (vi) the Aggregate Outstanding Amount of the Class E Notes and (vii) the Aggregate Outstanding Amount of the Class F Notes.

"**Class B-1 Scheduled Final Payment Date Redemption Amount**": The meaning specified in Section 4(a)(iii).

"**Class B-2 Adjustment Reference Entity**": The meaning specified in Section 3(d)(ii).

"**Class B-2 Aggregate Loss Amount**": The meaning specified in the Class B-2 Credit Swap.

"**Class B-2 Cash Settlement Amount**": The meaning specified in the Class B-2 Credit Swap.

"**Class B-2 Credit Protection Payment Amount**": The meaning specified in the Class B-2 Credit Swap.

"**Class B-2 Credit Swap**": The meaning specified in the definition of "Credit Swaps".

"**Class B-2 Deferred Interest Amount**": In respect of the Class B-2 Notes on a Deferred Interest Payment Date and the related Class B-2 Adjustment Reference Entity, an amount determined by the Credit Swap Calculation Agent in its sole discretion, acting in a commercially reasonable manner, on the relevant Deferred Interest Cut-off Date as being equal to the excess (if any) of:

(i)    the amount of interest that would otherwise have been payable in respect of the Class B-2 Notes on the relevant Payment Date or the Scheduled Final Payment Date (without duplication) if:

(A)    in the circumstances set out in sub paragraph (a)(1) of Section 3(d)(ii), the relevant Final Price in respect of such Class B-2 Adjustment Reference Entity had actually been determined under the Class B-2 Credit Swap on the relevant Event Determination Date; or

(B)    in the circumstances set out in sub paragraphs (a)(2) or (a)(3) of Section 3(d)(ii), where the Potential Failure to Pay or the Potential Repudiation/Moratorium develops into an actual Failure to Pay or Repudiation/Moratorium (as the case may be), the relevant Final Price in respect of such Class B-2 Adjustment Reference Entity had actually been determined under the Class B-2 Credit Swap on the date on which such Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) was determined by the Credit Swap Calculation Agent to have occurred; or

9

(C)    in the circumstances set out in sub paragraphs (a)(2) or (a)(3) of Section 3(d)(ii), where the relevant Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) is subsequently cured, the Class B-2 Adjustment Amount in respect of such Class B-2 Adjustment Reference Entity had actually been zero on the date on which such Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) was determined by the Credit Swap Calculation Agent to have occurred;

*minus:*

(ii)    the Class B-2 Interest Distribution Amount (if any) paid on such payment date.

**"Class B-2 Fixed Amount"**:  The meaning specified in the Class B-2 Credit Swap.

**"Class B-2 Interest Distribution Amount"**:  The meaning specified in Section 3(e)(i).

**"Class B-2 Note Interest Rate"**:  The meaning specified in Section 3(b).

**"Class B-2 Notes"**:  The Class B-2 Floating Rate Notes due on the Scheduled Final Payment Date.

**"Class B-2 Relevant Proportion"**: The proportion which the Aggregate Outstanding Amount of the Class B-2 Notes bears to the aggregate of (i) the Aggregate Outstanding Amount of the Class A Notes, (ii) the Aggregate Outstanding Amount of the Class B-1 Notes, (iii) the Aggregate Outstanding Amount of the Class B-2 Notes, (iv) the Aggregate Outstanding Amount of the Class C Notes, (v) the Aggregate Outstanding Amount of the Class D Notes (vi) the Aggregate Outstanding Amount of the Class E Notes and (vii) the Aggregate Outstanding Amount of the Class F Notes.

**"Class B-2 Scheduled Final Payment Date Redemption Amount"**:  The meaning specified in Section 4(a)(iii).

**"Class C Adjustment Amount"**:  The meaning specified in Section 3(e)(ii).

**"Class C Adjustment Reference Entity"**:  The meaning specified in Section 3(e)(ii).

**"Class C Aggregate Loss Amount"**:  The meaning specified in the Class C Credit Swap.

**"Class C Cash Settlement Amount"**:  The meaning specified in the Class C Credit Swap.

**"Class C Credit Protection Payment Amount"**:  The meaning specified in the Class C Credit Swap.

10

"**Class C Credit Swap**":  The meaning specified in the definition of "Credit Swaps".

