EXECUTION VERSION

AMENDED AND RESTATED NOTE PURCHASE AGREEMENT


Dated as of October 23, 2007


by and among


LVFN PARTNERS, L.P.
as Issuer,


LEHMAN BROTHERS INC.
as Noteholder Representative,


RELATIONSHIP FUNDING COMPANY, LLC,


LEHMAN BROTHERS SPECIAL LENDING LLC


and

THE VARIOUS FINANCIAL INSTITUTIONS AND OTHER PERSONS
FROM TIME TO TIME PARTIES THERETO
as Noteholders


_____

Relating to

Variable Funding Floating Rate Notes

_____

# TABLE OF CONTENTS

Page

## ARTICLE I

### Definitions

SECTION 1.01    Defined Terms ...............................................................................1
SECTION 1.02    Terms Generally..............................................................................1
SECTION 1.03    Accounting Terms; GAAP................................................................2

## ARTICLE II

### Amount and Terms of Commitment

SECTION 2.01    Form of Notes; Principal of Notes ..............................................2
SECTION 2.02    Drawdowns .................................................................................2
SECTION 2.03    Termination and Increases of Commitment...................................4
SECTION 2.04    Payment of Principal...................................................................4
SECTION 2.05    Optional Prepayment ..................................................................5
SECTION 2.06    Mandatory Prepayment ...............................................................5
SECTION 2.07    Fees ...........................................................................................5
SECTION 2.08    Interest........................................................................................5
SECTION 2.09    Break Funding Payments ............................................................6
SECTION 2.10    Increased Costs ..........................................................................7
SECTION 2.11    Taxes..........................................................................................8
SECTION 2.12    Payments Generally ..................................................................10
SECTION 2.13    Mitigation Obligations; Replacement of Noteholder.................10
SECTION 2.14    Representations of Noteholders; Securities Legend .................11
SECTION 2.15    Execution, Delivery and Dating .................................................12
SECTION 2.16    Registration, Registration of Transfer, Transfer Restrictions.....12
SECTION 2.17    Mutilated, Destroyed, Lost and Stolen Notes ...........................14
SECTION 2.18    Persons Deemed Owners ..........................................................15
SECTION 2.19    Cancellation ..............................................................................15
SECTION 2.20    Sharing of Payments .................................................................16
SECTION 2.21    Calculation Agent .....................................................................16
SECTION 2.22    Noteholder Representative.........................................................16

## ARTICLE III

### Representations and Warranties

SECTION 3.01    Organization; Powers.................................................................17
SECTION 3.02    Authorization; Enforceability ...................................................17

SECTION 3.03    Governmental Approvals; No Conflicts ................................................17
SECTION 3.04    Properties .................................................................................17
SECTION 3.05    Litigation Matters.........................................................................18
SECTION 3.06    Compliance with Laws and Agreements ...................................................18
SECTION 3.07    Investment Company .....................................................................18
SECTION 3.08    Taxes .....................................................................................18
SECTION 3.09    ERISA .....................................................................................19
SECTION 3.10    Disclosure ................................................................................19
SECTION 3.11    Subsidiaries ..............................................................................19
SECTION 3.12    Commodities ..............................................................................19

## ARTICLE IV

### Conditions

SECTION 4.01    Conditions to Effectiveness of Commitment...........................................19
SECTION 4.02    Conditions to Drawdown ..................................................................21

## ARTICLE V

### Affirmative Covenants

SECTION 5.01    Reporting Requirements ...................................................................22
SECTION 5.02    Notices of Material Events..................................................................23
SECTION 5.03    Existence; Conduct of Business..............................................................23
SECTION 5.04    Payment of Obligations....................................................................23
SECTION 5.05    Maintenance of Properties; Insurance........................................................23
SECTION 5.06    Books and Records; Inspection Rights .......................................................24
SECTION 5.07    Compliance with Laws .....................................................................24
SECTION 5.08    Use of Proceeds...........................................................................24
SECTION 5.09    Compliance with Constituent Documents ..................................................24
SECTION 5.10    LTV Ratio ................................................................................24
SECTION 5.11    Notification of Change in Status or Domicile.................................................24
SECTION 5.12    Reserved..................................................................................24
SECTION 5.13    Protection of Security Interest ..............................................................24
SECTION 5.14    Additional Collateral.......................................................................25
SECTION 5.15    Reserved..................................................................................25
SECTION 5.16    Authorized Officer, Etc.....................................................................25

## ARTICLE VI

### Negative Covenants

SECTION 6.01    Indebtedness..............................................................................25
SECTION 6.02    Liens.....................................................................................25
SECTION 6.03    Fundamental Changes ....................................................................26

SECTION 6.04    Transactions with Affiliates.................................................................27
SECTION 6.05    Security Interest.........................................................................................27
SECTION 6.06    VFN Outstanding Amount Limit..............................................................27
SECTION 6.07    Use of Proceeds..........................................................................................27
SECTION 6.08    ERISA..........................................................................................................27

## ARTICLE VII

### Events of Default

SECTION 7.01    Events of Default ........................................................................................27

## ARTICLE VIII

### Miscellaneous

SECTION 8.01    Limitation of Liability...............................................................................31
SECTION 8.02    Notices .........................................................................................................31
SECTION 8.03    Waivers; Amendments................................................................................32
SECTION 8.04    Expenses; Indemnity; Damage Waiver.....................................................33
SECTION 8.05    Successors and Assigns...............................................................................34
SECTION 8.06    Survival.........................................................................................................34
SECTION 8.07    Counterparts; Integration; Effectiveness...................................................34
SECTION 8.08    Severability ..................................................................................................34
SECTION 8.09    Right of Setoff..............................................................................................35
SECTION 8.10    Governing Law; Jurisdiction; Consent to Service of Process....................35
SECTION 8.11    WAIVER OF JURY TRIAL........................................................................36
SECTION 8.12    Headings .......................................................................................................36
SECTION 8.13    Confidentiality..............................................................................................36
SECTION 8.14    USA PATRIOT Act......................................................................................37
SECTION 8.15    Special Provisions Related to RFC.............................................................37

<u>SCHEDULES</u>:
Schedule 1.01 — Defined Terms
Schedule 3.01 — List of Authorized Officers

<u>EXHIBITS</u>:
Exhibit A — Form of Note
Exhibit B — Form of Drawdown Notice
Exhibit C — Form of Transferee Certificate
Exhibit D — Aggregate Haircut Calculation
Exhibit E — Form of Monthly Report
Exhibit F — List of Initial Collateral Securities Issuers and Sub-Funds
Exhibit G —Form of Non-Disclosure Agreement
Exhibit H —Form of Paying Agent Agreement

FIRST AMENDED AND RESTATED NOTE PURCHASE AGREEMENT, dated as of October 23, 2007 by and among LVFN PARTNERS, L.P., a Delaware Limited Partnership (the "Issuer"), LEHMAN BROTHERS INC. (the "Noteholder Representative"), and RELATIONSHIP FUNDING COMPANY, LLC ("RFC"), LEHMAN BROTHERS SPECIAL LENDING LLC ("LBSL") and THE VARIOUS FINANCIAL INSTITUTIONS AND OTHER PERSONS FROM TIME TO TIME PARTIES HERETO as noteholders, (the "Noteholders"). This Agreement amends and restates in its entirety the Note Purchase Agreement, dated as of August 28, 2007, by and among the Issuer, the Noteholder Representative, and the Noteholders.

W I T N E S S E T H:

WHEREAS, the Issuer desires financing through the issuance of variable funding notes (each a "Note" and together, the "Notes") to each of the Noteholders on the terms and conditions set forth herein; and

WHEREAS, each Noteholder is willing to acquire a Note and to enter into the associated Commitment, whereby from time to time the Issuer will draw down and repay principal amounts in respect of the Notes on the terms and conditions provided for herein;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and other good and valuable consideration, the receipt and adequacy of which are hereby expressly acknowledged, the parties hereto agree as follows:

## ARTICLE I

### DEFINITIONS

SECTION 1.01.    Defined Terms.    Certain capitalized terms used herein that are not otherwise defined in the body of this Agreement or one of the Exhibits hereof shall have the meanings set forth in Schedule 1.01 hereof.

SECTION 1.02.    Terms Generally.    The definitions of terms herein or in Schedule 1.01 hereof shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and

Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.03.    Accounting Terms; GAAP.    Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that if the Issuer notifies the Noteholder Representative that the Issuer requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Noteholder Representative notifies the Issuer that it requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

# ARTICLE II

## AMOUNT AND TERMS OF COMMITMENT

SECTION 2.01.    Form of Notes; Principal of Notes.    (a) Concurrently with the execution hereof, the Issuer shall execute and deliver a Note, substantially in the form of Exhibit A hereto, in the name of each Noteholder, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement, and with such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may, consistently herewith, be determined by the officers executing such Note, as evidenced by their execution of such Note.  Each Note will have a maximum principal amount equal to such Noteholder's Commitment.

(b)    Each Note shall be issuable only in registered form.  Payments by a Noteholder in accordance with Drawdowns by the Issuer pursuant to Section 2.02 shall increase the VFN Outstanding Amount of such Noteholder's Note.  Repayments of principal on such Note shall decrease the VFN Outstanding Amount of such Noteholder's Note.  The initial Commitment of each Noteholder shall be the amount set forth next to such Noteholder's signature on the signature pages hereof and the initial Aggregate Commitment shall be $500,000,000.

SECTION 2.02.    Drawdowns.    (a) On and subject to the terms and conditions of this Agreement, including without limitation the conditions in this Section 2.02 and in Section 4.02, each Noteholder agrees to permit the Issuer to draw down principal amounts in respect of its Note from time to time during the Availability Period.

(b)    Each Drawdown hereunder on the applicable Drawdown Date, which in all cases shall be a Drawdown Business Day, shall be upon delivery of a Drawdown Notice by the Issuer to the Noteholder Representative and the Noteholders received no later than 10:00 a.m., New York City time, at least five (5) Drawdown Business Days prior to such Drawdown Date.  Each Drawdown Notice shall be in the form of the Drawdown Notice attached hereto as

Exhibit B. Each Drawdown Notice shall be irrevocable and shall specify the aggregate amount being drawn down on such Drawdown Date (the "Aggregate Drawdown Principal Amount") and each Noteholder's Pro Rata Share of such Aggregate Drawdown Principal Amount (each such Noteholder's "Drawdown Principal Amount"); provided, that there shall be no more than three Drawdowns in the aggregate for each calendar month by the Issuer under this Agreement. The Aggregate Drawdown Principal Amount shall be equal to at least $5,000,000 with increments of $100,000 thereafter and the purchase price to be paid by each Noteholder pursuant to a Drawdown shall equal 100% of such Noteholder's Drawdown Principal Amount.  Each Noteholder will cause such Noteholder's Drawdown Principal Amount to be recorded on the Schedule of Drawdowns and Principal Repayments at the Annex of each Note and any such recordation shall constitute prima facie evidence of the accuracy of the information so recorded; provided that the failure of such Noteholder to make such recordation (or any error in such recordation) shall not affect the obligations of the Issuer or such Noteholder hereunder or under its Note.

(c)    Each Noteholder will not later than 2:00 p.m., New York City time, on the applicable Drawdown Date make the purchase price for its related Drawdown Principal Amount available by wire transfer thereof to the account specified by the Issuer in the applicable Drawdown Notice. The Respective obligations of the Noteholders hereunder are several and not joint and the failure of any Noteholder to pay the purchase price for its related Drawdown Principal Amount or to perform any of its obligations hereunder shall not relieve any other Noteholder from any of its obligations hereunder.  Except as set forth in Section 2.02(f) herein, no Noteholder shall be responsible for the failure of any other Noteholder to pay the purchase price of its related Drawdown Principal Amount or to perform any of its other obligations hereunder.

(d)    In no event may any Drawdown Principal Amount be requested by the Issuer hereunder, nor shall any Noteholder be obligated to purchase a Drawdown Principal Amount, if, after giving effect to such Drawdown Principal Amount, (i) the VFN Outstanding Amount of such Noteholder's Note would exceed such Noteholder's Commitment, (ii) the Aggregate VFN Outstanding Amount would exceed the Aggregate Commitment, or (iii) the conditions set forth in Section 4.02 are not met.

(e)    Each VFN Outstanding Amount is revolving in nature and within the foregoing limits and subject to the terms and conditions set forth herein, the Issuer may draw down, prepay and draw down again the principal amounts in respect of each Noteholder's Note on a revolving basis based on each Noteholder's Pro Rata Share.

(f)    In the event that RFC fails to purchase or otherwise elects not to purchase its Drawdown Principal Amount as of any Drawdown Date for any reason, LBSL shall be deemed to have assumed RFC's obligation to purchase such Drawdown Principal Amount and shall make the purchase price for such Drawdown Principal Amount available to the Issuer on the applicable Drawdown Date as set forth herein.  LBSL shall cause such Drawdown Principal Amount to be recorded on the Schedule of Drawdowns and Principal Repayments at the Annex of its Note and shall be treated as the recipient of the Drawdown Notice for all purposes under this Agreement.

(g)     In the event that LBSL shall be required to fund any Drawdown Principal Amount as set forth in Section 2.02(f) herein, effective as of the applicable Drawdown Date, LBSL's Commitment shall be deemed to increase, and RFC's Commitment shall be deemed to decrease, in an amount equal to such Drawdown Principal Amount.

SECTION 2.03.   Termination and Increases of Commitment.   (a) Unless previously terminated, each Noteholder's Commitment shall terminate on the Stated Maturity Date; provided that such Commitment may be renewed for an additional term of one year with the consent of the Noteholder Representative and the related Noteholder following receipt of written notice by the Noteholder Representative from the Issuer no earlier than 180 days prior to the Stated Maturity Date, but no less than 90 days prior thereto, subject to arrangements separately agreed with the Noteholder Representative and each Noteholder. In the event the Noteholder Representative and some but not all of the Noteholders consent to the extension (the "Renewing Noteholders") (i) this Agreement shall be extended only with respect to such Renewing Noteholders, (ii) the Commitment of any Noteholders that elected not to renew their Commitments (the "Non-Renewing Noteholders") shall terminate on the Stated Maturity Date and all amounts owed to such Non-Renewing Noteholders shall be paid in full on the Stated Maturity Date, and (iii) the Aggregate Commitment shall be reduced by the aggregate amount of the Commitments on the Non-Renewing Noteholders.

(b)     Subject to Section 8.03, upon mutual written consent of the Issuer, the Noteholder Representative and Noteholders holding not less than two-thirds (2/3) of Aggregate VFN Outstanding Amount (the "Required Noteholders"), the Aggregate Commitment may be increased (the amount of such increase, the "Aggregate Commitment Increase") on a mutually agreed date either to permit additional Noteholders to accede to this Agreement or to increase the amount of the existing Noteholders' Commitments or a combination of both, and each Commitment shall accordingly be modified as agreed among the Issuer, the Noteholder Representative and the Required Noteholders. In the event that an Aggregate Commitment Increase is approved by the Required Noteholders but less than all of the Noteholders, the Pro Rata Share of such increase with respect to each Noteholder that fails to consent to such Aggregate Commitment Increase may be allocated among the consenting Noteholders and any additional Noteholders as agreed by the Issuer, the Noteholder Representative and such consenting and additional Noteholders.

(c)     The Commitment may be terminated, in whole but not in part by the Issuer by written notice to the Noteholder Representative, in which case the Issuer shall pay the entire VFN Outstanding Amount owing to each Noteholder under its Note no later than the third Business Day next following the giving of such notice (together with any Accrued Interest thereon to and including the date of the payment in full of the Note; and any other amounts owing hereunder).

SECTION 2.04.   Payment of Principal.   (a) The Issuer hereby unconditionally promises to pay to each Noteholder on such Noteholder's Termination Date the VFN Outstanding Amount of its Note (together with any Accrued Interest thereon).

(b)     Notwithstanding any other provisions of the Notes, this Agreement or any other agreement with respect to the Transactions, the obligations of the Issuer under the Notes,

and any other agreement with respect to the Transactions are recourse only to the Issuer. No recourse shall be had against any officer, member, director, employee, security holder or incorporator of the Issuer or its successors or assigns or any advisor, general partner, shareholder, unitholder, trustee or limited partner of the Issuer (or any officer, member, director, employee, security holder or incorporator of any such Person) for the payment of any amounts payable under any Note or any agreement with respect to the Transactions.

SECTION 2.05.    Optional Prepayment. (a)  The Issuer shall have the right, up to two times per month, to prepay all or a portion of the Aggregate VFN Outstanding Amount and any Accrued Interest thereon, subject to prior notice in accordance with paragraph (b) of this Section; provided, however, that any such prepayment shall be made ratably among the Noteholders based on their Pro Rata Shares. Each partial prepayment of the Aggregate VFN Outstanding Amount shall be in an amount not less than $5,000,000. Each Noteholder will record the amount of the prepayment to such Noteholder on the Schedule of Drawdowns and Principal Repayments on the Annex of its Note.

(b)    The Issuer shall notify the Noteholder Representative by telephone (confirmed by email) of any prepayment hereunder, not later than 11:00 a.m., New York City time, not less than four Business Days before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the Aggregate VFN Outstanding Amount or portion thereof to be prepaid and the VFN Outstanding Amount or portion thereof of each Note to be prepaid.

(c)    Upon a prepayment (other than pursuant to Section 2.06(a)), the Available Amount, which amount shall be available for Drawdowns following such prepayment, will be increased by the aggregate amount of the VFN Outstanding Amounts so prepaid.

SECTION 2.06.    Mandatory Prepayment. If on any day the Aggregate VFN Outstanding Amount shall exceed the Aggregate Commitment  (such difference, the "Excess VFN Outstanding Amount"), the Issuer shall within three (3) Business Days prepay (a "Mandatory Prepayment") the VFN Outstanding Amount of each Noteholder in an amount equal to such Noteholder's Pro Rata Share of the Excess VFN Outstanding Amount; provided, however, that in the event the Excess VFN Outstanding Amount represents 5% or more of the Commitment, then the Issuer shall effect such Mandatory Prepayment within two (2) Business Days.

SECTION 2.07.    Fees. All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Noteholders. Fees paid shall not be refundable under any circumstances.

SECTION 2.08.    Interest.    (a) Interest shall accrue daily and shall be compounded on each Monthly Compounding Date during each Interest Period in an amount equal to (i) the VFN Outstanding Amount of each Note *multiplied by* (ii) an annual rate equal to LIBOR plus the Spread *multiplied by* (iii) the actual number of days in the interest period *and divided by* (iv) 360 (such interest, the "Accrued Interest"). In the event of the payment of principal on a Note other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), Accrued Interest shall be calculated as described in the

previous sentence but with respect to the daily weighted average of VFN Outstanding Amounts for each Note during such Interest Period. Accrued Interest shall be increased, on each day on which the Aggregate VFN Outstanding Amount is less than $50,000,000 (the "Minimum Aggregate VFN Outstanding Amount"), by an amount equal to the Minimum Aggregate VFN Outstanding Amount less the Aggregate VFN Outstanding Amount *multiplied by* the Spread *divided by* 360.

(b)    "LIBOR" for each Reset Date shall be the rate for deposits in U.S. Dollars for a period of one month which appears on (i) Telerate 3750, or any successor page, as of 11:00 a.m., London time, on the day that is two London banking days preceding that Reset Date, or (ii) on Bloomberg screen via ticker [US0001M<Index>].  The relevant LIBOR rate shall be reset on each Reset Date.

(c)    With respect to a Drawdown effective on a date that is not a Reset Date, the applicable interest rate will be determined in the manner set forth above using straight line interpolation by reference to two rates, one of which shall be the rate that appears for deposits of a period next shorter than the period from, but excluding, the first day of such calculation period to, and including, the last day of such calculation period and one that appears for deposits of a period next longer than that period.

(d)    The "Spread" on any day shall be determined based on the LTV Ratio as of such day as follows:

| LTV Ratio | Spread |
| --- | --- |
| Less than or equal to 50% | 0.80% |
| Greater than 50% but less than or equal to 67% | 0.90% |
| Greater than 67% | 1.00% |

(e)    Accrued Interest shall be payable on each Interest Payment Date, commencing on the first such date to occur after the date hereof.

(f)    The Issuer agrees to pay to each Noteholder such additional fees, if any, as may be agreed in writing between such Issuer and the Noteholder.

(g)    Notwithstanding the foregoing, if any principal on the Notes, any Accrued Interest thereon, any fee or any other amount payable by the Issuer hereunder is not paid when due, whether on the Stated Maturity Date, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to 2% plus the rate otherwise applicable to the Notes as provided in paragraph (a) of this Section.  Such interest shall accrue daily and shall be compounded monthly on such overdue amount, and shall be payable on demand.

(h)    All interest and fees hereunder shall be computed on the basis of year of 360 days and shall be payable for the actual number of days elapsed.

SECTION 2.09.    Break Funding Payments.  In the event of (a) the payment of any principal on the Notes other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the failure to draw down on the Notes on the

date specified in a Drawdown Notice delivered pursuant hereto, or (c) the transfer of any Note other than on the last day of the Interest Period applicable thereto as a result of a request by the Issuer pursuant to Section 2.13(b), the Issuer shall compensate each relevant Noteholder for the loss, cost and expense attributable to such event. Such loss, cost or expense to a Noteholder shall be deemed to include an amount determined by such Noteholder to be the excess, if any, equal to (i) the amount of interest at LIBOR plus the Spread that would have been applicable to such VFN Outstanding Amount had such event not occurred and which would have accrued on such VFN Outstanding Amount for the period from the date of such event to the last day of the related Interest Period (or, in the case of a failure to draw down, for the period that would have been the Interest Period for such Drawdown Principal Amount), over (ii) the amount of interest which would accrue on such VFN Outstanding Amount at LIBOR with a designated maturity equal to the number of days from such event to the end of the related Interest Period.  A certificate of the Noteholder setting forth any amount or amounts that such Noteholder is entitled to receive pursuant to this Section shall be delivered to the Issuer and shall be conclusive absent manifest error.  The Issuer shall pay such Noteholder the amount shown as due on any such certificate within 10 days after receipt thereof.

SECTION 2.10.    Increased Costs.  (a)  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or the credit extended by, any Noteholder;

(ii)    impose on any Noteholder or the London interbank market any other condition affecting this Agreement or its Note; or

(iii)    subject any Noteholder to any Tax of any kind whatsoever with respect to this Agreement or its Note (excluding net income, franchise tax or Excluded Taxes or Other Taxes) or change the basis of taxation of payments to such Noteholder;

and the result of any of the foregoing shall be to increase the cost to such Noteholder of holding its Note (or of maintaining its obligation to purchase Drawdown Principal Amounts) or to reduce the amount of any sum received or receivable by such Noteholder hereunder (whether of principal, interest or otherwise), then the Issuer will pay to the Noteholder such additional amount or amounts as will compensate such Noteholder for such additional costs incurred or reduction suffered.

(b)    If the Noteholder Representative determines that any Change in Law regarding capital requirements has or would reasonably be expected to have the effect of reducing the rate of return on any Noteholder's capital, if any, as a consequence of this Agreement or the held by such Noteholder to a level below that which such Noteholder could have achieved but for such Change in Law (taking into consideration such Noteholder's policies with respect to capital adequacy), then from time to time the Issuer will pay to such Noteholder such additional amount or amounts as will compensate such Noteholder for any such reduction suffered.

(c)    A certificate of the Noteholder Representative setting forth the amount or amounts necessary to compensate a Noteholder as specified in paragraph (a) or (b) of this Section shall be delivered to the Issuer and, unless contested by the Issuer by written notice to the Noteholder Representative within five (5) days after receipt thereof, shall be conclusive absent manifest error.  The Issuer shall pay to the relevant Noteholder the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Failure or delay on the part of the Noteholder Representative to provide any notice or to demand compensation pursuant to this Section shall not constitute a waiver of the rights of the Noteholder or the Noteholder Representative hereunder to demand such compensation; provided that the Issuer shall not be required to compensate a Noteholder pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that the Noteholder Representative notifies the Issuer of the Change in Law giving rise to such increased costs or reductions and of the Noteholder Representative's intention to claim compensation therefor; provided, further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)    Upon payment by the Issuer of any additional amounts required to be paid pursuant to this Section 2.10, the Issuer shall have the option to terminate the Commitment of such Noteholder by written notice to the Noteholder Representative and prepay the entire VFN Outstanding Amount of such Noteholder (together with any Accrued Interest thereon and all fees and other amounts owing hereunder but excluding any break funding payments under Section 2.09 hereof) no later than the third Business Day next following the giving of such notice, and the Aggregate Commitment shall be reduced by the amount of such Noteholder's Commitment.

(f)    Sections 2.10 and 2.13 of this Agreement shall apply to any hedging arrangements between a Noteholder and a Hedge Counterparty as though such Hedge Counterparty is a Noteholder and the Noteholder Representative, as applicable, and the document evidencing such hedging arrangement is a Note.

SECTION 2.11.    Taxes.  (a) Any and all payments by or on account of any obligation of the Issuer under this Agreement or a Transaction Document to a Noteholder shall be made free and clear of and without deduction or withholding for any Taxes unless required by law; provided that if the Issuer shall be required to deduct or withhold any Indemnified Taxes from such payments, then (i) the Issuer shall make such deductions and withholdings, (ii) the Issuer shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and (iii) the sum payable shall be increased as necessary so that after making all required deductions and withholdings (including deductions and withholdings applicable to additional sums payable under this Section) such Noteholder receives an amount equal to the sum it would have received had no such deductions or withholdings been made.

(b)    The Issuer shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    The Issuer shall indemnify and accordingly reimburse each Noteholder, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or

Other Taxes paid by such Noteholder, as the case may be, on or with respect to any payment by or on account of any obligation of the Issuer under this Agreement or a Transaction Document (including Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable out-of-pocket expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; provided, however, that the Issuer shall not be obligated to make payment to a Noteholder pursuant to this Section 2.11(c) in respect of penalties, interest and other liabilities attributable to any Indemnified Taxes or Other Taxes, if such penalties, interest and other liabilities are attributable to the gross negligence or willful misconduct of such Noteholder (as finally determined by a court of competent jurisdiction). If a Noteholder has actual knowledge of any Indemnified Taxes or Other Taxes that are reimbursable to such Noteholder by the Issuer, such Noteholder, shall, within a reasonable period of time, provide notice to the Issuer of such occurrence; provided, however, that (i) the giving of such notice shall not be a condition to such Noteholder's indemnity or reimbursement for such Indemnified Taxes or Other Taxes and (ii) failure or delay on the part of such Noteholder to provide such notice shall not constitute a waiver of such Noteholder's right to demand indemnity and reimbursement for such Indemnified Taxes or Other Taxes. A certificate as to the amount of such payment or liability delivered to the Issuer by such Noteholder shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of Taxes under this Section 2.11 by the Issuer to a Governmental Authority, the Issuer shall deliver to the relevant Noteholder the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to such Noteholder.

(e)    Any Noteholder that is entitled to an exemption from or reduction in the rate of the imposition, deduction or withholding of any Indemnified Tax or Other Tax under the laws of the jurisdiction in which the Issuer is organized or has an office, or any treaty to which such jurisdiction is a party, with respect to any payments under this Agreement, such Noteholder shall promptly deliver to the Issuer or the relevant Governmental Authority, in the manner and at the time or times prescribed by applicable law, such properly completed and duly executed documentation prescribed by applicable law or reasonably requested by the Issuer (other than if such Noteholder is legally prohibited from delivery or such delivery is commercially disadvantageous, as determined by the Noteholder Representative) as will permit such payments to be made without the imposition, deduction or withholding of such Indemnified Tax or Other Tax or at a reduced rate.

(f)    Upon payment by the Issuer of any Indemnified Taxes, Other Taxes or any other amounts required to be paid pursuant to this Section 2.11 with respect to a Noteholder, the Issuer shall have the option to terminate the Commitment of such Noteholder by written notice to the Noteholder Representative and prepay the entire VFN Outstanding Amount owed to such Noteholder (together with any Accrued Interest thereon and any fees or other amounts owing hereunder but excluding any break funding payments under Section 2.09 hereof) no later than the third Business Day next following the giving of such notice. Upon termination of such Noteholder's Commitment, the Aggregate Commitment shall be reduced by the amount of such Noteholder's Commitment.

SECTION 2.12.  Payments Generally.  (a) The Issuer shall make each payment required to be made by it hereunder (whether of principal, Accrued Interest, fees or amounts payable under Section 2.10 or 2.11, or otherwise) to each Noteholder prior to 3:00 P.M., New York City time, on the date when due, in immediately available funds, without set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of the relevant Noteholder, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in U.S. Dollars and shall be made to the account of each Noteholder set forth on such Noteholder's signature pages hereof (or as otherwise directed by such Noteholder).

If at any time insufficient funds are received by a Noteholder to pay fully all amounts of principal, interest and fees then due hereunder to such Noteholder, such funds shall be applied (i) first, towards payment of fees owed hereunder (ii) second to the payment of interest owed on its Note hereunder, (iii) third, to the payment of the principal on its Note then due hereunder and (iv) fourth towards payment of all other amounts owing hereunder.

SECTION 2.13.  Mitigation Obligations; Replacement of Noteholder.  (a) If a Noteholder requests compensation under Section 2.10, or if the Issuer is required to pay any additional amount to a Noteholder or any Governmental Authority for the account of the Noteholder pursuant to Section 2.11, then such Noteholder shall, at the request of the Issuer, use reasonable efforts (consistent with its internal policies and legal and regulatory restrictions) to designate a different investing office for its Note hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of the Noteholder Representative, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.10 or 2.11, as the case may be, in the future and (ii) would not subject such Noteholder to any unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Noteholder.  The Issuer hereby agrees to pay all reasonable costs and expenses incurred by such Noteholder in connection with any such designation or assignment.

(b)  If a Noteholder requests compensation under Section 2.10, or if the Issuer is required to pay any additional amount to a Noteholder or any Governmental Authority for the account of a Noteholder pursuant to Section 2.11, or if a Noteholder defaults in its obligation to purchase its Drawdown Principal Amount hereunder and such Noteholder fails to cure such default within three (3) Business Days after receipt by the Noteholder Representative and such Noteholder of notice from the Issuer that such funds were not received by the Issuer in accordance with Section 2.02, then, in addition to other rights and remedies the Issuer may have, the Issuer may, upon notice to the Noteholder Representative, require such Noteholder to transfer, without recourse, its Note and all its interests, rights and obligations under this Agreement to a Transferee in accordance with Section 2.16; provided that (i) such Noteholder shall have received payment of an amount equal to the VFN Outstanding Amount, any Accrued Interest and all other amounts then due and payable to it hereunder, from the designated Transferee (to the extent of such outstanding principal and accrued interest) or the Issuer (in the case of all other amounts) and (ii) in the case of any such transfer resulting from a claim for compensation under Section 2.10 or payments required to be made pursuant to Section 2.11,

such transfer will eliminate such compensation or payments.  No Noteholder shall be required to make any such transfer if, prior thereto, as a result of a waiver by such Noteholder or otherwise, the circumstances entitling the Issuer to require such transfer cease to apply.

SECTION 2.14.   Representations of Noteholders; Securities Legend.  (a) Each Noteholder understands, and each Transferee is deemed to understand, that the Notes have not been registered under the Securities Act and may be resold only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, except under circumstances where neither such registration nor such an exemption is required by law, and that the Issuer is not required to register the Notes.

