**EXHIBIT B**

## LOAN AND SECURITY AGREEMENT
### (Rake Securities)

**Dated as of May [    ], 2011
(but effective as of May 30, 2008)**

## CWCAPITAL EY REIT LB2 LLC
### as Borrower

**and**

## LEHMAN COMMERCIAL PAPER INC.
### as Lender

# TABLE OF CONTENTS

**Page**

SECTION 1.    Definitions and Accounting Matters ............................................................... 1
  1.01    Certain Defined Terms............................................................................. 1
  1.02    Accounting Terms and Determinations ........................................... ~~13~~11

SECTION 2.    Advance, Note and Prepayments .......................................................... ~~13~~12
  2.01    Advance ............................................................................................. ~~13~~12
  2.02    Notes ................................................................................................. ~~14~~12
  2.03    Reserved ............................................................................................ ~~14~~12
  2.04    Limitation on Types of Advances; Illegality ..................................... ~~14~~12
  2.05    Repayment of Advance; Interest~~, Extension of Termination Date~~ ............... 14 13
  2.06    ~~Market Value Requirement; Cash or Collateral Deposit;~~ Mandatory
           Prepayment. ...................................................................................... ~~15~~13
  2.07    Optional Prepayments ....................................................................... ~~17~~14
  2.08    Requirements of Law ........................................................................ ~~18~~15
  2.09    Purpose of Advance .......................................................................... ~~19~~16

SECTION 3.    Payments; Computations; Taxes; Facility Fee........................................... ~~19~~16
  3.01    Payments........................................................................................... ~~19~~16
  3.02    Computations .................................................................................... ~~19~~17
  3.03    Taxes ................................................................................................ ~~19~~17
  3.04    [Reserved] ......................................................................................... ~~21~~18
  3.05    Application of Collections ................................................................. ~~21~~18

SECTION 4.    Collateral Security ............................................................................. ~~22~~19
  4.01    Collateral; Security Interest .............................................................. ~~22~~19
  4.02    Further Documentation and Information ............................................ ~~24~~21
  4.03    Changes in Locations; Name, etc....................................................... ~~24~~22
  4.04    Lender's Appointment as Attorney-in-Fact........................................ ~~25~~22
  4.05    Performance by Lender of Borrower's Obligations............................. ~~26~~23
  4.06    Proceeds ........................................................................................... ~~26~~24
  4.07    [Reserved] ......................................................................................... ~~26~~24
  4.08    Limitation on Duties Regarding Preservation of Collateral ............... ~~27~~24
  4.09    Powers Coupled with an Interest ....................................................... ~~27~~24
  4.10    Release of Security Interest ............................................................... ~~27~~24

SECTION 5.    Reserved............................................................................................. ~~27~~25

SECTION 6.    Representations and Warranties............................................................ ~~27~~25
  6.01    Existence ........................................................................................... ~~27~~25
  6.02    [Reserved] ......................................................................................... ~~27~~25
  6.03    Single Purpose Entity........................................................................ ~~28~~25
  6.04    Litigation........................................................................................... ~~29~~27
  6.05    No Breach .......................................................................................... ~~29~~27
  6.06    Action................................................................................................. ~~29~~27

i

# TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 6.07 | Approvals | 2927 |
| 6.08 | Margin Regulations | 2927 |
| 6.09 | Taxes | 3027 |
| 6.10 | Investment Company Act | 3028 |
| 6.11 | No Legal Bar | 3028 |
| 6.12 | No Default | 3028 |
| 6.13 | Collateral; Collateral Security | 3028 |
| 6.14 | Corporate Form and Jurisdiction of Organization; Chief Executive Office; Chief Operating Office | 3129 |
| 6.15 | Location of Books and Records | 3129 |
| 6.16 | True and Complete Disclosure | 3129 |
| 6.17 | No Prohibited Persons | 3229 |
| 6.18 | ERISA | 3230 |
| 6.19 | Reserved | 3230 |
| 6.20 | Solvency | 3230 |
| 6.21 | [Reserved] | 3230 |
| 6.22 | No Burdensome Restrictions | 3330 |
| 6.23 | Subsidiaries | 3330 |
| 6.24 | Minimum Tangible Net Worth | 3330 |
| 6.25 | Liquidity | 3330 |
| SECTION 7. | Covenants | 3330 |
| 7.01 | Financial Statements | 3330 |
| 7.02 | Litigation | 3432 |
| 7.03 | Existence, Etc | 3432 |
| 7.04 | Prohibition of Fundamental Changes | 3532 |
| 7.05 | Collateral Deficiency | 35 |
| 7.05 | [Reserved] | 33 |
| 7.06 | Notices | 3533 |
| 7.07 | Collateral Security | 3633 |
| 7.08 | [Reserved] | 3633 |
| 7.09 | Minimum Tangible Net Worth | 3633 |
| 7.10 | Debt to Equity Ratio | 3633 |
| 7.11 | Liquidity | 3633 |
| 7.12 | [Reserved] | 3633 |
| 7.13 | Transactions with Affiliates | 3634 |
| 7.14 | Distributions | 3634 |
| 7.15 | [Reserved] | 3634 |
| 7.16 | Cooperation | 3634 |
| 7.17 | Solvency | 3734 |
| 7.18 | No Amendment, Modification or Waiver | 3734 |
| 7.19 | Reserved | 3735 |
| 7.20 | Further Identification of Collateral | 3735 |

ii

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 7.21 | Estoppel Statement | 3735 |
| 7.22 | Reserved | 3835 |
| 7.23 | Compliance Certificate | 3835 |
| 7.24 | Prohibited Persons | 3835 |
| 7.25 | Further Documentation | 3836 |
| 7.26 | Organizational Documents | 3836 |
| SECTION 8. | Events of Default | 3836 |
| SECTION 9. | Remedies Upon Default | 4138 |
| SECTION 10. | No Duty on Lender's Part | 4240 |
| SECTION 11. | Miscellaneous | 4340 |
| 11.01 | Waiver | 4340 |
| 11.02 | Notices | 4340 |
| 11.03 | Indemnification and Expenses | 4341 |
| 11.04 | Amendments | 4442 |
| 11.05 | Successors and Assigns | 4442 |
| 11.06 | Survival | 4442 |
| 11.07 | Captions | 4542 |
| 11.08 | Counterparts | 4543 |
| 11.09 | Loan Agreement Constitutes Security Agreement; Governing Law | 4543 |
| 11.10 | SUBMISSION TO JURISDICTION; WAIVERS | 4543 |
| 11.11 | WAIVER OF JURY TRIAL | 4643 |
| 11.12 | Acknowledgments | 4644 |
| 11.13 | Reserved | 4644 |
| 11.14 | Assignments; Participations | 4644 |
| 11.15 | Servicing | 4846 |
| 11.16 | Periodic Due Diligence Review | 4946 |
| 11.17 | Recourse Obligations | 4947 |
| 11.18 | Set-Off | 5148 |
| 11.19 | Entire Agreement | 5148 |

## SCHEDULES

| | |
|---|---|
| SCHEDULE 1 | Borrower Representations and Warranties |
| SCHEDULE 2 | Filing Jurisdictions and Offices |
| SCHEDULE 3 | Ownership Chart |
| SCHEDULE 4 | Subsidiaries |
| SCHEDULE 5 | Reserved |
| SCHEDULE 6 | Rake Securities |
| SCHEDULE 7 | Reserved |
| SCHEDULE 8 | Allocated Advance Amount |
| SCHEDULE 9 | Form of Trustee Instruction Letter |

# LOAN AND SECURITY AGREEMENT

## (Rake Securities)

LOAN AND SECURITY AGREEMENT (Rake Securities), dated as of May [__], 2011 (but effective as of May 30, 2008) (this "Loan Agreement"), between CWCAPITAL EY REIT LB2 LLC, a Delaware limited liability company (the "Borrower") and LEHMAN COMMERCIAL PAPER INC., a New York corporation (the "Lender").

## RECITALS

TheOn the Funding Date, the Borrower wishes to obtainobtained financing from Lender for the purchase of those certain Rake Securities, which Rake Securities are more particularly described on Schedule 6 attached hereto, and which.

The parties hereto desire to enter into this Loan Agreement to evidence the financing obtained by Borrower from Lender on the Funding Date (to the same extent as if this Loan Agreement were executed on the Funding Date), and to provide that the Rake Securities shall secure the Loan to be made by the Lender hereunder. on the Funding Date.

In order to induce the Lender to enter into this Loan Agreement, the Guarantor is willing to provide the Guaranty. On the Closing Date, the outstanding principal amount of the Advance is equal to $ [44,030,232.85],[1] and accrued interest on the Loan has been paid by Borrower through May [    ], 2011.

TheIn order to induce the Borrower to enter into this Loan Agreement, the Lender has agreed, subject to the terms and conditions of this Loan Agreement, to continue to provide such financing to the Borrower. Accordingly, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## SECTION 1.  Definitions and Accounting Matters.

**1.01  Certain Defined Terms.**  As used herein, the following terms shall have the following meanings (all terms defined in this Section 1.01 or in other provisions of this Loan Agreement in the singular to have the same meanings when used in the plural and vice versa):

"Additional Collateral" shall mean the additional collateral pledged by Borrower under clauses (ii) and (iii) of Section 2.06(a) hereof. "Advance" shall mean the sum of (1) the outstanding principal amount of the Initial Advance and (2) outstanding principal amount of all Re-Advances made pursuant to Section 2.06(c) hereof, as the same may be reduced from time to time in accordance with this Loan Agreement.

---

[1]  The $2.5 million principal prepayment to be made on the closing date is reflected in this amount. The required principal prepayment will be documented in a side letter agreement.

"Advance Rate" shall mean 76%, with respect to any Rake Security, the percentage determined by dividing (x) the Allocated Advance Amount for such Rake Security by (y) the outstanding certificate balance for such Rake Security.

"Affiliate" shall mean, with respect to any Person, any other Person which, directly or indirectly, controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" (together with the correlative meanings of "controlled by" and "under common control with") means possession, directly or indirectly, of the power (a) to vote 10% or more of the securities (on a fully diluted basis) having ordinary voting power for the directors or managing general partners (or their equivalent) of such Person, or (b) to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by contract, or otherwise.

"Allocated Advance Amount" shall mean, with respect to each Rake Security, the amount set forth on Schedule 8 for such Rake Security as of the Closing Date, as the same may be reduced from time to time in accordance with Sections 2.06 and 2.07 hereof.

"Applicable Interest Rate" shall mean an interest rate per annum equal to (i) the LIBO Base Rate plus the Applicable Margin, and (ii) if the provisions of Section 2.04 hereof apply, the Base Rate plus the Base Rate Margin.

"Applicable Margin" shall mean 0.75%.

"Assumed Final Distribution Date" shall mean, with respect to any Rake Security, the "Distribution Date" following the final maturity date, as extended (including pursuant to all extension options) for the related Underlying Mortgage Loan.

"Bankruptcy Code" shall mean the United States Bankruptcy Code of 1978, as amended from time to time.

"Base Rate" shall mean the annual rate of interest publicly announced by Citibank, N.A. in New York, New York, as its base rate, as such rate shall change from time to time. If Citibank, N.A. ceases to announce a base rate, Base Rate shall mean the rate of interest published in The Wall Street Journal from time to time as the "Prime Rate." If The Wall Street Journal ceases to publish the "Prime Rate," the Lender shall select an equivalent publication that publishes such "Prime Rate," and if such "Prime Rates" are no longer generally published or are limited, regulated or administered by a governmental or quasi-governmental body, then Lender shall select a reasonably comparable interest rate index.

"Base Rate Margin" shall mean the difference (expressed as the number of basis points) between (a) the LIBO Base Rate plus the Applicable Margin on the date the LIBO Base Rate was last applicable to the Loan and (b) the Base Rate on the date that the LIBO Base Rate was last applicable to the Loan; provided, however, in no event shall such difference be a negative number.

"Beacon Fund II Rake Pool" shall collectively mean the following Rake Securities: (i) Beacon Fund II—100 Citigroup Center Rake Bond and (ii) Beacon Fund II—1888 Century Park East Rake Bond.

"Beacon Fund III Rake Pool" shall collectively mean the following Rake Securities: (i) Beacon Fund III—100 California Street Rake Bond, (ii) Beacon Fund III—50 Beale Street Rake Bonds, (iii) Beacon Fund III—200 State Street Rake Bonds and (iv) Beacon Fund III—1000 Wilshire Rake Bonds.

"Book Value" shall mean, (i) with respect any Rake Security, as of any date of determination, an amount, as certified by the Borrower, equal to the lesser of (x) the price that the Borrower initially paid or advanced (including, any reserves or escrows) for or in respect of such Rake Security or (y) the outstanding principal balance of such Rake Security, less an amount equal to the sum of all principal paydowns paid and realized losses recognized relating to such Rake Security and (ii) with respect to any Additional Collateral pledged as Collateral hereunder pursuant to Section 2.06(a)(iii), as of any date of determination, the outstanding principal balance of such Additional Collateral, less an amount equal to the sum of all principal paydowns paid and realized losses recognized relating to such Additional Collateral.

"Borrower" shall have the meaning provided in the heading hereto.

"Breakage Costs" shall mean, with respect to the Loan, any amount necessary to compensate the Lender for any losses or costs (including, without limitation, the costs of breaking any "LIBOR" contract, if applicable, or funding losses determined on the basis of Lender's reinvestment rate and the LIBO Rate) if the Loan, or any portion thereof, is prepaid for any reason whatsoever (other than a mandatory repayment under Section 2.06(d) hereof) on any date other than a Payment Date.

"Business Day" shall mean any day other than a Saturday, Sunday or any other day on which national banks in New York, New York are not open for business.

"Capital Lease Obligations" shall mean for any Person, all obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) the Property to the extent such obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP, and, for purposes of this Loan Agreement, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP.

"Cash Management Account" shall mean the segregated interest bearing account established and maintained at the Depository, in the name of and for the benefit of the Lender pursuant to Section 3.01 hereof.

"Capital Stock" shall mean any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, membership interests in a limited liability company, general and limited partnership interests in a partnership, any and all similar ownership interests in a Person (other than a corporation) and any and all warrants or options to purchase any of the foregoing.

"Cash Equivalents" shall mean any of the following: (a) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one (1) year from the date of acquisition, (b) time deposits or

certificates of deposit of any commercial bank incorporated under the laws of the United States or any state thereof, of recognized standing having capital and unimpaired surplus in excess of $1,000,000,000 and whose short-term commercial paper rating at the time of acquisition is at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's (any such bank, an "Approved Bank"), with such deposits or certificates having maturities of not more than one (1) year from the date of acquisition, (c) repurchase obligations with a term of not more than seven (7) days for underlying securities of the types described in clauses (a) and (b) above entered into with any Approved Bank, (d) commercial paper or finance company paper issued by any Person incorporated under the laws of the United States or any state thereof and rated at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's, and in each case maturing not more than one (1) year after the date of acquisition, and (e) investments in money market funds that are registered under the 40 Act, which have net assets of at least $1,000,000,000 and at least 85% of whose assets consist of securities and other obligations of the type described in clauses (a) through (e) above.  All such Cash Equivalents must be denominated solely for payment in United States Dollars.

"Change of Control" shall mean any of the following events shall have occurred: (i) if forty-nine percent (49%) or more of the ownership interest in Borrower shall at any time be owned, directly or indirectly, by any person other than Guarantor or if Guarantor ceases to Control Borrower; or (ii) CWCI Enhanced Yield GP LLC (the "CW General Partner") is not the general partner of Guarantor or CW Capital Investments LLC does not Control CW General Partner.

"Closing Date" shall mean May [   ], 2011.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Collateral" shall have the meaning provided in Section 4.01(b) hereof.

~~"Collateral Deficiency" shall have the meaning provided in Section 2.06(a) hereof.~~

~~"Collateral Deficiency Deposit Account" shall have the meaning provided in Section 2.06(b) hereof.~~

~~"Collateral Deficiency Deposit Account Agreement" shall have the meaning provided in Section 2.06(b) hereof.~~

~~"Collateral Value" shall mean (i) with respect to any Rake Security, as of any date of determination, the lesser of (a) the Book Value of such Rake Security and (b) the Market Value of such Rake Security; (ii) with respect to any Additional Collateral pledged pursuant to Section 2.06(a)(iii) hereof, as of any date of determination, the lesser of (a) the Book Value of such Additional Collateral and (b) the Market Value of such Additional Collateral and (iii) with respect to any Additional Collateral which consists of cash or a Letter of Credit deposited into the Collateral Deficiency Deposit Account pursuant to Section 2.06(a)(ii) hereof, the face value of such cash or Letter of Credit.~~

"Contractual Obligation" shall mean as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound or any provision of any security issued by such Person.

"Control" (and the correlative terms "controlled by" and "controlling") shall mean, unless otherwise specifically defined herein, the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of the business and affairs of the entity in question by reason of the ownership of beneficial interests, by contract or otherwise.

"Controlling Party" shall have the meaning provided in Section 6.03 hereof.

"Default" shall mean an event that with notice or lapse of time or both would become an Event of Default.

"Depository" shall mean Wachovia Bank, N.A., or any successor Depository appointed by Lender and approved by Borrower, which approval shall not be unreasonably withheld, conditioned or delayed.

"Depository Agreement" shall mean the agreement governing the Cash Management Account between the Depository, the Lender and the Borrower and their respective successors and assigns as the same may be modified, amended or supplemented from time to time.

"DTC" shall mean Depository Trust Company, New York, New York, a limited purpose trust company organized under the Banking Law of the State of New York, and its nominee companies.

"Determination Date" shall mean, with respect to any Interest Period, the date that is two (2) LIBOR Business Days prior to the fifteenth (15th) calendar day of the month in which such Interest Period commenced.

"Direction Letter" shall mean, with respect to each Rake Security, a letter signed by Borrower directing, to the extent applicable, (a) reserved; (b) the holder of the Underlying Mortgage Loan and the servicer of the Underlying Mortgage Loan (if there is a servicer with respect to such Underlying Mortgage Loan); and/or (c) the cash management or lockbox bank(s) maintaining accounts in which payments relating to the Rake Security are deposited, as applicable, to send all Income with respect to the Rake Security to the Cash Management Account held by the Depository within one (1) Business Day of receipt.

