Hearing Date: December 6, 2011 at 10:00 a.m. (prevailing Eastern Time)

CADWALADER, WICKERSHAM & TAFT LLP
Mark C. Ellenberg, Esq.
John H. Thompson, Esq.
700 6th Street, NW
Washington, DC 20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

*Attorneys for CQS ABS Master Fund Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                            :
**In re:**                                  :
                                            :        **Chapter 11**
                                            :
**LEHMAN BROTHERS HOLDINGS INC., *et al.*,** :        **Case No. 08-13555 (JMP)**
                                            :
                                            :        **(Jointly Administered)**
                 **Debtors.**               :
                                            :
-------------------------------------------------------------------x

**OBJECTION OF CQS ABS MASTER FUND LIMITED TO THE DEBTORS'**
**PROPOSED ASSUMPTION OF CERTAIN EXECUTORY CONTRACTS**

**TO:   THE HONORABLE JUDGE JAMES M. PECK**
**UNITED STATES BANKRUPTCY JUDGE**

CQS ABS Master Fund Limited ("**CQS**") submits this objection to the Plan Supplement

[Docket No. 21254], filed by the Debtors on October 25, 2011, and the Debtors' proposed

assumption of a purported "novation fee" allegedly owing from CQS to Lehman Brothers

Special Financing Inc. ("**LBSF**").[1]

_____

[1] A form of order is attached as <u>Exhibit A</u>.

## BACKGROUND

1.    On September 10, 2008, CQS and Lehman Brothers International (Europe) ("**LBIE**") entered into a novation (the "**Novation**"), pursuant to which LBIE agreed to replace CQS in a derivatives contract between CQS and Merrill Lynch International ("**Merrill Lynch**"). In consideration for the Novation, CQS agreed to pay LBIE $2,299,288.89 (the "**Novation Fee**").

2.    On September 10, 2008, a LBIE employee sent an email confirmation (the "**LBIE Confirmation**") memorializing the Novation. The Confirmation clearly states that "CQS Master Fund Limited Pay USD 2,299,288.89 to LBIE on 17-Sep-2008."[2]

3.    Pursuant to the International Swaps and Derivatives Association, Inc., Novation Protocol II (the "**Novation Protocol**"), the Novation did not become effective until CQS obtained Merrill Lynch's consent to the Novation. See Novation Protocol at Annex 1, § 2(e) (2006).[3]  The Novation Protocol requires, inter alia, that the transferor's request for consent include the name of the proposed transferee. See id. at Annex 1, § 2(b)(ii).

4.    On September 10, 2008, CQS sent a request for consent to Merrill Lynch and "Assignments LB LDN" (the "**CQS Request**"), stating that the proposed transferee under the Novation was "Lehman Brothers International – London."[4]

5.    Pursuant to the Novation Protocol, Merrill Lynch was required to consent to the Novation by 6:00 p.m. GMT on September 10, 2008. If Merrill Lynch failed to provide its consent by that deadline, the Novation would be deemed ineffective. See id., at Annex 1 §

---

[2] A copy of the LBIE Confirmation is attached as Exhibit B.

[3] A copy of the Novation Protocol is attached as Exhibit C.

[4] A copy of the CQS Request is attached as Exhibit D.

2(e)(ii)(A).  Shortly after receiving the Request, Merrill Lynch consented via email (the "**Merrill Consent**"), thereby effectuating the Novation.[5]

6.      On September 15, 2008, LBIE entered English administration proceedings pursuant to the English Insolvency Act of 1986.  Beginning on September 15, 2008 and periodically thereafter, Lehman Brothers Holdings Inc. and certain of its affiliates, including LBSF (collectively, the "**U.S. Debtors**") commenced voluntary cases under chapter 11 of the Bankruptcy Code.

7.      On or about August 18, 2011, CQS filed a claim against LBIE in its U.K. administration (the "**Claim**").  In calculating the amount of the Claim, CQS setoff the Novation Fee against certain obligations owed by LBIE to CQS.

8.      On September 1, 2011, the U.S. Debtors filed their Third Amended Joint Chapter 11 Plan [Docket No. 19627] (the "**Plan**") and the Disclosure Statement for the Third Amended Joint Chapter 11 Plan [Docket No. 19629] (the "**Disclosure Statement**").  The Plan provides, in pertinent part:

> [A]ll executory contracts and unexpired leases that exist between a Debtor and any person or entity shall be deemed rejected by such Debtor, as of the Effective Date, except for any executory contract or unexpired lease . . . (c) that is specifically designated in the Plan Supplement as a contract or lease to be assumed by the Debtor.

Plan § 11.1.

9.      On October 25, 2011, the U.S. Debtors filed the Plan Supplement, seeking to assume a "Novation Fee" allegedly between CQS and LBSF.  The information provided in the

---

[5] A copy of the Merrill Consent is attached as <u>Exhibit E</u>.

Plan Supplement regarding the "Novation Fee" does not match CQS's books and records, but CQS has determined that it is likely that the U.S. Debtors are proposing to assume the Novation.[6]

10.     On October 27, 2011, the U.S. Debtors served CQS with a Notice of Proposed Assumption of Executory Contract, informing CQS that the U.S. Debtors propose to assume the "Novation Fee."

