**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000
Harold S. Novikoff
Amy R. Wolf
Douglas K. Mayer
Ian Boczko
Karen Lin

*Attorneys for JPMorgan Chase Bank, N.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | Case No. 08-13555 (JMP) |
| Debtors. | : | |
| In re | : | |
| LEHMAN BROTHERS INC., | : | Case No. 08-01420 (JMP) SIPA |
| Debtor. | : | |

**RESPONSE OF JPMORGAN CHASE BANK, N.A. TO OBJECTION TO
PORTIONS OF PROOFS OF CLAIM NO. 66462 AGAINST LEHMAN BROTHERS
HOLDINGS INC. AND NO. 4939 AGAINST LEHMAN BROTHERS INC.
<u>REGARDING TRIPARTY REPO-RELATED LOSSES</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................. 5

    A.      JPMorgan's claims against LBI under the Clearance Agreement ..........................5

    B.      JPMorgan's claims against LBHI under the August and September
           Agreements ........................................................................................................7

    C.      JPMorgan's sale of LBI Securities Collateral..........................................................9

    D.      Collateral Disposition Agreement.....................................................................14

    E.      Payment of JPMorgan's claims .........................................................................16

    F.      Settlements with Barclays.................................................................................18

    G.      Settlement with LBI .........................................................................................20

RESPONSES TO OBJECTIONS ........................................................................................... 22

POINT I       JPMORGAN SOLD THE LBI SECURITIES COLLATERAL IN A
              COMMERCIALLY REASONABLE MANNER ................................................. 22

    A.      Legal Standard ..................................................................................................22

    B.      JPMorgan's liquidation of the LBI Securities Collateral was
           commercially reasonable under Article 9 of the N.Y. U.C.C. .............................24

          1.      JPMorgan's liquidation fell within section 9-627(b)'s safe harbors..........25

                   a.      JPMorgan sold most of the LBI Securities
                        Collateral in the usual manner in recognized
                        markets ...........................................................................26

                   b.      JPMorgan acted in conformity with reasonable
                        commercial practices among dealers ................................27

          2.      Every aspect of JPMorgan's liquidation was commercially
               reasonable ...............................................................................................29

                   a.      JPMorgan used commercially reasonable
                        procedures to liquidate the collateral ................................31

                   b.      JPMorgan sold LBI Securities Collateral at
                        commercially reasonable prices.........................................35

         c.      JPMorgan's purchases of LBI Securities Collateral
were commercially reasonable............................................38

POINT II      ANY VALUE RECEIVED BY JPMORGAN FROM BARCLAYS
SHOULD NOT REDUCE THE LBI CLEARANCE CLAIM AND LBHI
DEFICIENCY CLAIM ......................................................................................... 39

POINT III     JPMORGAN'S INTEREST CLAIM SHOULD BE ALLOWED........................ 45

    A.     JPMorgan is not undersecured ...............................................................................45

    B.     JPMorgan's interest claim is neither inequitable nor subject to
disallowance.........................................................................................................46

# TABLE OF AUTHORITIES

**Page**

**Cases**

*AKA Mgmt., Inc.* v. *Branch Banking & Trust Co.*,
    621 S.E.2d 576 (Ga. Ct. App. 2005) .................................................................................32

*Bankers Trust Co.* v. *J.V. Dowler & Co., Inc.*,
    47 N.Y.2d 128 (1979) ............................................................................24, 26, 27, 31, 36

*Cent. Soya Co.* v. *Epstein Fisheries, Inc.*,
    676 F.2d 939 (7th Cir. 1982) .........................................................................................43 n.9

*Colonial Pac. Leasing Corp.* v. *Elite S-W Mo., Inc.*,
    2010 WL 3119448 (W.D. Mo. Aug. 4, 2010) ..................................................................28

*Commerce Commercial Leasing, LLC* v. *PIO Enters., Inc.*,
    78 A.D.3d 1105 (2d Dep't 2010) ...............................................................................22-23

*Coxall* v. *Clover Commercial Corp.*,
    781 N.Y.S.2d 567 (Civ. Ct. 2004) ..............................................................23-24, 29-30, 31

*Davis* v. *Concord Commercial Corp.*,
    434 S.E.2d 571 (Ga. App. 1993) .....................................................................................28

*ESL Fed. Credit Union* v. *Bovee*,
    801 N.Y.S.2d 482 (Sup. Ct. 2005) .................................................................................23

*First Fed. Sav. & Loan Ass'n of Rochester* v. *Romano*,
    253 A.D.2d 363 (1st Dep't 1998) ...............................................................................35, 36

*First Nat'l Bank of Glens Falls* v. *G.F. Clear, Inc.*,
    93 A.D.2d 925 (3d Dep't 1983) ....................................................................................28, 32

*Ga.-Pac. Corp.* v. *First Wis. Fin. Corp.*,
    805 F. Supp. 610 (N.D. Ill. 1992) ...................................................................................32

*Hicklin* v. *Onyx Acceptance Corp.*,
    970 A.2d 244 (Del. 2009) ...............................................................................................23

*In re Circuit City Stores, Inc.*,
    426 B.R. 560 (Bankr. E.D. Va. 2010) .........................................................................43 n.9

*In re El Paso Ref. Inc.*,
    192 B.R. 144 (Bankr. W.D. Tex. 1996) .......................................................................43 n.9

*In re Emergency Beacon Corp.*,
  48 B.R. 341 (S.D.N.Y. 1985) ...............................................................................................38

*In re Excello Press, Inc.*,
  890 F.2d 896 (7th Cir. 1989) ...............................................................................................37

*In re Exec. Office Ctrs., Inc.*,
  96 B.R. 642 (Bankr. E.D. La. 1988) .....................................................................................42

*In re Lapiana*,
  909 F.2d 221 (7th Cir. 1990) .............................................................................. 47-48, 47 n.11

*In re Lehman Bros. Holdings Inc.*,
  445 B.R. 143 (Bankr. S.D.N.Y. 2011) .............................................................3, 6, 36 n.8, 37

*In re Pilgrim's Pride Corp.*,
  453 B.R. 691 (Bankr. N.D. Tex. 2011) .............................................................................43 n.9

*In re W.T. Grant Co.*,
  4 B.R. 53 (Bankr. S.D.N.Y. 1980) .......................................................................................42

*Jason* v. *Carpet Cleaning, Inc.*
  (*In re Jason*),
  2007 WL 4553608 (Bankr. E.D. Va. Dec. 19, 2007) .......................................................42 n.9

*Laczko* v. *Toledo Trust Co.*,
  1985 WL 7507 (Ohio Ct. App. June 14, 1985).......................................................................32

*Layne* v. *Bank One, Ky., N.A.*,
  395 F.3d 271 (6th Cir. 2005) .........................................................................................26, 27

*Lincoln First Bank, N.A.* v. *Salvaterra*,
  437 N.Y.S.2d 611 (Cnty. Ct. 1981) ................................................................................ 24-25

*L. Perrigo Co.* v. *Robins*,
  2009 WL 2095990 (W.D. Mich. July 14, 2009).....................................................................34

*Moore* v. *Driggers*
  (*In re Morgan*),
  2003 WL 1728667 (Bankr. S.D. Ga. Mar. 14, 2003) .......................................................43 n.9

*Morris* v. *Citibank*,
  1999 WL 461161 (S.D.N.Y. July 6, 1999) ............................................................................35

*Moulded Prods., Inc.* v. *Barry*,
  (*In re Moulded Prods., Inc.*),
  474 F.2d 220 (8th Cir. 1973) ...............................................................................................42

*Nat'l Hous. P'ship* v. *Mun. Capital Appreciation Partners*, *I, L.P.*
    935 A.2d 300 (D.C. Ct. App. 2007)...............................................................29, 34

*Old Colony Trust Co.* v. *Penrose Indus. Corp.*,
    280 F. Supp. 698 (E.D. Pa. 1968)...............................................................33

*Panora State Bank* v. *Dickinson*,
    2006 WL 228882 (Iowa Ct. App. Feb. 1, 2006) .................................... 32-33

*PNC Bank, Nat'l Ass'n* v. *Park Forest Dev. Corp.*
    *(In re Park Forest Dev. Corp.)*,
    197 B.R. 388 (Bankr. N.D. Ga. 1996) .........................................................43 n.9

*Rochester* v. *Thomas*,
    59 A.D.3d 242 (4th Dep't 1977)...............................................................23

*Rozel Indus., Inc.* v. *Internal Revenue Serv.*
    *(In re Rozel Indus, Inc.)*,
    120 B.R. 944 (Bankr. N.D. Ill. 1990) .......................................................48

*Siemens Credit Corp.* v. *Marvik Colour, Inc.*,
    859 F. Supp. 686 (S.D.N.Y. 1994).............................................................23

*SNCB Corp. Fin. Ltd.* v. *Schuster*,
    877 F. Supp. 820 (S.D.N.Y. 1994).............................................................30, 37

*Solomon* v. *Wein*
    *(In re Huhn)*,
    145 B.R. 872 (W.D. Mich. 1992) ...............................................................48

*Suffield Bank* v. *LaRoche*,
    752 F. Supp. 54 (D.R.I. 1990).................................................................26

*Sumner* v. *Extebank*,
    88 A.D.2d 887 (1st Dep't 1982) ...............................................................37

*United States* v. *Oakland City Apartments*
    *(In re Oakland City Apartments)*,
    1 B.R. 123 (Bankr. N.D. Ga. 1979) .........................................................43 n.9

*United States* v. *Ron Pair Enters., Inc.*,
    489 U.S. 235 (1989)......................................................................... 46-47, 50

*Washburn* v. *Union Nat'l Bank & Trust Co. of Juliet*,
    502 N.E.2d 739 (Ill. App. 1986) .............................................................26, 27

**Other Authorities**

4 James J. White & Robert S. Summers, Uniform Commercial Code
  § 34-11(e)(2) (6th ed. 2010)....................................................................................30

11 U.S.C.A. § 506 (West 2005)...............................................................45, 46, 47, 50

11 U.S.C.A. § 546 (West 2006).........................................................................45

N.Y. U.C.C. § 9-102 (McKinney) ..............................................................22 n.7

N.Y. U.C.C. § 9-504 (McKinney) ................................................................23, 27

N.Y. U.C.C. § 9-507 (McKinney) ................................................................23, 29

N.Y. U.C.C. § 9-610 (McKinney) ........................................................22, 29, 33, 34, 38

N.Y. U.C.C. § 9-625 (McKinney) ...................................................................24

N.Y. U.C.C. § 9-626 (McKinney) ......................................................22, 22 n.7, 23

N.Y. U.C.C. § 9-627 (McKinney) ..............................22, 23, 25, 26, 27, 28, 29, 32, 34

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

     **JPMORGAN CHASE BANK, N.A.** ("JPMorgan"), by and through its

undersigned counsel, hereby submits this response (the "Response") to the "Objection to

Portions of Proofs of Claim No. 66462 Against Lehman Brothers Holdings Inc. and No. 4939

Against Lehman Brothers Inc. of JPMorgan Chase Bank, N.A. Regarding Triparty Repo-Related

Losses," dated August 31, 2011 (the "Objection"), filed by Lehman Brothers Holdings Inc.

("LBHI") and its official creditors committee (the "Committee," together the "Objectors").

Capitalized terms used herein without definition have the meanings ascribed thereto in the

Objection, and LBHI and LBI are referred to jointly as "Lehman."  In support of its Response,

JPMorgan respectfully states as follows:

## PRELIMINARY STATEMENT

     Following Lehman's massive defaults in repaying JPMorgan's clearing-related

extensions of credit, JPMorgan was left with the monumental task of selling the securities

collateral posted by Lehman in what might well be the largest liquidation of securities collateral

ever.  The LBI securities collateral left for JPMorgan to sell were the securities that Barclays

chose not to purchase when it acquired LBI's business and most of its assets.  Objectors

themselves concede that much of the securities collateral remaining after the sale was highly

illiquid and lacked any price information through Bloomberg.  *See* Objection ¶ 57.  Even worse

than the LBI collateral was the collection of securities that LBHI had posted as collateral, which

was entirely illiquid.  Furthermore, Lehman's bankruptcy, together with the prospects for failure

of several other systemically important firms, confronted JPMorgan with tumultuous markets as

further obstacles to achieving successful sales.