"**Class C Deferred Interest Amount**":  In respect of the Class C Notes on a Deferred Interest Payment Date and the related Class C Adjustment Reference Entity, an amount determined by the Credit Swap Calculation Agent in its sole discretion, acting in a commercially reasonable manner, on the relevant Deferred Interest Cut-off Date as being equal to the excess (if any) of:

(i)  the amount of interest that would otherwise have been payable in respect of the Class C Notes on the relevant Payment Date or the Scheduled Final Payment Date (without duplication) if:

(A) in the circumstances set out in sub-paragraph (a)(1) of <u>Section 3(e)(ii)</u>, the relevant Final Price in respect of such Class C Adjustment Reference Entity had actually been determined under the Class C Credit Swap on the relevant Event Determination Date; or

(B) in the circumstances set out in sub-paragraphs (a)(2) or (a)(3) of <u>Section 3(e)(ii)</u>, where the Potential Failure to Pay or the Potential Repudiation/Moratorium develops into an actual Failure to Pay or Repudiation/Moratorium (as the case may be), the relevant Final Price in respect of such Class C Adjustment Reference Entity had actually been determined under the Class C Credit Swap on the date on which such Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) was determined by the Credit Swap Calculation Agent to have occurred; or

(C) in the circumstances set out in sub-paragraphs (a)(2) or (a)(3) of <u>Section 3(e)(ii)</u>, where the relevant Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) is subsequently cured, the Class C Adjustment Amount in respect of such Class C Adjustment Reference Entity had actually been zero on the date on which such Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) was determined by the Credit Swap Calculation Agent to have occurred;

*minus*:

(ii) the Class C Interest Distribution Amount (if any) paid on such payment date.

"**Class C Fixed Amount**":  The meaning specified in the Class C Credit Swap.

"**Class C Interest Distribution Amount**":  The meaning specified in <u>Section 3(f)(i)</u>.

"**Class C Note Interest Rate**":  The meaning specified in <u>Section 3(b)</u>.

11

**"Class C Notes"**:  The Class C Fixed Rate Notes due on the Scheduled Final Payment Date.

**"Class C Relevant Proportion"**:  The proportion which the Aggregate Outstanding Amount of the Class C Notes bears to the aggregate of (i) the Aggregate Outstanding Amount of the Class A Notes, (ii) the Aggregate Outstanding Amount of the Class B-1 Notes, (iii) the Aggregate Outstanding Amount of the Class B-2 Notes, (iv) the Aggregate Outstanding Amount of the Class C Notes, (v) the Aggregate Outstanding Amount of the Class D Notes (vi) the Aggregate Outstanding Amount of the Class E Notes and (vii) the Aggregate Outstanding Amount of the Class F Notes.

**"Class C Scheduled Final Payment Date Redemption Amount"**:  The meaning specified in Section 4(a)(iv).

**"Class D Adjustment Amount"**:  The meaning specified in Section 3(f)(ii).

**"Class D Adjustment Reference Entity"**:  The meaning specified in Section 3(f)(ii).

**"Class D Aggregate Loss Amount"**:  The meaning specified in the Class D Credit Swap.

**"Class D Cash Settlement Amount"**:  The meaning specified in the Class D Credit Swap.

**"Class D Credit Protection Payment Amount"**:  The meaning specified in the Class D Credit Swap.

**"Class D Credit Swap"**:  The meaning specified in the definition of "Credit Swaps".

**"Class D Deferred Interest Amount"**:  In respect of the Class D Notes on a Deferred Interest Payment Date and the related Class D Adjustment Reference Entity, an amount determined by the Credit Swap Calculation Agent in its sole discretion, acting in a commercially reasonable manner, on the relevant Deferred Interest Cut-off Date as being equal to the excess (if any) of:

(i)  the amount of interest that would otherwise have been payable in respect of the Class D Notes on the relevant Payment Date or the Scheduled Final Payment Date (without duplication) if:

(A) in the circumstances set out in sub-paragraph (a)(1) of Section 3(f)(ii), the relevant Final Price in respect of such Class D Adjustment Reference Entity had actually been determined under the Class D Credit Swap on the relevant Event Determination Date; or

(B) in the circumstances set out in sub-paragraphs (a)(2) or (a)(3) of Section 3(f)(ii), where the Potential Failure to Pay or the Potential