(b)      Each Noteholder represents, and each Transferee is deemed to represent, that (i) it is a Qualified Institutional Buyer and a Qualified Purchaser; (ii) it is acquiring the Note for its own account or the account of one or more beneficial owners, each of which is a Qualified Institutional Buyer and a Qualified Purchaser; and (iii) it is not a dealer described in Rule 144A(a)(1)(ii) that owns and invests on a discretionary basis less than $25,000,000 in securities of issuers that are not affiliated with the dealer.  These representations are deemed to continue and be in force and effect throughout the term of this Agreement (and shall be deemed to be re-confirmed upon any renewal or increase pursuant to Section 2.03 hereof).

The Notes issued hereunder will contain the following legend limiting sales to Qualified Institutional Buyers and Qualified Purchasers:

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR REGULATORY AUTHORITY OF ANY STATE.  THIS NOTE HAS BEEN OFFERED AND SOLD PRIVATELY.   THE OWNER HEREOF ACKNOWLEDGES THAT THIS NOTE IS A "RESTRICTED SECURITY" THAT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT AND AGREES FOR THE BENEFIT OF THE ISSUER AND ITS AFFILIATES THAT THIS NOTE MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED (NOR MAY ANY PERSON RECEIVE ANY DERIVATIVE ECONOMIC OR BENEFICIAL INTEREST IN THIS NOTE PURSUANT TO ANY SWAP, HEDGING OR SIMILAR ARRANGEMENTS, OTHER THAN PURSUANT TO THE NOTEHOLDER'S HEDGING ARRANGEMENTS WITH ANY HEDGE COUNTERPARTIES) EXCEPT TO A PERMITTED TRANSFEREE (A) WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, AND IN ACCORDANCE

WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION AND (B) WHO IS A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 2(A)(51) OF THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED ("QUALIFIED PURCHASER"), AND (C) WHO HAS PREVIOUSLY DELIVERED A CERTIFICATE TO THE ISSUER IN THE FORM OF EXHIBIT C TO THE NOTE PURCHASE AGREEMENT OR SUCH OTHER FORM AS MAY BE ACCEPTABLE TO COUNSEL TO THE ISSUER. IN ADDITION, THE CONSENT OF THE ISSUER SHALL BE REQUIRED TO CERTAIN TRANSFERS SPECIFIED IN THE NOTE PURCHASE AGREEMENT. THE ISSUER SHALL NOT REGISTER OR ACKNOWLEDGE ANY PURPORTED TRANSFER TO A HOLDER THAT WAS NOT A QUALIFIED PURCHASER AT THE TIME OF SUCH PURPORTED TRANSFER AND ANY SUCH TRANSFER TO A HOLDER THAT WAS NOT A QUALIFIED PURCHASER AT THE TIME OF SUCH PURPORTED TRANSFER SHALL BE VOID AB INITIO AND OF NO FORCE AND EFFECT WHATSOEVER.

SECTION 2.15.   Execution, Delivery and Dating.   (a) Each Note shall be executed on behalf of the Issuer by any of its Authorized Officers, and the Issuer shall provide evidence satisfactory to the Noteholder Representative of the authority of such officers to execute such Note on behalf of the Issuer.  The signature of any of these officers on a Note may be manual or facsimile.

(b)    The manual or facsimile signatures on a Note of individuals who were at any time Authorized Officers shall bind the Issuer, notwithstanding that such individuals or any of them have ceased to hold such offices after the delivery of such Note.

(c)    Each Note shall be dated the date of its execution.

SECTION 2.16.   Registration, Registration of Transfer, Transfer Restrictions. (a) The Issuer shall cause to be maintained at all times a register in which the Issuer shall provide for the registration of the Notes and the registration of transfers of the Notes; provided, however, that in the event such register does not accurately reflect the holders of the Notes at any time, such register shall not control the Notes.

(b)    Upon surrender of a Note for registration of a permitted transfer of a Note at the office or agency of the Issuer, the Issuer shall execute and deliver, in the name of the designated Transferee, a new Note of a like tenor and aggregate principal amount.  In the event of a transfer of a portion of a Note, the Issuer shall execute and deliver in the name of the transferor and the designated Transferee, as applicable, new Notes reflecting the Commitments of such transferor and Transferee immediately following the effectiveness of such transfer.

(c)     A replacement Note issued upon any registration of a permitted transfer of a Note shall be the valid obligation of the Issuer, evidencing the same debt, and entitled to the same benefits under this Agreement, as the Note surrendered upon such registration of transfer and references to a "Note" in this Agreement shall be deemed to be references to the replacement Note.

(d)     If presented or surrendered for registration of transfer, a Note shall (if so required by the Issuer) be duly endorsed, or be accompanied by a written instrument of transfer in form reasonably satisfactory to the Issuer duly executed by such Noteholder or his attorney duly authorized in writing with such signature guaranteed by a commercial bank or trust company, or by a member firm of a national securities exchange, and such other documents as the Issuer may reasonably require.

(e)     No service charge shall be made for any registration of transfer of a Note (or portions thereof as contemplated under this Section 2.16), but the Issuer may require payment of a sum sufficient to cover any Tax, Other Taxes or other governmental charge that may be imposed in connection with any registration of transfer of such Note (other than taxes and charges of the type referred to in Sections 2.10 and 2.11).

(f)     A Noteholder or any subsequent transferee shall not transfer its Note (or any portion thereof) (nor, except for the Noteholder and its Affiliates, may any person receive any derivative economic or beneficial interest in the Note pursuant to any swap, hedging or similar arrangements (a "Derivative Transaction")) without the Issuer's consent unless (i) such transfer or Derivative Transaction is made to a transferee or counterparty, as the case may be, who is a Qualified Institutional Buyer and a Qualified Purchaser and in accordance with the registration and qualification requirements (or any applicable exemptions therefrom) under applicable state securities laws, (ii) the proposed transferee or counterparty (A) is a Noteholder, the Noteholder Representative or an Affiliate of any of the foregoing or (B) provides a certificate relating to such transfer or Derivative Transaction, as the case may be, in the form of Exhibit C, or such other form as may be acceptable to counsel to the Issuer (such transferee, a "Transferee," and such counterparty, a "Hedge Counterparty"); (iii) except in the case of a transfer to a Noteholder, the Noteholder Representative or an Affiliate of any of the foregoing, such Noteholder has provided no less than ten (10) days notice of such transfer or Derivative Transaction to the Noteholder Representative and the Issuer; (iv) the Transferee or Hedge Counterparty, as applicable, has entered into a non-disclosure agreement substantially in the form attached as Exhibit G, which will provide, without limitation, that such information will not be used by such Transferee or Hedge Counterparty for purposes other than as contemplated by this Agreement; and (v) the Transferee or Hedge Counterparty is not a Competitor.  The Issuer shall not register or acknowledge any purported transfer or Derivative Transaction to a holder that was not a Qualified Purchaser at the time of such purported transfer or Derivative Transaction and any such transfer or Derivative Transaction to a holder or counterparty, as the case may be, that was not a Qualified Purchaser at the time of such purported transfer or Derivative Transaction, as applicable, shall be void *ab initio* and of no force or effect whatsoever.  Notwithstanding anything herein to the contrary, RFC may, at any time in its sole discretion, elect to assign all of its obligations hereunder to LBSL.  Any such assignment shall become effective immediately upon RFC delivering written notice of such election to LBSL (which shall promptly furnish a copy of such notice to the Noteholder Representative and the

Issuer), without any consent or other action by any party.  Upon the delivery of such notice, (i) LBSL shall be deemed to have assumed all of RFC's obligations hereunder (including, without limitation, RFC's Commitment) and (ii) RFC shall be automatically released from all further obligations hereunder.

(g)    In the event that a Noteholder shall sell or otherwise transfer (excluding for the avoidance of doubt any Derivative Transaction) its Note to any Person other than the Issuer, the following provisions shall apply:

(i)    From and after the effective date of the transfer, such transferee Noteholder shall be a party to this Agreement and, to the extent of the interest transferred by the transferring Noteholder, have the rights and obligations of the transferring Noteholder under this Agreement and the Security Agreement, and the transferring Noteholder shall, to the extent of the interest so transferred, be released from its obligations under this Agreement (other than its obligations under Section 8.13) and the Security Agreement (and, in the case of an assignment of all of the transferring Noteholder's rights and obligations under this Agreement and the Security Agreement, shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.10, 2.11 and 8.03 with respect to facts and circumstances occurring prior to the effective date of such transfer).  The Issuer shall execute and deliver new or replacement Notes to the transferring Noteholder and the transferee Noteholder.

(ii)    If a Note shall have been transferred to another holder and such holder shall have designated in writing the address to which communications with respect to such Note shall be mailed, all notices, certificates, requests, statements and other documents required or permitted to be delivered to the transferring Noteholder by any provision hereof shall also be delivered to each such holder.

(iii)    The Issuer will provide the Noteholder Representative with sufficient information, sufficiently far in advance of the date a decision is required, to enable the Noteholder Representative to make an informed and considered decision with respect to any proposed amendment, waiver or consent in respect of any of the provisions hereof or of the Notes.  The Issuer will deliver executed or true and correct copies of each amendment, waiver or consent to the Noteholder Representative promptly following the date on which it is executed and delivered by, or receives the consent or approval of, the Noteholder Representative.

(iv)    The Issuer will not directly or indirectly pay or cause to be paid any remuneration, whether by way of supplemental or additional interest, fee or otherwise, or grant any security, to any holder of Notes as consideration for or as inducement to the entering into by any holder of Notes of any waiver or amendment of any of the terms and provisions hereof unless such remuneration is concurrently paid, or security is concurrently granted, on the same terms, ratably to each holder of Notes then outstanding even if such holder did not consent to such waiver of amendment.

SECTION 2.17.    <u>Mutilated, Destroyed, Lost and Stolen Notes</u>.  (a) If a Note is mutilated and is surrendered to the Issuer, the Issuer shall execute and deliver in exchange

therefor a new Note of like tenor and maximum principal amount and bearing a new number. If there shall be delivered to the Issuer (a) evidence to the Issuer's satisfaction of the destruction, loss or theft of such Note (which evidence shall be, in the case of an institutional investor, notice from such institutional investor of such ownership and such loss, theft or destruction) and (b) such security or indemnity as may be required by them to hold the Issuer and any of its agents harmless (provided that if the holder of such Note is, or is a nominee for, a holder of a Note that is an institutional investor with a minimum net worth of at least $250,000,000, such Person's own unsecured agreement of indemnity shall be deemed to be satisfactory), then, in the absence of notice to the Issuer that the Note has been acquired by a protected purchaser, the Issuer shall execute and deliver, in lieu of any such destroyed, lost or stolen Note, a new Note of the same series and of like tenor and principal amount and maximum principal amount and bearing a number not contemporaneously outstanding.

(b)     In case a Note is mutilated, destroyed, lost or stolen, and has become or is about to become due and payable, the Issuer in its discretion may, instead of issuing a new Note, pay such Note.

(c)     Upon the issuance of any new Note under this Section, the Issuer may require the payment of a sum sufficient to cover any Tax, Other Taxes or other governmental charge (other than taxes and charges of the type referred to in Sections 2.10 and 2.11) that may be imposed in relation thereto and any other reasonable expenses connected therewith.

(d)     Every new Note issued pursuant to this Section in lieu of any destroyed, lost or stolen Note shall be the valid obligation of the Issuer, and entitled to the same benefits under this Agreement to which the destroyed, lost or stolen Note was entitled, and references to "Note" shall be deemed to be references to the replacement Note.

(e)     The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of the Note if it is mutilated, destroyed, lost or stolen.

SECTION 2.18.     Persons Deemed Owners.  Prior to due presentment of the Note for registration of transfer, the Issuer and any agent of the Issuer may treat the Person in whose name a Note is registered as the absolute owner of such Note for the purpose of receiving payment on such Note and for all other purposes whatsoever, whether or not such Note be overdue, and neither the Issuer nor any agent of the Issuer shall be affected by notice to the contrary.

SECTION 2.19.     Cancellation.  If a Note is surrendered for payment in whole or for registration of a permitted transfer, such Note shall, if surrendered to any Person other than the Issuer, be delivered to the Issuer and shall be promptly cancelled by the Issuer.  The Issuer may at any time cancel such Note if previously delivered hereunder and acquired by the Issuer in any manner whatsoever.  No Note shall be executed and delivered in lieu of or in exchange for any Note cancelled as provided in this Section, except as expressly permitted by this Agreement. If a Note is cancelled and is held by the Issuer, such Note shall be held or destroyed by the Issuer in accordance with the Issuer's standard retention or disposal policy as in effect at the time.

SECTION 2.20.  <u>Sharing of Payments</u>.  If any Noteholder (the "First Noteholder") shall obtain payment in respect of any principal of or interest on its Note or in respect of fees from the Issuer resulting in the First Noteholder receiving payment of a greater proportion of its VFN Outstanding Amount and accrued interest thereon or of its fees than the proportion received by any other Noteholder, then the First Noteholder shall pay to such other Noteholders (the "Other Noteholders") (for cash at face value) such portion of the payments received by it as are necessary so that the benefit of all such payments shall be shared by the Noteholders ratably in accordance with their respective Pro Rata Shares provided that (i) if all or a part of such proportionately greater payment received by the First Noteholder is recovered from the First Noteholder upon the bankruptcy or reorganization of the Issuer or otherwise, the Other Noteholders agree to return to the First Noteholder all or any portion of the payments received by such Other Noteholders to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any other payment made by the Issuer pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Noteholder as consideration for the assignment of or sale of a participation in its Note to any assignee or participant or pursuant to any Derivative Transaction.  The Issuer consents to the foregoing.

SECTION 2.21.  <u>Calculation Agent</u>.  Lehman Brothers Inc. shall serve initially as the Calculation Agent.  When the Calculation Agent is required to act, it shall do so in good faith and in a commercially reasonable manner.  All determinations, calculations or valuations made by the Calculation Agent shall be at the sole discretion of the Calculation Agent and, in the absence of manifest error, shall be conclusive for all purposes and binding on the Issuer, the Noteholder Representative and each Noteholder.  The Calculation Agent will not be liable for any loss, liability, cost, claim, action, demand or expense (including, without limitation, all costs, charges and expenses paid or incurred in disputing or defending any of the foregoing) arising out of or in relation to or in connection with its appointment or the exercise of its functions, except such as may result from its own willful default or gross negligence or that of its officers or agents.  The Calculation Agent may resign at any time upon written notice to the Issuer and the Noteholder Representative, and the Noteholder Representative may remove the Calculation Agent at any time upon written notice to the Issuer.  Neither resignation nor removal of the Calculation Agent will take effect until a successor Calculation Agent has been appointed.

SECTION 2.22.  <u>Noteholder Representative</u>.  Lehman Brothers Inc. shall serve initially as the Noteholder Representative.  The Noteholder Representative will make all determinations and exercise all voting rights, rights to direct and consent or any other rights as Noteholder Representative in its sole discretion and acting in a commercially reasonable manner.  Absent manifest error, all determinations, decisions and other actions of the Noteholder Representative under this Agreement will be final and binding without any liability on the part of the Noteholder Representative.  The Noteholder Representative will not be liable for any loss, liability, cost, claim, action, demand or expense (including, without limitation, all costs, charges and expenses paid or incurred in disputing or defending any of the foregoing) arising out of or in relation to or in connection with its appointment or the exercise of its functions, except such as may result from its own willful default or gross negligence or that of its officers or agents.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

The Issuer represents and warrants to each Noteholder and the Noteholder Representative that:

SECTION 3.01.    Organization; Powers.    The Issuer and each Collateral Securities Issuer (i) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (ii) has all requisite power and authority, and all material governmental licenses, authorizations, consents and approvals, required to own and hold its properties and to carry on its businesses as now being conducted  (including without limitation to enter into the Transactions) and (iii) is duly qualified and in good standing as a foreign corporation in all jurisdictions in which the character of its properties or the nature of its businesses requires such qualification, except for qualifications the lack of which, individually or in the aggregate, would not result in a Material Adverse Effect.

SECTION 3.02.    Authorization; Enforceability.  The Transactions are within the Issuer's powers and have been duly and validly authorized by all necessary corporate action on its part and require no other proceedings or actions by it.  Each of this Agreement, the Security Agreement, the Note, and the other documents and agreements executed in connection herewith has been duly executed and delivered by the Issuer and, as applicable, each Collateral Securities Issuer, and constitutes a legal, valid and binding obligation of the Issuer and each Collateral Securities Issuer, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03.    Governmental Approvals; No Conflicts.    The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect, (b) will not violate any applicable law or regulation of any Governmental Authority having jurisdiction over the Issuer or any of the Collateral Securities Issuers or the organizational documents of the Issuer or any Collateral Securities Issuer or any other Constituent Documents or any order, writ, injunction or decree of any Governmental Authority applicable to the Issuer or any Collateral Securities Issuer, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Issuer, any Collateral Securities Issuer or their respective assets, or give rise to a right thereunder to require any payment to be made by the Issuer or any Collateral Securities Issuer, and (d) will not result in the creation or imposition of any Lien on any asset of the Issuer or any Collateral Securities Issuer, except for the Liens created pursuant to the Security Agreement.

SECTION 3.04.    Properties.  (a)  The Issuer has good and indefeasible title to, or valid leasehold interests in, the Collateral Securities, free and clear of any Liens.  Each Collateral Securities Issuer has good and indefeasible title to, or valid leasehold interests in, the Sub-Fund interests as set forth in Exhibit E, free and clear of any Liens.

(b)    The Issuer is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business, and the use thereof by the Issuer and the Collateral Securities Issuers, as the case may be, does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; and

(c)    The Issuer has acquired or shall acquire its ownership in the Collateral Securities in good faith without notice of any adverse claim (within the meaning given to such term by Section 8-102(a)(1) of the UCC) other than the Lien of the Security Agreement. The Security Agreement is effective to create a legal, valid and continuing Lien in the Collateral Securities in favor of the Secured Party for the benefit of itself and the Noteholders and such Lien constitutes a first priority perfected and continuing Lien on the Collateral Securities, securing the payment of the Secured Obligations, enforceable against the Issuer and all third parties; all filings and other actions necessary to perfect the Secured Party's security interest in the Collateral Securities have been duly made or taken and are in full force and effect.

SECTION 3.05.    Litigation Matters.    There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Issuer, threatened against or affecting the Issuer or any of the Collateral Securities Issuers or its or their assets (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) which in any manner call in question the validity or enforceability of this Agreement, the Security Agreement, the Note, any other Transaction Document, or the Transactions.

SECTION 3.06.    Compliance with Laws and Agreements.    The Issuer and each Collateral Securities Issuer are in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. No Default has occurred and is continuing.

SECTION 3.07.    Investment Company.    Assuming the accuracy of the representations and warranties of, and the information provided by, the Noteholders herein, the Issuer and each Collateral Securities Issuer is not, and after giving effect to the Drawdowns contemplated hereby, will not be, required to register as an "investment company" within the meaning of the as defined in the Investment Company Act. The General Partner, and the general partner of each Collateral Securities Issuer, is currently exempt from registration under the Investment Advisors Act.

SECTION 3.08.    Taxes.    The Issuer and each Collateral Securities Issuer has timely filed or caused to be filed (giving effect to all extensions) all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes and Other Taxes required to have been paid by it, except Taxes and Other Taxes that are being contested in good faith by appropriate proceedings and for which the Issuer or such Collateral Securities Issuer, as applicable, has set aside on its books adequate reserves.

SECTION 3.09.    ERISA.  The Issuer and each Collateral Securities Issuer is not (1) an "employee benefit plan" (within the meaning of Section 3(3) of ERISA, that is subject to Title I of ERISA) or a "plan" (within the meaning of Section 4975(e)(1) of the Code), (2) an entity the underlying assets of which include plan assets by reason of investment in the entity (within the meaning of U.S. Department of Labor regulation § 2510.3-101) as modified by Section 3(42) of ERISA by such an "employee benefit plan" or "plan" or (3) a "governmental plan" (within the meaning of Section 3(32) of ERISA).  No ERISA Event has occurred or is reasonably expected to occur.

SECTION 3.10.    Disclosure.  On the Effective Date, the Issuer has disclosed to the Noteholder Representative, and on each Drawdown Date the Issuer will have disclosed to the Noteholder Representative, all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished in writing (including email correspondence) by or on behalf of the Issuer to the Noteholder Representative (or any subsequent Transferees) in connection with the negotiation of this Agreement or the Security Agreement or the other documents entered into in connection herewith or therewith or delivered hereunder or thereunder  (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, if any, the Issuer represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time and if delivered prior to the Effective Date, as of such Effective Date.

SECTION 3.11.    Subsidiaries.  The Issuer does not have any Subsidiaries other than Collateral Securities Issuers.  The Collateral Securities Issuers do not have any Subsidiaries.

SECTION 3.12.    Commodities.  The Issuer may be deemed a "pool" as that term is defined in Regulation 4.10(d) under the Commodity Exchange Act.  The "commodity pool operator" for the Issuer is in compliance with all applicable laws and regulations of the Commodity Futures Trading Commission and the National Futures Association and any other regulation that results from either status.

## ARTICLE IV

## CONDITIONS

SECTION 4.01.    Conditions to Effectiveness of Commitment.  The Commitment shall not become effective until the date on which each of the following conditions are satisfied (or waived in accordance with Section 8.03):

(a)    Completion by the Noteholder Representative of due diligence of the Issuer and each Collateral Securities Issuer, the results of which are satisfactory to the Noteholder Representative.

(b)      Each Noteholder and the Noteholder Representative shall have received all necessary internal authorizations and approvals to enter into this Agreement and the other Transaction Documents and the Transactions contemplated therein.

(c)      The Noteholder Representative (or its counsel) shall have received from each party hereto either (i) an executed counterpart of this Agreement and the other Transaction Documents signed on behalf of such party or (ii) written evidence satisfactory to the Noteholder Representative (which may include facsimile transmission of a signed signature page of such Transaction Documents) that such party has signed a counterpart of this Agreement.

(d)      The Noteholder Representative shall have received favorable written opinions (addressed to the Noteholder Representative and dated as of the Effective Date) of Kelly Hart & Hallman LLP, in each case for the Issuer, the General Partner and each Collateral Securities Issuer, and each in form and substance satisfactory to the Noteholder Representative.

(e)      The Noteholder Representative shall have received such documents and certificates relating to the organization, existence and good standing of the Issuer, the General Partner and each Collateral Securities Issuer, the authorization of the Transactions and any other legal matters relating to the Issuer, the General Partner or any Collateral Securities Issuer or the Transactions as the Noteholder Representative or its counsel may reasonably request, all in form and substance satisfactory to the Noteholder Representative and its counsel.

(f)      The Noteholder Representative shall have received a certificate dated as of the Effective Date and signed by an Authorized Officer, confirming satisfaction of the following conditions as of the Effective Date:

(i)      the representations and warranties of the Issuer set forth in this Agreement and the Security Agreement shall be true and correct; and

(ii)      no Default shall have occurred and be continuing.

(g)      Each Noteholder's purchase of Notes shall (i) be permitted by the laws and regulations of each jurisdiction to which it is subject, (ii) not violate any applicable law or regulation (including, without limitation, Regulation U, T or X of the Board) and (iii) not subject such Noteholder to any tax, penalty or liability under or pursuant to any applicable law or regulation; provided that if requested by the Noteholder Representative, the Noteholder Representative shall have received a certificate signed by an Authorized Officer certifying as to such matters of fact as the Noteholder Representative may reasonably specify to enable it to determine whether such purchase is so permitted.

(h)      All filings, documents and other actions necessary to perfect the first-priority security interest created under the Security Agreement shall have been filed, executed or made, as applicable, and all other actions to perfect the security interest shall have been taken including, without limitation, the following: (i) the Noteholder Representative shall have received a Side Letter from each Collateral Securities Issuer and from Domestic CAP Partners LP, which Side Letter, on terms and conditions satisfactory to the Noteholder Representative, shall consent to the Lien of the Secured Party in the Collateral Securities and permit the Noteholder to foreclose on its Lien in the Collateral Securities with respect to such Collateral

Securities Issuer; (ii) the Noteholder Representative shall have received from the Issuer with respect to each Collateral Securities Issuer and Domestic CAP Partners LP signed but undated interest transfers and notices of redemption in form and substance satisfactory to the Noteholder Representative; (iii) the Noteholder Representative shall have received opinions of counsel admitted in New York and Texas satisfactory to the Noteholder Representative with respect to the Transaction Documents in form and substance satisfactory to the Noteholder Representative; (iv) the Issuer shall have filed a financing statement relating to all assets of the Issuer and naming the Issuer as debtor and the Secured Party as secured party; (v) and the Issuer shall have made all other filings, provided all other documents, and taken all other actions requested by the Noteholder Representative to perfect the first-priority security interest created under the Security Agreement.

(i)    The Issuer shall have delivered a certificate with respect to the security matters set forth in clause (h) above in form and substance satisfactory to the Noteholder Representative.

(j)    Each Noteholder shall have received all fees due and payable on or prior to the Effective Date.

(k)    The Noteholder Representative shall have received the original copy of each executed Note.

(l)    No court or governmental or regulatory authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, judgment, decree, injunction or other order (whether temporary, preliminary or permanent) or taken any action that prohibits the consummation of the Transactions.

(m)    The Issuer shall have received all required consents, authorizations or approvals from the governmental agencies, in each case in form and substance reasonably satisfactory to the Noteholder Representative, and no such consent, authorization or approval shall have been revoked.

SECTION 4.02.    Conditions to Drawdown.    The obligation of any Noteholder to allow a Drawdown by the Issuer in respect of a Drawdown Principal Amount on any Drawdown Date is subject to the satisfaction of the following conditions:

(a)    the representations and warranties of the Issuer set forth in this Agreement and the Security Agreement shall be true and correct on and as of such Drawdown Date (except any such representation or warranty that relates to or is made as of a specific earlier date, in which case such representation and warranty shall be true and correct with respect to such specific earlier date);

(b)    the LTV Ratio shall have been met after giving effect to the Drawdown on such Drawdown Date (based on the Adjusted Collateral Securities Value on such Drawdown Date) and the Issuer shall have caused all other documents to be executed and all other actions to be taken as are necessary or advisable to perfect the security interest in any additional Collateral Securities;

(c)     the Aggregate VFN Outstanding Amount shall not exceed the Aggregate Commitment after giving effect to the Drawdown on such Drawdown Date, and the VFN Outstanding Amount with respect to each Noteholder's Note shall not exceed such Noteholder's Commitment after giving effect to the Drawdown on the Drawdown Date;

(d)     at the time of and immediately after giving effect to such Drawdown, no Default shall have occurred and be continuing; and

(e)     there shall be no more than three Drawdowns during any calendar month.

Each Drawdown shall be deemed to constitute a representation and warranty by the Issuer on the date thereof as to the matters specified in paragraphs (a) through (e) of this Section.

## ARTICLE V

## AFFIRMATIVE COVENANTS

Until the Commitments have terminated and the principal of and Accrued Interest on the Notes and all other amounts payable hereunder shall have been paid in full, the Issuer covenants and agrees with the Noteholders and the Noteholder Representative that:

SECTION 5.01.    Reporting Requirements.    From and after the date hereof, the Issuer shall deliver to the Noteholder Representative so long as any Note remains Outstanding (the "Reporting Requirements"):

(a)     Within 45 days of the end of each calendar month, (i) a report in .pdf format substantially in the form attached as Exhibit E-1, accompanied by an Excel version of the portion of the report that details strategy allocations of the Collateral Securities Issuers and their related owned Sub-Funds (the "Monthly Report"); and (ii) an Excel report providing the allocation of Collateral Securities, final net asset values of the Collateral Securities for the prior calendar month, the Liquidity terms for each Sub Fund, and the final monthly returns of each Sub Fund since inception (or since the earliest date as of which final monthly returns have been made available to the Issuer, a Collateral Securities Issuer or one of their Affiliates), substantially in the form attached as Exhibit E-2.

(b)     Within 90 days of the end of the Issuer's fiscal year, a compliance certificate executed by an Authorized Officer and in a form reasonably satisfactory to the Noteholder Representative;

(c)     Within 5 days of the day of receipt thereof, with respect to Domestic CAP Partners LP, any monthly, quarterly and annual information furnished to the holders thereof, to the extent consistent with relevant confidentiality agreements;

(d)     Within 45 days of the last day of each calendar quarter, with respect to Domestic CAP Partners LP, unaudited quarterly financial statements thereof; and

(e)    The Issuer shall prepare such reports omitting data relating to any Sub Fund failing to timely produce reports required for the Issuer to produce the above reports.  Any such omission shall be considered when computing the Aggregate Haircut and shall not be an Event of Default.  The Issuer shall give the Noteholder Representative notice of any such failure.  The Aggregate Haircut shall be recomputed within three (3) Business Days after the date on which the delinquent information has been furnished.

SECTION 5.02.    Notices of Material Events.  The Issuer will furnish to the Noteholder Representative prompt written notice of the following:

(a)    the occurrence of any Default;

(b)    the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Issuer, a Collateral Securities Issuer, or any Affiliate thereof that, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

(c)    any Lien or claim made or asserted against any of the Collateral; and

(d)    any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of an Authorized Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03.    Existence; Conduct of Business.  The Issuer will do or cause to be done, and will cause each Collateral Securities Issuer to do or cause to be done, all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, privileges, franchises, governmental authorizations, and licenses material to the conduct of its business.

SECTION 5.04.    Payment of Obligations.  The Issuer will pay, and will cause each Collateral Securities Issuer to pay, its obligations, including Tax liabilities, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Issuer or a Collateral Securities Issuer, as applicable, has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.05.    Maintenance of Properties; Insurance.  The Issuer will, and will cause each Collateral Securities Issuer to, (a) keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and (b) maintain, with financially sound and reputable insurance companies, insurance and casualty insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

SECTION 5.06.    Books and Records; Inspection Rights.    The Issuer will, and will cause each Collateral Securities Issuer to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.    The Issuer will permit, and will cause each Collateral Securities Issuer to permit, any representatives designated by the Noteholder Representative or its Affiliates, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times (and, so long as no Default or Event of Default has occurred and is continuing, during regular business hours) and as often as reasonably requested (provided that, prior to the occurrence and continuation of an Event of Default, such inspections shall occur no more frequently than once per calendar year), subject to the reasonably adequate assurance of the confidentiality of proprietary non-public information of the Issuer, any Collateral Securities Issuer and any Sub-Fund.

SECTION 5.07.    Compliance with Laws.    The Issuer will, and will cause each Collateral Securities Issuer to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.08.    Use of Proceeds.    The proceeds may be used for any purpose permitted by law.    No part of the proceeds of the Note will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X.

SECTION 5.09.    Compliance with Constituent Documents.    The Issuer will comply, and will cause each Collateral Securities Issuer to comply, in all material respects with all of the terms and conditions of its Constituent Documents.

SECTION 5.10.    LTV Ratio.    Except as otherwise provided in this Section 5.10, the Issuer shall maintain the LTV Ratio at all times at or below 77.5% (the "Maximum LTV Ratio").    If on any Business Day, the LTV Ratio exceeds the Maximum LTV Ratio, the Issuer shall, within five (5) Business Days, either (i) prepay a sufficient portion of the VFN Outstanding Amount such that the LTV Ratio is less than the Maximum LTV Ratio by at least 2.5%; or (ii) provide additional Collateral Securities such that the LTV Ratio is less than the Maximum LTV Ratio by at least 2.5%.