"Distributions" shall mean any dividends (other than dividends payable solely in common stock), distributions, return of capital to any stockholders, general or limited partners or members, other payments, distributions or delivery of property or cash to stockholders, general or limited partners or members, or any redemption, retirement, purchase or other acquisition, directly or indirectly, of any shares of any class of capital stock now or hereafter outstanding (or any options or warrants issued with respect to capital stock) general or limited partnership interest or membership interest, or the setting aside of any funds for the foregoing.

"Dollars" and "$" shall mean lawful money of the United States of America.

"Due Diligence Review" shall mean the performance by the Lender of any or all of the reviews permitted under Section 11.16 hereof.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and the regulations promulgated thereunder.

"ERISA Affiliate" shall mean any corporation or trade or business that is a member of any group of organizations (i) described in Section 414(b) or (c) of the Code of which Borrower is a member or (ii) solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the lien created under Section 302(f) of ERISA and Section 412(n) of the Code, described in Section 414(m) or (o) of the Code of which Borrower is a member.

"Event of Default" shall have the meaning provided in Section 8 hereof.

"~~Excess Margin~~" ~~shall have the meaning provided in Section 2.06(c) hereof.~~"Funding Date" shall mean ~~the date on which the Initial Advance is made hereunder.~~May 30, 2008.

"GAAP" shall mean generally accepted accounting principles as in effect from time to time in the United States of America.

"Governing Agreements" shall mean, with respect to any Rake Security, the pooling and servicing agreement and such other agreements that are executed in connection with the issuance of the applicable Rake Security and evidencing the terms thereof.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any court or arbitrator having jurisdiction over the Borrower, Guarantor any of its Subsidiaries or any of its properties.

"Guarantor" shall mean CWCapital Enhanced Yield Debt Fund II LP, a Delaware limited partnership.

"Guaranty" shall mean the Guaranty, dated ~~of even date herewith~~as of the Closing Date, executed by the Guarantor in favor of the Lender and any amendment, modification or replacement thereof.

"Income" shall mean, with respect to any Rake Security, any principal (including any principal prepayments) thereof payable pursuant to the Rake Security Documents and all interest, dividends or other distributions thereon and all proceeds thereof.

"Indebtedness" shall mean, for any Person: (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, the issuance and sale of debt securities or the sale of Property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services, other than trade accounts payable (other than for borrowed money) arising, and accrued expenses incurred, in the

6

ordinary course of business so long as such trade accounts payable are payable within 90 days of the date the respective goods are delivered or the respective services are rendered; (c) indebtedness of others secured by a Lien on the Property of such Person, whether or not the respective Indebtedness so secured has been assumed by such Person; (d) obligations (contingent or otherwise) of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for account of such Person; (e) Capital Lease Obligations of such Person; (f) obligations of such Person under repurchase agreements, sale/buy back agreements or like arrangements; (g) indebtedness of others guaranteed by such Person; (h) all obligations of such Person incurred in connection with the acquisition or carrying of fixed assets by such Person; (i) indebtedness of general partnerships of which such Person is a general partner; (j) any other indebtedness of such Person by a note, bond, debenture or similar instrument; and (k) any other liabilities, contingent or otherwise, recognized under GAAP.

"Independent Director" shall mean a Person that is not and has not been for at least five (5) years: (a) a stockholder, director, officer, employee, partner, member, attorney or counsel of Guarantor, Borrower or of the Controlling Party or any Affiliate of any of them; (b) a customer, supplier or other Person who derives its purchases or revenues (other than any fee paid to such director as compensation for such director to serve as an Independent Director) from its activities with Guarantor, Borrower, the Controlling Party or any Affiliate of any of them (a "Business Party"); (c) a person or other entity controlling or under common control with any such stockholder, partner, member, director, officer, attorney, counsel or Business Party; or (d) a member of the immediate family of any such stockholder, director, officer, employee, partner, member, attorney, counsel or Business Party. Notwithstanding the foregoing, no Independent Director shall also serve as an Independent Director (as such term is defined in the Underlying Mortgage Loan Documents) for any Mortgage Borrower or any Principal (as such term is defined in the Underlying Mortgage Loan Documents) of Mortgage Borrower.

"Initial Advance" shall have the meaning set forth in Section 2.01 hereof.

"Interest Period" shall mean, with respect to the Advance, in connection with the calculation of interest accrued with respect to any specified Payment Date, the period from and including the fifteenth (15th) day of the prior calendar month to and including the fourteenth (14th) day of the calendar month in which the applicable Payment Date occurs; provided, however, the first Interest Period shall be the period from the Funding Date to and including June 14, 2008; provided further, that interest shall continue to accrue on all amounts due and payable hereunder that remain unpaid on the Termination Date. Each Interest Period, except for the first Interest Period, shall be a full month and shall not be shortened by reason of any payment of the Loan prior to the expiration of such Interest Period.

"Lender" shall have the meaning provided in the heading hereto.

"Letter of Credit" shall mean a clean, irrevocable, unconditional, transferable letter of credit payable on sight draft only, with an initial expiration date of not less than one (1) year and with automatic renewals for one (1) year periods (unless the obligation being secured by, or otherwise requiring the delivery of, such letter of credit is required to be performed prior to the initial expiry date of such letter of credit), for which Borrower shall have no reimbursement obligation and which reimbursement obligation is not secured by the Collateral or any other

~~property pledged to secure the Note, in favor of Lender and entitling Lender to draw thereon in
New York, New York or in such other city as Lender may reasonably determine, issued by Bank of
America, N.A., JPMorgan Chase Bank or another domestic bank or the U.S. agency or branch of a
foreign bank, provided such other bank has a long-term unsecured debt rating at the time such
letter of credit is delivered and throughout the term of such letter of credit, of not less than "A+"
from each of Fitch, Inc. and S&P and "A1" from Moody's.~~

"LIBO Base Rate" shall mean, for each Interest Period, the quoted offered rate for
one-month United States dollar deposits with leading banks in the London interbank market that
appears as of 11:00 a.m. (London time) on the related Determination Date on Telerate Page 3750.
If, as of such time on any Determination Date, no quotation is given on Telerate Page 3750, then
Lender shall establish the LIBO Base Rate on such Determination Date by requesting four
Reference Banks meeting the criteria set forth herein to provide the quotation offered by its
principal London office for making one-month United States dollar deposits with leading banks in
the London interbank market as of 11:00 a.m. (London time) on such Determination Date.

(i)    If two or more Reference Banks provide such offered quotations,
then the LIBO Base Rate for the next Interest Period shall be the arithmetic mean of such offered
quotations (rounded upward if necessary to the nearest whole multiple of 1/1,000%).

(ii)    If only one or none of the Reference Banks provides such offered
quotations, then the LIBO Base Rate for the next Interest Period shall be the Reserve Rate.

(iii)    If on any Determination Date, Lender is required but is unable to
determine the LIBO Base Rate in the manner provided in paragraphs (i) and (ii) above, the LIBO
Base Rate for the next Interest Period shall be the LIBO Base Rate as determined on the preceding
Determination Date.

The establishment of the LIBO Base Rate on each Determination Date by Lender
shall be final and binding absent manifest error.

"LIBOR Business Day" shall mean a day upon which United States dollar deposits
may be dealt in on the London interbank markets and commercial banks and foreign exchange
markets are open in London.

"Lien" shall mean any mortgage, pledge, hypothecation, assignment, deposit
arrangement, encumbrance, lien (statutory or other), other charge or security interest, or any
preference, priority or other agreement or preferential arrangement of any kind or nature
whatsoever.

"Liquidity" shall mean, as of a particular date, the amount of (x) unrestricted cash
of Guarantor, (y) unrestricted Cash Equivalents of Guarantor and (z) undrawn amounts of capital
commitments and subscriptions of the investors in Guarantor.

"Loan" shall mean the loan made pursuant to the terms of this Loan Agreement.

"Loan Agreement" shall mean this Loan and Security Agreement, as may be amended, supplemented or otherwise modified from time to time as mutually agreed by the parties in writing.

~~"Loan Amount" shall equal $54,515,590.85.~~

"Loan Documents" shall mean collectively, this Loan Agreement, the Note, the Guaranty, the Securities Account Control Agreement and each other document or agreement relating to the transactions contemplated by this Loan Agreement.

~~"Market Value" shall mean (i) with respect to any Rake Security, as of any relevant date, the market value for such Rake Security on such date as determined by Lender in its sole but good faith discretion, and with such value determination to be based on the assumption that any Rake Security purchase would be financed on substantially the same economic terms as those set forth in this Agreement; and (ii) with respect to any Additional Collateral pledged pursuant to Section 2.06(a)(iii) of this Loan Agreement, as of any relevant date, the market value for such Additional Collateral, on such date as determined by Lender in its sole but good faith discretion.~~

"Material Adverse Effect" shall mean a material adverse effect on (a) the property or financial condition of Borrower or Guarantor, (b) the ability of Borrower or Guarantor to perform in all material respects its obligations under any of the Loan Documents to which it is a party, (c) the validity or enforceability in all material respects of any of the Loan Documents, (d) the rights and remedies of the Lender under any of the Loan Documents, (e) the timely payment of the principal of or interest on the Advance or other amounts payable in connection therewith or (f) the Collateral.

~~"Maximum Advance Amount" shall mean $54,515,590.85.~~

"Mortgage Borrower" the borrower under the applicable Underlying Mortgage Loan Documents.

"Multiemployer Plan" shall mean a multiemployer plan defined as such in Section 3(37) of ERISA to which contributions have been or are required to be made by Borrower or any ERISA Affiliate and that is covered by Title IV of ERISA.

"Note" shall mean the promissory note provided for by Section 2.02 hereof for the Advance and any promissory note delivered in substitution or exchange therefor, in each case as the same shall be modified and supplemented and in effect from time to time in accordance with the terms hereof.

"Obligations" shall mean all the payment obligations of the Borrower hereunder, under the Note, and under the other Loan Documents, including but not limited to the principal of and interest on the Advance and all other fees, expenses and amounts owing to the Lender.

"Organizational Documents" shall mean (i) with respect to a corporation, such Person's certificate of incorporation and by laws, and any shareholder agreement, voting trust or similar arrangement applicable to any of such Person's authorized shares of capital stock, (ii) with respect to a partnership, such Person's certificate of limited partnership, partnership agreement,

voting trusts or similar arrangements applicable to any of its partnership interests, (iii) with respect to a limited liability company, such Person's certificate of formation, limited liability company agreement or other document affecting the rights of holders of limited liability company interests, and (iv) any and all agreements between any constituent member, partner or shareholder of the Person in question, including any contribution agreement or indemnification agreements. In each case, "Organizational Documents" shall include any indemnity, contribution, shareholders or other agreement among any of the owners of the entity in question.

"Payment Date" shall mean (a) the seventeenth (17th) day of each calendar month or, if such day is not a Business Day, the immediately preceding Business Day or (b) in the case of the final Payment Date, the Termination Date.

"PBGC" shall mean the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"Person" shall mean any individual, corporation, company, bank, voluntary association, partnership, joint venture, limited liability company, trust, unincorporated association or Governmental Authority and any fiduciary acting in such capacity on behalf of any of the foregoing.

"PHOV Rake Security" shall mean the Rake Security identified on Schedule 6 as the PHOV Hotel Portfolio Rake Security.

"Plan" shall mean an employee benefit or other plan established or maintained by either Borrower or any ERISA Affiliate and that is covered by Title IV of ERISA, other than a Multiemployer Plan.

"Post-Default Rate" shall mean, during the continuance of any Event of Default, a rate per annum equal to the lesser of (i) the sum of (x) 4% per annum, plus (y) the Applicable Interest Rate and (ii) the maximum non-usurious interest rate permitted by applicable law.

"Prohibited Person" shall have the meaning provided in Section 6.17 hereof.

"Property" shall mean any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Purchase Price" shall mean, with respect to the Rake Securities, $71,731,040.59.

"Rake Security" shall individually and collectively, as the context may require, mean, each commercial mortgage backed security, secured by a single commercial mortgage loan, as described on Schedule 6 hereto.

"Rake Security Documents" shall mean any and all documents required in connection with any Rake Security, including, without limitation with respect to any Rake Security, (i) each of the Governing Agreements related to such Rake Security, (ii) copies of any public or private offering documents under which such Rake Security was offered for sale and (iii) (a) if such Rake Security is currently in physical, certificated form, the Rake Security certificate, in the name of the Borrower, and an undated bond power covering the certificated Rake Security,

duly executed in blank by the Borrower with signature guaranteed, along with any other documents necessary to re-register such Rake Security or (b) if such Rake Security is held through DTC, written evidence satisfactory to the Lender that the records of DTC indicate that the Lender or its designee is the beneficial owner of the Rake Security, or written evidence that such Rake Security has been credited to a securities account for which the Lender is the sole "entitlement holder" together with a securities account control agreement acceptable to the Lender in its sole discretion.

~~"Re-Advance" shall have the meaning provided in Section 2.06(e) hereof.~~

"Reference Bank" shall mean a lending bank engaged in transactions in Eurodollar deposits in the international Eurocurrency market that has an established place of business in London. If any Reference bank should be removed from the Telerate Page 3750 or in any other way fail to meet the qualifications of a Reference Bank, Lender may designate alternative Reference Banks meeting the criteria specified above.

"Regulations T, U and X" shall mean Regulations T, U and X of the Board of Governors of the Federal Reserve System (or any successor), as the same may be modified and supplemented and in effect from time to time.

~~"Request for Excess Margin" shall have the meaning provided in Section 2.06(e) hereof.~~

~~"Request for Re-Advance" shall have the meaning provided in Section 2.06(e) hereof.~~

"Requirement of Law" shall mean as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation (including without limitation the Investment Company Act of 1940, as amended) or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Reserve Rate" shall mean the rate per annum which Lender reasonably determines to be either (i) the arithmetic mean (rounded upwards if necessary to the nearest whole multiple of 1/1,000%) of the one-month United States dollar lending rates that at least three major New York City banks selected by Lender are quoting at 11:00 a.m. (New York time) on the relevant Determination Date, to the principal London offices of at least two of the Reference Banks, or (ii) in the event that at least two such rates are not obtained, the lowest one-month United States dollar lending rate which New York City banks selected by Lender are quoting as of 11:00 a.m. (New York time) on such Determination Date to leading European banks.

"Responsible Officer" shall mean, as to any Person, the chief executive officer or, with respect to financial matters, the chief financial officer of such Person; provided, that in the event any such officer is unavailable at any time he or she is required to take any action hereunder, Responsible Officer shall mean any officer authorized to act on such officer's behalf as demonstrated by a certificate of corporate resolution or other evidence of such officer's authority to the Lender.

11

"Secured Obligations" shall have the meaning provided in Section 4.01(c) hereof.

"Securities Account" shall have the meaning set forth in the Securities Account Control Agreement.

"Securities Account Control Agreement" shall mean that certain Securities Account Control Agreement dated as of the date hereofClosing Date between Borrower, Lender and the Securities Intermediary.

"Securities Intermediary" shall mean have the meaning set forth in the Securities Account Control Agreement.

"Servicer" shall mean any third party servicer (other than Borrower) under any Servicing Agreement, if any.

"Servicing Agreement" shall mean a servicing agreement between Borrower and a Servicer.

"Servicing Records" shall have the meaning provided in Section 11.15(b) hereof.

~~"Sponsor Related Default" shall mean with respect to the Beacon Fund II Rake Pool and the Beacon Fund III Rake Pool, the occurrence of any of the following events: (a) a bankruptcy, insolvency, reorganization, winding-up, or composition or adjustment of debts with respect to any direct or indirect member of the Mortgage Borrower, including any underlying mezzanine borrower under a mezzanine loan owned by Lender and any guarantor of the Underlying Mortgage Loan; (b) the occurrence of any "event of default" under any underlying mezzanine loan owned by Lender or the exercise by the mezzanine lender thereunder of any rights or remedies with respect thereto; and (c) the occurrence of any Event of Default (as defined in the Underlying Mortgage Loan Documents) under the Underlying Mortgage Loan Documents (including failure of the Mortgage Borrower to repay the Underlying Mortgage Loan in full upon the scheduled maturity date under the Underlying Mortgage Loan Documents) as a result of any failure to satisfy any condition to extending the scheduled maturity date under the Underlying Mortgage Loan Documents related to the extension of the maturity date of the applicable mezzanine loan owned by Lender.~~

"Subsidiary" shall mean, with respect to any Person, any corporation, partnership or other entity of which at least a majority of the securities or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other persons performing similar functions of such corporation, partnership or other entity (irrespective of whether or not at the time securities or other ownership interests of any other class or classes of such corporation, partnership or other entity shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person.

"Tangible Net Worth" shall mean, as of a particular date, all amounts which would be included under capital of Guarantor and its consolidated subsidiaries on a balance sheet of Guarantor and its consolidated subsidiaries at such date, including, without limitation, undrawn

amounts of capital commitments and subscriptions of the investors in Guarantor, determined in accordance with GAAP, less intangible assets of Guarantor and its consolidated subsidiaries.

"Telerate Page 3750" shall mean the display designated as Page 3750 on the Dow Jones Telerate (or other page as may replace Page 3750 on that service or such other service as may be nominated by the British Bankers-Association as the information vendor for the purposes of displaying British Bankers-Association Interest Settlement Rates for U.S. dollar deposits).

"Termination Date" shall mean the date that is six (6) months ~~from~~after the latest Assumed Final Distribution Date for the Rake Securities.

"Total Indebtedness" shall mean with respect to any Person, for any period, the aggregate Indebtedness of such Person and its Subsidiaries during such period, less the amount of any nonspecific consolidated balance sheet reserves maintained in accordance with GAAP.

"Trustee" shall mean any trustee under the applicable Governing Agreement with respect to any Rake Security.

"Trustee Instruction Letter" shall have the meaning set forth in Section 4.01 hereof.

"Underlying Mortgage Loan" shall mean with respect to any Rake Security, the mortgage loan such Rake Security is related to.

"Underlying Mortgage Loan Documents" shall mean with respect to any Rake Security, the underlying mortgage loan documents the Rake Security is related to.

"Underlying Mortgaged Property" shall mean, with respect to any Rake Security, the property securing the Underlying Mortgage Loan such Rake Security relates to.

"Uniform Commercial Code" or "UCC" shall mean the Uniform Commercial Code as in effect on the ~~date hereof~~Closing Date in the State of New York; provided, that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" or "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection.