## OBJECTION

### LBSF is Not a Party to the Novation.

11.     As a threshold matter, LBSF cannot assume the Novation because LBSF is not party to the contract.  Section 365(a) of the Bankruptcy Code provides that a debtor "may assume or reject any executory contract or unexpired lease *of the debtor*."  11 U.S.C. § 365(a) (emphasis added).  As discussed above, the overwhelming consensus among the trade documents is that the Novation was between CQS and LBIE:

- The LBIE Confirmation identifies LBIE as the party to whom CQS "pays" the $2,299,288.89 Novation Fee;

- The LBIE Confirmation was sent by Brent M. Berg – an employee of LBIE;

- Pursuant to the Novation Protocol at Annex 1 § 2(b)(i)-(iii), CQS sent Merrill Lynch and "Assignments LB LDN" the CQS Request, identifying "Lehman Brothers International – London" as the proposed transferee under the Novation;

- Pursuant to the Novation Protocol at Annex 1 § 2(c), Merrill Lynch sent CQS and "Assignments LB LDN" the Merrill Consent, consenting to the proposed novation between CQS and "Lehman Brothers International – London;" and

- The CQS Request and the Merrill Consent unambiguously state that LBIE was the proposed transferee under the Novation.

---

[6] The Plan Supplement states that the title of the agreement to be assumed is "NOVATION FEE FOR TRADE 220709631HYGOTH DATED 11TH SEPT 2008 WITH MATURITY 20TH JUNE 2013."  See Plan Supplement, Ex. 2.  CQS does not have any record of a novation with that trade number, trade date or maturity.

12.     Based upon the totality of the circumstances, it is clear that LBSF was not and could not have been a party to the Novation.  Accordingly, LBSF cannot assume the Novation pursuant to section 365 of the Bankruptcy Code.  Moreover, the Novation Fee was not owed to LBSF, but to LBIE, and the Novation Fee has been paid in full.

## **CONCLUSION**

WHEREFORE, CQS respectfully requests that the Court enter an order (i) holding that LBSF is not a party to the Novation, (ii) denying the Debtors' proposed assumption of the Novation, and (iii) removing the Novation from the list of derivatives contracts to be assumed in Exhibit 2 of the Plan Supplement.

Dated: Washington, DC
      November 14, 2011

                  CADWALADER, WICKERSHAM & TAFT LLP

                  */s/ Mark C. Ellenberg*
                  Mark C. Ellenberg, Esq.
                  John H. Thompson, Esq.
                  700 6th Street, NW
                  Washington, DC 20001
                  Telephone:  (202) 862-2200
                  Facsimile:  (202) 862-2400

**<u>EXHIBIT A</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
                                                    :
In re:                                              :
                                                    :                    **Chapter 11**
                                                    :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*        :                    **Case No. 08-13555 (JMP)**
                                                    :
                                                    :                    **(Jointly Administered)**
          **Debtors.**                              :
                                                    :
----------------------------------------------------------------x

<u>**ORDER GRANTING OBJECTION OF CQS ABS MASTER FUND LIMITED TO
DEBTORS' PROPOSED ASSUMPTION OF CERTAIN "EXECUTORY" CONTRACTS**</u>

Upon the *Objection of CQS ABS Master Fund Limited to Debtors' Proposed Assumption*

*of Certain "Executory" Contracts* (the "<u>Objection</u>"), requesting entry of an order (i) holding that

LBSF is not a party to the Novation, (ii) denying the Debtors' proposed assumption of the

Novation and (iii) removing the Novation from the list of derivatives contracts to be assumed in

Exhibit 2 of the Plan Supplement, as more fully described in the Objection, and the Court having

jurisdiction to consider the Objection and the relief requested therein pursuant to 28 U.S.C. §§

157 and 1334; and due and proper notice of the Objection having been provided; and it appearing

that no other or further notice need be provided; and the Court having heard the statements in

support of the Objection at the hearing before the Court on December 6, 2011; and the Court

having determined that there exists just cause for the relief granted herein; and upon all of the

proceedings had before the Court and after due deliberation; it is hereby

**ORDERED** that that LBSF is not a party to the Novation; and it is further

**ORDERED** that the Debtors' proposed assumption of the Novation is denied; and it is

further

**ORDERED** that the Debtors shall remove the Novation from the list of derivatives contracts to be assumed in Exhibit 2 to the Plan Supplement.

Dated: New York, New York
      _____, 2011


                                    _____
                                    HONORABLE JAMES M. PECK
                                    UNITED    STATES    BANKRUPTCY    JUDGE

# **EXHIBIT B**

From: Berg, Brent M. [brentm.berg@lehman.com]
Sent: Wednesday, September 10, 2008 1:16 PM
To: Lawless, Christian; Pater, John, Lumsden, Alistair
Cc:
Subject: Unwind RECAP: CQS ABS sells $5mm ABX 06-1 AA at 54-00 - CDS_172597