JPMorgan tackled this daunting task with a high degree of professionalism, devoting enormous resources from its world-class securities trading operation. JPMorgan timely analyzed the more than 4,600 different securities that Barclays left behind, and allocated them to the appropriate trading desks for further analysis and sales that were targeted, strategic and informed. JPMorgan's traders sold what they could reasonably sell at favorable prices and protected the Lehman estates by not forcing a fire sale of the most illiquid securities. JPMorgan was successful in generating more than $18 billion of cash proceeds – representing nearly 90% of the securities' undiscounted marks provided by pricing vendors, Lehman and other dealers, and were reflected on JPMorgan's systems as of September 17, 2008 – through commercially reasonable sales of the LBI securities collateral in some of the most difficult markets in modern times.

Any dispassionate review of the results of JPMorgan's efforts would conclude that, not only did JPMorgan conduct a commercially reasonable collateral liquidation, but that JPMorgan did a far better job of selling Lehman securities than Lehman did itself in the transaction with Barclays Capital. The combination of the proceeds from JPMorgan's hugely successful sales, the $8.6 billion of cash collateral that had been posted by LBHI, and JPMorgan's decision not to engage in fire sales made it possible for LBHI's estate to obtain from JPMorgan billions of dollars of illiquid securities pursuant to the Collateral Disposition Agreement. The assets underlying those securities — principally real estate and corporate loans — now constitute a significant portion of the chapter 11 estate's assets which are being turned into cash over a period of years by the estate and its professionals. JPMorgan's success in achieving excellent recoveries, for which it charged Lehman nothing, redounded not only to its own benefit, but to Lehman's benefit as well.

Rather than acknowledging the reality that JPMorgan achieved an outstanding overall result, however, Objectors have seen fit to pick through the more than 4,400 securities sale transactions conducted by JPMorgan and second-guess, and take potshots at, a mere handful of them in an effort to portray JPMorgan as both unconcerned about the results of its liquidation efforts and overreaching.  Objectors' challenges are meritless and totally divorced from the realities of the markets when the sales occurred.  For example, Objectors resurrect their argument – already rejected by this Court in their unsuccessful Rule 60(b) challenge to the Barclays transaction, *see In re Lehman Brothers Holdings Inc.*, 445 B.R. 143, 182-87 (Bankr. S.D.N.Y. 2011) [hereinafter *60(b) Decision*] – that stale, theoretical, often unrealistic prices for Lehman's illiquid structured securities represent the amount for which they could have been sold in those markets.  Even more obtusely, Objectors assert that JPMorgan's traders should have conducted public auctions of the securities, without any apparent recognition that public auctions would have turned an orderly and highly successful sales process into a fire sale of epic proportions. Evidently determined to attack JPMorgan at every turn, with or without good reason, Objectors even engage in the perverse exercise of criticizing JPMorgan for *not* charging Lehman for the cost of the liquidation.

Objectors also accuse JPMorgan of taking many securities onto its own books for its own advantage.  Again they disregard the economic realities that made doing so to Lehman's advantage.  Due to the state of the markets following Lehman's failure, sometimes the best alternative was for JPMorgan to accept the risk of further market deterioration and purchase the securities itself.  In almost all of these instances, the securities were liquid and sold in recognized markets —  though the quantities to be sold often far exceeded normal transaction size and the ability of the weakened markets to absorb them — and JPMorgan solicited bids and matched or

topped any bids received.  Though JPMorgan's willingness to shoulder this additional risk

worked to Lehman's benefit, much of Objectors' harshest criticism is aimed at those transactions

in which JPMorgan accepted the risk but ultimately recovered on those securities more than it

paid for them.  In any event, those transactions accounted for just a small percentage of the total,

and it was inevitable that JPMorgan would later recover on some securities more than it paid.

Particularly in view of the volatility of the markets, that occasional outcome says nothing about

the fairness of the initial price obtained on those trades.  And, of course, Objectors barely

mention the numerous instances in which JPMorgan recovered *less* than it paid.

Objectors assert two additional claim objections:  (1) LBHI is somehow entitled

to the alleged consideration paid by Barclays in settlement of JPMorgan's claim against Barclays

for a breach of Barclays' own separate representation to JPMorgan, even though LBHI was not a

party to the settlement and the settlement agreement states that LBHI is not entitled to any

benefit thereunder; and (2) based on the indisputably premature and unwarranted assumption that

Objectors will prevail in their undecided adversary proceeding (the "Adversary Proceeding"),

JPMorgan's claim for postpetition interest should be disallowed.  Neither of these positions has

any merit, as shown in detail below.

Admittedly, the Objection cannot be entirely decided solely on the parties' initial

submissions.  This Response is intended to give an overview of JPMorgan's positions.  In due

course, JPMorgan will file motions addressed to matters of law and present evidence supporting

its positions as appropriate on a motion for summary judgment or at an evidentiary hearing.

JPMorgan looks forward to the opportunity to demonstrate fully that – in the most difficult of

circumstances – it conducted the sales with a high degree of professionalism and in a

commercially reasonable manner, obtained fair market values for the securities sold, and

achieved by the diligence and hard work of its traders excellent results that conferred a

substantial benefit on the Lehman estates.

## BACKGROUND

**A.      JPMorgan's claims against LBI under the Clearance Agreement**

1.      From June 2000 through September 2008, JPMorgan served as LBI's

primary securities clearing bank.  In that capacity, JPMorgan facilitated the clearance and

settlement of securities transactions on behalf of LBI, including acting as agent for LBI and its

customers in connection with triparty repurchase agreements (referred to as "triparty repos"), all

in accordance with the Clearance Agreement entered into between LBI and JPMorgan in June

2000 (as amended from time to time, and including the related Custodial Undertakings for

triparty repos, the "Clearance Agreement," *see* Ex. A).

2.      Throughout the term of the Clearance Agreement, JPMorgan extended

credit to LBI at the start of each trading day to settle (or "unwind") the outstanding triparty repos

by paying to the triparty repo investors, on LBI's behalf, the repurchase price for those repos.

Contemporaneously with such payments, JPMorgan transferred the repurchased securities from

the triparty repo investors' overnight collateral accounts (referred to as "shells") back into LBI's

clearance accounts so that the securities would be available intraday for LBI's broker-dealer

activities.

3.      During the course of each trading day, JPMorgan cleared and settled

securities transactions for LBI and extended intraday credit to LBI to facilitate the clearance and

settlement of those securities transactions.  At the end of each trading day, JPMorgan's

extensions of credit would typically be fully repaid through a combination of the purchase prices

paid by triparty repo investors and the proceeds of other LBI financings.  When JPMorgan was

not fully repaid by the end of the trading day, JPMorgan would typically make an overnight "fail

financing" to LBI, *i.e.*, an overnight loan secured by securities collateral not allocated to triparty

repo shells.  Pursuant to Section 11 of the Clearance Agreement, LBI granted JPMorgan a

security interest in all of its accounts, all of the securities, cash and other property in such

accounts, and all of the proceeds thereof (collectively, the "LBI Collateral," and the securities

portion of the LBI Collateral, the "LBI Securities Collateral") to secure LBI's obligations to

JPMorgan under the Clearance Agreement.  *See* Ex. A, § 11.

4.      Even after LBHI commenced its chapter 11 case before the opening of

trading on September 15, 2008, JPMorgan continued to clear and settle LBI's securities activities

during the week of September 15 through September 19, 2008, and, in connection therewith,

extended tens of billions of dollars of credit to LBI pursuant to the Clearance Agreement each

day.  JPMorgan's ongoing support avoided a mass fire sale of LBI's securities portfolio by

triparty repo investors and other creditors exercising default rights.  JPMorgan's continued

financing also made possible the sale of LBI's business and much of its assets as a going concern

to Barclays Capital Inc. ("Barclays"), together with the attendant preservation of jobs, orderly

transfer of thousands of LBI customer accounts, and mitigation of systemic risk.  *See 60(b)*

*Decision*, 445 B.R. 143, 153.

5.      Notwithstanding Lehman's assurances to JPMorgan that, upon

consummation of the Barclays' transaction, Lehman would sell the securities in LBI's triparty

repo book to Barclays and would repay in full all of JPMorgan's extensions of credit under the

Clearance Agreement, Lehman did not do so.  Consequently, JPMorgan was left with

$25,279,675,964 of unpaid extensions of credit following the commencement by the Securities

Investor Protection Corporation ("SIPC") of LBI's liquidation proceeding (the "LBI

Proceeding") under the Securities Investor Protection Act, which resulted in an order dated

September 19, 2008 (the "LBI Liquidation Order"), appointing James W. Giddens as trustee (the

"LBI Trustee").[1]  JPMorgan validly and timely filed proof of claim number 4939 in the LBI

Proceeding for that claim (the claim, together with all interest accrued thereon and related

amounts owing by LBI, the "LBI Clearance Claim").  *See* JPMorgan's Proof of Claim No. 66462

Against LBHI (Ex. B), Amended and Restated Annex to the JPMorgan Proof of Claim Against

LBI, at 2.

6.    On September 22, 2008, JPMorgan entered into the Services and

Settlement Agreement (the "SSA," *see* Ex. C) with LBHI, the LBI Trustee, SIPC and Barclays.

Pursuant to the SSA, LBHI, the LBI Trustee and SIPC expressly consented to the exercise by

JPMorgan of its contractual rights with respect to any securities contract, repurchase agreement,

swap agreement and other safe-harbor contracts with LBI notwithstanding any provision of the

LBI Liquidation Order or otherwise.  As described below, JPMorgan exercised its rights as a

secured creditor, in accordance with the Clearance Agreement and the SSA and in compliance

with applicable law, against the LBI Securities Collateral to recover most of the LBI Clearance

Claim.

**B.    JPMorgan's claims against LBHI under the August and September Agreements**

7.    On or about August 29, 2008, LBHI executed and delivered to JPMorgan

the August Agreements whereby LBHI, among other things, (a) guaranteed payment of all

obligations owing by LBI to JPMorgan under the Clearance Agreement, *see* August Guaranty

---

[1]    This claim amount is as of October 1, 2008, and gives effect to the postpetition cure of certain failed
securities transactions and receipt of certain payments in accordance with the LBI Liquidation Order and the
Services and Settlement Agreement discussed *infra* ¶¶ 6, 29-30.

(Ex. D), and (b) secured such obligations by granting a security interest in favor of JPMorgan in collateral (the "LBHI Securities Collateral") comprising certain accounts, the cash, securities and other property contained in such accounts (including securities known as Fenway, Spruce, Verano and Pine), and the proceeds thereof, *see* August Security Agreement (Ex. E).

8.      On or about September 10, 2008, LBHI executed and delivered to JPMorgan the September Agreements whereby LBHI, among other things, (a) guaranteed the payment of all obligations owing by all of LBHI's subsidiaries to JPMorgan and all of its subsidiaries and affiliates, including LBI's obligations to JPMorgan under the Clearance Agreement, *see* September Guaranty (Ex. F), and (b) secured those obligations by granting a security interest in favor of JPMorgan in all of its accounts, the securities, cash and other property contained in such accounts, and the proceeds thereof, *see* September Security Agreement (Ex. G).  In addition, from September 9 through September 12, 2008, LBHI delivered to JPMorgan a total of approximately $8.6 billion of cash and money market fund collateral (the "LBHI Cash Collateral" and, together with the LBHI Securities Collateral, the "LBHI Collateral").

9.      On LBHI's motion, which the Federal Reserve Bank of New York and JPMorgan supported, this Court entered an order on September 16, 2008, (a) confirming that the extensions of credit made on and after September 15, 2008, under the Clearance Agreement would be allowed as claims under the August Agreements and September Agreements and secured by the LBHI Collateral to the same extent as if such extensions had been made prior to the commencement of LBHI's chapter 11 case, and (b) authorizing such extensions under section 364 of the Bankruptcy Code to the extent that they constituted postpetition incurrence of debt.

*See* Order Pursuant to Section 105 of the Bankruptcy Code Confirming Status of Clearing

Advances, D.I. 47 (Bankr. S.D.N.Y. Sept. 16, 2008) (Ex. H).

10.    As a result of the August Agreements and September Agreements,

JPMorgan had a claim against LBHI for the amount of the LBI Clearance Claim secured by the

LBHI Collateral.  JPMorgan duly and timely filed amended proof of claim number 66462 in

LBHI's chapter 11 case for that claim (the claim against LBHI, together with all interest accrued

thereon and related amounts owing by LBHI, the "LBHI Deficiency Claim").  *See* Ex. B.

## C.    JPMorgan's sale of LBI Securities Collateral

11.    Following the commencement of the LBI Proceeding, JPMorgan applied

account balances and transferred a substantial amount of the LBI Securities Collateral to cash

purchasers in accordance with prepetition instructions from LBI, all in accordance with the SSA

and the LBI Liquidation Order.  Even after this was accomplished, however, JPMorgan was still

owed more than $25 billion under the Clearance Agreement as described above.  JPMorgan had

no choice but to exercise its rights as a secured creditor against the LBI Collateral and the LBHI

Collateral to recover on the huge balance still owing to it as a result of Lehman's defaults.