12

Repudiation/Moratorium develops into an actual Failure to Pay or Repudiation/Moratorium (as the case may be), the relevant Final Price in respect of such Class D Adjustment Reference Entity had actually been determined under the Class D Credit Swap on the date on which such Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) was determined by the Credit Swap Calculation Agent to have occurred; or

(C) in the circumstances set out in sub-paragraphs (a)(2) or (a)(3) of Section 3(f)(ii), where the relevant Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) is subsequently cured, the Class D Adjustment Amount in respect of such Class D Adjustment Reference Entity had actually been zero on the date on which such Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) was determined by the Credit Swap Calculation Agent to have occurred;

*minus*:

(ii) the Class D Interest Distribution Amount (if any) paid on such payment date.

"**Class D Fixed Amount**":  The meaning specified in the Class D Credit Swap.

"**Class D Interest Distribution Amount**":  The meaning specified in Section 3(g)(i).

"**Class D Note Interest Rate**":  The meaning specified in Section 3(b).

"**Class D Notes**":  The Class D Floating Rate Notes due on the Scheduled Final Payment Date.

"**Class D Relevant Proportion**":  The proportion which the Aggregate Outstanding Amount of the Class D Notes bears to the aggregate of (i) the Aggregate Outstanding Amount of the Class A Notes, (ii) the Aggregate Outstanding Amount of the Class B-1 Notes, (iii) the Aggregate Outstanding Amount of the Class B-2 Notes, (iv) the Aggregate Outstanding Amount of the Class C Notes, (v) the Aggregate Outstanding Amount of the Class D Notes (vi) the Aggregate Outstanding Amount of the Class E Notes and (vii) the Aggregate Outstanding Amount of the Class F Notes.

"**Class D Scheduled Final Payment Date Redemption Amount**":  The meaning specified in Section 4(a)(v).

"**Class E Adjustment Amount**":  The meaning specified in Section 3(g)(ii).

"**Class E Adjustment Reference Entity**":  The meaning specified in Section 3(g)(ii).

"**Class E Aggregate Loss Amount**":  The meaning specified in the Class E Credit Swap.

13

"**Class E Cash Settlement Amount**":  The meaning specified in the Class E Credit Swap.

"**Class E Credit Protection Payment Amount**":  The meaning specified in the Class E Credit Swap.

"**Class E Credit Swap**":  The meaning specified in the definition of "Credit Swaps".

"**Class E Deferred Interest Amount**":  In respect of the Class E Notes on a Deferred Interest Payment Date and the related Class E Adjustment Reference Entity, an amount determined by the Credit Swap Calculation Agent in its sole discretion, acting in a commercially reasonable manner, on the relevant Deferred Interest Cut-off Date as being equal to the excess (if any) of:

(i)  the amount of interest that would otherwise have been payable in respect of the Class E Notes on the relevant Payment Date or the Scheduled Final Payment Date (without duplication) if:

(A) in the circumstances set out in sub-paragraph (a)(1) of <u>Section 3(g)(ii)</u>, the relevant Final Price in respect of such Class E Adjustment Reference Entity had actually been determined under the Class E Credit Swap on the relevant Event Determination Date; or

(B) in the circumstances set out in sub-paragraphs (a)(2) or (a)(3) of <u>Section 3(g)(ii)</u>, where the Potential Failure to Pay or the Potential Repudiation/Moratorium develops into an actual Failure to Pay or Repudiation/Moratorium (as the case may be), the relevant Final Price in respect of such Class E Adjustment Reference Entity had actually been determined under the Class E Credit Swap on the date on which such Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) was determined by the Credit Swap Calculation Agent to have occurred; or

(C) in the circumstances set out in sub-paragraphs (a)(2) or (a)(3) of <u>Section 3(g)(ii)</u>, where the relevant Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) is subsequently cured, the Class E Adjustment Amount in respect of such Class E Adjustment Reference Entity had actually been zero on the date on which such Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) was determined by the Credit Swap Calculation Agent to have occurred;

*minus*:

(ii)  the Class E Interest Distribution Amount (if any) paid on such payment date.

"**Class E Fixed Amount**":  The meaning specified in the Class E Credit Swap.