SECTION 5.11.    Notification of Change in Status or Domicile.    To the extent practicable, the Issuer shall provide the Noteholder Representative reasonable advance notice of any change in status or domicile of the Issuer or any Collateral Securities Issuer.

SECTION 5.12.    Reserved.

SECTION 5.13.    Protection of Security Interest.    The Issuer will take such action, and will cause each Collateral Securities Issuer to take such action, as is necessary or advisable or as may be reasonably requested by the Secured Party in order to perfect and to

maintain the perfection and priority of the security interest of the Secured Party in the Collateral Securities granted in the Security Agreement.

SECTION 5.14.    <u>Additional Collateral</u>.  Each time that the Issuer, or the General Partner on behalf of the Issuer, shall grant additional Collateral Securities under this Agreement and the Security Agreement, the Issuer shall provide an Opinion of Counsel satisfactory to the Noteholder Representative in substantially the form of the opinion delivered pursuant to Section 4.01(h) specifying that such grant of additional Collateral Securities results in a valid, perfected, first priority security interest in favor of the Secured Party and general corporate matters concerning the new Collateral Securities Issuers. To the extent such additional Collateral Securities are granted in respect of a Collateral Securities Issuer listed on Exhibit F, the Calculation Agent shall promptly recalculate the LTV Ratio to account for such additional Collateral Securities. To the extent such additional Collateral Securities are granted in respect of a new Collateral Securities Issuer, Exhibit F hereto shall be amended to include any new Collateral Securities Issuers, and the Calculation Agent shall recalculate the Adjusted Collateral Securities Value, within one (1) Business Day of receiving the Reporting Requirements in respect of such new Collateral Securities Issuer, or comparable information in respect of such new Collateral Securities Issuer that the Calculation Agent deems sufficient to make such calculation, to account for such additional Collateral Securities.  Any such new Collateral Securities Issuers shall be in a legal form substantially similar to the Collateral Securities Issuers in existence at the date hereof.

SECTION 5.15.    <u>Reserved</u>.

SECTION 5.16.    <u>Authorized Officer, Etc.</u>  The Noteholders shall at all times be entitled to accept and act upon Drawdown Notices and payment instructions received from an Authorized Officer designated in a certificate of the Issuer to that effect provided from time to time to the Noteholders.

# ARTICLE VI

## NEGATIVE COVENANTS

Until the Commitment has expired or terminated and the principal of and interest on each Note and all fees payable hereunder have been paid in full, the Issuer covenants and agrees with the Noteholders and the Noteholder Representative as follows:

SECTION 6.01.    <u>Indebtedness</u>.    The Issuer will not, and will cause each Collateral Securities Issuer to not, incur, assume or permit to exist any Indebtedness, other than the Note.

SECTION 6.02.    <u>Liens</u>.    The Issuer will not, and will cause each Collateral Securities Issuer to not, sell, assign, participate, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate, grant any Lien or otherwise encumber or (or permit such to occur or suffer to exist), any part of the Collateral Securities or any interests it owns in any Sub-Fund, as applicable, except for Permitted Encumbrances or as provided in this Agreement, the Security Agreement or the Side Letters.

SECTION 6.03.    Fundamental Changes.  (a) The Issuer will not, and will cause each Collateral Securities Issuer to not, without the written consent of the Noteholder Representative, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or any substantial part of its assets (whether now owned or hereafter acquired), or liquidate or dissolve in whole or in part.

(b)    The Issuer will not, and will cause each Collateral Securities Issuer to not, without the written consent of the Noteholder Representative, enter into any amendment or modification of any of its Constituent Documents, including without limitation the investment policies or guidelines of the Issuer, or any of its management agreements that could reasonably be expected to have an adverse effect on the Issuer, a Collateral Securities Issuer or a Noteholder, as applicable.

(c)    The Issuer will not, and will cause each Collateral Securities Issuer to not, without the prior written consent of the Noteholder Representative, change its general partner or admit any limited partner that did not have a pre-existing relationship with the Lee M. Bass or Ardon E. Moore.  For purposes of this Section 6.03(c), Persons deemed to have a pre-existing relationship with Lee M. Bass or Ardon E. Moore shall be limited to (i) Persons that have a material business or employment relationship with Lee M. Bass or Ardon E. Moore and (ii) Affiliates of such Persons.

(d)    The Issuer will not, and will cause each Collateral Securities Issuer to not, incur, assume or guarantee any Indebtedness or create any Liens except as contemplated under the Transaction Documents and the transactions contemplated thereby.

(e)    Except as permitted under Section 3.11, the Issuer will not, and will cause each Collateral Securities Issuer to not, have any Subsidiaries during the term of this Agreement; provided, however, that this Section 6.03(e) shall not prohibit the Issuer from purchasing interests in Additional Issuer Investments in accordance with Section 6.03(f).

(f)    The Issuer will not engage in any business or activity other than (i) borrowing pursuant to the Transaction Documents, (ii) entering into the Transaction Documents or any documentation required pursuant to the Security Agreement in connection with the pledge of Collateral Securities, (iii) entering into any Transactions contemplated by the Transaction Documents, (iv) issuing and redeeming interests, and (v) acquiring, owning, holding and pledging and disposing of investments in the Collateral Securities Issuers and entities substantially in the form of the Collateral Securities Issuers ("Additional Issuer Investments"). All representations and warranties of the Issuer hereunder with respect to the Collateral Securities Issuers shall be deemed to be repeated with respect to the Additional Issuer Investments and all covenants of the Issuer hereunder with respect to the Collateral Securities Issuers shall be deemed to have been made with respect to the Additional Issuer Investments.

(g)    The Issuer will prevent each Collateral Securities Issuer from engaging in any business or activity other than (i) issuing and redeeming interests and (ii) acquiring, holding, and disposing of investments in a Sub-Fund (or in the case of AEM HF Holdings, L.P., any number of Sub-Funds) or an entity or entities substantially in the form of the Sub-Funds.  The

Issuer shall cause each Collateral Securities Issuer, except for AEM HF Holdings L.P., to acquire, hold and dispose of investments only in a single Sub-Fund and shall prevent any two or more Collateral Securities Issuers from investing in the same Sub-Fund at any time.

SECTION 6.04.    Transactions with Affiliates.    Except for distributions to its equity owners in accordance with the terms of this Agreement and the applicable Constituent Documents, the Issuer will not, and will cause each Collateral Securities Issuer to not, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except in the ordinary course of business at prices and on terms and conditions not less favorable to the Issuer or the Collateral Securities Issuer, as applicable, than could be obtained on an arm's-length basis from unrelated third parties.

SECTION 6.05.    Security Interest.    The Issuer will not, and will cause each Collateral Securities Issuer to not, from and after the date hereof:  (A) permit the validity or effectiveness of the Security Agreement or the grant thereunder to be impaired, or permit the Lien created thereunder to be amended, hypothecated, subordinated, terminated or discharged, except as may be expressly permitted hereby or thereby, (B) permit any Lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the Lien under the Security Agreement) to be created on or extend to or otherwise arise upon or burden the Collateral Securities or any part thereof, any interest therein or the proceeds thereof; or (C) or take any action that would permit the Lien created under the Security Agreement not to constitute a valid first priority security interest in the Collateral Securities.

SECTION 6.06.    VFN Outstanding Amount Limit.    No VFN Outstanding Amount of any Noteholder shall exceed such Noteholder's Commitment.  The Aggregate VFN Outstanding Amount shall not exceed the Aggregate Commitment.

SECTION 6.07.    Use of Proceeds.    No part of the proceeds of the Note will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X.

SECTION 6.08.    ERISA.    The Issuer shall not, and will cause each Collateral Securities Issuer to not, become (1) an "employee benefit plan" (within the meaning of Section 3(3) of ERISA, or a "plan" (within the meaning of Section 4975(e)(1) of the Code), (2) an entity the underlying assets of which include plan assets by reason of investment in the entity (within the meaning of U.S. Department of Labor regulation § 2510.3-101) by such an "employee benefit plan" or "plan" or (3) a "governmental plan" (within the meaning of Section 3(32) of ERISA).

## ARTICLE VII

## EVENTS OF DEFAULT

SECTION 7.01.    Events of Default.    If any of the following events ("Events of Default") shall occur:

(a)      the Issuer shall fail to pay any principal of the Note or any Accrued Interest thereon when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for Mandatory Prepayment thereof or otherwise and, in the case of Accrued Interest, such failure to pay Accrued Interest shall continue unremedied for a period of three (3) days;

(b)      the Issuer shall fail to pay any fees or other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) days;

(c)      the Lien created pursuant to the Security Agreement shall at any time fail or cease for any reason (excluding the affirmative release or subordination of any security interest by the Secured Party) to constitute a valid and perfected first priority Lien on any portion of the Collateral Securities purported to be subject thereto, securing the obligations purported to be secured thereby, or the Issuer shall so assert in writing;

(d)      as of any Business Day, the Aggregate VFN Outstanding Amount exceeds the Aggregate Commitment, and the Issuer fails to effect a Mandatory Prepayment within seven (7) Business Days;

(e)      Lee M. Bass and Ardon E. Moore cease to be actively involved or are otherwise unavailable in the day to day activities of the Issuer, the General Partner or any Collateral Securities Issuer;

(f)      the Issuer fails to comply with any of the Reporting Requirements set forth in Section 5.01 herein and such failure is not remedied within three (3) Business Days following receipt by the Issuer of written notice thereof; provided, however, that, notwithstanding the foregoing, if the delay in providing such information is due solely to error or omission of an administrative or operational nature it shall not be considered an Event of Default if such failure to report is remedied within five (5) Business Days;

(g)      any representation or warranty made or deemed made by or on behalf of the Issuer in or in connection with this Agreement or the Security Agreement or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or the Security Agreement or any amendment or modification hereof or thereunder or waiver hereunder or thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(h)      the Issuer or a Collateral Securities Issuer shall fail to observe or perform any covenant, condition or agreement contained in this Agreement, the Security Agreement or any of the other Transaction Documents, and such failure shall continue unremedied for a period of seven (7) days after the earlier of (i) the date the Issuer, the General Partner or the Collateral Securities Issuer obtained actual knowledge, or (ii) written notice to the Issuer or the Collateral Securities Issuer, as applicable, from a Noteholder, the Noteholder Representative, or the Secured Party;

(i)    on any Business Day, the LTV Ratio exceeds the Maximum LTV Ratio and (i) within two (2) Business Days, no action to reduce the LTV Ratio to a level at least 2.5% below the Maximum LTV Ratio is communicated by the Issuer to the Noteholder Representative or (ii) within seven (7) Business Days, the LTV Ratio is not reduced to a level at least 2.5% below the Maximum LTV Ratio;

(j)    a Material Adverse Effect shall have occurred and (i) within two (2) business Days, no action to cure such Material Adverse Effect shall have been communicated by the Issuer to the Noteholder Representative or (ii) within seven (7) Business Days, such Material Adverse Effect shall not have been irrevocably cured to the satisfaction of the Noteholder Representative;

(k)    with respect to the Issuer or a Collateral Securities Issuer, the conversion of a share or interest of such entity into another class of shares or series of interests or securities or the split of securities of such entity, or the consolidation or merger of such entity (for which it is not the surviving entity, or if it is the surviving entity, such consolidation or merger, in the opinion of the Calculation Agent, could reasonably be expected to have an adverse effect on such entity or the terms under which an interest holder can effect a withdrawal or otherwise dispose of the Collateral Securities, as applicable) with, or its sale or its conveyance of all or substantially all of its assets to, a third party;

(l)    the Issuer or a Collateral Securities Issuer shall have permitted or voted for the Issuer or a Collateral Securities Issuer (i) to retire any of its Equity Interests or other instruments or securities evidencing ownership or reduce its capital, and in the opinion of the Calculation Agent such event could reasonably be expected to have an adverse effect on the Issuer, a Collateral Securities Issuer or a Noteholder, as applicable, or (ii) to sell or encumber all or substantially all of its assets;

(m)    the Issuer, the General Partner or a Collateral Securities Issuer (i) is dissolved or has a resolution passed for its dissolution, winding up, or official liquidation; (ii) makes a general assignment or arrangement with or for the benefit of its creditors; (iii)(A) institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organization or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official, or (B) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition is instituted or presented by a person or entity not described in clause (A) above and either (x) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (y) is not dismissed, discharged, stayed or restrained in each case within 15 days of the institution or presentation thereof; (iv) seeks or becomes subject to the appointment of an administrator, provisions liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all it assets; (v) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment,

sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged or restrained, in each case within 15 days thereafter; or (vi) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (i) through (v) above;

(n)    on or after the date hereof (i) due to any change in any applicable law or regulation (including, without limitation, any tax law), or (ii) due to any change in the interpretation by any court, tribunal or regulatory authority of any applicable law or regulation, the Calculation Agent determines that (a) it has become illegal for a Noteholder and/or its Affiliates to hold, acquire or dispose of the Notes or the Collateral Securities or (b) a Noteholder and/or its Affiliates will incur a materially increased cost in performing its obligations in relation to the Transactions;

(o)    the modification of the Issuer, the General Partner or a Collateral Securities Issuer (including modification of its organizational or constitutive documents) or any event or any change affecting such entity (such as, but not limited to, interruption, breakdown, disappearance, suspension or deferral of the calculation or the publication of the net asset value of such entity) and that, in the opinion of the Calculation Agent, could reasonably be expected to have an adverse effect on a Noteholder or other holder of interests in such entity;

(p)    any governmental, legal or regulatory entity with authority over the Issuer, the General Partner or a Collateral Securities Issuer cancels, suspends or revokes any material registration, approval, license or regulatory authorization of any such entity arising from an allegation of impropriety, illegality, negligence, fraud, contractual or fiduciary breach or other wrongdoing of such entity;

(q)    any claim, demand, charge, complaint or the commencement of any inquiry, investigation or proceeding with respect to Issuer, the General Partner, a Collateral Securities Issuer or any of their Affiliates, employees, officers or agents by any regulatory, legal or governmental authority is made or threatened to be made which if successful, in the opinion of the Calculation Agent could reasonably be expected to adversely affect the ability of the Issuer or a Collateral Securities Issuer to perform its obligations under this Agreement;

(r)    the commencement of any legal proceeding alleging a material breach of a fiduciary duty on the part of the Issuer, the General Partner, a Collateral Securities Issuer or any of their Affiliates, employees, officers or agents which if successful, in the opinion of the Calculation Agent, could reasonably be expected to adversely affect the ability of the Issuer or a Collateral Securities Issuer to perform its obligations under this Agreement;

(s)    the Issuer, a Collateral Securities Issuer, the General Partner, any administrator, manager, or general partner of the Issuer or Collateral Securities Issuer, or any Affiliate, employee, officer or agent of such entity breaches any applicable law or regulation material to the day to day operations of the Issuer or a Collateral Securities Issuer, or any regulatory (including, without limitation, any self-regulatory organization) or governmental authority or other person brings an administrative or judicial proceeding or commences an

inquiry against any such person alleging any misconduct or wrongdoing material to the day to day operations of the Issuer or a Collateral Securities Issuer;

(t)        any default, event of default or other similar event or condition in respect of a Collateral Securities Issuer or the Issuer under one or more agreements or instruments relating to any obligations in respect of borrowed money which has resulted in such obligations becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable;

(u)        one or more judgments is rendered against the Issuer or a Collateral Securities Issuer (i) for the payment of money in an aggregate amount in excess of $50,000,000 or (ii) that, in the determination of the Calculation Agent, could have a Material Adverse Effect on the Issuer or a Collateral Securities Issuer.

(v)        except as otherwise set forth herein, the Issuer or a Collateral Securities Issuer breaches or otherwise fails to comply with any material obligation under the Transaction Documents or another agreement between the Issuer and a Noteholder, the Noteholder Representative or the Secured Party and such breach is not cured within three (3) Business Days.

THEN, and in every such event, and at any time thereafter during the continuance of such event, the Noteholder Representative may, by notice to the Issuer, take either or both of the following actions, at the same or different times:   (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (ii) declare the Notes to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the Aggregate VFN Outstanding Amount, together with all Accrued Interest and all other obligations of the Issuer accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Issuer.   Upon the occurrence and the continuance of an Event of Default, the Noteholder Representative may instruct the Secured Party to exercise any rights and remedies provided to the Secured Party under the Security Agreement, including all remedies provided under the UCC.   For the avoidance of doubt, a general market event that does not have one of the effects described in the definition of Material Adverse Effect specifically with respect to an Issuer or a Collateral Securities Issuer shall not constitute a Material Adverse Effect hereunder.

## ARTICLE VIII

## MISCELLANEOUS

SECTION 8.01.   <u>Limitation of Liability</u>.   In no event shall a Noteholder or the Noteholder Representative have recourse, whether by setoff or otherwise, with respect to any amounts owed or liabilities incurred, to or against any assets of the General Partner, except in the case of gross negligence or willful misconduct by the General Partner.

SECTION 8.02.   <u>Notices</u>.   (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be

delivered by hand or overnight courier service, mailed by certified or registered mail or sent by email or facsimile, as follows:

(i)      if to the Issuer, to it at 201 Main Street Suite 2600, Fort Worth, Texas 76102, Attn: Thomas W. White;

(ii)      if to a Noteholder, at the address of such Noteholder set forth on the signature pages hereof;

(iii)      if to a Transferee, to it at its address (or facsimile number) set forth in the applicable transfer certificate or as otherwise provided by the Transferee;

(iv)      if to the Noteholder Representative, at the address of the Noteholder Representative set forth on the signature pages hereof;

(v)      if to the Secured Party, to it at its address (or facsimile number) set forth in the Security Agreement or as otherwise provided by the Secured Party.

(b)      Notices and other communications to a Noteholder or the Noteholder Representative hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by such Noteholder or the Noteholder Representative.  The Issuer may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; _provided_ that approval of such procedures may be limited to particular notices or communications.

(c)      Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

SECTION 8.03.    Waivers; Amendments.    (a) No failure or delay by a Noteholder or the Noteholder Representative in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Noteholders and the Noteholder Representative hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by the Issuer therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, payment by any Noteholder in accordance with a Drawdown shall not be construed as a waiver of any Default, regardless of whether such Noteholder or the Noteholder Representative may have had notice or knowledge of such Default at the time.

(b)      Neither this Agreement nor any provision hereof may be waived, amended, supplemented or modified except pursuant to an agreement or agreements in writing entered into by the Issuer, the Noteholder Representative and the Required Noteholders;

provided, however, that no such waiver, amendment, supplement or modification shall: (i) increase any Noteholder's Commitment or extend the Stated Maturity Date of any Note, or decrease any rate of interest or fee payable to a Noteholder hereunder, in each case without the consent of each Noteholder affected thereby, or (ii) waive, amend, supplement or modify any provision of this Section 8.03.

(c)     The Issuer, the Noteholders and the Noteholder Representative agree that, except with respect to the arrangements with respect to any renewals pursuant to Section 2.03(a), this Agreement and the other Transaction Documents entered into by the Noteholders or the Noteholder Representative in connection herewith, as amended as permitted hereby, shall constitute the entire understanding between such Persons and no other side letters or other arrangements of any nature shall be entered into by such Persons.

SECTION 8.04.    Expenses; Indemnity; Damage Waiver.  (a) The Issuer shall pay  (i) all  out-of-pocket expenses incurred by each Noteholder and the Noteholder Representative, including the reasonable fees, charges and disbursements of counsel, in connection with the administration of this Agreement and the preparation of any amendments, modifications or waivers of the provisions hereof (whether or not the transactions contemplated thereby shall be consummated), (ii) all out-of-pocket expenses incurred by each Noteholder and the Noteholder Representative, including the fees, charges and disbursements of any counsel for such Noteholder and the Noteholder Representative, in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this Section, or in connection with the Notes made or issued and principal amount purchased hereunder, and (iii) all fees and expenses of the Secured Party, including fees and expenses arising out of actions taken by the Secured Party or its agents in connection with a Default or Event of Default hereunder.

(b)     The Issuer shall indemnify each Noteholder, the Noteholder Representative and each Related Party of the Noteholder and the Noteholder Representative (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, joint or several, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) the Notes or the use or purported use of the proceeds therefrom, or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto, and to reimburse such Indemnitees for any legal or other expenses as they are incurred in connection with investigating, responding to or defending any of the foregoing; provided that such indemnity shall not be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(c)     To the extent permitted by applicable law, the Issuer shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages arising out of, in connection with, or as a result of, this

Agreement or any other Transaction Document or any agreement or instrument contemplated herein or therein, the Transactions, any Note or the use of the proceeds thereof.

(d)      All amounts due under this Section shall be payable promptly after written demand therefor and, in the case of any expenses referred to in paragraph (a) upon presentation of invoices or statements specifying the expense.

SECTION 8.05.    <u>Successors and Assigns</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective participants, successors and assigns or transferees permitted hereby (including any Hedge Counterparty), except that (i) the Issuer may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Noteholder Representative (and any attempted assignment or transfer by the Issuer without such consent shall be null and void) and (ii) the Noteholder and the Noteholder Representative may not assign or otherwise transfer their rights or obligations hereunder except in accordance with Section 2.16.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, and, to the extent expressly contemplated hereby, the Related Parties of the Noteholders, any Hedge Counterparty, and the Noteholder Representative) any legal or equitable right, remedy or claim under or by reason of this Agreement.

SECTION 8.06.    <u>Survival</u>.    All covenants, agreements, representations and warranties made by the Issuer herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the purchase of any Drawdown Principal Amounts or the repayment thereof, regardless of any investigation made by any such other party or on its behalf and notwithstanding that a Noteholder or the Noteholder Representative may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on a Note or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Sections 2.10, 2.11, 8.04 and 8.13 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, payment of all principal on the Notes, the termination of the Commitments or the termination of this Agreement or any provision hereof.

SECTION 8.07.    <u>Counterparts; Integration; Effectiveness</u>.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 8.08.    <u>Severability</u>.    Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to

the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 8.09.   Right of Setoff.   If an Event of Default shall have occurred and be continuing, each Noteholder and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Noteholder or Affiliates to or for the credit or the account of the Issuer against any of and all the obligations of the Issuer now or hereafter existing under this Agreement held by such Noteholder, irrespective of whether or not such Noteholder shall have made any demand under this Agreement and although such obligations may be unmatured.  The rights of the Noteholders under this Section are in addition to other rights and remedies (including other rights of setoff) which the Noteholders may have.

SECTION 8.10.   Governing Law; Jurisdiction; Consent to Service of Process. (a)  This Agreement shall be construed in accordance with and governed by the law of the State of New York (including Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York).

(b)     Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Noteholder may otherwise have to bring any action or proceeding relating to this Agreement against the Issuer or its properties in the courts of any jurisdiction.

(c)     Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     The Issuer irrevocably appoints and designates Kelly Hart & Hallman LLP, a Texas limited liability partnership, as the duly authorized agent for acceptance of service of process against the Issuer.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 8.11.  <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 8.12.  <u>Headings</u>.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 8.13.  <u>Confidentiality</u>.  The Noteholders and the Noteholder Representative agree that for a period of three years from the date of maturity of the Notes that they will not disclose without the prior consent of the Issuer any Information which constitutes or contains confidential business, financial or other information which has been clearly identified by the Issuer at the time of delivery as confidential (the "Information") with respect to the Issuer, the General Partner or any Collateral Securities Issuer or Sub-Fund which is furnished from, or on behalf of, the Issuer relating to the Issuer pursuant to this Agreement or any other Transaction Document or any documents contemplated by or referred to herein or therein, except that the Noteholder Representative may disclose any such Information (a) to any Noteholder that has been approved in writing by the Issuer to receive such Information, (b) to its employees, affiliates, auditors or counsel (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential), (c) as has become generally available to the public other than by a breach of this Section 8.13, (d) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or federal regulatory body having or claiming to have jurisdiction over the Noteholder Representative or to the U.S. Securities and Exchange Commission or the National Association of Insurance Commissioners or the NASD or similar organizations (whether in the United States or elsewhere) or their successors, (e) as may be required or appropriate in response to any summons or subpoena or any law, order, regulation or ruling applicable to the Noteholder Representative, (f) to any prospective transferee (or its advisors) or Hedge Counterparty or any other actual or prospective counterparty (or its advisors) to any Derivative Transaction relating to the Issuer and its obligations in connection with any contemplated transfer pursuant to Section 2.16, <u>provided</u> that such prospective transferee, Hedge Counterparty or other actual or prospective counterparty (or its advisors) shall have been made aware of this Section 8.13 and shall have agreed to be bound by its provisions, (g) in connection with any suit, action or proceeding for the purpose of defending itself, reducing its liability, or protecting or exercising any of its claims, rights, remedies or interests under or in connection with this Agreement or (g) any nationally recognized rating agency that requires access to information about a Noteholder's investment portfolio in connection with ratings issued with respect to such Noteholder.

SECTION 8.14.    USA PATRIOT Act.  To the extent that a Noteholder is subject to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), such Noteholder hereby notifies the Issuer that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Issuer, which information includes the name and address of the Issuer and other information that will allow such Noteholder to identify the Issuer in accordance with the Patriot Act.

SECTION 8.15.    Special Provisions Related to RFC.

(a)    Each party hereto (including without limitation any party to which all or any portion of this Agreement is assigned) hereby covenants and agrees that on behalf of itself and each of its Affiliates, that prior to the date which is one year and one day after the payment in full of all indebtedness for borrowed money of RFC, such party  will not institute against, or join any other Person in instituting against, RFC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings or other similar proceeding under the laws of the United States, any state of the United States or any other jurisdiction; provided, that nothing herein shall prohibit such Person from filing proofs of claim or participating in any such proceedings instituted by any other Person.  The provisions of this paragraph shall survive termination of the Transactions and of this Agreement.

(b)    Notwithstanding anything to the contrary contained herein, each of the parties hereto hereby acknowledges and agrees that all transactions with RFC hereunder shall be without recourse of any kind to RFC except as provided in this paragraph.  RFC shall have no obligation to pay any amounts owing under the Transaction Documents.  In addition, each party hereto agrees that RFC shall have no obligation to pay any party hereto any amounts constituting fees, reimbursement for expenses, damages or indemnities (collectively, "Expense Claims"), and such Expense Claims shall not constitute a claim against RFC (as defined in Section 101 of Title 11 of the United States Code), unless RFC has received amounts pursuant to the Notes sufficient to pay such Expense Claims and such amounts are not required to pay the indebtedness for borrowed money of RFC.  No recourse shall be had for the payment of any amount owing hereunder or for the payment of any fee hereunder or any other obligation of, or claims against RFC arising out of or based upon the Transaction Documents, against any member, equity holder, employee, officer, director, or Affiliate thereof.  The provisions of this paragraph will survive the termination of the Transaction and of this Agreement.  For the avoidance of doubt, if RFC issues commercial paper for the specific purpose of funding a Drawdown pursuant to this Agreement and receives proceeds from such issuance in an amount sufficient to fund such Drawdown in full, RFC will remit the amount of such proceeds to Lehman Brothers Special Financing Inc. as RFC's paying agent promptly following RFC's receipt of the same.

(c)    RFC and LBSL shall enter into a paying agent agreement substantially in the form of Exhibit H hereto.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

LVFN PARTNERS, L.P.,
By: LVFN Genpar, L.L.C., its General Partner

By: _____
      Name:  Ardon E. Moore
      Title:  President

Address for Notices
201 Main Street, Suite 2600
Forth Worth, Texas 76102
Attention: Thomas W. White
Facsimile: 817-390-8739
E-mail: TWhite@bass-net.com

Amount of Commitment: $0_____

LEHMAN BROTHERS SPECIAL LENDING
LLC, as Noteholder

By: _____
Name: Russell Schreiber
Title: Managing Director

Address for Notices
Lehman Brothers Special Lending LLC
  c/o Lehman Brothers Inc.
745 Seventh Avenue
New York, NY 10019-6801
Attn: Fund Derivatives U.S. Trading
E-mail:fundderivativesustrading@lehman.com
Facsimile: 646-834-1108

Amount of Commitment: $500,000,000          RELATIONSHIP    FUNDING    COMPANY,
LLC, as Noteholder

By: _____
    Name:    Thomas J. Irvin
    Title:        Manager

Address for Notices
227 West Monroe, Suite 4900
Chicago, Illinois 60606
Attn: Operations Department
E-mail: chioperations@libhamp.com
Facsimile: 312-977-1967/1699

with a copy to:
Lehman Brothers Special Lending LLC
c/o Lehman Brothers Inc.
745 Seventh Avenue
New York, NY 10019-6801
Attn: Fund Derivatives U.S. Trading
E-mail:fundderivativesustrading@lehman.com
Facsimile: 646-834-1108

LEHMAN BROTHERS INC., as Noteholder
Representative

By: _____
    Name:
    Title:

Address for Notices
Lehman Brothers Inc.
745 Seventh Avenue
New York, NY 10019-6801
Attn: Fund Derivatives U.S. Trading
E-mail:fundderivativesustrading@lehman.com
Facsimile: 646-834-1108

LEHMAN BROTHERS INC., as Calculation Agent

By: _____
   Name:
   Title:

Address for Notices
Lehman Brothers Inc.
745 Seventh Avenue
New York, NY 10019-6801
Attn: Fund Derivatives U.S. Trading
E-mail:fundderivativesustrading@lehman.com
Facsimile: 646-834-1108

**Bank Accounts for Payments**

**<u>Relationship Funding Company, LLC</u>:**

Crediting Account #: 00-448-104
Name of Crediting Account: Relationship Funding Company, LLC
Bank of Crediting Account: Deutsche Bank Trust Company Americas
City and State of Bank: New York, New York
Crediting Bank ABA #: 021 001 033
Reference Information: Lehman Brothers Special Financing Inc. – HF Assets

**<u>Lehman Brothers Special Lending LLC</u>:**

CITIBANK
CITIUS33XXX
ABA:  021000089
BENEFICIARY DETAILS (FBO):
  Account:30716122
SWIFT:  fbo SLHIUS3HXXX
  LEHMAN BROTHERS HOLDINGS INC
  for further account of Lehman Brothers Special Lending LLC

SCHEDULE 1.01

## DEFINED TERMS

As used in the Agreement, the following terms have the meanings specified below:

"Accrued Interest" has the meaning specified in Section 2.08(a).

"Additional Issuer Investments" has the meaning specified in Section 6.03(f).

"Adjusted Collateral Securities Value" means, as of any date of determination, an amount equal to the product of (i) the Net Asset Value of the Collateral Securities after giving effect to the Aggregate Haircut and (ii) the Volatility Factor.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Aggregate Commitment" means the sum of the Commitments of all the Noteholders hereunder.  As provided in Section 2.01(b), the initial Aggregate Commitment shall be $500,000,000.

"Aggregate Commitment Increase" has the meaning specified in Section 2.03.

"Aggregate Drawdown Principal Amount" means the aggregate principal amount drawn down or to be drawn down pursuant to Section 2.02 hereof.

"Aggregate Haircut" has the meaning set forth in Exhibit D.

"Aggregate VFN Outstanding Amount" means the sum of the VFN Outstanding Amounts of the Noteholders hereunder.

"Agreement" means this First Amended and Restated Note Purchase Agreement, as amended, supplemented or otherwise modified from time to time.