**1.02    Accounting Terms and Determinations**.  Except as otherwise expressly provided herein, all accounting terms used herein shall be interpreted, and all financial statements and certificates and reports as to financial matters required to be delivered to the Lender hereunder shall be prepared, in accordance with GAAP.

## SECTION 2. Advance, Note and Prepayments.

**2.01     Advance.**

(a)     The Lender agrees, on the terms and conditions of this Loan Agreement, to make a loan (the "Initial Advance") to the Borrower in Dollars, on the ~~date hereof~~Funding Date, in the original principal amount of $54,515,590.85. Lender acknowledges that, on the Closing Date, the outstanding principal balance of the Advance is $ [44,030,232.85].[2]

(b)     ~~Except as provided in Section 2.06(c) hereof, the~~ Lender shall not be required hereby to make any loan to the Borrower other than ~~(i)~~ the Initial Advance on the Funding Date ~~and (ii) any Re-Advances pursuant to the terms and conditions of Section 2.06(c) hereof.~~.

(c)     ~~Except as provided in Section 2.06(c) hereof, the~~The Borrower shall not be permitted to ~~reborrow~~re-borrower hereunder.

**2.02     Notes.**

The ~~Initial Advance and each Re-Advance~~Loan made by the Lender shall be evidenced by the promissory note of the Borrower (the "Note"), dated ~~the date hereof~~as of the Closing Date (but effective as of the Funding Date), payable to the Lender in a principal amount equal to the ~~amount of the Maximum~~Initial Advance ~~Amount~~. The Lender shall have the right to have the Note subdivided, by exchange for promissory notes of lesser denominations or otherwise in accordance with the provisions of Section 11.14 hereof.

**2.03     Reserved.**

**2.04     Limitation on Types of Advances; Illegality.**  Anything herein to the contrary notwithstanding, if, on or prior to the determination of the LIBO Base Rate:

(a)     the Lender determines, which determination shall be conclusive and binding upon the Borrower (absent manifest error), that quotations of interest rates for the relevant deposits referred to in the definition of "LIBO Base Rate" in Section 1.01 hereof are not being provided in the relevant amounts or for the relevant maturities for purposes of determining rates of interest for the Advance as provided herein; or

(b)     In the event that Lender shall have determined (which determination shall be conclusive and binding upon Borrower absent manifest error) that by reason of circumstances affecting the interbank eurodollar market, adequate and reasonable means do not exist for ascertaining the LIBO Base Rate; or

(c)     it becomes unlawful for the Lender to honor its obligation to maintain the Advance hereunder using a LIBO Rate;

---

[2]     The $2.5 million principal prepayment to be made on the closing date is reflected in this amount.  The required principal prepayment will be documented in a side letter agreement.

14

then the Lender shall give the Borrower prompt notice thereof and the Borrower shall, at its option, either (i) prepay the Advance and all other Obligations then outstanding or (ii) pay interest on the Advance at an interest rate per annum equal to the sum of the Base Rate and the Base Rate Margin.

### 2.05    Repayment of Advance; Interest~~, Extension of Termination Date~~.

(a)    (i)    The Borrower shall repay in full on the Termination Date the aggregate outstanding principal amount of the Advance (as evidenced by the Note) and all other Obligations, to the extent outstanding, including, without limitation, the interest that would have accrued at the Applicable Interest Rate on the amount then repaid from and including the first day of the Interest Period in which the payment occurs through and including the date of such payment.

(ii)    No later than the Business Day prior to each Payment Date, the Lender shall provide to the Borrower a report which shall state the interest amount due for the current Interest Period on the Advance; provided, that the failure of the Lender to make any such report shall not affect the obligations of the Borrower to make a payment when due of any amount owing hereunder or under the Note in respect of the Advance. Interest on the outstanding principal balance of the ~~Loan~~Advance shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate equal to the Applicable Interest Rate divided by three hundred sixty (360) by (c) the outstanding principal balance of the ~~Loan~~Advance.

(iii)    In accordance with Section 3.05(a), the Borrower shall pay to the Lender interest on the unpaid principal amount of the Advance for the period from and including the date of the Advance to but **[excluding]  [SJC — SHOULD BE INCLUDING?]**including the date the Advance shall be paid in full, at a rate per annum equal to the Applicable Interest Rate. Notwithstanding the foregoing, during the continuance of an Event of Default, the Borrower shall pay to the Lender interest at the applicable Post-Default Rate on the principal of the Advance and on any other amount then due and payable by the Borrower hereunder or under the Note (whether at stated maturity, by acceleration or by mandatory prepayment or otherwise). Accrued interest on the Advance as calculated by Lender pursuant to Section 2.05(a)(ii) above shall be payable monthly on each Payment Date and on the Termination Date, except that interest payable at the Post-Default Rate shall accrue daily and shall be payable promptly upon receipt of invoice. Promptly after the determination of any interest rate provided for herein or any change therein, the Lender shall give written notice thereof to the Borrower.

### 2.06    Mandatory Prepayment.

(a)    ~~(b)~~[reserved].

(b)    ~~(c)~~[reserved].

### ~~2.06    Market Value Requirement; Cash or Collateral Deposit; Prepayment.~~

~~(a)    In the event that at any time the outstanding principal amount of the Advance exceeds the sum of (1) the Collateral Value of any cash or Letters of Credit deposited pursuant to (ii) below, (2) the aggregate Collateral Value of any Additional Collateral pledged as Collateral pursuant to (iii) below, multiplied by the Advance Rate and (3) the aggregate Collateral~~

15

Value of the Rake Securities multiplied by the Advance Rate (any such excess, a "Collateral Deficiency"), the Borrower shall, within ten (10) Business Days of notice from the Lender of the occurrence of such Collateral Deficiency, (i) prepay the Loan in whole or in part in accordance with Section 2.07 hereof, (ii) deposit cash or Letters of Credit in the Collateral Deficiency Deposit Account, (iii) pledge Additional Collateral (other than cash or Letters of Credit), acceptable to the Lender in its sole and absolute discretion, or (iv) complete any combination of (i), (ii) and (iii) above, such that after giving effect to such prepayment, deposit of cash and/or pledge of Additional Collateral, the outstanding principal amount of the Advance plus any fees and other amounts due under this Loan Agreement does not exceed the sum of (A) the Collateral Value of any deposited cash or Letters of Credit pursuant to (ii) above, (B) the aggregate Collateral Value of any Additional Collateral pledged pursuant to (iii) above, multiplied by the Advance Rate and (C) the aggregate Collateral Value of the Rake Securities multiplied by the Advance Rate, provided however, that, notwithstanding the Advance Rate, with respect to the first notice of a Collateral Deficiency hereunder, the Lender shall not give such notice of a Collateral Deficiency hereunder unless and until the Lender has determined that the outstanding principal amount of the Advance plus any fees and other amounts due under this Loan Agreement exceeds the sum of (1) the Collateral Value of any cash or Letters of Credit deposited pursuant to (ii) above, and (2) the aggregate Collateral Value of any Additional Collateral pledged as Collateral pursuant to (iii) above, multiplied by 81% and (3) the aggregate Collateral Value of the Rake Securities, multiplied by 81%. Any amounts prepaid pursuant to (i) above shall be applied to repay all or a portion of the outstanding principal amount of the Advance in accordance with Section 2.07 hereof. Lender agrees to provide to Borrower, for informational purposes only, a written explanation as to how Lender calculated a Collateral Deficiency. Notwithstanding the foregoing, with respect to the Beacon Fund II Rake Pool and the Beacon Fund III Rake Pool only, Lender agrees that it shall not give notice of a Collateral Deficiency solely upon the occurrence of a Sponsor Related Default.

(b) In the event that Borrower elects to deposit cash to cure a Collateral Deficiency pursuant to Section 2.06(a)(ii) above, Borrower shall cause a new account (the "Collateral Deficiency Deposit Account") to be created as a "deposit account" (as such term is defined in Section 9-102(a)(29) of the UCC), in such a manner that Lender shall have control (within the meaning of Section 9-104(a)(2) of the UCC) over such Collateral Deficiency Deposit Account and such that Borrower shall not have any right of withdrawal from the Collateral Deficiency Deposit Account and no cash shall be released to Borrower from the Collateral Deficiency Deposit Account. Borrower shall establish and maintain the Collateral Deficiency Deposit Account with the Depository, which shall execute an agreement (the "Collateral Deficiency Deposit Account Agreement") in such form as is reasonably acceptable to Lender. In the event that Borrower elects to pledge Additional Collateral under Section 2.06(a)(iii) above, and Lender accepts such collateral in its sole and absolute discretion, Borrower shall prepare, execute and deliver such additional documents as reasonably required by Lender to perfect Lender's security interest in such Additional Collateral pursuant to the terms of this Loan Agreement.

(c) So long as no Event of Default has occurred and is continuing, if at any time prior to the Termination Date, the sum of (1) the Collateral Value of any deposited cash and Letters of Credit pursuant to Section 2.06(a)(ii) above, (2) the aggregate Collateral Value of any Additional Collateral pledged pursuant to Section 2.06(a)(iii) above multiplied by the Advance Rate and (3) the aggregate Collateral Value of the Rake Securities multiplied by the Advance Rate, exceeds the outstanding principal amount of the Advance (such excess, "Excess Margin"), Lender

~~shall, provided that such Excess Margin is equal to or exceeds $250,000, within two (2) Business Days after receipt of a written request from Borrower (a "Request for Excess Margin"), release Additional Collateral to Borrower to the extent of such excess (if divisible). A Request for Excess Margin shall not be made more than once in any four (4) consecutive month period and shall include, among other things, a certification of Borrower certifying to Lender that both before and after giving effect to such release of Additional Collateral, no Event of Default will have occurred and be continuing under this Loan Agreement. If at any time prior to the Termination Date, the Collateral Value of the Rake Securities multiplied by the Advance Rate exceeds the outstanding principal amount of the Advance the Lender shall, within five (5) Business Days of a written request from the Borrower (a "Request for Re-Advance") re-advance any portion of the Advance that the Borrower previously prepaid pursuant to Section 2.06(a)(i) above, provided that each of the following conditions are satisfied: (i) no Event of Default has occurred and is continuing; (ii) the outstanding principal amount of the Advance, after giving effect to the requested Re-Advance, does not exceed the Maximum Advance Amount; (iii) after giving effect to the requested Re-Advance, the outstanding principal amount of the Advance shall not exceed the Collateral Value of the Rake Securities multiplied by the Advance Rate; and (iv) the requested Re-Advance equals or exceeds $250,000. Each Request for Re-Advance (i) shall be executed by the Borrower and a Responsible Officer of the Borrower, (ii) shall specify the aggregate principal amount of the requested re-advance (the "Re-Advance") and the requested date of the Re-Advance, and (iii) shall certify that, (x) no Event of Default has occurred and is continuing and (y) all of the conditions precedent to such Re-Advance have been complied with. The Borrower shall not make a request for more than one (1) Re-Advance in any consecutive three (3) month period and the Lender shall not be obligated to make more than one (1) Re-Advance in any consecutive three (3) month period.~~ [reserved].

      (d)     The Borrower must prepay ~~the Advance in whole~~<u>a portion of the Advance equal to the lesser of (x) either (i) with respect to the PHOV Rake Security, the applicable Allocated Advance Amount or (ii) with respect to all other Rake Securities, 110% of the applicable Allocated Advance Amount and (y) the then aggregate outstanding principal amount of the Advance,</u> upon any sale, assignment, pledge, grant of a security interest in, issuance of a participation interest in or other encumbrance or disposition of its interest in ~~any Collateral~~<u>such Rake Security</u> hereunder, and any amounts prepaid shall be applied to repay the outstanding Obligations hereunder ~~in accordance with Section 3.05 hereof~~<u>until the outstanding principal amount of the Advance is paid in full</u><u>; provided that, Borrower shall pay to Lender simultaneously with such prepayment, the interest accrued at the Applicable Interest Rate on the amount then prepaid from and including the first day of the Interest Period in which such prepayment occurs through and including the date of such prepayment</u>. The Borrower must prepay a portion of the Advance equal to the ~~Allocated Advance Amount for the applicable Rake Security~~<u>lesser of (x) either (i) with respect to the PHOV Rake Security, the applicable Allocated Advance Amount or (ii) with respect to all other Rake Securities, 110% of the applicable Allocated Advance Amount and (y) the then aggregate outstanding principal amount of the Advance,</u> upon any prepayment in whole of any Rake Security, and any amounts prepaid shall be applied to repay the outstanding Obligations hereunder ~~in accordance with the order of application set forth in Section 3.05 hereof~~ ~~until the outstanding principal amount of the Advance is paid in full~~<u>until the outstanding principal amount of the Advance is paid in full</u><u>; provided that, Borrower shall pay to Lender simultaneously with such prepayment, the interest accrued at the Applicable Interest Rate on the amount then prepaid from and including the first day of the Interest Period in which such prepayment occurs</u>

through and including the date of such prepayment.  With respect to each Rake Security, the Borrower must prepay the applicable Allocated Advance Amount in part upon any prepayment in part of any such Rake Security, in an amount equal to the lesser of (x) the product of (i) the amount of such partial prepayment multiplied by (ii) the Advance Rate, and (y) the then aggregate outstanding principal amount of the Advance; provided, that such amount shall be applied to repay the outstanding Obligations hereunder until the outstanding principal amount of the Advance is paid in full, and the Allocated Advance Amount for such Rake Security shall automatically be reduced by the amount determined pursuant to sub-clause (x) hereof; provided, further, that, Borrower shall pay to Lender simultaneously with such prepayment, the interest accrued at the Applicable Interest Rate on the amount then prepaid from and including the first day of the Interest Period in which such prepayment occurs through and including the date of such prepayment. Any other sums received by Borrower which are not required to be prepaid to Lender pursuant to the terms of this Agreement may be retained by Borrower for its own account.  ~~The Borrower must prepay the Advance in part upon any prepayment in part of any Rake Security, and the product of (i) the amount of such partial prepayment, and (ii) the Advance Rate, shall be applied to repay the outstanding Obligations hereunder~~Any prepayment amounts not otherwise allocated to a specific Rake Security shall be allocated to reduce the Allocated Advance Amounts for all Rake Securities on a pro rata basis.  In connection with any prepayment made pursuant to this Section 2.06(d), if the Allocated Advance Amount for any Rake Security is reduced to zero, then Lender's security interest and Lien in such Rake Security and other Collateral relating solely to such Rake Security shall automatically be released in accordance with Section ~~3.05 hereof until the outstanding principal amount of the Advance is paid in full.~~4.10 hereof.

### 2.07    **Optional Prepayments**~~.~~

(a)    The Advance is prepayable without premium or penalty, in whole or in part~~, on each Payment Date~~; provided that~~, subject to the provisions of clause (b) below~~, Borrower shall pay to Lender simultaneously with such prepayment, the interest ~~that would have~~ accrued at the Applicable Interest Rate on the amount then prepaid from and including the first day of the Interest Period in which the prepayment occurs through and including the date of such prepayment. Any prepayments made in accordance with this Section 2.07 may be allocated, at the election of Borrower, to reduce the Allocated Advance Amount for one or more specific Rake Securities. If Borrower elects to make a prepayment hereunder that results in the Allocated Advance Amount for a Rake Security being reduced to zero, then Borrower shall be required to prepay an amount equal to the lesser of (x) either (i) with respect to the PHOV Rake Security, the applicable Allocated Advance Amount or (ii) with respect to all other Rake Securities, 110% of the applicable Allocated Advance Amount and (y) the then aggregate outstanding principal amount of the Advance. Any prepayments made in accordance with this Section 2.07 shall be applied, first, to accrued and unpaid interest on the outstanding principal balance of the ~~Loan that would have~~Advance accrued at the Applicable Interest Rate on the amount prepaid from and including the first day of the Interest Period in which the prepayment occurs through and including the date of such prepayment (such payments shall represent additional interest payable hereunder), and then to all other outstanding Obligations hereunder ~~in accordance with Section 3.05(b) hereof~~until the outstanding principal amount of the Advance is paid in full.    Amounts repaid under this Section may not be ~~reborrowed~~re-borrowed.  If the Borrower intends to prepay the Advance in whole or in part from any source (other than in connection with a prepayment under Section 2.06(a~~d~~) hereof), the Borrower shall give two (2) Business Days' prior written notice thereof to the

Lender, which notice shall be irrevocable. If such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid. Any prepayment amounts not otherwise allocated to a specific Rake Security shall be allocated to reduce the Allocated Advance Amounts for all Rake Securities on a pro rata basis. In connection with any prepayment made pursuant to this Section 2.07(a), if the Allocated Advance Amount for any Rake Security is reduced to zero, then Lender's security interest and Lien in such Rake Security and other Collateral relating solely to such Rake Security shall automatically be released in accordance with Section 4.10 hereof.

(b)    [Reserved].

**2.08    Requirements of Law.**

(a)    If there is a change in any Requirement of Law (other than with respect to any amendment made to the Lender's certificate of incorporation and by-laws or other organizational or governing documents) or any change in the interpretation or application thereof or compliance by the Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereofClosing Date that:

(i)    shall subject the Lender to any tax of any kind whatsoever with respect to this Loan Agreement, the Note or the Advance made by it (excluding Excluded Taxes) or change the basis of taxation of payments to the Lender in respect thereof; or

(ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory advance or similar requirement against assets held by deposits or other liabilities in or for the account of the Advance or other extensions of credit by, or any other acquisition of funds by any office of the Lender which is not otherwise included in the determination of the LIBO Base Rate hereunder.

and the result of any of the foregoing is to increase the cost to the Lender, by an amount which the Lender deems to be material, of making, continuing or maintaining the Advance or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay the Lender such additional amount or amounts as will compensate the Lender for such increased cost or reduced amount receivable thereafter incurred.

(b)    If the Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof or compliance by the Lender or any corporation controlling the Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereofClosing Date shall have the effect of reducing the rate of return on the Lender's or such corporation's capital as a consequence of its obligations hereunder to a level below that which the Lender or such corporation (taking into consideration the Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by the Lender to be material, then from time to time, the Borrower shall promptly pay to the Lender such additional amount or amounts as will thereafter compensate the Lender for such reduction.

(c)    If the Lender becomes entitled to claim any additional amounts pursuant to this subsection, it shall promptly notify the Borrower of the event by reason of which it has become so entitled.  A certificate as to any additional amounts payable pursuant to this subsection submitted by the Lender to the Borrower shall be conclusive and binding on the Borrower in the absence of manifest error.