08-13555-mg    Doc 22109   Filed 11/14/11   Entered 11/14/11 16:26:48   Main Document
Pg 11 of 31

```
ABCDS Step-In Trade: CQS ABS MASTER FUND LIMITED Sells ABX.HE.AA.06-1 To
LBSF
Product:     ABCDS-NY
Credit:      ABX.HE.AA.06-1
Notional: USD 5,000,000
Traded:    10-Sep-2008  Eff: 10-Sep-2008  Mat: 25-Jul-2045
Price:     54.0  Orig Spd: 32.0 bps  Orig Eff: 10-Sep-2008
New CP:    Merrill Lynch International (102696MLIL)
  CQS ABS MASTER FUND LIMITED Pays USD 2,299,288.89 To LBIE, on:
17-Sep-2008
Ref Obl:       ABX_HE_AA061 32.0 25-Jul-2045 ISIN: 0A08AGAA9
Credit Events: 2003 ISDA, SENIOR Standard Terms
MTS #7326760    Sales ID: N587   Credit: Pre-approved
Entity Master:  092106CQSU
Sales Person:  Lawless, Christian
Factor:1.0
Current Face:5000000.0
Comments:
Trade ID:      215003


-----------------------------------------------------------------
---------
This information has been provided as a courtesy to you and does not
replace or supersede your normal trade confirm or your Lehman Brothers
Inc. client statement.  This information is subject to daily market
fluctuation and is not intended for tax purposes.  In the case of any
conflict, the information on your normal trade confirmation or customer
account statement shall control: we do not guarantee the accuracy or
completeness of this information.  Lehman Brothers Inc. Member SIPC


From: Lumsden, Alistair [mailto:Alistair.Lumsden@cqsm.com]
Sent: Wednesday, September 10, 2008 1:16 PM
To: Lawless, Christian; McNiff, John
Cc: Carpenter, Scott; Assignments CQSM
Subject: CQS ABS sells $5mm ABX 06-1 AA at 54-00

Assignment facing ML.
CQS ABS pays Lehman $2,299,288.89
Tks for the trade.
Ali


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
```

This message is intended only for the personal and confidential use of the designated
recipient(s) named above.  If you are not the intended recipient of this message you are
hereby notified that any review, dissemination, distribution or copying of this message is
strictly prohibited.  This communication is for information purposes only and should not
be regarded as an offer to sell or as a solicitation of an offer to buy any financial
product, an official confirmation of any transaction, or as an official statement of

## EXHIBIT C

# ISDA®

International Swaps and Derivatives Association, Inc.

## ISDA NOVATION PROTOCOL II

published on February 1, 2006
by the International Swaps and Derivatives Association, Inc.

The International Swaps and Derivatives Association, Inc. ("ISDA") has published this ISDA Novation Protocol II (this "Protocol") to enable parties to confirm their understanding and intentions regarding the transfer by novation of Covered Transactions.

Accordingly, a party that has entered and/or anticipates entering into Covered Transactions governed by a Master Agreement may adhere to this Protocol and be bound by its terms by completing and delivering a letter substantially in the form of Exhibit 1 to this Protocol (an "Adherence Letter") to ISDA, as agent, as described below.

Capitalized terms used herein and in Annex 1 hereto have the meaning ascribed to them in Section 6 of this Protocol or, if not defined therein, in the relevant Master Agreement or the 2004 ISDA Novation Definitions (the "Novation Definitions").

## 1. Amendments

(a)     By adhering to this Protocol in the manner set forth in Section 2 below, a party (an "Adhering Party") that has entered and/or anticipates entering into a Master Agreement agrees, in each case on the terms and subject to the conditions set forth in this Protocol and the relevant Adherence Letter, that certain amendments will be deemed to be made to any Master Agreement between it and any other Adhering Party and that certain procedures will be followed by such Adhering Party (acting as Transferor, Transferee or Remaining Party) in relation to a transfer by novation of a Covered Transaction.

(b)     The amendments and agreements provided for in this Protocol are set forth in Annex 1.

## 2. Adherence and Effectiveness

(a)     Adherence to this Protocol will be evidenced by the execution and delivery, in accordance with the first sentence of Section 5(f) below, to ISDA, as agent, of an Adherence Letter.  ISDA shall have the right, in its absolute discretion, upon sixty days' notice to Adhering Parties to designate a closing date of the Protocol (the "Cut-off

Copyright © 2006 by International Swaps and Derivatives Association, Inc

Date").    After the Cut-off Date, ISDA will not accept any further Adherence Letters to the Protocol.

    (i)    Each Adhering Party will deliver two copies of the Adherence Letter, one a manually signed original and the other a conformed copy containing, in place of each signature, the printed or typewritten name of each signatory.

    (ii)    Each Adhering Party agrees that, for evidentiary purposes, a conformed copy of an Adherence Letter certified by the General Counsel or an appropriate officer of ISDA will be deemed to be an original.

(b)    The agreement to make the amendments contemplated by this Protocol and to follow the procedures set forth in this Protocol in relation to a transfer by novation of a Covered Transaction, on the terms and subject to the conditions set forth in this Protocol, as between any two Adhering Parties, will be effective on receipt by ISDA, as agent, of an Adherence Letter from the later of the Adhering Parties to adhere. Any such amendments and procedures will apply to each transfer by novation of a Covered Transaction between the Adhering Parties (whether entered into before, on or after the Cut-off Date or the relevant Annual Revocation Date, if applicable, and whether the Adhering Party is acting as the Transferor, the Transferee or the Remaining Party).

(c)    This Protocol is intended for use without negotiation, but without prejudice to any amendment, modification or waiver in respect of a Covered Transaction that the parties may otherwise effect in accordance with the terms of the relevant Master Agreement.