12.    The task facing JPMorgan was enormous.  There were more than 4,600

different securities CUSIPs in the LBI Securities Collateral.  A substantial portion of the LBI

Securities Collateral consisted of high-quality, readily-marketable securities, such as U.S.

Treasury and agency debt instruments.  But much of the LBI Securities Collateral was

substantially more difficult to sell and value, including USAID bonds, asset-backed commercial

paper, auction rate securities ("ARS," both preferred stock and municipal bonds), common stock,

convertible stock, American Depositary Receipts ("ADRs"), high-yield corporate bonds, general

obligation municipal bonds, nonprofit-organization bonds, agency mortgage pass-through securities, subprime mortgage-backed securities, collateralized debt obligations ("CDOs") backed by real estate and other investments, collateralized loan obligations ("CLOs") backed by corporate loans, residential mortgage-backed securities, commercial mortgage-backed securities and other structured credits.  Objectors themselves estimate that more than 30% of the LBI Securities Collateral was illiquid and lacked price information on Bloomberg.  *See* Objection ¶ 57.

13.     The LBHI Securities Collateral was even worse.  It consisted of a small number of very large denomination securities, all of which were illiquid.  Indeed, JPMorgan was never able to sell any of them.

14.     As it embarked upon the liquidation process, during one of the most tumultuous periods in American financial history, JPMorgan had no basis for confidence that the LBI Securities Collateral could be sold in the then current markets for amounts sufficient to satisfy in full the LBI Clearance Claim, or that the LBI Collateral and the LBHI Collateral could satisfy all of the claims secured thereby.  The marks (without any discount or haircut, the "Pre-Failure Marks") recorded in the JPMorgan Treasury and Securities Services ("TSS") system had been provided by LBI, other broker-dealers and third-party vendors.  While the Pre-Failure Marks for highly liquid, readily marketable securities were generally based on observable market transactions, the marks for securities with no or relatively few trades were far less reliable.  In many cases, the Pre-Failure Marks were based on financial models reflecting a theoretical "inherent" value if the securities were held to maturity rather than sold in the then current discount-ridden market.  In other cases, the Pre-Failure Marks were based on stale transaction information or supposedly comparable sales of similarly rated securities (even when downgrades

of the Lehman-posted securities now appeared imminent).  Perhaps the least reliable were

Lehman's own marks, often at par or other inflated values and often covering securities

structured by Lehman itself, for which little information was available.  For some of these

structured securities, the mark was derived from Lehman's own credit support, precisely the risk

that the collateral was intended to secure against.

15.    Thus, even *before* Lehman failed many of the Pre-Failure Marks for the

LBI Securities Collateral and LBHI Securities Collateral were not reliable indicators of the

prices at which such securities could actually be sold in the markets.  But JPMorgan had to

contend with markets that were in turmoil as a result of Lehman's bankruptcy, not to mention the

prospect of possible failures of AIG, Goldman Sachs, Morgan Stanley and other systemically

important firms.  Those markets had fallen generally and were continuing to fall, and the few

purchasers remaining in the market had a strong aversion to risk.  Thus, real estate-based

securities and other structured securities were selling at steep discounts from their inherent

values, subordinate and mezzanine positions were viewed as undesirable, and selling failed

securities such as ARS presented extraordinary challenges.  Furthermore, many of the LBI

securities positions were so large that sales of such outsized positions could themselves

significantly affect the prices of those securities.  Even worse, a number of securities valued in

the aggregate by Lehman at several billion dollars were structured with credit support from

LBHI or one of its now-defunct subsidiaries.

16.    JPMorgan thus viewed recovery on its claims under the Clearance

Agreement as vitally dependent on the values that it could obtain from the disposition of the LBI

Collateral, and recognized that maximizing its recovery would require traders with expertise in

the relevant markets to execute transactions effectively.  By any measure, JPMorgan had a

substantial economic stake in the success of the securities sales.

17.     Although the LBI Clearance Claim originated in JPMorgan's TSS

business line, JPMorgan determined that using its Investment Bank business line to handle the

sale would optimize the sales' results because the Investment Bank had a world-class securities

trading operation and experienced personnel with extensive expertise in trading a wide range of

securities.  The sales effort by the Investment Bank was known internally as Project Tassimo.

18.     JPMorgan sought to maximize the proceeds to be obtained from the LBI

Securities Collateral by conducting the sales as if it were acting on behalf of a customer.  No

single sales method would optimize the sale of all of the LBI Securities Collateral; a U.S.

Treasury bond should not be sold in the same manner as a subordinated CDO tranche, and an

ARS municipal bond could not be sold in the same manner as a high-yield corporate bond.

Thus, JPMorgan grouped the LBI Securities Collateral so that similar securities could be

allocated to traders with expertise and experience in selling collateral of that type.  The traders

were instructed to use their expertise to sell the securities to maximize the sale proceeds.  In

some instances this meant selling the securities in the usual manner in a recognized market for

those securities; in others, it meant selling at the current price in a recognized market; and in

others, it meant selling in conformity with reasonable commercial practices among dealers in the

type of security to be sold.  The traders were instructed not to charge brokerage fees or similar

charges, even though JPMorgan was entitled to payment of reasonable brokerage fee

commissions under Sections 11(c) and 16 of the Clearance Agreement.  *See* Ex. A, §§ 11(c), 16.

19.     JPMorgan acted appropriately, fairly and diligently in selling the LBI
Securities Collateral.  It recognized that the markets could continue to fall and did not want to
expose itself or Lehman unnecessarily to continued market exposure.  Thus, many of the highest-
quality, most-liquid securities were sold within days of the commencement of Project Tassimo,
during the week of September 22, 2008.  Other securities, however, required weeks or months to
sell on favorable terms.  As discussed below, more than 850 of the securities were never sold by
JPMorgan because they could not be sold at acceptable prices.

20.     Due to the scarcity of purchasers in the markets following Lehman's
failure, the best alternative in a number of instances was for JPMorgan to purchase certain
securities itself and thereby accept the risk of further market deterioration.  In almost all of these
instances, the securities were of a type that was liquid and sold in recognized markets (though
the quantities often far exceeded normal transaction size), and JPMorgan matched or topped any
other bids received.  In almost all of these instances, widely-distributed standard prices were
available and the prices paid by JPMorgan were at or near those prices.  In some instances,
JPMorgan was ultimately able to recover on the purchased securities more than it paid, and in
others it recovered less than it paid.

21.     JPMorgan assembled a group of professionals from its Investment Bank's
Special Situations Group ("SSG," which included Mr. Costango, who is referenced in the
Objection) to coordinate the identification and allocation of LBI Securities Collateral to trading
desks, collect sales information from the traders, and coordinate with the TSS group.  The SSG
personnel played an important role in organizing and coordinating Project Tassimo, but SSG
personnel did not sell securities and were not responsible for determining appropriate prices.
The expertise and market acumen of JPMorgan traders, not SSG personnel, was used to effect

the sale of LBI Securities Collateral.  And the fact that more than 850 securities were not sold

evidences that JPMorgan's traders exercised substantial discipline in not selling securities for

unreasonably low prices.

22.    The LBHI Securities Collateral (Fenway, Spruce, Verano, and a small

remaining amount of Pine) and substantial portions of the LBI Securities Collateral (including

the RACERS, SASCO and Kingfisher securitizations) were difficult to sell for a price that would

have been satisfactory to JPMorgan because there was little available information about the

assets underlying those securitizations.  In November 2008, JPMorgan requested that LBHI

provide it information about the underlying assets so that JPMorgan could effectively market

those securities, but LBHI refused (apart from limited cooperation in attempting to derive some

value from Kingfisher).  Indeed, LBHI and/or its subsidiary-debtors impeded JPMorgan's efforts

to derive value from Fenway and RACERS by retaining or blocking payments that should have

been paid to the holders of Fenway and RACERS notes and that could have been used by

JPMorgan to pay the LBHI Deficiency Claim.

23.    After months of effort by dozens of Project Tassimo traders, JPMorgan

ultimately was able to sell over 3,600 different CUSIPs of the LBI Securities Collateral in more

than 4,200 separate transactions, generating more than $18 billion of cash proceeds that were

periodically applied against the LBI Clearance Claim.  Overall, JPMorgan's efforts generated

proceeds equal to approximately 88% of the Pre-Failure Marks as of September 17, 2008.

**D.    Collateral Disposition Agreement**

24.    Notwithstanding these efforts to sell the entirety of the LBI Securities

Collateral described above, JPMorgan was unable to generate sufficient proceeds to pay fully the

LBI Clearance Claim and LBHI Deficiency Claim, as it could not sell more than 850 securities

in the LBI Securities Collateral at acceptable prices.  JPMorgan chose not to sell those securities

at public auction or through some other means that would not generate favorable prices or would

interfere with LBHI's ability to realize value from the underlying assets.  At the same time,

JPMorgan understood that LBHI valued the real estate and corporate loans underlying certain of

the unsold securities as being worth several billion dollars.  Accordingly, JPMorgan initiated and

ultimately engaged in extensive negotiations with LBHI and the other chapter 11 debtors to craft

an agreement that would permit JPMorgan to transfer to LBHI the unsold securities (and,

through such securities, the underlying real estate and corporate loans) so that LBHI could use its

large staff and knowledge of the underlying assets to attempt to recover value by collecting,

restructuring and otherwise realizing on and against those assets, in exchange for payment

substantially in full of JPMorgan's claims.

   25. Pursuant to the Collateral Disposition Agreement dated as of March 16,

2010 (the "CDA," *see* Ex. I), to which JPMorgan and LBHI are parties, which this Court

approved on March 24, 2010, D.I. 7785, (a) LBHI made a cash payment of more than $500

million to JPMorgan (the "CDA Cash Payment") to pay the LBHI Deficiency Claim and other

JPMorgan claims, (b) JPMorgan returned to LBHI all of the LBHI Securities Collateral (Fenway,

Spruce, Verano and Pine, which were valued collectively by LBHI and LBI in the billions of

dollars), (c) LBHI was subrogated to and assigned the LBI Clearance Claim to the extent it had

been paid by the CDA Cash Payment and application of LBHI Collateral, and (d) JPMorgan

transferred to LBHI all of the remaining unsold LBI Securities Collateral (including RACERS,

Kingfisher and SASCO 2008 C-2, which were valued collectively by LBI in the billions of

dollars) as collateral for the LBI Clearance Claim.  Much of the real estate and corporate loans

remaining in the chapter 11 estates backed the securities that JPMorgan returned or transferred to LBHI pursuant to the CDA.  Afterward, rather than attempting to sell many of the largest securities itself, LBHI caused many of the embedded securitization structures to be terminated so LBHI could deal directly with the underlying assets.

26.     Under the CDA, LBHI reserved such rights as it may have had to object to JPMorgan's claims and seek the return of collateral, and JPMorgan retained all of its defenses.

**E.     Payment of JPMorgan's claims**

27.     JPMorgan obtained provisional payment in full of its $25,279,675,964 claim under the Clearance Agreement, together with $280,224,670 of postpetition interest, from the following sources:[2]

<u>Applied prior to the March 31, 2010 closing under the CDA</u> –

(a)  $18,073,916,198 – proceeds of, and principal and interest distributions on, LBI Securities Collateral;

(b)  $549,294,427 – cash balance of a LBI demand deposit account;

(c)  $272,755,947 – cash repurchase agreement adjustments and other LBI account activity;

(d)  $49,928,292 – excess LBI securities lending collateral.[3]

---

[2]     All of these amounts exclude cash transferred to Barclays under the December Settlement Agreement referred to *infra* ¶¶ 30-32.

[3]     The application of items (a) through (d) against the $25,279,675,964 claim gave rise to the $6,333,781,099 principal balance stated as owing as of March 15, 2010 in the proofs of claim.  *See* Ex. B, Amended and Restated Annex to the JPMorgan Proof of Claim Against LBHI, at 29.