14

**"Class E Interest Distribution Amount"**: The meaning specified in Section 3(h)(i).

**"Class E Note Interest Rate"**: The meaning specified in Section 3(b).

**"Class E Notes"**: The Class E Fixed Rate Notes due on the Scheduled Final Payment Date.

**"Class E Relevant Proportion"**: The proportion which the Aggregate Outstanding Amount of the Class E Notes bears to the aggregate of (i) the Aggregate Outstanding Amount of the Class A Notes, (ii) the Aggregate Outstanding Amount of the Class B-1 Notes, (iii) the Aggregate Outstanding Amount of the Class B-2 Notes, (iv) the Aggregate Outstanding Amount of the Class C Notes, (v) the Aggregate Outstanding Amount of the Class D Notes (vi) the Aggregate Outstanding Amount of the Class E Notes and (vii) the Aggregate Outstanding Amount of the Class F Notes.

**"Class E Scheduled Final Payment Date Redemption Amount"**: The meaning specified in Section 4(a)(vi).

**"Class F Adjustment Amount"**: The meaning specified in Section 3(g)(ii).

**"Class F Adjustment Reference Entity"**: The meaning specified in Section 3(g)(ii).

**"Class F Aggregate Loss Amount"**: The meaning specified in the Class F Credit Swap.

**"Class F Cash Settlement Amount"**: The meaning specified in the Class F Credit Swap.

**"Class F Credit Protection Payment Amount"**: The meaning specified in the Class F Credit Swap.

**"Class F Credit Swap"**: The meaning specified in the definition of "Credit Swaps".

**"Class F Deferred Interest Amount"**: In respect of the Class F Notes on a Deferred Interest Payment Date and the related Class F Adjustment Reference Entity, an amount determined by the Credit Swap Calculation Agent in its sole discretion, acting in a commercially reasonable manner, on the relevant Deferred Interest Cut-off Date as being equal to the excess (if any) of:

　　　　(i) the amount of interest that would otherwise have been payable in respect of the Class F Notes on the relevant Payment Date or the Scheduled Final Payment Date (without duplication) if:

　　　　　　(A) in the circumstances set out in sub-paragraph (a)(1) of Section 3(h)(ii), the relevant Final Price in respect of such Class F Adjustment Reference Entity

had actually been determined under the Class F Credit Swap on the relevant Event Determination Date; or

(B) in the circumstances set out in sub-paragraphs (a)(2) or (a)(3) of Section 3(h)(ii), where the Potential Failure to Pay or the Potential Repudiation/Moratorium develops into an actual Failure to Pay or Repudiation/Moratorium (as the case may be), the relevant Final Price in respect of such Class F Adjustment Reference Entity had actually been determined under the Class F Credit Swap on the date on which such Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) was determined by the Credit Swap Calculation Agent to have occurred; or

(C) in the circumstances set out in sub-paragraphs (a)(2) or (a)(3) of Section 3(h)(ii), where the relevant Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) is subsequently cured, the Class F Adjustment Amount in respect of such Class F Adjustment Reference Entity had actually been zero on the date on which such Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) was determined by the Credit Swap Calculation Agent to have occurred;

*minus*:

(ii) the Class F Interest Distribution Amount (if any) paid on such payment date.

**"Class F Fixed Amount"**: The meaning specified in the Class F Credit Swap.

**"Class F Interest Distribution Amount"**: The meaning specified in Section 3(i)(i).

**"Class F Note Interest Rate"**: The meaning specified in Section 3(b).

**"Class F Notes"**: The Class F Fixed Rate Notes due on the Scheduled Final Payment Date.

**"Class F Relevant Proportion"**: The proportion which the Aggregate Outstanding Amount of the Class F Notes bears to the aggregate of (i) the Aggregate Outstanding Amount of the Class A Notes, (ii) the Aggregate Outstanding Amount of the Class B-1 Notes, (iii) the Aggregate Outstanding Amount of the Class B-2 Notes, (iv) the Aggregate Outstanding Amount of the Class C Notes, (v) the Aggregate Outstanding Amount of the Class D Notes, (vi) the Aggregate Outstanding Amount of the Class E Notes and (vii) the Aggregate Outstanding Amount of the Class F Notes.

**"Class F Scheduled Final Payment Date Redemption Amount"**: The meaning specified in Section 4(a)(vi).

**"Closing Date"**: April 10, 2007.

16

"**Closing Date Deposit Account**"  The trust account designated the "Closing Date Deposit Account" and established by the Trustee pursuant to <u>Section 10(b)</u>.