"Authorized Officer" means any officer or director of the General Partner who is authorized to act for the Issuer and who is identified on the list of Authorized Officers on Schedule 3.01 (as such list may be modified or supplemented by the Issuer from time to time thereafter and delivered to the Noteholder Representative).

"Availability Period" means the period from and including the Effective Date to but excluding the Termination Date.

"Available Amount" means, at any time, the excess at such time of (x) the Aggregate Commitment minus (y) the Aggregate VFN Outstanding Amount.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Business Day" means any day on which commercial banks and foreign exchange markets settle payments and are open for general business in New York City.

"Calculation Agent" shall have the meaning set forth in Section 2.21.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by a Noteholder (or, for purposes of Section 2.09(b) or 2.12(a), as applicable, by any investing office of such Noteholder or by such Noteholder's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral Securities" means the interests of the Collateral Securities Issuers owned by the Issuer that have been pledged in accordance with the terms hereof and of the Security Agreement to secure the obligations of the Issuer to the Noteholders hereunder.

"Collateral Securities Issuer" means each limited partnership, interests of which are owned by the Issuer and have been pledged in accordance with the terms hereof and of the Security Agreement to secure the obligations of the Issuer to the Noteholders hereunder. The Collateral Securities Issuers shall initially be those entities listed as such on Exhibit F and shall be amended from time to time in accordance with Section 5.14, pursuant to the Transaction Documents, or as agreed by the Issuer and the Noteholder Representative.

"Collateral Securities Issuer Value" means as of any date of determination with respect of any Collateral Securities Issuer, the Net Asset Value of the related Collateral Securities, determined by reference to the Net Asset Value of the corresponding Sub-Fund, as determined by the Calculation Agent.

"Commitment," with respect to each Noteholder, means the commitment of such Noteholder to fund the principal amount of its Note issued hereunder expressed as an amount representing the maximum VFN Outstanding Amount hereunder of such Noteholder, as such commitment may be increased from time to time pursuant to Section 2.03.   The initial Commitment of each Noteholder shall be the amount set forth opposite its name on the signature pages hereof.

"Competitor" means (i) a Person primarily engaged in the business of private investment management as a hedge fund, commodity fund or private equity fund, which is in

direct or indirect competition with the Issuer or the General Partner or any of their Affiliates or (ii) any Affiliate of a Person referred to in clause (i) above.

"Constituent Documents" means, with respect to the Issuer and any Collateral Securities Issuer, the constitutive and governing documents, subscription agreements and other agreements, including without limitation any investment policies or guidelines, of the related fund specifying the terms and conditions relating to the Issuer interests or the Collateral Securities Issuer interests, as applicable, as amended from time to time.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Derivative Transaction" has the meaning specified in Section 2.16(f).

"Dollars" or "$" refers to lawful money of the United States of America.

"Drawdown" means a drawdown by the Issuer of principal of the Notes pursuant to Section 2.02.

"Drawdown Business Day" means any day on which commercial banks and foreign exchange markets settle payments and are open for general business in New York City and London.

"Drawdown Date" means any Business Day during the Availability Period on which the Issuer undertakes a Drawdown in respect of the Notes.

"Drawdown Notice" means a notice, substantially in the form of Exhibit B, delivered by the Issuer to the Noteholder Representative and the Noteholders pursuant to Section 2.02(b) of this Agreement, requesting a Drawdown in an amount equal to the Aggregate Drawdown Principal Amount and setting forth (i) the Aggregate Commitment and each Noteholder's Commitment, (ii) each Noteholder's Drawdown Principal Amount and the Outstanding VFN Amount of such Noteholder (after giving effect to the Drawdown on such Drawdown Date) and (iii) the Aggregate Drawdown Principal Amount and the Aggregate Outstanding VFN Amount (after giving effect to the Drawdown on such the Drawdown Date).

"Drawdown Principal Amount" means the principal amount being drawn down with respect to each Noteholder on a Drawdown Date pursuant to Section 2.02 hereof.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 8.03).

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Issuer or a Collateral Securities Issuer, as applicable, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Issuer, a Collateral Securities Issuer or any of their ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Issuer, a Collateral Securities Issuer or any of their ERISA Affiliates from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Issuer, a Collateral Securities Issuer or any of their ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by the Issuer, a Collateral Securities Issuer or any of their ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from the Issuer, a Collateral Securities Issuer or any of their ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Event of Default" has the meaning assigned to such term in Article VII.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excess VFN Outstanding Amount" has the meaning set forth in Section 2.06.

"Excluded Taxes" means (a) income or franchise taxes, branch profits tax or other similar tax imposed on (or measured by) the net income of any Noteholder by the jurisdiction under the laws of which such Noteholder is organized or in which the office which purchased, holds or owns its Note is located, unless such Taxes are imposed as a result of such Noteholder having executed, delivered or performed its obligations or received payments under, or enforced this Agreement, the Security Agreement or any of the agreements or other documents entered into in connection herewith or therewith (in which case such Taxes will not be treated as Excluded Taxes) and (b) any Taxes imposed, deducted or withheld on or from any amounts

payable to such Noteholder by reason of such Noteholder's failure to comply with Section 2.11(e), and (c) any Taxes imposed, deducted or withheld on or from any amounts payable to such Noteholder or Transferee at the time it becomes a Noteholder (unless it is a Transferee pursuant to a request by the Issuer under Section 2.12(b)), or payable to such Noteholder at the time it changes the office which holds or owns its Note, except to the extent that such Noteholder or its assignor, if any, or in the case of a Transferee, the transferor, was entitled, at the time of change of office or assignment, to receive additional amounts from the Issuer with respect to such Taxes pursuant to Section 2.10(a).

"First Noteholder" has the meaning specified in Section 2.20.

"GAAP" means generally accepted accounting principles in the United States of America.

"General Partner" means LVFN Genpar, L.L.C., a Delaware limited liability company.

"Governmental Authority" means the government of the United States of America or any other nation. or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Hedge Counterparty" means an entity satisfying the requirements set forth in Section 2.16(f) with which a Noteholder has entered into a Derivative Transaction for the primary purpose of hedging such Noteholder's obligations under the Note.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property

acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances and (k) the net obligations of such Person under derivative transactions (including, but not limited to, under Swap Agreements), commodity transactions, foreign exchange transactions, repurchase agreements, reverse repurchase agreements or securities lending agreements.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Interest Payment Date" means, at the election of the Issuer upon five (5) Business Days notice prior to September 1, 2008, as follows:  September 1, 2008, annually thereafter on the first Business Day of August, and the Stated Maturity Date.  If no such election is timely made, the Interest Payment Date shall be the Stated Maturity Date.

"Interest Period" means for each Drawdown, (i) initially, the period commencing on the date such Drawdown is made hereunder up to but excluding the first Reset Date, and (ii) thereafter, the period from and including each Reset Date up to but excluding the immediately following Reset Date; provided no Interest Period shall extend beyond the Stated Maturity Date.

"Investment Advisors Act" means the Investment Advisors Act of 1940.

"Investment Company Act" means the U.S. Investment Company Act of 1940, as amended from time to time.

"Issuer" has the meaning specified in the preamble to this Agreement.

"LBSL" has the meaning specified in the preamble to this Agreement.

"LIBOR" has the meaning set forth in Section 2.08(b).

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, or (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"LTV Ratio" means an amount, determined by the Calculation Agent and expressed as a percentage, equal to (i) the sum of (x) the Aggregate VFN Outstanding Amount plus (y) Accrued Interest on the Notes, divided by (ii) the Adjusted Collateral Securities Value.

"Mandatory Prepayment" has the meaning set forth in Section 2.06.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, liabilities (actual or contingent), operations, properties, business prospects or financial condition, of the Issuer or one or more Collateral Securities Issuers having a combined value of 50% or more of the excess of (i) the Adjusted Collateral Securities Value over (ii) the Aggregate VFN Outstanding Amount, (b) the ability of the Issuer or a Collateral Securities Issuer to perform any of its respective obligations under the Transaction Documents to which it is a party or any other agreement, instrument, document or certificate delivered in connection herewith or therewith, (c) the Collateral Securities or the Secured Party's Lien on the Collateral Securities (on behalf of itself and the Noteholder) or (d) the rights of or benefits available to the Noteholders, the Noteholder Representative or the Secured Party under the Transaction Documents or any other agreement, instrument, document or certificate delivered in connection herewith or therewith.

"Maximum LTV Ratio" has the meaning set forth in Section 5.10.

"Minimum Aggregate VFN Outstanding Amount" has the meaning set forth in Section 2.08(a).

"Monthly Compounding Date" means the first Business Day of each calendar month from and including the date the Note is issued through but excluding the Stated Maturity Date.

"Monthly Report" has the meaning specified in Section 5.01.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Asset Value" means as of any date of determination with respect to the Issuer, a Collateral Securities Issuer, or a Sub-Fund, as applicable, the market value of such entity or securities, as determined by the Calculation Agent, based on the most recent relevant net asset valuation report provided in accordance with the Reporting Requirements set forth in Section 5.01 herein; provided that if such net asset valuation reports (i) are not delivered to the Calculation Agent or (ii) in the Calculation Agent's determination, any such report does not appropriately reflect the net asset value of the Issuer or a Collaterals Securities Issuer, the Calculation Agent shall determine the market value of such entity or securities.

"Non-Renewing Noteholders" has the meaning specified in Section 2.03.

"Note" and "Notes" have the meaning specified in the recitals to this Agreement.

"Noteholder" means, at any time, the registered holder of a Note.

"Noteholder Representative" means Lehman Brothers Inc. or its designee.

"Other Noteholders" has the meaning specified in Section 2.20.

"Other Taxes" means any and all present or future stamp, recording or documentary taxes or any excise, value added or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery, registration, performance or enforcement of, or otherwise with respect to, this Agreement or the Notes.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Encumbrances" means:

(a)      Liens imposed by law for Taxes or other governmental charges that are not yet due or are being contested in compliance with Section 5.04;

(b)      Liens in respect of judgments that do not constitute an Event of Default under clause (k) of Section 7.01; and

(c)      Liens in favor of banks on items in collection (and the documents related thereto) arising in the ordinary course of business under Article IV of the UCC.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Issuer or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Post-Petition Interest" means any interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency or reorganization of the Issuer (or would accrue but for the operation of applicable bankruptcy or insolvency laws), whether or not such interest is allowed or allowable as a claim in any proceeding.

"Pro Rata Share" means, on any date with respect to a Noteholder, a fraction, the numerator of which shall be such Noteholder's Commitment on such date and the denominator of which shall be the Aggregate Commitment on such date.

"Qualified Institutional Buyer" has the meaning specified in Rule 144A, as amended, under the Securities Act.

"Qualified Purchaser" has the meaning specified in Section 2(a)(51) of the Investment Company Act.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Renewing Noteholders" has the meaning specified in Section 2.03.

"Reporting Requirements" has the meaning specified in Section 5.01.

"Required Noteholders" has the meaning specified in Section 2.03.

"Reset Date" means the first Drawdown Date and the first day of each month thereafter to but excluding the Stated Maturity Date.

"RFC" has the meaning specified in the preamble to this Agreement.

"Schedule of Drawdowns and Principal Repayments" means the schedule in the form attached to each Note.

"S&P" means Standard & Poor's Ratings Service, a division of The McGraw-Hill Companies, Inc.

"Secured Obligations" means all principal of the Notes outstanding from time to time, all Accrued Interest (including Post-Petition Interest) on the Notes and all other amounts now or hereafter payable by the Issuer pursuant to this Agreement or the Notes.

"Secured Party" has the meaning assigned to it under the Security Agreement.

"Securities Act" means the Securities Act of 1933, as amended from time to time.

"Security Agreement" means the Security Agreement between the Issuer, in its capacity as pledgor, and the Secured Party, entered into in connection with this Agreement, as amended, supplemented or otherwise modified from time to time.

"Side Letters" means the letters entered into from time to time between (i) the Noteholder Representative and (ii) each Collateral Securities Issuer or Domestic CAP Partners LP, as applicable, in connection with the Transactions.

"Spread" has the meaning set forth in Section 2.08(d).

"Stated Maturity Date" means September 20, 2012, or, in the event this Agreement is renewed as provided in Section 2.03, September 20, 2013.

"Sub-Fund" means each entity interests of which are owned by a Collateral Securities Issuer, initially as set forth on Exhibit F and as may be amended from time to time pursuant to the agreement of the Issuer and the Noteholder Representative.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial

statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority, including penalties, interest and additions to tax.

"Termination Date" means with respect to a Noteholder, the earliest to occur of (i) the Stated Maturity Date for such Noteholder, (ii) a date on which such Noteholder's Commitment is terminated or deemed terminated following an Event of Default pursuant to Article VII or (iii) any other date on which such Noteholder's Commitment is terminated or deemed terminated in accordance with this Agreement.

"Transaction Documents" means this Agreement, the Security Agreement, the Note, the Side Letters and the other documents and agreements entered into in connection therewith, each dated on, prior to or after the date hereof, as such agreements and documents may be amended from time to time pursuant to the terms hereof.

"Transactions" means the execution, delivery and performance by the Issuer of this Agreement, the Security Agreement, the issuance of the Notes hereunder, and the use of the proceeds thereof and the creation, perfection and enforcement of any security interest created under the Security Agreement.

"Transferee" means a transferee in respect of the Notes in accordance with Section 2.16.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York (the "New York UCC"); provided, however, in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of the Secured Party's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, then the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction or jurisdictions for purposes of any provisions hereof relating to perfection or priority and for purposes of any definitions related to such provisions.

"Volatility Factor" means an amount equal to (i) 12.5% *divided by* (ii) the maximum of (a) 12.5% and (ii) the standard deviation of the 18 most recent monthly returns on

the value of the Issuer, assuming the investment portfolio of the Issuer as of the date of determination to be constant over such period.

"VFN Outstanding Amount" means, with respect to a Note, at any time, the outstanding principal amount of the Note at such time.  In respect of each Interest Period for which Accrued Interest has not been paid, the VFN Outstanding Amount shall increase by an amount equal to such Accrued Interest effective as of the first day of the following Interest Period.  In the event of the payment of any principal on the Note other than on the last day of an Interest Period, the VFN Outstanding Amount shall decrease by an amount equal to such principal payment effective on the day of payment.  In the event of a Drawdown, the VFN Outstanding Amount shall increase by an amount equal to the Drawdown Principal Amount effective on the Drawdown Date.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SCHEDULE 3.01

## LIST OF AUTHORIZED OFFICERS

1.      Ardon E. Moore, President

2.      Lee M. Bass, Vice President

3.      Thomas W. White, Vice President

4.      Gary W. Reese, Treasurer

EXHIBIT A

FORM OF NOTE

VARIABLE FUNDING

[_____], [_____]

LVFN Partners, L.P. a Delaware limited partnership (the "Issuer"), promises to pay to the order of [_____], (the "Noteholder") (i) the VFN Outstanding Amount plus (ii) Accrued Interest thereon, in immediately available funds at the designated office of the Noteholder, in the amounts and on the dates set forth in the Note Purchase Agreement.

Interest shall accrue daily and shall be compounded on each Monthly Compounding Date during each Interest Period in an amount equal to (i) the VFN Outstanding Amount of each Note multiplied by (ii) an annual rate equal to LIBOR plus the Spread multiplied by (iii) the actual number of days in the interest period and divided by (iv) 360 (such interest, the "Accrued Interest") or as otherwise provided in this Note and the Note Purchase Agreement. The Accrued Interest on the Note shall be payable together with the principal on the Note at such times and on such terms as provided in this Note and the Note Purchase Agreement.

The Noteholder shall, and is hereby authorized to, record the date and amount of each Drawdown and the date and amount of each principal repayment hereunder on the Schedule of Drawdowns and Principal Repayments annexed hereto and any such recordation shall constitute prima facie evidence of the accuracy of the amount so recorded; provided that the failure of the Noteholder to make such recordation (or any error in such recordation) shall not affect the obligations of the Issuer hereunder or under the Note Purchase Agreement.

This Note is a variable funding note (a "Note") issued pursuant to, and is entitled to the benefits of, the First Amended and Restated Note Purchase Agreement, dated as of October 23, 2007 (as amended, from time to time, the "Note Purchase Agreement"; capitalized terms used but not defined herein shall have the respective meanings given thereto in the Note Purchase Agreement) by and among the Issuer, Lehman Brothers Inc., as Noteholder Representative, and Relationship Funding Company, LLC, Lehman Brothers Special Lending LLC and the various financial institutions and other persons from time to time parties thereto as Noteholders, to which reference is hereby made for a statement of the terms and conditions governing this Note, including the terms and conditions under which this Note may be prepaid or its maturity date accelerated.

Notwithstanding any other provisions of this Note, the Note Purchase Agreement or any other agreement with respect to the Transactions, the obligations of the Issuer under this Note, and any other agreement with respect to the Transactions are recourse only to the Issuer and to the Pledged Collateral (as defined in the Security Agreement). No recourse shall be had against any officer, member, director, employee, security holder or incorporator of the Issuer or

its successors or assigns or any advisor, general partner, shareholder, unitholder, trustee or limited partner of the Issuer (or any officer, member, director, employee, security holder or incorporator of any such Person) for the payment of any amounts payable under the Note or any agreement with respect to the Transactions.

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR REGULATORY AUTHORITY OF ANY STATE. THIS NOTE HAS BEEN OFFERED AND SOLD PRIVATELY.  THE OWNER HEREOF ACKNOWLEDGES THAT THIS NOTE IS A "RESTRICTED SECURITY" THAT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT AND AGREES FOR THE BENEFIT OF THE ISSUER AND ITS AFFILIATES THAT THIS NOTE MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED (NOR MAY ANY PERSON RECEIVE ANY DERIVATIVE ECONOMIC OR BENEFICIAL INTEREST IN THIS NOTE PURSUANT TO ANY SWAP, HEDGING OR SIMILAR ARRANGEMENTS, OTHER THAN PURSUANT TO THE NOTEHOLDER'S HEDGING ARRANGEMENTS WITH ANY HEDGE COUNTERPARTIES) EXCEPT TO A PERMITTED TRANSFEREE (A) WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, AND IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION AND (B) WHO IS A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 2 (A)(51) OF THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED ("QUALIFIED PURCHASER") AND (C) WHO HAS PREVIOUSLY DELIVERED A CERTIFICATE TO THE ISSUER IN THE FORM OF EXHIBIT C TO THE NOTE PURCHASE AGREEMENT OR SUCH OTHER FORM AS MAY BE ACCEPTABLE TO COUNSEL TO THE ISSUER.  IN ADDITION, THE CONSENT OF THE ISSUER SHALL BE REQUIRED TO CERTAIN TRANSFERS SPECIFIED IN THE NOTE PURCHASE AGREEMENT.  THE ISSUER SHALL NOT REGISTER OR ACKNOWLEDGE ANY PURPORTED TRANSFER TO A HOLDER THAT WAS NOT A QUALIFIED PURCHASER AT THE TIME OF SUCH PURPORTED TRANSFER AND ANY SUCH TRANSFER TO A HOLDER THAT WAS NOT A QUALIFIED PURCHASER AT THE TIME OF SUCH PURPORTED TRANSFER SHALL BE VOID AB INITIO AND OF NO FORCE AND EFFECT WHATSOEVER.

[_____]


By:_____
     Name:
     Title:

ANNEX

Schedule of Drawdowns and Principal Repayments

| **Date of Drawdown or Repayment** | **Amount** |
|---|---|
| | $_____ |
| | $_____ |
| | $_____ |
| | $_____ |
| | $_____ |
| | $_____ |
| | $_____ |
| | $_____ |
| | $_____ |
| | $_____ |
| | $_____ |
| | $_____ |
| | $_____ |
| | $_____ |
| | $_____ |
| | $_____ |

EXHIBIT B

FORM OF DRAWDOWN NOTICE

[date]

To:    [INSERT NOTEHOLDERS' ADDRESSES]

cc:    [INSERT NOTEHOLDER REPRESENTATIVE'S ADDRESS]

Re:    Drawdown under First Amended and Restated Note Purchase Agreement, dated as of October 23, 2007 by and among LVFN Partners, L.P. (the "Issuer"), Lehman Brothers Inc. (the "Noteholder Representative"), and Relationship Funding Company, LLC, Lehman Brothers Special Lending LLC and the other Financial Institutions and other Persons from time to time party thereto as Noteholders, (the "Noteholders") (as amended, the "Note Purchase Agreement"); terms used herein but not defined herein shall have the respective meanings given thereto in the Note Purchase Agreement

Ladies and Gentlemen:

The Issuer hereby requests a Drawdown pursuant to Section 2.02 of the Note Purchase Agreement:

1.    The Drawdown Date for the Drawdown requested hereby (the "Subject Drawdown") is _____, which is a Business Day permitted as a Drawdown Date pursuant to Section 2.02 of the Note Purchase Agreement.

2.    The Aggregate Drawdown Principal Amount requested to be drawn down hereby is $_____.

3.    The Aggregate VFN Outstanding Amount before giving effect to the Subject Drawdown is $[_____], and the Aggregate VFN Outstanding Amount after giving effect to the Subject Drawdown would be $[_____].

4.    The Pro Rata Share, Drawdown Principal Amount, VFN Outstanding Amount and Accrued Interest for each Noteholder is set forth below:

| Noteholder | % | Drawdown Principal Amount | VFN Outstanding Amount | Accrued Interest |
| --- | --- | --- | --- | --- |

5.      The undersigned hereby certifies and represents that each of the applicable conditions set forth in Section 4.02 of the Note Purchase Agreement to the making of the Subject Drawdown have been satisfied and that the representations and warranties set forth in paragraphs (a) through (e) of Section 4.02 are true and correct on the Drawdown Date.

6.      Wiring instructions are as follows:

Bank:
Address:
Bank                                                                                            ABA#:
Account #:
FAO:
Attention:

Very truly yours,

LVFN PARTNERS, L.P.
by LVFN Genpar, L.L.C., its General Partner

By:_____
        Name:
        Title:

B-2

EXHIBIT C

FORM OF TRANSFEREE CERTIFICATE FOR TRANSFER OF NOTE

[_____], [_____]

[_____]

Re:    First Amended and Restated Note Purchase Agreement dated as of
       October 23, 2007.

First Amended and Restated Note Purchase Agreement (the "Agreement") by and among LVFN Partners, L.P.    (the "Issuer"), Lehman Brothers Inc. (the "Noteholder Representative"), and Relationship Funding Company, LLC, Lehman Brothers Special Lending LLC and the other Financial Institutions and other Persons from time to time party thereto as Noteholders (the "Noteholders").   Capitalized terms used but not defined herein shall have the meanings given to them in the Agreement.  We (the "Purchaser") are purchasing a Note.

The Purchaser hereby represents, warrants and covenants for the benefit of the Issuer and the Noteholder that:

1.    It is a "qualified institutional buyer" as defined in Rule 144A under the Securities Act of 1933, as amended (the "Securities Act"), and is acquiring the Note in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder.

2.    It is not a dealer described in Rule 144A(a)(1)(ii) that owns and invests on a discretionary basis less than $25,000,000 in securities of issuers that are not affiliated with the dealer.

3.    If it is an investment company excepted from the 1940 Act pursuant to Section 3(c)(1) or Section 3(c)(7) thereof (or a foreign investment trust under Section 7(d) thereof relying on Section 3(c)(1) or Section 3(c)(7) thereof with respect to its U.S. holders) and was formed on or before April 30, 1996, the Purchaser has received the consent of each of its beneficial owners who acquired their interests on or before April 30, 1996 with respect to its treatment as a Qualified Purchaser in the manner required under Section 2(a)(51)(C) of the 1940 Act and the rules thereunder.

4.    It is not acting as a "swap" counterparty or any other type of intermediary, except as a depositary, whereby any other party is acquiring an economic or beneficial interest in the Note, unless such other party is a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) and a "qualified purchaser" (for the purposes of Section 3(c)7 of the Investment Company Act).

5.      It is not, and is not acting on behalf of or using the assets of, a benefit plan investor (including assets that may be held in a life insurance company account or separate account where assets in such accounts may be deemed "plan assets" for purposes of the Employee Retirement Security Act of 1974, as amended ("ERISA")), to acquire the Note and will not at any time hold the Note for a benefit plan investor.  For purposes of the foregoing certifications, the term "benefit plan investor" means (a) an employee benefit plan as defined in Section 3(3) of ERISA which is subject to the provisions of Title I of ERISA; (b) a plan described in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code") other than governmental or church plan described in Section 4975(g)(2) or (3) of the Code that is subject to Section 4975 of the code; or (c) an entity whose underlying assets include plan assets by reason of a plan's investment in the entity (within the meaning of Department of Labor Regulation Section 2510.3-101), as modified by Section 3(42) of ERISA.

6.      It understands that the Note is being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act; the Issuer has not been registered under the Investment Company Act of 1940, as amended (the "Investment Company Act") and that the Issuer is exempt from registration as such by virtue of Section 3(c)(7) of the Investment Company Act; the Note has not been and will not be registered under the Securities Act; and if in the future it decides to offer, resell, pledge or otherwise transfer the Note, the Purchaser understands and agrees that the Note may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of the Agreement, and with the legend on the Note.  In particular, it understands and agrees that the Note may be transferred, only to (a) a "qualified purchaser" for the purposes of Section 3(c)7 of the Investment Company Act; or (b) a corporation, partnership, limited liability company or other entity (other than a trust), each shareholder, partner, member or other owner of securities of which is a "qualified purchaser" for the purposes of Section 3(c)7 of the Investment Company Act; and in the case of (a) and (b) above that is a "qualified institutional buyer" as defined in Rule 144A under the Securities Act who purchases the Note in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder and takes delivery in the form of a certificated Note.  It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Note.

7.      (i) It is either (A) a "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act; or (B) a corporation, partnership, limited liability company or other entity (other than a trust) each shareholder, partner, member or other owner of securities of which is a "qualified purchaser"; (ii) it is acquiring the Note as principal solely for its own account or for the account of one or more beneficial owners, each of which is a "qualified institutional buyer" and a "qualified purchaser" and with respect to which each of the representations contained herein is true, for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (iii) it is not a (A) partnership, (B) common trust fund, or (C) special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants may designate the particular investments to be made; and (iv) it will provide notice of the relevant transfer restrictions to subsequent transferees.

8.      It agrees that in the event that at any time the Issuer determines or is notified that the Purchaser, or any holder of any interest in the Purchaser if applicable, is in

breach of any of the representations or agreements set forth herein or in any certificate delivered or deemed to be made by it as set forth in the Agreement and if, as a result, the Issuer would be required to register as an investment company, the Issuer may consider such acquisition and transfer void ab initio and of no force and effect whatsoever and require that the Note be transferred to a person designated by the Issuer if that would avoid the registration requirement.

9.      It is _____ (check if applicable) a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "Code"), and a properly completed and signed Internal Revenue Service ("IRS") Form W-9 (or applicable successor form) is attached hereto; or _____ (check if applicable) not a "United States person" within the meaning of Section 7701(a)(30) of the Code, and a properly completed and signed Internal Revenue Service Form W-8 BEN or W-8 ECI, or W-8 IMY (with appropriate attachments) (or applicable successor form) is attached hereto.

10.     It understands and acknowledges that failure to provide the Issuer with the applicable United States federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or successor applicable form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or an applicable Internal Revenue Service Form W-8 (or successor applicable form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code) may result in United States federal back-up withholding from payments to it in respect of the Note.

11.     It understands that pursuant to the terms of the Agreement, the Issuer has agreed that the Note will bear a legend to the following effect unless the Issuer determines otherwise in compliance with applicable law:

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR REGULATORY AUTHORITY OF ANY STATE. THIS NOTE HAS BEEN OFFERED AND SOLD PRIVATELY.  THE OWNER HEREOF ACKNOWLEDGES THAT THIS NOTE IS A "RESTRICTED SECURITY" THAT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT AND AGREES FOR THE BENEFIT OF THE ISSUER AND ITS AFFILIATES THAT THIS NOTE MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED (NOR MAY ANY PERSON RECEIVE ANY DERIVATIVE ECONOMIC OR BENEFICIAL INTEREST IN THIS NOTE PURSUANT TO ANY SWAP, HEDGING OR SIMILAR ARRANGEMENTS, OTHER THAN PURSUANT TO THE NOTEHOLDER'S HEDGING ARRANGEMENTS WITH ANY HEDGE COUNTERPARTIES) EXCEPT TO A PERMITTED TRANSFEREE (A) WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, AND IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION AND (B) WHO IS A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 2 (A)(51) OF THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED ("QUALIFIED PURCHASER") AND (C) WHO HAS PREVIOUSLY DELIVERED A CERTIFICATE TO THE ISSUER IN THE FORM OF EXHIBIT C TO THE

NOTE PURCHASE AGREEMENT OR SUCH OTHER FORM AS MAY BE ACCEPTABLE TO COUNSEL TO THE ISSUER. IN ADDITION, THE CONSENT OF THE ISSUER SHALL BE REQUIRED TO CERTAIN TRANSFERS SPECIFIED IN THE NOTE PURCHASE AGREEMENT.    THE ISSUER SHALL NOT REGISTER OR ACKNOWLEDGE ANY PURPORTED TRANSFER TO A HOLDER THAT WAS NOT A QUALIFIED PURCHASER AT THE TIME OF SUCH PURPORTED TRANSFER AND ANY SUCH TRANSFER TO A HOLDER THAT WAS NOT A QUALIFIED PURCHASER AT THE TIME OF SUCH PURPORTED TRANSFER SHALL BE VOID AB INITIO AND OF NO FORCE AND EFFECT WHATSOEVER.

12.    It acknowledges that the foregoing are ongoing representations and hereby agrees to notify the Issuer in writing if it becomes aware that any of the representations are no longer accurate.

13.    It understands that the Issuer, the Noteholder and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

14.    It understands that the Agreement shall be binding upon and shall inure to the benefit of it as Transferee and Noteholder thereunder.

Name of Purchaser:

Dated:
By:
Name:
Title:

Taxpayer identification number:


| Addresses for notices | Wire transfer information for payments: |
|---|---|
| | Bank: |
| | Address: |
| | Bank ABA # |
| | Account # |
| Telephone: | FAO: |
| Facsimile: | Attention: |
| Attention: | |

EXHIBIT D

## Aggregate Haircut Calculation

**Aggregate Haircut**:  As of any date of determination, the Aggregate Haircut shall be the sum of (i) the Strategy Haircut, (ii) the Sub-Strategy Haircut, (iii) the Liquidity Haircut, (iv) the CAP Fund LP Haircut, (v) the Single Fund Haircut, (vi) the Three Fund Haircut, (vii) the Track Record Haircut, (viii) the Single Fund Volatility Haircut, and  (ix) the Reporting Requirement Haircut.

Each of haircuts set forth below shall be determined by the Calculation Agent.

**Strategy Haircut**:  As of any date of determination, with respect to each Permitted Strategy of the Underlying Investments (on a look-through basis), the sum of the amounts, expressed in USD, by which (i) the relevant Strategy Allocation exceeds (ii) the product of (x) the applicable Strategy Concentration Limit multiplied by (y) the aggregate Underlying Investment Value.

> **Strategy Allocation:**  As of any date of determination, with respect to each Permitted Strategy, the portion of the aggregate Underlying Investment Value, expressed in USD, as determined by the Calculation Agent, allocated to such Permitted Strategy.