(d)    As promptly as reasonably practicable after Lender becomes aware of any event or condition that would entitle such Lender to receive payments under this Section or ceasing to maintain the Applicable Interest Rate based on the LIBO Base Rate, Lender will use commercially reasonable efforts (i) to maintain the Advance through another lending office of Lender or (ii) take such other measures as Lender may deem reasonable, if as a result thereof the additional amounts which would otherwise be required to be paid to Lender pursuant to this Section would be materially reduced or eliminated or the conditions rendering Lender incapable of maintaining the Advance based on the LIBO Base Rate no longer would be applicable, and if, in either case, as determined by Lender in its good faith discretion, the maintaining of the Advance through such other lending office or in accordance with such other measures, as the case may be, would not otherwise materially adversely affect the Advance or the interests of Lender.

**2.09    Purpose of Advance**.

The Initial Advance shall be used to finance a portion of the Purchase Price ~~of the Rake Securities equal to the Loan Amount for the acquisition~~ of the Rake Securities.

**SECTION 3.  Payments; Computations; Taxes; Facility Fee**.

**3.01    Payments**.

[Except to the extent otherwise provided herein, all Income and payments of principal, interest and other amounts to be made by the Borrower under this Loan Agreement and the Note, including without limitation, amounts payable by Borrower pursuant to Sections 2.06(d) and 2.07 hereof, shall be made in Dollars, in immediately available funds, without deduction, set-off or counterclaim, to the Lender at the Cash Management Account maintained by the Lender at Wachovia Bank, N.A.: Account Number 2000043050206, For the A/C of CWCapital EY REIT LB2 LLC Pledged Cash Management Account (B) for the Benefit of Lehman Commercial Paper Inc., Trimont Real Estate Advisors, Inc., as agent, ABA# 061-000-227,  Reference: 1196801 – Corp Rakes, not later than 1:00 p.m., New York City time, on the date on which such payment shall become due (each such payment made after such time on such due date to be deemed to have been made on the next succeeding Business Day).  The Borrower acknowledges that it has no rights of withdrawal from the foregoing account.  The Borrower shall deliver (i) the Direction Letter to the appropriate parties referenced in the definition of "Direction Letter" in Section 1.01 hereof and (ii) the Trustee Instruction Letter to the Trustee.] **[LEHMAN TO CONFIRM]**

**3.02    Computations**.  Interest on the Advance shall be computed on the basis of a 360-day year for the actual days elapsed (including the first day but excluding the last day) occurring in the period for which payable.

**3.03**    **Taxes**.

(a)    All payments made by the Borrower under this Loan Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities (including penalties, interest and additions to tax) with respect thereto imposed by any Governmental Authority thereof or therein (collectively, "Non-Excluded Taxes") all of which shall be paid by the Borrower for its own account not later than the date when due, but shall exclude income taxes, branch profits taxes, franchise taxes or any other tax imposed on the net income by the United States, a state or a foreign jurisdiction under the laws of which the Lender is organized or of its applicable lending office, or any political subdivision thereof (collectively, "Excluded Taxes") which Excluded Taxes shall be the sole responsibility of Lender.  If the Borrower is required by law or regulation to deduct or withhold any Non-Excluded Taxes from or in respect of any amount payable hereunder, Borrower shall: (a) make such deduction or withholding; (b) pay the amount so deducted or withheld to the appropriate Governmental Authority not later than the date when due; (c) deliver to the Lender, promptly, original tax receipts and other evidence satisfactory to the Lender of the payment when due of the full amount of such Non-Excluded Taxes; and (d) pay to the Lender such additional amounts as may be necessary so that the Lender receives, free and clear of all Non-Excluded Taxes, a net amount equal to the amount it would have received under this Loan Agreement, as if no such deduction or withholding had been made.

(b)    In addition, the Borrower agrees to pay to the relevant Governmental Authority in accordance with applicable law any current or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies (including, without limitation, mortgage recording taxes, transfer taxes and similar fees) imposed by the United States or any taxing authority thereof or therein that arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Loan Agreement ("Other Taxes").

(c)    Borrower agrees to indemnify the Lender for the full amount of Non-Excluded Taxes (including additional amounts with respect thereto) and Other Taxes, and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, provided that the Lender shall have provided the Borrower with evidence, reasonably satisfactory to the Borrower, of payment of Non-Excluded Taxes or Other Taxes, as the case may be.

(d)    Any assignee of, or participant with, the Lender under this Loan Agreement pursuant to Section 11.14 that is not incorporated under the laws of the United States, any State thereof, or the District of Columbia (a "Foreign Lender") shall provide the Borrower with properly completed United States Internal Revenue Service ("IRS") Form W-8BEN or W-8ECI or any successor form prescribed by the IRS, certifying that such Foreign Lender is entitled to benefits under an income tax treaty to which the United States is a party which reduces the rate of withholding tax on payments of interest to zero or certifying that the income receivable pursuant to this Loan Agreement is effectively connected with the conduct of a trade or business in the United States on or prior to the date upon which each such Foreign Lender becomes a Foreign Lender. Each Foreign Lender will resubmit the appropriate form on the earliest of (A) the third anniversary of the prior submission or (B) on or before the expiration of thirty (30) days after there is a "change in circumstances" with respect to such Foreign Lender as defined in Treas. Reg. Section

21

1.1441(e)(4)(ii)(D). For any period with respect to which a Foreign Lender has failed to provide the Borrower with the appropriate form or other relevant document pursuant to this Section 3.03(d) (unless such failure is due to a change in treaty, law, or regulation occurring subsequent to the date on which a form originally was required to be provided), such Foreign Lender shall not be entitled to any "gross-up" of Non-Excluded Taxes or indemnification under Section 3.03(c) with respect to Non-Excluded Taxes imposed by the United States; provided, however, that should a Foreign Lender, which is otherwise exempt from a withholding tax, become subject to Non-Excluded Taxes because of its failure to deliver a form required hereunder, the Borrower shall take such steps as such Foreign Lender shall reasonably request to assist such Foreign Lender to recover such Non-Excluded Taxes.

(e)    Without prejudice to the survival or any other agreement of the Borrower hereunder, the agreements and obligations of the Borrower contained in this Section 3.03 shall survive the termination of this Loan Agreement. Nothing contained in this Section 3.03 shall require a Lender to make available any of its tax returns or other information that it deems to be confidential or proprietary.

(f)    Each party to this Loan Agreement acknowledges that it is its intent for purposes of U.S. federal, state and local income and franchise taxes to treat the Advance as indebtedness of Borrower that is secured by the Rake Securities and that the Rake Securities are owned by the Borrower in the absence of an Event of Default by the Borrower. All parties to this Loan Agreement agree to such treatment and agree to take no action inconsistent with this treatment, unless required by law.

**3.04    [Reserved].**

**3.05    Application of Collections.**

(a)    On each Payment Date, provided that no Event of Default has occurred and is continuing, all payments and other sums received in respect of the Rake Securities pledged hereunder (other than any late fees payable to the Trustee pursuant to the Governing Agreements relating to any such Rake Security) (including, without limitation any scheduled repayments of principal) during the related Interest Period, and any net gains on investments of amounts on deposit in the Cash Management Account, in each case to the extent of remaining funds, shall be applied by [the Depository (at the direction of the Lender)] **[LEHMAN TO CONFIRM]**:

(i)    reserved;

(ii)    to the Securities Intermediary (if any) under the Securities Account Control Agreement, if any, the applicable fee then due and payable (if any) pursuant to the Securities Account Control Agreement;

(iii)    to the Lender, an amount equal to all fees, expenses and other Obligations then due and payable under this Loan Agreement (including, but not limited to, Breakage Costs), other than interest due on the Advance and the unpaid principal amount of the Advance;

(iv)    to the Lender, an amount equal to interest due on the Advance calculated pursuant to Section 2.05;

(v)    to the Lender, an amount equal to all unreimbursed expenses incurred by the Lender in connection with the enforcement of Borrower's obligations under this Loan Agreement or any Loan Document, including, without limitation, legal fees (if any);

(vi)    reserved;

(vii)    to the Lender, in payment of all remaining Obligations then due and payable (if any); and

(viii)    to the Borrower, all remaining funds.

(b)    ~~On any Business Day, if any Income is received by the Depository in respect of any Rake Security subject to this Loan Agreement that is attributable to any prepayment or other unscheduled payment of principal on any such Rake Security, the amount of such prepayment or other unscheduled payment of principal shall be applied on such Business Day to pay first, the amount of accrued and unpaid interest on the amount of principal being prepaid through and including the date of prepayment and the interest that would have accrued from and including the first day of the Interest Period in which the prepayment occurs through and including the date of such prepayment, second, the outstanding principal balance of the Advance and third, to Breakage Costs, if any.~~   [reserved].

(c)    All distributions made to the Lender on each Payment Date shall be made by wire transfer of immediately available funds to the account of the Lender at a bank or other entity having appropriate facilities therefor.

## SECTION 4.  Collateral Security.

### 4.01    Collateral; Security Interest.

(a)    Each of the Rake Securities and the Rake Security Documents shall be delivered to the Lender not later than the ~~Funding~~Closing Date.  The Borrower shall take such steps as necessary to establish the Lender's control over each Rake Security in accordance with the UCC, including, but not limited to, (i) if such Rake Security is currently in physical, certificated form, delivering to the Lender on or before the ~~Funding~~Closing Date, the Rake Security certificate, in the name of the Borrower, and an undated bond power covering the certificated Rake Security, duly executed in blank by the Borrower with signature guaranteed, along with any other documents necessary to re-register such Rake Security or (ii) if such Rake Security is held through DTC, delivering written evidence satisfactory to the Lender that the records of DTC indicate that the Lender or its designee is the beneficial owner of the Rake Security, or written evidence that such Rake Security has been credited to a securities account for which the Lender is the sole "entitlement holder" together with a securities account control agreement acceptable to the Lender in its sole discretion.  The Borrower agrees and acknowledges that while any Obligations are outstanding, the Lender may at its sole discretion re-register any such Rake Securities delivered as Collateral hereunder into the Lender's name.

(b)    Each of the following items or types of property, whether now owned or hereafter acquired, now existing or hereafter created and wherever located, is hereinafter referred to as the "Collateral":

(i)    all of the Rake Securities identified herein;

(ii)    all of the Rake Security Documents;

(iii)    [reserved];

(iv)    [reserved];

(v)    all insurance policies and insurance proceeds relating to any of the Underlying Mortgaged Properties held for the benefit of, or in the name of, the Borrower, if applicable;

(vi)    the Cash Management Account and all monies from time to time on deposit in the Cash Management Account;

(vii)    ~~the Collateral Deficiency Deposit Account (if any) and all monies from time to time on deposit in the Collateral Deficiency Deposit Account;~~[reserved];

(viii)    ~~all Additional Collateral;~~[reserved];

(ix)    all "accounts", "chattel paper", "general intangibles", "instruments", "investment property" and "deposit accounts" as defined in the Uniform Commercial Code relating to or constituting any or all of the foregoing; and

(x)    any and all replacements, substitutions, distributions on or proceeds of any or all of the foregoing, including, without limitation, all causes of action, claims and warranties now or hereafter held by the Borrower or its designee or agent in respect of any of the foregoing, all shares, securities, moneys (including cash) or property representing a current dividend, collection, income or distribution on any of the Rake Securities, all current income, collections and distributions with respect to any of the foregoing and, to the extent related to any of the foregoing, all books, correspondence, files, records and other papers necessary to protect the Lender's security interest hereunder, including, without limitation, all amounts and other proceeds received in connection with any enforcement action relating to the Collateral.

(c)    The Borrower hereby assigns, pledges and grants a continuing, first priority security interest to the Lender and its successors, endorsees, transferees and assigns in all of its right, title and interest in, to and under all the Collateral, whether now owned or hereafter acquired, now existing or hereafter created and wherever located (including, but not limited to, all Rake Security Documents, Servicing Records and Servicing Files), to secure the repayment of principal of and interest on the Advance and all other fees, expenses and amounts owing to the Lender hereunder, under the Note, under the other Loan Documents (collectively, the "Secured Obligations"). The Borrower agrees to mark its computer records and tapes to evidence the security interests granted to the Lender hereunder.

(d)    The Borrower and the Lender agree that the Borrower shall direct the Trustee to make all payments with respect to any Rake Securities directly to the Securities Intermediary and Borrower shall direct the Securities Intermediary to make all payment with respect to any Rake Securities directly to Lender. Unless an Event of Default shall have occurred and be continuing, the Borrower shall be entitled to exercise all voting and corporate rights with respect to the Rake Securities, and the Lender shall exercise such rights on the Borrower's behalf during the time in which the Lender is the registered holder of such Rake Securities, provided, however, that no vote shall be cast or other action taken which, in the Lender's judgment, would materially impair the Rake Securities or which would be inconsistent with or result in any violation of any provision of this Loan Agreement.

(e)    Upon an Event of Default, the Lender or its designee shall have the rights of conversion, exchange, subscription and any other rights, privileges and options pertaining to the Rake Securities with any committee, depository, transfer agent, registrar or other designated agency upon such terms and conditions as the Lender may determine. Prior to an Event of Default, the Borrower shall obtain the Lender's prior written consent, not to be unreasonably withheld, before exercising any of the rights described in this clause (e).

(f)    Concurrently with the delivery to the Lender of each certificate representing one or more of the Rake Securities or the crediting of such certificates to the Securities Account pursuant to the Securities Account Control Agreement, (A) in the event the Rake Security is in physical, certificated form, the Borrower shall have (1) notified the Trustee in connection with the related securitization transaction of the pledge of each related Rake Security hereunder, (2) instructed the Trustee to pay all amounts payable to the holders of each Rake Security to the Cash Management Account, in the form of the instruction letter attached hereto as Schedule 9 (the "Trustee Instruction Letter") and (3) caused the Trustee to acknowledge in writing the instructions set forth in clause (2) above, or (B) in the event the Rake Security is held through DTC, the Borrower shall (i) have delivered to Lender confirmation that such Rake Security has been credited to the securities account for which Lender is the sole "entitlement holder" and (b) have caused the execution and delivery of the Securities Account Control Agreement, and shall cause Lender to have control (within the meaning of Section 9-106(a) of the UCC) over such Rake Security and such control will constitute a fully perfected first priority security interest under the Uniform Commercial Code. In addition, with respect to each Rake Security, Borrower shall have delivered to the Lender a copy of each applicable pooling and servicing agreement executed in connection with the issuance of each such Rake Security.

**4.02    Further Documentation and Information**. At any time and from time to time, upon the written request of the Lender, and at the sole expense of the Borrower, the Borrower will (i) promptly and duly execute and deliver, or will promptly cause to be executed and delivered, such other instruments and documents and take such further action as the Lender may reasonably request in order to ensure the Lender has a valid, first priority, perfected security interest in the Collateral or for the purpose of obtaining or preserving the full benefits of this Loan Agreement and of the rights and powers herein granted, including, without limitation, the filing of any financing or continuation statements or amendments thereto under the Uniform Commercial Code in effect in any jurisdiction with respect to the Liens created hereby assigning or endorsing Collateral in blank or to the Lender or its designee and delivering Collateral to the Lender and (ii) furnish such information regarding the financial condition of the Borrower or the Guarantor as

may be reasonably requested by the Lender. The Borrower hereby authorizes the Lender to file any financing or continuation statement or amendments thereto referred to in clause (i) above without the signature of the Borrower to the extent permitted by applicable law.

**4.03    Changes in Locations; Name, etc**. The Borrower shall not (i) change the location of its chief executive office/chief place of business from that specified in Section 6.14 hereof, (ii) change its name, identity or corporate structure (or the equivalent) or change the location where it maintains its records with respect to the Collateral, or (iii) reincorporate or reorganize under the laws of another jurisdiction unless it shall have given the Lender at least 30 days prior written notice thereof and shall have delivered to the Lender all Uniform Commercial Code financing statements and amendments thereto as the Lender shall request and taken all other actions deemed necessary by the Lender to continue its first priority perfected status in the Collateral.

**4.04    Lender's Appointment as Attorney-in-Fact**.

(a)    The Borrower hereby irrevocably constitutes and appoints the Lender and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Borrower and in the name of the Borrower or in its own name, from time to time following the occurrence and during the continuance of an Event of Default, in the Lender's discretion, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to protect the Lender's interest in the Collateral. Without limiting the generality of the foregoing, the Borrower hereby gives the Lender the power and right, on behalf of the Borrower, without assent by, but with notice to, the Borrower, if an Event of Default shall have occurred and be continuing, to do the following:

(i)    in the name of the Borrower or its own name, or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any mortgage or other insurance or with respect to any other Collateral and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Lender for the purpose of collecting any and all such moneys due under any such mortgage or other insurance or with respect to any other Collateral whenever payable;

(ii)    to pay or discharge taxes and Liens levied or placed on or threatened against the Collateral; and

(iii)    (A) to direct any party liable for any payment under any Collateral to make payment of any and all moneys due or to become due thereunder directly to the Lender or as the Lender shall direct; (B) to ask or demand for, collect, receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (C) to take any and all appropriate action, including without limitation the right to give or receive any notice or other document provided for hereunder on behalf of Borrower; (D) to sign and endorse any invoices, assignments, verifications, notices and other documents in connection with any of the Collateral; (E) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; (F) to defend any suit,

26

action or proceeding brought against the Borrower with respect to any Collateral; (G) to settle, compromise or adjust any suit, action or proceeding described in clause (E) above and, in connection therewith, to give such discharges or releases as the Lender may deem appropriate; and (H) generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Lender were the absolute owner thereof for all purposes, and to do, at the Lender's option and the Borrower's expense, at any time, or from time to time, all acts and things which the Lender deems necessary to protect, preserve or realize upon the Collateral and the Lender's Liens thereon and to effect the intent of this Loan Agreement and any other Loan Document, all as fully and effectively as the Borrower might do.

The Borrower hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

(b)    The Borrower also authorizes the Lender, at any time and from time to time, to execute, in connection with the sale provided for in Section 9 hereof, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral, including, without limitation, the filing of financing statements or amendments thereto to the fullest extent permitted by applicable law.

(c)    The powers conferred on the Lender are solely to protect the Lender's interests in the Collateral and shall not impose any duty upon the Lender to exercise any such powers. The Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither the Lender nor any of its officers, directors, or employees shall be responsible to the Borrower for any act or failure to act hereunder, except for its own gross negligence or willful misconduct.