    (i)    In adhering to this Protocol, an Adhering Party may not specify additional provisions, conditions or limitations in its Adherence Letter or otherwise.

    (ii)    Any purported adherence that ISDA, as agent, determines in good faith is not in compliance with this Section will be void.

## 3. Representations

Each Adhering Party represents to each other Adhering Party with which it has or may have a Master Agreement, on the date on which the later of them adheres to this Protocol in accordance with Section 2 above that:

(a)    *Status.* It is, if relevant, duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing or, if it otherwise represents its status in or pursuant to the Master Agreement, has such status;

(b)    *Powers.* It has the power to execute and deliver the Adherence Letter and to perform its obligations under the Adherence Letter and the relevant Master Agreement, in each case as amended by the Adherence Letter and this Protocol, and has taken all necessary action to authorize such execution, delivery and performance;

2

(c)    ***No Violation or Conflict.*** Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(d)    ***Consents.*** All governmental and other consents that are required to have been obtained by it with respect to the Adherence Letter and the relevant Master Agreement, in each case as amended by the Adherence Letter and this Protocol, have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

(e)    ***Obligations Binding.*** Its obligations under the Adherence Letter and the relevant Master Agreement, in each case as amended by the Adherence Letter and this Protocol, constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)); and

(f)    ***Credit Support.*** Its adherence to this Protocol and any amendment contemplated by this Protocol will not, in and of itself, adversely affect any obligations owed, whether by it or by any third party, under any Credit Support Document relating to the relevant Master Agreement.

Each Adhering Party agrees with each other Adhering Party with which it has or may have a Master Agreement that each of the foregoing representations will be deemed to be a representation for purposes of Section 5(a)(iv) of each such Master Agreement (then or in the future) between them.

**4.     Evidence of Capacity and Authority**

Each Adhering Party may deliver to ISDA, as agent, such evidence as it deems appropriate to evidence its capacity to adhere to this Protocol and the authority of anyone signing on its behalf.

**5.     Miscellaneous**

(a)    ***Entire Agreement; Restatement; Survival.***

(i)    This Protocol constitutes the entire agreement and understanding of the Adhering Parties with respect to its subject matter. Each Adhering Party acknowledges that in adhering to this Protocol it has not relied on any oral or written representation, warranty or other assurance (except as provided for or referred to in Annex 1 or elsewhere in this Protocol) and waives all rights and remedies which might otherwise be available to it in respect

3

thereof, except that nothing in this Protocol will limit or exclude any liability of an Adhering Party for fraud.

(ii)    Except for any amendment deemed to be made pursuant to this Protocol in respect of a Master Agreement, all terms and conditions of the Master Agreement will continue in full force and effect in accordance with its provisions on the effective date of that amendment. This Protocol will, with respect to its subject matter, survive, and any amendments deemed to be made pursuant to it, will form a part of the Master Agreement between the Adhering Parties notwithstanding Section 9(a) of the Master Agreement.

(b)    *Limited Right to Revoke.*    Adherence to this Protocol is irrevocable, except that on any Business Day during the Annual Revocation Period, an Adhering Party may deliver to ISDA, as agent, a notice substantially in the form of Exhibit 2 to this Protocol (a "Revocation Notice") to designate the next Annual Revocation Date as the last date on which any counterparty may adhere to this Protocol in respect of any Master Agreement then or in the future between the counterparty and such Adhering Party.

(i)    Upon the effective designation of the next Annual Revocation Date by an Adhering Party, this Protocol will not amend the Master Agreement or otherwise affect any transfer by novation of a Covered Transaction between that Adhering Party and a party which adheres to this Protocol after that Annual Revocation Date occurs.  The foregoing is without prejudice to (A) any amendment to any Master Agreement between two Adhering Parties effected pursuant to this Protocol on or before the day on which that Annual Revocation Date occurs or is deemed to occur and (B) any amendment effected pursuant to this Protocol to any Master Agreement entered into after the day on which that Annual Revocation Date occurs between two Adhering Parties that each adhered to this Protocol on or before that day, which in each case will be (or continue to be) effective.

(ii)    Each Revocation Notice must be delivered by the means specified in the first sentence of Section 5(f) below.

(iii)    Each Adhering Party agrees that, for evidentiary purposes, a conformed copy of a Revocation Notice certified by the General Counsel or an appropriate officer of ISDA will be deemed to be an original.

(iv)    Any purported revocation that ISDA, as agent, determines in good faith is not in compliance with this Section will be void.

(c)    *Amendments.*  An amendment, modification or waiver in respect of the matters contemplated by this Protocol will only be effective if made in accordance with the terms of the relevant Master Agreement and then only with effect between the parties to that Master Agreement (and will only be effective to amend or override the provisions

4

contained in Annex 1 to this Protocol if it expressly refers in writing to this Section of this Protocol and would otherwise be effective in accordance with Section 9(b) of the Master Agreement).

(d)    **Headings.** The headings used in this Protocol and any Adherence Letter are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Protocol or any Adherence Letter.

(e)    **Governing Law.** This Protocol and each Adherence Letter will, as between two Adhering Parties and in respect of the relevant Master Agreement between them, be governed by and construed in accordance with the law specified to govern that Master Agreement and otherwise in accordance with applicable choice of law doctrine.