<u>Applied upon the March 31, 2010 closing under the CDA</u> –

> (e)  $31,949,277 – proceeds of, and principal and interest distributions on, LBI Securities Collateral;

> (f)  $142,476,437 – prepetition cash balances in LBI prime brokerage accounts[4];

> (g)  $183,943,860 – principal and interest distributions on the LBHI Securities Collateral;

> (h)  $5,731,602,041 – LBHI Cash Collateral;

> (i)  $524,034,154 – CDA Cash Payment.[5]

28.      Although it was not required to do so, JPMorgan first used all available sources of collateral and setoffs from LBI before resorting to LBHI Collateral.  LBHI and the Committee made clear that they did not want JPMorgan to apply the LBHI Collateral against the LBI Clearance Claim absent agreement.  For example, the Stipulation and Consent Order entered on November 5, 2008, relating to the Committee's discovery demand under Rule 2004 on JPMorgan (the "Rule 2004 Stipulation"), D.I. 1402 (*see* Ex. J), required JPMorgan to advise and discuss with the Committee and LBHI in advance of any liquidation of the LBHI Collateral, including the LBHI Cash Collateral, so that the Committee and LBHI could dissuade JPMorgan from doing so or seek Court relief.  Indeed, Objectors have now taken the position (with which JPMorgan disagrees) that the application of a portion of the LBHI Cash Collateral to certain

---

[4]      Payment of a portion of this amount was reversed pursuant to the LBI Settlement Agreement referred to below.

[5]      This amount was subsequently adjusted with respect to claims other than those at issue here.

derivative and other safe harbor claims before the Rule 2004 Stipulation violated the automatic

stay in LBHI's chapter 11 case.  *See* First Amended Complaint in Adversary Proceeding

("Amended Complaint"), Counts XXXIII and XXXIV.

**F.      Settlements with Barclays**

29.      Section 4 of the SSA contained a settlement and mutual release between

JPMorgan and Barclays whereby (a) JPMorgan and Barclays released each other with respect to

certain disputes relating to LBI and its accounts at JPMorgan, including with respect to Barclays'

alleged failure to consummate a $15.8 billion repurchase agreement on or about September 18,

2008 (the "$15.8 Billion Repo"), and (b) Barclays agreed to withdraw a pending lawsuit

unrelated to Lehman against an entity acquired by JPMorgan (the "Lawsuit").  *See* Ex. C, § 4.

Even though LBHI and the LBI Trustee were parties to the SSA, Section 4 was an agreement

solely between JPMorgan and Barclays, did not contain a release in favor of Lehman, did not

require a reduction of the LBI Clearance Claim or LBHI Deficiency Claim, and did not require

application of any funds to Lehman's obligations.  No value was attributed to the Lawsuit in the

SSA.  The SSA deals expressly and specifically with continued transactions between JPMorgan

and LBI under the Clearance Agreement, but nothing in the SSA provides for any application of

any value of the Lawsuit to amounts owing to JPMorgan under the Clearance Agreement.

30.      Following execution of the SSA, JPMorgan and Barclays disagreed as to

whether the releases in Section 4 of the SSA covered claims by Barclays that $7 billion of cash

had been improperly deposited into one of LBI's cash accounts instead of paid to Barclays.  *As a

result, Section 4 of the SSA was not consummated and did not take effect*.  Nor did Barclays

withdraw the Lawsuit.  Ultimately, JPMorgan, Barclays and the LBI Trustee reached a lasting

settlement incorporated into the Settlement Agreement dated as of December 5, 2008 (the

"December Settlement Agreement," *see* Ex. K), which this Court approved by an order entered

on December 22, 2008, in the LBI Proceeding.  Unlike the SSA, the settlement embodied in the

December Settlement Agreement *was* consummated in accordance with its terms.  LBHI was *not*

a party to the December Settlement Agreement.

31.     Under the express provisions of the December Settlement Agreement, (a)

Section 4 of the December Settlement Agreement supersedes Section 4 of the SSA, and (b)

Section 4 of the SSA "shall have no further force or effect."  *See* Ex. K, § 4(a).  Moreover, the

terms of the settlement are quite different from those contemplated by the SSA.  Under Section 1

of the December Settlement Agreement, JPMorgan transferred to Barclays substantial amounts

of securities and cash from LBI's clearance accounts (referred to in the December Settlement

Agreement as the "Settlement Consideration") in lieu of the return of the $7 billion of cash

(referred to in the December Settlement Agreement as the "Subject Funds") that had been sought

by Barclays.  *See* Ex. K, § 1.  Pursuant to Sections 4(b), 4(c) and 4(e) of the December

Settlement Agreement, upon Barclays' receipt of the Settlement Consideration, it withdrew the

Lawsuit (which it never actually released under the SSA), and JPMorgan and Barclays released

each other from all claims "relating to the Subject Funds, the Replacement Transaction [the $45

billion reverse repurchase transaction between Barclays and LBI for the funding of securities that

had been financed by the Federal Reserve Bank of New York on the evening of September 17,

2008] or the Delivered Securities [the securities delivered by LBI to Barclays on September 18,

2008]" as well as triparty repos relating to LBI.  *See* Ex. K, §§ 4(b), (c), (d).

32.     Notably, in Section 2 of the December Settlement Agreement, the LBI

Trustee acknowledges and agrees with specificity which amounts of securities and cash are and

are not to be applied to reduce the LBI Clearance Claim.  *See* Ex. K, § 2.  The December

Settlement Agreement does not, however, contemplate any application of any value of the

Lawsuit to reduce the LBI Clearance Claim or the LBHI Deficiency Claim.  Again, no value was

attributed to the Lawsuit.  Moreover, Section 5 of the December Settlement Agreement provides

that it confers no rights on LBHI or other non-parties.  *See* Ex. K, § 5.

## G.    Settlement with LBI

33.    The LBI Trustee asserted several claims against JPMorgan and certain of

its affiliates, including claims relating to alleged customer property and the claim that JPMorgan

had not sold the LBI Securities Collateral in a commercially reasonable manner.  The latter claim

is the same claim asserted in the Objection.  After extensive discovery by the LBI Trustee and

arm's-length negotiations, JPMorgan reached a settlement with the LBI Trustee, which is

incorporated in the Settlement Agreement dated as of April 20, 2011 (the "LBI Settlement

Agreement," *see* Ex. L) among JPMorgan and its relevant affiliates and the LBI Trustee,

approved by this Court in the SIPA proceeding.

34.    Under Section 2(a) of the LBI Settlement Agreement, LBI released its

claims against JPMorgan, including the alleged customer property claims and all of the

objections asserted by Objectors here as to the LBI Clearance Claim.  *See* Ex. L, § 2(a).  In

addition, the LBI Trustee agreed to the allowance in full of the LBI Clearance Claim in the LBI

Proceeding.  *See* Ex. L, § 3.

35.    LBHI consented to this Court's approval of the LBI Settlement

Agreement, and the Committee agreed not to object to it, in exchange for the inclusion of the

following paragraph in this Court's June 23, 2011, order approving the LBI Settlement

Agreement:

- 20 -

**ORDERED** that except with respect to the Specified Claims described in Sections A.(1) through A.(7) of the Settlement Agreement, notwithstanding the releases contained in the Settlement Agreement or the allowance of claims of JPMorgan against LBI pursuant to the Settlement Agreement, neither the Settlement Agreement nor the entry of this Order shall have any effect on LBHI's or its official creditors' committee's (the "Committee") rights, claims or defenses, either directly or derivatively, in the SIPA Proceeding, in connection with the Chapter 11 Cases, or in any related adversary proceeding, including, but not limited to, those that may be based upon derivative standing or standing as a customer claimant or unsecured creditor in the SIPA Proceeding, and the JPMorgan Releasees and the Trustee are estopped from asserting, in response to any claim or objection asserted by LBHI or the Committee, as the case may be, that any such claim or defense has been released under the Settlement Agreement;

Order Approving Settlement Agreement Between Trustee, JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and J.P. Morgan Clearing Corp, D.I. 4356, at 2 (Bankr. S.D.N.Y. June 23, 2011) (Ex. M). Thus, while the challenges contained in the Objection as to the LBI Clearance Claim have now been resolved between JPMorgan and the LBI Trustee, Objectors preserved their rights to assert the same challenges. JPMorgan agreed not to assert the releases contained in the LBI Settlement Agreement to defeat the Objection. However, the foregoing language does not affect LBHI's rights and certainly does not contain any consent or admission by JPMorgan or the LBI Trustee to Objectors' asserted derivative standing to object to JPMorgan's claims in the LBI Proceeding, and Objectors have stated no basis for such standing apart from LBHI's status as a major creditor of LBI.

# RESPONSES TO OBJECTIONS

# POINT I

## JPMORGAN SOLD THE LBI SECURITIES COLLATERAL IN A COMMERCIALLY REASONABLE MANNER

### A.    Legal Standard

36.    Under New York's Uniform Commercial Code ("N.Y. U.C.C."), "[a]fter default, a secured party may sell, lease, license, or otherwise dispose of the collateral in its present condition or following any commercially reasonable preparation or processing."  N.Y. U.C.C. § 9-610(a) (McKinney).[6]  A secured party's disposition of collateral must be "commercially reasonable," *id.* § 9-610(b), and is presumed to be commercially reasonable unless the "debtor or a secondary obligor places the secured party's compliance in issue," *id.* § 9-626(a)(1).[7]  If, however, the debtor or a secondary obligor places "in issue" the commercial reasonableness of a disposition of collateral, the burden shifts to the secured creditor to establish commercial reasonableness.  *See id.* § 9-626(a)(2); *Commerce Commercial Leasing, LLC* v. *PIO Enters., Inc.*, 78 A.D.3d 1105, 1107 (2d Dep't 2010).  A secured party can establish commercial reasonableness by showing either that all aspects of the sale were commercially reasonable or that the disposition complies with the requirements of one of the § 9-627(b) safe harbors.  *See*

---

[6] This Response includes citations to cases decided under the previous version of the N.Y. U.C.C. and the U.C.C. as adopted in other jurisdictions where the analysis under those statutes is the same as under the current N.Y. U.C.C.

[7] Objectors are incorrect in their assertion that LBHI qualifies as a "debtor" for purposes of Article 9 of New York's U.C.C. and has standing in such capacity to object to the commercial reasonableness of JPMorgan's disposition of LBI collateral under N.Y. U.C.C. § 9-626(a)(1).  The cases cited by Objectors for this supposed proposition all interpret the definition of "debtor" under the previous version of New York's U.C.C.  But as the comments to the current U.C.C. explain, revised Article 9 "redefines 'debtor' and adds new defined terms, 'secondary obligor' and 'obligor'" to reduce the need to examine the context in which the term "debtor" was used to determine its applicability.  N.Y. U.C.C. § 9-102(a) cmt. 2.  The comments further explain that "debtors" are "those persons who may have a stake in the proper enforcement of a security interest by virtue of their non-lien property interest (typically, an ownership interest) in the collateral." *Id.*  "Secondary obligors," on the other hand, are "those persons who may have a stake in the proper enforcement of the security interest because of their obligation to pay the secured debt." *Id.*  Because LBHI had no property interest in the LBI Securities Collateral prior to the transfers under the CDA, and then acquired only a lien, LBHI is not a "debtor" for purposes of Article 9 of the N.Y. U.C.C. and is, at most, a secondary obligor.

N.Y. U.C.C. §§ 9-610(b), 9-627; *see also Hicklin* v. *Onyx Acceptance Corp.*, 970 A.2d 244, 249-

50 (Del. 2009) (applying Delaware statute adopting §§ 9-610 and 9-627).

37.    In the event that a secured party is unable to prove the commercial

reasonableness of its disposition of collateral, the "rebuttable presumption" rule applies.  Under

the "rebuttable presumption" rule, "the debtor or obligor is to be credited with the greater of the

actual proceeds of the disposition or the proceeds that would have been realized had the secured

party complied with the relevant provisions," which is presumed to be "equal to the sum of the

secured obligation, expenses, and attorney's fees" unless the secured party proves that the

amount is less than the sum.  N.Y. U.C.C. § 9-626(a)(3)-(4) & cmt. 3; *see also ESL Fed. Credit

Union* v. *Bovee*, 801 N.Y.S.2d 482, 488 (Sup. Ct. 2005) (explaining rebuttable presumption rule

as "presumption that the security was equal to the debt and that the secured party has the burden

of proof to overcome such presumption" (quoting *Rochester* v. *Thomas*, 59 A.D.3d 242, 246 (4th

Dep't 1977)) (internal quotation marks omitted)).

38.    Contrary to Objectors' assertions, they are *not* entitled to prove any

damages caused by the secured creditor's failure to comply with the requirement of the U.C.C.

under the so-called "setoff rule."  Objectors cite a case interpreting the former § 9-507(1) of the

N.Y. U.C.C., *see* Objection ¶ 42 (citing *Siemens Credit Corp.* v. *Marvik Colour, Inc.*, 859 F.