"**Co-Issuer**":  Penn's Landing CDO LLC, a limited liability company formed under the laws of the State of Delaware until a successor Person shall have become the Co-Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Co-Issuer" shall mean such successor Person.

"**Co-Issuers**":  The Issuer and the Co-Issuer.

"**Collateral**":  The meaning specified in the Granting Clauses hereto.

"**Collections**":  With respect to any Payment Date, an amount equal to the sum of (i) Interest Collections and (ii) Principal Collections, if any, for such Payment Date.

"**Company**":  Penn's Landing CDO SPC, a segregated portfolio company incorporated in the Cayman Islands with limited liability.

"**Company Charter**":  The Memorandum and Articles of Association of the Company, dated March 29, 2007, as the same may be amended, supplemented or otherwise modified and in effect.

"**Contingency Amount**":  When used with respect to a Class of Notes on the Scheduled Final Payment Date, an amount equal to the sum of (i) the Contingency Cash Settlement Amount with respect to such Class of Notes, and (ii) the aggregate of all Outstanding Adjustment Amounts with respect to the Adjustment Reference Entities related to such Class of Notes.

"**Contingency Cash Settlement Amount**":  When used with respect to a Class of Notes, an amount determined by the Credit Swap Calculation Agent in its sole discretion, acting in a commercially reasonable manner, as being equal to the greater of (i) an amount equal to the sum of the Cash Settlement Amounts that would be determined in respect of two (2) additional Long Reference Entities if (A) a Credit Event had occurred with respect to each such Long Reference Entity and the Conditions to Settlement had been satisfied on or prior to the Scheduled Final Payment Date, and (B) the Final Price with respect to each such Long Reference Entity were zero (assuming for purposes of such calculations that (a) a Potential Failure to Pay with respect to an Adjustment Reference Entity was an actual Failure to Pay or (b) a Potential Repudiation/Moratorium with respect to an Adjustment Reference Entity was an actual Repudiation/Moratorium, as applicable), and (ii) zero.

"**Controlling Class**":  Shall mean the holders of a Majority of the Class A Notes, for so long as any Class A Notes are outstanding, then the holders of a Majority of the Class B-1 Notes and Class B-2 Notes, for so long as any Class B-1 Notes and Class B-2 Notes are outstanding, then the holders of a Majority of the Class C Notes, for so long as any Class C Notes are outstanding, then the holders of a Majority of the Class D Notes, for so long as any Class D Notes are outstanding, then the holders of a Majority of the Class E Notes, for so long as any Class E Notes are outstanding and then the holders of a Majority of the Class F Notes, for so long as any Class F Notes are outstanding.

17

"**Corporate Trust Office**": The corporate trust office of the Trustee, currently located at 1 Federal Street, 3rd Floor Mail Station EX-MA-FED Boston, Massachusetts 02110, Attention: Amy Byrnes Corporate Trust Services/CDO Administration, telephone number (617) 603-6479/6480, or such other address and telephone number as the Trustee may designate from time to time by notice to the Noteholders and the Issuer or the principal corporate trust office of any successor Trustee.

"**Credit Swaps**": The 1992 ISDA Master Agreement (Multicurrency-Cross Border), dated the Closing Date, between the Issuer and the Credit Swap Counterparty, as supplemented by the schedule attached thereto and seven (7) separate confirmations the "Class A Credit Swap", the "Class B-1 Credit Swap", the "Class B-2 Credit Swap", the "Class C Credit Swap", the "Class D Credit Swap", the "Class E Credit Swap" and the "Class F Credit Swap", respectively.

"**Credit Swap Counterparty**": Lehman Brothers Special Financing Inc.

"**Credit Swap Calculation Agent**": Lehman Brothers Special Financing Inc., as calculation agent under the Credit Swaps.

"**Credit Swap Guarantor**": Lehman Brothers Holdings Inc.

"**Credit Swap Posted Amount**": The meaning specified in the Class A Credit Swap, the Class B-1 Credit Swap and the Class B-2 Credit Swap.

"**Credit Swap Posted Amount Account**": The trust account designated the "Credit Swap Posted Amount Account" and established by the Trustee pursuant to Section 10(c).

"**Defaulting Party**" The meaning specified in the Credit Swaps.

"**Deferred Amount**": The meaning specified in Section 4(a)(vii).