> **Underlying Investment**:  means for purposes of the Aggregate Haircut computations, computed on a look-through basis as if the portions of the related Sub-Fund(s) owned by Collateral Securities Issuers were owned directly by the Issuer.

> **Underlying Investment Value**:  means for purposes of the Aggregate Haircut computations and each Sub-Fund, the aggregate of the Collateral Securities Issuer Values related to such Sub-Fund owned by all the Collateral Securities Issuers.

### Permitted Strategies and Strategy Concentration Limits

| Permitted Strategy | Strategy Concentration Limit (as a percentage of the aggregate Underlying Investment Value) |
|---|---|
| Cash | 100% |
| Relative Value | 65% |
| Event Driven | 65% |
| Long/Short Equity | 50% |
| Directional | 35% |
| Long Only | 35% |

**Permitted Strategy:** As of any date of determination, as determined by the Calculation Agent with respect to each strategy, the strategies indicated in the above table and in the Monthly Report.

**Sub-Strategy Haircut:** As of any date of determination, with respect to each Sub-Strategy and each Underlying Investment (on a look through basis), the sum of the amounts, expressed in USD, by which (i) each Sub-Strategy Allocation exceeds (ii) the product of (x) 33% multiplied by (y) the aggregate Underlying Investment Value.

> **Sub-Strategy Allocation:** As of any date of determination, with respect to each Sub-Strategy, the portion of the aggregate underlying Investment Value, expressed in USD, as determined by the Calculation Agent, allocated to such Sub-Strategy.

> **Sub-Strategy:** As of any date of determination, the sub-strategies indicated on the Monthly Report, as determined by the Calculation Agent.

**Liquidity Haircut:** As of any date of determination, the portion of the aggregate Underlying Investment Value, expressed in USD, represented by Underlying Investments that do not satisfy the Liquidity Limits.

**Liquidity Limits** means:

When the LTV Ratio is less than or equal to 50%:

| Stated Time Period | Liquidity Limit (as a percentage of the aggregate Underlying Investment Value) |
|---|---|
| 135 Days or Less | 20% |
| 185 Days or Less | 40% |
| 470 Days or Less | 50% |
| 730 Days or Less | 60% |

When the LTV Ratio is greater than 50% but less than or equal to 77.5%:

| Stated Time Period | Liquidity Limit (as a percentage of the aggregate Underlying Investment Value) |
|---|---|
| 135 Days or Less | 20% |
| 185 Days or Less | 40% |
| 470 Days or Less | 75% |
| 730 Days or Less | 85% |

**Liquidity:** means, in respect of any Underlying Investment, the maximum of (i) the sum of (x) the redemption frequency in days (where monthly = 30 days; quarterly = 90 days; semi-annually = 180 days; annually = 360 days) and (y) the notice period in days or (ii) the number of days remaining in the lock-up period. For purposes of calculating Liquidity, any Underlying Investment with a rolling lock-up period will be deemed to have a redemption frequency of zero days, and the days remaining in the lock-up period

will be based upon the date of expiration of the first lock-up period for which the minimum notice period has not yet passed. For the avoidance of doubt, once the minimum notice period has passed, the days remaining in the lock-up period will be based on the expiration date of the next lock-up period.

**CAP Fund LP Haircut**: As of any date of determination, the sum of the amount by which (i) the portion of the Underlying Investment Value, expressed in USD, allocated to Domestic CAP Partners, L.P. exceeds (ii) the lesser of (x) the product of (1) 50% and (2) the aggregate Underlying Investment Value and (y) the sum of (1) $100,000,000 and (2) the difference between (a) the aggregate Collateral Securities Value (reduced by all Haircuts except the CAP Fund LP Haircut) and (b) the VFN Outstanding Amount.

**Single Fund Haircut:** As of any date of determination, the sum of the amounts by which, with respect to each Underlying Investment (except Domestic CAP Partners, L.P.), (i) the portion of the Underlying Investment Value, expressed in USD, allocated to such Underlying Investment exceeds (ii) the product of (x) 20% multiplied by (y) the aggregate Underlying Investment Value.

**Three Fund Haircut:** As of any date of determination, the amount by which, with respect to the three Underlying Investments (except Domestic CAP Partners, L.P.) representing the largest percentage of the Underlying Investment Value, (i) the portion of the Underlying Investment Value, expressed in USD, allocated to such Underlying Investments exceeds (ii) the product of (x) 40% multiplied by (y) the aggregate Underlying Investment Value.

**Track Record Haircut:** As of any date of determination, the amount by which, with respect to Underlying Investments with less than 18 months of Proxy Track Record, (i) the portion of the aggregate Underlying Investment Value attributable to such Underlying Investments, expressed in USD, exceeds (ii) the product of (x) 25% multiplied by (y) the aggregate Underlying Investments Value.

> **Proxy Track Record:** As of any date of determination, and with respect to each Underlying Investment and its related manager or adviser, (i) actual performance history of the related Underlying Investment, (ii) the performance of a related "master fund" of an Underlying Investment, (iii) the performance of a managed account or proprietary trading account for which the related manager or advisor served in an analogous role following an analogous strategy.

**Single Fund Volatility Haircut**: As of any date of determination, the sum of, for each Underlying Investment having a Volatility Percentage in excess of the Fund Volatility Limit, of the product of (a) the corresponding Underlying Investment Value and (b) the quotient of (i) the related Volatility Percentage minus the Fund Volatility Limit (ii) the related Volatility Percentage.

> **Fund Volatility Limit:** means, for each Underlying Investment on any date of determination, 20%.

**Volatility Percentage:** means, for each Underlying Investment on any date of determination, the annualized standard deviation of the 12 most recent monthly returns on the value of the Underlying Investment as determined by the Calculation Agent. When less than 12 monthly returns are available, the Volatility Percentage shall be calculated based upon as many recent monthly returns as are available (including through Proxy Track Record).

**Reporting Requirement Haircut**:  As of any date of determination, the portion of the aggregate Underlying Investment Value represented by Underlying Investments which fail to provide (whether by reason of market disruptions, inability, failure to perform, or otherwise) any data required in the Reporting Requirements, subject to the last sentence of Section 5.01(e).

EXHIBIT E

FORM OF MONTHLY REPORT

See Attached.

Exhibit E-1

core.risk



# ALBOURNE

| Style | |
|---|---|
| Portfolio | LB Portfolio (Mar 07 NAV) |
| Client | Lee Bass Inc. |
| Month | May 2007 (published 27 Jul 2007) |

**Reporting Currency** USD

**Performance**

| | Portfolio |
|---|---|
| May 2007 | 2.21% |
| QTD | 3.82% |
| YTD | 8.44% |

**Since inception**

| | |
|---|---|
| Annualised Return | 12.80% |
| Annualised Risk | 3.16% |
| Downside Risk | 1.79% |
| Sharpe | 3.22 |
| Sortino Ratio | 2.32 |
| Max drawdown | -2.41% |
| Benchmark Alpha | 4.53% |
| Systematic Alpha | 5.69% |
| Downside Risk | 1.79% |
| 1 month 95% VAR | -1.98% |
| Correlation between forecast and actual returns | 0.78 |

**VAMI for portfolio, systematic returns and benchmark**

— Portfolio  — Systematic  — HFR Fund Of Funds



**Strategy Allocation**

Relative Value 24.3%
Equity L/S 23.2%
Long Only 4.6%
Directional 2.2%
Event Driven 45%

**Regional Allocation**

N. America 60.1%
Global 33.9%
W. Europe 4.4%

Please refer to the Important Notice at the end of this document.
Copyright © 2007 Albourne Partners Limited. The Albourne logo, the Albourne Village logo and core.risk are trademarks of Albourne Partners Limited.



# ALBOURNE

## core.risk

## Comments

No portfolio specific comments for May 2007.

All calculations and analysis is done on a portfolio return series constructed from proforma returns for the period from Dec 2001 to Feb 2007 and calculated returns from Mar 2007 to May 2007. The proforma series is calculated from the allocations at the end of Feb 2007 and allocations are rebalanced if no returns are available for some funds. Where returns for hedge funds are not available modelling assumptions are made to create a proxy series (see Modelling Assumptions).

Actual portfolio return and risk is within the stated objectives and investment guidelines.

## Returns

Year to date (YTD) portfolio return of 8.44% is above the target return of 4.74% (T-bills + 6.00% = 8.63% for 5 months) and the benchmark return of 7.12% (HFR Fund Of Funds) (see Performance Summary). Annualised actual portfolio return since inception of 12.80% is above the target return of 8.63% (T-bills + 6.00% = 8.63%) and the benchmark return of 8.27%.

For May 2007 the actual portfolio return of 2.21% was above the expected return of 1.21% by 1.00%. Year to date the actual portfolio return is more than the expected return by 3.38%. Since inception the portfolio return is more than the expected return by 5.69% p.a. The expected return is based on the product of the style exposures and the style returns (systematic portfolio). There was a weak correlation of 0.44 between the actual portfolio returns and the expected forecast returns. (see Systematic Performance).

For May 2007, on an absolute basis Tiger Global Fund, LP was the highest contributor to the actual portfolio return and Coatue Qualified Partners Fund, was the highest contributor to the portfolio alpha, while Corriente Master Fund was the largest detractor from both the actual portfolio return and the portfolio alpha. After taking the portfolio weighting into account the largest contributor to portfolio returns becomes CAP Fund, L.P, but the largest contributor to portfolio alpha becomes CAP Fund, L.P. On the downside the detractors remain the same. (see Return/Risk Rank and Performance vs Styles).

Over the last 12 months 11 of the 13 funds generated more returns than that required of them, after considering the funds' weighting in the portfolio, their contribution to the risk of the portfolio and the risk/return objectives. The 2 that did not were CAP Fund, L.P and Goldman Sachs Global Alpha LP. (see Performance Summary).

Over the last 12 months 12 of the 13 funds out-performed their style. The 1 that did not was Goldman Sachs Global Alpha LP. (see Required Rate of Return).

Over the past month HFR Event-Driven is the style that made the largest contribution to the portfolio return with 0.28%, while year to date HFR Fixed Income Convertible Bonds made the largest contribution with 1.16%. Over the past month, as well as for the year to date (Big Cap - Small Cap) + T Bills made the smallest contribution to the portfolio return with 0.00% and -0.05% respectively (see Factor Return Contribution).

## Risk

Annualised actual portfolio risk of 3.16% is within the target range of 3% to 6%. Annualised volatility of the systematic portfolio since Jan 1997 is 3.57%, while the portfolio forecast residual risk is 2.14% bringing the total forecast volatility to 4.17% and implying a monthly 95% VaR of 1.98%. The VaR limit has never been breached.

The portfolio is not currently in a drawdown and the maximum drawdown of -2.41% occurred in the period from May 2002 to Jul 2002 and the portfolio took 5 months to recover. The systematic portfolio experienced its worst drawdown since Jan 1997 of -5.76% in the period from May 2002 to Sep 2002 and the recovery period was 8 months (see Drawdown Comparison).

Beta of the actual portfolio relative to US Equity since Dec 2001 is 4.70%, and the beta relative to US High Yield Bonds is 14.84%. The respective betas for the last 12 months are 9.86% and 30.85% (see Beta of Portfolio Return Series).

The following comments are based on the systematic portfolio with returns going back to Jan 1997. The portfolio lost on average -0.92%when considering only the 10% worst returns for US Equity and made 1.40% on average during the best 10%. Similar numbers with respect to US High Yield Bonds are -0.90% and 1.25% respectively. Results from the Monte Carlo simulation show that the portfolio, with 95% confidence, would not lose more than -1.60% under normal market conditions, -2.79% during event months for the S&P500 Total Return, -2.80% during event months for the US High Yield Bonds and -0.84% under current market conditions (see Stress Test in Event Periods).

On an incremental basis (effect of a 1% of the portfolio increase in weight of a fund), Corriente Master Fund is the largest contributor with 3.01 bp and GSO Origination Funding is the



# ALBŌURNE

## core_risk

largest detractor with -1.58 bp from portfolio VaR. Considering the impact on VaR after the complete removal of a fund Corriente Master Fund is the largest contributor with -6.50 bp and GSO Special Situations Overseas Fund LP is the largest detractor with 18.86 bp (see Risk vs Fund Allocation). Similarly at the style level MSCI World ex-US is the largest contributor and VIX is the largest detractor if marginal weights are considered and HFR Fixed Income Convertible Bonds is the largest contributor if the entire style is removed (see Risk vs Style).

## Portfolio Composition

On a super-strategy level the portfolio's allocation differs significantly from that of the market (cap-weighted as observed by Albourne) (see Strategy Weight Comparison). The largest investment is 42.59% and the top 5 investments comprise 76.58%. There are 2 funds with weights higher than 9.69% (1/(number of funds) + 2% of fund investments).

## Modelling Assumptions

- Cushing MLP Opportunity Fund I LP uses Cushing Fund LP The as proxy from Jun 2005 to Oct 2006.
- GSO Origination Funding uses Varde Fund (Cayman) Ltd as proxy from Jun 2005 to Feb 2006.
- GSO Special Situations Overseas Fund LP uses GSO Special Sit proxy - Strategic Portfolio/CFO as proxy from Jun 2005 to Jul 2005.
- Ocravian Advisors Fund uses Halcyon Enhanced LP as proxy from Jun 2005 to Mar 2006.
- Wintergreen Partners Fund uses Franklin Mutual Discovery Fund-Z as proxy from Jun 2005 to Sep 2005
- The portfolio returns series is constructed from proforma returns for the period from Dec 2001 to Feb 2007 and calculated returns from Mar 2007 to May 2007. The proforma series is calculated from the allocations at the end of Feb 2007 and funds are dropped from the proforma if no returns are available, and the capital is re-allocated pro-rata to the remaining funds.

3



# ALBOURNE

## core.risk

| Objectives | Return | Volatility | | Composition | | |
|---|---|---|---|---|---|---|
| Targets: T-bills + 6.00% = 8.63% | 6.00% | 3.0% - 6.0% | | | Total: | Allocation Change: |
| | | | | | $ 589.85m | $ 1.72m |

| | AUM | #Mgrs | Leverage |
|---|---|---|---|
| | $ 1.72m | 13 | 1.00 |
| | Current DD | Worst DD | |
| | 0 | | |

Benchmark: HFR Fund Of Funds

### Performance

| Performance | May 2007 | YTD | 1 Year | 3 Year | 5 Year | Inception |
|---|---|---|---|---|---|---|
| Portfolio | 2.21% | 8.44% | 16.10% | 14.05% | 12.37% | 12.80% |
| Benchmark | 2.11% | 7.12% | 12.83% | 10.25% | 8.46% | 8.27% |
| Benchmark Alpha | 0.10% | 1.32% | 3.27% | 3.80% | 3.91% | 4.53% |
| Systematic | 1.21% | 5.06% | 13.91% | 9.76% | 7.05% | 7.11% |
| Systematic Alpha | 1.00% | 3.38% | 2.19% | 4.28% | 5.32% | 5.69% |

### Performance Measures[1]

| | Risk | Sharpe[2] | Skew | Kurtosis | Sortino[3] | Sortino[4] | Sortino[5] | Omega |
|---|---|---|---|---|---|---|---|---|
| Portfolio | 3.16% | 3.22 | -0.44 | 0.22 | 13.33 | 5.40 | 2.32 | 2.73 |
| Benchmark | 3.53% | 1.60 | -0.39 | -0.18 | 5.34 | 1.40 | -0.13 | 1.57 |
| Systematic | 4.98% | 0.90 | -1.26 | 4.14 | 2.23 | 0.51 | -0.37 | 1.07 |

Track Error: 3.0%    Max DD: 3.0%

[1] Calculated over period from Dec 2001 to May 2007    [2] Risk Free rate used for the period Dec 2001 to May 2007 = 2.63%.    [3] MAR = 0%    [4] MAR = 5.20%    [5] MAR = 8.63%.

### Risk Summary[*]

| | Total Value | Total Change | Systematic Value | Systematic Change | Contribution to risk from Value | Contribution to risk from Residual |
|---|---|---|---|---|---|---|
| Portfolio Forecast Volatility | 4.17% | -0.07% | 3.57% | -0.11% | 2.14% | 0.04% |
| Portfolio 1 month 95% VAR | 6.85% | -0.12% | 5.88% | -0.18% | 3.52% | 0.07% |
| Portfolio 1 month 99% VAR | 9.69% | -0.17% | 8.31% | -0.25% | 4.98% | 0.10% |
| Conditional VaR | | | 2.79% | | | |
| Modified VaR | | | 2.80% | | | |
| US Equity 1 month 95% VAR | | | | | | |
| US HYB 1 month 95% VAR | | | | | | |

Frequency of violations of 95% VAR (66 months)    0.00%

* Risk calculated over period from Jan 1997 to May 2007

### Systematic Exposures

| | Beta | Change | R² | Alpha | Correl | 12m Beta | 12m R² | 12m Alpha |
|---|---|---|---|---|---|---|---|---|
| Relative to US Equity | 19.42% | -0.33% | 67.36% | 0.47% | 82.07% | 15.55% | 49.96% | 0.62% |
| Relative to US HYB | 32.88% | -0.97% | 42.48% | 0.41% | 65.18% | 27.24% | 18.76% | 0.58% |
| Relative to Benchmark | 48.33% | -1.60% | 64.10% | 0.27% | 80.06% | 39.22% | 86.49% | 0.47% |

3 of 13 funds have no systematic factors, representing 19.4% of the portfolio.



# ALBOURNE

## core.risk

### Allocation Changes

| Fund | Amount | Fund | Amount |
|---|---|---|---|
| CAP Fund, L.P | $ 1.1m | Canyon Value Realization Fund LP Series B | $ 0.7m |
| Canyon Value Realization Fund LP Series A | $ 0.7m | Coatue Qualified Partners Fund | $ -0.9m |

### Investment Guidelines

| | Target | Current | Result |
|---|---|---|---|
| Return | T-bills + 6.00% = 8.63% | 12.80% | OK |
| Risk | 3.0% - 6.0% | 3.16% | OK |
| Tracking Error | 3.0% | 2.6% | OK |
| Historic Sharpe Ratio | 1.50 | 3.22 | OK |
| Style Allocation Bounds | Relative Value (0% - 65%) | 24% | OK |
| Style Allocation Bounds | Event Driven (0% - 65%) | 45% | OK |
| Style Allocation Bounds | Equity L/S (0% - 50%) | 23% | OK |
| Style Allocation Bounds | Directional (0% - 35%) | 2% | OK |
| Style Allocation Bounds | Long Only (0% - 35%) | 5% | OK |
| Rolling 3 Year Risk | 0.0% - 12.5% | 2.60% - 3.35% | OK |
| Allocation to n Funds | <50.0% in 1 funds | 42.6% | OK |
| *Fund/Strategy level constraints* | | | |
| *Max Style Allocation* | 33.0% | 29.72% | OK |
| *12m Risk of Fund* | <20.0% | | NO |
| Corriente Master Fund [Lee Bass Inc.] | <20.0% | | NO |



# ALBOURNE

core.risk

## Proforma Returns

| Performance | May 2007 | YTD | 1 Year | 3 Year | 5 Year | Inception | Current DD | Worst DD |
|---|---|---|---|---|---|---|---|---|
| Portfolio | 2.21% | 8.44% | 16.10% | 14.05% | 12.37% | 12.80% | 0.00% | - |
| Proforma | 2.24% | 8.47% | 16.18% | 14.01% | 12.39% | 12.82% | 0.00% | - |
| Systematic Series | 1.20% | 4.74% | 10.86% | 8.51% | 6.91% | 6.67% | 0.00% | - |
| Proforma w/o Changes | 2.25% | 8.49% | 16.20% | 14.04% | 12.40% | 12.83% | 0.00% | - |
| Systematic w/o Changes | 1.20% | 4.73% | 10.84% | 8.49% | 6.89% | 6.65% | 0.00% | - |

| Performance Measures[1] | Risk | Sharpe[2] | Skew | Kurtosis | Sortino[3] | Sortino[4] | Sortino[5] | Omega |
|---|---|---|---|---|---|---|---|---|
| Portfolio | 3.16% | 3.22 | -0.44 | 0.22 | 13.33 | 5.40 | 2.32 | 2.73 |
| Proforma | 3.12% | 3.26 | -0.40 | 0.09 | 14.07 | 5.60 | 2.40 | 2.78 |
| Systematic Series | 3.00% | 1.35 | -1.06 | 2.47 | 4.09 | 0.68 | -0.75 | 1.55 |
| Proforma w/o Changes | 3.13% | 3.26 | -0.38 | 0.04 | 14.28 | 5.65 | 2.41 | 2.79 |
| Systematic w/o Changes | 2.99% | 1.35 | -1.06 | 2.47 | 4.10 | 0.67 | -0.76 | 1.55 |

[1] Calculated over period from Dec 2001 to May 2007   [2] Risk Free rate used for the period Dec 2001 to May 2007 = 2.63%.   [3] MAR = 0%.   [4] MAR = 5.20%.   [5] MAR = 8.63%.

## Risk without changes for May 2007

| Risk Summary without changes for May 2007 and difference to current* | Total Value | Total Difference | Contribution to risk from Systematic Value | Systematic Difference | Residual Value | Residual Difference |
|---|---|---|---|---|---|---|
| Portfolio Forecast Volatility | 4.16% | -0.01% | 2.15% | -0.01% | | 0.01% |
| Portfolio 1 month 95% VAR | 6.84% | -0.01% | 3.53% | -0.02% | | 0.01% |
| Portfolio 1 month 99% VAR | 9.68% | -0.01% | 4.99% | -0.03% | | 0.02% |
| Conditional VaR | | | | | | |
| Modified VaR | | | | | | |

* Risk calculated over period from Jan 1997 to May 2007



# ALBÖURNE

core.risk

# Return/Risk Rank

| Returns | Risk |
|---|---|
| **Fund Return (May 2007)** | **Fund Return (Last 12 months)** |
| *The 3 most positive funds in the portfolio* | *The 3 most positive funds in the portfolio* |
| 1 Tiger Global Fund, LP | 1 Coriente Master Fund |
| 2 Coatue Qualified Partners Fund. | 2 Cushing MLP Opportunity Fund I LP |
| 3 GSO Special Situations Overseas Fund LP | 3 Tiger Global Fund, LP |
| *The 3 most negative funds in the portfolio* | *The 3 most negative funds in the portfolio* |
| 1 Coriente Master Fund | 1 Goldman Sachs Global Alpha LP. |
| 2 Goldman Sachs Global Alpha LP. | 2 CAP Fund, LP |
| 3 Octavian Advisors Fund | 3 Octavian Advisors Fund |
| **Style Alpha  (May 2007)** | **Style Alpha (Last 12 months)** |
| *The 3 funds that most out-performed their style* | *The 3 funds that most out-performed their style* |
| 1 Coatue Qualified Partners Fund. | 1 Coriente Master Fund |
| 2 Tiger Global Fund, LP | 2 Tiger Global Fund, LP |
| 3 GSO Special Situations Overseas Fund LP | 3 Coatue Qualified Partners Fund. |
| *The 3 funds that most under-performed their style* | *The 3 funds that most under-performed their style* |
| 1 Coriente Master Fund | 1 Goldman Sachs Global Alpha LP. |
| 2 Goldman Sachs Global Alpha LP. | 2 Canyon Value Realization Fund LP Series B |
| 3 Cushing MLP Opportunity Fund I LP | 3 CAP Fund, L.P |
| **Marginal Increase** | **Removal** |
| *The 3 funds with the most significant risk in the portfolio* | *The 3 funds with the most significant risk in the portfolio* |
| 1 Coriente Master Fund | 1 Coriente Master Fund |
| 2 Wintergreen Partners Fund | 2 Canyon Value Realization Fund LP Series A |
| 3 Cushing MLP Opportunity Fund I LP | 3 Wintergreen Partners Fund |
| *The 3 funds with the least significant risk in the portfolio* | *The 3 funds with the least significant risk in the portfolio* |
| 1 GSO Origination Funding | 1 GSO Special Situations Overseas Fund LP |
| 2 GSO Special Situations Overseas Fund LP | 2 CAP Fund, L.P |
| 3 Octavian Advisors Fund | 3 GSO Origination Funding |
| **Marginal Increase** | **Removal** |
| *The 3 most significant factors in the portfolio* | *The 3 most significant factors in the portfolio* |
| 1 MSCI World ex-US | 1 HFR Fixed Income Convertible Bonds |
| 2 S&P500 Total Return | 2 HFR Event-Driven |
| 3 US Equity | 3 Value Equity |
| *The 3 least significant factors in the portfolio* | *The 3 least significant factors in the portfolio* |
| 1 VIX | 1 Barclay CTA |
| 2 HFR Short Selling | 2 HFR Equity Hedge |
| 3 Barclay CTA | 3 HFR Equity Market Neutral Stat Arb |



ALBOURNE

# Table of Contents

core.risk

Overview ................................................................ 1
Comment ............................................................... 2
 Modelling Assumptions ....................................... 3
Performance & Risk Metrics .................................. 4
Proforma ............................................................. 6
Return/Risk Rank ................................................ 7

I Return Analysis
 Performance Summary ......................................... 10
 Performance vs Styles .......................................... 11
 Portfolio Returns vs Benchmark ........................... 12

II Portfolio Composition
 Strategy Composition .......................................... 13
 Strategy Weight Comparison ................................ 14

III Factor Decomposition
 Factor Breakdown ............................................... 16
 Factor Breakdown Evolution ................................ 17
 Systematic Performance ....................................... 19
 Factor Return Contribution .................................. 20

IV Beta Analysis
 Beta of Portfolio Return Series ............................ 21
 Beta of Systematic Series .................................... 22
 Beta of Forecast Systematic Series ...................... 23

V Drawdown Analysis
 Drawdown Comparison ........................................ 24

VI Swoosh Analysis
 Swoosh Analysis ................................................. 26

VII Monte Carlo Analysis

VIII Marginal Analysis
 Beta vs Fund Allocation ...................................... 35
 Risk vs Fund Allocation ...................................... 36
 Risk vs Fund Residual ......................................... 37
 Risk vs Style ...................................................... 38

IX Required Rate of Return
 Required Rate of Return ....................................... 39

X Market State Analysis
 Market State Analysis .......................................... 40

XI Risk Analysis
 Risk Decomposition ............................................ 43

XII Risk Vs Return
 Risk vs Alpha Since Inception ............................. 44
 Risk vs Return Since Inception ............................ 45
 Risk vs Alpha 12m .............................................. 46
 Risk vs Return 12m ............................................. 47
 Risk vs Alpha ..................................................... 48
 Risk vs Return .................................................... 49

XIII Appendix
 Fund Style Modelling .......................................... 50
 Returns Summary ................................................ 52
 Portfolio Strategy Composition ............................ 53

Systematic vs Tactical Benchmarks ....................... 31
Stress Test in Event Periods ................................. 32
Stress Test .......................................................... 33
 vs US Equity .................................................... 33
 vs US High Yield Bonds .................................... 34



core.risk

Systematic Beta Analysis ........................................................... 55
Disclaimer .................................................................................. 63

ALBOURNE



core.risk

I Return Analysis

ALBOURNE

## LB Portfolio (Mar 07 NAV): Performance Summary

| Fund | Alloc % | Alloc $m | Fund Return May 2007 | Rank | Style Alpha May 2007 | Rank | Fund Return YTD | Rank | Style Alpha YTD | Rank | Fund Contrib $ May 2007 | Rank | Style Alpha $ May 2007 | Rank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CAP Fund, L.P. | 42.59% | 251.22 | 1.76% | 8 | 1.06% | 5 | 6.73% | 10 | 2.93% | 8 | 432.55% | 1 | 2.61 | 1 |
| GSO Special Situations Overseas Fund LP | 11.08% | 65.37 | 3.85% | 3 | 3.41% | 3 | 11.48% | 5 | 9.31% | 3 | 242.33% | 2 | 2.15 | 2 |
| Canyon Value Realization Fund LP Series A | 8.96% | 52.87 | 2.21% | 6 | 0.67% | 6 | 7.18% | 8 | 0.66% | 10 | 112.70% | 5 | 0.34 | 7 |
| Canyon Value Realization Fund LP Series B | 8.96% | 52.85 | 2.17% | 7 | 0.50% | 8 | 6.99% | 9 | 0.23% | 12 | 110.66% | 6 | 0.25 | 7 |
| Tiger Global Fund, LP | 4.99% | 29.41 | 6.80% | 1 | 4.72% | 2 | 13.12% | 4 | 7.15% | 5 | 187.25% | 3 | 1.30 | 4 |
| Coatue Qualified Partners Fund. | 4.52% | 26.66 | 6.20% | 2 | 5.76% | 1 | 16.14% | 1 | 13.97% | 1 | 160.94% | 4 | 1.49 | 3 |
| Crestline Partners Fund | 4.30% | 25.37 | 1.46% | 10 | 0.62% | 7 | 6.68% | 11 | 2.58% | 9 | 36.51% | 8 | 0.16 | 8 |
| GSO Origination Funding | 3.82% | 22.55 | 3.19% | 4 | 2.75% | 4 | 7.28% | 7 | 5.11% | 6 | 69.72% | 7 | 0.60 | 5 |
| Corriente Master Fund | 3.46% | 20.43 | -4.54% | 13 | -6.13% | 13 | 17.65% | 2 | 10.34% | 2 | -97.18% | 13 | -1.31 | 13 |
| Goldman Sachs Global Alpha LP | 2.15% | 12.69 | -2.30% | 12 | -4.02% | 12 | -5.78% | 13 | -9.68% | 13 | -29.87% | 12 | -0.52 | 12 |
| Wintergreen Partners Fund | 1.79% | 10.57 | 2.22% | 5 | -0.34% | 9 | 10.44% | 6 | 3.87% | 7 | 22.97% | 9 | -0.04 | 9 |
| Octavian Advisors Fund | 1.74% | 10.27 | 0.60% | 11 | -0.62% | 10 | 5.41% | 12 | 0.36% | 11 | 6.13% | 11 | -0.06 | 10 |
| Cushing MLP Opportunity Fund I LP | 1.63% | 9.59 | 1.70% | 9 | -1.54% | 11 | 19.60% | 1 | 9.29% | 4 | 16.03% | 10 | -0.14 | 11 |
| LB Portfolio (Mar 07 NAV) | 100.00% | 589.85 | 2.21% | | 1.00% | | 8.44% | | 3.38% | | 1270.70% | | 6.82 | |

village.albourne.com

See Returns Summary for a detailed breakdown of fund performance.

10





Performance vs Styles

I Return Analysis

ALBOURNE






I Return Analysis

**Portfolio Returns vs Benchmark**
**Objective Benchmark is HFR Fund Of Funds**

core.risk

ALBOURNE

village.albourne.com



12

core.risk

II Portfolio Composition

## Strategy Composition

### Current Super-Strategy Allocation for Portfolio



Relative Value 24.3%

Equity L/S 23.2%

Directional 2.2%

Long Only 4.6%

Event Driven 45%

### Current Actual Strategy Allocation for Portfolio



Event Driven - Multi-Strategy 1.8%

Event Driven - Equity 24.5%

Event Driven - Credit 18.7%

Equity L/S - Region 16.7%

Equity L/S - Sector 6.5%

Directional - Systematic 2.2%

Long Only - Equity 3.5%

Long Only - Alternatives 1.1%

Relative Value - Equity Derivative 6.5%

Relative Value - Non Equity 8.4%

Relative Value - Credit

### Regional Allocation



N. America 60.1%

Global 33.9%

W. Europe 4.4%

### Largest 8 Current Sub-Strategy Allocations in Portfolio

Value Equity 6.6%

Risk Arbitrage 7%

Fixed Income Arbitrage 8.4%

Relative Value Credit 8.8%

Activist 10.9%

Distressed / Restructuring 14.7%

Global Long / Short 16.7%

Other 20.5%

CB Arbitrage 6.3%

ALBOURNE





village.albourne.com

See Portfolio Strategy Composition for a fund level strategy breakdown.