**4.05    Performance by Lender of Borrower's Obligations**.  If an Event of Default has occurred and is continuing, interest shall thereafter accrue at a rate per annum equal to the Post-Default Rate and shall be payable by the Borrower to the Lender promptly following receipt of written demand therefor, and the Borrower's obligations to make such payments shall constitute Secured Obligations.  If an Event of Default has occurred and is continuing, and the Lender performs or complies with the applicable defaulted obligations of Borrower, or otherwise causes performance or compliance, and the reasonable out-of-pocket expenses (including, without limitation, reasonable fees and disbursements of counsel) of the Lender incurred in connection with such performance or compliance, together with interest thereon at a rate per annum equal to the Post-Default Rate, shall be payable by the Borrower to the Lender promptly following receipt of written demand therefor, and the Borrower's obligations to make such payments shall constitute Secured Obligations.

**4.06    Proceeds**.  So long as an Event of Default shall occur and be continuing, (a) all proceeds of Collateral received by the Borrower consisting of cash, checks and other non-cash items shall be held by the Borrower in trust for the Lender, segregated from other funds of the Borrower, and shall forthwith upon receipt by the Borrower be turned over to the Lender in the exact form received by the Borrower (duly endorsed by the Borrower to the Lender, if required) and (b) any and all such proceeds received by the Lender will be applied by the Lender against the Secured Obligations (whether matured or unmatured), such application to be in such order as the Lender shall elect. Any balance of such proceeds remaining after the Secured Obligations shall

have been paid in full and this Loan Agreement shall have been terminated shall be promptly paid over to the Borrower or to whomsoever may be lawfully entitled to receive the same. For purposes hereof, proceeds shall include, but not be limited to, all principal and interest payments, all prepayments and payoffs, insurance claims, condemnation awards, sale proceeds, real estate owned rents and any other income and all other amounts received with respect to the Collateral.

**4.07**    **[Reserved]**.

**4.08**    **Limitation on Duties Regarding Preservation of Collateral**. The Lender's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as the Lender deals with similar property for its own account. Neither the Lender nor any of its directors, officers or employees shall be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of the Borrower or otherwise.

**4.09**    **Powers Coupled with an Interest**.    All authorizations and agencies herein contained with respect to the Collateral are irrevocable and powers coupled with an interest.

**4.10**    **Release of Security Interest**.    Upon repayment to the Lender of all Secured Obligations and the performance of all obligations under the Loan Documents, the Lender shall (i) release its security interest in any remaining Collateral and deliver the Collateral to the Borrower; and (ii) ~~the Lender shall~~ reasonably cooperate with Borrower with respect to delivery of notices regarding the release of such security interest to all applicable parties, provided, that if any payment, or any part thereof, of any of the Secured Obligations is rescinded or must otherwise be restored or returned by the Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or a trustee or similar officer for the Borrower or any substantial part of its Property, or otherwise, this Loan Agreement, all rights hereunder and the Liens created hereby shall continue to be effective, or be reinstated, until such payments have been made.

<u>Upon the payment in full of the Allocated Advance Amount for any Rake Security pursuant to Sections 2.06 or 2.07 hereof and provided no Event of Default shall have occurred and be continuing, Lender shall (i) release its security interests created by this Loan Agreement and the other Loan Documents in such Rake Security and other Collateral relating solely to such Rake Security, (ii) reasonably cooperate with Borrower with respect to delivery of notices regarding the release of such security interest to all applicable parties and (iii) execute, acknowledge and deliver to Borrower (at Borrower's cost and expense) the applicable Rake Security and any and all documents, instruments and agreements necessary to release all Liens and security interests in such Rake Security and other Collateral relating solely to such Rake Security; provided, that if any payment, or any part thereof, of any of the Secured Obligations is rescinded or must otherwise be restored or returned by the Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or a trustee or similar officer for the Borrower or any substantial part of its Property, or otherwise, this Loan Agreement, all rights hereunder and the Liens created hereby</u>

with respect to such Rake Security shall continue to be effective, or be reinstated, until such payments have been made.

**SECTION 5.** **Reserved**.

**SECTION 6.** **Representations and Warranties**.  The Borrower represents and warrants to the Lender that throughout the term of this Loan Agreement, except that any representation and warranty made as to a specific date, shall only be made as of that specific date:

**6.01**    **Existence**.  Borrower (a) is a Delaware limited liability company duly formed, validly existing and in good standing under the laws of the jurisdiction of its formation; (b) has all requisite power, and has all governmental licenses, authorizations, consents and approvals, necessary to own its assets and carry on its business as now being or as proposed to be conducted, except where the lack of such licenses, authorizations, consents and approvals would not be reasonably likely to have a Material Adverse Effect; (c) is qualified to do business and is in good standing in all other jurisdictions in which the nature of the business conducted by it makes such qualification necessary, except where failure so to qualify would not be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect; and (d) is in compliance with all Requirements of Law.  Attached hereto as Schedule 3 is an organizational chart of Borrower and Guarantor (the "Ownership Chart").  Borrower hereby represents and warrants that the Ownership Chart is true, correct and complete as of the ~~Funding~~Closing Date.  Borrower has delivered to Lender true and correct copies of the Organizational Documents of Borrower and Guarantor, all of which are in full force and effect.

**6.02**    **[Reserved]**.

**6.03**    **Single Purpose Entity**.  Borrower has not and shall not: (a) engage in any business or activity other than the ownership and servicing of the Rake Securities, and activities incidental thereto; (b) acquire or own any material assets other than the Rake Securities and such incidental Personal Property as may be necessary for the ownership and servicing of such Rake Securities; (c) merge into or consolidate with any person or entity or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure, without in each case Lender's consent; (d) fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, or without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of Borrower's Partnership Agreement, Articles of Incorporation, Operating Agreement or similar organizational documents, as the case may be, as same may be further amended or supplemented, if such amendment, modification, termination or failure to comply would adversely affect the ability of Borrower to perform its obligations hereunder, under the Note or under the other Loan Documents; (e) own any subsidiary or make any investment in, any person or entity without the consent of Lender; (f) commingle its assets with the assets of any of its general partners, affiliates, principals or of any other person or entity; (g) incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Loan and fees due to the Servicer under the Servicing Agreement, except for liabilities incurred in the ordinary course of business relating to the ownership of its interest in the Rake Securities and the routine administration of Borrower, in amounts not to exceed $200,000 which liabilities are not more than sixty (60) days past due and are not evidenced by a note; (h) become

insolvent and fail to pay its debts and liabilities from its assets as the same shall become due; (i) fail to maintain its records, books of account and bank accounts separate and apart from those of the general partners, principals and affiliates of Borrower, the affiliates of a general partner of Borrower, and any other person or entity; (j) enter into any contract or agreement with any general partner, principal or affiliate of Borrower, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any general partner, principal or affiliate of Borrower; (k) seek the dissolution or winding up in whole, or in part, of Borrower; (l) maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any general partner, principal or affiliate of Borrower, or any general partner, principal or affiliate thereof or any other person; (m) hold itself out to be responsible for the debts of another person; (n) make any loans or advances to any third party, including any general partner, principal or affiliate of Borrower, or any general partner, principal or affiliate thereof; (o) fail to file its own tax returns; (p) fail either to hold itself out to the public as a legal entity separate and distinct from any other entity or person or to conduct its business solely in its own name in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that Borrower is responsible for the debts of any third party (including any general partner, principal or affiliate of Borrower, or any general partner, principal or affiliate thereof); (q) fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; (r) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, or make an assignment for the benefit of creditors; (s) fail to provide in its Articles of Incorporation, Partnership Agreement, Operating Agreement or similar organizational documents, that for so long as the ~~Loan~~Advance is outstanding pursuant to the Note, this Loan Agreement and the other Loan Documents, it shall not file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, or make an assignment for the benefit of creditors without the affirmative vote of the Independent Director and of all other general partners/managing members/directors; or (t) fail to have at least one (1) Independent Director. The foregoing covenants shall also apply to the managing member of Borrower (the "Controlling Party") provided that all references to "Rake Securities" in this Section shall be deemed to refer to the interest of the Controlling Party in Borrower and all references to "Borrower" in this Section shall be deemed to refer to the Controlling Party.

     6.04    **Litigation**. There are no actions, suits, arbitrations, investigations or proceedings pending or, to its knowledge, threatened against the Borrower or affecting any of the Collateral before any Governmental Authority, (i) as to which individually or in the aggregate there is a reasonable likelihood of an adverse decision which would be reasonably likely to have a Material Adverse Effect or (ii) which questions the validity or enforceability of any of the Loan Documents or any action to be taken in connection with the transactions contemplated hereby and there is a reasonable likelihood of a Material Adverse Effect or material adverse decision.

     6.05    **No Breach**. Neither (a) the execution and delivery of the Loan Documents nor (b) the consummation of the transactions therein contemplated in compliance with the terms and provisions thereof will conflict with or result in a material breach of the charter or by-laws (or equivalent documents) of the Borrower or any applicable law, rule or regulation, or any order, writ, injunction or decree of any Governmental Authority, or other agreement or instrument to which

the Borrower is a party or is subject, or constitute a material default under any such agreement or instrument, or (except for the Liens created pursuant to this Loan Agreement) result in the creation or imposition of any Lien upon any property of the Borrower pursuant to the terms of any such agreement or instrument.

**6.06    Action**. Borrower has all necessary power, authority and legal right to execute, deliver and perform its obligations under each of the Loan Documents to which it is a party; the execution, delivery and performance by the Borrower and Guarantor of each of the Loan Documents to which it is a party has been duly authorized by all necessary action on its part; and each Loan Document has been duly and validly executed and delivered by the Borrower and constitutes a legal, valid and binding obligation of the Borrower enforceable against the Borrower in accordance with its terms.

**6.07    Approvals**. No authorizations, approvals or consents of, and no filings or registrations with, any Governmental Authority, or any other Person, are necessary for the execution, delivery or performance by the Borrower of the Loan Documents to which it is a party or for the legality, validity or enforceability thereof, except for filings and recordings in respect of the Liens created pursuant to this Loan Agreement.

**6.08    Margin Regulations**. Neither the making of the Advance hereunder, nor the use of the proceeds thereof, will violate or be inconsistent with the provisions of Regulation T, U or X.

**6.09    Taxes**.

(a)    The Borrower has filed all Federal income tax returns and all other tax returns that are required to be filed by it and has paid all taxes due pursuant to such returns or pursuant to any assessment received by it, except for any such taxes, if any, that are being appropriately contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been provided. The charges, accruals and reserves on the books of the Borrower in respect of taxes and other governmental charges are, in the opinion of the Borrower, adequate.

(b)    The Borrower's United States taxpayer identification number is 26-2686427.

**6.10    Investment Company Act**. The Borrower is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended (the "Investment Company Act"). The Borrower, to the extent it is controlled by an investment company, is controlled by a "registered investment company" within the meaning of the Investment Company Act. The Borrower is not subject to any Federal or state statute or regulation which limits its ability to incur indebtedness.

**6.11    No Legal Bar**. The execution, delivery and performance of this Loan Agreement and the Note, the borrowings hereunder and the use of the proceeds thereof will not violate any Requirement of Law or Contractual Obligation of the Borrower and will not result in, or require, the creation or imposition of any Lien (other than the Liens created hereunder) on any of its respective properties or revenues pursuant to any such Requirement of Law or Contractual Obligation.

**6.12    No Default**.    Borrower is not in default under or with respect to any of its Contractual Obligations in any respect which should reasonably be expected to have a Material Adverse Effect. No Default or Event of Default has occurred and is continuing.

**6.13    Collateral; Collateral Security**.

(a)    The Borrower has not, directly or indirectly, sold, assigned, pledged, issued participation interests in, or otherwise conveyed or encumbered any Rake Security or any Additional Collateral pledged as Collateral hereunder to any other Person, and immediately prior to the pledge of any such Rake Security or any such Additional Collateral, the Borrower was the sole owner of such Rake Security or such Additional Collateral and had good and marketable title thereto, free and clear of all Liens, and no Person other than the Lender (pursuant to the terms of the Loan Documents) has any Lien on any Rake Security or any Additional Collateral.

(b)    The From and after the Closing Date, the provisions of this Loan Agreement are effective to create in favor of the Lender a valid security interest in all right, title and interest of the Borrower in, to and under the Collateral.

(c)    [Reserved].

(d)    (i) If the Rake Security is in physical, certificated form, upon delivery of the Rake Security certificate (in the name of the Borrower) and an undated bond power covering the certificated Rake Security, duly executed in blank by the Borrower with signature guaranteed, Lender shall have control (within the meaning of Section 9-106(a) of the UCC) over such Rake Security and such control will constitute a fully perfected first priority security interest under the Uniform Commercial Code; or (ii) if the Rake Security is held though DTC, upon (a) confirmation from the DTC that the Lender is the beneficial owner of the Rake Security or confirmation that such Rake Security has been credited to a securities account for which Lender is the sole "entitlement holder" and (b) execution and delivery of the Securities Account Control Agreement, Lender shall have control (within the meaning of Section 9-106(a) of the UCC) over such Rake Security and such control will constitute a fully perfected first priority security interest under the Uniform Commercial Code.

(e)    Upon execution of the Depository Agreement by the Lender, the Borrower and the Depository, the Depository Agreement will create a valid and continuing security interest (as defined in the UCC) in the Cash Management Account in favor of Lender, and pursuant to the terms of the Depository Agreement, Lender shall have control (within the meaning of Section 9-104(a)(2) of the UCC) over such Cash Management Account such that the Lender's security interest in the Cash Management Account and all amounts on deposit therein will constitute a fully perfected first priority security interest under the Uniform Commercial Code.

(f)    Upon execution of the Collateral Deficiency Deposit Account Agreement by the Lender, the Borrower and the Depository, the Collateral Deficiency Deposit Account Agreement will create a valid and continuing security interest (as defined in the UCC) in the Collateral Deficiency Deposit Account in favor of Lender, and pursuant to the terms of the Collateral Deficiency Deposit Account Agreement, Lender shall have control (within the meaning of Section 9-104(a)(2) of the UCC) over such Collateral Deficiency Deposit Account such that the

32

~~Lender's security interest in the Collateral Deficiency Deposit Account and all amounts on deposit therein will constitute a fully perfected first priority security interest under the Uniform Commercial Code.~~

**6.14    Corporate Form and Jurisdiction of Organization; Chief Executive Office; Chief Operating Office**.

(a)    Borrower is organized solely under the laws of the State of Delaware and its organizational identification number is 4552567.

(b)    Borrower's chief executive office on the ~~Funding~~Closing Date is located ~~at~~in New York.

**6.15    Location of Books and Records**.  The location where the Borrower keeps its books and records including all computer tapes and records relating to the Collateral is its chief executive office or chief operating office or the offices of the Borrower at One Charles River Place, 63 Kendrick Street, Needham, MA 02494.

**6.16    True and Complete Disclosure**.  The information, reports, financial statements, exhibits and schedules furnished in writing by or on behalf of the Borrower and the Guarantor to the Lender in connection with the negotiation, preparation or delivery of this Loan Agreement and the other Loan Documents or included herein or therein or delivered pursuant hereto or thereto, when taken as a whole, do not contain any untrue statement of material fact or omit to state any material fact necessary to make the statements herein or therein, in light of the circumstances under which they were made, not misleading. All written information furnished after the ~~date hereof~~Closing Date by or on behalf of the Borrower and the Guarantor to the Lender in connection with this Loan Agreement and the other Loan Documents and the transactions contemplated hereby and thereby will be true, complete and accurate in every material respect, or (in the case of projections) based on reasonable good faith estimates, on the date as of which such information is stated or certified. There is no fact known to a Responsible Officer that, after due inquiry, could reasonably be expected to have a Material Adverse Effect that has not been disclosed herein, in the other Loan Documents or in a report, financial statement, exhibit, schedule, disclosure letter or other writing furnished to the Lender for use in connection with the transactions contemplated hereby or thereby.

**6.17    No Prohibited Persons**.  Neither the Borrower nor the Guarantor are nor are any of their respective officers, directors, partners or members, an entity or person (or to the Borrower's or Guarantor's knowledge, owned or controlled by an entity or person): (i) that is listed in the Annex to, or is otherwise subject to the provisions of Executive Order 13224 issued on September 24, 2001 ("EO13224"); (ii) whose name appears on the United States Treasury Department's Office of Foreign Assets Control ("OFAC") most current list of "Specifically Designated National and Blocked Persons" (which list may be published from time to time in various mediums including, but not limited to, the OFAC website, http:www.treas.gov/ofac/t11sdn.pdf); (iii) who commits, threatens to commit or supports "terrorism", as that term is defined in EO13224; or (iv) who is otherwise affiliated with any entity or person listed above (any and all parties or persons described in clauses (i) through (iv) above are herein referred to as a "Prohibited Person").

**6.18    ERISA**. Neither the Borrower nor Guarantor has any Plan or Multiemployer Plan subject to the provisions of ERISA, the Code and other Federal or State law.

**6.19    Reserved**.

**6.20    Solvency**. The Borrower is solvent and will not be rendered insolvent by the transactions contemplated by this Loan Agreement and the other Loan Documents, and, after giving effect to such transactions, will not be left with an unreasonably small amount of capital with which to engage in its business. The Borrower does not intend to incur, or believe that either has incurred, debts beyond its ability to pay such debts as they mature. As of the ~~date hereof~~Closing Date, the Borrower does not intend to commence of insolvency, bankruptcy, liquidation or consolidation proceedings or the appointment of a receiver, liquidator, conservator, trustee or similar official in respect of the Borrower or any of its assets. The Borrower has not had a judgment entered against it that has been returned unsatisfied. The Borrower is not pledging the Collateral to the Lender, as provided in this Loan Agreement, with any intent to hinder, delay or defraud any of its creditors.

**6.21    [Reserved]**.

**6.22    No Burdensome Restrictions**. No Requirement of Law or Contractual Obligation of the Borrower or any of its Subsidiaries has a Material Adverse Effect.

**6.23    Subsidiaries**. All of the Subsidiaries of the Borrower as of the ~~date hereof~~Closing Date are listed on Schedule 4 to this Loan Agreement.

**6.24    Minimum Tangible Net Worth**. Notwithstanding the foregoing, as of the Funding Date, Guarantor had a Tangible Net Worth equal to or greater than $150,000,000.00.

**6.25    Liquidity**. Notwithstanding the foregoing, as of the Funding Date, the Guarantor had Liquidity of at least equal to $50,000,000.00.