(f)    **Notices.** Any Adherence Letter or Revocation Notice must be in writing and delivered as a locked PDF (portable document format) attachment to an email to ISDA at protocol@isda.org and will be deemed effectively delivered on the date it is delivered unless on the date of that delivery the New York ISDA office is closed or that communication is delivered after 5:00 p.m., New York time, in which case that communication will be deemed effectively delivered on the next day the New York ISDA office is open. Each Adhering Party agrees that the determination of the date and time of delivery of any Adherence Letter shall be determined by ISDA in its absolute discretion.

## 6. Definitions

(a) "Annual Revocation Date" means, with respect to each calendar year, February 15 of such calendar year. If February 15 in any calendar year is not a day on which the ISDA's New York office is open, the Annual Revocation Date with respect to such calendar year will be deemed to occur on the next day that the ISDA's New York office is open.

(b) "Annual Revocation Period" means the period between January 1 and January 31 of any calendar year.

(c)    "Covered Transaction" means a Credit Derivative Transaction or an Interest Rate Transaction.

(d)    "Credit Derivative Transaction" means any transaction that is identified in the related confirmation as a credit derivative transaction or credit swap transaction or any transaction that incorporates the 1999 ISDA Credit Derivatives Definitions or the 2003 ISDA Credit Derivatives Definitions.

(e)    "Implementation Date" means the date any adherence as between any two Adhering Parties is effective pursuant to Section 2(b) of this Protocol.

(f)    "Interest Rate Transaction" means any transaction in which the payment obligations of both parties to the transaction are calculated solely by reference to the provisions of the 2000 ISDA Definitions or the 1991 ISDA Definitions (other than a

transaction for which one or both of the payment obligations are calculated by reference to the Price Options defined in Section 7.2 of the 1991 Definitions).

(g)    "Master Agreement" means any of the following: (i) the ISDA 2002 Master Agreement; (ii) the 1992 ISDA Master Agreement (Multicurrency – Cross Border); (iii) the 1992 ISDA Master Agreement (Local Currency – Single Jurisdiction); (iv) the 1987 ISDA Interest Rate and Currency Exchange Agreement; and (v) the 1987 ISDA Interest Rate Swap Agreement.

(h)    "Novation Confirmation" means documents and other confirming evidence exchanged between the parties or otherwise effective for the purpose of confirming or evidencing the transfer by novation of a Covered Transaction.

(i)    "Remaining Party" means a party to a Transaction whose consent is required in connection with, or who has consented to, a Transferor's transfer by novation and the acceptance thereof by the Transferee of all the Transferor's rights, liabilities, duties and obligations with respect to such Remaining Party under and in respect of the Novated Amount of a Transaction.

(j)    "Transferee" means a party that proposes to accept, or has accepted, a Transferor's transfer by novation of all the rights, liabilities, duties and obligations of a Transferor with respect to a Remaining Party under and in respect of the Novated Amount of a Transaction.

(k)    "Transferor" means a party to a Transaction that proposes to transfer, or has transferred, by novation to a Transferee all its rights, liabilities, duties and obligations with respect to a Remaining Party and releases and discharges such Remaining Party under and in respect of the Novated Amount of a Transaction.

6

**EXHIBIT 1**
**to ISDA Novation Protocol II**

---

### Form of Adherence Letter

---

### [Letterhead of Adhering Party]

**[Date]**
**Send to:  protocol@isda.org**

Dear Sirs,

**ISDA Novation Protocol II - Adherence**

The purpose of this letter is to confirm our adherence to the ISDA Novation Protocol II as published by the International Swaps and Derivatives Association, Inc. on February 1, 2006 (the "Protocol"). This letter constitutes an Adherence Letter as referred to in the Protocol. The definitions and provisions contained in the Protocol are incorporated into this Adherence Letter, which will supplement and form part of the Master Agreement (now or in the future) between us and each other Adhering Party.

### 1.   Specified Terms

The terms of Annex 1 shall apply.

### 2. Appointment as Agent and Release

We hereby appoint ISDA as our agent for the limited purposes of the Protocol and accordingly we waive, and hereby release ISDA from, any rights, claims, actions or causes of action whatsoever (whether in contract, tort or otherwise) arising out of or in any way relating to this Adherence Letter or our adherence to the Protocol or any actions contemplated as being required by ISDA.

### 3. Contact Details

Our contact details for purposes of this Adherence Letter are:
Name:
Address:
Telephone:
Fax:
E-mail:

7

We consent to the publication of the conformed copy of this letter by ISDA and to the disclosure by ISDA of the contents of this letter.


Yours faithfully,

[ADHERING PARTY][1]
By:
Name:
Title:
Signature:

---

[1] Specify legal name of Adhering Party.

**EXHIBIT II**
**to ISDA Novation Protocol II**

### Form of Revocation Notice

_____
_____

**[Letterhead of Adhering Party]**
**[Date]**

**Send to:  protocol@isda.org**

Dear Sirs,
ISDA Novation Protocol II – Designation of Annual Revocation Date

The purpose of this letter is to notify you that we wish to designate this year's Annual Revocation Date as the last date on which any counterparty may adhere to the ISDA Novation Protocol II as published by the International Swaps and Derivatives Association, Inc. on February 1, 2006 (the "Protocol") in respect of any Master Agreement (now or in the future) between us.