Supp. 686 (S.D.N.Y. 1994)), without acknowledging that the revisions to Article 9 superseded

that case and adopted the "rebuttable presumption" rule, and *only* the "rebuttable presumption"

rule, as the appropriate remedy.  *See Coxall* v. *Clover Commercial Corp.*, 781 N.Y.S.2d 567, 576

(Civ. Ct. 2004) (recounting divergent approaches to prescribing remedy for noncompliance

under former U.C.C. § 9-504, including under the so-called "setoff rule," and explaining that

"Revised Article 9 resolves the conflict and uncertainty for transactions other than consumer

transactions by adopt[ing] the 'rebuttable presumption' rule").  Consistent with this adoption of

the "rebuttal presumption" rule, revised § 9-625(d) states that "a debtor or secondary obligor

whose deficiency is eliminated or reduced under Section 9-626 may not otherwise recover under

subsection (b) for noncompliance with the provisions of this part relating to collection,

enforcement, disposition, or acceptance."  N.Y. U.C.C. § 9-625(d).

**B.      JPMorgan's liquidation of the LBI Securities Collateral was commercially reasonable under Article 9 of the N.Y. U.C.C.**

39.     As an initial matter, Objectors have failed to put "in issue" the commercial

reasonableness of JPMorgan's disposition of most of the LBI Securities Collateral, so the burden

does not shift regarding the sale of that collateral.  Objectors have identified only a handful of the

more than 4,400 sale transactions conducted by JPMorgan that they allege were conducted in a

commercially unreasonable manner.  For instance, in alleging that the sale prices were

commercially unreasonable, Objectors identify several securities that they claim were sold at low

prices but fail to address the rest, either individually or in the aggregate.  *Cf. Bankers Trust Co.*

v. *J.V. Dowler & Co., Inc.*, 47 N.Y.2d 128, 135 (1979) (evaluating average price of bonds sold,

not individual prices of each bond sold, in evaluating commercial reasonableness of sale).

Similarly, Objectors identify only a limited number of securities that they allege JPMorgan

improperly sold to itself.  Apart from making wholly irrelevant assertions regarding the

background and supervision of individuals helping to coordinate the administration of the

liquidation process, *see infra* ¶¶ 56-57, Objectors failed to put in issue the commercial

reasonableness of the vast majority of the sales of LBI Securities Collateral by JPMorgan.  *See*

*Lincoln First Bank, N.A.* v. *Salvaterra*, 437 N.Y.S.2d 611, 613 (Cnty. Ct. 1981) (recognizing that

"naked assertions of impropriety in the sale cannot overcome the presumption of commercial

reasonableness"). Accordingly, JPMorgan need not prove the commercial reasonableness of its disposition of the collateral the Objectors have not specifically identified.

40. Even assuming *arguendo* that Objectors successfully put "in issue" the commercial reasonableness of JPMorgan's entire liquidation of the LBI Securities Collateral, JPMorgan demonstrably acted in a commercially reasonable manner. Not only did JPMorgan's liquidation fall within the scope of § 9-627(b)'s safe harbors, but every aspect of the liquidation was commercially reasonable.

**1.    JPMorgan's liquidation fell within section 9-627(b)'s safe harbors**

41. Section 9-627(b) of the N.Y. U.C.C. sets forth three sets of circumstances in which the disposition of collateral will conclusively be found to be commercially reasonable:

> A disposition of collateral is made in a commercially reasonable manner if the disposition is made:
>
> > (1) in the usual manner on any recognized market;
> >
> > (2) at the price current in any recognized market at the time of the disposition; or
> >
> > (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

42. JPMorgan's disposition of the LBI Securities Collateral was done largely in the usual manner and at the then-current price in recognized markets, and all collateral was sold in conformity with reasonable commercial practices among dealers of the types of securities being sold. Accordingly, JPMorgan's disposition of the LBI Securities Collateral was commercially reasonable.

### a. JPMorgan sold most of the LBI Securities Collateral in the usual manner in recognized markets

43.     Under § 9-627(b)(1) of the N.Y. U.C.C., a sale of collateral in the usual manner on a recognized market is *per se* commercially reasonable.  *See Bankers Trust*,  47 N.Y.2d at 135 (secured party's sale of bonds through "regular market channels" was "immune to attack on the grounds of commercial unreasonableness"); *see also Layne* v. *Bank One, Ky., N.A.*, 395 F.3d 271, 279-280 (6th Cir. 2005) (interpreting Kentucky's statute adopting § 9-627 to mean that "where the collateral is sold in a recognized market, Kentucky courts have found the transaction to be commercially reasonable as a matter of law"); *Suffield Bank* v. *LaRoche*, 752 F. Supp. 54, 59 (D.R.I. 1990) (sale of pledged stock on the American Stock Exchange "ensured that its sale was commercially reasonable and beyond the scrutiny of this Court").  As the comments to § 9-627 explain, a "recognized market" applies to "markets in which there are standardized price quotations for property that is essentially fungible."  N.Y. U.C.C. § 9-627 cmt. 4.

44.     JPMorgan obtained the vast majority of proceeds from securities that are sold on a recognized market.  Case law has acknowledged that a number of types of securities included in the LBI Securities Collateral are traded on recognized markets – such as U.S. Treasuries and agency debt, *see Washburn* v. *Union Nat'l Bank & Trust Co. of Juliet*, 502 N.E.2d 739, 742 (Ill. App. 1986) ("Ginnie Mae bonds are customarily sold on a recognized market"), equity securities, *see* N.Y. U.C.C. § 9-627 cmt. 4 (identifying stocks as being sold on a "recognized market"), and municipal bonds, *see Bankers Trust*, 47 N.Y.2d at 135 (municipal bonds held as collateral were securities  "customarily sold on a recognized market") – and many of the other fixed-income and structured securities in the LBI Securities Collateral are sold on recognized markets as well.

45.     Moreover, JPMorgan sold those securities in the usual manner on those recognized markets.  It used professional traders who specialize in trading those types of securities, and the traders used their customary means to sell the LBI Securities Collateral—either by selling the securities directly on exchanges, *see, e.g.,* Ex. O (documenting JPMorgan's sale of equities on exchanges); *Layne*, 395 F.3d at 280-81 (disposition of shares through sale on NASDAQ commercial market was commercially reasonable), or by soliciting bids, *see, e.g.,* Ex. P (documenting JPMorgan's process of solicitation of likely bidders for corporate bonds); *Bankers Trust*, 47 N.Y.2d at 133, 135 (bank sold municipal bonds through "regular market channels" by using its municipal-bonds department to solicit bids for the bonds); *Washburn*, 502 N.E.2d at 742 (bank followed usual procedures for sale of Ginnie Mae bonds held as collateral by soliciting bids from three firms and accepting best price).  The sale of those securities is therefore conclusively commercially reasonable under § 9-627(b)(1) of the N.Y. U.C.C.

46.     Even if there were instances in which JPMorgan sold a security in something other than the usual manner on any recognized market, it sold securities at the price current in the market at the time of sale and, thus, acted in a commercially reasonable manner. *See* N.Y. U.C.C. § 9-627(b)(2).

### b.    JPMorgan acted in conformity with reasonable commercial practices among dealers

47.     JPMorgan's disposition of all of the collateral is *per se* commercially reasonable because it was all conducted "in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition."  N.Y. U.C.C. § 9-627(b)(3).

48.    Courts have found § 9-627(b)(3) satisfied where, as JPMorgan did in selling the LBI Securities Collateral, the secured party used a well-known and widely-used dealer in the type of collateral to dispose of the collateral.  *See, e.g., Colonial Pac. Leasing Corp. v. Elite S-W Mo., Inc.*, 2010 WL 3119448, at *2, *5 (W.D. Mo. Aug. 4, 2010) (disposition of motor vehicle as collateral conformed to reasonable commercial practices among motor-vehicle dealers when an auctioneer, who specialized in selling motor vehicles to dealers and whom dealers—including the debtor—frequently used to buy and sell vehicles, sold the vehicle collateral); *Davis* v. *Concord Commercial Corp.*, 434 S.E.2d 571, 576 (Ga. App. 1993) (use of "expert dealer" experienced in selling type of goods at issue conformed to reasonable commercial practices among dealers in the type of property sold); *First Nat'l Bank of Glens Falls* v. *G.F. Clear, Inc.*, 93 A.D.2d 925 (3d Dep't 1983) (secured party's sale of collateral was commercially reasonable because it used well-qualified and experienced auctioneer to seek out prospective purchasers).  As described above, JPMorgan has a major, world-class securities trading operation and used its professional traders to sell the LBI Securities Collateral. JPMorgan assigned responsibility for the sale of each security to a trading desk with expertise in that type of security.

49.    The traders responsible for selling the LBI Securities Collateral used the same means and methods of selling the securities as they did in their normal course of business, taking into consideration the size of each position.  Traders selling the collateral were instructed to, and did, treat the Lehman liquidation like a sale for a customer.  *See* Costango Tr. (Ex. N), at 75:11-20.  The only difference of process to which Objectors can point is that the traders did not take fees or commissions on the trades, *see* Ex. N, at 75:17-20, a fact that underscores

JPMorgan's commitment to maximizing the amount of proceeds that could be applied against the LBI Clearance Claim and LBHI Deficiency Claim, all to the benefit of Lehman.

50.     As commercial practices dictated, the traders tailored the methods used to sell the collateral to the characteristics of each security and, rather than conduct fire-sale auctions for the collateral, used their professional experience and judgment to determine the best method for targeting likely purchasers.  *See* Ex. N, at 122:14-20; *Nat'l Hous. P'ship* v. *Mun. Capital Appreciation Partners I, L.P.*, 935 A.2d 300, 318 (D.C. 2007) (noting that use of "safe harbor" methods of section 9-507(2), predecessor to 9-627(b), would entail undertaking targeted research to identify members of the relevant industry most likely to be interested in the collateral as opposed to public advertising).  Given the size of the portfolio and the concomitant potential to depress prices by flooding the market, the reasonable commercial practice was not to dump the securities into the market, as that would have triggered a public fire sale.  It was eminently reasonable – and a best practice – to seek bids from potential purchasers the traders knew to have the appetite and ability to purchase the relevant securities.

51.     JPMorgan's liquidation of the LBI Securities Collateral accordingly satisfies the conditions of § 9-627(b)(3) of the N.Y. U.C.C. and is *per se* commercially reasonable.

### 2.     Every aspect of JPMorgan's liquidation was commercially reasonable

52.     Even assuming *arguendo* that § 9-627(b)'s safe harbors do not apply, every aspect of JPMorgan's sale of the LBI Securities Collateral was commercially reasonable, thereby satisfying § 9-610's requirements.  The central inquiry in the commercial reasonableness analysis is "whether the secured party 'acted in good faith and to the parties' mutual best

advantage.'"  *Coxall* v. *Clover Commercial Corp.*, 781 N.Y.S.2d 567, 574 (Civ. Ct. 2004)

(internal quotation marks omitted); *see also SNCB Corp. Fin. Ltd.* v. *Schuster*, 877 F. Supp. 820,

828 (S.D.N.Y. 1994), *aff'd*, 71 F.3d 406 (2d Cir. 1995) ("A commercially reasonable disposition

makes a 'good faith attempt to dispose of the collateral to the parties' mutual best advantage.'"

(internal quotation marks omitted)).

      53.     JPMorgan had every incentive to sell the collateral for the highest

recovery possible.  As one treatise has noted:

> In a world where the recovery of deficiency judgments is far from
> certain, because the debtor is likely to be in Chapter 7 or to be without
> funds, why would the creditor not conduct a sale in a way that is likely
> to bring the best net price?  If the probability of the recovery of a
> deficiency is low, the creditor's failure to conduct a proper sale falls
> on the creditor, not on the debtor.  Unless we are to say that creditors
> are stupid (when the debtor cannot pay the deficiency), or vindictive
> and mean spirited (when the debtor can pay), we fail to understand the
> incentives for taking a low price and we see incentives for getting a
> high price.

4 James J. White & Robert S. Summers, Uniform Commercial Code § 34-11(e)(2), at 481-82

(6th ed. 2010).

      54.     Thus, motivated by well-founded concerns that the LBI Securities

Collateral would not be sufficient to satisfy in full the LBI Clearance Claim and by concerns

about the likelihood of recovering the deficiency fully from the LBHI Collateral, JPMorgan

informed its traders that Project Tassimo was a priority and that it was very important to the firm

that the traders use good-faith efforts to obtain appropriate prices for the securities.  *See* Ex. N, at

75:4-20, 115:14-116:2.  Both the procedures used and the results achieved make evident

JPMorgan's good faith in attempting to dispose of the collateral to both Lehman's and

JPMorgan's mutual best advantage.