"**Deferred Interest Amount**": means each of the Class A Deferred Interest Amount, the Class B-1 Deferred Interest Amount, the Class B-2 Deferred Interest Amount, the Class C Deferred Interest Amount, the Class D Deferred Interest Amount, the Class E Deferred Interest Amount and the Class F Deferred Interest Amount.

"**Deferred Interest Cut-off Date**": In respect of an Adjustment Reference Entity and a Class of Notes (a) the date on which the relevant Final Price is determined under the applicable Credit Swap; or (b) the date that the Credit Swap Calculation Agent determines in its sole discretion, acting in a commercially reasonable manner, that the relevant Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) has been cured, whichever is applicable.

"**Deferred Interest Payment Date**": In respect of the relevant Adjustment Reference Entity, the third Business Day following the relevant Deferred Interest Cut-off Date.

"**Deferred Redemption Amount**": In respect of (A) a Class of Notes and each related Adjustment Reference Entity for which a Final Price is determined, an amount (rounded

18

up to the nearest cent and subject to a minimum of zero) determined by the Credit Swap Calculation Agent, acting in a commercially reasonable manner, on the relevant Deferred Redemption Cut-off Date as being equal to the Adjustment Amount in respect of such Adjustment Reference Entity *minus* the actual Cash Settlement Amount determined in respect of such Adjustment Reference Entity, (B) a Class of Notes and each related Adjustment Reference Entity for which no Final Price is determined because the relevant Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) is cured, an amount (rounded up to the nearest cent) determined by the Credit Swap Calculation Agent, acting in a commercially reasonable manner, on the relevant Deferred Redemption Cut-off Date as being equal to the Adjustment Amount in respect of such Adjustment Reference Entity, (C) a Class of Notes whose Contingency Cash Settlement Amount is greater than zero on the Scheduled Final Payment Date, such Contingency Cash Settlement Amount *minus,* if the Conditions to Settlement are satisfied during the Notice Delivery Period with respect to a maximum of two (2) additional Reference Entities (other than Adjustment Reference Entities with respect to such Class of Notes), the sum of the actual Cash Settlement Amount determined in respect of each such Reference Entity, and (D) a Class of Notes whose Contingency Cash Settlement Amount is greater than zero on the Scheduled Final Payment Date, such Contingency Cash Settlement Amount if the Conditions to Settlement are not satisfied during the Notice Delivery Period with respect to any such additional Reference Entity (other than an Adjustment Reference Entity with respect to such Class of Notes).

"**Deferred Redemption Cut-off Date**: In respect of (i) a Class of Notes and a related Adjustment Reference Entity, (a) the date on which the relevant Final Price is determined under the applicable Credit Swap, or (b) the date that the Credit Swap Calculation Agent determines in its sole discretion, acting in a commercially reasonable manner, that the relevant Potential Failure to Pay or Potential Repudiation/Moratorium (as the case may be) has been cured, whichever is applicable, (ii) a Class of Notes whose Contingency Cash Settlement Amount is greater than zero on the Scheduled Final Payment Date and a related Reference Entity (other than Adjustment Reference Entity with respect to such Class of Notes) in respect of which the Conditions to Settlement are satisfied during the Notice Delivery Period, the date on which the relevant Final Price is determined under the applicable Credit Swap, and (iii) a Class of Notes whose Contingency Cash Settlement Amount is greater than zero on the Scheduled Final Payment Date, the end of the Notice Delivery Period if the Conditions to Settlement are not satisfied during the Notice Delivery Period with respect to any related Reference Entity (other than an Adjustment Reference Entity with respect to such Class of Notes).

"**Deferred Redemption Date**": In respect of (i) a Class of Notes and the related Adjustment Reference Entity, the third New York Business Day following the relevant Deferred Redemption Cut-off Date, and (ii) a Class of Notes whose Contingency Cash Settlement Amount is greater than zero on the Scheduled Final Payment Date, the third New York Business Day following the relevant Deferred Redemption Cut-off Date.

"**Designated Maturity**": With respect to (i) the Class A Notes, the Class B-1 Notes, the Class B-2 Notes the Class C Notes, the Class D Notes, the Class E Notes, and the Class F Notes, 3-month LIBOR, and (ii) the Permitted Long-Term Investment, 3-month LIBOR (as defined in the Permitted Long-Term Investment), provided that in each case the Designated

19