13



core.risk

II Portfolio Composition

## Strategy Weight Comparison

### Active Strategy Allocation versus Model Portfolios (Super-Strategy level)

■ Albourne Model Portfolio (May 2007)    ■ Hedge Fund Market (Mar 2007)



### Active Strategy Allocation versus Model Portfolios (Strategy Level)

■ Albourne Model Portfolio (May 2007)    ■ Hedge Fund Market (Mar 2007)



ALBOURNE



core.risk

II Portfolio Composition

ALBŎURNE

## Strategy Weight Comparison (2)

### Breakdown of Active Strategy Allocation versus Model Portfolios

■ Albourne Model Portfolio (May 2007)   ■ Hedge Fund Market (Mar 2007)



### Breakdown of Active Strategy Allocation versus Model Portfolios

■ Albourne Model Portfolio (May 2007)   ■ Hedge Fund Market (Mar 2007)









III Factor Decomposition

**Factor Breakdown**

Change in Style Exposure Over Time

■ Feb 2007    ■ May 2007

HFR Convertible Arbitrage — 3.7% / 3.8%
HFR Distressed Securities — 8.1% / 8.0%
HFR Equity Market Neutral — 9.0% / 10.1%
HFR Event-Driven — 3.8% / 13.5%
HFR Fixed Income Arbitrage — 0.1% / 0.1%
HFR Fixed Income Convertible Bonds — 36.1% / 8.5%
HFR Macro — 1.9% / 1.7%
HFR Merger Arbitrage — 0.7% / 0.9%
HFR Sector Energy — 1.3% / 1.3%
MSCI World ex-US — 2.6% / 2.3%
Value Equity — 6.2% / 6.2%

core.risk

See Fund Style Modelling for a fund level strategy breakdown.

*village.albourne.com*



ALBOURNE

III Factor Decomposition

core.risk

## Factor Breakdown Evolution

### Historical Evolution of the Systematic Basket



(Big Cap - Small Cap) + T Bills ▶ ▶ HFR Convertible Arbitrage ▶ HFR Distressed Securities ▶ HFR Equity Market Neutral ▶ HFR Event-Driven ▶ HFR Fixed Income Arbitrage

HFR Fixed Income Convertible Bonds ◢ HFR Macro ▶ HFR Merger Arbitrage ◢ HFR Sector Energy ▶ MSCI World ex-US ▶ Value Equity ▶ US T Bills

ALBOURNE



III Factor Decomposition

# ALBOURNE

core.risk

**Factor Breakdown Evolution w.o. Cash**

Historical Evolution of the Systematic Basket







III Factor Decomposition

**Systematic Performance**

Comparison of Forecast Systematic Returns and Actual Portfolio Returns

**Correlation between forecast and actual: 44%**

— Forecast Returns —    — Actual Returns ---    --- 95% VaR

Comparison of Systematic, Systematic at February 2007, and Portfolio

— Systematic  ··· Feb 2007 Style Mix  — LB Portfolio (Mar 07 NAV) Actual

ALBOURNE



core.risk

village.albourne.com

20

ALBÖURNE



## Factor Return Contribution

**Style Contribution**

- May 2007
- Year to date
- Inception (Feb 2007) to date (Annualised)





**IV Beta Analysis**

**Beta of Portfolio Return Series**

Rolling Beta of Portfolio Returns against US Equity

—— Long-term beta    —— 12m Rolling Beta    —— Beta from Dec 2001 to Month

Rolling Beta of Portfolio Returns against US High Yield Bonds

—— Long-term beta    —— 12m Rolling Beta    —— Beta from Dec 2001 to Month

core.risk

village.albourne.com



ALBOURNE



core.risk

IV Beta Analysis

## Beta of Systematic Series

### Rolling Beta of Systematic Returns against US Equity

— Long-term beta   — 12m Rolling Beta   — Beta from Jan 1997 to Month



### Rolling Beta of Systematic Returns against US High Yield Bonds

— Long-term beta   — 12m Rolling Beta   — Beta from Jan 1997 to Month



ALBOURNE




core.risk

IV Beta Analysis

# Beta of Forecast Systematic Series

Rolling Beta of Forecast Systematic Returns against US Equity

— 12m Rolling Forecast Beta    — Long Term Forecast Beta for Month



Rolling Beta of Forecast Systematic Returns against US High Yield Bonds

— 12m Rolling Forecast Beta    — Long Term Forecast Beta for Month





ALBOURNE



core.risk

# V Drawdown Analysis

# ALBOURNE

## Drawdown Comparison (1)

Worst draw down since Mar 2002. Returns in *italic* are based on the systematic series for that fund, rather than actual fund returns, due to insufficient returns history.

| | CAP Fund, L.P. (Apr 2005-May 2005) | Canyon Value Realization Fund LP Series A (Jun 2002-Aug 2002) | Canyon Value Realization Fund LP Series B (May 2002-Jul 2002) | Coatue Qualified Partners Fund. (Aug 2003-Dec 2003) | Corrente Master Fund (Apr 2004-Jul 2004) | Crestline Partners Fund (Jun 2002-Jul 2002) | Cushing MLP Opportunity Fund I LP (Oct 2005-Nov 2005) | GSO Origination Funding (Oct 2005-Nov 2005) | GSO Special Situations Overseas Fund LP | Goldman Sachs Global Alpha LP. (Apr 2006-May 2007) |
|---|---|---|---|---|---|---|---|---|---|---|
| CAP Fund, L.P. | -1.52% | | | | | | | | | 13.74% |
| Canyon Value Realization Fund LP Series A | -0.54% | -5.58% | | | | | | | | 17.85% |
| Canyon Value Realization Fund LP Series B | -6.90% | -4.67% | -5.27% | | | | | | | 17.29% |
| Coatue Qualified Partners Fund. | -0.67% | -5.17% | -6.91% | 4.85% | | | | | | 19.93% |
| Coatue Master Fund | 6.53% | 3.28% | 2.23% | 14.16% | 5.98% | | | | | 62.68% |
| Corrente Partners Fund | -7.23% | -6.81% | -3.18% | 7.20% | 1.67% | -5.66% | 1.06% | 1.06% | | 14.14% |
| Crestline Partners Fund | -0.48% | -1.18% | -0.85% | -8.45% | 1.38% | 2.73% | -0.94% | -0.94% | | 37.48% |
| Cushing MLP Opportunity Fund I LP | -1.32% | -7.65% | -10.20% | 31.30% | -4.85% | -7.57% | -0.16% | -0.16% | | 18.56% |
| GSO Origination Funding | 1.31% | -6.11% | -5.61% | 4.62% | -17.88% | -9.22% | 1.27% | 1.27% | | 22.15% |
| GSO Special Situations Overseas Fund LP | 1.30% | 10.83% | 6.10% | 13.00% | -0.42% | -6.39% | -7.21% | -7.21% | | -21.59% |
| Goldman Sachs Global Alpha LP. | 9.72% | 6.44% | 10.27% | 17.16% | 1.90% | 2.91% | 0.68% | 0.68% | | 14.92% |
| Octavian Advisors Fund | -0.89% | -3.46% | -3.77% | 4.83% | 5.45% | 4.37% | -0.70% | -0.70% | | 32.62% |
| Tiger Global Fund, LP | -1.24% | 7.57% | 7.15% | 4.44% | -2.29% | 6.09% | 7.01% | 7.01% | | 30.31% |
| Wintergreen Partners Fund | 1.34% | -11.45% | -11.65% | 16.92% | -0.91% | -12.33% | -1.49% | -1.49% | | |
| HFR Fund Of Funds | -1.17% | -1.89% | -1.78% | 5.84% | -2.08% | -2.21% | 0.21% | 0.21% | | 12.63% |
| Systematic Series | -0.43% | -4.23% | -4.17% | 5.10% | -0.11% | -4.44% | 0.29% | 0.29% | | 12.02% |
| Proforma May 2007 | -0.73% | -1.95% | -1.40% | 6.70% | 2.48% | -2.33% | 0.38% | 0.38% | | 18.19% |
| LB Portfolio (Mar '07 NAV) (extended) | -0.75% | -2.02% | -1.41% | 6.84% | 2.40% | -2.41% | 0.39% | 0.39% | | 18.15% |



core.risk

# V Drawdown Analysis

# ALBOURNE

## Drawdown Comparison (2)

Worst draw down since Mar 2002. Returns in *italic* are based on the systematic series for that fund, rather than actual fund returns, due to insufficient returns history.

| | Octavian Advisors Fund Sep 2005 - Oct 2005 | Tiger Global Fund, LP May 2006 - Jun 2006 | Wintergreen Partners Fund May 2006 - Jun 2006 | HFR Fund Of Funds May 2006 - Jul 2006 | Systematic Series Jun 2002 - Sep 2002 | Proforma May 2007 Jun 2002 - Jul 2002 | LB Portfolio (Mar 07 NAV) (extended) Jun 2002 - Jul 2002 |
|---|---|---|---|---|---|---|---|
| CAP Fund, L.P | 0.96% | 1.55% | 1.55% | 0.90% | -6.86% | -5.66% | -5.66% |
| Canyon Value Realization Fund LP Series A | 0.12% | 0.64% | 0.64% | 1.17% | -5.54% | -5.56% | -5.56% |
| Canyon Value Realization Fund LP Series B | 0.05% | 0.58% | 0.58% | 1.07% | -4.74% | -6.19% | -6.19% |
| Coatue Qualified Partners Fund | 8.53% | -8.06% | -8.06% | -7.90% | 6.80% | 2.73% | 2.73% |
| Corrente Master Fund | 5.97% | -1.93% | -1.93% | -0.35% | -5.81% | -7.57% | -7.57% |
| Crestline Partners Fund | 0.01% | -0.04% | -0.04% | 0.14% | -1.03% | -1.47% | -1.47% |
| Cushing MLP Opportunity Fund II LP | -2.91% | 1.28% | 1.28% | 2.58% | -8.29% | -9.21% | -9.21% |
| GSO Origination Funding | 0.90% | 4.25% | 4.25% | 6.60% | -6.06% | -6.39% | -6.39% |
| GSO Special Situations Overseas Fund LP | 1.32% | 1.22% | 1.22% | 2.02% | 10.38% | 2.91% | 2.91% |
| Goldman Sachs Global Alpha LP | 12.41% | -1.91% | -1.91% | 0.91% | 5.22% | 4.37% | 4.37% |
| Octavian Advisors Fund | -2.27% | 2.50% | 2.50% | 3.54% | -4.06% | -3.70% | -3.70% |
| Tiger Global Fund, LP | 1.06% | -6.49% | -6.49% | -3.78% | 15.43% | 6.09% | 6.09% |
| Wintergreen Partners Fund | 2.83% | -3.66% | -3.66% | -0.01% | -16.00% | -12.33% | -12.33% |
| HFR Fund Of Funds | 0.08% | -2.50% | -2.50% | -2.70% | -2.33% | -2.21% | -2.21% |
| Systematic Series | 0.26% | 0.14% | 0.14% | 0.57% | -5.76% | -4.44% | -4.44% |
| Proforma May 2007 | 1.48% | 0.26% | 0.26% | 0.63% | -0.08% | -2.33% | -2.33% |
| LB Portfolio (Mar 07 NAV) (extended) | 1.52% | 0.28% | 0.28% | 0.65% | -0.23% | -2.41% | -2.41% |



core.risk

VI Swoosh Analysis

Swoosh Analysis (1)
CAP Fund, L.P

ALBOURNE






VI Swoosh Analysis

**Swoosh Analysis (2)**
**Coatue Qualified Partners Fund.**

**ALBOURNE**



**Corriente Master Fund**

**Crestline Partners Fund**





village.albourne.com





village.albourne.com




VI Swoosh Analysis

**Swoosh Analysis (5)**
**Wintergreen Partners Fund**

core.risk







ALBOURNE

30



core.risk

VII Monte Carlo Analysis

## Systematic vs Tactical Benchmarks

**ALBOURNE**



Returns of Current Systematic Exposure versus US Equity (Jan 1997 to Date)



Returns of Current Systematic Exposure versus US High Yield Bonds (Jan 1997 to Date)



Portfolio Average Systematic and Residual Performance in Different Market Environments for US Equity Deciles

■ US Equity    ■ Systematic    ■ Residuals    ▨ Total






Portfolio Average Systematic and Residual Performance in Different Market Environments for US High Yield Bonds Deciles

■ US High Yield Bonds    ■ Systematic    ■ Residuals    ▨ Total

village.albourne.com



VII Monte Carlo Analysis

# ALBOURNE

## Historic and Simulated Performance of the Systematic Mix

### Historical Average Performance of the Systematic Mix and the Residuals

| | US Equity Deciles | | | | US High Yield Bonds Deciles | | | |
|---|---|---|---|---|---|---|---|---|
| | US Equity | Systematic | Residuals | Total | US High Yield Bonds | Systematic | Residuals | Total |
| Worst | -8.07% | -1.22% | 0.29% | -0.92% | -3.61% | -1.12% | 0.22% | -0.90% |
| 9th | -3.45% | 0.04% | 0.15% | 0.19% | -1.12% | 0.37% | 0.22% | 0.59% |
| 8th | -1.96% | -0.05% | 0.39% | 0.34% | -0.44% | 0.31% | 0.21% | 0.52% |
| 7th | -0.76% | 0.26% | 0.21% | 0.47% | 0.26% | 0.55% | 0.20% | 0.74% |
| 6th | 0.63% | 0.58% | 0.14% | 0.72% | 0.64% | 0.63% | 0.29% | 0.93% |
| 5th | 1.29% | 0.76% | 0.56% | 1.31% | 1.07% | 1.14% | 0.12% | 1.26% |
| 4th | 2.22% | 1.00% | 0.26% | 1.26% | 1.37% | 0.77% | 0.37% | 1.14% |
| 3rd | 3.77% | 1.43% | 0.21% | 1.64% | 1.57% | 0.73% | 0.32% | 1.05% |
| 2nd | 5.39% | 1.64% | -0.02% | 1.63% | 1.97% | 1.28% | 0.18% | 1.46% |
| Best | 7.32% | 1.47% | -0.07% | 1.40% | 3.79% | 1.25% | -0.01% | 1.25% |

### Monte Carlo Simulations for Systematic Exposures only

| | Normal Market Conditions | | S&P500 Total Return Event Market Conditions | | US High Yield Bonds Event Market Conditions | | Current Market Conditions | |
|---|---|---|---|---|---|---|---|---|
| | Current | Overlay | Current | Overlay | Current | Overlay | Current | Overlay |
| Worst of 10000 | -3.78% | -2.30% | -8.03% | -3.08% | -6.22% | -3.81% | -1.88% | -1.36% |
| 99% | -2.27% | -1.42% | -3.86% | -1.83% | -3.98% | -1.92% | -1.20% | -0.79% |
| 95% | -1.60% | -1.01% | -2.79% | -1.30% | -2.80% | -1.37% | -0.84% | -0.55% |
| 75% | -0.68% | -0.41% | -1.14% | -0.54% | -1.14% | -0.55% | -0.34% | -0.22% |
| 50% | -0.01% | 0.00% | 0.01% | 0.01% | -0.02% | 0.00% | 0.00% | 0.00% |
| Beta to US Equity | 0.181 | -0.013 | 0.180 | -0.014 | 0.181 | -0.013 | 0.198 | 0.004 |
| R squared | 61% | 1% | 77% | 2% | 77% | 2% | 56% | 0% |
| Beta to US High Yield Bonds | 0.336 | 0.125 | 0.361 | 0.116 | 0.361 | 0.122 | 0.373 | 0.162 |
| R squared | 46% | 16% | 49% | 22% | 49% | 24% | 33% | 14% |
| Systematic Vol (p.a.) | 3.38% | 2.11% | 5.82% | 2.81% | 5.79% | 2.81% | 1.77% | 1.18% |

core.risk

village.albourne.com



village.albourne.com

core.risk

VII Monte Carlo Analysis

# Simulation of the Return Pattern of the Style Exposure Given Different Data Samples versus US Equity



ALBOURNE



Simulated systematic returns under normal market conditions

• Current Portfolio    ▶ Portfolio with Overlay



Simulated systematic returns under S&P500 Total Return event market conditions

• Current Portfolio    ▶ Portfolio with Overlay



Simulated systematic returns under US High Yield Bonds event market conditions

• Current Portfolio    ▶ Portfolio with Overlay

Simulated systematic returns under current market conditions

• Current Portfolio    ▶ Portfolio with Overlay













village.albourne.com

core.risk

VII Monte Carlo Analysis

ALBOURNE



# VIII Marginal Analysis

# Change in Portfolio Beta Subject to Changes in Fund Allocations



### Effect on Portfolio Beta of a increase of 1% of Portfolio Value to Each Fund Individually (with Rebalancing)

■ US Equity    ■ US High Yield Bonds

* indicates that the fund has no systematic factors.



### Effect on Portfolio Beta of the Removal of Each Fund Individually (with Rebalancing)

■ US Equity    ■ US High Yield Bonds

* indicates that the fund has no systematic factors.



ALBOURNE

village.albourne.com



core.risk

VIII Marginal Analysis

## Change in Portfolio Risk (Basis Points) Subject to Changes in Fund Allocations



Effect on Portfolio Risk of an Increase of 1% of Portfolio Value in Each Fund Individually with Rebalancing



Effect on Portfolio Risk of Removal of Each Fund Individually with Rebalancing

ALBOURNE





core.risk

VIII Marginal Analysis

ALBOURNE

## Effect on Portfolio Risk (Basis Points) of Removal of Each Fund's Residual Risk

Largest negative bar represents the biggest source of fund-specific risk to the portfolio.

Effect on Portfolio Risk of Removal of Each Fund's Residual Risk





core.risk

village.albourne.com

VIII Marginal Analysis

ALBOURNE

**Change in Portfolio Risk (Basis Points) Subject to Changes in Style Allocations**



Effect on Portfolio Risk of a 1% Increase in Implied Allocation to Styles



Effect on Portfolio Risk of Removal of Implied Allocation to Styles





core.risk

IX Required Rate of Return

**Required Rate of Return**



Required and Actual Rates of Return

- RRoR
- Fund Return
- 12m Fund Return



ALBOURNE



core.risk

X Market State Analysis

**Market State Analysis (1)**

Jan 1998 to May 2007 (112 data points)



ALBOURNE

40

village.albourne.com





core.risk

X Market State Analysis

**Market State Analysis (3)**
Jan 1998 to May 2007 (112 data points)



■ Average Return    Average Index Return    —— Hit Rate    ● May 2007 Return    ▲ May 2007 Index Return

ALBOURNE



# XI Risk Analysis

ALBOURNE

## Risk Decomposition

### Proforma from Jun 2005 to May 2007

| Fund | Allocation $m | Allocation Perc | Fund Risk | Decomposed Risk Act. | Decomposed Risk Rank | Decomposed Risk Perc |
|---|---|---|---|---|---|---|
| CAP Fund, LP | $251.22 | 42.59% | 2.19% | 0.64% | 2 | 22.63% |
| Canyon Value Realization Fund LP Series A | $52.87 | 8.96% | 2.73% | 0.18% | 6 | 6.34% |
| Canyon Value Realization Fund LP Series B | $52.85 | 8.96% | 2.73% | 0.18% | 7 | 6.33% |
| Costue Qualified Partners Fund. | $26.66 | 4.52% | 11.44% | 0.30% | 4 | 10.51% |
| Corriente Master Fund | $20.43 | 3.46% | 26.98% | 0.65% | 1 | 23.19% |
| Crestline Partners Fund | $25.37 | 4.30% | 2.46% | 0.08% | 10 | 2.95% |
| Cushing MLP Opportunity Fund I LP | $9.59 | 1.63% | 10.38% | 0.08% | 8 | 3.67% |
| GSO Origination Funding | $22.55 | 3.82% | 3.61% | 0.04% | 11 | 1.42% |
| GSO Special Situations Overseas Fund LP | $65.37 | 11.08% | 2.98% | 0.19% | 5 | 6.66% |
| Goldman Sachs Global Alpha LP. | $12.69 | 2.15% | 14.64% | 0.02% | 13 | 0.54% |
| Octavian Advisors Fund | $10.27 | 1.74% | 4.01% | 0.02% | 12 | 0.78% |
| Tiger Global Fund, LP | $29.41 | 4.99% | 10.30% | 0.34% | 3 | 11.92% |
| Wintergreen Partners Fund | $10.57 | 1.79% | 6.93% | 0.09% | 9 | 3.06% |
| Portfolio | $589.85 | 100.00% | 2.82% | 2.82% | | 100.00% |

core.risk





## Marginal Risk vs Average Monthly Alpha Since Inception

Marginal Contribution to Risk and Alpha Since Inception

- ● CAP Fund, L.P
- ◆ Canyon Value Realization Fund LP Series A
- ◆ Canyon Value Realization Fund LP Series B
- ◀ Coatue Qualified Partners Fund
- ■ Corrente Master Fund
- ✚ Crestline Partners Fund
- ✱ Cushing MLP Opportunity Fund I LLP
- ● GSO Origination Funding
- ● GSO Special Situations Overseas Fund LP
- ◆ Goldman Sachs Global Alpha LP.
- ◀ Octavian Advisors Fund
- ■ Tiger Global Fund, LP
- ✚ Wintergreen Partners Fund

XII Risk V/s Return

ALBOURNE

core.risk






Marginal Risk vs Average Monthly Return Since Inception

XII Risk Vs Return

Marginal Contribution to Risk and Average Monthly Return

ALBOURNE

core.risk

● CAP Fund, L.P
◆ Canyon Value Realization Fund LP Series A
▼ Canyon Value Realization Fund LP Series B
■ Coatue Qualified Partners Fund.
● Corriente Master Fund
+ Crestline Partners Fund
✱ Cushing MLP Opportunity Fund I LP
● GSO Origination Funding
● GSO Special Situations Overseas Fund LP
◆ Goldman Sachs Global Alpha LP
▼ Octavian Advisors Fund
■ Tiger Global Fund, L.P
+ Wintergreen Partners Fund

Average Monthly Return from Inception

Relative Marginal Risk











**Marginal Risk vs Average Monthly Return Over The Last 12 Months**

XII Risk Vs Return

core.risk

- ● CAP Fund, L.P.
- ◆ Canyon Value Realization Fund LP Series A
- ▼ Canyon Value Realization Fund LP Series B
- ◆ Coatue Qualified Partners Fund.
- ■ Corriente Master Fund
- ✚ Crestine Partners Fund
- ✳ Cushing MLP Opportunity Fund I LP
- ● GSO Origination Funding
- ◆ GSO Special Situations Overseas Fund LP
- ◆ Goldman Sachs Global Alpha LP
- ▼ Octavian Advisors Fund
- ■ Tiger Global Fund, LP
- ✚ Wintergreen Partners Fund

Marginal Contribution to Risk and Last 12 Month's Average Monthly Return

Relative Marginal Risk

Last 12m Average Monthly Return



ALBOURNE






Marginal Risk vs Monthly Alpha for May 2007

Marginal Contribution to Risk and Last Month's Alpha

XII Risk Vs Return



ALBOURNE

core.risk

- ● CAP Fund, L.P
- ▶ Canyon Value Realization Fund LP Series A
- ◆ Canyon Value Realization Fund LP Series B
- ◀ Coatue Qualified Partners Fund.
- ■ Contente Master Fund
- ✚ Crestline Partners Fund
- ✕ Cushing MLP Opportunity Fund I LP
- ● GSO Origination Funding
- ▶ GSO Special Situations Overseas Fund LP
- ◆ Goldman Sachs Global Alpha LP.
- ▲ Octavian Advisors Fund
- ■ Tiger Global Fund, LP
- ✚ Wintergreen Partners Fund








# XIII Appendix

## Fund Style Modelling (1)

**ALBOURNE**

core.risk

| | CAP Fund, L.P | Canyon Value Realization Fund LP Series A | Canyon Value Realization Fund LP Series B | Coatue Qualified Partners Fund. | Corriente Master Fund | Crestline Partners Fund | Cushing MLP Opportunity Fund I LP | GSO Origination Funding | GSO Special Situations Overseas Fund LP |
|---|---|---|---|---|---|---|---|---|---|
| Actual Allocation | $ 251.22m | $ 52.87m | $ 52.85m | $ 26.66m | $ 20.43m | $ 25.37m | $ 9.59m | $ 22.55m | $ 65.37m |
| Allocation | 42.6% | 9.0% | 9.0% | 4.5% | 3.5% | 4.3% | 1.6% | 3.8% | 11.1% |
| Asset/Style 1 | HFR Fixed Income Convertible Bonds | HFR Distressed Securities | HFR Distressed Securities | | MSCI World ex-US | HFR Distressed Securities | HFR Sector Energy | | |
| Beta | 0.37† | 0.57*** | 0.55*** | | 0.67** | 0.21+ | 0.83*** | | |
| Forecast Beta | 0.20+ | 0.42+ | 0.42+ | | 0.67 | 0.12+ | 0.83 | | |
| Asset/Style 2 | HFR Event-Driven | HFR Convertible Arbitrage | HFR Convertible Arbitrage | | | HFR Event-Driven | | | |
| Beta | 0.00* | 0.27* | 0.45** | | | 0.13* | | | |
| Forecast Beta | 0.26+ | 0.21+ | 0.21+ | | | 0.36+ | | | |
| Asset/Style 3 | | Value Equity | Value Equity | | | HFR Fixed Income Arbitrage | | | |
| Beta | | 0.03 | 0.07*** | | | 0.19** | | | |
| Forecast Beta | | 0.27+ | 0.27+ | | | 0.03+ | | | |
| Asset/Style 4 | | HFR Merger Arbitrage | HFR Merger Arbitrage | | | | | | |
| Beta | | 0.23 | 0.15 | | | | | | |
| Forecast Beta | | 0.05+ | 0.05+ | | | | | | |
| Actual Fund Alpha | 2.60% | 2.20% | 1.18% | 10.84% | 22.23% | 1.99% | 6.17% | 5.68% | 25.11% |
| Residual scaler | 100% | 150% | 150% | 100% | 100% | 100% | 100% | 150% | 150% |
| $R^2$ | 6.99% | 51.09% | 68.68% | | 17.59% | 61.74% | 48.50% | | |

* T-Stat>2   ** T-Stat>3   *** T-Stat>4   + Beta overridden



core.risk

XIII Appendix

**ALBOURNE**

## Fund Style Modelling (2)

| | Goldman Sachs Global Alpha LP. | Octavian Advisors Fund | Tiger Global Fund, LP | Wintergreen Partners Fund |
|---|---|---|---|---|
| Actual Allocation | $12.69m | $10.27m | $29.41m | $10.57m |
| Allocation | 2.2% | 1.7% | 5.0% | 1.8% |
| Asset/Style 1 | HFR Macro | HFR Event-Driven | HFR Equity Market Neutral | Value Equity |
| Forecast Beta | 0.79* | 0.48* | 2.03** | 0.76*** |
| Asset/Style 2 | | | | |
| Beta | | | | |
| Forecast Beta | 0.79 | 0.48 | 2.03 | 0.76 |
| Asset/Style 3 | | | | |
| Beta | | | | |
| Forecast Beta | | | | |
| Asset/Style 4 | | | | |
| Beta | | | | |
| Forecast Beta | | | | |
| Actual Fund Alpha | 3.48% | 1.70% | 19.25% | 10.79% |
| Residual scaler | 150% | 100% | 100% | 100% |
| R² | 8.98% | 21.25% | 13.78% | 47.03% |