**SECTION 7. Covenants**. The Borrower and Guarantor each covenants and agrees with the Lender that, so long as the Advance or other Obligations are outstanding and until payment in full of all Secured Obligations:

**7.01    Financial Statements**. The Borrower shall deliver or caused to be delivered to the Lender:

(a)    as soon as available and in any event within sixty (60) days after the end of each of the first three quarterly fiscal periods of each fiscal year of the ~~Borrower and~~ Guarantor, the consolidated balance sheets of the Guarantor (including Borrower) as of the end of such period and the related unaudited consolidated statements of income and retained earnings and of cash flows for the ~~Borrower and~~ Guarantor for ~~such period and the portion of the fiscal year through the end of~~ such period accompanied by a certificate of a Responsible Officer of the Borrower and Guarantor, which certificate shall state that said consolidated financial statements fairly present the consolidated financial condition and results of operations of the ~~Borrower and~~ Guarantor and its Subsidiaries in accordance with GAAP, consistently applied, as at the end of, and for, such period (subject to normal year-end audit adjustments);

(b)    as soon as available and in any event within one hundred fifty (150) days after the end of each fiscal year of the Guarantor (including Borrower), the audited consolidated balance sheets of the ~~Borrower and~~ Guarantor and its consolidated Subsidiaries as of the end of such fiscal year and the related audited consolidated statements of income and retained earnings and of cash flows for ~~the Borrower~~ and Guarantor and its consolidated Subsidiaries for such year, setting forth in each case in comparative form the figures for the previous year, and accompanied by (i) an independent auditor's report (from a "big four" national public accounting firm or other accountant reasonably satisfactory to Lender) stating that the referenced financial statements present fairly, in all material respects, the combined financial position, results of operations and cash flows as of and for the applicable periods in conformity with GAAP, with such certification to be free of exceptions and qualifications as to the scope of the audit as to the going concern nature of the business and (ii) a certificate of a Responsible Officer of the Borrower and Guarantor, which certificate shall state that said consolidated financial statements fairly present the consolidated financial condition and results of operations of the ~~Borrower and~~ Guarantor and its consolidated Subsidiaries at the end of, and for, such fiscal year in accordance with GAAP, consistently applied, and a certificate of such Responsible Officer stating that, in making the examination necessary for his or her certification, such Responsible Officer obtained no knowledge, except as specifically stated, of any Default or Event of Default. In addition, Borrower shall deliver to Lender as soon as available and in any event within ninety (90) days after the end of each fiscal year, unaudited versions of each of the consolidated balance sheets and consolidated statements of income and retained earnings and of cash flows described above in this clause (b);

(c)    [reserved];

(d)    with respect to each Rake Security, as soon as available but in any event not later than five (5) Business Days after receipt thereof, upon request by Lender the related monthly ~~securitization~~trustee report and any notices, requests for approval and other reports delivered or made available to the Borrower under the applicable pooling and servicing agreement executed in connection with the issuance of such Rake Security;

(e)    from time to time such other information regarding the financial condition, operations, or business of the Borrower and Guarantor as the Lender may request;

(f)    [reserved]; and

(g)    the Borrower and Guarantor shall furnish to the Lender, at the time it furnishes each set of financial statements pursuant to paragraphs (a) and (b) above, a certificate of a Responsible Officer of the Borrower and Guarantor to the effect that, to the best of such Responsible Officer's knowledge, the Borrower and Guarantor during such fiscal period or year has observed or performed all of its covenants and other agreements, and satisfied every condition, contained in this Loan Agreement and the other Loan Documents to be observed, performed or satisfied by it, and that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate (and, if any Default or Event of Default has occurred and is continuing, describing the same in reasonable detail and describing the action the Borrower and Guarantor has taken or proposes to take with respect thereto).

**7.02    Litigation**. The Borrower shall promptly, and in any event within two Business Days after service of process of any of the following, give to the Lender notice of all legal or arbitrable proceedings affecting the Borrower, Guarantor or any of their respective Subsidiaries that questions or challenges the validity or enforceability of any of the Loan Documents or as to which there is a reasonable likelihood of an adverse determination which would result in a Material Adverse Effect.

**7.03    Existence, Etc**. The Borrower will:

(a)    preserve and maintain its legal existence and all of its material rights, privileges, licenses and franchises except where the failure to maintain same would not be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect;

(b)    comply with the requirements of all applicable laws, rules, regulations and orders of Governmental Authorities and other Requirements of Law if failure to comply with such requirements would be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect;

(c)    keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied;

(d)    not move its chief executive office from the addresses referred to in Section 6.14 unless it shall have provided the Lender thirty (30) days prior written notice of such change;

(e)    pay and discharge all taxes, assessments and governmental charges or levies imposed on it or on its income or profits or on any of its Property prior to the date on which penalties attach thereto, except for any such tax, assessment, charge or levy the payment of which is being contested in good faith and by proper proceedings and against which adequate reserves are being maintained or where any failure to do so would not be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect; and

(f)    permit representatives of the Lender, during normal business hours upon prior written notice at a mutually desirable time (or at any time and from time to time upon the occurrence of an Event of Default and during the continuance thereof), to examine, copy and make extracts from its and/or the Servicer's and/or the Guarantor's books and records, to inspect any of its Property, and to discuss its business and affairs with its officers, all to the extent reasonably requested by the Lender.

**7.04    Prohibition of Fundamental Changes**. Neither Guarantor nor the Borrower shall enter into any transaction of merger or consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation, winding up or dissolution) or sell all or substantially all of its assets.

**7.05    ~~Collateral Deficiency~~. ~~If at any time there exists a Collateral Deficiency the Borrower shall cure same in accordance with Section 2.06 hereof.~~[Reserved]**.

**7.06    Notices**. The Borrower shall give notice to the Lender promptly:

(a)    within five (5) Business Days after the Borrower becomes aware of the occurrence of any Default or Event of Default or any event of default or default under any other material agreement of the Borrower or Guarantor;

(b)    within five (5) Business Days after service of process on the Borrower, Guarantor or any of their respective Subsidiaries, or any agent thereof for service of process, in respect of any legal or arbitrable proceedings affecting the Borrower, Guarantor or any of their respective Subsidiaries (i) that questions or challenges the validity or enforceability of any of the Loan Documents or (ii) in which the amount in controversy exceeds $100,000;

(c)    reserved;

(d)    ~~upon the Borrower becoming aware during the normal course of its business that the Underlying Mortgaged Property in respect of any Rake Security has been damaged by waste, fire, earthquake or earth movement, windstorm, flood, tornado or other casualty, or otherwise damaged, in any case, so as to materially and adversely affect the Collateral Value of such Rake Security;~~ reserved;

(e)    upon the entry of a judgment or decree against the Borrower in an amount in excess of $100,000 or against the Guarantor in an amount in excess of $2,000,000; and

Each notice pursuant to this Section 7.06 (other than 7.06(e)) shall be accompanied by a statement of a Responsible Officer of the Borrower and Guarantor setting forth details of the occurrence referred to therein and stating what action the Borrower and/or Guarantor has taken or proposes to take with respect thereto.

**7.07**    **Collateral Security**.  The Borrower shall not, directly or indirectly, assign, sell, pledge, grant a security interest in, issue participation interests in, or otherwise transfer, convey or encumber any Rake Security ~~or any Additional Collateral~~ pledged as Collateral hereunder to any other Person.

**7.08**    **[Reserved]**.

**7.09**    **Minimum Tangible Net Worth**.  The Guarantor shall maintain a Tangible Net Worth equal to or greater than ~~$150,000,000.00.~~the greater of (i) the product of (x) two (2) multiplied by (y) the then current outstanding principal balance of the Advance and (ii) $30,000,000.

**7.10**    **Debt to Equity Ratio**.  The Guarantor shall at all times maintain a ratio of Total Indebtedness to Tangible Net Worth that is less than or equal to 4:1, provided, however, during the "Investment Period" (as such term is defined in the Guarantor's private placement memorandum) only, Guarantor shall not be deemed to be in default under this covenant if it fails to maintain such 4:1 ratio if it maintains Liquidity at least equal to $50,000,000.00.

**7.11**    **Liquidity**.  The Guarantor shall at all times maintain Liquidity at least equal to $10,000,000.00.

**7.12**    **[Reserved]**.

37

**7.13**   **Transactions with Affiliates**.  The Borrower will not enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of property or the rendering of any service, with any Affiliate unless such transaction is (a) in the ordinary course of the Borrower's business and (b) upon fair and reasonable terms no less favorable to the Borrower than it would obtain in a comparable arm's length transaction with a Person which is not an Affiliate.

**7.14**   **Distributions**.  Borrower shall not pay or declare any Distributions if an Event of Default has occurred and is continuing.

**7.15**   **[Reserved]**.

**7.16**   **Cooperation**.  Borrower agrees to, and agrees to direct the Servicer to, cooperate with Lender and Lender's asset manager with respect to obtaining and maintaining information in Borrower's possession or control with respect to the Loan, the Rake Securities, the Underlying Mortgage Loan, and the Underlying Mortgaged Property, including, without limitation, coordinating discussions between Lender, the Trustee and Mortgage Borrower and arranging for inspections of the Underlying Mortgaged Property and the books and records of the Trustee and the Mortgage Borrower, in each case subject to the terms of the Rake Security Documents and the Underlying Mortgage Loan Documents, respectively.

**7.17**   **Solvency**.  Borrower is solvent and shall not be rendered insolvent by the transactions contemplated by this Loan Agreement and the other Loan Documents, and, after giving effect to such transactions, shall not be left with an unreasonably small amount of capital with which to engage in its business.  Borrower shall not incur debts beyond its ability to pay such debts as they mature.

**7.18**   **No Amendment, Modification or Waiver**.  (a) Without the prior written consent of the Lender (except to the extent otherwise provided in Section 7.18(c) below), the Borrower will not, nor will the Borrower permit or allow others to (i) amend, modify, terminate or waive (i) to the extent Borrower's consent is required, consent to any amendment, modification, termination or waiver of any material provision of any of the Rake Security Documents; (ii) agreeto the extent Borrower's consent is required, consent to any substitution or release of the collateral for each of the Underlying Mortgage Loan other than as may be expressly provided for in the Underlying Mortgage Loan Documents; (iii) to the extent Borrower's consent is required, consent to or approve any transfer, conveyance, pledge of, or grant of a security interest in, directly or indirectly, all or any part of the Collateral, or an assumption of the Underlying Mortgage Loan, other than as may be expressly provided for in the Underlying Mortgage Loan Documents.

(b)    Without the prior written consent of the Lender (except to the extent otherwise provided in Section 7.18(c) below), the Borrower will not, nor willto the extent Borrower permit or allow others to's consent is required, consent or agree to or approve of any actions to be taken under the applicable pooling and servicing agreement executed in connection with any Rake Security including, without limitation, the following actions:  (i) any amendment, modification, termination or waiver of any provision of any of the Underlying Mortgage Loan Documents; (ii) any substitution or release of the Underlying Mortgaged Property; (iii) any transfer, conveyance, or pledge of, or grant of a security interest in, directly or indirectly, all or any part of the Underlying Mortgaged Property or any direct or indirect interest in the Mortgage

Borrower, or any assumption of the Underlying Mortgage Loan, other than as may be expressly provided for in the Mezzanine Loan Documents; or (iv) any release of the Mortgage Borrower or any guarantor under the Underlying Mortgage Loan Documents from any liability with respect to the Underlying Mortgage Loan.

(c)    [Reserved].  Notwithstanding the foregoing, Lender's prior written consent shall not be required under Sections 7.18(a) and (b) above (and Borrower may take such actions referenced therein without such consent) with respect to any Rake Security in the event that Lender (or any Affiliate thereof) owns or otherwise holds any direct or indirect interest (including, without limitation, any security interest or similar interest) in (i) the related obligor or guarantor under the Underlying Mortgage Loan for such Rake Security, (ii) any Indebtedness secured directly or indirectly by the Underlying Mortgaged Property for such Rake Security that is *pari passu* with, or junior to, such Underlying Mortgage Loan or (iii) any Indebtedness secured directly or indirectly by the related obligor under the Underlying Mortgage Loan for such Rake Security.

**7.19    Reserved.**

**7.20    Further Identification of Collateral**. The Borrower will furnish to the Lender from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Lender may request, all in reasonable detail.

**7.21    Estoppel Statement**. (a) After request by Lender, Borrower shall, within ten (10) days, furnish Lender with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the Applicable Interest Rate, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Obligations, and (vi) that the Note, this Loan Agreement, and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

**7.22    Reserved.**

**7.23    Compliance Certificate**. Simultaneously with the delivery of the financial statements as required pursuant to Sections 7.01(a) and 7.01(b) hereof, or at any time within ten (10) daysBusiness Days of a request by Lender, the Borrower shall cause the Guarantor to furnish a certificate of a Responsible Officer of Guarantor certifying that, to the best of such Responsible Officer's knowledge, during the previous quarterly fiscal period, Guarantor complied with and satisfied at all times the financial covenants set forth in Sections 7.09, 7.10, and 7.11 of this Loan Agreement, which certificate shall include the method of calculation and supporting documentation, in form and substance reasonably acceptable to the Lender, establishing the basis for the certification for each such financial covenant.

**7.24    Prohibited Persons**. Neither Guarantor nor the Borrower does and neither will knowingly: (i) conduct any business, nor engage in any transaction or dealing, with any Prohibited Person, including, but not limited to, the making or receiving of any contribution of funds, goods, or services, to or for the benefit of a Prohibited Person; or (ii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to

violate, any of the prohibitions set forth in EO13224. The Borrower and Guarantor each further covenants and agrees to deliver (from time to time) to the Lender any such certification or other evidence as may be requested by the Lender in its sole and absolute discretion, confirming that: (i) neither the Borrower, Guarantor nor any of their respective officers, directors, partners or members, is an entity or person (or to the Borrower's knowledge, owned or controlled by an entity or person) which is a Prohibited Person; and (ii) neither Guarantor nor the Borrower has to its knowledge engaged in any business transaction or dealings with a Prohibited Person, including, but not limited to, the making or receiving of any contribution of funds, goods, or services, to or for the benefit of a Prohibited Person.

**7.25    Further Documentation**. If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any instrument (including any certificated security or promissory note) or chattel paper (in each case as defined in the UCC), such instrument or chattel paper shall be immediately delivered to Lender, duly endorsed in a manner satisfactory to Lender, to be held as Collateral pursuant to this Loan Agreement. Prior to such delivery, the Borrower shall hold all such instruments or chattel paper in trust as agent for the Lender and shall not commingle any of the foregoing with any assets of the Borrower.

**7.26    Organizational Documents**. The Borrower shall give 10 days prior notice to Lender of any amendment to Borrower's organizational documents.

**SECTION 8. Events of Default**. Each of the following events shall constitute an event of default (an "Event of Default") hereunder:

(a)    the Borrower shall fail to make a payment of any principal of or interest on the Advance or the Guarantor shall fail to make such payments required to be paid by it under the Guaranty, in each case by no later than the close of business on the date on which such payment is due (whether at stated maturity, the Termination Date, upon acceleration or at mandatory prepayment or otherwise); or

(b)    the Borrower shall default in the payment of any amount (other than the amounts set forth in Section 8(a) above) payable by it hereunder or under any other Loan Document or the Guarantor shall default under any other obligation under the Guaranty (other than as set forth in Section 8(a) above), in either case, after notification by the Lender of such default, and such default shall have continued unremedied for three (3) Business Days; or

(c)    the Borrower shall fail to comply with the provisions of Section 2.06(d) of this Loan Agreement; or

(d)    any representation, warranty or certification made or deemed made herein or in any other Loan Document by the Borrower or the Guarantor or any certificate furnished to the Lender pursuant to the provisions thereof, shall prove to have been false or misleading in any material respect as of the time made or furnished and the same is not cured within ten (10) days of notice from Lender; or

(e)    if the Borrower shall fail to comply with Section 7.01, Section 7.09 through Section 7.11 hereof, Section 7.18, Section 7.23 or Section 7.25 hereof and such failure is not cured within ten (10) days;

(f)     the Borrower or Guarantor shall fail to comply with the requirements of Section 7.04 hereof, and such default shall continue unremedied for a period of one (1) Business Day; or the Borrower shall otherwise fail to observe or perform any other agreement contained in this Loan Agreement or any other Loan Document and such failure to observe or perform shall continue unremedied for a period of thirty (30) Business Days; provided however, that in the event such matters are not reasonably susceptible to cure in such period, so long as Borrower is diligently attempting to cure the same, such period shall be extended by the time reasonably necessary to cure such matter, which shall not, in any event, exceed an additional sixty (60) days; or

(g)     a final judgment or judgments for the payment of money (i) with respect to the Borrower, in excess of $100,000 in the aggregate (to the extent that it is, in the determination of the Lender, uninsured and provided that any insurance or other credit posted in connection with an appeal shall not be deemed insurance for these purposes) shall be rendered against the Borrower or, (ii) with respect to the Guarantor, which is reasonably likely to have a Material Adverse Effect on Guarantor; or

(h)     the Borrower or the Guarantor shall admit in writing its inability to pay its debts as such debts become due; or

(i)     the Borrower, the Guarantor or any of their respective Subsidiaries shall (i) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee, examiner or liquidator of itself or of all or a substantial part of its property, (ii) make a general assignment for the benefit of its creditors, (iii) commence a voluntary case under the Bankruptcy Code, (iv) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, liquidation, dissolution, arrangement or winding-up, or composition or readjustment of debts, (v) fail to dismiss or controvert in a timely and appropriate manner, or acquiesce in writing to, any petition filed against it in an involuntary case under the Bankruptcy Code or (vi) take any corporate or other action for the purpose of effecting any of the foregoing; or

(j)     a proceeding or case shall be commenced, without the application or consent of the Borrower, the Guarantor or any of their respective Subsidiaries, in any court of competent jurisdiction, seeking (i) its reorganization, liquidation, dissolution, arrangement or winding-up, or the composition or readjustment of its debts, (ii) the appointment of a receiver, custodian, trustee, examiner, liquidator or the like of the Borrower, the Guarantor or any such Subsidiary or of all or any substantial part of its property, or (iii) similar relief in respect of the Borrower, the Guarantor or any such Subsidiary under any law relating to bankruptcy, insolvency, reorganization, winding-up, or composition or adjustment of debts, and such proceeding or case shall continue undismissed, or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue unstayed and in effect, for a period of ninety (90) or more days; or an order for relief against the Borrower, the Guarantor or any such Subsidiary shall be entered in an involuntary case under the Bankruptcy Code; or

(k)     any Loan Document shall for whatever reason (including an event of default thereunder) be terminated or the lien on the Collateral created by this Loan Agreement or Borrower's obligations hereunder or Guarantor's obligations under the Guaranty shall cease to be

in full force and effect, or the enforceability thereof shall be contested by the Borrower or the Guarantor; or

(l)    (i) the Borrower, Guarantor or any ERISA Affiliate shall engage in any non-exempt "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any material "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan or any Lien in favor of the PBGC or a Plan shall arise on the assets of the Borrower, Guarantor or any ERISA Affiliate, (iii) an event described in Section 4043 of ERISA shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Plan of the Borrower, Guarantor or any ERISA Affiliate, which reportable event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Lender, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any such Plan shall terminate for purposes of Title IV of ERISA, (v) the Borrower, Guarantor or any ERISA Affiliate shall, or in the reasonable opinion of the Lender is likely to, incur any liability in connection with a withdrawal from, or the insolvency or reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect; or

(m)    any Change of Control of the Borrower or the Guarantor shall have occurred without the prior written consent of the Lender; or

(n)    the Borrower shall grant, or suffer to exist, any Lien on any Collateral except the Liens contemplated hereby; or the Liens contemplated hereby shall cease to be first priority perfected Liens on the Collateral in favor of the Lender or shall be Liens in favor of any Person other than the Lender; or

(o)    [reserved]; or

(p)    the Borrower sells, assigns, pledges, grants a security interest in, or issues participation interest in, or otherwise transfers or encumbers any Rake Security in whole or in part, directly or indirectly other than as expressly permitted pursuant to the terms of this Agreement.