This letter constitutes a Revocation Notice as referred to in the Protocol.

We consent to the publication of the conformed copy of this notice by ISDA on and after the Annual Revocation Date and to the disclosure by ISDA of the contents of this letter.

Yours faithfully,

[ADHERING PARTY][2]

By:

| |
|---|
| Name: |
| Title: |
| Signature: |

---

[2]    Specify legal name of Adhering Party.

9

**ANNEX 1**
**to ISDA Novation Protocol II**

Each of the forms of Master Agreement published by ISDA includes a provision that, subject to certain limited exceptions, neither the Master Agreement nor any interest or obligation in or under the Master Agreement (including any Swap Transaction or Transaction, as defined in the respective Master Agreement) may be transferred by either party without the prior written consent of the other party. Each Master Agreement explicitly provides that any purported transfer not in compliance with the prior written consent requirement will be void.

Consent to transfer may, unless the parties have otherwise agreed, be withheld for any or no reason. Relevant factors in a party's decision whether or not to consent to a transfer may include funding costs, credit exposure concerns, credit valuation charges, collateral, netting, tax, operational, accounting, relationship and other considerations relating to either the Transferor or the Transferee.

Accordingly, each Adhering Party confirms and agrees as follows:

1.    *Familiarity with Certain ISDA Publications.* Each Adhering Party confirms that it is familiar with (a) the "ISDA Statement on Consent Requirement for Transfer of Transactions" published on April 3, 2003 and available at http://www.isda.org/whatsnew/pdf/isdastatement.pdf, and (b) the "Best Practice Statement: Processing Novations" published by the Process Working Group of the ISDA Operations Committee on May 4, 2004 and available at http://www.isda.org/publications/pdf/BestPracticeStatement.pdf. While the documents referred to in (a) and (b) are not legally binding on an Adhering Party, each Adhering Party acknowledges the importance of the issues and processes highlighted in those documents.

2.    *Process of Obtaining Consent.*

   *(a)     Agreement to Protocol Terms.* Notwithstanding Section 7 or Section 9(b) or anything else to the contrary in the Master Agreement between the Adhering Parties and unless the parties to a Master Agreement have previously agreed that prior written consent is not required for the transfer by novation of any rights, liabilities, duties and obligations under such Master Agreement, each Adhering Party agrees that, from and after the Implementation Date, the transfer by novation of any interest or obligation in or under a Covered Transaction may be accomplished in accordance with the terms of this Protocol. The process described in this Annex 1 assumes that, in the transfer by novation of a Covered Transaction, each of the Transferor, the Transferee and the Remaining Party is an Adhering Party. In the event that only two of the Transferor, the Transferee and the Remaining Party are Adhering Parties, such Adhering Parties agree to follow

the process described in this Annex 1 to the extent practicable and consistent with the rights of the party to such transfer by novation that is not an Adhering Party.

**(b)      *Obligations of Transferor.*** Each Adhering Party agrees that, when it is in the position of Transferor in a proposed transfer by novation of a Covered Transaction:

> (i) it shall be responsible for seeking the Remaining Party's consent to a proposed transfer by novation of a Covered Transaction, which consent may be requested by electronic messaging or communications system or email;

> (ii) in such request, it shall identify and copy  the Transferee(s) and shall provide detail sufficient to permit the Remaining Party to identify the Covered Transaction proposed to be transferred, including, at a minimum, the information set forth in the form of request for consent attached as Exhibit A to this Protocol and any other trade details it considers relevant for trade processing; and

> (iii) promptly after obtaining evidence of the Remaining Party's consent as contemplated by Section 2(c) below, it shall provide such evidence to the Transferee, unless it is evident from Remaining Party's response that Transferee has received a copy directly from Remaining Party.

**(c)      *Obligations of Remaining Party.*** Each Adhering Party agrees that, when it is in the position of Remaining Party in a proposed transfer by novation of a Covered Transaction, it will respond promptly to any request made by a Transferor for consent to a proposed transfer by novation of a Covered Transaction on the day on which it receives such request. Such response may be by electronic messaging or communications system or email, shall indicate whether or not Remaining Party consents to such transfer and shall copy any persons copied on Transferor's request for consent.

**(d)      *Obligations of Transferee.*** Each Adhering Party agrees that, when it is in the position of Transferee in a proposed transfer by novation of a Covered Transaction, it will, promptly after it receives evidence of the consent of the Remaining Party to the transfer by novation of a Covered Transaction, confirm with the Remaining Party, by electronic messaging or communications system or email, all relevant trade details of the Covered Transaction that has been transferred.

**(e)      *Effect of Failure or Delay in Obtaining Consent of Remaining Party.***

> (i) Transferor and Transferee agree that they are legally bound by the terms of a transfer by novation of a Covered Transaction from the moment they agree to those terms (whether orally or otherwise), subject only to

the condition that evidence of the consent of the Remaining Party to such transfer is received by the Transferee not later than 6:00 p.m. in the location of the Transferee on the day such transfer is agreed to.

(ii) If evidence of the consent of the Remaining Party to such transfer is not received by Transferee by 6:00 p.m. in the location of the Transferee on the day such transfer is agreed to or if Remaining Party indicates to Transferor and Transferee that it does not consent to such transfer, the following provisions shall apply:

(A) The Transferor and the Transferee shall be deemed not to have entered into a transfer by novation of the Covered Transaction.