- 30 -

### a. JPMorgan used commercially reasonable procedures to liquidate the collateral

55.     JPMorgan employed commercially reasonable procedures to ensure that it received fair market prices for LBI's collateral.  Although there is "no magic set of procedures [that] will immunize the sale from scrutiny," *Coxall*, 781 N.Y.S.2d at 574 (internal quotation marks omitted), the New York Court of Appeals has recognized that the U.C.C.'s commercial-reasonableness standard "invites consideration of accepted business practices as a guide to what is most likely to protect both debtor and creditor," as "[c]ustoms and usages that actually govern the members of a business calling day-in and day-out not only provide a creditor with standards that are well recognized, but tend to reflect a practical wisdom born of accumulated experience." *Bankers Trust Co.* v. *J.V. Dowler & Co., Inc.*, 47 N.Y.2d 128, 134 (1979).

56.     Objectors erroneously focus on the operations of JPMorgan's Special Situation Group in arguing that the procedures used by JPMorgan to liquidate the LBI Securities Collateral were commercially unreasonable.  Objectors thus allege that the SSG consisted of individuals with little or no experience in liquidating collateral, that the SSG did not create formal processes for the traders to follow, and that the SSG did not substantively review the trades.  *See* Objection ¶¶ 44-45.  This focus is misplaced.  Professional traders in JPMorgan's Investment Bank devised the strategy by which the LBI Securities Collateral would actually be sold and carried out the liquidation, *see* Ex. N, at 250:10-19, whereas the SSG served a "coordination role" that consisted largely of "data collection and reporting," *see* Ex. N, at 69:23-71:4.  Thus, the Objectors' observations that SSG's "Project Tassimo Trade Process and Procedure" memorandum addressed mainly administrative and information-flow issues and that the individuals in the SSG did not generally review trades substantively are both unremarkable and inapposite.

57.     There is no authority, and Objectors cite none, for the proposition that the qualifications and procedures of persons other than those actually responsible for disposing of collateral have any bearing on the commercial reasonableness of the disposition of collateral.  To the contrary, courts have made clear that it is the liquidator's procedures, and not those of a coordinator or any other person, that matter.  *See, e.g., First Nat'l Bank of Glens Falls* v. *G.F. Clear, Inc.*, 93 A.D.2d 925, 926 (3d Dep't 1983) ("[I]t is the auctioneer's practice in conducting the sale, rather than the bank's, that should govern . . . .").  The liquidators in this case were professional traders in JPMorgan's Investment Bank.  Accordingly, only the traders' procedures are relevant, and these were manifestly commercially reasonable.

58.     The decision to use professional traders who were experienced in selling securities in the market to carry out the liquidation in accordance with their usual practices, and to entrust those traders with the responsibility to judge how best to target potential purchasers, was a commercially reasonable one.  *See, e.g., Ga.-Pac. Corp.* v. *First Wis. Fin. Corp.*, 805 F. Supp. 610, 617 (N.D. Ill. 1992) (sale of collateral using professional auctioneer familiar with collateral was commercially reasonable); *AKA Mgmt., Inc.* v. *Branch Banking & Trust Co.*, 621 S.E.2d 576, 580-81 (Ga. Ct. App. 2005) (relying in part on fact that secured party "utilized professionals in the industry to assist in the sale of the equipment" to affirm the commercial reasonableness of the sale under Georgia's adoption of § 9-627 of the U.C.C.).  Indeed, it would have been commercially *un*reasonable to have the less-experienced coordinators in the SSG direct the traders as to how they should sell the securities.  *See Laczko* v. *Toledo Trust Co.*, 1985 WL 7507, at *6 (Ohio Ct. App. June 14, 1985) (sale of collateral by individual with no previous experience selling similar collateral was commercially unreasonable).  Likewise, given JPMorgan's in-house expertise and experience, it would have been commercially unreasonable

for JPMorgan to use a third-party agent, as Objectors claim should have been done, because

doing so would have "required the bank to place unwarranted trust in . . . a third-party, incur

significant additional expenses, or both, with little if any certainty that it would receive a greater

return." *Panora State Bank* v. *Dickinson*, 2006 WL 228882, at *3 (Iowa Ct. App. Feb. 1, 2006).

59.    JPMorgan's traders used commercially reasonable means to sell the

collateral.  Using their practical wisdom born of accumulated experience in selling securities,

traders customized the process for selling each security in order to obtain the highest possible

price for each security, including determining the best way to target potential purchasers for the

LBI Securities Collateral.  *See* Ex. N, at 107:4-20; 250:10-19.  In certain instances, this meant

that the trader reached out to select bidders who had the knowledge, appetite and resources to

purchase the securities.  JPMorgan traders also used their experience and professional judgment

to evaluate the bids received by those bidders.  Contrary to Objectors' assertion that "no price

was ever deemed too low," *see* Objection ¶ 31, JPMorgan traders exercised pricing discipline not

to sell securities at unreasonably low prices, as amply evidenced by the fact that, as of March

2010, more than 850 securities remained unsold and were ultimately transferred to LBHI

pursuant to the CDA.  *See supra* ¶ 21.

60.    Although Objectors label the use of targeted private sales as being

commercially unreasonable, *see* Objection ¶¶ 60-61, this process is expressly permitted by the

Uniform Commercial Code.  Section 9-610 of the N.Y. U.C.C. "encourages private dispositions

on the assumption that they frequently will result in higher realization on collateral for the

benefit of all concerned."  N.Y. U.C.C. § 9-610 cmt. 2; *see also Old Colony Trust Co.* v. *Penrose

Indus. Corp.*, 280 F. Supp. 698, 713 (E.D. Pa. 1968), *aff'd*, 398 F.2d 310 (3d Cir. 1968) (private

sale was commercially reasonable given judgment of broker in industry that private sale would

produce highest price).  In the same vein, courts have recognized that targeting interested parties in the relevant industry is often the optimal way to maximize value, and is therefore commercially reasonable.  *See, e.g., L. Perrigo Co.* v. *Robins*, 2009 WL 2095990, at *2, *4 (W.D. Mich. July 14, 2009) (liquidation of collateral was commercially reasonable when auctioneer targeted marketing and communications toward prospective purchasers in relevant industry); *Nat'l Hous. P'Ship*, 935 A.2d at 318-321 (noting evidence that commercially reasonable way of selling partnership interests in multifamily properties was by contacting unique, specialized investor base through market participants and remanding for reconsideration whether use of public sale in this instance was commercially reasonable).  In the context of the liquidation of the LBI Securities Collateral, given the size and nature of the securities being sold and the fragility of the markets at the time, the efforts of JPMorgan's traders to identify and solicit bids from likely purchasers in private sales was commercially reasonable.

61.    Moreover, N.Y. U.C.C. § 9-610(a) expressly permits collateral to be sold as a unit or in parcels.  Thus, Objectors' broad indictment of the process JPMorgan used in grouping certain securities misses the mark.  It also ignores the fact that Lehman sold most of its remaining securities as a group to Barclays in a private sale and that this sale was authorized by an order of this Court.  In instances in which JPMorgan's traders determined that it was appropriate to sell certain low-quality, illiquid securities in groups, those transactions were commercially reasonable.

62.    Thus, the procedures used by JPMorgan's professional traders in selling the LBI Securities Collateral further demonstrate that JPMorgan disposed of the collateral in a commercially reasonable manner.

- 34 -

b.      **JPMorgan sold LBI Securities Collateral at commercially reasonable prices**

63.      Even though the N.Y. U.C.C. makes clear that "the fact that a greater amount could have been obtained by a . . . disposition . . . at a different time or in a different method . . . is not of itself sufficient" to establish that the sale was not made in a commercially reasonable manner, N.Y. U.C.C. § 9-627(a), Objectors purport to object to JPMorgan's claim by challenging the sale prices achieved in a handful of sales.  In any event, in the overwhelming majority of instances, JPMorgan achieved high sale prices for the LBI Securities Collateral.  And the limited cases in which JPMorgan sold at a price that Objectors now find objectionable are indicative only of the unrealistic nature of the Pre-Failure Marks, the poor collateral quality and the weak markets rather than of any defects in the sale process.  *See* Appendix 1 annexed to this Response for more detailed responses to Objectors' securities-specific objections.

64.      As an initial matter, Objectors err in their choice of benchmarks against which to compare the sale prices JPMorgan obtained.  The appropriate metric is the market value of the collateral at the time of sale.  *Cf. Morris* v. *Citibank*, 1999 WL 461161, at *5 (S.D.N.Y. July 6, 1999) (rejecting debtor's argument that sale price of collateral was commercially unreasonable because debtor relied on untimely and generalized valuations); *First Fed. Sav. & Loan Ass'n of Rochester* v. *Romano*, 253 A.D.2d 363, 364 (1st Dep't 1998) (using more recent appraisal of fair-market value of collateral instead of original purchase price as benchmark against which to compare sale price).  In contrast, as described *supra* ¶ 14, Objectors point to marks that were not reliable indicators of realizable market value.  Objectors often refer to Pre-Failure Marks or other marks that were based on (i) stale market data, (ii) theoretical financial models rather than actual sales, (iii) ratings that were imminently to be downgraded, (iv) Lehman's own inflated marks used to obtain financing, and (v) Lehman's own pre-bankruptcy

- 35 -

ratings or creditworthiness.  *See* Objection ¶¶ 49, 50, 66.  In some instances, Objectors even cite the wholly irrelevant par values of subordinate and mezzanine tranches of CDOs as if those par values had any bearing on potential sale prices.  *Id.* ¶ 68.

65.      However, even if the values obtained by JPMorgan are compared to the Pre-Failure Marks as of September 17, 2008, the majority of the proceeds obtained from such sales represent recoveries well in excess of 90% of the Pre-Failure Marks of the LBI Securities Collateral sold, and the aggregate proceeds represent recoveries near 90% of the Pre-Failure Marks of those securities.  The recovery rates thus refute any inference of commercial unreasonableness, especially considering the extreme volatility and lack of liquidity in the markets at the time.  *See, e.g., Bankers Trust*, 47 N.Y.2d at 135 (sale price of collateral that averaged more than 10% lower than prices at which collateral was purchased was "not surprising in light of the sharp drop in the published bond indexes"); *First Fed. Sav. & Loan Ass'n of Rochester*, 253 A.D.2d at 364 ("It has been held that bids ranging from as low as 30% and 37% of market value are not commercially unreasonable."  (internal citations omitted)).

66.      Indeed, the results of JPMorgan's sales effort demonstrate a level of performance exceeding a commercial reasonableness standard.  JPMorgan was left with the securities that Barclays declined to purchase, but achieved sales results that compare well with Lehman's own negotiated, court-approved sale of the portfolio that Barclays chose to purchase. This Court has had the opportunity to review intensively the sale of securities to Barclays at approximately 89% of the Pre-Failure Marks[8] in the context of the Barclays Rule 60(b) litigation.

---

[8]   The $45 billion sale price to Barclays expressed as a percentage of the $50.62 billion value attributed by Pre-Failure Marks to the Fed-financed securities portfolio as of September 17, 2008 is 88.9%.  *See 60(b) Decision*, 445 B.R. 143, 170.  The 88% percent result ascribed to the proceeds of the JPMorgan sales is based on Pre-Failure Marks as of the same date.

It is submitted that the Court's acceptance of the eminent reasonableness of obtaining 89% of

Pre-Failure Marks, and its crediting the opinion that it is "almost inconceivable" that Lehman

would have realized as much as it received from Barclays by selling the securities into the

market, *see 60(b) Decision*, 445 B.R. at 183, strongly supports the reasonableness of the

JPMorgan sales that achieved a comparable percentage of approximately 88%.

67.     Poor collateral quality – including illiquid structured securities that were

particularly unpopular in the risk-averse markets following Lehman's failure – also played a role

in the level of realization obtained from the sales of the LBI Securities Collateral.  Courts have

recognized that a low price "might simply reflect a greatly depreciated piece of collateral."  *In re*

*Excello Press, Inc.*, 890 F.2d 896, 905-06 (7th Cir. 1989) (citing *Sumner* v. *Extebank*, 88 A.D.2d

887 (1st Dep't 1982)) (applying New York law).  For instance, in *SNCB Corporate Finance Ltd.*,

the low sale price achieved was attributable to the fact that the value of the assets sold depended

on the debtor's parent company, which was experiencing financial difficulties at the time, and

not the commercial unreasonableness of the sale.  877 F. Supp. at 828.