* T-Stat>2  ** T-Stat>3  *** T-Stat>4  + Beta overridden



core.risk

XIII Appendix

# ALBOURNE

## Returns Summary

| | CAP Fund, L.P | Canyon Value Realization Fund LP Series A | Canyon Value Realization Fund LP Series B | Coatue Qualified Partners Fund. | Corriente Master Fund | Crestline Partners Fund | Cushing MLP Opportunity Fund I LP | GSO Origination Funding | GSO Special Situations Overseas Fund LP | Goldman Sachs Global Alpha LP. | Octavian Advisors Fund | Tiger Global Fund, LP | Wintergreen Partners Fund | Portfolio | HFR Fund Of Funds | Forecast Series |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jun 2006 | 1.03% | 0.04% | 0.01% | -2.45% | -4.34% | 0.26% | 0.86% | 2.80% | 0.45% | 2.02% | 2.48% | -3.30% | -0.10% | 0.29% | -0.60% | 0.20% |
| Jul 2006 | -0.64% | 0.53% | 0.49% | 1.64% | 1.28% | 0.18% | 2.26% | 2.26% | 0.79% | 2.87% | 1.01% | 3.79% | 3.79% | 0.37% | -0.21% | 0.49% |
| Aug 2006 | 0.36% | 1.36% | 1.33% | -1.70% | -1.70% | 0.35% | 0.57% | 2.56% | 0.53% | -8.89% | 0.45% | 1.62% | 1.62% | 0.44% | 0.78% | 0.98% |
| Sep 2006 | 0.29% | 0.40% | 0.40% | 2.50% | -9.56% | 0.60% | -1.93% | 0.57% | 1.08% | -2.76% | 0.70% | -1.09% | -1.09% | 0.13% | -0.03% | 0.78% |
| Oct 2006 | 0.71% | 2.27% | 2.23% | 14.46% | 8.71% | 1.48% | -4.37% | 0.14% | 1.45% | -2.81% | 1.26% | 4.84% | 1.62% | 1.62% | 1.69% | 1.07% |
| Nov 2006 | 1.57% | 2.23% | 2.50% | 6.40% | 13.36% | 1.57% | 0.97% | 1.44% | 1.20% | -7.33% | 1.51% | 4.19% | 2.07% | 1.69% | 1.80% |  |
| Dec 2006 | 1.84% | 1.81% | 1.81% | -0.10% | 8.44% | 0.73% | 1.72% | 0.73% | 2.13% | 5.10% | 1.38% | 6.30% | 1.95% | 1.86% | 2.05% | 1.80% |
| Jan 2007 | 1.08% | 1.18% | 1.15% | 8.44% | 8.44% | 0.70% | 3.64% | 0.39% | 1.73% | 3.72% | -0.37% | 4.80% | 1.76% | 2.07% | 1.55% |  |
| Feb 2007 | 1.22% | 1.42% | 1.39% | 2.80% | 2.48% | 2.48% | 0.97% | 0.73% | 0.90% | -5.57% | 0.95% | 3.54% | 1.79% | 1.76% | 1.02% | 2.05% |
| Mar 2007 | 1.71% | 1.06% | 1.03% | 1.87% | -6.50% | 1.25% | 2.48% | 0.39% | -2.00% | -2.03% | 0.92% | -0.52% | 1.30% | 1.02% | 0.55% | 1.55% |
| Apr 2007 | 1.18% | 0.83% | 0.80% | 3.10% | 5.70% | 1.23% | 4.75% | 1.40% | 2.36% | 0.32% | 1.38% | 2.51% | 1.45% | 0.82% | 1.01% | 1.02% |
| May 2007 | 0.69% | 1.47% | 1.42% | 3.70% | 7.03% | 1.46% | 1.70% | 1.11% | 2.17% | 0.50% | 2.09% | 2.40% | 1.79% | 1.14% | 0.94% | 0.55% |
| **Since Inception** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| (Inception) | Jan 2006 | Jan 1999 | Jan 1999 | Dec 2001 | Dec 1999 | Oct 1997 | Nov 2006 | Mar 2006 | Aug 2005 | Dec 2001 | Apr 2006 | Mar 2001 | Oct 2005 | Dec 2001 | Jan 1990 | Dec 2001 |
| Annualised Return | 9.04% | 14.39% | 13.78% | 14.24% | 33.12% | 8.68% | 42.27% | 14.99% | 15.21% | 11.21% | 12.66% | 29.11% | 24.60% | 12.80% | 10.11% | 7.11% |
| Annualised Volatility | 2.81% | 5.12% | 4.98% | 12.73% | 22.07% | 2.89% | 14.99% | 3.25% | 3.08% | 13.14% | 2.78% | 10.62% | 7.39% | 3.16% | 5.44% | 4.98% |
| Risk Free Rate | 2.83% | 3.53% | 3.53% | 2.71% | 2.89% | 3.74% | 5.26% | 5.10% | 4.68% | 2.63% | 5.13% | 2.82% | 4.77% | 2.63% | 4.45% | 7.38% |
| Sharpe Ratio | 2.21 | 2.12 | 2.06 | 0.85 | 1.38 | 1.71 | 6.09 | 3.05 | 3.42 | 0.65 | 2.71 | 2.47 | 2.68 | 3.22 | 0.90 | 0.90 |
| **Since the Following Date** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| (Date) | Jan 2003 | Dec 2001 | Dec 2001 | Dec 2001 | Jul 2001 | Oct 1997 | Nov 2006 | Jun 2005 | Aug 2005 | Dec 2001 | Jun 2005 | Dec 2001 | Jun 2005 | Dec 2001 | Dec 2001 | Dec 2001 |
| Annualised Return | 9.04% | 13.73% | 12.64% | 16.25% | 35.13% | 9.59% | 42.27% | 14.83% | 15.51% | 11.43% | 11.43% | 25.68% | 25.43% | 12.80% | 8.27% | 8.27% |
| Annualised Volatility | 2.81% | 4.26% | 4.22% | 10.23% | 22.72% | 2.89% |  | 3.61% | 2.98% | 13.14% | 4.01% | 9.86% | 6.93% | 3.16% | 3.53% | 7.11% |
| Risk Free Rate | 2.83% | 2.65% | 2.65% | 2.65% | 2.63% | 2.63% |  | 4.51% | 4.51% | 2.63% | 4.51% | 2.63% | 4.51% | 2.63% | 2.63% | 4.98% |
| Sharpe Ratio | 2.21 | 2.61 | 2.37 | 1.33 | 1.43 | 2.76 |  | 2.86 | 3.69 | 0.65 | 1.72 | 2.34 | 3.02 | 3.22 | 1.60 | 2.63 |
| **Returns by Year** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| YTD 2007 | 6.73% | 7.18% | 6.99% | 16.14% | 17.65% | 6.68% | 19.60% | 7.28% | 11.48% | -5.78% | 5.41% | 13.12% | 10.44% | 8.44% | 7.12% | 5.00% |
| 2006 | 10.88% | 13.27% | 12.83% | 11.79% | 78.36% | 11.99% | 26.33% | 13.96% | 11.80% | -8.83% | 15.29% | 23.44% | 27.28% | 14.78% | 10.39% | 13.87% |
| 2005 | 3.99% | 9.44% | 8.82% | 48.41% | 50.64% | 8.01% |  |  | 38.04% | 1.22% |  | 35.04% | 11.67% | 11.67% | 7.50% | 4.19% |
| 2004 | 10.23% | 14.61% | 12.55% |  | 62.40% | 7.66% |  |  |  |  |  | 21.03% |  | 10.93% | 6.87% | 7.38% |
| 2003 | 7.99% | 24.97% | 21.87% |  | 34.38% | 13.03% |  |  |  |  |  | 14.48% |  | 14.39% | 11.62% | 13.91% |
| 2002 | 5.17% | 5.21% | 5.61% |  | -4.54% | 5.02% |  |  |  | 8.67% |  | 30.24% |  | 8.27% | 1.01% | -5.35% |



core.risk

XIII Appendix

# Portfolio Strategy Composition

ALBOURNE

| Fund | Allocation $m | Allocation % | Quantitative Equity MN (Equity) | CB Arbitrage (Equity Derivative) | Volatility Arbitrage | Fixed Income Arbitrage (Non Equity) | Relative Value Credit (Credit) | Distressed / Restructuring (Credit) | Direct Lending | Risk Arbitrage (Event Driven Equity) | Value Equity | Activist | Multi-Strategy - Event Driven (Multi-Strategy) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **589.85** | **100.00%** | | | | | | | | | | | |
| CAP Fund, L.P | 251.22 | 42.59% | | | | | 0.1 | 0.4 | 0.0 | 0.1 | 0.3 | | |
| Canyon Value Realization Fund LP Series A | 52.87 | 8.96% | | 0.1 | | 0.2 | | 0.4 | 0.0 | 0.1 | 0.3 | | |
| Canyon Value Realization Fund LP Series B | 52.85 | 8.96% | | 0.2 | | 0.0 | | | | | | | |
| Coatue Qualified Partners Fund | 26.66 | 4.52% | | | | | | | | | | | |
| Corrente Master Fund | 20.43 | 3.46% | | | | | | | | | | | |
| Crestline Partners Fund | 25.37 | 4.30% | 0.1 | | 0.1 | | 0.2 | 0.1 | | 0.1 | | | 0.2 |
| Cushing MLP Opportunity Fund I LLP | 9.59 | 1.63% | | | | | | | | | | | |
| GSO Origination Funding | 22.55 | 3.82% | | | | | | 1 | | | | | |
| GSO Special Situations Overseas Fund LP | 65.37 | 11.08% | | | | | 0.3 | 0.3 | 0.3 | | | | |
| Goldman Sachs Global Alpha LP | 12.69 | 2.15% | | | | | | | | | | | |
| Octavian Advisors Fund | 10.27 | 1.74% | | | | | | 0.1 | | | | | 0.5 |
| Tiger Global Fund, LP | 29.41 | 4.99% | | | | | | | | 0.5 | 0.3 | 0.3 | |
| Wintergreen Partners Fund | 10.57 | 1.79% | | | | | | | | | 1 | | 0.5 |

Allocation per strategy: Quantitative Equity MN 0.6%, CB Arbitrage 6.3%, Volatility Arbitrage 0.2%, Fixed Income Arbitrage 8.4%, Relative Value Credit 8.8%, Distressed / Restructuring 14.7%, Direct Lending 4.0%, Risk Arbitrage 7.0%, Value Equity 6.6%, Activist 10.9%, Multi-Strategy - Event Driven 1.8%

Allocation per super strategy: Equity 0.6%, Equity Derivative 6.5%, Non Equity 8.4%, Credit 18.7%, Event Driven Equity 24.5%, Multi-Strategy 1.8%

Super Strategy: Relative Value 24.3%, Credit 18.7%, Event Driven 45.5%, Multi-Strategy 1.8%





core.risk

XIII Appendix

**ALBOURNE**

## Portfolio Strategy Composition

| | Allocation $m | Allocation % (Strategy) | Global Long / Short (Region) | Sector Commodity | Sector Technology | Sector Utilities / Energy | CTA | Global Asset Allocation | Global Long Only (Equity) | Private Equity (Alternatives) | Other | Cash |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **589.85** | **100.00%** | 16.7% | | | | | | | | | |
| CAP Fund, L.P | 251.22 | 42.59% | 1 | | | | | | | | | |
| Canyon Value Realization Fund LP Series A | 52.87 | 8.96% | 0.1 | | | | | | | | | |
| Canyon Value Realization Fund LP Series B | 52.85 | 8.96% | 0.3 | | | | | | | | | |
| Coatue Qualified Partners Fund. | 26.66 | 4.52% | | | 1 | | | | | | | |
| Corrente Master Fund | 20.43 | 3.46% | | 0.1 | | | | | | | | |
| Crestline Partners Fund | 25.37 | 4.30% | | | | | | | | | | |
| Cushing MLP Opportunity Fund I LP | 9.59 | 1.63% | | | | 1 | | | | | | |
| GSO Origination Funding | 22.55 | 3.82% | | | | | | | | 0.1 | | |
| GSO Special Situations Overseas Fund LP | 65.37 | 11.08% | | | | | | | | | | |
| Goldman Sachs Global Alpha LP | 12.69 | 2.15% | | | | | | 1 | | | | |
| Octavian Advisors Fund | 10.27 | 1.74% | | | | | | | | | 0.1 | |
| Tiger Global Fund, LP | 29.41 | 4.99% | | | | | | | 1 | | | |
| Wintergreen Partners Fund | 10.57 | 1.79% | | | | | | | | | | 0.1 |

Super Strategy percentages:

| Strategy | Equity L/S | | | | Directional (Systematic) | | Long Only (Equity / Alternatives) | | Other | Cash |
|---|---|---|---|---|---|---|---|---|---|---|
| | Global Long / Short | Sector Commodity | Sector Technology | Sector Utilities / Energy | CTA | Global Asset Allocation | Global Long Only | Private Equity | Other | Cash |
| 100.00% | 16.7% | 0.3% | 6.5% | 1.6% | 0.0% | 2.2% | 3.5% | 1.1% | 0.5% / 0.0 | 0.2% |
| | 16.7% | 23.2% | 4.5% | | 0.0% | 2.2% 2.2% | 3.5% | 1.1% | 0.5% 0.5% / 0.0 | 0.2% 0.2% |
| | | | | | | | 4.6% | | | |





LB Portfolio (Mar 07 NAV): Systematic Beta Analysis for May 2007

● HFR Convertible Arbitrage
◆ HFR Distressed Securities
◆ HFR Equity Market Neutral
◀ HFR Even-Driven
■ HFR Fixed Income Arbitrage
✚ HFR Fixed Income Convertible Bonds
✖ HFR Macro
● HFR Merger Arbitrage
▲ HFR Sector Energy
◆ MSCI World ex-US
◀ Value Equity

XIII Appendix



ALBOURNE

XIII Appendix

ALBOURNE

## core.risk

| Factor | Weight |
|---|---|
| HFR Event-Driven | 13.45% |
| HFR Equity Market Neutral | 10.13% |
| HFR Fixed Income Convertible Bonds | 8.52% |
| HFR Distressed Securities | 8.04% |
| Value Equity | 6.21% |
| HFR Convertible Arbitrage | 3.76% |
| MSCI World ex-US | 2.31% |
| HFR Macro | 1.70% |
| HFR Sector Energy | 1.35% |
| HFR Merger Arbitrage | 0.90% |
| HFR Fixed Income Arbitrage | 0.13% |

| | Current Weights | Period |
|---|---|---|
| Risk | 3.08% | |
| Return | 7.48% | |
| Sharpe | 1.11 | |
| Omega | 1.54 | |
| Drawdown | -3.92% | |
| Skew | -1.14 | |
| Kurtosis | 2.55 | |
| Libor Plus | 3.42% | |
| Beta-MSCI World | 0.23 | |
| Bubble Burst | 4.64% | Apr 2000 - Jan 2001 |
| September 11 | -1.37% | Sep 2001 - Sep 2001 |
| Credit Event | -3.92% | Jul 2002 - Sep 2002 |
| HF Drawdown | 0.21% | Apr 2004 - Aug 2004 |
| FI Event | 1.13% | Jun 2003 - Jul 2003 |

HFR Convertible Arbitrage (Jun 2002 - May 2007)

HFR Distressed Securities (Jun 2002 - May 2007)







core.risk

XIII Appendix

village.albourne.com

ALBOURNE

58















# ALBOURNE

## core.risk

### IMPORTANT NOTICE

The following should be particularly noted in connection with your use of this report and any communication concerning this report between you and Albourne Partners Limited (the "Company") or any subsidiary or affiliate of the Company (including but without limitation Albourne America LLC and Albourne Partners (Asia) Limited) (together "Albourne"). The words and phrases used below shall be subject to the interpretation given in the relevant Albourne terms and conditions of business (the "Ts&Cs").

1. This report has been prepared for information purposes only and not with a view to inviting or inducing the acquisition or disposal of, or any interest in the fund or funds mentioned in this report, any other fund or to engage in any other investment activity.

2. The conclusions of this report are statements of opinion only which are based upon data which is reasonably believed to be true, accurate, complete and sufficiently comprehensive to give a fair portrayal of the matters concerned, but Albourne does not otherwise give any warranty as to the truth, accuracy or currency of such third party data or that it is complete or sufficient to give a comprehensive or fair picture of the matters concerned.

3. The opinions stated in this report are derived from third party data from official and public records and funds or fund managers which may or may not be within a regulatory system. Unless there are reasonable grounds to question its accuracy, Albourne does not routinely conduct any due diligence on third party data to verify its adequacy, accuracy or completeness.

4. Any opinion expressed or advice contained in this report is warranted in accordance with Albourne's Ts&Cs as at the date of this report. Unless otherwise provided for in such Ts&Cs, Albourne does not accept a continuing duty to review its opinions after the date of the report or to communicate any change to its opinions to you.

5. **Conflicts of Interest**: We give general notice to you that as well as investors, Albourne clients include asset allocators connected with funds which may be the subject of this report. Albourne will take reasonable steps to manage any conflict or potential conflict of interest arising, but regards it as in the best interest of all of its clients that Albourne should not be restricted in relation to the funds taken into review as a result only of any actual or potential conflict of interest arising. In appropriate cases Albourne will decline to act for an asset allocator.

6. This report is for the use of the Client and/or any Approved Person, as the case may be, only who has represented that it is acting in the course of its profession and is able to make investment decisions without reliance on the information in this report.

7. For the protection of persons other than the Client who are not authorised to receive the information contained in this report, this report may not be reproduced in whole or in part in any media except for the personal reference of the Client and no part of this material may be reproduced, distributed or transmitted or otherwise made available so that it may be seen by any other person or incorporated in any way into another document or other material or posted to any bulletin board.

8. You understand that you are solely responsible for reviewing any fund, its offering documents and any statements made by a fund or its manager and for performing such additional due diligence as you may deem appropriate including consulting your own legal, tax and compliance advisors and any information provided by Albourne shall not form the primary basis of any investment decision you may make.

9. You also understand that investments in hedge funds are speculative, involve a high degree of risk and are illiquid: you could lose all or a substantial amount of any investment you make in a hedge fund. Further you understand that hedge funds:

   1. are not required to provide periodic pricing or valuation information to you, the investor, or to your agent;
   2. may involve complex tax structures and delays in distributing important tax information;
   3. are not necessarily subject to the same regulatory requirements as mutual funds;
   4. often charge higher fees than mutual funds, which high fees may off set the funds' trading profits;
   5. may have a limited operating history;
   6. may be highly leveraged and their performance can be volatile;
   7. may have a fund manager who has total trading authority over the fund and the use of a single advisor applying generally similar trading programmes with the potential for a lack of diversification and concomitantly higher risk;
   8. may not have a secondary market for your interest in the fund, with none expected to develop;
   9. may have restrictions on transferring interests in the funds; and
   10. may effect a substantial portion of their trades on foreign exchanges.

10. This report is provided subject to the Ts&Cs. In the case of any conflict between the Ts&Cs and anything set out herein, the terms of the Ts&Cs shall take precedence and for the avoidance of doubt, any exclusion or restriction on liability referred to herein shall be qualified by the terms of the Ts&Cs.

### ADDITIONAL IMPORTANT INFORMATION FOR U.S. CLIENTS AND PERSONS RECEIVING THIS REPORT WITHIN THE U.S.

The interest or the fund or funds mentioned in this report have not been registered or qualified for sale under the United States Securities Act of 1933, as amended, or any state's securities laws. Such interests are generally offered pursuant to exemptions from such registration or qualification. The offering documents with respect to the fund or funds mentioned in this report are generally not filed with the United States Securities and Exchange Commission (the "SEC") and neither the SEC nor any state securities administrator has passed on, or endorsed, the merits of an investment in such a fund or funds or the accuracy or the adequacy of the information contained in such offering documents. Additionally, you should be aware that the offering documents do not constitute an offer to sell, or a solicitation to buy, interest in such a fund or funds in any state or jurisdiction in which such an offer or solicitation is unlawful. You should carefully review the relevant offering documents before investing in the fund or funds mentioned in this report.





| Super-Strategy | | | | | | | | | | |
| Strategy | | | | | | | | | | |
| Sub-Strategy | | | | | | | | | | |
| | Fundamental Equity MN | Quantitative Equity MN | Statistical Arbitrage | Closed-End Fund | Index Arbitrage | CB Arbitrage | Volatility Arbitrage | Fixed Income Arbitrage | Mortgage Arbitrage | Municipal Bond Arbitrage |
| CAP Fund, L.P | 0.00% | 0.56% | 0.00% | 0.00% | 0.00% | 6.25% | 0.22% | 8.43% | 0.00% | 0.00% |
| Canyon Value Realization Fund LP Series A | | | | | | | | | | |
| Canyon Value Realization Fund LP Series B | | | | | | | | | | |
| Coatue Qualified Partners Fund. | | | | | | | | | | |
| Corriente Master Fund | | | | | | | | | | |
| Crestline Partners Fund | | | | | | | | | | |
| Cushing MLP Opportunity Fund I LP | | 0.13 | | | | 0.06 / 0.21 / 0.21 | 0.05 | 0.20 | | |
| GSO Origination Funding | | | | | | | | 0.02 | | |
| GSO Special Situations Overseas Fund LP | | | | | | | | | | |
| Goldman Sachs Global Alpha L.P. | | | | | | | | | | |
| Octavian Advisors Fund | | | | | | | | | | |
| Tiger Global Fund, LP | | | | | | | | | | |
| Wintergreen Partners Fund | | | | | | | | | | |

Style Allocations











Exhibit E-2

**LMB HEDGE FUND INVESTMENTS**
**SUMMARY OF TERMS**
($ Millions)

CONFIDENTIAL
As of 8/7/07

| Fund Name (1) / Internal Partnership | Description | LP Investment (2) | | | Lock-Up | Lock-Up Exp Date | Liquidity | |
|---|---|---|---|---|---|---|---|---|
| | | Allocation % | Amount | Date | | | Frqncy | Notice |
| **Domestic CAP Partners, L.P.**<br>*None, direct investments* | Multi-strategy fund seeking stable, uncorrelated returns by opportunistically allocating across event-driven arb, equity L/S, and fixed income arb through positive gamma strategies (Related Party; Sid Bass controls GP) | 22.4%<br>19.0% | Jan-05 Round<br>Apr-06 Round | $ 138.3<br>$ 117.5 | 1/1/01<br>4/3/06 | 2 years<br>2 years | Expired<br>4/3/08 | Quarterly<br>Quarterly | 30 days<br>30 days |
| **Canyon Value Realization Fund, L.P.**<br>*CVRF Partners, L.P.* | Multi-strategy, credit-focused fund with a risk averse, event-driven approach to investing across strategies and asset classes | 8.9%<br>8.9% | Class A<br>Class B | $ 55.0<br>$ 55.1 | 2/1/07<br>2/1/07 | None<br>1 year (3) | Expired<br>12/31/08 | Quarterly<br>Annual | 90 days<br>90 days |
| **Tiger Global, L.P.**<br>*Tiger 32 Partners, L.P.* | Global equity L/S fund that pursues thematic investments in conjunction with in-depth fundamental research | 5.6% | | $ 34.8 | 8/1/06 | 2 years | 8/1/08 | Semianni | 45 days |
| **Corriente Partners, L.P.**<br>*LMB Corriente Partners, L.P.* | Global equity L/S fund employing largely macro-economic-based investment themes | 4.0% | | $ 24.5 | 4/1/07 | 1 Year (4) | 12/31/07 | Quarterly | 45 days |
| **Coatue Qualified Partners, L.P.**<br>*Coatue 32 Partners, L.P.* | Concentrated global equity L/S fund focused on technology, media, and telecom sectors | 2.1%<br>0.8%<br>0.8%<br>0.8% | Jul-05 Round (5)<br>May-05 Round (5)<br>Jun-07 Round (5)<br>Jul-07 Round (5) | $ 13.2<br>$ 5.2<br>$ 5.0<br>$ 5.0 | 7/31/06<br>5/31/07<br>6/29/07<br>7/31/07 | 3 years<br>3 years<br>3 years<br>3 years | 7/31/09<br>5/31/10<br>6/29/10<br>7/31/10 | Rolling<br>Rolling<br>Rolling<br>Rolling | 45 days<br>45 days<br>45 days<br>45 days |
| **Goldman Sachs Global Alpha Fund, L.P.**<br>*Global Alpha 32 Partners, L.P.* | Multi-strategy, quantitative fund exploiting trends and mispricings across and within various asset classes and global markets | 2.1% | | $ 12.8 | 2/28/06 | 1 year | Expired | Quarterly | 60 days |
| **GSO Special Situations Fund, L.P.**<br>*GSO 32 Partners, L.P.* | Diversified, event-driven fund employing credit research-intensive, disciplined investment strategy within the leveraged finance sector | 5.4%<br>5.4% | Jul-05 Round (6)<br>Nov-05 Round (6) | $ 33.2<br>$ 33.2 | 7/29/05<br>11/30/05 | 2 years (6)<br>2 years (6) | 7/29/07 (6)<br>11/30/08 (6) | Rolling (7)<br>Rolling (7) | 65 days<br>65 days |
| **GSO Origination Funding Partners, L.P.**<br>*GSO 32 Origination Partners, L.P.* | Special purpose fund designed to warehouse GSO-originated credits destined for GSO's offshore fund during required "seasoning" period | 3.8% | | $ 23.6 | 2/24/06 | 2 years (8) | 3/31/08 | Quarterly | 180 days |
| **Wintergreen Partners Fund, L.P.**<br>*WGP Investors, L.P.* | Global value equity fund with maximum investment flexibility, pursuing a long-term approach. Run by former President & CIO of Franklin Mutual Advisers | 1.6% | | $ 10.0 | 6/30/07 | 1 year | 6/30/08 | Semianni | 75 days |
| **Octavian Global Fund, L.P.**<br>*OGF Partners, L.P.* | Event-driven fund focusing on risk arb, catalysts-driven equities, event-driven credit (incl distressed), and private/illiquid structured holdings | 1.6% | | $ 10.2 | 5/31/07 | 1 year | 5/30/08 | Quarterly (9) | 60 days |
| **Cushing MLP Opportunity Fund I**<br>*CMLP Investors, L.P.* | Concentrated L/S fund focused on traditional public equity and PIPE investments in energy Infrastructure Master Limited Partnerships | 1.7% | | $ 10.4 | 6/1/07 | 2 years (10) | 6/30/09 | Quarterly | 45 days |
| **Cushing MLP Enhanced Return Fund**<br>*CMLP ER Investors, L.P.* | Concentrated, leveraged fund focused primarily on long investments in the most stable energy Infrastructure Master Limited Partnerships | 0.9% | | $ 5.3 | 6/11/07 | None | Expired | Quarterly | 45 days |
| **Crestline Partners, L.P.**<br>*FW Crestline, L.P.* | Fund of funds seeking stable, low vol, low-beta returns through a diversified pool of absolute return hedge funds | 4.1% | | $ 25.4 | 1/1/06 | 1 year | Expired | Quarterly | 65 days |
| **Total** | | **100.0%** | | **$ 617.7** | | | | | |

*Notes:*

(1)  All funds are not audited, domiciled in the U.S., and have assets under management in excess of $200 million (except Cushing MLP Enhanced Return Fund which has less than $200 million in assets)

(2)  % allocation based on NAV as of 6/30/07; with the exception Wintergreen (based on amount funded 6/30/07);

       LP Investment amount for Coatue represents NAV as of 6/30/07 plus an additional $10 million investment funded 6/29/07, 7/31/07 ($5 mm increments)

(3)  Canyon's Class B lock-up expires at the end of the calendar year in which the investment achieves its 1-year anniversary

(4)  Corriente's lock-up expires at the end of the calendar year in which the investment was made

(5)  Coatue Qualified Partners does not report NAVs by investment round.  Indicated allocations of the reported NAV are based upon investment dates, investment amounts, and reported monthly returns since investment

(6)  50% of amount committed to GSO Special Situations was funded on 7/29/05 and is initially locked up for 2 years; the other 50% was funded 11/30/05 and is initially locked up for 3 years.  Amounts not

       withdrawn are subject to rolling 2-year lock-ups.  GSO does not report NAVs by date of investment; indicated allocations of the reported NAV assume a 50%/50% split between investment rounds

(7)  Up to 30% of the investment in GSO Special Situations may be allocated to illiquid side pocket investments, which cannot be redeemed prior to a liquidity event

(8)  GSO Origination Funding's lock-up expires at the end of the calendar quarter in which the investment achieves its 2-year anniversary

(9)  Up to 20% of the investment in Octavian Global Fund may be allocated to illiquid side pocket investments, which cannot be redeemed prior to a liquidity event

(10) Up to 30% of the Cushing MLP Opportunity Fund's lock-up expires at the end of the calendar quarter in which the investment achieves its 2-year anniversary, after which withdrawals

       are subject to a 20% aggregate gate, the fund may make short-term illiquid investments which cannot be redeemed prior to a liquidity event

**LMB HEDGE FUND INVESTMENTS**
**NET RETURN INFORMATION**

*Note: Select return information for certain funds provided by a third party.*

| Month | Domestic CAP Partners | Canyon Value Realization Series A | Canyon Value Realization Series B | Tiger Global | Corriente Partners | Coatue Qualified Partners | Goldman Sachs Global Alpha | GSO Special Situations Fund | GSO Origination Funding | Wintergreen Partners Fund | Octavian Global | Cushing MLP Opportunity Fund I | Cushing MLP Enhanced Return Fund | Crestline Partners |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jun-07 | 1.3% | 0.2% | 0.2% | 5.3% | 5.0% | 3.4% | 1.3% | 1.3% | 0.7% | (0.4%) | (0.1%) | 4.0% | 6.3% | 0.8% |
| May-07 | 1.6% | 2.2% | 2.2% | 6.8% | (4.5%) | 6.2% | (2.3%) | 2.2% | 3.2% | 2.2% | 0.6% | 1.7% | | 1.5% |
| Apr-07 | 0.7% | 1.4% | 1.5% | 2.1% | 7.0% | 3.7% | 0.5% | 0.5% | 1.0% | 3.5% | 2.1% | 4.8% | | 1.2% |
| Mar-07 | 1.2% | 0.8% | 0.8% | 3.5% | (6.5%) | 3.1% | (2.0%) | 2.4% | 1.1% | 2.4% | 0.3% | 5.7% | | 1.3% |
| Feb-07 | 1.7% | 1.0% | 1.1% | 2.7% | 13.6% | (0.5%) | (5.6%) | 0.9% | 1.4% | (0.5%) | 0.9% | 2.5% | | 1.9% |
| Jan-07 | 1.2% | 1.4% | 1.4% | 4.8% | 8.4% | (0.1%) | 3.7% | 1.7% | 0.4% | 2.5% | 1.4% | 3.6% | | 0.7% |
| Dec-06 | 1.1% | 1.2% | 1.2% | 6.3% | 13.4% | 2.8% | 5.1% | 1.2% | 0.7% | 3.5% | 1.5% | 1.7% | | 1.6% |
| Nov-06 | 1.6% | 1.8% | 1.8% | 1.2% | 14.5% | 6.4% | (7.3%) | 1.5% | 1.4% | 4.2% | (0.4%) | 1.0% | | 1.7% |
| Oct-06 | 0.7% | 2.2% | 2.3% | 2.5% | (0.7%) | (0.7%) | (2.8%) | 1.1% | 0.1% | 4.8% | 0.6% | | | 1.5% |
| Sep-06 | 0.4% | 0.4% | 0.4% | 0.4% | (9.6%) | 2.5% | (2.8%) | 0.5% | 0.6% | (1.1%) | 1.0% | | | 0.6% |
| Aug-06 | 0.4% | 1.3% | 1.4% | 0.7% | (1.7%) | 2.1% | (8.9%) | 0.8% | 2.3% | 1.6% | 1.0% | | | 0.4% |
| Jul-06 | (0.6%) | 0.5% | 0.5% | 2.9% | 1.6% | 0.2% | 2.9% | 0.5% | 2.8% | 3.8% | 2.5% | | | 0.3% |
| Jun-06 | 1.0% | 0.0% | 0.0% | (3.3%) | (4.3%) | (2.5%) | 2.0% | 0.8% | 1.4% | (0.1%) | 0.0% | | | (0.3%) |
| May-06 | 0.5% | 0.6% | 0.6% | 4.7% | 2.5% | (2.2%) | (3.9%) | 1.0% | 0.1% | (3.6%) | 1.9% | | | 1.0% |
| Apr-06 | 1.5% | 1.3% | 1.3% | 1.6% | 10.6% | 0.8% | 2.5% | 2.2% | 0.4% | 2.0% | | | | 1.7% |
| Mar-06 | 1.4% | 1.2% | 1.3% | (1.0%) | 7.5% | 9.8% | 0.4% | 0.6% | | 1.6% | | | | 0.5% |
| Feb-06 | 1.0% | 1.5% | 1.5% | 0.2% | (2.3%) | 2.6% | 0.2% | 0.0% | | 4.1% | | | | 2.4% |
| Jan-06 | 1.6% | 1.2% | 1.3% | (1.3%) | 22.8% | 0.0% | 2.8% | 0.7% | | 2.3% | | | | 1.5% |
| Dec-05 | (0.2%) | 0.8% | 0.8% | 0.8% | 10.6% | 4.7% | 4.1% | 0.7% | | 0.3% | | | | 1.7% |
| Nov-05 | (0.0%) | (1.0%) | (1.0%) | 0.9% | 3.1% | 3.6% | 8.0% | 0.2% | | | | | | 0.5% |
| Oct-05 | (0.0%) | (1.0%) | (1.0%) | 1.1% | (3.9%) | 1.8% | (0.5%) | | | | | | | (0.4%) |
| Sep-05 | 1.0% | 1.1% | 1.1% | 2.7% | 10.3% | 1.9% | 3.6% | | | | | | | 0.9% |
| Aug-05 | 0.5% | 1.6% | 1.7% | 1.8% | 5.4% | 6.1% | 2.1% | | | | | | | 0.9% |
| Jul-05 | 0.9% | 2.6% | 2.7% | 0.9% | 3.4% | 3.2% | 10.0% | | | | | | | 1.4% |
| Jun-05 | 0.1% | 1.7% | 1.7% | 5.3% | 4.1% | (0.3%) | (0.2%) | | | | | | | 0.9% |
| May-05 | (0.3%) | 0.7% | 0.8% | (2.6%) | 0.7% | 0.4% | 1.8% | | | | | | | 0.1% |
| Apr-05 | (1.2%) | (1.4%) | (1.3%) | 1.4% | (7.9%) | 7.5% | 1.0% | | | | | | | (0.5%) |
| Mar-05 | 1.4% | (0.2%) | (0.2%) | 0.3% | 1.4% | 0.9% | 0.9% | | | | | | | 0.1% |
| Feb-05 | 0.8% | 1.1% | 1.4% | 1.4% | 0.3% | (3.3%) | 3.9% | | | | | | | 1.4% |
| Jan-05 | 0.9% | 0.1% | 0.1% | 8.5% | 13.5% | 5.5% | (2.7%) | | | | | | | 0.4% |
| Dec-04 | 1.5% | 1.8% | | 0.6% | 4.8% | 2.4% | (3.2%) | | | | | | | 2.1% |
| Nov-04 | 0.9% | 2.6% | | 1.0% | (1.2%) | (0.7%) | (2.1%) | | | | | | | 1.7% |
| Oct-04 | 1.1% | 1.2% | | 4.3% | 11.9% | (0.6%) | (0.7%) | | | | | | | 0.6% |
| Sep-04 | 0.3% | 1.3% | 1.9% | 1.9% | 1.3% | (3.8%) | 2.5% | | | | | | | 0.6% |
| Aug-04 | (0.0%) | 0.8% | 2.7% | (1.0%) | 6.7% | 2.5% | (2.4%) | | | | | | | 0.0% |
| Jul-04 | (0.1%) | 0.2% | 1.3% | 4.0% | 1.4% | 1.2% | (1.7%) | | | | | | | 0.3% |
| Jun-04 | 0.2% | (0.4%) | 1.4% | (1.4%) | (5.2%) | 2.2% | 2.2% | | | | | | | (0.4%) |
| May-04 | 0.8% | 0.8% | 0.9% | 0.8% | 0.8% | 2.8% | 0.6% | | | | | | | (0.5%) |
| Apr-04 | 3.8% | 0.2% | 0.3% | 1.9% | (0.0%) | 4.3% | 4.3% | | | | | | | 1.4% |
| Mar-04 | (0.5%) | 0.3% | (0.4%) | 2.6% | (13.6%) | (1.8%) | 5.3% | | | | | | | 0.7% |
| Feb-04 | 0.6% | 1.3% | 0.4% | 6.9% | 1.4% | 1.0% | (3.0%) | | | | | | | 0.9% |
| Jan-04 | 0.1% | 2.4% | 1.3% | 2.4% | (0.4%) | 0.6% | 4.2% | | | | | | | 1.2% |
| Dec-03 | 1.5% | 3.6% | 2.4% | 5.0% | 5.9% | 0.7% | 3.8% | | | | | | | 1.2% |
| Nov-03 | 0.8% | 1.7% | 3.6% | 1.0% | 10.7% | (1.4%) | 6.8% | | | | | | | 0.9% |
| Oct-03 | 1.5% | 2.2% | 1.7% | 0.1% | 9.9% | 0.3% | (1.0%) | | | | | | | 1.3% |
| Sep-03 | 0.4% | 3.3% | 2.2% | 3.8% | 0.1% | 5.6% | 7.2% | | | | | | | 1.0% |
| Aug-03 | 0.4% | 2.0% | 3.8% | 2.7% | 7.9% | 1.3% | 6.0% | | | | | | | 0.3% |
| Jul-03 | 2.0% | 1.5% | 2.0% | 5.9% | 3.4% | 3.4% | 5.2% | | | | | | | 0.7% |
| Jun-03 | 0.1% | 0.0% | 1.5% | 0.4% | 2.6% | 9.0% | (2.3%) | | | | | | | 1.2% |
| May-03 | (0.7%) | 1.5% | 0.0% | 1.1% | 9.0% | 2.8% | 4.1% | | | | | | | 0.7% |
| Apr-03 | 1.0% | 2.5% | 1.5% | 0.7% | 0.3% | 0.3% | (4.8%) | | | | | | | 1.4% |
| Mar-03 | 0.2% | 1.6% | 2.5% | (1.5%) | 4.3% | 0.7% | 4.0% | | | | | | | 1.9% |
| Feb-03 | (0.0%) | 1.8% | 1.6% | 0.1% | 2.5% | 0.1% | (2.1%) | | | | | | | 0.4% |
| Jan-03 | 0.4% | 1.8% | 1.8% | 5.9% | (0.6%) | 1.4% | | | | | | | | 1.0% |
| Dec-02 | (0.5%) | 2.1% | 2.1% | 2.5% | | (3.3%) | | | | | | | | 2.1% |
| Nov-02 | 4.8% | (0.1%) | (0.1%) | (2.4%) | | | | | | | | | | 1.2% |