## SECTION 9. Remedies Upon Default.

(a)    Upon the occurrence of one or more Events of Default (subject to the expiration of the applicable cure period contained therein) other than those referred to in Section 8(g), (h) or (i) the Lender may (i) immediately declare the principal amount of the Advance then outstanding under the Note to be immediately due and payable, together with all interest thereon and reasonable fees and out-of-pocket expenses (including without limitation reasonable fees and disbursements of counsel) accruing under the Note, this Loan Agreement or any other Loan Document; provided, that upon the occurrence of an Event of Default referred to in Sections 8(g), (h) or (i), such amounts shall immediately and automatically become due and payable without any further action by any Person and (ii) exercise, in addition to all other rights and remedies granted to it in this Loan Agreement and the other Loan Documents, all rights and remedies of a secured party

under the Uniform Commercial Code and all other rights and remedies at law or in equity. Upon such declaration or such automatic acceleration, the balance then outstanding on the Note and all other amounts due under this Loan Agreement and the other Loan Documents shall become immediately due and payable, without presentment, demand, protest or other formalities of any kind, all of which are hereby expressly waived by the Borrower and Lender may thereupon exercise any remedies, including, but not limited to, the transfer of servicing or the liquidation of the Collateral on a servicing released basis. Without limiting the generality of the foregoing, the Lender without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Borrower or any other Person (all and each of which demands, defenses, presentments, protests, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels or as an entirety at public or private sale or sales, at any exchange, broker's board or office of the Lender or elsewhere upon such terms and conditions and at prices that are consistent with a recognized market for similar collateral as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. The Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in the Borrower, which right or equity is hereby waived or released. The Borrower further agrees, at the Lender's request, to assemble the Collateral and make it available to the Lender at places which the Lender shall reasonably select, whether at the Borrower's premises or elsewhere. The Lender shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Lender hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Secured Obligations, in such order as the Lender may elect, and only after such application and after the payment by the Lender of any other amount required or permitted by any provision of law, including, without limitation, Sections 9-608(a) and 9-615(a)(3) of the Uniform Commercial Code, need the Lender account for the surplus, if any, to the Borrower. To the extent permitted by applicable law, the Borrower waives all claims, damages and demands it may acquire against the Lender arising out of the exercise by the Lender of any of its rights hereunder, other than those claims, damages and demands arising from the gross negligence, bad faith or willful misconduct of the Lender. If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition. The Borrower shall remain liable for any deficiency (plus accrued interest thereon as contemplated pursuant to Section 2.05 hereof) if the proceeds of any sale or other disposition of the Collateral are insufficient to pay the Secured Obligations and the reasonable fees and disbursements incurred by the Lender to collect such deficiency. Because the Borrower recognizes that it may not be possible to purchase or sell all of the Collateral on a particular Business Day, or in a transaction with the same purchaser, or in the same manner because the market for such Collateral may not be liquid, the Borrower agrees that liquidation of the Collateral does not require a public purchase or sale and that a good faith private purchase or sale shall be deemed to have been made in a commercially reasonable manner. Accordingly, the Lender may elect, in its sole discretion, the time and manner of

liquidating any Collateral and nothing contained herein shall (A) obligate the Lender to liquidate any Collateral on the occurrence of an Event of Default or to liquidate all Collateral in the same manner or on the same Business Day or (B) constitute a waiver of any of the Lender's rights or remedies.

(b)    Upon the occurrence of one or more Events of Default, the Lender shall have the right to obtain physical possession of the Rake Security Documents and all other files of the Borrower relating to the Collateral and all documents relating to the Collateral which are then or may thereafter come in to the possession of the Borrower, the Trustee or any third party acting for the Borrower, and the Trustee, the Borrower shall deliver to the Lender such assignments and documentation and files as the Lender shall request. The Lender shall be entitled to specific performance of all agreements of the Borrower contained in this Loan Agreement and any other Loan Document.

(c)    If an Event of Default shall occur and be continuing, the Lender may, at its option, enter into one or more interest rate protection or other hedge agreements covering all or a portion of the Rake Securities pledged to the Lender hereunder, and the Borrower shall be responsible for all damages, judgments, costs and expenses of any kind which may be imposed on, incurred by or asserted against the Lender relating to or arising out of such interest rate protection or hedge agreements; including without limitation any losses resulting from such interest rate protection or hedge agreements.

SECTION 10.    **No Duty on Lender's Part**.

The powers conferred on the Lender hereunder are solely to protect the Lender's interests in the Collateral and shall not impose any duty upon it to exercise any such powers. The Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to the Borrower for any act or failure to act hereunder, except for its or their own gross negligence, bad faith or willful misconduct.

SECTION 11.    **Miscellaneous**.

**11.01    Waiver**. No failure on the part of the Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any Loan Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The remedies provided herein are cumulative and not exclusive of any remedies provided by law or in equity.

**11.02    Notices**. Except as otherwise expressly permitted by this Loan Agreement, all notices, requests and other communications provided for herein (including, without limitation, any modifications of, or waivers, requests or consents under, this Loan Agreement) shall be given or made in writing (including, without limitation, by telex or telecopy) delivered to the intended recipient at the "Address for Notices" specified below its name on the signature pages hereof) or, as to any party, at such other address as shall be designated by such party in a written notice to each other party. Except as otherwise provided in this Loan Agreement and except for notices given

under Section 2 (which shall be effective only on receipt), all such communications shall be deemed to have been duly given when transmitted by telex or telecopier or personally delivered or, in the case of a mailed notice, upon receipt, in each case given or addressed as aforesaid.

**11.03    Indemnification and Expenses.**

(a)    Borrower hereby agrees to hold the Lender, and its Affiliates and their officers, directors, employees, agents and advisors harmless from and indemnify the Lender against all liabilities, losses, damages, judgments, costs and expenses of any kind which may be imposed on, incurred by, or asserted against the Lender, relating to or arising out of, this Loan Agreement (including without limitation any cost, loss or expense which the Lender may sustain or incur as a consequence of any acceleration of the maturity of the Advance by the Lender in accordance with the terms of this Loan Agreement, including, but not limited to, any cost, loss or expense arising in liquidating the Advance and the Collateral and from interest or fees payable by the Lender to lenders of funds obtained by it in order to maintain the Advance hereunder), the Note, any other Loan Document or any transaction contemplated hereby or thereby, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Loan Agreement, the Note, any other Loan Document or any transaction contemplated hereby or thereby, that, in each case, results from anything other than the Lender's gross negligence, bad faith or willful misconduct. Without limiting the generality of the foregoing, the Borrower agrees to hold the Lender and any other indemnified party described above harmless from and indemnify such indemnified party against all costs with respect to any Rake Security relating to or arising out of any violation or alleged violation of any environmental law, rule or regulation or any consumer credit laws, including without limitation laws with respect to unfair or deceptive lending practices and predatory lending practices, the Truth in Lending Act and/or the Real Estate Settlement Procedures Act, that, in each case, results from anything other than such indemnified party's gross negligence or willful misconduct. In any suit, proceeding or action brought by the Lender in connection with any Rake Security or any other asset pledged hereunder for any sum owing thereunder, or to enforce any provisions of any Rake Security Documents or any other asset pledged hereunder, Borrower and Guarantor will save, indemnify and hold the Lender harmless from and against all expense, loss or damage suffered by reason of any defense, set-off, counterclaim, recoupment or reduction or liability whatsoever of the account debtor or obligor thereunder, arising out of a breach by the Borrower or Guarantor of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to or in favor of such account debtor or obligor or its successors from the Borrower or Guarantor. Borrower agrees to reimburse the Lender as and when billed by the Lender for all the Lender's reasonable out-of-pocket costs and expenses incurred in connection with the enforcement or the preservation of the Lender's rights under this Loan Agreement, the Note, any other Loan Document or any transaction contemplated hereby or thereby, including without limitation the reasonable fees and disbursements of its counsel. The Borrower hereby acknowledges that, notwithstanding the fact that the Note is secured by the Collateral, the obligation of the Borrower under the Note is a full recourse obligation of the Borrower.

(b)    Borrower agrees to pay as and when billed by the Lender all of the out-of-pocket costs and expenses reasonably incurred by the Lender in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Loan Agreement, the Note, any other Loan Document or any other documents prepared in

connection herewith or therewith. Borrower agrees to pay as and when billed by the Lender all of the out-of-pocket costs and expenses, reasonably incurred in connection with the consummation and administration of the transactions contemplated hereby and thereby including, without limitation, (i) all the reasonable fees, disbursements and expenses of counsel to the Lender and (ii) all the due diligence, inspection, testing and review costs and expenses incurred by the Lender with respect to Collateral under this Loan Agreement, including, but not limited to, those costs and expenses incurred by the Lender pursuant to Sections 11.03(a), 11.14 and 11.16 hereof other than any costs and expenses incurred in connection with the Lender's re-hypothecation of prior to an Event of Default.

**11.04** **Amendments**. Except as otherwise expressly provided in this Loan Agreement, any provision of this Loan Agreement may be modified or supplemented only by an instrument in writing signed by Borrower, the Lender and, if its rights or obligations are affected thereby, or the Servicer, as applicable, and any provision of this Loan Agreement may be waived by the Lender.

**11.05** **Successors and Assigns**. The rights and obligations of the Borrower under this Loan Agreement and the other Loan Documents shall not be assignable by the Borrower without the Lender's prior written consent. The Lender may assign its rights and obligations under the Loan Agreement and the other Loan Documents without the consent of the Borrower. This Loan Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**11.06** **Survival**. The obligations of the Borrower under Sections 3.03 and 11.03 hereof shall survive the repayment of the Advance and other Obligations and the termination of this Loan Agreement for a period of two years following the satisfaction in full of all of the Borrower's obligations hereunder; _provided,_ that with respect to any claim made prior to the expiration of such two-year period, the obligations of the Borrower under Sections 3.03 and 11.03 hereof shall continue in full force and effect until the final resolution of such claim. In addition, each representation and warranty made herein or pursuant hereto shall survive the making of such representation and warranty until such time as the Advance is repaid in full, and the Lender shall not be deemed to have waived, by reason of making the Advance, any Default that may arise by reason of such representation or warranty proving to have been false or misleading, notwithstanding that the Lender may have had notice or knowledge or reason to believe that such representation or warranty was false or misleading at the time such Advance was made. Notwithstanding the foregoing, Borrower's obligations pursuant to Section 3.03 hereof shall only survive to the extent that (i) no change of law existed at the time the Advance was repaid, (ii) a subsequent change of law was given retroactive effect and (iii) Lender suffers actual loss due to such change.

**11.07** **Captions**. The table of contents and captions and section headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Loan Agreement.

**11.08** **Counterparts**. This Loan Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Loan Agreement by signing any such counterpart.

**11.09    Loan Agreement Constitutes Security Agreement; Governing Law**. This Loan Agreement shall be governed by New York law without reference to choice of law doctrine (but with reference to Sections 5-1401 and 1402 of the New York General Obligations Law, which by its terms applies to this Loan Agreement), and shall constitute a security agreement within the meaning of the Uniform Commercial Code.

**11.10    SUBMISSION TO JURISDICTION; WAIVERS**. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY:

(A)    SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS LOAN AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK, THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF;

(B)    CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND, TO THE EXTENT PERMITTED BY LAW, WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREES NOT TO PLEAD OR CLAIM THE SAME;

(C)    AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO ITS ADDRESS SET FORTH UNDER ITS SIGNATURE BELOW OR AT SUCH OTHER ADDRESS OF WHICH THE LENDER SHALL HAVE BEEN NOTIFIED; AND

(D)    AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION.

**11.11    WAIVER OF JURY TRIAL**. EACH OF THE BORROWER AND THE LENDER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS LOAN AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

**11.12    Acknowledgments**. Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Loan Agreement, the Note and the other Loan Documents to which it is a party;

(b)    the Lender has no fiduciary relationship to the Borrower, and the relationship between the Borrower and the Lender is solely that of debtor and creditor; and

(c)    no joint venture exists among or between the Lender and the Borrower.

**11.13    Reserved**.

**11.14    Assignments; Participations**.

(a)    The Lender may sell, assign, transfer, pledge or grant participations in all or any of its rights or obligations under this Loan Agreement and the other Loan Documents, together with any or all servicing rights with respect thereto, to one or more lenders or other entities ("Assignees"). Each Assignee (other than a Participant) shall be a party hereto and to each Loan Document to the extent of the applicable percentage interest assigned to such Assignee and shall succeed to the rights and obligations of Lender hereunder in respect of the Loan.  The liabilities of Lender and each of the Assignees shall be several and not joint.  Additionally, in connection with any sale or assignment by Lender, Lender agrees that it will remain as the administrative agent under this Loan Agreement for such purchasers and/or assignees for the term of the Loan and that it shall maintain at least a ten percent (10%) interest in the Loan.

(b)    In the event of any such sale by the Lender of participating interests to an Assignee (in such capacity, a "Participant"), the Lender's obligations under this Loan Agreement to the Borrower shall remain unchanged, the Lender shall remain the holder of the Note for all purposes under this Loan Agreement and the other Loan Documents, and the Borrower shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under this Loan Agreement and the other Loan Documents (including, without limitation, the right to provide consents, waivers, to enforce any remedies in connection with a Default or Event of Default hereunder or to require action hereunder); notwithstanding the foregoing, Borrower acknowledges that the Participant may have approval and consent rights with respect to some or all of the terms and conditions of this Loan Agreement.  The Borrower agrees that if amounts outstanding under this Loan Agreement and the Note are due or unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under this Loan Agreement and the Note to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Loan Agreement or the Note; provided, that such Participant shall only be entitled to such right of set-off if it shall have agreed in the agreement pursuant to which it shall have acquired its participating interest to share with the Lender the proceeds thereof. The Lender also agrees that each Participant shall be entitled to the benefits of Sections 2.08 and 11.03 with respect to its participation in the Advance outstanding from time to time; provided, that the Lender and the Participant shall be entitled to receive no greater amount in the aggregate pursuant to such Sections than the Lender would have been entitled to receive had no such transfer occurred.

48

(c)     The Lender may furnish any information concerning the Loan, the Collateral, the Borrower, Guarantor, or any of their respective Subsidiaries (including, without limitation, financial information with respect to the Borrower, Guarantor and their respective Subsidiaries) in the possession of such Lender from time to time to assignees and participants (including prospective assignees and participants). Borrower and Guarantor each irrevocably waives any and all rights it may have under any applicable laws to prohibit such disclosure, including, but not limited to, any right of privacy. Notwithstanding the foregoing, Lender shall not deliver Guarantor's financial statements to any Person unless such Person agrees to treat such financial statements as confidential.

(d)     If Lender elects, in its sole discretion, in connection with any assignment or participation in the Loan, to split the Loan into two or more parts, or the Note into multiple component notes or tranches which may have different interest rates, principal amounts, payment priorities and maturities, Borrower agrees to cooperate with Lender in connection with the foregoing and to execute the required modifications and amendments to the Note, this Loan Agreement and the Loan Documents and to provide opinions necessary to effectuate the same. Such Notes or components may be assigned different interest rate margins, so long as (i) the weighted average of such interest rate margins does not exceed the Applicable Margin or the Base Rate Margin, as applicable, (ii) any such actions do not have any adverse economic affect on Borrower and (iii) any such actions do not otherwise impose material additional obligations on Borrower or materially adversely affect the rights of Borrower under the Loan Documents.

(e)     Subject to subsection (d) above, the Borrower and Guarantor each agrees to cooperate with the Lender in connection with any such assignment, participation, and/or splitting, tranching or componentization of the Loan, to execute and deliver such replacement notes, (including, supplemental notes in the principal amount of any assignee's pro rata share of the Loan substantially in the form of the Note payable to the order of such assignee, dated as of the ~~date hereof~~Closing Date, and maturing on the Termination Date and to enter into such restatements of, and amendments, supplements and other modifications to, this Loan Agreement and the other Loan Documents in order to give effect to such assignment and/or participation. The Borrower further agrees to furnish to any Participant identified by the Lender to the Borrower copies of all reports and certificates to be delivered by the Borrower to the Lender hereunder, as and when delivered to the Lender.

(f)     In connection with any such assignment, participation and/or splitting, tranching or componentization of the Loan, Borrower and Guarantor shall, if requested by Lender, execute and deliver the estoppel certificate required pursuant to Section 7.21 hereof.

(g)     Lender agrees to pay for all fees, costs and expenses incurred by Lender in connection with any such assignment, participation and/or splitting, tranching or componentization of the Loan, including, without limitation, Lender's reasonable attorneys' fees and expenses (but Borrower shall be responsible for its own legal fees and expenses in connection with any such assignment, participation and/or splitting, tranching or componentization of the Loan).