(B) The Transferor and the Transferee shall be deemed instead to have entered into a Transaction identical to the Covered Transaction in which Transferor is in the position taken by the Remaining Party in such Covered Transaction and Transferee is in the position taken by the Transferor in such Covered Transaction. The effective date of such new Transaction shall be the effective date of the proposed transfer by novation of the Covered Transaction. All other terms and conditions of the original Covered Transaction will be replicated in the new Transaction such that the Transferor's economic position under the original Covered Transaction shall be offset by its economic position under the new Transaction. The new Transaction shall be a Transaction governed by the Master Agreement between Transferor and Transferee, and a Confirmation of such new Transaction shall be entered into by Transferor and Transferee, as contemplated by Section 9(e)(ii) of the Master Agreement.

(C) Any obligation that Transferor or Transferee may have to make a payment to the other in connection with the proposed transfer of a Covered Transaction shall not be affected by the provisions of this Section 2(e), and such payment shall be made in connection with the new Transaction referred to in Section 2(e)(ii)(B) above at such time and in such amount as originally agreed by the parties.

*(f)* *Agreement to Enter Into Novation Documentation.* Each Adhering Party agrees that a Novation Confirmation will be entered into by Transferor, Transferee and Remaining Party as soon as practicable after consent to transfer by novation of a Covered Transaction is received from the Remaining Party. The Novation Confirmation may be executed and delivered in counterparts (including by facsimile transmission) or may be created by an exchange of telexes, by an exchange of electronic messages or communications on an electronic messaging or communications system or by an exchange of e-mails, which in each case will

be sufficient for all purposes to evidence the transfer by novation of a Covered Transaction.  The parties will specify therein or through another effective means that any such counterpart, telex, electronic message or communication or e-mail constitutes a Novation Confirmation. Failure by the parties to execute a Novation Confirmation shall not affect the validity of a transfer by novation of a Covered Transaction pursuant to the terms of this Annex 1.

3.   **_Failure to Comply._** Any purported transfer for which the consent of the Remaining Party pursuant to the terms of this Annex 1 is not obtained or that is not otherwise in compliance with Section 7 of the relevant Master Agreement shall be void.  Failure by any Adhering Party to comply with the agreements and obligations set forth in this Annex 1 shall not constitute an Event of Default or Potential Event of Default under Section 5(a)(ii) of the relevant Master Agreement.

EXHIBIT A TO
ISDA NOVATION PROTOCOL II

**Standard Email/Bloomberg Message from
Transferor to Remaining Party**

| | |
|---|---|
| From: | [contact name at Transferor] |
| To: | [contact name at Remaining Party] |
| CC: | [contact name at Transferee] |

Re:  Request for Consent to Proposed Transfer
     Transaction References (include if available):
     [Our Reference Number:          ]
     [Your Reference Number:         ]
     [Third Party Reference:  *eg Swapswire, DTCC and reference information*]

We have agreed with the proposed Transferee to the transfer by novation of the transaction described below (the "Transaction"), subject to your consent to such transfer.

Transferor:                              [                    ]

Proposed Transferee:                     [                    ]

Novation Trade Date:                     [                    ]

Trade Date:                              [                    ]

Novated Amount:                       [                    ]

**Details to Include for Credit Derivative Transactions**

Reference Entity / Ticker / RED Code:    [                    ]

Reference Obligation / CUSIP:            [                    ]

Scheduled Termination Date:              [                    ]

[Notional allocation                              ]

[Non-Standard Terms                               ]

**Details to Include for Interest Rate Derivative Transactions**

Termination Date:                        [                    ]

Notional Amount:                         [                    ]

[Fixed Rate:]                            [                    ]

[Floating Rate:]                         [                    ]

Please advise promptly as to your consent to the transfer by novation of this Transaction, by replying to all addressees of this email and indicating your decision regarding consent.

# **EXHIBIT D**

From:                    Assignments ML [assignments@ml.com]
Sent: 08-13555-mg    Doc 22100ay, September 10, 2008 9:13 AM  11/14/11 16:26:48    Main Document
To:                      Stevens, Jack; Assignments CQSK; Assignments ML NYK; Assignments LB LDN
Cc:                      ABS Novations NY; Barnett, Tasha A
Subject:                 RE: ABX.HE.06-1 AA 32bp Jul45/#10  - CQS Ref CDS_172597 Novation - Please provide
                         consent

Attachments:             RE: ABX.HE.06-1 AA 32bp Jul45/#10  - CQS Ref CDS_172597 Novation - Please provide
                         consent

RE: ABX.HE.06-1
AA 32bp Jul45/...
             Please see attached consent

-----Original Message-----
From: Stevens, Jack [mailto:jack.stevens@lehman.com]
Sent: Wednesday, September 10, 2008 8:55 AM
To: Assignments CQSM; Assignments ML NYK; Assignments LB LDN
Cc: ABS Novations NY; Barnett, Tasha A
Subject: RE: ABX.HE.06-1 AA 32bp Jul45/#10 - CQS Ref CDS_172597 Novation
- Please provide consent


Cc'ing abs

-----Original Message-----
From: ABatFAExec [mailto:ABatFAExec@cqsm.com] On Behalf Of Assignments
CQSM
Sent: 10 September 2008 13:51
To: Assignments ML NYK; Assignments LB LDN
Cc: Assignments CQSM
Subject: ABX.HE.06-1 AA 32bp Jul45/#10 - CQS Ref CDS_172597 Novation -
Please provide consent

We have agreed with the proposed Transferee to the transfer by novation
of the transaction described below, subject to your consent to such
transfer.