68.     Here, the allegedly "low prices" were not a result of traders' willingness to

accept low prices, as Objectors suggest.  *See* Objection ¶¶ 31, 46.  When JPMorgan traders in

fact received unreasonable low bids or saw no opportunity for acceptable sales, the securities

were not sold and were ultimately transferred to LBHI under the CDA.  The results that

Objectors attack as "low prices" are attributable to unrealistic Pre-Failure Marks, the poor quality

of the relevant securities, and adverse market conditions.  In each instance, a number of factors

may have contributed to a facially unfavorable-appearing sale transaction.  A non-exhaustive

response to the specific transactions criticized in the Objection is annexed to this Response as

Appendix 1.

- 37 -

69.     In sum, the deficiency with which JPMorgan was left after the disposition of the LBI Securities Collateral was not a result of commercially unreasonable sales by JPMorgan.  As the court in *In re Emergency Beacon Corp.* explained, a secured party "should not be faulted for being unable to turn vinegar into wine."  48 B.R. 341, 349 (S.D.N.Y. 1985). Likewise, JPMorgan should not be faulted for its inability to match the unrealistic marks cited by Objectors for what Objectors themselves concede were extremely illiquid securities.  *See, e.g.*, Objection ¶ 57 ("much of the LBI collateral liquidated by JPMorgan did not trade on an exchange and did not consist of 'widely traded' securities"); ¶ 59 ("the bonds were highly illiquid and were not subject to widely distributed price quotations"); ¶ 69 ("Most of the [CMO and ABS] collateral sold in this manner does not have any publicly available pricing information. . . . Objectors have been able to find Bloomberg pricing for only three.")

### c.     JPMorgan's purchases of LBI Securities Collateral were commercially reasonable

70.     Finally, JPMorgan's purchase of some of the LBI Securities Collateral does not render the disposition of the collateral commercially unreasonable.

71.     As explained above, the vast majority of the LBI Securities Collateral was of a type sold on a "recognized market," and therefore JPMorgan was not prohibited from purchasing the securities.  *See* N.Y. U.C.C. § 9-610(c)(2).  Additionally, any potential for "self dealing" was reduced by the instruction given to traders that, where bids were received, they could purchase securities generally only if they either matched or beat those bids.  *See* Ex. N, at 106:4-22.  In fact, these procedures ensured that Lehman *benefited* from any purchase of any of the LBI Securities Collateral by JPMorgan because the proceeds from that purchase would be greater than had JPMorgan not purchased the security.  Furthermore, JPMorgan's willingness to

assume substantial risk and purchase LBI Securities Collateral in a generally weak, illiquid and strongly risk-averse market provided an important additional outlet to realize value from the LBI Securities Collateral and avoided further depressing the market, all to Lehman's benefit.  The sales were therefore consistent with JPMorgan acting in good faith and to the parties' mutual advantage, and were accordingly commercially reasonable.

72.     In those instances in which JPMorgan acquired LBI Securities Collateral in the absence of bids from other potential purchasers – for example, when the other bidders all passed on a particular security – the availability of widely accepted market prices for such securities will demonstrate that JPMorgan's prices were fairly representative of value.

## POINT II

### ANY VALUE RECEIVED BY JPMORGAN FROM BARCLAYS SHOULD NOT REDUCE THE LBI CLEARANCE CLAIM AND LBHI DEFICIENCY CLAIM

73.     Objectors assert that the any value received by JPMorgan in the SSA or December Settlement Agreement should be applied in reduction of the LBHI Deficiency Claim on the implausible ground that Barclays, *not* Lehman, was the *sole* cause of JPMorgan's losses. This assertion is both factually and legally wrong, and amounts to a request for an unfair windfall.

74.     In the December Settlement Agreement, JPMorgan and Barclays agreed that, among other things, Barclays would give up rights as plaintiff in the Lawsuit in satisfaction of certain claims against Barclays that were held by JPMorgan (and *not* by LBHI).  Even on its face, this exchange to which LBHI was not a party has nothing to do with any amounts owed by

LBHI to JPMorgan, and LBHI should get no credit against JPMorgan for whatever value might have inhered in the cause of action that Barclays surrendered.

75.     Objectors mischaracterize JPMorgan's position that *Barclays* breached its representation that it would purchase all of the LBI Securities Collateral, with *Lehman's* own contractual obligations to repay the financing secured by such collateral, which, if not fully performed or secured, would cause the loss.  Any consideration received from Barclays was in satisfaction of Barclays' liability for failing to purchase (or provide replacement financing for) all of the LBI Securities Collateral; the consideration does not satisfy Lehman's contractual obligations to pay the financing.

76.     Lehman is the cause of, and responsible for, the deficiency claim here. Barclays is not obligated to pay the claim.  The deficiency claim at issue here is the excess of the amount of the credit extended by JPMorgan to LBI over the amount realized by JPMorgan from LBI Securities Collateral, together with interest and related amounts on such claim.  The LBI Clearance Claim arises from LBI's failure to perform its contractual obligation under the Clearance Agreement to pay such claim; similarly, the LBHI Deficiency Claim arises from LBHI's failure to perform its contractual obligation under the August Agreements and September Agreements to pay such claim.  The proofs of claim challenged by the Objection assert the LBI Clearance Claim and LBHI Deficiency Claim, respectively, as contract claims.

77.     The LBI Clearance Claim and LBHI Deficiency Claim are debts of LBI and LBHI, respectively.  They are not debts of Barclays, and JPMorgan has never contended that they were debts of Barclays.  Indeed, the initial proposed transaction for Barclays to acquire LBHI's operating subsidiaries failed on September 14, 2008, when Barclays' principal regulator

failed to waive a shareholder vote requirement needed to authorize Barclays to guarantee LBI's obligations, including the LBI Clearance Claim. *See* Report of Anton R. Valukas, Examiner, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (JMP), Vol. 4, at 1526-29 (Bankr. S.D.N.Y. Mar. 11, 2010) (Ex. Q). Moreover, Barclays refused JPMorgan's request made during the week of September 15, 2008, that Barclays guarantee LBI's obligations.

78.     Similarly, when JPMorgan transferred to Barclays the alleged $5 billion margin referred to in paragraphs 76 and 77 of the Objection, the margin came from securities accounts maintained by LBI at JPMorgan and the transfer was made at the instruction of LBI, as the account owner. JPMorgan has never contended that it acted – and it did not act – at Barclays' instruction, and Barclays would have had no right to give such an instruction.

79.     JPMorgan does contend, however, that Barclays represented that it had agreed with Lehman that JPMorgan's financing of LBI's securities would be fully taken out by Barclay's own purchase and financing. JPMorgan's position has consistently been that Barclays was liable to JPMorgan for failing to consummate a purchase or financing that would have produced sufficient proceeds for LBI to eliminate JPMorgan's clearance exposure. But Barclays' liability to JPMorgan for breach of its own representation is wholly separate from LBI's contractual obligation to pay the LBI Clearance Claim.

80.     The situation is closely analogous to an agreement to purchase a claim – the purchaser (Barclays) may be obligated to purchase the claim from the holder of the claim (JPMorgan), but the purchaser does not by such agreement become obligated to the holder to pay the claim. The payment of the purchase price for the claim by the purchaser to the holder is not a payment of the underlying claim; indeed, the purchaser typically purchases the claim to become

the new holder of the claim *without* any reduction of the claim amount.  *See, e.g., Moulded Prods, Inc.* v. *Barry (In re Moulded Prods., Inc.)*, 474 F.2d 220, 224-225 (8th Cir. 1973), *cert denied*, 412 U.S. 940 (1973) (refusing to limit claim purchaser's claim to amount of consideration it paid); *In re Exec. Office Ctrs., Inc.*, 96 B.R. 642, 649 (Bankr. E.D. La. 1988) ("The courts have repeatedly refused to limit a creditor's claim to the discounted purchase price where the court found that the facts did not create a fiduciary status or breach of fiduciary duty." (collecting cases)); *cf. In re W.T. Grant Co.*, 4 B.R. 53, 77 (Bankr. S.D.N.Y. 1980), *aff'd*, 699 F.2d 599 (2d Cir. 1983) (acknowledging that "post-bankruptcy purchasers of debt securities of an entity in bankruptcy obtain allowable claims equal to the face amount of such securities, provided that such purchasers owe no fiduciary obligations to the debtor, other creditors or shareholders of the debtor, and have not acquired the debt securities through fraud, misrepresentation or any other form of overreaching" (collecting cases)).  Of course, the failure of the purchaser to consummate the purchase may give rise to a cause of action by the holder for breach of contract, but, just as the payment of the purchase price does not reduce the underlying claim, the payment of damages for breach of the purchase agreement is not a payment of the underlying claim and does not reduce the claim.  Thus, the value of any consideration paid by Barclays to JPMorgan does not affect the amount of JPMorgan's claim against LBI (or LBHI) for the unpaid financing.

81.     The cases cited in paragraphs 78 through 80 of the Objection are all therefore inapposite.  All of those cases stand for the proposition that a claim should be reduced by prior payments or other consideration received in direct satisfaction of such claim—an unremarkable prohibition against double recovery on a single claim.[9]  None of the cases cited by

---

[9] Those cases are, in order of citation in the Objection, *Jason* v. *Carpet Cleaning, Inc. (In re Jason)*, 2007 WL

Objectors, however, stands for the proposition that an amount paid in satisfaction of a breach of

an agreement to purchase, acquire or replace a loan or other claim should be applied to reduce

the loan or other claim.  JPMorgan has discovered no such case, and there is no reason to believe

that any such case exists because it would be totally illogical.  Using the instant case as an

example, to the extent Barclays provided any value (which, as explained below, is far from clear)

to JPMorgan in consideration of its breached agreement to purchase all of the LBI Securities

Collateral (or provide replacement financing), Barclays was paying its own liability to

JPMorgan, not Lehman's obligations.

83. Objectors' half-hearted reference to New York General Obligations Law

section 15-108 dealing with joint tortfeasors is similarly unavailing.  The LBI Clearance Claim

and LBHI Deficiency Claim are clearly stated as contract claims, not tort claims, so the provision

is simply inapplicable.

83. Regardless of JPMorgan's ultimate recovery on the LBI Clearance Claim

and LBHI Deficiency Claim, Barclays' breach caused JPMorgan to incur substantial costs and

expenses and dedicate substantial resources to collect the claims from the unpaid financing and

to liquidate the LBI Securities Collateral, much of which JPMorgan is not seeking to recover

---

4553608, at *5 (Bankr. E.D. Va. Dec. 19, 2007) (postpetition partial payment by debtor's bankruptcy trustee of debtor's obligation reduced the remaining amount of the obligation); *Moore* v. *Driggers (In re Morgan)*, 2003 WL 1728667, at *1 (Bankr. S.D. Ga. Mar. 14, 2003) (claims by co-guarantors); *PNC Bank, Nat'l Ass'n* v. *Park Forest Dev. Corp. (In re Park Forest Dev. Corp.)*, 197 B.R. 388, 397 (Bankr. N.D.Ga. 1996) (payment of a claim by debtor reduces guarantor's obligation on same claim); *In re Pilgrim's Pride Corp.*, 453 B.R. 691 (Bankr. N.D. Tex. 2011) (debtor's prior settlement with former counterparty barred all subsequent claims against debtor by same counterparty); *United States* v. *Oakland City Apartments (In re Oakland City Apartments)*, 1 B.R. 123, 124-25 (Bankr. N.D. Ga. 1979) (ordering hearing to determine value of foreclosure properties to prevent excess recovery on claims); *In re Circuit City Stores, Inc.*, 426 B.R. 560, 578-79 (Bankr. E.D.Va. 2010) (temporarily disallowing creditors' administrative expense claims pending determination of avoidance claims against the same creditors); *In re El Paso Ref. Inc.*, 192 B.R. 144, 148-49 (Bankr. W.D. Tex. 1996) (ordering additional proceedings to determine value rendered by primary obligor to creditor prior to determining guarantor's liability on same claim to creditor); *Cent. Soya Co. v. Epstein Fisheries, Inc.*, 676 F.2d 939, 941-43 (7th Cir. 1982) (same).

from Lehman. Thus, there is no prospect for a double recovery in any event. Moreover, if

JPMorgan ultimately does not recover fully on the LBI Clearance Claim and LBHI Deficiency

Claim, any reduction of JPMorgan's claims would simply aggravate JPMorgan's losses under

the mantle of preventing an imaginary double recovery.