**LMB HEDGE FUND INVESTMENTS**
**NET RETURN INFORMATION**

*Note: Select return information for certain funds provided by a third party.*

| Month | Domestic CAP Partners | Canyon Value Realization Series A | Canyon Value Series B | Tiger Global | Corriente Partners | Coatue Qualified Partners | Goldman Sachs Global Alpha | GSO Special Situations Fund | GSO Origination Funding | Wintergreen Partners Fund | Octavian Global | Cushing MLP Opportunity Fund I | Cushing MLP Enhanced Return Fund | Crestline Partners |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct-02 | (1.7%) | 1.2% | 1.5% | (1.9%) | (9.0%) | 0.8% | (5.8%) | | | | | | | 0.2% |
| Sep-02 | (3.6%) | 1.5% | 1.5% | 7.3% | 1.1% | 3.4% | (1.2%) | | | | | | | 0.2% |
| Aug-02 | 2.4% | (1.4%) | (1.4%) | 1.4% | 0.8% | 0.5% | 2.0% | | | | | | | 0.3% |
| Jul-02 | (6.5%) | (2.3%) | (2.3%) | 3.4% | (8.6%) | 2.7% | 2.7% | | | | | | | (1.4%) |
| Jun-02 | (2.3%) | (3.3%) | (3.3%) | 2.6% | 1.1% | 0.1% | 2.7% | | | | | | | (0.1%) |
| May-02 | (0.1%) | 1.0% | 1.0% | 1.0% | 4.8% | 0.6% | 1.6% | | | | | | | 0.6% |
| Apr-02 | 0.2% | 0.5% | 0.5% | 1.0% | 0.4% | 0.6% | 5.7% | | | | | | | 0.5% |
| Mar-02 | 0.4% | 1.3% | 1.3% | -% | 2.2% | (3.1%) | 3.8% | | | | | | | 1.0% |
| Feb-02 | | 3.0% | 1.8% | 3.5% | 0.5% | 5.2% | (2.7%) | | | | | | | 0.5% |
| Jan-02 | | 1.8% | 1.8% | 5.4% | 1.3% | 3.9% | 1.4% | | | | | | | 0.8% |
| Dec-01 | | 1.4% | 1.4% | 3.3% | 0.5% | 1.9% | (0.5%) | | | | | | | 0.4% |
| Nov-01 | | 2.7% | 2.7% | (0.2%) | (1.4%) | 1.0% | 2.4% | | | | | | | 0.5% |
| Oct-01 | | 1.8% | 1.8% | 0.1% | (2.7%) | (4.2%) | | | | | | | | 0.6% |
| Sep-01 | | (2.5%) | (2.5%) | 3.7% | 3.0% | 10.8% | | | | | | | | (0.4%) |
| Aug-01 | | 0.9% | 0.9% | 3.3% | 1.7% | (0.9%) | | | | | | | | 0.9% |
| Jul-01 | | 0.5% | 0.5% | 8.4% | 3.3% | 3.0% | | | | | | | | 0.9% |
| Jun-01 | | (0.3%) | (0.3%) | 7.0% | | 3.6% | | | | | | | | 0.2% |
| May-01 | | 0.8% | 0.8% | 0.9% | | 5.2% | | | | | | | | 0.7% |
| Apr-01 | | 1.1% | 1.1% | 0.6% | | (4.6%) | | | | | | | | 0.7% |
| Mar-01 | | (0.8%) | (0.8%) | 11.5% | | (0.3%) | | | | | | | | -% |
| Feb-01 | | 1.4% | 1.4% | | | 10.7% | | | | | | | | 0.8% |
| Jan-01 | | 4.8% | 4.8% | | | (0.8%) | | | | | | | | 1.9% |
| Dec-00 | | 0.0% | 0.0% | | | (6.2%) | | | | | | | | (0.5%) |
| Nov-00 | | (1.8%) | (1.8%) | | | 0.7% | | | | | | | | (0.5%) |
| Oct-00 | | (1.2%) | (1.2%) | | | (0.7%) | | | | | | | | 0.1% |
| Sep-00 | | 0.0% | 0.0% | | | (0.3%) | | | | | | | | 1.0% |
| Aug-00 | | 1.7% | 1.7% | | | (0.9%) | | | | | | | | 0.9% |
| Jul-00 | | 0.2% | 0.2% | | | (2.9%) | | | | | | | | 0.5% |
| Jun-00 | | 3.3% | 3.3% | | | (1.2%) | | | | | | | | 1.0% |
| May-00 | | (1.6%) | (1.6%) | | | 1.3% | | | | | | | | 0.8% |
| Apr-00 | | 0.3% | 0.3% | | | (3.5%) | | | | | | | | 1.0% |
| Mar-00 | | 1.9% | 1.9% | | | (4.1%) | | | | | | | | 1.5% |
| Feb-00 | | 2.6% | 2.6% | | | 15.2% | | | | | | | | 1.7% |
| Jan-00 | | (0.6%) | (0.6%) | | | (3.1%) | | | | | | | | 1.9% |
| Dec-99 | | 4.4% | 4.4% | | | 2.2% | | | | | | | | 0.9% |
| Nov-99 | | 2.0% | 2.0% | | | | | | | | | | | 1.1% |
| Oct-99 | | 0.1% | 0.1% | | | | | | | | | | | 0.2% |
| Sep-99 | | 0.8% | 0.8% | | | | | | | | | | | 0.6% |
| Aug-99 | | 0.2% | 0.2% | | | | | | | | | | | 0.4% |
| Jul-99 | | 2.3% | 2.3% | | | | | | | | | | | 0.7% |
| Jun-99 | | 3.0% | 3.0% | | | | | | | | | | | 1.1% |
| May-99 | | 3.3% | 3.3% | | | | | | | | | | | 1.0% |
| Apr-99 | | 5.8% | 5.8% | | | | | | | | | | | 2.1% |
| Mar-99 | | 2.2% | 2.2% | | | | | | | | | | | 1.4% |
| Feb-99 | | 1.2% | 1.2% | | | | | | | | | | | 0.7% |
| Jan-99 | | 2.6% | 2.6% | | | | | | | | | | | 0.9% |
| Dec-98 | | 0.2% | 0.2% | | | | | | | | | | | 0.5% |
| Nov-98 | | 1.4% | 1.4% | | | | | | | | | | | 1.8% |
| Oct-98 | | (0.6%) | (0.6%) | | | | | | | | | | | (2.4%) |
| Sep-98 | | (1.1%) | (1.1%) | | | | | | | | | | | (1.4%) |
| Aug-98 | | (15.9%) | (15.9%) | | | | | | | | | | | (3.0%) |
| Jul-98 | | 0.3% | 0.3% | | | | | | | | | | | 0.8% |
| Jun-98 | | (0.9%) | (0.9%) | | | | | | | | | | | (0.1%) |
| May-98 | | (1.5%) | (1.5%) | | | | | | | | | | | 1.3% |
| Apr-98 | | 0.9% | 0.9% | | | | | | | | | | | 1.3% |
| Mar-98 | | 2.9% | 2.9% | | | | | | | | | | | 1.5% |

**LMB HEDGE FUND INVESTMENTS**
**NET RETURN INFORMATION**

*Note: Select return information for certain funds provided by a third party.*

| Month | Domestic CAP Partners | Canyon Value Realization Series A | Canyon Value Realization Series B | Tiger Global | Corriente Partners | Coatue Qualified Partners | Goldman Sachs Global Alpha | GSO Special Situations Fund | GSO Origination Funding | Wintergreen Partners Fund | Octavian Global | Cushing MLP Opportunity Fund I | Cushing MLP Enhanced Return Fund | Crestline Partners |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Feb-98 | | 2.4% | 2.4% | | | | | | | | | | | 0.9% |
| Jan-98 | | (0.5%) | (0.5%) | | | | | | | | | | | (0.0%) |
| Dec-97 | | 1.5% | 1.5% | | | | | | | | | | | 1.0% |
| Nov-97 | | 1.3% | 1.3% | | | | | | | | | | | 1.3% |
| Oct-97 | | (1.6%) | (1.6%) | | | | | | | | | | | 0.3% |
| Sep-97 | | 4.9% | 4.9% | | | | | | | | | | | |
| Aug-97 | | 1.7% | 1.7% | | | | | | | | | | | |
| Jul-97 | | 2.5% | 2.5% | | | | | | | | | | | |
| Jun-97 | | 2.4% | 2.4% | | | | | | | | | | | |
| May-97 | | 2.1% | 2.1% | | | | | | | | | | | |
| Apr-97 | | 1.3% | 1.3% | | | | | | | | | | | |
| Mar-97 | | (0.5%) | (0.5%) | | | | | | | | | | | |
| Feb-97 | | 1.9% | 1.9% | | | | | | | | | | | |
| Jan-97 | | 1.7% | 1.7% | | | | | | | | | | | |
| Dec-96 | | 2.6% | 2.6% | | | | | | | | | | | |
| Nov-96 | | 0.6% | 0.6% | | | | | | | | | | | |
| Oct-96 | | 2.0% | 2.0% | | | | | | | | | | | |
| Sep-96 | | 3.7% | 3.7% | | | | | | | | | | | |
| Aug-96 | | 3.0% | 3.0% | | | | | | | | | | | |
| Jul-96 | | 1.8% | 1.8% | | | | | | | | | | | |
| Jun-96 | | 0.8% | 0.8% | | | | | | | | | | | |
| May-96 | | 1.7% | 1.7% | | | | | | | | | | | |
| Apr-96 | | 2.4% | 2.4% | | | | | | | | | | | |
| Mar-96 | | 1.0% | 1.0% | | | | | | | | | | | |
| Feb-96 | | 1.9% | 1.9% | | | | | | | | | | | |
| Jan-96 | | 1.3% | 1.3% | | | | | | | | | | | |
| Dec-95 | | 2.4% | 2.4% | | | | | | | | | | | |
| Nov-95 | | 1.6% | 1.6% | | | | | | | | | | | |
| Oct-95 | | 0.5% | 0.5% | | | | | | | | | | | |
| Sep-95 | | 3.4% | 3.4% | | | | | | | | | | | |
| Aug-95 | | 1.5% | 1.5% | | | | | | | | | | | |
| Jul-95 | | 1.6% | 1.6% | | | | | | | | | | | |
| Jun-95 | | 1.1% | 1.1% | | | | | | | | | | | |
| May-95 | | 1.9% | 1.9% | | | | | | | | | | | |
| Apr-95 | | 2.3% | 2.3% | | | | | | | | | | | |
| Mar-95 | | 1.3% | 1.3% | | | | | | | | | | | |
| Feb-95 | | 1.1% | 1.1% | | | | | | | | | | | |
| Jan-95 | | 1.2% | 1.2% | | | | | | | | | | | |

EXHIBIT F

LIST OF INITIAL COLLATERAL SECURITIES ISSUERS AND SUB-FUNDS

| Sub Fund | Collateral Securities Issuer | Percentage Ownership By Issuer* |
|---|---|---|
| Domestic Cap Partners, L.P. | DCP Partners, L.P. | 100% |
| Canyon Value Realization Fund, L.P. | CVRF Partners, L.P. | 100% |
| (Series A; Series B) | AEM HF Holdings, L.P. | 100% |
| Tiger Global, L.P. | Tiger 32 Partners, L. P. | 98.3823% |
| Corriente Partners, L.P. | LMB Corriente Partners, L.P. | 100% |
| | AEM HF Holdings, L.P. | 100% |
| Coatue Qualified Partners, L.P. | Coatue 32 Partners, L.P. | 99.5140% |
| Goldman Sachs Global Alpha Fund, L.P. | Global Alpha 32 Partners, L.P. | 98.3439% |
| GSO Special Situations Fund, L.P. | GSO 32 Partners, L.P. | 98.9103% |
| GSO Origination Funding Partners, L.P. | GSO 32 Origination Partners, L.P. | 98.7644% |
| Wintergreen Partners Fund, L.P. | WGP Investors, L.P. | 100% |
| | AEM HF Holdings, L.P. | 100% |
| Octavian Global Fund, L.P. | OGF Partners, L.P. | 100% |
| | AEM HF Holdings, L.P. | 100% |
| The Cushing MLP Opportunity Fund, L.P. | CMLP Investors, L.P. | 100% |
| | AEM HF Holdings, L.P. | 100% |
| The Cushing MLP Enhanced Return Fund, L.P. | CMLP ER Investors, L.P. | 100% |
| | AEM HF Holdings, L.P. | 100% |
| Crestline Partners, L.P. | FW Crestline, L.P. | 99.8718% |
| Maple Leaf Partners, L.P. | MLL 32 Investors, L.P. | 100% |
| Canyon Special Opportunities Fund, L.P. | CHY Investors, L.P. | 100% |
| GSO Liquidity Partners, L.P. | GSO HY Investors, L.P. | 100% |

*Represents entire ownership percentage interest of the Issuer in the indicated Collateral Securities Issuer. The percentage interest pledged from time to time will be as set forth on Exhibit I to the Security Agreement.

EXHIBIT G

FORM OF LVFN PARTNERS, L.P.
CONFIDENTIALITY AGREEMENT

[Transferee Name]
[Transferee Address]

This Confidentiality Agreement (the "Agreement") is made this ___day of _____ 200___ by and between the company or person named above and on the signature page of this Agreement ("Counterparty"), and LVFN Partners, L.P. ("LVFN"), whose principal office is located at _____. This agreement is ancillary to and hereby made part of any separate agreement(s) which may be entered into between the parties.

WHEREAS, LVFN proposes to enter into a business relationship with Counterparty (which may include a lender/borrower relationship or other contractual relationship) or Counterparty may enter into a hedging transaction with a lender or other financing party of LVFN, pursuant to which, in either case, Counterparty expects to earn compensation and/or profits;

WHEREAS, LVFN is the owner of entities with interests in certain collective investment vehicles (the "Funds"), which LVFN and its affiliates, subsidiaries and agents (collectively, "LVFN") manage for the benefit of the LVFN's investors and;

WHEREAS, the Counterparty may from time to time in anticipation of, or in the course of, its business relationship with LVFN or as a hedge counterparty, need information regarding LVFN and therefore will require access to certain forms of information regarding LVFN;

NOW, THEREFORE, in consideration of the commencement or the continuation of the contractual relationship between the parties, and of the economic benefits to the Counterparty of its relationship to LVFN, and as a strict condition of the Counterparty's continuing to be able to obtain such information, the Counterparty hereby understands and agrees as follows:

1.      Scope of the Agreement
Counterparty recognizes that LVFN has numerous affiliates. For purposes of this Agreement, LVFN and the affiliates of LVFN are referred to within this Agreement collectively as "LVFN." LVFN recognizes that Counterparty has numerous affiliates. For purposes of this Agreement, Counterparty and the affiliates of Counterparty are referred to within this Agreement collectively as "Counterparty."

2.      Confidentiality
Counterparty acknowledges and agrees that any information whether or not meeting the legal definition of a trade secret, which relates to the past, present or future business, structure, strategies, portfolios, products, research or development of LVFN including without limitation, the contents of any limited partnership agreements and any confidential private placement

G-1

memoranda of the Funds; the monthly and annual financial statements of the Funds or LVFN; information relating to the Funds' trading positions, trading data, performance, managers, operations, risk management, allocation policies and protocols, investments and investment strategies; the identity of any investors and all correspondences with the investors in the Funds; the Fund's trading authorizations, signing authorizations, attribution reports, annual reports, track records, schedules of net asset values and liquidity indicators, security liquidity analyses; LVFN's business models, trading systems and methodologies and research; LVFN's computer programs, data bases, software, files, operating systems disks and output, program listings, simulated results, mathematical models, programs, algorithms, numerical techniques, analytical results; LVFN's procedural guidelines, forms, internal memoranda, accounting and financial records, budget, supervisory and risk control techniques and procedures, fee and compensation structures, costs, methods, business plans or marketing methods and strategies, disaster recovery plans, information regarding LVFN's brokers, investors, counterparties and service providers (including information identifying any such parties); and notes  and other records, correspondence, memoranda, reports, drawings, photographic images and designs made in the course of or relating to Counterparty's relationship with LVFN, or which relates to LVFN's direct or indirect owners, directors, officers  and employees or personnel information (collectively, the "Confidential Information"), is confidential and proprietary to LVFN. Counterparty agrees that the existence of its relationship with the Company shall be treated and regarded as Confidential Information, as well.

The term "Confidential Information" does not include any information:  (a) that is or becomes publicly available (other than as a result of a breach of this Agreement); (b) that is or becomes available to Counterparty from a source other than LVFN; or (c) is known by Counterparty prior to its disclosure by LVFN;  provided, however, that Counterparty is able to prove by documentary evidence produced to LVFN that the Confidential Information was obtained by or made available to Counterparty as described in any of (a) through (c) above.

Except as expressly directed by LVFN, Counterparty shall not, during or after the term of Counterparty's business relationship with LVFN, disclose, in whole or in part, such Confidential Information to any person, firm, corporation, association or other entity for any reason or purpose whatsoever. Confidential Information shall not be utilized by Counterparty except as required in the course of performing Counterparty's contractual obligations with LVFN or as a hedge counterparty, nor shall Counterparty make use of any such Confidential Information for Counterparty's own purposes or for the benefit of any person, firm, corporation or other entity under any circumstances during or after the term of Counterparty's engagement, provided, however, that Counterparty may, as expressly directed by LVFN, and as provided for in this Agreement, disclose such Confidential Information to those of its employees that have credit risk management responsibilities and duties, and senior management, operations and accounting personnel, internal and external counsel and independent auditors as needed to make credit and business determinations regarding LVFN; provided that Counterparty shall keep and maintain an information barrier between any such persons and its other personnel, including, without limitation, those personnel engaged in capital markets or trading activities.

Counterparty shall take all reasonable security precautions in the safekeeping of the Confidential Information and in preventing its unauthorized disclosure to third parties.  Further, Counterparty shall not make copies of the Confidential Information other than to the extent that is strictly

necessary in order to carry out the business purposes of Counterparty with reference to LVFN, and shall use the Confidential Information solely for the purpose of furthering those business purposes.

The provisions of this Agreement pertaining to "Confidential Information" shall also preclude Counterparty from (i) providing to third parties actual copies or portions thereof of documents provided by LVFN to Counterparty which constitute Confidential Information; (ii) referencing its business relationship with LVFN; or (iii) assigning attribution to LVFN of Confidential Information in any communications by Counterparty which includes Confidential Information subject to exclusions (a) through (c) above.

Counterparty agrees to notify LVFN promptly upon learning about any request to it for production of Confidential Information, whether related to civil, criminal or enforcement proceedings, regarding LVFN or Counterparty, or arising in a non-legal context, including but not limited to press, credit rating or investor inquiries, including but not limited to court orders or other legal requirements that purport to compel disclosure of any Confidential Information. Further, Counterparty agrees to cooperate with LVFN in the exercise of LVFN's right to protect the confidentiality of the Confidential Information in any context whatsoever, including before any tribunal or governmental agency.

Disclosure of Confidential Information pursuant to a court order or other legal requirement that purports to compel disclosure of any Confidential Information shall not alter the character of that information as Confidential Information hereunder, or constitute a waiver by LVFN of any of its rights hereunder.

3.      Termination/Return of Confidential Information/Survival

Counterparty agrees that this Agreement may be terminated by LVFN (i) at any time; (ii) upon termination of Counterparty's business relationship with LVFN for any reason; or (iii) in the event of any breach of this Agreement.  Upon such termination, Counterparty shall immediately turn over to LVFN all tangible documents, tapes and computer files containing Confidential Information in the possession or control of Counterparty, including all copies thereof, and any other documents or electronic storage device of any kind or description in the possession or control of Counterparty relating to the affairs of LVFN, and destroy or erase any electronic copies, notices or extracts containing Confidential Information, so that no Confidential Information is retained by Counterparty, it being understood all such documents and other written, documented or recorded Confidential Information are and shall remain the property of LVFN.

Counterparty's obligations under this Agreement will survive the termination of this Agreement and of Counterparty's prospective or actual business relationship with LVFN.

4.      Non-Disparagement

Counterparty agrees that during the term of its business relationship with LVFN and after termination for any reason, Counterparty will not make or publish any derogatory or disparaging statements or do anything in relation to LVFN or its direct or indirect owners, directors, officers and employees that is intended to or which might reasonably be expected to damage or lower LVFN's or any such individual's reputation.

5.      Remedies Upon Breach

Counterparty acknowledges that in the event of a breach or a threatened or imminent breach of Counterparty's obligation under this Agreement, LVFN will suffer irreparable harm and may not have an adequate remedy at law.  Accordingly, in the event of any such breach or threatened or imminent breach, LVFN  shall be entitled to such equitable and injunctive relief as may be available to restrain the Counterparty and any business, firm, partnership, individual or entity participating in such breach or threatened or imminent breach from the violation of the provisions hereof.  In addition, LVFN may pursue any other remedies available at law or in equity for such breach or threatened or imminent breach.

6.      Indemnification

Counterparty agrees to indemnify and hold harmless LVFN for any loss, cost, liability or expense (including but not limited to lawyers' fees and expenses), caused by any use or disclosure of the Confidential Information not permitted under the terms of this Agreement; and to cooperate with LVFN in any litigation or other process initiated by LVFN to protect LVFN's rights to prevent disclosure or misuse of the Confidential Information.

7.      No Waiver

The failure to exercise, or the delay in exercising, a right or remedy provided by this Agreement does not constitute a waiver of any right or remedy provided by this Agreement, nor a waiver of any other rights or remedies.

8.      Severability

If any provision of this Agreement shall, in whole or in part, be determined to be invalid, unenforceable or void for any reason, such determination shall affect only the portion of such provision determined to be invalid, unenforceable or void and shall not affect in any way the remainder of such provision or any other provision of this Agreement, and the invalid, unenforceable or void provision shall be enforceable to the fullest extent possible to reflect the parties intentions hereunder.

9.      Choice of Law and Jurisdiction

The laws of the State of New York shall govern this agreement, without reference to principles of conflicts or choice of law that would cause the application of the internal laws of any other jurisdiction, and the parties consent to the jurisdiction of New York state and federal courts in relation to this agreement.


AGREED:


Name of Counterparty:        _____


By:        _____


Printed Name of Person
Signing on behalf of Counterparty:        _____


Title: _____


Date: _____


LVFN PARTNERS, L.P.


By: _____
　　  Name
　　  Title


Date: _____

EXHIBIT H

## FORM OF PAYING AGENT AGREEMENT

THIS PAYING AGENT AGREEMENT ("Agreement") is dated as of October 23, 2007, between Relationship Funding Company, LLC (the "RFC"), and Lehman Brothers Special Financing Inc. (the "Paying Agent").  Terms not otherwise defined herein shall have the meaning assigned to them in the First Amended and Restated Note Purchase Agreement (the "Note Purchase Agreement"), dated as of October 23, 2007, by and among LVFN Partners, L.P. (the "Note Issuer"), Lehman  Brothers Inc., Lehman Brothers Special Lending LLC and the various financial institutions and other persons from time to time parties thereto.

SECTION 1.  <u>Appointment of Paying Agent</u>.  RFC hereby appoints the Paying Agent as its agent to perform the Services (as defined in <u>Section 2</u> below).  The Paying Agent accepts such appointment.

SECTION 2.  <u>Description of Services</u>.

(a)     The Paying Agent hereby agrees to perform and provide the following services (the "Services") on behalf of RFC:

(i)     To transfer moneys from time to time from RFC or on its behalf to the Note Issuer in respect of purchases by RFC of Drawdown Principal Amounts as contemplated by the Note, dated October 23, 2007, issued in the name of RFC pursuant to the Note Purchase Agreement (the "RFC Note"); and

(ii)     To receive moneys from time to time from the Note Issuer or its designee in respect of the Note Issuer's obligations under the RFC Note and to transfer such proceeds in accordance with the written instructions of RFC.

(b)     The Paying Agent may refuse to perform all or any portion of the Services if, and to the extent that, the performance of such Services by the Paying Agent would be in contravention of any applicable law or regulation.  The Paying Agent shall immediately notify RFC of the occurrence of any such event.

(c)     Except to the extent expressly set forth in this Agreement or the Note Purchase Agreement, the Paying Agent shall have no responsibility for performing or exercising, or any right to perform or exercise any functions, duties, or rights of RFC.

(d)     The Paying Agent shall not be authorized to sign any document on behalf of RFC.

SECTION 3.  <u>Compensation and Expense</u>.   The Paying Agent shall be responsible for all costs and expenses reasonably incurred by the Paying Agent in connection with the performance of the Services.

SECTION 4.    No Partnership.    Nothing contained herein shall be construed to create a partnership between the parties.

SECTION 5.    Term.    The effective term of this Agreement shall be from the date hereof until the earlier of (i) the Stated Maturity Date, (ii) the date the RFC Note is cancelled or (iii) the termination of the Confirmation, effective June 25, 2007, with respect to the swap transaction entered into between the Paying Agent and RFC.

SECTION 6.    Assignment.    Neither RFC nor the Paying Agent may assign to a third party or pledge all or any part of its rights and obligations under this Agreement without obtaining prior written consent from the other party.

SECTION 7.    Special RFC Provisions.

(a)    Each party hereto (including without limitation any party to which all or any portion of this Agreement is assigned) hereby covenants and agrees that on behalf of itself and each of its Affiliates, that prior to the date which is one year and one day after the payment in full of all indebtedness for borrowed money of RFC, such party  will not institute against, or join any other Person in instituting against, RFC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings or other similar proceeding under the laws of the United States, any state of the United States or any other jurisdiction; provided, that nothing herein shall prohibit such Person from filing proofs of claim or participating in any such proceedings instituted by any other Person.    The provisions of this paragraph shall survive termination of Agreement.

(b)    Notwithstanding anything to the contrary contained herein, each of the parties hereto hereby acknowledges and agrees that all transactions with RFC hereunder shall be without recourse of any kind to RFC except as provided in this paragraph.    RFC shall have no obligation to pay any amounts owing under this Agreement.    In addition, each party hereto agrees that RFC shall have no obligation to pay any party hereto any amounts constituting fees, reimbursement for expenses, damages or indemnities (collectively, "Expense Claims"), and such Expense Claims shall not constitute a claim against RFC (as defined in Section 101 of Title 11 of the United States Code).    No recourse shall be had for the payment of any amount owing hereunder or for the payment of any fee hereunder or any other obligation of, or claims against RFC arising out of or based upon this Agreement, against any member, equity holder, employee, officer, director, or Affiliate thereof.    The provisions of this paragraph will survive the termination of this Agreement.  For the avoidance of doubt, if RFC issues commercial paper for the specific purpose of funding a Drawdown pursuant to this Agreement and receives proceeds from such issuance in an amount sufficient to fund such Drawdown in full, RFC will remit the amount of such proceeds to the Paying Agent promptly following RFC's receipt of the same

SECTION 8.    Governing Law.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first written above.

RELATIONSHIP FUNDING COMPANY, LLC

By: _____
     Name:
     Title:

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
     Name:
     Title:

H- 3