**11.15  Servicing**.

The Borrower agrees as follows:

(a)     Borrower shall continue to cause the Rake Securities to be serviced for the benefit of itself and the Lender.  The Borrower shall monitor the servicing and administration of the bonds and the underlying loan(s) and report to Lender any breach of the applicable pooling and servicing agreement executed in connection with the issuance of such Rake Security or misapplication of funds by any party thereto.

(b)     Reserved.

(c)     The Borrower shall provide to the Lender, periodically at the request of the Lender, any and all material information that is pertinent or related to the assessment and valuation of the Rake Securities, as or when received or available from the Trustee.  Such information includes, but is not limited to, property operating statements, rent rolls, financial statements and other financial reports for each Rake Security, as well as any other material information or events affecting the interests in or valuation of the Rake Securities.

(d)     Upon the occurrence and continuance of an Event of Default, the Lender may, in its sole discretion, (i) sell any Rake Security in accordance with Section 9 hereof on a servicing released basis or (ii) terminate the Borrower or any sub-servicer of any Rake Security with or without cause, in each case without payment of any termination fee.  Notwithstanding any provision of this Loan Agreement to the contrary, upon the occurrence and during the continuation of an Event of Default, the Lender shall have sole control over all decisions, approvals or determinations made with respect to the servicing and administration of any Rake Security and the exercise of all rights and remedies with respect to any such Rake Security and the related Governing Documents.

(e)     The Borrower shall not employ sub-servicers to service any Rake Security without the prior written approval of the Lender which approval shall not be unreasonably withheld.  If any Rake Security is serviced by a sub-servicer, the Borrower shall irrevocably assign all rights, title and interest in the Servicing Agreements in such Rake Security to the Lender.

(f)     The Borrower shall cause any sub-servicers engaged by the Borrower to execute a letter agreement with the Lender acknowledging the Lender's security interest and agreeing that it shall deposit all Income with respect to any Rake Security ~~and Additional Collateral~~ in the Cash Management Account.

**11.16  Periodic Due Diligence Review**.  The Borrower acknowledges that the Lender has the right to perform continuing due diligence reviews with respect to any Rake Security, for purposes of verifying compliance with the representations, warranties and specifications made hereunder, or otherwise, and the Borrower agrees that upon reasonable (but no less than five (5) Business Days) prior notice to the Borrower (unless an Event of Default shall have occurred, in which case prior notice shall not be required), the Lender or its authorized representatives will be permitted during normal business hours to examine, inspect, make copies of, and make extracts of the Rake Security Documents and any and all documents, records, agreements, instruments or information relating to any such Rake Security in the possession, or under the control, of the

Borrower and/or Servicer. The Borrower also shall make available to the Lender a knowledgeable financial or accounting officer for the purpose of answering reasonable questions respecting the Rake Security Documents, the Servicing Files and any other document relating thereto and the Rake Securities and each other asset pledged hereunder. Without limiting the generality of the foregoing, the Borrower acknowledges that the Lender shall make the Advance to the Borrower based solely upon the information provided by the Borrower to the Lender pursuant to this Loan Agreement and the representations, warranties and covenants contained herein, and that the Lender, at its option, has the right, at any time to conduct continuing or additional due diligence review on the Borrower, Guarantor, and on some or all of the Rake Securities securing the Advance, including, without limitation, ordering new credit reports, new appraisals on any related Underlying Mortgaged Properties. The Lender may perform such continuing or additional due diligence of the Borrower, Guarantor, and of the Collateral itself or engage a mutually agreed upon third party underwriter to perform such due diligence. The Borrower agrees to cooperate with the Lender and any third party underwriter in connection with such continuing or additional due diligence, including, but not limited to, providing the Lender and any third party with access to any and all documents, records, agreements, instruments or information relating to the Borrower, Guarantor, and the Collateral in the possession, or under the control, of the Borrower or Guarantor. In addition, the Lender has the right to perform continuing Due Diligence Reviews of the Borrower and its Affiliates, directors, officers, employees and significant shareholders. The Borrower further agrees that all out-of-pocket costs and expenses incurred by the Lender in connection with the Lender's activities pursuant to this Section 11.16 shall be paid for by the Borrower.

### 11.17    Recourse Obligations.

(a)    The Obligations of the Borrower under the Note, this Loan Agreement and the other Loan Documents shall be full recourse Obligations to the Borrower; provided, however, Borrower's personal liability to Lender shall not exceed 85.5263100% of the full outstanding principal balance of the Advance. Notwithstanding the preceding sentence, nothing herein shall prevent Lender from bringing a foreclosure action, action for specific performance or other appropriate action or proceeding to enable Lender to enforce and realize upon this Agreement, the Note, the other Loan Documents, and the Collateral given to Lender created by this Agreement, the Note, and the other Loan Documents in the event the Obligations are not satisfied in full, and any judgment or personal liability in any such action or proceeding against Borrower shall only be limited to the extent expressly provided for herein. The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by this Agreement, the Note or the other Loan Documents; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Loan Documents; (iii) affect the validity or enforceability of any indemnity, guaranty or similar instrument made in connection with this Agreement, the Note, or the other Loan Documents; or (iv) impair the right of Lender to obtain a deficiency judgment or other judgment on the Note against Borrower if necessary to preserve or enforce its rights and remedies against the Collateral. The Borrower further agrees to pay any and all reasonable and actually incurred expenses (including, without limitation, all reasonable fees and disbursements of counsel) which may be paid or incurred by the Lender in enforcing any rights with respect to, or collecting against, the Borrower under this Loan Agreement. Borrower's Obligations under this Section 11.17(a) shall remain in full force and effect until the LoanAdvance is paid in full.

51

(b)    ~~Notwithstanding the provisions of this Section 11.17(a) to the contrary, Borrower shall be personally liable to Lender for the Losses it incurs due to: (i) fraud or intentional misrepresentation in connection with the execution and the delivery of this Loan Agreement, the Note or the other Loan Documents; (ii) Borrower's intentional misapplication or misappropriation of Insurance Proceeds, Awards, income generated by the premises securing the Underlying Mortgage Loan, any distribution relating to such premises made to the Mortgage Borrower, or any payments received by Borrower pursuant to the Underlying Mortgage Loan Documents, with respect to the Collateral, in each case in violation of the Loan Documents or the Governing Agreements, as applicable; or (iii) Borrower's or Guarantor's failure to comply with the terms of Section 7.14 hereof. For the avoidance of doubt, the liability of Borrower for Losses under this Section 11.17(b) shall not be subject to any limitation or any other cap (i.e., Borrower shall be liable for 100% of such Losses).~~[reserved].

(c)    ~~Notwithstanding the foregoing, the agreement of Lender to pursue limited recourse liability with respect to principal as set forth in Section 11.17(a) hereof SHALL BECOME NULL AND VOID and shall be of no further force and effect (i) in the event of an Event of Default under Sections 8(g), (h), (i), (k), (l), (m), (o) or (p) hereof, (ii) the Borrower or the Guarantor shall fail to comply with Sections 7.01, 7.04, 7.07, 7.17 or 7.18 hereof, (iii) if the Collateral or any part thereof shall become an asset in (A) a voluntary bankruptcy or insolvency proceeding or (B) an involuntary bankruptcy or insolvency proceeding commenced by any person (other than Lender) and Borrower consents to such proceedings or where Borrower (or any person acting at the direction or request of Borrower) colludes, conspires or otherwise acts in concert with its creditors (other than Lender) in the filing of such involuntary bankruptcy or insolvency proceeding, or (iv) if the first monthly debt service payment amount is not paid when due.~~[reserved].

Nothing herein shall be deemed to be a waiver of any right which Lender may have under Sections 506(a), 506(b), 1111(b) or any other provision of the U.S. Bankruptcy Code to file a claim for the full amount of the indebtedness secured by this Loan Agreement or to require that all collateral shall continue to secure all of the indebtedness owing to Lender in accordance with this Loan Agreement, the Note and the other Loan Documents.

**11.18    Set-Off**. In addition to any rights and remedies of the Lender provided by this Loan Agreement and by law, the Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all Property and deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Lender or any Affiliate thereof to or for the credit or the account of the Borrower. The Lender may set-off cash, the proceeds of the liquidation of any Collateral and all other sums or obligations owed by the Lender or its Affiliates to Borrower against all of Borrower's obligations to the Lender or its Affiliates, whether under this Loan Agreement or under any other agreement between the parties or between Borrower and any affiliate of the Lender, or otherwise, without prejudice to the Lender's or its Affiliate's right to recover any deficiency. The Lender agrees promptly to

notify the Borrower after any such set-off and application made by the Lender; provided, that the failure to give such notice shall not affect the validity of such set-off and application.

**11.19  Entire Agreement**.    This Loan Agreement and the other Loan Documents embodies the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings relating to the matters provided for herein. No alteration, waiver, amendments, or change or supplement hereto shall be binding or effective unless the same is set forth in writing by a duly authorized representative of each party hereto.

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, the parties hereto have caused this Loan Agreement to be duly executed and delivered as of the day and year first above written.

**CWCapital EY REIT LB2 LLC**, a Delaware limited liability company

By:    CWCapital Enhanced Yield REIT LLC, a Delaware limited liability company, its sole member

By: _____
    Name:
    Title: Authorized Signatory

Address for Legal Notices:

1540 Broadway
23rd Floor
New York, NY 10036
~~Attn: Craig Henrich, Senior Managing Director~~
Attn: Sam Rodman, Associate
Telephone: 646-253-88~~02~~<u>8855</u>
Telecopy: 646-253-8849
Email: <u>srodman@cwcapital.com</u>

1540 Broadway
23rd Floor
New York, NY 10036
Attn: Paul Sherrington, <u>Assistant</u> General Counsel
Telephone: 646.253.8808
Telecopy: 646.253.8849

and

One Charles River Place,
63 Kendrick Street,
Needham, MA 02494
Attn: Jill R. Hyde, ~~Senior Vice President~~<u>Managing Director</u> and Deputy General Counsel
Telephone:<u> 781-707-9312</u>
Telecopy:<u> 781-707-9499</u>
Email:<u> jhyde@cwcapital.com</u>

With a copy to:

~~LATHAM & WATKINS~~<u>Dechert</u> LLP
~~633 West Fifth Street, Suite 4000~~
~~Los Angeles, CA 90071-2007~~
~~Attn: Don Berger~~
<u>Cira Centre</u>
<u>2929 Arch Street</u>
<u>Philadelphia, PA 19014</u>
<u>Attention:</u> Richard D. Jones, Esq.
Telephone: ~~213-891-8998~~<u>212-698-3844</u>
Telecopy: ~~213-891-8763~~<u>215- 655-2501</u>

~~16226836.1.~~<u>16226836.7.</u>
16819450

Address for Purposes of Settlement Logistics:

CWCapital Investments LLC
1540 Broadway
23rd Floor
New York, NY 10036
~~Attn: Craig Henrich, Senior Managing Director~~
Attn: Sam Rodman, Associate
Telephone: 646-253-88~~02~~<u>8855</u>
Telecopy: 646-253-8849
Email: ~~chenrich~~<u>srodman</u>@cwcapital.com

CW Capital ~~Investments~~<u>Asset Management</u> LLC
70 13th Street NW Suite 1000
Washington, D.C. 20005
Attn: Kevin Thompson
Telephone:
Telecopy:
Email: kthompson@cwcapital.com

Address for Delivery of Financial and Other Related Reports:

~~CWCapital Investments LLC~~
~~5956 Sherry Lane~~
~~Suite 1201~~
~~Dallas, TX 75225~~
<u>CW Financial Services LLC</u>
<u>One Charles River Place</u>
<u>63 Kendrick Street</u>
<u>Needham, MA 02494</u>
Attn: ~~Michael Volz~~ <u>Robert Barrows</u>, Vice President - Finance
Telephone: ~~214-438-6407~~ <u>781-707-9463</u>
Telecopy: ~~214-438-6320~~ <u>781-707-9499</u>
Email: ~~mvolz~~<u>rbarrows</u>@cwcapital.com

CW Capital ~~Investments~~<u>Asset Management</u> LLC
~~70-13th~~<u>111 South Calvert</u> Street ~~NW~~
Suite ~~1000~~<u>2830</u>
~~Washington, D.C. 20005~~

Baltimore, MD 21202                              Telecopy: 202-715-9699
Attn: Kevin Thompson, Vice President – Asset Manager    Email: kthompson@cwcapital.com
Telephone: 202-715-9577

**LEHMAN COMMERCIAL PAPER INC., as
Lender**

By:_____
Name:
Title:

Address for Notices:

Lehman Commercial Paper Inc.
~~Global Real Estate Group~~
~~745  Park~~1271 Avenue,~~13~~ of the Americas
39th Floor
New York, New York ~~10019~~10020
Attention: Michael Lascher
~~Telecopier No.:~~Telecopy: (646-) 758-2744
~~Telephone No.: 212-526-2109~~


With a copy to:

~~Thacher Proffitt & Wood LLP~~
SNR Denton
Two World Financial Center
New York, New York 10281
Attention:  Mitchell G. Williams, Esq.
Telecopy:  (212) 912-7751

**Schedule 1**

**Reserved**

**Schedule 2**

**Filing Jurisdictions and Offices**

Delaware Secretary of State

**Schedule 3**

**Ownership Chart**

**Schedule 4**

**Subsidiaries**

None

**Schedule 5**

**[Reserved]**

**Schedule 6**

### Schedule of Rakes

| Rake Security | Rake Amount |
|---|---|
| Beacon Fund III- 100 California Street Rake Bond | $5,700,000.00 |
| Beacon Fund III- 50 Beale Street Rake Bonds | $6,400,000.00 |
| Beacon Fund III- 1000 Wilshire Rake Bonds | $8,430,000.00 |
| Beacon II- 1888 Century Park East Rake Bond | $4,000,000.00 |
| Stonebridge II Rake Bond | $3,900,000.00 |
| Crescent Portfolio- Austin Centre Rake Bond | $1,777,469.00 |
| Crescent Portfolio- Denver Marriott Rake Bonds | $5,900,000.00 |
| Hyatt Summerfield Suites Rake Bond | $3,100,000.00 |
| Hyatt Regency Houston Rake Bond | $2,900,000.00 |
| Fifth Third Center Rake Bond | $6,500,00.006,500,000.00 |
| PHOV Hotel Portfolio Rake Bond | $8,420,000.00 |
| Hyatt Arlington Rake Bonds | $5,000,000.00 |

16226836.1 16226836.7.
16819450

**Schedule 7**

**[Reserved]**

~~16226836.1~~.16226836.7.
16819450

**Schedule 8**

### Allocated Advance Amount Schedule

| Rake Security | Allocated Advance Amount (as of May [ ], 2011) |
|---|---|
| Beacon Fund III- 100 California Street Rake Bond | $3,920,460.003,709,819.53 |
| Beacon Fund III- 50 Beale Street Rake Bonds | $4,401,920.004,165,411.40 |
| Beacon Fund III- 1000 Wilshire Rake Bonds | $5,798,154.005,486,627.83 |
| Beacon II- 1888 Century Park East Rake Bond | $2,751,200.002,603,382.13 |
| Stonebridge II Rake Bond | $2,682,420.002,538,297.57 |
| Crescent Portfolio- Austin Centre Rake Bond | $1,222,543.181,156,857.76 |
| Crescent Portfolio- Denver Marriott Rake Bonds | $4,058,020.003,839,988.64 |
| Hyatt Summerfield Suites Rake Bond | $2,132,180.002,017,621.15 |
| Hyatt Regency Houston Rake Bond | $1,994,620.001,887,452.04 |
| Fifth Third Center Rake Bond | $4,470,700.004,230,495.96 |
| PHOV Hotel Portfolio Rake Bond | $5,791,276.005,480,119.38 |
| Hyatt Arlington Rake Bonds | $3,439,000.003,254,227.66 |

**Schedule 9**

**(Form of Trustee Instruction Letter)**

_____, 2008

_____, 2011

[_____], as Trustee

_____

_____

Attention: _____

Re:    Loan and Security Agreement (the "Loan Agreement"), dated as of May
[ _____] 2011 (but effective as of May 30, 2008), 2008, by and between
Lehman Commercial Paper Inc., as Lender (the "Lender") and
[_____]CWCapital EY Reit LB2 LLC, as Borrower (the
"Borrower")

Ladies and Gentlemen:

Pursuant to Section 4.01 of the Loan and Security Agreement, dated as of
[_____], 2008, (the "Agreement"), between the Lender and the Borrowers (you are hereby
notified that: (i) the undersigned Borrower has pledged to the Lender the Rake Securities described
on Schedule 1 hereto (the "Rake Securities"), (ii) each of the Rake Securities is subject to a
security interest in favor of the Lender and (iii) unless otherwise notified by the Lender in writing,
any payments or distributions made with respect to such Rake Securities should be remitted
immediately by the Trustee directly to the Lender, in accordance with the following wire
instructions:

[_____]
ABA #[_____]
Acct Name: [_____].
A/C #: [_____]
Attn:    [_____]

All remittance reports, statements and notices shall be sent to the attention of:

Lehman Commercial Paper Inc.399 Park
1271 Avenue of the Americas
39th Floor
New York, New York 1002210020

Telecopier No.: (___) [____]-[_____]
Telephone No.: (___) [____]-[_____]

Attn:

16226836.1.16226836.7.
16819450

Please acknowledge receipt of this instruction letter by signing in the signature block below and forwarding an executed copy to the Lender promptly upon receipt

Very truly yours,

[＿＿＿＿＿＿＿＿＿＿＿]

By
:
Name:
Title:


ACKNOWLEDGED:

＿＿＿＿＿＿＿＿＿＿＿＿, as Trustee

By:＿＿＿＿＿＿＿＿＿＿＿＿
Name:
Title:

16226836.1 16226836.7.
16819450

Document comparison done by Workshare DeltaView on Tuesday, May 10, 2011
10:58:43 AM

| Input | |
|---|---|
| Document 1 | interwovenSite://NA_INTERWOVEN.DECHERT.COM/BUSINESS/16226836/1 |
| Document 2 | interwovenSite://NA_INTERWOVEN.DECHERT.COM/BUSINESS/16226836/7 |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | Count |
|---|---|
| Insertions | 293 |
| Deletions | 312 |
| Moved from | 5 |
| Moved to | 5 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 615 |