NOVATION TRADE
 Our Reference        : ABX.HE.06-1 AA 32bp Jul45/#10 (Trade 1051517)
 Transferor           : CQS ABS Master Fund (Jeremy Deacon)
 Proposed Transferee  : Lehman Bros.International - London
 Remaining Party      : Merrill Lynch New York
 Trade Date           : 2008-09-10
 Effective Date       : 2008-09-11
 Nominal              : 5,000,000
 Currency             : USD

ORIGINAL TRADE
 Broker Reference     :
 Reference Obligation :  ()
 Reference Entity - Seniority     : ABX.HE.06-1 AA (0A08AGAA9) - SNR
 Trade Date           : 2008-08-25
 Effective Date       : 2008-04-25
 Maturity             : 2045-07-25
 Buy Protection       : Merrill Lynch New York
 Sell Protection      : CQS ABS Master Fund

                                  1

```
Nominal                : 5,000,000
Currency               : USD
Spread                 : 0.32
Restructuring          : ex
First Payment Date     : 2008-06-03
```

Please advise promptly as to your consent to the transfer by novation of
this transaction, by replying to all addressees of this email and
indicating your decision regarding consent.
Please note that the original trade may not yet have been legally
executed.

Thanks.

Assignments@cqsm.com
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -

This message is intended only for the personal and confidential use of
the designated recipient(s) named above.  If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited.  This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers.  Email
transmission cannot be guaranteed to be secure or error-free.
Therefore, we do not represent that this information is complete or
accurate and it should not be relied upon as such.  All information is
subject to change without notice.
--------------------------------------------------------

This message w/attachments (message) may be privileged, confidential or proprietary, and
if you are not an intended recipient, please notify the sender, do not use or share it and
delete it. Unless specifically indicated, this message is not an offer to sell or a
solicitation of any investment products or other financial product or service, an official
confirmation of any transaction, or an official statement of Merrill Lynch. Subject to
applicable law, Merrill Lynch may monitor, review and retain e-communications (EC)
traveling through its networks/systems. The laws of the country of each sender/recipient
may impact the handling of EC, and EC may be archived, supervised and produced in
countries other than the country in which you are located. This message cannot be
guaranteed to be secure or error-free. This message is subject to terms available at the
following link: http://www.ml.com/e-communications_terms/. By messaging with Merrill Lynch
you consent to the foregoing.
--------------------------------------------------------

2

## EXHIBIT E

From:     Assignments ML [assignments@ml.com]
Sent:     08-13555-mg   Doc 22109, Filed 11/04/2008 sentered 11/14/11 16:26:48   Main Document
To:       Assignments CQS; Assignments Page 31 of 31K; Assignments LB LDN
Subject:  RE: ABX.HE.06-1 AA 32bp Jul45/#10  - CQS Ref CDS_172597 Novation - Please provide
          consent

ML Agrees  ntd 9/10/08  e/d 9/11/08
08ML132925A      656599   ABXN    5.0000000              ABX.HE.AA.06-1
ML buys
NOR

-----Original Message-----
From: ABatFAExec [mailto:ABatFAExec@cqsm.com] On Behalf Of Assignments
CQSM
Sent: Wednesday, September 10, 2008 8:51 AM
To: Assignments ML NYK; Assignments LB LDN
Cc: Assignments CQSM
Subject: ABX.HE.06-1 AA 32bp Jul45/#10 - CQS Ref CDS_172597 Novation -
Please provide consent

We have agreed with the proposed Transferee to the transfer by novation
of
the transaction described below, subject to your consent to such
transfer.


NOVATION TRADE
 Our Reference       : ABX.HE.06-1 AA 32bp Jul45/#10 (Trade 1051517)
 Transferor          : CQS ABS Master Fund (Jeremy Deacon)
 Proposed Transferee : Lehman Bros.International - London
 Remaining Party     : Merrill Lynch New York
 Trade Date          : 2008-09-10
 Effective Date      : 2008-09-11
 Nominal             : 5,000,000
 Currency            : USD

ORIGINAL TRADE
 Broker Reference    :
 Reference Obligation :  ()
 Reference Entity - Seniority    : ABX.HE.06-1 AA (0A08AGAA9) - SNR
 Trade Date          : 2008-08-25
 Effective Date      : 2008-04-25
 Maturity            : 2045-07-25
 Buy Protection      : Merrill Lynch New York
 Sell Protection     : CQS ABS Master Fund
 Nominal             : 5,000,000
 Currency            : USD
 Spread              : 0.32
 Restructuring       : ex
 First Payment Date  : 2008-06-03

Please advise promptly as to your consent to the transfer by novation
of this transaction, by replying to all addressees of this email and
indicating your decision regarding consent.
Please note that the original trade may not yet have been legally
executed.

Thanks.

Assignments@cqsm.com

1