84.     In addition, Objectors' description of the settlement between JPMorgan

and Barclays is wrong in several fundamental respects. Objectors assert that JPMorgan released

its claims against Barclays relating to the $15.8 Billion Repo (which might have been part of a

replacement of JPMorgan's financing had Barclays lived up to its representation) pursuant to a

provision of the SSA quoted at paragraph 73 of the Objection. But, as discussed above, this

portion of the SSA was never consummated and the parties agreed in the December Settlement

Agreement that the provision of the SSA on which Objectors relied was *superseded and of no

further force or effect*. The Lawsuit was released in the December Settlement Agreement, but as

part of a settlement resolving the rights of Barclays, JPMorgan and the LBI Trustee to the

Subject Funds, the Replacement Transaction and the Delivered Securities, as well as claims

relating to triparty repos with LBI. *See* Ex. K, §§ 4(b), (c), (e). The December Settlement

Agreement expressly specified what amounts were and were not applied to the LBI Clearance

Claim, *see* Ex. K, § 2, and nothing in the December Settlement Agreement even remotely

suggests that any value for the Lawsuit should be applied against the LBI Clearance Claim. The

December Settlement Agreement states that it confers no rights on LBHI or any other non-party,

and constitutes the entire contract among the parties relative to the subject matter thereof. *See*

Ex. K, § 5.

85.     Finally, any value of the Lawsuit was at most nominal. JPMorgan

admitted no liability with respect to the causes of action contained in the Lawsuit. The value

attached to the Lawsuit by Objectors is based on the damages sought and does not reflect any

evaluation of the actual strengths and weaknesses of the causes of action.

## POINT III

### JPMORGAN'S INTEREST CLAIM SHOULD BE ALLOWED

86.    Objectors assert that JPMorgan's claim for postpetition interest should be

disallowed on two grounds:  (1) *If* Objectors prevail in the Adversary Proceeding to avoid

JPMorgan's interest in the LBHI Cash Collateral, then JPMorgan will not be oversecured and

will not be entitled to interest under Bankruptcy Code section 506(b); and (2) Equity requires

disallowance of the postpetition interest claim.  Objectors are wrong on both grounds.

**A.      JPMorgan is not undersecured**

87.    Objectors' avoidance argument is plainly premature.  There has been no

ruling on the avoidance issue in the Adversary Proceeding.  JPMorgan has moved to dismiss the

Amended Complaint because, among other grounds, the preference and constructive fraudulent

transfer actions relating to the LBHI Deficiency Claim are plainly barred by the safe harbors

against avoidance contained in Bankruptcy Code section 546(e), (f), (g), and (j), and Objectors

have not stated a cause of action for actual fraudulent transfer.

88.    But even assuming *arguendo* that Objectors were to prevail in the

Adversary Proceeding, JPMorgan may still be oversecured as to the LBI Clearance Claim.  In

accordance with the "true-up" provisions contained in Section 6 of the CDA, the secured status

of JPMorgan's claims

> shall be determined as if [JPMorgan] had (i) retained its Lien, if any,
> against all of the Transferred Collateral[10] (rather than transferring or

---

[10]  The "Transferred Collateral" is the unsold securities transferred by JPMorgan to LBHI pursuant to the CDA, and includes RACERS, Fenway, Spruce, Verano, Pine, Kingfisher, SASCO and more than 850 other securities.

> releasing such Lien pursuant to this Agreement), and (ii) realized at the
> time of the Cash Payment proceeds from the sale of the Securities
> Collateral equal in amount to the portion of the Cash Payment received
> by [JPMorgan], it being understood that the transfer of the Cash
> Payment does not increase the value of the Collateral for purposes of
> determining which claims are allowed secured claims.

Ex. I, § 6. In other words, if JPMorgan's security interest in the LBHI Cash Collateral is

avoided, the LBHI Deficiency Claim will still be treated as secured to the extent of the value of

the unsold securities collateral transferred to LBHI under the CDA, less the amount of the CDA

Cash Payment. Objectors contend in the Adversary Proceeding and the Objection that JPMorgan

was oversecured *before* it obtained the LBHI Cash Collateral. *See* Objection ¶ 19; Amended

Complaint ¶¶ 45, 62, 68, 69. If Objectors are correct in that contention, JPMorgan would have

an allowed claim for its postpetition interest under section 506(b) to the extent that the value of

the Transferred Collateral exceeds the unpaid amount of the LBI Clearance Claim.

**B.       JPMorgan's interest claim is neither inequitable nor subject to disallowance**

89.     Objectors' argument that JPMorgan's postpetition interest should be

disallowed on equitable grounds ignores controlling Supreme Court precedent and disregards the

pertinent facts.

90.     If JPMorgan is oversecured, it is entitled to postpetition interest under

section 506(b) of the Bankruptcy Code to the extent the value of its collateral exceeds the

amount of its prepetition claim. In *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235,

241-45 (1989), the Supreme Court considered section 506(b) of the Bankruptcy Code and found

that the entitlement to postpetition interest is "unqualified" and is to be paid on *all* oversecured

claims. In other words, section 506(b)'s mandate that "there shall be allowed" postpetition

interest on an oversecured claim means exactly what it says. The Supreme Court expressly noted

that section 506(b) is a clear codification that contravenes case law under the former Bankruptcy

Act permitting courts' equitable powers to intrude on the allowance of postpetition interest.  *Id.*

at 248.

91.     There is no general equitable exception to section 506(b).  Indeed, the

principal case cited by Objectors makes precisely this point.  In *In re Lapiana*, 909 F.2d 221 (7th

Cir. 1990), the Court of Appeals stated:

> We deprecate flaccid invocations of "equity" in bankruptcy
> proceedings.  Creditors have rights, among them the right of
> oversecured creditors to post-petition interest, and bankruptcy judges
> are not empowered to dissolve rights in the name of equity.  Flexible
> interpretation designed to allow the judicial interpolation of traditional
> defenses in a statute silent on defenses is one thing; standardless
> decision-making in the name of equity is another.  *Ron Pair* makes
> clear that section 506(b) provides more than merely "guidance in the
> exercise of [the bankruptcy court's] equitable powers." 109 S.Ct. at
> 1034.  If the statute were read merely to authorize the bankruptcy
> judge to award post-petition interest as a matter of grace, secured
> creditors would lack a clear idea of what their rights would be if the
> debtor went broke.

*Id.* at 224 (alteration in original).

92.     The Court of Appeals acknowledged in *Lapiana* that well-recognized

defenses such as estoppel and statute of limitations might apply, but it flatly declined the

invitation "to create a new equitable defense:  lack of diligence by senior lienors."  *Id.*  The

Seventh Circuit's rationale for doing so fully applies here.  In *Lapiana*, a junior lienor sought to

have the postpetition interest of the senior lienor (the Internal Revenue Service) disallowed

because the senior lienor had allegedly not been sufficiently diligent in obtaining the collateral

proceeds.  The Court refused to apply the defense of estoppel because there was no showing that

the senior lienor was deliberately stalling, and the applicable interest rate was "not princely."[11]

*Id.* Furthermore, the Court declined to create a new "watered-down" version of equitable

estoppel, noting that it would "complicate the law needlessly by requiring a searching and often

inconclusive inquiry into the relevant fault of a debtor and creditor." *Id.* In *Lapiana,* the Court

noted that such an inquiry would have to delve into the failure of the junior lienor to attempt to

cause the proceeds to be applied. *Id.* at 224-25. Here, the Court would have to consider the role

of Objectors in discouraging, rather than facilitating or even requesting, the application of the

LBHI Cash Collateral, as discussed below. No such novel and unprecedented equitable defense

should be created here.

93.     The other cases cited by Objectors do nothing to support their position.

*Rozel Indus., Inc.* v. *Internal Revenue Serv. (In re Rozel Indus, Inc.)*, 120 B.R. 944, 954 (Bankr.

N.D. Ill. 1990) held that the Internal Revenue Service would be deemed to have set off a refund

against the debtor's taxes six months after the submission of the request for the refund, and

therefore was only entitled to post-petition interest until that date, because the Internal Revenue

Code required the Service to respond by that time. Not only does no such statute exists here, but

the consideration of whether the IRS intentionally withheld funds was relevant only to the

question of when a setoff was deemed to have occurred, an issue that is wholly absent from this

case. In *Solomon* v. *Wein (In re Huhn)*, 145 B.R. 872, 878 (W.D. Mich. 1992), the court

disallowed postpetition interest based on equitable estoppel where the failure to apply the

proceeds earlier to the outstanding debt was solely attributable to delay caused by the creditor's

unreasonable refusal to supply an adequate accounting. No such showing can be made here. As

---

[11]     The rate in *Lapiana* was the Treasury bill rate plus 3% per annum, which is higher than the rate charged here by JPMorgan. *Id.*

discussed below, Objectors discouraged JPMorgan from applying the LBHI Cash Collateral and, if Objectors are correct, JPMorgan was statutorily stayed from doing so.

94.     Nonetheless, Objectors assert that JPMorgan's statutorily mandated postpetition interest should be disallowed on equitable grounds.  Not only do they ignore the Supreme Court precedents, Objectors even omit the information that would be most relevant to the equitable decision that they contend is applicable.  For example, Objectors do not provide any description of the calculation of the postpetition interest claim to which they object — other than to assert that "JPMorgan was charging interest at an incorrectly high level," *see* Objection ¶ 88 — even though JPMorgan fully disclosed to them the applicable rates and manner of calculation.

95.     JPMorgan's rates were, in fact, fair and reasonable.  JPMorgan calculated the postpetition interest at the Effective Federal Funds Rate (the "EFF") plus 2% per annum, with a small price and volume adjustment.  Interest was charged on the outstanding overdraft balance from September 22, 2008, through March 31, 2010, when the claim was fully paid pursuant to the CDA.  The average EFF was 1.3804% per annum for the eight days during September 2008.  Thereafter, the EFF charged was always less than 1% per annum and, notably, was less than 0.2% per annum for the entire period from December 2008 through March 2010. The weighted average EFF applied to the LBHI Deficiency Claim was 0.2388% per annum. Certainly, the interest rate is not so high as to compel an equitable remedy.

96.     Objectors also fail to mention that JPMorgan gave LBHI an earnings credit for its cash collateral balances at the EFF, less an adjustment for FDIC reserves charges.

And, of course, the portion of the money market funds posted as LBHI Cash Collateral continued to earn interest during the relevant period.

97.    Objectors also baselessly allege that "JPMorgan routinely delayed the application of proceeds from the sales of securities." *See* Objection ¶ 88.  In fact, commencing in November 2008 JPMorgan applied available securities proceeds against the outstanding overdraft on a monthly basis (except for two months during which the amount of proceeds had tailed off).  And, had LBHI not interfered with the payment of cash flow from Fenway and RACERS, the LBHI Deficiency Claim would have been further reduced and, thus, would have accrued less interest.

98.    Moreover, Objectors fail to own up to their role in discouraging JPMorgan from applying the LBHI Cash Collateral to the LBHI Deficiency Claim and thereby *pro tanto* stopping the running of interest.  For example, Objectors made it clear to JPMorgan that they preferred that JPMorgan's claim be paid from LBI's collateral, and erected obstacles to application of the LBHI Cash Collateral.  *See* Ex. J (requiring prior notice to Objectors of any liquidation of the LBHI Cash Collateral so that Objectors could seek to block it).  At no time did Objectors or any other party in interest ever request that JPMorgan apply the LBHI Cash Collateral to the LBHI Deficiency Claim.  Indeed, Objectors assert in the Adversary Proceeding that JPMorgan violated the automatic stay when it applied LBHI Cash Collateral to other safe harbor claims.  *See* Amended Complaint, Counts XXXIII, XXXIV.  No doubt, Objectors would

now be taking the position that JPMorgan violated the automatic stay if it had applied the LBHI

Cash Collateral to the LBHI Deficiency Claim before the closing under the CDA.[12]

99.    Thus, even if the language of Bankruptcy Code section 506(b) and *Ron Pair* permitted such equitable disallowance (and they do not), there is simply no equitable reason to consider disallowing JPMorgan's postpetition interest claim.

\* \* \*

100.    JPMorgan requests further proceedings, including as appropriate a motion for summary judgment and an evidentiary hearing following discovery, to address the legal and/or factual issues raised in the Objection and this Response.

101.    For the foregoing reasons, JPMorgan requests that the LBHI Deficiency Claim be allowed in full and that it be granted such other relief as may be appropriate.

Dated: New York, New York
      November 15, 2011

WACHTELL, LIPTON, ROSEN & KATZ

*/s/ Harold S. Novikoff*
Harold S. Novikoff
Amy R. Wolf
Douglas K. Mayer
Ian Boczko
Karen Lin

51 West 52nd Street
New York, NY 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000

*Attorneys for JPMorgan Chase Bank, N.A.*

---

[12]    Paragraph 14 of this Court's order dated March 24, 2010 approving the CDA, D.I. 7785, lifted the automatic stay to the extent necessary to permit such application in accordance with the CDA.